place upon their expression. A few, non-exhaustive examples of those burdens are offered here.

Photographer Dave Levingston, a photographer who produces erotic art non-commercially, has simply stopped creating important, artistic photographs that might contain content triggering the record keeping and labeling requirements and has deleted an award-winning photo published on a website for fear that its publication will subject him to liability under the statutes. In order to continue to produce adult films, Dave Conners, a sole proprietor who produces and appears in sexually explicit expression, must return to his home each day between the hours of 1:00 p.m. and 5:00 p.m. Monday through Friday, year round, to be available for an inspection of his records; he, too, has dramatically cut back on his production of adult expression as a consequence of the criminal sanctions punishing a misstep in creating or maintaining records for such expression. Channel 1 Releasing, a commercial producer of adult entertainment material, has hired a full-time employee at an annual salary of $ 50,000.00 who exclusively tends to its record keeping obligations. Plaintiff David Steinberg, a photographer and the North American Coordinating editor of *Cupido*, a Norwegian journal of erotic art and prose, has been chilled in his efforts to launch distribution of the journal in the United States because it contains photographs by European photographers who do not comply with the statutes and therefore, does not carry the requisite label. Plaintiffs Barbara Nitke and Barbara Alper both wish to publish compilations of their work that include artistic and socially important sexually explicit photographs, but are prohibited from doing so because they cannot obtain records for their pre-1995 photographs which they wish to include with current material. Plaintiff Betty Dodson, an octogenarian sex educator who holds a Ph.D. from the Institute for the Advanced Study of Human Sexuality, had to remove roughly 2,000 constitutionally protected images of genitalia from a gallery on her website that provided a forum for adults to work through shame related to the look of their genitalia and that served as an important source for her own research on

sexuality, as a result of the statute's requirements that the adults submitting the photos had to produce photo identification as a condition of publishing photographs depicting their genitals.

Again, the above list is not exhaustive. Each Plaintiff must grapple with the chilling effect of the statutes' provisions that impose strict criminal liability on him, her or it, if they make a mistake in creating or maintaining the requisite records.

As for a husband and wife who want to exchange intimacies with one another using a digital camera, they must relinquish their right to speak anonymously or face criminal sanction–a burden whose weight the First Amendment cannot countenance. *Watchtower Bible & Tract Society of N.Y., Inc.*, 536 U.S. 150, 166-67 (2002); *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 341-42 (1995).

The net cast by the statutes brings within its sweep an enormous amount of protected expression that neither resembles nor is akin to child pornography. And thus the statutes' burdens fall heavily on artistic and valuable expression depicting adults and created for adults– innocent bystanders in the government's prosecution of child pornography. But like the statutes in *Playboy Entertainment, Stevens,* and *Center for Democracy & Technology,* 18 U.S.C. § 2257 and 18 U.S.C. § 2257A cannot survive scrutiny under the First Amendment.

**B. TITLE 18 U.S.C. § 2257 AND 18 U.S.C. § 2257A ARE UNCONSTITUTIONALLY OVERBROAD.**

A law will be found unconstitutionally overbroad and facially invalid if it regulates a substantial amount of protected expression. *Broadrick v. Oklahoma,* 413 U.S. 601, 615 (1973); *Grayned v. City of Rockford,* 408 U.S. 104, 114 (1972); *American Civil Liberties Union,* 534 F.3d at 205-06 (3rd Cir. 2008). The threat that such a law "deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas" requires that it be struck down as violative of the First Amendment. *A.C.L.U.,* 534 F.3d at 205, *quoting United States v. Williams,* _U.S._, 128

S.Ct. 1830, 1838 (2008). Thus, where a law applies to "a wide swath of speech...that adults have a constitutional right to receive and to address to one another" and "chill[s] a substantial amount of protected speech,"–as does the legislation at issue here–it will be struck down as unconstitutionally overbroad. *Id.* at 206-07.

The evaluation of whether a law is unconstitutionally overbroad because it reaches a substantial number of impermissible applications relative to its legitimate sweep, *id.* at 206, is similar to the evaluation required by intermediate scrutiny's "narrowly tailored" inquiry. *Conchatta, Inc. v. Miller*, 458 F.3d 258, 267 (3rd Cir. 2006). Thus the discussion describing the vast amount of constitutionally protected expression that is burdened by these laws above, pp. 27-29 *supra*, demonstrates why they are unconstitutional under the overbreadth doctrine as well. *See A.C.L.U.*, 534 F.3d at 206 (finding federal statute "overinclusive because it...encompass[es] a vast array of speech that is clearly protected...").

Judge Kennedy in a thoughtful and scholarly opinion, joined by five judges of the Sixth Circuit Court of Appeals, explained the basis for her conclusion that 18 U.S.C. § 2257 was, indeed, unconstitutionally overbroad. Her opinion carefully dissects the statute and examines its smothering operation and effect on constitutionally protected expression that explores sexuality as entertainment as well as part of the human relationship between adults.

Judge White, in her dissenting opinion, identified the staggering dimension of expression burdened by the record keeping and labeling requirements:

> My joining in Judge Kennedy's conclusion that the facial challenge should be upheld is based not only upon the application to the private couple, but also upon its application to plaintiffs and those like them, and to all adults who desire in any fashion to create or share, or disseminate non-obscene, sexually explicit depictions of themselves, or other adults without relinquishing their anonymity. While the majority correctly observes that we have no proof regarding the number of individuals who would be adversely affected by the application of § 2257, we do know that millions of adults exchange or share personally-produced sexually explicit depictions. See J.A. at

1007-11 (stipulation of the parties noting the existence of, and incorporating an exhibit listing, over 13 million personal ads containing sexually-explicit text and images on a single website for sex and swinger personal ads, of which those examined showed that 94% involved adults over 21).

557 F.3d at 370.

Plaintiffs urge this Court to follow the reasoning of Judge Kennedy's opinion and strike down the statutes as unconstitutionally overbroad.

C. TITLE 18 U.S.C. § 2257 AND 18 U.S.C. § 2257A ARE CONTENT-BASED REGULATIONS OF SPEECH AND ARE UNCONSTITUTIONAL UNDER STRICT SCRUTINY.

1. Both Statutes Single Out a Particular Category of Expression Based on Its Content and Impose Restrictions on Its Production and Dissemination.

On their face, 18 U.S.C. §§ 2257 and 2257A are content-based regulations of speech: they single out a particular category of expression (visual depictions of sexually explicit conduct) and restrict its dissemination by imposing identification and labeling requirements on it. They are, therefore, not content-neutral.

Judge Moore explained in her dissent in *Connection*:

[T]he evil at which § 2257 is aimed, child pornography, is a type of speech, albeit, unprotected, that is a subset of the regulated speech, sexually explicit images. It is therefore impossible to separate the content-based aspect of the regulation from the justification [of deterring the depiction of children in sexually explicit expression], as the justification itself relates to an aspect of the speech: its sexually explicit nature.

