IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| _____ ) | |
| FREE SPEECH COALITION, INC. et al., ) | Civil Action No. 2:09-4607 |
| ) | |
| Plaintiffs, ) | Judge Michael M. Baylson |
| ) | |
| v. ) | |
| ) | DEFENDANT'S MOTION TO |
| THE HONORABLE ERIC H. HOLDER, JR., ) | DISMISS |
| Attorney General, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), defendant hereby

respectfully moves this Court to dismiss the above-captioned action for lack of subject matter

jurisdiction and for failure to state a claim upon which relief may be granted, for the reasons set

forth in the accompanying memorandum in support of this motion

December 14, 2009                          Respectfully submitted,

                                          TONY WEST
                                          Assistant Attorney General
                                          MICHAEL L. LEVY
                                          United States Attorney
                                          VINCENT M. GARVEY
                                          Deputy Branch Director

                                          /s/ Kathryn L. Wyer
                                          KATHRYN L. WYER
                                          U.S. Department of Justice, Civil Division
                                          20 Massachusetts Avenue, N.W.
                                          Washington, DC 20530
                                          Tel. (202) 616-8475 / Fax (202) 616-8470
                                          kathryn.wyer@usdoj.gov
                                          *Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREE SPEECH COALITION, INC. et al., | ) Civil Action No. 2:09-4607 |
| Plaintiffs, | ) Judge Michael M. Baylson |
| v. | ) DEFENDANT'S MEMORANDUM |
| THE HONORABLE ERIC H. HOLDER, JR., Attorney General, | ) IN OPPOSITION TO PLAINTIFFS' ) MOTION FOR PRELIMINARY ) INJUNCTION AND IN SUPPORT OF |
| Defendant. | ) DEFENDANT'S MOTION TO DISMISS |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iv

INTRODUCTION .........................................................................................................1

STATUTORY BACKGROUND ....................................................................................3

    1.    1988 Enactment and Early Amendments ..................................................3

    2.    2003 Amendments ....................................................................................6

    3.    2006 Amendments ....................................................................................7

    4.    Application to Primary and Secondary Producers ...................................9

    5.    Storage and Inspection of Records .........................................................10

FACTUAL AND PROCEDURAL BACKGROUND ..................................................10

STANDARD OF REVIEW ..........................................................................................11

    A.    Preliminary Injunction ...........................................................................11

    B.    Motion to Dismiss ..................................................................................11

ARGUMENT ...............................................................................................................13

    I.    THE RECORDKEEPING REQUIREMENTS DO NOT VIOLATE
        THE FIRST AMENDMENT ...............................................................13

        A.    The Requirements Are Content Neutral and Are Therefore
            Properly Analyzed Under Intermediate Scrutiny .......................13

        B.    The Recordkeeping Requirements Are Narrowly Tailored to
            Serve the Government's Significant Interest in Preventing Child
            Pornography ...............................................................................16

            1.    As Other Courts Have Held, the Recordkeeping Requirements
                Satisfy the Narrow Tailoring Requirement ....................17

            2.    The Requirements Directly Advance the Government's
                 Interests Because They Ensure that Performers Are Adults ..........18

3.      The Requirements Do Not Burden Substantially More
Speech Than Necessary Because Exceptions Based on
Subjective Assessments Would Undermine the
Recordkeeping Scheme ................................................................26

C.      The Requirements Leave Adequate Alternative Channels for
Communication ..........................................................................31

D.      The Requirements Are Not Unconstitutionally Overbroad ......................31

E.      The Requirements Do Not Unconstitutionally Infringe on
Anonymous Speech ...................................................................34

F.      The Requirements Are Not An Unconstitutional Prior Restraint .............36

G.      The Requirements Do Not Violate the First Amendment on the
Basis that They Impose Strict Liability ......................................37

II.     THE REQUIREMENTS DO NOT VIOLATE THE FIFTH
AMENDMENT'S EQUAL PROTECTION GUARANTEE ...............................38

III.    THE REQUIREMENTS DO NOT VIOLATE THE FOURTH
AMENDMENT .........................................................................41

IV.     THE ALLEGATIONS THAT PLAINTIFFS DO NOT ADDRESS
IN THEIR MOTION BUT THAT ARE RAISED IN THEIR
COMPLAINT SHOULD ALSO BE DISMISSED ...............................................48

V.      PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION ...49

CONCLUSION ....................................................................................51

-iii-

# TABLE OF AUTHORITIES

## CASES

ACLU v. Ashcroft, 322 F.3d 240 (3d Cir. 2003) .........................................36

ACLU v. Mukasey, 534 F.3d 181 (3d Cir. 2008), cert. denied 129 S. Ct. 1032 (2009) ..............31

Am. Library Ass'n ("ALA I") v. Thornburgh, 713 F. Supp. 469 (D.D.C. 1989) ..........................6

Am. Library Ass'n ("ALA II") v. Barr, 956 F.2d 1178 (D.C. Cir. 1992) .......................................6

Am. Library Ass'n v. Reno ("ALA III"),
    33 F.3d 78 (D.C. Cir. 1994) ............................................1, 13, 14, 17, 18, 19, 20, 23, 24, 27

Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997) .......................................................50

Ashcroft v. ACLU, 542 U.S. 656 (2004) ...................................................................36

Ashcroft v. Free Speech Coal., 535 U.S. 234 (2002) ..................................................24

Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009) .............................................................12, 47

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ..................................................12

Broadrick v. Oklahoma, 413 U.S. 601 (1973) ...........................................................32

Brown v. City of Pittsburgh, No. 08-1819, 2009 WL 3489838 (3d Cir. Oct. 30, 2009) ...13, 14, 17

Cal. Bankers Ass'n v. Shultz, 416 U.S. 21 (1974) ......................................................49

Camara v. Municipal Court, 387 U.S. 523 (1967) .......................................................42

City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425 (2002) (plurality) ...........................20

City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986) .....................................20

Connection Distrib. Co. v. Holder ("Connection I"), 154 F.3d 281 (6th Cir. 1998) ..1, 18, 33, 36, 49

Connection Distrib. Co. v. Gonzales ("Connection II"),
    No. 95-1993, 2006 WL 1305089 (N.D. Ohio May 10, 2006) ...........................................21

Connection Distrib. Co. v. Holder ("Connection III"), 557 F.3d 321 (6th Cir. 2009)
    (en banc), cert. denied, 77 U.S.L.W. 3658 (U.S. Oct. 5, 2009) (No. 08-1449)

......................1, 10, 13, 15, 17, 18, 19, 20, 21, 26, 27, 28, 30, 31, 32, 33, 34, 35, 49

Ctr. For Democracy & Technology v. Pappert, 337 F. Supp. 2d 606 (E.D. Pa. 2004) ...........22, 23

Del. Valley Fin. Group, Inc. v. Principal Life Ins. Co., 640 F. Supp. 2d 603 (E.D.Pa. 2009) ........11

Denver Area Educ. Tele. Consortium v. FCC, 518 U.S. 727 (1996) ............................................36

DLS, Inc. v. City of Chattanooga, 107 F.3d 403 (6th Cir. 1997) ..................................................39

Donovan v. Dewey, 452 U.S. 594 (1981) .....................................................................................42

Dungan v. Slater, 252 F.3d 670 (3d Cir. 2001) ...........................................................................39

Elrod v. Burns, 427 U.S. 347 (1976) ..........................................................................................49

Faustin v. City & County of Denver, 423 F.3d 1192 (10th Cir. 2005) .........................................27

FCC. v. Beach Commc'ns, Inc., 508 U.S. 307 (1993) ...................................................................39

Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009) ...........................................................12

Free Speech Coal. v. Gonzales ("FSC I"),
        406 F. Supp. 2d 1196 (D. Colo. 2005) ............................................2, 13, 17, 19, 21, 36, 49

Free Speech Coal. v. Gonzales ("FSC II"), 483 F. Supp. 2d 1069 (D. Colo. 2007) ....................36

Freedman v. Maryland, 380 U.S. 51 (1965) ................................................................................36

Gasparo v. City of New York, 16 F. Supp. 2d 198 (E.D.N.Y. 1998) .............................................39

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005) ..................................................................39

Hill v. Colorado, 530 U.S. 703 (2000) ........................................................................................13

Hohe v. Casey, 868 F.2d 69 (3d Cir. 1989) .................................................................................50

Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797 (3d Cir. 1989) .............................11

Kos Pharms. Inc. v. Andrx Corp., 369 F.3d 700 (3d Cir.2004) ....................................................11

Kost v. Kozakiewicz, 1 F.3d 176 (3d Cir.1993) ...........................................................................12

Kuhns v. City of Allentown, 636 F. Supp. 2d 418 (E.D. Pa. 2009) ..............................................12

Lambert v. California, 355 U.S. 225 (1957) ..............................................................37, 38

Leveto v. Lapina, 258 F.3d 156 (3d Cir. 2001) ................................................................44

Markowitz v. Ne. Land Co., 906 F.2d 100 (3d Cir. 1990) ........................................12 38

Marshall v. Barlow's, Inc., 436 U.S. 307 (1978) .............................................................42

McGuire v. Reilly, 260 F.3d 36 (1st Cir. 2001) ...............................................................39

McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995) .......................................34, 35

New York v. Burger, 482 U.S. 691 (1987) ..........................................................42, 45, 46

New York v. Ferber, 458 U.S. 747 (1982) .............................................14, 17, 22, 32

Nw. Municipal Util. Dist. v. Holder, 129 S. Ct. 2504 (2009) ........................................21

O'Connor v. Ortega, 480 U.S. 709 (1987) ......................................................................44

R.A.V. v. City of St. Paul, 505 U.S. 377 (1992) ..............................................................15

Roberts v. Mentzer, No. 08-4507, 2009 WL 1911687 (E.D. Pa. July 2, 2009) ..............44

Save Ardmore Coal. v. Lower Merion Township, 419 F. Supp. 2d 663 (E.D. Pa. 2005) .............12

Showers v. Spangler, 182 F.3d 165 (3d Cir. 1999) .........................................................47

Showers v. Spangler, 957 F. Supp. 584 (M.D. Pa. 1997) ...............................................47

Sibron v. New York, 392 U.S. 40 (1968) .........................................................................42

Siegel v. LePore, 234 F.3d 1163 (11th Cir. 2000) ..........................................................50

Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105 (1991) ......16

Smith v. California, 361 U.S. 147 (1959) ..................................................................37, 38

Taylor Inv., Ltd. v. Upper Darby Twp., 983 F.2d 1285 (3d Cir. 1993) ..........................12

Thomas v. Chicago Park Dist., 534 U.S. 316 (2002) ......................................................36

Thompson v. Horsham Tp., 576 F. Supp. 2d 681 (E.D. Pa. 2008) ..................................44

Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180 (1997) ............................................18, 27

United States v. Adams, 343 F.3d 1024 (9th Cir. 2003) ...............................................31

United States v. Albertini, 472 U.S. 675 (1985) ...........................................................17

United States v. Frabizio, 459 F.3d 80 (1st Cir. 2006) .................................................30

United States v. Freeman, 808 F.2d 1290 (8th Cir.1987) .............................................31

United States v. Lacey, 569 F.3d 319 (7th Cir. 2009) ...................................................24

United States v. Munsingwear, Inc., 340 U.S. 36 (1950) ................................................6

United States v. Playboy Entm't Group, Inc., 529 U.S. 803 (2000) .............................21

United States v. Rodriguez-Pacheco, 475 F.3d 434 (1st Cir. 2007) .............................24

United States v. Stevens, 533 F.3d 218 (3d Cir. 2008) (en banc),
    cert. granted 129 S. Ct. 1984 (2009) ..................................................................22

United States v. Williams, 128 S. Ct. 1830 (2008) ..........................................24, 31, 32

United States v. X-Citement Video, Inc., 513 U.S. 64 (1994) .................................30, 48

Virginia v. Hicks, 539 U.S. 113 (2003) ........................................................................32

Ward v. Rock Against Racism, 491 U.S. 781 (1989) ...............................13, 17, 18, 26

Warshak v. United States, 532 F.3d 521 (6th Cir. 2008) (en banc) .............................42

Watchtower Bible v. Vill. of Stratton, 536 U.S. 150 (2002) ...................................34, 35

## STATUTES

18 U.S.C. § 2256 ...................................................................................6, 7, 32, 40, 46

18 U.S.C. § 2257 .....................................................................................................passim

18 U.S.C. § 2257A ..................................................................................................passim

Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. No. 95-225,
    92 Stat. 7 (1978) .....................................................................................................7

Child Protection and Obscenity Enforcement Act of 1988, Pub. L. No. 100-690,
102 Stat. 4181 (1988) .................................................................................3, 5, 6

Child Protection Restoration and Penalties Enhancement Act of 1990,
Pub. L. No. 101-647, § 311, 104 Stat. 4789 (1990) (codified as amended
at 18 U.S.C. § 2257(f), (i)) ..........................................................................5, 7

