# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREE SPEECH COALITION, INC., et al.** | ) | **Civil Action No. 2:09-4607** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **JUDGE MICHAEL M. BAYLSON** |
| -vs- | ) | |
| | ) | |
| **THE HONORABLE ERIC H. HOLDER, JR.,** | ) | |
| Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND REPLY TO DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio 44113-1949
(216) 781-5245
(216) 781-8207 (Facsimile)

KEVIN E. RAPHAEL (72673)
KER@Pietragallo.com
J. PETER SHINDEL, JR. (201554)
JPS@Pietragallo.com
PIETRAGALLO GORDON ALFANO BOSICK
    & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200
(215) 981-0082 (Facsimile)

Attorneys for Plaintiffs

## TABLE OF CONTENTS

Page

STATEMENT OF THE CASE AND OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED . . . . . . . . . . . . . . . . . 1

II.     TITLE 18 U.S.C. § 2257 AND 18 U.S.C. § 2257A ARE UNCONSTITUTIONAL
        REGULATIONS OF SPEECH ON THEIR FACE AND AS APPLIED UNDER
        INTERMEDIATE SCRUTINY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.      Title 18 U.S.C. § 2257 and 18 U.S.C. § 2257A Do Not Advance the Government's
        Interest in Combating Child Pornography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.      The Government Must Adduce Evidence Demonstrating the
                Existence and Scope of the Problem It Claims the Statutes Were
                Designed to Address . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.      The Government Must Establish That a Regulation of Speech Is a
                Necessary Means to Address the Problem It Has Identified . . . . . . . . . . . . . . . 7

B.      The Statutes Are Not Narrowly Tailored to Advance the Government's Interest in
        Combating Child Pornography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

C.      Title 18 U.S.C. § 2257 and 18 U.S.C. § 2257A Are Overinclusive and Burden More
        Speech Than Is Necessary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.    TITLE 18 U.S.C. § 2257 AND 18 U.S.C. § 2257A ARE UNCONSTITUTIONALLY
        OVERBROAD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.     THE RECORD KEEPING STATUTES ARE CONTENT-BASED REGULATIONS
        OF SPEECH AND ARE UNCONSTITUTIONAL UNDER STRICT SCRUTINY . . . 27

V.      THE STATUTES UNCONSTITUTIONALLY SUPPRESS ANONYMOUS
        SPEECH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VI.     TITLE 18 U.S.C. § 2257 AND 18 U.S.C. § 2257A IMPOSE A PRIOR RESTRAINT
        ON EXPRESSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## TABLE OF CONTENTS (cont'd)

Page

VII.    THE STATUTES UNCONSTITUTIONALLY IMPOSE STRICT LIABILITY FOR FAILING TO CREATE AND MAINTAIN THE REQUISITE RECORDS AND THEREBY RESTRICT FREE EXPRESSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VIII.   THE STATUTES VIOLATE THE GUARANTEE TO EQUAL PROTECTION OF LAWS OF THE FIFTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IX.     THE STATUTES AND THEIR IMPLEMENTING REGULATIONS AUTHORIZE UNCONSTITUTIONAL WARRANTLESS SEARCHES AND SEIZURES OF HOMES AND BUSINESSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## TABLE OF AUTHORITIES

Page

**CASES**

*American Library Association v. Reno*, 33 F.3d 78 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . 15, 28

*Arizona v. Gant,* U.S. , 129 S. Ct. 1710 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Arizona v. Hicks*, 480 U.S. 321 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Ashcroft v. Iqbal,* U.S. , 129 S. Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Bantam Books, Inc. v. Sullivan,* 372 U.S. 58 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Brown v. City of Pittsburgh*, 586 F.3d 263 (3rd Cir. 2009) . . . . . . . 3-5, 7, 8, 15-17, 25, 28-30, 36

*California Bankers Association v. Shultz*, 416 U.S. 21 (1974) . . . . . . . . . . . . . . . . . . . . . . . . 38

*Camera v. Municipal Court*, 387 U.S. 523 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40, 44

*Center for Democracy & Technology v. Pappert,*
    337 F.Supp.2d 606 (E.D. Pa. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

*Citizens United v. Federal Election Commission,*
    558 U.S. __; No. 08-205, slip op. (Jan. 21, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 29, 36

*City of Los Angeles v. Alameda Books*, 535 U.S. 425 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Connection v. Holder*, 557 F.3d 321 (6th Cir. 2009) . . . . . . . . . . . . . . . 12, 15, 18, 19, 28, 29, 32

*DeJohn v. Temple University,* 537 F.3d 301 (3rd Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Dow Chemical v. U.S.*, 476 U.S. 227 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Forsyth County, Ga. v. Nationalist Movement,*505 U.S. 123 (1992) . . . . . . . . . . . . . . . . . . . . 30

*Fowler v. UPMC Shadyside,* 578 F.3d 203 (3rd Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Free Speech Coalition v. Ashcroft*, 535 U.S. 234 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 26

*G. M. Leasing Corp. v. U. S.,*429 U.S. 338 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

iii

## **TABLE OF AUTHORITIES (cont'd)**

Page

*Haefner v. City of Philadelphia*, 2005 WL 525404 (E.D. Pa. 2005) . . . . . . . . . . . . . . . . . . . . . . 44

*Heffner v. Murphy*, 590 F. Supp.2d 710 (M.D. Pa. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Hill v. Colorado*, 530 U.S. 703 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hill v. Scranton*, 411 F.3d 118 (3rd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re U.S. for an Order Directing a Provider of Electronic Communication Service,*
     534 F. Supp.2d 585 (W.D. Pa. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Johnson v. U.S.*, 333 U.S. 10 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Katz v. United States*, 389 U.S. 347 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Kyllo v. U.S.,* 533 U.S. 27 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Lambert v. California*, 355 U.S. 225 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Langford v. City of Atlantic City*, 235 F.3d 845 (3rd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 3

*League of Women Voters of Pennsylvania v. Cappy*, 2009 WL 1845217
     (U.S. Dist. Ct. M.D. Pa. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Maffucci v. City of Philadelphia,* 1999 WL 320940 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . 44

*Mancusi v. DeForte*, 392 U.S. 364 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*McDonald v. U.S.*, 335 U.S. 451 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 31

iv

## <u>TABLE OF AUTHORITIES (cont'd)</u>

<u>Page</u>

*Miller v. Skumanick*, 605 F.Supp. 2d 643 (M.D. Pa. 2009)
*appeal pending* (Case No. 09-2144) (3rd Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mobley v. Tarlini*, 641 F. Supp. 2d 430 (E. D. Pa. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

*Nami v. Fauver*, 82 F.3d 63 (3rd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Nationwide Life Ins. Co. v. Commonwealth
Land Title Ins. Co.*, 579 F.3d 304 (3rd Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*New York v. Burger*, 482 U.S. 691 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 44

*Payton v. New York*, 445 U.S. 573 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Policemen's Benev. Ass'n of New Jersey, Local 318 v. Washington Tp.*,
850 F.2d 133 (3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Professional Dog Breeders Advisory Council*, 2009 WL 2948527 (M.D. Pa 2009) . . . . . . . . . 44

*Rakas v. Illinois*, 439 U.S. 128 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Schenck v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357 (1997) . . . . . . . . . . . . . . . . . . . . . . . 16

*See v. City of Seattle*, 387 U.S. 541 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40, 44

*Shoemaker v. Handel,* 795 F.2d 1136 (3rd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Showers v. Spangler*, 957 F.Supp. 584 (M.D. Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Simon & Schuster v. Members of N.Y. Crime Victims Bd.*,
502 U.S. 105 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Skinner v. Railway Labor Executives' Association,* 489 U.S. 602 (1989) . . . . . . . . . . . . . . . . . 38

*Smith v. California*, 361 U.S. 147 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Steagald v. U.S.*, 451 U.S. 204 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Steffel v. Thompson,* 415 U.S. 452 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

<u>**TABLE OF AUTHORITIES (cont'd)**</u>

<u>Page</u>

*Thomas v. Independence Tp.*, 463 F.3d 285 (3rd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

*Turner Broad. Sys. v. FCC,* 512 U.S. 622 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

*U.S. v. Leary*, 846 F.2d 592 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*U.S. v. National Treasury Employees Union*, 513 U.S. 454 (1995) . . . . . . . . . . . . . . . . . . . . . 7

*U.S. v. Ross*, 456 U.S. 798 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Gray*, 484 F.2d 352 (6th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Jacobsen*, 466 U.S. 109 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) . . . . . . . . . . 3-6, 8, 29

*United States v. Stevens,* 533 F.3d 218 (3rd Cir. 2008)*,*
    *cert. granted*    U.S.    , 129 S.Ct. 1984 (2009**)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5

*United States v. United States District Court*, 858 F.2d 534 (9th Cir. 1988) . . . . . . . . . . . . . . . 7

*Walter v. U.S.,* 447 U.S. 649 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16, 17, 30

*Watchtower Bible & Tract Society of N.Y., Inc.*, 536 U.S. 150 (2002) . . . . . . . . . . . . . . . . . 31, 32

**CONSTITUTIONAL PROVISIONS**

United States Const., amend. I . . . . . . . . . . . . . . . . . . . . . . . . 2-4, 8, 15, 16, 26, 29, 30, 33-35, 37

United States Const., amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 37-46

United States Const., amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 36

## <u>TABLE OF AUTHORITIES (cont'd)</u>

<u>Page</u>

**STATUTES, RULES AND REGULATIONS**

18 U.S.C. § 2257 . . . . . . . . . . . . . . . . 1, 2, 4, 7, 10, 11, 13, 15-18, 20, 22, 25, 28, 32, 35, 36, 43

18 U.S.C. § 2257 (f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 2257 (f)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

18 U.S.C. § 2257(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 2257A . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 7, 10, 15-18, 20, 25, 29, 32, 36

18 U.S.C. § 2257A (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18 U.S.C. § 2257A (f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 2257A (f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 2257A (f)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

18 U.S.C. § 2257A (h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

18 U.S.C. § 2257A (h)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 28, 29

18 U.S.C. §2257A (h)(1)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 C.F.R. § 75 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 C.F.R. § 75.1 (c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 C.F.R. § 75.1 (c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 C.F.R. § 75.2 (h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28 C.F.R. § 75.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 38

28 C.F.R. § 75.5 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

28 C.F.R. § 75.5 (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

### TABLE OF AUTHORITIES (cont'd)

Page

28 C.F.R. § 75.5 (f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

28 C.F.R. § 75.5 (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

28 C.F.R. § 75.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20

Federal Rules of Civil Procedure, Rule 12 (b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3

Federal Rules of Civil Procedure, Rule 12 (b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

### MISCELLANEOUS

152 CONG. REC. S.8027 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

152 CONG. REC. H5725 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Adam Walsh Child Protection and Safety Act of 2006
     Pub. L. 109-248, Title V, §§ 501, 502, 503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 36

**STATEMENT OF THE CASE AND OF THE FACTS**

Plaintiffs' Complaint sets forth in specific detail the effect of 18 U.S.C. § 2257 and 18 U.S.C. § 2257A and their implementing regulations, 28 C.F.R. § 75 *et. seq.*, on each of the fifteen Plaintiffs, *Complaint*, pp. 7-24, ¶¶ 18-58 and the constitutional rights that the statutes and regulations violate. *Id.* at pp. 24-31, ¶¶ 59-84. Plaintiffs also provided a detailed discussion of the constitutional violations wrought by the record keeping and labeling scheme in their Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction.[1]

In responding to Defendant's Motion to Dismiss, Plaintiffs, for the sake of brevity, will not repeat those factual allegations and discussion, but incorporate the allegations of the Complaint and the Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction by reference in this Memorandum.

