**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FREE SPEECH COALITION, INC., et al.** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| **v.** | : | **Case No. 2:09-CV-4607 (MMB)** |
| | : | |
| **THE HONORABLE ERIC H. HOLDER, JR.,** | : | |
| **Attorney General,** | : | |
| | : | |
| Defendant. | : | |

---

**BRIEF OF AMICUS CURIAE THE ELECTRONIC FRONTIER FOUNDATION
IN SUPPORT OF PLAINTIFFS**

---

Carl A. Solano (Pa. I.D. No. 23986)
Edward J. Sholinsky (Pa. I.D. No. 206561)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103-7286
(215) 751-2000

Matthew Zimmerman
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333

Attorneys for *Amicus Curiae* Electronic Frontier Foundation

Dated:  March 5, 2010

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

I.   INTEREST OF *AMICUS CURIAE* ....................................................... 1

II.  INTRODUCTION ................................................................................. 2

III. ARGUMENT ......................................................................................... 5

   A.   Section 2257 Infringes the Right to Anonymous Speech and Association and
   Chills Those Adults Who Wish to Lawfully Express Themselves Through Sexual
   Imagery. ....................................................................................................... 5

   B.   The Fourth Amendment Does Not Permit Warrantless Entry and Search of the
   Homes of Ordinary Individuals Who Produce First Amendment-Protected Materials. 11

      1.   Warrantless Searches of the Home Are Presumptively Unreasonable............. 11
      2.   The Administrative Search Doctrine Does Not Authorize the Search
      of the Homes of Ordinary Individuals Who Produce First Amendment-Protected
      Materials. ................................................................................................. 13
      3.   Plaintiffs' Challenge Is Justiciable. ................................................. 15

IV.  CONCLUSION ................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adolph Coors Co. v. Wallace*, 570 F. Supp. 202 (N.D. Cal. 1983) .................................. 8

*American Civil Liberties Union v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996),
*aff'd*, 521 U.S. 844 (1997) ........................................................................................ 11

*Bates v. City of Little Rock*, 361 U.S. 516 (1960) ............................................................ 8

*Berger v. New York*, 388 U.S 41 (1967) ....................................................................... 17

*Britt v. Superior Court*, 20 Cal.3d 844 (1978) ................................................................ 8

*Brown v. Socialist Workers '74 Camp. Committee*, 459 U.S. 87 (1982) ........................... 7

*Buckley v. Valeo*, 424 U.S. 1 (1976) .............................................................................. 7

*Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972) .................................................. 8

*Camara v. Municipal Court*, 387 U.S. 523 (1967) ................................................... 14, 21

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) ............. 19, 20, 21

*Connection Distrib. Co. v. Holder*, 557 F.3d 321 (en banc) ............................................ 4

*Denver Area Educational Telecommunications Consortium v. FCC*,
518 U.S. 727 (1996) ................................................................................................... 9

*Donovan v. Dewey*, 452 U.S. 594 (1981) ................................................................ 15, 16

*Dow Chemical Co. v. United States*, 476 U.S. 227 (1986) ............................................ 14

*Ealy v. Littlejohn*, 569 F.2d 219 (5th Cir. 1978) ............................................................ 8

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................... 21

*Frey v. Panza*, 621 F.2d 596 (3d Cir.1980) ................................................................. 16

*Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963) .............. 7, 8

*Illinois v. Rodriguez*, 497 U.S. 177 (1990) .................................................................. 12

*In re Grand Jury Proceeding*, 842 F.2d 1229 (11th Cir. 1988) ........................................ 8

*International Longshoremen's Ass'n. v. Waterfront Commission of New York Harbor*,
667 F.2d 267 (2d Cir. 1981) ........................................................................................ 8

*Johnson v. United States*, 333 U.S. 10 (1948) .............................................................. 13

*Katz v. United States*, 389 U.S. 347 (1967) .................................................................... 9

*Kyllo v. United States*, 533 U.S. 27 (2001) ............................................................. 12, 14

*Long Island Vietnam Moratorium Comm. v. Cahn*, 437 F.2d 344 (2d Cir.1970) ........... 10

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................... 19

*Marshall v. Barlow's Inc.*, 436 U.S. 307 (1978) ........................................................... 15

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ............................................6, 8

*Michigan v. Tyler*, 436 U.S. 499 (1978) ........................................................................ 15

*NAACP v. Alabama,* 357 U.S. 449, 462 (1958) ............................................................... 7

*NAACP v. Button*, 371 U.S. 415 (1963) ......................................................................... 19

*New York v. Burger*, 482 U.S. 691 (1987) ..............................................................15, 16

*Payton v. New York*, 445 U.S. 573 (1980) ...............................................................14, 18

*Pollard v. Roberts*, 283 F. Supp. 248 (W.D. Ark. 1968) ................................................. 8

*Prof'l Dog Breeders Advisory Counsel v. Wolff*,
No. 09-0258, 2009 WL 2948527 (M.D. Pa. Sept. 11, 2009) .......................................... 16

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ................................................................. 8

*Sable Communications of California, Inc. v. FCC*, 492 U.S. 115 (1989) ......................... 8

*Savola v. Webster*, 644 F.2d 743 (8th Cir. 1981) ............................................................ 8

