UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF PENNSYLVANIA


FREE SPEECH COALITION,      :      <u>CIVIL ACTION</u>
INC., et al.,               :
          Plaintiffs,       :      Case No. 09-CV-4607 (MMB)
                            :
     v.                     :      Philadelphia, PA
                            :      March 12, 2010
THE HONORABLE ERIC H.       :      1:55 p.m.
HOLDER, JR., Attorney       :
General,                    :
          Defendant.        :
----------------------------


                  TRANSCRIPT OF ORAL ARGUMENT
            BEFORE THE HONORABLE MICHAEL M. BAYLSON
                 UNITED STATES DISTRICT JUDGE



APPEARANCES:

For Plaintiffs:             J. MICHAEL MURRAY, ESQUIRE
                            LORRAINE R. BAUMGARDNER, ESQUIRE
                            Berkman, Gordon, Murray & Devan
                            55 Public Square
                            Suite 2200
                            Cleveland, Ohio  44113

                            J. PETER SHINDEL, JR., ESQUIRE
                            Pietragallo, Gordon, Alfano,
                            Bosick & Raspanti, LLP
                            1818 Market Street
                            Suite 3402
                            Philadelphia, Pennsylvania  19103


For Defendant:              KATHRYN WYER, ESQUIRE
                            U.S. Department of Justice
                            Civil Division
                            20 Massachusetts Avenue
                            Washington, D.C.  20530

```
APPEARANCES:                  (Continued)

Amicus Curiae:                FRED T. MAGAZINER, ESQUIRE
                              Dechert, Price & Rhoads
                              1717 Arch Street
                              4000 Bell Atlantic Tower
                              Philadelphia, Pennsylvania  19103

                              CARL A. SOLANO, ESQUIRE
                              Schnader, Harrison, Segal & Lewis
                              1600 Market Street
                              Suite 3600
                              Philadelphia, Pennsylvania  19103

                              MARY CATHERINE ROPER, ESQUIRE
                              ACLU of PA
                              P.O. Box 40008
                              Philadelphia, Pennsylvania  19106

                              KRISTINA CAROL EVANS COLE, ESQUIRE
                              Dechert, LLP
                              Cira Centre
                              2929 Arch Street
                              Philadelphia, Pennsylvania  129104
                              Kairys & Rudovsky
                              924 Cherry Street, Suite 500
                              Philadelphia, PA  19107

                              VICTOR S. PERLMAN, ESQUIRE
                              2005 Market Street
                              Philadelphia, Pennsylvania  19103

Audio Operator:               Milahn Hull




Transcribed by:               DIANA DOMAN TRANSCRIBING
                              P.O. Box 129
                              Gibbsboro, New Jersey  08026-0129
                              (856) 435-7172
                              FAX:  (856)  435-7124
                              EMAIL:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
```

3

I N D E X

| MOTION | PAGE |
|---|---|
| Facial Challenge | |
| Argued by Mr. Murray | 8/18 |
| Argued by Ms. Wyer | 13 |
| | |
| As Applied Challenge | |
| Argued by Mr. Murray | 21/26 |
| Argued by Ms. Wyer | 25/33 |
| | |
| Burden Issue | |
| Argued by Mr. Murray | 37/42/72 |
| Argued by Ms. Wyer | 38/74 |
| | |
| 2257(a) Issue | |
| Argued by Mr. Murray | 46/54 |
| Argued by Ms. Wyer | 51/61 |
| | |
| Miscellaneous Questions | |
| By The Court | 64 |
| | |
| Argument | |
| By Mr. Magaziner | 66/76 |
| Response by Ms. Wyer | 75 |
| | |
| Search and Seizure Issue | |
| Argued by Mr. Murray | 77/85/96 |
| Argued by Ms. Wyer | 82/90 |
| | |
| Hypothetical Questions by Court | |
| Response by Mr. Murray | 109/117 |
| Response by Ms. Wyer | 104/114 |

                          Colloquy                              4

1              THE COURT:  Okay, good afternoon.

2              MR. MURRAY:  Good afternoon, Your Honor.

3              MS. WYER:  Good afternoon, Your Honor.

4              THE COURT:  Please be seated, everyone.

5         Okay, we're here for oral argument and other matters

6    that may come up in a case captioned Free Speech Coalition,

7    Inc., et al. vs. Eric Holder, Attorney General.  And I

8    appreciate having the appearance forms filled out for the

9    plaintiffs, Mr. Murray.

10             MR. MURRAY:  Yes, Your Honor.  Good afternoon.

11             THE COURT:  All right, good afternoon.  And with you

12   Ms. Baumgartner.

13             MS. BAUMGARTNER:  Good afternoon, Your Honor.

14             THE COURT:  All right, how are you.  Mr. Shindel.

15             MR. SHINDEL:  Good afternoon, Your Honor.

16             THE COURT:  All right, good afternoon to you.  And

17   for the defendant, Ms. Wyer.

18             MS. WYER:  Good afternoon, Your Honor.

19             THE COURT:  All right, how are you all.  Okay.

20             I also have some Amicus here, Mr. Magaziner,

21   pleasure to see you.

22             MR. MAGAZINER:  Good afternoon, Your Honor.

23             THE COURT:  Mary Catherine Roper, pleasure to see

24   you.  Who else is there, who I don't know?

25             MS. COLE:  Kristina Evans --

                            Colloquy                        5

1              THE COURT:  What's your name?

2              MS. COLE:  Kristina Evans Cole.

3              THE COURT:  How are you.  All right, good afternoon.

4     Anybody else want to note their appearance?  Mr. Solano, how

5     are you?

6              MR. SOLANO:  Good afternoon, Your Honor.

7              THE COURT:  You can sit in the front seat if you

8     like, in the front row.  What?

9              MR. SOLANO:  I'm fine, thank you.

10             THE COURT:  All right.  Okay.  I did say I would

11    hear some argument by the Amicus if they're interested, and I

12    will certainly do that.

13             The main purpose of this hearing is to hear oral

14    argument on the defendant's motion to dismiss.  That's the

15    primary purpose.  But as I indicated in a procedural order

16    that I sent out a few days ago, since everybody's here

17    together today, I am interested in talking briefly about the

18    motion for preliminary injunction.

19             But I agree with the Government in general that I

20    should pay primary attention to the motion to dismiss.  And at

21    least not until I'm satisfied that I'm going to deny that in

22    whole or part should the parties get into discovery or should

23    I start having -- taking evidence.  So I mean I agree

24    conceptually with what you said in your conference report, Ms.

25    Wyer -- did I pronounce that correctly, Wyer?

1          MS. WYER:  Yes.

2          THE COURT:  Okay.  So, I mean, conceptually I agree

3     that that determination should come first.  It may be, because

4     there's a lot of different issues in this case, that I

5     conclude that there's some aspects of the plaintiff's claims

6     that should be dismissed but that others should go forward, at

7     least for some discovery.  I don't know that, I haven't

8     determined that.  But there are a lot of different claims.

9          The first thing I do is I want to ask Ms. Wyer, in

10    your conference report you said that the Court doesn't have

11    subject matter jurisdiction.  Can you just explain what you

12    meant by that?

13         MS. WYER:  We have moved for -- our motion to

14    dismiss raised a (b)(1) claim in regard to the Fourth

15    Amendment issue.

16         THE COURT:  Yes, but that's only one part of the

17    case.  You're not asserting that I don't have subject matter

18    jurisdiction over any part of the case?

19         MS. WYER:  No, but there are various aspects of the

20    First Amendment claim where we have argued that there is no

21    standing.  And there's also a question of res judicata in

22    regard to two of the plaintiffs.  As I have lopoked at the

23    files for the previous cases, I've discovered that two of the

24    plaintiffs in this case have actually fully litigated their

25    First and Fourth Amendment claims in the District of Colorado

Colloquy                                7

1    case.

2              THE COURT:  All right, who are those?

3              MS. WYER:  The Free Speech Coalition and David --

4              THE COURT:  What's the last name, sorry?

5              MS. WYER:  The Free Speech Coalition, the

6    organization, and David Connors.

7              THE COURT:  And David?

8              MS. WYER:  Connors.

9              THE COURT:  Connors.  All right, I don't recall that

10   you briefed that.

11             MS. WYER:  We haven't raised that in our motion.

12             THE COURT:  All right, well, let me say at the

13   outset, I'm going to be asking a lot of questions today, and I

14   intend to give everybody a chance, if they want, to file a

15   supplemental brief on some of the questions I ask if you don't

16   think your initial briefs cover it enough.  So that would be

17   one aspect that you ought to bring up in a supplemental brief,

18   and of course the plaintiffs would have the chance to argue

19   that.

20             All right, now, the way I generally proceed, rather

21   than just have one side argue completely and then the other,

22   is I'd sort of like to cover some of the questions I posed in

23   my order of March 8th, and then I have other questions as we

24   go along, and I will in general hear both sides back and forth

25   as we go through these.

Colloquy                          8

1          So, the first question is as to 2257 itself, which

2    was the subject of the Sixth Circuit decision, I'd like to

3    know if the plaintiffs assert there are any material factual

4    differences between this case and the case in front of the

5    Sixth Circuit.

6               MR. MURRAY:  Yes, Your Honor.

7               THE COURT:  Mr. Murray, yes.

8               MR. MURRAY:  Thank you very much.

9          Yes indeed, Your Honor, there are very substantial

10   and extensive material factual differences between the record

11   that we will be making here and the record that was made in

12   the Connection case.  The record --

13              THE COURT:  You were counsel in the Connection case?

14              MR. MURRAY:  I was.

15              THE COURT:  Okay.

16              MR. MURRAY:  Yes, I was, Your Honor.

17         And the record and facts in that case were very

18   narrowly focused on the effect of the statute upon Swingers

19   magazines.

20              Now, I will tell you we had extensive evidentiary

21   hearings, two of them, one in 1996, believe it or not, 14

22   years ago, and one in 2005.  But the evidence was focused upon

23   Swingers, who they were, what their ages were.  It was focused

24   upon their desire for anonymity.  It was focused upon their

25   refusal to submit photo identification to the Government.  It

Colloquy                                    9

1    was focused upon the issues surrounding the effect upon those

2    particular publications that the statute had.

3          And that was the record.  And it was made in that

4    fashion because it was primarily it began as an applied attack

5    by this particular discrete magazine publisher.

6          Here, however, we have a much broader factual and

7    legal attack upon 2257 by a much more disparate group of

8    plaintiffs.  We do have the Free Speech Coalition, which

9    itself represents the entire adult industry, and we have facts

10   in support of our constitutional claims on behalf of the

11   entire adult industry, none of which were presented in the

12   Connection case --

13         THE COURT:  Well, would those factual differences

14   only apply to the as applied challenge as opposed to the

15   facial challenge?

16         MR. MURRAY:  No, it will apply to the factual

17   challenge as well, Your Honor.

18         THE COURT:  Well, why would it also apply to the

19   facial challenge?  I mean, the statute's the same, is it not?

20         MR. MURRAY:  Well, it is the same.  However, the

21   facial challenge on behalf of the adult industry for example

22   will focus upon the fact that the Government will not be able

23   to prove that a problem existed in the first instance.

24         We will put on evidence on behalf of the industry to

25   the effect that long before 2257 became enforceable in July of

Colloquy                          10

1    1995, dating back into the 1980's, the maintain adult

2    entertainment industry scrupulously took care to obtain photo

3    identification from all performers, and was scrupulous in its

4    adherence to make sure that no minors ever appeared in adult

5    films.

6              Now, in a First Amendment challenge, upon a statute

7    that is this burdensome, that poses a potential five-year

8    prison term, and imposes all the onerous requirements that it

9    imposes, we think the case law is clear that the Government

10   has to prove a couple of things; is there really a problem, to

11   begin with.  Playboy Enterprises we think makes that clear.

12   That was the signal bleeding case.  And there the Government

13   posited that cable providers --

14             THE COURT:  So you think that's part of the --

15   that's a burden of the Government as to the facial challenge -

16   -

17             MR. MURRAY:  Yes.

18             THE COURT:  -- is showing the problem.

19             MR. MURRAY:  Yes.  Because they have to show the

20   existence --

21             THE COURT:  Well, why can't I accept the findings of

22   Congress, that if Congress felt there was a problem, why --

23   and I'm only talking about the facial challenge now.

24             MR. MURRAY:  Yes.

25             THE COURT:  But if Congress, you know, delineated

1    what it felt was a problem, why would I take evidence about

2    that?  I mean, I can't, you know, I'm not a -- I'm not sure I

3    understand what -- and I'm not an expert on the Playboy case

4    either, but I'm not sure that holds what you're saying, but

5    I'll check it.

6           But I'm talking solely about a facial challenge, why

7    do I have to get into the Government's proof?  I thought that

8    the issue on a facial challenge is to look at the language of

9    the statute and determine whether on its face, it violates the

10   Constitution?

11          MR. MURRAY:  Well, that is true, Your Honor, but in

12   order for it to be sustained under the First Amendment, there

13   has to be proof that a governmental interest exists, that the

14   statute furthers that governmental interest, and depending

15   upon whether strict scrutiny or intermediate scrutiny applies

16   that it either, in the case of intermediate scrutiny, doesn't

17   substantially burden more speech than necessary, or in the

18   case of strict scrutiny, is the lease restrictive means.

19          Now for example, in the Playboy case, Congress made

20   a determination that signal bleed by purveyors of sexually

21   explicit material on cable TV stations was a sufficiently

22   serious problem to justify a statute that required them to

23   either fully scramble their signals or only limit showing

24   their movies between the hours I think of ten p.m. and six

25   a.m., the safe harbor period.

1            There was a trial, a full trial, at which the

2    Government was put to its burden of proof ultimately to

3    demonstrate the existence of that problem, to demonstrate that

4    the statute, which in that case was content based and

5    therefore had to satisfy strict scrutiny, that that statute

6    furthered the Government's compelling interest, and that it

7    did so in the least restrictive way.

8            One of the things that the Supreme Court said was

9    that there's very little evidence in the record that would

10   suggest that signal bleed was a problem, let alone that it was

11   a serious enough problem to require or to entitle the

12   Government through a statute to burden the substantial amount

13   of speech that was being burdened by the hours of operation

14   provision.

15           And, the Court said we understand that the

16   Government and Congress in passing a law is saying that

17   millions of children are exposed to these sexually explicit

18   images when they're not fully scrambled by the TV cable

19   networks, but the Supreme Court said there's little evidence

20   that that's even true, and there's little evidence that it's

21   even a serious problem.  And when the Government legislates in

22   the area of protected speech in a way that imposes burdens

23   upon that speech, the Government has to do more than simply

24   posit the existence of a problem.  The Government has to

25   demonstrate that it's a problem that really exists, and that

Colloquy                                    13

1    justifies the burden on speech.

2              THE COURT:  Okay, now I'm going to hear Ms. Wyer's

3    response to that.

4              All right, we're limited now to talking about a

5    facial challenge to 2257 and whether any evidence would be

6    required by the Government or anybody else would even be

7    relevant.

8              MS. WYER:  No, I mean no evidence, no evidentiary

9    findings are -- any further evidentiary findings are necessary

10   there, Your Honor.

11             And let me go back to the question of what is

12   different in this case versus previous cases.  In terms of the

13   facial challenge, there has been no statutory change to 2257

14   since the Connection case, except that the category of

15   lascivious exhibition of the genitals has been added to what

16   qualifies as subject to the age verification and record

17   keeping requirements.

18             THE COURT:  Well, that's in 2257(a).

19             MS. WYER:  The lascivious exhibition --

20             THE COURT:  It applies to 2257.

21             MS. WYER:  I think 2257 itself was amended because

22   lascivious exhibition is one category of actual sexual

23   conduct.

24             THE COURT:  Okay, all right, well, then we'll come

25   back to that.

Colloquy                                           14

1           MS. WYER:  Okay.

2           THE COURT:  I mean that's a -- that's a discrete

3    issue in my opinion.

4           MS. WYER:  Okay.

5           THE COURT:  All right.

6           MS. WYER:  Well, in regard to the evidential

7    question on --

8           THE COURT:  Now what's your argument about the

9    Playboy case and about the plaintiffs say I need to take

10   testimony.  You need to prove that there was a problem and

11   that is something that I need to do based on the factual

12   record in this case, which is different than what was in front

13   of the Sixth Circuit.

14          MS. WYER:  The Playboy case does not require that

15   result here.  First of all, the Playboy case was --

16          THE COURT:  Does not require what?

17          MS. WYER:  The result -- the conclusion that

18   evidence is necessary here.

19          For one thing, the Playboy case, as the plaintiffs

20   indicated, was a strict scrutiny case and the evidentiary

21   issue that the Court was, that the Supreme Court was focused

22   on was whether the mechanism that Congress had devised was the

23   least restrictive means.

24          After that decision was issued, the Sixth Circuit

25   addressed, or directed the District Court to address what

Colloquy                                15

1   impact the Playboy case had in the Connection case, and the

2   Court concluded that it was not applicable because Playboy

3   was --

4               THE COURT:  Which Court concluded that?

5               MS. WYER:  The District -- first the District Court,

6   the Northern District of Ohio, but then the Sixth Circuit En

7   Banc Court also affirmed that conclusion.

8               THE COURT:  That Playboy did not apply?

9               MS. WYER:  Right.

10              THE COURT:  Were you counsel in that case, in

11  Connection as well?

12              MS. WYER:  No, I was not.

13              THE COURT:  Okay.  And have you read the record, or

14  are you familiar with it?

15              MS. WYER:  I have looked at a lot of the record and

16  I've read the decisions.

17              THE COURT:  Okay.

18              MS. WYER:  But it's in the decision that goes

19  through the different -- there was a whole group of cases

20  where the District Court was --

21              THE COURT:  Is this in the en banc decision?

22              MS. WYER:  There are so many different opinions.

23              THE COURT:  Well, I'm talking about the opinion, the

24  last opinion, which is February 20th, 2009, reported at 957 --

25  no, sorry -- 557 F.3d 321 -- is it 557?

