**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC., et al. | : | CIVIL ACTION |
| v. | : | |
| HONORABLE ERIC H. HOLDER, JR. | : | NO. 09-4607 |

**MEMORANDUM RE: DEFENDANT'S MOTION TO DISMISS AND
PLAINTIFFS' MOTION FOR LEAVE TO AMEND**

Baylson, J.                                                                    **July 27, 2010**

I.    INTRODUCTION...........................................................................................................3
II.   FACTUAL BACKGROUND ........................................................................................7
      A.    The Statutes and Implementing Regulations ...................................................7
            1.    Relevant Text of the Statutes and Implementing Regulations........................7
                  a.    18 U.S.C. § 2257.........................................................................7
                  b.    18 U.S.C. § 2257A.......................................................................9
                        i.    Section 2257A(h)'s Certification Provision for
                              Commercial Producers...............................................9
                  c.    Implementing Regulations.............................................................10
            2.    Legislative Background....................................................................11
                  a.    Child Pornography Legislation Predating §§ 2257 and
                        2257A...........................................................................12
                  b.    Legislative History of § 2257......................................................13
                        i.    The Final Report of the Attorney General's
                              Commission on Pornography.................................13
                        ii.   Congressional Action.........................................14
                  c.    Legislative History of § 2257A....................................................16
                  d.    Additional Background Material....................................................18
                        i.    Congressionally Mandated Amendments to
                              the Sentencing Guidelines.................................18
                        ii.   State Laws....................................................19
      B.    Plaintiffs..................................................................................19
III.  PROCEDURAL HISTORY........................................................................23
IV.   STANDARD OF REVIEW........................................................................23
V.    THE PARTIES' CONTENTIONS.................................................................26
      A.    First Amendment Challenges....................................................................26
            1.    Level of Scrutiny...........................................................................26
                  a.    Plaintiffs.....................................................................26

1

|  |  | b. | Defendant.................................................................27 |
|  | 2. |  | Other First Amendment Challenges...........................29 |
| B. |  |  | Fifth Amendment Challenges...................................... 31 |
| C. |  |  | Vagueness Challenges................................................. 31 |
| D. |  |  | Fourth Amendment Challenge..................................... 32 |
| E. |  |  | Collateral Estoppel......................................................33 |
| VI. | ANALYSIS.............................................................................................33 |
| A. |  |  | Past Litigation Regarding § 2257...............................34 |
|  | 1. |  | American Library Association v. Reno.........................34 |
|  | 2. |  | Connection Distributing Co. v. Holder........................ 36 |
|  | 3. |  | Free Speech Coalition v. Gonzales.............................. 39 |
| B. |  |  | Collateral Estoppel......................................................41 |
| C. |  |  | First Amendment Challenges.......................................45 |
|  | 1. |  | Regulations of Child Pornography and the First Amendment..................46 |
|  | 2. |  | The Statutes Are Content Neutral................................50 |
|  | 3. |  | The Statutes Survive Intermediate Scrutiny As Applied to Plaintiffs.....................................................56 |
|  |  | a. | The Statutes Advance a Significant Governmental Interest............................................57 |
|  |  | b. | An Evidentiary Hearing and/or Discovery Is Not Necessary......................................................59 |
|  |  | c. | The Statutes Are Narrowly Tailored................................64 |
|  |  | d. | The Statutes Leave Open Adequate Alternative Channels of Communication..............................67 |
|  | 4. |  | The Statutes Are Not Facially Unconstitutional..................68 |
|  | 5. |  | Other First Amendment Challenges...........................77 |
|  |  | a. | Anonymous Speech..................................................77 |
|  |  | b. | Prior Restraint........................................................80 |
|  |  | c. | Strict Liability........................................................81 |
| D. |  |  | Fifth Amendment Challenges...................................... 84 |
|  | 1. |  | The Statutes Do Not Violate the Equal Protection Clause........................84 |
|  | 2. |  | The Challenge Under the Self-Incrimination Clause Is Not Ripe.............84 |
| E. |  |  | Vagueness Challenges.................................................86 |
| F. |  |  | Fourth Amendment Challenge.....................................89 |
|  | 1. |  | Summary of the Parties' Arguments............................89 |
|  | 2. |  | Plaintiffs' Motion for Leave To Amend......................92 |
|  | 3. |  | There Is No Reasonable Expectation of Privacy in the Records Required by the Statutes and Regulations..................93 |
|  | 4. |  | The Inspection Program Falls Within the Administrative Search Exception to the Warrant Requirement.........................102 |
| VII. | CONCLUSION....................................................................................112 |

\*　　　　　　\*　　　　　　\*

## I.    INTRODUCTION

Child pornography is one of the serious scourges of our time.  Devoid of any trace of social value, child pornography inflicts severe and reprehensible harm upon the children exploited in its production.  The Supreme Court has consistently ruled it outside of the protections of the First Amendment, and Congress has taken many measures to eradicate it, criminalizing not only its creation, but also its possession and distribution.  Nonetheless, an appetite for this debasement persists, with its trafficking only facilitated by advances in technology, particularly the growth of the internet.

Let us turn to recordkeeping, as old as history itself.  Prehistoric relics, Biblical references, Greek, Roman, Chinese and Egyptian antiquities make clear that the creation and maintenance of records has featured prominently in the customs and practices of many different cultures.  Recordkeeping has been undertaken voluntarily, for personal use and gratification—such as the detailed records kept by Mozart's hero, Don Giovanni, regarding his amorous conquests, so melodiously documented by his sidekick, Leporello, in the aptly named "catalog aria"—and has also been made mandatory in certain circumstances, in order to serve a particular public interest, for instance.  Such mandatory recordkeeping has become commonplace in modern times: shortly after World War II, President Truman signed Executive Order 9784, ordering all federal agencies to adopt record-management practices; in 1950, Congress passed the Federal Records Act; and the drumbeat of mandatory recordkeeping has continued unabated. Congress has enacted laws requiring individuals and businesses to keep records concerning taxes as well as regarding immigration and environmental transactions, and has often authorized administrative agencies to detail the records that must be maintained.  Courts have routinely

3

upheld the validity of such recordkeeping statutes and regulations.

Faced with the grave and persisting problem of child pornography, and cognizant of First Amendment concerns with statutory overbreadth and content-based restrictions on speech, Congress has chosen to extend the practice of mandatory recordkeeping into the realm of sexually explicit expression, employing it as a tool in the ongoing fight against the sexual exploitation of children.  18 U.S.C. §§ 2257 and 2257A are two federal criminal statutes that impose recordkeeping, labeling, and inspection requirements on certain visual depictions of actual or simulated sexually explicit conduct.  Under these statutes and their implementing regulations, see 28 C.F.R. § 75 et seq., the producers of such depictions must create and maintain records regarding the ages and identities of the performers appearing in the depictions, must affix labels to the depictions indicating where the records are located, and must permit periodic inspection of the records by authorized government officials.  The aim of the requirements is to provide a reliable mechanism for verifying the ages of the performers appearing in these sexually explicit depictions, to help ensure that children are not being used in their production.  The requirements apply regardless of the performers' actual or apparent age, and regardless of whether the depiction in question is obscene, thereby reaching expression protected under the First Amendment.

Plaintiffs in the present case characterize themselves as "a broad array of producers and distributors of expression that has as its theme, the 'great and mysterious motive force in human life . . . [which] has indisputably been a subject of absorbing interest to mankind through the ages,' that being, sex."  (Compl. ¶ 2) (quoting Roth v. United States, 354 U.S. 476, 487 (1957)).  Plaintiffs do not specifically attack the right of Congress to require recordkeeping, and they

emphatically denounce child pornography.  Plaintiffs assert, however, that the age-verification requirements of §§ 2257 and 2257A go too far, infringing upon their constitutional rights.  Thus, plaintiffs have brought this lawsuit seeking a declaratory judgment and an injunction against the enforcement of the statutes and their regulations, alleging that they violate the First, Fourth, and Fifth Amendments of the United States Constitution.

This case thus presents two concerns of the highest order: the sexual exploitation of children in the production of pornography, and the infringement of the individual rights guaranteed under the Constitution.  The question is whether Congress, in enacting §§ 2257 and 2257A, has charted a constitutionally sound course between them.  As discussed at length below, this Court concludes that it has.

To date, two Circuit courts and a district court have addressed and rejected similar constitutional challenges to § 2257; this decision appears to be the first regarding the constitutionality of § 2257A, which was added in 2006.  As in these past cases, plaintiffs here assert that, under the guise of recordkeeping and the deterrence child pornography, Congress has impermissibly "chilled" their legitimate First Amendment rights.  In considering this challenge, a primary principle on which this Court relies is the legal distinction between content-based and content-neutral—sometimes referred to as viewpoint-specific and viewpoint-neutral—statutes in the First Amendment context.[1]

This gap, although linguistically only a few words apart, is thematically as wide as that between Beethoven and the Beatles or between Manet and Matisse, and plays a critical role in

---

[1]This conceptual distinction was explored by this Court in a recent Opinion holding that the Pennsylvania Anti-Blasphemy Statute was unconstitutional.  See Kalman v. Cortes, Civ. A. No. 09-684, 2010 WL 2649869, at *29–32 (E.D. Pa. June 30, 2010).

determining a statute's viability under the First Amendment.  The Supreme Court has carefully but consistently struck down content-based statutes because they target speech based on its message or viewpoint and inhibit freedoms guaranteed under the First Amendment, but has upheld content-neutral statutes because they primarily serve other societal values without unduly interfering with constitutionally protected expression.[2]  In the present case, this doctrinal distinction lays the foundation for the following conclusions:

1.      The statutes and regulations are content neutral.  That is, whatever burden these age-verification requirements place on constitutionally protected expression is not motivated by any disagreement with or disapproval of the content of that expression, but instead arises incidentally in the furtherance of a purpose—preventing the sexual exploitation of children—that is unrelated to the protected expression's message or viewpoint.

2.      In light of the nature and needs of this content-neutral purpose, the age-verification requirements are not unduly onerous or overly sweeping; rather, under an intermediate level of scrutiny, they are a narrowly tailored means for Congress to combat child pornography, and do not unconstitutionally suppress protected expression.

In so ruling, this Court follows previous courts' analyses upholding § 2257, and finds that § 2257A is valid under the same reasoning.

As to the inspection program authorized by the statutes and regulations—the focus of plaintiffs' Fourth Amendment challenge—this Court concludes that it does not implicate any

---

[2]In its most recent term, the Supreme Court has continued to look to, and approve of, the content-based/content-neutral dichotomy.  See Christian Legal Soc'y Chapter of Univ. of California, Hastings Coll. of Law v. Martinez, 130 S. Ct. 2971, 2993–95 (2010); Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2723–24 (2010); United States v. Stevens, 130 S. Ct. 1577, 1584 (2010); see also Doe No. 1 v. Reed, 130 S. Ct. 2811, 2817–18 (2010).

reasonable expectation of privacy that producers may claim to have in the records they are required to maintain, and also that it amounts to a valid warrantless administrative search.

These threads weave together with various other legal doctrines—pertaining to ripeness and preclusion, for instance—to convince this Court that plaintiffs' challenges should be rejected, and that dismissal of their claims is warranted.  Plaintiffs urge that this Court must allow discovery and take evidence before reaching any such conclusion, and thus that their claims should survive at this stage of the litigation.  This Court disagrees: taking plaintiffs' factual allegations as true, they do not support a claim under the relevant legal standards.

Defendant has moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  (Doc. 17).  This Court held oral argument on March 12, 2010, and plaintiffs subsequently filed a Motion for Leave to Amend their Complaint.  (Doc. 49).  For the reasons set forth below, defendant's Motion to Dismiss will be granted, and plaintiffs' Motion for Leave to Amend will be denied.

## II.   FACTUAL BACKGROUND

### A.   The Statutes and Implementing Regulations

#### 1.   Relevant Text of the Statutes and Implementing Regulations

##### a.   18 U.S.C. § 2257

Originally enacted in 1988, 18 U.S.C. § 2257 provides that producers of certain visual depictions of actual sexually explicit conduct "shall create and maintain individually identifiable records pertaining to every performer portrayed in such a visual depiction."  § 2257(a).  Actual "sexually explicit conduct" comprises actual (1) "sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex"; (2)

7

"bestiality"; (3) "masturbation"; (4) "sadistic or masochistic abuse"; and (5) "lascivious exhibition of the genitals or pubic area of any person."  18 U.S.C. § 2256(2)(A)(i)–(v) (incorporated by reference in § 2257(h)(1)).

A producer subject to this requirement must "ascertain, by examination of an identification document containing such information, the performer's name and date of birth" as well as any other name ever used by the performer, and must maintain records of this identifying information "at his business premises, or at such other place as the Attorney General may by regulation prescribe and shall make such records available to the Attorney General for inspection at all reasonable times."  § 2257(b), (c).  "No information or evidence obtained from the records required to be created or maintained by this section shall . . . , directly or indirectly, be used as evidence against any person with respect to any violation of law," except there may be "use of such information or evidence in a prosecution or other action for a violation of this chapter or chapter 71, or for a violation of any applicable provision of law with respect to the furnishing of false information."  § 2257(d).  The producer must also "affix[] to every copy of any [visual depiction covered by § 2257] . . . a statement describing where the records required by this section with respect to all performers depicted in that copy of the [depiction] may be located."  § 2257(e)(1).

A producer who falls under this section will be subject to criminal liability if he or she: "fail[s] to create or maintain the records as required"; "knowingly . . . make[s] any false entry in or knowingly . . . fail[s] to make an appropriate entry in, any [required] record"; "knowingly . . . fail[s] to comply with" the labeling requirements; or "refuse[s] to permit the Attorney General or his or her designee to conduct an inspection."  § 2257(f)(1)–(3), (5).  It is also unlawful for an

8

individual "knowingly to sell or otherwise transfer, or offer for sale or transfer," a book,

magazine, film, or any other matter which contains a depiction covered by this section and which

does not have the requisite label affixed.  § 2257(f)(4).

### b.     18 U.S.C. § 2257A

Added in 2006, § 2257A pertains to depictions of simulated (rather than actual) sexually

explicit conduct.  The regulations implementing this provision make clear that

> [s]imulated sexually explicit conduct means conduct engaged in by performers that is
> depicted in a manner that would cause a reasonable viewer to believe that the performers
> engaged in actual sexually explicit conduct, even if they did not in fact do so.  It does not
> mean not [sic] sexually explicit conduct that is merely suggested.

28 C.F.R. § 75.1(o).  Section 2257A imposes the same recordkeeping, inspection, and labeling

requirements on producers of these depictions, and identifies the same criminal offenses for

noncompliance, as § 2257.

### i.     Section 2257A(h)'s Certification Provision for
### Commercial Producers

When Congress enacted § 2257A, it provided that the requirements of both §§ 2257 and

2257A "shall not apply to matter, or any image therein, containing one or more visual depictions

of simulated sexually explicit conduct, or [of actual lascivious exhibition of the genitals or pubic

area of any person], if such matter" (1) "is created as a part of a commercial enterprise by a

person who certifies to the Attorney General that such person regularly and in the normal course

of business collects and maintains individually identifiable information regarding all performers,

including minor performers, employed by that person, pursuant to Federal and State tax, labor,

and other laws, labor agreements, or otherwise pursuant to industry standards, where such

information includes the name, address, and date of birth of the performer"; and (2) is either

"intended for commercial distribution" and "not produced, marketed or made available by the person described [above] . . . to another in circumstances such than an ordinary person would conclude that the matter contains a visual depiction that is child pornography"; or is "subject to the authority and regulation of the Federal Communications Commission acting in its capacity to enforce section 1464 of this title, regarding the broadcast of obscene, indecent or profane programming."  § 2257A(h)(1).  Nothing in this provision "shall be construed to exempt any matter that contains any visual depiction that is child pornography, . . . or is actual sexually explicit conduct" aside from the lascivious exhibition of the genitals or pubic area of any person.  § 2257A(h)(2).

### c.      Implementing Regulations

As noted, the Department of Justice has promulgated regulations implementing §§ 2257 and 2257A.  See 28 C.F.R. § 75.  These regulations provide definitions of various statutory terms, such as "producer" and "sexually explicit conduct," see § 75.1, and flesh out the recordkeeping, labeling, and inspection requirements set forth in the statutes, see §§ 75.2–75.9.  Of particular relevance to the present case are the provisions pertaining to the location and inspection of records, §§ 75.4 and 75.5.   Specifically, the regulations provide that "[a]ny producer required by this part to maintain records shall make such records available at the producer's place of business or at the place of business of a non-employee custodian of records."  § 75.4.  Inspections pursuant to the statutes may be performed by "[i]nvestigators authorized by the Attorney General," who "are authorized to enter without delay and at reasonable times any establishment of a producer where records under § 75.2 are maintained to inspect during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable

10

manner, for the purpose of determining compliance with the record-keeping requirements of the [statutes] and any other provision of the [statutes]." § 75.5(a). "Records may be inspected once during any four-month period, unless there is a reasonable suspicion to believe that a violation of this part has occurred . . . ." § 75.5(d). "Advance notice of record inspections shall not be given." § 75.5(b). "Inspections shall take place during normal business hours and at such places as specified in § 75.4," and "shall be conducted so as not to unreasonably disrupt the operations of the establishment." § 75.5(c)(1), (3). At the outset of the inspection, the inspector must "[p]resent his or her credentials," "[e]xplain the nature and purpose of the inspection," and "[i]ndicate the scope of the specific inspection and the records that he or she wishes to inspect." § 75.5(c)(2). "An investigator may copy, at no expense to the producer or to his non-employee custodian of records, during the inspection, any record that is subject to inspection." § 75.5(e). Lastly, the regulations make clear that they "do not restrict the otherwise lawful investigative prerogatives of an investigator while conducting an inspection," § 75.5(f), and that "[n]otwithstanding any provision of this part or any other regulation, a law enforcement officer may seize any evidence of the commission of any felony while conducting an inspection," § 75.5(g).

### 2. Legislative Background

As discussed in greater detail below, Congress enacted §§ 2257 and 2257A as a means to combat the use of children in the production of pornography. These statutes, however, are not the only legislation Congress has promulgated to this end, but instead represent just one aspect of larger a statutory scheme—beginning as early as 1978, and continuing through to the present—that has sought to protect children from sexual exploitation.

11

a.      **Child Pornography Legislation Predating §§ 2257 and 2257A**

In 1978, Congress promulgated the Protection of Children Against Sexual Exploitation Act of 1977 ("1977 Act"), Pub. L. No. 95-225, 92 Stat. 7 (1978) (codified as amended at 18 U.S.C. §§ 2251–2252, 2256), which criminalized the use of children under the age of sixteen in sexually explicit productions "for the purpose of sale or distribution for sale."  The 1977 Act imposed penalties of up to ten years' imprisonment and/or a $10,000 fine.  18 U.S.C. § 2251(c) (1979).  In considering the legislation, Congress convened "one Senate and two House subcommittees over ten dates and four cities from May to September of 1977."  Attorney General's Commission on Pornography, Final Report, Ch. 3 (1986) ("Final Report").  The accompanying report from the Senate Judiciary Committee explained that Congress aimed to eradicate the "highly organized, multimillion dollar" child pornography and child prostitution industries "that operate on a nationwide scale."  S. Rep. No. 95-438, at 5 (1977).

Seven years later, the Child Protection Act of 1984 ("1984 Act"), Pub. L. No. 98-292, 98 Stat. 204 (codified as amended at in various sections of 18 U.S.C.), significantly expanded the 1977 Act.  The 1984 Act was enacted after congressional hearings revealed that federal enforcement of the 1977 Act had been "seriously impaired" because much of the industry had gone underground after the Act's promulgation, meaning that "the bulk of child pornography traffic [had become] noncommercial."  Exploited and Missing Children:  Hearing Before the Subcomm. on Juvenile Justice, Comm. on the Judiciary, 97th Cong., 39 (1982) (statement of Dana E. Caro, Deputy Assistant Director, Organized Crime Division, FBI); id. at 47 (statement of Charles P. Nelson, Assistant Chief Postal Inspector, U.S. Postal Service).  The 1984 Act increased tenfold the fines for distributing materials that depicted children engaged in sexual

activity.  Pub. L. No. 98-292, § 3.  The 1984 Act also altered the definition of "sexually explicit

conduct" by replacing the word "lewd" with "lascivious" to describe the exhibition of genitals or

pubic area.  As for the production of child pornography, the 1984 Act broadened its reach to

cover noncommercial materials, no longer requiring that production be engaged in for "pecuniary

profit" in order to constitute criminal behavior.  Id. § 5.  Additionally, the 1984 Act added

criminal and civil forfeiture provisions that required persons convicted of child pornography

offenses to forfeit the interest or gross proceeds they obtained from committing the offenses.  Id.

§ 6, 98 Stat. 205–26 (1984), 18 U.S.C. §§ 2253(a)(2), 2254.

> **b.** **Legislative History of § 2257**

> **i.** **The Final Report of the Attorney General's**
> **Commission on Pornography**

In 1986, the Attorney General's Commission on Pornography issued a Final Report,

which found that "[t]he legislative assault on child pornography drastically curtailed its public

presence; it has not, however ended the problem.  Sexual exploitation of children has retreated to

the shadows, but no evidence . . . suggests that children are any less at risk than before."  Final

Report, at 314.  The Commission emphasized the "extremely broad array of backgrounds[] and

occupations" of perpetrators, who adopt a widely varying set of approaches to sexually exploiting

children, as well as the vulnerability of the children who are victimized.  Id. at Ch. 3.  The

Commission found that one cause for the continuing market for child pornography was the

industry's use of young-looking performers in so-called "pseudo child pornography," which "has

made it increasingly difficult for law enforcement officers to ascertain whether an individual in a

film or other visual depiction is a minor."  Id.

In order to fill the "gaps" in then-existing legislation which "allow[ed] the exploitation of minors to continue," the Commission on Pornography recommended that Congress "enact a statute requiring the producers, retailers or distributors of sexually explicit visual depictions to maintain records containing consent forms and proof of performers' ages." Id.  The Commission also recommended a requirement that the location of this information be identified "in the opening or closing footage of a film, the inside cover of the magazine, or standard locations in or on other material containing visual depictions," and that the information be "available for inspection by any duly authorized law enforcement officer upon demand as a regulatory function for the limited purposes of determining consent and proof of age." Id.  The Final Report explained that such legislation would "protect minors from abuse." Id.  The Commission noted that child "[p]erformers in pornography face more risks than just sexual abuse," because such participation "may destroy employment prospects and threaten family stability." Id.  In addition, the recommended legislation would "place the burden of ensuring this protection [i]s implemented squarely on the producers of the materials." Id.  In fact, the Final Report recommended that Congress impose "[t]he recordkeeping obligation . . . on wholesalers, retailers, producers and any one [sic] engaged in the sale or trade of sexually explicit material," in order to "afford protection to minors through every level of the pornography industry." Id. at 619.  The Final Report noted that the recommended requirements would be "comparable" to "that found in environmental and similar statutes." Id.; see also id., at Ch. 3, n.469 (listing such statutes).

### ii.    Congressional Action

In 1988, after the Senate Judiciary Committee held extensive hearings on the Final Report's recommendations, Congress acted upon the Attorney General's findings by enacting the

14

Child Protection and Obscenity Enforcement Act, which included what has been codified as §

2257, the recordkeeping requirement recommended by the Final Report.  See Pub. L. No. 100-

690, § 7513, 102 Stat. 4485, 4487–88 (1988); Child Protection and Obscenity Enforcement Act

and Pornography Victims Protection Act of 1987: Hearing on S. 704 and S.2033 Before the S.

