# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC. et al. | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE HONORABLE ERIC H. HOLDER, JR | : | 9-4607 |
| | : | |
| Defendant. | : | |

Baylson, J.                                                                                          December 5, 2012

## MEMORANDUM RE: MOTION TO DISMISS IN PART

The Government moves to dismiss Plaintiffs' Fourth Amendment claim, Count III of the Amended Complaint, for lack of subject matter jurisdiction. It contends Plaintiffs lack standing and that the claim is not ripe. For the reasons set forth below, the motion was DENIED by order on November 26, 2012 (ECF 113).

**I. Facts and Procedural History**

Plaintiffs brought the instant lawsuit in 2009 seeking a declaratory judgment and injunction against the enforcement of 18 U.S.C. § 2257 and 2257A, two federal statutes that impose recordkeeping, labeling, and inspection requirements on producers of sexually explicit depictions. Plaintiffs alleged the statutes and their implementing regulations violated the First, Fourth, and Fifth Amendments of the United States Constitution, and were also unconstitutionally vague. The Government moved to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), (ECF 17), and this Court granted the motion,

1

dismissing the Complaint in its entirety. Free Speech Coal. v. Holder, 729 F. Supp. 2d 691, 746 (E.D.Pa. 2010). Regarding the First Amendment claim, this Court held the statutes and regulations were content neutral and survived intermediate scrutiny, because they are a narrowly tailored means for Congress to effectuate its goal of combating child pornography. Regarding the Fourth Amendment claim, this Court held Plaintiffs have no reasonable expectation of privacy in the records they are required to maintain under the statute, and that the inspections amount to constitutionally valid administrative searches. This Court also dismissed Plaintiffs' Fifth Amendment and vagueness challenges.

The Third Circuit affirmed in part and vacated and remanded in part. Free Speech Coal. v. Holder, 677 F.3d 519, 543 (3d Cir. 2012). It vacated this Court's dismissal of the First and Fourth Amendment claims, concluding Plaintiffs should be afforded the opportunity to conduct discovery and further develop the record on issues such as whether the statutes burden more speech than is necessary to further the government's interest (First Amendment), whether they intrude on a reasonable expectation of privacy (Fourth Amendment), and whether they authorize a valid administrative search program (Fourth Amendment). It also held Plaintiffs should be afforded leave to amend their Complaint and add allegations about specific inspections that were brought against them in the past. The Third Circuit affirmed this Court's dismissal of the Fifth Amendment and vagueness claims, as well as its rulings on several other issues.

Following the Third Circuit's remand, Plaintiffs filed an Amended Complaint in this Court on June 29, 2012 (ECF 84, adding a new paragraph 20). They added a new Paragraph 20, stating that "[s]everal of Free Speech Coalition's members have been subject to inspections pursuant to 18 U.S.C. § 2257"; that "[i]n each instance, a team of

2

FBI agents came to the member's private business premises, without a warrant or prior notice . . . [and] entered areas of the business premises not open to the public"; and that "[i]nspections have also been made by FBI agents of producers who are not members of Plaintiff Free Speech Coalition, and in two instances, upon information and belief, inspections were conducted at private residences of the producers because that is where their records were maintained." (Amended Compl. ¶ 20) (ECF 84).

The Government filed its Motion to Dismiss in Part on August 20, 2012 (ECF 92). Oral argument was held on November 26, 2012.

**II. Discussion**

The Government argues Plaintiffs' Fourth Amendment claim should be dismissed for lack of subject matter jurisdiction. It argues first, that Plaintiffs do not have the requisite standing to bring this claim and second, that the claim is not ripe. Each argument will be analyzed below.[1]

