# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREE SPEECH COALITION, INC., et al.** | ) | **Civil Action No. 2:09-4607** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **JUDGE MICHAEL M. BAYLSON** |
| -vs- | ) | |
| | ) | |
| **THE HONORABLE ERIC H. HOLDER, JR.,** | ) | |
| Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR FIRST AMENDMENT FACIAL OVERBREADTH AND FOURTH AMENDMENT CLAIMS WITH MEMORANDUM, AND EVIDENTIARY MATERIAL IN SUPPORT AND PROPOSED ORDER

J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio  44113-1949
(216) 781-5245
(216) 781-8207 (Facsimile)

KEVIN E. RAPHAEL (72673)
KER@Pietragallo.com
J. PETER SHINDEL, JR. (201554)
JPS@Pietragallo.com
PIETRAGALLO GORDON ALFANO BOSICK
     & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200
(215) 981-0082 (Facsimile)

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREE SPEECH COALITION, INC., et al.** | ) | **Civil Action No. 2:09-4607** |
| | ) | |
| Plaintiffs, | ) | **JUDGE MICHAEL M. BAYLSON** |
| | ) | |
| -vs- | ) | **PLAINTIFFS' MOTION FOR SUMMARY** |
| | ) | **JUDGMENT ON THEIR FIRST** |
| **THE HONORABLE ERIC H. HOLDER, JR.,** | ) | **AMENDMENT FACIAL OVERBREADTH** |
| Attorney General, | ) | **AND FOURTH AMENDMENT CLAIMS** |
| | ) | **WITH MEMORANDUM OF LAW IN** |
| Defendant. | ) | **SUPPORT** |

Plaintiffs, by and through counsel, pursuant to Fed. R. Civ. P. 56, respectfully move this Court for summary judgment in their favor on their facial overbreadth claim under the First Amendment and Fourth Amendment claim.

A memorandum and evidentiary material in support accompanies this motion. Pursuant to Section C.1 of this Court's Pretrial and Trial Procedures-Civil Cases, a Statement of Undisputed Facts has been filed as a separate document.

Respectfully submitted,

Date: May 10, 2013

/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio 44113-1949
(216) 781-5245 / (216) 781-8207 (Facsimile)

KEVIN E. RAPHAEL (72673)
KER@Pietragallo.com
J. PETER SHINDEL, JR. (201554)
JPS@Pietragallo.com
PIETRAGALLO GORDON ALFANO BOSICK
 & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200 / (215) 981-0082 (Facsimile)
 Attorneys for Plaintiffs

## TABLE OF CONTENTS

Page

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.    THE   CHALLENGED   STATUTES   ARE   UNCONSTITUTIONALLY
      OVERBROAD UNDER THE FIRST AMENDMENT. . . . . . . . . . . . . . . . . . . . . . 14

      A.    Private, Noncommercial Sexual Imagery.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      B.    Sexual Expression Depicting Mature Adults.. . . . . . . . . . . . . . . . . . . . . . . . 22

II.   THE   CHALLENGED   STATUTES   AND   REGULATIONS   ARE
      UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT. . . . . . . . . . . . . . 27

      A.    The Warrantless Searches Authorized by the Statutes and Regulations Violate
            the Fourth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      B.    The Administrative Search Exception Does Not Apply. . . . . . . . . . . . . . . . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## EXHIBIT LIST

28 C.F.R. 75.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit A
Declaration of Dan Linz, Ph.D.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit B
Declaration of Marc Zimmerman, Ph.D.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit C
Declaration of Michelle Drouin, Ph.D.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit D
Declaration of William Livingston
      (exhibits filed in paper format and on disk).. . . . . . . . . . . . . . . . . . . . . . . . . Exhibit E
Declaration of Kristi Witsman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit F
Stipulations Between the Parties Regarding Defendants' Ex. A-E and
      Plaintiffs' Rebuttal Exhibits 72 and 74,
      *Connection Distributing Co.,* (Doc. No. 134) . . . . . . . . . . . . . . . . . . . . . . . . Exhibit G
U.S. Census Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit H
Redacted Deposition Transcript of Charles Joyner .. . . . . . . . . . . . . . . . . . . . . . . . Exhibit I
Deposition Transcript Excerpts of Barbara Alper. . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit J
Deposition Transcript Excerpts of Francis Biro, M.D.. . . . . . . . . . . . . . . . . . . . . . . Exhibit K
Deposition Transcript Excerpts of Betty Dodson. . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit L

## **TABLE OF CONTENTS (cont'd)**

Page

**EXHIBIT LIST (cont'd)**

Deposition Transcript Excerpts of Jeffrey Douglas. . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit M
Deposition Transcript Excerpts of Marie Levine.. . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit N
Deposition Transcript Excerpts of David Levingston. . . . . . . . . . . . . . . . . . . . . . . . . Exhibit O
Deposition Transcript Excerpts of Eugene Mopsik. . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit P
Deposition Transcript Excerpts of Barbara Nitke. . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit Q
Deposition Transcript Excerpts of Carol Queen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit R
Deposition Transcript Excerpts of Carlin Ross. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit S
Deposition Transcript Excerpts of Steven David Steinberg. . . . . . . . . . . . . . . . . . . . Exhibit T
Deposition Transcript Excerpts of Linda Dian Wilson. . . . . . . . . . . . . . . . . . . . . . . . Exhibit U
Plaintiff Alper's Answers to Defendant's Second Set of
    Interrogatories, Nos. 15, 23 (g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit V
Plaintiff Free Speech Coalition's Answers to Defendant's Second Set of
    Interrogatories, No. 19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit W
Plaintiff Levingston's Answers to Defendant's First Set of
    Interrogatories, No. 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit X
Plaintiffs Ross and Dodson's Answers to Defendant's First Set of
    Interrogatories, No. 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit Y
Plaintiff Sinclair Institute's Answers to Defendant's First Set of
    Interrogatories, No. 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit Z
Plaintiff Steinberg's Answers to Defendant's First Set of
    Interrogatories, No. 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit AA
Photos taken during 2257 inspections
    (submitted in paper format and on computer disk). . . . . . . . . . . . . . . . . . . . . . Exhibit BB

## TABLE OF AUTHORITIES

Page

CASES

*Chandler v. University of Pennsylvania,*   F. Supp.2d   ,
   2013 WL 754689 (E.D. Pa. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Disciplinary Counsel v. Detweiler,* 2013-Ohio-1747
   (Ohio Sup. Ct., May 2, 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Donovan v. Dewey*, 452 U.S. 594 (1981).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Florida v. Jardines,* 133 S.Ct. 1409 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Free Speech Coalition v. Holder*, 677 F.3d 519 (3rd Cir. 2012). . . . . . . . . 2, 3, 17, 19, 22, 24, 27

*G. M. Leasing Corp. v. United States,* 429 U.S. 338 (1977). . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Jacobs v. Seay,* Case No. 13-13626CA02, Circuit Court of the Eleventh
   Judicial Circuit in and for Miami-Dade County, Florida.. . . . . . . . . . . . . . . . . . . . . . . . 6

*Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Mancusi v. DeForte,* 392 U.S. 364 (1968).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*McLean v. Sullivan-McLean*, FA114049528S,
   2013 WL 951370 (Conn. Super. Ct. Feb. 7, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Rakas v. Illinois,* 439 U.S. 128 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ray v. Township of Warren*, 626 F.3d 170 (3d Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rudzavice v. State*, 10-12-00300-CR, 2013 WL 1188924
   (Tex. App. Mar. 21, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Taylor v. Franko,* 2011 WL 2746714 (D. Hawaii) (July 12, 2011).. . . . . . . . . . . . . . . . . . . . . 6

*Thomas v. Independence Tp.*, 463 F.3d 285 (3d Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . 21

