# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREE SPEECH COALITION, INC., et al.** | ) | **Civil Action No. 2:09-4607** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **JUDGE MICHAEL M. BAYLSON** |
| -vs- | ) | |
| | ) | |
| **THE HONORABLE ERIC H. HOLDER, JR.,** | ) | |
| Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR FIRST AMENDMENT FACIAL OVERBREADTH AND FOURTH AMENDMENT CLAIMS

J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio  44113-1949
(216) 781-5245
(216) 781-8207 (Facsimile)

KEVIN E. RAPHAEL (72673)
KER@Pietragallo.com
J. PETER SHINDEL, JR. (201554)
JPS@Pietragallo.com
PIETRAGALLO GORDON ALFANO BOSICK
     & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200
(215) 981-0082 (Facsimile)

Attorneys for Plaintiffs

**STATEMENT OF UNDISPUTED FACTS**

  Pursuant to C.1 of this Court's Pretrial and Trial Procedures-Civil Cases, Plaintiffs submit this Statement of Undisputed Facts in support of their Motion for Partial Summary Judgment on Overbreadth and Fourth Amendment Grounds.

**I. UNDISPUTED FACTS REGARDING REQUIREMENTS AND APPLICATION OF STATUTES AND REGULATIONS**

  1. The challenged statutes, 18 U.S.C. § 2257 and 18 U.S.C. § 2257A, and their implementing regulations, 28 C.F.R. § 75.1 *et seq.*, require anyone who produces sexually explicit visual depictions:

  (1) to obtain copies of government issued photo identification of the persons in the depictions, 18 U.S.C. §§ 2257(a), 2257A (a); 28 C.F.R. § 75.2; (a) (1);

  (2) to create records of all names, including maiden names and aliases, of the persons appearing in the depictions, 18 U.S.C. §§ 2257(b), 2257A (b); 28 C.F.R. § 75.2 (a)(2);

  (3) to maintain legible copies of the government identifications, copies of the depictions, all urls associated with the depictions, records of names and aliases of the persons in the depictions, and dates of their production, 18 U.S.C. §§ 2257(a),(b), (c), 2257A (a),(b), (c); 28 C.F.R. § 75.2 (a)(1),(2),(4);

  (4) to label the depictions with a statement, meeting certain specifications for the medium of the depiction, that identifies the address where the requisite records are maintained, 18 U.S.C. §§ 2257(e), 2257A (e); 28 C.F.R. § 75.6;

  (5) to maintain the records alphabetically and prepare and keep various indices and cross references of these records, by titles, legal names of the persons depicted and their aliases, 18 U.S.C. §§ 2257(b)(3), 2257A (b)(3); 28 C.F.R. §§ 75.2 (a)(3), (d), 75.3; and

2

(6) to allow government agents to enter, without advance notice, a warrant, or probable cause, the premises where the records are maintained–whether home, office or studio–to search the records and seize copies during normal business hours, or if the producer does not maintain normal business hours, to provide notice to the government of hours when the records will be available for inspection, which must be at least 20 hours per week, 18 U.S.C. §§ 2257(c), 2257A (c); 28 C.F.R. § 75.5.

2.        Secondary producers–persons who wish to publish or reproduce sexually explicit expression produced by others–must likewise comply with the statutes' requirements and regulations. 28 C.F.R. §§ 75.1 (c)(2).  Retailers are prohibited from distributing any expression that does not bear a label stating where the requisite records are located. 18 U.S.C. §§ 2257 (f)(4); 2257A (f)(4).

3.        A violation of these requirements is a criminal offense punishable by imprisonment. 18 U.S.C. § 2257 (f), (i); 18 U.S.C. § 2257A (f), (i). Ex. I, Redacted Deposition Transcript of Charles Joyner (Joyner) at 152.

4.        Between July 24, 2006 and September 19, 2007, the FBI conducted inspections of the records of 29 producers of sexually explicit expression pursuant to 18 U.S.C. §2257 to investigate compliance with the statute.  Ex. I, Joyner at 181, 210. Twelve of the 29 inspections were conducted of producers who, at the time of the inspection, were members of the Free Speech Coalition; of those twelve, four are current FSC members. Ex. W, Free Speech Coalition's Answers to Defendant's Second Set of Interrogatories, No. 19; Ex. I, Joyner at 83, 97, 124, 146, 181, 188, 207, 218, 224, 241, 250, 261; Ex. M, Deposition Transcript of Jeffrey Douglas (Douglas) at 48-49, 52.

3

5.      As a result of these inspections, the FBI reported a number of statutory violations to the Department of Justice.  Ex. I, Joyner at 111. The violations referred to the Department of Justice for potential prosecution included: (1)  failure to maintain an adequate or up-to-date cross-reference system,  *id.* at 66-67, 101, 134, 151, 198, 246, 251; (2) failure to maintain the records in alphabetical order, *id.* at 225; (3) failure to maintain an identification document of sufficient legibility,  *id.* at 101-02, 161, 167, 188, 211;  (4) failure to maintain an identification document on which the date of birth was readily determined (document used Buddhist calendar), *id.* at 224; (5) failure to display the 2257 compliance statement on a website for a sufficient duration to be read by an average viewer,  *id.* at 116-17; (6) failure to list the apartment number of the producer's condominium in the address listed in the 2257 compliance statement, *id.* at 203; and (7) failure to give notice of the hours when the records were available for inspection when the producer did not maintain at least 20 normal business hours, *id.* at 134, 257. Each of these violations constituted felonies under 18 U.S.C. § 2257 f(1), (i). Ex. I, Joyner at 30, 104, 118, 152.

