# In The Matter Of:

*Free Speech Coalition, Inc., et al  vs.*
*The Honorable Eric H. Holder, Jr.*

---

*SSA Charles Joyner*
*April 12, 2013*

---

*CONTINENTAL COURT REPORTERS, INC.-Houston*
*2777 Allen Parkway, Suite 600*
*Houston, Texas  77019-2166*
*(713) 522-5080  |  (800) 779-6981*
*www.TexasDepos.com*



COPY

Original File 130412CJ_ts.txt
Min-U-Script® with Word Index

Free Speech Coalition, Inc., et al vs.                                              SSA Charles Joyner
The Honorable Eric H. Holder, Jr.                                                       April 12, 2013

---

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
   FREE SPEECH COALITION,         *
3  INC., et al,                   *
                                  *
4       Plaintiffs,               *   CASE NO. 2:09-4607
                                  *
5  vs.                            *   JUDGE MICHAEL M. BAYLSON
                                  *
6  THE HONORABLE ERIC H.          *
   HOLDER, JR., Attorney          *
7  General.                       *
                                  *
8       Defendant.                *

9  *****************************************************

10              ORAL DEPOSITION

11              SSA CHARLES JOYNER

12              APRIL 12, 2013

13 *****************************************************

14

15       ORAL DEPOSITION of SSA CHARLES JOYNER,

16 produced as a witness at the instance of the

17 Plaintiffs, and duly sworn, was taken in the

18 above-styled and numbered cause on the 12th day of

19 April, 2013, from 8:58 a.m. to 4:11 p.m. before me,

20 Jodi Wells, CSR, in and for the State of Texas,

21 reported by machine shorthand, at the U.S. Attorney's

22 Office, 1000 Louisiana, Suite 2300, Houston, Texas

23 77002, pursuant to Notice and the Federal Rules of

24 Civil Procedure and the provisions stated on the

25 record attached hereto.
```

Page 2

```
1                  APPEARANCES

2

3  FOR THE PLAINTIFFS:

4       Mr. J. Michael Murray
        BERKMAN, GORDON, MURRAY & DEVAN
5       55 Public Square, Suite 2200
        Cleveland, Ohio 44113-1949
6       Telephone:  (216)781-5245
        Facsimile:  (216)781-8207
7
8  FOR THE DEFENDANT:

9       Ms. Kathryn L. Wyer
        U.S. Department of Justice, Civil Division
10      20 Massachusetts Avenue Northwest
        Washington, D.C. 20001
11      Telephone:  (202)616-8475
        Facsimile:  (202)616-8470
12
        and
13
        Mr. David M. Samonds
14      U.S. Department of Justice
        Civil Litigation Unit
15      935 Pennsylvania Avenue Northwest
        Room PA-400
16      Washington, D.C. 20535
        Telephone:  (202)220-9308
17      Facsimile:  (202)220-9341
18
19
20
21
22
23
24
25
```

Page 3

```
1                      INDEX

2  Appearances                                        2
   Stipulations                                       1
3
4  SSA CHARLES JOYNER

5       Examination by Mr. Murray                     6
        Examination by Ms. Wyer                     267
6       Further Examination by Mr. Murray           268

7

8  Changes and Signature                           275

9  Reporter's Certificate                          277

10

11                    EXHIBITS

12 No.    Description                              Page

13  1     Regulatory Inspection Report of
          The Agency 8/20/2007                        6
14
    2     Regulatory Inspection Report of
15        Bacchus Video Releasing, Inc.
          6/19/2007                                    6
16
    3     Regulatory Inspection Report of
17        Darkside Entertainment 9/12/2006             6

18  4     Regulatory Inspection Report of
          A. Lords Productions, LLC 9/17/2007          6
19
    5     Regulatory Inspection Report of
20        All Good Video 8/16/2006                     6

21  6     Regulatory Inspection Report of
          Angry Young Man 3/27/2007                    6
22
    7     Regulatory Inspection Report of
23        Shooting Star Video 8/22/2007                6

24  8     Regulatory Inspection Report of
          Candid Cam Productions 9/18/2007             6
25
```

Page 4

```
1   9     Regulatory Inspection Report of
          Cinema Play Entertainment
2         6/27/2007                                    6

3  10     Regulatory Inspection Report of
          Darkside Entertainment 4/9/2007              6
4
   11     Regulatory Inspection Report of
5         Dead Men Hanging Productions
          3/13/2007                                    6
6
   12     Regulatory Inspection Report of
7         Diabolic Video Production 7/24/2006          6

8  13     Regulatory Inspection Report of
          Don Goo Enterprises 5/22/2007                6
9
   14     Regulatory Inspection Report of
10        Erotic Angel 12/19/2006                      6

11 15     Regulatory Inspection Report of
          Evasive Angles 9/27/2006                     6
12
   16     Regulatory Inspection Report of
13        Ghost Pro Productions, Inc.
          9/18/2007                                    6
14
   17     Regulatory Inspection Report of
15        Gentlemen's Video 7/19/2007                  6

16 18     Regulatory Inspection Report of
          Real Wild Girls (RWG) Media, Inc.
17        9/17/2007                                    6

18 19     Regulatory Inspection Report of
          Moonlight Entertainment 5/3/2007             6
19
   20     Regulatory Inspection Report of
20        Pony Boy Films 9/19/2007                     6

