SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 93

(10:54-10:55)

1  are going to be stored and they determined where we're
2  going to conduct the paperwork.  So, wherever we were,
3  we were invited to be there.  We asked, "Where would
4  you like us to conduct this?"  So the break room is
5  where they had selected.  The records location is
6  where they selected.
7  Q.  That's not my question.
8  A.  Okay.
9  Q.  My question is much simpler than that, Agent.
10  First of all, the statute required them to --
11  A.  Maintain them.
12  Q.  -- keep these records, correct?
13  A.  Yes, sir.
14  Q.  And the statute required them to segregate
15  those records from any other records, correct?
16  A.  That's correct.
17  Q.  And I gather that you would expect somebody
18  who is keeping records -- well, back up.
19     Those records contained some pretty private
20  information about people, didn't they?
21     MS. WYER:  Objection.
22  A.  It contained driver's license information.  So
23  the information that would be contained on a driver's
24  license.
25  Q.  (By Mr. Murray)  IDs, date of birth, correct?

Page 94

(10:55-10:56)

1  A.  Yes.
2  Q.  In some cases, Social Security numbers if
3  they're on the driver's license?
4     MS. WYER:  Objection.
5  A.  I don't believe that was on the driver's
6  license.
7  Q.  (By Mr. Murray)  Okay.  And stage names,
8  nicknames, aliases, private information about people,
9  correct?
10     MS. WYER:  Objection.
11  A.  That information was in the records.  Yes.
12  Q.  (By Mr. Murray)  Okay.  Well, you wouldn't
13  expect these producers to keep those records in a
14  place where any member of the general public can just
15  walk in and start examining them, would you?
16  A.  No.
17  Q.  Getting back to my question, it is true, is it
18  not, that the area that is depicted on page 122 is an
19  area where, if it weren't for 2257, an FBI agent on
20  official business wanting to enter that area on a
21  criminal investigation, absent exigent circumstances
22  and/or voluntary consent, would need a search warrant,
23  correct?
24     MS. WYER:  Objection.  The witness has
25  testified he was not at this inspection.

Page 95

(10:56-10:57)

1  A.  And we have discussed that before.  So, absent
2  2257 inspection, as an FBI agent, if I were there as
3  part of a criminal investigation and I want to go
4  there to search for evidence, yes, I would require a
5  warrant.
6  Q.  (By Mr. Murray)  And the same would be true of
7  the area depicted on page 123, correct?
8  A.  I don't know if that's --
9     MS. WYER:  Objection.  Calls for
10  speculation.
11  A.  Again, I don't know if that's a public area or
12  not.
13  Q.  (By Mr. Murray)  Well, it's called a break
14  room, correct?
15  A.  Uh-huh.  That's correct.  That's how it was
16  labeled on the photo log.
17  Q.  And it's got a table and chairs, correct?
18  A.  Correct.
19  Q.  And a microwave oven, correct?
20  A.  Correct.
21  Q.  Assuming it was accurately described as a
22  break room, a place where employees would go to take a
23  break, isn't it true that, before an FBI agent could
24  enter that area, if it weren't for 2257, the FBI agent
25  on an official investigation of criminal activity

Page 96

(10:57-10:59)

1  would need a search warrant?
2     MS. WYER:  Objection.  Lack of foundation
3  and calls for speculation.
4  A.  If the agent were there on official business
5  conducting a criminal investigation, yes, they would
6  need a warrant without the things that you have
7  mentioned.
8  Q.  (By Mr. Murray)  Right.  Without exigent
9  circumstances or voluntary consent?
10  A.  Correct.
11  Q.  And the same is true that, without 2257, the
12  FBI agent would need a search warrant, absent exigent
13  circumstances or voluntary consent, to examine the
14  records that were in those file cabinets documenting
15  the performers' names and dates of birth?
16     MS. WYER:  Objection, form.  Without
17  2257, there would be no 2257 records.
18  Q.  (By Mr. Murray)  You can answer the question.
19  A.  Absent the 2257 inspection, to look at a
20  company's records without their consent, without
21  exigent circumstances, yes, you would need a warrant.
22  Q.  Okay.  Thank you.
23     Were any minors found on this inspection?
24  A.  No.
25  Q.  I want to show you what has been marked as

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 97

(10:59-11:01)

1  Plaintiff's Exhibit 3.  Darkside is the name.

2  A.  Okay.

3     MS. WYER: What is the serial?

4     MR. MURRAY: 11.  You mean -- is that

5  what you mean, this number here?

6     MS. WYER: Uh-huh.

7  Q.  (By Mr. Murray) All right.  Plaintiff's

8  Exhibit 3 is another record maintained in the ordinary

9  course of business by the FBI pertaining to these

10  inspections, correct?

11  A.  That's correct.

12  Q.  And this one is Darkside Entertainment; is

13  that correct?

14  A.  That's correct.

15  Q.  And the date of that inspection was September

16  12, 2006; is that correct?

17  A.  That's correct.

18  Q.  Let me just show you again.  So far, returning

19  to Plaintiff's Exhibit 39, that's the 22 -- that's

20  2257 that was effective July 27, 2006, correct?

21  A.  That's correct.

22  Q.  So far, all of the inspections that we've

23  talked about have occurred after July 27, 2006,

24  correct?

25  A.  I'd have to look at the other two.

Page 98

(11:01-11:02)

1  Q.  Yeah.  Let's be sure about that.

2  A.  That's correct.

3  Q.  Okay.  And this Plaintiff's Exhibit 3 also

4  occurred after July 27, 2006, correct?

5  A.  That's correct.

6  Q.  Okay.  Now, if you would turn to page 178.

7  Are you there?

8  A.  Yes, I am.

9  Q.  Okay.  So this indicates this was your report,

10  correct?

11  A.  That's correct.

12  Q.  And you've made the report on September 22nd;

13  is that correct?

14  A.  That's correct.

15  Q.  All right.  The inspection was in Van Nuys,

16  California, correct?

17  A.  Yes, sir.

18  Q.  It says that you had previously visited

19  Darkside Enter -- that reminds me.

20    Of the inspections that we've seen so far, no

21  advance notice was given to the parties inspected,

22  correct?

23     MS. WYER: Objection.

24  A.  I can only speak to the one that I conducted,

25           and no advance notice was given at

Page 99

(11:02-11:04)

1        I'm not familiar with

2  Q.  But the protocol that was set up was such

3  that, with a couple exceptions that we'll get to, no

4  advance notice was to be given, correct?  That was the

5  protocol?

6  A.  That's correct.

7  Q.  And Special Agent Joyner was charged with the

8  responsibility of carrying out that protocol as well,

9  correct --

10     MS. WYER: Objection.

11  Q.  -- in the inspections that he did?

12  A.  Could you say that again, please?

13  Q.  He was charged with the responsibility of

14  carrying out that same protocol in any inspections

15  that he did; namely, the protocol called for him not

16  to give advance warning, correct?

17     MS. WYER: You said "Joyner."

18  Q.  (By Mr. Murray)  I'm sorry.  Lawrence.

19    Special Agent Lawrence was responsible for

20  carrying out the protocol that you had developed for

21  this program, correct, when he did an inspection?

22  A.  In general, yes.  Per 2257, advance notice is

23  not to be given.  There were times when we did give

24  advance notice.

25  Q.  And we'll get to those when we --

Page 100

(11:04-11:05)

1  A.  Okay.

2  Q.  -- tet to them.  But in most of the 29, no

3  advance notice was given?

4  A.  In most of them, that's correct.

5  Q.  Okay.  So, anyway, what's interesting is on

6  this one you say that you had visited Darkside

7  Entertainment on Friday, September 8th, but no one was

8  present during the morning hours.  Do you see that?

9  A.  Yes.

10  Q.  And then you say, "Due to this, Darkside

11  Entertainment likely had advance notice of the

12  inspection," correct?

13  A.  That's correct.

14  Q.  And why would you come to that conclusion if

15  no one was there when you showed up the first time?

16  A.  I don't remember this.  I don't know if it's

17  in a business complex.  I don't know if somebody else

18  would have seen us.  I don't know.

19  Q.  Anyway, that was your conclusion at the

20  time that you wrote the report?

21  A.  Yes.

22  Q.  Okay.  And the person that you encountered

23  there was Mr. Fred Wilson, the general manager,

24  correct?

25  A.  That's correct.

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

**Page 101**

(11:05)

1  Q.  And he was present during the inspection?
2  A.  Correct.
3  Q.  As was the owner of the business?
4  A.  No.  The owner was not present.
5  Q.  Oh, I'm sorry.  Was not present.  He was
6  attending to his ill father; is that correct?
7  A.  Yes.
8  Q.  Okay.  If you look at the bottom of the page,
9  you determined that Darkside had 2257 violations,
10  correct?
11  A.  Yes.
12  Q.  They didn't have the records for one of the
13  movies; is that correct?
14  A.  Correct.
15  Q.  The photograph of one of the performers was of
16  such poor quality that you couldn't make it out?
17  A.  Correct.
18  Q.  Kind of like the photographs that you've
19  provided me?
20  A.  Yes, sir.
21      MS. WYER: Objection.
22      MR. MURRAY: I'm just trying to do a
23  little humor.  It wasn't anything other than that.
24      MS. WYER: Well, the witness did not
25  provide you with those.

**Page 102**

(11:06-11:07)

1      MR. MURRAY: Okay.
2  Q.  (By Mr. Murray)  And you had another problem
3  with the cross-referencing here, correct?
4  A.  That's correct.
5  Q.  That seemed to be one of the more common
6  violations.  Do you recall that being the case?
7  A.  Going back six or seven years, I do think that
8  was -- when there were violations, I do believe that
9  was one of the more common.
10  Q.  Okay.  All right.  And then on page 179, you
11  said one performer appeared underage, but a DMV check
12  was run to determine her true date of birth.
13  Investigation determined photo identification was
14  authentic and she was of legal age at the time of the
15  filming; is that correct?
16  A.  That's what it states.  Yes.
17  Q.  But that was your report, correct?
18  A.  That's correct.
19  Q.  Okay.  So, if you go to page 181 on the
20  findings, No. 3 of the findings, of the movie, "In the
21  Thick #4," the photo identification for a particular
22  person was not identifiable.  Again, that was because
23  it wasn't legible enough?  It was of poor quality?
24  A.  I don't remember this specific one, but most
25  of those that were not identifiable was because they

**Page 103**

(11:07-11:08)

1  had been Xeroxed so many times and you just end up
2  with a dark blob.
3  Q.  Right.
4  A.  So that would be my guess why this one was not
5  identifiable.
6  Q.  Well, you indicated on page 178 that the
7  photograph was of such poor quality --
8  A.  Okay.
9  Q.  -- it was not identifiable, correct?
10  A.  Okay.
11  Q.  But they had a photo.  It was just of poor
12  quality and you couldn't verify the date of birth,
13  correct?
14  A.  No.  You couldn't identify it by facial
15  recognition.  You were not able to make out the facial
16  characteristics of the individual.
17  Q.  But you were able to see the date of birth?
18  A.  I don't see that here, and the date of birth
19  is not mentioned in the report.  So, as this is
20  written, we have the screen capture of the performer
21  and they're saying here's the ID for this performer,
22  but you can't make a match because you can't see a
23  facial recognition from the ID.
24  Q.  I see.
25  A.  So that would be the violation is that the

**Page 104**

(11:08-11:09)

1  date of birth may have been of legal age but we don't
2  know that these two are the same people.
3  Q.  I see.  And, so, because the photo that they
4  had was of poor quality, that actually constituted a
5  violation of the law?
6      MS. WYER: Objection.
7  Q.  (By Mr. Murray)  Is that what you're saying in
8  this finding?
9  A.  Yes.  According to 75.2, they have to maintain
10  a legible copy of identification.
11  Q.  And, so, that could be prosecuted as a felony
12  if the U.S. Attorney decided to do so, correct?
13      MS. WYER: Objection.
14  A.  That would be up to the U.S. Attorney's Office
15  what to prosecute, what not to prosecute.
16  Q.  (By Mr. Murray)  Right.  But not having a
17  legible photograph is a felony in this context, isn't
18  it?
19      MS. WYER: Objection.  The witness has
20  not testified he understands what is or is not a
21  felony.
22  A.  Yes.
23      MR. MURRAY: Will you read the question
24  back and the answer so I know?
25      (Requested testimony read back)

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 105

(11:09-11:10)

