SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 189

(13:57-13:58)

1  A.  That's correct.
2  Q.  And the second one you were also provided with
3    the male performer whose identification you didn't see
4    before?
5  A.  We were provided with his photo
6    identification.  Correct.
7  Q.  On page 1206, if you'll refer to that, what
8    time did you begin?
9  A.  10:00 a.m.
10  Q.  Did you take the standard photographs?
11  A.  Yes, we did.
12  Q.  Do you know whether you had a letter to
13    deliver by then or had it been formulated?
14  A.  There's no reference to the letter.
15  Q.  Okay.  All right.  You made the copies of the
16    records that you examined?
17  A.  Yes, sir.
18  Q.  And you left at 11:15, correct?
19  A.  That's correct.
20  Q.  An hour and 15 minutes; is that correct?
21  A.  That's correct.
22  Q.  Now, let's go to the photo log appearing on
23    page 1232.  If you look at page 1235, you see, I
24    guess, the outside of the building?  It's not a very
25    good photo.

Page 190

(13:58-13:59)

1  A.  That's correct.
2  Q.  Can you make out what is 1236?
3  A.  It looks like the front door --
4  Q.  Okay.
5  A.  -- with the address.
6  Q.  The next picture is an 18 USC 2257 type
7    statement that is photographed?
8  A.  Yes.
9  Q.  The next picture shows an area that looks like
10    a desk with a bunch of papers on it, correct?
11  A.  That's correct.
12  Q.  And some boxes along the walls?
13  A.  That's correct.
14  Q.  And the next photograph looks like another
15    view of that same room or no?
16  A.  I remember this location was a large, open
17    room.
18  Q.  Were you on this one?
19  A.  Yes, I was.
20  Q.  Okay.  That's right.  You signed the report.
21    Okay.  But, again, this was not a retail store?
22  A.  For some reason, I think on this one they did
23    have walk-in traffic, but I don't remember if they
24    were retail.
25  Q.  Okay.  But the area depicted in the photograph

Page 191

(14:00-14:01)

1    on page 1239 is an area that -- and on 1238 that
2    ordinarily one would need an invitation to enter?
3  A.  If I remember this location, once you enter
4    the front door, I think it was just a wide open room.
5    So the public could walk in and they're in this room,
6    but it's a large room.
7  Q.  Okay.  But to actually enter into the area
8    where the boxes are, would you expect that one would
9    have to invite a person to enter into that area?
10  A.  It would be polite to do so.  Yes.
11  Q.  And one wouldn't expect any member of the
12    public to walk in there and start rifling through
13    those boxes, would you?
14  A.  No.
15  Q.  Or examining those papers that are on that
16    person's desk?
17  A.  No.
18  Q.  Okay.  Let's go to 15 then.  I'm sorry.  What
19    was that number?  That was 14.  Oh, here it is.
20    That's on _ _ _ _ _ Serial 16.
21    Agent Joyner, can you tell me what Plaintiff's
22    Exhibit 16 is?
23  A.  It's the inspection report of
24    in Chatsworth, California.
25  Q.  And what's the date?

Page 192

(14:01-14:03)

1  A.  September 27, 2006.
2  Q.  And this is the one that Agent        went
3    on, correct?
4  A.  That's correct.
5  Q.  Did you go with him on that one?  This was
6    pretty early in the program.
7  A.  I don't remember.  I would have to -- I don't
8    recall going on this one.
9  Q.  There were a couple of references in some of
10    these records.  I just want to make sure that anybody
11    who looks at them understands this.  References where
12    the production in question that was being looked at
13    where it appeared that it was -- that you were about
14    to inspect a secondary producer, you didn't do it
15    then.  Do you recall that?
16  A.  No.  I know that we didn't inspect secondary
17    producers, and that was a question that had come up at
18    one time in one of the conferences.
19  Q.  Do you recall there being an injunction in
20    place at any time on the secondary producer issue?
21  A.  No.  I believe by the statute that it was
22    specific that we're to inspect primary producers.
23  Q.  Okay.  So you don't recall an injunction out
24    of Denver?
25  A.  I don't.

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 193

(14:03-14:05)

1 Q.  All right.  In any case, the
2 inspection done by Agent          , if you look at the
3 second paragraph, he indicates that the inspection
4 took place at the building which had an externally
5 mounted sign.  Do you see that paragraph?  I'm sorry.
6 I'm on page 1335.
7 **A.  Okay.**
8 Q.  And I'm looking at the middle paragraph where
9 it says in the middle, "The inspection team was met by
10           ." Do you see that?
11 **A.  Yes, I do.**
12 Q.  Okay.  And Mr. --
13     MR. MURRAY: Hold on.  Can we go off the
14 record one minute?
15     THE REPORTER:  Okay.
16     (Off-the-record discussion)
17 Q.  (By Mr. Murray)  Anyway, the inspection team
18 was met by the Director of Sales and by a woman who
19 identified herself as the person hired to maintain the
20 2257 records, correct?
21 **A.  Per          report, that's correct.**
22 Q.  Okay.  And according to his report, this
23 person who was in charge of maintaining the records
24 had them in what was called their "2257 Room"
25 according to this report, correct?

Page 194

(14:05-14:07)

1 **A.  That's correct.**
2 Q.  And it said the "2257 Room" was secured with a
3 locked door with access limited to the owner and this
4 employee, correct?
5 **A.  That's correct.**
6 Q.  Okay.  And there's no question, again, that,
7 before the FBI can enter a locked room inside a
8 business, absent 2257 and exigent circumstances and
9 absent voluntary consent, the FBI needs a search
10 warrant to enter such a room, correct?
11     MS. WYER: Objection.
12 **A.  With all the qualifications we mentioned**
13 **before, yes.**
14 Q.  (By Mr. Murray)  And those qualifications
15 being -- well, actually, you're referring to the fact
16 that assuming the FBI went there on a criminal
17 investigation looking for evidence of a crime?
18 **A.  That's correct.**
19 Q.  Okay.  But when you make that qualification,
20 it's because that's really the only reason the FBI
21 would show up, correct?
22 **A.  Other than conducting a 2257 inspection, yes.**
23 Q.  Okay.  Anyway, if you look at page 1337, this
24 is the one report that doesn't really tell us how long
25 it took, does it?

Page 195

(14:07-14:08)

1 **A.  I don't see it listed in the report.**
2 Q.  Okay.  Maybe it's later.  I'm sorry.  Go to
3 page 1435.  I take it back.  The inspection began
4 at -- 1345.
5 **A.  Okay.**
6 Q.  The inspection began at 9:55 a.m., correct?
7 **A.  Yes.**
8 Q.  The standard photographs were taken, correct?
9 **A.  Correct.**
10 Q.  They reviewed the records, correct?
11 **A.  Correct.**
12 Q.  They made the copies of the records and took
13 them with them?
14 **A.  That's correct.**
15 Q.  And they finished at 4:15 p.m.?
16 **A.  That's correct.**
17 Q.  So, again, we're talking about the 6 hour and
18 15 or 20 minute inspection by these governmental
19 personnel, correct?
20 **A.  Yes.**
21 Q.  And if you turn to the photos beginning on
22 page 1376, and I guess the only one that is a little
23 bit legible in terms of where they were looking is
24 1379.  You can see, can you not, it looks like a door
25 to the 2257 record room?

Page 196

(14:09-14:11)

1 **A.  Yes.  It's labeled at "2257 records."**
2 Q.  Okay.  Let's move on to Plaintiff's Exhibit
3 16.  We've reached the halfway mark.
4 **A.  Is that all?**
5 Q.  Well, according to my math.
6     MR. SAMONDS: Which one?
7     MR. MURRAY: 16 which is          Serial
8 30.
9 Q.  (By Mr. Murray)  All right.  Agent Joyner,
10 tell us what this record is.
11 **A.  It's the Regulatory Inspection Report of**
12             n Naples, Florida.  Date of
13 **inspection is September 18, 2007.**
14 Q.  And this one was authored by whom?
15 **A.  Steve Lawrence.**
16 Q.  Okay.  Ah, yes.  This was the one -- if you
17 read his report, I think this was the one inspection
18 where Agent Lawrence finally determined that the owner
19 and custodian of records was determined to be living
20 in Thailand.  Do you see that?
21 **A.  I do.**
22 Q.  And as a consequence, it looks like the only
23 way he was able to get some of the records by
24 requesting that they be sent.  Let's go to page 1505
25 and see what the outcome was.  It looks like there was

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 197

(14:11-14:12)
1   a post office box address that photos were taken of,
2   correct?
3   **A.  That's correct.**
4   Q.  But the owner couldn't be located by that
5   method until someone advised Special Agent Lawrence
6   that the records were maintained in Thailand; is that
7   correct?
8   **A.  According to the report, that's correct.**
9   Q.  But it looks like Agent Lawrence was able to
10  get somebody to send him some records.  Is that the
11  way you see paragraph three?
12  **A.  That's correct.**
13  Q.  All right.  That's now we go to 17,
14  Plaintiff's Exhibit 17.  Tell us what --
15  **MS. WYER:** Which one?
16  **MR. MURRAY:** Oh, I'm sorry.
17  Serial 15.
18  Q.  (By Mr. Murray)  Agent Joyner, tell us what
19  this record is.
20  **A.  Regulatory Inspection Report of (**
21  \           **Chatsworth, California, date of inspection**
22  **July 19, 2007.**
23  Q.  And who was the author of the report?
24  **A.  I was.**
25  Q.  Okay.  All right.  And you indicate that the

Page 198

(14:12-14:14)
1   owner was present during the inspection; is that
2   correct?
3   **A.  That's correct.**
4   Q.  Okay.  And I think you indicate in your report
5   that the inspection revealed, again, there was an
6   inadequate cross-referencing system, correct?
7   **A.  That's correct.**
8   Q.  That seemed to be at least a common -- one of
9   the common problems that you encountered with the way
10  these records were being kept?
11  **A.  Yes.  I would agree.**
12  Q.  Now go to page 1591 and tell us what time you
13  began this inspection.
14  **A.  10:30 a.m.**
15  Q.  And did you provide the standard letter that
16  we've seen before?
17  **A.  Yes.**
18  Q.  And you took the photos of the business, where
19  the records were stored, and the area where you
20  inspected the records, correct?
21  **A.  Yes, sir.**
22  Q.  And you followed the same procedure of taking
23  a photo before you left?
24  **A.  Yes, sir.**
25  Q.  And copying the records that you examined?

Page 199

(14:14-14:15)
1   **A.  That's correct.**
2   Q.  And, here again, we're talking about a
3   three-hour inspection process, correct?
4   **A.  Yes, sir.**
5   Q.  And let's go to the photos to see what kind of
6   facility you were examining.
7       Okay.  So page 1619 shows the outside of the
8   premises; is that correct?
9   **A.  That's correct.**
10  Q.  Again, it's not a retail outlet.  It's just a
11  business premises?
12  **A.  That's what it looks like.**
13  Q.  Okay.
14  **A.  I don't remember this one specifically.**
15  Q.  But the appearance -- it looks like not a
16  retail outlet.  In other words, it looks like just a
17  regular business premises?
18  **A.  I agree.**
19  Q.  Go to page 1621.  That's an area -- a room
20  inside that business premises that has several filing
21  cabinets, correct?
22  **A.  That's correct.**
23  Q.  It has some records on top of the filing
24  cabinets?
25  **A.  It looks like there's a box and some paper on**

Page 200

(14:15-14:17)
1   **top.  Yes.**
2   Q.  There's a desk and a chair, correct?
3   **A.  That's correct.**
4   Q.  It looks like a computer mouse?
5   **A.  That's correct.**
6   Q.  Some artwork on the walls?
7   **A.  Yes.**
8   Q.  The next picture shows that same desk with
9   the -- now you've got a shot of the computer, correct?
10  **A.  Yes.**
11  Q.  That's somebody's office, isn't it?
12  **A.  That looks like it.  Yes.**
13  Q.  Then the next picture is of the kitchen area
14  for the business premises.  It's got a refrigerator
15  and a table, correct?
16  **A.  It looks like a break room.**
17  Q.  And if you look at the photo log on page 1616,
18  it says the fourth picture, "2257 room - all records
19  in office and door locked," correct?
20  **A.  That's correct.**
21  Q.  Then the next picture, "2257 cabinets -
22  records, computer and desk - electronic records,
23  workroom area."  These were all areas that are typical
24  in a business premises that is not available to the
25  general public, correct?

