# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC. et al., | ) | Civil Action No. 2:09-4607 |
| | ) | |
| Plaintiffs, | ) | Judge Michael M. Baylson |
| | ) | |
| v. | ) | |
| | ) | DEFENDANT'S MEMORANDUM IN |
| THE HONORABLE ERIC H. HOLDER, JR., | ) | SUPPORT OF DEFENDANT'S MOTION |
| Attorney General, | ) | FOR SUMMARY JUDGMENT |
| | ) | |
| Defendant. | ) | |
| | ) | |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATUTORY AND REGULATORY FRAMEWORK ..................................... 4

PROCEDURAL HISTORY.................................................................................. 6

STANDARD OF REVIEW ................................................................................. 9

ARGUMENT........................................................................................................ 10

    I.      NO FACIAL FOURTH AMENDMENT CLAIM IS BEFORE
           THIS COURT, NOR COULD SUCH A CLAIM SUCCEED ................ 10

          A.    The Third Circuit Implicitly Held that Plaintiffs' Fourth
                Amendment Claim Could Only Be Considered as an As-
                Applied Claim Rather than as a Facial Challenge to the
                Statute and Regulations................................................................. 10

          B.    To the Extent a Facial Fourth Amendment Challenge Is at
                Issue, Defendant Is Entitled to Judgment as a Matter of
                Law ............................................................................................... 12

    II.     TO THE EXTENT PLAINTIFFS RAISE AN AS-APPLIED
           FOURTH AMENDMENT CHALLENGE TO ONE OR MORE
           PRIOR INSPECTIONS, THE INJUNCTIVE RELIEF THEY
           SEEK CANNOT REDRESS THEIR ASSERTED INJURY .................. 15

    III.    THE INSPECTIONS THAT OCCURRED IN 2006 AND 2007
           DID NOT VIOLATE THE FOURTH AMENDMENT .......................... 22

          A.    The Inspections Did Not Constitute Searches Under the
                Fourth Amendment ...................................................................... 22

           B.    To the Extent Any of the Inspections Implicate the Fourth
                Amendment, They Should Be Upheld Under the
                Administrative Subpoena Standard............................................... 26

          C.    To the Extent Any of the Inspections Constitute Searches
                Under the Fourth Amendment, They Should Be Upheld as
                Valid Administrative Searches ..................................................... 27

          D.    In the Alternative, the Inspections Should Be Upheld as
                Reasonable Based on the Totality of the Circumstances.............. 29

    IV.    NO CASE OR CONTROVERSY EXISTS WITH RESPECT TO
           PLAINTIFFS ALPER, HYMES, LEVINGSTON, AND QUEEN
           BECAUSE THEY ARE NOT ENGAGED IN ACTIVITIES
           SUBJECT TO THE 2257 REQUIREMENTS........................................ 30

          A.    Barbara Alper.............................................................................. 32

          B.    Thomas Hymes ........................................................................... 32

ii

C.      David Levingston ............................................................................ 33

D.      Carol Queen ................................................................................... 34

V.      NO PLAINTIFF CAN PREVAIL IN AN AS-APPLIED FIRST
AMENDMENT CHALLENGE .................................................................. 35

      A.      The Third Circuit Has Already Held that the 2257
Requirements Directly Advance the Government's
Important Interests and    Leave Open Ample Alternative
Channels for Communication ........................................................ 35

      B.      As a Matter of Law, the 2257 Requirements Are Narrowly
Tailored as Applied to Plaintiffs ................................................... 37

VI.     PLAINTIFFS CANNOT ESTABLISH THAT THE 2257
REQUIREMENTS ARE SUBSTANTIALLY OVERBROAD .............. 45

CONCLUSION .......................................................................................................... 51

## TABLE OF AUTHORITIES

### Cases

*Am. Library Ass'n v. Reno*, 33 F.3d 78 (D.C. Cir. 1993) ....................................................35, 39

*181 South Inc. v. Fischer*, 454 F.3d 228 (3d Cir. 2006) ...............................................................46

*Aiello v. City of Wilmington*, 623 F.2d 845 (3d Cir. 1980)....................................................46, 47

*Ashcroft v. ACLU*, 535 U.S. 564 (2002)........................................................................................46

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) ...........................................30

*Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n,*
    Nos. 12-2316, 12-2460, 2013 WL 1776633 (7th Cir. Apr. 26, 2013) ....................................14, 26

*Boliden Metech, Inc. v. United States*, 695 F. Supp. 77 (D.R.I. 1988) .........................................12

*Borden v. Sch. Dist. of Tp. of E. Brunswick*, 523 F.3d 153 (3d Cir. 2008)..................................47

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973).....................................................................45, 46, 48

*Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009) ....................................................12, 45

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013)......................................................... 15, 16

*Common Cause v. Pennsylvania*, 558 F.3d 249 (3d Cir. 2009)....................................................35

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ..................................................48

*Connection Distrib. Co. v. Holder*, 557 F.3d (6th Cir. 2009)................................................passim

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) .................................................................15

*Davis v. FEC*, 554 U.S. 724 (2008)................................................................................................15

*Faustin v. City, Cnty. of Denver*, 268 F.3d 942 (10th Cir. 2001) ................................................31

*FSC v. Attorney Gen.,* 677 F.3d 519 (3d Cir. 2012) ..............................................................passim

*FSC v. Gonzales,* 406 F. Supp. 2d 1196 (D. Colo. 2005)........................................................36, 39

*FSC v. Holder,* 729 F. Supp. 2d 691 (E.D. Pa. 2010)............................................................passim

*FSC v. Holder, No. 09-4607,* 2012 WL 6059189 (E.D. Pa. 2012) ...........................................9, 16

*Freeman v. Corzine*, 629 F.3d 146 (3d Cir. 2010)................................................................... 16, 17

*Friedman v. Market Street Mortg. Corp.*, 520 F.3d 1289 (11th Cir. 2008).................................37

*Gibson v. Mayor & Council*, 355 F.3d 215 (3d Cir. 2004)....................................................47, 50

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) ...................................................31

*Interstate Outdoor Advertising, L.P. v. Zoning Bd.*, 706 F.3d 527 (3d Cir. 2013) ...................................10

*Johnson v. City & Cnty. of Philadelphia*, 665 F.3d 486 (3d Cir. 2011) ...................................37

*Katz v. United States*, 389 U.S. 347 (1967)...................................22

*Kaucher v. Cnty. of Bucks*, 455 F.3d 418 (3d Cir. 2006)...................................10

*Laird v. Tatum*, 408 U.S. 1 (1972)...................................30

*Lewis v. United States*, 385 U.S. 206 (1966) ...................................24

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................16

*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978)...................................12, 13

*Maryland v. Macon*, 472 U.S. 463 (1985)...................................13

*Members of City Council v. Taxpayers for Vincent, 466 U.S. 789 (1984)* ...................................38, 46, 50

*Minnesota v. Olsen*, 495 U.S. 91 (1990)...................................18

*N.Y. State Club Ass'n., Inc. v. City of New York*, 487 U.S. 1 (1988) ...................................46

*Nat'l Fed'n of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202 (5th Cir. 2011) ...................................31

*New York v. Ferber*, 458 U.S. 747...................................35, 43

*NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182 (3d Cir. 2006) ...................................11

*Patel v. City of Los Angeles*, 686 F.3d 1085 (9th Cir. 2012)...................................13

*Pub. Serv. Co. v. U.S. EPA*, 509 F. Supp. 720 (D. Ind. 1981) ...................................13

*Renne v. Geary*, 501 U.S. 312 (1991)...................................21

*Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183 (3d Cir. 1990) ...................................30

*Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) ...................................46

*See v. City of Seattle*, 387 U.S. 541 (1967)...................................14, 26

*Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir. 1986) ...................................21

*Sibron v. New York*, 392 U.S. 40 (1968) ...................................10, 20

*Tennessee v. Garner*, 471 U.S. 1 (1985)...................................29

*United States ex rel. McArthur v. Rundle*, 402 F.2d 701 (3d Cir. 1968) ...................................11

*United States v. $291,828.00 in United States Currency*, 536 F.3d 1234 (11th Cir. 2008)...................................11

*United States v. Barton*, 633 F.3d 168 (3d Cir. 2011) ...................................12

*United States v. Cerri*, 753 F.2d 61 (7th Cir. 1985) ...................................24

*United States v. Huff*, 703 F.3d 609 (3d Cir. 2013) ................................................................ 35

*United States v. Jones*, 132 S. Ct. 945 (2012) ........................................................................ 22

*United States v. King*, No. 09-1434, 2010 WL 438417 (3d Cir. Feb. 8, 2010) ...................... 18

*United States v. Mitchell*, 652 F.3d 387 (3d Cir. 2011) .......................................................... 29

*United States v. Sczubelek*, 402 F.3d 175 (3d Cir. 2005) ....................................................... 29

*United States v. Williams*, 553 U.S. 285 (2008) ..................................................................... 46

*Virginia v. Hicks*, 539 U.S. 113 (2003) .................................................................................. 46

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .......................................................... 35, 37

*Warshak v. United States*, 532 F.3d 521 (6th Cir. 2008) ........................................................ 21

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ........................ 12

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) .......................................................................... 16

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ......................................... 16, 31

## Statutes

5 U.S.C. § 706 ........................................................................................................................... 11

18 U.S.C. § 2256(2)(A) ......................................................................................................... 38, 48

18 U.S.C. § 2257-2257A ................................................................................................... passim

## Regulations

28 C.F.R. § 75.1 .......................................................................................................................... 6

28 C.F.R. § 75.2 ...................................................................................................................... 6, 32

28 C.F.R. § 75.4 ................................................................................................................ 6, 13, 25

28 C.F.R. § 75.5 ..................................................................................................................... 6, 13

70 Fed. Reg. 29609 .................................................................................................................... 32

73 Fed. Reg. 77432 ...................................................................................................................... 6

## INTRODUCTION

Plaintiffs raise constitutional challenges to 18 U.S.C. §§ 2257 and 2257A and their implementing regulations, which set forth age verification and recordkeeping requirements for producers of images depicting real people engaged in sexually explicit conduct ("the 2257 requirements"). This Court previously rejected all of the various challenges plaintiffs originally raised under numerous different First Amendment theories, as well as under the Fourth and Fifth Amendments. The Third Circuit upheld this Court's rulings in many respects but remanded three issues for further factual development. Having completed discovery on those issues, defendant moves for summary judgment because there are no genuine issues of disputed fact, and defendant is entitled to judgment as a matter of law.

First, defendant is entitled to summary judgment with respect to plaintiffs' Fourth Amendment claim, which seeks to enjoin future inspections of the records producers must maintain under the 2257 requirements. Plaintiffs cannot meet their heightened burden at the summary judgment stage to show that they have standing to seek injunctive relief, or that their claims are ripe. The only inspections that ever occurred took place over five years ago. Currently, there is no active 2257 inspection program. Even if a new program were established, past inspections (which themselves had their own unique circumstances) do not necessarily illustrate how any inspection might occur in the future. Given that the number of producers is larger than the FBI originally anticipated, that 2257 records are increasingly likely to be kept in digital format, and that the original inspection program focused exclusively on commercial producers within the adult entertainment industry, it would be impossible for plaintiffs to establish that hypothetical future inspections would necessarily share any material characteristics with the inspections that previously took place. The Court should reject plaintiffs' request that it

issue what would essentially be 29 advisory opinions regarding whether each of the 29 past inspections comported with the Fourth Amendment and conclude that their Fourth Amendment claim for injunctive relief is not redressable and is unripe.

To the extent the Court proceeds to consider the 29 inspections that occurred in the past, it should conclude that, as a matter of law, they were reasonable under the Fourth Amendment. As this Court has already recognized, the 2257 inspections are essentially nothing more than inspections of records that producers of sexually explicit material are statutorily required to maintain. The Court's prior holding that producers have no expectation of privacy in these records continues to apply. And insofar as the Third Circuit suggested it was necessary to assess whether the inspections involved common law trespass, nothing in the record establishes that any trespass occurred. Indeed, the FBI inspection team simply gave producers a list of the 2257 records they wanted to inspect, and the producers brought those records to wherever the producers had requested that the team stay during the inspection. No non-consensual entry into non-public areas was involved.

Even if the inspections qualified as "searches" for Fourth Amendment purposes, nothing in the record requires any deviation from this Court's prior conclusion that warrantless inspections of the age verification records that producers of sexually explicit material are statutorily required to maintain are reasonable. Producers of such material have long been on notice that the ages of people appearing in their work are a subject of government concern and close regulation to ensure that minors are not exploited, and the very limited nature of the record inspections at issue is reasonable under the totality of circumstances.

