IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC. et al., | ) | Civil Action No. 2:09-4607 |
| | ) | |
| Plaintiffs, | ) | Judge Michael M. Baylson |
| | ) | |
| v. | ) | |
| | ) | DEFENDANT'S STATEMENT OF |
| THE HONORABLE ERIC H. HOLDER, JR., | ) | UNDISPUTED MATERIAL FACTS |
| Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# TABLE OF CONTENTS

I.     STATUTORY AND REGULATORY HISTORY ....................................................2

    A.   1988 Enactment & 1990 Amendment ................................................................2

    B.   1992 Rulemaking ...............................................................................................3

    C.   2003 Statutory Amendment ...............................................................................3

    D.   2005 Rulemaking ...............................................................................................4

    E.   2006 Statutory Amendments ..............................................................................4

    F.   2008 Rulemaking ...............................................................................................7

    G.   Effective Date of Requirements .........................................................................7

II.    TIME AND SCOPE OF PAST 2257 RECORDS INSPECTIONS ...........................8

III.   MATERIAL CHANGES THAT INCREASE THE UNCERTAINTY
    REGARDING PROCEDURES OR PARAMETERS OF ANY FUTURE
    2257 INSPECTIONS ...............................................................................................9

IV.    CONCRETE DETAILS OF PAST 2257 RECORDS INSPECTIONS ....................10

V.     THE ATTORNEY GENERAL'S ADOPTION OF FREE SPEECH
    COALITION'S COMMENTS DURING 2008 RULEMAKING THAT A THIRD-
    PARTY CUSTODIAN OPTION WOULD ELIMINATE MANY BURDENS ........18

VI.    PLAINTIFFS' PRODUCTION OF MATERIAL SUBJECT TO THE 2257
    REQUIREMENTS ..................................................................................................19

    A.   Free Speech Coalition .....................................................................................19

    B.   Barbara Alper ..................................................................................................21

    C.   American Society of Media Photographers ("ASMP") ....................................23

    D.   Betty Dodson and Carlin Ross .........................................................................25

    E.   Thomas Hymes ..................................................................................................28

    F.   Marie Levine .....................................................................................................30

    G.   David Levingston ..............................................................................................32

    H.   Barbara Nitke ...................................................................................................34

    I.   Carol Queen ......................................................................................................36

    J.   Sinclair Institute ...............................................................................................38

    K.   David Steinberg ................................................................................................40

VII.   THE VAST PLAINLY LEGITIMATE SWEEP OF 2257 REQUIREMENTS ........41

VIII.  PRIVATE EXPRESSION HAS NOT BEEN CHILLED ........................................44

# I.      STATUTORY AND REGULATORY HISTORY

## A.      1988 Enactment & 1990 Amendment

1.      Title 18, §§ 2257 and 2257A impose a set of recordkeeping requirements upon producers of visual depictions of sexually explicit conduct. 18 U.S.C. §§ 2257, 2257A.

2.      The recordkeeping requirements were based initially upon the findings and of the Attorney General's Commission on Pornography, which arrived at its recommendations after "fourteen months of investigations." *See ALA v. Reno*, 33 F.3d 78, 89 (D.C. Cir. 1994). The Report found that "child pornography is extraordinarily harmful both to the children involved and to society," but that, nevertheless, there was a "consumer demand for youthful performers" in pornography. Attorney General's Commission on Pornography, *Final Report*, ("Final Report") 417-18, 618 (July 1986).[1] The Report found that this demand had fueled the growth of "pseudo child pornography," using models that are allegedly over the age of eighteen but appear to be minors even when they are not. *Id.*; *see also id.* at 855 ("Perhaps the single most common feature of models [in pornography] is their relative, and in the vast majority of cases, absolute youth."). The Report concluded that this development had "made it increasingly difficult for law enforcement officers to ascertain whether an individual in a film or other visual depiction is a minor." *Id.* at 618.

3.      In order to address this problem and close the loophole in existing child protection laws, the Report recommended the adoption of comprehensive record-keeping requirements to "'afford protection to minors through every level of the pornography industry.'" *ALA*, 33 F.3d at 86 (*quoting* Final Report at 619). In particular, the Report recommended that Congress require producers of sexually explicit visual depictions "to obtain proof of the age of the performer"

---

[1] The Attorney General's Report is available at http://www.porn-report.com/contents.htm .

from a verifiable form of age documentation, such as a driver's license or birth certificate, and to maintain release forms recording this information. Final Report at 619-20. The Report recommended that producers be required to identify the location of the forms "in the opening or closing footage of a film, the inside cover of the magazine, or standard locations in or on other material containing visual depictions." *ALA*, 33 F.3d at 85 (*quoting* Final Report at 620). The Report recommended that the release forms be "available for inspection by any duly authorized law enforcement officer upon demand as a regulatory function for the limited purposes of determining consent and proof of age." Final Report at 621. The Report stated that "'The proposed legislation would serve a record keeping purpose comparable to that found in environmental and similar statutes.'" *ALA*, 33 F.3d at 85-86 (quoting Final Report at 622).

4.      Following the Commission's Report, the Senate Committee on the Judiciary held extensive hearings on proposed statutory amendments implementing some of the Report's recommendations, including the recordkeeping requirements. *Child Protection and Obscenity Enforcement Act and Pornography Victims Protection Act of 1987: Hearing Before the S. Comm. on the Judiciary*, 100th Cong. (1988) ("1988 Senate Hearing").

5.      Congress enacted the first version of these requirements in 18 U.S.C. § 2257 as part of the Child Protection and Obscenity Enforcement Act of 1988, Pub. L. No. 100-690, 102 Stat. 4487-89. As enacted in 1988, § 2257 required producers to examine identification documents for each performer in a sexually explicit visual depiction, ascertain any aliases of the performer, record this information in individually identifiable records for each performer, and maintain these records "at [the producer's] business premises, or at such other place as the Attorney General may by regulation prescribe and . . . make such records available to the Attorney General for inspection at all reasonable times." Pub. L. No. 100-690, § 7513(a)

2

(codified as amended at 18 U.S.C. § 2257). In addition, the 1988 statute required producers to affix a statement indicating the location of these records to each copy of the sexually explicit visual depiction that was produced.  Id.

6.      In 1990, Congress added a definition of what would constitute "unlawful" conduct under § 2257 and set forth a criminal penalty for those specified violations. Child Protection Restoration and Penalties Enhancement Act of 1990, Pub. L. No. 101-647, § 311, 104 Stat. 4816-17 (1990) (codified as amended at 18 U.S.C. § 2257(f), (i)).

**B.      1992 Rulemaking**

7.      The Attorney General issued a Final Rule implementing § 2257 in 1992. See Dep't of Justice, Final Rule, 57 Fed. Reg. 15017 (1992) (promulgating 28 C.F.R. §§ 75.1 - .8). The Rule became effective May 26, 1992. Id.

**C.      2003 Statutory Amendment**

8.      The original enactment applied the requirements to the producers of "any book, magazine, periodical, film, videotape, or other matter" containing visual depictions of actual sexually explicit conduct. Pub. L. No. 100-690, § 7513 (18 U.S.C. § 2257(a)). In 2003, recognizing that "the vast majority of child pornography prosecutions today involve images contained on computer hard drives, computer disks, and/or related media," Congress amended § 2257 to confirm that the recordkeeping requirements apply to digital pornography. Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108-21, §§ 501(6), 511, 117 Stat. 650 (2003). Thus, the requirements were expressly applied to producers of any "computer generated image, digital image, or picture." Id. § 511(a)(2) (now codified at 18 U.S.C. § 2257(h)(3)); *see also* Department of Justice ("DOJ"), Final Rule, 70 Fed. Reg. 29607 (May 24, 2005).

**D.      2005 Rulemaking**

9.      In 2005, the Attorney General issued a Final Rule implementing the PROTECT

Act amendments and otherwise amending the regulations promulgated in 1992. Dep't of Justice,

Final Rule, 70 Fed. Reg. 29607 (2005) (amending 28 C.F.R. §§ 75.1 -.8).

10.      The 2005 Final Rule addressed comments that small businesses may not keep

regular 9am-5pm business hours by adjusting the proposed regulation "to permit inspections

during the producer's normal business hours," or "[t]o the extent the producer does not maintain

or post regular business hours, . . . to provide notice to the inspecting agency of the hours during

which their records will be available for inspection, which must total no less than twenty (20)

hours per week, in order to permit reasonable access for inspectors." 70 Fed. Reg. at 29613.

11.      The 2005 Final Rule rejected comments suggesting that the Attorney General

permit third-party custody of records. 70 Fed. Reg. at 29613. The 2005 Final Rule also rejected

comments proposing that the Attorney General provide advance notice prior to inspections,

explaining that "[l]ack of specific case-by-case notice prior to inspection will promote

compliance with the statute and encourage producers to maintain the records in proper order at

all times, as is contemplated by the statute." *Id.* at 29614. The Final Rule noted that "[t]he

inspection process clearly does not contemplate warrantless forced entry solely because no one is

present when the investigator arrives." *Id.*

**E.      2006 Statutory Amendments**

12.      In 2006, Congress enacted the Adam Walsh Child Protection and Safety Act of

2006 ("Adam Walsh Act"), Pub. L. No. 109-248, 120 Stat. 587 (2006). The Adam Walsh Act

sets forth Congress's finding that "[a] substantial interstate market in child pornography exists,

including not only a multimillion dollar industry, but also a nationwide network of individuals

openly advertising their desire to exploit children and to traffic in child pornography. Many of these individuals distribute child pornography with the expectation of receiving other child pornography in return." *Id.* § 501(1)(B).

13.     Congress also found that "[t]he advent of the Internet has greatly increased the ease of transporting, distributing, receiving, and advertising child pornography in interstate commerce. The advent of digital cameras and digital video cameras, as well as videotape cameras, has greatly increased the ease of producing child pornography. The advent of inexpensive computer equipment with the capacity to store large numbers of digital images of child pornography has greatly increased the ease of possessing child pornography. Taken together, these technological advances have had the unfortunate result of greatly increasing the interstate market in child pornography." *Id.* § 501(1)(C). Congress further found that "[t]he government has a compelling State interest in protecting children from those who sexually exploit them, and this interest extends to stamping out the vice of child pornography at all levels in the distribution chain." *Id.* § 501(2)(C).

