IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREE SPEECH COALITION, INC. et al., | ) Civil Action No. 2:09-4607 |
| Plaintiffs, | ) Judge Michael M. Baylson |
| v. | ) DECLARATION OF CHARLES R. |
| THE HONORABLE ERIC H. HOLDER, JR., Attorney General, | ) JOYNER |
| Defendant. | ) |

I, Charles R. Joyner, declare as follows:

(1)     I became a FBI Special Agent in July 1987.  After completing the FBI Academy in October 1987, I was assigned to the FBI Los Angeles Field Office. I initially primarily worked Violent Crimes/Major Offenders violations and training. I was a SWAT team member from April 1991 to August 1997. I was the Principal Firearms Instructor from 1997 until becoming a Supervisory Special Agent in June 2001. I was initially in charge of training and administration, and later was also responsible for the critical incident programs (SWAT, Crisis Management, Special Events, Weapons of Mass Destruction program, HazMat program, and Special Agent Bomb Technicians). In May 2006, I was tasked with creating the 2257 inspection program. In September 2007, I was tasked with creating the FBI Child Sex Tourism program, in conjunction with continuing my responsibilities with the 2257 Inspection program. In February 2008, the 2257 contract inspectors were released and I then worked full-time on the Child Sex Tourism program. I continued in this assignment until my transfer to the FBI Houston Field Office as a Supervisory Special Agent in charge of an Intelligence Squad. I was later assigned as the

supervisor over a squad in charge of critical incident programs, training, and administration. I held this position until my retirement in October 2011.

(2)     Between May 2006 and February 2008, I was assigned as a Supervisory Special Agent to supervise a regulatory inspection program based in Van Nuys, California, through which inspections were conducted pursuant to 18 U.S.C. § 2257 and 28 C.F.R. Part 75 and I am therefore familiar with the history, operation, and cessation of that program and with particular inspections in which I participated. The statements contained in this declaration are based upon my personal knowledge and upon information obtained in the course of my official duties.

(3)     In May 2006, I was tasked by FBI Headquarters with starting up a new regulatory inspection program for the purpose of conducting inspections authorized under 18 U.S.C. § 2257 and 28 C.F.R. Part 75. The program would focus on inspecting the records of entities within the adult entertainment industry that produced video, print, or electronic images of people engaged in actual sexually-explicit conduct within the meaning of 18 U.S.C. § 2257, as it existed at the time, which was limited to actual, not simulated, sexual acts and did not include lascivious displays of the genitals. We were also directed that only producers that qualified as "primary producers" under the regulations were subject to inspection, so any producer that was only a "secondary producer" would not be subject to inspection.

(4)     It was determined we would select producers at random using a computerized random number generator. We made this selection from a list of producers who had been identified as part of the adult entertainment industry and engaged in the commercial production of sexually explicit films and videos. We initially had a list of approximately 300 producers, and the list was gradually expanded to around 1200 producers by the time the program ended.

(5)     In addition to myself, one other Supervisory Special Agent ("SSA") was initially assigned to the inspection team. After the other SSA was not selected for a permanent position, SSA Stephen Lawrence joined the team in early 2007. In addition, five contractors were hired to perform the initial preparation and audits of producers' records.

(6)     We were provided inspection checklists by FBI Headquarters, which we followed during the pre-inspection and inspection process. Examples of these checklists are attached as Exhibits A and B. The contract staff also recorded their pre-inspection review of materials in FD-302s. An example is attached as Exhibit C.

(7)     The first inspection occurred on July 24, 2006, of Diabolic Video Productions in Chatsworth, CA. Prior to the inspection, I obtained a sample of videos produced by this company and provided this sample to the contract staff. Members of the contract staff reviewed each video, verified that it contained material subject to regulation under § 2257, checked whether the video contained a label in compliance with § 2257, and made a list of all performers appearing in that video. The inspection would then focus on 2257 records for these performers. This pre-inspection process was conducted for all inspections in order to make a list of specific 2257 records to be inspected, and to minimize the time that would be spent conducting the actual inspection. If a producer produced sexually explicit materials in other formats, such as digital content on websites, we attempted to include examples from each format in the list. The number of samples that were obtained and reviewed depended on how large the producer was. We also used the custodian of records address identified in the 2257 statements on these materials as the address where we would initiate the records inspection.

