IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREE SPEECH COALITION, INC. et al., | ) Civil Action No. 2:09-4607 |
| Plaintiffs, | ) Judge Michael M. Baylson |
| v. | ) |
| THE HONORABLE ERIC H. HOLDER, JR., Attorney General, | ) DECLARATION OF STEPHEN LAWRENCE |
| Defendant. | ) |

I, Stephen Lawrence, declare as follows:

(1) I am a Supervisory Special Agent ("SSA") with the Federal Bureau of Investigation ("FBI") and have been employed by the FBI since 1996. Since 2010, I have been assigned to the Los Angeles Field Office ("LAFO") as an SSA of a Public Corruption squad, which is responsible for investigating federal public corruption, international corruption and fraud against the United States Government. From 2009 to 2010, I was a Special Agent ("SA") assigned to the LAFO and worked counterintelligence matters. From 2007 to 2008, I was an SSA in the FBI's Crimes Against Children Unit ("CACU"). From 2005 to 2006, I was an SSA assigned to work counterintelligence matters in Los Angeles. From 2002 to 2004, I was an SA assigned to work counterintelligence matters in Los Angeles, and from 2001 to 2002, I was an SA assigned to work public corruption matters in Los Angeles. From 1996 to 2000, I was an SA in the Miami Field Office assigned to work white collar crime matters. I have been a licensed Certified Public Accountant since 1990, and prior to joining the FBI, worked in private industry and public accounting, the latter of which included conducting and supervising financial and regulatory audits.

(2) In January 2007, while an SSA in the FBI's CACU, I was assigned to a regulatory inspection program based in Van Nuys, California, through which inspections were conducted pursuant to the Child Enforcement Protection and Obscenity Enforcement Act of 1988, 18 U.S.C. § 2257 as amended and 28 C.F.R. Part 75. I am therefore familiar with the history, operation, and cessation of that program and with particular inspections in which I participated. The statements contained in this declaration are based upon my personal knowledge and upon information obtained in the course of my official duties.

(3) I was assigned to the inspection program in late 2006 and reported in early January 2007. At the time, the program was still in its early stages, although a number of inspections had already occurred. I initially accompanied SSA Charles Joyner on one inspection in January 2007 to observe an inspection being conducted. The first inspection I was responsible for overseeing was in March 2007. The inspection was of the 2257 records of Dead Men Hanging Productions ("Dead Men Hanging"), a producer in the adult entertainment industry that created and sold videos containing depictions of actual sexually explicit conduct. As with every 2257 records inspection that was conducted, Dead Men Hanging had been selected for inspection using a computerized random number generator. During the pre-inspection process, one movie produced by Dead Men Hanging was downloaded from the commercial website of Dead Men Hanging onto a DVD via streaming video. Contract staff verified that the movie contained material subject to regulation under § 2257, checked whether it contained a label in compliance with § 2257, and made a spreadsheet listing all performers who were shown engaging in sexually explicit conduct in that movie. I accessed the Dead Men Hanging website and identified the name and address of the custodian of 2257 records as listed on the website. A banner ad that I found on the website was added to the spreadsheet list.

(4)     The inspection occurred at the address specified on the 2257 statements that had been found on Dead Men Hanging's products selected for inspection. The business premises were in an office suite that shared common space with other companies. At the start of the inspection, I identified myself and explained that I was there to conduct an inspection of the 2257 records listed on the spreadsheet, which I provided to the owner. The owner, who was present at the business throughout the inspection, did not object to the inspection and did not request that the FBI obtain a warrant prior to the inspection. I asked the owner where he would prefer the team to sit and conduct the inspection, and the owner indicated the team, which consisted of myself and one contract staff, should use a conference room within the office suite. I had no knowledge and did not ask who normally had access to the conference room.

(5)     The owner brought the 2257 records corresponding to the performers listed on the spreadsheet to the conference room for the team to review. Prior to the inspection, the team had determined that the streaming video downloaded from Dead Men Hanging's website did not contain the required 2257 information. During the course of the inspection, the contract inspector asked the owner for a retail copy of the movie and upon review of the retail copy, the contract inspector observed that a 2257 statement appeared on that copy. The team was unable to determine whether the omission of the 2257 statement from the copy available online was due to a third party or a technical malfunction. Accordingly, no violation was noted for the omission of the statement.

