# In The Matter Of:

*FREE SPEECH COALITION, INC. et v*
*THE HONORABLE ERIC H. HOLDER*

---

*March 14, 2013*

---

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File d3enalpd.txt

**Min-U-Script® with Word Index**

FREE SPEECH COALITION, INC. et v
THE HONORABLE ERIC H. HOLDER

March 14, 2013

Page 9

Alper

1
2    A.   I am in the process of creating a new
3    website.
4    Q.   Do you use some kind of a program so
5    that you control and manage the content?
6    A.   I have not been able to do that.  I
7    had somebody -- it's complicated.  I had
8    somebody who designed my site.  It is too much
9    trouble for me, so I haven't done anything as
10   far as changing images for about a year, which
11   is why I am now creating a new website where I
12   can change images around at will, but I am
13   learning how to do that.
14   Q.   Why do you have a website?
15   A.   For people to be able to see the kind
16   of work I do for reference, for work purposes.
17   Q.   So you do it for commercial purposes?
18   A.   Yes.
19   Q.   Do you know of other websites where
20   you have content or pages or something like
21   that?
22   A.   I am a finalist in a Hasselblad
23   Masters Competition, so I am on their website.
24   I have a stock agency that represents some of my
25   work, so I am on their website.

Page 10

Alper

1
2         I don't know where else my work might
3    be showing up.
4    Q.   Can you mark this as Alper 2.
5         (Alper Exhibit 2 marked for
6    identification)
7    Q.   Do you recognize this?  Could you
8    describe what that is.
9    A.   I am not sure where this is from.
10   Q.   The URL is at the bottom of the first
11   page.
12   A.   Oh, Saatchi.  I forgot about them.
13   Yes, I posted work on their site a year or two
14   years ago.  It's completely forgotten.
15   Q.   How did you come to post work on this
16   website?
17   A.   Either they solicited or I knew of
18   them, and they are more of a fine arts source.
19   Q.   What did you see as the purpose of
20   posting your work on this website?
21   A.   Exposure and possible sales.
22   Q.   Did you choose the images that would
23   be shown?
24   A.   Yes.
25   Q.   So did you submit image files to them

Page 11

Alper

1
2    and then they posted it on the site?
3    A.   Yes.
4    Q.   Do you think that the images that you
5    see there are representative of your current
6    work?
7         MS. BAUMGARDNER: Objection.
8    A.   My work is varied.  So it's
9    representative of some area and aspect of my
10   work.
11   Q.   How would you characterize your work
12   currently?
13        MS. BAUMGARDNER: Objection.  If you
14   can, Barbara.
15   A.   It is varied.
16   Q.   Could you give examples of the kind of
17   work that you are doing now?
18        MS. BAUMGARDNER: Objection.
19   A.   I do editorial work on assignment, and
20   I do personal work.
21   Q.   What kinds of subject matter appear in
22   your work?
23   A.   People, food, clubs, fashion, flowers,
24   gardens, a whole range of stuff really.
25   Q.   Have you made photographs that depict

Page 12

Alper

1
2    sexually explicit conduct.  When I say "sexually
3    explicit conduct," I mean work as defined in the
4    2257 and 2257A statutes.
5    A.   Yes.
6    Q.   Are you familiar with the definition
7    of "sexually explicit conduct" in those
8    statutes?
9    A.   I believe so.
10   Q.   Could you describe the work that
11   you've produced that falls within that category?
12   A.   I have photographed at clubs.  I've
13   photographed at S & M clubs, and I have
14   photographed at clubs around the world, and I
15   have photographed privately.
16   Q.   What time period did you take these
17   photographs?
18        MS. BAUMGARDNER: Objection.  Do you
19   want to clarify which ones?
20   Q.   During what time period did you take
21   your photographs of sexually explicit conduct?
22   A.   Well, that's --
23        MS. BAUMGARDNER: I don't think that
24   clarifies it.
25   Q.   Is there more than one time period

FREE SPEECH COALITION, INC. et v
THE HONORABLE ERIC H. HOLDER

March 14, 2013

Page 13

Alper

1
2  where you took such photographs?
3  A.   Yes.
4  Q.   What was the earliest time period when
5  you were taking photographs of sexually explicit
6  conduct?
7  A.   Actually, the earliest would be 1978.
8  Q.   What were those photographs?
9  A.   Couples.
10  Q.   In what sense?
11  A.   A couple making love.
12  Q.   Where was the setting?
13  A.   In their home.
14  Q.   Are you talking about more than one
15  photograph or couple or --
16  A.   That was one instance.
17  Q.   That was one instance?
18  A.   Yes.
19  Q.   When was the next time?
20  A.   There might have been some others
21  along the way, but then I photographed at clubs
22  starting in 1981.
23  Q.   How did you come to photograph at
24  clubs?
25  A.   A photographer who was having a party

Page 14

Alper

1
2  at one of the S & M clubs invited me and said
3  bring my camera.
4  Q.   At the time what else were you doing
5  in photography?
6  A.   I was working for American Lawyer
7  Magazine.  I was freelancing, and I started a
8  series on Rockaway Beach.
9  Q.   When you went to these clubs, the
10  first, when you went to the first club and were
11  asked to bring your camera, was that -- did that
12  qualify as an assignment or --
13  A.   It was a personal project.
14  Q.   Were you paid for this?
15  A.   No.
16  Q.   Why did your friend or acquaintance
17  ask you to bring your camera?
18  MS. BAUMGARDNER: Objection.
19  Q.   If you know.
20  A.   They thought I would be interested and
21  want to take pictures.
22  Q.   When you went to this club, what was
23  the setting?
24  A.   It was an S & M club called the
25  Hellfire Club.

Page 15

Alper

1
2  Q.   What was it?  What time of day was the
3  event?
4  A.   It was at night.
5  Q.   I'm not very familiar with clubs, so
6  what was it like?  Was it very crowded?
7  A.   Yes.
8  Q.   Noisy?
9  A.   I don't remember.
10  Q.   Was it dark?
11  A.   Yes.
12  Q.   Were people drinking?
13  A.   Yes.
14  Q.   Were you drinking?
15  A.   No.
16  Q.   How did you decide what photographs to
17  take?
18  A.   I photograph what interests me.
19  Q.   Were people using drugs at the club?
20  MS. BAUMGARDNER: Objection.
21  A.   I have no idea.
22  Q.   That you know of?
23  A.   I have no idea.
24  Q.   Were you using drugs when you were
25  taking photographs at the club?

Page 16

Alper

1
2  MS. BAUMGARDNER: Objection.
3  A.   No.
4  Q.   Did you ever think when you were
5  taking these photographs that -- first of all,
6  were all the photographs that you took at this
7  club photographs of sexually explicit conduct?
8  A.   Yes.
9  Q.   In what sense?
10  MS. BAUMGARDNER: Objection.
11  A.   I don't understand.
12  Q.   What was involved that makes you
13  believe that the photographs you were taking
14  were of sexually explicit conduct?
15  A.   It was an S & M club.
16  Q.   So all of the photographs that you
17  took involved S & M conduct?
18  A.   Yes.
19  Q.   Did you ever wonder about the fact
20  that if you were to photograph a minor engaged
21  in that conduct -- let me rephrase.  Did it ever
22  occur to you to wonder whether any of the
23  individuals in the club were minors?
24  A.   It is an adult-only club.
25  Q.   What does that mean?

Case 2:09-cv-04607-MMB   Document 178-2   Filed 05/10/13   Page 4 of 168
FREE SPEECH COALITION, INC. et v
THE HONORABLE ERIC H. HOLDER

March 14, 2013

Page 17

Alper

1
2     A.   It means people had to be over 21 to
3  get in.
4     Q.   How is that enforced?
5     A.   There was a sign posted at the
6  entrance, and IDs were checked.
7     Q.   Who was checking IDs?
8          MS. BAUMGARDNER: Objection.
9          If you can remember.
10    A.   Whoever took people's money to enter
11  the club.
12    Q.   Have you ever heard of underaged
13  individuals getting into clubs that had age
14  restrictions?
15    A.   I have no idea.
16    Q.   You never looked at the IDs of the
17  people whose photographs you were taking?
18    A.   There would be no reason to.
19    Q.   So you were operating on an assumption
20  that the people you were photographing were 18
21  or over or 21 or over?
22          MS. BAUMGARDNER: Objection. I don't
23  think it was an assumption. But go ahead. You
24  can answer Ms. Wyer's question.
25    A.   I knew that people were older.

Page 18

Alper

1
2     Q.   This was based on the fact, your
3  understanding that there was a sign posted?
4          MS. BAUMGARDNER: Objection.
5     A.   And by appearance. People were older.
6  There were no young people there.
7     Q.   What do you mean by "young"?
8          MS. BAUMGARDNER: Objection.
9     A.   Teenage.
10    Q.   So that was the first time you went to
11  a club, in 1986?
12    A.   No, I didn't say '86.
13    Q.   What did you say?
14    A.   1981.
15    Q.   1981. How many additional times did
16  you go to clubs like that to take photographs?
17    A.   Several.
18    Q.   Do you have a more specific number?
19    A.   No.
20    Q.   Less than five or more than five?
21    A.   I don't remember.
22    Q.   Less than ten?
23    A.   I don't remember, honestly.
24    Q.   How frequently would you go to clubs
25  to take photographs?

Page 19

Alper

1
2     A.   If there was a party that I knew of
3  and I was invited to photograph it.
4     Q.   Was the total number of times when you
5  went to clubs to take photographs more than a
6  hundred?
7          MS. BAUMGARDNER: Objection.
8          She's testified she doesn't remember.
9     A.   Right. I don't remember.
10    Q.   You don't remember if it was more than
11  a hundred or less than ten?
12    A.   I don't think it was more than a
13  hundred.
14    Q.   Do you think it was more than 50?
15    A.   I don't know.
16    Q.   More than 90?
17          MS. BAUMGARDNER: Objection. She's
18  answered the question that she doesn't remember.
19  It's less than a hundred.
20          THE WITNESS: Right.
21          MS. BAUMGARDNER: We have provided
22  photos of some of the clubs she photographed.
23    Q.   When was the last time that you took
24  photographs at a club of S & M?
25    A.   1995.

Page 20

Alper

1
2     Q.   What was that occasion?
3     A.   There was a party in England in London
4  that I was invited to photograph.
5     Q.   So between 1981 and 1995 was the
6  period when were you taking photographs in clubs
7  of S & M?
8     A.   Yes.
9     Q.   In 1995 what else was happening in
10  your career?
11    A.   I was photographing for the New York
12  Times and working on other projects.
13    Q.   Is there a trajectory of your career
14  that you can describe starting in 1980.
15          MS. BAUMGARDNER: Objection. I am not
16  sure -- perhaps if you could clarify what you
17  mean by "trajectory."
18    Q.   I am not sure how it worked because of
19  your working on assignments. Did you have one
20  main employer and then it changed over time, or
21  how did it develop or how did you go from one
22  thing to the next, starting in 1980?
23    A.   Things evolve and I have various
24  clients along the way. I have the New York
25  Times I worked for for ten years, and I would

FREE SPEECH COALITION, INC. et v
THE HONORABLE ERIC H. HOLDER

March 14, 2013

---

Page 25

Alper

1   exhibition of genitals?
2   A.   I am not sure what "lascivious
3   exhibition" means.
4   Q.   So you have not attempted to determine
5   whether -- have you ever taken a photograph
6   where you wondered if it qualified as lascivious
7   exhibition of the genitals?
8       MS. BAUMGARDNER: Objection.  I think
9   it's fair she's asked you what lascivious
10  exhibition of the genitals means so she can
11  answer your question.  If you would provide her
12  the definition, she could answer.
13  Q.   Let me rephrase.  You say other than
14  the photographs of you and your husband you have
15  never taken photographs of sexually conduct
16  since 1995, correct?
17  A.   Correct.
18  Q.   Is that correct or not?
19  A.   That's correct.
20      MS. BAUMGARDNER: Can I bring Cara
21  back in.
22      THE WITNESS: Yes.
23      MS. BAUMGARDNER: Kathy, is that all
24  right with you?  We will ask her to leave the

---

Page 26

Alper

1   subject matter comes up again.  I got the
2   impression that you were moving on to a new area
3   of questioning.
4       MS. WYER: OK.
5       (Ms. Gagliano present)
6   Q.   Let's turn to 2257.  Could you
7   describe what requirements of 2257 cause you
8   concern.
9   A.   This is a couple of things.  One is
10  the requirement of showing people's IDs and
11  revealing their identity; two, the recordkeeping
12  involved.  Those are a couple of things.
13  Q.   When you say showing peoples IDs and
14  revealing their identity is a concern, are you
15  concerned about people revealing their
16  identities to you?
17  A.   Not to me.
18  Q.   Are you concerned about looking at
19  people's IDs?
20  A.   No.
21  Q.   So what is concerning about looking --
22  A.   Their information could be made
23  public.
24  Q.   How do you think that would happen?

---

Page 27

Alper

1   A.   I don't remember the specifics of the
2   law, but I believe that if -- what?  If it were
3   shared, if somebody wanted to examine my
4   records, that's how.
5   Q.   In your understanding, someone
6   examining your records could lead to your
7   records becoming public?
8   A.   Yes.  That's one.
9       Isn't there another aspect of the law
10  where the -- I am not good at remembering
11  specific details of the law in general.
12  Q.   You are not concerned with yourself
13  checking IDs, correct?
14  A.   I didn't say that.
15  Q.   You are concerned?  Are you concerned
16  about checking IDs?
17  A.   I would not photograph anyone
18  underage.  That is of no interest to me.  So I
19  know that people are old enough and over the age
20  of 21 or 18 -- over the age of 21 before I would
21  be photographing them.
22  Q.   So the requirement that you check IDs,
23  is that a concern to you, just the checking of
24  the IDs?

---

Page 28

Alper

1       MS. BAUMGARDNER: Can you clarify what
2   you mean by concern, Kathy.  I don't mean to be
3   playing games here.  That might be kind much a
4   loose term.  If you could clarify that a bit, it
5   might make it easier for her to respond.
6   A.   I know the people I photograph, so I
7   don't need to check ID.
8   Q.   So you view checking IDs as
9   unnecessary because you never -- when you say
10  you know the people you photograph, what
11  photographs are you describing?
12  A.   The personal ones that I take.
13  Q.   I think now we are going back to the
14  subject.
15      MS. BAUMGARDNER: OK.  This may elicit
16  more testimony that will be subject to the
17  protective order, so I am going to ask the law
18  student in the room to leave the room, please.
19      (Ms. Gagliano not present)
20  A.   I know how old I am, and I know how
21  old my husband is.  And I have our IDs.
22  Q.   So these are the only photographs that
23  you are describing?
24  A.   That I am photographing currently.

---

FREE SPEECH COALITION, INC. et v
THE HONORABLE ERIC H. HOLDER

March 14, 2013

Page 33

Alper

1
2   A.   Yes.
3   Q.   Is that always the case, that they are
4   for sale?
5   A.   If they are at a museum, they are not
6   for sale.
7   Q.   But at a gallery they would always be
8   for sale?
9   A.   Yes.
10   Q.   When you responded to the defendant's
11   request for production and provided 10 examples
12   of your work, do you remember the photographs
13   that you gave us as examples?
14   A.   Not off the top of my head.
15       MS. BAUMGARDNER: Do you have the list
16   available.  That would be helpful.
17   Q.   Would just looking at the list from
18   your discovery responses refresh your memory?
19   A.   Of what?
20   Q.   Of the photographs that you gave us as
21   examples.
22   A.   Yes.
23   Q.   The list, if we gave you the list.
24   A.   I'm not sure what you are asking to
25   elicit.

Page 34

Alper

1
2   Q.   There is one copy.  I will show it to
3   you to refresh your memory.
4       MS. BAUMGARDNER: That was response to
5   question No. 5 of the defendant's first set of
6   interrogatories propounded to plaintiffs?
7       MS. WYER: Yes.
8   A.   So what is your question?
9   Q.   Does looking at that list of titles
10   refresh your memory about what photographs you
11   provided to the defendant as examples of your
12   work?
13   A.   Yes.
14   Q.   How did you select the photographs in
15   that list to provide?
16   A.   I don't --
17       MS. BAUMGARDNER: Would you let her
18   read the statute.  That might help her refresh
19   her memory of how she --
20       MR. BLADUELL: I don't think she's
21   established that she doesn't remember, and she
22   cannot answer the question without the list.
23       MS. BAUMGARDNER: Kathy asked how she
24   selected them.  And I think if she reads the
25   question of what she was supposed to produce,

Page 35

Alper

1
2   that might refresh her recollection as to how
3   she made those selections.
4   A.   Because they are a representative
5   sample of my work.
6   Q.   Would any photograph from the clubs
7   that you took of S & M conduct before 1995 be
8   representative?
9   A.   Yes.
10   Q.   So were these a random selection?
11   A.   Yes.  Some of them I had already
12   scanned.
13   Q.   How many of these photographs from
14   that set of pre-1995 S & M conduct have been
15   sold or collected?
16   A.   The New York Public Library purchased
17   20 of them.  The Bibliothèque Nationale in Paris
18   purchased -- I can't remember exactly how many.
19   They purchased 10 or 20.  I don't remember
20   exactly.  So those are two examples.
21   Q.   Any other sales that you can remember?
22   A.   Yes.  My work has been published in
23   a -- is it a Danish, Norwegian magazine called
24   Cupido.
25       I don't remember if I was paid --

Page 36

Alper

1
2   yeah, I have work in a book called Sex in New
3   York City, and I think I was probably paid a fee
4   for use of those pictures for the book.
5   Q.   Do you recall what year that book was
6   published?
7   A.   Since 2000 -- no, I can't remember.
8   Q.   Was it after 1995?
9   A.   I'm not sure.
10   Q.   But the book would have a copyright
11   date that would indicate that?
12   A.   Yes.
13   Q.   Going back to the 2257 requirements,
14   we've talked about the ID requirement.  When I
15   ask you what requirements cause you concern,
16   what I mean is which ones do you feel impact you
17   or which ones are you objecting to.
18       Are you objecting to the requirement
19   of checking IDs?
20       MS. BAUMGARDNER: Objection.
21   A.   Of checking ID?  No.
22   Q.   So I will try to explain what I mean
23   by "of concern" further.  What I am asking is
24   which requirements do you feel burden you, which
25   ones are the ones that are the reason that you

FREE SPEECH COALITION, INC. et v
THE HONORABLE ERIC H. HOLDER

March 14, 2013

Alper

the grounds that I think it's unfair --
    MS. WYER: I understand all of that.
    MS. BAUMGARDNER: -- that you are
asking these questions without allowing her to
review the particular regulations in the law.
    MS. WYER: We've noted that objection.
    Q.   You mentioned here that one of your
concerns is that you will not be able to find
the IDs of individuals that appear in your work
before 1995, and your concern there -- did I
understand correctly that your concern is that
you cannot publish, in your understanding you
cannot publish such images from your pre-1995
period together with any image that you might
produce after the requirements have gone into
effect?
    A.   Yes.
    Q.   But nothing would prevent you in your
understanding from publishing your pre-1995 work
separately, is that correct?
    MS. BAUMGARDNER: Objection.
If you know.
    A.   I don't think it would affect, but
that's not what I want to do.

Alper

explain this? Fire Island, where there are
people openly having sex, there are men openly
having sex that I could photograph, but it is in
a totally anonymous situation, so I can't do it.
    Q.   Are you saying that you would like to
take photographs of these people without their
knowledge?
    A.   I can't do that.
    Q.   I don't understand.
    A.   I might be able to approach them
afterwards, but nobody is willing to give an ID
when people are having anonymous sex.
    Q.   You mentioned Fire Island.  What does
that mean?
    A.   There are areas in Fire Island --
    Q.   Where is Fire Island?  I am not
familiar.
    A.   It is on Long Island.
    Q.   Why is that a location in particular
that you mentioned?
    A.   Because it is a location that's known.
    Q.   So going back to the photos of you and
your husband, how many photographs exist from
that?

Alper

    Q.   So could you explain what your plan is
for this compilation that you have indicated you
are interested in producing?
    A.   I would like to produce a book of work
that I have taken prior to 1995 and include work
that I've taken and/or will take since 1995 and
put it together as representative of a body of
work that I've done in my lifetime.
    Q.   Since 1995 so far the only --
    MS. BAUMGARDNER: This may also
implicate protected information protected by the
protective order.  So I am going to ask Cara to
leave.
    (Ms. Galiano not present)
    Q.   Since 1995 the only images that you
have produced that qualify as depictions of sex
reply explicit conduct are the images of you and
your husband, correct?
    A.   Yes.  There are other situations that
I have opportunity to photograph, but I can't
because I can't ask for IDs.
    Q.   What do you mean you can't ask for
IDs?
    A.   There are situations where -- how do I

Alper

    MS. BAUMGARDNER: Objection.
    A.   I don't know.
    Q.   These are photographs, not video, is
that correct?
    A.   Yes.  That's correct.
    Q.   You said that you've taken these such
photographs on approximately five occasions?
    A.   No.
    MS. BAUMGARDNER: Objection.
    A.   That is not what I said.
    Q.   OK.  Please repeat what you said.  I
don't remember.
    A.   I said I had photographed over the
last five years.
    Q.   And how many occasions?
    A.   I don't remember.
    Q.   So what has happened to these
photographs?
    A.   One, I have them; two, they were
published in Cupido, in the magazine that is
published in Norway.
    Q.   Do you know what year, what issue of
the magazine?
    A.   I don't know specific issues, no.

FREE SPEECH COALITION, INC. et v
THE HONORABLE ERIC H. HOLDER

March 14, 2013

Alper

1
2    Q.   Would that be the most recent of your
3    sales, to Cupido?
4    A.   Yes.
5    Q.   Did you create records under 2257 for
6    these images?
7         MS. BAUMGARDNER: Objection.
8    A.   No.  I could at any time.  It is my
9    husband and me, and we're way overage.  We could
10   almost fall into the granny group.
11   Q.   Just for the record, how old are you?
12   A.   63.
13        MS. BAUMGARDNER: You are under oath.
14        THE WITNESS: OK.  I should have said
15   50.
16   Q.   Is that the only sale of your
17   photographs of you and your husband that has
18   happened?
19   A.   Yes.
20   Q.   Have these photographs been exhibited?
21   A.   No.
22   Q.   Have these photographs been posted
23   online?
24   A.   No.
25   Q.   Are these photographs that you want to

Alper

1
2    publish in the compilation that you have
3    mentioned?
4    A.   Conceivably.
5    Q.   Have you contacted any publisher about
6    a specific project that would involve a
7    compilation such as you have described?
8    A.   Not yet.
9    Q.   So going back, just to summarize
10   regarding the 2257 requirements, you've
11   mentioned your understanding of the requirements
12   that would apply to the compilation that you
13   have described and the IDs of individuals in
14   your pre-1995 work, correct?
15   A.   Yes.
16   Q.   And you have described a concern with
17   the inspections, correct?
18   A.   Yes.
19   Q.   And you have described a concern with
20   ID, including the names and IDs of individuals
21   with the exhibited work?
22   A.   Yes.
23        MS. BAUMGARDNER: Objection.
24   Q.   In your understanding of these
25   requirements, are there any other aspects of

Alper

1
2    them that you feel impose a burden on you?
3    A.   I think I already mentioned
4    recordkeeping.
5    Q.   Anything else?
6    A.   I would have to see a copy of the law
7    to refresh my memory.
8         MS. BAUMGARDNER: Just to be complete,
9    objection.  I think that isn't a complete list
10   of her testimony, but the transcript will speak
11   for itself.  I think she identified other areas
12   as well.
13        Barbara, do you need a break?
14        THE WITNESS: What time is it?
15        MR. BLADUELL: It is 1:50.
16        THE WITNESS: I can wait a little bit
17   longer.  Thank you.
18   Q.   Has anyone ever contacted you from the
19   government saying that they wanted to conduct an
20   inspection of your records under 2257?
21   A.   No.
22   Q.   Why haven't you made any other
23   photographs, any other depictions of sexually
24   explicit conduct since 1995?
25        MS. BAUMGARDNER: That has not been

Alper

1
2    her testimony.
3    Q.   Other than the photographs of you and
4    your husband, why have you not made any other
5    photographs of sexually explicit conduct since
6    1995?
7    A.   Partly because the restrictions of the
8    ID and lack of anonymity with the 2257 ruling.
9    Q.   How did you become aware of those
10   requirements?
11   A.   Through people I know.
12   Q.   When did you become aware of them?
13   A.   I don't remember exactly.  In
14   addition, I have also had other projects I have
15   been working on.  As I indicated before, I have
16   different projects in my work.
17   Q.   Why did you stop taking photographs at
18   S & M clubs?
19   A.   Because they were closed.
20   Q.   Why did you close?
21        MS. BAUMGARDNER: Objection.
22   Q.   Was there some --
23   A.   There was AIDS, and I think that might
24   help define reasons why the clubs closed.
25   Q.   So the fact that you stopped taking

FREE SPEECH COALITION, INC. et v
THE HONORABLE ERIC H. HOLDER

March 14, 2013

Page 69

Alper

1
2    MS. BAUMGARDNER: Yes.  I object.  I
3 don't want the --
4    MS. WYER: Are you objecting to her
5 answer?
6    MS. BAUMGARDNER: Yes, I am.  I don't
7 want her to guess.  I don't think you want her
8 to guess.  Can you give an estimate?
9    Q.   Can you say with any certainty that
10 you have ever been to Fire Island more than five
11 times in a year?
12    A.   Probably not.
13    Q.   Meaning you can't say with any
14 certainty or you probably have not been to Fire
15 Island?
16    A.   I probably have not been more than --
17 oh, so when I go out, I might go for a weekend
18 or I might go for a week.  So that's where it
19 gets -- the question is too broad.  I can't say
20 how many times I've been because it doesn't
21 mean -- it could be days or it could be a week.
22    Q.   On any of these occasions when you
23 have gone to Fire Island and seen people having
24 sex outside, have you ever attempted to ask
25 those individuals if you could photograph them?

Page 70

Alper

1
2    A.   No.
3    Q.   So you don't know if they would agree
4 or not, correct?
5    A.   With pretty fair certainty I know that
6 they would not agree.
7    Q.   What is that based on?
8    A.   They are having anonymous sex.
9    Q.   So you don't think that they want to
10 be photographed, is that right?
11    A.   I can say with a fair amount of
12 certainty that they would not want to reveal
13 their identity for any formal record.
14    Q.   So if you were to take these
15 individuals' photographs without checking their
16 IDs how would you know whether they were 18 or
17 over?
18    A.   I wouldn't.
19    Q.   You have already mentioned that you
20 have taken photographs of you and your husband.
21 Have these photographs been of you and your
22 husband having sex?
23    A.   Yes.
24    MS. BAUMGARDNER: Excuse me.  Just for
25 the record, this is protected information.

Page 71

Alper

1
2    MS. WYER: OK.
3    MS. BAUMGARDNER: I think it requires
4 me to say that.
5    Q.   Have you ever sent any of these
6 photographs to anyone by e-mail?
7    A.   For publication in Finland -- not in
8 Finland, in Norway.  It's Norway or Sweden for
9 Cupido.
10    Q.   Have you ever sent any of the
11 photographs of you and your husband engaged in
12 sexual conduct by text message?
13    A.   No.
14    Q.   Have you ever posted any of these
15 photographs on a social networking site?
16    A.   No.
17    Q.   Do you have a Facebook account?
18    A.   I do.
19    Q.   Do you consider that work related?
20    A.   I don't know what I consider it.  I
21 rarely go to it.  I can't figure it out.  That's
22 what I think of Facebook.
23    Q.   Your circle of friends, do you think
24 that they are very active in Facebook?
25    A.   Maybe some more than others.

Page 72

Alper

1
2    Q.   And are you generally aware of
3 whether -- never mind that.
4    MS. WYER: Can we take a break just so
5 we can confer?
6    MS. BAUMGARDNER: Sure.
7    (Recess)
8    Q.   How did you become a plaintiff in this
9 case?
10    A.   Honestly, I don't remember exactly.
11 I think possibly one of the other
12 plaintiffs gave my name knowing the kind of
13 pictures that I have shot.  I think that's how
14 it came about.
15    Q.   Are you personally acquainted with any
16 of the other plaintiffs in the case?
17    A.   Yes.
18    Q.   Which ones?
19    A.   Barbara Nitke, David Steinberg, Betty
20 Dodson.  I can't remember who else is involved.
21    MS. BAUMGARDNER: She's identified
22 Victor Perlman and Eugene Mopsik in her earlier
23 testimony.
24    Q.   So Eugene Mopsik and Victor Perlman as
25 officers and representative of ASMP?

FREE SPEECH COALITION, INC. et v
THE HONORABLE ERIC H. HOLDER

March 14, 2013

Page 81

Alper
1
2  requirements?
3     A.   I haven't spoken to any publishers
4  about it.
5     Q.   Do you have any other concerns
6  regarding the 225and 2257A requirements that you
7  haven't identified here?
8     A.   I don't remember all of the details of
9  those two to be able to say.
10    Q.   But nothing stands out in your mind as
11  something that you are particularly concerned
12  about that you haven't mentioned?
13    A.   I don't remember all the details to be
14  able to respond.
15    Q.   But you have identified certain
16  things, so I assume that those issues are the
17  ones that stand out in your mind as a concern?
18    A.   Yes.
19         MS. WYER: I think that's it.
20         THE WITNESS: Terrific.
21         MS. BAUMGARDNER: OK.  I would like to
22  ask a follow-up question if I may.
23  EXAMINATION
24  BY MS. BAUMGARDNER:
25    Q.   Ms. Alper, you were asked about

Page 82

Alper
1
2  photographing the people you said you observed
3  having sex on Fire Island.
4     A.   Right.
5     Q.   Kathy will correct me if I'm wrong, if
6  I misphrase this, but I believe you were asked
7  without checking their IDs, there was no way for
8  you to know that they were over 18.
9         MS. BAUMGARDNER: Have I phrased that
10  fairly, Ms. Wyer?  Was that the question to her?
11         MS. WYER: I think we would have to go
12  back and look at the transcript.
13         MS. BAUMGARDNER: I believe, if you
14  accept it, something like that, and you said
15  there wasn't.
16    Q.   Is there any other way that you could
17  tell, apart from checking someone's photo ID, to
18  establish whether they were an adult or not?
19    A.   Yes.  I could tell by visually I could
20  tell that they weren't teenagers.
21    Q.   As far as identifying all of the
22  burdens and issues you have with 2257 and
23  compliance, you have identified other, a
24  complete issue after consulting with your legal
25  counsel in responding to the government's paper

Page 83

Alper
1
2  discovery that we call interrogatories, have you
3  not?
4     A.   Say the question again.
5     Q.   You recall that the government asked
6  you certain questions and you had to write down
7  on paper?
8     A.   Right.
9     Q.   Then you reviewed your answers after
10  consulting with me?
11    A.   Yes.
12    Q.   Then you swore to the truth and
13  accuracy of those answers?
14    A.   Yes.
15    Q.   So, in addition to your testimony here
16  as far as any concerns and problems you have,
17  you also adopt what you have said in the written
18  discovery to the government?
19    A.   Oh, yeah.  Yeah, absolutely.
20         MS. BAUMGARDNER: That is all I have.
21         MS. WYER: We have follow-up.
22  EXAMINATION
23  BY MS. WYER:
24    Q.   In regard to what you just said about
25  being able to visually determine whether someone

Page 84

Alper
1
2  was a teenager, with what degree of accuracy do
3  you believe you can determine someone's age by
4  looking at them?
5         MS. BAUMGARDNER: Objection.  That
6  wasn't her testimony.
7     A.   I think I can fairly accurately tell
8  if somebody is a teenager or not.
9     Q.   By a teenager, do you mean anyone
10  between the age of 13 and 19?
11    A.   Anyone under the age of 18.
12    Q.   Can you tell by looking at someone
13  whether they are 17 or 18?
14    A.   Probably not.
15    Q.   Do you think you can tell by looking
16  at someone whether they are 17 or 19?
17         MS. BAUMGARDNER: Objection.
18    A.   Maybe.  I have absolutely no interest
19  in photographing anyone who is underage.  I have
20  no interest in child pornography.  I am totally
21  opposed to it.  I have no interest at all in
22  engaging anyone who is not of legal age, period.
23    Q.   Do you think that people under the age
24  of 18 have sex?
25    A.   I think there are news reports that

Case 2:09-cv-04607-MMB   Document 178-2   Filed 05/10/13   Page 11 of 168
FREE SPEECH COALITION, INC. et v
THE HONORABLE ERIC H. HOLDER

March 14, 2013

Page 85

Alper

1     Alper
2   people under the age of 18 have sex.  I don't
3   have any doubt.
4     Q.   Is there any reason for you to assume
5   no one under the age of 18 ever has sex outside?
6     A.   I have no idea.
7     Q.   So, as far as you know, people under
8   the age of 18 may have sex outside?
9     A.   I have no idea.  But the area that I
10  go to, the area where we are talking about on
11  Fire Island is not a teenage hangout.  It is a
12  place where adults go.  It's not teenagers who
13  go there.
14    Q.   Is there any person at the entrance to
15  this area checking IDs?
16    A.   It is an island, it is a public space,
17  but it is a residential space, so it's not a
18  public beach.  I mean, it's -- it's too
19  complicated.  It is an island.
20    Q.   Are people under the age of 18
21  prohibited from visiting the island?
22    A.   No.
23    Q.   So, as far as you know, there may be
24  people under the age of 18 on the island?
25    A.   There are families, but there are

Page 86

1     Alper
2   communities and areas that are a family
3   community or not a family community.
4     Q.   This area where you observed people
5   having sex outside, is there any fence around
6   this area?
7     A.   No.
8     Q.   Is there any checkpoint that someone
9   has to pass in order to access this area?
10    A.   No.
11    Q.   Do you think that you can tell by
12  looking whether someone is 30 or 40?
13        MS. BAUMGARDNER: Objection.
14    A.   Maybe.
15    Q.   Does it depend on the person?
16    A.   Yes.  People differ.
17    Q.   Can you tell whether someone is 40 or
18  55?
19        MS. BAUMGARDNER: Objection.
20    A.   No.
21    Q.   Can you tell whether someone is 25 or
22  30?
23        MS. BAUMGARDNER: Objection.
24    A.   No.
25    Q.   Can you tell whether someone is 20 or

Page 87

1     Alper
2   30?
3        MS. BAUMGARDNER: Objection.
4     A.   Maybe.  Probably.
5     Q.   Does it depend on the person?
6        MS. BAUMGARDNER: Objection.
7     A.   Yes.
8     Q.   Do you have any specialized training
9   in identifying someone's age by looking at them?
10    A.   Is there such a thing?
11    Q.   Is the answer no?
12    A.   No.
13        MS. WYER: I think that's all.
14        MS. BAUMGARDNER: OK.  Thank you very
15  much.
16        THE WITNESS: Thanks.
17        MS. BAUMGARDNER: I think we'll read,
18  Sam.
19        (Deposition concluded at 3:15 p.m.)
20
   _____
21  BARBARA ALPER
22
    Subscribed and sworn to
23  before me this            day
    of        , 2013.
24
25  _____

Page 88

1     Alper
2
3        I N D E X
4
5   WITNESS: Barbara Alper
6   EXHIBITS
7   Description              Page
8   Alper 1              8
9   Alper 2              10
10  Alper 3              29
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# In The Matter Of:

*FREE SPEECH COALITION, INC v*
*THE HONORABLE ERIC H. HOLDER*

---

*March 15, 2013*

---

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File d3fndodd.txt

**Min-U-Script® with Word Index**

Page 1

```
 1                    Dodson
 2  UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF PENNSYLVANIA
 3  -----------------------------x
 4  FREE SPEECH COALITION, INC. et
    al.,
 5
                 Plaintiffs,
 6
         v.                    No. 09-4607
 7
    THE HONORABLE ERIC H. HOLDER,
 8
                 Defendant.
 9
    -----------------------------x
10
                        March 15, 2013
11                      12:50 p.m.
12
13
14      Deposition of BETTY DODSON, taken by
15  Defendant, at the United States Attorney's
16  Office, One St. Andrew's Plaza, New York, New
17  York, before Samuel G. Mauro, Jr., a Registered
18  Merit Reporter and Notary Public of the State of
19  New York.
20
21
22
23
24
25
```

Page 2

```
 1                    Dodson
 2             A P P E A R A N C E S
 3
 4  BERKMAN, GORDON, MURRAY & DEVAN
 5  Attorneys for Plaintiffs
 6       55 Public Sq., Ste. 2200
 7       Cleveland, OH 44113-2000
 8  BY:  LORRAINE BAUMGARDNER, ESQ.
 9
10
11  United States Department of Justice
12  Civil Division, Federal Programs Branch
13       Attorneys for Defendant
14       20 Massachusetts Avenue, N.W.
15       Room 7130
16       Washington, DC 20530
17  BY:  KATHRYN WYER, ESQ.
18       HECTOR G. BLADUELL, ESQ.
19
20  ALSO PRESENT:  Carlin Ross
21
22
23
24
25
```

Page 3

```
 1                 Dodson
 2  BETTY DODSON,
 3     called as a witness by Defendant,
 4     having been duly sworn, testified as follows:
 5  EXAMINATION
 6  BY MR. BLADUELL:
 7     Q.   Good afternoon, Ms. Dodson.
 8          As I said, my name is Hector Bladuell.
 9  I represent the government in this lawsuit.
10  This is a challenge to the constitutionality of
11  Section 2257 under the First and Fourth
12  Amendments.
13          Ms. Dodson, have you been deposed
14  before?
15     A.   Deposed?  Yes.
16     Q.   And can you tell us in what instance
17  when have you been deposed before?
18     A.   It was so long ago; it was ages ago.
19  It was a lawsuit for a company that had a
20  construction on the sidewalk.
21     Q.   It was not related to sexually
22  explicit images?
23     A.   It was what?
24     Q.   Not related to sexually explicit
25  images?
```

Page 4

```
 1                 Dodson
 2     A.   Nothing, no.
 3     Q.   The overall purpose of this deposition
 4  is not to discuss the merits of your claim.  The
 5  purpose is for us to ask you questions so we can
 6  understand better your claim.  If you don't
 7  understand a question that I ask, please ask me
 8  to clarify --
 9     A.   Oh, I will.
10     Q.   And I will rephrase or ask it again.
11          -- your counsel, Ms. Baumgardner here,
12  will make objections to some of my questions.
13  Unless she instructs you not to answer, you can
14  answer the question.
15     A.   OK.
16     Q.   I understand that you have a hearing
17  impairment, correct?
18     A.   I have my hearing aids all the way up,
19  but it's still difficult.
20     Q.   Does your hearing impairment affect
21  your ability to remember details about things
22  that happened before?
23     A.   No.
24     Q.   Are you under any medication that
25  would impair your ability to remember?
```

Page 5

Dodson

1
2    A.   No, I take no meds.
3    Q.   No medical condition that would impair
4    your ability to remember?
5    A.   None.
6    Q.   Now, Ms. Dodson, have you prepared for
7    this deposition?
8    A.   Have I been what?
9    Q.   Prepared?
10   A.   Yes.
11   Q.   Can you describe the steps that you
12   took to prepare for the deposition.
13   A.   Well, you asked a lot of questions,
14   and we discussed it, yes.
15   Q.   By "you," you mean your counsel?
16   A.   Yes.
17   Q.   Ms. Baumgardner?
18   A.   Yes.
19   Q.   Did you review any documents in
20   connection with your preparation?
21   A.   Documents, no.
22   Q.   You didn't read any documents to
23   prepare for the deposition?
24   A.   No, I didn't.
25   Q.   Did you make any notes to prepare for

Page 6

Dodson

1
2    the deposition?
3    A.   None.
4    Q.   Could you please describe what your
5    current occupation is.
6    A.   Yes.  I am a sex educator, and I am
7    answering questions on a website that I run with
8    my partner, Carlin.
9    Q.   By sex educator, what do you mean?
10   A.   I am a Ph.D. sexologist, and I have
11   been teaching women about orgasms for the last
12   40-some years.
13   Q.   Do you also produce sexually explicit
14   images?
15   A.   I have in the past, yes.
16   Q.   When you say in the past, what date
17   ranges?
18   A.   Well, all right.  Just let me think a
19   minute.  I produced videotapes, DVDs in the
20   '90s.  And I think we had one -- when did that
21   one come out the recent --
22        MS. ROSS: I can't really answer.
23   A.   Oh, there was one that we produced a
24   couple of years ago.
25   Q.   Do you have a company?

Page 7

Dodson

1
2    A.   Yes.
3    Q.   That you run?
4    A.   Yes.
5    Q.   What is the name of the company?
6    A.   Bad Media.  Those are my initials.
7    Q.   You are the president of Bad Media?
8    A.   I'm the founder.
9    Q.   The founder?
10   A.   Yeah.
11   Q.   When did you start Bad Media?
12   A.   Five years ago, approximately.
13   Q.   So 2008, approximately?
14   A.   See, it is very difficult for me to
15   remember dates.  You know, ask me anything about
16   sex and I've got it nailed.  Date, I don't know.
17   She knows dates.
18   Q.   Before founding Bad Media, what did
19   you do?
20   A.   Same thing.  I had a website, and I
21   was teaching and I ran workshops and I had
22   private sessions.
23   Q.   Do you remember the name of the
24   website?
25   A.   Betty Dodson.

Page 8

Dodson

1
2    Q.   Betty Dodson.  OK.
3        Do you have a college degree?
4    A.   Yes.  And I also have a Ph.D. from a
5    private school in San Francisco.
6    Q.   Where did you go to college?
7    A.   Wichita University.
8    Q.   Wichita?
9    A.   Wichita University.
10   Q.   Is that in Kansas?
11   A.   Nowhere else.
12   Q.   What was your major?
13   A.   Art.
14   Q.   What do you mean by art?
15   A.   Oh, wait a minute.  I didn't
16   matriculate at the university.  Then I came to
17   New York and I went to art school for five
18   years.  You don't matriculate in art school.  I
19   got a lot of scholarships.
20   Q.   OK.  But in this university in Kansas
21   that you said --
22   A.   Yes.
23   Q.   -- what was your major?
24   A.   Art.
25   Q.   Art meaning?

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 15, 2013

Page 9

Dodson

2    A.   Drawing and painting.
3    Q.   After you took art, do you remember
4  the year that you graduated?
5    A.   I graduated, you don't -- in art
6  school you don't graduate.  You don't
7  matriculate.  You just go to school.
8    Q.   So you didn't get a degree a
9  bachelor's degree in art?
10    A.   No.  No, I did not.
11    Q.   For how long did you study art in
12  Kansas?
13    A.   Oh, I got out of Kansas right away.  I
14  moved to New York.  So I was in art school in
15  New York.
16    Q.   When was your move from Kansas to New
17  York?  Do you remember the date?
18    A.   1950.
19    Q.   1950.  In New York, have you taken art
20  courses?
21    A.   In New York did I take art courses?
22  It is not like we take courses.  We do it.  We
23  draw and we paint.
24    Q.   OK.  But you have not --
25    A.   I went to the national academy of

Page 10

Dodson

2  design and the students league, and I got a lot
3  of scholarships.  I'm good.
4    Q.   Have you received a degree from these
5  institutions?
6    A.   No, we don't do degrees for art.  You
7  do art.
8    Q.   The only degree that you have is a
9  Ph.D. that you mentioned, correct?
10    A.   Yes.  From the -- it is a private
11  school in San Francisco.  I think it's the only
12  one that you are judged on your merit and not
13  your academic background.
14    Q.   So do I understand correctly that you
15  don't need a bachelor's degree to matriculate?
16    A.   They like that, but in my case it was
17  waived because I had produced so much.
18    Q.   When did you get this Ph.D.?  What
19  year, if you remember?
20    A.   '94.  I'm guessing.  I think '94.
21    Q.   How many years of study did it take
22  you to get the Ph.D.?
23    A.   25 years of actually running workshops
24  and teaching.
25    Q.   Do you remember the date that you

Page 11

Dodson

2  started taking courses at this institute in San
3  Francisco?
4    A.   You don't -- you are on a wrong track.
5  This is not a strict academic routine.  You are
6  judged on your merit.  Ooh, surprise.  Shocking,
7  I know.
8    Q.   How many years did you stay in San
9  Francisco?
10    A.   I actually lived there part-time for a
11  few years, but it had nothing to do with living
12  there to go to school.
13    Q.   Did you have any coursework related to
14  this Ph.D., classes that you took?
15    A.   The coursework was the work I had been
16  doing and continue to do.  So you might say it
17  is an honorary degree.  In other words, it's
18  what they call fieldwork.  I'm working in the
19  field with women.
20    Q.   Did they require you to take any
21  courses at this institute?
22    A.   No.  At that point my work was
23  established, and I was quoted in many, many,
24  many sex books.  So it is not an academic
25  approach.  It is you are judged on your merit

Page 12

Dodson

2  and what you have accomplished and your
3  reputation and how many people refer to your
4  work in their work.  I am way ahead of the
5  curve.  I think it's called being a genius.
6    Q.   So if I am understanding correctly,
7  the people who run the institute evaluated your
8  work throughout your career and decided to grant
9  you a Ph.D.?
10    A.   Yes.
11    Q.   Have you taken any courses related to
12  medical training?
13    A.   No.
14    Q.   No courses in physiology?
15    A.   Well, I studied anatomy for six years
16  as an artist, drawing the nude, but no formal.
17    Q.   No formal, OK.
18         Courses in pediatrics?
19    A.   Pardon?
20    Q.   Courses in pediatrics?
21    A.   No.
22    Q.   Or internal medicine?  No?
23    A.   None of that.  You guys are all up on
24  the wrong track anyway.
25    Q.   The Ph.D. that you're mentioning is

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 15, 2013

Dodson

1   Dodson
2   not a medical degree?
3      A.   Not at all.
4      Q.   Did you have to write a thesis to
5   obtain this Ph.D.?
6      A.   I documented my work.  They have a
7   folder at the university that cites all of the
8   references to my work.  So, once again, you have
9   to deal with fieldwork rather than academic
10  sitting and writing and learning and reading and
11  stupid things that you have to do.
12     Q.   So could you describe, how have you
13  learned the issues and materials about sexuality
14  in general?  Have you read books?
15     A.   Oh, absolutely.  The teacher is the
16  learner, and my method of teaching stems from
17  the feminist movement that started in the early
18  '70s.  We called it consciousness raising, where
19  we simply sit in a circle and we listen to one
20  another talk using first person.
21          So, people sharing their history, what
22  has gone on in their lives is the best learning
23  there is as possible.  It is no theory.  It is
24  people's actual lives, and we share that
25  information with each other.  You can't get that

Dodson

1   Dodson
2   out of no book, honey.
3      Q.   Have you done any research on
4   sexuality?
5      A.   My work is research.
6      Q.   So listening to people --
7      A.   Absolutely.
8      Q.   -- is the research?
9          Other than listening to what people
10  tell you, have you read books about sexuality as
11  well?
12     A.   I've read practically, let's say I've
13  perused a lot of books, and they bore me because
14  I'm past it.
15     Q.   It is fair to say that you consider
16  yourself an expert in sexuality?
17     A.   On female sexuality.  I know a lot
18  about guys, too, but I focus on women.  Do you
19  have a question?
20     Q.   Not about that, no.
21          You know Ms. Carlin Ross?
22     A.   Carlin, yes.
23     Q.   She is your business partner?
24     A.   Yes.
25     Q.   Does she report to you in your

Dodson

1   Dodson
2   company?
3      A.   No.
4      Q.   Are you her superior?
5      A.   No.  We're equals.  Another shocking
6   concept.
7      Q.   When did you meet Ms. Ross?
8      A.   It was in -- can't I ask her?
9      Q.   No.
10          MS. ROSS: No, you are answering the
11  questions.
12     A.   It's five or six years ago, so
13  somebody do the math for me.
14     Q.   All the questions that I'm asking you
15  are about your recollection.
16     A.   OK.
17     Q.   So just review your recollection.
18     A.   As I recall, it was five or six years
19  ago.
20     Q.   Can you describe your business
21  relationship with Ms. Ross?
22     A.   Yes, we're equal partners.
23     Q.   In doing what?
24     A.   In running a website that is basically
25  for women, but it's very beneficial for men who

Dodson

1   Dodson
2   relate to women if they're lucky.
3      Q.   What is the division of work between
4   you and Ms. Carlin Ross in relation to your
5   business?
6      A.   She is the -- she is my girl geek and
7   I'm the educator.  I've got the brand and the
8   years of information.
9      Q.   What do you mean by "girl geek"?
10     A.   She's the techy.  She runs the
11  website, she knows all about everything that
12  goes on in cyberspace.  And in my 80s I'm a
13  latecomer to cyberspace, so I need someone who
14  really understands it, and she's got it nailed.
15     Q.   You produce sexually explicit videos,
16  correct?
17     A.   Not now, but we -- yeah.
18     Q.   You have produced?
19     A.   I have, yes.
20     Q.   Since 2009?
21     A.   I have.
22     Q.   Can you explain what you do to produce
23  the videos?
24     A.   What I do to produce videos?
25          Well, I have a topic, and it's usually

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 15, 2013

Dodson

1
2  female orgasm because way too many women were
3  not having orgasms.  We're faking you guys out
4  right and left, and they really do want to
5  learn.  But we can't use the male model of
6  sexual response for women.
7       So this is what I am trying to get
8  through to the world, is that we operate
9  differently, and that after listening to women
10 tell their stories for 45 years, I pretty much
11 understand the problem.  So the tapes are set up
12 to help women discover their own bodies and
13 their own orgasmic response.
14    Q.   You have done this work after the
15 statutes in this litigation took effect?
16    A.   Huh?
17    Q.   You don't understand the question?
18    A.   No, I don't.
19    Q.   Do you know the statute in question in
20 this case?  Section 2257?
21    A.   I know what 2257 is, yes.
22    Q.   So you have done this work after
23 Section 2257 was enacted?
24    A.   And before.
25    Q.   Before and after?

Dodson

1
2     A.   Yes.
3     Q.   So even if Section 2257 currently is
4  the law, you have continued doing that?  You
5  have continued doing your work?
6     A.   Yes.  Unless we win the lawsuit,
7  ba-ba-ba.
8     Q.   Has the statute prevented you from
9  doing your work?
10    A.   Oh, yeah.  One of my research projects
11 the Genital Art Gallery, the country is
12 drenched, male and female, in genital shame.
13 The fig leaf has got to come off.
14       So, in order to do this, I requested
15 people send in an image of their genitals, and
16 they give me just a little information about the
17 first time they masturbated, how did you start?
18 How did you discover your sexuality?  Now, some
19 go into great lengths and some say very little.
20       But there was, until you guys came
21 along with your 2257, this was my research
22 project, and it was very healing for people to
23 see a huge range of genitals, because we are all
24 different.  And in porn -- which is not what I
25 am, I am education -- the female genitals are

Dodson

1
2  altered for the boys' taste.  They all end up
3  looking like little dolls.  And the males are
4  chosen in porn because they've got big dicks,
5  and this does not represent the population in
6  terms of their genitals.
7       So everybody is walking around
8  thinking there is something wrong with what's
9  between their legs.  This is damaging, damaging
10 to everyone's sex life.  As an educator I am
11 dedicated to changing that.
12    Q.   How many depictions of genitals are
13 there in the Genital Art Gallery?
14    A.   Well, there were many, many before
15 your law came out.
16    Q.   How many?
17    A.   I've never counted them, honey.
18    Q.   Would you say that hundreds?
19    A.   Yes, I had hundreds, more than, yes,
20 many hundreds.
21    Q.   Right now, if I go to your website, do
22 you know how many there are?
23    A.   No, but you're welcome to go and
24 count.
25    Q.   Would you say that there's more than

Dodson

1
2  50?
3     A.   More than 50.  I am so disheartened
4  with what's gone on because it's literally
5  brought that project of mine to a halt that I
6  haven't been there lately.  No.  It's
7  depressing.  I'm answering questions directly to
8  people who write in to me.
9     Q.   Have you received submissions for your
10 gallery after the law that you are challenging
11 took effect?
12    A.   No, it stopped.  I mean a couple,
13 yeah.  They're not going to send their driver's
14 license and all that information.  It's
15 daunting.  The whole thing was based on
16 anonymity.
17       If you're anonymous, you will tell the
18 truth.  But if you think it a going to be under
19 your own name, ew, especially when it comes to
20 sexuality, you know, America and sex, we're
21 idiots.
22    Q.   Have you had people tell you that they
23 are not going to submit images?
24    A.   They don't have to tell me.  It's not
25 coming in.

**SOUTHERN DISTRICT REPORTERS**

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 15, 2013

---

Page 21

Dodson

1
2 Q.   My question is do you recall people
3 telling you, I am not going to submit images
4 because of the requirements of submitting an ID?
5 A.   I wouldn't handle that information.
6 Q.   OK.  So --
7 A.   My partner would.
8 Q.   So you don't know for sure, correct?
9       MS. BAUMGARDNER: Objection.  You can
10 go ahead and answer.  I'm objecting for the
11 record.
12       THE WITNESS: I say what?
13       MS. BAUMGARDNER: You go ahead and
14 answer.  I am just objecting for the report.
15 A.   I don't know.  No, I don't know.
16 Q.   You cannot think of the name of one
17 person that has said I am not going to submit
18 it?
19 A.   Anonymity.
20 Q.   You don't have to tell me the name,
21 but can you think of one person that has told
22 you, I am not going to submit images to the
23 gallery?
24 A.   I can't think of one person's name.  I
25 think there was a Hector.

---

Page 22

Dodson

1
2 Q.   It was not me.
3 A.   Pity.
4 Q.   You said something about the images of
5 female genitalia that you see in porn --
6 A.   Yes.
7 Q.   -- in the mainstream porn.
8       Can you describe that, or can you
9 describe what you were meaning to say when you
10 said that?
11 A.   Can I describe the alterations that
12 they do?
13 Q.   Why do they do alterations?
14 A.   The fashion or the style is no inner
15 lips to be extended beyond the outer lips.  So
16 the inner lips are surgically removed, which has
17 created this whole fashion now with young women,
18 because their boyfriends are watching porn and
19 beating off.  So they look at pictures and the
20 women all have no inner lips showing.  They also
21 bleach the asshole and dye it pink, no hair.
22       OK.  And then also cosmetic surgery,
23 any moles, bumps, pimples, whatever, stretch
24 marks, all disappear.  So it's very unrealistic.
25       This is the fashion for porn besides

---

Page 23

Dodson

1
2 big boobs and blonde hair and all the other
3 stuff.
4 Q.   Does this fashion make them look
5 younger?
6 A.   Yes.  It sort of infantilizes women, I
7 think so.
8 Q.   The purpose is to look younger?
9 A.   Yes, yes.  You guys don't seem to like
10 mature women because we know too much.
11 Q.   If someone is looking at a picture of
12 a performer who's had this surgery, the surgery
13 would affect the person's ability, the viewer's
14 ability to determine the age of that performer?
15       MS. BAUMGARDNER: Objection.
16 A.   No.
17 Q.   No?  Let's say that we have a
18 performer that has had this alteration in the
19 genitals to look younger than she really is.
20 A.   I don't know that it makes them look
21 younger.  It alters the image of the genitals.
22 So, in other words, I think it was a cosmetic
23 surgeon that established the clamshell, some
24 jackass out in LA, and boy is he making a
25 killing driving around in his beamer.

---

Page 24

Dodson

1
2 Q.   I'm going to show you a document.
3 It's been marked already as Exhibit RD-4.
4       MS. BAUMGARDNER: I can share my copy.
5 Q.   The second paragraph.
6 A.   Do you have a --
7 Q.   Can you read the third paragraph?
8 A.   Barely.  Why I started the genital
9 gallery.  You know I wrote this a hundred years
10 ago.
11 Q.   This paragraph is something that you
12 wrote, correct?
13 A.   Correct.  Look, it says in 1998.
14 That's when my website went up.
15 Q.   And in the third paragraph, "Today
16 many women," correct?
17 A.   Yes.
18 Q.   Do you follow me I am going to read
19 it.  "Today many women in the adult industry
20 have undergone surgery for the removal of their
21 extended inner lips to achieve what one surgeon
22 calls a clamshell look reminiscent of a
23 prepubescent girl.  Other women began to want a
24 similar look."
25 A.   Yes.

---

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 15, 2013

Page 25

Dodson

2  Q.   Did I read that accurately?
3  A.   Yes, you read it correctly.
4  Q.   This is something that you wrote?
5  A.   Yes, I did.
6  Q.   Now, you had a basis for writing this,
7  correct?
8  A.   It is just what I told you.  Yes.
9  Q.   I mean you didn't make this up,
10  correct?
11  A.   Make it up?
12  Q.   Yes.  Is it correct you did not make
13  this up?
14  A.   Well, I made it up, but it's the
15  truth.
16  Q.   It's the truth.  OK.
17       You didn't -- it is not a lie, it's a
18  hundred percent?
19  A.   It is a fact.
20  Q.   It is a fact.  OK.
21       A prepubescent girl, do you know what
22  age is a prepubescent girl?
23  A.   Anywhere between, I don't know, 12 to
24  18.
25  Q.   12 to 18.

Page 26

Dodson

2       Prepubescent is before puberty?  Is
3  that what it means?
4  A.   You know, I really don't know what
5  prepubescent means.  That's Grant.  That was my
6  editor at the time.  It's the youth culture that
7  everyone is addicted to.  And I know where
8  you're going with this, which is a lot of crap.
9  But men don't like contemporary or older women.
10  They want children or younger women, because
11  they can pull the wool over their eyes, because
12  then this young girl -- whatever.  But I got
13  news for you.  Some children at five are already
14  sexual, not with a partner but with themselves.
15  So what are you getting at here?
16  Q.   I get to ask the questions.
17  A.   "I get to ask the questions."
18       MS. BAUMGARDNER: OK, Betty.
19       Go ahead.  Pose your question.
20  Q.   Do you have a question?
21  A.   Do I have one?
22  Q.   Yes.
23  A.   I thought you were going to ask me
24  one.
25  Q.   Yes.

Page 27

Dodson

2  A.   Go ahead.
3  Q.   About the deposition.  Do you have a
4  question about the deposition?
5  A.   I don't know what you mean.
6  Q.   The deposition?
7       MS. ROSS: Do you have a question
8  about what's going on right now?
9       THE WITNESS: No.
10  Q.   OK.
11  A.   Except it's boring.
12  Q.   Do you have an office?
13  A.   I work in my home.
14  Q.   And your home has how many rooms?
15  A.   A foyer, a living room, a kitchen, and
16  a back room, bedroom, bedroom/office?
17  Q.   Is that where you keep your 2257
18  records?
19  A.   Yes.  It's out in the foyer in a
20  separate unit.
21  Q.   Do you keep the IDs of your performers
22  there?
23  A.   Absolutely.  This is way before 2257.
24  Q.   Do you keep the model releases there
25  as well?

Page 28

Dodson

2  A.   Yes, it's in a filing cabinet.
3  Q.   Do you keep any 2257 records outside
4  of this cabinet?
5  A.   No.
6  Q.   Everything is in the cabinet?
7  A.   Yes.
8  Q.   This cabinet is not in your bedroom?
9  A.   It's in the foyer, in the front room.
10  Q.   Do you have a studio?
11       Do you have a studio where you record
12  videos?
13  A.   No, it's always done in my living
14  room.  So it is a living room/workshop
15  space/studio.
16  Q.   Most of your sexually explicit
17  depictions are about masturbation?
18  A.   Female orgasm.
19  Q.   Female orgasm.  Would it be accurate
20  to say that 99 percent of them are about that?
21  A.   Uh-huh.
22       MS. BAUMGARDNER: Betty, you have to
23  answer yes or no because the court reporter
24  can't take down.
25       THE WITNESS: You can't say she nodded

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 15, 2013

Page 41

Dodson

2   Q.   My question is did you write it?
3   A.   No. But I stand behind the concept.
4   Q.   There is a reference in this writing
5 about clearly mature, correct?
6   A.   You lost me.
7   Q.   In the second sentence of the first
8 paragraph.
9   A.   OK, yes. Yes.
10   Q.   What does it mean to be "clearly
11 mature adult"?
12   A.   A woman. A woman doesn't look like a
13 girl, a child. I guess some try, but they won't
14 succeed. You can tell by the body shape, by the
15 breast development, you can tell by the pubic
16 hair, the genital development, in terms of
17 visual, looking at a body, and since I am a
18 painter and drawer of the nude. I have never
19 even had the opportunity to draw children. I
20 have to make that up. It is always mature
21 women.
22   Q.   Do you have a specific age in mind
23 that you associate with being clearly mature
24 adult?
25   A.   An age? I have women that are 40 and

Page 42

Dodson

2 they act like idiots, so they could be
3 teenagers, or they could try to be. What was
4 that?
5   Q.   Do you have an age that you associate
6 with someone being clearly mature?
7   A.   No.
8   Q.   When does someone become clearly
9 mature, at what age?
10   A.   When does someone become mature? As I
11 said, I have women in their 40s that are like
12 teenagers.
13   Q.   So women in their 40s may not be
14 clearly mature is what you are saying?
15   A.   Mature physically or mentally
16 emotionally or sexually? What?
17   Q.   Let's say about the way they look.
18   A.   Their appearance?
19   Q.   Yes. At what age does someone look
20 clearly mature?
21   A.   Teens.
22   Q.   15?
23   A.   Possibly.
24   Q.   A 15-year-old could look clearly
25 mature?

Page 43

Dodson

2   A.   Not clearly mature. She would have to
3 have on a lot of makeup and the clothes and how
4 she's dressed.
5   Q.   A 13-year-old could look --
6   A.   No.
7   Q.   A 16-year-old could look clearly
8 mature?
9   A.   Maybe.
10   Q.   17-year-old?
11   A.   Could look mature?
12   Q.   Clearly mature.
13   A.   17 -- I don't think this way. I don't
14 know what you're getting at.
15   Q.   I am just asking you.
16       An 18-year-old would look clearly
17 mature?
18   A.   It depends on the individual.
19   Q.   It depends on the individual?
20   A.   Yes.
21   Q.   Do you agree with me that looking at
22 someone it might be difficult to determine that
23 person's exact age?
24   A.   It could be. Yes, it could be
25 difficult to determine.

Page 44

Dodson

2   Q.   Why could it be difficult to determine
3 a person's age by looking at them?
4   A.   This doesn't make sense to me, but the
5 way they're dressed, their mannerism, their
6 speech, overall demeanor, sophistication.
7   Q.   Having surgery, having cosmetic
8 surgery could affect how old people look?
9   A.   Yes. When I had a facelift, I dropped
10 about ten years, but I didn't look like a
11 teenager.
12   Q.   How about breast implants? Do they
13 affect how old a woman looks?
14   A.   Yes, that could, breast development.
15 But that's not true either. Because young girls
16 can have huge breasts, and mature women don't
17 have any. You can't go on that.
18   Q.   So breast augmentation does not affect
19 how old people look or could it affect it?
20   A.   It could.
21   Q.   Do you know what other factors may
22 affect how old people look? You mentioned the
23 clamshell look?
24   A.   Well, that is a fashion. You could
25 have that at any age.

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 15, 2013

Page 45

Dodson

1
2    Q.   But it would affect how old or how
3    young you look?
4    A.   No.
5    Q.   So it is difficult to tell from
6    looking at a person how old they are?
7    A.   Yes.  Like I'm not sure how old you
8    are.  Let's say you're late 30s, early 40s.
9        THE WITNESS: He's probably 28.
10   Q.   So is it difficult to tell how old I
11   am?
12   A.   Yeah.  I can guestimate but -- you're
13   cute, but you're young from my point of view.  I
14   would make a pass at you.
15   Q.   Do you know the physical differences
16   between a 16-year-old and an 18-year-old?
17   A.   Physical differences?  You can't ask a
18   general question like that.  It's very
19   individualistic.  Absolutely.
20   Q.   It depends on the person?
21   A.   Absolutely.
22   Q.   Between a 17-year-old and a
23   20-year-old, it would depend on the person?
24   A.   It would depend on the person.
25   Q.   Do you know if an 18-year-old can

Page 46

Dodson

1
2    reach full maturity with respect to pubic hair
3    before 18, a woman -- I'm sorry.  Let me
4    rephrase that?
5    A.   Good.
6    Q.   Can a woman achieve full maturity with
7    respect to pubic hair before reaching 18?
8    A.   You lost me.
9    Q.   OK.  Can a 17-year-old reach full
10   maturity with respect to pubic hair development?
11   A.   Yes.
12   Q.   A 16-year-old can fully develop in the
13   pubic area?
14   A.   Individual.
15   Q.   How about women?  Can a woman fully
16   develop her breasts by 16?
17   A.   Yes.  And the other thing is that
18   because of all the hormones that are going into
19   food a lot of these girls are maturing way too
20   soon.  They're getting their periods, they're
21   getting breast development, they're getting
22   pubic hair, and it's because of the hormones
23   that are in Mr. Perdue's chicken and all the
24   fast food outlets.
25   Q.   Have you read about this somewhere?

Page 47

Dodson

1
2    A.   Yes.  Absolutely.  This is a known
3    fact.
4    Q.   It is a fact, OK.
5        Do you interact with a lot of
6    individuals under the age of 18?
7    A.   No, because my work is all dealing
8    with women.
9    Q.   OK.  So it would be fair to say that
10   you have not seen many individuals under the age
11   of 18 naked in connection to your work?
12   A.   Not in connection to my work.  But I
13   have been to nudist colonies.
14   Q.   I'm sorry?
15   A.   I have been to nudist colonies where
16   you see all ages.
17   Q.   And approximately how many times have
18   you been to --
19   A.   I haven't done it recently, because
20   when you get old you're not so anxious to take
21   your clothes off.
22   Q.   You haven't done it in the past five
23   years?
24   A.   No.  Well, I have a health club where
25   the women all walk around without clothes on.

Page 48

Dodson

1
2    Q.   Are there a lot of women under 18 at
3    that club?
4    A.   Yeah, they have little kids.
5    Q.   No, women you have seen naked under
6    18, or men?
7    A.   No, we don't have men in our locker
8    room.
9    Q.   But it would be fair to say that it is
10   not many that you've seen?
11   A.   No, not many.
12   Q.   You said that you had a Ph.D. in human
13   sexology, correct?
14   A.   Correct.
15   Q.   Does that Ph.D. equip you with
16   knowledge to determine a person's age by visual
17   observation?
18   A.   Wait a minute.  I'm glad I don't have
19   your job.  Say it again, honey.
20   Q.   Does your Ph.D. in human sexology
21   equip you with knowledge, special knowledge to
22   determine a person's age by visual observation?
23   A.   No.  You are reaching now.  You're
24   really reaching.  That's silly.
25   Q.   Do you consider that you have special

Dodson

2 expertise in telling someone's age by visual
3 observation?
4   A.   No, I do not.  I'm not an expert at
5 telling age.  My expertise is sexuality.
6   Q.   I'm going to show you other documents
7 if I can find them.  Just give me a second.
8       MS. BAUMGARDNER: Betty, do you need
9 to take a break at all?
10   Q.   Do you want to take a break?
11   A.   Let's take a break and stretch.
12       MR. BLADUELL: OK.  We will take a
13 break.
14       (Recess)
15       MR. BLADUELL: So, for the record, we
16 took a little break.  We are back.
17   Q.   Ms. Dodson, before the break you were
18 talking about your production of videos,
19 correct?
20       Do you remember?
21   A.   No, but I'll take your word for it.
22   Q.   Is there a reason you don't remember?
23   A.   It's probably because I smoked too
24 much dope, short-term memory loss.
25   Q.   Do you suffer from short-term memory

Dodson

2 loss?
3   A.   Objection.
4   Q.   Is that a no?  Is it a joke?
5   A.   No, I don't.  I was teasing because
6 we're back and I am not in my formal chair.
7   Q.   So you have no problem with
8 recollecting events?
9   A.   No.
10   Q.   We were talking about production of
11 videos, and you were saying that you are going
12 to stop producing videos or that you have
13 stopped producing videos.
14       Can you clarify that?
15   A.   I shouldn't say that we are going to
16 stop.  I don't know.  I doubt if we are going to
17 produce any more videos because everything is
18 now online.  I do think we are going to be
19 producing educational materials.
20       So now I'm getting ready to -- we have
21 several projects forming the Betty Dodson
22 Foundation which will set up a formal way to
23 teach women and men how to do sex education that
24 is functional and practical because we are not
25 doing it now.  No one is dealing with it and no

Dodson

2 one is teaching it.
3   Q.   Would that involve the production of
4 images, sexually explicit images?
5   A.   It might, yes.
6   Q.   Publishing them?
7   A.   It might.
8   Q.   But you are not sure yet?
9   A.   Well, I will definitely need images of
10 the female and the male genitalia -- genitalia,
11 that's so funny -- sex organs.
12   Q.   How many images?
13   A.   Millions.
14   Q.   You would need millions of images?
15   A.   Thousands, hundreds.  Enough to show a
16 variation, so that people don't have a fixed
17 image.
18   Q.   How much is enough to show a
19 variation?
20   A.   I'll let you know when I do it.  I
21 have no idea.
22   Q.   How many different varieties of --
23   A.   Infinite.  Infinite variety.  I would
24 need to show you enough so that you would
25 understand that it was an infinite.  It's like

Dodson

2 looking at people's faces.  You know, oval,
3 round, square, long, diamond, you know.  As an
4 artist just think of the different images that
5 you can conjure up in terms of any part of the
6 human body, vast variation.
7   Q.   Do different types of female genitals
8 have different names?
9   A.   That was my thing to give them an
10 association to an architectural style.
11   Q.   So how many types or names of female
12 genitalia do you know?
13   A.   Well, now, let's see.
14       I would have to think of the different
15 architect styles.  What I am using now, and it's
16 more like to kind of make everyone feel at ease,
17 we have Renaissance, we have Gothic, we have
18 Danish modern, we have Renaissance, we have that
19 kind of thing.  I have run out.
20   Q.   Continue.  I interrupted you.
21 Continue.
22   A.   It's to give a frame of reference, in
23 other words, styles.  Right now the style for
24 genitals that has been determined by the porn
25 industry or by these cosmetic surgeons is the

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 15, 2013

---

Page 65

Dodson

1
2    Q.   Have you seen that picture before?
3    A.   No.
4    Q.   Do you know that person?
5    A.   No.
6    Q.   Can you tell if that person is clearly
7    mature?
8    A.   That ain't no kid.
9    Q.   So the answer is, yes, you can tell
10   that that person is clearly mature?
11   A.   This is a mature woman.
12   Q.   How can you tell that?
13   A.   Her titties are sagging a little bit,
14   and she's got -- I can't really tell, but, you
15   know, no, that's not a young child, a preteen.
16   This is a woman.
17   Q.   So you would say that she's over 18.
18   A.   Definitely.
19   Q.   Would you say that she is over 30?
20   A.   Possibly.
21   Q.   Can you determine the exact age of the
22   person just by looking at them?
23   A.   No.  What's going on down below is
24   what I'd like to know.  Whose hands are those,
25   and what is he doing?

---

Page 66

Dodson

1
2    Q.   I'm going to show you another exhibit,
3    RD-10.
4         (Exhibit RD-10 was marked for
5    identification.)
6    Q.   Have you seen that picture before,
7    Ms. Dodson?
8    A.   No.
9    Q.   Can you tell the exact age of the
10   person depicted?
11   A.   Can I tell the age?
12   Q.   Yes.
13   A.   No.  Approximate, anywhere between --
14   I don't know, 20 and 40.  You know you can't
15   tell these days.
16   Q.   With a hundred percent accuracy, can
17   you tell me the --
18   A.   A hundred percent accuracy?
19   Q.   -- exact age?
20   A.   Come on.
21   Q.   If I show you an ID of that person,
22   would it assist you in determining the age?
23   A.   If it's written -- if her date of
24   birth is written on it, absolutely.  So what is
25   it?  You are not going to tell me after all

---

Page 67

Dodson

1
2    this.  How old is she?
3    Q.   I don't recall.
4    A.   Well, it's not a teen, or a tween,
5    whatever they call them.
6    Q.   I am going to show you another
7    document.
8    A.   Come on, Hector, show me some dirty
9    pictures.  Let's get down.
10   Q.   This is going to be marked as Exhibit
11   No. 11.
12        (Exhibit RD-11 marked for
13   identification.)
14        MS. BAUMGARDNER: I'm providing a copy
15   to counsel, and I am providing a copy to
16   Ms. Dodson.
17   A.   This is from my Genital Art Gallery.
18   Q.   There are three pictures in Exhibit
19   No. 11, correct?
20   A.   Yes, but you see they're not very well
21   taken.  These are all like iPhone pictures.
22   There's not enough light on them.
23   Q.   Are there three different pictures?
24   A.   Yes.
25   Q.   It is not the same person?

---

Page 68

Dodson

1
2    A.   It is not the same person.
3    Q.   How can you tell that it is not the
4    same person?
5    A.   The piercing.  So she could take --
6    no.  No, it is not the same person.
7    Q.   Could you determine the exact age of
8    each individual picture?
9    A.   Well, obviously this is a more mature
10   person because they had the guts to get all
11   those piercings.
12   Q.   Are you talking about the one in the
13   middle?
14   A.   The piercing, yes.  That could be a
15   young woman, but you have to be -- they don't
16   tattoo or pierce unless you are 18 or over.
17   Q.   But in terms of the characteristics of
18   the genitals, can you determine the exact age of
19   each of those?
20   A.   No, no.
21   Q.   Can you tell if they are over 18?
22   A.   Yeah.  Well, this one has to be.
23   Q.   The one in the --
24   A.   Yeah, because they won't do that
25   unless she is.

---

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 15, 2013

Page 77

Dodson

1
2  perfectly nice people.
3      MS. BAUMGARDNER: I would like to
4  think so.
5   Q.  Remember the list, the long list of
6  websites and things?
7   A.  I'm taking that with me.
8   Q.  It is your understanding this was a
9  document that we worked together on and you did
10  not prepare that list, correct?
11   A.  No, I didn't.
12   Q.  And the very beginning question
13  indicates that you and Carlin, with the
14  assistance of counsel answered the
15  interrogatories?
16   A.  The what.  The inter who?
17   Q.  These.
18   A.  Oh.
19   Q.  Who answered them?  It was the three
20  of us, correct?
21   A.  OK.
22   Q.  You understood that?
23   A.  I guess.
24      MS. BAUMGARDNER: All right.  That is
25  all I have.

Page 78

Dodson

1
2      MR. BLADUELL: I have two questions.
3  EXAMINATION
4  BY MR. BLADUELL:
5   Q.  Ms. Dodson, do you know anyone who has
6  been criminally prosecuted for a violation of
7  the age verification requirement?
8   A.  Personally, no.
9   Q.  Do you know anyone who is in jail
10  right now because of a violation of the age
11  verification requirements?
12   A.  No.
13      MR. BLADUELL: Thank you.
14      MS. BAUMGARDNER: I do.
15      THE WITNESS: Is that it?
16      MS. BAUMGARDNER: That's it.
17      (Deposition concluded at 2:40 p.m.)
18
19
20
21
22
23
24
25

Page 79

Dodson

1
2
3  WITNESS: BETTY DODSON
4  EXHIBITS
5  Description            Page
6  RD-9                   64
7  RD-10                  66
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 80

Dodson

1
2      CERTIFICATE
3
STATE OF NEW YORK )
4          : ss
COUNTY OF NEW YORK)
5
6      I, Samuel Mauro, Jr., a Registered
7  Merit Reporter and Notary Public within and for
8  the State of New York, do hereby certify:
9      That BETTY DODSON, the witness whose
10  deposition is hereinbefore set forth, was duly
11  sworn by me and that such deposition is a true
12  record of the testimony given by such witness.
13      I further certify that I am not
14  related to any of the parties to this action by
15  blood or marriage and that I am in no way
16  interested in the outcome of this matter.
17      In witness whereof, I have hereunto
18  set my hand this _____ day of
19  _____ 2_____.
20
21
22
23  _____
24  SAMUEL G. MAURO, RMR
25

# *In The Matter Of:*

### *Free Speech*
### *v.*
### *The Honorable Eric H. Holder, Jr.*

-----

### *Jeffrey J. Douglas VOL I*

### *April 9, 2013*

-----



## BENHYATT
### Certified Deposition Reporters

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **1008990**
number of pages 209

## *Word Index Included with this Condensed Transcript.*

Jeffrey J. Douglas - 4/9/2013

Page 25

```
 1   participate in the legal committee?
 2       A   I don't think so.
 3       Q   How many members does Free Speech Coalition have
 4   currently?
 5       A   Probably about 800.  That's best guess.
 6       Q   Can you describe the membership?
 7       A   Categories of members?  The various business
 8   interests are one category -- so manufacturers,
 9   distributors, retailers.  Each of those are categories.
10   They are often divided.  For instance, retailers are
11   divided between brick and mortar and online.  I think we
12   probably distinguish between producers that produce
13   entirely for the Internet.  Toy manufacturers are separate
14   category.  Attorneys and talent agents are a separate
15   category.  Performing artists are a separate category, and
16   then there's another membership group that are just
17   individual industry professionals.  So if I am a lighting
18   engineer or makeup artist, I would join in that category.
19       Q   How does someone become a member?
20       A   Fill out an application and provide a dues
21   payment.
22       Q   These days is that usually done online or?
23       A   Yes.
24       Q   Do you know?
25       A   Yes.
```

Page 26

```
 1       Q   Okay.
 2       A   Yes.
 3       Q   Has anyone been rejected as a member that you
 4   know?
 5       A   I don't know that that has happened.  I'm not
 6   certain.
 7       Q   Are members required to pay dues?
 8       A   Yes.
 9       Q   Looking at the bylaws where it talks about
10   membership dues.
11       A   I assure you in the amended bylaws there would be
12   page numbers.
13       Q   Have you found it?
14       A   I don't know what I'm looking for.  I'm sorry.
15           MS. BAUMGARDNER:  Is it a section on dues?
16   BY MS. WYER:
17       Q   I think it's on membership.  Okay.  On Section 3
18   on the second page.
19       A   Dues, fees, and assessments.
20       Q   It says "Dues, fees, and assessments shall vary
21   by each member depending upon such member's position in
22   the industry and as determined by the board and * its
23   reasonable discretion"; is that right?
24       A   Yes.  Yes.
25       Q   What does that mean?
```

Page 27

```
 1       A   An individual's membership would necessarily be
 2   less expensive than a business's.  And because of a
 3   perception of -- well, for instance, as I said a camera
 4   person would necessarily pay a smaller amount of dues than
 5   a manufacturer.  I think performers, the dues is $50.  I'm
 6   not sure.  It might be more than that but a relatively
 7   small amount of money.
 8       Q   Are the dues determined by category --
 9       A   Yes.
10       Q   -- of profession?  Is there a schedule of dues?
11       A   Yes.
12       Q   Is that on the Web site?
13       A   Probably.  Should be.  I don't know.
14       Q   Are there any categories where members are not
15   required to pay dues?
16       A   You can -- not a member in the bylaws sense of
17   having voting privileges, no.  But if you want to donate
18   money to the organization, get copies of electronic
19   newsletters, there's -- I don't know what we call it, but
20   it's sort of, you know, interested person membership
21   category.  I think it's $25 or something like that.
22       Q   But that still requires a fee?
23       A   I don't think it really does.  Just sort of a
24   recommended donation.  But since there's no specific
25   rights that are associated with the status, it's just
```

Page 28

```
 1   that, you know, someone wants to support the organization
 2   is interested in our work.  They can essentially become an
 3   affiliate something or other, something along those lines,
 4   but it carries no rights or responsibility.
 5       Q   So technically -- but those individuals are not
 6   actually members?
 7       A   They are not members within the meaning of the
 8   bylaws.  That is, they get a right to vote and other
 9   privileges.
10       Q   On what basis would a member be suspended?
11       A   I never ran into it; so I don't know.  You know,
12   I have an imagination; so I can probably come up with
13   something.  But I don't know in real life.  It hasn't
14   happened.
15       Q   It's never happened?
16       A   Not that I know of.
17       Q   How does the Free Speech Coalition communicate
18   with its member?
19       A   Not as well as we'd like.  We have an e-mail that
20   goes out regularly on Fridays, reasonably consistently
21   that provides news that we believe would be of interest.
22   So some of that involves actual activities of Free Speech
23   Coalition, other might be just trade information.  You
24   know, a big merger or something.  There's a lot of -- we
25   send out links to news articles that we believe would be
```

7 (Pages 25 to 28)

Jeffrey J. Douglas - 4/9/2013

Page 33

1  sexuality.  And so like many pejorative phrases or terms,
2  the object of the hostility often adopts them as a form of
3  self-protection.  So it is unlikely, for instance, that
4  African Americans would call themselves "niggers" but for
5  the fact as it was used as hostile for so many years.  And
6  so as a form of self-protection, you take it on and make
7  it your own.
8      So hardcore pornography was a term, I believe,
9  that was developed to try to distinguish and denigrate one
10 portion of the entertainment industry from the rest of the
11 entertainment industry.  That is, when major studios are
12 making substantial donations to members of Congress, even
13 though there's a substantial amount of nudity and emphasis
14 on human sexuality in their works, if -- to the extent
15 that they are part of the mainstream culture, a politician
16 would have -- in the broadest sense of the term, someone
17 who is an advocate whether they are elected official or
18 not -- has a need to distinguish between the good guys and
19 the bad guys, and hard core pornography was a way to
20 distinguish because the more serious hostiles to
21 depictions of human sexuality want to still criticize
22 Hollywood for undermining Western civilization by showing
23 an unclothed body.  But the primary source of the
24 hostility was the -- what we know of the adult industry,
25 the sort of stepchild of the rest of entertainment.  And

Page 34

1  so that is how the term of hardcore and soft core evolved.
2  Still want to condemn, but you want to make the
3  particularly savage condemnation targeted.  Does that
4  answer the question?
5      So anyway, pornography is a term almost entirely
6  without a definition.  That is, if you go across the
7  political --
8      Q  Spectrum?
9      A  Thank you.  The political spectrum, you --
10 pornography would include, on one extreme, a short skirt
11 worn by a woman, not a very, very short skirt but
12 revealing -- perhaps going above the knee and going all
13 the way to pornography would be limited to explicit
14 depictions of genitals.
15     Since the term is defined as the writing of
16 prostitutes in its original form, pornography means
17 nothing.  If you go to a dictionary, the range of
18 definitions that are found in dictionaries and
19 encyclopedia -- they're all over the map.  When you take a
20 word that has such an ill-defined definition -- that is so
21 ill-defined and then you crop it to be porn, you reduce
22 its meaning substantially more.  And then you use a phrase
23 like hardcore that means nothing, it's just -- I mean,
24 it's a reflection of what is sexually stimulating, and
25 there is an infinite variety of what people find sexually

Page 35

1  stimulating.  It's just why advertisers make so much
2  money.
3      Q  So does the adult industry include -- is your
4  understanding of the phrase "adult industry" broader than
5  what you think is referenced by the term "hardcore porn"
6  or is it --
7      A  It depends -- it depends on who's using the term
8  "hardcore porn."  Robert T. Chowers, the former head of
9  the child exploitation and obscenity section believed that
10 a bare breast was hardcore pornography.  Most people
11 wouldn't use that term to encompass that.  So it depends
12 on who's doing the talking.  If you tell me what you mean
13 by "hardcore pornography," then I will tell you whether or
14 not that -- how that fits into the adult entertainment
15 industry.
16     Q  So you know what the adult entertainment industry
17 is, or is that term equally broad?
18     A  No.  I would think the adult entertainment
19 industry is made up of people who view themselves as being
20 members of the adult entertainment industry.  That is, for
21 instance, for many years the -- I don't know what the
22 title was.  But Hugh Hefner's daughter, Christie, who ran
23 what was known as the "empire" within the Playboy
24 business, said they weren't pornographers.  They weren't
25 part of the adult industry.  They were lifestyle.

Page 36

1      So for all intents and purposes, they weren't a
2  member of the adult entertainment industry because by
3  self-definition they weren't.  Most consumers and critics
4  of the industry regarded them as the adult entertainment
5  industry because they didn't like them or did like them.
6  When something doesn't have a real definition, then
7  self-definition is what it is.
8      You know, in a more serious area, when Sammy
9  Davis, Jr., announced that he was a Jew, there was a very,
10 very broad and intense reaction to that solely on the
11 grounds of his skin color.  So by various traditions
12 within various portions of the Jewish community he was or
13 wasn't a Jew.  Because some believe that, if your mother
14 isn't Jewish, you're not Jewish.  You can't really
15 convert.  Others say if you go through, you know, certain
16 number of classes and make certain pledges, then you're a
17 Jew.  So a Jew is someone who thinks they're a Jew,
18 self-defined.  That's what being a member of the adult
19 entertainment industry is.
20     Q  Why do you think Hugh Hefner's -- did you say
21 daughter?  Why do you think Hugh Hefner's daughter
22 redefines the empire as lifestyle?
23     A  You would have to ask her.  Presumably she
24 thought it would make more money, but I have no idea why.
25     Q  What is Free Speech Coalition's understanding of

9 (Pages 33 to 36)

Jeffrey J. Douglas - 4/9/2013

Page 37

1    the term adult industry?  Is it the same as yours?
2        A   I don't -- the Free Speech Coalition is not -- is
3    a legal entity.  It exists only because -- you know,
4    whatever it was, somebody came with the idea of a
5    corporation.  So the Free Speech Coalition's views are
6    either the collective set of the members, collective set
7    of directors, collective set of members or staff.  You
8    know, I've been elected a lot.  So presumably people's
9    ideas are the same as mine, but I don't know.  I'm sorry.
10   I don't think that means anything to say what is the Free
11   Speech Coalition's view on what adult entertainment is.
12   It differs from person to person and probably director to
13   director.  What I said is likely a widely held view by
14   members and directors, but I don't know.
15       Q   So the Free Speech Coalition would not ever
16   reject a member on the ground that that entity or person
17   was not a part of the adult entertainment industry?
18       A   Well, yes, that is probably correct.  I mean,
19   again I have an imagination.  I probably could come up
20   with something.  But if the American Nazi party said they
21   wanted to join the Free Speech Coalition, there would
22   probably be some discussions on the board.  On the other
23   hand, if a packaging company or a communications
24   company -- someone that manufacturers handsets -- wanted
25   to join the Free Speech Coalition, we would welcome them

Page 38

1    as members if they paid their dues because they are
2    providing support for the adult entertainment industry,
3    and their rationale for joining would be because an
4    important portion of their clientele was the adult
5    entertainment industry.
6        Q   That's what you would assume?
7        A   Yes.  I mean, it might be that a CEO of a company
8    that has nothing to do with the entertainment industry
9    believes passionately in adult entertainment, wants to
10   avoid government intrusion.  If the government wanted to
11   join, we would welcome them.  We have no secrets.
12       Q   Do you happen to know what the dues are for a
13   production company, for example?
14       A   I would characterize myself as being not
15   particularly well versed in that, but my belief is that
16   it's $3,000 a year.  But we have it staged for size, and
17   that's self-defined.  So we ask someone are they large,
18   medium, or small, and there's some gradation of the dues
19   within that.  But I think a media manufacturer, I believe,
20   is $3,000, but I wouldn't, you know, bet a dollar on me
21   being accurate on that.
22       Q   Okay.  You are familiar with the Federal Statute
23   18 U.S.C. 2257 which imposes age verification requirements
24   on producers of films and photographs that include images
25   of sexually explicit conduct; correct?

Page 39

1        A   Yes.
2        Q   And you first became familiar with these
3    requirements before the current version of the statute and
4    regulations?
5        A   Yes.
6        Q   How did you become familiar with those
7    requirements?
8        A   I'm a criminal defense attorney, and a portion of
9    my clientele is affected by those -- by that set of laws
10   and regulations; so it's part of my job.  Just like I
11   could tell you what the punishment is for driving under
12   the influence for California under a variety of different
13   circumstances.
14       Q   Was your first inkling of the existence of these
15   requirements from communication from a client?
16       A   I don't remember.  I'm -- probably another
17   lawyer.  I was aware of -- my recollection -- we're
18   talking about 1988; so it's 25 years ago -- is dimmed over
19   time, but it was probably another lawyer.  It might have
20   been at the First Amendment Lawyers Association.  That's a
21   highly likely possibility, but I was aware of it post
22   passage but before it took effect.
23       Q   That was very early on after its enactment?
24       A   Yes.  I was aware of it before the first
25   regulations came out.  They haven't gotten any better.

Page 40

1        Q   And you are aware of it before the Free Speech
2    Coalition even existed?
3        A   Yes.
4        Q   Do you think the -- or do you know whether the
5    existence of the Free Speech Coalition has anything to do
6    with those requirements?
7            MS. BAUMGARDNER:  Objection.  Go ahead and answer
8    if you understand.
9            THE WITNESS:  I don't understand the question.
10   BY MS. WYER:
11       Q   Do you think the enactment of those laws had
12   anything to do with the formation of the Free Speech
13   Coalition?
14           MS. BAUMGARDNER:  You mean in particular?
15           MS. WYER:  Yeah.
16           THE WITNESS:  I don't know.  I mean, I'm aware of
17   what some people said was their motivation for forming yet
18   another organization.  As I said, there's been a series of
19   them.  But I also recall what was said when previous
20   organizations were formed, and often the people who spoke
21   were not representative of the people that ultimately
22   animated the organization.  I do not recall 2257 as being
23   a specifically stated motivator, but insofar as the
24   purpose of the formation of the organization was to
25   address the trade's needs, 2257 was -- would certainly

10   (Pages 37 to 40)

Jeffrey J. Douglas - 4/9/2013

Page 41

1  qualify as one of those.
2  BY MS. WYER:
3      Q   When did Free Speech Coalition become aware that
4  any of its members were following the requirements of 2257
5  and implementing?
6      A   Did you say when did the Free Speech Coalition
7  become aware?  That is, the Free Speech Coalition in that
8  fashion because again I don't think of an organization
9  having awareness.  Directors have awareness because
10 they're human beings, but I can answer it this way.  It's
11 unimaginable to me that any member of the initial board of
12 directors was unaware of 2257 and its impact on the
13 industry.  It was incorporated in '91.
14     Q   When, in your understanding, did Free Speech
15 Coalition members begin implementing actions in order to
16 comply with the requirements?
17     A   My guess is that the majority of members of the
18 Free Speech Coalition were attempting, with a greater or
19 lesser degree of energy and success, to comply with the
20 2257 at the time of the formation of the organization
21 because the organization existed in 1991 -- was formed in
22 1991, and people were making efforts at complying since
23 1988.
24         Now, the injunctions and the rulings against 2257
25 that went from '88 to the initial real enforceable date in

Page 42

1  July of '95 -- there was an enormous variation in how the
2  businesses that were directly affected by 2257, how they
3  responded to that.  Some said wait to see if it ever goes
4  into effect.  Others attempted to comply immediately, but
5  everyone was aware of it.  I can't say everyone.  Everyone
6  I interacted with was aware of it.  Again, it was part of
7  my job to make sure they did.
8      Q   Are you familiar with the term primary producer
9  as used in the 2257 scheme?
10     A   Yes.  I think as used.  I don't think it has a
11 particularly meaningful distinction currently.
12     Q   What do you mean?
13     A   Well, Adam Walsh enactments attempted to
14 eliminate the distinction between primary and secondary.
15     Q   But you're aware that implementing regulations
16 that have a definition of primary producer and a
17 definition --
18     A   Yes.
19     Q   -- of secondary producer?  Is Free Speech
20 Coalition a primary producer?
21     A   No.
22     Q   Are Free Speech Coalition members primary
23 producers?
24     A   Some.
25     Q   What kinds of activities are they engaged in that

Page 43

1  qualify them as primary producers?
2      A   There are members who arrange for the recordation
3  of sexually explicit and sexually simulated images.  There
4  are members who record those images, and there are members
5  who put those images into the stream of commerce.
6      Q   Could you put them in categories like magazines
7  and things like that, or is there a way to categorize
8  them?
9      A   Sure.  I could, but it doesn't make any
10 difference.  If I'm a toy manufacturer and I have an image
11 on the packaging that is sexually explicit, I'm a primary
12 producer.  If there's a magazine and it has those images,
13 then I'm a primary producer.  If the image is a moving
14 image in a tangible object, like DVD, VHS, or 8mm, I'm a
15 primary producer.  If it's created only and exists only
16 in, you know, electronic form transmitted, for instance,
17 through the Internet, then it's a primary producer.
18     Q   Do you know how many Free Speech Coalition
19 members are primary producers?
20     A   I don't have a specific number but the vast
21 majority are.  The exceptions would be lawyers, and I mean
22 I'm assuming that none of the lawyer members are primary
23 producers.  They're not mutually exclusive, but one would
24 not expect that.  I don't know of any lawyers that are
25 primary producers.  Talent agents probably are not primary

Page 44

1  producers.  In the category of nonperformer individual
2  members, I couldn't break down, but some of them are
3  primary producers because they are individuals who are not
4  otherwise -- who don't have a corporate existence but just
5  are an individual producer.  Someone who takes pictures,
6  photographers -- they're primary producers, and they're
7  members.  One would not anticipate if you're the sound
8  engineer or camera person or makeup artist that you're a
9  primary producer not in that role, and they are members.
10 The majority of performers are primary producers because
11 of their Web site participation and social media.  The
12 majority of brick and mortar retailers are because they
13 have Web sites.  The majority of distributors have Web
14 sites that makes them -- excuse me.  Those are secondary
15 producers.  So I would assume that most retailers and
16 distributors are secondary producers, not primary
17 producers.  So those would be the group that are not
18 primary producer, but I think I said most performers are
19 insofar as they commission imagery of themselves that
20 appears on the Web site.  They of course can be second
21 producers that simply take images recorded by others and
22 use on their Web sites.
23     Q   So what percentage of Free Speech Coalition
24 members do you think are primary producers?
25     A   The quality of my estimate is so poor as to

11  (Pages 41 to 44)

Jeffrey J. Douglas - 4/9/2013

Page 45

1  qualify as a guess.
2      Q   We've already mentioned the term secondary
3  producer, but you're familiar with that term as used in
4  the regulations?
5      A   Yes.
6      Q   And Free Speech Coalition is not a secondary
7  producer?
8      A   That's correct.
9      Q   And you've explained that, of the categories of
10  Free Speech Coalition members, the activities that would
11  qualify as secondary producers are conducted by retailers
12  and distributors?
13      A   Well, most.  The only categories that would not
14  be secondary producers -- because I think most
15  manufacturers are primary and secondary.  So the only ones
16  that I could think of that would be secondary only would
17  be distributors who have Web sites, retail outlets who
18  have Web sites, and possibly a handful of artists, actors
19  and actresses who don't commission anything for themselves
20  and rely exclusively on materials created by others.  I
21  don't know what fraction.  I would assume a minority, but
22  some fraction of the performing artist community is
23  exclusively secondary producer.
24      Q   Do you think there are any categories of primary
25  producers who are not also secondary producers?

Page 46

1      A   Yeah.  The independent contractor who creates
2  movies to sell to others.  They are not secondary.
3  They're exclusively primary.
4      Q   Or could that also include manufacturers?
5      A   Most manufacturers.  I can't say all because I
6  don't know that, but my assumptions is that most, if not
7  all, acquire product that was created by a separate
8  primary producer.  That would not qualify as a joint
9  primary production because it could be multiple primary
10  producers for one work of art.  Recognizing that, my guess
11  is that the large majority of primary producers are
12  secondary producers as well.  That is, they acquire
13  finished product and distribute it, put it into the --
14  distribute it, put it into the stream of commerce, and
15  therefore are secondaries.
16      Q   So you think that even small producers who are
17  creating films are also secondary producers?
18      A   It just all depends what you mean by "small."
19  That's why I used the term "manufacturer."  When I think
20  of a producer is somebody who puts up the money to create,
21  for instance, a movie or a scene.  If that's all they do,
22  essentially arrange for production, they would be unlikely
23  to be secondary producers, but I wouldn't think of them as
24  a manufacturer because, once they create that, they would
25  turn around and sell that to someone else who bundles it

Page 47

1  in some fashion and puts it into the stream of commerce.
2      Q   Did you say you would not think of them as
3  manufacturers?
4      A   I would not think of that person that I just
5  described -- that person who is basically directing and
6  funding a scene and selling it to a third party to put
7  into the stream of commerce.  I would not think of that
8  person as manufacturer.  The distinction initially
9  manufacturer is someone who would take the image and put
10  it on discs or videotape it and push it out into the
11  world.  That's what they were manufacturing.
12      Now, with the Internet that term is probably not
13  particularly descriptive or accurate.  But let's say I am
14  a sort of stereotypical small producer that makes 20
15  scenes a year.  Every other week I'll shoot a 6- to
16  15-minute scene.  It is likely that, rather than
17  distributing that through a Web site because that wouldn't
18  generate substantial enough income to carry me through,
19  it's much more convenient for me to sell that scene to
20  someone else who has a large Web site that has the scenes
21  of many, many different creators in it and just get income
22  from them.  In which case, that person would be a primary.
23  They would never be buying other people's product.
24      Q   Does Free Speech Coalition members upload
25  material onto Web sites?

Page 48

1      A   Yes.
2      Q   Would such entities or individuals qualify as
3  primary producers or secondary producers or both?
4      A   Could be either or both.
5      Q   Depending on whether the material they're
6  uploading is material they've created?
7      A   Yes.
8      Q   Is there any type of activity, for example,
9  creating digital films or creating videos or creating
10  print images that is more common amongst Free Speech
11  Coalition members than others?
12      A   I would think that Free Speech Coalition fairly
13  represents the market, and in the market more -- the
14  majority of images are created electronically for
15  electronic distribution than for tangible distribution.
16      Q   Is the --
17      A   Don't mind me.
18      Q   Free Speech Coalition, for purposes of this case,
19  has identified a certain number of entities or individuals
20  as members; correct?
21      A   I believe so.
22      Q   Those include David Connors, Marie Levine, the
23  Sinclair Institute or Townsend Enterprises; correct?
24      A   Yes.
25      Q   And those are Vivid Video Pictures, Wicked

12  (Pages 45 to 48)

Page 85

1  say it was not the primary factor that it shut down?
2      A   There are -- I have been told by third parties --
3  so not directly with the policy maker of companies that
4  have shut down.  And when it has been told to me why they
5  shut down, the cost of compliance with 2257 and/or the
6  fear of a criminal prosecution because of a record keeping
7  error were significant factors, but I've not spoken to any
8  of those people directly.  People have said that such and
9  such company went out of business and that has been said
10 as being factors.  But as I'm saying this, I'm trying to
11 remember names, and I'm not sure that I can distinguish
12 one from the other.  So I'm loath to mention specific
13 names.
14     Q   Do you have a sense of how many producers you've
15 heard of in that category?
16     A   Probably a half dozen.  That's the right
17 magnitude.  I have had a couple of people, maybe three,
18 post Adam Walsh who consulted me with the intention of
19 becoming a producer who told me, either at the end of the
20 consultation or after, that ultimately they decided they
21 just didn't want to do it, saying that 2257 was a specific
22 factor.  This is attorney-client privileged material; so I
23 cannot disclose names.  But I would say that two or
24 three -- three is my best guess -- have post-Adam Walsh,
25 chosen not to enter the business because of fear of

Page 86

1  criminal prosecution under 2257 or the burden.
2      Q   Are you intending to testify regarding
3  information that you got within the attorney-client
4  relationship?
5      A   I am not.
6          MS. BAUMGARDNER:  Objection.
7          THE WITNESS:  I am not intending to.
8  BY MS. WYER:
9      Q   Okay.  Just for the record, to the extent that
10 you intend to testify to such information, we reserve the
11 right to reserve to exclude it to the extent we have not
12 been able to probe it further.
13         MS. BAUMGARDNER:  And I'm objecting because
14 you're inquiring about privileged areas, anyway.  You're
15 not entitled to a response.
16 BY MS. WYER:
17     Q   In regard to Dave Connors, what is your basis for
18 your understanding regarding his going out of business and
19 the reasons for that?
20     A   I believe he has said it -- I believe I've read
21 it in a trade publication.
22     Q   Do you recall where?
23     A   No.
24     Q   You have not spoken with him about it?
25     A   I have an attorney-client relationship with Dave;

Page 87

1  so I cannot answer that question.
2      Q   Do Free Speech Coalition use young-looking
3  performers in the images of sexually explicit conduct that
4  they produce?  And by "sexually explicit conduct," I
5  mean -- can we agree that I mean activities that would be
6  subject to the 2257 requirements?
7      A   You want -- I don't need a definition of that
8  term.  I need the definition of the term "young looking."
9  I'm 56 years old.  Most people are young looking.
10     Q   What do you consider to be young looking?
11     A   I -- I don't know what that term means.  Younger
12 than what?
13     Q   Well, I guess we can just go to some examples.
14     A   I'm going to need a reference.  Younger than me?
15 Younger than something.  Right.  Because "young" doesn't
16 mean anything.  I have a five-year-old son.  He is young.
17 I have not seen a commercial production of sexually
18 explicit material that depicts anyone that could be
19 mistaken for my son.
20     Q   For a five-year-old?
21     A   Correct.
22     Q   In your opinion, what does the term "mature"
23 mean?
24         MS. BAUMGARDNER:  Objection.
25         THE WITNESS:  Should I answer?

Page 88

1          MS. BAUMGARDNER:  Yeah.  Go ahead.  In terms of
2  what?  If you understand what she's asking.
3          THE WITNESS:  Mature means to me to have an
4  appreciation of the complexity of the world that we
5  participate in and understanding individual
6  responsibility.
7  BY MS. WYER:
8      Q   Is it your belief that the images produced by
9  Free Speech Coalition members contain -- are exclusively
10 of mature-looking individuals?
11     A   Depending on what you mean by the term "mature,"
12 yes or maybe no.  But I don't know what you mean by the
13 term "mature."
14     Q   Do you have an understanding of the term "old"?
15     A   Without a context, it doesn't mean anything.
16 Again, I mean at five years old, my son does not
17 distinguish between an 11-year-old and 56-year-old.  We're
18 all old.  What do you mean?
19     Q   Do you think that you can determine a person's
20 age by their visual appearance?
21     A   No, I do not.
22     Q   I just saw a picture of Rachel -- a video of
23 Rachel Robinson, Jackie Robinson's widow.
24         MS. BAUMGARDNER:  Oh.
25         THE WITNESS:  She is 85.

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jeffrey J. Douglas - 4/9/2013

Page 97

1    Q    What is the decision making process when Free
2  Speech Coalition is considering filing a lawsuit?
3    A    Importance or perhaps you can say relevance to
4  the national impact of the -- whatever it is that we would
5  be challenging in the litigation, the cost of litigation,
6  and whether there are more suitable plaintiffs.
7    Q    Aside from Free Speech Coalition?
8    A    Correct.
9    Q    Who makes the decision?
10   A    Board of directors.
11   Q    Does it -- is there a vote, or is it a consensus?
12   A    Could be either.
13   Q    So is that the process that was -- that occurred
14 in this case?
15   A    Yes.
16   Q    Was there a vote?
17   A    Probably. I don't remember.
18   Q    At what point would it be decided in terms of,
19 like, how far in advance before filing?
20       MS. BAUMGARDNER: Objection.
21       THE WITNESS: That depends. I mean --
22       MS. BAUMGARDNER: Kathy, I don't mean to
23 interrupt, but I can use a bite to eat when it is a good
24 stopping point. I think Mr. Douglas probably could too,
25 if not the court reporter. I know you're an iron woman;

Page 98

1  so --
2        MS. WYER: Maybe in 15 minutes.
3        MS. BAUMGARDNER: That's fine.
4        MS. WYER: Maybe less. This section might not
5  take long.
6  BY MS. WYER:
7    Q    You've been involved in prior litigation
8  involving 2257; correct?
9    A    Yes.
10   Q    What cases were you involved in?
11   A    The Free Speech Coalition versus -- trying to
12 remember.
13       MS. BAUMGARDNER: Gonzales, I think.
14       THE WITNESS: I think it started with Ashcroft
15 and Gonzales came in afterwards. Maybe not. I don't
16 remember. In any case, it was a challenge to the -- when
17 the -- when the set of regulations in 2005 came out with
18 the revival of secondary producers, we filed a lawsuit in
19 Denver.
20 BY MS. WYER:
21   Q    That was the -- so that was district of Colorado?
22   A    Yes. At one point it was FCC vs. Gonzales. It
23 may have been the entire time.
24   Q    During that case, there was a point where there
25 was an agreement that the government would not take

Page 99

1  enforcement action against Free Speech Coalition members;
2  correct?
3    A    Yes.
4    Q    There was a cutoff date by which anyone who was a
5  member by that date would be covered by that agreement;
6  correct?
7    A    Yes.
8    Q    That cutoff date was 2:00 p.m. June 25th, 2005?
9    A    I have no independent recollection, but that
10 sounds correct.
11   Q    Do you recall how many new members Free Speech
12 Coalition -- joined Free Speech Coalition as of -- during
13 the time period between the agreement and the cutoff date?
14   A    We were utterly completely unprepared and
15 overwhelmed. It was probably 2,000. That's the right
16 magnitude. It could have been 1,200. It could have been
17 2,000, but 2,000, as I said, is the correct magnitude.
18   Q    That time period in which these members joined
19 was?
20   A    Like, ten days. It was a disaster.
21   Q    But today you mentioned that the current
22 membership of Free Speech Coalition is 950, did you say?
23   A    I think I said 800, but again that's the right
24 magnitude.
25   Q    So do you know -- do you have any sense of how

Page 100

1  long those new members remained members? Obviously, not
2  all of them remained members.
3    A    There were a number of problems. We did not have
4  any mechanism in place to receive the number of calls that
5  we were getting, and so we made a number of fatal errors
6  which resulted in the lack of renewals. We hired a phone
7  service to take the orders, and they might be quite fine
8  if you're going to be ordering pens or garbage cans from
9  them, but they failed to get almost all of the necessary
10 information. That is, they got names incorrectly. They
11 got phone numbers incorrectly. The only thing they got
12 were credit card numbers. That's the only thing they
13 cared about. So we had hundreds of companies that we had
14 listed as members whom we could not contact. And when we
15 sent out renewal notices, that's when we found out that we
16 didn't have addresses or we had partial addresses or we
17 had incorrect addresses. So there was a substantial
18 number that we simply had no means of contacting.
19       The other issue was that a number of companies no
20 longer felt that there was the urgency of joining because
21 they formed the opinion they were getting the benefit,
22 which is to say, lack of enforcement whether they were
23 members or not.
24       And then in addition, that occurred at a
25 relatively dynamic time in the evolution of the adult

25 (Pages 97 to 100)

**Jeffrey J. Douglas - 4/9/2013**

Page 137

1  were worthless to you.
2  Q   What was the prior understanding based on?
3  A   The five-year washout?  It's in the regs, the old
4  regs.
5  Q   That was amended in this proposed --
6  A   In the proposed regs, they said that you could
7  sell to a secondary only if you provided them with the
8  records.  But if you didn't need to maintain those
9  records, then those records would lawfully been disposed
10  of.  So you're creating an obligation to maintain records
11  in order to make material commercially viable that the
12  government had previously said you didn't need to
13  maintain.  That's a problem.
14  Q   So there was an assumption, based on the
15  indication in the prior version of the rules, that records
16  need only be maintained for five years.  It was an
17  assumption that meant that, if one was going to engage in
18  secondary protection of that same material, somehow that
19  material would be exempt from the requirements?
20  A   There was no lawful provision for secondary
21  producers.  Right.  From the date of the Sundance
22  opinion -- apart from the fact that just on its face,
23  secondary producer was a creation entirely on some small
24  section of the attorney general's office.  There was
25  nothing that suggested that anyone other than a producer,

Page 138

1  a person who arranged for or did the recording of the
2  material or paid for the performers was a record keeper.
3  That was it.  That was the entire universe of record
4  keeper.  The attorney general said oh, it's not just --
5  it's not just the driver of the car who's drunk.  If any
6  of the passengers are in the car, that's a crime too.
7  That's not what the statute on drunk driving says.  That
8  is precisely analogous to what happened here.  So ultra
9  vires regulations were created that everybody, except a
10  handful of people in the justice department, recognized
11  that could not be lawful and effective.
12       Then Sundance comes out and says, yeah, you're
13  right.  This is ultra vires.  This is indefensible.  The
14  government did not appeal, and there was no attempt to do
15  anything to communicate that this was not the position of
16  the Justice Department until the 2007 regs -- 2005 regs
17  come out.  So from the date of Sundance -- which I don't
18  recall what it is, and it may be in here somewhere.
19       MS. BAUMGARDNER:  I think it's '98.  I'm not
20  sure.
21       THE WITNESS:  So from 1998 to 2005, there were no
22  secondary producers.  That was entirely an artificial
23  creation of the attorney general and no one on earth was
24  complying with it, nor was there any rational reason to
25  comply with it because, besides the fact that it was

Page 139

1  self-evident, there was a published unappealed opinion
2  saying so.
3       Then in 2005 it's ha, ha, ha.  You cannot sell
4  your material to another seller without providing them the
5  records that, under the existing law, you could destroy.
6  Therein lies the problem.
7  BY MS. WYER:
8  Q   Was Sundance a Supreme Court opinion?
9  A   Tenth Circuit.
10  Q   So the secondary producer requirements don't
11  apply in California; correct?
12  A   No.  They were unconstitutional at the time ab
13  initio.  If tomorrow government were to say based on
14  legislation but on a regulation generated by executives
15  that it was illegal to be a passenger in a car with .08
16  that would be void ab initio.  There is nothing about that
17  that's enforceable.  There's nothing about that that is
18  law.  That is dictatorship.  That is an arbitrary rule
19  announced inconsistent with due process.  That's what
20  Sundance said.  That's what was the -- as a result of
21  Ashcroft vs. Free Speech Coalition, and the government did
22  nothing during that period to suggest or imply that that
23  was not correct.
24       There is, as we found out in Denver, a cost to
25  not aggressively consistently challenge unconstitutional

Page 140

1  regulation because government said you sat on your hands
2  all this time.  There's a flip side to that too when the
3  government is told by a Court of Appeal that they had done
4  something that is patently indefensibly beyond its
5  authority, and the government does nothing inconsistent
6  with that for seven years and then says ha, ha, ha.  All
7  you guys you have to do what we did nothing to convey that
8  you had to do after a Court of Appeal said -- stated the
9  obvious.  Yeah.  That's a huge problem.
10  Q   Okay.  I think I understand that position.
11       Going on to No. 2 in the --
12  A   Yes.
13       MS. BAUMGARDNER:  Exhibit 7?
14  BY MS. WYER:
15  Q   2 in Exhibit 7 on page 4.
16  A   4.  Yeah.
17  Q   The definition of producer --
18  A   Is unwarranted by the statute and burdens too
19  many people.
20  Q   Was this comment adopted?
21  A   Not going to jump the gun this time.  I'm going
22  to look at it.  Do you know -- is there a place in the
23  final regs that you believe this is referenced?
24  Q   On page 777439.
25  A   439?

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Jeffrey J. Douglas - 4/9/2013

Page 193

1 that you would attribute to 2257?
2     A   That's exactly correct.  The acquisition of a
3 reliable form of identification government issued ID not
4 necessarily precisely those prescribed by 2257.  For
5 instance, if a performer provided me -- if I was a
6 producer -- with a passport from Canada, I would find that
7 to be perfectly reliable and be comfortable establishing
8 that identity and age, but in any case government issued
9 ID is proof that the person is of the age of majority.
10 That is not a burden.  It's everything else.  And since
11 everything else, as I indicated and overenunciated, is
12 unnecessary in order to achieve the goals of legislation,
13 that's why it's such an enormous burden.  Recognize that,
14 if a production company puts into the stream of commerce
15 material that has a minor in it, if they are in compliance
16 with 2257 and their good faith is established therefore
17 they don't have to worry about doing 15 years mandatory
18 minimum for producing child pornography.  The cost of
19 having a minor get into the system, having to recall that
20 material is overwhelming and generally catastrophic.
21     Q   Can you identify other requirements that apply to
22 Free Speech Coalition, other legal requirements under
23 which they operate --
24     A   Sure.
25     Q   -- that relate to age verification?

Page 194

1     A   Then -- sorry.  That fooled me.  Repeat the
2 question.
3     Q   Can you identify any other legal requirements
4 under which Free Speech Coalition members operate that
5 relate to age verification?
6     A   Yes.  I cannot imagine any member of the Free
7 Speech Coalition who distributes an image of a performer
8 not intending to have a model release on file.  And since
9 a model release is a contract and a contract with a minor
10 is not enforceable, the producer has a civil legal
11 obligation to be a functioning profitable business to
12 verify that the person with whom they are contracting is
13 of age.
14     Q   And the result if a producer did not do that
15 would be that the rights that they would have required
16 through the release would not be valid; correct?
17     A   Right.  They would have dual obligations to
18 recall and destroy the product one criminal one civil.
19     Q   What would the criminal obligation be?
20     A   Violation of child pornography laws.  If I sign a
21 contract with a minor and distribute images of that minor
22 and it turns out that person is a minor unbeknownst to me,
23 once I find out, I have the affirmative obligation to stop
24 distributing the material, and to the extent that I
25 previously distributed material, see to its lawful

Page 195

1 destruction.
2     Q   So you have identified child pornography criminal
3 laws and the requirement that contracts must be signed by
4 individuals who are either of legal age or have been
5 otherwise adjudged competent to enter into contracts as --
6     A   Correct.
7     Q   -- to age-related contracts --
8     A   Correct.
9     Q   -- applicable to members?  Are there any others?
10     A   No.  Nothing I can think of.  Well, let's see.  I
11 think -- I'm not familiar with state laws on hiring a
12 minor; so I don't know if I were to hire a 16-year-old or
13 17-year-old for the purpose of, you know, filing documents
14 in my office if I have some special obligation once they
15 are a minor.  I don't know that.  It may well be there are
16 others.  I'm not familiar with that.  The ones I'm aware
17 of are criminal and civil side.  So if one fantasized a
18 world where there are no child pornography laws, but I
19 have inadvertently hired a minor and distributed the
20 material in order to minimize my civil liability once the
21 minor sues me or once I'm notified and recognize I might
22 be sued, I would have a similar obligation to, A, stop
23 distributing the material and recall the material as
24 quickly as possible in order to minimize my civil
25 liability.  Has an extremely costly effort, costly not

Page 196

1 only in terms of my out-of-pocket loss and expense for
2 doing that but also the loss of good will is profound.
3     Q   And the impact that would have would be a
4 professional and financial impact to the producer?
5     A   Yes.
6     Q   In looking at Interrogatory 9, I wanted to note
7 in the response that this is a question that asked for the
8 number of individuals appearing in the Free Speech
9 Coalition members who are in particular age ranges.  And
10 the -- in the response it stated in all likelihood there
11 are more than 1000 depictions for each category except
12 perhaps for 6, which is the category of over 65.
13     A   Right.  Since Dave Connors may have well been
14 close in a thousand by himself over the age of 65.
15 Certainly he has done hundreds.  Maybe be that that 65 --
16 over 65 does meet the thousand.
17     Q   That's based on an understanding of -- if the
18 question had asked instead for numbers of individual
19 performers?
20     A   There are likely scores if not hundreds of
21 performers over the age of 65 who have engaged in sexually
22 explicit conduct.  I don't know if they are all members.
23     MS. BAUMGARDNER:  I want to clarify.  The
24 interrogatory asked for total number of depictions.
25     MS. WYER:  I was saying if performers.

49  (Pages 193 to 196)

**Jeffrey J. Douglas - 4/9/2013**

Page 197

1    THE WITNESS:  That is, there is -- there are all
2  of the sort of subcategories that are created for
3  marketing purposes so there is a subcategory of granny
4  porn.  There is surely scores of people that perform under
5  granny porn, and there are likely hundreds.  And if you
6  were to tell me there are thousands, that is not an
7  unlikely number.  Now what percentage of those productions
8  are created or districted by our members?  I don't know.
9  But you're talking about a measurable and significant
10  portion of the fraction of the material that is available
11  both tangible and online.
12  BY MS. WYER:
13    Q   But even under the interrogatories where -- your
14  answer suggests that the number of individuals in the
15  other -- the number of depictions in the other age ranges
16  would be more?
17    MS. BAUMGARDNER:  Objection.  More than what?
18  BY MS. WYER:
19    Q   More than the number in the Category 6?
20    A   We specifically say -- without waiving the
21  objection -- there are substantially -- there are more
22  than 1,000 depictions for each category.
23    Q   Except perhaps for six.
24    A   Right.  I'm not sure that exception is correct,
25  but we were extraordinarily cautious.

Page 198

1    Q   Does that answer reflect your understanding that
2  there are likely more in the other age ranges than in the
3  over 65 age range?
4    A   Yes.  It reflects -- you said understanding.
5  That's a strong guess -- estimate.
6    Q   Do you have any way of knowing the ages of
7  performers that appear in depictions produced by Free
8  Speech Coalition members?
9    A   Not specifically, no.  Well, yeah.  They're all
10  over 18, 100 percent.
11    Q   Do you -- does Free Speech Coalition engage in
12  any monitoring of its members' production activities in
13  order to evaluate whether they are in fact using only
14  performers 18 or over?
15    A   No.
16    Q   Is there any contract between Free Speech
17  Coalition and its members that requires that?
18    A   No.  There is a best practices.  That's the
19  closest thing that comes to that, and I don't know off the
20  top of my head if best practices include specifically of
21  age, but it says comply with applicable laws.  And I don't
22  believe that you could find a single knowledgeable person
23  who would disagree with the statement that there is no
24  knowing production of sexually explicit material with
25  someone under age by, A, members of the Free Speech

Page 199

1  Coalition or, B, the substantially larger class of
2  commercial producers or distributors of adult pornography.
3  Even the most committed critics of the industry do not
4  suggest that commercial child pornography has a
5  relationship, a commercial relationship with the adult
6  entertainment industry.  No one believes that.
7    Q   Is that your understanding yourself?
8    A   I'm sorry?  Is it my understanding?  There's no
9  commercial relationship between the production of child
10  pornography and production of adult entertainment.  Yes.
11    Q   Going to Interrogatory 12, this lists various Web
12  sites.  Were you involved in compiling this list of Web
13  sites?
14    A   I don't think so.  I may.  I'm not sure whether I
15  mentioned any of these or not.  I'm familiar with a
16  fraction of these, and I don't remember whether I proposed
17  them or not.  Let's assume no.
18    Q   That was my only question on that.  Have you --
19  are you aware of any -- are you aware that in response to
20  these interrogatories there was also -- this was -- let's
21  give you 10.
22    MS. WYER:  Let this be marked as Exhibit 10.
23  This is the second set of interrogatories responses.
24    (Defendant's Exhibit 10 was marked for
25    identification and is annexed hereto.)

Page 200

1    THE WITNESS:  Yes.
2  BY MS. WYER:
3    Q   From Free Speech Coalition; correct?
4    A   Yes.
5    Q   And in response to Interrogatory 23 there are
6  various categories on subsections of that, and I want you
7  to look at subsections H and I on page 10 which asks for
8  examples of sexually explicit visual depictions in a
9  documentary on rape and sexually explicit visual
10  depictions in a documentary on sexual abuse in war-torn
11  countries.
12    A   That's on page 10?
13    MS. BAUMGARDNER:  Mine is misstapled.  Let's see
14  if yours may have too.  Yours is correct.
15    THE WITNESS:  And your question is?
16  BY MS. WYER:
17    Q   Whether you are familiar with any of the examples
18  provided on page 12 in response to subsection H and I?
19    A   I have not seen but I am aware of abused
20  innocents.  I heard it discussed on an MPR program.  And
21  likewise I'm pretty sure that what I was familiar with is
22  inside the anonymous hacking file of the Steubenville rape
23  crew.
24    Q   Are you aware whether those depictions -- whether
25  those works include images that would be -- that in your

50  (Pages 197 to 200)

Page 205

1  the Court about that.
2          THE REPORTER:  Would you like copy?
3          MS. BAUMGARDNER:  I'll let you know.
4          (Deposition concluded at 4:21 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 206

1          I declare under penalty of perjury under the laws of
2  the State of California that the foregoing is true and
3  correct.
4          Executed on _____, 2013, at.
5  _____, _____.
6          (city)            (state)
7
8
9
10          _____
                JEFFREY J. DOUGLAS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 207

1          REPORTER'S CERTIFICATE
2          I, ELIDA REYES, Certified Shorthand Reporter in
3  and for the State of California, License No. 13547, hereby
4  certify that the deponent was by me first duly sworn and
5  the foregoing testimony was reported by me and was
6  thereafter transcribed with computed-aided transcription;
7  that the foregoing is a full, complete, and true record of
8  said proceedings.
9          I further certify that I am not of counsel or
10  attorney for either or any of the parties in the foregoing
11  proceedings and caption named or in any way interested in
12  the outcome of the cause in said caption.
13          The dismantling, unsealing, or unbinding of the
14  original transcript will render the reporter's certificate
15  null and void.
16          In witness whereof, I have hereunto set my hand
17  this day: _____, 2013.
18
19          [ ] Reading and Signing was requested.
20          [ ] Reading and Signing was waived.
21          [ X ] Reading and Signing was not requested.
22
23          _____
24          Elida Reyes, CSR No. 13547
25

Page 208

1              INDEX
2
3  Tuesday, April 9, 2013
4
5  WITNESS                    EXAMINATION
6
7  JEFFREY J. DOUGLAS
8
9          (By KATHRYN L. WYER)           3
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

52 (Pages 205 to 208)

# *In The Matter Of:*

### *Free Speech*
### *v.*
### *The Honorable Eric H. Holder, Jr.*

---

### *Thomas Hymes VOL I*

### *April 8, 2013*

---



**BENHYATT**
Certified Deposition Reporters

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **1008991**
number of pages 162

*Word Index Included with this Condensed Transcript.*

Thomas Hymes - 4/8/2013

Page 5

BY MS. WYER:
1
2    Q    And when you answer, please answer verbally
3  so that the court reporter can record your response,
4  because she can't understand nods.
5    A    Okay.
6    Q    What did you do to prepare for the deposition
7  today?  Anything?
8    A    We met yesterday for a few hours, and that's
9  about it.  I haven't really done much other
10 preparation for it.  I looked over my -- I had a copy
11 of my first -- the answer to my first interrogatories.
12 I went over that briefly, and that's about it.
13    Q    Is that the only document that you looked
14 at?
15    A    That is the only document that I looked at.
16    Q    Okay.
17    A    I looked at a couple -- I also looked at a
18 couple of old news stories on avn.com just to refresh
19 my memory, and that's it.
20    Q    About the litigation?
21    A    Well, about -- in fact, the meeting I had
22 talked to you about when we went to the -- I've
23 forgotten when it was.  So I wanted to refresh my
24 memory.  We went to the meeting with the FBI in
25 Washington DC in 2007.  Mark Kerns had written an

Page 6

1  article about it, and I reread that last night to just
2  refresh my memory.
3    Q    Let's just start with your background.  What
4  kind of education background do you have?
5    A    I have two years of college, and I'm also an
6  actor.  My wife is an actor.  So I've studied a lot of
7  acting-type classes in New York when I was younger.
8  But two years of college in Boston plus some other
9  matriculated -- various matriculated courses over the
10 years.  So that's the extent of my higher education.
11 Then I graduated obviously high school in New York
12 City.
13    Q    Did you have a major?
14    A    It was English, yeah.  Creative writing, that
15 type of stuff.
16    Q    Okay.  How did you become involved in the
17 adult industry?
18    A    Well, I was introduced to it by an actor
19 friend who was in my theater company.  She was writing
20 for AVN at the time.  She asked me if I wanted to get
21 some writing work, which I did.  I began part time
22 just reviewing movies, which I didn't particularly
23 like, and then they started this magazine called AVN
24 Online and they hired me as a staff writer.  And I
25 eventually became the editor and chief, and that all

Page 7

1  began in 1999.  And I've been covering the industry
2  ever since.
3    Q    So when you first got the job as a staff
4  writer, that was 1999?
5    A    That was -- it was -- I believe it was still
6  in 1999, yes.
7    Q    So were you --
8    A    I was hired part time to just review movies
9  and then they hired me full time at AVN to be a staff
10 writer for this new magazine, AVN Online, and that was
11 all -- that all began in 1999.
12    Q    Okay.  It all happened within the year that
13 you --
14    A    Well, I didn't become editor in chief right
15 away.  That was about three years later, but I was a
16 staff writer for a couple of years.
17    Q    Okay.  And was that here in California?
18    A    Yes, in Chatsworth.
19    Q    Okay.
20    A    Yes.
21    Q    So when did you come to California?
22    A    I'm from New York.  I moved out here in 1979
23 actually, so I've been out here since 1979.
24    Q    Okay.
25    A    Uh-huh.

Page 8

1    Q    And what were you doing between 1979 -- what
2  were you doing between 1979 and when you started with
3  AVN?
4    A    Working, living, a lot of theater, a lot of
5  acting type of work, improv group, that type of
6  stuff.
7    Q    Did you come to California to be --
8    A    Not really.
9        MS. BAUMGARDNER:  Let her finish.
10       THE DEPONENT:  I thought she finished.  To be
11 an actor?  Not really.  I'd always done acting.  I
12 kind of came out here; my brother was living here; so
13 I just stayed here and then just continued doing the
14 things that I had always been doing.  But I didn't
15 specifically move out here to be an actor like
16 everyone else does.
17 BY MS. WYER:
18    Q    When you started with AVN Magazine, was that
19 an online magazine?
20    A    No.  AVN Online was a print magazine, so they
21 began a print magazine back then.  It's no longer
22 being published, but it was -- it was AVN Online.
23 They started a magazine to cover the online industry
24 separate from AVN Magazine, which covered the video
25 side of the industry.  So there was a magazine

2 (Pages 5 to 8)

Thomas Hymes - 4/8/2013

Page 9

1  dedicated to covering the adult online industry, and
2  that's the one I wrote for.
3      Q   Okay.  And so for three years you were a
4  staff writer?
5      A   Well, I don't remember exactly when I became
6  editor and chief.  It was about two or three years
7  that I was a staff writer.  Then I became the editor
8  and chief for another three years or so, and then I
9  left AVN in 2004.
10     Q   What kind of stuff do you do when you're
11  editor and chief?
12     A   Everything.  You're responsible -- I was
13  responsible for assigning all the articles.  I had a
14  staff and overseeing the production of the magazine,
15  the content of the magazine, the budget of the
16  magazine, so from A to Z.  I was in control of that
17  magazine.
18     Q   The advertising?
19     A   There was obviously a sales department, so
20  sales would do -- you know, sell the advertising.  I
21  would work with them, but I was editorial.
22     Q   Okay.  And during this whole period from 1999
23  to 2004, AVN Online was a print --
24     A   Yes.
25     Q   -- magazine?

Page 10

1      A   Yes, a print publication.
2      Q   So you were working exclusively with --
3      A   No.  Because we also had avnonline.com, so I
4  was also charged -- I also had, at that time, one
5  staff member who was dedicated to posting stories on
6  avn.com.  So there was an online component to it as
7  well, and, of course, I oversaw that as well.
8      Q   And in 2004 what did you do?
9      A   I left AVN.  I resigned from AVN, and shortly
10  thereafter I was hired to be the communications
11  director for the Free Speech Coalition.
12     Q   Why did you leave AVN?
13     A   Because -- well, it's kind of -- not
14  personal.  It was business stuff.  I was a little
15  upset about -- it had to do with internal politics
16  frankly.  And so there was a sort of direction -- they
17  hired a new publisher and he was taking the magazine
18  in a direction that I was not very comfortable with.
19  So I left for that reason.  I mean it took me a year
20  to leave because I wanted to be in good graces with
21  everyone there and with the owners, who I'm very fond
22  of, but that's why I left.  I left because it was
23  being taken in a direction that I was uncomfortable
24  with, so I resigned.
25         And I didn't really know what I was going to

Page 11

1  do after that.  And then Michelle Freridge, who was
2  the executive director of Free Speech Coalition at the
3  time, called me and offered me this other position,
4  which I took.
5      Q   What do you mean when you say AVN was going
6  in a direction you weren't comfortable with?
7      A   Well, I'm a -- I have strong journalistic
8  ethics and I don't like to -- I mean there was -- you
9  know, it's a trade magazine so it's -- you have to
10  fight all the time to hold the line on your editorial
11  integrity, and not everyone necessarily shares those.
12         They just hired a publisher who had kind of a
13  different philosophy and was sort of intruding into
14  editorial areas, and I wasn't really comfortable with
15  that and I couldn't stop it, and I was concerned about
16  the trajectory of where they wanted to take that
17  magazine and I didn't really want to be a part of
18  that.  It was just too -- it wasn't pure enough for
19  me, and I thought it was really important that we
20  maintain our editorial integrity there and that was my
21  concern.  So I take those things really seriously.
22     Q   Let's back up.  So what is AVN?  What does it
23  mean to be a trade magazine?
24     A   A trade magazine covers a particular
25  industry.  So AVN magazine is, you know, a -- it

Page 12

1  covers -- that's what a trade publication is.  It
2  covers an industry.
3         And so for AVN, it covers the adult
4  entertainment industry, which is vast.  So depending
5  on its resources, it will have different publications
6  that target different sectors of that industry.
7         At one time we had AVN Video, AVN Magazine,
8  AVN Online, online, and then there was an AVN Novelty
9  separate publication which covered the novelty sector.
10  Those have since, because of, you know, the market and
11  because of tough times, been combined into one
12  magazine now.  There is no longer a separate novelty
13  magazine or an online magazine.  They've all gone back
14  into AVN Magazine.
15         So depending on your resources, you have
16  either different ones or one, but they all cover --
17  they all cover a particular industry.  They're not
18  consumer magazines.  In other words, the readership
19  are members of the industry and people who are
20  interested in the industry as opposed to consumers, so
21  these are not consumer publications.  They're trade
22  publications.
23     Q   So what did you do for Free Speech
24  Coalition?
25     A   I wrote all of the press releases.  I

3  (Pages 9 to 12)

Thomas Hymes - 4/8/2013

Page 13

1  communicated with all the media. I arranged
2  interviews and anything related to a communications
3  director type of position. Basically it was -- I
4  would do -- also I did -- at that time Michelle was
5  not so comfortable doing media interviews so I did all
6  of them. Now Diane is very comfortable in that role
7  so she tends to do them. They don't have a de facto
8  communications director right now.
9      Q   When you say "Diane," do you mean --
10     A   Diane Duke. Diane Duke, current executive
11  director. But at that time, I would do all of the
12  interviews. I did hundreds of the mainstream
13  interviews about all of these same issues, .xxx, 2257,
14  whatever issues were coming up, whatever the media
15  needed to talk about. And then also I also wrote
16  articles and press releases and that type of stuff.
17     Q   When you wrote articles, were they articles
18  as a journalist or how does that work in being --
19     A   No. They would be more in -- they wouldn't
20  be a journalist because I wasn't a journalist at that
21  time. They would be more advocate oriented. They
22  would be advocating or communicating the positions of
23  the Free Speech Coalition as I was -- at whatever they
24  were. I was not -- there was a board of directors.
25  There was an executive director. So I was

Page 14

1  communicating whatever the positions of the Free
2  Speech Coalition were through the oral and verbally
3  and written word to whomever the audience was. Mostly
4  if it was written it would be to the industry, writing
5  something for AVN or for XBIZ or for YNOT, Y-N-O-T.
6      Q   So AVN publishes articles that it gets from
7  Free Speech Coalition?
8      A   Yeah. I mean occasionally that will happen.
9  Diane will also write columns. She'll write -- I
10  think she writes a regular column for XBIZ. So, you
11  know, they're not published as journalism pieces.
12  They're published as -- those particular things would
13  be published as, you know, an advocacy piece or an
14  opinion piece or whatever it would be from the Free
15  Speech Coalition.
16     Q   And how long were you in that position?
17     A   Just about a year and a half actually. Only
18  about a year and a half.
19     Q   And why was that?
20     A   I left because money -- there were financial
21  issues at Free Speech Coalition. And the reason for
22  that is really beyond -- I don't -- I can't speak to
23  that since I was not in charge of any finances. But
24  there were some financial issues. I was unsure at
25  that point in time that I was going to continue to get

Page 15

1  paid, and I had a young son, a family to support, a
2  little baby at home, so I was -- I was between a rock
3  and a hard place at that time.
4      I loved my job and I was not finished with my
5  job. But I found myself in a position where I wasn't
6  sure that I was going to be able to -- that they were
7  going to have the money to pay me at that point in
8  time. It's very specific to that point in time.
9      And the owner of XBIZ approached me at a
10  trade show just by coincidence and offered me the job
11  of publisher of XBIZ at that same period. And I
12  thought long and hard and I took the position. So I
13  went from -- right from Free Speech Coalition to
14  XBIZ.
15     Q   And what year was that? Do you know?
16     A   That was -- oh, boy. It was probably 2006.
17  The exact day -- I didn't look that up. I was just
18  looking around for dates or something. But it was --
19  actually the end of 2006, yes. Actually I can tell
20  you for a fact. It was 2006 when I went to XBIZ. I
21  don't remember the month.
22     Q   And what is XBIZ?
23     A   XBIZ is a competitor to AVN, so it's another
24  media company that does basically the same thing,
25  magazines, online, trade shows type of stuff.

Page 16

1      Q   Trade shows?
2      A   Uh-huh.
3      Q   What is that?
4      A   A trade show? A trade show is a live event
5  that is produced by, in this case, these same media
6  entities where industry professionals come to network
7  and, you know, and do business and see -- go to
8  seminars and that type of stuff. So both AVN and XBIZ
9  produce shows now.
10     Q   Is it a place where things are sold?
11     A   At the AVN I believe there -- huh. You know,
12  that's a very good question. I believe there are some
13  sales at trade show booths. My role for the trade
14  shows is to coordinate all of the seminars. I
15  currently do that for AVN and I did it for XBIZ back
16  then. So I don't really involve myself with the show
17  floor stuff. I do believe some sales are done there.
18     I think people actually do business there,
19  because there's consumer elements as well to the AVN
20  show. I don't believe the -- like there's fan days at
21  AVN. It's like the January shows. They're huge the
22  whole week in Las Vegas, so there's trade only days
23  and then there's fan days when the fans come in to see
24  their stars, and there might be some like sales
25  components, like some people might sell their DVDs on

4 (Pages 13 to 16)

Thomas Hymes - 4/8/2013

Page 17

1    the show floor or something like that.
2        Q    So you're a publisher?
3        A    At XBIZ.
4        Q    And what did that involve?
5        A    Truth be told, it was a title that didn't
6    have -- it was -- I was a publisher in name only.  In
7    fact, I went to the owner of XBIZ after about a couple
8    of months and I said, You know, I'm not a real
9    publisher.  A publisher has a budget.  They have
10    information.  They have data.  They have all the
11    things that they need to do a publisher -- to be a
12    publisher.  I had none of that.
13        So, in fact, I was hired, as happened before,
14    so he could hire me because I was a well-known entity
15    and he could hire me as the publisher without giving
16    me the tools I needed, which was why I didn't stay at
17    AVN.  I was there only for about maybe a year and a
18    half.
19        MS. BAUMGARDNER:  You meant XBIZ.
20        THE DEPONENT:  XBIZ.  I'm so sorry.  I was
21    there only for about a year and a half and then left
22    there as well.  But I was -- a publisher normally
23    oversees -- hires people, oversees editorial, does
24    business development, has sort of overall control over
25    the editorial side of the business, which would also

Page 18

1    include sales, you know, because the publisher would
2    be responsible for that side of the business.  And so
3    ideally that's what I would have been doing.
4        In this particular circumstance, it didn't
5    quite work out that way, but that's what a publisher
6    normally does.  I was a publisher in name only and so
7    I was just sort of overseeing editorial and then I did
8    all the seminars.  It was during that time period that
9    XBIZ was expanding its trade shows.
10        And when I was there, they did their first
11    February show.  Now they do them annually in January
12    to compete with AVN straight up at the beginning of
13    the year.  The first one they ever did -- they had
14    only done one trade show when I arrived there.  Since
15    then, then they did two a year.  We did our first
16    February one.  And the very first show I did was huge
17    for them.  And that's when I actually invited the FBI
18    to come to the XBIZ show in February of 2007 where
19    Chuck Joyner addressed the industry and spoke about --
20    specifically about 2257 inspections.  So those were
21    the types of things I was doing.
22    BY MS. WYER:
23        Q    When you were in XBIZ, were you working again
24    with print media?
25        A    Yes, there was a print magazine.  They had an

Page 19

1    online XBIZ magazine and a video magazine and so I was
2    working -- it was almost the same type of thing.  In
3    fact, he took his model, you know, from AVN.  XBIZ as
4    a media company was begun to compete with AVN
5    specifically.  So he sort of modeled it and had all
6    the same types of products and things that he was
7    doing, yeah.
8        Q    Are AVN and XBIZ the only two like --
9        A    Well, no, YNOT is -- there's ynot.com, and
10    YNOT actually predates in terms of articles and -- and
11    its being in existence predates XBIZ, and not AVN of
12    course as an entity.  And both XBIZ and AVN began as
13    "webmaster resource sites."  So they began as sites
14    that were to provide resource information and that --
15    and -- information and access and all sorts of things
16    for adult webmasters.
17        XBIZ blew up and decided to develop itself
18    into a media entity.  And YNOT also went down that
19    road a little bit.  YNOT hasn't had the resources or
20    the structure or, you know, the people behind it, so
21    it's never done any print magazines.  It flurried with
22    trade shows but it doesn't do them anymore.
23        So the two top media entities in adult are
24    XBIZ and YNOT -- I mean XBIZ and AVN and then YNOT is
25    like way down.  And then there's just individual

Page 20

1    bloggers and -- but there's no other really trade
2    media entities I don't think other than those two, the
3    two biggies.
4        Q    What is the relationship between AVN and XBIZ
5    and the adult industry?
6        A    What is the --
7        Q    The relationship between AVN and XBIZ on the
8    one hand as --
9        A    What is their relationship?
10        Q    No, not between them, but between these trade
11    magazine, whatever they are, and the adult industry.
12        A    It is a business relationship in that people
13    advertise with them.  We promote -- these companies
14    promote the products of the industry, whether they
15    are -- any type of product, the movies, the
16    performers, products, promotions, however they're
17    promoting themselves.  We do news.
18        And so it's these -- you know, like with, you
19    know, any trade entry for anyone, The Hollywood
20    Reporter or Variety, which is not what it used to be.
21    Those entities promote, support, and have reciprocal
22    business relationships with companies in the industry.
23    And so there's a lot of business that goes on in
24    between them.  And then we also have our journalistic
25    role, which is supposed to be obviously separate from

5 (Pages 17 to 20)

Thomas Hymes - 4/8/2013

Page 25

1       And then I was unemployed just doing
2   freelance for a little while.  Actually it was
3   probably in 2008 and 2009, only for about say nine
4   months or so.  I was picking up regular freelance work
5   from both AVN and XBIZ, because for years I've been
6   writing major feature articles for both these
7   publications.  That's mainly what I am.  I'm a writer.
8       And so -- but because I can handle staffs and
9   I'm good with responsibility, I always got hired, and
10  I loved running the magazine and being the editor and
11  chief and being the boss, but I wasn't writing as
12  much.
13      So once I was weaning off of XBIZ, I went
14  into a freelance mode and was writing feature articles
15  for both AVN and XBIZ and negotiating payments for
16  that and just trying to keep my head above water as
17  the economy -- the larger economy and my little
18  personal economy was destroyed.
19      And then in the nick of time towards the
20  latter part of 2009 I went to meet Darren Roberts, who
21  was my previous employer, one of the owners at AVN,
22  and they hired me back as a staff writer.  I mean I
23  went all the way up and then all the way back down.
24  And things were so bad that I was hired back.  There
25  was another guy covering the online industry.  They

Page 26

1   promptly let him go and so I'm like the only person.
2       So we went from full staffs at AVN, you know,
3   these full-service companies.  I had my own staff,
4   four or five people, which we covered the entire
5   online industry, to being the only person covering the
6   online side of the industry for AVN.  And I have been
7   in that role since I returned to AVN as a senior
8   editor at the end of 2009.
9       And so I'm still employed there.  And I have
10  been working as a -- just furiously as a writer since
11  then just covering -- writing stories, stories,
12  stories, stories, hundreds of them, mostly for the
13  website because they don't have a magazine now and
14  there's a new editor and chief for AVN Magazine.  So
15  we have an editor and chief and there's all those
16  people.  So that's what I'm doing now, plus I'm still
17  coordinating the seminars for the trade shows.
18      AVN has new owners now also, and so there's a
19  whole new ethic and feeling to AVN, and all of that is
20  being worked out.  So I was in -- when I returned,
21  Darren Roberts and Paul Fishbein still owned AVN.  And
22  in that process I've been there -- they no longer own
23  it.  They found -- this whole -- this whole tortuous
24  process where the owners who had owned it for 30 years
25  and then it segued into new ownership and management.

Page 27

1   And all of that has happened between when I returned
2   in 2009 to now.  And that's kind of my story.
3       Q   Are you still the only writer?
4       A   I am still the only writer whose beat is
5   specifically online.  There are other staff writers
6   who cover the video side of the industry and the
7   novelty side of the industry.  And some of those
8   writers are well-versed and can cover online stories,
9   but that's my beat.  And there's only one writer whose
10  beat is online and that's me.  So my title is -- they
11  had it senior editor digital, which is awkward and
12  kind of not really correct, but it kind of gives you
13  an indication of what my focus is.  Like for online
14  stuff they always come to me.
15      Q   Going back, just because I forgot to cover
16  this, when you were editor and chief at XBIZ --
17      A   No.  I wasn't the editor and chief of XBIZ.
18  I was the publisher there.  When I was at XBIZ, our
19  editors -- both of the editors of the two magazines
20  quit.  So at a certain point in time still in 2006, I
21  was the publisher, plus I was running the two
22  magazines, plus I was coordinating all the seminars.
23  My plate was rather full, but I was never the editor
24  and chief.  I was the publisher and then he gave me a
25  new title, executive editor, and then I left.

Page 28

1       Q   Okay.  But I thought you said that you --
2       A   Editor and chief at AVN.
3       Q   Right.  I thought you had said that your work
4   at XBIZ was -- had tapered off and that's --
5       A   Yes.  It was tapering off, yes.  It was
6   tapering -- yeah, my -- my -- I -- at a certain point
7   he goes, I don't need a publisher anymore.  He goes,
8   So we're going to give you a new title.  And he goes,
9   I made a mistake.  I didn't need you to do whatever --
10  whatever all that stuff was.  It was just ridiculous.
11  So I said, Well, okay.  So he goes -- I go, What do
12  you want the title?  He goes, Well, I thought
13  executive editor would be good.  I'm like, Fine,
14  whatever.  Because titles are meaningless in this
15  industry.  At one point I made up my own title.  It's
16  the work that you do.
17      And these guys, they make up titles and they
18  go, oh, he's my -- I mean, you know, I don't like it,
19  because I don't believe in this type of stuff that
20  they do.  They give you a title but they won't give
21  you the tools to do your job.  And that happened to
22  me, whatever.  I'm over it and I'm past it, but those
23  types of things happen.  So he gave me a new title,
24  which was executive editor.
25      And, you know, over at AVN they were freaking

7 (Pages 25 to 28)

Page 41

1  the right way.  You know, it was -- it has not gone
2  away since then.  Not for -- not for any of us and
3  certainly not for Free Speech Coalition whose role is
4  not just to litigate but also to help members of the
5  industry to survive certain laws if possible.
6     Q   Were you involved in that aspect while you
7  were at Free Speech Coalition?
8     A   Just peripherally.  If the Free Speech
9  Coalition was going to put out recommendations for --
10 or a press release about, say we lost the case but
11 it's still -- you know, it is still incumbent upon a
12 webmaster to abide by the law, this is the law.  This
13 is what you have to do.  Obviously I would have been
14 producing those.
15    Q   Then you mentioned that when you went to --
16 after you started the job at XBIZ you continued being
17 involved with 2257.
18    A   Yes.
19    Q   And how did that happen?
20    A   I was -- I had segued back into more of an
21 editorial journalism role.  I was no longer in an
22 advocacy role.  So at that point, because inspections
23 were ramping up, it was -- there was -- there was
24 still a tremendous amount of work to do in order to
25 help webmasters and people in the industry to

Page 42

1  understand what was expected of them, what -- you
2  know, what the current situation was.  And so that was
3  more sort of like education.
4        Staff members were writing articles if there
5  was any news or there was any information, doing
6  interviews with people, and I was coordinating
7  seminars.
8        And so after I left the Free Speech Coalition
9  I went to XBIZ.  So if I went there in August,
10 immediately -- no, in September of 2006, immediately I
11 started preparing for the first ever February show of
12 XBIZ.  And it was huge.  That's the -- that's when I
13 got the FBI to come for the first time in history to
14 address the industry at that show specifically about
15 2257.  So, yeah, I was steeped in it.
16    Q   When you say the first ever February show, do
17 you mean the first show --
18    A   For XBIZ.
19    Q   The first XBIZ show or the first show in
20 February?
21    A   The first XBIZ show.
22    Q   The first show it had ever had?
23    A   In February, yes, to go up against AVN.
24    Q   Oh, okay.
25    A   Yes.  Yeah.

Page 43

1     Q   Did this help?
2     A   Did the --
3        MS. BAUMGARDNER:  Objection.
4  BY MS. WYER:
5     Q   Did bringing the FBI into the XBIZ show help
6  with the competing against AVN?
7     A   Immeasurably.  I mean it was a home run.  It
8  was huge.  And that wasn't the only thing I did there,
9  I mean for that show.  It was huge.  Yeah.  Yeah.  I
10 put them on the map.  It was huge.  It was a huge
11 coup.
12    Q   How did you arrange it?
13    A   There -- I knew some -- I had some help.  I
14 knew some people.  I didn't know Chuck Joyner that
15 well, but I had a contact with him and they agreed to
16 help put us together and I invited them.  I just made
17 my pitch, and he went to his superiors and got
18 permission to do it.  It was great.
19    Q   Was it -- what happened during -- what was
20 it?
21        MS. BAUMGARDNER:  Objection.  You want to
22 make your question a little clearer?
23 BY MS. WYER:
24    Q   Well, you were saying that Chuck Joyner came
25 and it was great, so I was asking what happened.

Page 44

1     A   It was a seminar where he came to talk about
2  2257 inspections specifically.  I asked him questions.
3  That was the first part of the -- I forget if it was
4  an hour or an hour and a half.  We gave him plenty of
5  time.
6        Then we had members of the audience write
7  down questions which were submitted to attorneys to
8  vet the questions to make sure that no questions were
9  asked that could put the questioners in any jeopardy
10 or trouble.  The FBI is in the room.  And then those
11 questions were asked of Mr. Joyner and he answered
12 them and then he left the room.  And then for the last
13 part the attorneys addressed the audience about what
14 had just taken place.  And that was -- that was it.
15    Q   Was he the only one from the FBI --
16    A   Yes.
17    Q   -- who came?
18    A   Yes.  He was not the only FBI agent there,
19 but he was the only one addressing the audience.
20    Q   How did you know him before that?
21    A   I didn't.  I didn't know him.  I knew of him
22 because he was of the team who was, you know, putting
23 together the inspections.  I can't recall when I first
24 heard his name or how -- when I first learned of him.
25 I don't remember.  But he was in charge or the -- I

11 (Pages 41 to 44)

Thomas Hymes - 4/8/2013

Page 45

```
1    forget.  I don't remember but he was present at every
2    single inspection.  And my understanding was he was
3    either the leader of the team or the co-leader of the
4    team.
5        Q    So this trade show was February of 2007?
6        A    2007.
7        Q    And what do you think the impact of that
8    session was?
9        A    Well, reading back from the article -- you
10   know, at trade shows I'm always busy so I'm running
11   here and I'm running there because my work is never
12   done.  But reading back from the article, it said that
13   the audience was -- was very pleased with having him
14   there and that they learned a lot from his answers.
15   And so I believe that the reactions from the people
16   who attended was very -- was positive.
17       In the article it said that the industry
18   attorneys cautioned against taking everything that he
19   said at face value.  They asserted -- whatever.  But
20   that's what they said.  But it was a very positive
21   experience overall.
22       Q    The article that you mentioned, this is the
23   article that you said at the beginning you had looked
24   at before this deposition?
25       A    Yes.
```

Page 46

```
1        Q    Is that what you're talking about?
2        A    Yes.
3        Q    And that was an article on XBIZ or --
4        A    On avn.com.  Mark Kerns wrote coverage of
5    that meeting in 2007.  So I just went onto AVN because
6    I had forgotten -- I just wanted to remind myself when
7    that meeting was that I had put that together, and
8    then, of course, it all came back to me that that was
9    in February of 2007, so I just read it last night just
10   to -- you know, because I had forgotten.  You know, it
11   was so long ago.
12       Q    So AVN covered this event?
13       A    Yes.  Yes.  Well, yes.  I know.  I was like,
14   gosh, I didn't even know that he was there, but he
15   did.  He had to because it's Mark Kerns and he has to
16   cover this stuff so, yes.  I think it was Mark who did
17   it.  You know something, it might have been someone
18   else who covered it.  It may have been another writer
19   who covered it, but it was covered by AVN.  Actually
20   now that -- it might not have been Mark.
21       Q    Did you have any further engagement with the
22   2257 inspections that were going on at that time?
23       MS. BAUMGARDNER:  Objection.
24       THE DEPONENT:  No.  I had no engagement with
25   inspections other than once we learned of them,
```

Page 47

```
1    covering them.  That's it.  Um --
2        MS. BAUMGARDNER:  You answered the
3    question.
4    BY MS. WYER:
5        Q    You can go ahead.
6        A    Well, I did go back to Washington DC.  There
7    was a meeting at the FBI building when I was at XBIZ
8    and I was invited to attend that.  So I -- as a
9    journalist.  So I did attend a meeting in Washington
10   DC at the Hoover Building with the FBI, which was
11   invited.  It's the only meeting where members of the
12   industry were -- came in and we had a meeting to talk
13   about inspections.  I attended that meeting.  But in
14   terms of my involvement since then with 2257, it has
15   been journalistic, and then also as a member of the
16   board of directors of the Free Speech Coalition.
17       Q    When was that meeting that you talked
18   about?
19       A    Oh, gosh.  I looked that up.  It was in 2007.
20   2007.  I don't remember the month.  I believe later in
21   the year.
22       Q    This was the meeting at the FBI
23   headquarters?
24       A    Headquarters.  Correct.
25       Q    And who else was there?
```

Page 48

```
1        A    A lot of people.  Industry attorneys were
2    there representing companies.  There were owners of
3    companies there.  There were over ten of us that went
4    there, that traveled back there for this meeting, half
5    a dozen agents including an assistant director, and
6    Chuck Joyner was there.  So quite a -- a pretty
7    sizable group.
8        Q    What were you told about the purpose of the
9    meeting before it happened?
10       A    The purpose of the meeting, as I understood
11   it, was simply to discuss the inspection regime and to
12   address any questions the industry might have about
13   it.
14       Q    And is that what happened?
15       A    Yes.
16       Q    What was your impression?
17       A    Extremely informative meeting.  My impression
18   was that the FBI agents were doing their job and were
19   amenable to making inspections as -- you know, as easy
20   and effective as possible.  That was the impression
21   that I had.  They answered all the questions.  And
22   people, as I recall, seemed to be generally satisfied
23   with the answers, despite the industry's opposition to
24   2257.  So essentially to make a bad situation as, you
25   know -- you know, as survivable as possible.  That was
```

12  (Pages 45 to 48)

Thomas Hymes - 4/8/2013

Page 49

1    the point of it.
2         There was a lot of -- there have always been
3    a lot of questions about inspections, you know, and
4    what people are responsible for.  A lot of confusion.
5    So that was the purpose of the meeting.
6         Q    Generally what is your perception of the
7    relationship between the Government and the adult
8    industry, the Federal Government?
9         A    Generally my feeling is that the Government
10   has a generally hostile position with respect to adult
11   entertainment, but it is a legal industry and so my
12   sense is that -- you know, there's different
13   administrations and they bring -- they seem to bring
14   different points of view to bear with respect to the
15   industry.  But it's tough.  I mean which part of the
16   government?  I'm not sure how to answer that question.
17   Maybe you can be more specific.
18        There's a natural -- I mean there's a natural
19   antagonism with adult entertainment because there's
20   criminal laws that impact it.  So that's always in
21   play.
22        Q    Criminal laws.  Do you mean obscenity laws?
23        A    Yes, obscenity laws.  Zoning laws.  Zoning
24   laws are very, very serious and impact the adult
25   entertainment industry in a really big way.  Negative

Page 50

1    often.
2         Q    The zoning laws are local.
3         A    Yes.  But in my view, the adult entertainment
4    clubs and businesses are the front lines of adult
5    entertainment.  I personally write about them as
6    frequently as I can because I don't necessarily
7    separate them from the, you know, San Fernando Valley
8    side of the industry.  I mean they're out there on the
9    front lines and they have to deal with a lot of
10   stuff.
11        Q    Let's talk about your Daily Babylon site
12   which is listed on your LinkedIn profile.
13        A    Yes.
14        Q    It says you started the site in April 2009?
15        A    Yeah.
16        Q    So what is that?
17        A    Well, Daily Babylon was begun as a project
18   with other -- with partners that was hopefully going
19   to become a going concern.  And we started it that way
20   and it didn't work out that way.  But that's how it
21   was begun, as a side project from our regular jobs
22   that would develop into something that we could, you
23   know, monetize and maybe develop into something that
24   could actually support us so that we could do our own
25   thing, you know.  So that's how it began.

Page 51

1         Q    At the time you started it, where were you
2    working?
3         A    Well, if that's April 2009, I'm -- that's a
4    time period where I'm mostly doing freelance, you
5    know, and I'm just -- I'm doing freelance articles.
6    I'm probably still part time at sex.com and I'm just
7    cobbling together a living, because it's after the
8    recession hit.  And so that's during that time period
9    where I was really looking to be, you know, aggressive
10   in terms of building something and making something
11   and making our own business and doing something like
12   that.  So that was during that time period in April of
13   2009.
14        And so even if I left -- you know, you can't
15   take these necessarily to the bank.  Did I finally
16   leave XBIZ in August?  It might have been, but I had
17   been pared down so much by that time and I don't even
18   remember at that point.  So April, May, June, July,
19   August, during that time period, I'm totally -- I
20   simply don't remember exactly.  But what I do recall
21   was this feeling that I had to get something going.  I
22   had to, you know -- we wanted to make something of our
23   own, and that's what Daily Babylon was supposed to
24   be.
25        Q    But it didn't turn out like that?

Page 52

1         A    It didn't work out.  We lost our CEO because
2    of his problems with his other company.  And we
3    didn't -- we weren't -- we didn't get the resources we
4    needed.  We had everything in place.  We had our site.
5    We had 600 stories in there.  I put a business plan
6    together.  I put everything together.  I was working
7    with him, and then it just all fell apart.
8         And then I lost Kathee Brewer who had been at
9    AVN and is now at YNOT, wonderful writer and just, you
10   know, extremely just -- just really fabulous
11   individual.  You know, we just couldn't hold it
12   together.  So she went off to YNOT and she's still
13   there and she's just -- you know, they have her
14   working double time.  And we just -- we couldn't --
15   you know, we couldn't get it.  So then it just all
16   came back to me, and I was just doing my best.
17        But then I went right to AVN.  And once I got
18   to AVN, I was the only person covering the online
19   industry.  It was just -- if I could post up
20   something, a story or two to Daily Babylon even during
21   the week with everything that I had to do, I was lucky
22   to do that.  So it just -- we had several -- like a
23   six-month time period we tried to get this thing off
24   the ground.  We couldn't do it.  I mean just life
25   intruded so.

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Thomas Hymes - 4/8/2013

Page 53

1    Q   Well, that kind of answers this.  But --
2        MS. WYER:  I'll just mark this as Exhibit
3    Hymes 2.
4        (Whereupon, a two-page document was marked as
5            Exhibit 2 for identification.)
6    BY MS. WYER:
7    Q   Do you recognize this?
8    A   Yeah.
9    Q   So is this from the Daily Babylon website?
10   A   Yes, this absolutely is.
11   Q   And this is that part of the website that
12   describes the people --
13   A   Yes.
14   Q   -- involved in the website?
15   A   Yes.  Those are the three people, me, Kathee,
16   and Scott.
17   Q   So who is Scott?
18   A   Scott was our business person.  He was the
19   person who's going to take care of business while we
20   made the site, and that's the person who we -- who
21   totally imploded, just totally imploded.
22   Q   He imploded?
23   A   His business imploded, and he imploded
24   personally, his relationship, everything in his life
25   fell apart after his -- he had a business in adult

Page 54

1    that had been there for many years, very respected
2    person.  And I mean that has nothing to do with this,
3    but there was just -- his life fell apart, and with it
4    his role with us as well.  So that's what happened.
5    Q   So this isn't really -- is this active
6    still?
7    A   No, this is not.  You know, this is still --
8    I mean, what I'm doing -- the site now, that's still
9    on the site, but it's not relevant anymore.  I'm in
10   fact -- and after my accident, in fact, I thought that
11   the site went offline when I checked it.  I was in the
12   hospital for three weeks.  I mean it was a very
13   serious accident.  I had seven surgeries and I wasn't
14   paying attention.  And when I got back home I checked
15   the site and it was offline and I thought I had it for
16   another year.  And I called Go Daddy and I had it up,
17   you know, within a day.  I didn't even know it had
18   gone offline because I wasn't checking and I was in
19   the hospital.  You know, I was just on my back the
20   whole time.
21       So now what I'm doing is I'm going to -- it's
22   on a Joomla platform.  That's a CMS sort of platform.
23   I'm going to switch over to WordPress.  I am not going
24   to let Daily Babylon go because I love the name and I
25   love the idea, but I need to switch it over to a

Page 55

1    platform that's easier for me to do.  The way it's
2    structured right now is like a full site, and we had
3    stories -- lots of stories in each one of these areas,
4    money, legal politics, cultural, and society.  There's
5    600 stories in there, but I can't do it by myself.  I
6    have to turn it into a simpler type of blog and then
7    continue on with it with a similar mission but just
8    simpler, because it's impossible for me to do this at
9    AVN and then also do it here.  I can't.  So that's
10   what I'm doing right now.
11       MS. WYER:  I'll mark this as Hymes 3.
12       (Whereupon, a two-page document was marked as
13           Exhibit 3 for identification.)
14   BY MS. WYER:
15   Q   Do you recognize this?
16   A   Yes.
17   Q   This is the about Babylon page on the Daily
18   Babylon website; right?
19   A   Uh-huh.
20       MS. BAUMGARDNER:  You have to answer
21   verbally, Tom.
22       THE DEPONENT:  Okay.
23   BY MS. WYER:
24   Q   So what does this mean?
25       MS. BAUMGARDNER:  Objection.

Page 56

1        THE DEPONENT:  It's an attempt to define what
2    we're about.
3    BY MS. WYER:
4    Q   Does this reflect what you were saying about
5    what you had hoped the Daily Babylon would be?
6    A   Yes.
7    Q   Is it still accurate in any way?
8        MS. BAUMGARDNER:  Objection.
9        THE DEPONENT:  Parts of it may still be
10   accurate.
11       MS. BAUMGARDNER:  Take your time to read
12   through it.
13       THE DEPONENT:  Some of it is relevant, some
14   of it no longer is because there's, first of all, no
15   longer a we.  So there's no longer a Kathee Brewer.
16   So it's just me.  And I'll probably have to cut back
17   on some of this.  It's like kind of ambitious.  I
18   wanted to really cover everything.  Everything -- you
19   know, a limited form of everything.  I had honed these
20   subjects down to things that were of intense interest
21   to the both of us and other writers that we knew,
22   because the idea was obviously to bring in other
23   contributors and then staff writers and build it up.
24   But whether once I've moved it over to my new thing I
25   stick with all of these, probably because they're

14  (Pages 53 to 56)

Thomas Hymes - 4/8/2013

Page 65

1    A    That would have been let's say -- boy, oh,
2  boy.  I would say -- when did we implode?  It had to
3  be late 2009.  It had to be.  It was late 2009.  It
4  wasn't long after -- it wasn't long -- you know, this
5  was all late -- not this stuff, but all this, like
6  this was posted when?  This was updated in May of
7  2009.  So putting the whole site together.  We're all
8  done.  We're all ready to go and the whole thing falls
9  apart.  So it was 2009.  And exactly when, I don't
10  know.
11    Q    And this was because of the recession?
12    A    Yeah, basically and our partner -- our
13  business partner, the partner we were counting on to
14  take care of the business side was no longer available
15  to us.  And then we ran out of time essentially where
16  we had to -- you know, unless you've got a buffer, a
17  zone to give yourself where you can survive and pay
18  your bills for six months while you're wrapping up
19  your business or something like that, you've got to
20  get back to work.
21         And so at a certain point in time I ran out
22  of time.  And so, you know, I've been very lucky.  And
23  then AVN came back to me and offered this job, you
24  know, a position making much less than I was making
25  before, but it was a job I was happy to have and happy

Page 66

1  to be writing again.
2    Q    So you don't keep records under the 2257
3  requirements?
4    A    I do not.
5    Q    Have you ever kept --
6    A    No.
7    Q    -- those records?
8    A    No.  No.
9         MS. BAUMGARDNER:  Let her finish.
10         THE DEPONENT:  I'm so sorry.  No.
11  BY MS. WYER:
12    Q    Have you ever created images of sexually
13  explicit conduct?
14    A    No.
15         MS. WYER:  Let's go to the -- let this be
16  marked as Hymes 7.
17         (Whereupon, a 21-page document was marked as
18             Exhibit 7 for identification.)
19  BY MS. WYER:
20    Q    Do you recognize this document?
21    A    Yes.
22    Q    These are your responses to the first set of
23  written discovery requests.
24    A    Correct.  Yes.
25    Q    How were these responses prepared?

Page 67

1    A    I answered the interrogatory questions and
2  then sent them off to the attorneys.
3    Q    So you prepared the answers?
4         MS. BAUMGARDNER:  Objection.  That's not what
5  he said.
6         THE DEPONENT:  I answered the questions I was
7  able to answer and -- I mean we prepared this
8  together.
9  BY MS. WYER:
10    Q    Meaning you and your --
11    A    Yeah.  I didn't actually create this
12  document.  I made my own Word document and sent it
13  back to the attorneys and then received this.
14    Q    Let me just ask.  What is your claim in this
15  case based on?
16    A    My claim in this case is simply based on the
17  fact that my -- I believe my expression has been
18  chilled because of 2257.  For me, it's what I'm not
19  prepared to do rather than what I have done and the
20  burden that I have incurred.  If there's been a
21  burden, it's because I'm censoring myself, the types
22  of images that I might use on the site because I
23  don't -- I can't -- I don't have any money to use a
24  third-party service.  They would have to be kept in my
25  home.  I have a nine-year-old.  My wife has nothing to

Page 68

1  do with the industry.  We don't -- I'm not a porn guy.
2  I cover the industry and don't want agents at my --
3  I'm just not going there.  If I had an office or
4  something like that.  I'm not doing that.  So that is
5  the -- that has been my situation that the records
6  will be kept at home and I'm -- that is -- that's --
7  that's my part of -- that's my position with respect
8  to this case.
9    Q    It's based -- so this is your concern, that
10  the records would be kept at your home?
11    A    In addition to other concerns that I have
12  with 2257, that it's essentially impossible to comply
13  with.  Yes, that was probably the deciding factor or
14  one of the deciding factors, that I wanted to avoid
15  triggering 2257.  And that is still the case with
16  whatever the new iteration of Daily Babylon will be.
17    Q    What is it that you would do that you have
18  not done in the absence of the requirements?
19    A    I would probably be a lot more open to using
20  images that I am now unwilling to contemplate using
21  that could, in fact, trigger 2257.  And if I was
22  unsure, I would err on the fact that they did, which
23  means that I would of necessity, because I follow the
24  law, have to keep the records, have to abide by
25  everything.  That's just it for me.  I don't break the

17 (Pages 65 to 68)

Thomas Hymes - 4/8/2013

Page 69

1    law. So I'll avoid the law rather than engage this
2    one. I mean I will avoid it.
3        Q   Where would these images come from?
4        A   They might come from industry sources. They
5    might come from -- they might come from -- I might
6    create them myself. They could come from any number
7    of areas. I might go on set. I might shoot something
8    that triggers 2257 at a trade show, at a party. They
9    might be sent to me as part of marketing materials,
10   any number of ways. I might find them on the Internet
11   and I might be able to use them. They might have a
12   free open copyright that I can use. Any number of
13   ways.
14       Q   Do you take photographs on sets normally?
15       A   Normally, no, because I'm the online guy. I
16   don't normally go on sets, but I've been on some and
17   I've been in proximity to adult activity certainly
18   over the years. So I would want to cover it.
19       Q   Have you ever created a photograph of --
20       A   No.
21       Q   -- of sexually explicit material?
22       A   No, I have not. I have not.
23       Q   Looking at your response to Interrogatory 10.
24       A   Uh-huh.
25           MS. BAUMGARDNER: Take your time to read it

Page 70

1    first, Tom.
2            THE DEPONENT: Okay.
3    BY MS. WYER:
4        Q   So it says on the top first paragraph, the
5    first paragraph on Page 6, so the next page. It says,
6    "For Daily Babylon, I use graphics to most accurately
7    illustrate a story, often using marketing materials
8    provided by companies, including box covers, banners,
9    e-mailed graphics, or other pre-produced marketing
10   materials that I may either use as provided or change
11   to suit my own purposes. I might, in fact, use
12   supplied images along with my own, or other licensed
13   or bought images to create something original." Did I
14   read that accurately?
15       A   You did.
16       Q   What do you mean by this?
17       A   Hum. Well --
18           MS. BAUMGARDNER: Objection. Go ahead.
19           THE DEPONENT: I mean hum. I don't want to
20   just reread it. It means -- I mean it's really
21   literal. These are my words. You create a graphic.
22   You have an image to illustrate a story. You know,
23   it's either -- you know, you either try to be creative
24   and -- you know, I mean it's as simple as that.
25           Lots of people in this industry provide

Page 71

1    marketing materials of differing explicitness, to say
2    the least. They can come in, you know, just -- you
3    know, just -- it's just unbelievable what you will be
4    sent. So you take that as an editorial entity,
5    whether it's AVN, XBIZ, or me. You can -- it's up to
6    you what part of those images you use or how you
7    utilize them.
8            So this is just saying -- that is just the
9    process. This is the process. They come in. You use
10   them as they are or you change them or you create
11   something new with them. And so that's what the --
12   that's what the intent was. You know, that's what the
13   process ideally is.
14   BY MS. WYER:
15       Q   Do you receive this marketing material?
16       A   Less and less now for Daily Babylon. Hardly
17   at all because it's fallen off the map. When we were
18   ramping up in 2009, people in the industry knew us and
19   we were sending out things, and I had also signed up
20   for press releases. So I still, in fact, on my Daily
21   Babylon account will receive those, because what
22   they'll do is they'll just put you on a list and
23   they'll keep you on the list and they send out their
24   PR. So I still will occasionally receive PRs, but I
25   don't receive nearly -- and the PRs will sometimes

Page 72

1    have images attached to them for use or not.
2            And so -- but I receive far fewer now because
3    Daily Babylon has, for all intents and purposes, been
4    moribund for the last couple of years, and so not so
5    much. But we did -- we were receiving them. And all
6    you have to do is sign up to receive press releases.
7    Send them to me at AVN and send them over here also,
8    and all the PR people will gladly do that.
9        Q   So when you were getting this PR material,
10   were you using images from it?
11       A   Well, as I state here, of course if I did use
12   them -- if I used explicit ones, I would be triggering
13   U.S.C. 2257. So, in fact, I was erring on the side of
14   caution to not trigger it. So if they came in and
15   they were explicit or if I wanted to use them and I
16   thought they triggered 2257, I wouldn't use them.
17       Q   But did you use other images from --
18       A   Well, what I started doing on -- what I
19   started doing for a lot of my stories was I would find
20   a book on amazon.com where the book had some sort of
21   relevance to the story and it was a really cool box
22   cover, and I would use the book to illustrate my story
23   and link that image to Amazon so that maybe I could
24   drive some sales of the book to Amazon to those
25   people.

18  (Pages 69 to 72)

Page 85

1  plus the knock on the door means, yes, I'm not -- I'm
2  not going to assume any risk of criminal prosecution
3  under the statute, as I wrote here.  I'm going to
4  avoid it.  I'm not going to do it.  I can't.  I have
5  to support my family.  There's no one else.
6  BY MS. WYER:
7     Q   Could you explain more what you mean when you
8  were talking about the implications?
9     A   The inference that it's criminal, that
10  there's a criminal statute, in my mind, the inference
11  from that.  What is being inferred is that the
12  industry wants to use these underage, and we have to
13  have these statutes in order to prevent them from
14  doing what they want to do, which is to use underage
15  performers even though it's already, you know, one of
16  the worst crimes on the books that you can do.
17        Not only do I find that wrong, I find it
18  offensive.  And that is precisely what I read into
19  these statutes.  Absolutely, literally and precisely,
20  that you can only infer that from adding this
21  criminal -- criminal remedy onto this.  It's not a
22  fine.  It's not a, you know, some sort of other sort
23  of business related sanction.  It's not a sanction.
24  It's jail time potentially.  And that's just -- you
25  know, I don't know.

Page 86

1        My understanding is there's not too many
2  other regulatory schemes that necessarily, you know,
3  come with that.  And if they do, I just think there's
4  a really good reason.  I don't see it here.  That's
5  what I mean by inference.
6        That's the inference that I read into that,
7  that you're inferring that these people want to do
8  that.  And I don't believe it.  It's not my
9  experience.  It's not what I believe about this
10  industry or the people in it.  And even if they
11  wanted, there's child pornography laws.  You face 15
12  years.  It's just not going to happen.
13     Q   So do you -- if you were going to use an
14  image -- a sexually explicit image in the absence of
15  the requirements, would you do anything to verify the
16  ages of the people appearing in the image?
17     A   Would I do anything to verify the ages of the
18  people?  Absent these regulations, other than a common
19  sense assessment of the content, probably not.
20  Probably the answer is no.
21     Q   So you would just rely on looking at them?
22     A   By and large, yes.  The vast majority of
23  images, you know, that we use are performers who we
24  know.  And I would say -- and, you know, are companies
25  that we have worked with, so I would say most of the

Page 87

1  time.  I mean, you know, we get a number of years
2  under your belt and you know.  And if you're dealing
3  with people you don't know and you don't know where
4  images come from, you might do some more work on that,
5  you know, so.
6        MS. WYER:  I'll mark this as Hymes 8.
7        (Whereupon, a four-page document was marked as
8        Exhibit 8 for identification.)
9  BY MS. WYER:
10     Q   At the bottom of this exhibit do you see
11  where it says XBIZ Premiere?
12     A   Okay.
13     Q   Do you recognize this as the kind of content
14  that is -- well, have you seen this article?
15     A   I have not.
16     Q   Do you recognize this as the kind of article
17  or material that could appear on the XBIZ Premiere
18  website, or are you familiar with XBIZ Premiere?
19     A   This is actually from the magazine.  So this
20  appeared in the magazine, I presume, because this is
21  XBIZ Premiere, which is a print magazine.  This seems
22  to be the type of ad that is --
23        MS. BAUMGARDNER:  Take your time to review
24  it.
25        Are you talking about the news story or the

Page 88

1  advertisement?
2        MS. WYER:  The whole thing.
3        THE DEPONENT:  Oh.  It looks typical of what
4  they might publish.
5  BY MS. WYER:
6     Q   And when you say "this seems to be the type
7  of ad," what were you --
8     A   These are box covers and they don't look
9  entirely unique to me.
10     Q   So is this the kind of PR material that you
11  were talking about -- or this isn't from an article.
12  But this is an ad.
13     A   Yes.
14     Q   Can you tell by looking at these individuals
15  what their ages are?
16     A   No.
17     Q   And I'm talking about the ad that appears on
18  the first page of the article.
19     A   Correct.  No.
20     Q   Do you think that these images trigger the
21  2257 requirements?
22     A   I'm -- I'm a little unclear.  There's nothing
23  sexually explicit here necessarily.  I'm unclear.
24  They -- they may.  I have to tell you, I'm not sure.
25     Q   Do you recognize the individuals?

Thomas Hymes - 4/8/2013

Page 93

1    A   I wouldn't verify ages because I wasn't -- I
2  wasn't -- I wasn't triggering 2257 so the issue of age
3  for me was not an issue.
4       If there's someone -- if there's an image for
5  Daily Babylon that I think even might remotely we're
6  flirting with underage territory, I'm not going to use
7  it. But I'm not -- but it's not a question of age
8  anyway. Because if I decided, which I wouldn't,
9  because it's an adult site, even if it's not a porn
10 site, why would I put -- I probably -- though I think
11 I actually put a story up with a picture of my son at
12 one point. I think I did put one up there. And I
13 think I had that. So I think -- as I recall, I think
14 I did that once. Something happened or something, you
15 know, and I put a picture of him, probably the only
16 time I would do that. I don't like to mix that, you
17 know.
18      But the issue of age is not relevant other
19 than that -- other than my own, you know, disinterest
20 in doing that because I'm not triggering 2257, so why
21 would I worry about age.
22    Q   But if there were no 2257 and you were going
23 to use such images, would you know that people that
24 appeared?
25    A   It's hard for me to -- I can't theorize or

Page 94

1  speculate. We do have 2257. We've got to live in the
2  reality of 2257. So if there were -- you know, there
3  was no 2257. There was no 257. You didn't see a lot
4  of underage performers, you know, in this industry
5  because we already had child pornography laws.
6       The sanctions were already so onerous, so
7  serious that no one goes there. Plus if you're
8  shooting people, whether it's a film or photographing,
9  you need model releases. You're going to take that ID
10 anyway because you need to protect your material for
11 copyright purposes so that other people don't rip it
12 off. You've shot those images. You have
13 relationships with them. I don't see it. I don't see
14 it.
15      We didn't have it before or even
16 beforehand -- even before it was being -- you know,
17 2257 languished there for years. It wasn't enforced.
18 We didn't really have a problem in this industry.
19 Whatever problems there were with underage performers
20 were -- even few and far between doesn't begin to
21 state how rare it was.
22    Q   Other than the criminal possibility of
23 criminal sanction, is there anything specific in the
24 requirements that you find problematic?
25    A   I think the cross -- what is it called? The

Page 95

1  cross where you have to -- what is it called?
2       MS. BAUMGARDNER: I can't help you.
3       THE DEPONENT: Oh, shoot.
4  BY MS. WYER:
5    Q   Cross-referencing?
6    A   Cross-referencing is, I think, is
7  problematic. And my understanding is that the
8  majority of people who were not compliant who were
9  inspected, of the 20 or so people who were inspected,
10 that that was their issue, that they weren't compliant
11 because of, you know, they got that kind of stuff
12 wrong.
13      And I think it's very confusing and very
14 difficult for people, especially in this industry.
15 That's particularly problematic. You know, the
16 posting up, giving home information, which you can
17 now, my understanding is, redact that. That was
18 problematic. You know, there were certain things that
19 were very problematic with 2257.
20    Q   Do you see any chance that you would ever
21 have to worry about cross-referencing if you were
22 going to --
23    A   Everyone does. If you're under 2257, you
24 have to worry about cross-referencing.
25    Q   Would you anticipate using the same -- images

Page 96

1  of the same person more than once?
2    A   Under the original scheme for Daily Babylon,
3  absolutely. Since, you know, you're covering the same
4  companies, the same performers, doing different
5  things, so absolutely. Totally. Frequently.
6    Q   And now?
7    A   Not at all. Not really. But just -- I'm not
8  actually doing Daily Babylon. But if I get back to
9  it -- you know, it's hard for me -- I still want to
10 cover the industry. I'll just have to do it in just a
11 totally safe way. That's just what I'll have to do.
12      There's tons of images of performers and of,
13 you know, people that you can use that are -- they're
14 actually clothed. They're just there. They're
15 glamour shots or something like that. So there is
16 other ways to get around it. Totally. But it's not
17 as -- I don't know. It's not -- you know, it's -- you
18 know, it's safe. It's not -- you know, it may or may
19 not illustrate the point -- the story or the point.
20    Q   And the other thing you mentioned about
21 posting -- I think you -- were you talking about the
22 transmission of performer address information?
23    A   From primary to secondaries. That was always
24 extremely problematic. So my understanding now is you
25 can send documentation and redact, you know, addresses

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Thomas Hymes - 4/8/2013

Page 109

1  is that often how content gets to someone, there's
2  brokers, they buy it.  It's a complicated, as you may
3  know, content world out there, how content goes.
4       Generally speaking -- I want to be careful
5  here because, you know, if -- in a world -- I don't
6  really have a problem with a -- with a notification
7  stating where the records can be kept -- where you can
8  find those records.  What -- you know, and so, you
9  know, in a general way, I -- you know, if a regime
10  could be created that is not onerous and not
11  burdensome and where there's a trail back to the
12  primary producer where these records can be found and
13  it's workable and there's no criminal sanctions
14  attached to it, that's relatively reasonable, and I
15  wouldn't -- I personally would not have an objection
16  to that, no.
17  BY MS. WYER:
18       Q   Just trying to flush out what you were
19  saying.  Is that because the trail could be so
20  convoluted and the primary producer and the --
21       A   Yeah.
22       Q   -- where the images ultimately show up, there
23  could be many steps along the way, different places or
24  intermediaries --
25       A   Correct.  I mean there are content brokers.

Page 110

1  There are businesses, you know, that are content
2  brokers out there, and so they do provide content.
3  There's white label entities that provide you with
4  content, so they got that content from somewhere.
5       So, yes, there are -- there absolutely are
6  intermediaries in this industry.  But still my belief
7  is that the content brokers, you know, deal in 2257
8  compliant content and, you know -- so -- but, yes,
9  that -- that's the complication, that there are
10  intermediaries and it's not always directly from the
11  producer, you know, right to the secondary producer.
12  That's not insurmountable.
13       Q   But without some kind of a way to link things
14  back from a secondary producer, it could be very
15  difficult to trace it back to the primary producer, or
16  if the secondary producer does not have his own
17  records or provide a way to link back to the primary
18  producer, it would be very difficult to find the
19  original records.
20       MS. BAUMGARDNER:  Objection.
21  BY MS. WYER:
22       Q   Is that right?
23       A   You know, that's theocratical.  I guess
24  potentially.  Potentially.
25       Q   Oh, what time period were you a board member

Page 111

1  of the Free Speech Coalition?
2       A   I -- from -- I joined -- I ran for the board
3  when I was still at XBIZ, so I think it was like in
4  2008, something like that that I ran and I was elected
5  to the board.  And I was a board member for two terms
6  and then I declined to run again this last time.  I
7  think -- what is it?  Two year terms?  So eight, nine,
8  ten, eleven, twelve.  And then I just was done.
9       Q   What does it mean to be a board member on the
10  Free Speech Coalition?
11       A   Well, it means that the board has a lot of
12  responsibility of the Free Speech Coalition in terms
13  of setting priorities, approving budgets, and doing
14  the substantial things that boards do.  It's not --
15  it's a hands-on board, not just fund raising or
16  anything, but actually helping to devise mission,
17  focus, strategy, that type of stuff, the real -- all
18  that stuff is taken and then implemented by Diane and
19  the staff.  But the board is quite involved.
20       Q   How many people are on the board?
21       A   That's a good -- 10 to 12, something like
22  that.
23       Q   Who are they?  I mean you were a journalist.
24  Who are --
25       A   Yeah.  Well, they're mostly company owners,

Page 112

1  but there's some other types.  That's one of the
2  reasons I left is because writers and journalists on
3  there.  There should be more company owners.  But it's
4  a mix.  It's a mix of people who are -- don't own
5  companies but care about the issues and are sort of
6  activist-minded and want to roll up their sleeves and
7  help the industry get involved.  And then company
8  owners who have an obvious vested interest, and you
9  know, a performer or two and then attorneys.  It's a
10  mix bag.
11       Q   And company owners, you mean owners of
12  companies that produce films, adult industry films?
13       A   Not just that.  They might be those.  They
14  might be owners of novelty companies or of website
15  companies.  So the owners come from -- you know, from
16  the different areas of the industry, not just the
17  producers.  Because Free Speech Coalition represents
18  all of those, you know, disparate sections of the
19  industries.
20       MS. WYER:  We'll mark this as 10, Hymes 10.
21       (Whereupon, a two-page document was marked as
22       Exhibit 10 for identification.)
23  BY MS. WYER:
24       Q   Do you recognize Exhibit Hymes 10?
25       A   I don't recognize it, but it's from Daily

28  (Pages 109 to 112)

Thomas Hymes - 4/8/2013

Page 129

1  of reasons why I eventually left the ASACP.
2      Q   What were the other reasons?
3      A   The shift in mission.
4      Q   Of --
5      A   The mission shift.
6      Q   That was what your were just describing
7  before the break?
8      A   Uh-huh.  And that's it basically.  A lot of
9  this stuff really didn't come to light until many
10  years later.
11      Q   So -- okay.  I think that's covered.  So
12  going back to your work on Daily Babylon.  So if you
13  were going to write an article for Daily Babylon based
14  on -- you never know in advance what the topics of the
15  articles are going to be.  You can't -- can you
16  predict with any certainty what the topics of articles
17  that you might write in the future might be?
18      A   No.
19          MS. BAUMGARDNER:  Objection.
20          THE DEPONENT:  No.
21  BY MS. WYER:
22      Q   And in short, you could write about anything
23  in the future really.
24      A   Yes.  Right.
25      Q   And you don't know in advance what

Page 130

1  promotional materials you might get in connection
2  with -- from -- if you did start up Daily Babylon
3  again and you did begin to get promotional materials
4  or marketing materials again, you don't know exactly
5  what the nature of those materials will be in advance.
6      A   Correct.
7      Q   So they could involve -- would this kind of
8  marketing material, would that material include
9  marketing about films or online production by
10  producers?
11      A   Yes.  Yes.
12      Q   Online content produced by industries or
13  companies who are themselves creating or posting as
14  secondary producers depictions of sexually explicit
15  conduct?
16      A   You've got to rephrase that for me, please.
17      Q   Sorry.  Is the kind -- what do the -- so
18  right now Daily Babylon is basically not functioning;
19  right?
20          MS. BAUMGARDNER:  Objection.
21          THE DEPONENT:  It's live, but it's more or
22  less moribund.  I'm not actively posting to it but you
23  can go and access it and read all the past articles on
24  it.  But it's not just being updated regularly.
25  ///

Page 131

1  BY MS. WYER:
2      Q   And you're not getting marketing materials,
3  very much marketing materials right now?
4      A   No.
5      Q   But the kind of marketing materials you would
6  anticipate getting if you were to start up -- become
7  more active on the site again, what kind of things
8  would they be marketing or promoting?
9      A   The same stuff, adult films.  I don't really
10  do novelty on here, so websites, web content,
11  performers, parties, you know, anything involved with
12  their businesses I suppose.
13      Q   So you don't know -- you can't predict
14  exactly what film or exactly what performer you might
15  get promotional material about.
16      A   Correct.
17      Q   And you can't predict who would be in the
18  images -- who would appear in the images that you
19  would get as part of that promotional material.
20      A   Correct.
21      Q   What kinds of -- who would the primary
22  producer be in this kind of material?
23      A   Primary producer would be, I suppose, Vivid,
24  you know, a studio, or something like that or Wicked.
25  You know, they would be a primary producer or anyone

Page 132

1  who's shooting primary content.  So there's lots of
2  producers with primary content.
3      Q   So essentially you could be getting marketing
4  material from any of those producers that could
5  contain images of sexually explicit material about a
6  film that hasn't even been made yet with performers
7  that you can't predict who they might be.
8          MS. BAUMGARDNER:  Objection.
9          THE DEPONENT:  I guess the answer is yes.  I
10  don't -- I don't -- the answer is yes.  I don't know
11  that they're going to send out.  It's up to their
12  business, what they're producing.  I don't know.  They
13  send out press releases.  We never know.
14          MS. WYER:  I'll mark this as Exhibit Hymes
15  13.
16          (Whereupon, an 11-page document was marked as
17              Exhibit 13 for identification.)
18  BY MS. WYER:
19      Q   Do you recognize this document?
20      A   Yes.  This is my answers to the second set of
21  interrogatories.
22      Q   Did you go through the same process in
23  preparing these answers that you described for the
24  first set?
25      A   Yes.

33  (Pages 129 to 132)

Thomas Hymes - 4/8/2013

Page 133

```
 1     Q    Looking at Interrogatory 22, it starts on
 2  Page 6.
 3     A    Okay.
 4     Q    Did you have a chance to read that?
 5     A    Uh-huh.
 6     Q    So your response says, "As a journalist, I am
 7  subject to the code of ethics and standards of my
 8  profession as well as state and federal laws that
 9  prohibit the depiction of minors in sexually explicit
10  expression." Did I read that correctly?
11     A    You did.
12     Q    What code ethics and standards are you
13  subject to?
14     A    Of my profession to tell the truth, to
15  protect my sources, to -- to basically -- that's it.
16  You know, it's a hard job and it's very simple. Those
17  are basically it.
18     Q    How did you become subject to these codes and
19  standards?
20     A    Self-imposed.
21     Q    Did you go to -- did you get any degree in
22  journalism?
23     A    I do not have a journalism degree.
24     Q    So how can it -- how does one know that
25  you're a journalist?
```

Page 134

```
 1     A    Because I've been working as one.  I've been
 2  working as one for years and years and years, so I'm a
 3  journalist.  I backed into it.
 4     Q    As a journalist -- do you have to get a
 5  license to become a journalist?
 6     A    You do not.
 7     Q    Do you enter into any kind of contract to
 8  follow journalistic codes and standards?
 9     A    No, you do not.
10     Q    Is anyone who writes a lot of articles a
11  journalist?
12     A    No.
13     Q    Who decides whether someone is a journalist
14  or not?
15     A    I don't have that answer.  I'm not sure that
16  there is an answer to that.  I'm not sure that there's
17  a god journalist or journalist god that makes that
18  determination.  I just think -- there is no one who
19  makes the final determination that someone is a
20  journalist.
21     Q    So not everyone who posts articles on the
22  Internet would qualify as a journalist in your view.
23     A    In my opinion.
24     Q    But someone could claim to be a journalist.
25  Anyone who posted articles could claim to be a
```

Page 135

```
 1  journalist.
 2     A    And often do.
 3     Q    So like if I made a website and posted an
 4  article, I could say I was a journalist.
 5     A    Yes.
 6     Q    And what would be the difference between you
 7  and some random person like me who just --
 8     A    I don't know.  It's too vague.  I would have
 9  to see.  You know, I mean I can't say without -- about
10  something I don't know with a specific -- they're
11  either acting journalistically or they're not.
12     Q    But what is the definition of -- I mean you
13  have a certain idea of what a journalist is.
14     A    Yes.
15     Q    So you would decide -- you would go and you
16  can only decide whether another site is journalistic
17  by going and looking at the site and seeing if it
18  seems to meet your own standard criteria?
19           MS. BAUMGARDNER:  Objection.
20           THE DEPONENT:  Is the question what I would
21  do?  Yes.
22  BY MS. WYER:
23     Q    So it would be a case-by-case --
24     A    Yes.
25     Q    -- decision?
```

Page 136

```
 1     A    Yes.
 2     Q    Or evaluation?
 3     A    Yes.
 4     Q    Going back to the first set of
 5  interrogatories, which was Exhibit 7.  Look at
 6  Interrogatory 7.
 7           MS. BAUMGARDNER:  Do you have a question?
 8  BY MS. WYER:
 9     Q    I was indicating.  Have you had a chance to
10  read it?
11     A    Yeah.
12     Q    In the first paragraph you say the
13  statutes -- "I wish to use visual depictions of
14  sexually explicit imagery that depict mature adults on
15  my website to illustrate its written content.  The
16  statutes are not narrowly tailored to advance any
17  interest in protecting children as applied to sexual
18  imagery depicting mature adults published as part of a
19  story addressing adult topics on my website."
20           Is there anything other than the points
21  you've already made that you would provide as a
22  further detail on why you think the statutes are not
23  narrowly tailored?
24     A    Points -- other points I made where?
25     Q    That we've already talked about here today.
```

34  (Pages 133 to 136)

Thomas Hymes - 4/8/2013

Page 141

1      A    Only one, the Steubenville.
2      Q    Which one was that?
3           MS. BAUMGARDNER:  Last one under H.
4    BY MS. WYER:
5      Q    What was that?  Did that show an actual rape
6    occurring?
7      A    I'm just -- I'm sorry.  I misunderstood the
8    question.  I'm just informed about the case and I
9    didn't look at the actual documentary, so I don't
10   know.
11     Q    Have you seen documentaries that show rapes
12   or sexual abuse occurring that would qualify as
13   depictions of sexually explicit conduct?
14     A    I'm sorry.  The question again?  Is it have I
15   seen documentaries?
16     Q    Have you seen documentaries that include
17   footage of an actual rape occurring or sexual abuse
18   occurring?
19     A    I've seen documentaries on Abu Ghraib in
20   which there's sexual abuse taking place.
21     Q    In your view, would those images meet the
22   definition of sexually explicit conduct under the
23   requirements?
24     A    I can't -- I don't know.  I don't know.  They
25   were -- the ones I saw were redacted.  I don't think

Page 142

1    the original images were pixelated or redacted.  So
2    the original images were of actual sexual abuse, so it
3    may very well.
4      Q    Are there other examples that you can think
5    of?
6      A    For me personally, no.
7      Q    Do you create -- you've already said that you
8    don't create images yourself of sexually explicit
9    conduct; is that correct?
10     A    Correct.
11     Q    Does that include private images or private
12   communications?
13     A    Correct.
14     Q    So --
15     A    Yes.
16     Q    -- have you ever sent depictions of sexually
17   explicit conduct through your cell phone, if you have
18   a cell phone?
19     A    I do, and I never have.
20     Q    Have you posted such images on Facebook?
21     A    Never.
22     Q    Do you know other people who have sent images
23   to their sexual partners depicting sexually explicit
24   conduct?
25     A    I don't know.  I don't know yes or no.  I

Page 143

1    don't -- I don't know if they -- I don't know.
2      Q    On your website -- I don't know if I have
3    a -- do you remember on your Daily Babylon website
4    listing Wicked as the Whore of Babylon or something
5    like that?
6      A    No.
7      Q    Or something --
8      A    No.  No.  No.  That was going to be -- the
9    Whore of Babylon was going to be a regular little
10   feature where we picked someone who had done something
11   especially horrible out there and they were going to
12   be our weekly Whore of Babylon.  And it could have
13   been anyone.  So Wicked, no.  It was like people
14   outside.  It would have been like Jerry Falwell or
15   someone like that.  Public figures who did something
16   so egregious that they earned the Whore of Babylon.
17   That's all that was.  Yeah, I had one up there and
18   just everything fell apart, but it wasn't Wicked.  I
19   don't believe it was Wicked.
20     Q    What is Wicked Pictures?  Is it -- it's not a
21   large -- is it a large --
22     A    It's an adult entertainment studio.
23     Q    Is it one of the largest do you think?
24     A    It is -- I don't really know.  It's one of
25   the originals.  It's one of the oldest.  And it's one

Page 144

1    of the most famous.  And I don't -- they're all
2    private companies, so I don't know, you know, whether
3    it's one of the largest or not.  But it's certainly
4    one of the largest in terms of brands.
5      Q    And Vivid, is that another one --
6      A    Yes.
7      Q    -- similar to that?
8      A    Yes.
9      Q    Are there any others that are of similar age
10   and brand recognition?
11     A    Sure.  Yes.
12     Q    And size?
13     A    Yes.
14     Q    Like what?
15     A    Evil Angel, Digital Playground.  Those are
16   just two.  There's a number of studios that have been
17   around for years.
18     Q    When you were talking about the end of the
19   period right before you got your current job at AVN --
20     A    Uh-huh.
21     Q    -- did you go bankrupt?
22     A    I did.
23     Q    So in this article --
24          MS. WYER:  We'll mark this as Exhibit 14.
25          (Whereupon, a two-page document was marked as

36 (Pages 141 to 144)

Thomas Hymes - 4/8/2013

Page 145

1          Exhibit 14 for identification.)
2   BY MS. WYER:
3      Q   This article is from your Daily Babylon
4   website?
5      A   Yep.
6      Q   Correct?
7      A   Correct.
8      Q   And it's about bankruptcy written by you?
9      A   That's right.
10      Q   So is it about -- it's written in first
11   person?
12      A   Yes, it is.
13      Q   Is it actually about your own bankruptcy?
14      A   Yes.
15      Q   Okay.
16      A   And that's me.  Not really.  See, I had hair
17   then.
18      Q   Bankruptcy does --
19      A   Yeah, it does that to you.
20      Q   So how many hours are you now working at
21   AVN?
22      A   Well, currently I'm on disability, so I work
23   full-time hours.  Full time plus.
24      Q   Is that like many jobs where you actually
25   work more than 40?

Page 146

1      A   Yes.  I'm on salary, so if I have to work
2   more, I work more.
3      Q   How many hours do you actually work?
4      A   60, 70.  I don't know.  I'm always there.
5   Even at home.  It's a lot.  I don't count.  Better not
6   to count.  I just do whatever.
7      Q   And that's one of the reasons that you said
8   you could not maintain the Daily -- the Daily Babylon
9   site dropped off because you no longer had time?
10      A   Yeah, to devote to it.
11      Q   Do you foresee that changing?
12      A   Don't know what's going to happen.  I don't
13   know.  I really don't know.  I -- I hope so.
14      Q   But you don't know.
15      A   I don't know.
16          MS. WYER:  That's all I have.
17          THE DEPONENT:  Okay.
18          MS. WYER:  Thank you.
19          MS. BAUMGARDNER:  I have a few follow-up
20   questions.
21          I don't think they'll be long, but how are
22   you doing?
23          THE REPORTER:  I'm okay.
24          MS. BAUMGARDNER:  Like I said, I don't think
25   it will take long.

Page 147

1              CROSS-EXAMINATION
2   BY MS. BAUMGARDNER:
3      Q   Mr. Hymes, let's just talk about -- a little
4   bit about Daily Babylon.  You've in no way abandoned
5   that project, have you?
6      A   No.
7      Q   It still remains very important to you,
8   doesn't it?
9      A   Yes.
10      Q   And it's an important avenue and outlet for
11   your expression on areas of great concern and
12   interest; correct?
13      A   Correct.
14      Q   Okay.  So all the issues with regard to 2257
15   are just -- you haven't abandoned those.  They are
16   still present.  It's just not a business venture
17   that's going to be able to support you; is that
18   accurate to say?
19      A   Correct.  That is accurate to say.
20      Q   Now, Ms. Wyer asked you questions about the
21   burdens of 2257 and what it imposes.
22      A   Yes.
23      Q   Including 2257A, which is kind of one of the
24   reasons for those new regulations to have been
25   effected --

Page 148

1      A   Yeah.
2      Q   -- that now applies to simulated sexually
3   explicit conduct; correct?
4      A   Uh-huh.
5      Q   You have to answer verbally.
6      A   Yeah.
7      Q   Yes.  Okay.  And you do know that both the
8   statutes make it unlawful for any person to fail to
9   create or maintain the records as required by the
10   regulations, do you not?  Is that your
11   understanding?
12      A   That is.
13      Q   Okay.  And so when we talk about what the
14   regulations require, Ms. Wyer asked you about it's not
15   particularly onerous or you would expect to get photo
16   IDs from people as part of the process of creating
17   sexual explicit expression; correct?
18      A   I'm sorry.  What is the question?
19      Q   Ms. Wyer had asked you, you know, you
20   didn't -- whether you thought it was onerous or
21   unreasonable to require producers of sexually explicit
22   expression to collect IDs from people.
23      A   Uh-huh.
24      Q   Is that correct?
25      A   Correct.

37  (Pages 145 to 148)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

Free Speech Coalition,   )
et al.,                  )
                         )
         Plaintiffs,     )
                         )
     vs.                 )  Case No.: 02:09-4607
                         )
Eric Holder,             )
                         )
         Defendant.      )

- - -

Deposition of David Levingston, a plaintiff
herein, called by the defendant for
cross-examination pursuant to the Federal Rules of
Civil Procedure, taken before Karen A. Toth, RPR
and Notary Public in and for the State of Ohio, at
the offices of Berkman, Gordon, Murray & DeVan,
55 Public Square, Suite 2200, Cleveland, Ohio 44113,
on Tuesday, March 26, 2013, commencing at 11:56 a.m.

- - -

Page 2

1   APPEARANCES:
2   On behalf of Plaintiff David Levingston:
3       Lorraine R. Baumgardner, Esq.
        Berkman, Gordon, Murray & DeVan
4       55 Public Square, Suite 2200
        Cleveland, Ohio 44113
5
6   On behalf of the Defendant:
7       Hector G. Bladuell, Esq.
        Trial Attorney
8       U.S.Department of Justice
        20 Massachusetts Avenue,NW
9       Washington, DC 20530
10          - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                    INDEX
2   WITNESS:           CROSS   REDIRECT  RECROSS
3   David Levingston
4     By Mr. Baduell      4              213
5     By Ms. Baumgardner       201, 218
6                      - - -
7              E X H I B I T S
8   Defendant's:            Marked
9     1 and 2              34
10    3                    42
11    4                    58
12    5                    65
13    6                    72
14    7                    90
15    8 through 10              92
16    11                  103
17    12                  115
18    13                  124
19    14                  131
20    15                  136
21    16                  159
22    17                  177
23    18                  207
24    18 (remarked)            208
25                     - - -

Page 4

1            DAVID LEVINGSTON
2   Of lawful age, being first duly sworn, as
3   hereinafter certified, was examined and testified as
4   follows:
5            CROSS-EXAMINATION
6   By Mr. Bladuell:
7   Q    Good afternoon, Mr. Levingston.
8   A    Good afternoon.
9   Q    My name is Hector Bladuell.  I'm an attorney
10      for the government in this lawsuit.  Have you
11      been deposed before?
12  A    No, I haven't.
13  Q    Okay.  Well, the purpose of this deposition,
14      as probably counsel has explained to you, is
15      for us to learn more about your claim.  It's
16      not to discuss the merits of your claim.
17           We have a court reporter here and it's
18      very important that for every question that I
19      ask you you give a verbal response yes or no
20      and an explanation instead of a nod that could
21      not be transcribed.
22  A    I understand.
23  Q    I'm going to be asking you several questions.
24      If you don't understand a question that I ask
25      you please tell me and I'll try to rephrase.

1 (Pages 1 to 4)

Page 5

1    I'll try to make it clearer.
2  A    All right.
3  Q    Your counsel may make some objections to some
4  of my questions.  Those objections are to
5  preserve them for trial or to contest
6  something about the question.
7  A    Yes.
8  Q    Unless she instructs you not to answer though,
9  you can answer the question based on her
10  objection.
11      I understand that you had eye surgery
12  last week; is that correct?
13  A    Yes, I did.
14  Q    Did it go well?
15  A    Still figuring it out, but yes.  I had
16  cataract surgery so now I can see better than
17  I have since sixth grade.  But I'm adapting to
18  reading glasses which I've never used before.
19  Q    Did that surgery in any way impair your
20  ability to recollect events in the past?
21  A    No.
22  Q    Did that eye surgery in any way affect your
23  ability to understand my questions?
24  A    No.
25  Q    Any other medical condition that you suffer

Page 6

1    from that would impair your ability to answer
2  my questions?
3  A    No.
4  Q    No medication -- you're currently under no
5  medications that would --
6  A    Thyroid pills.
7  Q    But they would not affect your ability to
8  recall events?
9  A    Right.
10  Q    Now, you understand that you have taken an
11  oath to tell the truth today?
12  A    I do.
13  Q    Do you have any questions before we begin the
14  deposition?
15  A    No, I don't.
16  Q    Can you please state your full name for the
17  record?
18  A    David Bertram Levingston.
19  Q    And did you prepare for this deposition today?
20  A    Yes.
21  Q    How did you prepare for the deposition today?
22  A    I just talked with my attorney.
23  Q    Okay.  Did you make any notes preparing for
24  this deposition?
25  A    No.

Page 7

1  Q    Did you review any documents in preparation
2  for this deposition?
3  A    No, I didn't.
4  Q    Okay.
5      MS. BAUMGARDNER:  One of the things,
6  David, Hector would probably remind you is
7  wait until he finishes his question completely
8  because it makes it difficult for the court
9  reporter when you are talking at the same
10  time.
11      THE WITNESS:    Right.
12      MR. BLADUELL:    Thank you, counsel.
13  Q    Mr. Levingston, would you please describe your
14  educational background?
15  A    My educational background?
16  Q    Yes.
17  A    I have a Bachelor's of Science Degree in
18  journalism from Ohio University.  Did a couple
19  years of graduate work in sociology before I
20  came to my senses and went and got a real
21  job.  But that's the basics past high school
22  education.
23  Q    At what university did you take sociology
24  courses?
25  A    Ohio University.

Page 8

1  Q    You have not received any medical training
2  throughout your career?
3  A    No.  Other than first aid or something like
4  that, first aid training, Red Cross stuff.  I
5  used to do mountain climbing so I paid a lot
6  of attention to first aid training.
7  Q    And could you describe your work history after
8  you graduated from college?
9  A    Well, I'd like to start earlier than that
10  because I actually started working as a
11  newspaper photographer when I was 16 years old
12  and worked at several newspapers while I was
13  in college.  And during that time I was also
14  drafted and spent a couple years in the Army
15  in the bad old days when we had a draft.  And
16  then went to college and did the degree in
17  journalism, which was really a photojournalism
18  program that wasn't formally established at
19  that time.  So it combined photography courses
20  and journalism courses.
21      Then I got a job after the time in grad
22  school with the federal government in
23  Columbus, Ohio as a photojournalist and did
24  that for five years.  Got a job at an Air
25  Force base as an editor of a base newspaper

2  (Pages 5 to 8)

Page 9

1   and within a year of that I was promoted to
2   the chief of the public affairs office for
3   that Air Force base, Newark Air Force Base in
4   Ohio.  And had that job for about 15 years, at
5   which time the base wound up on the base
6   closure list and I went through the base
7   closure and did the -- was responsible for
8   communicating the impact of all of that to all
9   of the workers at the base.
10      I considered that the high point of my
11  career because we had no suicides and no
12  workplace violence, which is almost unheard of
13  in base closures.  And I'd like to take at
14  least a tiny bit of the credit for that, for
15  my communication work.
16      When the base closed the work --
17  Q   What year did the base close?
18  A   '96.
19  Q   Okay.
20  A   At that time my work had been noticed and I
21      was offered a job at Wright-Patterson Air
22      Force Base at the headquarters for Air Force
23      material command.
24  Q   When you say your work was noticed, what kind
25      of work?

Page 10

1   A   The work at Newark Air Force Base as chief of
2       the public affairs office.  The work
3       particularly in the base closure.
4           There were -- they saw that I did a
5       good job there and offered me the job at
6       Wright-Patterson where I was -- most of the
7       time I was there I was deputy chief for media
8       relations for Air Force Material Command.  And
9       then I retired from there when I hit
10      retirement eligibility and have been retired
11      for five and a half years now.
12  Q   Okay.  So you retired in around 2007 or 2006?
13  A   It was beginning of November and it will be
14      six years this coming year.  Math is not my
15      strong point.
16  Q   And since your retirement what have you been
17      doing?
18  A   Photography.  And I also did photography
19      during all of that time.  In fact, I had a
20      portrait studio for a while during the time I
21      was working at the Newark Air Force Base and
22      never -- I'm a photographer first and all
23      these other things were just jobs.  So I've
24      always done photography.  Since retirement
25      it's been what I do to stay busy.

Page 11

1   Q   Do you receive a pension from your government
2       service?
3   A   I do.
4   Q   And is that pension the bulk of your income?
5   A   Yes.
6   Q   Do you receive any income from your
7       photography work?
8   A   I seldom net anything out of it.  I do
9       occasionally sell prints but not to where it's
10      adding any significant income.
11  Q   Okay.  Would you say that it's less than five
12      percent of your income?
13  A   Yes.
14  Q   And do you live in Springfield, Ohio?
15  A   Yes, I do.
16  Q   Do I have that right?  Okay.  Are you married?
17  A   Yes, I am.
18  Q   How long have you been married for?
19  A   This time?
20  Q   Yeah.
21  A   18 years.  It will be 18 years in July.
22  Q   And you were married before?
23  A   Yes.
24  Q   Okay.  Do you have children?
25  A   Yes.

Page 12

1   Q   How many?
2   A   Three.
3   Q   And how old are you?
4   A   I am, let's see, 61 now, yeah.
5   Q   How did your interest in photography develop?
6   A   How did it develop?  I discovered it when I
7       was a sophomore in high school and was so
8       excited by it that I checked an encyclopedia
9       of photography out of the library and read it
10      all the way through, taught myself to develop
11      film and make prints and all that sort of
12      thing.  And then very shortly after that at
13      the age of 16 I walked into a local daily
14      newspaper and they hired me.  So from there I
15      was a photographer intern for a while and
16      became a photographer that way.
17  Q   So you've been a photographer for a long time?
18  A   Yes.
19  Q   Would it be accurate to say that it's been 30
20      years?
21  A   More than that.
22  Q   40?
23  A   40 professionally.  I started -- I started my
24      first job as a photographer in 1968.
25  Q   How much would you say you make a year making

3 (Pages 9 to 12)

Page 13

1  photography, if you had to put a dollar amount
2  on it?
3  A   It varies a lot.  I think last year I had
4  about four or $500 in print sales.  It used to
5  be more before the economy crashed.  All of a
6  sudden the collectors stopped buying.
7  Q   Now, from that four or 5,000 --
8  A   Hundred.
9  Q   Four or 500?
10 A   Hundred, yes.
11 Q   And is that five percent of your income?
12 A   No.
13 Q   No.  So is that more?
14 A   Less.
15 Q   Less.  Okay.  So this 400 and $500,000 in
16 photography is much less than your government
17 pension?
18 A   $400.
19 Q   400.  I'm sorry.
20     MS. BAUMGARDNER:  I was going to
21 object.
22 Q   I'm sorry.  $400?
23 A   Yes.
24 Q   Okay.
25 A   It's not a significant source of income.

Page 14

1  Q   Okay.  Now, from those 400 to $500 how much of
2  that is production of sexually explicit
3  material?
4      MS. BAUMGARDNER:  Objection as to time
5  frame.
6  Q   Well, you said last year you made 400 to $500
7  in selling photography, correct?
8  A   Yes.
9  Q   And how much of that from last year was
10 sexually explicit material?
11 A   None.
12 Q   None?
13 A   Because when 2257(a) took effect I stopped
14 doing anything that might fall under 2257(a).
15 Q   Okay.  You produced sexually explicit material
16 from 2005 to 2009, correct?
17 A   Some.
18 Q   Some, yeah?
19 A   Very small amount.
20 Q   Okay.  And what percentage of the income that
21 you got in photography during those years
22 would you say was production of sexually
23 explicit material?
24     MS. BAUMGARDNER:  Objection.  You can
25 go ahead and answer if you know.

Page 15

1  A   I don't know.
2  Q   Would you say that it was 90 percent?
3  A   No.
4  Q   Less than 20 percent?
5  A   Yes.
6  Q   And I understand you have one publication?
7  A   One?
8  Q   Publication.
9  A   I have many publications.
10 Q   Could you just let me know, can you tell me
11 your publications?
12 A   Well, my work has been published since 1968 in
13 many different places.  Are you referring to
14 the one book that I've published?
15 Q   Yes.
16 A   Yes, I have self-published one book.
17 Q   Okay.  And that's "The Figure in Nature"?
18 A   Yes.
19 Q   Mr. Levingston, do you produce videos?
20 A   No.  Well, I guess I should qualify that.  I
21 actually have worked on a couple videos that
22 haven't been published, although an early
23 version of one is available on YouTube right
24 now.
25 Q   You don't produce any sexually explicit

Page 16

1  videos?
2  A   No.
3  Q   Could you describe how your photographic work
4  has evolved since 1968 in terms of the context
5  of the photography that you take and that kind
6  of thing?
7  A   I'd like to think it's gotten better but I
8  don't know that my interests have changed
9  significantly from the beginning.
10     I've always been interested in
11 documentary work, reported or reportage, that
12 sort of thing, and still occasionally I have
13 several projects along those lines that I'm
14 working on right now.
15     And I started as a teenager.  I was
16 interested in women and have always one way or
17 another photographed women.  I think that has
18 evolved into a more sophisticated product in
19 later years.
20 Q   Would you say that photographing women has
21 been the bulk of your photography work
22 throughout your career?
23 A   Not throughout but in the -- since 2002 it has
24 been.
25 Q   Okay.  And what was your photographic work

4  (Pages 13 to 16)

1   before you started concentrating on women?
2   A   Photojournalism, portraits, weddings, anything
3   for a buck at my studio.
4   Q   So since 2002 have you done any photographic
5   work for newspapers?
6   A   Yes.  I also photograph dance and some of
7   those dance photographs have been published in
8   newspapers in connection with the productions
9   that I was photographing.
10          I'm trying to think what else has been
11  -- for a while in the late '90s and beginning
12  of the 2000s I worked for some magazines,
13  beauty magazines that you would have bought at
14  CVS or Walgreens and did content for those
15  magazines at my studio.
16  Q   And how much of that -- what proportion of
17  your photographic work involves selling the
18  pictures to magazines and newspapers?
19  A   Today, none.
20  Q   None?
21  A   Yeah.  I'm semi-retired from that kind of
22  work.
23  Q   From the photo -- from photojournalism, or
24  what do you mean by that kind of work?
25  A   Well, I don't seek those kind of assignments.

1   The magazine industry has gone down the tubes
2   so there is very little work there and I've
3   decided not to waste my time pursuing the
4   little bit of work that remains.  So as I
5   said, I do documentary work.  And I have two
6   major projects that I expect to take a decade
7   that I'm working on now that are documentary
8   in nature.
9   Q   Can you explain these projects?
10  A   If you wish.  There are two.  One was inspired
11  by going to a lot of funerals.  I'm an old
12  newspaper guy and a lot of my old friends from
13  the newspaper days are dying.  I realized at
14  the most recent funeral that I'm the only one
15  left from that crew that I started out with in
16  1968 so I can make up any stories I want about
17  those days and no one can contradict me.
18          But I started in newspapers when there
19  were linotype machines setting type with hot
20  lead and there were guys with green eye shade,
21  garters on their shirt sleeves who know
22  everything.  They knew more than Google.  And
23  they would -- when you made a mistake it was
24  not just corrected, you were stood up in
25  public, humiliated in the newsroom.

1           I'll never forget the day I misspelled
2   Pittsburgh in a story and two of the editors
3   were from Pittsburgh.  And I've never
4   misspelled Pittsburgh from that day.
5           The point of all this is there was a
6   culture and environment in those newsrooms
7   that doesn't exist today as newspapers are
8   fading.  So my project is traveling around,
9   photographing and interviewing the people who
10  worked in that kind of a newsroom and getting
11  their stories captured on tape and pictures of
12  them.  And those are being produced on a blog
13  that I've set up where you can actually listen
14  to the whole interview, see the portrait of
15  the person and read a few quotes from the
16  interview.
17  Q   Is it accurate to say that that's not going to
18  involve any nudes?
19  A   Yes.
20  Q   Or sexually explicit?
21  A   Right, nothing there.  And the same with the
22  other project.  These are not --
23  Q   The funeral and the newsrooms or the two
24  projects, right?
25  A   No, no, this project is about the people who

1   are dying, trying to get them before they die.
2   Q   Okay.
3   A   The other project is photographers today as a
4   reaction to -- well, some of them as a
5   reaction to digital photography.  There are
6   many photographers who are starting to use
7   antiquated photographic processes like the wet
8   plate process or platinum plating printing.
9   And the second project involves -- it's a
10  similar project -- interviewing, photographing
11  and putting up on a blog those people where
12  they can talk about why they use a process
13  that was invented in the 1850s today where
14  they have to make all their own materials.
15  And I'm just getting started on that.
16          I have a blog set up but there is
17  nothing on it yet.  I've done a few interviews
18  and I'm trying to work on that and this whole
19  eye surgery thing has thrown my schedule out
20  of whack.
21          But again, non one is going to be
22  getting naked for those.  It's a different
23  kind of a project.
24  Q   Why have you decided to -- I assume you've
25  said -- let me rephrase that.

Page 21

1       You have decided to switch the scope
2   of your work from nudes to these kind of
3   projects; is that accurate?
4       MS. BAUMGARDNER: Objection. Go ahead
5   and answer.
6   A   Okay. Not really.
7   Q   Okay.
8   A   I've been looking for -- well, nudes have
9   never been everything. They've been a major
10  thing for ten years, coming up on 11 years
11  now. And I'm starting to feel like I've kind
12  of done what I set out to do with that, but
13  I'm not done with it. It's still something
14  I'm interested in and I'll probably, you know,
15  be 90 years old and barely able to lift a
16  camera and still do nudes because it's
17  important. It's a significant part of what my
18  personal vision is about.
19      But there has always been other things
20  too. And I -- I discovered "The Figure in
21  Nature" in 2002, realized it was the thing
22  that I was put on this planet to do and have
23  spent ten years, 11 years focused on doing
24  that.
25      I've achieved quite a bit and have a

Page 22

1   significant body of work in that genre now.
2   But I've always done other things too. And I
3   kind of felt like it's time to do some
4   different things.
5       I've always done dance photography.
6   That's an important thing for me. I spend a
7   lot of time photographing a dance production.
8   I don't photograph it like basketball. I go
9   to the rehearsals, I learn the dance and then
10  I try to make my photographs say something
11  about the dance. So it's a thoughtful
12  process.
13  Q   When you say you have things that you still
14  want to do in nude photography, what is it
15  that you want to do that is missing from the
16  work that you've done?
17  A   You're talking about the nudes?
18  Q   Yeah.
19  A   I don't know. That's something that evolves
20  and I never -- I experiment. I try things. I
21  wander around in the woods with a model and
22  look for a place to take a picture. I don't
23  plan.
24  Q   So you don't have any concrete projects this
25  year to do nudes?

Page 23

1   A   Well, yes.
2   Q   Yes. Okay.
3   A   Yeah. Nothing specific. You know, I have a
4   model coming into the studio on Thursday to
5   work on some different lighting techniques
6   that may lead to something I'll do in the
7   studio, but I never know. My process is take
8   pictures and see what happens.
9   Q   Other than that project do you have anything
10  planned for the rest of the year regarding
11  nudes?
12  A   Nothing specific. I'll be making a trip to
13  Philadelphia I understand at some point
14  beginning of June. I may make that a long
15  road trip and stop and take some pictures
16  along the way. There are some people in
17  Pennsylvania who want to work with me, so
18  yeah.
19  Q   Other than that nothing comes to mind at this
20  point?
21  A   Nothing specific at this point. There will be
22  other things that I'll do as the year moves
23  along but it tends to be more of a spur of the
24  moment thing. I'll be doing road trips for
25  these other projects that will probably take

Page 24

1   me near people who want to work with me, so
2   that may result in nude shoots as well as the
3   other things that I'll be doing.
4   Q   So have you identified those people that are
5   going to be close to the places that you're
6   going to go?
7   A   No, I haven't.
8   Q   Your non-nude photography, where has it been
9   published?
10  A   Oh, let's see. Start with the Newark Advocate
11  in Newark, Ohio; the Athens Messenger in
12  Athens, Ohio; the Associated Press, I
13  worked -- you know, I've worked with them.
14  Let's see. I've had work exhibited in Europe
15  and, you know, with the one contest you were
16  published in books in Europe in the '70s.
17  It's been a long time.
18      There is many, many places. The
19  magazines, what were the names of those
20  magazines? They changed the name all the
21  time. I can't even remember now. "Beauty
22  Handbook" I think was one of the names. They
23  published a bunch of different magazines.
24  They had a version for the Hispanic audience.
25  They had just all sorts of different things.

6 (Pages 21 to 24)

Page 25

1  Then when the market started disappearing they
2  started firing everybody and folding all those
3  magazines up and I've lost track of them.  But
4  those are some places.  There are many
5  others.
6       I get published -- well, you asked for
7  non-nudes but most of the publications over
8  the past decade have been in places that
9  publish my nude work.
10  Q    So you said that your nude work was your --
11  what you think is your call in this life; is
12  that correct?
13  A    Yes.  As an artist.
14  Q    As an artist.  Would it be accurate to say
15  that that has been a really substantial
16  proportion of your work --
17  A    For the past --
18  Q    -- in photography?
19  A    For the past ten years it's been a
20  substantial -- it's been the bulk of the work.
21  Q    So you would say 80 percent?
22  A    Are you talking about during the past ten
23  years?
24  Q    During the past ten years.
25  A    Yes, I would say 80 percent would be good.

Page 26

1  Q    Do you sell your nudes?
2  A    Yes.
3  Q    And how do you sell them?
4  A    Through galleries for the most part, or
5  through various shows that -- juried shows
6  where you enter the show and if you're
7  accepted, those prints are available for
8  sale.  And several of those shows also will
9  have a store where I make smaller prints and
10  send a quantity of the prints into the store
11  and sell them out of the store at the event.
12  Q    Well, last year when you said that you made
13  400 and $500 in photography was that from
14  nudes; do I understand that correctly?
15  A    Yes.  It might have been -- I think there was
16  a 50 buck thing from a newspaper in there.
17  It's from a dance photograph.
18  Q    And if I ask you the year before last year
19  would the answer be the same, 400 to 500?
20  A    Something like that.
21  Q    So has it been that much pretty consistently
22  since you started concentrating in nudes?
23  A    It's hard.  I think I used to make more than
24  that before the economy went in the toilet.
25  Q    More than a thousand a year would you say?

Page 27

1  A    Rarely.  Yeah.
2  Q    So around a thousand?
3  A    Yeah.  It's not been a -- I've never done this
4  for money.
5  Q    I understand.
6  A    That's not the motivating factor anyway.  It
7  would be nice but it doesn't happen.  I have
8  hopes that some day there'll be more income
9  from it.
10  Q    And can you tell me the web sites where your
11  nude work has appeared?
12  A    Not off the top of my head.  I don't memorize
13  URLs.
14  Q    Any web sites that you can remember right now?
15  A    Well, I think we provided some of those,
16  haven't we?  I have a portfolio on Model
17  Mayhem.  I have one on Deviant Art.  I rarely
18  change anything on there.  Of course, I have
19  my own web site.
20  Q    Okay.
21  A    Davelevingston.com.  And that's where I --
22  most of my work is available on the web.  I
23  know there is other places out there that have
24  my work and there are places that steal my
25  work and put it on the web too.

Page 28

1  Q    Can you explain how you get women to pose
2  naked or do nudes for you?
3  A    Yeah.  Well, I hesitate to tell this story
4  because I'm under oath but what I usually --
5  the answer I usually give to that question is
6  that if you go hiking in the woods, you know,
7  they are out there, you just have to know
8  where to look.  It's like hunting mushrooms.
9  That's not true.
10       MS. BAUMGARDNER:  I was going to say, I
11  think you want to answer the question.
12  A    In general most frequently they come to me.  I
13  have a reputation for the work that I do.
14  Models who are interested in the work that I
15  do will seek me out and ask to be part of it.
16  I do look for models on Model Mayhem which is
17  why I'm on that site.
18       Generally I'll look for a model that is
19  an experienced nude model, that has examples
20  of work similar to the kind of work that I
21  do.  Particularly when I'm traveling, if I'm
22  looking for a model in a location that I'm
23  going to be visiting I'll look for models in
24  that location who have a track record of doing
25  the kind of work that I do and contact them to

7 (Pages 25 to 28)

1   see if they're interested in working for me.
2   Q   Do the models pay you to photograph them?
3   A   We don't exchange money. I should probably
4       say I do -- I have several policies about
5       money with models. They aren't allowed to
6       spend money in order to work with me, so if
7       we're working together and there are any
8       expenses that come up I cover those expenses.
9           And the other thing I consider my
10      models to be co-creators of the work that I do
11      so I share copyright with them. They get all
12      the pictures and full rights to do anything
13      they want with the pictures.
14  Q   What do you look for in a model?
15  A   It might surprise you that physical things are
16      not significant. I look for a model who is
17      reasonably attractive, has a reasonably fit
18      body. And the main thing I'm looking for is
19      someone who gets what I'm trying to do and
20      wants to be a part of it. Those are -- I'm
21      looking for someone that is actually committed
22      to making art and interested in the nude as
23      art and likes what it is that I do in that
24      regard and wants to be part of it. That's
25      more significant than pretty much anything

1       else.
2   Q   Is youth important for a model?
3   A   Not significantly, no. I work with models of
4       all ages as long as they are reasonably fit.
5   Q   Okay. Have you ever worked with a model
6       that's a grandmother?
7   A   Yes.
8   Q   How many would you say?
9   A   I don't know. Several. I have one model that
10      I've worked with quite a bit who is in her
11      late 60s.
12  Q   Okay. Other than her, anyone else?
13  A   There are several in their late 40s, 50s,
14  Q   That are grandmothers?
15  A   Yeah, I think several of them have grandkids,
16      yeah.
17  Q   Would you say you've worked with ten that are
18      grandmothers?
19  A   Somewhere around there maybe. I can't -- you
20      know, it's not something I track.
21  Q   Right.
22  A   I may not know if they are a grandmother or
23      not.
24  Q   And how many models in your nude work would
25      you say you've worked with since 2002 when you

1       started concentrating on that?
2   A   How many models? Wow. I don't know.
3   Q   10,000?
4   A   No.
5   Q   Okay. 5,000?
6   A   No.
7   Q   A thousand.
8   A   No.
9   Q   Less?
10  A   Less.
11  Q   500?
12  A   I'm sure it's less than 500 but I don't know
13      how much lower I can go and be confident with
14      it.
15  Q   Let's say 250?
16  A   It's possible that many.
17  Q   Okay.
18  A   Yeah. I don't keep track of that.
19  Q   It could be less than 250?
20  A   It could be less.
21  Q   And out of those 250, like ten have been
22      grandmothers?
23          MS. BAUMGARDNER: Objection.
24  A   I don't know. I really don't know.
25  Q   But it -- has it been more than ten?

1           MS. BAUMGARDNER: Objection.
2   A   I don't know. Don't know. Can't answer the
3       question. I really just don't know.
4   Q   Has it been -- do you recall if they have been
5       a substantial amount of those 250?
6   A   No.
7           MS. BAUMGARDNER: Objection.
8   A   I just don't know.
9   Q   Okay. Would it be accurate to say that most
10      of your models have not been grandmothers?
11  A   Yes.
12  Q   Have most of your models been mothers?
13          MS. BAUMGARDNER: Objection. You can
14      go ahead and answer if you know.
15  A   Many. I don't know.
16  Q   Well, more than 50 percent?
17  A   I would say 50 percent might be a good
18      number. Might be higher than that.
19  Q   Of mothers?
20  A   Yeah.
21  Q   You said you don't -- do you keep records
22      documenting if they have children, the models?
23  A   No.
24  Q   Do you ask them?
25  A   No. I guess to understand you need to know

8 (Pages 29 to 32)

Page 53

1   A   Right.
2   Q   Mr. Levingston, have some of the models that
3       you have photographed nude been college
4       students in the last ten years?
5   A   Yes.
6   Q   How many have been college students?
7   A   I have no way of knowing.  I can't answer that
8       question.
9   Q   Okay.  Would you say that more than ten
10      percent have been college students?
11          MS. BAUMGARDNER:  Objection.
12  A   I don't know.  I really don't know.
13  Q   Can you think of women who have -- you've
14      photographed that have been college students?
15  A   Yes.
16  Q   Okay.  Can you give me their names?
17  A   No.
18  Q   Can you give me their initials?
19  A   Yes.  Some of them.  Let's see.  G.  Doesn't
20      use a last name.
21  Q   And where was she a college student?
22  A   I'm not going to provide that.
23  Q   Name of the university?
24  A   If I think it gets into the privacy of the
25      model that's not something I'm comfortable

Page 54

1       talking about.
2   Q   Do you have a real concern that I can find out
3       her name by you giving me the university?
4   A   I think it is reaching a point where I'm -- I
5       would be revealing more information than I'm
6       comfortable about the background and life of
7       my models, yes.
8   Q   Okay.  Well, do you know their date of birth?
9   A   Not off the top of my head.
10  Q   All right.  So can you give me another college
11      student?
12  A   GA.  Again, I'm having a hard time -- I'm a
13      visual person.  I can see them but getting
14      their name to come up is a --
15  Q   You can just tell me when you remember someone
16      visually, you tell me; one, two and then --
17  A   Okay.  There is one.  Another one.
18  Q   So we have two already?
19  A   Three.
20  Q   We have three.
21  A   Trying to think of some others.  Yeah, there
22      is another one.  Another one.  Another one.  I
23      can give you initials on a few of those that
24      I've thought of now.  One of them was BL, KD,
25      C, HH.  I don't know.

Page 55

1   Q   Okay.  So by my calculation it's six?
2   A   That's not all, that's just all I can recall
3       off the top of my head.
4   Q   There is many more?
5   A   Yes, there is some more.
6   Q   Ten more?
7   A   Probably.
8   Q   20?
9   A   Maybe.
10  Q   More than -- no more than 50?
11  A   Probably not.
12  Q   Okay.  Is it accurate to say that more of your
13      models have been college students than 50 year
14      olds --
15          MS. BAUMGARDNER:  Objection.
16  Q   -- of your nude models in the last ten years?
17  A   Yes.
18          MS. BAUMGARDNER:  And again, this is
19      nude, correct?
20          MR. BLADUELL:    Nude.  All nude.
21  A   But not erotic?
22  Q   Well --
23  A   I think we need to make that distinctions.
24  Q   We'll get to that.
25          Have you recruited some models in

Page 56

1       college campuses?
2   A   No.
3   Q   Where have you recruited nude models?
4   A   I don't recruit models.
5   Q   So is my understanding correct that all of
6       these college students who have appeared in
7       your nudes have contacted you?
8   A   Or I contacted them through Model Mayhem where
9       they had modeling portfolios.
10  Q   Okay.
11  A   Or there might have been other model sites as
12      well as Model Mayhem.  There are older sites
13      that did that.
14  Q   So online, online modeling sites?
15  A   For the most part, yeah.
16  Q   Okay.  So you've never reached out to a model
17      that's college age?  Have you reached out to a
18      model that is college age through Model Mayhem
19      or any of these other sites?
20  A   Yes.
21  Q   Have some of your models been high school
22      students?
23  A   Not for nude work.
24  Q   Okay.  Have some of your models for nude work
25      been recent high school students?

14  (Pages 53 to 56)

Page 57

1        MS. BAUMGARDNER: Objection.
2   A   Very few. I mean recent, I don't -- if they
3       are in college they are recent high school
4       students.
5   Q   That's fair. Have you had models who have
6       posed nude for your pictures for the last ten
7       years who have graduated college but have not
8       entered college -- have graduated high school
9       but have not entered college yet?
10  A   There have been some.
11  Q   Okay. How many would you say?
12  A   I have no idea.
13  Q   Can you recall anyone specifically?
14  A   I can't even -- no.
15  Q   You cannot recall any?
16  A   No, I can't. That's not something that I
17      would care about or think about.
18  Q   Why would you not care about it?
19  A   Well, what they are doing with their education
20      and career is not really something I delve
21      into to great depth.
22        MS. BAUMGARDNER: Are you doing okay?
23        THE WITNESS:    Not right this
24      instance but sometime before too long.
25        MS. BAUMGARDNER: Let Mr. Bladuell

Page 58

1       know.
2         MR. BLADUELL:    I'm going to mark as
3       Exhibit DL4 a document that I took from
4       Mr. Levingston's web site. I'm going to hand
5       a copy to counsel as soon as I can find it.
6         (Defendant's Exhibit DL4
7         marked for identification.)
8   Q   Mr. Levingston do you recognize that
9       document?
10  A   Yes.
11  Q   And what is that document?
12  A   It's a print out from my blog.
13  Q   Okay. Could you read the first paragraph?
14  A   "Sometimes I find myself" --
15  Q   For yourself.
16  A   Oh, okay.
17  Q   Sorry.
18  A   Okay. Okay.
19  Q   Can you read the second paragraph to
20      yourself. It's on the second page.
21  A   Yes.
22  Q   Do you remember this model?
23  A   Oh, yes.
24  Q   What can you tell me about this model?
25  A   She's a wonderful model, very experienced when

Page 59

1       she contacted me. She's a friend. I work
2       with her whenever I can.
3   Q   Is Kelsey Dylan her real name?
4   A   No.
5   Q   What are the initials of her real name?
6   A   KS.
7   Q   Do you know her birth -- date of birth?
8   A   Not off the top of my head, no.
9   Q   Is she a friend?
10  A   Yes.
11  Q   In the second paragraph, I'm going to read
12      it. "She said she was going to the west coast
13      to go to college but wanted to work with me
14      before she left Ohio. We did a shoot"
15      ellipses -- "a wonderful shoot that produced a
16      bunch of keeper photographs. Then she was
17      gone to school. But we stay in touch and work
18      together whenever she is back in Ohio. Kelsey
19      is a great model, beautiful and highly skilled
20      and as with all my models she's a very nice
21      person. I love working with her and try to
22      shoot with her as often as I can."
23        Mr. Levingston, did I read that
24      accurately?
25  A   You did.

Page 60

1   Q   So is it correct that you worked with this
2       model before she went to college?
3   A   Yes.
4   Q   Do you know what age she was when she went to
5       college?
6   A   I'd have to look.
7   Q   Do you remember the year that this was -- that
8       you first did a shoot with her?
9   A   I don't remember. Must have been five years
10      ago. Something like that.
11  Q   So this would be -- I'm not terribly good at
12      math either but it's --
13  A   I'm guessing.
14  Q   It's like 2009?
15  A   Probably around there.
16  Q   And that's the first time that you
17      photographed her?
18  A   Yes.
19  Q   Did those photographs involve nudes?
20  A   Yes.
21  Q   Do you remember what age she was at the time?
22  A   No, I don't.
23  Q   So could she have been 17?
24  A   No.
25  Q   How are you sure about that?

15 (Pages 57 to 60)

Page 61

1    A    I did check her ID.
2    Q    Okay.  Do you have a copy of the ID?
3    A    I believe I do.
4         MR. BLADUELL:    Okay.  I'm going to
5    request, counsel, to identify the ID that was
6    provided to us of this model Kelsey Dylan and
7    the associated model release.
8    Q    Mr. Levingston, have there been other models
9    in Ohio like Kelsey Dylan who you have shot
10   nude before they go to college?
11        MS. BAUMGARDNER:  Objection.
12   A    Don't know.  I can't really answer that.
13   That's not something I keep track of.
14   Q    Is it possible?
15   A    It's possible.
16   Q    But you don't -- is it fair to assume that
17   Kelsey Dylan was around the age of 18 at the
18   time you first shot her nude?
19        MS. BAUMGARDNER:  Objection.
20   A    I don't know.  I think she was older.
21   Q    Older.  So was she -- you don't know her exact
22   age?
23   A    I don't know her exact age.
24   Q    But do you recall if she was over 20 or
25   between 18 and 20?

Page 62

1         MS. BAUMGARDNER:  Objection.
2    A    I don't know.
3    Q    But it's not uncommon for you to photograph
4    models around that age?
5         MS. BAUMGARDNER:  Objection.
6    Q    Right, nude?
7         MS. BAUMGARDNER:  Objection.
8    A    It's not common.
9    Q    It's not common?
10   A    Right.
11   Q    It's more common that they are older than 20?
12   A    Yes.  Kelsey is an exceptional model and I
13   should mention that she had an extensive nude
14   portfolio online when she contacted me.
15   Q    Do you know if those pictures were taken
16   before she was 18?
17   A    I don't know when those pictures were taken.
18   Q    Do you remember how extensive her background
19   was in nude photography at the time that you
20   first shot her?
21   A    She was quite accomplished as a nude model.
22   Q    Do you remember how many shoots she had?
23   A    I would have no way of knowing.
24   Q    Do you remember if it was more than ten?
25   A    I would have no way of knowing how many.

Page 63

1    Q    When you say accomplished, would that mean
2    more than five?
3         MS. BAUMGARDNER:  Objection.
4    A    She was highly skilled at -- I have no idea
5    how many shoots she had done.
6    Q    But you reviewed some of the shoots before you
7    photographed her?
8    A    I looked at her online portfolio.
9    Q    Is my understanding correct that she contacted
10   you?
11   A    Yes.
12   Q    You didn't contact her?
13   A    Right.
14   Q    And did she contact you through Model Mayhem?
15   A    I don't remember.
16   Q    Are you still in touch with Kelsey Dylan?
17   A    Yes, I am.
18   Q    Do you still do regular nudes of her?
19   A    Whenever she's around.  Whenever she's
20   available.
21   Q    Is she a full-time model?
22   A    Yes, she is.
23   Q    Does she live in Ohio?
24   A    She travels.
25   Q    But she doesn't permanently live in Ohio?

Page 64

1    A    Her home is in Ohio but she's seldom there.
2    Q    Were the nude pictures of Kelsey Dylan
3    published?
4         MS. BAUMGARDNER:  Which nude pictures
5    are you talking about?
6         MR. BLADUELL:    The first ones that
7    he took right after she graduated from high
8    school.
9    A    They've been on my blog.
10        MS. BAUMGARDNER:  Objection to that,
11   but go ahead.
12   A    Trying to think if they've been in printed
13   products.  They may have been but I'm not
14   sure.
15        MR. BLADUELL:    Okay.  I'm going to
16   request a sample picture, the nude of Kelsey
17   Dylan as well for the record.
18        MS. BAUMGARDNER:  And you can.
19   A    You have them right here.
20   Q    Right, I understand that.
21        MR. BLADUELL:    I'm requesting it and
22   you may object, but I just wanted to note for
23   the record and we can discuss it later.
24        MS. BAUMGARDNER:  I'm going to object
25   as to relevance.

16  (Pages 61 to 64)

Page 85

1  A   Yes.
2  Q   Even if the statutes have been -- even if 2257
3  has been in place, correct?
4  A   Yes.
5  Q   Has 2257 prevented you from making nudes?
6  A   No.
7  Q   So what, your concern is 2257(a)?
8  A   Primarily.
9  Q   Okay.  Has that prevented you from making
10  nudes?
11        MS. BAUMGARDNER:  Objection.
12  A   Some.
13  Q   Which ones?
14  A   Well, they weren't made so that's an
15  impossible question to answer.
16  Q   Okay.  Since the enactment of 2257 have you
17  wanted to do nudes that you decided not to do
18  because of the statutes?
19  A   Yes.
20        MS. BAUMGARDNER:  Just to clarify, you
21  said 2257.
22        MR. BLADUELL:    (a).
23        MS. BAUMGARDNER:  Okay.  (a).
24  A   Yes.
25  Q   Can you tell me which ones?

Page 86

1  A   No.
2  Q   What projects?
3  A   In general I have stayed away from any work
4  that might be conceived to fall under 2257(a,)
5  so despite an interest in art that would
6  explore human sexuality I've stayed away from
7  that subject matter because of this law.
8  Q   But have you had a particular concrete project
9  that you wanted to do and you said oh, I'm not
10  going to do it because of 2257(a)?
11  A   I don't work that way so I'd have to say no
12  concrete projects.  Although there were ideas
13  for projects that were rejected.
14  Q   Rejected by you?
15  A   Yes.
16  Q   When you have these ideas about projects after
17  2257(a), do you consult an attorney about how
18  to reasonably comply with the statutes and
19  make your projects?
20  A   No.
21  Q   Do you take any concrete steps to see how you
22  could comply with the statute and still make
23  your project?
24  A   I don't believe that would be possible or I
25  would do the project.

Page 87

1  Q   What do you mean, that it would not be
2  possible?
3  A   If I'm doing a project that -- well, if I'm
4  thinking about a project that I feel would
5  fall under 2257(a) then I don't do it.  If it
6  wouldn't fall under 2257(a) then I would
7  proceed with the project.
8  Q   Okay.  Why would you not do it?
9  A   Because of the legal problems that 2257(a),
10  the burden that it imposes on me, my inability
11  to comply with the statute if I did that.
12  Q   What are the concrete burdens, what are the
13  concrete impediments?
14  A   I'm congenially unable to keep records, as you
15  have seen today.  I would be very concerned
16  that whatever efforts I might make at
17  recordkeeping would not be adequate to satisfy
18  the statute if I were to try that.
19  Q   Is it your view that any law that requires
20  someone to keep records would be
21  unconstitutional?
22        MS. BAUMGARDNER:  Objection.
23  A   No.
24  Q   So why is this one in particular, the record
25  -- why is the recordkeeping unconstitutional?

Page 88

1  A   The recordkeeping seems to me to be so complex
2  that I could not achieve it.
3  Q   What is your understanding of the
4  recordkeeping requirement?
5  A   It's a limited understanding but there seems
6  to be a bunch of cross indexing required, and
7  I don't know -- I don't even -- I can't even
8  comprehend how to do that.
9  Q   Have you read the statute to understand the
10  recordkeeping requirements?
11  A   I've read writing about the statute.
12  Q   You haven't actually read the statutes
13  themselves, correct?
14  A   I don't know.  I've read portions of it.
15  Q   Do you feel that if you read the statute that
16  might help you understand what the
17  requirements are?
18  A   No.  I've read an exposition on the statute
19  that was written in layman's terms that I
20  couldn't understand.
21  Q   So you don't think that you would -- you
22  haven't read the statute, correct?
23  A   I've read parts of it.
24        MS. BAUMGARDNER:  Objection.
25  Q   You read parts of the statute itself?

22  (Pages 85 to 88)

Page 89

1  A   Yes.
2  Q   You did not understand some of those parts,
3  correct?
4  A   Yes.
5  Q   Which parts do you not understand?
6       MS. BAUMGARDNER:  Objection.
7  A   The recordkeeping requirements.
8       MS. BAUMGARDNER:  I mean, in fairness,
9  if you want to show him the statute.  I don't
10  think it's fair to ask him questions when he
11  doesn't have it in front of him.
12      MR. BLADUELL:    Well, he said that
13  he's read it.
14  A   Read parts of it.
15      MR. BLADUELL:    I'm asking him his
16  recollection.
17  A   And that was a while back.  Frankly, in
18  reading it I was so angry that it's hard to
19  remember.
20  Q   So other than reading parts of it and reading
21  articles on it have you taken any other steps
22  to get better acquainted with this statute?
23      MS. BAUMGARDNER:  Objection.
24  A   Actually I became aware of the statute because
25  a friend of mine who is a photographer and a

Page 90

1  retired lawyer wrote a book about the impact
2  on the statute.
3  Q   Who is this friend?
4  A   Stephen Haynes.
5  Q   And what was the book?
6  A   I can't remember the title but it's -- I think
7  2257 is in the title.
8  Q   That's how you became aware?
9  A   Yes, he asked me to edit the book for him and
10  I was so angry when I finished reading his
11  account of the law that I was moved to try to
12  do something about this law.
13  Q   I'm going to mark another exhibit, I think
14  we're at 7.
15      (Defendant's Exhibit DL7
16      marked for identification.)
17      MR. BLADUELL:    I'm handing a copy to
18  counsel of U.S.C. -- I'm sorry, this is 28 CFR
19  75.1.
20      I'm handing a copy of the exhibit to
21  Mr. Levingston as well.
22  Q   Mr. Levingston, have you read this document
23  before?
24  A   I don't recognize it.
25  Q   Okay.  So is it -- so the answer is you have

Page 91

1  not read it before?
2  A   I don't believe so.
3  Q   I represent to you that this is a regulation
4  passed by the Department of Justice in
5  accordance with the Statute 2257, 2257(a).
6  I'm going to direct your attention to Letter O
7  in the third page.
8       Do you see that it says simulated
9  sexually explicit conduct means?
10  A   Yes.
11  Q   Can you just read it for yourself for a couple
12  of seconds?
13  A   Okay.
14  Q   Do you understand it?
15  A   It seems clear as mud to me.
16  Q   What don't you understand?
17  A   I don't -- I do not understand it.  I don't
18  know how much more than that I can say.
19  Q   Well, what --
20  A   It seems contradictory.  Internally
21  contradictory to me.
22  Q   What does it -- why is it internally
23  contradictory?
24  A   The last sentence seems to contradict the
25  first sentence.

Page 92

1  Q   "It does not mean not sexually explicit
2  conduct that is merely suggested."
3  A   It seems like the first sentence describes
4  something that's suggested.  But I'm no
5  lawyer.  I'm not qualified to analyze this.
6  That's the problem.
7  Q   Have you consulted an attorney about this
8  provision?
9  A   No.
10  Q   Even before today you said you haven't read
11  it, correct?
12  A   I have not seen this particular document.
13  Q   Okay.  I'm going to mark some of
14  Mr. Levingston's work as exhibits and we can
15  talk about them.
16      I'm marking three exhibits, DL8, DL9
17  and DL10.
18      (Defendant's Exhibit DL8 through DL10
19      marked for identification.)
20  Q   I'm going to hand them to Mr. Levingston.  I'm
21  going to find a copy for counsel --
22      MS. BAUMGARDNER:  Thank you.
23  Q   -- and a copy for myself and then we can talk
24  about the pictures.
25      Mr. Levingston, could you describe each

23  (Pages 89 to 92)

Page 93

1   of these exhibits?
2        MS. BAUMGARDNER: Objection.
3   A   Well, they are --
4   Q   You don't have to say much about them, just
5   describe them for the record.
6   A   They are all photographs that were taken last
7   summer on the coast of Maine.
8   Q   What's in the photographs?
9   A   The coast of Maine and nude models.
10  Q   Are these three exhibits, 8, 9 and 10,
11  representative of your work involving nude
12  models?
13  A   Yes.
14  Q   How many pictures like these would you say
15  you've produced in the last ten years?
16  A   Probably hundreds of thousands.
17  Q   Okay. Around the ballpark of 200,000?
18  A   I don't know.
19  Q   Or more than that?
20  A   I don't -- I really don't know. Thousands and
21  thousands. Hundreds of thousand. That's as
22  good as I can do.
23  Q   But if we can try to get a reasonable estimate
24  of the thousands, is it more than 500,000 or
25  less than 500,000?

Page 94

1        MS. BAUMGARDNER: Objection.
2   A   I don't know. I don't count.
3   Q   So it could be either?
4   A   Yeah.
5   Q   Okay. It could be 100,000 -- or I'm sorry,
6   it's not more than a million?
7   A   I don't know. I shoot lots. I shoot -- at a
8   shoot like this I could go look and tell you
9   how many pictures I took that day but I'm sure
10  it's more than a thousand in that day.
11  Q   For each shoot?
12  A   Well over a thousand is often the case.
13  Q   And how many shoots would you say you've --
14  A   There is no pattern.
15  Q   Okay. So it's possible that it could be
16  millions of pictures?
17        MS. BAUMGARDNER: Objection.
18  A   I don't know.
19  Q   It's not ten million pictures?
20  A   I don't know. Probably not.
21  Q   Okay. All right. That's progress. It's not
22  -- is it five million pictures?
23  A   I don't know.
24  Q   Is it possible?
25  A   It might be possible.

Page 95

1   Q   Okay. So let's take five million pictures as
2   a possible estimate.
3        MS. BAUMGARDNER:  Objection.
4   Q   Is there any way you can know exactly?
5   A   No. I don't have the records to know.
6   Q   But the figure five million, it's not -- does
7   that sound absurd?
8   A   Not absurd.
9   Q   Now, in these three pictures in Exhibits DL8,
10  9 and 10, the women are not touching their
11  genitals, correct?
12  A   That is correct.
13  Q   But you can see some of the genital area of
14  the women, correct?
15        MS. BAUMGARDNER: Objection.
16  A   No, you can't.
17  Q   Can you see pubic hair?
18  A   Yes.
19  Q   So from the pictures we can see pubic hair but
20  you would say that you cannot see the genital
21  area?
22  A   Yes.
23  Q   And in most of your pictures that would be
24  consistent, that you could see the pubic hair
25  but not the genital areas in most of your nude

Page 96

1   pictures?
2        MS. BAUMGARDNER: Objection.
3   A   Most. Not all.
4   Q   Okay. So in some of your nude pictures you
5   can see the full genital area?
6   A   Yes.
7   Q   And those would be you would consider sexually
8   explicit?
9   A   No.
10  Q   No. Okay. Why would you not consider those
11  sexually explicit?
12  A   I don't think there is anything -- well, I
13  think the entire body is beautiful and that
14  there is no particular area of the body that
15  is more or less erotic than another area.
16  When I compose a photograph I'm looking at the
17  overall composition and the look of the
18  photograph, I'm not concerned about what parts
19  of the model's body are showing or not
20  showing. Not something that goes into the
21  thinking when I produce photographs.
22  Q   Okay. Do you alter the pictures in any way,
23  photo shop the woman's body?
24  A   I do very limited photo shop work. I don't
25  change the bodies of the models.

24  (Pages 93 to 96)

Page 97

1  Q    So what limited photo shop work have you done
2       on the models?
3  A    The same kind of work on the photos that you
4       would do in a chemical darkroom, adjust for
5       exposure and cropping and things like that.
6       But no, I don't go in and change the bodies of
7       the models.
8  Q    You don't alter their appearance?
9  A    No.  I might take a zit out or I might
10      occasionally take a zit or something like that
11      off a model but not much more than that.
12 Q    Okay.  Do you recognize who these models are
13      in these pictures?
14 A    Yes, I do.
15 Q    Are all of them your friends?
16 A    Yes.
17 Q    Do you know their ages at the time that they
18      were shot?
19 A    Not exactly.
20 Q    Okay.  Will you be able to give us a good
21      estimate of their ages?
22 A    I can tell you.
23 Q    Let's look at DL8 first, which is the one that
24      you have in front.
25 A    Okay.  They are in their mid to late 20s, with

Page 98

1       the exception of one model who is in her 30s.
2  Q    And who is the model that is in their 30s?
3  A    The second from the top.
4  Q    Okay.  And you can tell that from your
5       recollection of the models, right?
6  A    Yeah.
7  Q    Not by looking at the picture?
8  A    Right.
9  Q    And let's go to the next one.  Let me see
10      which one you have in front of you.  DL9.
11      This is one single woman on top of a rock
12      naked, correct?
13 A    Yes.
14 Q    Do you know her name?
15 A    Yes, I do.
16 Q    And do you recognize her?
17 A    Yes.
18 Q    And how old was she when she was shot?
19 A    I'm trying to -- I think I misspoke before.  I
20      think this one was not taken on the coast of
21      Maine.
22 Q    Okay.
23 A    I'm not sure.  I'd have to go look.  It could
24      have been taken on the north shore of Lake
25      Superior.

Page 99

1  Q    Lake Superior.  What state?  I'm sorry.
2  A    Minnesota.
3  Q    Minnesota?
4  A    Yeah.  I'm not -- I think -- I think that's
5       where this was taken.
6  Q    And do you know the age?
7  A    Mid 20s.
8  Q    And let's go to the next one, DL10, please.
9            Do you recognize her?
10 A    Yes.
11 Q    Do you know the age at the time that they were
12      shot?
13 A    She's in her mid 20s.
14 Q    By looking at the picture you cannot give me
15      an accurate estimate of the age -- a more
16      accurate estimate of the age?
17      MS. BAUMGARDNER:  Objection.  More
18 accurate than mid 20s.
19      MR. BLADUELL:    Than mid 20s.
20 A    That's the best.  I don't remember their birth
21      dates.
22 Q    Okay.  Just from looking at the picture not
23      from your recollection of them.
24 A    That's hard to separate.  I know this woman so
25      I know how old she is or approximately how old

Page 100

1       she is, so I don't know how I can remove that
2       information and analyze the picture,
3       especially a very poor quality one like that.
4  Q    Sorry.  But if you look at a picture of a nude
5       woman will you be able to tell the exact age
6       of that woman?
7       MS. BAUMGARDNER:  Objection.
8  A    No.
9  Q    Do you consider that these images are subject
10      to Section 2257?
11 A    No.
12 Q    And why are they not subject to 2257?
13 A    There is nothing -- no sexual activity.
14 Q    No sexual intercourse you mean?
15 A    Right.
16      MS. BAUMGARDNER:  Objection.
17 A    Well, sexual activity.
18 Q    Okay.
19 A    I don't understand the statutes that well but
20      there is nothing sexual going on in these
21      pictures.
22 Q    What do you mean by sexual activity?
23 A    There are forms of sexual activity other than
24      intercourse.
25 Q    Yes.  Is masturbation one of them?

25 (Pages 97 to 100)

Page 101

1  A   Yes.
2  Q   Do you consider that these pictures are
3      lascivious exhibition of genitals or pubic
4      area?
5  A   No.  I wouldn't have taken them if they -- if
6      I felt that.
7  Q   I'm sorry.  You said that you -- what year did
8      you take them?
9  A   Two of these were taken this past summer in
10     2012.
11 Q   Which ones, DL?
12 A   10 and 8.
13 Q   This past summer meaning 2012?
14 A   Right.  I'd have to look to know the -- when I
15     made that trip to the north shore of Lake
16     Superior but it was within the last three
17     years.
18 Q   Is that DL8?
19 A   DL9.
20 Q   DL9 is the one that you had done you're not
21     sure?
22 A   Yeah.  Three years maybe ago.  I can't -- I
23     can't remember.
24 Q   So it's older than the other pictures?
25 A   Yes.

Page 102

1  Q   Do you keep 2257 records --
2  A   No, I do not.
3  Q   -- for these pictures?  Do you consider that
4      these images are subject to 2257(a)?
5  A   No.
6  Q   Why don't you consider them subject to
7      2257(a)?
8          MS. BAUMGARDNER:  Objection.
9  A   Well, they don't show any simulated sexual
10     activity.
11 Q   So the statutes have -- 2257, 2257(a) have not
12     prevented you from taking these pictures?
13 A   No, I wouldn't have taken them if I felt they
14     were constrained by the statutes.
15 Q   Okay.  Now, you have produced pictures that
16     you think are covered by 2257(a), correct?
17 A   Yes.
18 Q   But the pictures that you have created that
19     you think are covered by 2257(a) have been
20     less than the ones that you think are not
21     covered by 2257(a), correct?
22 A   I mean I created fewer.
23 Q   Fewer?
24 A   Yes.
25 Q   A lot fewer?

Page 103

1  A   A lot fewer.
2          MR. BLADUELL:    I'm going to mark
3      another exhibit, Exhibit DL11.
4          (Defendant's Exhibit DL11
5          marked for identification.)
6          MR. BLADUELL:    I'm handing a copy to
7      the witness.  I handed a copy to counsel.
8  Q   This is an image titled "You can put an eye
9      out," correct?
10 A   Yes.
11 Q   And this was exhibited in the juried show in
12     Detroit in February of 2009; is that correct?
13 A   Yes.  Well, I'm not sure of the year but that
14     sounds about right.
15 Q   And you produced this image in August of 2008?
16 A   Sounds right.  Again, I'd have to check to be
17     sure of the date.
18 Q   Sounds about right?
19 A   Sounds about right.
20 Q   Where was it published?
21 A   It was published in a book.  I can't
22     remember.  Did I give you a title of that
23     book?  I can't remember the name of the book.
24 Q   Is it "The Figure in Nature"?
25 A   No.  It was a collection of erotic

Page 104

1      photography.
2  Q   Not all produced by you?
3  A   No.  It was -- it was a juried exhibit and
4      book.
5  Q   Did you put this image on your web site?
6  A   I had it on my web site at one time.
7  Q   The davelevingston.com?
8  A   No, it was a different URL at the time.
9  Q   Do you remember that URL?
10 A   It was on blog spot, exposed from the shadows
11     dot blog spot dot com or something like that.
12 Q   Is that now davelevingston.com?
13 A   It's been migrated over to that, yeah.
14 Q   At some point you removed this picture from
15     your web site?
16 A   Yes.
17 Q   This was around the time that 2257(a) was
18     enacted?
19 A   Yes.
20 Q   What was your understanding about what 2257
21     required you to do with respect to the
22     picture?
23 A   Well, I was concerned that -- there was
24     expressed to me that this would be interpreted
25     as sadomasochistic abuse.

26  (Pages 101 to 104)

Page 105

1  Q    And who said that to you?
2         MS. BAUMGARDNER: Objection. I believe
3  that would be privileged, so I'm going to
4  instruct him not to answer.
5         MR. BLADELL:    Okay. Let's get
6  clear for the record, the question was who
7  told you that this could be subject to the
8  statutes and counsel has said --
9         MS. BAUMGARDNER: Okay. Actually I
10 withdraw that objection. You can go ahead and
11 answer that.
12 A    Counsel told me that.
13 Q    Okay. Which counsel?
14 A    This lady right here. (Indicating.)
15 Q    And did she tell you that at -- that would be
16 Ms. Baumgardner, correct?
17 A    Yes.
18 Q    Did she tell you that in August at the time
19 the statute was enacted?
20 A    I don't know when she told me that.
21 Q    Okay. But was it around the time that you --
22 did you rely on that advice to take it out?
23 A    Yes.
24 Q    Off your web site?
25 A    Yes, I did.

Page 106

1  Q    Did you read the statute before taking it out?
2  A    I had read my friend's book at that time so I
3  was going from what he had written in his book
4  which included quotes from the statute.
5  Q    And you came to an understanding from
6  Ms. Baumgardner's advice and from your
7  friend's advice that this would be subject to
8  the statute?
9         MS. BAUMGARDNER: Objection. I'm going
10 to instruct him not to answer that. I think
11 you're encroaching on attorney-client
12 privileged communication I made to him.
13        MR. BLADUELL:    I'm asking about his
14 understanding, not about what you specifically
15 told him.
16        MS. BAUMGARDNER: Based on my advice,
17 so implicit in that is what -- would reveal
18 what my advice to him was.
19        You can answer the question with regard
20 to your friend's book but any conversation or
21 communications we've had -- I've let you ask
22 him, he can identify when he recalled it and
23 that we had it, but any further subject matter
24 regarding our communication is privileged.
25 Q    You can answer the question.

Page 107

1  A    Which question?
2         MS. BAUMGARDNER: I'm instructing you
3  not to answer the question.
4         MR. BLADELL:    Which one, the one
5  about --
6         MS. BAUMGARDNER: Well, I guess it was
7  a two-part question. Why don't you divide it
8  up.
9  Q    Okay. You came to an understanding that this
10 picture was subject to 2257(a)?
11 A    I don't think I would say that.
12 Q    Okay. So you relied on what other people told
13 you to make the -- to remove this picture?
14 You based -- I'm sorry, let me rephrase that.
15        You based your removal of the picture
16 from your web site from what other people told
17 you, correct?
18 A    Yes.
19 Q    Not from your own reading of the statute and
20 determination that this was subject to the
21 statute?
22        MS. BAUMGARDNER: Objection. Go ahead,
23 you can answer that.
24 A    Not from my own understanding.
25 Q    You said that they told you it could be

Page 108

1  interpreted as sadistic or masochistic
2  behavior, correct? That's something you said
3  already; is that accurate?
4  A    Yes.
5  Q    What does sadistic mean to you?
6  A    It means inflicting pain.
7  Q    And what does masochistic mean to you?
8  A    Receiving pain I guess.
9  Q    Does it look from the picture that the model
10 is in pain?
11 A    No.
12 Q    Do you believe that the picture is sadistic
13 behavior, according to your definition?
14        MS. BAUMGARDNER: Objection. We're
15 talking about 2257(a) and you're leaving out
16 an important word of simulated.
17        MR. BLADUELL:    Well, I'm asking him.
18        MS. BAUMGARDNER: Well, you have to be
19 fair.
20        MR. BLADUELL:    You can object to the
21 question.
22        MS. BAUMGARDNER: Well, I'm objecting
23 because I don't think it's a fair question.
24        MR. BLADUELL:    But, counsel, you can
25 object to the question but speaking

27 (Pages 105 to 108)

Page 109

1    objections, you know, they are not allowed
2    under the rules.
3  Q   Go ahead please, sir.
4  A   Could you restate the question, please?
5  Q   Do you believe this picture depicts sadistic
6    behavior?
7  A   No.
8  Q   And were you concerned that you could not
9    comply with the requirements of the statute
10   2257(a) as to this picture and that's the
11   reason that you removed it?
12 A   Yes.
13 Q   And why could you not comply with the statutes
14   as regards to this picture?
15 A   I do not and will not maintain 2257 records.
16   Period.
17 Q   And that's why?
18 A   I'm not willing to be subject to warrantless
19   searches.  I'm not able to be available 20
20   hours a week to allow those searches, and I
21   don't believe I could keep records in the
22   manner that the statute requires.
23 Q   But you do keep model releases for other
24   models who have appeared in nude pictures,
25   correct?

Page 110

1  A   Yes.
2  Q   And it would not be burdensome for you to keep
3    a model release for this model, correct?
4        MS. BAUMGARDNER:  Objection.
5  Q   Would it be burdensome to keep a model release
6    for this model?
7  A   No.
8  Q   Would it be burdensome to keep a photo of her
9    ID?
10 A   No.
11 Q   It would be burdensome to be available 20
12   hours a week for the inspections?
13 A   Certainly.  Yes.
14 Q   And that is because -- and why would that be
15   burdensome?
16 A   I go places.  I'm not home 20 hours a week.
17 Q   So how often do you travel?
18 A   Frequently.
19 Q   Do you travel every week?
20 A   No.
21 Q   Do you travel every month?
22 A   Pretty much, yes.
23 Q   And where do you travel?
24 A   Anywhere I want to go.
25 Q   Okay.  Let's talk about this year.  What trips

Page 111

1    have you taken this year?
2  A   Let's see.  I was in Florida in February.  I
3    was in --
4  Q   For how long?
5  A   For a week.  In South Carolina for a week.
6  Q   When, in February?
7  A   February, March.  I'm trying to think where
8    else have I been.
9  Q   And is this travel connected to photography?
10 A   Sometimes.
11 Q   But not necessarily?
12 A   Not necessarily.
13 Q   Some of this travel would be for vacation --
14 A   Vacation.
15 Q   -- purposes?  Okay.  So you can go on with
16   other travels during this year.
17 A   I'd have to look at my calendar.  I travel
18   frequently.
19 Q   Okay.  Let's say last year, 2012.
20 A   You want me to go through everywhere I went
21   last year?
22 Q   Yes.  If you remember.
23 A   I can't from memory.
24 Q   You don't remember.  I remember.
25 A   I was in Maine for an extended week.  I've

Page 112

1    been to Vermont several times.  We have a 98
2    year old mother-in-law that is in a nursing
3    home in Vermont.  We go up there every other
4    month or so.  I'm trying to think where else I
5    went in the last year.  I do this a lot, and
6    without looking at my calendar I can't really
7    answer the question.
8  Q   Do you remember now for work where you
9    traveled last year?
10 A   Well, Maine was the main trip last year.
11 Q   And this was in what month?
12 A   I think it was July.
13 Q   July of 2012?
14 A   Right.
15 Q   And how long were you there?
16 A   Over a week.
17 Q   Two weeks?
18 A   Well, I don't think it was quite two weeks.
19 Q   A week and a half?
20 A   Yeah.  I drive on these trips so there is
21   travel time.
22 Q   Any other work related to photography that you
23   remember from last year?
24 A   I'm sure there was some but I can't remember.
25 Q   Probably one more?

28  (Pages 109 to 112)

Page 113

1   A   Several more.
2   Q   Several, like five more?
3   A   Maybe at the most.
4   Q   Where are the places?
5   A   I can't remember.  I really -- I'd have to
6       look at my calendar.  I do this all the time.
7   Q   So do you keep a calendar of your travels for
8       last year?
9   A   Well, I keep a personal calendar that often
10      has notes that would help me remember where I
11      was when.
12          MR. BLADUELL:   I'm going to request
13      production of that calendar just to -- just
14      note the answer to my question about the
15      travels that you've taken during the last
16      year.  I believe they are relevant to us.
17          MS. BAUMGARDNER:  You make the request
18      to me.
19          MR. BLADUELL:   Right.  I'll make the
20      request to counsel.
21  Q   This photograph in DL11, Mr. Levingston, was
22      exhibited in the Detroit Dirty Show.  Did I
23      get that correct?
24  A   Right.  That's close to correct.  Yeah.
25  Q   Does it have a different name?

Page 114

1   A   It's just Dirty Show.  The Dirty Show.
2   Q   That takes place in Detroit?
3   A   That takes place in Detroit.
4   Q   Is this something that's done every year?
5   A   Sometimes twice a year.
6   Q   And how often do you go to the show?
7   A   I try to go every year.  I don't always make
8       it.
9   Q   Okay.  Did you go there this year?
10  A   Yes, I did.
11  Q   And when was that?
12  A   In February.
13  Q   Okay.
14  A   That's one of the trips.
15  Q   I'm sorry?
16  A   That's one of the trips.
17  Q   One of the trips.  Okay.  Making progress.
18          Did you exhibit work at The Dirty Show
19      this year?
20  A   Yes, I did.
21  Q   And what did you exhibit?
22  A   I think I had three photographs in the main
23      show.
24  Q   And are these photographs sexually explicit?
25  A   No.

Page 115

1   Q   Are these photographs nude?
2   A   Yes.
3   Q   Would these photographs resemble Exhibits DL8,
4       DL9 and DL10?
5   A   Yes.
6   Q   Do you have sexually explicit material that
7       you wanted to exhibit in The Dirty Show that
8       you didn't?
9   A   Not this year.
10  Q   Okay.  Last year?
11  A   No.  I haven't been doing anything that would
12      fall under 2257(a) since it took affect.
13  Q   Now, besides this picture, DL11, you have
14      produced other depictions that you think --
15      you would consider could be subject to the
16      statutes, to 2257(a), correct?
17  A   Yes.
18          MR. BLADUELL:   I'm going to mark as
19      Exhibit DL12 a list of photographs, or it's a
20      list -- it's a list of birth dates and other
21      dates.  I'm providing also a copy to counsel.
22          (Defendant's Exhibit Dl12
23          marked for identification.)
24  Q   I provided the exhibit to Mr. Levingston.
25      Now, do you recognize this list,

Page 116

1       Mr. Levingston?
2   A   Yes, I do.
3   Q   And could you describe what it is?
4   A   It's a list of basically models with their
5       date of birth and photos in which they appear
6       but would have fallen under 2257(a) had they
7       been produced after that.
8   Q   When did you compile this list?
9   A   A week or so ago.
10  Q   Now, the list identifies the date of birth for
11      18 models; is that correct?
12  A   I think that's right.  Well, there is only 17
13      here.  There is the eighteenth one, yes.
14  Q   If you look at number two on the list of
15      DL12.
16  A   Yes.
17  Q   3-16-09 is the date of the shoot, correct?
18  A   Yes.
19  Q   And 50 pictures were the total amount of
20      pictures taken in that photo shot?
21  A   No.
22  Q   Okay.  What would 50 photos mean?
23  A   That means that out of that shoot there were
24      50 that, looking at them now I felt could be
25      considered to be under the statute.  And

29  (Pages 113 to 116)

Page 117

1    that's just my conservative opinion.
2  Q   Okay.  Would that also be the case for all the
3    other ones?
4  A   It's either the number of pictures in the
5    shoot that I think might fall under the
6    statute or the total number of pictures taken
7    in the shoot if the majority of the pictures
8    or all the pictures fell into that category.
9  Q   Now, when we go to Florida, 2-09, do you see
10    that?
11  A   Yes.
12  Q   What does that mean?
13  A   That means the pictures were taken in February
14    of '09 in Florida.  That's how they are filed
15    in my computer.  As I mentioned earlier,
16    sometimes they are filed by the location.
17  Q   And what are 491 to 534?
18  A   Those are the file numbers of the photos that
19    I considered might fall under the statute.
20  Q   So is it accurate to say that for every shoot
21    that you take you have a file number for that?
22  A   Well, those are the numbers that the camera
23    assigns to each individual picture as it's
24    taken.
25  Q   Okay.  And are those numbers recorded in the

Page 118

1    pictures that you keep?
2  A   Yes.
3  Q   So the number of pictures would be, you know,
4    if we subtract 534 from 491, that would be the
5    number of pictures --
6  A   Yes.
7  Q   -- that you think would be sexually explicit?
8  A   No.  Simulated.
9  Q   Simulated.  I'm sorry.  Simulated.
10    Now, within the 2005, 2009 framework
11    how many models have you photographed nude?
12  A   I can't say.
13  Q   Okay.
14  A   A lot.
15  Q   It's been a lot more than 18?
16  A   Yes.
17  Q   100, is that fair?
18  A   I don't know if there were a hundred models
19    but there were certainly more than 100 photo
20    shoots.
21  Q   So not 100 models, but 50 models?
22  A   It's hard for me -- I can't guess at that.  I
23    work with the same models over and over
24    again.  When I have a good model I photograph
25    her regularly.  So I might have 20 shoots with

Page 119

1    one model in that time period.
2  Q   Okay.  But if we can try to get around a
3    number of models in this time period --
4      MS. BAUMGARDNER:  Objection.
5  Q   -- would that be 50 or lower than 50?
6  A   I can't even guess.  I don't know.
7  Q   Is there a way for you to find out?
8  A   I would have to go through the files for that
9    period, which took me four days to compile
10    this list, and I'm not interested in doing
11    that again.
12  Q   Well, if you don't have a good recollection is
13    it your opinion now that you would not be able
14    to tell me an accurate number?
15  A   That's right.
16  Q   But looking at the list, would that be able --
17    you would be able to provide a number?
18      MS. BAUMGARDNER:  Objection.
19  Q   Looking at your files you would be able to
20    provide a number?
21  A   It's possible.
22  Q   Okay.
23      MR. BLADUELL:    I'm going to have to
24    request, counsel, the number of models during
25    this time period.

Page 120

1      MS. BAUMGARDNER:  I'm going to object
2    to that request, but you can make it.  It's
3    completely irrelevant.
4      MR. BLADUELL:    I disagree on that.
5  Q   But this list captures all of your sexually
6    explicit material from 2005 through 2009,
7    simulated?
8  A   Simulated.
9  Q   Okay.  You didn't produce sexually explicit --
10    actual sexually explicit material?
11  A   No, never have.
12  Q   Now, how did you determine that these were the
13    only models appearing in simulated sexually
14    explicit material from 2005 to 2009?
15  A   I looked at every fricking picture.  That's
16    why it took four days.
17  Q   So, I mean, you've done this -- you know,
18    you've done this recently, within the past
19    week, right?
20  A   What was it?  A week and a half ago, something
21    like that.
22  Q   And you --
23  A   It took a big chunk out of my time in recent
24    time.
25  Q   And do you remember how many models there

FINCUN-MANCINI -- THE COURT REPORTERS
(216)696-2272

Page 121

1  were --
2  A   I didn't count.
3  Q   -- during the time period?  Okay.
4  A   I was only looking for models that would fit
5  this category.
6  Q   Okay.
7  A   Or shoots that would fit this category.
8  Q   You don't segregate your photographs by
9  categories of simulated sexually explicit and
10  nude?
11  A   No.
12  Q   And you said that you invested four days
13  looking at this?
14  A   Yes.
15  Q   Four full days?
16  A   Well --
17  Q   A couple of hours every day?
18  A   No, major -- the entire working time of four
19  days.
20  Q   So eight hours?
21  A   Well, I'm not that hard a worker.  I don't
22  think anybody works that hard.  I was -- I got
23  up in the morning, I went to the studio.  I
24  spent the day going through these files for
25  four days.  I went home at the end.

Page 122

1  Q   Approximately five hours a day?
2  A   Well, I was at the studio close to eight hours
3  each day, but, you know, we do go to the
4  bathroom now and then.
5  Q   And do you look at -- were these pictures in
6  your computer?
7  A   Yes.
8  Q   Did you go through the IDs that you had of
9  these models?
10  A   Yes, I did, to come up with the dates of birth
11  and all of that.
12  Q   And so did you use the IDs for that or the
13  model releases?
14  A   Both.
15  Q   Both.  Were there pictures depicting simulated
16  sexually explicit material for which you
17  couldn't find the IDs?
18  A   Yes, I think there was one.
19  Q   And which one?  Is it listed here?
20  A   No.  I don't remember which one.
21  Q   So there could be another -- a nineteenth?
22  A   No.
23  Q   It's here?
24  A   Yes.
25  Q   And for that particular one, how did you

Page 123

1  determine the date of birth?
2  A   The model release.
3  Q   Through the model release.  Okay.  And that's
4  something that the model's report themselves,
5  right?
6  A   Yes.
7  Q   And that's the only one that you say you
8  couldn't find the ID?
9  A   Right.
10  Q   For all the other ones you could find the ID?
11  A   I think, if I remember correctly that's right.
12      MR. BLADUELL:   Okay.  Counsel, we
13  don't have the IDs for the ones 11 in this
14  list, 12, 14, 16 and 17.
15      MS. BAUMGARDNER:  Well, as I recall
16  before the deposition began I told you I was
17  going to give you a package of discovery.  I
18  believe that will be included in that package.
19      MR. BLADUELL:    Well, for the record,
20  I just want to state that we have not received
21  11, 12, 14, 16 and 17, so I'm going to check
22  in that packet that counsel is going to
23  provide me.  If they are not there I would
24  request production of them at a later time.
25  Q   Now, if we go to your discovery responses,

Page 124

1  this DL -- maybe not.  Let's see.  Do I have
2  the second one?  No, I don't think you do.
3  Mark it as an exhibit.
4  A   Is this a good spot for a break?
5  Q   Sure.  You want to take five minutes.
6          (Short recess.)
7  (Defendant's Exhibit DL13
8  marked for identification.)
9  Q   We're going to mark DL13 Plaintiff Dave
10  Levingston's answer to the defendant's second
11  set of interrogatories.  I'm handing a copy to
12  Mr. Levingston.
13      If we go to Interrogatory No. 15,
14  Mr. Levingston, I'll tell you the page in a
15  moment.
16  A   I found it.
17  Q   It's page I guess 4.  Can you please just read
18  it to yourself and read the answer?
19  A   Okay.
20  Q   The interrogatory asks for you to identify
21  individuals appearing in sexually explicit
22  depictions, correct?
23  A   Yes.
24  Q   And you provided this information on the list
25  marked as Exhibit DL12?

31 (Pages 121 to 124)

Page 125

1  A   Okay.
2  Q   Is that correct?
3  A   Yes.
4        MS. BAUMGARDNER:  For --
5        MR. BLADUELL:    Simulated --
6        MS. BAUMGARDNER:  And for the time
7   period specified.
8        MR. BLADUELL:    For 2005 through
9   2009, correct.
10 A   Yes.
11 Q   But you said in your Interrogatory 15, "I have
12  not maintained records or any system that
13  would allow me to identify which of the photos
14  I took or which of the photo shoots I
15  conducted would yield the information asked
16  for by this interrogatory," correct?
17 A   Yes, since 1978, which is what you asked for.
18 Q   But at that time were you able to figure out
19  the answer from 2005 to 2009?
20 A   Yes.
21 Q   And why didn't you do that at that time?
22 A   Because that's not what you asked for.
23 Q   Well, I asked for -- we asked for since '78?
24 A   Right.
25 Q   So --

Page 126

1  A   That's very different.
2  Q   Well, 2005 to 2009 falls within '78, correct,
3   since 1978, correct?
4  A   Yes.
5  Q   So at the time could you have provided it from
6   2005 to 2009?
7  A   2005 to 2009.
8  Q   (Nods head.)
9  A   Well, with enough work, yes, I could have
10  found those records.
11        MS. BAUMGARDNER:  Well, and also let
12  the record reflect what this interrogatory has
13  asked for in comparison to what Mr. Levingston
14  has produced which is not --
15 Q   Well, the interrogatory asks for the birth
16  dates, right?
17 A   Name and aliases.
18 Q   The interrogatory asks for birth dates,
19  correct?
20 A   Yes.
21 Q   And if you were able to provide that answer at
22  that time why didn't you do it?
23 A   That's not what you asked for.
24        MS. BAUMGARDNER:  Objection.  And part
25  of it was in consultation with counsel who

Page 127

1   created this.  I mean, we had to come to an
2   agreement on production and answering this.
3   So I don't really think it's fair to ask
4   Mr. Levingston these questions.
5  Q   Can you -- I understand the objection but it's
6   not an instruction not to answer so you can
7   answer.
8        MS. BAUMGARDNER:  If you can answer, go
9   ahead.
10 A   I'm not sure what you're asking.  What was the
11  question?
12 Q   At the time that we made the interrogatory you
13  could have provide the birth dates of these
14  individuals, correct; the ones that you
15  provided on the list of DL12?
16 A   Yes.
17 Q   And you didn't do so?
18 A   Because that's not what you asked for.
19 Q   What do you understand that we asked for?
20 A   You asked for name --
21 A   Well, I asked for the birth dates, correct?
22 A   You asked for a name, aliases and birth date.
23 Q   Well, but you could have provided the birth
24  dates, right?
25 A   Not since 1978.

Page 128

1  Q   But since 2005 to 2009, correct?
2  A   Yes, and we did.
3  Q   Last week?
4  A   Yes.
5  Q   And when was this interrogatory made?
6  A   You didn't ask for that date range until right
7   before I provided it.
8  Q   Well, but the date range was within the date
9   range that appears on the interrogatory,
10  correct?
11 A   That's true.
12        MS. BAUMGARDNER:  You know, you can
13  keep asking the witness, but again, some of
14  that determination was made by counsel.
15 Q   If we go to Interrogatory No. 13, please, it's
16  on page --
17 A   One.
18 Q   Thank you.  Two.  Right, one and the response
19  is on Page 2.
20 A   Okay.
21 Q   If we go to number 2, the answer.
22        MS. BAUMGARDNER:  You mean Page 2?
23        MR. BLADUELL:    Yeah, Page 2.
24 Q   I'm going to read it.  It's in the middle of
25  the paragraph on your answer, "Prior to

32  (Pages 125 to 128)

Page 129

1   enactment of 18 U.S.C. 2257(a), in the course
2   of photographing nudes I took photographs that
3   I believe would have been subject to 18 U.S.C.
4   Section 2257(a).  Those photos constitute a
5   portion of thousands of photos that I took
6   during each photo shoot."
7        Did I read that accurately,
8   Mr. Levingston?
9   A   Yes.
10  Q   And the photos that you're referring to in
11  Interrogatory No. 13 are the ones referenced
12  in the list that you have in front of you
13  marked as Exhibit DL12, correct?
14  A   Yes.
15       MS. BAUMGARDNER:  Objection.
16  Q   Are there any other photos or models that
17  you're referencing in your answer to
18  Interrogatory 13 that are not included on the
19  list in the DL12?
20  A   The list only covers the date range that was
21  specified.
22  Q   So for the 2005 to 2009 time frame all of the
23  models doing sexually explicit material that
24  you would consider sexually explicit from the
25  statutes are identified on the list?

Page 130

1   A   Simulated.
2   Q   Simulated?
3   A   Yes.
4   Q   Okay.  Thank you.
5        And when you say those photos in
6   Interrogatory No. 13 you're referring to the
7   ones in DL12, correct?
8        MS. BAUMGARDNER:  Objection.
9   Q   For the period of 2005 to 2009 --
10  A   Yes.
11  Q   -- constitute a portion of the thousands of
12  photos that I took during each photo shoot.
13  And what portion did they constitute from 2005
14  to 2009?
15  A   I don't know.
16  Q   Is it 50 percent?
17  A   No.
18  Q   Less?
19  A   Yes.
20  Q   30 percent?
21  A   No.
22  Q   Less?
23  A   Yes.
24  Q   Okay.  Ten percent?
25  A   I doubt that it reaches ten percent.

Page 131

1   Q   Okay.  Thank you.
2        And when you first produced the list,
3   DL12, correct, you listed 17 models; do you
4   remember that?
5   A   Yes.
6   Q   And then there was one that you missed?
7   A   Yes.
8   Q   That you provided the next day?
9   A   Yes.
10  Q   And how did you miss that?
11  A   As I recall, it was somebody who was in a
12  shoot with several models and I missed adding
13  the -- it was just a clerical error as I was
14  counting.
15       MR. BLADUELL:     I'm going to mark
16  another exhibit, DL14.
17  (Defendant's Exhibit DL14
18  marked for identification.)
19  Q   Mr. Levingston, do you recognize that picture?
20  A   Yes, I do.
21  Q   And is that one of the pictures referenced in
22  your list of DL -- marked as Exhibit DL12?
23  A   Yes.
24  Q   And this picture -- strike that.
25       Why do you think that this picture is

Page 132

1   subject to 2257(a)?
2   A   Well, I'm not sure that it is but it could be
3   interpreted that way because the model's
4   genitals are visible.
5   Q   Okay.  So the difference between this picture
6   and the ones that you've provided before --
7   the ones that are marked as exhibits DL8 to
8   DL10 is that the genital area is more exposed?
9   A   Yes.
10  Q   And why do you consider that simulated?
11  A   I don't.
12  Q   But why do you consider that they could be
13  interpreted that way?
14  A   It's because of the ambiguity of lascivious
15  display.  I don't know what that means but
16  there they are so.
17  Q   But you don't think it means the other
18  pictures, correct?
19  A   Yes, I do.
20  Q   But this one does then?
21  A   I think it could be interpreted by someone to
22  fall under the statute.
23  Q   And is the reason just because it's more of
24  the genital area than the other ones?
25  A   Yes.

33  (Pages 129 to 132)

Page 133

1  Q    After 2009 have you produced other images that
2       you think are subject to 2257(a)?
3  A    No.  Well, wait.  There was one that in
4       retrospect looking back I thought well
5       somebody could think this is, so I included it
6       on the list.
7  Q    Is that number one on DL12?
8  A    Yes.
9  Q    So is that the only model who has appeared
10      depicted in simulated sexually explicit
11      conduct after March 18, 2009?
12 A    Yes.
13          MS. BAUMGARDNER:  Which model, number
14      one?
15          MR. BLADUELL:    Number one.
16 Q    All of the other ones were made before March
17      18, 2009?
18 A    Right.
19 Q    Now, is it your understanding that for the
20      number -- for number one, is it your
21      understanding that you have to keep 2257
22      records for that model?
23 A    No.
24 Q    And why do you think that?
25 A    Nothing has ever been done with those

Page 134

1       photographs.  It was a failed photo shoot.
2       That's why I didn't remember it even.  And I
3       didn't even discover it until going through
4       and looking for this in specific, and I found
5       this shoot and I looked at the pictures and I
6       thought well, maybe somebody would think this
7       would fall under it, so I included it on the
8       list.
9  Q    So the picture number one in DL12 has not been
10      published --
11 A    No.
12 Q    -- anywhere?
13 A    Or seen by anyone.
14 Q    Or seen by anyone?
15 A    Right.
16 Q    How about the other pictures in this -- in
17      DL12, have they been published?
18 A    Some of them have been.  Well, I don't know
19      that anything has been published without doing
20      a check for that, but -- and I don't really
21      have records that I can check, but some of
22      them have been exhibited in galleries.
23 Q    And web sites?
24 A    Yes.
25 Q    Have you sold any of these?

Page 135

1  A    I don't know.
2  Q    You don't recall right now?
3  A    I don't recall.  I don't have any records
4       either.
5  Q    You don't have records of when you sell?
6  A    Right.
7  Q    But was your primary intent when you took
8       these photographs to sell them?
9  A    No.
10 Q    Or to trade them --
11 A    No.
12 Q    -- for other photographs?
13 A    No.
14 Q    No?
15 A    No.
16 Q    Your primary purpose was just to take them to
17      express a feeling or?
18 A    To create art.
19 Q    To create art.
20          MR. BLADUELL:    I'm going to mark
21      another exhibit, DL15, and I'm going to
22      provide a copy to Mr. Levingston and a copy to
23      Ms. Baumgardner.
24          (Defendant's Exhibit DL15
25          marked for identification.)

Page 136

1  Q    Mr. Levingston, can you describe what DL15 is?
2  A    It's my profile page from the web site Model
3       Mayhem.
4  Q    Can you describe what Model Mayhem is?
5  A    It's a site where models and photographers
6       show their work and a place for models to find
7       work and photographers to find models.
8  Q    How often have you used Model Mayhem to
9       recruit -- find models?
10 A    I don't know.  I probably would find maybe two
11      or three models a year on the site.
12 Q    When did you write this profile?
13 A    Maybe -- well, I've edited the profile within
14      the past year.
15 Q    Okay.  Do you see that the document has some
16      dates at the right?
17 A    This here?  (Indicating.)
18 Q    I'm sorry, at the left top that says info in
19      that column, last activity?
20 A    Oh, last activity, yes.
21 Q    March 21, 2013?
22 A    Uh-huh.
23 Q    So that's the last time you logged into it?
24 A    No.
25 Q    No?

34  (Pages 133 to 136)

Page 137

1  A    No.  That records whenever you log into the
2       site.  I log into the site every day.
3  Q    So is that the last time that you logged in by
4       the date that appears on the lower level of
5       the document?
6  A    The last time I logged in was yesterday.
7  Q    Okay.
8  A    I log in every day.
9  Q    Did you change anything?
10 A    No.
11 Q    So if I go to your profile right now does it
12      say the same thing at the beginning?
13 A    I believe so, yes.
14 Q    Okay.  You say in this document I'm no longer
15      using models for my primary photo work,
16      correct?
17 A    Yes.
18 Q    So why have you decided not to use models for
19      your work?
20 A    As I mentioned earlier I have two new projects
21      that are the primary emphasis of my work right
22      now.  But another reason for this, this web
23      site Model Mayhem is problematic in that you
24      get lots of emails from models.  And I try
25      keep models that I don't want to talk to from

Page 138

1       emailing me.  So that's one reason for that
2       first line.
3  Q    And is it accurate what is in the document,
4       that the bulk of my new work does not involve
5       new models?
6  A    Yes.
7  Q    And the reason for that is that the projects
8       that you're interested in doing, the ones that
9       you described before about journalism and the
10      funerals, do not involve depictions of models?
11 A    It's journalism and alternative process
12      photographers.
13 Q    I'm sorry.  Thank you for correcting me.
14 A    Yes.  Nobody gets naked in those pictures.
15 Q    Did you decide to shift attention to those
16      projects because it was burdensome to do nude
17      models?
18 A    No.
19 Q    Let's go back to DL3.  It's the answers to
20      your first set of interrogatories.  And if we
21      go to the third -- Interrogatory No. 10, it
22      Page 5.  I'm sorry, Page 6.  The last
23      paragraph here on Page 6 of DL3, can you just
24      read that for a second and let me know when
25      you're finished please.

Page 139

1  A    Okay.
2  Q    It says that you were approached by a former
3       prostitute while doing a project that
4       contained depictions that could fall under
5       2257(a), correct?
6  A    Yes.
7  Q    Well, in light of your desire to move away
8       from model work, is this a project that you
9       still want to do?
10 A    This is not a model project, this is a
11      documentary project, so yes.
12 Q    You still want to do this?
13 A    Yes.
14 Q    When were you approached by this former
15      prostitute?
16 A    Within the past year.
17 Q    2012?
18 A    Yes.
19 Q    And where were you approached by this former
20      -- by this person?
21 A    In my studio.
22 Q    She came to your studio?
23 A    Yes.
24 Q    Is this a person that you knew before you met
25      her?

Page 140

1  A    Yes.  No, I didn't know her before I met her.
2  Q    Okay.
3  A    But yes, I've known her --
4  Q    Did you know her before she came to your
5       studio.
6  A    I've known her for some time, yes.
7  Q    Is she your friend?
8  A    Yes.
9  Q    Is she also a model?
10 A    Yes.
11 Q    So after she was a prostitute she became a
12      model?
13 A    No.
14 Q    She was a model who became a prostitute?
15 A    Yes.
16 Q    Have you had work with her as a model before
17      she became a prostitute?
18 A    Yes.
19 Q    Does that involve nude work?
20 A    Yes.
21 Q    Do you have any records documenting this
22      approach by this person?
23 A    No.  It was just a conversation.
24 Q    And how long did the conversation last?
25 A    I don't know.  We were talking for an hour or

35 (Pages 137 to 140)

Page 141

1    two probably.
2  Q   Okay.  What is the age of this person?
3  A   I don't know.  I think she just turned 30.
4  Q   And have you published pictures of this
5    person, nude pictures of this person?
6  A   I've exhibited some.
7  Q   And can you describe more in detail what you
8    discussed about this project with this person?
9  A   Well, I guess so.  She knows a number of
10   former prostitutes and she is an author now
11   and is interested in doing a book about her
12   experiences and the impact of that part of her
13   life on her later life, and we discussed the
14   possibility of making a book with photographs.
15 Q   And you discussed that with her for an hour?
16 A   More than an hour.
17 Q   An hour, an hour and a half?
18 A   I don't know, I wasn't watching the clock.  We
19   talked.
20 Q   Approximately an hour and a half?
21 A   I don't know.
22       MS. BAUMGARDNER:  Objection.
23 A   I don't know.  I didn't -- I didn't keep
24   track.
25 Q   Is it possible that it was more than two

Page 142

1    hours?
2  A   It's possible.  And there has been more than
3    one conversation.
4  Q   Okay.  So subsequent conversations, can you
5    describe them?
6  A   Just?
7  Q   The number of times.
8  A   No, I don't know.
9  Q   Is it more than ten conversations?
10 A   No.
11 Q   Approximately five?
12 A   Maybe.  In that neighborhood
13 Q   Maybe less than five?
14 A   Approximately five.
15 Q   Okay.  And how have the conversations evolved
16   in relation to this project?
17 A   We haven't gone very far with it.  She's
18   finishing up a book now so this is something
19   for down the road once we get this law
20   overturned.
21 Q   Do you have any concrete plans to take
22   pictures associated with this book?
23 A   No.
24 Q   Is taking pictures necessary for the book that
25   she's writing?

Page 143

1       MS. BAUMGARDNER:  Objection.
2  A   The book can take many forms.  That's one form
3    that it could take.  It's in the conceptual
4    stage so it's hard to say.
5  Q   You don't know, haven't contacted a publisher
6    about this book?
7  A   No.
8  Q   Haven't got any advance?
9  A   No.
10 Q   You haven't met any of the other former
11   prostitutes that would be involved with this
12   work?
13 A   No.  This is a project I would not pursue
14   while this law is in force so I have not
15   pursued it.
16 Q   Now, you said in your answer to Interrogatory
17   10 that this project would involve depictions
18   of the scars of the former prostitutes,
19   correct?
20 A   That is a possible thing that could be
21   included.  This is all at the conceptual stage
22   now so I don't know what the photographs would
23   include.
24 Q   Would the depictions include their faces?
25 A   That again would depend on the situation and

Page 144

1    how the project evolves.  Certainly it
2    wouldn't without the consent of the person
3    involved.
4  Q   Well, you say here that, "Perhaps could show
5    the scars or other physical effects of the
6    work that the women did," correct?
7  A   Yes.  That's a possibility.
8  Q   Would you think that those pictures would be
9    sexually explicit?
10 A   They could be interpreted as lascivious
11   display.  It's possible.
12 Q   And by lascivious display you mean?
13 A   The genitals might be in the picture or
14   something.
15 Q   Would it be like a close up of the genital
16   area?
17 A   You're asking for specifics on something that
18   is nowhere near specific at this point.
19 Q   So there is really no way you can know right
20   now if the pictures would be subject to the
21   statutes?
22       MS. BAUMGARDNER:  Objection.
23 A   Well, it's way too early to know.
24 Q   You haven't -- you have not fully
25   conceptualized what the pictures would entail,

36  (Pages 141 to 144)

Page 145

1   correct?
2   A   Correct.  It's certainly possible to believe
3       that they could include things that would fall
4       under 2257(a).
5   Q   And it's possible that they could not be
6       subject to the statutes?
7   A   It's possible.
8   Q   Would you publish the names of the former
9       prostitutes in the book?
10  A   I don't know.  Probably not.
11  Q   Now, you said that you -- the recordkeeping
12      requirements of the -- in your answer to
13      Interrogatory No. 10 you said that the
14      recordkeeping requirements of the statute
15      would compromise the identities of the
16      subjects, correct?
17  A   Yes.
18  Q   And the recordkeeping requirements would
19      require you to take a photo of their -- or to
20      make a copy of their ID, correct?
21  A   I believe so, yes.
22  Q   And why would that -- but you don't need to
23      publish that in the book, correct?
24  A   I believe that's right.
25  Q   And if you don't publish the information in

Page 146

1       the book how would it compromise the identity
2       of the subjects?
3   A   It would be revealed to any inspector who
4       inspected the records.
5   Q   If no inspector inspected the records then how
6       would that compromise the identity of the
7       individuals?
8   A   Well, it could make the individual reluctant
9       to participate just by having to provide their
10      ID.
11  Q   That's not the question.  The question is how
12      they would compromise the identity, not if
13      they are reluctant.  So how would they
14      compromise the identity of the individual if
15      there is no inspection of records?
16  A   It would compromise the identity of the
17      individual because I would know their name.
18  Q   So other than you would anyone necessarily
19      have that information?
20  A   Not necessarily, but possibly.
21  Q   How would they obtain that information?
22  A   Through my records.
23  Q   And would you provide that to other people?
24  A   We're way beyond -- we're way into speculation
25      here but it's possible that someone could get

Page 147

1       access to my records and thereby --
2   Q   But you would not willingly share that with
3       other people, correct?
4   A   That's true.
5   Q   So what you're saying is it's possible that
6       someone can access the records without your
7       consent?
8   A   Yes.
9   Q   Have people accessed records in your studio
10      without your consent?
11  A   No.
12  Q   Do you think it's likely that people would
13      access records in your studio without your
14      consent?
15  A   No.
16  Q   Have you contacted an attorney to advise you
17      on how to publish this book?
18  A   No.
19  Q   Or about how to comply with the 2257 in
20      relation to the book?
21  A   No.
22  Q   Do you have plans to talk to this individual
23      in the near future to discuss this book?
24  A   No specific plans at this time.
25  Q   Do you anticipate making plans?

Page 148

1   A   Yes.
2   Q   When do you think you're going to talk to this
3       person again?
4   A   I have no idea.
5   Q   You don't have it in your calendar?
6   A   Right.
7   Q   Are there any other projects like the one you
8       described in Interrogatory No. 10 involving
9       depictions of sexually explicit material or
10      simulated sexually explicit material that you
11      want to do but you wouldn't -- you've decided
12      that you would not do because of the statutes?
13  A   Nothing specific.
14  Q   When you say nothing specific, is there -- do
15      you have an idea in your mind of a project
16      that you would like to do?
17  A   Not at this time.
18  Q   Let's go back to Interrogatory No. 5, please.
19      It's on Page 3.  It says in this second
20      paragraph, Mr. Levingston, "I have ceased
21      producing any erotic work that might arguably
22      fall under the statute because I am unable to
23      be constantly available to allow inspection of
24      the records as required by the statutes and
25      therefore do not want to risk prosecution for

37 (Pages 145 to 148)

Page 149

1    violating the statutes, nor am I willing to
2    waive my Fourth Amendment rights to allow such
3    inspections."  Is that an accurate reading?
4    A    Yes.
5    Q    By erotic work in this sentence do you mean
6    nudes or --
7    A    I mean work that would fall under 2257(a).
8    Q    So you have not ceased producing nude work
9    because of this statute?
10   A    No.
11   Q    Correct?  Is that a yes?
12   A    I have not ceased producing nude work.
13   Q    Okay.
14   A    Yes.
15   Q    Now, do you keep your records in your studio?
16   A    Yes.
17   Q    And where is that studio?
18   A    In Dayton, Ohio.
19   Q    And how far is that from your house?
20   A    About 25 miles.
21   Q    Are there other people in the studio?
22   A    Yes.
23   Q    And who are these people?
24   A    I share the studio with two other
25   photographers.

Page 150

1    Q    Are these photographers your friends?
2    A    Acquaintances.
3    Q    So not really friends?
4    A    Right.
5    Q    How long have you known them for?
6    A    One of them for about five years, the other
7    one for less than a year.
8    Q    Have they been to your house?
9    A    No.
10   Q    Have you been to their house?
11   A    No.  Well, one of them I've been to his house,
12   yes.
13   Q    In a social setting?
14   A    Not for a party or anything, just stopping by.
15   Q    Was it work related or --
16   A    Yes.  Yeah.
17   Q    Is there a secretary in the studio?
18   A    No.
19   Q    When you travel for work do they travel with
20   you?
21   A    They?
22   Q    The photographers.
23   A    No.
24   Q    So sometimes when you travel these
25   photographers stay in the studio?

Page 151

1    A    Yes.
2    Q    Are there sometimes that you all travel at the
3    same time?
4    A    Not together.
5    Q    What is the nature of their work, the other
6    two photographers in your studio?
7    A    One of them does nude work, the other does
8    commercial work.
9    Q    Do they travel often for their work?
10   A    The one that does nude work does.
11   Q    And the other one doesn't?
12   A    Right.
13   Q    Does the other photographer that does nudes,
14   does he travel more than you?
15   A    No, I'd say I travel more than him.
16   Q    So when you're traveling could they serve as
17   custodian of the records?
18        MS. BAUMGARDNER:        Objection.
19   A    No.
20   Q    Could they open the door of the studio to an
21   inspector?
22   A    Yes.
23   Q    But your records would be in your computer,
24   right?
25   A    I don't keep any records.

Page 152

1    Q    Any pictures -- well, you keep IDs, right, of
2    the models?
3    A    Yes.
4    Q    And model releases?
5    A    Yes.
6    Q    In paper form?
7    A    The releases are in paper form.
8    Q    And those releases are in a cabinet?
9    A    In a desk drawer.
10   Q    Desk drawer.  And is that drawer locked?
11   A    No.
12   Q    Okay.  Do you feel it's likely that you will
13   be prosecuted under the statutes?
14        MS. BAUMGARDNER:  Objection.
15   A    I certainly hope not.
16   Q    But you don't think it's likely?
17        MS. BAUMGARDNER:  Objection.
18   A    I hope not.  I think the statute is so vague
19   that anyone who takes a nude photograph could
20   be prosecuted under it.
21   Q    Do you know any other photographers who have
22   photographed nudes without being inspected?
23   A    No.
24   Q    Do you know any of the other photographers who
25   do nudes who have been prosecuted?

38  (Pages 149 to 152)

Page 177

1    them sign model releases that include
2    statement of their age"?
3  A    Yes.
4  Q    When you say that you've never worked with
5    models under the age of 18, does that apply to
6    your -- are you referring to your nude work?
7  A    Yes.
8  Q    Not only your sexually explicit -- simulated
9    sexually explicit work?
10 A    Yes.
11 Q    If we go to Interrogatory No. 10, if we go to
12   the third paragraph, the last sentence, it
13   says, "Yet none of my work depicts persons who
14   could be confused as children."
15 A    Yes.
16 Q    When you say none of my work, does that
17   include your nudes that are not simulated
18   sexually explicit?
19 A    Yes.
20 Q    Okay.
21   (Defendant's Exhibit DL17
22   marked for identification.)
23        MR. BLADUELL:    I'm going to provide
24   a copy to counsel. I'm not going to question
25   the witness.

Page 178

1        Just for the record we had requested
2    some samples of depictions and counsel has
3    refused to provide them arguing that they were
4    not relevant. And we do believe that these
5    are relevant to assess the claims
6    Mr. Levingston makes with regards to his First
7    Amendment claim, therefore, we're going to
8    request again these pictures.
9        We ask them to be produced
10   immediately. If we don't reach an agreement
11   by the end of the deposition or today our
12   intention is to contact the court to compel.
13        MS. BAUMGARDNER: Okay.
14        MR. BLADUELL:    Refusal to provide
15   the pictures limits our ability to assess this
16   claim by Mr. Levingston for the deposition
17   today. The exhibit reflects that we've made
18   that clear to opposing counsel. So we reserve
19   the right to reopen the deposition if we get
20   these pictures to question Mr. Levingston
21   about them.
22 Q    When you say in Interrogatory No. 10,
23   Mr. Levingston, that none of my work depicts
24   persons who could be confused as children,
25   that's accurate, right?

Page 179

1  A    Yes.
2  Q    But you have produced depictions of models
3    that are 18 years of age, correct?
4  A    Have I? I don't believe so.
5  Q    Nude depictions?
6  A    I don't believe so.
7  Q    You don't believe -- okay. So you have not --
8    your recollection is that you have produced
9    nude depictions?
10 A    You're talking about have I taken?
11 Q    Yes.
12 A    I don't believe so but it's possible.
13 Q    Is it possible that you've taken pictures
14   involving nudes of women that are 19 years
15   old?
16 A    That is possible
17 Q    Do you believe that it is possible or
18   probable?
19 A    Probable.
20 Q    And is it your opinion that an 18 year old and
21   a 19 year old cannot be confused with a minor?
22 A    Not if you're checking their ID.
23 Q    So you would need the ID to know, correct?
24        MS. BAUMGARDNER: Objection.
25 A    I would check their ID to be sure.

Page 180

1  Q    Can you tell from looking at them? Can you
2    tell apart a 17 year old and a 19 year old?
3        MS. BAUMGARDNER: Objection.
4  A    No.
5  Q    Can you tell apart a 17 year old from a 19
6    year old?
7        MS. BAUMGARDNER: Objection.
8  A    Probably not.
9  Q    Can a person below the age of 18 reach full
10   maturity with respect to pubic hair?
11 A    I don't know. You're in an area I just don't
12   know.
13 Q    Have you photographed individuals under 18
14   years old nude?
15 A    No.
16 Q    Ever?
17 A    No.
18 Q    Other than your kids have you seen individuals
19   under the age of 18 nude?
20        MS. BAUMGARDNER: Objection.
21 A    Not that I know of.
22 Q    When you wrote in Interrogatory No. 7,
23   Mr. Levingston --
24        MS. BAUMGARDNER: Of Exhibit 3?
25        MR. BLADUELL:    Of DL3, correct.

45  (Pages 177 to 180)

Page 217

1  A    G applies to this.
2  Q    Okay.
3  A    You didn't let me read.
4  Q    You can read it.  "Notwithstanding any
5       provision of this part or any other regulation
6       a law enforcement officer may seize any
7       evidence of the commission of any felony while
8       conducting an inspection."
9  A    Sounds to me like they can look around and
10      seize anything that they want to.
11 Q    I mean, it doesn't say the law enforcement
12      officers can look around for evidence,
13      correct?
14            MS. BAUMGARDNER:  Objection.
15 A    It doesn't use those words.
16 Q    It says the officers may seize any evidence?
17 A    Right.
18 Q    Do you see in number three that it says, "The
19      inspection should not be conducted so as to
20      unreasonable disrupt the operations of the
21      establishment"?
22 A    Yes.
23 Q    I have no further questions at this time.
24            MS. BAUMGARDNER:  Just have one more
25      follow-up.

Page 218

1            FURTHER REDIRECT EXAMINATION
2  By Ms. Baumgardner:
3  Q    G, as you pointed out, states,
4       "Notwithstanding any provision of this part or
5       any other regulation;" is that correct?
6  A    Yes.
7  Q    So although Mr. Bladuell pointed out three, G
8       says notwithstanding any other provision?
9  A    It does.
10            MS. BAUMGARDNER:  I have nothing
11      further.
12            MR. BLADUELL:    Okay.
13      (Deposition concluded at 5:25 p.m.)
14      (Signature waived.)
15            - - -
16
17
18
19
20
21
22
23
24
25

Page 219

1  State of Ohio,      )
                       ) SS:  CERTIFICATE
2  County of Cuyahoga,  )
3      I, Karen A. Toth, RPR and Notary Public
4  in and for the State of Ohio, duly commissioned and
5  qualified, do hereby certify that the within named
6  witness, Dave Levingston, was by me first duly sworn
7  to testify the truth, the whole truth, and nothing
8  but the truth in the cause aforesaid; that the
9  testimony then given by him was by me reduced to
10 stenotypy/computer in the presence of said witness,
11 afterward transcribed, and that the foregoing is a
12 true and correct transcript of the testimony so
13 given by him as aforesaid.
14     I do further certify that this deposition was
15 taken at the time and place in the foregoing caption
16 specified and was completed without adjournment
17     I do further certify that I am not a relative,
18 counsel, or attorney of either party, or otherwise
19 interested in the event of this action.
20     IN WITNESS WHEREOF, I have hereunto set my
21 hand and affixed my seal of office at Cleveland,
22 Ohio on this 8th day of April, 2013.
23 _____
24 Karen A. Toth, RPR and Notary Public in
   and for the State of Ohio.
25 My Commission expires May 6, 2013.

55 (Pages 217 to 219)



# Compressed Transcript of the Testimony of
# **EUGENE H. MOPSIK, 3/19/13**

**Case:** Free Speech Coalition, Inc., et al., v. Holder, Jr.

Summit Court Reporting, Inc.
Phone:215.985.2400
Fax:215.985.2420
Email:depo@summitreporting.com
Internet: www.summitreporting.com

**Free Speech Coalition, Inc., et al., v. Holder, Jr.**    **EUGENE H. MOPSIK, 3/19/13**

Page 9

1  A    That was my only source of income for 32
2  years.
3  Q    How would you characterize the membership
4  of your organization?
5  A    Clarify, please.  Do you mean -- I guess
6  my question would be what kind of work did they do?
7  Are they happy?  Are they sad?  I'm not sure -- how
8  would I characterize them?  It depends on a lot of
9  things.
10  Q    Well, they're all, I assume,
11  photographers?
12  A    Most of our members are working
13  photographers; some of them are students.  We do
14  have a student member category.  We have different
15  categories of membership.
16       We have a full-time, working
17  photographer category that comprises our voting
18  membership.  Then we have a kind of
19  emerging-photographer category, we have a
20  student-photographer category.
21       We also have a category for
22  affiliated people in the trades so that if someone
23  from Nikon or Canon or Olympus or Adobe wanted to be
24  tuned into what our association is doing, they could
25  become an affiliate member.

Page 10

1  Q    Do the photographers in your organization
2  work in a particular medium of photography?  Is that
3  the right --
4  A    Are you talking about whether it's sports
5  or fashion or --
6  Q    What is the word that you use to indicate
7  digital versus print versus video?
8  A    Well, almost all photographers today are
9  working digitally.  The ones who aren't doing it,
10  either out of some technical necessity, which would
11  be more in the case of architecture people who shoot
12  large format material and then scan it immediately
13  to digital format, but the capture would be in an
14  analog means on film.
15       But most photographers, their
16  original capture or the original impression would be
17  gathered digitally today.
18  Q    Does your membership include filmmakers as
19  well as still photographers?
20  A    More and more still photographers are
21  crossing over into motion work out of necessity and
22  out of -- it's -- the old paradigm was images going
23  to print.  The new paradigm is images going to
24  digital use.
25       And so the digital formats, which is

Page 11

1  primarily the digital vehicles which -- things like
2  iPads and the web and other means of display, like
3  motion.  So photographers move to motion because
4  that's what the medium wants.
5  Q    Do you think all of the photographers in
6  your group that do video began as still
7  photographers and then became --
8  A    Couldn't say all of them.  I would say
9  many of them were -- again, if you're looking at
10  members prior to digital transition who were film
11  shooters, they would first transition to digital and
12  then along the way, given the technology of today's
13  DSLR cameras, which have the capability to shoot
14  both stills and HD video, it was a logical
15  transition for them.  So they kind of tested the
16  water there.
17       But we also have some members who
18  are, I would grant it, probably a fairly small
19  number who are strictly motion photographers.
20  Q    Could you describe the process for
21  becoming a member?
22  A    Well, to become a voting -- let's start
23  with voting member, which would be what we classify
24  as a general member.  So to be a general member of
25  ASMP -- we're the only photographers association

Page 12

1  that I'm aware of that you simply can't join by
2  writing a check and saying I want to be a voting
3  member.
4       You need to, number one, have two
5  member sponsors, you need to show a body of work
6  that indicates you've worked as a professional for a
7  period of three years, and you need to make the
8  majority of your earned income from the sale or
9  license of your images.
10       (Exhibit Mopsik-1 was marked
11       for identification.)
12       MS. WYER:  Let the record reflect I've
13  marked an exhibit as Mopsik-1.
14  BY MS. WYER:
15  Q    Do you recognize this?
16  A    It appears to be a capture from our
17  application page on the website.  I think that's
18  what it is.
19  Q    Is this the application form that someone
20  would have to fill out to become a member?
21  A    Well, it's part of it for general members.
22  Because for a general member, if they were to fill
23  this out and submit it what happens is that triggers
24  a response on our side that would go to the Chapter
25  Membership Committee and then they would reach out,

3 (Pages 9 to 12)

**Free Speech Coalition, Inc., et al., v. Holder, Jr.**                    **EUGENE H. MOPSIK, 3/19/13**

Page 17

1    a local level.
2        Q    What is the mission of ASMP?
3        A    Is to protect and promote the interests of
4    working publication photographers, primarily through
5    information, education and advocacy.
6        Q    Are there particular issues that you focus
7    on?
8        A    If ASMP is known for anything over its
9    years -- we were founded in 1944 by a group of
10   primarily Jewish disgruntled socialist photographers
11   who were bigtime photographers working primarily for
12   Time Life and all the major news media.  They
13   weren't happy with what basically came down to rates
14   and rights that they were getting.  They were the, I
15   guess, original -- you know, they kind of set the
16   tone for ASMP's future.
17       Today, I guess we're known as an
18   association who, I guess, we're the leader in
19   business and rights education for photographers.  We
20   do a number of seminars and programs, either through
21   our chapters or through other trade events around
22   the country, on an annual basis promoting various
23   aspects of business practices for working
24   photographers, along with trying to educate
25   photographers regarding their copyright, copyright

Page 18

1    issues, and the value of their rights.
2        Q    So when you say "rights," do you mean --
3        A    Intellectual property rights.
4        Q    Other than the geographical chapters, is
5    there any other kind of subdivision?  Are there
6    subdivisions within the organization?
7        A    No.
8        Q    Are there subgroups?
9        A    Not officially.  So a school like Brooks
10   or RIT or SCAD, they're all college-level programs
11   with significant photography departments.
12   Unofficially they may have what they call a student
13   chapter.  They don't exist on our books anywhere as
14   a student chapter.  They're basically a student
15   group that would be tied to the nearest actual
16   chapter.
17       But when I have a significant number
18   of students, they sometimes think of themselves as a
19   chapter, but they're not officially.
20       Q    Are there groups based on subject matter?
21       A    Virtual, not actual.
22       Q    What does that mean?
23       A    Means we have online communities.  We have
24   specialty groups that exist only in the virtual
25   world.  So we have a fine art group, we have a

Page 19

1    corporate group, we have an underwater group, we
2    have an architecture group, but they only meet
3    virtually.
4        Q    What do they do in this virtual meeting?
5        A    Well, they're primarily list serves.  They
6    talk about trade issues, business issues.  Sometimes
7    it's technical discussions about craft, issues
8    related to dealing with a particular circumstance on
9    the job, be it lighting or technical or file
10   processing or something or another.
11       Other times it's about people have
12   questions about what they might charge for a job or
13   what other people charge for similar jobs, so they
14   could get an idea of what they should be charging.
15       Q    Is there any official designation of
16   someone when they join a group like that?
17       A    No official designation.  In our database
18   there's a field which would indicate whether or not
19   they've designated themselves as a participant in
20   that group, which would mean they've, in
21   effect, logged in to that list serve.
22       Q    Can you be in more than one specialty
23   group?
24       A    Yes.
25       Q    They can just decide to join themselves?

Page 20

1        A    Yes.
2        Q    Do your members create depictions of
3    sexually-explicit conduct?  When I say
4    "sexually-explicit conduct" I mean as defined under
5    the 2257 requirements.  First of all, are you
6    familiar with 2257?
7        A    Yeah, basically I am.  I would say yes.
8        Q    Do you know if any of your members qualify
9    as secondary producers?
10       MS. BAUMGARDNER:  Objection.  If you know
11   what that is, Mr. Mopsik.  But go ahead and
12   answer.  I'm just objecting for the record.
13       THE WITNESS:  I'm not sure what that
14   means, if that's a distributor or some other
15   level of involved in the production chain of
16   that material.
17       If that's what you're asking, then again I
18   have no firsthand knowledge of that.  But I
19   wouldn't be surprised, I guess, either.
20   BY MS. WYER:
21       Q    Okay.  So you're not familiar with the
22   term "secondary producer" in the 2257 context?
23       A    No.
24       Q    What percentage of your membership creates
25   images that are covered under 2257 or 2257A?

5 (Pages 17 to 20)

**Free Speech Coalition, Inc., et al., v. Holder, Jr.**                    **EUGENE H. MOPSIK, 3/19/13**

Page 37

1    members who create depictions of sexually-explicit
2    conduct in the context of health or medical
3    related --
4       A    Again, I don't know the specific members
5    who were doing this. I know we have a lot of -- I
6    guess a significant number of members who are
7    involved in, you know, work related to the
8    healthcare trade, hospital and mental health areas.
9            We also have a significant number of
10   photographers who supply images for textbooks, which
11   is a major source of income for many photographers.
12   But specifically in regard to this type of images,
13   no.
14      Q    What about ASMP members who create
15   depictions of sexually-explicit conduct as part of
16   the adult film industry?
17      A    Yeah, I don't -- I'm not familiar with
18   them. I would assume that -- again, through our
19   responses -- that there are a small number of ASMP
20   members who actually contribute to the adult film or
21   adult entertainment industry, but I'm not familiar
22   with them.
23      Q    And by "adult film industry," you mean
24   what others might call hardcore pornography films?
25      A    Producing sexually-explicit films.

Page 38

1       Q    Can ASMP members -- nothing prevents
2    someone who produces adult films from being an ASMP
3    member, correct?
4       A    Correct. Assuming they have good business
5    practices, they meet the requirements for
6    membership, then they can be a member.
7            MS. BAUMGARDNER:  I don't mean to
8    interrupt, when you have a moment, I could use
9    a break. If you need to finish, I don't want
10   to interrupt your flow here.
11           MS. WYER:  I'll just finish the last
12   category he mentioned and we can...
13           MS. BAUMGARDNER:  I appreciate it.
14   BY MS. WYER:
15      Q    The last category you mentioned was the
16   sexual and psychological counseling. Do you know of
17   any examples of ASMP members who create depictions
18   of sexually-explicit conduct in that context?
19      A    Again, I'm not familiar with the
20   photographers personally, but again I think it would
21   fall under images that end up being used primarily
22   in textbooks and perhaps again in videos.
23           I haven't -- I guess I haven't seen
24   the kinds of video productions that are used to
25   counsel people for sexual or psychosexual issues, so

Page 39

1    I'm not familiar. But I would assume that they
2    exist.
3       Q    So you can't think of any examples for any
4    ASMP members in this category of independent film
5    productions in adult entertainment?
6       A    Me personally, no, I can't.
7            MS. WYER:  We can take a break now.
8            MS. BAUMGARDNER:  Okay. Thank you very
9    much.
10           (Brief recess.)
11   BY MS. WYER:
12      Q    So continuing -- and for the record, we
13   just took a break. Now we're back and going back to
14   the response to Interrogatory number 7.
15           The next sentence states, Some of our
16   members create erotic portraits commissioned by
17   adult couples or individuals for their own private
18   use.
19           Did I read that accurately?
20      A    Mm-hmm. Yes.
21      Q    What is this sentence referring to?
22      A    I would -- my understanding would be, and
23   again I'm not -- I don't have direct knowledge of
24   particular members who do this, but I'm aware of, I
25   guess, this genre of work, and I guess it would

Page 40

1    revolve around couples who, for one reason or
2    another, want erotic portraits of each other, either
3    of one partner or the other or both together as a
4    gift memento, remembrance of the other partner.
5       Q    Do you know how many ASMP members are in
6    this category?
7       A    No.
8       Q    Can you name any examples?
9       A    No.
10      Q    Do you know if the ASMP members in this
11   category know the individuals that they are
12   photographing?
13      A    Yes.
14      Q    You know --
15      A    Would believe, just because my members are
16   professionals. They wouldn't be randomly
17   photographing people in erotic circumstances. These
18   would be commissioned works. So, I mean, whether
19   they know them -- they're not bosom buddies; they're
20   clients.
21      Q    So they would not necessarily know them
22   beforehand, they would just be hired to take --
23      A    Clients. Client/photographer
24   relationship.
25      Q    So if there were any -- if we could

10 (Pages 37 to 40)

**Free Speech Coalition, Inc., et al., v. Holder, Jr.**                    **EUGENE H. MOPSIK, 3/19/13**

Page 45

1  results list who would be involved in creating
2  depictions of sexually-explicit conduct?
3       A   No.  Did you do a search for anything to
4  see what the returns looked like?
5       Q   I'm not sure.
6           How many ASMP members are currently
7  maintaining records under 18 USC 2257 or 2257A?
8       MS. BAUMGARDNER:  Objection.
9       THE WITNESS:  I have no knowledge.
10  BY MS. WYER:
11      Q   Does ASMP provide any guidance to its
12  members on maintaining records under 2257 or 2257A
13  or otherwise complying with the 2257, 2257A
14  requirements?
15      A   I think in general ASMP promotes good
16  business practices and professionalism.  I believe
17  in the article that appeared in our magazine, we
18  advised our members regarding this matter.
19          I don't believe we have any other
20  information on it, on our website to my knowledge.
21      Q   And this article was around three months
22  ago?
23      A   I think that was within the last three or
24  four months.  Can I ask --
25      MS. BAUMGARDNER:  You can't ask me, no.

Page 46

1       THE WITNESS:  I can't communicate with
2       counsel.  I don't know the exact date when that
3       appeared.  I know it was an article by Victor
4       Perlman in our ASMP bulletin.
5  BY MS. WYER:
6       Q   Are those bulletins available on your
7  website?
8       A   They are.
9       Q   Was that the first time that ASMP has ever
10  mentioned 2257, 2257A to its members?
11      A   To my knowledge, it probably was.  Other
12  than -- I mean, I'm not sure -- well, it probably
13  was.
14      Q   I'd like to go back to the Interrogatories
15  which are Exhibit 3.
16      A   (Witness complies.)
17      Q   So going to Interrogatory 8 which starts
18  on page 4.
19      A   Mm-hmm.
20      Q   The response states, Our members never
21  photograph minors in sexual conduct.  We advise all
22  of our members to attain model releases for any
23  person they photograph.
24          Did I read that accurately?
25      A   Correct.

Page 47

1       Q   What is the purpose of a model release?
2       A   I guess in this context -- first of all,
3  again, ASMP is built on a foundation of good
4  business practices.  So our photographers are
5  professionals.  Many of the subjects that -- I guess
6  under most circumstances professional photographers
7  don't go trolling the streets for models.  They call
8  up an agency and they have a casting call and they
9  send models.
10          So these are people who are being
11  compensated through an agency for appearing in
12  whatever the particular vehicle is, whether it's
13  advertising, editorial, corporate.  Our
14  photographers need a release for a number of
15  reasons.
16          One, I guess in this context to
17  ascertain that the person is of age of majority and
18  able to sign their right.  What's happening is the
19  model is assigning a publication right to the
20  photographer, which the photographer then reassigns
21  to his client.  So that model release is, in fact, a
22  release of rights, a grant of rights, to the
23  photographer.
24          So those are the purposes, the basic
25  purposes of it.

Page 48

1       Q   And an ASMP member can get a model release
2  for someone under 18, correct?
3       A   We have it on our website, a minor
4  release.
5       Q   In that context, who would sign the
6  release?
7       A   Parent or guardian.
8       Q   But then sometimes individuals younger
9  than 18 can sign their own release, correct?
10      A   Anybody can do anything.
11      Q   Sometimes individuals under 18 are legally
12  able to sign their own release, correct?
13      A   I'm not aware of that.  I mean, I guess --
14  legal?  You're the lawyer.  Are there legal
15  circumstances where someone who is under the age of
16  majority is actually of the age of majority, I
17  guess, or emancipated?  Is that what we're talking
18  about here?
19      Q   Well, let's look at another exhibit from
20  the website.
21      A   Emancipated minors?
22          (Exhibit Mopsik-5 was marked
23          for identification.)
24  BY MS. WYER:
25      Q   Do you recognize this?

12  (Pages 45 to 48)

**Free Speech Coalition, Inc., et al., v. Holder, Jr.**                    **EUGENE H. MOPSIK, 3/19/13**

Page 53

1   to check IDs?
2         MS. BAUMGARDNER:  Objection.
3         If you understand the question...
4         THE WITNESS:  Yeah, I would ask for a
5   clarification.
6   BY MS. WYER:
7         Q    Under a common-sense approach, should an
8   ASMP member always check IDs for individuals who are
9   under a particular age?
10        A    Again, my members are professionals.  It's
11  in their best interest to acquire the rights and
12  permissions that they need in order to be able to
13  fulfill the requirements of the job; therefore, it
14  would be my assertion that if they had any question
15  as to the age of majority of the subject, they would
16  ask for adequate ID.
17        Q    Is it possible that different ASMP members
18  would have a question -- one ASMP member might have
19  a question in regard to an individual while another
20  member wouldn't?
21        A    Is that possible?  Yes.  And pigs can fly.
22  Anything is possible.
23        Q    Do you think every ASMP member would check
24  an ID for the same -- when presented with a
25  particular individual, do you think every ASMP

Page 54

1   member would check that individual's ID or not?
2         A    Again, I would go back to my original
3   statement that my members are professionals, they
4   need to do what they need to do to fulfill the
5   requirements of the job.  So again, photographers
6   are as risk averse as clients.  That being said, my
7   position would be if they had any questions, they
8   would ask for ID.
9         Q    So as you were saying, the risk if an ASMP
10  member doesn't check an ID when the person -- when
11  the individual being depicted in an image is not --
12  is under 18 and can't enter into a contract, the
13  risk in that context is simply that the photographer
14  would not be able to use that image in a commercial
15  context, correct?
16        A    And assuming that it's a commercial
17  assignment that he's involved in, that then his
18  client wouldn't be able to use the image.  There are
19  different levels of use within photography.
20        So there's the primary use, the
21  commissioned use for the job, and then there are
22  secondary uses that become available to
23  photographers sublicensing and secondary licensing
24  of images after the fact.  So neither would be
25  available if you don't have a valid release.

Page 55

1         Q    And when photographers are trying to get
2   model releases, that's their concern, correct?
3         A    I guess, again, as professionals their
4   concern is fulfilling the obligations of the job.
5   So...
6         Q    Which in the commercial context is
7   obtaining an image that they can --
8         A    Provide the client with proper rights and
9   clearances to use the images that are produced.
10        Q    Is it ASMP's position that it's possible
11  to determine a person's age by visual observation?
12        A    I would say not in all cases, no.  Some
13  people appear younger than others.
14        Q    And ASMP has not set a cutoff age under
15  which its members are required to check IDs,
16  correct?
17        A    Correct.  We have no means to compel our
18  members to do anything.  I guess we're specifically
19  limited by the Justice Department in many ways in
20  engaging in any form of collective action.
21        Q    Let's go back to Exhibit 3, Interrogatory
22  number 9.
23        A    (Witness complies.)
24        Q    In Interrogatory number 9 -- I'll give you
25  a minute to look at it.  In ASMP's response to that

Page 56

1   Interrogatory it states:  Hundreds of our members
2   take photographs of the nude human body and sexual
3   conduct.  Given that fact, I believe that there are
4   more than a thousand images in each of the age
5   categories designated above.
6         Did I read that accurately?
7         A    Correct.
8         Q    And age categories designated above are 18
9   to 25; 26 to 35; 36 to 45; 46 to 55; 56 to 65; and
10  over 65, correct?
11        A    Correct.
12        Q    And this question is asking about
13  depictions of sexually-explicit conduct, correct?
14        A    Actual or simulated sexually-explicit
15  conduct.
16        Q    So this response is essentially saying
17  that ASMP members, that there are more than a
18  thousand images produced by ASMP members of
19  sexually-explicit conduct in each of these age
20  categories, correct?
21        A    Correct.
22        Q    How did ASMP make that determination?
23        MS. BAUMGARDNER:  Objection.
24        THE WITNESS:  I did not make this
25  determination, but my judgment would come just

14  (Pages 53 to 56)

**Free Speech Coalition, Inc., et al., v. Holder, Jr.**                    **EUGENE H. MOPSIK, 3/19/13**

Page 57

1  from my understanding of how photographers work
2  and what's involved in creating or fulfilling
3  the requirements of any particular assignment.
4      There are generally many more images
5  created than are actually needed to fulfill the
6  specific job requirement. It's just the nature
7  of the way photographers work. They create
8  many images to fulfill the one requirement. So
9  I think that's probably -- so it doesn't take
10  long to get to a thousand.
11  BY MS. WYER:
12      Q   So you understand this response as
13  including every individual image in a single shoot,
14  model shoot, as a separate image?
15      A   They are separate images.
16      Q   So the number a thousand is not a high
17  number in this context?
18      MS. BAUMGARDNER: Objection.
19      THE WITNESS: I would say you are correct.
20  BY MS. WYER:
21      Q   For this response can you be more specific
22  in regard to which age categories have a larger
23  number or fewer images?
24      A   No.
25      Q   Do you have any way of making that

Page 58

1  determination?
2      A   No.
3      Q   So you cannot provide us with information
4  that shows the range of ages of individuals depicted
5  in the depictions of sexually-explicit conduct
6  produced by your members; is that correct?
7      A   State the question again.
8      Q   You cannot provide us with information
9  that indicates the range of ages of individuals
10  appearing in depictions of sexually-explicit conduct
11  produced by your members?
12      A   At this time, no, I can't.
13      Q   Do you have any way of doing that in the
14  future?
15      MS. BAUMGARDNER: Objection.
16      THE WITNESS: I guess theoretically we
17  could survey our members. I know of no other
18  way to...
19  BY MS. WYER:
20      Q   Do you have any way of requiring your
21  members to respond?
22      A   No. We're a trade association. We have
23  no force. We're not -- we're not, we're not rights
24  holders. We're not -- we have no compelling force
25  over our members.

Page 59

1      Q   Let's now look at Interrogatory number 10
2  in the same exhibit, which is just the next one
3  down.
4      A   (Witness complies.)
5      Q   In the second paragraph of the response, I
6  think fourth sentence states: Photojournalists who
7  are on the road for months at a time are simply
8  unable to maintain and categorize the records as the
9  statutes and regulations require.
10      Did I read that accurately?
11      A   Yes.
12      Q   What do you mean by this?
13      A   To my understanding, it means that
14  photographers who travel extensively who may either
15  be in areas of conflict or may simply be out on
16  location for a protracted period of time -- I
17  frequently went out for two, three weeks at a time
18  as an industrial photographer.
19      Photographers involved in conflict or
20  other areas sometimes go for months at a time. I
21  don't know how they could possibly fulfill the
22  requirements of this statute, how they would make
23  records available 20 hours a week.
24      The simple act of having to record or
25  to maintain all of those records in some type of

Page 60

1  searchable database while on the road, I think, is
2  incredibly burdensome.
3      It's hard enough getting the releases
4  they require, but to have to do all of this extra
5  record keeping and, again, make those records
6  available -- we're dealing with, again, one- and
7  two-man shops who are already extraordinarily
8  burdened by the blessing of digital photography.
9      The world said it was going to be
10  better, faster, cheaper. It may be better and the
11  capture may be faster, but the post-production is
12  considerably more burdensome on a photographer
13  today. Previously you shot film and gave it to a
14  client. At the end you gave him transparencies and
15  you were done.
16      Now, all that post-production work
17  that was previously done by third parties is now
18  done by the photographer. So the photographer does
19  the retouching, photographer does the file prep, the
20  photographer creates the print files, the output
21  files. And he may or may not be compensated for
22  that work, but he's still got to do it all.
23      And so the job doesn't end when the
24  shoot ends. It was much easier when you were
25  dealing with film and transparencies. So things

15 (Pages 57 to 60)

**Free Speech Coalition, Inc., et al., v. Holder, Jr.**                    **EUGENE H. MOPSIK, 3/19/13**

Page 77

1     A   Again, I would defer to Victor Perlman,
2  but I'm not sure that he would know either.
3     Q   Has ASMP issued any press release
4  regarding this litigation or its participation in
5  this litigation?
6     A   Not that I'm aware of.  I think we
7  mentioned it in a -- may have mentioned it in an
8  e-news, but I don't believe we've issued any press
9  release.
10          (Exhibit Mopsik-6 was marked
11          for identification.)
12  BY MS. WYER:
13     Q   You've been handed what's been marked as
14  Exhibit Mopsik-6.  Do you recognize this?
15     A   It says it's the -- our list of press
16  releases.
17     Q   Do you see that this list of press
18  releases goes to the most recent one, March 7, 2013?
19     A   Mm-hmm.
20     Q   Actually there's one section of the
21  website called Recent Releases and another that has
22  Prior Releases, so there's another --
23     A   Right.
24     Q   -- that starts on page 5, starts again at
25  page 1 because it's from the non-recent releases

Page 78

1  section, correct?
2     A   Mm-hmm.
3     Q   And that section goes from December 15,
4  2011, back to November 19, 2008?
5     A   Okay, I got it.
6     Q   Are you aware of any press release issued
7  by ASMP regarding this litigation during that time?
8     A   If there is one in here, I don't recall
9  it.
10     Q   If there is not one in here, would that
11  indicate there was no such press release?
12     A   Assuming that the guy who puts them up on
13  the website was doing his job, yeah.  I mean, this
14  is the only record we keep of our releases.  Is
15  there one in here?
16     Q   If you want to try to find one -- can you?
17          MS. BAUMGARDNER:  Can you direct his
18     attention to any particular one?
19          MS. WYER:  I'm not able to.
20          THE WITNESS:  I didn't recall one.
21     Commented on a lot of other things of
22     significant importance.
23  BY MS. WYER:
24     Q   ASMP has brought and has applied First
25  Amendment challenge to the 2257 and 2257A

Page 79

1  requirements.  Do you understand what that means?
2     A   No.
3     Q   That the requirements violate the First
4  Amendment as applied to ASMP?
5          MS. BAUMGARDNER:  I object.  This is a
6     legal question that you're asking him.  It's a
7     legal term.
8  BY MS. WYER:
9     Q   Do you understand what I mean by the
10  question?
11     A   I mean, my understanding would be that
12  you've said we've made a challenge on the basis of
13  the First Amendment as it applies to ASMP members.
14     Q   So if ASMP were to prevail or were to win
15  on that applied challenge, is there anything that
16  would stop producers from the hardcore adult
17  industry from joining ASMP?
18          MS. BAUMGARDNER:  Objection.
19          Do you understand the question?
20          THE WITNESS:  Well, is there anything that
21     would -- so you want to know if there's
22     anything that would prevent a producer of
23     hardcore pornography from becoming a member of
24     ASMP if we were to prevail in this
25     constitutional challenge; is that correct?

Page 80

1  BY MS. WYER:
2     Q   You've already indicated that filmmakers
3  who make what could be characterized as hardcore
4  sexually-explicit films could become ASMP members?
5     A   "Could" is the operative word, yeah.
6  There's no restriction in our bylaws that says
7  producers of sexually-explicit materials cannot be
8  members.
9     Q   Going back to the relationship between
10  ASMP and its membership, are there rules that ASMP
11  has established to govern the conduct of its
12  members?
13     A   There is a code of ethics on the website.
14  I don't know exactly where it is, but there is one.
15     Q   Is there any specific role in that code of
16  ethics that prohibits ASMP members from using
17  individuals under 18 in depictions of
18  sexually-explicit conduct?
19     A   I don't believe that any of the code would
20  specifically state that.  It would state that
21  members are to be professional, that they are, I
22  guess -- I don't even know -- I guess it would go
23  without saying that they're expected to uphold the
24  laws of the land.
25          And if, in fact, which it is, you

20  (Pages 77 to 80)

# In The Matter Of:

*FREE SPEECH COALITION, INC v*
*THE HONORABLE ERIC H. HOLDER*

---

*March 16, 2013*

---

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File d3gnnitd.txt

**Min-U-Script® with Word Index**

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 16, 2013

Page 17

Nitke

1   Nitke
2   in the way that producers --
3   A.   No.
4   Q.   -- checked the ages of performers?
5   A.   No.  The producers were always
6   scrupulous.  It was always a very big deal.
7   Q.   They always checked the ID cards even
8   before 2257 went into effect, is that right?
9   A.   Yes.
10  Q.   And they always had model releases
11  even before 2257?
12  A.   Absolutely.
13  Q.   Let's look at interrogatory 15.  It is
14  on page 4.  We are just looking at the answer I
15  don't know if you need to look at the question
16  to understand the question?
17  A.   All right.
18  Q.   In the answer you say, "I have created
19  a large body of sexual artwork from 1982 to the
20  present that involves approximately 425 people."
21  Correct?
22  A.   Correct.
23  Q.   Did I read that correctly?
24  A.   Yes.
25  Q.   How did you determine the number

Page 18

1   Nitke
2   approximately 425?
3   A.   I guessed.
4   Q.   How did you guess?
5   A.   I just thought over how many people
6   might have been in 300 movies, plus the work I
7   did after that.
8   Q.   So you have 300 movies.  How many
9   individuals in each movie do you think?
10  A.   A lot of them are in more than one
11  movie, right, making it a little bit difficult
12  to be accurate.
13  How did I break it down?  I don't
14  remember.
15  Q.   So what would you say now about how
16  many individuals?
17  A.   I would probably say the same thing.
18  Q.   How would you reach that figure now?
19  A.   I would guess.
20  I mean outside of spending a couple of
21  days, you know, trying to look at every title
22  and remember who was in it, how would I do it
23  other than guessing.
24  Q.   So how many of the 425 people were
25  from that period when you were taking

Page 19

Nitke

1   Nitke
2   photographs on the adult film sets do you think?
3   A.   So you are asking how many were after
4   say '95 as opposed to before?  I am not sure I
5   understand.
6   Q.   Well, just how many were from that
7   period when you were taking the photographs on
8   the adult film sets, which you have said
9   occurred between 1983 and sometime in the
10  mid-'90s?
11  A.   Do you want to give me a minute to see
12  if I can calculate this out again?
13  Q.   If you want to.
14  A.   Yes, could I have a pencil and paper.
15  MS. BAUMGARDNER: Would it be easier
16  to do it backwards from since '95 on, when 2257
17  took effect?  I mean, Kathy, it is your
18  question.
19  THE WITNESS: I just have to go back
20  over how I figured it out, so I would need a
21  pencil and paper and a few minutes.
22  MS. BAUMGARDNER: Can we go off the
23  record then and let her make the calculation.
24  MS. WYER: Sure.
25  (Discussion off the record)

Page 20

1   Nitke
2   Q.   Let the record reflect that we have
3   taken a break and Ms. Nitke has done a
4   calculation on paper.
5   Could you explain what process you
6   have just gone through and what result you have
7   reached?
8   A.   Yes.  I am guessing that on the
9   hardcore movies I worked on, which would be in
10  New York from 1982 to 1991, I'm guessing there
11  was approximately 50 to 100 people who were in
12  that pool of actors that worked regularly at
13  that time.
14  Then I'm also guessing that from 1991
15  to 1994, when I worked in fetish porn movies, we
16  shot a lot more movies in a smaller time, and
17  I'm guessing that there were also around 50 to
18  100 people that were performers in that group.
19  Then when I began photographing in the
20  SM community, I think I shot around 150 people
21  for my own artwork at that time.
22  Q.   What time period was that?
23  A.   That would be -- and that's the
24  black-and-white work -- and that would be from
25  1994 to 1998 or 1999.

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 16, 2013

---

Page 21

Nitke

Then I did another smaller body of
work called Illimunata, and that was from 1999
to 2007, and I think I probably added another 30
to 50 people on top of the original 150 that I
was shooting in that time period.

Then, most recently, from 2007 to now,
there are probably about 20 models that I have
shot that could possibly fall within this
grouping. They're mostly doing bondage, and I
don't know whether they really fall into the
category you are talking about or not.

So that adds up to 370 to 470 people,
that range.

So that's how I came up with the 425.

Q.   You have a method.

A.   I have a method.

MS. BAUMGARDNER: So that wasn't a
guess. That was actually pretty good.

THE WITNESS: I still think it's a
guess, but yes.

Q.   The period from 1982 to 1991, you
would describe that as the hardcore films
period?

A.   Yes.

---

Page 22

Nitke

Q.   Are you saying that there was like a
pool of regulars during that time?

A.   Yes.

Q.   Were you working only for certain
directors?

A.   Yes.

Q.   So was this pool for certain
directors, or was this pool general to the
industry?

A.   I don't know. They were the people I
knew.

Q.   And the fetish porn period that you
described occurred from 1991 to 1994, how was
that different from the hardcore porn industry,
I mean just in terms of the industry that you
were working within?

A.   It is a different segment of the
industry.

Q.   Does that mean different -- I mean how
do you know if it's one or the other?

A.   Well, they do different things in the
movie.

Q.   So do different directors focus on a
different category, hardcore or fetish? Is it

---

Page 23

Nitke

by director?

A.   No, it's by genre. At the time they
never had sex, they didn't have genital sex if
it was a fetish movie. I don't know if that's
still true, but at that time that was true. And
rather than have sex they would do various BDSM
activities.

Q.   Why were you working only in the
hardcore type movies from 1982 to 1991 and then
1991 to 1994 you were only working in fetish
movies?

A.   That just reflects who was hiring me.

Q.   So the same people were not doing
both? Some people were doing --

A.   No. Some people were doing both. It
is just how I break down my own, my artwork
categories.

Q.   The same people who were hiring you to
do the still shots for the hardcore movies, did
they later hire you to do work on fetish movies?

A.   In some cases.

Q.   But for some reason it just turned out
that all of the fetish movies were in the '91 to
'94 period?

---

Page 24

Nitke

A.   Yes.

Q.   Just kind of random or --

A.   I am not sure what you are asking.

Q.   I am just trying to understand the
progression of your career. I guess I don't
understand why all of the work that you got
would be in one category and then suddenly be in
a different category.

A.   The X-rated industry pretty much moved
out to Los Angeles in the late '80s. So the
amount of work I was getting on X-rated movies
in New York started to dwindle.

In the early '90s, there was an
expansion of the fetish movie field, and there
were some producers in New York still who made
fetish movies, so they started hiring me. It
was kind of a geographical thing, because there
was almost no hardcore movies being shot in New
York in the '90s.

Q.   Then in 1994 or the mid '90s, did the
fetish porn industry also move?

A.   No. Let's see what happened there. I
was asking for higher pay by the mid '90s and
the people I was working for didn't want to pay

---

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 16, 2013

Page 25

Nitke
1
2  more, so I just gradually quit working for them.
3     Q.   Then was it after that time that you
4  began photographing SM?  You described that
5  period as 1994 to 1999?
6     A.   Correct.
7     Q.   How did you transition from, or do you
8  see them as just a new thing that you started
9  doing the BDSM?
10    A.   Yes.
11    Q.   How did you start doing that?
12    A.   I met some people in the BDSM world
13  and started photographing them.
14    Q.   How did that happen?  How did you
15  start photographing them?
16    A.   I asked them.  They let me photograph
17  them.
18    Q.   What kinds of contexts were you in
19  when this happened?
20    A.   Again, I'm just not sure, like what --
21    Q.   Were you walking down the street and
22  you saw a person and you asked to photograph
23  them?  There must have been some --
24    A.    I was introduced to some people at a
25  group called the Eulenspiegel Society here in

Page 26

Nitke
1
2  New York, and I started going to their meetings
3  and I met a lot of people there and I went to
4  their parties and things like that.
5         I formulated a concept that I wanted
6  to photograph.  I spent about six months just
7  being with the people, and then I formulated
8  something.  I wanted to show them as romantic
9  people who were expressing love for each other.
10        So I started to talk to them about
11  that and whether they would let me photograph
12  them in a private setting, like their own homes
13  or whatever, and some of them agreed and I
14  started doing that.
15    Q.   Let's look at Interrogatory 8.  I
16  think this is a different exhibit.
17    A.   You mean not this one?
18    Q.   Yes.  It is a different set.
19        MS. WYER: I will mark this at Nitke
20  2.
21        (Nitke Exhibit 2 marked for
22  identification)
23        MS. BAUMGARDNER: Thank you.
24    Q.   On page 5 you say in the response to
25  interrogatory 8 where the answer reads --

Page 27

Nitke
1
2  speaking of the BDSM community, by the way,
3  let's clarify, what does BDSM stand for?
4     A.   I knew you were going to ask that.
5  BDSM is bondage, discipline, dominance
6  submission, sadomasochism.
7     Q.   I think I get that.
8     A.   You can see the BD, bondage
9  discipline, and the DS, DM, the SM,
10  sadomasochism.  It is a clever acronym.
11    Q.   The answer says, "This is a tightly
12  knit community where everybody knows each other
13  and where no one under 18 is ever allowed to
14  join any of the groups or attend any events."
15        Is that correct?
16    A.   Correct.
17    Q.   Why do you say that the community is
18  tightly knit?
19    A.   It is a subculture where the people
20  just are very close.  They know each other.
21  They are very intimate with each other.  When
22  someone new comes into the group, everyone kind
23  of looks them over to see if they like them.  So
24  they are just tightly knit and close.
25    Q.   How many people are in the community?

Page 28

Nitke
1
2     A.   The Eulenspiegel Society at that time
3  had close to a thousand members in New York --
4  or the Eulenspiegel Society is in New York, the
5  membership was not all New York.  Some were in
6  other parts of the country, but they had about a
7  thousand members.
8     Q.   Do you know what "Eulenspiegel" means?
9     A.   I forget.  It is from I believe an
10  opera called Till Eulenspiegel.  What does that
11  character do?  I forget.  It is a German opera
12  and there's this character named Till
13  Eulenspiegel who does something or another and
14  they took their name from that.
15    Q.   When you say the BDSM community, are
16  you talking about the Eulenspiegel Society?
17    A.   Well, that was my main point of
18  contact with the community.  There are groups
19  like that, but smaller ones, around the country.
20    Q.   So you think there were a thousand
21  members of the Eulenspiegel Society?
22    A.   At that time.  I think there were 900
23  and some at that time.
24    Q.   In New York?
25    A.   They weren't all in New York, but the

Page 53

Nitke

1   Q.   Why do you know the --
2   A.   Because one of the models, I just
3   remembered her age.
4   Q.   Are you able to make a complete
5   breakdown of all of the ages of those
6   individuals?
7   A.   I think I did.
8   Q.   Have you provided that to us?
9   A.   I think so.
10      MS. WYER: I'd like to mark this as
11   Nitke 3.
12      (Nitke Exhibit 3 marked for
13   identification)
14   Q.   I'm handing you what's been marked as
15   Nitke 3.
16      Do you recognize this?
17   A.   Yes.
18   Q.   It's titled "Model List."
19   A.   Right.
20   Q.   Is this something you provided to us
21   in discovery?
22   A.   Uh-huh.
23      MS. BAUMGARDNER: You have to answer
24   verbally.

Page 54

Nitke

1   A.   Yes. Sorry.
2   Q.   What does this list represent?
3   A.   I believe what I was being asked is
4   the date of birth and how many images I shot of
5   people in a certain -- this is that from 2005 to
6   2009, where I was asked to break down the models
7   by their birth date.
8   Q.   I haven't counted how many there are.
9   Let's see. 26. If I'm counting correctly there
10   are 26 models identified here?
11   A.   No. Because some of those are
12   repeats.
13   Q.   I didn't count every line.
14   A.   Are there 26 different models? OK.
15   Do you want me to verify that? Can I just trust
16   you?
17   Q.   If you want to count, you can go
18   ahead.
19   A.   That takes a while to do, though. OK.
20   Q.   Now I'm getting 27. I have numbered
21   them on the marked exhibit if you want to look
22   at it. Did you want to look at it?
23   A.   It is a better method than mine.
24   I mean, I guess accuracy matters. OK.

Page 55

Nitke

1   It seems like there might.
2   Q.   I don't know if the C.M. is the same
3   on --
4   A.   Oh, no. This is set up by -- oh, of
5   course, that's right. I scrupulously set it up
6   by, each model is in their group. Duh. OK.
7   Sorry. Yes. That's right. It all comes back
8   to me. It was a lot of work.
9   Q.   So there are 27 models?
10   A.   Are there? OK.
11   Q.   Identified here, right?
12   A.   Right.
13   Q.   I got to 27 here.
14   A.   OK.
15   Q.   This is from January 1, 2005, to
16   December 31, 2009?
17   A.   Correct.
18   Q.   So this starts in the period when you
19   were working on the Illimunata series, and then
20   it covers part of the current, the Smooth Hotel
21   project?
22   A.   Right.
23   Q.   So where is the cutoff? Would that
24   be --

Page 56

Nitke

1   A.   Probably around 2008. I'm trying to
2   remember.
3      MS. BAUMGARDNER: Cutoff of what, just
4   so I understand.
5      MS. WYER: Between the two projects.
6   A.   That's wrong.
7   Q.   Between the Illimunata --
8   A.   I can tell by the titles. Polysexuals
9   is the Smooth Hotel. So, yeah, 2008 is correct.
10   That's when I started that. These are all the
11   other ones. Polysexuals, 2008. Yeah, 2008.
12   2007 on this is the cutoff, and 2008 begins the
13   new project.
14   Q.   So anything where the title is
15   Polysexuals, that refers to the Smooth Hotels
16   project?
17   A.   Yes. So there are 11 models here.
18   Q.   You mean for the Smooth Hotels?
19   A.   Oh, no.
20   Q.   Then there's one, R.K., who appeared
21   in both projects.
22   A.   He was in both.
23   Q.   So starting at D.P. at the bottom of
24   the page, there's ten from D.P. to L.C. on the

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 16, 2013

---

Page 57

Nitke

1            Nitke
2   next page, and then R.K., so that's a total of
3   11 --
4      A.   Correct.
5      Q.   -- from the Smooth Hotels project.
6           Then there would be 16 plus R.K.
7   again.
8           So that's 17 from the Illuminata
9   project.  Do you think that's correct?
10     A.   Correct.
11     Q.   This is a complete list of all of
12  the --
13     A.   There's one off, though.  The 2007 Max
14  and Too is kind of in neither one.  But they're
15  kind of, they are in an aborted idea that I
16  never completed.
17     Q.   So even though your BDSM projects
18  involved around 200 individuals from the period
19  of 2005 through the end of the project you, only
20  photographed 17 of those during that time
21  period, is that right?
22     A.   I'm sorry.  Ask it again.  Can you ask
23  it again.
24     Q.   The total number of individuals
25  involved in the projects involving the BDSM

---

Page 58

1            Nitke
2   community which were the black-and-white project
3   and the Illuminata project, the total number
4   that you identified was 200?
5      A.   Maximum.
6      Q.   Maximum.  But during the period from
7   January 1, 2005 through the end of that project,
8   the Illuminata project, you only photographed 16
9   of them?
10     A.   Correct.
11     Q.   Maybe 15?
12     A.   Right.
13     Q.   Because M.R. and P.C. were outside of
14  that?
15     A.   Right.
16     Q.   Do you believe that this list of 15 is
17  representative -- I mean it is hard to say that
18  this list is representative of -- through this
19  period it covers the end of one project and the
20  beginning of another project, right?
21     A.   Right.
22     Q.   But this is a complete list --
23     A.   Correct.
24     Q.   -- of work that you photographed for
25  the purpose of publishing?

---

Page 59

1            Nitke
2      A.   Correct.
3           MS. WYER: I will mark this as Nitke
4   4.
5           (Nitke Exhibit 4 marked for
6   identification)
7      Q.   I am handing you what's been marked as
8   Nitke 4 to the witness.  This is titled --
9      A.   I'm sorry.  Before we start a new
10  thing could I take a bathroom break.
11     Q.   Sure.
12          (Recess)
13          MS. WYER: Let the record reflect that
14  we just took a short break and now we're back.
15     Q.   Previous to the break I handed you
16  Exhibit Nitke 4, titled Shoot List.
17          Do you recognize this?
18     A.   I do.
19     Q.   This was something that you provided
20  to us?
21     A.   Yes.
22     Q.   What does this represent?
23     A.   These are the shoots that I did from
24  2005 through 2009.
25     Q.   Are all of the individuals listed on

---

Page 60

1            Nitke
2   the model list somewhere on the shoot list also?
3      A.   Yes.
4      Q.   And then on the shoot list you also
5   indicate that there were, for example, the first
6   line in February 2005 at the Winter Fire BDSM
7   event, was that one of the conferences?
8      A.   Yes.
9      Q.   And you took 953 shots of around 100
10  models for the models' private use?
11     A.   Correct.
12     Q.   That's what you described previously,
13  where you took this other set of photographs
14  that was not to be published, so you didn't keep
15  2257 records for those?
16     A.   Correct.
17     Q.   Just to understand exactly, was this
18  like at a baseball game where there is a
19  photographer who takes your photograph and then
20  asks you if you want a copy and then you order a
21  copy, or was this something different?
22     A.   No.  Well, again, they all operated
23  maybe a little differently.  But usually I would
24  be at the event available to take pictures, and
25  I would give the shots to the event coordinator

---

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 16, 2013

Page 61

Nitke

1
2     so that they could share them with people as
3     needed. Sometimes people would ask me to write
4     a CD for them, and there would be a small charge
5     for me to do that, but I would have to edit out
6     their photos for them. But other times the
7     event people would just do it for them.
8         Q.   In those cases you would provide these
9     photographs to the event coordinator?
10        A.   Yes.
11        Q.   You said you didn't charge for your --
12    did you receive a fee for when you were --
13        A.   No. They would let me go to the event
14    for free in return for my taking pictures for
15    people.
16        Q.   Then you would give the photographs of
17    the event, including photographs of individuals,
18    to the event coordinator and then that person
19    would just allow the individuals to get copies?
20        A.   Correct.
21        Q.   So for this one involving M.R. and
22    P.C., you listed the event --
23            MS. BAUMGARDNER: Can you give the
24    date.
25            THE WITNESS: 2007.

Page 62

Nitke

1
2         Q.   The September 2007 Dark Odyssey BDSM
3     event?
4         A.   Correct.
5         Q.   That's where the M.R. and P.C.
6     individuals, the Max and Too photographs were
7     taken?
8         A.   Right.
9         Q.   You said this was part of a project
10    that you never completed?
11        A.   That's correct. I might use them for
12    something one day, but --
13        Q.   Is this a complete list of all of the
14    occurrences where -- I don't know what to call
15    it -- all of the times when you took photographs
16    involving depictions of sexually explicit
17    conduct from January 1, 2005, to December 31,
18    2009?
19        A.   It is a complete list of any shoots
20    that I did that I think could possibly apply to
21    the 2257 law.
22            There's a lot of other shoots that I
23    did that just would have no application, but in
24    most of these cases they're not sexually
25    explicit. They just have some SM content.

Page 63

Nitke

1
2         Q.   OK. Well --
3         A.   When you used the words "sexually
4     explicit" are you meaning?
5         Q.   I am meaning whatever fits within the
6     definition, that falls under the 2257
7     requirements.
8         A.   OK. Then this is a complete list of
9     that.
10        Q.   OK. So for the Smooth Hotels project
11    you said there were, you think, 20 individuals
12    involved in photographs in that project where
13    the 2257 requirements may be implicated and 11
14    of them are on this model list, right?
15        A.   That's right.
16        Q.   So there are nine other individuals
17    who you must have photographed after December
18    31, 2009?
19        A.   There may be less than 20. I think 20
20    is the maximum.
21        Q.   Do you know the ages of the others? I
22    mean, would it be possible to get just a list of
23    whatever, since it is a small number of
24    people --
25        A.   Sure.

Page 64

Nitke

1
2         Q.   -- could we just get the ages of those
3     up to nine?
4             MS. BAUMGARDNER: We will have to talk
5     about that.
6             MS. WYER: OK.
7         Q.   It seems like your work is focused
8     kind of thematically. So we have the photos on
9     the porn sets in the '80 through the mid '90s,
10    and then there's the BDSM photos from around the
11    mid-'90s through 2007, and now you're on a new
12    project.
13            Have you taken any other photos
14    implicating 2257 other than those projects that
15    we've already talked about?
16        A.   No.
17        Q.   After you are done with the Smooth
18    Hotel project, you could go on to a different
19    project?
20        A.   Yes.
21        Q.   But you don't even know what that is
22    now?
23        A.   That's right.
24        Q.   So it could involve a completely
25    different population of people?

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 16, 2013

Page 65

Nitke

1   A.   It could.
2   Q.   So you have no way of predicting today
3   what group of people you might photograph in the
4   future or where the photographs might implicate
5   2257, is that right?
6        MS. BAUMGARDNER: Objection.  Go ahead
7   and answer.
8   A.   I have no way of predicting.  Yeah, I
9   guess that's true.
10  Q.   Let's go back to the one that looks
11  like this, what's been marked as Nitke 2, which
12  are the responses to the first set of
13  interrogatories.  That one.
14  A.   OK.
15  Q.   Let's look at interrogatory 10, which
16  is starting on page 6.
17  A.   OK.
18  Q.   I am actually looking at the top of
19  page 7.
20       MS. BAUMGARDNER: Why don't you read
21  through it completely, and then Ms. Wyer can ask
22  you questions about it.
23       THE WITNESS: OK.
24  A.   OK.
25

Page 66

Nitke

1   Q.   Do you remember preparing this
2   response?
3   A.   Yes.
4   Q.   You have now looked over your
5   responses.  Has that refreshed your memory about
6   what you said?
7   A.   Yes.
8   Q.   I am just looking at the top of page
9   7, where you say, "In order to comply with 18
10  U.S.C. 2257 I make triplicate copies of all
11  forms and required identification, which I keep
12  in my home."
13       Did I read that accurately?
14  A.   Yes.
15  Q.   Why do you keep triplicate copies?
16  A.   I have the original copy.  Then I have
17  a copy, which is in the filing system that I
18  have set up, which cross-references the models
19  with the alias names and all of that stuff.
20  Then I have a second copy of that filing system
21  in case anything happened to the first copy of
22  it, and then I also have a set of the records
23  that go into my storage locker.
24  Q.   So you actually have four copies of

Page 67

Nitke

1   it?
2   A.   I have an original and three copies.
3   Q.   The one that you keep in the storage
4   locker is just a backup?
5   A.   Yes.
6   Q.   Do you work only with paper copies?
7   A.   Correct.
8   Q.   You don't have a digital filing
9   system?
10  A.   No.
11  Q.   Where are the original copies, the
12  originals that are not copies?
13  A.   Some are in my home and some end up in
14  storage after I have all the copies made.
15  Q.   Do you really have like two backups?
16  You have the originals and a backup copy that
17  you just keep?
18  A.   I have the original model release and
19  the driver's license and the 2257 form.  I make
20  three copies of it when I do the filing, when I
21  set up the files.
22       As I'm setting up the files, I run off
23  three copies out of my fax machine.  I put the
24  copies in folders, two sets of those folders for

Page 68

Nitke

1   2257 files.  I have two sets of that.  Then
2   there's another copy that goes in like the
3   folder that has the shoot in it.  Then
4   eventually either a copy or an original lands up
5   in my storage locker when I have time to get it
6   up there.
7   Q.   So the copy that goes with the shoots,
8   that's not part of the 2257 records?  That's
9   just your regular -- is that right?  That's just
10  part of your regular --
11  A.   No.  Well -- meaning?  I'm not sure.
12  Q.   Do you keep a copy of these documents
13  just as part of your regular business records
14  also?
15  A.   No, why would I -- no.  The only thing
16  I would do for my regular business records is
17  have a model release.
18  Q.   So do you keep a copy of the model
19  release with your business records?
20  A.   Yes.  But if 2257 laws might apply,
21  then I just have it all.
22  Q.   I wasn't clear what the third copy was
23  or the second copy.  You said you have the
24  original, and for two of the copies that you

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 16, 2013

Page 97

Nitke

1
2    Q.   Did the publisher work with you in
3    making that statement?
4    A.   No.  Because I'm the publisher.
5    Q.   It is self-published?
6    A.   Yes.
7    Q.   Is Kiss of Fire also?
8    A.   No.  That was published by a
9    publisher.
10   Q.   Does that book have images from the
11   BDSM black-and-white project?
12   A.   Yes.
13   Q.   That was after 1995, so you had 2257
14   records for all of the images in that book?
15   A.   That's correct.
16   Q.   What was the publisher's involvement
17   in putting a statement in that book?
18   A.   The publisher is a German publisher.
19   They weren't aware of the law, but I told them
20   we should put that statement in for American
21   distribution.
22   Q.   So what is your understanding of the
23   requirements for these statements based on?
24   A.   It is just based on what I understand,
25   that you have to have a statement saying where

Page 98

Nitke

1
2    the records are kept, stating that you have the
3    records and where they're kept, and I got the
4    wording from somebody.  I don't know.
5    Q.   Did you do online research to try to
6    figure this out?
7    A.   I asked around.
8    Q.   Was it as a result of asking around
9    that you got the impression that you could not
10   publish pre-1995 work in a book that also had
11   post-1995 work covered by 2257 without going
12   back and getting 2257 records for all of the
13   pre-1995 work?
14   A.   Correct.
15   Q.   Do you remember who told you that?
16   A.   No, I don't.
17   Q.   But you understood that you could
18   publish the pre-1995 work separately as long as
19   it didn't have any post-1995 work in it in the
20   same book?
21   A.   Yes.  That's my understanding.  I hope
22   it's correct.
23   Q.   You could publish the post-1995 work
24   separately with the 2257 --
25   A.   Yes.  My understanding was when I was

Page 99

Nitke

1
2    going to publish all four bodies of work, my
3    understanding was that I would have to actually
4    publish it in two volumes, before and after
5    2257.
6    Q.   So you thought you could publish the
7    whole compilation, but in two separate volumes?
8    A.   That was my understanding, yes.
9    Q.   So other than what you talk about in
10   the response to interrogatory 10, is there
11   anything else about the 2257 requirements that
12   is a problem in your view?
13   A.   Wow.  That is a great question.
14   Actually, everything about the 2257 law is a
15   problem to me.
16        I would never photograph anyone under
17   the age of 18 doing anything sexual or SM.  I
18   don't know a single person who would do that.
19   It's completely and totally against the law.
20   It's against my moral compass.  The person isn't
21   of age.  They are not old enough to consent to
22   it.  It just would never happen in my lifetime
23   or anyone I know.
24        I resent the law to be honest.  I
25   totally resent it.  It's just something that --

Page 100

Nitke

1
2    it is just so not what I would ever do.  It's
3    almost like the law is accusing me of being a
4    kiddy porn person unless someone holds my hand
5    and makes me fill out a bunch of forms.
6        The other thing I resent is that the
7    law doesn't protect children, because anyone
8    could be fooled by a fake ID anyway.  And I
9    think that my own system of knowing the people I
10   photograph and making sure that I ask about
11   them, that I use my judgment, that I talk to
12   other people about who they are, I think is a
13   far better system than this kind of regulation
14   that isn't going to really accomplish protecting
15   minors.
16        I think if I thought about it I could
17   come up with even more things that I resent.
18   But I think those are the biggest issues, is
19   that this is supposed to protect children and I
20   don't think it does.
21   Q.   You described your own practices and
22   that you do certain things to try to ensure or
23   that make you feel that you are certain without
24   checking IDs that individuals are over 18, is
25   that right?

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 16, 2013

Page 117

Nitke

1             Nitke
2    Q.   This question asked, subsection a of
3 this question was asking how much money you have
4 spent per year for each of the past ten years
5 creating visual depictions of sexually explicit
6 conduct, excluding any time spent complying with
7 the 2257 requirements.
8    A.   OK.
9    Q.   Did I indicate that accurately?
10    A.   That's correct.
11    Q.   In the answer on page 4 when you say,
12 for example, that you are still at a loss on the
13 books, are the amounts listed in response to
14 interrogatory 14a, do those reflect your
15 expenses for those books?
16    A.   No.
17       As I understood that question, as I
18 understood it, the question asked how much it
19 cost me, how much I spent creating visual
20 depictions, which I took to mean taking the
21 pictures.  So what I added up was buying film,
22 renting cars to travel, if I had to pay a
23 location fee or something like that.  That's
24 what these numbers are.
25       I didn't think that question applied

Page 118

Nitke

1             Nitke
2 to publishing costs for a book, so I didn't put
3 that in here.
4    Q.   OK.
5    A.   Did you want it?  Was it supposed to
6 be?
7    Q.   No.  I just wanted to understand how
8 you did that and what that meant.
9    A.   OK.
10    Q.   We have been talking until now about
11 your work producing images of sexually explicit
12 conduct covered by 2257, correct?
13    A.   Correct.
14    Q.   Where does that fit within your work
15 in general?
16       First of all, do you make your living
17 from photography?
18    A.   I do.
19    Q.   Is that the only income-producing
20 activity that you are engaged in?
21    A.   Photography?
22    Q.   Yes.
23    A.   Yes.
24    Q.   Do you have any related kinds of
25 activities that generate income, such as

Page 119

Nitke

1 teaching?
2    A.   Yes, I do.  I forgot.  I do teach
3 photography.  Thank you.
4    Q.   Are you teaching now, currently?
5    A.   I am.  I teach a class at School of
6 Visual Arts.
7    Q.   How long have you done that?
8    A.   I think I'm close to 20 years.
9    Q.   Are you on the faculty there?
10    A.   I am.
11    Q.   I don't know what kind of faculty
12 system they have, but are you on the regular
13 faculty?
14    A.   I am in the continuing ed. faculty.
15    Q.   Other than teaching and producing the
16 images that we have been talking about, is there
17 another aspect of your photography work?
18    A.   Yes.
19    Q.   What is that?
20    A.   I work on television sets, taking
21 publicity shots on set, and I do corporate
22 photography.  I have photographed lawyers at big
23 firms.  And I do some, a tiny bit of event
24 photography, and I should add a little bit of

Page 120

Nitke

1             Nitke
2 fashion.  I would like to do more, but I do a
3 little bit.
4       MS. WYER: I am marking another
5 exhibit as Nitke 11.
6       (Nitke Exhibit 11 marked for
7 identification)
8    Q.   Do you recognize this?
9    A.   Oh, Project Runway, absolutely.
10       MS. WYER: Let the record reflect that
11 I have marked Nitke 11 and handed it to the
12 witness and the witness's counsel.
13    Q.   This is a document from the website
14 IMDb.com, correct?
15    A.   Oh, correct, yes.
16    Q.   Do you know what this is?
17    A.   I do.  It is so funny.
18    Q.   Are you familiar with the website
19 IMDb.com?
20    A.   I am.
21    Q.   Could you explain what it is?
22    A.   It is a website that lists credentials
23 of people who work in film and television.
24    Q.   The individuals who are working, do
25 they provide the data for those entries

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 16, 2013

Page 121

Nitke

1
2  themselves, or does someone else compile and
3  publish this information?
4      A.   It is my understanding that anyone can
5  go in there and put in people's credentials. I
6  don't know if they have some system for checking
7  whether they're accurate or not.
8      Q.   Did you make this entry? This is an
9  entry that lists your name, correct?
10     A.   Correct.
11     Q.   Have you seen this before?
12     A.   I have. I haven't looked at it
13 lately, but I have seen it.
14     Q.   Did you make this entry yourself?
15     A.   Which one?
16     Q.   Did you post all of this information
17 on IMDb.com yourself, or did someone else put
18 this up here?
19     A.   Someone went into IMDb and put in as
20 many of my porn credentials as they could find.
21     Q.   Oh, really?
22     A.   I did not enter them. I went in and
23 added a bunch of my mainstream credentials. And
24 I haven't looked at it in, I don't know, years.
25     Q.   So you can't vouch for the accuracy of

Page 122

Nitke

1
2  every single entry on here, is that right?
3      A.   I can look at it and tell you.
4      Q.   You don't need to.
5      A.   It looks accurate. I don't know where
6  they gather everything, but this looks accurate.
7  I don't have any problem with it.
8      Q.   This refers to you?
9      A.   That's me.
10     Q.   Do you know if the IMDb website is
11 used by potential employers who are looking to
12 hire a photographer?
13     A.   I suspect that it might be, but I
14 don't know.
15         MS. WYER: I am marking another
16 exhibit, Nitke 12.
17         (Nitke 12 was marked for
18 identification)
19     Q.   I have marked as Exhibit Nitke 12 a
20 document titled Barbara Nitke Photography with a
21 URL at the bottom that begins with
22 www.barbaranitke.com.
23         Do you recognize this document?
24     A.   I do.
25     Q.   Is this your website?

Page 123

Nitke

1
2      A.   Correct.
3      Q.   Is this a website that you maintain
4  yourself?
5      A.   It is.
6      Q.   Do you actually manage the content of
7  the website yourself?
8      A.   I do.
9      Q.   This page is under the biography tab
10 or something on the website, right?
11     A.   Right.
12     Q.   And this lists your -- how would you
13 describe it?
14     A.   It is my biography or my résumé.
15     Q.   Is it a selective résumé?
16     A.   It is a selective résumé.
17     Q.   For what purpose?
18     A.   It is aimed at the art gallery world.
19     Q.   What is your purpose in having a
20 website?
21     A.   Making my work known.
22     Q.   Is that in the interest of selling it?
23     A.   Hopefully, someday.
24     Q.   Is it part of the kind of business of
25 being a photographer that you are trying to

Page 124

Nitke

1
2  disseminate your work?
3      A.   Well, this website, barbaranitke.com,
4  is aimed at letting people know about my artwork
5  and hopefully finding an art gallery that might
6  want to sell it, which I don't currently have.
7  So the purpose of it is to get the work known in
8  the world and hopefully one day sell the work.
9      Q.   Do you have an agent?
10     A.   No.
11     Q.   You said you don't have a gallery that
12 represents you?
13     A.   Correct.
14     Q.   For this other kind of work that you
15 do with the -- I always lose track of what
16 things are called -- the work on the TV shows?
17     A.   Television stills work.
18     Q.   Television stills work, how do you get
19 those jobs?
20     A.   I maintain a separate website that's
21 aimed at that group of people that might hire me
22 for that, but most of the work is word of mouth.
23     Q.   What is the website that you maintain
24 for that?
25     A.   Awesomestills.com.

FREE SPEECH COALITION, INC v
THE HONORABLE ERIC H. HOLDER

March 16, 2013

Page 145

Nitke

1
2    Q.    So you don't think you can say
3  accurately the specific age of this person?
4    A.    I just don't want to take a guess at
5  it.
6    Q.    Do you think that you can say within a
7  ten-year range what you think?
8    A.    My fear is that it is a trick question
9  to be honest with you, so I just don't want to
10 go there.
11   Q.    How could it be a trick question?
12   A.    Well, if she's 16 but she looks 30,
13 and I say she looks 30 and she's not, that would
14 be a bad reflection on my ability to guess
15 people's ages, so I just don't want to take a
16 guess.  I don't know anyone that knows her.  I
17 don't know her.  I have never seen her ID.  I
18 just don't want to guess at it.
19   Q.    So is this consistent with what you
20 have said about the way you practice, that you
21 don't rely on appearance?
22   A.    Yes.
23   Q.    So, without knowing someone and
24 looking at their ID, you don't feel
25 comfortable --

Page 146

Nitke

1
2    A.    I just think there's too much at stake
3  in an issue like that.  And I didn't mean
4  anything insulting about the trick question
5  remark.  You know, I am just being candid.
6    Q.    Well, do you think that you would be
7  any worse at determining someone's age than
8  someone else by looking at an image?
9    A.    It depends on who the someone else is.
10 I mean, if you are talking about a casual viewer
11 who has nothing at stake by guessing someone's
12 age, that's kind of a different frame of
13 reference than me, a photographer who might have
14 taken that picture.
15   Q.    Did you take this picture?
16   A.    No.  But I'm saying, you know, if
17 you're asking me in my role as a photographer
18 who might possibly take a picture like this,
19 then I just don't want to go there with
20 guessing.  If it is a viewer who is looking at
21 it just to enjoy looking at it, one would assume
22 that viewer is going to say, yeah, that is a
23 mature person, you know, wow, it's cool to look
24 at that picture.  I'm not looking at a child.
25          But that viewer doesn't have the same

Page 147

Nitke

1
2  stake in it as I the photographer do.
3    Q.    Do you think that law enforcement has
4  a stake in knowing the age of individuals in
5  pictures like this?
6          MS. BAUMGARDNER: Objection.
7    A.    I can't wrap my head around it.  I am
8  not sure I know what you mean.
9    Q.    You said that as a photographer you
10 feel that there's too much at stake to guess
11 someone's age in an image like this just based
12 on looking at the image?
13   A.    Correct.
14   Q.    I assume that that's because if the
15 individual were under 18 it would be child
16 pornography?
17          MS. BAUMGARDNER: Objection.
18   Q.    Is that why?
19   A.    Taking the term "child pornography"
20 out, it would be illegal for me to photograph
21 someone -- I guess you could call that a sexual
22 situation, so it could be in an illegal area for
23 me.
24   Q.    For someone like an officer of the law
25 who is charged with enforcing those laws, do you

Page 148

Nitke

1
2  think that they also have a stake in making sure
3  of the ages of these individuals?
4    A.    I think where I'm having -- I am
5  trying to figure out why I'm having difficulty
6  with that question.  I think it is because I
7  don't understand the role of the law enforcement
8  people that I can't figure out how to answer the
9  question.  Are there law enforcement people that
10 look at images like this all the time to figure
11 out if there's anyone underage or -- I just
12 don't know how their side of it works, if that
13 makes sense.  I don't know how they go about
14 what they go about.  I would have assumed that
15 they would have a complaint that they would
16 follow up on.
17   Q.    So your assumption would be that they
18 would only investigate instances of underage
19 performers, underage individuals being depicted
20 over an act that has happened?
21          MS. BAUMGARDNER: Objection.
22   A.    Well, I don't know how that side of it
23 works.  I mean I just don't know.
24          MS. WYER: I will take this back.
25   Q.    Let's go to interrogatory No. 7.  That

**In The Matter Of:**

*Free Speech Coalition Inc. v.*
*The Honorable Eric H. Holder, Jr., Attorney General*

---

*Carol A. Queen, Ph.D.*
*April 18, 2013*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94105*
*(415) 597-5600*

Original File 21607Queen.txt

**Min-U-Script® with Word Index**

Page 13

1    MS. BAUMGARDNER: I don't know yet.
2    MR. SCHWARTZ: Okay. Well, I'm going to try to
3 remember to ask you. At the end I'll probably forget.
4    MS. BAUMGARDNER: I'll try to remember.
5    MR. SCHWARTZ: Yeah, but I'd like to just get
6 that on the record.
7 BY MR. SCHWARTZ:
8    Q. But what we're talking about there, there's
9 a -- your lawyer will decide at the end whether you have
10 an opportunity to read and review what happened here
11 today before it goes to final. If your lawyer decides
12 that that's something you want to do, you'll take a look
13 at it. If you need to make any changes to it, you can,
14 with the help of your lawyer, to make sure everything is
15 accurate.
16    But just so you know, if there's any
17 significant substantive changes to your testimony, we
18 may need to come back and do another deposition to
19 explore what happened with those answers and why there
20 were the changes. Do you understand that?
21    A. Yes, thank you.
22    Q. Okay, that's the preamble. So now I'm just
23 going to do a couple -- some background questions.
24    Did you prepare for this deposition today?
25    A. When you say "prepare," could you tell me what

Page 14

1 you mean.
2    Q. Did you meet with anyone before this
3 deposition?
4    A. Lorraine and I spoke before the deposition.
5    Q. Okay. Did you review any documents?
6    A. No.
7    Q. Did you meet with anyone else other than
8 Lorraine?
9    A. No.
10    Q. Did you take any notes to prepare for the
11 deposition?
12    A. No, I didn't.
13    Q. Did you participate in preparing the discovery
14 responses? And by that I mean, they're called
15 interrogatories or request for production of documents.
16    A. The questions that were sent, yes. Yes, I did.
17    Q. Okay. What did you do for those, those
18 questions that were asked?
19    A. Well, I answered them to the best of my
20 ability.
21    Q. Okay.
22    A. There were some documents that were requested,
23 and I made copies of them and sent them off so that they
24 could be forwarded to you all.
25    Q. Great. Can you describe your educational

Page 15

1 background.
2    A. I have a B of science in sociology, from the
3 University of Oregon. I have a year of graduate school,
4 also sociology, from that same institution. Then I
5 switched from sociology to sexology and moved to San
6 Francisco and attended the Institute for Advanced Study
7 of Human Sexuality, a small graduate program here. And
8 got my Ph.D. in -- I think it was 1998.
9    Q. And was that from the Institute for Advanced
10 Study of Human Sexuality?
11    A. Yes.
12    Q. Can you describe your work history.
13    A. Some stints in restaurants back in the day. I
14 was a graduate teaching fellow in college, and I also
15 was the director of my campuses, LGBT student
16 organization, for a while. I was the director of
17 education at the Willamette AIDS Council in Eugene.
18 When I had moved to San Francisco I worked at the Lusty
19 Lady theater, which is a peep show, while I was going to
20 school.
21    And then worked at -- these two things are
22 simultaneous. Worked at Good Vibrations, beginning in
23 1990. My responsibilities, they're morphed into being
24 in charge of education programming. And, also, for a
25 couple of years was in charge of trainings at San

Page 16

1 Francisco Sex Information. That was a shorter period of
2 time, but was over the same period of time. I am
3 currently, in addition to the Good Vibrations job that I
4 still hold, the founding director at the Center for Sex
5 & Culture.
6    Q. Can you describe what the Center for Sex &
7 Culture is.
8    A. Center for Sex & Culture is a small nonprofit
9 that maintains a library and archive, as well as a
10 gallery, having to do with sexuality-related topics. We
11 collect notable papers from writers and activists,
12 books, from pop culture to academic, a range of
13 materials having to do with sexuality. And we produce
14 and offer sex ed classes, sex-related cultural
15 programming, and related benefits and things that
16 help -- allow the entity to continue.
17    Q. All right. And at Good Vibrations, currently
18 are you still in charge of their educational program?
19    A. My title now is staff sexologist and staff
20 historian, as well as the curator of the Antique
21 Vibrator Museum.
22    Q. Can you just describe what your duties are.
23    A. My fundamental role is overseeing educational
24 programming for the staff and the public, as far as the
25 entities that we do or the workshops that we do within

Page 21

1   Q.  That's all right.
2   A.  All right.
3   Q.  Can you describe what type of sexually explicit
4   material that you produce.
5   A.  I have been involved in.  Although, I wouldn't
6   say I was a producing entity of sex education videos.  I
7   do erotic art, collage art, that sometimes has sexually
8   explicit components to it, taken from other images.  I'm
9   a writer and sometimes do sexually explicit writing.
10  I'm not sure if that counts as what you're asking me to
11  describe, but that's part of my output.
12      And at the Center for Sex & Culture we do two
13  things that might have a relationship to this:  One is
14  the Masturbate-a-Thon and the other is our
15  currently-inactive photo club.
16  Q.  And you say "inactive."  What does that mean?
17  A.  We're not holding meetings of the photo club at
18  the present, but we have, and we may again in the
19  future.
20  Q.  When was the last time you held a meeting of
21  the photo club?
22  A.  My recollection is it was late last summer.
23  Q.  What was the purpose of the photo club?
24  A.  The photo club brings nascent interested
25  photographers in to work with more experienced

Page 22

1   photographers in a group setting where they get
2   education classes in photography, principles, and
3   techniques.  And then they do a shoot with models.
4   Q.  And are these nude models?
5   A.  They can be nude models and may be sexually
6   explicit in their behavior.  It just depends on the
7   model and the day.
8   Q.  Okay.  Is the class -- are these classes
9   specifically for how to take photographs of sexually
10  explicit material?
11  A.  Of erotic material.  We wouldn't call it
12  "sexually explicit" specifically, because someone might
13  want to take any kind of a range of photos inclusive of
14  that, but that wouldn't be it.
15  Q.  Okay.  So sexually explicit could be a subset
16  of what they are learning?
17  A.  That sounds right, yes.
18  Q.  And why isn't the photo club meeting currently?
19  A.  We had reached a kind of stasis with the
20  members.  There was a group of people who had been with
21  it for a long time.  People were starting to not come to
22  meetings, so we decided to let it go fallow for a while
23  and maybe revive it later with new members.
24  Q.  What sort of material is in the -- that is
25  sexually explicit is in the sexual educational videos

Page 23

1   that you make?
2   A.  What kind of material that's explicit?
3   Q.  Yes.
4   A.  Either alone or with my partner.  Or in a few
5   cases with another performer I have done sex ed
6   associated with masturbation and vibrator use; lesbian
7   or woman-to-woman safer sex; female ejaculation, also a
8   masturbation-centric video; what is now called
9   "pegging," which is a woman giving anal pleasure to a
10  man.  Those are the main -- the Sinclair movies were --
11  I think one was a Tantra movie and one was a oral sex
12  technique movie, if I remember that correctly.
13  Q.  Okay.  And are you currently making these
14  videos?
15  A.  At the moment, no.  I can't say I've stopped
16  permanently, but there hasn't been a project for a
17  while.
18  Q.  When was the last time that you made a sex ed
19  video?
20  A.  The last time I was associated in a production
21  of a sex ed video was probably two years ago.  I wasn't
22  in front of the camera.  I was a script writer and a
23  host at that point, the talking head.
24  Q.  Is there a reason why you haven't done a video
25  in the last two years?

Page 24

1   A.  A project hasn't come along that appealed to
2   me.
3   Q.  How many sex ed videos would you say you've
4   made in the past?
5   A.  If you give me a minute to count on my fingers,
6   I think I could.
7       MS. BAUMGARDNER:  And can we clarify?  You're
8   meaning produced and made in the generic sense rather
9   than the statutory, I'm assuming?
10      MR. SCHWARTZ:  Right.
11      THE WITNESS:  Those that I have been involved
12  with; is that really the clarification?
13  BY MR. SCHWARTZ:
14  Q.  Yes.
15  A.  About 13, if I haven't forgotten one.
16  Q.  That's okay.  And what time frame are we
17  talking about, if you know, that these videos were
18  produced over?
19  A.  I can give you a pretty good range.  1988, I
20  think, was the first one, to, say, 2011.
21  Q.  And for those videos that you were involved
22  with that had sexually explicit material in it prior to
23  2257, did you make any effort to get age verification
24  from the people who are performing?
25  A.  I wasn't involved in the production of anything

Page 25

1  before that time.  I do remember giving my ID in those
2  contexts.  So there was age verification conducted.  I
3  just wasn't in charge of conducting it.
4     Q.  What about after the enactment of 2257 and the
5  videos, were you involved in the collection of IDs for
6  that?
7     A.  Always, yes.
8     Q.  What was that process?
9     A.  That process involved -- I was not the -- sort
10 of the originating entity of collection then either.
11 That involved showing ID, having ID recorded in some
12 manner, photocopied or -- signing a release that
13 included name, any other names performed under or aka's,
14 pseudonyms, address, date of birth.  And I believe that
15 in each case there was the -- pursuant to U.S. 2257 as
16 part of the language of that release.  That's my
17 recollection.
18    Q.  Okay.  The erotic art that you talked about
19 that you've done in the past.  Can you describe what
20 that is.
21    A.  Sure.  I'm a collage artist, paper, scissors,
22 and glue.  I take images usually that are from explicit
23 art but sometimes also from books of fine art, found
24 paper, anything that has an image on it that seems as
25 though it might work as it collides.  It's a little

Page 26

1  difficult to explain collage in terms of that part.
2        I do maybe a few a year.  I don't do a lot of
3  them, but I have displayed and shown them more than
4  once.  And I will cut or tear images and assemble them
5  in a way that speaks to me, and I hope will speak to
6  viewers, to either highlight something about the
7  eroticism of the situation that I've compiled or
8  something else, some aesthetic communication or some
9  cultural or social communication.
10    Q.  When is the last time you put together a piece
11 of erotic art?
12    A.  I don't think -- I think the last collage I
13 constructed actually didn't have erotic elements
14 specifically.  It was a gift for someone.  That was late
15 last year.  So I'm going to say it's been about a year
16 and a half, roughly, since I've done any new collage
17 work.
18    Q.  And is there a reason why you haven't made any
19 art?
20    A.  It's mainly associated with time frame, and it
21 takes a certain kind of inspiration to do visual art
22 like that, for me.  And if I'm too busy I don't do it.
23    Q.  The requirements of 2257 are not preventing you
24 from creating erotic art?
25    A.  Well, they're problematic in the creation of

Page 27

1  the art, because I don't always know the date of the
2  materials that I am pulling from.  It seems clear that
3  when I have a photo of a naked person or sexually
4  explicitly conduct that I want to utilize in a piece of
5  art, that I can't get that 2257.  If I were to put the
6  art out in the world in a published form -- I've done
7  gallery shows, but I've not published.  And I'm hesitant
8  to publish because I don't have any idea how I would
9  come at this question of how to -- I don't know if that
10 makes me a secondary producer.
11       The language of 2257 is a little daunting, but
12 also a little unclear to me in this particular context.
13 I haven't ever sought any legal opinion about it,
14 really, but it's one of the things I think that's
15 probably slowed me down from attempting to publish them.
16    Q.  But not necessarily the creation of it?
17    A.  No.  I wouldn't not say that I have not created
18 a piece when I was moved to create one for this reason.
19 But certainly what I do then with the finished piece of
20 paper, once the glue dries, this is somewhat relevant
21 too.
22    Q.  If you wanted to put sort of the art in a book
23 or --
24    A.  Yes.
25    Q.  Has it ever prevented you from having a gallery

Page 28

1  showing, the requirements of 2257?
2     A.  I don't think so.  Although, to be frank, I
3  don't know if a gallery showing is a form of
4  publication, so it does give me some concern.
5     Q.  And the other thing you mentioned was the
6  Masturbate-a-Thon?
7     A.  Right.
8     Q.  Is that -- would you consider that your primary
9  involvement with sexually explicit material?
10    A.  I think it's one of my two primary
11 involvements.  The other one being my involvement in the
12 sex ed videos.  But the Masturbate-a-Thon, I think it's
13 fair to say, is the other most intensive involvement.
14    Q.  Okay.  Can you describe the Masturbate-a-Thon
15 for me.
16    A.  Sure.  The Masturbate-a-Thon -- and I want to
17 state here that it's the live Masturbate-a-Thon as
18 opposed to any other Masturbate-a-Thon, because the
19 original Masturbate-a-Thon wasn't a group event.  It
20 wasn't an event that would have been recorded or webcast
21 or anything or even held in a group.  It was a private
22 event.
23       Which I can clarify for you, if you need me to.
24 The live Masturbate-a-Thon is an event at which people
25 are supposed to get pledges from others.  They can also

Page 29

1  pledge themselves if they don't have appropriate others
2  to ask for pledges.  It's a charity fund-raising
3  event -- comparable to a walkathon, only involving
4  masturbation, and you don't have to get a permit to walk
5  in a park to do it -- that brings a range of people
6  together into one space, usually -- we've done these as
7  benefits for the Center for Sex & Culture.  Usually the
8  space is at the Center for Sex & Culture, but we're not
9  always at the same location.  Our current location is
10 too small to allow for the kind of Masturbate-a-Thon I'm
11 about to describe for you, so we've scaled back a little
12 bit.
13       I'm going to describe the place that we mostly
14 used.  It had three relatively large rooms.  One room
15 would be the room where people who wanted to be involved
16 in a live webcast could go.  They would have to sign
17 paperwork, give us copies of their ID.  We carded
18 everyone who entered the building, but those people
19 would have to give us their real name and their aka's,
20 fill out paperwork, allow us to copy their ID, and then
21 they would get a band that would allow them to go into
22 the room where there would be people at the door to
23 prevent other people from going into the room.
24       And there would be a room that was set up as a
25 private room where people would not have to worry about

Page 30

1  a camera entering on any level, and we would have guards
2  there at the door as well.  And then there would be a
3  room -- the refreshment table -- the place where I would
4  give interviews and interview other people while the
5  Masturbate-a-Thon was going on.  Because the point of
6  the whole thing, as a live event webcast, is to talk
7  about masturbation and communicate ideas and information
8  about masturbation from the perspective of both the
9  people who are there, but also the -- the sexology of
10 it.
11       So people would enter.  They would stay at
12 the -- stay in line for the desk, the registration desk,
13 until we had everyone carded.  The people who wanted to
14 be in the public room would go over to the side to talk
15 to the people who are doing that, taking their IDs, and
16 then everyone would mingle until they went into their
17 general rooms.  People didn't have to masturbate, but
18 they could.  There was a space set aside for women only,
19 if women didn't want to be in a group.  Also one for men
20 only, if men didn't want to be in the group.
21       And the other thing that was salient to all of
22 these Masturbate-a-Thons is that we gave awards for the
23 person who masturbated the longest time.  So people
24 would come in and set themselves up with timekeepers and
25 do that whole competitive thing.  And I would talk about

Page 31

1  that from the -- either from the public room or from the
2  main rooms, see how people were doing, talk about what
3  it takes to masturbate for a long time.  Not everyone
4  can do it, et cetera.
5       Does that give you the information you need?
6  Q.  Yes, it does.
7  A.  All right.
8  Q.  This is probably a fairly obvious point, but I
9  just want to get it on the record.  Is there any sexual
10 intercourse at the Masturbate-a-Thon?
11 A.  It is expressly forbidden.  Sexual intercourse
12 is expressly forbidden.  Partner sex is not
13 masturbation.  If a partner wants to be with their
14 masturbating partner, they can be with them, in contact
15 with them, but no sexual intercourse.
16 Q.  Okay.  So what -- just to clarify, what you
17 would show on a webcast would be basically images of
18 masturbation and depictions of genitalia?
19 A.  Right, and discussions thereof.
20 Q.  Okay.  And can you describe to me how it works
21 that the -- I'm going to call it "streaming."  Is that
22 how --
23 A.  I think that's the right term.  I'm not a
24 techie, but I think that's --
25 Q.  Me neither, but if we could just agree on that

Page 32

1  term, we'll call it "streaming," the method by which you
2  put it on the internet.
3  A.  Right.
4  Q.  Can you describe that process.
5  A.  I can describe only a little, because there's a
6  technology involved that I don't fully understand.  My
7  understanding is that our crew would come in and connect
8  some kind of device -- that I'm not even sure of the
9  name of -- that allowed for enough bandwidth to go out
10 and actually do a successful stream.  The first time we
11 tried it we didn't have such a bandwidth ability, and we
12 don't think we actually did stream.  We don't even know.
13       We got people in who knew how to do it, and so
14 they would really be in charge of the entire technical
15 piece of how they would -- how they wanted the room so
16 that they would have camera ability, that they wouldn't
17 disturb people but they could go into the people who did
18 wish to be depicted and get them appropriately, get them
19 on the stream.  And I believe the camera is attached to
20 this device with long, long cords.  That's what I
21 remember.
22       And there was an element involved with our
23 webmaster installing a button so that people could go
24 and access the stream, I think.
25 Q.  Okay.  When is the -- what year was the first

Page 33

1 time you successfully did stream it to the internet?
2   A.  I think the answer to that -- I think the
3 answer to that is 2005.
4   Q.  Have you at least attempted to stream it every
5 Masturbate-a-Thon since then?
6   A.  With the exception of the last two years, when
7 we have moved into a venue that's too small to allow the
8 kind of moving around and grouping of people that I just
9 described to you, I think the answer is yes.
10   Q.  Okay.  So just to clarify, you have not
11 streamed to the internet the Masturbate-a-Thons for the
12 last two years?
13   A.  That's correct.
14   Q.  For the ones that did get streamed to the
15 internet, how many people would you say were in the room
16 where the streaming occurred?  And by that I mean -- I
17 don't care about the techies, but the people who were
18 masturbating.
19   A.  The people who were willing to be depicted?
20   Q.  Yes.
21   A.  Because they didn't all masturbate,
22 necessarily.  It depended upon how they felt, I suppose.
23 I'm going to say that the high end of that number was
24 about 70 at our largest event, and was more like 30,
25 maybe, at the smallest.

Page 34

1   Q.  And I presumed just by how this works, that
2 people would come in and out?
3   A.  Yes.
4   Q.  So that 70 represents not at any one particular
5 time but over the course of the event?
6   A.  Right.  That's right.
7   Q.  How would someone access the live stream who
8 wasn't there?  How would they access it over the
9 internet?
10   A.  Generally, what they would do -- and, again,
11 this is me not being the tech person in my entity -- is
12 they would go to the website, and there was a -- I
13 believe there was a requirement of a credit card
14 donation that would allow them to access the stream.
15 That was one more piece of both fund raising and also
16 protection around the stream.
17       And my understanding is that we were not -- we
18 were not the big cheeses as far as this was concerned.
19 It didn't always succeed.  It wasn't always a
20 successfully sent stream.  I know I was the one who had
21 to send apology letters if somebody's stream got
22 interrupted.  So it really was a one-time a year.  We
23 would start it from scratch each time we did it.  So I
24 don't know if we changed the technology, even.  I have
25 to tell you I don't know that part.

Page 35

1   Q.  Okay.  What was the donation that people had to
2 make to access?
3   A.  I think it was minimum of $5, if I remember
4 rightly.
5   Q.  How would people know that it was out there,
6 that this was being put on the internet?
7   A.  We would announce it to our mailing list and
8 the people associated with us, and we would talk about
9 it, starting a couple of months in advance.  The
10 original Masturbate-a-Thon, the not live one that I
11 didn't describe, during that period of time always had a
12 PR presence that we could piggyback on and say that we
13 too were doing a Masturbate-a-Thon, only a different
14 kind, as will the other Masturbate-a-Thons around the
15 world.
16       There's at least two others that I know of.
17 One does not meet the criterion that I just described to
18 you.  It's more of a club event with a masturbation
19 theme.  I'm not even sure what to say about that.  I'm
20 not associated with it directly, so I'm not really sure.
21 And the other one is in Copenhagen.  There was one in
22 the UK one time too that I was a participant in.
23       So there will be a press release sent by the
24 original Masturbate-a-Thon.  We'll send a press release,
25 and they'll be some press.  It's actually more

Page 36

1 interesting to international press than to U.S. press,
2 which is fascinating.  And so I'll do -- I will do
3 telephone interviews with people from around the world
4 and a few people in the U.S. to try to get pre-attention
5 made, and we'll mention that there's a streaming part,
6 if we've got -- if we think we've got that as part of
7 the Masturbate-a-Thon.
8       And then it appears to me that there is -- that
9 there has been just general word of mouth or word of --
10 I don't know -- word of Facebook, word of internet
11 chatter, because people will e-mail us to ask us about
12 the Masturbate-a-Thon and when it is, who are not on our
13 list and whom we have not heard of before.
14       So people, we'll hear back, will want to
15 attend.  People come from out of town to attend it
16 sometimes.
17       So that's the -- that's what I know about that.
18   Q.  All right.  Did you ever receive any reports or
19 anything that would enable you to know how many people
20 were viewing the live stream?
21   A.  Yes, I think so.  A couple of times at least,
22 and it was not an enormous number.  I do not remember
23 for certain, but it would surprise me if it were more
24 than 150 people who had actually accessed it.  But
25 that's not something that I can say with 100 percent

Page 37

1  recollection.
2  Q.  And, just to be clear, can you describe what
3  appeared on the live stream video.
4  A.  I think I can.
5  Q.  Okay.
6  A.  To my knowledge, what somebody would get would
7  be one of two things:  Either an image, like a YouTube
8  image, I suppose, except without all of the surroundings
9  of either the room, the large room, with the people
10  within it, who consented to go in there masturbating, so
11  that you could see a group of people, or more close-up
12  focus on individual people.
13     There would be in, many cases, a particular
14  space where people could go and sit if they wanted to be
15  featured.  So sometimes people would do that, or that
16  the crew would go around and find one or another person
17  who looked like they were informing the world about
18  masturbation in an enthusiastic way.  So there would be
19  that part.
20     And/or -- and when I say "and" -- I think they
21  could do split screen.  So sometimes I would pop up on
22  the side or whoever I was interviewing, just talking
23  about masturbation while you could see masturbation
24  happening.  Or there would be me doing that or sort of a
25  person on the street.  Only they weren't on the street;

Page 38

1  they were there in the building.  People saying, "How do
2  you like the Masturbate-a-Thon?  What do you want to let
3  people know about masturbating; when did you start
4  masturbating," any question that would be germane to
5  that.
6     And when we had featured celebrities there --
7  which we didn't always, but sometimes we did -- we tried
8  to have somebody there who, you know, as I told you, was
9  one of our guests at one point.
10  Q.  And just to clarify, Nina Hartley?
11  A.  Nina Hartley, yes.
12  Q.  Okay.
13  A.  Then they would come and do sometimes a lot of
14  interviewing with me, sometimes a half an hour or
15  40-minute interview, depending on the time frame of the
16  day, the number of people who were there, whether people
17  had sort of cleared out of the public room by now but we
18  were still waiting to see if somebody was going to break
19  the record.  And so I would do additional content that
20  was basically a talk show about masturbation.
21  Q.  Is there any way you can estimate a percentage
22  of what was of the sexually explicit material, the
23  masturbation, versus what was, as you say, sort of talk
24  show?
25  A.  I'm afraid that I can't estimate that.  It is

Page 39

1  my sense, from having been there on the ground, that
2  there was more talk show than explicit most years.  But
3  I couldn't say that conclusively because, rather than
4  viewing the stream, I was participating.
5  Q.  Does -- the live streams, are they ever
6  replayed, sort of like you might see a repeat episode on
7  television?  Did you ever replay like the, let's throw
8  out, 2008 Masturbate-a-Thon?  Did you ever replay them
9  on the internet?
10  A.  We never replay anything, no.  Because
11  there's -- no.  I don't know about the UK TV show.  I
12  don't know about that.  Maybe, but I don't know.
13  Q.  And what do you mean?  What is the UK TV show?
14  A.  Well, there was a TV show made in the UK about
15  the Masturbate-a-Thon that we participated in, but
16  we weren't the -- I mean, we were the subjects of it,
17  really, not the producers or anything like that.  And I
18  don't know -- I'm almost positive that has never aired
19  here.  I'm not even sure it aired there.
20  Q.  But as far as you and the people who actually
21  put it on and the center, you never -- it's a one-time
22  deal?  Each Masturbate-a-Thon is a one-time deal for
23  when it appears on the internet?
24  A.  That's correct.  It's meant to be special in
25  that way.  It's really meant to be effervescent.  It's

Page 40

1  not to capture these people's likenesses permanently,
2  because they're mostly not performers.  They're mostly
3  individuals who want to come do it.
4  Q.  So there's no -- is it in any way recorded
5  permanently?
6  A.  There's photo documentation some years in that
7  room, but, to my knowledge, no.  To my knowledge, it's
8  not retained.
9  Q.  The video?
10  A.  Yes.
11  Q.  And when you say "the photos," that's someone
12  with a camera who comes in and takes pictures?
13  A.  That's correct.
14  Q.  Versus -- I think it's possible you could take
15  stills from a video, but that's not what you're talking
16  about?
17  A.  Right.  That's not what I'm talking about.
18  Q.  Okay.  Do you keep copies of any of the photos
19  of sexually explicit material that might be taken at a
20  Masturbate-a-Thon?
21  A.  I don't think we have any copies of any of this
22  material at the center.  I think the arrangement that we
23  made was that the photographer would handle all of
24  the -- making those photos available to press, if that
25  were desired in the future.  That's my understanding of

Page 41

1  the arrangement that we had with him.
2  **Q. And who is that photographer?**
3  A. David Steinberg.
4  **Q. Okay. So you don't post pictures on your own**
5  **website from the Masturbate-a-Thons?**
6  A. We don't have any of those kinds of pictures on
7  the Center for Sex & Culture's website, and I don't
8  think we ever -- I don't think we ever posted anything
9  on the Masturbate-a-Thon's own site that were from the
10  Masturbate-a-Thon. I don't think so.
11  **Q. Do you know of any other producers of sexually**
12  **explicit material who concentrate on masturbation and**
13  **the candid display of genitals?**
14  A. There are certainly -- there are certainly
15  plenty of masturbation-focused videos and sites. Some,
16  I think, are subsites of other larger ones, if I
17  understand correctly. I know that there have been
18  specific -- as I told you, there have been a couple of
19  specific masturbation-related things that I've been
20  involved in, but they weren't all that those producers
21  wanted to do.
22      The main entities I know of right now are the
23  people in Australia who do -- oh, what's their name?
24  It's got "Exquisite" in the title, I think. Anyway,
25  it's a focus -- I don't even know if they have genital

Page 42

1  depiction. It may only be faces. It may only be
2  orgasmic faces.
3      There was a couple here in the Bay Area who
4  were doing something called "Red Handed Productions"
5  that cosponsored the Masturbate-a-Thon one year to
6  promote their little masturbation videos. And I know
7  there must be zillions more, but I couldn't tell you
8  specific names of companies.
9  **Q. Do you know what the age range of people that**
10  **participate in the Masturbate-a-Thons?**
11  A. Well, it goes up to the 60s or even 70 years
12  old. I'm trying to remember the age of the youngest
13  person that I can remember seeing an ID for. I feel
14  like it's 19 or 20. People in their early 20s are rare
15  there. That's not the kind of thing that most young
16  people are interested in at all. It's mostly people in
17  their 30s and 40s who attend.
18  **Q. But if someone came who had an ID, an**
19  **appropriate ID who was 18 or 19, you would not prevent**
20  **them from participating; is that accurate?**
21  A. If they had an appropriate ID, no.
22  **Q. No, meaning you would not --**
23  A. No, no. I'm sorry, yes, I would not prevent
24  them from participating if they had an appropriate ID.
25  **Q. Okay. How many of the 19- or 20-year-olds do**

Page 43

1  you recall participating over the course of the
2  Masturbate-a-Thons that you've held?
3  A. Three or four.
4  **Q. And that's since you started doing the --**
5  A. Yes, that's right.
6  **Q. What was the year? What was the year that you**
7  **did the first one?**
8  A. The very first one that we didn't have a
9  successful attempt at a web -- the attempted webcast was
10  not successful. If my memory serves me, that was in
11  2001. It was in the spring of 2001.
12  **Q. And have you held it every year since then?**
13  A. There were a couple of years when we did not
14  have a venue, so no. Most years since then, yes. I
15  don't know that we had a venue that next year. I know
16  we had our own venue in 2005 and at least one time we
17  rented a different venue. It might have been twice, but
18  it was at least once. So in the early 2000s it was not
19  as consistent as it became once we had our venue.
20  **Q. And when was the most recent Masturbate-a-Thon?**
21  A. The most recent Masturbate-a-Thon was last May.
22  **Q. May 2012?**
23  A. May 2012, that's right. But it was not
24  streamed.
25  **Q. If I'm correct, the last one that was streamed**

Page 44

1  was in 2010?
2  A. I believe that's right.
3  **Q. Is another Masturbate-a-Thon planned?**
4  A. Yes.
5  **Q. And when is that going to happen?**
6  A. We are going to have another Masturbate-a-Thon
7  or similar event, because we're not sure that we want to
8  continue the duration part. And the duration part is
9  part of what makes it a Masturbate-a-Thon. So we might
10  call it something else, but the gist will be the same.
11  The last Saturday in May is when we have that scheduled.
12  **Q. This year?**
13  A. Yes.
14  **Q. Are there plans in place to live stream that?**
15  A. No. No, it will not be live-streamed.
16  **Q. Okay. So just to be clear, what impact is 2257**
17  **having, if any, on your Masturbate-a-Thons and your**
18  **ability to put them on?**
19  A. The fact that 2257 is a somewhat -- involves a
20  somewhat complex set of instructions about how to take
21  IDs, maintain those materials, and make them accessible
22  is, frankly, really worrisome to us. We believe we did
23  what we needed to do to make sure that we were in
24  compliance, but we hope that's the case. So there's a
25  little fear associated with that.

Page 45

1   We are a small all-volunteer nonprofit that
2   doesn't have regular office hours.  So the part about
3   someone wanting to come in and actually see the
4   materials -- some appropriate entity coming to see the
5   materials, because inappropriate people don't get to see
6   them.  They're on lockdown.  We don't even allow our
7   interns to go through them.  I'm essentially the person
8   who has to handle the material.  This means that if
9   we're not there in the middle of the day, and we often
10  are not because our events are generally in the evening,
11  the place will be locked up and there would be no one to
12  give the FBI access, if the FBI is the entity that would
13  do that inspection.  Whoever appropriate would do that
14  inspection, I guess, is what I mean.
15      These are not the only reasons that we are not
16  streaming the Masturbate-a-Thon now.  It also has to do
17  with the venue and the way that it's set up.  But it's
18  true in part that our concern about the 2257s and that
19  whole part of what we need to do to comply affects our
20  decision.  It's not irrelevant.  It's not the only
21  thing, but it's not irrelevant either.
22      The other piece that I probably ought to say
23  about this -- I think I adequately described that some
24  people say, "Yeah, I want to be in that room.  I want to
25  show the world."  And other people want to go into the

Page 46

1   private room where there isn't going to be any risk of
2   them being recorded.  And sometimes people will say that
3   they would do the live stream if they didn't have to
4   leave their ID, if they didn't have to give their name
5   and their home address, if they didn't have to step
6   across a line having to do with their own privacy that
7   they consider too problematic.  Whether they don't trust
8   us to maintain their materials, I don't know.  Whether
9   it's something larger, I don't necessarily know, because
10  I'm too busy in front of a camera at the
11  Masturbate-a-Thon to engage people a lot about this.
12  But they do say, sometimes, that if they could just sign
13  with the name, sort of their -- the name they use within
14  the sex community, that they would do it.  But because
15  they have to give all of their real information, that
16  they're hesitant and unwilling.
17      So how many of the people who actually do leave
18  their material and go in and participate also feel that,
19  I don't know.  But, you know, I had signed these
20  releases, and it is not -- not of no concern to me that
21  I have now signed my name on a dotted line in this
22  context.
23      So I think there's the phrase "the chilling
24  effect," right?  I think there's a chilling effect.  I
25  can't tell you how vast it is, but I can tell you that I

Page 47

1   think that there are people for whom something that
2   otherwise would be an adult sexuality community event of
3   interest is made frightening on some level by this
4   requirement.  And I'll never know how many people just
5   don't come into the door at all.  I'll never know that.
6   Q.  But 2257 has not ever prevented you in and of
7   itself from hosting a Masturbate-a-Thon?
8   A.  No.  During the periods that we were doing this
9   streaming -- obviously, when we weren't doing streaming
10  it's not really a relevant question.  But when we were
11  doing the streaming, no, it has never prevented us.  It
12  probably has been part of the reason that we decided
13  only to stream and not to do anything further.  That I
14  think goes without saying.  Actually, I think if we
15  didn't have to have the concern about this set of
16  issues, that we would have retained more materials for
17  our archives and so forth, instead of it be an
18  effervescent thing.
19      We do collect a certain amount of the material
20  that the press puts together and talks about.  You know,
21  we try to keep clippings and things like that.  I have
22  to tell the press about 2257 at every single event.
23  They don't understand.  They don't know it's there.
24  They've never heard of it.  They don't know what its
25  requirements are.  If they have heard of it, they don't

Page 48

1   think it applies to the press.  It's kind of
2   extraordinary.
3   Q.  Well, speaking of the press, I have some --
4   we'll go into that.
5       I think it's what you -- the 11th
6   Masturbate-a-Thon, I think, was in 2010.  Are you aware
7   that there was a photographer named Gretchen Robinette
8   at that event?
9   A.  We knew that there was a photographer from the
10  San Francisco Weekly.  Is that the person that you're
11  talking about?
12  Q.  Yes.
13  A.  Okay.
14  Q.  Are you familiar with the San Francisco Weekly?
15  A.  I'm familiar with the San Francisco Weekly.
16  Q.  Can you tell me what that is.
17  A.  It's a free weekly newspaper that has been
18  published in the Bay Area for at least 25 years, I
19  think.  It used to be locally owned.  I don't think it
20  is any longer.  They've got a website and they've got a
21  paper now.
22  Q.  Are you aware that pictures of past
23  Masturbate-a-Thons are on their website?
24  A.  I was told that the person had acquired images.
25  I explained -- I remember when they walked in, and I

Page 65

1   about that were discussed.  I don't know that I can
2   recall an instance where a prosecution was actually
3   taking place.  So I guess the answer to the question is,
4   no, I don't think I can cite an instance that I know of.
5       Q.  And then, just to be clear, it's not -- the
6   question wasn't about actual prosecution, but anyone who
7   has been threatened with prosecution.
8       A.  I'm just having a little trouble parsing the
9   word "threatened" right now.  That's why I'm being
10  silent a little bit.  I think I know that people feel
11  under threat of potential prosecution, but I don't think
12  that's what you mean.  Am I right?
13      Q.  No, I mean -- yes.  Do you know of anyone where
14  the government or the FBI has come to an individual and
15  said, "We're considering prosecuting you under 2257"?
16      A.  I understand.  I don't know of a specific
17  situation like that.
18      Q.  Okay.  And what you refer to as "people are
19  aware," that's a possibility?
20      A.  That's correct.
21      Q.  But no one has ever officially told them that
22  they -- you don't know of any instances where an
23  official from the government has said, "We're thinking
24  about prosecuting"?
25      A.  That's right.  I don't know of any instances of

Page 66

1   that kind.
2       Q.  Do you know of anyone who has actually been
3   prosecuted under 2257?
4       A.  Not to my recollection.
5       Q.  And I think we wanted to -- I think you covered
6   this a little bit, but I want to explore it and make
7   sure you have a complete answer on it.
8           If you were not subject to the age verification
9   requirements and recordkeeping requirements of 2257,
10  would you still check IDs of the people who are
11  appearing in streaming video at your Masturbate-a-Thons?
12      A.  Absolutely.  The Center for Sex & Culture is an
13  18-and-over venue, because of the materials we keep
14  there.  And if there's any chance that we're going to
15  have any nudity, explicit conduct, we check IDs.
16      Q.  And why would you do that?
17      A.  Because it would not be appropriate to have
18  people under 18 be in a space with nudity and explicit
19  conduct.  It's not legal in the first place, and it's
20  not something we do.  We're an adult education entity.
21  There's a kind of education for young people that's
22  quite appropriate, but that's not it.
23      Q.  Okay.  If you weren't subject to the
24  recordkeeping requirements of 2257, would you still keep
25  a copy of those, the IDs that you would have collected?

Page 67

1       A.  While we haven't discussed it among ourselves
2   as to whether we would or would not, my feeling right
3   now in answering your question is that we wouldn't
4   because we're conscious of this question of privacy.
5   And we know that many people have that concern who come
6   to us.  So if we weren't required to do this, I think we
7   probably would keep the records.  We would still
8   check the ID; that would not change.
9       Q.  But without 2257 you may not necessarily take a
10  Xeroxed copy of it?
11      A.  That's correct.  In a situation like the photo
12  club, where a record may still be kept of the person
13  modeled, we would keep their release.  We would still
14  want a model release, but I don't think that we would
15  photocopy ID and keep them with the model release.
16      Q.  And in the absence of 2257, what instances in
17  what you do -- any aspect of what you do or the center,
18  would you do a model release?
19      A.  In the absence of 2257?
20      Q.  Yes.
21      A.  The model release that we would keep would be
22  associated with -- I believe only the photo club.  I
23  think that's the only time when we know there may be a
24  record of the image that the person participated in
25  creating.

Page 68

1       Q.  You know, you probably wouldn't do it -- you
2   would probably not get a record, a model release from
3   someone who wanted to appear on the live stream; is that
4   accurate?
5       A.  We would still get a release from them, saying
6   that they knew that they were going to go into a
7   sexually-related environment.  We would still check
8   their ID.  I don't know that we would maintain a copy of
9   the release.  But this is a little bit projective,
10  because at the present we're not doing streaming, and in
11  the future -- I don't know if we're going to stream the
12  Masturbate-a-Thon again.  It's perfectly possible we
13  would stream something else, classes, things like that.
14  And I think we would cross that bridge when we came to
15  it and determine what we needed to do in order to
16  protect the people participating but also to protect
17  ourselves and comply with whatever compliance needed to
18  be done.
19      Q.  But, as we sit here today, if 2257 ceased to
20  exist tomorrow and you did decide to do a live stream of
21  a Masturbate-a-Thon, for those people who wished to
22  appear on the live stream, you would still get a model
23  release from those people; is that right?
24      A.  That's right.
25      Q.  Okay.  And you're uncertain as we sit here

Page 77

1  explicit material -- colloquially, we could say the porn
2  industry, and I suppose -- I mean, that's as good a --
3  that's as clear a representation I think I could make
4  about it.
5      Q.  Okay.  In that first paragraph of your answer,
6  you use the term "clearly mature adult."  Can you
7  describe what you mean by that term?
8      A.  In this context, this would be -- well, people
9  who could not be mistaken for minors, for one thing.
10  But, as I said, most of the people involved in this kind
11  of work that I've done have been in their 30s and 40s.
12  So what I mean is over the age of majority, by "clearly
13  mature."
14      Q.  In your educational background, all of the
15  extensive education you've had, as part of that, did you
16  ever receive any training or education upon which you
17  could base your opinion that someone is clearly mature
18  at a particular age?
19      A.  No.  No, I rely on IDs for that.  When I have
20  to make a distinction about somebody's age, that's the
21  way that it has to be done.
22      Q.  And no part of your education involved -- I
23  mean, I understand you took classes in human sexuality.
24      A.  Sure.
25      Q.  Was there any aspect of it that discussed human

Page 78

1  biology?
2      A.  Sure, discussion of Tanner stages and so forth,
3  but I'm not a specialist in any of that.  That's not
4  something that I can state that I have enough expertise
5  in.
6      Q.  But you're familiar with how individuals are
7  judged as to being when they become sexually mature or
8  through puberty?
9      A.  Generally, but sexual maturity and age of
10  majority are two completely different things.  They
11  can't be confused, especially not in a situation like
12  this.
13      Q.  And you would agree with me that it is
14  difficult to tell just by an image when a person agewise
15  becomes sexually mature?
16      MS. BAUMGARDNER:  Objection.
17      THE WITNESS:  Well, I would say that it's not
18  difficult to tell by most images if someone is of age.
19  In the world in which I'm primarily working, as I've
20  told you, few people are very young.  And by "very
21  young," I mean close to 18, above but close.  So it is,
22  in a way, difficult to watch people walking in who are
23  in their 30s and 40s and know that it's -- you know, we
24  check their ID anyway.  We take their paperwork anyway,
25  but it's not a question.  And it's very rarely a

Page 79

1  question, and we check IDs.  So it wouldn't be
2  appropriate for us to try to determine that in any other
3  way.
4  BY MR. SCHWARTZ:
5      Q.  Would you agree with me that it is difficult to
6  tell the specific age of a person just by visual
7  observation without checking their ID?
8      A.  The specific age?
9      Q.  Yes.
10      A.  Sure, but that's not how we try to do it in
11  this context.
12      Q.  And that's why you check IDs, because you can't
13  tell just by looking at someone?
14      A.  One of the reasons to check IDs is because that
15  takes some of the guesswork out of figuring out how old
16  someone is, yes.
17      Q.  And having checked the ID, that allows you to
18  be more competent about a person's age?
19      A.  That's right.
20      Q.  Especially for you, you would not turn away
21  someone who is 18 from a Masturbate-a-Thon, correct?
22      A.  I would not turn away someone who was 18 and
23  had the proper ID.
24      Q.  Do you -- through any of your training, do you
25  know the physiological and psychological differences

Page 80

1  between an 18-year-old and a 16-year-old?
2      A.  That would really depend on individual people.
3  I can't generalize to age 18 and age 16, and I don't
4  know that my training is sufficient to allow me to say
5  that I have real expertise in this topic.  My work is in
6  adult sexuality, so that's a different level of
7  expertise.
8      Q.  Is there a reason why you can't generalize the
9  differences between a 16-year-old and an 18-year-old?
10      A.  Because people mature at different rates, and
11  I'm conscious of the need to see people as individuals
12  rather than aggregates.
13      Q.  And, based on your training, would you agree
14  with me that someone can reach sexual maturity prior to
15  age 18?
16      A.  Not legal sexual maturity, no.  The biology of
17  it, I suppose, would be yes.  It's not something that
18  would ever be germane to this work that I do, though.
19      Q.  Right.  But it is possible for someone to
20  become physically sexually mature before they reach the
21  age of 18?
22      A.  In certain cases, yes, I guess so.
23      Q.  You talked about this a little bit, in your
24  answer to No. 7.  You responded that artists are subject
25  to 2257.  What did you mean by that specifically?

Page 85

1  materials subject to 2257.  I think we just talked about
2  one example.
3      A.  Right.
4      Q.  Are there any other examples that you know of?
5      A.  That's an example.  Individuals who might be
6  making erotic materials to share with their partner,
7  people who put up their exhibitionistic or frisky
8  pictures on websites.  Web camming might be an example
9  of this.  Some people do it not for money but for other
10 reasons.  Sexting might be included in this sort of
11 thing.  Certainly taking cell phone or electronic camera
12 shots in private moments would potentially, particularly
13 if they got out of a couple or an individual's hands,
14 then make this kick in, as I understand it.
15     Q.  Okay.  Do you know any private individuals who
16 are producing sexually explicit materials in the course
17 of their private sex lives who are complying with 2257?
18     A.  No.  And I should say, it's not that I don't
19 know people who are using cameras in their private sex
20 lives.  I do know people like that.  I don't know anyone
21 who is complying with 2257.
22     Q.  Okay.  And is there -- we may have already
23 discussed it, but I want to sort of break it out as an
24 individual question.
25         Why do you think that the statute applies to

Page 86

1  individuals who are taking sexually explicit images or
2  videos in their private sex lives?
3         MS. BAUMGARDNER: Objection.
4         THE WITNESS: Not being an attorney, I can tell
5  you that my cultural concern is, rather than giving you
6  my legal opinion.
7  BY MR. SCHWARTZ:
8      Q.  Sure.
9      A.  My cultural concern is two-fold:  One is,
10 people who make private materials aren't always
11 successful at keeping them private.  And once something
12 like this becomes public -- an excellent example of this
13 would be a revenge website -- then it is now a produced
14 and published item.  And my understanding of 2257 -- and
15 this is the other piece.  This is connected.  My
16 understanding of 2257 is that it doesn't make exceptions
17 for such things, that it probably was written at a time
18 when this was not a common phenomenon, but it certainly
19 is now.
20         So whenever I do public speaking these days, I
21 warn people about -- especially young people, if I'm
22 talking to college students, I warn them that what has
23 become a common courtship ritual is potentially going to
24 subject them to real legal problems.  And if someone who
25 is under 18 -- and I don't really go talk to people who

Page 87

1  are under 18.  But if someone were under 18, then they
2  not only potentially would be up against 2257, they
3  would be making child porn.  And I'm very, very
4  concerned about that.
5      Q.  Do you know any individuals whose private sex
6  lives have been affected by 2257?
7         MS. BAUMGARDNER: Objection.
8         THE WITNESS: I think most private individuals
9  have no clue that they should consider their private sex
10 life potentially affected by 2257.  So the answer is no,
11 but that doesn't mean that they wouldn't potentially be
12 affected under some circumstances.
13 BY MR. SCHWARTZ:
14     Q.  Do you know of any individuals who have been
15 prosecuted under 2257 for sending sexually explicit
16 depictions of themselves privately to their significant
17 other?
18     A.  I do not know of anyone that falls under that
19 description, no.
20     Q.  Do you know of any private individuals who have
21 been subject to a 2257 inspection?
22     A.  No.
23     Q.  Going back to the interrogatories, No. 8 --
24 actually, we already talked about -- yeah, we already
25 discussed how you collect them and where you keep them

Page 88

1  and how many you have.
2         In Interrogatory No. 9 -- we did touch a little
3  bit on this earlier -- I'm just wondering if you can
4  give an estimate on the number of people who have come
5  to your Masturbate-a-Thons between the ages of 18 and
6  25?
7      A.  I could not tell you conclusively, but people
8  under 25 are the exception, not the rule.  And I can
9  estimate the percentage of people under 25 as being
10 10 percent or fewer.  I don't know if that's helpful.
11     Q.  That's a perfectly good response.  That's what
12 you believe.
13         For Interrogatory No. 10, in your response you
14 state that there are a number of images that you would
15 publish as a part of your work were it not for the 2257
16 requirements.
17         I just want to confirm that we've already
18 basically discussed that as sort of your art and collage
19 images?
20     A.  And we likely would make different choices
21 about the Masturbate-a-Thons if we felt it was safer to
22 do it, so the Masturbate-a-Thon is also relevant to this
23 question, I think.
24     Q.  And just on sort of the images you would
25 publish, would you publish more images from the

Page 109

1  addition to the experience that the photographers get
2  from doing that photo shoot, they also make those
3  available to the couple.  So that's a variant, I think,
4  of what you're asking me.
5    Q.  Yes.  And those were not made generally
6  available.  It was just for the couple who was
7  participating in the photo session?
8    A.  Our agreement with the photo club photographers
9  is that unless they get a separate release from the
10  models -- we're attempting to install in them good
11  practices around 2257 compliance, in asking them to do
12  this; it's the reason that we do it -- we ask that they
13  not do anything else with those images.  So, really, the
14  images exist for the use of the models and of the
15  photographers on a learning level, not a publication
16  level.
17    Q.  And the couples that were photographed, you did
18  the ID check and the model releases?
19    A.  Yes, absolutely right.
20    Q.  And they signed the releases?
21    A.  Yes.
22    Q.  Do you know any photographers that it's
23  their -- sort of their profession to take pictures of
24  couples engaged in sexually explicit material for their
25  own private use?

Page 110

1    A.  For their own private use?
2    Q.  The couple's private use.
3    A.  Right, right.  As opposed to them having copies
4  of the pictures, but the photographer also being free to
5  publish that or use it in some other way?  Is that what
6  you mean?
7    Q.  Yes.
8    A.  I know that there are photographers who
9  advertise those kinds of services.  I don't believe I
10  know anybody who restricts their photographic work to
11  that, personally.
12    Q.  I know we've talked a little bit about this,
13  but just to make sure I've got everything covered.  You
14  have read Section 2257, correct?
15    A.  Yes.
16    Q.  Have you read the regulations that go along
17  with it?
18    A.  I don't think so.
19    Q.  Do you understand the difference between the
20  statute and the regulations?
21    A.  I'm not sure that I do.
22    Q.  Okay.  One of the other claims is that the
23  Statute 2257 is burdensome.  Are you familiar with that?
24    A.  Uh-huh.  Yes.
25    Q.  Can you describe for me what those burdens are,

Page 111

1  that you believe is burdensome to the point of being
2  unconstitutional.
3    A.  Burdens would include the fact that the
4  provisions in 2257 might fall upon people that perhaps
5  they weren't intended to in the first place.  They
6  certainly seem to relate to all sexual depictions, and
7  that, it seems to me, is overly broad, and for that
8  reason is burdensome.  This last set of discussions
9  we've been having about people's private uses and stuff,
10  that seems relevant to this question to me.
11        The way that the recordkeeping requirements can
12  be onerous, particularly for a small entity -- a big
13  entity that does this all the time, it's my
14  understanding that all those guys did their best to find
15  out how they could comply as soon as they possibly
16  could.  And it's the journalists, the artists, the
17  community-based organizations like mine, and the people
18  who don't -- and also the people who don't even know
19  that 2257 might relate to them, I think it's safe to say
20  that most Americans don't actually know anything about
21  these regulations.  And some subset of those people are
22  engaging in some kind of sexually frisky behavior that
23  might at some point land them in this field of concern.
24        The other thing that I will say in answer to
25  your question is sort of a more personal one, but I

Page 112

1  imagine that it is a sentiment that other people who are
2  plaintiffs here and who are in relevant situations to us
3  may feel.  And that's that these are Federal charges,
4  and they're frightening to contemplate.  The degree of
5  responsibility that I have for my nonprofit affects its
6  well-being and it affects my well-being, and it's kind
7  of terrifying.  It's kind of terrifying.  So that's part
8  of my answer to that question.
9        I think the people who are not worried about
10  these regulations are mostly the people who don't know
11  they exist.
12    Q.  Okay.  So previously we talked about your
13  understanding in sort of a layperson's understanding of
14  narrowly tailored.  You've also just discussed what some
15  of the burdens are that you believe.
16        Are there any other reasons that you have that
17  you believe 2257 is unconstitutional?
18        MS. BAUMGARDNER:  Objection.
19        THE WITNESS:  This makes me want to go back to
20  school and be a constitutional scholar.
21        MS. BAUMGARDNER:  I will make an objection for
22  the record that I think it is an unfair question,
23  asking, you know, this plaintiff how a law is
24  unconstitutional.  But to the best of her ability, I'll
25  allow her to answer.

Page 121

1    because it is possible for a minor to look over 18?
2          MS. BAUMGARDNER: Objection.
3          THE WITNESS: I would imagine that it is
4    possible for a minor to look over 18. That is not
5    something that is my area of expertise, but clearly this
6    is -- I'm going to leave it there.
7    BY MR. SCHWARTZ:
8      Q. And why is it your belief that it's a good
9    practice to check IDs no matter what?
10     A. Because treating everybody who comes in the
11   door the same way is wise, for one thing. That way
12   people's interpretation doesn't overlay the policy and
13   the procedure. Because it's illegal for someone under
14   18 to be in a sexually explicit depiction or to access
15   sexually explicit space, and the effects on that person
16   are what the law is attempting to protect them from.
17   And we also have a stake in protecting them from those,
18   and we have a stake in protecting the other people there
19   from the accusation that people may have been under 18.
20        So, really, the protection goes both ways in
21   terms of that policy and in terms of the law.
22        MR. SCHWARTZ: That's all I have. I wanted to
23   ask about signing reading and signing.
24        MS. BAUMGARDNER: Okay. We'll stay and work on
25   the spellings after we're off the record, and we will

Page 122

1    waive then.
2          (At 12:21 P.M., the deposition proceedings
3          concluded.)
4
5
6          ------------------------------
7          CAROL A. QUEEN, Ph.D.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 123

1    STATE OF CALIFORNIA    )
2                           ) Ss.
3    COUNTY OF SAN FRANCISCO )
4
5        I hereby certify that the witness in the
6    foregoing deposition, CAROL A. QUEEN, Ph.D., was by me
7    duly sworn to testify to the truth, the whole truth, and
8    nothing but the truth, in the within-entitled cause;
9    that said deposition was taken at the time and place
10   herein named; that the deposition is a true record of
11   the witness's testimony as reported by me, a duly
12   certified shorthand reporter and a disinterested person,
13   and was thereafter transcribed into typewriting by
14   computer.
15       I further certify that I am not interested in
16   the outcome of the said action, nor connected with, nor
17   related to any of the parties in said action, nor to
18   their respective counsel.
19       IN WITNESS WHEREOF, I have hereunto set my hand
20   this 30th day of April, 2013.
21
22
23
24       DAWN E. HOWARD, CSR NO. 13201
25       STATE OF CALIFORNIA

# In The Matter Of:

*FREE SPEECH COALITION, INC. v*
*THE HONORABLE ERIC H. HOLDER,*

---

*March 15, 2013*

---

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File d3fnrosd.txt

**Min-U-Script® with Word Index**

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,

March 15, 2013

---

Page 1

```
1                    Ross
2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF PENNSYLVANIA
3  -----------------------------x
4  FREE SPEECH COALITION, INC. et
   al.,
5
                   Plaintiffs,
6
         v.                    No. 09-4607
7
   THE HONORABLE ERIC H. HOLDER,
8
                   Defendant.
9
   -----------------------------x
10
                        March 15, 2013
11                      9:00 a.m.
12
13
14        Deposition of CARLIN ROSS, taken by
15   Defendant, at the United States Attorney's
16   office, One St. Andrew's Plaza, New York, New
17   York, before Samuel G. Mauro, Jr., a Registered
18   Merit Reporter and Notary Public of the State of
19   New York.
20
21
22
23
24
25
```

---

Page 3

```
1        Ross
2  CARLIN ROSS,
3     called as a witness by the Defendant,
4     having been duly sworn, testified as follows:
5  EXAMINATION
6  BY MR. BLADUELL:
7     Q.   Good morning, Ms. Ross.  We thank you
8  for being here with us to explain your claim.
9         My name is Hector Bladuell.  I
10 represent the government in this case.
11        Have you been deposed before?
12    A.   Yes, I have.
13    Q.   When have you been deposed?
14    A.   It was a case when I was counsel at a
15 company years ago on an insurance claim, 9/11
16 business interruption insurance claim.
17    Q.   You are an attorney also, correct?
18    A.   Yes, I am.
19    Q.   As you know, the purpose of this
20 deposition is not to discuss the merits of your
21 claim.
22    A.   Yes.
23    Q.   The purpose is to understand better
24 your claim.
25        To do that I am going to ask you
```

---

Page 2

```
1                    Ross
2            A P P E A R A N C E S
3
4  BERKMAN, GORDON, MURRAY & DEVAN
5  Attorneys for Plaintiffs
6       55 Public Sq., Ste. 2200
7       Cleveland, OH 44113-2000
8  BY:  LORRAINE BAUMGARDNER, ESQ.
9
10
11 United States Department of Justice
12 Civil Division, Federal Programs Branch
13      Attorneys for Defendant
14      20 Massachusetts Avenue, N.W.
15      Room 7130
16      Washington, DC 20530
17 BY:  KATHRYN WYER, ESQ.
18      HECTOR G. BLADUELL, ESQ.
19
20
21
22
23
24
25
```

---

Page 4

```
1        Ross
2  several questions.
3         Your counsel is probably going to have
4  at most two objections during this examination.
5  Unless she instructs you not to answer, you
6  should answer the question if you know the
7  answer.
8         If you don't understand my question,
9  please ask me, and I will rephrase it.  If you
10 need a break, please ask me and we will break.
11        Do you have any condition that would
12 impair you from understanding my questions
13 today?
14    A.   No.
15    Q.   Are you under any medication that
16 would impair your ability to understand my
17 questions today?
18    A.   No.
19    Q.   Do you also understand that you have
20 taken an oath to tell the truth today?
21        Yes?
22    A.   Yes.
23    Q.   Before I begin, do you have any
24 questions at this point about the deposition?
25    A.   No.
```

---

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,

March 15, 2013

Page 5

Ross

1
2    Q.   Ms. Ross, have you prepared for this
3    deposition?
4    A.   Yes.
5    Q.   How have you prepared for the
6    deposition?
7    A.   I met with Lorraine and we just went
8    over answers to some of the interrogatories.
9    Q.   Besides the answers for the
10   interrogatories, did you go through any other
11   documents?
12   A.   No.
13   Q.   So you reviewed the answers to the
14   first set of interrogatories, correct?
15   A.   Correct.
16   Q.   The second set of interrogatories?
17   A.   I believe so, yes.
18   Q.   The requests for admissions?
19   A.   Yes.
20   Q.   The requests for production?
21   A.   Yes.
22   Q.   Did you make any notes to prepare for
23   this deposition?
24   A.   No.
25   Q.   You don't have any notes with you

Page 6

Ross

1
2    today?
3    A.   No.
4    Q.   Did you participate in preparing the
5    discovery responses?
6    A.   Yes.
7    Q.   All of the ones I just mentioned?
8    A.   Yes.
9    Q.   Let's talk a little bit about your
10   education.
11   A.   Sure.
12   Q.   You went to law school where?
13   A.   I went to Brooklyn Law School.
14   Q.   You graduated when?
15   A.   '98.
16   Q.   '98.  It is not so long ago.  That
17   year you took the bar, correct?
18   A.   Yes.
19   Q.   You passed the bar?
20   A.   I did, first time, yes.
21   Q.   Great.  Are you still a member of a
22   bar?
23   A.   Yes.
24   Q.   What is this bar?  The New York bar, I
25   assume?

Page 7

Ross

1
2    A.   Yes, the New York bar.
3    Q.   You are a member in good standing?
4    A.   Yes.
5    Q.   You have never been suspended or
6    reprimanded?
7    A.   No.
8    Q.   Do you currently practice law?
9    A.   No.
10   Q.   After law school, what was your first
11   job?
12   A.   My first job was working as general
13   counsel of Globex Corporation.
14   Q.   What did you do as general counsel of
15   that corporation?
16   A.   Mostly contractual-based work.  We
17   were an Internet service provider, so it was
18   heavy service agreements.  Then we would bring
19   in programmers from India and Russia with H-1Bs
20   and stuff like that, and so some immigration,
21   employee manuals, like all that corporate kind
22   of stuff.
23   Q.   You did this job for how long?
24   A.   I guess it was three years.
25   Q.   Three years.  After this job what did

Page 8

Ross

1
2    you do?
3    A.   Then I went independent.  I guess I
4    was self-employed.  I was hired by companies to
5    roll up assets of failed dot-coms.  I joined an
6    LLC, and we rolled up the assets of a company
7    Pseudo Programs and relaunched as an online
8    broadcaster.  That's how I segued from law to
9    media.
10   Q.   After this job is when you started
11   working with Betty Dodson, correct?
12   A.   There were a few years that I was
13   independent, so after that job I started a
14   website.  I was blogging, and then I interviewed
15   Betty.
16   Q.   What were you blogging about?
17   A.   Female sexuality and relationships.
18   Q.   Do you have any training in sexuality?
19   A.   No.
20   Q.   What was your bachelor's degree in?
21   A.   Political science.
22   Q.   You have no medical training?
23   A.   No.
24   Q.   Any courses that you took before law
25   school about sexuality?

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,

**March 15, 2013**

Page 9

Ross

1
2    A.    No.
3    Q.    Or male or female genitalia?
4    A.    No.
5    Q.    Any courses you have taken after law
6  school about genitalia?
7    A.    No.
8    Q.    About sexuality?
9    A.    No.
10   Q.    So how do you know about sexuality and
11 genitalia?
12        MS. BAUMGARDNER: Objection.  Go
13 ahead.
14   A.    I guess I did my own studies, and I
15 have been practicing with Betty now for five
16 years.  And we have traveled the world
17 lecturing.  Betty is the number one sexologist
18 in the world, so I guess that's more like
19 training.  It is more of an apprenticeship.
20   Q.    Before you started with Ms. Dodson,
21 what kind of how did you acquire the knowledge
22 about sexuality and genitalia?
23        MS. BAUMGARDNER: Objection.
24        Go ahead.
25   A.    Reading books.  Reading books,

Page 10

Ross

1
2  educating myself.
3    Q.    Do you recall any books in particular
4  that you read?
5    A.    Good question.
6        You know I wouldn't say I read
7  anything specifically about female genitalia,
8  maybe more about body image.  "Why We Love" by
9  Helen Fisher;  "She Comes First," Ian Kerner;
10 "The Ethical Slut"; "The Guide to Getting It
11 On."
12        What else?  That would be pretty
13 much -- I mean "The Guide to Getting It On" is
14 kind of a 2,000-page primer.
15   Q.    Did any of these books discuss how you
16 would determine someone's age by looking at
17 them?
18   A.    No.
19   Q.    By looking at their genitals?
20   A.    No.
21   Q.    You said you are working with Betty
22 Dodson?
23   A.    Yes.
24   Q.    Since what year?
25   A.    Since 2006.

Page 11

Ross

1
2    Q.    Can you please describe what you do
3  with Betty Dodson in this business?
4    A.    Sure.  I am editor in chief of the
5  website.  So we have --
6    Q.    What is the name of this website.  I'm
7  sorry to interrupt.
8    A.    That's OK.  Dodsonandross.com.
9    Q.    OK.
10   A.    We have 25 writers.  So I manage the
11 writers.  I decide what kind of content we are
12 going to go after at what time, like any editor
13 of a magazine.
14        I have the whole technical strategy of
15 the website.  I run the website.  I am not a
16 programmer, but I sit on top of them and manage
17 work that needs to be done from our affiliate
18 sales and affiliate deals to all of our customer
19 service, to our product fulfillment -- we have a
20 lot of original product -- to the video
21 production.
22   Q.    Are you the president of -- is there a
23 company name?
24   A.    Yes.  Bad Media LLC, which is Betty
25 Anne Dodson.

Page 12

Ross

1
2    Q.    Betty Anne Dodson.
3    A.    LLC.
4    Q.    Bad Media is the holding company?
5    A.    Well, it is a limited liability
6  corporation.
7    Q.    Limited liability corporation.  Do you
8  have other companies that Bad Media owns?
9    A.    No.
10   Q.    So the website is owned -- the name of
11 the website BettyDodson.com?  bettyandross.com?
12   A.    dodsonandross.com.
13   Q.    Is that website owned by the company?
14   A.    Yes.
15   Q.    Are you the president of the company?
16   A.    Yes.
17   Q.    You have been the president since
18 when?
19   A.    Inception, so I guess I was like 2007
20 I believe.
21   Q.    Is Betty Dodson your superior?
22   A.    She is the founder.  She is the big
23 boss, yes.
24   Q.    So you report to her?
25   A.    Yes.

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,

March 15, 2013

Page 13

Ross

1       Ross
2    Q.   She doesn't report to you?
3    A.   No.
4    Q.   Is there a Genital Art Gallery in this
5    website?
6    A.   Yes.
7    Q.   Do you manage the content of that
8    gallery?
9    A.   Yes.
10   Q.   Ms. Dodson, does she manage the
11   content, too?  Is it a joint operation?
12   A.   I would say, yes, it's joint.
13   Q.   You said you managed the videos,
14   correct?
15   A.   Yes.
16   Q.   Would you say that you are the best
17   person along with -- do you have any other
18   employees?
19   A.   No.
20   Q.   So you would be the person that knows
21   more about the videos and the depictions in the
22   gallery?
23   A.   Yes.
24   Q.   Do you have any publications?
25   A.   What do you mean by "publications"?

Page 14

1       Ross
2    Q.   Articles that you have written.
3    A.   Yes.
4    Q.   How many?
5    A.   A few.  I have a column now on
6    Huffington Post.  So I think maybe four, because
7    we just started.
8    Q.   Have you written any books?
9    A.   Yes.  I just launched my book a month
10   ago.  I am so excited.
11   Q.   What is the name of the book?
12   A.   "How to Make a Girl Come."  I just
13   want to say for the record I chose that name
14   because it is the most searched phrase that
15   people use to find the site.  That's why I did
16   it.
17   Q.   How do you know that it's the phrase
18   that most people use to search the site?
19   A.   We have an account with Google
20   Analytics, so you can go in if you link your
21   website to it, and it will tell you what's the
22   most popular content what are the top keywords,
23   where people are coming from all over the world
24   to visit your site.
25       That is a large part of what I do is I

Page 15

1       Ross
2    kind of manage what people are clicking on, what
3    they're looking for.  Because we are really
4    global.  We are in every country but
5    Turkmenistan and three countries in Africa.  So
6    we're accessed worldwide.
7    Q.   The phrase that is most used is "how
8    to make a girl come"?
9    A.   After "Betty Dodson."  Betty is first.
10   Then it's "how to make a girl come."
11   Q.   Do you recall any other phrases in the
12   top five?
13   A.   Oh, God.
14       It is always "Betty Dodson," "how to
15   make a girl come," then "Betty Dobson," d-o-b,
16   so I bought that keyword because I saw they were
17   spelling it wrong, "female orgasm" and then
18   "pussy."  Sorry.
19   Q.   Anything else that you recall at this
20   point?
21   A.   Sure.  I mean all kinds of words like
22   "threesomes."
23       "Genital shame" is a big one.  "Am I
24   normal?"  We get a lot of that.  They will give
25   you hundreds of them, but it is kind of

Page 16

1       Ross
2    permutations, and most of it is focused on
3    genital and genital issues and orgasm for women.
4    Q.   Any search terms related to "young"?
5    A.   No.
6    Q.   Or "teen"?
7    A.   We don't get any "barely legal," no.
8    Q.   How would you described division of
9    work in this Bad Media company between you and
10   Betty Dodson?
11   A.   Betty is the brand.  Betty has a very
12   authentic kind of unspoiled brand.  She answers
13   the sex questions.  We get about 20 to 30 sex
14   questions from the web a day, and she answers
15   those.  Then I would say I'm kind of the
16   one-woman show behind that.
17   Q.   Do you consider Betty Dodson an expert
18   in sexuality?
19   A.   Yes.
20   Q.   Do you consider her an expert in
21   genitals?
22   A.   Yes.
23   Q.   Does Betty Dodson manage the
24   day-to-day operations of the company?
25   A.   To a certain degree because I include

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,

March 15, 2013

Page 25

Ross

1
2     Q.    The videos are mostly about
3  masturbation, correct?
4     A.    Correct.
5     Q.    And display of the genitals?
6     A.    Yes.
7     Q.    Would you say 99 percent of the videos
8  are about masturbation?
9     A.    Yes.
10    Q.    So what sexually explicit videos has
11 your company produced since 2005?
12    A.    It think The Orgasm Doctor, then a
13 Manual Skills series, our Sex Positions with Sex
14 Toys series.  I think that's in 2005.  I think
15 that's it.
16    Q.    So you mentioned the Orgasm Doctor?
17    A.    Yes.
18    Q.    You mentioned the Manual Skills
19 series?
20    A.    Yes.
21    Q.    Then you mentioned another one?  A
22 third one?
23    A.    Sex Positions with Sex Toys.
24    Q.    Sex Positions with Sex Toys, what year
25 was it produced?

Page 26

Ross

1
2     A.    I think it was 2010 or 2011.
3     Q.    And the one -- the Manual Skills?
4     A.    Yes.
5     Q.    What year was that produced?
6     A.    I believe that was 2009 or 2010
7  because we kind of did them really close
8  together.
9     Q.    Any other videos produced since 2005?
10    A.    I don't believe so.
11    Q.    Before 2005?
12    A.    Yes.
13    Q.    What videos have you produced?
14    A.    That was pre-me.  I came in in --
15    Q.    2005?
16    A.    Yes.  Betty did the Joy of Self-joy,
17 Viva La Vulva, Celebrating Orgasm, Orgasmic
18 Women, and The Orgasm Doctor.  I think she shot
19 it and then I worked on the editorial.
20    Q.    You granted us access to your website,
21 correct?
22    A.    Yes.
23    Q.    You gave us a user name?
24    A.    Yes.
25    Q.    And a password?

Page 27

Ross

1
2     A.    Yes.
3     Q.    Were you the one responsible for
4  managing that access?
5     A.    Yes.
6     Q.    It was not Betty Dodson?
7     A.    No.
8     Q.    Did you grant us complete access to
9  all the videos shown on your website?
10    A.    I believe so, yes.
11    Q.    So you didn't select a portion of
12 videos?
13    A.    I don't believe so.
14    Q.    For us to see.
15          So all the videos on your website are
16 accessible to us free of charge?
17    A.    I believe so, yes.
18    Q.    You said you believe so.  Are you sure
19 about it or you're not sure about it?
20    A.    I am a not a hundred percent because
21 it was done a while ago.  I can't remember how
22 much I gave you.  I think I gave you everything.
23          MS. BAUMGARDNER:  Can we go off the
24 record for a minute.  If you want to go back
25 on --

Page 28

Ross

1
2     Q.    I'm sorry.  Do you have a question
3  about a question that I have asked?
4     A.    To ask you?
5     Q.    Yes.
6     A.    No, I don't.
7          MR. BLADUELL:  So why are you --
8          MS. BAUMGARDNER:  I just want to
9  clarify.  My understanding is we granted you
10 access.
11          MR. BLADUELL:  I am not asking you for
12 your understanding, counsel.
13          MS. BAUMGARDNER:  I was just going to
14 go off the record so I could explain to you what
15 we did.
16          MR. BLADUELL:  Can we go off the
17 record, please.
18          (Discussion off the record)
19    Q.    Ms. Ross.
20    A.    Yes.
21    Q.    I am going to show you a document.  It
22 is a printout of your website that I printed
23 out.  I am going to mark it as Exhibit 1.
24    A.    That lists all the videos, OK, easy.
25          (Exhibit RD-1 marked for

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,

March 15, 2013

Page 29

Ross

1          Ross
2    identification)
3    Q.    We?
4          MR. BLADUELL: have marked the
5    exhibit as RD-1, Ross Dodson.
6          MS. BAUMGARDNER: May I see a copy of
7    that, please.
8          MR. BLADUELL: Yes.  That's your copy.
9    I'm sorry.  This is your copy.
10         For the record I'm handing a copy to
11   the witness, Carlin Ross, and to counsel.
12   Q.    This is a copy of the section my
13   account.
14   A.    Yes.
15   Q.    Related to the access that you
16   provided us?
17   A.    Uh-huh.
18         MS. BAUMGARDNER: You have to answer
19   verbally, Carlin.
20         THE WITNESS: Sorry.
21         MR. BLADUELL: Thank you, counsel.
22   A.    Yes.
23   Q.    It lists the videos that we have
24   access to, correct?
25   A.    Correct.

Page 30

1          Ross
2    Q.    Videos that are not on this list we
3    don't have access to, correct?
4    A.    Correct.  I think there are just two I
5    missed.
6    Q.    I'm sorry.
7          Could you explain what you are saying?
8    A.    I think there are two clips I didn't
9    give you access to on this list.
10   Q.    That is fine.
11   A.    OK.
12   Q.    Let's just stay in this document for a
13   while.
14   A.    Sure.
15   Q.    Orgasmic Women is a video produced in
16   2005, correct?
17   A.    Yes.
18   Q.    Manual Skills is a video you said you
19   produced around 2000 --
20   A.    '9 or '10.
21   Q.    '9 or '10?
22   A.    Yes.
23   Q.    Orgasm Doctor, 2005?
24   A.    Uh-huh.
25         MS. BAUMGARDNER: You have to answer

Page 31

1          Ross
2    verbally.
3    A.    Yes.
4          MR. BLADUELL: Thank you, counsel.
5    Q.    Women Using Homemade Zucchini Dildo,
6    2005?
7    A.    Yes.  Those are, the next bunch are
8    all 2009 or 2010.
9    Q.    The next bunch, you mean which ones?
10   A.    From Women Masturbating with Barbell
11   and mystic to Right-Angle Position with Hitachi
12   Magic Wand.
13         Those were all produced together.
14   Q.    In 2010?
15   A.    Yes.
16   Q.    Now, now you have said that these are
17   not all the videos available for purchase,
18   right, in your website?
19   A.    Yes.
20   Q.    How do you select these videos and
21   excluded others?
22   A.    Well, I have to go into each clip and
23   go into a little tab that says access control
24   and add your user.
25         So when I was doing it -- you know,

Page 32

1          Ross
2    there are a lot of clips.  I might have missed
3    one or two, but I can grant you access.
4    Q.    I am going to show you another
5    document.  It is another printout of your
6    website.  I am going to hand first a copy to
7    counsel.
8    A.    Oh, yes.
9    Q.    I will give you your copy.
10   A.    OK.
11   Q.    Don't worry.
12   A.    Sorry.
13         MS. BAUMGARDNER: We share.  I can
14   share.
15   Q.    I am handing a copy to the witness and
16   I have a copy that I am going to mark as RD-2.
17         (Exhibit RD-2 marked for
18   identification)
19   Q.    This is a copy of the video portion of
20   your website, correct?
21   A.    Correct.
22   Q.    Can you take a look at -- it's printed
23   on the front and on the back.
24   A.    Oh.
25   Q.    Can you just take a look at it and let

Page 33

Ross

1
2    me know if these are fair representation of all
3    the videos for purchase in your website?
4       A.   Yes.
5       Q.   The answer is that this is all that
6    you have available?
7       A.   Correct, yes.
8       Q.   Now, the first one on the left corner,
9    Betty Dodson Bodysex Workshop?
10      A.   Yes.
11      Q.   That was produced in what year?
12      A.   2011.
13      Q.   And Carlin and Liandra, part I and II?
14      A.   Same, 2011.
15      Q.   Carlin is your name, too, correct?
16      A.   That's me.  Maybe that is why I didn't
17   put on it the list.  It might have been an
18   embarrassment.
19      Q.   You are the performer in this video?
20      A.   Yes, I was a performer in that video.
21      Q.   You obviously know the other
22   performer?
23      A.   Yes.
24      Q.   How old is the other performer?
25      A.   How old?  She's 27.

Page 34

Ross

1
2       Q.   27.  OK.  Darcy Cures Her Cramps is
3    another video?
4       A.   That's part of --
5       Q.   Orgasmic Women?
6       A.   Yes, that is an excerpt from Orgasmic
7    Women.
8       Q.   How to Use a Menstrual Cup?
9       A.   Yes.
10      Q.   What year was that produced?
11      A.   That was shot by one of our users and
12   that was, gosh -- maybe 2009.
13      Q.   So your users shoot videos and send
14   them to you?
15      A.   Sometimes.  This is a blogger.  I'm
16   sorry.
17      Q.   2002, you said?
18      A.   2009.
19      Q.   2009.  A Girl Masturbating with a
20   Pearl Necklace and Glass Dildo?
21      A.   That is also a blogger, the same one.
22      Q.   What year was it produced?
23      A.   I think around the same time 2009.
24      Q.   Reverse Cowgirl?
25      A.   That's the Sex Positions with Sex

Page 35

Ross

1
2    Toys, all of these, the next several, yes.
3       Q.   And are these also 2009?
4       A.   I think those are 2009 or '10.
5       Q.   Do you know the performer in How To
6    Use a Menstrual Cup?
7       A.   Yes.
8       Q.   Have you provided us with the ID of
9    this performer?
10      A.   I don't know.  I mean --
11      Q.   You don't know?
12      A.   It should have been in the group, but
13   I don't know offhand.  I would have to look
14   through it.
15      Q.   Let's flip the page?
16      A.   OK.
17      Q.   There is approximately eight or --
18   twelve more videos here, right?
19      A.   Yes.
20      Q.   Sixteen if we count the other page?
21      A.   Yes.
22      Q.   Side Positions with Hitachi Magic
23   Wand, and the videos that are here, some of them
24   were produced between 2005 and 2009?
25      A.   I think these were produced in 2010,

Page 36

Ross

1
2    2009, 2010.
3       Q.   All right.  I can represent to you
4    that I don't know if we have the IDs for these
5    people.
6       A.   You have the IDs for this because this
7    is me and Eric Wilkinson.  I did this series.
8       Q.   Sex Positions?
9       A.   Yes.
10           MS. BAUMGARDNER: That answer just
11   elicited information subject to the protective
12   order.
13           THE WITNESS: Sorry.
14           MS. BAUMGARDNER: I just need to note
15   that for the record, Carlin.
16      Q.   I am going to ask for production of
17   all the IDs and model releases for the people
18   depicted in your video for the record.  Because
19   I believe we don't have some of theme.
20           MS. BAUMGARDNER: For what time
21   period, Hector.
22           MR. BLADUELL: From 2005 on.
23           MS. BAUMGARDNER: That is assuming you
24   don't have them.  We will look.
25           MR. BLADUELL: I am sure I don't have

Ross

1
2  a lot of them. But we'll discuss more IDs and
3  releases shortly.
4     Q.   In these exhibits, the videos in
5  Exhibit RD-2, you keep 2257 records for them?
6     A.   Correct.
7     Q.   For the videos that you produce, do
8  you employ the same performers for all the
9  videos?
10    A.   No.
11    Q.   You employ different performers?
12    A.   Correct.
13    Q.   So from video to video they can be
14  different performers?
15    A.   Correct.
16    Q.   And from year to year they can be
17  different performers?
18    A.   Correct.
19    Q.   I mean, is it your preference that
20  they would be different performers?
21    A.   No.
22    Q.   Do you look for new performers for
23  videos?
24    A.   No. We don't do that porn thing, no.
25    Q.   What do you mean "that porn thing"? I

Ross

1
2  don't understand.
3     A.   Well, in porn it's always about
4  someone new, a fresh face. Not necessarily.
5  Like women have been in multiple productions.
6     Q.   Have you watched a lot of porn would
7  you say?
8        MS. BAUMGARDNER: Objection.
9     Q.   Would you say that you have watched
10  several porn movies?
11    A.   Of course, it's the Internet age.
12    Q.   You notice this trend --
13    A.   Yes.
14    Q.   -- of new people all the time,
15  correct?
16    A.   Correct.
17    Q.   Do you notice a trend for young people
18  in mainstream porn?
19    A.   You know, I don't know. I think now
20  with online porn everything is very niche.
21  Everything is kind of there. I mean, maybe you
22  could make the argument for studio, you know,
23  the big studios, but I don't know -- the most
24  searched sex term in the United States is
25  "MILF", so I think people kind of want to see

Ross

1
2  older women.
3     Q.   How do you know this?
4     A.   There was an article in the Daily Mail
5  that was fascinating. It took by country what
6  is the most popular sex keyword. Australia was
7  "gay men," we were MILF, and then -- what was
8  the UK? I forgot. Anyway --
9     Q.   Do you know the second most used?
10    A.   No. They just did the top.
11    Q.   Do you know if "teen porn" is one of
12  the most searched?
13    A.   I don't know.
14    Q.   You don't know. Have you seen young
15  people in the porn you have seen?
16    A.   I mean --
17    Q.   Let's say people that resemble 20
18  years old?
19    A.   20? Sure.
20    Q.   It is not uncommon to find people that
21  are 20 years old or resemble 20 years old in
22  porn videos, right?
23    A.   I guess. I mean, I don't know.
24    Q.   In the videos that you have seen?
25    A.   Yeah.

Ross

1
2     Q.   Is it uncommon to find an 80-year-old
3  in porn videos that you have seen?
4     A.   I don't think soy. There's a whole
5  genre of GILF films. I don't think that is
6  uncommon.
7     Q.   In the mainstream porn industry, is it
8  uncommon to find an 80-year-old?
9     A.   I would think so, yes.
10    Q.   Is it uncommon to find a 60-year-old?
11    A.   Yes.
12    Q.   A 50-year-old?
13    A.   I don't know. Nina Hartley is still
14  in the game, but I think there are some
15  50-year-olds that are still there.
16    Q.   It is more common to find 20-year-olds
17  than 50-year-olds, correct?
18    A.   I would imagine.
19    Q.   From the videos that you have seen --
20    A.   From what I have seen. I am not an
21  expert. From what I have seen, yes.
22    Q.   It is more common to find 20-year-olds
23  than 50-year-olds?
24    A.   Correct.
25    Q.   How about 30-year-olds, and

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,

March 15, 2013

Page 41

Ross

1
2  20-year-olds?  Are there more 20-year-olds,
3  people in their 20S than people in their 30s?
4      A.   I will say that most of the porn stars
5  I know, because we are in sex ed, we rub
6  shoulders, most of them that I know are in their
7  late 20s, early to mid 30s.
8      Q.   But in the videos that you have seen,
9  can you say that most people, most of the
10  performers resemble more of the 20s look than
11  the 30s?
12     A.   I don't know.  Because they always
13  have such large breasts, and I don't know if I
14  could distinguish between 20 and 30.
15     Q.   So it is hard to say the age range of
16  the performers?
17     A.   Between 20 and 30, some 30-year-olds
18  look really good.
19     Q.   When you mentioned the enhanced
20  breasts, you mentioned that you think that makes
21  women look older than they are?
22     A.   I think so, yes.
23     Q.   Now let's talk a little bit about your
24  IDs.  Do you need a break?
25     A.   No.

Page 42

Ross

1
2      Q.   Let's talk a little bit about your IDs
3  and model releases.
4          You are aware that we've requested
5  production of all of the IDs that you keep and
6  all of the model releases that you keep?
7      A.   Yes.
8      Q.   Do you know the number of
9  identification cards that you have produced to
10  us?
11     A.   I don't know the exact number.
12     Q.   Do you know an approximate number?
13     A.   15.
14     Q.   15?
15     A.   I don't know.
16     Q.   That is close enough?
17     A.   That was prepared by an intern, so I
18  just gave her the files.  I don't know.  I am
19  assuming everything --
20     Q.   Did you check the files before
21  producing documents to us?
22     A.   I checked them and then I had her scan
23  them and then I sent it over.
24     Q.   Before you sent them over, did you
25  recheck them?

Page 43

Ross

1
2      A.   No.
3      Q.   So there could have been a couple
4  missed?
5      A.   There could have been.  That's why --
6  mea culpa, there could have been a couple.
7      Q.   As long as you tell the truth, nothing
8  bad is going to happen.
9      A.   Oh, good.  I like this.
10     Q.   I have been able to count 18?
11     A.   So I wasn't so bad at guesstimating.
12     Q.   You weren't that bad?
13     A.   OK.
14     Q.   You keep IDs of more than 18
15  performers, wouldn't you say so?
16     A.   Well, there are some multiple people,
17  so, you know, like my license is on file, and
18  I'm in one, two, three, four, five, six, seven,
19  eight, you know what I mean, clips.
20     Q.   In that videos page that you have,
21  RD-2 I believe, we established that there's like
22  30 videos, correct?
23     A.   Yes.  Also just looking at -- where is
24  it?  Yes.  Celebrating Orgasm.  I think that was
25  before the statute, or I mean that's before my

Page 44

Ross

1
2  time.  I don't think that we had IDs.  We had
3  signed releases, but we didn't have any IDs for
4  that.
5      Q.   To your best knowledge, you would say
6  that you have in your possession more than 18
7  IDs of performers?
8      A.   I don't know.  I believe the number is
9  close.
10     Q.   But you don't know?
11     A.   Not offhand.
12     Q.   OK.
13     A.   I don't want to nail down an answer
14  because I already said I missed two clips.
15     Q.   Do you have hundreds of IDs for
16  videos?
17     A.   No.  We haven't produced hundreds of
18  videos.
19     Q.   Well, I am going to request
20  production --
21     A.   OK.
22     Q.   -- of all the IDs that you have for
23  the videos appearing in RD-1, RD-2, the exhibits
24  that you have not produced.
25     A.   OK.

Page 45

Ross

MS. BAUMGARDNER: I am going to object that, because I believe the production was subsequent to the court order, and the Court limited the period from January 1, 2005, to December 31, 2009.

MR. BLADUELL: We can discuss the scope of the request later.

MS. BAUMGARDNER: I am making it clear for the record because you are implying that our production was incomplete.

THE WITNESS: That's right. It was '5 to '9.

MS. BAUMGARDNER: We were operating within those confines.

MR. BLADUELL: OK.

MS. BAUMGARDNER: You can make your request.

MR. BLADUELL: Yes. I am making the request for the record. I am also making a request for the videos that we don't have access to. I think it is Manual Skills I and II, and there was another video.

A. No, you have access. No?

Q. I'm sorry.

Page 46

Ross

A. Carlin & Liandra that was probably a Freudian weird thing that happened in my head.

Q. So I would like to see all the videos on my account.

A. I will get them for you for the weekend.

Q. Thank you.

A. You have to laugh about these things.

Q. Yes, no problem.

Are there any documents showing how many performers you have employed other than the IDs?

A. No.

Q. You don't make a summary?

A. No.

Q. Would the model releases show how many performers you have?

A. Well, yes.

Q. OK. So there are other records other than the IDs? There are the model releases?

A. Yes.

Q. Do you keep a database of the names of the people online?

A. No.

Page 47

Ross

Q. It is all paper?

A. Yes.

Q. Were the records that you produced including people in your Genital Art Gallery?

A. I believe so, yes.

Q. How many --

A. There would only be a few. What's left up now is what was before the -- I don't know what the cutoff is, remember in 2009 -- they said just genitals before that it didn't need a release and ID.

Q. How many pictures do you have in the Genital Art Gallery?

A. Up now? A hundred, two hundred.

Q. 200?

A. I think.

Q. You don't keep IDs of all of those people?

MS. BAUMGARDNER: Objection.

Go ahead and answer.

A. OK. No, because the majority of that gallery was under Betty's old website, which was produced in the '90s, I think it was '88 it launched, and she started doing that. So they

Page 48

Ross

were before the new regs on the statute. So they wouldn't -- if it was just a genital, it didn't have to have the signed release. So there was no process where she did that. So I kept up what was all the old ones.

Q. But since 2009 you have been requesting IDs of the people?

A. Yes.

Q. So you have some IDs?

A. We have like two.

Q. You have two?

A. I think we have two.

Q. Can you identify the initials of the people that you know that you keep IDs in the Genital Gallery?

A. I don't know offhand. I know by the image of their genitals, but I don't know their names.

Q. I am going request production of the initials and the dates of birth so we can verify that we have the records for the record.

A. OK.

Q. Now, you don't have records for a lot of the people in the Genital Art Gallery?

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,

March 15, 2013

Page 49

Ross

1
2    A.   Correct.
3    Q.   But you still post those pictures up,
4    correct?
5    A.   Correct.
6    Q.   How do you know that there's no minor
7    that is depicted there?
8    A.   Well, we asked them to send in a sex
9    essay about their sex life and their sexual
10   development.
11       So they are writing about being
12   married and having children and pregnancy and
13   sex postpregnancy, and, you know, some of them
14   have graying pubic hair.  I am not an expert in
15   looking at someone's genitals, I know, and
16   saying what the age is, but there are times I
17   think there are clearly of majority.
18   Q.   There are sometimes that it's
19   difficult to tell?
20   A.   Yes.  Over the years Betty has had
21   people send in things that she didn't put up.
22   Q.   So you rely on their essays to
23   determine their age and insure -- do you try to
24   insure that there are no minors in this --
25   A.   Our website is about women.  We're

Page 50

Ross

1
2    feminists.  We are not about exploiting young
3    girls.  Absolutely not.  So, yes, it could go
4    against my brand.  I would never want a minor in
5    there, ever.
6    Q.   But you rely on what they write to
7    know if they are over 18, correct?
8    A.   And the look of their genitals.
9    Q.   Is it possible that they could lie.
10   Is it possible that someone could lie about
11   being 18?
12   A.   I don't think so.  I don't think any
13   young child wants to take an image of their
14   genitals and upload it to a site for no money.
15   There are so many sites where you can upload
16   images and make money off them.
17   Q.   It is just possible that someone could
18   lie?
19   A.   Everything is possible, yes.
20   Q.   Right?
21   A.   Yes.
22   Q.   Are you aware of instances where
23   minors have tried to lie about their age to get
24   into clubs?
25   A.   Of course.  But don't bouncers rely --

Page 51

Ross

1
2    if the person looks 25 or above, you don't have
3    to ask for a license.  Like I was a bartender in
4    college, and they would say if they looked under
5    25, so you are making that judgment.
6    Q.   The ID would show if someone is under
7    18 or not?
8    A.   Of course.
9    Q.   A government-issued ID would be a good
10   indication, correct?
11   A.   Correct.
12   Q.   That ID would help you to be more
13   sure, right, about someone's age?
14   A.   Correct.
15   Q.   I'm going to show you another
16   document.
17       MR. BLADUELL: This is going to be
18   RD-3 I believe.
19       It is a document that you are familiar
20   with hopefully.  It is responses to first and
21   second set of interrogatories.
22   A.   OK.
23       (Exhibit RD-3 was marked for
24   identification)
25       MS. BAUMGARDNER: First and second

Page 52

Ross

1
2    set?
3        MR. BLADUELL: First set.  I am going
4    to give a copy to counsel for the record.  It's
5    going to be interrogatory No. 9.
6    Q.   Actually, can I switch the copy.
7    A.   Sure.
8    Q.   I marked that one, and I want to keep
9    it for the record.  I am going to give you
10   another one.  It's interrogatory No. 9.
11   A.   Uh-huh.
12       MS. BAUMGARDNER: You have to answer
13   verbally, Carlin.
14       THE WITNESS: Yes, I'm sorry.  I am
15   such an "uh-huh" person.
16   Q.   You have seen this document before,
17   correct?
18   A.   Yes.
19   Q.   This document asks you to identify for
20   each such age group whether the total number of
21   depictions is more than five, greater than ten,
22   greater than twenty, greater than fifty, greater
23   than one hundred, greater than one thousand.
24   A.   Uh-huh.
25   Q.   If you flip the page, on page 6, we

Page 53

Ross

1
2 have your answers.
3    A.   Yes.
4    Q.   You said, "We are unable to provide
5 data for many images produced throughout the
6 years," correct?
7    A.   Yes.
8    Q.   Why do you say you are unable to
9 provide data for many images throughout the
10 years?
11    A.   I believe that is the Genital Art
12 Gallery.  At that time it wasn't a legal
13 requirement to request someone's ID so we just
14 didn't collect it.
15    Q.   Do you believe that the images in the
16 Genital Art Gallery fall under the statute?
17    A.   No, I don't.
18    Q.   You don't believe so?
19    A.   No.
20    Q.   Why don't you believe so?
21    A.   Because as a now sex educator I can
22 tell you we've traveled the world, from Cuba to
23 Scandinavia, and the number-one issue people
24 have that keeps them from having good sex, which
25 is about intimacy and relationships, is genital

Page 54

Ross

1
2 shame.
3        And I don't want to censor porn, but
4 the majority of vulvas in pornography have been
5 surgically enhanced.  They clip the inner lips,
6 they bleach the vagina, they bleach the asshole.
7 So it is to maybe look like a little girl.  I
8 don't know what their intent is.
9        People look at those images, and if
10 they don't see something that looks like them
11 they think they are deformed.
12        The same thing for men.  They are
13 choosing men that are very large, most of them
14 are circumcised.  So we have a lot of people
15 writing in saying, I can't have sex with someone
16 because I think there's something wrong with me,
17 which is why Betty started the Genital Art
18 Gallery, so you can see a real image of a real
19 person, which is why anonymity is important,
20 because real people with day jobs and wives and
21 husbands and kids don't want their license
22 floating around and someone can find out that
23 they've done something like that.
24    Q.   You said in your answer right now that
25 in mainstream porn women sometimes undergo

Page 55

Ross

1
2 certain procedures?
3    A.   Yes.
4    Q.   To look younger?
5    A.   I don't know.  The ideal look of a
6 vulva, a clamshell, which means if there's any
7 little dangling inner lips they cut them off,
8 and now labioplasty is the number one plastic
9 surgery procedure requested by women in the
10 United States, and now it's going across to
11 Europe.  And then they bleach everything so that
12 it's pink.  The whole point is no brown.  I
13 don't know why they do it --
14    Q.   But does that make them look younger
15 than they really are?  Is that the purpose?
16    A.   I don't know if that's the purpose.
17    Q.   Well --
18    A.   There is a range of looks of vulvas,
19 different styles.
20    Q.   I think you said that the purpose was
21 to make them look like a little girl.
22    A.   I don't know what the purpose is.  I
23 can't really speak for them.
24    Q.   Didn't you say that, that the purpose
25 was to make them look like a little girl?

Page 56

Ross

1
2    A.   I said I don't know after that.  I
3 don't know why they do it.  You could make the
4 argument so that it's so that they look younger.
5 You could make that argument.
6    Q.   If it is a hundred percent successful
7 surgery, that would make them look young -- and
8 if it is to look for them to look like a little
9 girl, then it would make them look younger,
10 correct?
11    A.   I guess.  You could make the argument,
12 that removing the pubic hair and clipping the
13 inner lips and dyeing everything pink, bleaching
14 everything pink you could make the argument; or
15 it could be a style, because some women are born
16 with pink and there are no inner lips, some
17 women have that style but it's probably, from
18 what we gather, like 10, 15 percent.
19    Q.   What other purpose would there be if
20 they're doing this procedure than to resemble a
21 little girl and to look younger, what other
22 purpose?
23    A.   That's a style.  You know, why do we
24 like, you know, the waif look?  Why do we like
25 Twiggy?  It could be a style.

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,

March 15, 2013

Page 57

Ross

1          Ross
2     Q.   The style to look younger?
3     A.   I don't know what their intent is
4  because we don't do that.  So it could either be
5  looking younger or it could be like a style.
6     Q.   What kind of style would that be?
7     A.   The clamshell.  That's what it's
8  called, the clamshell style.
9     Q.   This clamshell style, what is the
10 style?  Can you describe what it is?
11    A.   A style.  So there is a range of
12 genitals and how they look.  The majority of
13 women have dangling inner lips, and the outside
14 of them are a little brown.  But some women it's
15 completely closed and it's pinker.  Like
16 anything in life, there is a variation in the
17 appearance of the body.
18    Q.   Do young girls have this clamshell
19 look, resemble the clamshell look?
20    A.   Oh, I know what you're getting at.
21 No.  It is a style.  Some little girls have
22 dangling inner lips from the get-go.  That's the
23 way it is.
24    Q.   Do you know if most little girls have
25 this clamshell style look?

Page 58

1          Ross
2     A.   That I don't know.
3     Q.   You have not seen a lot of --
4     A.   No.
5     Q.   But you do have some kind of knowledge
6  that this clamshell look is to make, it could be
7  to make people look like little girls because
8  you just said that, right?  You didn't make that
9  up, correct?
10    A.   No.
11    Q.   You didn't lie about it, right?
12    A.   The purpose could be.  I mean, you
13 should depose Hugh Hefner and ask him, and some
14 of the other --
15    Q.   Maybe I will.
16    A.   -- multimillion dollar pornographers
17 because maybe they could shed light on it.
18         MS. BAUMGARDNER: Or the women.
19    Q.   Let me show you a document.
20    A.   Sure.
21         MS. BAUMGARDNER: Are we done with
22 this one?
23         MR. BLADUELL: No.  We'll hold it.
24         MS. BAUMGARDNER: Can I have a copy?
25         MR. BLADUELL: I'm sorry.  I'm handing

Page 59

Ross

1          Ross
2  the witness a document called the Genital Art
3  Gallery artist statement.  I'm handing a copy to
4  counsel.  And I'm going to mark this as Exhibit
5  RD-4.
6         (Exhibit RD-4 was marked for
7  identification)
8         THE WITNESS: The first time I heard
9  about labioplasty was on Howard Stern.  He would
10 have the porn stars come on and they would talk
11 about clipping the inner lips and the procedures
12 they would undergo.  I guess this was in the
13 '80s.  And I had never heard of that, and now
14 it's the number one procedure women request.
15    Q.   Do they say why they do this?
16    A.   I guess it must be the most pleasing
17 aesthetic.  Why do supermodels starve
18 themselves?  It must be what the industry wants.
19    Q.   It would help them get more business?
20    A.   Yes, they would make more money.
21    Q.   Now, if we look at the third paragraph
22 in this RD-4, the Genital Art Gallery artist
23 statement.  It says, "Today many women in the
24 adult industry have undergone surgery for
25 removal of their extended inner lips to achieve

Page 60

1          Ross
2  what one surgeon calls the clamshell look,
3  reminiscent of a prepubescent girl."
4     A.   Yes.
5     Q.   "Other women began to want a similar
6  work."
7         Do you think that statement is
8  accurate?
9     A.   This is Betty's statement, and, yes,
10 it's accurate.  Betty can say.  She's the
11 oracle.
12    Q.   This is a similar statement that you
13 just made, correct?
14    A.   Well, no.  My statement was about why
15 people in the adult industry -- and I can't
16 speak for them, so that's why I'm saying I don't
17 know what the intent is, but it would seem that
18 it was because you would look younger.
19    Q.   A prepubescent girl is how old?
20    A.   I don't know.  Just probably --
21    Q.   12, 13?
22    A.   I would imagine, prepubescent.
23    Q.   There are no 10 or 13-year-olds in the
24 porn industry that you know of?
25    A.   No, not that I know of.

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,

**March 15, 2013**

Ross

1
2   Q.   It would be a crime, right?
3   A.   Yes.
4   Q.   It would be child pornography?
5   A.   Yes.
6   Q.   So most of the women in the adult
7   industry are over 18, correct?
8   A.   Correct.
9        MS. BAUMGARDNER: Objection.
10  Q.   If you know?
11  A.   Well, I would imagine, since you
12  haven't busted them, that they are.
13  Q.   The purpose that they undergo this
14  procedure is they could look like a prepubescent
15  girl that is around 13 or 14, correct?
16       MS. BAUMGARDNER: Objection.
17  A.   I assume, yes.
18  Q.   Yes?
19  A.   Yes.
20  Q.   Thank you.  Let's continue on
21  interrogatory No. 9.  It asks about the
22  breakdown of ages.
23  A.   You see we have some 62-year-olds.
24  Q.   Well, let's go back to page 5.
25  A.   OK.

Ross

1
2   Q.   Would you say that the number of
3   people 18 to 25 in your depictions and images is
4   greater than 50?
5   A.   No.
6   Q.   It is greater than 20?
7   A.   No.
8   Q.   It's greater than 10?
9   A.   No.
10  Q.   Greater than 5?
11  A.   Yes.
12  Q.   And 26 to 35, it would be greater than
13  20?
14  A.   No.
15  Q.   Greater than 10?
16  A.   Yes.
17  Q.   36 and 45, greater than 5?
18  A.   Yes.
19  Q.   Greater than 50?
20  A.   No.
21  Q.   Greater than 20?
22  A.   No.
23  Q.   I mean, you said you don't have that
24  many.  You don't have more than 20 performers?
25  A.   That's what I am saying, so 20.

Ross

1
2   Q.   So all of thee categories would be
3   greater than 5?
4   A.   Probably greater than 5, yes.
5        MS. BAUMGARDNER: I just want to
6   object.
7        MR. BLADUELL: I'm sorry.  She has no
8   question.  You cannot interrupt.  If you have an
9   objection note it for the record.  Do not coach
10  the witness.
11       MS. BAUMGARDNER: I am not.  I am
12  pointing out that the question asks for the
13  number of depictions, not the number of
14  performers.
15       MR. BLADUELL: OK.
16       THE WITNESS: Oh.
17       MS. BAUMGARDNER: I think your
18  question was misleading.
19  Q.   Does that change your answer?
20  A.   Let me think about it.  So each
21  depiction is one.  Now I'm confused.
22  Q.   Would it still be fair to say that it
23  would be greater than 5 for all categories?
24  A.   Yes.
25  Q.   Accurate to say that?

Ross

1
2   A.   Yes.
3   Q.   Now, if we flip the page, page 6.
4        Images on the Genital Art Gallery were
5   submitted by people ranging from 20 years of age
6   to 83 years of age?
7   A.   Correct.
8   Q.   Do you see that?
9   A.   Yes.
10  Q.   How do you know that they range from
11  20 to 83?
12  A.   When they make their submission we
13  have them include their age.  We don't publish
14  that.  Since it's not published, I feel that
15  they probably tell the truth.
16  Q.   So this is based on the model
17  releases, on the releases, right?
18  A.   Yes.
19  Q.   It's not based on IDs that you have?
20  A.   No.
21  Q.   You said that you have a hundred of
22  these releases?
23       MS. BAUMGARDNER: Objection.
24       Go ahead.
25  A.   No licenses or releases were used

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,

March 15, 2013

Page 77

Ross

1           Ross
2   a lot of time doing this because we really focus
3   on women, so it's never an issue.  But how I
4   aged someone when I was tending bar through
5   college and law school, yes, I believe I knew
6   when someone was 25.  18 to 20 is harder to
7   tell.
8       Q.   That is all I am asking.
9       A.   Yes.
10      Q.   Thank you.
11           You don't have any formal education in
12  determining a person's age --
13      A.   No.
14      Q.   -- by facial observation?
15      A.   No.
16      Q.   So you agree with me it is difficult
17  to say a person's exact age with a hundred
18  percent confidence only by visual inspection?
19      A.   Correct, yes.
20      Q.   It's difficult by visual observation
21  of an image to say someone's exact age?
22      A.   Correct.
23      Q.   Or even if someone is 25?
24           MS. BAUMGARDNER: Objection.
25      A.   I think you can within a five-year

Page 78

1           Ross
2   span kind of guess what someone's age is by
3   looking at a visual -- I mean, you can look at
4   someone and say if they're 40.  You can look at
5   someone and say if you think they're 30, if
6   they're 20.  I think that's clear.
7       Q.   But an exact age is impossible?
8       A.   Yes, of course.
9       Q.   Is it impossible?
10      A.   I wouldn't say it's impossible there
11  might be someone who can do it.  I can't.
12      Q.   Would having an ID of the person that
13  you have a depiction of increase your confidence
14  in that person's age?
15      A.   Yes and no, because we get a lot of
16  international submissions, so I don't know how
17  to know whether or not an international license
18  or passport is forged or not, I mean, really.
19      Q.   I am going to show you other documents
20  so bear with me for a second.  You can have a
21  sip of water.
22           THE WITNESS: What time is it?
23           MS. WYER: It's 10:15.
24           THE WITNESS: OK.  I just want to give
25  Betty a wakeup call.

Page 79

1           Ross
2       Q.   Do you need a break?
3       A.   No, not right now.
4       Q.   I'm going to show you an image, and
5   I'm going to label it as RD-6.
6       A.   Are you testing me now.
7       Q.   I get to ask the questions.
8       A.   Oh, no.
9           (Exhibit RD-6 was marked for
10  identification)
11           MR. BLADUELL: For the record, I have
12  provided an image RD-6 to the witness.  Have you
13  seen this image before?
14      A.   I have not.
15      Q.   Can you tell if this person is clearly
16  mature?
17      A.   She looks mature, so I guess yes.
18      Q.   In your view is this person clearly
19  mature?
20      A.   It don't know the.  Breast implants
21  throw me off.  Yes, she looks like a woman to
22  me, yes.
23      Q.   That is not my question.  My question
24  is, can you tell with a hundred percent
25  confidence that this person is clearly mature?

Page 80

1           Ross
2           MS. BAUMGARDNER: Objection.
3       A.   Yes, I think she's mature.
4       Q.   By mature, you mean what age?
5       A.   You want me to give her an age now?
6       Q.   If you can.
7           MS. BAUMGARDNER: Objection.  I think
8   this is completely unfair.  But go ahead.
9       A.   I don't know.  I would put her in the
10  18-to-24 bracket.  You never know.  People of
11  color they can be much older and look young.
12           Are you going to tell me her age now?
13      Q.   I get to ask the questions.
14      A.   OK.
15      Q.   Exact age, can you tell with a hundred
16  percent confidence how old exactly this person
17  is?
18      A.   No.  I thought you were going to show
19  me her vulva.
20      Q.   Maybe.
21      A.   I am just teasing you.  I'm sorry.
22           MS. BAUMGARDNER: Hector, I would like
23  to take a break when it's convenient.
24           MR. BLADUELL: OK.  Thank you.
25      Q.   I am going to show you another

FREE SPEECH COALITION, INC. v
THE HONORABLE ERIC H. HOLDER,                                          **March 15, 2013**

Page 161

1          Ross

2                I N D E X

3

4    WITNESS: CARLIN ROSS

5    EXHIBITS

6    Description              Page

7    RD-1                     29

8    RD-2                     32

9    RD-3                     51

10   RD-4                     59

11   RD-5                     73

12   RD-6                     79

13   RD-7                     81

14   RD-8                     82

15

16       REQUESTS FOR PRODUCTION

17   Description                  Page

18   IDs for videos in RD-1 and RD-2  44

19   Initials and dates of birth      48

20   Releases for Genital Art Gallery 66

21   Free Speech Coalition forms      112

22

23

24

25

---

Page 162

1          Ross

2

3                CERTIFICATE

4

   STATE OF NEW YORK )

5                    : ss

   COUNTY OF NEW YORK)

6

7          I, Samuel Mauro, Jr., a Registered

8    Merit Reporter and Notary Public within and for

9    the State of New York, do hereby certify:

10         That CARLIN ROSS, the witness whose

11   deposition is hereinbefore set forth, was duly

12   sworn by me and that such deposition is a true

13   record of the testimony given by such witness.

14         I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage and that I am in no way

17   interested in the outcome of this matter.

18         In witness whereof, I have hereunto

19   set my hand this _____ day of

20   _____ 2_____.

21

22

23

24   _____

25   SAMUEL G. MAURO, RMR

# In The Matter Of:

*Free Speech Coalition Inc., et al. v.*
*The Honorable Eric H. Holder, Jr., Attorney General*

---

*Steven David Steinberg*
*April 19, 2013*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94105*
*(415) 597-5600*

Original File 21612Steinberg.txt
**Min-U-Script® with Word Index**

Page 21

1  because I really like film, and I like -- I'm just stuck
2  in my ways.
3      Q.  Do you develop the film yourself?
4      A.  No.  I have a lab that does my -- all of my
5  developing and printing.
6      Q.  And you only take black and white?
7      A.  I take a little bit of color, but -- and Cupido
8  encourages me.  They want more color, but I mostly do
9  black and white.  I think it's more artful.  And,
10  especially in the realm of sexual photography, I'm
11  trying to take my photography out of the mindset that
12  people are used to with sexual photography, which is
13  related to commercial pornography, which is almost all
14  in color.  So being in black and white helps put me in a
15  different category.
16      Q.  You mentioned your very first photo shoot ended
17  up being in Cupido?
18      A.  Yes.
19      Q.  So did you -- did your photography become
20  commercial, something you did for money right away,
21  then?
22      A.  Yeah, it did.  It was quite surprising.
23  Barbara Nitke -- not to take up your time, but Barbara
24  Nitke, when I work, I have always admired.  I showed her
25  some of my initial photographs.  And she said, "David,

Page 22

1  you have to take this seriously.  How often do you come
2  on something that's useful that you do well, that's fun
3  to do, and that you can make money from?"
4          So at that point it was just kind of a lark for
5  me.  But at that point I really started saying, "Oh, I
6  can do something significant with this.  And, plus, all
7  of a sudden everybody I knew wanted to be photographed.
8      Q.  Since the time you started as a photographer,
9  what has -- how has your career progressed?
10      A.  Well, initially, it was for Cupido.  Initially,
11  it was people I knew.  It's expanded.  People have seen
12  my work.  People have asked to reproduce my work.  I now
13  get requests from strangers who want me to photograph
14  them.  I've been in lots of art shows.  I've won awards.
15  I was declared erotic photographer of the year in 2010,
16  I think it was, by the Leydig Trust in London.  I was
17  declared one of the first of the initial five masters,
18  so-called masters of erotic art by the Seattle Erotic
19  Art Festival last year.
20          And I have a following now.  I think people
21  appreciate sexual photography that's genuine, that you
22  would look at them and say, "Oh, these are regular
23  people.  This could be me in this photograph."  When I
24  show my work, that's mostly what people respond to,
25  because I don't pose my models.  I don't tell them what

Page 23

1  to do.  I just say, "Try to be natural and be yourself.
2  I'm just trying to document who you are.
3          Also, I've done a number of specialties,
4  including older people, people who are not
5  traditionally, quote, "beautiful."  Heavy people.  I'm
6  doing a whole series of people with disabilities who's
7  sexuality nobody takes seriously.  Because one of the
8  messages in the work that I'm trying to do is that you
9  don't have to be young and thin and glamorous to be
10  sexually attractive and wonderful sexually.
11      Q.  When you take these photographs, where do
12  you -- where does it happen?
13      A.  Almost always I photograph people where they
14  live, because I think that's where people are most
15  comfortable.  I don't work in studio.  I have debates
16  with other photographers about that.  But I'm convinced
17  that, at least for the photography that I'm interested
18  in, which, as I say, is getting people to be honest and
19  natural and genuine.  The best place to have that happen
20  is when they're at home.
21      Q.  Do you use lighting, specialized lighting?
22      A.  Yeah, I have basic lights, two tripods with hot
23  lights and umbrellas.  And I move my lights around,
24  again, because I don't pose people.  I don't say, "Be
25  here.  Do this."  Sometimes people will say, "Well, what

Page 24

1  do you want us to do?"  And I say, "Well, it's up to
2  you."
3          I mean, the whole thing that I do is to try to
4  make people feel comfortable with me, comfortable with
5  the unnatural situation of being photographed while
6  being sexual, so that hopefully they can be sexual in
7  more than a superficial way.  And then I get the
8  photographs that I think really had something to say
9  about being sexual people.
10      Q.  So at this point -- I mean, from the time you
11  became a photographer, did you make your living from
12  doing that?
13      A.  Partially, I do.  It's not the only thing I do
14  for money, but yeah.  Yeah, pretty much from the time I
15  started I started earning income from it.
16      Q.  What are the other components of your income?
17      A.  I have a business that I've owned for 30 years,
18  selling herbs and teas and spices to health food stores
19  in Santa Cruz.  I mean, I make some money from my
20  writing.  And at this point -- I mean, I'm 68 years
21  old -- a fair amount of my income comes from investments
22  that I get dividends from.
23      Q.  Between --
24      A.  Oh, and, sorry, Cupido, where I get commissions
25  on the work of other people's photography that I sell to

Page 25

1  them or that I broker to them.  And, of course, when
2  they use my photographs, they pay me for them.  So in
3  addition to my photography, I'm also -- there's like the
4  agenting income that I have.
5  **Q.  So "Photo Sex" was published in 2003.  Do**
6  **you -- were the photographs included in that book**
7  **created at around the same time period that the book was**
8  **published?**
9  A.  No, some of them were quite earlier.  I don't
10  know when all the photographs were created, but I know
11  that some of them were definitely from the '80s and '90s
12  and so on.  Some probably -- actually, some from earlier
13  than that, '60s and '70s.  Some of them were, you know,
14  right before 2003, as well.
15  **Q.  And then your next -- your book "Divas of San**
16  **Francisco," was that a specific project that you**
17  **undertook during a certain time period?**
18  A.  Uh-huh, yes.
19  **Q.  When was that?**
20  A.  Let's see.  I think the first -- Divas of San
21  Francisco is a name of a night club.  It's a club in San
22  Francisco, a transsexual club.  It's the largest
23  transsexual club in the country.  I've been a fan of the
24  club and hanging out at the club for many years.  And,
25  initially, Spectator Magazine wanted me to take some

Page 26

1  photos there when Divas started having topless shows two
2  nights a week.  So I photographed some of the dancers
3  there.  But as I got to know them, I also got interested
4  in photographing them when they weren't performing.  So
5  I ended up with lots of, essentially, portrait
6  photography of what I think is an extraordinary group of
7  women.
8  And then at some point I had a -- let's see.  I
9  guess the first show of those photographs that I had was
10  at the Center for Sex & Culture in San Francisco.  I'm
11  sorry, the first show I had was at a meeting of
12  sexologists at the Society for the scientific study of
13  sexuality, which is a professional organization I've
14  been a member of for many years.  And they expressed
15  interest in these photographs, and I had a show of those
16  photographs at one of their conventions and then a show
17  of the photographs at the Center for Sex & Culture.
18  **Q.  Do you remember when those shows were?**
19  A.  No, I don't.  It should be on the list that we
20  submitted to you, but I don't remember.
21  And then I had a well-respected fine art
22  photography gallery in Seattle, called Benham Gallery,
23  B-E-N-H-A-M, who expressed interest in the photos.  And
24  I had a big show up there.  It would be right at the
25  same time that the book was published.  I really get the

Page 27

1  years all mixed up.  And at that point I decided if I
2  was going to have a show at a major gallery, I wanted to
3  have a book to go with the show, and I put the book
4  together.
5  **Q.  Does 2008 sound like the right year for that?**
6  A.  It's plausible.  Sorry I don't have all the
7  chronology in front of me.
8  MS. BAUMGARDNER: That's okay.  Ms. Wyer will
9  tell you you don't have to guess.
10  THE WITNESS: I'm sure you can get that from
11  all of that right there.
12  This is very different.  This is nonsexual
13  photography.  This is just photographs of women.  There
14  are, I think, 59 photographs in the book, of which only
15  four are full-body nudes where, for example, you see
16  people's genitals.  But that's not the point of the book
17  at all.  The point of the book was to do portraits and
18  photographs that give the viewer more than a superficial
19  sense of who this person is that they're looking at.
20  **BY MS. WYER:**
21  **Q.  Did that -- how many years were you engaged in**
22  **that project?**
23  A.  I think the first pictures that I took of
24  people from Divas was 1993, and then it was 2008.  So
25  that's 15 years, and I still do photography there.  I

Page 28

1  took photos there last week.  I do photographs at the
2  club.  I do photographs of some of the women at home.
3  Sometimes -- I live two blocks from the club.  Sometimes
4  people come back to my place and we do photographs
5  there.
6  **Q.  So that's not something that has stopped?**
7  **You're still engaged in that?**
8  A.  I'm still engaged in, yes, doing the
9  photographs.  I haven't published any -- Cupido
10  occasionally publishes one or two of those photographs.
11  I have not published any of those photographs since
12  Divas was published.  And since I've been talking with
13  Lorraine -- I mean, people ask me when am I going to do
14  a second book.  But at this point I don't think I could
15  do a second book because I think I would be required to
16  add 2257 information for all the people in the book,
17  even though these are nonsexual photographs and I don't
18  have that information.
19  MS. WYER: I'd like to mark this as Steinberg
20  2.
21  (Whereupon, Defendant's Exhibit No. 2 was
22  marked for identification.)
23  **BY MS. WYER:**
24  **Q.  Do you recognize this?**
25  A.  Yeah, it looks like my LinkedIn profile.  My

Page 33

1  that's essentially complete.
2  **Q.  And in terms of your photographic work, you**
3  **mentioned the adult couples having sex, photography that**
4  **you do.  And you've mentioned the photographs of -- is**
5  **it of performers at the Divas of -- did you say Divas of**
6  **San Francisco was the name of a club?**
7  A.  Yes.
8  **Q.  And the photographs that you take are of**
9  **performers at that club?**
10  A.  Not entirely.  Sometimes it's performers.
11  Sometimes it's bartenders.  Sometimes it's just people
12  who are patrons of the club.  It started with the
13  performers but it has expanded.  I would say at this
14  point most of the people I photograph are nonperformers.
15  **Q.  And other than those two topics, does your**
16  **photography encompass any other subjects?**
17  A.  In the last, what is it now, three years I've
18  been doing still photography at photo shoots at
19  kink.com, which is a producer of BDSM porn films in San
20  Francisco.  They run a number of websites.  One of their
21  websites is called "Public Disgrace."  And, initially,
22  from an article that I wrote for Cupido about kink.com,
23  I got connected with the people at Public Disgrace.  And
24  I've been doing a project of taking still photographs at
25  some of their shoots.  I've shown some of those

Page 34

1  photographs in art shows, but I haven't published any of
2  those photographs to date.
3  **Q.  Is that something that they commission from you**
4  **or pay for?**
5  A.  No.
6  **Q.  It's something you asked them to allow you to**
7  **do?**
8  A.  The circumstance of Public Disgrace is that
9  there's an audience of people, and people in the
10  audience are allowed and encouraged, actually, to take
11  photographs for private use.  Because I was doing --
12  initially, this was before the story that I was doing
13  for Cupido.  Then I had to ask them for permission to
14  use photographs that I had taken there for that purpose,
15  and I obtained permission for that.
16  And when I've had shows I've had to ask them
17  for permission to show photographs that I've taken at
18  those shows, and they've granted me permission.  So I
19  believe that technically I own the photographs, but I
20  don't have permission to do anything with them without
21  their permission.
22  **Q.  Are the photographs you take -- they're of what**
23  **would be considered sexually explicit conduct?**
24  A.  Some of them are and some of them are not.
25  **Q.  And when I say "sexually explicit conduct," do**

Page 35

1  **you know what that means in the context of the statute**
2  **at issue in this case, which is 18 U.S.C. 2257?**
3  A.  I don't believe that anybody knows what that
4  means in terms of the statute.  I don't think the
5  statute is the least bit clear about that.  And it's one
6  of the problems with the statute, is that nobody can
7  figure out what the hell it's talking about.
8  **Q.  But you're familiar with that phrase as**
9  **something --**
10  A.  Yes.
11  **Q.  -- in the statute?**
12  A.  Yes.
13  **Q.  So when I use that phrase, can we agree that**
14  **I'm talking about the phrase as used in the statute and**
15  **regulations?**
16  A.  I'm familiar with it.  If you were to ask me
17  which of my photographs are sexually explicit according
18  to the statute and which are not, I don't think I can --
19  there are some photos, I think, that are obviously not
20  sexuality explicit.  There are some photographs that
21  are, in my mind, sexually explicit.  And then there
22  would be a whole bunch in the middle that I don't know
23  how the statute would interpret them.
24  **Q.  Is there a -- you've described, I think, some**
25  **of your rationale or motivations for the kind of**

Page 36

1  **photographic work that you do.  How would you describe**
2  **the difference in terms of the visual difference between**
3  **your work and what would be considered mainstream**
4  **pornography?  Do you agree with the use of the term**
5  **"mainstream pornography" to describe the adult industry,**
6  **or is there another term you would use?**
7  A.  That's pretty good.  I usually use "commercial
8  pornography," because, to me, what you're calling
9  "mainstream pornography -- there's a whole distribution
10  network.  There's a whole -- so I usually say
11  "commercial pornography," but "mainstream pornography"
12  is fine.  I think we would be talking about the same
13  thing.
14  **MS. BAUMGARDNER:**  And I'll show an objection to
15  that.  I think there were multiple questions in that.
16  **BY MS. WYER:**
17  **Q.  Okay.  So, first, we're agreed on the use of**
18  **the term "commercial pornography" or "mainstream**
19  **pornography" to refer to what could be called the "adult**
20  **industry," or -- I don't know how to define it, but --**
21  A.  I don't -- that's one of the -- for example, is
22  Cupido Magazine part of what you're calling the "adult
23  industry"?  Cupido Magazine would say, absolutely not.
24  People in Norway would say, absolutely not; it's sold at
25  drug stores and supermarkets, not in porn shops.  And it

Page 37

1  was created as an alternative to so-called mainstream
2  pornography in Norway. But you might think Cupido was
3  mainstream pornography. I don't.
4  **Q. Is that -- is it a subject determination?**
5  A. Definitely. Unless you can show me a
6  definition, then I can say, you know, "If you're" -- in
7  Norway the law is very clear. If genitals are
8  touching -- they've changed the law now. Until
9  recently, if genitals were touching, then it was
10  illegal. If there was the slightest bit of space
11  between the genitals touching, then it was legal.
12     If you have a definition like that, then you
13  can say, "Okay, this is in Category A; this is in
14  Category B." We do not have anything like that in this
15  country, which is one of the problems with laws trying
16  to regulate sexual imagery. So nobody knows what the
17  boundary line is.
18     I could show you 100 photographs, and I'd say,
19  "You tell me which of these are pornographic and which
20  are not."
21  **Q. Are you familiar with different genres of**
22  **pornography, such as what could be called "amateur**
23  **pornography"?**
24     MS. BAUMGARDNER: Objection.
25     THE WITNESS: I've heard of people talking of

Page 38

1  amateur pornography.
2  **BY MS. WYER:**
3  **Q. And what does that mean, in your understanding?**
4  A. Some combination of people who are genuinely
5  amateur, in the sense of not having any monetary
6  interest, doing sexual pornography. But probably more
7  often people pretending to be amateurs, as a way of
8  marketing their own commercial pornography.
9  **Q. Can you identify any objective differences**
10  **between your photographic work and what could be called**
11  **"amateur pornography."**
12     MS. BAUMGARDNER: Objection.
13     THE WITNESS: Objective differences, no. I
14  could identify subjective differences, but not -- I
15  don't think there are any. I mean, I don't know what
16  objective -- I'm a mathematician. I know what objective
17  is. I don't think that objective -- that the word
18  "objective" pertains, unless you say, "If the genitals
19  are touching, then it's this. And if they're not, then
20  it's that." Then you have an objective criterion to
21  judge with. You know, "I know it when I see it" is not
22  an objective criteria.
23  **BY MS. WYER:**
24  **Q. What are the subjective differences that you**
25  **would identify?**

Page 39

1  A. So subjective means -- this is my point of
2  view. My point of view, I believe that the purpose of
3  most -- what you're calling mainstream pornography is to
4  turn people on, to arose people. Pornography has been a
5  masturbation tool for most of its existence in this
6  country. I think that the people who make mainstream
7  pornography, for the most part, want to turn people on.
8     The purpose of my photography is not to turn
9  people on. Although, it may turn people on. The
10  purpose of my photography is to say something about
11  sexuality other than "Oh, look, sex is happening and we
12  get to watch." I want it to, as with all art, make a
13  statement about the important aspect of existence that
14  is human sexuality. This is what people are really
15  like. This is what intimacy is about. This is what
16  emotional connection with another human being is about
17  through being sexual. That's what I'm going for in my
18  photography.
19     Whether other -- although the purpose of my
20  photographs is not to turn people on, it may turn people
21  on. Although the purpose, it seems to me, of most
22  commercial pornography is to turn people on, it may also
23  be making a statement about human sexuality. I just
24  don't think that that's generally the prime purpose. So
25  in that way, that's how I see my work as being different

Page 40

1  from mainstream pornography; although, there are
2  overlaps. But I think primary intent is significant,
3  and that's what my primary intent is.
4     Nobody at -- out of all the shows that I've
5  had, of all the books I've published, nobody has ever
6  said, "I think your work is pornographic." So somebody
7  sees a difference, and each person's subjective criteria
8  would be different. That's the way it is with
9  subjective criteria.
10  **Q. But there's no way to define the**
11  **visual distinct -- you can't define anything about the**
12  **appearance of a photograph that clearly reflects the**
13  **intent of the photographer?**
14     MS. BAUMGARDNER: Objection.
15     THE WITNESS: No, I don't think you can at all,
16  and therein is the problem. I've seen work by
17  photographers who I know their intent is being totally
18  misunderstood. Artists have always been misunderstood,
19  and one of the thing as an artist is, you subject
20  yourself to the possibility of being misunderstood. The
21  problem with 2257 is not only do you subject yourself to
22  the possibility of being misunderstood, you subject
23  yourself to the possibility of going to jail.
24  **BY MS. WYER:**
25  **Q. Let me go back and talk about the works that**

Page 57

1  work with the technical advisor, and he would accomplish
2  that. But the decision about what to post would be
3  mine.
4      Q. So in the past when you were -- when material
5  was being posted, did you provide the content that you
6  wanted to be posted?
7      A. Yes.
8      Q. Did you control the layout of how it appeared?
9      A. A.D. Colman, who hosts the website, and the web
10  designer he was working with, put the design together
11  and got my approval for it.
12      MS. WYER: We'll mark this as Exhibit 4.
13      (Whereupon, Defendant's Exhibit No. 4 was
14      marked for identification.)
15  BY MS. WYER:
16      Q. You've just been handed what's been marked as
17  Steinberg 4. Is this your introduction to the section
18  of the Nearby Cafe website that is your section?
19      A. It looks like it.
20      Q. The last time that you updated anything here
21  was in -- 15 years ago?
22      A. This says -- well, this says copyright 2005, so
23  maybe it was eight years ago. Yeah, I guess -- I don't
24  remember, but I'm looking at this, and this says "2005,"
25  so that's possible. When the website -- when this part

Page 58

1  of the website was originally set up, it was a huge
2  project, and nothing has changed since then.
3      Q. You mean you provided all the initial content
4  and it has never been updated?
5      A. That's correct.
6      MS. WYER: Okay. We'll mark this as Steinberg
7  5.
8      (Whereupon, Defendant's Exhibit No. 5 was
9      marked for identification.)
10  BY MS. WYER:
11      Q. The exhibit marked as Steinberg 5, is this the
12  initial portal for the photographic portfolios on the
13  website, on yours?
14      A. Yes.
15      Q. Do you know where on the website the 2257
16  statement is?
17      A. No. I know it's there. I've found it myself
18  by searching the website for 2257, and it took me there.
19      Q. Okay. Because I've not been able to find it.
20      MS. BAUMGARDNER: I think he supplied
21  directions in an answer to an interrogatory or requests
22  for production.
23      THE WITNESS: It's there. I've seen it. I
24  just don't remember specifically where on the site it
25  is.

Page 59

1  BY MS. WYER:
2      Q. Did you provide A.D. Colman with copies of all
3  of the 2257 records related to these photographs?
4      A. Yes.
5      Q. So he has complete copies of those?
6      A. Yes.
7      Q. And the address listed on the 2257 statement
8  would be his address? Or is it your address?
9      A. I don't -- I think so. I don't know what
10  address he's using.
11      Q. Do you think it's his or yours?
12      A. I don't know. It's not mine. I don't know if
13  it's his home, his office, his whatever, but it's
14  different from -- it's not mine.
15      Q. Okay. So Exhibit 3, it states that -- and this
16  is kind of -- this was not written by you, correct, or
17  was it?
18      A. That's correct.
19      Q. It was written --
20      A. -- by Allan Colman.
21      Q. And it states that, "This portion of the Nearby
22  Cafe website serves as the central web repository for
23  all of David Steinberg's diverse activities."
24      Is that accurate at this point?
25      A. Yes. It's the -- it's as close to a central

Page 60

1  repository as I have.
2      Q. Why was this website set up?
3      MS. BAUMGARDNER: Objection.
4      THE WITNESS: Why did Allan Colman set up the
5  website?
6  BY MS. WYER:
7      Q. Was he the one that initiated the project of
8  setting this up?
9      A. Yes.
10      Q. Do you know why he did that?
11      A. No. I really -- I could guess, but I don't
12  know. He asked me to be part of it, and I agreed.
13      Q. So this was not a commercial effort on your
14  part?
15      A. Well, it had commercial interest to me because
16  it was a way to make my work known. The original plan
17  was that books of mine could be purchased through the
18  website, although that actually never got set up. So
19  there was some commercial interest for me in terms of
20  promoting my work.
21      But, as is the case, my interest in my work is
22  somewhat commercial, but that's not the main purpose of
23  my work, to make money from it. My main purpose is to
24  make a statement about human sexuality, and, of course,
25  I would like to make some money from it. Generally, I

Page 65

1   what does that reflect?  In your view, when you say
2   "advertisements contain a certain kind of image," what
3   does that reflect?
4       MS. BAUMGARDNER: Objection.
5       THE WITNESS: I think advertisements both
6   establish and reinforce stereotypical notions of who is
7   attractive or sexually desirable.  The components of
8   that -- those aesthetic judgments are complex and
9   involve age, how symmetrical a face is, how symmetrical
10   a body is, whether a person has smooth skin or not
11   smooth skin, frizzy hair or silky hair, and so on.  The
12   components of what is beautiful has been subject to many
13   studies.  I'm not an expert in those.
14   BY MS. WYER:
15    Q.  But you use something as a benchmark against
16   which you are trying to put yourself -- your work as a
17   contrast or as a counterpoint?
18       MS. BAUMGARDNER: Objection.  I think that
19   mischaracterizes what Mr. Steinberg has testified to.
20       THE WITNESS: I photograph a wide variety of
21   couples.  I'm especially happy when couples who do not
22   reinforce societal stereotypes of who is beautiful or
23   sexually attractive and want to be photographed by me.
24   And I emphasize those works when I have art shows, and I
25   will emphasize those works in the books that I'm working

Page 66

1   on.  So I tend to emphasize people who are older, you
2   know, older than what you say.
3      But somebody who's 50 compared to somebody
4   who's 25 is going to be more likely to show up in my
5   book; somebody who's heavier compared to somebody who's
6   thinner; somebody who's not Caucasian compared to
7   somebody who is Caucasian; somebody who has a disability
8   compared to somebody who does not have a disability.  I
9   want to emphasize works that counter the stereotypes
10   that I see in society of who is beautiful and sexually
11   desirable.
12   BY MS. WYER:
13    Q.  Going back to your response to Interrogatory 7
14   and your use of the terms "clearly and obviously adults
15   and mature couples," do you contend that it is possible
16   to determine a person's age based on their visual
17   appearance?
18    A.  Sometimes.
19    Q.  Within what degree of accuracy?
20    A.  Lorraine is not under 18; I would bet with 99.9
21   percent accuracy on that.  You are not under 18, I would
22   bet that with 80 percent accuracy.  I think it varies
23   from person to person.  Obviously, I am not under 18.
24    Q.  Does it depend on the person's age how
25   accurately you can tell their age?

Page 67

1       MS. BAUMGARDNER: Objection.
2       THE WITNESS: Many factors would go into it.
3   It can be complicated to decide.  I'm very bad at
4   estimating people's ages in general.  No, I don't think
5   that you can, you know, make hard and fast rules about
6   how you could visually determine somebody's age, and I
7   certainly don't try to do that myself.
8      But if I'm photographing somebody who's 72
9   years old, which I have done, it is odd to be -- have to
10   prove that they're not 18, compared, for example, to
11   when somebody buys cigarettes or somebody buys alcohol.
12   Nobody cards me when I walk into a liquor store and
13   says, "Prove to me that you're 21 years old.
14   BY MS. WYER:
15    Q.  Is there a correlation, in your view, between
16   how old a person looks and whether the person is
17   perceived as beautiful or glamorous, which are terms
18   that you used in your response to Interrogatory 7?
19    A.  It varies.  I think there are very few
20   75-year-old people who are considered glamorous.
21    Q.  Do you think a person who is seen as beautiful
22   or glamorous may be perceived as younger than they
23   actually are?
24    A.  Yes.
25    Q.  Do you think a person who is not seen as

Page 68

1   beautiful or glamorous may appear older than they
2   actually are?
3    A.  Possibly.  I think anybody -- some people look
4   older than they are; some people look younger than they
5   are.  Whether being glamorous makes you look younger or
6   older, well, you can ask the people over at Estee Lauder
7   about that.
8    Q.  Is there a correlation between whether a person
9   has a physical disability and how old the person looks?
10    A.  Personally, I would say probably not.
11    Q.  In your response to Interrogatory 9, which the
12   question starts on page 5 and your response is on page
13   6 --
14    A.  Oh, okay.  Yes.
15    Q.  Do you recall preparing this response?
16    A.  Yes.
17    Q.  This asks for a breakdown of the ages of
18   individuals appearing in your work, correct?
19    A.  Yes.
20    Q.  How did you determine the breakdown that's
21   provided here?
22    A.  My wonderful spreadsheet.
23    Q.  So you used your spreadsheet that you created
24   for purposes of complying with 2257 in order to provide
25   this information?

Page 69

1    A.  Yes.
2    Q.  Does the sum of all of these categories
3  represent the total number of individuals that you
4  photographed in works that you -- that you considered
5  depictions of sexually explicit conduct as of the date
6  you provided the response?
7    A.  This represents all the people that I
8  photographed.  When I take a photograph of a couple
9  being sexual, it's quite possible that half of those
10  photographs are not sexually explicit at all.  So this
11  is not broken down according to which photographs are
12  sexually explicit or not.  I wouldn't know how to do
13  that.  This is a breakdown of all the people I have
14  photographed.  I believe this wasn't just my couples
15  photography.
16    Q.  Okay.  So this is --
17    A.  But it might include the transsexual pictures,
18  but I don't remember whether I included those or not.
19    Q.  Do you have 2257 records for the transsexual
20  pictures?
21    A.  Oh, no, I don't.  So you're right, I probably
22  did not.  So this must be the people involved in the
23  couples photography.
24    Q.  All of the couples photography involved
25  photography of couples having sex?

Page 70

1    A.  Yes.
2    Q.  So at least some of the photographs in a shoot
3  would show those individuals having sex?
4    A.  Yes, I think that's right.  Of these models
5  we're talking about here, I have sexually explicit
6  photos -- at least one sexually explicit photo of all of
7  them.  I think that's right.
8    Q.  And this is accurate as of the date you
9  provided the response?
10    A.  Yes.
11    Q.  So that's October -- you probably provided it
12  sometime before we got it, so approximately
13  October 2012?
14    A.  That sounds right.
15    Q.  And the total here -- if you add up all of
16  these numbers:  4 plus 52 plus 41 plus 41 plus 87 plus
17  60 plus 37 plus 27 plus 42 plus 4 is 395?
18    A.  If you say so.
19    MS. BAUMGARDNER:  You're the mathematician.  We
20  should make you add it up.
21    THE WITNESS:  I'm good but I'm not that fast.
22  BY MS. WYER:
23    Q.  Does that -- would that represent all of the
24  individuals you photographed in the adult couple having
25  sex photographs --

Page 71

1    A.  Yes.
2    Q.  -- up to that time?
3    A.  Yes.
4    Q.  So the first two categories are 19 to 20, which
5  you identified four, and 21 to 25 you identified 52.  So
6  that means that 56 individuals out of the 395 were 25 or
7  younger at the time you took their photographs?
8    A.  Right.
9    Q.  Correct?
10    A.  Right, about 15 percent.
11    Q.  And 97, if you add up the first three, which
12  includes 26 to 30, 97 of the individuals were 30 or
13  younger, correct?
14    A.  Okay.
15    Q.  So you do not rule out taking photographs of
16  younger individuals?
17    A.  No.
18    Q.  Have you ever refused to photograph someone
19  because he or she was too young?
20    A.  No, I have not had that problem.
21    Q.  If an 18-year-old couple asks you to photograph
22  them having sex, would you do so?
23    A.  Probably.
24    Q.  And you indicated, at the bottom line of your
25  response, that you have more than 1,000 images in each

Page 72

1  age group.  And that's because when you have a session
2  with a couple, you take a lot of photographs of that
3  couple, correct?
4    A.  Yes.
5    Q.  Do you keep separate 2257 records for every
6  image?
7    A.  That would be -- talking about burdensome.  No,
8  I do not.  No, I have one -- the age of the couple does
9  not change during a shoot significantly.  Actually, it
10  does not change at all.
11    Q.  So you just keep the records according to the
12  shoot?
13    A.  Yes.
14    MS. WYER:  We'll mark this as Steinberg 7.
15    (Whereupon, Defendant's Exhibit No. 7 was
16    marked for identification.)
17  BY MS. WYER:
18    Q.  Exhibit Steinberg 7, is that a photograph from
19  your -- from the Nearby Cafe, your part of the website?
20    A.  Yes.
21    Q.  Is that a photograph that you took?
22    A.  Yes.
23    Q.  Can you tell how old the individuals in the
24  central photograph were?
25    A.  By looking at the photograph?

Page 109

1  documentation that the model has given you permission to
2  use the photograph that's taken?
3    A.  Yes.
4    Q.  Would you -- do you use model releases for
5  every photograph that you take?
6    A.  No, but sometimes every photograph that I'm
7  taking with a purpose of showing or publishing, or
8  selling.
9    Q.  How often do you take photographs that don't
10  have one of those purposes?
11    A.  Often.  I take a lot of photography at Divas,
12  the transsexual club, mostly just as a favor to the
13  people I'm photographing.  But in terms of the sexual
14  photography that we've been talking about, I always
15  intend to use them and I always get releases.
16    Q.  Is there any aspect of the process of signing a
17  model release that has to do with age verification?
18    A.  No.
19    Q.  Are there any practices of your profession as a
20  photographer that relate to the ages of subjects in
21  sexually explicit photographs other than the 2257
22  requirements?
23    A.  Wait.  I didn't hear what you said.  Are there
24  any what?
25    Q.  Are there any practices of your profession, as

Page 110

1  a -- of the profession of photography that relate to age
2  verification of individuals appearing in sexually
3  explicit images?
4      MS. BAUMGARDNER:  Objection.
5      THE WITNESS:  I don't understand.  I mean, my
6  profession is I'm a photographer, and there are other
7  photographers.  Are there standard practices among
8  photographers about that?
9    Q.  Yes.
10    A.  Not that I know of.
11    Q.  In order to be a professional photographer, do
12  you have to have a license?
13    A.  No.
14    Q.  So you're not governed by any conditions of
15  licensing in your use of models?
16    A.  That's correct.
17    Q.  Are you a party to any contract that imposes
18  obligations on you with respect to the ages of models in
19  your work?
20    A.  In taking the photographs, no.  If I wanted to
21  submit photos somewhere or whoever I'm submitting photos
22  to could have their own criteria, but that's a different
23  story.
24    Q.  Has that occurred?
25    A.  Related to the age of the models, no.  In terms

Page 111

1  of explicit -- I mean, I presume that anybody who wants
2  to show my work knows that it's illegal to take pictures
3  of people under age and wouldn't do that or want to do
4  that.  But it's understood.  It's not something
5  talked about.  Nobody is going to say, "Listen, you have
6  to make sure your models are 18."
7    Q.  Are you familiar with the American Society of
8  Media Photographers?
9    A.  Only that they're plaintiffs in the suit.
10    Q.  Had you heard of them before?
11    A.  No.
12    Q.  So you're not a member of that organization?
13    A.  No.
14    Q.  Do you have any understanding of what that
15  organization does?
16    A.  No.
17    Q.  Do you know any members of that organization?
18    A.  Not that I know of.  I may, but I don't know
19  that for a fact.
20    Q.  Are you familiar with the Free Speech
21  Coalition?
22    A.  Yes.
23    Q.  Were you familiar with that organization before
24  this -- before hearing about this lawsuit?
25    A.  Yes.

Page 112

1    Q.  How are you aware of that organization?
2    A.  Kat Sunlove, who was an earlier publisher of
3  Spectator Magazine, was active in the Free Speech
4  Coalition.  I knew about it through her.
5    Q.  Are you a member of the Free Speech Coalition?
6    A.  No.
7    Q.  Have you been a member in the past?
8    A.  I don't think so.
9    Q.  Do you know any other members other than --
10    A.  Kat Sunlove, K-A-T S-U-N-L-O-V-E, probably.  I
11  think a lot of the people at Spectator Magazine were
12  involved with Free Speech Coalition, but I don't
13  specifically know who was a member.
14    Q.  What is your understanding of the purpose of
15  the Free Speech Coalition?
16    A.  To advocate against unreasonable constraints
17  against free speech related to adult sexual material.
18    Q.  How did you become a plaintiff in this case?
19    A.  I believe that Lorraine called me and told me
20  about the suit and asked if I wanted to become a
21  plaintiff.
22    Q.  Did you know Lorraine before that time?
23    A.  No.
24    Q.  I think you mentioned one other organization
25  that you were a member of, but I can't remember.

Page 125

1  you could identify the ages of each of those, the
2  persons depicted in those.  Do you remember that?
3      A.  Yes.
4      Q.  And you were unable to identify their exact
5  ages; is that correct?
6      A.  Yes.
7      Q.  Okay.  You are able to identify one important
8  fact about each of those models depicted, however,
9  aren't you --
10         MS. WYER: Objection; leading.
11  BY MS. BAUMGARDNER:
12      Q.  -- that they are all adults over the age of 18
13  years of age?
14         MS. WYER: Objection; leading.
15         THE WITNESS: I can identify it because I have
16  their records on file, and they're my models.  I think I
17  said at the time I could.  If you asked me for their
18  age, I could look up their ages and confirm their ages.
19  But that's different from being able to visually
20  determine their age from looking at a photo.
21  BY MS. BAUMGARDNER:
22      Q.  Correct.  But you are certain that all of the
23  people depicted are adults?
24      A.  Yes.
25         MS. WYER: Objection; leading.

Page 126

1         THE WITNESS: These are my models.  I don't
2  photograph people under 18.
3  BY MS. BAUMGARDNER:
4      Q.  And that's because there is a very important
5  law in the United States against that; isn't that true?
6         MS. WYER: Objection; leading.
7         THE WITNESS: Yeah, they're all the anti-child
8  pornography laws that make it illegal to photograph
9  people under 18 in sexual illicit ways.
10  BY MS. BAUMGARDNER:
11      Q.  And so as a matter of practice, you would
12  require IDs of anyone if there was any question in your
13  mind -- maybe even if there weren't a question in your
14  mind -- that they would produce proof of their age in
15  order for you to photograph them; isn't that true?
16         MS. WYER: Objection; leading.
17         THE WITNESS: I think that any responsible
18  photographer would want to check the age of their models
19  and make a record of that to protect them if there was
20  ever any question in the sort of system that I was
21  purposing as a more reasonable system for dealing with
22  sexual photography of underaged people.
23         That comes off of an understanding that any
24  photographer in his right mind would protect himself or
25  herself against potential legal problems.  One, about

Page 127

1  child pornography.  Two, about -- for example, if a
2  photographer signs a model release and they're not 18,
3  then you can't enforce the model release.  So there's
4  a -- you know, there are many reasons for a photographer
5  to identify -- to determine and verify the age of their
6  models.
7      I would -- if somebody wanted me to take sexual
8  pictures of them, I would not want to do anything
9  before -- if I had any doubt whatsoever before
10  determining their age, just because I wouldn't want to
11  take a picture of an underage person.  I certainly
12  wouldn't want to subject myself to potential prosecution
13  for that.
14      Q.  Okay.
15      A.  The people doing fine art sexual photography
16  are a responsible group of people.  We -- I mean, in any
17  group of people, I guess there might be somebody that's
18  weird.  But, you know, I've represented over 200
19  photographers to Cupido Magazine, and this started with
20  people that I knew but also includes new people that
21  e-mail me out of the blue.  I have no idea who they are,
22  and I've never had any reason to question the integrity
23  of any of them.
24      So I don't think 2257 is required in order to
25  be sure that photographers take care -- to think about

Page 128

1  the ages of the people that they're photographing.  I
2  just think, you know, unless somebody was really into
3  producing child pornography for the purpose of producing
4  child pornography, which is a whole 'nother group of
5  people, nobody is going to take photographs of people
6  unless they're damn sure that they know the ages of the
7  people that are -- you know, the majority of -- meaning
8  over 18 of their models.
9         MS. BAUMGARDNER: Thank you.
10         MS. WYER: I have some follow-up questions.
11         FURTHER EXAMINATION
12  BY MS. WYER:
13      Q.  How do you know whether someone is a fine art
14  sexual photographer?
15      A.  Well, you don't.  I know, because those are the
16  people who -- that's who contacts me because they know
17  that that's what I'm interested in.  I'm just saying,
18  of all the people -- maybe I shouldn't classify
19  everybody that -- of all of the photographers who have
20  contacted me in the -- what is it, 25 years now that
21  I've been brokering, you know, being the Cupido's rep in
22  the U.S., I've never dealt with anybody that I have any
23  reason to believe was not a person of integrity, in
24  terms of what they were doing with their photography and
25  who they were photographing.

Case 2:09-cv-04607-MMB   Document 178-2   Filed 05/10/13   Page 147 of 168
Free Speech Coalition Inc., et al. v.                                    Steven David Steinberg
The Honorable Eric H. Holder, Jr., Attorney General                              April 19, 2013



Page 129

1    I don't know everybody personally. I can't
2  100 percent vouch for everybody. I'm just saying that I
3  would -- I just think that anybody who is photographing
4  anybody whose age could possibly be questioned would
5  have to be really stupid to not say, "Hey, let me see
6  your ID before I take your picture." And if they were
7  smart, they would then make a record of it.
8    Q. And 2257 requires age verification and keeping
9  records, correct?
10   A. Yes. The problem with 2257 is it requires so
11 much more above and beyond what would be reasonable to
12 ensure that people under 18 were not being exploited for
13 sexual photography. That's the problem with 2257, not
14 what its intent is but the lengths to which it goes,
15 allegedly in that interest, so much so that it makes you
16 question what the real intent of what 2257 is.
17   Q. Does the age verification requirement make you
18 question the intent --
19     MS. BAUMGARDNER: Objection.
20 BY MS. WYER:
21   Q. -- the requirement to check photo IDs by
22 itself?
23     MS. BAUMGARDNER: Objection.
24     THE WITNESS: Well, it makes me question either
25 the intent or the sanity of the people who wrote the

Page 131

1    You don't have to set up a whole structure that
2  says, "You must have these records. You must keep them
3  in such and such a way in order to make it in the
4  self-interest of photographers to be careful about who
5  they're photographing in terms of their age." All you
6  have to do is say, "Look, if anybody questions this and
7  you can't prove that this person is under 18, you're
8  going to be in deep trouble."
9    That seems to be perfectly adequate to result
10 in a situation where photographers will, in fact, make
11 sure that the people they are photographing are over 18.
12     MS. WYER: I have no more questions.
13 Thank you for appearing here today.
14     THE WITNESS: You're welcome.
15     (At 1:23 P.M., the deposition proceedings
16     concluded.)
17
18
19     ------------------------------
20         STEVEN DAVID STEINBERG
21
22
23
24
25

Page 130

1  law. I mean, there are so many obviously better ways to
2  do this. That, combined with the prior existence of
3  adequate legal means to prosecute people who are
4  producing child pornography is beyond me. I mean, I can
5  understand somebody coming up with 2257 to get
6  reelected. I can't really understand somebody coming up
7  with this in order to protect children.
8  BY MS. WYER:
9    Q. So what is the intent that you are talking
10 about?
11   A. I think that this is an issue. It's a highly
12 charged issue that is being exploited by politicians for
13 their own purposes.
14   Q. And the alternative that you suggested was that
15 records should not be required until after the image was
16 made?
17     MS. BAUMGARDNER: Objection.
18     THE WITNESS: I think that -- if I was
19 designing the system, it would not be that the
20 government requires photographers to do this, rather
21 that photographers would understand that they may have
22 to come up with these records, which would make it the
23 obvious thing to do, for photographers to obtain -- you
24 know, to check the IDs and get copies, verification, in
25 case they were ever questioned.

Page 132

*F*(415) 597-5600*F*

1  STATE OF CALIFORNIA    )
2                         ) Ss.
3  COUNTY OF SAN FRANCISCO )
4
5    I hereby certify that the witness in the
6  foregoing deposition, STEVEN DAVID STEINBERG, was by me
7  duly sworn to testify to the truth, the whole truth, and
8  nothing but the truth, in the within-entitled cause;
9  that said deposition was taken at the time and place
10 herein named; that the deposition is a true record of
11 the witness's testimony as reported by me, a duly
12 certified shorthand reporter and a disinterested person,
13 and was thereafter transcribed into typewriting by
14 computer.
15   I further certify that I am not interested in
16 the outcome of the said action, nor connected with, nor
17 related to any of the parties in said action, nor to
18 their respective counsel.
19   IN WITNESS WHEREOF, I have hereunto set my hand
20 this 1st day of May, 2013.
21
22
23     _Dawn E. Howard_
24     DAWN E. HOWARD, CSR NO. 13201
25     STATE OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CASE NO. 2:09-4607
Judge Michael M. Baylson

--------------------------------------------------------------------------
--------------------

FREE SPEECH COALITION, IND.,;
AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC.;
MICHAEL BARONE;
DAVID CONNERS a.k.a. DAVE CUMMINGS;
THOMAS HYMES;
TOWNSEND ENTERPRISES, INC., d.b.a.
SINCLAIR INSTITUTE;
C 1 R DISTRIBUTION, LLC. d.b.a CHANNEL 1 RELEASING;
BARBARA ALPER; CAROL QUEEN; BARBARA NITKE;
DAVID STEINBERG; MARIE L. LEVIN a.k.a NINA HARTLEY;
DAVE LEVINGTSON; BETTY DODSON; and CARLIN ROSS,

                                    Plaintiffs,

v.

THE HONORABLE ERIC H. HOLDER, JR.,
in his official capacity as Attorney General of the United States,

                                    Defendant.
--------------------------------------------------------------------------
-----------------------

Deposition

of

LINDA DIAN WILSON


In Raleigh, North Carolina
Wednesday, April 3, 2013
8:59 a.m. - 4:17 p.m.


                    Reported by:
                Margaret M. Powell, CVR-M
                    919.779.0322

Page 2

A P P E A R A N C E S
LORRAINE BAUMGARDNER
lbaumgardner@bgmdlaw.com
Berkman, Gorden, Murray & DeVan
Suite 2200
55 Public Square
Cleveland, Ohio  44113-1949
Phone: (216) 781-5245
FAX: (216) 781-8207
(For the Plaintiffs)

HECTOR G. BLADUELL
hector.bladuell@usdoj.gov
Trial Attorney
Federal Programs Branch
United States Department of Justice
Civil Division
20 Massachusetts Avenue, NW
Washington, D.C.  20530
Phone: (202) 514-4470
FAX: (202) 616-8470
(For the Defendant)

C O N T E N T S

E X A M I N A T I O N

| ATTORNEY | EXAMINATION | PAGE |
|---|---|---|
| Mr. Bladuell | Direct | 7 |
| Ms. Baumgardner | No Cross-Exam | |
| Witness's Signature - Waived | | |

REPORTER'S CERTIFICATE  -   Page 281

Margaret M. Powell, CVR - (919) 779-0322

---

Page 4

No. 16   Plaintiff's Townsend Answers to Defendant's      235
Second Set of Interrogatories, Townsend
Responses to Defendant's Second Set of
Requests for Production, 20 pages

No. 17   TOWNSEND/Sinclair VIDEO SALES      266
2005 thru 2009, 1 page

No. 18   Advisory Council - Sinclair Institute, 4/2/13,    274
3 pages

Margaret M. Powell, CVR - (919) 779-0322

---

Page 3

E X H I B I T S

Defendant's
Page No.

No. 1   Defendant's Notice to Townsend Enterprises      10
of Deposition dated 3/27/13, 3 pages
No. 2   Sinclair Institute Web page, color, 1 page     100
No. 3   Plaintiff Townsend Responses to Defendant's    104
First Set of Interrogatories and Requests for
Production of Documents and Second Set
of Requests for Production, 20 pages

No. 4   Sinclair Institute Web pages, color, 4/1/13,   118
3 pages
No. 5   Sinclair Institute Web pages, color, 4/2/13,   128
4 pages

No. 6   sinclairinstitute.com/index, "Teach Me" video  136
advertisement, color, 4/1/13, 1 page
No. 7   sinclairinstitute.com/index, "Wet 'n Nasty" video  143
advertisement, color, 4/1/13, 1 page

No. 8   Letter dated 2/18/13, Baumgardner to Wyer,     159
3 pages
No. 9   bettersex.com/adult-movies-c-5.aspx Web page   168
advertisement for videos, 6 pages

No. 10  Better Sex Web page "Petite Coeds" video       173
advertisement, 1 page
No. 11  adamevepictures.com Web page videos            186
advertisement, 4/1/13, 1 page

No. 12  Sinclair Sex Ed videos advertisement, 1 page   197

No. 13  Products advertisement, 1 page                 201

No. 14  Westlaw 18 U.S.C.A. 2257, 3 pages              205
No. 15  Advertisement flyer, 1 page                    208

(Continued.)

Margaret M. Powell, CVR - (919) 779-0322

---

Page 5

S T I P U L A T I O N S
    IT IS HEREBY STIPULATED AND AGREED BETWEEN
THE PARTIES TO THIS ACTION THROUGH THEIR RESPECTIVE
COUNSEL OF RECORD:
    1.  ON MOTION OF COUNSEL FOR THE DEFENDANT,
THE ORAL DEPOSITION OF LINDA DIAN WILSON MAY BE TAKEN
BEGINNING AT OR AROUND 9:00 A.M. ON April 3, 2013, AT
THE OFFICES OF THE UNITED STATES ATTORNEY IN RALEIGH,
NORTH CAROLINA, BEFORE MARGARET M. POWELL, CERTIFIED
VERBATIM REPORTER AND NOTARY PUBLIC;
    2.  FORMAL OPENING AND CLOSING OF THE
DEPOSITION BY THE COURT REPORTER IS WAIVED;
    3.  THE FEDERAL RULES OF CIVIL PROCEDURE
SHALL CONTROL THE TAKING OF SAID DEPOSITION AND THE USE
THEREOF IN COURT;
    4.  OBJECTIONS TO QUESTIONS AND MOTIONS TO
STRIKE ANSWERS NEED NOT BE MADE DURING THE TAKING OF
THIS DEPOSITION, BUT MAY BE MADE FOR THE FIRST TIME
DURING THE PROGRESS OF THE TRIAL OF THIS CASE, OR AT
ANY PRETRIAL HEARING HELD BEFORE ANY FEDERAL COURT
JUDGE FOR THE PURPOSE OF RULING THEREON, OR AT ANY
OTHER HEARING OF SAID CASE AT WHICH SAID DEPOSITION
MIGHT BE USED, EXCEPT THAT AN OBJECTION AS TO THE FORM
OF A QUESTION MUST BE MADE AT THE TIME SUCH QUESTION IS
ASKED OR OBJECTION IS WAIVED AS TO THE FORM OF THE

Margaret M. Powell, CVR - (919) 779-0322

Page 6

QUESTION.

    5.  THAT THE SIGNATURE OF THE WITNESS TO THE
TRANSCRIPT OF HIS TESTIMONY IS HEREBY WAIVED.

    6.  EXCEPT AS WAIVED BY THESE STIPULATIONS,
THE PROVISIONS OF THE FEDERAL RULES OF CIVIL PROCEDURE
SHALL APPLY TO THE TAKING OF SAID DEPOSITION AND AS TO
ITS SUBMISSION TO THE RESPECTIVE DEPONENT,
CERTIFICATION AND FILING WITH THE APPROPRIATE NOTICING
ATTORNEY.

    - - -

Margaret M. Powell, CVR - (919) 779-0322

---

Page 8

1  doesn't instruct you not to answer, you can answer the
2  question despite the objection.
3      We are recording this deposition.
4  There's going to be a transcript at the end, so you
5  need to answer verbally instead of nodding ---
6      A.   Okay.
7      Q.   --- during the deposition.
8      A.   Okay.
9      Q.   Do you suffer any condition that would
10 impair -- that impairs you to understand my questions
11 today?
12     A.   No, sir.
13     Q.   Okay.  Do you suffer any condition that
14 would impair you to remember events that happened in
15 the past?
16     A.   No, sir.
17     Q.   Any medication impairing your ability to
18 understand my questions?
19     A.   Certainly nothing that would impair my
20 ability.
21     MS. BAUMGARDNER: If I just might
22 add, Ms. Wilson, could you keep your voice up a little
23 bit.  You're soft-spoken ---
24     THE WITNESS:  Oh, I'm sorry.
25     MS. BAUMGARDNER:  --- and, also,

---

Page 7

1      (Whereupon,
2      LINDA DIAN WILSON,
3      having been first duly sworn,
4      was examined and testified
5      as follows:)
6  DIRECT EXAMINATION by MR. BLADUELL:
7      Q.   Good morning, Ms. Wilson, my name is
8  Hector Bladuell, I'm an attorney with the U.S.
9  Department of Justice; I represent the government in
10 this case.
11     Have you been deposed before?
12     A.   No.
13     Q.   Okay.  Well, the purpose of this
14 deposition is for me to ask you questions about your
15 claim so that we can understand it better, learn more
16 about it. It's not a matter of discussing the merits
17 of your claim, there's going to be a trial for that.
18     So I'm just going to ask you a series of
19 questions.  You let me know the answer if you know it.
20 If you don't know it, you let me know.  If you don't
21 understand something I say, please let me know and I'll
22 try to rephrase it.
23     Your counsel will make some objections
24 during -- to some of my questions.  Those objections
25 are for -- to preserve them for trial.  But if she

---

Page 9

1  Ms. Powell needs to be able to hear what you say
2  clearly.
3      THE WITNESS:  Ah.
4      MS. BAUMGARDNER:  We'll try to
5  remind you if you are a little too soft.
6      THE WITNESS:  You're speaking our
7  words, okay.
8      Q.   Okay.  Now, do you understand that you
9  have taken an oath to tell the truth today?
10     A.   Yes, sir.
11     Q.   Okay.  Do you have any other -- any
12 questions before we begin the deposition?
13     A.   No.
14     Q.   Okay.  Well, could you please state your
15 full name for the record?
16     A.   Linda Dian Wilson.
17     Q.   And what is your association with the
18 Sinclair Institute?
19     I'm the office manager.
20     Q.   And as office manager, what are your
21 duties?
22     A.   I take care of the vendors that are
23 involved in maintaining our property.  I take care of
24 the needs of the individuals in the office as support
25 for what they need every day to do their job.  And I am

---

3  (Pages 6 to 9)

**Linda Dian Wilson - 4/3/13**

Page 14

1    employment after you graduated from college?
2        A.    I worked in a frame shop framing art,
3    taking orders. I worked for a printer in Richmond,
4    Virginia, and I was his office manager and I kept his
5    books. And that's -- and after that, I worked for a
6    small media company that produced dog-training videos,
7    and I performed all of the duties to acquire them, make
8    sure they were shipped out, and keeping the financial
9    records. I'm not a CPA, so we had a CPA, but I did
10   everything else, except the marketing, for that
11   company. And I've been with Sinclair as an office
12   manager for seven years.
13       Q.    So you've been with Sinclair since 2006;
14   is that about right?
15       A.    2005.
16       Q.    2005?
17       A.    Yes, we are going on the eighth year
18   now.
19       Q.    Okay. When you started at Sinclair,
20   what were your duties?
21       A.    I was the office manager in a building
22   that we did not own, so my duties were to look after
23   the general needs of the people that worked in the
24   office every day to make sure that they had everything
25   they needed to do their job; get in touch with building

Page 15

1    management if there was a problem in our office; take
2    care of some financial reporting, basically just
3    compiling information from reports in a form that was,
4    you know, on one or two pages instead of pages and
5    pages of print.
6        I prepared for parties and for lunches
7    for people that came from out of town.
8        Q.    Okay.
9        A.    That was in the beginning.
10       Q.    When you say you were in a building that
11   you didn't own, do you know who owned the building?
12       A.    The name of the building was Vilcom in
13   Chapel Hill. And since we purchased our own building
14   within a year of my working there, so my duties
15   changed.
16       Q.    Was that a building that rented out
17   office space ---
18       A.    That's correct.
19       Q.    --- to a lot of different people?
20       A.    That's correct.
21       Q.    And now you are in a building that
22   Sinclair owns?
23       A.    That's correct.
24       Q.    Where is this building?
25       A.    It's in Hillsborough, North Carolina on

Page 16

1    Millstone Drive.
2        Q.    Do you know the address?
3        A.    402 Millstone Drive, Hillsborough 27278.
4        Q.    So were you there when -- were you at
5    Sinclair when they moved to the new building?
6        A.    Yes, I moved us.
7        Q.    Okay. So what year was that?
8        A.    I started in August 31, 2005, and we
9    moved in January of 2006.
10       Q.    Okay. How many people work at Sinclair?
11       A.    It does vary. There are, I believe, 18
12   people that are Sinclair employees in our building
13   right now.
14       Q.    Do you have people other than Sinclair
15   people working there?
16       A.    One of the flanker companies maintains
17   offices there and I believe there are six people
18   working for that company.
19       Q.    What is the flanker company?
20       A.    Our business is a sister business of
21   PHE, which is Phil Harvey Enterprises, and we have
22   different brands and, you know, sell to different
23   markets. And this other company is a home-party
24   business and they maintain their offices. They rent --
25   they basically pay us to have their offices in our

Page 17

1    building.
2        Q.    Okay. What is Phil Harvey Enterprises?
3        A.    Phil Harvey is the president of --
4    overall, he owns the company. He started the company
5    in the early '70s.
6        Q.    He started Phil Harvey Enterprises?
7        A.    Correct. And our brand has been around
8    now for, you know, Sinclair Institute has been around
9    now for 20, 25 years -- 20? Twenty (20) years, I
10   think.
11       Q.    Is there some -- so what does Phil
12   Harvey Enterprises do?
13           MS. BAUMGARDNER: Objection. Just
14   for the record, this -- none of this is in the subject
15   matter of the -- in the Notice of Deposition we're
16   supposed to cover. So I'll let her answer a few more
17   questions, but I think we ought to move on.
18           MR. BLADUELL: You can answer.
19       A.    We -- Phil Harvey Enterprises has
20   several companies. Our relationship with them is a
21   little different from the other companies, probably in
22   a way that I don't fully understand. I'm not in
23   business, you know, like an MBA, so I don't really
24   understand business structure very well.
25           I just know that our relationship is a

Page 18

1  little bit different in the way we pay -- Phil Harvey
2  Enterprises consists of a warehouse and an accounting
3  department and a legal department and we -- the
4  marketing is done in our building for our company, and
5  we have an agreement with Phil Harvey Enterprises to
6  take care of our accounting and our order fulfillment,
7  that kind of stuff.
8      Q.    Who is Phil Harvey?
9      A.    He started our company.  He's a public
10 health graduate from ---
11     Q.    When you say your company -- I'm sorry,
12 when you say your company, you mean Sinclair?
13     A.    I believe that Phil is an officer in our
14 company.
15     Q.    In Sinclair?
16     A.    That's right.  And -- but we have a
17 person -- he's the president of Phil Harvey
18 Enterprises, but we have a president of Sinclair.
19     Q.    Is Sinclair owned by Phil Harvey
20 Enterprises?
21     A.    I believe Phil is a shareholder in our
22 company.
23     Q.    Okay.  Are there -- do you know how many
24 other shareholders there are ---
25     A.    I do not.

Page 19

1      Q.    --- in your company?
2      A.    I do not.
3      Q.    Okay.  You said that Phil Harvey
4  Enterprises has different companies, correct?
5      A.    Uh-huh (yes).
6      Q.    One of them is -- is that correct?  Yes?
7      A.    That is correct.
8      Q.    And one of his companies is Sinclair; is
9  that right?
10         MS. BAUMGARDNER: Would you repeat
11 that question again?
12     Q.    One of the companies that Phil Harvey
13 Enterprises owns is Sinclair?
14         MS. BAUMGARDNER: Objection.
15     A.    In part, because he's a shareholder and
16 we pay them to perform certain parts of what it takes
17 for us to run our business.  I'm not sure that I
18 completely understand -- wow!
19         MR. BLADUELL: I'm sorry.  Just
20 for the record, the light just went off.  I'm going to
21 stand up and try to -- it's a motion sensor.
22     Q.    I'm sorry, Ms. Wilson.  The question
23 was, does Phil Harvey Enterprise own Sinclair
24 Institute?  You can answer.
25         MS. BAUMGARDNER: And, again, I'm

Page 20

1  going to have a running objection and ask that you wrap
2  this line of questioning up because it's not one of the
3  designated topics.
4      Q.    You can answer.
5      A.    I don't completely understand the
6  relationship, the full financial relationship, between
7  Phil Harvey Enterprises and Sinclair Institute.  I do
8  know that Phil Harvey Enterprises is comprised of
9  different brands and we started our company after
10 recognizing that there -- that we could address an
11 adult sexual health and education market.
12         How are we related to PHE financially is
13 not clear to me, but there are some facts that I know.
14     Q.    Well, other than financially, can you
15 describe the relationship between Phil Harvey
16 Enterprises and Sinclair?
17         MS. BAUMGARDNER: Objection.
18 Again, that's all in the written discovery.
19         MR. BLADUELL:  You can answer the
20 question.
21     A.    I don't feel confident that I can give
22 you a complete and accurate answer.  It's out of my
23 realm, it's -- it's so far out of the realm of my work,
24 it's not something that I'm really exposed to.
25     Q.    You said there were Phil Harvey

Page 21

1  Enterprises employees in your building, correct?
2      A.    Yes.
3      Q.    Who are these employees of Phil Harvey
4  Enterprises in your building?
5      A.    They work for one of the companies.  I
6  think I've heard the term "umbrella" used to describe
7  PHE, and under that umbrella there are several
8  companies and they are called flanker companies.  We
9  are called a sister company for some reason that I
10 don't completely understand. The people that are in our
11 building that are in the flanker company work for --
12 they're -- they're doing business as Temptations
13 Parties, and they're a home-party business.
14     Q.    What is a home-party business?
15     A.    It is a business not -- where there are
16 consultants who go into people's homes that have
17 requested the consultant to come and they invite
18 friends and they -- it's an opportunity to do business,
19 but it's in the home as opposed to a store front.
20     Q.    An opportunity to do -- you said an
21 opportunity to do business at home, but what kind of
22 business?
23     A.    Oh.  It is an adult-novelty business, so
24 we sell potions and lotions and lingerie and adult
25 toys.

Linda Dian Wilson - 4/3/13

Page 22

1    Q.    When you say "we," do you mean
2  Temptations?
3    A.    That's correct.
4    Q.    Okay.  So, other than Temptation
5  employees in your building, are there other Phil Harvey
6  Enterprise employees?
7    A.    We are Sinclair Institute employees.  We
8  pay Phil Harvey Enterprises to take care of our
9  payroll, our accounting, our order fulfillment.  I
10  believe Phil is a shareholder in our company.  We share
11  information back and forth that is useful to both of
12  our companies, but I don't really think that it would
13  be correct to say that Phil Harvey is the sole owner of
14  our company because I know there are other people who
15  own shares in my company.
16    Q.    Okay.  Who are these people?
17        MS. BAUMGARDNER: Objection.  I'm
18  going to instruct the witness not to answer any more of
19  these questions.  They are not -- we are so far afield.
20  They are not designated as topics.  In this we produced
21  her answer to questions about it and she is ---
22        MR. BLADUELL: Okay.  I under ---
23        MS. BAUMGARDNER: --- she doesn't
24  -- she isn't qualified to give you answers on these
25  questions.

Page 23

1        MR. BLADUELL: Okay.  For the
2  record, counsel has instructed the witness not to
3  answer on relevancy grounds; is that right?
4        MS. BAUMGARDNER: No.  On the fact
5  that we haven't produced this witness under Rule 30.
6  If you want me to read the rule, Rule 30(b) 5 or 6.
7        MR. BLADUELL: Are you ---
8        MS. BAUMGARDNER:  We produced her,
9  not on relevance ---
10        MR. BLADUELL: Counsel -- counsel
11  -- so, okay, so are you instructing the witness not to
12  answer on a privilege ground?
13        MS. BAUMGARDNER: No.
14        MR. BLADUELL: Then the instruction
15  not to answer is not proper.  I represent to you that
16  it's not a privilege; you can answer the question, so I
17  ask you to answer the question, Ms. Wilson.
18        THE WITNESS: Could you repeat the
19  exact question you'd like me to answer?
20        MR. BLADUELL: Sure.  I'm sorry.
21  Can we have the court reporter read it back?
22        (Question read back.)
23        MS. BAUMGARDNER: You can answer
24  if you know.
25    A.    I don't know that, but I know that there

Page 24

1  are employees at Sinclair that are shareholders.  I
2  could only give you a guess as to who I believe that
3  they are because we do not discuss our financial
4  relation, our individual financial relationships, with
5  our company with each other as employees.
6    Q.    So this -- the people that -- so do you
7  know their names or you don't know their names?
8        MS. BAUMGARDNER: Objection.  She
9  said she didn't know who they are.
10    A.    I believe I -- I believe I just answered
11  that by saying I could only make a guess ---
12    Q.    Okay.
13    A.    --- and I don't feel comfortable under
14  oath making guesses about questions.
15    Q.    I understand that.  But, I mean, we're
16  not -- are we talking about a hundred employees or are
17  we talking about five or six?
18    A.    Our company, I believe, has about 18
19  employees now.
20    Q.    But the ones that you said are
21  shareholders, so it's a limited number, it's like five
22  or six?
23    A.    It is -- it is not everyone in our
24  building.  That much I know ---
25    Q.    Okay.

Page 25

1    A.    --- because I am not a shareholder.
2    Q.    Okay.  Now, you said that Phil Harvey
3  Enterprises has different companies, correct?  One of
4  them is Temptations, which is in your building.  What
5  other companies does Phil Harvey own?
6        MS. BAUMGARDNER: Objection.
7    Q.    Phil Harvey Enterprises.
8        MS. BAUMGARDNER:  Objection.
9    A.    Do I answer?
10    Q.    Yeah, you can answer.  It's not an
11  instruction.
12        MS. BAUMGARDNER: If you know.
13    A.    Adam & Eve.
14    Q.    And what do they do?
15    A.    They are ---
16        MS. BAUMGARDNER: Objection.  Go
17  ahead and answer.
18    A.    They are an adult novelty business, like
19  entertainment and novelty.  So they sell adult toys,
20  they sell lingerie, they sell films.
21    Q.    Okay.  Are there Adam & Eve employees in
22  your building?
23        MS. BAUMGARDNER: Objection.
24    A.    No.
25    Q.    Okay.  So what -- what -- so Adam & Eve

7  (Pages 22 to 25)

Margaret M. Powell, CVR - (919) 779-0322

Linda Dian Wilson - 4/3/13

Page 30

1  both companies adhere to. It's very important to us --
2  Phil Harvey was a public health person, and that is how
3  he got into this business.
4          It's very important to us that
5  everything that we do meet these standards. So in that
6  sense they are similar.
7          They are different in that we are
8  selling to a different adult market. Our adult market
9  is people who may have problems because of their
10 health, people who may lack information about healthy
11 sexual relationships among adults.
12         We have experts in our films that are
13 sexual education -- they're educators and researchers,
14 therapists, because we -- our market is people who are
15 looking for certain advice in a more clinical, I would
16 say, way.
17         The things -- the titles that Adam & Eve
18 produce are more, I would say, adult entertainment
19 without that, you know, like they probably would not
20 have an expert speaking on camera in their film. In
21 this way they are different.
22    Q.   Okay. When you say, "adult
23 entertainment," is that -- is it -- do I understand
24 correctly that you're making a distinction between that
25 adult entertainment and what Sinclair produces?

Page 31

1          MS. BAUMGARDNER: Objection.
2     A.   There are some distinctions because we
3  specifically have experts who are educators and
4  clinicians in our films. It gives our films a
5  different look, I think, a different tone because we
6  are selling to a different adult market.
7     Q.   But when you say that the Adam & Eve
8  productions are adult entertainment, what do you mean
9  by that?
10    A.   They are films that are produced to
11 enhance the mature sexual lives and experiences of
12 adults who may not feel like they need to speak -- they
13 need to have an expert speaking to them on film. They
14 are just people like the people that view the films,
15 adults, adults that view the films.
16    Q.   Would those films -- are those films
17 pornography?
18         MS. BAUMGARDNER: Objection.
19    Q.   The films from Adam & Eve?
20    A.   Could you define pornography?
21    Q.   Sexual -- sexually explicit images,
22 intercourse ---
23    A.   Yes.
24    Q.   --- display of genitals?
25    A.   Yes.

Page 32

1     Q.   Oral, oral sex?
2     A.   Probably.
3     Q.   And do you have that same content in the
4  Sinclair videos?
5     A.   Yes.
6     Q.   Have you met Mr. Phil Harvey?
7          MS. BAUMGARDNER: Objection.
8     A.   Yes. Yes.
9     Q.   When did you meet him?
10    A.   He -- we have a -- Phil Harvey has
11 another interest called DKT International. He spends
12 about half of his time, or maybe more, traveling around
13 the world helping more impoverished areas learn about
14 how to prevent sexually transmitted disease, how to
15 prevent unwanted pregnancy because, like I said, he's a
16 public health person, that, that's his interest.
17         A portion of the profits of all of the
18 companies go to support DKT International.
19         So he's not in Hillsborough all the
20 time, but he does keep office hours and he comes and he
21 attends some of our monthly employee meetings, and he
22 comes to our Christmas parties, and frequently consults
23 with different members of the company who have
24 questions that his experience might, you know, be
25 needed about the marketing that we do and that kind of

Page 33

1  thing.
2     Q.   Is it accurate to say you've seen him
3  more than ten times?
4     A.   Yes.
5     Q.   And you've talked to him more than ten
6  times?
7     A.   I don't think I've talked to him more
8  than ten times.
9     Q.   Five times?
10    A.   I've sent him thank you notes for what
11 he does and who he is and -- but I don't talk to him
12 much.
13    Q.   Have you had work interactions with Mr.
14 Phil Harvey?
15    A.   No, not really, like we don't work
16 together.
17    Q.   But he comes to the Sinclair building,
18 correct?
19    A.   And speaks with our producer and our
20 president.
21    Q.   Does he have an office in the Sinclair
22 building?
23    A.   No.
24    Q.   Okay. You say he speaks to your
25 producers -- producer; is that right?

9  (Pages 30 to 33)

Margaret M. Powell, CVR - (919) 779-0322

Linda Dian Wilson - 4/3/13

Page 34

1      A.    That's correct.
2      Q.    Who is your producer?
3      A.    Kathy Brummitt.
4      Q.    And what is her job?
5      A.    She was the first Sinclair employee; and
6  her job, until recently, was to oversee the production
7  of our proprietary video, the video that we produce.
8      Q.    Sexually explicit videos?
9      A.    And non-sexually explicit videos.
10     Q.    Okay.
11     A.    Now she is -- we're in a bit of a
12  transition in our company and we're looking at
13  different ways to achieve what we do, and she is now
14  the head of new customer acquisition.  But she probably
15  still maintains the title of head of production.  We
16  are not in production right now, so.
17     Q.    Okay.  About how often do you see that
18  Ms. Kathy -- I'm sorry, what -- what was her last name?
19     A.    Brummitt.
20     Q.    So how often do you see Kathy Brummitt
21  talk to Phil Harvey?
22          MS. BAUMGARDNER: Objection.
23     A.    Maybe three times a year.
24     Q.    Okay.  And you said that Phil Harvey
25  also comes to Sinclair to talk to other employees; is

Page 35

1  that right?
2      A.    He comes to meet with our president.
3      Q.    And who is your president?
4      A.    Patrick Smith.
5      Q.    Okay.  So how often does he meet with
6  your president?
7          MS. BAUMGARDNER:  Objection.
8      A.    I believe he has -- in our building,
9  which would be the meetings that I would know about, I
10  think Phil may have been there three times in the past
11  year and a half to visit with Patrick, maybe a little
12  more.  I'm -- I'm uncertain.
13     Q.    Okay.  So the Sinclair Institute has a
14  president, correct?
15     A.    A president?  Yes.
16     Q.    And this president -- his name is?  You
17  just said it's Patrick.
18     A.    Patrick Smith.
19     Q.    And has a director of production, Ms.
20  Kathy Burmitt?
21     A.    Brummitt.
22     Q.    Brummitt?
23     A.    Uh-huh (yes).
24     Q.    Who are the rest of the employees at
25  Sinclair?

Page 36

1      A.    Kathy works with -- do you want me to
2  say their names?
3      Q.    Sure.  Yes, please.
4      A.    Betsey Grondy, who helps with new
5  customer acquisition.  Rebecca Cook, who is the head of
6  our wholesale division.  She works with Donica McClean
7  -- I'm sorry, she's married now, Donica Reardon, and
8  Brittany Cox.
9      Q.    Are these, Brittany Cox and Donica, are
10  also employees of Sinclair?
11     A.    Correct, in the wholesale division.
12          Our Senior Buyer is Wayne Johnson.  He
13  works on catalog with George Campbell.
14          The person that does our e-mail
15  marketing is Rick Miller.
16          The head of our website is David Allen.
17          We have four graphic artists.  Their
18  names are Doris Rudd, Clark Gimenez, Sarah Wilson and
19  Meredith Pratt.
20     Q.    Okay.  Is that all?  Oh, I'm sorry.
21     A.    We have Alan Julich, who works in -- he
22  works on our web team helping with the duties of the
23  website.
24          Jesse Sirbaugh also works on our web
25  team.

Page 37

1          Maureen Castro is -- she sort of heads
2  up the organization of the duties of the web team.
3      Q.    Okay.  But for the -- for the leadership
4  of Sinclair, who would you say that is, Patrick?
5      A.    Patrick Smith.
6      Q.    And who else?
7          MS. BAUMGARDNER:  Objection.
8      A.    I would say Patrick.
9      Q.    Is there a vice president?
10          MS. BAUMGARDNER: Objection.
11     A.    I'm not aware of a vice president.
12     Q.    Is there ---
13     A.    If there is, I just don't know what it
14  is.
15     Q.    Okay.  Is there a Chief Financial
16  Officer?
17          MS. BAUMGARDNER: Objection.
18     A.    No.  Our accounting department, I
19  suppose would be.
20     Q.    So who's the head of the accounting
21  department?
22     A.    Ginger Stallings, but she is not a
23  Sinclair employee.
24     Q.    Where does she work?
25     A.    She works at PHE.

10  (Pages 34 to 37)

Margaret M. Powell, CVR - (919) 779-0322

Linda Dian Wilson - 4/3/13

Page 42

1    Q.   Okay.  Have you worked for any other
2  company under the umbrella of PHE that is not Sinclair?
3         MS. BAUMGARDNER: Objection.
4    A.   No.
5    Q.   What is Townsend Enterprises?
6    A.   That is the legal name of our business.
7  We do business as Sinclair Institute, but Townsend
8  Enterprises is the name on our business license.
9    Q.   So Townsend Enterprises and Sinclair are
10 the same thing?
11   A.   That is correct.
12   Q.   Townsend Enterprises is not a different
13 entity?
14   A.   Correct.
15   Q.   Okay.  So let's say that Sinclair
16 Enterprises is going to do a film, sexually explicit
17 film, could you walk me through your involvement in the
18 production of that film?
19   A.   Once the film is complete, I process the
20 paperwork involved that is a part of keeping 2257
21 records.  I maintain copies of the IDs of everyone in
22 the film, including the people that are in the building
23 working that are not actually performers in the film.
24        So everyone that is involved in the
25 production, we keep their ID.  In other words, this is

Page 43

1  all happening, you know, our films are all -- everyone
2  on the crew is an adult, the performers are all adults.
3    Q.   Just for clarification, the performers,
4  is -- is -- do the performers film the movie at the
5  offices of Sinclair?
6    A.   No.
7    Q.   There's a studio where this production
8  happens?
9    A.   Takes place in a studio.
10   Q.   And where is this studio?
11   A.   In California.
12   Q.   Okay.  So no productions take place in
13 North Carolina?
14   A.   Nothing above and beyond maybe a
15 product demo/video that would just show a product in
16 someone's hand or something like that.
17   Q.   Okay.  Now this studio in California, is
18 it owned by Sinclair?
19   A.   No.
20   Q.   Who owns this studio?
21   A.   I have no idea.
22   Q.   Do you -- it is owned by PHE
23 Enterprises?
24        MS. BAUMGARDNER: Objection.
25   A.   I have no idea, and I would tend to

Page 44

1  doubt it.
2    Q.   Okay.  Okay.  So, they are filming this
3  movie and how do you get the copies of the IDs?
4    A.   They take a picture of the performer
5  holding their ID.
6    Q.   And is this picture taken in California?
7    A.   Correct.
8    Q.   Okay.
9    A.   At the date of the, you know, first date
10 of production.
11   Q.   Is there someone from Sinclair at this
12 production?
13   A    Yes.
14   Q.   And who is that?
15   A.   Kathy Brummitt.
16   Q.   And does she take -- is she the one
17 taking the pictures of the IDs?
18   A.   I don't know who takes the pictures.
19   Q.   Okay.  So someone takes the pictures of
20 the IDs, then gives this picture to Ms. Burmitt [sic]?
21   A.   Brummitt.
22   Q.   Brummitt, I'm sorry, Brummitt.  Correct?
23   A.   To my knowledge, I mean ---
24   Q.   Yes, to your -- as far as you know?
25   A.   Yes.  It's like they sign model

Page 45

1  releases, they have their picture taken with their ID,
2  and all of this happens, you know, that's -- that --
3  wow!  It's almost like it cuts off if we're not moving.
4        MR. BLADUELL:  Yeah, it's going to
5  happen.
6        MS. BAUMGARDNER:  Yeah, it's a
7  motion detector so that's why you have to get up.
8        MR. BLADUELL:  For the record, the
9  light went off again.  They're sending us a message.
10        So you can continue.
11        THE WITNESS:  I have never been at
12 a Sinclair Institute production.
13   Q.   Okay.  So Ms. Brummitt collects the IDs
14 and the model releases, and does she send them to you
15 by e-mail?
16   A.   No.
17   Q.   By mail?
18   A.   No.
19   Q.   She brings them from California to North
20 Carolina?
21   A.   That's correct.
22   Q.   Okay.  Does -- is Ms. Brummitt -- does
23 Ms. Brummitt do this--taking IDs and model
24 releases--for other companies that are part of the
25 umbrella of Phil Harvey Enterprises?

Margaret M. Powell, CVR - (919) 779-0322

**Linda Dian Wilson - 4/3/13**

Page 90

1           MS. BAUMGARDNER: Objection.
2      A.   I really feel like that without a
3  calculator and sitting down and writing all this stuff
4  down that I couldn't give you an accurate answer.
5      Q.   Okay. All right.
6      A.   I am under oath.
7      Q.   Yes. And nothing bad is going to happen
8  if you give us a reasonable estimate based on your
9  knowledge of the process.
10          So, you know, would you say that that
11 process of just the cross-referencing, typing up the
12 bar codes would take, in between the time that you
13 spent on it and the time that the graphic artists spend
14 on it, would you say it would take up to an hour?
15          MS. BAUMGARDNER: Objection.
16     A.   When all is said and done, yeah -- yes.
17     Q.   And it could take less than an hour?
18     A.   Well, there are a certain number of
19 things that we have to do with everything, so one image
20 wouldn't take any less or any more, really, unless our
21 equipment isn't operating properly.
22     Q.   Okay.
23     A.   You know, we have to sit and wait for
24 these circles to go around on this screen while the
25 images upload; and once they're uploaded, they get a

Page 91

1  bar code, you know. That -- it could be more than an
2  hour if our ---
3      Q.   If there's something wrong.
4      A.   --- server is ---
5      Q.   Right.
6      A.   --- there could be something wrong,
7  yeah. I mean, you know, there are sort of these
8  aggravating parts of this that are necessary for --
9  because of keeping the records and the best available
10 technology, you know, that we have that we can afford,
11 you know, is not -- is not perfect.
12     Q.   Okay.
13     A.   That -- and I guess, just knowing all of
14 that it makes it difficult for me to tell you exactly
15 how long I feel like this takes. I really just know
16 about how much of my job is dedicated to this, and ---
17     Q.   Which is?
18     A.   --- which is about half.
19     Q.   Half of it, 20 hours a week?
20     A.   (Indicates.)
21     Q.   Okay.
22     A.   I know the other stuff -- and that's
23 just based on all of the other stuff that I do and
24 about how easy I know my job used to be before I
25 started doing this. I used to have a lot more time to

Page 92

1  have discussions with my co-workers, for example.
2      Q.   You don't recruit the individuals
3  appearing in your, in Sinclair, videos, correct?
4      A.   Me?
5      Q.   Yes.
6      A.   No.
7      Q.   Who does that recruiting?
8      A.   That would be Kathy Brummitt, or it
9  could be a director might be involved in the process,
10 but I don't have that knowledge because I'm not on site
11 when -- or in offices when all of that stuff is going
12 on.
13          But I would say the person ultimately
14 responsible is Kathy Brummitt, and she's been -- she's
15 been with our company 30 years. She was the first
16 employee of Sinclair, so she knows this industry. And
17 we frequently use the same people in our -- because
18 they're familiar with working with us and we're
19 familiar with working with them.
20          And so, you know, how one particular
21 actor was discovered as a person that we would like to
22 be in our film in the very beginning, I wouldn't have
23 any knowledge of that at all, but I know that she would
24 maybe be the one that would contact, you know, the
25 agency that they work for or them directly depending on

Page 93

1  how their relationship is set up.
2      Q.   So the individuals that are depicted in
3  Sinclair videos have agencies representing them?
4      A.   I -- I -- I don't have any knowledge of
5  that.
6      Q.   Okay.
7      A.   I'm just thinking, you know, people who
8  are in films typically work through agencies, but I
9  don't have any -- I can't answer that.
10     Q.   Okay. And who do you report to in your
11 work?
12     A.   Patrick Smith.
13     Q.   Patrick Smith.
14          And who does Patrick report to?
15     A.   The -- he reports to Phil Harvey and
16 David Groves. I believe David Groves is considered
17 the CEO at PHE.
18     Q.   I'm sorry, you said David?
19     A.   Groves.
20     Q.   Who is David Groves?
21     A.   I believe he is the CEO of PHE.
22     Q.   Okay. I'm sorry, you said that, I did
23 not get it. CEO of PHE.
24          So Phil Harvey is not the CFO of PHE?
25     A.   Well, you just said CFO.

**Margaret M. Powell, CVR - (919) 779-0322**

Linda Dian Wilson - 4/3/13

Page 94

1    Q.    I'm sorry, CEO.  The CEO of PHE is David
2  Groves?
3    A.    I believe Phil Harvey is considered the
4  president ---
5    Q.    Okay.
6    A.    --- and principal owner of PHE.  And
7  David Groves is the CEO of PHE.
8    Q.    Owner.  All right.  Does PHE own
9  Sinclair?
10        MS. BAUMGARDNER:  Objection.
11    A.    I don't completely understand the
12  financial relationship, once again, between PHE and
13  Sinclair.  I believe Phil Harvey is a shareholder in
14  Sinclair.
15    Q.    Okay.
16    A.    I know that our relationship -- among
17  the companies that are associated with PHE, I believe
18  our relationship is unique among those companies, and
19  that we are not considered a flanker company, but a
20  sister company.  Whatever that means to people in
21  business.  I'm not really sure what it means.
22    Q.    Okay.  Do you know the year that the
23  Sinclair Institute was founded?
24    A.    That shouldn't be too hard.  I want to
25  say 1993.

Page 95

1    Q.    Okay.  And who founded the Sinclair
2  Institute?
3    A.    It was an out -- employee -- Kathy
4  Brummitt was working for PHE ---
5    Q.    Okay.
6    A.    --- and I think that somehow they
7  decided we're going to have another company to market
8  to another demographic and it's going to have a
9  different brand and a different purpose.  And I know
10  that the people that made Sinclair were PHE employees.
11  How the business was structured is something I don't
12  understand.
13    Q.    Okay.  Now, you said that Sinclair sells
14  Adam & Eve pictures, correct?
15        MS. BAUMGARDNER:  Objection.
16    A.    We have -- we buy Adam & Eve productions
17  and sell them in our catalog and on our website, in
18  addition to our own -- they are another
19  non-proprietary, basically, company that we purchased
20  and, you know?
21    Q.    Are you a secondary producer of those
22  materials?
23    A.    We would be considered a secondary
24  producer, yes.
25    Q.    Would you be considered a secondary

Page 96

1  producer of the Wicked features, as well?
2    A.    Yes.
3    Q.    So, of the films that you decide to sell
4  on your website, you would be considered a secondary
5  producer for those films?
6    A.    Yes, unless they were proprietary, and
7  then we are the primary producer of those films.
8        MR. BLADUELL:  Okay.
9        THE WITNESS:  Can I go to the
10  restroom?
11        MR. BLADUELL:  Yes, we can have a
12  break.  I was about to ask you that, but I saw that we
13  were close to lunch time, but why don't we have a
14  break, I can use it, too.  Then we will be back here in
15  like in ten minutes?
16        MS. BAUMGARDNER:  Or less.
17        MR. BLADUELL:  Or less.  Okay.
18        (Recess 11:09 a.m. - 11:14 a.m.)
19    Q.    (BY MR. BLADUELL)  Ms. Wilson, the
20  Sinclair Institute has a website called
21  sinclairinstitute.com; is that correct?
22    A.    That's correct.
23    Q.    And it also manages a website called
24  bettersex.com?
25    A.    That's correct.

Page 97

1    Q.    What is the relationship between
2  Sinclair and the "Better Sex" website?
3    A.    The better -- the Sinclair Institute
4  website is designed to have more content related to
5  things that would help sexual, adult sexual, health
6  therapists identify products that their patients may be
7  interested in, or their clients may be interested in.
8        It has more information that a person
9  unfamiliar with the kinds of materials that we sell
10  could identify what would best help them or be the best
11  product for them to buy.
12        It contains articles about sexual health
13  and adult sexual health and adult sexual education.
14        We try to provide information to go
15  along with the products that we sell on
16  sinclairinstitute.com because we know that there is a
17  market of -- who -- who need this information.
18        The "Better Sex" website is not quite as
19  concerned with -- it -- the "Better Sex" website would
20  be for people more familiar with the kinds of products
21  that we sell.
22        So it is -- there is not as much written
23  content.  Of course, there are descriptions of what we
24  sell, but what I feel like is different is that there
25  is not as much to read, to educate yourself by reading,

**Linda Dian Wilson - 4/3/13**

Page 126

```
 1       A.   I could -- I could tell you this: If we
 2  sold that film, I know she would be -- I would know
 3  exactly how old she was because I would have her ID.
 4       Q.   Okay.  So the ID gives you the -- the
 5  ID tells you the exact age?
 6       A.   Yeah.
 7       Q.   Okay.  But just looking at that picture,
 8  can you tell the exact age ---
 9             MS. BAUMGARDNER: Objection.
10       Q.   --- of that person depicted?
11       A.   She just looks like an adult woman
12  younger than I am, and I'm 50 years old.
13       Q.   But the exact age?  I mean, it's a yes
14  or no question; can you tell the exact age?
15       A.   I cannot tell the exact age.
16       Q.   Okay.  And that woman that's on Page 1
17  in the banner is on Page 2 of Exhibit Number 4,
18  correct?
19       A.   Page 1 of the banner and Page 2 of
20  Exhibit Number 4, okay.
21       Q.   All right.  Is the same one?
22       A.   It appears to be, yes.
23       Q.   Okay.  And the three titles, "Erotic
24  Stories Trilogy," "Recipe for Romance" and "A Little
25  Part of Me," that are on Page 1 are on Page 2?
```

Page 127

```
 1       A.   That is right.
 2       Q.   Okay.  And below those titles are other
 3  titles, correct?
 4       A.   Correct.
 5       Q.   There are nine titles on the second page
 6  of Exhibit Number 4?
 7       A.   They're actually ten because "Portrait
 8  of a Call Girl" is also a title ---
 9       Q.   Okay.  So that's a banner ---
10       A.   Yes.
11       Q.   --- that we've been talking about?
12       A.   Yes.  But there are nine titles there
13  underneath the banner title that I see, yes.
14       Q.   Okay.  And do you recognize any of these
15  titles as titles that Sinclair sells?
16       A.   Yes.  The "Better Sex" -- "The Best of
17  the Better Sex Collection" is a proprietary title, and
18  I believe I distinctly remember processing the 2257
19  documents for -- for some reason "Recipe for Romance"
20  is escaping me; but, as you see, there's another film
21  here called, "A Little Romance," and then another one
22  has "Romance" written real big across the front of it,
23  but I recognize them as titles -- most of these
24  specifically as titles that I remember in recent, you
25  know, in recent time as having processed the 2257
```

Page 128

```
 1  documents for.
 2       Q.   Okay.  Now I'm going to show you another
 3  document.  I'm going to mark it as Exhibit Number 5.
 4  I'm going to provide you with a copy, and I'm going to
 5  provide a copy to your counsel.
 6             Now Exhibit Number 5, do you see you on
 7  top on the left-hand corner that it has a web address?
 8             (Defendant's Wilson Deposition
 9             Exhibit Number 5 Marked.)
10       A.   I do.
11       Q.   And it says "http"?
12       A.   With no "S."
13       Q.   With no "S," colon, forward slash,
14  forward slash, www.sinclairinstitute.com?
15       A.   I see that.
16       Q.   Okay.  www.sinclairinstituite.com is the
17  website for the Sinclair Institute?
18       A.   That is correct.
19       Q.   Okay.  And below that we have the same
20  logo, Sinclair Institute, that appears on Exhibits 2
21  and 4?
22       A.   That is correct.
23       Q.   And the same phone number?
24       A.   That is correct.
25       Q.   And the same tabs, "adult sex
```

Page 129

```
 1  education," "adult movies," "sex toys," "lubes and
 2  accessories," "new on sale," "sexual health articles"?
 3       A.   Yes.
 4       Q.   Now, there is a search box on top of
 5  those titles and there is a word typed in there and the
 6  word is "Young"?
 7       A.   That's correct.
 8       Q.   And below the titles it says, "Home>
 9  Search Results For: Young"?
10       A.   Yes.
11       Q.   Okay.  In this -- the first page of
12  Exhibit 5, there are three titles, correct?
13       A.   That's right.
14       Q.   "The Best of Nina Hartley 3" ---
15       A.   Uh-huh (yes).
16       Q.   --- "Girls Wanting Girls" ---
17       A.   That's right.
18       Q.   --- and "Teach Me"?
19       A.   That's correct.
20       Q.   Are you familiar with these titles?
21       A.   I am.
22       Q.   What can you tell me -- how are you
23  familiar?
24       A.   Well, Nina Hartley was -- she's been in
25  the business a very, very long time--I think Nina was a
```

33  (Pages 126 to 129)

Linda Dian Wilson - 4/3/13

Page 134

1    for a Lifetime Volume 1" are proprietary titles.  And
2    the other two are non-proprietary titles, but I'm
3    familiar with them.
4        Q.    And those are "My Girlfriend's Mother"?
5        A.    Yes.
6        Q.    And "British MILFs"?
7        A.    Yep.  Yes.
8        Q.    Okay.  Now, let's go back to the ones
9    that -- "Teach Me," on the first page.
10       A.    Uh-huh (yes).
11       Q.    You said that you processed 2257
12   documents for that?
13       A.    Pretty sure I did.  I know I sent it out
14   for review ---
15       Q.    Okay.
16       A.    --- because they are recent.
17       Q.    And are you familiar with the content of
18   that film?
19       A.    I have not seen the film, no.
20       Q.    Okay.
21       A.    Only the images associated with the
22   marketing of the film.
23       Q.    And what does the images tell you about
24   the marketing of the film?
25       A.    Do you mean you want me to explain what

Page 135

1    I think the film is about just by looking at the
2    images?
3        Q.    Yes.
4             MS. BAUMGARDNER: Objection.
5        A.    I think that it is -- it looks like --
6    on "Teach Me," there are two people on the front cover,
7    and I would think that that particular film may be
8    about one person teaching another person certain
9    techniques.  And some people find that -- some adults
10   find that visually stimulating and -- and ---
11       Q.    Sexual techniques, you mean?
12       A.    Yes.
13       Q.    Okay.  Is one person older than the
14   other?
15       A.    It's hard to tell.
16       Q.    Okay.  I'm going to mark another
17   exhibit, Exhibit Number 6.
18       A.    Do you have the IDs for these people?
19   Some of these images would require you if you ---
20       Q.    I don't.
21            I'm going to hand Exhibit Number 6 to --
22   a copy of Exhibit Number 6 to counsel.  I'm going to
23   hand an Exhibit to the witness and I keep a copy.
24            Can you tell me -- do you see in this
25   Exhibit Number 6 at the bottom that it has an address

Page 136

1    for the Sinclair Institute?
2             (Defendant's Wilson Deposition
3             Exhibit Number 6 Marked.)
4        A.    You mean at the bottom of the page right
5    here?
6        Q.    Yes.
7        A.    Yes, I do.
8        Q.    And do you see on top that it's "Teach
9    Me"?
10       A.    Yes.
11       Q.    The name of the title that appears on
12   Exhibit Number 5, right?
13       A.    Yes.
14       Q.    And then "Adult DVDs," and then it says,
15   "Lesbian"?
16       A.    Yes.
17       Q.    "Lesbian" would be the category of the
18   DVD under which "Teach Me" is at or sold?
19       A.    That's right.
20       Q.    Then -- now from this image, which is a
21   little bigger than the one in Exhibit Number 5, can you
22   tell if someone is -- it depicts two women, correct?
23       A.    That is correct.
24       Q.    And is one older than the other?
25       A.    I'm reading the copy that was written

Page 137

1    for this film.
2        Q.    Oh, okay, but just from the film, from
3    the cover?
4        A.    From the picture, can I tell that one is
5    -- can I accurately say that one of these people is
6    older than the other one?  No.
7        Q.    Okay.  Now, if you read down, it says --
8    the description for this film, it says, "Drop dead
9    gorgeous cougars school nubile newbies in the art of
10   lesbian love!  Legendary Julia Ann demonstrates
11   cunnilingus on young 18 plus lover Jessie, bringing the
12   girl next door to pulsating climax.  Freckled redhead
13   Darla Crane teaches adorable coed Allie the pleasures
14   of her G-spot, with each woman taking a turn as
15   ecstatic guinea pig.  During a sweaty session, busty
16   Lisa Ann introduces innocent Jana to the thrills of 69,
17   with provocative interviews and scorching bonus
18   features!"
19       A.    Yes.
20       Q.    Did I read that accurately?
21       A.    You did.
22       Q.    Okay.  From that description, is it
23   reasonable to say that one of the -- in the first
24   sentence, one of the artists or performers, let's say,
25   is much older than the other one?

Margaret M. Powell, CVR - (919) 779-0322

Page 138

1    A.    Well, because it says, "legendary," that
2  makes me think that the person who is Julia Ann, even
3  if I didn't know who Julia Ann is, and I do, that would
4  make me assume that that person was older than her
5  lover, Jessie.
6    Q.    Is Julia Ann depicted in the picture?
7    A.    Julia Ann is the one, I believe, the one
8  that is more facing -- more blonde ---
9    Q.    Okay.
10    A.    --- kind of facing the ---
11    Q.    Okay.  And that's the cougar?
12          MS. BAUMGARDNER: Objection.
13    A.    I believe the word, "cougar" indicates a
14  woman that is ---
15    Q.    Applied to Julia Ann?
16    A.    I think Sarah Palin was considered a
17  cougar.
18    Q.    But in this context, it is a word used
19  to describe Julia Ann?
20    A.    Yes.
21    Q.    And the young one, Jessie, is that -- do
22  you know if that's the one depicted here?
23    A.    I do not know that.
24    Q.    Okay.  But it says that she's young?
25    A.    Yes.  Eighteen (18) plus is what it

Page 139

1  says.
2    Q.    Okay.  Now, there's -- besides a scene
3  between these two, there is also in this -- from the
4  description of the video, the description describes
5  another scene between "Darla Crane teaches adorable
6  coed Allie," correct?
7    A.    That's right.
8    Q.    Do you know what the term, "coed" means?
9    A.    Yes.
10    Q.    What does it mean?
11    A.    To me, it means someone who goes to a
12  university with males and females allowed to go to the
13  university.
14    Q.    A student or a professor?
15    A.    A student.
16    Q.    Okay.  And Sinclair -- the Sinclair
17  Institute is a secondary producer of the image ---
18    A.    That's correct.
19    Q.    --- that's on the website?
20    A.    Uh-huh (yes).
21    Q.    You don't consider yourself a secondary
22  producer of the actual content of the video?
23    A.    That's correct.
24    Q.    Okay.
25    A.    The way that I understand those two

Page 140

1  terms where they are used -- you know, we had nothing
2  to do with the production of the video.
3    Q.    Uh-huh (yes).
4    A.    But, you know?
5    Q.    Do you know who produced this one?
6    A.    I believe that -- I want to say this
7  might be a "New Sensations" video, but I'm not totally
8  sure.  It's hard for me to read the -- it's hard for me
9  to read, you know, what the letters -- what the words
10  say that are on the package.
11    Q.    Okay.
12    A.    But I would know if it were in front of
13  me because I could read it and it would be a part of
14  all of the records that are kept.
15    Q.    Now, the lover Jessie, it says that
16  she's 18-plus, right?
17    A.    Which is still legal, I believe, right?
18  Yes, it does say that.
19    Q.    Do you think it's -- what do you think
20  -- is it legal, 18-plus?
21    A.    Yes.
22    Q.    Okay.  And -- but it doesn't say her
23  exact age, correct?
24    A.    No, it doesn't.
25    Q.    So you wouldn't -- and assuming that

Page 141

1  Jessie is the one depicted here, you would not know her
2  exact age by just looking at the picture, correct?
3    A.    That is correct.
4    Q.    You would need an ID to know her exact
5  age?
6    A.    I would have her ID with her 2257 stuff
7  if I were the, you know?
8    Q.    But, yes or no, would you need her ID to
9  know her age?
10    A.    To know her exact age, yes.
11    Q.    Okay.
12    A.    And we have her ID.
13    Q.    You know that for a fact?
14    A.    I know it for a fact because we wouldn't
15  be able to sell this film if we didn't.  We wouldn't be
16  able to order the product.
17          That was what I was explaining to you
18  about the way that our AS/400 and our VLS are set up.
19    Q.    Do you know when this film -- when you
20  process these documents?
21    A.    Do I know when I processed the documents
22  for that film?
23    Q.    Yes, what year?
24    A.    No; but it seems to me like it's been
25  pretty recent.  I kind of -- the title is in my head

**Linda Dian Wilson - 4/3/13**

Page 146

1      Q.    Is she -- she's wearing pigtails,
2  correct?
3      A.    That's right.
4      Q.    Is that something that people in their
5  30s usually do?
6          MS. BAUMGARDNER: Objection.
7      A.    I don't know.  I never wore pigtails,
8  ever.
9      Q.    Okay.  Now if we go to the description
10 of the film, it says, "The folks next door like it
11 sweaty & slippery!  Body beautiful Melanie gets
12 dripping wet while riding her hubby to multiple orgasm.
13 Young 18-plus, fresh faced gymnast Trinity and her BMOC
14 beau engage in positions even we've never seen, peaking
15 in both male and female ejaculation.  Just as wild, a
16 youthful 'Santa Claus' penetrates his sexy Mrs. to
17 drenching climax under the Christmas tree."
18     A.    "Sexy Mrs."
19     Q.    Okay.  Is that right; did I read that
20 accurately?
21     A.    Yes.
22     Q.    Okay.  Do you know what "BMOC" means?
23     A.    Big man on campus.
24     Q.    Okay.  And is that a term that you have
25 come to know through your work at Sinclair?

Page 147

1      A.    I think I've probably understood that
2  term since I watched a film on television growing up in
3  ---
4      Q.    Okay.
5      A.    --- you know, maybe like "My Three Sons"
6  or something.
7      Q.    Okay.  I mean, from the description,
8  it's pretty clear that the individuals are young and
9  youthful, correct?
10         MS. BAUMGARDNER: Objection.
11     A.    From the description it sounds like it,
12 which as far as I know, that's legal.
13     Q.    Okay.
14     A.    Still.
15     Q.    I'm sorry, I forget.  Did you say that
16 you processed 2257 documents for this picture?
17     A.    I would have to look at our AS/400 to
18 give you an accurate record.
19     Q.    So you don't remember right now?
20     A.    I don't remember this specific one.
21     Q.    Okay.
22     A.    But if we sell it, they've been
23 processed and certified.
24     Q.    Now it says, "Young 18-plus" here in the
25 description, correct?

Page 148

1      A.    That's correct.
2      Q.    Now, do you know the difference between
3  a 17-year-old and an 18-year-old?
4          MS. BAUMGARDNER: Objection.  In
5  what way?
6      A.    In what way?  Yeah, I don't -- wouldn't
7  even know how to ---
8      Q.    Can you tell a -- if I show you two
9  people, could you tell -- and one is 17 and one 18,
10 could you accurately tell which one is 18 and 17?
11         MS. BAUMGARDNER: Objection.
12     A.    No.
13     Q.    Do you know the, physically speaking,
14 the differences between a 17-year-old and an
15 18-year-old?
16     A.    Are there physical differences?  I mean
17 ---
18     Q.    So you don't know if there are?
19     A.    It just seems like an arbitrary sort of,
20 you know, I mean, I'm not even really sure what you're
21 asking me.  It doesn't seem like a -- I guess I'm
22 trying to answer your question based on some sort of
23 logic.
24     Q.    Yeah.
25     A.    And I don't understand your logic.

Page 149

1      Q.    Is -- I mean, do you know in there are
2  physical differences between 17-year-olds and
3  18-year-olds?
4      A.    I don't know if there are.
5      Q.    Okay.
6      A.    There could be.
7      Q.    Okay.  So ---
8      A.    Depending on the 17-year-old or the
9  18-year-old.
10     Q.    Would you have difficulty in telling a
11 17-year-old from an 18-year-old?
12         MS. BAUMGARDNER: Objection.
13     A.    Would I have difficulty?  I don't know.
14 That would probably depend.
15         MR. BLADUELL: On the person.
16 Okay.
17         Why don't we take a break now and
18 we come back around 1:15?
19         MS. BAUMGARDNER:  I'd like to --
20 because Ms. Wilson has a pet that she needs to tend to,
21 I'd like to take a shorter lunch because it looks like
22 you still have a lot of ground to cover.
23         MR. BLADUELL:  That's fine.  Why
24 don't we say -- did I say, what, 1:15?
25         MS. BAUMGARDNER:  You said 1:15.

38  (Pages 146 to 149)

Linda Dian Wilson - 4/3/13

Page 150

1  Can we make it like -- I have 12:25, so could we make
2  it 20?
3            (Recess 12:25 p.m. - 12:52 p.m.)
4     Q.    (BY MR. BLADUELL) Ms. Wilson, I am
5  going to show you, again, Exhibit Number 2, which it
6  contains titles for which Sinclair Institute is the
7  primary producer, correct?
8     A.    That's correct.
9     Q.    And is it your -- do you have a practice
10  with respect to what age your performers have to be to
11  be included in these videos?
12    A.    We have identified that in our market
13  people have a range of interests in what they find
14  attractive and not attractive. We -- we do try to use
15  much older performers, sometimes, than might be in
16  videos because our market is often older adults.
17          So we know that older adults also like
18  looking at people who are, you know, more than an
19  older adult is able to maintain. When I say "older
20  adult," I mean 60, 70, I mean. But we make films for
21  people throughout their lifetime for their sex lives.
22          But we don't have any rules other than
23  what -- you know, we follow the rules that creators of
24  adult content have to follow, but we don't have a kind
25  of ageism in our company.

Page 151

1     Q.    So is it accurate to say that one rule
2  with respect to ages is that all of the performers have
3  to be above 18?
4     A.    All of our performers are adults; yes.
5     Q.    And is there a rule that performers have
6  to be above 30?
7          MS. BAUMGARDNER: Objection.
8     A.    There -- we really don't have any rules,
9  other than the rules that, you know, common decency and
10  the law would consider appropriate.
11    Q.    You don't -- you don't restrict the
12  individuals appearing in your films to people over 30?
13          MS. BAUMGARDNER: Objection.
14    A.    We do not.
15    Q.    Is that the same case -- is it the same
16  for people, for individuals, appearing in the videos
17  for which you are a secondary producer?
18    A.    I'm sorry?
19    Q.    Is it the same practice for individuals
20  appearing in the pictures for which you are a secondary
21  producer?
22          MS. BAUMGARDNER: Objection.
23    A.    In other words, do we have any rules
24  about how -- what age range the people that are ---
25    Q.    Yeah.

Page 152

1     A.    There are -- there are no -- there are
2  no rules. If an adult film can be certified, you know,
3  by its producers as being legal, then it can be
4  considered if it meets our standards of our company.
5     Q.    Okay. When you said before that your --
6  you said before that your company had done some market
7  research --
8          MS. BAUMGARDNER: Objection.
9     Q.    --- to determine what your viewers like.
10    A.    Our -- many of our viewers write us
11  letters and tell us what they want to see. And also,
12  because we have an advisory board of professional
13  educators and therapists and researchers, they -- we
14  consult with them about what people need, you know,
15  what our market needs as far as -- you know, especially
16  our proprietary videos, we want to know what are the
17  issues that are concerning adults and sexuality that
18  they're going to see therapists for that the educators
19  are doing research on.
20          And so, in that sense, you know, we are
21  very much in touch with ---
22    Q.    But you said -- I mean, you said just a
23  moment ago that your research indicated something
24  related to fitness of the models ---
25          MS. BAUMGARDNER: Objection.

Page 153

1     Q.    --- of the people depicted.
2     A.    When I say research ---
3          MS. BAUMGARDNER: Let me just -- I
4  just want to object.
5          MR. BLADUELL: Sure. And you can
6  answer the question.
7          MS. BAUMGARDNER: Yes. Go ahead.
8     A.    When I say "research," I'm using that
9  term very loosely.
10    Q.    Okay. So what do you mean by that?
11    A.    I mean what we know, what we understand.
12    Q.    How do you come to that understanding?
13    A.    The way that any company that sells any
14  product would come to the understanding, through people
15  in their own industry who they have conversations with,
16  people they may meet at a trade show or at a
17  professional conference.
18          We also consult sexuality studies.
19  Because we are in the adult sexual health and education
20  industry, we feel like it is our responsibility to our
21  market to provide them with topics, you know, to cover
22  topics that they are most interested in, and, you know,
23  sometimes it's just a matter of hearsay, just what you
24  hear, you know?
25          And we have people write us letters

39 (Pages 150 to 153)

Margaret M. Powell, CVR - (919) 779-0322

**Linda Dian Wilson - 4/3/13**

Page 174

1  study session with a blond jock into hot dorm room
2  fellatio & intercourse.  Irresistable cheerleader
3  Taylor manages to accommodate all of a hugely hung
4  basketball player in the men's locker room.  Feeling
5  daring, blonde 4'11" Sasha deep throats her law student
6  beau in the library stacks.  School is in session!"
7        A.    Yes.
8        Q.    What does that description tell you
9  about the ages of the performers in this?
10       A.    Well, I know that coeds are college
11  students.  We don't typically refer to people in high
12  school as coeds.
13             It says that these people are petite,
14  which is something that some people prefer, and that
15  none of them have had their breasts altered.
16       Q.    Now, have you looked at the images on
17  the cover, are they -- is it reasonable to say that
18  these are people that are around the age of 18?
19             MS. BAUMGARDNER: Objection.
20       A.    They are younger than I am, and I'm 50.
21       Q.    Okay.  So you cannot -- do they look
22  like they're 18?
23             MS. BAUMGARDNER: Objection.
24       A.    I couldn't say.
25       Q.    Could they be younger than 18?

Page 175

1             MS. BAUMGARDNER: Objection.
2        A.    No.
3        Q.    Why do you say that they're ---
4        A.    They just don't look younger than 18 to
5  me.
6        Q.    Okay.
7        A.    And I happen to know that they aren't
8  because we carry the film and we have all the IDs.
9        Q.    But just looking at the picture, why can
10  you -- why do you say that they don't look younger than
11  18?  What are the characteristics that make you say
12  that?
13       A.    They are pretty fully developed young
14  women.  I mean, they don't look like children.
15       Q.    Okay.  So looking at them, you would not
16  think that they could be under 18?
17       A.    Did you say looking at them I could not
18  think that?
19       Q.    Yes.
20       A.    I think, you know, I don't -- I don't
21  really think that -- if what you're asking me is, would
22  I think they're under 18, no, because they are on the
23  front of a porn movie.
24       Q.    Right.  But just looking at the image
25  without knowing ---

Page 176

1        A.    Like totally out of context, right?
2        Q.    Yes.
3        A.    I would say there is no way that I could
4  tell you exactly how old they are.
5        Q.    Okay.  If we go below the image to the
6  left, to the right of the description, it says,
7  "Genre," correct?
8        A.    Uh-huh (yes).
9        Q.    Says, "Gonzo"?
10       A.    Uh-huh (yes).
11       Q.    What is "Gonzo?"
12       A.    I'm not sure.  It's a category -- it's a
13  porn movie category, but I'm not sure what it means.
14       Q.    Okay.
15       A.    I mean, I understand some of the more
16  obvious ones, like lesbian or heterosexual or -- but I
17  don't know what "Gonzo" means.
18       Q.    And "Younger"?
19       A.    "Younger, 18 + women."
20       Q.    What does that mean?
21       A.    It means that they are younger women
22  over 18.
23       Q.    Younger than what?
24       A.    Younger than older women.  Over 18 --
25  you know, way over 18, perhaps 30 years more than 18.

Page 177

1        Q.    Okay.  And "Pulse Pictures" ---
2        A.    I mean, "18 +" means they're over 18,
3  that they're younger women, not dead women, but
4  younger.  Do you know what I'm saying?  I mean ---
5        Q.    Well, does that category, "Younger, 18
6  plus," would it be accurate to apply it to people who
7  are 30 and are in movies?
8        A.    I'm 50, and I consider a 30-year-old
9  woman younger.
10       Q.    Okay.  But from -- that's a different
11  kind of question.
12             My question is: when you're going to put
13  the label, "Younger, 18 plus," would it be accurate to
14  put that label for movies depicting people 30 and over?
15             MS. BAUMGARDNER: Objection.
16       A.    I don't -- I really don't know.  I don't
17  -- I don't -- I'm not in the mind of the people that do
18  this.
19       Q.    Categorize?
20       A.    That categorize our -- yeah.  I just
21  know what it says and you're asking me what it means to
22  me.
23       Q.    Uh-huh (yes).
24       A.    And what it means to me is that they are
25  over 18 and they are younger, probably, than I am

45  (Pages 174 to 177)

**Linda Dian Wilson - 4/3/13**

Page 226

```
1          A.   --- Page 9, 11 ---
2          Q.    Yeah.  "Sinclair Institute shoulders all
3    these burdens despite the fact that the expression it
4    produces and distributes is important expression
5    depicting adults that could in no way be confused as
6    child pornography."
7               Did I read that accurately?
8          A.    You did.
9          Q.    And child pornography, what do you
10   understand child pornography to be?
11         A.    Child pornography is -- the way that I
12   understand it is not adults, but children, who are
13   misused in visual depictions that could be construed as
14   sexual.
15         Q.    When you say "adults," you mean what
16   age?
17              MS. BAUMGARDNER: Objection.
18         A.    What the law says adults are.
19         Q.    And do you know what that is?
20         A.    Eighteen (18) years old.
21         Q.    Okay.  So child pornography is
22   everything under 18 years old, correct?
23         A.    I don't know how the law defines child
24   pornography, but I know that our company is an adult
25   company and we only use adults.
```

Page 227

```
1          Q.    Okay.  Would depictions of sexual
2    intercourse between 17-year-olds, would that be child
3    pornography?
4               MS. BAUMGARDNER: Objection.
5          A.    I thought it was like statutory rape or
6    something like that.
7          Q.    Okay.  So you don't know if it's
8    considered child pornography?
9          A.    I don't know the definition of child
10   pornography.
11         Q.    Okay.  But when you wrote this, right,
12   because you wrote this correctly -- correct?
13              MS. BAUMGARDNER: With the
14   assistance of counsel.
15         Q.    Okay.  So, do you remember writing this?
16         A.    I mean, I remember almost every single
17   bit of this.
18         Q.    Okay.  So ---
19         A.    Some of it I don't remember to the
20   letter, but I know that these are -- that this is true
21   and that these words are my words and that these
22   calculations were calculations I made at my desk and
23   typed into a document and provided the lawyer with.
24         Q.    That's fine.
25              So when you say "child pornography," is
```

Page 228

```
1    it accurate to say that you mean people below the age
2    of 18 or do you mean younger than that?
3          A.    I don't know -- I mean, we know that
4    adults in our -- I mean, the law seems to be based on
5    what the general population considers to be normal
6    behavior.  and it was decided that 18 was the age of
7    adult.
8          Q.    Okay.
9          A.    You know, and I, you know, I think that,
10   you know, if you've graduated from high school and
11   you've -- you know, you can leave home and you know
12   your parents no longer have any say in your life, if
13   you don't want it that way, you know, and so that's an
14   adult, and so, I would say that, you know -- when I
15   think child pornography, I do think little kids, but,
16   you know, and then I think adults are 18 and up even
17   though you can't drink until you're 21.
18         Q.    Okay.  But adults are 18 and up,
19   correct?
20         A.    Yes.
21         Q.    Adult?
22              And child would be under 18, correct?
23         A.    I don't call 17-year-olds children.
24         Q.    Okay.  So you probably would not
25   consider ---
```

Page 229

```
1          A.    They can have children themselves, so I
2    think ---
3          Q.    So you would not ---
4          A.    --- that it gets a little mushy.  We
5    just follow the law in our business.
6          Q.    Depictions of 17-year-olds, you,
7    personally, would not consider it as child
8    pornography?
9               MS. BAUMGARDNER: Objection.
10         A.    I can't answer that.  It just seems so
11   off the wall.  I mean, it's -- it's so incredibly
12   hypothetical, I just don't know how to answer it.
13         Q.    What if ---
14         A.    I don't consider 17-year-olds children.
15   I don't know what the legal definition of child
16   pornography is.
17              MR. BLADUELL: Oops, sorry.  For
18   the record, the lights are off again.
19         Q.    I'm sorry?
20         A.    I don't know what the definition of
21   child pornography, the legal definition of child
22   pornography is.
23         Q.    I'm not asking for the legal, for your
24   -- for your definition.  I mean, you said a moment ago,
25   child pornography, I think of kids.  Does that mean
```

Linda Dian Wilson - 4/3/13

Page 238

1     A.    (Indicates yes.)
2     Q.    Yes?
3     A.    Yes.
4     Q.    And that server, does it contain other
5  type of information other than 2257 records?
6     A.    I would have to look at what -- I would
7  have to review the Answers in order to know ---
8     Q.    So you don't -- right now you don't
9  know?
10    A.    It's technical knowledge and I just
11 don't -- I don't have it at my ---
12    Q.    You don't -- you don't know?
13    A.    I don't know if it's separate or, you
14 know, I know that there was a separate -- I know a
15 separate program was commissioned and paid for so that
16 the 2257 records could be kept on our -- in our VLS
17 Program with our images.
18          It may be a completely separate machine,
19 I just don't know, and I wouldn't even know what it
20 looked like.
21    Q.    Okay.
22    A.    Or where it is.
23    Q.    Okay.  So that's -- if we see the server
24 -- you mean, you don't know -- you don't know if it's
25 in the Sinclair building?

Page 239

1     A.    We have a server in our building.
2     Q.    Well, let's go to -- so you have a
3  conflict?
4     A.    I don't think that it is because I think
5  that's why it takes so long for us to upload the images
6  is because it's not on site, it has to go through, you
7  know, digital communication that isn't immediate.  My
8  best guess would be that it is not on site at our ----
9     Q.    When you say that it would be in PHE if
10 it's not Sinclair, the building?
11    A.    That's my guess.
12    Q.    Okay.  If we go to Page 4 here, the last
13 paragraph on this Exhibit 16, Page 4, which is your
14 Answer to Interrogatory Number 14, says, "In 2006, PHE,
15 Inc. purchased a server for the purpose of maintaining
16 records under 18 U.S.C. 2257 at the cost of
17 $105,524.39."
18    A.    Uh-huh (yes).
19    Q.    "In 2009 Sinclair Institute converted
20 its paper records to digital format for the purpose of
21 storing them on the server at a cost of $12,000.00."
22    A.    Yes.
23    Q.    So the server was purchased by PHE,
24 Inc., correct?
25    A.    Yes.

Page 240

1     Q.    And do you know if it contains records
2  for other PHE companies?
3     A.    We share all of the 2257 records, so the
4  server exists -- every -- the server -- we have access
5  to all of the records on the server.  So, does that
6  answer your ---
7     Q.    Yes.  So the server would contain
8  records from Adam & Eve, correct?
9     A.    And if we needed them and Adam & Eve
10 hadn't put them on there, we'd have to put them on
11 there.
12    Q.    And there's another company in the
13 Sinclair Building, which is affiliated with PHE?
14    A.    Temptations Parties.
15    Q.    Temptations.
16          Would those records be there as well?
17    A.    Yes, very little of their stuff would
18 fall under this stuff because it's very tame.
19    Q.    Are there other companies that would
20 have -- that are not Sinclair that would be -- that
21 would have records in that server?
22    A.    That carry the same films that we do.
23 If they ---
24    Q.    So what are these other ---
25    A.    We share the records.

Page 241

1     Q.    So what are these other companies?
2          MS. BAUMGARDNER: Objection.
3     A.    Adam Male.
4     Q.    Adam Male.  Okay.
5     A.    That's the only one that I know of.  And
6  Temptations would have very little because -- so Adam &
7  Eve and ---
8     Q.    Temptations and Adam Male?
9     A.    Yes.  Yes, and Adam & Eve and Sinclair,
10 we all have access to all of the records on the server
11 except for that they don't have access to ours.
12    Q.    Okay.  Do you know if Sinclair paid a
13 portion of that one hundred thousand (100,000) for the
14 server?
15    A.    I don't know what the -- I don't know
16 what the financial arrangement is at all.  I just know
17 that if it weren't for that server, we couldn't keep
18 these records.
19    Q.    So you don't know where the money came
20 to purchase that server?
21    A.    No.
22    Q.    Now in ---
23    A.    PHE, Inc., I guess it says, purchased a
24 server.
25    Q.    Okay.  So the money came from PHE, Inc.?

61  (Pages 238 to 241)

**Linda Dian Wilson - 4/3/13**

Page 266

1  you would be secondary producers?
2      A.   No, I think it's about -- it's about the
3  same for that, too.
4      Q.   Okay.
5      A.   I mean, there are -- most of the people
6  are in their 20s and 30s.
7      Q.   Okay.  Yeah.  So 70 percent if we add
8  this percentages would be in the 20s and 30s?
9      A.   Of what I see.
10     Q.   Okay.
11     A.   So that's like what we carry.
12          Another company may carry a hundred
13  percent of material where they make sure everybody is
14  20 years old, I don't know, but this is just what I --
15  it seems to be of all of the things available to us to
16  sell, this is the representative, that's what I see.
17     Q.   Okay.  Let me give you another document.
18  Seventeen, Exhibit Number 17 I am marking.  It is
19  titled, "Townsend Sinclair Video Sales 2005 thru 2009."
20  Providing a copy of the exhibit to Ms. Wilson and one
21  to counsel.
22          Ms. Wilson, have you seen this document
23  before?
24          (Defendant's Wilson Deposition
25          Exhibit Number 17 Marked.)

Page 267

1      A.   This must have come from our -- the
2  information must have come from our accounting
3  department, and I honestly cannot remember if I've ever
4  seen it before.
5      Q.   Okay.
6      A.   I would not have had this information.
7  We would have had to ask accounting for it because
8  these are very specific numbers.
9      Q.   Do you remember counsel asking you for
10  that information?
11     A.   Obviously I can't remember.
12     Q.   Okay.  And you don't remember in
13  relation to this litigation looking up this
14  information?
15     A.   I would not have had access to it.  We
16  would have had to ask someone else for the -- we would
17  have had to ask accounting.
18     Q.   Yes, I understand that, but do you
19  remember doing that, asking accounting?
20     A.   I remember e-mails where Ginger and
21  Patrick were cc'd that talked about financial numbers.
22  I can't remember if it was sales or if it were costs.
23     Q.   Ginger Stallings?
24     A.   Stallings, uh-huh (yes).
25     Q.   Okay.  And do you know what -- in this

Page 268

1  Exhibit Number 17 when it says, "retail," do you know
2  what that would mean?
3      A.   We have a retail division and a
4  wholesale division, and the total number could be split
5  up between those divisions.
6      Q.   And units, would that be individual
7  number of videos?
8      A.   That -- I would think that that's what
9  this means.
10     Q.   And those -- that would include the
11  Sinclair videos for which you are the primary producer,
12  such as the "Better Sex" videos, correct?
13     A.   That I would have no way of knowing from
14  looking at this.
15     Q.   Okay.
16     A.   And, like I said, I don't really
17  completely -- I don't remember -- I don't have full
18  knowledge of my memory of this.  I just remember some
19  -- knowing that I would -- had I been asked this, I
20  would not have been able to give this information, it
21  would have had to come from accounting.
22     Q.   So you don't know if in these figures --
23  you don't know if these figures include titles for
24  which you are secondary producer of the covers?
25     A.   If you'll give me a second to look at it

Page 269

1  and think about it, I might be able to give you a
2  guess.
3      Q.   Okay.
4      A.   Okay.  Because I just know about how
5  much money we gross per year; and if this were wildly
6  under that, then I would have to assume it was only our
7  videos.  Okay?
8      Q.   Okay.
9      A.   My guess is this is total and not just
10  Sinclair Institute for proprietary video sales.
11     Q.   And that's -- and that's -- can explain
12  your reasoning?
13     A.   I just know that we sell more than
14  videos.  I know we sell a lot of other companies'
15  videos.  We have a lot of other companies' videos in
16  our catalog.  The majority of the videos in our catalog
17  are other companies' videos.
18     Q.   So if we look at the grand total, is
19  that 52 million?
20     A.   That's what it -- that's what I'm
21  reading on this paper.
22     Q.   From 2005 to 2009, you would ---
23     A.   In sales.
24     Q.   Yeah.  It would not be -- it would not
25  be accurate to assume that you just -- you made 52

**Margaret M. Powell, CVR - (919) 779-0322**

Linda Dian Wilson - 4/3/13

| Page 278 | Page 280 |
|---|---|
| 1  consulted the Council on the standards for Sinclair? | 1  have nothing. |
| 2          MS. BAUMGARDNER: Objection. | 2          MR. BLADUELL: Nothing?  Okay. |
| 3      A.   No. | 3          (Whereupon, the deposition of |
| 4          Sorry, I didn't mean to interrupt you. | 4  LINDA DIAN WILSON was concluded at 4:17 PM.) |
| 5          No. | 5               - - - |
| 6      Q.    And your opinion that they were -- that | 6 |
| 7  the standards were developed in consultation with this | 7 |
| 8  Council is based on what someone told you about it? | 8 |
| 9          MS. BAUMGARDNER: Objection. | 9 |
| 10      A.   It's based on my general understanding | 10 |
| 11  after working with these people all of these years and | 11 |
| 12  seeing their faces on the back of our videos and seeing | 12 |
| 13  little spots of our videos where they are talking and | 13 |
| 14  -- I'm sure they are re compensated for being in our | 14 |
| 15  films. | 15 |
| 16      Q.   Are these standards written anywhere? | 16 |
| 17      A.   Probably.  But I don't have to access | 17 |
| 18  them, I just know that they are constantly referred to | 18 |
| 19  in our reviews and discussed in front of me.  But I | 19 |
| 20  don't see them. | 20 |
| 21      Q.   Okay.  Are they publicly available? | 21 |
| 22          MS. BAUMGARDNER: Objection. | 22 |
| 23      A.   I don't know. | 23 |
| 24      Q.   Okay.  But have you seen a paper | 24 |
| 25  describing the standards? | 25 |

| Page 279 | Page 281 |
|---|---|
| 1      A.   I've seen a paper that has our mission | |
| 2  statement on it. | |
| 3      Q.   Okay.  But not the standards that you're | STATE OF NORTH CAROLINA |
| 4  --- | COUNTY OF WAKE |
| 5      A.   That they go by for the reviewing, no. | CERTIFICATE OF TRANSCRIPT |
| 6  I just hear it referred to all the time. | I, Margaret M. Powell, Certified |
| 7      Q.   Okay.  Have you met some of the | Verbatim Reporter-Notary Public, the officer before |
| 8  individuals here? | whom the foregoing proceeding was taken, do hereby |
| 9          MS. BAUMGARDNER: Objection. | certify that the attached transcript is a true, correct |
| 10      A.   I have met Lori Buckley.  I have met -- | and verbatim record of this proceeding. |
| 11  I talk to Eli Coleman.  I have talked to some of these. | I further certify that I am neither |
| 12  I've talked to -- I've met Beverly Whipple.  They have | counsel for, related to, nor employed by any of the |
| 13  come by our building for a little event that we had. | parties to the action in which this proceeding was |
| 14      Q.   So, have your -- your discussions with | heard; and further, that I am not a relative or |
| 15  them have been informal --- | employee of any attorney or counsel employed by the |
| 16      A.   Yes. | parties thereto, and am not financially or otherwise |
| 17      Q.   --- discussions, not necessarily about | interested in the outcome of the action. |
| 18  the videos? | This the 15th day of April 2013. |
| 19      A.   Correct. | |
| 20          MR. BLADUELL:  Okay.  I have no | /s/Margaret M. Powell, CVR |
| 21  further questions at this time. | Margaret M. Powell, CVR |
| 22          I would like to thank you for your | |
| 23  answers and your patience. | Notary Number 19970780127 |
| 24          THE WITNESS:  Sure. | |
| 25          MS. BAUMGARDNER:  Thank you.  I | Margaret M. Powell, CVR - (919) 779-0322 |

Margaret M. Powell, CVR - (919) 779-0322