

September 10, 2007

Andrew Oosterbaan
Chief
Child Exploitation and Obscenity Section
Criminal Division, United States Department of Justice
Washington DC 20530
Attn: "Docket No. CRM 104"

Dear Mr. Oosterbaan,

The Free Speech Coalition (FSC) is the trade association for the Adult Entertainment Industry.  Our mission is to: *Lead, protect and support the growth and wellbeing of the adult entertainment community*.  We have over 3000 members spanning the United States and some areas overseas.

FSC is gravely concerned over the Justice Department's proposed rule to amend the record-keeping, labeling, and inspection requirements to be implemented pursuant to 18 U.S.C. § 2257.  *See* 72 Fed. Reg. 38033 (July 12, 2007) ("Proposed Rule").  We have included a detailed comment on the proposed rule, drafted by Reed Lee Esq. and Jeffrey Douglas Esq., for your consideration.

An additional comment letter will be submitted on our behalf, by Kelley Drye & Warren LLP with a report from Georgetown Economic Services, LLC.

Our Comments will be sent via email and fax for your convenience.  Thank you for your consideration in this matter.  Feel free to contact us if you have questions or would like additional information.

Sincerely,

Diane Duke
Executive Director

# **Contents of Comments**

I. The regulations should adopt a purely prospective effective date ........................................................ 1
    A. Retrospective application will raise constitutional questions which are otherwise moot ..................... 1
    B. Congress has wisely rejected retrospective application in amending the statute. ............................ 2
    C. Prospective application is the only fair way to implement a complex record-keeping requirement................. 2
    D. No obligations should be imposed respecting images first made prior to the effective date ...................... 3
    E. No obligations should be imposed on a producer for images acquired prior to the effective date ................. 3

II. The definition of "producer" is unwarranted by the statute and burdens too many people ............................ 4
    A. There should be only one primary producer.......................................................................... 4
    B. The regulation defines too many secondary producers for each re-issuance .................................... 5

III. The record-keeping requirements are unclear and are too burdensome .................................................... 6
    A. The rule should prescribe a simple form for primary producers to complete ................................ 7
    B. Secondary producers should not be required to physically examine any performer's identity
       document...................................................................................................................... 7
    C. Producers under Section 2257 should be afforded the same compliance alternatives as producers
       under Section 2257A ...................................................................................................... 8
    D. Records should be acceptable if they are in digital form instead of on paper.................................. 8
    E. It is extraordinarily burdensome to require that the records contain a copy of each work ................... 9
    F. The proposed rule confuses the indexing requirements for the records....................................... 11
    G. The record segregation requirement is unduly harsh ............................................................. 12
    H. The regulations require that the records be maintained for too long ......................................... 12

IV. The record-shifting requirements are impermissibly burdensome ...................................................... 14
    A. The record-shifting requirements seriously burden and chill the dissemination of constitutionally
       protected expression....................................................................................................... 14
    B. Substantially less restrictive regulatory alternatives are available............................................. 15

V. The inspection provisions are in some respects improper and in other respects incomplete ........................ 17
    A. The final rule should fully and properly define "investigators" ............................................... 17
    B. Advance notice of inspections should be provided ............................................................... 18
    C. The regulation excessively and incompletely defines "reasonable times" .................................... 18
    D. The regulations allow unnecessarily frequent and insufficiently justified inspections..................... 19
    E. The regulations should expressly clarify the right to remain silent ........................................... 20
    F. The proposed rule should address the seizure of the required records......................................... 20

VI. The disclosure statement requirements are confusing and, in many cases, too burdensome........................ 21
    A. Requiring the open disclosure of the custodian's name and address is impermissible in many
       situations ................................................................................................................... 21
    B. The requirements concerning the placement of the disclosure statement are confusing..................... 22
    C. The regulations concerning the date of production are inappropriate or incomplete........................ 24
    D. The typographic requirements for the disclosure statement are unreasonable................................ 24
    E. Provisions governing an "exemption statement" are unnecessary and improper............................. 25
    F. The regulation should specify that "transfer" is limited to commercial transfer ............................. 25

VII. The proposed rule contains some minor grammatical errors and drafting problems................................. 26
    A. The final rule should distinguish between "actual" and "simulated" masturbation........................... 26
    B. The final rule should define "sadistic or masochistic abuse" ................................................... 26
    C. The final rule should define "lascivious display of the genitals" in contexts involving depictions of
       adults......................................................................................................................... 27
    D. The final rule should permit a foreign equivalent to serve as a "picture identification card"
       whenever a foreign national appears in an image initially created outside of the United States .................. 27
    E. Mere gratuitous transfer of a covered image should not make the transferor a producer of that
       image......................................................................................................................... 28
    F. The final rule should define "acts of production"................................................................. 28
    G. There must be a "news event" exception............................................................................ 29

## I.      The regulations should adopt a purely prospective effective date.

The Department apparently proposes to retain an initial effective date of July 3, 1995 even though primary producers of covered images initially created on that date could, under current regulations, have disposed of the records respecting those images more than five years ago. Because the Department has itself materially changed the applicable regulations over the years since Section 2257 was enacted, such an early effective date leads to complex regulatory provisions phasing in (and possibly phasing out) different record-keeping obligations for images initially created on different dates.  Since the Department itself conceded during the last round of notice-and-comment rule making that the regulatory requirements were then in need of updating, it makes sense to start Section 2257 obligations with respect to primary producers on the effective date of the current regulations:  June 23, 2005.  Beyond that, we understand and appreciate the Department's determination to "avoid any conceivable *ex post facto* concern" regarding secondary producers' obligations, 72 Fed. Reg. 38036 (July 12, 2007), but note that regulatory fairness requires that those obligations (assuming that they are constitutional, a matter which it is pointless to address here) begin as of the effective date of the final rule contemplated here rather than the effective date of the statutory amendment which removed the *ultra vires* problem.  This overall approach gives effect to both primary and secondary producer obligations at just those times when the Department took the actions properly required of it.  The Department should avoid retrospective investigations and prosecutions looking further back than these effective dates.

### A.      Retrospective application will raise constitutional questions which are otherwise moot.

By its own terms, of course, section 2257 became effective on May 17, 1989.  P.L. 100-690 sec. 7513(c), 102 Stat. 4488.  Yet the initial version of the Section was declared unconstitutional by the United States District Court for the District of Columbia, *American Library Association v. Thornburg*, 713 F. Supp. 469 (D. D.C. 1989) and, after the appeal in that case was argued before a panel of the United States Court of Appeals for the District of Columbia, *American Library Association v. Barr*, 956 F.2d 1178, 1186 (D.C. Cir. 1992), Congress amended the section in order to – to use the term adopted by Congress – "restor[e]" the record-keeping provisions, P.L. 101-647 sec. 301(a), 104 Stat. 4816.  Both Congress and this Department thus ultimately, and wisely, refrained from adopting May 17, 1989, or any earlier date, as the effective date.  For the same reasons, this Department should now avoid articulating any effective date earlier than April 30, 2003.  Any effort to inspect records or prosecute violations dating between February 6, 1978, and November 29, 1990, will re-raise all questions concerning the initial constitutionality of Section 2257 – questions which Congress plainly intended to moot in 1990.  Similarly, any effort to inspect records or prosecute violations dating between November 29, 1990, and April 30, 2003, will raise questions concerning the constitutionality of the Section during that period. Since Congress amended Section 2257(d)(2) in 2003, P.L 108-21 sec. 511(a)(1), 117 Stat. 684, in order to avoid a constitutional problem (though it may have created another, *cf. Message from President Transmitting Child Protection and Obscenity Enforcement Act of 1987*, H.R. Doc. 100-129 at 66-68), this Department should avoid the necessity of litigating the Section's validity prior to its recent amendments by promulgating a purely prospective effective date.

1

**B.     Congress has wisely rejected retrospective application in amending the statute.**

Although what became Section 2257 was originally proposed with a 25-year retroactive effective date, *Message from President*, H.R. Doc. 100-126 at 8, Congress was always concerned about the validity and feasibility of such a proposal.  And although it initially enacted the section with a ten-year retroactive effective date, P.L. 100-690 sec. 7513(a) (original § 2257(a)(1)), 102 Stat. 4487; *but see Id.* sec. 7513(c), 102 Stat. 4488 (180-day prospective "effective date"), Congress essentially altogether abandoned any effort at imposing any retroactive date when it amended the section in an effort to save its constitutionality.  P.L 101-647 sec. 301(b), 104 Stat. 4816.  Since valid and comprehensive implementing regulations were plainly both contemplated and required, *see* P.L. 101-647 sec. 312(1), 104 Stat. 4817, and since this Department has previously recognized the shortcomings of the regulations as initially promulgated, the spirit of purely prospective application mandates an effective date of any new obligation no earlier than 30 days after the publication of the final rule contemplated here.

**C.     Prospective application is the only fair way to implement a complex record-keeping requirement.**

Section 2257 and, especially, its implementing regulations purport to impose upon those who produce and disseminate constitutionally protected expression a genuinely novel and quite elaborate record-keeping scheme.  That requirement extends far beyond the verification of each performer's age; it extends to the production, organization, maintenance, transfer, disclosure, and inspection of a potentially extensive set of carefully cross-referenced records.  Even assuming that it is constitutionally permissible to impose such burdensome requirements upon those who are merely exercising their constitutional rights in order to catch others who may have exceeded theirs, simple fairness dictates that producers and disseminators of the protected expression have a genuine chance to prepare to meet those obligations once they are clearly in place.  This Department vigorously and successfully prosecuted child pornography cases for many years without resort to a single inspection under Section 2257.  Since it cannot be said that this Department showed any serious need or interest in inspecting the required records prior to promulgating what became the current regulations, there is no basis – short of sheer harassment – for sanctioning those who have operated within their constitutional rights for not having undertaken the substantial record-keeping burdens earlier.  Indeed, the regulatory history shows that this Department itself has sought to impose ever more expansive record-keeping requirements which it has felt necessary to phase in as of different dates.  It is fair to suggest that this Department should "have its act together" before it expects compliance with novel and burdensome record-keeping requirements.  The final rule should thus adopt a prospective effective date for new obligations no earlier than 30 days after publication of the final rule, and this Department should avoid retrospective investigations and prosecutions.

