# Linz Exhibit 5

Report of Janis Wolak, J.D.

**Expert qualifications**

1.      I am a Senior Researcher at the Crimes against Children Research Center at the University of New Hampshire.  I have a bachelor's degree in sociology from New College in Sarasota, FL (1970), a law degree from Southwestern University School of Law in Los Angeles (J.D., 1978) and a master's degree in sociology from the University of New Hampshire (1996).  I have worked at the Crimes against Children Research Center since 1998.  I conduct research that focuses on Internet-related sex crimes committed against children and adolescents, including child pornography production, possession and distribution.  My curriculum vitae is attached and accurately reflects my professional experience and accomplishments.  This is the first time I have been asked to serve as an expert witness.

2.      I have conducted three research projects pertaining to child pornography.
- The National Juvenile Online Victimization (NJOV) Study collected information from a national sample of law enforcement agencies about the prevalence of arrests for and characteristics of technology-facilitated sex crimes against minors, including child pornography possession, distribution and production, during three 12 month periods: July 1, 2000 through June 30, 2001 (NJOV1), and calendar years 2006 (NJOV2) and 2009 (NJOV3).  The research was funded by the U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.
- Improving Responses to Victims of Child Pornography is conducting interviews with mental health practitioners, parents of child victims and adult survivors who have been photographed for child pornography.  The aim is to improve criminal justice and treatment responses to victims.  This study is funded by the U.S. Department of Justice, Office of Victims of Crime and will be completed at the end of 2013.
- A collaborative project with the computer scientists who developed the RoundUp software, which is used by law enforcement to conduct proactive investigations of child pornography trafficking in peer-to-peer file sharing networks.  The goal is to begin to quantify and characterize child pornography trafficking in such networks.  This project is funded by the National Science Foundation and will be completed by the end of 2013.  An additional collaborative study, RoundUp Predictive Tool Project, is funded by the Department of Justice, OJJDP.

3.      I am the author and co-author of peer-reviewed articles and reports about technology-facilitated child pornography crimes and have provided training and served on expert panels nationally and internationally pertaining to online child sexual exploitation.  Relevant peer-reviewed publications and research reports are listed below:
- ***Wolak, J.***, Finkelhor, D., & Mitchell, K.J., (2012). How often are teens arrested for sexting? Data from a national sample of police cases. *Pediatrics, 129(1): 4-12.*
- ***Wolak, J.***, Finkelhor, D. & Mitchell, K. & Jones, L.M. (2011). Arrests for child pornography production: Data at two time points from a national sample of US law enforcement agencies. *Child Maltreatment, 16(3): 184-195.*
- ***Wolak, J.***, Finkelhor, D. & Mitchell, K. (2011). Child pornography possessors: Trends in offenders and case characteristics. *Sexual Abuse: A Journal of Research & Treatment,*

*23(1), 22-42.*
- **Wolak, J.**, Finkelhor, D., & Mitchell, K.J., (2012). Trends in arrests for child pornography possession: The third National Juvenile Online Victimization Study (NJOV3). Durham NH: Crimes against Children Research Center.
- **Wolak, J.**, Finkelhor, D., & Mitchell, K.J., (2012). Trends in arrests for child pornography production: The third National Juvenile Online Victimization Study (NJOV3). Durham NH: Crimes against Children Research Center.
- **Wolak, J**, & Finkelhor, D. (2011). Sexting: A typology. Durham NH: Crimes against Children Research Center.
- **Wolak, J.**, Finkelhor, D., & Mitchell, K.J. (2005). The varieties of child pornography production. In Quayle, E. & Taylor, M. (Eds.), *Viewing child pornography on the Internet: Understanding the offense, managing the offender, helping the victims* (pgs. 31-48). Dorset, UK: Russell House Publishing.
- **Wolak, J.**, Finkelhor, D. & Mitchell, K. (2005). *Child pornography possessors arrested for Internet-related crimes: A national study*. Report prepared for the National Center for Missing & Exploited Children. Alexandria, VA. (No. 06-05-023).

4.    I have made numerous presentations on the topic of child pornography, which are listed in my CV, and been invited to speak on the subject as an expert and be part of national and international expert panels, including United States Sentencing Commission Public Hearing on Federal Child Pornography Crimes; Office of Victims of Crimes Working Group on Restitution and other Legal and Mental Health Issues for Child Victims of Child Pornography; Global Symposium for Examining the Relationship between Online and Offline Offenses; Preparatory Thematic Expert Meeting on Child Abuse Images and Sexual Exploitation of Children Online for the World Congress III on Sexual Exploitation of Children and Adolescents; National Center for Missing & Exploited Children Roundtable on Child Pornography; Federal Bureau of Investigation Online Sexual Victimization of Children Working Group.

5.    I am being paid $225.00/hour.

6.    I have been asked by the Department of Justice to review and respond to the conclusions in the Report of Daniel Linz, PhD., based on my research about the extent and characteristics of child pornography.
- Dr. Linz states that the quantity of pornography that depicts persons who are not obviously adults is very small compared to the quantity that depicts persons who are obviously adults (page 6, #4).   I disagree.   A considerable amount of child pornography involves teenagers, and it can be difficult to distinguish teens ages 17 and younger from 18 and 19 year olds, who are legally adults.
- Dr. Linz concludes that child pornography makes up an insubstantial portion of the commercial pornography market and that peer-to-peer networks contain an insubstantial amount of child pornography (page 5, #11 & #12).  In my opinion, he is minimizing the amount of child pornography that is available online and the problems related to it.
- Dr. Linz implies that only pedophiles are interested in child pornography (page 7, #4), but research shows that other groups are interested in pictures of underage teens.

- Dr. Linz concludes that since most child pornography is transferred through P2P networks, the record keeping requirements for commercial adult pornography websites are too burdensome (page 5, #11). However, this conclusion is flawed. Child pornography is trafficked through a variety of online venues and law enforcement has limited resources. In my opinion, age verification requirements protect minors by requiring a high degree of vigilance by legal producers of sexually explicit material.

**Child pornography depicts teens younger than 18, and it can be difficult to distinguish teens from adults.**

1.      It is not correct to conclude that most child pornography involves prepubescent children who could not be confused with adults. We have consistently found that the majority of persons arrested for possessing child pornography have images of both younger children and teens. Research we conducted between 2000 and 2009 found that at least two-thirds of suspects arrested for possession of child pornography had images of children ages 13 to 17[1, 2].

2.      In addition, when we examined arrests for child pornography production we found that the biggest area of growth was in images of teenagers ages 13 to 17 [3, 4]. The percent of arrests involving teen victims increased from 47% in 2000 to 70% in 2009, while the number of arrests for technology-facilitated child pornography production increased from an estimated 402 in 2000 to 1,910 in 2009. Thirty-nine percent of 2009 arrests were of adults who solicited adolescents to take pictures of themselves, and those pictures constituted child pornography. Further, the Child Victim Identification Program operated by NCMEC found that 56% of victims pictured in child pornography and identified through their program were pubescent when images were created (http://www.missingkids.com/en_US/documents/Legal_AmicusBriefMonzel.pdf).

3.      In child pornography possession cases, prosecutors must charge defendants with possessing specific images. Prosecutors usually do not charge defendants with all of the images they are found with, but rather select a certain number based on specific criteria [5]. The burden is on the prosecution to prove the images that are charged meet legal definitions of child pornography, including that the child depicted is younger than 18. Prosecutors often prefer to charge images that show prepubescent children because it is apparent those victims meet the age criterion. Prosecuting pictures of teens can be more difficult; it may not be possible to distinguish a physically mature 14 or 15 year old from an 18 year old. In some cases, prosecutors use expert testimony from medical professionals, but often they simply choose not to charge ambiguous images since child pornography depicting much younger children is usually also available.

4.      Further, the age of a person depicted in a photograph cannot be determined solely based on apparent sexual maturity because some sexual characteristics, such as the presence of pubic hair, can be manipulated. Because of this, an older adolescent or adult can look younger in an image and younger individuals can look older [6]. While Dr. Linz states that "the vast majority of pornographic material in the commercial domain involves persons that any law officer would conclude is an adult" (page 6, #3), he cites no meaningful support for this conclusion. Instead, he appears to rely on calculations based on the numbers of results from a Google search for "teen

porn" versus "porn" to measure the quantity of pornography depicting "older adolescents" (page 6, #2). He fails to define "older adolescents," which could include minors younger than 18, or to establish what kind of images are found with such a search. As I explained above, teenagers under 18 make up a significant proportion of the young people who are victimized by child pornography. Because physically mature minors cannot be easily distinguished from adults, in my opinion age verification requirements protect minors by insuring that producers of legal material do not rely on appearance to assure that performers are of legal age. Age verification requirements also protect the adult pornography industry, which can assure customers that images are legal when age verification laws are followed.

**Child pornography is a substantial problem.**

1.     The 2010 National Strategy for Child Exploitation Prevention and Interdiction referred to by Dr. Linz (page 5, #8) presents evidence in its report to Congress that child pornography harms the children and adolescents who are pictured in the images, that it is proliferating, that producers and distributors are becoming more sophisticated and that organized crime is involved [7].

2.     The 2010 National Strategy report also notes that it is very difficult to measure the quantity of child pornography that is available online. However, there are three sources of data that provide a sense of the scope of the problem. Using a limited "watch list" of about 120,000 unique known child pornography files, law enforcement software called "RoundUp" observed approximately 9.8 million U.S. IP addresses sharing copies of these 120,000 files on the Gnutella peer-to-peer network between October 2008 and October 2009 [7].

3.     In 2011, the National Center for Missing & Exploited Children (NCMEC) screened 17.3 million electronic child pornography files seized by law enforcement agencies from across the U.S. as part of their Child Victim Identification Program. (http://www.missingkids.com/CVIP). Since 2002 they have screened 80 million images (http://www.missingkids.com/Exploitation).

4.     In 2012 the Internet Watch Foundation (IWF), responding to reports from the public, located 9,550 web pages that contained child pornography, hosted on 1,516 domains [8]. Of the 9,550 web pages, 2,587 appeared on commercial websites that required a financial transaction.

5.     Dr. Linz suggests that most child pornography is made by those who know the victims ("homemade"), and therefore does not appear in a commercial context (page 2, #3 & #4). His attempt to create a dichotomy between "homemade" and "commercial" child pornography distribution is based on a 20 year old report (Lanning, 1992), which describes child pornography as "primarily a cottage industry run by pedophiles and child molesters." This is an outdated pre-Internet description. Images are no longer "smuggled in" from foreign countries. Nowadays, child pornography is a global phenomenon with images distributed online, including commercial distribution.