557 F.3d at 362.

"The government's purpose is the controlling inquiry" in distinguishing between content-based and content-neutral regulations of expression. *Ward*, 491 U.S. at 791. To qualify as content-neutral, a regulation must "serve[ ] purposes unrelated to the content of expression." *Id.*

The purpose of 18 U.S.C. § 2257, according to the government, is to prevent the use of minors in visual depictions of sexually explicit activity. While that objective is no doubt worthy and

33

laudable, it cannot be said that it is unrelated to the content of expression. Indeed, in keeping with that purpose, the statute is designed precisely to influence and affect the content of sexual expression. Specifically, the goal of the statute is to induce a producer of visual depictions to make one of two choices: either (1) use only adult performers if his work includes depictions of sexual activity, or (2) remove any sexual activity from the work if using a performer who has not yet reached the age of majority. The justification for the statutes, therefore, *cannot* be said to be *unrelated* to the content of the speech that they regulate.

The Supreme Court in *Simon & Schuster*, explained precisely why a statute with similar laudatory objectives was nevertheless a content-based regulation of expression that had to be examined under strict scrutiny:

> The Board next argues that discriminatory financial treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas. This assertion is incorrect; our cases have consistently held that "[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment." *Minneapolis Star & Tribune Co. V. Minnesota Comm'r of Revenue*, 460 U.S. 575, 592, 103 S.Ct. 1365, 1375, 75 L.Ed.2d 295 (1983). Simon & Schuster need adduce "no evidence of an improper censorial motive." *Arkansas Writer's Project, supra*, 481 U.S. at 228, 107 S.Ct. at 1727. As we concluded in *Minneapolis Star*: "We have long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment." 460 U.S., at 592, 103 S.Ct., at 1375.

502 U.S. at 116.

The statutes are content-based regulations of speech that must satisfy strict scrutiny.

2. **Title 18 U.S.C. § 2257 Must Be Evaluated as a Content-Based Regulation of Speech as a Result of 18 U.S.C. § 2257A's Differentiation in Treatment of Commercially Produced Expression Containing Simulated Sexually Explicit Depictions or Lascivious Displays of the Genitals or Pubic Region.**

The content-based nature of 18 U.S.C. § 2257 is further demonstrated by the difference in treatment of expression based on its content contained in 18 U.S.C. § 2257A(h)(1). Title 18 U.S.C. § 2257A(h)(1) exempts expression depicting *simulated* sexually explicit conduct or lascivious

34

display of the genitals or pubic region produced commercially from the record keeping and labeling requirements under a prescribed set of circumstances. *See*, p. 11, n. 7, *supra*. ***No such*** exemption is provided for expression depicting ***actual*** sexually explicit conduct. The distinction in treatment is based solely on the content of the expression at issue.

If the expression depicts ***simulated*** sexual imagery, then its commercial producer can avoid the onerous record keeping and labeling requirements simply by certifying to the Attorney General that it maintains information on its performers in the form of tax or labor records or other records pursuant to industry standards.[19] But if the content of the expression depicts ***actual*** sexually explicit conduct, its producer is entitled to no such exemption–even if the producer (as many of the members of Plaintiff Free Speech Coalition do) stands in the same shoes as the producer of simulated sexually explicit expression qualifying for such exemption, i.e. intends the expression to be distributed commercially, is created as part of a commercial enterprise, maintains individually identifiable information regarding all performers, pursuant to Federal and State tax, labor or other laws or industry standards, that includes the name, address, and date of birth of the performer. Title 18 U.S.C. § 2257A therefore discriminates between types of expression based on its content–the very type of viewpoint discrimination that demands strict scrutiny under the First Amendment.

Indeed, the Court in *Simon & Schuster* found that a New York statute that drew a distinction



display of the genitals or pubic region produced commercially from the record keeping and labeling requirements under a prescribed set of circumstances. *See*, p. 11, n. 7, *supra*. ***No such*** exemption is provided for expression depicting ***actual*** sexually explicit conduct. The distinction in treatment is based solely on the content of the expression at issue.

If the expression depicts ***simulated*** sexual imagery, then its commercial producer can avoid the onerous record keeping and labeling requirements simply by certifying to the Attorney General that it maintains information on its performers in the form of tax or labor records or other records pursuant to industry standards.[19] But if the content of the expression depicts ***actual*** sexually explicit conduct, its producer is entitled to no such exemption–even if the producer (as many of the members of Plaintiff Free Speech Coalition do) stands in the same shoes as the producer of simulated sexually explicit expression qualifying for such exemption, i.e. intends the expression to be distributed commercially, is created as part of a commercial enterprise, maintains individually identifiable information regarding all performers, pursuant to Federal and State tax, labor or other laws or industry standards, that includes the name, address, and date of birth of the performer. Title 18 U.S.C. § 2257A therefore discriminates between types of expression based on its content–the very type of viewpoint discrimination that demands strict scrutiny under the First Amendment.

Indeed, the Court in *Simon & Schuster* found that a New York statute that drew a distinction similar to that created by § 2257A(h)'s exemption, in that it treated profits derived from a criminal defendant's expressive activity more harshly than the proceeds of his other criminal activities, ran afoul of the First Amendment.

The Court found that the State did indeed have "an undisputed compelling interest in ensuring

---

[19] A commercial producer of expression depicting simulated sexually explicit conduct is also eligible for exemption by certifying that it is subject to the authority of the FCC. 18 U.S.C. § 2257A (h)(1)(B)( i ).

that criminals do not profit from their crimes" and "in using these funds to compensate victims." 502 U.S. at 119. But given that compelling interest, the State could not justify "a greater interest" in treating profits gained from "storytelling" more harshly than profits from other criminal assets. *Id.* at 120. The Court wrote:

> In short, the State has a compelling interest in compensating victims from the fruits of crime, but little if any interest in limiting such compensation to the proceeds of the wrongdoer's speech about the crime.

*Id.* at 120-21. It determined that New York's statute must, therefore, be evaluated as a content-based regulation of speech.

Thus under *Simon & Schuster*, 18 U.S.C. § 2257 must be evaluated as a content-based regulation of speech. While the government has a compelling interest in protecting children from appearing in sexually explicit expression, it has "little interest" in limiting that protection to actual but not simulated sexually explicit conduct. *See United States v. Knox*, 32 F.3d 733 (3rd Cir. 1994).

Title 18 U.S.C. § 2257 must be evaluated as a content-based regulation of speech.

### 3. The Statutes Are Not Narrowly Tailored to Further a Compelling Government Interest, Nor Are They the Least Restrictive Alternative to Advance That Interest.

In order to survive constitutional scrutiny, a content-based regulation must promote a compelling interest and employ the least restrictive means to further that interest. *Playboy Entertainment*, 529 U.S. at 813; *Sable Communications*, 492 U.S. at 126; *Simon & Schuster*, 502 U.S. at 118; *A.C.L.U.*, 534 F.3d at 187. The statutes at issue here fail miserably.

It is self-evident that imposing stringent age verification record keeping and labeling requirements on ***constitutionally protected adult expression*** is not the least restrictive means of combating child pornography. Rather the direct criminal sanctions on child pornography in 18 U.S.C. § 2251, *et seq.*, are obviously a less restrictive means of doing so.