Prosecutorial Remedies and Other Tools to End the Exploitation of Children
Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108-21, §§ 501(6), 511,
117 Stat. 650 (2003) ..........................................................................................6

Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"),
Pub. L. No. 109-248, § 501(1)(B), 120 Stat. 587 (2006) ............................6, 7, 8

## LEGISLATIVE MATERIALS

Child Protection and Obscenity Enforcement Act and Pornography Victims Protection
Act of 1987: Hearing Before the S. Comm. on the Judiciary, 100th Cong. (1988)
("1988 Senate Hearing") .................................................................................5, 23

Stopping Child Pornography: Protecting Our Children and the Constitution: Hearing
Before the S. Comm. on the Judiciary, 107th Cong. 7 (2002) (statement of Sen.
Carnahan) ...........................................................................................................25

## REGULATIONS

28 C.F.R. Part 75 ...........................................................................................................1

28 C.F.R. § 75.1 ........................................................................................8, 9, 29, 48

28 C.F.R. § 75.2 .............................................................................9, 10, 29, 30, 34, 48

28 C.F.R. § 75.4 ..................................................................................3, 10, 29, 43

28 C.F.R. § 75.5 ..................................................................................10, 29, 45, 46

28 C.F.R. § 75.6 ...........................................................................................................48

## ADMINISTRATIVE MATERIALS

Department of Justice ("DOJ"), Final Rule, 70 Fed. Reg. 29607 (May 24, 2005) .....6, 30, 43, 45, 46

DOJ, Proposed Rule, 73 Fed. Reg. 32262 (Jun. 6, 2008) ..............................................................40

DOJ, Final Rule, 73 Fed. Reg. 77432 (Dec. 18, 2008) ...........................................10, 26, 28, 33, 43

Attorney General's Commission on Pornography, *Final Report* (July 1986)
("Commission Report"), <u>available at</u> http://www.porn-report.com/contents.htm .....4, 5, 18

## INTRODUCTION

Plaintiffs' motion for a preliminary injunction should be denied, and this action should be dismissed.  Plaintiffs challenge the age verification and recordkeeping requirements, set forth at 18 U.S.C. §§ 2257 and 2257A and 28 C.F.R. Part 75, which apply to all images produced for sale or trade that, if they involved child performers, would qualify as child pornography. Congress enacted the original version of these requirements over twenty years ago, and despite recent statutory amendments and the promulgation of new regulations, plaintiffs' challenge presents very little that has not been addressed, and rejected, previously by other courts.  The rationale behind the statutory and regulatory scheme is a simple one: If we require producers of sexually explicit images to verify in advance that their performers are at least eighteen years old, we can ensure that these producers will not create or publish such images using underage performers.

Two federal Courts of Appeals and a district court in another jurisdiction have already rejected First Amendment challenges to this scheme, recognizing that by requiring producers to verify performers' ages before they are filmed or photographed, and to keep records of the age verification documents, the Act "advance[s] the abatement of child pornography in fundamental ways."  Am. Library Ass'n v. Reno ("ALA III"), 33 F.3d 78, 88 (D.C. Cir. 1994); see Connection Distrib. Co. v. Holder ("Connection III"), 557 F.3d 321, 329 (6th Cir. 2009) (en banc) ("[A] universal age-verification requirement advances [the government's] interest [in protecting children] in a reasonably tailored way for several reasons."), cert. denied, 77 U.S.L.W. 3658 (U.S. Oct. 5, 2009) (No. 08-1449); Connection Distrib. Co. v. Holder ("Connection I"), 154 F.3d 281, 292 (6th Cir. 1998) ("[A] universal requirement of age

disclosure, regardless of the apparent age of an individual in a visual depiction, is critical to the government's interest in ensuring that no minors are depicted in actual sexual conduct."); see also Free Speech Coal. v. Gonzales ("FSC I"), 406 F. Supp. 2d 1196, 1206-07 (D. Colo. 2005) (following ALA III and Connection I).  As these courts have recognized, Congress' compelling goal of preventing the sexual exploitation of children would be undermined if the recordkeeping requirements allowed for exceptions on a subjective basis, such as where a producer believes that a performer is an adult, or where a producer believes that a depiction has artistic or social value.  Congress' adoption of an objective, universal requirement prevents circumvention of the rules through such subjective assessments.  Indeed, visual depictions of child performers engaged in actual or simulated sexually explicit conduct do qualify as illegal child pornography, regardless of how artistic or socially valuable a producer intends such images to be.

Recent statutory amendments have no bearing on the First Amendment analysis, despite plaintiffs' attempts to argue otherwise.  In 2006, Congress conformed the recordkeeping requirements to other laws defining child pornography, so that the requirements apply to visual depictions of actual performers engaged in simulated sexually explicit conduct, as well as the lascivious display of the genitals or pubic area ("lascivious display").  At the same time, recognizing that some producers of images of simulated sex or lascivious displays may already be required by state or federal law to verify performers' ages and maintain records, Congress allowed such producers, upon certification that they are under such requirements, to continue to follow their previous regime rather than adopting the format set forth in § 2257 and implementing regulations.  Like the previously-existing requirements, these amendments were motivated by Congress' goal to prevent child sexual exploitation, not by hostility to any

- 2 -

particular viewpoint.  They therefore cannot transform a content-neutral regulation into one that is content-based, nor do they violate equal protection principles.

While plaintiffs' Fourth Amendment challenge is new, it fails to state a claim that could entitle plaintiffs to relief.  For one thing, no "search" or "seizure" has as yet occurred, and courts generally refrain from addressing Fourth Amendment issues in the abstract.  In addition, the inspections at issue are limited to the very records that producers must create and maintain to comply with §§ 2257 and 2257A.  Moreover, producers need not keep these records at their own place of business, but may use a third-party custodian, in accord with the new regulations, 28 C.F.R. § 75.4.  Given the fact that producers' premises need never be entered if a third-party custodian is used, and that producers have no reasonable expectation of privacy in the records themselves, the inspection provisions on their face clearly comply with the Fourth Amendment, and it is unclear whether an as-applied challenge would ever arise.

Plaintiffs' claim of irreparable harm is entirely dependent on the assumption that their First Amendment challenge has merit.  Because plaintiffs are unlikely to succeed on the merits, there is no justification for a preliminary injunction.  The government's interests, and those of the public, would be significantly harmed if producers of visual depictions of sexually explicit conduct were relieved of the requirement that they verify performers' ages.  These requirements should remain in effect, and this action should be dismissed.

## **STATUTORY BACKGROUND**

### **1.     1988 Enactment and Early Amendments**

The statutory scheme at issue here dates back to 1988, when Congress first established age verification and recordkeeping requirements for producers of visual depictions of sexually

explicit conduct in 18 U.S.C. § 2257, enacted as part of the Child Protection and Obscenity

Enforcement Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181, 4487-89 (1988).  The

requirements that were enacted in 1988 implemented recommendations issued two years earlier

by the Attorney General's Commission on Pornography.  The Commission's Report found that

"child pornography is extraordinarily harmful both to the children involved and to society," but

that, nevertheless, there was a "consumer demand for youthful performers" in pornography.

Attorney General's Commission on Pornography, *Final Report* 417-18, 618 (July 1986)

("*Commission Report*").[1]  As a result of this demand, "[p]ornographers use minors as performers

in films and other visual depictions."  Id. at 618.

    At the same time, the Commission found that the same demand had fueled the growth of

"pseudo child pornography," using models that are allegedly over the age of eighteen but appear

to be minors even when they are not.  Id.; see also id. at 855 ("Perhaps the single most common

feature of models [in pornography] is their relative, and in the vast majority of cases, absolute

youth.").  This development had "made it increasingly difficult for law enforcement officers to

ascertain whether an individual in a film or other visual depiction is a minor."  Id. at 618.  In

order to address this problem and close the loophole in existing child protection laws, the

Commission recommended that Congress require producers of sexually explicit visual depictions

"to obtain proof of the age of the performer" from a verifiable form of age documentation, such

as a driver's license or birth certificate, and to maintain release forms recording this information

as permanent evidence of the performers' ages.  Id. at 619-20.  The producers would then be

required to identify the location of the forms "in the opening or closing footage of a film, the

---

[1]The Commission's Report is available at http://www.porn-report.com/contents.htm.

inside cover of the magazine, or standard locations in or on other material containing visual depictions." Id. at 620. The Commission recommended that the release forms be "available for inspection by any duly authorized law enforcement officer upon demand as a regulatory function for the limited purposes of determining consent and proof of age." Id. at 621. Following the Commission's Report, the Senate Committee on the Judiciary held extensive hearings on proposed statutory amendments implementing some of the Report's recommendations, including the recordkeeping requirements. Child Protection and Obscenity Enforcement Act and Pornography Victims Protection Act of 1987: Hearing Before the S. Comm. on the Judiciary, 100th Cong. (1988) ("1988 Senate Hearing").

As enacted in 1988, 18 U.S.C. § 2257 required producers to examine identification documents for each performer in a sexually explicit visual depiction, ascertain any aliases of the performer, record this information in individually identifiable records for each performer, and maintain these records "at [the producer's] business premises, or at such other place as the Attorney General may be regulation prescribe and . . . make such records available to the Attorney General for inspection at all reasonable times." Pub. L. No. 100-690, § 7513(a) (codified as amended at 18 U.S.C. § 2257). In addition, the 1988 statute required producers to affix a statement indicating the location of these records to each copy of the sexually explicit visual depiction that was produced. Id. In 1990, Congress added a criminal penalty for failure to comply with these recordkeeping requirements. Child Protection Restoration and Penalties Enhancement Act of 1990, Pub. L. No. 101-647, § 311, 104 Stat. 4789 (1990) (codified as

amended at 18 U.S.C. § 2257(f), (i)).[2]

## 2.    2003 Amendments

Nearly 20 years later, § 2257's recordkeeping requirements are substantially the same as they were in 1990, though adapted to modern technology. The original enactment applied the requirements to the producers of "any book, magazine, periodical, film, videotape, or other matter" containing sexually explicit visual depictions. Pub. L. No. 100-690, § 7513 (18 U.S.C. § 2257(a)). In 2003, recognizing that "the vast majority of child pornography prosecutions today involve images contained on computer hard drives, computer disks, and/or related media," Congress amended § 2257 to confirm that the recordkeeping requirements apply to digital pornography. Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108-21, §§ 501(6), 511, 117 Stat. 650 (2003). Thus, the requirements were expressly applied to producers of any "computer generated image, digital image, or picture." Id. § 511(a)(2) (now codified at 18 U.S.C. § 2257(h)(3)); see also Department of Justice ("DOJ"), Final Rule, 70 Fed. Reg. 29607 (May 24, 2005).

---

[2]The 1990 amendment deleted language in the original 1988 Act that had imposed a rebuttable presumption, unless a defendant could produce the required records, that a performer in a visual depiction of sexually explicit conduct was a minor, for purposes of prosecuting a producer for creating or distributing child pornography. Cf. Pub. Law No. 101-647, § 311; Pub. Law No. 100-690, § 7513. In 1989, the District Court for the District of Columbia had held that such a rebuttable presumption, in the context of criminal prosecutions, violated the accused's due process rights. Am. Library Ass'n ("ALA I") v. Thornburgh, 713 F. Supp. 469, 482 (D.D.C. 1989). After the 1990 amendment, the D.C. Circuit vacated the district court's decision, holding that the plaintiff's challenge to the recordkeeping requirements was moot and that vacatur was warranted since the government had had no opportunity to contest the district court's ruling on appeal. Am. Library Ass'n ("ALA II") v. Barr, 956 F.2d 1178, 1186-87 (D.C. Cir. 1992) (applying United States v. Munsingwear, Inc., 340 U.S. 36, 39-40 (1950)). Thus, to the extent plaintiffs seek to rely on the district court's decision, which they cite without noting its subsequent history, Pl. Mem. at 4-5, their reliance is misplaced.

3.    **2006 Amendments**

In 2006, Congress continued to find that "[a] substantial interstate market in child

pornography exists."  Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh

Act"), Pub. L. No. 109-248, § 501(1)(B), 120 Stat. 587 (2006).  With respect to recordkeeping

requirements, Congress decided to conform the definition of "sexually explicit conduct" that

applied for recordkeeping purposes to the definition, set forth in 18 U.S.C. § 2256(2)(A), that

had otherwise been generally applicable to child pornography violations.  Cf. 18 U.S.C. §

2256(8)(A) (defining "child pornography" as the production of any visual depiction of a minor

engaging in "sexually explicit conduct," as defined in § 2256(2)(A)).  Section 2256(2)(A)

defines "sexually explicit conduct" as:

> actual or simulated--
> (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-
> anal, whether between persons of the same or opposite sex;
> (ii) bestiality;
> (iii) masturbation;
> (iv) sadistic or masochistic abuse; or
> (v) lascivious exhibition of the genitals or pubic area of any person[.]