<u>**ARGUMENT**</u>

**I.      DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED.**

Defendant seeks dismissal of Plaintiffs' Fourth Amendment challenge to the record keeping statutes under Rule 12 (b)(1) of the Federal Rules of Civil Procedure, alleging that the Fourth Amendment challenge is not ripe for review. *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction and in Support of Defendant's Motion to Dismiss,*[2] pp. 11-12. Defendant seeks dismissal of the remainder of Plaintiffs' constitutional challenges to the statutes under Rule 12 (b)(6) of the Federal Rules of Civil Procedure on the ground that Plaintiffs' Complaint

---

[1]    *Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction* will be designated as "*Plaintiffs' Memorandum*" in succeeding references.

[2]    *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction and in Support of Defendant's Motion to Dismiss* will be designated as "*Defendant's Memorandum*" in succeeding references.

fails to state a claim upon which relief can be granted. *Defendant's Memorandum*, p. 12. The Motion to Dismiss should be denied on both grounds.

Plaintiffs will address why Defendant is wrong that, as a matter of law, their constitutional challenges to 18 U.S.C. § 2257 and 18 U.S.C. § 2257A should be dismissed– including Defendant's challenge on ripeness grounds–in the discussion of the merits in the pages that follow. But, here at the outset, Plaintiffs explain why, as a matter of pure application of the standard of review for dismissal of claims under Rule 12 (b), Defendant's motion should be denied.

On October 7, 2009, Plaintiffs filed their Complaint together with a Motion for Preliminary Injunction, challenging the constitutionality of 18 U.S.C. § 2257, 18 U.S.C. § 2257A and their implementing regulations under the First, Fourth and Fifth Amendments, both on their face and as applied. The Complaint sets out detailed factual allegations in support of Plaintiffs' claims that the statutes violate their respective rights to free speech, their rights to equal protection of the laws, and their rights to be free from unreasonable searches and seizures. *See Complaint,* ¶¶ 1-58.[3] As noted above, the 57-page Memorandum submitted in support of Plaintiffs' Motion for Preliminary Injunction sets forth the case law and other legal authority in support of Plaintiffs' facial and as-applied constitutional challenges.

In reviewing a motion to dismiss, all factual allegations must be accepted as true, and the Complaint must be construed in Plaintiffs' favor to determine whether, under any reasonable reading of the Complaint, Plaintiffs may be entitled to relief. *Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, 579 F.3d 304, 307 (3rd Cir. 2009). Defendant's motion to dismiss Plaintiffs'

---

[3] Defendants nowhere assert that the Complaint is deficient for failure to provide sufficient factual allegations in support of their claims for relief.

Complaint under Rule 12 (b)(6) must be denied if the Complaint contains sufficient factual matter to state a claim that is plausible on its face. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3rd Cir. 2009) *citing Ashcroft v. Iqbal,* __U.S.__, 129 S. Ct. 1937, 1949 (2009). In assessing a motion to dismiss in terms of a Complaint that alleges the deprivation of constitutional rights, a court should not "inquire whether the plaintiffs will ultimately prevail, ***only whether they are entitled to offer evidence to support their claims.***" *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3rd Cir. 2000) *quoting, Nami v. Fauver*, 82 F.3d 63, 65 (3rd Cir. 1996) (Emphasis added). Thus, if a complaint alleges sufficient facts giving rise to a plausible claim for the deprivation of constitutional rights, the motion must be denied, and Plaintiffs must be given the opportunity to offer evidence in support of their claims.

This is particularly so in a case challenging, on First Amendment grounds, a statute regulating speech. For it is the government that bears the burden of proving the constitutionality of such a law. In defending the constitutionality of a regulation of speech, the government bears the burden of demonstrating, at minimum: (1) the existence of the problem which it claims the regulation addresses, *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 819 (2000), (2) the regulation advances its goals in addressing that problem, *United States v. Stevens,* 533 F.3d 218, 234-35 (3rd Cir. 2008)(*en banc), cert. granted* __U.S.__, 129 S.Ct. 1984 (2009**)**, and (3) the regulation is narrowly tailored and does not burden substantially more speech than is necessary. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989); *Brown v. City of Pittsburgh*, 586 F.3d 263, 277 (3rd Cir. 2009). It must put on evidence establishing each component; Plaintiffs are likewise entitled to put on evidence showing that these constitutional requirements have not been met as well as evidence in support of their claims that the statutes are unconstitutionally overbroad. *See e.g., City*

*of Los Angeles v. Alameda Books*, 535 U.S. 425 (2002).

Furthermore, the development of an adequate evidentiary record is fundamental to the assessment of Plaintiffs' as-applied challenges. *See, e.g., Mobley v. Tarlini*, 641 F. Supp. 2d 430, 441 (E. D. Pa. 2009) (Baylson, J.) (Plaintiff, alleging that City Council unconstitutionally applied its rules of order to deprive him of his First Amendment rights, was entitled to opportunity to present facts demonstrating violation, which could not be determined as a matter of law, and claim would not be dismissed.) Plaintiffs must, therefore, be given an opportunity to develop a factual record regarding the application of the law to them. *See Brown*, 586 F.3d at 289 (As-applied challenges depend on facts unique to the particular circumstances under which challenged law's restrictions are enforced.)

## II.     TITLE 18 U.S.C. § 2257 AND 18 U.S.C. § 2257A ARE UNCONSTITUTIONAL REGULATIONS OF SPEECH ON THEIR FACE AND AS APPLIED UNDER INTERMEDIATE SCRUTINY.

### A.     Title 18 U.S.C. § 2257 and 18 U.S.C. § 2257A Do Not Advance the Government's Interest in Combating Child Pornography.

In evaluating the statutes under the first step of intermediate scrutiny, both Plaintiffs and Defendant agree that combating child pornography is an important governmental interest; they disagree, however, on the more critical question of whether the statutes advance that interest–a fundamental prerequisite to the constitutionality of any regulation of speech, whether tested under strict scrutiny,[4] *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000)*; Stevens,*

---

[4] Plaintiffs maintain that the statutes are content-based and should be subject to strict scrutiny, *infra* at 27-31, while Defendant argues that the statutes are content-neutral and are subject to intermediate scrutiny. Plaintiffs maintain in the argument presented here that even under intermediate scrutiny, the statutes are unconstitutional.

4

533 F.3d at 234-35, [5] or intermediate scrutiny. *Turner Broad. Sys. v. FCC,* 512 U.S. 622, 664 (1994); *Center for Democracy & Technology v. Pappert*, 337 F.Supp.2d 606, 655 (E.D. Pa. 2004); *Brown v. City of Pittsburgh*, 586 F.3d 263 (3rd Cir. 2009).

That inquiry requires an assessment of: (1) the seriousness and extent of the problem that the regulation was designed to address, *Playboy Entertainment*, 529 U.S. at 819, and (2) the efficacy of the means chosen to address the identified problem. *Stevens*, 533 F.3d at 234-35; *Brown,* 586 F.3d at 279-80*; Center for Democracy & Technology*, 337 F. Supp. 2d at 655.

1.    **The Government Must Adduce Evidence Demonstrating the Existence and Scope of the Problem It Claims the Statutes Were Designed to Address.**

In *Playboy*, the Court stressed the importance of evaluating evidence of the alleged problem justifying a regulation of speech.  In noting that the government's evidence was wanting in establishing the breadth and severity of the problem at which the statute there was aimed, the Court wrote:

> There is little hard evidence of how widespread or how serious the problem of signal bleed is.  Indeed, there is no proof as to how likely any child is to view a discernible explicit image, and no proof of the duration of the bleed or the quality of the pictures or sound.  To say that millions of children are subject to the risk of viewing signal bleed is one thing; to avoid articulating the true nature and extent of the risk is quite another....The First Amendment requires a more careful assessment and characterization of an evil in order to justify a regulation as sweeping as this.

---

[5] Defendant pronounces *Playboy Entertainment* and *Stevens* inapplicable as authority for this proposition because those decisions involved strict scrutiny. *Defendant's Memorandum*, pp. 20-21. But as noted above, under either strict scrutiny or intermediate scrutiny, the government must show that the speech regulation furthers its legitimate interest: Under strict scrutiny, the court must evaluate whether the regulation advances a compelling governmental interest using the least restrictive alternative; under intermediate scrutiny, the court must evaluate whether the regulation advances an important governmental interest in a narrowly tailored way without burdening substantially more speech than is necessary.  Both tests require an evaluation of whether the legislative means advances the government's interest.

529 U.S. at 819.

The government identifies the problem that the record keeping statutes were designed to address as "the inadvertent use of underage performers in pornography." *Defendant's Memorandum*, pp. 20, 24. *See also, Id.* at 46, n. 22 ("As discussed above, the purpose of the age verification and recordkeeping procedures is not–contrary to plaintiffs' assertion–primarily to assist law enforcement efforts to prosecute child pornography possession or trade; rather, the, requirements are primarily intended to ensure that producers of sexually explicit images do not use underage performers to begin with.")

It has offered no evidence, however, demonstrating the existence of the alleged problem of the inadvertent, careless, reckless or intentional use of underage performers–much less its extent or severity– by those who produce constitutionally protected adult speech like members of Plaintiff Free Speech Coalition, or Plaintiffs Conners, C 1R Distribution, or Hartley in the adult entertainment industry or the members of Plaintiff American Society of Media Photographers or Plaintiffs Barone, Hymes, Sinclair Institute, Alper, Queen, Nitke, Steinberg, Dodson or Ross who produce constitutionally protected adult speech for artistic, journalistic, educational or therapeutic purposes. *Playboy Entertainment Group, Inc.*, 529 U.S. at 819. Indeed, it has "avoid[ed] articulating the true nature and extent of the risk" of the problem. *Id.*

Plaintiffs contend (and will present evidence demonstrating) that the problem identified by the government–the inadvertent use of underage performers in adult productions–is non-existent and has always been so. *See Plaintiffs' Memorandum*, p. 25, n. 15.  The one well-publicized instance of an underage performer appearing in an adult film involved a  sophisticated ruse employing artifice and fraud which would not have been prevented by the most punctilious compliance with either 18

6

U.S.C. § 2257 or 18 U.S.C. § 2257A. *United States v. United States District Court*, 858 F.2d 534, 536 (9th Cir. 1988).