*Shelton v. Tucker*, 364 U.S. 479 (1960) .....................................................................7, 11

*Sibron v. New York*, 392 U.S. 40 (1968) ..................................................................17, 18

*Talley v. California*, 362 U.S. 60 (1960) ........................................................................ 6

*Thornhill v. Alabama*, 310 U.S. 88 (1940) ................................................................... 20

*Torres v. Puerto Rico*, 442 U.S. 465 (1979) ................................................................. 18

*United States v. Biswell*, 406 U.S. 311 (1972) .............................................................. 15

*United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993) ...................... 19

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000) ................................ 9

*United States v. U.S. District Court*, 407 U.S. 297 (1972) .........................................9, 13

*Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ............................... 20

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*,
536 U.S. 150 (2002)................................................................................................6, 11

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ........................................................... 18

**Statutes**

18 U.S.C. § 2257 ....................................................................................................passim

## I.     INTEREST OF *AMICUS CURIAE*

The Electronic Frontier Foundation is a non-profit, member-supported civil liberties organization working to protect rights in the digital world.  EFF actively encourages and challenges industry, government, and the courts to support free expression, privacy, and openness in the information society.  Founded in 1990, EFF is based in San Francisco, California.  EFF has members in all 50 states and maintains one of the most linked-to websites (http://www.eff.org) in the world.  As part of its mission, EFF has served as counsel or *amicus* in key cases addressing people's right to remain anonymous when they post comments on the Internet, as well as making sure that anonymous speakers' due process rights are respected.  *See, e.g.*, *Sony Entertainment Inc. v. Does*, 326 F. Supp. 2d 556, 564-65 (S.D.N.Y. 2004); *Doe v. Cahill*, 884 A.2d 451 (Del. 2005); *H.B. Fuller Co. v. Doe*, 60 Cal. Rptr. 3d 501 (Ct. App. 2007); *Mobilisa, Inc. v. Doe*, 170 P.3d 712 (Ariz. Ct. App. 2007).  In addition, EFF has been at the forefront of key cases, as both counsel and *amicus*, to ensure the protection of Fourth Amendment rights in the context of searches involving the Internet and other new digital technologies.  *See, e.g.*, *In re NSA Telecommunications Records Litigation*, 564 F. Supp. 2d 1109 (N.D. Cal. 2008); *Warshak v. U.S.*, 532 F.3d 521 (6th Cir. 2008); *In re Application of the United States of America for an Order Directing a Provider of Electronic Communications Service to Disclose Records to the Government*, No. 07-524M, 2008 U.S. Dist. LEXIS 98761 (W.D. Pa. Sept. 10, 2008), *appeal docketed*, No. 08-4227 (3d Cir. 2009).  Particularly where private and personal activity is involved, as it is here, any statutory and regulatory scheme must be carefully examined and challenged to justify the extent of its reach.  EFF believes that the Court will benefit from a more thorough analysis of the First and Fourth Amendment rights implicated by the statute and its corresponding regulations.

## II.    INTRODUCTION

The current implementation of 18 U.S.C. § 2257 unconstitutionally encroaches on the free expression of a staggering number of Americans.  Section 2257, which originally targeted producers of child pornography by creating a rebuttable presumption that an individual depicted in sexually explicit expression was a minor in a child pornography prosecution if the producer did not maintain records, has been amended to expand its scope such that it now applies to individual photographers and videographers who create and publish sexual content for personal and non-commercial purposes.[1]  As a result, the use of social networking applications, dating profiles, personal erotic websites, sexual text messaging and other forms of adult expression are burdened by onerous record-keeping requirements of which most speakers are likely not even aware.  The price of failure to comply is potential criminal penalties and significant prison time.

At some point in the past, the kind of sexual content that Section 2257 regulates may not have been typically created by the average American.  But times have changed, with respect to both social mores and technical abilities.  Digital cameras and videocameras and the Internet have combined to make it easy and inexpensive for people to take photos and videos of themselves while nude or in sexual situations and to share those images with others in a wide variety of ways.

Americans have embraced the opportunity.  In 2007, 62% of Americans owned a digital camera, 41% owned a video camera, and 58% used their cell phones to take photographs.[2]  Furthermore, 70% of those who took digital pictures shared them through email, and 34% posted them to the Internet.[3]  As a result, the regulations now potentially affect millions of people.  The United States had 220 million Internet users in 2008,

---

[1] Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction ("Plaintiffs' Motion") at 3-4.
[2] Pew Internet Annual Gadgets Survey 2007 at 21, Dec. 13, 2007, *available at* http://www.pewinternet.org/~/media//Files/Questionnaire/2009/PIAL%20Gadgets07%20 FINAL%20Topline_1213.pdf (last visited Mar. 2, 2010).
[3] *Id.*

2

representing 71.2% of the population.[4]  The Nielsen Company estimated the number of

users in its "Current Digital Media Universe" to be approximately 235 million as of

December 2009.[5]  One report showed that in 2006, 35% of total Internet users in the

United States created content online,[6] while another source reported 82.5 million user-

generated content creators, or 42.8% of total Internet users in 2008.[7]

     The exponential growth of user-generated content includes sexually explicit

content. According to recent surveys, 33% of young adults had sent or posted nude or

semi-nude images of themselves.[8]  Sending explicit images is by no means limited to

young adults.  It is also common among the middle-aged and senior citizens.[9]

AdultFriendFinder.com, a personals site for adult dating, reports more than 30 million

members,[10] many of whom post suggestive or intimate photos of themselves to attract

potential partners.  The personals section of craigslist includes listings with explicit adult

photos — many shot only from the neck down.  One of the more popular social sites this

---

[4] International Telecommunication Union, Information Society Statistical Profiles 2009: Americas at 15, *available at* http://www.itu.int/dms_pub/itu-d/opb/ind/D-IND-RPM.AM-2009-E09-PDF-E.pdf (last visited Mar. 2, 2010).