1            (Pause)

2            THE COURT:  I don't remember reading, it doesn't

3    mean it's not there.

4            MS. WYER:  I know that there was one case where it

5    went through all of the new cases including the <u>Playboy</u> case

6    and concluded that they were inapplicable.  It's in the

7    Northern District of Ohio --

8            THE COURT:  All right, is that in your --

9            MS. WYER:  -- 2006 case --

10            THE COURT:  -- brief?

11            MS. WYER:  I don't recall.

12            THE COURT:  All right, well, make a note that this

13    may be something else that may need to be part of a

14    supplemental brief.  Okay.

15            All right, now, I'll hear Mr. Murray's reply briefly

16    and then we'll go onto the next issue -- are you don't on this

17    issue or --

18            MS. WYER:  No.

19            THE COURT:  ALL RIGHT.

20            MS. WYER:  I also wanted to point out that it's not

21    only the Sixth Circuit <u>Connection</u> case that has addressed

22    this, it's also every time the plaintiffs mount a facial

23    challenge to the statute, which has happened in three

24    different jurisdictions, the plaintiffs have raised this

25    argument that first of all, that they themselves don't engage

1    -- there's no risk as far as they're concerned.  But the

2    Courts have repeatedly indicated that that was no basis for

3    overturning the statute on its face.

4         And the Sixth Circuit Court and the DC Circuit

5    addressed issue -- that issue, and recognized that -- all the

6    Courts have addressed that the record as Congress concluded,

7    when the statute was first enacted in 1988, Congress based its

8    decision to enact that requirement in 1988 on 14 months of

9    investigations by the Attorney General's Commission on

10   pornography.  Following that there were Senate hearings.  And

11   the Commission actually specifically recommended that this age

12   verification and record keeping system be implemented.

13        So Congress, based on that finding, that is a

14   sufficient basis for Congress's action.  That together with

15   the common sense inference that was based on the reality that

16   there's assessed societal preference for younger looking

17   performers in sexually explicit materials.

18        There's no doubt that -- I mean, the Turner

19   Broadcasting Supreme Court case emphasized that Congress's

20   findings are entitled to a significant amount of deference,

21   not only in regard to its factual findings, but in regard to

22   its predictive judgments.  But Congress has the -- is entitled

23   to make predictive judgments based on the information before

24   it.  Here, that's what happened.  The evidentiary basis was

25   the preference for younger looking performers.  Based on that,

                              Colloquy                          18

1    it made the common sense inference --

2              THE COURT:  Well, you said the DC Circuit had agreed

3    with the Sixth Circuit.  What case are you replying on for

4    that?

5              MS. WYER:   The American Library Association case,

6    the 1994 --

7              THE COURT:  Okay.  All right.  Okay.

8              MS. WYER:  -- decision.

9              THE COURT:  Okay, thank you.

10             All right, now can I turn the floor back to Mr.

11   Murray.  Do you want to reply briefly on this issue, the

12   facial challenge --

13             MR. MURRAY:  Yes, Your Honor --

14             THE COURT:  -- and the burden of proving facts.

15             MR. MURRAY:  Yes.  And I was going to then tell you

16   what other facts were going to -- that are going to be

17   different.

18             One of the issues that the Sixth Circuit said the

19   record was not sufficient on was, for example, on the over-

20   breadth issue.  And so all the evidence that I'm describing --

21   and that's a facial attack as well, Your Honor, and all the

22   evidence that I'm describing, including with the respect to

23   the adult entertainment industry will go to not only the over-

24   inclusiveness issue, whether the statute's narrowly tailored,

25   but it also goes to the facial over-breadth challenge, which a

1   plaintiff is always, I believe, entitled to try to put on

2   evidence to demonstrate the scope of the statute and the type

3   of constitutionally protected speech to which it applies.

4           So in addition to the evidence that we will offer by

5   the adult industry, we have a number of other plaintiffs who

6   have evidence that addresses the facial issue of over-breadth

7   and the narrow tailoring insofar as the statute burdens that

8   type of speech.

9           For example, the American Society of Media

10  Photographers is a plaintiff.  Journalists, photographic

11  journalists who are burdened and affected by this statute.

12  They have 7,000 members.  They -- we will put on evidence of

13  the burdens that the statute imposes upon them.

14          We have numerous photographers, artists, sex

15  therapists, producers of educational films, researchers,

16  educators, website producers, they will put on evidence which

17  was not in the record in Connection which will demonstrate why

18  the statute is not narrowly tailored, is over-broad, and how

19  significantly it burdens their constitutionally protected

20  speech.

21          None of which, of course, was in the record before

22  Connection, which was one of the criticisms -- not criticism,

23  but was one of the reasons that the majority said that we

24  can't say that the statute is over-broad because the record is

25  too thin on precisely the kinds of points that I'm talking

Colloquy                                    20

1    about.

2            We will also offer evidence that wasn't in the

3    record in Connection of the millions of Americans who email

4    now, who sexting is a phenomenon now, who participate in

5    social networking sites, enter chat rooms, post videos and

6    images on YouTube and other tube sites, all again to show the

7    over-breadth and the lack of narrow tailoring, the very type

8    of evidence that the majority in Connection said was lacking

9    in the case before them.  So --

10           THE COURT:  All right, go ahead, you want to sum up

11   because --

12           MR. MURRAY:  Yes.

13           THE COURT:  -- I want to move on to on apply -- the

14   as applied challenge.

15           MR. MURRAY:  Yes, Your Honor.  And so we fully

16   intend to create a factual record that is far more extensive

17   and it will be far more current too.

18           THE COURT:  All right.  Now, let's turn to the as

19   applied aspect of Connection.  I am sure that incorporating

20   what you just said about the facial challenge would apply as

21   well to your as applied challenge.

22           MR. MURRAY:  Yes, Your Honor.

23           THE COURT: And that you would differentiate that.

24           Now, the first thing is, in the Connection case,

25   which is I thought a little unusual, not that I'm perhaps

1    nearly as expert as you are, but I thought most Courts in

2    dealing with this, usually deal with facial challenge first

3    and then go to the as applied challenge.  Whereas the Sixth

4    Circuit seemed to do it the other way around.

5           Do you have any comments about that?

6           MR. MURRAY:  I think that -- I think it's a matter

7    of judicial discretion, Your Honor.

8           THE COURT:  Okay.  All right, well, now, turning to

9    the as applied, the first holding there was that intermediate

10   scrutiny applies.  Now I presume you disagree with that?

11          MR. MURRAY:  I do.

12          THE COURT:  All right, now, are you saying that I

13   should, as a matter of law, decide that the Sixth Circuit was

14   wrong and that strict  scrutiny applies.  Or that after you

15   produce all this evidence that you've been talking about, I

16   will then -- I should then conclude that strict scrutiny

17   applies?

18          MR. MURRAY:  No, I think --

19          THE COURT:  Or both?

20          MR. MURRAY:  No, I think that you can determine the

21   issue of strict scrutiny based upon the legal arguments

22   without regard to the evidence.

23          THE COURT:  All right.  Well, now that -- so you're

24   saying the Sixth Circuit was wrong as a matter of law.

25          MR. MURRAY:  Yes.  The dissenters were right and the

                         Colloquy                            22

1    majority was wrong.

2              THE COURT:  All right.  Now, do you have anything --

3    and remember, and I may say this more than once today and if

4    so, forgive me -- you know, I'm a lonely District Court judge

5    sitting by myself, okay?

6              MR. MURRAY:  Yes.

7              THE COURT:  This was the Sixth Circuit, en banc, and

8    the Supreme Court denied cert.  Now, I just want to be candid

9    with you.  You're going to have to -- before I'm willing to

10   depart from that kind of a holding with the Supreme Court

11   denying cert, you're going to have to persuade me that there's

12   a Third Circuit case that mandates that I find strict

13   scrutiny.  I'm just -- I want to just be candid with you,

14   okay?

15             I'm not going to buck the Sixth Circuit unless you

16   convince me that I have to because of Third Circuit juris

17   prudence -- this relates to another question in my order.  So

18   tell me where I find that Third Circuit case.

19             MR. MURRAY:  I will, Your Honor.  But just so that

20   there's no misunderstanding.  We also believe that we can

21   prevail under intermediate scrutiny.

22             THE COURT:  Oh, I'm sure I understand that.  But

23   let's talk about which one applies.

24             MR. MURRAY:  Okay. The <u>Brown</u> case out of the Third

25   Circuit that was decided --

Colloquy                                          23

1          THE COURT:  Okay, I'm looking at it --

2          MR. MURRAY:  -- just last October --

3          THE COURT:  I've read it, yes.

4          MR. MURRAY:  One thing --

5          THE COURT:  Now that's a case which involves the

6    abortion issue.

7          MR. MURRAY:  That is correct, Your Honor.  And one

8    of the things that's important about that case -- I think it's

9    important to remember, the Sixth Circuit never addressed the

10   argument that I'm making here that the exemption in 2257(a)

11   makes 227 -- 2257 content based.  Because we filed the appeal

12   before that new law was passed.

13         THE COURT:  Well, I'm sure you're going to make that

14   argument, and we're going to come to 2257(a), but you know,

15   that applies to the certification procedure, which in my view

16   is a subset of the overall issue here.

17         MR. MURRAY:  Yes.

18         THE COURT:  But let's -- I promise you we'll come to

19   that.

20         First of all, you tell me -- I'm looking at <u>Brown</u>.

21   You tell me where in <u>Brown</u> I -- there's a holding that I have

22   to apply strict scrutiny instead of intermediate scrutiny to

23   your complaint.

24         MR. MURRAY:  Well, I think -- I can't say it was the

25   holding because they ended up avoiding the issue by construing

Colloquy                                24

1   the ordinance but what they said was they --

2            THE COURT:  All right, well --

3            MR. MURRAY:  -- had to -- in order to avoid strict

4   scrutiny under that ordinance, they had to construe the

5   exemption in that ordinance for police officers, fire

6   personnel, and employees of the medical clinics.  They had to

7   construe it to prevent them from engaging in the speech which

8   was otherwise prohibited to the other citizens.

9            THE COURT:  All right, well, what makes that -- from

10  what -- how from that do you reach some conclusion that strict

11  scrutiny would apply to this case?

12           MR. MURRAY:  Because 2257(a) creates an exemption

13  solely on the basis of content.  If you're a commercial

14  producer of simulated sexual material, you don't have to

15  comply with the record keeping, inspection, labeling regime.

16  All you have to do is send in a letter to the Attorney

17  General.

18           But if you're a producer identically situated, same

19  business practices, same operation, and you produce actual

20  explicit material, you don't get the exemption.

21           And the only difference is the content of the

22  materials.

23           THE COURT:  We'll come back to that when we deal

24  with 2257(a).  But that's your answer, that that's why you

25  think <u>Brown</u> would require strict scrutiny in this case?

Colloquy                          25

1          MR. MURRAY:  Yes.

2          THE COURT:  All right.

3          MR. MURRAY:  Because there's no justification for

4    that difference in content treatment.

5          THE COURT:  Okay.  All right.  Okay, now, let me go

6    to my next question.

7          All right, the next question was, do you rely on --

8    well, first of all, I'm going to give Ms. Wyer a chance to

9    respond to that last one.  So this is the argument that I

10   should apply strict scrutiny to the as applied challenge.

11         MS. WYER:  Your Honor, I think Brown is consistent

12   with Supreme Court case law in recognizing that a requirement

13   is -- cannot be deemed content based unless it reflects the

14   Government's disagreement with the message conveyed.  If the

15   Government is trying to express disapproval with a particular

16   message, that is what makes a regulation content based.

17         But where, as here, the purpose of the regulation is

18   clearly not to express disapproval of any protected form of

19   speech, but is aimed at preventing the exploitation of

20   children and the creation of sexually explicit images, and to

21   prevent child pornography which is not protected, that is

22   simply not a situation where a content for strict scrutiny

23   should apply.

24         Again, this is an issue that every jurisdiction that

25   has looked at these requirements in the past has determined

Colloquy                              26

1    that intermediate scrutiny is the appropriate level of

2    scrutiny.  Not only the Sixth Circuit, but also the DC Circuit

3    and the District of Colorado have looked at that issue.  The

4    same arguments that are made here were made in those cases,

5    and all three jurisdictions concluded that intermediate

6    scrutiny was the appropriate level.

7                THE COURT:  Okay, all right, thank you.

8                All right, let's go to the next question, and that

9    is whether -- well, let me put it -- let me ask you this way,

10   Mr. Murray.  Are there any other Third Circuit cases that you

11   think are binding -- relevant and binding on me in determining

12   this?

13               MR. MURRAY:  Just the content based issue or the

14   question of whether to follow the majority in Connection?

15               THE COURT:  Anything.

16               MR. MURRAY:  Yes, I do, Your Honor.

17               THE COURT:  Aside from the certification --

18               MR. MURRAY:  Yes.

19               THE COURT:  -- issue.

20               MR. MURRAY:  I think that there are a number of

21   Third Circuit cases that to me demonstrate that the Third

22   Circuit is much more in harmony with the dissent in Connection

23   than it is with the majority in Connection.

24               And I think you need only to begin by comparing the

25   Third Circuit's decision in Conchatta with the Sixth Circuit's

1   decision in a case called <u>J.L. Spoons vs. Dragani</u> which is at

2   538 Fed 3d 379.

3               THE COURT:  Wait, 538 F.3d 379?

4               MR. MURRAY:  Yes.

5               THE COURT:  All right.

6               MR. MURRAY:  In <u>Conchatta</u> --

7               THE COURT:  What's the citation of <u>Conchatta</u>?

8               MR. MURRAY:  It's in the brief, Your Honor, that's

9   the only reason I didn't --

10              THE COURT:  Well, how do you spell it then?

11              MR. MURRAY:  C-O-N-C-H-A-T-T-A.  <u>Conchatta vs.</u>

12  <u>Miller</u> Third Circuit decision 2006, we cited it extensively in

13  the --

14              THE COURT:  I'm looking at your memo.  I don't see

15  it here.  But let me have the site anyway.

16              MR. MURRAY:  Yes, Your Honor.  It's 458 Fed 3d 258,

17  Third Circuit 2006.

18              THE COURT:  Okay.

19              MR. MURRAY:  Now in that case, the Third Circuit

20  struck down as unconstitutionally, over-broad, a Pennsylvania

21  statute and regulation that essentially prohibited nude

22  dancing in liquor permit establishments.  They applied

23  intermediate scrutiny to the statute and regulation.  And they

24  found it to be over-broad because it applied to thousands of

25  liquor permit holders outside of the adult cabaret context who

1   might present serious artistic productions involving nudity.

2           The Sixth Circuit, two years later, in the J.L.

3   Spoons case, rejected an identical over-breadth challenge to

4   the same prohibition that Ohio law had on nude entertainment

5   in liquor permit premises on virtually the exact same

6   evidentiary record that was in front of the Third Circuit,

7   proof that it involved thousands of mainstream venues that

8   presented serious artistic performances, and in fact the

9   dissent -- it was a two-to-one decision, the dissent in the

10  Sixth Circuit pointed out that it was in direct conflict with

11  the Third Circuit's decision in Conchatta.

12          Conchatta is extremely important for yet a second

13  reason as to how the Third Circuit will treat Connection.  In

14  rejecting the facial over-breadth challenge, the 2257, the

15  Sixth Circuit majority placed great emphasis upon the

16  Government's representations that it had not brought

17  prosecutions against private couples, for example, and that it

18  had no intention of enforcing the statute in that fashion.

19          The Third Circuit in Conchatta was presented with

20  the very same argument by the state of Pennsylvania; namely

21  that he argued there the law had only been applied to fully

22  nude presentations by adult cabarets, and that they had no

23  intention of applying it to the mainstream artistic concert or

24  theatrical type venues.

25          Whereas the Sixth Circuit majority in Connection

Colloquy                                    29

1    found that -- basically accepted the Government's

2    representation in rejecting the over-breadth challenge, the

3    Conchatta Court rejected both of these contentions as a basis

4    for saving the statute from an over-breadth analysis.  They

5    said the past practice of enforcement doesn't change anything;

6    you look at the statute and see what it potentially covers.

7    Nor does the claim that they won't enforce it in the future

8    matter.  Current enforcement intentions are of no relevance to

9    their analysis.

10          And so -- and if you look at the opinions of the

11   dissenters in Connection, you will find that they are in

12   complete harmony with the Third Circuit's decision in

13   Conchatta, whereas the majority in Connection is at odds with

14   the Third Circuit's decision in Conchatta.

15          The U.S. vs. Stevens, the Third Circuit decision

16   that struck down 18 U.S.C. Section 48, which is the one that

17   prohibits commercial production of depictions of animal

18   cruelty.  As Your Honor probably recalls, that case has been

19   argued in the Supreme Court, and it's awaiting decision on the

20   merits.  But the Third Circuit struck it down, and at the very

21   end of the -- and it was an en banc opinion by the Third

22   Circuit, and at the very end, in footnote 16, the Court

23   discusses the question of over-breadth and how that issue is

24   to be analyzed.  And again, they end up not reaching the issue

25   because they struck it down on other grounds, but they

Colloquy                                               30

1   described the way you do it.  And it's exactly the way the

2   <u>Conchatta</u> Court said, and the dissenting opinions in

3   <u>Connection</u>.  You have to look at the plain language of the

4   statute and pose reasonable but challenging hypotheticals to

5   determine the statute's reach.

6           And then the Court did just that, and they pointed

7   out again that in several hypothetical examples of

8   constitutionally protected depictions, the statute covered

9   them.  And the only protection that a citizen would have were

10  two things.  There was a statutory provision that exempted

11  serious works, or, prosecutorial discretion; just like the

12  Government represented in <u>Connection</u> in the majority.  And

13  they said we do not believe that the constitutionality of

14  Section 48 should depend on prosecutorial discretion for a

15  statute that sweeps this widely.