Comm. on the Judiciary, 100th Cong. (1988).  Congress subsequently amended § 2257 in 1990,

2003, and 2006; these amendments left intact, and in some respects expanded the coverage of,

the statute's recordkeeping, labeling, and inspection requirements for depictions of actual

sexually explicit conduct.

　　　In 1990, Congress, inter alia, added to the statute criminal penalties for failing to comply

with its requirements.[3]  Child Protection Restoration and Penalties Enhancement Act of 1990,

Pub. L. No. 101-647, § 311(f), 104 Stat. 4816, 4816–17.  In 2003, Congress extended the

statute's requirements to apply to any "computer generated image, digital image, or picture."

Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today (PROTECT)

Act, Pub. L. No. 108-21, § 511(a)(2), 117 Stat. 650, 685 (2003) (codified at 18 U.S.C. §

2257(h)(3) (2003)).  Congress found that "the vast majority of child pornography prosecutions

today involve images contained on computer hard drives, computer disks, and/or related media,"

and emphasized that "[t]he Government has a compelling state interest in protecting children

---

　　　[3]As originally enacted, § 2257 imposed no direct penalties for noncompliance, but
provided that, in a prosecution for other child-pornography offenses, failure to comply with the
statute's requirements would result in a "rebuttable presumption" that certain performers
appearing in the depictions in question were minors.  See Pub. L. No. 100-690, § 7513, 102 Stat.
at 4487–88.  In 1989, the United States District Court for the District of Columbia determined
the statute's imposition of this presumption was unconstitutional.  Am. Library Ass'n v.
Thornburgh, 713 F. Supp. 2d 469, 480–82 (D.D.C. 1989).  In 1990, Congress responded by
removing the presumption and imposing criminal penalties for certain acts of noncompliance.

from those who sexually exploit them" and in "ensuring that the criminal prohibitions against

child pornography remain enforceable and effective." Id. § 501(6), (2), (3), 117 Stat. at 676–77.

Congress also increased the criminal penalties for violating the statute's requirements and

broadened the scope of criminal prosecutions in which use of evidence or information obtained

during an inspection of the statutorily required records may be used. Id. § 511(a)(3), (1), 119

Stat. at 684–85.

Lastly, through the amendments in 2006, Congress brought the definition of "actual

sexually explicit conduct" into full conformance with that provided in 18 U.S.C. § 2256(2)(A).[4]

Adam Walsh Child Protection and Safety Act of 2006 ("2006 Act"), Pub. L. No. 109-248, §

502(a)(4), 120 Stat. 587, 625.  Congress also made it unlawful for a producer subject to the

statute's requirements to refuse an inspection authorized under the statute.  Id. § 502(a)(3)(C),

120 Stat. at 625.

### c.    Legislative History of § 2257A

In the 2006 Act, Congress noted that it continued to find that a "substantial interstate

market in child pornography exists." Id. § 501(B), 120 Stat. at 623.  Thus, in addition to the

amendments to § 2257, mentioned above, the 2006 Act introduced § 2257A to address depictions

of simulated sexually explicit conduct, extending § 2257's age-verification requirements and

---

[4]Between 1990 and 2006, § 2257's definition of "actual sexually explicit conduct" did not include "lascivious exhibition of the genitals or pubic area."  The statute as originally enacted in 1988, however, covered this category of depictions, albeit in slightly different terms.  See Pub. L. No. 100-690, § 7513, 102 Stat. at 4488 (stating that "'actual sexually explicit conduct' means actual but not simulated conduct as defined in subparagraphs (A) through (E) of section 2256 of this title," which included "lewd" exhibitions of the genitals or pubic area).  As noted above, when Congress reintroduced this category of depictions in 2006, it also extended, through the provision now codified at § 2257A(h), a certification exemption for certain commercial producers of such depictions.  Pub. L. No. 109-248, § 503, 120 Stat. at 627–28.

penalties to such depictions and providing a certification exemption for certain commercial producers of such depictions.  Id. § 503, 120 Stat. at 626–29.

Members of both the House and Senate discussed how § 2257A was an important means of combating and deterring further child exploitation.  First, Representative Michael Pence remarked that he first introduced § 2257A's recordkeeping and labeling requirements in a previous bill.  Representative Pence stated that his intent in drafting his bill was "to prevent American children from becoming victims of pornography," including exploitation that occurs in the home, when "children are forced to pose for pornographic pictures or act in pornographic videos."  152 Cong. Rec. H5724 (2006).  Representative Pence noted that § 2257A's recordkeeping requirement "[p]rovid[es] law enforcement with the tools to combat child pornography contained in this legislation," which he viewed as "a much-needed and overdue step that must be taken to protect our children."  Id.  In addition, Representative Pence explained that his bill went "a step further by requiring that records be kept for lascivious exhibitions—nude photographs or displays.  No child should be used in either nude pictures or sexually explicit materials because these items only serve to inflame the prurient interest in child predators.  Requiring that records be kept will serve as a deterrent."  Id. at H5725.

Similarly, Senator Mitchell McConnell took care to note that § 2557A "strengthens the pornography recordkeeping and labeling requirements passed by Congress in 1988 to protect children from exploitation by pornographers."  152 Cong. Rec. S8024 (2006).  Senator McConnell noted that such "provisions were originally part" of a bill sponsored by Senator Orrin Hatch and co-sponsored by Senator McConnell, and that he was "doubly pleased now to see these provisions included."  Id.  Speaking to the certification exemption provided in § 2257A(h),

17

Senator Patrick Leahy noted that "[b]ecause the focus of these requirements is adult pornography and the protection of children, not mainstream visual depictions and activities that do not threaten children, [§ 2257A] includes provisions intended to limit the reach of these requirements to those who are actually exploiting children."  Id. at S8027.

### d.      Additional Background Material

#### i.      Congressionally Mandated Amendments to the Sentencing Guidelines

Congress has further shown that it continues to view child pornography as a serious threat by repeatedly increasing the criminal penalties for possessing and distributing child pornography. In 1990, upon criminalizing the possession of child pornography, Congress directed the United States Sentencing Commission ("Sentencing Commission") to "amend existing guidelines for sentences involving sexual crimes against children . . . so that more substantial penalties may be imposed."  Pub. L. No. 101-647, § 321, 104 Stat. 4789, 4817–18 (1990).  A year later, Congress instructed the Sentencing Commission to "promulgate guidelines, or amend existing or proposed guidelines" to increase sentences for simple possession of visual depictions of minors.  Pub. L. No. 102-141, § 632, 105 Stat. 834, 876 (1991).

In 1995, Congress directed the Sentencing Commission to amend the sentencing guidelines by increasing by two levels the base offense level for "certain conduct involving the sexual exploitation of children," and to provide a two-level enhancement if a computer was used to possess or transmit child pornography.  Pub. L. No. 104-71, §§ 2-3, 109 Stat. 774, 774 (1995). Three years later, Congress instructed the Commission to "clarify that the term 'distribution of pornography' applies" to both distribution "for monetary remuneration" and "for a non-pecuniary

18

interest." Pub. L. No. 105-314, § 506(2), 112 Stat. 2974, 2982 (1998). More recently, in 2003, Congress directed the Commission to increase the base offense level provided in United States Sentencing Guidelines ("U.S.S.G.") §§ 2G2.2 and 2G2.4 if "material portrays sadistic or masochistic conduct, or other violence," and in light of the number of child pornography-related images the offender possesses or distributes. Pub. L. No. 108-21, § 401(i), 117 Stat. 650, 672–73 (2003). Congress also provided that judges could only apply downward departures that have been "affirmatively and specifically identified as [] permissible ground[s]." Id. § 401(a), 117 Stat. at 669. In response to Congress's directions to increase the penalties for possessing and distributing child pornography, the Sentencing Commission has repeatedly amended U.S.S.G. §§ 2G2.2 and 2G2.4.

### ii.    State Laws

Lastly, Congress has not been alone in passing legislation aimed at eradicating child pornography. As noted in the 1986 Final Report of the Commission on Pornography, "[n]early all [states] ban the production of child pornography, and an overwhelming majority prohibit distribution as well." Final Report, at Ch. 3. Presently, all states and the District of Columbia prohibit the distribution, promotion, and possession of child pornography, and nine states also prohibit the viewing of such pornography.[5]

### B.    Plaintiffs

---

[5] See National Center for Prosecution of Child Abuse, National District Attorney's Association [hereinafter "NCPCA"], Child Pornography Distribution and Promotion Statutes (Mar. 2010), http://www.ndaa.org/pdf/Child_Pornography_Distribution_and_Dissemination.pdf; NCPCA, Viewing Child Pornography Statutory Compilation (Oct. 2009), http://www.ndaa.org/pdf/Child_Pornography_Viewing.pdf; NCPCA, Child Pornography Possession Statutes (Sept. 2009), http://www.ndaa.org/pdf/Child_Pornography_Possession.pdf.

Plaintiffs in the present case "include artists, sex educators, photographers, performers, commercial producers of adult expression, and persons engaged in the dissemination of sexually explicit materials," (Compl. ¶ 2), all of whom allege that §§ 2257 and 2257A "unconstitutionally restrict and burden a vast amount of constitutionally protected expression that [they] produce, wish to produce, disseminate and wish to disseminate." (Compl. ¶ 51).

As alleged in the Complaint, plaintiff Free Speech Coalition, Inc. is "a trade association . . . represent[ing] more than 1,000 businesses and individuals throughout the United States engaged in the production, distribution, and sale and presentation of non-obscene, adult-oriented materials that include visual depictions of adults engaged in actual and/or simulated sexually explicit conduct and/or candidly displaying their genitals." (Compl. ¶ 18). "The Coalition and its members, as commercial producers of sexually explicit expression, are not involved in the production of child pornography and actively employ measures to assure that minors simply do not appear in their expression." (Compl. ¶ 19).

Plaintiff American Society of Media Photographers, Inc. is "the leading trade association for photographers who photograph for publication . . . including books, magazines, newspapers, web uses, corporate reports, publicity, and advertising. In the course of pursuing their profession, ASMP's members produce photographs that document the range of human experience and interests—including those involving sexual content." (Compl. ¶ 20).

Plaintiff Townsend Enterprises, Inc. d.b.a. Sinclair Institute, in furtherance of its "purpose of educating adults about sexual health and fulfillment," "produces and distributes materials containing visual depictions of adults of all ages and ethnicities engaging in actual and simulated sexually explicit conduct and candidly displaying their genitals," and "has developed a

comprehensive library of sex education videos." (Compl. ¶ 30).

Plaintiff C 1 R Distribution, L.L.C. d.b.a. Channel 1 Releasing "produces and offers for sale DVDs containing visual depictions of adults engaged in actual and simulated sexually explicit conduct and candidly displaying their genitals, and operates an Internet website that allows subscribers to pay to view videos containing [such] visual depictions . . . and to view adults engaged [in such conduct] live . . . , and operates a brick and mortar retail store." (Compl. ¶ 32).

Plaintiff David Conners, a.k.a. Dave Cummings, "produces and performs in videotapes and digital video discs (DVDs) that contain visual depictions of adults engaged in actual and simulated sexually explicit conduct and candidly displaying their genitals," and "also operates two computer websites that contain [such] visual depictions." (Compl. ¶ 25). "He operates his small business as a sole-proprietorship . . . from his private home." (Compl. ¶ 25). Plaintiff Carol Queen is a "sociologist, sexologist, and feminist sex educator" who has, among other things, "authored a substantial number of sexuality-related articles, essays and books," and has "performed as a sex educator in films." (Compl. ¶ 36). Much of her work, including images that are live-streamed over the internet, contains depictions of adults that are subject to the statutes' requirements. (Compl. ¶¶ 36–37). Plaintiff Marie L. Levine a.k.a. Nina Hartley is an actress who "has appeared in more than 650 adult films," "has created a 40-volume educational series on human sexuality," and "operates a website . . . that features her films and offers live shows to persons who purchase a membership to the site." (Compl. ¶ 45). Plaintiff Betty Dodson "is an octogenarian sexologist, sex educator, author, and artist," much of whose work includes depictions subject to the statutes' requirements. (Compl. ¶ 49). She and plaintiff Carlin Ross

21

"host a website that addresses issues of sexuality and genitalia.  The website includes a 'genital art gallery' created by Dodson, the purpose of which was to help adult men and women work through shame related to the look of their genitalia, by providing a forum for individuals to post images of and essays about their genitalia and to do so anonymously."  (Compl. ¶ 50).

Plaintiff Michael Barone is "an artist and accomplished professional photographer who creates commercial and fine art works," including "erotic portraits" commissioned by individuals and couples.  (Compl. ¶ 22).  "He displays his work at public galleries and on the Internet; his commissioned erotic portraits are created for private use."  (Compl. ¶ 22).  Plaintiff Thomas Hymes is "a journalist who . . . operates a web site . . . that chronicles society, culture and politics, in a broad sense, and as they relate to the adult industry, in particular."  (Compl. ¶ 28).  Plaintiff Barbara Alper is a "recognized commercial photographer" who has, among other things, "documented various lifestyles including sexual subcultures" and published a "compilation of fine art photography" containing photographs of adults that are subject the statutes' requirements.  (Compl. ¶ 34).  Plaintiff Barbara Nitke is "an internationally known photographer who specializes in the subject of human sexual relations"; her work includes "photographs chronicling relationships between consenting adults engaged in sadomasochistic activities," and she has worked "for many years as a behind-the-scene photographer on the shoots of hundreds of adult films."  (Compl. ¶ 39).  Plaintiff David Steinberg is "an acclaimed photographer" who "writ[es] about sexual issues" and "tak[es] fine art photographs of couples in long-term, loving relationships engaged in actual and simulated sexually explicit conduct and candidly displaying their genitals."  (Compl. ¶ 43).  Plaintiff Dave Levingston is a photographer "who creates photographic expression, not for commercial purposes, but for its own sake."  (Compl. ¶ 48).  "A

22

portion of his art depicts adults in erotic and sexual settings." (Compl. ¶ 47).

## III.    PROCEDURAL HISTORY

On October 7, 2009, plaintiffs filed their Complaint (Doc. 1) and their Motion for

Preliminary Injunction (Doc. 3).  On December 14, 2009, defendant filed both its Response to

Plaintiffs' Motion for Preliminary Injunction (Doc. 16) and its Motion to Dismiss (Doc. 17).  On

February 1, 2010, plaintiffs filed their Reply to defendant's Response and their Response to

defendant's Motion to Dismiss.  (Doc. 25).  On February 22, 2010, defendant filed its Reply to

plaintiffs' Response to the Motion to Dismiss.  (Doc. 33).  The Court also received briefs from

amici curiae—namely, the American Civil Liberties Union of Pennsylvania (Docs. 29, 34) and

the Electronic Frontier Foundation (Docs. 32, 35) in support of plaintiffs, and from the American

Center for Law and Justice and numerous United States Congressmen (Docs. 38, 43) in support

of defendant.  The Court held oral argument on these motions on March 12, 2010.  (Docs. 44,

46).  Subsequently, the parties filed supplemental briefing.  (Docs. 48, 50–52, 57–60, 62, 64–65).

Plaintiffs also filed a Motion for Leave to Amend the Complaint (Doc. 49); defendant submitted

its Response to this Motion on April 22, 2010 (Doc. 53), and plaintiffs their Reply on April 29,

2010 (Doc. 56).

At oral argument, it became clear that this Court should decide defendant's Motion to

Dismiss before determining whether to have a hearing on plaintiffs' Motion for Preliminary

Injunction.  Accordingly, the Motion for Preliminary Injunction was denied without prejudice

pending the Court's ruling on the Motion to Dismiss and on plaintiffs' Motion for Leave to

Amend the Complaint.  (Doc. 63).

## IV.    STANDARD OF REVIEW

23

When deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), this Court must accept as true all well-pleaded allegations and view them in the light most favorable to the plaintiff. Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985). "In evaluating a Rule 12(b)(6) motion, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents." Ogbin v. Fein, Such, Kahn & Shepard, PC, Civ. A. No. 08-4138, 2009 WL 1587896, at *1 (D.N.J. June 1, 2009) (Cavanaugh, J.) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)).

A valid complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted). Iqbal clarified that the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), which required a heightened degree of fact pleading in an antitrust case, "expounded the pleading standard for 'all civil actions.'" 129 S. Ct. at 1953.

Iqbal explained that although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted. Id. at 1949, 1953. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949 (citing Twombly, 550 U.S. at 555); see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not

24

only 'fair notice,' but also the 'grounds' on which the claim rests." (citing Twombly, 550 U.S. at

556 n.3)).  Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556).  "[W]here the

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id.

(quoting Fed. R. Civ. P. 8(a)(2)).  "This 'plausibility' determination will be 'a context-specific

task that requires the reviewing court to draw on its judicial experience and common sense.'"

Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) (quoting Iqbal, 129 S. Ct. at

1949).

      Upon a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P.

12(b)(1), the plaintiff bears the burden of persuading the court that subject matter jurisdiction

exists. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991). "[T]here are

two types of Rule 12(b)(1) motions: those that attack the complaint on its face and those that

attack subject matter jurisdiction as a matter of fact." Petruska v. Gannon Univ., 462 F.3d 294,

302 n.3 (3d Cir. 2006).  "When considering a facial attack, 'the Court must consider the

allegations of the complaint as true,' and in that respect such a Rule 12(b)(1) motion is similar to

a Rule 12(b)(6) motion." Id. (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884,

891 (3d Cir. 1977)).  When considering a factual attack, on the other hand, "the trial court is free

to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In short,

no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed

material facts will not preclude the trial court from evaluating for itself the merits of

jurisdictional claims."  Id. (quoting Mortenson, 549 F.2d at 891).

## V.   THE PARTIES' CONTENTIONS

### A.   First Amendment Challenges

Plaintiffs assert that §§ 2257 and 2257A violate the First Amendment, both facially and as applied to them, in myriad ways.  Defendant avers that a majority of plaintiffs' contentions have already been addressed by previous courts evaluating the constitutionality of § 2257, and in light of these decisions and the allegations in the Complaint, plaintiffs' First Amendment challenges should be dismissed.  Plaintiffs respond, however, that those prior decisions do not bind this Court and that, regardless, their claims are distinguishable, particularly in light of the introduction of § 2257A into the statutory scheme.  According to plaintiffs, the facts alleged in their Complaint are extensive and certainly sufficient to state a claim, and the development of a factual record is essential to the proper assessment of their facial and as-applied challenges.

### 1.   Level of Scrutiny

#### a.   Plaintiffs

As to the substance of the claims, plaintiffs first contend that §§ 2257 and 2257A are content-based regulations of speech, and thus their constitutionality must be assessed under strict scrutiny, because both single out a particular category of expression—visual depictions of actual and simulated sexually explicit conduct—and impose restrictions on its production and dissemination based on its content.  Furthermore, plaintiffs contend, § 2257 must be evaluated as a content-based regulation of speech because § 2257A provides different treatment for certain commercially produced expression containing depictions of simulated sexually explicit conduct or of actual lascivious displays of the genitals or pubic region.

26

As content-based regulations of speech, plaintiffs argue, §§ 2257 and 2257A fail strict scrutiny because they do not employ the least restrictive means of advancing the government's interest in protecting children from sexual exploitation.  Even if evaluated under intermediate scrutiny, however, plaintiffs maintain the statutes are unconstitutional, both facially and as applied to them.  While plaintiffs do not contest the significance of the government's interest in protecting children, they contend the statutes fail to advance that interest in a direct and material way.  Plaintiffs seek to introduce evidence that the particular problems purportedly addressed by the statutes do not, in fact, exist, or are not served by the statutes' requirements.  Plaintiffs also assert the requirements are unnecessary in light of industry standards governing many to whom the statutes apply, as well as the array of other state and federal criminal statutes directed toward child pornography.  Moreover, plaintiffs contend, the statutes are overinclusive, as they apply to all visual depictions of sexually explicit conduct—regardless of their commercial or noncommercial nature, their duration, their social or political value, or how clear the maturity of the individuals depicted may be—and sweep within their scope a vast amount of purely private, protected expression between adults.  According to plaintiffs, § 2257A(h)'s certification exemption for certain commercial producers demonstrates, by contrast, how unnecessarily burdensome the requirements presently are.  Lastly, plaintiffs claim the statutes do not leave open adequate alternative channels for communication, as their restrictions, while not explicitly banning the protected speech in question, have that effect in practice.  According to plaintiffs, these claims are plausible and can only be assessed properly through the development of an evidentiary record.

### b.      Defendant

27

Defendant counters that the statutes are content neutral, as Congress's goals in establishing the statutes' requirements are unrelated to the content or message of the protected speech in question and any burdens that may be placed on this protected speech are incidental.  In support, defendant points to previous courts' determinations that § 2257 is content neutral.  According to defendant, the enactment of § 2257A does not alter this conclusion as to either statute.

Defendant also maintains that the statutes' recordkeeping, labeling, and inspection requirements satisfy intermediate scrutiny.  As their legislative history makes clear, these requirements directly advance the government's interest by ensuring that the performers in the depictions are adults, and are a necessary aid in the prevention of sexual exploitation of children and enforcement with respect to it.  Furthermore, defendant contends, the requirements advance the government's interest in a narrowly tailored fashion, both facially and as applied to plaintiffs: The requirements only apply to those depictions that would be child pornography if the performers were minors, and they apply universally out of necessity, as the allowance of exceptions based on subjective assessments (such as the apparent age of the performers, or the perceived value of the expression) would greatly undermine the effectiveness of the statutory scheme.  In addition, the Department of Justice's longstanding, official position that the statutes would only be enforced with respect to depictions produced "for sale or trade," and not with respect to purely private expression, limits their reach even further.

According to defendant, plaintiffs fall within the scope of producers whose depictions are properly targeted by the statutes, and they provide no explanation as to why the reasoning underlying a universal age-verification requirement with respect to such depictions would not

apply to them. As to § 2257A(h)'s certification exemption, defendant notes that it simply reflects sound legislative judgment as to what producers are likely to already be bound by other reliable age-verification requirements, and intermediate scrutiny does not require Congress to adopt the least restrictive means of advancing an interest. Lastly, defendant contends the statutes leave open adequate alternative channels of communication, as they do not ban any speech, but only impose recordkeeping and labeling requirements with respect to it—the type of requirements commonly found in many other legal contexts, such as immigration. According to defendant, these conclusions find ample support in the statutes' legislative history and previous courts' analyses of § 2257, and the additional evidentiary showings sought by plaintiffs would be both unnecessary and improper for this Court to consider in its intermediate-scrutiny analysis.

## 2. Other First Amendment Challenges

The parties next dispute whether the statutes are unconstitutionally overbroad, with each relying on essentially the same arguments raised regarding the statutes' "narrow tailoring." Again, plaintiffs seek to develop an evidentiary record regarding overbreadth, whereas defendant contends the claim can be dismissed based on the allegations of the Complaint, the statutes themselves, and the analyses of previous courts that have addressed the issue.

Plaintiffs also claim the statutes unconstitutionally suppress anonymous speech. According to plaintiffs, the statutes, by requiring personal information of performers to be made available for inspection, chill the ability to speak anonymously, which is constitutionally protected. Defendant responds that plaintiffs are not asserting that their own right to speak anonymously has been burdened, but only that of their performers, and regardless, any burden placed on this right by the statutes must be evaluated under intermediate scrutiny. Here, any

minor burden the statutes' requirements place on this right survives such scrutiny.

Plaintiffs next assert that the statutes are unconstitutional prior restraints on speech, as they create conditions that must be followed before certain protected expression can be produced or distributed and impose criminal sanctions for any failure to comply.  According to defendant, however, plaintiffs misconstrue the prior restraint doctrine; properly understood, the statutes are not unconstitutional prior restraints, because nothing in their requirements provides a means for the government to review a depiction and withhold permission for its publication or distribution based on a judgment regarding its content.