---

[1] This is not the first time the Government has challenged Plaintiffs' standing or raised the issue of ripeness. In its original motion to dismiss, the Government argued the Fourth Amendment claim should be dismissed because it was unripe – Plaintiffs had failed to mention any actual inspections that had occurred in their Complaint, and so the issue was unfit for judicial determination. (ECF 17). Plaintiffs sought leave to amend the Complaint, so they may add allegations that certain members of FSC as well as third parties had been subjected to inspections. (ECF 49). Defendants objected, now raising the issue of standing. It claimed FSC lacked representational standing to assert constitutional claims on behalf of its members and nonmembers and so the proposed averments should not be added. (ECF 53).
    Neither this Court nor the Third Circuit directly ruled upon the Government's arguments. This Court dismissed the Fourth Amendment claim and denied Plaintiffs' Motion to Amend not on account of standing or ripeness, but because it held the claim was not viable on the merits. The undersigned reasoned: "[P]laintiffs failed to state a viable Fourth Amendment claim because (1) they have no reasonable expectation of privacy in the records subject to inspection and (2) the inspection program . . . constitutes a permissible warrantless administrative search," and these facts would continue to be true even if Plaintiffs made the proposed amendments to their Complaint. Free Speech Coal., 729 F. Supp. 2d at 746. The Third Circuit vacated the dismissal of the Fourth Amendment claim and the denial of Plaintiffs' Motion to Amend, but again without ruling on standing or ripeness.

3

**A. Standing**

The Government contests Plaintiffs' standing for two reasons. First, it claims Plaintiffs do not have standing to request an injunction under the Fourth Amendment because they cannot show an equitable remedy would redress their injury – that is, Plaintiffs cannot show they face a "real, immediate and direct" threat of future inspections under Section 2257, and that an injunction would be necessary to cure such injuries. Second, the Government contends one of the Plaintiffs, Free Speech Coalition ("FSC"), suffers additional deficiencies because it cannot claim representational standing on behalf of its members.

**1. Redressability**

For a plaintiff to have standing under Article III, three requirements must be met: (1) she must show she has suffered an "injury in fact"; (2) the injury must be "fairly traceable" to the defendant"; and (3) the injury must be capable of being redressed by the relief plaintiff seeks. Common Cause of Pa v. Pennsylvania, 558 F.3d 249, 258 (3d Cir. 2009). When the relief sought is an injunction, the "redressability" prong of the standing test demands that the plaintiff be able to demonstrate an ongoing or imminent injury – otherwise, the remedy requested would not redress the harm being suffered. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 564 (1992) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.") (internal quotation marks and citation omitted).

The Government contends no Plaintiff can satisfy the redressability requirement of the Article III standing test because none can prove he or she is likely to undergo a future inspection under Section 2257, and to thereby suffer a future injury. The Government relies on an affidavit filed FBI Special Agent Nanavaty, attached to the Motion to Dismiss, to make this argument. The affidavit attests: the FBI conducted a total of 29 inspections over a 14-month period between July 2006 and October 2007; the FBI's Section 2257 inspection program was terminated in 2007 after the Sixth Circuit found the statute invalid under the First Amendment (that decision was reversed by the Sixth Circuit en banc in 2009, but no new inspection program was initiated); there is no team currently in place at the FBI that is directed to conduct Section 2257 inspections; and no funding has been allocated for the purpose of conducting inspections pursuant to Section 2257. (Nanavaty Decl. ¶¶ 8-11) (ECF 92).

The Government's argument regarding redressability is unavailing for two reasons. First, Plaintiffs face a substantial possibility of injury – that is, being subjected to allegedly unconstitutional searches about which they complain – as a result of the plain operation of the statute. Sections 2257 and 2257A impose a record-keeping requirement on "producers" of sexually explicit materials and require that they "make such records available to the Attorney General for inspection at all reasonable times." 18 U.S.C. §§ 2257(c) & 2257A(c). The implementing regulations authorize investigators to conduct warrantless searches of record-holders "during regular working hours and at other reasonable times," and provide that "[a]dvance notice . . . shall not be given." 28 C.F.R. § 75.5(a) & (b). As long as the statutes are in force, Plaintiffs, all of whom are

"producers,"[2] stand in danger of being subjected to intrusive and allegedly unconstitutional searches at virtually any hour of the work-day.