## <u>TABLE OF AUTHORITIES (cont'd)</u>

<u>Page</u>

*Toups v. GoDaddy.com*, D130018-C, 260th Jud. Dist. Texas . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. 4,432 Mastercases of Cigarettes*,
    448 F.3d 1168 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Jefferson*, 571 F. Supp. 2d 696 (E.D. Va. 2008). . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Jones,* 132 S.Ct. 945 (2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Leary*, 846 F.2d 592 (10th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Stevens*, 559 U.S. 460 (2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

*Voth v. Marsh*, Case No. 2009-L-009522,
    Circuit Court of Illinois County. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2


<u>CONSTITUTIONAL PROVISION</u>

United States Const., amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

United States Const., amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 14, 15, 17, 21, 22, 27


<u>STATUTES, RULES AND REGULATIONS</u>

18 U.S.C. § 2257. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 8, 9, 13, 17-21, 26

18 U.S.C. § 2257 (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24

18 U.S.C. § 2257 (f)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

18 U.S.C. § 2257A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 9, 13, 18

18 U.S.C. § 2257A (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24

### <u>TABLE OF AUTHORITIES (cont'd)</u>

<u>Page</u>

18 U.S.C. § 2257A (f)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

21 CFR § 1140.14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 C.F.R. § 75.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 C.F.R. § 75.5 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 C.F.R. § 75.5 (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 C.F.R. § 75.5 (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 C.F.R. § 75.5 (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 C.F.R. § 75.5 (f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28 C.F.R. § 75.5 (g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

N.Y. Pub. Health Law § 1399-cc (McKinney). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Oregon Administrative Rule 845-006-0335. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ORS 471.130. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Rule 201, Federal Rules of Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>MISCELLANEOUS</u>

I. Asimov, "I Have Seen the Video Future...And It Is Sex,"
    Home Video 2, 1 (January 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

J. Cook, "The X-rated Economy," *Forbes*, Sept. 18, 1978. . . . . . . . . . . . . . . . . . . . . . . . 4

J. Coopersmith, *Pornography, Technology, and Progress,*
    ICON 4 (1998), 94-125. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

M. Drouin, et al.,"Let's talk about sexting, baby: Computer-mediated
    sexual behaviors among young adults," *Computers in*
    *Human Behavior* (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

M. Drouin, et al., "Texting, sexting, attachment, and intimacy
    in college students' romantic relationships," 28 *Computers
    in Human Behavior* 444 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

J. Gernzfurthner, G. Friesinger, and D. Fabry, eds., *prOnnovation?
    Pornography and Technological Innovation*,
    (San Francisco: Re/Search 2008) 48-55.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D. Gordon-Messer, et al., "Sexting among young adults,"
    *Journal of Adolescent Medicine* (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

M. Olshaker, *The Polaroid Story: Edwin Land and the Polaroid
    Experience* (New York, 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT ON THEIR FIRST AMENDMENT FACIAL
OVERBREADTH AND FOURTH AMENDMENT CLAIMS**

STATEMENT OF FACTS

Pursuant to Section C.1 of this Court's Pretrial and Trial Procedures-Civil Cases, Plaintiffs

have prepared and submitted a Statement of Undisputed Facts as a separate document in support of

their Motion for Summary Judgment on Their Facial Overbreadth and Fourth Amendment Claims.[1]

They adopt and incorporate that statement in this memorandum in support of their motion for

summary judgment.

Plaintiffs' Statement of Undisputed Facts demonstrates that a vast quantity of  protected

speech is unconstitutionally burdened by 18 U.S.C. § 2257 and 18 U.S.C. § 2257A. It also

demonstrates that the statutory and regulatory inspection scheme authorizing government agents to

enter private property, including homes and private areas of business premises and records to which

the general public is not allowed access, for the purpose of obtaining information–without notice,

without a warrant, and without probable cause–violates the Fourth Amendment.

STATEMENT OF THE CASE

The Third Circuit Court of Appeals remanded this case for the development of a factual

record for evaluating Plaintiffs' claims that the challenged statutes and their implementing

---

[1]  An index of the evidentiary materials attached in support of Plaintiffs' motion is set forth
in the preceding Table of Contents.  The materials include a copy of the deposition transcript of
Charles Joyner, that has been redacted in accordance with the Agreed Protective Order (Doc. No.
124) entered on  January 14, 2013. The exhibits attached to Ex. E, Declaration of William
Livingston, and the photos contained in Ex. BB have been filed with the Court in paper format with
the requisite computer disk containing the documents in pdf format pursuant to Rule 5.1.2 (2)(b);
(6), Local Rules of Civil Procedure of the United States District Court for the Eastern District of
Pennsylvania.  A copy of the exhibits attached to Ex. E, Declaration of William Livingston, has been
served on Defendant by electronic mail.  A copy of Ex. BB was served on Defendant by Federal
Express.

regulations are unconstitutional under the First and Fourth Amendments.  Discovery is complete.

Plaintiffs now move for summary judgment in their favor as a matter of law on two of their claims:

(1) the statutes are unconstitutionally overbroad on their face under the First Amendment, and (2)

the statutes and implementing regulations authorize warrantless searches and seizures in violation

of the Fourth Amendment.

## I.      THE CHALLENGED STATUTES ARE UNCONSTITUTIONALLY OVERBROAD UNDER THE FIRST AMENDMENT.

Title 18 U.S.C. § 2257 and 18 U.S.C. § 2257A burden a substantial amount of speech that

lies far beyond the statutes' purported goal "of protecting children from sexual exploitation." *Free

Speech Coalition v. Holder*, 677 F.3d 519, 538 (3rd Cir. 2012).  A regulation of speech that "reaches

too much expression that is protected by the Constitution," will be invalidated as overbroad. *DeJohn

v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008). In evaluating whether such a regulation is

unconstitutionally overbroad, the number of its unconstitutional applications are compared to the

regulation's "plainly" legitimate sweep.  *Id.* at 537 *quoting Wash. State Grange v. Wash. State

Republican Party*, 552 U.S. 442, 449, n. 6 (2008). If the law "sweeps [too] widely"–only to be

limited by prosecutorial discretion, it fails to pass muster under the First Amendment.  *United States

v. Stevens*, 559 U.S. 460, 130 S.Ct. 1577, 1584 (2010) (determining that federal criminal statute

purporting to target videos depicting torture of small animals as a sexual practice criminalized a vast

amount of protected expression depicting hunting and killing of animals such that it was

unconstitutionally overbroad).

In determining the scope of the statutes, the court of appeals specifically rejected the

government's argument that the statutes were susceptible to a construction that limited their

application to expression offered for sale or trade, stating:

> We conclude that the Statutes are not susceptible to such a limiting construction....Here, the plain language of the Statutes makes clear that they apply broadly to all producers of actual or simulated sexually explicit depictions regardless of whether those depictions were created for the purpose of sale or trade....As a result, the plain text of the Statutes setting forth their broad scope must trump any conflicting statements contained within the preamble to the regulations, including the assertion that the Statutes are "limited to pornography intended for sale or trade." 73 Fed. Reg. at 77,456.

*Id.* at 539.  Construed as such, the court recognized  that the statutes "apply to more than those producers who sexually exploit children." *Free Speech Coalition*, 677 F.3d at 538. The court wrote:

> [The statutes] mandate compliance by "[w]hoever produces" sexually explicit depictions regardless of the performers' actual or apparent ages.  *See, e.g.,* 18 U.S.C. §§ 2257(a), 2257A(a).  Plaintiffs assert that a "vast quantity" of protected sexually explicit depictions include performers who are "clearly mature adults" that "could not be mistaken for children." Pls.' Br. At 41.  The degree of the asserted overbreadth is obviously the critical determination, but Plaintiffs were never afforded the opportunity to conduct discovery or develop a record from which we could determine this degree.  Without some notion of both the amount of speech that implicates the government's interest in protecting children (e.g., depictions of performers who reasonably could be minors based on their apparent ages) and the amount of speech that is burdened but does not further the government's interest (e.g., depictions of performers who are obviously adults), we cannot intelligently weigh the legitimate versus problematic applications of the Statutes.
>
> Moreover, Plaintiffs should be permitted to develop the record as to whether the Statutes are unconstitutionally overbroad based on their purported regulation of purely private conduct.  Plaintiffs assert that the Statutes are substantially overbroad because they burden the entire universe of constitutionally protected expression involving sexually oriented images of adults–including private, noncommercial depictions created and viewed by adults in their homes.