## II.    UNDISPUTED FACTS RELEVANT TO PLAINTIFFS' OVERBREADTH CLAIM UNDER THE FIRST AMENDMENT

### A.    PRIVATE COMMUNICATIONS BETWEEN ADULTS CONTAINING SEXUALLY-EXPLICIT VISUAL DEPICTIONS

#### 1.    Sexting, Videos, Cybersex Between Private Citizens

6.      Millions of adults produce non-commercial, private messages containing sexually explicit visual depictions and send them to their spouses, partners, or lovers using cell phones and other mobile media–a practice commonly known as sexting. Ex. C, Declaration of Marc A. Zimmerman, Ph.D. (Zimmerman); Ex. D, Declaration of Michelle A. Drouin, Ph.D. (Drouin); Ex. B, Declaration of Daniel Linz, Ph.D.

7.      Michelle A. Drouin, Ph.D., Assistant Professor of Psychology, Indiana University-Purdue University, conducted a study examining the role of sexting in college students' romantic relationships.  Ex. D, Drouin at Report, Ex. A. The study involved 744 adult students[1] between the ages of 18 and 36 enrolled in an introductory psychology class, representing 48 majors, who had been in committed relationships. *Id.* at 446.   The participants in the study were questioned about the frequency with which they sent sexually explicit picture and video messages to their partners. *Id.* Of the 744 participants, 54% indicated that they had sent sexually explicit picture or video messages within their most significant committed relationship.  *Id.*

8.      In a follow-up study examining the frequency of sending different types of sexually-explicit picture and video messages among 253 adult college students conducted by Dr. Drouin, 49% of the participants in a committed relationship indicated that they had sent a sexually explicit picture or video message; 37% of the participants in a casual sexual relationship had sent a sexually explicit picture or video message to their casual sex partner; and 45% of the participants who reported having had a cheating relationship had sent a sexually explicit picture or video message to their cheating partner. Ex. D, Drouin at Report, Ex. B at 4.

9.      Based on her research as well as data collected in several national studies on sexting–specifically Associated Press & MTV (2009) "AP-MTV Digital abuse study," Ferguson (2011) "Sexting behavior among young Hispanic women," Gordon-Messer, et al, (2012) "Sexting among young adults," and National Campaign to Prevent Teen and Unplanned Pregnancy (2008) "Sex and Tech"– Dr. Drouin has expressed the opinion to a reasonable degree of scientific certainty

---

[1]  This number was culled from a larger sample of 878 students; those who were not in committed relationships were excluded.

that approximately one-third of young adults between the ages of 18 and 24 have sent messages containing sexually-explicit visual depictions, and that based on recent U.S. census data, approximately 10.2 million young adults have sent such messages. Ex. D, Drouin Report at 5-6.

10.     Marc A. Zimmerman, Ph.D., Chair of the Department of Health Behavior and Health Education, School of Public Health, University of Michigan, together with three colleagues at the University of Michigan, conducted a study examining sexting as part of the sexual behavior of young adults.  Ex. C, Zimmerman Report at1.  Of a weighted sample of 827 participants (from an original sample of 2,447), 30% of the participants had sent a sexually suggestive photo message of themselves through a cell phone or other media, while 41% of the participants had received such a message. *Id.* at 2.  Dr. Zimmerman's study found that sexting is normative sexual behavior in this age group. *Id.* at Ex. B, 4.

11.     Based on this study, the results of which were substantiated by other studies, Dr. Zimmerman, using U.S. census data, extrapolated the number of young adults between the ages of 18 and 24 who have sent a sext of themselves to be 9,201,626 and the number of young adults between these ages who have received a sext to be 12,575,560.  *Id.* at 2.  Even assuming an error of 50% in making such an extrapolation–a rate of error that Dr. Zimmerman finds unlikely–he estimates that the number of young adults between these ages who have sent sexts is 4.6 million and that the number of young adults in this age group who have received such messages is 6.3 million. *Id.* This estimate does not include the number of adults outside of the 18-24 age group that send sexually explicit images of themselves to a partner.

12.     Daniel Linz, Ph.D., a tenured professor in the Department of Communications at the University of California, Santa Barbara, has identified various means of communication  that allow

adults to produce, send, and receive non-commercial, private sexually explicit visual depictions. Ex. B, Declaration of Daniel Linz (Linz) at Report at ¶4. Specifically, he found that the following media allow the production and communication of sexually explicit images: Facebook, Twitter, Instagram, Imageboards (e.g., 4chan, Futaba Channel), Streaming video (e.g., Youtube, Vimeo, BlipTV, UStream), Private/sem-private/public forums, Image sharing services (e.g., imgur), Reddit, and Live streaming (e.g., Skype, private webcam, Openbroadcaster). *Id.*  at ¶4(1). Dr. Linz also explained that torrents, direct file sharing, private servers, dropbox, and personal email boxes can be used to share sexually candid images with other adults. *Id.* at ¶4(2).