21 21     Regulatory Inspection Report of
          Private 11/6/2006                            6
22
   22     Regulatory Inspection Report of
23        Robert Hill Releasing Company
          8/1/2006                                     6
24
25
```

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 5

| 1 | 23 | Regulatory Inspection Report of |  |
| 2 |  | Robert Hill Releasing Company 3/21/2007 | 6 |
| 3 | 24 | Regulatory Inspection Report of |  |
| 4 |  | Silver Star 9/11/2006 | 6 |
| 5 | 25 | Regulatory Inspection Report of Shane's World Studios 5/7/2007 | 6 |
| 6 | 26 | Regulatory Inspection Report of |  |
| 7 |  | Temptations 8/2/2007 | 6 |
| 8 | 27 | Regulatory Inspection Report of Tennervision 10/10/2006 | 6 |
| 9 | 28 | Regulatory Inspection Report of JT |  |
| 10 |  | Video 5/31/2007 | 6 |
| 11 | 29 | Regulatory Inspection Report of Wicked Pictures 1/24/2007 | 6 |
| 12 | 30 | 145C-LA-245111 Authentic Supplement |  |
| 13 | 31 | 145C-LA-245111 Pictures | 6 |
| 14 | 32 | FBI letter to Bacchus dated June 19, |  |
| 15 |  | 2007 | 6 |
| 16 | 33 | FBI letter to Gentlemen's Video dated July 19, 2007 | 6 |
| 17 | 34 | FBI letter to Moonlight |  |
| 18 |  | Entertainment dated March 21, 2007 | 6 |
| 19 | 39 | Section 2257 Record keeping requirements, 18 USCA Section 2257 | 6 |
| 20 | 41 | Code of Federal Regulations 28 Part |  |
| 21 |  | 43 to End as of July 1, 2005 | 6 |
| 22 | 42 | Electronic Code of Federal Regulations, Part 75 | 6 |
| 23 | 44 | Title 18 - Crimes and Criminal |  |
| 24 |  | Procedure, Section 2257, pages 467 through 469 | 6 |
| 25 |  |  |  |

Page 6

(08:58-08:59)

1 (Exhibit Nos. 1 through 44 premarked)

2 SSA CHARLES JOYNER,

3 having been duly sworn, testified as follows:

4 **EXAMINATION**

5 **BY MR. MURRAY:**

6 Q. Would you please state your full name and

7 address for the record, sir?

8 A. Charles R. Joyner, J-O-Y-N-E-R, address P.O.

9 Box 571073, Houston, Texas 77257.

10 Q. Now, Agent Joyner, I'm going to ask you a

11 series of questions and I'm going to do the best I can

12 to make them clear and understandable.

13 A. I'm no longer an agent.

14 Q. That's all right. I think you're entitled --

15 A. Oh, okay.

16 Q. -- to the respect of that title still.

17 A. Thank you.

18 Q. And I'm going to try to make my questions

19 clear and understandable. Can I have your agreement,

20 however, that if you do not understand one of my

21 questions you will bring that to my attention?

22 A. Yes, sir.

23 Q. Thank you. The next request I have of you is

24 to make sure that all your answers are verbal rather

25 than gestures so that our court reporter can record

Page 7

(08:59-09:00)

1 it. Is that agreeable?

2 A. Yes, sir.

3 Q. And the last request I have of you is: I will

4 do the best I can to wait for you to complete your

5 answer before I begin another question. Could I have

6 your agreement that you will make sure to do your best

7 to wait for me to complete my question before you

8 begin your answer?

9 A. I will.

10 Q. Okay. Thank you. And if you need a break at

11 any time, just let us know.

12 A. Okay.

13 Q. Now, tell us what your current occupation is.

14 A. I'm retired. So, I'm self-employed.

15 Q. Okay. In what kind of business?

16 A. I do -- I wrote a book. I do consulting, and

17 I also do training.

18 Q. Okay. Just, generally speaking, what kind of

19 consulting and training do you do?

20 A. Primarily for law enforcement on use of force

21 and liability or excessive force cases.

22 Q. Okay. Are you an expert witness from time to

23 time in court cases?

24 A. Yes. I could be.

25 Q. Okay. Good. Okay. So when did you retire

Page 8

(09:00-09:01)

1 from the Government service?

2 A. October of 2011.

3 Q. And, briefly, why don't you tell me what your

4 career was in the Government, what assignments?

5 A. With the FBI?

6 Q. Well, even before that. Where did you start

7 out?

8 A. With the Federal Government, I started with

9 the CIA.

10 Q. Okay.

11 A. That was 1983 to 1987. I joined the FBI in

12 1987 and was assigned to Los Angeles primarily working

13 violent crimes. Later I was on the SWAT team. I then

14 became a full-time firearms instructor, later the

15 principal firearms instructor, which meant I was in

16 charge of all the firearms defensive tactics, chemical

17 agent training.

18 After that I became a supervisor over training

19 and the critical incident programs. And critical

20 incident programs are SWAT, bomb techs, HazMat, WMD.

21 From there I became the supervisor over the 2257

22 program.

23 Q. Okay. And, so, how many years did you spend

24 in the FBI? From '87 to '11? Is that what you're

25 saying?

Min-U-Script®

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 9

(09:01-09:02)

1 A.  Yes, sir.
2 Q.  Okay.  So, in 2006, where were you stationed
3   when this program began?
4 A.  In Los Angeles.
5 Q.  And what was your assignment before this
6   program?  Just general duties?
7 A.  I was a supervisor over training in the
8   critical incident programs.
9 Q.  Okay.  And tell me how you got involved in
10   2006 in the 2257 inspection program.
11 A.  The FBI was told to set up an inspection
12   program, and I was tasked with doing that.
13 Q.  So you were the one in charge of putting the
14   program together?
15 A.  Initially there were two supervisors that were
16   named to start the program.  The other supervisor had
17   other duties that he couldn't get away with -- get
18   away from.  So I was primarily responsible for setting
19   up the training and the policy and the buildings and
20   the supplies, and then later they advertised for a
21   second supervisor to come in.
22 Q.  And who did that end up being?
23 A.  Steve Lawrence.
24 Q.  And he was a Supervising Special Agent as
25   well?

Page 10

(09:02-09:04)

1 A.  Yes, sir.
2 Q.  And when did he come on-board approximately?
3 A.  I don't remember.  We started, I believe, in
4   May of 2006.  I think he came on-board, I'm guessing,
5   November, December 2006, but I'm not certain.
6 Q.  Okay.  Now, as a consequence of being assigned
7   to put this program together, you needed to
8   familiarize yourself with 2257 and its implementing
9   regulations, did you not?
10 A.  Yes, sir.
11 Q.  Okay.  And I want to show you what has been
12   marked as Plaintiff's Exhibit 44.
13   MS. WYER:  Could I have a copy?
14   MR. MURRAY:  You know, I do have an extra
15   copy of this.  I don't have an extra copy of these
16   though.  I could only bring the original and one, but
17   you have all those.
18   MS. WYER:  Well, not with me.
19 Q.  (By Mr. Murray)  Plaintiff's Exhibit 44,
20   you're familiar with that, are you not?
21 A.  I recognize it as being a 2257 statement.
22 Q.  Okay.  If you go to the second page of that
23   exhibit, you will see that this is 2257 as it existed
24   on April 30, 2003.  Do you see that?
25 A.  I don't.

Page 11

(09:04-09:05)

1 Q.  (Indicating)
2 A.  Okay.
3   MS. WYER:  Objection.
4 Q.  (By Mr. Murray)  So this statute requires
5   every producer of books, magazines, periodicals,
6   films, videotapes or other matter to create records,
7   correct, if they contain sexual images that are actual
8   sexually explicit conduct?
9 A.  Okay.
10 Q.  Is that your understanding of the statute?
11 A.  Yes, sir.
12 Q.  Okay.  And it requires the producer to collect
13   IDs from any performers in films or other media that
14   has sexually explicit conduct, correct?
15 A.  Yes, sir.
16 Q.  It requires them to maintain the records,
17   correct?
18 A.  Yes, sir.
19 Q.  To maintain them by title and name of
20   performer, correct?
21 A.  Yes, sir.
22 Q.  Cross-index them as well, correct?
23 A.  Yes, sir.
24 Q.  Okay.  It also requires them to put a label on
25   the book, the film, or in the case of a computer web

Page 12

(09:05-09:06)

1   site on the web site, correct?
2 A.  That's correct.
3 Q.  Okay.  And it also requires them to make
4   records available to the Attorney General or his
5   designee at any reasonable time, correct?
6 A.  Yes, sir.
7 Q.  Okay.  Now, do you know whether this was the
8   statute that was in effect at the time that you began
9   putting together the program, this version of the
10   statute?
11 A.  I don't know.  I do know that at the time I
12   had downloaded a copy that, I believe, was dated 2006
13   or 2007.
14 Q.  Okay.  Let me show you then what has been
15   marked as Plaintiff's Exhibit 39, and you will see
16   that this is the version of 18 USC Section 2257 that
17   was effective as of July 27, 2006; is that correct?
18 A.  Yes, sir.
19   MS. WYER:  Objection.  No source is
20   identified for where this document came from.
21   MR. MURRAY:  Well, if you look at the
22   bottom, it came from Westlaw.
23   MS. WYER:  I can't read it.
24   MR. MURRAY:  Okay.
25 Q.  (By Mr. Murray)  Well, anyway, does this look

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 13

(09:06-09:08)

1   like 2257 to you, Agent?  If you want to read it,
2   that's fine if need be in order to authenticate that
3   this is the actual statute that was amended as of July
4   27, 2006.
5   **A.  It does look like it's portions of it.  It**
6   **looks a little thin, but yes.**
7   Q.  Well, tell me what you think is missing from
8   2257.
9   **A.  It doesn't seem to be as complete as the**
10  **previous version.  So I don't know if this is just**
11  **some revisions or not.**
12  Q.  Well, take a look at it because it's important
13  to make sure that we agree that this is the statute
14  that was in effect as of July 27, 2006.
15  **A.  Okay.  It seems to be in a different format,**
16  **but it seems to be the same document.**
17  Q.  Okay.  Now, I will tell you that this is the
18  current statute just so that we're on the same page.
19  I will represent to you that --
20  **A.  July 27, 2006.**
21  Q.  Yes.  As a matter of fact, you know that the
22  Adam Walsh Act was the act by which the 2257 was last
23  amended, at least in terms of when you were in
24  service, correct?
25  **A.  I don't know if that was the last correction**

Page 14

(09:08-09:09)

1   **or last amendment.**
2   Q.  Okay.  The July 27, 2006 version of the
3   statute which is the current statute is the --
4   **A.  Okay.**
5   Q.  -- is the version that you acted pursuant to
6   with respect to all but one of the 29 inspections that
7   you carried out; isn't that true?
8       **MS. WYER:** Objection.  Objection;
9   misleading.
10  Q.  (By Mr. Murray)  You can answer.  She makes
11  objections for the record; but unless she instructs
12  you not to answer the question --
13  **A.  Okay.  Could you repeat the question, please?**
14  Q.  Yes.  You had a program by which you carried
15  out a certain number of inspections pursuant to 2257
16  and its implementing regulations; isn't that true?
17  **A.  That's correct.**
18  Q.  And you put together that program and you
19  ultimately were in charge of what led to a total of 29
20  inspections; isn't that true?
21  **A.  In terms of the number that we did, I don't**
22  **remember, but that sounds correct.**
23  Q.  Okay.
24  **A.  Yes.**
25  Q.  Approximately 29?

Page 15

(09:09-09:10)

1   **A.  Yes, sir.**
2   Q.  Okay.  And you did that pursuant to the
3   authority of 2257 and the implementing regulations
4   that were in existence at the time that you carried
5   out those duties, correct?
6   **A.  Yes, sir.**
7   Q.  Okay.  And the first of those inspections
8   occurred on July 24, 2006.  Does that sound right to
9   you?  And we'll go through these.
10  **A.  Okay.  I do recall the first one was in**
11  **July --**
12  Q.  Okay.
13  **A.  -- 2006.**
14  Q.  Every other inspection occurred, did it not,
15  after July 27, 2006?
16  **A.  I don't know the time period between the first**
17  **inspection and the second inspection.  I don't**
18  **remember that.**
19  Q.  Okay.  Well, we'll go through that.
20  **A.  Okay.**
21  Q.  In any case, whatever version of the statute
22  was in effect at the time that you carried out those
23  duties was the one that you were acting pursuant?
24      **MS. WYER:** Objection.  Calls for a legal
25  conclusion.

Page 16

(09:10-09:11)

1   Q.  (By Mr. Murray)  Is that correct?
2       **MS. WYER:** The witness is not a lawyer
3   and does not know all of the details of that kind
4   of --
5       **MR. MURRAY:** Are you going to make
6   speaking objections throughout this deposition?  You
7   can make your objection, and you can either instruct
8   him not to answer or let him answer; but you're not
9   entitled to tell him the answer to give through a
10  speaking objection.
11  **A.  Could you repeat the question, please?**
12  Q.  (By Mr. Murray)  Sure.  You acted in
13  connection with this program pursuant to a statute
14  known as 18 USC 2257, correct?
15  **A.  Yes, sir.**
16  Q.  And the regulations that implemented that
17  statute, correct?
18  **A.  Yes, sir.**
19  Q.  And you read and studied that statute and
20  those regulations, did you not, at the time that you
21  put this program together?
22  **A.  Yes, sir.**
23  Q.  And you familiarized yourself with those --
24  that statute and those regulations so that you could
25  act in accordance with them; isn't that true?

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 17

(09:11-09:12)

1  A.  Yes, sir.
2  Q.  Now, you will see that -- if you go to the
3  second page of Plaintiff's Exhibit 39, you will see
4  that under (f)(5) at the very bottom it says, "It
5  shall be unlawful (5) for any person to whom
6  subsection (a) applies to refuse to permit the