1  Q.  (By Mr. Murray)  And No. 4, the records were
2  not properly cross-referenced, correct?
3  **A.  Can I ask you a question just so I'm clear?**
4  Q.  Actually, you don't get to ask questions.
5  **A.  I don't get to ask questions?**
6  Q.  No.  That's the beauty of --
7  **A.  I was going to have you define a felony for**
8  **me.  I think I know what it is, but okay.**
9  Q.  Well, what is your understanding of a felony
10  under federal law?
11  **A.  If it's punishable by more than one year.**
12  Q.  And under 2257, we went over the penalty
13  provisions and it is punishable for greater than a
14  year, correct?
15  **A.  Yes, sir.**
16      MS. WYER: Objection.
17  Q.  (By Mr. Murray)  Now, No. 4, the records were
18  not properly cross-referenced, correct?
19  **A.  That's correct.**
20  Q.  So, again, that doesn't mean -- they might
21  have had all the records they needed to maintain, but
22  they didn't have a system that would enable the
23  records to be cross-referenced with other records.  Is
24  that what you're saying?
25  **A.  No, because they don't have all the records.**

Page 106

(11:10-11:11)

1  **If they're not cross-referenced correctly, then**
2  **they're missing records.  So, if it's not -- if it**
3  **doesn't list all the stage names, maiden names, all**
4  **other aliases, then those are missing records; and if**
5  **they have not cross-referenced that correctly, then**
6  **that is a violation.**
7  Q.  Well, the section that you cite says, "Records
8  required to be maintained under this part shall be
9  categorized and retrievable to:  All names of each
10  performer, including any alias, maiden name, nickname,
11  stage name or professional name."  Do you see that?
12  **A.  Yes.**
13  Q.  So could it be -- if they have a record that
14  contains all that information but it's only
15  retrievable -- let's say it's a computer.  If it's
16  only retrievable by the true name rather than plugging
17  in the stage name, isn't that a cross-reference
18  violation?
19  **A.  Yes.**
20  Q.  Okay.  So they could actually have all the
21  information in their record system, but if it's not
22  retrievable by all of these various categories, that
23  could be a -- that's a violation?
24  **A.  Yes.  It's possible they could have all the**
25  **information but have not cross-referenced it**

Page 107

(11:11-11:12)

1  **correctly, and that would be a violation.**
2  Q.  Okay.  Now go to page 186.  This was an
3  inspection that began at 9:20 a.m., correct?
4  **A.  Yes.**
5  Q.  And, again, as all these inspections that you
6  participated in, five to seven Government personnel,
7  correct, were there?
8  **A.  Yes, sir.**
9  Q.  You took photographs of the business and the
10  room where the 2257 records were stored, correct?
11  **A.  That's correct.**
12      **MS. WYER:** Objection.  I'm going to make
13  a standing objection to all of this testimony because
14  the witness has not testified that he independently
15  remembers any of this.
16      **MR. MURRAY:** Okay.
17  Q.  (By Mr. Murray)  And then, of course, the
18  records were reviewed, correct?
19  **A.  That's correct.**
20  Q.  And copies were made of the records that you
21  reviewed, the specific records you reviewed, correct?
22  **A.  That's correct.**
23  Q.  And those copies were taken with you when you
24  left, correct?
25  **A.  That's correct.**

Page 108

(11:13-11:14)

1  Q.  And then you took photographs of the room just
2  before you left, correct?
3  **A.  That's correct.**
4  Q.  This inspection took about just under four
5  hours, correct?
6  **A.  Correct.**
7  Q.  All right.  Now, if you would look at -- page
8  208 of this exhibit is a log of the eight photographs
9  that were taken of the premises; is that correct?
10  **A.  That's correct.**
11  Q.  Okay.  And then if you look at some of these
12  photographs -- go to page 211.
13  **A.  Okay.**
14  Q.  That's a photograph of the door leading to the
15  premises?
16  **A.  Yes.**
17  Q.  Do you know who that guy is walking with the
18  briefcase?
19  **A.  That's me.**
20  Q.  I was going to say it looks kind of like you.
21  **A.  Yeah.  That's me.**
22  Q.  And then the next page is another picture of
23  the outside of this business?
24  **A.  Yes, sir.**
25  Q.  And if you look at page 214, again, it's

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

---

Page 109

(11:14-11:15)

1  hard -- these are -- these would be 2257 violations if
2  these were -- I'm sorry.
3      214 is a picture that at least we can make out
4  that are file cabinets there, correct?
5  A.  Yes, sir.
6  Q.  Then it looks like one of the drawers is open?
7  A.  That's correct.
8  Q.  And there are records inside?
9  A.  Yes.
10  Q.  And that's where the records were stored,
11  correct?
12  A.  That's correct.
13  Q.  And, again, that's an area where, absent 2257,
14  an FBI agent would need a search warrant before he
15  could enter those premises on an official
16  investigation if he didn't have exigent circumstances
17  or voluntary consent?
18      MS. WYER:  Objection.  Lack of foundation
19  and calls for speculation.
20  A.  Absent 2257 inspections, if conducting a
21  criminal investigation looking for evidence of that
22  criminal activity, yes, you would need a warrant.
23  Q.  (By Mr. Murray)  To enter that area?
24  A.  Correct.
25  Q.  Okay.  And to look through those records?

---

Page 110

(11:15-11:16)

1  A.  Yes, sir.
2  Q.  Look at page 216.
3  A.  Okay.
4  Q.  Is that a picture of the area where you and
5  the other agents were?
6  A.  According to the photo log, it's a work area.
7  Yes.
8  Q.  And "work area" means work area for you?
9  A.  Where we were set up to work.
10  Q.  And, again, that's an area -- same question.
11  Absent 2257, an official investigation of a criminal
12  nature, the FBI would need a search warrant to enter
13  that area absent exigent circumstances or voluntary
14  consent?
15      MS. WYER:  Objection.  Assumes facts not
16  in evidence, lack of foundation, calls for
17  speculation.
18  A.  Absent exigent circumstances or absent the
19  consent of the owner and absent 2257, if we're there
20  to conduct a criminal investigation, yes, we would
21  need a warrant.
22  Q.  (By Mr. Murray)  Okay.  By the way, after each
23  inspection where there was a violation noted, you
24  would forward that information to the U.S. Attorney's
25  Office?

---

Page 111

(11:16-11:18)

1  A.  No.  The procedure was, if a violation was
2  noted, I would provide a copy of that violation to the
3  owner or the custodian of records, whoever was
4  present, and they were given a week to rectify that,
5  and whatever their actions were were then noted.  So
6  probably a week or two weeks later that report would
7  be sent to DOJ.
8  Q.  Right.  But the report that would get sent to
9  DOJ would include the finding of the initial violation
10  as well as the correction by the person, correct?
11  A.  Yes.
12  Q.  Okay.  So the U.S. -- the Department of
13  Justice would have the information about the initial
14  finding of a violation, correct?
15  A.  That's correct.
16  Q.  And it would be their decision, not yours, as
17  to whether to initiate a prosecution for that finding,
18  correct?
19  A.  That's correct.
20  Q.  Okay.  And there were no minors found on this
21  one, I think, except that one that got cleared up?
22  A.  Yeah.  There was controversy on this one and I
23  think it was because it was an ID using the Buddhist
24  calendar and the owners didn't know how to calculate
25  the actual date of birth.  That's just from my

---

Page 112

(11:18-11:19)

1  recollection of this.
2  Q.  Well, let me help you there, Agent, because I
3  think you're thinking of another one.
4  A.  Okay.
5  Q.  And I don't want you to get confused.
6  A.  Okay.
7  Q.  If you go back to page 179, it looks like this
8  is not the Buddhist calendar one.
9  A.  Okay.
10  Q.  But you can't correct me if I'm wrong.  Take a
11  quick look at that again.
12  A.  Okay.  Okay.
13  Q.  Doesn't it appear to be that this was the one
14  where you had some question about the age of the
15  performer, but by a check of the DMV, you were able to
16  determine that her true date of birth was what was on
17  the photo identification?
18  A.  That's correct.  That's what's listed here.
19  Q.  And she was of legal age?
20  A.  Yeah.  That's what's listed here.  That's
21  correct.
22  Q.  Okay.  All right.  Let's take a look at
23  Plaintiff's Exhibit 4 which is            Serial 18.
24  All right.  This appears to be an inspection that was
25  done --

---

CONTINENTAL COURT REPORTERS, INC.          Min-U-Script®
                                      (713) 522-5080

Page 113

(11:19-11:20)

1   **MS. WYER: Take a minute to look at it.**

2   **THE WITNESS: Okay.**

3   Q.   (By Mr. Murray)  If you look at page 298,

4   let's start there just so that --

5   A.   Okay.

6   Q.   -- we have a framework.

7        That's your cover page.  And by "you," I mean

8   the cover page that was maintained by the FBI in

9   connection with these inspections, correct?

10  **A.   Yeah.  This appears to be FBI cover page.**

11  Q.   Okay.  And we're only distinguishing that from

12  some of the earlier pages that were provided because

13  of the discovery in this lawsuit.

14  **A.   Okay.**

15  Q.   Okay.  All right.  So this is the record of an

16  inspection done on 9/17/07 of ʄ

17  formerly known as                        , correct?

18  **A.   According to this, correct.**

19  Q.   And, again, this is an inspection that

20  occurred after July 27th of '06, which was the

21  effective date of 2257 with certain amendments,

22  correct?

23       **MS. WYER: Objection.**

24  **A.   That's subsequent to Exhibit 39 that you**

25  **showed me.  So, yeah, it came after that date.**

Page 114

(11:20-11:21)

1   Q.   (By Mr. Murray)  Yes.

2   **A.   Okay.**

3   Q.   All right.  And this one was headed by Special

4   Agent Lawrence; is that correct?

5   **A.   That's correct.**

6   Q.   And this one was conducted on 9/17/07 at the

7   residence of                   one of the owners and

8   sole custodian of records for

9   correct?

10  **A.   That's what's listed in the report.  Yes.**

11  Q.   Okay.

12  **A.   I wasn't present.  So I have to go by what's**

13  **in the report.**

14  Q.   Right.  But these were reports kept in the

15  ordinary course of business made by people familiar

16  with the facts and who recorded the facts at or near

17  the time that they were recorded?

18  **A.   Yes, sir.**

19  Q.   Okay.  And the FBI relies on reports like this

20  for their accuracy for investigative purposes,

21  correct?

22  **A.   Well, this is for inspection.  So we're doing**

23  **this --**

24  Q.   For inspection?

25  **A.   -- for inspection purposes, yes.**

Page 115

(11:22-11:24)

1   Q.   Okay.  All right.  So, if you look at page

2   302, there's a determination that the

3                    had three 2257 violations, correct?

4   **A.   Yes.**

5   Q.   And if you look at page 304, the first finding

6   was that -- are you on 304 yet?

7   **A.   Not yet.**

8   Q.   Okay.

9   **A.   Okay.**

10  Q.   The first finding was that not every page on

11  their website containing a sexually explicit conduct

12  had the label that is required by 2257, correct?

13  **A.   That's correct.**

14  Q.   And I think we talked about it earlier that

15  one of the requirements of the statute is that, on a

16  website, you have to put the 2257 label identifying

17  where the records are maintained and by whom on every

18  page of the website where actual sexually explicit

19  conduct is depicted, correct?

20  **A.   Yes.**

21  Q.   Okay.  And, so, in this case, even if they had

22  the 2257 label on nine out of ten of -- 95 percent of

23  every page, they would still be in violation for not

24  having it on the remaining pages, correct?

25       **MS. WYER: Objection.**

Page 116

(11:24-11:25)

1   **A.   I would have to review the law.**

2   Q.   (By Mr. Murray)  Okay.  Go to page 306.

3   Finding No. 3, do you see that on page 306?

4   **A.   Yes, I do.**

5   Q.   Finding No. 3 was that the 2257 statement was

6   not displayed for a sufficient duration in some of

7   their depictions, correct?

8   **A.   Yes.**

9   Q.   For example, on one of them it was displayed

10  for 4.5 seconds and another one for 3 seconds,

11  correct?

12  **A.   Correct.**

13  Q.   And that's a violation?

14       **MS. WYER: Objection.**

15  **A.   The statute states that it has to be displayed**

16  **long enough to be read by the average viewer.**

17  Q.   (By Mr. Murray)  Okay.  And how long is that?

18  **A.   I would have to find the average viewer.  I**

19  **don't know.**

20  Q.   But 4.5 seconds is not long enough for the

21  average viewer apparently?