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 201

(14:17-14:18)

1   **MS. WYER:** Objection.
2 A.   **That would be my assumption.  Yes, sir.**
3 Q.   (By Mr. Murray)  And it, again, indicates that
4   these records were in an office and the door was
5   locked?
6 A.   **Yes.**
7 Q.   So, again, there's no question that these were
8   private areas that, in the absence of 2257 and with
9   all the other qualifications that I've had in my other
10   questions, you'd need a search warrant to enter,
11   correct?
12   **MS. WYER:** Objection.  Assumes facts not
13   in evidence; lack of foundation; calls for
14   speculation.
15 A.   **With all the qualifications we had mentioned,**
16   **that's correct.**
17 Q.   (By Mr. Murray)  Okay.  And on your end, those
18   qualifications are that it's a criminal investigation
19   by the FBI for a search for evidence?
20 A.   **That's correct.**
21 Q.   Okay.  Do you need a break?
22 A.   **I'm still good for a little while.**
23   **MS. WYER:** Water?
24   **THE WITNESS:** No.  That's okay.
25   **MR. MURRAY:** How are you doing?

Page 202

(14:18-14:19)

1   **THE REPORTER:** I'm good.
2 Q.   (By Mr. Murray)  Okay.  Plaintiff's Exhibit 18
3   which is I            Serial 15.  All right.  Agent
4   Joyner, tell us what this record is.
5 A.   **What was the --**
6 Q.   Plaintiff's Exhibit 18.
7 A.   **Okay.  A Regulatory Inspection Report of**
8   **  .  It took place in Hallandale Beach,**
9   **Florida on September 17, 2007.**
10 Q.   And who was the author of the report?
11 A.   **I was.**
12 Q.   Okay.  So this was another one in Florida; is
13   that correct?
14 A.   **That's correct.**
15 Q.   And this one was done at a residence, was it
16   not?
17 A.   **That's correct.**
18 Q.   Of an individual whose name appears in the
19   report, correct?
20 A.   **That's correct.**
21 Q.   And the owner -- the individual who resided
22   there, the resident, was present during the
23   inspection, correct?
24 A.   **That's correct.**
25 Q.   Okay.  You found certain deficiencies in the

Page 203

(14:19-14:21)

1   record keeping?
2 A.   **Yes.**
3 Q.   And those are listed on page 1725?
4 A.   **That's correct.**
5 Q.   You found three titles that didn't have the
6   label, the 2257 label, correct?
7 A.   **That's correct.**
8 Q.   In No. 4 you say, "The most recent address for
9   custodian of records is '
10   Hallandale Beach, Florida.  However, this is a large
11   condominium complex and additional investigation was
12   required to identify unit 2118 as the residence of the
13   owner/custodian of records."  Do you see that?
14 A.   **Yes, I do.**
15 Q.   Why is that a violation?
16 A.   **Because the custodian of records was not**
17   **clearly listed on the 2257 statement.  It's got to be**
18   **a physical address that we can go to.**
19 Q.   Well, was the residence at 2
20   Drive?
21 A.   **Along with maybe a hundred other condominiums.**
22 Q.   Okay.  So, in that situation, you're saying
23   that your reading of the regs required that the
24   specific unit be identified?
25 A.   **We need to know where the records are**

Page 204

(14:21-14:23)

1   maintained.
2 Q.   If you go to page 1728, this is his -- the
3   producer's response to your findings; is that correct?
4 A.   **That's correct.**
5 Q.   One of the things that you found was that
6   there was a series of -- were these DVDs?
7 A.   **Yes, they were.**
8 Q.   Okay.  There were one, two, three, four, five,
9   six, seven DVDs that you couldn't find any of the
10   records for, correct?  You didn't have the records for
11   those?
12 A.   **That's correct.**
13 Q.   And his response to that was that, since he
14   didn't have the records, he pulled them from
15   distribution altogether, correct, if you look at page
16   1728, paragraph three?
17 A.   **That's correct.**
18 Q.   Now, you don't have any evidence that any of
19   those seven films or DVDs portrayed included any
20   minors?
21 A.   **We couldn't tell because we had no records.**
22 Q.   But you don't have any evidence that there
23   were minors in any of those films?
24 A.   **There were people in the films that looked to**
25   **be underage.  So, no, we had no evidence that they**

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

Page 205

(14:23-14:24)

1 were minors. We had no evidence that they were not
2 minors.
3 Q. And, so, they may have been perfectly legal
4 from a child pornography standpoint; but, yet, they
5 were taken out of circulation, correct?
6 A. That's correct, but we have no way of knowing
7 since he didn't maintain the proper records required
8 by 2257.
9 Q. Right. And, so, as a consequence, he just
10 took them out of circulation and they couldn't be --
11 he couldn't disseminate them anymore?
12 A. Well, he claimed that's what he did. If he
13 did or not, I don't know.
14 Q. Okay. Now, I don't see anything in your
15 report -- and maybe I missed it -- on page 1723 where
16 you gave him advanced notice that you were coming.
17 Did you?
18 A. No, we did not.
19 Q. Okay. So this was -- this is the third
20 residence that we've come across where an inspection
21 was done, correct, so far?
22 A. I would have to go through them again, but
23 that sounds right.
24 Q. Okay. And if you look at the photos beginning
25 on page 17 -- I guess start with 1758. You can see --

Page 206

(14:24-14:26)

1 does that -- oh, that's the condominium complex,
2 correct, 1758?
3 A. Yes. That's correct.
4 Q. And, so, there's no question that those are
5 residences there?
6 A. That's correct.
7 Q. And then the next picture shows what's area in
8 his residence that had a computer and a desk?
9 A. Yes.
10 Q. And, again, without 2257, you would certainly
11 have needed a search warrant absent exigent
12 circumstances or voluntary consent before you could
13 enter this man's residence?
14 MS. WYER: Objection; calls for
15 speculation.
16 A. With the qualifications we mentioned before,
17 that's correct.
18 Q. (By Mr. Murray) Meaning that if you're on
19 official business investigating a potential criminal
20 violation?
21 A. Yes.
22 Q. And you would need the search warrant to --
23 again, with the same qualifications, to examine the
24 records that you examined?
25 A. With the same qualifications, that's correct.

Page 207

(14:26-14:27)

1 MS. WYER: Same objection.
2 Q. (By Mr. Murray) Okay. Let's go to
3 Plaintiff's Exhibit 19, and I'd ask you to tell us
4 what that is.
5 MS. WYER: Which one?
6 MR. MURRAY: Oh, I'm sorry. It is
7 Serial 8.
8 A. It's a Regulatory Inspection Report of
9 which was conducted in
10 Winnetka, California on May 3, 2007.
11 Q. (By Mr. Murray) And who is the author of this
12 one?
13 A. I am.
14 Q. It looks like this one was done at a residence
15 as well.
16 A. That's correct.
17 Q. So this would be the fourth one. So we might
18 as well keep track, correct --
19 A. Okay.
20 Q. -- since that was the third one?
21 A. Okay.
22 Q. Now, is this the one where you gave advance
23 notice or no?
24 A. Yes.
25 Q. Okay. And your report indicates that the

Page 208

(14:27-14:28)

1 individual whose residence you went to was the former
2 owner of ! which had gone out of business a
3 few years earlier, is that correct, looking at 1832?
4 A. That's correct.
5 Q. And that the 2257 records were maintained in
6 file cabinets located in the garage of his residence,
7 correct?
8 A. That's correct.
9 Q. And you did find some three deficiencies as I
10 recall; is that correct?
11 A. That's correct.
12 Q. Okay. So, yeah. Go to page 1836.
13 A. Okay.
14 Q. You began the inspection at 9:30, correct?
15 A. That's correct.
16 Q. And you indicate that prior contact had been
17 made with him by telephone and this was the time he
18 agreed to meet you and the inspectors, correct?
19 A. That's correct.
20 Q. At his residence, correct?
21 A. That's correct.
22 Q. You gave him the standard letter that we've
23 seen, correct?
24 A. Yes.
25 Q. You took the photographs of the front of the

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 209

(14:28-14:30)
1  residence and the garage where the records were
2  stored?
3  **A.  That's correct.**
4  Q.  And you left about an hour and 45 minutes
5  later; is that correct?
6  **A.  That's correct.**
7  Q.  And then if you look at the photos, is there a
8  photo of the front of his house?
9  **A.  It looks like 1853 is the front of the**
10 **residence.**
11 Q.  It's hard to make out.
12 Q.  I'm going by the photo log.
13 Q.  No, no.  I understand that that's the case.
14 **A.  You can't tell from the photo that that's a**
15 **house, but that's what the photo log has.**
16 Q.  Do you remember if there was an attached
17 garage or unattached?
18 **A.  I believe it was attached.**
19 Q.  So then there's a photo of the inside of the
20 garage?
21 **A.  That's correct.**
22 Q.  I don't see any cars there.  A lot of junk in
23 that garage, huh?  Is that what it looks like?
24 **A.  Yes.**
25 Q.  Then if you go a couple of photographs beyond,

Page 210

(14:30-14:31)
1  you do see boxes and file cabinets, correct?
2  **A.  That's correct.**
3  Q.  All right.  And, again, absent 2257, the FBI
4  needs a search warrant under the -- with the
5  qualifications I've included in other questions, to
6  enter a man's garage attached to his house, correct?
7  **MS. WYER:** Objection; calls for
8  speculation.
9  **A.  With the qualifications we mentioned, yes,**
10 **that's correct.**
11 Q.  (By Mr. Murray)  And you need a search warrant
12 with those same qualifications to examine those
13 records in that man's garage?
14 **A.  With the same qualifications we mentioned,**
15 **yes, that's correct.**
16 **MS. WYER:** Same objection.
17 Q.  (By Mr. Murray)  Okay.  We're up to No. 20
18 which would be              Serial 12.  And can you
19 identify that record, Agent Joyner?
20 **A.  A Regulatory Inspection Report of**
21 **       in Casselberry, Florida, and the date of**
22 **inspection is September 19, 2007.**
23 Q.  And who is the author of that one?
24 **A.  I was.**
25 Q.  Okay.  This looks to me like it's, yet,

Page 211

(14:31-14:33)
1  another inspection that occurs at a residence; is that
2  correct?
3  **A.  That's correct.**
4  Q.  So we're now up to five?
5  **A.  That's correct.**
6  Q.  And, in fact, the mom was living there?
7  **A.  Yes.**
8  Q.  And she told you that the custodian of those
9  records was currently in the Czech Republic and that
10 she was taking his place; is that correct?
11 **A.  That's correct.**
12 Q.  And you found a couple of deficiencies after
13 you did your inspection, correct?
14 **A.  That's correct.**
15 Q.  Now, was there -- is there any -- let's go
16 to -- if you go to page 1902, you list the findings
17 that you made?
18 **A.  Yes.**
19 Q.  And, again, No. 1 is there didn't appear to be
20 a cross-reference system in use, correct?
21 **A.  That's correct.**
22 Q.  And then, second, there was one photo
23 identification that was not legible enough to
24 ascertain the date of birth, correct?
25 **A.  That's correct.**

Page 212

(14:33-14:34)
1  Q.  And the third one you say the records for
2  another title were present in a computer at the
3  residence, but the inspectors were unable to print or
4  copy the records.  What do you mean by that?
5  **A.  The mother was able to pull up on a home**
6  **computer those records, but she didn't have it hooked**
7  **up to a printer.**
8  Q.  Okay.
9  **A.  So she pulled up that information for us so we**
10 **could see on the screen that the records were there,**
11 **but we weren't able to make a copy of it.**
12 Q.  Why is that a violation on her part?
13 **A.  That wasn't a violation.  It said there are**
14 **two violations which are the first two.  So the third**
15 **one is just listed as we need to be able to make**
16 **copies of it.  I just put it in there that we're**
17 **asking that she e-mail that to us.**
18 Q.  I see.  Okay.  So you weren't suggesting that
19 that's a violation?
20 **A.  No, because in the inspection summary, I**
21 **mentioned that there are two violations.**
22 Q.  Okay.  I got you.
23 **A.  So it's a finding that probably shouldn't**
24 **appear under "Findings," but that was the note.**
25 Q.  Let's go to 1908.