Second, with respect to plaintiffs' as-applied First Amendment claims, several plaintiffs are not engaged in the production of depictions of sexually explicit conduct, nor do they have

any concrete plans to produce such depictions in the future. They have no injury-in-fact that can support standing to raise their First Amendment claim.

Third, even with respect to those plaintiffs that are producing such material, the Third Circuit has already affirmed most of this Court's holdings with respect to an as-applied First Amendment challenge: that the 2257 requirements are content neutral regulations so intermediate scrutiny applies; that the requirements directly advance the important, indeed compelling, government interest in protecting children from sexual exploitation; and that there are ample alternative channels for communication. On the sole remaining issue of whether the 2257 requirements are narrowly tailored as applied to plaintiffs, the material facts are undisputed. As a general matter, the universal application of the 2257 requirements is necessary in order to avoid subjective decisions by the very producers subject to regulation regarding whether ages should be checked or records should be maintained for particular works, or particular performers. A system where the requirements only apply on a case-by-case basis depending on how old a person appears to be or the producer's subjective intent in creating the work (both of which require highly subjective evaluations) would introduce loopholes and open the door to circumvention, making the requirements less effective. None of the plaintiffs confines their production of sexually explicit material to works that are the equivalent of illustrated sex manuals for the elderly – the only example that other courts have identified as potentially beyond the reach of the requirements. To the contrary, all plaintiffs that have produced sexually explicit material have included young and youthful-looking individuals in their depictions. Defendant is therefore entitled to summary judgment with respect to plaintiffs' as-applied First Amendment challenge.

Fourth, with respect to plaintiffs' facial overbreadth challenge, plaintiffs cannot establish

that striking the requirements down as facially invalid would be appropriate, given the plainly

legitimate sweep of the requirements to a vast array of published and otherwise widely-

disseminated material depicting people engaged in sexually explicit conduct. The possibility that

the requirements might be enforced with respect to private communications between consenting

adults is remote, and there is no evidence whatsoever that such communications have been

chilled by the existence of the 2257 requirements. In the absence of such a chilling effect, the

requirements should be left facially intact so that they can continue to operate as Congress

intended—as a prophylactic measure designed to ensure that children are not used in the

production of sexually explicit material. Congress's scheme not only prevents this harm but also

provides some assurance to others along the chain of distribution, from secondary producers to

distributors to consumers, and a means of verification for law enforcement, that the original

creators of such material have checked individuals' ages before depicting them engaged in

sexual acts. Even if the 2257 requirements might conceivably be deemed invalid in the specific

context of private communications, such issues could be resolved in the future on an as-applied

basis rather than entirely removing the tool that Congress designed to serve such important

purposes.

## STATUTORY AND REGULATORY FRAMEWORK[1]

Sections 2257 and 2257A require producers of materials that contain depictions of real

people engaged in actual or simulated sexually explicit conduct to examine the driver's licenses

or other identification documents for the people being depicted and to maintain records of having

done so. 18 U.S.C. §§ 2257(a), (b); 2257A(a), (b). "Produces" means "actually filming,

videotaping, photographing, creating a picture, digital image, or digitally- or computer-

---

[1] A more detailed description of the statutory and regulatory background of the 2257 requirements, and of the factual background of this case, is set forth in the accompanying Statement of Material Facts, which defendant hereby incorporates herein.

manipulated image of an actual human being," as well as "digitizing an image of a visual depiction of sexually explicit conduct," "assembling, manufacturing, publishing, duplicating, reproducing, or reissuing" works containing such depictions, and "inserting on a computer site or service a digital image of, or otherwise managing the sexually explicit content, of a computer site or service that contains" such depictions. *Id.* §§ 2257(h)(2), 2257A(g). "Produces" does not include certain commercial activities—such as photo or film processing, digitization, printing, video duplication, providing a telecommunications or Internet access service, or distribution— where the commercial interest is unrelated to the content of the depictions. *Id.*

Producers are required to keep their 2257 records at their "business premises, or at such other place as the Attorney General may by regulation prescribe and shall make such records available to the Attorney General for inspection at all reasonable times." *Id.* §§ 2257(c), 2257A(c). Producers are required to affix a statement to the works that they produce subject to the requirements, "in such manner and in such form as the Attorney General shall by regulations prescribe, describing where the records required by this section with respect to all performers depicted in that copy of the matter may be located." *Id.* §§ 2257(e), 2257A(e).

Section 2257A sets forth an exception to the requirements for those who produce depictions of simulated sexually explicit conduct or actual sexually explicit conduct limited to lascivious exhibition of genitals, for those who submit certifications to the Attorney General indicating that they already, in the normal course of business, collect and maintain age verification records for performers pursuant to other laws, labor agreements, or industry standards. *Id.* § 2257A(h). The statutes identify certain failures to comply with the requirements as unlawful, subject to penalties that may include fines or imprisonment or both. *Id.* §§ 2257(f), (i), 2257A(f), (i).

The Attorney General has promulgated regulations implementing these requirements, most recently in December 2008. *See* Final Rule, 73 Fed. Reg. 77432 (amending 28 C.F.R. §§ 75.1 - .9). These regulations identify a "primary producer" as one who "actually films, videotapes, photographs, or creates a digitally- or computer-manipulated image, a digital image, or a picture of, or who digitizes an image of, a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct." 28 C.F.R. § 75.1(c)(1). A "secondary producer" is one who

> produces, assembles, manufactures, publishes, duplicates, reproduces, or reissues a book, magazine, periodical, film, videotape, or digitally- or computer-manipulated image picture, or other matter intended for commercial distribution that contains a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct, or who inserts on a computer site or service a digital image of, or otherwise manages the sexually explicit content of a computer site or service that contains a visual depiction of, an actual human being engaged in actual or simulated sexually explicit conduct.

*Id.* § 75.1(c)(2).

The regulations allow a primary producer to redact nonessential information about performers from 2257 records before sharing them with secondary producers. 28 C.F.R. § 75.2(b). The regulations also allow both primary and secondary producers to keep their 2257 records with a third-party custodian rather than at their own place of business. *Id.* §§ 75.2(h), 75.4. The regulations governing inspections are set forth at 28 C.F.R. § 75.5. They authorize inspections of 2257 records during normal business hours. *Id.* § 75.5(c)(1). However, for producers who do not maintain normal business hours, they allow the producer to identify other hours during which its 2257 records will be available, as long as those hours are at least 20 hours per week. *Id.*

## PROCEDURAL HISTORY

Plaintiffs filed suit on October 7, 2009, raising facial and as-applied constitutional

challenges to the 2257 requirements under the First, Fourth, and Fifth Amendments. Compl. ¶¶ 59-84. With respect to their First Amendment claims, plaintiffs asserted that the requirements were subject to strict scrutiny, could not survive under intermediate scrutiny, were overbroad, constituted a prior restraint, placed impermissible restrictions on anonymous speech, were impermissibly vague, and impermissibly imposed strict liability. *Id.* ¶ 60. With respect to the Fifth Amendment, plaintiffs contended that the requirements violated equal protection principles, due process principles (again based on vagueness), and their privilege against self-incrimination. *Id.* ¶¶ 62, 68, 77. Plaintiffs also asserted that the requirements authorized warrantless searches in violation of the Fourth Amendment. *Id.* ¶¶ 72-73. Plaintiffs sought declaratory and injunctive relief and a preliminary injunction. *Id.* at 31-32.

Defendant opposed plaintiffs' request for a preliminary injunction and moved to dismiss, arguing, among other things, that previous courts had already considered and rejected most of plaintiffs' claims, and that plaintiffs' Fourth Amendment claim was unripe because plaintiffs had failed to assert that any of them had been subject to inspection under the 2257 requirements. ECF No. 16-17. Plaintiffs then sought to amend their complaint in order to add assertions that unidentified members of one plaintiff, Free Speech Coalition, Inc. ("FSC"), had been subject to inspections. ECF No. 49.

This Court denied plaintiffs' motion for a preliminary injunction and motion to amend and granted defendant's motion to dismiss. ECF Nos. 63, 67; *FSC v. Holder*, 729 F. Supp. 2d 691 (E.D. Pa. 2010) ("*FSC I*"). With respect to plaintiffs' First Amendment claims, the Court held that the 2257 requirements were content neutral regulations and that intermediate scrutiny was the appropriate standard. *Id.* at 723-24. The Court further held that the requirements satisfied intermediate scrutiny as applied to plaintiffs, *id.* at 731, and that the requirements were not

7

facially overbroad, *id.* at 736-37. With respect to plaintiffs' Fourth Amendment claim, the Court held that producers of sexually explicit materials who were required to maintain records under the 2257 requirements had no reasonable expectation of privacy in such records. *Id.* at 751. The Court also held that, even if inspection of such records qualified as a "search" under the Fourth Amendment, no warrant was required because producers of sexually explicit expression were pervasively regulated with respect to "age verification and the protection of children from sexual exploitation." *Id.* at 753. The Court further held that the analysis was no different where a producer maintained his business premises at his own residence, particularly given that the 2257 requirements allowed for third-party custodians. *Id.* at 752. The Court also rejected all of plaintiffs' other claims, as well as their motion to amend. *Id.* at 757. In particular, the Court rejected plaintiffs' claim regarding anonymous speech, whether relating to performers' alleged privacy interests or producers' alleged interest in not disclosing their home address. *Id.* at 737. The Court also rejected the notion that plaintiffs' expression was chilled based on their assumption that the 2257 requirements would be applied on a strict liability basis. *Id.* at 740. And the Court rejected the notion that terms such as "sadistic and masochistic abuse," "lascivious exhibition of the genitals," or "digitizes" were impermissibly vague. *Id.* at 743.

On appeal, the Third Circuit affirmed this Court's rulings in many respects. *FSC v. Attorney General*, 677 F.3d 519 (3d Cir. 2012) ("*FSC II*"). It upheld this Court's dismissal of plaintiffs' claims based on prior restraint, anonymous speech, strict liability, vagueness, equal protection, and the privilege against self-incrimination. *Id.* at 545. It also affirmed this Court's conclusions that, with respect to plaintiffs' as-applied First Amendment claim, intermediate scrutiny was the appropriate standard and that the first and third prongs of the intermediate scrutiny test were satisfied. *Id.* at 535-36 & n.13.

The Third Circuit determined that plaintiffs should be allowed to develop the factual record with respect to three discrete issues. First, the court held that "Plaintiffs must be afforded the opportunity to conduct discovery and develop a record" with respect to the second prong of the First Amendment as-applied intermediate scrutiny analysis, in order to attempt to "support their claim that the Statutes burden substantially more speech than is necessary" as applied to plaintiffs. *Id.* at 537. Second, the court concluded plaintiffs should be afforded an opportunity to develop the record with respect to their facial overbreadth claim. *Id.* at 538. Finally, the court determined that the "concrete factual context" of the inspections that plaintiff FSC asserted had occurred in the past should be developed with respect to plaintiffs' as-applied Fourth Amendment claim. *Id.* at 544-45. Accordingly, the Third Circuit remanded the case for further proceedings consistent with its determinations.

Following remand, plaintiffs filed an Amended Complaint including assertions regarding inspections of unidentified FSC members. *See* ECF No. 84. Defendant moved to dismiss plaintiffs' amended Fourth Amendment claim on the basis that FSC lacked organizational standing and that, because the only inspection program that had ever existed under the 2257 requirements had ceased operations before this case was filed, and only 29 inspections had ever taken place, no "case or controversy" existed with respect to plaintiffs' Fourth Amendment claim for injunctive relief. ECF No. 92. However, the Court denied the government's motion and allowed discovery to proceed regarding the 29 past inspections. *FSC v. Holder*, No. 09-4607, 2012 WL 6059189 (E.D. Pa. 2012) ("*FSC III*"), ECF Nos. 113, 117.[2]

## STANDARD OF REVIEW

Defendant moves for summary judgment under Rule 56 of the Federal Rules of Civil

---

[2] Since the time that plaintiffs' original Complaint was filed, three plaintiffs have voluntarily dismissed their claims and are no longer parties in the case: CIR Distributing, ECF No. 87; David Conners, ECF No. 125; and Michael Barone, ECF No. 135.

Procedure.  A court should grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Interstate Outdoor Advertising, L.P. v. Zoning Bd.*, 706 F.3d 527, 530 (3d Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). A court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation omitted). However, a factual dispute "is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).