14.     With respect to recordkeeping requirements, Congress in the Adam Walsh Act amended § 2257 to clarify its application to production of digital images and digitally- or computer-manipulated images of an actual human being. *See* Pub. L. 109-248, § 502(a) (amending § 2257(a) and (h)(2)).

15.     Congress also decided in the Adam Walsh Act to conform the definition of "sexually explicit conduct" that applied for recordkeeping purposes to the definition, set forth in 18 U.S.C. § 2256(2)(A), that had otherwise been generally applicable to child pornography violations. *Cf.* 18 U.S.C. § 2256(8)(A) (defining "child pornography" as the production of any visual depiction of a minor engaging in "sexually explicit conduct," as defined in § 2256(2)(A)).

5

Section 2256(2)(A) defines "sexually explicit conduct" as:

> actual or simulated--
> (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
> (ii) bestiality;
> (iii) masturbation;
> (iv) sadistic or masochistic abuse; or
> (v) lascivious exhibition of the genitals or pubic area of any person[.]

18 U.S.C. § 2256(2)(A).[3]

16.    Section 2257 had originally applied the recordkeeping requirements only to visual depictions of "actual" conduct as described in subsections (i) through (iv); the requirements had thus not applied to depictions of actual sexually explicit conduct consisting of lascivious exhibition of genitals, nor had they applied to depictions of actual performers engaged in "simulated" sexually explicit conduct. Pub. L. No. 101-647, § 311. However, depictions of sexually explicit conduct in those categories meet the definition of "child pornography" if they include individuals under the age of 18. 18 U.S.C. § 2256(2)(A). In order to conform the definitions in 2006, Congress amended the definition of "actual sexually explicit conduct" in § 2257(h)(1) to mean "actual but not simulated conduct as defined in clauses (i) through (v) of [§] 2256(2)(A)." Pub. L. No. 109-248, § 502(a).[4] Thus, depictions of actual sexually explicit conduct consisting of lascivious exhibition of genitals would now be subject to the requirements. In addition, Congress added another statutory section so that – like the definition in § 2256(2)(A)

---

[3]This definition has been in effect, with minor wording changes, since 1978.  See Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. No. 95-225, 92 Stat. 7, 8 (1978) (enacting 18 U.S.C. § 2253, which in 1986 was renumbered as 18 U.S.C. § 2256).

[4]Congress specified that the recordkeeping requirements would not apply to visual depictions of sexually explicit conduct as defined in 18 U.S.C. § 2256(2)(A)(v) that were produced prior to the effective date of the Adam Walsh Act "unless that depiction also includes actual sexually explicit conduct as described in clauses (i) through (iv)" of § 2256(2)(A). Pub. L. No. 109-248, § 502(b).

– the recordkeeping requirements would apply to simulated as well as actual sexually explicit conduct. Pub. L. No. 109-248, § 503 (codified at 18 U.S.C. § 2257A).[5]

17.     The Adam Walsh Act also clarified that § 2257 "applies both to primary and secondary producers." 152 Cong. Rec. H5705-01, H5725 (statement of Rep. Pence); 73 Fed. Reg. at 77434.

18.     The Adam Walsh Act also added a subsection making it unlawful for any producer subject to the recordkeeping requirements "to refuse to permit the Attorney General or his or her designee to conduct an inspection" of the producer's records, as required under § 2257(c) and § 2257A(c). Pub. L. No. 109-248, §§ 502(a) (amending § 2257(f) by adding subsection (5)), 503 (enacting § 2257A(f)).

**F.      2008 Rulemaking**

19.     In 2008, the Attorney General issued a Final Rule implementing the Adam Walsh Act amendments and otherwise amending the regulations. Dep't of Justice, Final Rule, 73 Fed. Reg. 77432 (2008).

20.     The 2008 Final Rule reconsidered the Attorney General's prior decision regarding third party custodians and allowed producers to keep their 2257 records with third party custodians. 73 Fed. Reg. at 77445.

**G.      Effective Date of Requirements**

21.     The 2257 requirements apply to depictions of actual sexually explicit conduct

---

[5] "Simulated" sexually explicit conduct refers to "conduct engaged in by [actual, not virtual] performers that is depicted in a manner that would cause a reasonable viewer to believe that the performers engaged in actual sexually explicit conduct, even if they did not in fact do so." 28 C.F.R. § 75.1(o). However, "sexually explicit conduct that is merely suggested" is excluded from this category. *Id.*

created after July 3, 1995, unless the actual sexually explicit conduct is limited to lascivious exhibition of genitals. 28 C.F.R. § 75.2(a). The requirements apply to depictions of simulated sexually explicit conduct, and to depictions of actual sexually explicit conduct limited to lascivious exhibition of genitals, that are created after March 18, 2009. *Id.*; *see* 73 Fed. Reg. at 77444-45.

## II.   TIME AND SCOPE OF PAST 2257 RECORDS INSPECTIONS

22.   The only 2257 records inspections that have ever occurred pursuant to 28 C.F.R. § 75.5  were conducted under a program that was in operation between 2006 and early 2008. Declaration of Special Agent Alan S. Nanavaty ("Nanavaty Dec.") ¶¶ 3-11, ECF No. 92-1; Declaration of  Charles Joyner ("Joyner Dec.") ¶¶ 2-22; Declaration of Stephen Lawrence ("Lawrence Dec.") ¶¶ 2-9 & ex. A (Final Progress Report (2/22/2008)).

23.   Twenty-nine (29) inspections occurred under the 2257 records inspection program as it was in effect between 2006 and early 2008. Nanavaty Dec. ¶ 8; Lawrence Dec. ¶ 9 & ex. A. These inspections took place between July 24, 2006, and September 19, 2007. Nanavaty Dec. ¶ 8; Lawrence Dec. ex. A.

24.   These 29 inspections took place under the 2005 Final Rule and did not incorporate the Adam Walsh Act's amendments to § 2257 and enactment of § 2257A. *See* Joyner Dec. ¶ 3 & exs. A (2257 Project Child Protection and Obscenity (CPO) Inspections Checklist) & B (2257 Project Child Protection and Obscenity (CPO) Inspections Review Form) (referencing 2257 requirements as they existed under 2005 Final Rule).

25.   These 29 inspections were limited to commercial producers in the adult entertainment industry who qualified as "primary producers" under 28 C.F.R. § 75.1(c)(1) and who produced depictions of "actual" sexually explicit conduct as defined in 18 U.S.C. §

8

2256(2)(A)(i)-(iv) (actual sexual intercourse, bestiality, masturbation, sadistic or masochistic

abuse). Joyner Dec. ¶ 3. The inspection team had been directed not to inspect any producer that

was solely a "secondary" and not a "primary" producer. *Id.* Producers of depictions that

contained only simulated sexually explicit conduct or actual sexually explicit conduct limited to

lascivious exhibition of genitals were not included among those who were potentially subject to

inspection under this program. *Id.*

26.     Under the rules that the 2257 records inspection team was applying, producers

were not allowed to keep their 2257 records with third party custodians. 70 Fed. Reg. at 29613.

## III.   MATERIAL CHANGES THAT INCREASE THE UNCERTAINTY REGARDING PROCEDURES OR PARAMETERS OF ANY FUTURE 2257 INSPECTIONS

27.     A number of changes that have occurred since the 2257 records inspection

program ended could impact the manner in which any future 2257 records inspections are

conducted.

28.     The scope of producers subject to inspection has expanded. Unlike under the past

inspection program, the 2257 requirements now apply to depictions of simulated as well as

actual sexually explicit conduct, and they apply to depictions of actual sexually explicit conduct

limited to lascivious exhibition of genitals, that are created after March 18, 2009. 28 C.F.R. §

75.2(a).

29.     In addition, following the Adam Walsh Act amendments, there is no doubt that

the requirements apply to both primary and secondary producers, so secondary producers may

now be included in the scope of producers subject to inspection. *See* 152 Cong. Rec. H5705-01,

H5725 (statement of Rep. Pence); 73 Fed. Reg. at 77434.

30.     Because the scope of producers subject to 2257 records inspections has expanded,

the number of producers subject to 2257 records inspections has likely increased. Moreover, the number of producers of depictions of sexually explicit conduct has also likely increased because of increasing access to digital technology and the Internet. Pub. L. No. 109-248, § 501(1)(C).

31.     In addition, the regulations allow 2257 records to be kept in digital format. 73 Fed. Reg. at 77443. Even where the original documents were hard copies, the documents may be scanned and kept in digital form. *Id.* Maintenance of records in digital, rather than paper, format has likely increased in this context just as it has generally.

32.     Unlike under the past 2257 inspection program, producers are now allowed to keep 2257 records with a third party custodian, so future inspections are less likely to occur at a producer's place of business. 28 C.F.R. §§ 75.4, 75.5(a).

## IV.   CONCRETE DETAILS OF PAST 2257 RECORDS INSPECTIONS

33.     The Attorney General first tasked the FBI with developing and implementing a 2257 inspection program in 2005. Nanavaty Dec. ¶ 3. In 2006, the FBI began setting up a separate team to conduct inspections, based in southern California. *Id.* ¶ 4. Supervisory Special Agent ("SSA") Charles Joyner was assigned to the team at its inception. Joyner Dec. ¶ 3. A second SSA, Stephen Lawrence, joined the team in January 2007. *Id.* ¶ 5; Lawrence Dec. ¶¶ 2-3. Five contractors were also assigned to the team under the supervision of the SSAs. Joyner Dec. ¶ 5. The inspection team reported to Unit Chief Alan Nanavaty of the FBI's Crimes Against Children Unit in Washington, DC. Nanavaty Dec. ¶ 4.

34.     The 2257 inspection program focused on commercial producers in the adult entertainment industry. Nanavaty Dec. ¶¶ 3, 5, 8; Joyner Dec. ¶ 4. The FBI initially estimated the total number of producers, including film producers, print publishers, and webmasters, at 425. Nanavaty Dec. ¶ 5. The FBI began compiling a database of such producers, attempting to

identify those who were publicly advertising materials for sale containing visual depictions of sexually explicit conduct. Nanavaty Dec. ¶ 6. By August 2007, this database contained the names of approximately 1237 producers. Nanavaty Dec. ¶ 6; Joyner Dec. ¶ 4.