(8)     The inspection of Diabolic Video took place at its business address and began at approximately 10:50 a.m. during regular business hours. I entered the reception area of the

business, which was open to the public, in order to initiate the inspection. I identified myself, explained that the team and I were there to conduct an inspection under § 2257, and provided the list of titles and performers at the outset and indicated that these were the records we wished to inspect. The owner was present at the beginning of the inspection and throughout most of the inspection. He was familiar with § 2257 and the possibility of inspections. During the inspection, he asked whether he could contact AVN, one of the major adult entertainment media outlets. I made clear that he was free to contact AVN or anyone else. I later learned that while the inspection was still underway, it had already been announced on the AVN website.

(9)    The owner of Diabolic never suggested that the FBI would need a warrant to conduct the inspection or enter the business premises and fully cooperated in the inspection. I asked the owner where he would prefer that we review the records during the inspection, and he requested that we review the records in the same room where the company kept its 2257 records. We complied with this request. We did not look through the 2257 files ourselves to find records. Rather, an individual whom the owner indicated was either an employee or a contractor of Diabolic, was also present. That individual located and provided us with the specific records that we had identified.

(10)    The inspection team made copies of the identification documents of the specified performers using a portable copier that we brought with us to the inspection. A member of the team photographed the outside of the business to document that we were at the correct location. He also photographed the room where the producer kept its 2257 records and where we had been asked to stay during the inspection, both before and after the inspection, to document that the team had caused no damage to the premises and had left the room as we found it.

- 4 -

(11)   In every inspection where I was present, the team followed similar procedures although every inspection also presented its own unique circumstances. Most inspections were initiated at the custodian of record's address, as listed on 2257 statements on the materials reviewed for that producer. At every inspection where I was present, I initiated the contact with the producer and never encountered any denial of entry or request that the team obtain a warrant prior to the inspection. On one occasion, when I initiated the inspection at Legend Video, the owner of Legend Video presented me with a letter from his attorney, Jeffrey Douglas, suggesting that all businesses at that address were secondary producers and were therefore not subject to inspection. He indicated that the business where we were at that time was actually Tennervision. However, the information I had confirmed that the owner of Legend was also listed on 2257 statements as the custodian of records for Tennervision and that Tennervision was a label of Legend. The owner did not contradict any of these facts. When I explained that I was certain that Tennervision/Legend qualified as a primary producer, the owner agreed to allow the team to proceed with the inspection. I was asked to speak to the producer's attorney on the telephone and I agreed to do so.

(12)   On at least two occasions, the individuals that I spoke with at the producer's premises requested that the inspection team remain in the front reception area, which was open to the public, during the inspection. On both of these occasions, the team remained in the reception area except when a member of the team took a photograph of the file cabinet or work room where the producer stored its 2257 records, or when a team member used the restroom. On occasions where the producer indicated that the inspection team should use a break room, conference room, or other location for the inspection, I did not inquire whether that area was open to the public and do not have personal knowledge regarding who had access to these areas.

(13)     On at least one occasion, all of the producer's 2257 records were in digital format. I therefore gave the custodian of records the option of downloading all the requested 2257 records on CDs, which we could take with us and review back at our office. The custodian chose that option, and I provided her with CDs to use when downloading the records. Due to this, we were at the producer's premises for only about an hour.

(14)     Because the producers we were inspecting were commercial producers, we assumed that the address listed on the 2257 statements on a producer's DVDs was the producer's business address, and this was the address where we went to conduct the inspection. In some instances, it turned out that the producer's business address was also the business owner's residence. This occurred, for example, on two inspections that I led, of the companies Real Wild Girls and Pony Boy Films. These inspections took place in Florida, when the team traveled there for several days to inspect producers that had been previously selected through the random number generator. In these instances, instead of entering the premises initially, I would approach the front door and knock or ring the doorbell, and identify myself and explain the purpose of the inspection while still outside the premises.  At the 2257 records inspection of Pony Boy Films, the door was answered by the owner's mother, who indicated she was acting as custodian of records while her son was out of the country. She invited us into the house and indicated we should conduct the inspection in the living room area. The 2257 records inspection of Real Wild Girls occurred at the owner's condominium, and the owner was present and indicated we should use a spare bedroom as our work area during the inspection.

(15)     On some occasions, it was determined prior to an inspection, or during an initial unsuccessful attempt to conduct an inspection, that the address listed on the 2257 statement on a producer's DVDs was not the location where the 2257 records of that producer were located. For

example, when we initiated an inspection of the 2257 records of Moonlight Entertainment, it was discovered that this producer had gone out of business. I was able to contact the former owner who informed me that he kept 2257 records for the company in his garage. We arranged to visit his residence at 9:30 am on a particular day and conducted a records inspection at that time. We did not enter the house except for the garage area where the records were stored.