(6)     The team and I followed similar procedures for every inspection that I led or participated in. The team would generally go to the address listed on the producer's 2257 statements, enter the reception area (where there was one) to initiate contact with the producer, and follow procedures for initiating an inspection. The team would stay in the location that the

producer or their authorized designee specified, and the producer would bring the requested 2257 records to the team. In other respects, each inspection presented its own unique circumstances. On four occasions, the address listed on the producer's DVD 2257 statements was a P.O. Box. In one of those instances, involving producer Fifth Element, the team attempted to initiate an inspection at the address listed on the 2257 statement but discovered it was a P.O. Box registered to Ghost Pro Productions. The team made several attempts to locate the owner of Ghost Pro and eventually reached him by telephone overseas. The owner indicated that Ghost Pro was the primary producer for all but one of the DVDs that were reviewed in the pre-inspection process, and that Fifth Element was a distributor. The owner provided copies of the 2257 records for the DVDs for which Ghost Pro was the primary producer via e-mail.

(7) The 2257 statement on DVDs for J.T. Video also turned out to identify a P.O. Box. I eventually located the owner of J.T. Video by telephone and determined that he ran his business out of his residence and had the 2257 records there. The owner indicated he did not maintain regular business hours and worked somewhere else during the day. The owner also advised that he was about to go out of town for approximately ten days, so we arranged to do the 2257 records inspection in the early morning the day after he returned. However, the inspection team received information the next day that soon after the inspection was arranged, the owner sent an email about the upcoming inspection to a reporter who operated a website and blog related to the adult entertainment industry. The reporter posted the email about the upcoming scheduled inspection on his blog. As a result, the team decided to conduct the inspection that evening and I contacted the owner, who met us at his residence. The owner agreed that we could conduct the inspection at that time and did not request that the FBI obtain a warrant prior to the

inspection, which lasted approximately one hour. While photographs are normally taken at inspections, the team did not take photographs at this inspection due to potential privacy issues.

(8)     Another producer randomly selected for 2257 records inspection, Angry Young Man, also used a P.O. Box address on its 2257 statement, and the records on file with the P.O. Box location led to another P.O. Box. The second location had a phone number for the owner, which I used to contact the owner. The owner referred me back to the original P.O. Box address and said that an employee of the third-party mailbox service that operated the P.O. Box had possession of the 2257 records for Angry Young Man. The owner subsequently contacted me and stated that his attorney advised him to have the FBI conduct any pending inspection at Angry Young Man's studio and avoid using an intermediary, such as the third-party mailbox service. The owner indicated the 2257 records were located at Angry Young Man's office, and that he did not keep regular business hours. I advised the owner I could not disclose when an inspection of Angry Young Man's 2257 records would be conducted, but since the owner advised he lived nearby, I agreed to contact him about 30-60 minutes beforehand so he could meet me at Angry Young Man's office. This inspection was also unique in that the producer's website purported that its movies contained surreptitious recordings made in locker rooms and showers on actual military bases. During the inspection, the producer showed the team film sets where some of the scenes from Angry Young Man's website and movies selected for inspection may have been filmed. The inspection team informed the Naval Criminal Investigative Service (NCIS) about this matter, but did not itself take any further action.

(9)     In October 2007, the team was informed that a court had ruled § 2257 unconstitutional and that we should stop conducting inspections immediately. For a few months, we completed reports for inspections that had already been conducted and continued to prepare

as though inspections were going to resume, but in or around early 2008, the inspection program was terminated. The Final Progress Report for the inspection program, listing all 29 inspections that had occurred, was issued on February 22, 2008. See Exhibit A. SSA Joyner and I were reassigned to stand-up the CACU's Child Sex Tourism Initiative in Southeast Asia, and the contract staff were let go. Since that time, I have not had any discussions indicating that any similar inspection program would be established again.

Executed this 10TH day of May, 2013.