### D.    No obligations should be imposed respecting images first made prior to the effective date.

In offering the foregoing comments, we are aware of a potential distinction between the date on which newly enacted legislation attains the force of law and the date of the earliest matters affected by the new legislation.  Ordinarily, the second of these dates is no earlier than the first, for very strong reasons.  We recognize that Congress departed from this very sound ordinary practice by some ten years in originally enacting Section 2257 and, again, by some 28 days in first amending it (although we do not believe that Congress intended this second instance).  We believe that it is quite clear, for both due process and free expression reasons, that the statute and regulations cannot now require that records be generated and maintained for images which were initially created or transferred at times and places when and where there was no valid, applicable record-keeping or record-shifting requirement.  Indeed, this is the very reason why this Department has quite properly found it necessary to phase in new and additional regulatory record-keeping requirements.  This observation prompts one final comment concerning the effective date of the final rule:  Sections 75.1(c)(1) and (2) and 75.2(a) of the regulations now reach images in other than printed or analog form.  This is not itself a problem.  But the language of these sections could be read to impose record-keeping requirements when, in 2008, an individual digitizes an image from a photographic postcard print originally photographed in France in 1923.  A "digital image" would thus be "made" after the effective date of the statute and regulations.  But the records required here all properly apply to the *initial* image-making event, when the performers were present and their ages at issue.  In this case there would be no hope of constructing the required records, and the proposed rule would thus prevent the republication of presumptively protected material in the public domain.  There is no sound policy reason for regulating changes in the media on which an old image is stored.  The final rule should make clear that no record-keeping or related obligations arise at all with respect to any image *first* made (*i.e.* actually formed from contemporaneous live conduct by actual performers) prior to the effective date, regardless of whether such image is later converted to a different expressive or storage medium.

### E.    No obligations should be imposed on a producer for images acquired prior to the effective date.

These same underlying considerations apply to obligations imposed upon secondary producers.  Obviously, if a primary producer was not required to create records when an image was first created and is therefore exempt from maintaining them now, the same goes for a secondary producer of the same image.  But additional problems arise with respect to a secondary producer's obligations.  Even where a primary producer maintains its own records concerning an image, a secondary may well have acquired republication rights at a time when republishing did not, in the view of the only court squarely addressing the issue, amount to "produc[ing]" under Section 2257.  Under those circumstances, a primary may properly have refused to transfer copies of its records to the secondary even as it licensed republication, and the secondary may perfectly properly have agreed to such an arrangement.  Indeed, primary producers widely so refused, at least until very recently.  Primary producers have always had a range of reasons – from performer privacy and trade secret interests to perhaps less laudable anti-competitive goals – for refusing to transfer records unless actually required by law.  Secondary producers have often

accommodated many of these concerns by not insisting that they receive copies of records which were not validly required by law.  In this context, any suggestion that a legal change prospectively requiring the transfer of such records would apply to the subsequent republication of images acquired before that change would be improper.  It would effectively ban all subsequent republication of such images because it is unreasonable to expect a secondary producer to track down a primary producer, who may have moved or even died, and unreasonable to expect that the primary would now willingly transfer the records absent, or even contrary to, a prior contractual arrangement.  Such a suggestion would thus effectively render many valuable images worthless in the hands of secondary producers.

## II.    The definition of "producer" is unwarranted by the statute and burdens too many people.

The question of the proper scope of the regulatory definition of "producer" has, of course, previously been litigated under a superseded version of Section 2257.  *Sundance Associates, Inc. Reno*, 139 F.3d 804 (10th Cir. 1998).  With respect, there can be little doubt that, as a matter of statutory and regulatory construction, that case was properly decided at the time.  Even though the judgment in that case was entered by only one of several intermediate appellate courts, this Department has quite properly determined to avoid the need to re-litigate that issue before other federal courts by foregoing any retrospective inspection or prosecution of secondary producers. 72 Fed. Reg. 38036 (July 12, 2007).  The tension between the words "other than those activities identified in paragraphs (c)(1) and (2) of this section" currently in section 75.1(c)(4)(iii) and the 1990 "produces" proviso, *compare* 18 U.S.C. § 2257(h)(3) (prior to July 27, 2007), *with* 28 C.F.R. § 75.1(c)(4) (iii), has now been resolved by inserting the regulatory language into the proviso.  Unfortunately, this dramatic narrowing of the statutory proviso resurrects the serious constitutional problems which Congress sought to avoid when it "restor[ed]" Section 2257 by inserting the proviso in the first place.  So although the recent statutory amendment has removed the previous *statutory* problem, it has deepened the source of Section 2257's invalidity considerably.  But even beyond the renewed constitutional problems which must be resolved elsewhere, the regulation presents definitional difficulties regarding both primary and secondary producers.  As we have previously observed, the regulation should be amended to delete the term "assembles" from section 75.1(c)(2) since neither it nor any form of that word appears in the statutory definition of "produces."  Far more importantly, though, the current regulations define too many primary producers and too many secondary producers for a single act of republication.

### A.    There should be only one primary producer.

The regulations pose serious problems and substantial burdens by defining "producer" so generally that there may be more very many producers of a given image; indeed even more than one "primary producer."  28 C.F.R. § 75.1(c)(1).  The proposed rule defines multiple primary producers in at least two ways.

First, by multiplying the types of activities which will qualify one as a primary producer, section 75.1(c) (1) makes it all but inevitable that most images will have more than one individual

primary producer.  Prior to 2005, the rule listed three actions which will render a person a
primary producer, and that list is composed of *alternative* actions, *i.e.* any given image is likely
to have been filmed or videotaped or photographed but (assuming that the terms are semantically
distinct) not two or three of those things.  In contrast, it is not at all unusual that a computer im-
age was first photographed and then digitized, each action accomplished by different individuals.
The same problem arises with respect to the current regulatory term "creates a computer-genera-
ted image" since that term must refer to actual, not virtual, persons, *see Ashcroft v. Free Speech
Coalition*, 535 U.S. 234 (2002), and those actual persons were probably first filmed, videotaped,
or photographed.

Second, section 75.1(c), and (c)(5), read straightforwardly, provide that a corporate producer
employing an individual primary producer is itself a primary producer along with any parent and
subsidiary corporations.  Thus where a corporation employs a photographer and a digitizer and
has a) a parent corporation which is a stock holding company investing in many varied business
having nothing to do with entertainment and b) two subsidiary corporations one of which rents
stage lighting to mainstream Hollywood productions and the other of which provides security
services for special events, there are *six* primary producers!  Each primary producer, under the
statute, had an obligation to examine identity documents and each has an obligation to create and
maintain the required records.  Whatever the original intent of section 75.1(c)(5), it should be
narrowed to avoid this result.

As noted, this multiplicity of primary producers is especially problematic because each must
collect and maintain *original* records.  Section 75.2(b)'s permissive provision concerning copies
of records applies only to secondary producers.  The final rule contemplated here should care-
fully provide that there is only one primary producer per image.  In keeping with what remains of
statutory "produces" proviso, that might be either the actual, initial image-maker or the agent
who arranges for the performers' participation.  The final rule should clearly spell out which one
will be the primary producer in any common situation.  Where this individual is employed, or
perhaps otherwise retained, by a corporation or other business entity, it may make perfect sense
to declare that that entity, not the individual, is the primary producer.  Again, the final rule
should clearly specify when this is so, and it should expressly relieve the employed individual(s)
of primary producer responsibilities.  It is utterly senseless and extremely burdensome to have
more than one primary producer for any given image.

> **B.     The regulation defines too many secondary producers for each re-issuance.**

Even beyond the *Sundance* issues concerning the permissible scope of a regulation implementing
a statute, it is important to understand why the definition of secondary producer is so problemat-
ic.  Given the presence of the (improper) limiting language in the present section 75.1(c)(4)(iii),

The regulatory definition of "secondary producer" was always very broad, including as it always
has many persons (and presumably corporations and their parents and subsidiaries) who have no
hope of actually collecting and assembling record information directly.  28 C.F.R. § 75.1(c)(2).
The 2005 additions to that subsection made matters even worse, by again multiplying individual
and corporate secondary producers even for a single republication event.  If a previously existing

photographic print is turned into a digital image by one person, inserted on a computer site by another, which site is managed by a third, and each is employed by a corporation like that envisioned in the previous subsection of these comments, then there are now *seven* more secondary producers arising out of a single republication!

And if that original photographic print had been in the public domain, it could, absent the provisions of section 75.1(c)(2), have been freely posted on the computer site without any contact with the primary producer(s) or the performers.  But the regulation now purports to prevent this constitutionally protected republication apart from the unlikely happenstance that the computer site personnel can track down and obtain information from the primary producer or from each and every performer.

Even beyond actually limiting some otherwise lawful and constitutionally protected republication, the secondary producer provisions very seriously burden *all* of it.  This burden arises from what we shall refer to as the "record-shifting" requirements.  We elaborate on this concept and these requirements in considerable detail in section IV of these comments, and we show how they very seriously burden and chill constitutionally protected expression.  We also offer a report by economist who have made an initial study of these burdens.  We also demonstrate, we think, that far less restrictive means are available to achieve the statute's legitimate purposes.  In advance of detailing them, we assert that all of those comments apply here because the concept and definition of "secondary producer" vastly expand the number of individuals and entities who bear very burdensome record-keeping duties and thus necessitate the record-shifting requirements in the first place.  It might well be that if a secondary producer were required to do nothing more than record and maintain the address of the individual or entity from whom the secondary obtained the right to republish the images and continue to use the primary producer's disclosure statement, there would be few who would object to the regulatory provisions now that the technical statutory *Sundance* defect has been formally overcome.

For all of the foregoing reasons, the final rule should require no more than that secondary producers record the address of the primary producer, or other copyright holder, where permission to republish was necessary.  The final rule should also, for these and other reasons detailed in other sections, provide that third-party custodians may maintain original records at their own places of business on behalf of primary and secondary producers simultaneously.