6.     A 2011 IWF report also notes that, in some cases, what appear to be legitimate websites hosting adult content have been found also to host child pornography, although there was no evidence that such practices have been traced to U.S. servers. The IWF report states:

"Our Hotline analysts … have discovered that a cluster of commercial (and some non-commercial) sites can only be accessed via a predetermined 'digital path'. These 'disguised websites' therefore present different content based on the route the user takes. When the URL is loaded directly into a browser, the page that loads usually contains legal adult content. However, if the same website is accessed via a particular gateway (referrer), the site displays child sexual abuse images. This is a legitimate web development technique, commonly used, for example, on shopping websites which remember who you are when you return. … There are several reasons why this method of 'disguising' the criminal content is used. Firstly it masks the criminal website from those who have not followed the correct digital path. Secondly, it means that a commercial child sexual abuse business may be able to acquire legitimate business services, such as banking services, if the website appears to host legal content when directly accessed – essentially tricking companies into providing their services for what is actually a criminal enterprise. … This is an emerging trend and as yet, these sites have not been encountered on UK servers. Our analysts noted the use of this technique on 579 occasions during 2011." (http://www.iwf.org.uk/resources/trends#Back3)

7.     Dr. Linz also attempts in his report to quantify the amount of child pornography versus adult pornography on the internet. Dr. Linz's method for assessing the amount of child pornography and adult pornography is flawed. Currently, it is not possible to reasonably estimate the quantity of commercial versus non-commercial child pornography circulating on the Internet or the ratio of child pornography to pornography featuring adults. There appear to be vast amounts of both types of materials accessible online.

8.     There is also no way to know whether or how the results of Google searches for child pornography and associated terms are related to the actual quantity of child pornography images. Google policies clearly state that it has a zero tolerance policy toward such material (http://www.google.com/sites/help/intl/en/program_policy.html). As Dr. Linz noted, Google searches for child pornography mostly found articles on the subject and did not locate any images.

9.     To quantify how much child pornography is available online, first one would have to determine all the places where child pornography can be found. This includes numerous online venues, including peer-to-peer file sharing networks; email, instant message and chat sites; social networking sites; image hosting and storage sites; commercial, temporary and other websites; forums, image boards and blogs.

10.     Second, the images that are circulated in each venue would have to be identified as child pornography and counted. This would require classifying unknowable but probably vast numbers of images. As noted above, between 2002 and 2012, the National Center for Missing & Exploited Children (NCMEC) screened more than 80 million electronic child pornography files seized by law enforcement, attempting to identify the children and adolescents pictured in the images. (http://www.missingkids.com/Exploitation). This number does not represent unique images; it would have included many copies. However, the 80 million images submitted to

NCMEC by law enforcement probably represent a very small percentage of the child pornography that can be found online.

11.     Finally, even if these problems could be overcome, for example by devising sampling procedures, the numbers and content of electronic child pornography files change constantly, as do the online venues where they are trafficked. Photographs are copied and modified. Videos are divided into frames or spliced into other video files. Images circulated on one peer-to-peer network are introduced into another. Images of new victims appear. Peer-to-peer network users abandon older networks and move to new ones. People who stored images on hard drives or flash drives move to cloud storage. No parts of the system are static.

12.     In my opinion, comparing the amount of child pornography to the amount of legal pornography featuring adults is not relevant to the issues in this case. The results of Google searches, as used by Dr. Linz, bear no relationship to any measure of the quantity of online child pornography. Rather, the point is that child pornography is a serious crime problem, and a large one. It has commercial aspects and there is evidence that it is entwined, to some degree, with the adult pornography industry. Age verification requirements help draw clear lines between legal and illegal activity.

**Sexual interests of child pornography viewers**

1.     Pedophiles, who are sexually interested in pre-pubescent children, are not the only viewers of child pornography. Seto (2006) found that while 61% of a sample of child pornography offenders showed a pedophilic pattern of sexual arousal during clinical testing, 39% did not [9]. Further, a study that examined queries for child pornography files in a peer-to-peer network found that the median age searched for was 13 years old. About 53% of searches were for ages 13 to 17. The age most commonly searched for was 14 years old (18%). This indicates that many child pornography viewers are specifically interested in child pornography that depicts underage teenagers. There is certainly a segment of the sex offender population that targets this group. Research suggests that about one-quarter of reports of sexual offenses against minors involve statutory rape (i.e., illegal sexual activity with adolescents below the age of consent, which is 16 in most states) [10].

2.     More importantly, as noted above, when we examined arrests for child pornography production we found that the biggest area of growth was in images of teenagers ages 13 to 17. Data from our NJOV-3 Study showed that more than two-thirds of 2009 arrests for child pornography production involved 13 to 17 year old teenagers.

**Circulation of child pornography**

1     Dr. Linz concludes that age verification requirements overburden commercial producers of legal adult pornography because child pornography is an insubstantial part of the overall commercial pornography market, and most is transferred through peer-to-peer (P2P) networks (page 5, #11). It is true that P2P networks are probably the biggest sources for public access to child pornography and that the amount of child pornography found on such networks probably exceeds that which can be obtained from commercial sources. My belief is based on the sheer

size of P2P file sharing networks, which span the globe and have millions of users.  However, the amount of child pornography distributed online through other sources is unknown.

2.      Dr. Linz states that "child pornography is a very insubstantial portion of [the] overall commercial pornography market" and that "[w]ell over 99 percent of material in this market is clearly identifiable as adult pornography."  However, it is not clear where these conclusions come from.  As noted above, there are no accurate estimates of the amount of child pornography that can be found through either commercial or non-commercial sources.  According to the IWF, "Each of the [commercial] websites is a gateway to hundreds or even thousands of individual images      or      videos      of      children      being      sexually      abused." (http://www.iwf.org.uk/resources/trends#Back3).

3.      The 2010 National Strategy for Child Exploitation Prevention and Interdiction Report to Congress makes it clear that child pornography is trafficked online through a variety of venues, including email, chat, IRC, websites and other applications (page 13).  Popular forms of communication like Facebook, Twitter, Instagram, imageboards, streaming video, private forums, image sharing services and reddit can also be used to transmit child pornography.  Law enforcement data captures a limited amount of the overall online child pornography trade and does not fully measure child pornography trafficking on P2P networks.  Many child pornography files are not recognized by law enforcement tools and law enforcement does not observe activity in every P2P network.

5.      In my opinion, there is a significant amount of child pornography circulating online.  Age verification requirements help to clearly designate what material is legal and reduce exploitation of minors.


/s/ Janis Wolak

## References

1.  Wolak, J., D. Finkelhor, and K.J. Mitchell, *Trends in Arrests for Child Pornography Possession: The Third National Juvenile Online Victimization Study (NJOV-3)*, 2012, Crimes against Children Research Center, University of New Hampshire: Durham, NH.

2.  Wolak, J., *[Characteristics of child pornography cases with arrested offenders]. Unpublished raw data.*, 2009.

3.  Wolak, J., et al., *Arrests for Child Pornography Production: Data at Two Time Points From a National Sample of U.S. Law Enforcement Agencies.* Child Maltreatment, 2011. **16**(3): p. 184-195.

4.  Wolak, J., D. Finkelhor, and K.J. Mitchell, *Trends in Arrests for Child Pornography Production: The Third National Juvenile Online Victimization Study (NJOV-3)*, 2012, Crimes against Children Research Center: Durham, NH.

5.  Walsh, W., J. Wolak, and D. Finkelhor *Prosecution Dilemmas and Challenges for Child Pornography Crimes: Third National Juvenile Online Victimization Study (NJOV-3).* 2013.

6.  Cooper, S.W., *The Medical Analysis of Child Sexual Abuse Images.* Journal of Child Sexual Abuse, 2011. **20**(6): p. 631-642.

7.  Justice, U.S.D.o., *The National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress*, 2010: Washington DC.

8.  Internet Watch Foundation *Internet Watch Foundation Annual and Charity Report 2012*. 2013.

9.  Seto, M.C., J.M. Cantor, and R. Blanchard, *Child pornography offenses are a valid diagnostic indicator of pedophilia.* Journal of Abnormal Psychology, 2006. **115**(3): p. 610-615.

10. Troup-Leasure, K. and H.N. Snyder, *Statutory rape known to law enforcement.* Juvenile Justice Bulletin, 2005(August).

# Linz Exhibit 6

# EMPIRICAL OVERBREADTH

## By Geoffrey McGovern[1] and Jonathan S. Krasno[2]

*Abstract: The Supreme Court's inability to define substantial overbreadth reveals conceptual flaws in a core component of First Amendment law. We argue for a new approach to overbreadth that takes cognizance of the empirical nature of the question. The article advances overbreadth scholarship by articulating a means—both empirically plausible and theoretically valid—for applying the overbreadth doctrine in a more routine, measurable, and administrable fashion. In Part I we derive three doctrinally supported measures of statutory imprecision. We establish that only one closely comports with First Amendment goals, is stable in different test scenarios, and provides a substantive measure of statutory sweep. In Part II we empirically examine measurement's central role in a landmark overbreadth case,* McConnell v. F.E.C., *showcasing the pressing need for a definitive standard for measuring overbreadth. Our preferred metric remedies the Court's repeated errors by more clearly providing guidance to lower courts and litigants, while closely tracking the overbreadth doctrine's important First Amendment goals.*

## Introduction

How much overbreadth is too much? More than seventy years of doctrine has failed adequately to answer the question.[3] Jurists and scholars agree: despite attempts at "making sense of overbreadth,"[4] the standard remains "erratic and confusing,"[5] "not readily reduced to an exact definition,"[6] and presents a prophylactic rule that "functions somewhat crudely."[7] Because the doctrine is of central importance to the zealous defense of free expression—a matter "of transcendent value to all society,"[8] attacks against which are of "extraordinary constitutional concern"[9]—the Court's fumbled administration of overbreadth's "strong medicine"[10] raises chilling concerns about the health of free speech jurisprudence.

Why has a standard for overbreadth been so elusive? There are two reasons. First, the matter of thresholds is inherently subjective; the question of how much is too much depends on

---

[1] J.D., Harvard Law School (2005). Ph.D. Candidate, Department of Political Science, Binghamton University—State University of New York.

[2] Associate Professor, Department of Political Science, Binghamton University—State University of New York. Professor Krasno was an expert witness for the State of Missouri in Nixon v. Shrink Missouri Government PAC, 528 U.S. 377 (2000); and for the Federal Election Commission in both F.E.C. v. Colorado Republican Federal Campaign Committee, 533 U.S. 431 (2001), and McConnell v. Federal Election Commission, 540 U.S. 93 (2003). The authors would like to thank the following for their comments on earlier versions of this article: Judge Lynn Adelman, and Professors Richard Hasen, Michael Dimino, Sr., Mary E. Basile, and Wendy Martinek  All errors are ours.

[3] The doctrine first appears in Thornhill v. Alabama, 310 U.S. 88 (1940). This article deals only with overbreadth as applied to First Amendment cases, and not, *per se*, with the federal courts law of overbreadth. For a review of the latter, see Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 YALE L.J. 853 (1991).

[4] Fallon, *supra* note 3.

[5] Henry Paul Monaghan, *Overbreadth*, 1 SUP. CT. REV. 1, 2 (1981).

[6] Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984).

[7] Fallon, *supra* note 3, at 885.

[8] Dombrowski v. Pfister, 380 U.S. 479, 486 (1965).

[9] Fallon, *supra* note 3, at 884.

[10] *See, e.g.,* Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973); Osborne v. Ohio, 110 S. Ct. 1691 (1990); Martin H. Redish, *The Warren Court, the Burger Court and the First Amendment Overbreadth Doctrine*, 78 NW. U. L.REV. 1031, 1040 (1984).