Application of the statutes' record-keeping and labeling requirements to this robust and substantial body of expression does not advance the government's interest in preventing child pornography; rather, they are overinclusive in their sweep and operate to burden constitutionally protected speech without any corresponding benefit.

## D. THE STATUTES UNCONSTITUTIONALLY SUPPRESS ANONYMOUS SPEECH.

The Supreme Court in *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), struck down a state statute under the First Amendment that prohibited the anonymous distribution of campaign literature–finding that "an author's decision to remain anonymous,"[20] like other decisions concerning omissions or additions to the content of a publication, is an aspect of freedom of speech protected by the First Amendment." *Id.* at 342. The Court explained that anonymity historically provided persecuted groups or those with unpopular beliefs with protection in publishing their messages. *Id.*[21] Protection of anonymous speech, the Court found, "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from

---

[20] The Court provided examples of famous writers who published their works under a nome de plume:

American names such as Mark Twain (Samuel Langhorne Clemens) and O. Henry (William Sydney Porter) come readily to mind. Benjamin Franklin employed numerous different pseudonyms. See 2 W. Bruce, Benjamin Franklin Self-Revealed: A Biographical and Critical Study Based Mainly on His Own Writings, ch. 5 (2d ed. 1923). Distinguished French authors such as Voltaire (Francois Marie Arouet) and George Sand (Amandine Aurore Lucie Dupin), and British authors such as George Eliot (Mary Ann Evans), Charles Lamb (sometimes wrote as "Elia"), and Charles Dickens (sometimes wrote as "Boz"), also published under assumed names. Indeed, some believe the works of Shakespeare were actually written by the Earl of Oxford rather than by William Shaksper of Stratford-on-Avon.

*Id.* at 341, n.4.

[21] The Court emphasized: "The decision to favor anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *Id.* at 341-42. These observations are particularly apt here.

retaliation–and their ideas from suppression–at the hand of an intolerant society." *Id.* at 357.

Seven years later, the Court in *Watchtower Bible v. Village of Stratton*, 536 U.S. 150 (2002), reaffirmed and expanded upon the protection the First Amendment accords to anonymous expression. The Court wrote:

> The requirement that a canvasser must be identified in a permit application in the mayor's office and available for public inspection necessarily results in a surrender of that anonymity. Although it is true...that persons who are known to the resident reveal their allegiance to a group or cause when they present themselves at the front door to advocate an issue or to deliver a handbill, the Court of Appeals erred in concluding that the ordinance does not implicate anonymity interests...The fact that circulators revealed their physical identities [does] not foreclose our consideration of the circulators' interest in anonymity. In the Village, strangers to the resident certainly maintain their anonymity, and the ordinance may preclude such persons from canvassing for unpopular causes.

*Id.* at 166-67. Finding that the regulation imposed an unconstitutional restriction on anonymous expression, the Court struck down the ordinance as violative of the First Amendment. *See also, Denver Area Educational Telecommunications Consortium v. FCC*, 518 U.S. 727, 754 (1996) (striking down a statutory provision that required a citizen to provide written notice to cable operator requesting transmission of channels that broadcast "patently offensive" shows on the ground that the notice requirement restricted "viewing by subscribers who fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish to watch the 'patently offensive' channel."); *ACLU v. Ashcroft*, 322 F. 3d 240, 259 (3rd Cir. 2003), *on remand* 535 U.S. 564 (2002), *affirmed* 542 U.S. 656 (2004) (striking down 47 U.S.C. § 231 as unconstitutional on ground that demanding credit card or other identifying information as a condition to access speech posed an invasive hurdle that chilled First Amendment expression–notwithstanding statutory limitation on the information's use); *Ashcroft v. A.C.L.U.*, 542 U.S. 656, 670-71 (2004) (recognizing the self-censorship and serious chill on expression imposed by Child Online Protection Act); *LaMont v. Postmaster*, 381 U.S. 301, 305 (1965) (finding statute that required post office to destroy

38

mail from foreign countries deemed to be communist propaganda unless addressee returned reply card requesting delivery of mail to be unconstitutional abridgment of First Amendment rights because of deterrent effect and inhibition it imposed).

Judge Kennedy, in dissent, described the history of the First Amendment's protection in this realm and explained the statutes' stifling effect on private, anonymous speech:

> "Privacy of communication is an important interest" and "fear of public disclosure of private conversations might well have a chilling effect" on that important interest "even without the reality" of surreptitious monitoring. *Bartnicki v. Vopper*, 532 U.S. 514, 532-33, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001). Registration requirements have been recognized to have a significant chilling effect on speech because they force those who would speak anonymously "to forgo their right." *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 166 n. 14, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002). The Supreme Court has noted the long and illustrious history of anonymous speech while at the same time pointing out that "identification requirement[s][ ] tend to restrict freedom ... of expression." *Talley v. California*, 362 U.S. 60, 64, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960). The record-keeping requirement of § 2257 mandates not only record-making before engaging in protected speech between "neighbors," *Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at 166, 122 S.Ct. 2080, but also the universality of the record-keeping requirement mandates record-making before engaging in protected speech between friends, lovers, and a husband and wife.

557 F.3d at 346-47. *See also, Id.* at 352, 364 (Moore, J.) (dissenting).

Title 18 U.S.C. §§ 2257 and 2257A both demand would-be anonymous publishers to come forward and provide detailed identification to be maintained for government inspection as a condition of publishing their speech. The statutes thus obliterate the right to speak anonymously protected by the First Amendment.

### E.   TITLE 18 U.S.C. § 2257 AND 18 U.S.C. § 2257A IMPOSE A PRIOR RESTRAINT ON PROTECTED EXPRESSION.

Title 18 U.S.C. § 2257 and 18 U.S.C. § 2257A impose a prior restraint on protected expression. They prohibit, on penalty of criminal sanction, the dissemination of protected expression for which the producer has not, *prior to publication*, for whatever reason, secured photo

identification for persons depicted in sexually explicit conduct. Thus, even if the material portrays an adult who is clearly beyond the age of majority and constitutes important, non-obscene, constitutionally protected expression, the producer is ***absolutely barred*** from publishing that expression if he has not secured and maintained copies of government-issued photo identification. In this way, the statutes act as a complete restraint on expression that is otherwise entitled to the full breadth of First Amendment protection–for it is no defense to the statutes' criminal sanctions that the expression is constitutionally protected.

As such, 18 U.S.C. § 2257 and 18 U.S.C. § 2257A are akin to the licensing laws struck down as unconstitutional prior restraints in *Freedman v. Maryland*, 380 U.S. 51 (1965); *Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969); *Teitel Film Corp. v. Cusack*, 390 U.S. 139 (1968); *Riley v. National Federation of the Blind*, 487 U.S. 781 (1988); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990); *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992). *But see, Connection v. Reno*, 154 F.3d 281, 295-96 (6ᵗʰ Cir. 1998). A publisher of expression must first obtain the requisite identification from the person depicted–who can withhold such identification for any reason (whether fanciful or grave), much like the censor with unbridled discretion in granting or withholding a permit to speak–and, if the publisher is unable to obtain such identification, he is forever barred from publishing the expression, even it communicates an important political, scientific, social or artistic message[22]–on penalty of imprisonment. *See e.g., Center For Democracy & Technology v. Pappert*, 337 F.Supp.2d 606 (E.D.Pa.2004).