18 U.S.C. § 2256(2)(A).[3]  Since 1990, the recordkeeping requirements had applied only to visual

depictions of "actual" conduct as described in subsections (i) through (iv), thus excluding

subsection (v) as well as all depictions of actual performers engaged in "simulated" sexually

explicit conduct.  Pub. L. No. 101-647, § 311.  Accordingly, in order to conform the definitions

in 2006, Congress amended the definition of "actual sexually explicit conduct" in § 2257(h)(1)

to mean "actual but not simulated conduct as defined in clauses (i) through (v) of [§]

_____

[3]This definition has been in effect, with minor wording changes, since 1978.  See
Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. No. 95-225, 92 Stat. 7,
8 (1978) (enacting 18 U.S.C. § 2253, which in 1986 was renumbered as 18 U.S.C. § 2256).

2256(2)(A)." Pub. L. No. 109-248, § 502(a).[4]  In addition, Congress added another statutory

section so that – like the definition in § 2256(2)(A) – the recordkeeping requirements would

apply to simulated as well as actual sexually explicit conduct.  Pub. L. No. 109-248, § 503

(codified at 18 U.S.C. § 2257A).[5]  The Adam Walsh Act also added a subsection making it

unlawful for any producer subject to the recordkeeping requirements "to refuse to permit the

Attorney General or his or her designee to conduct an inspection" of the producer's records, as

required under § 2257(c) and § 2257A(c).  Pub. L. No. 109-248, §§ 502(a) (amending § 2257(f)

by adding subsection (5)), 503 (enacting § 2257A(f)).

The recordkeeping requirements imposed on producers of visual depictions of simulated

sexually explicit conduct are, in large part, the same as those imposed on producers of visual

depictions of actual sexually explicit conduct.  Compare 18 U.S.C. § 2257(a)-(h), with id. §

2257A(a)-(g).  However, Congress recognized that commercial producers of simulated sexually

explicit conduct and of actual sexually explicit conduct as defined in § 2256(2)(A)(v) may more

commonly distribute these depictions through broadcast television or other mainstream media,

and thus are more likely already to collect and maintain individually-identifying information

about performers for independent reasons.  Congress therefore included an exception to the

---

[4]Congress specified that the recordkeeping requirements would not apply to visual depictions of sexually explicit conduct as defined in 18 U.S.C. § 2256(2)(A)(v) that were produced prior to the effective date of the Adam Walsh Act "unless that depiction also includes actual sexually explicit conduct as described in clauses (i) through (iv)" of § 2256(2)(A).  Pub. L. No. 109-248, § 502(b).

[5]"Simulated" sexually explicit conduct refers to "conduct engaged in by [actual, not virtual] performers that is depicted in a manner that would cause a reasonable viewer to believe that the performers engaged in actual sexually explicit conduct, even if they did not in fact do so."  28 C.F.R. § 75.1(o).  However, "sexually explicit conduct that is merely suggested" is excluded from this category.  Id.

recordkeeping requirements of §§ 2257 and 2257A for these producers when the matter

containing the visual depiction (1) is created as part of a commercial enterprise; (2) either is

intended for commercial distribution and not marketed or made available in circumstances

suggesting that the material contains child pornography, or is subject to regulation by the Federal

Communications Commission ("FCC") under its authority over the broadcast of obscene,

indecent or profane programming; and (3) the producer is able to certify that the producer

"regularly and in the normal course of business collects and maintains individually identifiable

information [including name, address, and date of birth] regarding all performers . . . employed

by that person, pursuant to Federal and State tax, labor, and other laws, labor agreements, or

otherwise pursuant to industry standards."  18 U.S.C. § 2257A(h)(1)(A), (B).

4.      **Application to Primary and Secondary Producers**

In §§ 2257 and 2257A, the term "producer" includes both those who create a visual

depiction of actual or simulated sexually explicit conduct, which the implementing regulations

call "primary producers," 28 C.F.R. § 75.1(c)(1), and "secondary producers," id. § 75.1(c)(2),

who digitize, assemble, manufacture, publish, duplicate, reproduce, or reissue an item intended

for commercial distribution that contains a visual depiction of sexually explicit conduct, or who

upload or manage digital online content portraying sexually explicit conduct.  See 18 U.S.C. §§

2257(h)(2), 2257A(g); 28 C.F.R. § 75.1(c).[6]  While primary producers must examine and copy a

performer's original picture identification in order to satisfy age verification and recordkeeping

---

[6]Certain activities that may involve inadvertent handling or transmission of visual
depictions of sexually explicit conduct – such as film processing,  transferring imagery from film
to digital format, or providing internet access, hosting, or search services –  are expressly
excluded from the definition of "producer."  18 U.S.C. § 2257(h)(2)(B); 28 C.F.R. § 75.1(c)(4).

requirements, secondary producers may rely on copies of records obtained from a primary

producer.  28 C.F.R. § 75.2(a)(1), (b).  Before disclosing these records to secondary producers, a

primary producer may redact all information that is not necessary to confirm the name and age of

the performer, including the performers' addresses, phone numbers, and social security numbers.

Id. § 75.2(b).

**5.       Storage and Inspection of Records**

Neither primary nor secondary producers are obligated to store the records required by §§

2257 and 2257A on their own business premises; rather, producers may contract with a

nonemployee records custodian, who must comply with the statutory and regulatory

recordkeeping requirements.  18 U.S.C. §§ 2257(c), 2257A(c) (authorizing Attorney General to

prescribe the storage location by regulation); 28 C.F.R. § 75.2(h) (allowing for third-party

custodians).  Regardless of where producers choose to store the required records, the records

must be available for inspection, for the purpose of determining compliance with recordkeeping

requirements, at least 20 hours per week.  Id. §§ 75.4, 75.5(a), (c)(1).  Inspections must occur at

reasonable times, within reasonable limits, and in a reasonable manner without causing

unreasonable disruption.  Id. § 75.5(a), (c).  Unless investigators have reasonable suspicion to

believe a producer has not complied with recordkeeping requirements, inspections may occur no

more than once in a four-month period.  Id. § 75.5(d).

## FACTUAL AND PROCEDURAL BACKGROUND

On December 18, 2008, the Department of Justice ("DOJ") issued its Final Rule

amending and adding some provisions to the regulations that implement 18 U.S.C. §§ 2257 and

2257A.  73 Fed. Reg. 77432.  These regulatory revisions went into effect on March 18, 2009.  Id.

- 10 -

at 77432.  On February 20, 2009, the Sixth Circuit, sitting en banc, issued its final decision in

Connection III, rejecting many of the same arguments that plaintiffs raise here.  Connection III,

557 F.3d 321.  The Supreme Court subsequently denied certiorari to the Sixth Circuit on October

5, 2009.  Connection Distrib. Co. v. Holder, 77 U.S.L.W. 3658 (U.S. Oct. 5, 2009) (No. 08-

1449). Plaintiffs filed suit in this Court on October 7, 2009, asserting claims under the First,

Fourth, and Fifth Amendments, and filed a motion for preliminary injunction the same day.

## STANDARD OF REVIEW

### A.      Preliminary Injunction

A preliminary injunction is an "'extraordinary remedy'" that "'should be granted only in

limited circumstances.'"  Del. Valley Fin. Group, Inc. v. Principal Life Ins. Co., 640 F. Supp. 2d

603, 616 (E.D.Pa. 2009) (quoting Kos Pharms. Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d

Cir.2004); accord Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir.

1989).  In order to demonstrate entitlement to this extraordinary remedy, a plaintiff must show

"(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction

is denied; (3) that granting preliminary relief will not result in even greater harm to the

nonmoving party; and (4) that the public interest favors such relief."  Kos Pharms. Inc., 369 F.3d

at 708.  Unless the plaintiff meets its burden of establishing each of these elements in its favor,

"the grant of a preliminary injunction is inappropriate."  Del. Valley Fin. Group, Inc., 640 F.

Supp. 2d at 616.

### B.      Motion to Dismiss

Defendant's argument that plaintiffs' Fourth Amendment claim is unripe "is

appropriately brought as a motion to dismiss for lack of subject matter jurisdiction."  Save

- 11 -

Ardmore Coal. v. Lower Merion Township, 419 F. Supp. 2d 663, 669 (E.D. Pa. 2005).  "'[T]he district court is not limited to the face of the pleadings in deciding such a motion.'"  Id. (quoting Taylor Inv., Ltd. v. Upper Darby Twp., 983 F.2d 1285, 1290 n.7 (3d Cir. 1993)).

Defendant's other arguments in favor of dismissal fall under Rule 12(b)(6).  A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993).  In order to survive a motion to dismiss, a plaintiff's complaint must state a claim that is "'plausible on its face,'" providing more than a formulaic recitation of a claim's elements that amount to mere labels and conclusions.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56 (2007)); see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Thus, the complaint's factual allegations must "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  A court's review of a 12(b)(6) motion is ordinarily "limited to the contents of the complaint, including any attached exhibits," but may also include public records, documents essential to a plaintiff's claim that are attached to a defendant's motion, and items appearing in the record of the case.  Kuhns v. City of Allentown, 636 F. Supp. 2d 418, 425 (E.D. Pa. 2009).  Dismissal is warranted when, taking all factual allegations and inferences as true, the moving party is entitled to judgment as a matter of law.  Markowitz v. Ne. Land Co., 906 F.2d 100, 103 (3d Cir. 1990).

## ARGUMENT

I.   **THE RECORDKEEPING REQUIREMENTS DO NOT VIOLATE THE FIRST AMENDMENT**

    A.   **The Requirements Are Content Neutral and Are Therefore Properly Analyzed Under Intermediate Scrutiny**

The recordkeeping requirements at issue here do not place any direct restriction on protected speech.  Over the past decades, most courts that have already examined the recordkeeping requirements have readily recognized that these requirements are content neutral because their purpose is to protect children from use as performers in pornography, not to express disagreement with the message conveyed by depictions of adults engaged in sexually explicit conduct.  E.g., Connection III, 557 F.3d at 328; ALA III, 33 F.3d at 86; FSC I, 406 F. Supp. 2d at 1205-06.  Yet plaintiffs continue to assert that the requirements are subject to strict scrutiny as content-based restrictions on speech.  Pl. Mem. at 33.  Plaintiffs fail to overcome well-established precedent to the contrary.

The "principal inquiry" when determining whether a regulation is content based or content neutral "'is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'"  Brown v. City of Pittsburgh, No. 08-1819, 2009 WL 3489838, at *4 (3d Cir. Oct. 30, 2009) (quoting Hill v. Colorado, 530 U.S. 703, 719 (2000)). Thus, as long as the government "'*justifie[s]* [a requirement] without reference to the content of the regulated speech,'" the requirement is deemed content neutral even if it incidentally burdens particular categories of speech more than others.  Connection III, 557 F.3d at 328 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).  The Third Circuit, following the Supreme Court, recently held that a statute restricting protest activities near health care facility entrances

was content neutral because its goal was to protect those seeking medical treatment from

potential physical and emotional harm, not to prevent them from hearing a particular message.

Brown, 2009 WL 3489838, at *5.

Because Congress' goals in establishing the recordkeeping requirements are unrelated to

the content of the *protected* speech (visual depictions of adults engaged in sexually explicit

conduct) that is incidentally regulated here, the requirements are content neutral.  The purposes

of the recordkeeping requirements "are threefold: (a) to prevent the exploitation of children by

requiring" those who create visual depictions of sexually explicit conduct "to secure proof of the

performer's age and to keep a record of the same as evidence of their compliance;" (b) "to

deprive child pornographers of access to commercial markets by requiring secondary producers

to inspect (and keep a record of) the primary producers' proof that the persons depicted were

adults at the time" the visual depiction was created; and (c) "to establish a system by which a law

enforcement officer in possession of materials containing depictions of sexually explicit acts will

be able to identify the performers and verify compliance with the Act."  ALA III, 33 F.3d at 86.

Any burdens placed on protected depictions of adults engaged in sexually explicit conduct are

merely incidental to these goals.

In arguing to the contrary, plaintiffs first assert that the recordkeeping requirements are

inextricably intertwined with content because they seek to prevent child pornography – a type of

speech that is not entitled to First Amendment protection.  Pl. Mem. at 33.  However, child

pornography receives no First Amendment protection precisely because it is inextricably

intertwined with non-speech-related harms.  New York v. Ferber, 458 U.S. 747, 764 (1982)

("When a definable class of material . . . bears so heavily and pervasively on the welfare of

- 14 -

children engaged in its production, we think . . . it is permissible to consider these materials as without the protection of the First Amendment."). "When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992). Thus the Sixth Circuit's en banc majority properly concluded that "[i]f Congress may suppress child pornography in its entirety due to its scarring impact on the children exploited in its production, surely it may facilitate the enforcement of laws devoted to that end by imposing a proof-of-age requirement on the producers and distributors of images of sexually explicit conduct – without triggering the most rigorous scrutiny known to constitutional law." Connection III, 557 F.3d at 328-29.