"'[W]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' ... It must demonstrate that the recited harms are real, not merely conjectural....'" *U.S. v. National Treasury Employees Union*, 513 U.S. 454, 475 (1995) *quoting Turner Broadcasting System v. FCC,* 512 U.S. 622, 664 (1994). Defendant has failed to meet that burden.[6]

### 2.    The Government Must Establish That a Regulation of Speech Is a Necessary Means to Address the Problem It Has Identified.

In *Brown v. City of Pittsburgh*, a recent decision of the Third Circuit that supports and confirms many of the arguments advanced in support of Plaintiffs' Motion for Preliminary Injunction,[7] the court struck down, on its face, an ordinance regulating expression near abortion clinics because the government  failed to show that the regulation was an effective and necessary means to address the  problem offered as justification for the regulation.  586 F.3d at 299. The Third Circuit found that there was no support in the record or case law for "the factual proposition" that the ordinance's restriction on expression was "needed to achieve the City's legitimate interests in preventing harassment and obstruction" of the entrances of medical facilities–the problem asserted

_____

[6] Although the government now claims that the statutes' primary purpose is not, in fact,  to assist law enforcement with problems in prosecuting child pornography, *Defendant's Memorandum*, p. 46, n.22, Plaintiffs in their Memorandum in Support of their Motion for Preliminary Injunction, cited data compiled and published by Defendant that rebuts any claim that a serious and discrete problem exists in this regard as well. *Plaintiffs' Memorandum*, pp. 25-27.

[7]  The decision in *Brown* was issued after Plaintiffs filed their Motion for a Preliminary Injunction; the government relies on *Brown* in arguing that the record keeping statutes are content-neutral regulations of speech. *Defendant's Memorandum*, pp. 13, 14, 17.

as the justification for the restriction of expressive activities. *Id.* at 279.

Like the Defendants in *Brown*, the Defendant here offers no support "for the factual proposition" that the burdensome record keeping statutes[8] are needed to achieve its interests in ensuring that "producers of sexually explicit images do not use underage performers," *Defendant's Memorandum*, p. 46, n.22, nor any support for the broader proposition, that they are needed to reduce the sexual exploitation of children as a whole.

The government's contention that the record keeping requirements are a ***necessary*** means to assure that underage performers do not appear in adult films fails to take into account two important facts: (1) commercial producers of adult films have always checked identification to verify that their performers are adults, thereby ensuring that their expression is protected by the First Amendment; and (2) there are numerous state and federal criminal child pornography laws, *see e.g.,Plaintiffs' Memorandum,* p. 27, n.16, the violation of which leads to harsh punishment, that serve as compelling incentives for producers of sexually explicit expression to be certain that young-looking performers are, in fact, adults and not minors. *See Free Speech Coalition v. Ashcroft*, 535 U.S. 234, 254 (2002).

Congress itself has recognized that the statutes' record keeping requirements are not

---

[8]   In the course of its argument, the government asserts that "these requirements do not *prohibit*" any visual depiction of adults engaging in sexually explicit activity. *Defendant's Memorandum*, p. 20. (Emphasis in original). As the allegations of the Complaint demonstrate, the statutes, by operation and effect, do, in fact, suppress substantial quantities of constitutionally protected sexual images of adults, *Complaint,* ¶¶ 23, 26, 29, 35, 38, 41, 42, 44, 48, 50–just as the state statute found to be unconstitutional in *Center for Democracy & Technology*, 337 F. Supp. 2d at 611(discussed at pp. 22-24 of *Plaintiffs' Memorandum*). Just as importantly, as the Supreme Court observed in *Playboy Entertainment,* "[i]t is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree." 529 U.S. at 812.

necessary to assure that commercial producers of simulated sexually explicit expression or expression with lewd displays of the genitals do not mistakenly use underage performers.  It enacted 18 U.S.C. § 2257A (h) that exempts such producers from the burdens of the statutes if they simply certify to the Attorney General that they already maintain age verification records of their performers based on industry standards or federal tax or labor laws.  Plaintiffs will demonstrate that commercial producers of adult films also keep (wholly apart from the demands of § 2257) age verification records of their performers based on industry standards.  The substantial burdens imposed upon them by the statutes are no more necessary than they are for those whom Congress has exempted from the statutory scheme.  *See Citizens United v. Federal Election Commission*, 558 U.S. at__; No. 08-205, *Slip Op.* at 36 (Jan. 21, 2010) (exemption for certain corporations from selected provisions of Campaign Reform Act is "all but an admission" of invalidity of those provisions).

**B.      The Statutes Are Not Narrowly Tailored to Advance the Government's Interest in Combating Child Pornography.**

The first step in evaluating whether a regulation of speech meets the requirement that it must be narrowly tailored is identifying its actual reach and scope.

Here, the statutes sweep within their purview a vast amount of constitutionally protected expression; whoever produces a picture, digital image, video or other expression that includes sexual imagery must comply with their record keeping, inspection and labeling mandates.  They make no distinction between commercially produced films and non-commercial expression between adults; no distinction between expression depicting young-looking models and expression depicting obviously mature adults; no distinction between an adult film and a textbook on human sexuality. All expression depicting sexual conduct is subject to the record keeping and labeling requirements

9

of the statutes and regulations.

The government, however, suggests that the statutes apply only to "images produced for sale or trade." *Defendant's Memorandum,* p. 1; *See also, Id.* at 26, n.12, 33-34.

The plain language of the statutes and regulations is to the contrary.[9] Title 18 U.S.C. § 2257 reads in relevant part:

> (a) ***Whoever*** produces ***any*** book, magazine, periodical, film, videotape, digital image, digitally- or computer-manipulated image of an actual human being, picture, or other matter which–
>
> (1) contains one or more visual depictions made after November 1, 1990 of actual sexually explicit conduct; and
>
> (2) is produced in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce, or is shipped or transported or is intended for shipment or transportation in interstate or foreign commerce;
>
> shall create and maintain individually identifiable records pertaining to every performer portrayed in such a visual depiction.

(Emphasis added). *See also*, 18 U.S.C. § 2257A (a). There is no language limiting the record keeping requirements' application to images produced for sale or trade. The text is clear: the requirements apply to "whoever produces" a sexual image.

The exemption from compliance provided for certain producers of simulated sexually explicit expression in 18 U.S.C. § 2257A further demonstrates that the statutory scheme applies to both

---

[9] So is the legislative history. Representative Pence, one of the sponsors of the Adam Walsh Child Protection and Safety Act of 2006 , explained: "A main tenet of my legislation is the addition of language that will fix a technicality that so-called home pornographers have used to evade federal prosecution on child pornography charges. Home pornographers use digital cameras, Polaroid cameras and video cameras to make pornographic pictures and videos...." 152 CONG. REC. H5725 (2006). He also specifically noted that child pornography is often produced "by family members, family friends, caretakers and other trusted individuals who violate that trust, " 152 CONG. REC. H5724 (2006), in contrast to the commercial production of adult expression.

private and commercial expression.   Title 18 U.S.C. § 2257A (h)(1) reads in relevant part:

> The provisions of this section and section 2257 shall not apply to matter, or any image therein, containing one or more visual depictions of simulated sexually explicit conduct, or actual sexually explicit conduct as described in clause (v) of section 2256(2)(A) [lascivious exhibition of the genitals or pubic area], if such matter–
>
> (A)(i) *is intended for commercial distribution;* ....

(Emphasis added).  As the first of several conditions of qualifying for the exemption, Congress

requires the producer of that material to establish that its expression "is intended for *commercial*

*distribution*." (Emphasis added).   If, as the government argues, 18 U.S.C. §2257 applies only to

material produced for sale or trade, there would be no need whatsoever for 18 U.S.C. §2257A

(h)(1)(A)(i); there would be no reason to require a producer to establish that his expression is

intended for commercial distribution to qualify for §2257A (h)'s exemption, if, in fact, that were the

only type of expression regulated by 18 U.S.C. §2257 in the first instance.

The regulations also make clear that both commercial and private expression is subject to the

record keeping statutes.  In defining *producers*, those subject to the statutes' requirements, the

regulations distinguish between *primary producers* and *secondary producers*.  The definition of

*primary producer* reads:

> *Primary producer* is any person who actually films, videotapes, photographs, or creates a digitally- or computer-manipulated image, a digital image, or a picture of, or who digitizes an image of, a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct....

28 C.F.R. § 75.1 (c)(1).  The definition of *primary producer* broadly includes any person who

produces expression with sexual imagery; it contains no language confining the statutes' or

regulations' application to expression intended for sale or trade.

In addition to primary producers who actually create sexually explicit expression, the

11

regulations provide that the record keeping requirements also apply to those who publish or reproduce sexually explicit depictions, even though they have not created them, as part of a book or magazine or on a computer website.  The regulations characterize this class of publishers as *secondary producers*.

The definition of *secondary producer* contains two categories: (1) those who  produce, assemble, manufacture, publish, duplicate, reproduce or reissue a book, magazine, periodical, film, videotape, or digitally- or computer-manipulated image, picture, or other matter **intended for commercial distribution** and (2) those who insert such depictions on a computer site or service.  The regulation reads:

> *Secondary producer* is any person who produces, assembles, manufactures, publishes, duplicates, reproduces, or reissues a book, magazine, periodical, film, videotape, or digitally- or computer-manipulated image, picture, or other matter **intended for commercial distribution** that contains a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct, or who inserts on a computer site or service a digital image of, or otherwise manages the sexually explicit content of a computer site or service that contains a visual depiction of, an actual human begin engaged in actual or simulated sexually explicit conduct, including any person who enters into a contract, agreement, or conspiracy to do any of the foregoing.

28 C.F.R. § 75.1 (c)(2) (Emphasis added).

For one discrete class of secondary producers, the regulations restrict application of the record keeping requirements to matter **for commercial distribution**.  The regulations impose no such qualification on secondary producers who post images on computer websites.

Indeed, the government was unable to convince either the majority or the dissents in *Connection v. Holder*, 557 F.3d 321 (6th Cir. 2009) (*en banc*) that the language of the statute permitted a construction confining its reach to expression produced "for sale or trade." *Id.* at 338,

346-47, 349, 352, 354, 358-59, 361, 370.