[5] Nielsen Wire, Top U.S. Web Brands and Site Usage:  December 2009, *available at* http://blog.nielsen.com/nielsenwire/online_mobile/top-u-s-web-brands-and-site-usage-december-2009 (last visited Mar. 2, 2010).

[6] Organization for Economic Co-operation and Development, Working Paper on the Information Economy — Participative Web:  User-Generated Content at 11, *available at* http://www.oecd.org/dataoecd/57/14/38393115.pdf (last visited Mar. 2, 2010).

[7] eMarketer.com, A Spotlight on UGC Participation, *available at* http://www.emarketer.com/Article.aspx?R=1006914 (last visited Mar. 2, 2010).

[8] The National Campaign to Prevent Teen and Unplanned Pregnancy, Sex and Tech: Results from a Survey of Teens and Young Adults at 14, *available at* http://www.thenationalcampaign.org/SEXTECH/PDF/SexTech_Summary.pdf  (20–26 year olds); A Thin Line 2009  AP MTV Digital Abuse Study, Dec. 2009, *available at* http://www.athinline.org/MTV-AP_Digital_Abuse_Study_Executive_Summary.pdf and http://www.athinline.org/MTV-AP_Digital_Abuse_Study_Full.pdf (18-24 year olds) (last visited Mar. 2, 2010).

[9] Jessica Leshnoff, AARP.org, *C\*U\*2nite: Sexting not Just for Kids*, Nov. 2009, http://www.aarp.org/family/love/articles/sexting_not_just_for_kids.html  (last visited Mar. 2, 2010).

[10] http://www.adultfriendfinder.com (last visited Mar. 4, 2010).

week, ChatRoulette, randomly connects people with webcams around the world, some of whom are transmitting naked images of themselves.[11]  Clearly, "millions of adults exchange or share personally-produced sexually-explicit depictions."  *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 370 (6th Cir. 2009) (en banc) (White, J., dissenting).[12]

By the plain language of Section 2257, adults who merely take sexual photos or videos of themselves in the privacy of their own homes are subject to the onerous burdens of the regulations.  *See id.* at 338 (6th Cir. 2009) (majority opinion) (rejecting the Government's argument that the statutory text could be construed to reach only expression offered for sale or trade); Plaintiffs' Motion at 10-12.  Its reach is not limited to expression produced only for sale or trade as the Government argues.  Furthermore, the Government concedes that persons engaging in mere non-commercial trading of images are subject to the record-making and record-keeping burdens of Section 2257.  Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction and in Support of Defendant's Motion to Dismiss ("Defendant's Motion to Dismiss") at 34; Defendant's Reply in Support of Motion to Dismiss ("Defendant's Reply") at 15.[13]

A person, whether seeking to create for himself or to communicate with others his sexual interests, must maintain a copy of his own driver's license and the licenses of

---

[11] *See* Dan Fletcher, *ChatRoulette: The Perils of Video Chats with Strangers*, Time.com, Feb. 16, 2010, http://www.time.com/time/business/article/0,8599,1963943,00.html (noting that over 10,000 are logged on at any time and a "disturbing number of people video-chatting in the buff") (last visited Mar. 4, 2010).

[12] Judge White's dissent also highlighted the "stipulation of the parties noting the existence of, and incorporating an exhibit listing, over 13 million personal ads containing sexually-explicit text and images on a single website for sex and swinger personal ads, of which those examined showed that over 94% involved adults over 21."  *Connection Distrib.*, 557 F.3d at 370

[13] Even while claiming that private sharing of images between "couples and intimate associates" does not fall under the statute, the Government claims "images themselves may be an item of trade," implying that a couple that *exchanges* images with each other or with another couple would be subject to 2257 regulations.  *Id.*

anyone else in the image, record the URL where his photograph is posted, record the date

he took the photo or video, and maintain the records in his own home (because he does

not run a business, he has no business premises) and post his home address online

attached to the photograph, thus displaying his identity to the world, or pay for the

services of a third-party custodian in order to maintain a modicum of privacy.[14]  The

person may want to share the image, but not his name, birth date, or address.

Furthermore, the person would have no privacy or anonymity with respect to the

Government, as Section 2257 gives inspectors full access to the records stored in his

home or office, and the right to copy them, with no judicial oversight.  Failure to comply

with these regulations, whether through ignorance or oversight, is punishable by up to

five years in prison.  The high financial and administrative costs for those who wish to

create or trade sexual imagery — even for personal or non-commercial use — plus the

draconian criminal penalties, unconstitutionally burden average Americans seeking to

engage, anonymously or otherwise, in protected sexual expression.