16          That's exactly what the dissenters in <u>Connection</u>

17  said.  And that's at odds, entirely at odds, with what the

18  majority said.

19          And then the other Third Circuit decisions which I

20  think make it abundantly clear that the Third Circuit would

21  follow the dissent in <u>Connection</u> rather than the majority, are

22  the two most recent COPA decisions, the Child Online

23  Protection Act, where the ACLU versus whoever the Attorney

24  General was at the given time.

25          Both of those decisions, and that's been up and down

1   the Courts, and on two occasions --

2                THE COURT:  That's the case Judge Reed had, I

3   think --

4                MR. MURRAY:  Yes.  Yes, Your Honor.

5         The Third Circuit renders three decisions in that

6   case, the last two of which have been affirmed by the Supreme

7   Court.

8                THE COURT:  Right.

9                MR. MURRAY:  The last two are the ones I'm talking

10  about.

11        If you look at those opinions, you will discover --

12  this was the statute that made it a crime for a commercial

13  enterprise to knowingly put on the web material harmful to

14  juveniles if it was designed to reach juveniles, and they

15  defined harmful to juveniles by a three-part modified Miller

16  obscenity test.

17        And the Third Circuit struck it down for a multitude

18  of reasons.  One of which addressed the fact that the

19  Government said well, you've got an affirmative defense if you

20  use credit cards or an adult ID card, some way to ensure that

21  you're not presenting the material to minors.  And the Court -

22  - and this is what I think is significant -- in both the 2003

23  and the 2008 opinions, gave great weight to the burdens and

24  chilling effect on speech posed by the requirements that

25  users, people who wanted to view this speech, would have to

Colloquy                                    32

1   give up their anonymity as a condition of accessing

2   constitutionally protected sexually explicit speech.

3            The Court stressed that point in the 2000 opinion at

4   322 Fed 3d 259 and 260, and in the 2008 opinion at 534 Fed 3d

5   196 and 197.

6            The significance of that is that the majority in the

7   Connection case gave virtually no weight to the interests of

8   the swingers in that case in anonymity, and to the chilling

9   effect of the statutory scheme that requires citizens to

10  report to the Government that they are posting sexually

11  explicit images of themselves.  Indeed, the majority dismissed

12  that concern and stated, quote, "They have no more to complain

13  about than every taxpayer in the country".

14           Well, the dissenters in Connection said no, there is

15  a substantial interest in anonymity when you're talking about

16  provocative material, particularly private or sexual

17  practices, and the right to engage in controversial sexually

18  explicit speech anonymously.  And that was one of the reason

19  that the dissenters thought that 2257 was unconstitutional

20  because it totally eliminates that anonymity, and because

21  citizens have to tell the Government about their sexual

22  practices.

23           On this point again, both of the Third Circuit COPA

24  decisions are in complete harmony with the dissenting opinions

25  in Connection and are at complete odds with the majority

Colloquy                                     33

1    opinion in <u>Connection</u>.

2            THE COURT:  All right, any other cases?

3            MR. MURRAY:  And so those are the Third Circuit

4    cases, Your Honor --

5            THE COURT:  Okay, let me hear from Ms. Wyer on this

6    point.

7            MS. WYER:  In regard to the over-breadth issue, it

8    has to be emphasized that the <u>Connection</u> case found the only

9    possible area that the statute could conceivably be considered

10   over-broad is in regard to its application to private couples.

11   Otherwise, there is -- clearly the over-breadth analysis

12   requires a comparison of the statute's legitimate read versus

13   application to protected speech where it didn't have a

14   purpose.  So --

15           THE COURT:  What I want you to address now, the

16   Third Circuit case law that you think would support <u>Connection</u>

17   -- the <u>Connection</u> majority.  Mr. Murray was detailing a number

18   of Third Circuit cases where he said that the Third Circuit

19   had some cases that were at variance with the <u>Connection</u>

20   majority.  So I want to know if you want to respond to that.

21   If you'd rather do that in a supplemental brief, you may.

22           MS. WYER:  I may, because I have not looked --

23           THE COURT:  Okay.

24           MS. WYER:  -- <u>Conchatta</u> case.  But I do want to say

25   in regard to <u>Brown</u> and the notion of the -- the exceptions

1    that the Court was looking at in regard to the demonstrations

2    in front of the clinics, the Court looked at those as -- this

3    goes back to the content base rather than over-breadth, but it

4    looked at those exceptions as possibly going to the content,

5    because the demonstrators that would be allowed within the

6    zone would be expressing an anti -- a pro-choice position,

7    whereas those excluded from the zone would be anti-abortion.

8            And so there was a content based distinction there,

9    whereas here the only exception that the plaintiffs are

10   talking about is the certification option in 2257(a) which

11   first of all does not exclude any producer from having to

12   verify the ages and keep records, it just is a different

13   method for them to do so.

14           So the exception distinctions between <u>Brown</u> and here

15   are completely different.

16           In regard to the anonymity issue that the plaintiffs

17   were just talking about and that the COPA case addressed, the

18   Supreme Court case law on anonymity in <u>McIntyre</u> and <u>Watchtower</u>

19   that -- where anonymity is a real issue is in the sphere of

20   the core political speech for the most part.  <u>McIntyre</u> dealt

21   with core political speech.

22           The <u>Watchtower</u> case, the Third Circuit has actually

23   recognized that <u>Watchtower</u> was a very fact specific decision,

24   in <u>Riel vs. City of Bradford</u> 485 F.3d 736.  And --

25           THE COURT:  Say that again.

Colloquy                                35

1            MS. WYER:   In R-I-E-L <u>vs. City of Bradford</u> in 485

2    F.3d 736, a 2007 Third Circuit case, and <u>Watchtower</u> was a

3    situation where the anonymity concern had to do with people

4    going from door to door distributing pamphlets.  And the

5    Supreme Court referred to the interest in anonymity there in

6    that context, but that kind of activity is direct -- very

7    closely connected to political expression.

8            Whereas here, this kind of expression, even though

9    it does receive First Amendment protection, the Supreme Court

10   has recognized that it is really on the margins of First

11   Amendment protection.  In the <u>Young vs. American Mini Theaters</u>

12   case 427 U.S. 50, this type of expression is of a wholly

13   different and lesser magnitude than the interest in

14   untrammeled political debate.  The interest in anonymity in

15   this context does not outweigh the Government's interest in

16   the intermediate scrutiny analysis of protecting children from

17   exploitation through these age verification requirements.

18           THE COURT:  All right, thank you.

19           Okay.  All right, now, let's -- just give me one

20   second here.

21                           (Pause)

22           THE COURT:  I want to talk -- I'd like to ask some

23   questions about the burden of proof.  Because the Third

24   Circuit talked about it in the <u>Brown</u> case, and it was frankly

25   a little confusing to me, and the plaintiffs dwell on this a

Colloquy                                           36

1    great deal in their briefs in this case.  And they --

2    plaintiffs keep insisting that the Government has the burden

3    of proving this and proving that.

4              Now, in -- and I -- I don't know that the Supreme

5    Court has ever really laid out in a single case the allocation

6    of burdens in this context.

7              Now I would -- in terms of the motion to dismiss, I

8    don't think there's so much of an issue of burden as there are

9    a decision to be made as to whether the complaint states a

10   claim upon which relief can be granted.  And that means that I

11   have to take the factual allegations as true, and then

12   determine whether under those facts, the plaintiffs would be

13   entitled to have a jury decide in their favor.

14             The -- and I'm not talking about <u>Twombly</u> and <u>Iqbal</u>

15   in this context, so don't -- let's not get into that.  This is

16   not a notice pleading case.  There's lots of facts in the

17   complaint.  It's a very detailed complaint, and it's plausible

18   and it's -- and so forth.  So I'm not into that -- in that

19   debate that's going on these days.

20             But, so I really have these questions.  On the Rule

21   12 motion, Mr. Murray, do you contend I should do anything

22   other than what a judge traditionally does in assessing a Rule

23   12(b)(6) motion; that is you look at the facts, as I said, and

24   see whether they're sufficient to -- that if they were,

25   assuming they were proven at trial and a jury accepted them,

1    the plaintiffs would be entitled to win.

2          Secondly, if we were to start a preliminary

3    injunction proceeding, do you agree or disagree that you would

4    have the burden of proceeding, and then we could argue about

5    whether at some point the burden shifted to the Government to

6    prove certain things?

7          Those are the two questions, that I would like to --

8    and whether that -- whether that burden would be different any

9    different at trial on the preliminary injunction as opposed to

10   a trial.  Go ahead.

11         MR. MURRAY:  Yes, Your Honor.  No, I think that

12   you're right, that the legal standard for the 12(b)(6) is the

13   one that you enunciated.

14         The only thing that I would say with respect to

15   burden of proof is that the backdrop for that motion to

16   dismiss is the recognition that the rule of law that would

17   ultimately apply as to the constitutionality of a regulation

18   of speech is one that requires the Government to prove the

19   regulation of speech meets either intermediate scrutiny or

20   strict scrutiny.

21         THE COURT:  Okay.

22         MR. MURRAY:  Which seems to me bears on the

23   plausibility of the plaintiffs' claims.

24         THE COURT:  All right, okay.  Well, now on that

25   point, so your point is that whether I find strict scrutiny or

1    intermediate scrutiny, whichever they are, then the burden

2    shifts to the Government to show either a compelling state

3    interest or something -- or the other requirement.

4              And you -- okay, well, first of all, Ms. Wyer, do

5    you agree with that, just as an abstract legal proposition?

6              MS. WYER:  Whether the Government has the burden

7    under --

8              THE COURT:  Well, whether there's a burden on the

9    Government to show a compelling state interest or compelling a

10   rational, you know, relationship between the regulation and

11   the objective.

12             MS. WYER:  Yes, it is the Government's burden to

13   show that the intermediate scrutiny elements are satisfied.

14   But it can do so based on the congressional findings that have

15   already --

16             THE COURT:  All right.  And the same thing with, if

17   there was strict scrutiny, you'd have the burden of showing a

18   compelling state interest, is that right?

19             MS. WYER:  Right.

20             THE COURT:  You would have the burden of showing

21   that Congress considered that there was a compelling state

22   interest, right?

23             MS. WYER:  On the facial challenge, correct.

24             THE COURT:  Facial challenge.

25             MS. WYER:  Correct.

Colloquy                                      39

1          THE COURT:  Okay.  Now what about on an as applied

2   challenge?

3          MS. WYER:  On an as applied challenge, I disagree to

4   the extent that plaintiffs are saying that the Government has

5   the burden to show that the requirements are necessary like on

6   an individual basis from plaintiff to plaintiff.  Because the

7   Government's rationale is to apply the requirements

8   universally is the most important means to avoid

9   circumvention.  So --

10         THE COURT:  So do you think -- I'm sorry.

11         MS. WYER:  And my --

12         THE COURT:  Go ahead.

13         MS. WYER:  And my understanding, it would be the

14  plaintiff's burden to explain why allowing an exemption for

15  one of them would not interfere with the rationale behind

16  universality.

17         THE COURT:  All right, so your contention is that on

18  an as applied challenge, the plaintiffs have the burden of

19  showing that they have some deprivation -- they individually

20  have some deprivation of a right, is that right?  And then if

21  they show that, then the burden would shift to the Government

22  to show some counterbalancing factor?

23         MS. WYER:  That they have a burden I think goes to

24  standing.  So I think they've asserted that their burden

25  therefore, they have standing to raise the as applied

Colloquy                                    40

1   challenge.

2            But then in order to make an as applied challenge to

3   these requirements, you would have to explain why applying the

4   requirements to your situation, your specific situation, would

5   not -- would somehow not interfere with the rationale behind

6   applying the requirements universally, which is the

7   Government's -- the Government has consistently argued that

8   the requirements must be applied universally because any other

9   regime would allow circumvention.  And all of the three

10  previous jurisdictions that have addressed this have addressed

11  the universality element of this scheme.

12           THE COURT:  Well, can you cite a Supreme Court case

13  that's ever enunciated this just the way you said it?

14           MS. WYER:  Well, I think this is --

15           THE COURT:  Or what's your best -- and maybe you'd

16  rather -- maybe both of you want to put this in a supplemental

17  brief, but I mean, I'd be interested in knowing you know,

18  where the Supreme Court has laid all this out, that both of

19  you seem to have such confidence is the law.

20           MS. WYER:  Well, I'm not sure I see it as really a

21  burden --

22           THE COURT:  Well, I'm sure you don't, but the Courts

23  have used that phrase lots.

24           MS. WYER:  I think in terms of the facial challenge,

25  I agree that it's the Government's burden.  But where it's an

1   as applied challenge, presumably the scheme has already been

2   upheld on its face, and the situation is that there the

3   plaintiff would be having to overcome the facial validity of

4   the scheme and why it should not apply in their specific

5   situation.

6            THE COURT:  All right.  Well --

7            MS. WYER:  And on the over-breath --

8            THE COURT:  All right --

9            MS. WYER:  On the over-breadth issue though, the

10  plaintiffs do have the burden to show over-breadth.

11           THE COURT:  All right.  Now, Mr. Murray, I'm -- at

12  least we have agreement on one thing.  On strict scrutiny, the

13  Government agrees that there is this burden.

14           Now you say that the -- that the Government just

15  can't rely on congressional findings, the Government has to

16  present evidence in a Court hearing to show that the -- that

17  they meet their burden that there's a compelling state

18  interest, is that right?  And do you have a Supreme Court case

19  that supports that view?

20           MS. WYER:  Yes, I think the Playboy Enterprises --

21           THE COURT:  You said -- well, we talked about that

22  before.  That's your case.

23           MR. MURRAY:  -- put them to that very burden and

24  held that they hadn't met that burden at the trial.

25           THE COURT:  All right.  Now on as applied, there

1    there is complete disagreement.

2              MR. MURRAY:  Yes.

3              THE COURT:  And you know, I'm going to give both

4    sides a chance to address this in a supplemental brief if you

5    want to.  Okay.

6              Now, but let me get back to the preliminary

7    injunction hearing.  If we go down the preliminary injunction

8    route, I assume you have the burden of going forward, by that

9    I mean calling witnesses before the Government calls its

10   witnesses, or no?

11             MR. MURRAY:  Yes, we have to meet the four-part

12   test, Your Honor.

13             THE COURT:  Okay.

14             MR. MURRAY:  I will concede that.  We have to show a

15   likelihood of success --

16             THE COURT:  Right.

17             MR. MURRAY:  -- we have to show irreparable harm, no

18   harm to the public and no real harm to the defendant.  And

19   that is the burden --

20             THE COURT:  Okay.

21             MR. MURRAY:  -- at the preliminary injunction stage.

22   At the final hearing, the burden is upon the Government to

23   prove the constitutionality of its law.

24             THE COURT:  All right.

25             MR. MURRAY:  And I think that's all pretty well

1   established, those two propositions.

2            THE COURT:  All right.  Well, while we're talking

3   about that and before we get to 2257(a), and I know the

4   Government doesn't want me to address this until I've decided

5   and denied the motion to dismiss, but since we're all here I

6   think it makes sense to at least explore what the parties'

7   view is.

8            Do the plaintiffs insist on having a preliminary

9   injunction as opposed to a final hearing?

10           MR. MURRAY:  We don't insist upon it, Your Honor.

11           THE COURT:  Okay.  So --

12           MR. MURRAY:  If we could do it efficiently the other

13  way, we would be perfectly willing to combine the two.

14           THE COURT:  All right.  Well, you know, I think it

15  makes a lot of sense.  I don't see a reason in this case to

16  have a preliminary injunction hearing beforehand.  And I saw

17  somewhere that you thought six months of discovery would be

18  sufficient, is that --

19           MR. MURRAY:  I think we said 120 days.

20           THE COURT:  Maybe it's the Government said six

21  months, all right, you said 120 days.  Okay.

22           And then we would go into a trial.

23           MR. MURRAY:  Yes.

24           THE COURT:  And does anybody assert there's a right

25  to a jury trial here on any of these claims?

Colloquy                                    44

1              MR. MURRAY:  No --

2              THE COURT:  You're not seeking any damages, is that

3     correct?

4              MR. MURRAY:  That is correct.

5              THE COURT:  All right, has the Government asserted a

6     jury trial issue here or not?

7              MS. WYER:  I have not looked at that but no.  As far

8     as I know, it has not.

9              THE COURT:  All right, well, you need to come to

10    grips with that at some point.  All right.  But if the

11    plaintiffs aren't seeking damages, I'm not sure there are any

12    jury issues.  But that's not a ruling, it's just an

13    observation.

14             Now, how long do you think it would take to present

15    your case?

16             MR. MURRAY:  I think we estimated a week.

17             THE COURT:  You could present -- so you're not going

18    to call all your plaintiffs?

19             MR. MURRAY:  Oh, I will.

20             THE COURT:  You think that would only take a week,

21    to call all of them, with cross-examination?

22             MR. MURRAY:  Maybe ten days.  You're right, Your

23    Honor, I guess --

24             THE COURT:  I'm just getting --

25             MR. MURRAY:  -- when you stop and think about it.

1          THE COURT:  Do you intend to have expert testimony?

2          MR. MURRAY:  Perhaps.  I haven't made a final

3    decision, but we might.

4          THE COURT:  Okay.

5          MR. MURRAY:  So you're probably right, it may take

6    ten days, it might be two weeks for our case.

7          THE COURT:  All right.  Okay.  And does the

8    Government have any views on that, how long it would take?

9          MS. WYER:  That sounds right.

10         THE COURT:  Do you have any objection to going right

11   to a final hearing as opposed to having a preliminary hearing?