Lastly, plaintiffs contend that the statutes unconstitutionally impose strict liability for the offense of failing to create or maintain the required records.  Plaintiffs observe that the statutes contain no scienter requirement for this offense, and argue that, as a result, they unconstitutionally chill protected speech and fall short of basic due process requirements. Defendant responds that plaintiffs' argument must fail in this case because none of them has been charged with committing this offense, let alone held strictly liable for it.  Furthermore, defendant contends, there is no indication that the statutes would be enforced in the manner suggested by plaintiffs, as the mere absence of a scienter requirement from a criminal statute does not, in itself, require that the statute be read to impose strict liability.  Additionally, defendant notes, punishment for violation of the statutes' requirements does not raise due process concerns, because, contrary to plaintiffs' characterization, the production of depictions of sexually explicit conduct does not constitute the type of passive act where such concerns are implicated.  Lastly, defendant questions how this claim is relevant to plaintiffs' First Amendment challenges to the statutes, as they do not explain how the expression of those who do not know of the requirements

would be chilled, nor how the expression of those who know about the requirements would be affected by the imposition of strict liability.

   B.   **Fifth Amendment Challenges**

       Plaintiffs raise two challenges to the statutes under the Fifth Amendment.  Reprising their arguments as to why the statutes are content based, plaintiffs contend the statutes deny them equal protection of the law in light of the differential treatment the statutes afford commercial producers of depictions of simulated sexually explicit conduct and of actual lascivious displays of the genitals and pubic region.  In response, defendant points to caselaw indicating that a statute deemed permissible under the First Amendment is likely to be permissible under the Equal Protection Clause of the Fifth Amendment as well.  In particular, defendant notes that content-neutral statutes subject to intermediate scrutiny in the First Amendment context are analyzed under rational-basis review in the equal-protection context, and Congress had a rational basis for the distinction in treatment identified by plaintiffs.

       Plaintiffs also allege that the statutes violate the Fifth Amendment's right against self-incrimination.  Defendant contends that this claim is not ripe for review because plaintiffs do not claim to have invoked this privilege in response to a government demand for disclosure.

   C.   **Vagueness Challenges**

       Plaintiffs also allege that various terms in the statutes and their implementing regulations are unconstitutionally vague.[6]  Defendant contends that these allegations either have been

------

       [6]Though plaintiffs identified the challenged provisions in their Complaint, they offered little explanation, particularly with regard to the regulatory provisions, as to why they are vague. Nor did plaintiffs offer any argument in support of these claims in their briefing on their Motion for Preliminary Injunction or on defendant's Motion to Dismiss, leading defendant to argue that plaintiffs had waived these claims.  At oral argument, plaintiffs confirmed that they had not

previously rejected by the Supreme Court or are too underdeveloped to state a plausible claim on their face, and thus should be dismissed.

D.    **Fourth Amendment Challenge**

Plaintiffs contend the inspection program set forth by the statutes and their implementing regulations authorizes warrantless searches and seizures in violation of the Fourth Amendment. According to plaintiffs, an inspection of records performed under these statutes would constitute a search and—if the records are copied or taken—a seizure under the Fourth Amendment; the statutes, however, do not require a warrant or probable cause for the search or seizure to occur, in contravention of that amendment's demands.  Plaintiffs recognize that warrantless administrative searches may be lawful under certain discrete and limited circumstances, but assert that those circumstances are not present here.

Defendant raises three primary arguments in response.  First, defendant contends that plaintiffs' claims are not ripe for review, as none claim to have been subject to an inspection pursuant to the challenged procedure; accordingly, any attempt to assess the inspection scheme's validity under the Fourth Amendment would be unduly speculative and premature.  Even if the challenge is addressed, however, defendant contends that inspections conducted pursuant to the statutes would not fall within the scope of the Fourth Amendment.  According to defendant, the statutes authorize only an inspection of the age-verification records required by the statutes; as these records are made and kept solely for the purpose of compliance with the statutes, the producers of the records cannot be said to have a reasonable expectation of privacy in them such

waived these claims, and in response to this Court's requests, provided a short explanation of the claims in subsequent supplemental briefing.

that their inspection would be a "search" or "seizure" under the Fourth Amendment. Lastly, defendant argues that, even if analyzed under the Fourth Amendment, an inspection conducted pursuant to the statutes would meet the requirements of a valid warrantless administrative search, and thus pass constitutional muster.

In response to defendant's ripeness argument, plaintiffs submitted a Motion for Leave to Amend their Complaint, seeking to add allegations that certain unidentified members of Free Speech Coalition, as well as other unidentified producers of sexually explicit expression, have been subject to inspections pursuant to the statutes and their implementing regulations. Defendant contends this Motion does not cure the defects of plaintiffs' Complaint and thus should be denied. These contentions are discussed at greater length in Part VI.F.1, infra.

### E.   Collateral Estoppel

Lastly, defendant raised at oral argument and in post-argument briefing the contention that two plaintiffs, Free Speech Coalition and David Conners, are collaterally estopped from bringing before this Court all of their claims that are not specific to § 2257A, due to their participation as plaintiffs in a previous challenge to § 2257 in the District of Colorado. Plaintiffs counter that this prior proceeding ultimately resulted in dismissal without prejudice, and thus does not carry any preclusive effect as to Free Speech Coalition and Conners. Defendant responds that, while the District of Colorado court dismissed some of these plaintiffs' claims without prejudice, it granted summary judgment against them as to their other claims, including those at issue in the present case, thereby disposing of those other claims with sufficient finality for preclusive effect to attach.

### VI.   ANALYSIS

33

A.     <u>Past Litigation Regarding § 2257</u>

"Judging the constitutionality of an Act of Congress is 'the gravest and most delicate duty that this Court is called upon to perform.'" <u>Citizens United v. Fed. Election Comm'n</u>, 130 S. Ct. 876, 917–18 (2010) (Roberts, C.J., concurring) (internal quotation marks omitted).  At the outset, this Court notes that it is not the first to be called upon to undertake this "gravest and most delicate duty" with respect to the recordkeeping, labeling, and inspection requirements of § 2257; the D.C. Circuit, Sixth Circuit, and District of Colorado have all addressed various constitutional challenges to that statute which are similar to those raised by plaintiffs here.  As these previous cases provide significant guidance to this Court's analysis in the present case, a brief review of them is in order.

1.     <u>American Library Association v. Reno</u>

Shortly after § 2257 was enacted in 1988, the constitutionality of several of its provisions was challenged in the district court for the District of Columbia.  The plaintiffs in that case included a number of associations representing producers and distributors of books, magazines, and films containing depictions covered by the statute.  The district court determined, inter alia, that significant portions of the statute violated the First Amendment.  <u>See</u> <u>Am. Library Ass'n v. Thornburgh</u>, 713 F. Supp. 469 (D.D.C. 1989).  In 1990, while appeal of this determination was pending, Congress amended § 2257.  As these amendments "significantly altered" the "scope and burden" of the statute's recordkeeping requirements, the D.C. Circuit "vacate[d] the portion of the [district] court's judgment concerning the [statute's] recordkeeping provisions" as moot. <u>Am. Library Ass'n v. Barr</u> (<u>ALA I</u>), 956 F.2d 1178, 1186–87 (D.C. Cir. 1992).  On remand, the district court found that, notwithstanding the amendments, § 2257's requirements were

34

unconstitutional under the First Amendment. In particular, the court found that the requirements were not "narrowly tailored to achieve a significant legislative goal," primarily because they "applie[d] to all depictions of actual sexually explicit conduct regardless of the age or even apparent age of the model." Am. Library Ass'n v. Barr, 794 F. Supp. 412, 418, 417 (D.D.C. 1992). Accordingly, the court "enjoin[ed] enforcement of [the] Act as it applies to records that must be kept pertaining to images of adult models," and ruled that the "Act may not be applied to Plaintiffs[] and other producers of such images who use due diligence to satisfy themselves that the subjects in these images are over 18 years of age." Id. at 419. It found the statute constitutional, however, "as applied to images of models under 18 years of age." Id.

On appeal, the D.C. Circuit, in a 2-1 decision, affirmed in part and reversed in part the district court's judgment. Am. Library Ass'n v. Reno (ALA II), 33 F.3d 78 (D.C. Cir. 1994). The court first clarified that the plaintiffs were bringing an as-applied, rather than facial, challenge to the statute. Id. at 83–84. The court then determined that the statute was a content-neutral regulation of speech, as "it [was] clear that Congress enacted the Act not to regulate the content of sexually explicit materials, but to protect children by deterring the production and distribution of child pornography." Id. at 86.

Applying intermediate scrutiny, the court found that the statute's requirements "leave[] open ample avenues for the communication of sexually explicit materials" and "advance the abatement of child pornography in fundamental ways." Id. at 88. The court "reject[ed] appellees' contention that the Act is substantially overinclusive" because it "applies almost entirely to constitutionally protected depictions of adults," finding that "it is essential to Congress's design that the Act impose its recordkeeping requirements on all performers who

appear in sexually explicit materials" and thus "the Act . . . burdens only that protected speech necessary to advance the Government's interest in preventing child pornography." Id. at 89–90.

The court then addressed a number of specific objections raised by the plaintiffs regarding particular provisions and applications of § 2257's requirements.  As is relevant to the challenges raised in the case before this Court, the D.C. Circuit noted that "[t]he record-keeping required of producers can hardly be considered onerous" as "[s]uch records are routinely required to facilitate the enforcement of our immigration, labor, and tax laws." Id. at 91.  The court also rejected "the district court's contention that the Act is overly burdensome because it will invade the privacy of adult models and discourage them from engaging in protected expression" due to its exposure of the models' personal information; the statute and its regulations, the court explained, do not require disclosure of this information to anyone other than "the Attorney General or his delegee," who "has a legitimate right to the information," and "the persons for whom they willingly pose . . . and those who publish the resulting pictures or videotapes," whose knowledge of this information would presumably not be of concern to the performers. Id. at 94 (internal quotation marks omitted).  The plaintiffs petitioned for rehearing en banc of the decision in ALA II, which the D.C. Circuit denied. Am. Library Ass'n v. Reno, 47 F.3d 1215 (D.C. Cir. 1995) (per curiam).  The Supreme Court subsequently denied certiorari. Am. Library Ass'n v. Reno, 515 U.S. 1158 (1995) (mem.)

## 2.  Connection Distributing Co. v. Holder

In 1995, Connection Distributing Co., a publisher of several magazines devoted to "swinging," brought a First Amendment challenge to § 2257 in the United States District Court for the Northern District of Ohio.  Seeking declaratory and injunctive relief, Connection alleged

36

the statute was unconstitutional both facially and as applied to it and its advertisers.  Following

an evidentiary hearing, the district court denied Connection's motion for a preliminary

injunction, which the Sixth Circuit affirmed on appeal.  See Connection Distrib. Co. v. Reno

(Connection I), 154 F.3d 281, 286, 296 (6th Cir. 1998).  In determining that Connection did not

have a reasonable likelihood of success on its claims, the Sixth Circuit concluded, inter alia, that

§ 2257 was a content-neutral regulation that survived intermediate scrutiny as applied to

Connection and its advertisers, id. at 290–94, and that the statute was not an unconstitutional

prior restraint, id. at 294–95.

   Subsequently, the district court granted summary judgment against Connection, which a

panel of the Sixth Circuit reversed, ordering the district court to allow the parties additional

discovery and to reconsider the motion in light of recent Supreme Court precedents.  See

Connection Distrib. Co. v. Reno (Connection II), 46 F. App'x 837, 837 (6th Cir. 2002) (per

curiam) (nonprecedential).  The panel confirmed, however, that these intervening decisions did

not alter the applicability of intermediate scrutiny to Connection's challenge.  Id. at 837 & n.2.

On remand, Connection amended its complaint, adding plaintiffs and a challenge to the validity

of § 2257 under the Fifth Amendment's Self-Incrimination Clause.  The plaintiffs again sought a

preliminary injunction, and the government again moved for summary judgment; the district

court denied the former and granted the latter.  The plaintiffs appealed, and after an initial

reversal of the district court, rehearing en banc was granted.

   In an 11-6 decision, the en banc Sixth Circuit determined that § 2257 did not violate the

First Amendment, either facially or as applied to the plaintiffs.  See Connection Distrib. Co. v.

Holder (Connection III), 557 F.3d 321 (6th Cir. 2009) (en banc).  The court first determined that

§ 2257 was content neutral and thus should be analyzed under intermediate scrutiny.  Id. at

328–29.  The court then concluded the statute satisfied intermediate scrutiny as applied to the

plaintiffs.  The court found that "the government's interest in protecting children is

'substantial,'" "[a]nd a universal age-verification requirement advances that interest in a

reasonably tailored way for several reasons."  Id. at 329 (citing ALA II, 33 F.3d at 86, 88–90).

The court rejected the plaintiffs' argument that the statute's requirements unduly burdened their

interests in engaging in anonymous speech, noting that "[n]othing in the statute . . . makes the

required records available to the public" and that, "[t]o the extent the advertisers are concerned

that the law gives the government access to their names, addresses and other identifying

information, they have no more to complain about than every taxpayer in the country."  Id. at

330.  The court also found the statute was not overinclusive for requiring the maintenance of

records of all performers regardless of age rather than, as the plaintiffs suggested, imposing the

requirement only for those performers who appear below a certain threshold age, because (1) "in

enacting a content-neutral proof-of-age requirement, Congress need not employ the least

speech-restrictive means of advancing the Government's interests," and (2) providing the sort of

scheme suggested by the plaintiffs would "inject[] an ineffectual subjectivity into the

proof-of-age requirement" and would "effectively delegat[e] enforcement of this critical issue to

the industry being regulated—two of the problems Congress permissibly sought to correct."  Id.

at 331 (internal quotation marks omitted).  Lastly, the court concluded that § 2257 left "ample

alternative channels of communication for Connection's advertisers," as the statute "bans no

form or expression" but "merely ensures the advertisers are who they say they are."  Id. at 332

(internal quotation marks omitted).  "Similar record-keeping requirements, indeed, are routinely

required to assist the enforcement of tax, employment and immigration laws." Id.

Turning to the facial challenge, the Sixth Circuit determined § 2257 was not unconstitutionally overbroad. While the court acknowledged Connection's claim that the statute may be unconstitutional as applied to a publication containing only depictions of self-evidently mature performers, "the question is not whether the claimant can imagine some 'overbreadth'; it is whether the claimant can show 'substantial overbreadth.'" Id. at 337. "At this point in the case," the court noted, "there is little basis for dispute that § 2257 complies with the First Amendment in most settings" and "that this 'legitimate sweep' of the law represents a vast majority of its applications." Id. at 336, 337. Similarly, the court found the potential application of § 2257's requirements "to a couple who produced, but never distributed, a home video or photograph of themselves engaging in sexually explicit conduct" did not render the statute unconstitutionally overbroad, given the "contextual vacuum" and "law-enforcement vacuum" presented by the record before it. Id. at 337, 339.

Lastly, the Sixth Circuit rejected as unripe the plaintiffs' challenge that § 2257 violated the Fifth Amendment's Self-Incrimination Clause, noting that, "[a]s the record now stands, we simply have no idea whether or when the Attorney General will attempt to inspect any of Connection's records, let alone refuse to respect a proper claim of privilege." Id. at 343 (internal quotation marks omitted).

The Supreme Court subsequently denied certiorari. Connection Distrib. Co. v. Holder, 130 S. Ct. 392 (2009) (mem.).

### 3.    Free Speech Coalition v. Gonzales

In 2005, § 2257 and its regulations were challenged again, this time in the district court of

39

the District of Colorado; among the plaintiffs were Free Speech Coalition and David Conners, both of whom are plaintiffs in the present case as well.  See Free Speech Coal. v. Gonzales (FSC I), 406 F. Supp. 2d 1196, 1199 (D. Colo. 2005).  The plaintiffs in that case alleged the recordkeeping requirements of the statute and its regulations violated their First Amendment and privacy rights, and sought preliminary injunctive relief.  Id. at 1201.  The court granted the plaintiffs' motion in part.  As is relevant to the present case, the court determined that § 2257 did not constitute a prior restraint on speech, id. at 1204, and was a content-neutral regulation subject to intermediate scrutiny, id. at 1205–06.  In applying this level of scrutiny, the court, inter alia, rejected the notion "that the statute and regulations do not advance the government's interest in preventing child pornography," id. at 1206, and found that the plaintiffs "failed to demonstrate a substantial likelihood that the statute and regulations fail to leave the quantity and accessibility of speech substantially intact," id. at 1208 (internal quotation marks and alteration marks omitted).  The court determined preliminary injunctive relief was not warranted on this basis, with the exception of two particular applications not at issue in the case before this Court.  See id. at 1208–09.  The court also determined that the plaintiffs had "not demonstrated a substantial likelihood of success with regards to their claim that the statute and regulations infringe upon protected privacy rights" of producers and performers whose personal information may be disclosed as a result of the recordkeeping and labeling requirements.  Id. at 1211.

The government subsequently filed a motion to dismiss or, in the alternative, for summary judgment; the court granted the motion for summary judgment in part.  Free Speech Coal. v. Gonzales (FSC II), 483 F. Supp. 2d 1069, 1073 (D. Colo. 2007).  As is relevant to the present case, the court confirmed, "for substantially the reasons given in [its] prior order, that

there is no prior restraint, the statute and regulations are content-neutral, and intermediate

scrutiny applies." Id. at 1076.  The court also "continue[d] to find, for substantially the reasons

given in [its] prior order, that the statute and regulations satisfy intermediate scrutiny, with the

two exceptions noted in that order." Id.  Next, the court reviewed and rejected the plaintiffs'

argument "that a number of provisions in the statute and regulations are, on their face,

impermissibly vague, overbroad, or both," id., including the plaintiffs' vagueness challenge to

the term "sadistic or masochistic abuse" in the statute's definition of "sexually explicit conduct,"

id. at 1077.  The court then dismissed the plaintiffs' claim that § 2257 violated the Fifth

Amendment's Self-Incrimination Clause, noting that the plaintiffs "have not produced any

evidence that they have ever been subjected to an inspection" and that they "have made no

attempt to explain how the judicial capacity to protect their rights is threatened" by the statute's

requirements.  Id. at 1080, 1081.  Lastly, the court noted that the plaintiffs had failed to respond

regarding a group of their claims, which included a Fourth Amendment challenge to the statute

and regulations; upon review of the government's arguments and evidence supporting these

claims, the court granted summary judgment as to them as well.  Id. at 1081.

Following the court's grant of partial summary judgment, the case was administratively

closed and, pursuant to the plaintiffs' unopposed motion, ultimately was dismissed without

prejudice under Fed. R. Civ. P. 41(a)(2).

## B.     Collateral Estoppel

Turning to the present case, before reaching plaintiffs' constitutional challenges to §§

2257 and 2257A, this Court must first address defendant's contention that two plaintiffs, Free

Speech Coalition and David Conners, are collaterally estopped from bringing all of their claims

41

except those specific to § 2257A as a result of their participation as plaintiffs in <u>Free Speech Coalition v. Gonzales</u>.

"Issue preclusion, or collateral estoppel, prevents parties from relitigating an issue that has already been actually litigated.  The prerequisites for the application of issue preclusion are satisfied when: (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." <u>Peloro v. United States</u>, 488 F.3d 163, 174–75 (3d Cir. 2007) (internal quotation marks and alteration marks omitted) (quoting <u>Burlington N. R.R. Co. v. Hyundai Merch. Marine Co.</u>, 63 F.3d 1227, 1231–32 (3d Cir. 1995)). "In its classic form, collateral estoppel also required 'mutuality'—i.e., that the parties on both sides of the current proceeding be bound by the judgment in the prior proceeding." <u>Id.</u> at 175. This mutuality principle has given way, however, to the doctrine of non-mutual issue preclusion, under which "a litigant may . . . be estopped from advancing a position that he or she has presented and lost in a prior proceeding against a different adversary." <u>Id.</u> (citing <u>Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.</u>, 402 U.S. 313, 324 (1971); <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 329 (1979)).

There is no dispute that plaintiffs Free Speech Coalition and Conners were also plaintiffs in <u>Free Speech Coalition v. Gonzales</u>.  Plaintiffs also do not seem to dispute that a number of the constitutional challenges they raise as to § 2257 were also raised in that previous case.  Plaintiffs contend, however, that because that case ultimately was dismissed without prejudice under Fed. R. Civ. P. 41(a)(2), those challenges were not determined by a final and valid judgment, and thus Free Speech Coalition and Conners are not collaterally estopped from pursuing them here.

Defendant responds that the constitutional challenges in question were disposed of in the court's

partial grant of summary judgment prior to the dismissal of the case, and this determination was

sufficiently final for an issue-preclusive effect to attach.  Plaintiffs disagree, citing Fed. R. Civ. P.

54(b) in support.

> Rule 54(b) provides:
>
> When an action presents more than one claim for relief—whether as a claim,
> counterclaim, crossclaim, or third-party claim—or when multiple parties are
> involved, the court may direct entry of a final judgment as to one or more, but fewer
> than all, claims or parties only if the court expressly determines that there is no just
> reason for delay. Otherwise, any order or other decision, however designated, that
> adjudicates fewer than all the claims or the rights and liabilities of fewer than all the
> parties does not end the action as to any of the claims or parties and may be revised
> at any time before the entry of a judgment adjudicating all the claims and all the
> parties' rights and liabilities.

Fed. R. Civ. P. 54(b).  "Generally speaking, a judgment entered pursuant to Rule 54(b) has the

same finality as any other judgment."  Johnson v. Orr, 897 F.2d 128, 130 (3d Cir. 1990); see also

18A Wright, Miller & Cooper, Federal Practice and Procedure § 4444, at 297–98 (2d ed. 2002 &

Supp. 2009) ("Summary judgment as to part of an action may be made final under Civil Rule

54(b), . . . and then is final for preclusion purposes as well as appeal purposes.").  Plaintiffs point

to the second sentence of Rule 54(b) in support of their argument, suggesting that the partial

grant for summary judgment in Free Speech Coalition v. Gonzales was not made final under that

rule.  Based on this Court's understanding of the proceedings in the District of Colorado, this

characterization is correct; this fact, however, does not in itself resolve whether the partial grant

of summary judgment has an issue-preclusive effect.  See Wright, Miller & Cooper, supra, §

4432, at 60 ("Failure to enter a partial final judgment under Rule 54(b) defeats appeal.  The

failure bears on a determination whether the partial disposition is sufficiently final to support

preclusion, but is not determinative." (footnotes omitted)).

The Third Circuit has made clear that a judgment not final for certain purposes, such as appeal, may nonetheless be deemed sufficiently final for it to have an issue-preclusive effect:

> As we recognized in In re Brown, 951 F.2d 564, 569 (3d Cir. 1991), the concept of finality for purposes of "collateral estoppel does not require the entry of a judgment final in the sense of being appealable." Instead, "the doctrine of collateral estoppel applies whenever an action is sufficiently firm to be accorded conclusive effect." Id. (internal quotation marks omitted). We concluded there that "[t]he wisest course [was] to regard the prior decision of the issue as final for the purpose of issue preclusion without awaiting the end judgment." Id. Brown held that "[i]n determining whether the resolution was sufficiently firm, the second court should consider whether the parties were fully heard, whether a reasoned opinion was filed, and whether that decision could have been, or actually was, appealed." Id. (We admitted, however, that "[f]inality 'may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.'" Id. (quoting Dyndul v. Dyndul, 620 F.2d 409, 412 n.8 (3d Cir. 1980)).)