Moreover, the fact that no searches have been conducted since 2007 is not consequential because as long as Section 2257 is in force, the searches could be resumed at any moment. See Chamber of Commerce v. FEC, 69 F.3d 600, 603 (D.C. Cir. 1995) (finding plaintiffs had standing even though the FEC declined to enforce a rule because "[n]othing . . . prevents the Commission from enforcing its rule at any time with, perhaps, another change of mind of one of the Commissioners"). In United States v. Stevens, the Supreme Court declined to construe a statute narrowly even though the government assured the Court that it would enforce the statute narrowly, because the Court held that the Constitution "does not leave us at the mercy of noblesse oblige." 130 S. Ct. 1577, 1591 (2010); see also Free Speech Coal., 677 F.3d at 539 (drawing on Stevens to hold that "[l]imiting statements in regulatory preambles, like assurances of prosecutorial discretion, may one day be modified by the executive branch to permit the exercise of the Statutes' full authority"). A change in FBI priorities, or a new FBI director, or a new Attorney General, could summarily negate the policies attested to in Agent Nanavaty's affidavit. The Court cannot ignore the potential impact of a congressional statute.

---

[2] The regulations implementing Section 2257 define "producer" as "any individual, corporation, or other organization, who is a primary producer or a secondary producer." 28 C.F.R. § 75.1(c). A primary producer is an individual who "actually films, videotapes, photographs, or creates a digitally- or computer-manipulated image, a digital image, or a picture of . . . a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct." Id. § 75.1(c)(1). A secondary producer is any person who "produces, assembles, manufactures, publishes, duplicates, reproducers, or reissues" these depictions. Id. § 75.1(c)(2). Plaintiffs represent a "broad array of producers and distributors of expression," meaning all are primary or secondary producers, or an organization representing such entities, under the statute. (Amended Compl. ¶¶ 2, 18-52) (ECF 84).

Furthermore, the existence of Section 2257's inspection program distinguishes this case from those in which courts have held plaintiffs' injuries were too speculative to confer standing. In Lujan, the Supreme Court held plaintiffs' "'some day' intentions" to return to environmental areas and observe endangered species "d[id] not support a finding of the 'actual or imminent' injury that our cases require." 504 U.S. at 564. In City of Lyons v. Los Angeles, the Court held a plaintiff who was placed in a chokehold after being pulled over for a traffic code violation could not show with any "sufficient likelihood that he will again be wronged in a similar way," and so lacked standing. 461 U.S. 95, 111-12 (1983); see also ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 302-03 (3d Cir. 2012) (holding plaintiffs lacked standing to seek an injunction in an antitrust suit because there was "no more than a 'possibility'" that plaintiffs would "reenter the market"). Here, the statute authorizes the federal government to conduct warrantless searches of Plaintiffs' records during "regular working hours and at other reasonable times," thus placing them in harms way day-in and day-out, all year long. This suffices to establish a likelihood of imminent injury. See Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 344-45 (2d Cir. 1998) (distinguishing Lyons, in which "there was no formal policy which sanctioned the application of the choke hold" and the present case, in which "the challenged interrogation methods . . . are officially endorsed policies . . . authorized by a written memorandum of understanding between the Corporation Counsel and Police Commissioner"); Melendres v. Arpaio, 695 F.3d 990, 998 (9th Cir. 2012) (holding "Defendants have engaged in a pattern or practice of conducting traffic stops as part of 'saturation patrols' or 'sweeps' targeting Latinos" and future injury to plaintiffs, who were Latino, was "sufficiently likely"); McBride v. Cahoone, 820 F. Supp. 2d 623, 635

(E.D. Pa. 2011) ("While we are aware that in analyzing standing, courts generally decline to presume that a plaintiff will violate the law in the future, we believe that the analysis does, and should, differ when an official policy mandates the allegedly unconstitutional conduct."). The principle to be gleaned is that when a statute is in force, a court must analyze it as is and determine whether it is constitutional – assurances of prosecutorial discretion and recesses in enforcement may be pleasant, but they do not override the text of a statute. And the Government has not cited any precedential authority in a case involving an act of Congress, and its suspension in enforcement, to support its argument. And the Government has not cited any precedential authority in a case involving an act of Congress, and a temporary suspension in enforcement, to support its argument.[3]