*Id.* at 538. It thus directed that a record be developed regarding the extent of this overbreadth.

## A.    Private, Noncommercial Sexual Imagery

Creating sexually explicit images as part of sexual intimacy between adults is nothing new.

*See generally* J. Coopersmith, *Pornography, Technology, and Progress,* ICON 4 (1998), 94-125;

J. Gernzfurthner, G. Friesinger, and D. Fabry, eds., *prOnnovation? Pornography and Technological Innovation*, (San Francisco: Re/Search 2008) 48-55.  Edwin Land's self-developing Polaroid camera is said to have provided freedom from "the censoring eye of the local druggist or the ogling leer of the film laboratory technician" and assured "Edwin Land's spot in photographic heaven." M. Olshaker, *The Polaroid Story: Edwin Land and the Polaroid Experience* (New York, 1978), 70.  The introduction of camcorders expanded the possibilities still further, prompting Isaac Asimov to observe: "The age of home video will fundamentally alter our approach to sex." I. Asimov, "I Have Seen the Video Future...And It Is Sex," Home Video 2, 1 (January 1981), 34; *see also*, J. Cook, "The X-rated Economy," *Forbes*, Sept. 18, 1978, 82 (camcorder's "biggest market" is sex).  Cell phones and computers have made the creation and sharing of sexually explicit visual depictions as part of sexual intimacy available to millions of couples and have allowed them to send one another sexually suggestive images using their cell phones or "mobile devices," a practice known as "sexting."[2] Adults exchange sexually explicit images with fellow members of adult dating websites and social networks, while still others share their "do-it-yourself" pornography on tube sites.  Couples use "computer-mediated" communications such as Skype and webcams to engage in sexual intimacies while they are apart.  Technology has not stopped at the bedroom door; million of adults have welcomed it in.

Michelle Drouin, Ph.D, and Marc A. Zimmerman, Ph.D., two of Plaintiffs' experts, have studied sexting as part of the sexual behavior of young adults. *See* M. Drouin, et al., "Texting, sexting, attachment, and intimacy in college students' romantic relationships," 28 *Computers in*

---

[2]    For a discussion of the origins of the word, *sexting*, see http://www.theatlanticwire.com/national/2011/06/brief-history-sexting/38668/

*Human Behavior* 444 (2012); M. Drouin, et al.,"Let's talk about sexting, baby: Computer-mediated sexual behaviors among young adults," *Computers in Human Behavior* (2013); D. Gordon-Messer, et al., "Sexting among young adults," *Journal of Adolescent Medicine* (2012).

In Dr. Drouin's study of 744 adults between the ages of 18 and 36 who had been in a committed relationship, 54% had sent sexually explicit photos or videos to their partners. Ex. D, Drouin at Report, Ex. A. In a follow-up study of 253 adult college students, Dr. Drouin found that 49% of participants in a committed relationship had sent sexts to their partners, 37% in a casual relationship had sent sexts to their partners, and 45% of the participants in a cheating relationship had sent sexts to their cheating partners. Ex. D, Drouin at Report, Ex. B.

In Dr. Zimmerman's study of a national sample of young adults between the ages of 18 and 24, 30% of the participants had sent a sexually explicit photo of themselves to a partner through a cell phone or other media , while 41% of the participants had received such a message. Ex. C, Zimmerman Report at1.

Based on her own research and data collected in several national studies, Dr. Drouin estimates that approximately one-third of young adults between the ages of 18 and 24 have sent messages containing sexually explicit visual depictions. Ex. D, Drouin Report at 5-6. Using U.S. census data, she estimates that approximately 10.2 million young adults have sexted. *Id.* Dr. Zimmerman estimates that, based on the results of his study, which have been substantiated by other national studies, between 9,201,626 and 4.6 million young adults have sent sexts and between 12,575,560 and 6.3 million young adults have received them. Ex. C, Zimmerman Report at 2.

It bears emphasizing that the estimates of Plaintiffs' experts focus on the number of individual adults who engage in sexting.  The actual body of expression comprised of the visual

depictions sent by these adults is actually far greater since many adults who sext do not simply send a single message in communicating with their partners.

The prevalence of sexting as an accepted sexual behavior in adult relationships is substantiated by a range of other evidence.  A Harris Interactive Poll commissioned by Lookout Mobile Security found that 32 % of 18- to 34-year-old men and 25% of 35- to 44-year-old women have sexted, that 1 in 10 people age 55 and older with smart phones said they also sexted, that 30 % of moms and dads with children under age 18 said they have sent or received explicit photos on their phones, and that 11 percent of Americans said they record explicit videos on their phones, including 18 percent of dads and 5 percent of moms.  Ex. E, Declaration of William Livingston (Livingston) at ¶ 70. Another study at Boise State reported that 60% of the students surveyed said that they had sent or posted a nude or semi-nude photo of themselves. *Id.* at ¶86.

Indeed, various cell phones applications have been marketed as a means to accommodate sexting. *Id.* at ¶¶72-74.  A popular national television ad campaign for Samsung referred (with a wink and a nod) to sexting as a marital practice in two commercials–one featuring a mother of young children and another featuring Mrs. Santa Claus– in which each wife suggested she had produced a spicy depiction on her cell phone as she bid good-bye to her husband who was departing for a trip away from home.  *Id.* at ¶81.[3]

---

[3]  Former Congressmen, FBI employees, and attorneys have gotten themselves in trouble as a result of their sexting activities.  Livingston at ¶84; *Disciplinary Counsel v. Detweiler,* 2013-Ohio-1747 (Ohio Sup. Ct., May 2, 2013). Sexting has made its way into other judicial proceedings as evidence of infidelity, *McLean v. Sullivan-McLean,* FA114049528S, 2013 WL 951370 (Conn. Super. Ct. Feb. 7, 2013), and as the basis of a defense in criminal proceedings, *Rudzavice v. State,* 10-12-00300-CR, 2013 WL 1188924 (Tex. App. Mar. 21, 2013). Private images created of sexual intimacies have also been the subject of proceedings prompted when an ex-partner uses them to seek revenge for a break-up. *Taylor v. Franko,* 2011 WL 2746714 (D. Hawaii) (July 12, 2011); *Voth v. Marsh,* Case No. 2009-L-009522, Circuit Court of Illinois County; *Jacobs v. Seay,* Case No. 13-

In addition to sexting, many couples create their own sexually explicit digital images of themselves in the bedroom or arrange or commission professional photographers to produce sexually explicit portraits for their own private use.  Ex. J, Deposition Transcript of Barbara Alper (Alper) at 22; Ex. T, Deposition Transcript of Steinberg (Steinberg) at 19-24; Ex. Q, Deposition Transcript of Barbara Nitke (Nitke) at 39, 45-46, 60-61,162-63; Ex. P, Deposition Transcript of Eugene Mopsik (Mopsik) at 39-40; Ex. V, Plaintiff Alper's Answers to Defendant's Second Set of Interrogatories, Interrogatory Nos. 15, 23 (g). Many of these couples decide to share their "do-it-yourself" productions with others on the internet–either by uploading them to adult tube sites or broadcasting their videos using a webcam. Ex. B, Declaration of Daniel Linz, Ph.D.  (Linz) at Report at ¶4.Couples also use webcams and other devices to engage in "cybersex" with one another at a distance. *Id.*; Ex. E, Livingston at ¶¶ 77, 79 -80, 85.