13.    Dr. Linz has expressed the opinion that "many millions of Americans exchange sex depictions and images by these means" as private citizens not engage in economic enterprise but simply to share sexually explicit images with one another." *Id.*  at ¶ 4 (3).

14.    Other surveys and polls confirm the prevalence of sexting as a means of communicating sexual intimacy. Ex. E, Declaration of William C. Livingston (Livingston) at ¶¶ 70-87. *See e.g., Id.* at ¶70 ( Harris Interactive Poll commissioned by Lookout Mobile Security ("18- to 34-year-old men (32 percent) and 35- to 44-year-old women (25 percent)" have sexted,  "1 in 10 people age 55 and older with smartphones said they also sexted,"" 30 percent of moms and dads with children under age 18 also said they have sent or received explicit photos on their phones," "11 percent of Americans said they record explicit videos on their phones, including 18 percent of dads and 5 percent of moms"); *Id.* at ¶ 86 (Boise State Study, "Sexting and Sexual Relationships among Teens and Young Adults," (60% of students surveyed said they had  sent/posted a nude or semi-nude photo of themselves)).

15.    Various cell phone applications are marketed for sexting and serve as additional

evidence of its prevalence. Ex. E, Livingston at ¶¶ 72-74.

16.     A quarterly report of the FBI's Office of Professional Responsibility sent to all FBI employees on October 1, 2012 with summaries of adjudicated cases that was designed to "educate employees about the Bureau's standards of conduct and to aid employees in steering clear of ethical pitfalls and other violations" included reports of FBI employees using their cell phones and email accounts to send sexually explicit messages. Ex. E, Livingston at ¶84.

17.     Anecdotal evidence regarding sexting, media reports of sexting by public figures and reference to the practice in a popular national television advertising campaign likewise evidence the prevalence of sexting among U.S. adults. *See e.g., Disciplinary Counsel v. Detweiler,* 2013-Ohio-1747 (Ohio Sup. Ct., May 2, 2013) (attorney disciplined for sending sext to client); *McLean v. Sullivan-McLean*, FA114049528S, 2013 WL 951370 (Conn. Super. Ct. Feb. 7, 2013) (spouse's sexting behavior with another man as evidence of infidelity in dissolution proceedings); *Rudzavice v. State*, 10-12-00300-CR, 2013 WL 1188924 (Tex. App. Mar. 21, 2013) (complainant's sexting behavior as defense in prosecution for burglary); *Taylor v. Franko,* 2011 WL 2746714 (D. Hawaii) (July 12, 2011) (action against former boyfriend for posting private sexually explicit photos to internet); *Voth v. Marsh*, Case No. 2009-L-009522, Circuit Court of Illinois County (same); *Jacobs v. Seay,* Case No. 13-13626CA02, Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (same); *Toups v. GoDaddy.com*, D130018-C, 260th Jud. Dist. Texas (class action by 17 women for same) . Ex. E, Livingston at ¶71 (AARP article on sexting by older Americans); *Id*. at ¶78.

18.     In addition to sexting, a large number of adult Americans produce photographic portraits or videos of themselves engaged in sexually explicit conduct for their own use, many of

which are uploaded to tube sites and/or are displayed by amateur adult webcam sites. Ex. J, Deposition Transcript of Barbara Alper (Alper) at 22; Ex. B, Linz at Report at ¶4.

19.     Websites and devices are also available to allow couples to engage in "cybersex" which includes live-streaming sexually explicit visual images using computers. Ex. E, Livingston at ¶¶ 77, 79 -80, 85. *See Id.* at ¶85 (K. Daneback, *An Internet Study of Cybersex Participants*, 34 Archives of Sexual Behavior 321, 326 (2005) (finding "cybersex not to be primarily a 'singles' activity").

20.     All of the above-described private communications between adults are subject to the statutes' requirements.  Therefore, each person who creates a sexual image by any of these means must maintain a copy of her photo identification together with a copy of the image and must label her image with a statement listing the home address where these records are located.  And since she as a private citizen does not "maintain at least 20 normal business hours per week" in the production of these images, she must provide notice to the inspecting agency of the hours–which must be at least 20 hours per week–during which the records are available for inspection at her home.  Failure to do so is a crime.

### 2.     Adult Social Networking Websites

21.     Millions of adult Americans are members of adult social networking websites on which they exchange sexually explicit visual images with one another. *See* Ex. F, Declaration of Kristi Witsman (Witsman) at ¶4; Ex. E, Livingston at ¶¶3-23.

22.     In *Connection Distributing Co. v. Gonzales*, Case No. 95 CV 1993 (U.S.Dist. Ct. N.D. Ohio), Defendant produced the results of a search conducted by a government computer forensic specialist, Krisi Witsman, of a single adult social network website more than seven years

ago. Ex. F, Witsman at ¶¶ 1-2. Ms. Witsman accessed www.adultfriendfinders.com, a website that

described itself as the "World's Largest Sex and Swingers Personals Site." *Id.* at 2. She attached

the results of her searches to her Declaration filed in that case. *Id.* at ¶ 3. Many of the personal ads

included sexually explicit photos. Ex. F, Witsman, Ex. C-E.