7  Attorney General or his or her designee to conduct an
8  inspection under subsection (c)"; is that correct?
9  A.  Yes, sir.
10  Q.  And you knew that and were familiar with that
11  provision, correct?
12  A.  Yes, sir.
13  Q.  And, in fact, you knew that that was a
14  provision that was added in the amendment that became
15  effective July 27, 2006, correct?
16      MS. WYER: Objection.
17  A.  I wasn't aware when that was added, and I'm
18  not -- again, we're talking about something six, seven
19  years ago.  So, when these changes occurred, I don't
20  know.
21  Q.  (By Mr. Murray)  Okay.  But you acted pursuant
22  to the authority that included that section (f)(5),
23  correct --
24      MS. WYER: Objection.
25  Q.  -- when you carried out most of the

Page 18

(09:12-09:13)

1  inspections?
2  A.  It was my understanding during the inspections
3  that that person did not have the legal right to
4  refuse the inspection --
5  Q.  Okay.  Now, and in fact --
6  A.  -- as long as we met the parameters within the
7  guidelines.
8  Q.  Right.  And, in fact, it would be a felony for
9  the person under this statute to refuse to permit the
10  Attorney General or his designee to conduct the
11  inspection, correct?
12  A.  I wasn't aware if it was a felony or a
13  misdemeanor.
14  Q.  Well, did you -- you weren't familiar with
15  whether or not the statutory provisions -- take a look
16  at the last page of this statute, section (i).
17  A.  Okay.
18  Q.  Do you see it states that "Whoever violates
19  this section shall be imprisoned for not more than
20  five years and fined in accordance with the provisions
21  of this title, or both.  Whoever violates this section
22  after having been convicted of a violation punishable
23  under this section shall be imprisoned for any period
24  of years not more than ten years but not less than two
25  years and fined in accordance with the provisions of

Page 19

(09:13-09:15)

1  this title, or both," correct?
2  A.  That's correct.
3  Q.  And you know from reading that that type of
4  penalty makes this statutory provision a felony if you
5  violate it, correct?
6      MS. WYER: Objection.  Asked and
7  answered.
8  A.  Yes, sir.
9  Q.  (By Mr. Murray)  Is that correct?
10  A.  Yes, sir.
11  Q.  Okay.  Now, I want to show you what has been
12  marked as Plaintiff's Exhibit 42 and ask if you can
13  tell me whether or not you familiarized yourself with
14  part 75 of the Code of Federal Regulations when you
15  were carrying out your 2257 inspection program.
16  A.  This one is dated April 5, 2013.  So I don't
17  know if this has been amended since the time we were
18  doing inspections; but, yes, we also reviewed Code of
19  Federal Regulations 75.
20  Q.  Okay.  And you can see from the -- let me show
21  you where to look.  If you'll look there --
22  A.  Okay.
23  Q.  -- it indicates that the source was an order
24  issued on May 25, 2005, unless otherwise noted; is
25  that correct?

Page 20

(09:15-09:17)

1  A.  That's correct.
2  Q.  So any of -- to the extent that any of these
3  provisions were in effect since May 24, 2005, you
4  would have acted pursuant to whatever regulations
5  existed as of that date, correct?
6  A.  Yes, sir.
7  Q.  Okay.  And if you turn to -- you'll notice
8  that we've put numbers on the bottom left.  We've
9  paginated all these documents.
10  A.  Okay.
11  Q.  Turn to page 3273 of this exhibit.
12  A.  Okay.
13  Q.  And do you see that section 75.5 is the
14  regulation pertaining to inspection of records?
15  A.  Yes, sir.
16  Q.  Okay.  And do you see that -- okay.  So hold
17  onto that.  Let me show you then what has been marked
18  as Plaintiff's Exhibit 41.  And, again, can you see
19  that that is Part 75 of the Code of Federal
20  Regulations that was in effect as of July 1st, 2005
21  according to the cover page?
22  A.  Yes, sir.
23  Q.  Okay.  And you were familiar with those --
24  that version of the regulations, were you not?
25  A.  Yes, I was.

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 21

(09:17-09:19)

1  Q.  Okay.  Now, if you look at page 3265 of
2  Plaintiff's Exhibit 41 --
3  A.  Okay.
4  Q.  -- you see that there is a provision 75.5
5  Inspection of Records; is that correct?
6  A.  That's correct.
7  Q.  Okay.  Now, if you would compare that version
8  of the regulation with the version that is set forth
9  in Plaintiff's Exhibit 42, can you tell me whether or
10  not they are the same or whether there are any
11  differences that you notice?
12     MS. WYER: Objection.  This is
13  inappropriate.
14  A.  Okay.  You're just asking about paragraph (a)?
15  Q.  (By Mr. Murray)  No.  75.5.
16  A.  Oh, the entire section?  Do you want me to
17  check it word-for-word or just that the general
18  meaning seems to be the same?
19  Q.  Well, if you can scan it, I think that my
20  representation to you will be that it is the same, but
21  I want you to verify that it looks to be the same to
22  you as well so that we're on the same program here.
23  A.  Okay.  It's not word-for-word the same.
24  Q.  Where do you find a difference?
25  A.  (C)(1).

Page 22

(09:19-09:21)

1  Q.  Okay.
2  A.  Inspection shall take place on the -- what
3  exhibit is this?  Let me see.  Exhibit 42.
4  Q.  Yes, sir.
5  A.  I probably lost my place.  Let me see.
6     It says, "Inspection shall take place during
7  normal business hours," and, yet, in Plaintiff's
8  Exhibit 41, "Inspection shall take place during the
9  producer's normal business hours.  So you just have an
10  additional word.  So it's not --
11  Q.  Yes.  Correct.
12  A.  It's not verbatim the same.
13  Q.  Right.  The word "producers" doesn't appear in
14  the -- in 41.
15  A.  Okay.  There are some differences in the
16  words, but the meaning seems to be the same.
17  Q.  Can you point out some of the other
18  differences that you found?
19  A.  Yes.  In paragraph (c) -- I probably should
20  get a pen so I can remember which one is which.
21  Q.  Sure.
22  A.  Okay.  This one is 42.  Is it okay if I mark
23  on this?
24  Q.  Yeah.  Sure.
25  A.  Thank you.

Page 23

(09:21-09:24)

1     Okay.  In 41, talking about inspections,
2  "Monday through Friday, or any other time during which
3  the producer is actually conducting," and the other 42
4  reads, "local time, Monday through Friday, or for
5  inspections to be held at the place of business of a
6  producer."  So, again, there's slight changes in the
7  wording; but, again, the content seems to be the same.
8  Q.  Okay.
9  A.  Okay.  There's just slight changes in some of
10  the wording, but the meaning appears to be the same
11  for both exhibits.
12  Q.  The slight wording changes are nonsubstantive.
13  Is that an accurate way to put it?
14     MS. WYER: Objection.  Calls for a legal
15  conclusion and legal knowledge.
16  A.  As a layman looking at this, to me, they have
17  the same meaning.
18  Q.  (By Mr. Murray)  Okay.  What is your
19  educational background by the way, Agent?
20  A.  I had a double major in biology and
21  psychology.  I have a master's in organizational
22  industrial psychology.
23  Q.  And where did you achieve those degrees?
24  A.  University of West Florida.
25  Q.  All right.  So, now, let's talk about the

Page 24

(09:24-09:25)

1  regulation pertaining to inspections, and let's focus
2  on Exhibit 41 which was the one in effect as of May
3  23, 2005.
4  A.  Okay.
5  Q.  Under the regulation, you -- and by "you," I'm
6  talking about you in your capacity as implementing the
7  2257 inspection program, you and your colleagues.
8     You were authorized to enter without delay at
9  any reasonable time any establishment of a producer
10  where records were maintained under 2257; isn't that
11  true?
12  A.  Yes, sir.
13  Q.  You were authorized to do that without a
14  warrant -- search warrant; isn't that correct?
15     MS. WYER: Objection.  Calls for legal
16  knowledge.
17  A.  That's correct.  According to the regulations,
18  this is not a search.  It's an inspection.  So no
19  warrant is necessary.
20  Q.  (By Mr. Murray)  Okay.  So you were authorized
21  to conduct this operation of these inspections without
22  a search warrant, correct?
23  A.  Yes, sir.
24  Q.  You were authorized to do it without any
25  probable cause to believe any crime had been

Min-U-Script®

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 25

(09:25-09:26)

1  committed, correct?
2      MS. WYER: Objection.
3  A.  That's correct.  Again, this is an inspection.
4  It's not a criminal investigation.
5  Q.  (By Mr. Murray)  Okay.  This is a criminal
6  statute, however, 2257 isn't it?
7  A.  Yes, sir.
8  Q.  It's not just a civil statute, is it?
9  A.  It's a federal statute.
10  Q.  You can go to prison for violating it,
11  correct?
12  A.  Yes, sir.
13  Q.  Okay.  I think we agreed a violation of it is
14  felony, did we not?
15  A.  Yes, sir.
16  Q.  Okay.  All right.  So it is correct that you
17  were authorized to enter the premises of a producer
18  without delay, without a warrant, and without any
19  problem cause to believe any crime had been committed;
20  isn't that true?
21      MS. WYER: Objection.
22  A.  That's correct.
23  Q.  (By Mr. Murray)  Okay.  The regulation also
24  provides that advanced notice shall not be given to
25  the producer whose premises you're going to enter,

Page 26

(09:26-09:27)

1  correct?
2  A.  That's correct.
3  Q.  And if the records are maintained at someone's
4  residence, you were authorized to enter there without
5  delay and without advanced notice, correct?
6      MS. WYER: Objection.
7  A.  By the statute, that is correct.
8  Q.  (By Mr. Murray)  And by the regulation?
9  A.  That was not what was done in practice, but
10  you're correct.
11  Q.  Okay.  And by the regulation, correct,
12  authorized to do that?
13  A.  Yes, sir.
14      MS. WYER: Objection.  "Authorized" is
15  undefined.
16  Q.  (By Mr. Murray)  And you were authorized by
17  the statute and regulation to enter a private
18  residence for purposes of an inspection without a
19  search warrant and without probable cause to believe
20  any crime had been committed, correct?
21  A.  Meeting all the parameters of the inspection
22  and the inspection policies and procedures, yes.
23  Q.  So, it is true you were not required to obtain
24  a search warrant and you were not required to have
25  probable cause before you were authorized to enter the

Page 27

(09:27-09:28)

1  premises of a private residence within the parameters
2  of this statute and regulation, correct?
3      MS. WYER: Objection.
4  A.  If a company had been randomly selected for an
5  inspection and on their 225 statement they listed that
6  address as the location for those physical records,
7  then we're allowed to go to that physical location to
8  inspect.
9  Q.  (By Mr. Murray)  Right.
10  A.  Yes, sir.
11  Q.  And you're allowed to do it without a search
12  warrant and without probable cause, correct?
13      MS. WYER: Objection.
14  A.  That's correct.
15  Q.  (By Mr. Murray)  Okay.
16  A.  Because it's coming under the parameters of
17  the 2257 inspection.
18  Q.  Right.  And it is true it would be a felony
19  for the person whose premises you sought to enter
20  without delay to refuse to permit you to enter it and
21  carry out the inspection, correct?
22      MS. WYER: Objection.
23  A.  They could prevent us from going into specific
24  areas of their home if it's at a residence if that's
25  what they listed as the physical address for those

Page 28

(09:28-09:29)

1  records, but they couldn't prevent us from seeing
2  those records and where those records were stored
3  based on the 2257.
4  Q.  Okay.  So it is correct that it would be a
5  felony for someone at a private residence who
6  maintained 2257 records to refuse to permit you to
7  carry out an inspection under the authority of 2257
8  and its implementing regulations; isn't that true?
9      MS. WYER: Objection.  Uses legal
10  terminology.
11  A.  It depends on where those records are located.
12  So, if it's located in the garage, we have access to
13  that garage to review those records.  So it depends on
14  where in that residence they kept the records.
15  Q.  (By Mr. Murray)  If they're kept in the garage
16  and the person refuses to let you enter the garage to
17  inspect the records, that's a felony, isn't it?
18  A.  That would be a violation.  Yes, sir.
19  Q.  Okay.  If it's kept in the bedroom and he
20  refuses to let you into the bedroom for purposes of
21  inspecting the records, that's a felony, isn't it?
22      MS. WYER: Objection.
23  A.  If that's where they listed the physical
24  location of those records, then that's the business
25  location in terms of inspections.  Yes, sir.

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 29

(09:29-09:31)

1   Q.   (By Mr. Murray)  So the answer is yes?
2   A.   Yes.
3   Q.   Okay.  Now, it is also true that the
4   regulation permitted you to conduct inspections during
5   normal business hours which was 9:00 to 5:00 p.m.
6   local time Monday through Friday, correct?
7   A.   That's correct.
8   Q.   Or at other times if the inspection was to be
9   held at the place of business of a producer and the
10   producer was actually conducting business relating to
11   producing a depiction of actual sexually explicit
12   conduct during hours other than 9:00 to 5:00, correct?
13   A.   I'm not aware of that.
14   Q.   Take a look at paragraph (c) of 75.5(c) in
15   Plaintiff's Exhibit 41.
16   A.   Okay.  That's how it reads.
17   Q.   So that is correct?
18   A.   Yes.