22  **A.   I don't know how much material was contained**

23  **in that 2257 statement.  Normally it's the names, it's**

24  **the address, maybe other information.  I don't know.**

25  Q.   Well, did you have any guidelines to go by in

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 117

(11:25-11:26)

1  terms of how long you expected the message to be
2  displayed?
3  A.  The only guideline is that provided by the
4  statute which is to be read by the average viewer.
5  And, again, I --
6  Q.  Well, how -- I'm sorry.  I didn't mean to
7  interrupt you.
8  A.  Go ahead.  I'm sorry.
9  Q.  So how would you go about ascertaining whether
10  there was a violation or not if you were looking at
11  that issue?
12  A.  If I were conducting an inspection and I'm
13  looking at the length of time that it was displayed, I
14  would probably see if I could read it and then I would
15  probably have some of the other inspectors read it and
16  see if they also were able to identify it and call it.
17  Q.  Okay.  So the finding here was that, even
18  though they might have had a totally good and accurate
19  2257 statement, if it wasn't displayed long enough,
20  that's a violation?
21  MS. WYER: Objection.
22  A.  I don't know how this inspection took place.
23  Q.  (By Mr. Murray)  Right.  But that's what this
24  statement is --
25  A.  Yes.

Page 118

(11:26-11:28)

1  Q.  -- attempting to explain?
2  A.  Well, yes.  And the code is it has to be
3  displayed long enough to be read by the average
4  viewer.
5  Q.  Okay.  And if it isn't, then, even though it
6  has all the information needed on it, it's still a
7  felony, correct?
8  MS. WYER: Objection.
9  A.  If it's not displayed long enough to be read
10  by the average viewer, yes, it's a violation.
11  Q.  (By Mr. Murray)  And it's a violation that
12  constitutes a felony?
13  MS. WYER: Objection.
14  A.  Yes.
15  Q.  (By Mr. Murray)  Okay.  Go to page 316,
16  please.
17  A.  Okay.
18  Q.  Again, this shows the pre-inspection
19  procedures followed.  This is the same form that we've
20  seen so far in each one, correct, this page?
21  A.  Yes, sir.
22  Q.  Okay.  And it says here that the inspection
23  began at 11:15 a.m., correct?
24  A.  Correct.
25  Q.  And that Special Agent Lawrence immediately

Page 119

(11:28-11:29)

1  identified himself and the purpose of the inspection
2  upon entering the residence of
3  correct?
4  A.  Correct.
5  Q.  And then in paragraph four, it says that he
6  provided him with the letter that is similar to
7  Exhibit 34 that we've reviewed, correct?
8  A.  Correct.
9  Q.  That's a form letter, wasn't it --
10  A.  Yes, sir.
11  Q.  -- that you created?  Okay.
12  A.  I didn't create it; but, yes, it's a form
13  letter.
14  Q.  Okay.  And then it says, prior to the
15  inspection, digital photographs were taken of the
16  exterior of his residence, location of the records
17  storage, and the working area assigned to the
18  inspectors, correct?
19  A.  Correct.
20  Q.  And it also says on page 317 copies were made
21  of the selected performers' identifications, correct?
22  A.  Correct.
23  Q.  And the inspection concluded at 2:45, correct?
24  A.  Correct.
25  Q.  And they took photographs before leaving,

Page 120

(11:29-11:31)

1  correct?
2  A.  Correct.
3  Q.  And, so, there were five or six Government
4  agents in this residence between -- for three and a
5  half hours approximately according to this report,
6  correct?
7  A.  There would not have been five or six.  Let me
8  back up just one second.
9  For the Florida inspections, they would have
10  had -- the teams were halved.  So he would have either
11  two or three inspectors with him.  So it would have
12  been three or four people.
13  Q.  Okay.  Yes, because this inspection -- I'm
14  glad you reminded me.  This inspection actually
15  occurred in Miami, Florida, correct?
16  A.  Correct.
17  Q.  So far, the ones that we've talked about were
18  inspections done in California; is that correct?
19  A.  That's correct.
20  Q.  Okay.  So, by September of '07, you had
21  expanded to also doing some inspections in the state
22  of Florida?
23  MS. WYER: Objection.
24  A.  Well, the companies were randomly selected.
25  The initial companies that were selected were all

Page 121

(11:31-11:33)

1  located in California.  Once there had been companies
2  randomly selected that were in Florida, we grouped
3  them together and then used -- did those inspections
4  all at one time.
5  Q.   Okay.  But, again, they were done by the same
6  team, only the team was cut in half?
7  A.   That's correct.
8  Q.   But you're not talking about different people?
9  A.   No.  It's the same people that were identified
10  earlier.
11  Q.   So, in this case, there would have been two or
12  three agents in this residence for three and a half
13  hours?
14  A.   It would have been three or four.
15  Q.   Okay.  Is there any indication that you found
16  here that advance notice had been given to the owner
17  of that residence?  Did you see anything to that
18  effect?
19       MS. WYER:  Objection.  Have you had a
20  chance to review it?
21       THE WITNESS: I haven't.
22  A.   I don't see any reference to giving advanced
23  notice.
24  Q.   (By Mr. Murray)  Now turn to page 334, the
25  photo log.

Page 122

(11:33-11:34)

1  A.   Okay.
2  Q.   What is this -- I saw this in a couple others.
3  The first thing that is usually described is "title
4  page."
5  A.   Uh-huh.
6  Q.   Was a picture taken of the title page?  What
7  does that mean?
8  A.   It's missing in this one.  The title page --
9  you can see it in the others.
10  Q.   Yeah.
11  A.   The title page would just include the name of
12  the company being inspected and the date of the
13  inspection.
14  Q.   But how would that be created?  Is that a
15  picture of a sign or what is a picture of that?
16  A.   Yeah.  That's just generated and then place it
17  on the floor and take a photograph of it.
18  Q.   Okay.  So that's not something that's at the
19  premises?
20  A.   Oh, no, no, no.  That's just something we did
21  so that we can differentiate the photos.
22  Q.   I got you.  Okay.  All right.
23       So, then, if you look at page 335, you see
24  that that's a photo of the front of the residence that
25  was the subject of this inspection, correct?

Page 123

(11:34-11:35)

1  A.   Correct.
2  Q.   And the next page is a photo of, again, a file
3  cabinet, correct, with records in it?
4  A.   Yes, sir.
5  Q.   As is the next page, correct?
6  A.   Yes, sir.
7  Q.   And the next page looks to be the dining room
8  of this residence, doesn't it?
9  A.   That's what it looks like.
10  Q.   And that's true of the next picture as well,
11  correct?
12  A.   Yes, sir.  There's your title page, just out
13  of order.
14  Q.   Ah.  Yes.
15       Now, these photos, it is true, is it not,
16  that, absent 2257 and absent exigent circumstances and
17  absent voluntary consent, the FBI would need a search
18  warrant and probable cause to get a search warrant
19  before it could enter the residence depicted in these
20  photos, correct?
21       MS. WYER:  Objection.  Lack of foundation
22  and calls for speculation.
23  A.   Absent the 2257 inspections and if conducting
24  a criminal investigation in search of evidence, yes,
25  they would need probable cause and a search warrant to

Page 124

(11:35-11:38)

1  enter.
2  Q.   And they would need probable cause and a
3  search warrant in that same scenario to search -- to
4  inspect or examine the file cabinets and the records
5  contained in those file cabinets depicted on these
6  pictures?
7       MS. WYER:  Same objection.
8  A.   In the same scenario, yes.
9  Q.   (By Mr. Murray)  Okay.  Now, in this
10  particular person, again, there were some violations
11  noted; is that correct?
12  A.   Yes.  And this would include -- on page 306,
13  No. 3, again, was the 2257 statement was not displayed
14  for a sufficient period of time?
15  A.   Correct.
16  Q.   Okay.  Let's take a look at Plaintiff's
17  Exhibit 5 which is                  I 13.  This was an
18  inspection done of /
19              , on August 16, 2006, correct?
20  A.   Correct.
21  Q.   Again, after the July 27th, 2006 effective
22  date of the most recent amendment to 2257, correct, as
23  depicted in Plaintiff's Exhibit 39?
24  A.   Correct.
25       MS. WYER:  Objection; misleading.

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 125

(11:38-11:40)

1  Q.  (By Mr. Murray)  And this was one that you did
2   if you look at page 408?
3  A.  Yes.
4  Q.  Okay.  And one of the owners was present
5   during this inspection?
6  A.  Yes.
7  Q.  And you report that the owner of the business,
8        provided a copy of court records dated in 2004
9   which indicated that            had purchased
10  product from          and          and that
11           and            had gone out of
12  business and that        had successfully bid
13  on the products those companies had in stock, correct?
14   She told you that according to your report?
15  A.  According to the report, yes.
16  Q.  And according to the report, you explained to
17   her that             , then had the
18   responsibility to maintain proper 2257 information
19   upon the receipt and ownership of these films that
20   belonged to                , correct?
21  A.  Correct.
22  Q.  And she didn't have the 2257 records for the
23   videos that she had bid on, correct?
24  A.  From reading this, I don't know if it's the
25  same videos that she had bid upon or not, but she had

Page 126

(11:40-11:41)

1  2257 violations.
2  Q.  Okay.  So she had several 2257 violations I
3   think you indicated in your report, did she not?
4  A.  Yes.
5  Q.  Now, if you would look at page 433, which
6   shows your report of inspection procedures, you began
7   at 9:30 in the morning, correct?
8  A.  Correct.
9  Q.  You took the photographs of the business in
10  the room where they had their 2257 records, correct?
11  A.  Correct.
12  Q.  You made copies of the records that you
13   examined, correct?
14  A.  Correct.
15  Q.  And you took photographs before you left?
16  A.  Correct.
17  Q.  And you stayed there until about 3:00 in the
18   afternoon?
19  A.  That's correct.
20  Q.  So that inspection took approximately five and
21   a half hours; is that correct?
22  A.  Yes, sir.
23  Q.  And where were they located again?  Were they
24   in Florida or in -- oh, they're in California.
25   They're in Van Nuys.

Page 127

(11:41-11:43)

1  A.  Yes.
2  Q.  Now let's go to the photos beginning on page
3   459.  That's a photograph of the building that the
4   business was located in?
5  A.  Yes.
6  Q.  And the next page shows the entrance to the
7   business premises?
8  A.  That's correct.
9  Q.  Now, the next page shows an office, does it
10  not, or some kind of an area within the business?
11  A.  Yes.
12  Q.  And then the next page shows a hallway within
13   the confines of the business premises?
14  A.  Yes.
15  Q.  The next picture is difficult to make out.
16  A.  According to the photo log, it says same
17   hallway.
18  Q.  Right.  And then the next picture is supposed
19   to be what?
20  A.  Entryway to 2257 workroom.
21  Q.  Okay.  And then the next picture would be the
22   2257 storage area where they keep the records?
23  A.  The photo log just lists it as a workroom.
24  Q.  Okay.  And that workroom consists of some
25   shelving type cabinets, correct?

Page 128

(11:43-11:45)

1  A.  Correct.
2  Q.  With what appears to be various binders of
3   records?
4  A.  I can't tell what it is; but, yes, it could be
5   binders.
6  Q.  And there are boxes on the right side?
7       MS. WYER: Could you specify what
8   photograph you're looking at?
9       MR. MURRAY: Yeah, 465.
10  A.  Yes.
11  Q.  (By Mr. Murray)  Okay.  And then if you look
12   at page 466, it's easier to see that these are, in
13   fact, binders of records, correct?
14  A.  I don't know what's contained in them, but it
15   looks like binders.
16  Q.  Binders with some contents in them?
17  A.  I can't see that.
18  Q.  Okay.  And then the next --
19  A.  But I'm sure it does.
20  Q.  And then the next picture is what?  I see a
21   filing cabinet.  Do you not see that with the drawer
22   open?
23  A.  Yes.
24  Q.  And then the next picture is -- do you know
25   who that person is sitting behind that desk?