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 213

(14:34-14:35)

1 A.  Okay.

2 Q.  You began this inspection at 10:30 in the

3   morning?

4 A.  That's correct.

5 Q.  Now, I don't see anything in this report --

6   and you'll correct me if I'm wrong -- where you gave

7   advance notice.  Did you?

8 A.  I don't recall giving advance notice to this

9   one.

10 Q.  Okay.

11 A.  The reason that we gave advance notice to

12   _____ is I had gone to that residence a couple

13   times and he was never home or nobody answered the

14   door.

15 Q.  I see.  Okay.  So, had he been there the first

16   time, you would have done the inspection without

17   advance notice?

18 A.  That's correct.

19 Q.  Okay.  All right.  So, 1908.  You began at

20   10:30.  You provided the mom with the standard letter,

21   correct?

22 A.  That's correct.

23 Q.  You took the photographs that you generally

24   take, namely, of the residence, the location of the

25   records, storage and the working area where you

Page 214

(14:35-14:36)

1   inspected the records, correct?

2 A.  That's correct.

3 Q.  And you took the photograph at the end,

4   correct?

5 A.  That's correct.

6 Q.  And you ended at 12:30?

7 A.  That's correct.

8 Q.  So that was a two-hour inspection?  You were

9   in that home for two hours?

10 A.  That's correct.

11 Q.  And this being Florida, we're talking about,

12   again, how many Government personnel?

13 A.  Three or four.

14 Q.  And if we take a look at the photographs

15   beginning with page 1925, we see the outside of this

16   house, correct?

17 A.  That's correct.

18 Q.  It was a single family residence?

19 A.  Yes, it was.

20 Q.  And I guess the next page is another

21   photograph of the outside of the house?

22 A.  That's correct.

23 Q.  And then the next page is inside the house,

24   correct?

25 A.  That's correct.

Page 215

(14:36-14:37)

1 Q.  And do you know what room that is or can't you

2   tell from this photo?

3 A.  I can't tell; but from memory, I believe we

4   were in the living room.

5 Q.  Can you identify what this last photo is?

6 A.  I believe that's also in the living room.  It

7   looks like there's a desk and some paper on it.  A lot

8   of it looks like CDs.  I believe that was also the

9   living room area.

10 Q.  Okay.  All right.  And certainly the FBI would

11   ordinarily need a search warrant before entering a

12   private residence in the course of a criminal

13   investigation in the absence of 2257 and the absence

14   of voluntary consent and in the absence of exigent

15   circumstances, correct?

16 A.  With the qualifications we mentioned before,

17   that's correct.

18 Q.  And, so, you ordinarily would have needed a

19   search warrant for this particular residence?

20 A.  With the qualifications we mentioned before,

21   that's correct.

22      MS. WYER: Objection.

23 Q.  (By Mr. Murray)  And you, with the same

24   qualifications, would have needed a search warrant to

25   examine the records?

Page 216

(14:37-14:38)

1      MS. WYER: Objection.  Same objection.

2 A.  And with the same qualifications, that's

3   correct.

4 Q.  (By Mr. Murray)  Okay.  Plaintiff's Exhibit 21

5   which is ___ Serial 21.  Happy coincidence, 21 is

6   21.  Can you identify that record, Agent?

7 A.  A Regulatory Inspection Report of ___ in

8   Chatsworth, California which occurred on November 16,

9   2006.

10 Q.  And can you tell me who the author of the

11   report is?

12 A.  I was.

13 Q.  Okay.  Can you generally tell me -- in some

14   instances, there seems to be a little bit more lag

15   time than others between the inspection and the

16   authorship of the report.

17 A.  Uh-huh.

18 Q.  Was there a reason for that or was it just a

19   matter of the press of business?

20 A.  There could be a number of reasons.  It could

21   be training.  It could have been annual leave.  It

22   could have been other business that was going on.

23 Q.  But nothing -- ordinarily not something

24   related to the inspection itself?

25 A.  No.

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 217

(14:39-14:40)

1  Q.  Okay.  So we shouldn't regard it as of any

2  consequence if we have a situation where the one

3  report is two weeks after the inspection; whereas, the

4  other one might be three days?

5  **A.  It doesn't indicate anything.**

6  Q.  Okay.  That's all I wanted to know.

7     All right.  So this was an inspection that you

8  did at their business premises?

9  **A.  That's correct.**

10  Q.  And an individual identified herself as the

11  Compliance Supervisor for the company?

12  **A.  That's correct.**

13  Q.  And that she had assumed the role of the

14  custodian of records who was no longer working there?

15  **A.  That's correct.**

16  Q.  Okay.  All right.  Up until this point, you've

17  not found any -- on any of the ones that we've looked

18  at, you've not found anyone under the age of 18

19  appearing in any of these titles, have you?

20  **A.  That's correct.  We have not.**

21  Q.  All right.  Let's look at page 1963.  Here the

22  inspection began at 10:00 a.m.; is that correct?

23  **A.  Actually, if I can go back to the previous**

24  **question, we had not verified that anybody was**

25  **underage, but there were a number of people,**

Page 218

(14:40-14:41)

1  **particularly the inspection of** t            **, where**

2  **we could not tell if they were underage because we had**

3  **no records.**

4  Q.  I understand.

5  **A.  Okay.  I'm sorry.**

6  Q.  You began this inspection at 10:00 a.m.?

7  **A.  That's correct.**

8  Q.  You took the standard photographs that you had

9  always been taking?

10  **A.  That's correct.**

11  Q.  Now, in this situation, it says in paragraph

12  five, as :            2257 records were all automated,

13  this individual downloaded all of the requested 2257

14  information of the selected performers'

15  identifications indicating date of birth on CDs

16  provided by you.  Tell me what you mean by that.  How

17  did that happen?

18  **A.  They didn't have anything on paper.  They**

19  **didn't have the standard paper files.  Everything was**

20  **computerized.  So we had our own CDs.  So, again,**

21  **they're not supposed to suffer a loss.  So we had CDs**

22  **that we gave them to download onto our CDs.**

23  Q.  Did you bring those every time you went to an

24  inspection in case you encountered --

25  **A.  Yes.**

Page 219

(14:41-14:43)

1  Q.  -- somebody who kept their records on

2  computers?

3  **A.  We always brought our own copier, our own**

4  **paper, our own CDs.**

5  Q.  Now, it's not a violation to keep it on the

6  computer as opposed to hard copy, is it?

7  **A.  No.**

8  Q.  Okay.  So you were allowed to do it either

9  way?

10  **A.  That's correct.**

11  Q.  Okay.  And they happened to choose to do it

12  electronically?

13  **A.  Yes, sir.**

14  Q.  Now, does that mean that -- so you were able

15  to -- so you took the CDs with you?

16  **A.  That's correct.**

17  Q.  Did you look on the screen to see what was

18  being downloaded or tell me how that works when you're

19  getting it off a computer like that?  What did you

20  guys and lady do while you were there?

21  **A.  That's probably why this was a short one**

22  **because most of the work would have come later.  I**

23  **don't remember exactly what happened on this one; but**

24  **just from reading this, we would have provided her**

25  **with the film titles and the performers, and based on**

Page 220

(14:43-14:44)

1  **that, she would pull it up and she would make the**

2  **copies for us.  We wouldn't sit there and watch her do**

3  **it, but she would just download her information**

4  **directly into our CDs.**

5  Q.  And then you would take the CDs with you and

6  that would contain all the records --

7  **A.  Yes.**

8  Q.  -- that you requested?

9  **A.  We would go back to our office space to do the**

10  **review and to do the copies.**

11  Q.  Okay.  All right.  And you took photographs on

12  the way out again before you left, correct?

13  **A.  That's correct.**

14  Q.  And let's see.  Did you find violations?  I

15  can't remember.  Yes.  You found some deficiencies,

16  correct?

17  **A.  That's correct.**

18  Q.  All right.  Now, let's take a look at the

19  photos to see what kind of a premises you were in.

20  All right.  The photo on page 2010 just looks like

21  it's the address and front door, I guess.  No.  It's

22  actually not even the front door, just the number,

23  correct?

24  **A.  That's correct.**

25  Q.  And then the next page is the front door?

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 221

(14:44-14:45)

1  A.  Yes.

2  Q.  Okay.  And, again, this is not a retail

3  outlet?

4  A.  No, it's not.

5  Q.  Now, the photo log says that the next picture

6  is of a sign that says "Use rear entrance."  But,

7  obviously, that didn't make it on our copy, did it?

8  A.  They show another door.  So maybe that's just

9  showing the door and you can't see the sign that says

10  the door is open.  I don't know.  Oh, this?  Yes.

11  Q.  Don't you think that the next picture is of

12  the private -- what the photo guy describes as the

13  private back door?

14  A.  Oh, okay.  Yes.

15  Q.  So the entrance told you to go to the back

16  apparently?

17  A.  I don't remember this, but that's what it

18  sounds like.  Yes.

19  Q.  And then there's picture of a 22 -- what's

20  called a "2257 Room" which it's got a bunch of filing

21  cabinets and a chair?

22  A.  Yes.

23  Q.  Is it possible that that means they also had

24  it on paper and the CDs were more convenient for you?

25  A.  I don't remember.  From reading the report, it

Page 222

(14:45-14:47)

1  sounds like they didn't have it on paper, that it was

2  all electronic.  I also notice they have CDs on the

3  table or desk, too.

4  Q.  In the event on an inspection, if the producer

5  had both hard copies and on the computer, is it --

6  would there be a preference for which you would want

7  to access?

8  A.  We would leave it up to them, whichever they

9  prefer to provide.

10  Q.  Either way?

11  A.  Yes.

12  Q.  And then the last photo, then, is of the desk

13  and area where the computer is; is that correct?

14  A.  That's correct.

15  Q.  Now, clearly, these photos show private

16  business premises not accessible to the general

17  public, correct?

18      MS. WYER:  Objection.  Assumes facts not

19  in evidence.

20  A.  It appears so.  Yes.

21  Q.  (By Mr. Murray)  So, again, we're in a

22  situation where, absent the qualifications that we've

23  talked about before -- including the qualifications, I

24  should say, that we talked about before, the FBI would

25  need a search warrant to enter those premises

Page 223

(14:47-14:57)

1  ordinarily?

2      MS. WYER:  Objection.  Assumes facts not

3  in evidence; lack of foundation; calls for

4  speculation.

5  A.  With all the qualifications we mentioned

6  before, yes, that's correct.

7  Q.  (By Mr. Murray)  And your end of those

8  qualifications are that the FBI was there on official

9  business to investigate a potential criminal

10  violation?

11  A.  Criminal activity and search of evidence of

12  that criminal activity.

13  Q.  And the answer to the question would be the

14  same.  You'd need a search warrant with those

15  qualifications to examine the records that were on

16  that computer?

17      MS. WYER:  Same objection.

18  A.  With the same qualifications as before, that's

19  correct.

20  Q.  (By Mr. Murray)  Why don't we take about a

21  five-minutes break if that's acceptable?

22  A.  Sounds like a good plan.

23      (Brief recess)

24  Q.  Plaintiffs' Exhibit 22 which is l

25  serial 18.

Page 224

(14:57-14:59)

1  A.  Okay.

2  Q.  So, when you're able to, if you would please

3  identify what that is.

4  A.  A Regulatory Inspection Report of '

5  Releasing Company in Chatsworth, California, and the

6  date of inspection was August 1st, 2006.

7  Q.  And who was the author of the report?

8  A.  I was.

9  Q.  Okay.  And this was done at the office or

10  business premises of the entity?

11  A.  Yes, it was.

12  Q.  And who was present, not by name but by title?

13  A.  The owner and custodian of records.

14  Q.  Okay.  All right.  Here's the one about the

15  Buddhist calendar?

16  A.  Yes.

17  Q.  So, after you did an inspection, you

18  determined that there were several 2257 violations,

19  and this included 11 performers who were only

20  identified by Thai identification which uses the

21  Buddhist calendar.  So the date of births could not be

22  readily determined.  That was one violation, correct?