## ARGUMENT

## I.   NO FACIAL FOURTH AMENDMENT CLAIM IS BEFORE THIS COURT, NOR COULD SUCH A CLAIM SUCCEED

### A.   The Third Circuit Implicitly Held that Plaintiffs' Fourth Amendment Claim Could Only Be Considered as an As-Applied Claim Rather than as a Facial Challenge to the Statute and Regulations

In remanding plaintiffs' Fourth Amendment claim for factual development, the Third Circuit relied heavily on *Sibron v. New York*, 392 U.S. 40 (1968), a case in which the Supreme Court refused to address the facial constitutionality of the statute at issue. *Id.* at 62. The Court's refusal was based on its recognition that the "constitutional validity of a warrantless search is preeminently the sort of question which can only be decided in the concrete factual context of the individual case." *Id.* at 59. Accordingly, the Supreme Court in *Sibron* "confine[d] [its] review" to the as-applied context, considering only "the reasonableness of the [particular] searches and seizures which underlie" the defendants' convictions. *Id.* at 62.

It is clear that the Third Circuit intended exactly the same as-applied, rather than facial, review to take place in this case. The Third Circuit quoted the very language from *Sibron* set forth above and recognized that the Court in *Sibron* had "declin[ed] to hold whether a particular

statute was facially invalid under the Fourth Amendment." *FSC II*, 677 F.3d at 543. The Third

Circuit also cited *United States ex rel. McArthur v. Rundle*, 402 F.2d 701, 704-05 (3d Cir. 1968),

and *United States v. $291,828.00 in United States Currency*, 536 F.3d 1234, 1238 (11th Cir.

2008), where again only as-applied analyses of the particular searches at issue in those cases took

place. *See FSC II*, 677 F.3d at 543.

Furthermore, the Third Circuit consistently referred to "Plaintiffs' Fourth Amendment

claim, as sought to be amended," as the claim that it was remanding. *Id.* That claim "would

allege that government officials searched and/or seized without a warrant . . . the premises and

effects of certain FSC members and others," and the court determined that the "factual context"

of those searches was necessary to evaluate that claim. *Id.* at 543-44. In footnote 22, the court

referred to this as "Plaintiffs' as-applied Fourth Amendment claim." *Id.* at 544 n.22.

The Third Circuit, like the Supreme Court in *Sibron*, thus declined to consider a facial

Fourth Amendment claim in this case. Rather, it concluded that only an as-applied Fourth

Amendment claim would be appropriate because, first, whether a "search" within the meaning of

the Fourth Amendment occurred at all was a "fact-intensive inquiry," and second, "[t]he nature

and manner of the search are critical factors when determining both whether an industry is

closely regulated and the reasonableness of the particular search." *Id.* at 544. Accordingly, only

an as-applied Fourth Amendment claim is before this Court on remand.[3]

### B.     To the Extent a Facial Fourth Amendment Challenge Is at Issue, Defendant Is Entitled to Judgment as a Matter of Law

Even if this Court were to consider a "facial" Fourth Amendment challenge to §§ 2257

---

[3] As defendant has previously noted, a facial challenge to the DOJ regulations that set forth the inspection requirements, as opposed to the statutes themselves, could properly be brought only pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which limits a court's review to the administrative (or here, rulemaking) record. *NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 185 (3d Cir. 2006). Plaintiffs have not brought an APA claim. For that reason as well, no facial Fourth Amendment claim is at issue here.

and 2257A, the statutory language on its face does not violate the Fourth Amendment. The statutes themselves state only that producers shall make their 2257 records "available to the Attorney General for inspection at all reasonable times." 18 U.S.C. §§ 2257(c), 2257A(c). This statutory language cannot possibly be deemed to violate the Fourth Amendment on its face. To succeed in a facial challenge, plaintiffs would have to establish that "'no set of circumstances exists'" under which the statutory inspection provision would be valid, "'i.e., that the law is unconstitutional in all of its applications.'" *United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)); *accord Brown v. City of Pittsburgh*, 586 F.3d 263, 269 (3d Cir. 2009). However, the plain statutory language here only sets forth a general statement that records created pursuant to these statutes shall be subject to government inspection "at all reasonable times." Any further details of how records inspections would occur, in general, were left to be determined by the Attorney General, pursuant to his authority to promulgate implementing regulations or otherwise to set policy regarding the conduct of inspections.

Plaintiffs cannot show that there is "no set of circumstances" under which an inspection program could be established pursuant to this provision that comports with the Fourth Amendment. As the most obvious example, plaintiffs do not contest the fact that the Attorney General could implement the inspection program by having the inspecting agents seek an administrative warrant, either prior to every inspection or in any instance where a producer refuses inspection without a warrant. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 316 (1978) (recognizing statutory text of OSHA did not preclude obtaining ex parte administrative warrant); *Boliden Metech, Inc. v. United States*, 695 F. Supp. 77, 81 (D.R.I. 1988) (recognizing EPA's authority under Toxic Substances Control Act to obtain ex parte administrative warrants even

though statute was silent on the question); *Pub. Serv. Co. v. U.S. EPA*, 509 F. Supp. 720, 723 (D. Ind. 1981) (same, in regard to Clean Air Act).

Moreover, to the extent this Court considers a "facial" Fourth Amendment claim, its prior conclusion—that producers of material depicting real individuals engaged in sexually explicit conduct "do not have a reasonable expectation of privacy in the [age verification] records kept pursuant to §§ 2257 and 2257A and their implementing regulations"—continues to hold. *See FSC I*, 729 F. Supp. 2d at 747. The Third Circuit's opinion did not question this determination. Instead, the Third Circuit raised a concern that, in the as-applied context, an inspection may have involved entry onto premises in a manner that could be considered a "common-law trespass." *See FSC II*, 677 F.3d at 544. In the facial context, the Third Circuit's concern is not implicated because the statutory text refers only to inspection of the age verification records, not to entry onto any premises.[4]

Indeed, a recent decision in the Seventh Circuit supports this Court's conclusion that, on their face, the records inspection requirements are just that—an authorization to inspect records that producers are statutorily required to maintain. *See Big Ridge, Inc. v. Fed. Mine Safety &*

---

[4] The DOJ's implementing regulation does not affect the analysis of the statutory language on its face. To the extent the regulation is considered, it authorizes an investigator to enter the location where records are kept but does not suggest that anything beyond the records themselves are subject to inspection. 28 C.F.R. § 75.5(a), (c). The location where records are kept may be the premises of a third-party custodian. *Id.* § 75.4. The regulation also does not suggest that, if records are kept at the producer's place of business, the inspectors need go beyond the publicly-accessible reception area. In either instance, no reasonable expectation of privacy would be implicated. *See, e.g., Maryland v. Macon*, 472 U.S. 463, 469 (1985) (holding that a bookseller had no reasonable expectation of privacy "in areas of the store where the public was invited to enter and to transact business"); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 309-10 (1978) (failing to identify OSHA inspector's initial entry into a "customer service area" as implicating a business's reasonable expectation of privacy, but holding a warrant was required because the inspector had sought to inspect a "nonpublic area" of the business); *Patel v. City of Los Angeles*, 686 F.3d 1085, 1090 (9th Cir. 2012) (ordinance that required hotel operators to maintain guest registry information and make it available for government inspection did not implicate common-law trespass because the register information could be maintained and made available for inspection in the hotel's reception area, which "is by nature public, not private").

*Health Review Comm'n*, Nos. 12–2316, 12–2460, 2013 WL 1776633 (7th Cir. Apr. 26, 2013).
There, the court construed statutory and regulatory language that similarly imposed
recordkeeping requirements and authorized the government to inspect and copy records on
request. *See id.* at *12-13. The court noted that the records inspections at issue did not involve
"government inspectors themselves open[ing] file cabinets and examin[ing] computer hard
drives," but instead simply "require[d] mine operators to allow [Mine Safety and Health
Administration ("MSHA")] inspectors to review and keep copies of the records." *Id.* at *12.
Thus, even though "the Mine Safety Act does not expressly refer to  MSHA's document review
power as the power to issue an 'administrative subpoena,' the authority the Act confers upon
MSHA amounts to an administrative subpoena in substance." *Id.* at *13. The court held that the
government's requests to inspect records pursuant to the Mine Safety Act comported with Fourth
Amendment requirements for administrative subpoenas because the requests were "'sufficiently
limited in scope, relevant in purpose, and specific in directive so that compliance will not be
unreasonably burdensome.'" *Id.* at *14 (quoting *See v. City of Seattle,* 387 U.S. 541, 544 (1967)).

Here, to the extent the Court were to consider the question based on the statutory
language alone, a request to inspect the very records that §§ 2257 and 2257A require is, as a
matter of law, sufficiently limited in scope, relevant in purpose, and specific in directive. At the
very least, the Court could not hold that there is "no set of circumstances" under which such a
request would be valid under that standard. The Court should therefore grant summary judgment
to defendant with respect to plaintiffs' facial Fourth Amendment challenge.

II.     **TO THE EXTENT PLAINTIFFS RAISE AN AS-APPLIED FOURTH AMENDMENT CHALLENGE TO ONE OR MORE PRIOR INSPECTIONS, THE INJUNCTIVE RELIEF THEY SEEK CANNOT REDRESS THEIR ASSERTED INJURY**

As defendant has previously explained, only 29 inspections have taken place pursuant to the 2257 requirements, under an inspection program that was operated by the FBI for a limited period in 2006 and 2007 and then discontinued. While four of the 27 producers that were inspected are FSC members, neither FSC nor any other plaintiff has standing to challenge these past inspections because they seek only injunctive relief as to future action. As the Supreme Court has recently emphasized, "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies,'" including the requirement that a plaintiff "have standing to sue." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) (internal quotation omitted). The standing requirement "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* The inquiry is thus "especially rigorous" where, as here, reaching the merits of a plaintiff's claims would force the court to decide whether an "action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 1147 (internal quotation omitted).

To establish Article III standing, a plaintiff must demonstrate an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* A plaintiff "'must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006)). Now at the summary judgment stage, plaintiffs can no longer rely on mere allegations "'but must set forth by affidavit or other evidence *specific facts*'" establishing that all three Article III requirements of standing

are satisfied. *Freeman v. Corzine*, 629 F.3d 146, 153 (3d Cir. 2010) (emphasis added) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))).

A plaintiff seeking injunctive relief must establish that he is "under threat" of suffering such an injury. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012). It is well established, as confirmed by the Supreme Court in *Clapper*, that, in such an instance, the asserted injury "'must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 133 S. Ct. at 1147 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). The Court rejected the notion that an "objectively reasonable likelihood" of future injury was sufficient. *Id.* Moreover, a plaintiff must show, not that some speculative future injury might be redressed, but that its *asserted* injury would be "redressable by a favorable ruling." *Id.*.

This Court has previously suggested that plaintiffs have standing because theoretically, based on the pleadings and the statutory framework alone, any plaintiff could be subject to an inspection under 18 U.S.C. §§ 2257 or 2257A at an undetermined point in the future. *FSC III*, 2012 WL 6059189, at *3. However, as discussed above, the very premise of the Third Circuit's remand was that the statutory framework alone was insufficient to evaluate a Fourth Amendment challenge, and that such a challenge could only proceed on an as-applied basis, taking into account the "concrete factual context" of an inspection that had actually occurred. *FSC II*, 677 F.3d at 543-44. At summary judgment, the Court cannot merely assume that any future inspection would take place in the exact same "concrete factual context" as the past inspections that plaintiffs cite as the basis for their as-applied Fourth Amendment challenge. Rather, plaintiffs bear the burden of establishing "*specific facts*" sufficient to support the notion that their asserted past injury (the prior inspections that actually occurred) somehow translates into a

"certainly impending" future injury redressable by injunctive relief. *Freeman*, 629 F.3d at 153 (emphasis added) (internal quotation omitted).

As a matter of law, plaintiffs cannot meet this burden based on the record developed in discovery. For one thing, the 29 inspections that occurred in the past focused exclusively on commercial producers in the adult entertainment industry who qualified as "primary producers," who offered material for sale containing visual depictions of actual sexually explicit conduct (not including lascivious exhibition of genitals or pubic area), and whose material contained a 2257 statement identifying an address where the producer's 2257 records were located. Most plaintiffs in this case—those, for example, who purport to be photographers, educators, and artists outside the adult entertainment industry—are not in this category and therefore are necessarily outside the "concrete factual context" of those inspections.[5]  Moreover, none of the 29 inspections occurred at the premises of a "third-party custodian"; indeed, the regulations in effect at the time did not allow producers to keep their 2257records with third-party custodians. Those inspections therefore cannot provide a "concrete factual context" for 2257 records inspections that might take place at the premises of a third party custodian rather than a producer. At least one plaintiff, Marie Levine, who is also a FSC member, now keeps her 2257 records with a third-party custodian, as permitted by the current regulations; that custodian's address, in Montreal, Canada, appears on the 2257 statement on Levine's website. Levine Dep. 76:15-77:10.