35.     The inspection team used a random number generator to select producers from its producer database for records inspections. Nanavaty Dec. ¶ 7; Joyner Dec. ¶ 4; Lawrence Dec.

¶ 3; Excerpts of the 29 Regulatory Inspection Reports ("Insp. Rpts."), filed herewith (listed on Index of Exhibits).

36.     The inspection team conducted the first of its 29 inspections, of Diabolic Video Productions, on July 24, 2006, and its last inspection, of Pony Boy Films, on September 19, 2007. Lawrence Dec. ex. A; Insp. Rpts. (Diabolic, Pony Boy). Selected records of twenty-seven producers were inspected. Joyner Dec. ¶ 7; Lawrence Dec. ¶ 3 & ex. A. The team also reinspected the records of two producers due to their failure to pass the original inspections. Joyner Dec. ¶ 17; Lawrence Dec. ex. A.

37.     After a producer was selected through the random number generator, but prior to initiating an inspection, the inspection team obtained a sample of materials produced by that producer, containing visual depictions subject to the pre-Adam Walsh Act version of § 2257. Joyner Dec. ¶¶ 7, 11 & ex. B, at 1-5 ("Pre-Inspection Product Review"); Lawrence Dec. ¶ 3. For each work selected, the inspection team reviewed the work in advance for 2257 compliance, following a checklist provided by FBI Headquarters, and attempted to identify all depicted performers. *See id.*; Joyner Dec. ¶ 6 & ex. C. The inspection team prepared a spreadsheet listing the works reviewed and all the performers that had been identified. Joyner Dec. ¶ 17 & ex. D.

38.     All twenty-nine inspections involved producers that had published and/or advertised for sale material that contained visual depictions of sexual explicit conduct and that

11

contained a 2257 statement pursuant to § 2257(e), indicating an address where the 2257 records were supposedly maintained. Joyner Dec. ¶ 7.

39.     In most instances, the inspection team initiated an inspection by arriving at the address listed on the producer's 2257 statement. Joyner Dec. ¶ 11; Lawrence Dec. ¶¶ 4, 6; Insp. Rpts. A member of the inspection team would photograph the exterior of the premises. Joyner Dec. ¶ 10; Insp. Rpts. (photo logs). The SSA leading the inspection would approach the premises and, where the premises were a business location, enter the publicly-accessible reception area of the business. Joyner Dec. ¶¶ 8, 11; Lawrence Dec. ¶ 6. Upon entering the premises, the SSA would identify himself and explain that he and the team were there to conduct a 2257 inspection. *Id.* The SSA would explain "the nature and purpose of the inspection, including the limited nature of the records inspection." Joyner Dec. ex. A, at 2.

40.     On or about March 2007, the SSA began providing the producer with a letter at the time he first initiated contact, explaining the purpose of the inspection. Joyner Dec. ¶ 17 & ex. D. The letter further stated that the inspection would be "limited to the records that specifically relate to products and performers which are identified in the attached document." *Id.* The document attached to the letter, and provided to the producer, consisted of the spreadsheet that the inspection team had prepared, listing the specific works that the team had reviewed, and the performers identified in those works. *Id.*

41.     A checklist describing the inspection process indicated that: "If access to the records is denied, the Lead Inspector will advise the Producer that a Court Order can be obtained, which will compel the Producer to provide access to the records, and that failure to comply with the Order could result in an arrest for contempt. If the Producer persists in denying access, the Lead Inspector will leave the Producer's facilities and seek a Court Order in conjunction with the

local U.S. Attorney's Office." Joyner Dec. ex. A.

42.     Upon being advised that the inspection team sought to conduct a 2257 inspection of their records, the custodian of records for one producer, Tennervision, dba Legend Video, Inc., provided SSA Joyner with a letter from the producer's attorney, Jeffrey Douglas, suggesting that none of the producers at that address were subject to inspection because they were secondary producers rather than primary producers. Joyner Dec. ¶ 11; Insp. Rpt. (Tennervision). However, when SSA Joyner expressed the view that the producer qualified as a primary producer, the custodian was "fully cooperative" with the inspection process. See Insp. Rpt. (Tennervision).

43.     While a number of inspections presented unique circumstances, in no instance did a producer demand that the inspection team obtain a court order prior to the inspection. Joyner Dec. ¶ 9; Lawrence Dec. ¶ 4; Insp. Rpts. Nor did any producer refuse entry to the inspection team. *See* Insp. Rpts. In no instance did the inspection team attempt to enter premises by force in order to conduct an inspection. *See id.*

44.     After explaining the inspection to the producer, the SSA would ask the producer where the inspection team should review the 2257 records that were the subject of the inspection. Joyner Dec. ¶¶ 9, 11; Lawrence Dec. ¶ 6. In at least two instances, the producer asked the inspection team to conduct its review of the 2257 records in the business's reception area. Joyner Dec. ¶ 12; Insp. Rpts. (Sunshine, Agency). On other occasions, the producer allowed the inspection team to sit in a break room, lunchroom, or conference room while reviewing the 2257 records. Joyner Dec. ¶ 12; Lawrence Dec. ¶ 4; Insp. Rpts.

45.     The reception areas of Sunshine and Agency were open to the public. Joyner Dec. ¶ 12. In most other instances, the inspection team did not attempt to determine whether the area where they were asked to stay during the inspection was an area that was accessible to the public

but simply conducted the records inspection in whatever area the producer indicated. Joyner Dec.

¶ 12; Lawrence Dec. ¶ 4.

46. The inspection team members did not themselves access the producer's 2257 files in order to retrieve the records for the works that they had designated for inspection. Rather, the producer would retrieve the 2257 records for the works listed on the spreadsheet that the team had prepared in advance, and would bring those records to the team. Joyner Dec. ¶ 9; Lawrence Dec. ¶ 6.

47. During the inspections, members of the team made copies of the identification documents that the producer included in its 2257 records for the performers appearing in the designated works. Joyner Dec. ¶ 10. In addition to photographing the exterior of the building and the location where the 2257 records were stored, a member of the team also photographed the room where the inspection team reviewed the 2257 records, before and after the inspection, in order to document that the team had left the room as they had found it. *Id.* The team followed and filled out the On-Site Inspection Review portion of the records review checklist for each work, indicating whether the 2257 records complied with the requirements as set forth in the 2005 Final Rule. Joyner Dec. ¶ 6 & ex. B.

48. Where a producer maintained records in digital format, the team sometimes, at the producer's option, copied the relevant records to CDs that the team provided and completed this portion of the inspection at the team's office. Joyner Dec. ¶ 13; Insp. Rpt. (Pure Play Media).

49. Of the 27 producers that were subject to 2257 records inspections, four—Darkside Productions, Diabolic, K-Beech, and Wicked—were members of Free Speech Coalition, Inc. on October 7, 2009, when this lawsuit was filed. Letter from Lorraine Baumgarder to Kathryn L. Wyer (Nov. 19, 2012). All four of these inspections occurred at commercial business premises.

Insp. Rpts. (Darkside, Diabolic, K-Beech, Wicked).

50.     In some instances not involving FSC members, the address listed on the 2257 statement for a producer selected for inspection turned out to be a Post Office Box. Lawrence Dec. ¶ 6; Insp. Rpt. (Angry Young Men, Fifth Element, JT Video). In other instances, inspections occurred at a storage unit or a residential garage because the primary producer was no longer in business and/or had transferred its records to another company. Joyner Dec. ¶¶ 15, 16; Insp. Rpts. (Don Goo, Silver Star, Moonlight). In three instances, all of them involving producers located in Florida, the address listed on the producer's 2257 statement was a residential address. Joyner Dec. ¶ 14; Insp. Rpts. (Alexislord, Real Wild Girls, Pony Boy Films). In some of these instances, the inspection team contacted the producer in advance to attempt to locate the producer's 2257 records and/or arrange a time for the inspection. Joyner Dec. ¶¶ 15-16; Lawrence Dec. ¶¶ 6-8; Insp. Rpts. (Angry Young Men, Fifth Element, JT Video, Don Goo, Silver Star, Moonlight).

51.     The inspection team made efforts to conduct the inspections in a manner "so as not to unreasonably disrupt he operations of the establishment" where the records were located. 28 C.F.R. § 75.5(c)(3); Insp. Rpts. The FBI also made efforts to reduce alarm within the adult entertainment industry after the inspections began. Joyner Dec. ¶ 18. During the first inspection, of FSC member Diabolic Video, SSA Joyner assured the owner that he was free to contact anyone, including AVN, the adult entertainment media outlet, during the inspection. Joyner Dec. ¶ 8.

52.     The FBI held two meetings at FBI Headquarters, to which representatives from the adult industry were invited. The first such meeting occurred in October 2006, and was attended by SSA Joyner as well as representatives of some of the larger producers, including

Wicked and Vivid, and their attorneys, including Jeffrey Douglas. Clay Calvert & Robert D. Richards, *Inside the FBI Inspections of Adult Movie Company Age-Verification Records*, 15 UCLA Ent. L. Rev. 55, 65 (2008); Joyner Dec. ¶ 18.  At the first meeting, the FBI indicated the inspection team would allow a minimum one-week grace period after an inspection took place, within which a producer could attempt to cure any 2257 violation, before the inspection report would be sent to the U.S. Attorney's Office. 15 UCLA Ent. L. Rev. at 69; Joyner Dec. ¶ 18. The second meeting at FBI Headquarters occurred in September 2007, and was attended by SSAs Joyner and Lawrence as well as members of the adult entertainment industry and plaintiff Thomas Hymes. Joyner Dep. ¶ 18; Hymes Dep. 47:6-48:13. At these meetings, FBI representatives explained the FBI's 2257 inspection procedures and sought input from the industry attendees. Joyner Dec. ¶ 18.

¶ 18. Hymes' impression of the meeting he attended was that it was an "[e]xtremely informative meeting" and that "the FBI agents were doing their job and were amenable to making inspections as – you know, as easy and effective as possible. That was the impression that I had." Hymes Dep. 48:17-21.