(16)    Prior the 2257 records inspection of Silver Star, it was determined that the address on the 2257 statements for Silver Star DVDs was the business address of NuTech Digital. The owner of NuTech Digital indicated NuTech Digital had converted some Silver Star films from VHS to digital format and that his attorney had advised that he was not a producer subject to inspection. However, he agreed to permit us to inspect the 2257 records for the four Silver Star DVDs that we had identified. He indicated that these records were kept in a storage unit, and I arranged in advance for the inspection team to meet him at this storage unit at a particular time, where we inspected the records in a common area outside of the storage unit.

(17)    On or about March 2007, we were provided with a standard form of letter to present to the producer at the time we initiated an inspection. From then on, I provided producers with such letters together with the spreadsheet identifying the 2257 records we were seeking to inspect. See Exhibit D. At the same time, we were also provided with a standard form of letter to send to producers that had already been inspected, in order to notify them in writing that they were subject to reinspection due to violations that had been found during the first inspection. See Exhibit E. We conducted reinspections of 2257 records of two producers after sending them such letters.

(18)    After every inspection, the SSA who had led the inspection prepared a report describing the inspection and identifying any violations of the 2257 regulations that the team had

found. The reports did not contain any recommendations regarding prosecution but simply described the violations. These reports were provided to the United States Attorney's Office.

(18)    After I began leading 2257 inspections, I became aware that there was misinformation and confusion in the adult entertainment community regarding the inspection process. I participated in a number of efforts to provide the adult entertainment industry with accurate information about the inspection process in order to alleviate their concerns. I attended two meetings at FBI Headquarters, the first in October 2006 and the second in September 2007, where a number of producers in the adult entertainment industry were invited. At the first of these meetings, FBI representatives, including myself, provided information about the inspection program and sought input from producers on the process. The FBI advised those present at the meeting that producers would be provided a minimum one-week period to attempt to fix any 2257 violations that were identified during the inspection. The producer's efforts would then be noted in the report that we prepared following the inspection. At the second meeting, approximately a year later, FBI representatives gave an update on the inspection process and again asked for feedback.

(19)    I also agreed to participate in a panel discussion that took place during the XBIZ trade show in February 2007. On that occasion, I described the inspection process and responded to questions.

(20)    I also agreed, with FBI approval, to be interviewed by Clay Calvert and Robert Richards. During this interview, I described the inspection process and some of the compliance issues we had noticed so far. I explained that ideally, all inspections would result in no violations because that would mean the producers were verifying identification documents and ensuring that minors were not used in the creation of sexually explicit videos.

- 8 -

(21)    I also communicated with producers individually. I gave my e-mail address and phone number to producers so that they could contact me with questions. Some producers asked me if they were going to be inspected next, and I would respond that the producers were chosen for inspection randomly. On one occasion, I was contacted by David Connors (identified by name to me by the Free Speech Coalition attorney), who expressed concern because he operated his business at his home. Mr. Connors advised he lived in a complex with security at the entrance so we may not be able to enter the complex unless we notified him in advance. I told him that if he were selected, we would notify him.

(22)    In October 2007, we were informed by FBI Headquarters and the Department of Justice that a court had held 2257 unconstitutional and were directed to cease inspections immediately. For a time, we continued finishing reports of past inspections and preparing for future inspections. In early 2008, the inspection program ceased operations entirely.


Executed this _10th_ day of May, 2013.

Charles R. Joyner
Houston, TX

Joyner Declaration
Exhibit A

# 2257 PROJECT
# Child Protection and Obscenity (CPO) Inspections Checklist

**Company inspected:**  DEAD MEN HANGING PRODUCTIONS
**Address:**  958 POSTAL WAY, UNIT 4C, VISTA, CA  92083
**Date of inspection:**  03/13/2007
**Lead Inspector:**  SSA STEPHEN G. LAWRENCE
**Other Inspectors on-site:**  ███ █ █▌

## PRE-INSPECTION PRODUCT REVIEW

1.  ___✓___  Select Producers to be reviewed, using the computerized random selection program. An FD-71 will be completed requesting that a case be opened and a file number issued.

2.  ___✓___  Check logical sources of information to identify Producer's products which appear to contain sexually explicit material.

3.  ___✓___  Purchase products covertly. The method of purchase of each product will be carefully documented.

   A.  At least one of each type of product produced by the entity to be inspected (i.e., book, magazine, periodical, film, videotape, digitally- or computer-manipulated image, digital image, picture, internet computer site or services, or other matter) will be purchased for analysis.