*Stephen Lawrence*
Stephen Lawrence
Supervisory Special Agent
Federal Bureau of Investigation
Los Angeles Field Office

# Lawrence Declaration Exhibit A

# FINAL PROGRESS REPORT
## 02/22/2008

SUMMARY:

| | |
|---|---|
| Inspections to date: | 29 |
| Producers w/ 2257 Violations: | 25 |
| Percentage w/ Violations: | 86% |
| Producers Re-inspected: | 2 |
| Producers w/ Violations on Re-inspection: | 2 |
| Percentage w/ Violations on Re-inspection: | 100% |
| Reports w/ Violations Forwarded to USAO: | 25 |
| Prosecutions: | 0 |

INSPECTIONS:

| Producer | Inspector | Insp. Date | Findings | To USAO | Prosecution |
|---|---|---|---|---|---|
| 1. Diabolic | Joyner | 07/24/2006 | No | Yes | N/A |
| 2. Robert Hill | Joyner | 08/01/2006 | Yes | Yes | No |
| 3. All Good Video | Joyner | 08/16/2006 | Yes | Yes | No |
| 4. Silver Star | Joyner | 09/11/2006 | Yes | Yes | No |
| 5. Darkside | Joyner | 09/12/2006 | Yes | Yes | No |
| 6. Evasive Angles | McGuire | 09/27/2006 | Yes | Yes | No |
| 7. Tennervision | Joyner | 10/01/2006 | Yes | Yes | No |
| 8. Private | Joyner | 12/14/2006 | Yes | Yes | No |
| 9. Erotic Angel | Joyner | 12/14/2006 | Yes | Yes | No |
| 10. Wicked | Joyner | 01/24/2007 | No | Yes | N/A |
| 11. Dead Men Hng. | Lawrence | 03/13/2007 | No | Yes | N/A |
| 12. Robert Hill * | Joyner | 03/21/2007 | Yes | Yes | No |
| 13. Angry Yng. Mn. | Lawrence | 03/27/2007 | Yes | Yes | No |
| 14. Darkside * | Joyner | 04/09/2007 | Yes | Yes | No |
| 15. Moonlight | Joyner | 05/03/2007 | Yes | Yes | No |
| 16. Shane's World | Joyner | 05/07/2007 | No | Yes | N/A |
| 17. Don Goo | Lawrence | 05/22/2007 | Yes | Yes | No |
| 18. JT Video | Lawrence | 05/31/2007 | Yes | Yes | No |
| 19. Bacchus/Filmco | Lawrence | 06/19/2007 | Yes | Yes | No |
| 20. Cinema Play | Joyner | 06/27/2007 | Yes | Yes | No |
| 21. Gent's Video | Joyner | 07/19/2007 | Yes | Yes | No |
| 22. Temptations | Joyner | 08/02/2007 | Yes | Yes | No |
| 23. Agency | Joyner | 08/20/2007 | Yes | Yes | No |
| 24. Authentic Xtrem | Lawrence | 08/22/2007 | Yes | No | No |
| 25. RealWildGirls | Joyner | 09/17/2007 | Yes | Yes | No |
| 26. Alexis Lords | Lawrence | 09/17/2007 | Yes | No | No |
| 27. Candid Cam | Joyner | 09/18/2007 | Yes | Yes | No |
| 28. Fifth Element | Lawrence | 09/18/2007 | Yes | No | No |

| | | | | | |
|---|---|---|---|---|---|
| 29. Pony Boy | Joyner | 09/19/2007 | Yes | Yes | No |

\* = Re-inspection due to unresolved violations after first inspection.

PRODUCT REVIEW COMPLETED/PENDING INSPECTIONS:

1. New Breed (Joyner) – located in Las Vegas, NV
2. AMA (Lawrence)– located in Las Vegas, NV
3. Trampas (Joyner) – located in Tucson, AZ
4. Swank (Joyner) – located in Los Angeles, CA
5. Angry Young Men (Lawrence) – located in San Diego, CA (review for re-inspection)
6. Networx (Joyner) – located in Sacramento
7. Legal Pink (Lawrence) – located in Los Angeles, CA
8. Zane Entertainment – located in Heights Town, NJ
9. Male Media One – located in Los Angeles, CA