## III.    The record-keeping requirements are unclear and are too burdensome.

For all of this Department's efforts to update the regulations for the Internet age, the regulations still contemplate record-keeping procedures which seem to have been designed with a large producer of magazines or videotapes/DVDs in mind.  Even there, the regulation is often too vague or too burdensome.  But since this Department seems to have made a substantial effort to redraft the regulation to cover digital images on computer sites, it is surprising and disappointing that the record-keeping provisions seem to ignore the very different circumstances under which these producers must generate and maintain records.  The final rule should thus take account of the following difficulties arising from current or proposed regulatory language.

### A.    The rule should prescribe a simple form for primary producers to complete.

As we have noted previously, the regulations require a record-keeping scheme which is unusually detailed and complex.  Many features of this record-keeping scheme strike producers as intimidating because the regulations themselves provide only the stark requirements and give no guidance concerning acceptable implementations of the contemplated record-keeping scheme.  Now there are, of course, many places where federal regulations require that persons provide the government with information in considerable detail and in a specified arrangement or order.  Income tax reporting is one obvious example.  The standard response, which Americans have come to expect, is for the appropriate agency to guide the information recording and disclosure process by prescribing and issuing a form which, if fully and properly filled out, will assure the filer that he, she, or it has complied with all statutory and regulatory reporting requirements.  Without such forms, few Americans could comply with income tax reporting requirements.  And such a prescribed form is also available for employers to record the fact that they have examined appropriate identity documents, as required by law, before employing any individual in covered employment.  Assuming that the record creation obligations imposed on a primary are reasonably straightforward (as they must be in order to avoid unconstitutional burdens on creating expression), this Department should demonstrate this fact by prescribing a form which, if honestly and fully executed by a primary producer, will insure compliance with the identity document examination and record production obligations.  Primary producers should not be left to guess about the required contents of their initial records or to seek expensive legal advice concerning the matter.  They should not be forced to purchase expensive record-keeping forms from attorneys or even, for that matter, from their trade association.  This Department should provide a form which may be used to create paper records or which may be directly incorporated into record-keeping software for those who choose to keep the required records in digital form.

### B.    Secondary producers should not be required to physically examine any performer's identity document.

In resolving the statutory problem identified in *Sundance*, Congress incorporated this Department's regulatory language into the statute itself.  In particular, Congress made a critical change to the 1990 "produces" proviso to exempt secondary producers from the proviso and thus leave what they do within the statutory definition of "produce."  This indeed resolved the statutory difficulty which had previously been identified.  As we have said, it merely resurrected and exacerbated constitutional difficulties, but for present purposes, we note it had another, almost certainly unintended and indeed largely unnoticed effect.  Under Section 2257(a), (b), (c), and (b), anyone who "produces" a covered image is under several statutory obligations.  Congress deliberately expanded the definition of "produces" (by restricting its proviso) in order to impose the statutory record-keeping and inspection obligations on secondary producers.  *Cf*. 18 U.S.C. § 2257(b)(3), (c).  It is far from clear, however, that Congress also understood that its action effectively imposed the identity document examination and information collection obligations on those same secondary producers as well.  *Cf*. 18 U.S.C. § 2257(b)(1),(2).  Indeed, this Department seems to have overlooked this unintended consequence as well in promulgating the propose rule.  It is at least as unrealistic to expect secondary producers to physically examine identity documents and collect alias name information as it is to expect them to originally create the

required records on their own.  For this reason, just as the regulations effectively permit the primary producer's *creation* of records to satisfy the secondary producer's statutory obligations to do, 28 C.F.R. §75.2(b), so the final rule should provide that no secondary producer need personally discharge the statutory obligations imposed by subsections (b)(1) and (2) but that the primary producer must do so.  Failure to make such a regulatory provision would, we respectfully submit, leave Section 2257 with yet another grave constitutional defect.

**C.**   **Producers under Section 2257 should be afforded the same compliance alternatives as producers under Section 2257A.**

At the same time it effectively expanded the statutory definition of "produces" in order to reach secondary producers of images depicting actual sexual activity, Congress also expanded federal law to reach those who produce images of simulated sexual activity and of lasciviously displayed genitals.  *Cf.* 18 U.S.C. § 2257A.  This action largely eliminated a disturbing underinclusiveness in the statutory record-keeping scheme insofar as it is designed to help combat child pornography.  Seriously problematic child pornography can, of course, depict merely simulated or imminent sexual conduct just as it can depict actual sexual conduct.  So whatever legitimate governmental concerns underlie Section 2257 apply with equal force to Section 2257A.  Nothing except the content of expression or the precise identity of the producers distinguishes the terms of Section 2257 from those of Section 2257A.  It therefore follows that producers under Section 2257 should have the same compliance alternatives as those under Section 2257A.  This Department should thus include in the final rule contemplated here, provisions permitting Section 2257 compliance on terms identical with those prescribed in Section 2257A(h)(1).  The statutory language is, of course, already available for incorporation into the final rule.  Hundreds if not many thousands of producers under Section 2257 could, under the language of Section 2257A(h)(1)(A) – and virtually all such producers surely would – avail themselves of the opportunity to comply with Section 2257 by making a certification as specified in Section 2257A(h)(1)(A)(ii).  Such a certification procedure would substantially reduce Section 2257 compliance costs by eliminating the need, imposed by the current regulations, to produce and maintain segregated records, even if this information is fully redundant with respect to information kept for other legal or business purposes.  It is an understatement to say that this certification alternative is vastly preferable for all or virtually all Section 2257 producers to the current seriously burdensome regulatory requirements.  Inclusion of such a compliance option under Section 2257 would dramatically alter the regulatory landscape in a (distinctly positive) manner which has already been endorsed by Congress for producers who are identical in every permissibly relevant respect.  Failure to include it here will subject Section 2257 to the strict constitutional scrutiny which properly applies whenever any statutory or regulatory scheme discriminates against expression on the basis of its content or the identity of the speaker.

**D.**   **Records should be acceptable if they are in digital form instead of on paper.**

Prior to 2005, the regulations seemed to assume that the required records will be prepared and maintained as hard copies, *i.e.* printed on paper.  *See, e.g.*, §§ 75.1(a)(3), (e), 75.5(e) (prior to May 24, 2005), 69 Fed. Reg. 35551, 35553.  This model might well suffice for a small magazine

producer with a large file cabinet and three sets of index cards. But when it comes to computer sites, there are hundreds if not thousands of sites in this country each of which have many thousands (some have *hundreds* of thousands) of images, separately produced or gathered in small galleries which have been separately produced. Unless a good deal of generalization (never contemplated by the regulation) were permitted, these computer sites faced truly awesome record-keeping burdens. We previously observed that those burdens might remain acceptable if the required records could be generated, maintained, and inspected in digital form, but it would be altogether unrealistic to expect that such records be printed onto paper and then physically sorted and cross-indexed for inspection. We noted that the operators of these large computer sites are obviously computer-savvy, and that there is no reason not to permit them to use computers to reduce their record-keeping burdens to more manageable proportions should they choose to do so. We were thus happy to see that this Department expressly adopted the suggestion that the regulation should expressly permit records to be maintained in digital form. 28 C.F.R. § 75.2(f). We are equally disappointed that the Department now proposes to reverse course. The proposed insertion of the word "hard" at two points in section 75.2(a)(1) (confusingly, without modifying subsection (f) at all) would eliminate the possibility of efficient completely digitized records. No reason for this change is identified, and indeed it is difficult to believe that such a change is necessary at all. Even the most important contemporary images are stored in digital form by businesses and government. Inexpensive and readily available consumer-grade scanners can easily produce digital images at resolutions comparable to those acceptable for high quality printing of text and for the printing of standard photographs. The final rule should continue to permit identity documents to be scanned into digital form at a standard minimum resolution (*e.g.* 300 dots per inch). Any other difficulties in reading a copy of the identity document are likely to arise from the analog photographic aspect rather than any digitizing aspect of the copying procedure. That is, it is at least as unlikely that a standard photocopy of a drivers' license will result in a less-than-ideal reproduction of the photograph as it is that a direct digitization will suffer the same problem. But unless this Department seeks to impose extraordinarily expensive requirements concerning the copying of identity documents – requirements which are altogether avoided by other federal regulations which require employers, for instance, to examine identity documents – Section 2257 inspectors are going to have to expect that copies of identity documents may be less than visibly perfect.

> **E.**     **It is extraordinarily burdensome to require that the records contain a copy of each work.**

The regulations require that the records include a copy of each image. § 75.2(a)(1) (i). Again, this requirement may make sense for a magazine producer whose press run typically numbers in the thousands or tens of thousands of copies. Here, the marginal cost of throwing one of those copies in the file cabinet in the proper folder may seem perfectly reasonable. And although the physical storage requirements might be greater for the videotape producer, the task still seems imaginable, even over the required maintenance period. Even here, though, the storage requirements will become more substantial. Videotape and DVD packaging of the expression at issue here typically contains images which are covered by Section 2257. If these must be stored, a substantial amount of warehouse space will be devoted to seven year's worth out possibly obsolete video containers rather than to current expressive materials. But again, the final rule should

9

fully and fairly consider the large computer sites as well.  There are thousands if not tens of thousands of computer sites in this country each of which posts thousands and sometimes hundreds of thousands of images.  Moreover, there is substantial commercial pressure on these sites to post new images on a regular basis, so virtually every adult entertainment web site is constantly changing.  So even assuming still images of small size, mediocre resolution, and substantial compression, each image will take several tens of kilobytes of computer storage.  Under these limiting assumptions, the largest sites must devote many gigabytes of computer storage to their current images.  These current storage undertakings are economically and technologically feasible even when larger files – still images of higher resolution and better color depth or motion picture images of any length and resolution – are involved.  But matters quickly become much less tractable when *cumulative* and *segregated* storage requirements are considered for the required record maintenance periods.