Electronic copy available at: http://ssrn.com/abstract=1032341

the issue at hand. No one would argue for a single standard that applies equally well to regulations of child pornography, campaign financing, and leafleting in airports. The second reason is what we present below: the outright conceptual confusion surrounding the meaning of overbreadth, a development that is neither inevitable nor desirable. The extent of this confusion becomes evident when we assume that overbreadth is a theoretically measurable construct (even if the appropriate data are unobservable) and we apply a social scientific approach to its measurement. In short, to specify fully a standard for substantial overbreadth requires articulation of a threshold—below which a statute survives and beyond which it falls to a constitutional challenge—*and* clarification of a predicate metric for measuring the simple degree to which a statute is overbroad. The Court has provided neither.

We endeavor to provide the latter. In arguing for a new approach to overbreadth, we advance a method for applying the overbreadth doctrine in a more routine, measurable, and administrable fashion. We derive three doctrinally supported measurements of statutory imprecision, establish that only one closely comports with First Amendment goals, and reference the other metrics' misuse in key overbreadth cases.

To provide substance for our theoretical argument, we studied the role of measurement in the landmark campaign finance decision *McConnell v. Federal Election Commission*,[11] a decision revisited in the October 2006 term in *F.E.C. v. Wisconsin Right to Life Committee, Inc.*[12] *McConnell* provides an excellent case study that demonstrates how measurement is a lynchpin, but unresolved, overbreadth issue. We selected *McConnell* as our subject because of the availability of extensive empirical evidence on campaign advertisements, and because one author (Krasno) created one of the "key studies"[13] cited as essential to the Court's decision. Using the most extensive dataset to date on campaign finance we demonstrate the gross variability associated with our different measurements—a variability exploited by the litigants. The conclusions from the empirical review exacerbate the need for guidance in measuring overbreadth.[14]

Part I of this article advances the overbreadth literature by creating three alternative measurements of statutory imprecision, each of which can be found in the overbreadth doctrine. We run each metric through a series of test scenarios and demonstrate that only one comports with overbreadth doctrine goals while maintaining conceptual stability. Equipped with this valid measurement, Part II incorporates our empirical research. Here we both describe the data on campaign advertisements during the 1998 congressional and 2000 presidential elections, and calculate overbreadth using all three measurements in order to demonstrate the significant differences that each measurement produces. We conclude with a sober review of empirical limits (including a few words on the availability of data), but recapitulate the need for clearer

---

[11] 540 U.S. 93 (2003).

[12] 127 S. Ct. 2652 (2007).

[13] *Id* at 12. *See also* JONATHAN S. KRASNO & DANIEL E. SELTZ, BUYING TIME: TELEVISION ADVERTISING IN THE 1998 CONGRESSIONAL ELECTIONS (2000); McConnell v. F.E.C., *supra* note 11, at 146, 155, and 206, as well as n.18, n.23, and n. 77.

[14] We do not employ statistical methods more sophisticated than ratios. For readers looking for a refresher in descriptive statistics, see HUBERT M. BLALOCK, SOCIAL STATISTICS (1970). For a more in-depth analysis using these data, see KRASNO & SELTZ, *supra* note 13. We also recommend, for a scathing critique of empiricism as practiced in law review articles as well as for a meditation on measurement issues, Lee Epstein and Gary King, *The Rules of Inference*, 69 CHI. L.REV. 1, 85 (2002)("As a rule, then, human judgment should be removed as much as possible from measurement or, when judgment is necessary, the rules underlying the judgments should be clarified enough to make them wholly transparent to other researchers").

2

Electronic copy available at: http://ssrn.com/abstract=1032341

doctrinal guidance in measuring substantial overbreadth.

## I. Measuring Substantial Overbreadth

Overbreadth history and the doctrinal development have been artfully described elsewhere, so we will not defile those analyses in a piecemeal reproduction.[15]  Suffice it to say that overbreadth, according to Justice O'Connor, "is a judicially created doctrine designed to prevent the chilling of protected expression."[16]  In its most raw form the overbreadth doctrine prohibits "a governmental purpose to control or prevent activities constitutionally subject [to] regulation…by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms."[17]  The obvious concern is the degree of statutory imprecision with respect to constitutionally protected speech.

When we refer to the overbreadth doctrine, however, we really mean the substantial overbreadth doctrine.[18]  By way of introduction to the substantiality problem, consider the biblical account of Sodom's destruction.[19]  In the story, Abraham bargains with God in hopes of saving the ancient city, asking him to spare Sodom should a decreasing number of righteous citizens be found there.  In other words, Abraham wants to know how much collateral damage is too much.  The passage contains two elements that will be crucial to understanding and

---

[15] We will, from time to time, cite particularly relevant cases and arguments.  However, for a more comprehensive overview of judicial approaches to overbreadth, see Fallon, *supra* note 3, Monaghan, *supra* note 5, Redish, *supra* note 10, and Richard L. Hasen, *Measuring Overbreadth: Using Empirical Evidence to Determine the Constitutionality of Campaign Finance Laws Targeting Sham Issue Advocacy*, 85 Mn. L.Rev. 1773 (2002).

[16] Massachusetts v. Oakes, 491 U.S. 476, 584 (1989).

[17] N.A.A.C.P. v. Alabama, 377 U.S. 288, 376 (1964).

[18] *See* Broadrick v. Oklahoma, 413 U.S. 601 (1973).  *Broadrick* is the first case wherein the Court announces the new substantial overbreadth doctrine.  Previously, the Court had announced only two overbreadth decisions, but had never specified a prohibitive degree of overbreadth.  *See, e.g.,* Thornhill v. Alabama, 310 U.S. 88, 104 (1940)(holding an anti-picketing statute unconstitutionally overbroad because it prohibited "nearly every practicable, effective means whereby those interested—including the employees directly affected—may enlighten the public on the nature and causes of a labor dispute"); and Dombrowski v. Pfister, 380 U.S. 479 (1965)(relaxing the general prohibition on third party standing).

[19] Genesis 18:23-32 reads in pertinent part:

And Abraham drew near and said, Wilt thou also destroy the righteous with the wicked?  Peradventure there be fifty righteous within the city: wilt thou also destroy and not spare the place for the fifty righteous that are therein?  That be far from thee to do after this manner, to slay the righteous with the wicked: and that the righteous should be as the wicked, that be far from thee: Shall not the Judge of all the earth do right?  And the Lord said, If I find in Sodom fifty righteous within the city, then I will spare all the place for their sakes.

And Abraham answered and said, Behold now, I have taken upon me to speak unto the Lord, which am but dust and ashes: Peradventure there shall lack five of the fifty righteous: wilt thou destroy all the city for lack of five?  And he said, If I find there forty and five, I will not destroy it.  And he spake unto him yet again, and said, Peradventure there shall be forty found there.  And he said, I will not do it for forty's sake.  And he said unto him, Oh let not the Lord be angry, and I will speak: Peradventure there shall thirty be found there.  And he said, I will not do it, if I find thirty there.  And he said, Behold now, I have taken upon me to speak unto the Lord: Peradventure there shall be twenty found there.  And he said, I will not destroy it for twenty's sake.

And he said, Oh let not the Lord be angry, and I will speak yet but this once: Peradventure ten shall be found there.  And he said, I will not destroy it for ten's sake.

Alexander Volokh, *n Guilty Men*, 146 U. Penn. L.Rev. 173 (1997).  Per Volokh's citation, "All biblical quotations are from the King James Version (Meridian 1974), unless otherwise noted."

eventually measuring the degree of statutory imprecision.[20]  First, the verses reveal a system of classification and prescription.  The righteous and the wicked are identified and, implicitly, the punishment befits only those in the latter category.  This classification enables a basic measurement: a count of collateral damage by summing the number of righteous that would unintentionally perish.  If the punishment affects even one member of the righteous, then the judgment is, *per se*, imprecise.  This does not mean, however, that the judgment is substantially, that is, prohibitively imprecise.  That determination is the province of the second key element of the passage: the rough articulation of a threshold level of substantial imprecision.  Fifty innocents smitten by divine decree is too many; likewise forty, thirty, even ten.  One gets a sense from the passage that the tolerance for imprecision—the willingness to condemn the righteous in pursuit of retribution against the wicked—is low.[21]  Even a dozen righteous residents would have saved the whole lot in Sodom.

Similar concerns appear in the First Amendment overbreadth doctrine.  According to one commentary, "Overbreadth may be conceptualized as legislative failure to focus explicitly and narrowly on social harms which are the valid concern of government and are the justification for interfering with expressive activities."[22]  This first-cut analysis gets the aspiration correct, but mere concern over imprecise legislative pens fails to instruct judges in how to translate the proscriptions into legal policy.  Legal scholars, like Abraham, are left pondering the substantiality problem.

To answer the question, one needs a way to gauge overbreadth.  Our goal, the first of its kind in the literature, is to find a metric that logically measures overbreadth (as opposed to some other form of statutory imprecision, such as regulatory inefficiency) and provides judges with a practical framework for assessing statutory language.  Below, we examine three ways empirically to measure statutory imprecision.  All three metrics find support in the doctrine,[23] but we conclude only one method is acceptable for measuring substantial overbreadth.  In the course of our argument we demonstrate why the other metrics are either analytically weak, or measuring a characteristic that is distinct from overbreadth and, though useful in its own right, constitutionally troublesome when used as a defense against sweeping statutory language.

Any analysis of statutory precision when regulating speech involves two types of utterances: those protected by the First Amendment, and those unprotected that a legislature seeks to restrict or control in some fashion.  For regulators the challenge is to regulate as many of the second group as possible while inadvertently netting as few of the first.  This scenario is represented graphically in Figure One, below, where a somewhat intermingled field of constitutionally protected and unprotected utterances, denoted by "p" and "u," respectively, is bisected by a diagonal line depicting the definitional boundary of a statute.  Utterances to the left of the line are untouched by the policy; utterances to the right of the line are subject to some form of restriction.  Since few regulatory regimes manage perfect precision, a number of u's located left of the line manage to avoid the statute's reach.  More important for our discussion of overbreadth, however, in our field of ten p's and ten u's, two p's lie right of the line and thus are subject to regulation.

---

[20] We use the term *imprecision* rather than overbreadth in this case because, as we argue in the subsequent discussion, imprecision can take one of two forms: overbreadth and inefficiency.

[21] Alas, the judgmental overbreadth was not substantial, as Genesis 19:24-5 tells of the destruction of Sodom through brimstone and fire.

[22] Note: *The First Amendment Overbreadth Doctrine*, 83 HARV. L.REV. 844, 859 (1970).

[23] We have relegated most of the doctrinal analysis to the footnotes, choosing to organize this section based on the metrics.

Figure One: A Graphic Representation of Overbreadth—A Generic Case



The question for courts is whether this degree of imprecision rises to the level of substantial overbreadth. The Court has suggested at least three ways to consider that question; from those suggestions we have created three metrics. The most direct and simple measure, a concept we call *absolute imprecision*, focuses only on a count of the individual instances of constitutionally protected utterances falling victim to imprecise statutory language.[24] To produce an absolute imprecision measurement, simply sum the number of protected, yet regulated utterances. In Figure One, the absolute imprecision measurement is two; if there were seven p's to the right of the dividing line, the measurement would be seven. Once this count is made, courts must decide whether two (or seven) is substantial. Although the absolute count gives us a very precise measurement, the conceptual tractability is relatively low. Obviously, without more context this absolute count does little to clarify the issues in a substantial overbreadth challenge.