Ironically, this particular suffocating effect of the statute arose from Congress's attempt to salvage the original version of the law after the D.C. District Court determined that it created an

---

[22]   As a side note, Gustave Courbet would have risked criminal prosecution for *The Origin of the World*– Peter Paul Rubens for *Leda and the Swan* had they not created and maintained records for their models and labeled their masterpieces accordingly.

unconstitutional criminal presumption. As explained above, in the original version of 18 U.S.C. § 2257, failure to comply with its record keeping obligations gave rise to a presumption in a criminal prosecution involving that expression that the person depicted in it was a minor. The defendant could rebut that presumption, however, by showing that the person depicted was, in fact, an adult.

In response to the D.C. District Court's determination, Congress got rid of the presumption and instead simply made it an outright crime for anyone to create expression depicting sexually explicit conduct without securing and maintaining age verification records for the persons depicted in that expression. In doing so, Congress eliminated the presumption with which the First Amendment shelters all expression–namely, that it is constitutionally protected, *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978)–and saddled the creators of such expression with the burden of proving that their expression is constitutionally protected, before publishing it, by requiring them to obtain and keep records proving the protected status of that expression.

The statutes, therefore, effect a far more onerous burden on the exercise of First Amendment rights than the original version of 18 U.S.C. § 2257 did. They unconstitutionally dissolve the presumption of protection afforded by the First Amendment, shift the burden to the creators of expression to demonstrate that it is constitutionally protected by acquiring and maintaining proof of age as a precondition of publishing their expression and impose a prior restraint on them if they cannot meet that burden.

**F. THE STATUTES UNCONSTITUTIONALLY IMPOSE STRICT LIABILITY FOR FAILING TO CREATE AND MAINTAIN THE REQUISITE RECORDS AND THEREBY RESTRICT FREE EXPRESSION.**

Both 18 U.S.C. § 2257 and 18 U.S.C. § 2257A impose strict liability on a producer of expression for failing to create or maintain the identification records required by their provisions. 18 U.S.C. § 2257 (f)(1); 18 U.S.C. § 2257A (f)(1). They read in relevant part:

41

(f)   It shall be unlawful–

(1) for any person to whom subsection (a) applies to fail to create or maintain the records as required by subsections (a) and (c) or by any regulation promulgated under this section.

Neither statute contains a scienter requirement as an element of the offense of failing to create or maintain records in connection with sexually explicit expression. *Contrast* 18 U.S.C. § 2257 (f)(2), (3) and (4) and 18 U.S.C. § 2257A (f)(2), (3) and (4) specifying that violations must be committed *knowingly*.

Thus, under the statutes, a producer of sexually explicit expression faces imprisonment if he fails to maintain the requisite records–even if they are lost or destroyed through no fault of his own, even if he is unaware that the material he has produced contains an image that requires such record, or even if he is wholly ignorant of the record keeping requirements' existence, as the evidence will show that millions of Americans who exchange sexually explicit expression with one another are.

In *Smith v. California*, 361 U.S. 147 (1959), the Court struck down a Los Angeles ordinance that criminalized the possession of obscene or indecent materials in any place of business, as unconstitutional under the First Amendment. The ordinance included no element of scienter.

While the Court acknowledged that states were ordinarily free to impose strict criminal liability by defining offenses without any element of scienter, they could not do so where such laws would "work a substantial restriction on freedom of speech and of the press." *Id.* at 150. The Los Angeles ordinance, the Court found, did precisely that. For, in order to avoid criminal prosecution under the ordinance, the Court found, booksellers would restrict the material offered for sale on their premises to that which they could familiarize themselves to assure that it was not obscene, and thus, their self-censorship and "timidity" prompted by the ordinance, would consequently restrict access to constitutionally protected material for the public at large. The Court concluded: "It is plain to us

42

that the ordinance in question, though aimed at obscene matter, has such a tendency to inhibit constitutionally protected expression that it cannot stand under the Constitution." *Id.* at 155. *See also, Hamling v. United States*, 418 U.S. 87, 120-21(1974)(knowledge of character of materials is a constitutionally required element of obscenity offense).

The Supreme Court made clear in both *Smith* and *Hamling* that strict liability cannot be imposed in crimes implicating expression. The statutes here offend that well-established principle.

The statutes' imposition of strict liability for failing to create and maintain records for protected expression without requiring proof of scienter also fails to meet basic due process demands.

In *Lambert v. California*, 355 U.S. 225 (1957), the Court struck down another Los Angeles ordinance that required persons convicted of felonies to register with the municipality. Failure to register carried criminal penalties. Acknowledging the deeply ingrained rule that "ignorance of the law is no excuse," the Court explained that "due process places some limits" on the rule's exercise. *Id.* at 228. Key to due process, the Court noted, is the requirement of notice. *Id.* "Where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case" as in the circumstance in which a person fails to register in compliance with a law "designed for the convenience of law enforcement," the Court found due process required proof of knowledge of the registration requirement before criminal liability could be imposed. *Id.* at 229. *Cf. United States v. Engler*, 806 F.2d 425, 435-36 (3rd Cir. 1986) (capture and sale of species protected by Migratory Bird Treaty Act punishable without proof of scienter upheld as constitutional because conduct was *not* wholly passive and was such that "one would be hardly surprised to learn [the prohibited conduct was] not an innocent act."); *United States v. Weiler*, 458 F. 2d 474, 478 (3rd Cir. 1972) (finding none of three *Lambert* factors– "(1) the crime was one of omission, not

43

commission, (2) the situation to which the ordinance addressed itself was not such as might move one to inquire as to the applicable law and (3) the purpose of the statute was solely to compile a list which might assist law enforcement agencies"– present to require invalidation of statute punishing felon's transportation of firearm across state lines.)

Here, as in *Lambert*, the record keeping statutes punish passive conduct–failure to create or maintain identification records associated with wholly innocent conduct such as a suggestive photo taken by a spouse in the privacy of the bedroom–that is fully protected by the First Amendment. The vast majority of Americans would no doubt be surprised to learn that they could face a prison term of up to five years for failing to create and maintain records consisting of government-issued photo identification together with a list of names by which they are known and a copy of any photo or video made capturing a moment of intimacy or suggestive display of their bodies. *See Lawrence v. Texas*, 539 U.S. 572, 574 (2003) (finding how people choose "to conduct their private lives in matters pertaining to sex" is a protected liberty interest.)

Thus, under *Smith* and *Lambert*, the provisions of 18 U.S.C. §§ 2257, 2257A that impose criminal sanction without proof of scienter are unconstitutional under the First and Fifth Amendments.