Plaintiffs next argue that the recordkeeping requirements in § 2257 are content based because of the alleged "difference in treatment" that Congress accorded depictions of simulated sexually explicit conduct and lascivious displays in 18 U.S.C. § 2257A, allowing producers of such depictions, but not those of other forms of actual sexually explicit conduct, to provide certifications that they are already obligated to verify performers' age under some other regulatory scheme. See Pl. Mem. at 34-35. This argument makes no sense at all because § 2257A qualifies as content neutral for the same reasons that § 2257 does. The fact that Congress adopted different means of achieving its content neutral goals in the two statutory provisions does not transform either one into a content-based regulation of speech.[7] Moreover, the

_____

[7]Indeed, if such "different treatment" were sufficient to transform a content neutral regulation into one that is content based, the fact that Congress did not impose age verification and recordkeeping requirements on producers of depictions of simulated sexually explicit conduct at all until 2006 could as easily have justified a holding that § 2257 was a content-based regulation; yet, as discussed, courts have consistently held the opposite, recognizing as

certification alternative available for some depictions in some circumstances does not reflect Congress' preference for one viewpoint over another. After all, the certification alternative does not exempt any depiction of sexually explicit conduct from the requirement that producers verify performers' ages; it simply reflects Congress' reasonable assumption that depictions of simulated conduct or lascivious displays are more likely to be created and disseminated by producers subject to other regulatory schemes that already require them to verify and maintain records of performers' ages.

Plaintiffs' citation of Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105 (1991), does not help them. The "Son of Sam" law at issue in Simon & Schuster, while ostensibly intended to force criminals to financially compensate their victims, only imposed this requirement on income that criminals would earn by writing stories about their crimes, not on other sources of income, or on income derived from stories on other subjects. Id. at 116. In holding that the law was content based, the Court in effect recognized that the government's goal was not simply to compensate victims, but was more specifically to compensate victims with profits that criminals would otherwise earn by publishing stories about their crimes. See id. at 108, 116. In other words, unlike the recordkeeping requirements at issue here, the government's *justification* was itself tied to the content of the burdened speech. Because the government's justification for §§ 2257 and 2257A is to protect children from illegal exploitation – a goal entirely unrelated to the content of visual depictions of adults engaged in sexually explicit conduct, which is the protected content at issue here – these provisions qualify

---

determinative the fact that Congress intended the age verification and recordkeeping requirements to address harms unrelated to the content of the protected speech that was incidentally regulated.

as content neutral.

**B.    The Recordkeeping Requirements Are Narrowly Tailored to Serve the Government's Significant Interest in Preventing Child Pornography**

Applying intermediate scrutiny, a content-neutral regulation that imposes an incidental burden on speech will be upheld if it is "'narrowly tailored to serve the government's legitimate, content-neutral interests,'" and "'leave[s] open ample alternative channels for communication.'" Brown, 2009 WL 3489838, at *5 (quoting Ward, 491 U.S. at 798).  The means chosen by the government to achieve its interests "need not be the least restrictive or least intrusive means of doing so."  Ward, 491 U.S. at 798.  Plaintiffs concede that the government's interest in combating the exploitation of children in pornography is significant, and indeed compelling, Pl. Mem. at 21, and courts have easily reached the same conclusion.  Ferber, 458 U.S. at 757 ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."); Connection III, 557 F.3d at 329 ("No one disputes that the government's interest in protecting children is 'substantial.'"); ALA III, 33 F.3d at 88 ("Appellees concede, as they must, that the Government has a significant – indeed compelling – interest in the prevention of child pornography."); FSC I, 406 F. Supp. 2d at 1206 ("It does not appear to be disputed that the government interest put forward – preventing child pornography – is significant.").

**1.    As Other Courts Have Held, the Recordkeeping Requirements Satisfy the Narrow Tailoring Requirement**

The recordkeeping requirements at issue are narrowly tailored to serve that interest. "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'"

- 17 -

Ward, 491 U.S. at 799 (quoting United States v. Albertini, 472 U.S. 675, 689 (1985)).  "So long

as the means chosen are not substantially broader than necessary to achieve the government's

interest, . . . the regulation will not be invalid simply because a court concludes that the

government's interest could be adequately served by some less-speech-restrictive alternative."

Id. at 800; see also Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 189 (1997).  Due to the

"substantial deference" that a court must grant to Congress, the court's "sole obligation is to

assure that, in formulating its judgments, Congress has drawn reasonable inferences based on

substantial evidence."  Id. at 195 (applying a standard that is even "more deferential" than that

accorded a federal agency on review of the administrative record).

Other courts have already applied intermediate scrutiny to the age verification and

recordkeeping requirements and have upheld these requirements, concluding that Congress

adequately justified its concern that, absent these requirements, pornography producers would be

more likely to use underage performers.  Connection III, 557 F.3d at 328-32; Connection I, 154

F.3d at 292 ("Because the Act supports the government's interest in fighting [child]

pornography, while allowing Connection and its readers to exercise their free speech rights, it

satisfies the requirement of narrow tailoring."); ALA III, 33 F.3d at 88 ("[I]t seems obvious to us

that, as a general matter, the requirements of section 2257 advance the abatement of child

pornography in fundamental ways.").  In ALA III, the D. C. Circuit observed that the original

enactment of § 2257 followed "fourteen months of investigations" by the Commission on

Pornography, and followed the Commission's express recommendation that the current law

contained "gaps" and "loopholes" that "facilitated the exploitation of children.  ALA III, 33 F.3d

at 89 (citing *Commission Report* at 618-20).  The court concluded that § 2257 accomplished

Congress' goal "by ensuring that honest but careless producers secure documentary evidence of

a performer's age and by denying unscrupulous producers the defense that they reasonably

believed the performer to be of age." Id. Most recently, the Sixth Circuit held that "a universal

age-verification requirement advances [the government's] interest in a reasonably tailored way"

because:

> It ensures that primary producers of pornography confirm that performers are of
> age before filming them; it permits secondary producers (who rarely will know
> the performers) to ensure that the individuals depicted in their publications are of
> age; it prevents children from attempting to pass themselves off as adults; and it
> creates a compliance system in which law-enforcement officers not only can
> identify the performers depicted in magazines and movies and verify their ages
> but also can eliminate subjective disputes with producers over whether a model's
> apparent age should have triggered an age verification check.

Connection III, 557 F.3d at 332-30; see also ALA III, 33 F.3d at 88-89 (listing similar ways in

which the requirements advance Congress' goal); FSC I, 406 F. Supp. at 1206 (same).

### 2. The Requirements Directly Advance the Government's Interests Because They Ensure that Performers Are Adults

Plaintiffs raise few, if any, new arguments here, and none that warrant a different holding

in this case.[8] Plaintiffs first argue that the requirements do not advance the government's interest

---

[8]It is worth noting that the only First Amendment arguments in plaintiffs' motion for a
preliminary injunction that rely on more recent amendments to the requirements relate solely to
the certification exception set forth in § 2257A(h), which plaintiffs cite not as basis for
challenging the alleged restrictions in § 2257A, but rather as another reason that the restrictions
in § 2257 allegedly violate the First Amendment. E.g., Pl. Mem. at 28 (arguing that the
certification exception should be available to producers of visual depictions of all categories of
sexually explicit conduct, not just those listed in § 2257A); id. at 34-35 (arguing that the
enactment of § 2257A transforms § 2257 into a content-based restriction). In other words,
plaintiffs concede that, if anything, the restrictions in § 2257A are more narrowly-tailored than
the restrictions in § 2257. Considering that § 2257 has been repeatedly upheld under the First
Amendment's intermediate scrutiny analysis, and that § 2257A, like § 2257, only imposes
recordkeeping requirements on images that, if they were made using children, would qualify as
illegal child pornography, there is no basis for § 2257A to be held invalid.

because they apply to "constitutionally protected expression depicting *adults*."  Pl. Mem. at 21-22.  However, these requirements do not *prohibit* any visual depiction of adults engaging in sexually explicit activity, nor do they restrict the creation or distribution of such depictions as long as producers ensure that these depictions actually *are* of adults, and maintain the records to show it.  As other courts have recognized, "the statutory scheme depends upon requiring producers to identify and maintain records of every performer who appears in their sexually explicit materials.  The entire point of the Act is to prevent subjective determinations of age by implementing a uniform procedure . . . ."  ALA III, 33 F.3d at 90; accord Connection III, 557 F.3d at 331-32 (recognizing that a universal age verification requirement advances Congress' goal by eliminating subjectivity and avoiding "delegating enforcement of this critical issue to the industry being regulated").  Indeed, the connection between these limited recordkeeping requirements and the government's goal is clear: Producers of pornography who are required to verify and maintain records of the age of their performers are less likely to use (whether intentionally or inadvertently) performers who are in fact minors.  The requirement therefore directly advances the prevention of child pornography, specifically focusing on child pornography using older children where it is difficult to tell, just by looking, that they are not adults.

Plaintiffs next argue that "there is no evidence that there is a problem with minors appearing in adult films," and discount the extensive legislative history that supported the enactment of § 2257 by complaining that it "is more than 20 years old."  Pl. Mem. at 25 & n.14.  However, in the normal course of things, the justification for a statutory requirement is presented to a legislature before the requirement is put into effect.  See City of Los Angeles v. Alameda

Books, Inc., 535 U.S. 425, 439-40 (2002) (plurality); City of Renton v. Playtime Theatres, Inc.,

475 U.S. 41, 51-52 (1986) (studies preceded enactment of statutes under review). That is what

happened here, as the courts in Connection III and ALA III described. There is no authority for

the notion that a law, once justified in a legislative history, must be justified again in court

through new evidence.[9] Moreover, even where courts have considered additional evidence on

this issue, as in the District of Colorado, they have concluded that "[i]t appears undisputed that

there is a significant market for pornography involving young-looking performers," and that

"given extensive demand for pornography involving young-looking performers, . . . there is a

substantial risk that performers under the age of 18 will be used in such materials." FSC I, 406

F. Supp. 2d at 1207 (citing exhibits). As the court in Free Speech recognized, "[s]uch a common

sense conclusion is certainly within the realm of congressional authority." Id.

The cases that plaintiffs cite do not support the need for any further evidence, beyond

Congress' findings, to be presented in this case. Plaintiffs rely heavily on United States v.

Playboy Entm't Group, Inc., 529 U.S. 803, 816 (2000), but that case is inapplicable because the

Court in Playboy was applying strict scrutiny to a content-based regulation. See Connection

Distrib. Co. v. Gonzales ("Connection II"), No. 95-1993, 2006 WL 1305089, at *7 (N.D. Ohio

_____

[9]Other than the dissenting opinion in Connection III, the only case cited by plaintiffs for this proposition is Nw. Municipal Util. Dist. v. Holder, 129 S. Ct. 2504 (2009). But Nw. Municipal declined to rule on the constitutional issue before it, citing the principle of constitutional avoidance. Id. at 2513. Moreover, when the Court in Nw. Municipal questioned whether the facts on the ground had changed, it did so based on later *congressional* testimony suggesting that the data underlying a formula that had been designed to identify particular jurisdictions for different treatment may no longer be reliable. See id. at 2512. Here, plaintiffs have pointed to no later evidence before Congress that undermines the idea that youth remains a valued commodity in the pornography industry, as it is in society at large, and that, in the absence of age verification and recordkeeping requirements, there is a greater risk that underage performers will be used in visual depictions of sexually explicit conduct.

- 21 -

May 10, 2006) (Playboy "has no bearing on this case because intermediate scrutiny applies here."). The "least restrictive means" requirement that applies in a strict scrutiny case is inapplicable here. See Connection III, 557 F.3d at 331 ("[I]n enacting a content-neutral proof-of-age requirement, Congress need not employ 'the least restrictive means of advancing the Government's interests[.]'").

The other cases that plaintiffs cite are equally inapplicable. Like Playboy, United States v. Stevens, 533 F.3d 218 (3d Cir. 2008) (en banc), cert. granted 129 S. Ct. 1984 (2009), applied strict scrutiny to the statute there in question – 18 U.S.C. § 48, which prohibits selling depictions of animal cruelty in interstate commerce for commercial gain. Stevens, 533 F.3d at 221, 223. The court first considered whether depictions of animal cruelty qualified as a category of unprotected speech, following the analysis that the Supreme Court had applied in Ferber when holding that child pornography constituted such a category, and concluded that – unlike child pornography – depictions of animal cruelty were protected speech. See Stevens, 533 F.3d at 232 ("The attempted analogy to Ferber fails because of the inherent differences between children and animals."). The court concluded that the total ban imposed by § 48 on a category of protected speech was not the least restrictive means available to serve a compelling interest. Stevens, 533 F.3d at 235. Stevens does not apply here because this is an intermediate scrutiny case, and because the age verification/recordkeeping requirements, unlike § 48, do not impose a total ban on any category of protected speech.