As support for its position, the government cites, not to the statutes or regulations, but to a passage in the preamble to the regulations in which the Department of Justice stated that the statute is "limited to pornography intended for sale or trade." *Defendant's Memorandum*, pp. 26, n.12; 33 *citing* 73 Fed. Reg. at 77456. The passage on which the government relies, appears in response to a public comment urging that the record keeping requirements be limited "to producers who pay performers and not individuals who post photos of themselves" as well as a comment urging that "an exemption statement[10] should not be required if a depiction is produced by married couples who produce videotaped images of themselves for their own personal use." *Id.* at 77456. In response, the government stated that it adopted the comments in part and rejected them in part. In rejecting the notion that the record keeping requirements should be limited to producers who pay performers and should not extend to individuals who simply post photos of themselves, the Department of Justice stated that the statutes are "***not*** clearly limited to producers who pay performers." *Id.* (Emphasis added). In "adopting" the comment that images created by married couples for their own personal use should not be covered by 18 U.S.C. § 2257, it stated that the statute "is limited to pornography intended for sale or trade"–adding that it "speaks in terms of participants in the professional pornography industry," *id.*–a statement in apparent contradiction to its claim that the statute was clearly not limited to producers who pay performers.

Other passages in that same preamble completely defeat the representation that the statute

---

[10]  The only exemption provided for in the regulation is found in 28 C.F.R. § 75.7, which allows a producer to place an exemption statement on depictions of actual sexual conduct produced before July 3, 1995 and depictions of lascivious displays of the genitals and simulated sexually explicit conduct after March 18, 2009.

is limited to "pornography intended for sale and trade" and make clear that the record keeping requirements apply to a substantial amount of private expression that is produced for neither sale nor trade. For instance, the preamble indicates that the record keeping requirements apply to adults who post candid sexual images on adult social networking web sites. *Id.* at 77437. ("[O]ne who posts sexually explicit activity on 'adult' networking sites may well be a primary or secondary producer. Users of social networking sites may therefore well be subject to the proposed rule, depending on their conduct.") In another passage in the preamble, the government reiterates that it "cannot exempt the users [of adult social networking sites] from the record keeping requirements." *Id.* at 77461. But clearly, the expression posted by these citizens is not intended for sale or trade.

Similarly, in response to a comment in the preamble regarding the application of the record keeping requirements to expression posted on a website like YouTube that allows users to upload videos for sharing with others, the government expressly states that a person who posts a video that includes simulated sexual conduct on a website like YouTube "is required to affix a disclosure notice to each page of a sexually explicit depiction." *Id.* at 77439.

The government's claim, then, that the statutes are limited to expression "produced for sale or trade" is contradicted by the commentary in the very preamble on which it relies for that limitation in the first instance. For, users of adult social networking sites who post images of themselves on such websites are not doing so for the purposes of "sale or trade"; they are publishing their expression for the purpose of meeting and communicating with other like-minded adults. Likewise, a person who uploads a homemade video to a website like You Tube is not doing so in furtherance of "sale or trade," but, like millions of other Americans, does so simply to share his ideas and expression with others.

14

The statutes impose their burdens on a vast amount of expression depicting adults that is fully protected by the First Amendment and that in no way implicates children. They are, therefore, not narrowly tailored regulations of speech.

The government argues, nevertheless, that since other courts, in opinions not binding on this Court, have found that prior versions of 18 U.S.C. § 2257 were narrowly tailored on the facts before them, this Court should, as a matter of a law, do likewise. *Defendant's Memorandum*, pp. 17-19.

However, in the appellate decisions cited by the government, both the D.C. Circuit Court of Appeals in *American Library Association v. Reno*, 33 F.3d 78 (D.C. Cir. 1994), and the Sixth Circuit Court of Appeals in *Connection* recognized that 18 U.S.C. § 2257 was constitutionally flawed ***in a number of its applications not presented on the record before them*** (but which are now presented here). *American Library Association,* 33 F.3d at 83, 90, 94-95; *Connection,* 557 F.3d at 334, 336, 339-41. Moreover, the government's argument overlooks the expansion of the record keeping and labeling requirements' breadth and scope effected by the amendment of 18 U.S.C. § 2257 and enactment of 18 U.S.C. § 2257A and disregards the discrete and concrete claims of the Plaintiffs presented here under the current version of 18 U.S.C. § 2257 and its newer companion statute, 18 U.S.C. § 2257A. Just as importantly, the decisions cited by the government are not binding in this Circuit. This Court is entitled to give thorough, independent consideration of its own to the various opinions, including the dissents, issued in *Connection* and to determine for itself which is the most persuasive and most consistent with the authority of the Third Circuit.

The Third Circuit's decision in *Brown* is instructive in this regard. The ordinance at issue in *Brown* contained two provisions that had been upheld as constitutional by the United States Supreme Court in decisions that were obviously binding on all lower courts. The Third Circuit noted that "the

15

bubble zone defined by the Ordinance is virtually identical to the one in the Colorado statute *Hill* [*v. Colorado*, 530 U.S. 703 (2000)] found facially valid." 586 F.3d at 270.  Moreover, it acknowledged that the Supreme Court in *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) and *Schenck v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357 (1997) had upheld even more restrictive buffer zones than that established by the Pittsburgh ordinance. *Id.* at 273.

Recognizing that these decisions controlled its analysis, the Third Circuit did not simply conclude that the Pittsburgh ordinance must be constitutional as a matter of law, but concluded that "because the combination of the two prophylactic zones here represented a restrictive step" beyond that approved by the Supreme Court, it was required to "apply the *Ward*[11] test for [itself.]" *Id.* at 279. Consequently, it carefully examined the ordinance under First Amendment doctrine on the record before it, to conclude that the City Defendant had ***not*** carried its burden in demonstrating that its ordinance was narrowly tailored to advance the City's objectives *Id.* at 280.  Accordingly, it reversed the district court's denial of a preliminary injunction and struck down the ordinance on its face. *Id.* at 298.

The First Amendment requires that the same critical analysis employed by the Third Circuit in *Brown*  be pursued in evaluating the constitutionality of 18 U.S.C. § 2257 and 18 U.S.C. § 2257A on the record to be made in this case.

**C.    Title 18 U.S.C. § 2257 and 18 U.S.C. § 2257A Are Overinclusive and Burden More Speech Than Is Necessary.**

The Supreme Court in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), in identifying how the constitutionality of a content-neutral regulation of expression was to be measured,

---

[11]  *Ward v. Rock Against Racism*, 491 U.S. 781 (1989).

cautioned:

> To be sure, this standard does not mean that a time, place, or manner regulation may **burden substantially more speech than is necessary** to further the government's legitimate interests. Government may not regulate expression in such a manner that **a substantial portion of the burden on speech does not serve to advance its goals**.

491 U.S. at 799 (Emphasis added). *See Brown,* 586 F.3d at 281. ("As these consequences demonstrate, if the multi-zone Ordinance does not effectively foreclose leafletting entirely, it severely curtails it.  In our view, the combination of *the two zones burdens substantially more speech than appears necessary, on this record, to achieve the government's interests. See Ward*, 491 U.S. at 800, 109 S. Ct. 2746." (Emphasis added).)

The inquiry is fact-based, and as the Third Circuit indicated in *Brown*, is a decision to be made based on the record detailing the burdens a regulation places on speech that do not advance, and therefore, are not necessary in achieving the government's goals.

In consonance with that approach, Plaintiffs in their Memorandum in Support of their Motion for a Preliminary Injunction provided a discussion of a number of the burdens that 18 U.S.C. § 2257 and 18 U.S.C. § 2257A impose on constitutionally protected expression in the name of combating child pornography, which, they maintain, do not advance that goal and are not necessary in achieving that goal.  In addition to describing the burdens generally, they summarized the factual allegations set forth in the Complaint–which in the face of Defendant's Motion to Dismiss, are to be taken as true, *Mobley,* 641 F. Supp. 2d at 437–describing the considerable prohibitions and restrictions that the record keeping and labeling requirements place on the Plaintiffs' expression and demonstrating that the statutes burden substantially more speech than is necessary.  *Plaintiffs' Memorandum*, pp. 28-31.  They intend to adduce evidence of these burdens at the hearing on their Motion for a

17

Preliminary Injunction.

In response, Defendant does not contest Plaintiffs' claim that the statutes restrict and burden a substantial amount of protected expression. They do not contest that the statutes apply to "*all* expression containing sexual imagery–no matter how fleeting, no matter how artistic or valuable as political commentary or journalistic documentary, no matter how clear it is that the persons depicted are middle-aged adults." *Plaintiffs' Memorandum*, p. 29.

Rather the government maintains that the statutes' application to this vast amount of protected expression is necessary because the statutory objectives can tolerate no subjectivity in evaluating a person's age. *Defendant's Memorandum*, p. 28. Citing *Connection*, the government writes: "Allowing law enforcement personnel, or producers themselves, to decide on a case by case basis whether a performer appears old enough not to require age verification would introduce too much room for error." *Id.*

But that premise withers under examination.

First, as will be demonstrated at hearing, the adult industry does, in fact, verify and document that the performers appearing in their films are adults. Those producers do not simply make a subjective judgment. Wholly apart from § 2257, these producers have always checked the IDs of their performers. That has been a long-established industry practice. As the exemption in 18 U.S.C. § 2257A recognizes, the record keeping requirements are not necessary to achieve its objectives in those instances. The statutes achieve nothing other than to impose unnecessary substantial burdens on the production of that expression and to work an invasion of privacy.

As for the necessity of the record keeping requirements in addressing the inadvertent use of minors in other contexts, that claim has no footing either.

18

Clearly, there is *no* chance of error in making the determination that a person depicted in a sexually suggestive pose is not a minor when he is in his 30s, 40s, 50s or beyond. The record keeping requirements are not necessary to achieve the government's objectives in those instances.

Likewise, there is *no* chance of error in making that same determination when the person depicted is the producer himself, or his spouse or his lover with whom he is intimately familiar. The millions of Americans who post their own images and the images of their partners on adult social network websites do not need to check their IDs to know that they are adults. *See Connection*, 557 F.3d at 370 ("[W]e do know that millions of adults exchange or share personally-produced sexually explicit depictions. See J.A. at 1007-11 (stipulation of the parties noting the existence of, and incorporating an exhibit listing over 13 million personal ads containing sexually-explicit text and images on a single website for sex and swinger personal ads, of which those examined showed that 94% involved adults over 21.)") Nor do the countless American couples who e-mail explicit images to one another or send "sext" messages on their cell phones need to look at their own IDs to verify that they are adults. *See* http://www.aarp.org/family/love/articles/sexting_not_just_for_kids.html (last visited January 27, 2010)(discussing incidence of sexting among older adults).[12] The record keeping requirements are not necessary to achieve the government's objectives in any of these circumstances.

The burdens imposed on a substantial and robust body of protected expression are simply unnecessary. Plaintiffs are entitled to put on evidence establishing that fact.