## III.   ARGUMENT

### A.   Section 2257 Infringes the Right to Anonymous Speech and Association and Chills Those Adults Who Wish to Lawfully Express Themselves Through Sexual Imagery.

Section 2257's record-keeping, labeling, and inspection requirements infringe the

rights of individuals to participate in anonymous expression, a problem of expanding

scope as more and more individuals utilize what are increasingly ubiquitous

communications technologies.

---

[14] One third party offers storage for an initial fee of $300, plus a fixed fee per record.
2257 Services, https://www.2257services.net/services.php.  Another offers record-
keeping services for $12.95 per month, plus a registration fee of $99. Pepper Law Group,
http://www.informationlaw.com/index.php?option=com_virtuemart&page=shop.browse
&category_id=1&Itemid=58 (last visited Mar. 4, 2010). Since records must be
maintained for seven years, this adds up to a minimum of $1186.80.

Courts have long recognized protection under the First Amendment for the right to engage in anonymous communication — to communicate, listen, and/or associate anonymously — as fundamental to a free society.  The U.S. Supreme Court has consistently upheld the right to speak anonymously in a variety of contexts, noting that "[a]nonymity is a shield from the tyranny of the majority . . . [that] exemplifies the purpose [of the First Amendment] to protect unpopular individuals from retaliation . . .  at the hand of an intolerant society."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995); *id.* at 342 ("[A]n  author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment."); *Talley v. California*, 362 U.S. 60, 64 (1960) (finding a municipal ordinance requiring identification on hand-bills unconstitutional, noting that "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind.").   As the Supreme Court noted in *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 166 (2002), this right to engage in anonymous speech is more than just one form of protected speech; it is part of "our national heritage and constitutional tradition."

It is also clearly established that the First Amendment protects Plaintiffs' right to associate privately, free from unwarranted government surveillance or interference.  The U.S. Supreme Court has long held that associational privacy is intimately connected to First Amendment freedoms.  More than 50 years ago, the Court secured First Amendment freedoms by prohibiting improper surveillance, as well as other forced disclosures of private membership or identifying information.  For example, in *NAACP v. Alabama*, 357 U.S. 449 (1958), the Supreme Court invalidated an Alabama order that would have required the NAACP to disclose its membership lists because protecting First Amendment interests hinges on keeping private membership information out of the hands of government.  The Supreme Court wrote:

6

> It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as the forms of governmental action in the cases above were thought likely to produce upon the particular constitutional rights there involved.  This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.

*Id*. at 462.  Similarly, in *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 544 (1963), the Supreme Court held that the state was not entitled to compel a local race relations association to produce its membership records in order to determine whether any of its members were also alleged Communists.  *See also Brown v. Socialist Workers '74 Camp. Comm.*, 459 U.S. 87, 91 (1982) ("[C]ompelled disclosure . . . 'can seriously infringe on privacy of association and belief guaranteed by the First Amendment.'") (quoting *Buckley v. Valeo*, 424 U.S. 1, 64 (1976)); *Shelton v. Tucker*, 364 U.S. 479, 485-86 (1960).  A wide range of courts have further found a connection between the right to privacy and fundamental First Amendment freedoms in cases dealing with registration statutes,[15] grand jury subpoenas,[16] government subpoenas *duces tecum*,[17] and civil discovery requests between private parties.[18]

Adult sexual communications, if not obscene, enjoy First Amendment protection for all the reasons that animate the right to anonymity.  *See, e.g., McIntyre*, 514 U.S. at 341-42 ("The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible."); *Sable Commc'ns. of Cal., Inc. v. FCC*, 492 U.S.

---

[15] *See, e.g., Bates v. City of Little Rock*, 361 U.S. 516 (1960).
[16] *See, e.g., Ealy v. Littlejohn*, 569 F.2d 219, 230-31 (5th Cir. 1978); *Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972) (abrogated by statute on other grounds).
[17] *See, e.g., Gibson*, 372 U.S. 539 (legislative subpoena and subpoena *duces tecum* ("SDT")); *In re Grand Jury Proceeding*, 842 F.2d 1229 (11th Cir. 1988) (grand jury SDT); *Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267 (2d Cir. 1981) (government commission SDT); *Pollard v. Roberts*, 283 F. Supp. 248 (W.D. Ark. 1968), *aff'd per curiam*, 393 U.S. 14 (1968) (prosecutor SDT).
[18] *Britt v. Superior Court*, 20 Cal.3d 844 (1978); *Adolph Coors Co. v. Wallace*, 570 F. Supp. 202 (N.D. Cal. 1983); *Savola v. Webster*, 644 F.2d 743 (8th Cir. 1981).

115, 126 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment . . . ."); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984) (noting that the freedom of association extends to "choices to enter into and maintain certain intimate human relationships" and that they "must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme."); *United States v. U.S. District Court*, 407 U.S. 297, 312-13 (1972) (holding that in the Fourth Amendment context, "private speech," a "cherished privacy of law-abiding citizens" the Bill of Rights was meant to safeguard, is shielded from "unreasonable surveillance") (citing *Katz v. United States*, 389 U.S. 347, 348 (1967)); *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 826 (2000) (writing that "[t]he history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly," referring to the sexually explicit speech at issue in the case); *Denver Area Educ. Telecommc'ns Consortium v. FCC*, 518 U.S. 727, 754 (1996) (striking down a statutory provision that required a citizen to provide written notice to cable operator requesting transmission of channels that broadcast "patently offensive" shows on the ground that the notice requirement restricted "viewing by subscribers who fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish to watch the 'patently offensive' channel").