12         MS. WYER:  No.

13         THE COURT:  All right.  Now --

14         MS. WYER:  We would prefer no hearing.

15         THE COURT:  Well, I understand that.

16         Now, Mr. Murray says, and this is way before -- this

17   is the cart well before the horse but I just want to ask it

18   anyway.  Mr. Murray thinks, he said at the final hearing you

19   have the burden.  Now are you saying the Government has the

20   burden of proceeding or you would proceed procedurally  by

21   calling witnesses but the Government has the burden of proof

22   on the substantive issues?

23         MR. MURRAY:  Yes, Your Honor.  We would proceed with

24   our witnesses but the ultimate burden of proof and persuasion

25   lies on the Government.

Colloquy                                46

1          THE COURT:  All right, well, I don't have to address

2     that right now.  Okay.  All right.  But that's helpful to

3     know.

4          All right, now, I want to turn to 2257(a).  Now, in

5     my mind, if this is an over-simplification don't hesitate to

6     say that.  There are two aspects of 2257(a) that are different

7     from 2257.  One is the application to simulated versus actual

8     sex.  And the second is what I call the certification

9     procedure, for which there is an exemption for a commercial

10    producer.

11         Is that a fair summary, Mr. Murray, in your view or

12    is there other things I should --

13         MR. MURRAY:  It is, it is.

14         THE COURT:  Okay.  Now, on the first point, do you

15    see any constitutional significance to the ban on simulated

16    sex in 2257(a) compared to the ban on actual sex in 2257 in

17    the context of the Sixth Circuit decision or otherwise?

18         MR. MURRAY:  Yes.  In two respects.  It demonstrates

19    that the statute keeps getting more expansive and covers a

20    broader range of constitutionally protected material which

21    implicates a vaster quantity of First Amendment protected

22    material, which it seems to me requires an even greater

23    justification by the Government.

24         And secondly, the one that I've already addressed,

25    which is it, to me, proves that 2257(a) is content based

Colloquy                    47

1    because whether you are burdened by all the record keeping and

2    inspection and labeling requirements depends solely and

3    entirely, not upon your business practices, not upon your

4    industry practices, but upon the content of the material.

5            THE COURT:  Well, but you see, we agree that -- and

6    I don't know if -- you may be right that 2257 itself was

7    enacted, it was amended, but we agree first of all that the

8    Sixth Circuit didn't cover 2257(a), and that the certification

9    requirement, or at least part of it applies to actual sex.  Is

10   that right?

11           MR. MURRAY:  It applies to the -- to the

12   lasciviousness aspect --

13           MR. MURRAY:  Yes, which was also part of the Adam

14   Walsh Act of 2006, and that was not before the Supreme Court.

15           See, what happened is in 2006, Congress amended 2257

16   to add lascivious exhibition of the genitals, and adopted,

17   enacted 2257(a).  Those statutes, however, didn't go into

18   effect until March of '09 because the statute specifically

19   said they wouldn't go into effect until regulations were

20   promulgated which didn't happen till March of '09 --

21           THE COURT:  Right.

22           MR. MURRAY:  -- after the Sixth Circuit's decision

23   in Wong (phonetic) and the '06 Adam Walsh Act came after we

24   already filed our notice of appeal.

25           So lascivious exhibition of the genitals was not in

Colloquy                                    48

1    front of the Sixth Circuit, which is now in 2257(a) -- 2257,

2    and no part of 2257(a) was before the Sixth Circuit.

3              THE COURT:  All right, now, Ms. Wyer, do you agree

4    with that little bit of legislative history?

5              MS. WYER:  Yes.  In terms of --

6              THE COURT:  That's an accurate --

7              MS. WYER:  -- chronology.

8              THE COURT:  -- chronology.  All right.  Well, that's

9    helpful, because I wasn't sure about that.  Thank you.

10             Now, okay, so what I don't understand though is

11   this.  We talked about content based statutes.  My -- and I

12   understand your point about, that by making simulated sex

13   illegal -- no, strike that -- making the reference to

14   simulated sex have the record keeping requirements as does

15   actual sex, you're saying Congress was making it more

16   expansive and making it for over-broad than it already was.

17             But are you saying that from a constitutional point

18   of view, and from the Congressional purpose of preventing

19   child pornography, that the addition of simulated sex is a

20   content based statute?

21             MR. MURRAY:  What I'm saying -- yes.  Well, first of

22   all, we argued that both statutes are content based.

23             THE COURT:  Right, well, I know that.

24             MR. MURRAY:  So yes.

25             THE COURT:  The Sixth Circuit clearly ruled that

Colloquy                                    49

1    2257 was not content based, that was the majority --

2              MR. MURRAY:  The majority.  The dissent agreed with

3    that.

4              THE COURT:  Dissent agreed, all right.  Now, would

5    you agree that under the same principles that governed the

6    Sixth Circuit majority, that it would find that record keeping

7    as to simulated sex was not content based?

8              MR. MURRAY:  I think the majority would. But one of

9    the things you have to understand about that majority opinion,

10   Your Honor, is that procedurally it was a strange issue, the

11   content based.  Because what happened is the first time we

12   argued the case, the 1998 opinion by the Sixth Circuit in

13   Connection I held to be content neutral intermediate scrutiny.

14             Connection II said that was the law of the case, and

15   we couldn't reargue the content based.  So when it went en

16   banc, we really didn't argue content based, because the prior

17   panel had ruled that it was the rule of the case.

18             So it is true, the majority then did consider it on

19   its own and say that it was content neutral rather than

20   content based, but it was not an issue because of that

21   procedural peculiarity of where we were when we got to the En

22   Banc Court, the issue wasn't really litigated before the En

23   Banc Court.  But they did hold, as Your Honor indicated, that

24   on their own, that it was content neutral.

25             But we think the Third Circuit, and of course Your

Colloquy                                          50

1    Honor obviously will look at the Third Circuit law --

2              THE COURT:  Right.

3              MR. MURRAY:   -- and the Supreme Court decisions, we

4    think they got it wrong, because --

5              THE COURT:  All right, well, I hear you but assuming

6    for the moment that I -- well, let me put it this way.

7    Assuming for the moment that I disagree with you about <u>Brown</u>

8    and that I am prepared to follow the Sixth Circuit majority,

9    that 2257 was not content based.  Do you see any grounds to

10   distinguish adding simulated sex to the statute on a

11   constitutional basis?

12             MR. MURRAY:  Only because of the difference in

13   treatment, only because the difference in burdens that are

14   imposed, which I've already alluded to.

15             THE COURT:  Yes, but --

16             MR. MURRAY:  But if the burden were identical --

17             THE COURT:  And you think that's both factual --

18   that's both facial and as applied?

19             MR. MURRAY:  Yes.  Facially, since the burdens are

20   different, it renders both statutes content based, an argument

21   that the Sixth Circuit was never presented with because it

22   hadn't happened at that time.

23             THE COURT:  Yes, but from where I'm sitting, that's

24   what they ruled, you know.  I'm not -- you know, I hear you as

25   to what went on there, but you know --

Colloquy                                    51

1          MR. MURRAY:  They didn't rule on -- what I'm saying

2    is they never were -- they couldn't have ruled on the issue of

3    whether the 2257(a) distinction --

4          THE COURT:  No, you're right --

5          MR. MURRAY:  -- renders 2257 content based.  We

6    don't know what the Sixth Circuit would say had they been

7    presented with that situation, because it wasn't ripe at that

8    juncture.

9          THE COURT:  Okay, well, I mean you're right about

10   that.

11         All right, now let me ask Ms. Wyer for her response

12   to this issue.

13         I'm sorry to make you get back and forth, but I

14   think this is the best way to approach all these different

15   issues.

16         MR. MURRAY:  I appreciate it, Your Honor.

17         THE COURT:  Yes.

18         MS. WYER:  Our position is that the same, exact same

19   rationale applies to 2257(a).  And that the Sixth Circuit En

20   Banc Court did discuss the issue in detail and come to a

21   conclusion that it seemed to be making an independent

22   determination there.

23         Also, the 1994 DC Circuit opinion addressed that

24   issue specifically and talked about the rule that because --

25   held that again that the requirements were content neutral,

Colloquy                        52

1   citing O'Brien and Renton, the Supreme Court cases about --

2   and Renton was the, where they upheld the restriction on adult

3   movie theaters and zoning based on the secondary effects,

4   holding that that was not content based because what the

5   statute or the ordinance was getting at was something

6   unrelated to the speech itself but it was addressing another

7   harm, just as here the requirements are addressing another

8   harm, whether you're talking about actual sexual activity or

9   simulated.  Both of those categories are in the definition for

10  child pornography in 2256.

11          So it really makes no difference at all, the harm is

12  the same whether it's simulated or actual activity there.

13          THE COURT:  All right, well, Mr. Murray, I assume,

14  but let me just make sure the plaintiffs -- as far as child

15  pornography goes, you wouldn't draw a distinction between

16  actual or simulated sex involving a minor?

17          MR. MURRAY:  No, plaintiffs are opposed to all form

18  of sexual abuse of children.

19          THE COURT:  Right, okay.  I thought that would be

20  your response, I just wanted to clarify that.

21          Now, do you agree with what Mr. Murray said about

22  the little bit of procedural history in the Sixth Circuit

23  about what was argued in front of the Court en banc?  If you

24  know.

25          MS. WYER:  I recall reading that, but I'm not sure

Colloquy                                   53

1   that that detracts in any way from the Sixth Circuit en banc

2   decision.

3          THE COURT:  I'm not sure it does either.  I'm just

4   asking if that was --

5          MS. WYER:  I have not looked at the briefs to see

6   whether it was discussed in the briefs to the en banc panel.

7          THE COURT:  All right.

8          MS. WYER:  I think the next issue is whether the

9   certification scheme in 2256(a) makes a difference.  I think

10  it's clear that the plaintiffs here are not challenging the

11  certification option as something that they are trying to

12  overturn.  What they seem to be saying is because there is

13  this option for certain producers, it somehow makes the whole

14  scheme content based.  But I don't think that that argument

15  really has any merit.

16         I think it mostly goes to the issue of narrowly

17  tailoring versus least restrictive means, because we are

18  arguing this is an intermediate scrutiny case and that is what

19  the decisions of other Courts support.

20         The means that Congress chooses to address a problem

21  do not have to be the least restrictive means.  I think what

22  plaintiffs are really saying is that the certification option

23  should apply to everyone because that's a less restrictive

24  means than the age verification and record keeping scheme that

25  applies generally --

Colloquy                                54

1          THE COURT:  Well, let me hear what Mr. Murray wants

2     to argue about that and then I'll give you a chance to

3     respond.

4          MS. WYER:  Okay.

5          THE COURT:  All right, let's talk about

6     certification.  I mean, I think, Mr. Murray, you're objecting

7     to both the concept of certification and as well as the

8     exemption for commercial producers.  Is that right?

9          MR. MURRAY:  We think that the certification

10    provision demonstrates constitutional flaws in the following

11    ways.  It renders 2257 content based, that's number one.

12    Number two, it demonstrates that 2257 is not narrowly tailored

13    because Congress has made the judgment that for those

14    commercial producers who in the ordinary course of their

15    industry practice already collect and maintain ID's, that the

16    burdens of record keeping and labeling and being searched

17    without a warrant need not be imposed upon them if they'll

18    simply send a letter to the Attorney General.  So it

19    demonstrates that 2257 is not narrowly tailored.

20         We also think it deprives the commercial producers

21    of actual sexually explicit material equal protection of the

22    laws as guaranteed by the due process clause of the Fifth

23    Amendment.

24         And we think that there's just no justification for

25    the differential of treatment.  I mean, for example,

Colloquy                                           55

1    75.9(a)(4) is a regulation.  And it says, and this is

2    interesting, "A producer of materials depicting sexually

3    explicit conduct not covered by the certification regime, is

4    not disqualified from using the certification regime for

5    materials covered by the certification regime."

6              So what they're saying is you can have a single

7    company producing both actual and simulated sexual films, and

8    the adult industry historically has usually created an R-rated

9    version of their sexually explicit films, but you can have a

10   single company using the exact same business practices, with

11   respect to both types of films, to ensure that minors are not

12   used, complying with the same tax and labor laws and industry

13   practices, and they can certify to the Attorney General for

14   their simulated films, but they have to be burdened with all

15   of the ramifications of record keeping, labeling and being

16   subjected to a potential prison sentence of five years and

17   being searched without a warrant for their actual explicit

18   films.

19             And I can see no justification for that other than

20   content.  And if you can't justify something other than by

21   content, that is black letter law for a content based statute.

22             And it doesn't -- and it's even true if the goal is

23   worthy.  And we agree that combating child pornography is a

24   worthy laudable goal.  But you still can't achieve that goal

25   through a content based scheme.  That's the Supreme Court's

1    teaching in the <u>Simon & Schuster</u> case, the <u>Son of Sam</u> case

2    where they said it doesn't matter that the Government is

3    achieving a laudable goal.  They don't need to have an illicit

4    motive.  If they differentiate based on the content of speech,

5    and it's not justified other than by reference to the content

6    of speech, it's a content based distinction.

7          And we think that that is -- those are the

8    constitutional ramifications of the certification regime that

9    is promulgated in 2257(a).

10         THE COURT:  Well, you know, if -- see, here's the

11   problem I have with that argument, or at least the question I

12   have.

13         If you were talking about having a comparison

14   between actual -- and the goal is to prevent child

15   pornography, which we all agree about -- and you have a

16   distinction between movies depicting actual sex and movies

17   showing a farmer raising plants.  That would be a very sound

18   argument.  That's content based.

19         But where the distinction is between actual sex and

20   simulated sex, we all agree that both are illegal in the

21   context of child pornography.  So therefore, why is that --

22   why does that make it content based -- why is that a content

23   based distinction?  Because in terms of preventing child

24   pornography, they're both important, we all agree on that.

25         MR. MURRAY:  Because they're treated differently

1    solely based on content.  And the legislative history, which

2    we've cited in our brief, what little there is --

3         THE COURT:  You know, I'm a little familiar with the

4    Son of Sam case and all about that, but you know, that's a

5    whole different thing.  I mean, can you cite any case that

6    would support this argument that in purposes of preventing

7    child pornography a distinction between simulated sex and

8    actual sex is a content based -- is an unconstitutional

9    content based variance.

10        But you know, without that, to be candid, I don't

11   think I'm going to be the first judge to say that.  Now, if

12   you've got a holding for me, let me know about it, or put that

13   in your supplemental brief, but I frankly doubt I'm going to

14   be the first judge to come to that conclusion, because to be

15   honest, it just doesn't make any sense to me.

16        MR. MURRAY:  Well --

17        THE COURT:  And I'm being very candid, I mean.

18        MR. MURRAY:  Because the legislative history shows a

19   preference in favor of its viewpoint discrimination.  When you

20   look at the legislative history, they did the certification

21   for the Hollywood movies.  And when you look at it, it says

22   because they're good, they're First Amendment protected

23   activity.

24        But these other people, these pornographers, they're

25   bad.  And therefore they have --

1          THE COURT:  Well, probably some lobbyist from

2     Hollywood, you know, convinced somebody in Washington to add

3     this exception there so, because they said look, we already

4     keep all these records and so forth, so why should we have to

5     do it.  So --

6          MR. MURRAY:  But so do the adult -- the point is,

7     that's exactly the identical position of the adult industry.

8     They kept the records long before Hollywood did probably,

9     because they were more concerned about --

10          THE COURT:  But these are judgments that Congress

11     made.  Congress wanted to lessen the burden on mainstream

12     Hollywood producers.  So they said if you're going to put this

13     simulated sex into commercial production, you know, you don't

14     have to do this.

15          Now, but let me get to my point.  I would like to

16     know if you can cite a case supporting your argument that this

17     is a content based distinction.  Because we're all talking

18     about this is in the context of child pornography.  And I

19     mean, I'll give you a chance to do it.  I mean, I'm not

20     looking for you to, you know, dream this up on the spot

21     because none of us carry all this around in our head.  But I'm

22     just telling you that would be important to me.

23          MR. MURRAY:  I think the closest would be the R.A.V.

24     case that Justice Scalia wrote where he said that you can

25     proscribe all obscenity because all obscenity is unprotected

Colloquy                                      59

1   by the First Amendment, but even in the spheres of obscenity,

2   you can't ban obscenity with a particular viewpoint and not

3   ban obscenity with another viewpoint.  That's the <u>R.A.V.</u>

4   decision, and I think it fits almost perfectly here.  Because

5   that's talking --

6               THE COURT:  Forgive my ignorance, but do you have

7   the citation?

8               MR. MURRAY:  You know, I don't think I do.  I'm not

9   even sure I cited it in the brief, Your Honor.  It just came

10  to mind in response to your question.

11              THE COURT:  Okay, well, you can put it in the

12  supplemental brief.

13              MR. MURRAY:  But I think that is pretty close to the

14  very point that I'm arguing.  You cannot be -- you cannot have

15  viewpoint discrimination even as to unprotected speech.  Then

16  it's unconstitutional, even though all of it's unprotected,

17  you can't pick out part of it to ban because you favor that

18  type of obscenity, for example, over a different kind.

19              And that's what this is.

20              THE COURT:  Okay.  Now, let me go and ask the next

21  question on my list, and then we're going to take a short

22  break.

23              Do any of you -- well, first the plaintiff and then

24  the defendant.  Are there any Third Circuit cases that you can

25  cite that would support your view on 2257(a) about the

1    exclusion of the commercial trade?

2              MR. MURRAY:  You mean the exemption, Your Honor?

3              THE COURT:  Yes, do you think that would -- yes, any

4    Third Circuit cases --

5              MR. MURRAY:  Yes, I think, as I said, I think the

6    Brown case is the one case that --

7              THE COURT:  Okay.

8              MR. MURRAY:  -- that illustrates the point.

9              And I do want to stress, Your Honor, we've been

10   talking so much about content based.  I don't want the Court

11   to think otherwise.  We are convinced we have no problem

12   defeating this law under intermediate scrutiny.

13             THE COURT:  No, I understand that.  I understand

14   that.  All right.