Burlington N. R.R., 63 F.3d at 1233 n.8; see also Henglein v. Colt Indus. Operating Corp., 260 F.3d 201, 210 (3d Cir. 2001) (stating that finality in the context of issue preclusion "is a more 'pliant' concept than it would be in other contexts" (quotation marks omitted)); Greenleaf v. Garlock, Inc., 174 F.3d 352, 360 (3d Cir. 1999) (discussing Brown and Burlington, and the degree of finality necessary for issue preclusion to apply).[7]

---

[7]One treatise offers the following with respect to issue preclusion and partial grants of summary judgment:

> There may be settings short of trial on the merits in which preclusion is warranted as to fully contested matters that have been decided beyond apparent reconsideration, notwithstanding the fact that appellate review will be available only at some time in the future. Partial summary judgment as to specific issues or parties may be a worthy example. Summary judgment at least represents a determination that the outcome of the issues is clear. At the same time, it is often vulnerable to appellate reversal—the extent of this risk will depend on fluctuations in contemporary views of summary judgment. For this reason, interlocutory summary-judgment rulings frequently are found unsuitable support for preclusion.

For the reasons discussed at length below, this Court will grant defendant's Motion to Dismiss, and so it need not reach whether plaintiffs Free Speech Coalition and Conners are collaterally estopped from pursuing certain claims. That said, this Court's review of the proceedings in Free Speech Coalition v. Gonzales strongly suggests that the court definitively decided against the plaintiffs in that case with respect to their First Amendment challenges to § 2257, and that those challenges were fully developed by the parties and thoroughly addressed by the court. As such, this Court believes its discretion would be properly exercised by applying the doctrine of issue preclusion against plaintiffs Free Speech Coalition and Conners as to those claims. Therefore, as an alternative holding, these two plaintiffs' First Amendment challenges not specific to § 2257A will be dismissed on grounds of issue preclusion.[8]

## C.   **First Amendment Challenges**

As noted, plaintiffs raise numerous challenges to the constitutionality of §§ 2257 and

---

Perhaps the most satisfactory approach is to find that preclusion is available only on showing both that the summary judgment was thoroughly contested in the first action and that substantial burdens would be required to renew the summary judgment in the second action. Even then, this is an area in which it is suitable to recognize a relatively wide zone of discretion in determining whether preclusion is appropriate.

Wright, Miller & Cooper, supra, § 4434, at 118–22 (footnotes omitted).

[8]As to the rest of the plaintiffs in this case, defendant has not argued that collateral estoppel should preclude them from raising their First Amendment challenges to § 2257, and the Court agrees that existing precedent would not support such a ruling. That said, based on the allegations in the Complaint, this Court can discern no meaningful differences between these plaintiffs and Free Speech Coalition and Conners with respect to their First Amendment claims. Furthermore, as discussed in this memorandum, this Court finds the analysis and legal conclusions of the court in Free Speech Coalition v. Gonzales—as well as of the Sixth Circuit in Connection III and the D.C. Circuit in ALA II—correct and persuasive, and will follow them in this case. Thus, while the proceedings in the District of Colorado preclude only certain claims of Free Speech Coalition and Conners, this Court considers them highly relevant as to the claims of all plaintiffs here.

2257A under the First Amendment.  In this Court's view, an understanding of the broader

jurisprudence surrounding regulations of child pornography and the First Amendment is critical

to a proper analysis of these challenges.  Accordingly, this Court will begin with a brief synopsis

of this jurisprudence.

### 1.    Regulations of Child Pornography and the First Amendment

As the Supreme Court has recognized, and as no one in the present case disputes, "[c]hild

pornography harms and debases the most defenseless of our citizens." United States v. Williams,

553 U.S. 285, 307 (2008); see, e.g., Ashcroft v. Free Speech Coal., 535 U.S. 234, 244 (2002)

("The sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts

of a decent people.").  Correspondingly, the Court's jurisprudence, beginning with New York v.

Ferber, 458 U.S. 747 (1982), has made clear that, "[b]ecause of the surpassing importance of the

government's interest in safeguarding the physical and psychological wellbeing of children, the

government has greater leeway to regulate child pornography than it does other areas." United

States v. Malloy, 568 F.3d 166, 175 (4th Cir. 2009) (citing Ferber, 458 U.S. at 756); see also

United States v. Knox, 32 F.3d 733, 749 (3d Cir. 1994).[9]  This is in contrast to the political-

speech context, for instance, where First Amendment protection is "at its zenith" and where laws

---

[9]This Court's own experience in certain criminal cases regarding child pornography, which required the observation of materials that were degrading to and destructive of young children without any trace of socially redeeming features, has cast in sharp relief the "surpassing importance" of the government's interest in preventing and deterring the use of children in pornographic productions.  See United States v. Schade, Crim. A. No. 07-555, 2008 WL 2201772 (E.D. Pa. May 22, 2008) (judgment of sentence following a jury trial in which jury was required to view the images in question because the defendant declined to stipulate that images were child pornography), aff'd, 318 F. App'x 91 (3d Cir. 2009); United States v. MacEwan, Crim. A. No. 04-262, 2004 WL 3019316, at *3 (E.D. Pa. Dec. 29, 2004) (nonjury trial upholding the reference to internet usage as establishing sufficient nexus with interstate commerce), aff'd, 445 F.3d 237 (3d Cir. 2006).

regulating such speech are subject to exacting scrutiny.  <u>Buckley v. Am. Constitutional Law</u>

<u>Found., Inc.</u>, 525 U.S. 182, 186–87 (1999); <u>see</u> <u>McIntyre v. Ohio Elections Comm'n</u>, 514 U.S.

334, 346 (1995) (political speech "occupies the core of the protection afforded by the First

Amendment"); <u>FSC I</u>, 406 F. Supp. 2d at 1210 (noting that "under First Amendment case law,"

laws impacting pornography are "viewed differently" than those regulating political speech).

In <u>Ferber</u>, for instance, the Supreme Court "sustained [New York] legislation aimed at

protecting the physical and emotional well-being of youth even when the laws have operated in

the sensitive area of constitutionally protected rights."  458 U.S. at 757.  The Court stated that it

would "not second-guess" the legislature's judgment that "[t]he public policy of the state

demands the protection of children from exploitation through sexual performances."  <u>Id.</u> at

757–58 (quoting 1977 N.Y. Laws, ch. 910, § 1).  The Court reasoned,

> Suffice it to say that virtually all of the States and the United States have passed
> legislation proscribing the production of or otherwise combating "child
> pornography."  The legislative judgment, as well as the judgment found in the
> relevant literature, is that the use of children as subjects of pornographic materials is
> harmful to the physiological, emotional, and mental health of the child.  That
> judgment . . . easily passes muster under the First Amendment.

<u>Id.</u> at 758 (footnote omitted). This reasoning has guided the Supreme Court's subsequent

evaluation of various pieces of child-pornography-related legislation.  As the Court recently

summarized,

> We have held that a statute which proscribes the distribution of all child
> pornography, even material that does not qualify as obscenity, does not on its face
> violate the First Amendment.  Moreover, we have held that the government may
> criminalize the possession of child pornography, even though it may not criminalize
> the mere possession of obscene material involving adults.

<u>Williams</u>, 553 U.S. at 288 (citation omitted); <u>see</u> <u>Ferber</u>, 458 U.S. at 751–53; <u>Osborne v. Ohio</u>,

495 U.S. 103, 111 (1990).  The Court also concluded in <u>Williams</u> that "offers to provide or

requests to obtain child pornography are categorically excluded from the First Amendment."  553

U.S. at 293.

     In keeping with this line of precedent, the Third Circuit has recognized that child

pornography implicates an "extremely narrow class of speech that is unprotected" and is

"locate[d] . . . on the margin as an unprotected speech category" because of the "conflation of the

underlying act with its depiction":

> By criminalizing the depiction itself, "[c]hild pornography law has collapsed the
> 'speech/action' distinction that occupies a central role in First Amendment law[,]"
> and "is the only place in First Amendment law where the Supreme Court has
> accepted the idea that we can constitutionally criminalize the depiction of a crime.

<u>United States v. Stevens</u>, 533 F.3d 218, 224, 226 (3d Cir. 2008) (en banc) (alterations in original)

(quoting <u>Ferber</u>, 458 U.S. at 970, 984), <u>aff'd</u>, 130 S. Ct. 1577 (2010).  Accordingly, in vacating a

defendant's conviction for violating a statute prohibiting depictions of animal cruelty, the Third

Circuit in <u>Stevens</u> rejected "the Government['s] attempts to analogize between the depiction of

animal cruelty and the depiction of child pornography" and declined "to extend the rationale of

<u>Ferber</u> beyond the regulation of child pornography without express direction from the Supreme

Court."  <u>Id.</u> at 224, 226.

     Although this jurisprudence indicates that, given the nature of the harm at issue,

expression related to child pornography is at the fringes of constitutional protection and thus

tolerates a unique degree of regulation, "[t]he broad authority to proscribe child pornography is

not . . . unlimited."  <u>Williams</u>, 553 U.S. at 284.  In <u>Ashcroft v. Free Speech Coalition</u>, the

Supreme Court addressed a facial challenge to two provisions of the Child Pornography

Prevention Act of 1996 (CPPA), a statute which "extend[ed] the federal prohibition against child

pornography to sexually explicit images that appear to depict minors but were produced without

using any real children." 535 U.S. at 239. The Court determined that both provisions in question

were impermissibly overbroad. In particular, the Court distinguished the the CPPA, which

"prohibits speech that records no crime and creates no victims by its production," id. at 250, from

those prohibitions upheld under the Ferber line of precedent, in which "[t]he production of the

work, not its content, [is] the target of the statute." Id. at 249; see id. at 250–51 (noting that

"Ferber's judgment about child pornography was based upon how it was made, not on what it

communicated," and that the Court in Osborne similarly "anchored its holding in the concern for

the participants, those whom it called the victims of child pornography" (internal quotation

marks omitted)). As the Court later summarized, Ashcroft v. Free Speech Coalition indicated

that "the child-protection rationale for speech restriction does not apply to materials produced

without children." Williams, 553 U.S. at 289.

   With this background in mind, this Court now turns to plaintiffs' First Amendment

challenges to §§ 2257 and 2257A. As discussed in greater detail below, these statutes, like those

in presented in Ferber and its progeny, were enacted to combat the use of children in the

production of pornography and to prevent the "harm[] and debase[ment of] the most defenseless

of our citizens," Williams, 553 U.S. at 307; their target is not the content of certain speech, but

rather its production. Accordingly, this Court will rely upon the Ferber line of precedent in

analyzing the statutes' constitutionality. Furthermore, many of the particular challenges raised by

plaintiffs in the present case have been analyzed with respect to § 2257 in the previous decisions

from the Sixth and D.C. Circuits and the District of Colorado, outlined above. This Court finds

that these prior analyses are persuasive and that their reasoning should be used to inform this Court's evaluation of both §§ 2257 and 2257A.

### 2. The Statutes Are Content Neutral

Plaintiffs first maintain that §§ 2257 and 2257A are content-based regulations of speech that must be evaluated under strict scrutiny. As the Supreme Court has explained, "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Hill v. Colorado, 530 U.S. 703, 719 (2000) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)); see Brown v. City of Pittsburgh, 586 F.3d 263, 270 (3d Cir. 2009). "The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Ward, 491 U.S. at 791.

Applying this standard, courts that have confronted First Amendment challenges to § 2257 uniformly have found the statute to be content neutral. See Connection III, 557 F.3d at 328–29; ALA II, 33 F.3d at 84–87; FSC I, 406 F. Supp. 2d at 1205–06. As the Sixth Circuit explained:

> Congress's "unanimous concern" in enacting [§ 2257] was to deter the production and distribution of child pornography. Congress singled out these types of pornography for regulation not because of their effect on audiences but because doing so was the only way to ensure that its existing ban on child pornography could be meaningfully enforced. That objective not only is independent of the content of the regulated speech, but it also is a concern of the highest order, one that relates to a category of speech that the government may regulate, indeed completely suppress, based on its content. . . .
>
>     Nor does the law implicate the central risk of a content-based regulation of speech: that the government has impermissibly interfered with the free exchange of ideas by imposing trade barriers on certain viewpoints but not on others. No doubt,

50

§ 2257 favors a particular viewpoint on this issue: Congress is against child pornography and is using this law to prevent it. Although that kind of viewpoint discrimination normally would be fatal to a law, that is not true here because the Constitution allows the government to embrace this viewpoint and to act on it by imposing a complete trade barrier on the production and trafficking of this kind of speech. What we have, then, is a valid speech-related end—eliminating child pornography—followed by a means of achieving that end, a proof-of-age requirement that refers to the content of the speech (specifically defined images) not because of its effect on the audience but because it is the kind of speech that implicates the government's ban on child pornography. That kind of sensible reference to the content of speech—how else would the government impose a proof-of-age requirement designed to address child pornography?—does not rise to the level of a presumptively impermissible content-based regulation of speech.

Connection III, 557 F.3d at 328–29 (citations omitted). This Court adopts the reasoning set forth in these prior determinations, and believes it applies with equal force to § 2257A's extension of § 2257's recordkeeping, labeling, and inspection requirements to depictions of simulated sexually explicit conduct.

Plaintiffs contend that the introduction of § 2257A into the statutory scheme renders the statutes content based. Namely, plaintiffs point to § 2257A(h), which provides that commercial producers of depictions of either simulated sexually explicit conduct under § 2257A, or actual lascivious displays of the genitals or pubic area under § 2257, are eligible for an exemption from §§ 2257 and 2257A's requirements if they meet certain criteria. According to plaintiffs, this differentiation in treatment manifests a legislative preference for one type of expression over another based on the content of that expression, and thus warrants strict scrutiny. Plaintiffs direct this Court to statements by Senator Patrick Leahy indicating that "the exemption was enacted to excuse from compliance 'legitimate businesses that have no role in harming children.'" (Doc. 25, at 37) (quoting 152 Cong. Rec. S.8027). This expression of congressional intent, plaintiffs assert, confirms the content-based nature of the exemption: "If the producer's expression

depicted simulated sexually explicit expression, Congress concluded they were legitimate businesses having no role in harming children; if the expression depicted actual sexually explicit conduct, Congress concluded that they were not.  That is the epitome of a regulation that exhibits hostility against speech based on its content."  (Doc. 25, at 37).

This Court disagrees with plaintiffs' characterization.  While a producer's eligibility for § 2257A(h)'s exemption is defined in part by the content of the depiction being produced, this Court does not view the commercial exemption as expressing any disagreement with the message conveyed by that content.  As plaintiffs correctly observe, § 2257A(h)'s exemption limits itself to producers of certain types of content covered by the statutes; it does not, however, extend to all producers of that content.  Instead, only those producers who meet the criteria specified by the provision can avail themselves of the exemption.  These criteria are aimed at identifying which producers are already subject to other regulatory schemes that, in Congress's judgment, adequately achieve the same age-verification ends as §§ 2257 and 2257A's recordkeeping scheme.[10]  If, for example, a producer of depictions of simulated sexually explicit conduct does

---

[10]As Senator Leahy explained,

The [House bill's] proposed expansion of section 2257 gave rise to legitimate concerns, expressed by groups as far-ranging as the Chamber of Commerce, the Motion Picture Association of America, the American Hotel and Lodging Association, the American Library Association, and the American Conservative Union, that its record-keeping and labeling requirements, and associated criminal liability, might now affect an array of mainstream, legitimate, and first-amendment-protected activities and industries.  These industries are leaders in protecting children employed in their industries and are far removed from the problem that the legislation purportedly sought to address.  Subjecting them to the burdens of a recordkeeping and labeling statute intended for the pornography industry would create substantial burdens of compliance without any added benefit in the wholly legitimate and vital cause of actually safeguarding the security and welfare of children.

not meet these criteria, then that producer is subject to the same requirements as a producer of

depictions of actual sexually explicit conduct that are not otherwise covered by the exemption.

In other words, among those producers eligible for exemption, § 2257A(h) only provides it to

those who demonstrate that they are already effectively complying with the statutes' age-

verification requirements.  Thus, § 2257A(h)'s exemption provision is primarily oriented, like

the statutory scheme surrounding it, toward the permissible and content-neutral goal of

"deter[ring] the production and distribution of child pornography."  Connection III, 557 F.3d at

328.  While the content of the speech may prove relevant to the applicability of the exemption, it

is not the content, nor its message, that motivates or ultimately determines any differentiation in

treatment between producers of depictions of sexually explicit conduct.

　　　In support of their position that the statutes are content based, and in response to this

---

152 Cong. Rec. S8027 (2006).  For instance, "the motion picture industry currently operates
under a panoply of laws, both civil and criminal, as well as regulations and labor agreements
governing the employment of children in any production."  Id.  To address these concerns,
Senator Leahy continued,

> section 2257A(h) enables law-abiding, legitimate businesses, which create and
> commercially distribute materials that are not, and do not appear to be, child
> pornography, to certify to the Attorney General that, pursuant to existing laws, labor
> agreements, or industry standards, they regularly and in the normal course of business
> collect the name, date of birth, and address of performers employed by them. This
> recognizes that such legitimate, law-abiding industries in fact routinely collect the
> information necessary to demonstrate their compliance with the child protection laws
> and that for this reason they were never intended to be the focus of this more
> extensive recordkeeping and labeling statute.  Businesses that so certify and thus
> exhibit their good faith can avoid some of the more onerous requirements, and
> associated criminal liability, rightfully placed on others whose compliance is more
> likely to further the interest of protecting children.

Id.

Court's inquiry at oral argument as to whether the Third Circuit would follow the Sixth Circuit's reasoning in Connection III, plaintiffs point to the Third Circuit's recent decision in Brown v. City of Pittsburgh, 586 F.3d 263 (3d Cir. 2009).  This Court finds plaintiffs' analogy to Brown unavailing.

Brown presented a First Amendment challenge to a city ordinance establishing a fifteen-foot "buffer zone" and one-hundred-foot "bubble zone" around hospitals, medical offices, and clinics.  The "buffer zone" provided that "no person shall knowingly congregate, patrol, picket, or demonstrate" within fifteen feet of "an entrance to a hospital or health care facility."  Id. at 273 (alteration marks and quotation marks omitted).  The ordinance, however, "explicitly exempt[ed] certain persons from the buffer zone's restrictions"—namely, "police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or . . . authorized security personnel employees or agents of the hospital, medical office, or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic."  Id. at 273–74 (internal quotation marks omitted).  According to the plaintiff, this exemption rendered the ordinance content based.  The Third Circuit noted that "[t]he City does not deny that the buffer zone's restrictions would be content-based if the Ordinance allowed the exempted categories of persons (including, most notably, volunteers assisting women in entering the building) to 'picket or demonstrate' within the fifteen-foot zone while denying all others the same ability."  Id. at 274.  The court rejected such a construction of the exemption, however, finding instead that the ordinance was "amenable to the content-neutral construction urged by the City, that is, an interpretation prohibiting even the exempted classes of persons from picketing or demonstrating within the buffer zone."  Id. at 275 (internal quotation marks and alteration marks

omitted).  The court explained:

> Each of the exempted classes of persons . . . performs important safety functions.
> The clear purpose of the exemption is to ensure that the Ordinance's restrictions do
> not impair the performance of those functions. . . . The functions performed by these
> persons are likely to require their presence in the buffer zone, thus warranting an
> exemption from [the Ordinance's] general prohibitions on congregating or patrolling
> within that space.  But these functions do not require or entail the picketing or
> demonstrating activities generally proscribed by the buffer-zone restriction.
> Consequently, a construction that does not include these advocacy activities in the
> exemption is fairly possible.

Id. (internal quotation marks and footnote omitted).

Plaintiffs here contend that, under the reasoning of Brown, § 2257A(h)'s exemption must

be understood as content based, as it exempts some persons from its restrictions based on the

content of their speech and, unlike the ordinance in Brown, is not susceptible to a more limited,

content-neutral construction.  What made the exemption in Brown potentially content based,

however, was the prospect that the exemption, if construed in a certain manner, would allow

individuals sympathetic to one viewpoint in the debate over abortion (such as volunteers helping

women enter the building) to engage in advocacy within the buffer zone, while denying that same

right to those who do not share that viewpoint.  The court rejected this construction, however,

and deemed the exemption content neutral because "[t]he clear purpose of the exemption" was

not to create a message-based disparity in treatment between individuals, but to facilitate the

permissible goal of ensuring the safety of the employees and patients seeking entry to and exit

from the facilities.  Id. at 275.  Similarly, here, the purpose of § 2257A(h)'s exemption is not to

express disagreement with, or preference for, the message of a particular form of content, but to

effectuate the statutes' permissible and content-neutral goal of deterring the sexual exploitation

of children.  While the exemption may bear secondary effects on expression in a manner defined

55

in part by content, this is not sufficient, in this Court's view, to render § 2257 or § 2257A content based.

### 3.    The Statutes Survive Intermediate Scrutiny As Applied to Plaintiffs

Because §§ 2257 and 2257A are content neutral, this Court applies intermediate scrutiny to determine whether the statutes violate the First Amendment as applied to plaintiffs.  Content-neutral legislation is "subject to an intermediate level of scrutiny, because in most cases [it] pose[s] a less substantial risk of excising certain ideas or viewpoints from the public dialogue." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642 (1994) (citation omitted).  Under intermediate scrutiny, a court "must consider whether the restriction on . . . speech [i]s narrowly tailored to serve a significant government interest, and whether it le[aves] open ample alternative channels of communication."  Startzell v. City of Phila., 533 F.3d 183, 201 (3d Cir. 2008) (citing Ward, 491 U.S. at 791).  "The burden is on the [government] to demonstrate the constitutionality of its actions."  Id.; see Brown, 586 F.3d at 278.

"In Ward, the Supreme Court made clear that the 'narrowly tailored' standard affords the government some discretion in deciding how best to achieve its legitimate purposes."  Brown, 586 F.3d at 277; see id. at 280 n.17 ("In secondary effects cases such as this, where a regulation is justified on the basis of conduct that is associated with certain types of protected expression (but is not the direct result of the expression's content), courts owe deference to legislative judgments.").  Thus, a regulation "will be found to be 'narrowly tailored' even if 'a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative,' '[s]o long as the means chosen are not substantially broader than necessary to achieve [that] interest.'"  Id. at 277 (alterations in original) (quoting Ward, 491

U.S. at 800).

Plaintiffs do not dispute the magnitude of harm suffered by children who are used in the production of depictions of actual or simulated sexually explicit conduct, nor do they dispute the significance of the government's interest in protecting children from such sexual exploitation. Plaintiffs contend, however, that the age-verification requirements imposed by §§ 2257 and 2257A do not advance that interest in a direct and material fashion, are not narrowly tailored, and do not leave open adequate alternative channels of communication. Many of the arguments raised by plaintiffs in this regard have been addressed in the intermediate-scrutiny analyses of § 2257 applied by previous courts, and this Court sees no reason to depart from those analyses here.

### a.      The Statutes Advance a Significant Governmental Interest

First, as previous courts have enumerated, there are "several reasons" why "a universal age-verification requirement advances [the government's] interest in a reasonably tailored way." Connection III, 557 F.3d at 329; see also ALA II, 33 F.3d at 86, 88–90; FSC I, 406 F. Supp. 2d at 1206–07.  As the Sixth Circuit summarized,

> It ensures that primary producers of pornography confirm that performers are of age before filming them; it permits secondary producers (who rarely will know the performers) to ensure that the individuals depicted in their publications are of age; it prevents children from attempting to pass themselves off as adults; and it creates a compliance system in which law-enforcement officers not only can identify the performers depicted in magazines and movies and verify their ages but also can eliminate subjective disputes with producers over whether a model's apparent age should have triggered an age-verification check.

Connection III, 557 F.3d at 329–30 (citing ALA II, 33 F.3d at 86, 88–90).