A second reason why Plaintiffs' injury should be deemed ongoing and imminent, irrespective of the threat of resumption of searches, such that standing for an injunction is present, is that Plaintiffs have suffered and are continuing to suffer significant compliance costs under the statute. The regulations require producers to "make [their] records available at the producer's place of business or at the place of business of a non-employee custodian of records" for "seven years from the date of creation or last amendment." 28 C.F.R. § 75.4. If they keep "normal business hours," meaning 9 a.m. to

---

[3] The mootness doctrine also suggests a flaw in the Government's argument. It provides that a case does not become moot merely upon the government's voluntary suspension of an offending activity. Friends of the Earth, Inc. v. Laidlaw Env'tl Servs., Inc., 528 U.S. 167, 189 (2000) ("It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'") (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)); United States v. Gov't of V.I., 363 F.3d 276, 285 (3d Cir. 2004). Rather, the standard for mootness is whether "subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, 528 U.S. at 189 (internal quotation marks and citation omitted). Applied here, the mootness doctrine counsels that the FBI's decision to stop enforcing Section 2257 for five years does *not* make it "absolutely clear" that enforcement will not resume in the future, and so this decision would not make the case moot. Similarly, the government's voluntary suspension of enforcement should not render Plaintiff's injuries too speculative to confer standing.

8

5 p.m. Monday through Friday, their records must be available for inspection "during regular working hours and at other reasonable times" because the FBI can show up at any such instance. *Id.* §§ 75.5(a). If producers do not keep normal business hours, they must provide notice to the government of "hours during which records will be available for inspection, which in no case may be less than 20 hours per week." *Id.* § 75.5(c)(1). These are significant burdens for Plaintiffs because they obligate them to be near their records – or to have a custodian near them – for substantial periods of time during the work week. (ECF 101).

Courts have made clear that when plaintiffs absorb significant costs to comply with a statute, this situation can supply the requisite standing to bring a pre-enforcement suit for equitable relief. See, e.g., Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 392 (1988) (holding the injury "requirement is met here, as the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures [by declining to sell certain materials] or risk criminal prosecution"). In Lozano v. City of Hazelton, the Third Circuit held that plaintiff-employers had standing to challenge an immigration ordinance because it imposed substantial compliance obligations upon them; plaintiffs were the "direct targets of an ordinance they allege to be unconstitutional, complaining of what the ordinance would compel them to do." 620 F.3d 170, 185 (3d Cir. 2010), overruled on other grounds, 131 S. Ct. 2958 (2011); see also Hays v. City of Urbana, 104 F.3d 102, 103 (7th Cir. 1997) ("What is necessary for standing is a concrete injury, redressable by success in the litigation. Costs of compliance necessary to avoid prosecution can constitute that injury. Plaintiffs have alleged that compliance would be costly, because the federal government

9

would require longer lease terms and lengthy procedures to evict tenants. These costs would be avoided if they prevail."). Plaintiffs' compliance costs under Section 2257 thus confirm that they have standing to request an injunction.[4]

### 2. Free Speech Coalition's Representational Standing

The Government asserts FSC lacks representational standing to request an injunction under the Fourth Amendment on behalf of its members. Representational standing requires: (1) that an organization's members "'otherwise have standing to sue in their own right'"; (2) that the interests claimed by the organization are germane to its purpose; and (3) that "'neither the claim asserted nor relief requested can require the participation of individual members in the lawsuit.'" Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc., 280 F.3d 278, 283 (3d Cir. 2002) (quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)). The Government contends prongs (1) and (3) are not satisfied with respect to FSC.

The Government's argument regarding prong (1) mirrors its argument for why all Plaintiffs lack standing to request an injunction: it claims no member of FSC can show he

---

[4] It is true that several compliance-cost cases speak of the plaintiff's sacrifice of a legally protected right, such as the right to speech or to use a business license, when discussing why compliance resulted in an ongoing injury. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 129 (2007) ("In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do (enter into a lease, or distribute handbills at the shopping center)."). But Plaintiffs here could also be described as sacrificing a legal right: the right to freely conduct their businesses and allocate their time and resources in the manner they see fit. See Kress v. New Jersey, 455 Fed. Appx. 266, 270 (3d Cir. 2011) (holding plaintiff had standing because he "suffered economic injury because he has ceased his business operations due to the prosecution of others under the Statute" and "economic injury, such as the inability to run one's business, is [a legally protected interest]").

or she is likely to suffer an imminent injury under Section 2257 needing to be redressed. For a discussion of this argument and why it is unconvincing, see supra.