Daniel Linz, Ph.D., a tenured professor in the Department of Communications at the University of California, Santa Barbara, has identified various means of communication  that allow adults to produce, send, and receive non-commercial, private sexually explicit visual depictions.  Ex. B, Linz at Report at ¶4. Specifically, he found that the following media allow the production and communication of sexually explicit images: Facebook, Twitter, Instagram,  Imageboards (e.g., 4chan, Futaba Channel), Streaming video (e.g., Youtube, Vimeo, BlipTV, UStream), Private/sem-private/public forums, Image sharing services (e.g., imgur), Reddit, and Live streaming (e.g., Skype, private webcam, Openbroadcaster). *Id.*  at ¶4(1). Dr. Linz also explained that torrents, direct file sharing, private servers, dropbox, and personal email boxes can be used to share sexually

---

13626CA02, Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida; *Toups v. GoDaddy.com*, D130018-C, 260th Jud. Dist. Texas (class action).

candid images with other adults. *Id.* at ¶4(2).

Dr. Linz has expressed the opinion that "many millions of Americans exchange sex depictions and images by these means" as private citizens not engaged in an economic enterprise but simply "to share sexually explicit images with one another." *Id*. at ¶ 4 (3).

Millions of adults, including those who are in committed relationships, are members of online adult social networks through which they exchange sexually explicit photos and videos with one another as part of private sexual communication.  Ex. F, Declaration of Kristi Witsman (Witsman) at ¶4; Ex. E, Livingston at ¶¶3-23.

 In litigation involving a prior constitutional challenge to 18 U.S.C. § 2257, the government asked one of its computer forensic specialists, Kristi Witsman, to conduct a search of an adult social network website, adultfriendfinders.com., which described itself as the "World's Largest Sex and Swingers Personals Site."  Ex. F, Witsman at ¶ 1-2. Many of the personal ads contained sexually explicit photos. Ex. F, Witsman, Ex. C-E,.   Ms. Witsman's search, which was performed seven years ago, revealed that the website contained nearly 14 million personal ads. Ex. G, Stipulations Between the Parties Regarding Defendants' Ex. A-E and Plaintiffs' Rebuttal Exhibits 72 and 74, *Connection Distributing Co.,* (Doc. No. 134) at ¶3.

The popularity of these websites has grown exponentially since then.  Millions of adults visit or become members of adult social networks and dating sites for the purpose of meeting like-minded adults who share their views on sexuality. Ex. E, Livingston at ¶3 (Alt.com - 2,007,247 members); *id.* at ¶4 (AdultSpace.com - 24 million visits per month); *id.* at ¶7 (Iwantu.com- 21,165 visitors per month); *id.* at ¶8 (Upforit.com - 6.1 million visitors per month);  *id*. at ¶13 (HornyMatches.com - 11 million visits per month);*id.* at ¶ 15 (Ashley Madison - 18,845,000 members); *id.* at ¶16

(AdultFriendFinder.com - 110 million visits per month); *id.* at ¶18 (NaughtyConnect.com - 3,013,960 members); *id.* at ¶21 (Flirt.com - 3.5 million visits per month); *id.* at ¶22 (Adam4Adam.com - 3.2 million visitors per month); *id.* at ¶23 (Collarme.com - 8.1 million visits per month).   The messages they exchange with one another include sexually explicit images, made for no reason other than for private discourse–sans any commercial purpose. *See e.g.,* Ex. E, Livingston at Ex. 1-A.

All of the above-described private communications between adults are subject to the statutes' requirements.   Therefore, each person who sends a sext, creates a boudoir photo or video, or exchanges sexually explicit images on an adult social network website must maintain a copy of his or her photo identification together with a copy of his or her sexual imagery and must label the image with a statement listing the location of the records, namely, his or her home address.   And since private citizens do not "maintain at least 20 normal business hours per week" in the production of their images, someone who produces a sext or other private message with sexual imagery must provide notice to the inspecting agency of the hours–which must be at least 20 hours per week–during which the records are available for inspection.   Failure to do so is a crime.   Millions of Americans who share purely personal sexually explicit imagery with one another as part of their sexual lives are required, on pain of criminal prosecution, to comply with 18 U.S.C. §§ 2257, 2257A.

## B.    Sexual Expression Depicting Mature Adults

The objective advanced in support of the statutes by the government is the prevention of the production of sexually explicit expression using children.   To this end, their age verification requirements are designed to distinguish between underage teens who might appear to be adults and youthful looking adults who might appear to be underage. Ex. K, Deposition Transcript of Francis

9

Biro, M.D. (Biro) at 56 (age range of 14 to 25 captures "clearly most" people who would potentially be confused). The statutes, therefore, focus on a narrow segment of the population. Their extensive burdens are not necessary as applied to sexual expression depicting mature adults who could not be confused as minors. For, as the Third Circuit recognized, when the statutes' age verification requirements are applied to persons depicted who are obviously over the age of 18, they unconstitutionally burden protected speech.

A considerable body of sexually explicit expression depicts mature adults. Defendant's own expert, Dr. Francis Biro, an expert in pubertal maturation, testified that generally speaking, individuals who have reached the age of 25 cannot be confused as minors. Ex. K, Biro at 53. Various legislative and regulatory bodies have crafted legislation and regulations designed to protect minors that adopt that view. *See e.g.,* 21 CFR § 1140.14 (providing that no age verification is required for sale of tobacco products for any person over the age of 26); N.Y. Pub. Health Law § 1399-cc (McKinney) (providing that with regard to the sale of tobacco products, "identification need not be required of any individual who reasonably appears to be at least twenty-five years of age...."); Oregon Administrative Rule 845-006-0335 ("(a) ORS 471.130 requires a licensee or permittee to verify the age of a person who wants to buy or be served alcoholic beverages when there is 'any reasonable doubt' that the person is at least 21 years old. The Commission requires a licensee or permittee to verify the age of anyone who wants to drink alcoholic beverages, or is in an area prohibited to minors, if there is reasonable doubt that the person is at least 21 years old. 'Reasonable doubt' exists if the person appears to be under the age of 26.")

Data about the composition of U.S. population by age from the U.S. Census defines the narrow segment of the population at which the statutes are aimed and illustrates the substantial size

10

of the population that is unnecessarily burdened.[4]  U.S. Census data for 2010 indicates that a little more than 66% of the U.S. population (203,891,983 of 308,745,538) is 25 years of age or older, while 15 to 19 year olds constitute 7.14% of the U.S. population (22,040,343 of 308,745,538) and 20 to 24 year olds constitute 6.99% of the population (21,585,999 of 308,745,538).  Ex. H.

The amount of sexually explicit expression depicting adults who are 25 years old or older is massive.  Adding together the amount of sexually explicit sexts depicting adults over the age of 25, the amount of photos or videos created in the bedrooms depicting adults over the age of 25, the amount of sexual images depicting adults over the age of 25 exchanged on adult social networks and websites, the amount of sexually explicit fine art photography depicting adults over the age of 25, the amount of sexually explicit educational material depicting adults over the age of 25, and the amount of commercially produced adult films that depict adults over the age of 25, the quantity of expression unnecessarily burdened by the statutes is staggering.  Therefore, just like the statute in *Stevens*, the challenged statutes here extend far beyond their legitimate target; they burden a substantial amount of protected expression that in no way involves the sexual exploitation of children.

The expression produced by many of the Plaintiffs themselves provides a good representation of the body of sexual imagery depicting mature adults.[5]

Plaintiff Sinclair Institute produces materials developed by experts in sex education, research,

---

[4]  This Court may take judicial notice of U.S. Census data. Rule 201, Federal Rules of Evidence; *Chandler v. University of Pennsylvania,* __F. Supp.2d__, 2013 WL 754689, n.2 (E.D. Pa. 2013).

[5]  This is not to suggest that Plaintiffs produce absolutely no images of younger adults under the age of 25.  Those images are substantially outnumbered, however, by their work depicting models who are clearly and obviously adults.