 23.   The results of Ms. Witsman's search revealed that on August 25, 2005, the

adultfriendfinders' website contained 13,776,925 personal ads from persons in the United States.

Ex. G, Stipulations Between the Parties Regarding Defendants' Ex. A-E and Plaintiffs' Rebuttal

Exhibits 72 and 74, *Connection Distributing Co.,* (Doc. No. 134) at ¶3, attached. [2] Of those persons

placing personal ads on adultfriendfinders, between 94% and 98% were 21 years of age or older;

only 2 to 6% were between the ages of 18 and 20. *Id.* at ¶¶ 5-14. Adultfriendfinders.com currently

has 110 million visits per month to its website. Ex. E, Livingston at ¶16.

 24.   Currently, there are numerous adult dating websites and social networks on which

adults exchange a multitude of sexually explicit images with one another for non-commercial, purely

private purposes. Ex. E, Livingston at ¶3 (Alt.com - 2,007,247 members); *id.* at ¶4 (AdultSpace.com

-24 million visits per month); *id.* at ¶7 (Iwantu.com- 21,165 visitors per month); *id.* at ¶8

(Upforit.com - 6.1 million visitors per month); *id.* at ¶13 (HornyMatches.com - 11 million visits per

month);*id.* at ¶15 (Ashley Madison - 18, 845,000 members); *id.* at ¶16 (AdultFriendFinder.com -

110 million visits per month); *id.* at ¶18 (NaughtyConnect.com - 3,013,960 members); *id.* at ¶21

(Flirt.com - 3.5 million visits per month); *id.* at ¶22 (Adam4Adam.com - 3.2 million visitors per

month); *id.* at ¶23 (Collarme.com - 8.1 million visits per month).

 25.   Each person who includes a sexually explicit image as part of his communication

---

[2] The government stipulated to certain facts regarding Ms. Witsman's search results.

with fellow members of an adult social network or dating website must maintain a copy of his photo identification together with a copy of the image and must label his image with a statement listing the home address where these records are located.  And since as a private citizen, he does not "maintain at least 20 normal business hours per week" in the production of such expression, he must provide notice to the inspecting agency of the hours–which must be at least 20 hours per week–during which the records are available for inspection at his home.  Failure to do so is a crime.

### 3.      Private Sexually Explicit Portraits

26.      A substantial number of adults commission or arrange to have portraits produced of themselves engaged in sexually explicit conduct for their own private use.  Ex. T, Deposition Transcript of Steinberg (Steinberg) at 19-24; Ex. Q, Deposition Transcript of Nitke (Nitke) at 39, 45-46, 60-61,162-63;Ex. V, Plaintiff Alper's Answers to Defendant's Second Set of Interrogatories, Interrogatory Nos. 15, 23 (g).  Plaintiffs Nitke and Steinberg have produced  thousands of photographic images of mature adults in sexually explicit conduct taken at the request of the individuals portrayed in the photos. Ex. Q, Nitke at 167-69; Ex. T, Steinberg at 20.  All of these images are subject to the statutes' recordkeeping, labeling, and inspection requirements.

### B.      EXPRESSION DEPICTING MATURE ADULTS

27.      Plaintiff Sinclair Institute produces sex education material for "people who may have problems because of their health" and "people who may lack information about healthy sexual relationships among adults." Ex. U, Deposition Transcript of Linda Dian Wilson (Wilson) at 30. Its materials are developed by experts in sex education, research, therapy, and clinical practice, *id.* at 30-31 and have received awards from numerous organizations including The Society for the Scientific Study of Sexuality, National Council on Family Relations, and International Health &

Medical Media (Time, Inc. Health). Ex. Z, Plaintiff Sinclair Institute's Answers to Defendant's First

Set of Interrogatories, Interrogatory No. 7. The majority of the persons appearing in Sinclair

Institute's films are 30 years of age or older. *Id.,* Interrogatory No. 9. Each film in Sinclair Institute's

catalogue is reviewed by a professional reviewer who evaluates whether it meets the standards set

by Sinclair's panel of professional sex educators and therapists. Ex. U, Wilson at 60-61.

28.     Plaintiff s Betty Dodson and Carlin Ross operate a website designed to provide sex

positive education. Ex. S, Deposition Transcript of Carlin Ross (Ross) at 16, 21.  Specifically,

Dodson and Ross focus on "women understanding their bodies and how to stimulate their bodies and

appreciate their bodies" as part of feminist sex education. *Id.* at 21. In addition, they have produced

a series of sex education DVDs that contain sexually explicit visual depictions. *Id.* at 25. The

majority of performers in their DVDs are over the age of 25 and range up to age 60. Ex. Y, Plaintiffs

Ross and Dodson's Answers to Defendant's First Set of Interrogatories, Interrogatory No. 9. The

website includes a genital art gallery.  Ex. S, Ross at 49.  Ross and Dodson have traveled the world

as sex educators and have found that the "number-one issue people have that keeps them from

having good sex, which is about intimacy and relationships, is genital shame." *Id.* at 53-54.  The

genital art gallery is designed to remove "the fig leaf." Ex. L, Deposition Transcript of Betty Dodson

at 18. People posted photos of their genitals accompanied by essays about their sex life and sexual

development; they wrote about being married, having children, and sex post pregnancy.  Ex. S, Ross

at 49.  Prior to the amendment to 18 U.S.C. § 2257 which applied its requirements to the lascivious

display of the genitals, the genital art gallery had hundreds of images.  Ex. L, Dodson at 19. Some

of the images had graying pubic hair. Ex. S, Ross at 49.  After the law's amendment, the genital art

gallery was vastly reduced because people refused to provide photo identification as a condition of

posting their images Ex. L, Dodson at 19-20.  The project has come to a halt. *Id.* at 20.