19   Q.   And then it also provides that, if the
20   producer doesn't maintain at least 20 normal business
21   hours per week, the producer must provide notice to
22   the inspecting agency of the hours during which
23   records will be available for inspection which in no
24   case may be less than 20 hours per week, correct?
25   A.   That's correct.

Page 30

(09:31-09:32)

1   Q.   So, under this regulation, for someone who has
2   less than 20 normal business hours, the law required
3   that person to send some kind of a notice to whom?
4   The FBI?  The Attorney General?  Who would they send
5   that to?
6   A.   I don't know.
7   Q.   But they were required --
8   A.   They could they could send the notice to me.
9   Q.   Okay.  But if they send it to no one, they
10   would be in violation, correct?
11       MS. WYER: Objection.  If you know.
12   A.   According to the regulation, it says that the
13   producers must provide notice of the hours during
14   which records will be available.
15   Q.   (By Mr. Murray)  Right.  And if they fail to
16   do so knowingly, that would be a felony, wouldn't it?
17   A.   That would be in violation.  Yes, sir.
18       MS. WYER: Objection.
19   Q.   (By Mr. Murray)  And, so, once they give that
20   notice, the person must remain on the premises during
21   the 20 hours that notice was given, correct?
22       MS. WYER: Objection.
23   A.   I don't see that.
24   Q.   (By Mr. Murray)  Well, let's put it this way.
25   The regulation requires the notice to identify the

Page 31

(09:32-09:34)

1   hours during which the records will be available for
2   inspection, correct?
3   A.   Yes.
4   Q.   And the person then must make sure that during
5   those hours the records would be available for
6   inspection, correct?
7       MS. WYER: Objection.  Calls for
8   inference.
9   A.   According to the CFR 75, it does say that
10   producers must provide notice to the inspecting agency
11   of the hours during which records will be available
12   for inspection which in no case may be less than 20
13   hours per week.
14   Q.   (By Mr. Murray)  Well, doesn't that make it
15   clear that they must make the records available during
16   the 20 hours that they've designated?
17       MS. WYER: Objection.  Clear to who?
18   A.   I know how this was handled in practice.  I
19   was only asked about it one time for somebody who
20   maintained records at their home.
21   Q.   (By Mr. Murray)  Well, my question -- we'll
22   get to the practice --
23   A.   Okay.
24   Q.   -- when we get to the --
25   A.   Okay.

Page 32

(09:34-09:35)

1   Q.   -- to the 29 inspections.  But my question is:
2   Is it not clear to you, as the person who was in
3   charge of this inspection program and carrying it out,
4   that the person who needs to send the notice of the 20
5   hours per week that the records will be available for
6   inspection has to tell the truth about which hours
7   they'll be available for inspection?
8       MS. WYER: Objection.
9   A.   Reading this, the way that I would interpret
10   it is that, yes, it does sound as if they need to be
11   available at least 20 hours per week.
12   Q.   (By Mr. Murray)  Okay.  Now, in terms of the
13   carrying out of the inspection, if you go to
14   75.5(c)(2), it indicates that when you arrive you are
15   to present your credentials, correct?
16   A.   Correct.
17   Q.   And to explain the nature and purpose of the
18   inspection, correct?
19   A.   Yes, sir.
20   Q.   And to indicate the scope of the specific
21   inspection and the records that you want to examine,
22   correct?
23   A.   Yes, sir.
24   Q.   And in paragraph (4) -- and (3) says you're
25   supposed to do the best you can to not unreasonably

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 33

(09:35-09:36)

1  disrupt the operations of the place you're inspecting,
2  correct?
3  **A. Yes, sir.**
4  Q.   And then (4) says that, at the conclusion of
5  the inspection, you may informally advise the person
6  that you encountered of any apparent violations,
7  correct?
8  **A. That's correct.**
9  Q.   Under (d), you're permitted to inspect the
10  records once during any four-month period but more
11  often if you have a reasonable suspicion to believe
12  that a violation has occurred, correct?
13  **A. That's correct.**
14  Q.   You're permitted under (e) to make copies of
15  any of the records that are maintained under 2257,
16  correct?
17      MS. WYER: Objection.  Mischaracterizes
18  the language.
19  **A. According to that paragraph, yes, we can copy**
20  **the 2257 records that they have on-hand for those**
21  **items that we had selected for inspection.**
22  Q.   (By Mr. Murray)  Okay.  And you're in charge
23  of which items you select, correct?
24  **A. Yes, sir. I was.**
25  Q.   Now, then under (f) it says that the

Page 34

(09:36-09:37)

1  regulations do not restrict the otherwise lawful
2  investigative prerogatives of an investigator while
3  conducting an inspection, correct?
4      MS. WYER: Objection.
5  **A. That's what it reads.  Correct.**
6  Q.   (By Mr. Murray)  And then under (g) it
7  indicates that, notwithstanding any provision of this
8  part or any other regulation, a law enforcement
9  officer may seize any evidence of the commission of
10  any felony while conducting an inspection, correct?
11  **A. That's correct.**
12  Q.   And, again, that would be without a warrant,
13  correct?
14      MS. WYER: Objection.
15  **A. If it's in plain view, yes.  We can seize**
16  **contraband in plain view.  Yes, sir.**
17  Q.   (By Mr. Murray)  Well, this says "any evidence
18  of the commission of any felony," correct, not just
19  contraband, doesn't it?
20      MS. WYER: Objection.
21  **A. The way that it was explained to us before we**
22  **started inspections, it was all related to the plain**
23  **view doctrine.  So, if we walked in and you see a**
24  **rocket launcher in the corner, yes, we can seize it.**
25  **We don't have the ability to go and search other**

Page 35

(09:37-09:40)

1  **areas.  We're very restricted into what we can look at**
2  **and where we can look.  It's all related to those**
3  **records.**
4  Q.   And who gave you these instructions?
5  **A. It would have been in a series of**
6  **conversations with the U.S. Attorney's Office, with**
7  **the FBI's Office of General Counsel.**
8  Q.   I want to show you what has been marked as
9  Plaintiff's Exhibit 34.  And if you would show Ms.
10  Wyer that because I don't have an extra copy.
11  **A. Okay.**
12  Q.   I thought I did.
13      MS. WYER: I need to ~~have my own copies.~~
14      MR. MURRAY: I'm sorry.  I can't hear
15  what you're saying.
16      MS. WYER: If you're going to be
17  referring to the text of this, I really need to have
18  my own copy so I can --
19      MR. MURRAY: Well, I don't really have
20  the ability.  These are documents that you provided
21  us.  You can see the mountain of materials that I've
22  managed to bring to this.  I sent you a letter
23  explaining every subject matter that we were going to
24  cover.
25      MS. WYER: Well, you didn't tell me

Page 36

(09:40-09:42)

1  that --
2      MR. MURRAY: So I presumed that you would
3  have brought with you or have access to the documents
4  that you provided.
5      MS. WYER: You did not tell me that you
6  were not going to provide copies of your exhibits to
7  counsel.  It's customary to provide copies to counsel
8  of the exhibits.
9      MR. MURRAY: Okay.  Well, we have -- you
10  provided us with some 6,000 pages of records
11  pertaining to these inspections.
12      MR. SAMONDS: Separate from those, we may
13  have copies.  I have brought some copies, but for all
14  the documents which of the smaller copies.
15      MR. MURRAY: Yeah.  I thought I brought a
16  copy for you, Kathy, of all these smaller ones, and
17  this is the one that I can't seem to find.
18  Q.   (By Mr. Murray)  Which number did I give you,
19  Agent?  34?
20  **A. 34.**
21      MR. MURRAY: Why don't you use 35?
22  They're identical.  I was going to show him that at
23  some point.
24  Q.   (By Mr. Murray)  All right.  So we were
25  talking about Plaintiff's Exhibit 32?

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

---

Page 37

(09:42-09:43)

1  A.  34.
2  Q.  34?  Okay.
3     MR. SAMONDS: Do you have other small
4  exhibits that you would like me to go get copies of?
5     MR. MURRAY: Yes.  Yeah.  There's only --
6  there were a total of four or five of these letters.
7  So, if you want to --
8  Q.  (By Mr. Murray)  All right.  Plaintiff's
9  Exhibit 34 is a letter that bears your signature, does
10 it not?
11 A.  Yes, sir.
12 Q.  Okay.  And this one happens to be addressed to
13 _____ correct?
14 A.  That's correct.
15 Q.  And it's dated March 21, 2007?
16 A.  That's correct.
17 Q.  And that's an establishment where an
18 inspection occurred, correct?
19 A.  That's correct.
20 Q.  And you participated in that inspection?
21 A.  Yes, I did.
22 Q.  And at the outset of that inspection, you
23 presented the person that you encountered with a copy
24 of this letter, correct?
25 A.  That's correct.

---

Page 38

(09:43-09:44)

1  Q.  And this letter advised the person that you
2  were conducting an inspection under 2257, correct?
3  A.  That's correct.
4  Q.  It advised this person that section (c) of 18
5  USC 2257 requires that you make such records available
6  to the Attorney General or designee thereof for
7  inspection at all reasonable times, correct?
8  A.  That's correct.
9  Q.  It advised him that violations of section 2257
10 are subject to criminal penalties, correct?
11 A.  That's correct.
12 Q.  Two paragraphs below that you advised the
13 person that, "Pursuant to these laws and regulations,
14 the FBI is authorized to enter your place of business
15 without delay," correct?
16 A.  That's correct.
17 Q.  And you advised this person, "It is a criminal
18 violation of federal law to delay or obstruct the FBI
19 from conducting the investigation," correct?
20 A.  That's not correct.  It's from conducting the
21 inspection.
22 Q.  I'm sorry.  I misspoke.
23 A.  Okay.
24 Q.  Thank you.
25     The sentence reads, "It is a criminal

---

Page 39

(09:44-09:46)

1  violation of federal law to delay or obstruct the FBI
2  from conducting the inspection," correct?
3  A.  That's correct.
4  Q.  And you give that notice to the person in this
5  letter when you begin the inspection, correct?
6  A.  That's correct.  Well, it was given prior to
7  the inspection.
8  Q.  When you first show up?
9  A.  When we first arrived, yes, sir.
10 Q.  Okay.
11    (Proceedings interrupted)
12 Q.  All right.  So who did you report to when you
13 were given the assignment to develop this program for
14 2257?  Who was your immediate supervisor?
15 A.  Allen Anovte.
16 Q.  And he was stationed in Washington?
17 A.  He was.
18 Q.  Okay.  And did you keep him abreast of the
19 developments in connection with establishing the
20 program?
21 A.  Yes.
22 Q.  Now, who all was on the team besides yourself?
23 A.  Originally, it was me and four contract
24 inspectors.  All four are retired agents.
25 Q.  Now, tell me what you mean by a contract

---

Page 40

(09:46-09:47)

1  inspector.
2  A.  They were not employees of the FBI.  They were
3  independent contractors.
4  Q.  And how did you get them?  Did you advertise?
5  A.  It was advertized.
6  Q.  Okay.  And then what -- and were these all
7  retired FBI agents?
8  A.  The four that were selected were all retired
9  FBI agents.  Correct.
10 Q.  But they were independent contractors rather
11 than employees when they participated in this program?
12 A.  Yes, sir.
13 Q.  Okay.  And were they given any training?
14 A.  Yes, they were.
15 Q.  By whom?
16 A.  Several people.  I know that we had somebody
17 from OGC.  I believe we had somebody from the U.S.
18 Attorney's Office, an L.A. office.  We had LAPD
19 detectives that also provided some training, and I
20 provided some of the training.
21 Q.  Okay.  And who were the four contract
22 inspectors?  Do you remember?
23 A.  Yes.
24 Q.  And they're in the records if need be.
25 A.                                              d

---

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

Min-U-Script®

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

**Page 41**

(09:47-09:48)

1
2 Q.  Now, besides yourself, were there any other
3   FBI agents that participated in the program?
4 **A.  Initially?**
5 Q.  Later on.
6 **A.  When you say "participate," in terms of**
7   **conducting the actual inspections?**
8 Q.  Yes.
9 **A.  Later it was Steve Lawrence.**
10 Q.  Okay.  And I thought I saw -- and we'll show
11   you, but I think --
12 **A.  And later we did hire a fifth contractor.**
13 Q.  Okay.  And I thought I saw one other FBI agent
14   on one of the inspection reports.
15 **A.  Oh.                    ə was part of the program**
16 **initially.**
17 Q.  What was his role in the program initially?
18 **A.  The two of us were tasked with starting it up;**
19   **and as I mentioned, he had other duties that he was**
20   **responsible for.  So he couldn't break away from his**
21   **other duties.  So I spent most of my time on the 2257.**
22   **I think he did -- he may have gone to one, maybe two**
23   **inspections.**
24   **Then those positions were advertised, and I**
25   **can't remember if     . chose not to apply or what the**

**Page 42**

(09:48-09:49)

1   situation was, but Steve Lawrence was selected for the
2   **second position.**
3 Q.  Okay.  And I think you indicated that he might