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

Min-U-Script®

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

---

**Page 129**

(11:45-11:46)

1  A.  Yes.
2  Q.  Who is that?
3  A.  That's
4  Q.  He's one of the Government agents?
5  A.  He is one of the independent contractors.
6  Q.  And he's sitting behind a desk and in front of
7  him it looks like there's some kind of machinery on a
8  table?
9  A.  That's probably the copier that we brought
10 with us.
11 Q.  And the next two pictures are, again, of that
12 area where he's sitting behind that desk?
13 A.  Yes.
14 Q.  Now, it is true, is it not -- again, let's
15 make sure that we're on the same page.
16     Absent 2257, absent exigent circumstances,
17 absent voluntary consent, if the FBI on official
18 business wanted to gain entrance to the areas depicted
19 in the photos beginning on page 461 and ending on
20 469 -- I'm sorry -- 470, the FBI would have to get a
21 search warrant, correct?
22     MS. WYER:  Objection.  Assumes facts not
23 in evidence; lack of foundation; calls for
24 speculation.
25 A.  To save time, instead of doing this for each

---

**Page 130**

(11:46-11:47)

1  one, can we just say "blanket"?  Can we do that?
2  Q.  Yes.
3  A.  But yes.
4  Q.  You agree with that?  With all the -- look,
5  let's stipulate that each time I ask this question,
6  even if I forget to include one of the qualifications,
7  all the qualifications that were in the previous
8  questions:  absent exigent circumstances, absent
9  voluntary consent, absent 2257 authority, an official
10 visit by the FBI on a criminal investigation, to enter
11 these areas, you would need a search warrant, correct?
12     MS. WYER:  Objection.  I'll make the same
13 standing objection.
14 A.  If we can agree that your question remains the
15 same and my answer remains the same for all of these.
16 Q.  (By Mr. Murray)  Yes, but I need your answer.
17 A.  Yes.
18 Q.  Your answer is yes?
19 A.  Yes.
20 Q.  Okay.  And the same would be true with respect
21 to examining the records that were contained within
22 those premises?
23 A.  Absent a 2257 inspection, on official
24 business, if an agent wanted to look at those records
25 for a criminal investigation in search of evidence,

---

**Page 131**

(11:47-11:49)

1  yes, it would require probable cause and a warrant.
2  Q.  Thank you.
3     Okay.  Let's go to No. 6 which is
4  18. All right.  On page 546, this indicates that it
5  was an inspection done of --
6     MS. WYER:  Could he have a chance to look
7  at it?  Are you ready?
8     MR. MURRAY:  I was just going to ask him
9  about the title page.
10    THE WITNESS:  Uh-huh.  Yeah.  546.
11    MS. WYER:  Okay.  If you're ready.
12 Q.  (By Mr. Murray)  Are you ready?
13 A.  Yes, sir.
14 Q.  Okay.  This was an inspection done of
15     ＿＿＿ in San Diego, California on March 27, 2007,
16 correct?
17 A.  That's correct.
18 Q.  Again, after the July 27, 2006 effective date
19 of 2257 in Plaintiff's Exhibit 39?
20    MS. WYER:  Objection; misleading.
21 A.  That's correct.
22 Q.  (By Mr. Murray)  All right.  And this one was
23 done by Agent Lawrence as the lead, correct?
24 A.  Correct.
25 Q.  And the owner -- according to his report, the

---

**Page 132**

(11:49-11:50)

1  owner was present throughout the inspection?
2  A.  Correct.
3  Q.  Okay.  The inspection summary is a little bit
4  different on this one because, if you look at the
5  second to last paragraph, it indicates that --
6     MS. WYER:  Could he have a chance to read
7  the whole thing first?
8     MR. MURRAY:  Well, I was going to read it
9  to him, but okay.
10 A.  (Reading)
11    Okay.
12 Q.  (By Mr. Murray)  So, in this one, according to
13 Agent Lawrence's report, in the second to last
14 paragraph on page 549, he indicates that their website
15 purports that its movies contain surreptitious
16 recordings made in locker rooms and showers on actual
17 military bases which my be a violation of 18 USC
18 Section 1801, Video Voyeurism Prevention Act, 18 USC
19 Section 2511, which is the wiretapping statute; is
20 that correct?  That's what he writes in his report?
21 A.  That's what's listed.  Yes.
22 Q.  Okay.  And then in the last paragraph, it does
23 state, though, that during the inspection the
24 inspectors observed a studio containing a locker room
25 and showers that had been built in the back of ＿

---

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 133

(11:50-11:52)

1     . offices.  This studio accounted for some
2  but not all of the scenes contained in .
3       . website; is that correct?
4  **A.  That's correct.**
5  Q.  And then on the next page he also writes that
6  the producer advised that approximately 90 percent of
7  the performers appearing in the movies are active
8  military personnel from a certain station, correct?
9  **A.  Correct.**
10  Q.  And Agent Lawrence reports that, "Consultation
11  with personnel from the United States Naval Criminal
12  Investigative Services determined that such actions by
13  active military personnel would be a violation of the
14  Uniform Code of Military Justice.  Liaison with NCIS
15  personnel regarding this and possible surreptitious
16  recording on military bases is continuing."  Is that
17  correct?
18  **A.  That's what it states.**
19  Q.  So, at least in this inspection, there is a
20  report that would indicate a potential investigation
21  of potential violations of other criminal statutes,
22  correct?
23  **A.  Yes, sir.**
24  Q.  Now, it was determined that they had seven
25  violations of 2257, correct?

Page 134

(11:52-11:53)

1  **A.  That's what the report says.  Yes.**
2  Q.  If you look at page 552, one of the
3  violations, No. 3, is that the producer does not
4  maintain at least 20 normal business hours per week
5  and normal business hours were not posted; is that
6  correct?
7  **A.  That's correct.**
8  Q.  So this goes back to -- remember, we were
9  talking earlier about the fact that, if you don't have
10  normal business hours of at least 20 hours a week,
11  you've got to give a notice to somebody of which hours
12  you're going to be there, correct?
13  **A.  Correct.**
14  Q.  And according to Agent Lawrence's report, this
15  particular person didn't keep 20 normal business hours
16  and didn't give the proper notice, correct?
17  **A.  That's what the report states.  Correct.**
18  Q.  And that's a violation?
19  **A.  That's correct.**
20       **MS. WYER:** Objection.
21  Q.  (By Mr. Murray)  And, again, here we've got
22  this no cross-reference system again, No. 4, on this
23  one, correct?
24  **A.  Yes.**
25  Q.  Okay.  Now let's take a look at the photos to

Page 135

(11:53-11:55)

1  see where these inspections occurred.  The photo log,
2  Agent Joyner, is on page 588.
3  **A.  Okay.**
4  Q.  According to this photo log, there was the
5  title page, which is standard, correct?
6  **A.  Yes, sir.**
7  Q.  And then the building front and then the
8  building front door, correct?
9  **A.  Yes.**
10  Q.  I'm just looking at the log.
11  **A.  Okay.**
12  Q.  Then it says "2257 records, red binder on
13  table."  And then it has all these pictures of the
14  studio lockers, studio medical exam room, studio
15  lockers and storage area.  What is the justification
16  for taking those pictures?
17       **MS. WYER:** Objection.
18  **A.  I wasn't present.  So I couldn't answer that.**
19  Q.  (By Mr. Murray)  Well, can you think of any
20  justification for taking those photos?
21       **MS. WYER:** Objection.  Calls for
22  speculation.
23  **A.  I wasn't present.**
24  Q.  (By Mr. Murray)  Well, does your understanding
25  of the statute regulations authorize you to enter

Page 136

(11:55-11:56)

1  other areas besides the area that you need to enter to
2  examine the 2257 records?
3  **A.  If you see -- it goes back to the plain view**
4  **doctrine or it's indications of other criminal**
5  **activity.  I don't know if the owner granted access.**
6  **I don't know if the owner provided a tour of the**
7  **building.  I don't know any of these things.  I can't**
8  **answer.**
9  Q.  Okay.  All right.  Take a look, then, at page
10  592.  That's an area with -- it's got a table, does it
11  not, and some records on it?
12  **A.  Yes, sir.**
13  Q.  Most of these photos are hard to make out.
14  These are some of the worst ones.  But 599 shows this
15  locker room area, correct?
16  **A.  Yeah.  I see lockers.**
17  Q.  The next one that seems to be somewhat legible
18  is on 609 -- 602, I should say.
19  **A.  Okay.**
20  Q.  And that appears to be some boxes with
21  whatever contents are in them, correct?
22  **A.  Correct.**
23  Q.  A table of some kind and a chair?
24  **A.  Correct.**
25  Q.  The next one appears to be a bathroom?

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 137

(11:56-11:58)

1  A.  Yes, a series of sinks.
2  Q.  If you look at page 605, again, it's a little
3  better picture of this office area that has a desk,
4  correct?
5  A.  It looks like a table and a chair.
6  Q.  With a bunch of papers strewn, you know, on
7  that table, correct?
8  A.  Yes, sir.
9  Q.  Like a bulletin board type thing on the wall?
10  A.  Yes.
11  Q.  Some shelving on the left side of this with
12  some other papers and objects?
13  A.  Yes.
14  Q.  File cabinets on the right side of this?
15  A.  I guess that's a file cabinet.  Yes.
16  Q.  It looks like there's even some type of
17  artwork at the top.  I can't make out what it is, but
18  it looks like picture frames, doesn't it, on the wall?
19  A.  Oh, on the wall?  Yes.
20  Q.  This area is an area that the FBI could not
21  enter without a search warrant unless they had exigent
22  circumstances or voluntary consent --
23  A.  I thought we were going to stipulate --
24  Q.  -- in the absence of 2257 with all those same
25  qualifications?

Page 138

(11:58-12:00)

1  A.  I thought we were going to stipulate to all
2  this?
3      MS. WYER:  Objection.  Assumes facts not
4  in evidence, including that these are private areas.
5  Calls for speculation and lack of foundation.
6  A.  If this were a private area in a private
7  business, absent the situations that you mentioned, if
8  it were a criminal investigation, an agent looking for
9  evidence of a crime would require probable cause and a
10  warrant.
11  Q.  (By Mr. Murray)  Well, are you saying this is
12  not a -- this is not an area of -- a private area of
13  the premises -- of this business premises, this
14  photograph?
15  A.  I don't know.  I wasn't there for the
16  inspection.
17  Q.  This was an inspection of business premises of
18              wasn't it, according to the report on
19  page 549?
20  A.  According to the report, yes.
21  Q.  And, in fact, the photographs show the outside
22  of the business premises?
23  A.  That's what's listed in the photo log.
24  Q.  Okay.  And if you look at page 590 and 591, it
25  appears to be the outside of a building.

Page 139

(12:00-12:01)

1  A.  Correct.
2  Q.  And we know from the report that there were
3  these locker areas inside the building?
4  A.  That's correct.
5  Q.  But are you saying that looking at what is
6  depicted -- well, okay.  If you look at the photo log,
7  the fourth picture is described as "2257 records, red
8  binder on table."  Do you see that description in the
9  photo log?
10  A.  Yes.
11  Q.  Okay.  And if you look at that photo on page
12  592, do you see the binder on the table?
13  A.  Yes.
14  Q.  And is it your testimony that you can't tell
15  from this picture and from that description that this
16  is business premises and an area of the business
17  premises that is not open to the general public?  Is
18  that your testimony?
19  A.  I can assume that, but I don't know that
20  because I wasn't there.  So I have no idea where this
21  was located.
22  Q.  From the picture, what is your belief?
23  A.  What is my assumption?
24  Q.  Yes.
25  A.  My assumption is that it would be that it's in

Page 140

(12:01-12:03)

1  the business.
2  Q.  In a private area in the business as opposed
3  to John Doe just walking in and wandering around
4  there, correct?
5  A.  I don't know if this is a general office area,
6  if this is a reception area.  I don't know.  And the
7  photograph is certainly not clear enough for me to
8  determine that.
9  Q.  And what about the locker area?  Based on the
10  report and the description, that's not -- that's a
11  private part of the business premises, isn't it?
12      MS. WYER:  Objection; mischaracterizing.
13  A.  Again, I wasn't there.  So my assumption is
14  that it would be, but I wasn't there.
15  Q.  (By Mr. Murray)  Based on your best
16  information by looking at these reports, you would
17  agree, would you not, that with all the qualifications
18  in my prior questions, the FBI would need a search
19  warrant ordinarily to enter those areas -- those
20  premises and those areas within that business?
21      MS. WYER:  Objection.  Assumes facts not
22  in evidence; lack of foundation; calls for
23  speculation.
24  A.  With all the caveats that you provided and
25  with the assumption that all these areas are within a

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 141

(12:03-12:05)

1  private area of the business, yes.

2  Q.  (By Mr. Murray)  And, certainly, to examine

3  the records kept on those business premises, with all

4  the qualifications, the FBI would need a search

5  warrant, correct?

6  **MS. WYER:** Objection.  Same objection.