23  A.  That's correct.

24  Q.  Is it a violation to use the Buddhist

25  calendar?

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 225

(14:59-15:00)

1  A.  By itself, no, but they would need to show
2  what the actual date of birth was.  They had no idea
3  what the date of birth was.  So, when they filmed,
4  they had no idea if these people were of age or not of
5  age.
6  Q.  You also said the records were not kept in
7  alphabetical order, and here you say one performer was
8  later determined to be underage; is that correct?
9  A.  According to the report, that's correct.
10  Q.  And that's the only instance that I could find
11  in all 29 of these.  Does that coincide with your
12  recollection?
13  A.  If I remember correctly -- and it's been a
14  long time -- I think there were two that initially
15  appeared to be underage, and I couldn't tell you the
16  other company.
17  Q.  Did that get resolved?
18  A.  Yes.
19  Q.  In favor of the person not being underage?
20  A.  That's correct.
21  Q.  The second one?
22  A.  That's correct.
23  Q.  So what I'm saying is this is the only one
24  where you weren't able to ultimately -- they weren't
25  ultimately able to prove that the performer was over

Page 226

(15:00-15:03)

1  18?
2  A.  As I recall, that's correct.
3  Q.  All right.  And if you look at page 2168, can
4  you take a look at that and see if that refreshes your
5  recollection what the producer was able to do by way
6  of trying to demonstrate that the performer was of
7  age?
8  MS. WYER:  Objection; characterization.
9  A.  I'm sorry.  Is there a question?
10  Q.  (By Mr. Murray)  I thought I asked a question.
11  Maybe I didn't.
12  A.  Oh, I'm sorry.
13  Q.  Why don't we go to the last page?  I think
14  that will clear up where this ended up.  So the last
15  page of these records are always the final Inspection
16  Compliance Determination, correct?
17  A.  I believe that was the typical format or that
18  was the summary.
19  Q.  And in this case, it indicates that the
20  company was found not to be in compliance with 2257,
21  correct?
22  A.  That's correct.
23  Q.  In addition, it was determined an underage
24  performer was depicted in engaging in sexual activity
25  in the movie -- it's "Khatoey the 3rd Sex."  The

Page 227

(15:03-15:04)

1  listed production date was such that the performer was
2  no older than 17 at the time of the filming.  That was
3  the conclusion that you came to?
4  A.  That's correct.
5  Q.  Okay.  And, therefore, it says this
6  information was provided to another Supervisory Agent
7  who supervises the squad involving Crimes Against
8  Children, correct?
9  A.  That's correct.
10  Q.  And the SAFE team, what's that stand for?
11  A.  Sexual Assault -- I don't know the rest of it.
12  Q.  So a meeting was held on August 28, 2006 to
13  discuss the matter of an underage performer with the
14  U.S. Attorney's Office.  Were you involved in that
15  meeting?
16  MS. WYER:  Objection.
17  A.  I believe so.
18  Q.  (By Mr. Murray)  Okay.  And then it indicates
19  that the AUSA Chief of the Criminal Division declined
20  prosecution, correct?
21  A.  That's correct.
22  Q.  Okay.  Now, let's go back then to the
23  procedures that you followed in this inspection which
24  appear on page 2216.
25  A.  Okay.

Page 228

(15:04-15:06)

1  Q.  What time did you begin?
2  A.  9:40 in the morning.
3  Q.  Okay.  You took the photographs of the
4  business and the room used to store the 2257
5  information, correct?
6  A.  That's correct.
7  Q.  You reviewed the records?
8  A.  That's correct.
9  Q.  You made copies of the records, correct?
10  A.  That's correct.
11  Q.  You took a photo at the end?
12  A.  That's correct.
13  Q.  And you left at 4:30, correct?
14  A.  That's correct.
15  Q.  So you spent almost seven hours, just under
16  seven hours?
17  A.  Yes, sir.
18  Q.  And let's go to the photo log which appears on
19  page 2241.
20  A.  Okay.
21  Q.  And photo No. 10 says it's the 2257 workroom,
22  file cabinets, correct?
23  A.  That's correct.
24  Q.  And 11 shows the workroom from the doorway, 12
25  shows the workroom, 13 shows the workroom as do 14 and

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 229

(15:06-15:07)

1  15 shows it from the doorway, correct?
2  **A.  Correct.**
3  Q.  So, again, this was not a retail store,
4  correct?
5      MS. WYER: Objection;
6  mischaracterization.
7  **A.  I'm trying to remember this one.  I know they**
8  **had a warehouse store that was open to the parking lot**
9  **and they had a door with walk-in -- they had walk-in**
10 **traffic.  I don't know what they were selling for**
11 **retail, but I know they did have some walk-in traffic,**
12 **I believe.**
13 Q.  (By Mr. Murray)  Well, you've been to
14 bookstores before?
15 **A.  Yes.**
16 Q.  And retail outlets?
17 **A.  Yes.**
18 Q.  Was this a typical retail outlet or was it a
19 business premises?
20 **A.  Definitely more business premises.**
21 Q.  Okay.  All right.  So some of these photos are
22 not the greatest.  For example, 2244, do you know what
23 that depicts, page 2244?
24 **A.  I think that is the address that's listed in**
25 **the custodian of records.**

Page 230

(15:07-15:08)

1  Q.  All right.  Let's go to 2251 with at least one
2  photo that seems to be legible.
3  **A.  Okay.**
4  Q.  And what is that?
5  **A.  File cabinets.**
6  Q.  And is that where the records were maintained?
7  **A.  Yes, it was.**
8  Q.  And then the next picture would be of shelving
9  with objects on it in a box?
10 **A.  I see file cabinets to the left, which I**
11 **believe are the same file cabinets in the previous**
12 **photo, and then the shelving that you mentioned.**
13 Q.  And then the next photo is of those file
14 cabinets again?
15 **A.  Yes.**
16 Q.  And one of them is open with records inside
17 visible?
18 **A.  That's correct.**
19 Q.  And then the next photo is of that room with
20 shelving and the file cabinets?
21 **A.  That's correct.**
22 Q.  And the next one is of the file cabinets?
23 **A.  Yes.**
24 Q.  And the next one of the shelving?
25 **A.  That's correct.**

Page 231

(15:09-15:10)

1  Q.  Now, all those photos beginning with 2251
2  through the end depict areas inside that business
3  premises that is not accessible to the general public,
4  don't you agree?
5      MS. WYER: Objection.  Assumes facts not
6  in evidence; lack of foundation; and calls for
7  speculation.
8  **A.  Yes, I agree.**
9  Q.  (By Mr. Murray)  So you would agree that,
10 absent 2257 and absent exigent circumstances and
11 absent voluntary consent, the FBI would need a search
12 warrant to enter those areas depicted in those photos
13 if the FBI was engaged in an official criminal
14 investigation looking for evidence of criminal
15 activity, correct?
16     MS. WYER: Same objection.
17 **A.  With the qualifications you mentioned before,**
18 **yes, that's correct.**
19 Q.  (By Mr. Murray)  Well, which other -- which
20 qualifications did I leave out of that question
21 because I thought I included them?
22 **A.  No.  I'm saying, with all the qualifications I**
23 **mentioned before, yes.**
24 Q.  But I tried to include --
25 **A.  I think you did.**

Page 232

(15:10-15:11)

1  Q.  Did I fail?
2  **A.  I think you did, but just in case I missed it.**
3  Q.  You think I included them all in that
4  question?
5  **A.  Yes.**
6  Q.  Good.  Thanks.
7      And the same answer, the search warrant would
8  be required under those circumstances to inspect the
9  records?
10 **A.  That's correct.**
11     MS. WYER: Same objection.  Asked and
12 answered.
13 Q.  (By Mr. Murray)  Let's go to Plaintiff's
14 Exhibit 23,              Serial 41.  And whenever
15 you're able and ready to do so, Agent Joyner, tell us
16 what that record is.
17 **A.  A Regulatory Inspection Report of**
18 **Releasing Company in Chatsworth, California.  The date**
19 **of the reinspection is March 21, 2007.**
20 Q.  Okay.  Who is the author of the report?
21 **A.  I was.**
22 Q.  Now, you call this a reinspection, and it is
23 obviously a reinspection in the sense that this is the
24 second time that you've been there, correct?
25 **A.  That's correct.**

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 233

(15:11-15:12)

1 Q. But you didn't -- it wasn't a reinspection
2 that occurred sooner than four months after the first
3 one, did it?
4 A. Let's see the date of the first one.
5 Q. Well, it says right here in your report.
6 A. Oh, okay.
7 Q. It was August 1st, '06, and this one was March
8 21, '07.
9 A. Okay. So, yes, it was greater than four
10 months.
11 Q. But given the fact that you had found some
12 violations, you would have been authorized by the
13 statute and regs to inspect even sooner than that and
14 within the four-month period immediately after the
15 first inspection, correct?
16 A. That's correct.
17 Q. Okay. And, so, when you called a
18 reinspection, how did you determine which entities or
19 persons to reinspect?
20 A. Those with unresolved issues or egregious
21 issues would be reinspected.
22 Q. Okay. Because I think we came -- I think this
23 is the second instance of a reinspection --
24 A. Yes.
25 Q. -- that we've come across so far, isn't it?

Page 234

(15:12-15:14)

1 A. Yes. I believe Darkside was the first.
2 Q. Right. Okay. All right. So, if I'm
3 understanding your report correctly, on the bottom you
4 found that the violations had not been entirely
5 resolved in fact; isn't that true?
6 A. That's correct.
7 Q. And that there were actually some new
8 deficiencies, correct?
9 A. That's correct.
10 Q. Okay. Go to page 2359.
11 A. Okay.
12 Q. What time did you begin this inspection?
13 A. 9:30 a.m.
14 Q. It looks like you provided the standard letter
15 that we've seen?
16 A. That's correct.
17 Q. You took the photographs that your protocol
18 called for?
19 A. I didn't take them personally; but, yes,
20 photographs were taken.
21 Q. Okay. Your inspectors reviewed the records?
22 A. That's correct.
23 Q. And made copies of the records that you
24 inspected?
25 A. Yes.

Page 235

(15:14-15:16)

1 Q. And photographs were taken before you left?
2 A. That's correct.
3 Q. And you left at about 11:30, approximately two
4 hours after you arrived?
5 A. That's correct.
6 Q. And rather than go through the -- I mean, we
7 can go through some of these photos again, but we just
8 went through them and the premises hadn't changed
9 between the first inspection and the second one, had
10 they --
11 A. No.
12 Q. -- in any material way?
13 A. No.
14 Q. Okay. And, so, the same answers that you gave
15 about the need -- the circumstances under which the
16 FBI would have needed a search warrant that you
17 answered in response to Plaintiff's Exhibit 22
18 involving the first inspection would remain the same
19 as to this inspection, correct?
20 A. The same answers would apply. That's correct.
21 Q. Okay. I'm going to show you Plaintiff's
22 Exhibit 24 which is [         Serial 10. And when
23 you're able to and have the opportunity to review what
24 you need to review in order to do it, please identify
25 what this record is.

Page 236

(15:16-15:17)

1 A. It's a Regulatory Inspection Report of [
2 [       hich took place in Hollywood, California on
3 September 11, 2006.
4 Q. And who was the author of this report?
5 A. I was.
6 Q. Okay. Who was present for this inspection?
7 A. The owner was present.
8 Q. Okay. And what was the finding, if any? Were
9 there deficiencies?
10 A. Yes, there were.
11 Q. And you listed them?
12 A. Yes, I did.
13 Q. Okay. Well, let's move to 2523, page 2523 of
14 Plaintiff's Exhibit 24.
15 A. Okay.
16 Q. And what time did you begin this inspection?
17 A. 9:50 a.m.
18 Q. And this would have been, since it's
19 California, we're talking five to seven Government
20 personnel?
21 A. That's correct.
22 Q. You took the photographs of the business and
23 the vault used to store the 22 information -- 2257
24 information?
25 A. When you say "you," I know you're referring to

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 237

(15:17-15:19)

1   the inspection team.  So, yes.
2   Q.   Yes.
3   A.   That's correct.  Yes.
4   Q.   Yes.  I'm using it in its collective sense.
5   A.   Yes.  That's correct.
6   Q.   You made copies of the records that were
7   examined?
8   A.   That's correct.
9   Q.   It doesn't say it, but you presumably had
10  another photograph taken before you left?
11  A.   Yes.
12  Q.   And --
13  A.   By the photo log.
14  Q.   We'll see when we get to the photo log.  And
15  this inspection ended at 11:10.  So that was about an
16  hour and 20 minutes; is that correct?
17  A.   That's correct.
18  Q.   And what kind of a business was            ?
19  Do you know?
20      MS. WYER: Objection; vague.
21  A.   According to the report,           produced
22  videos.
23  Q.   (By Mr. Murray)  Okay.  All right.  So the
24  photo log is on page 2542?
25  A.   Okay.