Plaintiffs also cannot establish that other potentially material details of past inspections would be present in any future inspections that might occur. Indeed, even among the small

---

[5] Of course, the Third Circuit remanded an as-applied Fourth Amendment claim based on allegations of past inspections in the Amended Complaint that were asserted with respect to only one plaintiff, FSC. The as-applied Fourth Amendment claim at issue in this case is therefore properly viewed as brought solely by FSC, on behalf of its members. Even so, as discussed below, the past inspections do not provide a concrete factual context for evaluating whether future inspections—whose parameters remain unknown—would be consistent with the Fourth Amendment.

number of inspections that did occur in the past, there were factual variations. At some inspections, the business owner or custodian of records asked the FBI inspection team to use a break room or conference room during the inspection; at other inspections, the FBI inspection team was asked to conduct the records inspection in the producer's reception area and did so.[6] Declaration of Charles R. Joyner ("Joyner Dec.") ¶ 12.

Of the several inspections that occurred at a residence, the inspection team sometimes contacted the producer in advance and sometimes did not. Joyner Dec. ¶¶ 14-16; Declaration of Stephen Lawrence ("Lawrence Dec.") ¶¶ 7-8. Two inspections occurred at a storage unit, one occurred in a garage, and one involved receiving 2257 records by email from overseas. Joyner Dec. ¶¶ 15-16; Lawrence Dec. ¶ 6. Thus, even if the Court were to conclude that a "search" occurred at a particular inspection, and that the Fourth Amendment required a warrant for that particular search, such a holding could not possibly apply to every one of the 29 inspections that occurred in the past. *Cf. United States v. King*, No. 09-1434, 2010 WL 438417, at *5 (3d Cir. Feb. 8, 2010) ("To establish standing, the party contesting the legality of the search bears the threshold burden of establishing that he or she had a reasonable expectation of privacy in the property searched and the item seized.") (citing *Minnesota v. Olse*n, 495 U.S. 91, 96-97 (1990)).

Much less can any plaintiff establish that it or any of its members face an imminent likelihood of an inspection exactly like one of the 29 past inspections, such that an *injunction* of an inspection meeting that particular description would be appropriate. If the Court were to

---

[6] At those inspections, one member of the inspection team may have left the reception area in order to photograph the area where the producer stored its 2257 records or to use a restroom. Even assuming those areas were not public, there is no indication in the record that any producer did not consent to entry into those areas for such brief and limited purposes. Moreover, nothing prevents a producer from storing 2257 records in the reception area, or on a laptop or portable hard drive that the producer could bring to the reception area. In addition, since neither the statutes nor the regulations specifically reference photographing the 2257 record storage location during an inspection, it is mere speculation that any future inspections would involve such photographs.

evaluate whether each of the 29 inspections that occurred comported with Fourth Amendment requirements, its 29 holdings would not justify injunctive relief; rather, the result would simply be 29 advisory opinions. *United States v. Thomas*, No. 10-2866, 2013 WL 1442489, at * (3d Cir. Apr. 10, 2013) ("A judicial decision rendered in the absence of a case or controversy is advisory, and federal courts lack power to render advisory opinions.").

Beyond the fact that the 29 inspections that occurred under the previous inspection program each occurred in its own unique factual context, the Court should also consider in assessing plaintiffs' standing for prospective relief that no inspection program is currently in operation, Declaration of Special Agent Alan S. Nanavaty ("Nanavaty Dec.") ¶¶ 10-11, ECF No. 92-1, and that changed circumstances render an attempt to enjoin based on past events particularly inappropriate. The regulatory changes that have occurred since 2007, and the confirmation by Congress that secondary producers are subject to the 2257 requirements, mean that the scope of producers subject to inspection has expanded, and their total number has increased. *See* SMF ¶¶ 27-32. The locations where inspections might occur will also be different now that producers may keep their records with third-party custodians. In addition, a far greater number of producers may keep their records in digital format. These differences could affect "when and where" inspections might occur, the "frequency and extensiveness" of inspections, whether the producer subject to inspection is "engaged in commercial activities within a particular industry," whether a producer would have a reasonable expectation of privacy at stake, and whether a "common-law trespass" might occur at a particular inspection—all factual issues that the Third Circuit specifically identified as potentially relevant to a Fourth Amendment evaluation. *FSC II*, 677 F.3d at 545-46.

Moreover, there is no reason to assume that, despite these changed circumstances, the

Attorney General would simply resuscitate the old program, unmodified, should he ever decide to resume inspections. Given the much larger number of producers and advances in digital technology, the Attorney General could adopt a process that would involve merely one inspector going to a producer's place of business and asking the producer to make digital copies of the 2257 records to be inspected, dispensing with the need for a team to review records at the business premises. It is also conceivable that, if an inspection program were to cover an expanded array of producers, the Attorney General could adopt a uniform practice of seeking administrative warrants in advance of inspections.

In light of the Third Circuit's holding in remanding this case that a "concrete factual context" is necessary to evaluate whether a particular inspection comports with Fourth Amendment requirements, the mere fact that a statute is involved here does not mean that plaintiffs' as-applied Fourth Amendment claim is redressable. Significantly, in *Sibron*, the case on which the Third Circuit relied, the Court limited its analysis to "the reasonableness of the searches and seizures which underlie these two convictions," and there was a direct connection between that issue and the remedy sought in that case—the overturning of those convictions on the basis that the evidence obtained through those searches and seizures should have been excluded. *See Sibron*, 392 U.S. at 44. Here, on the other hand, there is a fatal disconnect between the various inspections that occurred in the past and the remedy of enjoining potentially different inspections in the future. Plaintiffs cannot possibly meet their burden to establish that any defects in past inspections would be redressed through injunctive relief.[7]

---

[7] Plaintiffs previously argued that they have standing to assert their Fourth Amendment claim because they face "compliance costs" as long as the statutes are in effect. *FSC III*, 2012 6059189, at *4. However, plaintiffs' obligations to maintain records in accord with §§ 2257 and 2257A and their implementing regulations will in no way be affected if the Court were ultimately to hold that one or more of the inspections that previously occurred violated Fourth Amendment requirements. Such a holding would not redress an asserted injury of "compliance

For similar reasons, plaintiffs cannot meet their burden to establish that an as-applied claim challenging future inspections of uncertain parameters is ripe. The heightened burdens that plaintiffs face at summary judgment to establish an Article III "case or controversy" apply to ripeness as well as standing. *See Renne v. Geary*, 501 U.S. 312, 315-16 (1991). In order to establish that an as-applied Fourth Amendment challenge to future inspections is ripe, plaintiffs bear the burden to show that there is a "concrete factual context" for these possible future inspections.

But at this stage, the conduct and circumstances of future inspections are purely hypothetical. This situation is similar to that considered in *Warshak v. United States*, 532 F.3d 521 (6th Cir. 2008) (en banc), where the Sixth Circuit noted that the government had sought Warshak's e-mail communications from Internet Service Providers twice in the past, yet concluded that Warshak's attempt to assert a claim with respect to future such requests was unripe because the details of any future request for e-mails that the government might make were not yet known. *Id.* at 527 ("Nor can we rely on *previous* government searches of Warshak's e-mails to hypothesize the factual context of the next search."). In reaching this conclusion, the Sixth Circuit recognized the unique nature of Fourth Amendment claims; "[t]he Fourth Amendment is designed to account for an unpredictable and limitless range of factual circumstances, and accordingly it generally should be applied after those circumstances unfold, not before." *Id.* at 528; *cf., Shoemaker v. Handel*, 795 F.2d 1136, 1143 (3d Cir. 1986) (upholding warrantless urine testing scheme for jockeys but holding jockeys' as-applied privacy claims were unripe).

---

costs"—including an assertion (which no plaintiff here actually makes) that the plaintiff is staying at the location of his or her 2257 records 20 hours per week solely in order to make the records available for inspection. The only potential impact is that future inspections identical to those that were held unconstitutional (which there is no indication would ever occur in the first place) would be enjoined.

Similarly here, plaintiffs cannot meet their burden to establish that any future inspection that might occur would take place in any particular "concrete factual context"—much less in the same factual context as any particular prior inspection. In the absence of any such concrete factual context, plaintiffs' as-applied Fourth Amendment challenge, seeking prospective relief with respect to future inspections, is unripe.

III.   **THE INSPECTIONS THAT OCCURRED IN 2006 AND 2007 DID NOT VIOLATE THE FOURTH AMENDMENT**

A.   **The Inspections Did Not Constitute Searches Under the Fourth Amendment**

To the extent the Court proceeds to analyze the concrete factual contexts of the 29 inspections that occurred in 2006 and 2007, it should hold as a matter of law that those inspections were consistent with the Fourth Amendment. As an initial matter, the Court should hold that the inspections did not involve "searches" within the meaning of the Fourth Amendment. The Third Circuit identified two inquiries in regard to whether past 2257 inspections implicate the Fourth Amendment. First, the Third Circuit indicated that an inspection may constitute a "search" within the meaning of the Fourth Amendment if the facts indicate that the producer had "an objective expectation of privacy in the searched areas and effects." *FSC II*, 677 F.3d at 544 (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)). Second, the Third Circuit, interpreting the Supreme Court's recent decision in *United States v. Jones*, 132 S. Ct. 945 (2012), indicated that an inspection may constitute a "search" if a "fact-intensive inquiry" demonstrates that "a common-law trespass occurred during any of the alleged searches." *FSC II*, 677 F.3d at 544.

With respect to the *Katz* analysis, the FBI reports of the 29 past inspections confirm that the only records that the inspection teams inspected were records that a producer maintained

pursuant to § 2257.[8] *See* Joyner Dec. ¶ 9; Lawrence Dec. ¶¶ 5-6. As discussed above, this Court has already held that producers do not have a reasonable expectation of privacy in these records. *FSC I*, 729 F. Supp. 2d at 747. As the Court explained, these records "do not entail confidential communications or files, and they cannot be classified as being a producer's 'private papers.' To the contrary, they are copies of records and files that are compiled, maintained, and kept according to statutes and regulations that are known to and followed by plaintiffs, and that contain information that enables authorities to verify the ages and identities of performers in depictions of sexually explicit conduct." *Id.* at 748-49 (footnote omitted).

With respect to the *Jones* analysis, there is no evidence in the Inspection Reports sufficient to conclude that any of the 29 inspections involved common law trespass. For those inspections that occurred without advance notice at the producer's place of business, as listed on their 2257 statement, the inspections were initiated by the lead FBI agent, who entered the reception area of the business (or where the business address was at a private residence, knocked on the door or rang the doorbell) in the same manner that anyone wishing to contact someone at that business might do. Joyner Dec. ¶¶ 8, 11; Lawrence Dec. ¶ 4. Certainly, that initial contact did not involve a trespass. The agent then indicated that he and his team were there to conduct a 2257 inspection and provided the producer with a list of the specific 2257 records they wished to inspect. *Id.* The producer was free to contact his attorney or anyone else before or during the inspection. Joyner Dec. ¶¶ 8, 11.

At the outset of the inspection, the lead FBI agent also asked the producer where the

---

[8] Excerpts of the FBI Regulatory Inspection Reports ("Insp. Rpts.") for the 29 inspections that occurred are attached as exhibits hereto. *See* Index of Exhibits. The full reports contain multiple checklists and FD-302s for the 2257 records that were reviewed, *see, e.g.*, Joyner Dec. exs. B, C, as well as copies of photographs taken during the inspection. In order to reduce this size of this filing, those portions of the reports have been omitted, as have blank pages. The excerpts include all other portions of the reports.

inspection team should stay while reviewing the 2257 records. Joyner Dec. ¶ 9; Lawrence Dec. ¶ 6. In some instances, the producer asked the team to stay in the reception area. Joyner Dec. ¶ 12. In other instances, the producer asked them to use a break room or conference room. *Id.* The inspection team reviewed the 2257 records in the area designated by the producer. *Id.* The inspection team did not inquire of the producers or others present during the inspections whether the areas where they were asked to sit were normally open to the public. Joynder Dec. ¶ 12; Lawrence Dec. ¶ 4. However, to the extent the producer chose to have the inspection team sit in a nonpublic area rather than in the public reception area, the team's entry into that area was consensual.