53.     In addition to these meetings, SSA Joyner also agreed to speak about the 2257 inspection process in a panel discussion at an XBIZ trade show in February 2007, organized by plaintiff Thomas Hymes soon after Hymes was hired as publisher of XBIZ. 15 UCLA Ent. L. Rev. at 67; Joyner Dec. ¶ 19; Hymes Dep. 18:8-21, 42:9-45:21. According to Hymes, "the audience was . . . very pleased with having [SSA Joyner] there and. . . they learned a lot from his answers. And so I believe that the reactions from the people who attended was very – was positive. . . . it was a very positive experience overall." Hymes Dep. 45:13-21.

54.     SSA Joyner also agreed to be interviewed about the 2257 inspections in June

16

2007 by Clay Calvert and Robert D. Richards. 15 UCLA Ent. L. Rev. at 62; Joyner Dec. ¶ 20;

An article describing this interview was published on the AVN website shortly after it occurred.

http://business.avn.com/articles/legal/FBI-Agent-Joyner-2257-Record-Keeping-Very-Poor-But-

Improving-25351.html. The article reported that SSA Joyner had provided advance notice of an

inspection "in two instances where the records were kept at private residences," though notice

was not required. *Id.*

    55.    SSA Joyner also provided his email address and telephone number to individual

producers and responded to individual inquiries. 15 UCLA Ent. L. Rev. at 67; Joyner Dec. ¶ 21.

For example, when approached by David Connors regarding a concern about the inspection team

arriving at his residence, where he kept his 2257 records, without advance notice, SSA Joyner

indicated that he would notify Mr. Connors prior to an inspection in the event Mr. Connors were

selected for inspection by the random number generator. Joyner Dec. ¶ 21.

    56.    As a result of these efforts, the FBI's general procedures for conducting a 2257

inspection were made publicly available and were well known within the adult entertainment

industry.

    57.    On October 23, 2007, a panel of the Sixth Circuit held that § 2257 was facially

invalid under the First Amendment. *Connection Distrib. Co. v. Holder*, 505 F.3d 545 (6th Cir.

2007), *subsequently vacated on rehearing en banc*, 557 F.3d 321 (6th Cir. 2009).

    58.    The next day, the 2257 inspection team was directed to cease conducting

inspections immediately. Nanavaty Dec. ¶ 9.

    59.    The inspection program ceased operations entirely in early 2008. Joyner Dec. ¶

22; Lawrence Dec. ¶ 9 & ex. A. The SSAs who had been assigned to the team were reassigned to

other positions, and the contract staff were released. Nanavaty Dec. ¶ 10; Joyner Dec. ¶ 22;

Lawrence Dec. ¶ 9.

60.    The Sixth Circuit en banc reversed the panel decision on February 20, 2009.

*Connection Distrib. v. Holder*, 557F.3d 321 (6th Cir. 2009) (en banc). However, the FBI has

taken no steps toward establishing a new inspection program, and no funding has been allocated

for this purpose. Nanavaty Dec. ¶ 11.

## V.    THE ATTORNEY GENERAL'S ADOPTION OF FREE SPEECH COALITION'S COMMENTS DURING 2008 RULEMAKING THAT A THIRD-PARTY CUSTODIAN OPTION WOULD ELIMINATE MANY BURDENS

61.    Plaintiff Free Speech Coalition ("FSC") submitted comments on the Attorney

General's Proposed Rules issued in 2007 and 2008. Douglas Dep. 131:7-12; FSC, Comments

(attached to Letter from Diane Duke to Andrew Oosterbaan (Sept. 10, 2007) ("FSC Comment").[2]

62.    In these comments, FSC repeatedly suggested that allowing producers to keep

their 2257 records with a third party custodian rather than on their own business premises would

substantially alleviate many concerns that FSC had raised. FSC Comment, at 6 ("The final rule

should also, for these and other reasons detailed in other sections, provide that third-party

custodians may maintain original records at their own places of business on behalf of primary

and secondary producers simultaneously."); 15 ("If, for instance, third-party agents were

permitted to act as records custodians at their own places of business, properly disclosed by the

required statement – the record-shifting problem would be resolved. . . . The record-shifting

burdens could be eliminated entirely and the record-keeping burdens could be minimized by

concentrating those burdens on third-parties who are ready, willing, and technically able to

receive the required basic information from primary producers and then organize it, maintain it,

---

[2] FSC submitted three other documents as part of its comments on the 2007 and 2008 Proposed Rules, which are not included in the excerpt attached hereto.

and make it available for proper inspection."); 16 ("All that would be necessary to permit such a system is for section 75.4 of the final rule to provide that the required records may, at the producer's discretion, be maintained at a competent third-party custodian's place of business, properly designated in the disclosure statement."); 19 (any problem making 2257 records available 20 hours/week "could, of course, be eliminated entirely by alternative compliance procedures such as . . . that involving third-party record keepers."); 22 ("the burdens and chills imposed by the disclosure requirements could be substantially reduced – or eliminated entirely – simply by permitting third-party records custodians to maintain records at their own business premises.").

63.     In response to these and other such comments, the Attorney General adopted a third party custodian option in the 2008 Final Rule, which remains in effect. *See* 28 C.F.R. § 75.4; 73 Fed. Reg. at 77445.

## VI.   PLAINTIFFS' PRODUCTION OF MATERIAL SUBJECT TO THE 2257 REQUIREMENTS

### A.   Free Speech Coalition

64.     Plaintiff FSC is the trade association for the adult entertainment industry. Am Comp. ¶ 18.

65.     FSC does not produce depictions of sexually explicit conduct. Douglas Dep. 42:19-21 ("Q: Is Free Speech Coalition a primary producer? A: No."), 45:6-8 ("Q: And Free Speech Coalition is not a secondary producer? A: That's correct.").

66.     FSC raises its as-applied claim on behalf of its members, who are "commercial producers of sexually explicit expression." Am Compl. ¶ 19.

67.     Anyone in the adult entertainment industry can become a FSC member. Douglas
Dep. 26:3-5. There is no objective definition of "adult entertainment industry." *Id.* 35:18-20
("[T[he adult entertainment industry is made up of people who view themselves as being
members of the adult entertainment industry."). There are no objective criteria for being a
member of FSC. *Id.* 37:15-18 (FSC is unlikely to reject anyone as a member "on the ground that
that entity or person was not a part of the adult entertainment industry").

68.     FSC does not monitor "its members' production activities in order to evaluate
whether they are in fact using only performers 18 or over." Douglas Dep. 198:11-15. FSC does
not require its members to enter into a contract requiring them to use only performers 18 or over.
*Id.* 198:16-18. FSC has no way "of knowing the ages of performers that appear in depictions
produced by [its] members." *Id.* 198:6-10. However, FSC estimates that "in all likelihood there
are more than 1000 depictions" of individuals engaged in sexually explicit conduct, produced by
FSC members, in the following age categories: 18-25, 26-35, 36-45, 46-55, 56-65, over 65, "save
perhaps for" the "over 65" category. FSC Resp. to Int. 9; Douglas Dep. 196:8-16.

69.     FSC has identified the following individuals and entities as FSC members: David
Connors, plaintiff Marie Levine, plaintiff Townsend Enterprises (d.b.a. Sinclair Institute), Vivid
Video Pictures, Wicked Pictures, Diabolic Video Productions, Darkside Entertainment, and K-
Beech. Douglas Dep. 48:18-49:4; Letter from Lorraine Baumgardner to Kathryn L. Wyer (Nov.
19, 2012); FSC Resp. to Int. 5.

70.     Connors produces images of sexually explicit conduct that depict individuals
between the ages of 18 and 25. FSC member David Connor's Resp. to Int. No. 9 (101 out of 217
performers (47%) depicted in his videos are between the ages of 18 and 25).

71.     Vivid Video produces images of sexually explicit conduct that depict individuals between the ages of 18 and 25. FSC produced copies of "talent releases" for individuals appearing in 25 of Vivid's sexually explicit DVDs. Declaration of Adriana Vecchio ¶ 4(A). One hundred out of 44 performers (40.98%) depicted in those videos were between the ages of 18 and 25 at the time of production. *Id.* ¶ 6.

72.     Diabolic produces images of sexually explicit conduct depicting young individuals, including DVDs with titles such as "Spring Chickens #9" and "Teens with Tits #5." Insp. Rpt. (Diabolic), FBI_000013-17.

73.     K-Beech produces images of sexually explicit conduct depicting young individuals, including DVDs with titles such as "18 & Lost in Las Vegas," "18 and Lost in Chicago," "18 and Lost in New York," "G-strings and Bobby Socks," and "Naughty Young Nurses." Insp. Rpt. (Darkside), FBI_001046-48.

74.     FSC brought an earlier challenge to § 2257 in the District of Colorado. *FSC v. Gonzales*, No. 05-cv-1126 (D. Colo.). During one stage of that case, the government agreed not to take enforcement action under § 2257 against any individual or entity that was a member of FSC by a specified date. Douglas Dep. 98:11-99:10. Approximately 2000 individuals and/or entities became new members of FSC prior to the cutoff date. *Id.* 99:11-17. Currently, FSC has around 800 members. *Id.* 25:3-5. It is likely that, if the 2257 requirements were held unconstitutional as applied to FSC members, FSC membership would similarly skyrocket.

**B.     Barbara Alper**

75.     Plaintiff Barbara Alper is a commercial photographer whose current work focuses on, among other things, people, food, clubs, fashion, and gardens. Alper Dep. 11: 21-24. Beginning in 1981, Alper started taking photographs of sexually explicit conduct at various clubs

21

around the world, including the Hellfire Club in New York City. *Id.* 12:10-14:25. Specifically, Alper photographed club-goers engaged in sadomasochism ("S&M"). *Id.* 16:4-18.  During this time, Alper did not inquire about the ages of the persons she photographed, instead relying upon the clubs to enforce their policies of not permitting people younger than 21 to enter and her own determination of a person's age based on appearance. *Id.* 16:19-18:9. Alper stopped taking pictures of S&M in 1995, when several clubs closed due to the AIDS crisis. *Id.* 20:5-8; 48:17-24. Her decision to stop taking S&M photographs was unrelated to the requirements of 18 U.S.C. § 2257. Alper Dep. 48:25-49:4.