   B.  For Producers with more than one hundred pertinent products, no more than 20% of the products will be purchased, up to a maximum of forty total.

   C.  For Producers with less than one hundred pertinent products, no more than twenty products will be purchased.

4.  ___✓___  Prior to going on-site to a Producer's facilities, the inspectors will conduct an in-house Pre-Inspection analysis of the products by completing questions 1 through 14 of the CPO Inspection Protocol form. One form should be used per product.

5.  ___✓___  Inspectors should determine whether or not the address of the Producer's record keeping facility, which had been obtained from a statement in the product, is still current. Inspectors will also determine the regular work hours (normal business hours) of the Producer.

SUBJECT TO PROTECTIVE ORDER

## ON-SITE INSPECTION

6. ___√___  Inspectors will begin the on-site part of the inspection by arriving at the Producer's place of business no earlier than 9:00 A.M. local time, Monday through Friday, or any other time during which the producer is actually conducting business relating to the production of sexually explicit activity. (According to 28 CFR 75.5(c)(1), Producers with unconventional business hours must notify the inspecting agency of those hours).

7. ___√___  Immediately upon entering the Producer's place of business, the Lead Inspector (FBI SSA) will present his or her credentials to the owner, operator, or agent in charge of the establishment.

8. ___√___  The Lead Inspector will explain the nature and purpose of the inspection, including the limited nature of the records inspection, and the records required to be kept by Title 18 United States Code Section 2257 and 28 CFR Part 75. This may be accomplished by presenting a letter to the Producer outlining the details of this requirement.

9. ___√___  The Lead Inspector will indicate the scope of the specific inspection and the records that he or she wishes to inspect. Following the inspection, the Lead Inspector will leave an inventory of the records that have been inspected or copied for the Producer.

10. _N/A_  If access to the records is denied, the Lead Inspector will advise the Producer that a Court Order can be obtained, which will compel the Producer to provide access to the records, and that failure to comply with the Order could result in an arrest for contempt. If the Producer persists in denying access, the Lead Inspector will leave the Producer's facilities and seek a Court Order in conjunction with the local U. S. Attorney's office.

11. ___√___  The inspection will be conducted so as not to unreasonably disrupt the operations of the Producer's establishment. The operation should be kept as low key as possible. For example, requesting a room separate from the main lobby or receptionist area to do the inspection of records. Raid jackets will not be worn, appropriate business attire will be required.

12. ___√___  Each CPO Inspection Protocol form completed during the in-house Pre-Inspection analysis of products should be created (questions 15 through 26) at this time.

13.     ✓     Prior to completing the on-site inspection, the Lead Inspector should sit down with the Producer (record keeper) and informally advise the Producer of any apparent violations disclosed by the inspection. This gives the Producer the opportunity to bring to the attention of the Lead Inspector any pertinent information regarding the records inspected or any other relevant matter.

14.     ✓     During the inspection, all records subject to inspection may be copied, but at no expense to the producer.

15.     N/A    While conducting the inspection, the Lead Inspector is authorized to seize any evidence of the commission of any felony. The Lead Inspector will immediately be notified by inspectors if any evidence of another crime is uncovered during an inspection. The Lead Inspector will secure the evidence, notify the proper law enforcement authorities, and take whatever other actions he/she deems appropriate. Inspectors should not be actively looking for evidence of the commission of a felony, but if evidence is in "plain view," inspectors should immediately notify the Lead Inspector.

## POST-INSPECTION ACTIVITIES

16.     ✓     Once the on-site Inspection is completed, Inspectors will return to the CPO Team office and prepare a report, similar in form to a Prosecutive Report routinely issued by FBI agents at the conclusion of criminal investigations. This report will be submitted to the Child Exploitation and Obscenity Section of the Department of Justice, unless otherwise directed.

17.     N/A    Originals of any evidence obtained during the inspection will be submitted to the Evidence Control Technician in the Los Angeles Division.