The following situation is not at all uncommon (*i.e.* many dozens or hundreds of computer sites in this country are similar to what is described here):  a computer site offers to its willing adult customers sexually explicit but nonobscene recorded streaming video feeds on twenty channels, 24 hours per day, seven days per week.  Even assuming substantial compression and mediocre image size and resolution, each of these video streams is likely to generate something on the order of five or ten megabytes each minute.  The twenty streaming video channels might then generate something like 150 megabytes per minute.  To be sure, this requires fast processors and communications channels of wide bandwidth, but, so far, the digital *storage* requirements are not particularly daunting, because the computer site narrowcasts the streaming video.  Individual audience members may or may not record the performances for later replay, but if they do, they use their own digital storage resources for the purpose.  We candidly acknowledge that we previously suggested a similar example concerning *live* streaming video, and we recognize that this Department has now responded to those concerns as raised three years ago.  But the proposed modification of section 75.2(a)(1)(ii) is *limited* to live performances, and thus will not address the enormous storage burdens imposed by the requirement that at least seven years' worth of *recorded* video must be stored.  It is the sized and number of video files, not whether they were originally netcast live or as recorded, which imposes the burden here.  But the proposed rule would thus continue to require that all of these streaming images be accumulated for seven years as part of the required records.  *Now* the storage requirements quickly become unfathomable.  Since there are 1,440 minutes in each and every day, one day's streaming images from this twenty-channel site will require over 200 gigabytes of storage.  And since there are 2,556 days in the shortest minimum required storage period, it will take over 500 terabytes (*i.e.* $5 \cdot 10^{14}$ bytes) of storage to maintain these images even if old images are removed from the required records as soon as legally possible.  This storage requirement is in addition to whatever would be required for the other images – still or motion picture – offered on the site over the years.  This would be a truly staggering storage requirement even if our file size estimates were high by one or two orders of magnitude!  Matters are certainly no better if the records are required to be kept in "hard copy" rather than in digital storage.  Even assuming that the streaming video recorded at the lowest standard VHS video resolution would be acceptable to this Department, each streaming video channel would fill four standard video cassettes per day.  At that rate, the twenty channels would generate over 200,000 separate video cassettes over the shortest record maintenance period.  This is certainly no less staggering than the digital storage requirements.  The hard copy volume would be reduced somewhat by use of DVD's as storage media, but this reduction is

10

more than offset by another factor which we, frankly, overlooked in raising this problem three years ago:  for any records as vital as these are to a business enterprise, backup is essential.  For this reason, the very conservative storage estimates here must be doubled, requiring a full petabyte of digital storage even in the best case.

It is difficult to imagine what legitimate governmental purpose could require such burdensome storage, especially since it is quite likely that not one of the dozens or hundreds of customers who may have seen a particular streaming video on a particular day would have saved that image for anything like seven years.  Furthermore, it bears noting that, even if the cumulative storage requirements were more objectively feasible, any digital storage devoted to seven-year old images is a computer resources which cannot support current expression, so even more realistic requirements in this regard will substantially burden or limit much expression.  The final rule should operate to impose only realistic storage requirements.

The final rule should also take account of the possible *re*occurrence of a very rare but devastating event.  An underage performer might present identification documents which genuinely deceive many reasonable primary and secondary producers, as well as fellow performers, into believing that the performer is of proper age.  This performer could then use those identification documents to work on many "shoots," so that over even a short period of time, a very large number of this performer's images would be published and republished.  Nothing in Section 2257, 2257A, or any administrative regulations is designed to combat *this* possibility, since the entire record-keeping scheme at issue here hinges upon reasonable examination of identity documents – which are occasionally falsified in ways not reasonably detected.  Under the current regulations, though, a copy of each of these images must find its way into the records of the many primary and secondary producers involved.  Now, one way or another, this performers' fraud is revealed.  Those who were innocently duped nevertheless absorb the tremendous cost of destroying all of the circulating and warehoused images now known to be illegal and unprotected by the Constitution.  Retailers and other distributors conscientiously do the same thing.  But what of the images which are required in the records?  Can they be destroyed or not?  If not, how are the custodians to be protected against state laws which typically, and constitutionally, *Osborne v. State of Ohio*, 495 U.S. 103 (1990), criminalize even the private possession of child pornography?  Any final rule should expressly address and resolve these questions, and we respectfully submit that it is unconscionable for a law enforcement agency to fail to ignore this issue as the Department did in the last notice and comment round.

## F.    The proposed rule confuses the indexing requirements for the records.

The regulation articulates the indexing requirements in a manner which either has confused the inspectors who check records under Section 2257 or exceeds legitimate bounds.  Inspectors currently responsible for Section 2257 enforcement have stated their belief to industry representatives that the currently required cross-referencing is sufficiently robust that an inspector knowing the title of a work must be led not only to the actual name and identity information and documentation for every performer appearing therein but also to *every* alias name *ever* used by each such performer.  There is an obvious government purpose behind some cross-referencing requirement, but it is essentially a "one-way" indexing concern.  That is, we understand why an

inspector needs to get to performer identity records *from* a legal name or an alias or the title of a work.  But there is no basis whatever in this record-keeping scheme for an inspector to get an alias name which a performer used on her high school soccer team when the inspector already knows that performer's stage name used in a particular named production and can obtain the performer's legal name and copies of identity documents from the records.  The final rule should clarify that the required indexing must lead from legal or alias name, name of produced work, etc, to the identity information but not also back out to other alias names or to other unknown works.  The final rule should also all exempt producers from inquiring into and recording alias names used when performers were children.  There is simply no need to clutter Section 2257 records with "four-eyes" "chubby," or even "wiseguy" or worse.

### G.      The record segregation requirement is unduly harsh.

In the most abstract sense, perhaps, one can sympathize with this Department in worrying that a records custodian might delight in keeping perfectly arranged and cross-referenced records amidst so many other items that this Department's investigators will need to spend an inordinate amount of time, thrice yearly, *cf.* § 75.5(d), finding the required records in order to examine them.  Whether this possibility is at all likely is open to serious doubt, since it would do nothing more than simply prolong the inspections.  Perhaps one can imagine a lonely records custodian.  In any event, the regulation's "cure" here may well be far out of proportion to any imaginable disease.  *Cf.* § 75.2(e).  The basic performer information required by the statute and regulations will invariable track materials in a producer's personnel files quite closely.  Under the proposed rule, if a stray model release, 1099 form, or I-9 form winds up in the 2257 records instead of in the more general personnel file, the custodian or the producer faces five years' incarceration.  If the problem contemplated by section 75.2(e) is worth worrying about at all, a much kinder, gentler solution is called for in the case of inadvertent misfilings.

### H.      The regulations require that the records be maintained for too long.

Assuming for present purposes that the 2003 amendment of Section 2257(d)(2), P.L. 108_21 sec. 511(a), 117 Stat. 684, did not create serious constitutional difficulties, *cf. Message from Presi-dent*, H.R. Doc. 100-129 at 66-68, the reason for fixing the basic record-maintenance period at seven years, as proposed   § 75.4, 69 Fed. Reg. 35552, is fairly obvious, although the Meese Commission, which originally formulated the idea for Section 2257, suggested only five, 1 Attorney General's Commission on Pornography, *Final Report* 621 (1985).  Any fixed period is an improvement an unspecified one, although a shorter period obviously reduces the record storage requirements and so is preferred.  We see no principled objection to defining the main-tenance period with reference to a statute of limitations running from the initial creation of an image.  Nevertheless, there remain several problems with the maintenance period prescribed by the regulations.  First, in connection with the rule concerning the frequency of inspections, § 75.5 (d), 69 Fed. Reg. 35553, the seven-year period seems quite excessive (or, more likely, the routine inspections *much* too frequent).  The regulations as a whole require the primary producer to maintain the basic records concerning each image or work through twenty or twenty-one inspec-tion cycles.  There is no reason why this Department's investigators would need that many

inspections to assess any particular record.  If the records themselves disclose that a performer had been underage, that fact will appear as soon as the record is first seen.  If there is reason to doubt the authenticity of a recorded identification document, far less than seven years would be required to check it out.  Second, the regulations apparently contemplate culling seven-year old information out of an on-going cross-referenced set of records.  If they do not, they pose very substantial cumulative storage requirements.  The final rule should make it clear that the records concerning an image or work can be disposed of seven years after the image's initial creation and that a producer's records concerning a performer can be disposed of seven years after the perfor-mer is last imaged by the producer.

This raises two additional problems with the regulations.  One is that they are drafted in such a fashion that the basic seven-year maintenance period could turn into an almost *seventeen* year period, which would plainly be excessive by any stretch of the imagination.  If a corporate pro-ducer goes out of the business of producing sexually explicit images – say, to provide security services for special events instead – on the day before the basic seven-year period runs, it is required to keep the records for an additional five years.  If the corporation is then dissolved the day before *that* five-year period runs, the individual custodian is required to keep the records for *another* five-year period.  The final rule should make it clear; using "whichever occurs first" language, that the operative period is the *shortest* of whichever of these three possibilities obtains in fact.

Of far more basic concern is the apparent assumption underlying the regulations that secondary producers will be required to maintain records for seven years after they *re*produce an image.  If a secondary producer reproduces an image one day short of seven years after it was first made, the records concerning that image or work will have to be maintained for just shy of fourteen years, and this process could be extended indefinitely.  At first blush, this might seem entirely reasonable.  But as we have already observed, the information in the required records properly relates to the *initial* production, not to the *re*production, so there really is no good reason to start the maintenance clock running anew upon each republication.  Any rule requiring records to be maintained as long as an image is in circulation would be so cumulatively burdensome – and so fundamentally misguided – as to unconstitutionally throttle expression.  And consider the fore-going situation changed by just two days:  If a secondary producer decides to reproduce an image one day *after* seven years after it was first produced, how would the proposed rule operate?  The primary producer has now lawfully disposed of the original records, so he, she, it and/or they cannot transfer copies thereof to the secondary producer under section 75.2(b).  May the second-dary reproduce the image at all without the records or is further publication to be restricted, at very substantial constitutional cost, to the primary (who is *also* now quite lawfully without the records)?  The upshot of these observations is that *no one* should be required to keep records concerning a particular image more than seven years after the image was first created.  Similarly, *no producer* – primary or secondary – should be required to keep records concerning a particular performer for more than seven years after that performer last performed to create any image for any work published or republished by that producer.