Context will determine the type of information presented in the alternative measurements. For our purposes, context will be used in order to create two ratio measurements of statutory imprecision's relative frequency. Both of the following ratio statistics are measuring statutory imprecision, but only one of them is measuring overbreadth. These ratios improve on the absolute imprecision measurement by providing a reference point against which the absolute imprecision count can be judged.[25] In the doctrine these more nuanced measurements are incorrectly conflated into a single concept.[26] Therein lies the rub.

One of our ratio measurements assesses the number of improperly regulated utterances *in relation to all constitutionally protected utterances*. The contextual reference point (the

---

[24] Absolute imprecision appears in the case history as part and parcel of the concept of substantial overbreadth. Broadrick v. Oklahoma, *supra* note 18. *Broadrick*'s mention of an absolute standard appears in the dissent; Justice Brennan wrote, "We have never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application, and in that sense a requirement of substantial overbreadth is already implicit in the doctrine." At 630. The language of absolute imprecision is taken more directly from Justice Scalia's concurring opinion in Massachusetts v. Oakes, *supra* note 17, at 588 (1989)("a statute's unconstitutional application must be substantial, not just in an absolute sense, but 'judged in relation to the statute's plainly legitimate sweep'").

[25] In other words, the absolute imprecision count is the numerator of our two ratios. The denominators, however, are determined by the choice of referent.

[26] *See infra* note 34, and accompanying text.

denominator) is the total number of all protected utterances.  We call this measurement *sweeping overreach* because it captures the degree to which the statute invades the area of constitutionally protected speech.  Returning to Figure One, recall that there are two captured p's out of a total of ten p's.  The ratio of improperly regulated p's in relation to all p's is thus two to ten, meaning that our hypothetical statute regulates twenty percent of all constitutionally protected speech.[27] That statistic adds an important new piece of information, namely that the vast majority of protected utterances are untouched by this regulation.  Although this still leaves the courts to make a judgment call—is twenty percent too much?—we can now see how deeply the statue cuts into the protected category.  This quality uniquely distinguishes sweeping overreach: it is the only metric that measures a statute's sweep in relation to potentially threatened protected speech.  Surely, this lies at the heart of First Amendment aspirations.

The second ratio measurement we consider takes into account the number of improperly regulated utterances *in relation to all regulated utterances*.  The contextual reference point (the denominator) is the total number of statutorily regulated utterances.  We call this a measurement of *regulatory efficiency*.[28]  The term efficiency is somewhat loaded; we mean only the degree to which a statute captures what it intends in relation to what it actually captures.  Remember that the goal of the legislature should be to capture only those unprotected utterances deemed worthy of regulation.  The regulatory efficiency metric directly measures this relationship.  While useful for assessing the degree to which the legislature accomplishes its goal, the regulatory efficiency measurement does not measure statutory overbreadth because it lacks a reference to the area of protected speech.

We demonstrate this regulatory efficiency measurement by returning to Figure One.  Two p's and eight u's lie to the right of the line: the proportion of constitutionally protected, but legislatively regulated, utterances to all regulated utterances is two to ten or twenty percent.[29] For our hypothetical, this regulatory efficiency statistic offers mild reassurance that the regulators hit the target they were aiming at; the vast majority of utterances affected by the statute is unprotected and thus legitimately subject to regulation.  Nonetheless, this metric relays little information about the degree to which the legislature has invaded the area of protected freedoms because it depends largely on how many unprotected utterances are restricted, and not on how the statue affects the protected category.[30]

To recapitulate, we have thus far created three measurements of statutory imprecision. The *absolute imprecision* measure is the broadest and least useful metric, a blunt instrument that provides little guidance in solving the substantiality problem because it lacks a reference point. Our two ratio statistics resolve this problem by introducing some context.  However, only one of these ratios, *sweeping overreach*, provides information about the degree to which the statute

---

[27] The ratio for sweeping overreach is constructed with the number of captured protected utterances (those p's falling to the right of our statutory boundary) as the numerator, and the number of non-captured protected utterances (those p's falling to the left of the statutory boundary) as the denominator.

[28] The ratio for regulatory efficiency is constructed with the number of captured protected utterances (those p's falling to the right of our statutory boundary) as the numerator, and the number all captured protected utterances (the sum of both p's and u's falling to the right of the statutory boundary) as the denominator.

[29] Careful readers will notice we have intentionally designed the example to produce a measure that exactly matches our measure of sweeping overreach.

[30] In other words, as the denominator increases due to the restriction of more unprotected speech, the measure will fall, even thought the percentage of captured protected utterances vis-à-vis protected utterances remains static.

"sweep[s] unnecessarily broadly and thereby invade[s] the area of protected freedoms."[31]   It accomplishes this by using the area of protected speech as its referent.  Alternatively, *regulatory efficiency* measures the degree to which the statute captures what it was designed to capture—not the degree to which it protects or invades constitutionally privileged speech.   Regulatory efficiency accomplishes this by using the area of regulated speech as its referent.

At this point the two ratio level measurements may seem like a distinction without a difference since the example in Figure One yields the same result for sweeping overreach and for regulatory efficiency.   Imagine, however, that in an effort to placate jurists by reducing the number of protected utterances affected by a regulation, legislators draft a less inclusive bill. Figure Two depicts the result: the field of p's and u's is unchanged, but the diagonal line marking the boundary of the statue shifts (from the original line, now in dashes).   The new legislation succeeds in reducing the number of p's right of the new line by one—a fifty percent drop from two to one—with a concomitant decline in the number of u's captured by the statute.

Figure Two: A Narrower Statute



Now our two ratio measures produce strikingly different results.  There are still ten p's in the figure, but we improved our measure of sweeping overreach by fifty percent: only one out of ten constitutionally protected utterances (ten percent) is improperly captured by the new regulation.  This must be a step in the right direction because we have decreased the degree of overbreadth.  But since so many u's now lie outside the sweep of the statute, the total number of affected utterances shrinks from eight in Figure One to just four (one p and three u's) in Figure Two.  The result: the regulatory efficiency ratio becomes one to four (meaning that twenty-five percent of all regulated speech is constitutionally privileged).  Though the more narrowly drawn regulation affects fewer constitutionally protected utterances (and therefore should raise less of an overbreadth concern), the regulatory efficiency measure (which dominates the Court's overbreadth decisions)[32] declares the new, narrower legislation worse than the more sweeping

---

[31] *See supra* note 17 and accompanying text.

[32] *See* Hasen, *supra* note 15, at 1782: "The key point [of *Broadrick*] appears to be that the question of substantial overbreadth involves a *comparative* effort; one looks at the proportion of overbroad applications of the statute compared to legitimate ones."  Professor Hasen suggests that might be construed as a fourth metric for imprecision: one where the denominator is not the sum of regulated p's and u's, but the number of regulated u's alone.  Using this denominator causes an even greater inflation of the regulatory efficiency measurement, exacerbating the folly of using a regulatory efficiency standard to measure overbreadth.  *See also* Redish, *supra* note 10, at 1064 ("[*Broadrick*] probably should be construed to dictate that if the majority of cases reached by statute

original.  In fact, the two measures of overbreadth move in opposite directions in response to our statute's tailoring: sweeping overreach shrinks and regulatory (in)efficiency increases.  Though the hypothetical legislature improved their statute's degree of sweeping overreach, the measure of regulatory efficiency produces an undesirable increase in imprecision from twenty percent to twenty-five percent.  Using a measure that compares protected speech in relation to the statute's legitimate sweep means that the more narrowly drawn statute is less acceptable to the First Amendment.  *Q.E.D.*

To demonstrate another antithetical but logical extension of our argument, imagine the statute in Figure One manages to escape immediate judicial review, and turns out to be stunningly successful: prosecutions cause half of all unprotected utterances to disappear, but have no effect on protected utterances.  Figure Three illustrates this situation by randomly removing half of the u's.  Once again, the sweeping overreach ratio yields the familiar twenty percent (two out of ten p's lying right of the line), but the measure of regulatory efficiency balloons to thirty-three percent (two p's out of six total utterances lying to the right of the line).  This latter figure may cause alarm, yet the underlying number of protected utterances affected by the statute—by themselves or in relation to the total number of protected utterances--remains static.[33]  If regulatory efficiency is our standard, successful legislation is doomed from the start.

Figure Three: A Successful Statute's Aftermath



The scenarios shown in Figures Two and Three make clear the fundamental difference between the concepts of sweeping overreach and regulatory efficiency.  The former is derived only from constitutionally protected utterances that are of First Amendment concern, the latter from a combination of protected and unprotected utterances captured by the statute.  Because regulatory efficiency is not grounded in concern for constitutionally protected speech, fluctuations in the number of regulated unprotected utterances will have dramatic impact on the final measurement.  While the alterations depicted in Figure Two (with its more narrowly drawn statute) and in Figure Three (with its evidence of statutory effect) are clearly desirable improvements on the original statute, the measure of regulatory efficiency becomes appreciably worse as the number of improperly affected p's declines or stays static.  This underscores the

---

does not involve protected conduct, the statute's overbreadth will not be deemed 'substantial,' even though it might be 'real.'").

[33] Likewise, if a statute scares away or chills half of the protected utterances, the measure would show an improved situation if none (or few) of the remaining p's fall right of the line.

notion that this metric (one that has doctrinal support in overbreadth cases) is best understood as a measure of a statute's efficiency, not the degree to which a statute is overly broad.

This would all be an academic exercise were it not for the Court's confusion. Strangely, both ratio measurements find support in New York v. Ferber.[34] In *Ferber,* the Court upheld a prohibition on the distribution of material depicting child sexual performances. Arguing "the rationale of Broadrick is sound and should be applied in the present context," Justice White, writing for the majority comments, "While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation."[35] Unpacking this statement requires some careful exegesis. The clear aspiration is to limit the extent of the chilling effect by striking legislation whose reach is too broad. To do this, *illegitimate regulatory reach* needs to be shortened vis-à-vis the area of protected speech. In other words, acceptable regulation would reach fewer constitutionally protected expressions, in effect safeguarding constitutionally protected speech due to the alleviation of chill. It is from this language that we derive our concept of *sweeping overreach.*

Yet two paragraphs later, in a turn of course that has confounded the substantial overbreadth doctrine ever since, Justice White writes: "We consider this the paradigmatic case of a state statute whose *legitimate reach* dwarfs its arguably impermissible applications…we seriously doubt, and it has not been suggested, that these arguably impermissible applications of the statute amount to more than a tiny fraction of the materials within the statute's reach."[36] Here, Justice White implies that chill is limited by increasing the effectiveness of the statute. It is from this language that we derive our measure of *regulatory efficiency*. It is clear from the Court's confused and confusing treatment of the core measurement issues that the substantial overbreadth doctrine rests on shaky ground. The empirical approach advocated in this article, and the adoption of the sweeping overreach standard, would help firm up the Court's stance on this constitutionally important issue.

To be clear, judges and especially policymakers may, in myriad circumstances, wish to take regulatory efficiency into account. Regulatory efficiency *is* a measure of statutory imprecision, even though it does not measure overbreadth. It may be useful to know, for instance, that 95% of utterances affected by a regulation are those actually targeted. This sort of efficiency metric will be particularly suited for measuring the degree of a statute's narrow tailoring. While interesting in its own right, narrowness of the tailoring provides only an indirect glimpse at how deeply a statute affects protected speech in an overbreadth inquiry.