## G. THE STATUTES VIOLATE THE GUARANTEE TO EQUAL PROTECTION OF LAWS OF THE FIFTH AMENDMENT.

In addition to violating the First Amendment, the statutes violate the Fifth Amendment's guarantee to equal protection. The Court in *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972), explained: "There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard." (Footnote omitted).  It cannot, therefore, discriminate against speech based on its content.  Doing so not only offends the First Amendment, but also offends the right to equal protection of laws. *Hill v. Scranton*, 411 F.3d 118,

44

125 (3rd Cir. 2005).

When a law differentiates between expression based on its content, equal protection precedent requires the government to establish a governmental interest that is "suitably furthered by the differential treatment." *Id.* at 95, *citing Reed v. Reed*, 404 U.S. 71, 75-77 (1971); *Weber v. Aetna Casualty & Surety Co..* 406 U.S. 164 (1972); *Dunn v. Blumstein*, 405 U.S. 330 (1972). Here, no such justification exists for the differentiation in treatment between commercial producers of expression that depicts simulated sexually explicit conduct or lascivious display of the genitals and those that produce actual sexually explicit conduct created by the record keeping and labeling exemption in 18 U.S.C. § 2257A(h)(1).

As explained above, 18 U.S.C. § 2257A(h)(1) excuses commercial producers of expression that contains depictions of simulated sexually explicit conduct or lascivious display of the genitals from complying with the statutory record keeping requirements under the following circumstances: (1) the expression is intended for commercial distribution or is subject to regulation by the FCC; (2) the expression is created as part of a commercial enterprise by a person who certifies that, in the normal course of business, it regularly collects and maintains individually identifiable information about the performers pursuant to Federal and State tax, labor, and other laws, labor agreements, or industry standards that includes the performers' names, addresses and birth dates; and (3) the expression is not such that an ordinary person would conclude that it is child pornography.

There is no such exemption, however, for commercial producers of expression that depicts actual sexual conduct, like Plaintiff Free Speech Coalition's members,–even if (1) their expression is intended for commercial distribution; (2) their expression is created as part of a commercial enterprise by a person who certifies that, in the normal course of business, it regularly collects and maintains individually identifiable information about the performers pursuant to Federal and State

45

tax, labor, and other laws, labor agreements, or industry standards that includes the performers' names, addresses and birth dates; and (3) their expression is not such that an ordinary person would conclude that it is child pornography.

Thus, parties who are identically situated, save for the content of the expression that they produce, are treated unequally. The distinction in content, however, does not justify their disparate treatment.

The distinction in treatment effected by 18 U.S.C. § 2257A(h)(1) cannot withstand scrutiny under the Fifth Amendment.

## H. THE STATUTES AND THEIR IMPLEMENTING REGULATIONS AUTHORIZE UNCONSTITUTIONAL WARRANTLESS SEARCHES AND SEIZURES OF HOMES AND BUSINESSES.

Title 18 U.S.C. §§ 2257 and 2257A provide:

(c) Any person to whom subsection (a)[23] applies shall maintain the records required by this section at his business premises, or at such other place as the Attorney General may by regulation prescribe and shall make such records available to the Attorney General for inspection at all reasonable times.

---

[23] Subsection (a) of 18 U.S.C. § 2257 reads:

(a)    Whoever produces any book, magazine, periodical, film, videotape, digital image, digitally- or computer-manipulated image of an actual human being, picture, or other matter which—

(1) contains one or more visual depictions made after November 1, 1990 of actual sexually explicit conduct; and

(2) is produced in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce, or is shipped or transported or is intended for shipment or transportation in interstate or foreign commerce;

shall create and maintain individually identifiable records pertaining to every performer portrayed in such a visual depiction.

The provisions of 18 U.S.C. § 2257A are the same as applied to visual depictions of simulated sexually explicit conduct.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

(f) It shall be unlawful—

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

(5) for any person to whom subsection (a) applies to refuse to permit the Attorney General or his or her designee to conduct an inspection under subsection (c).

Title 18 U.S.C. § 2257 provides: "The Attorney General shall issue appropriate regulations to carry out this section"; while 18 U.S.C. § 2257A provides: "The provisions of this section shall not become effective until 90 days after the final regulations implementing this section are published in the Federal Register."

New regulations amending the existing regulations (effective June 23, 2005) took effect in January, 2009 and March, 2009, respectively. The regulations set forth the inspection regime as provided in 18 U.S.C. §§ 2257 and 2257A.

Title 28 C.F.R. § 75.5 provides in full:

## 75.5 Inspection of records.

(a) *Authority to inspect.* Investigators authorized by the Attorney General (hereinafter "investigators") are authorized to enter without delay and at reasonable times any establishment of a producer where records under § 75.2 are maintained to inspect during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, for the purpose of determining compliance with the record-keeping requirements of the Act and any other provision of the Act.

(b) *Advance notice of inspections.* Advance notice of record inspections shall not be given.

(c) *Conduct of inspections.* (1) Inspections shall take place during normal business hours and at such places as specified in §75.4. For the purpose of this part, "normal business hours" are from 9 a.m. to 5 p.m., local time, Monday through Friday, or, for inspections to be held at the place of business of a producer, any other time during which the producer is actually conducting business relating to producing a depiction of actual sexually explicit conduct. To the extent that the producer does not maintain at least 20 normal business hours per week, the producer must provide notice to the inspecting agency of the hours during which records will be available for inspection,

47

which in no case may be less than 20 hours per week.

(2) Upon commencing an inspection, the investigator shall:

(i) Present his or her credentials to the owner, operator, or agent in charge of the establishment;

(ii) Explain the nature and purpose of the inspection, including the limited nature of the records inspection, and the records required to be kept by the Act and this part; and

(iii) Indicate the scope of the specific inspection and the records that he or she wishes to inspect.

(3) The inspections shall be conducted so as not to unreasonably disrupt the operations of the establishment.

(4) At the conclusion of an inspection, the investigator may informally advise the producer or his non-employee custodian of records of any apparent violations disclosed by the inspection. The producer or non-employee custodian or records may bring to the attention of the investigator any pertinent information regarding the records inspected or any other relevant matter.

(d) *Frequency of inspections.* Records may be inspected once during any four-month period, unless there is a reasonable suspicion to believe that a violation of this part has occurred, in which case an additional inspection or inspections may be conducted before the four-month period has expired.

(e) *Copies of records.* An investigator may copy, at no expense to the producer or to his non-employee custodian of records, during the inspection, any record that is subject to inspection.

(f) *Other law enforcement authority.* These regulations do not restrict the otherwise lawful investigative prerogatives of an investigator while conducting an inspection.

(g) *Seizure of evidence.* Notwithstanding any provision of this part or any other regulation, a law enforcement officer may seize any evidence of the commission of any felony while conducting an inspection.

The regulation: (1) permits an investigator authorized by the Attorney General to enter the premises where a producer of expression maintains identification records *without notice and without a warrant*, § 75.5 (a), (b); (2) authorizes the warrantless seizure of evidence, § 75.5 (e), (g); and (3) imposes no limitation on the scope of the search and seizure. § 75.5 (f). Refusal to permit

48

the inspection is punishable as a felony. 18 U.S.C. §§ 2257(f)(5); 2257A (f)(5).