As for Ctr. For Democracy & Technology v. Pappert, 337 F. Supp. 2d 606, 654-55 (E.D. Pa. 2004), the court in that case focused on the unique situation presented – where the statute that Congress enacted did not, on its face, place *any* restriction on protected speech, but, due to

- 22 -

technological limitations, the internet service providers that the statute regulated could not

implement the filtering requirements without blocking protected speech.  See id.  The court also

found that technological limitations allowed publishers of websites that contain child

pornography to evade the filtering mechanisms in place, thus rendering the entire effort

ineffective, in the court's view.  Id. at 655.  The court noted that there was no evidence that the

statute in question furthered Congress' goal.  Id. at 656.  But significantly, in Ctr. For

Democracy there was no possibility that congressional findings could justify the burden on

protected speech because, as noted, the statute itself did not impose any such burden.  In other

words, the burden was not by congressional design, but was merely a technological accident.  In

contrast, as discussed, the requirements here were specifically designed by Congress based on

recommendations that resulted from extensive inquiries.[10]  ALA III, 33 F.3d at 89.

---

[10]Plaintiffs' implicit suggestion that the evidence before Congress was actually to the contrary, Pl. Mem. at 25, is without foundation  For example, plaintiffs claim that the evidence before Congress in 1988 "established that [pornography] producers . . . had stated that they did not want to use underage performers in their expression."  Id. (citing 1988 Senate Hearing, at 402).  However, Peggy Coleman, Legal Counsel to the American Family Association, offered that view as support for the idea that most producers would welcome the recordkeeping requirements as a means of ensuring that their performers were adults and not children.  See 1988 Senate Hearing, at 402.  Ms. Coleman relied on prior testimony given by Alan Dershowitz, in his role as counsel for *Penthouse* magazine, who stated that in his view, "every magazine should be required to get consent forms of models who do participate in this kind of activity." Id.  Other testimony in the 1988 hearing emphasized that "[p]ornography's 'models', 'actresses' and 'actors' are always young" and that "many of those used are under legal age."  Id. at 37 (testimony of H. Robert Showers, Executive Director, Nat'l Obscenity Enforcement Unit, Criminal Division, Department of Justice).  Another DOJ spokesperson further noted that federal prosecutions of child pornography were beginning to rise but that the proposed recordkeeping requirements "would significantly enhance the ability of U.S. attorneys" to obtain convictions. Id. at 53-54, 57, 61 (statement of Brent D. Ward, U.S. Attorney, District of Utah); see also id. at 19 (statement of Sen. Humphrey) (expressing support for the proposed recordkeeping requirements because they would "help to prevent pornographers from evading" federal law criminalizing child pornography "by professing ignorance as to the age or identity of those whom they exploit").

Plaintiffs next argue that federal child pornography prosecutions are generally successful, and that there is therefore no need for age verification or recordkeeping to prevent child pornography.  Pl. Mem. at 26-27.  Again, other courts have rejected this argument, recognizing that Congress intended the age verification and recordkeeping requirements to serve a specific purpose – to fill the loophole created when a performer's age cannot be identified.  See ALA III, 33 F.3d at 89 ("[W]e cannot agree . . . that the Act serves no meaningful purpose given the existence of other criminal laws prohibiting child pornography.").  As described above, the requirements also serve purposes other than to assist in prosecutions of child pornography possession, such as preventing even the inadvertent use of underage performers in pornography. Moreover, Congress has continued to adjust the laws criminalizing child pornography, as discussed by the Supreme Court in United States v. Williams, 128 S. Ct. 1830 (2008), reflecting Congress' recognition that challenges in child pornography prosecution and prevention continue to exist.  Id. at 1837 ("The [2003 PROTECT] Act's express findings indicate that Congress was concerned that limiting the child-pornography prohibition to material that could be *proved* to feature actual children . . . would enable many child pornographers to evade conviction.").[11]

---

[11] Williams concerned those provisions of the PROTECT Act that criminalize pandering of child pornography.  128 S. Ct. at 1837-38.  The Court held that "offers to provide or requests to obtain child pornography are categorically excluded from the First Amendment," including the situation where an individual offered material that was claimed to be, but actually was not, child pornography – where, for example, the material depicted a virtual child-image rather than an actual child.  Id. at 1842.  Justice Souter, quoted by plaintiffs, Pl. Mem. at 26, disagreed with the Court's holding on the latter point as in conflict with the Court's prior holding that transactions involving such virtual images could not themselves be banned.  Williams, 128 S. Ct. at 1857-58 (Souter, J., dissenting) (citing Ashcroft v. Free Speech Coal., 535 U.S. 234, 254-55 (2002)).  Justice Souter's citation of prosecution statistics was in furtherance of his position that applying the pandering ban to virtual images was unnecessary.  See id.  Unlike the provision at issue in Williams, the age verification and recordkeeping requirements do not impose a total ban on any category of protected speech, nor do they even ban the pandering of any category of

Among other things, modern computer technology allows producers to alter the appearance of real performers.  See Stopping Child Pornography: Protecting Our Children and the Constitution: Hearing Before the S. Comm. on the Judiciary, 107th Cong. 7 (2002) (statement of Sen. Carnahan) (recognizing that in 2003, loopholes in the law still existed because, among other things, "[w]ith modern technology, . . . pornographers can digitally alter the features of real children so they cannot be identified"), id. at 22 (statement of Daniel Armaugh, Director, Legal Resource Div., Nat'l Ctr. for Missing & Exploited Children) (elaborating on problems with computer manipulation of images so that actual performers cannot be identified).  Such a possibility only strengthens the case in favor of universal age verification and recordkeeping requirements, without regard to case-by-case subjective judgments about visual depictions and the performers that appear in them.

Finally, plaintiffs argue that the certification process that is available for certain producers of visual depictions of simulated sexually explicit conduct or lascivious displays, in 18 U.S.C. § 2257A(h), is a more narrowly tailored alternative that Congress should have made available for depictions of other categories of actual sexually explicit conduct.  Pl. Mem. at 28.

---

protected speech.  To the extent plaintiffs seek to cast doubt on whether records of performers' ages might be useful when prosecuting a charge of possession of or trade in child pornography, there is no doubt that the government bears the burden to prove that a performer in a visual depiction of sexually explicit conduct is an actual (nonvirtual) minor.  See United States v. Lacey, 569 F.3d 319, 324-25 (7th Cir. 2009); United States v. Rodriguez-Pacheco, 475 F.3d 434, 440 (1st Cir. 2007) (discussing the nature of that proof).  While courts have held that the images themselves can be sufficient proof, and Justice Souter suggested they are likely to be sufficient when an image looks like that of an actual child, Williams, 128 S. Ct. at 1858 (Souter, J., dissenting), common sense suggests that the images themselves may not be sufficient if the performer is an unidentified seventeen-year-old.  In addition, as discussed, these requirements serve purposes beyond whatever assistance they may provide to prosecutions of child pornography possession or trade.

However, as discussed above, Congress' chosen mechanism to prevent the exploitation of children in producing depictions of actual sexually explicit conduct does not need to be the least restrictive means available, and the fact that Congress provided a different alternative for certain other material does not undermine the conclusion that the age verification and recordkeeping requirements advance Congress' goals.

      **3.**      **The Requirements Do Not Burden Substantially More Speech Than Necessary Because Exceptions Based on Subjective Assessments Would Undermine the Recordkeeping Scheme**

Plaintiffs argue that the age verification and recordkeeping requirements are "overinclusive" because, they allege, the requirements apply to visual depictions of sexually explicit conduct "no matter how artistic or valuable as political commentary or journalistic documentary, no matter how clear it is that the persons depicted are middle-aged adults." Pl. Mem. at 29.[12]  However, plaintiffs fail to demonstrate that the requirements burden substantially more speech than is necessary to serve the government's interest in combating child exploitation.[13]  In regard to plaintiffs' suggestion that the requirements should not apply to

---

[12]Plaintiffs also argue that the requirements are overinclusive because they allegedly apply to purely private expression, such as email communications between spouses. Pl. Mem. at 29.  However, plaintiffs are simply wrong about the scope of the requirements' application.  The government has repeatedly taken the position that the recordkeeping requirements do not apply in private contexts of this kind.  See 73 Fed. Reg. at 77456 (recognizing that the requirements are "limited to pornography intended for sale or trade"); Connection III, 557 F.3d at 338-39 (reciting the government's previous argument that the requirements do not apply in the private setting, and that the government has no intention of enforcing these requirements in such a setting). Even if plaintiffs' interpretation of the statute were correct, the requirements could not be deemed "substantially" overinclusive as a result, and the fact that the government has disavowed any intention of enforcement in the private context casts doubt on plaintiffs' standing to raise such an argument.

[13]Plaintiffs' misquotation of the applicable standard as requiring that the regulation "not burden more speech than is necessary," Pl. Mem. at 28, when the actual standard requires that

depictions of "middle-aged adults," the importance of applying the requirements universally, regardless of any subjective evaluation of a performer's age, has already been explained above, and was expressly recognized by both the D.C. and Sixth Circuits. Connection III, 557 F.3d at 331-32; ALA III, 33 F.3d at 90.

In a similar vein, plaintiffs cannot prevail in their facial challenge simply by asserting that some who produce visual depictions of sexually explicit images do so as a form of artistic, political, or journalistic expression. Even assuming that the requirements were unconstitutional as applied to some images of this nature, that would not lead automatically to the conclusion that the requirements burden "substantially more speech than necessary." Turner Broad. Sys., Inc., 520 U.S. at 189.[14] Even more significantly, plaintiffs fail entirely to explain how the government's interest in preventing the exploitation of children could in any way be diminished simply because a producer intends – or purports to intend – the visual depiction in question to convey an artistic, political, or informational message.

Moreover, plaintiffs offer nothing by way of support for any as-applied challenge in regard to whether the requirements are narrowly tailored. While plaintiffs suggest that the depictions that they produce "neither resemble[] nor [are] akin to child pornography," Pl. Mem.

_____

the regulation "not 'burden *substantially* more speech than is necessary,'" Connection III, 557 F.3d at 329 (emphasis added) (quoting Ward, 491 U.S. at 791), suggests another attempt to induce the Court to apply strict, rather than intermediate scrutiny. As discussed above, intermediate scrutiny properly applies.

[14]Cf. Faustin v. City & County of Denver, 423 F.3d 1192, 1201 (10th Cir. 2005) (rejecting challenge to city ban on signs and banners on highway overpasses because "[e]ven if one were to hypothesize that the Denver policy might reach some expression on the overpass that could not impede traffic flow on the highway, there is nothing in this record to suggest that any such speech would be substantial in comparison to the legitimately prohibited expressions").

at 31, by conceding that the requirements apply to these depictions, plaintiffs effectively concede

that these depictions *would* in fact qualify as child pornography if they used performers who

were not adults.  Indeed, providing an exception for depictions based on their artistic or social

value would open wide the door to claims from any and all producers that their visual depictions

of sexually explicit conduct had such value – after all, who would concede that their own

depictions were not "artistic"? – and that they therefore should be deemed immune from the

recordkeeping requirements.  The requirements cannot be deemed overinclusive simply because

they fail to allow widespread circumvention of this kind.  See 73 Fed. Reg. at 77438 (rejecting

comment suggesting that news and documentary programming be excluded from the definition

of "producer," noting that "[t]he First Amendment does not permit even a bona fide reporter to

trade in child pornography in order to create a work of journalism, not to mention the possibility

that someone might purport to be a news or documentary producer to evade the statute" (citation

omitted)).

Indeed, if the recordkeeping requirements had varied according to the message that a

producer intends to, or does, convey, or based on an image's artistic, political, or journalistic

value, that would introduce the very subjectivity that the universal age verification and

recordkeeping requirements so carefully avoid.  See Connection III, 557 F.3d at 331-32.  There

is no objective or uniform way to make such determinations.  As discussed above, the Sixth

Circuit decided in Connection III that allowing law enforcement personnel, or producers

themselves, to decide on a case-by-case basis whether a performer appears old enough not to

require age verification would introduce too much room for error.  Id.  But that error would be

magnified exponentially if producers could decide for themselves whether the depictions they

create or distribute are sufficiently artistic or political that they need not ensure that their performers are adults, even if the performers appear underage.

The arguments raised by specific plaintiffs, alleging that particular elements of the statutory and regulatory scheme have a chilling effect on their expression, Pl. Mem. at 29-30, fail to establish that the requirements are not narrowly tailored. Indeed, many of these assertions fail to take accurate account of the statutory and regulatory requirements in question. For example, plaintiff Mr. Connors asserts that because he operates his business out of his home and is the sole proprietor, he is necessarily confined to his home for 20 hours a week so that his records can be accessible for inspection during those hours. Pl. Mem. at 30 (referring to the notice requirement set forth in 28 C.F.R. § 75.5(c)(1)). However, the DOJ regulations do not require any such sacrifice. As explained in greater detail below, producers are allowed to store their records either on their own business premises or off-site with third-party custodians. See 28 C.F.R. §§ 75.2(h), 75.4. Plaintiffs fail to provide a persuasive explanation of why that option does not sufficiently address the situation of individuals who operate businesses out of their homes.