---

[12] In fact, even teen-agers who are sexting know that they are underage; they do not publish their expression because they inadvertently but erroneously conclude that they are over the age of majority. *See e.g., Miller v. Skumanick*, 605 F.Supp. 2d 643 (M.D. Pa. 2009) *appeal pending* (Case No. 09-2144) (3rd Cir.).

19

Plaintiffs, by way of illustration, in their Memorandum in Support of their Motion for Preliminary Injunction described a few of the specific burdens placed on their expression by the record keeping statutes–none of which are necessary to achieve the government's objectives. *Plaintiffs' Memorandum*, pp. 29-31. Defendant has responded to these examples–although not all. Of course, in evaluating Defendant's Motion to Dismiss, this Court must consider and take as true, all the factual allegations of the **Complaint**, which set forth in more detail the onerous burdens the statutes impose on Plaintiffs' expression. *See Complaint*, ¶¶ 19, 21, 23, 24, 26, 27, 29, 31, 33, 35, 37, 38, 40, 41, 42, 44, 46, 48, 50.

In any event, the government's argument in response to the examples in Plaintiffs' Memorandum are unavailing.

Plaintiff Steinberg wants to distribute a serious, artistic journal of erotic art containing visual depictions with sexually explicit content taken by European photographers, who do not maintain records as required by 18 U.S.C. § 2257 and 18 U.S.C. § 2257A. *Complaint*, ¶ 44. And, of course, because the journal does not–for it cannot–bear a label identifying the location of the records required to be kept, Mr. Steinberg will be criminally liable under the statutes if he attempts to distribute this important body of expression. His burden is in no way lightened by the fact that the statutes permit verification of ages of non-Americans by "a foreign government issued equivalent of any of the documents" that can be used in the United States, as the government suggests.

And with regard to Plaintiffs Nitke and Alper, the government misunderstands their dilemma. They each wish to publish compilations of their body of work created over the decades–including photographs taken many years ago with more current pieces of their work. *Complaint*, ¶¶ 35, 41. While the regulations exempt visual depictions of actual sexual conduct produced before July 3,

1995, 28 C.F.R. § 75.7 requires that "where the matter consists of a ***compilation of separate primarily produced depictions***," the exemption applies only if "***the entirety of the conduct depicted was produced prior to July 3, 1995.***" (Emphasis added). Plaintiffs are therefore effectively prohibited from publishing compilations of their body of work through their professional careers, since by combining their pre-1995 work with current photographs, the "entirety of the conduct depicted" in the compilation will not have been produced prior to July 3, 1995. Both Plaintiffs are unable to obtain the requisite records from the subjects of their earlier work to allow publication of their intended compilations.

As for Dr. Dodson's gallery devoted to depictions of genitals created for therapeutic as well as research purposes, the government states: "[P]laintiffs have provided no persuasive reason that such images should be excluded from the universal age verification and recordkeeping requirements." *Defendant's Memorandum*, p. 30. But the government has it backwards. ***The government***, not Ms. Dodson, carries the burden of demonstrating why she must demand and maintain records for the adults who, as participants in her research, submit constitutionally protected expression, consisting of visual depictions of their genitals and accompanying essays, for publication on her website. It is the ***government*** that must explain how forcing Plaintiff Dodson to delete hundreds of images by adults who wish to remain anonymous and thus refuse to produce photo identification is necessary to its fight against child pornography. *Complaint,* ¶ 50.

And it is the ***government*** that must explain why the other burdens heaped upon Plaintiffs are necessary.

For instance, many of Plaintiff American Society of Media Photographers' members are one person or two-person operations who operate on tight budgets. *Complaint,* ¶ 21. Many of its

21

photojournalist members are on the road for months at a time. *Id.* Compliance with the administrative and financial burdens is next to impossible for them.

Plaintiff Michael Barone, who as a sole-proprietor labors under those same financial and administrative burdens, also is inhibited by the statutes in his creation of erotic portraits for couples who wish to have a professional photographer capture a moment of intimacy between them. *Complaint*, ¶ 23. Based on his experience, he believes that most couples will resist providing photo-identification for inspection by the government in connection with their portraits.

Plaintiff Thomas Hymes, a journalist, self-censors the content of his website, www.dailybabylon.com, because compliance with the record keeping requirements is cost prohibitive for his relatively young website and because he refuses to take the risk that a misstep in keeping the requisite records might result in federal criminal prosecution. *Complaint*, ¶ 29.

As its library of educational materials about sexual health and fulfillment has grown, so too have the burdens freighted upon Sinclair Institute, the producer of sex education videos. *Complaint*, ¶ 31. Sinclair was forced to incur the cost of converting its 2257 records to an electronic format, which it is careful to maintain and update in order to comply with the law and avoid criminal prosecution. The statutes have shaped its artistic and marketing decisions in creating and distributing its expression.

Carol Queen's work as a sex therapist and artist has been burdened by the statutes. *Complaint*, ¶ 37. As an academic and educator, she must take pains to collect and store photo identification cards for adults who participate in therapeutic and educational events she conducts to address sexual health and fulfillment. She likewise has experienced the chilling effect of the statutes in photography classes, once its participants are informed that they cannot participate anonymously.

Plaintiff Hartley experiences the burdens of the statutes both as a producer and as a performer. *Complaint*, ¶ 46. In both roles, she must forfeit her privacy: as a producer, she must place her home address, where she maintains the records, on her website, and as a performer, she must submit photo identification with private information to those filming her, over whom she has little, if any, control with regard to the security of the information she has provided.

As for Plaintiff Conners, the sole proprietor who must return to his home each day between the hours of 1:00 p.m. and 5:00 p.m. Monday through Friday, year round, to be available for an inspection of his records,[13] the government maintains that the newly minted regulation allowing producers to hire third parties to keep and maintain their records for them considerably lightens that burden.

It is important to be precise about how the regulation regarding third party record keepers operates in order to evaluate Defendant's contention.

First, the regulations do not ***compel*** the records to be kept by third party record keepers. They merely permit those who wish to hire someone to assume that obligation to do so. If the producer cannot afford to hire a third party record custodian, cannot find someone to assume that task (a not unlikely circumstance since for the first time in the 20-year history of the record keeping statutes, the regulations now allow what was previously prohibited), or, as a person who creates private, non-commercial expression might reasonably be expected, simply does not wish to hire

---

[13] Title 28 C.F.R. § 75.5 states in relevant part: "To the extent that the producer does not maintain at least 20 normal business hours per week, the producer must provide notice to the inspecting agency of the hours during which records will be available for inspection, which in no case may be less than 20 hours per week."

someone to perform that task, then he must maintain the records himself. It bears emphasis that the regulations provide that the records for each visual depiction must be maintained for a period of seven years, after it is created. Thus, the hiring of a third party custodian entails a long-term commitment.

Those who do not, cannot, or simply choose not to enter into such a commitment, and operate a business or studio out of their homes like Plaintiff Conners or create sexually explicit expression, not as part of a commercial enterprise but for private purposes, such as for posting on an adult social networking website or uploading to a tube site, and maintain their records in their homes, are subject to warrantless searches there. Refusal to allow the government agents into their homes to inspect their records is punishable as a felony.

The regulations themselves, in fact, provide a very strong disincentive to use a third party record keeper. Title 28 C.F.R. § 75.2 (h) reads:

> A primary or secondary producer may contract with a non-employee custodian to retain copies of the records that are required by this part. Such custodian must comply with all obligations related to the records that are required by this Part, and **such a contract does not relieve the producer of his liability under this part.**

(Emphasis added). Under the regulations, **the producer** is **criminally liable** if the third party custodian makes a mistake and fails to maintain the records in consonance with the statutory and regulatory requirements. Keep in mind that 18 U.S.C. § 2257 (f)(1) and 18 U.S.C. § 2257A (f)(1) impose **strict liability** for a producer's failure to "maintain the records as required" by the statute or "by any regulation promulgated" under it.

While allowing a producer to retain a third party custodian to maintain the records for him or her, the regulation requires that the producer, nevertheless, assume criminal liability for any

24

misssteps by the third party custodian.  Those producers who do not want to assume the risk of going to jail because the person they have hired to maintain their records "has not compl[ied] with all obligations" under the statutes and regulations will continue to maintain the records themselves.

For this reason alone, most commercial producers of adult films will not utilize a third party record keeper.[14]

## III.    TITLE 18 U.S.C. § 2257 AND 18 U.S.C. § 2257A ARE UNCONSTITUTIONALLY OVERBROAD.

As Plaintiffs noted in their opening brief, "the evaluation of whether a law is unconstitutionally overbroad because it reaches a substantial number of impermissible applications relative to its legitimate sweep...is similar to the evaluation required by intermediate scrutiny's 'narrowly tailored' inquiry." *Plaintiffs' Memorandum*, p. 32.

The Third Circuit confirmed that view in *Brown*–noting that the overbreadth doctrine applies where the government attempts to regulate non-protected activity, but because the statute is overboard, implicates protected expression.  586 F.3d at 273, n. 10; *See also, DeJohn v. Temple University,* 537 F.3d 301, 314 (3rd Cir. 2008) ("A regulation of speech may be struck down on its face if its prohibitions are sufficiently overbroad-that is, if it reaches too much expression that is protected by the Constitution." (Footnote omitted)).

The government attempts to avoid the statutes' overbreadth problem by a sleight of hand. Rather than justifying the the statutes' demands as a regulation of child pornography as ***unprotected***

---

[14]  It is true, as the government states, that Plaintiff Free Speech Coalition, but not the other fourteen Plaintiffs, urged the government to adopt the third party record keeping option, recognized that its adoption was a step in the right direction, and expressed its approval of the government's decision to adopt that option.  Plaintiff Free Speech Coalition has consistently maintained, however, that the statutory scheme remains unconstitutional and that the adoption of the third party record keeping option did not cure its constitutional flaws.

expression that incidentally implicates **protected** expression depicting adults, it argues that the statutes' regulation is focused on the "spectrum of speech" which, **if** it depicted children, would be unprotected expression.  It writes:

> Here, the spectrum of speech that is affected by the age verification and recordkeeping requirements, as set forth in the statutory definitions, is precisely the same spectrum of speech that would constitute child pornography, which is not protected speech, **if the performers in visual depictions in question were children**....The requirements therefore cannot be said to have an overbroad sweep because, in fact, there is a perfect fit between the requirements' sweep and the goal of ensuring that performers in visual depictions of sexually explicit conduct are not children.

*Defendant's Memorandum*, p. 33. (Emphasis added).

Its argument rests on the premise that if an adult depicted in constitutionally protected sexually explicit expression were actually a child, the expression would be unprotected child pornography. From this premise–that there is no constitutional impediment to regulating child pornography–the government concludes that it is perfectly reasonable to burden constitutionally protected sexually oriented expression that is **not** child pornography.