Given the sensitive nature of the communications implicated by Section 2257 and its accompanying regulations, the wide swath of individuals subject to the plain language of the statute, and the potential impact of the disclosure of their identities, this Court has considerable cause to scrutinize the First Amendment impact of this law.

While the right to anonymous speech is not absolute, the Government cannot penalize (or threaten) the lawful speech at issue here without at least demonstrating that the statute furthers a substantial governmental interest while being reasonably tailored to

advance that interest.[19]  It does not.  The parties agree that combating child pornography is an important governmental interest.  However, the statute does not further that interest in a manner consistent with the First Amendment.  By imposing the record-keeping, labeling, and inspection requirements on an expansive class of expression in which an increasing number of technology-enabled individuals participate, the statute is substantially overbroad and thus unconstitutional.

The rules are not saved by the Government's assertion that it does not intend to enforce the statute against persons engaged in private communications inside the home.  First, the Government has confirmed that private trade of covered images via text message, email, or other means, triggers the record-keeping requirement.[20]  Second, private creation is covered by the plain language of the statute.  18 U.S.C. § 2257.[21]

Finally, the overbreadth doctrine is designed in part to guard against the chilling effect created from law enforcement's discretion to engage in selective enforcement.  This chilling effect remains a serious concern here, even if the at-risk speech was limited to communications in the home.  *See, e.g.*, *Long Island Vietnam Moratorium Comm. v. Cahn*, 437 F.2d 344, 350 (2d Cir. 1970) (holding a statute unconstitutional on its face because it "vests local law enforcement officers with too much arbitrary discretion[,] . . .

---

[19] Plaintiffs argue that Section 2257 is content-based and should be subject to strict scrutiny but that it still runs afoul of the First Amendment if an intermediate scrutiny is applied.  *Amicus* agrees that the statute fails under either standard.

[20] Def.'s Motion to Dismiss at 34; Def.'s Reply to Motion to Dismiss at 15.

[21] (a) ***Whoever*** produces ***any*** book, magazine, periodical, film, videotape, digital image, digitally- or computer-manipulated image of an actual human being, picture, or other matter which–

> (1) contains one or more visual depictions made after November 1, 1990 of actual sexually explicit conduct; and
> (2) is produced in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce, or is shipped or transported or is intended for shipment or transportation in interstate or foreign commerce;
> shall create and maintain individually identifiable records pertaining to every performer portrayed in such a visual depiction.

(emphasis added).  *See also* 18 U.S.C. § 2257A (a).

permit[ting] only that expression which local officials will tolerate" as a result of the overbreadth of its statutory language, "render[ing] the statute unconstitutional"). The continued rapid emergence of low-cost and efficient Internet-enabled communications technologies — including such innovations as text-messaging, e-mail, web cams, social networking applications, and the like — raises the reasonable concern that the Government's enforcement priorities will change. *See, e.g.*, *Am. Civil Liberties Union v. Reno*, 929 F. Supp. 824, 857 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997) (rejecting the "troubl[ing]" argument that "the First Amendment should [ ] be interpreted to require [the court] to entrust the protection it affords to the judgment of prosecutors" when "[p]rosecutors come and go" but "[t]he First Amendment remains to give protection to future generations").

The Government asserts that the chilling effect of this regulation is minimal as the statutory scheme "would only allow the Government — not the public at large — to view identifying information about performers." *See, e.g.*, Defendant's Reply at 25. This argument ignores the doctrinal underpinnings of the right to speak anonymously. It also offers no comfort to the growing number of individuals who fall under the scope of these requirements. Neither Section 2257 nor its accompanying regulations impose confidentiality limitations on law enforcement. *See, e.g.*, *Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (recognizing the chilling effect of forced disclosure to the Government without a confidentiality agreement). Moreover, the incongruity between the requirements of the statute and the Supreme Court's aversion to schemes that mandate identification to the Government weighs strongly in favor of Plaintiffs' challenge. *See, e.g.*, *Watchtower Bible & Tract Soc'y of New York, Inc.*, 536 U.S. at 165-66 ("It is offensive — not only to the values protected by the First Amendment, but to the very notion of a free society — that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so.").

**B.    The Fourth Amendment Does Not Permit Warrantless Entry and Search of the Homes of Ordinary Individuals Who Produce First Amendment-Protected Materials.**

Section 2257 and its associated regulations further run afoul of the First and Fourth Amendments because they authorize the Government to conduct warrantless searches of the home without probable cause and outside of any valid exception to the warrant requirement.  *See, e.g.*, Plaintiffs' Memorandum In Opposition to Defendant's Motion to Dismiss and Reply to Defendant's Memorandum In Opposition to Plaintiffs' Motion for Preliminary Injunction ("Plaintiff's Opposition") at 43 (the regulations "authorize entry 'without delay' into . . . homes"); *id*. at 44 (the administrative search exception "has never been used to excuse a warrantless search of someone's home"). Pre-enforcement review under First Amendment standards is required because the undisputed impact of the inspection scheme is to burden producers of expression — artists, freelance photographers and journalists, sex educators and therapists, as well as millions of ordinary Americans.