15             Ms. Wyer, why's your view about 2257(a) and either

16   the Third Circuit or generally?  You know, the -- well, the

17   three things.  The certification requirement, Mr. Murray says

18   it's another -- makes it over-broad.  He says that it's

19   content based and that it's proven by Congress giving this

20   advantage to commercial -- this exclusion to commercially

21   produced movies, with simulated sex.

22             MS. WYER:  First of all, I think this is really a

23   situation where Congress in 1988 decided to put a certain

24   material under this age verification and record keeping

25   scheme, and then in 2006 it decided why are we not including

Colloquy                          61

1    everything that if child performers were used would qualify as

2    child pornography.  So that's where 2257(a) and the inclusion

3    of the lascivious conduct comes in.

4           But it's a well established principle as that

5    Congress can address a problem in a piecemeal fashion.  I

6    mean, it's often an argument that is made, why is the

7    Government regulating this when this is equally problematic,

8    but Congress does not have to address everything at once.  And

9    that is -- that's pretty much what happened here, I think.

10          And the case, the Third Circuit case in support of

11   that is cited in our brief, the Pollard case in our reply, 326

12   F.3d 397, quoting Williamson, a Supreme Court case.  But I

13   think that's a standard principle in the law.

14          So, just the fact that Congress did not include

15   simulated activity before 2006, had no bearing on other

16   Courts' determination that intermediate scrutiny applied.  And

17   it makes no difference now that Congress has included it.

18          In regard to the certification option, I don't even

19   see that as a content based restriction.  What it does is, is

20   recognize that some, as you said, I think you explained it

21   yourself, but some Hollywood studios are already subject to a

22   host of requirements and Congress just made the reasonable

23   judgment, well why do we have to make them do it twice.  And

24   so they allowed for this exemption.

25          But that's not a content based distinction in terms

Colloquy                                    62

1    of what images are produced.  It's just a realistic, a

2    reasonable determination that there are some industries that

3    are already subject to requirements.

4         And we don't know whether such industries would even

5    agree that it's less burdensome than the age verification and

6    record keeping scheme at issue here.  I mean, if you are

7    subject to that regime, maybe you would say that that is more

8    burdensome.

9              THE COURT:  Okay.

10             MS. WYER:  I don't think that really has any bearing

11   on the question of whether it's content based because again,

12   under Brown, the primary inquiry is whether the regulation is

13   making a distinction based on disagreement with the content of

14   the speech.

15        But here the certification option may apply to

16   simulated, some simulated sexual activity, whereas it may not

17   apply to other simulated sexual activity.  It depends on

18   whether the producer is already subject to requirements and

19   can provide a certification that he is.

20             So I don't see that as a content based decision.

21             Again, what the plaintiffs seem to be seeking is a

22   declaration from the Court that what Congress should have done

23   is allow everyone to use the certification option, but that is

24   not the role of the Court in this situation.

25             Unless -- and it's kind of doubling up on the

1    argument.  It's saying this certification option both makes

2    the requirement content based and therefore subjects the whole

3    scheme to strict scrutiny, and it also shows that the means

4    that Congress chose in the age verification and record keeping

5    system is not the least restrictive means.  It's kind of like

6    doing both at once there where under the intermediate scrutiny

7    regime, Congress did not have to choose the certification

8    option for everyone.  It chose a narrowly tailored system that

9    simply -- that does not ban any form of protected speech, but

10   simply requires that the producers check ages of their

11   performers before including them in sexually -- recording them

12   in sexually explicit films and photographs.

13              THE COURT:  All right.

14              MS. WYER:  And I think I already explained our view

15   of the Brown case, its analysis of the exceptions in the

16   statute for certain people to be inside the demonstrations on

17   that is not -- that is distinguishable from here because

18   there, there actually was a content based kind of distinction

19   because pro-choice protesters would have been allowed to

20   protest within the zone whereas anti-abortion demonstrators

21   would be excluded.  So that's a very different situation from

22   this.

23              THE COURT:  All right.  I'd like to take a ten-

24   minute break.  When I come back, I'd be happy to hear from the

25   Amicus if they want to speak for a few minutes.  I'd like to

Colloquy                                    64

1    talk about the warrantless record search for the records.  I'm

2    going to have some other questions, some hypos, we'll hear

3    closing arguments anybody wants to make, anything else they

4    feel they left out, and so be back in about ten minutes.

5    Thank you.

6                    (Off the record at 3:24 p.m.)

7                    (On the record at 3:43 p.m.)

8            THE COURT:  Okay.  All right, couple of

9    miscellaneous, if I call them that.

10           In the Government's brief, the Government asked for

11   a dismissal of some of the allegations because the plaintiffs

12   haven't specifically defended them.  One is the plaintiffs'

13   vagueness -- of the allegations that the definition of

14   sexually explicit conduct is vague.  Do the plaintiffs still

15   contend that it's vague?

16           MR. MURRAY:  Yes, Your Honor.  In at least one

17   respect that one of the plaintiffs will testify to, and that

18   is with respect to what is simulated sadomasochistic abuse,

19   which is one of the triggers for the record keeping

20   requirement.

21           THE COURT:  Okay.

22           MR. MURRAY:  She will testify that she's not sure

23   what is covered and what isn't covered in her artwork.  So

24   yes, we do maintain that there is still a vagueness problem

25   with at least that.

1          THE COURT:  ALL RIGHT.

2          MR. MURRAY:  As well as possibly simulated

3    masturbation.  It's hard to know what that is.

4          THE COURT:  Okay.  What about that the record

5    keeping requirements violate the Fifth Amendment right against

6    self-incrimination?

7          MR. MURRAY:  Yes, Your Honor.  No, we don't -- we do

8    not, we did not intend to waive that argument by limiting the

9    brief to some 57 pages or whatever it was.

10         The argument is very simple.  When the law was first

11   passed, they made a big deal, the entire Justice Department

12   went in front of the Congress and said you've got to exempt,

13   you've got to put in an immunity in the statute that it can't

14   be used to prosecute anybody for any crime except for failing

15   to keep the records; otherwise, it would violate the Fifth

16   Amendment right against self-incrimination.

17         In 2003, in the Protect Act, they changed that, and

18   they instead said that yes, you can now use all of these

19   records as evidence of federal obscenity violations.  So now

20   everybody who keeps records of actual sexually explicit

21   images, if the Government comes in and seizes the records,

22   they can be used in a prosecution of those people for

23   violating the federal obscenity laws.  And we think under the

24   Marchetti and Grosso line of Supreme Court cases, that that on

25   its face violates the Fifth Amendment privilege against self-

Mr. Magaziner                          66

1    incrimination.

2           The Sixth Circuit said that the issue wasn't ripe,

3    just so that you know.  We think it is ripe because people

4    have to keep -- they're compelled to put down this information

5    every day.  And so we think it is a ripe claim.  And it's that

6    simple.

7           THE COURT:  You also allege that some of the DOJ

8    regulations were unduly vague.  And I assume you don't waive

9    that either.

10          MR. MURRAY:  We don't, Your Honor.  But I think that

11   depends on some of the testimony that you'll hear as to

12   specific applications.

13          THE COURT:  All right.  Okay.  All right, now, would

14   any of the Amicus like to speak up?  Mr. Magaziner, good

15   afternoon.

16          MR. MAGAZINER:  Very briefly, Your Honor, if I may.

17          THE COURT:  Yes, sir.

18          MR. MAGAZINER:  First of all, I should tell the

19   Court that we're grateful that you have given the Amicae an

20   opportunity to argue orally.  That's not something that

21   happens very often.

22          THE COURT:  Well, thank you for filing such a very

23   well written brief.

24          MR. MAGAZINER:  Thank you, Your Honor.

25          A very important point that has not yet been argued

Mr. Magaziner                                    67

1   by the parties is this.  The Government has taken a position

2   in its brief that the statute applies only to pornography

3   intended for sale or trade.  The Government took the same

4   position in the <u>Connection</u> case in the Sixth Circuit, as Your

5   Honor knows from having read the <u>Connection III</u> opinion, even

6   the majority largely rejected that argument.

7            The Government has restated that argument or

8   resurrected that argument in this case, and it still has said

9   in its brief that the statute applies only to pornography

10  intended for sale or trade.

11           If that is still the Government's position, we think

12  it is a position without any merit whatsoever.  Both on the

13  face of the statute, and even in the Government's own

14  regulations, that position is not tenable.

15           The face of the statute, going to the issue you were

16  addressing just before the break, 2257(a) creates a

17  distinction between materials that are intended for commercial

18  distribution, that is intended for sale or trade, and those

19  that are not.  If indeed the statute only pertained to

20  materials intended for sale or trade, there would be no need

21  to distinguish between those that are intended for sale or

22  trade and others.  But in fact that's what the statute does.

23           It creates a very perverse distinction, as we

24  pointed out in our brief, because a publisher of a, what's

25  properly called girlie magazine with explicit photographs, is

1   exempt from the onerous record keeping government inspection

2   regime, whereas a private individual taking the same

3   photograph is not exempt, which is kind of a strange way for

4   the Government -- for Congress to have written the statute,

5   but that is what we did.

6           As we read the --

7           THE COURT:  Well, it's strange, but is it

8   unconstitutional?

9           MR. MAGAZINER:  I'm not making the point that it's

10  unconstitutional in that regard although one could make an

11  equal protection argument.  We don't have any clients here

12  that I can bring before the Court and assert an equal

13  protection claim.  But I think one could be created out of

14  that.

15          But the point I am making is --

16          THE COURT:  If strangest was the test, Mr.

17  Magaziner, there's little that Congress does that's -- that

18  would pass muster.

19                  (Laughter)

20          MR. MAGAZINER:  Yes.

21          THE COURT:  Maybe a little but only a little.  All

22  right.

23          MR. MAGAZINER:  Not very much.

24          But the point I'm making, Your Honor, is not that

25  it's unconstitutional --

1          THE COURT:  I mean, look at <u>RICO</u> and how many times

2     have you argued that <u>RICO</u> is vague and unclear and confusing.

3     You don't have to answer that.

4          MR. MAGAZINER:  I don't even put that in the top ten

5     of strange statutes.

6          THE COURT:  All right.

7          MR. MAGAZINER:  The point I'm making, Your Honor, is

8     quite different.  It is in trying to figure out how to

9     construe the statute, it's very hard to look at a distinction

10    drawn in the statute between commercial materials and others,

11    and then say that the statute is meant to apply only to

12    commercial materials.

13         And then of course as we point out in our brief, the

14    DOJ's own regulations having said in the preamble it's only

15    intended for materials for pornography intended for sale or

16    trade, when they get into actual regulations, they say it

17    covers those who post explicit pictures on social networking

18    sites.

19         Your Honor may well not be familiar with Craig's

20    List --

21         THE COURT:  I'm not.  I've heard about them, but.

22         MR. MAGAZINER:  Okay, and we described it in our

23    brief, and if Your Honor wishes to do so, you could on your

24    computer go back and access --

25         THE COURT:  I always tell jurors they're not allowed

1    to go on the internet to do homework or get evidence, and I

2    think the same ought to apply to me, so.

3         MR. MAGAZINER:  Well, I think that's actually a wise

4    decision that you're making here, but perhaps your law clerks

5    would like to look at Craig's List.  But there are lots of --

6         THE COURT:  I never ask them to incriminate

7    themselves.

8         MR. MAGAZINER:  There are people who post pictures

9    on Craig's List that are explicit and that would fall within

10   the definition of actual sexual conduct because they're

11   lascivious, by any definition, lascivious pictures of the

12   genitals.

13        But to say that someone who posts such a picture in

14   the hopes of attracting a sexual partner is engaged in

15   creating pornography intended for sale or trade is to stretch

16   that phrase out of --

17        THE COURT:  Yes.

18        MR. MAGAZINER:  As we read the statute, it covers

19   not only private individuals, private couples, which the Sixth

20   Circuit majority discussed and said they think it does cover

21   it, but it covers as we pointed out, if you look at the

22   literal language of the statute, it covers a sex manual that

23   is published, that includes pictures of adults actually

24   engaged in sexual activity; it covers art, because Congress in

25   writing the statute did not take the time to carve out those

Colloquy                                        71

1    areas of sexually explicit depictions that the Courts carved

2    out 40 years ago in distinguishing between obscenity and other

3    sexual related materials; it covers sex education manuals; it

4    covers art; it covers journalism, if a journalist happens to

5    take such a picture.  It's really an extraordinarily broad

6    collection of activity that is covered here.

7               So we hope the Court will agree with us and agree

8    with the Sixth Circuit majority that this statute sweeps far

9    more broadly than the Government has taken the position it

10   covers, and the Court will analyze the statute on that basis.

11              THE COURT:  Thank you.

12              MR. MAGAZINER:  Thank you, Your Honor.

13              THE COURT:  All right.  Mr. Solano.

14              MR. SOLANO:  Your Honor, Mr. Magaziner has

15   adequately described the position of Electronic Frontier

16   Foundation, and so I won't burden the Court with additional

17   argument.

18              THE COURT:  All right.  Well, thank you very much

19   for filing your brief.

20              MR. SOLANO:  Thank you, Judge.

21              THE COURT:  Okay.  Now let me turn to the so-called

22   search and seizure issue -- well, no, wait, before that.

23              I took a minute during the break to look at the

24   Playboy case.  Now, Mr. Murray, and I haven't had time to

25   study it completely but Playboy is clearly a strict scrutiny

Colloquy                                72

1    case, correct?

2              MR. MURRAY:  Yes, I said that.

3              THE COURT:  You did say that.  Now, so if I were to

4    find that this case, as the Sixth Circuit said, was -- called

5    for intermediate scrutiny, the Government's position, as I

6    understand it, Ms. Wyer, and correct me if I'm wrong, is that

7    whatever factual burden the Government may have in an

8    intermediate scrutiny case, can be found from the

9    Congressional findings.

10             Do you agree or disagree with that?

11             MR. MURRAY:  I disagree with that.  The only

12   difference --

13             THE COURT:  And what's the case citation you have --

14             MR. MURRAY:  Well, just about all the cases in the

15   Supreme Court that apply intermediate scrutiny, beginning with

16   Turner Broadcasting, Renton, Alameda Books vs. City of Los

17   Angeles, all the whole secondary effects doctrine when it

18   comes to adult zoning and that type of thing, commercial

19   speech cases which are intermediate scrutiny, Lorillard, the

20   Lorillard Tobacco case where the Court struck down bans on

21   advertising of cigarettes.  They didn't just accept the

22   findings, I think in that case it was of a state legislature.

23             The only difference between strict scrutiny and

24   intermediate scrutiny on this point, there really isn't much

25   of a difference.  Under strict scrutiny they have the burden

1    of proving that the law furthers a compelling governmental

2    interest.   Under intermediate scrutiny, they have to prove

3    that the law furthers a substantial governmental interest.

4             THE COURT:  Or a legitimate, sometimes they use the

5    word legitimate I think.

6             MR. MURRAY:  Yes.  Well, I think it's usually

7    substantial, legitimate, substantial governmental interest.

8             But when it comes to demonstrating that very point,

9    the proof is almost virtually the same.  They still have to

10   prove that there's a problem, and that the Government has a

11   legitimate interest in solving, that's the governmental

12   interest, there has to be a problem.  And then they have -- it

13   doesn't have to be compelling, it only has to be substantial.

14   But then they have to prove that the regulation advances the

15   governmental interest in alleviating that problems, and they

16   have to do so by evidence.

17            Now in all of these cases, don't misunderstand me,

18   Your Honor, they are entitled to go back to the legislative

19   history.  Don't misunderstand me.  Even in Playboy, they

20   always look at the legislative history and they always say

21   well, this is what Congress had in mind and this is the

22   problem that Congress thought they were solving, and this is

23   how Congress thought they were solving the problem.

24            But they don't stop there, unless it is beyond

25   debate at that juncture.  But if -- but under either form of

1   scrutiny, they go further and examine whether there really was

2   a problem, and examine whether the statute actually does

3   further the governmental interest in solving that problem.

4           So to this -- as far as this particular argument is

5   concerned, the fact that <u>Playboy Enterprises</u> was a strict

6   scrutiny case really doesn't matter at this point.

7           THE COURT:  Okay.  All right, Ms. Wyer, what's your

8   viewpoint of the law on this issue?  And if you can cite a

9   case, that would be helpful, or if you want to put it in your

10  supplemental brief, that's okay too.

11          If you've covered this in your brief, just tell me

12  where.

13          MS. WYER:  I think that I did cite cases that

14  indicate that the Government can rely on Congressional

15  findings and common sense.

16          THE COURT:  All right, where is this in your brief?

17          MS. WYER:  I'm looking for the citation.

18          But I don't think the cases that plaintiff has cited

19  actually require the Government to come forward with new

20  evidence.  And that's particularly true in the --

21          THE COURT:  Well, I know you don't.  I'm just

22  looking for some citations, if you have any.  Or why don't you

23  just jot this down to put it in a supplemental brief.  Would

24  you mind?

25          MS. WYER:  Okay.

Colloquy                                    75

1              THE COURT:  Okay.  All right.  Or if you've already

2      briefed it, you can just cite to the page number.

3              MS. WYER:  Okay.  I wanted to respond to the ACLU's

4      point about -- particularly about the requirements --

5              THE COURT:  All right, go ahead.

6              MS. WYER:  I don't think that that is accurate,

7      based on the 18 U.S.C. 2256 Subsection 11 expressly excludes

8      depictions that are drawings, cartoons, sculptures or

9      paintings from the definition of child pornography.

10             And there's a case that I found called <u>Z.A. Ex Rel.</u>

11     <u>Oswald</u>, it's an unpublished case in the Eastern District of

12     Missouri but it's a recent case that dismissed plaintiff's

13     claim that the Protect Act was violated based on the

14     defendant's alleged use of him in a sexually explicit cartoon.