Plaintiffs challenge whether the requirements imposed by the statutes are a necessary, or

even effective, means of furthering the government's interest.  They question whether burdening

constitutionally protected depictions of adults with these requirements aids in the fight against

child pornography.  As the D.C. Circuit has explained, however,

> This argument mistakenly assumes that burdening such materials will not further the
> Government's interest in preventing child pornography.  To the contrary, the
> statutory scheme depends upon requiring producers to identify and maintain records
> of every performer who appears in their sexually explicit materials.  The entire point
> of the Act is to prevent subjective determinations of age by implementing a uniform
> procedure that applies to all performers.

ALA II, 33 F.3d at 90.  Plaintiffs note that commercial producers of depictions of sexually

explicit conduct have always checked identification to ensure their performers are adults, and that

there are many federal and state criminal statutes directed toward child pornography that provide

compelling incentive in themselves for all producers to verify the age of their performers.  The

D.C. Circuit, however, squarely confronted, and rejected, these arguments as well.  As to the

argument that the statutes' requirements "will do little to encourage primary producers to secure

documentary confirmation of their subjects' ages because virtually all those engaged in providing

sexually explicit materials for commercial markets already require such evidence," the court

reasoned that, "[e]ven assuming that [this assertion is] correct, . . . the record-keeping obligations

imposed on primary producers remain elements of the statutory scheme that are critical to

ensuring that secondary producers deny child pornographers access to their markets."  Id. at 89.

And as to the argument that the requirements "serve[] no meaningful purpose given the existence

of other criminal laws prohibiting child pornography," the court explained:

> Here we deal with a law imposing new requirements that have a significant
> independent enforcement purpose.  After fourteen months of investigations, the
> Commission on Pornography recommended that "Congress should enact a statute
> requiring the producers . . . of sexually explicit visual depictions to maintain records

58

containing consent forms and proof of performers' ages," precisely because of "gaps" and "loopholes" in existing law that facilitated the exploitation of children.  Final Report at 618–20.  The Act accomplishes these ends by ensuring that honest but careless producers secure documentary evidence of a performer's age and by denying unscrupulous producers the defense that they reasonably believed the performer to be of age.

Id. at 89–90.

### b.    An Evidentiary Hearing and/or Discovery Is Not Necessary

Plaintiffs argue, however, that this Court may not rely upon these previous assessments of other courts in its analysis, and that an evidentiary hearing and/or discovery is necessary regarding the scope and severity of the problems purportedly addressed by §§ 2257 and 2257A. Plaintiffs look primarily to United States v. Playboy Entertainment Group, Inc., 529 U.S. 803 (2000), for support.

As a preliminary point, this Court notes that, as it is reviewing this First Amendment claim under Fed. R. Civ. P. 12(b)(6), it must, and does, assume the truth of plaintiffs' factual allegations (but not their legal conclusions).  Thus, for the purposes of disposing of the present Motion to Dismiss, this Court sees no point in holding an evidentiary hearing to give plaintiffs the opportunity to prove facts that this Court assumes are true.

Nor does this Court agree with plaintiffs' position that the question whether §§ 2257 and 2257A advance significant governmental interest can only be properly resolved in this case by taking additional evidence, thereby rendering dismissal of plaintiffs' claim unwarranted.  First, plaintiffs' reliance on Playboy Entertainment is not persuasive.  At issue in that case was a First Amendment challenge to § 505 of the Telecommunications Act of 1996, 47 U.S.C. § 561 (1994 ed., Supp. III), which "requir[ed] cable television operators providing channels primarily

59

dedicated to sexually-oriented programming either to fully scramble or otherwise fully block

those channels or to limit their transmission to hours when children are unlikely to be viewing,

set by administrative regulation as the time between 10 p.m. and 6 a.m." Playboy Entm't, 529

U.S. at 806 (internal quotation marks omitted). "The purpose of § 505 is to prevent children

from hearing or seeing images resulting from signal bleed."[11] Id. A three-judge court in the

District of Delaware held a full trial, largely concerned with the seriousness of the problem of

"signal bleeding" and the impact and efficacy of the restrictions imposed by § 505, and

determined the provision was unconstitutional. Id. at 807; see Playboy Entm't Gr., Inc. v. United

States, 30 F. Supp. 2d 702 (D. Del. 1998).

The Supreme Court affirmed, first determining the regulation was content based and thus

could "stand only if it satisfies strict scrutiny." Playboy Entm't, 529 U.S. at 813. The Court

explained that, under this level of scrutiny, the statute "must be narrowly tailored to promote a

compelling Government interest. If a less restrictive alternative would serve the government's

purpose, the legislature must use that alternative." Id.

Undertaking this less-restrictive-alternative analysis, the Court explained that, "[w]hen a

plausible, less restrictive alternative is offered to a content-based speech restriction, it is the

Government's obligation to prove that the alternative will be ineffective to achieve its goals." Id.

at 816. The Court concluded "[t]he Government has not met that burden here," focusing in

particular on "a central weakness in the Government's proof":

> There is little hard evidence of how widespread or how serious the problem of signal

---

[11]As the Court explained, "signal bleed" results from imprecise scrambling, such that
"either or both audio and visual portions of the scrambled programs might be heard or seen."
Playboy Entm't, 529 U.S. at 807.

> bleed is.  Indeed, there is no proof as to how likely any child is to view a discernible explicit image, and no proof of the duration of the bleed or the quality of the pictures or sound.  To say that millions of children are subject to a risk of viewing signal bleed is one thing; to avoid articulating the true nature and extent of the risk is quite another.  Under § 505, sanctionable signal bleed can include instances as fleeting as an image appearing on a screen for just a few seconds.  The First Amendment requires a more careful assessment and characterization of an evil in order to justify a regulation as sweeping as this.

Id.  According to plaintiffs, this criticism highlights the need for this Court to take evidence as to this point, and renders defendant's motion to dismiss inappropriate.  Plaintiffs explain:

> [U]nder either strict scrutiny or intermediate scrutiny, the government must show that the speech regulation furthers its legitimate interest:  Under strict scrutiny, the court must evaluate whether the regulation advances a compelling governmental interest using the least restrictive alternative; under intermediate scrutiny, the court must evaluate whether the regulation advances an important governmental interest in a narrowly tailored way without burdening substantially more speech than is necessary.  Both tests require an evaluation of whether the legislative means advances the government's interest.

(Doc. 25 at 5 n.5).

This Court disagrees with plaintiffs' position that Playboy Entertainment requires this Court to receive evidence regarding whether §§ 2257 and 2257A advance the government's interest in preventing the sexual exploitation of children.  First, §§ 2257 and 2257A are content-neutral, not content-based, regulations of speech, and so are subject to intermediate, not strict, scrutiny.  While plaintiffs are correct that both levels of scrutiny require a court to evaluate whether a regulation advances a governmental interest, neither Playboy Entertainment, nor any other case cited by plaintiffs, supports the proposition that the standards that govern this evaluation under strict scrutiny necessarily define those that control under intermediate scrutiny.  In fact, Playboy Entertainment itself indicates otherwise.  See 529 U.S. at 815 ("We have made clear that the lesser scrutiny afforded regulations targeting the secondary effects of crime or

declining property values has no application to content-based regulations targeting the primary

effects of protected speech."); see also id. at 817 ("When the Government seeks to restrict speech

based on its content, the usual presumption of constitutionality afforded congressional

enactments is reversed.  Content-based regulations are presumptively invalid, and the

Government bears the burden to rebut that presumption." (internal quotation marks and citation

omitted)).

Under an intermediate, rather than strict, level of scrutiny, "[i]n reviewing the

constitutionality of a statute, courts must accord substantial deference to the predictive judgments

of Congress." Turner, 520 U.S. at 195 (internal quotation marks omitted).  While courts are not

prohibited from looking to an evidentiary record in performing this assessment, see, e.g., Ctr. for

Democracy & Tech. v. Pappert, 337 F. Supp. 2d 606, 655 (E.D. Pa. 2004) (DuBois, J.), the

Supreme Court has also allowed the government to "justify restrictions based solely on history,

consensus, and simple common sense." Fla. Bar v. Went For It, Inc., 515 U.S. 618, 628 (1995)

(internal quotation marks omitted).  Accordingly, the Court is not convinced by plaintiffs'

contention that Playboy Entertainment provides the controlling standard for assessing whether §

2257 or § 2257A advances a significant governmental interest in this case.

Moreover, in Playboy Entertainment, the Court observed that "[n]o support for the

restriction can be found in the near barren legislative record relevant to th[e] provision" in

question, which "was added . . . by floor amendment, accompanied only by brief statements, and

without committee hearing or debate."  529 U.S. at 822.  The Court found this sparse legislative

history inadequate to address "whether an actual problem had been proved in this case,"

clarifying that "[t]his is not to suggest that a 10,000-page record must be compiled in every case

or that the Government must delay in acting to address a real problem; but the Government must present more than anecdote and supposition." Id.

In contrast to this "near barren legislative record," Congress, as detailed above, has made extensive factual findings regarding the harms caused to children in the production of sexually explicit material and the manner in which age-verification requirements such as those presented by §§ 2257 and 2257A would combat those harms. Thus, this Court is not faced with the same deficiency of factual support as presented in Playboy Entertainment. While plaintiffs may disagree with aspects of Congress's findings, such disagreement does not prevent this Court from relying upon the findings in its intermediate-scrutiny analysis, nor does it require this Court to supplant them with newly received evidence. Nothing in Playboy Entertainment indicates otherwise. And, though this Court is assuming the truth of plaintiffs' factual allegations at this stage of the litigation, it need not, and will not, assume that these allegations usurp Congress's findings in this case.

Nor does the Court believe that additional evidence on this matter would contribute to the analyses already performed by the other courts to have addressed this very same question. Free Speech Coalition v. Gonzales is particularly instructive in this regard. The plaintiffs in that case, like plaintiffs here, "argue[d] that [the government] ha[d] failed to advance any concrete evidence to justify [§ 2257] and [its] regulations, specifically arguing that there is no evidence that regulated producers such as themselves ever create material involving persons under the age of 18, or that the record keeping or labeling requirements impact child pornographers." FSC I, 406 F. Supp. 2d at 1206. In light of prior analyses of this issue by the Sixth and D.C. Circuits, the court was "not convince[d]" by this argument, noting that "[i]t appears undisputed that there

is a significant market for pornography involving young-looking performers," and explaining that

> although I accept that Plaintiffs themselves would not knowingly engage in child pornography, it only makes sense, given extensive demand for pornography involving young-looking performers, to conclude that there is a substantial risk that performers under the age of 18 will be used in such materials.  This risk necessitates government regulatory efforts, including imposing on producers of pornography mandatory age-checking and record-keeping to provide a shield against child pornography.

Id. at 1206–07; see also id. (finding that "[s]uch a common sense conclusion is certainly within the realm of congressional authority").  This Court agrees with this rationale as applied to both §§ 2257 and 2257A, and finds that, in light of prior courts' analyses and the extensive findings made by Congress, the role of these statutes' age-verification requirements in advancing the government's interest in preventing the sexual exploitation of children is sufficiently substantiated for the purposes of intermediate scrutiny.

### c.      The Statutes Are Narrowly Tailored

This Court also rejects plaintiffs' contention that the statutes are not narrowly tailored. Plaintiffs point out that the statutes' requirements apply to all visual depictions of sexually explicit conduct, "no matter how fleeting, no matter how artistic or valuable as political commentary or journalistic documentary, no matter how clear it is that the persons depicted are middle-aged adults."  (Doc. 3 at 29).  As noted above, however, "[t]he entire point of the [recordkeeping requirements] is to prevent subjective determinations of age by implementing a uniform procedure that applies to all performers":

> Absent documentation, such determinations are not easy.   Where pornographic materials are concerned, "[p]erhaps the single most common feature of models is their relative, and in the vast majority of cases, absolute youth," Final Report at 855, with most female models appearing to have "[begun] their careers in their late teens." Final Report at 855.  As the Commission points out, "[b]y viewing a visual depiction, how does one decide if the performer is fourteen or eighteen,

64

seventeen or twenty-one?"  Id. at 620.  The Government must be allowed to paint with a reasonably broad brush if it is to cover depictions of all performers who might conceivably have been minors at the time they were photographed or videotaped.

ALA II, 33 F.3d at 90 (alterations in original); see Connection III, 557 F.3d at 331 ("No doubt requiring identification only where the individuals appear to be below a certain threshold age would lead to accurate determinations in many cases.  But it could not do so without injecting an ineffectual subjectivity into the proof-of-age requirement and without effectively delegating enforcement of this critical issue to the industry being regulated—two of the problems Congress permissibly sought to correct."  (internal quotation marks and citation omitted)).

Providing an exception based on artistic or social value would likewise undermine the statutory scheme by "injecting an ineffectual subjectivity" into the requirements.  Furthermore, the artistic or social value of a given depiction, or the duration of that depiction, does not eliminate the potential harm suffered by a child who may be used in the production of that depiction.  See Ferber, 458 U.S. at 761 ("[A] work which, taken on the whole, contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography.  'It is irrelevant to the child [who has been abused] whether or not the material . . . has a literary, artistic, political or social value.'" (second alteration in original) (quoting Memorandum of Assemblyman Lasher in Support of § 263.15)); see also Free Speech Coal. v. Ashcroft, 535 U.S. at 240 ("Ferber recognized that '[t]he Miller[v. California, 413 U.S. 15 (1973),] standard [for assessing obscenity, which includes evaluating whether a work lacks serious, literary, artistic, political, or scientific value] . . . does not reflect the State's particular and more compelling interest in prosecuting those who promote the sexual exploitation of children.'" (first alteration in original) (quoting Ferber, 458 U.S. at 761)).  Based on the

65

allegations in their Complaint, plaintiffs produce depictions that would constitute child pornography if they were to involve minors; this Court does not see how the age-verification requirements of §§ 2257 and 2257A can be considered overinclusive because they reach such depictions without further qualification.

Plaintiffs point to the exemption provided to certain commercial producers in § 2257A(h), and contend that its presence proves the overinclusiveness of § 2257, as there is no reason such an exemption could not be extended to similarly situated producers of all depictions of actual sexually explicit conduct. Congress's decision to provide this exemption on a limited basis, however, does not undermine § 2257's constitutionality. Rather, "in enacting a content-neutral proof-of-age requirement, Congress need not employ 'the least speech-restrictive means of advancing the Government's interests' but must show only that the government's 'interest . . . would be achieved less effectively absent the regulation' and that the measure 'do[es] not burden substantially more speech than is necessary.'" Connection III, 557 F.3d at 331 (alterations in original) (quoting Turner, 512 U.S. at 662); see also Brown, 586 F.3d at 277.

As already discussed and as previous courts have found, there are constitutionally sound reasons for the reach of § 2257's requirements; this Court does not believe that these reasons have been compromised by the passage of § 2257A(h). Rather, Congress included § 2257A(h) to reflect its judgment that, with the introduction of § 2257A and the accompanying expansion of the recordkeeping scheme, there may certain producers of sexually explicit depictions who would now be subject to the statutes' requirements but whose compliance with them would be unnecessary to further the statutes' goals. This Court "accord[s] substantial deference to th[is] predictive judgment[]," Turner, 520 U.S. at 195, and does not find that, by tailoring the new

66

statutory scheme in this manner, Congress has undermined the established constitutionality of § 2257 in the process.[12]

### d.   The Statutes Leave Open Adequate Alternative Channels of Communication

Lastly, this Court finds the statutes leave open ample alternative channels of communication.  "Indeed, the [statutes], by [their] terms, ban[] no form of expression."  ALA II, 33 F.3d at 88; see also Connection III, 557 F.3d at 332 (relying upon ALA II in reaching this same conclusion as to § 2257, and noting that "[s]imilar record-keeping requirements . . . are routinely required to assist the enforcement of tax, employment and immigration laws"); FSC I, 406 F. Supp. 2d at 1205, 1208 (finding that "most of the obligations imposed by the statute have been in place for over ten years, yet the output of the adult entertainment industry has grown, not dwindled," and concluding that the plaintiffs "have failed to demonstrate a substantial likelihood that [§ 2257] and its regulations fail to 'leav[e] the quantity and accessibility of speech substantially intact'" (quoting City of L.A. v. Alameda Books, 535 U.S. 425, 449 (2002) (Kennedy, J., concurring))).

*                    *                    *

For the reasons set forth above, this Court finds that §§ 2257 and 2257A are "narrowly tailored to serve a significant government interest . . . and le[ave] open ample alternative channels of communication."  Startzell, 533 F.3d at 201.  Accordingly, this Court concludes that

---

[12]Plaintiffs additionally contend the statutes are overinclusive in their application to purely private expression; plaintiffs do not, however, claim to produce such depictions themselves.  Accordingly, this Court will take up that argument in the context of plaintiffs' facial, rather than as-applied, First Amendment challenge.

they survive intermediate scrutiny as applied to plaintiffs.

### 4.    The Statutes Are Not Facially Unconstitutional

This Court now turns to plaintiffs' contention that §§ 2257 and 2257A are facially invalid under the First Amendment.  As the Supreme Court recently explained,

> To succeed in a typical facial attack, [the plaintiff] would have to establish that no set of circumstances exists under which [the statute in question] would be valid, or that the statute lacks any plainly legitimate sweep. . . .
> In the First Amendment context, however, this Court recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.

Stevens, 130 U.S. at 1587 (internal quotation marks and citations omitted); see also Brown, 586 F.3d at 269 ("As a general matter this court will not invalidate a statute on its face simply because it may be applied unconstitutionally, but only if it cannot be applied consistently with the Constitution. . . . Thus, plaintiff['s] facial challenge will succeed only if [the statute in question] is unconstitutional in every conceivable application, or . . . it seeks to prohibit such a broad range of protected conduct that it is constitutionally overbroad." (internal quotation marks omitted) (alterations in original)).  As already discussed, §§ 2257 and 2257A do not violate the First Amendment as to at least some of their applications; plaintiffs contend, however, that the statutes are impermissibly overbroad.

The Supreme Court has explained that the First Amendment overbreadth doctrine "seeks to strike a balance between competing social costs," and facial invalidation under that doctrine "is strong medicine that is not to be casually employed."  Williams, 553 U.S. at 292–93 (internal quotation marks omitted).  "Although the Supreme Court has not explicitly listed the factors to be considered in an overbreadth analysis, those factors have been identified as the number of

valid applications, the historic or likely frequency of conceivably impermissible applications, the nature of the activity or conduct sought to be regulated, and the nature of the state interest underlying the regulation." Gibson v. Mayor & Council of City of Wilmington, 355 F.3d 215, 226 (3d Cir. 2004) (internal quotation marks omitted).

As a general matter, "[f]acial challenges are disfavored" because such claims "often rest on speculation," "raise the risk of premature interpretation of statutes on the basis of factually barebones records," "run contrary to the fundamental principle of judicial restraint," and "threaten to short circuit the democratic process by . . . frustrat[ing] the intent of the elected representatives of the people." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450–51 (2008) (internal quotation marks omitted). The Supreme Court, therefore, has cautioned courts to "vigorously enforce the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." Williams, 553 U.S. at 292. As a result, "this standard imposes a very heavy burden" on plaintiffs, as the "part[ies] who mount[] facial challenge[s]" to §§ 2257 and 2257A. Brown, 586 F.3d at 269 (quoting McCullen v. Coakley, 571 F.3d 167, 174 (1st Cir. 2009); see also Connection III, 557 F.3d at 336 ("plac[ing] the burden of demonstrating substantial overbreadth on the claimant" (internal quotation marks and alteration omitted)).

In considering child-pornography-related legislation, courts conducting a First Amendment overbreadth inquiry have been particularly reluctant to invalidate a statute merely because they could conceive of potentially impermissible applications. For example, in Williams, the Supreme Court rejected the plaintiffs' argument that 18 U.S.C. § 2252A(a)(3)(b), which criminalizes the pandering and solicitation of child pornography, is overbroad, because it

could apply to an individual who turns child pornography over to the police.  See 553 U.S. at

297–98.  The Williams Court reasoned that this objection was a "fanciful hypothetical[]," given

that the Court was aware of "no [such] prosecution . . . .  We can hardly say, therefore, that there

is a realistic danger that [the statutory provision] will deter such activity."  Id. at 301–02 (internal

quotation marks omitted).  Instead, the Supreme Court cautioned that "[t]he mere fact that one

can conceive of some impermissible applications of a statute is not sufficient to render it

susceptible to an overbreadth challenge.  In the vast majority of its applications, th[e] statute

raises no constitutional problems whatever."  Id. at 303 (internal quotation marks and citation

omitted).

      The Supreme Court took the same approach in Ferber, holding that a New York statute

prohibiting persons from knowingly promoting child sexual performances and distributing

material depicting such performances, was not overbroad for prohibiting "educational, medical,

or artistic works" that employ children engaged in such conduct.  458 U.S. at 773.  The Court

expressed "serious[] doubt" that "arguably impermissible applications of the statute amount to

more than a tiny fraction of the materials within the statute's reach."  Id.  The Court also declined

to "assume that the New York courts will widen the possibly invalid reach of the statute by

giving an expansive construction to the proscription on lewd exhibitions of the genitals."  Id.

(internal quotation marks and alteration marks omitted).  Accordingly, the Court concluded that

"[u]nder these circumstances, [the statute] is not substantially overbroad and whatever

overbreadth may exist should be cured through case-by-case analysis of the fact situations to

which its sanctions, assertedly, may not be applied."  Id. at 773–74 (internal quotation marks and

alteration marks omitted).

For similar reasons, the Sixth Circuit rejected an overbreadth challenge to § 2257 in Connection III. The court acknowledged Connection's claim that the statute may be unconstitutional as applied to a publication containing only depictions of self-evidently mature performers, but concluded that "Connection at most has identified a discrete application of the statute that may be problematic," emphasizing that "the question is not whether the claimant can imagine some 'overbreadth'; it is whether the claimant can show 'substantial overbreadth.'" Id. at 337. "At this point in the case," the court noted, "there is little basis for dispute that § 2257 complies with the First Amendment in most settings" and "that this 'legitimate sweep' of the law represents a vast majority of its applications." Id. at 336, 337.

Similarly, the Sixth Circuit found the potential application of § 2257's requirements "to a couple who produced, but never distributed, a home video or photograph of themselves engaging in sexually explicit conduct," id. at 337, did not render the statute unconstitutionally overbroad. Even assuming the statute applied to this situation and that such application would be unconstitutional, the court noted that it had "no record, and therefore no context, for assessing the substantiality of this overbreadth problem"—that is, "whether some, many, indeed any, American couples are affected by this proposed application." Id. at 338.[13] Furthermore, "[t]he government . . . informed [the court] that, during the twenty years that § 2257 has been in existence, it has never been enforced in this setting," and "the Attorney General has stated in the preamble to the new regulations [implementing § 2257] that the statute . . . is limited to pornography intended for

_____

[13]As the Sixth Circuit noted, "[a]t the panel stage of this case, the judges on their own initiative raised [this] second overbreadth problem [regarding purely private expression], one not raised in Connection's amended complaint, in its briefs before the district court or in its briefs before the panel." Connection III, 557 F.3d at 337.

sale or trade." Id. at 339 (original alteration marks and internal quotation marks omitted).[14]

Though the absence of a prior application of § 2257 to purely private expression "does not by

itself doom this facial-overbreadth challenge," the court noted, "that does not mean the

government's track record in this case—of never applying the law in this setting over twenty

years and of disclaiming any authority and intention of doing so—has no role to play in the

exercise of our judgment about whether to strike this law in its entirety":

> [I]n exercising [our] judgment [regarding whether to grant overbreadth relief], the Supreme Court tells us to consider whether the alleged overbreadth is "substantial" and "real," Broadrick[ v. Oklahoma], 413 U.S. [601, 615 (1973)], the whole point being to determine whether "there [is] a realistic danger that the statute itself will significantly compromise" the First Amendment rights of the parties not before us, such as the hypothesized private couples, Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984).  Surely one factor to consider in assessing the "realistic danger" of inhibiting speech, but hardly the only factor to consider, is the past practices and future prospects of enforcement.