The Government also contends FSC lacks standing because proof of the Fourth Amendment claim will require considerable participation by the individual members of FSC. The representational standing test instructs that if "the claim asserted" requires significant "individual participation" by an organization's members, representational standing is not appropriate. Pa. Psychiatric Soc'y, 280 F.3d at 283. The typical situation in which this occurs is a suit for damages, where proof of harm and suffering necessitates a high level of individual participation. Id. at 284. The Government highlights a portion of the Third Circuit's opinion in Free Speech Coalition where it held that Plaintiffs' Fourth Amendment claim will necessitate a consideration by this Court of "the concrete factual context" of the Section 2257 inspections, to determine their constitutionality. Free Speech Coal., 677 F.3d at 543. It contends that because an exploration of "the concrete factual context" of the searches will require members of FSC to testify, representational standing should be denied.

The Government's argument is unpersuasive. "The need for some individual participation . . . does not necessarily bar association standing." Pa. Psychiatric Soc'y, 280 F.3d at 283. When an organizational plaintiff can "establish [its] claims with limited individual participation," such as "with sample testimony," associational standing may be granted. Id. at 286; see also Hosp. Council v. City of Pittsburgh, 949 F.2d 83, 89-90 (3d Cir. 1991) (holding "some participation by some [organizational] members" did not defeat associational standing because "participation by 'each [allegedly] injured party' would not be necessary"). FSC contends participation by its members will not be

extensive because "[t]he primary evidence that will flesh out what happened during the inspections will be the testimony of the FBI agents who performed them and the records they created in connection with those inspections." (ECF 101). And even if a small number of FSC's members were called to testify, this would be the type of "limited participation" sanctioned by the Third Circuit.

**B. Ripeness**

The Government next contends Plaintiff's Fourth Amendment claim should be dismissed because it is not ripe.

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300 (1998) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81 (1985)). But "ripeness is a matter of degree whose threshold is notoriously hard to pinpoint," Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66, 580 F.3d 185, 190 (3d Cir. 2009) (internal quotation marks and citation omitted), and such determinations necessarily involve "a large discretionary element." Step-Saver Data Sys., Inc. v. Wyse Tech., 912 F.2d 643, 646 n.5 (3d Cir. 1990) (internal quotation marks and citation omitted). The Third Circuit tends to apply two tests when determining ripeness. The first, more general test derives from Abbott Labs v. Gardner, 387 U.S. 136, 149 (1967), and involves examining: "(1) the fitness of the issues for judicial decision and (2) the hardship of the parties of withholding court consideration." Surrick v. Killion, 449 F.3d 520, 527 (3d Cir. 2006) (internal quotation marks and citation omitted). The second, "more refined test," employed in cases where

the plaintiff seeks a pre-enforcement declaratory judgment, provides: "(1) the parties must have adverse legal interests; (2) the facts must be sufficiently concrete to allow for a conclusive legal judgment, and (3) the judgment must be useful to the parties." Id. (citing Step-Saver Data Sys., 912 F.2d at 647).

The Parties dispute which test should apply. The Government advocates for the fitness/hardship test, while Plaintiffs invoke the Step-Saver, pre-enforcement test. They also dispute whether, under their preferred tests, the Fourth Amendment claim survives. The Government contends it does not survive because the Third Circuit directed this Court to analyze the specifics of the Section 2257 inspections on remand, Free Speech Coal., 677 F.3d at 543, and such an analysis will not be possible given that no searches are currently taking place and the 29 inspections in 2006-2007 were carried out under a different regulatory framework. Plaintiffs respond that Step-Saver is the controlling test for pre-enforcement suits and under Step-Saver, the factors that determine ripeness are the adversity of interests of the parties, the conclusiveness of the judgment, and the utility of that judgment. The Step-Saver factors are met here, Plaintiffs claim, because Plaintiffs "have had to alter their conduct and lives to comply with the very requirements of the inspection regime" (adversity), and a determination by the court of whether Section 2257 is constitutional would resolve whether they need to continue to absorb these costs going forwards (conclusiveness and utility). (ECF 101).