11

therapy, and clinical practice to provide adults with advice on sexual health.  Ex. U, Deposition

Transcript of Linda Dian Wilson (Wilson) at 30. The Institute has received awards from numerous

organizations including The Society for the Scientific Study of Sexuality, National Council on

Family Relations, and International Health & Medical Media (Time, Inc. Health). Ex. Z, Plaintiff

Sinclair Institute's Answers to Defendant's First Set of Interrogatories, Interrogatory No. 7. The

majority of the persons appearing in the large library of Sinclair Institute's films are 30 years of age

or older and are obviously adults. Ex. Z,  Interrogatory No. 9. (Dr. Biro, Defendant's expert, agreed

that a reasonable person will not confuse a person who is 30 years old as a minor. Ex. K, Biro at 56.)

The same is true of the expression created by Plaintiffs Dodson, Ross, Queen, and Levine,

feminist sex educators who create important expression educating adult women and men about

sexual health and fulfilling sex lives.  The vast majority of performers in Ross and Dodson's DVD

series are more than 25 years old and include performers in their 40s and 60s. Ex. Y, Plaintiffs Ross

and Dodson's Answers to Defendant's First Set of Interrogatories, Interrogatory No. 9. The

participants in Queen's Masturbate-a-Thons, designed to raise awareness of masturbation, are mainly

in their 30s and 40s. Ex. R, Deposition Transcript of Carol Queen (Queen) at 30, 42. Levine's

webshows on sexual health and fulfillment feature herself (she is 54 years old) and other individuals

who are unmistakably adults. Ex. N, Deposition Transcript of Marie Levine (Levine) at 122.

In addition to expression created by Plaintiffs, the statutes burden similar material aimed at

sex education produced by others. Ex. E, Livingston at ¶27.

Plaintiffs Alper, Steinberg, Levingston, and Nitke are award-winning photographers whose

sexually explicit work depicting adults has been displayed in galleries, exhibits, and museums in the

United States and internationally. Ex. V, Plaintiff Alper's Answers to Defendant's First Set of

12

Interrogatories, Interrogatory No. 5.; Ex. AA, Plaintiff Steinberg's Answers to Defendant's First Set

of Interrogatories, Interrogatory No. 6.; Ex. X, Plaintiff Levingston's Answers to Defendant's First

Set of Interrogatories, Interrogatory No. 5; Ex. Q, Nitke, Ex. 12. The great majority of their models

are well over the age of 25.  The majority of David Steinberg's models are between the ages of 36

and 45 with many others who are older. *See* Ex. AA, Plaintiff Steinberg's Answers to Defendant's

First Set of Interrogatories, Interrogatory No. 9.  Most of the subjects of Barbara Nitke's work are

in their 30s or 40s or older.  Ex. Q, Nitke at 140.  Many of Dave Levingston's nude models are in

their 30s and 40s or older and are mature adults. Ex. O, Deposition Transcript of David Levingston

(Levingston) at 30, 213; Ex. DL 12. Each of these photographers has many thousands of sexually

explicit photographs of their mature models. Ex. Q, Nitke at 168-69; Ex. O, Levingston at 205; Ex.

AA, Plaintiff Steinberg's Answers to Defendant's First Set of Interrogatories, Interrogatory No. 9.

Other artistic sexually explicit expression that depicts clearly mature adults and is subject to

the statutes' burdens includes an array of erotic fine art and social commentary. Ex. E,  Livingston

at ¶¶24-44.

Indeed, even commercial producers of adult material produce a number of productions that

depict obviously mature adults.  Ex. B, Linz at Appendix B; Ex. S, Deposition Transcript of Carlin

Ross (Ross) at 38-39 (most searched sex term in the United States is "MILF").

Documentaries, news reports, pictorials, and films based on true events depict sexually

explicit conduct as part of important political and social commentary.  They are, nonetheless, subject

to 18 U.S.C. §§ 2257, 2257A's criminal prohibitions.  Examples include documentaries, new reports,

pictorials, and films on Abu Ghraib, Ex. E, Livingston at ¶¶ 45-47, 64-66 ; on rape, *id.* at ¶¶ 54,57,

69-70; on sexual abuse as part of the atrocities of war, *id.* at ¶¶49, 50, 52, 53, 56, 58-61, 68; and

female genital mutilation. *Id.* at ¶67.

A substantial and diverse amount of constitutionally protected expression falls within the statutes' sweep.  When all is taken into account, the extent of the statutes' overbreadth is fatal to their constitutionality.

## II.   THE CHALLENGED STATUTES AND REGULATIONS ARE UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT.

Plaintiffs challenged the inspection regime established by the statutes and regulations under the Fourth Amendment.  The statutes  provide: "Any person to whom subsection (a) applies shall maintain the records required by this section at his business premises, or at such other place as the Attorney General may by regulation prescribe and shall make such records available to the Attorney General for inspection at all reasonable times."  18 U.S.C. §§ 2257 (c), 2257A (c).

The regulations implementing the statutes provide that "investigators authorized by the Attorney General" are authorized to enter the premises of any producer "without delay" and without advance notice "for the purpose of determining compliance with the record-keeping provisions of the Act and any other provision of the Act...." 28 C.F.R. § 75.5 (a), (b). They provide that the inspections are to take place during normal business hours or any other time that the producer "is actually conducting business relating to producing a depiction of actual sexually explicit conduct." *Id.* at § 75.5 (c).  If the producer does not maintain at least 20 normal business hours per week, the regulations require him or her to provide notice to the inspecting agency the hours during which the records will be available for inspection, which in no case may be less than 20 hours per week. *Id.*

The regulations further provide that the investigator may copy any record that is subject to inspection. *Id.* at § 75.5 (e).  They do not restrict otherwise lawful investigative prerogatives and

expressly authorize law enforcement officers to seize any evidence of the commission of a felony while conducting an inspection. *Id.* at § 75.5 (f), (g).

Refusal to permit an inspection is punishable by a term of imprisonment.  18 U.S.C. §§ 2257 (f)(5), 2257A (f)(5).

Under the statutes and regulations, a government investigator is authorized to enter the homes, offices, and studios of persons who produce sexual imagery to inspect the records required to be maintained: (1) without probable cause to believe that a crime has been committed, (2) without a warrant, (3) without delay, and (4) without advance notice.  A person who receives a knock on the door by an investigator must let him into his home, office, or studio or face criminal prosecution under the statutes. Once the person lets the investigator inside, he must further allow the investigator to search through the personal identification documents of the people appearing in his expression, other documents with personal information about them  as well as copies of the expression itself, and must permit the investigator to make copies of those documents. Again, refusal to allow the investigator to search through these documents is a criminal offense punishable by a term of imprisonment.

A. **The Warrantless Searches Authorized by the Statutes and Regulations Violate the Fourth Amendment.**

The Third Circuit remanded Plaintiffs' Fourth Amendment claim for development of a factual record.  The court wrote:

> The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S. Const. amend. IV. "If the search is reasonable, there is no constitutional problem, for the Fourth Amendment only protects individuals from unreasonable searches and seizures." *United States v. Sczubelek*, 402 F.3d 175, 182 (3d Cir.2005). It is well settled that the Fourth Amendment's scope extends beyond criminal investigations

and protects against certain arbitrary and invasive acts by the government. *See, e.g., City of Ontario v. Quon*,_U.S._, 130 S.Ct. 2619, 2627, 177 L.Ed.2d 216 (2010).

There are two ways in which the government's conduct may constitute a "search" implicating the Fourth Amendment. First, a Fourth Amendment search occurs when "the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (citations and quotation marks omitted); *see also Kyllo v. United States*, 533 U.S. 27, 32-33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) ("[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."); *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied ... and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment."). Determining whether one's expectation of privacy is justifiable involves two separate inquiries: (1) whether the individual demonstrated an actual or subjective expectation of privacy in the subject of the search or seizure; and (2) whether this expectation of privacy is objectively justifiable under the circumstances. *Smith*, 442 U.S. at 740, 99 S.Ct. 2577 (quotation marks omitted); *Katz,* 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring); *United States v. Ferri*, 778 F.2d 985, 994 (3d Cir.1985).