29.     Plaintiff Carol Queen is also a feminist sex educator who founded the Center for Sex and Culture.  Ex. R, Deposition Transcript of Carol Queen (Queen) at 16. As part of Queen's educational mission regarding sexual health, including masturbation, she has organized Masturbate-a-Thons, which are designed to raise awareness of masturbation and to communicate about the sexology of masturbation. *Id.* at 30. The event is confined to adults and mainly attracts adults in their 30s and 40s with some participants in their 60s and 70s. *Id.* at 42.  The Masturbate-a-Thons have attracted interest from media all over the world. *Id.* at 36, 39.  The event is livestreamed on the internet. *Id.* at 31-32.

30.     Plaintiff Marie Levine produces webcam shows that are available for viewing on her website, Nina.com. Ex. N, Deposition Transcript of Marie Levine (Levine) at 60. She holds a bachelors degree in nursing, *id.* at 7 and has appeared in adult films as well as sex education videos, including a 38-volume series by Adam and Eve. *Id.* at 63-64. In her webcam shows, Ms. Levine, who is 54 years old, presents important lessons on sexual health with other individuals who are also unmistakably adults. *Id.* at 122.

31.     Plaintiffs Steinberg, Levingston, Nitke, and Alper all produce artistic expression depicting mature adults who could not be mistaken as children.  Barbara Alper's work has been purchased by the New York Public Library for their collection. Ex. V, Plaintiff Alper's Answers to Defendant's First Set of Interrogatories, Interrogatory No. 5. Her work has been exhibited and written about nationally and internationally, most recently in Sydney, Australia in a show called "Night Vision." *Id.*   David Steinberg was named 2010 Erotic Photographer of the Year by the Leydig Trust (London), and was honored as one of five inaugural Masters of Erotic Art by the

13

Seattle Erotic Art Festival in June 2012). Ex. AA, Plaintiff Steinberg's Answers to Defendant's First Set of Interrogatories, Interrogatory No. 6. Dave Levingston's work has been  displayed at the Kinsey Institute and is featured on a number of websites. Ex. X, Plaintiff Levingston's Answers to Defendant's First Set of Interrogatories, Interrogatory No. 5. Barbara Nitke's work has been exhibited in galleries throughout the United States as well as internationally; she is a member of the faculty of the School of Visual Arts, New York. Ex. Q, Nitke, Ex. 12. The vast majority of their models are adults who are 25 years or older. *See* Ex. AA, Plaintiff Steinberg's Answers to Defendant's First Set of Interrogatories, Interrogatory No. 9 (majority of models between the ages of 36 and 45); Nitke at 140 (most models in their 30s and 40s and older); Ex. O, Levingston at 30, 213 (works with many models in their 30s, 40s and older); Ex. DL 12.  Each of these photographers has many thousands of sexually explicit photographs. Ex. Q, Nitke at 168-69; Ex. O, Levingston at 205; Ex. AA, Plaintiff Steinberg's Answers to Defendant's First Set of Interrogatories, Interrogatory No. 9.

32.     Other examples of artistic expression depicting adults who cannot be confused as children include an array of erotic fine art and social commentary. Ex. E, Livingston at ¶¶ 24-45. The images depict the human body in a variety of contexts  as well as persons engaged in sexual conduct.

33.     Numerous documentaries and pictorials addressing important social and political issues contain sexually explicit visual depictions. Among them are documentaries and pictorials on Abu Ghraib, on rape, on wartime sexual abuse, and genital mutilation. Ex. E., Livingston at ¶¶46-69.

34.     Dr. Linz has expressed the opinion that "the vast majority of pornographic material in the commercial domain involves persons that any law officer would conclude is an adult." Ex.

14

B, Linz Report at 6, ¶3.  He concludes that "the quantity of sexually explicit expression depicting persons who are not obviously adults vs. the quantity of sexually explicit expression depicting persons who are obviously adults is very small." *Id.* at 6, ¶4.

35.     Defendant's expert, Dr. Francis Biro, an expert in pubertal maturation, testified that once someone achieves the age of 25, generally speaking, a reasonable person looking at that person would not confuse him or her as a minor. Ex. K, Deposition Transcript of Francis Biro, M.D. (Biro) at 53.  Moreover, he agreed that a reasonable person will not confuse someone who is 30 years old or above as a minor. *Id.* Dr. Biro also agreed that the age range that captures most people for which there might be some confusion as to whether they are an adult or a minor is between the ages of 14 and 25. *Id.* at 56.