4   have come on-board about November?
5 **A.  I can't remember if it was late 2007 or early**
6   **2008.  I think it was probably November, December of**
7   **2006.**
8 Q.  And the Government has provided us with
9   reports of some 29 inspections, and I think you agreed
10   that that sounds approximately the right number?
11 **A.  Yes.  Can I go back?**
12 Q.  Sure.
13 **A.  It wasn't                      .  I think it was .**
14   **ı                    I apologize.**
15 Q.  Okay.  So approximately 29 inspections were
16   ultimately carried out under this program; is that
17   correct?
18 **A.  Yes, sir.**
19 Q.  And is it true that all 29 of them were done
20   without a search warrant, correct?
21 **A.  They were done as inspections and no search**
22   **warrant was required.  That's correct.  No search**
23   **warrant was used for any of those.  Correct.**
24 Q.  Okay.  Well, my question wasn't whether one
25   was required.  I just want to make sure that it is

**Page 43**

(09:49-09:50)

1   true that there was no search warrant associated with
2   any of the 29 inspections, correct?
3 **A.  That's true.**
4 Q.  Okay.  And except for a handful of what you
5   called reinspections, they were all based on random
6   selection process, correct?
7 **A.  Yes, sir.**
8 Q.  And, so, they weren't based on any probable
9   cause to believe a violation --
10 **A.  No.**
11 Q.  -- had occurred?  Okay.  They weren't even
12   based on a reasonable suspicion that a violation of
13   this criminal statute would be found?
14 **A.  That's correct.  They all were randomly**
15   **selected.**
16 Q.  And all but a couple of them were done without
17   advance notice, correct?
18 **A.  That's correct.**
19     MS. WYER: Objection.
20 Q.  (By Mr. Murray)  Now, how many of the 29 were
21   you present for approximately?
22 **A.  I'd have to look.  More than half.**
23 Q.  Okay.  And as to the ones that you were not
24   present at, were you briefed on them after they
25   occurred?

**Page 44**

(09:50-09:51)

1 **A.  No.  I would have seen a report probably, but**
2   **I was not given a briefing.**
3 Q.  Okay.  But you reviewed the report of the ones
4   that you didn't do?
5     MS. WYER: Objection.
6 **A.  Not necessarily.**
7 Q.  (By Mr. Murray)  Some of the reports you
8   reviewed?
9 **A.  I may have seen some of the others reports.**
10   **That wouldn't have fallen under my purview.**
11 Q.  Okay.  Now, I think there was one done in a
12   storage area.  Do you remember that?
13 **A.  I don't.**
14 Q.  Okay.  In every case, with maybe one or two
15   exceptions, your team, Government agents entered
16   either a private residence or a private business
17   premises to carry out the inspection, correct?
18     MS. WYER: Objection.  "Private" is
19   undefined.
20 **A.  To me, it's a public business.  They were open**
21   **for business.  So my interpretation would be it's a**
22   **public business.**
23 Q.  (By Mr. Murray)  But it was owned by private
24   citizens, correct?  This wasn't governmental -- these
25   were not governmental entities that you were

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 45

(09:51-09:52)

1  searching, correct?
2  **A.  That's correct.**
3  Q.  Okay.  So they were -- so, when I say "a
4  private business," I'm referring to the fact that they
5  were not a governmental entity, okay?
6  **A.  Yes, sir.**
7  Q.  Okay.  And they were owned by citizens of the
8  United States or other persons, correct, private
9  persons?
10 **A.  As far as I know, I don't know if it was a**
11 **corporation or an individual.  I don't know.**
12 Q.  Okay.  So, in just about every case, just so
13 that we're clear, the Government agents entered either
14 a residence or a business premises to carry out the
15 inspections, correct?
16 **A.  The places we entered was the places that were**
17 **listed on the 2257 as the location for the records.**
18 Q.  And in every case --
19 **A.  If that's a business -- or I think in two**
20 **instances it may have been a residence.**
21 Q.  Okay.  My question is a little bit more direct
22 than that.
23 **A.  Okay.**
24 Q.  I recognize that you looked at the label as to
25 where the records were kept in order to ascertain

Page 46

(09:52-09:54)

1  where to go, correct?
2  **A.  Correct.**
3  Q.  Okay.  But in almost every case where you
4  ended up going -- the Government ended up going was
5  either a residence or a business premises to enter,
6  correct?
7  **A.  Yes, sir.**
8  Q.  Okay.  Now, it is true that in almost every
9  case the Government agents entered areas of the
10 residence or the business premises that was not open
11 to the general public?
12 **MS. WYER:** Objection.
13 Q.  (By Mr. Murray)  Correct?
14 **MS. WYER:** Objection.  Lack of
15 foundation.
16 **A.  When you say "not open to the general public,"**
17 **could somebody from the general public walk through**
18 **those areas?  A lot of the places we did in the**
19 **reception area or in a common area.  There were some**
20 **that were done in a break room.  So I'm sure the**
21 **public wouldn't be allowed to go back to their break**
22 **room.**
23 Q.  (By Mr. Murray)  Well, none of these were
24 retail operations where customers would come in and
25 buy merchandise, for example, correct?

Page 47

(09:54-09:55)

1  **MS. WYER:** Objection.  Lack of
2  foundation.
3  **A.  I don't believe so.**
4  Q.  (By Mr. Murray)  Okay.  In other words, that's
5  correct?  When you say you don't believe so, you're --
6  **A.  I don't know if they also had retail**
7  **merchandise that was available.  I'm trying to think**
8  **of the different inspections we did.  I do know that**
9  **there were other people coming and going as we did the**
10 **inspections.  If they sold products there or not, I**
11 **don't know.**
12 Q.  In each of the inspections, private records
13 belonging to the producer were examined, correct?
14 **MS. WYER:** Objection.
15 **A.  When you say "private records," these are the**
16 **records that are required by 2257.  The only records**
17 **that we examined were the records, which I assume**
18 **makes them public, as required by 2257.  Those are the**
19 **only records we looked at.**
20 Q.  (By Mr. Murray)  Yeah.  But those records
21 belonged to the producers, didn't they?  They were the
22 records of the producers you were --
23 **A.  They were the records that the producers were**
24 **required to maintain by 2257.**
25 Q.  Well, whose records were they?

Page 48

(09:55)

1  **A.  In essence, the records that are being**
2  **required by the Government.**
3  Q.  I know, but whose -- who created the records?
4  **A.  Their producer --**
5  Q.  Okay.
6  **A.  -- created the records.**
7  Q.  And, therefore, they owned the records, did
8  they not?
9  **MS. WYER:** Objection.
10 **A.  Legally, I wouldn't know who would have**
11 **ownership of those records.**
12 Q.  (By Mr. Murray)  Well, they didn't belong to
13 you, did they?
14 **A.  We're allowed to look at those and inspect**
15 **them.**
16 Q.  Right.
17 **A.  But we had no ownership.  We're allowed to**
18 **copy them based on the statute.**
19 Q.  Exactly.  But they didn't belong to you, did
20 they?
21 **MS. WYER:** Objection.  Calls for legal
22 knowledge.
23 **A.  And I say I don't know legally who would have**
24 **ownership, who would have property rights.**
25 Q.  (By Mr. Murray)  You're telling me that you

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 49

(09:55-09:57)

1  don't know whose records they -- whose records were
2  being examined, who owned those records?  Is that your
3  testimony?
4  **A.   If I have a tax record, does that tax record**
5  **belong to me?  Does it belong to the IRS?  I would say**
6  **the IRS has some claim to it.  I don't know.**
7  Q.   So, if you keep a copy of your tax return at
8  home, you don't think that that's something that
9  belongs to you, that copy?
10 **A.   Yes.  I have ownership of it, but also I**
11 **have -- the IRS also has some ownership of it also**
12 **because they require it.**
13 Q.   But you've already submitted your tax return.
14 I'm talking about the copy that you maintain in your
15 home.  You're saying that the IRS owns that copy?
16 **A.   I'd have to ask a legal professor.**
17 Q.   It is true, is it not, that in nearly every
18 case you entered premises that ordinarily, as an FBI
19 agent, absent exigent circumstances or voluntary
20 consent, you would need a search warrant to enter,
21 correct?
22 **A.   No.**
23 Q.   Do you need a search warrant to enter
24 someone's home to search for evidence?
25 **A.   Not if they allow us in, they invite us in.**

Page 50

(09:57-09:58)

1  Q.   That's what I said.  Listen very carefully to
2  my question.
3  **A.   Okay.**
4  Q.   In nearly every case, you entered premises
5  that ordinarily, absent exigent circumstances or
6  voluntary consent, you would need a search warrant to
7  enter?
8     MS. WYER: Objection.
9  **A.   For the businesses, we wouldn't need a search**
10 **warrant to go into a business.  Any business that's**
11 **open to the public we have the ability to walk in.**
12 Q.   (By Mr. Murray)  Okay.  Would you have the
13 ability without a search warrant to go into areas not
14 accessible to the public to search through records
15 without a search warrant and without consent and
16 without exigent circumstances?
17    MS. WYER: Objection.
18 **A.   Without consent?  Unless they told us that,**
19 **no, you're not allowed to do that, then that would be**
20 **correct.**
21 Q.   (By Mr. Murray)  You'd need a search warrant,
22 correct, in that circumstance?
23 **A.   If we were searching for criminal activity,**
24 **yes.**
25 Q.   Well, if you arrive at someone's home, whether

Page 51

(09:58-09:59)

1  you're searching for criminal activity or not, and
2  they say "I don't want you in my home," you can't
3  enter without a search warrant, can you?
4  **A.   That's correct.**
5  Q.   Okay.  Regardless of what your reason for
6  being there is, correct?
7  **A.   That's correct.**
8  Q.   And it's also the case that in nearly every
9  situation you ordinarily, absent exigent circumstances
10 or voluntary consent, would have needed probable cause
11 to obtain a search warrant to enter areas not
12 accessible to the general public?
13    MS. WYER: Objection.  Calls for legal
14 knowledge.
15 **A.   Could you rephrase that, please?**
16 Q.   (By Mr. Murray)  It is true that in nearly
17 every case involving these inspections you went -- to
18 the extent that you went into areas not accessible to
19 the general public, ordinarily, absent exigent
20 circumstances or voluntary consent, you would have
21 needed probable cause to obtain a search warrant to
22 enter those areas?
23 **A.   I think we're almost talking apples and**
24 **oranges because, in the inspection process, that's not**
25 **required.  If you're talking about suspicion of a**

Page 52

(09:59-10:01)

1  **criminal activity and we're going to look for evidence**
2  **of that criminal activity, yes, we would need a**
3  **warrant and we need probable cause to obtain that**
4  **warrant.**
5  Q.   Okay.  I understand.  2257 and the
6  implementing regulations allows you to perform these
7  inspections without a warrant and without probable
8  cause.  We've already agreed with that, correct?
9  **A.   Yes, sir.**
10 Q.   Okay.  What I'm asking is:  Ordinarily, if it
11 weren't for 2257 and the implementing regulations, if
12 you wanted to enter residences or business premises
13 and areas within those residences and business
14 premises not accessible to the general public, you as
15 an FBI agent would need to obtain a warrant, correct?
16 **A.   I'm not sure about the characterization of**
17 **that, and I'm looking at it from the actual happenings**
18 **of these inspections.**
19     **If we went to a place of business to conduct**
20 **the inspection and they said, "We don't want you to,"**
21 **it's not that we're going to continue on anyway.  If**
22 **it were a search warrant, they don't have the ability**
23 **to say that.  Well, they can't say that.  We'll**
24 **continue with the search.**
25     **With the inspection, if they said, "We're not**

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

---

**Page 53**

(10:01-10:02)

1  going to allow you in these areas," then that becomes
2  a whole other issue that we have to then place calls
3  back to DOJ.
4      As we conduct the inspections, the places
5  we're allowed to look at are where those records are
6  stored.  We don't have ability to wander around their
7  business and look at whatever we want to look at.  So
8  the only places that we could look are very restricted
9  by 2257, and the places that we could look are where
10  the records are stored.
11  Q.  And what I'm saying is that, absent 2257 and
12  the implementing regulation, ordinarily, unless you
13  had exigent circumstances or voluntary consent, if you
14  wanted to enter those areas, you'd have to get a
15  search warrant?
16      MS. WYER: Objection.
17  Q.  (By Mr. Murray)  Isn't that true?
18      MS. WYER: Objection.  "Ordinarily" is
19  undefined.
20  A.  We would need either their permission or a
21  search warrant.
22  Q.  (By Mr. Murray)  Okay.  Thank you.
23      Now, it is true, is it not, that in every case
24  you examined records of IDs and names, those type of
25  things, correct?

---

**Page 54**

(10:02-10:03)

1  A.  The records required under 2257.
2  Q.  And those include IDs.  They include a record
3  of nicknames and aliases.  And it includes dates of
4  birth and dates of production of the film, if it's a