7  **A.  Again, absent 2257 and if it were a criminal**

8  **investigation in search of evidence, yes, the agent**

9  **would need probable cause and a search warrant.**

10  Q.  (By Mr. Murray)  No. 7, Plaintiff's Exhibit 7,

11  which is Authentic.  I think I will give you the

12  supplement.  Yes.  I also want to show you -- well,

13  I'm going to show you Plaintiff's Exhibit 7 and then

14  I'm going to also show you Plaintiff's Exhibit 30

15  because this was a supplement provided to Plaintiff's

16  Exhibit 7, which I think is the rest of the report,

17  but we'll establish that in a minute once you've had a

18  chance to look at it.

19  **MS. WYER:** Do you want to take a break?

20  **MR. SAMONDS:** I'm just going to take a

21  quick restroom break.

22  **MR. MURRAY:** I mean, we can break.

23  **THE WITNESS:** Do you want to break for

24  lunch?

25  **MR. MURRAY:** The agent says he likes to

Page 142

(12:05-12:49)

1  eat lunch.

2  **THE WITNESS:** Is there something close by

3  that's fast?  I can just grab a sandwich or something.

4  That will be fine.

5  **MR. MURRAY:** Let's go off the record.

6  (Lunch recess)

7  Q.  (By Mr. Murray)  All right.  Agent Joyner, I

8  put in front of you when we left for lunch Plaintiff's

9  Exhibit 7 as well as 30, I think.

10  **A.  Yes, sir.**

11  Q.  I think when you combine the two of them that

12  constitutes the inspection report for an entity known

13  as _____ dealing first with Plaintiff's

14  Exhibit 7, would you turn to page 659 which is the

15  title page?

16  **A.  Okay.**

17  Q.  And this was an inspection done of

18  _____ also known as / _____ in

19  San Clemente, California on August 22, 2007; is that

20  correct?

21  **A.  That's correct.**

22  Q.  So far, you would agree with me we haven't

23  come across any inspections that occurred prior to

24  July 27th, '06?

25  **A.  That's correct.**

Page 143

(12:49-12:51)

1  Q.  Okay.

2  **MS. WYER:** Objection; misleading.

3  **A.  We haven't reviewed any of the inspections**

4  **before that date.  Correct.**

5  Q.  (By Mr. Murray)  Yeah.  Okay.  All right.  If

6  you turn to page 661, the report date on this -- this

7  was Special Agent Lawrence who wrote this report,

8  correct?

9  **A.  Correct.**

10  Q.  And he reported on January 14, 2008?

11  **A.  Correct.**

12  Q.  Although the inspection was conducted on

13  August 22, '07, correct?

14  **A.  That's what's listed.  Yes.**

15  Q.  Okay.  And if you look at the -- and the owner

16  was present throughout the inspection, correct,

17  according to his report?

18  **A.  _____ : sold _____ and**

19  **_____ was the one that was present.**

20  Q.  Yes.  Okay.  In fact, he might have been the

21  former owner, but the point is the principal involved

22  in whatever entity was being inspected was there?

23  **A.  Correct.**

24  Q.  Okay.  And if you look at page 663, the

25  inspection procedures, that inspection began at 12:40

Page 144

(12:51-12:52)

1  p.m.; is that correct?

2  **A.  That's correct.**

3  Q.  And the agent identified himself and the

4  purpose of the inspection upon entering the residence

5  of this individual, correct?

6  **A.  That's correct.**

7  **MS. WYER:** According to the document.

8  **A.  Yes.**

9  Q.  (By Mr. Murray)  So this was an -- this is the

10  second inspection that occurred at a residence,

11  correct --

12  **MS. WYER:** Objection.

13  Q.  -- that we've encountered.  We had one other

14  previous.

15  **A.  Of the ones that we reviewed so far?**

16  Q.  So far, yes.

17  **A.  Yes.  Correct.**

18  Q.  Okay.  Special Agent Lawrence provided the

19  letter that we've talked about before that was a

20  temp -- you know, a prototype letter that you used

21  whenever you did these inspections, correct?

22  **A.  That's what's listed in the report.  Yes.  And**

23  **I wasn't present during this report.**

24  Q.  Right.  But the letter --

25  **A.  That's what the report says.**

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

---

Page 145

(12:52-12:53)

1  Q.  And I think that we -- pull out 34.  Let's
2  make sure we've got all these letters accounted for.
3  If you would go back to Exhibit 34.  Oh, here it is.
4  Okay.
5  A.  Okay.
6  Q.  Exhibit 34 was the letter that you signed,
7  correct, that we talked about before?
8  A.  That's correct.
9  Q.  And I think I gave you 32.  Do you have that,
10  the original?  Did I give Ms. Wyer 32?
11      MS. WYER: I don't know.  I didn't know
12  this was the original.
13      MR. MURRAY: Yeah.  Because I gave that
14  to you because I thought it was going to be the same.
15      MS. WYER: I thought he had made copies.
16      MR. SAMONDS: I made copies of the two
17  that you gave to me.
18      MR. MURRAY: And did you give me back
19  the -- I don't think you gave them back to me though.
20      MR. SAMONDS: Yes.  I gave her the two
21  copies and you the two copies.
22      MR. MURRAY: Ah.  Okay.
23  Q.  (By Mr. Murray) I'm showing you what's been
24  marked as Plaintiff's Exhibit 32.  This is a letter
25  sent to                 . it not, or addressed to        |

---

Page 146

(12:53-12:55)

1  should say?
2  A.  Yes.  Correct.
3  Q.  And that's signed by Agent Lawrence?
4  A.  That's correct.
5  Q.  But it's the same letter that you wrote and
6  signed which is Plaintiff's Exhibit 34, correct?
7  A.  I don't know who originally drafted the
8  letter, but it's the same letter that we disseminated
9  at the beginning of the inspection.
10  Q.  Right.
11  A.  I think it was drafted by OGC.  I'm not sure.
12  Q.  And "OGC" stands for?
13  A.  Office of General Counsel with the FBI.
14  Q.  Okay.  And then Plaintiff's Exhibit 33 is
15  another letter.  This one bears your name; is that
16  correct?  And that's addressed to whom?
17  A.
18  Q.  And, again, that's the same -- the content is
19  the same as the other letters, correct?
20  A.  They're not identical, but they're the same
21  message.
22  Q.  Is there something -- show me what's different
23  about the two.
24  A.  It says, "If any violations of 18 USC.  If no
25  violations are discovered."  Then it lists the

---

Page 147

(12:55-12:56)

1  company.  Just a little bit different wording.
2  Q.  Okay.
3  A.  But the meaning is the same.
4  Q.  All right.  Now, getting back to Plaintiff's
5  Exhibit 7.  So Agent Lawrence provided this individual
6  with that type of a letter that we've been talking
7  about, correct?
8      MS. WYER: According to the report.
9  A.  Yes.  Correct.
10      MR. MURRAY: Is that an objection or are
11  you adding something to my question?
12      MS. WYER: Are you asking whether he has
13  personal knowledge?
14      MR. MURRAY: No.  I'm asking you whether
15  you're trying to add to my question which I think is
16  improper.  If you'll make an objection, I'll be glad
17  to take it into account in determining whether I
18  should rephrase the question, but I don't think you
19  should be adding something to my question is what I'm
20  saying.
21  A.  As I mentioned, I wasn't present.  So all of
22  my answers are based upon the report --
23  Q.  (By Mr. Murray) Of course.
24  A.  -- prepared by Steve Lawrence.
25  Q.  Of course.  All right.  And, again, the same

---

Page 148

(12:56-12:57)

1  protocol, according to this document, was filed and
2  prior to the inspection digital photographs were taken
3  of          residence and the working area assigned
4  to the inspectors, correct?
5  A.  Correct.
6  Q.  And copies -- if you go to the next page,
7  copies of the examined records were made and taken off
8  the premises, correct?
9  A.  Correct.
10  Q.  And then photographs were taken of the area
11  used by the inspection team before departing, correct?
12  A.  Correct.
13  Q.  And the inspection ended at 2:30 p.m.
14  according to the report?
15  A.  That's correct.
16  Q.  So that inspection was about just under three
17  hours?  I'm sorry.  A little over two hours, I should
18  say?
19  A.  A little over two, yes.
20  Q.  Okay.  Now, unfortunately, I don't think we
21  have any of the photos.  I don't know where they are,
22  but see if you can find any of the photos in
23  Plaintiff's Exhibit 30, which is the supplement to
24  this.
25  A.  There's the photo log and the title but no

---

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 149

(12:57-12:59)

1  other photos.
2  Q.  (By Mr. Murray)  We would request that those
3  be provided, and we do need legible copies of the
4  photos.  If those can't be done, we would like an
5  opportunity to look at the originals at some point,
6  but I don't think we were -- now, I will say this.
7  There is one other supplemental picture.  See if you
8  can -- but I don't think that was one of them.  I'm
9  going to show you Plaintiff's Exhibit 31, and let me
10  know if you can find -- I don't think they're in
11  there, but see if you can locate the photographs for
12         .  I think they're for a couple of other
13  places.
14         MR. MURRAY: Do you have them?  Can I see
15  those?  Is that the photo?
16         MS. WYER: These are just a copy of that.
17         MR. MURRAY: Oh, okay.
18  A.  Unless it has a title page, I wouldn't
19  recognize --
20  Q.  (By Mr. Murray)  All right.  Well, then let's
21  just move on.
22  A.  Okay.
23  Q.  I didn't see it in there either.
24         Okay.  Let's go to Plaintiff's Exhibit 8.
25  A.  Can I put these aside now?

Page 150

(12:59-13:00)

1  Q.  Yes.
2  A.  Okay.
3  Q.  Yes.  You can put those aside for the moment.
4         MS. WYER: What is 8?
5         MR. MURRAY: Candid Serial 20.
6  Q.  (By Mr. Murray)  And if you turn to page 670
7  of the title page, this was a report of an inspection
8  done at (        on September 18, 2007,
9  correct?
10  A.  That's correct.
11  Q.  And if you go to page 673, you will see that
12  you are the author of the Regulatory Inspections
13  Report, correct?
14  A.  That's correct.
15  Q.  And that the date of your report is October
16  16, 2007; whereas, the date of the inspection was
17  September 18, 2007; is that correct?
18  A.  That's correct.
19  Q.  And the inspection was conducted at the
20  business premises of that entity in St. Petersburg,
21  Florida, correct?
22         MS. WYER: Do you need a minute to read
23  it?
24  A.  That's correct.
25  Q.  (By Mr. Murray)  And the owner of the entity

Page 151

(13:00-13:02)

1  was present during the inspection?
2  A.  That's correct.
3  Q.  Okay.  There were several 2257 findings of
4  violations, correct, according to the second to last
5  paragraph?
6  A.  That's correct.
7  Q.  And, for example, on page 675, the first
8  finding was that they used a post office box rather
9  than a physical address as the location of the records
10  for certain titles?
11  A.  That's correct.
12  Q.  And at that time, you had to actually list the
13  physical address under the regulations?  You couldn't
14  identify a post office box address?
15  A.  That's correct.
16         MS. WYER: Objection.
17  Q.  (By Mr. Murray)  They had a cross-reference
18  system, but it wasn't updated.  That was another
19  problem; is that correct?  No. 3.
20  A.  That's correct.
21  Q.  No. 2, the problem was a production date is
22  listed on the DVD jacket, but no production date is
23  included in the movie for the following titles; is
24  that correct?
25  A.  That's correct.

Page 152

(13:02-13:03)

1  Q.  So what you're saying there or what you were
2  finding there is that, under the regulations, it's not
3  enough to list the production date of the DVD in this
4  case on the jacket of the DVD?  It's actually got to
5  be some place in the movie?
6  A.  I'd have to refer back to the regulations.
7  Q.  Well, you say --
8  A.  But that's what it's showing here.  Yes.
9  Q.  Okay.
10  A.  According to this report, it's not sufficient
11  to have it on the DVD jacket.  It has to be on the DVD
12  itself or within the DVD.
13  Q.  And, so, that's a violation that is a felony?
14         MS. WYER: Objection.
15  Q.  (By Mr. Murray)  Is that correct?
16         MS. WYER: Objection.
17  A.  I'm no longer familiar with 2257; but based on
18  this report, it's indicating that it is a violation.
19  Yes.
20  Q.  (By Mr. Murray)  And every violation of 2257
21  we've discovered is a felony, correct?
22         MS. WYER: Objection; misleading.
23  A.  For the violations that are listed, yes.  I
24  believe it did say that the possible sentencing is up
25  to five years.