Page 238

(15:19-15:20)

1   Q.   And it indicates that a total of it looks like
2   six photos were taken; is that correct?
3   A.   That's correct.
4   Q.   And photo No. 2, which is on 2544, is of the
5   front of the business; is that correct?
6   A.   That's of the place where the records are
7   stored which was Iron Mountain.
8   Q.   So they were stored off-site?
9   A.   I don't know if they were off-site any longer;
10  but, yes, they had been stored at Iron Mountain.
11  That's correct.
12  Q.   And that's because somebody had gone out of
13  business, I think.  Explain to me why they were in a
14  storage facility as you understood it.
15  A.   From the report, it said           I now
16  own the rights to $        __, and the
17  custodian of records listed on the videos was now the
18  address of I
19  Q.   I see.  Okay.  And you did say in your report
20  that the inspection was conducted at Iron Mountain,
21  which is a storage facility specializing in products
22  from the film industry, correct?
23  A.   That's correct.
24  Q.   Okay.  So that is a picture of Iron Mountain
25  on page 2544?

Page 239

(15:20-15:22)

1   A.   That's correct.
2   Q.   And then the next page, I guess, is the front
3   door; is that correct?
4   A.   Yes.
5   Q.   And then the next page is what they call the
6   vault door?
7   A.   That's correct.
8   Q.   And under the "Miscellaneous Comments" is
9   written in the photo log "rented by
10                        " correct?
11  A.   That's correct.
12  Q.   And then the next page is the inside of the
13  vault rented by                 correct?
14  A.   That's correct.
15  Q.   And you can see a number of items appear to be
16  stored there, correct?
17  A.   That's correct.
18  Q.   There's some shelving?
19  A.   Yes.
20  Q.   And then the next picture is of the records,
21  the two boxes containing the 2257 records?
22  A.   I don't know if that's 2257 records.
23  Referring to the photo log, it says "records for
24  DVDs."  So I would assume that's also some of the 2257
25  records.  I'm not sure.

Page 240

(15:22-15:23)

1   Q.   Okay.  All right.  So, in this case, again,
2   Agent Joyner, we have a situation where the inspection
3   occurred in a private storage area that was rented by
4              .  correct?
5   A.   That's correct.
6   Q.   And accessible not to the general public,
7   correct?
8   A.   That's correct.
9   Q.   Okay.  And, so, in order to enter that area,
10  absent 2257 and absent exigent circumstances and
11  absent a voluntary consent, you would agree that the
12  FBI would need a search warrant in order to enter that
13  area for purposes of investigating whether evidence of
14  a crime is there, correct?
15      MS. WYER: Objection; calls for
16  speculation.
17  A.   With the qualifications we mentioned, yes,
18  that's correct.
19  Q.   (By Mr. Murray)  Okay.  But I think I've
20  included all the qualifications this time again, have
21  I not?
22  A.   I would have to listen to the question again.
23  I apologize.
24  Q.   Okay.  Absent 2257, absent voluntary consent
25  by the owner --

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 241

(15:23-15:25)

1 A.  Yes.
2 Q.  -- absent exigent circumstances, in order to
3 enter the storage area depicted in these photos that
4 we've just reviewed rented by ⸱ ⸱        for the
5 purpose of investigating whether there is evidence of
6 a criminal offense, the FBI would need to obtain a
7 search warrant?
8 A.  That's correct.
9    MS. WYER: Objection; calls for
10 speculation.
11 Q.  (By Mr. Murray)  Okay.  Let's go to Exhibit 25
12 which is SWS Serial 14.  And whenever you're able to,
13 Agent Joyner, please identify what that record is.
14 A.  A Regulatory Inspection Report of ⸱
15       in Chatsworth, California.  Date of
16 inspection is May 7, 2007.
17 Q.  Okay.  And who was the author of the report?
18 A.  I was.
19 Q.  Okay.  And who was present during the
20 inspection from the producer?
21 A.  The owner and they have an employee and I
22 believe the employee was also the custodian of
23 records, but the owner of         ⸱ was located
24 there.
25 Q.  And it appears that, after the inspection, it

Page 242

(15:25-15:26)

1 was determined that this entity got a clean bill of
2 health, right?
3 A.  That's correct.
4 Q.  Okay.  Now, let's take a look at page 2596 of
5 this exhibit.  And tell me, what time did you arrive
6 at the premises?
7 A.  9:50 a.m.
8 Q.  Did you provide the standard letter that we've
9 seen?
10 A.  Yes, we did.
11 Q.  You took the standard photographs of the
12 business, the place where the records were stored, and
13 the place where you examined the records, correct?
14 A.  That's correct.
15 Q.  You collectively did review the records for
16 ten videos, correct?
17 A.  That's correct.
18 Q.  And the inspection ended; but before that, you
19 took a last photo to show what it looked like before
20 you left?
21 A.  That's correct.
22 Q.  And it ended at 1:30 p.m.; is that correct?
23 A.  That's correct.
24 Q.  So that would have been a little over three
25 and a half hours; is that correct?

Page 243

(15:26-15:27)

1 A.  That's correct.
2 Q.  And then, if you look at the photos again, we
3 see that this is not a business that's a retail
4 outlet, correct?
5 A.  That's correct.
6    MS. WYER: Objection.
7 Q.  (By Mr. Murray)  And it would appear that, if
8 you look at page 2625, it shows the outside of the
9 building where this business is located, correct?
10 A.  Yes.
11 Q.  And then the next picture shows again a series
12 of file cabinets; is that correct?
13 A.  Yes.
14 Q.  One of them is open a little bit, correct?
15 A.  Yes.
16 Q.  And you can see there are records inside the
17 one that is open, correct?
18 A.  That's correct.
19 Q.  And the photo journal describes that as the
20 "2257 cabinets - record room," correct?
21 A.  That's correct.
22 Q.  And then the next photo is supposed to be the
23 workroom.  It's hard to make out though, isn't it?
24 A.  That little white spot is a pug.
25 Q.  It's a dog?

Page 244

(15:27-15:28)

1 A.  Yeah.  That's a pug.  It was there during the
2 entire inspection.
3 Q.  Okay.  And then the last photo -- was he
4 friendly?
5 A.  He was very friendly.  That's why I remember
6 this inspection.
7 Q.  The owner had a pug?
8 A.  Yes, a very friendly pug.
9 Q.  And then the last photo is of -- again, it's
10 hard to make out, but it's the workroom after the
11 inspection, correct?
12 A.  That's correct.
13 Q.  Okay.  So you'll agree with me, based upon
14 your presence there and these photos, that these were
15 business premises and within the business premises
16 these were areas that were not accessible to the
17 general public?
18    MS. WYER: Objection.
19 A.  Yes.  I agree.
20 Q.  (By Mr. Murray)  And that absent 2257, absent
21 voluntary consent, absent exigent circumstances, the
22 FBI would have needed a search warrant in order to
23 carry out any duties involving looking for evidence of
24 criminal behavior in those areas?
25    MS. WYER: Objection.  Assumes facts not

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 245

(15:28-15:29)
1  in evidence; lack of foundation; calls for
2  speculation.
3  A.  Yes.
4  Q.  (By Mr. Murray)  And the same answer, a search
5   warrant would have been needed under those
6   circumstances to examine those records?
7  A.  Yes.
8      MS. WYER:  Same objection.
9  Q.  (By Mr. Murray)  Okay.  Let's go to
10  Plaintiff's Exhibit 26 which is            Serial 8.
11  And whenever you're able to do so, if you'll please
12  identify what this record is.
13  A.  A Regulatory Inspection Report of
14  in Canoga Park, California.  Date of inspection is
15  August 2, 2007.
16  Q.  And who was the author of this report?
17  A.  I was.
18  Q.  Okay.  Yes.  This was one of the ones where
19  you see the inspection was July 19th but you didn't
20  author your report until August 23rd.  Do you see
21  that?
22  A.  Yes.
23  Q.  But there's no significance at all we've
24  agreed, correct?
25  A.  No.  More than likely I was in training or

Page 246

(15:29-15:32)
1  FMLA leave.
2  Q.  Now, who was present at that inspection?
3  A.  An owner of
4  Q.  Okay.
5  A.  And then the owners of                arrived
6  later.
7  Q.  And the findings after the inspection -- as a
8  result of the inspection were what?
9  A.  The finding was that they did not list the
10  correct custodian of records or they listed the
11  custodian of records without his knowledge and they
12  also didn't have adequate cross-referencing.
13  Q.  And the response by the producer was what?
14  A.  That they would update their record keeping
15  system to include cross-referencing and they reached
16  an agreement with              o permit the
17  storage of 2257 records at his address.
18  Q.  Okay.  All right.  Go to page 2729 and tell
19  us -- it looks like you don't list the time on this
20  one.  You can't tell us what time this began, can you?
21  A.  No.  Just from reading the previous pages, I
22  remember this was really messed up because you have
23  somebody saying "I'm listed as custodian of records,
24  but I never agreed to it" and he must have called the
25  actual owners and may have arrived later.  So, when

Page 247

(15:32-15:34)
1  the actual inspection actually took place, I don't
2  know.
3  Q.  In any case, once you got all that straight so
4  you knew what you were going to do that day, you
5  carried out the inspection?
6  A.  That's correct.
7  Q.  And, so, where did the inspection actually
8  occur?  I guess I'm a little bit confused by paragraph
9  four of your -- let me withdraw that and start over on
10  this question.
11      If you go back to page 2724 --
12  A.  Okay.
13  Q.  -- you indicate in your second sentence of
14  your Producer Information, "Initially,
15                was randomly selected and inspected on
16  7/19/2007."  Isn't that one of the ones that we've
17  already gone over?
18  A.  We went over (                          Yes.
19  Q.  Okay.  So we've already talked about that
20  inspection.  And I think what you're saying -- correct
21  me if I'm wrong -- is that, during that inspection,
22  you learned that three of the movies were actually
23  produced by             , correct?
24  A.  Per this report, that's what the owner was
25  saying, that those titles were produced by another

Page 248

(15:34-15:35)
1  company other than his.
2  Q.  And that's what caused you to go -- to try to
3  do an inspection of                , correct?
4  A.  I don't remember that, but I believe so.
5  Q.  Although, if you look -- and, again, I
6  recognize that it's been a long time.  But if you look
7  at page 2729 on Pre-inspection Procedures, you say
8  that                          was randomly
9  selected, but you might be -- in other words, you see
10  the --
11  A.  Yes.
12  Q.  You see the problem --
13  A.  Yes.
14  Q.  -- in trying to piece it together?  But it
15  appears from your first report that, because you
16  learned that            might have been the producer
17  of three of these films that you were interested in,
18  that is why you then perhaps decided to do an
19  inspection of                 ?
20  A.  I could answer that question in 2007.  I don't
21  recall now.
22  Q.  Okay.  In any case, whether it was random or
23  whether it was because of the outgrowth of the other
24  inspection, you did, in fact, do an inspection of the
25  records that were available at some site in Van Nuys,

Free Speech Coalition, Inc., et al vs.                                    SSA Charles Joyner
The Honorable Eric H. Holder, Jr.                                          April 12, 2013

Page 249

(15:35-15:37)