The fact that some inspections occurred at residences does not change the analysis. In most of these instances, the inspection team went to the address listed on a producer's 2257 statement as the location where 2257 records were kept. Joyner Dec. ¶ 14.These instances involved producers who were operating a commercial business out of their home. *Id.* "When used as a place of business, the home has the same status under the Fourth Amendment as any other place of business." *United States v. Cerri*, 753 F.2d 61, 64 (7th Cir. 1985) (citing *Lewis v. United States,* 385 U.S. 206, 211 (1966)). In *Cerri*, the court followed this principle when upholding a warrantless inspection that occurred at a residence pursuant to a statute authorizing inspections of firearms dealers. *See id.* Here, inspections that took place at a producer's residence that was also the producer's business address, for purposes of his commercial production of sexually explicit material, should be evaluated in the same way as the other inspections at commercial premises. Again, the lead FBI agent's initial approach, knocking on the door or ringing the doorbell, could not qualify as a trespass, and the inspection team again reviewed the 2257 records wherever the producer chose. Indeed, in one instance where the producer kept his

24

2257 records in the garage, the team did not enter any part of the residence other than the garage, Joyner Dec. ¶ 15, suggesting that the team would have stayed outside a residence during an inspection while the producer brought the 2257 records outside, if the producer so requested.

In addition, few, if any, inspections involved the inspection team searching the filing cabinet or other location where 2257 records were kept. Rather, in most instances, the producers chose to locate and bring the 2257 records that the team had requested to the team. Joyner Dec. ¶ 9, 11; Lawrence Dec. ¶¶ 5-6. In one instance, where all the records were in digital format, the team gave the producer the option to download the requested records to a CD that the team provided, which reduced the time that the team remained at the producer's place of business. Joyner Dec. ¶ 13. In another instance, where the producer was out of the country, the inspection team accepted copies of the producer's 2257 records by e-mail, sent from overseas. Lawrence Dec. ¶ 6. Where possible, a member of the inspection team usually did photograph the location where the producer's 2257 records were stored. Joyner Dec. ¶ 10; *but see* Lawrence Dec. ¶ 7. However, to the extent that involved entering a nonpublic area, it was a consensual entry as well as a very limited one. Given the inspection team's practice of allowing the producer to dictate where the team would stay while reviewing 2257 records, and the lack of any indication that the team demanded entry into a nonpublic area without the producer's consent, the Court should conclude that, as a matter of law, no common law trespass occurred.[9]

---

[9] Even if the Court concludes that common law trespass occurred in one or more of the inspections, it could not possibly have occurred in every inspection – for example, the inspection where the producer e-mailed his 225 records to the team from overseas, and the inspections where the team remained in the reception areas. And again, common law trespass is not at all likely to occur in every instance in the future, even if a new inspection program is established, because the current regulations allows producer to keep their records with a third-party custodian. *See* 28 C.F.R. § 75.4 (records may be made available "at the place of business of a non-employee custodian of records").

**B.    To the Extent Any of the Inspections Implicate the Fourth Amendment, They Should Be Upheld Under the Administrative Subpoena Standard**

As discussed above, the Seventh Circuit has recently pointed out in a similar context that when an inspection program is aimed at inspecting nothing but records that the government requires certain businesses to maintain, it can appropriately be analyzed under the Fourth Amendment requirements for administrative subpoenas even if the statutory language does not refer to the inspection as involving an administrative subpoena. *See Big Ridge, Inc.*, 2013 WL 1776633, at *14. Under that standard, a request by the government to inspect records comports with the Fourth Amendment as long as the request is "'sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.'" *Id.* (quoting *See,* 387 U.S. at 544).

When applied to the past inspections that occurred here, this standard is easily met. As described in the FBI reports, the 29 past 2257 inspections were limited to specific 2257 records that the team identified to the producer at the outset of the inspection. *See* Insp. Rpts.; Joyner Dec. ¶¶ 8,11; Lawrence Dec. ¶ 4.  The number of records inspected was proportionate to the size of the producer and was in no instance excessive. Joyner Dec. ¶ 7. The inspection team reviewed those records in order to determine whether the producers were in compliance with the age verification requirements set forth in § 2257 and its implementing regulations, as they then existed. That purpose was directly relevant to the government's compelling interest in ensuring that producers of images depicting real people engaged in sexually explicit conduct verify the ages of the people engaging in this conduct. And the inspections were conducted in a manner designed to minimize any disruption to producers' businesses—including engaging in extensive preparation work in advance of the inspection so that the team could finish the inspection itself as efficiently as possible, and allowing the producer to select the location where the team would

stay while reviewing the 2257 records and how the requested  records would be provided. The past inspections should be upheld on this basis as a matter of law.

**C.      To the Extent Any of the Inspections Constitute Searches Under the Fourth Amendment, They Should Be Upheld as Valid Administrative Searches**

The prior 2257 inspections can also be upheld as a matter of law pursuant to the administrative search exception to the warrant requirement. This Court has already analyzed the inspection regime under that standard and properly concluded that the inspections contemplated by the 2257 statutory and regulatory framework qualify for this exception. *FSC I*, 729 F. Supp. 2d at 751. The Third Circuit suggested that factual development was required in order to determine "[t]he nature and manner of the search[es]" that occurred, "the frequency and extensiveness of the alleged searches; whether the alleged searches occurred exclusively on commercial premises; and whether the Plaintiffs who were subjected to the alleged searches were engaged in commercial activities within a particular industry." *FSC II*, 677 F.3d at 544-45. The record now before the Court confirms that all FSC members who were subject to 2257 records inspections were commercial producers who create and sell videos and other material containing visual depictions of sexually explicit conduct as part of the adult entertainment industry.[10] *See* Insp. Rpts. (Diabolic, Darkside, K-Beech, Wicked). All the inspections of these producers took place at commercial premises during normal business hours. *Id.*

As this Court previously explained, "for over three decades the creation, production, and distribution of sexually explicit expression has been the subject of extensive federal regulation

---

[10] By letter dated November 19, 2012, plaintiffs' counsel identified Diabolic Video, Darkside Entertainment, K-Beech, and Wicked Pictures as the four current FSC members that were among the 27 companies subject to 2257 records inspections. *See* Letter from Lorraine Baumgardner to Kathryn L. Wyer (Nov. 19, 2012). Dues statements provided by FSC indicate none of the companies plaintiffs' counsel identified in this letter as "inactive" were FSC members at the time this case was filed. Thus, FSC's as-applied claim is based only on the inspections of these four companies.

aimed at protecting children from sexual exploitation." *FSC I*, 729 F. Supp. 2d at 753. Due to a

"steadily strengthening web of initiatives," producers of sexually explicit expression"—and

certainly those in the commercial adult entertainment industry—"have been on notice for some

time that, when it comes to ensuring the performers in their expression are adults, they will be

subject to various forms of government oversight, including inspection of age-verification

records." *Id.* There can be no question that the adult industry is closely regulated with respect to

the age of their performers, particularly given the compelling government interest not only in

apprehending those who have created child pornography in the past but, even more so, in

preventing child pornography from being created in the first place. Once a child has been used to

make sexually explicit images, it is simply too late to protect that child from harm. Given the age

verification requirements that have been in effect or over thirty years, it can be no surprise to the

adult industry that government regulation will take the form of prophylactic measures designed

to ensure age verification occurs in a context where sexually explicit material is being produced.

    The Court's prior application of the "three-prong test to determine if a warrantless

inspection of a pervasively regulated activity survives constitutional scrutiny" continues to be

valid. *FSC I*, 729 F. Supp. 2d at 753. It is undisputed that "the government has a substantial

interest in preventing the sexual exploitation of children in the production of sexually explicit

expression, and this interest informs the age-verification requirements at issue here." *Id.* at 754.

Moreover, "warrantless entrance onto a producer's premises to inspect the required records is

necessary to further the regulatory scheme." *Id.* As the Court previously observed, "by not

requiring advance notice or a warrant, the inspection program encourages producers to follow the

age-verification procedures regularly and in advance of the production of the depictions, and

deters the possibility of fabrication or after-the-fact compilation of such information." *Id.*

Finally, the inspection procedures, as described in the regulations and as followed in practice, provide a "constitutionally adequate substitute for a warrant." *See id.* at 754. The FBI inspection teams attempted to follow a regular protocol in accord with the regulations, to the extent possible given variations in the circumstances they encountered. They selected producers for inspection using a random number generator, initiated the inspections during regular business hours, displayed their credentials at the outset of inspections, explained the purpose and limited nature of the inspections, identified the statutory authority for conducting the inspections, provided a list of the specific 2257 records they wished to inspect, and took measures to minimize any disruption to the producer's business operations. In sum, the inspections should be upheld as a matter of law as valid warrantless administrative searches.

### D. In the Alternative, the Inspections Should Be Upheld as Reasonable Based on the Totality of the Circumstances

The Third Circuit has also recognized that a warrantless search may be upheld under the "totality of the circumstances," even where it does not qualify as an administrative search. *United States v. Mitchell*, 652 F.3d 387, 403 (3d Cir. 2011) (applying "totality of the circumstances" test after confirming the test was a proper analytical framework because "'the balancing of competing interests' is 'the key principle of the Fourth Amendment'" (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985))); *United States v. Sczubelek*, 402 F.3d 175, 184-87 (3d Cir. 2005) (concluding that the warrantless DNA testing of a probationer was reasonable because the blood test was a "minimal" intrusion, the plaintiff probationer had a lowered expectation of privacy, and the government had a compelling interest in the testing scheme). The "totality of the circumstances" test balances "on the one hand, the degree to which the search intrudes upon an individual's privacy and, on the other, the degree to which the search is needed for the promotion of legitimate governmental interests." *Mitchell*, 652 F.3d at 402

(internal quotation and alteration omitted).

For the same reasons described above, the 2257 inspections that took place in 2006 and 2007 were reasonable under the totality of the circumstances. The intrusion on a producer's privacy, involving only an inspection of specific 2257 records that producers are required to maintain for the very purpose of being inspected, was minimal to nonexistent. On the other hand, the inspections promoted legitimate governmental interests by ensuring that the 2257 age verification requirements were being followed, and, by their example, encouraging compliance throughout the industry. Accordingly, these prior inspections may also be upheld as reasonable in light of the totality of circumstances in which they occurred.

## IV. NO CASE OR CONTROVERSY EXISTS WITH RESPECT TO PLAINTIFFS ALPER, HYMES, LEVINGSTON, AND QUEEN BECAUSE THEY ARE NOT ENGAGED IN ACTIVITIES SUBJECT TO THE 2257 REQUIREMENTS

Beyond the fact that no plaintiff can establish standing to seek prospective relief for their Fourth Amendment claim, all of the claims of certain plaintiffs should be entirely dismissed because they are no longer (or never were) engaging in conduct subject to the 2257 requirements. Indeed, even in the First Amendment context, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). Rather, a "pre-enforcement plaintiff" must demonstrate "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Accordingly, this Court has already recognized that "'there must be a real and immediate threat of enforcement against the plaintiff'" for a First Amendment challenge to be justiciable. *FSC I*, 729 F. Supp. 2d at 740 (quoting *Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 192 (3d

Cir. 1990)).

Under this rule, a plaintiff lacks standing when not engaged in conduct that implicates the challenged statute. *See, e.g., Nat'l Fed'n of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011) (charitable organizations lacked standing to raise First Amendment challenge to statutory subsection where their method of fundraising did not implicate that subsection); *Faustin v. City, County of Denver*, 268 F.3d 942 (10th Cir. 2001) (plaintiff lacked standing to seek injunctive relief in challenge to sign-posting ordinance because it had been determined that plaintiff's practice of holding signs without posting them did not implicate the ordinance). In accord with these principles, the Third Circuit found standing lacking when a plaintiff established "no more than a 'possibility'" that it would one day reenter the market in which it claimed its former competitor has violated antitrust laws. *ZF Meritor,* 696 F.3d at 301. "'Such some-day intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of . . . actual or imminent injury.'" *Id.*

Here, plaintiffs Alper, Hymes, Levingston, and Queen cannot show that they suffer a "certainly impending" injury and a "credible threat of prosecution." None of these plaintiffs currently produces sexually explicit material subject to the 2257 requirements. In addition, none of them has concrete plans to engage in such activities in the certain future. Moreover, unlike the situation in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010), these plaintiffs cannot rely on the notion that the government has "charged about 150 persons" with violating the requirements at issue, as a basis for contending that they face a credible threat of prosecution under §§ 2257 or 2257A. *See Humanitarian Law Project*, 130 S. Ct. at 2717. These plaintiffs therefore lack standing to challenge the 2257 requirements.