76.     Although many of the images Alper took of S&M conduct between 1981 and 1995 have already been sold or collected, Alper now "would like" to produce a compilation of images she has produced over the span of her career, including her S&M work. Alper Dep. 35:13-36:9; 42:5-9. Alper contends that § 2257 precludes her from including any pre-1995 images of sexually explicit conduct in a compilation because she is unable to locate the persons depicted in the images and, even if she were able to do so, she believes that "they might well be expected to refuse to provide" her with photo identification. Alper Resp. to Int. 10.  Despite stating that she has a "plan" to publish a cumulative body of her work, *id.*, Alper has not contacted a publisher about a compilation project. Alper Dep. 46:5-8.

77.     Alper has also expressed a desire to photograph men having anonymous sex on Fire Island but believes they would be unwilling to provide her with identification. Alper Dep. 42:16-43:5. In addition, Alper is concerned that under § 2257, information obtained from persons depicted in images of sexually explicit conduct "could be made public." Alper Dep. 26:22-27:9. Alper, however, has not attempted to ask permission to photograph any of the individuals she says she has witnessed engaging in anonymous sex. *Id.* 69:22-70:13.

78.     Alper cannot identify the age of an individual without checking identification. Alper Dep. 70:14-18 (Alper could not determine whether individuals having anonymous sex on Fire Island are 18 or older without checking their identification); *id.* 84:7-14; 86:21-24 (Alper "probably" cannot distinguish between a 17-year-old and an 18-year-old or between a 25-year old or a 30-year old based on appearance alone).

79.     There are no objective criteria by which Alper could be identified as someone who should be exempt from the 2257 requirementst. Rather, Alper expresses her subjective view that she is "totally opposed" to child pornography and has no interest in photographing people younger than 18. Alper Dep.  84:18-22.

### C.     American Society of Media Photographers ("ASMP")

80.     Plaintiff ASMP is trade association for photographers. Am. Comp. ¶ 21. The mission of ASMP is to "protect and promote the interests of working publication photographers." Mopsik Dep. 17:2-5. ASMP is the "leader in business and rights education for photographers" and organizes seminars and programs for photographers around the country "promoting various aspects of business practices for working photographers, along with trying to educate photographers regarding . . . copyright issues, and the value of their [intellectual property] rights." *Id.* 17:18-18:3.

81.     ASMP has never provided any information to its members about 18 U.S.C. §§ 2257 or 2257A, or guidance on how to comply with the 2257 requirements, except for one article that appeared in its year end bulletin in 2012, discussing this litigation. Mopsik Dep. 45:11-20, 46:9-13; Victor S. Perlman, Free Speech Coalition et al. v. Holder, *ASMP Bulletin* (Year End 2012) ("ASMP Bulletin").

82.     ASMP members include both still photographers and motion (video/film)

23

photographers. Mopsik Dep. 10:18-11:4, 11:17-19. Most photographers today primarily use digital means of taking or capturing an image. *Id.* 10:8-9, 15-17.

83.     ASMP members have no specialized training in age verification. They are unable to determine individuals' ages without checking identification. Mopsik Dep. 55:10-13 ("Q: Is it ASMP's position that it's possible to determine a person's age by visual observation? A: I would say not in all cases, no. Some people appear younger than others.").

84.     ASMP is not aware how many of its members currently maintain records under 18 U.S.C. §§ 2257 or 2257A. Mopsik Dep. 45:6-9. ASMP estimates that its members have produced more than a thousand depictions of sexually explicit conduct that depict individuals in each of the following age ranges: 18-25, 26-35, 36-45, 46-55, 56-65, over 65. ASMP Resp. to Int. 9. ASMP has no way to determine whether the universe of depictions of sexually explicit conduct produced by ASMP members contains more depictions of individuals in one age range, as compared to another age range. Mopsik Dep. 57:16-58:25.

85.     ASMP undertook a survey by e-mail in September 2012 in which it asked members to identify whether they had "ever made photographs showing nude or seminude subjected or showing actual or simulated sexual conduct." *ASMP Bulletin*, at 16. Although ASMP received 400 responses to this inquiry, it has identified only one ASMP member, Craig Morey, in addition to plaintiff Barbara Alper, as producing depictions of sexually explicit conduct that are representative of ASMP members' work subject to the 2257 requirements. ASMP Resp. to Int. 5. ASMP produced IDs and model releases for 30 women appearing in Morey's sexually-explicit work. Vecchio Dec. ¶ 4(b). Sixty-one percent of these women were 25 years old or younger, and 33% were 21 years old or younger. *Id.* ¶ 6.

86.     Producers who are part of the adult entertainment industry may also be ASMP

members. Mopsik Dep. 38:1-6. ASMP "assume[s] that . . . there are a small number of ASMP members who actually contribute to the adult film or adult entertainment industry." *Id.* 37:18-22. Nothing prevents more producers in the adult entertainment industry from joining ASMP in the future. *Id.* 80:6-8.

87.     There are no objective criteria by which ASMP members could be identified as properly exempt from the 2257 requirements. There is no objective way to identify an image as "journalistic" or "artistic," as opposed to "pornographic," based on the creator's asserted identity as a journalist or artist. Hymes Dep. 134:13-136:3 ("Q: Who decides whether someone is a journalist or not? A: I don't have that answer. I'm not sure that there is an answer to that. . . . there is no one who makes the final determination that someone is a journalist."); Steinberg Dep. 38:9-40:20 ("Q: Can you identify any objective differences between your photographic work and what could be called 'amateur photography'? . . . [A:] Objective differences, no. . . . I don't think there are any."), 128:13-15 ("Q How do you know whether someone is a fine art sexual photographer? Well, you don't."); *see also* Mopsik Dep. 38:1-6, 79:14-80:8) ("[Q:] nothing prevents someone who produces adult films from being an ASMP member, correct? A: Correct." and acknowledging that if ASMP were to prevail in its as-applied challenge, hardcore pornography producers could become ASMP members).

### D.  Betty Dodson and Carlin Ross

88.     Plaintiff Betty Dodson has been teaching women about orgasms for the last 40 years. Dodson Dep. 6:10-12. She has produced sexually-explicit images and DVDs in connection to this work. *Id.* 6:13-21. Dodson received an honorary Ph.D. in human sexuality from a "private school in San Francisco" in 1994. *Id.* 10:8-11, 11:13-17.

89.     Plaintiff Carlin Ross is an attorney who graduated from Brooklyn Law School in 1998.  Ross Dep. 6:12-16. After a few years doing corporate legal work in New York City, Ross began blogging about female sexuality and relationships. Ross Dep. 7:10-8:17. Ross met Dodson in 2005 or 2006 and soon thereafter began working with Dodson. *Id.* 10:21-25; 26:13-16.

90.     In 2007 or 2008, Dodson founded a limited liability company called Bad Media, LLC. Dodson Dep. 6:25-7:13; Ross Dep. 12:17:20. Ross is the president of this company. Ross Dep. 12: 17-20. This company owns a website called www.dodsonandross.com. Ross Dep. 12:10-14. Ross is the editor-in-chief of the website. *Id.* 11:2-5. Dodson answers sex questions submitted to the website by the public. Dodson Dep. 6:4-8.

91.     The website managed by Dodson and Ross includes a Genital Art Gallery ("GAG"). Dodson Dep. 13:4-6. The GAG was started by Dodson in the 90s and was published in her old website. Ross Dep. 47:22-25.  Dodson asked people to send images of their genitals and write a brief essay about their sexual history. Dodson Dep. 18:14-19. The purpose of the GAG was to show real genitals, as opposed to the genitals depicted in porn. *Id.* 18:20-19:11. According to Dodson, in porn female genitals are altered "for the boys' taste" and women "all end up looking like little dolls." *Id.*  In addition, the males are chosen because "they've got big dicks, and this does not represent the population in terms of their genitals." *Id.* Currently, the GAG has approximately 200 images of genitals. Ross Dep. 47:13-15. Dodson and Ross do not keep § 2257 documents for the vast majority of the images in the GAG because most were submitted before 2009, when § 2257 was amended to apply to images consisting of lascivious exhibition genitals. Ross Dep. 47:18-48:6.  Dodson and Ross now require people who submit an image to the GAG to include a copy of their ID.  *Id.* 48:7-9.

92.     Before partnering with Ross, Dodson produced several sexually explicit DVDs. Ross Dep. 26:16-19.  Since 2005, Dodson and Ross have produced 3 sexually-explicit DVDs. Ross Dep. 25:10-15. Besides these videos, there are other sexually explicit video clips available on their website. Ross Dep. 31:5-35:24.

93.     The age range of individuals depicted in the GAG is 20-83.  Dodson & Ross Resp. to Int. No. 9; Ross Dep. 64:3-7. The age range of individuals appearing in 5 of their DVDs is 20-68.  Dodson & Ross Resp. to Int. No. 9. In discovery, Dodson and Ross produced 20 IDs of individuals appearing in their images. Vecchio Decl. ¶ 4(C). Based on that production, twenty-five percent (25.00%) of the individuals appearing in their work were 25 years of age and younger. *Id.* ¶ 6.

94.     The images on the GAG consist of depictions of isolated body parts. Dodson Dep. 18:14-19:11. It is not possible to determine a person's age based on a photograph of the person's genitals. Dodson Dep. 68:7-16 (indicating photo of genitals "could be a young woman" but assuming that individual is over 18 due to piercing).

95.     Dodson and Ross cannot identify the ages of individuals without checking identification. Dodson Dep. 48:20-49:5 ("I'm not an expert at telling age."), 43:21-44:20 (it could be difficult to tell someone's age by looking at them because of "the way they're dressed, their mannerisms, their speech, overall demeanor, sophistication" and because "[y]ou can't go on" breast development to determine age), 45:5-47:3; Ross Dep. 41:15-22 ("Because [porn stars] always have such large breasts, and I don't know if I could distinguish between 20 and 30.").

96.     There are no objective criteria by which Dodson and Ross could be identified as individuals properly exempt from the 2257 requirements.

**E. Thomas Hymes**

97.     Plaintiff Thomas Hymes is a journalist in the adult entertainment industry and has

worked for the two major adult entertainment industry media outlets AVN and XBIZ. Am.