18.     N/A    Inspectors may be called upon to testify in trial proceedings.

2257 Inspection Checklist

SUBJECT TO PROTECTIVE ORDER

Joyner Declaration
Exhibit B

# 2257 PROJECT
# Child Protection and Obscenity (CPO) Inspections
## Review Form

## PRE-INSPECTION PRODUCT REVIEW

Inspector: _JAMES L. PAULSON_
Date of Review: _7/26/06_
Title of product: _My Dream Girl #3 (MDG #3)_
Producer of product: _Robert Hill_

_✓_ 1.  Product is a

> _____ Book
> _____ Magazine
> _____ Periodical
> _____ Film
> _____ Videotape
> _____ Digitally- or Computer-manipulated image
> _____ Digital Image
> _____ Picture
> _____ Internet computer site or services
> _____ Other matter (Describe: _DVD_____ )

[2257 (a) & CFR 75.2(a)]

_✓_ 2.  Product contains one or more visual depictions of an actual human being engaged in actual sexually explicit conduct described as follows:

> _✓_ Sexual intercourse, including
> > _✓_ Genital-Genital
> > _✓_ Oral-Genital
> > _____ Anal-Genital
> > _____ Oral-Anal
> _____ Bestiality
> _✓_ Masturbation
> _____ Sadistic or masochistic abuse

[2256 (2)(a)(i-iv)]

_✓_ 3.  Visual depiction of sexually explicit conduct made after November 1, 1990?

[2257 (a)(1)]

SUBJECT TO PROTECTIVE ORDER

FBI_000145

___✓___ 4.   Is the product

___✓___ produced in whole or in part with materials that have been mailed or shipped in interstate or foreign commerce

or

___✓___ is shipped or transported or intended for shipment or transportation in interstate or foreign commerce?

[2257 (a)(2)]

___✓___ 5.   Product is:

___✓___ produced
_____ manufactured
_____ published
_____ duplicated
_____ reproduced or
_____ re-issued

on or after November 1, 1990.

*Date of Production : 09/01/2003*

[2257(h)(3)]

**If all four prior questions are answered affirmatively, continue.**

___✓___ 6.   The producer has caused to be affixed to the matter a statement describing the location of the records.

_____ For books, magazines and periodicals, the statement is either:

_____ on the first page

or

_____ on the page on which copyright information appears.

[CFR 75.8(a)]

For film or videotape *DVD* which contains end credits for the production, direction, distribution, or other activity in connection with the film or videotape, the statement is:

_____ Presented at the end of the end titles or final credits

and

_____ is displayed for a sufficient duration to be read by the average viewer.

[CFR 75.8(b)]

SUBJECT TO PROTECTIVE ORDER

FBI_000146

___ Any other film or videotape shall contain the required statement:
___ within one minute from the start of the film or videotape, and
___ before the opening scene, and
___ is displayed for a sufficient duration to be read by the average viewer.

[CFR 75.8(c)]

N/A A computer site or service or Web address containing a digitally- or computer-manipulated image, digital image, or picture, contains the required statement (or a hypertext link that opens upon the viewer's clicking a hypertext link that states, "18 U.S.C. 2257 Record-Keeping Requirements Compliance Statement") on:
___ Its homepage
___ Any known major entry points
   or
___ Principal URL (including the principal URL of a sub-domain)

[CFR 75.8(d)]

N/A For all other categories not otherwise mentioned in this section, the statement is to be prominently displayed consistent with the manner of display required for the aforementioned categories.

[CFR 75.8(e)]

___ 7.   One of the following is true.
___ The statement contains the title of the product.
   or
___ The title is prominently set out elsewhere in the product.
   or
___ If there is no title, an identifying number or similar identifier that differentiates this matter from other matters, which the producer has produced, is included on the statement.

[CFR 75.6(b)(1)]

SUBJECT TO PROTECTIVE ORDER                    FBI_000147

____ ✓ 8.   The statement on the matter includes the date of one of the following:
  ____ ✓ Production   09/01/2003
  ____ Manufacture
  ____ Publication
  ____ Duplication
  ____ Reproduction
  ____ Re-issuance

[CFR 75.6(b)(2)]

____ ✓ 9.   The statement on the matter includes a street address at which the records required by 2257 may be made available.  (A P.O. Box is not allowed.)
The address is as follows:

21598 MARILLA ST.
CHATSWORTH, CA 91311

[CFR 75.6(b)(3)]

____ ✓ 10.   If the producer is an organization, the statement provides the name, title, and business address of the individual employed by such organization who is responsible for maintaining the records required by 2257.

Name:        ███████████
Title:         CUSTODIAN OF RECORDS
Bus Address: (IN THE OFFICES OF)   ROBERT HILL RELEASING
21598 MARILLA ST
CHATSWORTH, CA 91311

[CFR 75.6(c)]

____ ✓ 11.   The statement is
  ____ ✓ Displayed in typeface that is no less than 12-point type.
  or is
  ____ ✓ No smaller than the second-largest typeface on the material.

[CFR 75.6(e)]

SUBJECT TO PROTECTIVE ORDER

12.     The statement is in a color that clearly contrasts with the background color of the material.

[CFR 75.6(e)]

13.     For any electronic or other display of the notice that is limited in time, the notice is displayed for:

_____ a sufficient duration
       and
_____ of a sufficient size

to be capable of being read by the average viewer.