**IV.     The record-shifting requirements are impermissibly burdensome.**

As we suggested in section II-B of these comments, a great deal of the burden on expression imposed by the regulations at issue results from the "record-shifting" requirements.  That is, the regulations expressly require that copies of the full set of required records must *follow* any image to any secondary producer, broadly defined, who assists in disseminating the constitutionally protected expression.  § 75.2 (a), (b).  That is akin to saying, first, that no one may write a news-paper article critical of a public figure without first recording written proof that the article is *not* unprotected defamation.  Such a requirement would be problematic enough, but it would be made dramatically worse if that very elaborate written proof had to be transferred to others before they could republish the article.  Such a requirement would dramatically increase both the number of individuals and entities burdened by the novel and arcane record-keeping require-ments as well as the overall costs, to publishers and to society, imposed by those requirements.  And so it is here.  These record-shifting requirements will chill the willingness of others to re-distribute images, and they will thereby restrict the dissemination of constitutionally protected expression.

**A.     The record-shifting requirements seriously burden and chill
the dissemination of constitutionally protected expression.**

This Department has quite properly recognized that secondary producers cannot be required to assemble their own records from "scratch."  It has thus provided in section 75.2(b) that secon-dary producers may satisfy their own record-keeping requirements by receiving copies of a pri-mary producer's records so long as the secondary producer also obtains, records, and maintains the primary's business address.  28 C.F.R. § 75.2(b).  That is, the primary producer generates and then "shifts" copies of records to each secondary producer for each republication event.

This solution to the secondary producer's otherwise intractable record-making problem is certainly no panacea.  For one thing, the volume and complexity of those records will very likely chill the willingness of many to republish material, thus limiting the distribution of constitution-ally protected expression.  Where a primary producer licenses some but not all of his, her, its and/or their images to a secondary producer, for instance, it will likely be daunting work to untangle the cross-references so that the secondary producer receives *only* the required records, *cf.* § 75.2 (e) (subjecting anyone with extraneous matter in the required records to five years' incarceration).  Furthermore, many primary producers have some at least moderately good business reasons for not wanting to share their records concerning performer identities with secondaries who may be interested in becoming competing primary producers if only they knew where to find and contact willing performers.  Far more importantly, many performers might agree to part with identity information to a primary producer whom they know and trust, but (since the required records will likely contain a copy of a driver's license or other identity docu-ment even a redacted copy of which will contain information valuable to identity thieves) those same performers may well refuse to allow such records to go to unknown secondaries who may openly publish their identities, steal their identities, attempt blackmail, or worse:  performers in sexually explicit works have well-founded fears of stalkers.  In this situation, a performer either will not perform or will insist on a binding agreement that the primary producer will never use a

14

secondary to republish.  In either case, constitutionally protected expression will be chilled if not frozen out of existence.

These serious burdens and chills must be evaluated in light of the governmental purpose in generating them.  Presumably, this Department seeks to avoid a situation where investigators have to trace back through a long line of secondary producers to find the primary in order to examine the original records.  It is difficult, however, to see how such a situation would arise or needs to arise.  First of all, if there were no such thing as a secondary producer at all, each republisher would have to include the primary producer's disclosure statement on every republished copy.  18 U.S.C. 2257(f)(4).  So an investigator obtaining any copy would immediately and directly know where to find the primary producer.  It is easier to find this from a glance at a disclosure statement than from an inspection of the secondary producer's records.  It is also possible that this Department reasons that the more individuals and entities required to keep the records, the more likely it will be that *someone* actually follows the law and keeps them.  The same reasoning, of course, would support requiring that copies of the records follow *all* distribution of an image or work.  That way, this Department's investigators could expect to inspect records in the hands of anyone possessing the image or work, even an ultimate retail consumer.  But this reasoning merely compounds a serious constitutional problem underlying the entire statutory scheme:  it deliberately and seriously burdens the constitutionally protected expression of the law abiding on the assumption that *others* will violate applicable laws.

### B.  **Substantially less restrictive regulatory alternatives are available.**

It is important to recognize that the entire record-shifting difficulty (together with important problems concerning disclosure statements, raised in section VI-A of these comments) arises from the requirement that records be maintained at the producer's *own* place of business.  If other locations were permitted – if, for instance, third-party agents were permitted to act as records custodians at their own places of business, properly disclosed by the required statement – the record-shifting problem would be resolved:  both primary and secondary producers could rely on the *same* records in the hands of the *same* third party custodian using the *same* disclosure statement.  To be sure, this Department's investigators would have fewer choices of places to visit, but, as noted at the end of the previous section of these comments, that is only because fewer lawful producers, acting within their constitutional rights, would be burdened by the regulatory scheme.  The record-shifting burdens could be eliminated entirely and the record-keeping burdens could be minimized by *concentrating* those burdens on third-parties who are ready, willing, and technically able to receive the required basic information from primary producers and then organize it, maintain it, and make it available for proper inspection.  Under such a system, this Department's investigators might become more familiar with these dedicated, professional custodians, and they might develop relationships with them – including some training, competence, and certification requirements for such third-party record keepers and their software – which might better insure proper cross-referencing and full observation of other peculiar record-keeping details.

This Department is entirely free to implement such a system, as the one suggested in the preceding paragraph, by regulation.  The statute itself expressly provides that the required records be maintained at the producer's "business premises, or at *such other place as the Attorney General*

*may by regulation prescribe . . ..*"  *Cf.* 18 U.S.C. § 2257(c) (emphasis added).  The business office of a competent third-party custodian is certainly an available regulatory option.  It may be, that a very small producer – such as one of the many thousands of individuals operating very small, personal websites – would prefer to hire a competent third-party record-keeper rather than to undertake the task of learning how to cross-reference the records and then personally arranging the records maintaining them for a long time.  It would also be possible for producers to effectively *share* competent custodians.  That is, dedicated records custodians, could provide record-keeping services for many small producers at once, thereby allowing the custodians to make a full-time business out of it at a known address with fixed hours and without the need to divide time between maintaining records and producing expression.  Whether such a system would result in many individuals seeking to do business as records custodians or in a very few large and highly computerized operations dominating the "records custodian" market is, perhaps, worth careful thought.  We believe that several dozen individuals and firms might well come forward to act as professional third-party record keepers under a reasonable certification system, and these persons would bring substantial software expertise to bear of the problem of keeping many producers' records.  In any event, industry groups, such as the Free Speech Coalition, might well be interested in providing seed resources to help establish training programs and to produce compliant record-keeping software packages for dedicated records custodians.

Under such a system as proposed here, this Department's investigators would still know where to find the required records, but many of the chilling burdens imposed upon producers would be eliminated altogether, and the remaining burdens could be concentrated upon those competent individuals or entities willing to undertake them voluntarily.  All that would be necessary to permit such a system is for section 75.4 of the final rule to provide that the required records may, at the producer's discretion, be maintained at a competent third-party custodian's place of busi-ness, properly designated in the disclosure statement.  Such a change would provide for profes-sional third-party custodians who could not only better serve this Department and its investiga-tors, but could also serve the needs of the thousands or tens of thousands of very small primary producers in this country by performing the arcane record cross-referencing and maintenance functions, by making their records available for proper inspection a full forty hours per week, and by avoiding the need for these individual primary producers to risk using their personal names and their only address on the disclosure statements.  The overall burdens imposed by the current and proposed regulatory scheme, especially upon small producers, by the substantial record-keeping and record-shifting requirements would be eased dramatically if they could lawfully be transferred to those who are willing to specialize in the required services and to provide those services to many producers at once. Under such a system, in short, primary pro-ducers would be left free to produce (provided they check identification and copy identification documents and send the required information along to their custodians), secondary producers would be left free to republish (provided they include the primary's disclosure statement), and custodians would be free to specialize in the business of cross-referencing, maintaining, and permitting proper inspection of the required records.

**V.      The inspection provisions are in some respects improper and in other respects incomplete.**

The regulations devote considerable attention to the contemplated inspection process.  In one sense, at least, this attention is welcome.  It is certainly better that potential questions surrounding the inspection process be addressed in advance than that they be left to arise as conflicts during individual inspections.  Nevertheless, section 75.5 contains provisions which are inappropriate and, in some respects, it leaves out other provisions which would be appropriate.  The final rule should address the following difficulties.

**A.      The final rule should fully and properly define "investigators."**

The first and most basic problem with section 75.5(a) is that it assumes that the statute authorizes the Attorney General to designate inspectors other than him- or herself.  It does not.  Under the statute, a producer has an obligation to make the required records available only to the Attorney General.  18 U.S.C. § 2257(c).  In the very same clause imposing this obligation, Congress expressly left it to the Attorney General to alter or expand *other* provisions of the statute.  18 U.S.C. § 2257(c) ("at his business premises, or at such other place as the Attorney General may by regulation prescribe").  As the common lawyers of old used to say:  *expressio unius est exclusio alterius*.  Black's Law Dictionary at 692 (Rev. 4th Ed. 1968).  Even assuming that this was an oversight, it should be remedied by statutory amendment rather than by a regulation exceeding statutory authority.  Indeed, further amendment of section 2257 would be most welcome if the process at last included committee hearings which would *finally* permit an opportunity, not yet afforded to anyone, to the tens of thousands of affected persons to comment on the statutory scheme, to indicate the burdens it imposes, and to suggest less restrictive and less burdensome alternatives.

Assuming that this Department intends, as it has, to authorize investigators other than the Attorney General even absent statutory amendment, the regulations leave the matter entirely too unclear.  The ideal way of designating such investigators would be "by regulation," as the parallel provision of Section 2257(c) suggests.  That would require that the final rule designate who the authorized "inspectors" are     – not of course, by name, but by designating a class of persons (*e.g.* attorneys employed by CEOS or FBI agents assigned to a particular unit) as authorized investigators.  In the alternative, the final rule could provide for some mechanism by which the Attorney General's designation is reduced to a verifiable writing.  How else is a custodian to know whether to answer the door when a stranger comes knocking claiming to be a designated inspector?  *Cf.* § 75.5(c)(2)(i), 69 Fed. Reg. 35552 ("credentials").  This is not an abstract question.  Although Section 2257 does not currently prohibit records custodians from freely disseminating the required records to the world at large (it should *surely* be amended to do so), a conscientious records custodian will realize the important policy reasons behind limiting inspections to those absolutely required by statute and by valid implementing regulation.  A potential stalker appearing at the office of a primary producer in the guise of an authorized inspector would pose a genuine problem for a producer who refuses a proper inspection on pain of a federal felony conviction.  At the very least, the final rule should designated the type of officer authorized (*e.g.* FBI agents and those under the direct control thereof) or the contents of

proper identification (presumably fashioned with some protection against counterfeiting) of an authorized officer.  Again, as we suggested earlier, this is the least that a law enforcement agency should do, especially when trying to demonstrate to those subject to inspections that the inspection authority will not be abused.