To the contrary, if we are truly interested in safeguarding constitutionally protected speech via the strong medicine of substantial overbreadth, then a measure of overbreadth must focus on the proportion of constitutionally protected speech improperly regulated in relation to the population of protected utterances.[37]

---

[34] 458 U.S. 747 (1982).

[35] *Id* at 772.

[36] *Id* at 773.

[37] It is important to distinguish what this discussion of measurement has and has not accomplished. We defined a metric of sweeping overreach: a way of measuring a statute's sweep that comports with First Amendment aspirations and overbreadth doctrine goals. We also demonstrated that alternative measures—absolute imprecision and regulatory efficiency—are either unhelpful or inappropriate in an overbreadth inquiry. This is particularly important given the Court's indication that a ratio of protected to unprotected speech is the dominant—and indeed, erroneous—understanding of overbreadth. All three are measurements of statutory imprecision. But although all overbreadth is imprecision, not all imprecision is overbreadth.

## II. An Empirical Investigation of Overbreadth Using Campaign Finance Data

In Part I we derived three metrics for assessing a statute's imprecision and presented stylized representations that reveal each metric's arithmetic character in relation to First Amendment principles. Scrutiny of each metric showed that only sweeping overbreadth reveals the degree to which a statute threatens constitutionally protected speech. The analysis demonstrates that the doctrinally supported regulatory efficiency metric is inappropriate and erroneous for overbreadth analysis.

In this section, the focus moves from the theoretical and mathematically logical to the observable. We want to put some empirical flesh on the bones of Part I's arithmetical argument. Our goal is to apply the three metrics in a way that demonstrates how a choice of measurement affects the outcome of an overbreadth analysis. To do so, we marshal extensive data to show that the choice of measurement is a contentious and unresolved battleground for overbreadth cases, a weakness that is exploited by litigants, but one that can be remedied by an understanding of our measurement argument and a revised doctrinal standard.

Our subject is campaign finance, "an area of enduring First Amendment conflict,"[38] specifically the overbreadth battle for the Bipartisan Campaign Reform Act of 2002, and our goal is to apply the three overbreadth metrics to demonstrate how a choice of measurement affects the outcome of an overbreadth analysis. [39] Put differently, this section shows that the

---

We have not, however, articulated a threshold level. Recall from our introduction that an overbreadth inquiry requires both a predicate metric and a substantiality threshold level. Our measurement discussion advances the literature by providing the former. Application of the measurement to specific cases remains the province of the courts and fodder for doctrinalists. We concur with Professor Fallon that the "hard question, normatively as well as doctrinally, is how the substantiality of a statute's overbreadth ought to be gauged." *See* Fallon *supra* note 3, at 893. But we differ because we consider the gauging—we would say measuring—of overbreadth and the final determination of constitutionality or unconstitutionality are distinct issues. We patently disagree with the conclusion that a search for a "geometric proportion" necessitates and actuates "uncabined judicial speculation in areas that are, at best, on the outer fringes of the court's practical competence." *Id.* In the foregoing section we have shown the measurement concept requires no speculation; it is the application that requires empirical evidence or estimation. We believe the former to be necessarily predicate to the latter in any well-specified, and as yet unrecognized, doctrine. Stated differently, we must first determine how to measure overbreadth before actually measuring substantial overbreadth.

Having said that, however, we are in complete accord with Professor Fallon's observation that "There is no sensible substitute, at least in hard cases, for a forthright judicial balancing…[because] the question of when overbreadth is intolerably substantial has an irreducible component of policy." *Id* at 894. We, of course, agree that tough questions require principled judicial balancing. But a threshold must be determined in reference to the metric of sweeping overbreadth before any empirical overbreadth analysis—grounded in reality and not in pure speculation—can begin. Before we can determine a threshold, we must know the unit of measurement and the population of protected utterances that may potentially fall prey to overbroad legislation.

[38] Hasen, *supra* note 15, at 1773. Professor Hasen's piece is commendable for its attempt empirically to examine an overbreadth application; however, Professor Hasen uncritically accepts the measure of regulatory overbreadth that erroneously has been used by the Court, the measure that we have demonstrated provides no true measure of overbreadth.

[39] Section 201 of the Bipartisan Campaign Finance Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81, hereinafter "BCRA," sought to replace the existing definition of electioneering communications, the so-called "magic words test," with its proponents call the "bright-line test." *See* Thomas E. Mann and Norman J. Ornstein, *Reforming Campaign Finance* (Brookings Institution, Working Paper 1996); Anthony Corrado, Michael Malbin, Norman Ornstein, and Paul Taylor, *5 Ideas for Practical Campaign Reform* (League of Women Voters Education Fund, Working Paper 1996); *see also* Hasen, *supra* note 15. The magic words test derives from footnote 52 in *Buckley v. Valeo*, 424 U.S. 1, 44 (1976), where the justices, in an effort to rescue the 1974 Amendments to the

choice of measurement is an unresolved and significant battleground for overbreadth cases.

Courts rarely review extensive empirical evidence about utterances that may fall prey to overbroad legislation.[40]  The campaign finance battle is a remarkable exception to this trend. Not only have substantial data and social science methods been brought to bear on the campaign finance overbreadth question, but also all three alternative measures of statutory imprecision that we specify, above—absolute imprecision, sweeping overreach, and regulatory efficiency—played a role in the landmark decision in *McConnell v. F.E.C.*[41]  Indeed, one of the unusual features of the *McConnell* litigation, a feature that played prominently in the passage of the original bill, was the existence of fairly comprehensive data with which to assess statutory overbreadth, and the controversy over which measurement to choose.

Because one author (Krasno) was a central figure in the empirical analysis of these influential data—both at the legislative phase and as an expert witness for the defense in the *McConnell* litigation—we provide a short review of the data collection process as well as an explanation of the dataset itself.  In 1999, the Brennan Center for Justice at New York University School of Law, with a grant from the Pew Charitable Trusts,[42] purchased 1998 campaign

---

Federal Election Campaign Act (hereinafter "FECA") from vagueness about it application to non-candidates, offered some clarification:

> This construction would restrict the application of 608(e)(1) to communications containing express words of advocacy of election or defeat, such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," "reject."

Over time, lower courts have come to interpret this literally so that use of the words or phrases in footnote 52 are defining characteristic of "express advocacy" or electioneering, with at least one major exception in *F.E.C. v. Furgatch*, 807 F.2d 857 (9th Cir. 1987).  Nearly two decades passed after *Buckley* before political practitioners made extensive use of loopholes created by the magic words test; but by the mid-1990s interest groups and parties began running "issue ads" funded with soft money that usually featured harsh attacks on particular candidates.  In 1998 and 2000, the two election cycles immediately preceding BCRA's passage, parties and groups aired nearly 430,000 issue ads in 1998 and 2000 in the top seventy-five media markets, at an estimated cost of at least $290 million.  *See* Jonathan S. Krasno and Kenneth Goldstein, *The Facts about Television Advertising and the McCain-Feingold Bill*, 35 PS: POL. SCI. & POLITICS 207 (2002).   Total expenditures, however, can only be estimated because, since these activities were not counted as electioneering, they were not subject to the reporting requirements in FECA.

Congress responded in BCRA by defining electioneering via the bright line test:  electioneering ads are those mass communications that identify a federal candidate by name and appear within thirty days of the primary or sixty days of the general election in the district where he or she is running.  This would have pulled the vast majority of issue ads aired in 1998 and 2000 under FECA's umbrella, forcing ad-makers to abide by FECA restrictions on source and amount of fundraising, as well as its reporting requirements.  BCRA congressional sponsors--notably Senators McCain and Feingold, and Representatives Shays and Meehan--argued that the bright line test's combination of timing and geographic targeting would exclude nearly all genuine issue ads from the FECA's grasp, and that no advertisements would ever be absolutely prohibited (merely restricted as to their funding).

[40] The omission is further evidence that the substantial overbreadth doctrine has been aimless in its pursuit of First Amendment protections.

[41] *See supra* note 11. We do not undertake a full analysis of the campaign finance doctrine.  For an excellent review see Richard Briffault, *Issue Advocacy: Redrawing the Election/Politics Line*, 77 TEX. L.REV. 1751 (1999); Hasen, *supra* note 15; Richard L. Hasen, *The Surprisingly Complex Case for Disclosure of Contributions and Expenditures Funding Sham Issue Advocacy*, 48 UCLA L.REV. 265 (2000); Lillian BeVier, *Mandatory Disclosure, "Sham Issue Advocacy," and* Buckley v. Valeo: *A Response to Professor Hasen*, 48 UCLA L.REV. 285 (2000); Kirk L. Jowers, *Issue Advocacy: If It Cannot Be Regulated When It Is Least Valuable, It Cannot Be Regulated When It Is Most Valuable*, 50 CATH. U. L.REV. 65 (2000).

[42] Professor Krasno, who at the time worked for the Center, was author of the successful Pew grant proposal and responsible for the empirical analysis of overbreadth that culminated in the publication BUYING TIME, *supra* note 13.

advertisement tracking data for the top seventy-five media markets.[43]   The Center subsequently purchased similar data for the 2000 election.[44]   The resulting studies[45] and data were available both to Congress as it debated BCRA's passage, and to the courts as they considered BCRA's constitutionality.

The data consist of two components: a "storyboard" (a snapshot every four to five seconds of the video and a transcription of the audio), and a record of each time it aired, including the time, date, media market, and program during which it appeared), along with estimates of the cost and viewership of the airtime.[46]   The storyboards allowed coders[47] to examine and evaluate the content of each advertisement along a variety of criteria.  The type of advertisement, whether it is an issue ad or one funded by hard money, can be determined from the language of the disclaimers.[48]

Together, these two pieces provide the most complete look at political advertising ever assembled--a virtual minute-by-minute account of more than 300,000 spots aired in 1998 and 835,000 in 2000--along with a wealth of direct evidence by which to answer the key questions about overbreadth.[49]   Normally, courts are left in an empirical vacuum to speculate about the extent of overbreadth.  With *McConnell*, however, the expert witnesses could measure the precise extent of overbreadth by applying BCRA's standards to data from the previous two election cycles.  This impressive feat of empiricism presented the courts with a remarkable and rarely afforded opportunity to replace "uncabined judicial speculation"[50] about the extent of overbreadth with real-world evidence.  The courts soon found, however, that in the absence of an overbreadth metric, the battle had just begun.

To use these data and measure BCRA's overbreadth along each of these metrics, three pieces of information were needed: 1) the number of pure issue ads aired in 1998 and 2000 (or, harkening back to Figure One, the number of p's present in the data); 2) the number of issue ads that would have been affected by BCRA (*i.e.*, the total number of p's and u's regulated by the statute); and 3) the number of pure issue ads treated as electioneering ads (*i.e.*, the number of p's

---

[43] These data were purchased from the Campaign Media Analysis Group (hereinafter, "CMAG").

[44] CMAG used satellite technology to monitor broadcast television and an assortment of national cable networks in the top seventy-five (out of 210 total) media markets in 1998 and 2000.  These markets reached approximately seventy-five to eighty percent of households in the U.S.  Their system detected the seams in programs where commercials appear, took a digital snapshot of the ad or ads, and recorded the time and date of its appearance.