The statutes and regulations therefore authorize unconstitutional warrantless searches and seizures in violation of the First and Fourth Amendments.

At the outset, it must be stressed that the searches authorized here involve constitutionally protected expression. The records are not ordinary business records; they are records demanded to be kept in connection with the production of speech, which brings into play the well-established precedent imposing vigorous standards on searches involving constitutionally protected expression.

The Supreme Court in *Stanford v. Texas*, 379 U.S. 476, 484-85 (1976) explained the need for scrupulously confining searches implicating the First Amendment:

> "The use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable publications is not new." *Marcus v. Search Warrant*, 367 U.S. 717, at 724, 81 S.Ct. 1708, at 1712. "This history was, of course, part of the intellectual matrix within which our own constitutional fabric was shaped. The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Id.*, at 729, 81 S.Ct. at 1715. As MR. JUSTICE DOUGLAS has put it, 'The commands of our First Amendment (as well as the prohibitions of the Fourth and the Fifth) reflect the teachings of *Entick v. Carrington*, supra. These three amendments are indeed closely related, safeguarding not only privacy and protection against self-incrimination but 'conscience and human dignity and freedom of expression as well.'' *Frank v. Maryland*, 359 U.S. 360, 376, 79 S.Ct. 804, 814 (dissenting opinion).

*See also, A Quantity of Copies of Books v. Kansas*, 378 U.S. 205 (1964).

The First Amendment is therefore an additional formidable gatekeeper looking over the shoulder of the Fourth Amendment. It requires that the Fourth Amendment be meticulously applied so as to invoke the utmost solicitude for protected expression. *Marcus*, 367 U.S. at 730-32; *A Quantity of Books*, 378 U.S. 213; *Roaden v. Kentucky*, 413 U.S. 496, 502-06 (1973); *Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636, 637 (1968).

The regulation at issue here authorizes warrantless searches not only of business premises but, in the instance of Plaintiff Barone, Conners, Hartley, and Nitke and countless other Americans like

49

them, the *homes* of those who produce expression containing sexually explicit imagery. Its constitutionality must be approached with the recognition that it authorizes intrusions that may themselves have a censorial effect.

The Fourth Amendment–save for a few discrete exceptions–prohibits warrantless searches and seizures of businesses as well as homes. *Camara v. Municipal Court*, 387 U.S. 523, 531-32 (1967); *Marshal v. Barlow's Inc.*, 436 U.S. 307, 311-12 (1978); *Donovan v. Dewey*, 452 U.S. 594, 602 (1981). Here, no exception exists justifying the regulation's authorization of warrantless searches and seizures to allow inspections of the records required to be kept by the criminal statutes here.

Nor can the government find support for this warrantless search and seizure regimen under the judicial precedent authorizing warrantless administrative searches under certain discrete and limited circumstances.

The United States Supreme Court in *New York v. Burger*, 482 U.S. 691 (1987) set forth the circumstances under which "warrantless *administrative* searches" could be lawfully conducted of business premises in a "closely regulated industry"–where the expectation of privacy is sufficiently diminished by a history of government oversight. *Id.* at 701.[24] The threshold issue therefore is whether the inspection procedures challenged here apply to a "closely regulated industry"–such that

---

[24] The Ninth Circuit Court of Appeals catalogued the types of industries that have qualified as closely regulated industries subject to the warrantless administrative search exception:

Industries deemed "closely regulated" under this doctrine include liquor distribution, *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); sale of sporting weapons, *United States v. Biswell*, 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); stone quarrying and mining, *Donovan*, 452 U.S. at 606, 101 S.Ct. 2534; and automobile junkyards, *Burger*, 482 U.S. at 703- 04, 107 S.Ct. 2636. *See also United States v. Argent Chem. Labs., Inc.*, 93 F.3d 572, 575 (9th Cir.1996) (veterinary drugs); *United States v. V-1 Oil Co.*, 63 F.3d 909, 911 (9th Cir.1995) (transportation of hazardous materials).

*U.S. v. 4,432 Mastercases of Cigarettes, More or Less*, 448 F.3d 1168, 1176 (9th Cir. 2006).

"regulatory presence is sufficiently comprehensive and defined that the owner of *commercial property* cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan*, 452 U.S. at 600. (Emphasis added).

At the outset, it cannot be overemphasized that the inspection regimen in the statutes and regulations at issue here is not limited to commercial premises but applies to private homes as well. Thus, for that fundamental reason, the body of law permitting warrantless administrative searches of commercial property has no application in the first instance. Nor are record keeping inspections limited to a specific industry, let alone one that is part of a "closely regulated industry." The inspection provisions apply to a vast assortment of disparate producers of expression–artists, free lance photographers and journalists, sex educators and therapists, lovers–all of whom create non-commercial expression and none of whom are part of any industry, much less a closely regulated one. Yet the statutes clearly apply to all producers of expression–whether private, non-commercial or otherwise–and authorize warrantless searches of their homes and studios. The same holds true for those who are involved in the adult industry. *Complaint*, ¶¶ 25-26.

However, even if the intrusion were confined to the commercial premises of producers of sexually explicit expression in the adult industry, it would fail under *Burger* because they, too, are not part of a closely regulated industry; the First Amendment prevents that very circumstance. The district court in *J.L. Spoons v. City of Brunswick*, 49 F. Supp. 2d 1032, 1040 (N.D. Ohio 1999) in striking down an ordinance that permitted warrantless searches of adult businesses as unconstitutional under the Fourth Amendment, observed:

Although there is a narrow exception to the warrant requirement for administrative searches conducted in "closely regulated" industries, sexually oriented businesses do not qualify as highly regulated industries. *See, e.g., New York v. Burger*, 482 U.S. 691, 700-01, 107 S.Ct. 2636, 96 L.Ed2d 601 (1987) (finding vehicle dismantling businesses to be highly regulated, like mining and firearms industries). Indeed, because sexually oriented businesses enjoy a degree of First Amendment protection, the government

51

probably *could not regulate them* under the *Burger* line of cases without running afoul of the First Amendment.

(Emphasis added). *See also, Deja Vu v. Union Township*, 326 F.3d 791, 806 (6th Cir. 2003) *reheard en banc*, 411 F.3d 777 (6th Cir. 2005);[25] *Annex Books, Inc. v. City of Indianapolis*, 333 F. Supp. 2d 773, 787-89 (S.D. Ind. 2004) *reversed on other grounds,* __F.3d __, 2009 WL 2855813 (7th Cir. 2009).

Thus, the threshold showing justifying warrantless administrative searches cannot be satisfied here.

Even if it could, however, the warrantless inspection regimen established by the statutes and regulations do not satisfy the constraints found to be constitutionally required by *Burger*. The Court in *Burger* determined that the following conditions had to be met for warrantless administrative searches conducted of participants in closely regulated industries to pass constitutional muster:

(1) There must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made;

(2) The warrantless searches must be necessary to further [the] regulatory scheme;

(3) The statute's inspection program, in terms of the certainty and regularity of its application [must] provid[e] a constitutionally adequate substitute for a warrant.