In regard to Mr. Steinberg's assertion that he is chilled in using visual depictions produced by foreign producers who do not comply with recordkeeping requirements, Pl. Mem. at 30, the DOJ regulations allow producers to comply with the requirements by verifying the ages of non-American performers with "a foreign government-issued equivalent of any of the documents" that can be used in the United States. 28 C.F.R. § 75.1(b). Thus, assuming that some foreign producers wish to have their visual depictions distributed in the United States, there is no reason that they could not provide Mr. Steinberg with copies of records sufficient to comply with the requirements. On the other hand, to create an exception for materials of foreign

origin would, once again, allow for circumvention of the requirements and undermine the goal of preventing the sexual exploitation of children.

In regard to Ms. Nitke and Ms. Alper, who wish to publish compilations that include images produced before 1995, the regulations make clear that the requirements that apply to each image are those that were in effect when each image was created, and that the requirements do not apply at all to images created before 1995. See 28 C.F.R. § 75.2(a) (referring to producers of books containing "visual depictions . . . made after July 3, 1995" or "visual depictions . . . made after March 18, 2009," and applying the recordkeeping requirements in effect during the applicable period to "each performer protrayed in such visual depiction."); see also 70 Fed. Reg. at 29609 (DOJ regulations impose no obligations prior to 1995). Thus, these plaintiffs' concern that they would need to create new records for pre-1995 depictions is unfounded.

In regard to Ms. Dodson, who alleges that the recordkeeping requirements interfere with her ability to post images of genitalia online, Pl. Mem. at 30; Comp. ¶ 50, to the extent these images qualify as "lascivious display[s]," they would constitute child pornography if they depicted children, and plaintiffs have provided no persuasive reason that such images should be excluded from the universal age verification and recordkeeping requirements. To the extent Ms. Dodson, and other plaintiffs, seek to rely on the notion that the term "lascivious" is vague or overbroad, see Comp. ¶ 53, that argument has been rejected by the Supreme Court. United States v. X-Citement Video, Inc., 513 U.S. 64, 78-79 (1994); United States v. Frabizio, 459 F.3d 80, 85 (1st Cir. 2006) ("The courts are . . . in agreement that the term 'lascivious' is sufficiently well defined to provide persons of reasonable intelligence, guided by common understanding and practices, notice of what is permissible and what is impermissible." (internal quotation omitted));

accord United States v. Adams, 343 F.3d 1024, 1035-36 (9th Cir. 2003); United States v. Freeman, 808 F.2d 1290, 1292 (8th Cir.1987).

In short, none of plaintiffs' assertions suffice to show that the requirements are not narrowly tailored, and none are sufficient to state an as-applied claim.

### C.    The Requirements Leave Adequate Alternative Channels for Communication

While plaintiffs' motion for a preliminary injunction does not address the availability of alternative channels for communication, it is clear that such channels are available.  Most significant is the fact that the recordkeeping requirements do not prohibit any visual depictions of the sexually explicit conduct of adults; rather, they simply require that these performers' ages be verified in advance, and that copies of the verification documents be maintained.  The allegations set forth in plaintiffs' Complaint do not provide any ground for concluding that any significant amount of expression is actually precluded by operation of these requirements.  See Connection III, 557 F.3d at 332 (concluding the requirements left ample alternative channels for communication).  As the Sixth Circuit recognized, even channels for anonymous communication remain open because the requirements do not involve making performers' identities public.  Id.

### D.    The Requirements Are Not Unconstitutionally Overbroad

Plaintiffs also cannot prevail in their overbreadth challenge to the requirements.  Under the First Amendment's overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech."  Williams, 128 S. Ct. at 1838; ACLU v. Mukasey, 534 F.3d 181, 205 (3d Cir. 2008), cert. denied 129 S. Ct. 1032 (2009).  This doctrine allows a court to alleviate burdens on protected speech, but only where the harm that is caused by invalidating a law that Congress enacted to address real evils can be justified.  See Williams, 128 S. Ct. at

- 31 -

1838. Thus, "[i]n order to maintain an appropriate balance, [courts] have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." Id. (observing that invalidating a statute on overbreadth grounds is "strong medicine" that should not be "casually employed"). Following this principle, where a statute's "legitimate reach dwarfs its arguably impermissible applications," Ferber, 458 U.S. at 773, "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." Broadrick v. Oklahoma, 413 U.S. 601, 615-16 (1973). Significantly, the plaintiff bears the burden to establish, not only that there may be isolated instances where a law is unconstitutional as applied, but that there is *substantial* overbreadth. Connection III, 557 F.3d at 340 (citing Virginia v. Hicks, 539 U.S. 113, 122 (2003)).

The Third Circuit's overbreadth analysis in ACLU v. Mukasey, focusing on specific statutory terms, serves to highlight the inapplicability of the overbreadth doctrine here. The court there held that the Child Online Protection Act ("COPA"), a statute that prohibited the posting of material "harmful to minors" on the internet for commercial purposes, was overbroad because its definitions of certain terms, including "harmful to minors," extended the statute's applicability to too broad a spectrum of protected speech. 534 F.3d at 206. Here, the spectrum of speech that is affected by the age verification and recordkeeping requirements, as set forth in the statutory definitions, is precisely the same spectrum of speech that would constitute child pornography, which is not protected speech, if the performers in the visual depictions in question were in fact children. Compare 18 U.S.C. § 2256(2)(A), with 18 U.S.C. §§ 2257(h)(1) (cross-referencing § 2256(2)(A)), 2257A(a)(1). The requirements therefore cannot be said to have an

- 32 -

overbroad sweep because, in fact, there is a perfect fit between the requirements' sweep and the

goal of ensuring that performers in visual depictions of sexually explicit conduct are not

children.

The Sixth Circuit, again, has considered and rejected an overbreadth challenge to these

requirements, concluding that "the overwhelming majority of applications of § 2257 do not

offend" the First Amendment.  Connection III, 557 F.3d at 335-42; accord Connection I, 154

F.3d at 292.  Indeed, there are only two settings in which the court in Connection III questioned

the constitutionality of the recordkeeping requirements as applied: First, the court addressed the

requirements' applicability to a magazine that confined its publication to depictions of "self-

evidently mature models" and "also did not permit the depiction of isolated body parts."

Connection III, 557 F.3d at 336.  The court noted that the plaintiff "ha[d] not pointed [the court]

to any such magazine or book and ha[d] not introduced any evidence showing that this third-

party situation even exists," but that even assuming such a magazine existed, it would not justify

holding the requirements facially invalid as substantially overbroad.  Id.  Second, the court

addressed the possibility that the requirements might apply to private, noncommercial

communications between couples, recognizing that the government does not interpret the

requirements to apply in that setting at all.  Id. at 339-40.  Again, the court did not consider it

appropriate to hold the requirements facially invalid based on a potential application that may

never occur.  Id. at 342.

Plaintiffs urge the court to follow the opinions of the dissenting judges in Connection

III's 11-6 en banc decision.  Pl. Mem. at 32.  However, the dissenters were primarily concerned

with the potential that the requirements might apply to private individuals or couples making

videos of themselves in the privacy of their own home.  See Connection III, 557 F.3d at 347

(Kennedy, J., dissenting) (expressing concern about the requirements' applicability to "protected

speech between friends, lovers, and a husband and wife"); id. at 361 (Moore, J., dissenting)

(similar); id. at 370 (White, J., dissenting) (noting concern with the requirements' applicability to

private couples as well as any adults wishing to share sexually explicit depictions of themselves

with others).  These concerns are unwarranted.  The Department of Justice  – the agency

responsible for administering and enforcing the requirements – has clearly stated that the

requirements are "limited to pornography intended for sale or trade," explaining that § 2257

"speaks in terms of participants in the professional pornography industry."  73 Fed. Reg. at

77456.  The DOJ's interpretation is the only interpretation consistent with the statutory

requirement that records be maintained at a producer's "business premises, or at such other place

as the Attorney General may by regulation prescribe."  18 U.S.C. § 2257(c).  Thus, while the

Sixth Circuit majority left the interpretational issue undecided, Connection III, 557 F.3d at 338,

it properly concluded, in light of "the government's track record . . . of never applying the law in

this setting over twenty years and of disclaiming any authority and intention of doing so," that

the requirements survive an overbreadth challenge.  Id. at 341.

> ### E.    The Requirements Do Not Unconstitutionally Infringe on Anonymous Speech

Plaintiffs invoke the Supreme Court's decisions in McIntyre v. Ohio Elections Comm'n,

514 U.S. 334 (1995), and Watchtower Bible v. Vill. of Stratton, 536 U.S. 150 (2002), as

applicable here because, they argue, the recordkeeping requirements chill the anonymous speech

of those who create visual depictions of sexually explicit conduct.  However, these cases do not

establish an absolute right to speak anonymously, nor do they require overturning the age

verification and recordkeeping requirements at issue here.  In <u>McIntyre</u>, the Court applied strict scrutiny and struck down a state law prohibiting distribution of anonymous campaign literature, recognizing that "core political speech" was at issue, and that the state's interest in preventing fraud and libel did not justify the restriction.  <u>McIntyre</u>, 514 U.S. at 347.  In <u>Watchtower</u>, the Court struck down an advance-permitting requirement for door-to-door canvassers, again conducting a balancing analysis "between [the government's] interests and the effect of the regulations on First Amendment rights."  <u>Watchtower</u>, 536 U.S. at 151.

Here, the impact of the age verification and recordkeeping requirements on anonymous speech is minor, compared to <u>McIntyre</u> and <u>Watchtower</u>, while the government's interest is indisputably compelling.  For one thing, "[n]othing in the statute[s] . . make[] the required records available to the public."  <u>Connection III</u>, 557 F.3d at 330.  Rather, performers need only disclose their ages and identities to those who create the visual depictions in question.  <u>See id.</u> Moreover, primary producers may redact identifying information about performers, other than their names and ages, before providing copies of their records to secondary producers.  28 C.F.R. § 75.2(b).  There is no reason that the government's access to this information through the inspection process should chill the expression of performers since the recordkeeping requirements do not impose any penalties on performers, and there is no reason to assume "the improper use of these records by government agents."  <u>Connection III</u>, 557 F.3d at 330. Ultimately, however, even if there were some minimal chill on those who wish to create and distribute depictions of the sexually explicit conduct of anonymous performers, that chill is justified, on balance, by the interests that the requirements serve, in preventing the sexual exploitation of children.  Thus, the interest in anonymous speech does not warrant overturning

the requirements under the intermediate scrutiny analysis that applies here.  See Connection III,

557 F.3d at 330, 333; FSC I, 406 F. Supp. 2d at 1210-11 (both courts rejecting similar

arguments).[15]

> **F.    The Requirements Are Not An Unconstitutional Prior Restraint**

Plaintiffs' contention that the age verification and recordkeeping requirements constitute

an impermissible prior restraint is meritless.  The prior restraint doctrine is a limited one and

arises from the notion that "a scheme conditioning expression on a licensing body's prior

approval of content 'presents peculiar dangers to constitutionally protected speech.'"  Thomas v.

Chicago Park Dist., 534 U.S. 316, 321 (2002) (quoting Freedman v. Maryland, 380 U.S. 51, 57

(1965)).  In Thomas, the Supreme Court rejected the notion that the prior restraint doctrine was

applicable to a permitting requirement that did not "authorize a licensor to pass judgment on the

content of speech," recognizing that, instead, the requirement was a content-neutral time, place,

or manner restriction.  Id. at 322.  The age verification and recordkeeping requirements at issue

here are similarly content neutral, as discussed, and do not authorize any government official to

proscribe protected speech entirely based on disagreement with its content.  They do not

constitute a prior restraint.  See Connection I, 154 F.3d at 294-95; Free Speech Coal. v. Gonzales

("FSC II"), 483 F. Supp. 2d 1069, 1076 (D. Colo. 2007); FSC I, 406 F. Supp. 2d at 1205 (all

---

[15]The other cases cited by plaintiffs also do not support overturning the recordkeeping requirements; the courts in those cases overturned certain requirements based on the regular First Amendment analysis, whether under strict or intermediate scrutiny, that applied.  See Ashcroft v. ACLU, 542 U.S. 656, 665-70 (2004) (applying strict scrutiny); Denver Area Educ. Tele. Consortium v. FCC, 518 U.S. 727, 754-60 (1996); ACLU v. Ashcroft, 322 F.3d 240, 259 (3d Cir. 2003) (applying strict scrutiny).  As previously explained, the requirements here survive intermediate scrutiny, and the minimal interests of anonymous speakers here, described above, does not warrant any change in the analysis.

rejecting similar prior restraint arguments).  Plaintiffs' argument on this point should be rejected.