That same reasoning could justify regulating almost any expression, without limitation.  If a newspaper article contained deliberately false, damaging statements, it would be unprotected libel; therefore, it is perfectly reasonable, under the government's "spectrum of speech" theory, to impose restrictions on **all** newspaper articles because if their accurate statements were replaced by damaging falsehoods, they would not be protected by the First Amendment.  If a speech by a political activist included language that immediately and intentionally incited her audience to riot, then it would be unprotected speech; therefore, it is perfectly reasonable to impose restrictions on **all** speech by political activists because they are part of "the spectrum of speech" that include unprotected incitement to riot.  The list could go on.

26

The Supreme Court rejected similarly misguided reasoning several years ago in *Free Speech Coalition*–finding that the provisions of the child pornography statutes criminalizing virtual depictions of child pornography were unconstitutionally overbroad in suppressing protected expression that the government had argued "resembled" unprotected speech. The Court wrote:

> The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse. "[T]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted ...." *Broadrick v. Oklahoma*, 413 U.S., at 612, 93 S.Ct. 2908. The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process.

535 U.S. at 255. The same conclusion obtains here with even greater force. The expression at issue here involving adult images bears ***no*** resemblance to child pornography in the first place.

By attempting to obscure the boundaries between protected and unprotected expression and consequently lumping them together, the government tries to side step the inescapable conclusion that the statutes intrude far into the territory of protected expression in imposing their burdens on speech.

At the hearing in support of Plaintiffs' Motion for a Preliminary Injunction, Plaintiffs intend to adduce additional evidence demonstrating the statutes' overbreadth. *See Gibson v. Mayor and Council of the City of Wilmington*, 355 F.3d 215, 226 (3rd Cir. 2004).

## IV. THE RECORD KEEPING STATUTES ARE CONTENT-BASED REGULATIONS OF SPEECH AND ARE UNCONSTITUTIONAL UNDER STRICT SCRUTINY.

As demonstrated above, the statutes do not survive as constitutional regulations of expression under intermediate scrutiny. Plaintiffs contend, however, that they are, in fact, content-based regulations of speech that must be subjected to strict scrutiny.

27

The government responds that the statutes are content-neutral regulations of expression–arguing that "over the past decades, most courts that have examined the recordkeeping requirements have readily recognized that these requirements are content neutral."[15] *Defendant's Memorandum*, p. 13. In making that determination "over the past decades," however, no court has been confronted with the exemption for certain expression based on its content in 18 U.S.C. § 2257A (h)(1), the implementation of which began just a few months ago.

The Third Circuit in *Brown* considered the question of whether the Pittsburgh's ordinance's exemption of certain persons from its buffer zone restrictions rendered the law a content-based regulation subject to strict scrutiny. 586 F.3d at 273. The Pittsburgh ordinance established a fifteen-foot buffer zone in which "no person or persons shall knowingly congregate, patrol, picket or demonstrate." *Id.* The ordinance, however, "explicitly exempted" police, fire and rescue personnel and other emergency workers from the buffer zone's restrictions. *Id.* at 273-74.

The court noted that the City did not deny– and the court appeared to agree with it–that "the buffer zone's restrictions **would** be content-based if the Ordinance allowed the exempted category of persons" to "'picket or demonstrate' within the fifteen-foot zone while denying the others the same ability." *Id.* at 274 (Emphasis added). In order to avoid the "serious constitutional problems" this construction raised, however, the court construed the exemption as also prohibiting persons within the exempted class from picketing or demonstrating and construed the exemption to be limited to the performance of safety functions within the course of their official business. *Id.* at 274-

---

[15] Three judges of the Sixth Circuit, however, concluded in *Connection*, that 18 U.S.C. § 2257 was a content-based regulation of expression. 557 F.3d at 361-62. (Moore, J., *dissenting*) (joined by Judges Martin and Cole). The dissenting judge in *American Library Ass'n v. Reno*, 33 F.3d 78, 95 (D.C. Cir. 1994) also was not "convinced that [18 U.S.C. § 2257] [was] 'content neutral.'"

75. The distinction between expressive activities based on their content created by the exemption, which would have triggered strict scrutiny of content-based regulations, was thus removed.

No such limiting construction can be given the exemption conferred on producers of simulated sexually explicit expression in 18 U.S.C. § 2257A to avoid the content-based distinction it creates. As explained in Plaintiffs' Memorandum in Support of their Motion for a Preliminary Injunction, a producer of expression depicting *simulated* sexually explicit conduct is exempted from compliance with the statutory record keeping requirements if he meets certain specified conditions. 18 U.S.C. § 2257A (h)(1). A producer of expression depicting *actual* sexually explicit conduct meeting those exact same specified conditions must, nonetheless, comply with the full panoply of the statute's and regulations' obligations or face criminal prosecution. The only distinction between the two is the content of their speech. As the Third Circuit in *Brown* fully recognized, a law containing an exemption that creates such a distinction is content-based and is thus subject to strict scrutiny. *Id.* at 274; *see also, Citizens United*, 558 U.S. at __, No. 08-205, *Slip Op.* at 24 (First Amendment protects speech and speaker alike.)

The exemption, in fact, brings into focus the content-based nature of the record keeping statutes in their entirety, as three judges in *Connection* found to be the case, 557 F.3d at 361-62. For, with or without the exemption, the record keeping statutes are akin to the regulation of speech under review in *U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000).

Indeed, the government's discussion of the statutes' purpose underscores their content-based nature. It explains that the record keeping requirements' purpose is to assure that underage performers are not depicted in sexually explicit imagery. *Defendant's Memorandum*, pp. 20, 24. Plaintiffs agree that is a laudable goal; indeed, it is a goal they fully support. It is not, however, a

content-neutral one.

The government cannot reasonably maintain that the goal of preventing creators of expression from using minors in productions with a sexually explicit theme is "justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791. Rather, with that as the statutes' purpose, the record keeping requirements are specifically designed to affect the content of expression in a direct way: If the producer of the expression wants to use an underage actor, he must remove any sexuality in the work; conversely, if the producer of the expression determines that a sexually explicit scene is essential to his message, he must make sure that he uses only adult actors. *See Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 134 (1992). (Rejecting government's claim that a parade assessment fee based on audience's hostility to speech was content-neutral because it related to the cost of policing to maintain public order, finding "it cannot be said that the fee's justification 'ha[s] nothing to do with content.'" (Citations omitted)).

In response to the contention that the government advances here–that content-based regulations trigger First Amendment scrutiny only when they are fueled by "an improper censorial motive" – the Supreme Court explained in *Simon & Schuster v. Members of N.Y. Crime Victims Bd.*, 502 U.S. 105, 116 (1991), that "even regulations aimed at proper governmental concerns" must be analyzed as content-based regulations when they discriminate between categories of speech based on their content. Indeed, in *Brown*, the distinction in treatment created by the exemption arguably pertaining to the expressive activities of police, fire and emergency personnel and expressive activities by all others within the designated buffer zone could not be characterized as one fueled by a censorial motive. 586 F.3d at 274. Rather, it was a simple, straightforward distinction based on the status of the speaker, much like the regulation found to be content-based in *Simon & Schuster*. Had

the court not been able to construe the exemption to apply only to activities performed in the course of official business by the exempted category of persons, it would have qualified as a content-based regulation of speech–notwithstanding the fact that the distinction was not the product of an illicit legislative intent. *Id.* at 274-75.

The record keeping statutes do not satisfy strict scrutiny review by which the constitutionality of content-based regulations are evaluated, for, they do not promote a compelling governmental interest using the least restrictive alternative.

## V.    THE STATUTES UNCONSTITUTIONALLY SUPPRESS ANONYMOUS SPEECH.

The government does not contest that Plaintiffs have a right to speak anonymously, nor does it deny that the record keeping statutes implicate that right; rather, it broadly claims that "the impact of the age verification and recordkeeping requirements on anonymous speech is ***minor***" compared to the speech at issue in *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) and *Watchtower Bible & Tract Society of N.Y., Inc.*, 536 U.S. 150 (2002). *Defendant's Memorandum*, p. 35. (Emphasis added). Exactly how the government comes to that conclusion is mystifying.

The statutes at issue here regulate a category of expression of the most intimate and controversial sort. And in doing so, they invade the privacy of those producing and those appearing in that expression.[16] They require all such expression to bear a label identifying the address where the records are kept–which may be the home address of the producer and may, in fact, also be the home address of the person depicted. And, of course, they compel those depicted in such expression

---

[16] It bears noting that the Supreme Court determined in *Watchtower*, that the revelation of a person's physical identity does not foreclose his or her interest in anonymity. *Watchtower*, 536 U.S. at 166-67.

to submit photo identification documents–completely dispelling any shred of anonymity–so that government agents can examine and copy them.

Although the majority in *Connection* found that 18 U.S.C. § 2257 did not unconstitutionally abridge the right to speak anonymously of the Plaintiff magazine or its subscribers whose claims they advanced on their behalf, the court's analysis of the issue makes clear that its determination was based on the evidence before it, established at two separate evidentiary hearings, and that a determination of the issue by this Court cannot be made without the development of a factual record here. *Connection*, 557 F.3d at 330-31. [17]

Plaintiffs contend that the record keeping statutes unconstitutionally abridge the right to anonymous speech–a claim that they will support by evidence at the hearing on their Motion for Preliminary Injunction.

## VI.    TITLE 18 U.S.C. § 2257 AND 18 U.S.C. § 2257A IMPOSE A PRIOR RESTRAINT ON EXPRESSION.

The government argues that Plaintiffs' contention that the statutes impose a prior restraint on expression is "meritless" because they are content-neutral and "do not authorize any government official to proscribe protected speech entirely based on disagreement with its content." *Defendant's Memorandum*, p. 36.

Again, the government misses the point of Plaintiffs' argument.

The record keeping statutes single out a category of protected expression, establish requirements that must be fulfilled ***before*** that category of expression can be created or published,

---

[17] *Watchtower* proceeded to a full bench trial in the district court; *McIntyre* arose from state court proceedings in which the plaintiff was sanctioned and fined by the Ohio Elections Commission and subsequently reviewed by the Ohio trial court, which determined that the Ohio law at issue was unconstitutional as applied to the plaintiff's conduct. Thus, both these decisions were made on a full evidentiary record.

32

and absolutely ban creation or publication of that category of expression if those requirements are not or cannot be met. 18 U.S.C. § 2257(f); 18 U.S.C. § 2257A (f). And if the expression is created or published without meeting those requirements, its publisher will be criminally punished for violating the requirements–*without regard to the protected nature of the expression*. As such, the record keeping statutes are a species of prior restraints. *See, e.g., Bantam Books, Inc. v. Sullivan,* 372 U.S. 58 (1963).