**1.    Warrantless Searches of the Home Are Presumptively Unreasonable.**

"At the very core of the Fourth Amendment stands for the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.  With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (internal quotation marks and citations omitted); *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) ("The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects.").

The Government denies the problem by asserting that every producer of sexually explicit material is a business subject to warrantless inspection.  Defendant's Reply at 31 ("that some producers of sexually-explicit material may choose to operate businesses out of their homes and to maintain records at their home-businesses has no bearing on whether the inspection scheme on its face comports with the Fourth Amendment."); *id*. at

35 ("government inspection of these records simply does not implicate any reasonable expectation of privacy on the part of producers").

This response stands the Fourth Amendment and its protection of the home on its head. The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *U.S. District Court*, 407 U.S. at 313. The Government cannot, by regulation or legislation, convert Plaintiffs' homes into businesses to be inspected at the discretion of law enforcement. As the Supreme Court explained more than half a century ago:

> Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

*Johnson v. United States*, 333 U.S. 10, 14 (1948).

The Fourth Amendment's protections cannot be circumvented by sending government agents into the home without warrants for "limited" inspections of records. No home would be safe from such record-keeping/inspection schemes. That "the regulations require the inspector to notify a producer of 'the limited nature of the records inspection,' and inform the producer of 'the records that he or she wishes to inspect,'" and that "an inspector could conduct such an inspection in the entryway or waiting area of a producer's business," Defendant's Reply at 32, is meaningless: once in the home, law enforcement will inevitably be privy to many details of household life. Indeed,

> The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. . . . [A]ny physical invasion of the structure of the home, "by even a fraction of an inch," was too much, and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor. In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes.

*Kyllo*, 533 U.S. at 37 (emphasis in original) (citation omitted).

12

Indeed, the Government has made plain that inspectors are supposed to collect these intimate details:  the "2257 Program Inspection Procedures" posted on the FBI's website indicate that "as part of the inspection procedure, investigators photograph the exterior of the premises and the interior area of the premises where the records are stored and the area of the premises where the records are examined."  Plaintiffs' Opposition at 43 (citation omitted).

The Fourth Amendment draws "a firm line at the entrance to the house," *Payton v. New York*, 445 U.S. 573, 590 (1980), and the Government cannot eliminate Plaintiffs' reasonable expectation of privacy in their homes and domestic lives, "where privacy expectations are most heightened," *Dow Chemical Co. v. United States*, 476 U.S. 227, 237 n.4 (1986).

### 2. The Administrative Search Doctrine Does Not Authorize the Search of the Homes of Ordinary Individuals Who Produce First Amendment-Protected Materials.

As Plaintiffs demonstrate, "the Fourth Amendment — save for a few discrete exceptions —  prohibits warrantless searches and seizures of businesses as well as homes." Plaintiffs' Motion at 50 (citing *Camara v. Municipal Court*, 387 U.S. 523, 531-32 (1967); *Marshall v. Barlow's Inc.*, 436 U.S. 307, 311-12 (1978); *Donovan v. Dewey*, 452 U.S. 594, 602 (1981)).  No exception to the Fourth Amendment warrant requirement justifies the warrantless intrusion authorized by Section 2257.

Of particular concern to *amicus* is the Government's improper invocation of the administrative search doctrine.  Under the doctrine, certain searches of "closely-regulated industries" are permissible without a warrant when the following conditions are met:  (1) a substantial government interest informs the regulatory scheme under which the search is made; (2) the search is necessary to further the regulatory scheme; and (3) the statute's inspection program is a "constitutionally adequate substitute for a warrant."  *New York v. Burger*, 482 U.S. 691, 702-04 (1987) (warrantless administrative inspection of premises of closely regulated business) (citations omitted); *see also Michigan v. Tyler*, 436 U.S.

13

499, 507-12 (1978) (administrative inspection of fire-damaged premises to determine cause of the fire).

Section 2257's search regime does not fall under the administrative search exception to the Fourth Amendment's warrant requirement.  The obligations and authorized intrusions imposed by Section 2257 target expressive activity.  The number of individuals participating in that expressive activity grows every day, influenced by changes in both technology and social values.  Thus the regulations do not map closely (or even remotely) on a "closely-regulated" industry — or an industry of any kind.  They affect ordinary adult Americans with digital cameras and Internet connections.  Burdening their legal expression with these regulations is inconsistent with the doctrinal underpinnings behind the administrative search doctrine and runs afoul of the protections of the Fourth Amendment.  *See, e.g.*, *Burger*, 482 U.S. at 700 ("An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home.") (citing *Donovan*, 452 U.S. at 598-599).

The Government counters that "producers of sexually-explicit materials have long been on notice that the government expects them to ensure that their performers are adults, that such producers must verify performers' ages and maintain records of having done so, and that these records are subject to warrantless inspection," so that "[t]he industry can therefore be considered 'closely regulated.'"  Defendant's Reply at 36.