15     He was claiming that he was the model for the cartoon and that

16     that violated the Protect Act.  The Court held that 2256, the

17     definition there excluded drawings, cartoons, paintings and

18     sculpture from the definition of visual depiction and child

19     pornography in that statute.  And I have a copy of that, if

20     that would be helpful.

21             THE COURT:  Sure.

22                          (Pause)

23             THE COURT:  Thank you.  Okay.  All right, I want to

24     turn to the -- you want to respond to that briefly?

25             MR. MAGAZINER:  If I may, Your Honor?

Colloquy                                           76

1        THE COURT:  Yes, sir.

2        MR. MAGAZINER:  Subsection 11 to which the

3   Government responds -- cites, is the term indistinguishable is

4   defined in 2256 as -- because it appears in 2257(a) and 2257,

5   simulated sex that is indistinguishable from actual sex is

6   treated as actual sex.  That's what -- if you look at 2257,

7   2257(a).  And 2256 it defines what indistinguishable means.

8   And then it says, "This definition of indistinguishable does

9   not apply to depictions that are drawings, cartoons,

10  sculptures or paintings depicting minors or adults."

11       But that doesn't mean that the rest of 2257 and

12  2257(a) don't apply to art.  It merely means that the

13  definition of indistinguishable does not apply to paintings

14  and drawings.  It's really quite off point.

15       THE COURT:  All right, thank you.

16       All right, I want to turn to the search and seizure

17  issue, so-called.

18       Now it's my understanding, Mr. Murray, that in the

19  Sixth Circuit case, they dealt with a Fifth Amendment claim

20  against self-incrimination, but they did not address the

21  search and seizure, the Fourth Amendment issue, is that right?

22       MR. MURRAY:  That is correct.  And the reason for

23  that is again, because the -- in 2006 in the Adam Walsh Act,

24  for the first time, Congress added the provision that it's a

25  felony now to refuse the inspection.  And so that made the

Colloquy                                        77

1    Fourth Amendment issue front and center, whereas in the past

2    it was not a crime to refuse the inspection.

3         THE COURT:  However, if you go to the last paragraph

4    of the Sixth Circuit en banc decision, there is all of a

5    sudden out of the blue a reference to the Fourth Amendment.

6    And I'm referring to -- okay, I'm referring to 557 F.3d at

7    343.

8         The last sentence reads as follows, the next to last

9    sentence.  They're talking about the Fifth Amendment not being

10   ripe, but they say this.  "At least until the Attorney General

11   attempts to obtain Section 2257 records from these

12   individuals, they face no greater risk of prospective harm

13   than a claimant concerned that the Government will violate his

14   Fourth Amendment rights in future services.  C.F. Warshak 532

15   F.3d at 533."  I haven't read that case yet.

16        So that seemed to me to virtually -- and maybe it's

17   dictum, but they're sort of saying you know, we don't have to

18   reach the Fifth -- well, that the Fifth Amendment is ripe for

19   the same reason the cases hold -- excuse me -- the Fifth

20   Amendment claim is not ripe for the same reason the cases hold

21   that a Fourth Amendment claim would not be ripe.

22        Now, you were involved in this case.  Maybe you know

23   more about it and would like to explain what that means.

24        MR. MURRAY:  Your Honor, I think it was a -- the

25   only thing that I took from it is that it's a gratuitous

Colloquy                                    78

1    comment that has no bearing on what we're arguing today.   It

2    was in the context of the question of whether the Fifth

3    Amendment claim was ripe.

4              THE COURT:  All right --

5              MR. MURRAY:  It's a gratuitous comment --

6              THE COURT:  -- well, tell me why -- well, let me put

7    it this way.  In terms of the facial claim, there are cases

8    and there are statutes, and the Fair Labor Standards Act is

9    one of them, where companies are required to keep records, and

10   the Government has the right to knock on the door and demand

11   the production of the records.

12             Now, as a small, perhaps small footnote, I don't

13   think any judge has ever said that means the Government has

14   the right to swoop in and look in every desk drawer and you

15   know, go through your belongings and so forth.  It means that

16   they can knock on your door and say we want to see your

17   records, and you can bring the records to the front door.

18             But you can comment on anything that you may like.

19   But to me, it's not exactly a search and seizure requirement.

20   It's a production of records requirement.

21             MR. MURRAY:  But this is different.

22             THE COURT:  Why?

23             MR. MURRAY:  Because they get to enter.  You cannot

24   keep them out of your door.  You can't bring the records to

25   them.

1          THE COURT:  Well, the statute's not clear.  You can

2    enter, but it doesn't say, and I don't -- and I think that if

3    you had a situation where they barged in and they you know,

4    started going through every desk drawer, and let's say it's in

5    an office and not in a home, so we don't get into this home is

6    your castle situation.  Let's say it's a business.  Whether

7    that would be appropriate.

8          I mean, sometimes you get into, you know, concepts

9    of due process overriding the exact words of a statute.

10          But the point is, there hasn't been any of these, so

11    why should I rule on it in the abstract?  Now that's another

12    question.  But I'm happy to hear what your argument is.

13          MR. MURRAY:  Thank you, Your Honor.

14          This claim is ripe, and it's ripe for a number --

15    first of all, if you look at the regulation, it is quite

16    clear, unambiguous.  "Investigators are authorized to enter

17    without delay."  So you can't keep them out.  They have a

18    right, without a warrant and without probable cause, to demand

19    -- and without advance notice, to come to the premises, for

20    the purposes of investigating whether you've committed a

21    federal crime that can send you to prison for five years.

22    They have the authority without a warrant, without probable

23    cause, to demand and gain entry to your home or your

24    business --

25          THE COURT:  All right.

Colloquy                                          80

1            MR. MURRAY:  -- for the purpose -- and the law is

2    clear.  Once an officer gains entry, that's a search.

3            THE COURT:  Okay, well, let's talk about the facial

4    challenge.  All right.  There are other statutes, and I'm not

5    a student in this area, but there are other statutes that

6    clearly allow Government regulators to make unannounced visits

7    to someone and demand records.  You agree with that,

8    conceptually.

9            MR. MURRAY:  The administrative search exception to

10   the warrant requirement.

11           THE COURT:  Okay, right.

12           MR. MURRAY:  Berger, Camara.

13           THE COURT:  Now if that has been upheld, then what's

14   wrong with this on a facial challenge basis?

15           MR. MURRAY:  Because those requirements are, it's

16   got to be in a regulatory context, not in an investigation for

17   a criminal -- of a criminal law, that's one of the

18   requirements.

19           Number two -- actually the first requirement, it can

20   only apply to a closely regulated industry.  The Supreme Court

21   has said that if it's not a closely regulated industry, the

22   administrative warrant exception will not apply.

23           Now think about who this applies to.  First of all,

24   even if you just limit it to the adult entertainment industry,

25   that's not a closely regulated industry by itself because the

1    First Amendment prohibits close regulation of constitutionally

2    protected speech.

3              But it goes beyond that because artists,

4    photographers, sex educators, private citizens who post their

5    sexually explicit images, millions of Americans who put it on

6    their cell phone, they've got to subject themselves to

7    warrantless searches of their homes.  It's not a closely

8    regulated industry.  And if it isn't, the Supreme Court has

9    made it clear that they cannot rely upon that exception to the

10   warrant requirement.

11             THE COURT:  All right.  And you've argued in your

12   brief that -- the Government says well, this has never been

13   enforced.  Now the Sixth Circuit, where it was persuaded by

14   that -- I mean, the Government said there, as I understand it,

15   that well, look, you don't have to worry about that because

16   that's not how we enforce these laws and we're not going to

17   enforce this in that manner.  And you argued that that is

18   irrelevant, that it's dangerous the way it's written.

19             Now the Sixth Circuit rejected your argument, as far

20   as I can tell, whereas the dissent thought it was very

21   meritorious.  But you know, there we go again.

22             But tell me what -- you know, whether, once again,

23   as the Third Circuit opined on this issue, that I should be

24   entitled to ignore what the Sixth Circuit held.

25             MR. MURRAY:  Well, the Sixth Circuit never held

Colloquy                                                82

1    anything on this Fourth Amendment issue, Your Honor.

2              THE COURT:  Right, but they --

3              MR. MURRAY:  It was never presented to them.

4              THE COURT:  But they did address your whole argument

5    about enforcement in the context of the Fifth Amendment

6    argument.  They addressed your argument, as I understand it,

7    about the enforcement and said well, the Government has said

8    we don't enforce things that way.

9              Now if the Government said that about the Fifth

10   Circuit -- if the Government said that about the self-

11   incrimination provision in the Sixth Circuit, and they're

12   prepared to say the same thing about how they would look for

13   records in this context --

14             MR. MURRAY:  Oh, no they're not.  That's the

15   difference.  Because the regulation -- the difference is the

16   regulation spells out precisely what they do.  And every

17   single inspection has to be done by the investigator in strict

18   compliance with the regulation.  So every single --

19             THE COURT:  Let me ask Ms. Wyer what your view is on

20   this matter.  Mr. Murray is not done yet.  I'm interrupting

21   him for this point of view.

22             MS. WYER:  Well, first of all, I think it's

23   important to note that the statute says "any person to whom

24   Subsection A applies who's subject to the record keeping

25   requirements shall maintain the records required by this

1    section at his business premises and shall make such records

2    available to the Attorney General for inspection at all

3    reasonable times".

4           So, the statutory language does not even refer to

5    entry at all.  And the only thing subject to inspection under

6    the statutory language is the records which the producers, we

7    have argued, can have no expectation of privacy in records

8    that they are creating only for purposes of complying with the

9    statute.  So --

10          THE COURT:  Am I correct that the Government made an

11   argument in the Sixth Circuit that you would -- you had

12   certain enforcement parameters that should be respected?

13   Isn't that correct?

14          MS. WYER:  In the -- in regard to the Fifth

15   Amendment issue --

16          THE COURT:  Yes.

17          MS. WYER:  I'm not familiar with the exact argument

18   that was made, but it's definitely true that the enforcement -

19   - the particulars of enforcement are very relevant to a Fourth

20   Amendment claim.

21          THE COURT:  And that's why you say it's not ripe.

22          MS. WYER:  Right.

23          THE COURT:  That you ought to wait and see how it's

24   enforced.

25          MS. WYER:  Right.

Colloquy                                        84

1           THE COURT:  All right.

2           MS. WYER:  And I also want to point out that that

3    issue had to do with the inspection regulation which was

4    promulgated in 2005.  And the <u>Connection</u> plaintiffs amended

5    their complaint after those regulations were promulgated and

6    raised the Fifth Amendment issue in regard to the inspection.

7    So they could have raised a Fourth Amendment issue about the

8    inspections if they had wanted to at that time.

9           And in the Colorado case, they actually did raise

10   the same Fourth Amendment claim, in the 2005 <u>Free Speech</u>

11   <u>Coalition</u> case in the District of Colorado. And in that case,

12   the Government moved to dismiss the Fourth Amendment claim,

13   and the plaintiffs simply did not respond to the Government's

14   arguments on that point, and the Court granted the

15   Government's motion in its 2007 decision.  In that decision

16   when it's referring to Count 31, that's talking about the

17   Fourth Amendment issue.  It doesn't even refer to the Fourth

18   Amendment because the plaintiffs didn't respond, so it just

19   said that that claim -- the Government's motion on that claim

20   is granted.

21          THE COURT:  All right.  Mr. Murray, sorry to

22   interrupt you.

23          MR. MURRAY:  That's all right.  No, this is

24   important, Your Honor, and I want to be clear that if you read

25   -- when you read the statute and the reg, I am absolutely

Colloquy                                                    85

1    certain that the conclusion has to obtain that every single

2    inspection that will be carried out will violate the Fourth

3    Amendment.   There can never be an inspection under this regime

4    that will not violate the Fourth Amendment because it will be

5    done without a warrant and without probable cause.

6          And the statute proves that.   The statute and the

7    reg.   The statute says, "Any person to whom this statue

8    applies shall maintain the records required by this section at

9    their business premises or at such other place as the Attorney

10   General may by regulation proscribe, and shall make such

11   records available to the Attorney General for inspection at

12   all reasonable times."

13         Then it goes on to say, "It shall be unlawful for

14   any person to whom Subsection A applies to refuse to permit

15   the Attorney General or his or her designee to conduct an

16   inspection under Subsection C."

17         And it authorizes regulations.   And when you go to

18   the regulations, they are quite clear.   "Investigators

19   authorized by the Attorney General are authorized to enter

20   without delay and at reasonable times any establishment of a

21   producer where records are maintained to inspect during

22   regular working hours.   Advance notice is not required.   Upon

23   commencing an inspection, the investigator has to present his

24   credentials, explain the nature and purpose of the inspection,

25   indicate the scope of the inspection and the records that he

Colloquy                                    86

1    wants to inspect, and he's got to conduct the inspection so as

2    to not unreasonably disrupt the operations.  An investigator

3    may copy, at no expense to the producer, any record that is

4    subject to inspection" --

5                THE COURT:  Well, let me just interrupt you for a

6    minute.  At page 43 of the Government's brief, Ms. Wyer, she -

7    - and this is what I was sort of asking her about -- she says

8    that the Government adopted certain regulations that were

9    specifically raised by the plaintiffs and changed them so that

10   producers may make their records available at the place of

11   business of a non-employee, custodian of records.

12               Is that right?

13               MR. MURRAY:  Yes, the regulation does --

14               THE COURT:  So it doesn't have this Draconian effect

15   that -- there's an option to produce them otherwise.

16               MR. MURRAY:  No, what that means is you could retain

17   a third party --

18               THE COURT:  Right.

19               MR. MURRAY:  -- to keep your records on his business

20   premises.  Then the Government gets to go into his business

21   premises, same thing, they go back to the records, they're

22   allowed to inspect them, our records, they're allowed to copy

23   them, they're allowed to take those records out.  It's just

24   that the --

25               THE COURT:  And that's what I started out saying.

Colloquy                                          87

1    This is not an unusual provision.  There are many areas of the

2    law where Government regulators are allowed to go to a

3    business and demand to see records immediately.  Isn't that

4    right?

5              MR. MURRAY:  No, no.

6              THE COURT:  It's not right?

7              MR. MURRAY:  It is not right.

8              THE COURT:  It's not under the Fair Labor Standards

9    Act there's not a --

10             MR. MURRAY:  Only in the closely regulated

11   industries.

12             THE COURT:  What you're saying is that because your

13   clients are exercising First Amendment rights, that they

14   shouldn't be subject to what something who's -- you know,

15   producing -- killing chickens or producing mushrooms or

16   something like that.

17             MR. MURRAY:  Not only that, but they can't do it at

18   home, Judge.  There's never been --

19             THE COURT:  Well, let's --

20             MR. MURRAY:  -- there's never been an inspection

21   regime upheld by any Court that authorized the entry onto a

22   home --

23             THE COURT:  You may be right about that.  But you

24   know, just from sitting here, you know, it's really a stretch

25   to say to some District Judge that I should strike this whole

Colloquy                                          88

1    thing down because there's some possibility that a Government

2    agent may go to the home of somebody who's involved in adult

3    entertainment or in art or an artist or something like that.

4            I mean, it's so fundamentally unfair that it's hard

5    to envision a Government agent doing that, and that I should

6    stretch out and say this whole thing is unconstitutional

7    because there's a provision here that a Government agent could

8    go to a home of say, a psychologist involved in counseling sex

9    people who -- sex couples or sex addicts, and they have

10   explicit pictures in their offices, and for that reason the

11   whole statute is unconstitutional.

12           I mean, that's not the way judges think.  I mean, I

13   don't -- I've never seen an opinion like that.  You're

14   grasping at the extremist of extremities and saying because

15   that's in there, the whole thing should fall.  And that's just

16   not the law, and I don't think you can find a case that's

17   going to say that.

18           MR. MURRAY:  Your Honor, I think that if they go to

19   a commercial producer at his office without a warrant, without

20   probable cause, to investigate a crime, and they demand

21   entrance and they search through the records, the Supreme

22   Court, as I understand their juris prudence, that is what's a

23   violation of the Fourth Amendment.

24           THE COURT:  What's a case that says that?

25           MR. MURRAY:  Every case that stands for the

1    proposition that there's a presumption that you need a warrant

2    and probable cause to conduct a search.

3              THE COURT:  Well, just tell me one.  I mean, I don't

4    -- I think there are lots of cases that allow that.  You've

5    got the Fair Labor Standards Act, the IRS has that privilege

6    in certain circumstances.

7              MR. MURRAY:  The IRS can't come into my home and

8    demand records.  They can summons me --

9              THE COURT:  Well, you may be right.  But the Fair --

10             MR. MURRAY:  There's process.

11             THE COURT:  -- Labor Standards Act gives that right.

12   I've got a case under the FLSA.  They have, the Government has

13   a right to demand records without a warrant and without notice

14   --

15             MR. MURRAY:  But I think --

16             THE COURT:  -- on wage and hour compliance --

17             MR. MURRAY:  Sure, but I think they have to issue an

18   administrative summons.  There's process at issue.  It isn't

19   that they can show up with the force of law and say you have

20   to permit me to enter and I'm going to go search your records.

21   They have to issue a summons.  There's process.  In all the

22   cases you're talking about, Your Honor, there's process.

23             An IRS summons, a notice to produce records, a

24   subpoena.  There's no case out there, other than the

25   administrative law exception cases, the Berger line of cases,

Colloquy                                  90

1      that upholds a search without a warrant under circumstances in

2      which there's no other process, like a subpoena or a summons.

3              So no, this is, in my view, Your Honor, this is

4      really just black letter law.  And it's the Government in the

5      statute that has promulgated something that is unique and that

6      has never been attempted.

7              THE COURT:  All right, Ms. Wyer, why about that

8      argument?  I mean, I think he may have a point there.  That

9      usually with administrative subpoenas, you do have a subpoena

10     or summons.  You go to the door under the FLSA, I mean, I

11     don't remember this exactly, but an inspector has something to

12     show the business owner, and this statute doesn't seem to

13     require that.  Or does it?  Or are there regulations that have

14     been enacted that would require it?