Id. at 341.  As "Connection offer[ed] no argument, much less proof, that there are a meaningful

number of individuals who would be adversely affected by this construction of the law," the

court concluded it had not carried its burden of demonstrating substantial overbreadth on this

basis.  Id. at 339–40.

This Court agrees with the reasoning of the Sixth Circuit, and finds it persuasive as to

both §§ 2257 and 2257A.  Plaintiffs contend the statutes are overbroad due to their failure to

provide exceptions based on artistic or social value, for instance, or apparent age of the

performers, but as discussed above, the breadth of the statutes' scope of coverage in this regard is

---

[14]The Sixth Circuit did not adopt the Attorney General's "for sale or trade" language as a limiting construction of § 2257; instead, as noted above, the court premised its overbreadth analysis on the assumption that the statute extended to purely private expression and that the statute, when so applied, would be unconstitutional.  See Connection III, 557 F.3d at 338.

necessary to their effectiveness.  <u>Free Speech Coalition v. Ashcroft</u> does not indicate otherwise.

While, in that case, the Supreme Court found the CPPA's ban on "virtual" child pornography to

be overbroad in part because it "prohibit[ed] speech despite its serious literary, artistic, political,

or scientific value," 535 U.S. at 246, the Court also made clear that its analysis was not

controlled by the <u>Ferber</u> line of precedent, which focuses on the sexual exploitation of children in

the production of pornography and which, consequently, is not concerned with the potential

"value" of the expression produced, <u>id.</u> at 240, 249–51.

　　　Plaintiffs further emphasize that "[t]he statutes also apply to a vast amount of protected

private expression between adults: an army wife e-mailing a suggestive photo of herself to her

husband stationed far from home, two adults 'sexting' messages to one another on their cell

phones, and adults privately exchanging sexually candid photos with one another on a social

networking website, among others."  (Doc. 3 at 29) (emphasis omitted).  Even assuming that

these potential applications of the statutes would be unconstitutional, however, this Court rejects

plaintiffs' contention that, as a result, the statutes are facially overbroad.  As noted by the Sixth

Circuit, the government has disavowed the enforcement of the statutes beyond "pornography

intended for sale or trade," and plaintiffs have not alleged that the government has deviated from

this position or has sought to enforce the statutes in any of the scenarios identified by plaintiffs

here.  While this Court recognizes that it may consider hypothetical applications in its

overbreadth analysis, "[s]ome sensitivity to reality is needed" when doing so.  <u>Gibson</u>, 355 F.3d

at 226 (quoting <u>Magill v. Lynch</u>, 560 F.2d 22, 30 (1st Cir. 1977)); <u>see Connection III</u>, 557 F.3d at

341 ("Surely one factor to consider in assessing the realistic danger of inhibiting speech, but

hardly the only factor to consider, is the past practices and future prospects of enforcement."

(internal quotation marks omitted)).  Given "the number of valid applications" of the statutes,

"the historic or likely frequency of [the] conceivably impermissible applications" identified by

plaintiffs, "the nature of the activity or conduct sought to be regulated," and the strength "of the

state interest underlying the [statutes]," Gibson, 355 F.3d at 226,  this Court sees no basis for

finding the statutes substantially overbroad either "in an absolute sense" or "relative to [their]

plainly legitimate sweep," Williams, 553 U.S. at 292.

In resisting this conclusion, plaintiffs invoke the Supreme Court's statement from Free

Speech Coalition v. Ashcroft that "[t]he Government may not suppress lawful speech as the

means to suppress unlawful speech.  Protected speech does not become unprotected merely

because it resembles the latter."  535 U.S. at 255.  This language, however, does not provide the

standard for assessing overbreadth.  Rather, as the Court made clear immediately after that

statement, "The overbreadth doctrine prohibits the Government from banning unprotected speech

if a substantial amount of protected speech is prohibited or chilled in the process."  Id.  That §§

2257 and 2257A reach protected expression is not, in itself, determinative of the statutes' facial

constitutionality.  Instead, the substantiality of the overbreadth, both in an absolute and relative

sense, is the guiding consideration, and for the reasons discussed above, this Court believes the

statutes satisfy this standard.

Furthermore, the applicability of this language to the present case diminishes when read

in proper context.  The Court made this statement in rejecting the government's contention that,

because "the possibility of producing images by using computer imaging makes it very difficult"

to distinguish between depictions of actual and "virtual" child pornography and thus "to

prosecute those who produce pornography by using real children," "[t]he necessary solution . . .

is to prohibit both kinds of images." Id. at 254.  As the Court emphasized in its analysis,

however, the solution of banning virtual child pornography proved to be unconstitutional in part

because it was not directly targeted toward the protection of real children from the harms that

may occur in the production of that pornography.  Unlike the CPPA, however, §§ 2257 and

2257A do not ban any form of speech based upon the harms that may flow from its content, see

id. at 242, nor do they reduce protected expression to unprotected expression; rather, they impose

content-neutral regulations on the production of certain expression in order to prevent the sexual

exploitation of children.  Thus, this Court heeds the caution urged by the Supreme Court in Free

Speech Coalition v. Ashcroft, but does not find it implicated by these statutes.

Plaintiffs also contend that this Court can no longer rely on the Sixth Circuit's

overbreadth analysis in light of the Supreme Court's recent decision in Stevens.  At issue in that

case was whether a federal statute criminalizing the commercial creation, sale, or possession of

certain depictions of animal cruelty was facially unconstitutional under the First Amendment.

The Supreme Court determined the statute was content based and unconstitutionally overbroad.

The government, in an attempt to stave off the overbreadth attack, had pointed out that "[t]he

Executive Branch construes § 48 to reach only 'extreme' cruelty, and it 'neither has brought nor

will bring a prosecution for anything less.'" Stevens, 130 S. Ct. at 1591 (citation omitted).  The

Court rejected this argument:

> [T]he First Amendment protects against the Government; it does not leave us at the
> mercy of noblesse oblige.  We would not uphold an unconstitutional statute merely
> because the Government promised to use it responsibly.  Cf. Whitman v. American
> Trucking Assns., Inc., 531 U.S. 457, 473 (2001).
>     This prosecution is itself evidence of the danger in putting faith in
> government representations of prosecutorial restraint.  When this legislation was
> enacted, the Executive Branch announced that it would interpret § 48 as covering

> only depictions "of wanton cruelty to animals designed to appeal to a prurient interest in sex." See Statement by President William J. Clinton upon Signing H.R. 1887, 34 Weekly Comp. Pres. Doc. 2557 (Dec. 9, 1999). No one suggests that the videos in this case fit that description. The Government's assurance that it will apply § 48 far more restrictively than its language provides is pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading.

Id. According to plaintiffs, this language undermines the propriety of the Sixth Circuit's reliance on the nonenforcement of § 2257 in assessing the statute's overbreadth. This Court, however, does not understand Stevens to have this effect. Stevens addressed a restriction on speech that was content based and that, as the Supreme Court made clear, did not share the concerns inherent in the regulation of child pornography. Id. at 1599–1601. When, on the other hand, the Supreme Court recently addressed an overbreadth challenge to legislation regulating child pornography, it recognized the statute's history of nonenforcement as a legitimate consideration in its analysis. See Williams, 553 U.S. at 301–02 (rejecting as a "fanciful hypothetical[]" the plaintiffs' argument that the statute in question was overbroad because of its potential application to an individual who turns child pornography over to the police, given that the Court was aware of "no [such] prosecution" and could "hardly say, therefore, that there is a realistic danger that [the statutory provision would] deter such activity"). Furthermore, as the Court pointed out in Stevens, the very prosecution giving rise to the case before the Court undermined the government's "representation[] of prosecutorial restraint" with respect to the statute in question. 130 S. Ct. at 1591. Plaintiffs' allegations in the present case provide no similar reason to question the government's intentions with respect to the enforcement of §§ 2257 and 2257A. Given this distinction and the more closely analogous authority of Williams, this Court is not convinced that Stevens compromises the Sixth Circuit's overbreadth analysis or prevents this

76

Court from relying upon that analysis here.

Accordingly, this Court rejects plaintiffs' contention that §§ 2257 and 2257A are overbroad.  Plaintiffs also contend the statutes fail intermediate scrutiny on their face.  This contention comprises the arguments made by plaintiffs with respect to their as-applied and overbreadth challenges, and for the reasons set forth in the above analysis of those arguments, this contention is rejected as well.

### 5.    Other First Amendment Challenges

Plaintiffs raise three other First Amendment challenges to §§ 2257 and 2257A: (1) they unconstitutionally infringe on the right to speak anonymously; (2) they constitute impermissible prior restraints on speech; and (3) they unconstitutionally impose strict liability.

### a.    Anonymous Speech

First, plaintiffs contend the statutes unconstitutionally infringe on the right to speak anonymously.  Plaintiffs identify two particular objections in this regard: (1) the statutes "require all [covered] expression to bear a label identifying the address where the records are kept—which may be the home address of the producer and may, in fact, also be the home address of the person depicted"; and (2) the statutes "compel those depicted in such expression to submit photo identification documents—completely dispelling any shred of anonymity—so that government agents can examine and copy them."  (Doc. 25 at 31–32).  Plaintiffs do not seem to allege that the statutes' requirements have impaired their own anonymous speech, and thus it is not clear whether plaintiffs contend the statutes interfere with their own right to speak anonymously or instead raise this contention as part of their facial challenge to the statutes; under either understanding, however, this Court finds plaintiffs' arguments unavailing.

Neither of the objections raised by plaintiffs here is novel.  As to the first objection, the plaintiffs in <u>Free Speech Coalition v. Gonzales</u> argued that § 2257 and its regulations "violate[d] the privacy rights of . . . producers who work out of their homes by mandating disclosure of the actual place of business on the label."  406 F. Supp. 2d at 1210.  The court recognized that "under some circumstances the First Amendment provides a right to anonymous speech," but found "the cases which might arguably support Plaintiffs' position, <u>Buckley</u>[, 525 U.S. 182,] and <u>McIntyre</u>[, 514 U.S. 334], both addressed laws impacting political speech, which . . . is viewed differently than pornography under First Amendment case law."  <u>FSC I</u>, 406 F. Supp. 2d at 1210.  "Even in the context of political speech," the court continued, "invalidating disclosure requirements requires evidence of a reasonable probability that the compelled disclosure of . . . names will subject them to threats, harassment or reprisals from either Government officials or private parties," and the plaintiffs had not identified evidence sufficient "to establish a reasonable probability of harm resulting from the regulations."  <u>Id.</u> (internal quotation marks omitted). Lastly, the court noted that the requirement at issue was not "new[, but] again[ the plaintiffs] fail[ed] to provide any indication that the quantity of explicit speech ha[d] diminished due to [it]."  <u>Id.</u>

Plaintiffs' second objection was addressed by both the D.C. Circuit in <u>ALA II</u> and the Sixth Circuit in <u>Connection III</u>.  In <u>ALA II</u>, the court rejected "the district court's contention that the Act is overly burdensome because it will invade the privacy of adult models and discourage them from engaging in protected expression" due to its exposure of the models' personal information.  33 F.3d at 94.  The court explained:

The Act and its implementing regulations . . . do not require that this information be

disclosed to anyone other than "the Attorney General or his delegee," 28 C.F.R. § 75.5, the persons for whom they willingly pose while engaged in sexual acts, and those who publish the resulting pictures or videotapes.  The first of these has a legitimate right to the information, and we believe we may safely assume that the performers are not concerned over the prospect of being stigmatized, harassed, or ridiculed by the producers they help enrich.

Id.  In Connection III, the plaintiffs "argue[d] that the record-keeping requirements place[d] undue barriers on the [plaintiffs'] interests in engaging in anonymous speech."  557 F.3d at 330. In rejecting this challenge, the Sixth Circuit observed that "[n]othing in [§ 2257] . . . makes the required records available to the public," and "[t]o the extent the [plaintiffs] are concerned that the law gives the government access to their names, addresses and other identifying information, they have no more to complain about than every taxpayer in the country."  Id.  Furthermore, "[t]o the extent their concern is that the government somehow plans to use this information for a purpose for which it was not intended,  . . . they offer nothing more than two unverified anecdotes to support the point, and both anecdotes have nothing to do with the improper use of these records by government agents."  Id.

As these analyses indicate, the Supreme Court has recognized a right to anonymous speech under the First Amendment in some circumstances, but that right is not absolute; rather, the constitutionality of a burden on anonymous speech depends on the nature of that burden and the nature of the governmental interest served by it.[15]  Plaintiffs here, like those in Free Speech Coalition v. Gonzales, premise their arguments regarding anonymous speech upon caselaw

---

[15]For example, "First Amendment challenges to disclosure requirements in the electoral context" have been "reviewed . . . under what has been termed 'exacting scrutiny.' . . . To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."  Doe No. 1 v. Reed, 130 S. Ct. 2811, 2814 (2010) (internal quotation marks omitted).

addressing statutes that regulated some form of political speech or that were content based and

subject to strict scrutiny; given the different interests and levels of scrutiny at play in those cases,

this Court does not believe they provide useful analogies for the content-neutral, child-

pornography-related statutes at issue here.  Nor does this Court believe that, in light of the

governmental interest served by §§ 2257 and 2257A, whatever burden these statutes may place

on anonymous speech alters this Court's intermediate-scrutiny or overbreadth analyses.  While

the labeling requirement may result in disclosure of the home address of a producer or performer,

this Court does not see how an exemption for such scenarios could be provided without

undermining the effectiveness and integrity of the statutory scheme.  Furthermore, there is

nothing in the statutes requiring that the requisite records be kept in that location.[16]  As to the

disclosure of performers' personal information to the government, this Court agrees with the

D.C. Circuit's and Sixth Circuit's treatment of this issue and notes that plaintiffs here do not

allege any mishandling or misuse of such information by the government.  Accordingly, this

Court declines to find that the constitutionality of §§ 2257 and 2257A is compromised by

whatever burden on anonymous speech these statutes might impose.

### b.    Prior Restraint

Plaintiffs next contend the statutes are unconstitutional prior restraints on speech.  "The

term prior restraint is used 'to describe administrative and judicial orders forbidding certain

communications when issued in advance of the time that such communications are to occur.'"

Alexander v. United States, 509 U.S. 544, 550 (1993) (quoting M. Nimmer, Nimmer on Freedom

---

[16]As noted, the implementing regulations provide that the records may be maintained and made available for inspection "at the producer's place of business or at the place of business of a non-employee custodian of records."  28 C.F.R. § 75.4.

of Speech § 4.03, at 4-14 (1984)).  Previous courts have squarely rejected this challenge as to §

2257, and this Court adopts their rationale as to both statutes here.  See Connection I, 154 F.3d at

295 ("Connection and its subscribers are not being forbidden from engaging in expressive

activity in the future, but rather they potentially are being subjected to sanctions following their

expressive activity—but only if they subsequently are found guilty of violating the

record-keeping provisions.  Because there is a 'well-established distinction between prior

restraints and subsequent criminal punishments,' Alexander, 509 U.S. at 548, [§ 2257] does not

constitute a prior restraint."); FSC I, 406 F. Supp. 2d at 1204 ("[I]t is clear that the statute and

regulation do not constitute a 'prior restraint' as traditionally described by the Supreme Court.").

### c.    Strict Liability

Lastly, plaintiffs contend that §§ 2257 and 2257A violate the First Amendment because

they "impose strict liability on a producer of expression for failing to create or maintain the

identification records required by their provisions," noting that "[n]either statute contains a

scienter requirement as an element of th[at] offense."  (Doc. 3 at 41–42).[17]

"Strict liability is generally disfavored in criminal law, particularly with respect to cases

that implicate the First Amendment."  United States v. Sheehan, 512 F.3d 621, 629 (D.C. Cir.

2008) (citing Smith v. California, 361 U.S. 147, 150–54 (1959)).  Sections 2257 and 2257A both

provide that "[i]t shall be unlawful . . . for any person to whom subsection (a) applies to fail to

create or maintain the records as required by subsections (a) and (c) or by any regulation

promulgated under this section."  § 2257(f)(1); § 2257A(f)(1).  Thus, plaintiffs are correct that

---

[17]Plaintiffs also suggest in their briefing that the statutes' imposition of strict liability
violates the Fifth Amendment guarantee of due process; plaintiffs do not, however, allege this in
their Complaint.

Congress has not specified a scienter requirement for this offense.  This is in contrast to some of the other offenses listed in §§ 2257 and 2257A, which must be committed "knowingly."  See § 2257(f)(2)–(4); § 2257A(f)(2)–(4).

While this distinction might be read to suggest that Congress did not likewise intend a "knowingly" requirement to apply to the offense of failing to create or maintain records,[18] this Court does not take it to mean that the statutes necessarily establish a strict-liability regime for that offense.  First, plaintiffs have not identified, and this Court is not aware of, any indication that Congress intended, by its silence, to impose strict liability for that offense.  Cf. Staples v. United States, 511 U.S. 600, 606 (1994) ("[O]ffenses that require no mens rea generally are disfavored, and . . . some indication of congressional intent, express or implied, is required to dispense with mens rea as an element of a crime." (citation omitted)).  Nor is there any allegation or indication that the statutes have been enforced in that manner.

In so reasoning, this Court is mindful that "[a] First Amendment  claim . . . is subject to a relaxed ripeness standard . . . because of concern that, even in the absence of a fully concrete dispute, unconstitutional statutes or ordinances tend to chill protected expression among those who forbear speaking because of the law's very existence."  Peachlum v. City of York, 333 F.3d 429, 434–35 (3d Cir. 2003).  This Court also recognizes that, as a general matter, "where

_____

[18]See Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2717–18 (2010) (finding that a statutory provision "prohibit[ing] 'knowingly' providing material support" to a foreign terrorist organization should not be interpreted to require specific intent to further the organization's terrorist activities, in part because of "the sections immediately surrounding [the provision], both of which do refer to intent to further terrorist activity"); see generally United States v. X-Citement Video, Inc., 513 U.S. 64 (1994) (inferring the express scienter requirement of one element of a criminal offense to apply to other elements of that offense, and providing an extensive discussion regarding the circumstances under which an inference of scienter may be warranted).

threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced."  MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128–29 (2007) (emphasis omitted); see also Peachlum, 333 F.3d at 435 ("The courts have allowed somewhat liberally constitutional challenges under circumstances where the government has not initiated enforcement proceedings.").

Nonetheless, even in the context of First Amendment preenforcement challenges to criminal statutes, "there must be a real and immediate threat of enforcement against the plaintiff" for the challenge to be justiciable.  Salvation Army v. Dep't of Cmty. Affairs of N.J., 919 F.2d 183, 192 (3d Cir. 1990) (internal quotation marks omitted).  For instance, in the Supreme Court's recent opinion, Holder v. Humanitarian Law Project, 130 S. Ct. 2705 (2010), the Court found that the plaintiffs' First and Fifth Amendment preenforcement challenges to a criminal statute were ripe because the plaintiffs "face[d] 'a credible threat of prosecution' and 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'"  Id. at 2717 (quoting Babbitt v. United Farm Workers Nat'l Union, Inc., 442 U.S. 289, 298 (1979)). The Court explained that the Government "has charged about 150 persons with violating [the statute], and . . . several of those prosecutions involved the enforcement of the statutory terms at issue here," and that "[t]he Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do."  Id.

In the present case, defendant has not made any express representation regarding whether the statutes would be enforced in a strict-liability fashion if plaintiffs were prosecuted for failing to create or maintain the required records.  As noted, however, there is also no allegation or

indication that the statutes have been enforced in that manner, nor is there any

indication—congressional or prosecutorial—that it should or will be enforced in that manner.

Thus, this Court does not believe plaintiffs presently face a credible threat that they will be

prosecuted or convicted under a theory of strict liability for any failure to create or maintain the

required records.  As such, this Court is not prepared at this point to assume, as plaintiffs do, that

the statutes impose strict liability for this offense or find that they, as a result, impermissibly chill

protected speech.

### D.    Fifth Amendment Challenges

#### 1.    The Statutes Do Not Violate the Equal Protection Clause

Plaintiffs contend that §§ 2257 and 2257A violate the Equal Protection Clause under the

Fifth Amendment because of the differential treatment afforded certain producers under §

2257A(h)'s exemption scheme.  As noted above, this claim essentially reprises the arguments

regarding this provision made by plaintiffs in their First Amendment challenges, and this Court

finds those arguments no more availing here.  See Brown, 586 F.3d at 283 ("'[W]here the state

shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that

regulation necessarily' survives scrutiny under the Equal Protection Clause." (quoting McGuire

v. Reilly, 260 F.3d 36, 49–50 (1st Cir. 2001))).

#### 2.    The Challenge Under the Self-Incrimination Clause Is Not Ripe

Plaintiffs' contention that §§ 2257 and 2257A violate the Fifth Amendment's Self-

Incrimination Clause focuses on subsection (d) of both statutes, which provides that "information

or evidence obtained from records required to be created or maintained by this section" is not

precluded from use "in a prosecution or other action for a violation of this chapter [titled 'Sexual

Exploitation and Other Abuse of Children'] or chapter 71 [titled 'Obscenity'] or for a violation of any applicable provision of law with respect to the furnishing of false information." § 2257(d)(1), (d)(2); § 2257A(d)(1), (d)(2).  According to plaintiffs, "[w]hen a law mandates that a select group of persons, whom the government suspects of criminal activity, create and maintain records relative to that activity and allows the government to use information contained in those records to prosecute related criminal violations, it violates the Fifth Amendment's prohibition against compelled self-incrimination."  (Doc. 57 at 4).  Defendant contends that plaintiffs' challenge is not ripe for review, citing in support the Sixth Circuit's treatment of this same issue in Connection III.

As the Sixth Circuit explained, in determining the plaintiffs' Fifth Amendment challenge to § 2257 was unripe:

> [T]he Supreme Court has previously held that a pre-enforcement self-incrimination challenge to a reporting requirement is 'premature' even when the plaintiff insists that he 'intend[s] to engage' in the conduct that triggers the requirement—so long as the plaintiff has yet to assert a privilege claim in response to a government demand for disclosure. Cal. Bankers Ass'n v. Shultz, 416 U.S. 21, 72-74 (1974); see also Trs. for Alaska v. EPA, 749 F.2d 549, 560 (9th Cir. 1984) (dismissing as "unripe" a pre-enforcement self-incrimination challenge to self-monitoring, reporting and record-keeping requirements contained in federal pollutant-discharge permits where no one contended those requirements had been "improperly applied in an actual case").  That is precisely the case here.  As the record now stands, we simply "have no idea whether or when" the Attorney General will attempt to inspect any of Connection's records, let alone refuse to respect a proper claim of privilege. Warshak, 532 F.3d at 526 (internal quotation marks omitted); cf. Free Speech Coal. v. Gonzales, 483 F. Supp. 2d 1069, 1081 (D. Colo. 2007) (dismissing on standing grounds the plaintiffs' self-incrimination attack on § 2257 because they failed to show a concrete injury, as they "ha[d] not produced any evidence that they have ever been subjected to an inspection").

Connection III, 557 F.3d at 342–43.  The Sixth Circuit further noted that "the plaintiffs have not shown that 'withholding court consideration' until a concrete conflict arises will prejudice them

in any material way. . . . At least until the Attorney General attempts to obtain § 2257 records

from these individuals, they face no greater risk of prospective harm than a claimant concerned

that the government will violate his Fourth Amendment rights in future searches." Id. at 343.

This Court finds the Sixth Circuit's analysis persuasive and applicable to plaintiffs in the

present case.  Plaintiffs here, like the plaintiffs in Connection III and Free Speech Coalition v.