Plaintiffs have the better argument. The Third Circuit's decision in Lewis v. Alexander, 685 F.3d 325, 341-42 (3d Cir. 2012), is instructive. In Lewis, individual and corporate plaintiffs requested an injunction and declaratory judgment barring the enforcement of a Pennsylvania statute regulating special needs trusts, claiming the statute

was preempted by federal law. The Pennsylvania Department of Public Welfare argued the case was not ripe because it (the agency) had not yet issued regulations resolving the statute's "scope and meaning" and because certain statutory provisions had not yet been enforced against trusts in Pennsylvania. Id. at 338, 342. The Third Circuit applied Step-Saver and concluded the case was ripe. It held: "[The] opposing interests [required under the ripeness doctrine] are clearly present here, as Defendants have an obligation to enforce Section 1414, and Plaintiffs seek to evade its strictures. . . . A decision here would establish whether the statute can be enforced against the Plaintiffs, so it would define and clarify Plaintiffs' legal rights." Id. at 341.

Lewis teaches that when a statute requires a class of persons to conduct their behavior in a particular way, and the government has the right to enforce the statute, and the affected persons would be risking legal sanction if they chose not to comply, Step-Saver is satisfied. Id. at 340-41. The direct impact of the statute on the regulated entities and their potential for prosecution if they choose not to comply establishes ripeness. Pic-A-State Pa., Inc. v. Reno, 76 F.3d 1294, 1298 (3d Cir. 1006) ("Although Pic-A-State has not been prosecuted under the Interstate Wagering Amendment, the impact of the Amendment is sufficiently direct and immediate to create an adversity of interest between Pic-A-State and the Government."); Presbytery of N.J. of the Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1463-68 (3d Cir. 1994) (holding the state's refusal to disavow an intent to prosecute the plaintiff was sufficient to create adversity between the parties and make the case ripe). Here, Section 2257 demands that Plaintiffs create records and maintain them available for inspection, and the government has the right to enforce the statute as long as it is on the books. The claim is ripe.

14

Finally, the changes made to the DOJ's Section 2257 regulations in 2008 do not somehow render the Fourth Amendment claim unripe. In 2008, the DOJ modified its regulations to provide: (1) visual depictions of simulated sexually-explicit conduct fall within the scope of materials for which the recordkeeping requirement is triggered; (2) actual lascivious exhibitions of the genitals or pubic area are also within the scope of materials triggering the requirement; and (3) producers may use third-party custodians to store their records. <u>Compare</u> Revised Regulations for Records Relating to Visual Depictions of Sexually Explicit Conduct, 73 Fed. Reg. 77432, 77469-77470 (Dec. 18, 2008), <u>with</u> Inspections of Records Relating to Depiction of Sexually Explicit Performance, 70 Fed. Reg. 29607 (May 24, 2005). The Government contends these changes make the 2006-2007 inspections outdated and irrelevant, thereby depriving this Court of a factual basis upon which to assess Section 2257's constitutionality, and thereby making the Fourth Amendment claim unripe. Not so. The 2008 changes will not cause every inspection in the future to be materially different from those in the past. The broader scope of images for which the recordkeeping requirement is triggered will not lessen the invasiveness of future searches. And while the allowance of third-party custodians may change the analysis for some searches going forwards, namely those at third-party locations, no Plaintiff states that he or she uses or intends to use a third-party custodian. (Amended Compl. ¶¶ 21- 51) (ECF 84). The Court cannot preclude the threat that at least some of the Plaintiffs will undergo future inspections under Section 2257 resembling those in the past – i.e., occurring at their place of business – and therefore the 2006-2007 inspections continue to serve as relevant evidence.

\*\*\*

For the reasons stated above, the Government's Motion to Dismiss in Part was DENIED.

BY THE COURT:

/s/ Lawrence F. Stengel/for
_____
Michael M. Baylson, U.S.D.J.

O:\CIVIL 09\09-4607 Free Speech v. Holder\09-4607.memorandum denying mtd.doc.