Second, as the Supreme Court's recent decision in [*United States v. ] Jones,* makes clear, a Fourth Amendment search also occurs where the government unlawfully, physically occupies private property for the purpose of obtaining information. See 132 S.Ct. [945] at 949-52 [(2012)](stating that the reasonable-expectation-of-privacy test set forth in *Katz* was "***added to***, not ***substituted for***, the common-law trespassory test") (emphasis in original). Under this analysis, we must determine whether the government committed common-law trespass when obtaining the information. *See Jones*, 132 S.Ct. at 949-52; *see also Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (explaining the common-law-trespass test employed prior to *Katz* ). If such a trespass occurs, then the government's actions constitute a search implicating the Fourth Amendment. *See Jones*, 132 S.Ct. at 949-52.

Here, the District Court erred in dismissing Plaintiffs' Fourth Amendment claim, as sought to be amended. Courts generally must consider the concrete factual context when determining the constitutional validity of a warrantless search. *See Sibron v. New York*, 392 U.S. 40, 59, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (declining to hold whether a particular statute was facially invalid under the Fourth Amendment because the "constitutional validity of a warrantless search is preeminently the sort of question which can only be decided in the concrete factual context of the individual case"); *United States ex rel. McArthur v. Rundle*, 402 F.2d 701, 704-05 (3d Cir.1968) (stating that in the case of warrantless searches, courts are required to

consider the concrete factual context); *see also United States v. $291,828.00 in United States Currency*, 536 F.3d 1234, 1238 (11th Cir.2008). Plaintiffs' complaint, as amended, would allege that government officials searched and/or seized without a warrant– and in violation of the Fourth Amendment– the premises and effects of certain FSC members and others. The record, however, is not clear as to: which specific members of FSC were searched; when and where the searches of the FSC members and others occurred (i.e., offices or homes); and the conduct of the government during the search (*e.g.*, what specific information the government reviewed and whether the government exceeded its authority under the applicable regulations).

This factual context is necessary for determining whether the government's conduct was a "search" under the Fourth Amendment pursuant to either the reasonable-expectation-of-privacy test set forth in *Katz* or the common-law-trespass test described in *Jones*. As to the *Katz* analysis, we cannot conclude on this record whether plaintiffs have an objective expectation of privacy in the searched areas and effects unless the contours of the alleged searches are more fully delineated. Likewise, an analysis under *Jones* would benefit from a more developed record because the court must conclude whether a common-law trespass occurred during any of the alleged searches, which is traditionally a fact-intensive inquiry

*Free Speech Coalition,* 677 F.3d at 542-44.

The factual record regarding the inspections conducted under the statutes and regulations demonstrates that they violate the Fourth Amendment.

In 2006, Charles Joyner, a Supervising Special Agent of the FBI, was assigned the task of setting up an inspection program under 18 U.S.C. § 2257. Ex. I, Redacted Deposition Transcript of Charles Joyner (Joyner) at 9. He familiarized himself with the statute and regulations and set up the policy and training to implement the inspection program. *Id.*

The first inspection took place on July 24, 2006. *Id.* at 181.  Twenty-eight additional inspections followed between August 1, 2006 and September 19, 2007.  *Id.* at 14-15, 226, 210.  Two of the 29 inspections were re-inspections of producers whose records were deficient. *Id.* at 166-67, 232.  Agent Joyner explained that it was his understanding that the inspection program was to

17

continue indefinitely, with the goal of having an inspection conducted every two weeks. *Id.* at 265.

All but one of the inspections occurred after July 27, 2006, the effective date of the current versions of 18 U.S.C. §§ 2257, 2257A to which Congress added the provision criminalizing the refusal to permit an inspection of records. 18 U.S.C. §§ 2257 (f)(5), 2257A (f)(5).  Therefore, 28 of the 29 inspections were conducted under the current version of the statutes.   The regulation governing inspections, 28 C.F.R. § 75.5,  then in effect, was identical in all material respects to the current regulation. Ex. I, Joyner at 22-23; Ex. A.

Of the 27 producers who were searched, 12 were members of the Free Speech Coalition at the time of their inspection. Ex. W, Free Speech Coalition's Answers to Defendant's Second Set of Interrogatories, No. 19; Ex. I, Joyner at 83, 97, 124, 146, 181, 188, 207, 218, 224, 241, 250, 261. Four producers who were inspected are currently members. Ex. M, Deposition Transcript of Jeffrey Douglas (Douglas) at 48-49, 52.

All 29 inspections were conducted without a search warrant and without probable cause to believe that a crime had been committed. Ex. I, Joyner at 42-43. The agents entered six private residences to perform inspections of 2257 records, *id.* at 119-21, 144-48, 205-06, 208-09, 210-11, 254-55, as well as private areas of  business premises to which the general public was not given access–private offices, filing cabinets, employee break rooms, locked file rooms– to perform the inspections.  *Id.* at 77-78, 89-94, 108-111, 126-30, 135-38, 158-60, 163-65, 168-70, 172-75, 185-87, 190-91, 193-94, 199-201, 221-23, 228-32, 243-44, 252-53, 263-64.  In two instances, the agents gained access to private storage facilities that had been rented by the producers to store the records and to which the public did not have access. *Id.* at 180-81, 239-41.

With the exception of one or two inspections, a team of between three and seven agents

appeared at the home or office of the producer without advance notice. *Id.* at 58, 120, 43, 100 .

When the agents arrived, they presented the producer (with a few exceptions) with a letter advising

him or her that the FBI was conducting an inspection of records to insure compliance with 18 U.S.C.

§ 2257, that the statute required the producer to make such records available at all reasonable times,

that violations of the statute were subject to criminal penalties, that the FBI was authorized to enter

the premises without delay, and that it was a criminal violation to delay or obstruct the FBI from

conducting the inspection. *Id.* at 37-39, 183.

Before beginning the inspections, the FBI took photographs of the exterior of the premises

and various interior areas documenting where the records were maintained and where the agents

examined the records. *Id.* at 70.   These photographs show that the FBI entered personal offices,

employee break rooms, office conference rooms and studios. *Id.* at 77-78, 89-94, 108-111, 126-30,

135-38, 158-60, 163-65, 168-70, 172-75, 185-87, 190-91, 193-94, 199-201, 221-23, 228-32, 243-44,

252-53, 263-64.   The agents gained access to locked rooms where the records, which included

private information about the performers depicted, were stored as well as closed file cabinets. *Id.* at

93-94, 192, 200. The photos taken during record inspections at residences capture home offices, file

cabinets, a dining room table, *id.* at 123, and the inside of an attached garage. *Id.* at 208-09.[6]

After taking photos of the inspection site, the agents examined the producer's 2257 records.

The FBI either searched through the producer's records and removed those it wished to examine or

told the custodian of records which records it wanted to examine and had him or her pull out the

records and bring them to the inspection team. Ex. I, Joyner at 75.   The team of agents examined the

---

[6] The photos, contained in Ex. BB, amply demonstrate that the agents occupied private areas for the purpose of gathering information.  *Free Speech Coalition*, 677 F.3d at 543.

19

records and completed an on-site inspection review. *Id.* at 81-82. For many inspections, the team of agents was on the premises for more than five or six hours. *Id.* at 126, 158, 162, 184, 195, 228. During each of the inspections, the agents made copies of all of the 2257 records for the items that they had selected with a portable copy machine. *Id.* at 88.  At the end of the inspection, the agents took a photo of the area where the records were examined. *Id.* at 73, 108.