36.     U.S. Census data for 2010 indicates that a little more than 66% of the U.S. population (203,891,983 of 308,745,538) is 25 years of age or older. Ex. H. Moreover, that data indicates that 15 to 19 year olds constitute 7.14% of the U.S. population (22,040,343 of 308,745,538) while 20 to 24 year olds constitute 6.99% of the population (21,585,999 of 308,745,538). *Id.*

## III.   UNDISPUTED FACTS RELATED TO PLAINTIFFS' FOURTH AMENDMENT CLAIM

37.     Title 18 U.S.C. §§ 2257 (c), 2257A (c)  provide: "Any person to whom subsection (a) applies shall maintain the records required by this section at his business premises, or at such other place as the Attorney General may by regulation prescribe and shall make such records available to the Attorney General for inspection at all reasonable times."  Refusal to permit an inspection is punishable by a term of imprisonment.  18 U.S.C. §§ 2257 (f)(5), 2257A (f)(5).  The current version of the statutes took effect on July 27, 2006.

38.     The regulations implementing 18 U.S.C. § 2257 and 18 U.S.C. § 2257A set forth the following provisions governing record inspections under the statute, effective as of December 18, 2008:

§ 75.5   Inspection of records.

(a) Authority to inspect. Investigators authorized by the Attorney General (hereinafter "investigators") are authorized to enter without delay and at reasonable times any establishment of a producer where records under § 75.2 are maintained to inspect during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, for the purpose of determining compliance with the record-keeping requirements of the Act and any other provision of the Act (hereinafter "investigator").

(b) Advance notice of inspections. Advance notice of record inspections shall not be given.

(c) Conduct of inspections. (1) Inspections shall take place during normal business hours and at such places as specified in § 75.4. For the purpose of this part, "normal business hours" are from 9 a.m. to 5 p.m., local time, Monday through Friday, or, for inspections to be held at the place of business of a producer, any other time during which the producer is actually conducting business relating to producing a depiction of actual sexually explicit conduct. To the extent that the producer does not maintain at least 20 normal business hours per week, the producer must provide notice to the inspecting agency of the hours during which records will be available for inspection, which in no case may be less than 20 hours per week.

(2) Upon commencing an inspection, the investigator shall:

(i) Present his or her credentials to the owner, operator, or agent in charge of the establishment;

(ii) Explain the nature and purpose of the inspection, including the limited nature of the records inspection, and the records required to be kept by the Act and this part; and

(iii) Indicate the scope of the specific inspection and the records that he or she wishes to inspect.

(3) The inspections shall be conducted so as not to unreasonably disrupt the operations of the establishment.

16

(4) At the conclusion of an inspection, the investigator may informally advise the producer or his non-employee custodian of records of any apparent violations disclosed by the inspection. The producer or non-employee custodian or records may bring to the attention of the investigator any pertinent information regarding the records inspected or any other relevant matter.

(d) Frequency of inspections. Records may be inspected once during any four-month period, unless there is a reasonable suspicion to believe that a violation of this part has occurred, in which case an additional inspection or inspections may be conducted before the four-month period has expired.

(e) Copies of records. An investigator may copy, at no expense to the producer or to his non-employee custodian of records, during the inspection, any record that is subject to inspection.

(f) Other law enforcement authority. These regulations do not restrict the otherwise lawful investigative prerogatives of an investigator while conducting an inspection.

(g) Seizure of evidence. Notwithstanding any provision of this part or any other regulation, a law enforcement officer may seize any evidence of the commission of any felony while conducting an inspection.

[Order No. 2765-2005, 70 FR 29619, May 24, 2005, as amended at 73 FR 77470, Dec. 18, 2008]

39.     The prior version of 28 C.F.R. § 75.5, effective May 24, 2005, was identical in every material respect, save for a small number of non-substantive changes in wording.[3] Ex. I, Joyner at

---

[3] The prior version of 28 C.F.R. § 75.5 read:

§ 75.5 Inspection of records.

(a) Authority to inspect. Investigators authorized by the Attorney General (hereinafter ''investigators'') are authorized to enter without delay and at reasonable times any establishment of a producer where records under § 75.2 are maintained to inspect during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, for the purpose of determining compliance with the record-keeping requirements of the Act and any other provision of the Act (hereinafter ''investigator'').

(b) Advance notice of inspections. Advance notice of record inspections shall not be given.

(c) Conduct of inspections.

(1) Inspections shall take place during the producer's normal business hours and at such places as specified in § 75.4. For the purpose of this part, ''normal business hours'' are from 9 a.m. to 5 p.m., local time, Monday through Friday, or any other time during which the producer is actually conducting business relating to producing depiction of actual sexually explicit conduct. To the extent that the producer does not maintain at least 20 normal business hours per week, producers must provide notice to the inspecting agency of the hours during which records will be available for inspection, which in no case may be less than twenty (20) hours per week.

(2) Upon commencing an inspection, the investigator shall:

(i) Present his or her credentials to the owner, operator, or agent in charge of the establishment;

(ii) Explain the nature and purpose of the inspection, including the limited nature of the records inspection, and the records required to be kept by the Act

and this part; and

(iii) Indicate the scope of the specific inspection and the records that he or she wishes to inspect.

(3) The inspections shall be conducted so as not to unreasonably disrupt the operations of the producer's establishment.

(4) At the conclusion of an inspection, the investigator may informally advise the producer of any apparent violations disclosed by the inspection. The producer may bring to the attention of the investigator any pertinent information regarding the records inspected or any other relevant matter.