5  film, those type of records, correct?
6  A.  Yes, sir.
7  Q.  Okay.  And oftentimes they were stored in file
8  cabinets, correct?
9  A.  That's correct.
10  Q.  Sometimes they were on computers?
11  A.  I believe so.
12  Q.  But in every case you examined those type of
13  records if they were available, correct?
14  A.  The 2257 records?  Correct.
15  Q.  And it is true that ordinarily, if it weren't
16  for 2257 and its implementing regulation, absent
17  exigent circumstances or voluntary consent, you would
18  need a search warrant to search through records like
19  that; isn't that true?
20      MS. WYER: Objection.
21  A.  If I were an FBI agent conducting a criminal
22  investigation, I would need a search warrant to look
23  for those records if they were evidence of that
24  criminal activity.
25  Q.  (By Mr. Murray)  Well, even if you weren't

---

**Page 55**

(10:03-10:04)

1  looking for criminal activity, if you showed up at the
2  door of a business premises and you said, "I'd like to
3  look at records that you have of all the performers
4  that you've used in your films," whether you were
5  looking at it for civil, criminal, or any other
6  purpose, and they said "no," ordinarily you would have
7  to go get a search warrant before you could enter the
8  premises to examine those records, correct?
9  A.  Well, as an FBI agent, I wouldn't be there
10  unless it's part of an investigation or, in this case,
11  as an inspection.  So, yes.  If I'm there as an FBI
12  agent in official capacity, if I want to look at --
13  and it's not within the 2257 inspection, if it's
14  another FBI agent conducting a criminal investigation
15  and he wants to look at whatever records they may
16  have, yes, it will require a warrant.
17  Q.  Okay.  Let me make sure I understand what
18  you're saying.
19      We recognize, then, we have already agreed
20  upon the fact that 2257 and the implementing
21  regulation allows you to check those records without
22  a warrant and without probable cause, correct?
23      MS. WYER: Objection.
24  A.  Yes.
25  Q.  (By Mr. Murray)  Okay.  What I'm saying and

---

**Page 56**

(10:04-10:06)

1  asking you:  Whether you agree or not, if it weren't
2  for 2257 and the implementing regulation that
3  authorized you to do that without a warrant, you would
4  have to have a warrant to do it, correct?
5      MS. WYER: Objection.
6  A.  The part of the question that's confusing to
7  me, as I'm looking at it in an official capacity as an
8  FBI agent, the only reason I would want to look at
9  information is as evidence of criminal activity.  In
10  order to do that, I would need a warrant.
11  Q.  (By Mr. Murray)  Okay.  And probable cause,
12  too, in that scenario?
13  A.  You can get the warrant without probable
14  cause.
15  Q.  All right.  So, if I understand the program
16  that you developed, you tried to develop a program
17  that would be efficient, correct, and useful?
18  A.  We tried to develop a program that was well
19  within the law and that fulfilled the mission.
20  Q.  And you randomly selected the producers whose
21  establishments you would enter to inspect, correct?
22  A.  Yes, sir.
23  Q.  By some computer program that just spit out at
24  random the names of producers that you knew about were
25  in -- were dealing in sexually explicit materials,

---

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 57

(10:06-10:07)

1   correct?
2   **A.   We used a random number generator.**
3   Q.   Okay.  And from that point, your contract
4    agents would attempt to obtain a sample of the
5    sexually explicit images that that producer had
6    created?
7   **A.   No, sir.**
8   Q.   Didn't they try to order merchandise?
9   **A.   No.  That would be my job.**
10   Q.   Oh, okay.  So you were the one that obtained a
11    sample of the sexually explicit materials that were at
12    issue?
13   **A.   Yes, sir.**
14   Q.   Okay.  But your contract employees then
15    examined the images to determine whether they came
16    within 2257 and other information?
17   **A.   Correct.**
18   Q.   And they identified performers and titles, for
19    example, the records of which you wanted to inspect?
20   **A.   Yes, sir.**
21   Q.   And then you would go out to do the
22    inspections, correct?
23   **A.   That's correct.**
24   Q.   And how many people would be on the inspection
25    team generally speaking?

Page 58

(10:07-10:08)

1   **A.   It would typically -- for the ones that I**
2   **conducted, it would be me and the four contractors.**
3   Q.   So there was a team of five?
4   **A.   Yes.  And then later, once we hired the fifth**
5   **contractor, there could be six.**
6   Q.   Okay.  And when Agent Lawrence did an
7    inspection, was that generally what he would do as
8    well?
9   **A.   Yes.  And I think originally, when he first**
10   **was coming on, he would go, too, so he could learn the**
11   **process.  And I can't remember if           , had been**
12   **hired at that point or not.  So there may have been**
13   **seven.  So, five, six, seven typically was the number**
14   **that we would take.**
15   Q.   So Agent Lawrence would go with you for the
16    first few once he came on-board?
17   **A.   Yes, sir.**
18   Q.   Okay.  And then he would do some on his own --
19    I mean, without you?
20   **A.   Yes, sir.**
21   Q.   Okay.  But he would have the similar team of
22    contract agents, correct?
23   **A.   He had the same members.**
24   Q.   So each inspection would involve anywhere from
25    five to seven Government personnel, correct?

Page 59

(10:08-10:10)

1   **A.   That's correct.**
2   Q.   And then various reports would be completed
3    with respect to each inspection, correct?
4   **A.   Yes.**
5   Q.   Okay.  Then let's take a look at some of these
6    reports.
7   **A.   Do you want me to continue to hold onto these?**
8   Q.   Yeah.  You can just set them right there.
9   **A.   Okay.**
10   Q.   Keep them right in front of you.
11    I want to show you what's been marked as
12    Plaintiff's Exhibit 1.
13    MS. WYER: Could you identify which
14    report you're looking at?
15    MR. MURRAY: I'm about to.  Yes.
16   Q.   (By Mr. Murray)  This, Agent, is it not, the
17    report of an inspection of something called          ?
18   **A.   Yes. sir.**
19   Q.                  , I guess, is the name; is that
20    correct?
21   **A.   That's what's listed on here.  Correct.**
22    MS. WYER: Could you wait until we find
23    the report?
24    MR. MURRAY: Sure.  So you do have them?
25    MS. WYER: He told you earlier that he

Page 60

(10:10-10:11)

1    had them.
2    MR. MURRAY: Well, I didn't hear that.
3    Well, then why were you complaining that I didn't
4    bring an extra copy?
5    MS. WYER: I did not bring them.
6    MR. SAMONDS: And, also, we didn't have
7    copies of all the other documents which you've been
8    going through and sorting through.
9    MR. MURRAY: But I provided you with
10    copies with the one exception that you were able to
11    make a copy of, that letter.
12    MR. SAMONDS: There are some which she
13    specifically asked for a copy for, and we had no idea
14    how many more documents there would be that you
15    wouldn't have copies of.
16    MR. MURRAY: Well, you know, you've got
17    the reports?
18    MR. SAMONDS: I think I have all of them.
19    I would just like to see.
20    MR. MURRAY: I thought you didn't want to
21    to have to carry -- you told me when we were coming in
22    the last thing you wanted was to have to go home with
23    6,000 pages of the records that you provided us.
24    MS. WYER: Well, I don't want to carry it
25    all, but I did not know and I was not informed that

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 61

(10:11)

1   you were going to enter all of these as exhibits at
2   this deposition.
3       MR. MURRAY: Well, I wasn't required to
4   inform you of that. I know of no rule that requires
5   me to tell you what I'm going to ask in a deposition.
6       MS. WYER: That's fine.
7       MR. MURRAY: I know of no rule that
8   required me to make 6,000 pages of documents and lug
9   them from Cleveland to Houston so that you could have
10  a set of copies of the 29 reports that you sent me.
11      MS. WYER: I believe it's customary at a
12  deposition for the counsel to provide opposing counsel
13  with a copy of any exhibits.
14      MR. MURRAY: Not when there are 6,000
15  pages that you provided me and that you have.
16      MS. WYER: I have not experienced that
17  exception.
18      MR. MURRAY: Okay. Well, I know of no
19  rule that required me to do that, but you can look on
20  with the agent. He's got the document right with you.
21      MS. WYER: He's attempting to find that
22  document.
23      MR. MURRAY: I'm talking about the
24  witness.
25      MR. SAMONDS: I don't appear to have The

Page 62

(10:12)

1   Agency. I think I have almost all of the others. I'm
2   not sure why that one would not be here. It wasn't in
3   the supplement, was it? I'm not sure why I don't have
4   that one.
5   Q. (By Mr. Murray) All right. Agent Joyner, you
6   have in front of you Plaintiff's Exhibit 1, do you
7   not?
8       MS. WYER: For the record, let the record
9   reflect that counsel for the witness has not been
10  provided a copy of this exhibit.
11      MR. MURRAY: And let the record show that
12  you're welcome to examine the -- here. Let me have
13  that.
14      MR. SAMONDS: Would you let me go make a
15  copy?
16      MR. MURRAY: Let me have that exhibit
17  back.
18  Ms. Wyer, here is Plaintiff's Exhibit 1.
19  Please take a look at it before I show it to the
20  witness.
21      MR. SAMONDS: Would you like me to go
22  make a copy of it?
23      MR. MURRAY: That's up to you. I don't
24  care. You're going to have to do it for 6,000 pages.
25      MR. SAMONDS: No. I think I have the

Page 63

(10:12-10:19)

1   vast majority of them.
2       MR. MURRAY: Why don't we take a short
3   break?
4       (Brief recess)
5   Q. (By Mr. Murray) All right. Agent Joyner,
6   Plaintiff's Exhibit 1 is in front of you; is that
7   correct, sir?
8   A.  That's correct.
9   Q.  And Plaintiff's Exhibit 1 is a set of records
10  pertaining to one of the search -- one of the
11  inspections that was carried out under 2257; isn't
12  that correct?
13  A.  This is one of the inspections. Correct.
14  Q.  And are you familiar with this packet of --
15  this type of package of documents?
16  A.  Yes, I am.
17  Q.  And so that --
18      MS. WYER: Take a minute. Have you had a
19  chance to look at it?
20  A.  Yes.
21  Q.  (By Mr. Murray) Okay. And is this the type
22  of record that your program called for creating in
23  connection with an inspection?
24  A.  Yes.
25  Q.  Okay. And if you turn to -- well, let me ask

Page 64

(10:19-10:20)

1   you this: Does that include this cover page or was
2   that something that's added for purposes of the case?
3   A.  That was something that was added.
4   Q.  Okay. As was page 2 was added, correct?
5   A.  Correct.
6   Q.  And there's nothing on page 3. It's blank.
7   Where does the record begin that consists of the
8   record that was created in connection with this
9   inspection?
10  A.  Page 4.
11  Q.  Okay. And then does it go all the way to page
12  84?
13  A.  That's correct.
14  Q.  So, from pages 4 through 84, that constitutes
15  the record pertaining to the inspection that occurred
16  with respect to this particular establishment,
17  correct?
18  A.  That's correct.
19  Q.  And it consists of a number of items. There's
20  a Table of Contents, correct?
21  A.  Yes.
22  Q.  And the Table of Contents then identifies
23  various tabs, correct?
24  A.  That's correct.
25  Q.  And was this the type of template that you

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 65

(10:20-10:21)

1  created?
2  A.  Yes, sir.
3  Q.  Okay.  And it was followed in every case?
4  A.  I believe this same format was used for all
5  the inspections.
6  Q.  Very good.  Now, if you turn to page 7 of
7  Plaintiff's Exhibit 1, there is a document entitled
8  Regulatory Inspections Report, correct?
9  A.  That's correct.
10  Q.  And this is a report of Supervisory Special
11  Agent Charles R. Joyner, which is yourself, correct?
12  A.  That's correct.
13  Q.  And the date of the report is August 24, 2007;
14  is that correct?
15  A.  That's correct.
16  Q.  And this is the report that you created in
17  connection with the inspection of The Agency, correct?
18  A.  That's correct.
19  Q.  And that inspection occurred on August 20,
20  2007, correct?
21  A.  That's correct.
22  Q.  Now, you indicate in the summary the DVDs had
23  been ordered from the internet, correct?
24  A.  Yes.
25  Q.  And then the contract inspectors reviewed them

Page 66

(10:21-10:22)

1  and identified the various performers that you would
2  be interested in, correct?
3      MS. WYER: Objection.
4  A.  They identified all the performers that were
5  engaged in a sexually explicit act.
6  Q.  (By Mr. Murray) Right.  And you wanted --
7  ultimately, your mission was to inspect records
8  pertaining to those performers, correct?
9  A.  That's correct.
10  Q.  Now, you indicate that there was one 2257
11  violation that was found after the inspection,
12  correct, if you go back to page 7?
13  A.  That's correct.
14  Q.  Okay.  And then on page 8 you have a finding;
15  is that correct?
16  A.  That's correct.
17  Q.  And you write, "A 'Y-Tracker' program was
18  installed as the cross-reference system, but the stage