Min-U-Script®

Page 153

(13:04-13:05)

1  Q.  (By Mr. Murray)  I want to show you again
2  Plaintiff's Exhibit 39 just so that we're --
3  A.  Okay.
4  Q.  -- clear about a couple of things.
5      That's, as we've talked about, the 2257
6  statute effective July 27, '06, correct?  Do you see
7  that?
8  A.  Yes.
9  Q.  And if you go to the second page of that, it
10  is subsection (f) that specifies what shall be
11  unlawful.  Do you see that?
12  A.  Yes, I do.
13  Q.  And it says in subsection (f)(1) that it is
14  unlawful for any person to whom subsection (a) applies
15  to fail to create or maintain the records as required
16  by subsections (a) and (c) or by any regulation
17  promulgated under this section.  Do you see that?
18  A.  I do.
19  Q.  So it's a violation if you don't comply with
20  the statute in that regard and it's also a violation
21  if you don't comply with the regulation in that
22  regard, correct?
23      MS. WYER: Objection.  The witness is not
24  a lawyer.
25  A.  As this reads, that's correct.

Page 154

(13:05-13:06)

1  Q.  (By Mr. Murray)  And subsection 2 says, "For
2  any -- it shall be unlawful for any person to whom
3  subsection (a) applies knowingly to fail to make an
4  false entry in or knowingly to fail to make an
5  appropriate entry in any record required by subsection
6  (b) of this section or any regulation promulgated
7  under this section."  Do you see that?
8  A.  I do.
9  Q.  So, again, a violation of both the statute and
10  the reg is a crime, correct?
11      MS. WYER: Objection.  Calls for legal
12  knowledge.
13  A.  As this reads, that's how I would interpret
14  it.  Yes.
15  Q.  (By Mr. Murray)  Okay.  And it goes on to say
16  in subsection (3), "It shall be unlawful for any
17  person to whom subsection (a) applies knowingly to
18  fail to comply with the provisions of subsection (e)
19  or any regulation promulgated pursuant to that
20  subsection," correct?
21  A.  That's correct.
22  Q.  And if you go to subsection (e), that's the
23  section up above there that describes the requirement
24  of putting the 2257 statement or label on, correct?
25  A.  That's correct.

Page 155

(13:06-13:07)

1  Q.  Okay.  So, when you combine that with (f)(3),
2  it is a violation of the statute as well as -- a
3  violation of both the statute and/or the reg is a
4  criminal offense?
5      MS. WYER: Objection.  Lack of
6  foundation.  Lack of legal foundation.
7  A.  That's how I would interpret it.  Yes.
8  Q.  (By Mr. Murray)  Thank you.
9      On page 678, there was something entitled
10  "Producer Response to Findings"; is that correct?
11      MS. WYER: Are you back on exhibit --
12      MR. MURRAY: Yes.  I'm sorry.  On
13  Plaintiff's Exhibit 8.
14  A.  Yes.  That's correct.
15  Q.  (By Mr. Murray)  Okay.  And you record what
16  the responses were by the producer to your findings of
17  violations, correct?
18  A.  That's correct.
19  Q.  And I notice in No. 5 it says, "Copies of
20  identifications were later provided for 'Surveillance
21  Sex' and the performers were properly identified with
22  the exception of one male performer being
23  unidentified."  Do you see that?
24  A.  I do.
25  Q.  But then you go on to say, "However, this

Page 156

(13:07-13:10)

1  performer was obviously of legal age"; is that
2  correct?
3  A.  That's correct.
4  Q.  So that just by looking at his image, you
5  could tell that he was not a minor without even
6  looking at an ID?
7  A.  That's correct.  That would still be a
8  violation, but the primary purpose obviously is to
9  avoid having minors appear in this.
10  Q.  Sure.
11  A.  So, even though we didn't know what his age
12  was, by looking at the photo we know he wasn't a
13  minor.
14  Q.  Even in a case which it's perfectly obvious
15  that the person in the image may be 40 or 50 years
16  old, it's still a criminal offense not to maintain the
17  record called for by the statute with respect to that
18  performer, correct?
19      MS. WYER: Objection.
20  A.  Yes.  It would still be a violation.
21      (Proceedings interrupted)
22  Q.  (By Mr. Murray)  Agent, 682 page of
23  Plaintiff's Exhibit 8 records your inspection
24  procedures, correct?
25  A.  That's correct.

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 157

(13:10-13:11)

1  Q.  And you began this inspection at 10:30 a.m.?
2  **A.  Yes.**
3  Q.  Now, was this one of the ones, since this was
4    in California, that would have been five to seven
5    Government personnel?
6  **A.  This was in Florida.**
7  Q.  Oh, I'm sorry.  Then this would have been the
8    three to four or two to four?
9  **A.  Three to four.**
10 Q.  Yeah.  You're right.  St. Petersburg.  Okay.
11     You provided the individual with the letter
12   that is similar to Plaintiff's Exhibit 32 --
13 **A.  Yes.**
14 Q.  -- or 34?
15 **A.  Yes.**
16 Q.  You took the photographs of the business,
17   where they stored the records, and where you inspected
18   the records, correct?
19 **A.  That's correct.**
20 Q.  It doesn't say that you made copies of the
21   records, but does that mean you didn't or is that, you
22   think, just an inadvertent omission in this report?
23 **A.  That would have been an omission because we**
24   **did copy at every inspection that I remember.**
25 Q.  Okay.  And then you finished at 4:30, correct?

Page 158

(13:11-13:13)

1  **A.  That's correct.**
2  Q.  And you took a photograph before you left; is
3    that correct?
4  **A.  That's correct.**
5  Q.  So you were there for six hours?
6  **A.  That's correct.**
7  Q.  Did you get a lunch break?
8  **A.  I would certainly hope so.  I don't remember,**
9    **but I'm sure somebody at least went out and got some**
10   **food.**
11 Q.  Okay.  All right.  So let's take a look at the
12   photos of this inspection, and the photo log appears
13   on page 704.  And it looks like pictures were taken of
14   the outside of the building, the address of the
15   building, the conference room before the inspection,
16   file cabinets containing 2257 records, and the
17   conference room upon exit, correct?
18 **A.  That's correct.**
19 Q.  Okay.  So, 707 shows the building in which the
20   business is located, correct?
21 **A.  Correct.**
22 Q.  708 shows the address number, correct?
23 **A.  Correct.**
24 Q.  709 shows a conference room, correct?
25 **A.  Correct.**

Page 159

(13:13-13:14)

1  Q.  With windows and a long table and chairs
2    correct?
3  **A.  That's correct.**
4  Q.  And the next photograph shows a room where
5    there are file cabinets, correct?
6  **A.  That's correct.**
7  Q.  And one of the file cabinets is open and you
8    can see that there's some records in it?
9  **A.  That's correct.**
10 Q.  And then the last picture again depicts the
11   conference room; is that correct?
12 **A.  That's correct.**
13 Q.  Okay.  Now, you would agree with me, would you
14   not, again, with all the qualifications that we've
15   been talking about, that ordinarily, subject to all
16   those qualifications, the FBI would need a search
17   warrant to enter the areas that are depicted in these
18   photographs inside the building?
19     MS. WYER: Objection.  Assumes facts not
20   in evidence; lack of foundation; calls for
21   speculation.
22 **A.  With all the qualifications that we mentioned**
23   **and for a criminal investigation looking for evidence,**
24   **yes, it would require a search warrant.**
25 Q.  (By Mr. Murray) And the same answer with

Page 160

(13:14-13:15)

1    respect to an examination of the records contained
2    within that room that is depicted in one of these
3    photographs.  You would need a warrant with all of
4    those qualifications?
5     MS. WYER: Objection.
6  **A.  Yes, with all the qualifications you**
7    **mentioned.**
8  Q.  (By Mr. Murray) Okay.  Let's take a look at
9    Plaintiff's Exhibit 9 which is              Serial 15.  And
10   on page 786 is the title page; is that correct?
11 **A.  That's correct.**
12 Q.  It shows the date of inspection June 27, 2007,
13   correct?
14 **A.  That's correct.**
15 Q.  Again, we've yet to find -- we've yet to come
16   upon any that happened before July 27, 2006, correct?
17 **A.  That's correct.**
18     MS. WYER: Objection; misleading.
19 Q.  (By Mr. Murray) Okay.  Page 789, again,
20   you're the author of the Regulatory Inspection Report,
21   correct?
22 **A.  That's correct.**
23 Q.  And this was an inspection conducted of
24              ! which is a subsidiary of
25                      correct?

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 161

(13:15-13:16)

1  A.  That's correct.
2  Q.  Okay.  And I        was present, correct,
3  from        ?
4  A.  That's correct.
5  Q.  Also present was the Vice President of
6  Business and Legal Affairs for        ?
7  A.  That's correct.
8  Q.  And someone whose last name was unknown,
9  correct?
10  A.  That's correct.
11  Q.  Okay.  After the inspection, it was determined
12  that        had one 2257 violation, correct?
13  A.  That's correct.
14  Q.  And that violation is recorded on page 791,
15  correct?
16  A.  That's correct.
17  Q.  And it says, for the movie, "
18  ," the photo identification for one of the
19  performers did not contain a legible date of birth; is
20  that correct?
21  A.  That's correct.
22  Q.  And that constitutes a violation of the
23  regulation that you cited right underneath there,
24  correct?
25  A.  That's correct.

Page 162

(13:16-13:18)

1  Q.  And they were able to come up, however, with a
2  legible copy of the identification for that performer,
3  correct?
4  A.  That's correct.
5  Q.  So go to page 793.  You recorded both the
6  pre-inspection procedures and the inspection
7  procedures, correct?
8  A.  That's correct.
9  Q.  And this inspection began at 9:55 a.m.?
10  A.  That's correct.
11  Q.  You provided I        with the letter of the
12  kind that we've seen which is Plaintiff's Exhibit 32
13  and 33 and 34?
14  A.  Correct.
15  Q.  You took the photographs before beginning the
16  inspection, correct?
17  A.  That's correct.
18  Q.  Of the business and of where the records were
19  maintained and where you were going to examine the
20  records, correct?
21  A.  That's correct.
22  Q.  Again, you don't say here you made copies, but
23  you're confident that you made copies, correct?
24  A.  That's correct.
25  Q.  And then you took a photo before you left?

Page 163

(13:18-13:19)

1  A.  That's correct.
2  Q.  And that inspection ended at 3:45 a.m.?
3  A.  That's correct.
4  Q.  So you were there for, let's see, I guess a
5  little over five hours?
6  A.  That's correct.
7  Q.  Okay.  Then the photos begin on page 829, and
8  there's a photograph of the
9        building, correct?
10  A.  Okay.  Okay.  That's correct.
11  Q.  And then the next photo is of several filing
12  cabinets?
13  A.  Yes, sir.
14  Q.  The next photo is of an area that includes, it
15  looks like, a computer and a table, chair?
16  A.  Yes, sir.
17  Q.  And the next photo is another view of that; is
18  that correct?
19  A.  I can't tell if that's the same room or not.
20  Q.  Now, again, this was a -- this was a business
21  premises, correct?
22  A.  That's correct.
23  Q.  And you were able to gain entry without delay
24  under the authority of 2257 and the regulation?
25  A.  Yes, sir.