1   California, correct?
2   A.  Correct.  And I'm trying to remember this.
3   For some reason, I think that we drove to a second
4   site that was given to us by the owners of
5                    but I'm not certain of that.
6   Q.  Okay.  I don't know that I saw any photos in
7   that.  Do you see any photos?
8   A.  I don't have any, and I'm trying to remember
9   if we drove to a second site or if they brought the
10  records to us at the              location.
11  Q.  Paragraph four says that it took place at the
12  2257 off-site located in Van Nuys on page 2729.
13  A.  Yes.
14  Q.  So, in any case, your recollection isn't very
15  clear on that?
16  A.  No.  I don't remember if they brought the
17  material to that location.  So I don't remember where
18  it actually took place.
19  Q.  Okay.  In any case, but it would have taken
20  place at a location where the general public wasn't
21  present?
22  A.  That's correct.
23      MS. WYER: Objection.  Assumes facts not
24  in evidence.
25  Q.  (By Mr. Murray)  All right.  Let's look then

Page 250

(15:37-15:38)

1   at Plaintiff's Exhibit 27 which is           Serial 7.
2   And let me -- as soon as you're in a position to tell
3   us -- take your time; but as soon as you're able to,
4   please identify this record.
5   A.  It's a Regulatory Inspection Report of
6                    Chatsworth, California.  The date of
7   inspection is October 10th of 2006.
8   Q.  And can you tell me who the author of this
9   report is?
10  A.  I was.
11  Q.  And can you tell me who was present at this
12  inspection?
13  A.  The owner.
14  Q.  And this occurred at
15  A.  Yes.                was doing business as
16
17  Q.  Okay.  This was the one there was apparently
18  some question raised by the owner through a letter
19  that he provided from his attorney as to whether he
20  was a primary or secondary producer?
21  A.  That's correct.
22  Q.  Okay.  And you were satisfied that he was a
23  primary producer that was subject to inspection?
24  A.  That's correct.
25  Q.  Okay.  All right.  And, so, you proceeded with

Page 251

(15:38-15:40)

1   the inspection and you found only one minor violation
2   is what I see; is that correct?
3   A.  That's correct.
4   Q.  The sole violation was failure to maintain the
5   2257 cross-reference system up to date?
6   A.  And that was only for one performer.  So
7   that's correct.  So they had a cross-reference system
8   in place, but it was not up to date and that one
9   performer was not cross-referenced correctly.
10  Q.  All right.  And then, if you turn to page 2781
11  of this exhibit, you'll see that you began the
12  inspection at 9:30 in the morning, correct?
13  A.  That's correct.
14  Q.  And that you took photographs of the business
15  and the room that was used to store the 2257
16  information; is that correct?
17  A.  That's correct.  Yes.
18  Q.  You reviewed the records, examined them,
19  correct?
20  A.  That's correct.
21  Q.  You made copies of the records that you
22  examined and took them with you?
23  A.  Yes.
24  Q.  You took photographs again before you left?
25  A.  Yes.

Page 252

(15:40-15:41)

1   Q.  And you left at 12:00 noon?
2   A.  That's correct.
3   Q.  So that was an inspection that lasted two and
4   a half hours?
5   A.  That's correct.
6   Q.  Okay.  Now, let's take a look at the photo
7   log.  It looks like only about five photos were taken
8   there.  And if you look at page 2799, do you see a
9   photograph of the outside of the building with the --
10  and it says on the building '          ," I think,
11  correct?
12  A.  That's correct.
13  Q.  Again, this was not a retail store?
14  A.  No, it was not.
15  Q.  And then the next photo is supposed to be of
16  the lobby area, I guess, once you enter the building;
17  is that correct?  I know it's hard to make out.
18  A.  That's correct.
19  Q.  And then they have a 2257 room which is
20  depicted in the next photo?
21  A.  That's correct.
22  Q.  And then it's hard to make out, but you can
23  see at least some file cabinets, correct?
24  A.  Yes.
25  Q.  And the last picture is described as from the

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 253

(15:41-15:42)

1  entry of the work room, correct?
2  **A.  That's correct.**
3  Q.  And, again, from your presence during the
4  course of this inspection and your further review of
5  these photographs, you'll agree with me that the areas
6  that you entered to examine the records are not areas
7  generally accessible to members of the public?
8  **A.  That's correct.**
9  Q.  Okay.  And you would agree --
10    **MS. WYER:** Objection.
11  Q.  -- that, therefore, absent exigent
12  circumstances or voluntary consent and absent 2257,
13  the FBI would ordinarily need a search warrant to
14  enter those premises and those areas for the purpose
15  of investigating whether there is evidence of criminal
16  activity, correct?
17    **MS. WYER:** Objection.  Assumes facts not
18  in evidence; lack of foundation; calls for
19  speculation.
20  **A.  Yes.  That's correct.**
21  Q.  (By Mr. Murray)  And the same answer in terms
22  of needing a search warrant under those circumstances
23  to examine the records?
24    **MS. WYER:** Same objections.
25  **A.  Yes.  That's correct.**

Page 254

(15:42-15:44)

1  Q.  (By Mr. Murray)  Okay.  Now we're on 28,
2  Plaintiff's Exhibit 28, '          Serial 15.  And
3  whenever you're able to identify this record, Agent
4  Joyner, please do so for us.
5  **A.  It's a Regulatory Inspection Report of
6        Hollywood, California.  Date of inspection is
7  May 31, 2007.**
8  Q.  And who was the author of this report?
9  **A.  Steve Lawrence.**
10  Q.  Agent Lawrence?
11  **A.  That's correct.**
12  Q.  Okay.  And his report is dated July 23, '07;
13  is that correct?
14  **A.  That's correct.**
15  Q.  And the inspection itself was, according to
16  the report, conducted on May 31, '07; is that correct?
17  **A.  That's correct.**
18  Q.  Okay.  And the owner was present, correct?
19  **A.  That's correct.**
20  Q.  And this was done at his apartment, his
21  residence, correct, according to the report?
22  **A.  Uh-huh.  That's correct.**
23  Q.  Okay.  So that's the sixth one that was done
24  at a residence, correct?
25  **A.  I believe so.**

Page 255

(15:44-15:45)

1  Q.  Okay.  The report indicates that this was one
2  of those cases where Agent Lawrence telephoned this
3  owner.  Do you see that?
4  **A.  Yes.  I do see that.**
5  Q.  And the owner advised that the records were
6  maintained in his apartment.  He also advised that he
7  doesn't maintain regular business hours for
8  and does not spend 20 hours a week on the business.
9  Apparently, he worked for a third party.  He's got a
10  job apparently, correct, other than this is what the
11  report indicates?
12  **A.  That's what the report indicates.  Yes.**
13  Q.  And, so, there was an arrangement according to
14  the Agent Lawrence.  Due to the records being
15  maintained in a personal residence, the lack of normal
16  business hours, employment with a third party during
17  the day and his being out of town, the lead inspector
18  arranged to meet with this individual early in the
19  morning of June 11, 2007, correct?  See that there?
20  **A.  I'm sorry.  Where was that?**
21  Q.  This paragraph here.
22  **A.  Okay.**
23  Q.  Is that correct?
24  **A.  That's correct.**
25  Q.  Okay.  But according to Agent Lawrence's

Page 256

(15:45-15:47)

1  report, within hours of being contacted by Agent
2  Lawrence, this owner e-mailed a reporter who maintains
3  an industry-related internet website and blog and the
4  owner apparently advised this reporter that he had
5  been contacted by the FBI and that they would be
6  conducting an inspection on June 11th.  Do you see
7  that there?
8  **A.  I do.**
9  Q.  And, so, after Agent Lawrence was made aware
10  of that posting -- excuse me.
11      After being made aware on 5/31/2007 that the
12  e-mail had been posted on the reporter's internet
13  blog, the lead inspector conducted the inspection that
14  evening shortly after the owner got off work, correct?
15  **A.  That's what the report says.  Yes.**
16  Q.  So, according to this report, there was an
17  agreement between Agent Lawrence that the inspection
18  would occur on June 11th, correct?
19  **A.  That's correct.**
20  Q.  When Agent Lawrence learned that the owner had
21  contacted a reporter to let that reporter know about
22  that fact, Agent Lawrence determined to proceed with
23  the inspection on May 31st instead?
24  **A.  That's what his report indicates.  Yes.**
25  Q.  Okay.  And then if you go to page 2858 under

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 257

(15:47-15:48)

1   the Findings, Agent Lawrence lists as one of the
2   deficiencies that the 2257 statement listed a post
3   office box as the address, correct?
4   A.   That's correct.
5   Q.   And that's a violation?
6   A.   That's correct.
7   Q.   And then he listed the fact that the producer
8   does not maintain at least 20 normal business hours
9   per week and his normal business hours were not
10  posted; is that correct?
11  A.   That's correct.
12  Q.   And then underneath that he cites the part of
13  the reg that says as follows:  "To the extent that the
14  producer does not maintain at least 20 normal business
15  hours per week, producers must provide notice to the
16  inspecting agency of the hours during which records
17  will be available for inspection, which in no case may
18  be less than 20 hours per week," correct?
19  A.   Correct.
20  Q.   So the violation in this case was his failure
21  to maintain the 20 normal business hours and notify
22  the inspecting agency of the hours when he would be
23  available, correct?
24  A.   That's what's listed in the report.
25  Q.   And he also outlines the producer's response

Page 258

(15:48-15:50)

1   to his findings, correct?
2   A.   Yes.
3   Q.   He reports what he apparently found on the
4   owner's blog entry.  Do you see that in the second
5   paragraph?
6   A.   Yes, I do.
7   Q.   Because he says, in his blog entry posted on
8   May 31, 2007 at 10:01 p.m., the owner indicated he had
9   two minor violations writing, quote, "I did not use a
10  physical address for records.  I never felt
11  comfortable using my home address and I moved several
12  times since '97," correct?  That was his apparent
13  response according to Agent Lawrence?
14  A.   That's correct.
15  Q.   Okay.  And that same sentiment is repeated,
16  according to Agent Lawrence, in a blog entry dated
17  June 1st, 2007, correct?
18  A.   That's correct.
19  Q.   And then this report goes on to actually print
20  out this person's blog entries, and they appear on
21  page 2859 and 2860 and 2861 of this official FBI
22  record, correct?
23  A.   That's correct.
24  Q.   So, when you go to page 2863, you will see
25  that the inspection procedures that occurred are

Page 259

(15:50-15:51)

1   outlined there, correct?
2   A.   Correct.
3   Q.   And the inspection began at 8:00 p.m. in the
4   evening at nighttime, correct?
5   A.   Correct.
6   Q.   And Special Agent Lawrence immediately
7   identified himself and the purpose of the inspection
8   upon entering the apartment of the owner, correct?
9   A.   Correct.
10  Q.   And Agent Lawrence provided the owner with a
11  letter explaining the parameters of the inspection and
12  advising that there could be a reinspection at any
13  time if violations were discovered; is that correct?
14  A.   That's correct.
15  Q.   And that's the standard letter that we have
16  seen which was Exhibits 32, 33, and 34, that type of
17  letter?
18  A.   I would assume it's the same letter.
19  Q.   That's the only form letter that was used,
20  correct?
21  A.   That's the only one that I'm aware of that was
22  being used.  Yes.
23  Q.   Then the inspectors examined the records at
24  this apartment, correct?
25  A.   Correct.