## A.      Barbara Alper

Early in her career and before the 2257 requirements were in effect, plaintiff Barbara Alper, a commercial photographer, took sexually explicit photographs at S&M clubs. Alper Dep. 13:20-14:3; 19:23-20:8. However, she has not taken any such photos since 1995, for reasons unrelated to the 2257 requirements. *Id.* 48:17-49:4 (indicating that the clubs shut down, primarily because of AIDS). In the Amended Complaint, Alper identifies her primary concern as being precluded from publishing a compilation of her sexually explicit work, containing pre-1995 images together with other images that she has not yet taken. Am. Compl. ¶ 36. However, Alper has no concrete plans to publish such a compilation. Alper Dep. 46:5-8.  Moreover, her understanding that she would have to obtain age verification records from individuals appearing in images created before 1995 is incorrect. 28 C.F.R. § 75.2(a) (requirements apply to images of actual sexually explicit conduct "made after July 3, 1995"); 70 Fed. Reg. 29609 (DOJ "imposes no obligations on producers concerning sexually explicit depictions manufactured prior to [July 3, 1995]").

And while Alper states that she wishes to take photographs of individuals having sex in public on Fire Island, she admits that she has never approached any such individuals and that, if she were to approach them, they would not agree to have their photograph taken while having sex. Alper Dep. 69:22-70:13. Alper's vague future plans do not establish a "certainly impending injury" that could create a credible threat of prosecution sufficient to confer standing.

## B.      Thomas Hymes

Plaintiff Thomas Hymes, a journalist focusing on the adult entertainment industry, has never produced any depictions of sexually explicit conduct. Hymes Dep 66:12-14. In the Amended Complaint, Hymes alleges that the 2257 requirements prevent him from publishing

certain material on his website, dailybabylon.com. Am. Compl. ¶ 29. Hymes first established this website in April 2009, with the hope that it would become self-sustaining, but by the end of the year the project had fallen apart, due to the recession and his partners leaving, and Hymes had taken a new job with the adult media company AVN. Hymes Dep. 50:17-52:25, 65:1-66:1, 72:2-5 ("Daily Babylon has, for all intents and purposes, been moribund for the last couple of years"), 96:7-8 ("I'm not actually doing Daily Babylon"). Although Hymes expressed a hope that someday he would go back to working on the Daily Babylon site, he has no certain plans to do so, nor does he have time to devote to it; Hymes now regularly works 60 or 70 hours a week at AVN and does not know when that might change. *Id.* 146:3-15. Hymes therefore lacks a "certainly impending injury" and does not face a credible threat of prosecution sufficient to confer standing.

### C.    David Levingston

Plaintiff David Levingston is a professional photographer who has, in the past, focused on photographing nude women, and who occasionally still takes such photographs. Levingston Dep. 16:15-24, 101:7-23. Levingston does not consider most of these photographs to depict sexually explicit conduct or to be subject to the 2257 requirements, nor does he keep 2257 records for these images. *Id.* 92:16-93:13; 100:9-15; 102:1-10. Levingston identified a small number of his nude photographs, taken between 2005 and 2009, as depicting women engaged in simulated sexually explicit conduct. *Id.* 115:18-116:13. While Levingston claims that he stopped producing such images because of the enactment of § 2257A in 2009, he was unable to identify any specific project that he failed to undertake because of the 2257 requirements. *Id.* 85:9-86:15, 92:16-93:13, 100:9-15, 102:3-10. Levingston also explained that his current work no longer focuses primarily on nude models; rather, he is engaged in "two new projects," focusing on the

"culture and environment" in old newsrooms, and photographers who have reacted to the advent of digital photography by going back to older photographic techniques. *Id.* 19:5-12, 20:3-5, 137:18-22, 138:3-18. Indeed, Levingston announced in his Model Mayhem profile that he "has changed the direction of [his] work and [is] no longer seeking new models. The bulk of my new work does not involve models." *Id.* 135:19-136:3. While Levingston has pointed to vague plans to collaborate with a former prostitute on a book, he has indicated that he does not know, at this stage whether such a book would include any photographs at all. *Id.* 139:2-18, 141:9-14, 142:24-143:23, 144:15-145:7. Thus, again, Levingston has no "certainly impending injury" and faces no credible threat of prosecution sufficient to confer standing.

### D.    Carol Queen

Plaintiff Carol Queen is the founder and current director of the Center for Sex and Culture, a non-profit organization that maintains a library, archive and gallery on sexually-related topics and offers sex education classes and sex-related cultural programming. Queen Dep. 16:8-13. In her role as Center director, Queen organizes an annual Masturbate-a-thon, a charity event comparable to a walk-a-thon but involving masturbation. *Id.* 29:2-4. In the Amended Complaint, Queen alleged that the Masturbate-a-thon was live-streamed on the internet and thus implicated the 2257 requirements. Am. Compl. ¶ 38. However, the Masturbate-a-thon has not been live-streamed since 2010 because the current venue is not large enough to support a live stream broadcast. Queen Dep. 33:4-9. Queen also alleged that the 2257 requirements had a chilling effect on participants in the Center's photography club, but the club was suspended due to lack of interest in the summer of 2012, and there are no plans to revive it. *Id.* 21:15-22, 22:18-23. And while Queen claimed that the 2257 requirements have prevented her from publishing her art work, which consists of collages using images appropriated from other sources, she has not

created any such work for over a year and a half because she has neither the time nor the inspiration. *Id.* 26:18-22. Like the others, Queen has no "certainly impending injury" and faces no credible threat of prosecution sufficient to confer standing.[11]

## V.   NO PLAINTIFF CAN PREVAIL IN AN AS-APPLIED FIRST AMENDMENT CHALLENGE

### A.   The Third Circuit Has Already Held that the 2257 Requirements Directly Advance the Government's Important Interests and Leave Open Ample Alternative Channels for Communication

The Third Circuit has already affirmed several aspects of this Court's holdings with respect to plaintiffs' as-applied First Amendment challenge. For one thing, the Third Circuit confirmed that the requirements set forth in §§ 2257 and 2257A are content neutral, and that strict scrutiny therefore does not apply. *FSC II*, 677 F.3d at 535 ("[W]e conclude that the Statutes are content neutral."). Under intermediate scrutiny, a statute should be upheld as long as it "(1) advances a 'substantial' governmental interest; (2) does not 'burden substantially more speech than is necessary' (i.e., the statute must be narrowly tailored); and (3) leaves open 'ample alternative channels for communication.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

The Third Circuit has also already determined, in accord with this Court's prior holdings, that the first and third prongs of this test are satisfied. In regard to the first prong, the Third Circuit concluded that "[t]he Statutes clearly advance a substantial government interest – protecting children from sexual exploitation by pornographers." *Id.*[12] Indeed, the court agreed

---

[11] Even if any of these plaintiffs might have had standing when this case was filed in 2009, their claims have now become moot. *United States v. Huff*, 703 F.3d 609, 611 (3d Cir. 2013); *Common Cause v. Pennsylvania*, 558 F.3d 249, 255 n.2 (3d Cir. 2009).

[12] There is no doubt whatsoever that this interest qualifies as substantial. *Ferber*, 458 U.S. at 757 ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."); *Connection*, 557 F.3d at 329 ("No one disputes that the government's interest in protecting children is 'substantial.'"); *Am. Library Ass'n v. Reno*

with the Sixth Circuit that the 2257 requirements directly advance the government's asserted

interest by "combat[ting] child pornography in at least four specific ways: (1) they ensure that

primary producers of sexually explicit expression confirm the ages of their performers prior to

filming; (2) they permit secondary producers that publish the depictions to verify that the

performers were not children; (3) they prevent children from passing themselves off as adults;

and (4) they aid law enforcement and eliminate subjective disputes with producers over whether

the producer should have verified the age of a particular performer." *Id.* (citing *Connection*, 557

F.3d at 329-30).

In so holding, the Third Circuit specifically rejected plaintiffs' arguments that "the

government failed to demonstrate that the Statutes advance that particular interest or that the

problems identified are real, not conjectural," and also rejected the opinion expressed in the

concurrence that "the government has not demonstrated that the Statutes advance the

government's interest of protecting children in a direct and effective way." *Id.* at 535-36 & n.12.

To the contrary, the court upheld this Court's conclusion "that the government adequately

demonstrated that the Statutes advance the substantial interest of protecting children." *Id.* at 536.

In regard to the third prong of the intermediate scrutiny analysis, the Third Circuit

recognized that, while "[t]he Statutes regulate recordkeeping and labeling procedures," the 2257

requirements "do not ban or otherwise limit speech." Id. at 535 n.13. Accordingly, the Third

Circuit held that this Court "did not err in concluding that the Statutes leave open ample

alternative channels for communication." *Id.*

Given the Third Circuit's clear holdings, this Court may not revisit any issue associated

("*ALA*"), 33 F.3d 78, 88 (D.C. Cir. 1993) ("Appellees concede, as they must, that the
Government has a significant – indeed compelling – interest in the prevention of child
pornography."); *Free Speech Coal. v. Gonzales*, 406 F. Supp. 2d 1196, 1206 (D. Colo. 2005),
("It does not appear to be disputed that the government interest put forward – preventing child
pornography – is significant.").

with the first or third prongs of the intermediate scrutiny analysis. The Third Circuit "in no wise directed the district court to reexamine" any of its conclusions with respect to those issues, "nor did the panel postpone the resolution of th[ese] issue[s] pending further discovery on remand." *Friedman v. Market Street Mortg. Corp.*, 520 F.3d 1289, 1294 (11th Cir. 2008). Those issues are settled in this case, even as the case may proceed on other questions. .

### B.   As a Matter of Law, the 2257 Requirements Are Narrowly Tailored as Applied to Plaintiffs

The only question before this Court, with respect to plaintiffs' as-applied First Amendment challenge, is the second prong of the intermediate scrutiny analysis – whether the 2257 requirements are "narrowly tailored" as applied to each plaintiff. Under the "narrow tailoring" standard of intermediate scrutiny, the means chosen by Congress need not be "the 'least restrictive or least intrusive' means of furthering the government's substantial interest." *FSC II*, 677 F.3d at 535 (quoting *Ward*, 491 U.S. at 798). The "narrow tailoring" prong is satisfied "where the statute at issue does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 536 (quoting *Ward*, 491 U.S. at 799). Under this standard, the 2257 requirements should be upheld if the government's interests "'would be achieved less effectively" if the requirements did not apply to the speech at issue in the case. *Johnson v. City & County of Philadelphia*, 665 F.3d 486, 492 (3d Cir. 2011) (quoting *Ward*, 491 U.S. at 799).

In *Johnson*, the Third Circuit considered a city ordinance banning signs on designated public property. *See id.* The court upheld the ordinance under an intermediate scrutiny analysis because there was a perfect fit between the general object of the city's concern (signs on public property) and the target of the regulation (signs on public property). *Id.* at 493 (city's regulation "'respond[ed] precisely to the substantive problem which legitimately concern[ed] the City"

(quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984)).

Similarly here, there is a perfect fit between the general object of the government's concern (sexually explicit material that, if it involved underage individuals, would qualify as child pornography) and the target of the 2257 requirements (the same). The "sexually explicit conduct" to which the 2257 requirements apply is defined in 18 U.S.C. § 2256(2)(A), which is the same definition of "sexually explicit conduct" that would qualify as child pornography if underage individuals are involved. *See id.* §§ 2251, 2252, 2256(2)(B)(8). Unlike the ordinance at issue in *Johnson*, however, §§ 2257 and 2257A do not impose a ban on all visual depictions of sexually explicit conduct. Instead, the statutes set forth a prophylactic mechanism—an age verification, labeling, and recordkeeping scheme—designed to ensure that those who purport to produce such depictions using adults check the ages of the individuals appearing in their work, and keep records of having done so.

As a matter of law, none of the twelve plaintiffs in this case—consisting of nine individuals, one corporation, and two organizations purporting to raise claims on behalf of their members—are entitled to an exemption from the 2257 requirements, to the extent that they or their members[13] produce films or photographs containing sexually explicit conduct as defined in § 2256(2)(A).[14] It is undisputed that each of the plaintiffs that does produce such material (or has produced it in the past or claims an intent to produce it in the future) would be producing child pornography if the material included an individual under eighteen years old. That fact alone warrants application of the age verification requirements to these plaintiffs and suffices to conclude that the requirements are narrowly tailored as applied to them.

_____

[13] Unless otherwise specified, further references to "plaintiffs'" production in this section include the production of individual plaintiffs, the corporate plaintiff, and organizational plaintiffs' members.

[14] As discussed above, a number of plaintiffs do not produce any images subject to the requirements, and therefore lack standing to raise any challenge to the statutes in the first place.