Compl. ¶ 29; Hymes Dep. 6:18-7:6, 15:9-25, 19:23-20:3. For approximately a year and a half,

starting in 2004, Hymes was Communications Director for plaintiff Free Speech Coalition,

where his role was more of an advocate than a journalist. Hymes Dep. 10:8-11, 13:17-21. He left

FSC in 2006 to become publisher of XBIZ. Id. 15:9-20. Between 2008 and 2012, Hymes was

also on the Board of Directors of Free Speech Coalition. Id. 111:2-8.

98.     In 2008, Hymes left his full-time position at XBIZ and was unemployed, picking

up regular freelance work from both AVN and XBIZ for around nine months between 2008 and

2009, as the economy weakened. Hymes Dep. 25:1-18.

99.     During that period, in April 2009, Hymes and two partners began a new website

project called Daily Babylon, which they hoped to "monetize and maybe develop into something

that could actually support us so that we could do our own thing." Hymes Dep. 50:11-25.

However, one of the partners, who was the CEO, left "because of his problems with his other

company." Id. 52:1-7. His other partner also left. Id. 52:8-16. Thus, within a six month period,

the project failed. Id. 52:22-25 ("[W]e tried to get this thing off the ground. We couldn't do it.");

65:1-22.

100.     At that point, in late 2009, Hymes was facing bankruptcy. Hymes Dep. 144:18-

145:14. He then got a full-time job back at AVN. Id. 65:22-66:1. After that, Hymes stopped his

work on the Daily Babylon site because "it's impossible for me to do this at AVN and then also

do it [with Daily Babylon]. I can't." Id. 55:5-9; id. 52:17-22 ("once I got to AVN, I was the only

person covering the online industry. It was just – if I could post up something, a story or two to

Daily Babylon even during the week with everything that I had to do, I was lucky to do that."). Hymes is now working 60 or 70 hours per week at AVN. *Id.* 146:3-6. Although he has a notion that he would like to resume work on the Daily Babylon site, his lack of time has been a factor that has prevented him from working on the site in the past, and he does not know whether that will change. *Id.* 146:7-15.

101.    The most recent stories published in the various sections of the Daily Babylon site are as follows: Politics & Law: August 23, 2009; Money: April 9, 2011 (the only story published since October 27, 2009); Culture & Society: April 19, 2011 (a total of two stories published since October 7, 2009); 'Tude: April 20, 2011 (a total of four stories published since October 11, 2009); Adult Biz: April 22, 2011 (the only story published since August 4, 2009). *See* http://dailybabylon.com (last visited April 6, 2013).[3] Thus, Hymes has published a total of eight stories on the Daily Babylon site during the three and a half years that have passed since late October 2009, and no stories for the past two years. *See id.*

102.    Hymes has never produced visual depictions of sexually explicit conduct. Hymes Dep. 66:12-14, 69:19-22. He has never kept records under the 2257 requirements. *Id.* 66:2-8.

103.    Hymes suggests that, if he were actively working on the Daily Babylon site, he might want to use sexually explicit images that he received as promotional material in order to illustrate a story, but that he would not do so because he does not wish to comply with the 2257 requirements. Hymes Dep. 68:17-69:18. However, Hymes has no concrete plan to use such material, even if he were working on Daily Babylon. *See id.* ("I would probably be a lot more open to using images that I am now unwilling to contemplate using"). Indeed, Hymes is not

---

[3] When counsel for defendant attempted to access the site on May 8, 2013, the site could not be accessed, and it was not possible to determine whether the site is still in existence.

receiving very much marketing material anymore because the Daily Babylon site is "more or less moribund." *Id.* 130:21-131:4.

104.    If Hymes were to resume work on Daily Babylon, and were to start receiving promotional materials again, he does not know what topics he would write about, or what promotional materials he might receive. Hymes Dep. 129:12-130:6, 131:13-132:13. He therefore cannot predict the ages of the individuals engaged in sexually explicit conduct whose images he may wish to post on his website. *See id.*

105.    Hymes cannot identify the age of an individual without checking identification. Hymes Dep. 88:14-16 ("Q: Can you tell by looking at these individuals what their ages are?" "A: No.").

106.    There are no objective criteria by which Hymes could be identified as someone who should be exempt from the 2257 requirements. While Hymes considers himself a journalist, he has received no formal education in journalism, nor was he required to obtain a license to become a journalist, nor was he required to enter into any contract that requires him to follow particular "journalistic codes and standards." Hymes Dep. 133:21-134:9. Not everyone "who writes a lot of articles [is] a journalist," but "there is no one who makes the final determination that someone is a journalist." *Id.* 134:10-135:8. Hymes cannot articulate the difference between someone who is a journalist and someone who is not but would have to make the determination on a case-by-case basis. *Id.* 135:6-136:3.

###    F.    Marie Levine

107.    In 1984, Plaintiff Levine (a.k.a. Nina Hartley) appeared in her first sexually-explicit ("porn") video, "Educating Nina." Levine Dep. 9:1-10:1. Since 1984, Plaintiff Levine has performed in "many hundreds" of porn videos. *Id.* 16:8-18:9. She is considered an adult film

star. *Id.* 18:10-12. Levine developed the notion that she wanted to perform in porn movies when she was 17. *Id.* 14:14-15:8.

108.    According to Levine, the adult film industry was smaller in 1984 than it is now. Levine Dep.18:13-19:25. Although in 1984, one "could actually know most everyone in [the industry]," this is "[n]ot true nowadays." *Id.* 19:8-15; 20:1-21:12.

109.    Levine is now 54 years old. Levine Dep. 21:14-15. Her age "makes her a rarity in the porn industry." *Id.* 31:14-32:1. She stated that she has "been technically a MILF now for 15 years." *Id.* 24:15-16.  The terms "MILF" and "cougar" in the adult industry are used to describe "[o]lder women that other people consider attractive." *Id.* 24:12-25; 41:10-16.

110.    Besides performing in sexually explicit videos, Levine also produces sexually explicit content that appears on her website www.nina.com.  Levine Dep. 60:12-15. When she is able, she gets "willing performers over to [her] place and … [they] do the paperwork and shoot content" for her website. *Id.* 60:19-23. Levine meets the performers for her web shows on paid movie sets or at industry events. *Id.* 86:2-16. Levine does not believe that she has employed performers under 21 for her web shows. *Id.* 122:24-123:5. Levine, however, does not rule out performing with people between 18 and 20 in her web shows. *Id.* 123:15-18. In discovery, Levine produced 66 IDs of individuals appearing in her work. Vecchio Dec. ¶ 4(D). Based on that production, twenty-four percent (24.24%) of the individuals appearing in her work were 25 years of age or younger. *Id.* ¶ 6.

111.    Levine does not personally manage her website. Levine Dep. 66:3-5. Instead, a company called PremiumCash manages her website. *Id.* 66:6-7. PremiumCash is a company located in Montreal, Canada. *Id.* 76:15-16. Levine records the web shows and provides them to

PremiumCash, which decides when to upload them to her website. *Id.* 68:7-24; 73:17-74:19. PremiumCash also acts as Levine's custodian of records for § 2257 purposes. *Id.* 77:2-4.

112.    PremiumCash links other sexually-explicit content to Levine's website. Levine Dep. 88:15-90:13. The sexually explicit content that PremiumCash currently has linked to Levine's website includes women that look to be in their 20s. *Id.* 90:7-95:19. There are also "Teen Webcams" linked to Levine's website. *Id.* 102:1-23. Levine gets some of the revenue generated by the content that PremiumCash links to her website. *Id.* 96:25-16; 102:18-20.

113.    Levine cannot identify the age of an individual without checking identification. Levine Dep. 47:3-4 ("I don't think you can tell exact ages by looking at pictures.").

114.    There are no objective criteria by which Levine could be identified as someone who should be exempt from the 2257 requirements.

### G.    David Levingston

115.    Plaintiff Levingston has been a professional photographer for approximately 40 years. Levingston Dep. 12: 17-24.  He began his photography career as a photojournalist for the federal government. *Id.* 8: 23-24.  He then worked in the public affairs offices of various military bases until retiring from the federal government approximately six years ago.  *Id.* 10: 12-15. Levingston has several photographic interests, such as documentary work, reported or reportage, *id.* 16:10-14, and "dance photography," *id.* 22:6-12.

116.    In 2002, Levingston started focusing on photographing nude women. Levingston Dep. 16:15-24.  In 2005, Levingston published the book *The Figure in Nature*, which generally depicts nude women in natural settings. *Id.* 15:15-18. Levingston has continued producing photographs such as those appearing in *The Figure in Nature*. For example, in his deposition, Levingston identified two similar photographs that he took in 2012 and one that he took

32

approximately three years ago.  *Id.* 101:7-23 (DL 8, 9, and 10). These photographs are representative of Levingston's nude work. *Id.* 93:10-13. Levingston does not consider that these photographs, which are similar to those appearing in his book *The Figure in Nature*, are subject to § 2257 or § 2257A. *Id.*  92:16-93:13; 100:9-15; 102:3-10. Accordingly, he does not keep § 2257 records for these and similar photographs. *Id.* 102:1-10. Levingston has produced "hundreds of thousands" of this kind of photographs. *Id.* 93:10-16. He estimates that, since 2002, he has photographed approximately 250 nude models. *Id.* 30:24-31:20. Levingston's photography work is not a significant source of income. *Id.* 11:6-10.

117.    During the 2005-2009 time period, Levingston produced a small number of photographs depicting nude women that he considers would have fallen under § 2257A had it been in effect. *Id.* 115:18-116:7. Levingston produced a list of 18 models who have appeared in images that, according to him, contain simulated sexually explicit material that would have been subject to § 2257A. *Id.* 115:18-116:13 (DL 12). These images constitute a "very small amount" of Levingston's photography work.  *Id.* 14:15-19. Levingston does not know if any of these photographs were published, although he thinks some of them were exhibited in galleries. *Id.* 134:16-22.

118.    In discovery, Levingston produced 270 IDs of individuals appearing in his work. Vecchio Dec. ¶ 4(E). Forty-four percent (44.07%) of the individuals depicted in the associated work were 25 years of age and younger. *Id.* ¶ 6.

119.    Levingston claims that when § 2257A took effect on March 18, 2009, he stopped producing any simulated sexually-explicit work. *Id.*  14:13-14.  According to Levingston, he stopped producing this kind of work because he did not want to be subject to warrantless searches, he could not be available at least 20 hours a week for inspections, and he does not

believe that he could keep records in the manner required by the statutes. *Id.* 109:18-22.