[CFR 75.6(e)]

14.     Information on each person portrayed in a visual depiction engaging in, or assisting another person to engage in, actual sexually explicit conduct is identified in Attachment A to this report. (Attachment A will include any identification information obtained from credits of the product, if available. Otherwise, printed copies of visual depictions of the performer should be attached.)

## ON-SITE INSPECTION REVIEW

15.     For each performer portrayed in this product, records have been created and maintained containing the legal name and date of birth of each performer, obtained by the producer's examination of a picture identification card.

[2257 (b)(1), CFR 75.1(b), CFR 75.2(a)(1)]

16.     For any performer portrayed in this product made **after July 3, 1995,** producer maintains:

_____ a legible copy of the identification document examined and, if that document does not contain a recent and recognizable picture of the performer,

_____ a legible copy of a picture identification card (with a recent and recognizable picture of the performer).

[CFR 75.2(a)(1)]

_N/A._ For any performer portrayed in such a depiction **after June 23, 2005,** the producer maintains:

_____ A copy of the depiction, and

_____ Where the depiction is published on an Internet computer site or service, a copy of any URL associated with the depiction or,

_____ if no URL is associated with the depiction, another uniquely identifying reference associated with the location of the depiction on the Internet.

[CFR 75.2(a)(1), CFR 75.2(a)(1)(i-ii)

_✓_ 18. Producer maintains any name, other than (statute should read "in addition to the") performer's legal name (present and correct name), ever used by the performer, including the performer's maiden name, alias, nickname, stage name, or professional name,

and

_✓_ For depictions made **after July 3, 1995,** these names are indexed by the title or identifying number of the product.

[CFR 75.2(a)(2)]  [2257(b)(2)]

_No_ 19. Records required to be created and maintained under this part are organized

_No_ alphabetically, or numerically where appropriate,

_No_ by the legal name of the performer (by last or family name, then first or given name).

[CFR 75.2(a)(3)]

_No_ 20. Records are indexed or cross-referenced:

_No_____ to each alias or other name used

and

_No_____ to each title or identifying number of the product.

[CFR 75.2(a)(3)]

_No_ 21. The records are current as of the time the primary producer actually creates the product.

[CFR 75.2(a)(3)(c)]

N/A 22.   For any record created or amended **after June 23, 2005**, if the producer subsequently produces an additional product (including but not limited to Internet computer site or services) that contains one or more visual depictions of an actual human being engaged in actual sexually explicit conduct made by a performer for whom he maintains records as required by regulation, the producer has added the additional title or identifying number and the names of the performer to the existing records, and such records have been maintained as required by regulation.

[CFR 75.2(a)(3)(c)]

23.   Records, as described above:
        ___ are segregated from all other records,
        ___ do not contain any other records,
        and
        ___ are not contained within any other records.

[CFR 75.2(a)(3)(e)]

N/A 24.   Records (required to be maintained by regulation) which are kept in digital form include scanned copies of forms of identification
        and
        ___ there is a custodian of the records who can authenticate each digital record.

[CFR 75.2(a)(3)(f)]

N/A 25.   Records are maintained for seven years from the date of creation or last amendment or addition.

[CFR 75.4]

N/A 26.   If the producer ceases to carry on the business, the records are maintained for five years thereafter.

[CFR 75.4]

SUBJECT TO PROTECTIVE ORDER

FBI_000151

Joyner Declaration
Exhibit C

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   08/17/2006

On 7/26/06 Inspector JAMES L. PAULSON reviewed a DVD entitled MY
DREAM GIRL #3, produced by ROBERT HILL RELEASING CO.  The following
actors were listed in the credits:

(P-1)

Upon review, nine (9) actors were depicted in the DVD (five (5)
males and four (4) females).

The review of the DVD entitled MY DREAM GIRL #3 reflects that the
DVD contains visual depictions of actual human beings engaged in
sexually explicit conduct.  The visual depiction of the sexually
explicit conduct was made after 11/1/90.  The DVD is intended for
shipment in interstate or foreign commerce.  The DVD contained a
statement specifying the location of the 2257 records.  The
statement was presented within one minute of the start of the DVD
and was displayed for sufficient duration to be read by the average
viewer.  The date of production 9/1/2003 was included in the 2257
statement.  The 2257 statement listed the Custodian of Records as
████████  at the offices of ROBERT HILL RELEASING CO., 21598
Marilla St., Chatsworth, CA 91311.  The 2257 statement was in
typeface no smaller than 12-point type and the statement was in a
color that clearly contrasted with the background color.