### B.        Advance notice of inspections should be provided.

At first blush, it is perhaps not surprising that section 75.5(b) expressly provides that no advance notice of records inspection will be provided.  Law enforcement officers are understandably trained that surprise is an important part of many "inspections" because it deprives suspected wrongdoers of the opportunity to destroy or to conceal evidence of illegality.  But even a moment's reflection will indicate that this principle does not operate here.  This Department's inspectors are not, as in the case of a "drug bust," looking for items that should *not* be present (and so could be hidden or destroyed).  Here, they are looking to see that items which must be present and in order are, in fact, just that.  Even in the very unlikely case of a record which actually indicates that a performer had been underage, the records custodian could not avoid a problem simply by destroying that record:  that would still leave a required record missing, also an unlawful situation.  And even if a producer keeps somewhat messy records after six and one-half years but uses advance notice of an inspection to put them in proper order, absolutely no legitimate purpose underlying the record-keeping requirement would be undermined or disserved in any way.  Finally, advance notice would serve to limit the occasions on which an investigator is put to the choice between knocking down a locked door – because no one happens to be present on the premises at the time the investigator arrives – or chalk the attempted inspection up to wasted time and effort.  When we last suggested this, this Department indicated that it had no intention of knocking down locked doors.  We appreciate that, and we have observed a generally high level of professionalism which has attended inspections under these regulations so far.  Nevertheless, the final rule should expressly specify precisely what will happen if no one is present when an inspector arrives.  Section 75.5(b) of the final rule should also flatly reverse course and provide for reasonable advance notice of routine inspections.

### C.        The regulation excessively and incompletely defines "reasonable times."

We recognize and appreciate the fact that this Department responded to our comments directed to the last proposal concerning inspection times.  The current section 75.5(c)(1), however, remains unrealistic in defining reasonable times, particularly as it applies to the thousands or tens of thousands of very small producers in this country, such as those who operate small or personal websites.  Not only would it be difficult for these (typically) one-person operations to staff an office for all reasonable times contemplated by the regulations, but these individuals also very likely work full time at other jobs, making it very difficult to staff their *relevant* place of business consistently even during more reasonable business hours.  Even the 20 hours per week allowed under the current regulations, would be very difficult for these producers to maintain.  The final rule should permit the posting of reduced inspection hours, chosen by a producer, on a reasonably legible sign near the main door of the records locations.  Again, we appreciate the efforts to permit reduced hours, but it is difficult to see how some legitimate producers will be able to

designate more than a few hours per week.  This problem could, of course, be eliminated entirely by alternate compliance procedures such as that following the Section 2257A model or that involving third-party record keepers.

Moreover, section 75.5(c)(1)'s additional provision concerning "reasonable times" will operate with consequences which, whether or not intended by this Department, are altogether unnecessary and constitutionally unacceptable.  If a producer is actually engaging in a photo shoot or if live models are posing and acting for live streaming internet video at 2:30 am, local time, the proposed rule would permit inspections at that time.  There are at least two problems with this proposal.  First, even assuming that the production work in question is occurring on the business premises, this is the situation in which inspection is *most* likely to interrupt production, since spare personnel, let alone designated records custodians, are unlikely to be present at those hours.  More importantly, perhaps, the proposed rule would permit inspections at the place of business even if the late-night/early-morning shoot is "on location" at some distant place.  Indeed, under the literal regulatory language, a mid-day shoot at a European location could justify nighttime or early morning inspections on the home front.  These problems seem especially unnecessary since such late-night/early-morning inspections could have nothing to do with the ongoing production because some time is surely required before all of the cross-indexing is done, and because it may not even be clear which performers on the set will actually appear in any published image until the editing is complete.  On the other hand, if there is probable cause to believe that an underage performer is actually participating in an on-going off-hours' production, the courts of this country are well equipped to issue warrants on child pornography or child abuse charges without the requirement for any late-night records inspection at all.

Section 75.5(c)(1) of the final rule should specify much more realistic "reasonable times" for regularly-staffed places of business, and it will also have to deal with the very difficult issue of inspection timing where a producer has an entirely separate full-time job elsewhere.  It is difficult to envision how this latter set of problems can be dealt with absent adoption of some of the other proposals advanced here, *e.g.* permitting certification to the Attorney General, permitting record maintenance at a third-party custodian's place of business, or providing for advanced notice of inspections.

### D.    The regulations allow unnecessarily frequent and insufficiently justified inspections.

As we have previously noted, regulatory section 75.5(d), together with section 75.4, permits twenty or twenty-one sequential inspections of a given record.  This seems very plainly excessive and unreasonably burdensome.  But in general, it is difficult to evaluate section 75.5(d)'s frequency provision as a whole.  One can imagine production operations which are so large and so prolific that a four-month schedule for routine inspections would not be particularly unreasonable.  Some such production operations may actually exist.  Similarly, if third-party professional custodians are permitted, some of them may well have a sufficient client base to warrant quite frequent and routine inspections.  But there are hundreds or thousands of production operations which are so small and so static that the required records are unlikely to change much at all over any particular four-month period.  Routine reinspection every four months for the sole purpose

19

of repeatedly reviewing the same records is unwarranted.  Presumably, the Department's inspec-
tors will realize that some record sets warrant more frequent routine inspection than others.  And
emergency inspection is always available in any case, though we think non-routine inspections
should always require probable cause and a search warrant.  Any inspection will be at least
somewhat burdensome, and for the vast majority of cases, the proposed inspection frequency
amounts to an invitation for harassment.

### E.  The regulations should expressly clarify the right to remain silent.

Since section 75.5(c)(4) of the regulations goes to all of the trouble of specifying what the
investigator *may* say at the conclusion of an inspection, and since it goes even further to *permit*
the producer to speak to the investigator at that time, perhaps the final rule ought to take the
trouble to also specify that no one need say anything at all to an investigator or answer any
questions during an inspection, *i.e.* that the authority to search does not include the authority to
require that questions be answered.  And while the final rule is at it, it should also specify that
anyone and everyone on the premises is free to leave before the commencement of or at any time
during a records inspection.  If this Department thinks that there would be anything wrong with
the producer and the records custodian leaving the premises during an inspection, leaving behind
only an uninformed security guard to watch the investigator, then the final rule should say so and
include the constitutional safeguards appropriate for custodial interrogation situations.  Having
thus reiterated comments which went unaddressed three years ago, we add that from the brief
experience so far, inspectors have made an effort to make helpful observations at the time of
inspection.  As we contemplate rules for the indefinite future, though, we should strive to ensure
that profession inspection do not depend upon the particular personnel carrying them out or on
the particular "mood" of relations between the adult entertainment industry and the government.

### F.  The proposed rule should address the seizure of the required records.

From past experience, it is apparent that many peace officers and magistrates have forgotten the
strict specificity requirements and other procedures which are constitutionally required when
search warrants and other seizures affect expressive materials.  It has happened in the past that,
upon executing a search warrant concerning obscenity or child pornography, peace officers have
seized original records which the statute and regulations currently require be kept at a producer's
place of business.  If left to their own devices, these peace officers would typically hold these
records for many, many months – certainly more than the four-month routine inspection period,
*cf.* § 75.5 (d).  The final rule should expressly address this situation in a number of particulars.
First, this Department should consider legislation forbidding anyone other than a custodian or
one of this Department's investigators from moving, disturbing, or interfering with the required
records in any way.  Local peace officers rarely know what these records are, and their routine
search and inventory procedures will very likely destroy the required cross-referencing and may
very well otherwise disturb the integrity of the records.  Second, and far more importantly, the
final rule should make it clear that the seizure – and, for that matter, the theft – of the some or all
of required records does not require the cessation of any on-going or previously planned expres-
sion.  If seizure of the required records did have that effect, then the seizing authority would, of

course, be required to provide copies of such records back to the producer within 24 hours so that expression could promptly resume.  *Cf. Heller v. State of New York*, 413 U.S. 483, 492-93 n. 10 (1973).  In the alternative, the final rule should provide that the seizing authority thereupon becomes the lawful custodian of the records and is required to provide the producer with an individual custodian's name and street address so that proper disclosure statements can be affixed to any new copies produced.  These alternatives may be amusing to contemplate, but the problem is serious and real.  The final rule should address it.

## VI.   The disclosure statement requirements are confusing and, in many cases, too burdensome.

The regulations' requirements concerning the contents and location of the disclosure remain confusing at best, ridiculous at times, and unconstitutional in very many situations.  The final rule should address the following difficulties,

### A.   Requiring the open disclosure of the custodian's name and address is impermissible in many situations.

As with many of the record-keeping requirements, the regulatory provisions concerning the contents of the disclosure statement, § 75.6(b)(3), seem to have been drafted with a few large producers of magazines or videotapes in mind.  For such producers – invariably incorporated and operating large warehouse and, perhaps, production facilities – most of the current and some of the proposed requirements may be perfectly acceptable.  Even for these producers, the proposed rule is entirely unclear concerning which or how many producers must be named if, as recognized in section II of these comments, there is more than one primary or more than one secondary producer.  Corporate parents and subsidiaries, § 75.1(c)(5), for instance, will generally not share the same business address.  Moreover, if there is no legitimate need to keep records with respect to a work beyond seven years after the images it contains were first created, *see* section III-H of these comments, there is certainly no need to continue printing any disclosure statement at all after that date.  The final rule should clarify which producer should be used for the disclosure statement, and it should expressly "sunset" the disclosure statement requirement when the relevant records may be discarded.