[45] *See, e.g.,* KRASNO & SELTZ, *supra* note 13; Krasno and Goldstein, *supra* note 36; CRAIG B. HOLMAN & LUKE P. MCLOUGHLIN, BUYING TIME: TELEVISION ADVERTISING IN THE 2000 FEDERAL ELECTIONS (2001).

[46] CMAG merged estimates of advertising costs drawn from published rate schedules and gross rating points from Nielsen data to each spot.

[47] Coders were undergraduates at the Universities of Arizona and Wisconsin—Madison, working under the direction of Professor Ken Goldstein with a coding instrument designed largely by Professor Krasno.

[48] Candidate ads contained disclaimers for their campaign committee (*e.g*., "Paid for by friends of John Smith"), and independent expenditures by groups or parties or coordinated expenditures by parties contained language that make clear what category they fall in (*e.g*., "Paid for by Citizens United without authorization by friends of John Smith").  Issue ads, by contrast, would only include the sponsoring party or group without reference to any candidate.

[49] One important finding preliminary to the questions about overbreadth involved the justification for BCRA's attempt to discard *Buckley's* magic words test.  Examination of candidates' ads, which by definition are electioneering, revealed very few (four percent in 1998 and ten percent in 2000) that used magic words.

[50] Fallon, *supra* note 37, and accompanying text.

lying to the right of the regulatory line).[51]   Using the dataset on TV advertising in the largest media markets, these figures break down as follows:[52]

|  |  | 1998 | 2000 |
|---|---|---|---|
| 1. | Number of "pure" issue ads broadcast | 11,785 | 45,001 |
| 2. | Number of issue ads regulated by BCRA | 4,847 | 60,623 |
| 3. | Absolute Overbreadth (regulated "pure" issue ads) | 713 | 1,413 |
| 4. | Regulatory Efficiency (row 3 ÷ row 2) | 14.7% | 2.3% |
| 5. | Sweeping Overreach (row 3 ÷ row 1) | 6.1% | 3.1% |

Using our three metrics of overbreadth described in Part II, BCRA overbreadth could be measured in three ways shown in rows 3 thru 5.[53]   Absolute imprecision (the number of protected ads regulated by BCRA) would have equaled 713 in 1998, and 1413 in 2000 when the volume of advertising was much higher; regulatory efficiency (the percentage of regulated ads that were protected) would have equaled 14.7% in 1998 and just 2.3% in 2000; and sweeping overreach (the percentage of protected ads improperly regulated) would have equaled 6.1% in 1998 and 3.1% in 2000.   The number that perhaps stands out most in this sequence is the measure of regulatory efficiency in 1998, 14.7%, although it is clear that from the table that the reason for its size is the number of issue ads regulated by BCRA during that year.   So, while the number of improperly regulated ads is actually larger in 2000 than in 1998, the sheer volume of advertising in the latter year drives down this ratio measure of efficiency to just 2.3% in 2000.

The *McConnell* litigants made two affirmative claims about these findings in labeling BCRA as a "wildly overbroad remedy."[54]   The first involved their effort to interpret the absolute imprecision measurement in row 3.  Plaintiffs provided some spurious context for these numbers by inflating the absolute count in proportion to the number of households viewing the

---

[51] The revised definition of electoral communications in Title II of BCRA apply to interest groups; political parties, the other major source of electioneering or sham issue ads, are dealt with elsewhere in the statute (Title I). As a result, our empirical discussion is confined to activity by groups only.

[52] We should acknowledge from the start that this table itself was the subject of considerable controversy as the plaintiffs challenged each individual entry, questioning the judgment of the coders, the alleged bias of the supervising faculty, the involvement of the Brennan Center, the validity of the coding instrument, etc.  *See, e.g.* Amended Defendant's Expert Report of Kenneth M. Goldstein; Plaintiff's Rebuttal Report of James L. Gibson; Defendant's Rebuttal Report of Jonathan S. Krasno, McConnell v. F.E.C., 251 F. Supp.2d 176 (D.D.C. 2003)(No. 02-582).   Indeed these ancient disputes over measurement resurfaced again in the recent ruling in *Wisconsin Right To Life, Inc. v. F.E.C., supra* note 12, in which the majority found that a 2006 ad, similar in some respects to ads aired by WRTL in 1998 and 2000, was miscoded (the minority withheld its endorsement of the BUYING TIME studies' methodology.   We are, apparently, more comfortable with the data and the coding of these studies than perhaps the justices were or are, especially since one of us (Krasno) helped design and oversee that process.  Either way, however, the questions about measurement have no bearing on our effort in this essay to conceptualize overbreadth and to settle on an appropriate metric with which to calculate it.   Measurement disputes are an unavoidable part of litigation as each side struggles to interpret the evidence and its relevance; our goal here is in some respects is to help define what qualifies as evidence and why.   Figures reported in the table come from expert reports of Jonathan S. Krasno and Frank J. Sorauf *infra* note 58, at 25.

[53] To clarify, the measures are hypothetical cases.   BCRA was passed in 2002.   Therefore, the measurements reveal what would have happened had BCRA been in effect during the 1998 and 2000 election cycles.

[54] Brief for Appellants Mitch McConnell et al., at 21, McConnell v. F.E.C., 540 U.S. 93 (2003)(No. 02-1674 et al.).

advertisements. By using gross ratings points[55] and population data, plaintiffs argued that the total theoretical audience for these spots reached into the millions. Were the same calculation applied to other ads–pure issue ads untouched by BCRA as well as other political ads–the pure issue ads in row 3 were a but a tiny drop in an ocean of advertising.

More important, plaintiffs also argued for the regulatory efficiency measure as the appropriate gauge of overbreadth. The results in row 4 show why as the figure of 14.7% clearly stands out. For the plaintiffs this estimate constituted compelling evidence of the statute's overreach: almost one in six of the statute's regulated utterances in 1998 was constitutionally shielded, highest value political speech.[56]

Defendants, in turn, argued for what we have described as sweeping overreach (row 5), the percentage of pure issue ads affected by BCRA in relation to the area of protected utterances. Indeed the figures in this row are reassuringly lower than 14.7%: 6.1% of pure issue ads aired in 1998 and 3.1% of pure issue ads aired in 2000 would have been regulated by BCRA. These results reveal the statute is *per se* overly broad (a point on which everyone agreed), but its magnitude far less substantial than the 14.7% figure suggests.

Thus, both sides were able in the absence of unambiguous guidance from the Court to pick overbreadth standards that offered empirical support for their core claims. From our point of view, the question of which calculation appropriately captures the essential concept of overbreadth is obviously what we label as sweeping overreach as shown in row 5. From the measurement standpoint, it offers advantages that track directly to our series of hypotheticals. Estimates of sweeping overreach are relatively stable in this instance since they are calculated as a percentage of the pure issue ads broadcast (row 1) rather than from the combination of pure and electioneering issue ads *regulated* by BCRA (row 2). In other words, its measurement is not dependent (as in Figure Three) in fluctuations of unprotected utterances, although in this case the fluctuations stemmed from the decisions of speakers rather than the effect of the statute. BCRA may be considerably more or less efficient at various times due to political circumstances like the presence of a presidential election – which accounted for a third of all regulated ads in 2000 and, of course, none at all in 1998 – or actions of political advertisers, but its sweep is far less variable. Table One confirms the claims of BCRA's sponsors that pure issue ads that both depict a candidate and appear in close proximity to an election are *relatively* rare events – that is relative to the universe of protected speech.[57] This is likely to be true for a variety of reasons. Congress usually takes breaks near elections so its members may campaign. Issue campaigns may find it inefficient to single out specific members of Congress, as opposed to asking viewers to contact "their senators."[58] It is possible that an issue may arise that sends advertisers to the

---

[55] Gross rating points is an industry term measuring the percentage of the target audience reached by an advertisement where one gross rating point equals percent of television households.

[56] *See, e.g., F.E.C. v. Wisconsin Right to Life Committee, Inc*, *supra* note 12, at 2653 (Roberts, C.J., "In drawing [the overbreadth] line, the First Amendment requires us to err on the side of protecting political speech rather than suppressing it.")

[57] *See* Krasno and Goldstein, *supra* note 42. It is also worth noting that the estimates of sweeping overreach here represent the upper boundary of BCRA's imprecision. Since BCRA would only affect ads broadcast in the thirty days before the primary and sixty days before the general election, the appropriate way to think of its sweep is to consider the population of pure issue ads aired during a federal official's entire term in office. Table One, however, only depicts a single year of advertising. If a steady stream of pure issue ads had appeared throughout, for example, a senator's six-year term the estimates in universe of pure issue ads in row 1 could be substantially higher and the resulting estimate of sweeping overbreadth in row 5 substantially lower.

[58] Jonathan S. Krasno and Frank J. Sorauf, *Evaluating the Bipartisan Campaign Reform Act*, 28 NYU REV. L. & SOC. CHANGE 163 (2003).

airwaves with a series of pure issue ads that mention candidates and that appear close to the election.  While a valid concern, nothing like that occurred in 1998 or 2000, and even the Court's recent ruling in *WRTL* does not suggest the danger of a widespread, as opposed to a singular, misapplication of BCRA.[59]

The Supreme Court ruled 5-4 in favor of the *McConnell* defendants preserving the bright-line test, although it took no explicit position on the various arguments about overbreadth measurement.[60]   Instead, the majority emphasized a variety of factors raised by BCRA's sponsors including the genesis of the magic words test and its inadequacy for distinguishing between express and issue advocacy, and the clarity of the bright-line test.  In the end, it is clear that, like BCRA's sponsors, the majority of justices was impressed that the explosion of electioneering issue ads in 1998 and 2000 was real, and posed a serious danger to reasonable financial regulations established by FECA.

We are less interested here in the fate of BCRA than in its application to the concept of overbreadth.  *McConnell v. F.E.C.* offers a series of important lessons.  First, it demonstrates that the conceptual differences between regulatory efficiency and sweeping overreach do matter in the real world, not just in the hypothetical one.  In this instance, both sides were able to choose a doctrinally-supported standard that confirmed the conclusion that they were hoping to draw.  This creates a quandary for judges as well as for policy-makers, leaving them to choose which standard is best without clear guidance from precedent.  It is probably not surprising, as a result, that the justices largely avoided overbreadth in their decisions, focusing instead on other matters.  That is far from ideal if overbreadth is a serious jurisprudential matter; at very least judges must be comfortable enough with the doctrine to be able to apply it in First Amendment litigation.  Second, the advertising data in this case confirm the sweeping overreach metric as the best measure of the degree to which the statute invades the area of constitutionally protected speech.  In contrast to the regulatory efficiency measure, which is largely driven by the volume of unprotected speech and thus varies widely from year to year, the sweeping overbreadth metric offers an unobscured view of the proportion of protected speech affected by the statute.

## Conclusions, or "*Measure Twice, Cut Once*"[61]

How much overbreadth is too much?  Unfortunately, the answer inevitably is "it depends."  It depends on the nature of the case and the type of behavior or activities at stake.  It depends, too, on the tastes of the judicial decision-makers and their tolerance for overbreadth in pursuit of various worthy goals.  These qualifiers are unavoidable.  What is avoidable is the situation where overbreadth is so poorly defined as a concept that no one – neither legislators nor judges – appears to have any consistent idea about what it means or how to analyze it.  The result

---

[59] Even this finding is heavily disputed in the dissenting opinion by Justice Souter noting that the WRTL ad referred to events that had taken place months before (leaving little reason to ask Wisconsinites to lobby Senator Feingold), that the organization was simultaneously and admittedly engaged in electioneering against Senator Feingold using hard-money donations, and that the ad in question linked to a website directly advocating Senator Feingold's defeat.  *Supra* note 12, at 2698.  Chief Justice Roberts in turn argued that this context was irrelevant to the potential viewers of the ad, and should not be considered by regulators or jurists.  *Id* at 2702.