482 U.S. at 702-03. As the Third Circuit explained in *Watson v. Abington Township*, 478 F.3d 144, 152 (3rd Cir. 2007):

In short, the closely regulated industry exception to the general rule requiring a warrant to search a property requires more than a finding that the business being conducted on that property is closely regulated. It requires that the search or seizure actually be carried out in accordance with a regulatory scheme that provides a constitutionally adequate substitute for a warrant.

The search and seizure regimen at issue here fails to comport with these constitutional requirements.

---

[25] The *en banc* court did not reach the merits of the Fourth Amendment issue.

The inspection provisions cannot clear the first hurdle underlying *Burger's* tri-partite test—namely, that they must be part of a ***regulatory*** scheme as opposed to a criminal investigatory or enforcement procedure. Title 18 U.S.C. § 2257 and § 2257A and their implementing regulations are not part of a regulatory scheme, "setting forth rules to guide an operator's conduct of business and allowing government officials to ensure that those rules are followed," *Burger*, 482 U.S. at 713, but are criminal laws intended wholly to serve criminal investigatory and enforcement purposes. *Id.* at 724; *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000); *Abel v. United States*, 362 U.S. 217, 226 (1960); *United States v. Johnson*, 994 F.2d 740, 742 (10th Cir.1993).

Unlike the provisions upheld in *Burger* whose legislative history described the statutes' administrative goals in encouraging businesses "to legally operate in a manner conducive to good business practices," 18 U.S.C. §§ 2257 and 2257A were avowedly passed as criminal laws designed to provide law enforcement with a ready mechanism for distinguishing between adults and minors in prosecuting child pornography. *See*, pp. 1-5, *supra*; *See also*, § 501, H.R. 4472 (Enrolled) (Legislative findings that describe purpose of amendment to § 2257 and enactment of § 2257A as addressing "the illegal production, transportation, distribution, receipt, advertising and possession of child pornography.") Their purpose was not to provide regulatory guidelines for the conduct of a closely regulated business like junkyards or mining operations, but rather Congress's stated objective for passing the record keeping and labeling provisions was to arm law enforcement with a mechanism to aid in prosecuting child pornography—a criminal investigatory, not regulatory purpose.

The regulations make clear that the inspections are conducted "for the purpose of determining compliance with the record keeping requirements...and other provisions of the [statutes]." 28 C.F.R. § 75.5(a). By operation and design, then, the inspections are conducted in furtherance of

investigating criminal activity and prosecuting child pornography. They are not simply part of a "regulatory scheme" of a "closely regulated" industry.

But if by some stretch, the record keeping regulations could be viewed as a regulatory scheme, they fail under *Burger's* requirement that the searches carried out pursuant to a regulatory scheme, provide a constitutionally adequate substitute for a warrant.

The district court in *Showers v. Spangler*, 957 F. Supp. 584 (M.D. Pa. 1997) evaluated the constitutionality of a Pennsylvania statute and regulation allowing the inspection of records required to be maintained by taxidermists licensed by the state–a schema that did not implicate the First Amendment concerns at issue here. The Pennsylvania statute provided that taxidermy records were to be kept for a period of three years and were to "be open to inspection by any officer of the [Pennsylvania Game Commission] during normal business hours" and were to be "the basis of any reports required by the commission." *Id.* at 590.

The regulation implementing the inspection statute further provided that the records were to be kept on forms provided by the game commission and that the "records, together with the premises, shall be open to inspection upon the demand of an officer of the Commission." *Id.* It also provided that the permittee was required to answer "without evasion" questions regarding the ownership of certain animals. *Id.*

Neither the statute nor regulation under review contained any sanction, criminal or otherwise, for their violation.

The district court determined that the inspection scheme failed to carefully limit inspections in place and scope as required by *Burger*. It concluded that the regulation did not provide sufficiently specific guidance to the law enforcement officers to limit their discretion in conducting searches–finding that the regulation did not make clear what premises may be inspected or what may

54

be examined on those premises. *Id.* at 592.[26]

The same is true of 28 C.F.R. § 75.5.

The regulation allows searches "at all reasonable times" of "any establishment" where records are maintained for the purpose of determining compliance with the record keeping requirements of the statutes. 28 C.F.R. § 75.5(a). It therefore authorizes searches of any business premises, studios or homes where the requisite records are maintained. The regulation does not limit the scope of the search to the records themselves, but specifically provides that the "otherwise lawful investigative prerogatives" of the government agent conducting the search are not confined by the regulation. 28 C.F.R. § 75.5(f). It specifically instructs that "[a]dvance notice of record inspections *shall not* be given." 28 C.F.R. § 75.5(b). (Emphasis added).

Moreover, the regulation expressly allows "a law enforcement officer" to "seize any evidence of the commission of any felony while conducting an inspection." § 75.5(g). It thus permits the law enforcement officer in conducting a search of a producer of expression to seize expressive materials themselves without a warrant if the law enforcement officer concludes that they are evidence of the commission of an obscenity offense–contrary to an unbending line of Supreme Court authority prohibiting such seizures discussed above. *See, Marcus v. Search Warrants,* 367 U.S. 717 ( 1961); *A Quantity of Books v. Kansas,* 378 U.S. 205 (1964); *Stanford v. Texas,* 379 U.S. 476 (1965); *Lee Art Theatre v. Virginia,* 392 U.S. 636 (1968); *Roaden v. Kentucky,* 413 U.S. 496 (1973).

Thus, like the regulatory scheme evaluated in *Showers,* the inspection scheme implementing 18 U.S.C. §§ 2257 and 2257A fails to circumscribe the discretion of the enforcement officers with respect to the place and scope of the warrantless searches and seizures it authorizes. It therefore fails

---

[26] The Commonwealth of Pennsylvania did not contest this determination on appeal. On review, the Third Circuit wrote: "Hence, we leave this portion of the District Court's order, and its thoughtful analysis, undisturbed." *Showers v. Spangler,* 182 F.3d 165, 168, n.1 (3rd Cir. 1999).

to comport with constitutional standards.

The inspection regimen promulgated in furtherance of 18 U.S.C. §§ 2257 and 2257A is unconstitutional under the Fourth Amendment.

## II. THE PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE EVENT AN INJUNCTION DOES NOT ISSUE.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 353 (1976), *citing New York Times v. United States*, 403 U.S. 713 (1976). "The denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). *See also Wooley v. Maynard,* 430 U.S. 705 (1977) (injunctive relief appropriate to prevent injury to plaintiff's First Amendment rights); *Miller v. Penn Manor School District,* 588 F.Supp. 2d 606, 630 (E.D. Pa. 2008) (restriction of speech by unconstitutionally overbroad school policy constituted irreparable injury).

Here, the statutes and regulations have silenced and restrained a vast amount of important and robust expression. As such, they have inflicted irreparable injury on Plaintiffs and others similarly situated.