### G.    The Requirements Do Not Violate the First Amendment on the Basis that They Impose Strict Liability

Plaintiffs assert yet another variation of their First Amendment challenge by citing Smith v. California, 361 U.S. 147 (1959), and Lambert v. California, 355 U.S. 225 (1957).  Pl. Mem. at 42-44.  In Smith, the Supreme Court overturned a state law that prohibited booksellers from having any books with obscene contents in their shop, regardless of whether they were aware that their shop contained such books.  Smith, 361 U.S. at 152.  In Lambert, there was no First Amendment issue under consideration, but the Court held that imposing criminal penalties for failure to comply with a felon registration law, where the defendant was unaware of the registration requirement, violated the defendant's due process rights.  Lambert, 355 U.S. at 229.  Neither of these cases have any application to the circumstances here.  The production of visual depictions of sexually explicit conduct for sale or trade is neither an "act of omission," nor a "passive" act that implicates a serious concern that someone could inadvertently become subject to the age verification and recordkeeping requirements.[16]  It can be assumed that anyone in the business of making visual depictions of sexually explicit conduct is likely to be aware of these requirements, and plaintiffs – who have filed suit to enjoin the requirements even though the requirements have never been enforced against them – provide no reason to think otherwise.  No "strict liability" concern justifies holding these requirements facially invalid.  Indeed, plaintiffs

---

[16]Again, to the extent plaintiffs seek to rely on the idea that couples making photographs or videos in their own bedrooms might risk criminal sanction for failure to comply with these requirements, see Pl. Mem. at 44 (referring to "wholly innocent conduct such as a suggestive photo taken by a spouse in the privacy of the bedroom"), that risk simply does not exist, as explained above.

lack standing to raise this argument because they have not been charged with violating the recordkeeping requirements and have not asserted lack of knowledge as a defense to such a charge. Cf. Smith, 361 U.S. at 148-50 (defendant had been convicted under the provision in question and claimed he had no knowledge of the contents of the book held to be obscene, and California courts had held that the provision had no scienter element); Lambert, 355 U.S. at 227 (defendant had been charged for violation of felon registration law and had raised lack of knowledge of the law as a defense, and California courts had denied the defense).

## II.     THE REQUIREMENTS DO NOT VIOLATE THE FIFTH AMENDMENT'S EQUAL PROTECTION GUARANTEE

In addition to their full battalion of First Amendment arguments, addressed above, plaintiffs mount an equal protection attack on the age verification and recordkeeping requirements, alleging that in the newer provision, 18 U.S.C. § 2257A, Congress established a content-based distinction in how the government treats visual depictions of sexually explicit conduct, depending on whether these depictions involve "actual" conduct (except for lascivious display of genitals), on the one hand, or "simulated" conduct or "actual" lascivious display of genitals, on the other hand. Essentially, plaintiffs' equal protection argument simply repeats their contention that the certification option in § 2257A transforms the age verification and recordkeeping requirements of § 2257 into a content-based restriction on speech. However, as explained above, these requirements are content neutral because Congress did not intend the requirements to favor any one category of protected speech over others, but instead intended them to combat an entirely unprotected category of speech – child pornography, with its accompanying harms. Congress' extension of the requirements to depictions of simulated conduct and lascivious displays of genitals, while allowing producers of such depictions to

continue to verify ages and keep records in a different format, where they are already required to do so, cannot possibly transform the nature of § 2257 from a content neutral regulation into one that is content-based.

Generally, "[i]f a law passes muster under the First Amendment it is also likely to be upheld under the Equal Protection clause." Hill v. City of Scranton, 411 F.3d 118, 126 (3d Cir. 2005). Moreover, where a law is subject to intermediate scrutiny under the First Amendment as a content-neutral regulation, it is subject to rational basis scrutiny under the equal protection guarantee. See McGuire v. Reilly, 260 F.3d 36, 49-50 (1st Cir. 2001) ("[W]here the state shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that regulation necessarily passes the rational basis test employed under the Equal Protection Clause."); DLS, Inc. v. City of Chattanooga, 107 F.3d 403, 412 n.7 (6th Cir. 1997) ("[I]f a sufficient rationale exists for the ordinance under the First Amendment, then the City has demonstrated a rational basis for the alleged disparate treatment under the Equal Protection Clause."); Gasparo v. City of New York, 16 F. Supp. 2d 198, 222 (E.D.N.Y. 1998) ("[I]n most circumstances, a content-neutral ordinance that can withstand scrutiny under the First Amendment is not vulnerable to an Equal Protection challenge.").

Under rational basis scrutiny, any distinction a federal law creates between classes of people "does not violate the Fifth Amendment so long as it is rationally related to a legitimate government purpose." Dungan v. Slater, 252 F.3d 670, 674 (3d Cir. 2001); see also FCC. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993) (recognizing "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices" and that, under rational basis scrutiny, "a statutory classification . . . must be upheld against equal protection challenge if

there is any reasonably conceivable state of facts that could provide a rational basis for the classification"). Here, that standard is easily met. Congress added § 2257A in recognition of the fact that chapter 110 of Title 18, which contains §§ 2257 and 2257A as well as other laws designed to prevent exploitation of children, generally prohibits visual depictions of sexually explicit conduct involving minors whether the conduct is actual or simulated. See 18 U.S.C. § 2256(2)(A); DOJ, Proposed Rule, 73 Fed. Reg. 32262, 32263 (Jun. 6, 2008).[17] This prohibition recognizes that visual depictions of simulated sexually explicit conduct involving children qualify as child pornography, and their production is harmful to children; it also recognizes that producers may edit visual depictions of performances involving actual sexually explicit conduct so as to omit the actual sex, while retaining imagery of simulated sex, in order to market them more widely as "soft porn." 73 Fed. Reg. at 32264.

The certification option that Congress included in § 2257A can be used by some producers of depictions of simulated sexually explicit conduct, and of actual lascivious displays of genitals, when they are already required to verify performers' ages and keep records of their identification in the ordinary course of business, although not in the format required by §§ 2257 and 2257A. See 18 U.S.C. § 2257A(h)(1); 73 Fed. Reg. at 32265. The certification option thus does not relieve any producers of age verification or recordkeeping obligations; it merely allows certain producers to continue to comply with those obligations in an alternative way, which they had already been following. It was a perfectly reasonable assumption, on Congress' part, that depictions of simulated sexually explicit conduct and of actual lascivious displays would more

---

[17]As indicated in the DOJ's Proposed Rule, many states' child-exploitation statutes similarly cover both actual and simulated sexual conduct. 73 Fed. Reg. at 32263-64.

likely be subject to other age verification and recordkeeping requirements under FCC

regulations, or other federal or state laws or labor agreements, because depictions of such

conduct are more likely to appear in "mainstream" media productions and productions that

appear on broadcast television, due to ratings and other content regulation that already applies in

those contexts.  Plaintiffs' Complaint does not identify any age verification or recordkeeping

requirements, other than those imposed by § 2257, that might cover any of their own productions

that are not currently eligible for the certification option.  It is therefore entirely unclear whether

any such depictions could qualify for a similar certification option even if it were available.  At

the same time, plaintiffs are in the same position as any producer to the extent they produce

depictions that are eligible for the certification option.  Thus, the certification option as it exists

is rational and does not violate equal protection.

## III.    THE REQUIREMENTS DO NOT VIOLATE THE FOURTH AMENDMENT

In order to ensure that producers of depictions of sexually explicit conduct are in

compliance with the age verification and recordkeeping requirements set forth in §§ 2257 and

2257A, the statutes require that these producers maintain the required records "at [their] business

premises, or at such other place as the Attorney General may by regulation prescribe," and that

the producers "make such records available to the Attorney General for inspection at all

reasonable times."  18 U.S.C. § 2257(c).  While plaintiffs challenge this provision and its

implementing regulations as allowing warrantless intrusions into the home, and as otherwise

allowing for unconstitutional searches and seizures, the contemplated inspection scheme is

reasonable and does not violate the Fourth Amendment.

As an initial matter, the Court should exercise caution in reviewing the inspection scheme

at issue here because plaintiffs do not claim to have been subject to any inspections; rather, they mount a purely abstract facial challenge to the scheme set forth by statute and regulation. "Concerns about the premature resolution of legal disputes have particular resonance in the context of Fourth Amendment disputes" because the reasonableness of a search under the Fourth Amendment depends upon the "totality of the circumstances."  Warshak v. United States, 532 F.3d 521, 528 (6th Cir. 2008) (en banc); see also Sibron v. New York, 392 U.S. 40, 59 (1968) ("The constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case.").  Even where courts have reviewed the facial validity of administrative inspection schemes, such as in New York v. Burger, 482 U.S. 691 (1987), they have done so after a search has taken place, or has at least been attempted.  See id. at 696 (addressing the Fourth Amendment issue in the context of a district court's denial of a criminal defendant's motion to suppress); Donovan v. Dewey, 452 U.S. 594, 597 (1981) (addressing Fourth Amendment issue after federal mine inspector sought to inspect defendant's mine but was refused access, and government sought court order to compel defendant to admit inspector); Marshall v. Barlow's, Inc., 436 U.S. 307, 310 (1978) (addressing Fourth Amendment issue after employer had refused to allow requested access by OSHA inspector and inspector had obtained a court order compelling employer's compliance); Camara v. Municipal Court, 387 U.S. 523, 525 (1967) (addressing Fourth Amendment issue raised by individual who was charged with violating city housing code by refusing to allow administrative inspection).

Here, there is no allegation that the government has initiated any inspection of records on plaintiffs' premises.  This fact is particularly significant because, in light of the applicable DOJ

regulations, it is not clear whether any inspection of premises (as opposed to records) would ever occur. This is because the regulations do not require a producer of visual depictions of sexually explicit conduct to keep the required records on the producer's own premises at all. See 28 C.F.R. § 75.4. Rather, producers may make their records available "at the place of business of a non-employee custodian of records." Id. This option was implemented by the DOJ specifically in order to respond to concerns such as those raised by plaintiffs here. 73 Fed. Reg. at 77445 (reporting comments expressing concern that "small businesses in this field work out of their homes, and cannot staff their operation for 20 hours per week while performing outside employment," and that "inspections [would] occur[] in their homes"). In response to these comments, DOJ explained:

> Upon reconsideration, the Department adopts this comment in part. The Department now believes that it can still accomplish the purposes of the statute . . . even allowing for third-party custodianship of the records. . . . By allowing third-party custodians to maintain the records, the burden on small businesses is reduced, including any fears arising from posting home addresses, where many of these small businesses are reported to operate, and any concerns of record-keeping inspections of those same premises.

Id.; see also id. at 77457 (explaining measures taken in the regulations to reduce the burden on small businesses).[18]

As a result of the DOJ's decision, in its Final Rule, to allow third-party custodians of the required records, it is entirely possible, should a producer wish to do so, to avoid giving inspectors access to business premises altogether. Instead, producers may keep their records off-

---

[18]The DOJ implemented the 20-hours-per-week requirement in 2005, in response to comments that small businesses may not maintain traditional business hours. See 70 Fed. Reg. at 29613 (noting that the requirement that records be accessible to inspectors 20 hours per week was "in order to permit reasonable access for inspectors" while accommodating small business concerns).

site, at the premises of a third-party custodian, so that only the records themselves are subject to inspection. The availability of the third-party custodian option also means that, contrary to plaintiffs' assertions, no producers who operate businesses out of their homes are required to allow inspectors to enter their homes. Because producers cannot plausibly claim to retain an expectation of privacy in the records themselves, as they are created and maintained for the very purpose of allowing inspection, the inspection scheme here does not implicate the Fourth Amendment at all where third-party custodians are used. Roberts v. Mentzer, No. 08-4507, 2009 WL 1911687, at *3 (E.D. Pa. July 2, 2009) ("A plaintiff's Fourth Amendment rights are implicated only if the conduct of the defendant infringed upon a reasonable expectation of privacy." (citing O'Connor v. Ortega, 480 U.S. 709, 715 (1987))). Moreover, the fact that any producer has the option to use a third-party custodian undermines any claim that the inspection scheme is facially invalid, even assuming that an inspection at an individual's home business premises might implicate the Fourth Amendment on an as-applied level. Given the purely speculative, and inaccurate, nature of plaintiffs' assertions, the Court should simply deem plaintiffs' Fourth Amendment challenge unripe. Thompson v. Horsham Tp., 576 F. Supp. 2d 681, 691 (E.D. Pa. 2008) ("The ripeness doctrine serves to determine whether a party has brought an action prematurely. If a dispute is not yet ripe, a court should abstain from ruling until the dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.").[19]

---

[19]The Court may take judicial notice of the fact that plaintiff Free Speech Coalition has publicly recognized that the option to use a third-party custodian significantly reduces any burden that the inspection scheme might otherwise impose on producers of visual depictions of sexually-explicit conduct. See http://www.freespeechcoalition.com/2257-update.html .