It matters not to the prior restraint analysis that the laws may be considered content neutral for the purposes of evaluating their constitutionality under intermediate scrutiny. Nor must they authorize a government official to proscribe speech based on its content to qualify as unconstitutional prior restraints. Under the First Amendment, the statutes effect an unconstitutional prior restraint on expression because they establish requirements for a particular category of expression *before* it can be created or published, which if not met, prohibit it altogether–again, without regard to its protected nature.

## VII. THE STATUTES UNCONSTITUTIONALLY IMPOSE STRICT LIABILITY FOR FAILING TO CREATE AND MAINTAIN THE REQUISITE RECORDS AND THEREBY RESTRICT FREE EXPRESSION.

In addition to their other First Amendment challenges, Plaintiffs challenge the statutes on the ground that they impose strict liability for failure to create and maintain records in connection with the production of sexually explicit expression and therefore, unconstitutionally chill protected expression.

The Supreme Court in *Smith v. California*, 361 U.S. 147, 154 (1959), explained that strict liability statutes may be perfectly acceptable under certain circumstances, but not when they implicate expression. So while strict liability can be imposed to regulate non-speech related activities–like the sale of cans of spinach, lawn mowers or antacids, it cannot constitutionally be

imposed on activities involving the dissemination and publication of expression. The Court in *Smith* explained:

> [T]he question here is as to the validity of this ordinance's elimination of the scienter requirement-an elimination which may tend to work a substantial restriction on the freedom of speech and of the press. Our decisions furnish examples of legal devices and doctrines in most applications consistent with the Constitution, which cannot be applied in settings where they have the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it.

*Id.* at 150-51.

Thus, here, where the record keeping statutes impose strict liability on producers for failing to create or maintain the records in connection with the production and publication of their speech, the First Amendment does not tolerate the chilling effect created by its imposition.

Defendant, without explaining why, pronounces *Smith* to be inapplicable, *Defendant's Memorandum*, p. 37–even though the statutes at issue here contain no scienter requirement in imposing criminal liability in connection with the publication and dissemination of expression, the very issue before the Court in that case. The government argues further that Plaintiffs lack standing to challenge the statutes because they have not been charged with violating them nor have asserted lack of knowledge as a defense. *Defendant's Memorandum*, pp. 37-38.

Where, as here, the Plaintiffs assert a facial challenge to the statute on the ground that it imposes strict liability and thus presents the risk that it will chill protected speech, traditional requirements of standing are relaxed. *League of Women Voters of Pennsylvania v. Cappy*, 2009 WL 1845217, (U.S. Dist. Ct. M.D. Pa. 2009.) ("The Court recognizes that courts have relaxed the standing inquiry in cases where plaintiffs have made facial challenges to a statute or regulation on the grounds that the statute or regulation impermissibly chills First Amendment activity.")

But even under traditional rules of standing, Plaintiffs clear the bar. Standing requires a

34

showing that Plaintiffs allege a violation of a legally protected interest which is concrete and particularized, a causal connection between the conduct complained of and the alleged injury, and that such injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Here, Plaintiffs are all producers of sexually explicit expression subject to the unconstitutional statutes and thus, subject to criminal prosecution for any unwitting mistakes or failures–either made by themselves or by a third party record custodian with whom they have contracted–in connection with the records required to be kept by the statutes. Clearly, they have alleged a sufficient concrete violation of the First Amendment that directly and immediately affects them and that will be redressed by striking down the statutes in order to confer standing to challenge the statutes.

The government argues that *Lambert v. California*, 355 U.S. 225 (1957) is inapplicable, too, because violation of the statutes does not involve an "act of omission" nor a "passive" act. *Defendant's Memorandum*, p. 37. It comes to this conclusion by mistakenly arguing that the "production of visual depictions of sexually explicit conduct" is neither an act of omission nor passive. But the relevant conduct criminalized by the statutes is not the production of sexually explicit expression, but the *failure* to create and maintain records pertaining to that expression–which is indeed an "act of omission."

In fact, millions of Americans who post images with sexual imagery on adult social networking sites or on tube sites or send such expression via e-mail or cell phone would no doubt be shocked to learn that they have committed federal felonies by failing to collect photo identification and put a label on their images, stating the location where the government can appear to perform a § 2257 inspection.

35

*Lambert* does apply and requires the statues to be struck down for that reason.

## VIII.    THE STATUTES VIOLATE THE GUARANTEE TO EQUAL PROTECTION OF LAWS OF THE FIFTH AMENDMENT.

The government defends against Plaintiffs' Fifth Amendment equal protection claim by arguing that the record keeping scheme is content neutral and that the exemption created in 18 U.S.C. § 2257A "cannot possibly transform the nature of § 2257 from a content neutral regulation into one that is content based." *Defendants' Memorandum*, p. 39. Thus, it reasons, it does not violate the Fifth Amendment's requirement of equal treatment, citing *Hill v. Scranton*, 411 F.3d 118, 126 (3rd Cir. 2005). But that is exactly what the court in *Brown* concluded, had the exemption there not been susceptible to a construction that avoided a content-based distinction. 586 F.3d at 273-74.

The exemption created for producers of expression depicting simulated sexual conduct that excuses them from compliance with the onerous record keeping while similarly–if not identically situated–producers of expression depicting actual sexual conduct must comply with the full measure of the law, not only creates a content-based distinction, but also denies producers of the latter category of expression, equal protection of the law. It favors producers of one category of speech over producers of another category of speech based on nothing other than the content of their speech. *See Citizens United*, 558 U.S. at___; No. 08-205, *Slip Op.* at 24 ("Government may commit a constitutional wrong when by law it identifies certain preferred speakers.")

Defendant argues that "Congress did not intend the requirements to favor any one category of protected speech over others." *Defendant's Memorandum*, p. 38. He provides no support for that claim, however, and the unadorned statutory scheme shows quite the opposite to be true.

The legislative history also suggests otherwise. The only discussion in the Congressional Record about the exemption came from Senator Leahy who candidly explained that the Adam Walsh

36

Act's extension of the record keeping requirements to expression depicting simulated sexually explicit conduct "gave rise to legitimate concerns, expressed by groups as far ranging as the Chambers of Commerce, the Motion Picture Association of American, the American Hotel and Lodging Association, the American Library Association and the American Conservative Union, that its record keeping and labeling requirements, and associated criminal liability, might now affect an array of mainstream, legitimate, and first amendment protected activities and industries." 152 CONG. REC. S.8027 (2006). Leahy explained that the exemption was enacted to excuse from compliance "legitimate businesses that have no role in harming children."  *Id.*  That quite perfectly describes the Plaintiffs here.

Congress, however, apparently decided to distinguish between those who should be excused from compliance because they were engaged in "legitimate and first-amendment-protected activities" who played "no role in harming children" and those who were subject to compliance based on nothing other than the content of their expression. If the producer's expression depicted simulated sexually explicit expression, Congress concluded they were legitimate businesses having no role in harming children; if the expression depicted actual sexually explicit conduct, Congress concluded that they were not. That is the epitome of a regulation that exhibits hostility against speech based on its content. The statutes violate Plaintiffs' right to equal protection.

## IX.    THE STATUTES AND THEIR IMPLEMENTING REGULATIONS AUTHORIZE UNCONSTITUTIONAL WARRANTLESS SEARCHES AND SEIZURES OF HOMES AND BUSINESSES.

Defendant begins its response to Plaintiffs' constitutional challenge to the inspection scheme under the Fourth Amendment by arguing that the issue is not ripe for review. *Defendant's Memorandum*, pp. 41-44.  The determination of whether a claim is ripe for review turns on whether the alleged harm is "imaginary or speculative." *Steffel v. Thompson,* 415 U.S. 452 (1974).  The

threatened risk to Plaintiffs' Fourth Amendment rights are neither.

Defendant argues that to establish that their constitutional challenge to the warrantless searches permitted under the statutes and regulations is ripe, Plaintiffs must have been subject to such a search. Numerous decisions, however, have addressed facial challenges to regulatory schemes allowing warrantless searches under the Fourth Amendment, even though the plaintiff had not been subjected to an actual search under its provisions. *See e.g., Skinner v. Railway Labor Executives' Association,* 489 U.S. 602 (1989) (review of federal railroad alcohol and drug testing program); *California Bankers Association v. Shultz*, 416 U.S. 21 (1974) (review of Bank Secrecy Act's foreign and domestic reporting requirements); *Shoemaker v. Handel,* 795 F.2d 1136 (3rd Cir. 1986) (review of random urine testing requirement of jockeys established by the New Jersey Racing Commission); *Policemen's Benev. Ass'n of New Jersey, Local 318 v. Washington Tp.,* 850 F.2d 133 (3rd Cir. 1988) (review of township drug testing policy of police force); *Heffner v. Murphy,* 590 F. Supp.2d 710, 720 (M.D. Pa. 2008) (challenge by funeral directors to warrantless searches authorized by state funeral law).

The factual allegations of the Complaint establish the immediacy of the threat of inspection. Each Plaintiff produces expression with sexual content subject to the record keeping requirements and must, therefore, on penalty of criminal prosecution, create and maintain the requisite records and label their expression with the location of those records. If they do not keep regular business hours, like Plaintiff Conners, the regulations require them to "provide notice to the inspecting agency of the hours during which records will be available for inspection, which in no case may be less than 20 hours per week." 28 C.F.R. § 75.5. And as the factual allegations of the Complaint make clear, a number of the Plaintiffs maintain their records in their homes.

Each Plaintiff ***must***, on penalty of criminal prosecution, allow the Attorney General or his

38

designee to enter upon the premises where the records are located for the purpose of inspecting them. 18 U.S.C. § 2257 (f)(5); 18 U.S.C. § 2257A (f)(5). Thus, the threat to Plaintiffs' Fourth Amendment rights is neither speculative nor imaginary. As the allegations of the Complaint demonstrate, the threat to Plaintiffs' Fourth Amendment rights is real, concrete and immediate.

As for the merits of the Fourth Amendment issue, to respond to the government's contention that, for reasons that we will address shortly, the Fourth Amendment is not even implicated by this statutory scheme, it is necessary to return to some basic bedrock Fourth Amendment principles.

1.    When federal law enforcement officials enter private homes or business premises (in this case, of producers of sexual images) to investigate compliance with a federal criminal law, that is a search within the meaning of the Fourth Amendment.[18] *Johnson v. U.S.*, 333 U.S. 10, 13 (1948); *Camera v. Municipal Court*, 387 U.S. 523, 534, 536 (1967); *See v. City of Seattle*, 387 U.S. 541, 543 (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property."); *G. M. Leasing Corp. v. U. S.,* 429 U.S. 338 (1977); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978); *Thomas v. Independence Tp.*, 463 F.3d 285, 296 (3rd Cir. 2006). It is also a search when they enter (for the same purpose) the premises of third party record keepers, whether business premises or homes, (if that is where they choose to operate their record keeping service.) *Id.; Steagald v. U.S.*, 451 U.S. 204 (1981) (Warrantless entry into third party's home in connection with arrest warrant for fugitive was unconstitutional under the Fourth Amendment).