Here again, the Government relies on the fiction that these regulations target an "industry."  In fact, the regulations target the common First Amendment activity of producing and distributing sexually explicit images — an activity that, today, many individuals lawfully enjoy both in the privacy of their homes and on the Internet, and without any idea that they could belong to any closely regulated "industry."  These creators and communicators simply are not so closely regulated that they "cannot help but be aware that [their] property will be subject to periodic inspections for specific purposes" under *Burger*, 482 U.S. at 703 (internal citations omitted).

14

That *commercial producers* of sexually-explicit materials may have previously been on notice of age-verification and inspection requirements is of no moment to whether Congress may decree that individuals engaged in First Amendment-protected expression constitute a "closely-regulated industry" for Fourth Amendment purposes. Congress may not. The Government's sole citation regarding this issue — to an unpublished opinion — is inapposite, as the "kennel industry" in that case was undoubtedly commercial and the regulated activity (dog breeding) did not implicate First Amendment rights. *See, e.g.*, *Professional Dog Breeders Advisory Counsel v. Wolff*, No. 09-0258, 2009 WL 2948527, *8 (M.D. Pa. Sept. 11, 2009) (quoting *Frey v. Panza*, 621 F.2d 596, 597 (3d Cir. 1980), for the proposition that "[i]ndividuals who 'choose to engage in such licensed and regulated businesses accept the burdens as well as the benefits of the trade'"). The Government does not and cannot directly challenge Plaintiffs' contention that the administrative search doctrine has never been invoked to justify a warrantless search of a non-commercial actor. Plaintiffs' Motion at 44.

### 3.      Plaintiffs' Challenge Is Justiciable.

The Government also claims that Plaintiffs' challenge to the warrantless inspection scheme is unripe and that the Court should await an actual warrantless inspection before evaluating its constitutionality.

As Plaintiffs have explained, facial Fourth Amendment challenges are fully justiciable. Plaintiffs' Opposition at 38. When a statute is "deficient on its face" because it authorizes searches "without adequate judicial supervision or protective measures," it makes no sense to wait for Fourth Amendment rights to be violated. *Berger v. New York*, 388 U.S. 41, 60 (1967); *id*. at 64 ("The Fourth Amendment . . . prescribe[s] a constitutional standard that must be met before official invasion is permissible").

Here, of course, the regulations plainly authorize official invasion of homes and businesses precisely because they are engaged in protected speech — without judicial supervision, without probable cause, and without exigent circumstances.

*Sibron v. New York*, 392 U.S. 40 (1968), does not support the Government's argument.  In *Sibron*, while the Supreme Court refrained from addressing the facial constitutionality of a state statute, the statute authorized certain warrantless encounters in "extraordinarily elastic" terms susceptible to a "wide variety of interpretations."  *Id.* at 59-60.  Thus, the Supreme Court as a matter of prudence chose not to address the constitutionality of the stop-and-frisk statute without a proper fact situation from which to assess its possible deficiencies.  *Id.* at 61-62. Where the home is the place being invaded, there are no "wide variety of interpretations" remotely comparable to stops in public places.  *Sibron* does not apply.[22]

In *Payton*, the Supreme Court facially invalidated a state statute authorizing warrantless entry into the home in order to make felony arrests.  The Supreme Court recognized that warrantless seizures in public places are often permissible.  445 U.S. at 587.  But the Supreme Court clearly stated:  "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  *Id.* at 590.

Furthermore, the warrantless searches here are aimed at materials clearly protected by the First Amendment.  Under *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), if the government scrupulously complies with the Fourth Amendment in applying for a warrant to search a newspaper office, then it also satisfies the First Amendment's requirements.  But this is true only "if the requirements of specificity and reasonableness are properly applied, policed, and observed."  *Id.* at 566.  Courts must "apply the warrant requirements with particular exactitude when First Amendment interests would be endangered by the search."  *Id.* at 565.

---

[22] And of course, the Supreme Court has facially invalidated statutes since *Sibron*.  *See, e.g.*, *Torres v. Puerto Rico*, 442 U.S. 465 (1979) (invalidating statute that authorized police to search the luggage of anyone entering Puerto Rico).

Where, as here, the search invades the home, targets expression, and is not subject to judicial oversight via the warrant requirement, the resulting search violates the First, as well as the Fourth, Amendment.  "Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands.  Where such multiple violations are alleged . . . we examine each constitutional provision in turn." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49-50 (1993) (citation omitted).

That these warrantless inspections are searches of the home aimed at protected expression triggers First Amendment standards for pre-enforcement review.  Normally, Article III standing exists only if the plaintiff has suffered an "injury in fact," there is a causal connection between the injury and the challenged conduct, and it is likely (not speculative) that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

First Amendment cases, however, are an exception to the usual rules governing standing because of "the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *NAACP v. Button*, 371 U.S. 415, 433 (1963) ("[t]he threat of sanctions may deter . . . almost as potently as the actual application of sanctions").

The warrantless inspections here pose dangers to speech identical to those of administrative speech licensing schemes.  Under *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), a would-be speaker may challenge a statute without first applying for a license.  The Supreme Court observed that "two major First Amendment risks [are] associated with unbridled licensing schemes:  self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the licensor's action." *Id.* at 759.