15             MS. WYER:  The statute is so limited in that all

16     that it authorizes is inspection of the very records that are

17     created just to comply with the statute.  This is a threshold

18     issue under the Fourth Amendment, whether any expectation of

19     privacy has been violated.  And if there hasn't, it does not

20     even qualify as a search.

21             THE COURT:  Well --

22             MS. WYER:  To the extent --

23             THE COURT:  Let's use Mr. Murray's example.  The

24     inspector -- under the statute, and if there are regulations

25     that bear on this, please tell me, because I'm not familiar

1    with them.   Under the statute, a -- someone from the

2    Department of Justice, you know, perhaps an FBI agent or

3    maybe, you know, so we don't get into a criminal investigation

4    necessarily, it could be somebody from the Civil Division,

5    let's say you know, a lawyer, wants to go to a producer of

6    adult movies.   And they knock on the door, without any kind of

7    document whatsoever, and they say we'd like to see your

8    records of all your employees.   All right?

9              No notice.   You're saying that's perfectly valid.

10   Now are there any regulations of this?   Why hasn't the

11   Department of Justice promulgated some regulations about the

12   circumstances under which this kind of search  can take place?

13   Or have you, and I'm ignorant about it?

14             MS. WYER:   Yes, the applicable regulation is 28 CFR

15   75.5.

16             THE COURT:   75 --

17             MS. WYER:   Point 5.   And there are two points --

18             THE COURT:   What does that say?

19             MS. WYER:   That describes the inspections.   But I

20   want --

21             THE COURT:   Is this in your brief?

22             MS. WYER:   Yes.

23             THE COURT:   I'm looking at page 45.   Is that where

24   you talk about it?

25             MS. WYER:   When I describe how the search procedures

1    are in compliance with the <u>Berger</u> standards --

2                THE COURT:  Yes.

3                MS. WYER:  -- I think I cite it there.  Because the

4    regulations require --

5                THE COURT:  Wait, you see where we are, Mr. Murray?

6                MR. MURRAY:  Your Honor, I actually read to you from

7    those regulations.  That's what I was reading from.  It's on

8    page 47 of our brief in support of our motion.  It was the

9    regs that I was reading from that authorized them to enter

10   without delay and without advance notice and to conduct a

11   search of the records and to copy the records and to take

12   anything with them that they want.  It even authorizes them to

13   take any evidence of a felony that they find there.

14               THE COURT:  Right.

15               MR. MURRAY:  Those were the regs that tell you how

16   the inspections are going to occur.

17               THE COURT:  Do you agree, that's what she cited, was

18   75.5, right?

19               MS. WYER:  Right.

20               THE COURT:  Okay.

21               MS. WYER:  And --

22               THE COURT:  All right.

23               MS. WYER:  I just wanted to make the point that the

24   plaintiffs counsel keeps referring to the criminal penalty as

25   if that is something quite unusual.  But every administrative

1   scheme for inspection normally carries a criminal penalty.

2   There was a criminal penalty issued in <u>Berger</u> if you didn't

3   allow the inspections that were authorized there.

4           If there is like housing inspections, building

5   inspections statute, usually failure to comply would subject

6   one to criminal penalties.  That's just a standard part of an

7   administrative inspection scheme.

8           So there's nothing at all unusual about the fact

9   that failure to allow the inspections authorized under 2257

10  would carry a criminal penalty. This is not -- this is not an

11  investigation of a crime, as the plaintiff referred to it.

12          And the other thing is that this -- everyone has

13  been on notice that anyone creating images subject to 2257

14  would be subject to inspections since 1988.  This was a

15  provision that was in the statute from the beginning.  So at

16  this point --

17          THE COURT:  Well, I understand that.

18          MS. WYER:  -- I think it qualifies as closely

19  regulated to that extent.  And that the records that you have

20  to create for purposes of this scheme are subject to

21  inspection, that is -- that aspect of producing these

22  materials is closely regulated.

23          THE COURT:  All right.  Are any of you aware of any

24  Third Circuit cases that would govern this issue?  I mean, on

25  page 47 the Government cites <u>Showers vs. Spangler</u> and if

1    anybody has any other cases on that, you can put them in your

2    supplemental brief, okay?

3              MS. WYER:  All right.  Well, I would say the

4    Professional Dog Breeders case is similar in that dog breeding

5    is a kind of activity that any -- you can do it at any level,

6    you can do it in your home, you can do it as an amateur

7    activity, and yet everyone who engages in dog breeding is

8    subject to inspections under the scheme in that case.

9              THE COURT:  Well, what's your response to Mr.

10   Murray's argument that a lot of his clients, if not all of his

11   clients, are engaged in First Amendment rights and exercising

12   them and therefore they're entitled to more protection than

13   dog breeders or farmers or chicken pluckers?

14             MS. WYER:  I think the scope of the inspections here

15   is so limited that they are reasonable under the First

16   Amendment and --

17             THE COURT:  Well, why do you keep saying it's

18   limited?  I mean, they're allowed to go and see any records

19   that they may have.  I mean, there's no limitation --

20             MS. WYER:  No.  And this is not any records that the

21   plaintiff happens to have in their filing cabinet.  These are

22   the specific records that are contained under the record

23   keeping scheme that show that the producer looked at the

24   identification of the performer.  And these records have to be

25   kept separately from any other records that the producer has.

1           And the DOJ when promulgating that requirement said

2    that the purpose of that is in a way to -- is to facilitate

3    the inspection, to streamline it for the sake of the

4    inspectors, but it also prevents inspectors from rummaging

5    through a producer's entire files.  All the inspector is doing

6    is looking at these -- those specific records that were

7    created only for purposes of this record keeping scheme.

8    These records, all they have is the identification of the

9    performer.  They're like indexed by the performer's name, and

10   they say this performer was in this production, this is the

11   website where this is, here's a picture of the image that

12   shows that the labeling requirements were followed.  It's all

13   supposed to be kept in this very sufficient -- efficient

14   manner so that all the inspector does -- the regulation

15   requires that when the inspector comes, he has to present his

16   credentials, explain the purpose of the inspection, including

17   the limited nature of the records inspection, and that's the

18   language in the regulation, and he has to identify the records

19   that he wants to inspect.  He has to explain the scope of the

20   inspection that he intends to conduct in that case.  He has to

21   conduct the inspection so as not to unreasonably disrupt the

22   operations of the producer.

23           THE COURT:  All right, let me just -- all right, I

24   see you've argued a good deal of this in your brief.  Let me

25   hear Mr. Murray's response and then we're going to move on and

Colloquy                                    96

1    come to a conclusion.

2              MR. MURRAY:  Just a couple points, Your Honor.

3              They're going in to investigate whether somebody

4    committed a crime.  They're not going to see if there's a

5    building code violation.  That automatically takes it out of

6    the administrative search --

7              THE COURT:  Well, that's entirely fair.  They're

8    going in to see whether someone has kept these records.  If

9    they failed to keep the records, that could be a crime.

10             MR. MURRAY:  Well --

11             THE COURT:  But if somebody has kept the records,

12   then the Government -- they want to see what the records are.

13   And I'm going to come back to that in a little hypo I'm going

14   to give you in a few minutes.

15             But it's only a crime if you haven't kept the

16   records.

17             MR. MURRAY:  Well, it's a crime --

18             THE COURT:  And there's a lot of statutes that

19   require people to keep records and make it a crime if you

20   don't.

21             You know, going back to the Internal Revenue

22   Service, you know, you and I, we're supposed to keep our

23   records for six years.

24             MR. MURRAY:  So they can civilly determine --

25   there's no civil component to this.  At least the IRS has a

1    civil reason, an administrative reason, as do building codes,

2    as do employment records.  The only purpose for these records

3    is a criminal statute.  And if you don't keep the record the

4    right way, you've committed a crime.  They're investigating a

5    crime, Your Honor.

6             THE COURT:  Well, you keep saying that, but the

7    purpose of this statute is to prevent child pornography.  And

8    you're right, if you ignore the requirements, then maybe you

9    are committing a crime.  But this is not like bank robbery,

10   you know, where you're going to be sent to jail if you rob a

11   bank.  This is to prevent child pornography.  That's the

12   overriding reason here that everybody's got to keep in mind.

13            MR. MURRAY:  But they didn't make it a civil

14   penalty.  They made it a crime not to keep these records and

15   not to put the --

16            THE COURT:  Because they want to be sure people do

17   it.  So deterrence -- that to me doesn't make it

18   unconstitutional.

19            MR. MURRAY:  Well, Your Honor --

20            THE COURT:  I mean, I think you've got a very

21   important argument about the procedural aspects of this, don't

22   get me wrong.  But, the concept of requiring the records does

23   not seem to me to be unconstitutional.

24            Are you saying -- and I don't think you're arguing

25   that keeping these records are unconstitutional, because

Colloquy                                              98

1    you've made the point that your clients and others in this

2    industry have voluntarily made these records for years.

3              MR. MURRAY:  No, the point on the Fourth Amendment

4    is that it's a search and seizure.  That's the point.

5              THE COURT:  No, I understand.

6              MR. MURRAY:  And Your Honor, I think it's important,

7    again, I defy the Government to find any statutory scheme and

8    set of regulations that authorizes what this set of statutes

9    and regulations authorizes in the way of warrantless searches

10   and seizures without some other form of process as a

11   substitute, be it a subpoena or a summons or an administrative

12   directive.

13             But one thing that I think -- I can't stress enough,

14   Your Honor, most -- a huge number of people, including many of

15   the plaintiffs in this case are photographers.  Huge numbers

16   of photographers, they're like one and two, two men and women

17   operations.  They keep all of their records in their home.

18   They work out of their home.

19             All the photographers that are going to be subjected

20   to the inspection for the most part are going to have their

21   homes inspected.  In fact, this regulation requires you, and

22   we have a plaintiff who did it, if you're not -- if you don't

23   keep regular business hours of at least 20 hours a week, you

24   have to write a letter to the Attorney General telling the

25   Attorney General what time of day and where his designee can

1    come in and inspect the records.  And it's got to be at least

2    20 hours a week.

3            We have a plaintiff who will testify that he's

4    written a letter to the Attorney General saying I will be

5    available at my home for you to inspect the records between

6    one and five, Monday through Friday.  And now he's got to stay

7    at home Monday through Friday.

8            But the point is, and I don't make that point only

9    to -- because I'm not making an as applied challenge.

10           THE COURT:  Here's -- yes, go ahead.

11           MR. MURRAY:  It's on its face unconstitutional.

12   There can never be an inspection under this regime that would

13   satisfy the First and Fourth Amendments.  And that's why it's

14   proper for this to be struck down on its face, because in

15   every single instance, the Government will be violating the

16   Fourth Amendment requirement that there either be a warrant,

17   probable cause, or some suitable substitute --

18           THE COURT:  All right, okay, well, this gets to the

19   ripeness issue.  And I'm with -- I found the part of the Sixth

20   Circuit majority that I'm talking about, where they say --

21   this was on the substantial over-breadth argument.  And the

22   majority decision, you know, considers your argument, and I

23   guess it was you personally who made it, that the enforcement

24   records -- this was where it was, I think you argued that this

25   could apply against a husband and wife, and the Court rejected

1    that argument and said there's never been any enforcement

2    about it.  And the Supreme Court has -- and I'm paraphrasing

3    now -- but the Supreme Court has never struck down a statute

4    because of some extreme application that has been disavowed by

5    the Government and never applied.

6            Is that a fair summary of what they held?

7            MR. MURRAY:  Of what the Sixth Circuit held?

8            THE COURT:  Yes.

9            MR. MURRAY:  That's a passage from the opinion, yes.

10           THE COURT:  All right.  Why wouldn't that apply

11   here?  You're -- why shouldn't we await -- why shouldn't a

12   ruling on this await an actual search and demand to see if

13   it's done in a manner that offends the Fourth Amendment or

14   offends due process or offends the First Amendment?  Why

15   should I, you know, be asked to strike something down that

16   could be applied in a proper manner merely because it could be

17   applied in an improper manner?

18           MR. MURRAY:  It can never be applied -- there have

19   been inspections, Your Honor, they'll be able to put on

20   evidence, and FBI does it, that's who does it.  FBI has done

21   these inspections at various places.

22           And what I'm saying is, every single -- you cannot

23   conceive of a set of facts in which they would conduct an

24   inspection under this -- consistent with this statute and regs

25   that would not violate the Fourth Amendment.

Colloquy                                               101

1              THE COURT:  Oh, sure they can --

2              MR. MURRAY:  I'm telling you every single --

3              THE COURT:  The agent knocks on somebody's door, on

4     -- let's leave it as a business, knocks on the business door,

5     and says I'd like to see your records.  The person says well,

6     I'm busy right now, would you mind coming back in an hour or

7     come back tomorrow.  And the FBI agent says sure.  And he

8     comes back in an hour or the next day and he gives him the

9     records.  What's illegal about that?

10             MR. MURRAY:  Because the compulsion.  It isn't

11    voluntary.  You're not consenting to it.  The law demands that

12    he obtain entry without delay and you have no choice.  So it's

13    a search.

14             THE COURT:  But I was just telling you, that you put

15    in without delay, and the FBI agreed to delay, agreed to give

16    him the opportunity to find the records.

17             I mean, it seems to me --

18             MR. MURRAY:  But it would still, if he comes back,

19    it's still a search --

20             THE COURT:  Look, I'm not minimizing your argument.

21    I'm just saying that it sounds to me like the Sixth Circuit

22    rejected it.

23             MR. MURRAY:  But Judge, we didn't have a Fourth

24    Amendment argument in the Sixth Circuit.

25             THE COURT:  Well, I understand that --

Colloquy                                         102

1           MR. MURRAY:  So they couldn't have rejected it.

2           THE COURT:  But the reasoning they gave --

3           MR. MURRAY:  And they're wrong if they rejected it.

4           THE COURT:  Well, now that's --

5           MR. MURRAY:  And it's not consistent with the Third

6    Circuit.

7           THE COURT:  Now that's your best argument, that

8    they're wrong.

9           Now the next question is where has the Third Circuit

10   ruled that I can say the Sixth Circuit was wrong?  Same

11   question I asked when we started off today.  And if you want a

12   chance to brief that, I'll be glad to give it to you.

13          But I -- I'm sitting here as a sole District Court

14   Judge, and I'm not looking forward to you know, the

15   opportunity to say that an en banc decision of a Circuit Court

16   where the Supreme Court denied cert is something I should

17   ignore.

18          MR. MURRAY:  Well, I think it's important to

19   understand that the Sixth Circuit was not talking about a

20   Fourth Amendment issue.  They were talking about --

21          THE COURT:  You're right, you're absolutely right --

22          MR. MURRAY:  So they never ruled on this issue.

23          THE COURT:  You're right, and I've said three times

24   you're right, but it seems to me like that reasoning applies

25   in the Fourth Amendment context.  But maybe not.  But I'm

1    asking you, or giving you the chance to cite a case or put it

2    in your supplemental brief, if you want, you know, some Third

3    Circuit ruling that would cast doubt on what I -- how I'm

4    looking at the Sixth Circuit.

5            MR. MURRAY:  I will, Your Honor.  But we have

6    Supreme Court precedent too that we think is --

7            THE COURT:  Well, then why didn't the Supreme Court

8    deny cert -- why did they grant cert if the Sixth Circuit is

9    contrary to Supreme Court precedent?

10           MR. MURRAY:  No, on this Fourth Amendment issue

11   which was not raised in the Sixth Circuit or in the Supreme

12   Court.

13           THE COURT:  Well, I know you say there are lots of

14   Supreme Court cases.  I'd appreciate your citing me a couple

15   that you think are most on point.  And I'll give them

16   careful --

17           MR. MURRAY:  Thank you, Your Honor.

18           THE COURT:  Now, I want to ask -- now I have a hypo,

19   because you're right, that some of the cases say that you

20   should test this against a hypo.

21           Now let me -- and this goes to the whole concept of

22   what we're talking about here, in my view.

23           Let's talk, and I'll give you both a chance to

24   expand on this and tell me where I'm wrong.

25           Let's say there's a husband and wife, they don't

1    have to be married but I'm just using that example, it could

2    be any couple, it could be a male and female, it could be two

3    males, it could be two females.  But let's say they live

4    together, and they engage in sexual conduct, and certainly

5    there's nothing wrong about that.  As a matter of fact, it's

6    constitutionally protected clearly, regardless of whether

7    they're married or not, in their own home.

8         Now, and they make a video of what they're doing.

9    Certainly can still -- completely within the First Amendment.

10   And let's say that they copy that video and they give it to a

11   friend of theirs.  Certainly that's within the First Amendment

12   as well.  Ms. Wyer, you would agree with that, so far?

13        MS. WYER:  That -- I think so far the Government has

14   taken the position that they would never apply the

15   requirements to the actual creation of the video by the

16   private couple.

17        THE COURT:  Okay, all right.  But you would agree

18   that there's language in the statute vel non that might

19   arguably say the statute would apply to that?

20        MS. WYER:  Well, the Department of Justice in

21   promulgating the regulations has interpreted the language,

22   looking at the scheme as a whole, to not be focused on that

23   situation.  So they just don't interpret it that way.

24        THE COURT:  All right, okay, well, let me -- all

25   right, now.  Let's say that couple has a child.  And the child

Colloquy                                    105

1    is 18 years old, or 18 years or older.  And that couple and

2    their child, their adult child, over 18, the three of them

3    participate in these sexual activities and are in the video.

4    Okay?  Would the Department of Justice believe -- and they

5    make a video and they make a copy of the video and they give a

6    copy to a friend.

7              Now, would this statute be implicated?

8              MS. WYER:  That -- that is a very -- I think it just

9    depends on, I mean, that has to await the actual situation.