Gonzales, have not alleged in their Complaint that they have been subject to any inspection under

the statutes, nor have they alleged that they have made a proper claim of privilege that has been

refused.[19]  Accordingly, this Court finds plaintiffs' Fifth Amendment self-incrimination challenge

unripe for adjudication at this time.

E.    **Vagueness Challenges**

Plaintiffs contend that various aspects of §§ 2257 and 2257A and their accompanying

regulations are unconstitutionally vague.  "The Supreme Court has explained that a statute is

unconstitutionally vague if it 'fails to provide a person of ordinary intelligence fair notice of what

is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory

enforcement.'"  Interactive Media Entm't & Gaming Ass'n v. Attorney Gen. of U.S., 580 F.3d

113, 116 (3d Cir. 2009) (quoting Williams, 553 U.S. at 304).  "[The Court has] said that when a

statute interferes with the right of free speech or association, a more stringent vagueness test

should apply.  But perfect clarity and precise guidance have never been required even of

_____

[19]In their proposed amended complaint, plaintiffs allege that certain members of Free
Speech Coalition have endured such inspections.  As discussed in Part VI.F.2, plaintiffs' Motion
for Leave to Amend will be denied.  Even if this Court were to grant plaintiffs' request to amend
their Complaint, it would not alter this Court's analysis here, as the amended complaint does not
allege that any plaintiffs, or anyone else for that matter, has "assert[ed] a privilege claim in
response to a government demand for disclosure."  Connection III, 557 F.3d at 343.

regulations that restrict expressive activity." Humanitarian Law Project, 130 S. Ct. at 2719 (internal quotation marks and citation omitted).

Plaintiffs first "challenge, on vagueness grounds, the statutory terms, actual or simulated sadistic or masochistic abuse, simulated lascivious exhibition of the genitals or public region, and simulated masturbation." (Doc. 57 at 2 (emphasis omitted); Compl. ¶ 60(J)).[20] These terms appear in the definition of "sexually explicit conduct" provided by 18 U.S.C. § 2256(2)(A). Previous courts have rejected vagueness challenges to this definition, and this Court sees no reason to rule otherwise here. See FSC II, 483 F. Supp. 2d at 1077 (rejecting the plaintiffs' vagueness challenge to the term "sadistic and masochistic abuse," and "find[ing] as other courts have that this language is materially indistinguishable from the language upheld by the Supreme Court in New York v. Ferber"); see also United States v. X-Citement Video, Inc., 982 F.2d 1285, 1288 (9th Cir. 1992), rev'd on other grounds, 513 U.S. 64 (1994); United States v. Lamb, 945 F. Supp. 441, 450 (N.D.N.Y. 1996).

Plaintiffs also contend that certain provisions of the regulations "run afoul of the First Amendment because of their vagueness and imprecision." (Doc. 57 at 2). The Complaint lists the challenged provisions, but provides no further indication of why plaintiffs consider them impermissibly vague. (See Compl. ¶ 68). As stated in a subsequent letter brief, however,

---

[20]"For instance," plaintiffs explain, "Plaintiff Nitke wants to expand her work to include pictures of fashion associated with sadomasochism, such as pictures of people in corsets or rope, without any sexual activity being depicted. Because of the sweeping and vague language of [§§ 2257 and 2257A], Nitke is uncertain about which types of images constitute sadomasochism that trigger the panoply of the statutes' record keeping and labeling requirements." (Doc. 57 at 2; Compl. ¶ 42). Plaintiffs also allege that "[i]n all cases where [they] are involved with producing or disseminating expression involving the candid display of human genitals, they legitimately fear that the Defendant will treat their expression as involving the lascivious display of the genitals or pubic region." (Compl. ¶ 53).

plaintiffs question (1) whether 28 C.F.R. § 75.1(c)'s definition of a producer as one who

"digitizes an image" would include a producer who "digitiz[es] a previously recorded image" or

who "reformat[s] . . . images into 'Blu Ray' formats"; (2) whether 28 C.F.R. § 75.2(a)(4)'s

requirement that "[t]he primary producer shall create a record of the date of original production

of the depiction" applies "only to recordings occurring after the effective date of the regulations";

and (3) how 28 C.F.R. § 75.6(a)'s requirement that the statement identifying the location of the

records appear on "every page of a Web site on which a visual depiction of an actual human

being engaged in actual or simulated sexually explicit conduct appears" would "apply to a

downloadable video clip."  (Doc. 57 at 2–3).

      As to plaintiffs' challenge to § 75.2(a)(4), the introductory language of § 75.2(a) makes

clear that the record-maintenance requirements outlined by the regulation (of which § 75.2(a)(4)

is one) apply to "visual depictions of an actual human being engaged in actual sexually explicit

conduct (except lascivious exhibition of the genitals or pubic area of any person) made after July

3, 1995," and "visual depictions of an actual human being engaged in simulated sexually explicit

conduct or in actual sexually explicit conduct limited to lascivious exhibition of the genitals or

pubic area of any person made after March 18, 2009."  As to plaintiffs' challenges to § 75.1(c)

and § 75.6(a), even if this Court accepts plaintiffs' claim that the regulations are unclear as to

these particular points, this Court does not believe that, because of this ambiguity, the regulations

"fail[] to provide a person of ordinary intelligence fair notice of what is prohibited, or [are] so

standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement."

Williams, 553 U.S. at 304; see Holder, 130 S. Ct. at 2719 ("'[P]erfect clarity and precise

guidance have never been required even of regulations that restrict expressive activity.'" (quoting

Williams, 553 U.S. at 304)).  Thus, this Court finds that any vagueness the regulations may possess in this regard is not constitutionally problematic, and plaintiffs do not state a claim as to them upon which relief can be granted.

### F.    Fourth Amendment Challenge

#### 1.    Summary of the Parties' Arguments

Plaintiffs argue in their Complaint that §§ 2257 and 2257A and their implementing regulations are unconstitutional under the Fourth Amendment because they authorize unreasonable warrantless searches and seizures.  Specifically, plaintiffs allege that they

> are subjected to repeated warrantless searches of their premises by government investigators who are empowered to appear without advance notice and demand entrance to the premises—whether office, studio, or private home—to inspect and copy the records that the statutes require to be maintained and are subject to seizure of anything on the premises that the government investigators believe is related to a commission of a felony, without a warrant.

(Compl. ¶ 56).  Plaintiffs further explain that "[t]he implementing regulations authorize the government to conduct searches and seizures of persons' homes, studios, and/or offices—without warrant or notice.  The government inspectors are authorized to copy any of the records and to seize any evidence of a felony—without limitation on the scope of the search or seizure."

(Compl. ¶ 72) (emphases omitted).  Thus, plaintiffs contend, the statutes and regulations "deprive and threaten to deprive Plaintiffs of their right guaranteed by the Fourth Amendment to be free of unreasonable searches and seizures . . . which have caused and threaten to cause in the future, irreparable harm to the Plaintiffs for which there is no adequate remedy at law."  (Compl. ¶ 83).

For these reasons, plaintiffs seek a judgment declaring that the statutes and regulations "are unconstitutional on their face and as applied under the Fourth Amendment to the United States

Constitution." (Compl. at 31).

In response, defendant points out that "plaintiffs do not claim to have been subject to any inspections; rather, they mount a purely abstract facial challenge to the scheme set forth by statute and regulation." (Doc. 17 at 42). Thus, defendant concludes, "[g]iven the purely speculative, and inaccurate, nature of plaintiffs' assertions, the Court should simply deem plaintiffs' Fourth Amendment challenge unripe." (Doc. 17 at 44).

Defendant also argues that plaintiffs do not have a reasonable expectation of privacy in the records at issue. Defendant reasons that "producers cannot plausibly claim to retain an expectation of privacy in the records themselves" because the records are "created and maintained for the very purpose of allowing inspection." (Doc. 17 at 44). Thus, according to defendant, "producers who are required to keep records demonstrating that they have verified the ages of performers in their depictions of sexually-explicit conduct have no reasonable expectation of privacy in the very records that they create in order to fulfill the statutory obligation." (Doc. 33 at 33).

Additionally, defendant contends that, even if this Court were to find that plaintiffs' Fourth Amendment challenge is ripe and that plaintiffs do have a reasonable expectation of privacy in the records at issue, the inspection scheme authorized under the statutes and their implementing regulations does not violate the Fourth Amendment because it is in accord with the administrative search exception to the warrant requirement. (Doc. 33 at 36–37.)

As the parties debated these points in their briefing, plaintiffs, in response to defendant's ripeness arguments, filed a Motion for Leave to Amend their Complaint, seeking "to allege additional facts relevant to their Fourth Amendment challenge." (Doc. 49 at 2). Specifically,

plaintiffs seek to amend their Complaint to include the following paragraph:

> Several of Free Speech Coalition's members have been subjected to inspections pursuant to 18 U.S.C. § 2257 and its implementing regulations.  In each instance, a team of FBI agents came to the member's private business premises, without a warrant or prior notice, gained access under authority of 18 U.S.C. § 2257 and its implementing regulations, entered areas of the business premises not open to the public, searched through the business's files and records owned and possessed by the member pertaining to its sexually explicit expression and made copies of certain records.  The agents also took photos of the interior areas of the business premises—again, all without a warrant.  Inspections have also been made by FBI agents of producers who are not members of Plaintiff Free Speech Coalition, and in two instances, upon information and belief, inspections were conducted at private residences of the producers because that is where their records were maintained.

(Doc. 49 at 2).

In response to this Motion, defendant first argues that plaintiffs' Fourth Amendment claim cannot be made ripe based on the assertion that various unidentified plaintiffs and non-plaintiffs have been subjected to inspections.  Furthermore, defendant contends, Free Speech Coalition lacks standing to assert an as-applied Fourth Amendment challenge on behalf of these non-plaintiffs and unidentified members of their organization.

Lastly, defendant contends that the only possible effect that plaintiffs' proposed amendment to their Complaint could have is to make their facial Fourth Amendment claim ripe—but that even if such a claim is ripe, it would still fail as a matter of law under the relevant legal standard, which requires plaintiffs to establish that no set of circumstances exist under which the inspection scheme would be valid.  According to defendant, this standard cannot be met in this case, even under the amended complaint, because:  (1) producers have no reasonable expectation of privacy in the records kept pursuant to the recordkeeping statutes and their implementing regulations; (2) even if a producer has an expectation of privacy in the premises

where an inspection occurred, the inspection scheme allows producers to keep these records with

a third-party custodian, negating any expectation of privacy that a producer would have in the

third-party premises; and (3) even if the producer's own place of business was entered, whether a

producer has a reasonable expectation of privacy would depend on the specific nature of the

premises accessed.  Furthermore, defendant argues, even if this Court were to conclude that the

inspection program implicates Fourth Amendment privacy concerns, the program is still lawful

under the administrative search exception to the warrant requirement.

### 2.    Plaintiffs' Motion for Leave to Amend

The Third Circuit has emphasized that under Fed. R. Civ. P. 15(a), "leave to amend

should be 'freely given when justice so requires,'" and "'a district court must permit a curative

amendment unless such an amendment would be inequitable or futile.'"  Toll Bros., Inc. v. Twp.

of Readington, 555 F.3d 131, 144 n.10 (3d Cir. 2009) (quoting Phillips v. Cnty. of Allegheny,

515 F.3d 224, 245 (3d Cir. 2008)).  An amendment is considered futile if "the complaint, as

amended, would fail to state a claim upon which relief could be granted."  In re Burlington Coat

Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).  Notably, the Third Circuit has stated

that "although amendments are to be liberally granted, the district court may properly deny leave

to amend where the amendment would not withstand a motion to dismiss."  Centifanti v. Nix,

865 F.2d 1422, 1431 (3d Cir. 1989).

In the present case, plaintiffs' proposed amended complaint merely indicates that

unidentified members of Free Speech Coalition were subject to inspections without specifically

identifying any such members, and also states that other unidentified producers who are not

members of Free Speech Coalition were subject to inspections.  As defendant notes, the amended

complaint thus would likely still retain the same questions of ripeness and standing that exist in the initial Complaint.  Furthermore, and as is ultimately fatal to plaintiffs' Motion, there is nothing in the proposed amended complaint that would alter this Court's determination, set forth at length below, that plaintiffs have failed to state a viable Fourth Amendment claim because (1) they have no reasonable expectation of privacy in the records subject to inspection and (2) the inspection program authorized by the statutes and regulations constitutes a permissible warrantless administrative search.  As this Court finds that "the complaint, as amended, would fail to state a claim upon which relief could be granted," In re Burlington, 114 F.3d at 1434, this Court will deny it as futile.

### 3. There Is No Reasonable Expectation of Privacy in the Records Required by the Statutes and Regulations

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "It is well settled that the Fourth Amendment's protection extends beyond the sphere of criminal investigations." City of Ontario v. Quon, 130 S. Ct. 2619, 2627 (2010) (citing Camara v. Mun. Court of City and Cnty. of S.F., 387 U.S. 523, 530 (1967)).  The Fourth Amendment "guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government, without regard to whether the government actor is investigating crime or performing another function." Id. (quoting Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 613–14 (1989)).  Yet, the Supreme Court has

emphasized that "'no interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy." United States v. Miller, 425 U.S. 435, 440 (1976) (quoting Hoffa v. United States, 385 U.S. 293, 301–02 (1966)).

Indeed, the Supreme Court has "uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." Smith v. Maryland, 442 U.S. 735, 740 (1979) (internal citations and quotation marks omitted). As the Third Circuit has explained, "[t]he fundamental task of any Fourth Amendment analysis is assessing the reasonableness of the government search," and "[i]f the search is reasonable, there is no constitutional problem, for the Fourth Amendment only protects individuals from unreasonable searches and seizures," United States v. Sczubelek, 402 F.3d 175, 182 (3d Cir. 2005) (citing United States v. Knights, 534 U.S. 112, 118 (2001); Skinner, 489 U.S. at 619); see also, e.g., Hunter v. Sec. & Exch. Comm'n, 879 F. Supp. 494, 498 (E.D. Pa. 1995) (Waldman, J.) (compiling cases and noting that "[o]f course, only items of information in which a party has a legitimate or reasonable expectation of privacy are [constitutionally] protected"). Whether a search is reasonable "depends on all of the circumstances," and involves balancing "on the one hand, the degree to which the search intrudes upon an individual's privacy and, on the other hand, the degree to which the search is needed for the promotion of legitimate governmental interests." Id. (internal quotation marks and alteration marks omitted)).

Determining the reasonableness of a person's expectation of privacy involves two separate inquiries:  first, whether a person in fact demonstrated an actual or subjective

-94-

expectation of privacy in the subject of the search or seizure; and second, whether a person's expectation is "one that society is prepared to recognize as reasonable," that is, an expectation that is objectively justifiable under the circumstances.  Smith, 442 U.S. at 740 (internal quotation marks omitted).  Stated otherwise, "a Fourth Amendment search does not occur—even when the explicitly protected location of a house is concerned—unless the individual manifested a subjective expectation of privacy in the object of the challenged search, and society [is] willing to recognize that expectation as reasonable."  Kyllo v. United States, 533 U.S. 27, 33 (2001) (internal quotation marks and citation omitted).

In the present case, defendant argues that plaintiffs do not have a reasonable expectation of privacy in the records because "the records are created and maintained for the very purpose of allowing inspection," (Doc. 17 at 44), and that "producers who are required to keep records demonstrating that they have verified the ages of performers in their depictions of sexually-explicit conduct have no reasonable expectation of privacy in the very records that they create in order to fulfill the statutory obligation," (Doc. 33 at 33).  Plaintiffs counter that the records they must keep are "are private papers and protected expression in which the owners of these records have a legitimate expectation of privacy."  (Doc. 50 at 23).   Plaintiffs describe the documents and papers subject to inspection as including: (1) a copy of a government issued photo identification card, such as a driver's license or passport, of each person depicted in expression created by the producer that contains sexual imagery; (2) a copy of the producer's expression itself, containing the sexual imagery; (3) a list created by the producer of any other names used by the person depicted in the producer's expression; and (4) the producer's required indices of the records.  (Doc. 50 at 21–22).  Thus, according to plaintiffs,

> The documents subject to search are, in fact, private papers, maintained by the producer and composed of very personal information about the persons depicted in the expression produced by him or her as well as the constitutionally protected expression itself. . . . Here, Plaintiffs can and do assert ownership and possession of the files, documents and expression subject to inspection.  They are collected by Plaintiffs in the course of producing their expression; they belong to the Plaintiffs; and Plaintiffs are in physical possession of them.

(Doc. 50 at 22).

After review, this Court concludes that plaintiffs do not have a reasonable expectation of privacy in the records kept pursuant to §§ 2257 and 2257A and their implementing regulations, as (1) plaintiffs do not have an actual or subjective expectation of privacy in the records, and (2) even if plaintiffs were to have a subjective expectation of privacy, any such expectation is not one that society would accept as reasonable.  This determination is based on the well-established principle that "the privilege which exists as to private papers cannot be maintained in relation to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established."  Shapiro v. United States, 335 U.S. 1, 33 (1948) (internal quotation marks omitted).

The Supreme Court's analysis in United States v. Miller, 425 U.S. 435 (1976), is highly relevant in this regard and provides the applicable analytical framework here.  In Miller, the Supreme Court held that a bank depositor did not have a reasonable expectation of privacy in bank records consisting of microfilms of checks, deposit slips, and other records relating to his bank accounts maintained pursuant to the Bank Secrecy Act of 1970.  Prior to Miller reaching the Supreme Court, the Fifth Circuit had reversed the trial court on the ground that the depositor's Fourth Amendment rights were violated when the bank records were obtained by means of a

-96-

defective subpoena.  Id. at 437.  The Supreme Court, however, reversed the Fifth Circuit, finding

that the depositor "had no protectable Fourth Amendment interest in the . . . documents," id., and

that "the Court of Appeals erred in finding [the bank records and] documents to fall within a

protected zone of privacy," id. at 440.

The Miller Court began its analysis by stating that the bank records and documents "[o]n

their face . . . are not [the depositor]'s 'private papers,'" and that the depositor "can assert neither

ownership nor possession.  Instead, these are the business records of the banks."  Id.  The Court

continued, "The records of [the depositor]'s accounts, like all of the records (which are required

to be kept pursuant to the Bank Secrecy Act,) pertain to transactions."  Id. at 440–41 (internal

citations and quotation marks omitted).  The Court then stated that the depositor "urges that he

has a Fourth Amendment interest in the records kept by the banks because they are merely copies

of personal records that were made available to the banks for a limited purpose and in which he

has a reasonable expectation of privacy."  Id. at 442.  For this reason, the Court stated that it was

required to "examine the nature of the particular documents sought to be protected in order to

determine whether there is a legitimate 'expectation of privacy' concerning their contents."  Id.

The Miller Court ultimately found that there was no legitimate expectation of privacy in

the contents of the documents, stating:

> The checks are not confidential communications but negotiable instruments to be
> used in commercial transactions.  All of the documents obtained, including financial
> statements and deposit slips, contain only information voluntarily conveyed to the
> banks and exposed to their employees in the ordinary course of business.  The lack
> of any legitimate expectation of privacy concerning the information kept in bank
> records was assumed by Congress in enacting the Bank Secrecy Act, the expressed
> purpose of which is to require records to be maintained because they have a high
> degree of usefulness in . . . regulatory investigations and proceedings.

Id. at 442–43 (internal quotation marks omitted) (alteration in original).  The Court therefore

found that the inspection scheme authorized under the Bank Secrecy Act did not implicate Fourth

Amendment concerns:  "By requiring that such records be kept by all banks, the Bank Secrecy

Act is not a novel means designed to circumvent established Fourth Amendment rights.  It is

merely an attempt to facilitate the use of a proper and long-standing law enforcement technique

by insuring that records are available when they are needed."  Id. at 444.

Here, as in Miller, recordkeeping requirements are not a means designed to circumvent

Fourth Amendment rights, but instead are intended to ensure that the required records are

available for inspection.  Additionally, as in Miller, the records that plaintiffs must keep do not

entail confidential communications or files, and they cannot be classified as being a producer's

"private papers."[21]  To the contrary, they are copies of records and files that are compiled,

---

[21]Without ruling on the issue, this Court notes that plaintiffs may not be the proper party
to claim an expectation of privacy in some of the records that they argue are their "private
papers."  Indeed, the privacy expectation in performers' personal identifying information, as
contained in government-issued identification including drivers' licenses and passports, likely
belongs not to the producers, but to the person whose personal information is contained within
such records.  Similarly, a producer likely does not have a privacy interest in a list of other names
used by a person who appears in that producer's expression; such a privacy interest likely
belongs to the person who actually used the other names.  That plaintiffs maintain physical
possession of copies of these records pursuant to the recordkeeping statutes and their
implementing regulations should not affect the conclusion that the privacy rights in such
information likely does not belong to them.  Furthermore, even if the persons appearing in the
expression were to claim an expectation of privacy in these records, there is Supreme Court
precedent for the conclusion that once a person gives such information or records to a third party,
such as a producer, the person forfeits whatever privacy right he or she once had in such
information or records.  See Sec. & Exch. Comm'n v. O'Brien, Inc., 467 U.S. 735, 743 (1984)
("It is established that, when a person communicates information to a third party even on the
understanding that the communication is confidential, he cannot object if the third party conveys
that information or records thereof to law enforcement authorities." (citing United States v.
Miller, 425 U.S. 435, 443 (1976)).  Thus, it is questionable whether plaintiffs can rightfully claim
an expectation of privacy in some of the records at issue here.

maintained, and kept according to statutes and regulations that are known to and followed by

plaintiffs, and that contain information that enables authorities to verify the ages and identities of

performers in depictions of sexually explicit conduct.  Furthermore, here, as in Miller, the

information contained in the bulk of the records—identifying information contained in copies of

drivers' licenses or passports, a listing of other names used when performing, and so forth—was

voluntarily conveyed to the producers and exposed to them by the persons handing over such

records.[22]

Other caselaw reinforces this Court's conclusion that plaintiffs do not have a reasonable

expectation of privacy in the records at issue here.  For instance, in United States v. Sorcher,

Crim. A. No. 05-0799, 2007 WL 1160099 (E.D.N.Y. Apr. 18, 2007), Judge Nina Gershon stated

that "where an entity governed by a regulatory scheme maintains documents required by that

scheme, its owners or operators would have no reasonable expectation of privacy that would

protect those documents from seizure by the regulators."  Id. at *8.  Additionally, in United

---

[22]Plaintiffs argue that because the statutes and regulations require that a copy of the expression itself be kept for inspection, the First Amendment is implicated in the Fourth Amendment analysis.  (See Doc. 50 at 22–23).  It is true that the Supreme Court has cautioned that "[t]he First Amendment imposes special constraints on searches for and seizures of presumptively protected material, and requires that the Fourth Amendment be applied with scrupulous exactitude in such circumstances."  Maryland v. Macon, 472 U.S. 463, 468 (1985) (internal quotation marks and citation omitted).  Nevertheless, the fact that a copy of the producer's work must be kept pursuant to the statutes and regulations does not instantly turn what this Court finds to be a non-reasonable expectation of privacy in the records as a whole, into a reasonable one.  This is not an instance where protected expression itself is the specific target of a government search or seizure; rather, as detailed above, the statutes and their implementing regulations were promulgated by Congress in an effort to prevent the sexual exploitation of children in the production of sexually explicit expression.  Accordingly, after carefully weighing the totality of the circumstances, this Court finds that, in this case, the fact that a copy of the producer's expression must be kept as part of the records does not in itself create a reasonable expectation of privacy in the records, nor does it create a Fourth Amendment violation.