If, as a result of the inspection, the agents found violations of 18 U.S.C. § 2257, they would provide a copy of their findings to the owner or custodian of records and give him or her  a week to rectify the deficiencies.  *Id.* at 111.  Any actions the producer took to correct the violations were noted in the 2257 inspection report. *Id.* A week or two after the inspection, the report of the violation would be sent to the Department of Justice for determination of whether a prosecution should be initiated. *Id.*

Agent Joyner admitted repeatedly that if it were not for the authority to inspect under 18 U.S.C. § 2257 and its implementing regulations, an FBI agent, acting in his or her official capacity, would have needed a search warrant to gain entrance to the homes and private areas of the businesses where the agents had performed record inspections, in the absence of voluntary consent or exigent circumstances. *Id.* at 79-80, 95, 109-10, 123-24, 129-30, 140-41, 159-60, 164-65, 169-70, 175, 181, 187, 194, 201, 206, 210, 215, 222-23, 231-32, 235, 240-41, 244-45, 253, 260-61, 264.

Agent Joyner also admitted repeatedly that if it were not for the authority to inspect under 18 U.S.C. § 2257 and its implementing regulations, an FBI agent, acting in his or her official capacity, would have needed a search warrant to permit him or her to examine the producer's filing cabinets and business records, in the absence of voluntary consent or exigent circumstances. *Id.* at 77-78, 96, 109-10, 124, 130, 138, 141, 159-60, 165, 170, 175, 187, 206, 210, 215-16, 223, 232, 244-

20

45, 253, 260-61, 264.

Agent Joyner further acknowledged that if, in his or her official capacity, an FBI agent wanted to enter a residence or private areas of a business in the absence of voluntary consent or exigent circumstances, he or she would have needed probable cause to secure a search warrant, if it were not for the authority conferred by 18 U.S.C. § 2257 and its implementing regulations. *Id.* at 123-24.   And an agent would likewise have needed probable cause to examine someone's records located on the premises if it were not for the authority conferred by 18 U.S.C. § 2257. *Id.* at 124, 131.

The record establishes that in conducting inspections under the statutes and regulations "for the purpose of determining compliance" with the statutes, FBI agents "physically occupied private property for the purpose of obtaining information." *Jones*, 132 S.Ct. at 949. The inspections, therefore, constituted searches under the Fourth Amendment–for the agents entered private homes[7] and private areas of businesses for the purpose of searching through the producers' records. *Florida v. Jardines,* 133 S.Ct. 1409, 1414 (2013); *Ray v. Township of Warren*, 626 F.3d 170, 175 (3d Cir. 2010); *G. M. Leasing Corp. v. United States,* 429 U.S. 338 (1977); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978); *Thomas v. Independence Tp.*, 463 F.3d 285, 296 (3d Cir. 2006).   They constituted a common law trespass as well as a violation of the producer's reasonable expectation of privacy in his or her home and private business areas and records to which the general public is not granted access.   And in each instance, the searches were conducted without probable cause and without a warrant. Ex. I, Joyner at 42-43.

Moreover, the agents' examination and copying of the producers' records and taking photos

---

[7] Three of the Plaintiffs have testified that they operate their businesses from their homes and maintain their 2257 records there.   Ex. L, Dodson at 27; Ex. T, Steinberg, at 30, 53;  Ex. Q, Nitke at 76.

while on those premises constituted a search and seizure under the Fourth Amendment. *Rakas v. Illinois,* 439 U.S. 128, 136 (1978); *G.M. Leasing*, 429 U.S. at 352-53; *United States v. Leary*, 846 F.2d 592, 596-97 (10th Cir. 1988); *Mancusi v. DeForte,* 392 U.S. 364, 369 (1968); *United States v. Jefferson*, 571 F. Supp. 2d 696, 703-04 (E.D. Va. 2008). *See also, Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 (1979). Again, this was all done without a warrant.

### B.     The Administrative Search Exception Does Not Apply.

Judge Rendell's concurring opinion in this case examined the administrative search exception and concluded that it did not apply. *Free Speech Coalition*, 677 F.3d at 548-50 (Rendell, J., concurring). The concurrence began:

> As a threshold matter, the statute and regulations must target businesses within a "pervasively regulated" industry to qualify for the exception. *See* [*Marshall v.* ] Barlow's, 436 U.S. [307] at 313, 98 S.Ct. 1816 [1978]]. Whether a particular industry satisfies that test depends on "'the pervasiveness and regularity of the federal regulation,'" the "effect of such regulation upon an owner's expectation of privacy," and "'the duration of a particular regulatory scheme.'" 482 U.S. 691, 701, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). Assuming the statute and regulations apply to a pervasively regulated industry, the warrantless inspections they authorize must satisfy three requirements to qualify as "reasonable" under the Fourth Amendment: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme'"; and (3) "'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" *Id*. at 702-03, 107 S.Ct. 2636 (alterations in original).

*Id.* at 548.

Evaluating these particular requirements, the concurrence concluded that the challenged statutes "do not target a 'pervasively regulated' industry" because "they are not directed at any industry at all" since they govern purely private conduct and images clandestinely traded over the internet as well as commercial pornography. *Id.* It went on to note that even if the statutes were

deemed to target the adult entertainment industry, there was no basis to conclude that the adult entertainment industry was one that was "pervasively regulated" in contrast to those types of industries involving junk yards, gun sales, or the transportation of hazardous materials that are subject to a panoply of health and safety regulations. *Id.*

Additionally, the concurrence concluded that the requirement that warrantless searches were necessary to further the statutes' purpose was not met either. *Id.* at 549. It explained that the statutes' provisions requiring producers to create and maintain records according to complicated indexing requirements "make it exceedingly unlikely that producers could fabricate and compile such records after the fact on short notice, as would be required to comply with a subpoena or warrant." *Id.* "Warrants," the concurrence wrote, "could issue on cause to believe that the producer is using child subjects in violation of the law based on appearance, as is always the case, or as part of 'an administrative plan containing specific neutral criteria.'" *Id.* at 550 (citations omitted).

The majority did not disagree with the concurrence's fundamental analysis of the administrative search exception here. Rather, it found that it "could not determine the applicability of the administrative search exception on the record before [it.]" *Id.* at 544. The appellate court noted that the "record is unclear" as to "frequency and extensiveness" of the searches, whether they "occurred exclusively on commercial premises," and whether those subject to the searches were "engaged in activities within a particular industry." *Id.* at 544-45. The majority wrote:

> We cannot agree with the concurrence's assertion that, at this time, we should conclude there is "no set of facts" that could justify the application of the administrative search exception. This matter is before us on a motion to dismiss under Rule 12(b)(6). The government has yet to file a responsive pleading, and the parties have not begun the discovery process. As discussed, *supra*, the parties must be allowed to develop the factual contours of their Fourth Amendment claims and defenses. Accordingly, we will not prejudge the validity of any claim or defense

23

prior to the creation of that record.

*Id.* at 545, n. 23.

The record is now complete, and there is **no** evidence to support the application of the administrative search exception.

As the majority and concurring opinions acknowledged, the threshold issue under the administrative search exception is whether the inspection procedures apply to a "closely regulated industry"–such that "regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan v. Dewey*, 452 U.S. 594, 600 (1981). (emphasis added).[8]

To begin, "the plain language of the Statutes makes clear that they apply to **all producers** of actual or simulated sexually explicit depictions regardless of whether those depictions were created for the purpose of sale or trade." *Free Speech Coalition*, 677 F.3d at 539. (emphasis added). The statutes require that **all** such producers "maintain the records" at their premises and "make such records available for inspection." 18 U.S.C. §§ 2257 (c), 2257A (c).  Therefore, photographers like Plaintiffs Barbara Nitke, Barbara Alper, David Steinberg, Dave Levingston, and members of the American Society of Media Photographers; sex educators like Plaintiffs Betty Dodson, Carlin Ross, Marie Levine, and Carol Queen;  journalists like Thomas Hymes, and private citizens who produce sexual imagery all are subject to record inspections under the statutes.  These producers are not part

---

[8]  See *United States v. 4,432 Mastercases of Cigarettes*, 448 F.3d 1168, 1176 (9th Cir. 2006) listing closely regulated industries subject to the warrantless administrative search exception: liquor distribution; sale of sporting weapons; stone quarrying and mining; automobile junkyards; veterinary drugs; transportation of hazardous materials.

of any particular industry–much less a closely regulated one.