(d) Frequency of inspections. A producer may be inspected once during any four-month period, unless there is a reasonable suspicion to believe that a violation of this part has occurred, in which case an additional inspection or inspections may be conducted before the four-month period has expired.

(e) Copies of records. An investigator may copy, at no expense to the producer, during the inspection, any record that is subject to inspection.

(f) Other law enforcement authority. These regulations do not restrict the otherwise lawful investigative prerogatives of an investigator while conducting an inspection.

(g) Seizure of evidence. Notwithstanding any provision of this part or any other regulation,

18

22-23.  A comparison of the current regulations with the prior regulation is attached to Plaintiffs'

Motion for Summary Judgment as Ex. A .

40.     In 2006, Charles Joyner, a Supervising Special Agent of the FBI, was assigned the

task of setting up an inspection program under 18 U.S.C. § 2257. Ex. I, Joyner at 9.  He familiarized

himself with the statute and regulations and set up the policy and training to implement the

inspection program. *Id.*

41.     Agent Joyner acknowledged that in performing the inspections under 18 U.S.C. §

2257, he and the other individuals conducting the inspections were authorized to enter the premises

of a producer of sexually explicit expression without delay, without a warrant, and  without probable

cause to believe that any crime had been committed. *Id.* at 25.  In fact, the regulation directed that

"advance notice shall not be given." *Id.* at 25-26.  He also acknowledged that refusal to permit the

inspection constituted a felony.  *Id.* at 18.

42.     The first inspection took place on July 24, 2006. *Id.* at 181.  Twenty-eight additional

inspections followed between August 1, 2006 and September 19, 2007.  *Id.* at 14-15, 226, 210.  All

but one of the 29 inspections took place after the July 27, 2006 effective date of the current versions

of 18 U.S.C. § 2257 and 18 U.S.C. § 2257A.

43.     Agent Joyner explained that it was his understanding that the inspection program was

to continue indefinitely, with the goal of having an inspection conducted every two weeks. *Id.* at

265.

_____

a law enforcement officer may seize any evidence of the commission of any felony while
conducting an inspection.

44.     For the most part, the inspections followed the same protocol, which will be detailed more fully below.  All 29 inspections were conducted without a search warrant and without probable cause to believe that a crime had been committed. *Id.* at 42-43. The agents entered six private residences to perform inspections of 2257 records, *id.* at 119-21, 144-48, 205-06, 208-09, 210-11, 254-55 as well as private areas of  business premises to which the general public was not given access–private offices, office filing cabinets, employee break rooms, locked file rooms– to perform the inspections. *Id.* at 77-78, 89-94, 108-111, 126-30, 135-38, 158-60, 163-65, 168-70, 172-75, 185-87, 190-91, 193-94, 199-201, 221-23, 228-32, 243-44, 252-53, 263-64.  In two instances, the agents gained access to private storage facilities that had been rented by the producers to store the records and to which the public did not have access. *Id.* at 180-81, 239-41.

45.     Of the 27 producers who were searched, 12 were members of the Free Speech Coalition at the time of their inspection. Ex. W, Free Speech Coalition's Answers to Defendant's Second Set of Interrogatories, No. 19; Ex. I, Joyner at 83, 97, 124, 146, 181, 188, 207, 218, 224, 241, 250, 261. Four producers who were inspected are currently members.  Ex. M, Douglas at 48-49, 52.

46.     Initially, producers of sexually explicit expression were selected by a computer program employing a random number generator. Ex. I, Joyner at 56-57.  Agent Joyner  then ordered merchandise from the randomly selected producers.  *Id.* A team of independent contractors, who were retired FBI agents, examined the materials to determine if they fell under 18 U.S.C. § 2257.  *Id.* at 40, 57. The contract agents prepared a list of titles and performers that served as the basis for inspecting the producer's 2257 records. *Id.* at 57.

47.     A team of six or seven agents conducted the inspections in California. *Id.* at 58.

The inspection teams in Florida consisted of three or four agents. *Id.* at 120.

48.     With the exception of one or two inspections, the team of agents appeared at the home or office of the producer without advance notice. *Id.* at 43, 100.  When the agents arrived, they presented the producer (with a few exceptions) with a letter advising him or her that the FBI was conducting an inspection of records to insure compliance with 18 U.S.C. § 2257, that the statute required the producer to make such records available at all reasonable times, that violations of the statute were subject to criminal penalties, that the FBI was authorized to enter the premises without delay, and that it was a criminal violation to delay or obstruct the FBI from conducting the inspection. *Id.* at 37-39.

49.     Before beginning the inspections, the FBI took photographs of the exterior of the premises and various interior areas documenting where the records were maintained and where the agents examined the records. *Id.* at 70.   These photographs show that the FBI entered personal offices, employee break rooms, office conference rooms and studios. *See e.g. Id.* at 78, 91-92, 127-28, 129, 137, 172-73, 174,132-33, 200; Ex. BB, Inspection Report Photos (Photos). The agents gained access to locked rooms where the records, which included private information about the performers depicted, were stored as well as closed file cabinets. *Id.* at 93-94, 192, 200. The photos taken during record inspections at residences capture home offices, file cabinets, a dining room table, *id.* at 123, and the inside of an attached garage. *Id.* at 208-09; Ex. BB, Photos.