19  names could not be determined from the true names of
20  the performers"; is that correct?
21  A.  That's correct.
22  Q.  What do you mean by that?
23  A.  The system that they had installed, they
24  couldn't pull up -- we'd have a stage name of this
25  performer, performer A, and with that performer A,

Page 67

(10:22-10:23)

1  they couldn't also tell us who the true name was or
2  the aliases.  So there was not an adequate
3  cross-reference system in place.
4  Q.  What do you mean by a Y-Tracker program?
5  A.  That was the name they gave us of the system
6  that they installed that they had purchased.
7  Q.  I see.  And under the regs, there has to be
8  the ability to retrieve not only the true name but the
9  alias or nickname or stage name, correct?
10  A.  That's correct.
11  Q.  And, so, that's why you cited that regulation
12  75.3 as being the regulation that would be violated by
13  their failure to be able to cross-reference the true
14  name and the stage name; is that correct?
15  A.  That's correct.
16  Q.  It doesn't mean they didn't have a record of
17  the performer.  It just means you couldn't
18  cross-reference it, correct?
19  A.  That's correct.
20  Q.  And even if they have the name of the
21  performer and they have the ID, if you can't
22  cross-reference it, you violated the law, didn't you?
23      MS. WYER: Objection.
24  A.  That is a requirement of 2257.  You have to
25  have the ability to cross-reference.

Page 68

(10:23-10:24)

1  Q.  (By Mr. Murray) And it's a criminal offense
2  if you don't, isn't it?
3      MS. WYER: Objection.
4  A.  It's a violation of 2257.  Correct.
5  Q.  (By Mr. Murray) Which is a criminal offense,
6  correct?
7      MS. WYER: Objection.
8  A.  That's correct.
9  Q.  (By Mr. Murray) Okay.  Then if you look at
10  page 9, you have a section entitled "Pre-inspection
11  Procedures"; is that correct?
12  A.  Yes, sir.
13  Q.  And you outline the four steps that were taken
14  before the inspection was carried out, correct?
15  A.  That's correct.
16  Q.  Again, there's a random selection of this
17  particular producer, correct?
18  A.  That's correct.
19  Q.  A sample of the producer's DVDs was ordered,
20  correct?
21  A.  That's correct.
22  Q.  The DVDs were reviewed for 18 USC 2257
23  compliance, correct?
24  A.  Correct.
25  Q.  And your contractors then fill out a

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 69

(10:24-10:25)

1  pre-inspection analysis for each DVD; is that correct?

2  **A.  That's correct.**

3  Q.   And then all the performers were identified by

4  either a stage name or by still photographs of their

5  likeness taken from the video, correct?

6  **A.  That's correct.**

7  Q.   Okay.  So you then go out to the premises on

8  August -- I think we said 17th, two thousand and --

9  **A.  August 20th.**

10  Q.   -- August 20th in 2007 and you arrived there

11  at about 9:30 a.m. in the morning, correct?

12  **A.  Yes, sir.**

13  Q.   And you were the lead inspector.  So, you

14  identified yourself and the purpose of the inspection

15  upon entering the premises, correct?

16  **A.  Yes, sir.**

17  Q.   And you explained the nature and purpose of

18  the inspection, correct?

19  **A.  Correct.**

20  Q.   And then you provided              who was

21  the person that you encountered at this inspection,

22  with a letter explaining the parameters of the

23  inspection and advising              could be

24  reinspected at any time if violations were discovered,

25  correct?

Page 70

(10:25-10:26)

1  **A.  Yes, sir.**

2  Q.   And that's similar to the letter that you

3  previously identified as Plaintiff's Exhibit 32?

4  **A.  Plaintiff's Exhibit 34.**

5  Q.   34?

6  **A.  Yes, sir.**

7  Q.   It was that type of letter you're referring

8  to?

9  **A.  Yes, sir.**

10  Q.   Okay.  Do you know why you weren't able to

11  retrieve or do you know where all these other letters

12  are?  We've gotten four or five of them.  Do you know

13  where the others would be?

14  **A.  I don't know.**

15  Q.   Okay.  Now, before you began the inspection,

16  you had photographs taken of the business location of

17  where the records were stored, correct?

18  **A.  That's correct.**

19  Q.   And you had photographs taken of the working

20  area assigned to the inspectors, correct?

21  **A.  That's correct.**

22  Q.   And then a disc containing the six photographs

23  was placed in an envelope and maintained with the case

24  file; is that correct?

25  **A.  That's correct.**

Page 71

(10:26-10:27)

1  Q.   Do you have any idea why the -- have you

2  looked at some of these records in preparation for

3  your deposition?

4  **A.  I have not.**

5  Q.   Do you know where the originals of these --

6  obviously, you don't know where they would be at this

7  juncture, do you?

8  **A.  No, sir.**

9  Q.   Okay.  What was the quality of the photos at

10  the time they were taken?

11  **A.  Typical digital photos.**

12      MR. MURRAY: Have you produced those or

13  just copies?

14      MR. SAMONDS: Just the copies have been

15  produced.

16      MR. MURRAY: Because most of them are

17  very, very poor.  Are the originals available to see?

18      MS. WYER: We produced a second set of

19  the photos, I believe.

20      MR. MURRAY: Well, the --

21      MR. SAMONDS: They're some of the photos.

22      MR. MURRAY: Go ahead.

23      MR. SAMONDS: I believe copies of all of

24  the photos have been produced.  To the extent you need

25  better copies, we can work on trying to get you better

Page 72

(10:27-10:28)

1  copies.

2      MR. MURRAY: Well, are there originals

3  some place that would be the best?

4      MR. SAMONDS: Within the case file, yes.

5      MR. MURRAY: Okay.  Because I think

6  ultimately we need those because most of these -- and

7  you've tried your best because we did get some

8  supplemental pictures and they really weren't much

9  better.

10      MR. SAMONDS: We can certainly work on

11  getting you better copies if those are necessary.

12      MR. MURRAY: That would be great or

13  access to the originals or maybe we'll just have to

14  have the originals --

15      MS. WYER: We can discuss this.

16      MR. MURRAY: -- brought to court.

17  Q.   (By Mr. Murray)  Okay.  So you took

18  photographs before.  Then you inspected the records

19  maintained by              correct?

20  **A.  For those six videos that were selected, yes,**

21  **sir.**

22  Q.   Okay.  And that took about -- the inspection

23  took about three hours because you say it concluded at

24  approximately 12:30?

25  **A.  Yes, sir.**

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 73

(10:28-10:30)

1  Q.  And then you say that a photograph was taken
2    of the room where you did the inspection, correct?
3  A.  That's correct.
4  Q.  You then have something called Records
5    Verification Spreadsheet, correct?
6  A.  Yes, sir.
7  Q.  Okay.  You then have the 302s that the
8    contract inspectors created, correct?
9  A.  That's correct.
10  Q.  And your name is on some of them as well.  And
11    those have to do with reviewing the DVDs, correct?
12  A.  Yes, sir.
13  Q.  You then have the photographs if you look at
14    page 27.  Well, I'm sorry go to page 25.  You have a
15    photo log first of all, correct?
16  A.  Yes, sir.
17  Q.  In which your photographer who in this case
18    was who?  Does it indicate who took these photos?
19  A.  [            ].
20  Q.  Okay.  And there's a total of six and they're
21    described, correct?
22  A.  That's correct.
23  Q.  And then if you look at page 28, you can see
24    that that is the front door of the building that you
25    entered; is that correct?

Page 74

(10:30-10:31)

1  A.  Yes, sir.
2  Q.  And if you look at page 29, you can see that
3    there's a picture of various file cabinets, correct?
4  A.  Yes, sir.
5  Q.  And the drawers to those file cabinets are
6    open; isn't that correct?
7  A.  That's correct.
8  Q.  And whose file cabinets were those?
9  A.  That was the --
10      MS. WYER:  Objection.
11  A.  That was the location that The Agency stored
12    their 2257 records.
13  Q.  (By Mr. Murray)  But those file cabinets
14    belonged to the proprietor, not to the Government,
15    correct?
16  A.  That's correct.
17  Q.  And did you search through the records
18    contained in the -- in those file cabinets as depicted
19    on this photograph?
20  A.  No, sir.
21  Q.  Did you inspect any of those records?
22  A.  We inspected the records that were on the list
23    of the six DVDs.
24  Q.  Well, then what are these -- what is this
25    picture of?

Page 75

(10:31-10:32)

1  A.  That's showing the location where they have
2    the records stored.
3  Q.  And are the records inside those file
4    cabinets?
5  A.  Yes, sir.
6  Q.  Well, did you examine any of the records that
7    were inside those file cabinets?
8  A.  Of the six that were selected for the
9    inspection, yes, sir.
10  Q.  Okay.  And they had to be removed from those
11    file cabinets to look at them?
12  A.  They did.
13  Q.  Now, correct me if I'm wrong, but isn't it
14    true, Agent Joyner, that ordinarily if an FBI agent
15    wants to peruse a file cabinet like this and look at
16    the records that are contained inside that are located
17    on a premises of a business, absent exigent
18    circumstances and voluntary consent or voluntary
19    consent, an FBI would ordinarily need a search
20    warrant, correct?
21  A.  For each of these inspections, we gave the
22    owner or the custodian of records the option.  They
23    could either have us pull the records or they could
24    pull them and bring them to us.  So it was up to them.
25    We asked them what they preferred.

Page 76

(10:32-10:33)

1  Q.  That's not my question.  My question is
2    different.
3      It is true, is it not, that ordinarily, in the
4    absence of exigent circumstances or voluntary consent,
5    an FBI agent who wants to peruse through the records
6    contained in a file cabinet like this located on a
7    business premises would need a search warrant?
8      MS. WYER:  Objection, form.
9  A.  Ordinarily during a 2256 inspection, the
10    answer would be no.
11  Q.  (By Mr. Murray)  Okay.  Absent 2257 --
12  A.  Uh-huh.
13  Q.  -- and the implementing regulations which
14    permit you to do it without a warrant, without
15    probable cause, without advance notice, if 2257 and
16    its implementing regulations didn't authorize what you
17    did here, ordinarily an FBI agent would need a search
18    warrant to look through this file cabinet on this
19    business premises and the records contained in there;
20    isn't that true?
21      MS. WYER:  Objection.
22  A.  If an agent absent 2257 inspections?
23  Q.  (By Mr. Murray)  Yes.
24  A.  If an agent were at that premise to conduct a
25    criminal investigation to look at the records, he

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 77
(10:33-10:34)

1    would need a warrant, which is completely separate
2    than a 2257 inspection.
3    Q.  I understand that.
4    A.  Okay.  Yes.
5    Q.  But that's my point.
6    A.  Yes.
7    Q.  I'm trying to divorce it from the 2257
8    inspection because we can agree you don't need a
9    warrant under this statute, you don't need probable
10   cause, and you don't have to give them advance
11   warning.  We've already agreed on that three times,
12   haven't we?
13   A.  For any criminal investigation to look at the
14   records without consent or exigent circumstances, yes,
15   you would require a warrant.
16   Q.  Well, actually, for any investigation, if you
17   just showed up and for whatever official reason you
18   might have, if they wouldn't consent to you perusing
19   through that file cabinet, you would need a search
20   warrant, correct?
21   A.  Well, the FBI wouldn't be there unless it was
22   a criminal investigation other than 2257 inspections.
23   Q.  Okay.  I think we're saying the same things.
24   You would need a search warrant if you were there in
25   an official capacity wanting to look through those

Page 79
(10:35-10:36)

1    inspection.
2    Q.  Okay.
3    A.  We always asked them where they would like us
4    to do the paperwork, and that's the area that they
5    selected.
6    Q.  Okay.  And when you entered this building --
7    do you remember this particular inspection?
8    A.  No.
9    Q.  Okay.  So you can't really describe what you
10   saw when you entered?
11   A.  No.
12   Q.  Okay.  Anyway, this picture depicts the area
13   that you did enter for purposes of examining records,
14   correct?
15   A.  Yes, sir.
16   Q.  And there were a total of five or six of you
17   in this area examining these records, correct?
18   A.  That's correct.
19   Q.  And the next page shows essentially the same
20   office area, correct?
21   A.  Yes, sir.
22   Q.  And, again, if it weren't for 2257 and its
23   implementing regulations, if an FBI agent had an
24   official reason to be at that premises wanting to
25   enter that area of those premises without consent by

Page 78
(10:34-10:35)

1    records if you didn't have the authority of 2257.
2        MS. WYER:  Objection.
3    Q.  (By Mr. Murray)  Do we agree on that?
4        MS. WYER:  Objection.
5    A.  Yes, sir.
6    Q.  (By Mr. Murray)  Okay.  Now, the next page
7    shows an office area, correct, or some -- tell me
8    what that shows, what that picture depicts.
9    A.  I don't know.  The quality is poor.  It looks
10   like a work area.