Page 164

(13:19-13:20)

1  Q.  And you were able under that same authority to
2  look at the records, go to an area inside the building
3  where the records were maintained, correct?
4  A.  That's correct.
5  Q.  You were then able under the same authority to
6  examine the records that you asked for, correct?
7  A.  That's correct.
8  Q.  You then were under that same authority able
9  to make copies of those records?
10  A.  That's correct.
11  Q.  And you were able to take photographs while
12  you were there under that same authority?
13  A.  Yes, sir.
14  Q.  And you were able to take the copies with you?
15  A.  Yes.
16  Q.  And you were able to do that all without a
17  search warrant, correct?
18  A.  Yes.
19  Q.  And all without probable cause, correct?
20  A.  Yes.
21  Q.  Okay.  And you would agree that, in the
22  absence of 2257 and its implementing regulation, an
23  FBI agent desiring to enter those same premises that
24  are depicted here in these photographs and enter into
25  those same areas that are depicted in this photograph,

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 165

(13:21-13:22)

1  absent exigent circumstances and absent voluntary
2  consent, would need a search warrant to conduct a
3  criminal investigation?
4      **MS. WYER:** Objection.  Assumes facts not
5  in evidence; lack of foundation; calls for
6  speculation.
7  **A.  With all the parameters that you had mentioned**
8  **and I had mentioned previously, yes.**
9  Q.  (By Mr. Murray)  Okay.  And the --
10     **MS. WYER:** Are you okay?
11     **THE WITNESS:** Uh-huh.  My eyes just get
12  sore after a while going back and forth.
13  Q.  (By Mr. Murray)  And your answer would be the
14  same, that a search warrant would be needed under all
15  of those conditions with the qualifications that I've
16  already enunciated for an FBI agent to examine those
17  records?
18     **MS. WYER:** Same objection.
19  **A.  Again, with all the qualifications you had**
20  **mentioned and I had mentioned, yes.**
21  Q.  Okay.  Let's go to Plaintiff's Exhibit 10,
22  which is Darkside Serial 20.  All right.  This was an
23  inspection, was it not, done of Darkside Entertainment
24  in Van Nuys, California?  I'm sorry.  This was a
25  reinspection actually done on 4/9/2007; is that

Page 166

(13:22-13:24)

1  correct?
2  **A.  That's correct.**
3  Q.  And there were a couple of occasions where you
4  had a follow-up inspection based on some findings that
5  you made in your first inspection of a particular
6  business, correct?
7  **A.  I recall at least two.**
8  Q.  Okay.  And this is one of them?
9  **A.  Yes, sir.**
10  Q.  Okay.  All right.  And this one was done by
11  you, this report on page 941.  On April 30, 2007 is
12  when you did the report?
13  **A.  That's correct.**
14  Q.  And the reinspection was done on 4/9/07,
15  correct?
16  **A.  That's correct.**
17  Q.  And you continued to find some violations even
18  after the reinspection; is that correct?
19  **A.  That's correct.**
20  Q.  But you never found any minors at any of the
21  media for this company that you were investigating,
22  did you?
23  **A.  No.**
24  Q.  Meaning that's correct?  You did not?
25  **A.  You're correct.  We didn't find a minor.**

Page 167

(13:24-13:25)

1  Q.  And, again, the findings that you had on page
2  943 included there was one particular film apparently
3  where the records were not maintained at their place
4  of business?
5  **A.  That's correct.**
6  Q.  The second violation was that one of the
7  photos for a particular person was not identifiable?
8  **A.  That's correct.**
9  Q.  In other words, when you looked at the photo,
10  you couldn't confirm that it showed accurately or that
11  you were able to see what the person looked like or
12  what?
13  **A.  That's correct.  We couldn't match that with**
14  **the screen capture we had from the film.**
15  Q.  And then the last one was the records were not
16  properly cross-referenced, correct?
17  **A.  That's correct.**
18  Q.  Okay.  And on page 946 of this exhibit, it
19  shows, does it not, that you began your inspection at
20  9:30 --
21  **A.  That's correct.**
22  Q.  -- in the morning, correct?
23  **A.  That's correct.**
24  Q.  You presented the standard letter?
25  **A.  That's correct.**

Page 168

(13:25-13:27)

1  Q.  You took the standard photographs?
2  **A.  That's correct.**
3  Q.  You made copies of the records that you
4  examined?
5  **A.  Yes.**
6  Q.  And you left at 11:30 after about a two-hour
7  inspection, correct?
8  **A.  That's correct.**
9  Q.  And the photos that begin on page 969 show in
10  that case the entrance to the business; is that
11  correct?
12  **A.  Okay.  That's correct.**
13  Q.  And then page 970 shows several filing
14  cabinets in the middle of the photo, and to the left
15  it shows some storage area?
16  **A.  Yes.**
17  Q.  Shelving?
18  **A.  Yes.**
19  Q.  And then the next picture shows more shelving
20  with various books and binders located there with
21  titles on the binders?
22  **A.  Yes.**
23  Q.  And then the next photo shows a work area
24  inside the building with a couple of chairs and a
25  table?

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 169

(13:27-13:28)

1  A.  Yes.
2  Q.  And another shot of that is shown on the next
3  page, correct?
4  A.  Yes.
5  Q.  And then another shot on the next couple of
6  pages of that same area?
7  A.  That's correct.
8  Q.  Again, these are areas within the confines of
9  this business entity, correct?
10  A.  Yes.
11  Q.  And it is true that these are areas within
12  this business entity?  These offices, these shelving
13  areas are areas that you would not be able to enter
14  but for 2257 unless you had voluntary consent, exigent
15  circumstances, or a search warrant?
16     MS. WYER: Objection.  Assumes facts not
17  in evidence; lack of foundation; calls for
18  speculation.
19  A.  With all the qualifications we had mentioned
20  before, yes, that's correct.
21  Q.  (By Mr. Murray)  Okay.  And just so that I'm
22  clear on what those qualifications are, it's got to be
23  a -- you're saying it has to be official FBI business,
24  an investigation of a criminal case or a criminal
25  investigation, and with those qualifications on your

Page 170

(13:28-13:29)

1  end, you would agree with the statement that you would
2  need a search warrant to enter these areas if it -- if
3  it weren't for 2257 unless you had voluntary consent
4  or exigent circumstances?
5     MS. WYER: Objection.  It assumes facts
6  not in evidence, including the assumption that these
7  are private areas.
8  A.  Absent a 2257, yes, and what you just said, if
9  it's a criminal investigation and there's a search for
10  evidence of criminal activity for an area that is not
11  public would require a search warrant.
12  Q.  (By Mr. Murray)  Well, these areas were not
13  public.  You're not quibbling over that, are you, in
14  this case?  You're not suggesting that --
15  A.  For this one, I do recall that structure, and
16  those areas were private areas within the business.
17  Q.  And your answer would be the same, that to
18  look through those records, you would need a search
19  warrant with all the qualifications contained in my
20  previous questions?
21     MS. WYER: Same objection.
22  A.  And with all the qualifications I had, yes.
23  Q.  (By Mr. Murray)  Let's go to Plaintiff's
24  Exhibit 11.
25     MR. SAMONDS: Which one?

Page 171

(13:29-13:31)

1     MR. MURRAY: Oh, I'm sorry.  This is
2  Serial 9.
3  Q.  (By Mr. Murray)  Page 1016 of this exhibit
4  shows that this was an inspection done on March 13,
5  '07, correct?
6  A.  Correct.
7  Q.  Of [                         ] in Vista,
8  California?
9  A.  That's correct.
10  Q.  This one on page 1019 was done by Special
11  Agent Lawrence; is that correct?
12  A.  That's correct.
13  Q.  If you go to 1024, the inspection procedures
14  that were followed, this one began at 10:50 a.m.
15  according to Agent Lawrence's report, correct?
16  A.  Yeah.  And, again, I was not present at this
17  one.  So, based on his report, it began at 10:50.
18  Correct.
19  Q.  And the protocol was followed in terms of the
20  photographs being taken both before and at the end,
21  correct?
22  A.  That's correct.
23  Q.  The records were reviewed and copies made of
24  the records, correct?
25  A.  That's correct.

Page 172

(13:31-13:33)

1  Q.  And the inspection ended at noon.  So it was
2  an hour and ten minute inspection; is that correct?
3  A.  That's correct.
4  Q.  And on this one, there were no violations
5  found if I'm not mistaken?  If you go back to page
6  1019, it looks like at the very end --
7  A.  I'm sorry.  What page?
8  Q.  Page 1019.
9  A.  Okay.  That's correct.
10  Q.  All right.  Now, let's take a look at the
11  photo log.  A total of ten photos were taken, correct?
12  A.  That's correct.
13  Q.  The third photo was the -- I'm sorry.  The
14  first four were the title page and -- strike that.
15     The first one was a title page.  The next two
16  were shots of the exterior of the building and the
17  front door according to the log?
18  A.  That's correct.
19  Q.  Then a shot of the front door of an office was
20  taken, correct, according to this?
21  A.  That's correct.
22  Q.  A conference room across from the office was
23  taken a photo of, correct?
24  A.  That's correct.
25  Q.  Inside of the office with files on the desk

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 173

(13:33-13:34)

1   was taken, correct?
2  **A.   Correct.**
3   Q.   A second photo of the inside of the offices
4   was taken, correct?
5  **A.   Correct.**
6   Q.   Another photo of a computer screen was taken,
7   correct?
8  **A.   Correct.**
9   Q.   And then two more shots of conference rooms,
10   correct?
11  **A.   Correct.**
12   Q.   Now, it is true, is it not, that in your
13   experience, when you have a business premises that has
14   offices and conference rooms in it, those are not
15   generally open to the general public --
16      **MS. WYER:** Objection.
17   Q.   -- like a retail store would be, correct?
18      **MS. WYER:** Objection.
19  **A.   That would be my understanding.  Yes.**
20   Q.   (By Mr. Murray)  I mean, for example, we're
21   sitting in a conference room right now, are we not?
22  **A.   Correct.**
23   Q.   It's not open to the general public here, for
24   example, just by way of example, correct?
25  **A.   That's correct.**

Page 174

(13:34-13:35)

1   Q.   And these photos -- beginning on page 1042,
2   there's a picture of this conference room, correct?
3  **A.   Yes.**
4   Q.   And it looks -- it's not the greatest picture,
5   but it looks pretty much like a normal conference
6   room, doesn't it?
7  **A.   Yes.**
8   Q.   Including it actually has artwork on the
9   walls?
10  **A.   Yes.**
11   Q.   And then the next picture shows boxes or at
12   least one box of records that is opened; is that
13   correct?
14  **A.   Yes.  Uh-huh.  That's correct.**
15   Q.   And the next picture shows that same box -- a
16   couple boxes of records that are open.  I guess it --
17   does the log say that's in a conference room?  Let's
18   go back and look at that.
19      No.  That says "inside of office with files on
20   desk."  So, after the conference room, you see there's
21   an office according to the photo log and this is a
22   picture inside that office with files open, correct?
23  **A.   That's correct.**
24   Q.   And is it your experience and understanding
25   that an office within a business premises -- that to

Page 175

(13:35-13:37)

1   enter an office within a business premises ordinarily
2   one needs an invitation?
3  **A.   Yes.**
4   Q.   All right.  So then --
5      **MS. WYER:** Objection; vague.
6   Q.   (By Mr. Murray)  If you skip forward, there
7   appear -- the last pictures -- last two pictures
8   appear to be two more views of the conference room,
9   correct?
10  **A.   I'm sorry.  Which page was that again?**
11   Q.   1046 and 1047.
12  **A.   That's correct.**
13   Q.   So, given what we've just reviewed, you would
14   agree that, with the qualifications that we've
15   previously discussed in my question, ordinarily the
16   FBI would need a search warrant, including the
17   qualifications in your usual answer, correct?
18      **MS. WYER:** Objection.
19  **A.   With all the qualifications we mentioned, yes,**
20  **that's correct.**
21   Q.   (By Mr. Murray)  And the answer would be the
22   same with respect to examining the records?
23      **MS. WYER:** Objection.  Same objection as
24   I already stated.
25  **A.   With all the same qualifications, yes, that's**

Page 176

(13:37-13:39)

1   correct.
2   Q.   (By Mr. Murray)  Okay.  All right.  We're on
3   to 12.  We're making headway.
4  **A.   Yeah.**
5   Q.   Like I said, I'm glad you quit at 29.  We
6   would be here a couple days.
7      **MS. WYER:** Which one is this?
8      **MR. MURRAY:** This is          Serial 16.
9  **A.   I have 12 that you just gave me.**
10   Q.   (By Mr. Murray)  Oh, I apologize.
11  **A.   Diabolic.**
12   Q.   Oh, here it is.  No.  That's --
13  **A.   Diabolic Video.**
14      **MR. SAMONDS:** Here's          .
15   Q.   (By Mr. Murray)  Can I see that real quick?
16  **A.   Sure.**
17   Q.   Oh, okay.  I gave it to you.  I got you.
18   That's fine.  12.  Okay.  I'm sorry.  That's Diabolic
19   Serial 24.  I apologize.  I think we have some photos
20   on that one, too.  Okay.
21      **MS. WYER:** Could you wait?  We haven't
22   found it.
23      **MR. MURRAY:** Yeah.  Yeah.
24      **MR. SAMONDS:** I don't see Diabolic.
25      **MR. SAMONDS:** Can I make a quick copy of

Free Speech Coalition, Inc., et al  vs.                                                    SSA Charles Joyner
The Honorable Eric H. Holder, Jr.                                                           April 12, 2013

---

Page 177

(13:39-13:41)

1  your Diabolic?
2      MR. MURRAY: Sure.  Yeah.
3      MR. SAMONDS: While I'm making a copy, do
4  you want to move on to 13?
5      MR. MURRAY: Yes, if you don't mind.
6      MR. SAMONDS: I'm happy to help.
7      MR. MURRAY: Let's do that.  Do you have
8  a copy of your supplemental on Diabolic that you gave
9  me?  Because there's some pictures of Diabolic, I
10  think.  So if you --
11      MR. SAMONDS: Was that the pictures?
12      MR. MURRAY: Oh, I think you had that.
13  Q.  (By Mr. Murray)  All right.  13 is I
14  Serial 16.  I'm showing you what's been marked as
15  Plaintiff's Exhibit 13, Agent Joyner.  The title page,
16  you'll agree, I think, savs it was an inspection on
17  May 22, 2007 of I        Enterprises in care of Pacific
18  Business Capital Corporation in Costa Mesa,
19  California; is that correct?
20  A.  That's correct.
21  Q.  Where is Costa Mesa?
22  A.  I think it's Orange County, but I'm not sure.
23  Q.  All right.  If you can turn to page 1119, this
24  was one, again, done by Agent Lawrence, and he
25  reported on July 25, '07, correct?