Page 260

(15:51-15:53)

1   Q.   They made the copies of the records, correct?
2   A.   Correct.
3   Q.   And then they left at about 9:00.  So they
4   were in this man's residence for about an hour?
5   A.   That's correct.
6   Q.   And this was California; is that right?
7   A.   Yes, it was.
8   Q.   So there would have been five to seven
9   Government personnel in this man's apartment?
10  A.   I don't think so.  Let me check.
11      It appears that there are only three.  I
12  wasn't aware of this inspection, and because it
13  happened at night, I'm sure he just grabbed whoever
14  had looked at these couple videos.  That would have
15  been three of them.
16  Q.   And I think we agree this was the sixth
17  residence that was inspected?
18  A.   Yes.
19  Q.   Okay.  And without 2257, in the absence of
20  exigent circumstances, in the absence of voluntary
21  consent, the FBI would need -- would have needed a
22  search warrant based upon probable cause to enter this
23  apartment for the purpose of looking for evidence of
24  criminal activity, correct?
25      MS. WYER: Objection.  Calls for

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 261

(15:53-15:54)

1    speculation and legal conclusion.
2  **A.   That's correct.**
3  Q.   (By Mr. Murray)  And they would have needed a
4    search warrant under those same circumstances to
5    examine the records that they examined?
6       **MS. WYER:** Same objection.
7  **A.   That's correct.**
8  Q.   (By Mr. Murray)  All right.  Now we're getting
9    to No. 29.  We saved the big one.  It's a thick one.
10   Wicked Serial 22.  Whenever you're able to identify
11   this record, please do so, Agent.
12 **A.   It's a Regulatory Inspection Report of Wicked**
13   **Pictures which took place in Canoga Park, California.**
14   **The date of inspection is January 24, 2007.**
15 Q.   Thank you.  And who was the author of the
16   report?
17 **A.   I was.**
18 Q.   Okay.  And who was present during this
19   inspection?
20 **A.   The owner, the Chief Compliance Officer, and**
21   **the Chief Technology Officer.**
22 Q.   And I believe that you determined that this
23   entity got a clean bill of health as well, no
24   violations?
25 **A.   That's correct.**

Page 262

(15:54-15:56)

1  Q.   Now, let's take a look at 2907, page 2907 of
2    this exhibit.  What time did you arrive at their
3    premises?
4  **A.   9:30 a.m.**
5  Q.   And there's no reference to the letter being
6    delivered.  Although, this was February of '07.  Do
7    you think you would have delivered the letter but just
8    neglected to put it in here?
9  **A.   I don't know what date we started using the**
10   **letter.  So I couldn't say.**
11 Q.   Okay.  In any case, you took the photographs
12   of the business and the place where the records were
13   stored, correct?
14 **A.   That's correct.**
15 Q.   You examined the records that you were
16   interested in examining?
17 **A.   That's correct.**
18 Q.   You made copies of those records and took them
19   with you?
20 **A.   Yes.**
21 Q.   You took photographs before leaving?
22 **A.   Correct.**
23 Q.   And the search -- the investigation -- I'm
24   sorry.
25   The inspection lasted approximately two and a

Page 263

(15:56-15:57)

1    half hours, correct?
2  **A.   That's correct.**
3  Q.   Because you left at noon and you knew Wicked
4    to be one of the -- an adult film producer?
5  **A.   Yes.**
6  Q.   And you knew that it was not a retail store?
7  **A.   That's correct.**
8  Q.   And, so, when we turn to the pictures and the
9    picture log, which appears at 2958, it looks like
10   approximately -- it looks like eight pictures were
11   taken according to the log; is that correct?
12 **A.   That's correct.**
13 Q.   And if we look at those pictures, page 2961
14   shows the outside of the entranceway, does it not?
15 **A.   Yes.**
16 Q.   Page 2962 shows a filing room for lack of
17   better terminology.  It has a bunch of filing
18   cabinets.  It's got a computer?
19 **A.   Yes.**
20 Q.   It looks like a desk of some sort?
21 **A.   Yes.**
22 Q.   The next page is a picture -- another picture
23   of that same room?
24 **A.   Yes.**
25 Q.   As is the next page which gives us a better

Page 264

(15:57-15:58)

1    view of the -- there's a chair in front of the desk
2    that contains the computer?
3  **A.   Yes.**
4  Q.   And then the last -- the next page, what does
5    that depict?
6  **A.   The work table.**
7  Q.   All right.  Clearly, again, these were areas
8    that were not accessible to the general public?
9  **A.   That's correct.**
10      **MS. WYER:** Objection.
11 Q.   (By Mr. Murray)  And absent exigent
12   circumstances, absent voluntary consent, and without
13   2257, the FBI would have needed a search warrant based
14   on probable cause to enter these business premises and
15   the areas that you were in, correct, if you were there
16   to investigate potential criminal activity?
17      **MS. WYER:** Objection.  Assumes facts not
18   in evidence; lack of foundation; calls for speculation
19   and legal conclusions.
20 **A.   Yes.**
21 Q.   (By Mr. Murray)  And the same answer would be
22   true that a search warrant would be needed under those
23   same circumstances to examine the records you
24   examined?
25      **MS. WYER:** Same objection.

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

Page 265

(15:58-16:00)
1  A.  Yes.
2  Q.  (By Mr. Murray)  All right.  I don't know
3  whether we looked at 30.  There's a supplement.  Did
4  we look at 30?  Yeah.  I guess we did.  Maybe this is
5  my copy of 30.  And 31.  We've already looked at the
6  additional photographs, I believe.
7       Okay.  Now, your office was in LA during this
8  two-year period?
9  A.  I had two offices.  I had one office in
10 Westwood in the FBI building at 11000 Wilshire, and I
11 had another office in Van Nuys at the Federal building
12 there.
13 Q.  Now, the program that you were supervising was
14 scheduled to continue into 2008, was it not?
15 A.  My understanding --
16      MS. WYER: Objection.  Objection; vague.
17 Q.  (By Mr. Murray)  You can answer.
18 A.  My understanding was the program was going to
19 continue indefinitely.
20 Q.  And, in fact, you were -- I think you told
21 someone and it was true that the plan was to do an
22 inspection every two weeks?
23 A.  That was our goal.
24 Q.  And there came a time when the Connection
25 decision came down?

Page 266

(16:00-16:01)
1  A.  I'm sorry?
2  Q.  Are you familiar with the Connection
3  Distributing case?
4  A.  Is that the 6th Circuit?  I am familiar with
5  the 6th Circuit decision.
6  Q.  It came to your attention that a panel of 6th
7  Circuit Court of Appeals had struck down as
8  unconstitutional under the First Amendment 2257 and
9  its implementing regulations?
10 A.  Yes, sir.
11 Q.  And after that, once that ruling came down, a
12 decision was made above your head, I guess, to
13 discontinue the program at that juncture?
14 A.  After that decision was -- after the decision
15 of the 6th Circuit, I was told to continue to order
16 and review the material but not to conduct any more
17 inspections until notified.
18 Q.  Okay.  And, so, you didn't conduct any further
19 inspections?
20 A.  That's correct.
21 Q.  Okay.  And then did your -- were you then
22 assigned other duties?
23 A.  I had already started another program.  So I
24 was already involved in both programs.
25 Q.  And that had nothing to do with what we're

Page 267

(16:01-16:03)
1  talking about?
2  A.  No.
3  Q.  That other program?
4  A.  No.
5  Q.  Okay.  That's all I have.  Thank you so much,
6  Agent Joyner, for your time.
7       EXAMINATION
8       BY MS. WYER:
9  Q.  I have just a couple questions.
10      Agent Lawrence, have you ever seen the current
11 version of the statute or regulations 2257 and the
12 companion statute 2257A and the current version of the
13 regulations?
14 A.  No.  The only statutes that I'm familiar with
15 are the ones that were in place in 2006, 2007.
16 Q.  And do you know what violations of the statute
17 as it was in -- of the regulations as they were
18 implementing a previous version of the statute
19 qualified as felony violations?
20      MR. MURRAY: Objection.
21 A.  Could you reword that, please?
22 Q.  (By Ms. Wyer)  Do you know which violations of
23 the regulations in effect at the time that you were
24 conducting the inspections qualified as felony --
25 A.  I do not.

Page 268

(16:03-16:04)
1  Q.  -- felony crimes or could have been prosecuted
2  as a felony?
3  A.  I don't know for certain.  No.
4  Q.  And in some questions you were asked whether
5  certain records could be inspected under certain
6  circumstances, whether the 2257 records could be
7  inspected in the absence of 2257.  Do you recall those
8  questions?
9  A.  Yes.
10 Q.  And without 2257, would there be any 2257
11 records?
12      MR. MURRAY: Objection.
13 A.  No.  The law itself requires that record
14 keeping.  So, if there's no law, there would be no
15 records for 2257.
16      MS. WYER: That's all I have.
17      FURTHER EXAMINATION
18      BY MR. MURRAY:
19 Q.  Agent Lawrence, you have seen exhibit --
20 A.  Joyner.  Chuck.
21 Q.  I'm sorry.  Agent Joyner.
22 A.  Kathy did it, too.
23      MS. WYER: Oh, did I?
24 A.  She started it.
25 Q.  (By Mr. Murray)  You've seen Plaintiff's

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

Page 269

(16:04-16:05)

1  Exhibit 39, correct?
2  **A.  Yes, I have.**
3  Q.  And you see that the -- that's 2257 effective
4  as of July 27th, 2006, correct?
5  **A.  That's correct.**
6  Q.  Do you know whether or not that is also the
7  current version of 2257 or are you just not aware of
8  it?
9  **A.  I do not know if this is the current version.**
10  **And, again, after the program ceased, I went on to**
11  **other duties.  And after I retired, I've had no**
12  **interest.  I have not continued to research it or keep**
13  **up to date on 2257.**
14  Q.  Okay.
15  **A.  So I wouldn't know.**
16  Q.  Okay.  So, for all you know, this is the
17  correct version?
18  **A.  As far as I know, yes.**
19  Q.  Now, I also want --
20  **A.  I do believe that it was mentioned yesterday**
21  **that there has been an update, but I'm not aware of**
22  **it.**
23  Q.  Who mentioned that yesterday?
24      MS. WYER:  Objection.  That's privileged.
25  Don't answer.

Page 270

(16:05-16:07)

1      THE WITNESS:  Okay.
2  Q.  (By Mr. Murray)  Now, let me show you again
3  Plaintiff's Exhibit 44 which is, as you will see, the
4  version of 2257 -- and I'll give you a chance to look
5  at it.
6  **A.  Okay.**
7  Q.  But I want to point out to you where you can
8  find this information -- the version of 2257 that was
9  in effect as of April 30, 2003, okay?
10  **A.  Okay.**
11  Q.  Do you see that?  And I think you said you're
12  familiar with that statute as well?
13  **A.  If this is the statute that was in place when**
14  **we started the program, I would have read it at that**
15  **time.**
16  Q.  Okay.  Now go to (f) of that statute.
17  **A.  Okay.**
18  Q.  And do you see in (f) that, under that
19  version, (f)(1) says, "It shall be unlawful for any
20  person to whom subsection (a) applies to fail to
21  create or maintain the records as required by
22  subsections (a) and (c) or by any regulation
23  promulgated under this section."  See that?
24  **A.  I do.**
25  Q.  Same language that we looked at before,

Page 271

(16:07-16:08)

1  correct, with the other version?
2  **A.  I would have to look at the other version.**
3  Q.  Similar?
4  **A.  Yes.**
5  Q.  Okay.  And subsection (2) refers to it being
6  unlawful to knowingly make any false entry in or
7  knowingly fail to make an appropriate entry in any
8  record required by subsection (b) of this section or
9  any regulation promulgated under this section?
10  **A.  Correct.**
11  Q.  Subsection (3) incorporates the regulation as
12  well.  Do you see that?
13  **A.  Yes.**
14  Q.  I'm sorry.  Did I say subsection (c)?  I meant
15  subsection (4).
16  **A.  Okay.**
17  Q.  Subsection (3) I meant.
18  **A.  3.**
19  Q.  And you see that there's a subsection (4),
20  correct?
21  **A.  Correct.**
22  Q.  But there is no subsection (5).  Do you see?
23  It he understands at (4).
24  **A.  That's correct.**
25  Q.  Okay.  Now, the only reason I point that out

Page 272

(16:08-16:09)

1  to you is that -- turn back to Plaintiff's Exhibit 39.
2  Where is your Exhibit 39?  I guess it is -- oh, here
3  it is.  I'm sorry.  Now go to section (f) of 2257 in
4  Plaintiff's Exhibit 39.
5  **A.  Okay.**
6  Q.  Do you see that a fifth -- there's a fifth
7  clause added?
8  **A.  Yes.**
9  Q.  And what does that say?
10  **A.  "For any person to whom subsection (a) applies**
11  **to refuse to permit the Attorney General or his or her**
12  **designee to conduct an inspection under subsection**
13  **(c)."**
14  Q.  And that wasn't present in the prior version,
15  was it?
16  **A.  It was not.**
17  Q.  Okay.  But your letters that we've talked
18  about -- and I'll show you Plaintiff's Exhibit 34.  In
19  the third paragraph, what does it say?
20  **A.  "Pursuant to these laws and regulations, the**
21  **FBI is authorized to enter your place of business**
22  **without delay.  It is a criminal violation of federal**
23  **law to delay or obstruct the FBI from conducting the**
24  **inspection."**
25  Q.  Okay.  And that is true because -- at least as