Defendant has previously explained that universal application of the 2257 requirements is necessary because allowing exceptions based on subjective judgments—for example, based on a subjective evaluation of an individual performer's age, on the subjective likelihood that a particular producer might use underage individuals in his or her work, or on the subjective artistic or educational value of a particular producer's work—would undermine and allow circumvention of the entire scheme. Other courts that have considered past challenges to these requirements have agreed. *See Connection*, 557 F.3d at 331-32 (recognizing that exceptions based on subjective determinations made by the regulated parties themselves would undermine the requirements' purpose); *ALA*, 33 F.3d at 90 ("The entire point of the Act is to prevent subjective determinations of age by implementing a uniform procedure that applies to all performers."); *Free Speech Coal*, 406 F. Supp. 2d at 1207 (quoting prior Sixth Circuit panel's opinion that "universal requirement of age disclosure, regardless of the apparent age of an individual in a visual depiction, is critical to the government's interest in ensuring that no minors are depicted in actual sexual conduct"). These courts did suggest the narrow possibility that the requirements might be unconstitutional as applied to "'an illustrated sex manual for the elderly,'" which "not only confined itself to self-evidently mature models but also did not permit the depiction of isolated body parts." *Connection*, 557 F.3d at 336 (quoting *ALA*, 33 F.3d at 90). However, as the Sixth Circuit noted, there was no evidence "that this third-party situation even exists." *Id.*

The Third Circuit did not quarrel, in general terms, with the government's explanation that "a uniform rule is necessary because sexually explicit images of adults often cannot be distinguished from images showing minors and such a rule eliminates subjectivity as to which performers' ages must be verified." *FSC II*, 677 F.3d at 537. However, with respect to plaintiffs'

as-applied challenges, the court noted that, in the absence of discovery, this argument was "in the abstract and may not necessarily apply to all Plaintiffs." *Id.* Citing the "sex manual for the elderly" hypothetical in *ALA*, the court suggested that "if one of the Plaintiffs employs performers that no reasonable person could conclude were minors, then that plaintiff may be able to demonstrate that the Statutes burden substantially more of that plaintiff's speech than is necessary to protect children from sexual exploitation." *Id.*

Now that the discovery required by the Third Circuit has concluded, it is clear that none of the plaintiffs can establish that they confine their production to sex manuals for the elderly that depict only "self-evidently mature models" and also "d[o] not permit the depiction of isolated body parts." *Connection*, 557 F.3d at 336. Indeed, all plaintiffs who have produced sexually explicit materials in the past have admitted that their sexually explicit work has contained depictions of young individuals, including individuals under the age of 25.[15] Moreover, not only have all plaintiffs who have produced sexually explicit films or photographs used relatively young individuals in such work in the past, but even those who claim not to have

---

[15]Responses to Requests for Admission Nos. 22-33 of ASMP, Dodson & Ross, FSC, Levine, Nitke, Sinclair, Steinberg; Response to Request for Admission No. 26 of Levingston; Queen Dep. 42:9-43:3 (individuals 19 or 20 years old have participated in Masturbate-a-thons and would not be prevented from participating); 88:2-10; FSC member David Connor's Resp. to Int. No. 9 (101 out of 217 performers (47%) depicted in his videos are between the ages of 18 and 25); Sinclair Institute's Resp. to Int. No. 9 (10% of individuals appearing in their sexually explicit visual depictions are "18-20 years old" and 30% are "in their 20s"); Dodson & Ross's Resp. to Int. No. 9 (ages of performers in videos ranged from 20 to 83); Levingston Dep. 30:2-4, 53:2-8; 56:24-57:10, 58:2-60:20 (admitting that he "work[s] with models of all ages as long as they are reasonably fit" and that some of the models appearing in his nude photographs have been recent high school graduates); Declaration of Adriana Vecchio ¶ 6 (recording age breakdowns based on plaintiffs' produced information, showing that 41% of performers in the work of FSC member Vivid Video were between 18 and 25 and 12% were between 18 and 21; 61% of performers in the work of ASMP member Craig Morey were between 18 and 25 and 33% were between 18 and 21; 25% of performers identified by Dodson and Ross were between 21 and 25; 24% of individuals appearing in Levine's work were between 21 and 25; 44% of individuals appearing in Levingston's work were between 18 and 25 and 11% were between 18 and 21).

focused on young individuals in the past acknowledge that the sexually explicit material they might produce in the future could include such individuals.[16]

Given that none of the plaintiffs fall into the very narrow exception that courts have hypothesized, plaintiffs' as-applied challenges necessarily fail because any exception that they might propose would introduce the very subjectivity that the universal age verification and recordkeeping requirements so carefully avoid. *See Connection*, 557 F.3d at 331-32. Plaintiffs concede that it is impossible to determine a person's age based on visual observation.[17]  This

---

[16] Hymes Dep. 129:11-132:13 (acknowledging that he cannot predict what promotional materials he might receive in the future, from which he might wish to post sexually explicit images on his Daily Babylon website, if he were ever to become active on that site again); Levine Dep. 123:15-18 (does not rule out producing work for her website depicting  individuals between 18 and 20); Nitke Dep. 64:7-65:10 (acknowledging that her work has gone from one project to another, that she does not know what her future projects will entail, and that it may involve "a completely different population of people"); Wilson Dep. 150:9-152:4 (stating that Sinclair Institute does not have any kind of "ageism" with respect to the performers it employs and that the company would employ performers as long as they are over 18).

[17] Alper Dep. 70:14-18 (conceding that she would not know whether individuals publicly having sex on Fire Island were 18 or over without checking their IDs); *id.* 84:12-14; 86:21-24 (admitting that she "[p]robably" could not distinguish between a 17-year-old and an 18-year-old or between a 25-year-old and a 30-year-old); Dodson Dep. 43:21-44:20 (it could be difficult to tell someone's age by looking at them because of "the way they're dressed, their mannerisms, their speech, overall demeanor, sophistication" and because "[y]ou can't go on" breast development to determine age); Douglas Dep. 88:19-21 ("Q Do you think that you can determine a person's age by their visual appearance?" "A No I do not."); Hymes Dep. 88:14-16 ("Q Can you tell by looking at these individuals what their ages are?" "A No."); Levine Dep. 120:24-121:5 (admitting that there are many young-looking performers in the adult industry that would not be easily identifiable as over 18 just by looking at them),47:3-4 ("I don't think you can tell exact ages by looking at pictures."); Levingston Dep. 179:20-22, 180:1-8 (indicating that the way not to confuse an 18 year old or a 19 year old with a minor would be to "check[] their ID" and that he probably could not distinguish a 17-year-old from a 19-year-old by looking at them); Mopsik Dep. 55:10-13 ("Q Is it ASMP's position that it's possible to determine a person's age by visual observation? A I would say not in all cases, no. Some people appear younger than others."); Nitke Dep. 145:19-22 (does not rely on appearance to determine age); Queen Dep. 79:5-23 ("One of the reasons to check IDs is because that takes some of the guesswork out of figuring out how old someone is, yes."); Ross Dep. 41:15-22 ("Because [porn stars] always have such large breasts, and I don't know if I could distinguish between 20 and 30."), 77:16-19 (stating that it is difficult to determine a person's exact age by visual inspection); Steinberg Dep. 66:13-68:7 ("some people look older than they are; some people look younger than they are");Wilson Dep. 126:7-15 ("I cannot tell the exact age [by just looking at the picture of a woman depicted in

undisputed fact is line with the Sixth Circuit's holding that allowing law enforcement personnel, or producers themselves, to decide on a case-by-case basis whether a performer appears old enough not to require age verification would introduce too much room for error and would raise the prospect that producers might evade 2257 requirements altogether by habitually claiming that they thought age verification was unnecessary for the particular individuals that they employed. *See Connection*, 557 F.3d at 331 (rejecting an exception for performers who appear sufficiently old because it would inject "'an ineffectual subjectivity' into the proof-of-age requirement" and would allow circumvention).

Any other criteria that a plaintiff might propose would introduce the same subjectivity, and are otherwise inappropriate bases for an exception. For example, some plaintiffs consider themselves fine art photographers (Alper, Nitke, Steinberg, ASMP members), journalists (Hymes), or engaged in an educational endeavor (Dodson & Ross, Sinclair). However, as some plaintiffs have already conceded, there is no objective or uniform way to distinguish a film or photograph according to the message that a producer intends to, or does, convey, or based on an image's artistic, political, or journalistic value. Hymes Dep. 134:13-136:3 ("Q: Who decides whether someone is a journalist or not? A: I don't have that answer. I'm not sure that there is an answer to that. . . . there is no one who makes the final determination that someone is a journalist."); Steinberg Dep. 38:9-40:20 ("Q: Can you identify any objective differences between your photographic work and what could be called 'amateur photography'? . . . [A:] Objective differences, no. . . . I don't think there are any."), 128:13-15 ("Q: How do you know whether someone is a fine art sexual photographer? A: Well, you don't."); *see also* Mopsik Dep. 38:1-6, 79:14-80:8) ("[Q] nothing prevents someone who produces adult films from being an ASMP member, correct? A: Correct."); *see also id.* (acknowledging that if ASMP were to prevail in its Sinclair's website.]").

as-applied challenge, hardcore pornography producers could become ASMP members). Granting a plaintiff's as-applied challenge on this basis would create a loophole in the requirements, allowing other producers to decide for themselves whether the depictions they create or distribute are sufficiently "artistic" or "journalistic" that they need not ensure that their performers are adults, even if the performers appear underage.

And of course, when it comes to child pornography, it simply does not matter how artistic a film or photograph is, if it portrays children engaged in sexually explicit conduct. The Supreme Court has recognized that "a work which, taken on the whole, contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography." *New York v. Ferber*, 458 U.S. 747, 761. Indeed, it is absolutely "irrelevant to the child who has been abused whether or not" the image recording the child engaged in sexually explicit conduct "has a literary, artistic, political or social value." *Id.* (internal quotation, alteration, and ellipsis omitted).

A system that would introduce subjective assessments, allowing loopholes and circumvention, would certainly be less effective than the current universal requirement. Moreover, the ultimate harm that is risked by opening a loophole is that a child may be exploited in the creation of child pornography. At that point, the damage has been done, and any benefit from a prophylactic measure such as the 2257 requirements is eviscerated. On the other hand, the current universal requirement does not prohibit any plaintiff from creating sexually explicit expression but merely requires that the plaintiff verify the ages of performers before doing so.

In the end, plaintiffs appear to believe they are entitled to an exemption from the requirements simply because, they assert, they would never intentionally produce child pornography. *E.g.*, Alper Dep. 84:18-22 ("I have no interest in child pornography. I am totally

opposed to it."); Levine Dep. 115:21-22 ("We're very serious about not wanting minors in our business."); Nitke Dep. 99:16-100:2 ("I would never photograph anyone under the age of 18 doing anything sexual or SM. . . . I resent the law to be honest. I totally resent it. . . . it is just so not what I would ever do."); Queen Dep. 66:8-22 ("The Center for Sex & Culture is an 18-and-over venue."); Ross Dep. 49:25-50:5 ("Our website is about women. We're feminists. We are not about exploiting young girls. Absolutely not."); Steinberg Dep. 127:10-16 ("I wouldn't want to take a picture of an underage person. . . . The people doing fine art sexual photography are a responsible group of people."); Wilson Dep. 226:23-25 ("I don't know how the law defines child pornography, but I know that our company is an adult company and we only use adults.").

However, even assuming that plaintiffs are sincere in these assertions, applying the requirements to plaintiffs still serves to prevent their use of underage performers, even inadvertently. It also prevents those who may not be sincere in their asserted desire not to depict underage performers from taking advantage of the same subjective exceptions from the requirements that plaintiffs seek. Moreover, applying the 2257 requirements to plaintiffs serves numerous other valid purposes. It allows secondary producers to assure themselves that plaintiffs have checked performers' ages and have records of having done so, even though the secondary producers did not have the opportunity to check an individual's identification at the time the original image was created; it also allows a viewer of such material to have some level of reassurance that the material being viewed is not child pornography; it also allows law enforcement to trace the location of age verification records, once a plaintiff makes an image publicly available, through the required 2257 label on the depiction; it prevents law enforcement from having a dispute with a plaintiff over the question of whether the plaintiff should have made a 2257 record for a particular performer or not; and it provides an efficient means for a

plaintiff to dispel any question that may arise about the age of a performer. *FSC II*, 677 F.3d at 535 (citing *Connection*, 557 F.3d at 329-30).