However, Levingston did take 1164 photographs of one model in November 18, 2009, that,

according to him, would fall under § 2257A.  *Id.*  133:1-12 (DL 12). Levingston has also

continued producing nude photography despite the enactment of § 2257A. *Id.* 84:24—85:12;

149:7-12. Although Levingston claims that § 2257A has prevented him from making some

nudes, *Id.* 85:9-12, there is no particular, concrete project that he has decided not to do because

of § 2257A. *Id.* 86:8-15.

120.     Recently, Levingston announced in his Model Mayhem[4] profile that he "has

changed the direction of [his] work and [is] no longer seeking new models. The bulk of my new

work does not involve models." *Id.* 135:19-136:3. During his deposition, Levingston explained

that he is no longer using models because he has "two new projects that are the primary

emphasis of my work right now." *Id.* 137:18-22. The first project is to document the culture and

environment in old newsrooms by "photographing and interviewing the people who worked in

that kind of a newsroom and getting their stories captured in tapes and pictures of them."  *Id.*

19:5-12. The second project is "photographers today as a reaction to … digital photography." *Id.*

20:3-5. "[N]obody gets naked in th[e] pictures" he is creating for either of these projects. *Id.*

138:7-14. Levingston did not decide to shift his attention from nudes to these two new projects

because it was burdensome to do nudes. *Id.* 138:15-18. Rather, Levingston felt that he has "done

was [he] set out to do with [nudes]."  *Id.* 21:8-12. Although Levingston said he is "not done"

with nude work, *Id.* 21:12-13, he thought it was "time to do some different things." *Id.* 22:1-4.

Levingston estimates that these two new projects will take him "a decade" to complete. *Id.* 18:4-

---

[4] Levingston described Model Mayhem as a site "where models and photographers show their
work and a place for models to find work and photographers to find models."  *Id.*136:4-7.

8. Levingston does not have any concrete plans to do nude or sexually-explicit work. *Id.* 22:13—23:21; 24:4-7.

121.    Levingston cannot identify the age of an individual without checking identification.Levingston Dep. 179:20-22, 180:1-8 (indicating that the way not to confuse an 18 year old or a 19 year old with a minor would be to "check[] their ID" and that he probably could not distinguish a 17-year-old from a 19-year-old by looking at them).

122.    There are no objective criteria by which Levingston could be identified as someone who should be exempt from the 2257 requirements. Steinberg Dep. 128:13-15 ("Q: How do you know whether someone is a fine art sexual photographer? A:Well, you don't.")

**H.    Barbara Nitke**

123.    Barbara Nitke is a professional photographer who makes her living through photography. Am. Comp. ¶ 40; Nitke Dep. 118:16-18. Her work involves both commercial photography—consisting primarily of television stills and corporate photography such as portraits of lawyers for law firms, as well as event and fashion photography—as well as fine art projects. *Id.* 119:16-120:3, 123:9-124:25.

124.    Nitke has undertaken fine art projects that have included the creation of depictions of sexually explicit conduct. In the past, these projects have focused on still depictions taken on hardcore pornography film sets, still depictions taken on fetish pornography film sets, and photographs of individuals in the BDSM (bondage-discipline, dominance-submission, sado-masochism) community. Nitke Dep. 20:8-21:6, 21:22-25, 22:13-19, 25:3-26:14, 27:3-10, 64:7-16. Currently, Nitke is focused on a project that she calls Smooth Hotels, which she began in 2008. *Id.* 55:19-56:14. In the course of working on the Smooth Hotels project, from 2008 to the present, she has photographed 20 individuals engaged in sexually explicit conduct. *Id.* 63:10-20.

35

Between 2005 and 2007, while Nitke was still involved in photographing individuals in the BDSM community, she photographed at most 17 different individuals engaged in sexually explicit conduct. *Id.* 57:6-58:15.

125.   After Nitke finishes the Smooth Hotels project, she may undertake a new project. Nitke Dep. 64:17-20. She cannot predict what that project will be or the population of individuals that might be depicted in photographs that she might take for such a future project. *Id.* 64:21-65:10. It necessarily follows that she cannot predict the age range of these as-yet unknown individuals.

126.   Nitke cannot identify the age of an individual without checking identification.

127.   There are no objective criteria by which Nitke could be identified as someone who should be exempt from the 2257 requirements. Rather, Nitke expresses her subjective view that she "would never photograph anyone under the age of 18 doing anything sexual or SM ." Nitke Dep. 99:16-100:2; *see also* Steinberg Dep. 38:9-40:20 128:13-15 ("Q How do you know whether someone is a fine art sexual photographer? Well, you don't.").

**I.     Carol Queen**

128.   Plaintiff Carol Queen is the founding and current director of the Center for Sex and Culture in San Francisco, California. Queen Dep. 16:3-5. The Center for Sex and Culture is a small, non-profit organization that maintains a library, archive and gallery on sexually related topics. *Id.* 16:8-13).  The Center for Sex and Culture also offers sexual education classes, sex-related cultural programming as well as benefits to raise funds to allow the Center for Sex and Culture to remain in business. *Id.* 16:13-16. As for sexually explicit materials produced, Queen testified that the Center for Sex and Culture has two activities that fall under the purview § 2257 – an annual Masturbate-a-thon and a currently inactive photo club. *Id.* 21:12-15.  Queen also

testified that she personally produces collage artwork that, if published, might implicate § 2257 because her collages contain sexually explicit components. *Id.* 21:7-9.

129.    The Masturbate-a-thon is an annual event put on by the Center for Sex and Culture that began in 2001 and will next held in May 2013. *Id.* 28:23-25, 43:8-11, 44:3-13. It is a charity event, comparable to a walk-a-thon, only involving masturbation. *Id.* 29:2-4. From the years 2005 – 2010, part of the event involved live streaming the Masturbate-a-thon to the internet where viewers could watch people masturbating or watch other activities associated with the event, like interviews. *Id.* 33:1-13, 37-39.  The Masturbate-a-thons are meant to be a one-time event and when it was live streamed to internet, no permanent recording was made and the Center for Sex and Culture has never and will never rebroadcast a Masturbate-a-thon. *Id.* 39:5-40: 25. The Masturbate-a-thon has not been publicly broadcast the previous two years and there are no plans to broadcast it in the future. *Id.* 33:4-13, 44:3-15, 68:11-12). This is due to the fact that the venue for the event changed in 2010 and live streaming became impractical as the current venue is too small to accommodate live streaming. *Id.* 33:4-9. Section 2257 has never prevented Queen or the Center for Sex and Culture from hosting or live streaming a Masturbate-a-thon. *Id.* 47: 6-11.

130.    People under 25 have attended the Masturbate-a-thons. Queen Dep. 88:2-10 (estimating their number at ten percent or fewer).

131.    The purpose of the photo club at the Center for Sex and Culture was to hold photography classes that would bring together beginner photographers with more experienced photographers in a group setting where photographic principles and techniques could be taught. Queen Dep. 21:23-25-22:7. Part of the club involved learning to take pictures of models who might be nude or engaging in sexually explicit behavior. *Id.* 22:4-7.  The Center's photo club is

currently inactive and has not met since the summer of 2012. *Id.* 21:15-22.  The photo club was suspended due to lack of interest and there are no current plans to revive the club. *Id.* 22:18-23.

132.    As for the erotic collage art created by Queen, that generally involves arranging clippings from explicit art, books on fine art, or found images into an art piece. Queen Dep. 25:18-25- 26:1-9. Typically, Queen might create a few pieces of sexually explicit art in a year, but she testified that she does not do a lot of them. *Id.* 26:2-4.  Queen has not created a piece of sexually explicit art in approximately a year and a half. *Id.* 26:10-17.  She has not created any new art in the previous year and a half because she has not been inspired to create art, nor has she had the time. *Id.* 26:18-22.  Compliance with § 2257 has not prevented Queen in the past from creating artwork when she was moved to do so. *Id.* 26:16-18.

133.    Queen cannot identify the age of an individual without checking identification. Queen Dep. 79:5-23 ("One of the reasons to check IDs is because that takes some of the guesswork out of figuring out how old someone is, yes.").

134.    There are no objective criteria by which Queen could be identified as someone who should be exempt from the 2257 requirements. Rather, Queen asks the Court to create an exception based on the notion that "The Center for Sex & Culture is an 18-and-over venue." Queen Dep. 66:8-22.

### J.    Sinclair Institute

135.    Plaintiff Townsend Enterprises does business as the "Sinclair Institute." Wilson Dep. 42:5-11. The Sinclair Institute is a company producing sexually-explicit material that addresses adult sexual health and education. *Id.* 20: 5-11. It was founded in 1993 by employees of Phil Harvey Enterprises, Inc. ("PHE").  *Id.* 94:22-95:12. PHE has several companies that produce sexually-explicit material, including Adam & Eve. *Id.* 17:19-20; 25:1-20. Phil Harvey is

an officer and part owner of the Sinclair Institute. *Id.* 18:11-22. The president of the Sinclair

Institute, Patrick Smith, reports to Phil Harvey and David Groves, who is the CEO of PHE. *Id.*

35:2-4; 93: 10-17. The Sinclair Institute is located in Hillsborough, North Carolina. *Id.* 15:21-

16:3.

136.    Sinclair Institute's videos depict sexual intercourse, oral sex, and display of the

genitals, among other sexually explicit conduct. Wilson Dep. 31:16-32:5. These videos are

recorded in a studio in California. *Id.* 43:3-11. The director of production of Sinclair, Kathy

Brummitt, collects copies of the IDs and model releases of the performers in California and

brings them over to North Carolina, where Linda Diane Wilson processes the paperwork for §

2257 purposes. *Id.* 42:15-45:20. Sinclair stores its § 2257 records digitally on a server bought by

PHE.  *Id.* 23912-25. This server includes § 2257 records for other PHE companies, including

Adam & Eve, Adam Male, and Temptation Parties. *Id.* 240:1-241:11.

137.    The Sinclair Institute sells the videos it produces on its two websites:

www.sinclairinstitute.com and www.bettersex.com. Wilson Dep. 96:19-25. The Sinclair Institute

also sells its videos and other products through its print catalogues. *Id.* 269:13-17.  From 2005-

2009, the Sinclair Institute had approximately $53 million in gross revenues from the sale of its

videos. Sinclair Resp. to Int. No. 21.