---

Investigation on   7/26/2006   at Los Angeles, California

File #   ████(F)████ -ROBERT HILL - 9          Date dictated   7/31/2006

by   James L. Paulson
     Charles R. Joyner

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.          SUBJECT TO PROTECTIVE ORDER          FBI_000116

Joyner Declaration
Exhibit D



**U.S. Department of Justice**

**Federal Bureau of Investigation**

In Reply, Please Refer to
File No.

11000 Wilshire Blvd.
Los Angeles, CA 90024
(310)477-6565
June 27, 2007

Dear **Cinema Play Entertainment:**

    The Federal Bureau of Investigation (FBI) is conducting
an inspection of records maintained by **Cinema Play Entertainment**.
The purpose of this inspection is to ensure compliance with the
record keeping requirements of Title 18, United States Code
Section 2257 (18 U.S.C. §2257) and Title 28, Code of Federal
Regulations Part 75 (28 C.F.R. Part 75), which are designed to
prevent the sexual exploitation of children.  Section (c) of 18
U.S.C. §2257 requires that you make such records available to the
Attorney General, or a designee thereof, for inspection at all
reasonable times.  Violations of Section 2257 are subject to
criminal penalties.

    These laws and regulations require that records be kept
for certain products made after November 1, 1990, and which
contain one or more visual depictions of an actual human being
engaged in actual sexually explicit conduct.  In general, the
records required to be maintained at this place of business
include records related to the verification of a performer's
legal name and date of birth, made by the producer's examination
of a picture identification card.  The specific requirements for
the creation and maintenance of these records may be found in the
above cited laws and regulations.

    Pursuant to these laws and regulations, the FBI is
authorized to enter your place of business without delay.  It is
a criminal violation of federal law to delay or obstruct the FBI
from conducting the inspection.

    This inspection will be limited to the records that
specifically relate to products and performers which are
identified in the attached document.  Copies of records subject
to the inspection will be made at no expense to **Cinema Play
Entertainment**.  Every effort will be made to prevent the
unreasonable disruption of the operations at your place of
business.

    If any violation of 18 USC 2257 is discovered, the FBI
may conduct a re-inspection of **Cinema Play Entertainment** without
notice.

SUBJECT TO PROTECTIVE ORDER

If no violations are discovered, **Cinema Play Entertainment** may not be inspected again for 18 USC 2257 compliance until four months from the date of this inspection has elapsed, unless there is reasonable suspicion to believe that a violation has occurred.

Please feel free to contact the on-site lead inspector, FBI Supervisory Special Agent Charles R. Joyner, with any questions you may have in regards to this inspection.

Sincerely,

Charles R. Joyner
Supervisory Special Agent

Attachment

2

SUBJECT TO PROTECTIVE ORDER

CINEMAPLAY

| TITLE | PRODUCTION DATE | STAGE NAME | DATE OF BIRTH | TRUE NAME |
|-------|-----------------|------------|---------------|-----------|
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | (P-1) | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| GIRLS HUNTING GIRLS 12 | 12/14/06 | | | |
| | | | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #1 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #2 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #3 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #4 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #5 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #6 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #7 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #8 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #9 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #10 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN MALE #1 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN MALE #2 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN MALE #3 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN MALE #4 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN MALE #5 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN MALE #6 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #11 | | |
| HARDCORE PARTYING 7 | 11/16/06 | UNKNOWN FEMALE #12 | | |
| | | | | |
| TEEN HITCHHIKERS | 02/04 | | | |
| TEEN HITCHHIKERS | 02/04 | | | |
| TEEN HITCHHIKERS | 02/04 | | | |
| TEEN HITCHHIKERS | 02/04 | | | |
| TEEN HITCHHIKERS | 02/04 | (P-1) | | |
| TEEN HITCHHIKERS | 02/04 | | | |
| TEEN HITCHHIKERS | 02/04 | | | |
| TEEN HITCHHIKERS | 02/04 | | | |
| TEEN HITCHHIKERS | 02/04 | | | |