One might assume that the same general statements could be made about the operators of at least a few of the largest adult websites.  But even there, looks may be deceiving.  The internet, and particularly the world wide web, has made it possible for individuals of even modest means and business sophistication to publish expression which rivals that of the largest corporations in its design sophistication.  Thus, even the largest adult mega-websites may be operated by a single individual or by a very small group of individuals organized in the loosest manner imaginable.  But whatever the picture concerning the largest sites, it is *certain* that there are thousands or even tens of thousands of very small adult world wide web operations, many operated by a single individual out of his or her residence.  In terms of sheer numbers, in fact, these producers overwhelmingly predominate over large, well-organized corporate producers operating from fixed places of business.  So it is fair say that the vast majority of the producers covered by the statute

21

and regulations will be very small concerns, some operating as nothing more than sole proprietorships or informal partnerships.

With respect to these very small producers, the requirement that the disclosure statement – which will be, in any event, available for all the world to see – include a street address and the name of an individual records custodian imposes a substantial burden and a very serious chilling effect on constitutionally protected expression.  While a large corporation may well be able to search far and wide to find a highly-paid records custodian willing to see his or her name plastered on thousands of items of sexually explicit expression, such a possibility lies far beyond the reach of the typical small producer.  Many thousands of internet operations run by one or a few individuals have no business address apart from the producer's residential address.  So in *many thousands* of cases, the rule effectively requires the disclosure of *this* address to the world.  Similar observations apply to the name of an organization's records custodian.  Not only do these provisions interfere with constitutionally protected rights to anonymous speech, *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995); *Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982); *Talley v. State of California*, 362 U.S. 60 (1960), they expose producers – who in small operations are very often also performers – to the very real dangers of identity theft, blackmail, and stalking.  And these dangers undoubtedly chill constitutionally protected expression.

As with the record-keeping and especially the record-shifting burdens, the burdens and chills imposed by the disclosure requirements could be substantially reduced – or eliminated entirely – simply by permitting third-party records custodians to maintain records at their own business premises.  While it is unrealistic to assume that each small producer, some living in small, rural hamlets, will be able to find a custodian willing to a) be named publicly and b) actually do business at the producer's address, it is not at all unlikely that there are individuals willing to be so named *somewhere* in this country.  If those individuals are permitted to market their record maintenance services to many small producers at once, they could easily afford to establish their operations at their own, secure business addresses, which would reduce the "stalking" and related concerns to the level experienced by the largest magazine or video producers.  Again, an incredible amount of constitutionally significant burden arises from the baseless requirement that the required records not be separated from the producers' business premises.  The final rule should alter that requirement.

### B.   The requirements concerning the placement of the disclosure statement are confusing.

The regulatory provisions concerning the placement of a disclosure statement within motion pictures,     § 75.8(b), (c), on any medium (*i.e.* film, videotape, and presumably also DVDs, and internet files such as .avi, .mpg, or streaming video), are unnecessarily confusing, and will pose traps for the only moderately wary.  While the contrast between subsections (b) and (c) is a nice one – in the very old-fashioned sense of "nice" – there is simply too much at stake to maintain it.  Fairly sophisticated producers who include end credits in their productions but remain inclined to place their disclosure statement where all of the other video producers put it:  at the beginning.  With five years' imprisonment at stake, unnecessarily Byzantine requirements have no place in

any final rule.  The final rule should choose between subsections (b) and (c), and make clear that it applies to all moving images which have a beginning and an end.

We appreciate that this Department is responding to a statutory amendment in proposing revised section 75.8(d).  It is problematic nevertheless.  If the disclosure statement were likely to be a one or two line affair in these cases, the proposed rule might be realistic if excessively redundant.  But almost every adult website is a composite work, consisting of thousands or sometimes hundreds of thousands of images organized into separately produced galleries.  It is quite common for a website to contain an index page contain thumbnail images linked to extensive galleries of images on other "pages" in the site.  An index page could easily contain a hundred such thumbnails, each part of a gallery of images initially created on a separate date.  Even if the web master is a secondary producer using its own records custodian and address, the disclosure statement is now required to enumerate the separate original production dates.   The disclosure statement in such a case could remain simple only if more generality were permitted.  If the final rule adopts such a strategy, it should plainly spell out the permitted generalizations.  If, on the other hand, a separate disclosure statement, or a separate line in a disclosure table, is to be required for each separately produced work, then it is absolutely unrealistic to require that all of this be placed each and every web page.  As we suggested three years ago, it seems that such a requirement is altogether unnecessary.  One of the distinguishing features of the hyper-text mark-up language (HTML) is its ability to support intricately linked documents.  It is thus perfectly possible for moderately sophisticated webmasters to link their complex disclosure statements, or disclosure tables, together in a coherent fashion    – enabling this Department's investigators to follow the links simply by "clicking" on them – without compromising the artistic design or literary integrity of their websites.  But for this possibility to satisfy the regulations, the final rule would have to permit the web site pages to display an appropriately labeled link, which would then open to perhaps several pages of disclosure statements or to an elaborate table of disclosure statements.  A webmaster who wished to do so could use a series of links to keep individual disclosure statements close to the galleries to which they belong, while at the same time saving this Department's investigators the trouble of sifting through all of those galleries.  The final rule should choose between the possibilities outline here, and perhaps those suggested by others, but as it stands the proposed rule, even as it responds to new legislation, falls far short of the required mark.

Finally, it is worth noting that most digital image file formats offer the capability of including a disclosure statement in a way which avoids interfering with the aesthetic integrity of the image itself.  The final rule should avoid a requirement that the statement appear, in such a case, on the face of each image, both because such a requirement would unnecessarily increase the size of the image files and because it would interfere with the integrity of the image itself.  Again, a solution is readily at hand.  Most if not all image file formats provide for comments – which do not affect the displayed image at all – to be placed within the digital file.  The final rule should provide, as an option, that the disclosure statement can be placed in such a comment field, at a defined location, where the producer will know where to put it and where this Department's investigators will know where to find it.  Indeed, such a placement in a motion picture file will make for a smaller file, since it is much more efficient to store the disclosure statement as ASCII characters in a comment field than as tens of seconds of displayed video.  No legitimate governmental interest forbids such "buried" disclosure statements.

C.     **The regulations concerning the date of production are inappropriate or incomplete.**

Both the present and the proposed rule exceed the statutory mandate by requiring that a disclosure statement specify the date of production.  *Compare* 18 U.S.C. § 2257(e)(1) with § 75.6 (b)(2), 69 Fed. Reg. 35553.  Perhaps for this reason, the regulations have never previously been particularly clear about *what* date is contemplated.  *Cf.* 28 C.F.R. § 75.6(a)(2).  Assuming that the statute required a date of production in the disclosure statement, we are inclined to agree that the date should be anything other than the date on which the images in the work were *first* recorded from live conduct by the performers.  This is the *only* date which matters for child pornography purposes and, as previously noted, all of the required records properly relate to that event alone.  Similarly, that date, or something very close to it, will determine when the record-keeping obligations expire and so when the disclosure statement no longer serves any useful purpose at all.  But even apart from these considerations, there is a very good reason why the date of production need not appear on the disclosure statement at all.  For law enforcement purposes, that date is critically important only once the performers' birth dates are known.  Since *that* information certainly will not be part of a disclosure statement, the inclusion of the production serves no real purpose either.  What makes sense is to require that the records pointed to by the disclosure statement themselves detail the relevant production dates, *i.e.* the earliest date on which the primary producer initially created any sexual image depicted each performer.

D.     **The typographic requirements for the disclosure statement are unreasonable.**

The regulations make an understandable effort to specify the appearance of the disclosure statement.  28 C.F.R. § 75.6(e).  Unfortunately that effort, as it stands, falls flat, resulting in truly absurd requirements.  The typeface requirements remain problematic.  Point size is an objective criterion.  This Department can specify how large the printed type must be; there is no need to tie the minimum typesize to the relative size of other printing involved.  Other provisions of the proposed rule also pose problems for images displayed on a computer site.  Since the size and appearance of any text posted on a computer site will depend on the settings of each remote computer monitor displaying it, the point-measured minimum type size requirements are meaningless.  While HTML provides for a standardized set of text headings for world wide web pages, distinguished by their *relative* size and weight, they too will appear differently on different monitors.  Reference to such standardized headings for websites is preferable, however, since it would allow this Department's investigators to configure their own monitors to avoid eyestrain.  While this Department's concerns here are understandable, there seems little reason to forecast that a requirement that the disclosure statement appears in the same typeface and size and against the same background as the copyright statement would not prevent the microscopic blue-on-dark-blue disclosure statements which this Department seems to fear.

### E.     Provisions governing an "exemption statement" are unnecessary and improper.

The regulatory provisions concerning a so-called "exemption statement," § 75.7, 69 Fed. Reg. 35553, are unnecessary, unauthorized, and, in any event, seriously underinclusive.  If, as will be the case very many situations, no disclosure statement is required, then no statement of any related kind is required either.  The absence of an exemption statement will not relieve the government of its burden of proof on any element of an alleged offense under Section 2257(f)(4).  If it did, serious problems would arise concerning the validity of the regulation.  Since section 75.7 can and should be ignored altogether, it is not particularly important that it is far from comprehensive in listing the circumstances under which no disclosure statement can be required.  To be sure, images created prior to the effective date, as we have used that term here, are subject to no record-keeping requirements and need no disclosure statement.  But the same is true for later-created images after the record-keeping period has expired for them.  And the same is also true, unless the statute is read to impose serious and constitutionally problematic obstacles to the importation of images, of images created in foreign lands by foreign producers using foreign performers without immediate regard to the U.S. market.  Finally, we seriously doubt that either the record-keeping or the disclosure statement requirements can constitutionally apply to amateur videotaped images made, for instance, by a married couple of themselves for their own personal use.  The regulatory definition of secondary producer is limited to those producing in commerce, but the primary producer definition is not.  Since there will surely be this and similar "privacy-type" exemptions   – whether or not the statute and regulations recognize them – this is another aspect in which section 75.7 under-enumerates the exemption circumstances.  The final rule should abandon all provisions concerning an exemption statement.