[60] By contrast, in a divided decision, the appellate panel found the test too restrictive mostly due to the dispute about coding and measurement, but in the process upheld BCRA's back-up version of a "reasonable person" standard that had previously been ruled unworkable.  McConnell v. F.E.C., 251 F. Supp 2d 176 (2003)(D.D.C.).

[61] NORM ABRAM, MEASURE TWICE, CUT ONCE: LESSONS FROM A MASTER CARPENTER (1996).

is the worst of all possible worlds in which the vagueness of the doctrine makes its application haphazard and capricious.[62]   This gives policymakers little guidance as to how to minimize overbreadth and satisfy the Court, or even much incentive to try.  The Constitution may compel well tailored statutes, but this goal can hardly be achieved amidst such doctrinal confusion. Existing jurisprudence does little to clarify the law, instruct judicial officers in the application of the overbreadth doctrine, or reveal transcendent constitutional protections to everyday speakers.

Our focus on measurement reveals just how fundamental a problem is the Court's failure to define overbreadth doctrine by showing how various measures may--and in one watershed decision did--lead to conflicting results as to overbreadth.  In response, we have argued for a new approach to overbreadth, one that takes cognizance of the empirical nature of the question. In order to do this, the Court should announce and justify a metric or metrics for overbreadth. We maintain that what we have described here as sweeping overreach--the ratio of the number of improperly captured or chilled utterances in proportion to the estimated population of constitutionally protected speech--captures the essence of what the Constitution requires and has measurement qualities that make it clearly preferable to any alternative.  Though a scattered few justices have shown willingness to construct a geometric standard for overbreadth, their attempts have been arithmetically misguided.  We demonstrated this error in Part I.

Showing that the question of measurement is not stagnantly Euclidean, or plagued by mathematical *rigor mortis*[63] and thereby rendered irrelevant to current jurisprudential problems, we incorporated our own empirical analysis of measurement effects in the campaign finance debate.  Grumblings over measurement murkiness surfaced during the *McConnell* litigation, and the resurfacing of those elements in *Wisconsin Right to Life* suggest that there are troubles still to come.  By applying the three metrics for overbreadth derived in Part I to the real-world campaign finance data, and subsequently revealing wide disparities in the resulting measurements, this article has shown that core political and legal matters hinge on the overbreadth measurement question.

Promulgation of some sort of metric for overbreadth would also serve the purpose of encouraging policymakers and interested parties to attempt to measure it.  *McConnell v. FEC* stands apart for perhaps the most notable and precise debate about various calculations of overbreadth, but this development did not come about by accident.  Rather, several of the organizations supporting BCRA--most notably the Pew Charitable Trusts and the Brennan Center for Justice at NYU School of Law--invested considerable resources to gauge its overbreadth out of the belief that the statute was narrowly drawn.  Given an incentive to do likewise, it is possible to imagine other groups, or scholars, or lawmakers themselves might make similar efforts.  We are under no illusion that each case will easily yield data that are directly applicable to the core question.  Instead, we note a principle widely recognized by our

---

[62] Another level of capriciousness is evident in the recent *WRTL* case, *supra* note 12, in which Chief Justice Roberts avoids the question of overbreadth entirely by carefully framing his decision as relating only to a single ad that BCRA prevented WRTL from paying for with soft money.  Thus, he notes that "At the outset, we reject the contention that issue advocacy may be regulated because express election advocacy may be," a position which is only true if one ignores the central element in overbreadth doctrine, namely that some protected speech is unintentionally swept up in an effort to regulate unprotected speech.  *Id* at 2673.  Thus, the Chief Justice is wrong: the societal interest in regulating the financing of WRTL's ad via BCRA comes from the statute's success in regulating a vast number of "sham" issue ads.  Indeed, the carving out of this individual exception without any recognition of the broader statutory context imperils the central authority of *McConnell*.

[63] We borrow the phrase from Stephen M. Walt, *Rigor or Rigor Mortis?  Rational Choice and Security Studies*, 23 INT'L SECURITY 5 (1999).

brethren in the social sciences: with enough effort and ingenuity even difficult to observe phenomena may be estimated by a variety of direct and indirect means. In other words, overbreadth may be measured in at least some rudimentary fashion in some and possibly many instances--if jurists were to motivate interested parties to try.

Such efforts, spurred by specification of an overbreadth metric, would surely result in more information about its degree in various situations.  That alone, of course, would not completely answer the question of how much overbreadth is too much.  It is exceedingly unlikely, of course, that judges would ever create an overbreadth standard as precise as five percent, seven-and-a-half percent, or ten percent.  What is possible is that the existence of empirical data could allow them to converge around a range of permissible levels in reasonably enough enumerated circumstances to offer some guidance to policymakers.  The metric is a necessary first step.

To understand more fully the substantiality threshold we need to look to context.  In so saying, we find ourselves in agreement with the prior literature that describes overbreadth as a balancing act for judges.[64]   But unlike the prior literature, this article articulates a means—both empirically plausible and theoretically valid—for applying the overbreadth doctrine in a more routine, measurable, and administrable fashion.  A more rigorous approach also would give judges a clearer view of the values at stake in overbreadth cases, from the First Amendment rights under some threat, to the objectionable behavior being regulated.

Ultimately, our argument hinges on a single claim that we find unexceptional and unexceptionable: namely that overbreadth is a fundamentally empirical question.  It is natural for judges to speculate about the reach of statutes versus their expectations of behavior, but where actual data are available or could be available, speculation should take a back seat to the facts.  Even speculation is aided when the nature of the concept is defined and judges can be more precise about that which they are speculating.  Focusing on the empirics thus offers conceptual clarity as well as the chance that overbreadth analysis can be, in certain cases, grounded in the facts about human behavior.

---

[64] *See* Fallon *supra* note 3, at 894.

# Linz Exhibit 7





# Child Molesters:
# A Behavioral Analysis

## For Professionals Investigating the
## Sexual Exploitation of Children

In cooperation with the 

# Child Molesters:
# A Behavioral Analysis

## For Professionals Investigating the Sexual Exploitation of Children

### Fifth Edition
### 2010

**Kenneth V. Lanning**
**Former Supervisory Special Agent**
**Federal Bureau of Investigation (FBI)**

Copyright © 2010 National Center for Missing & Exploited Children®.
All rights reserved.

This manual is provided for informational purposes only and does not constitute legal advice or professional opinion on specific facts. Information provided in this manual may not remain current or accurate, so recipients should use this manual only as a starting point for their own independent research and analysis. If legal advice or other expert assistance is required, the services of a competent professional should be sought.

This project was supported by Grant No. 2010-MC-CX-K001 awarded by the Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice. Points of view or opinions in this document are those of the author and do not necessarily represent the official position or policies of the U.S. Department of Justice. National Center for Missing & Exploited Children®, 1-800-THE-LOST®, Child Victim Identification Program®, and CyberTipline® are registered trademarks of the National Center for Missing & Exploited Children.

child-pornography distribution has returned to the United States and is growing. Internationally the situation involves more significant profit-motivated activity. To produce the material being distributed for profit, however, children still must be sexually exploited or abused. The estimates of financial profit from commercial child pornography vary widely. It is commonly understood by law enforcement, however, that the majority of child-pornography production involves an offender who has physical access to the child being exploited in the images.

## Commercial Versus Homemade

Child pornography can be divided into two subcategories. They are **commercial** and **homemade**. The distinction between these subcategories, however, has become increasingly unclear with online production and distribution.

**Commercial** child pornography is that which is produced and intended for commercial sale. Because of strict federal and state laws today, there is no place in the United States where commercial child pornography is knowingly openly sold. What child pornography is now being commercially distributed in the United States is most often sold via the Internet. For other than Internet distribution, the risks are usually too high for the strictly commercial dealer or common criminal. Because of their sexual and personal interests, however, preferential sex offenders are more willing to take those risks. Their motive goes beyond just profit. In the United States it is primarily a cottage industry run by pedophiles and child molesters. United States' citizens seem to be major consumers for much of this material. Some offenders collect their commercial child pornography in ways (*e.g.*, photographs of pictures in magazines, pictures cut up and mounted in photo albums, names and descriptive information written below, homemade labels on commercial videotapes or DVDs, images scanned or stored into a computer) that make it appear to be homemade child pornography. If necessary highly experienced investigators and forensic laboratories could be of assistance in making distinctions between homemade and commercially produced child pornography. Making this distinction could help in evaluating whether a subject is a producer/photographer, recipient/collector, or both.

Contrary to what its name implies, the quality of homemade child pornography can be as good if not better than the quality of any commercial pornography. This is especially true with the rapidly growing use of digital technology to take and reproduce images. The pedophile has a personal interest in the product. **Homemade** simply means it was not originally produced primarily for commercial sale. Although commercial child pornography is not openly sold in "brick and mortar" stores anywhere in this country, homemade child pornography is continually produced, swapped, and traded in almost every community in the United States primarily via the Internet. Although rarely found in "adult" bookstores, child pornography is frequently found in the homes and offices, especially on the computers and digital-memory storage devices, of doctors, lawyers, teachers, clergy members, and other apparent pillars of the community. There is, however, a connection between commercial and homemade child pornography. Often homemade child pornography is sold or traded and winds up on commercial child-pornography websites or in magazines, movies, and videos. These visual images are then reproduced and circulated again and again, sometimes for profit. Many adolescent

children who took or allowed sexually explicit images of themselves to be taken are learning this the hard way.

With rapidly increasing frequency, more and more of both commercial and homemade child pornography is found in digital format on computers and digital-memory storage devices. In this format there is no loss of quality when it is reproduced. This actually increases the odds of finding child pornography in any investigation. Again the Internet has tended to blur the distinction between commercial and homemade child pornography.

### Technical Versus Simulated

In understanding the nature of child pornography, investigators must also recognize the distinction between **technical** and **simulated** child pornography. As previously stated the federal, child-pornography law (18 U.S.C. § 2256) defines a child or **minor** as anyone younger than the age of 18; therefore a sexually explicit photograph of a pubescent, mature looking 15-, 16-, or 17-year-old girl or boy is what I call **technical** child pornography. Technical child pornography does not look like child pornography, but it is. The production; distribution; and, in some cases, the possession of this child pornography could and should be investigated under appropriate child-pornography statutes. Technical child pornography is an exception to much of what we say about child pornography. It often is produced, distributed, and consumed by individuals who are not child molesters or pedophiles; is more openly sold in stores and distributed around the United States; and more often portrays girls than boys. In essence, because it looks like adult pornography, it is more like adult pornography. Also, like adult pornography or obscenity, it is often not prosecuted because of legal difficulties and personal beliefs.