Accordingly, the second factor meriting injunctive relief is present.

## III. THE DEFENDANT WILL SUFFER NO HARM IF INJUNCTIVE RELIEF IS GRANTED.

The third factor, whether an order enjoining the enforcement of the law at issue will harm others, too, falls in Plaintiffs' favor. Issuing an injunction against the record keeping and labeling provisions will have no affect on the substantive state and federal criminal laws prohibiting child pornography, which remain a vital tool for prosecuting those who sexually exploit children. *See Connection*, 557 F.3d at 363. (Moore, J.) (dissenting). See p. 27, n.16, *supra.*

Accordingly, the third factor meriting injunctive relief is present.

56

## IV. THE PUBLIC INTEREST WILL BE SERVED BY THE ISSUANCE OF INJUNCTIVE RELIEF.

The fourth and final factor to be examined is whether the public interest is served by the issuance of an injunction. "[T]he public interest clearly favors the protection of constitutional rights...." *Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 884 (3ʳᵈ Cir. 1997); *Miller,* 588 F.Supp.2d at 631. Thus, the public interest is served by enjoining 18 U.S.C. §§ 2257, 2257A and 28 C.F.R. § 75 *et seq.*, which violate the First, Fifth and Fourth Amendments.

Accordingly, the last factor meriting injunctive relief is also present.

### CONCLUSION

Plaintiffs therefore respectfully request that this Court issue a preliminary injunction enjoining the enforcement of 18 U.S.C. § 2257, 18 U.S.C. § 2257A and their implementing regulations against Plaintiffs, their members, officers, directors, employees and agents.

Respectfully submitted,

Date: 10 / 7 / 09

KEVIN E. RAPHAEL (72673)
KER@Pietragallo.com
J. PETER SHINDEL, JR. (201554)
JPS@Pietragallo.com
PIETRAGALLO GORDON ALFANO BOSICK
    & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200 / (215) 981-0082 (Facsimile)

J. MICHAEL MURRAY (0019626)†
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)†
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio 44113-1949
(216) 781-5245 / (216) 781-8207 (Facsimile)
Attorneys for Plaintiffs

†Subject to admission pro hac vice

57

PUBLIC LAW 100–690—NOV. 18, 1988     102 STAT. 4487

"(7) 'custody or control' includes temporary supervision over or responsibility for a minor whether legally or illegally obtained.".

(c) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 110 of title 18, United States Code, is amended by inserting after the item relating to section 2251 the following:

"2251A. Selling or buying of children.".

SEC. 7513. RECORD KEEPING REQUIREMENTS.

(a) IN GENERAL.—Chapter 110 of title 18, United States Code, is amended by adding at the end thereof the following:

"§ 2257. Record keeping requirements

"(a) Whoever produces any book, magazine, periodical, film, videotape, or other matter which—

"(1) contains one or more visual depictions made after February 6, 1978 of actual sexually explicit conduct; and

"(2) is produced in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce, or is shipped or transported or is intended for shipment or transportation in interstate or foreign commerce;

shall create and maintain individually identifiable records pertaining to every performer portrayed in such a visual depiction.

"(b) Any person to whom subsection (a) applies shall, with respect to every performer portrayed in a visual depiction of actual sexually explicit conduct—

"(1) ascertain, by examination of an identification document containing such information, the performer's name and date of birth, and require the performer to provide such other indicia of his or her identity as may be prescribed by regulations;

"(2) ascertain any name, other than the performer's present and correct name, ever used by the performer including maiden name, alias, nickname, stage, or professional name; and

"(3) record in the records required by subsection (a) the information required by paragraphs (1) and (2) of this subsection and such other identifying information as may be prescribed by regulation.

"(c) Any person to whom subsection (a) applies shall maintain the records required by this section at his business premises, or at such other place as the Attorney General may by regulation prescribe and shall make such records available to the Attorney General for inspection at all reasonable times.    *Regulations.*

"(d)(1) No information or evidence obtained from records required to be created or maintained by this section shall, except as provided in paragraphs (2) and (3), be used, directly or indirectly, as evidence against any person with respect to any violation of law.

"(2) Paragraph (1) of this subsection shall not preclude the use of such information or evidence in a prosecution or other action for a violation of any applicable provision of law with respect to the furnishing of false information.

"(3) In a prosecution of any person to whom subsection (a) applies for an offense in violation of subsection 2251(a) of this title which has as an element the production of a visual depiction of a minor engaging in or assisting another person to engage in sexually explicit conduct and in which that element is sought to be established by showing that a performer within the meaning of this section is a minor—

**102 STAT. 4488**    **PUBLIC LAW 100–690—NOV. 18, 1988**

"(A) proof that the person failed to comply with the provisions of subsection (a) or (b) of this section concerning the creation and maintenance of records, or a regulation issued pursuant thereto, shall raise a rebuttable presumption that such performer was a minor; and

"(B) proof that the person failed to comply with the provisions of subsection (e) of this section concerning the statement required by that subsection shall raise the rebuttable presumption that every performer in the matter was a minor.

"(e)(1) Any person to whom subsection (a) applies shall cause to be affixed to every copy of any matter described in paragraph (1) of subsection (a) of this section, in such manner and in such form as the Attorney General shall by regulations prescribe, a statement describing where the records required by this section with respect to all performers depicted in that copy of the matter may be located.

"(2) If the person to whom subsection (a) of this section applies is an organization the statement required by this subsection shall include the name, title, and business address of the individual employed by such organization responsible for maintaining the records required by this section.

"(3) In any prosecution of a person for an offense in violation of section 2252 of this title which has as an element the transporting, mailing, or distribution of a visual depiction involving the use of a minor engaging in sexually explicit conduct, and in which that element is sought to be established by a showing that a performer within the meaning of this section is a minor, proof that the matter in which the visual depiction is contained did not contain the statement required by this section shall raise a rebuttable presumption that such performer was a minor.

Regulations.

"(f) The Attorney General shall issue appropriate regulations to carry out this section.

"(g) As used in this section—

"(1) the term 'actual sexually explicit conduct' means actual but not simulated conduct as defined in subparagraphs (A) through (E) of paragraph (2) of section 2256 of this title;

"(2) 'identification document' has the meaning given that term in subsection 1028(d) of this title;

"(3) the term 'produces' means to produce, manufacture, or publish and includes the duplication, reproduction, or reissuing of any material; and

"(4) the term 'performer' includes any person portrayed in a visual depiction engaging in, or assisting another person to engage in, actual sexually explicit conduct.".

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 110 of title 18, United States Code, is amended by adding after the item relating to section 2256 the following:

"2257. Record keeping requirements.".

18 USC 2257 note.

(c) EFFECTIVE DATE.—Section 2257 of title 18, United States Code, as added by this section shall take effect 180 days after the date of the enactment of this Act except—

(1) the Attorney General shall prepare the initial set of regulations required or authorized by section 2257 within 90 days of the date of the enactment of this Act; and

(2) subsection (e) of section 2257 of such title and of any regulation issued pursuant thereto shall take effect 270 days after the date of the enactment of this Act.