If the Court does address plaintiffs' Fourth Amendment challenge, it is in any case limited to the facial validity of the regulatory inspection scheme, as authorized by 18 U.S.C. § 2257(c) and as set forth in 28 C.F.R. § 75.5.  Under this provision, inspections may only take place "during normal business hours," or during the 20 hours per week that a producer indicates the records will be available for inspection.  28 U.S.C. § 75.5(c)(1).[20]  An investigator seeking to perform an inspection must inform the custodian of the records of "the limited nature of the records inspection," and must "[i]ndicate the scope of the specific inspection and the records that he or she wishes to inspect."  Id. § 75.5(c)(2)(ii)-(iii).  Inspections may only occur once within a four-month period, unless there is "a reasonable suspicion to believe that a violation [of the recordkeeping requirements] has occurred."  Id. § 75.5(c)(d).

Plaintiffs' challenge rests on the notion that the inspection scheme here authorizes the search of *business premises*, which the Supreme Court has held to be subject to Fourth Amendment protection.  See Burger, 482 U.S. at 699.  In fact, however, § 2257(c) requires that producers "make [the] *records* [that they are required to create and maintain pursuant to the statute] available . . . for inspection at all reasonable times."  18 U.S.C. § 2257(c) (emphasis added).  The DOJ's implementing regulation authorizes an investigator to enter the location where records are kept but does not suggest that anything beyond the records themselves are subject to inspection.  28 C.F.R. § 75.5(a), (c).  As noted above, because these records are not even regular "business records," but are records specifically required to be kept to comply with

---

[20]The Fourth Amendment is not implicated by the possibility that the premises may not be open at the time an inspector seeks to conduct an inspection.  As the DOJ has observed, "[t]he inspection process clearly does not contemplate warrantless forced entry solely because no one is present when the investigator arrives."  70 Fed. Reg. at 29614.

§§ 2257 and 2257A, producers cannot be deemed to have a reasonable expectation of privacy in these records. Again, unless there is an invasion of a reasonable expectation of privacy, no Fourth Amendment "search" has occurred.[21]

It is therefore not necessary to hold that the production of visual depictions of sexually explicit conduct qualifies as a closely-regulated industry in order to uphold the inspection scheme under the Fourth Amendment, though given the government's long-standing involvement in ensuring children are not used in such depictions, the industry could qualify as closely-regulated.[22] In any case, to whatever extent the Burger factors provide relevant guidance, the inspection scheme at issue satisfies their requirements. Under Burger, warrantless searches under an administrative search scheme must be justified by a "substantial government interest," must be "necessary to further the regulatory scheme," and must "advise the owner of

---

[21]To the extent plaintiffs complain that the inspection scheme allows inspectors to "seize any evidence of the commission of any felony while conducting an inspection," 28 C.F.R. § 75.5(g), such a claim is also unripe since no such seizure has occurred. In any case, this provision merely recognizes that inspectors who have lawfully entered business premises for the purpose of conducting a records inspection may seize evidence of a crime "under the plain-view exception to the Fourth Amendment warrant requirement." 70 Fed. Reg. at 29609.

[22]To the extent a "search" of any kind is involved, plaintiffs are incorrect in asserting that it would not qualify as an "administrative" or "regulatory" search. See Pl. Mem. at 53. The inspections are designed solely to determine compliance with the age verification and recordkeeping requirements as well as other requirements of the Act. 28 C.F.R. § 75.5(a). As discussed above, the purpose of the age verification and recordkeeping requirements is not – contrary to plaintiffs' assertion – primarily to assist law enforcement efforts to prosecute child pornography possession or trade; rather, the requirements are primarily intended to ensure that producers of sexually explicit images do not use underage performers to begin with. Cf. Burger, 482 U.S. at 713 ("an administrative scheme may have the same ultimate purpose as penal laws, even if its regulatory goals are narrower"). The fact that violation of the recordkeeping and inspection provisions may result in a criminal penalty does not distinguish the scheme in any way from the typical administrative search scheme. In Burger, for example, refusal to allow the inspection there at issue constituted a class A misdemeanor. Id. at 694 n.1.

- 46 -

the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." Burger, 482 U.S. at 702-03 (internal quotation and alteration marks omitted). Here, first of all, the government's interest in preventing the use of children in visual depictions of sexually explicit conduct is undeniably substantial, as discussed above. Second, in order for the recordkeeping requirements to be effective in preventing the sexual exploitation of children, the government must be able to inspect the required records without providing advance notice. See 70 Fed. Reg. at 29614 ("Advanced notice would provide the opportunity to falsify records in order to pass inspection."). Third, § 75.5(c)(2) does require investigators to identify themselves and their purpose to records custodians and to explain in advance the scope of their inspection, including identifying the records that the investigator wants to inspect. This scheme passes muster under Burger, particularly given the fact that the inspections are limited to the specific records maintained for the purpose of complying with §§ 2257 and 2257A.

In arguing to the contrary, plaintiffs mischaracterize the situation in Showers v. Spangler, 182 F.3d 165, 172-73 (3d Cir. 1999).[23] Like the inspection provision at issue here, the requirements at issue in Showers were "tied to the duty to keep and ability to inspect a permittee's *records*." Id. at 173. The Third Circuit concluded that the search that had occurred in that case, which extended well beyond the plaintiff's records, suggested that the officer had

_____

[23]Plaintiffs focus their discussion on the district court's decision, Pl. Mem. at 54 (discussing Showers v. Spangler, 957 F. Supp. 584 (M.D. Pa. 1997)). However, the relevant portion of the district court's decision addressed the lack of clarity in a regulation's authorization of premises inspections, having already concluded that premises inspections were in any case not authorized under the governing statute. Showers, 957 F. Supp. at 591-92. Because the regulations at issue here do not authorize inspections of anything other than records, plaintiffs' attempted analogy fails.

used the inspection scheme merely as a pretext to gain access to premises for other purposes, and

that the officer was not protected by qualified immunity under such circumstances.  <u>Id.</u> at 172-

73.  The court's holding did not suggest that the inspection scheme itself violated the Fourth

Amendment.  Because plaintiffs here do not challenge an inspection that has already occurred,

<u>Showers</u> has no bearing on this case and again strongly suggests that plaintiffs' Fourth

Amendment claim is unripe.

## IV.    THE ALLEGATIONS THAT PLAINTIFFS DO NOT ADDRESS IN THEIR MOTION BUT THAT ARE RAISED IN THEIR COMPLAINT SHOULD ALSO BE DISMISSED

Plaintiffs' Complaint asserts a small number of additional claims that are not discussed in

plaintiffs' motion for a preliminary injunction.  However, none of these save plaintiffs' action

from dismissal for failure to state a claim.  First, plaintiffs appear to challenge the definition of

"sexually explicit conduct" in 18 U.S.C. § 2256(2)(A) as unconstitutionally vague.  <u>See</u> Comp. ¶

60(J).  However, the Supreme Court has previously rejected a vagueness challenge to this

provision as "insubstantial," upholding the Ninth Circuit's ruling on this issue.  <u>X-Citement</u>

<u>Video, Inc.</u>, 513 U.S. at 78 (upholding, in relevant part, 982 F.2d 1285, 1288-89 (9th Cir. 1992)).

Second, plaintiffs also appear to assert vagueness challenges to various subsections in the DOJ

regulations, including 28 C.F.R. §§ 75.1(c)(1) (defining "primary producer"); 75.2(a)(4)

(requiring records of the date of original production of the depiction), and 75.6(a) (requiring

statement describing records' location to be affixed to depiction).  Comp. ¶ 68.  It is entirely

unclear from the allegations set forth in plaintiffs' Complaint on what basis these provisions

might be deemed unconstitutionally vague, and plaintiffs thus fail to meet the pleading standard

set forth in <u>Iqbal</u>, 129 S. Ct. at 1949.  Third, plaintiffs assert that the recordkeeping requirements

violate the Fifth Amendment right against self-incrimination.  Comp. ¶¶ 75-78 (Count Five).

The Sixth Circuit rejected the same argument on the basis that the claims of the individual

plaintiffs in that case were not ripe.  Connection III, 557 F.3d at 342-43.  The same is true here,

as none of the plaintiffs assert that they have invoked the Fifth Amendment privilege "in

response to a government demand for disclosure."  Id. at 343 (citing Cal. Bankers Ass'n v.

Shultz, 416 U.S. 21, 72-74 (1974)).  Thus, these claims, like plaintiffs' First, Fourth, and Fifth

Amendment claims addressed above, should be dismissed.

## V.    PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

As is clear from the discussion above, the aspects of the age verification and

recordkeeping requirements that plaintiffs challenge through this action have been in effect, in

substantially the same form, for decades.  A preliminary injunction, as a form of emergency

relief, is therefore clearly unwarranted.  Indeed, courts in the past have already considered and

rejected the appropriateness of preliminary injunctive relief for these very requirements.  See

Connection I, 154 F.3d at 284 (affirming district court's denial of preliminary injunction); FSC I,

406 F. Supp. 2d at 1211 (holding that plaintiffs failed to meet the standard for preliminary

injunction with respect to the claims at issue here, while granting a preliminary injunction with

respect to other claims that are no longer at issue due to statutory amendment).

In invoking the preliminary injunction mechanism here, plaintiffs primarily rely on the

Supreme Court's oft-quoted statement that "[t]he loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury."  Pl. Mem. at 56 (quoting

Elrod v. Burns, 427 U.S. 347, 353 (1976)).  However, the Third Circuit has recognized that "the

assertion of First Amendment rights does not automatically require a finding of irreparable

injury." Hohe v. Casey, 868 F.2d 69, 72-73 (3d Cir. 1989); see also Anderson v. Davila, 125

F.3d 148, 164 (3d Cir. 1997) ("Nothing in [Elrod] suggests that the Court meant to do away with

the traditional prerequisites for injunctive relief simply because First Amendment freedoms were

implicated."). Rather, "it is the direct penalization, as opposed to incidental inhibition, of First

Amendment rights which constitutes irreparable injury." Hohe, 868 F.2d at 73 (internal

quotation and alteration marks omitted); cf. Siegel v. LePore, 234 F.3d 1163, 1177-78 (11th Cir.

2000) (rejecting the notion that "a violation of constitutional rights always constitutes irreparable

harm"). Moreover, in order to invoke the connection between an alleged First Amendment

violation and irreparable injury, a plaintiff must show a likelihood of success on the First

Amendment claim. Hohe, 868 F.2d at 73. Here, the age verification and recordkeeping

requirements do not directly penalize any form of protected speech. At most, plaintiffs allege the

"incidental inhibition" of speech. Moreover, plaintiffs have not shown a likelihood of success,

for the reasons described above – and indeed, as discussed above, their claims are subject to

dismissal. Thus, plaintiffs' assertion of irreparable injury falls flat.

In regard to the remaining preliminary injunction factors, the public interest favors

allowing the age verification and recordkeeping requirements to remain in effect so that

producers are forced to verify that all performers used in visual depictions of sexually explicit

conduct are adults. Indeed, both the public and the government's compelling interests in

preventing the exploitation of children will be harmed if an injunction is granted, and these

interests outweigh any possible interest of plaintiffs in enjoining the requirements while the

merits of their claims are resolved. Plaintiffs argue that the government would remain free to

enforce criminal laws prohibiting child pornography during the pendency of a preliminary

injunction.  Pl. Mem. at 56.  But this is a false choice.  The various tools available to the government for protecting children from exploitation as pornography performers each have their own purpose and attack the problem from different perspectives.  Indeed, criminal prosecution of child pornography after it occurs is no substitute for requiring producers to ensure that their performers are adults to begin with.   The government should be free to use *all* tools to combat what all responsible citizens agree is an unmitigated evil.  The "extraordinary remedy" of a preliminary injunction is therefore unwarranted.

## <u>CONCLUSION</u>

For the foregoing reasons, this action should be dismissed in its entirety, and plaintiffs' motion for a preliminary injunction should be denied.


December 14, 2009                                    Respectfully submitted,

                                                    TONY WEST
                                                    Assistant Attorney General
                                                    MICHAEL L. LEVY
                                                    United States Attorney
                                                    VINCENT M. GARVEY
                                                    Deputy Branch Director

                                                    /s/ Kathryn L. Wyer
                                                    KATHRYN L. WYER
                                                    U.S. Department of Justice, Civil Division
                                                    20 Massachusetts Avenue, N.W.
                                                    Washington, DC 20530
                                                    Tel. (202) 616-8475 / Fax (202) 616-8470
                                                    kathryn.wyer@usdoj.gov
                                                    *Attorneys for Defendant*

- 51 -

<u>**CERTIFICATE OF SERVICE**</u>

Pursuant to Local Rule 5.1.2(8)(b), I hereby certify that the foregoing document has been filed electronically and is available for viewing and downloading from the ECF system. I further certify that the foregoing document was served via ECF on counsel of record for plaintiffs in the above-captioned case.


Dated: December 14, 2009                    /s/ _____

                                            Kathryn L. Wyer