---

[18]   The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The presumption is they need a warrant to enter any of these premises. *Arizona v. Gant,* __ U.S.__, 129 S.Ct. 1710 (2009) ("[O]ur analysis begins as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions.' *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)."); *Kyllo v. U.S.,* 533 U.S. 27, 31(2001) ("With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.") *Camera,* 387 U.S. at ; *See,* 387 U.S. at 544-45. They certainly need probable cause. *U.S. v. Ross,* 456 U.S. 798, 809 (1982). Since, under the statutory scheme at issue here, they need neither, for that entry by federal officials to comport with the Fourth Amendment, they must rely upon an exception to both the warrant and the probable cause requirements of that Amendment

2.      When, after gaining entry to the private premises of a producer, the federal law enforcement agents proceed to the area where private records are maintained and search through those records, that is also a search within the meaning of the Fourth Amendment. *G.M. Leasing*, 429 U.S. at 354 ("warrantless seizure of property, even that owned by a corporation, situated on private premises to which access is not otherwise available for the seizing officer" is unconstitutional under Fourth Amendment.); *Payton v. New York*, 445 U.S. 573, 586-87(1980). When, after gaining entry to the private premises of a third party record keeper, they then search through the private records belonging to the producer, that is a search of the ***producer's*** private records that have been entrusted to the third party record keeper, a search implicating the Fourth Amendment rights of ***both*** the producer and the third party record keeper. *Rakas v. Illinois*, 439 U.S. 128, 136 (1978) (Recognizing

40

standing to raise Fourth Amendment challenge based on possessory interest in the items seized); *G.M. Leasing*, 429 U.S. at 352-53; *U.S. v. Leary*, 846 F.2d 592, 596-97 (10th Cir. 1988) (recognizing legitimate expectation of privacy in corporate records and rejecting government's argument that record keeping scheme defeats that expectation.); *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968) (warrantless search and seizure of records from workplace violated Fourth Amendment). *See also, Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329  (1979) ("[T]here is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees.") The presumption is that a warrant is needed for that search. *McDonald v. U.S.*, 335 U.S. 451, 453 (1948).  Probable cause is also necessary.  *In re U.S. for an Order Directing a Provider of Electronic Communication Service*, 534 F. Supp.2d 585, 586-87 (W.D. Pa. 2008).

Thus, for the search of those records to comport with the Fourth Amendment, the government must be able to point to an exception to both the warrant and the probable cause requirements of that Amendment.

**3.**     When, after searching through those private records, the agents make copies of them, whether at the producer's premises or at his third party record keeper's premises, this constitutes a seizure of those records belonging to the producer within the meaning of the Fourth Amendment. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (Seizure of property occurs whenever "there is some meaningful interference with an individual's possessory interests in that property.") *Walter v. U.S.,* 447 U.S. 649, 654 (1980) (viewing of films lawfully within government's possession constituted warrantless search and seizure); *United States v. Gray*, 484 F.2d 352, 356 (6th Cir. 1973) (copying down serial numbers from rifles constituted a seizure.) The presumption is that a warrant

41

is needed for this seizure. *Id.* At a minimum, probable cause is necessary. *Arizona v. Hicks*, 480 U.S. 321, 326 (1987). Because the statutes require neither, to justify the seizure, the government must be able to point to an exception to both the warrant and probable cause requirements.

The government argues that because the statutes simply authorize the government to enter private premises to inspect records that are created to comply with the statutory record keeping provisions, the Fourth Amendment does not require a warrant or probable cause to do so. But as explained above, bedrock Fourth Amendment precedent holds otherwise. A law enforcement officer cannot enter someone's home or office without a warrant on the ground that he is simply seeking to inspect records required to be maintained by statute. Nor does any constitutional authority allow the government to perform warrantless searches of such records or to seize them without a warrant.

Defendant*, citing *New York v. Burger*, 482 U.S. 691 (1987), argues:

> Plaintiffs' challenge rests on the notion that the inspection scheme here authorizes the search of *business premises*, which the Supreme Court has held to be subject to Fourth Amendment protection. See Burger, 482 U.S. at 699. In fact, § 2257 (c) requires that producers "make [the] *records* [that they are required to create and maintain pursuant to statute] available for inspection at all reasonable times."

*Defendant's Memorandum*, p. 45. (Emphasis in original).

But the very statute that the Supreme Court in *Burger* determined implicated the Fourth Amendment, just as the statute and regulations at issue here, required those engaged in the vehicle dismantling business "to produce... records" at the request of the government for the purpose of inspecting the business's records required by a statutory record keeping scheme. ("Upon the request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping

42

requirements of this section and which are on the premises...." *Id.* at 695, n.1) While the Court upheld the provision as permitting an administrative search of a closely regulated industry, there was no question that the provision authorized a search within the meaning of the Fourth Amendment. The same conclusion must be reached here.[19]

Just as importantly, the regulations at issue here do ***not*** confine the investigators' search to the records themselves, as the government suggests.  *Defendant's Memorandum*, p.45. Rather they authorize entry "without delay" into businesses, homes and other premises.  28 C.F.R. § 75.5 (a),(b). They assure that investigators may utilize other "investigative prerogatives" during the inspection process. 28 C.F.R. § 75.5 (f).  And they authorize seizure of any evidence of the commission of a felony during the warrantless search.  28 C.F.R. § 75.5 (g).  In fact, the "2257 Program Inspection Procedures" posted on the FBI's website indicates that as part of the inspection procedure, investigators photograph the exterior of the premises and the interior area of the premises where the records are stored and the area of the premises where the records are examined. http://www.fbi.gov/hq/cid/cac/program2257.htm (last visited January 28, 2010). *See Dow Chemical v. U.S.*, 476 U.S. 227, 236 (1986) (A business has "a reasonable, legitimate, and objective expectation of privacy within the interior of its covered buildings").

As for Defendant's claim that no privacy interests are implicated because the records subject to inspection have simply been created to comply with the statutes, that assertion is too clever by half.   The records at issue are not simply administrative documentation recording the sale of car parts or employee overtime payments, but consist of pre-existing records recording the private,

---

[19]  As stressed in *Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction*, the interests here are even more compelling since the records at issue pertain to production and publication of constitutionally protected expression.  *Plaintiffs' Memorandum*, p. 49.

personal information–weight, date of birth, home address, and other physical and medical information–of the persons portrayed in sexual imagery. They most certainly raise issues of privacy of the first order. But even if the records *were* created solely to comply with the statutes, that is not an exception to the warrant or probable cause requirements of the Fourth Amendment.

The only conceivable exception to the warrant and probable cause requirements the government could attempt to argue to defend the inspection regimen here is the administrative search exception. It is telling that the government makes only a half-hearted attempt to rely upon that doctrine. And clearly the statute fails to satisfy any of the essential requirements of that exception. As discussed more completely in Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, the warrantless inspection regimen at issue here does not target a closely regulated industry, is not in aid of a regulatory (as opposed to a criminal investigatory) scheme, and does not provide a constitutionally adequate substitute for a warrant. *Plaintiffs' Memorandum*, pp. 51-55. *See Burger*, 482 U.S. at 701, 702-03; *Showers v. Spangler*, 957 F.Supp. 584, 592 (M.D. Pa. 1997). The statutes cannot, therefore, be salvaged under the administrative search exception.

This is especially so since the administrative search exception is confined to warrantless searches of commercial premises; it has never been used to excuse a warrantless search of someone's home. *Camera v. Municipal Court*, 387 U.S. 523, 534, 536 (1967); *Maffucci v. City of Philadelphia*, 1999 WL 320940 at *3 (E.D. Pa. 1999) (Kelly, J.); *Haefner v. City of Philadelphia*, 2005 WL 525404 (E.D. Pa. 2005) (Green, J.); *cf. Professional Dog Breeders Advisory Council*, 2009 WL 2948527 (M.D. Pa 2009) (Rambo, J.) (Construing kennel inspection statute as requiring a warrant in order to enter a home). Yet the regulations authorize that very thing.

The government tries to soften the unconstitutional impact of that authorization by taking

44

cover under a provision of the regulations that allows producers to use third party records custodians to maintain their records. Defendant contends that because the regulations provide the option of allowing producers to hire third parties to maintain their records, "no producers who operate businesses out of their homes are required to allow inspectors to enter their homes." *Defendant's Memorandum*, p. 44. Therefore, the government reasons, any Fourth Amendment violation is averted.

The government's argument proves too much, however. For the government could defend **any** warrantless search of any home or business premises by simply pointing out that the victim of the search could have avoided entry onto his premises in the first place had he or she simply stored the object of the search elsewhere.

Here, none of the Plaintiffs uses a third party record keeper.[20] Thus, the statutes authorize warrantless intrusions into their own homes or businesses and violate their Fourth Amendment rights. Plaintiffs have set forth in detail above, *supra* at 23-25, precisely why they have not retained third parties to assume the record keeping obligations imposed by the statutes. But even if they had, as explained above, the inspection regimen allowing warrantless entry on to the premises of third party record keepers to search and seize their private records, still offends bedrock Fourth Amendment precedent. It violates not only the rights of the third party record keepers, whose premises are entered, but also the rights of the producers, whose "papers, and effects" are searched and seized–all without benefit of a warrant or probable cause.

The warrantless searches and seizures authorized by the statutes and regulations violate the

---

[20] There may be members of Plaintiff Free Speech Coalition who have attempted to retain third party record keepers, but the majority, like the Plaintiffs here, have not done so.

Fourth Amendment.

## **CONCLUSION**

Plaintiffs respectfully request that this Court deny Defendant's Motion to Dismiss the Complaint and grant their Motion for a Preliminary Injunction, after holding an evidentiary hearing affording Plaintiffs the opportunity to adduce evidence in support of their claims.

Respectfully submitted,

Date:   February 1, 2010

/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio  44113-1949
(216) 781-5245 / (216) 781-8207 (Facsimile)

KEVIN E. RAPHAEL (72673)
KER@Pietragallo.com
J. PETER SHINDEL, JR. (201554)
JPS@Pietragallo.com
PIETRAGALLO GORDON ALFANO BOSICK
 & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200 / (215) 981-0082 (Facsimile)

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2010, the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


<u>/s/ J. Michael Murray</u>
J. MICHAEL MURRAY (0019626)
LORRAINE R. BAUMGARDNER (0019642)
BERKMAN, GORDON, MURRAY & DeVAN

KEVIN E. RAPHAEL (72673)
J. PETER SHINDEL, JR. (201554)
PIETRAGALLO GORDON ALFANO BOSICK
 & RASPANTI, LLP

Attorneys for Plaintiffs