Importantly, the licensing scheme in *Lakewood* did not directly regulate speech but rather sought to license the placement of newsracks.  The Supreme Court nevertheless applied First Amendment standards, because newsracks have a close nexus to expression, or conduct commonly associated with expression, and the licensing scheme thus posed analogous dangers to speech.  *Id.* at 759.

Similar dangers are presented by the record-keeping/warrantless-inspection scheme here, which targets the production and distribution of sexually explicit images.  First, while individuals wishing to publish sexually explicit images need not apply for a license to speak, the possibility of warrantless inspections of their homes has clearly caused many of the Plaintiffs to self-censor.  *See* Plaintiffs' Motion at  20-23.  This threat requires no inspection at all:  it is inherent in the very possibility of warrantless inspections.  *Cf. Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (self-censorship is "a harm that can be realized even without an actual prosecution") (permitting pre-enforcement challenge to state statute); *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940) ("It is not merely the sporadic abuse of power by the censor, but the pervasive threat inherent in its very existence, that constitutes the danger to freedom of discussion").

Second, the regulations here give the Government standardless discretion to conduct warrantless searches of the home aimed at protected expression.  In the traditional speech context,

> the absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power.  Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech.  Without these guideposts, post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression. . . . without standards to fetter the licensor's discretion, the difficulties of proof and the case-by-case nature of "as applied" challenges render the licensor's action in large measure effectively unreviewable.

*Lakewood*, 486 U.S. at 758 (citations omitted).  In other words, the judicial solution to the problem posed by highly discretionary regulation of the right to speak — that many individual instances of violations will be effectively unreviewable — is to permit the statute to be challenged before actual enforcement, and to permit invalidation for lack of standards or other procedural safeguards.  *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

This warrantless inspection presents the same underlying concerns for discretion and the difficulty of judicial review.  Every warrantless inspection under the Section 2257 regulatory scheme, whether of a home or a business, occurs without any judicial supervision and without the need to show exigent circumstances.  The Supreme Court's condemnation of the warrantless residential inspection in *Camara* applies almost perfectly to this scheme:

> Under the present system, when the inspector demands entry, the occupant has no way of knowing whether enforcement . . . requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization. These are questions which may be reviewed by a neutral magistrate without any reassessment of the basic agency decision to canvass an area. Yet only by refusing entry and risking a criminal conviction can the occupant at present challenge the inspector's decision to search. And even if the occupant possesses sufficient fortitude to take this risk, as appellant did here, he may never learn any more about the reason for the inspection than that the law generally allows housing inspectors to gain entry. The practical effect of this system is to leave the occupant subject to the discretion of the official in the field. This is precisely the discretion to invade private property which we have consistently circumscribed by a requirement that a disinterested party warrant the need to search.

387 U.S. at 532-533.

Accordingly, this Court may and should now rule that the Section 2257 regulatory scheme grants the Government too much discretion to invade homes and businesses on account of protected speech activities, and is thus facially unconstitutional under the First and Fourth Amendments.

**IV.     CONCLUSION**

For the reasons stated above, *amicus* urges the Court to grant Plaintiffs' Motion

for Preliminary Injunction and deny Defendant's Motion to Dismiss.

Respectfully Submitted,

/s/ Carl A. Solano
Carl A. Solano (Pa. I.D. No. 23986)
Edward J. Sholinsky (Pa. I.D. No. 206561)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103-7286
(215) 751-2000

Matthew Zimmerman
ELECTRONIC FRONTIER
FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333

Attorneys for *Amicus Curiae*
Electronic Frontier Foundation

Dated:  March 5, 2010

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of March, 2010, I caused a true and correct copy of the foregoing Brief of *Amicus Curiae* the Electronic Frontier Foundation in Support of Plaintiffs to be served via the ECF system and electronic mail upon:

J. Michael Murray, Esquire
Lorraine R. Baumgardner, Esquire
Berkman, Gordon, Murray, & Devan
55 Public Square
2121 The Illuminating Bldg.
Cleveland, OH 44113-1949
jmmurray@bgmdlaw.com

Kevin E. Raphael, Esquire
J. Peter Shindel, Jr., Esquire
Pietrangallo, Gordon, Alfano, Bosick & Raspanti LLP
1818 Market Street, Suite 3402
Philadelphia, PA 19103
ker@pietragallo.com

*Attorneys for Plaintiffs*

Kathryn Wyer, Esquire
U.S. Dept. of Justice Civil Div.
20 Massachusetts Avenue
Washington, D.C. 20530
kathryn.wyer@usdoj.gov

*Attorney for Defendant*

Fred T. Magaziner, Esquire
Dechert, Price & Rhoads
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA 19103-2793
fred.magaziner@dechert.com

Kristina Carol Evans, Esquire
Dechert, LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
kristina.evans@dechert.com

Mary Catherine Roper, Esquire
ACLU of Pennsylvania
PO Box 40008
Philadelphia, PA 19106
mroper@aclupa.org

*Attorneys for Amicus Curiae the American Civil Liberties Union of Pennsylvania*

<u>/s/ Edward J. Sholinsky</u>
Edward J. Sholinsky