10             THE COURT:  Okay, all right, now --

11             MS. WYER:  I can't --

12             MS. WYER:  Next question, all right.  The couple

13   have two children,  one is over 18 and one is under 18.  And

14   they have both their children participate in this sexual

15   activity, and they video it and they make a copy of -- no, and

16   then they make a copy of the video and give a copy to a

17   friend.

18             Would the Government say the statute is implicated?

19             MS. WYER:  I mean --

20             THE COURT:  And leave aside whether it's a gay

21   couple who have an adopted child or it's a heterosexual child

22   and it's their own child or whether you know, they had a

23   surrogate mother or anything like that.  Let's leave all that

24   aside.  They recognize this as a child, one's adult and one's

25   minor.

Colloquy                                    106

1              MS. WYER:  Well, if a minor child is in this video

2     that meets the definition of child pornography, and somehow

3     the FBI becomes aware of it, I couldn't say that they would

4     not apply their requirements, but more likely they would

5     simply prosecute the individuals for child pornography.

6              THE COURT:  Okay.  All right.  You think that might

7     implicate child pornography because it involves a minor child

8     engaged in sexual activity, right?

9              MS. WYER:  Yes.  Right.

10             THE COURT:  Okay.  Now, all right, now let's -- let

11    me change the hypo a little bit.  This couple, and they have

12    an adult child, and then they invite another child, another

13    younger person, and -- to participate in the video of sexual

14    activity and they make a copy.  It is not clear from the video

15    whether that other child is over or under 18.  Okay?  You

16    can't tell.  Because some children are well developed at 15 or

17    16, and others are not that well developed, and I'm not just

18    talking about a woman being well developed sexually, it could

19    be a man, muscular content and body size and so forth.  You

20    just can't tell.

21             Would the Government contend that that activity

22    would be subject to the statute?

23             MS. WYER:  If they --

24             THE COURT:  And that they should keep -- that couple

25    should have a record of this other younger person, whether --

                              Colloquy                        107

1           MS. WYER:  In regard to whether the record keeping

2    requirements apply, I --

3           THE COURT:  Yes, well, I'm talking about the record

4    keeping.  I'm saying when the statute applies, they need to

5    have a record of who -- their own child is 18, so it's not,

6    okay, it's not a minor, but he is engaged in sexual activity

7    and they made a video and they made a copy of the video.

8           Now, but they have this other younger person, and

9    you can't tell from looking at this video whether that person

10   is over 18 or under 18.  Would the Government assert that the

11   record keeping requirements apply?

12          MS. WYER:  At this point, the Government has not

13   disavowed the application of the requirements in that context.

14   It has only disavowed the application of requirements to a

15   private couple or intimate associates making --

16          THE COURT:  Okay, all right.  So, if the Government,

17   say an FBI agent -- no, let me change my hypo a little bit.

18          They make a copy of this video and they give a copy

19   to a friend.  And the friend, it so happens, takes the video

20   on a trip and takes a bus, and inadvertently leaves the video

21   on the bus.  So somebody picks it up and plays it and says oh,

22   my God, this may be child pornography, and they turn it over

23   to the FBI.

24          Now, in your view, would the Government be entitled

25   to demand that this -- and let's say this is a small town and

Colloquy                                      108

1    they find out who is the adult couple in the video.  Is the

2    Government entitled to go to their home and say we would like

3    to see your records of who are the two younger people in this

4    video?

5              MS. WYER:  I mean, I'm thinking that the way things

6    would play out is that at that point they may have probable

7    cause to conduct an investigation.

8              THE COURT:  Well, let -- well, I'm not asking you

9    whether the FBI could go and arrest them.  I'm asking you

10   whether under the statute the FBI could go and ask to see

11   their records of identifying the two younger people in this

12   video.

13             I mean, I don't understand why you're hesitating.

14   It seems to me clear that under the statute they would have

15   been obliged to keep a record of these two younger people and

16   have proof of their age.

17             MS. WYER:  Well --

18             THE COURT:  And if they could produce records

19   showing that both these other younger people are 18 or over,

20   then they've not committed any crime and the FBI agent can go

21   home and forget about it.

22             On the other hand, if they don't have the record,

23   then they may have committed a crime of not keeping records.

24   Or, they may be prosecuted for child pornography if the

25   Government could prove that one of the children was under 18.

Colloquy                                                    109

1    Isn't that clear?

2              MS. WYER:  I think so.  I think copying -- it

3    depends whether it falls under the definition of producer and

4    copying --

5              THE COURT:  Well, they made a copy of the video.

6              MS. WYER:  I believe that would qualify.

7              THE COURT:  All right.  Okay, now Mr. Murray, what's

8    your reaction to these hypos?

9              MR. MURRAY:  Your Honor, I think that the statute is

10   clear.  It covers every single one of the examples that Your

11   Honor gave.  There is just no -- there is no way --

12             THE COURT:  Well, wait, it wouldn't cover the

13   husband -- would it cover the husband and wife themselves

14   making the video?

15             MR. MURRAY:  Yes.  Yes.  If you read the statute,

16   and again --

17             THE COURT:  But see there, the Government's just

18   claimed enforcement.  Isn't that right?

19             MR. MURRAY:  Yes. But Conchatta says that doesn't

20   get them anywhere.

21             THE COURT:  All right.

22             MR. MURRAY:  The Third Circuit says that doesn't get

23   them anywhere.  And the two COPA decisions reject Government

24   arguments that tried to narrowly construe the Child Online

25   Protection Act.

Colloquy                                    110

1          They made very similar suggestions to the Third

2     Circuit in those two cases and the Third Circuit said no, the

3     statute -- the plain statutory language is to the contrary, so

4     we can't accept your narrowing construction.

5          And this statute and regulation is clear.  Whoever

6     produces any picture is required --

7          THE COURT:  Okay.  All right, now, let's assume in

8     this hypo that in my last hypo where they have the two younger

9     people, one of them is their own child over 18 and a younger

10    child.  And let's say that younger child is under 18.  Let's

11    say it's very much younger, okay.

12         If that's the situation, then it would be by

13    definition that these people, including their own adult child,

14    have engaged in child pornography, correct?

15         MR. MURRAY:  Yes.

16         THE COURT:  All right, now, in that context, is

17    there a -- is there a valid Government interest in having that

18    couple maintain proof of age requirements for people who

19    engage -- if they want to engage in sexual activity and make

20    videos of it, is there a governmental interest in requiring

21    them to keep records of the age of anybody who is involved in

22    those video -- in a video of sexual activity?

23         MR. MURRAY:  And the example is there are people

24    under the age of 18 in that video?

25         THE COURT:  Yes.

1           MR. MURRAY:  The answer is, that's precisely my

2     point, Your Honor.  The statute -- the only -- the one

3     interest the Government has is in applying this statute to

4     child pornography.  But the problem is, the reason it's over-

5     inclusive, the reason it's over-broad, the reason it isn't

6     narrowly tailored is because it applies to vast quantities of

7     protected material involving adults which is not child

8     pornography, and the Government is shifting the burden to

9     these innocent Americans to prove that their material is

10    protected when it's the Government who should bear the burden

11    of proving that it's unprotected.

12          So yes, applying the statute to child pornography is

13    fine.  We don't complain about that.  That would be a

14    legitimate governmental interest.  But applying it --

15          THE COURT:  Well, how could you draft this -- well,

16    two questions.

17          First of all, if I agreed with you, would it be

18    within my power to say well, this statute is okay as long as

19    it is only applied in certain instances, that is when minors

20    are being used?  Would that -- I mean, do I have the power to

21    say I'm going to enjoin the Government from enforcing the

22    statute in any situation other than where minors are involved

23    in the activities that are -- for which record keeping is

24    required?

25          MR. MURRAY:  Well, as much as I'd like to say you do

Colloquy                    112

1    have that power, probably you don't, because that would

2    require too much of a rewriting of the statute.  And there's

3    only so much rewriting that a Federal Judge can do in such an

4    instance.

5          In fact, the COPA decisions again are instructive,

6    because they say we're not going to tell Congress how we would

7    draft it and we recognize that that may create problems for

8    Congress because they may not figure out what to do in

9    response to our decision but we -- we don't have the power to

10   completely rewrite a statute.

11         So unfortunately, Your Honor, while that would

12   certainly help the plaintiffs, I don't think in all honesty

13   that Your Honor would have the power to rewrite the law in

14   that fashion.

15         But that's -- but you see, that's the whole point,

16   is that whenever in the interest of combating unprotected

17   speech, Congress also regulates protected speech.  That's

18   where the First Amendment issue arises.

19         THE COURT:  But let me change my question slightly.

20   Let's say that I agreed with you about your search and seizure

21   argument, but I disagree with you about your other argument.

22   And I'm just sort of dreaming this up, I'm not -- I don't know

23   how I'm going to rule.  I've got a lot more work to do.

24         But let's just say that was the conclusion.  Would

25   there be anything wrong with my upholding the statute insofar

Colloquy                                    113

1    as the record keeping requirements were concerned, but

2    striking it down as to the method of the Government obtaining

3    records and saying that it had to be done pursuant to a

4    subpoena or search warrant or summons or something like that?

5            MR. MURRAY:  Maybe.  The only reason I'm hedging on

6    that, Your Honor, is because I think the answer to that

7    requires a consideration of whether it's severable or not,

8    which in turn depends upon an examination of whether Congress

9    would have adopted the statute without it and I think it's

10   subject to argument.  Maybe is the answer.

11           Under some circumstances you can sever the offending

12   portion, leaving the rest of the statute intact.  In some

13   instances, you can't.  And it really depends upon a test that

14   is spelled out in the case law.

15           But Your Honor, the one thing I need to remind

16   everyone in the hypotheticals is, there's more than just

17   record keeping.  You've got to put a label on the video.  So

18   every time that video or the picture that you're describing,

19   no matter where it is, there should be a label on it saying

20   where the records can be found, in which case it's a felony

21   for the couple not to put a label on their images of

22   themselves saying that the records can be found at 123

23   Mayberry Street, and that labeling requirement is a very

24   burdensome and invasive provision of this statute as well.

25   And I don't want to lose sight of that.

Colloquy                                114

1          THE COURT:  Okay.  All right, let me have Ms. Wyer's

2    response to this argument, and the hypos -- I extended the

3    hypos a little bit.

4          MS. WYER:  I think this shows that the Government's

5    interest is in acknowledging the risk that there could be

6    underage performers.  The Government applies these

7    requirements where there is a risk.  So there's -- at this

8    point, the way the statutes are drawn, there is a perfect fit

9    between where the requirements apply and where there is a risk

10   that child pornography would be created if underage performers

11   were used in those images.

12         It does not apply to any image that, if it had a

13   child performer in it would not qualify as child pornography.

14   It only applies where the presence of a child in that image

15   would make it unprotected child pornography.

16         So that is what the Government was aiming for is to

17   recognize that risk and address that risk.  So I think your

18   hypotheticals illustrate that, where a child is in, is brought

19   into this video, where there's like a group of unidentified

20   people in the video and it's not between -- it's not only a

21   communication between intimate associates, that's where there

22   could be a risk of child pornography being created, whether

23   intentionally or inadvertently.  And the requirements --

24   Congress had a legitimate basis for addressing that.

25         THE COURT:  Okay.  What's your view of what I might

1    call -- what Mr. Murray referred to as the severability issue.

2    Could I -- if I felt the statute was over-broad, do I have any

3    power to enjoin the Government from enforcing certain aspects

4    of it such as the search and seizure aspect or require an

5    administrative subpoena or something like that?

6         MS. WYER:  If we're talking about only the search

7    provision, 75.5, it's important to recognize that that is a

8    regulation.  So, I actually think that this is most likely --

9    most likely it should be under administrative act review.  If

10   we're talking about a facial challenge to a regulation, it

11   really properly falls under an APA challenge where what the

12   Court would be examining is whether this regulation 28 CFR --

13        THE COURT:  So you're saying I don't have

14   jurisdiction, that they'd have to go through the

15   Administrative Procedure Act in front of the Department of

16   Justice to get that kind of relief?  Before I -- like there's

17   an exhaustion requirement, is that what you're saying?

18        MS. WYER:  No, I don't think there's an exhaustion

19   requirement.  I think it's just that you wouldn't have to

20   address the statute because the statute itself really has

21   nothing objectionable in it, and the plaintiff's challenge

22   really focuses on the --

23        THE COURT:  Well, then you're saying it's okay if I

24   just want to invalidate a regulation as opposed to a statute?

25        MS. WYER:  In terms of severability.

Colloquy                                   116

1          But then also, you mentioned the Sixth Circuit's

2     position regarding the inappropriateness of overturning an

3     entire statute --

4               THE COURT:  Right.

5               MS. WYER:  -- based on a limited --

6               THE COURT:  Yes.

7               MS. WYER:  -- speculative possibility.  And that was

8     in the First Amendment context where the rationale for facial

9     challenge is at its highest.  And if you were comparing that

10    to the Fourth Amendment context, there is -- the rationale for

11    allowing a facial challenge or allowing a statute to be

12    overturned on a facial challenge versus an as applied context

13    is much lower.

14              THE COURT:  All right.  I'm going to give Mr. Murray

15    the last word.  If there's anything you want to say you

16    haven't said yet.  I've very much learned a lot today and I

17    want to thank you for coming all the way from Cleveland.  And

18    as I said, I'm going to give both sides a chance for

19    supplemental brief.  We'll talk about that in a minute.

20              Is there any last few words that --

21              MR. MURRAY:  Yes, Your Honor.

22              THE COURT:  -- don't repeat what you said before

23    that you want to add?

24              MR. MURRAY:  Yes.  I think it might be useful to

25    bring us back to the procedural posture we're in.  I think if

1    anything has been proven by today's spirited arguments, it's

2    that we should survive a motion to dismiss, that we have

3    plausible claims, and that what the Court really needs in

4    order to fully adjudicate the various constitutional claims

5    here is a full and complete record.  And that if anything has

6    been demonstrated, the motion to dismiss should certainly be

7    denied.

8              We clearly have a statute and a set of regs that by

9    everyone's concession applies to millions of Americans, both

10   in the adult entertainment industry and not in the adult

11   entertainment industry.  Millions of Americans who post on

12   YouTube, who post on the social networking sites which the

13   Government says the statute applies to, they've got to put a

14   label on their images with their home address, they've got to

15   keep records.

16             Cell phones, she hasn't talked about that.  Think

17   about, even under sale and trade, cell phone to cell phone,

18   across state lines, private citizens of a sexual image,

19   they've got to put a label on their cell phone picture and

20   they've got to keep the records.  You can't avoid the

21   staggering over-breadth.  Journalists, sex educators, artists,

22   private citizens, and adult entertainment producers.

23             The over-inclusiveness and over-breadth is

24   staggering, Your Honor.  But we certainly have enough to go

25   forward and give you an evidentiary record so that the

1    ultimate decision can be made on a full record and not in a

2    vacuum.   Thank you.

3              THE COURT:  All right, thank you.

4              All right, now the one thing I don't want in a

5    supplemental brief is repeat of the arguments and citations

6    given before.  I mean there are certain discrete things I

7    asked today that I would like you to cover.

8              I'd like to put a page limit on it, just so we have

9    an understanding of what's going to be expected and I'd like

10   this done fairly promptly, like within a week or two.

11             Ms. Wyer, what's your view?  Would ten pages be

12   satisfactory, double-spaced?  I don't want a lot -- I asked

13   very discrete questions I asked for supplemental authority on.

14   I'm really just looking for citations or if you want to cross

15   reference the regs or your prior brief, you know, that would

16   be fine, and I'll read whatever you cite to me.  I'm not

17   looking for extended argument.

18             MS. WYER:  Yes, I guess.

19             THE COURT:  All right, ten pages.  And I think you

20   ought to -- well, I think you ought to file first, and then

21   I'll give plaintiffs a chance to respond, because you're the

22   moving party on the motion to dismiss.

23             MS. WYER:  Okay.

24             THE COURT:  Okay?  How much time do you want?

25             It's only ten pages.  That may take more time than

Colloquy                                    119

1   twenty pages, I know how lawyers think, having been one for

2   many years myself.

3           MS. WYER:  Two weeks?

4           THE COURT:  Okay.  All right, Mr. Murray, could you

5   respond in one week in ten pages, or do you want another two

6   weeks?

7           MR. MURRAY:  If I could have two weeks, Your Honor.

8           THE COURT:  All right, okay.

9           MR. MURRAY:  But I have to say one more thing about

10  pages because I was --

11          THE COURT:  Yes.

12          MR. MURRAY:  Last night as I was reading case law

13  and preparing for this, I was struck by the fact that it took

14  us all these long briefs, and I've got to ask you to read one

15  more thing, Your Honor, because it's only two pages.

16          THE COURT:  Yes.

17          MR. MURRAY:  And this Judge Wald and Judge Tatel in

18  the DC Circuit wrote a two-page dissent from the denial of

19  rehearing en banc in the <u>ALA vs. Reno</u> case, and the two pages

20  appear at 47 Fed 3d, 1215.  And they captured in a little over

21  two pages the essence of everything that I've tried to say

22  today in hours and in about a hundred pages of brief.

23          THE COURT:  I'll read it.

24          MR. MURRAY:  And I'm embarrassed to say that.

25          THE COURT:  Thank you.  Okay.  All right, so the

Colloquy                                   120

1     Government will respond, will have a supplemental brief in two

2     weeks, and then the plaintiffs will respond two weeks after

3     that.   Okay?

4              All right, and I will do my best to come out with a

5     decision not too longer after the supplemental briefs.   But

6     we're going to start working on it right away.

7              Okay, thank you very much.   It was very well

8     prepared.   I want to thank the Amicus for coming today, and

9     have a very nice weekend.

10             ALL COUNSEL:   Thank you, Your Honor.

11                  (Matter concluded at 5:00 p.m.)

12                           * * * *

121

**C E R T I F I C A T I O N**

I, Sandra Carbonaro, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____
SANDRA CARBONARO

<u>Diana Doman Transcribing</u>                    _____
AGENCY                                             DATE