States v. McCoy, 492 F. Supp. 540 (M.D. Fla. 1980), Judge Howell N. Melton held that a

customshouse broker could not claim a reasonable expectation of privacy in business records

which were required by administrative regulations to be retained and made available for

inspection.  Judge Melton explained:

> [T]he defendant . . . was aware of [his] responsibility . . . to provide [authorities] with
> access to his business records.  Indeed, the regulations could not be clearer on this
> subject. . . . Clearly, the . . . books and papers which the defendant seeks to suppress,
> if presently in his possession, would have to be released to the proper authorities.
> The defendant cannot claim a legitimate expectation of privacy in these documents.
> . . . [T]he customs records seized herein were "required records", which the
> government had statutory authority to inspect and remove. . . .
>       . . . With respect to [these] business records . . . the Court can detect no
> violation of any right of the defendant.  The law permits customs agents access to,
> and the privilege of copying required records.

Id. at 544.

Furthermore, numerous courts have ruled that a person does not have a reasonable

expectation of privacy in documents, files, or records that are compiled under, and may be

inspected or reviewed pursuant to, statutes or regulations.  See, e.g., Couch v. United States, 409

U.S. 322, 335–36 (1973) ("[T]here can be little expectation of privacy where . . . records are

handed to an accountant, knowing that mandatory disclosure of much of the information therein

is required . . . . Accordingly, petitioner here cannot reasonably claim . . . an expectation of

protected privacy or confidentiality."); United States v. Kamara Reid, 16 F. App'x 160, 161 (4th

Cir. 2001) (per curiam) (nonprecedential) (in immigration context, the plaintiff did not have

legitimate expectation of privacy in, and thus did not have a valid Fourth Amendment claim as

to, a photocopy of counterfeit green card given to her employer, as "the rationale for the

employer's collection of these immigration records is compliance with INS requirements and for

INS inspection; thus, the [plaintiff] should have been aware that the documents were likely to be

reviewed by the INS during her employment tenure" (citation omitted)); United States v.

Blocker, 104 F.3d 720, 728 (5th Cir. 1997) (holding, in the context of an audit of insurance

records, that the defendant did not have "any reasonable expectation of privacy" in the records

where the investigator "was authorized by statute and by [the defendant] to search [the

company's] records"); United States v. Chuang, 897 F.2d 646, 650 (2d Cir. 1990) ("In view of

the pervasive nature of federal regulation of the banking industry, [Defendant], as an officer of

the bank, knew that bank documents . . . were subject to periodic examination . . . . The existence

of a regulatory scheme necessarily reduces a bank officer's expectation of privacy in his

corporate office."); McLaughlin v. A.B. Chance Co., 842 F.2d 724, 726 (4th Cir. 1988) ("The

issue presented is whether . . . an OSHA compliance officer . . . may examine and copy OSHA

forms . . . when OSHA regulations require the maintaining of such forms and the production

thereof for inspection and copying by a representative of the Secretary of Labor for the purpose

of carrying out the provisions of the Act.  We hold that [the employer company] had no

reasonable expectation of privacy in [the] OSHA forms . . . and the information contained therein

. . . ."); United States v. Amon, 669 F.2d 1351, 1358 (10th Cir. 1981) ("It is also clear that

defendants' Fourth Amendment rights have not been violated by the Government since they

could not legitimately claim an expectation of privacy in documents which they submitted

voluntarily to the IRS and their employers."); United States ex rel. Terraciano v. Montanye, 493

F.2d 682, 685–86 (2d Cir. 1974) ("The New York statutes which furnished the authority for [the

investigator]'s search were limited to [files and records] which other New York statutes required

to be kept on the premises . . . . [W]e do not find . . . unconstitutional this . . . inspection . . . of

records . . . maintained on the premises as required [by statute]." (internal citations and quotation

marks omitted)); United States v. Szur, No. S5 97 CR 108, 1998 WL 132942, at *14 (S.D.N.Y.

Mar. 20, 1998) (Koeltl, J.) ("[T]o the extent a regulatory agency requires the production of

documents to which it would otherwise be entitled under a regulatory and statutory scheme . . . ,

the production of the documents does not violate a defendant's Fourth Amendment right since

the inspection does not intrude upon any reasonable expectation of privacy that a defendant

might have." (internal quotation marks and alteration marks omitted)).

     For the aforementioned reasons, this Court finds that plaintiffs do not have a subjective

expectation of privacy in the records, and that even if plaintiffs did have a subjective expectation

of privacy, the expectation is not one that society would recognize as reasonable.

### 4.    The Inspection Program Falls Within the Administrative Search Exception to the Warrant Requirement

     In addition to finding that plaintiffs have no reasonable expectation of privacy in the

records required to be kept pursuant to §§ 2257 and 2257 and their implementing regulations,

this Court finds that the statutes and regulations proscribe constitutionally valid administrative

searches.

     As discussed above, the regulations provide that producers must make the required

records available for inspection either "at the producer's place of business or at the place of

business of a non-employee custodian of records." 28 C.F.R. § 75.4. Further, investigators are

authorized to "enter without delay and at reasonable times any establishment of a producer where

records . . . are maintained to inspect during regular working hours and at other reasonable times,

and within reasonable limits and in a reasonable manner, for the purpose of determining

compliance with the record-keeping requirements." § 75.5(a). Inspections are to "take place during normal business hours," § 75.5(c)(1), and upon commencing an inspection, the investigator is to show his or her credentials, explain the nature and purpose of the inspection "including [its] limited nature," and indicate "the scope of the specific inspection and the records that [the investigator] wishes to inspect." § 75.5(c)(2). The inspections "shall be conducted so as not to unreasonably disrupt the operations of the establishment." § 75.5(c)(2). Records may be inspected no more than once every four months unless there is reasonable suspicion of a violation, and an investigator may copy any record that is subject to inspection. § 75.5(d), (e).

Plaintiffs argue that the statutes and regulations violate the Fourth Amendment by allowing warrantless searches of producers' commercial premises.[23] This Court disagrees,

---

[23]Plaintiffs also argue that the statutes and their regulations allow for warrantless searches that are "not limited to commercial premises" but extend "to private homes as well." (Doc. 3 at 51). Plaintiffs' Complaint, however, fails to allege any instances of inspections occurring in any of plaintiffs' private homes. Plaintiffs attempt to remedy this issue with their Motion for Leave to Amend, alleging that the FBI entered, for purposes of conducting records inspections, the homes of two producers "who are not members of Plaintiff Free Speech Coalition." (Doc. 49 at 2). Without ruling on the issue, this Court notes that under the related standing doctrines of organizational and third-party standing, there is nothing to indicate that Free Speech Coalition, or any other plaintiffs in this case, would have standing to assert claims on behalf of these unidentified producers. See, e.g., Pa. Psychiatric Soc. v. Green Spring Health Serv., Inc., 280 F.3d 278, 287 (3d Cir. 2002) ("Because the patients are not members of, or otherwise directly associated with, the Pennsylvania Psychiatric Society, the Society does not have associational standing to assert their claims."); League of Women Voters of Fla. v. Cobb, 447 F. Supp. 2d 1314, 1340 (S.D. Fla. 2006) ("Here, because Plaintiffs do not allege that the John and Jane Does are members of their respective organizations, Plaintiffs cannot pursue their [organizational] standing theory.").

Even assuming plaintiffs had standing as to this claim, or, alternatively, looking at the statutes and regulations purely on their face, this Court finds that because plaintiffs do not have a reasonable expectation of privacy in the records at issue, and because an inspector's entry onto a producer's premises for the limited purpose of inspecting records constitutes a lawful administrative search, there is no constitutional violation if a producer's commercial premises happens to be his home. Indeed, Congress expressly contemplated such a situation and provided producers with what this Court believes is an appropriate remedy: producers may use a non-

finding that the inspections authorized under the statutes and regulations are lawful under what

the Third Circuit has explained to be one of the "well recognized exceptions to the warrant

requirement—administrative inspections pursuant to regulatory regimes." Showers v. Spangler,

182 F.3d 165, 172 (3d Cir. 2009).

It is well established that, under the Fourth Amendment, a person's reasonable

expectation of privacy in his or her home or business exists "not only with respect to traditional

police searches conducted for the gathering of criminal evidence but also with respect to

administrative searches designed to enforce regulatory statutes." New York v. Burger, 482 U.S.

691, 699–700 (citing Marshall v. Barlow's, Inc., 436 U.S. 307, 312–13 (1978)). "An expectation

of privacy in commercial premises, however, is different from, and indeed less than, a similar

expectation in an individual's home." Id. at 700 (citing Donovan v. Dewey, 452 U.S. 594,

598-99 (1981)).

This expectation is particularly attenuated in commercial property employed in "closely

regulated" industries. Id. "'Certain industries have such a history of government oversight that

no reasonable expectation of privacy [can] exist for a proprietor over the stock of such an

enterprise.'" Id. (citation omitted) (quoting Marshall, 436 U.S. at 313). As the Third Circuit has

explained, "one who is engaged in an industry that is pervasively regulated by the government or

that has been historically subject to such close supervision is ordinarily held to be on notice that

periodic inspections will occur and, accordingly, has no reasonable expectations of privacy in the

areas where he knows those inspections will occur." Lovgren v. Byrne, 787 F.2d 857, 865 (3d

Cir. 1986). For this reason, a warrantless inspection of commercial premises may be reasonable

---

employee third-party custodian to maintain the records at issue. See 28 C.F.R. § 75.4.

-104-

within the meaning of the Fourth Amendment, and the Supreme Court has correspondingly

recognized an exception to the warrant requirement for searches of "closely" or "pervasively"

regulated industries.  Burger, 482 U.S. at 702–03.

A pervasively regulated business is one which has "such a history of government

oversight that no reasonable expectation of privacy could exist."  Marshall, 436 U.S. at 313

(citation omitted).  "[T]he doctrine is essentially defined by 'the pervasiveness and regularity of

the federal regulation' and the effect of such regulation upon an owner's expectation of privacy."

Burger, 482 U.S. at 701 (quoting Donovan, 452 U.S. at 606).  As the Third Circuit has

emphasized, individuals who "voluntarily engage in such [closely or pervasively] regulated

businesses accept the burdens as well as the benefits of the trade."  Frey v. Panza, 621 F.2d 596,

597 (3d Cir. 1980) (per curiam).

As discussed at length above, for over three decades the creation, production, and

distribution of sexually explicit expression has been the subject of extensive federal regulation

aimed at protecting children from sexual exploitation.[24]  As a result of this steadily strengthening

―――――――――――――

[24]Thirty years is a sufficient amount of time for an industry to have been closely or
pervasively regulated.  See, e.g., Prof'l Dog Breeders Advisory Council v. Wolff, Civ. A. No. 09-
0258, 2009 WL 2948527, at *9 (M.D. Pa. Sept. 11, 2009) (Rambo, J.) (concluding that "the
kennel industry is a pervasively regulated activity" in part because it "has been subject to random
inspections and searches since at least 1982").  Furthermore, while the length of time regulation
has been in place can be a factor in determining whether it is sufficiently pervasive to make the
imposition of a warrant requirement unnecessary, the Supreme Court has emphasized that "if the
length of regulation were the only criterion, absurd results would occur. . . . [N]ew or emerging
industries, including ones such as the nuclear power industry that pose enormous potential safety
and health problems, could never be subject to warrantless searches even under the most
carefully structured inspection program simply because of the recent vintage of regulation."
Donovan, 452 U.S. at 606.  In the present case, this Court finds that the duration and extent of the
legislative measures regarding the age of performers appearing in sexually explicit expression are
sufficient to make such regulation pervasive.

web of initiatives—which include §§ 2257 and 2257A and their implementing

regulations—producers of sexually explicit expression have been on notice for some time that,

when it comes to ensuring the performers in their expression are adults, they will be subject to

various forms of government oversight, including inspection of age-verification records.  Indeed,

the "regulatory presence is sufficiently comprehensive and defined" in this regard that producers

of such expression "cannot help but be aware that their property will be subject to periodic

inspections undertaken for specific purposes."  Burger, 482 U.S. at 705 n.16 (internal quotation

marks omitted).  Accordingly, this Court finds that, "in light of the regulatory framework

governing" the production of sexually explicit expression as it pertains to age verification and the

protection of children from sexual exploitation, plaintiffs have a "reduced expectation of privacy

in this 'closely regulated'" enterprise.  Id. at 707.

        The Supreme Court has promulgated a three-prong test to determine if a warrantless

inspection of a pervasively regulated activity survives constitutional scrutiny.  See id. at 702–03.

First, "there must be a substantial government interest that informs the regulatory scheme

pursuant to which the inspection is made."  Id. at 702 (internal quotation marks omitted).

Second, "the warrantless inspections must be necessary to further the regulatory scheme."  Id.

(internal quotation marks omitted).  Third, "the inspection program, in terms of the certainty and

regularity of its application, must provide a constitutionally adequate substitute for a warrant,"

meaning that it "must perform the two basic functions of a warrant:  (1) it must advise the owner

of the commercial premises that the search is being made pursuant to the law and has a properly

defined scope, and (2) it must limit the discretion of the inspecting officers."  Id. at 703 (internal

quotation marks and alteration marks omitted).  Regarding the first part of the final requirement,

the inspection program must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." Id. at 703 (quoting Donovan, 452 U.S. at 600). Regarding the second part of the final requirement, in restricting the discretion of inspectors, the inspection program must be "carefully limited in time, place, and scope." Id. (quoting United States v. Biswell, 406 U.S. 311, 315 (1972)).

The inspection program set forth by §§ 2257 and 2257A and their implementing regulations satisfies all three criteria. First, as discussed at length above, the government has a substantial interest in preventing the sexual exploitation of children in the production of sexually explicit expression, and this interest informs the age-verification requirements at issue here. As Senator Charles Grassley commented in the Senate Committee Report for the Child Pornography Prevention Act of 1995, "[t]he history of efforts to eliminate the scourge of child pornography is replete with examples of child pornographers finding ways around legislation intended to eliminate child pornography." S. Rep. No. 104-358, at 28 (1996). For the reasons already set forth, this Court is of the view that §§ 2257 and 2257A and their implementing regulations provide a critical tool in this ongoing battle against the sexual exploitation of children.

Second, warrantless entrance onto a producer's premises to inspect the required records is necessary to further the regulatory scheme. The statutes and regulations are designed to provide a reliable mechanism for inspectors—and producers—to verify that the performers appearing in depictions of sexually explicit conduct are adults, something which often cannot be ascertained by looking at the performers or depictions themselves. The purpose of the age-verification requirements, however, is not merely to identify producers who have used children in such

-107-

depictions, but to protect children from such harm before it happens.  Correspondingly, by not

requiring advance notice or a warrant, the inspection program encourages producers to follow the

age-verification procedures regularly and in advance of the production of the depictions, and

deters the possibility of fabrication or after-the-fact compilation of such information.  As the

Supreme Court has noted:

> [I]f inspection is to be effective and serve as a credible deterrent, unannounced, even
> frequent, inspections are essential.  In this context, the prerequisite of a warrant could
> easily frustrate inspection; and if the necessary flexibility as to time, scope, and
> frequency is to be preserved, the protections afforded by a warrant would be
> negligible.

Burger, 482 U.S. at 710 (quoting Biswell, 406 U.S. at 316).  Here, the warrantless and

unannounced inspections ensure that producers of sexually explicit expression obtain and

maintain accurate and truthful records of the ages, names, and other identifying information

regarding the performers appearing therein.  Administrative searches of producers' premises in

order to gain access to the records are thus necessary to further the government's substantial

interest in preventing the sexual exploitation of children.

Third and finally, the inspection program set forth by the statutes and regulations provides

a "constitutionally adequate substitute for a warrant," as it advises producers that the inspection

is being made pursuant to law, and both adequately defines the scope of the inspection and

properly limits the discretion of the inspecting officers.  Id. at 711 (quoting Donovan, 452 U.S. at

603).  The regulations inform producers of sexually explicit expression that, absent reasonable

suspicion of a violation of the age-verification requirements, inspections may occur no more than

once every four months.  28 C.F.R. § 75.5(d).  And, before commencing an inspection, the

inspector must display his or her credentials and explain the nature and purpose of the inspection.

28 C.F.R. § 75.5(c).  Thus, producers know that the inspections to which they are subject "do not constitute discretionary acts by a government official, but are conducted pursuant to statute." Burger, 482 U.S. at 711 (citing Marshall, 436 U.S. at 332).

Further, the "time, place, and scope" of the inspections are sufficiently limited so as to place "appropriate restraints upon the discretion of the inspecting officers." Id. In addition to the four-month limitation mentioned above, inspectors are only authorized to enter a producer's premises to inspect records "at reasonable times" and "during normal business hours"—between 9 a.m. and 5 p.m.[25]—"for the purpose of determining compliance with the record-keeping requirements." 28 C.F.R. § 75.5(a), (c)(1). The inspector must explain the "limited nature of the records inspection" and indicate "the scope of the specific inspection and the records that [the investigator] wishes to inspect." § 75.5(c). The regulations also detail where the records to be inspected should be located, and how they should be maintained and categorized. §§ 75.2–75.4. Thus, producers receive adequate "notice as to how to comply with" the regulatory scheme. Burger, 482 U.S. at 711. Because §§ 2257 and 2257A and their implementing regulations adequately advise those subject to inspection that the entrance onto their premises to review records is being made pursuant to law, and because the searches are properly limited in time, place and scope, a constitutionally adequate substitute for a search warrant has been established.

The Third Circuit has made clear that, under the administrative search exception to the warrant requirement, "'[b]ecause the owner or operator of commercial premises in a "closely

_____

[25]If a producer does not maintain "at least 20 normal business hours per week," the producer "must provide notice to the inspecting agency of the hours during which records will be available for inspection, which in no case may be less than 20 hours per week." 28 C.F.R. § 75.5(c).

regulated" industry has a reduced expectation of privacy, the warrant and probable-cause

requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a

government search, have lessened application in this context.'"  Watson v. Abington Twp., 478

F.3d 144, 151–52 (3d Cir. 2007) (quoting Burger, 482 U.S. at 702).  As the Supreme Court has

emphasized,

> The interest of the owner of commercial property is not one in being free from any
> inspections.  Congress has broad authority to regulate commercial enterprises
> engaged in or affecting interstate commerce, and an inspection program may in some
> cases be a necessary component of federal regulation.  Rather, the Fourth
> Amendment protects the interest of the owner of property in being free from
> unreasonable intrusions onto his property by agents of the government.

Donovan, 452 U.S. at 599 (some emphases added).  "[W]arrantless inspections of commercial

property may be constitutionally objectionable if their occurrence is so random, infrequent, or

unpredictable that the owner, for all practical purposes, has no real expectation that his property

will from time to time be inspected by government officials."  Id. (quoting Marshall, 436 U.S. at

323).  Thus, "[w]here Congress has authorized inspection but made no rules governing the

procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules

apply," id. (quotation marks omitted), and that "[i]n such cases, a warrant may be necessary to

protect the owner from the unbridled discretion [of] executive and administrative officers," id.

(internal quotation marks omitted) (second alteration in original).

     In the present case, to the extent producers have any reasonable expectation of privacy in

age-verification records relating to depictions of sexually explicit conduct, that expectation is

reduced.  Furthermore, the government has a substantial interest in preventing sexual exploitation

of children in the production of such depictions; producers of such depictions have adequate

notice that their records will periodically be inspected by government officials; and Congress has

both authorized inspections and created rules, further fleshed out by implementing regulations,

governing the procedures that inspectors must follow.  As such, this Court concludes that §§

2257 and 2257A and their implementing regulations authorize lawful administrative searches of

producers' premises for the specific and limited purpose of inspecting records required to be kept

pursuant to the regulatory scheme.  Such a holding is consistent with caselaw upholding valid

administrative searches conducted pursuant to lawful statutes and/or regulations.[26]

---

[26] See, e.g., Donovan, 452 U.S. at 606 (holding that warrantless inspections by federal mine inspectors of underground mines at least four times a year and surface mines at least twice a year to ensure compliance with health and safety standards required by federal legislation did not violate Fourth Amendment); Biswell, 406 U.S. at 317 (upholding validity of warrantless search for firearms or ammunitions dealer); Colonnade Catering Corp. v. United States, 397 U.S. 72 (1970) (granting agents of Alcohol and Tobacco Tax Division of the Internal Revenue Service authority to inspect facilities of licensed liquor dealers without a warrant); Peterman v. Coleman, 764 F.2d 1416, 1421 (11th Cir. 1985) ("We conclude . . . that the [administrative search] exception applies to the regulation of second-hand [firearms] dealers . . . . The only inspection authorized by the ordinance relates to the transaction registers second-hand dealers are required to maintain. . . . In light of the compelling state interest . . . , this intrusion is reasonable under the Fourth Amendment." (citation omitted)); Gallaher v. City of Huntington, 759 F.2d 1155 (4th Cir. 1985) (upholding warrantless inspection of record book of precious metal and gem purchases by a licensed pawnbroker); Bionic Auto Parts & Sales, Inc. v. Fahner, 721 F.2d 1072, 1081 (7th Cir. 1983) (rejecting Fourth Amendment challenge to warrantless searches of premises of automotive parts dealers because "[u]nder the carefully drawn provisions of the statute, the state's objective of deterring automobile theft through warrantless searches outweighs the licensees' right to privacy"); Wayne Cusimano, Inc. v. Block, 692 F.2d 1025, 1029 (5th Cir. 1982) (finding administrative search of produce dealer's records lawful, as "[t]he administrative regulations require a licensee to permit a representative of the regulatory agency to inspect during ordinary business hours the regulation-required records for the . . . specified inspection purposes provided by the Act itself. . . . [T]he present administrative searches authorized by statute are restricted to specified purposes.  Further, the warrantless administrative examinations . . . are reasonably related to, and required to effectuate, the statutory regulatory scheme . . . . We thus find no constitutional defect in the present unannounced, warrantless administrative examination of the . . . statutorily-required records . . . ."); United States v. Jamieson-McKames Pharm., Inc., 651 F.2d 532, 537–38 (8th Cir. 1981) ("We think the drug-manufacturing industry is properly within the [administrative search] exception to the warrant requirement. . . . [T]he enforcement needs are more critical in the drug-manufacturing field, and the interests of the general public are more

*                        *                        *

Because plaintiffs do not have a reasonable expectation of privacy in the records required by §§ 2257 and 2257A, and because, even if there were such an expectation, the statutes and their implementing regulations establish a valid inspection program under the administrative search exception to the warrant requirement, this Court rejects plaintiffs' Fourth Amendment challenge.[27]

**VII.   Conclusion**

For the reasons set forth above, defendant's Motion to Dismiss will be granted, and plaintiffs' Motion for Leave to Amend the Complaint will be denied.  An appropriate order follows.

O:\CIVIL 09-10\09-4607 Free Speech v. Holder\Free Speech v. Holder - Mem Mots Amend Dismiss.wpd

---

urgent.  We hold that inspections authorized [by federal statute] are 'reasonable' and therefore not inconsistent with the Fourth Amendment." (citations and footnotes omitted)); Terraciano, 493 F.2d at 685 ("[W]e do not find the statutes here at issue so seriously deficient as to render unconstitutional this non-forcible inspection and seizure, during business hours, by a narcotics agent, of records of a licensed pharmacist, maintained on the premises as required, relating to narcotics and stimulant or depressant drugs."); Prof'l Dog Breeders, 2009 WL 2948527, at *16 (finding that Pennsylvania statute authorizing warrantless searches and inspections of dog kennels did not violate the Fourth Amendment, as it was a valid administrative search which met all three Burger prongs).

[27]As noted, the parties also dispute whether plaintiffs' Fourth Amendment challenge is ripe; they do not, however, provide meaningful discussion or analysis of applicable Third Circuit caselaw on it.  Regardless, in light of the disposition above, this Court declines to take up the ripeness inquiry.