Indeed, at least six of the records inspections occurred in people's **homes**.  Ex. I, Joyner at 119-21, 144-48, 205-06, 208-09, 210-11, 254-55.  Yet, the administrative search exception has been applied only to searches of **commercial premises** of closely regulated **industries**. *Donovan,* 452 U.S. at 600. At least one of the of the inspections was conducted of a producer who held another job and devoted less than 20 hours per week to the production of sexually explicit expression. Ex. I, Joyner at 255-57. Thus, it is clear that the inspection regime was not focused on a closely regulated industry, but was carried out in homes and subjected "part-timers" to warrantless searches of their records.

The concurrence's assessment is confirmed by the evidence:

At least two aspects of that analysis are problematic in this case. First, sections 2257 and 2257A do not target a "pervasively regulated" industry. Indeed, the statutes and their associated regulations are not specifically directed at any industry at all– as the majority properly concludes, they govern purely private conduct and sexually explicit images that are traded clandestinely and over the Internet, as well as commercially produced pornography. Maj. Op. 538-40. But even if we were to ignore that fact and assume, contrary to their plain language, that sections 2257 and 2257A do specifically target the adult-entertainment industry, I do not see how we could conclude that industry is "pervasively regulated" as the term has been applied.

The District Court relied on the "steadily strengthening web" of statutes enacted over the last thirty years to "protect[ ] children from sexual exploitation" to conclude that the adult-entertainment industry is "pervasively regulated." *Free Speech Coal., Inc. v. Holder*, 729 F.Supp.2d 691, 753 (E.D.Pa.2010). But the statutes to which it refers are general criminal prohibitions on the creation and distribution of child pornography; they are not specific regulations governing the way that commercial, adult pornographers conduct their business. *Cf. Frey v. Panza*, 621 F.2d 596, 598 (3d Cir.1980) (per curiam) (affirming application of administrative-search exception to warrantless inspections of houses under construction in part because the municipal building code under which the inspections were conducted "is directed specifically and exclusively at that one industry"). Moreover, as general, criminal statutes, they do not imply any diminution in an adult-entertainment producer's expectations of privacy. At the very least, the government has not shown, and it seems to me that it would be difficult for it to show, that the adult-entertainment industry is governed by the type of specific, extensive, and intrusive safety or health regulations that exist in

25

other industries–liquor distribution, gun sales, stone quarrying and mining, automobile junkyards, veterinary drugs, transportation of hazardous materials–that courts have deemed pervasively regulated for purposes of the administrative-search exception. *See United States v. 4,432 Mastercases of Cigarettes*, 448 F.3d 1168, 1176 (9th Cir.2006) (listing "closely regulated" industries subject to administrative-search exception).

*Id.* at 548-49 (Rendell, J., concurring).

Moreover, as the concurrence explained, the warrantless inspection regime was not necessary to carry out the statutes' purposes. The inspections themselves demonstrate that quite convincingly. Agent Joyner testified that if, as a result of the inspection, the agents found violations of 18 U.S.C. § 2257, they would provide a copy of their findings to the owner or custodian of records and give him or her a week to rectify the deficiencies. Ex. I, Joyner at 111. Any actions the producer took to correct the violations were noted in the 2257 inspection report. *Id.* A week or two after the inspection, the report of the violation would be sent to the Department of Justice for determination of whether a prosecution should be initiated. *Id.*

Again, the record fully supports the concurrence's determination that the administrative search exception does not apply:

> [T]he warrantless inspection regime created by sections 2257 and 2257A is not necessary to further the statutes' purpose. This is not a case where the government must conduct random, unannounced inspections of a business premises to ensure health and safety (as, for example, in the case of mine inspections, *see Donovan v. Dewey,* 452 U.S. 594, 603, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (noting the "notorious history of serious accidents and unhealthful working conditions" in the mining industry)). In fact, such inspections are not even needed to ensure compliance with the statutes. The District Court reasoned that a warrantless inspection program "encourages producers to follow the age-verification procedures regularly and in advance of the production of the depictions, and deters the possibility of fabrication or after-the-fact compilation of such information." *Free Speech Coalition*, 729 F.Supp.2d at 754. But the amount and nature of the information the statutes and regulations require producers to record (performers' names, dates of birth, and aliases; copies of the performers' identification; a copy of the depiction; and the date

of the original production of the depiction, see 18 U.S.C. §§ 2257(b), 2257A(b); 28 C.F.R. § 75.2(a)) and their complicated indexing requirements (records must be organized alphabetically by performer's name and indexed or cross referenced by the performers' aliases and the title of the production, see 28 C.F.R. § 75.2(a)(3)) make it exceedingly unlikely that producers could fabricate and compile such records after the fact on short notice, as would be required to comply with a subpoena or warrant.

*Free Speech Coalition,* 677 F.3d at 549 (Rendell, J., concurring).

The inspection regime violates the Fourth Amendment.

**CONCLUSION**

Plaintiffs respectfully request that this Court grant summary in their favor on their First Amendment facial overbreadth and Fourth Amendment claims.

Respectfully submitted,


Date: May 10, 2013
/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio  44113-1949
(216) 781-5245 / (216) 781-8207 (Facsimile)

KEVIN E. RAPHAEL (72673)
KER@Pietragallo.com
J. PETER SHINDEL, JR. (201554)
JPS@Pietragallo.com
PIETRAGALLO GORDON ALFANO BOSICK
 & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200 / (215) 981-0082 (Facsimile)

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2013, the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

The exhibits to Ex. E, Declaration of William Livingston were served on Kathryn L. Wyer, U.S. Department of Justice, Civil Division, via email (kathryn.wyer@usdoj.gov);  Hector Bladuell, U.S. Department of Justice, Civil Division, via email (hector.bladuell@usdoj.gov); James Schwartz, U.S. Department of Justice, Civil Division, via email (james.schwartz@usdoj.gov); and Nathan Swinton via email (nathan.m.swinton@usdoj.gov), counsel for Defendant , this 10th day of May, 2013.   A computer disk containing Ex. BB was served upon counsel for Defendant, Kathryn L. Wyer, Hector Bladuell, James Schwartz, and Nathan Swinton, U.S. Department of Justice, Civil Division, 20 Massachusetts Avenue, N.W., Room 7124, Washington, DC 20530, via Federal Express on this 10th day of May, 2013.

/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
LORRAINE R. BAUMGARDNER (0019642)
BERKMAN, GORDON, MURRAY & DeVAN

KEVIN E. RAPHAEL (72673)
J. PETER SHINDEL, JR. (201554)
PIETRAGALLO GORDON ALFANO BOSICK
 & RASPANTI, LLP

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREE SPEECH COALITION, INC., et al.** | ) | **CASE NO. 2:09-4607** |
| | ) | |
| Plaintiffs, | ) | **JUDGE MICHAEL M. BAYLSON** |
| | ) | |
| -vs- | ) | |
| | ) | **ORDER GRANTING PLAINTIFFS'** |
| **THE HONORABLE ERIC H. HOLDER, JR.,** | ) | **MOTION FOR SUMMARY JUDGMENT** |
| Attorney General, | ) | **ON THEIR FIRST AMENDMENT** |
| | ) | **OVERBREADTH AND FOURTH** |
| Defendant. | ) | **AMENDMENT CLAIMS** |
| | ) | |

AND NOW this ___ day of _____, 2013, upon consideration of Plaintiffs' Motion for Summary Judgment on Their First Amendment Overbreadth and Fourth Amendment Claims and the evidentiary materials in support, it is hereby **ORDERED** and **DECREED** that Plaintiffs' Motion for Summary Judgment on Their First Amendment Overbreadth and Fourth Amendment Claims is **GRANTED.**


_____

**HON. MICHAEL M. BAYLSON**