50.     After taking photos of the inspection site, the agents examined the producer's 2257 records.  The FBI either searched through the producer's records and removed those it wished to examine or told the custodian of records which records it wanted to examine and had him or her pull out the records and bring them to the inspection team. Ex. I, Joyner at 75.  The team of

21

agents examined the records and completed an on-site inspection review. *Id.* at 81-82. For many

inspections, the team of agents was on the premises for more than five or six hours. *Id.* at 126,

158, 162, 184, 195, 228.  During each of the inspections, the agents made copies of all of the

2257 records for the items that they had selected with a portable copy machine. *Id.* at 88.  At the

end of the inspection, the agents took a photo of the area where the records were examined. *Id.*

at 73, 108.

     51.    If, as a result of the inspection, the agents found violations of 18 U.S.C. § 2257,

they would provide a copy of their findings to the owner or custodian of records and give him or

her  a week to rectify the deficiencies.  *Id.* at 111.  Any actions the producer took to correct the

violations were noted in the 2257 inspection report. *Id.* A week or two after the inspection, the

report of the violation would be sent to the Department of Justice for determination of whether

a prosecution should be initiated. *Id.*

     52.    One of the inspection reports reflects that during the inspection the agents learned

that many of the performers in the producer's movies were U.S. military personnel. Ex. I,  Joyner

at 133.  The FBI contacted the United States Naval Criminal Investigation Services who advised

the agents that such conduct would be a violation of the Uniform Code of Military Justice. *Id.* The

report indicates that the FBI was continuing its liaison with NCIS regarding those as well as other

criminal violations. *Id.*

     53.    Agent Joyner admitted repeatedly that if it were not for the authority to inspect set

forth in 18 U.S.C. § 2257 and its implementing regulations, an FBI agent, acting in his or her

official capacity, would need a search warrant to gain entrance to the homes and private areas of

the businesses where the agents had performed record inspections, in the absence of voluntary

consent or exigent circumstances. *Id.* at 79-80, 95, 109-10, 123-24, 129-30, 140-41, 159-60, 164-65, 169-70, 175, 181, 187, 194, 201, 206, 210, 215, 222-23, 231-32, 235, 240-41, 244-45, 253, 260-61, 264.

54.     Agent Joyner also admitted repeatedly that if it were not for the authority to inspect  set forth in 18 U.S.C. § 2257 and its implementing regulations, an FBI agent, acting in his or her official capacity, would need a search warrant to permit him or her to examine the producer's business records, in the absence of voluntary consent or exigent circumstances. *Id.* at 77-78, 96, 109-10, 124, 130, 138, 141, 159-60, 165, 170, 175, 187, 206, 210, 215-16, 223, 232, 244-45, 253, 260-61, 264.

55.     Agent Joyner further acknowledged that if, in his or her official capacity, an FBI agent wanted to enter a residence or private areas of a business in the absence of voluntary consent or exigent circumstances, he or she would need probable cause to secure a search warrant, if it were not for the authority set forth in 18 U.S.C. § 2257 and its implementing regulations. *Id.* at 123-24,   And an agent would likewise need probable cause to examine someone's records located on the premises. *Id.* at 124, 131.

56.      None of the inspections– which involved entry into private homes and private office areas, involved examining records containing personal information about performers, and involved copying those records–were conducted pursuant to a search warrant. *Id.* at 42-43.

57.     In the course of the inspections, the agents sought records for nearly 2,500 performers.  Among those records, the agents found what they believed to be a single underage performer. *Id.* at 225.  After referral to the Department of Justice, it declined to prosecute. *Id.* at 227.

58.     The inspections were halted when a panel of the Sixth Circuit struck down the statute and regulations as unconstitutional–although Joyner continued to order material for review in connection with 18 U.S.C. § 2257. *Id.* at 266.  The last inspection took place on September 19, 2007. *Id.* at 210.

                                    Respectfully submitted,

Date: May 10, 2013                  /s/ J. Michael Murray_____

                                    J. MICHAEL MURRAY (0019626)
                                    jmmurray@bgmdlaw.com
                                    LORRAINE R. BAUMGARDNER (0019642)
                                    lbaumgardner@bgmdlaw.com
                                    BERKMAN, GORDON, MURRAY & DeVAN
                                    55 Public Square, Suite 2200
                                    Cleveland, Ohio  44113-1949
                                    (216) 781-5245 / (216) 781-8207 (Facsimile)

                                    KEVIN E. RAPHAEL (72673)
                                    KER@Pietragallo.com
                                    J. PETER SHINDEL, JR. (201554)
                                    JPS@Pietragallo.com
                                    PIETRAGALLO GORDON ALFANO BOSICK
                                     & RASPANTI, LLP
                                    1818 Market Street, Suite 3402
                                    Philadelphia, Pennsylvania 19103
                                    (215) 320-6200 / (215) 981-0082 (Facsimile)

                                     Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2013, the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
LORRAINE R. BAUMGARDNER (0019642)
BERKMAN, GORDON, MURRAY & DeVAN

KEVIN E. RAPHAEL (72673)
J. PETER SHINDEL, JR. (201554)
PIETRAGALLO GORDON ALFANO BOSICK
 & RASPANTI, LLP

Attorneys for Plaintiffs