11   Q.  Right.  It looks like a work area.  There's a
12   chair in the middle, isn't there?
13   A.  Yes, sir.
14   Q.  There's a desk; isn't that true?
15   A.  That looks like a desk.
16   Q.  There's papers on that desk?
17   A.  Yes, sir.
18   Q.  There's a file cabinet to the right, correct?
19   A.  Yes, sir.
20   Q.  There looks like a printer or some kind of
21   maybe a fax machine on the left of that desk; is that
22   correct?
23   A.  That's what it looks like.
24   Q.  And that was an area that you entered?
25   A.  That was an area where they gave us to do the

Page 80
(10:36-10:37)

1    the owner, voluntary consent or exigent circumstances,
2    the FBI agent would need a search warrant, correct?
3        MS. WYER:  Objection.
4    A.  Absent the 2257 inspection, that's correct.
5    Q.  (By Mr. Murray)  Now, there is a 2257
6    checklist that is the next tab; is that correct?
7    A.  That's correct.
8    Q.  And it begins with what's known as a Review
9    Form, a Pre-inspection Product Review, correct?
10   A.  That's correct.
11   Q.  And this particular inspector was `
12            ´ whom you've identified before, correct?
13   A.  That's correct.
14   Q.  And there's a title of the DVD, correct?
15   A.  That's correct.
16   Q.  And then there's some premarked questions that
17   she's supposed to check, correct?
18   A.  That's correct.
19   Q.  And, for example, the very first one is -- you
20   say the "product is a" and it could be a book, a
21   magazine, it could be a periodical, for example,
22   correct?
23   A.  That's correct.
24   Q.  It could be a film, correct?
25   A.  That's correct.

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

Min-U-Script®

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 81

(10:38-10:39)

1 Q. Could be a videotape, correct?
2 A. Correct.
3 Q. Could be a digitally or computer-manipulated
4   image?
5 A. Correct.
6 Q. Could be a digital image?
7 A. Correct.
8 Q. Could be just a picture, correct?
9 A. Correct.
10 Q. Or it could be an internet computer site or
11   service, correct?
12 A. That's correct.
13 Q. Or it could be any other matter, correct?
14 A. That's correct.
15 Q. And that's because all of those various types
16   of items, if they portray a sexually explicit image,
17   are subject to 2257, correct?
18 A. That's correct.
19     MS. WYER: Objection.
20 Q. (By Mr. Murray) Now, then there's a place on
21   this report for a post -- an on-site inspection
22   review, correct?
23 A. What page is that?
24 Q. If you go to page 37. Is that correct?
25 A. That's correct.

Page 82

(10:39-10:40)

1 Q. And is that completed on the premises or after
2   you leave?
3 A. That's on premises.
4 Q. Okay. So, while the contract agents and
5   you -- well, describe how it works. If you've got
6   five or six people there, what are your -- you know,
7   who is doing what so that you don't fall over each
8   other looking at these records?
9 A. They each reviewed a DVD. So, in this case,
10   '-       - reviewed this one particular DVD. So
11   she's responsible for that DVD. She would have the
12   records for that DVD, the 2257 records, and she
13   would -- each one would have their own assignment
14   based on what they reviewed.
15 Q. Okay. What would your assignment be? Just to
16   supervise it?
17 A. Yes, and then to write up the final report.
18 Q. Okay. All right. So those -- I won't go over
19   all of those. But each DVD would have that same
20   pre-inspection and on-site inspection checklist,
21   correct?
22 A. Yes, sir.
23 Q. And then the last page, page 84, would
24   indicate whether the producer was compliant or not,
25   correct?

Page 83

(10:40-10:42)

1 A. Correct.
2 Q. And you indicated that they were determined to
3   be out of compliance, but they were able to resolve
4   the one violation, correct?
5 A. That's correct.
6 Q. They came up with a system to match the true
7   name to the stage name?
8 A. Yes, sir.
9 Q. Okay. So that took about three hours, I think
10   we indicated; is that correct?
11 A. 9:30 to 12:30. Correct.
12 Q. Let me show you what's been marked Plaintiff's
13   Exhibit 2 which is L___ _ Serial 12.
14     You didn't find any underage performers in
15   that first inspection that we went through, did you?
16 A. That's correct.
17 Q. And by "underage," that would be someone
18   younger than 18, correct?
19 A. That's correct.
20 Q. All right. Do you have Plaintiff's Exhibit 2
21   in front of you, Agent Joyner?
22 A. Yes, I do.
23 Q. And just so that we're clear, with respect to
24   Plaintiff's Exhibit 1 and I think you'll probably
25   agree that with respect to all of these reports, they

Page 84

(10:42-10:43)

1   were created at or near the time when the events
2   occurred, correct?
3 A. Yes, sir.
4 Q. By persons with knowledge of the events that
5   they recorded in them, correct?
6 A. Yes, sir.
7 Q. And they were kept in the ordinary course of
8   business and maintained in the ordinary course of
9   business by the Federal Bureau of Investigation?
10 A. That's correct.
11 Q. All right. So this was an inspection of
12   i_____ _____ ____ __ g also known as Filmco
13   Productions, correct?
14 A. Yes, sir.
15 Q. And this one -- if you go to page 92, this one
16   was done by Supervisory Special Agent Lawrence,
17   correct?
18 A. That's correct.
19 Q. And by the time he got on-board, he was given
20   full information about the program that you had set
21   up?
22 A. Yes, sir.
23 Q. Correct?
24 A. Yes, sir.
25 Q. And he was given any training that he needed

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 85

(10:43-10:44)

1  to carry out his duties, correct?
2  **A.  Yes, sir.**
3  Q.   And, in fact, all of the inspections were --
4  regardless by whom they were done, were to follow a
5  certain protocol, correct?
6  **A.  That's correct.**
7  Q.   All right.  So, on this occasion, this one was
8  done by Special Agent Lawrence, correct?
9  **A.  Yes, sir.**
10  Q.   July 23, '07, correct, is the date of the
11  report?
12  **A.  That's correct.**
13  Q.   And the date of the inspection was June 19,
14  2007; is that correct?
15  **A.  June 19th.  Correct.**
16  Q.   Do you know whether you went with him on this
17  one?
18  **A.  It doesn't look familiar.**
19  Q.   Okay.
20  **A.  The name doesn't ring a bell to me.  So I**
21  **don't think so.**
22  Q.   Okay.  This would indicate that he was
23  on-board as early as June of '07.  Well, actually, I
24  think you said November of '06 he was already
25  on-board, correct?

Page 86

(10:44-10:46)

1  **A.  I think it was November, December '06.  I'm**
2  **not certain when.**
3  Q.   Okay.  In any case, that inspection occurred
4  on June 19, '07, correct?
5  **A.  Yes, sir.**
6  Q.   And                 was the owner and the
7  custodian of records who was present throughout the
8  inspection, correct?
9       MS. WYER:  Objection.
10  Q.   (By Mr. Murray)  According to this report.
11  **A.  According to this report, yes.**
12  Q.   And according to Agent Lawrence, after the one
13  inspection -- after the inspection, it was determined
14  that Bacchus had one violation.  Another violation was
15  fixed prior to the completion of the inspection,
16  correct?
17  **A.  That's what it states.**
18  Q.   Okay.  Now, the other thing is that some of
19  these records show that the producer gives a response
20  to the findings, correct?
21  **A.  That's correct.**
22  Q.   And whatever the producer said in response to
23  any violation findings is also recorded in these
24  documents, correct?
25  **A.  It is in this one.  Yes.**

Page 87

(10:46-10:47)

1  Q.   All right.  Now, if you go to page 98 -- are
2  you there?
3  **A.  Not yet.**
4  Q.   Okay.
5  **A.  Okay.**
6  Q.   Again, this same format that we saw in
7  Plaintiff's Exhibit 1 is followed in this exhibit as
8  well, correct?
9  **A.  It looks like the same format.  Yes.**
10  Q.   You've got the pre-inspection procedures,
11  correct?
12  **A.  Yes.**
13  Q.   And then you've got the inspection procedures,
14  correct?
15  **A.  Yes.**
16  Q.   In this case, the inspection began at about
17  11:00 a.m., correct?
18  **A.  That's what it states.  Yes.**
19  Q.   And if you look at paragraph 4, it appears
20  that Agent Lawrence provided            with the same
21  type of letter that we saw in Plaintiff's Exhibit 34,
22  correct?
23  **A.  Yes, sir.**
24  Q.   And, again, before the inspection began, they
25  took digital photographs of the business location, the

Page 88

(10:47-10:48)

1  records storage, and the working area where they
2  carried out the inspection, correct?
3  **A.  Yes, sir.**
4  Q.   And in paragraph 7, in this case, they
5  actually made copies of the identifications of
6  selected performers, correct?
7  **A.  That's correct.**
8  Q.   So you would go out to the premises sometimes
9  with an actual copying machine of some kind, a
10  portable copying machine?
11  **A.  Yes.  We always went with a copy machine.**
12  Q.   And, so, in many cases, you would actually
13  copy some of these records and take them with you,
14  correct?
15       MS. WYER:  Objection.
16  **A.  It has been six, seven years.  If I recall, we**
17  **copied all of the 2257 records --**
18  Q.   (By Mr. Murray)  Okay.  All right.
19  **A.  -- for those items that were selected.**
20  Q.   All right.  So you come out to the premises
21  with a portable machine.  You'd examine the records
22  and then you would make copies of them and you would
23  take the copies of those records with you?
24  **A.  Yes, sir.**
25  Q.   Again, all without a warrant?  You never got a

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 89

(10:48-10:50)

1   warrant to remove copies from the premises, did you?
2       MS. WYER: Objection.
3  A.  None was required.
4  Q.  (By Mr. Murray)  Did you get one?
5  A.  A warrant?  No.
6  Q.  Okay.  And then this inspection lasted, it
7   looks like, about 2 hours and 45 minutes, is that
8   correct, if you go to page 99?
9  A.  Yeah.  It ended at 1:45 p.m.
10 Q.  Okay.  Now, if you would take a look at page
11  115, it would appear that on that occasion Agent
12  Lawrence actually did an interview of this
13  ˍˍˍˍˍ, correct?
14 A.  Yes.
15 Q.  Now, if you look at page 120 --
16 A.  Okay.
17 Q.  -- there's a picture of the front door of the
18  premises; is that correct?
19 A.  It's a door.  I wasn't there, but it looks
20  like a door to some building with a listing of
21  companies that are in that building.  It appears to be
22  a front door.  You can see out into the parking lot.
23 Q.  Right.  Okay.  Then look at the next page.
24 A.  Okay.
25 Q.  That's a photograph of several file cabinets,

Page 90

(10:50-10:51)

1   correct?
2  A.  Yes, sir.
3  Q.  Two of them opened; is that correct?
4  A.  Yes, sir.
5  Q.  With records inside, correct?
6  A.  Yes, sir.
7  Q.  And according to the photo log, it indicates
8   that's the 2257 cabinets, hard copies.  See that photo
9   log?
10 A.  Yes, I do.
11 Q.  So that would coincide with that picture?
12 A.  Yes, sir.
13 Q.  Now, that picture does not depict an area that
14  appears to be open to the general public, does it?
15     MS. WYER: Objection; foundation.
16 A.  I wouldn't know.
17 Q.  (By Mr. Murray)  Well, does it -- is there any
18  indicia of a premises that is open to the general
19  public in that picture?
20     MS. WYER: Objection.
21 A.  It's a very poor quality photograph, and about
22  the only thing I can make out are the file cabinets
23  and maybe a printer.  The rest of it is pretty dark.
24 Q.  (By Mr. Murray)  In any case, it is true, is
25  it not, that, absent 2257 and its implementing

Page 91

(10:51-10:52)

1   regulations, and if an FBI wanted to enter these
2   premises to examine the records contained in those
3   file cabinets, without exigent circumstances or
4   voluntary consent, the FBI agent would need to get a
5   search warrant, correct?
6      MS. WYER: Objection.
7  A.  That's the same question as before.  And the
8   answer is yes.  If it was absent the 2257 inspection,
9   as part of a criminal investigation, yes, you would
10  need a warrant.
11 Q.  (By Mr. Murray)  Okay.  Now go to the next
12  page.
13 A.  Okay.
14 Q.  That's a picture of somebody's desk, correct?
15 A.  Yes.
16 Q.  With a computer, correct?
17 A.  Yes.
18 Q.  There's some headphones on the wall, correct?
19 A.  Yes.
20 Q.  There's a calendar for 2007, correct?
21 A.  Yes, sir.
22 Q.  There's paper on the desk, correct?
23 A.  Yes, sir.
24 Q.  There's a paper.  It looks like it's on the
25  wall there or --

Page 92

(10:52-10:54)

1  A.  Yes.
2  Q.  -- tacked to the wall?
3  A.  Yes, sir.
4  Q.  And look at the next page.
5  A.  Okay.
6  Q.  That appears to be a room with a table and
7   chairs and a microwave oven, correct?
8  A.  Uh-huh.  The photo log described it as a break
9   room.
10 Q.  Okay.  And by "break room," where employees
11  might go to have their lunch type thing?  That's what
12  you mean by "break room"?
13 A.  Yes, sir.
14 Q.  Well, it is true that, both with respect to
15  the photograph on page 122 and on 123, those are areas
16  of a premises where, absent 2257, if an FBI agent
17  wanted to enter those areas and he didn't have
18  voluntary consent and he didn't have exigent
19  circumstances, he would have to obtain a search
20  warrant to enter those premises to conduct a criminal
21  investigation, correct?
22     MS. WYER: Objection.  Lack of foundation
23  and calls for speculation.
24 A.  Any location that we went into was determined
25  by the producer.  They determined where the records