---

Page 178

(13:41-13:43)

1  A.  That's correct.
2  Q.  Okay.  And this was an inspection that was
3  actually done at a storage facility that this business
4  had rented, correct, and at the offices?
5  A.  I was not present for this one.  So I just
6  have to go by the report, and that's what the report
7  states.  That's correct.
8  Q.  And if you look at the Inspection Summary, as
9  was the protocol, certain DVDs were ordered through
10  the internet pertaining to this entity, correct?
11  A.  That's correct.
12  Q.  And then the last paragraph indicates that
13  there was a -- that on 9/04           , President of
14          , signed an Accounts Receivable
15  Purchase & Security Agreement with
16                   and then in 2005 it was taken over
17  by that company, correct?
18  A.  That's correct.
19  Q.  And then in August of '05         , the
20  custodian of records, was removed from his position,
21  correct?
22  A.  That's what's stated in the report.  Correct.
23  Q.  And then I        took over
24  position but subsequently suffered a -- and there's a
25  blank.  Probably some illness, correct?

---

Page 179

(13:43-13:44)

1  A.  Correct.
2  Q.  And then, since no one was left to run the
3  company, I                      ll ceased all the
4  records of L                which ceased operations
5  in late 2005, correct?
6  A.  That's correct.
7  Q.  And, now, Agent Lawrence would have gathered
8  that information and put it in his report, correct?
9  A.  It's in the report.
10  Q.  In the ordinary course of an FBI agent's
11  duties, he put it in the report because he obviously
12  gathered that information?
13  A.  That's correct.
14  Q.  Okay.  In any case, if you turn to the next
15  page, it appears that on May 11, 2007 an inspection
16  was attempted at           residence based on
17  information he had provided to the lead inspector.
18  And the lead inspector is -- that's Agent Lawrence,
19  correct?
20  A.  That's correct.
21  Q.  That's what that means?  Okay.  But he didn't
22  have the 2257 records and he was interviewed to
23  ascertain their whereabouts.  So that led to this
24  storage facility, correct, if you read on?  I'm
25  summarizing.

---

Page 180

(13:44-13:46)

1  A.  Yes.
2  Q.  Okay.  All right.  Anyway, if you turn to page
3  1125, the inspection began at 11:00 a.m., correct?
4  A.  1125?
5  Q.  Yes.
6  A.  Okay.
7  Q.  And according to paragraph four, the standard
8  letter was provided, correct, to Mr. Cooper?
9  A.  Yes.  Correct.
10  Q.  The standard photographs were taken at the
11  storage facility and the location of the records
12  storage of the 2257 records?
13  A.  That's correct.
14  Q.  Okay.  The inspection lasted about two and a
15  half hours, correct?
16  A.  That's correct.
17  Q.  And if you look at the photo log on page
18  1149 -- take a look at page 1153.  I think that's the
19  best place to look.  That looks like it's the storage
20  facility, doesn't it?
21  A.  Okay.
22  Q.  1153?
23  A.  According to the photo log, that's the storage
24  area.
25  Q.  Okay.  And then the next page would be inside

---

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 181

(13:46-13:47)

1  the storage area, correct?
2  **A.   Correct.**
3  Q.   And then the next page would be the files with
4  the records themselves, correct?
5  **A.   Correct.**
6  Q.   And the next page would be file cabinets?
7  **A.   Correct.**
8  Q.   Now, is it true that ordinarily, in the
9  absence of the exigent circumstances and other
10  qualifications, that, in the absence of 2257, if the
11  FBI wants to enter a storage area that somebody has
12  rented to store things, the FBI would still have to
13  get a search warrant?
14       MS. WYER: Objection.  Assumes facts not
15  this evidence; lack of foundation; calls for
16  speculation.
17  **A.   With all the qualifications we mentioned**
18  **before, yes.**
19  Q.   (By Mr. Murray)  Okay.  Now, let's go back to
20  12.  Okay.  So, if you look at 1073, this was the
21  inspection of Diabolic Video Production in Chatsworth,
22  California on July 24, '06.  Do you see that?
23  **A.   Yes, I do.**
24  Q.   This is the first one that we've come up
25  against that actually occurred prior to the version of

Page 182

(13:47-13:48)

1  2257 that is Plaintiff's Exhibit 39 and that was
2  effective July 27, '06, correct?
3       MS. WYER: Objection; misleading.
4  **A.   That's correct.  This is the first inspection**
5  **prior to that date.**
6       MR. MURRAY: Could I ask what is
7  misleading about those dates or about that question?
8       MS. WYER: A legal issue.
9       MR. MURRAY: Well, that's fine, but
10  what's that got to do with misleading?  I don't want
11  to be misleading.
12       MS. WYER: It's misleading to suggest
13  that the statute -- that that statute was relevant to
14  these inspections.
15       MR. MURRAY: Why?
16       MS. WYER: Because the regulations were
17  promulgated pursuant to the previous version of the
18  statute.
19       MR. MURRAY: Okay.  But he wrote a letter
20  relying on the '06 statute that for the first time
21  said it was a violation of the law to refuse the
22  inspections, but okay.  All right.  I understand your
23  objection.
24  Q.   (By Mr. Murray)  Okay.  So this was -- but
25  this is the first one that we've encountered that

Page 183

(13:48-13:50)

1  occurred before July 27th of '06, correct?
2  **A.   That's correct.**
3  Q.   Okay.
4  **A.   And this would have been the only inspection**
5  **that we conducted that was prior to that date.**
6  Q.   Right.  Okay.  And you were the inspector
7  which makes sense because Agent Lawrence wasn't
8  on-board when this first started, right?
9  **A.   That's correct.**
10  Q.   Okay.  So Diabolic was inspected at their
11  premises.  The owner was present apparently; is that
12  correct?
13  **A.   That's correct.**
14  Q.   And on page 1076, we see that you began this
15  inspection at 10:50 a.m.?
16  **A.   That's correct.**
17  Q.   You took the photographs that were standard,
18  correct?
19  **A.   That's correct.**
20  Q.   You didn't give them a letter on this one,
21  though?  You hadn't formulated the letter yet, had
22  you?
23  **A.   I don't believe so.  Yeah.  I don't believe**
24  **so.**
25  Q.   All right.  You did the examination of the

Page 184

(13:50-13:51)

1  records that you were looking for, correct?
2  **A.   That's correct.**
3  Q.   You made copies of those records, correct, and
4  took them with you?
5  **A.   That's correct.**
6  Q.   You took the photographs before you left?
7  **A.   That's correct.**
8  Q.   And you ended the inspection at 5:30?
9  **A.   That's correct.**
10  Q.   So that particular inspection took a little
11  over six and a half hours; is that correct?
12  **A.   That's correct.**
13  Q.   Where did you record the results of the
14  inspection on this one?
15  **A.   I do remember they didn't have any violations.**
16  Q.   Okay.
17  **A.   So, on the very last sheet, Finding Results.**
18  Q.   Oh, there it is.  Okay.
19  **A.   Page 1111.**
20  Q.   Now, I think the photos are in 31, if I'm not
21  mistaken.  Yes.  Okay.
22       MR. MURRAY: Do you have 31?  Kathy, do
23  you have a copy of 31 for yourself?
24       MS. WYER: Yes.
25       MR. MURRAY: Okay.

Free Speech Coalition, Inc., et al  vs.                                        SSA Charles Joyner
The Honorable Eric H. Holder, Jr.                                                    April 12, 2013

Page 185

(13:51-13:52)

1  Q.  (By Mr. Murray)  All right.  I'm showing you
2    what's been marked as Plaintiff's Exhibit 31.  You can
3    see that in a supplement we were provided with the
4    photos for the Diabolic Video inspection of 7/24/06?
5  **A.  That's correct.**
6  Q.  Okay.  And I don't necessarily have a log, but
7    the photos show a building which appears to be a
8    business premises, correct?
9  **A.  Yes.**
10  Q.  It doesn't appear to be a retail store or
11    anything though, does it?
12  **A.  No.**
13  Q.  It wasn't a retail outlet?
14  **A.  No, it wasn't, I don't believe.**
15  Q.  Page 3192 shows what?
16  **A.  Appears to be an office.**
17  Q.  Okay.  What about the next page?
18  **A.  The outside door to the business.**
19  Q.  And the next page?
20  **A.  The parking lot and I assume the outside of**
21    **the structure.**
22  Q.  And 3195?
23  **A.  An office.**
24  Q.  And 3196?
25  **A.  An office.**

Page 186

(13:53-13:54)

1  Q.  3197?
2  **A.  Stairwell.**
3  Q.  3199?
4  **A.  A hallway.**
5  Q.  3200?
6  **A.  File cabinets.**
7  Q.  3201?
8  **A.  An office.**
9  Q.  3202?
10  **A.  File cabinets.**
11  Q.  And 3303?
12  **A.  It looks like an office with file cabinets.**
13  Q.  Do you know who the person is depicted in
14    there?
15  **A.  I believe she was the sister-in-law of the**
16    **owner and the custodian of records.**
17  Q.  Okay.  And the next is another showing of the
18    file cabinets?
19  **A.  Yes.**
20  Q.  And another view of the office?
21  **A.  Yes.**
22  Q.  And the next one?
23  **A.  It looks like another view of the office.**
24  Q.  Okay.  All right.  Now, you would agree with
25    me that those offices and storage areas are places

Page 187

(13:54-13:55)

1    that the general public does not ordinarily have
2    access to except upon invitation?
3  **A.  Yes.**
4        MS. WYER:  Objection; lack of foundation.
5  Q.  (By Mr. Murray)  And that, therefore, again,
6    with the normal qualifications that we've already
7    talked about, the FBI would ordinarily need a search
8    warrant based upon probable cause to enter those areas
9    in a criminal investigation?
10        MS. WYER:  Objection.  Assumes facts not
11    in evidence; lack of foundation; calls for
12    speculation.
13  **A.  With all the qualifications we mentioned**
14    **before, yes.**
15  Q.  (By Mr. Murray)  And the answer would be the
16    same?  With all those qualifications, the FBI would
17    need a search warrant to examine the records that were
18    examined and to make copies and take them away?
19        MS. WYER:  Same objection.
20  **A.  With all the qualifications we mentioned, yes.**
21  Q.  (By Mr. Murray)  Thank you.
22        THE WITNESS:  I just noticed we're
23    creating a sound barrier.  Should I move that or not?
24        THE REPORTER:  It's okay.
25        THE WITNESS:  Okay.

Page 188

(13:55-13:57)

1  Q.  (By Mr. Murray)  Okay.  Next is 14 which is
2    Serial 17.  And, Agent Joyner, can you tell me what
3    this documents, what inspection?
4  **A.  This was**
5  Q.  What was the date?
6  **A.  December 19, 2006.**
7  Q.  And where?
8  **A.  In Chatsworth, California.**
9  Q.  Okay.  And if you turn to page 1202, who was
10    the author of the report?
11  **A.  I was.**
12  Q.  And the date that you authored the report?
13  **A.  January 8, 2007.**
14  Q.  Okay.  The general manager was present during
15    this inspection?
16  **A.  Yes, he was.**
17  Q.  And you found two violations, correct?
18  **A.  That's correct.**
19  Q.  One photo identification did not have a
20    legible date of birth and no photo identification was
21    initially available for another performer, correct?
22  **A.  That's correct.**
23  Q.  Okay.  But in response to those findings on
24    page 1204, you were provided with a legible photo for
25    the one where the date of birth couldn't be detected?