Free Speech Coalition, Inc., et al vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

---

**Page 273**

(16:09-16:11)

1  of the July 27th, 2006 version, because it adds
2  subsection (5) that makes it a crime to refuse to
3  permit the inspection, correct?
4      **MS. WYER:** Objection.  It calls for a
5  legal interpretation beyond this witness' knowledge.
6  **A.   The dates of this, yes, preceded the letter.**
7  Q.   (By Mr. Murray)  And the dates of Plaintiff's
8  Exhibit 39 is what you're referring to?
9  **A.   That's correct.**
10 Q.   Okay.  That's all I have.  Thank you very
11 much.
12     Are you available to appear at trial the week
13 of June the 3rd in Philadelphia?
14 **A.   It's a good thing it's on the record.  Yes.**
15 **My calendar is clear for that week.**
16 Q.   And the next week, I guess?  It goes
17 potentially two weeks.
18 **A.   Yes, sir.**
19 Q.   Thank you very much.
20     If we were to want to subpoena you, could we
21 send a subpoena to Ms. Wyer  And would that be
22 sufficient?
23     **MS. WYER:** We can discuss that.
24     **MR. MURRAY:** Okay.  That's fine.  I'll
25 work it with Ms. Wyer so that we don't have to chase

---

**Page 274**

(16:11)

1  you down.
2      (Deposition adjourned at 4:11 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 275**

1                    CHANGES AND SIGNATURE
2  WITNESS NAME:_____  DATE OF DEPOSITION:_____
3  PAGE       LINE       CHANGE       REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

---

**Page 276**

1          I, SSA CHARLES JOYNER, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6
7                    SSA CHARLES JOYNER
8
9
10
11 STATE OF          )
12 COUNTY OF         )
13
14          Before me,_____, on this
15 day personally appeared SSA CHARLES JOYNER, known to
   me to be the person whose name is subscribed to the
16 foregoing instrument and acknowledged to me that they
   executed the same for the purposes and consideration
17 therein expressed.
18          Given under my hand and seal of office this
   _____ day of _____, 2013.
19
20
21                    NOTARY PUBLIC IN AND FOR
22                    THE STATE OF TEXAS
23
24
25

---

SSA Charles Joyner
April 12, 2013

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

---

Page 277

```
1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
  FREE SPEECH COALITION,     *
3 INC., et al,                *
                             *
4       Plaintiffs,          *   CASE NO. 2:09-4607
                             *
5 vs.                        *
                             *   JUDGE MICHAEL M. BAYLSON
6 THE HONORABLE ERIC H.       *
  HOLDER, JR., Attorney       *
7 General.                    *
                             *
8       Defendant.           *
9          REPORTER'S CERTIFICATION
         DEPOSITION OF SSA CHARLES JOYNER
10           TAKEN ON APRIL 12, 2013
11       I, JODI WELLS, Certified Shorthand Reporter,
   hereby certify to the following:
12
         That the witness, SSA CHARLES JOYNER, was duly
13 sworn by the officer and that the transcript of the
   oral deposition is a true record of the testimony
14 given by the witness;
15       That the deposition transcript was submitted
   on _____, 2013, to the witness or to
16 the attorney for the witness for examination,
   signature and return to me by _____,
17 2013;
18       That the amount of time used by each party at
   the deposition is as follows:
19
         Mr. Murray - 06:15
20       Ms. Wyer - 00:02
         Mr. Samonds - 00:00
21       That pursuant to information given to the
   deposition officer at the time said testimony was
22 taken, the following includes counsel for all parties
   of record:
23
         Mr. Murray, attorney for plaintiffs
24       Ms. Wyer, attorney for defendant
         Mr. Samonds, attorney for defendant
25
```

Page 278

```
1        I further certify that I am neither counsel for,
   related to, nor employed by any of the parties or
2 attorneys in the action in which this proceeding was
   taken, and further that I am not financially or
3 otherwise interested in the outcome of the action.
4        Certified to by me this _____ day of
5 _____, 2013.
6
7
8          JODI WELLS, TEXAS CSR NO. 6769
           Expiration Date:  December 31, 2013
9          CONTINENTAL COURT REPORTERS, INC.
           Firm Registration No. 61
10         2777 Allen Parkway, Suite 600
           Houston, Texas 77019-2166
11         (713)522-5080
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 279

```
1          FURTHER CERTIFICATION
2        The original deposition was/was not returned
   to the deposition officer on _____;
3
         If returned, the attached Changes and
4 Signature page contains any changes and the reasons
   therefor;
5
         If returned, the original deposition was
6 delivered to _____,
   Custodial Attorney;
7
         That $_____ is the deposition
8 officer's charges to the _____ for
   preparing the original deposition transcript and any
9 copies of exhibits;
10       That the deposition was delivered in
   accordance with Rule 30(f) and that a copy of this
11 certificate was served on all parties shown herein.
12       Certified to by me this _____ day of
   _____, 2013.
13
14
15
16
17         JODI WELLS, TEXAS CSR NO. 6769
           Expiration Date:  December 31, 2013
18         CONTINENTAL COURT REPORTERS, INC.
           Firm Registration No. 61
19         2777 Allen Parkway, Suite 600
           Houston, Texas 77019-2166
           (713)522-5080
20
21
22
23
24
25
```

---

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

Min-U-Script®

Free Speech Coalition, Inc., et al  vs.
The Honorable Eric H. Holder, Jr.

SSA Charles Joyner
April 12, 2013

**#**

**#4 (1)**
102:21

**0**

**05 (1)**
178:19
**06 (10)**
85:24;86:1;113:20;
142:24;153:6;181:22;
182:2,20;183:1;233:7
**07 (11)**
85:10,23;86:4;120:20;
143:13;171:5;177:25;
233:8;254:12,16;262:6

**1**

**1 (10)**
6:1;59:12;62:6,18;
63:6,9;65:7;83:24;87:7;
211:19
**1:30 (1)**
242:22
**1:45 (1)**
89:9
**10 (3)**
165:21;228:21;235:22
**10:00 (3)**
189:9;217:22;218:6
**10:01 (1)**
258:8
**10:30 (4)**
157:1;198:14;213:2,
20
**10:50 (3)**
171:14,17;183:15
**1016 (1)**
171:3
**1019 (3)**
171:10;172:6,8
**1024 (1)**
171:13
**1042 (1)**
174:1
**1046 (1)**
175:11
**1047 (1)**
175:11
**1073 (1)**
181:20
**1076 (1)**
183:14
**10th (1)**
250:7
**11 (8)**
8:24;97:4;170:24;
179:15;224:19;228:24;
236:3;255:19
**11:00 (2)**

87:17;180:3
**11:10 (1)**
237:15
**11:15 (2)**
118:23;189:18
**11:30 (2)**
168:6;235:3
**11000 (1)**
265:10
**1111 (1)**
184:19
**1119 (1)**
177:23
**1125 (2)**
180:3,4
**1149 (1)**
180:18
**115 (1)**
89:11
**1153 (2)**
180:18,22
**11th (2)**
256:6,18
**12 (8)**
83:13;97:16;176:3,9,
18;181:20;210:18;
228:24
**12:00 (1)**
252:1
**12:30 (3)**
72:24;83:11;214:6
**12:40 (1)**
143:25
**120 (1)**
89:15
**1202 (1)**
188:9
**1204 (1)**
188:24
**1206 (1)**
189:7
**122 (2)**
92:15;94:18
**123 (2)**
92:15;95:7
**1232 (1)**
189:23
**1235 (1)**
189:23
**1236 (1)**
190:2
**1238 (1)**
191:1
**1239 (1)**
191:1
**13 (6)**
124:17;171:4;177:4,
13,15;228:25
**1335 (1)**
193:6
**1337 (1)**
194:23
**1345 (1)**

195:4
**1376 (1)**
195:22
**1379 (1)**
195:24
**14 (5)**
143:10;188:1;191:19;
228:25;241:12
**1435 (1)**
195:3
**15 (8)**
160:9;189:20;191:18;
195:18;197:17;202:3;
229:1;254:2
**1505 (1)**
196:24
**1591 (1)**
198:12
**16 (9)**
124:19;150:16;176:8;
177:14;191:20,22;196:3,
7;216:8
**1616 (1)**
200:17
**1619 (1)**
199:7
**1621 (1)**
199:19
**17 (6)**
188:2;197:13,14;
202:9;205:25;227:2
**1723 (1)**
205:15
**1725 (1)**
203:3
**1728 (2)**
204:2,16
**1758 (2)**
205:25;206:2
**178 (2)**
98:6;103:6
**179 (2)**
102:10;112:7
**17th (1)**
69:8
**18 (19)**
12:16;16:14;38:4;
68:22;83:18;112:23;
131:4;132:17,18;
146:24;150:8,17;190:6;
196:13;202:2,6;217:18;
223:25;226:1
**1801 (1)**
132:18
**181 (1)**
102:19
**1832 (1)**
208:3
**1836 (1)**
208:12
**1853 (1)**
209:9
**186 (1)**

107:2
**19 (6)**
85:13;86:4;188:6;
197:22;207:3;210:22
**1902 (1)**
211:16
**1908 (2)**
212:25;213:19
**1925 (1)**
214:15
**1963 (1)**
217:21
**1983 (1)**
8:11
**1987 (2)**
8:11,12
**19th (2)**
85:15;245:19
**1st (4)**
20:20;224:6;233:7;
258:17

**2**

**2 (9)**
64:4;83:13,20;89:7;
151:21;154:1;238:4;
245:15;271:5
**2:30 (1)**
148:13
**2:45 (1)**
119:23
**20 (22)**
29:20,24;30:2,21;
31:12,16;32:4,11;65:19;
134:4,10,15;150:5;
165:22;195:18;210:17;
237:16;255:8;257:8,14,
18,21
**2003 (2)**
10:24;270:9
**2004 (1)**
125:8
**2005 (6)**
19:24;20:3,20;24:3;
178:16;179:5
**2006 (33)**
9:2,10;10:4,5;12:12,
17;13:4,14,20;14:2;15:8,
13,15;17:15;42:7;97:16,
20,23;98:4;124:19,21;
131:18;160:16;188:6;
192:1;216:9;224:6;
227:12;236:3;250:7;
267:15;269:4;273:1
**2007 (33)**
12:13;37:15;42:5;
65:13,20;69:10;85:14;
91:20;131:15;142:19;
150:8,16,17;160:12;
166:11;177:17;179:15;
188:13;196:13;197:22;
202:9;207:10;210:22;

232:19;241:16;245:15;
248:20;254:7;255:19;
258:8,17;261:14;267:15
**2008 (3)**
42:6;143:10;265:14
**2010 (1)**
220:20
**2011 (2)**
8:2
**2013 (1)**
19:16
**2030 (2)**
203:9,19
**208 (1)**
108:8
**20th (2)**
69:9,10
**21 (7)**
37:15;216:4,5,5,6;
232:19;233:8
**211 (1)**
108:12
**2118 (1)**
203:12
**214 (2)**
108:25;109:3
**216 (1)**
110:2
**2168 (1)**
226:3
**22 (9)**
97:19;142:19;143:13;
177:17;221:19;223:24;
235:17;236:23;261:10
**2216 (1)**
227:24
**2241 (1)**
228:19
**2244 (2)**
229:22,23
**225 (1)**
27:5
**2251 (2)**
230:1;231:1
**2256 (1)**
76:9
**2257 (183)**
8:21;9:10;10:8,21,23;
12:16;13:1,8,22;14:15;
15:3;16:14;19:15;24:7,
10;25:6;27:17;28:3,6,7;
33:15,20;38:2,5,9;39:14;
41:21;45:17;47:16,18,
24;52:5,11;53:9,11;54:1,
14,16;55:13,20;56:2;
57:16;63:11;66:10;
67:24;68:4,22;74:12;
76:11,15,22;77:2,7,22;
78:1;79:22;80:4,5;
81:17;82:12;88:17;90:8,
25;91:8;92:16;94:19;
95:2,24;96:11,17,19;
97:20;99:22;101:9;