In sum, none of the possible rationales for plaintiffs' claim to exemption justify any deviation from a uniform requirement. Defendant is entitled to summary judgment with respect to plaintiffs' as-applied First Amendment claims.

## VI.  PLAINTIFFS CANNOT ESTABLISH THAT THE 2257 REQUIREMENTS ARE SUBSTANTIALLY OVERBROAD

Nothing in the evidentiary record developed in discovery suggests that plaintiffs can show substantial overbreadth, as would be required to hold §§ 2257 and 2257 facially invalid as to all applications. A statute may be struck down on its face only if it "*cannot* be applied consistently with the Constitution." *Brown v. City of Pittsburgh*, 586 F.3d 263, 269 (3d Cir. 2009) (internal quotation omitted).  In other words, a law may be struck down only if it is "unconstitutional in every conceivable application," or it seeks to "prohibit such a broad range of protected conduct that it is constitutionally 'overbroad.'" *Id.* (internal quotation omitted).  The Third Circuit in this case recognized that plaintiffs' facial challenge relies solely on a theory of overbreadth. *FSC II*, 677 F.3d at 537.

The rationale behind the overbreadth doctrine is that, even when a statute is constitutional as applied to the plaintiff, its "'very existence'" may have a chilling effect on others not before the court, causing them "'to refrain from constitutionally protected speech or expression.'" *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). This doctrine allows a court to alleviate burdens on protected speech, but only where the harm that is caused by invalidating a law that Congress enacted to address real evils can be justified. For when a statute is deemed facially invalid, even otherwise legitimate applications of the statute are "totally forbidden"— leaving the harms originally identified by Congress to continue unabated until such time in the

future when a new law might be enacted. *Broadrick*, 413 U.S. at 613; *see United States v. Williams*, 553 U.S. 285, 292 (2008) (recognizing the "obvious harmful effects" of "invalidating a law that in some of its applications is perfectly constitutional"); *Aiello v. City of Wilmington*, 623 F.2d 845, 855 (3d Cir. 1980) ("[F]acial invalidation is not a finely honed scalpel in the hands of a judicial surgeon but a broad-blade instrument, which must be applied with restraint."). Thus, the Third Circuit in this case warned that "[d]eclaring a statute unconstitutional on overbreadth grounds is 'strong medicine' and should be used 'sparingly and only as a last resort.'" *FSC II*, 677 F.3d at 537 (quoting *Broadrick*, 413 U.S. at 613). And the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292 (citing *Broadrick*, 413 U.S. at 615); *see also 181 South Inc. v. Fischer*, 454 F.3d 228 (3d Cir. 2006) (rejecting overbreadth challenge to state regulation because *Broadrick*'s "substantial" standard could not be met). Striking down a law is inappropriate when there is a "core of easily identifiable" conduct that the statute can constitutionally regulate. *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 964-67 (1984)

Plaintiffs "bear[] the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (quoting *N.Y. State Club Ass'n., Inc. v. City of New York*, 487 U.S. 1, 14 (1988)); *see also Ashcroft v. ACLU*, 535 U.S. 564, 584 (2002) (rejecting plaintiffs' overbreadth challenge because they failed to show that statute's overbreadth was "'not only . . . real, but substantial as well'" (quoting *Broadrick*, 413 U.S. at 615)). Moreover, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Members of City Council v.*

*Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

The Third Circuit has identified four factors relevant to the overbreadth analysis: "(1) the number of valid applications, (2) the historic or likely frequency of conceivably impermissible applications, (3) the nature of the activity or conduct sought to be regulated, and (4) the nature of the state interest underlying the regulation." *FSC II*, 677 F.3d at 537-38. As far as defendant was able to determine, the Third Circuit has applied these factors in three prior cases, upholding the challenged law in each case. In *Aiello*, the court rejected an overbreadth challenge to state restrictions on the off-duty conduct of firemen because "the facial overbreadth of the rules, if any, fades significantly when compared with their otherwise legitimate sweep." *Aiello*, 623 F.2d at 856. In *Gibson v. Mayor & Council*, 355 F.3d 215 (3d Cir. 2004), the court rejected an overbreadth challenge to a directive that required police officers to "be truthful and forthright at all times," even though the plain language of the directive potentially applied to any context, including communications between father and son or husband and wife, because the scenarios of supposedly unconstitutional applications advanced by the plaintiff were "more than slightly unrealistic." *Id.* at 226. The court emphasized that "an invalid application that is far-fetched does not deserve as much weight as one that is probable," and held that "the number and weight of permissible applications far outweigh the possible invalid applications, if not in number, then certainly in kind." *Id.* at 226-27 (internal quotation omitted). Significantly, the court did not look to the number of occurrences of parents lying to children, or police officers lying to their spouses, but to the realistic probability that the directive would ever be applied in such a context. *See id.*

In the third case where the Third Circuit has applied these factors, *Borden v. Sch. Dist. of Tp. of E. Brunswick*, 523 F.3d 153 (3d Cir. 2008), it also upheld the regulation at issue, which

prohibited faculty participation in student-initiated prayer. *Id.* at 166. The court pointed to
"numerous valid applications" of the regulation, and the school district's compelling interest in
avoiding Establishment Clause violations, as justification for its ruling, noting that "any concern
about overbreadth may 'be cured through case-by-case analysis of the fact situations to which the
regulation's] sanctions, assertedly, may not be applied.'" *Id.* (quoting *Broadrick*, 413 U.S. at
615-16).

Here, with respect to the first *Gibson* factor, the plainly legitimate sweep of the 2257
requirements is undeniably vast. As explained above, the only images that are subject to the 2257
requirements are those that, if they depicted underage individuals, would qualify as child
pornography. Again, there is a perfect fit between the regulated expression and the expression
that implicates Congress's concern with preventing the sexual exploitation of children. *Compare*
18 U.S.C. § 2256(2)(A), *with* 18 U.S.C. §§ 2257(h)(1), 2257A(h)(1) (cross-referencing §
2256(2)(A)). In each instance where the requirements apply, the government legitimately seeks
to ensure that producers verify in advance that their performers are adults because, if they were
not, the production at issue would exploit children and qualify as illegal child pornography.
Indeed, the Sixth Circuit previously concluded that "the overwhelming majority of applications
of § 2257 do not offend" the First Amendment. *Connection Distrib. Co. v. Holder*, 557 F.3d
321, 335-42 (6th Cir. 2009) (en banc); *accord Connection Distrib. Co. v. Reno*, 154 F.3d 281,
292 (6th Cir. 1998).

On the other hand, plaintiffs cannot establish that "the history or likely frequency of
conceivably impermissible applications" is sufficient to deem any overbreadth "substantial." The
Third Circuit noted that plaintiffs had made assertions regarding "a 'vast quantity' of protected
sexually explicit depictions" that "include performers who are 'clearly mature adults' that 'could

not be mistaken for children.'" *FSC II*, 677 F.3d at 538. However, the fact that a sexually explicit depiction includes a performer of a particular age certainly does not render the 2257 requirements unconstitutional as applied to that depiction, that depiction's producer, or that performer. As explained in connection with plaintiffs' as-applied challenges, in the context of age verification requirements, "a uniform rule is necessary because sexually explicit images of adults often cannot be distinguished from images showing minors and such a rule eliminates subjectivity as to which performers' ages must be verified." *FSC II*, 677 F.3d at 537. As already explained, the uniform application of the requirements, regardless of the apparent age of an individual performer, is necessary to achieve the government's substantial interests without introducing a potential for loopholes and circumvention that is unacceptable, given the interests that are at stake.

While prior decisions have cited the producer of a "sex manual for the elderly," who *only* produced images in which *all* individuals were sufficiently mature that no one could ever mistake them for minors, and who *never* included images of isolated body parts in his work, as a hypothetical potential exception to the uniform requirement, *see FSC II*, 677 F.3d at 537; *see also Connection*, 557 F.3d at 336, plaintiffs in discovery did not identify a single example of such a producer, nor of a single sex manual of this kind. Rather, plaintiffs produced a list of websites, which were supposedly devoted to "mature" or "granny" porn, but which in fact are in no way equivalent to the hypothetical that courts have envisioned. *See, e.g.*, FSC's Resp. to Int. 12. Among other things, a cursory review of these websites shows that they are not confined to depictions of relatively "mature" individuals.[18] Moreover, even if these sites were confined to

---

[18] For example, when visited on May 10, 2013, the first page of #1 on plaintiffs' list (Xhamster/Mature Porn Videos) advertised a video entitled "Asseating mature slut having fun with teen"; the first page of #2 (YouJizz/Mature Porn Tube Videos) contained the titles "Stepmom teaches stepdaughter," "Magdalene Seduces Younger Woman," "Hot Busty Mom

depictions of the elderly (which they are not), their existence could not qualify as "substantial" relative to the vast quantity of sexual depictions of youthful-looking individuals, including depictions in the category of "teen porn," that dominate the internet. *See* Expert Report of Gail Dines, PhD, at 2, 6-13. Plaintiffs cannot establish overbreadth on this basis.

The Third Circuit also cited plaintiffs' contention that "the Statutes are unconstitutionally overbroad based on their purported regulation of purely private conduct." *FSC II*, 677 F.3d at 538. As far as defendant is aware, plaintiffs have no admissible evidence that such applications might qualify as "substantial." Indeed, any such notion is "more than slightly unrealistic." *Gibson*, 355 F.3d at 226. After all, just as in *Gibson* there was no realistic possibility that police officers would be disciplined based on lies told to their children or spouses, there is no realistic possibility here that §§ 2257 or 2257A would ever be applied to "purely private conduct," such as the production of a video or by a married couple for their own private use, or transmission of a sexually explicit image by text message between intimate partners. Indeed, to the extent such a video or text message were indeed "private," its existence would presumably be known only to the couple themselves, so the absence of a statement on the video or image identifying the location of 2257 records could have no practical consequence, even if the government took the position that the requirements applied in such a context. Plaintiffs have identified no evidence suggesting that those who wish to engage in "purely private conduct" of this kind are in any way chilled from doing so by the existence of §§ 2257 and 2257A. *Cf. Taxpayers for Vincent*, 466 U.S. at 801 ("there must be a realistic danger that the statute itself will significantly compromise

---

with Son," "Stepmom teaches stepson," "Seducing the Tutor," and "Joining Mom," among others; the first page of #3 (XVIDEOS/grannies videos) showed "Granny sucks young lover"; the first page of #4 (MadThumbs/Newest Mature Videos) contained the titles "Teen (18+) and M..[truncated]" and "Amateur Teen (18…[truncated]"; the first page of #5 (YouPorn/Mature Sex Porn Tubes) advertised "Mature woman likes the young pussys" and "Old Married Couple Get a Boy Toy"; and the first page of #6 (Tnaflix/Mature Sex Videos) had three videos simply labeled "old and young."

recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds"). Indeed, one plaintiff has suggested that "most Americans don't actually know anything about these regulations," indicating that they could not possibly be chilled by them. Queen Dep. 111:18-21. There is therefore no justification for applying the "strong medicine" of facially invalidating the statutes on this basis.

The third and fourth *Gibson* factors do not weigh in favor of an overbreadth holding. The activity subject to regulation—production of depictions of sexually explicit conduct that, if they included minors, would qualify as child pornography—is not mere speech; it is an activity that involves real people engaging in sexual acts. The government interest in ensuring that producers of such material take the simple precaution of checking the ages of the individuals who appear in such work, and keep records having done so, is compelling. Indeed, if the prophylactic measures set forth in §§ 2257 and 2257A fail, the gravest consequence is not that other statutory provisions (those that criminalize child pornography possession and distribution) will be violated; it is the risk that children will be harmed through their exploitation in the creation of sexually explicit material. Once that harm occurs, it cannot be undone, even if the producer is ultimately prosecuted for violation of child pornography laws.

In sum, plaintiffs cannot establish that the 2257 requirements are overbroad, nor can they demonstrate that any overbreadth, if it exists at all, could be deemed "substantial," either in an absolute sense or relative to the requirements' vast and plainly legitimate sweep as to sexually explicit images.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of defendant.

Dated this 10th day of May, 2013.                    Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General
ZANE DAVID MEMEGER
United States Attorney
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ Kathryn L. Wyer
HÉCTOR G. BLADUELL
JAMES J. SCHWARTZ
NATHAN M. SWINTON
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Washington, DC
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.1.2(8)(b), I hereby certify that the foregoing Memorandum has

been filed electronically and is available for viewing and downloading from the ECF system.  I

further certify that the foregoing document was served via ECF on counsel of record for

plaintiffs in the above-captioned case.


Dated: May 10, 2013                          /s/
                                             Kathryn L. Wyer