138.    Through its websites and catalogues, the Sinclair Institute also sells sexually-

explicit videos from many other companies. Wilson Dep. 95:16-20; 269:13-17.  Several of the

sexually explicit movies that the Sinclair Institute sells are described as depicting "Young (18+)"

performers. *Id.* 135:24-139:1; 146:9-21; 176:5-22.

139.    The Sinclair Institute does not have "a kind of ageism" with respect to the

performers it employs for its videos. Wilson Dep. 150:22-25. For example, it does not restrict the

individuals appearing in its films to people over 30. *Id.*  151:11-14. The Sinclair Institute

employs performers as long as they are 18. *Id.* 151:1-152:4; 226:23-25.

140.    The Sinclair Institute cannot identify the age of an individual without checking

identification. Wilson Dep. 136: 2-10; 140: 25-141:10 (30b(6) representative of the Sinclair

Institute, admitted that she could not tell the age of one of  the individuals depicted on the box

cover of one of the sexually explicit videos ("Teach Me") that Sinclair sells on its website, and

that she would need the person's ID to know the exact age), 148:8-149:14 (admitting that she

may not be able to tell the difference between an 18 and a 17 year old).

141.    There are no objective criteria by which the Sinclair Institute could be identified

as an entity that should be exempt from the 2257 requirements. Rather, Sinclair's representative

simply asserts that "I know that our company is an adult company and we only use adults."

Wilson Dep. 226:23-25.

### K.    David Steinberg

142.    David Steinberg is a professional photographer who photographs couples having

sex. Am. Comp. ¶ 44. Steinberg also takes photographs containing depictions of sexually explicit

conduct on BDSM film sets. Steinberg Dep. 33:17-34:2, 34:22-24. He also takes photographs at

a transsexual night club that he believes may qualify as photographs of lascivious exhibition of

genitals within the meaning of 18 U.S.C. § 2257. Steinberg Dep. 25:15-26:7, 27:13-16, 28:15-17.

143.    Steinberg regards the purpose of his photographs as to make a statement about

human sexuality. Steinberg Dep. 39:8-39:14. However, it is not possible to be certain about the

purpose of a photograph based on its appearance. *Id.* 40:10-18. There are no objective

differences between Steinberg's photographs of sexually explicit conduct and commercial

pornography. *Id.* 38:9-15, 39:19-23.

144.     Steinberg markets and sells his sexually explicit work. Steinberg Dep. 24:10-15; 60:13-25.

145.     Steinberg does not have a license and is not a party to any contract that requires him to verify the ages of his performers before taking sexually explicit photographs, and aside from the 2257 requirements, the process of having an individual sign a model release does not involve age verification. Steinberg Dep. 109:16-18, 110:11-20.

146.     Steinberg's photographs of sexually explicit conduct have depicted individuals between the ages of 18 and 25. Steinberg's Response to Requests for Admission Nos. 22-33.. Based on Steinberg's 2257 records, 56 out of 395 individuals that he photographed having sex were 25 or younger at the time he took their photographs. Steinberg Dep. 71:4-8. Steinberg would probably photograph an 18-year-old couple having sex if they asked him to. *Id.* 71:21-23.

147.     Steinberg cannot identify the age of an individual without checking identification. Steinberg Dep. 66:13-68:7 ("some people look older than they are; some people look younger than they are").

148.     There are no objective criteria by which Steinberg could be identified as someone who should be exempt from the 2257 requirements. Steinberg Dep. 38:9-40:20 ("Q: Can you identify any objective differences between your photographic work and what could be called 'amateur photography'? . . . [A:] Objective differences, no. . . . I don't think there are any."), 128:13-15 ("Q: How do you know whether someone is a fine art sexual photographer? A: Well, you don't.").

## VII.    THE VAST PLAINLY LEGITIMATE SWEEP OF 2257 REQUIREMENTS

149.     It is impossible to determine a person's age based on visual observation alone. Alper Dep. 70:14-18 (conceding that she would not know whether individuals publicly having

sex on Fire Island were 18 or over without checking their IDs); *id.* 84:12-14; 86:21-24 (admitting

that she "[p]robably" could not distinguish between a 17-year-old and an 18-year-old or between

a 25-year-old and a 30-year-old); Dodson Dep. 43:21-44:20 (it could be difficult to tell

someone's age by looking at them because of "the way they're dressed, their mannerisms, their

speech, overall demeanor, sophistication" and because "[y]ou can't go on" breast development to

determine age); Douglas Dep. 88:19-21 ("Q: Do you think that you can determine a person's age

by their visual appearance?" "A: No I do not."), 91:6-10 ("I could not distinguish between a 17-

year-old, 21-year-old, 23-year-old, or 27-year-old; and I definitely could not [based] on a still

photograph."); Hymes Dep. 88:14-16 ("Q: Can you tell by looking at these individuals what their

ages are?" "A: No."); Levine Dep. 47:3-4 ("I don't think you can tell exact ages by looking at

pictures."); Levingston Dep. 179:20-22, 180:1-8 (indicating that the way not to confuse an 18

year old or a 19 year old with a minor would be to "check[] their ID" and that he probably could

not distinguish a 17-year-old from a 19-year-old by looking at them); Mopsik Dep. 55:10-13

("Q: Is it ASMP's position that it's possible to determine a person's age by visual observation?

A: I would say not in all cases, no. Some people appear younger than others."); Nitke Dep.

139:22-140:4 ("Q: Do you think that someone looking at a photograph can always tell the age of

the person in the photograph by looking? A: No. Q: Can they always tell if the person is not a

minor? A No."), 140:25-141:6 ("Can someone look at a picture and go, 'That guy is 26 and a

half?' I don't think so."), 141:22-25 ("That one-year difference would be hard to determine.");

Queen Dep. 79:5-23 ("One of the reasons to check IDs is because that takes some of the

guesswork out of figuring out how old someone is, yes."); Ross Dep. 41:15-22 ("Because [porn

stars] always have such large breasts, and I don't know if I could distinguish between 20 and

30."), 77:16-19 (stating that it is difficult to determine a person's exact age by visual inspection);

Steinberg Dep. 66:13-68:7 ("some people look older than they are; some people look younger than they are"); Wilson Dep. 136: 2-10; 140: 25-141:10 (30b(6) representative of the Sinclair Institute, admitted that she could not tell the age of one of the individuals depicted on the box cover of one of the sexually explicit videos ("Teach Me") that Sinclair sells on its website, and that she would need the person's ID to know the exact age), 148:8-149:14 (admitting that she may not be able to tell the difference between an 18 and a 17 year old).

150.     There are many young-looking performers in depictions of sexually explicit conduct that would not be easily identifiable as over 18 just by looking at them. Expert Report of Gail Dines, PhD, at 2, 6-13; Levine Dep. 120:24-121:5. "Teen porn," depicting individuals who appear to be under 18 even if they are not, is one of the fastest growing genres of porn. Expert Report of Gail Dines, PhD, at 2, 6-13; *see also* Dodson Dep. 26:7-12 (stating that everyone is addicted to the "youth" culture and that "men don't like contemporary or older women. They want children or younger women[.]"). The surgical procedures that women performing in pornographic films undertake make it difficult to know their exact ages. Ross Dep. 41:8-22; 54:3-8. The surgical alterations to the genitals that women in porn undertake "infantilizes" them. Dodson Dep. 22:4-23:10; 24:2-25:25.

151.     More women still enter the adult industry in their 20s rather than in their 30s. Levine Dep. 29:8-15. Many people are under 25 when they enter the adult industry. *Id.* 38:21-24. Indeed, "young women are welcome in porn." *Id.* 39:11-12. It is not unusual to find 18 and 19 year old performers in the porn industry, *id.* 39:13-16, and 18 and 19 year olds are indeed in demand in the porn industry, *id.* 39:22-24. Plaintiff Levine, who is herself a porn star, has performed with "dozens" of teen performers. *Id.* 40:5-7; 45:19-46:3; 49:8-51:12; 54:14-56:6. In

addition, Levine has given advice to several young women interested in getting into the porn industry, including teen women. *Id.* 34:18-37:12.

152. There is no objective way to identify an image as "journalistic" or "artistic," as opposed to "pornographic," based on the creator's asserted identity as a journalist or artist. Hymes Dep. 134:13-136:3 ("Q: Who decides whether someone is a journalist or not? A: I don't have that answer. I'm not sure that there is an answer to that. . . . there is no one who makes the final determination that someone is a journalist."); Steinberg Dep. 38:9-40:20 ("Q: Can you identify any objective differences between your photographic work and what could be called 'amateur photography'? . . . [A:] Objective differences, no. . . . I don't think there are any."), 128:13-15 ("Q: How do you know whether someone is a fine art sexual photographer? A: Well, you don't."); *see also* Mopsik Dep. 38:1-6, 79:14-80:8) ("[Q:] nothing prevents someone who produces adult films from being an ASMP member, correct? A: Correct."); *id.* (acknowledging that if ASMP were to prevail in its as-applied challenge, hardcore pornography producers could become ASMP members).

## VIII.   PRIVATE EXPRESSION HAS NOT BEEN CHILLED

153. The government is not likely to enforce the 2257 requirements with respect to depictions that are created in and have never left the confines of an individual's home. To the extent a work is accessible to no one other than a private couple who created it, no one would ever see a 2257 statement attached to such a work. There is no reason to assume that individuals who create depictions of sexually explicit conduct and share them only with their spouse or other intimate partner are chilled from creating this expression due to the 2257 requirements. *E.g.*, Queen Dep. 111:18-21 ("most Americans don't actually know anything about these regulations").

44

Dated this 10th day of May, 2013.     Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General
ZANE DAVID MEMEGER
United States Attorney
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ Kathryn L. Wyer
HÉCTOR G. BLADUELL
JAMES J. SCHWARTZ
NATHAN M. SWINTON
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Washington, DC
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.1.2(8)(b), I hereby certify that the foregoing Memorandum has been filed electronically and is available for viewing and downloading from the ECF system. I further certify that the foregoing document was served via ECF on counsel of record for plaintiffs in the above-captioned case.

Dated: May 10, 2013     /s/
     Kathryn L. Wyer