SUBJECT TO PROTECTIVE ORDER

CINEMAPLAY

| TITLE | PRODUCTION DATE | STAGE NAME | DATE OF BIRTH | TRUE NAME |
|---|---|---|---|---|
| TEEN HITCHHIKERS | 02/04 | | | |
| TEEN HITCHHIKERS | 02/04 | | | |
| TEEN HITCHHIKERS | 02/04 | | | |
| TEEN HITCHHIKERS | 02/04 | | | |
| | | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| THE GIRLS OF AMATEUR PAGES # 5 | 10/04 | | | |
| | | | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | (P-1) | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | | | |
| TEEN HITCHHIKERS 8 | 10/04-4/05 | | | |
| | | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |
| JUNIOR COLLEGE GIRLS 3 | 2/05 | | | |

SUBJECT TO PROTECTIVE ORDER

CINEMAPLAY

| TITLE | PRODUCTION DATE | STAGE NAME | DATE OF BIRTH | TRUE NAME |
|---|---|---|---|---|
| RIGHT OFF THE BOAT 2 | 2/19/2005, 4/28/2005, 5/13/2005, 6/10/2005, 7/05, 17 & 24/2005, 8/15/2005 | (P-1) | | |
| RIGHT OFF THE BOAT 2 | | | | |
| RIGHT OFF THE BOAT 2 | | | | |
| RIGHT OFF THE BOAT 2 | | | | |
| RIGHT OFF THE BOAT 2 | | | | |
| RIGHT OFF THE BOAT 2 | | | | |
| RIGHT OFF THE BOAT 2 | | Unknown male #1 | | |
| THE GIRLS OF AMATEUR PAGES #12 | 7/05/2005-2/07/2006 | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | | | |
| THE GIRLS OF AMATEUR PAGES #12 | | (P-1) | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |
| CHEERLEADER AUDITIONS #3 | 11/2004 | | | |

SUBJECT TO PROTECTIVE ORDER

CINEMAPLAY

| TITLE | PRODUCTION DATE | STAGE NAME | DATE OF BIRTH | TRUE NAME |
|---|---|---|---|---|
| CHEERLEADER AUDITIONS #3 | 11/2004 | UNKNOWN MALE #1 | | |
| | | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/4/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/4/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/4/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/5/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/5/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/5/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/5/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/5/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/5/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/5/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/5/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/5/2005 | | | |
| THE GIRLS OFAMATEUR PAGES 10 | 11/5/2005 | | | |
| | | | | |
| TEEN HITCHHIKERS 9 | 11/16/2004-10/29/2005 | | | |
| TEEN HITCHHIKERS 9 | | | | |
| TEEN HITCHHIKERS 9 | | | | |
| TEEN HITCHHIKERS 9 | | | | |
| TEEN HITCHHIKERS 9 | | | | |
| TEEN HITCHHIKERS 9 | | (P-1) | | |
| TEEN HITCHHIKERS 9 | | | | |
| TEEN HITCHHIKERS 9 | | | | |
| TEEN HITCHHIKERS 9 | | | | |
| TEEN HITCHHIKERS 9 | | | | |
| TEEN HITCHHIKERS 9 | | | | |
| TEEN HITCHHIKERS 9 | | | | |
| | | | | |
| LATINA CALIENTE 2 | 11/13/2006 | | | |
| LATINA CALIENTE 2 | 11/13/2006 | | | |
| LATINA CALIENTE 2 | 11/13/2006 | | | |
| LATINA CALIENTE 2 | 11/13/2006 | | | |
| LATINA CALIENTE 2 | 11/13/2006 | | | |
| LATINA CALIENTE 2 | 11/13/2006 | | | |
| LATINA CALIENTE 2 | 11/13/2006 | | | |
| LATINA CALIENTE 2 | 11/13/2006 | | | |
| LATINA CALIENTE 2 | 11/13/2006 | | | |
| LATINA CALIENTE 2 | 11/13/2006 | | | |
| LATINA CALIENTE 2 | 11/13/2006 | | | |
| | | | | |

SUBJECT TO PROTECTIVE ORDER

# Joyner Declaration
# Exhibit E

U.S. Department of Justice

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

11000 Wilshire Blvd., Suite 1700
Los Angeles, CA 90024

March 19, 2007

Attention:   Robert Hill Releasing Company

RE:   18 USC 2257 Re-inspection

Dear Mr. Appleson:

Due to the fact that violations of Title 18 United
States Code Section 2257 and related regulations were
documented during an inspection of Robert Hill Releasing
Company by the FBI on 08/01/2006, Robert Hill Releasing
Company is subject to re-inspection without notice.

If you have any questions regarding this
notification, please contact Supervisory Special Agent Charles
R. Joyner at the telephone number noted below.

Sincerely

Charles R. Joyner
Supervisory Special Agent
(310) 996-3687

Joyner

(F)          — Robert Hill

SUBJECT TO PROTECTIVE ORDER