### F.     The regulation should specify that "transfer" is limited to commercial transfer.

For some of the reasons articulated in the preceding subsection of these comments, the final rule should also specify whether the term "transfer," as used in subsection (f)(4) of the statute is, like the term "distribute," 28 C.F.R. § 75.1(d), limited to commercial transfers.  Since the term appears in a statutory context which might suggest otherwise, 18 U.S.C. 2257(f)(4) ("sell or otherwise transfer"), and since extravagant claims have been advanced for the reach of the statute, *Message from President*, H.R. Doc. 100-129 at 60, the final rule should specify whether a disclosure statement is required for purely private expression.  If, for instance, one of the spouses in the married couple envisioned in the preceding subsection of these comments sent their videotape to the other spouse who was traveling on a long business trip, would the statute and regulations require a disclosure statement?  Section 75.1(d) of the regulations is on the right track in suggesting – to the extent that it actually does so – that the entire record-keeping scheme is restricted to commercial production operations (although it raises a slight problem identified below).  Any contrary suggestion will, of course, seriously exacerbate the constitutional problems surrounding both the statute and the regulations.

**VII.    The proposed rule contains some minor grammatical errors and drafting problems**

The regulation currently undertakes to define a number of important terms, but others should be added as some existing definitions should be adjusted.

### A.    The final rule should distinguish between "actual" and "simulated" masturbation.

This problem frequently arises in connection with the legal regulation of sexually oriented expression.  It arises from the fact that the term "masturbation" can be used in a manner strictly confined to autoerotic activity or it can be applied to erotic rubbing or touching of even a part-ner's genitals for purpose of sexual arousal or it can refer to any touching of the sort commonly associated with sexual arousal, whether or not the touching is, in fact, for that purpose.  In the first two senses of the term, the distinction between actual and simulated masturbation would turn on the actual intent of the person engaging in the touching involved.  In the third sense, the distinction would turn on whether actual touching or only the appearance of touching was depic-ted.  Because enormous differences, according to the statutory scheme enacted by Congress, turn on the distinction between actual and simulated, some attention to this problem is necessary here.

### B.    The final rule should define "sadistic or masochistic abuse."

This is another set of problems which often arise in connection with the regulation of sexual imagery.  In the first place many practioners of BDSM activities and lifestyles do not believe that safe, sane, and consensual bondage and related activity constitutes any sort of "abuse" at all.  Such a view is sufficiently widespread in some communities – and sufficiently grounded in their own understanding of the practices involved – that the unelaborated statutory term may genuine-ly lead some practitioners to believe that images of their own practices are not covered by Section 2257 because they do not depict any sort of abuse.  Because we rather suspect that this Department does not follow this precise line of reasoning we respectfully such that the regula-tions include a definition.  When it does, the regulation can also address the problems that the words of the statutory term do not expressly require any sort of sexual context.  The grisly torture scene from the motion picture *Marathon Man* sure amounts to "sadistic or masochistic abuse" but it would not have constituted child pornography even if Dustin Hoffman had been a child actor when it was filmed.  Presumably, some sexual context is required.  Finally, there remains the actual/simu-lated distinction.  If a model is depicted tied and hanging upside down, and another model is merely but obviously *pretending* to whip the first, is the image one of actual bondage or simulated whipping?  Again, we recognize that it brings no joy to drafters to address the matters expressly, but there is plainly some potential confusion to be avoided.

**C.** **The final rule should define "lascivious display of the genitals" in contexts involving depictions of adults.**

In the "Need for the Rule" section of the introductory comments, this Department notes that the case of *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), *aff'd sub nom. United States v. Weigand*, 812 F.2d 1239 (9th Cir. 1987), provides appropriate guidance for the otherwise undefined term "lascivious exhibition of the genitals." The Department further comments that of the six so-called *Dost* factors, only one – *Dost* factor three – is age-dependent. 72 Fed. Reg. 38034. The implication seems to be that the remaining five *Dost* factors are appropriate for determining whether the genital display is "lascivious." Yet there are several difficulties in relying upon *Dost*. First, since *Dost* was a child pornography case, applying its standards to nude images reinforces the inappropriate burden shift from presumed constitutional protection and lawfulness to a presumption of child pornography. Further, *Dost* factor four ("[w]hether the child is fully or partially clothed, or nude") is substantially less telling for adults than for minors, because of an inherent presumed impropriety in, at least non-infant, minors being photographed in the nude. Since this presumed impropriety is inapplicable for adults, the presence or absence of partial clothing is not an indicator of anything at all, certainly not of "lasciviousness." *Dost* factor five relies on "coyness" as an indicia of lasciviousness. Applying that term to adults is also wholly inappropriate. Merriam-Webster's defines "coy" as marked by "cute, coquettish, or artful playfulness." While such characteristics may be appropriate for determining lasciviousness in a minor, such characteristics cannot provide any relevant guidance when applied to adults. Finally, the sixth *Dost* factor ("[w]hether the visual depiction is intended or designed to elicit a sexual response in the viewer") is inconsistent with *Ashcroft v. Free Speech Coalition*, 535 US 234 (2002), which holds that the subjective response of the audience cannot be a factor in determining whether the material is protected: the key is whether the material represents an artifact of child sexual abuse. If this sixth factor is not excluded, the mere publication context (*e.g.* proximity to other adult imagery) could be deemed to render lascivious an image otherwise not inherently lascivious.

The final rule must also make clear that the exhibition of the genitals must be nude, in contrast to the holding of *U.S. v. Knox*, 32 F.3d 733 (3rd Cir., 1994). Were the *Knox* holding applicable to Section 2257, the expanse of that section would become breathtaking. Every photograph of male water polo players or other competitive swimmers would be potentially subject to 2257 record keeping. The mere presence of a bulge in the clothed crotch, or the suggestion of a labial cleft cannot threaten to require record keeping, with all of its burdens, under Section 2257. Underwear advertisements in mainstream magazines and catalogues would clearly be implicated as well, since advertising is consistently dependent upon sexual provocation, irrespective of the promoted product.

**D.** **The final rule should permit a foreign equivalent to serve as a "picture identification card" whenever a foreign national appears in an image initially created outside of the United States.**

We believe that we understand the intent behind the proposed amendment to section 75.1(b) concerning foreign-issued identity documents. First, U.S. citizens will provide identification

according to the basic definition whenever and wherever they model for images covered by the record-keeping requirement.  Second non-U.S. citizens must use some sort of U.S.- (or U.S. state-) issued identification if they model for such images within the United States.  Assuming that they are doing so as part of work activity, this poses little problem because the authorization to work will itself be demonstrated by such a document.  If the non-U.S. citizen is modeling for other than employment reasons (many gratuitous reasons would surely be constitutionally protected), this does pose something of a problem, perhaps one to be addressed along with problems connected with imaging of fleeting but newsworthy scenes addressed below.  More to the present point, only when neither a U.S. citizen is modeling nor a U.S. location is used should the foreign identification document equivalent be permitted.  If this is the Department's intention, it would be better to state this second condition in terms of the location of the imaging instead of the location of the producer.  As noted above, there can, unfortunately, be several primary producers, some of them corporate (and so arguably always present, for legal purposes, at their principal place of business and in their state of incorporation).  Some may remain in the U.S. even while the *primary* producer is photographing non-U.S. models well outside of the United States.

### E.      Mere gratuitous transfer of a covered image should not make the transferor a producer of that image.

The statutory and regulatory definitions have long made clear that one who does nothing more that distribute images covered by Section 2257 has no record-keeping or related obligations.  This is understandable since it would seriously exacerbate Section 2257's unconstitutional burdens to extend them to anyone coming into contact with a covered image.  The proposed rule would delete the word "mere" from section 75.1(c)(4)(ii).  We see no problem with that stylistic change, but suggest that the words "or gratuitous transfer" be added after distribution.  This would avoid a potential problem with the word "distribution" arising from the fact that section 75.1(d) restricts the term "distribute" to a commercial context.

### F.      The final rule should define "acts of production."

The proposed new language of section 75.2(g) unambiguously states that "[r]ecords are not required to be maintained by either a primary producer or by a secondary producer for a visual depiction of sexually explicit conduct that consists only of "lascivious exhibition of the genitals or pubic area of a person, and contains no other sexually explicit conduct, whose original production date was prior to July 27, 2006."  In contrast, in the "Need for the Rule" section of the introductory comments, this Department notes that the regulations applying record keeping to secondary producers will not be retroactively applied to "penalize secondary producers for failing to maintain required records in connection with those acts of production that occurred prior to the effective date of the Act."  72 Fed. Reg. 38036, (July 12, 2007) (emphasis added.) Yet there is no definition for "act[s] of production."  The final rule should employ the same unambiguous statement that secondary producers have no obligation to maintain records for visual depictions of sexually explicit conduct the original acquisition date of which was prior to the effective date of these regulations.  If the Department intends to use a different standard, it must define "act[s] of production," so that secondary producers know, based upon the acquisition

date or other date of specified acts, which of their content requires record keeping and which does not.

### G.     There must be a "news event" exception.

The proposed rules do not provide the necessary exception for recordings of newsworthy events. For instance, if security personnel were to record an act of homosexual oral copulation in a public alley performed by a member of Congress, an act denied by the Congressperson, the news media would be barred by the regulations from broadcasting the image, even if the genitals were pixilated.  Indeed, the playing of such a recording to a jury in evidence at a criminal trial would likely violate Section 2257.  Furthermore, the absurdity of applying the law to this situation is exemplified by the extrinsic proof of the age of the Congress member.  *Cf.* U.S. Const. Art. I § 2, clause 2 (25 year age minimum).  Yet Section 2257 makes no exception for any acceptable means of proving age other than the tendering of specified forms of identification.  It does not seem likely that a news figure recorded *in flagrante delicto*, would be so cooperative as to pro-vide identification so as to facilitate dissemination of the recording.  Yet without such coopera-tion, distribution of the recorded news event would be barred, irrespective of its significance, solely because there is, in essence, a statutory presumption that the material is child pornogra-phy.