On the other hand, sexually explicit photographs of 18-year-old or older males or females may not legally be child pornography, but, if the person portrayed in such material is young looking, dressed youthfully, or made up to look young, the material could be of interest to pedophiles. This is what I call **simulated** child pornography. Simulated child pornography looks like child pornography, but it is not. It is designed to appeal to those with a sexual interest in children but it usually is not legally child pornography because the individuals portrayed are older than 18. As will be discussed later, some individuals want **simulated** child pornography to legally be child pornography.

Simulated child pornography illustrates the importance and sometimes the difficulty in proving the age of the child in the photographs or videotapes. Particularly difficult is pornography portraying underage children pretending to be overage models pretending to be underage children and "virtual" child pornography created with computer software that does not involve the depiction of actual children. The ability to manipulate digital visual images with a computer can make it more difficult to determine the ages of the people in them.

Computer-manipulated and computer-generated visual images of individuals who appear to be, but are not, children engaging in sexually explicit conduct may call into question the basis for highly restrictive (*i.e.*, possessing, accessing, advertising) child-pornography laws. In an attempt to address this problem, Public Law No. 104-208, known as the Child Pornography Prevention Act (CPPA) of 1996

The offender accepts his word and then proceeds to send child pornography and make incriminating statements. Although their brains may tell them not to send child pornography or reveal details of past or planned criminal acts to someone they have not met in person, their need for validation often compels them to do so. They believe what they need to believe.

Some of the theme pornography and erotica collected by sex offenders is saved as a souvenir or trophy of the relationships with victims. All child victims will grow up and become sexually unattractive to the pedophile. In a photograph, however, a 9-year-old child stays young forever. This is one reason why many pedophiles date and label their pictures and video images of children. Images and personal items become trophies and souvenirs of their relationships – real or fantasized.

The offenders' needs to validate their behavior and have souvenirs of their relationships are the motivations most overlooked by investigators when evaluating the significance of the pornography and erotica collections of pedophiles and other preferential sex offenders.

## Use of Collection

Although the reasons sex offenders collect pornography and erotica are conjecture, we can be more certain as to how this material is used. Study and law-enforcement investigations have identified certain criminal uses of the material by offenders.

Child pornography and erotica are used for the **sexual arousal** and gratification of offenders. They use child pornography the same way other people use adult pornography – to feed sexual fantasies. Some offenders only collect and fantasize about the material without acting out the fantasies, but for others the arousal and fantasy fueled by the pornography is only a prelude to actual sexual activity with children. All sexual fantasies are not acted out, but to suggest regular, repeated, time-consuming sexual fantasies accompanied by masturbation have nothing to do with behavior is absurd.

A second use of child pornography and erotica is to **lower children's inhibitions**. A child who is reluctant to engage in sexual activity with an adult or pose for sexually explicit photographs can sometimes be convinced by viewing other children having "fun" participating in the activity. Peer pressure can have a tremendous effect on children. If other children are involved, the child might be led to believe the activity is acceptable. Adolescent children seem to be increasingly taking or allowing to be taken sexually explicit images of themselves and then sending or posting them online. When an offender uses child pornography to lower a child's inhibitions he will select images that depict children having or appearing to be having a good time participating in their sexual exploitation.

Books about human sexuality, sex education, and sex manuals are also used to lower inhibitions. Children accept what they see in books, and many pedophiles have used sex education books to prove to children such sexual behavior is acceptable. Adult pornography is also used, particularly with adolescent boy victims, to arouse them or lower inhibitions.

A third major use of child pornography and erotica collections is **blackmail**. If an offender already has a relationship with a child, seducing the child into sexual activity is only part of the plan. The offender must also ensure the child keeps the

many ways, however, the offenders utilizing computers and the Internet to facilitate their sexual exploitation of children are more like the "nice-guy" acquaintances who groom the children inside the schoolhouse rather than the "predatory strangers" who lure them outside on the schoolyard.

Many individuals with a sexual interest in children appear to be drawn to computers and the Internet because the technology provides them with added convenience and perceived anonymity, another method of access to children, an easier way to obtain and exchange child pornography, and the most effective method ever invented to locate and communicate with others who share and will validate these interests.

Some may wonder why a discussion of acquaintance molesters would include a section about the use of computers. A "friend" with whom a child regularly communicates with on the Internet, but sees for the first time only when they finally meet in person, should be viewed as an acquaintance offender, not a "stranger." Like most acquaintance molesters, individuals attempting to sexually exploit children through the use of computer online services or the Internet tend to gradually seduce their targets through the use of attention, affection, kindness, and gifts. They are often willing to devote time, money, and energy to this process. They will listen to and empathize with the problems of children. They may be aware of the music, hobbies, and interests of children. Unless the victims are already engaged in sexually explicit computer conversations and activity, offenders will usually lower any inhibitions by gradually introducing the sexual context and content. Some offenders use the computer primarily to collect and trade child pornography, while others also seek online contact with other offenders and children, and some do all of these things.

Children, especially adolescents, are often interested in and curious about sexuality and sexually explicit material and interaction. They will sometimes use their online access to actively seek out such material and contacts. They are moving away from the total control of parents/guardians and trying to establish new relationships outside the family. Sex offenders targeting children will use and exploit these characteristics and needs. Children also furnish false information and lie during their online activity. Adolescent children may also be attracted to and lured by online offenders closer to their age who, although not technically "pedophiles," may be exploitive or dangerous.

Although most of the offenders currently utilizing computers in their sexual victimization of children would generally be considered to be "acquaintance molesters," some might be family members and others might be strangers. Some of these offenders might also be sexually victimizing children without using computers. For example they may also be sexually abusing readily available children, including their own, or trafficking in or collecting child pornography in magazine, book, photograph, videotape, or DVD formats and using the mail. The focus of the investigation should not be only on the computer. The computer is only a tool. Also, as the capabilities and availability of this technology changes, their role in the sexual victimization of children will also change.

## Illegal Sexual Activity

Computer-related sexual exploitation of children has come to the attention of law enforcement as a result of civilian/victim complaints, referrals from commercial service providers, and inadvertent discovery during other investigations. Increasingly,

defined. It is usually used to refer to the practice of adolescent children creating and "texting" to other adolescent children (*e.g.,* boyfriend or girlfriend) messages of a sexual nature and visual images of themselves naked or in "sexy" poses. Sexting could involve "sexy" pictures that do not rise to the level of being "sexually explicit." Therefore "sexting" could in some cases be legal or illegal depending on the exact nature of any images involved. As with all digital images placed in cyberspace, the dissemination of such images can spread easily and rapidly and have unanticipated implications for these adolescent children. The images cannot be easily controlled, taken back, or destroyed like an old-fashioned photographic print. As indicated by the term "**sexting**," there is a sexual component to this activity. If visual images are involved, they usually were created and sent to elicit a sexual response. If the genitalia or pubic area of children are portrayed in these images and they were created by the adolescent photographer/producer for a sexual or lascivious purpose, such images would seem to clearly meet the legal criteria to be considered child pornography and would not be simply "innocent nudes."

Cases involving adolescents using the computer to solicit sex with other adolescents and traffic in child pornography portraying pubescent "children" are a problem area for the criminal-justice system, especially the federal system. As previously stated federal statutes define children or minors as individuals who have not yet reached their 18th birthdays. How such offenders should be addressed within the criminal-justice system is a complex matter. Each such case must be evaluated on its merits and facts avoiding extreme stereotypes claiming all such adolescents are innocuous children or emerging sexual predators. A case involving an 18-year-old boy downloading sexually explicit images of his 16-year-old girlfriend needs to be objectively evaluated so scarce resources are not wasted. Such behavior may be technically illegal, but may not be sexually deviant. Pubescent children might be of sexual interest to many individuals who are not diagnostically "pedophiles." As previously stated, the focus of this publication does not include sexual exploitation of children by peers.

It is possible, in addition to simply being typical teenagers, a factor in why so many adolescent children see no problem with their "**sexting**" activity is they see their behavior as having nothing to do with "sexual predators" and the disgusting images of very young "abused" children they have heard so much about. What they are doing meets legal criteria for production and dissemination of child pornography, but it does not meet the extreme stereotypes often presented by the media and some professionals. A permanent record, juvenile or criminal, for any sex-related charge can have serious lifetime consequences for the adolescent child. Law enforcement and prosecutors should give considerable thought before any filing of juvenile or criminal charges. Additionally, noncriminal courts, such as family or juvenile courts, may be a more appropriate forum to address a "sexting" type of offense.

## Legal Sexual Activity

Sexual activity involving the use of computers and the Internet that is usually legal includes

- Validating sexually deviant behavior and interests
- Reinforcing deviant arousal patterns
- Storing and sharing sexual fantasies

46% sent child pornography to the child, 44% got on the telephone with the child, 42% requested a picture of the child, 35% provided attention/social support to the child, 28% engaged in cybersex with the child, and 27% offered gifts (Eakin, 2009).

Offenders can use the online computer to troll for and communicate with potential victims with less risk of being identified. The use of a vast, loose-knit network like the Internet can sometimes make identifying the actual perpetrator difficult. On the computer the offender can assume any identity or characteristics he wants or needs and gain access to a large reservoir of potential child victims. Much of the grooming/seduction process can now begin and progress utilizing online text, voice, and visual communication. Although children from dysfunctional families and families with poor communication might be at higher risk for seduction, all children are vulnerable. Older children are obviously at greater risk than younger children. Adolescent boys confused over their sexual orientation are at particularly high risk of such contacts.

By no reasonable definition should an individual with whom a child has regularly communicated online for months be considered a "stranger," even if that individual has lied about his true identity. In the world of the Internet, someone you never met in person is not a stranger, but can be a "BFF" (best friend forever). Many offenders are in fact reasonably honest about their identity and some even send recognizable photographs of themselves. They spend hours, days, weeks, and months communicating, including a lot of listening, with children. The child can be indirectly "victimized" through conversation (*e.g.*, "e-mail," "chat," "instant messages," "blogs," "cybersex," "sexting") and the transfer of sexually explicit information and material. Through the use of webcams, offenders can, in real-time, display sexually explicit behavior to children (exhibitionism) and observe children engaging in suggested sexually explicit behavior (voyeurism). This interaction can be enhanced by digital teleconferencing that allows for online voice and visual participation, even by multiple offenders, in the sexual victimization of children. Such "cybersex" can call into question traditional definitions of child molestation as "hands-on" contact. The child can also be evaluated for future face-to-face contact and direct victimization.

Investigators must recognize many of the children lured from their homes after online computer conversations are not innocents who were duped while doing their homework. Most are normal, curious, rebellious, or troubled adolescents seeking sexual information or contact. Society has to stop focusing on the naive belief that teenagers are "accidentally" getting involved. Many adolescent children go online to deliberately find pornography. Investigation will sometimes discover significant amounts of adult and child pornography and other sexually explicit material on the computer of the child victim. Investigation can also sometimes discover the child victim has made as many, if not more, misrepresentations as the offender. Most of them have been seduced and manipulated by a clever offender and usually do not fully understand or recognize what they were getting into. The child victim may believe the offender is a "true love" or rescuer with whom they want to have sex. Even if they do fully understand, the law is still supposed to protect them from adult sexual partners. Consent should not be an issue with child victims even if they are "compliant" (Lanning, 2005). Investigators must recognize and address these dynamics when interviewing these online child victims (*see* the chapters titled "Acquaintance-Exploitation Cases," beginning on page 63, and "Investigating Acquaintance Sexual Exploitation" beginning on page 137).