IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREE SPEECH COALITION, INC. et al., | ) |
| | ) Civil Action No. 2:09-4607 |
| | ) |
| Plaintiffs, | ) Judge Michael M. Baylson |
| | ) |
| v. | ) |
| | ) DEFENDANT'S |
| THE HONORABLE ERIC H. HOLDER, JR., | ) MEMORANDUM IN SUPPORT |
| | ) OF MOTION TO |
| Attorney General, | ) EXCLUDE TESTIMONY OF |
| | ) MICHELLE DROUIN, MARC |
| Defendant. | ) ZIMMERMAN, AND DANIEL |
| | ) LINZ |
| | ) |

Deposition Transcripts of
Michelle Drouin and Marc Zimmerman

**In the Matter of:**

Free Speech Coalition, et al.

v

The Honorable Eric H. Holder, Jr.

---

**MICHELLE DROUIN**

*April 26, 2013*

---



203 West Wayne Street, Suite 406
Fort Wayne Indiana 46802
260.486.3954 | 800.977.3376
WWW.SUMMITCITYREPORTING.COM

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4   FREE SPEECH COALITION, et al.,    )
                                       )
 5                  Plaintiffs,        )
                                       )        Civil Action
 6          vs.                        )   No. 2:2009-cv-607
                                       )
 7   THE HONORABLE ERIC H. HOLDER, JR.,)
                                       )
 8                  Defendant.         )
     _____
 9

10

11            DEPOSITION OF MICHELLE A. DROUIN

12         DATE:      Friday, April 26, 2013

13         TIME:      9:00 a.m.

14         PLACE:     U.S. Attorney's Office
                      1300 South Harrison Street
15                    Room 215
                      Fort Wayne, Indiana  46802
16

17        Called as a witness herein in accordance with the

18           Federal Rules of Civil Procedure before

19     Susan J. Snyder, court reporter and Notary Public.

20

21

22
                      SUMMIT CITY REPORTING, INC.
23           Certified Stenographic Court Reporters
                   203 W. Wayne Street, Suite 406
24                  Fort Wayne, Indiana  46802
                   (260) 486-3954 · (800) 977-3376
25
```

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                    Pages 2..5

Page 2

```
 1   APPEARANCES:
 2
 3           Ms. Lorraine R. Baumgardner
             BERKMAN, GORDON, MURRAY & DEVAN
             55 Public Square
 4           Suite 2200
             Cleveland, Ohio  44113
 5           (216) 781-5245
             (216) 781-8207 (fax)
 6           lbaumgardner@bgmdlaw.com
 7               Appearing on behalf of plaintiffs
 8
 9           Mr. Nathan M. Swinton
             Trial Attorny, Civil Division
10           UNITED STATES DEPARTMENT OF JUSTICE
             20 Massachusetts Avenue N.W.
11           Washington, D.C.  20530
             (202) 305-7667
12           nathan.m.swinton@usdoj.gov
13               Appearing on behalf of defendant
14
15               * * * * *
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          W I T N E S S   I N D E X
 2                                          PAGE
 3   DIRECT EXAMINATION
     BY MR. SWINTON........................................  5
 4
     CROSS-EXAMINATION
 5   BY MS. BAUMGARDNER...................................257
 6   REDIRECT EXAMINATION
     BY MR. SWINTON......................................260
 7
 8          E X H I B I T   I N D E X
 9   EXHIBIT                                    MARKED
10   Deposition Exhibit No. DX-1
     Curriculum Vitae
11   Michelle A. Drouin.................................. 15
12   Deposition Exhibit No. DX-2
     Report of Michelle A. Drouin, Ph.D.................. 92
13
     Deposition Exhibit No. DX-3
14   Computers in Human Behavior
     Texting, Sexting, and attachment
15   in college students' romantic relationships...........111
16   Deposition Exhibit No. DX-4
     Computers in Human Behavior
17   Let's talk about sexting, baby:
     Computer-mediated sexual behaviors....................140
18
     Deposition Exhibit No. DX-5
19   Sexting Behaviors Among Young Hispanic Women:
     Incidence and Association with Other High-Risk
20   Sexual Behaviors.....................................150
21   Deposition Exhibit No. DX-6
     A Thin Line
22   2009 AP-MTV Digital Abuse Study......................183
23   Deposition Exhibit No. DX-7
     Sexting Among Young Adults...........................194
24   * * *
25   * * *
```

Page 4

```
 1          E X H I B I T   I N D E X
 2                  (continued)
 3   EXHIBIT                                    MARKED
 4   Deposition Exhibit No. DX-8
     Sex and Tech, Results from a Survey
 5   of Teens and Young Adults............................201
 6   Deposition Exhibit No. DX-9
     Prevalence and Characteristics of Youth Sexting:
 7   A National Study.....................................246
 8
 9                  * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              MICHELLE A. DROUIN,
 2        called as a witness herein, having been
 3      first duly sworn, as hereinafter certified,
 4       was examined and testified as follows:
 5              DIRECT EXAMINATION
 6   BY MR. SWINTON:
 7   Q.  Good morning, Dr. Drouin.
 8   A.  Good morning.
 9   Q.  We met just a few minutes ago downstairs.  My name
10       is Nathan Swinton, and I am an attorney with the
11       United States Department of Justice.  I'm
12       representing the United States in the case Free
13       Speech Coalition versus Holder, which is currently
14       pending in the Eastern District of Pennsylvania.
15           Are you represented today by counsel?  Have you
16       retained counsel in this case?
17   A.  Have I retained counsel in this case?
18   Q.  Yes.
19   A.  No.
20   Q.  Okay.  So you are not represented today by an
21       attorney?
22   A.  I'm sorry.  Can you clarify the question?  I'm
23       not -- I'm not familiar with these terms.
24   Q.  Have you entered into an agreement with an attorney
25       for purposes of this case?
```

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                        Pages 6..9

Page 6

1   A.   Can you can please clarify again?  I'm so sorry.
2   Q.   No problem.
3            MS. BAUMGARDNER:  Well, can I just let the
4        record reflect that I am counsel present for the
5        plaintiffs.  And we have retained Dr. Drouin as an
6        expert witness.  So to the extent that she is the
7        plaintiffs' expert, I am here in my capacity as
8        the plaintiffs' representative who have retained
9        her.  But I don't represent her per se.
10  Q.   So just --
11  A.   Would you like me to state that somehow?
12  Q.   Let me try to reframe the question.
13  A.   Okay.  Thank you.
14  Q.   I just want to make clear that you have not,
15       yourself, obtained counsel for this case.  You have
16       not sought an attorney to represent you in this
17       case?
18  A.   No, I have not.
19  Q.   Okay.
20  A.   Thank you.
21  Q.   Thank you.  Have you ever had your deposition taken
22       before?
23  A.   No, I have not.
24  Q.   Okay.  Are you familiar with depositions at all?
25  A.   Only in the explanation that Lorraine has given to

Page 7

1        me about depositions.  That's the extent of my
2        knowledge.
3   Q.   Okay.  And what did she tell you about depositions?
4   A.   She just said that I would be asked questions.  I
5        should answer them honestly and in a straightforward
6        way.  And they would be centered around the
7        knowledge that I have about this case.
8   Q.   Okay.  Just a little bit of background information
9        about depositions.  I'm going to be asking you a
10       series of questions and you're under oath to provide
11       full and complete answers.  If you don't understand
12       any question I ask, please let me know before you
13       respond and I will explain and can rephrase the
14       question.  Okay?
15  A.   Thank you.
16  Q.   If you do answer a question, I will assume that you
17       understood the question.
18  A.   Okay.
19  Q.   Did you take an oath before we started this morning?
20  A.   Yes, I did.
21  Q.   Do you understand the nature of that oath?
22  A.   Yes, I do.
23  Q.   Okay.  As a reminder, the oath requires you to fully
24       answer each question to the extent that you can.  If
25       you're not sure of an answer or don't have a

Page 8

1        complete answer, then you must still answer the
2        question to the extent you can.
3   A.   Okay.
4   Q.   As you can see, the court reporter is recording all
5        that is said here.  Because she can only record our
6        words and cannot understand head nods or hand
7        gestures -- she can't record head nods or hand
8        gestures, please answer each question with a verbal
9        response.
10  A.   I will.
11  Q.   Okay.  In addition, please also wait for me to
12       finish my question before you respond, so that we
13       can avoid talking over one another.  I like to take
14       breaks about every 90 minutes or so; however, if you
15       need to take a break before that, just let me know
16       at any time.
17  A.   Okay.
18  Q.   If there's a question pending, I'd ask that you
19       provide your full and complete response to that
20       question before we take a break.  Is that okay?
21  A.   Yes.
22  Q.   Okay.  Now, from time to time, my colleague,
23       Ms. Baumgardner, may object.  After her objection,
24       I'm going to ask you to go ahead and answer the
25       question unless she instructs you not to.  Do you

Page 9

1        understand?
2   A.   Yes, I do.
3   Q.   Okay.  Have you taken or do you intend to take any
4        medication that would affect your ability to testify
5        accurately or honestly?
6   A.   No.
7   Q.   Okay.  Can you please state your full name for the
8        record.
9   A.   Michelle Adrian Drouin.
10  Q.   And can you spell your name?
11  A.   From the beginning?
12  Q.   Yes, please.
13  A.   M-i-c-h-e-l-l-e, A-d-r-i-a-n, D-r-o-u-i-n.
14  Q.   Thank you.  What did you do to prepare for your
15       deposition today?
16  A.   I talked with Lorraine about the atmosphere of a
17       deposition and what I'd be required to do.  I
18       reviewed the documents that I had written as well as
19       some of the research documents cited in my report.
20       And I read the statement written by Dr. Stark that
21       commented on my report.
22  Q.   Do you read all of the -- did you reread all the
23       documents that are cited in your report or just some
24       of them?
25  A.   Just some of them.  And I only looked at certain

**Page 10**

1  parts of those documents.
2  Q.  Okay.  Did you speak with Ms. Baumgardner at all
3      about the substance of the deposition?
4  A.  Can you clarify your question in regard to the word
5      "substance."
6  Q.  Sure.  So you said that you spoke with
7      Ms. Baumgardner about the atmosphere of a
8      deposition --
9  A.  Yes.
10  Q.  -- and the procedures?
11  A.  Yes.
12  Q.  Did you also talk about the substance of your
13      testimony?
14  A.  Yes.  A little bit, yes.  We talked about the types
15      of things that I might be asked.
16  Q.  Okay.  And what did you discuss?  What types of
17      things might you be asked?
18          MS. BAUMGARDNER:  I'm going to object and
19          instruct the witness not to answer on the grounds
20          that this is covered by work product under Rule
21          26.
22  Q.  Did you talk to anybody else other than
23      Ms. Baumgardner about your deposition?
24  A.  No -- yes.  She has -- a man named Bill Livingston.
25      He arranged for us to have a conversation.

**Page 11**

1  Q.  And who is Bill Livingston?
2  A.  Bill Livingston is a colleague who works with
3      Ms. Baumgardner.
4  Q.  Okay.  And did you know Mr. Livingston before you
5      had the discussion about this deposition?
6  A.  Yes.  He contacted me originally about the case.
7  Q.  Okay.  Do you know any of the other experts in this
8      case?
9  A.  I do not personally know the experts in this case.
10  Q.  Have you spoken with any of the experts?
11  A.  No, I have not.
12  Q.  Okay.  Did you participate in preparing any
13      responses to any of the discovery requests in this
14      case?
15  A.  Can you clarify what is a discovery request?
16  Q.  Sure.  Did you have any involvement in this case
17      other than preparing your expert report?
18  A.  No.
19  Q.  And also coming -- and your other involvement is
20      coming to the deposition today.  Correct?
21  A.  Yes.
22  Q.  So you've been involved coming to the deposition and
23      preparing your expert report?
24  A.  Yes.  I'm sorry if my answer was misleading.  Yes.
25  Q.  That's fine.  Okay.  I want to talk a little bit

**Page 12**

1      about your background.
2  A.  Yes.
3  Q.  Do you consider yourself to be an expert in any
4      particular field?
5  A.  I believe that I am at present the expert in young
6      adult sexting.
7  Q.  Okay.  And you said the --
8  A.  Or one of the experts in young adult sexting.
9  Q.  And what is young adult sexting?
10  A.  Young adult sexting is the transmission of
11      sexually-explicit material by young adults.
12  Q.  What do you mean by transmission?
13  A.  Transmission -- what I am considering transmission
14      is electronic transmission.
15  Q.  So electronic transmission would be sending a cell
16      phone text message?
17  A.  It could be a cell phone text message.  It could be
18      transmitted over the computer.  Anything that --
19      computer-mediated communication is a broader term,
20      but considering a cell phone a computer.
21  Q.  Okay.  And what do you mean by young adults?
22  A.  Young adults -- well anywhere, I guess, from 18 to
23      26 is a typical inclusion criteria for young adults.
24  Q.  And when you say "typical," what do you mean?
25  A.  In the literature, when you look at young adults,

**Page 13**

1      sometimes the age range is a little different.  Some
2      people say 20 to 26, 18 to 26 is a commonly used age
3      range.  But some people extend young adulthood
4      longer than that.  As a developmental psychologist
5      which is also what I would say is my expertise, I
6      would say that the age range for young adulthood is
7      not written in stone.  It is not exceptionally well
8      defined.
9  Q.  Excuse me.  Just to clarify.  When you said "the
10      literature," what did you mean?
11  A.  Research literature on the topic of when we are
12      adolescents and when we are adults.
13  Q.  Okay.  Have you, yourself, ever sent a sexual text
14      message?
15  A.  Yes.
16  Q.  Have you received a sexual text message?
17  A.  No.
18  Q.  When did you send the sexual text message?
19  A.  I don't remember.
20  Q.  Was it in the last year?
21  A.  No.
22  Q.  Was it in the last five years?
23  A.  No.
24  Q.  Last ten years?
25  A.  Yes.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                                        Pages 14..17

Page 14

1  Q.  Was it by cell phone?
2  A.  Yes.
3  Q.  Okay.  Have you sent any sexual messages using any
4      other medium?
5  A.  Yes.
6  Q.  What medium?
7  A.  Computer.
8  Q.  Was that by e-mail?
9  A.  Probably.  I don't recall, but probably.
10 Q.  Okay.  And when you say "sexual text message," was
11     this a photograph?
12 A.  I don't think I sent a photograph.  By sexual text
13     message, it was probably text.
14 Q.  Okay.  So what you sent was a text message that was
15     sexual in nature?
16 A.  Yes.
17 Q.  Okay.  And was that part of any study you were
18     doing?
19 A.  No.
20 Q.  So you sent that message in your personal capacity?
21 A.  Yes.
22 Q.  Okay.  Do you consider yourself to be an expert
23     based on your personal experience with --
24 A.  No.
25 Q.  You don't consider yourself to be an expert based on

Page 15

1      your personal experience with sending sexual
2      messages?
3  A.  No.
4         MR. SWINTON:  Okay.  Thank you.
5             (Whereupon, Deposition Exhibit No. DX-1,
6             Curriculum Vitae of Michelle A. Drouin,
7             was marked for identification.)
8  Q.  Dr. Drouin, I'm handing you a ten-page document.
9      It's titled Curriculum Vitae for Michelle A. Drouin.
10     Have you seen this document before?
11 A.  Yes, I believe so.
12 Q.  You have seen the document before?
13 A.  Yes.
14 Q.  And what is the document?
15 A.  This is my curriculum vitae.
16 Q.  And did you write this document?
17 A.  I did.
18 Q.  When did you write it?
19 A.  I began writing it in probably 2004, and I
20     continually add to it.  It is a work in progress,
21     this document.
22 Q.  And the version of your curriculum vitae that you
23     attached to your expert report in this case, when
24     did you write that?
25 A.  I probably updated it right before I sent it, so I'm

Page 16

1      not sure of the exact date.  But it would have been
2      within the last few months.
3  Q.  Okay.  I want to keep talking about your background
4      and I thought it might be helpful to have this
5      document in front of you as we discuss.  Now, you
6      have a Bachelor of Arts in Psychology from Cornell?
7      Is that correct?
8  A.  That's right.
9  Q.  You have a Ph.D. in Experimental Psychology from the
10     University of Oxford?
11 A.  Ph.D. is the American terminology.  At Oxford, it's
12     D.Phil.
13 Q.  Okay.
14 A.  But's it's the same.
15 Q.  So D.Phil is the same as a Ph.D.?
16 A.  Doctor of Philosophy versus Philosophy Doctor,
17     Ph.D., yes.
18 Q.  Okay.
19 A.  It's the American equivalent.  But I put it on with
20     the American equivalent.
21 Q.  Okay.  Thank you for clarifying.  What is
22     experimental psychology?
23 A.  Experimental psychology focuses on the research.  So
24     you can specialize in a type of psychology -- you
25     could go into cognitive or neuroscience.

Page 17

1      Experimental focuses on research methods and
2      research.
3  Q.  So when you say "research methods," what do you
4      mean?
5  A.  Learning how to conduct actual research is research
6      methods.
7  Q.  Okay.  So experimental psychology is learning how to
8      conduct actual research methods in psychology -- in
9      the field of psychology?
10 A.  There are -- it's actually broader than that.  But
11     simplified, the focus of the program was on research
12     methodology and conducting actual research.
13 Q.  Okay.  What types of things did you study about
14     conducting research?
15 A.  Well, you go in and you immediately begin conducting
16     research under the supervision of experts in the
17     field.
18 Q.  What types of research did you do?
19 A.  I did, while I was at Oxford, a longitudinal study
20     of children's emergent literacy.  So the types of
21     things that children are learning in preschool that
22     contribute to their later literacy skills.
23 Q.  How did you conduct that study?
24 Q.  Can you clarify your question?
25 Q.  Sure.  Did you select a sample population to study?

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013
Pages 18..21

Page 18

1 A.  Did I select it, yes.  With the help of my
2     supervisor, I selected a sample population.
3 Q.  Okay.  How did you select that sample?
4 A.  I selected that sample by going into a neighboring
5     community, going through the schools and
6     distributing solicitation forms, I guess would be
7     the layman's term for participants.
8 Q.  And what was the target population that you were
9     studying?
10 A.  Three year olds at the time.
11 Q.  Three year olds.  So the schools you were going into
12     were preschools?
13 A.  Well, I actually started by going into a secondary
14     school.  The education system in England is a little
15     bit different in that they have local preschools
16     connected to the elementary schools.  They're not
17     called -- they're called primary schools.  So they
18     have quite a connection even with three-year-old
19     children within the school district.  So I started
20     with the secondary school in the school district and
21     then branched out into the elementary schools which
22     fed into preschools associated with the elementary
23     schools.
24 Q.  Okay.  And what were the solicitation forms that you
25     mentioned?

Page 19

1 A.  They were -- they were approved by the Oxford
2     Institutional Review Board, which is their ethics
3     board.  I don't know that they call it Institutional
4     Review Board, but that's our term for it in the
5     United States.  They're forms that describe what the
6     study is and then ask for participation.
7 Q.  And how did the participants participate in the
8     study?
9 A.  Can you clarify?  I'm sorry.
10 Q.  Sure.  Did you just observe -- did you observe their
11     behavior?
12 A.  I took measurements.  So they -- the students
13     actually participated in an intervention, a
14     reading -- a pre-reading intervention.  So some of
15     the participants participated in the intervention;
16     some of them did not participate in the
17     intervention.  Some of them participated with a
18     parent present; some participated without a parent
19     present.  So we had several different conditions.
20     But every -- every child who was involved in the
21     study was also measured on their literacy skills at
22     various points.  So that would have been the
23     consistent theme.
24 Q.  And what conclusions did you draw from your study?
25 A.  The conclusions were that children's letter-naming

Page 20

1     skills -- but letter-naming is different because
2     it's actually letter sound skills -- are related to
3     their later literacy development.  I also -- the
4     intervention aspect -- the parents involvement in
5     the intervention seemed to have an effect on their
6     performance in the intervention.
7 Q.  And I'm sorry.  Remind me of the target population
8     you were studying again?
9 A.  Three year olds.
10 Q.  And was this three year olds in the entire U.K.?
11 A.  This was three year olds in this area outside of
12     Oxford.
13 Q.  Okay.  How big was the area?
14 A.  I'm not sure how big the town was.
15 Q.  But was it a suburb of Oxford?
16 A.  No.  It was its own city.
17 Q.  Okay.  So it was a smaller city located near Oxford?
18 A.  I'm not even sure it was smaller.  I don't know the
19     population of the city.
20 Q.  But it was a city located near Oxford?
21 A.  It was a city located near Oxford.
22 Q.  Okay.  And you selected students from schools in the
23     city and then drew conclusions about the three year
24     olds in the city as a whole?
25 A.  No.  I drew conclusions about children's literacy

Page 21

1     development.
2 Q.  And those conclusions applied just -- did you draw
3     conclusions just about that city's population for
4     children?
5 A.  No.  I drew conclusions about children based on --
6     well, children who have a -- who learn letter sounds
7     first.  Because this was a particular type of
8     instruction.
9         In England, they have a very standardized
10     instruction.  So that children who are involved in
11     the school systems in England all receive a
12     standardized -- we have localized education systems
13     here; theirs is not localized to a particular city.
14     So whereas we could, in Fort Wayne, be doing
15     something very different with our curriculum than
16     someone in Cleveland, in England it's standardized
17     through the country.  So the -- anyone learning
18     letter sounds first would have -- this would have
19     been applicable to.
20 Q.  Okay.
21 A.  Where these were the conclusions that I drew.
22 Q.  Okay.  So your conclusions were applicable to the
23     entire U.K. for children?
24 A.  In my discipline, this is a standard way of
25     conducting research that you could apply broadly.  I

Page 22

1    wouldn't say that it applies to every child in the
2    U.K., but when you're looking at educational
3    phenomenon or psychological phenomenon and you have
4    a sample that's sufficiently large enough, you
5    typically, when you're examining these, you make
6    applications that are broader than just the sample
7    that you have tested.
8  Q. Correct.  And it helped in this instance that the
9    curriculum was standardized throughout the entire
10   U.K.
11 A. Though if I would have done the same study in the
12   United States, I would have -- my paper wouldn't
13   have been any different.
14 Q. Okay.
15 A. One other thing.  So it has broader applicability
16   than the U.K., because the parental involvement
17   aspect had nothing to do with the children learning
18   letter sounds first.  So any child who might have a
19   parent, it could be applicable to.  So -- and that
20   was a subsequent publication that's written in the
21   CV.
22 Q. Okay.  So you would feel comfortable drawing
23   conclusions about children outside of the U.K. based
24   on the studies performed?
25 A. Any child with a parent who could be involved in a

Page 23

1    literacy study, I feel comfortable making -- not
2    conclusions, but stating that this is something that
3    certainly is worth exploring in that population.  So
4    it could broadly be something that's worth
5    exploring.
6  Q. What do you mean by "worth exploring"?
7  A. Worth exploring with further tests.  If you would
8    like to replicate the study, it's often -- you're
9    talking about cross-culture.  So cross-cultural
10   studies are sometimes a little bit -- you don't want
11   to make too broad of conclusions.  So worth
12   exploring means I believe that there was enough
13   merit in what I did in one culture to merit its
14   exploration in another culture.
15 Q. Okay.  And cross-culture doesn't just mean two
16   different countries?
17 A. In literacy research, it does.
18 Q. Okay.  But the term could be used more broadly in
19   other contexts?
20 A. Cross-culture could be used more broadly, but here
21   I'm not using it more broadly.  I'm saying between
22   countries.
23 Q. Okay.  I see that you've been a professor for a
24   number of years?
25 A. Yes.

Page 24

1  Q. What is your teaching emphasis?
2  A. Developmental psychology.
3  Q. Okay.  And what types of classes do you teach?
4  A. I teach introductory psychology which is, in our
5    university, Elementary Psychology, Child Psychology,
6    Development Across the Lifespan, Social and
7    Personality Development, Language Development,
8    introduction to the major of psychology.  I teach a
9    research course which is the Readings and Research
10   in Psychology.  I think that might be it.  And
11   several of those I teach honors versions of.
12 Q. And what is developmental psychology?
13 A. Developmental psychology is the study of human
14   development.
15 Q. And human development could be at any age?
16 A. Human development?  It depends.  In my Child
17   Psychology course, we cover prenatal 'til
18   adolescence.  And then my Development Across the
19   Lifespan course, so that's a lifespan perspective,
20   we look at prenatal to death.
21 Q. So when you say you teach classes in developmental
22   psychology, that doesn't necessarily mean you're
23   focused on one age range?
24 A. No, I'm not focused on one age range.
25 Q. Okay.  I see that you're a member of American

Page 25

1    Psychological Association?
2  A. I'm a member of the American Psychological
3    Association, Division Two.  This is one focused on
4    teaching.
5  Q. Okay.  So Division Two is a division of the
6    association that's focused on teaching?
7  A. Yes.
8  Q. What does it mean to be a member?
9  A. To be a member?  Can you clarify your question?
10 Q. How do you become a member?
11 A. How do you become a member?  You apply.  I'm sure I
12   filled out some type of application, listed my
13   qualifications and -- this is a standard application
14   process that I'm referring to.  I don't recall
15   specifically how I became a member of APA, Division
16   Two.
17 Q. Okay.  And do you have any commitments to continue
18   to be a member?
19 A. Yes, I do.  I am presently on the PR committee.  And
20   I think it's PR and media relations; I'm not sure of
21   the exact name.  But I was just elected to that
22   committee for Division Two of the APA, which is the
23   society for teaching of psychology.
24 Q. And what is PR?
25 A. Public relations.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

Page 26

1  Q.  Public relations?  Okay.  I didn't know if you were
2      referring to something --
3  A.  Some other statistical term.
4  Q.  Okay.  And I also see that you're a member of the
5      Association for Psychological Science?
6  A.  Yeah, APS.  Actually, I've just received notice that
7      my -- that my membership is expiring, and I'm not
8      sure that I will renew with APS.
9  Q.  What is APS?
10 A.  The Association for Psychological Science.
11 Q.  I'm sorry.  I meant more broadly.  What does APS do?
12 A.  APS is akin to APA.  They have a little bit of a
13     different focus, but dedicated to the science of
14     psychology, both.
15 Q.  And was this something you had to apply to become a
16     part of?
17 A.  I don't remember what the application process was.
18     The APA is the premier association or membership in
19     my field, in my perspective.  Association for
20     Psychological Science was offering a one-year
21     membership for people who were a part of, I think,
22     the APA, Division Two.  So that's why I belonged to
23     that.
24         Did I answer your question?
25 Q.  You did.  Thank you.  And you don't intend to

Page 27

1      continue to be a member of the organization?
2  A.  At this point, no.
3  Q.  Okay.  I also see you're a member of the Midwestern
4      Psychological Association?
5  A.  I am, yes.
6  Q.  And did you apply to become a member of that
7      association?
8  A.  I believe I did.
9  Q.  And what is that association?
10 A.  The Midwestern Psychological Association is the
11     regional association of the American Psychological
12     Association focused on the Midwest.
13 Q.  Okay.  So it's a subdivision of the American
14     Psychological Association?
15 A.  I believe that would be the terminology.
16 Q.  Okay.
17 A.  It's -- yes.
18 Q.  Okay.  I also see that you've received multiple
19     teaching awards?
20 A.  I have, yes.
21 Q.  I wanted to ask you about those.
22 A.  Okay.
23 Q.  So the DECCO Award for Innovative Online Teaching,
24     what was the basis for that award?
25 A.  Innovations in online teaching was the basis of that

Page 28

1      award.
2  Q.  Why were you given that award?
3  A.  I had to put together an application for it that
4      highlighted the innovations I was using in my online
5      teaching.  And then I was awarded by a selection
6      committee.
7  Q.  So it was based on the techniques you were using for
8      online teaching?
9  A.  I assume so.  It could also have been, perhaps,
10     based on the way in which I presented the techniques
11     that I'm using in my online classroom.  I'm not sure
12     what the committee -- I'm not sure they can separate
13     those out.  But very likely, the techniques I use in
14     online teaching.
15 Q.  Okay.  And also the Faculty Colloquium on Excellence
16     in Teaching --
17 A.  Yes.
18 Q.  -- the FACET award.  Why did you get this award?
19 A.  I actually remember this application process well,
20     in comparison to the others.  The faculty -- well,
21     I'll just use FACET as the abbreviation.  FACET is
22     an organization that honors or recognizes teachers
23     who are in the Indiana university system who excel
24     in teaching.  The application, when I filled it out,
25     I think ultimately was about 30 pages of

Page 29

1      application, where you have to show the types of
2      things that you're doing in teaching that merit this
3      award.  There is a campus-level committee; I'm not
4      on that committee -- I was not yet a member
5      obviously, but I'm currently not on the committee
6      either.
7          Once you get feedback from the campus
8      committee, they can decide to send your application
9      forward to the state committee or not.  The state
10     committee has representatives from all of the
11     Indiana state universities.  They review all of the
12     dossiers submitted by the applicants, and then make
13     their decisions about who is ultimately honored with
14     a FACET recognition.
15 Q.  So you said this was based on the types of things
16     you were doing teaching.  Correct?
17 A.  Yes.
18 Q.  And by types of things, you mean techniques and
19     methods you were using as an educator?
20 A.  Yes.  How I integrated my teaching philosophy with
21     my methods was probably a large portion of that as
22     well.
23 Q.  Was this award based in any way on your research?
24 A.  No.
25 Q.  Was the DECCO award based in any way on your

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                    Pages 30..33

Page 30

1    research?
2  A.  I do research and -- I'm sorry. Can I -- I guess
3      I -- there are two types of research -- or two types
4      of research in my mind. There's disciplinary
5      research and pedagogical research. I assumed that
6      you were talking about disciplinary research. Was I
7      correct? And do you want me to clarify what I mean
8      by disciplinary research?
9  Q.  Maybe if might help if I clarify my questions.
10 A.  Please. That would be helpful.
11 Q.  So as I understand from what you're saying, you are
12     involved in two different types of research,
13     pedagogical and disciplinary?
14 A.  Yes.
15 Q.  So what do you mean by pedagogical?
16 A.  Pedagogical are teaching and learning research. So
17     the scholarship of teaching and learning. That is
18     one type of research that I do. The other type of
19     research, disciplinary, is related to my -- my
20     discipline of study is not related to teaching and
21     learning research.
22 Q.  So when we say disciplinary studying, we're
23     referring to developmental psychology?
24 A.  Broadly.
25 Q.  Broadly?

Page 31

1  A.  Yes.
2  Q.  And pedagogical research is the study of teaching
3      and the techniques used as an educator?
4  A.  It's the study of teaching and student learning.
5  Q.  Okay. So it's the study of educating, either as the
6      educator or the student?
7  A.  Usually both combined.
8  Q.  Okay. Fair enough. So the DECCO award, was that
9      given in any way for your disciplinary research?
10 A.  No.
11 Q.  And the FACET award, was that given in any way
12     because of your disciplinary research?
13 A.  You said "in any way," so I'm going to say yes. And
14     would you like me to clarify?
15 Q.  Sure.
16 A.  So as I mentioned to you, one of the courses that I
17     teach is a research course. So strongly highlighted
18     in my FACET application is my supervision of
19     undergraduate research assistants. I have a very
20     active laboratory where we do many activities
21     related to research. And my primary role is to
22     instruct them in the research method. So as part of
23     my application for FACET, I highlighted this. And
24     some of these students are co-authors on
25     publications. So yes, my disciplinary research is

Page 32

1      related to this because some of the student
2      co-authors and this work that I do with students was
3      highlighted in the application. And someone on the
4      selection committee mentioned to me that it was a
5      very strong point of my application.
6  Q.  So the laboratory you just described, you said you
7      are monitoring other students performing research?
8  A.  I am their professor for a course that they take in
9      learning research, yes.
10 Q.  And the students are the ones who are conducting
11     research themselves?
12 A.  Yeah. In some cases, the students run participants.
13     They might do data coding, data entry. They do a
14     variety of tasks.
15 Q.  But you said you sometimes are a co-author on these
16     studies?
17 A.  They are at times co-authors on the studies that I
18     do within our laboratory.
19 Q.  Okay. So you may have an independent research
20     project and then use this laboratory setting with
21     the students to do further work on that research
22     project you're doing, separate from the class?
23 A.  The class is the research project. So --
24        I'm sorry. Do you want me to answer your
25     question just yes or no?

Page 33

1  Q.  Please explain further.
2  A.  Okay. So the research is the class. We do not have
3      the typical classroom instruction in the way that
4      you might think of a class. We meet as a group. We
5      discuss research. We discuss protocols. We amend
6      protocols. We discuss theory. We talk about how
7      theory relates to design. They -- my research
8      assistants assist me on conceptualizing studies. I
9      would say their involvement in that aspect is
10     minimal. But they are integrated into the research
11     process.
12        So the goal of the class -- the goal of the
13     class per se, is to teach them about research and
14     research methodology. So we don't actually have a
15     formalized classroom experience. The classroom
16     experience is conducting research.
17 Q.  I understand. Okay. Moving on, one more award I
18     wanted to talk about. The Multidisciplinary Faculty
19     Scholar for the School of Arts & Sciences.
20 A.  Yes.
21 Q.  Do you know why you received that award?
22 A.  I put together an application with a couple of other
23     faculty members. It's multi-disciplinary, so we
24     represented different disciplines. And our
25     application was accepted by the College of Arts &

Page 34

1    Sciences.
2  Q.  And was that award given because of any of your
3       pedagogical research?
4  A.  No.  No.
5  Q.  Was it given because of any of your disciplinary
6       research?
7  A.  Given, no.  But I was approached to do this by other
8       faculty based on my developmental psychology
9       research.  They wanted a developmental psychologist
10      in their project.
11  Q.  But the award wasn't given because of your
12      developmental psychology research?
13  A.  I don't believe so.  I wasn't on the committee who
14      selected the award.  I don't know what they looked
15      at.
16  Q.  Okay.  Would you consider it to be a research award?
17  A.  It is a research award in that it gave me a course
18      release to conduct research.
19  Q.  Is it an award for honoring past research conducted?
20  A.  Not specifically.
21  Q.  So it's not an award for past research conducted?
22  A.  Again, I am not sure what the selection committee
23      looks at.  If they look at my CV and they say, we're
24      going to give this award based on the fact that she
25      has previous research that qualifies her as a

Page 35

1       development psychologist, then it seems like what
2       you are asking would be true.  So I don't know.  I
3       don't know how the selection committee makes it.  I
4       would say that I don't think so.
5  Q.  Okay.
6  A.  Okay.  I'm sorry.
7  A.  No.  That's fine.  Thank you.
8           I see a few of your areas of research interest
9       on the front page.  I wanted to find out more about
10      these.  So the first area you list is the "effects
11      of technology on communication and relationship
12      formation."  I think we talked about this a little
13      bit already.  Is this another way of saying -- or
14      this is one of your current areas of research
15      interest.  When did this become an area of research
16      interest to you?
17  A.  It became an area of research interest when I began
18      my texting and literacy studies.  So I don't recall
19      exactly when that was.  I would guess about -- I
20      guess I could look.  So in 2009, I started looking
21      -- or was my first publication for text speak and
22      literacy.  I suppose that research was conducted in
23      2008 or 2007.  So five to six years.
24  Q.  And you said this started in 2009?
25  A.  The publication was in 2009.  I don't remember when

Page 36

1       it was accepted, when it was submitted.
2  Q.  So it was maybe a year or two before 2009 when you
3       started working on this area?
4  A.  I'm guessing about two years before 2009, was when
5       the study was actually conducted.  Before that --
6       before you conduct a study, you usually do a little
7       bit of gathering of information, a literature
8       review.  So 2007, perhaps even 2006.  But
9       conservatively, I will say about six years.
10  Q.  Okay.  And this area of research interest, effects
11      of technology on communication and relationship
12      formation, this is how you described one of your
13      areas of expertise.  Correct?
14  A.  This is not exactly an area of expertise.  This is
15      my research interest.  I'm not an expert in that.
16  Q.  So your area of expertise is more narrow than
17      this --
18  A.  Yes.
19  Q.  -- research interest?
20  A.  I would say my present area of expertise is more
21      narrow than my research interests, yes.
22  Q.  What's the difference between the two?
23  A.  Research interest is everything you're currently
24      interested in studying.  So I could say right now
25      I'm very interested in studying the way that

Page 37

1       Facebook affects communication.  That could be my
2       primary area of interest.  I could be conducting six
3       studies about it right now.  But I may not be an
4       expert in the field.
5  Q.  So effects of technology on communication and
6       relationship formation is one of your areas of
7       research interest?
8  A.  That's right.
9  Q.  And how do you describe your area of expertise?
10  A.  I would say at present that I am -- my expertise is
11      in young adult sexting.
12  Q.  So your area of expertise is limited to young adults
13      and it's also limited to sexting?
14  A.  Area -- can you describe or further clarify for me
15      what you are considering area of expertise?
16  Q.  I'm sorry.  When I asked you before what was your --
17      do you consider yourself to be an expert and in what
18      area do you consider yourself to be an expert in,
19      that was the answer you gave.
20  A.  So -- but area of expertise has a broader
21      interpretation.  Area of expertise can be personal.
22      Area of expertise can be a socially-constructed
23      idea.  When I commented earlier and you asked if I
24      believed myself an expert -- I don't remember your
25      exact wording -- but that is true.  I believe that

Page 38

1  my research in young adult sexting is one of my
2  areas of expertise.
3      I'm not sure that I would consider myself an
4  expert in the field in some of these other broader
5  research interest categories.
6      But I want to know your interpretation of
7  expertise.
8  Q. I don't have a set interpretation.  So it might be
9  more helpful, when you say you consider yourself to
10 be an expert in sexting among young adults, what do
11 you mean by that?
12 A. I believe that I am one of the -- one of the only
13 people who's studying young adult sexting as
14 extensively as I am.  I think there are few people
15 in the country who are studying it this extensively,
16 from the perspective that I'm looking at it.
17     So there are people who are examining sexting
18 from many different areas.  There are people who are
19 looking at youth sexting.  There are people who are
20 looking at the legal aspects and implications of
21 sexting.  But I'm looking at it from a psychological
22 perspective.  I was asked to attend a roundtable --
23 let me see if I have it in my CV.
24     Under presentations of disciplinary research --
25 I have no page numbers, but it looks like on page 4.

Page 39

1  Q. Okay.
2  A. About -- almost down to the bottom.  You'll see in
3  July of 2011, I had an invited presentation --
4  invited paper at the Research Consortium on Youth
5  and Sexting.  I was invited to it because of my
6  publication in sexting.  There were about 20
7  researchers from across the country who were
8  invited.  We met at the Microsoft offices to discuss
9  sexting, the state of sexting.  I believe that the
10 people who were invited were all considered the
11 leading contributors in the field at the time.
12     Since that time, I've published more work and
13 am conducting more studies on sexting.  So it was
14 fortified, I think, my position as a person who has
15 expertise in this area.  I was the only
16 psychologist, I believe, who was in attendance.  We
17 were grouped by both age group -- and one of the
18 only people looking at young adults.  We were
19 grouped by age group and discipline.  So there were
20 educators, ethnologists, I was a psychologist.
21 There were -- there were other -- I think -- there
22 were two lawyers there.  But in my area of
23 psychology, I'm one of the only people -- I was the
24 only representative there who was looking at young
25 adult sexting.

Page 40

1  Q. When you say "my area of psychology," you mean
2  developmental psychology?
3  A. I mean developmental psychology, yes.  But I
4  actually -- I don't know that other people -- people
5  from different types of disciplines of psychology
6  could be approaching this, but I will say just
7  psychology -- as I recall, I was the only
8  psychologist there who was examining youth --
9  sorry -- young adult sexting.
10 Q. Okay.  You said you were at this roundtable based on
11 some of your publications -- or that you discussed
12 your publications at this roundtable.
13 A. I did discuss my publications.  I discussed my work
14 at this roundtable.  You know, it was in 2011, and
15 my first publication that was published was in 2012.
16 So I believe that they found me based on my
17 presentation of -- on page 5 near the top,
18 "'Sexting,' text message dependence, and intimacy
19 among college students," which was a poster
20 presented.  A man named Andrew Harris was one of the
21 co-organizers and Dana Boyd and they contacted me.
22 I think Andrew Harris originally, Dana Boyd also
23 subsequently, with regard to my participation in
24 this roundtable discussion.
25 Q. And you made a reference to one of your first

Page 41

1  articles was published in 2012?
2  A. Yes.
3  Q. What article did you mean by that?
4  A. "Texting, sexting, attachment, and intimacy" -- at
5  the top of page 3 -- "in college students' romantic
6  relationships."
7  Q. Okay.  And this article looked at sexting among
8  young adults?
9  A. Among other things, yes.
10 Q. So broadly speaking, this was about sexting among
11 young adults?
12 A. Sexting and texting in a young adult, college --
13 undergraduate sample.
14 Q. Okay.  And I see that you published a second article
15 also about sexting in young adults in 2013?
16 A. Yes, this year.  It may not yet be in print, but I
17 know it's online.
18 Q. Okay.  And this is the one called, "Let's talk about
19 sexting, baby"?
20 A. That's right.
21 Q. Okay.  Have you published any other articles on
22 sexting in young adults?
23 A. No, I have not.
24 Q. So I want to go back to some of the presentations
25 and roundtables you were involved in.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 42..45

Page 42

1  A.  Yes.
2  Q.  You pointed out the one in 2010 at the Midwestern
3      Psychological Association in Chicago.  Your
4      involvement in that, was that based on any articles
5      you had published about sexting in young adults?
6  A.  No.  But I would assume that data that I presented
7      there served as a basis either for study
8      construction of my 2012 publication or as -- or it
9      may have been -- either the data was used so that I
10     could further construct a study or that this could
11     have been preliminary data from that study.
12 Q.  So the study was already in motion at the time you
13     participated in this presentation?  The research
14     that led to the publication of your 2012 article was
15     already in motion at the time you participated in
16     the 2010 annual meeting?
17 A.  The research line, yes, was already in motion.  This
18     particular subject of the 2012 publication, I'm not
19     sure that this was the research that was already in
20     motion.
21 Q.  Okay.
22 A.  But the research program had begun.
23 Q.  But your participation at the 2010 meeting was not
24     based on your 2012 article, because that hadn't come
25     out yet.

Page 43

1  A.  That's correct.
2  Q.  Similarly, when we look at your, I believe, the
3      roundtable you pointed out --
4  A.  Yes.
5  Q.  -- that was in July 2011, "Sexting: A psychological
6      perspective" --
7  A.  Yes.
8  Q.  Your participation in that roundtable was also not
9      based on publication of an article about sexting in
10     young adults, because that hadn't come out yet?
11 A.  "Based on" is an ambiguous term for me.  I will say
12     that some of the work that was later published may
13     have been presented at that roundtable discussion.
14 Q.  But you hadn't --
15 A.  Is that what you meant?
16 Q.  I think that's fair.  Let me try to ask a question
17     in a different way.
18         You were not invited to participate in the
19     roundtable on the basis -- because you had published
20     an article on young adults and sexting because you
21     hadn't yet published an article on young adults and
22     sexting at the time the roundtable took place.
23 A.  I believe -- yes, I was not selected because of the
24     article.  I believe they -- as I mentioned before, I
25     believe that they recruited me based on my

Page 44

1      presentation.
2  Q.  Okay.  And then your participation in a 2012 -- a
3      May 2012 presentation, "Sexting among college
4      students in different types of romantic
5      relationships," had you published any articles on
6      sexting in young adults at the time you gave this
7      presentation?
8  A.  Yes, I had.  The Drouin and Landgraff study on the
9      top of page 3, "Texting, sexting, and attachment"
10     was actually published online in, I think, December
11     of 2011, and then came in print before I went to
12     that conference, I believe -- as I recall.
13 Q.  So sometimes when we have a citation to an article
14     and it has a year and a parenthetical, that refers
15     to the print publication date?
16 A.  This is what it refers to in this document, yes.
17 Q.  Okay.  So sometimes articles are released online
18     before they come out in print?
19 A.  They are.  And it's inconvenient when it's in a
20     different year.  It doesn't happen often.
21 Q.  Okay.  Earlier, when we were trying to clarify your
22     area of expertise, you mentioned you were one of the
23     only people studying this issue -- you were one of
24     the only people studying sexting among young adults
25     as extensively as you have, from your perspective.

Page 45

1  A.  From my perspective, yes.
2  Q.  What did you mean by only one?  Or only one of the
3      people?
4  A.  There are very few people who are conducting
5      research on sexting and I'm one of them.
6  Q.  Do you know how many are conducting research on
7      sexting?
8  A.  On young adult sexting?  I could not possibly
9      estimate the number of people who are conducting
10     research on young adult sexting.
11 Q.  But you said you're one of the few?
12 A.  That has published research in this area.
13 Q.  Okay.  So there could be many who are conducting
14     research, but you know there are few who have
15     published?
16 A.  Of the ones that I know, there are few, yes.  You
17     don't know of them until you see presentations or
18     publications with their names on it.
19 Q.  Can you estimate how many have published?
20 A.  I don't even know.
21 Q.  But you know it's few?
22 A.  From a psychological perspective, I just don't know.
23     I -- from my perspective, I have to -- I'm actively
24     researching in this field, which means that any
25     study that comes out on sexting, I'm reading and

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 46..49

Page 46

1  adding to my literature review, which is always in
2  progress -- a work in progress.  So any new research
3  that comes out is published, and I do extensive
4  searches often for sexting research, I'm usually
5  aware of.
6        Now, these are the people who are publishing in
7  the field.  I have very few citations for
8  psychological research that's related to sexting.
9  There are few references for it.  Not only that, I'm
10  often asked by people who are conducting research in
11  the field to cite my article, to have a copy of my
12  article, if they can't get it otherwise from their
13  institution.  I am often asked to review articles on
14  sexting.
15        So as all of those things -- it's like
16  converging evidence, that I am one of the people in
17  the field who is currently publishing work.  Working
18  on it, I just can't even estimate.  I have no idea.
19  Q.  So let's stick just with publication.
20  A.  Okay.
21  Q.  And you're saying there are few people who have
22  published on young adults and sexting?
23  A.  I am one of the first people who began publishing on
24  young adults and sexting.  At present, the number of
25  people is growing.  And I just cannot even --

Page 47

1  without doing a search today, I would not feel
2  comfortable making an estimate about how many people
3  that is.  But I'm one of the first and I have an
4  active lab where I'm continually presenting and
5  publishing in this field and being asked to review
6  studies in this.
7  Q.  And you're also keeping current with the literature,
8  as you described?
9  A.  Yes.
10  Q.  So if you're keeping current with the literature and
11  being asked to review studies, you can't give an
12  estimate about --
13  A.  Asking --
14  Q.  -- who have published?
15  A.  -- to review studies, I'm blind to the authorship,
16  so it could have been someone who's already
17  published in the field.  As well, I never know
18  until -- you usually have a lag time of months to
19  years before the study actually comes out in print.
20  So things that I review are not necessarily going to
21  get published.  So I -- no, it's really impossible
22  for me to estimate the number of people.  I don't
23  know how many things are under review.  I don't know
24  how many things have been accepted for publication.
25  It's really difficult.  This is a really emerging

Page 48

1  field.  I'm one of the first who began to examine
2  it.  I'm asked to review articles often on the
3  topic.  I just would not feel comfortable making an
4  estimate for the number of people who have
5  published.
6  Q.  Do you know if people are asked to review?
7  A.  I am sure they are.  There are at least two to three
8  reviewers on most peer-reviewed journals.
9  Q.  Okay.  Do you have an estimate of the number of
10  people who are asked to review studies on sexting in
11  young adults?
12  A.  I would estimate it's two to three.  Can I clarify
13  though that some of the journals, you don't have to
14  be an expert in order to -- it doesn't have to be
15  your disciplinary expertise.  I am often, I think,
16  tapped because -- for sexting studies to review,
17  because I know something about sexting.  But you
18  could be asked to review an article because you know
19  something about computer-mediated communication.  Or
20  you could be asked because you know something about
21  the statistical techniques that were used within the
22  article.
23  Q.  Okay.  I'm still trying to understand your prior
24  comment when you said you're one of the only people
25  who has studied this issue.  By that, you cannot

Page 49

1  make an estimate and say that there are few people
2  who have studied young adults and sexting.  Correct?
3  A.  No.  And if I said studied, I think I used an
4  incorrect word.
5  Q.  You can say you are one of the first people to have
6  studied young adults and sexting.  Correct?
7  A.  Based on my experience in being invited to the
8  roundtable discussion, I would say yes.
9  Q.  Okay.  So you do not feel comfortable saying you are
10  one of the few people who have studied sexting in
11  young adults?
12        MS. BAUMGARDNER:  Objection.
13  A.  If I used the word "studied," it was the wrong word.
14  I think I was using studied as research --
15  researched, meaning to publication.  And the term
16  "few," I think -- I consider -- I do not believe
17  there are hundreds of people who have published
18  psychological research on sexting in young adults.
19  Q.  But you cannot estimate the number of people who
20  have published on sexting in young adults?
21  A.  Can I add something before I answer this question?
22  It's a difficult question to answer because
23  publishing something, you could have a paper that
24  has five authors on it and only the primary author
25  has done most of the work.  And you have perhaps

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                    Pages 50..53

Page 50

1    other people who just helped with statistics or did
2    a variety of things.
3         So when you say the number of people, you might
4    be meaning the number of people who are included on
5    an article.  So maybe we would have 70 to a hundred
6    people who have been included on peer-reviewed
7    articles that examine a psychological perspective on
8    young adult sexting.  But if you have five people on
9    an article, only one could possibly be originating
10   that research, understanding the theoretical
11   background of the research.
12        So it's really difficult for me to estimate the
13   number of people who might contend with me as
14   experts in the field.  So co-authors on publication
15   does not necessarily mean to me people who are
16   publishing actively in this field.  You know, more
17   than one publication with the same authors might,
18   but I just don't remember that.  I just don't
19   remember how many people might be doing that.  So
20   it's a difficult question to estimate.
21  Q.  Can you estimate the number of primary authors of
22       studies on sexting in young adults?
23  A.  Sexting in young adults from a psychological
24       perspective?  Are you talking about sexting in young
25       adults prevalence data that was in a peer-reviewed

Page 51

1    journal?  Do you want me to limit it to
2    peer-reviewed journal?
3   Q.  Let's say, can you estimate the number of primary
4        authors who have published articles on sexting in
5        young adults from a psychological perspective?
6   A.  That I am aware of, probably 20.
7   Q.  And can you estimate the number of secondary or
8        co-authors for studies on sexting in young adults
9        from a psychological perspective?
10  A.  That's difficult to estimate.  You would like me to
11       estimate it regardless?
12  Q.  If you can.
13  A.  If you -- I would say most articles have two or
14       three co-authors so -- some have four to five.  If
15       you take an average of being three, then perhaps 60
16       from a psychological perspective.
17  Q.  Are you a primary author on sexting in young adults
18       from a psychological perspective?
19  A.  Yes.
20  Q.  So you are one of the 20 primary authors on sexting
21       in young adults from a psychological perspective?
22  A.  Yes.  And 20 is an estimate.
23  Q.  Could it be much more than 20?  Could it be 25?
24       MS. BAUMGARDNER:  Objection.
25  Q.  Could it be 25?

Page 52

1   A.  Could it be 25?  Without -- I have not run a search
2        in the last, probably, three or four days on the --
3        on sexting in young adults.  I just don't know.
4             This is such an emerging field that there
5        literally could be publications emerging every day.
6        So you asking me to estimate a number where I
7        haven't had a chance to look at my search sources to
8        see whether or not these primary authors exist, it's
9        really difficult for me to estimate.  I'm not
10       comfortable doing it because of what could have been
11       published in the last week or two or in an obscure
12       journal that I wouldn't have access to.
13            My estimate of 20 primary authors is
14       considering the fact that there are some articles
15       that are not indexed in psych info or psych articles
16       that would approach it from a psychological
17       perspective.  Those journals could exist and
18       never -- someone's article could never be cited or
19       never be read because that journal doesn't have a
20       large readership.  So what I have been in touch
21       with, I'm estimating 20 based on that fact.  But
22       what I have seen personally, a psychological
23       perspective on young adult sexting, there are few --
24       there are few articles that are approaching this
25       phenomenon from that perspective.

Page 53

1   Q.  And what do you mean by few?  Can you give me a
2        number for few?
3   A.  In my reference -- in my latest reference list of my
4        study published in 2013, I'm sure I had fewer than
5        ten.
6   Q.  Okay.  Thank you for going through that.
7             I also want to talk about some of the media
8        interviews and editorials you list on your CV.
9   A.  Yes.
10  Q.  I believe the first one you list that's related to
11       sexting is in 2011, an interview with Discovery
12       News.
13  A.  Okay.
14  Q.  Is that correct?
15  A.  Yes.
16            MS. BAUMGARDNER:  Can you point out where it
17       is?
18            MR. SWINTON:  Oh, I'm sorry.  This is the
19       last page of the CV.
20            MS. BAUMGARDNER:  Okay.  Thank you.
21  A.  Yes.
22  Q.  And you've been interviewed multiple times since
23       then?
24  A.  Yes.
25  Q.  How did Discovery News contact you?

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 54..57

Page 54

1   A.   Either by phone or e-mail very likely.
2   Q.   Do you know how they found out about you?
3   A.   Let's see.  I can probably deduce.  I believe it was
4        from my presentation.
5   Q.   Okay.  The interviews you gave from 2011 to the
6        present, when you were talking about sexting and
7        young adults.  The information you discussed, was
8        that based on anything other than your articles, the
9        information discussed in your articles in 2012 and
10       2013?
11  A.   I don't believe so.
12  Q.   So the interviews you gave that are listed on your
13       CV from 2011 to the present were based only on
14       information that you were studying in the articles
15       that were published in 2012 and 2013?
16  A.   Yes.  So data that I began collecting in probably --
17       what did we determine -- 2010.  And in these
18       interviews, I may not have been presenting parts of
19       data.  They may not have been the complete studies
20       at that point.  I don't recall specifically.
21  Q.   But the only studies about sexting in young adults
22       you've conducted and for which you've published are
23       discussed in the 2012, 2013 articles?
24  A.   For which I've published, yes.
25  Q.   And are there other studies that you've conducted?

Page 55

1   A.   Are there other studies that I've conducted?  I
2        mean, yes.
3   Q.   I'm sorry.  Other studies that you've conducted on
4        sexting in young adults?
5   A.   Yes.  I'm conducting studies presently on sexting in
6        young adults.
7   Q.   Are there any studies that you've conducted on
8        sexting in young adults that you've concluded that
9        weren't discussed in the 2012, 2013 articles?
10  A.   The 2012, 2013 articles give a snapshot of larger
11       studies.  So that does not wholly encapsulate the
12       work.  So they were larger studies in scope than
13       what was reported.  So the studies are concluded,
14       but some of the data were not published.
15  Q.   Okay.  How many studies on sexting in young adults
16       have you conducted?
17  A.   And am presently conducting?
18  Q.   Let's say you have conducted and have concluded.
19  A.   Conducted and concluded, three to four probably.
20  Q.   Do you know the exact number?
21  A.   I don't.  My studies go over multiple years usually.
22       So I believe that I've concluded three to four of
23       them.  And by concluded, I mean the study is
24       completely over, closed with the ethics board.
25  Q.   Did you work on those studies with anybody else?

Page 56

1   A.   My student co-authors.
2   Q.   And did you work with your student co-authors on all
3        three or four of those studies?
4   A.   Yes.  I believe I did.
5   Q.   So none of the studies you did completely
6        independent?
7   A.   No.  They're involved in various things.  These are
8        online studies, so my students would have been
9        recording credit for students who completed the
10       study.  And --
11  Q.   Just -- go ahead.  I'm sorry.
12  A.   -- doing other tasks related to the research.
13  Q.   Okay.
14  A.   Gathering sources, things like that.
15  Q.   And what types of tasks would they do?
16  A.   Let's see.  They would do when a study -- building a
17       survey.  So creating a survey in a program called
18       Qualtrics, which is an online survey software.  They
19       would, once the study is ongoing, grant credit for
20       people who have participated in studies as part of a
21       research requirement or a research option.  And they
22       would -- when I export the data from the system,
23       they would do kind of initial cleaning of a file, so
24       that the questions were truncated so that you
25       wouldn't have the full question in the label.

Page 57

1            They help with the conceptualization of
2        protocols.  I might ask them -- I usually have a
3        research team of five to ten students.  I might ask
4        them what -- would this type of question be
5        appropriate?  Would this kind of question -- is it
6        broad enough or narrow enough to capture what we're
7        looking at?
8            One of my recent studies which is -- I'm
9        including in concluded is an unwanted but consensual
10       sexting study.  And the student actually came up
11       with the idea of looking at it from an unwanted but
12       consensual sexting perspective.  So that student was
13       involved with the conceptualization.
14  Q.   Have you worked on these studies with anyone other
15       than students?
16  A.   These studies that have been concluded, no.
17  Q.   So none of the studies that have been concluded --
18       I'm sorry.  Let me rephrase the question.
19            You didn't work with anybody on any of the
20       studies that have been concluded other than
21       students?
22  A.   That's right.
23  Q.   And you have -- you estimate that you have three to
24       four studies that have been concluded about sexting
25       and young adults?

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                Pages 58..61

Page 58

1  A.  Yes.
2  Q.  And do you currently have ongoing studies?
3  A.  I do.
4  Q.  How many ongoing studies do you have?
5  A.  I have, I think, two ongoing studies about sexting
6      in young adults.  By ongoing, I mean one of them is
7      going -- we're doing the ethics board approval
8      application right now.  So ongoing in that it's
9      already been conceptualized.
10 Q.  So the ethics board approval is at the end of the
11     process?
12 A.  Beginning.
13 Q.  Beginning of the process?
14 A.  Yeah.
15 Q.  Okay.  And are you working with anybody else on
16     these ongoing studies?
17 A.  One of them, yes.  I'm working with someone else in
18     my department who studies intimate partner violence.
19 Q.  So that person is a professor?
20 A.  Yes.
21 Q.  In the psychology department?
22 A.  Yes.
23 Q.  And the other study, you're working on it
24     independently?
25 A.  I think I'm -- just with my students.

Page 59

1  Q.  Okay.  Now, you said the article that you published
2      in 2012 and then you published another one in 2013,
3      you said that those were snapshots of your research.
4      Does this mean -- let me rephrase that.
5          Were those articles based on any -- were those
6      articles summarizing a concluded study?
7  A.  Yes.
8  Q.  Okay.
9  A.  I said yes to the concluded part.  But summarizing,
10     oftentimes you can conduct a study, especially ones
11     that are more exploratory in nature and you are
12     looking at different things.  So sometimes you do a
13     study and you can publish two or three or four
14     articles from the same study, looking at it from a
15     different perspective.
16         I haven't yet done that with this research
17     because of time constraints and my desire to
18     actually do more and more studies.  But the research
19     is concluded.  I don't know that it summarizes
20     everything that I did within those studies.  They
21     were multi-faceted and it captures one facet of what
22     I did in those studies.
23 Q.  So an article, a published article, might just be
24     describing one angle of a study?
25 A.  Yes, it might just be describing one angle of the

Page 60

1      study.
2  Q.  Or one facet of the study, as you put it?
3  A.  Yes.  Yes.
4  Q.  Okay.  Do you ever publish an article about a study
5      that has not been completed?
6  A.  I could see that I might.  I don't know if I ever
7      have.  But I could see that you could.  So maybe you
8      publish something and then you decide, actually I
9      want to collect more data.  So you would have that
10     under the same umbrella of the same study and then
11     collect additional data.  I would say it's rare, and
12     I don't know that I've ever done it.
13 Q.  So the 2012 article on sexting in young adults, the
14     information discussed in that article was taken from
15     only a concluded study?
16 A.  I believe so.
17 Q.  And the 2013 article, the information discussed in
18     the 2013 article, was taken only from a concluded
19     study?
20 A.  Yes, I believe so.  By -- can you clarify concluded?
21 Q.  I'm thinking of concluded as the three to four
22     studies that you have described as being concluded.
23 A.  Yes.
24 Q.  Okay.  And what did you mean when you said that
25     these three to four studies had been concluded?

Page 61

1  A.  I mean that I don't intend to collect any more data
2      on those studies.
3  Q.  Okay.  So when you said that the 2012 article was a
4      snapshot of your research, that meant it was looking
5      at one facet of a concluded study?
6  A.  Yes.
7  Q.  And the 2013 article, when you described that as
8      being a snapshot of your research, it meant that it
9      was looking at one facet of completed research?
10 A.  Yes.
11 Q.  Okay.  Have you published any articles about your
12     ongoing studies?
13 A.  Not yet.
14 Q.  And do you intend to?
15 A.  Yes.
16 Q.  Okay.  If you could turn to page 6 of your CV, under
17     the heading service.
18 A.  Yes.
19 Q.  I had a few questions.  The first entry lists the
20     IPFW Peer Review Committee.  Correct?
21 A.  Yes.
22 Q.  Does this mean you're a member of the peer review
23     committee?
24 A.  Yes.  And I actually -- the peer review committee is
25     the larger governing body.  It's actually a teaching

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                      Pages 62..65

Page 62

1    fellows appointment, so -- I'm a teaching fellow.
2  Q.  And what is a teaching fellow?
3  A.  A teaching fellow is someone who provides
4      consultations to other teachers on campus.
5  Q.  And by teachers, do you mean professors?
6  A.  Yes.
7  Q.  Okay.
8  A.  They could be -- "professor" is a term that we use
9      only to refer to people who are on tenure track.
10     Other limited-term lecturers, continuing --
11     continuing lecturers, all of these people could
12     have -- potentially have a teaching review.
13 Q.  But it's not, say, like a student teacher who's
14     assisting a professor with a class?
15 A.  No.
16 Q.  Okay.  And so what do you do as a teaching fellow?
17 A.  As a teaching fellow, I can review -- it's driven by
18     the faculty member.  So they request that someone
19     assist them with their teaching, in some aspect of
20     their teaching.  So it could be a syllabus review.
21     It could be looking over their student evaluation
22     data.  It could be observing their class, and then
23     you provide them feedback.  Again, driven by them,
24     the type of feedback that they would like.
25 Q.  This is kind of like a mentorship?

Page 63

1  A.  A mini-mentorship.
2  Q.  Okay.  A mini-mentorship.  So in this context, peer
3      review does not mean the same as like a
4      peer-reviewed article?
5  A.  No.
6  Q.  Okay.  So it's a completely different concept?
7  A.  It is.  I mean, the only similarity is that in a
8      peer-reviewed article, you would have other people
9      looking at what you do, and saying I think this is
10     something that's good.  So in a broad sense, I guess
11     peer review does apply to both.
12 Q.  They both use the word "peer"?
13 A.  They both use the words "peer review."
14 Q.  Okay.  Correct.
15 A.  The term "peer review."
16 Q.  And can you describe more fully what do we mean,
17     peer review, when we think about it in the terms of
18     scholarly articles?
19 A.  Peer review is other people who have expertise,
20     ideally in the field, or other people who have
21     experience in the field examining your work, reading
22     through your work and giving it constructive
23     criticism.  Peer review, there's always constructive
24     criticism, even if -- well, ideally, there is always
25     constructive criticism even if an article is

Page 64

1    ultimately rejected.  But other people kind of
2    giving validation to your work, your methods, the
3    way in which you've presented your work.
4  Q.  When you say "methods," do you mean research
5      methods?
6  A.  Yes, research methods.
7  Q.  And what do you mean when you say that it gives
8      validation?
9  A.  It gives validation because you have other people
10     who are experts saying I believe what this person
11     has done is sound.
12 Q.  And the expert has expertise in the discipline being
13     discussed in the article?
14 A.  You're supposed to.  When you -- this is done in
15     different ways.  Oftentimes, I'm approached by, for
16     example, if you look at my manuscript reviews under
17     my professional service, which is on the very next
18     page, you have a variety of journals listed here.
19     And some of these journals contacted me because they
20     know who I am, based on the fact that perhaps I was
21     cited in research.  So they consider me having
22     expertise in the field, and they will say that when
23     they contact me.  You appear to have expertise in
24     this field -- I don't even think they say appear.
25     As an expert in the field, we would like you to

Page 65

1    review this article.
2       Another way expertise can be determined in the
3    field is some journals will ask you to indicate your
4    own areas of expertise.  I would say this is less
5    common.  I only had a few journals -- and I don't
6    recall which ones -- who've asked you to indicate
7    your areas of expertise.  So that if an article does
8    come through, they can contact people who have those
9    areas of expertise.
10      More likely, for most of these, I was cited,
11   sometimes the primary one cited in an article.  And
12   then I was asked to review that article.
13 Q.  So it sounds like there are kind of two ways you can
14     be considered to be an expert in the field for
15     purposes of peer review.  You can be cited or
16     referred to in literature and the journal will then
17     contact you --
18 A.  Yes.
19 Q.  -- is the first way.
20 A.  Yes.
21 Q.  The second way is that you provide a journal with
22     your -- with what you consider to be areas of
23     expertise and then you're on-call in case an
24     article -- in case the journal will publish an
25     article in that field, and they'll then contact you.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                              Pages 66..69

Page 66

1  A.   Yes.  And the latter description is much less common
2       in my experience.  You usually would have that if
3       you were submitting an article.  So it wouldn't
4       be -- I guess you could apply to be a reviewer, a
5       peer reviewer just because you're interested in that
6       journal.  But typically, you're only asked for this
7       type of information if maybe you're submitting a
8       manuscript or if they had already asked you to
9       submit a review and you go into the system and
10      you're submitting the review and they say can we
11      also then clarify your areas of expertise.
12  Q.  Okay.  So I know you said earlier that having an
13      article -- if an article is -- if a published
14      article has been peer reviewed, it gives validation
15      to that article?
16  A.  More than if I just published it myself, yes.
17  Q.  Will the journals accept articles that aren't peer
18      reviewed?
19  A.  Some do, yes.
20  Q.  And so if you were reading an article on sexting in
21      young adults that wasn't peer reviewed, would you --
22      what would you think about that article and the fact
23      it wasn't peer reviewed?
24  A.  This is an interesting question.  So there have been
25      surveys that have been conducted that were not peer

Page 67

1       reviewed.  The Sex and Tech survey, the MTV and
2       Associated Press survey, and those surveys are
3       surveys.  So there's a distinction here between
4       research related to psychological phenomena -- so
5       that would be one type of research that I would
6       expect to see in a peer-reviewed journal.  But
7       things that are not peer reviewed, like anything
8       coming out from Nielsen Mobile about text message
9       use or something coming out from the Pew Foundation
10      about peoples use of text messaging.  These are not
11      peer reviewed but they -- they employ a different
12      methodology.  So you're talking about two really
13      different types of research.  "Research," I'm saying
14      that as a loose term.
15  Q.  Sure.
16  A.  So from a psychological perspective, the type of
17      research that I conduct, which is not just polling
18      people, okay?  That type of research, I would -- if
19      it's not in a peer-reviewed journal, I would --
20      well, first of all, may not ever come in contact
21      with it, because the search engines that I use may
22      not pull it up.  But as well, I might be a little
23      bit less likely to cite it.
24  Q.  And it might help to distinguish between what you
25      say the type of research that you do versus the

Page 68

1       polling.  So how can we describe -- how do you
2       describe the type of research that you do?
3  A.   Okay.  So the research that I do, I'm looking at
4       human behavior in a broader sense.  So I'm usually
5       trying to contribute to theory in some way.  The
6       driving force of my research is to build upon
7       developmental -- or in a broad sense, human --
8       theory.  Theory about the ways that humans might
9       interact or humans might communicate.  So what you
10      have then is usually you begin with some examination
11      of a theory and where it might fit in.
12          What -- I'm distinguishing that from polling
13      data, which may just be interested in prevalence.
14      So the primary goal of that type of research, again
15      broadly used, is to see how often something is
16      occurring.  And it's actually -- the goal of it is
17      not to relate it to or build upon any particular
18      theory of human development or interaction or
19      whatever theory.  The goal of it is to just look at
20      prevalence.  And it's not -- it's a different -- I'm
21      not going to say that isn't a scientific approach,
22      so it's a different scientific approach.
23  Q.  So is it fair to say that the main difference
24      between the two types of research you were
25      discussing is one is polling to obtain pure hard

Page 69

1       data.  And then the other type is conducting studies
2       and then having that data contribute to a greater
3       theory?
4  A.   Yes.  And social science research largely has that
5       goal.  So that is the standard method of social
6       science research, is to contribute to theory.  The
7       other type of research that you're referring to, the
8       polling and getting the exact numbers, would be
9       undertaken by different types of groups.
10  Q.  The polling groups might not be associated with
11      universities and colleges as much, for example?
12  A.  Yeah.  I don't know of social scientists who conduct
13      polls.  I don't know any.  But --
14  Q.  Okay.
15  A.  -- it's certainly not the common method.
16  Q.  Whereas, the social science research is typically
17      associated with a university or a college?
18  A.  Social science research is associated very often, I
19      think, with a university or a college, but it
20      doesn't have to be.
21  Q.  So in the social science research, you would expect
22      to see an article -- let me rephrase that question.
23          In the social science research, would you give
24      more weight to an article that's been peer reviewed?
25  A.  Give more weight in what way?

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                        Pages 70..73

Page 70

1   Q.   For social science articles, would you be more
2        likely to trust the conclusions drawn in an article
3        that has been peer reviewed?
4   A.   Trust the conclusions, I guess that's not a term
5        that I would use.  But I guess if you'd distill it
6        down, perhaps.  I'm more likely to cite it.  I could
7        use it.  I might think that what they've done -- if
8        I read it and I think their methodology was sound.
9        There are a lot of things that prevent articles from
10       surfacing in peer-reviewed journals.  Sound
11       methodology is one, insufficient results are
12       another.
13           But I would not say a paper has no merit if
14       it's not published in a peer-reviewed journal.
15       Sometimes the person isn't a very good writer.  And
16       so their work never finds its way to a venue that
17       maybe is appropriate for the methodology.  I've
18       conducted quite a few reviews in the last few years,
19       and that is a stumbling block for some of the papers
20       that are submitted.  It's just not presented in a
21       way -- the research might be sound, but it's not
22       presented in a way that can contribute in a
23       meaningful way.
24           So if I read something in a non-peer-reviewed
25       journal, I would probably look myself at the

Page 71

1        methodology and the results.  And I could maybe use
2        that.  It would be unlikely that it would be in my
3        radar though.  These -- I actually don't even know
4        of a journal that I would reference that is not peer
5        reviewed.
6   Q.   So the journals you look at when you do your
7        literature review, for example, are all
8        peer-reviewed journals?
9   A.   For the most part, they would be.  In sexting, it's
10       a different -- it's an emerging field still.  So
11       I've been a little bit more lenient in just getting
12       any information.  So something I might reference as
13       being done, it may not have been in a peer-reviewed
14       journal, but I just want to say someone has looked
15       at something and this is what they found.  Anyone
16       who is a researcher would then look at the reference
17       list and see, well, where was this published?
18           I think in my original publication, I listed a
19       reference for a paper that hadn't even been
20       published anywhere.  It's just something I think
21       someone -- or if it was published, it was in
22       something that was not peer reviewed or some source
23       that wasn't, in my mind, very reputable.  But they
24       had still done some work in it.  So to acknowledge
25       that someone has done something, in an emerging

Page 72

1        field is, I think, appropriate.  So I'm not sure
2        that they're all from peer-reviewed journals.  But
3        again, as an emerging field, you have to say this
4        work has been done, if I can find it then it had
5        been done.
6   Q.   What about in a non-emerging field?
7   A.   In a non-emerging field, I think, unless you're
8        citing, like, prevalence data or, you know, these
9        studies that are focused on prevalence really, I
10       think it would be rare to find someone who uses many
11       non-peer-reviewed sources.
12  Q.   Okay.  Was your 2012 article peer reviewed?
13  A.   Yes.
14  Q.   And was your 2013 article peer reviewed?
15  A.   Yes.
16  Q.   Have any of your articles not been peer reviewed?
17  A.   No.
18  Q.   So all of your published articles have been peer
19       reviewed?
20  A.   Yes.
21  Q.   Would you feel comfortable publishing something
22       that's not peer reviewed?
23           MS. BAUMGARDNER:  Objection.
24  A.   Would I feel comfortable?  If I were working for the
25       Pew Foundation, I'd feel very comfortable publishing

Page 73

1        something that was not peer reviewed.  If I were
2        working for Nielsen Mobile, I'd feel very
3        comfortable.
4            My role as an educator in my university, I
5        would never submit my articles or my manuscripts --
6        peer review, I think, is an important part of the
7        publication process.  I would want to always have
8        someone look over my paper before it was published.
9   Q.   Sure.
10  A.   Not only because of the credibility issue, but as --
11       because it's a useful process, to get another set of
12       eyes on the work that you've completed.
13  Q.   So as a researcher in developmental psychology, if
14       you had the choice between publishing an article
15       that's not peer reviewed and not publishing at all,
16       which would you choose?
17  A.   It depends on the topic.
18  Q.   Okay.  In the area of sexting in young adults.
19  A.   I feel that the area of sexting in young adults is
20       still in its emergent phase.  We still -- it's
21       research that is -- hasn't been around for 20 years.
22       So because of that, I think I would feel comfortable
23       putting something out that was not peer reviewed if
24       it were never going to find another venue.
25           In emerging fields, there's something called

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 74..77

Page 74

1  "the file drawer phenomenon." I don't know if
2  you've ever heard of it, but probably not. So
3  sometimes people will conduct research and not find
4  anything that's significant. And if you don't find
5  any relationships that are significant or you don't
6  contribute to theory in any way, you sometimes --
7  people will not publish that research. Because it's
8  harder to find a venue if you're saying I didn't
9  find anything significant here. I didn't find
10 anything that would contribute to this theory, help
11 further this theory. So what you have is an
12 interesting phenomenon called the file drawer
13 phenomenon. So people just take that study and they
14 put it in a file drawer.
15      Well, particularly for emerging fields, I think
16 it would be important for those things that might
17 get stashed away in a file drawer to be available to
18 the public, so that I wouldn't have to go down any
19 routes that other people have already gone down
20 unsuccessfully.
21      So it's as if a rat went down the thing and
22 said, okay, guys. There's nothing down this arm of
23 the radial maze. You know, move on to another arm.
24      So in that case, if I couldn't get something
25 published in a peer-reviewed journal, specifically,

Page 75

1       that would be a good example of something that may
2       not be appealing to a peer-review journal, I would
3       be tempted in this emerging field to help further
4       the field.
5  Q.   So in the context of sexting in young adults, you
6       don't feel -- you don't think it's as important to
7       have peer-reviewed articles?
8            MS. BAUMGARDNER: Objection. I don't think
9         that's what she said.
10 A.   I think having a peer-reviewed article is very
11      important to further the field. And I think that is
12      what I said. But I think in an emerging field,
13      things that are not peer reviewed can still have
14      merit in contribution to our understanding of the
15      phenomenon.
16 Q.   And in an emerging field, you would be more likely
17      to consider non-peer reviewed than in a non-emerging
18      field.
19 A.   No. I wouldn't say that. Even if I were
20      publishing -- if I were publishing in literacy
21      research -- we have decades and decades and decades
22      of literary research. If I found something that was
23      published by a body like the Pew Foundation that
24      gave statistics about what people are doing in the
25      United States, I'd be very comfortable citing that,

Page 76

1  even though it's not a peer-reviewed journal. So
2  there are different types of sources that you might
3  use, even in very well established fields, and not
4  all of them would be peer-reviewed sources.
5  Anything that's contributing to the theoretical
6  knowledge of the field, I would feel most
7  comfortable if those are articles were peer
8  reviewed.
9  Q.   Thinking now of the separate context of the pure
10      polling data that groups like Pew conduct, is there
11      any peer-review process in that field?
12 A.   Not that I know of. I'm not sure.
13 Q.   Okay. I'm sorry. I actually want to jump back to
14      something you said a little while ago. I wanted
15      just to touch on it. This goes back to when we were
16      discussing and trying to estimate the number of
17      people who are studying sexting in young adults from
18      the perspective of psychology. And I think you had
19      said that, you know, you are one of the only people
20      who had studied it as extensively. What did you
21      mean by "extensively"?
22 A.   In my field of psychology, looking at the -- like,
23      the psychological drives and correlates of sexting,
24      having three or four studies completed in the field
25      is -- is pretty good at this point, because it is an

Page 77

1  emerging field.
2       Does that answer your question?
3  Q.   It does. So it's the number of studies that you've
4       completed in an emerging field is what you consider
5       to be extensive?
6  A.   The number of studies in the emerging field, as well
7       as my -- the number of ongoing studies that I have
8       and -- yeah. I guess that would be. I can think of
9       people who have kind of conducted continual studies
10      in this area. And I can think of people who I only
11      know of them publishing once in this field. So,
12      yes, in comparison, I am one of the people who's
13      publishing more in this field.
14 Q.   Has anybody published more than four studies on
15      sexting in young adults?
16 A.   Sexting in young adults, not that I know of.
17 Q.   Has anybody published three studies on sexting in
18      young adults?
19 A.   Not that I know of.
20 Q.   What about two studies on sexting in young adults?
21 A.   Yes, I believe a couple of people have done two
22      studies.
23 Q.   So two people have done two studies on sexting in
24      young adults?
25 A.   I don't know the exact number.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 78..81

Page 78

1  Q.  And you said some people have published one study on
2      sexting in young adults.  Correct?
3  A.  Yes.
4  Q.  Do you know how many people have published one
5      study?
6  A.  No, I don't.  I mean, I can think of one person in
7      particular, the only published study I know.  But I
8      don't know how many exactly.  I don't usually follow
9      the paper trail of authors.  Though if a particular
10     study piques my interest, then I might see what else
11     they are doing.  What is their current work?
12 Q.  Okay.
13 A.  And see if they're pursuing it any more.  So -- but
14     that would be rare.
15 Q.  So what does your literature review involve?
16 A.  My literature review involves --
17 Q.  I'm sorry.  Excuse me.  For sexting in young adults.
18 A.  Okay.  So I would -- various things.  Initially,
19     there were very few search terms that would return
20     any hits in my common psych info, psych articles.  I
21     use Academic Premiere Pro.  I use a variety of
22     databases and put in various terms.  So
23     computer-mediated sex, sexual activity, online,
24     mobile phones -- I mean, you put in a number of
25     search terms.

Page 79

1      And initially, when I was doing my research,
2  when I would try to do such searches, very few
3  things would come up.  Because these databases, they
4  will reference things that are not peer reviewed
5  sometimes.  But there's a heavy emphasis on
6  peer-reviewed articles.  And journals that have --
7  journals have to, I suppose, pay to have their
8  journals indexed within these databases.  So usually
9  you have more prestigious journals represented.
10     In any case, so when I first would do these
11 searches, very little would come up using multiple
12 search terms.  So I would just use Google and try to
13 find anything out there.  And -- which is the way
14 that I think some people found my research
15 initially.  You would just type in the same types of
16 words that you might use in a academic search.  I
17 guess, the words -- I would use a more layperson's
18 terms.  So I would probably use sexting in a Google
19 search, whereas in a academic search, I might use
20 different types of words more often.  So I would do
21 both the search of just generally what's out there.
22     And sometimes those links would lead you to
23 other places.  If I did happen to find an article on
24 sexting, I would look at their reference list, then
25 use their reference list to go out and see what

Page 80

1      other researchers have done, what have they
2      referenced, so kind of a snowball method.
3  Q.  Do you become familiar with certain authors or
4      researchers as you're doing a literature review?
5  A.  Familiar, can you describe what you mean?
6  Q.  Do you ever see multiple publications by a
7      particular author or researcher when you're doing a
8      literature review?
9  A.  In this area or in --
10 Q.  Yes.  In sexting in young adults.
11 A.  In sexting, you only have a few people who would
12     have multiple articles that would come up via these
13     searches.  If I'm doing a search in literacy, then
14     you would have far more that would have multiple
15     publications.
16 Q.  Who are some of the other researchers or people who
17     published articles about sexting in young adults
18     that you've seen come up multiple times when you do
19     your literature review?
20 A.  I haven't seen -- I could tell you in youth sexting,
21     the other lab that's quite active is the one that
22     Finkelhor, Mitchell -- their group has been cited
23     more than once.  They have a few articles.  "A few"
24     I use loosely.  I don't know if it's two or three.
25     I see my work as very separate from youth sexting,

Page 81

1  so I only cite it in talking about the methodologies
2  that they might employ of how a similar vein of
3  research might also -- or should be extended to
4  young adult sexting.
5  Q.  So is there anyone well known who's researched or
6      published in the area of young adults and sexting?
7  A.  From my -- that are applicable to my studies?
8      Applicable to my -- so my research is looking at not
9      just sexting in a prevalence way, but sexting from a
10     psychological perspective and also, like, risks --
11     my latest one is risks and feared risks associated
12     with it.  So I'm talking about a narrow thing.
13     So some people might be doing research in
14     sexting that is not really applicable to the types
15     of things that I'm looking at.  So in the types of
16     things I'm looking at, no.  I don't see -- I
17     don't have people who are listed multiple times as
18     authors in this area in what I'm looking at
19     specifically in young adult sexting.
20 Q.  Okay.  And that's one of the reasons why you think
21     that you are one of the more -- you have conducted
22     more extensive research in this field?
23 A.  In this area, yes.
24 Q.  From a psychological perspective?
25 A.  Yes.

Page 82

1  Q.  What about more broadly?  Are there any well known
2      people who have studied -- are there any people who
3      are well known because of their work on sexting in
4      young adults?
5  A.  Can you describe well known to me?
6  Q.  Are there any studies that you can think of -- let
7      me start over.
8          If you were going to -- if a new person was
9      going to look at sexting in young adults --
10 A.  Yes.
11 Q.  -- are there any studies that you would point that
12     person to as something that is essential to the
13     field to understand when they start out with their
14     research?
15 A.  Can you tell me what this person would be studying
16     exactly about sexting?
17 Q.  If you had a student who wanted to write about some
18     facet of sexting in young adults, but just wanted to
19     explore the topic broadly, would you point them to
20     any specific studies?
21 A.  Explore the topic broadly.  Yes, I would point them
22     to lots of studies.  I would tell them to look at my
23     reference list on my latest paper.  That would be
24     more inclusive, and then to do a literature search
25     that would include everything that was published in

Page 83

1      2012 and 2013.  Because those would be the things
2      that would be -- with the way that publications come
3      out, those references, the newer references would be
4      left out.
5  Q.  Okay.  So it would be the reference list on both
6      your 2012 and 2013 articles?
7  A.  I would tell them to look at those reference lists,
8      but as well to look at what else has been published
9      in 2012 and 2013.  Something -- my article that was
10     published in 2013 was submitted much earlier.  So
11     you're missing everything for you, you know, six to
12     eight months, at least, from your reference list.
13     So they would also have to conduct a more recent
14     literature review.
15 Q.  Certainly.  Is there any more recent article that
16     you would recommend to that person?
17 A.  Apparently, the Bauermeister article is --
18     Bauermeister, I think that's the name of it; the one
19     that Zimmerman is a co-author.  I only saw it
20     briefly.  And I have not been looking -- I'm past
21     the point in my study of doing the literature review
22     for the initial review.  And then I haven't yet done
23     the actually literature review.
24         So the stage that my research is in now, you
25     submit your initial proposal to the IRB, which could

Page 84

1      be a year, six months before the study concludes,
2      two years sometimes before the study concludes.  And
3      then you gather data on that study.  So right now,
4      I'm in the data gathering part, so there are a lot
5      of articles that I haven't been able to look at that
6      have been published in probably the last eight
7      months.  So anything from the middle of 2012 'til
8      now.
9  Q.  So articles since the middle 2012 on sexting in
10     young adults, if they do not concern the
11     psychological facet, you have not been following
12     those?
13 A.  What I've actually been following since the middle
14     of 2012 is things -- well, following.  Again, it's
15     kind of emerging so there's nothing really to
16     follow.  But the articles that I've been looking at
17     most recently have to do with intimate partner
18     violence and sexual coercion.  And following is
19     probably not the correct term.  The articles that I
20     am looking at in the construction of my ethics board
21     review are articles related to sexual coercion.  And
22     I don't think any of them were published in 2012 or
23     2013.  So until I start writing up one of my
24     studies, I probably won't get deep into the
25     literature about anything on young adults and

Page 85

1      sexting from the last six months.
2  Q.  Okay.  So your literature review from the last six
3      months has been focused on sexual coercion and
4      intimate partner violence?
5  A.  Not intimate partner violence specifically.  But
6      my -- the types of things that are presently related
7      to the work that I'm proposing now are sexual
8      coercion works.  And the recent -- you can see my
9      recent work under Presentations, Disciplinary
10     Research.  So I have two presentations and I also am
11     supervising a student who is participating in the
12     Midwestern Psychological Association Conference
13     under the Psi Chi competition, who is looking at
14     unwanted but consensual sex and correlates with
15     physical abuse.  So these are the types of things
16     that for the last six months I've been more
17     concentrated on, because these are my active
18     studies.
19 Q.  That makes sense.  So in the last six months, you
20     haven't been focused on conducting the literature
21     review for young adults and sexting?
22 A.  Yes, that's correct.
23         MR. SWINTON:   I said at the beginning that
24     we would take breaks every 90 minutes.  I think
25     we're a little bit over time.  It seems like this

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 86..89

Page 86

```
1          might be a good time to take a break.
2              MS. BAUMGARDNER:  That sounds good to me.
3              THE WITNESS:  Okay.
4                  (Whereupon, a recess was taken, after
5                  which the proceedings continued as
6                  follows:)
7   BY MR. SWINTON:
8   Q.   Dr. Drouin, did you speak with anybody during the
9        break?
10  A.   Yes.  I spoke with Lorraine.
11  Q.   And did you discuss the case?
12  A.   The case?
13  Q.   The case Free Speech Coalition v. Holder.
14  A.   We did not discuss anything about the case, no.
15  Q.   Did you discuss anything about this deposition?
16  A.   I mentioned that I have to not ask you questions,
17       that I have to overcome the urge to ask you
18       questions, yes.
19  Q.   And was that the only thing you discussed?
20  A.   And I said how was I doing, and she said I'm doing
21       great.
22  Q.   Okay.  Did you discuss anything else?
23  A.   No.
24  Q.   Okay.
25  A.   Oh, yes.  We discussed that she's a lawyer and she
```

Page 87

```
1        often finds it an occupational hazard as well with
2        her children that she will talk like a lawyer to her
3        children.  And I think that encapsulates all of our
4        conversation.
5   Q.   Okay.  Thank you.  I wanted to ask you a few
6        questions about the present lawsuit, Free Speech
7        Coalition v. Holder.
8   A.   Okay.
9   Q.   Are you familiar with this lawsuit?
10  A.   Only a little bit.
11  Q.   What do you know about it?
12  A.   I know that Lorraine is representing 13, I believe,
13       plaintiffs who are hoping or -- let me think of the
14       correct word -- who -- I don't know the legal term.
15       But who are concerned with one of the parts of the
16       Constitution, I don't know the number, that relates
17       to sending of sexually-explicit material.  And I
18       think the verbiage I'm using is not the correct
19       verbiage either.  And so it's constitutional law.
20           And to be honest, that's about the extent that
21       I know.  I know a little bit about who some of the
22       people are that she's representing.  And all the
23       rest that I know is that I'm supposed to be
24       commenting on my research.
25  Q.   Have you met any of the people who are plaintiffs?
```

Page 88

```
1   A.   I have not.
2   Q.   When did you first hear about the lawsuit?
3   A.   I think it was February or -- I think it was
4        February, a few months ago.
5   Q.   So you first heard about the case in February 2013?
6   A.   Yes.
7   Q.   How did you hear about it?
8   A.   I got a call from Bill Livingston, one of Lorraine
9        Baumgardner's colleagues who said that they were
10       possibly interested in me being an expert witness
11       for this case.  And he explained pretty much what
12       I've explained to you, he explained then about the
13       case.
14  Q.   Do you know why Mr. Livingston contacted you?
15  A.   Why he contacted me?  Can you clarify?
16  Q.   Yeah.  Let me rephrase the question.  Do you know
17       why Mr. Livingston wanted you to be an expert in
18       this case?
19  A.   Because he, I think, recognized me as an expert in
20       young adult sexting.
21  Q.   Did he recognize you as an expert in young adult
22       sexting broadly defined?
23           MS. BAUMGARDNER:  Objection.
24  A.   I don't know what he thought.
25  Q.   Okay.  What did the -- what do you know about the
```

Page 89

```
1        plaintiffs' position?  What do you know about the
2        plaintiffs' arguments in this case?
3   A.   I think that what they're saying is if this is
4        broadly applied, it could affect a large number of
5        people who are also transmitting this type of
6        sexually-explicit material.
7   Q.   And when you say "this," if this is broadly applied,
8        what --
9   A.   This part of the Constitution, this law.
10  Q.   Okay.  What did the plaintiffs ask you to do for
11       this case?
12  A.   The plaintiffs?
13  Q.   What did Mr. Livingston ask you to do for this case?
14  A.   Okay.  He just asked me to write -- first write a
15       statement that just talked about my research and
16       what I found.  And to then try to extrapolate from
17       my -- what my findings might be what might be
18       prevalent in a young adult sample.
19  Q.   And did he ask you to describe your research in
20       young adults and sexting?
21  A.   I don't think he asked me -- I don't think the word
22       was describe.  I'm not sure what the exact term was,
23       but yes, the young adult and sexting research --
24       there are two articles specifically that he asked me
25       to include descriptions of, what did I do, what did
```

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                                    Pages 90..93

Page 90

1   I find.
2   Q.  Did he ask you to include discussion of any other
3       articles you've published?
4   A.  No, he didn't.
5   Q.  So they asked you to summarize the article you
6       published in 2012 and the article you published in
7       2013?
8   A.  Yes.  I believe that's what he asked me to do.
9       Again, I don't think summarize is the word, but I
10      can't remember the exact term he used.
11  Q.  Okay.  Did he ask you to reach any specific
12      conclusion?
13          MS. BAUMGARDNER:  Objection.  Again, I'll
14      instruct her not to answer.  I think that's work
15      product.
16  Q.  Were you asked to make any assumptions for purposes
17      of your report?
18  A.  Assumptions, no.  Can you just -- assumptions, no.
19      But if you'd like to further describe what you mean
20      by assumptions.
21  Q.  Were you asked to assume any facts to be true?
22  A.  No.
23  Q.  Were you asked to assume -- well, strike that.
24          Did you write all of your expert report
25      yourself?

Page 91

1   A.  Yes.
2   Q.  How did you write it?
3           MS. BAUMGARDNER:  Objection.
4   Q.  Okay.  I'm sorry.  Let me rephrase that question.
5           Did you share a draft with anybody?
6   A.  No.
7           MS. BAUMGARDNER:  Again, objection.  I'm
8       going to instruct her not to answer on the grounds
9       of work product any questions about drafts.
10          THE WITNESS:  I'm sorry.  I --
11          MS. BAUMGARDNER:  So I'm going to instruct
12      you not to answer that question.
13          THE WITNESS:  Okay.
14  Q.  Let me ask again, did you -- you did write all of
15      your expert report yourself.  Correct?
16  A.  I did, yes.
17  Q.  Okay.  Nobody else wrote any sections for you?
18  A.  No.
19  Q.  Okay.  Did you receive any feedback on your report?
20          MS. BAUMGARDNER:  Again, objection.  In terms
21      of any discussion between plaintiffs' counsel and
22      the expert, that would be protected by work
23      product.  So I'll instruct her not to answer in
24      terms of our discussion.
25          But if you got feedback from anyone else,

Page 92

1       you may answer Mr. Swinton's question.
2   A.  And that's what I had assumed you meant about anyone
3       else.  No.
4   Q.  How long did it take you to write your expert
5       report?
6   A.  Maybe two hours.
7   Q.  Two hours total?
8   A.  Yeah.
9   Q.  What did you do to write the report?  What -- let me
10      ask a little bit more specifically.  What articles
11      did you consider when you wrote your report?
12  A.  I considered my two articles and other articles that
13      were related to young adult sexting that I had
14      previously referenced in my research and an
15      additional one on Hispanic women.
16  Q.  Okay.  So you looked at five articles total?
17  A.  Yes, I believe five articles.
18          (Whereupon, Deposition Exhibit No. DX-2,
19          Report of Michelle A. Drouin, Ph.D., was
20          marked for identification.)
21  Q.  Okay.  I'm handing you a copy of an exhibit marked
22      DX-2.  At the top, it's labeled "Report of Michelle
23      A. Drouin, Ph.D."
24  A.  Yes.
25  Q.  And it's about six pages long.  Have you seen this

Page 93

1       document before?
2   A.  I have, yes.
3   Q.  And this is the expert report you prepared for this
4       case?
5   A.  Yes.
6   Q.  And you wrote this yourself.  Correct?
7   A.  Yes.
8   Q.  Now, just to clarify, is your name spelled correctly
9       at the top?
10  A.  Oh, no.  It isn't.
11  Q.  Okay.  But this is -- you are the Michelle A. Drouin
12      referenced at the top of the --
13  A.  I am, yes.
14  Q.  Now, you said you relied on five articles in
15      preparing the report?
16  A.  Articles as in research articles, is that what
17      you're referring to?
18  Q.  Articles broadly.  You said you relied on five?
19  A.  Well, then it would be more than five.
20  Q.  How many was it?
21  A.  Well, let's see.  Seven.  And the Howden and Meyer
22      from the census data is not included in the
23      reference list.
24  Q.  So the total body of work you considered were the
25      six articles listed as references and then also the

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 94..97

| | Page 94 | | Page 96 |
|---|---|---|---|

Page 94

1      Howden and Meyer article?
2  A.  Yes.
3  Q.  Did you find these articles independently, without
4      any assistance from anybody else?
5  A.  Yes.
6  Q.  Did anybody tell you to look at specific articles?
7  A.  No, they did not.
8  Q.  Were you paid for preparing this report?
9  A.  Yes, I was.
10 Q.  I think it says on page 2, you received $1,500 as
11     compensation?
12 A.  I did.
13 Q.  And that was for the two hours spent preparing this
14     report?
15 A.  Yes.
16 Q.  Have you been paid in connection with any other work
17     on this case?
18 A.  None yet.
19 Q.  Not yet.  Outside of preparing for this deposition
20     and preparing the expert report, have you done any
21     other work on this case?
22 A.  I -- just reading -- reading articles and reading
23     through the statement by Philip Stark.  Just
24     reading.
25 Q.  Have you read articles that aren't listed or

Page 95

1      referenced in your expert report in connection with
2      this case?
3  A.  I did.  I reexamined Weisskirch and Delevi.
4  Q.  Okay.
5  A.  Weisskirch and Delevi was one of the first articles
6      that looked at sexting among young adults from a
7      psychological perspective.  And unfortunately, they
8      listed only the means for frequency data and no
9      prevalence data for young adult sexting.  So because
10     I was being asked to write about my reports and then
11     extrapolate to a young adult sample, I didn't find
12     anything useful in that article.
13 Q.  Did you look at that article before you wrote this
14     expert report?
15 A.  Oh, I've read that article a number of times, yes,
16     before I wrote this report.
17 Q.  Okay.  So you considered that article when you were
18     preparing the report, but decided not to use it?
19 A.  Yes.  There was nothing useful.
20 Q.  Okay.
21 A.  From my perspective.
22 Q.  Aside from the Stark declaration which -- you've
23     read the Stark declaration.  Correct?
24 A.  I have.
25 Q.  Okay.  Other than the Stark declaration, have you

Page 96

1      read anything else in connection with this case
2      that's not listed in your expert report?
3  A.  That's connected to this case, no.
4  Q.  Okay.  What conclusions did you draw in your expert
5      report?
6          MS. BAUMGARDNER:  I'm going to object.
7          But you can go ahead and answer the
8          question.
9  A.  I was not asked to draw a conclusion in the way that
10     I'm interpreting it.  Can I -- I wasn't asked to
11     draw a conclusion.  I was asked to say what I did in
12     my studies, say what I found.  And then extrapolate
13     from that data or my knowledge of the field to U.S.
14     census data, using U.S. census data to come up with
15     an estimation of how frequently young adult sexting
16     could be occurring.
17 Q.  Okay.
18 A.  I wasn't asked though to make any conclusions about
19     this research.
20 Q.  So you were asked to give an estimate?
21 A.  Yes.
22 Q.  Did you define the term "young adults"?  How did you
23     define the term "young adults" in your expert
24     report?
25 A.  Again, young adults is -- could be defined in

Page 97

1      different ways.  So young adults, I took it as a
2      researcher-specific term.  Anything 18 to 30, I
3      guess, that people had considered a young adult in
4      their own research, I included.
5          MS. BAUMGARDNER:  And for the record, the
6          defendant's Exhibit 2 is incomplete in that it
7          doesn't includes Exhibits A and B as attachments.
8          MR. SWINTON:  Okay.  We can mark those as
9          separate exhibits, and we'll get to them.
10         MS. BAUMGARDNER:  Okay.
11 Q.  Can we look at page 5 of the expert report.
12 A.  Yes.
13 Q.  And you say that approximately one-third of young
14     adults (aged 18 to 24).  So for purposes of this
15     estimate and this expert report, you were construing
16     the words "young adult" to mean people ages 18 to
17     24?
18 A.  Yes.  For the purposes of this report.
19 Q.  Did you come up with that age range on your own?
20 A.  I did not.  I looked at the census data and that was
21     the way they had grouped it, 18 to 24, for the
22     census data.  And because the next category spread
23     into numbers that would not generally be included as
24     young adult in these other samples, I had to take
25     the 18 to 24 age group, in order for it to be most

Page 98

1   applicable to the census data.
2   Q.  Okay.  You said earlier that sometimes young adult
3       can mean something different than 18 to 24?
4   A.  I mean some people -- it depends on the perspective.
5       Some people would argue that adolescence extends
6       into early 20s, especially in today's society where
7       many people are still -- are living at home or
8       returning to live home.  So it's a broad
9       interpretation.  But based on -- I had to use -- it
10      was recommended that I extrapolate to U.S. census
11      data, so I used their definition of young adulthood.
12  Q.  And it was recommended by Mr. Livingston that you
13      extrapolate to U.S. census data?
14  A.  It was.
15  Q.  Okay.  So if we stay on that same paragraph, you say
16      "my opinion is that approximately one-third of young
17      adults (aged 18 to 24) have sent text messages
18      involving sexually-explicit visual depictions."
19      Correct?
20  A.  Yes.
21  Q.  And then two sentences later, you say, "I would
22      estimate that approximately 10.2 million young
23      adults have sent text messages involving
24      sexually-explicit visual depictions."  Correct?
25  A.  Yes.

Page 99

1   Q.  What do you mean by "sexually explicit"?
2   A.  Well, this was a question that I had asked Lorraine
3       in a conversation, what does it mean?  And sexually
4       explicit, as I understood it, meant any visual
5       depiction.  It didn't even have to be someone
6       completely nude, but if it were sexually explicit in
7       nature.  So as an example, a man standing in his
8       underwear, if you could see the outline of his
9       genitals, could still be considered sexually
10      explicit.
11  Q.  Were you given any other examples of what would be
12      sexually explicit?
13  A.  I may have been.  I think I may have asked, so
14      masturbation is sexually explicit?  And entirely
15      nude is sexually explicit?  I think I may have asked
16      those things.  But the main part I remember about
17      the explanation I was given was that it didn't have
18      to be entirely nude to qualify.
19  Q.  What did it have to be to qualify as sexually
20      explicit?
21  A.  It had to be a visual depiction that was showing
22      something sexual.  I -- this sounds quite broad, but
23      if someone were fully clothed under the description
24      that I was given, I don't think it would qualify, if
25      I were turned around and just showing my backside if

Page 100

1   I were fully clothed.  For some reason, I feel like
2   the -- just depicting something that is sexual in
3   nature.
4   Q.  What does "sexual in nature" mean?
5   A.  It could be sex.  It could be masturbation.  It
6       could be a sexually-suggestive pose while you're
7       naked.  It could be a sexually-suggestive pose
8       apparently if you are still wearing underwear.  That
9       would have been my interpretation from what was
10      explained to me.
11  Q.  And by "sex," you mean sexual intercourse?
12  A.  Yes.
13  Q.  Okay.  And is that limited to sexual intercourse
14      involving two people's genitals?
15  A.  No.
16  Q.  Would it include oral sex?
17  A.  Yes, I believe so.
18  Q.  Okay.  So if -- you said that it had to be sexually
19      suggestive.  What does "sexually suggestive" mean?
20  A.  Suggesting sex.
21  Q.  Can a person be nude and not be sexually suggestive?
22  A.  The image or the person?
23  Q.  Can an image of a naked person not be sexually
24      suggestive?
25  A.  Could it not be sexually explicit, I mean, because I

Page 101

1   guess sexually suggestive would apply to non-nude,
2   sexually explicit might apply to nudes.  Explicit
3   meaning it's there.  So even if the person wasn't
4   meaning to be sexual, if someone derives sexual
5   pleasure from that image, then it could be sexually
6   explicit.
7   Q.  And if nobody derives sexual pleasure from the
8       image, then it's not sexually explicit?
9   A.  No.
10  Q.  Okay.  So there are instances in which a person can
11      be completely nude and it's not sexually explicit?
12  A.  No.
13  Q.  So every nude depiction of a person is sexually
14      explicit?
15  A.  From the perspective of the law or from the
16      perspective of . . .
17  Q.  From the perspective of your estimate in your expert
18      report.
19  A.  Anything that was involving a nude image was
20      included in sexually-explicit visual depictions.
21  Q.  Okay.  So when you say "sexually-explicit visual
22      depictions" in your expert report, you mean entirely
23      nude, masturbation, sexual intercourse, or clothed
24      but sexually suggestive?
25  A.  Yes.  And I'm not sure that that encapsulates it

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                    Pages 102..105

Page 102

1   all, but those things, yes.
2   Q.   What else would be included?
3   A.   I'm not sure.  But it's -- this research hasn't been
4        delineated that often -- oh, I don't have it.
5        Partially clothed as well; I don't think that you
6        mentioned that, partially clothed.  So that could be
7        included as well.
8   Q.   And what does "partially clothed" mean?
9   A.   Perhaps a girl without her shirt on.
10  Q.   Okay.  So you can see a woman's breasts would be
11       partially clothed?
12  A.   Yes.
13  Q.   And what about a man without his shirt on?  Is he
14       partially clothed?
15  A.   I'm not sure.  I don't know if those were things
16       that people would have included in their estimation.
17       So it's very difficult for me to say it.  I would
18       say under the current definitions of sexually
19       explicit, I would guess a man without his shirt
20       would not -- consider that a sexually explicit
21       image.
22  Q.   Okay.  So when you were using the term
23       "sexually-explicit visual depictions," you weren't
24       thinking of any sort of legal standard for sexually
25       explicit.  Correct?

Page 103

1   A.   Actually, I was.  I would -- I didn't think, I
2        guess, before I -- let me rephrase.  When I conduct
3        my research, I delineate now the types of images.
4        So "sexually explicit" in my current work will
5        probably not be the term that I use.  Because I
6        think it needs to be delineated more than that.  So
7        this is a little bit broader.  Because now I'm
8        focusing on photos or videos and I'm delineating
9        different types of sexual content that has been
10       termed sexual content by the person who is reporting
11       it and has sent it.  So that's not my own
12       estimation.  It's the person who participates, their
13       estimation.
14  Q.   Okay.  So when you say "sexually-explicit visual
15       depictions" in your expert report --
16  A.   That is a little bit broader than my current --
17       the -- currently the way I am exploring sexting.
18  Q.   So since the time you wrote your expert report,
19       you've narrowed how you're defining sexually
20       explicit for the purposes of sexting.  Correct?
21  A.   I don't -- no.  I haven't narrowed it.  I don't use
22       the term "sexually explicit" in my present research.
23       I haven't narrowed anything.
24  Q.   Okay.  So present research aside, I just want to
25       make sure I understand what you mean when you say

Page 104

1        sexually explicit here.  So right now, the list as I
2        have it is entirely nude, masturbation, sexual
3        intercourse, partially clothed, and sexually
4        suggestive -- clothed but sexually suggestive.
5   A.   Yeah.  And sexual intercourse includes any kind of
6        oral sex.  And you included masturbation in that
7        list as well?
8   Q.   Correct.
9   A.   Yes.
10  Q.   Is there anything I've left out?
11  A.   I don't believe so.
12  Q.   Okay.  If a person is -- to be sexually explicit in
13       the way that you're using the term in your expert
14       report, if a person is partially clothed -- for
15       example, a woman's breasts are showing -- does that
16       have to be sexually suggestive in order to be
17       sexually explicit?
18  A.   From my perspective as a researcher, I'm asking
19       people to say whether or not they've sent
20       sexually-suggestive images of that sort.  So they
21       would have to categorize it as sexually explicit or
22       suggestive or whatever wording that I'm using.  It
23       usually has "sexually" part of it.  With then, the
24       example of have I shown my breasts to -- have I sent
25       a picture of me topless or -- so it's a self-defined

Page 105

1        term.
2   Q.   Okay.  So when you say sexually-explicit visual
3        depictions, when you estimate that one-third of
4        young adults have sent text messages involving
5        sexually-explicit visual depictions, that estimation
6        is based on how the senders or receivers of those
7        images interpreted the depictions?
8   A.   Yes.  And my work that's published is focused on the
9        senders.  But I have work as well that looks at the
10       receivers, and some of the other work looks at the
11       receivers.  So their interpretation of the images,
12       yes.
13  Q.   Okay.  So just so I'm clear on this, in your expert
14       report you say that approximately one-third of young
15       adults have sent text messages involving
16       sexually-explicit visual depictions.  The phrase
17       "sexually explicit," as used in the report, depends
18       on how the sender -- whether the sender believed the
19       depiction to be sexually explicit?
20  A.   Yes.  Because these are all asking senders whether
21       or not they determine it.  It's not some outside
22       source who has determined the content to be sexually
23       explicit.  Everything, all of the work that I cite,
24       has asked senders to qualify it as such.
25  Q.   Okay.  And I want to make sure I didn't miss

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                              Pages 106..109

Page 106

1   anything in your report. Did you make any
2   estimations about the number of young adults who
3   have received --
4   A.   I didn't.
5   Q.   -- sexually-explicit images?
6   A.   No.
7   Q.   So you focused just on the senders of
8   sexually-explicit images?
9   A.   I did.
10  Q.   Okay. Did you conduct any studies specifically for
11  the purposes of preparing this expert report?
12  A.   No.
13  Q.   So your estimate was based solely on studies that
14  had already been completed?
15  A.   Yes.
16  Q.   Okay. And those are the six studies that are listed
17  in your references on the last page of your report?
18  A.   Yes.
19  Q.   Have you reevaluated your estimate since the time
20  you wrote your report?
21  A.   No. Reevaluated, have I thought about it or have I
22  changed my mind about it?
23  Q.   Have you reached -- well, you say one-third of young
24  adults have sent text messages involving
25  sexually-explicit visual depictions. Have you

Page 107

1   reached a different percentage --
2   A.   No.
3   Q.   -- since you wrote this report?
4   A.   No.
5   Q.   And you estimate that 10.2 million young adults have
6   sent text messages involving sexually-explicit
7   visual depictions. Have you reached a different
8   estimate of the number --
9   A.   No.
10  Q.   -- since you wrote this report?
11       Okay. Have you reconsidered your estimates in
12  the expert report since the time that you wrote it?
13  A.   Can you tell me what you mean by "reconsider"?
14  Q.   Sure. Have you looked at the studies, either the
15  ones that were referenced in your report or other
16  studies on sexting in young adults and tried to come
17  up with an estimate of the percentage of young
18  adults in the country who have sent
19  sexually-explicit visual images?
20  A.   I have reviewed the research, but I have not tried
21  to come up with a new estimate because I haven't
22  come up with any conflicting evidence.
23  Q.   Okay. Have you looked specifically for conflicting
24  evidence since the time you wrote your expert
25  report?

Page 108

1   A.   And after I read Philip Stark's -- what are you
2   calling it, the Stark report? No. The Stark . . .
3   Q.   I think I referred earlier to the Stark declaration.
4   A.   Yeah. The Start declaration. When I read
5   Dr. Stark's declaration, I considered my number and
6   I believe that it is true.
7   Q.   Okay. What did you do when you -- what did you look
8   at after you read the Stark declaration?
9   A.   I really looked at his reference list. Many of the
10  things that were included on his reference list
11  which were -- not studies that he referenced on his
12  own ofttimes. It was studies that myself or the
13  other expert witness had referenced. Many of them
14  are applicable to not the young adult population.
15  So I looked at the methods that he looked at and
16  rechecked some of the methods of my studies. And
17  mine were accurate, so . . .
18  Q.   So you looked again at the studies you referenced,
19  as well as the studies that were referenced in the
20  Stark declaration?
21  A.   I didn't look at all the studies referenced in the
22  Stark declaration.
23  Q.   Okay.
24  A.   Anything that was not relevant to my work, I didn't
25  look at.

Page 109

1   Q.   Okay. Did you look at anything that wasn't either
2   in your expert report or the Stark declaration?
3   A.   I looked again at Weisskirch and Delevi, just to
4   make sure there was nothing there that had any kind
5   of prevalence data and that was mentioned in neither
6   report.
7   Q.   And that study that you just referred to, I think
8   it's Weisskirch --
9   A.   Weisskirch --
10  Q.   -- and Delevi?
11  A.   -- Delevi.
12  Q.   You earlier decided not to rely on it because it
13  just calculated a means and wasn't a prevalence
14  determination. Is that correct?
15  A.   Yeah. Well, they didn't give prevalence data in the
16  study.
17  Q.   Okay.
18  A.   I also -- I did do a search to see if there was
19  anything about prevalence that had come out in --
20  just doing a Google search. And I didn't see
21  anything there either.
22  Q.   Okay. Did you search anywhere else --
23  A.   No.
24  Q.   -- other than Google?
25  A.   I went to search for a specific article after I read

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 110..113

Page 110

1    Philip Stark's declaration, but I don't remember
2    what it was.
3  Q.  Do you remember why you were looking for that
4    particular article?
5  A.  Because I was particularly interested in the things
6    he said about the methodologies.
7  Q.  Okay.  Was the article you were looking for about
8    sexting?
9  A.  Yes.
10  Q.  But you were unable to find it?
11  A.  No.  I think I found it.  I can't remember which
12    article it was, but . . .
13  Q.  Oh, okay.  It was one of the articles that was
14    referenced in the Stark declaration?
15  A.  Yes.
16  Q.  I see.  And you were able to find it?
17  A.  Yes.
18  Q.  Okay.  Three of the published studies, published
19    articles, that you reference in your expert report
20    were studies of students at universities.  Correct?
21  A.  One, two, three.  Yes.
22  * * *
23  * * *
24  * * *
25  * * *

Page 111

1          (Whereupon, Deposition Exhibit No. DX-3,
2          Computers in Human Behavior, Texting,
3          sexting, and attachment in college
4          students' romantic relationships, was
5          marked for identification.)
6  Q.  Okay.  So I've handed you an exhibit marked DX-3.
7    This is a seven-page article.  The title page is
8    Computers in Human Behavior.  The second page is the
9    title of the article, which is "Texting, sexting,
10    and attachment in college students' romantic
11    relationships."  Author is Michelle Drouin and Carly
12    Landgraff.
13  A.  That's correct.
14  Q.  Have you seen this document before?
15  A.  Yes.
16  Q.  And this is an article you were a co-author on.
17    Correct?
18  A.  I was the primary author on, yes.
19  Q.  You were the primary author.  And this article
20    contains data from your research.  Correct?
21  A.  Yes.
22  Q.  And for the record, this is -- you attached this
23    article as Exhibit A to your expert report?
24  A.  Yes.  I believe so, yes.
25  Q.  So the article is focused on sexting, texting, and

Page 112

1    the presence of certain attachment phenomena in
2    college students' relationships.  Is that correct?
3  A.  Yes.
4  Q.  Is that a fair characterization?
5  A.  Yes.
6  Q.  Okay.  And as we discussed earlier, this is a
7    snapshot of your broader research on sexting.
8    Correct?
9  A.  Yes.
10  Q.  Can you describe to me what -- what was the purpose
11    of the research?  Not the article, what was the
12    purpose of the research?
13  A.  The purpose of the research was to gain insight into
14    the phenomenon of sexting.  When I started
15    conducting this study, it was really emerging.  I
16    actually struggled to find almost any references for
17    this work.  And what had been published was mainly
18    just -- not in peer-reviewed journals.
19          So the purpose of the original study was to
20    examine what types of things are correlates, so
21    relate to sexting, attachment, personality
22    characteristics, other types of relationship
23    characteristics.  Personal characteristics like
24    intimacy issues.  And then as well, to look at
25    texting and how text messaging is also related to

Page 113

1    relationships.  So there was -- there were two
2    things, two angles.
3  Q.  So, for example, one thing you were able to tell
4    from this study, and that you discuss in the
5    article, is whether people who are -- I think you
6    used the phrase "attachment" -- are more likely to
7    text a person with whom they're in a relationship
8    than a person -- or whether a person who is
9    attachment-avoidant is more likely to send a text
10    message to someone with whom they're in a
11    relationship.  Correct?
12  A.  Yes.  But it's in the other direction.  So a --
13  Q.  Less likely?
14  A.  Yes, they're less likely.
15  Q.  And maybe somebody with anxiety attachment might be
16    more likely to send a text message to a person with
17    whom --
18  A.  No.  If you look at Table 3, I'll explain it to you.
19    Are you on Table 3?
20  Q.  I am.  And just to clarify it, I wasn't trying to
21    state what the findings were, but this was one of
22    the things that you might be able to tell from the
23    study, for example.
24  A.  Oh, yeah.  You might be able to.
25  Q.  Okay.  So it was kind of whether a person who had

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 114..117

Page 114

1    this particular characteristic might be more or less
2    likely to send a text message or more or less likely
3    to send a sexual image?
4  A.  That's right.
5  Q.  Okay.  And Table 3 that you just referred to, helps
6    show some of the results?
7  A.  Yes.
8  Q.  Okay.  How did you collect your data for this study?
9  A.  I used a psychology department research pool.  All
10   introductory psychology students are asked to
11   complete research or complete a separate research
12   assignment in conjunction with them learning about
13   psychology.  It's a pretty standard practice.  Many
14   universities use psychology department research
15   pools.  So I identified the pool -- first, I wrote
16   the IRB proposal for the study, I identified the
17   pool, and then I gave this for anyone who signed up
18   online.
19 Q.  And I'm sorry.  IRB means what?
20 A.  IRB is the Institutional Review Board.  It's an
21   ethics board.
22 Q.  And you have to get their approval before you can
23   move forward with conducting this study?
24 A.  Yes.
25 Q.  Okay.  And in that approval process, you outline and

Page 115

1    describe what you would do if you do get
2    authorization?
3  A.  Yes.
4  Q.  Okay.  So of the pool of the students -- let me back
5    up.  Was your pool limited -- or it says here that
6    your pool was limited to students from a
7    medium-sized university in the midwestern United
8    States.  Correct?
9  A.  It was, yes.
10 Q.  So your were drawing from students at one
11   university?
12 A.  Yes.
13 Q.  And was that university Indiana-Purdue Fort Wayne?
14 A.  Yes.
15 Q.  Okay.  And how did you select participants from that
16   pool?
17 A.  They selected -- they elected to participate in my
18   research study.
19 Q.  How did they find out about whether they could
20   participate?
21 A.  All of the studies are listed in a system called
22   Sona Systems.  So the study was listed in Sona
23   Systems.
24 Q.  So there were multiple studies that they could
25   choose from to participate in?

Page 116

1  A.  Yes.
2  Q.  And it sounds like, if I understood you correctly,
3    they are required to participate in a study as part
4    of the psychology curriculum?
5  A.  They can participate in a study or do an alternative
6    research assignment.
7  Q.  Okay.  And they receive credit for participating in
8    a study.  Correct?
9  A.  They get one research credit, yes.
10 Q.  Okay.  So what happens once somebody selects your
11   study as one they want to participate in?
12 A.  Then they directed to an external survey website and
13   are told that -- they are given a consent form that
14   explains what the benefits and risks are of the
15   study.  And they are -- they have explanations in a
16   general way about what they will be doing and how
17   long it will take and what their compensation will
18   be for the study.  They are also given the contact
19   number for the principal investigator who they can
20   contact with questions at any time.
21       And then they have to agree to consent --
22   sorry.  They have to agree to participate within
23   this online consent form in order to move forward
24   with the survey.
25       Then on the survey, they -- after the end of

Page 117

1    the survey, they don't have to have completed the
2    whole survey, but after the end of the survey, they
3    get directed to another -- an external site that
4    would record their name for credit-granting
5    purposes, so that the methods are completely
6    anonymous.
7  Q.  You mentioned a principal investigator.
8  A.  Yes.
9  Q.  Are you the principal investigator?
10 A.  Yes.
11 Q.  Okay.  And they were given that person's contact
12   information that they could contact with questions?
13 A.  Yes.
14 Q.  Did anybody contact you?
15 A.  No.
16 Q.  Now, it's -- how long did it take a participant to
17   complete the survey?
18 A.  The length of time I think I estimated was 30 -- it
19   was 30 to 45 minutes.
20 Q.  And is that, those 35 to 40 minutes, are limited to
21   just answering the questions or is that the entire
22   process of certifying and then collecting your
23   course credit afterwards?
24 A.  It would be the entire process.
25 Q.  Entire process?  So a student gets one semester

Page 118

1    credit for less than an hour's worth of work.
2    Correct?
3 A. I don't know that you're saying semester's credit
4    [sic].  They get one research credit within the
5    context of an introductory psychology course.
6    Research credit being one of the things they do as
7    part of introductory psychology.
8 Q. Okay.
9 A. So in a typical semester, they might have to do five
10   things related to research.
11 Q. Okay.
12 A. That would be a nice exchange for them, one credit
13   for one hour.
14 Q. Yeah.  I thought it seemed very generous.  So a
15   research credit is not the same as a semester --
16 A. Course credit, no.
17 Q. -- credit?
18 A. No.
19 Q. Okay.  Now, you didn't select everybody who wanted
20   to participate in the study.  Correct?
21 A. I didn't select them for what?
22 Q. Not everybody who wanted to participate in the
23   study -- I'm sorry.  Everybody who wanted to
24   participate in the study was able to complete the
25   questionnaire.  Correct?

Page 119

1 A. They had the opportunity to complete the
2    questionnaire, yes.
3 Q. But not everybody completed the questionnaire?
4 A. I would say that I don't remember how many people or
5    if people did not complete the questionnaire.  I
6    would assume that not everyone answered all the
7    questions on the questionnaire.
8 Q. And is that -- the percentage of people who
9    completed all the questions on the questionnaire,
10   that's called a response rate?
11 A. Response rate is not really usually termed like
12   that.
13 Q. How is it termed?
14 A. Response rate is how many people do you ask who
15   actually reply.
16 Q. Okay.  So was there a response rate with this study?
17 A. No.  The response rate -- it's not response rate --
18   it wouldn't be a typical response rate as you're, I
19   think, thinking of it.
20 Q. There's no response rate because people volunteer to
21   participate in the study?
22 A. Yes.
23 Q. Is there any similar rate that you measure for
24   volunteer studies?
25 A. Not -- not mine.  I guess you could do -- not that I

Page 120

1    know of, not as a standard practice.  There wouldn't
2    be any kind of response rate for volunteer studies.
3 Q. So you don't measure the number of people who
4    accessed the survey but didn't answer all the
5    questions?
6 A. No.  Because not answering all the questions, if you
7    have a survey that has 600 questions and someone
8    doesn't answer one, then that person would be in one
9    category, and one person doesn't answer two
10   questions.  So you're talking about quite a complex
11   calculation that really wouldn't add much to the
12   study -- the number of people who would sign up for
13   a study and then not complete any of the questions,
14   because that would make it useless, is probably very
15   low.  And I don't usually see it included in
16   research --
17 Q. And you didn't include it --
18 A. -- that I review.
19 Q. -- in your studies?
20 A. I did not.
21 Q. Okay.  Now, on the fourth page of your article under
22   Method and Participants --
23 A. Yes.
24 Q. -- you say, "The sample consisted of 744 college
25   students."  And then you talk about the recruiting

Page 121

1    method from the introductory psychology classes.
2    You say, "From a larger sample, only those
3    participants indicating that they had been in a
4    committed relationship were included in this study."
5 A. Yes.
6 Q. So does this mean 878 people completed the survey?
7 A. Yes.  And by completion, it's a liberal term.  If
8    you don't fill out a couple of questions, your data
9    can still be included.
10 Q. Right.
11 A. Yes.
12 Q. Okay.  Of those 878, 744 indicated they had been in
13   a committed relationship.  Correct?
14 A. That's correct.
15 Q. So that means there were -- my math here -- 134
16   students who indicated they had not been in a
17   committed relationship?
18 A. That's correct.
19 Q. What happened to those 134 students, for purposes of
20   this study?
21 A. I took them out of the analyses.
22 Q. And was that for the study altogether or just for
23   purposes of this article?
24 A. For the purposes of this article.
25 Q. Okay.  So you used them in other ways, but not in

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                    Pages 122..125

Page 122

1    this -- connected to your research, but not in this
2    article?
3  A.  I may use them in other ways.  These -- I still have
4    the data set.
5  Q.  Okay.  So they were still helpful -- or they may
6    have still been helpful to you to have gathered that
7    data for some reason --
8  A.  Yes.
9  Q.  -- not related to this article?
10  A.  Yes.
11  Q.  Okay.  So on this same page and then continuing on
12    to the next page, under Results and then the
13    subheading 3.1, Prevalence of texting and sexting in
14    romantic relationship.  You say, I think, 54 percent
15    of the survey's participants had sent
16    sexually-explicit pictures or videos to their
17    relationship partners more than never?
18  A.  Yes.
19  Q.  Now, that means the 54 percent were of the people
20    who were in committed relationships?
21  A.  Yes.
22  Q.  And it was the 54 percent of people who were in
23    committed relationships in the introductory
24    psychology classes during the two consecutive
25    semesters during which you were conducting the

Page 124

1  Q.  Okay.  So their data isn't considered at all?
2  A.  You cannot use it at all.
3  Q.  Okay.
4  A.  You cannot even -- yes.
5  Q.  Okay.  How did you define committed relationship for
6    purposes of the survey?
7  A.  I asked them to -- I said -- let's see.  Okay.  It's
8    on 2.3.2.  "This would be a person with whom you
9    shared an intimate relationship like a serious
10    boyfriend or girlfriend, and would not be just a
11    casual fling or person with whom you were involved
12    only sexually."
13  Q.  And you asked the question regarding the
14    frequency -- this is in the same paragraph you were
15    just reading from.  "Participants answered questions
16    regarding the frequency with which they sent text
17    messages, sexually-explicit text messages, and
18    sexually-explicit picture and video messages to
19    relationship partners."  Sexually explicit meant
20    only words.  Correct?
21  A.  Mm-hmm.
22  Q.  Something only in writing?
23  A.  Yes.
24  Q.  Sexually-explicit picture and video message was a
25    visual depiction?

Page 123

1    survey?
2  A.  Yes.
3  Q.  And it was 54 percent of the people in a committed
4    relationship in the introductory psychology classes
5    during the two consecutive semesters you were
6    completing the survey at Indiana-Purdue Fort Wayne?
7  A.  Yes.
8  Q.  So the participants were people who went to
9    Indiana-Purdue Fort Wayne, were in an introductory
10    psychology class, had volunteered to take the
11    survey, and who were in committed relationships?
12  A.  Yes.
13  Q.  Okay.  Did you have age restrictions on the
14    participants?
15  A.  No.
16  Q.  So anybody who was in an introductory psychology
17    class who volunteered, you would collect their data?
18  A.  Yes.  We collect it, but we don't include anyone
19    under the age of 18.  We have to throw it out.
20  Q.  Okay.
21  A.  It's a technical thing that they have to be able to
22    participate.  But because we haven't gotten parental
23    consent, we have to throw that out.
24  Q.  Okay.
25  A.  It's like they didn't even do it.

Page 125

1  A.  Yes.
2  Q.  Did you define the phrase "sexually explicit" in the
3    survey?
4  A.  I did not.
5  Q.  And why didn't you define that phrase?
6  A.  This was my first study and the -- at the time,
7    although some people had been delineating it, I
8    didn't know that that was necessary to research what
9    it was that I was exploring, which were the
10    correlates with texting and attachment as well.
11  Q.  So the participants were left to define it -- were
12    to use their own interpretation --
13  A.  That's right.
14  Q.  -- of sexually explicit?  And you did measure
15    frequency, meaning how often somebody sent a
16    sexually-explicit image or video.  Correct?
17  A.  Yes.
18  Q.  And so I think you had the categories on a Likert
19    scale?
20  A.  Correct.
21  Q.  Am I saying that name correctly?  Likert?
22  A.  Yes, Likert.
23  Q.  You had the categories never, very rarely, rarely,
24    occasionally, often, and very often.  Correct?
25  A.  Correct.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 126..129

Page 126

1  Q.  So the 54 percent that I talked to earlier, where
2      you say 54 percent reported sending
3      sexually-explicit pictures or videos, that 54
4      percent had sent it at least one time?
5  A.  They indicated -- yes.  Either very rarely or above.
6  Q.  Above.
7  A.  So it was anything that was not never.
8  Q.  So that meant 45.9 percent of the participants in
9      your study had reported never sending a sex picture?
10 A.  Correct.
11 Q.  And it looks like, based on Table 2, that 6.9
12     percent had sent a sex picture often or very often.
13     Correct?
14 A.  Yes, correct.  Indicated that they had sent.
15 Q.  Indicated.  Now, we talked earlier about the purpose
16     of this article and you were looking at how sexting
17     is related to attachment style and interpersonal
18     relationships.  Were you also trying to determine
19     the prevalence of sexting among young adults in this
20     article?
21 A.  I was looking at the prevalence in this sample, yes.
22     I wasn't -- that wasn't my goal of the research.
23 Q.  And research, you mean -- what do you mean by
24     research?
25 A.  I mean the larger research question that drove the

Page 127

1      study was not prevalence in young adults.
2  Q.  So your greater research project was not to
3      determine the prevalence of sexting in young adults?
4  A.  No.  That was not the greater research project goal.
5  Q.  Okay.  And research, again, we mean something that's
6      more than just this article.  Correct?
7  A.  Correct.
8  Q.  We mean the collecting of data from these students?
9  A.  Correct.
10 Q.  And, in fact -- strike that.
11         One thing you talk about on page 6 of this
12     Exhibit DX-3 is some of the limitations of the
13     study.  You say that "our texting and sexting
14     measures were not direct single-item questions.
15     These single-item measures do not allow for
16     reliability analyses."
17         What do you mean by that?
18 A.  In a field that's well established, they often have
19     scales, scales that will ask questions in multiple
20     ways and will get to a question using multiple items
21     instead of single items.  At the time when I
22     conducted this research and even now, there are no
23     reliable scales that I know of that measure sexting.
24         So because it's an emerging field, I had to
25     rely on one single item.  A reliability analysis is

Page 128

1      a statistical process that you use to see how items
2      hang together in -- not necessarily measuring what
3      you say they're measuring, but how do these items
4      hang together.  So if I ask four questions about a
5      single topic and those questions are very strongly
6      related to each other, meaning the person answered
7      that question very similarly for those four
8      questions, then your reliability for that item will
9      by higher.  And that gives you, you know,
10     reliability of a measure.
11         So one of the limitations of the study is that
12     I just asked a single question.  If I had asked more
13     questions that were actually getting at the same
14     topic without repeating myself, it would have
15     allowed me to have greater reliability in the
16     measure.
17 Q.  So a multi-item question -- is that the correct
18     phrase -- would ask the same question in different
19     variations?
20 A.  There would be a multiple question survey.  So these
21     are very common in other types of social sciences.
22     So you might have a -- for example, a text message
23     dependent scale might have 12 items.  And three of
24     the items are measuring one particular part of text
25     message dependence.  And, yes, they ask it in

Page 129

1      different ways.  So it would be a survey or -- I
2      think "survey" is the most commonly used word to use
3      to represent this type of thing.
4  Q.  Okay.  You also talked about a limitation about the
5      honesty in self-reporting?
6  A.  Yes.
7  Q.  And you indicate that it's possible participants
8      didn't provide accurate, honest reports.  And then
9      you postulate that people might be hesitant to
10     report that they sent sex pictures in texts because
11     it's controversial and, you know, thought it was
12     being non-normative.  Did you have any indication
13     that there was underreporting?
14 A.  No.  But generally, again, the social desirability
15     effect.  This is pretty commonly seen in social
16     sciences, that people want to portray themselves in
17     a positive light.  If you have a bias in something
18     that's anonymous, it might be because people would
19     like to portray themselves in a more positive light.
20     And so in this case because, at the time especially,
21     the sexting information that was out depicted it
22     usually in a negative way, court cases and people
23     being -- mainly court cases.  At the time that this
24     data was collected, the major headlines about
25     sexting were people who were getting in legal

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                              Pages 130..133

Page 130

1    trouble for sexting.  So because it's perhaps seen
2    as controversial, non-normative, maybe some people
3    saw it as illegal, the social desirability or the
4    want to not say that you have done something.
5  Q.  But you didn't have any evidence from the study to
6      suggest there was underreporting.  Correct?
7  A.  No.
8  Q.  Was there any evidence to suggest that there was
9      overreporting?
10 A.  No.
11 Q.  Okay.  A few lines down on this same page we were
12     looking at in DX-3, you say, "this study examined
13     texting and sexting within a college sample and only
14     within the content of close, committed
15     relationships.  Although these college students may
16     be representative of most American young adults,
17     this limits the generalizability of the findings."
18     What is generalizability?
19 A.  How well you can generalize a single sample to the
20     rest of the population.
21 Q.  And in this case, the rest of the population is
22     what?
23 A.  American young adults.
24 Q.  American young adults.  So you're saying here that
25     the findings in this study are limited in their

Page 131

1      generalizability to all American young adults?
2  A.  Yes.  They're limited in the way that they could
3      generalize to all American young adults, yes.
4  Q.  And what does that mean?  How are they limited?
5  A.  They're limited because they examine only close,
6      committed relationships.  So obviously, there are
7      people who have not had close, committed
8      relationships.  As well, it's a college sample; not
9      everyone's in college.
10 Q.  Could you generalize your findings to young adults
11     in college?
12 A.  No.  I'd be looking for a convergence of evidence if
13     I were going to try to generalize.  In the social
14     sciences, we would probably not generalize to all of
15     any time [sic].  You would probably just, as I say,
16     look for a convergence of evidence if you wanted to
17     make generalizations about a broader population.
18 Q.  And what do you mean by convergence of evidence?
19 A.  Convergence of evidence meaning multiple people who
20     have looked at the issue in different places and
21     have found something similar.
22 Q.  Okay.
23 A.  But when you're examining psychological
24     phenomenon -- so within the scope of social
25     sciences, again, I made this distinction between

Page 132

1      simple polls and things that are related to
2      underlining psychological theories.  And
3      theoretically, I would be very surprised if, in any
4      sample, any college sample in the United States,
5      they found something very different with regard to
6      my contribution to theory.  So prevalence data is
7      harder to do that type of generalization, but
8      theoretically, it's a little bit more acceptable.
9  Q.  Okay.  So just to make sure I'm clear about that,
10     your findings about the prevalence of sexting and
11     its relationship to, for example,
12     attachment-avoidance relationship style, might be
13     easier to generalize than the pure findings about
14     the prevalence of sexting among young adults?
15 A.  People would be more likely to generalize that, yes,
16     than the prevalence data.
17 Q.  Because it has that connection to a theory?
18 A.  Because it has a connection to a theory and you're
19     looked at a phenomenon, not prevalence.  Your
20     looking at the way in which something emerges in
21     human behavior.  And you're not looking to get, you
22     know, a representative sample.  And these facets of
23     human behavior are often studied like this.
24 Q.  Makes sense.  Would you feel comfortable -- could
25     you generalize the prevalence findings from this

Page 133

1      study to all of Indiana-Purdue Fort Wayne, to the
2      entire student population?
3  A.  No.  For the reasons I just said.  This was only
4      committed relationships in this sample.
5  Q.  Could you generalize the findings of this study
6      concerning the prevalence of sexting to all of the
7      students at Indiana-Purdue Fort Wayne in committed
8      relationships?
9  A.  I would feel comfortable doing that.  You have about
10     1200 people, I think, who take introductory
11     psychology each semester.  It's a general education
12     requirement.  It's one of the more appealing general
13     education requirements.  So as an approximate, you
14     know, yes.  And especially as relates to avoidance
15     attachment and the attachment variables that relate
16     to these behaviors.  Yes, I'd feel comfortable doing
17     that.
18 Q.  So you don't think -- or do you have any reason to
19     think that the prevalence of sexting might differ
20     between majors, for example?
21 A.  Of course it might differ between majors.
22 Q.  But not -- it wouldn't be different enough that you
23     wouldn't feel comfortable -- let me back that up.
24        You would feel comfortable saying that the
25     prevalence of sexting of psychology majors in

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                           Pages 134..137

Page 134

1   committed relationships is representative of other
2   students at Indiana-Purdue Fort Wayne who are not --
3   and who do not take introductory psychology classes,
4   who are in committed relationships?
5   A.  You said two things.  You said psychology majors and
6       people in introductory psychology.  Which one do you
7       mean?
8   Q.  Let me rephrase the question.  So your study looked at
9       students who had taken introductory psychology
10      classes.  Correct?
11  A.  Correct.
12  Q.  And your findings were that 54 percent of the
13      participants had at one time sent a
14      sexually-explicit image to someone else with whom
15      they were in a committed relationship.  Correct?
16  A.  Yes.  Of the people who said that they had a
17      committed relationship.
18  Q.  Correct.  So would you feel comfortable -- do you
19      feel comfortable saying that 54 percent of
20      engineering majors who are in committed
21      relationships -- or estimating.  Do you feel
22      comfortable estimating that 54 percent of
23      engineering majors in committed relationships had
24      sent a sexually-explicit image or video to the
25      person with whom they are in a relationship?

Page 135

1           MS. BAUMGARDNER:  Objection.
2              You can go ahead and answer.
3   A.  Can I point you to a part of the document that I
4       think is very important for you to consider before I
5       answer this question?
6   Q.  Actually, I'd prefer you to give the answer first,
7       and then why don't you direct me to the part of the
8       document.
9   A.  Yes.  I feel comfortable applying this to any major.
10      Because as you can see on page 446 under 2.1, more
11      than 48 different majors were represented.
12          In my average psychology introductory class,
13      oftentimes I can have one or two people out of 86
14      who think they want to be psychology majors.  It's a
15      general education -- not requirement, but one of the
16      more appealing classes that fits in the general
17      education program.  So people of all different
18      majors take introductory psychology.  So we are
19      not -- this is not just about psychology majors,
20      this is also -- I mean, 48 different majors.  I'm
21      actually not certain how many majors we have at
22      Indiana-Purdue Fort Wayne, but I would suspect it's
23      probably not a lot more than 48.
24  Q.  Okay.  Would you feel comfortable generalizing -- or
25      estimating, I'm sorry.  Would you feel comfortable

Page 136

1   estimating that 54 percent of people who take
2   introductory psychology at the University of Maine
3   have sent a sexually-explicit image or video to a
4   person with whom they're in a committed
5   relationship?
6   A.  Have ever.  I would like to see -- before I would
7       make that estimate, I would like to see a couple of
8       other studies done with people who are in committed
9       relationships.  So no, not at this point.
10  Q.  Okay.  I want to go back to the definition of
11      "sexually explicit."  And from what you said, that
12      phrase was not defined for purposes of this study.
13      Correct?
14  A.  Correct.
15  Q.  Do you have any data on the number of people who
16      sent videos as opposed to pictures?
17  A.  I don't.
18  Q.  Do you have any data on the type of
19      sexually-explicit conduct that was depicted?
20  A.  Not in this study, no.
21  Q.  Okay.  So for example, you don't know how many of
22      the depictions were of sexual intercourse?
23  A.  No.
24  Q.  You also don't know if certain participants
25      construed the words sexually -- let me rephrase

Page 137

1   that.
2          You also don't know if some of the images that
3   were sent from participants were of people who were
4   only partially nude, for example?
5   A.  That's correct.  I don't know.
6   Q.  Okay.  You said earlier, you wouldn't feel
7       comfortable making -- you wouldn't be able to
8       estimate the percentage of students in introductory
9       psychology classes at the University of Maine, who
10      were in committed relationships, about the
11      prevalence of sexting in that population.  Correct?
12  A.  That's correct.
13  Q.  So would you feel comfortable, solely off the basis
14      of this article, making an estimate of the number of
15      young adults in the country who have sent a
16      sexually-explicit photograph or video?
17  A.  On the basis of this article, no.
18  Q.  Okay.  What more would you need in order to make
19      that estimate?
20  A.  Other studies.  Other studies that have looked at
21      maybe national samples.  And when I use the word
22      "study," I'm using that loosely to also include what
23      I see as just kind of prevalence data gathering
24      studies.  I think that's what I would need.
25  Q.  How many would you need?

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 138..141

Page 138

1  A.  Probably six.
2  Q.  Six?
3  A.  No.  The actual number -- if not asked to make an
4      estimation -- making estimations about prevalence
5      data is not something that's typical in social
6      science research.  So there's no set amount of
7      studies, from my perspective, that you would need to
8      make these types of estimates.  Making an estimate
9      is taking the knowledge that is currently available
10     and making a judgment based on your knowledge, your
11     personal knowledge, and the knowledge that you see.
12     So the number that I referenced in my statement is
13     the number that I feel comfortable with making this
14     estimate.
15 Q.  Have you made estimates of prevalence in any other
16     context, other than sexting?
17 A.  No, I haven't.
18 Q.  Have you made any estimates of sexting other than
19     the one you made in your expert report?
20 A.  Estimates of sexting.  Well, kind of.  I mean, when
21     I -- when I produce these articles or I give these
22     presentations, although the limitations are stated,
23     it's sometimes inferred that this is kind of an
24     estimate in the population.  So kind of, but not
25     explicitly.

Page 139

1  Q.  What about a national estimate -- an estimate of the
2      national prevalence of sexting?
3  A.  I've never made, aside from in this report, an
4      estimate of the national prevalence.
5  Q.  Okay.  So the estimate you made in your expert
6      report is the only estimate you've made about
7      prevalence in any context?
8  A.  As I recall.
9  Q.  And you can't think of any others?
10 A.  I think in a media interview I probably said this is
11     more common than you think.  It's happening more
12     common than you think.  I think in the New York
13     Times mini op-ed that I wrote, I think I said that
14     it was more common than what people might assume.
15     So that is commenting on national prevalence, but
16     nothing where I've had to come up with a particular
17     percentage.
18 Q.  So this is the only instance in which you've come up
19     with a percentage --
20 A.  Yes.
21 Q.  -- for prevalence estimation nationwide?
22 A.  Nationwide.  I believe so.  Again, in my media
23     interviews, I don't know that I specified that this
24     was only in this sample.  I could have said, you
25     know, 54 percent or whatever percentage said that

Page 140

1      they have.  I don't -- I don't believe that I have
2      made any estimates of national percentages.
3  Q.  Okay.  I wanted to move on to another exhibit.  This
4      is DX-4, I believe.
5          (Whereupon, Deposition Exhibit No. DX-4,
6           Computers in Human Behavior, Let's talk
7           about sexting, baby: Computer-mediated
8           sexual behaviors, was marked for
9           identification.)
10 Q.  This is another article.  I believe its six pages
11     long, called "Let's talk about sexting, baby:
12     Computer-mediated sexual behaviors among young
13     adults."  The authors are Michelle Drouin, Kimberly
14     N. Vogel, Alisen Surbey, and Julie R. Stills.  Have
15     you seen this document before?
16 A.  Yes.
17 Q.  And this is an article that you published or have
18     published online in 2013?
19 A.  Yes.  I'm not sure that it's out in print yet.
20 Q.  Okay.  But it will be published in print at some
21     point?
22 A.  Yeah.  Very likely, if it hasn't already come out,
23     in the next couple of months.
24 Q.  Okay.
25 A.  Some journals are quicker than others.

Page 141

1  Q.  Okay.  And you were the principal author of this
2      article?
3  A.  Yes.
4  Q.  Okay.  This also looks at sexting among a population
5      at a medium-size university in the midwestern United
6      States.  And I think you say that on page 3.  Is
7      that medium-size university, Indiana-Purdue Fort
8      Wayne?
9  A.  Yes.
10 Q.  And is the data discussed in this article, was it
11     collected in the same process that you collected the
12     data in the 2012 article, which we marked Exhibit
13     DX-3?
14 A.  It was the same process, yes.
15 Q.  Was it the exact same data, or is this different?
16     Was it the exact same data?
17 A.  No.  Different data.
18 Q.  So this was newer data?
19 A.  Yes.
20 Q.  But it was the same process?
21 A.  Yes.
22 Q.  Do you remember when you collected the data for the
23     2013 article, DX-4?
24 A.  Fall 2011.
25 Q.  Okay.  Oh, I see that there.  I'm sorry.

Page 142

1   A.   Yes.  That's okay.

2   Q.   The purpose of this article was different than your
3        previous article, which we marked DX-3.  Here you
4        were trying to provide a more descriptive analysis
5        of sexting behavior.  And then you were specifically
6        looking at different types of relationships, defined
7        more specifically than committed.  Correct?

8   A.   Yes.

9   Q.   And the beginning of your article, on the first and
10       second pages, you discuss some of the
11       inconsistencies in the way sexting has been defined.
12       Correct?

13  A.   Yes.

14  Q.   What were some of the inconsistencies you found?

15  A.   So content, medium, and relationship context are the
16       three that I mentioned here.  So the content has
17       been defined in different ways.  Sexually explicit,
18       such as what I used in my previous study.  Some
19       people have said nude or nearly nude to describe
20       sexually transmitted visual depictions.  More
21       recently, people have started delineating the types
22       of content, nude or semi-nude.  The content one is
23       described on page 2.  Ferguson, erotic or nude
24       photographs.  So there have been much -- there's
25       been much variance in the terminology used to

Page 143

1        describe sexually-explicit visual depictions.

2   Q.   And why is this a problem?

3   A.   It's a problem because you may not be comparing the
4        same thing across studies.  So some of these might
5        be more liberal definitions, some are more narrow.

6   Q.   So for example, if a study's definition of sexually
7        explicit included people who were clothed but
8        sexually suggestive, and a separate study's
9        definition of sexually explicit was limited just to
10       people who are nude, the former we might expect to
11       have a higher prevalence rate because it is
12       encompassing a broader range of images?

13  A.   Yes.  It depends on the interpretation.  It might
14       also be narrower.  Maybe someone thinks something
15       that -- remember this is from the respondent's
16       perspective.  So you just don't know, you don't
17       know.  Yes.

18  Q.   We're not talking -- we're not comparing apples to
19       apples, in other words?

20  A.   Yeah.  That's exactly the term that I was thinking
21       of but I didn't use, yes.  Yes.  You're not always
22       comparing.  And so some of these might not be
23       capturing the full scope.  They might be -- they
24       might be too narrowly defined to include all of the
25       things that sexting might be to people.

Page 144

1   Q.   So in this study, when you conducted the survey --
2        let me back up.  I'm sorry.
3            When you conducted the study that was discussed
4        in the 2012 article which we marked DX-3, you used
5        the word "sexually explicit," but you didn't provide
6        any sort of clarifying definition.  Correct?

7   A.   That's correct.

8   Q.   So in this study, the 2013 study marked DX-4, you
9        did provide some further definitions.  Correct?

10  A.   Correct.

11  Q.   So I think on page 3 of the article, under Content
12       of picture or video message, you asked participants
13       whether the picture or video that they had sent
14       contained the following types of images:  Nude,
15       nearly nude, engaged in a sex act with another
16       person, engaged in a solo sex act (e.g.,
17       masturbation), or in a sexually-suggestive pose
18       (e.g., cleavage showing but clothed.  Correct?

19  A.   Yes.

20            MS. BAUMGARDNER:  Excuse me.  Where -- what
21       part?

22            THE WITNESS:  Page 3, right here.

23            MR. SWINTON:  The second column.

24            MS. BAUMGARDNER:  Okay.  Thank you.

25  * * *

Page 145

1   BY MR. SWINTON:

2   Q.   Where did you get these definitions from?

3            Let me ask it in a different way:  How did you
4        come up with these definitions?

5   A.   I think that they are similar to what I saw in --
6        let me find -- Mitchell, Finkelhor, Jones and Wolak
7        (2012).  They did some research on children and
8        teens where they had the children and teens
9        delineate the subcategories.  I'm not sure that I
10       copied them exactly, but I think that was used as an
11       inspiration.

12  Q.   So the way that the researchers in that study, the
13       Mitchell, Finkelhor study, you thought it was
14       helpful the way that they had broken this down?

15  A.   (Nodding).

16  Q.   And in particular, you thought that the way they had
17       broken it down was helpful.  Correct?

18  A.   Yes.

19  Q.   Okay.

20  A.   I think also distinguishing between nude and nearly
21       nude, as those were terms that were already included
22       in the previous research.  So this was just looking
23       at the previous research and the terminology that
24       they had used in trying to delineate them.

25  Q.   Was there any further definition of nude?

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                    Pages 146..149

Page 146

1  A.  No.

2  Q.  Was there any further definition of nearly nude?

3  A.  No.

4  Q.  Was there a further definition of engaged in a sex

5      act with another person?

6  A.  No.

7  Q.  So were participants instructed that that would

8      include oral sex?

9  A.  No.

10 Q.  And after "engaged in a solo act," you have a

11     parenthetical that says "e.g., masturbation."  Was

12     that example given to the participants in the

13     survey?

14 A.  Yes.

15 Q.  Were they given any other examples of a solo sex

16     act?

17 A.  No.

18 Q.  And also after "sexually-suggestive pose," you have

19     the parenthetical, "e.g., cleavage showing."  Were

20     participants given that example in the survey?

21 A.  Yes.

22 Q.  And were they given any other example of

23     sexually-suggestive pose?

24 A.  No.

25 Q.  Okay.  So again, the response rates in terms of

Page 147

1      whether, for example, somebody had sent a picture

2      that was sexually -- of a person in a

3      sexually-suggestive pose, that was based on the

4      respondent's interpretation of what that term meant,

5      with the help of your example of cleavage showing.

6      Correct?

7  A.  Yes.

8  Q.  Now, like in your 2012 study, you also measured the

9      frequency with which a person had sent a sex picture

10     or video.  Correct?

11 A.  Yes.

12 Q.  And you used the same six-point Likert scale?

13 A.  Yes.  I believe I did, yes.

14 Q.  So when we have your results that shows 37 to 49

15     percent of the participants had sent sex pictures or

16     videos to romantic partners --

17         MS. BAUMGARDNER:  Where are you?

18         MR. SWINTON:  Oh, I'm sorry.  This is the

19     bottom of page 3.

20         MS. BAUMGARDNER:  Okay.

21         MR. SWINTON:  It's under 3. Results,

22     subsection 3.1.

23         MS. BAUMGARDNER:  Okay.  Thank you.

24         THE WITNESS:  It's also depicted in Table 1,

25     on page 4.

Page 148

1  Q.  And let's turn to Table 1 on page 4.  So when you

2      have the results for people who had sent a sex

3      picture or video, it's committed partners, 49

4      percent; casual sex partners, 37 percent; and

5      cheating partners, 45 percent.  Correct?

6  A.  Yes.

7  Q.  These results were not broken out further by

8      frequency.  Correct?

9  A.  Not for this article.

10 Q.  So, for example, in the committed partner column,

11     49 percent were determined to have sent sex pictures

12     or video, that could range anywhere from one time to

13     multiple times?

14 A.  Yes.

15 Q.  And same for the results for casual sex partner and

16     cheating partner.  Correct?

17 A.  Yes.

18 Q.  I want to go to page 5 of the article, at the bottom

19     under subsection 4.1, Limitations and conclusion.

20 A.  Yes.

21 Q.  Some of these limitations that you discuss are

22     similar to the ones you discussed in the 2012

23     article, DX-3.  For example, you say, "Most notably,

24     our study focused on a sample of undergraduates in

25     the United States.  This sample is, by no means,

Page 149

1      representative all American young adults."

2          Can you explain what you meant by those

3      statements?

4  A.  Because it's focused on undergraduates, then you

5      can't apply it to American young adults.  Because

6      not all young adults are undergraduates.

7  Q.  Correct.  And this study also didn't -- this study

8      also didn't include responses for people who were

9      not in relationships.  Correct?

10 A.  Let's see.  Some type of relationship.  The analyses

11     include people who have only some type of

12     relationship.

13 Q.  Correct.

14 A.  Yes.  Have had.

15 Q.  Those types are committed, casual, and cheating?

16 A.  That's right.

17 Q.  So someone who had never had a committed, casual, or

18     cheating relationship would not be included in the

19     results of this study?

20 A.  That's correct.

21 Q.  Is that another reason why this might not be

22     representative of all American young adults?

23 A.  Yes.

24 Q.  So there are two reasons that you've identified why

25     the sample may not be representative of all American

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 150..153

Page 150

1      young adults, the fact that it was focused on
2      undergraduates in the United States and the fact
3      that it included people who had only been in
4      committed, casual, or cheating relationships?
5   A. Yes.
6                   (Whereupon, Deposition Exhibit No. DX-5,
7                   Sexting Behaviors Among Young Hispanic
8                   Women:  Incidence and Association with
9                   Other High-risk Sexual Behaviors, was
10                  marked for identification.)
11  Q. Okay.  We'll look at one more document.  I just
12     handed you document DX-5.  It's an article that is
13     five pages long -- excuse me, six pages long.  It's
14     by Christopher J. Ferguson.  It's titled Sexting
15     Behaviors Among Young Hispanic Women: Incidence and
16     Association with Other High-risk Sexual Behaviors.
17  A. Yes.
18  Q. Have you seen this document before?
19  A. I have, yes.
20  Q. And this is a study that you reference in your
21     expert report.  Correct?
22  A. I did, yes.
23  Q. Okay.  How did you become aware of this study?
24  A. I did a broader search for incidence or prevalence
25     data, and I found this study.

Page 151

1   Q. And when did you do that search?
2   A. I probably did the search in February.
3   Q. In February.  After you were asked to complete the
4      expert report?
5   A. Yes.
6   Q. Okay.  Now, this survey found that 20.5 percent of
7      the sample population had sent nude or erotic photos
8      of themselves to someone else at least once.
9      Correct?  And I believe that conclusion is listed on
10     page 3 of the article under the heading Results and
11     Incidence.
12  A. Yes.
13  Q. And on page 2, it describes the type of participants
14     who responded to the survey.  There were 207 young
15     women enrolled at a Hispanic-serving university in
16     the South, 96.1 percent were Hispanic.
17        And I'm sorry to jump documents on you, but if
18     we go back to DX-2, which is your expert report.
19  A. Yes.
20  Q. And I believe you discussed some -- you compared
21     this article to -- the findings in this article, you
22     compared to the findings in your 2012 and 2013
23     articles.  Correct?  And I'm on page 4 of your
24     expert report.
25  A. Yes.

Page 152

1   Q. Specifically, you said, "Differences in the
2      definition of sexting and composition of the samples
3      may have contributed to the difference in
4      prevalence."
5         So those differences in the composition of the
6      sample, the ones you identified were sex, meaning
7      the Ferguson article looked at only women.  Correct?
8   A. Yes.
9   Q. And another difference you noted was relationship
10     status, meaning the two studies you conducted were
11     of people who were only in some type of
12     relationship?
13  A. Yes.
14  Q. And third, geographic area.  The Ferguson study
15     looked at women who were at a college in the South,
16     and your two studies looked at participants who were
17     at Indiana-Purdue Fort Wayne.  Correct?
18  A. Yes.
19  Q. And ethnicity.  The difference there was the
20     Ferguson article looked at students at a Hispanic
21     serving university with a 96.1 response rate of
22     Hispanics.  Correct?
23  A. Yes.
24  Q. Were there any other differences that you noted
25     between the studies?

Page 153

1   A. These were examples of things that might influence
2      the prevalence rate differences.  So I wasn't
3      looking specifically for differences in these
4      studies.  So, no, nothing that I noticed.
5   Q. Were there any other differences that might have
6      influenced the prevalence rate that you didn't list?
7   A. Oh.  Not that I know of.
8   Q. What would be the problem with taking the -- I'm
9      sorry.
10        The Ferguson study says 20.5 percent of young
11     women reported sending erotic or nude photographs of
12     themselves to others at least once.  Could I take
13     that figure and say 20.5 percent of young women in
14     the country have sent erotic or nude photographs of
15     themselves to others at least once?
16        MS. BAUMGARDNER:  Objection.
17  A. Could you?  I mean you could do anything you want.
18     So . . .
19  Q. Would that be a legitimate research method?
20  A. That's not a research method, but would it be a
21     legitimate --
22  Q. Would it be a legitimate estimate?
23  A. I probably wouldn't make that estimate, no.
24  Q. And why wouldn't you make that estimate?
25  A. I wouldn't make that estimate because there are --

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                              Pages 154..157

Page 154

1      there's a significant body of research that shows
2      that ethnicity is a strong determinant of a lot of
3      behaviors.  So ethnicity is usually always included
4      as a factor in analyses.  So that would be one
5      reason.
6  Q.  Are there other reasons?
7  A.  It's a relatively small sample.
8  Q.  With 207 participants?
9  A.  Yeah.  And being in the South and relying on one
10     study.  I think estimating on the basis of one study
11     would be difficult to do.  Not recommended.
12 Q.  Sure.  Understood.  Do you recall how this study
13     defined erotic or nude photographs?
14 A.  Let's see.  I believe that the only information that
15     they provided is here on 240, which is the second
16     page of the survey.  "How frequently they 'sent
17     erotic or nude photographs of myself (sexting) to
18     another person' and 'received nude/erotic.'"  Which
19     you have different -- they gave you different data
20     regarding that, so . . .
21 Q.  Is that another reason why it would be difficult to
22     compare the findings in this study or that the
23     prevalence data might be different in the Ferguson
24     study compared with the findings in your 2012 and
25     2013 studies?

Page 155

1  A.  The definition?
2           MS. BAUMGARDNER:  Objection.
3           But go ahead.
4  A.  The definition, I think in some studies has been
5      under-inclusive.  So that makes comparability
6      difficult.  So, yes.
7  Q.  So the difference in the definition of sexting --
8      the lack of definition for sexting in the 2012
9      article and the 2013 article you wrote and also the
10     Ferguson article, makes it difficult to compare the
11     results?
12 A.  Did you say that there's a lack of definition in
13     each of those articles?
14 Q.  The lack of a same definition?
15 A.  A consistent definition across studies?
16 Q.  Consistent definition.
17 A.  It doesn't make comparisons -- what it would do is
18     make you consider it in your estimation, if asked to
19     make an estimation.  You would consider the fact
20     that there were not consistent definitions and you
21     would try to make a judgment about whether you
22     thought those definitions were under-inclusive and
23     make estimations on that.  So yes -- I guess the
24     answer is yes.  It would make comparability, direct
25     comparability, of the statistics difficult across

Page 156

1      studies because of an inconsistent definition.
2  Q.  And are there things you can do to address the lack
3      of consistency in definition when you're making a
4      comparison?
5  A.  Like statistically?  What's . . .
6  Q.  Let's start there.  Are there things you can do
7      statistically?
8  A.  Not really.  I don't know of anything statistically
9      that could be done.  Because you're talking about
10     different definitions.
11 Q.  Are there any other things that could be done,
12     non-statistically?
13 A.  People getting together and deciding on a consistent
14     definition, which was one of the objectives, I
15     think, of the roundtable.  Because we realized that
16     the definition of sexting was a bit vague.  So that
17     was one of the purposes.  We did not emerge, though,
18     with a cohesive definition.  So I don't know that
19     that was accomplished.  But aside from researchers
20     all deciding upon a consistent definition, there's
21     really nothing that can be done.  But that was
22     really the point of my second article, was that we
23     do need some type of consistent definition.
24 Q.  Sure.  And the only way you can think about to do
25     that is to get all the researchers together in some

Page 157

1      way and have people agree to use the same
2      definition?
3  A.  Or have some mandate, some legal mandate that you
4      must define it in this way.  I do literacy
5      research -- or that was my primary research for a
6      number of years.  And right now, I'm doing an
7      article on the inconsistency of the measuring of
8      letter knowledge.  Letter knowledge might seem like
9      a rather simple term, a child's knowledge of the
10     letters.  But there's so many nuances of letter
11     knowledge.  So it's been defined differently by
12     researchers.  Does that keep them from making
13     cross-study comparisons?  No.  But I mean, you
14     rarely find consistency in the definition of letter
15     knowledge, the way they measure it.
16           Someone might give eight letters, if the child
17     knows it, then that's their score.  Another might
18     give them three sets of batteries where they have to
19     write the letters, know the letter sounds, know
20     letter names.  And that's also called letter
21     knowledge.  So you would hope for this type of
22     coming together by researchers, but it doesn't
23     happen usually.
24 Q.  Sure.
25 A.  I would like to add one more thing.  And that is

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 158..161

Page 158

1    that letter knowledge is still equated to reading,
2    despite the fact that you have this very
3    inconsistent definition.
4  Q.  Meaning what?  There's a common use of the phrase?
5  A.  Meaning that even though there's no consistent
6    definition, it's still being used as a predictor of
7    reading ability.  So people in the social sciences
8    still, even though we have these inconsistent
9    definitions, we still make generalizations about
10   correlations based -- even though there are
11   inconsistent definitions.
12 Q.  Do you make estimates of prevalence?
13        MS. BAUMGARDNER:  Objection.
14        Go ahead.
15 A.  I've never had to.
16 Q.  Okay.  Are you aware of anybody else making
17   prevalence estimates?
18        MS. BAUMGARDNER:  Objection.  Anyone?
19        MR. SWINTON:  You can answer the question.
20 A.  Am I aware?  Estimates of prevalence of what?
21 Q.  Of letter reading.  I'm sorry.
22 A.  Of letter knowledge?
23 Q.  Yeah.
24 A.  I am pretty sure that there are probably statistics
25   about how many children enter kindergarten with

Page 159

1    letter knowledge.
2  Q.  Okay.
3  A.  I haven't read them, but I'm pretty sure I've heard
4    of things like that.
5  Q.  Okay.  I wanted to just go back to the Ferguson
6    article, one point -- let's see where this is
7    stated.  I guess it's on the first page in the
8    abstract, and it's talking about the sample.  And it
9    says the sample size consisted of women ages 16 to
10   25.  And I just want to make it clear that this
11   would be another reason why it would be difficult to
12   compare the findings in the Ferguson article to your
13   findings in your 2012 and 2013 articles.  Correct?
14 A.  Yes.  That could be, potentially.
15 Q.  Because this is a broader age range than what you
16   were looking at in your 2012, 2013 articles?
17        MS. BAUMGARDNER:  Objection.
18 A.  No.  It's not a broader age range.  In my 2013
19   article, I had a broader age range.  Do you mean
20   younger?
21 Q.  Yeah.  Your age range started at 18 and above.  I'm
22   sorry.  I shouldn't have used the word "broader."
23   It's a different age range than what you were using
24   in your 2012, 2013 articles.
25 A.  Yes.  Slightly different.  Though without their -- I

Page 160

1    don't see any distribution data for their -- if they
2    only had two 16-year-olds, or even one.  They could
3    have had one 16-year old.  So without having the
4    data about what their sample characteristics were, I
5    don't know how different it might be.
6        The fact that they were at a Hispanic
7    university means to me that I would suspect that the
8    data is not largely based on 16-year-olds, since
9    they were at a university.
10 Q.  If there was a different study -- strike that.
11       I'm going to go back to your expert report and
12   your discussion of the three studies we were just
13   looking at.  I think this is mostly on page -- well,
14   it starts on page 2, but it's kind of summarized
15   more on page 4 to 5.  So we talked about the
16   disparate results and where you say it's difficult
17   to generalize our findings to a national sample.
18   Correct?
19 A.  Yes.
20   The next sentence you say "if the findings from
21   Drouin and Landgraff and Drouin could be
22   generalized, then a large number of U.S. college
23   students (approximately 8.6 million) may have
24   transmitted sexually-explicit visual depictions via
25   text message."  Correct?

Page 161

1  A.  Yes.
2  Q.  And so that estimate excludes the Ferguson article.
3    Correct?
4  A.  Yes.
5  Q.  It's just the two articles for which you were the
6    principal author?
7  A.  Yes.
8  Q.  What do you mean "if the findings could be
9    generalized"?
10 A.  If they could be generalized.  Whether or not they
11   applied to a general population is unknown.
12 Q.  Okay.
13 A.  Because of what I say in the last sentence, romantic
14   relationships in undergraduate institutions are the
15   primary --
16 Q.  Right.
17 A.  -- issues.
18 Q.  Right.  So if the findings could be generalized
19   means it's difficult to generalize.  But if you were
20   to make an estimate based on the findings in those
21   two articles, this it what it would be.  Correct?
22 A.  Yes.
23 Q.  Okay.  In the next paragraph you say, "Too few
24   research studies have examined this topic among
25   undergraduates in the United States to make

Page 162

1      reasonable, scientific estimates of the prevalence
2      of sexting involving visual depictions within this
3      group."  Correct?
4   A. Yes.
5   Q. How many research studies on sexting and young
6      adults, among undergraduates in the United States
7      are you aware of?
8   A. A handful, five, six.
9   Q. So are there more than the three -- than the two you
10     did and then the Ferguson article?
11  A. I think -- none come to mind.  Looking at
12     undergraduates except for the Weisskirch and Delevi
13     study, which I've already mentioned.  Others don't
14     limit themselves to undergraduate populations.  And
15     again, as I said before, my recent research in this
16     topic, really looking for articles especially about
17     undergraduates and prevalence of sexting, that's not
18     been the focus of my recent literature searches.
19  Q. So you're aware --
20  A. So there could be some that exist.
21  Q. Excuse me.  So you are aware of four articles that
22     have examined sexting among undergraduates in the
23     United States?
24  A. Could I -- yes.  Among undergraduates, those four
25     articles.

Page 163

1   Q. Okay.
2   A. Exclusively undergraduates.
3   Q. Okay.  And you say, too few studies have been
4      examined on sexual -- on sexting in young adults
5      among undergraduates to make reasonable scientific
6      estimates of the prevalence of sexting, visual
7      depictions within this group.
8          What group are you talking about in that
9      sentence?
10  A. Undergraduates.
11  Q. Okay.  So in other words, you're saying you cannot
12     make nationwide estimates of the prevalence of
13     sexting among undergraduates in the United States
14     based on these three articles you mention in your
15     report that look at sexting among undergraduates
16     alone.  Correct?
17  A. But remember, two of those -- my two studies focused
18     on only people within relationships.
19  Q. Correct.
20  A. And the other one was focused only on Hispanic
21     women.  And the other one gives no prevalence data.
22     So I'm not talking about number.  I'm talking about
23     the fact that too few studies have been done that
24     have -- that can capture the whole range of
25     behavior, so each of these has limitations.

Page 164

1   Q. Sure.
2   A. In their generalizability.
3   Q. So in other words, you cannot generalize the
4      preference of sexting among undergraduates in the
5      United States on the basis of those three studies
6      solely?
7   A. Yeah.  And the fourth study, yes.
8   Q. Okay.  And you say -- I'm at the top of page 5 here,
9      the last sentence in the paragraph -- "the cohort of
10     students at our undergraduate institution in the
11     Midwestern United States is qualitatively different
12     somehow from young adults in other parts of the
13     country."  What do you mean by "qualitatively
14     different?"
15  A. Different in some way that you could talk about and
16     understand, qualitatively.  Describe.
17  Q. What's an example of a difference?
18  A. Perhaps people in Fort Wayne are conservative.  That
19     would be an example.
20  Q. Could it also refer to gender makeup?
21  A. Oh, yes.
22  Q. Racial makeup?
23  A. Sure.
24  Q. And number of people in relationships?
25  A. Yes.

Page 165

1   Q. Views about sex?
2   A. Yes.
3   Q. Can you make reasonable scientific estimates about
4      the prevalence of sexting involving visual
5      depictions among all young adults in the United
6      States on the basis of the 2012 Drouin article, the
7      2013 Drouin article?
8   A. No.  That would be very difficult.
9   Q. No, you can't do it?
10  A. No.
11  Q. And why not?
12  A. Because my samples were undergraduates in
13     relationships of some sort.
14  Q. And can you draw -- I'm sorry.  Can you make an
15     estimate, a reasonable scientific estimate about the
16     prevalence of sexting involving visual depictions
17     among young adults in the entire United States based
18     on the 2012 Drouin article, the 2013 Drouin article,
19     and the Ferguson article?
20  A. No.  I would not feel comfortable making such
21     estimates on the basis of studies that had a narrow
22     population focus without considering other sources
23     of information to make an estimate.
24  Q. What other sources of information would you need in
25     order to make an estimate?

Page 166

1  A.   I think what I would be looking is a convergence of
2       evidence.  So it could be that Hispanic women aged
3       16 to 25 is very different than the participants
4       that we had who are in relationships in Fort Wayne.
5       However, it could be that they were very similar.
6       We don't know.  So what I would be looking for are
7       other studies that are showing similar percentages.
8       Other people that are coming to similar conclusions
9       about the prevalence -- if that's what you're asking
10      me to estimate -- the prevalence in different
11      samples.
12           So in social science research, the type of
13      polling study that we discussed earlier, I
14      actually -- that's not primarily what social
15      scientists do.  Social scientists take samples from
16      their particular area and they're looking at some
17      phenomenon.  And although they don't say
18      definitively that these apply to the rest of the
19      United States, they would say this is what I found
20      and I think it a probably applies pretty generally,
21      because I don't see anything that would make these
22      results seem like they can't be included, they're
23      not valid for any reason.
24           And then in a larger picture, what social
25      scientists might do, is something called a meta

Page 167

1       analysis.  So in a meta analysis, you take research
2       that's been conducted in multiple places and you
3       compare what they've found.  And you put all the
4       data into kind of one statistical -- you do one kind
5       of statistical method on all of the data, to see,
6       well, can we generalize these findings?  Meta
7       analyses are usually prevalent in fields that are
8       non-emerging because you need a number of studies.
9            So at this point, my best estimates are based
10      on a small amount of studies that alone may or may
11      not be generalizable.  But when you are looking at
12      them all together, then you see kind of a
13      convergence of evidence.  So that's what I'd be
14      looking for at this point to make reasonable
15      estimates.
16  Q.   Do you have to have a certain number of studies
17      before you can make an estimate?
18  A.   I was asked to make an estimate.  This is not
19      something that I typically do, make estimates about
20      prevalence.  So from a statistical standpoint, I'm
21      not sure what that answer is.
22  Q.   So you don't know -- you're not aware if there's
23      some sort of statistical point at which there is a
24      convergence of data?
25  A.   No.  But I was asked to extrapolate.  And so there

Page 168

1       is a mathematical interpretation or definition of
2       extrapolation and there's a definition of
3       extrapolation that deals with human experience.  And
4       so you're supposed to look at what exists -- that
5       you know of that exists, and make an estimate based
6       on your knowledge of what currently exists.
7  Q.   And do you need to do any sort of verification to
8       make sure that what currently exists is
9       representative of the population you're making the
10      estimate on behalf of?
11  A.   Not in the definition of extrapolation.  That's not
12      included in the definition.  Statistically or
13      mathematically, there are probably things that you
14      need to do statistically or mathematically under
15      that mathematical definition, but if you're talking
16      about human behavior or human experience, it doesn't
17      suppose any prerequisite examination that these
18      things are representative of the entire sample.
19      It's based on your experience.  It's based on your
20      knowledge of the field or your knowledge of that
21      particular human behavior.  I was asked to
22      extrapolate and I think I did that.
23  Q.   So if the only studies that existed based on the
24      prevalence of sexting among young adults were your
25      two studies of populations at Indiana-Purdue Fort

Page 169

1       Wayne and the Ferguson study of the college in the
2       southern United States, and you were asked to make
3       an extrapolation --
4  A.   To young adults?
5  Q.   -- to young adults nationwide, you would have been
6       limited to those three studies.  Correct?
7  A.   You mean if I were asked to extrapolate, would I
8       have done so?  I'm sorry.  I don't understand your
9       question.
10  Q.   So if there were only three studies examining the
11      prevalence of sexting among young adults, and they
12      were your 2012 study, your 2013 study, and the
13      Ferguson study --
14  A.   These are the only studies that I found that had
15      prevalence data, correct.
16  Q.   Sure.
17  A.   Yes.
18  Q.   And you were asked to extrapolate to estimate the
19      percentage of young adults nationwide who have
20      engaged in sexting, would you have done so?
21  A.   No.  I don't think I would have.
22  Q.   Why not?
23  A.   Because we're talking about small groups.  I need
24      more convergence of evidence.  So I would like to
25      have seen other surveys that had been done, that did

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 170..173

Page 170

1    not only include Hispanic women or did not only
2    include undergraduates in relationships.  So you're
3    asking me to apply it broadly or generalize, I don't
4    think I would have been able to do that.
5  Q.  Because those studies were limited to two particular
6    universities?
7  A.  No.  Because those studies were limited to
8    particular samples that did not have the focus
9    primarily of young adults.  So what those studies
10   serve as is just pieces.  So three pieces of what
11   could be a convergence of evidence.
12 Q.  Previously you said that an extrapolation is making
13   an estimate based on the information that's
14   available at the time the extrapolation is made.  So
15   if those three studies are the only ones that are in
16   existence at the time you have to make the
17   extrapolation, do you still say you can't do it?
18       MS. BAUMGARDNER:  Objection.
19 A.  I would say that you can technically do it.  But
20   you're asking me if I would do it?  I think I said
21   that I wouldn't.  I'm not sure of my exact phrasing.
22   But personally, I would not have extrapolated to the
23   young adults U.S. census data based solely on three
24   studies that may not -- may not represent the entire
25   picture.  It could, again, be under-inclusive,

Page 171

1    over-inclusive in its definition.  I could be -- so
2    you need convergence of evidence.  I needed more
3    studies than that.  But theoretically, you could do
4    anything you want.
5  Q.  So tell me more what you mean by convergence of
6    evidence as you're using the term.
7  A.  So multiple sources that find something similar.  So
8    if I do feel like I have a sample that might be
9    different, I might look for other -- the same result
10   emerging in other samples.  So it would say that,
11   yes, my sample might be different, but that doesn't
12   mean that the underlying behavior that I'm measuring
13   is different.
14 Q.  And there's not -- is there a set number of findings
15   that you need to get in order for there to be a
16   convergence of estimates?  I'm sorry.  Convergence
17   of -- what's the term again?
18 A.  Evidence.
19 Q.  Evidence.  I'm sorry.
20 A.  I think you'd have that one.
21 Q.  Let's try that one again.  Are there a certain
22   number of findings, for you, that there need to be,
23   of similar findings in order for there to be a
24   convergence of evidence?
25 A.  No.

Page 172

1  Q.  How do you cross the line from not having a
2    convergence of evidence to having a convergence of
3    evidence?
4        MS. BAUMGARDNER:  Objection.  It assumes
5    there's a line to cross.
6        But go ahead.
7  A.  So how do you determine?
8  Q.  Yeah.  What is the tipping point for there to be a
9    convergence of evidence?
10 A.  For me, the tipping point that said that I should
11   consider all of these -- I'm considering all of
12   these findings.  Even if it isn't generalizable to
13   an entire population, them being generalizable to a
14   segment of the population is contributing to the
15   convergence.
16       I took all of the studies that I have
17   referenced in my report and looked at them
18   cohesively and made my estimation based on what I
19   felt they said collectively.  And there wasn't a set
20   number.  I don't know -- I don't believe there's a
21   set number.  A convergence of evidence is a belief.
22   So a set number tied to that belief would be really
23   difficult for me to imagine existing.  In any case,
24   just taking a cohesive look at what exists.
25 Q.  So the convergence of evidence is any sort of

Page 173

1    mathematical determination?
2  A.  No.
3  Q.  It's based on your comfort level?
4        MS. BAUMGARDNER:  Objection.
5  A.  It is based on my -- I don't think I said comfort.
6    I think I said I took a cohesive look at the
7    information that existed, and I made a extrapolation
8    based on the information that existed.
9  Q.  The convergence of evidence is based on your belief
10   I think was the word that you used.  So it's based
11   on your belief that there is a convergence?
12 A.  Yes.  Based on my knowledge.  And -- I mean, the
13   belief I have would have been based on the prior
14   knowledge that I have conducting social science
15   research.
16       MR. SWINTON:  I think once again, we ran well
17   over time.  Should we take a lunch break?
18       MS. BAUMGARDNER:  Why don't we go off the
19   record?
20       (Whereupon, a recess was taken, after
21       which the proceedings continued as
22       follows:)
23 BY MR. SWINTON:
24 Q.  So we're back on the record.  Dr. Drouin, we just
25   had a break for lunch.  Did you speak with anybody

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

Pages 174..177

Page 174

1  during that break?
2  A.  I spoke with Lorraine.
3  Q.  And did you discuss this case?
4  A.  No, I did not.
5  Q.  Okay.  Did you discuss this deposition?
6  A.  No, I did not.
7  Q.  Okay.  Before our break, we were looking at a few of
8      the articles you referenced in your expert report.
9      And one of the articles we looked at was an article
10     by Christopher Ferguson and it's marked DX-5.  I
11     wonder if we can just look at that one more time,
12     specifically the last page of the study.  I think
13     it's 243 at the top of the page there.  The study --
14     the paragraph is discussing the limitations of the
15     study.  And it says, "The current sample is
16     convenience in nature and comprised mainly of
17     Hispanic women."  Correct?
18 A.  Yes.
19 Q.  What does it mean when it says the current sample is
20     convenience in nature?
21 A.  The sample was convenient.  It was a sample that he
22     already had access to.
23 Q.  Okay.  Is that a -- a sample being "convenience in
24     nature," is that a term you're familiar with?
25 A.  A convenience sample, yes.

Page 175

1  Q.  And what's the definition of a convenience sample?
2      Can you say it one more time, please.
3  A.  It would be a sample that you have access to in some
4      way.
5  Q.  And "have access to," what do you mean?
6  A.  That you -- they're just a readily available sample.
7      You didn't have to go outside to search for the
8      sample.  It's a sample that's available to you, a
9      sample of convenience.  You're not looking for
10     certain types of demographic characteristics,
11     purposely identify the study as such.  You took
12     people who were already available to you.
13 Q.  Okay.  Do the participants have to volunteer for it
14     to be a sample of convenience?
15 A.  Participation in psychological research, as far as I
16     know, is always voluntary.
17 Q.  Okay.
18 A.  You can't be forced to participate.  They had prison
19     studies and things like that, that were . . .
20 Q.  And I'm sorry.  Maybe that was a little
21     inarticulate.  I was thinking, for example, in your
22     studies, people affirmatively selected to
23     participate in your studies, rather than being
24     randomly called, for example.  So when I was saying
25     volunteer, I was thinking of your studies, where

Page 176

1  people affirmatively selected to be in your studies,
2  among others.
3  A.  Then can you rephrase the question?  Because I'm
4      actually not sure what the question is anymore.
5  Q.  Okay.  Actually, we can just move on.
6  A.  Okay.  Sorry.
7  Q.  So you defined a sample of convenience as a group
8      that you have access to, and you don't have to go
9      outside to get participants.  Outside of what?
10 A.  Outside of the group that you already have access
11     to.  It's a group that is conveniently available to
12     you.
13 Q.  Okay.  Was your -- the participants you used in your
14     2012 study, which we have marked DX-3, was that a
15     sample of convenience?
16 A.  Yes.
17 Q.  And the sample in your 2013 study, which we marked
18     DX-4, was that a sample of convenience?
19 A.  Yes.
20 Q.  And do you agree with Ferguson that the sample size
21     in his study, which we've marked DX-5, is a sample
22     of convenience?
23 A.  The sample, not the sample size.  Yes, the sample.
24 Q.  I'm sorry.  So the sample size in the Ferguson
25     study, marked DX-5, was a sample of convenience?

Page 177

1  A.  The sample was the sample of convenience, yes.
2  Q.  I keeping using the word "size," don't I.
3  A.  Yes.
4  Q.  Let me try that one more time, just to make sure I
5      have it clear:  The sample in the Ferguson study,
6      which we've marked DX-5, was a sample of
7      convenience?
8  A.  Yes.
9  Q.  Okay.  Thank you.
10     Let's go back to your expert report, which is
11     marked DX-2, page 5.  You state that because the
12     cohort of students at the undergraduate institution
13     looked at in your two articles, it is quite possible
14     that that sample of students "is qualitatively
15     different somehow from young adults in other parts
16     of the country, it is prudent to compare our results
17     with those studies involving larger samples of U.S.
18     participants."  Correct?
19 A.  Yes.
20 Q.  So you compared the results from your two studies
21     with the results in studies involving larger
22     samples.  Correct?
23 A.  Yes.
24 Q.  And the studies that involve larger samples of the
25     U.S. participants, how many were there?

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 178..181

Page 178

1  A.  The studies that I compared were three other
2      studies.
3  Q.  And those are the studies by the Associated Press
4      and MTV, the Gordon-Messer study and the National
5      Campaign to Prevent Teen and Unplanned Pregnancy.
6      Correct?
7  A.  That's correct.
8  Q.  So these studies looked at results -- or used
9      samples, larger samples of U.S. participants.  You
10     say that they consistently showed that approximately
11     one-third of young adults have been involved in
12     sexting involving sexually-explicit visual
13     depictions.  Correct?
14 A.  Yes.  And I qualified that with descriptions of
15     sexting behaviors varied across studies.
16 Q.  And you estimate, based on these studies as well as
17     the studies you conducted, that approximately
18     one-third of young adults have sent text messages
19     involving sexually-explicit visual depictions?
20 A.  Yes.
21 Q.  How did you arrive at the figure one-third?
22 A.  When you look across these studies, you see that
23     it's about one-third of the sample that has
24     participated in this type of sexting activity,
25     however sexting was defined in those studies.

Page 179

1  Q.  So in your 2012 study, I believe you found that 54
2      percent of the participants had engaged in sending
3      sexually-explicit images.  Correct?
4  A.  Yes.
5  Q.  So that one was 54 percent.  Did you consider that
6      in arriving at the one-third estimate?
7  A.  I did.
8  Q.  So did you do any calculations in looking at these
9      studies to arrive at the one-third figure?
10 A.  It wasn't a statistical estimate.  I considered the
11     fact that most of my -- well, all of the
12     participants in my 2012 study were in committed
13     relationships.  I also considered the fact that in
14     my 2013 study, the prevalence of sending these types
15     of sexually-explicit visual depictions were higher
16     in committed relationships, less high among other
17     types of studies.  I thought then that my estimation
18     might be high and considering the one-third that was
19     prevalent in other studies and the types of trends I
20     was seeing in my other types of relationships.  So
21     the lowest percentage, as you'll recall in Exhibit
22     DX-4, the lowest percentage for pictures or videos
23     was 37 percent.  And that was for people who are in
24     relationships.
25         So if you consider as well that this does not

Page 180

1      include people who are not in relationships but that
2      they could still be forwarding sexually-explicit
3      images for -- I just don't have this kind of data
4      reported in any of my studies -- I thought one-third
5      was a good approximation of the amount of -- or the
6      prevalence of this behavior.
7  Q.  So you didn't adjust -- you didn't adjust the
8      findings of the percentage -- let me rephrase.
9          You didn't adjust the prevalence findings from
10     the three articles that used larger samples of U.S.
11     participants with the findings from your own
12     studies?
13         MS. BAUMGARDNER:  Objection.
14         Go ahead.
15 A.  I considered them all together.
16 Q.  Okay.  But you didn't mathematically adjust the
17     findings from the three studies using a national
18     sample with the findings from your own studies?
19 A.  No.  That type of mathematical computation would be
20     almost impossible to -- I wouldn't even know where
21     to begin.  How would I average something that only
22     has a segment of their population?
23 Q.  So it was based on your own judgment about what was
24     an appropriate estimation?
25 A.  Yes.

Page 181

1  Q.  When you use the word "approximately" -- you say,
2      "my opinion is that approximately one-third of young
3      adults have sent text messages."  What do you mean
4      by "approximately"?
5  A.  The actual percentage might be a little less; it
6      might be a little more.  But if I had to come up
7      with a approximate percentage, it would be about
8      one-third.
9  Q.  How much more could it be?
10 A.  I would be very surprised if you find that in --
11     because of the things that I saw about people in
12     committed relationships doing it more often than
13     people in those other types of relationships that
14     are less intimate, I'd be very surprised if the
15     national percentage were much higher than what I
16     found in my study.
17 Q.  Is there a number?  When you say approximately, it
18     could be a little bit more, it could be a little bit
19     less, is there -- for lack of a better word -- is
20     there a margin of error in that estimate?
21 A.  Well, approximately includes a margin of error
22     because it's an approximation.  So I don't have any
23     statistical margin of error.
24 Q.  So there's no number range in which your estimate
25     falls?

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 182..185

Page 182

1  A.  No.
2  Q.  Is there any numerical meaning to the word
3      "approximately" as you used it here in your expert
4      report?
5  A.  There's a numerical meaning to one-third.  One-third
6      would be 33 percent.
7  Q.  Correct.  But what about to the word
8      "approximately."  Is there any numerical value to
9      that?
10 A.  No.
11 Q.  Okay.  You said you hold this opinion to a
12     reasonable degree of scientific certainty.  Have you
13     used the phrase "reasonable degree of scientific
14     certainty" in any of your work previously?
15 A.  No.
16 Q.  Is it a phrase that's used in the field of
17     psychology?
18 A.  No.  Not that I know of.
19 Q.  What do you mean when you say "reasonable degree of
20     scientific certainty" in your expert report?
21 A.  I mean that I've examined the information that I
22     have, scientific information that was available to
23     me to the best of my ability.  And I believe what I
24     have said and believe it to that, a reasonable
25     degree.  I'm not 100 percent certain that these are

Page 183

1      the correct numbers, but I believe, based on my
2      examination of the scientific evidence, this is a
3      reasonable approximation.
4  Q.  So is your belief scientific?
5  A.  I think my approach to examining the evidence is
6      scientific.
7  Q.  Is your estimate scientific?
8  A.  My estimate scientific.  Scientific method involves
9      looking at a phenomenon.  And in this case the
10     phenomenon would be looking at the pieces of
11     evidence that exist and coming to some kind of
12     conclusion.  In lieu of some type of study that I
13     could conduct that would explore this -- this
14     question with scientific certainty, then I feel like
15     I've used a scientific approach.
16         Is that what you're asking?
17 Q.  No.  I think I need to rephrase my question.
18         How is your opinion -- what is the degree of --
19     well, strike that.
20         I'm going to shift gears.
21         (Whereupon, Deposition Exhibit No. DX-6,
22         A Thin Line, 2009 AP-MTV Digital Abuse
23         Study, was marked for identification.)
24 Q.  I've handed you a document labeled DX-6.  It's six
25     pages long.  It's titled A Thin Line, 2009 AP-MTV

Page 184

1      Digital Abuse Study.
2  A.  Yes.
3  Q.  Have you seen this document before?
4  A.  Yes.
5  Q.  Where did you see it?
6  A.  I have downloaded this document onto my computer.
7  Q.  Did you see this document before you prepared your
8      expert report?
9  A.  Yes.
10 Q.  How did you first become aware of this document?
11 A.  When I met the people from the Associated Press --
12     no, before that.  When we were given the compendium
13     for the sexting roundtable.
14 Q.  And do you recall what year that was?  It was --
15 A.  In, I think, 2011.
16 Q.  -- 2011.  Correct?
17 A.  Yes.
18 Q.  Excuse me for interrupting.  This study says it
19     recruited respondents from KnowledgePanel, which is
20     an online panel that is representative of the U.S.
21     population.  Are you familiar with KnowledgePanel?
22 A.  No.
23 Q.  Do you know what it is?
24 A.  It's an online panel.
25 Q.  Do you know anything about it, more than what's

Page 185

1      described in the document?
2  A.  No.  I know that some people use panels for their
3      research.  And I don't know the names of the
4      particular panels that people use.
5  Q.  Okay.  This study, on page 2, reports its findings.
6      It says that "3 in 10 young people report having
7      been involved in some type of naked sexting."
8      Correct?
9  A.  Yes.
10 Q.  And that "1 in 10 has shared a naked image of
11     themselves."  Correct?
12 A.  Yes.
13 Q.  Do you know what the difference is between "naked
14     sexting" and "shared a naked image of oneself"?
15 A.  The way I interpret is naked sexting could be images
16     sent of anyone, sent between -- sent somewhere.  And
17     then versus a picture of yourself, would be a naked
18     image of yourself.
19 Q.  And is there -- are you aware if the study defines
20     the phrase "naked sexting" in any way?
21 A.  I do not believe it does.  I didn't see it.
22     Although there may be other documents attached to
23     this that I've not -- I'm not aware of.  I don't
24     remember.
25 Q.  So you don't recall any definition of naked sexting.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                     Pages 186..189

Page 186

1  A.  I don't -- I don't recall.
2  Q.  Okay.  And the results for people reporting having
3      been involved in some type of naked sexting was
4      broken down between youth ages 14 to 17 and 18 to
5      24.  Correct?
6  A.  Yes.
7  Q.  And the youth ages 18 to 24 reported having been
8      involved in naked sexting 33 percent of the time?
9  A.  That's correct.
10 Q.  Was that 33 percent figure, did that inform your 33
11     percent estimate in your expert report?
12 A.  It helped to inform my 33 percent estimate, my
13     approximate estimate.
14 Q.  And how did it help?
15 A.  Because it was a convergence of evidence between the
16     multiple studies that it was about a third; higher
17     in some, lower in some.
18 Q.  Do you recall which studies had lower?
19 A.  Well, Ferguson lower.  Ferguson had only 20 percent.
20     Without seeing the studies, I don't recall which had
21     lower.
22 Q.  Okay.  Going back to the methodology.  I'm sorry to
23     jump around.  But back on page 1 under Methodology,
24     the description says "KnowledgePanel members are
25     randomly recruited by telephone through Random-Digit

Page 187

1      Dial."  Does this mean this sample was randomly
2      selected?
3  A.  Randomly recruited may not be randomly selected.  It
4      says that it's representative of the U.S.
5      population.  Not knowing enough about
6      KnowledgePanel's methods, I can't comment on whether
7      or not they randomly selected those people.  True
8      random selection, I would have to kind of verify.
9  Q.  And what is true random sample selection?
10 A.  You are as likely to end up in one group as you are
11     in another.
12 Q.  What's a simple random sample?  Have you heard that
13     phrase before?
14 A.  Where is it listed?
15 Q.  I'm sorry.  It doesn't appear in the document.  Have
16     you heard of the phrase "simple random sample"
17     before?
18 A.  A simple random sample, no.
19 Q.  Okay.  So your definition of a random sample is
20     every eligible person within the population has an
21     equal chance of being selected for the study?
22         MS. BAUMGARDNER:  Objection.
23             Go ahead.
24 A.  I don't know what they would say.  But for me, a
25     random sample -- random sampling method is that

Page 188

1      you're as likely to end up in the group as you are
2      not to end up in the group.
3  Q.  Okay.  Is that the same as every person in the
4      population having an equal chance being selected?
5  A.  Well, are they -- I don't know.  Are you talking
6      about --
7  Q.  And I'm not --
8  A.  -- you're just talking about random sampling.  An
9      equal chance of being selected?  It has to be your
10     target, it has to be your target audience, so -- of
11     those people in your target audience, they should
12     have an equal chance of being selected if you're
13     doing a random sampling.
14 Q.  Okay.  And what are the benefits of random sampling?
15 A.  Benefits of random sampling?  Random sampling is
16     mainly used for experiments.  So the benefits of
17     random sampling in an experiment is that you are --
18     by saying this group was equally likely to end up as
19     the other groups, it makes your comparisons more
20     meaningful between someone who may undergo some type
21     of manipulation and a group who isn't.  Because you
22     can say from the onset, they had an equal chance of
23     being in either group.
24 Q.  Is it helpful when you're trying to make an estimate
25     of prevalence?

Page 189

1  A.  To have random sampling, yes.  But you have to know
2      what population you're targeting.
3  Q.  Sure.  So for example, if you were trying to target
4      the population of Indiana, would it be helpful to
5      have a random sample of -- strike that.
6          If you were trying to have a study of the
7      population of Indiana, what would be the best way to
8      make that estimate when you were putting together a
9      study?
10 A.  What are we estimating?  You're saying a
11     population -- the population?
12 Q.  If you were trying to estimate the prevalence of a
13     characteristic within the population of Indiana,
14     what would be the best way to select your sample in
15     order to have the most accurate estimate possible?
16 A.  Oh.  Well, that's different.  That's not going to
17     probably be random sampling.  You're probably going
18     to have -- want to have representative samples.
19 Q.  And what's representative sampling?
20 A.  But still random sampling within representative
21     samples.  So you would probably want people from all
22     over.  I mean, randomly -- if I were to do it
23     randomly and I were trying to look at some
24     characteristic in all of Indiana, I could end up
25     with all people from Indianapolis, just randomly.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

Page 190

1    But that's different from a representative sample,
2    where you're saying that it represents a larger
3    area.
4         This -- okay.  That's it.
5  Q.  Okay.  So can you explain a little bit more the
6    difference between a random sample and a
7    representative sample.
8  A.  So a representative sample is chosen, selected
9    because they're representative of the population,
10   the target population.  A random sample is just
11   assigning people randomly to groups.  But sometimes
12   if you did a random sample, you could end up with
13   overrepresentation from one particular group.  So a
14   representative sample is making sure that all groups
15   are included.  And still, you could be random within
16   that representative group.
17 Q.  So they're not mutually exclusive, in other words?
18   Random sampling and representative sampling?
19 A.  No.
20 Q.  So the first objective in trying to -- if I was
21   trying to put together a prevalence estimate of the
22   characteristics on behalf of the population of
23   Indiana, the first objective would be to get a
24   representative sample.  And then the second
25   objective would be to randomly select people within

Page 191

1    that representative sample.  Is that correct?
2  A.  Yes.  Based on the characteristic that you're going
3    to be testing.  So your representative sample might
4    be different based on the characteristic you're
5    examining.
6  Q.  So let's look specifically at the MTV study marked
7    DX-6.
8  A.  Yes.
9  Q.  Are you aware if they used a representative sample
10   for purposes of this study?
11 A.  It says that they did.  An only online panel that is
12   representative of the U.S. population.
13 Q.  Okay.
14 A.  This is what they claim.
15 Q.  And are you aware if they used a random sample of
16   that population?
17 A.  It says that the panels were randomly recruited for
18   participation in the panel.  And so they used both
19   random and representative sampling.
20 Q.  Is random recruitment the same as random sampling?
21 A.  I don't -- I don't do random recruitment.  I don't
22   really know what that would be.  But I think if
23   they're using the term "random sampling," they know
24   what they've -- oh.  They used the term "randomly
25   recruited."  Or is that a random sample?  I don't

Page 192

1    know that "random sampling" is a term that anyone
2    would . . .
3         Well, I guess it is.  Random sampling.  I don't
4    know.  I don't know the difference between random
5    recruiting and random sampling.  Could it be that
6    their randomly recruited sample is a random sample?
7    Yes.  I just don't know the steps that they
8    followed.
9  Q.  Okay.  Did you consider their methodology and rely
10   on it to make your estimate of the prevalence of
11   sexting among young adults?
12 A.  I did.
13 Q.  And what specifically did you look for?
14 A.  I looked for how many respondents that they asked,
15   where those respondents were, whether it was -- they
16   said it was representative.  They said that they
17   used online methods to recruit something that was
18   random to make up the panel.
19 Q.  Did you --
20 A.  So I considered all of those things.
21 Q.  Did you look at the number of people who
22   participated from those who were sampled?
23 A.  I did not.
24 Q.  And earlier, I believe you said you weren't sure if
25   this -- if the sample in this MTV study was

Page 193

1    representative of the country.  Is that correct?
2  A.  When did I say -- what did you say that I said?
3  Q.  I believe that you said that the sample that was
4    used in this study, the MTV study, wasn't -- you
5    weren't sure if that was representative of the U.S.
6    population.  Is that correct?
7  A.  I don't -- I don't think I said that.
8  Q.  Okay.  I might be mis-remembering.  So I just wanted
9    to check.
10 A.  Yeah.  I don't think I said that.
11 Q.  Okay.  Do you think that the sample population from
12   the MTV study representative of the U.S. population?
13 A.  I think it's better than many of the other studies
14   that would have been claiming to be representative,
15   or that I had to make a conclusion based on.  Of the
16   studies that exist, I think it is fairly
17   representative, according to the methodology that
18   they describe.
19 Q.  And what does fairly well mean?
20 A.  Fairly well?  Reasonably well.
21 Q.  Are there weaknesses that you can identify in how
22   representative the sample is?
23 A.  I don't -- not knowing what their exact sample
24   demographics were, I don't know.  There are
25   weaknesses to every study.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                                    Pages 194..197

Page 194

1  Q.  Would you have to know those weaknesses before you
2      could make a determination about how representative
3      the sample is?
4  A.  Not only would I -- I think I would like to see the
5      exact methodology that they used.  But as well, one
6      of the limitations right now with regard to this is
7      not knowing what a representative sample actually
8      is.  What do you need to include for a sample to be
9      representative when you're looking at this issue?
10 Q.  So in other words, you cannot say that that MTV
11     study sample population is representative of the
12     U.S. population?
13 A.  I cannot say, no, definitively if it is.
14                  (Whereupon, Deposition Exhibit No. DX-7,
15                  Sexting Among Young Adults, was marked
16                  for identification.)
17 Q.  Okay.  Let's move on to DX-7.  I'll hand this to
18     you.
19 A.  Thank you.
20 Q.  This is a article, it's six pages and it's called
21     "Sexting Among Young Adults" written by Deborah
22     Gordon-Messer, Jose Arturo Bauermeister, Alison
23     Grodzinski, and Marc Zimmerman.  Have you seen this
24     document before?
25 A.  I have, yes.

Page 195

1  Q.  Where did you see it?
2  A.  I have it downloaded on my computer.
3  Q.  And were you aware of this article before you wrote
4      your expert report?
5  A.  Yes.
6  Q.  How did you become aware of it?
7  A.  I think I saw this in a -- I don't know.  Sometimes
8      things come up that are related to articles that I
9      have published or looked for.  And I think that's
10     probably how I saw it.
11 Q.  Do you remember when you first saw it?
12 A.  No.
13 Q.  Was it in 2013?
14 A.  I don't remember.
15 Q.  Before, we were talking about authors of these of
16     scholarly articles, and you said the first person
17     listed is usually the principal author?
18 A.  Yes.
19 Q.  So in this case is Deborah Gordon-Messer the
20     principal author?
21 A.  Yes.
22 Q.  Is there any significance to the order in which the
23     authors are listed?
24 A.  Usually, yes.
25 Q.  What's the significance?

Page 196

1  A.  Usually the person who's listed as the primary
2      author is someone who played the largest role in the
3      study.  This is in psychological research.  In other
4      disciplines, it's not the same.  But it could have
5      been they conceptualized the idea.  It could have
6      been they carried out the bulk of the research.  It
7      could have been they wrote most of the article.  The
8      APA has pretty liberal interpretations about what
9      the work is that you do, but it usually represents a
10     significant amount of work on the topic.
11 Q.  So are authors listed in decreasing order of
12     contributions to the article?
13 A.  Often, yes.
14 Q.  So the second person, for example, contributed less
15     than the first person listed?
16 A.  Less, that's not always the case.  I see that he is
17     the corresponding author, Bauermeister, so the
18     corresponding author is often someone who's
19     contributed significantly to an article as well.
20 Q.  Okay.
21 A.  So contributed significantly is a very hard thing to
22     describe.  I have -- I have a first-authored
23     publication that -- it was someone else's idea,
24     their research idea, but I did most of the work.  So
25     "significant contribution" is a hard term to apply

Page 197

1      to this, social science.
2  Q.  Does the primary author, is that person the one who
3      actually writes the article?
4  A.  Not necessarily.
5  Q.  Okay.  Is that commonly the case?
6  A.  Is it commonly the case?  I would say -- what do you
7      mean by common?
8  Q.  Is it common in your experience that the primary
9      author listed on an article is the person that wrote
10     the article?
11 A.  Yeah, but I asked you what you meant by common.
12 Q.  Is it typically the case in your experience that --
13 A.  Okay.  Is it typical?  I would say that many people
14     contribute to the writing of an article.  Sometimes
15     first authors don't do any of the writing of the
16     article.  So -- I don't know about common.
17         In my experience as a first author, I've done
18     the majority of the writing.  I know someone who
19     does research in literacy who has hired a writer for
20     their papers.  So they do none of the writing and
21     they're first author.  So I know of both cases.  So
22     common is a really difficult term for me too.
23 Q.  Have you ever been the principal author and not
24     written parts of an article?
25 A.  No.  But I'm a strong writer.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                          Pages 198..201

Page 198

1  Q.  Okay.  I want to take a look at the second page of
2      this document.  I want to look at Methods, which
3      starts at the bottom of the first column and carries
4      over to the top of the second column on the page.
5      It says that "participants were recruited using a
6      Web-based respondent-driven sampling strategy."  And
7      it goes on to discuss how 22 seeds were selected
8      based on race and regionality to create networks.
9      And then each seed essentially recommended other
10     people to participate in the study.  And everybody
11     who participated was given a gift card.  Are you
12     familiar with this sampling practice?
13 A.  Yes.  It's called the snowball method, colloquially.
14     The snowball method of recruitment.
15 Q.  The snowball method is the same as respondent-driven
16     sampling?
17 A.  I think it's probably the same -- it has the same
18     end product or the same process.
19 Q.  Okay.
20 A.  You get an original group and you have them reach
21     out to others that they know.
22 Q.  And why is it used, in your experience?
23 A.  It's usually used to reach parts of the population
24     that you might not have access to otherwise, who
25     might have a particular thing that you're interested

Page 199

1      in studying.
2  Q.  Have you ever used the snowball method?
3  A.  No.
4  Q.  So you're aware of it based on other articles you've
5      read?
6  A.  Yes.
7  Q.  Okay.  Are you aware of -- or do you know if a
8      certain number of referrals need to be made in order
9      to obtain a representative sample of the target
10     population?
11 A.  I'm not aware.
12 Q.  I want to also look at this same page we were on,
13     page 2, Measures, under the subheading Sexting.  It
14     says that participants were asked two questions:
15     Whether they had ever sexted using their cell phones
16     and whether they had ever received a sext.
17     Parenthetically, sext is defined as sent a
18     sexually-suggestive nude or nearly nude photo or
19     video of themselves to someone else.
20         Are you aware of any further definition of
21     sexting used in this study?
22 A.  I'm not aware of any other.
23 Q.  Did you consider the definition when you were
24     relying on this article for your expert report?
25 A.  Yes.  I considered all of the definitions when I

Page 200

1      wrote my report.
2  Q.  And what particularly did you look at when you
3      were considering the definitions?
4  A.  Whether they provided a definition or did they say
5      sexually explicit.
6  Q.  So this one does not use the term "sexually
7      explicit."  How would that have factored into your
8      analysis?
9  A.  They used the term "sexually suggestive, nude, or
10     nearly nude."  So that is also a phrase that has
11     been used to described the past, nude or nearly
12     nude.
13 Q.  And is this the same definition that you use when
14     you say "sexually depictions" in your expert report?
15 A.  Visual depictions.  My -- it's broader.  It includes
16     however people have defined it or had their
17     participants identify with sexually explicit.
18 Q.  The definition you use in your expert report is
19     broader than the definition in DX-7?
20 A.  Yes.  Because you don't have to be nude or nearly
21     nude to be involved with -- I guess one of the
22     persons could be, but -- for example, in -- I could
23     imagine oral sex where you could be fully clothed,
24     practically, and still be having an oral sex
25     depiction.  So that should be included as well.  So

Page 201

1      I think this is narrow.
2          (Whereupon, Deposition Exhibit No. DX-8,
3          Sex and Tech, Results From a Survey of
4          Teens and Young Adults, was marked for
5          identification.)
6  Q.  Okay.  Let's move on to DX-8.  This is a 19-page
7      document called "Sex and Tech, Results From a Survey
8      of Teens and Young Adults."  It looks like it's from
9      The National Campaign to Prevent Teen and Unplanned
10     Pregnancy.  Have you seen this document before?
11 A.  Yes.
12 Q.  Where did you see it?
13 A.  I have it downloaded on my computer.
14 Q.  And when did you first become aware of this
15     document?
16 A.  When I first started doing sexting research, so
17     2009, '10.
18 Q.  And you relied on this document in forming your
19     expert report.  Correct?
20 A.  I referenced this document, yes.
21 Q.  Did you rely on it?
22 A.  What do you mean by rely?
23 Q.  Did it play a role in you forming your estimate of
24     the percentage of young adults who have sent
25     sexually-explicit visual depictions --

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

Pages 202..205

Page 202

1  A.  Yes.
2  Q.  -- in the United States?  Okay.  What particularly
3      did you look at in this study?  Do you recall?
4  A.  I have read the whole study.  I have looked at
5      everything in this study.  But to form the report, I
6      remember looking at the prevalence data, the ages.
7      I remember looking at how they conducted their
8      research.  And I think I looked at -- 'cause they
9      actually have their survey, so I think I looked at
10     the actual questionnaire.  But I looked at it
11     selectively.
12 Q.  And what do you mean by selectively?
13 A.  I was looking for certain things.  But I can't
14     remember now what I was looking at.  Whenever
15     there's a survey attached to methods, I usually look
16     at the methods that are related to -- or the survey
17     parts that are related to the methods.
18 Q.  Okay.  If I could call your attention to page 5 of
19     the study.
20 A.  Yes.
21 Q.  There's a heading Definition of Terms.  So here,
22     they provide a definition of sexually-suggestive
23     pictures/video.  And the definition is "semi-nude or
24     nude personal pictures/video taken of oneself and
25     not found on the Internet, or received from a

Page 203

1      stranger, (like spam), etc."  Correct?
2  A.  Yes.
3  Q.  Is this the same -- is the definition of
4      sexually-suggestive pictures and video the same as
5      the definition of sexually-explicit depictions that
6      you used in your expert report?
7  A.  What is in my expert report would be inclusive of
8      this, yes.
9  Q.  So the definition in your expert report of sexually
10     explicit encompasses all of the definitions from the
11     studies you found?
12 A.  Yes.  It's not a definition I provided, but the
13     term, yes, encompasses it.
14 Q.  Encompasses all of the material --
15 A.  Various ways that people have defined it.
16 Q.  So all of the material defined as sexually explicit
17     or -- let me strike that.
18        Of the material respondents to surveys have
19     identified as being sexually explicit or some
20     analogous term you included, is encompassed by the
21     words "sexually explicit" in your expert report?
22 A.  Yes.
23 Q.  Also on page 5, under the heading about the survey,
24     it discusses the number of respondents.  And they
25     broke it in two categories, ages 13 to 19 and ages

Page 204

1      20 to 26.  Correct?
2  A.  Yes.
3  Q.  And it further says that respondents "were selected
4      from among those who have volunteered to participate
5      in TRU's online surveys."  Correct?  It's the next
6      paragraph down.
7  A.  Yes.
8  Q.  Do you know what TRU's online surveys are?
9  A.  I suppose they're surveys that TRU, this research
10     company, puts out as available to people who would
11     like to respond to surveys.
12 Q.  Have you ever heard of TRU before?
13 A.  No.  I don't know of any particular -- I don't use
14     this in my research.
15 Q.  Okay.  So this sampling method involved a random
16     sample of the volunteers -- of people who have
17     volunteered to participate in TRU's online surveys.
18     Correct?
19 A.  Yes.
20 Q.  Do you know if this -- if the sampling population
21     was representative of the national population?
22 A.  No.  I wouldn't know.  But they say they stratified
23     them according to U.S. census data they weighted to
24     reflect the demographic composition.
25 Q.  And what does that mean?  What does stratified mean?

Page 205

1  A.  I suppose that they put them into different groups
2      based on what they thought the demographic
3      representation would be of that respondent.
4  Q.  And what does weighted mean?
5  A.  I don't know what they did to weight this.
6  Q.  Okay.  So you don't know, in other words, that this
7      sample is representative of the national population?
8  A.  No, I don't know if it is.
9  Q.  The last sentence in this paragraph says
10     "Respondents do not constitute a probability
11     sample."  What does that mean?
12 A.  It's difficult to estimate probability of this
13     occurring in the real world based on their -- what
14     they -- their sampling techniques.
15 Q.  What do you mean by "this occurring"?
16 A.  Of whatever it is that they're measuring.  In this
17     case, sexting.
18 Q.  So in other words, is this saying that the
19     results -- or the findings from this survey do not
20     necessarily reflect the percentages of people who
21     send sexually-suggestive pictures nationwide?
22 A.  They're saying it's not that kind of sample.  That
23     was not the design of this study.  I believe that
24     they would say that they think this is reflective
25     based on what was written in this report, reflective

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                    Pages 206..209

Page 206

1  of a national sample.
2  Q.  So what's -- tell me again what a probability sample
3      is?
4  A.  Probability sample is a type of sample that I think
5      would represent the probability of this occurring
6      within the entire United States, I guess, is what
7      they mean.
8  Q.  And what do you -- I guess I don't understand.  What
9      do you mean by probability of this occurring?
10 A.  Of sexting.  Of whatever it is that they're -- it's
11     not only sexting, but . . .
12 Q.  Of the behavior --
13 A.  Yeah.  Whatever.
14 Q.  -- being studied?
15 A.  Yeah.  The term "probability sample," I don't use
16     that term.  I'm not sure but I'm surmising that what
17     they mean is probability of being able to generalize
18     it to the national -- that some samples are created
19     specifically for that.  But they didn't create this
20     sample, I guess, for that reason.  But they weighted
21     it, I believe, so that they thought it reflected
22     what they thought was the national trend.
23 Q.  So the sentence, "Respondents do not constitute a
24     probability sample" means that the sample was not
25     designed to reflect the national population?

Page 207

1          MS. BAUMGARDNER:  Objection.
2  A.  I don't know what they meant when they wrote that.
3  Q.  Did you consider that sentence when you were looking
4      at this study and writing your expert report?
5  A.  The term "probability sample" is not one that I use
6      in my research or I'm not familiar with.  I read
7      everything.  I assumed that it was what I'm
8      explaining to you, that they didn't choose this
9      sample specifically to estimate, you know, the
10     probability of this occurring.  But they had done
11     other things in their methods.  And that's what I
12     considered when I was writing my report, the other
13     methods that they used.
14 Q.  Did you look up the term "probability sample"?
15 A.  I think I did.  And I don't remember what it said.
16 Q.  So you were reassured by the fact that the
17     respondents were stratified and weighted.  Correct?
18     And using this information to estimate behavior at a
19     national population level?
20         MS. BAUMGARDNER:  Objection.
21         Go ahead.
22 A.  I did not use this study alone to make an estimate
23     of a national population.
24 Q.  But in considering this study, as part of the
25     studies you considered, it was significant to you

Page 208

1  that the respondents were stratified and the data
2  was weighted.  Correct?
3  A.  It was significant to me that -- yes, that they
4      stratified it.
5  Q.  And do you know --
6  A.  And they weighted it to reflect demographics, yes.
7      Demographic composition of these young adults.  It
8      was significant to me that it was a national sample
9      as well.
10 Q.  Do you know what they did to stratify?
11 A.  No, I don't.
12 Q.  And do you know how they weighted it?
13 A.  No, I don't.
14 Q.  So you didn't verify the stratification?
15 A.  No, I did not.
16 Q.  And did you verify the weighting of the data?
17 A.  No, I did not.
18 Q.  So the only thing you know about that is what is
19     written in this one sentence on page 5?
20 A.  Yes.
21 Q.  The only thing you know about the stratification and
22     the weighting is what is written on page 5?
23 A.  Yes.
24 Q.  The next paragraph says for additional data, you can
25     visit The National Campaign website or contact The

Page 209

1  National Campaign at a 202 area code phone number.
2  Did you visit the website?
3  A.  I did.
4  Q.  Did you look for additional data?
5  A.  Yes, I did.
6  Q.  What did you find?
7  A.  I found nothing related to the stratification in my
8      search.
9  Q.  Okay.
10 A.  Or the weighting or the probability sample or the
11     details.
12 Q.  Was there additional data available about this
13     study?
14 A.  There was additional data available mostly geared
15     towards information about -- about the broader
16     topic.  So preventing teen and unplanned pregnancy.
17     This is -- it was a bigger website.  It didn't lead
18     you directly to more information about the study.
19     It brought you to kind of a larger scope of the
20     study -- a larger scope of the organization.
21 Q.  But you did find additional data about the study at
22     that website?
23 A.  No.  I didn't find any additional data that I used
24     to in my report.
25 Q.  Do you contact The National Campaign at that

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 210..213

Page 210

1    telephone number?
2  A.  No, I didn't.
3  Q.  Okay.  If you could turn in this document to page
4      11.  And I believe these are the results from
5      certain questions asked of the study participants.
6      There was a question, the first one listed -- these
7      are the numbers -- strike that.
8          The question was, "Which of any of the
9      following have you personally ever done?  Please
10     mark all that apply."
11         The percentage of young adults who had sent a
12     nude or semi-nude picture or video of themselves to
13     someone else was 32 percent.  Correct?
14 A.  Yes.
15 Q.  And the percentage of teens who had done the same
16     was 19 percent?
17 A.  Yes.
18 Q.  Teens is defined for the purposes of the study as 13
19     to 19 year olds.  Correct?
20 A.  Yes.
21 Q.  And young adults is defined as 20 to 26 year olds.
22     Correct?
23 A.  Yes.
24 Q.  And if we look at the net behavior of people who had
25     either -- who had sent and/or posted a nude or

Page 211

1    semi-nude picture or video, the net values are
2    looking at the sending of these images across
3    multiple media.  Right?
4  A.  Yes.
5  Q.  And so the net percentages of young adults is 33
6      percent.  Correct?
7  A.  Yes.
8  Q.  And the net percentage of teens is 20 percent.
9      Correct?
10 A.  Yes.
11 Q.  And they're using the same age ranges, 13 to 19 year
12     olds for teens and 20 to 26 year olds for young
13     adults.  Correct?
14 A.  Yes.
15 Q.  Your estimate in your expert report was 18 to 24
16     year olds.  Correct?
17 A.  Yes.
18 Q.  And your estimate was that 33 percent of them had
19     transmitted a sexually-explicit depiction.  Correct?
20 A.  Approximately.
21 Q.  Approximately.  So when you were faced with --
22     strike that.
23         The teen category, the ages 13 to 19, do not
24     perfectly align with your category of young adults,
25     which is 18 to 24.  Correct?

Page 212

1  A.  That's right.
2  Q.  But there is some overlap?
3  A.  Yes.
4  Q.  There's two years worth of overlap?
5  A.  Yes.
6  Q.  And the young adult category from this study, DX-8,
7      the young adults age range is 20 to 26.  And that
8      does not perfectly align with your definition of
9      young adults.  Correct?
10 A.  That's correct.
11 Q.  There's four years of age overlap.  Correct?
12 A.  Four years of age overlap?
13 Q.  In the ranges.
14 A.  Yes.
15 Q.  Yet the percentage for young adults is 33 percent,
16     which is the same as the percentage you estimate in
17     your expert report.  Correct?
18 A.  Yes.  Approximately one-third, yes.
19 Q.  Approximately.  Did you -- and there's a 13 percent
20     difference between teens and young adults in DX-8.
21     Did you take these age ranges into account in trying
22     to make an estimate on behalf of young adults ages
23     18 to 24, for purposes of your expert survey?
24 A.  Make account of what?
25 Q.  Of the fact that there wasn't a perfect overlap

Page 213

1    between the age ranges in the study and the age
2    ranges you were making an estimate on behalf of?
3  A.  I considered it greatly, yes.
4  Q.  And what did you consider?
5  A.  I considered the fact that findings for youth
6      sexting are usually lower.  So that even if they had
7      a sample that was perfectly distributed from -- in
8      that 13 to 19 age group, you probably had lower
9      rates reported among the younger kids, if it were
10     consistent with the other data that comes out on
11     youth sexting.  And that the higher age ranges would
12     likely be more reflective of the young adults which
13     is -- would be within the typical age ranges that we
14     see in the other studies that look at people who are
15     18 to 24 or 18 to 26.
16 Q.  But the age range you were looking at was 18 to 24
17     --
18 A.  Yes.
19 Q.  -- correct?  Do you believe that as people get
20     older, they're more likely -- strike that.
21         Have you found that as people get older they're
22     more likely to send a sexually-explicit picture or
23     video?
24         MS. BAUMGARDNER:  Objection.
25 A.  I have not studied this in, like, the senior

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

Page 214

1   population.  I mean, it hasn't even been done.  So I
2   don't think I have enough knowledge to make that
3   decision.
4   Q.  But you believe that there's a higher prevalence of
5       sexting in the young adult population versus the
6       teenage population?
7   A.  Based on early teens.  Based on the existing
8       evidence that we have or the existing information
9       that we have, I would estimate yes.
10  Q.  Did you consider that the -- did you consider the
11      possibility that the young adults ages 24 to 26
12      might be sexting more frequently than young adults
13      ages 20 to 24?
14  A.  Well, in my original sample, I had people up to age
15      36, and I did age-related analyses.  And I don't
16      remember finding anything significantly different
17      with my age-related analyses.  There wouldn't be
18      anything that, as a developmental psychologist, I
19      would qualitatively distinguish a 24- from a 25-year
20      old.  There'd be no reason for me to.
21  Q.  Was there any mathematical calculation that went
22      into your use of the responses in DX-8 for purposes
23      of your expert report?
24  A.  No.  In a mathematical adjustment, no.
25  Q.  So it was based on your own judgment of what was

Page 215

1       appropriate?
2   A.  Of what was the appropriate method to make the
3       estimate?
4   Q.  Of whether the 33 percent response rate for young
5       adult ages 20 to 26 was -- strike that.
6           Isn't it true that it was your own judgment
7       that the fact that the age ranges in DX-8 don't
8       perfectly correlate to the age range you used in
9       your expert study --
10          Let me come back to this question.
11          Were there any statistical methods you used in
12      arriving at your 33 percent estimate in your expert
13      report?
14  A.  No.  I didn't use statistical methods.
15  Q.  That estimate was based on your judgment based on
16      your expertise in the field of sexting among young
17      adults?
18  A.  Based on the information that I looked at to make
19      the report, yes.
20  Q.  Did you add up all of the prevalence rates from the
21      data you were given and then average them to arrive
22      at 33 percent?
23  A.  No, I didn't.  Because it's not that
24      straightforward.  Because some of these studies are
25      examining a segment of the population that can't be

Page 216

1       generalized.  And because of that, you can't do a
2       purely statistical estimation.
3   Q.  Did you give the prevalence rates that you were
4       looking at or considering any sort of weight in --
5       any sort of mathematical weight --
6   A.  No.  Because --
7   Q.  -- in arriving at your 33 percent?
8   A.  No.  Because the mathematical weight, I wouldn't
9       even know where to begin to try to assign a
10      mathematical weight to the populations that may not
11      have been representative.  I wouldn't know how to
12      weight them.  We don't have enough information on
13      sexting to weight them.
14  Q.  Keeping math aside, putting math aside --
15  A.  Okay.
16  Q.  -- did you rely more heavily on the studies that
17      were making prevalence estimates on behalf of the
18      national population?  Did you rely on those studies
19      more than the studies that were just looking at a
20      university population?
21  A.  I would say I relied on them both equally.  I
22      considered them both.  I mentioned them all because
23      I considered them all in my estimation.
24  Q.  In your expert report, page 5, you said, "it is
25      prudent to compare our results" and I believe there,

Page 217

1   you're referring to the studies you performed in
2   2012 and 2013, "with those studies involving larger
3   samples of U.S. participants."
4   A.  That's right.
5   Q.  What comparisons did you make?
6   A.  Comparisons?  I compared the prevalence data that I
7       had in my samples to the prevalence data I was
8       seeing in the other studies.
9   Q.  And you just looked at the numerical values?
10  A.  I looked at the numerical values, but I took into
11      account the other things -- their populations.  So
12      whether they were sampling college students or
13      people who were in relationships or not.  I mean, if
14      that data were available.  So I looked at their
15      methodologies and their prevalence data.  But to
16      make my estimation, it was the prevalence data.
17  Q.  And you just noted what the prevalence data was for
18      all the different studies and then just determined
19      that 33 percent was the right estimation?
20  A.  I was asked to extrapolate.  So extrapolation
21      doesn't always mean right.  It just means you're
22      asked to make a judgment based on the information
23      given.  And I made a judgment of a approximate
24      number based on all of the information.  And that
25      judgment was about one-third.

Page 218

1  Q.  And not all of the prevalence rates were of the same
2      numerical value.  Correct?
3  A.  Numerical value.  I'm sorry.  I don't understand the
4      question.
5  Q.  Not all the prevalence rates were the same amount.
6  A.  No.
7  Q.  Correct?
8  A.  Yes.
9  Q.  For example, in your 2012 study --
10 A.  Yes.
11 Q.  -- was 54 percent?
12 A.  Yes.
13 Q.  Several of them were 33 percent.  Correct?
14 A.  Yes.
15 Q.  Was the fact that multiple prevalence rates were 33
16     percent, did that contribute to your estimate that
17     33 percent of youth -- of young adults across the
18     United States have sent sexually-explicit images?
19 A.  Yes.  The fact that most of the studies are around
20     one-third.  And I think you asked me to quantify,
21     well, in how many percentages are we near one-third.
22     I guess I'm getting liberal.  Because we have a low
23     of 20 percent, as a high, 54 percent, so I think 33
24     percent seemed to me neither to be an
25     underestimation or an overestimation.

Page 219

1  Q.  So the range we're dealing with is 20 percent to 54
2      percent?
3  A.  The range that I considered, yes, was 20 percent to
4      54 percent.
5  Q.  So your estimation has to fall somewhere within
6      there based on what you considered?
7  A.  Yes.  Extrapolating from that information, my
8      estimate would fall somewhere in between there.
9  Q.  So when you say approximately one-third of young
10     adults have sent sexually-explicit visual
11     depictions, does that approximately encompass the
12     range 20 percent to 54 percent?
13 A.  No, it doesn't encompass that range.  I'm going to
14     say that it's closer to one-third.  Because 20
15     percent to 54 percent are not inclusive samples.  So
16     I considered these, but I think the real prevalence
17     data would be somewhere in between those.  That's my
18     opinion.
19 Q.  And how many closer would you have to be to get to
20     approximately 33 percent, based on your reading of
21     these -- based on the findings you looked at?
22 A.  How much closer would I have to be to what?
23 Q.  To get into your range of approximate?
24         MS. BAUMGARDNER:  Objection.
25 A.  I actually don't understand the question.  I'm

Page 220

1      sorry.  How much closer would I have to be --
2  Q.  Sure.
3  A.  -- in terms of . . .
4  Q.  The findings you considered range from 20 percent to
5      54 percent prevalence rates.
6  A.  Okay.
7  Q.  You're saying that this falls somewhere close to 33
8      percent, approximately 33 percent.
9  A.  Yes.
10 Q.  How far above 33 percent can we go to still be -- to
11     still call that estimation approximate, to still be
12     within your range of approximation?
13 A.  I don't know.  I mean, I don't have any precise
14     mathematical calculations that went into this.  So I
15     can't give you numerical data.
16 Q.  Okay.  But you could give me 33 percent?
17 A.  I said approximately.  Approximately one-third, yes.
18     Approximately 33 percent.
19 Q.  You don't have any meaning to attach to the word
20     "approximately"?
21 A.  Not at this time.  Again, there are so many things
22     that prohibit me from making a precise estimation of
23     this.
24 Q.  Because sexting is an emerging field of study?
25         MS. BAUMGARDNER:  Objection.

Page 221

1          Go ahead.
2  A.  Because there are so many variables that need to be
3      considered.  As I said, we haven't even -- I don't
4      even know what a representative sample would look
5      like when we're considering this behavior.  I don't
6      even know what the question is when considering this
7      behavior.  The researchers haven't even defined the
8      term.  So based on my existing knowledge, it would
9      be very difficult to give precise measurements.
10     Because of the multiple things that we've discussed
11     today.
12 Q.  So is approximately one-third, is that a precise
13     measurement?
14 A.  No.
15 Q.  Is 10.2 million young adults who have sent text
16     messages involving sexually-explicit visual
17     depictions, is that a precise measurement?
18 A.  No.  It's an estimation.
19 Q.  Okay.  Is that a precise estimation?
20 A.  No.  It's a approximate estimation.
21 Q.  Okay.  And what did you mean by approximately when
22     you say approximately 10.2 million young adults have
23     sent text messages involving sexually-explicit
24     visual depictions?
25 A.  Well, this is easy.  Because I needed only apply my

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 222..225

Page 222

1    approximation of one-third to the census data. So
2    it's the same term.
3 Q. It's the same term that you used when you said
4    approximately one-third of young adults have sent
5    text messages?
6 A. It is. And not text messages.
7 Q. Excuse me. Have sent text messages involving
8    sexually-explicit visual depictions.
9 A. Yes.
10 Q. And we can't give any sort of number value to
11    approximately. Correct? I'm sorry. You cannot
12    give any sort of number value to approximately.
13    Correct?
14    MS. BAUMGARDNER: In what context?
15 Q. In the context of the estimates you're making.
16 A. Somewhere around one-third. No, it's not an exact
17    mathematical computation.
18 Q. But you said you hold this opinion to a reasonable
19    degree of scientific certainty. If you can't give
20    any further numbers other than the approximate
21    percentages, how are you offering this opinion to a
22    reasonable degree of scientific certainty?
23 A. Because the scientific process is looking at a
24    phenomenon or observable instances, forming a
25    conclusion about those, gathering information about

Page 223

1    those, and then coming up with what you see as the
2    explanation for this set of observations. That's
3    the scientific process. So my scientific certainty
4    is not mathematical -- which if you're in math, you
5    have different types of certainty. In the
6    scientific process, certainty is determined in a
7    different way.
8 Q. And the information you were gathering was the
9    prevalence rates from various studies. Correct?
10 A. For the purpose of this report?
11 Q. Yes.
12 A. Yes. I look at prevalence rates, among other
13    things, yes.
14 Q. And so when you say "reasonable degree of scientific
15    certainty," you're saying that -- you mean that I
16    went through -- I put this information through some
17    sort of scientific process in order to reach my
18    estimation?
19    MS. BAUMGARDNER: Objection.
20 A. I am saying that I used a scientific method where
21    you have a set of observations, you have some
22    hypothesis about these observations, you examine
23    what information you have, and you come to some
24    conclusion based on these.
25 Q. And the observations were the prevalence data from

Page 224

1    the different studies you reference?
2 A. The prevalence data as well as their methods, yes.
3 Q. And what were the other steps in that process? In
4    the scientific process you just described.
5 A. Looking at -- having a set of observations,
6    gathering other information that you need, and
7    coming to some conclusion based on the set of
8    observations. Usually you have a hypothesis that
9    drove your scientific inquiry.
10 Q. What was your hypothesis here?
11 A. My hypothesis was that sexting would be more than
12    zero in young adults.
13 Q. So your hypothesis was that at least one young adult
14    somewhere in the United States had sent a
15    sexually-explicit picture or video to someone else?
16
17 A. Probably greater than that, but I wouldn't want to
18    make any precises estimates.
19 Q. Okay. So your hypothesis was that more than nobody
20    had sent a sexually-explicit visual depiction?
21 A. Essentially, because this wasn't a scientific study.
22    I was asked to write a report. So hypotheses drive
23    scientific studies, but based on my experiences, I
24    expected to see, yes, greater than zero.
25 Q. But I thought you just -- so this was not a

Page 225

1    scientific report. Correct?
2 A. No.
3 Q. Your expert report was not a scientific report?
4 A. That's not what I said. I said this was not a
5    scientific study.
6 Q. Okay. So your expert report was not a scientific
7    study?
8 A. That's correct.
9 Q. Okay. Yet when you said you hold your estimations
10    made in the report to a reasonable degree of
11    scientific certainty, what does that mean?
12 A. It's the scientific process that I referred to
13    earlier. As a scientist, you look at a set of
14    observations, you evaluate those observation, you
15    draw conclusions based on those observations. So
16    it's part of the scientific process.
17 Q. So the scientific process is different than a
18    scientific study?
19 A. Yes.
20 Q. Okay. What evaluations did you make of the
21    observations you used -- you had for your scientific
22    process?
23 A. Well, one evaluation was whether or not the data
24    from the samples of college students might be
25    applicable to a broader spectrum of young adults.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 226..229

Page 226

1      That would be an example.
2  Q.  And another one would be whether age ranges that
3      don't precisely match up with the age range you were
4      making an estimate on behalf of, how to translate
5      that data to your age range.  Correct?
6  A.  I don't know that I approached that with a
7      scientific method, but that might be something that
8      one might consider in the scientific examination of
9      information.
10 Q.  And what did you do to make evaluations in your
11     scientific process to get this estimate?
12 A.  I considered all of the evidence.  I considered all
13     of the information that I knew of.  And I looked at
14     these observations and made a estimate based on
15     these multiple observations.
16 Q.  Did you give any report referenced -- strike that.
17     Did you find any report referenced -- strike that.
18        Did you rely on any report referenced more
19     heavily than other reports?
20 A.  I considered them all collectively.
21 Q.  Did you do any sort of weighting of the prevalence
22     data that you had from these reports?
23 A.  No, I did not do any weighting.
24 Q.  Do you weight the prevalence data from studies that
25     were looking at a national sample any differently

Page 227

1      than the prevalence data that were collected using
2      just a university sample?
3  A.  By weighting, are you meaning mathematically?
4  Q.  Yes.
5  A.  No.
6  Q.  What about non-mathematically?
7  A.  I took the sample into consideration.  So yes,
8      weighting in my mind, yes.
9  Q.  And you did you compare the prevalence rates from
10     different studies?
11 A.  Yes.
12 Q.  Okay.  And did you look at the definitions of
13     sexually explicit or an analogous term that was in
14     the studies when you were making your comparison?
15 A.  Yes, I did.
16 Q.  And what did you consider when you were making that
17     comparison about the definitions?
18 A.  The principal thing that I considered was whether or
19     not they had included text in their definition of
20     sexting or sexually-explicit sexting.
21 Q.  Okay.  Did you consider anything else?
22 A.  No.  Because as I say, the definition of sexting has
23     not yet really been defined.  It hasn't been cited
24     upon.  So I took their own interpretations.
25 Q.  When you were --

Page 228

1  A.  And it seemed to me, the term "sexually-explicit
2      visual depictions" would include everything that was
3      included in these studies.
4  Q.  Did you have that definition in mind -- did you have
5      any definition of sexually-explicit visual
6      depictions in mind before you looked at all the
7      studies for purposes of this expert report?
8  A.  Yes.  Non-text sexually-explicit images, visual
9      depictions.  Just anything that was non-text.
10 Q.  Okay.
11 A.  And inclusive of the things that we delineated
12     earlier.
13 Q.  So as long as another study -- strike that.
14        In other words, you incorporated all the
15     definitions that were used in all the studies that
16     you looked at of sexually explicit or whatever the
17     analogous terms was used?
18 A.  I didn't incorporate those definitions.  I don't
19     know that I understand what you mean by incorporate
20     the definitions.  However, any study that delineated
21     text from visual depictions, if they had visual
22     depictions in some way named in their study, then I
23     considered it as part of this, yes -- those
24     prevalence data.
25 Q.  So the words "sexually explicit" in your expert

Page 229

1      report has a very broad meaning then?
2  A.  Sexually explicit.  As broad as the interpretations
3      of the respondents who were responding to that, yes.
4  Q.  So as long as a respondent in any of the studies you
5      looked at believed a message or image sent was
6      sexually explicit, than that image is included in
7      your definition of sexually explicit in your expert
8      report?
9  A.  In considering the methodologies though, some had
10     more narrow definitions.  So very few of the studies
11     that I referenced had only sexually explicit.  So it
12     would have been interpreted as liberally as you are
13     stating here.
14 Q.  But you didn't exclude any findings of sexually
15     explicit or any analogous -- strike that.
16        You didn't exclude any response data based on
17     the definition of sexually explicit or the analogous
18     term?
19 A.  As long as it was not text, no, I did not.
20 Q.  As long as it was an image, a sexual image in some
21     way, it was included in your estimate for
22     sexually-explicit visual depictions?
23 A.  Yes.
24 Q.  Okay.  I wanted to look at DX-4, if you could.  This
25     is your study from 2013, on page 2, under Content of

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

Pages 230..233

Page 230

1    CMC-S.  And CMC-S, I believe, stands for
2    computer-mediated communication-sexual?
3 A.  Mm-hmm.
4 Q.  This paragraph describes the inconsistency in
5    definition of content of sex messages.  And towards
6    the end, you say, "Unfortunately, this inconsistency
7    in terminology makes comparability between previous
8    studies almost impossible."
9 A.  Yes.  That was what someone else had stated,
10    Lounsbury and colleagues.
11 Q.  Okay.  So that was attributed to somebody else?  It
12    reads in here as if it's -- do you agree with the
13    statement?
14 A.  This is what Lounsbury stated, and I think
15    comparability between studies is difficult.
16 Q.  Is it almost impossible?
17 A.  When you're looking at -- I would say it makes it
18    very difficult.
19 Q.  So do you agree with Lounsbury's statement?
20 A.  And I don't know exactly what Lounsbury's words
21    were.  I don't recall what his exact words were.
22 Q.  Okay.
23 A.  But if I'm attributing it to Lounsbury and
24    colleagues, then they must have said something akin
25    to this.

Page 231

1 Q.  Okay.  And this sentence appears in your study.
2    Correct?
3 A.  Yes.
4 Q.  So it's something you cited and you didn't indicate
5    any disagreement with it in the study?
6 A.  No.
7 Q.  Okay.  So if the inconsistency in terminology of the
8    content of sex messages makes comparability very
9    difficult, how can you compare the prevalence rates
10    from the studies you were looking at in your expert
11    report?
12 A.  It was very difficult.
13 Q.  And you were able to overcome the difficulty?
14 A.  Yes.  When asked to make an estimate, I looked at
15    the information that was there.  This is a -- again,
16    this is an emerging field.  So emerging fields often
17    have limitations.  This is one of the limitations of
18    the field at the moment.
19       So -- because we've had inconsistent results.
20    The fact is, no matter how people have asked it,
21    they've come up with relatively consistent data.  So
22    if we consider that, then it also means that our --
23    it may not matter how we define it, as long as we're
24    defining it liberally.
25       And more importantly, I think -- what I then

Page 232

1    say is that if we really want to see -- 'cause
2    sexting is a broad term.  If we want to focus in on
3    particular sexual behaviors, CMC-S, we need to focus
4    in on particular acts.  But it is difficult to make
5    estimations when they don't have consistent
6    definitions.  However, the sexually --
7    sexually-explicit visual depictions is a broader
8    term than is used in most studies.  So it
9    encompasses what we're -- what other researchers
10    have measured.
11       So yes, it's difficult to make comparisons when
12    I want to say what is the prevalence of -- what's
13    the prevalence of nude sexting?  I'm not exactly
14    sure, because some people haven't asked about nude.
15    They haven't delineated it like that.  However, in
16    the term that I used, it's broad enough.  So that in
17    this report, I'm not establishing comparability
18    across studies.  I'm including studies that included
19    sexually-explicit visual depictions in their
20    definition of sexting.
21 Q.  Although, you say in your expert report on page 5,
22    "it is prudent to compare our results," meaning the
23    2012 Drouin study and the 2013 Drouin study, "with
24    those studies involving larger samples of U.S.
25    participants."

Page 233

1 A.  Yes.
2 Q.  So you were comparing results of studies.  Correct?
3 A.  Yes.  Under this broad definition.
4 Q.  Okay.  So even though -- and what were you trying to
5    accomplish by comparing the results?
6 A.  By comparing the results.  To see whether or not
7    what is found in national samples is similar to what
8    the smaller studies with undergraduates have found.
9 Q.  Even though none of the studies use the same
10    definition of sexually explicit?
11 A.  I don't think "none" is the correct term.
12 Q.  Even though not all the studies use the same
13    definition of sexually explicit?
14 A.  Exactly.  But all of the studies, as we mentioned
15    before, the definitions that they've used were
16    included within my term of sexually-explicit visual
17    depictions.
18 Q.  Your term sexually explicit is the most broad, is
19    broader than any of the ones -- any of the
20    definitions used in the studies?
21 A.  I believe so.
22 Q.  Does it include any behavior not captured in the
23    studies?
24 A.  Sexually explicit.  It could.
25 Q.  It could.  So could your -- the phrase sexually

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Pages 234..237

Page 234

1   explicit as used in your expert report could be
2   broader or could include -- strike that.  Let me
3   start over.
4        The phrase "sexually-explicit visual
5   depictions," as used in your expert report, could
6   include conduct that wasn't reported in the data
7   from any of the studies you referenced?
8        MS. BAUMGARDNER:  Objection.
9   A.  Could it be broader.  My recent study asked about
10  forwarding images.  So many people ask about myself
11  or sent picture of yourself.  So in that case what I
12  used was broader, to talk about forwarding.  It's
13  not included here in these prevalence statistics,
14  but it could perhaps be included in prevalence
15  statistics.  So the number of people who would also
16  then forward images could be an additional category
17  of people to include in these studies.
18  Q.  Were the number of people forwarding images included
19  in your approximation of one-third of young adults?
20  A.  No.
21  Q.  Okay.  Or in your approximation of 10.2 million
22  young adults?
23  A.  No.  Because I don't actually have -- I didn't
24  compute -- although you do have a sort of prevalence
25  data because you see how many people have forwarded,

Page 235

1   the sample was small.
2   Q.  So if we used your definition of sexually explicit
3   to mean any type of depiction that a person would
4   interpret as being sexually explicit, it could be
5   very broad.  Correct?
6   A.  Yeah.  But that's not what I was -- that's not what
7   I was referring to here.  So if you look at the
8   studies that are listed, they usually provide a much
9   narrower definition.  So sexually-explicit visual
10  depictions -- and I think all of the studies mention
11  something aside from my initial study, which I
12  didn't rely upon heavily.  I relied more on my
13  latter study where I actually did have them
14  delineate the types of visual content that they were
15  sending.  So I think all of them mentioned something
16  about nude or nearly nude or something that would
17  have been more restrictive than that.
18  Q.  Okay.  You just said that you relied on your 2013
19  study more heavily than your 2012 study.  Correct?
20  A.  In terms of the definition.
21  Q.  Okay.  So you did rely on certain studies more
22  heavily than others?
23  A.  In terms of the definition, I considered that
24  definition a stronger weight.
25  Q.  And how did that factor in to reaching your estimate

Page 236

1   of one-third of young adults?
2   A.  There was no mathematical calculation that I used.
3   It was just -- I had a convergence of evidence from
4   one study to the next.  The fact that I found the
5   same type of results, even though I made the
6   definition of sexually explicit more explicit, gave
7   me a convergence of evidence for those two studies.
8   So the definition, I thought, from the second study,
9   got at more what I wrote in my report, which gave
10  further validation to my methods and my findings
11  from my study one.
12  Q.  Was there a convergence of data in making your
13  estimate that approximately one-third of young
14  adults have sent sexually-explicit text messages?
15  A.  Yes, I believe there was.
16  Q.  And what was that convergence of data?
17  A.  Convergence of evidence?
18  Q.  Convergence of evidence, I'm sorry.
19  A.  The convergence of evidence were that you had
20  several studies conducted by different people in
21  different places who found a similar percentage.
22  Q.  And you had six studies total.  Correct?
23  A.  I had six studies total, yes.  I believe.
24  Q.  And there was one study at a southern university,
25  two studies that took place at Indiana-Purdue Fort

Page 237

1   Wayne, and then three studies that were making
2   estimates about the national population.  Correct?
3   A.  Yes.
4   Q.  And why did you determine that this was a
5   convergence of evidence?
6   A.  Because it was -- a convergence means that you see
7   things all saying about the same thing.  And I did
8   see them saying all about the same thing.  There was
9   none, in this group of studies, that was drastically
10  different than the other in their findings.
11  Q.  And the prevalence rate varied from 20 percent to 54
12  percent.  Correct?
13  A.  Yes.
14  Q.  And that wasn't drastically different?
15  A.  You're talking about different populations.
16  Those -- for the Hispanic women, it was a different
17  population for my sample of people who were in
18  relationships [sic].  So I don't know.  So those
19  studies would not have been -- they were considered
20  with the idea that they were special populations.
21  Q.  Okay.  So the most important studies in making an
22  estimate about young adults nationwide who have sent
23  sexually-explicit visual depictions were the three
24  studies that tried to sample -- tried to have a
25  representative sample of the national population.

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                        Pages 238..241

Page 238

1   Correct?
2           MS. BAUMGARDNER:  Objection.
3   A.  I believe that they're all important.
4   Q.  But three were very -- three of those studies were
5       very provincial in their sample populations.
6       Correct?
7           MS. BAUMGARDNER:  Objection.
8   A.  "Provincial" is not a word that we use.  So you want
9       to . . .
10  Q.  Three of those studies were limited to universities
11      in particular regions of the country.  Correct?
12  A.  Three of those studies were limited to regions in
13      the country.  That doesn't mean that they were any
14      less considered.
15  Q.  Okay.  And they had prevalence rates that were at
16      the far reaches of the range of the studies you
17      considered.  Correct?
18  A.  Yes.
19  Q.  The 20 percent came from the study of the southern
20      university, and the 54 percent prevalence rate came
21      from the study of the IPFW students.  Correct?
22  A.  That's right.
23  Q.  And it was the studies that were purporting to have
24      samples representative of the national population
25      that were all clustered around 33 percent.  Correct?

Page 239

1   A.  That's correct.
2   Q.  So are you saying that when you made an estimate of
3       33 percent, those national samples that all had
4       findings around 33 percent, didn't play a more
5       important role in your estimation than the studies
6       that looked at the university population?
7   A.  Well, if you average 20 percent and 54 percent, if
8       you're doing it from a purely mathematical
9       standpoint, then -- or 50 percent because my more
10      recent studies looked at it in a broader sample --
11      and we have something closer to about 45 percent,
12      probably, average across the different relationship
13      types -- we're still converging at about one-third.
14  Q.  So I thought you had said earlier that you didn't do
15      any mathematical calculations in reaching 33
16      percent?
17  A.  I didn't.  I just did this for you.
18  Q.  Okay.  So the mathematical calculation does help you
19      get to 33 percent and is part of your support for
20      your estimate?
21          MS. BAUMGARDNER:  Objection.
22  A.  I'm saying to you that the upper range of
23      percentages and the lower range of percentages would
24      still, if you looked at them, would be -- and you
25      looked at some middle point, you'd still be around

Page 240

1   one-third.  So that's not, to me, a mathematical
2   computation.
3   Q.  Did you do that computation when you made your 33
4       percent estimate in your expert report?
5   A.  I didn't actually do a computation.  I did not do a
6       statistical computation, which I told you before
7       would be very difficult to do because you're not
8       comparing apples to apples.
9           So what I did was say, okay.  I'm looking and I
10      have about 37 percent to 54 percent across
11      relationship types.  They are finding about 20
12      percent.  If these two university samples are at the
13      extremes, or even somewhere in the middle, and you
14      take the midpoint somewhere, then it's probably
15      about a third.
16  Q.  And you didn't perform any sort of computations to
17      get at the midpoint?
18  A.  I did not.
19  Q.  Okay.  So you guessed to get at the midpoint?
20          MS. BAUMGARDNER:  Objection.
21  A.  I did not guess.  I looked at the midpoint.  I
22      looked at the averages in other studies, and I
23      considered the ranges, and I made an estimate based
24      on those.
25  Q.  And you didn't weight any of the data from the

Page 241

1   studies?
2   A.  How would I have weighted it?
3   Q.  Even -- you didn't weight it in any sort of
4       statistical way?
5   A.  No.
6   Q.  You didn't weight it in any other way in your mind
7       about giving these studies that were purporting to
8       have a sample representative of the national
9       population greater weight in forming your estimate?
10  A.  I considered them all in forming my estimate.
11  Q.  But you didn't rely on one any more heavily than
12      other?
13  A.  I considered them all.  I considered them all
14      equally when I was forming my estimate.
15  Q.  You considered them all equally?
16  A.  I considered them all.
17  Q.  So the fact that you arrived at 33 percent, which is
18      the same number that the studies that purport to
19      have a national sample size -- a nationally
20      representative sample size you used is just a
21      coincidence?
22          MS. BAUMGARDNER:  Objection.
23  A.  When you look at numbers, you don't have to do a
24      mathematical computation to make an estimate.
25      That's what I did.  I made an estimate looking at a

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

Page 242

1    group of prevalence data with consideration for
2    their methodologies and their different samples.
3  Q.  If the three studies purporting to have a nationally
4    representative sample size had been at 36 percent,
5    do you think it's more likely your estimate would
6    have been at 36 percent also?
7  A.  I would have estimated about one-third.
8  Q.  Okay.  Based on what?
9  A.  Based on all of the studies that I had read.  It
10    doesn't bring it down substantially, but --
11    3 percent may mean something to Gallup.  I think
12    when they make estimates, it's plus or minus 2
13    percent.  But 3 percentage points to me is not
14    something that would make a huge difference in my
15    estimates.
16  Q.  Is there a certain number of percentage points that
17    would make a difference in your estimates?
18  A.  If the other national samples had shown 45, then
19    yes, it would have probably made a difference in my
20    estimates.
21  Q.  How would it have --
22  A.  Because then the convergence of evidence would have
23    seemed as if it were converging somewhere more
24    around the percentage of 40s than in the 30s, with
25    consideration for all of the studies.  And I would

Page 243

1    have wondered about the Ferguson sample, if there
2    was something very unique about that population.
3  Q.  So the fact that there was a cluster of studies
4    around 33 percent was significant in you reaching
5    your estimate of 33 percent?
6  A.  No.  It's not the cluster of studies.  It's the
7    consideration of those studies with consideration
8    for the ends of those studies -- my studies and
9    Ferguson's study as well.
10  Q.  And the way that you considered that was just left
11    up to your own judgment, based on the sample size --
12    the sample populations used in the studies and the
13    methodologies that they employed?
14  A.  Extrapolation is based on judgment of a scientific
15    nature, I believe, in this instance of this report.
16  Q.  And how was your judgment scientific?
17  A.  In that I examined the pieces of evidence that I
18    had, and I made a judgment based on those pieces --
19    those observable pieces of evidence.
20  Q.  And that's what makes you hold the opinion to a
21    reasonable degree of scientific certainty?
22  A.  Because I observed -- because I employed a
23    scientific method to look at these.  Yes, I used my
24    scientific judgment.
25  Q.  And you've never used that term previously in a

Page 244

1    study?
2  A.  No.
3  Q.  Have you used scientific methods in other studies?
4  A.  Have I used methods? scientific methods?  Yes.
5  Q.  But you don't ever say that you hold your findings
6    with a reasonable degree of scientific certainty?
7  A.  No.
8  Q.  Why not?
9  A.  That's not a typical phrase in the social sciences.
10  Q.  Why did you use it here?
11  A.  It seemed to be a appropriate legal term.
12  Q.  How did you find out about that legal term?
13  A.  I don't remember.  I don't know.  Maybe it was
14    communicated to me.  I don't remember.
15  Q.  Who would it have been communicated by?
16  A.  If anyone, I think it would have been probably the
17    lawyers that I spoke to before writing the report.
18    I really don't remember exactly how that term
19    emerged.
20  Q.  So you hadn't heard the term before you wrote the
21    expert report?
22  A.  I don't know if I had heard the term or not.  I
23    don't remember.
24  Q.  But you had never used the term until you wrote your
25    expert report?

Page 245

1  A.  I don't believe I had ever used the term.
2  Q.  Okay.  When you make your findings and studies, do
3    you ever use the word "approximately"?
4  A.  Approximately.  This is not the nature of my work to
5    do.  "Approximately" would not be a word used in the
6    nature of my work usually.  I can't think of a study
7    where I've used the word "approximately."
8  Q.  And yet you use the word "approximately" in your
9    expert report?
10  A.  That's right.
11  Q.  Twice.
12  A.  Yes.
13  Q.  And why did you use it in your expert report?
14  A.  Because I was asked to make an estimate, an
15    extrapolation.
16  Q.  So you've never made an estimate before writing your
17    expert report?
18    MS. BAUMGARDNER:  Objection.
19  A.  I estimate all the time.
20  Q.  Do you use the word "approximately" when you make
21    estimates?
22  A.  All the time.
23  Q.  In a written report?
24  A.  I don't have to do written reports where I make
25    estimates probably.  I can't think of a written

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                          Pages 246..249

Page 246

1    report that I have -- that I've had to make
2    estimates before.
3              (Whereupon, Deposition Exhibit No. DX-9,
4              Prevalence and Characteristics of Youth
5              Sexting: A National Study, was marked
6              for identification.)
7    Q.   Okay.  I'll show you one more article, DX-9.  This
8         is approximately a nine-page article called
9         "Prevalence and Characteristics of Youth Sexting: A
10        National Study."  It's by Kimberly Mitchell, David
11        Finkelhor, Lisa Jones, and Janis Wolak.  Have you
12        seen this study before?
13   A.   Yes.
14   Q.   And in fact, I think we talked about it earlier in
15        this deposition.  Correct?
16   A.   Yes.
17   Q.   And it's a study that you have cited in one of your
18        studies.  Correct?
19   A.   Yes.
20   Q.   And you cited it for -- in the discussion of
21        clarifying the definitions of content.  Correct?
22   A.   Yes.
23   Q.   This was in a 2013 study --
24   A.   Yes.
25   Q.   -- that we marked DX-4.  You said that the study

Page 247

1         provided valuable information about the nature of
2         sexting in this age group.  This age group meaning,
3         I believe, people ages 10 to 17.  What was the
4         valuable information that the study provided that
5         you were referring to?
6    A.   Valuable information because it delineated the
7         definition.
8    Q.   Okay.  The definition of . . .
9    A.   It delineated the definition in Table 2 of their
10        study.  They delineated the communication medium,
11        which was the technology used.  They delineated how
12        often it occurred, which I used Likert instead of
13        actual numbers.  In Table 3, they delineated types
14        of pictures that were sent.  All of those things I
15        found useful.
16   Q.   And trying to get at a more specific definition of
17        sexually explicit or some analogous term.  Correct?
18   A.   Yes.  Of sexting in general.
19   Q.   Of sending a sexual image?
20   A.   Yes.
21   Q.   Do you recall the findings from this study?
22   A.   The findings.  I mean, I don't know that I could say
23        them in a sentence.  The findings that I found
24        useful or do you want to know the prevalence
25        findings?

Page 248

1    Q.   Prevalence findings.  Thank you for clarifying.
2    A.   Okay.  7.1 percent, as written in the abstract, said
3         they had received nude or nearly nude images of
4         others; 5.9 percent of youth reported receiving
5         sexually-explicit images are some of the findings.
6    Q.   Yeah.  And I think -- page 16 has a figure which
7         breaks down the findings, in terms of creating an
8         image.
9    A.   Yes.
10   Q.   I think it has -- is that 2.5 percent had appeared
11        or created an image --
12   A.   Yes.
13   Q.   -- of which 1.3 percent were sexually explicit?
14   A.   Yes.
15   Q.   Did you consider the results from this survey at all
16        in any of your studies, the 2012 study or the 2013
17        study?
18   A.   Consider the results?
19   Q.   Yes.
20   A.   I considered their questions in the construction of
21        my questions.
22   Q.   But not the prevalence data?
23   A.   No.  Not at all.  This is children.
24   Q.   Different age population?
25   A.   Yes.

Page 249

1    Q.   And then did you consider the prevalence data from
2         the study in your expert report at all?
3    A.   I did not.  This is children so a totally different
4         topic.
5    Q.   Okay.
6    A.   And children who are contacted via telephone, whose
7         parents need to give permission for their
8         participation.  It's an entirely different type of
9         study.
10   Q.   Oh, okay.  So there are differences other than just
11        the age range that make it hard too?  There are
12        differences other than just the age range?
13   A.   There are differences other than just the age range.
14   Q.   And so there are differences other than just the age
15        range.  Those are the reasons why you didn't
16        consider that study?
17   A.   There are other differences, but the primary reason
18        was the age range.
19   Q.   Okay.
20   A.   I consider this a completely different issue.
21   Q.   Okay.  In any of the studies you've done previously,
22        have you -- do you always conduct your own research
23        before you make findings?
24   A.   Before you make findings?  I'm sorry.  What does make
25        findings mean?

Page 250

1  Q.  Before you reach any conclusions, do you -- do you
2      always conduct your own research in terms of drawing
3      a sample and doing whatever -- asking them questions
4      or whatever type of study you're performing before
5      you make any conclusions?
6  A.  I don't usually make conclusions, but make
7      suggestions about how findings are interpreted.
8          I don't think that our disciplines are meshing
9      well here with terminology.  Because conclusions and
10     these words are not actually words that I would use.
11 Q.  The word you use is "findings"?
12 A.  So I would have a -- I would have some type of topic
13     in mind to study that was of my own creation.  And
14     then I would conduct research.  And then I would use
15     those results to make tentative interpretations --
16     interpretations of how they might be applied, with
17     including stated limitations and future directions
18     for research.  That's my typical method.
19 Q.  So whenever you make tentative interpretations, are
20     you always making those on the basis of data you've
21     obtained from your own studies?
22 A.  Yes.
23 Q.  Do you ever reach tentative interpretations using
24     anybody else's data?
25 A.  You're always doing that somewhat when you're -- not

Page 251

1      tentative interpretation, but when you're writing a
2      literature review, you're looking at what someone
3      else has done and relating it to a theory that
4      you're commenting on.  So in some respect -- again,
5      this is a way I think our disciplines differ in
6      terms of terminology, but in some respect, you're
7      always considering other people's findings when
8      you're conducting your own research.
9  Q.  Okay.  I want to go back to your 33 percent
10     estimate, and specifically on page 5 of your expert
11     report, marked as DX-2.  Middle paragraph in the
12     page, you say data presented on this topic in
13     national survey studies has shown consistently that
14     approximately one-third of young adults have been
15     involved in sexting involving sexually-explicit
16     visual depictions, which you have a parenthetical
17     noting that descriptions of sexting behaviors varies
18     across studies.
19 A.  Yes.
20 Q.  You said that the data in these national surveys has
21     shown consistently that one-third of young adults
22     engaged in sending sexual images.  Correct?
23 A.  Consistently that approximately, yes.
24 Q.  So --
25 A.  It's consistent that it's around a third.

Page 252

1  Q.  And if these national studies had shown around 28
2      percent of young adults had been involved in sending
3      sexually explicit depictions, would your estimate
4      have been lower?
5  A.  Around a third.  As I said before when you went in
6      the upward direction, it's two or three percentages.
7      Because this isn't an exact statistical
8      manipulation, two or three percentage points
9      probably wouldn't have changed my estimate very
10     much.  It's taking into consideration my own work as
11     well.  So one thing that these representative
12     samples may not have captured is people in different
13     relationship contexts.  That might not have been
14     something they would have looked for.  So that might
15     have been -- I don't know.  It didn't happen.  It's
16     hard for me to know what I would have done.
17 Q.  Yeah.  But previously, you seemed to say that you
18     couldn't rely solely on your own findings and you
19     had to look at some sort of national survey studies.
20     Correct?
21 A.  That's right.  I cannot rely solely on my own
22     studies.
23 Q.  Could you rely solely on the national surveys?
24 A.  We had a discussion earlier about peer review.  And
25     one of the things that I said that peer review does

Page 253

1      is take a critical look at your methodology and
2      outside sources, a couple of them, plus an editor
3      take a critical look of your methodology and your
4      results.  Because of that, I feel very comfortable
5      in meshing what was peer-reviewed research with
6      research that was non-peer reviewed.  So each of the
7      studies has limitations.  All studies have
8      limitations.  And I considered them all together.
9  Q.  So you would not have felt comfortable relying on
10     only non-peer-reviewed sources?
11 A.  Unless it were, like, a large -- like a Gallup poll
12     or something.  There are some non-peer-reviewed
13     sources that have great credibility.  So . . .
14 Q.  What about the MTV-AP poll?
15 A.  Would I have made this estimate based solely on
16     their numbers?
17 Q.  No.  I'm sorry.  Does that have the same credibility
18     as Pew?
19 A.  I said Gallup.
20 Q.  Does that have the same credibility as Gallup?
21 A.  Gallup?
22 Q.  To you.
23 A.  To me?  Gallup is a much bigger poll.  So I would
24     take their numbers as being more meaningful.
25 Q.  Than the AP-MTV?

Page 254

1  A.  Yeah.  But that doesn't mean that AP and MTV is
2      wrong.
3  Q.  Sure.
4  A.  Just because I have -- I place, maybe, more meaning
5      in a Gallup poll.
6  Q.  And what about National Campaign --
7  A.  To Prevent Teen and Unplanned Pregnancy?
8  Q.  Yeah.
9  A.  There are not -- I'm not actually commenting on the
10     strength of the institution.  I don't know -- I
11     really don't know anything about their -- the
12     companies that they use to do this online sampling.
13     There was a -- anyway, I don't know about those.  So
14     it could be that these are very strong companies.
15 Q.  Did you look to see how strong they were?
16 A.  I would have no basis to estimate how strong they
17     are.  I don't use them.  I have no -- I have no
18     experience with them.  I wouldn't -- there's not
19     a -- as far as I know, a ranking system of online
20     survey companies in terms of their credibility.
21 Q.  So you don't know how credible the AP and MTV
22     studies are?
23 A.  No.  No, you don't know how credible they are.
24 Q.  And you don't know how credible The National
25     Campaign to Prevent Teen and Unplanned Pregnancy's

Page 255

1      studies are?
2  A.  I mean, credibility is an interesting word.  I know
3      what they found.  I know what the methods were that
4      they used.  They seemed sound to me, so to me
5      they're credible.
6  Q.  Would you have relied -- would you have felt
7      comfortable making an estimate about young adults,
8      ages 18 to 24 sending text messages involving
9      sexually-explicit visual depictions based only on
10     the national surveys?
11 A.  As I said before, I feel like I just answered this
12     question.  But --
13 Q.  A yes or no.
14 A.  No.
15 Q.  You would not have felt comfortable relying only on
16     the national surveys to make your estimation?
17 A.  No.  I considered the national samples in
18     conjunction with the other research that I cited.
19     Comfort is not a word that I'm -- it wasn't about
20     comfort.
21 Q.  Would you have made your estimation based only on
22     the national surveys?
23 A.  You're asking something that would have probably
24     never happened.  If I hadn't had research in the
25     field, I would have probably never been approached.

Page 256

1      So I can't imagine what I would have done if I would
2      have never done research in this field.  I suspect
3      if I have never conducted research in this field, I
4      wouldn't have made any estimations, period.
5  Q.  What if you were told not to use your own estimates.
6      Would you still make an estimate based on the
7      national surveys?
8          MS. BAUMGARDNER:  Objection.
9  A.  These are things that did not occur.  So it's really
10     hard for me to say what I would have done.  But I'm
11     guessing because I have expertise in this field and
12     I was asked to comment on my own research, this is
13     why I agreed to participate in writing this.  So I
14     don't suppose I would have.
15 Q.  Okay.
16 A.  It's hard to know, though, what you might do.
17         MR. SWINTON:  It is.  I appreciate you
18     entertaining my hypotheticals.  I don't think I
19     have any more questions.
20         MS. BAUMGARDNER:  I have just a few.
21         Do you need to take a break?
22         THE WITNESS:  I'm fine.
23         MS. BAUMGARDNER:  Okay.  And this should be
24     brief.
25                  CROSS-EXAMINATION

Page 257

1  BY MS. BAUMGARDNER:
2  Q.  Dr. Drouin, you recall Mr. Swinton asking you about
3      convenience samples, do you not?
4  A.  Yes.
5  Q.  And you, in fact, used a convenience sample for your
6      research?
7  A.  Yes.
8  Q.  Okay.  Convenience samples are used by social
9      scientists, are they not?
10 A.  Yes.
11 Q.  And they are an accepted methodology within your
12     discipline?
13 A.  They are.
14 Q.  And they are considered to yield reliable -- a
15     methodology that yields reliable results within the
16     field of social science?
17 A.  That's what it's considered in social sciences, yes.
18 Q.  Okay.  Now, we talked little bit about the term that
19     you included -- this is an expert report that we
20     asked you to write.  Correct?
21 A.  Correct.
22 Q.  It's not a study?
23 A.  Correct.
24 Q.  Okay.
25 A.  Not a study.

Page 258

1   Q.   And in the report is the phrase that you are
2        expressing your expert opinion to a "reasonable
3        degree of scientific certainty."  Do you recall
4        that?
5   A.   Yes.
6   Q.   And you recall your testimony that you believe that
7        was a legal term.  Is that correct?
8   A.   I think so, yes.
9   Q.   And back, probably when we asked you to prepare this
10       sometime in February, someone may or may not have
11       explained to you that that legal term means -- a
12       reasonable degree of scientific certainty means more
13       probable than not or more likely than not.  Do you
14       recall that?
15  A.   Yes, I do recall that.
16  Q.   Okay.  And so that you are expressing the opinions
17       in your report to a reasonable degree of scientific
18       certainty, meaning after reviewing all the evidence,
19       including your own, that you hold these opinions and
20       you believe them to be more probable than not or
21       they are more likely than not to occur?
22  A.   Yes.
23  Q.   Okay.  One last thing.  We did discuss -- you
24       commented that there was variation in the term
25       sexting and how the questions were asked in the

Page 259

1        various studies that we've discussed.  Correct?
2   A.   Yes.
3   Q.   But we do know there were are few common things that
4        a sext message would have to contain to be
5        considered a sext message?
6             MR. SWINTON:  Objection.
7   Q.   A sext message has to have some sexual content, does
8        it not?
9   A.   From the perspective of the respondent, yes.
10  Q.   Okay.  And it has to be an image.  Correct?
11  A.   Yes.  It has to be an image or a video -- a still
12       image or a video.
13  Q.   So sending a picture of a ham sandwich would not be
14       considered --
15  A.   That's correct.  Not -- again, some people, I don't
16       know.  I doubt it.  When you're saying is this the
17       commonly used interpretation, no.
18  Q.   And so when you conduct studies, you have to kind of
19       assume that your respondents speak English and they
20       understand certain terms, that when they say
21       something that has a sexual content, they understand
22       what that means.  And when it has to be a photo or a
23       picture, they understand what that term means.  Is
24       that correct?
25  A.   Yes.  You make that assumption.

Page 260

1             MS. BAUMGARDNER:  Okay.  All right.  I have
2        nothing further.
3                  REDIRECT EXAMINATION
4   BY MR. SWINTON:
5   Q.   Just one line of questioning.
6             Dr. Drouin, going back to your expert report
7        and this phrase that we've been going over,
8        "reasonable degree of scientific certainty," I just
9        want to confirm that that's not a phrase you've ever
10       used before in any writing.  Correct?
11  A.   In any of my academic writing, no.
12  Q.   And that's not a term you've ever seen in any sort
13       of study in the field of psychology.  Correct?
14  A.   No.  I believe it to be a legal term.
15  Q.   And you were informed of that legal term in
16       conjunction with this case.  Correct?
17  A.   I can't remember how I was informed of this term.
18       But yes, I think it was in conjunction with this
19       case.
20            MR. SWINTON:  Okay.  No further questions.
21            MS. BAUMGARDNER:  Okay.  That's it.
22            We'll waive.
23            Well, unless you want to read through the
24       transcript of your deposition?
25            THE WITNESS:  Oh, waive.  I get it.  Yes, I

Page 261

1   waive.
2        (Whereupon, the deposition concluded on
3        Friday, April 26, 2013, at 3:52 p.m.)
4
5                  * * * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                                    Page 262

Page 262

```
 1              C E R T I F I C A T E

 2

 3          I, Susan J. Snyder, a court reporter and Notary

 4   Public, authorized to administer oaths and to take and

 5   certify depositions, do hereby certify that the above-named

 6   witness was by me, before the giving of their deposition,

 7   first duly sworn to testify to the truth, the whole truth,

 8   and nothing but the truth to questions propounded at the

 9   taking of the foregoing deposition in a cause now pending

10   and undetermined in said court.

11          I further certify that the deposition above-set

12   forth was reduced to writing by me by means of machine

13   shorthand and was later transcribed from my original

14   shorthand notes; that this is a true record of the testimony

15   given by the witness; and that said deposition was taken at

16   the aforementioned time, date, and place, pursuant to notice

17   or stipulations of counsel.

18          IN WITNESS WHEREOF, I have set my hand and seal

19   this 30th day of April, 2013.

20

21

22

23              /s/ Susan J. Snyder
                Susan J. Snyder, Notary Public
24              County of Kosciusko, State of Indiana
                My commission expires:  7/22/2020
25
```

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                                Index: $1,500..6

**$**

**$1,500** 94:10

**1**

**1** 147:24 148:1 185:10 186:23

**1.3** 248:13

**10** 185:6,10 201:17 247:3

**10.2** 98:22 107:5 221:15,22 234:21

**100** 182:25

**11** 210:4

**12** 128:23

**1200** 133:10

**13** 87:12 203:25 210:18 211:11,23 212:19 213:8

**134** 121:15,19

**14** 186:4

**16** 159:9 166:3 248:6

**16-year** 160:2,3,8

**17** 186:4 247:3

**18** 12:22 97:2,14,16,21,25 98:3,17 123:19 159:21 186:4,7 211:15,25 212:23 213:15,16 255:8

**19** 203:25 210:16,19 211:11,23 213:8

**19-page** 201:6

**2**

**2** 94:10 97:6 126:11 142:23 151:13 160:14 185:5 199:13 229:25 242:12 247:9

**2.1** 135:10

**2.3.2** 124:8

**2.5** 248:10

**20** 13:2 51:6,20,22,23 52:13, 73:21 186:19 204:1 210:21 211:8,12 212:7 214:13 215:5 218:23 219:1, 3,12,14 220:4 237:11 238:19 239:7 240:11

**20.5** 151:6 153:10,13

**2004** 15:19

**2006** 36:8

**2007** 35:23 36:8

**2008** 35:23

**2009** 35:20,24,25 36:2,4 183:22,25 201:17

**2010** 42:2,16,23 54:17

**2011** 39:3 40:14 43:5 53:11 54:5, 13 141:24 184:15,16

**2012** 40:15 41:1 42:8,14,18,24 44:2,3 54:9,15,23 55:9,10 59:2 60:13 61:3 72:12 83:1,6,9 84:7,9, 14,22 90:6 141:12 144:4 145:7 147:8 151:22 154:24 155:8 159:13, 16,24 165:6,18 169:12 176:14 179:1,12 217:2 218:9 232:23 235:19 248:16

**2013** 41:15 53:4 54:10,15,23 55:9, 10 59:2 60:17,18 61:7 72:14 83:1, 6,9,10 84:23 88:5 90:7 140:18 141:23 144:8 151:22 154:25 155:9 159:13,16,18,24 165:7,18 169:12 176:17 179:14 195:13 217:2 229:25 232:23 235:18 246:23 248:16 261:3

**202** 209:1

**207** 151:14 154:8

**20s** 98:6

**22** 198:7

**24** 97:14,17,21,25 98:3,17 186:5,7 211:15,25 212:23 213:15,16 214:11,13 255:8

**24-** 214:19

**240** 154:15

**243** 174:13

**25** 51:23,25 52:1 159:10 166:3

**25-year** 214:19

**26** 10:21 12:23 13:2 204:1 210:21 211:12 212:7 213:15 214:11 215:5 261:3

**28** 252:1

**3**

**3** 41:5 44:9 113:18,19 114:5 141:6

144:11,22 147:19,21 151:10 185:6 242:11, 247:13

**3.1** 122:13 147:22

**30** 28:25 97:2 117:18,19

**30s** 242:24

**32** 210:13

**33** 182:6 186:8,10,12 211:5,18 212:15 215:4,12,22 216:7 217:19 218:13,15,17,23 219:20 220:7,8, 10,16,18 238:25 239:3,4,15,19 240:3 241:17 243:4,5 251:9

**35** 117:20

**36** 214:15 242:4,6

**37** 147:14 148:4 179:23 240:10

**3:52** 261:3

**4**

**4** 147:25 148:1 151:23 160:15

**4.1** 148:19

**40** 117:20

**40s** 242:24

**446** 135:10

**45** 117:19 148:5 239:11 242:18

**45.9** 126:8

**48** 135:11,20,23

**49** 147:14 148:3,11

**5**

**5** 40:17 97:11 148:18 160:15 164:8 177:11 202:18 203:23 208:19,22 216:24 232:21 251:10

**5.9** 248:4

**50** 239:9

**54** 122:14,19,22 123:3 126:1,2,3 134:12,19,22 136:1 139:25 179:1,5 218:11,23 219:1,4,12,15 220:5 237:11 238:20 239:7 240:10

**6**

**6** 61:16 127:11

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**6.9** 126:11

**60** 51:15

**600** 120:7

---

**7**

**7.1** 248:2

**70** 50:5

**744** 120:24 121:12

---

**8**

**8.6** 160:23

**86** 135:13

**878** 121:6,12

---

**9**

**90** 8:14 85:24

**96.1** 151:16 152:21

---

**A**

**A-d-r-i-a-n** 9:13

**abbreviation** 28:21

**ability** 9:4 158:7 182:23

**abstract** 159:8 248:2

**abuse** 85:15 183:22 184:1

**academic** 78:21 79:16,19 260:11

**accept** 66:17

**acceptable** 132:8

**accepted** 33:25 36:1 47:24 257:11

**access** 52:12 174:22 175:3,5
176:8,10 198:24

**accessed** 120:4

**accomplish** 233:5

**accomplished** 156:19

**account** 212:21,24 217:11

**accurate** 108:17 129:8 189:15

**accurately** 9:5

**acknowledge** 71:24

**act** 144:15,16 146:5,10,16

**active** 31:20 47:4 80:21 85:17

**actively** 45:23 50:16

**activities** 31:20

**activity** 78:23 178:24

**acts** 232:4

**actual** 17:5,8,12 138:3 181:5
202:10 247:13

**add** 15:20 49:21 120:11 157:25
215:20

**adding** 46:1

**addition** 8:11

**additional** 60:11 92:15 208:24
209:4,12,14,21,23 234:16

**address** 156:2

**adjust** 180:7,9,16

**adjustment** 214:24

**adolescence** 24:18 98:5

**adolescents** 13:12

**Adrian** 9:9

**adult** 12:6,8,9,10 37:11 38:1,13
39:25 40:9 41:12 45:8,10 50:8
52:23 81:4,19 88:20,21 89:18,23
92:13 95:9,11 96:15 97:3,16,24
98:2 108:14 212:6 215:5 224:13

**adulthood** 13:3,6 98:11

**adults** 12:11,21,22,23,25 37:12
38:10 39:18 41:8,11,15,22 42:5
43:10,20,21 44:6,24 46:22,24
48:11 49:2,6,11,18,20 50:22,23,25
51:5,8,17,21 52:3 54:7,21 55:4,6,8,
15 57:25 58:6 60:13 66:21 73:18,
19 75:5 76:17 77:15,16,18,20,24
78:2,17 80:10,17 81:6 82:4,9,18
84:10,25 85:21 89:20 95:6 96:22,
23,25 97:1,14 98:17,23 105:4,15
106:2,24 107:5,16,18 126:19
127:1,3 130:16,23,24 131:1,3,10
132:14 137:15 140:13 149:1,5,6,22
150:1 162:6 163:4 164:12 165:5,17
168:24 169:4,5,11,19 170:9,23
177:15 178:11,18 181:3 192:11
194:15,21 201:4,8,24 208:7
210:11,21 211:5,13,24 212:7,9,15,
20,22 213:12 214:11,12 218:17

**affect** 89:4

**affects** 37:1

**affirmatively** 175:22 176:1

**age** 13:1,2,6 24:15,23,24 39:17,
97:19,25 123:13,19 159:15,18,19,
21,23 211:11 212:7,11,12,21
213:1,8,11,13,16 214:14 215:7,8
226:2,3,5 247:2 248:24 249:11,12,
13,14,18

**age-related** 214:15,17

**aged** 97:14 98:17 166:2

**ages** 97:16 159:9 186:4,7 202:6
203:25 211:23 212:22 214:11,13
215:5 247:3 255:8

**agree** 116:21,22 157:1 176:20
230:12,19

**agreed** 256:13

**agreement** 5:24

**ahead** 8:24 56:11 96:7 135:2 155:3
158:14 172:6 180:14 187:23
207:21 221:1

**akin** 26:12 230:24

**align** 211:24 212:8

**Alisen** 140:14

**Alison** 194:22

**allowed** 128:15

**alternative** 116:5

**altogether** 121:22

**ambiguous** 43:11

**amend** 33:5

**American** 16:11,19,20 24:25 25:2
27:11,13 130:16,23,24 131:1,3
149:1,5,22,25

**amount** 138:6 167:10 180:5
196:10 218:5

**analogous** 203:20 227:13 228:17
229:15, 247:17

**analyses** 121:21 127:16 149:10
154:4 167:7 214:15,17

**analysis** 127:25 142:4 167:1 200:8

**and/or** 210:25

**Andrew** 40:20,22

**angle** 59:24,25

**angles** 113:2

**annual** 42:16

**anonymous** 117:6 129:18

**answering** 117:21 120:6

**answers** 7:11

**anxiety** 113:15

**anymore** 176:4

**AP** 254:1,21

**AP-MTV** 183:22, 253:25

**APA** 25:15,22 26:12,18,22 196:8

**apparently** 83:17 100:8

**appealing** 75:2 133:12 135:16

**appeared** 248:10

**appears** 231:1

**apples** 143:18,19 240:8

**applicability** 22:15

**applicable** 21:19,22 22:19 81:7,8,
14 98:1 108:14 225:25

**applicants** 29:12

**application** 25:12,13 26:17 28:3,
19,24 29:1,8 31:18,23 32:3,5
33:22,25 58:8

**applications** 22:6

**applied** 21:2 89:4,7 161:11 250:16

**applies** 22:1 166:20

**apply** 21:25 25:11 26:15 27:6
63:11 66:4 101:1,2 149:5 166:18
170:3 196:25 210:10 221:25

**applying** 135:9

**appointment** 62:1

**approach** 52:16 68:21,22 183:5,
15

**approached** 34:7 64:15 226:6
255:25

**approaching** 40:6 52:24

**approval** 58:7,10 114:22,25

**approved** 19:1

**approximate** 133:13 181:7 186:13
219:23 220:11 222:20

**approximately** 97:13 98:16,22
105:14 160:23 178:10,17 181:1,2,
4,17,21 182:3,8 211:20,21 212:18,
19 219:9,11,20 220:8,17,18,20
221:12,21,22 222:4,11,12 236:13
245:3,4,5,7,8,20 246:8 251:14,23

**approximation** 180:5 181:22
183:3 220:12 222:1 234:19,21

**April** 261:3

**APS** 26:6,8,9,11,12

**area** 20:11,13 35:10,15,17 36:3,10,
14,16,20 37:2,9,12,14,15,18,20,21,
22 39:15,22 40:1 44:22 45:12
73:18,19 77:10 80:9 81:6,18,23
152:14 166:16 190:3 209:1

**areas** 35:8,14 36:13 37:6 38:2,18
65:4,7,9,22 66:11

**argue** 98:5

**arguments** 89:2

**arm** 74:22,23

**arranged** 10:25

**arrive** 178:21 179:9 215:21

**arrived** 241:17

**arriving** 179:6 215:12 216:7

**article** 41:3,7, 42:14,24 43:9,20,21,
24 44:13 46:11,12 48:18,22 50:5,9
52:18 59:1,23 60:4,13,14,17,18
61:3,7 63:4,8,25 64:13 65:1,7,11,
12,24,25 66:3,13,14,15,20, 69:22,
24 70:2 72:12, 73:14 75:10 79:23
83:9,15,17 90:5,6 94:1 95:12,13,
15,17 109:25 110:4,7,12 111:7,9,
16,19,23,25 112:11 113:5 120:21
121:23,24 122:2,9 126:16,20 127:6
137:14,17 140:10,17 141:2,10,12,
23 142:2,3,9 144:4,11 148:9,18,23
150:12 151:10,21 152:7,20 155:9,
10 156:22 157:7 159:6,12,19 161:2
162:10 165:6,7,18,19 174:9 174:20
195:3 196:7,12,19 197:3,9,10,14,
16, 199:24 246:7,8

**articles** 41:1,21 42:4 44:5,17
46:13 48:2 50:7 51:4,13 52:14,15,

24 54:8,9,14,23 55:9,10 59:5,6,14
61:11 63:18 66:17 70:1,9 72:16,18
73:5 76:7 78:20 79:6 80:12,17,23
83:6 84:5,9,16,19,21 89:24 90:3
92:10,12,16,17 93:14,16,18,25
94:3,6,22,25 95:5 110:13,19
138:21 151:23 159:13,16,24 161:5,
21 162:16,21,25 163:14 174:8,9
177:13 180:10 195:8,16 199:4

**Arts** 16:6 33:19,25

**Arturo** 194:22

**aspect** 20:4 22:17 33:9 62:19

**aspects** 38:20

**assign** 216:9

**assigning** 190:11

**assignment** 114:12 116:6

**assist** 33:8 62:19

**assistance** 94:4

**assistants** 31:19 33:8

**assisting** 62:14

**association** 25:1,3,6 26:5,10,18,
19 27:4,7,9,10,11,12,14 42:3 85:12
150:8,16

**assume** 7:16 28:9 42:6 90:21,23
119:6 139:14 259:19

**assumed** 30:5 92:2 207:7

**assumes** 172:4

**assumption** 259:25

**assumptions** 90:16,18,20

**atmosphere** 9:16 10:7

**attach** 220:19

**attached** 15:23 185:22 202:15

**attachment** 41:4 44:9 111:3,10
112:1,21 113:6,15 125:10 126:17
133:15

**attachment-avoidance** 132:12

**attachment-avoidant** 113:9

**attachments** 97:7

**attend** 38:22

**attendance** 39:16

**attention** 202:18

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**attorney**  5:10,21,24 6:16

**attributed**  230:11

**attributing**  230:23

**audience**  188:10,11

**author**  49:24 51:17 80:7 111:11,
18,19 141:1 161:6 195:17,20
196:2,17,18 197:2,9,17,21,23

**authorization**  115:2

**authors**  49:24 50:17,21 51:4,20
52:8,13 78:9 80:3 81:18 140:13
195:15,23 196:11 197:15

**authorship**  47:15

**average**  51:15 135:12 215:21
239:7,12

**averages**  240:22

**avoid**  8:13

**avoidance**  133:14

**award**  27:23,24 28:1,2,18 29:3,23,
25 31:8,11 33:17,21 34:2,11,14,16,
17,19,21,24

**awarded**  28:5

**awards**  27:19

**aware**  46:5 51:6 150:23 158:16,20
162:7,19,21 167:22 184:10 185:19,
23 191:9,15 195:3,6 199:4,7,11,20,
22 201:14

**B**

**baby**  41:19 140:7,11

**Bachelor**  16:6

**back**  41:24 76:13,15 115:4 133:23
136:10 144:2 151:18 159:5 160:11
173:24 177:10 186:22,23 215:10
258:9 260:6

**background**  7:8 12:1 16:3 50:11

**backside**  99:25

**based**  14:23,25 21:5 22:23 28:7,10
29:15,23,25 34:8,24 40:10,16 42:4,
24 43:9,11,25 49:7 52:21 54:8,13
59:5 64:20 98:9 105:6 106:13
126:11 138:10 147:3 158:10 160:8
161:20 163:14 165:17 167:9 168:5,
19,23 170:13,23 172:18 173:3,5,8,
9,10,12,13 178:16 180:23 183:1

191:2,4 193:15 198:8 199:4 205:2,
13,25 214:7,25 215:15,18 217:22,
24 219:6,20,21 221:8 223:24
224:7,23 225:15 226:14 229:16
240:23 242:8,9 243:11,14,18
253:15 255:9,21 256:6

**basis**  27:24,25 42:7 43:19 137:13,
17 154:10 164:5 165:6,21 250:20
254:16

**batteries**  157:18

**Bauermeister**  83:17,18 194:22
196:17

**Baumgardner**  6:3 8:23 10:2,7,18,
23 11:3 49:12 51:24 53:16,20
72:23 75:8 86:2 88:23 90:13 91:3,
7,11,20 96:6 97:5,10 135:1 144:20,
24 147:17,20,23 153:16 155:2
158:13,18 159:17 170:18 173:4,18
180:13 187:22 207:1,20 219:24
220:25 222:14 223:19 234:8 238:2,
7 239:21 240:20 241:22 245:18
256:8,20,23 260:1,21

**Baumgardner's**  88:9

**began**  15:19 35:17 46:23 48:1
54:16

**begin**  17:15 68:10 180:21 216:9

**beginning**  9:11 58:12,13 85:23
142:9

**begun**  42:22

**behalf**  168:10 212:22 213:2 216:17
226:4

**behavior**  19:11 68:4 111:2,8
132:21,23 140:6 142:5 163:25
168:16,21 171:12 180:6 206:12
207:18 210:24 221:5,7 233:22

**behaviors**  133:16 140:8,12 150:7,
9,15,16 154:3 178:15 232:3 251:17

**belief**  172:21,22 173:9,11,13 183:4

**believed**  37:24 105:18 229:5

**belonged**  26:22

**benefits**  188:14,15,16

**bias**  129:17

**big**  20:13,14

**bigger**  209:17 253:23

**Bill**  10:24 11:1,2 88:8

**bit**  7:8 10:14 11:25 18:15 23:10
26:12 35:13 36:7 67:23 71:11
85:25 87:10,21 92:10 103:7,16
132:8 156:16 181:18 190:5 257:18

**blind**  47:15

**block**  70:19

**board**  19:2,3,4 55:24 58:7,10
114:20,21

**body**  61:25 75:23 93:24 154:1

**bottom**  39:2 147:19 148:18 198:3

**Boyd**  40:21,22

**boyfriend**  124:10

**branched**  18:21

**break**  8:15,20 86:1,9 173:17,25
174:1,7 256:21

**breaks**  8:14 85:24 248:7

**breasts**  102:10 104:15,24

**briefly**  83:20

**bring**  242:10

**broad**  23:11 57:6 63:10 68:7 98:8
99:22 229:1, 232:2,16 233:3,18
235:5

**broader**  12:19 17:10 22:6,15 37:20
68:4 103:7,16 112:7 131:17 143:12
150:24 159:15,18,19,22 200:15,19
209:15 225:25 232:7 233:19 234:2,
9,12 239:10

**broadly**  21:25 23:4,18,20,21 26:11
30:24,25 41:10 68:15 82:1,19,21
88:22 89:4,7 93:18 170:3

**broke**  203:25

**broken**  145:14,17 148:7 186:4

**brought**  209:19

**build**  68:6,17

**building**  56:16

**bulk**  196:6

**But's**  16:14

**C**

**calculated**  109:13

**calculation**  120:11 214:21 236:2
239:18

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Index: calculations..collectively

**calculations** 179:8 220:14 239:15

**call** 19:3 88:8 202:18 220:11

**called** 5:2 18:17 41:18 56:17 73:25
74:12 115:21 119:10 140:11
157:20 166:25 175:24 194:20
198:13 201:7 246:8

**calling** 108:2

**Campaign** 178:5 201:9 208:25
209:1,25 254:6,25

**campus** 29:7 62:4

**campus-level** 29:3

**capacity** 6:7 14:20

**capture** 57:6 163:24

**captured** 233:22 252:12

**captures** 59:21

**capturing** 143:23

**card** 198:11

**Carly** 111:11

**carried** 196:6

**carries** 198:3

**case** 5:12,16,17,25 6:15,17 7:7
11:6,8,9,14,16 65:23, 74:24 79:10
86:11,12,13,14 88:5,11,13,18 89:2,
11,13 93:4 94:17,21 95:2 96:1,3
129:20 130:21 172:23 174:3 183:9
195:19 196:16 197:5,6,12 205:17
234:11 260:16,19

**cases** 32:12 129:22,23 197:21

**casual** 124:11 148:4, 149:15,17
150:4

**categories** 38:5 125:18,23 203:25

**categorize** 104:21

**category** 97:22 120:9 211:23,24
212:6 234:16

**cell** 12:15,17,20 14:1 199:15

**census** 93:22 96:14 97:20,22 98:1,
10,13 204:23 222:1

**centered** 7:6

**certainty** 182:12,14,20 183:14
222:19,22 223:3,5,6,15 225:11
243:21 244:6 258:3,12,18 260:8

**certified** 5:3

**certifying** 117:22

**chance** 52:7 187:21 188:4,9,12,22

**changed** 106:22 252:9

**characteristic** 114:1 189:13,24
191:2,4

**characteristics** 112:22,23 160:4
175:10 190:22 246:4,9

**characterization** 112:4

**cheating** 148:5,16 149:15,18
150:4

**check** 193:9

**Chi** 85:13

**Chicago** 42:3

**child** 19:20 22:1,18,25 24:5,
157:16

**child's** 157:9

**children** 17:21 18:19 21:4,5,6,10,
23 22:17,23 87:2,3 145:7,8 158:25
248:23 249:3,6

**children's** 17:20 20:25

**choice** 73:14

**choose** 73:16 115:25 207:8

**chosen** 190:8

**Christopher** 150:14 174:10

**citation** 44:13

**citations** 46:7

**cite** 46:11 67:23 70:6 81:1 105:23

**cited** 9:19,23 52:18 64:21 65:10,
11,15 80:22 227:23 231:4 246:17,
20 255:18

**citing** 72:8 75:25

**city** 20:16,17,19,20,21,23,24 21:13

**city's** 21:3

**claim** 191:14

**claiming** 193:14

**clarify** 5:22 6:1 10:4 11:15 13:9
17:24 25:9 30:7,9 37:14 44:21
48:12 60:20 66:11 88:15 93:8
113:20

**clarifying** 16:21 144:6 246:21
248:1

**class** 32:22,23 33:2,4,12,13 62:14,
22 123:10,17 135:12

**classes** 24:3,21 121:1 122:24
123:4 134:3,10 135:16 137:9

**classroom** 28:11 33:3,15

**cleaning** 56:23

**clear** 6:14 105:13 132:9 159:10
177:5

**cleavage** 144:18 146:19 147:5

**Cleveland** 21:16

**close** 130:14 131:5, 220:7

**closed** 55:24

**closer** 219:14,19,22 220:1 239:11

**clothed** 99:23 100:1 101:23 102:5,
6,8,11,14 104:3,4,14 143:7 144:18
200:23

**cluster** 243:3,6

**clustered** 238:25

**CMC-S** 230:1 232:3

**co-author** 32:15 83:19 111:16

**co-authors** 31:24 32:2,17 50:14
51:8,14 56:1,2

**co-organizers** 40:21

**Coalition** 86:13 87:7

**code** 209:1

**coding** 32:13

**coercion** 84:18,21 85:3,8

**cognitive** 16:25

**cohesive** 156:18 172:24 173:6

**cohesively** 172:18

**cohort** 164:9 177:12

**coincidence** 241:21

**colleague** 8:22 11:2

**colleagues** 88:9 230:10,24

**collect** 60:9,11 61:1 114:8 123:17,
18

**collected** 129:24 141:11,22 227:1

**collecting** 54:16 117:22 127:8

**collectively** 172:19 226:20

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                              Index: college..considered

**college** 33:25 40:19 41:5,12 44:3
69:17,19 111:3,10 112:2 120:24
130:13,15 131:8,9,11 132:4 152:15
160:22 169:1 217:12 225:24

**colleges** 69:11

**colloquially** 198:13

**Colloquium** 28:15

**column** 144:23 148:10 198:3,4

**combined** 31:7

**comfort** 173:3,5 255:19,20

**comfortable** 22:22 23:1 47:2 48:3
49:9 52:10 72:21,24,25 73:3,22
75:25 76:7 132:24 133:9,16,23,24
134:18,19,22 135:9,24,25 137:7,
138:13 165:20 253:4,9 255:7,15

**comment** 48:24 187:6 256:12

**commented** 9:21 37:23 258:24

**commenting** 87:24 139:15 251:4
254:9

**commitments** 25:17

**committed** 121:4,13,17 122:20,23
123:3,11 124:5 130:14 131:6,7
133:4,7 134:1,4,15,17,20,23 136:4,
8 137:10 142:7 148:3,10 149:15,17
150:4 179:12,16 181:12

**committee** 25:19,22 28:6,12 29:3,
4,5,8,9,10 32:4 34:13,22 35:3
61:20,23,24

**common** 65:5 66:1 69:15 78:20
128:21 199:11,12,14 158:4 197:7,
8,11,16,22 259:3

**commonly** 129:2,15 197:5,6
259:17

**communicate** 68:9

**communicated** 244:14,15

**communication** 12:19 36:11
37:1,5 48:19 247:10

**communication-sexual** 230:2

**community** 18:5

**companies** 254:12,14,20

**company** 204:10

**comparability** 155:5,24,25 230:7,
15 231:8 232:17

**compare** 154:22 155:10 159:12
167:3 177:16 216:25 231:9 232:22

**compared** 151:20,22 154:24
177:20 178:1 217:6

**comparing** 143:3,18,22 233:2,5,6
240:8

**comparison** 28:20 77:12 156:4
227:14,17

**comparisons** 155:17 157:13
188:19 217:5,6 232:11

**compendium** 184:12

**compensation** 94:11 116:17

**competition** 85:13

**complete** 7:11 8:1, 54:19 114:11
117:17 118:24 119:1,5 120:13
151:3

**completed** 56:9 60:5 61:9 73:12
76:24 77:4 106:14 117:1 119:3,9
121:6

**completely** 55:24 56:5 99:6
101:11 117:5 249:20

**completing** 123:6

**completion** 121:7

**complex** 120:10

**composition** 152:2,5 204:24
208:7

**comprised** 174:16

**computation** 180:19 222:17
240:2,3,5,6 241:24

**computations** 240:16

**compute** 234:24

**computer** 12:18,20 14:7 184:6
195:2 201:13

**computer-mediated** 48:19 78:23
140:7,12 230:2

**Computers** 111:2,8 140:6

**concentrated** 85:17

**concept** 63:6

**conceptualization** 57:1,13

**conceptualized** 58:9 196:5

**conceptualizing** 33:8

**concern** 84:10

**concerned** 87:15

**concluded** 55:8,13,18,19,22,23
57:9,16,17,20,24 59:6,9,19 60:15,
18,20,21,22,25 61:5 261:2

**concludes** 84:1,2

**conclusion** 90:12 96:9,11 148:19
151:9 183:12 193:15 222:25
223:24 224:7

**conclusions** 19:24,25 20:23,25
21:2,3,5,21,22 22:23 23:2,11 70:2,
96:4,18 166:8 225:15 250:1,5,6,9

**conditions** 19:19

**conduct** 17:5,8,23 34:18 36:6
59:10 67:17 69:12 74:3 76:10
83:13 103:2 106:10 136:19 183:13
234:6 249:22 250:2,14 259:18

**conducted** 34:19,21 35:22 36:5
54:22,25 55:1,3,7,16,18,19 66:25
70:18 77:9 81:21 127:22 144:1,3
152:10 167:2 178:17 202:7 236:20
256:3

**conducting** 17:12,14,15 21:25
32:10 33:16 37:2 39:13 45:4,6,9,13
46:10 55:5,17 69:1 85:20 112:15
114:23 122:25 173:14 251:8

**conference** 85:12

**confirm** 260:9

**conflicting** 107:22,23

**conjunction** 114:12 255:18
260:16,18

**connected** 18:16 96:3 122:1

**connection** 18:18 94:16 96:1
132:17,18

**consecutive** 122:24 123:5

**consensual** 57:9,12 85:14

**consent** 116:13,21, 123:23

**conservative** 164:18

**conservatively** 36:9

**consideration** 227:7 242:1,25
243:7 252:10

**considered** 39:10 65:14 92:12
93:24 95:17 97:3 99:9 107:20
108:5 124:1 179:10,13 180:15

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

192:20 199:25 207:12,25 213:3,5 216:22,23 219:3,6,16 220:4 221:3 226:12,20 227:18 235:23 237:19 238:14,17 240:23 241:10,13,15,16 243:10 248:20 253:8 255:17 257:14,17 259:5,14

**consisted**  120:24 159:9

**consistency**  156:3 157:14

**consistent**  19:23 155:15,16,20 156:13,20,23 158:5 213:10 231:21 232:5 251:25

**consistently**  178:10 251:13,21,23

**Consortium**  39:4

**constitute**  205:10 206:23

**Constitution**  87:16 89:9

**constitutional**  87:19

**constraints**  59:17

**construct**  42:10

**construction**  42:8 248:20

**constructive**  63:22,23,25

**construed**  136:25

**construing**  97:15

**consultations**  62:4

**contact**  53:25 64:23 65:8,17,25 67:20 116:18,20 117:11,12,14 209:25

**contacted**  11:6 40:21 64:19 88:14, 15 249:6

**contained**  144:14

**contend**  50:13

**content**  103:9,10 105:22 130:14 142:15,16,22 144:11 229:25 230:5 231:8 235:14 246:21 259:7,21

**context**  63:2 75:5 76:9 118:5 138:16 139:7 142:15 222:14,15

**contexts**  23:19 252:13

**continual**  77:9

**continually**  15:20 47:4

**continue**  25:17 27:1

**continued**  86:5 173:21

**continuing**  62:10, 122:11

**contribute**  17:22 68:5 69:2,6 70:22 74:6,10 197:14 218:16

**contributed**  152:3 196:14,19,21

**contributing**  76:5 172:14

**contribution**  75:14 132:6 196:25

**contributions**  196:12

**contributors**  39:11

**controversial**  129:11 130:2

**convenience**  174:16,20,23,25 175:1,9,14 176:7,15,18,22,25 177:1,7 257:3,5,8

**convenient**  174:21

**conveniently**  176:11

**convergence**  131:12,16,18,19 166:1 167:13, 169:24 170:11 171:2,5,16,24 172:2,9,15,21,25 173:9,11 186:15 236:3,7,12,16,17, 18,19 237:5,6 242:22

**converging**  46:16 239:13 242:23

**conversation**  10:25 87:4 99:3

**copied**  145:10

**copy**  46:11 92:21

**Cornell**  16:6

**correct**  11:20 16:7 22:8 29:16 30:7 36:13 43:1 49:2,6 53:14 61:20 63:14 78:2 84:19 85:22 87:14,18 91:15 93:6 95:23 98:19,24 102:25 103:20 104:8 109:14 110:20 111:13,17,20 112:2,8 113:11 116:8 118:2,20,25 121:13,14,18 124:20 125:16,20,24,25 126:10,13,14 127:6,7,9 128:17 130:6 134:10,11, 15,18 136:13,14 137:5,11,12 142:7,12 144:6,7,9,10,18 145:17 147:6,10 148:5,8,16 149:7,9,13,20 150:21 151:9,23 152:7,17,22 159:13 160:18,25 161:3,21 162:3 163:16,19 169:6,15 174:17 177:18, 22 178:6,7,13 179:3 182:7 183:1 184:16 185:8,11 186:5,9 193:1,6 201:19 204:1,5,18 207:17 208:2 210:13,19,22 211:6,9,13,16,19,25 212:9,10,11,17 213:19 218:2,7,13 222:11,13 223:9 225:1,8 226:5 233:2,11 235:5,19 236:22 237:2,12 238:1,6,11,17,21,25 239:1 246:15, 18,21 247:17 251:22 257:20,21,23 258:7 259:1,10,15,24 260:10,13,16

**correctly**  93:8 116:2 125:21

**correlate**  215:8

**correlates**  76:23 85:14 112:20 125:10

**correlations**  158:10

**counsel**  5:15,16,17 6:4,15 91:21

**countries**  23:16,22

**country**  21:17 38:15 39:7 107:18 137:15 153:14 164:13 177:16 193:1 238:11,13

**couple**  33:22 77:21 121:8 136:7 140:23 253:2

**courses**  31:16

**court**  8:4 129:22,23

**cover**  24:17

**covered**  10:20

**create**  198:8 206:19

**created**  206:18 248:11

**creating**  56:17 248:7

**creation**  250:13

**credibility**  73:10 253:13,17, 254:20 255:2

**credible**  254:21,23,24 255:5

**credit**  56:9,19 116:7,9 117:23 118:1,3,4,6,12,15,16,17

**credit-granting**  117:4

**criteria**  12:23

**critical**  253:1,3

**criticism**  63:23,24,25

**cross**  172:1,5

**cross-cultural**  23:9

**cross-culture**  23:9,15,20

**CROSS-EXAMINATION**  256:25

**cross-study**  157:13

**culture**  23:13,14

**current**  35:14 47:7,10 78:11 102:18 103:4,16 174:15,19

**curriculum**  15:6,9,15,22 21:15 22:9 116:4

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

Index: CV..determined

**CV** 22:21 38:23 53:8,19 54:13
61:16

---

**D**

---

**D-r-o-u-i-n** 9:13

**D.phil** 16:15

**D.phil.** 16:12

**Dana** 40:21,22

**data** 32:13 42:6,9,11 50:25 54:16,
19 55:14 56:22 60:9,11 61:1 62:22
68:13 69:1,2 72:8 76:10 84:3,4
93:22 95:8,9 96:13,14 97:20,22
98:1,11,13 109:5,15 111:20 121:8
122:4,7 123:17 124:1 127:8 129:24
132:6,16 136:15,18 137:23 138:5
141:10,12,15,16,17,18,22 150:25
154:19,23 160:1,4,8 163:21 167:4,
5,24 169:15 170:23 180:3 202:6
204:23 208:1,16,24 209:4,12,14,
21,23 213:10 215:21 217:6,7,14,
15,16, 219:17 220:15 222:1 223:25
224:2 225:23 226:5,22,24 227:1
228:24 229:16 231:21 234:6,25
236:12,16 240:25 242:1 248:22
249:1 250:20,24 251:12,20

**databases** 78:22 79:3,8

**date** 16:1 44:15

**David** 246:10

**day** 52:5

**days** 52:2

**dealing** 219:1

**deals** 168:3

**death** 24:20

**Deborah** 194:21 195:19

**decades** 75:21

**DECCO** 27:23 29:25 31:8

**December** 44:10

**decide** 60:8

**decided** 95:18 109:12

**deciding** 156:13,20

**decision** 214:3

**decisions** 29:13

**declaration** 95:22,23,25 108:3,4,
5,8,20,22 109:2 110:1,14

**decreasing** 196:11

**dedicated** 26:13

**deduce** 54:3

**deep** 84:24

**defendant's** 97:6

**define** 96:22,23 124:5 125:2,5,11
157:4 231:23

**defined** 13:8 88:22 96:25 136:12
142:6,11,17 143:24 154:13 157:11
176:7 178:25 199:17 200:16
203:15,16 210:18,21 221:7 227:23

**defines** 185:19

**defining** 103:19 231:24

**definition** 98:11 136:10 143:6,9
144:6 145:25 146:2,4 152:2 155:1,
4,7,8,12,14,15,16 156:1,3,14,16,
18,20,23 157:2,14 158:3,6 168:1,2,
11,12,15 175:1 185:25 187:19
199:20,23 200:4,13,18,19 202:21,
22,23 203:3,5,9,12 212:8 227:19,
22 228:4,5 229:7,17 230:5 232:20
233:3,10,13 235:2,9,20,23,24
236:6,8 247:7,8,9,16

**definitions** 102:18 143:5 144:9
145:2,4 155:20,22 156:10 158:9,11
199:25 200:3 203:10 227:12,17
228:15,18,20 229:10 232:6 233:15,
20 246:21

**definitively** 166:18 194:13

**degree** 182:12,13,19,25 183:18
222:19,22 223:14 225:10 243:21
244:6 258:3,12,17 260:8

**Delevi** 95:3,5 109:3,10,11 162:12

**delineate** 103:3 145:9,24 235:14

**delineated** 102:4 103:6 228:11,20
232:15 247:6,9,10,11,13

**delineating** 103:8 125:7 142:21

**demographic** 175:10 204:24
205:2 208:7

**demographics** 193:24 208:6

**department** 5:11 58:18,21 114:9,
14

**dependence** 40:18 128:25

**dependent** 128:23

**depends** 24:16 73:17 98:4 105:17
143:13

**depicted** 129:21 136:19 147:24

**depicting** 100:2

**depiction** 99:5,21 101:13 105:19
200:25 211:19 224:20 235:3

**depictions** 98:18,24 101:20,22
102:23 103:15 105:3,5,7,16 106:25
107:7 136:22 142:20 143:1 160:24
162:2 163:7 165:5,16 178:13,19
179:15 200:14,15 201:25 203:5
219:11 221:17,24 222:8 228:2,6,9,
21, 229:22 232:7,19 233:17 234:5
235:10 237:23 251:16 252:3 255:9

**deposition** 6:21 9:15,17 10:3,8,23
11:5,20,22 15:5 86:15 92:18 94:19
111:1 140:5 150:6 174:5 183:21
194:14 201:2 246:3,15 260:24
261:2

**depositions** 6:24 7:1,3,9

**derives** 101:4,7

**describe** 19:5 37:9,14 63:16 68:1,
2 82:5 89:19,22 90:19 112:10
115:1 142:19 143:1 164:16 193:18
196:22

**describes** 151:13 230:4

**describing** 59:24,25

**description** 66:1 99:23 186:24

**descriptions** 89:25 178:14 251:17

**descriptive** 142:4

**design** 33:7 205:23

**designed** 206:25

**desirability** 129:14 130:3

**desire** 59:17

**details** 209:11

**determinant** 154:2

**determination** 109:14 173:1
194:2

**determine** 54:17 105:21 126:18
127:3 172:7 237:4

**determined** 65:2 105:22 148:11
217:18 223:6

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**development** 20:3 21:1 24:6,7,14, 15,16,18 35:1 68:18

**developmental** 13:4 24:2,12,13, 21 30:23 34:8,9,12 40:2,3 68:7 73:13 214:18

**Dial** 187:1

**differ** 133:19,21 251:5

**difference** 36:22 68:23 152:3,9,19 155:7 164:17 185:13 190:6 192:4 212:20 242:14,17,19

**differences** 152:1,5,24 153:2,3,5 249:10,12,13,14,17

**differently** 157:11 226:25

**difficult** 47:25 49:22 50:12,20 51:10 52:9 102:17 154:11,21 155:6,10,25 159:11 160:16 161:19 165:8 172:23 197:22 205:12 221:9 230:15,18 231:9,12 232:4,11 240:7

**difficulty** 231:13

**Digital** 183:22 184:1

**direct** 5:5 127:14 135:7 155:24

**directed** 116:12 117:3

**direction** 113:12 252:6

**directions** 250:17

**directly** 209:18

**disagreement** 231:5

**disciplinary** 30:4,6,8,13,19,22 31:9,12,25 34:5 38:24 48:15 85:9

**discipline** 21:24 30:20 39:19 257:12

**disciplines** 33:24 40:5 196:4 250:8 251:5

**discovery** 11:13,15 53:11,25

**discuss** 10:16 33:5,6 39:8 40:13 86:11,14,15,22 113:4 142:10 148:21 174:3,5 198:7 258:23

**discussed** 40:11,13 54:7,9,23 55:9 60:14,17 64:13 86:19,25 112:6 141:10 144:3 148:22 151:20 166:13 221:10 259:1

**discusses** 203:24

**discussing** 68:25 76:16 174:14

**discussion** 11:5 40:24 43:13 49:8

90:2 91:21,24 160:12 246:20 252:24

**disparate** 160:16

**distill** 70:5

**distinction** 67:3 131:25

**distinguish** 67:24 214:19

**distinguishing** 68:12 145:20

**distributed** 213:7

**distributing** 18:6

**distribution** 160:1

**district** 5:14 18:19,20

**division** 25:3,5,15, 26:22

**Doctor** 16:16

**document** 15:8,10,12,14,16,21 16:5 44:16 93:1 111:14 135:3,8 140:15 150:11,12,18 183:24 184:3, 6,7,10 185:1 187:15 194:24 198:2 201:7,10,15,18,20 210:3

**documents** 9:18,19,23 10:1 151:17 185:22

**dossiers** 29:12

**doubt** 259:16

**downloaded** 184:6 195:2 201:13

**downstairs** 5:9

**draft** 91:5

**drafts** 91:9

**drastically** 237:9,14

**draw** 19:24 21:2 96:4,9,11 165:14 225:15

**drawer** 74:1,12,14,17

**drawing** 22:22 115:10 250:2

**drawn** 70:2

**drew** 20:23,25 21:5,21

**drive** 224:22

**driven** 62:17,23

**drives** 76:23

**driving** 68:6

**Drouin** 5:1,7 6:5 9:9 15:6,8,9 86:8 92:19,23 111:11 140:13 160:21 165:6,7,18 173:24 232:23 257:2

260:6

**drove** 126:25 224:9

**duly** 5:3

**DX-1** 15:5

**DX-2** 92:18,22 151:18 251:11

**DX-3** 111:1,6 130:12 141:13 142:3 144:4 148:23 176:14

**DX-4** 140:4,5 141:23 144:8 176:18 179:22 229:24 246:25

**DX-5** 150:6,12 174:10 176:21,25 177:6

**DX-6** 183:21,24 191:7

**DX-7** 194:14,17 200:19

**DX-8** 201:2, 212:6,20 214:22 215:7

**DX-9** 246:3,7

**E**

**e-mail** 14:8 54:1

**e.g** 144:16,18

**e.g.** 146:11,19

**earlier** 37:23 44:21 66:12 83:10 98:2 108:3 109:12 112:6 126:1,15 137:6 166:13 192:24 225:13 228:12 246:14 252:24

**early** 98:6 214:7

**easier** 132:13

**Eastern** 5:14

**easy** 221:25

**editor** 253:2

**editorials** 53:8

**educating** 31:5

**education** 18:14 21:12 133:11,13 135:15,17

**educational** 22:2

**educator** 29:19 31:3,6 73:4

**educators** 39:20

**effect** 20:5 129:15

**effects** 36:10 37:5

**elected** 25:21 115:17

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                          Index: electronic..exist

**electronic** 12:14,15

**elementary** 18:16,21,22 24:5

**eligible** 187:20

**else's** 196:23 250:24

**emerge** 156:17

**emerged** 244:19

**emergent** 73:20

**emerges** 132:20

**emerging** 47:25 52:4,5 71:10,25
72:3 73:25 74:15 75:3,12,16 77:1,
4,6 112:15 127:24 171:10 220:24
231:16

**emphasis** 24:1 79:5

**employ** 67:11 81:2

**employed** 243:13,22

**encapsulate** 55:11

**encapsulates** 87:3 101:25

**encompass** 219:11,13

**encompassed** 203:20

**encompasses** 203:10,13,14
232:9

**encompassing** 143:12

**end** 58:10 116:25 117:2 187:10
188:1,2,18 189:24 190:12 198:18
230:6

**ends** 243:8

**engaged** 144:15,16 146:4,10
169:20 179:2 251:22

**engineering** 134:20,23

**engines** 67:21

**England** 18:14 21:9,11,16

**English** 259:19

**enrolled** 151:15

**enter** 158:25

**entered** 5:24

**entertaining** 256:18

**entire** 20:10 21:23 22:9 117:21,24,
25 133:2 165:17 168:18 170:24
172:13 206:6

**entry** 32:13 61:19

**equal** 187:21 188:4,9,12,22

**equally** 188:18 216:21 241:14,15

**equated** 158:1

**equivalent** 16:19,20

**erotic** 142:23 151:7 153:11,14
154:13,17

**error** 181:20,21,23

**essential** 82:12

**essentially** 198:9 224:21

**established** 76:3 127:18

**establishing** 232:17

**estimate** 45:9,19 46:18 47:2,12,22
48:4,9,12 49:1,19 50:12,20,21
51:3,7,10,11,22 52:6,9,13 57:23
76:16 96:20 97:15 98:22 101:17
105:3 106:13,19 107:5,8,17,21
136:7 137:8,14,19 138:8,14,24
139:1,4,5,6 153:22,23,24,25 161:2,
20 165:15,23,25 166:10 167:17,18
168:5,10 169:18 170:13 178:16
179:6,10 181:20,24 183:7,8
186:11,12,13 188:24 189:8,12,15
190:21 192:10 201:23 205:12
207:9,18,22 211:15,18 212:16,22
213:2 214:9 215:3,12,15 218:16
219:8 226:4,11,14 229:21 231:14
235:25 236:13 237:22 239:2,20
240:4,23 241:9,10,14,24,25 243:5
245:14,16,19 251:10 252:3,9
253:15 254:16 255:7 256:6

**estimated** 117:18 242:7

**estimates** 107:11 138:8,15,18,20
140:2 158:12,17,20 162:1 163:6,12
165:3,21 167:9,15,19 171:16
216:17 222:15 224:18 237:2
242:12,15,17,20 245:21,25 246:2
256:5

**estimating** 134:21,22 135:25
136:1 189:10

**estimation** 96:15 102:16 103:12,
13 105:5 138:4 139:21 155:18,19
172:18 179:17 180:24 216:2,23
217:16,19 219:5 220:11,22 221:18,
19,20 223:18 239:5 255:16,21

**estimations** 106:2 138:4 155:23
225:9 232:5 256:4

**ethics** 19:2 55:24 58:7,10 84:20
114:21

**ethnicity** 152:19 154:2,3

**ethnologists** 39:20

**evaluate** 225:14

**evaluation** 62:21 225:23

**evaluations** 225:20 226:10

**everyone's** 131:9

**evidence** 46:16 107:22,24 130:5,8
131:12,16,18,19 166:2 167:13
169:24 170:11 171:2,6,18,19,24
172:2,3,9,21,25 173:9 183:2,5,11
186:15 214:8 226:12 236:3,7,17,
18,19 237:5 242:22 243:17,19
258:18

**exact** 16:1 25:21 37:25 55:20 69:8
77:25 89:22 90:10 141:15,16
170:21 193:23 194:5 222:16
230:21 252:7

**examination** 5:5 68:10 168:17
183:2 226:8 260:3

**examine** 48:1 50:7 112:20 131:5
223:22

**examined** 5:4 130:12 161:24
162:22 163:4 182:21 243:17

**examining** 22:5 38:17 40:8 63:21
131:23 169:10 191:5 215:25

**examples** 99:11 146:15 153:1

**excel** 28:23

**Excellence** 28:15

**exceptionally** 13:7

**exchange** 118:12

**exclude** 229:14,16

**excludes** 161:2

**exclusive** 190:17

**Exclusively** 163:2

**excuse** 13:9 78:17 144:20 150:13
162:21 184:18 222:7

**exhibit** 15:5 92:18,21 97:6 111:1,6,
23 127:12 140:3,5 141:12 150:6
183:21 194:14 201:2 246:3

**exhibits** 97:7,9

**exist** 52:8,17 162:20 183:11
193:16

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

Index: existed..field

**existed** 168:23 173:7,8

**existence** 170:16

**existing** 172:23 214:7, 221:8

**exists** 168:4,5,6,8 172:24

**expect** 67:6 69:21 143:10

**expected** 224:24

**experience** 14:23 15:1 33:15,16
49:7 63:21 66:2 168:3,16,19 197:8,
12,17 198:22 254:18

**experiences** 224:23

**experiment** 188:17

**experimental** 16:9,22,23 17:1,7

**experiments** 188:16

**expert** 6:6,7 11:17,23 12:3,5
14:22,25 15:23 36:15 37:4,17,18,
24 38:4,10 48:14 64:12,25 65:14
88:10,17,19,21 90:24 91:15,22
92:4 93:3 94:20 95:1,14 96:2,4,23
97:11,15 101:17,22 103:15,18
105:13 106:11 107:12,24 108:13
109:2 110:19 111:23 138:19 139:5
150:21 151:4,18,24 160:11 174:8
177:10 182:3,20 184:8 186:11
195:4 199:24 200:14,18 201:19
203:6,7,9,21 207:4 211:15 212:17,
214:23 215:9,12 216:24 225:3,6
228:7,25 229:7 231:10 232:21
234:1,5 240:4 244:21,25 245:9,13,
17 249:2 251:10 257:19 258:2
260:6

**expertise** 13:5 36:13,14,16,20
37:9,10,12,15,20,21,22 38:2,7
39:15 44:22 48:15 63:19 64:12,22,
23 65:2,4,7,9,23 66:11 215:16
256:11

**experts** 11:7,9,10 12:8 17:16
50:14 64:10

**expiring** 26:7

**explain** 7:13 33:1 113:18 149:2
190:5

**explained** 88:11,12 100:10 258:11

**explaining** 207:8

**explains** 116:14

**explanation** 6:25 99:17 223:2

**explanations** 116:15

**explicit** 99:1,4,6,10,12,14,15,20
100:25 101:2,6,8,11,14 102:19,20,
25 103:4,20,22 104:1,12,17,21
105:17,19,23 124:19 125:2,14
136:11 142:17 143:7,9 200:5,7,17
203:10,16,19,21 227:13 228:16,25
229:2,6,7,11,15,17 233:10,13,18,
24 234:1 235:2,4 236:6 247:17
248:13 252:3

**explicitly** 138:25

**exploration** 23:14

**exploratory** 59:11

**explore** 82:19,21 183:13

**exploring** 23:3,5,6,7,12 103:17
125:9

**export** 56:22

**expressing** 258:2,16

**extend** 13:3

**extended** 81:3

**extends** 98:5

**extensive** 46:3 77:5 81:22

**extensively** 38:14,15 44:25 76:20,
21

**extent** 6:6 7:1,24 8:2 87:20

**external** 116:12 117:3

**extrapolate** 89:16 95:11 96:12
98:10,13 167:25 168:22 169:7,18
217:20

**extrapolated** 170:22

**Extrapolating** 219:7

**extrapolation** 168:2,3,11 169:3
170:12,14,17 173:7 217:20 243:14
245:15

**extremes** 240:13

**eyes** 73:12

---

**F**

**Facebook** 37:1

**faced** 211:21

**facet** 28:18,21 29:14 31:11,18,23
59:21 60:2 61:5,9 82:18 84:11

**facets** 132:22

**fact** 34:24 52:14,21 64:20 66:22
127:10 150:1,2 155:19 158:2 160:6
163:23 179:11,13 207:16 212:25
213:5 215:7 218:15,19 231:20
236:4 241:17 243:3 246:14 257:5

**factor** 154:4 235:25

**factored** 200:7

**facts** 90:21

**faculty** 28:15,20 33:18,23 34:8
62:18

**fair** 31:8 43:16 68:23 112:4

**fairly** 193:16,19,20

**fall** 141:24 219:5,8

**falls** 181:25 220:7

**familiar** 5:23 6:24 80:3,5 87:9
174:24 184:21 198:12 207:6

**feared** 81:11

**February** 88:3,4,5 151:2,3 258:10

**fed** 18:22

**feedback** 29:7 62:23,24 91:19,25

**feel** 22:22 47:1 48:3 49:9 72:21,24,
25 73:2,19,22 76:6 100:1 132:24
133:9,16,23,24 134:18,19,21
135:9,24,25 137:6, 138:13 165:20
171:8 183:14 253:4 255:11

**fellow** 62:1,2,3,16,17

**fellows** 62:1

**felt** 172:19 253:9 255:6,15

**Ferguson** 142:23 150:14 152:7,
14,20 153:10 154:23 155:10 159:5,
12 161:2 162:10 165:19 169:1,13
174:10 176:20,24 177:5 186:19
243:1

**Ferguson's** 243:9

**fewer** 53:4

**field** 12:4 17:9,17 26:19 38:4 39:11
45:24 46:7,11,17 47:5,17 48:1
50:14,16 52:4 63:20,21 64:22,24,
25 65:3,14,25 71:10 72:1,3,6,7
75:3,4,11,12,16,18 76:6,11,22,24
77:1,4,6,11,13 81:22 96:13 127:18,
24 168:20 215:16 220:24 231:16,
18 255:25 256:2,3,11 257:16
260:13

---

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**fields** 73:25 74:15 76:3 167:7 231:16

**figure** 153:13 178:21 179:9 186:10 248:6

**file** 56:23 74:1,12,14,17

**fill** 121:8

**filled** 25:12 28:24

**find** 35:9 72:4,10 73:24 74:3,4,8,9 79:13,23 90:1 94:3 95:11 110:10, 112:16 115:19 145:6 157:14 171:7 181:10 209:6,21,23 226:17 244:12

**finding** 214:16 240:11

**findings** 89:17 113:21 130:17,25 132:10,13,25 133:5 134:12 151:21, 154:22,24 159:12,13 160:17,20 161:8,18,20 167:6 171:14,22,23 172:12 180:8,9,11,17,18 185:5 205:19 213:5 219:21 220:4 229:14 237:10 239:4 244:5 245:2 247:21, 22,23,25 248:1,5,7 249:23,24,25 250:7,11 251:7 252:18

**finds** 70:16 87:1

**fine** 11:25 35:7 256:22

**finish** 8:12

**Finkelhor** 80:22 145:6,13 246:11

**first-authored** 196:22

**fit** 68:11

**fits** 135:16

**fling** 124:11

**focus** 17:11 26:13 162:18 165:22 170:8 232:2,3

**focused** 24:23,24 25:3,6 27:12 72:9 85:3,20 105:8 106:7 111:25 148:24 149:4 150:1 163:17,20

**focuses** 16:23 17:1

**focusing** 103:8

**follow** 78:8 84:16

**force** 68:6

**forced** 175:18

**form** 116:13,23 202:5

**formalized** 33:15

**formation** 36:12 37:6

**forming** 201:18,23 222:24 241:9, 10,14

**forms** 18:6,24 19:5

**Fort** 21:14 115:13 123:6,9 133:1,7 134:2 135:22 141:7 152:17 164:18 166:4 236:25

**fortified** 39:14

**forward** 29:9 116:23 234:16

**forwarded** 234:25

**forwarding** 180:2 234:10,12,18

**found** 40:16 54:2 71:15 75:22 79:14 89:16 96:12 110:11 131:21 132:5 142:14 150:25 151:6 166:19 167:3 169:14 179:1 181:16 202:25 203:11 209:7 213:21 233:7,8 236:4,21 247:15,23 255:3

**Foundation** 67:9 72:25 75:23

**fourth** 120:21 164:7

**Free** 5:12 86:13 87:6

**frequency** 95:8 124:14,16 125:15 147:9 148:8

**frequently** 96:15 154:16 214:12

**Friday** 261:3

**front** 16:5 35:9

**full** 7:11 8:19 9:7 56:25 143:23

**fully** 7:23 63:16 99:23 100:1 200:23

**future** 250:17

---

## G

**gain** 112:13

**Gallup** 253:11,19,20,21,23 254:5

**gather** 84:3

**gathered** 122:6

**gathering** 36:7 56:14 84:4 137:23 222:25 223:8 224:6

**gave** 34:17 37:19 44:6 54:5,12 75:24 114:17 154:19 236:6,9

**geared** 209:14

**gears** 183:20

**gender** 164:20

**general** 116:16 133:11,12 135:15, 16 161:11 247:18

**generalizability** 130:17,18 131:1 164:2

**generalizable** 167:11 172:12,13

**generalization** 132:7

**generalizations** 131:17 158:9

**generalize** 130:19 131:3,10,13,14 132:13,15,25 133:5 160:17 161:19 164:3 167:6 170:3 206:17

**generalized** 160:22 161:9,10,18 216:1

**generalizing** 135:24

**generally** 79:21 97:23 129:14 166:20

**generous** 118:14

**genitals** 99:9 100:14

**geographic** 152:14

**gestures** 8:7,8

**get all** 156:25

**gift** 198:11

**girl** 102:9

**girlfriend** 124:10

**give** 34:24 47:11 53:1 55:10 69:23, 25 96:20 109:15 135:6 138:21 157:16,18 216:3 220:15,16 221:9 222:10,12,19 226:16 249:7

**giving** 63:22 64:2 241:7

**goal** 33:12 68:14,16,19 69:5 126:22 127:4

**good** 5:7,8 63:10 70:15 75:1 76:25 86:1,2 180:5

**Google** 79:12,18 109:20,24

**Gordon-messer** 178:4 194:22 195:19

**governing** 61:25

**grant** 56:19

**great** 86:21 253:13

**greater** 127:2,4 128:15 224:17,24 241:9

**greatly** 213:3

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**Grodzinski** 194:23

**grounds** 10:19 91:8

**group** 33:4 39:17,19 80:22 97:25 162:3 163:7,8 176:7,10,11 187:10 188:1,2,18,21,23 190:13,16 198:20 213:8 237:9 242:1 247:2

**grouped** 39:17,19 97:21

**groups** 69:9, 76:10 169:23 188:19 190:11,14 205:1

**growing** 46:25

**guess** 12:22 18:6 30:2 35:19,20 63:10 70:4,5 77:8 79:17 97:3 101:1 102:19 103:2 119:25 155:23 159:7 192:3 200:21 206:6,8,20 218:22 240:21

**guessed** 240:19

**guessing** 36:4 256:11

**guys** 74:22

---

**H**

**ham** 259:13

**hand** 8:6,7 194:17

**handed** 111:6 150:12 183:24

**handful** 162:8

**handing** 15:8 92:21

**hang** 128:2,4

**happen** 44:20 157:23 252:15

**happened** 121:19 255:24

**happening** 139:11

**hard** 68:25 196:21,25 249:11 252:16 256:10,16

**harder** 74:8 132:7

**Harris** 40:20,22

**hazard** 87:1

**head** 8:6,7

**heading** 61:17 151:10 202:21 203:23

**headlines** 129:24

**hear** 88:2,7

**heard** 74:2 88:5 159:3 187:12,16 204:12 244:20,22

**heavily** 216:16 226:19 235:12,19, 22 241:11

**heavy** 79:5

**helped** 22:8 50:1 186:12

**helpful** 16:4 30:10 38:9 122:5,6 145:14,17 188:24 189:4

**helps** 114:5

**hereinafter** 5:3

**hesitant** 129:9

**high** 179:16,18 218:23

**High-risk** 150:9,16

**higher** 128:9 143:11 181:15 186:16 213:11 214:4

**highlighted** 28:4 31:17,23 32:3

**hired** 197:19

**Hispanic** 92:15 150:7,15 151:16 152:20 160:6 163:20 166:2 170:1 174:17 237:16

**Hispanic-serving** 151:15

**Hispanics** 152:22

**hits** 78:20

**hold** 182:11 222:18 225:9 243:20 244:5 258:19

**Holder** 86:13 87:7

**home** 98:7,8

**honest** 87:20 129:8

**honestly** 9:5

**honesty** 129:5

**honored** 29:13

**honoring** 34:19

**honors** 24:11 28:22

**hope** 157:21

**hoping** 87:13

**hour** 118:13

**hour's** 118:1

**hours** 92:6,7 94:13

**Howden** 93:21 94:1

**huge** 242:14

**human** 24:13,15,16 68:4,7,18

**heavily** 111:2,8 132:21,23 140:6 168:3,16, 21

**humans** 68:8,9

**hundred** 50:5

**hundreds** 49:17

**hypotheses** 224:22

**hypothesis** 223:22 224:8,10,11, 13,19

**hypotheticals** 256:18

---

**I**

**idea** 37:23 46:18 57:11 196:5,23, 24 237:20

**ideally** 63:20,24

**identification** 15:7 92:20 111:5 140:9 150:10 183:23 194:16 201:5 246:6

**identified** 114:15,16 149:24 152:6 203:19

**identify** 175:11 193:21 200:17

**illegal** 130:3

**image** 100:22,23 101:5,8,19 102:21 114:3 125:16 134:14,24 136:3 185:10,14,18 229:5,6,20 247:19 248:8,11 259:10,11,12

**images** 103:3 104:20 105:7,11 106:5,8 107:19 137:2 143:12 144:14 180:3 185:15 211:2 218:18 228:8 234:10,16,18 248:3,5 251:22

**imagine** 200:23 256:1

**immediately** 17:15

**implications** 38:20

**important** 73:6 74:16 75:6,11 135:4 237:21 238:3 239:5

**importantly** 231:25

**impossible** 47:21 180:20 230:8,16

**inarticulate** 175:21

**incidence** 150:8,15,24 151:11

**include** 89:25 90:2 100:16 120:17 123:18 137:22 143:24 149:8,11 170:1,2 180:1 194:8 228:2 233:22 234:2,6,17

---

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**included** 50:4,6 93:22 97:4,23
101:20 102:2,7,16 104:6 108:10
120:15 121:4,9 143:7 145:21
149:18 154:3 166:22 168:12
190:15 200:25 203:20 227:19
228:3 229:6,21 232:18 233:16
234:13,14,18 257:19

**includes** 97:7 104:5 181:21
200:15

**including** 57:9 232:18 250:17
258:19

**inclusion** 12:23

**inclusive** 82:24 203:7 219:15
228:11

**incomplete** 97:6

**inconsistencies** 142:11,14

**inconsistency** 157:7 230:4,6
231:7

**inconsistent** 156:1 158:3,8,11
231:19

**inconvenient** 44:19

**incorporate** 228:18,19

**incorporated** 228:14

**incorrect** 49:4

**independent** 32:19 56:6

**independently** 58:24 94:3

**indexed** 52:15 79:8

**Indiana** 28:23 29:11 189:4,7,13,24
190:23

**Indiana-purdue** 115:13 123:6,9
133:1,7 134:2 135:22 141:7 152:17
236:25

**Indianapolis** 189:25

**indicating** 121:3

**indication** 129:12

**inferred** 138:23

**influence** 153:1

**influenced** 153:6

**info** 52:15 78:20

**inform** 186:10,12 209:24

**information** 7:8 54:7,9, 60:14,17
66:7 117:12 129:21 154:14 165:23,

24 170:13 173:7,8 182:21,22
207:18 209:15,18 214:8 215:18
216:12 217:22,24 219:7 222:25
223:8,16,23 224:6 226:9,13 231:15
247:1,4,6

**informed** 260:15,17

**initial** 56:23 83:22,25 235:11

**initially** 78:18 79:1,15

**innovations** 27:25 28:4

**Innovative** 27:23

**inquiry** 224:9

**insight** 112:13

**inspiration** 145:11

**instance** 22:8 139:18 243:15

**instances** 101:10 222:24

**institution** 46:13 164:10 177:12
254:10

**Institutional** 19:2,3 114:20

**institutions** 161:14

**instruct** 10:19 31:22 90:14 91:8,
11,23

**instructed** 146:7

**instruction** 21:8,10 33:3

**instructs** 8:25

**insufficient** 70:11

**integrated** 29:20 33:10

**intend** 9:3 26:25 61:1,14

**interact** 68:9

**interaction** 68:18

**intercourse** 100:11,13 101:23
104:3,5 136:22

**interest** 35:8,15,16,17 36:10,15,
19,23 37:2,7 38:5 78:10

**interested** 36:24,25 66:5 68:13
88:10 110:5 198:25

**interesting** 66:24 74:12 255:2

**interests** 36:21

**Internet** 202:25

**interpersonal** 126:17

**interpret** 185:15 235:4

**interpretation** 37:21 38:6,8 100:9
105:11 125:12 143:13 147:4 251:1
259:17

**interpretations** 196:8 227:24
229:2 250:15,16,19,23

**interpreted** 105:7 229:12 250:7

**interpreting** 96:10

**interrupting** 184:18

**intervention** 19:13,14,15,17 20:4,
5,6

**interview** 53:11 139:10

**interviewed** 53:22

**interviews** 53:8 54:5,12,18 139:23

**intimacy** 40:18 41:4 112:24

**intimate** 58:18 84:17 85:4,5 124:9
181:14

**introduction** 24:8

**introductory** 24:4 114:10 118:5,7
121:1 122:23 123:4,9,16 133:10
134:3,6,9 135:12,18 136:2 137:8

**investigator** 116:19 117:7,9

**invited** 39:3,4,5,8,10 43:18 49:7

**involve** 78:15 177:24

**involved** 11:22 19:20 21:10 22:25
30:12 41:25 56:7 57:13 178:11
185:7 186:3,8 200:21 251:15 252:2

**involvement** 11:16,19 20:4 22:16
33:9 42:4

**involves** 78:16 183:8

**involving** 98:18,23 100:14 101:19
105:4,15 106:24 107:6 162:2
165:4,16 177:17,21 178:12,19
217:2 221:16,23 222:7 232:24
251:15 255:8

**IPFW** 61:20 238:21

**IRB** 83:25 114:16,19,20

**issue** 44:23 48:25 73:10 131:20
194:9 249:20

**issues** 112:24 161:17

**item** 127:25 128:8

**items** 127:20,21 128:1,3,23,24

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**J**

**Janis** 246:11

**Jones** 145:6 246:11

**Jose** 194:22

**journal** 51:1,2 52:12,19 65:16,21, 24 67:6,19 70:14,25 71:4,14 74:25 75:2 76:1

**journals** 48:8,13 52:17 64:18,19 65:3,5 66:17 70:10 71:6,8 72:2 79:6,7,8,9 112:18 140:25

**judgment** 138:10 155:21 180:23 214:25 215:6,15 217:22,23,25 243:11,14,16,18,24

**Julie** 140:14

**July** 39:3 43:5

**jump** 76:13 151:17 186:23

**Justice** 5:11

**K**

**keeping** 47:7,10 177:2 216:14

**kids** 213:9

**Kimberly** 140:13 246:10

**kind** 56:23 57:5 62:25 64:1 65:13 77:9 80:2 84:15 104:5 109:4 113:25 120:2 137:23 138:20,23,24 160:14 167:4,12 180:3 183:11 187:8 205:22 209:19 259:18

**kindergarten** 158:25

**knew** 226:13

**knowing** 187:5 193:23 194:7

**knowledge** 7:2,7 76:6 96:13 138:9,10,11 157:8,9,11,15,21 158:1,22 159:1 168:6,20 173:12,14 214:2 221:8

**Knowledgepanel** 184:19,21 186:24

**Knowledgepanel's** 187:6

**L**

**lab** 47:4 80:21

**label** 56:25

**labeled** 92:22 183:24

**laboratory** 31:20 32:6,18,20

**lack** 155:8,12,14 156:2 181:19

**lag** 47:18

**Landgraff** 44:8 111:12 160:21

**Language** 24:7

**large** 22:4 29:21 52:20 89:4 160:22 253:11

**largely** 69:4 160:8

**larger** 55:10,12 61:25 121:2 126:25 166:24 177:17,21,24 178:9 180:10 190:2 209:19,20 217:2 232:24

**largest** 196:2

**latest** 53:3 81:11 82:23

**law** 87:19 89:9 101:15

**lawsuit** 87:6,9 88:2

**lawyer** 86:25 87:2

**lawyers** 39:22 244:17

**layman's** 18:7

**layperson's** 79:17

**lead** 79:22 209:17

**leading** 39:11

**learn** 21:6

**learning** 17:5,7,21 22:17 30:16,17, 21 31:4 32:9 114:12

**lecturers** 62:10,11

**led** 42:14

**left** 83:4 104:10 125:11 243:10

**legal** 38:20 87:14 102:24 129:25 157:3 244:11,12 258:7,11 260:14, 15

**legitimate** 153:19,21,22

**length** 117:18

**lenient** 71:11

**letter** 20:2 21:6, 22:18 157:8,10,14, 19,20 158:1,21,22 159:1

**letter-naming** 19:25 20:1

**letters** 157:10,16,19

**level** 173:3 207:19

**liberal** 121:7 143:5 196:8 218:22

**liberally** 229:12 231:24

**lieu** 183:12

**lifespan** 24:6,19

**light** 129:17,19

**Likert** 125:18,21,22 247:12

**limit** 51:1 162:14

**limitation** 129:4

**limitations** 127:12 128:11 138:22 148:19,21 163:25 174:14 194:6 250:17 253:7,8

**limited** 37:12, 100:13 115:5,6 117:20 130:25 131:2,4,5 143:9 169:6 170:5,7 238:10,12

**limited-term** 62:10

**limits** 130:17

**lines** 130:11

**links** 79:22

**Lisa** 246:11

**list** 35:10 53:3,8,10 71:17 79:24,25 82:23 83:5,12 93:23 104:1,7 108:9, 10 153:6

**listed** 54:12 71:18 81:17 94:25 95:8 96:2 106:16 115:21,22 151:9 187:14 195:17,23 196:1,11,15 197:9 210:6 235:8

**lists** 61:19 83:7

**literacy** 17:20,22 19:21 20:3,25 23:1,17 35:18,22 75:20 80:13 157:4 197:19

**literally** 52:5

**literary** 75:22

**literature** 12:25 13:10,11 36:7 46:1 47:7,10 65:16 71:7 78:15,16 80:4,8,19 82:24 83:14,21,23 84:25 85:2,20 162:18 251:2

**live** 98:8

**living** 98:7

**Livingston** 10:24 11:1,2,4 88:8, 14,17 89:13 98:12

---

(260) 486-3954          Summit City Reporting, Inc.          (800) 977-3376

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**local** 18:15

**localized** 21:12,13

**located** 20:17,20,21

**long** 92:4,25 116:17 117:16 140:11
150:13 183:25 228:13 229:4,19,20
231:23

**longer** 13:4

**longitudinal** 17:19

**looked** 9:25 34:14 41:7 71:14
92:16 95:6 97:20 107:14,23 108:9,
15,18 109:3 131:20 132:19 134:8
137:20 152:7,15,16,20 172:17
174:9 177:13 178:8 192:14 195:9
202:4,8,9,10 215:18 217:9,10,14
219:21 226:13 228:6,16 229:5
231:14 239:6,10,24,25 240:21,22
252:14

**loose** 67:14

**loosely** 80:24 137:22

**Lorraine** 6:25 9:16 86:10 87:12
88:8 174:2

**lot** 70:9 84:4 135:23 154:2

**lots** 82:22

**Lounsbury** 230:10,14,23

**Lounsbury's** 230:19,20

**low** 120:15 218:22

**lower** 186:17,18,19,21 213:6,8
239:23 252:4

**lowest** 179:21,22

**lunch** 173:17,25

**M**

**M-i-c-h-e-l-l-e** 9:13

**made** 131:25 138:15,18,19 139:3,
5,6 140:2 170:14 172:18 173:7
199:8 217:23 225:10 226:14 236:5
239:2 240:3,23 241:25 242:19
243:18 245:16 253:15 255:21
256:4

**main** 68:23 99:16

**Maine** 136:2 137:9

**major** 24:8 129:24 135:9

**majority** 197:18

**majors** 133:20,21,25 134:5,20,23
135:11,14,18,19,20,21

**make** 6:14 22:5 23:11 29:12 49:1
90:16 96:18 105:25 106:1 109:4
120:14 131:17 132:9 136:7 137:18
138:3,8 153:23,24,25 155:17,18,
19,21,23,24 158:9,12 159:10
161:20,25 163:5,12 165:3,14,23,25
166:21 167:14,17,18,19 168:5,8
169:2 170:16 177:4 188:24 189:8
192:10,18 193:15 194:2 212:22,24
215:2,18 217:5,16,22 224:18
225:20 226:10 231:14 232:4,11
241:24 242:12,14,17 245:2,14,20,
24 246:1 249:11,23,24 250:5,6,15,
19 255:16 256:6 259:25

**makes** 35:3 85:19 132:24 155:5,10
188:19 230:7,17 231:8 243:20

**makeup** 164:20,22

**making** 23:1 47:2 48:3 137:7,14
138:4,8,10,13 156:3 157:12 158:16
165:20 168:9 170:12 190:14 213:2
216:17 220:22 222:15 226:4
227:14,16 236:12 237:1,21 250:20
255:7

**man** 10:24 40:20 99:7 102:13,19

**mandate** 157:3

**manipulation** 188:21 252:8

**manuscript** 64:16 66:8

**manuscripts** 73:5

**Marc** 194:23

**margin** 181:20,21,23

**mark** 97:8 210:10

**marked** 15:7 92:20,21 111:5,6
140:8 141:12 142:3 144:4,8 174:10
176:14,17,21,25 177:6,11 183:23
191:6 194:15 201:4 246:5,25
251:11

**masturbation** 99:14 100:5 101:23
104:2,6 144:17 146:11

**match** 226:3

**material** 12:11 87:17 89:6 203:14,
16,18

**math** 121:15 216:14 223:4

**mathematical** 168:1,15 173:1

180:19 214:21,24 216:5,8,10
220:14 222:17 223:4 236:2 239:8,
15,18 240:1 241:24

**mathematically** 168:13,14 180:16
227:3

**matter** 231:20,23

**maze** 74:23

**meaning** 49:15 50:4 101:3,4
125:15 128:6 131:19 152:6,10
158:4,5 182:2,5 220:19 227:3
229:1 232:22 247:2 254:4 258:18

**meaningful** 70:23 188:20 253:24

**means** 23:12 45:24 95:8 109:13
114:19 121:15 148:25 149:14
160:7 161:19 206:24 217:21
231:22 237:6 258:11,12 259:22,23

**meant** 26:11 43:15 61:4,8 92:2
99:4 124:19 126:8 147:4 149:2
197:11 207:2

**measure** 119:23 120:3 125:14
127:23 128:10,16 157:15

**measured** 19:21 147:8 232:10

**measurement** 221:13,17

**measurements** 19:12 221:9

**measures** 127:14,15 199:13

**measuring** 128:2,3,24 157:7
171:12 205:16

**media** 25:20 53:7 139:10,22 211:3

**medication** 9:4

**medium** 14:4,6 142:15 247:10

**medium-size** 141:5,7

**medium-sized** 115:7

**meet** 33:4

**meeting** 42:16,23

**member** 24:25 25:2,8,9,10,11,15,
18 26:4 27:1,3,6 29:4 61:22 62:18

**members** 33:23 186:24

**membership** 26:7,18,21

**mention** 163:14 235:10

**mentioned** 18:25 31:16 32:4
43:24 44:22 86:16 102:6 109:5
117:7 142:16 162:13 216:22
233:14 235:15

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Index: mentorship..non-statistically

**mentorship** 62:25

**merit** 23:13 29:2 70:13 75:14

**meshing** 250:8 253:5

**message** 12:16,17 13:14,16,18
14:10,13,14,20 40:18 67:8 113:10,
16 114:2 124:24 128:22,25 144:12
160:25 229:5 259:4,5,7

**messages** 14:3 15:2 98:17,23
105:4,15 106:24 107:6 124:17,
178:18 181:3 221:16,23 222:5,6,7
230:5 231:8 236:14 255:8

**messaging** 67:10 112:25

**met** 5:9 39:8 87:25 184:11

**meta** 166:25 167:1,6

**method** 31:22 69:5,15 80:2 120:22
121:1 153:19,20 167:5 183:8
187:25 198:13,14,15 199:2 204:15
215:2 223:20 226:7 243:23 250:18

**methodologies** 81:1 110:6
217:15 229:9 242:2 243:13

**methodology** 17:12 33:14 67:12
70:8,11,17 71:1 186:22,23 192:9
193:17 194:5 253:1,3 257:11,15

**methods** 17:1,3,6,8 29:19,21 64:2,
4,5,6 108:15,16 117:5 187:6
192:17 198:2 202:15,16,17 207:11,
13 215:11,14 224:2 236:10 244:3,4
255:3

**Meyer** 93:21 94:1

**Michelle** 5:1 9:9 15:6,9 92:19,22
111:11 140:13

**Microsoft** 39:8

**middle** 84:7,9,13 239:25 240:13
251:11

**midpoint** 240:14,17,19,21

**Midwest** 27:12

**midwestern** 27:3,10 42:2 85:12
115:7 141:5 164:11

**million** 98:22 107:5 160:23
221:15,22 234:21

**mind** 30:4 71:23 106:22 162:11
227:8 228:4, 241:6 250:13

**mine** 108:17 119:25

**mini** 139:13

**mini-mentorship** 63:1,2

**minimal** 33:10

**minus** 242:12

**minutes** 5:9 8:14 85:24 117:19,20

**mis-remembering** 193:8

**misleading** 11:24

**missing** 83:11

**Mitchell** 80:22 145:6,13 246:10

**Mm-hmm** 124:21 230:3

**mobile** 67:8 73:2 78:24

**moment** 231:18

**monitoring** 32:7

**months** 16:2 47:18 83:12 84:1,7
85:1,3,16,19 88:4 140:23

**morning** 5:7,8 7:19

**motion** 42:12,15,17,20

**move** 116:23 140:3 176:5 194:17
201:6

**Moving** 33:17

**MTV** 67:1 178:4 191:6 192:25
193:4,12 194:10 254:1,21

**MTV-AP** 253:14

**multi-disciplinary** 33:23

**multi-faceted** 59:21

**multi-item** 128:17

**Multidisciplinary** 33:18

**multiple** 27:18 53:22 55:21 79:11
80:6,12,14,18 81:17 115:24
127:19, 128:20 131:19 148:13
167:2 171:7 186:16 211:3 218:15
221:10 226:15

**mutually** 190:17

---

## N

**naked** 100:7,23 185:7,10,13,14,15,
17,20,25 186:3,8

**named** 10:24 40:20 228:22

**names** 45:18 157:20 185:3

**narrow** 36:16,21 57:6 81:12 143:5
165:21 201:1 229:10

**narrowed** 103:19,21,23

**narrower** 143:14 235:9

**narrowly** 143:24

**Nathan** 5:10

**national** 137:21 139:1,2,4,15
140:2 160:17 178:4 180:17 181:15
201:9 204:21 205:7 206:1,18,22,25
207:19,23 208:8,25 209:1,25
216:18 226:25 233:7 237:2,25
238:24 239:3 241:8,19 242:18
246:5,10 251:13,20 252:1,19,23
254:6,24 255:10,16,17,22 256:7

**nationally** 241:19 242:3

**nationwide** 139:21,22 163:12
169:5,19 205:21 237:22

**nature** 7:21 14:15 59:11 99:7
100:3,4 174:16,20,24 243:15
245:4,6 247:1

**necessarily** 24:22 47:20 50:15
128:2 197:4 205:20

**needed** 171:2 221:25

**negative** 129:22

**neighboring** 18:4

**net** 210:24 211:1,5,8

**networks** 198:8

**neuroscience** 16:25

**newer** 83:3 141:18

**News** 53:12,25

**nice** 118:12

**Nielsen** 67:8 73:2

**nine-page** 246:8

**Nodding** 145:15

**nods** 8:6,7

**non-emerging** 72:6,7 75:17 167:8

**non-mathematically** 227:6

**non-normative** 129:12 130:2

**non-nude** 101:1

**non-peer** 75:17 253:6

**non-peer-reviewed** 70:24 72:11
253:10,12

**non-statistically** 156:12

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**non-text** 228:8,9

**notably** 148:23

**noted** 152:9,24 217:17

**notice** 26:6

**noticed** 153:4

**noting** 251:17

**nuances** 157:10

**nude** 99:6,15,18 100:21 101:11,13,
19,23 104:2 137:4 142:19,22,23
143:10 144:14,15 145:20,21,25
146:2 151:7 153:11,14 154:13,17
199:18 200:9,10,11,12,20,21
202:24 210:12,25 232:13,14
235:16 248:3

**nude/erotic.'** 154:18

**nudes** 101:2

**number** 23:24 45:9 46:24 47:22
48:4,9 49:19 50:3,4,13,21 51:3,7
52:6 53:2 55:20 76:16 77:3,6,7,25
78:24 87:16 89:4 95:15 106:2
107:8 108:5 116:19 120:3,12
136:15 137:14 138:3,12,13 157:6
163:22 164:24 167:8,16 171:14,22
172:20,21,22 181:17,24 192:21
199:8 203:24 210:1 217:24 222:10,
12 234:15, 241:18 242:16

**numbers** 38:25 69:8 97:23 183:1
210:7 222:20 241:23 247:13
253:16,24

**numerical** 182:2,5,8 217:9,10
218:2,3 220:15

---

**O**

**oath** 7:10,19,21,23

**object** 8:23 10:18 96:6

**objection** 8:23 49:12 51:24 72:23
75:8 88:23 90:13 91:3,7,20 135:1
153:16 155:2 158:13,18 159:17
170:18 173:4 180:13 187:22 207:1,
20 219:24 220:25 223:19 234:8
238:2,7 239:21 240:20 241:22
245:18 256:8 259:6

**objective** 190:20,23,25

**objectives** 156:14

**obscure** 52:11

**observable** 222:24 243:19

**observation** 225:14

**observations** 223:2,21,22,25
224:5,8 225:14,15,21 226:14,15

**observe** 19:10

**observed** 243:22

**observing** 62:22

**obtain** 68:25 199:9

**obtained** 6:15 250:21

**occasionally** 125:24

**occupational** 87:1

**occur** 256:9 258:21

**occurred** 247:12

**occurring** 96:16 205:13,15 206:5,
9 207:10

**offering** 26:20 222:21

**offices** 39:8

**oftentimes** 59:10 64:15 135:13

**ofttimes** 108:12

**older** 213:20,21

**olds** 18:10,11 20:9,10,11,24 160:2,
8 210:19,21 211:12,16

**on-call** 65:23

**one-third** 97:13 98:16 105:3,14
106:23 178:11,18,21,23 179:6,9,18
180:4 181:2,8 182:5 212:18 217:25
218:20,21 219:9,14 220:17 221:12
222:1,4,16 234:19 236:1, 239:13
240:1 242:7 251:14,21

**one-year** 26:20

**oneself** 185:14 202:24

**ongoing** 56:19 58:2,4,5,6,8,16
61:12 77:7

**online** 27:23,25 28:4,8,11,14 41:17
44:10,17 56:8,18 78:23 114:18
116:23 140:18 184:20,24 191:11
192:17 204:5,8,17 254:12,19

**onset** 188:22

**op-ed** 139:13

**opinion** 98:16 181:2 182:11
222:18,21 243:20 258:2

**opinions** 258:16,19

**opportunity** 119:1

**opposed** 136:16

**option** 56:21

**oral** 100:16 104:6 146:8 200:23,24

**order** 48:14 97:25 104:16 116:23
137:18 165:25 171:15,23 189:15
195:22 196:11 199:8 223:17

**organization** 27:1 28:22 209:20

**original** 71:18 112:19 198:20
214:14

**originally** 11:6 40:22

**originating** 50:9

**outline** 99:8 114:25

**over-inclusive** 171:1

**overcome** 86:17 231:13

**overestimation** 218:25

**overlap** 212:2,4,11,12,25

**overreporting** 130:9

**overrepresentation** 190:13

**Oxford** 16:10,11 17:19 19:1 20:12,
15,17,20,21

---

**P**

**p.m.** 261:3

**pages** 92:25 142:10 150:13 183:25
194:20

**paid** 94:8,16

**panel** 184:20,24 191:11, 192:18

**panels** 185:2,4 191:17

**paper** 22:12 39:4 49:23 70:13
71:19 73:8 78:9 82:23

**papers** 70:19 197:20

**paragraph** 98:15 124:14 161:23
164:9 174:14 204:6 205:9 208:24
230:4 251:11

**parent** 19:18 22:19,25

**parental** 22:16 123:22

**parenthetical** 44:14 146:11,19
251:16

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**Parenthetically** 199:17

**parents** 20:4 249:7

**part** 14:17 26:16,21 31:22 56:20 71:9 73:6 84:4 89:9 99:16 104:23 116:3 118:7 128:24 135:3,7 144:21 207:24 225:16 228:23 239:19

**partially** 102:5,6,8,11,14 104:3,14 137:4

**participant** 117:16

**participants** 19:7,15 32:12 115:15 120:22 121:3 122:15 123:8,14 124:15 125:11 126:8 129:7 134:13 136:24 137:3 144:12 146:7,12,20 147:15 151:13 152:16 154:8 166:3 175:13 176:9,13 177:18,25 178:9 179:2,12 180:11 198:5 199:14 200:17 210:5 217:3 232:25

**participate** 11:12 19:7,16 43:18 115:17,20,25 116:3,5,11,22 118:20,22,24 119:21 123:22 175:18,23 198:10 204:4,17 256:13

**participated** 19:13,15,17,18 42:13,15 56:20 178:24 192:22 198:11

**participates** 103:12

**participating** 85:11 116:7

**participation** 19:6 42:23 43:8 44:2 175:15 191:18 249:8

**partner** 58:18 84:17 85:4,5 148:10, 15,16

**partners** 122:17 124:19 147:16 148:3,4,5

**parts** 10:1 54:18 87:15 164:12 177:15 197:24 198:23 202:17

**past** 34:19,21 83:20 200:11

**pay** 79:7

**pedagogical** 30:5,13,15,16 31:2 34:3

**peer** 61:20,22,24 63:2,11,12,13,15, 17,19,23 65:15 66:5,14,17,21,23, 25 67:7,11 69:24 70:3 71:4,22 72:12,14,16,18,22 73:1,6,15,23 75:13 76:7 79:4 252:24,25

**peer-review** 75:2 76:11

**peer-reviewed** 48:8 50:6,25 51:2 63:4,8 67:6,19 70:10,14 71:8,13

72:2 74:25 75:7,10 76:1,4 79:6 112:18 253:5

**pending** 5:14 8:18

**Pennsylvania** 5:14

**people** 13:2,3 26:21 38:13,14,17, 18,19 39:10,18,23 40:4 44:23,24 45:3,4,9 46:6,10,16,21,23,25 47:2, 22 48:4,6,10,24 49:1,5,10,17,19 50:1,3,4,6,8,13,15,19 56:20 62:9, 11 63:8,19,20 64:1,9 65:8 67:18 74:3,7,13,19 75:24 76:17,19 77:9, 10,12,21,23 78:1,4 79:14 80:11,16 81:13,17 82:2 87:22,25 89:5 97:3, 16 98:4,5,7 102:16 104:19 113:5 119:4,5,8,14,20 120:3,12 121:6 122:19,22 123:3,8 125:7 129:9,16, 18,22,25 130:2 131:7,19 132:15 133:10 134:6,16 135:13,17 136:1, 8,15 137:3 139:14 142:19,21 143:7,10,25 148:2 149:8,11 150:3 152:11 156:13 157:1 158:7 164:18, 24 166:8 175:12,22 176:1 179:23 180:1 181:11,13 184:11 185:2,4,6 186:2 187:7 188:11 189:21,25 190:11,25 192:21 197:13 198:10 200:16 203:15 204:10,16 205:20 210:24 213:14,19,21 214:14 217:13 231:20 232:14 234:10,15, 17,18,25 236:20 237:17 247:3 252:12 259:15

**people's** 100:14 251:7

**peoples** 67:10

**percent** 122:14,19,22 123:3 126:1, 2,4,8, 134:12,19,22 136:1 139:25 147:15 148:4,5,11 151:6,16 153:10,13 179:2,5,23 182:6,25 186:8,10,11,12,19 210:13,16 211:6,8,18 212:15,19 215:4,12,22 216:7 217:19 218:11,13,16,17,23, 24 219:1,2,3,4,12,15,20 220:4,5,8, 10,16,18 237:11,12 238:19,20,25 239:3,4,7,9,11,16,19 240:4,10,12 241:17 242:4,6,11,13 243:4,5 248:2,4,10,13 251:9 252:2

**percentage** 107:1,17 137:8 139:17,19,25 169:19 179:21,22 180:8 181:5,7,15 201:24 210:11,15 211:8 212:15,16 236:21 242:13,16, 24 252:8

**percentages** 140:2 166:7 205:20 211:5 222:21 239:23 252:6

**perfect** 212:25

**perfectly** 211:24 212:8 213:7 215:8

**perform** 240:16

**performance** 20:6

**performed** 22:24 217:1

**performing** 32:7 250:4

**period** 256:4

**permission** 249:7

**person** 39:14 58:19 64:10 70:15 78:6 82:8,12,15 83:16 100:21,22, 23 101:3,10,13 103:10, 104:12,14 113:7,8,16,25 120:8,9 124:8,11 128:6 134:25 136:4 144:16 146:5 147:2,9 187:20 188:3 195:16 196:1,14,15 197:2,9 235:3

**person'** 154:18

**person's** 117:11

**personal** 14:20,23 15:1 37:21 112:23 138:11 202:24

**personality** 24:7 112:21

**personally** 11:9 170:22 210:9

**persons** 200:22

**perspective** 26:19 38:16,22 43:6 44:25 45:1,22,23 50:7,24 51:5,9, 16,18,21 52:17,23,25 57:12 59:15 67:16 76:18 81:10,24 95:7,21 98:4 101:15,16,17 104:18 138:7 143:16 259:9

**Pew** 67:9 72:25 75:23 76:10 253:18

**Ph.d.** 16:9,11,15,17 92:19,23

**phase** 73:20

**phenomena** 67:4 112:1

**phenomenon** 22:3 52:25 74:1,12, 13 75:15 112:14 131:24 132:19 166:17 183:9,10 222:24

**Philip** 94:23 110:1

**philosophy** 16:16 29:20

**phone** 12:16,17,20 209:1

**phones** 78:24 199:15

**photo** 199:18 259:22

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**photograph** 14:11,12 137:16

**photographs** 142:24 153:11,14 154:13,17

**photos** 103:8 151:7

**phrase** 105:16 113:6 125:2,5 128:18 136:12 158:4 182:13,16 185:20 187:13,16 200:10 233:25 234:4 244:9 258:1 260:7,9

**phrasing** 170:21

**physical** 85:15

**picture** 104:25 124:18,24 126:9, 144:12,13 147:1,9 148:3 166:24 170:25 185:17 210:12 211:1 213:22 224:15 234:11 259:13,23

**pictures** 122:16 126:3 129:10 136:16 147:15 148:11 179:22 203:4 205:21 247:14

**pictures/video** 202:23,24

**pieces** 183:10 243:17,18,19

**piques** 78:10

**place** 43:22 236:25 254:4

**places** 79:23 131:20 167:2 236:21

**plaintiffs** 6:5 87:13,25 89:10,12

**plaintiffs'** 6:7,8 89:1,2 91:21

**play** 201:23 239:4

**played** 196:2

**pleasure** 101:5,7

**point** 27:2 32:5 53:16 54:20 76:25 82:11,19, 83:21 135:3 136:9 140:21 156:22 159:6 167:9,14,23 172:8,10 239:25

**pointed** 42:2 43:3

**points** 19:22 242:13,16 252:8

**poll** 253:11,14,23 254:5

**polling** 67:17 68:1,12,25 69:8, 76:10 166:13

**polls** 69:13 132:1

**pool** 114:9,15,17 115:4,5,6,16

**pools** 114:15

**population** 17:25 18:2,8 20:7,19 23:3 108:14 130:20,21 131:17 133:2 137:11 138:24 141:4 151:7

161:11 165:22 168:9 172:13,14 180:22 184:21 187:5,20 188:4 189:2,4,7,11,13 190:9,10,22 191:12,16 193:6,11,12 194:11,12 198:23 199:10 204:20,21 205:7 206:25 207:19,23 214:1,5,6 215:25 216:18,20 237:2,17,25 238:24 239:6 241:9 243:2 248:24

**populations** 162:14 168:25 216:10 217:11 237:15,20 238:5 243:12

**portion** 29:21

**portray** 129:16,19

**pose** 100:6,7 144:17 146:18,23 147:3

**position** 39:14 89:1

**positive** 129:17,19

**possibility** 214:11

**possibly** 45:8 50:9 88:10

**posted** 210:25

**poster** 40:19

**postulate** 129:9

**potentially** 62:12 159:14

**PR** 25:19,20,24

**practically** 200:24

**practice** 114:13 120:1 198:12

**pre-reading** 19:14

**precise** 220:13,22 221:9,12,17,19

**precisely** 226:3

**precises** 224:18

**predictor** 158:6

**prefer** 135:6

**preference** 164:4

**pregnancy** 178:5 201:10 209:16 254:7

**Pregnancy's** 254:25

**preliminary** 42:11

**premier** 26:18

**Premiere** 78:21

**prenatal** 24:17,20

**prepare** 9:14 258:9

**prepared** 93:3 184:7

**preparing** 11:12,17,23 93:15 94:8, 13,19,20 95:18 106:11

**prerequisite** 168:17

**preschool** 17:21

**preschools** 18:12,15,22

**presence** 112:1

**present** 6:4 12:5 19:18,19 36:20 37:10 46:24 54:6,13 87:6 103:22, 24

**presentation** 39:3 40:17 42:13 44:1,3,7 54:4

**presentations** 41:24 45:17 85:9, 10 138:22

**presented** 28:10 40:20 42:6 43:13 64:3 70:20,22 251:12

**presenting** 47:4 54:18

**presently** 25:19 55:5,17 85:6

**Press** 67:2 178:3 184:11

**prestigious** 79:9

**pretty** 76:25 88:11 114:13 129:15 158:24 159:3 166:20 196:8

**prevalence** 50:25 68:13,20 72:8, 95:9 109:5,13,15,19 122:13 126:19,21 127:1,3 132:6,10,14,16, 19,25 133:6,19,25 137:11,23 138:4,15 139:2,4,7,15,21 143:11 150:24 152:4 153:2,6 154:23 158:12,17,20 162:1,17 163:6,12,21 165:4,16 166:9,10 167:20 168:24 169:11,15 179:14 180:6,9 188:25 189:12 190:21 192:10 202:6 214:4 215:20 216:3,17 217:6,7,15,16,17 218:1,5,15 219:16 220:5 223:9,12, 25 224:2 226:21,24 227:1,9 228:24 231:9 232:12, 234:13,14,24 237:11 238:15,20 242:1 246:4,9 247:24 248:1,22 249:1

**prevalent** 89:18 167:7 179:19

**prevent** 70:9 178:5 201:9 254:7,25

**preventing** 209:16

**previous** 34:25 142:3,18 145:22, 23 230:7

**previously** 92:14 170:12 182:14

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

243:25 249:21 252:17

**primarily** 166:14 170:9

**primary** 18:17 31:21 37:2 49:24
50:21 51:3,17,20 52:8,13 65:11
68:14 111:18,19 157:5 161:15
196:1 197:2,8 249:17

**principal** 116:19 117:7,9 141:1
161:6 195:17,20 197:23 227:18

**print** 41:16 44:11,15,18 140:19,20

**prior** 48:23 173:13

**prison** 175:18

**Pro** 78:21

**probability** 205:10,12 206:2,4,5,9,
15,17,24 207:5,10,14 209:10

**probable** 258:13,20

**problem** 143:2,3 153:8

**procedures** 10:10

**proceedings** 86:5 173:21

**process** 25:14 26:17 28:19 58:11,
13 73:7, 76:11 114:25 117:22,24,
25 128:1 141:11,14,20 198:18
222:23 223:3,6,17 224:3,4 225:12,
16,17,22 226:11

**produce** 138:21

**product** 10:20 90:15 91:9,23
198:18

**professional** 64:17

**professor** 23:23 32:8 58:19 62:8,
14

**professors** 62:5

**program** 17:11 42:22 135:17

**progress** 15:20 46:2

**prohibit** 220:22

**project** 32:20,22,23 34:10 127:2,4

**proposal** 83:25 114:16

**proposing** 85:7

**protected** 91:22

**protocols** 33:5,6 57:2

**provide** 7:10 8:19 62:23 65:21
129:8 142:4 144:5,9 202:22 235:8

**provided** 154:15 200:4 203:12

247:1,4

**provincial** 238:5,8

**prudent** 177:16 216:25 232:22

**Psi** 85:13

**psych** 52:15 78:20

**psychological** 22:3 25:1,2 26:5,
10,20 27:4,10,11,14 38:21 42:3
43:5 45:22 46:8 49:18 50:7,23
51:5,9,16,18,21 52:16,22 67:4,16
76:23 81:10,24 84:11 85:12 95:7
131:23 132:2 175:15 196:3

**psychologist** 13:4 34:9 35:1
39:16,20 40:8 214:18

**psychology** 16:6,9,22,23,24 17:7,
8,9 24:2,4,5,8,10,12,13,17,22
25:23 26:14 30:23 34:8,12 39:23
40:1,2,3,5,7 58:21 73:13 76:18,22
114:9,10,13,14 116:4 118:5,7
121:1 122:24 123:4,10,16 133:11,
25 134:3,5,6,9 135:12,14,18,19
136:2 137:9 182:17 260:13

**public** 25:25 26:1 74:18

**publication** 22:20 35:21,25 39:6
40:15 42:8,14,18 43:9 44:15 46:19
47:24 49:15 50:14,17 71:18 73:7
196:23

**publications** 31:25 40:11,12,13
45:18 52:5 80:6,15 83:2

**publish** 59:13 60:4,8 65:24 74:7

**published** 39:12 40:15 41:1,14,21
42:5 43:12,19,21 44:5,10 45:12,15,
19 46:3,22 47:14,17,21 48:5 49:17,
20 51:4 52:11 53:4 54:15,22,24
55:14 59:1,2,23 61:11 66:13,16
70:14 71:17,20,21 72:18 73:8
74:25 75:23 77:14,17 78:1,4,7
80:17 81:6 82:25 83:8,10 84:6,22
90:3,6 105:8 110:18 140:17,18,20
195:9

**publishing** 46:6,17,23 47:5 49:23
50:16 72:21,25 73:14,15 75:20
77:11,13

**pull** 67:22

**pure** 68:25 76:9 132:13

**purely** 216:2 239:8

**purport** 241:18

**purporting** 238:23 241:7 242:3

**purpose** 112:10,12,13,19 126:15
142:2 223:10

**purposely** 175:11

**purposes** 5:25 65:15 90:16 97:14,
18 103:20 106:11 117:5 121:19,23,
24 124:6 136:12 156:17 191:10
210:18 212:23 214:22 228:7

**pursuing** 78:13

**put** 16:19 28:3 33:22 60:2 74:14
78:22,24 167:3 190:21 205:1
223:16

**puts** 204:10

**putting** 73:23 189:8 216:14

**Q**

**qualifications** 25:13

**qualified** 178:14

**qualifies** 34:25

**qualify** 99:18,19, 105:24

**qualitatively** 164:11,13,16 177:14
214:19

**Qualtrics** 56:18

**quantify** 218:20

**question** 5:22 7:12,14,16,17,24
8:2,8,12,18,20,25 10:4 17:24 25:9
26:24 32:25 43:16 49:21,22 50:20
56:25 57:4,5,18 66:24 69:22 77:2
88:16 91:4,12 92:1 96:8 99:2
124:13 126:25 127:20 128:7,12,17,
18,20 134:8 135:5 158:19 169:9
176:3,4 183:14,17 210:6,8 215:10
218:4 219:25 221:6 255:12

**questioning** 260:5

**questionnaire** 118:25 119:2,3,5,
7,9 202:10

**questions** 7:4,10 30:9 56:24 61:19
86:16,18 87:6 91:9 116:20 117:12,
21 119:7,9 120:5,6,7,10,13 121:8
124:15 127:14,19 128:4,5,8,13
199:14 210:5 248:20,21 250:3
256:19 258:25 260:20

**quicker** 140:25

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                          Index: race..related

## R

**race** 198:8

**Racial** 164:22

**radar** 71:3

**radial** 74:23

**ran** 173:16

**random** 187:8,9,12,16,18,19,25 188:8,13,14,15,17 189:1,5,17,20 190:6,10,12,15,18 191:15,19,20, 21,23,25 192:1,3,4,5,6,18 204:15

**Random-digit** 186:25

**randomly** 175:24 186:25 187:1,3, 7 189:22,23,25 190:11,25 191:17, 24 192:6

**range** 13:1,3,6 24:23,24 97:19 148:12 159:15,18,19,21,23 181:24 212:7 213:16 215:8 219:1,3,12,13, 23 220:4,12 226:3,5 238:16 239:22,23 249:11,12,13,15,18

**ranges** 211:11 212:13,21 213:1,2, 11,13 215:7 226:2 240:23

**ranking** 254:19

**rare** 60:11 72:10 78:14

**rarely** 125:23 126:5 157:14

**rat** 74:21

**rate** 119:10,11,14,16,17,18,20,23 120:2 143:11 152:21 153:2,6 215:4 237:11 238:20

**rates** 146:25 213:9 215:20 216:3 218:1,5,15 220:5 223:9,12 231:9 238:15

**reach** 90:11 198:20,23 223:17 250:1,23

**reached** 106:23 107:1,7

**reaches** 238:16

**reaching** 235:25 239:15 243:4

**read** 9:20,22 52:19 70:8,24 94:25 95:15,23 108:1,4,8 109:25 159:3 199:5 202:4 207:6 242:9 260:23

**readership** 52:20

**readily** 175:6

**reading** 19:14 45:25 63:21 66:20 94:22,24 124:15 158:1,7,21 219:20

**Readings** 24:9

**reads** 230:12

**real** 205:13 219:16

**realized** 156:15

**reason** 100:1 122:7 133:18 149:21 154:5,21 159:11 166:23 214:20 249:17

**reasonable** 162:1 163:5 165:3,15 167:14 182:12,13,19,24 183:3 222:18,22 223:14 225:10 243:21 244:6 258:2,12,17 260:8

**reasons** 81:20 133:3 149:24 154:6 249:15

**reassured** 207:16

**recall** 14:9 25:14 35:18 40:7 44:12 54:20 65:6 139:8 154:12 179:21 184:14 185:25 186:1,18,20 202:3 247:21 257:2 258:3,6,14,15

**receive** 21:11 91:19 116:7

**received** 13:16 26:6 27:18 33:21 94:10 106:3 154:18 199:16 202:25 248:3

**receivers** 105:6,10,11

**receiving** 248:4

**recent** 57:8 83:13,15 85:8,9 162:15,18 234:9 239:10

**recently** 84:17 142:21

**recess** 86:4 173:20

**rechecked** 108:16

**recognition** 29:14

**recognize** 88:21

**recognized** 88:19

**recognizes** 28:22

**recommend** 83:16

**recommended** 98:10,12 154:11 198:9

**reconsider** 107:13

**reconsidered** 107:11

**record** 6:4 8:5,7 9:8 97:5 111:22 117:4 173:19,24

**recording** 8:4 56:9

**recruit** 192:17

**recruited** 43:25 184:19 186:25 187:3 191:17,25 192:6 198:5

**recruiting** 120:25 192:5

**recruitment** 191:20,21 198:14

**REDIRECT** 260:3

**reevaluated** 106:19,21

**reexamined** 95:3

**refer** 62:9 164:20

**reference** 40:25 53:3 71:4,12,16, 19 79:4,24,25 82:23 83:5,7,12 93:23 108:9,10 110:19 150:20 224:1

**referenced** 80:2 92:14 93:12 95:1 107:15 108:11,13,18,19,21 110:14 138:12 172:17 174:8 201:20 226:16,17,18 229:11 234:7

**references** 46:9 83:3 93:25 106:17 112:16

**referrals** 199:8

**referred** 65:16 108:3 109:7 114:5 225:12

**referring** 25:14 26:2 30:23 69:7 93:17 217:1 235:7 247:5

**refers** 44:14,16

**reflect** 6:4 204:24 205:20 206:25 208:6

**reflected** 206:21

**reflective** 205:24,25 213:12

**reframe** 6:12

**regard** 10:4 40:23 132:5 194:6

**regional** 27:11

**regionality** 198:8

**regions** 238:11,12

**rejected** 64:1

**relate** 68:17 112:21 133:15

**related** 20:2 30:19,20 31:21 32:1 46:8 53:10 56:12 67:4 84:21 85:6 92:13 112:25 118:10 122:9 126:17 128:6 132:1 195:8 202:16,17 209:7

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                    Index: relates..responses

**relates** 33:7 87:16 133:14

**relating** 251:3

**relations** 25:20,25 26:1

**relationship** 36:11 37:6 112:22 113:7,11 121:4,13,17 122:14,17 123:4 124:5,9,19 132:11,12 134:15,17,25 136:5 142:15 149:10, 12,18 152:9, 239:12 240:11 252:13

**relationships** 41:6 74:5 111:4,11 112:2 113:1 122:20,23 123:11 126:18 130:15 131:6,8 133:4,8 134:1,4,21,23 136:9 137:10 142:6 149:9 150:4 161:14 163:18 164:24 165:13 166:4 170:2 179:13,16,20, 24 180:1 181:12, 217:13 237:18

**release** 34:18

**released** 44:17

**relevant** 108:24

**reliability** 127:16,25 128:8,10,15

**reliable** 127:23 257:14,15

**relied** 93:14, 201:18 216:21 235:12,18 255:6

**rely** 109:12 127:25 192:9 201:21, 22 216:16, 226:18 235:12,21 241:11 252:18,21,23

**relying** 154:9 199:24 253:9 255:15

**remember** 13:19 26:17 28:19 35:25 37:24 50:18,19 90:10 99:16 110:1,3,11 119:4 141:22 143:15 163:17 185:24 195:11,14 202:6,7, 14 207:15 214:16 244:13,14,18,23 260:17

**Remind** 20:7

**reminder** 7:23

**renew** 26:8

**repeating** 128:14

**rephrase** 7:13 57:18 59:4 69:22 88:16 91:4 103:2 134:8 136:25 176:3 180:8 183:17

**replicate** 23:8

**reply** 119:15

**report** 9:19,21,23 11:17, 15:23 90:17,24 91:15,19 92:5,9,11,19,22 93:3,15 94:8,14,20 95:1,14,16,18 96:2,5,24 97:11,15, 101:18,22

103:15,18 105:14,17 106:1,11,17, 20 107:3,10,12,15,25 109:2,6 110:19 111:23 129:10 138:19 139:3,6 150:21 151:4,18,24 160:11 163:15 172:17 174:8 177:10 182:4, 20 184:8 185:6 186:11 195:4 199:24 200:1,14,18 201:19 202:5 203:6,7,9,21 205:25 207:4,12 209:24 211:15 212:17 214:23 215:13,19 216:24 223:10 224:22 225:1,3,6,10 226:16,17,18 228:7 229:1,8 231:11 232:17,21 234:1,5 236:9 240:4 243:15 244:17,21,25 245:9,13,17,23 246:1 249:2 251:11 257:19 258:1,17 260:6

**reported** 55:13 126:2,9 153:11 180:4 186:7 213:9 234:6 248:4

**reporter** 8:4

**reporting** 103:10 186:2

**reports** 95:10 129:8 185:5 226:19, 22 245:24

**represent** 6:9,16 129:3 170:24 206:5

**representation** 205:3

**representative** 6:8 39:24 130:16 132:22 149:1,22,25 168:9,18 184:20 187:4 189:18,19,20 190:1, 7,8,9,14,16,18,24 191:1,3,9,12,19 192:16 193:1,5,12,14,17,22 194:2, 7,9,11 199:9 204:21 205:7 216:11 221:4 237:25 238:24 241:8,20 242:4 252:11

**representatives** 29:10

**represented** 5:15,20 33:24 79:9 135:11

**representing** 87:12,22

**represents** 190:2 196:9

**reputable** 71:23

**request** 11:15 62:18

**requests** 11:13

**required** 9:17 116:3

**requirement** 56:21 133:12 135:15

**requirements** 133:13

**requires** 7:23

**reread** 9:22

**research** 9:19 13:11 16:23 17:1,2, 3,5,8,11,12,14,16,18 21:25 23:17 24:9 29:23 30:1,2,3,4,5,6,8,12,16, 18,19,21 31:2,9,12,17,19,21,22,25 32:7,9,11,19,21,23 33:2,5,7,10,13, 14,16 34:3,6,9,12,16,17,18,19,21, 25 35:8,14,15,17,22 36:10,15,19, 21,23 37:7 38:1,5,24 39:4 42:13, 17,19,22 45:5,6,10,12,14 46:2,4,8, 10 49:14,18 50:10,11 56:12,21 59:3,16,18 61:4,8,9 64:4,6,21 67:4, 5,13,17,18,25 68:2,3,6,14,24 69:4, 6,7,16,18,21,23 73:21 74:3,7 75:21,22 79:1,14 81:3,8,13,22 82:14 83:24 85:10 87:24 89:15,19, 23 92:14 93:16 96:19 97:4 103:3, 22,24 111:20 112:7,11,12,13 114:9,11,14 115:18 116:6,9 118:4, 6,10,15 120:16 122:1 125:8 126:22,23,24,25 127:2,4,5,22 138:6 145:7,22,23 153:19,20 154:1 157:5 161:24 162:5,15 166:12 167:1 175:15 196:3,6,24 197:19 201:16 202:8 204:9,14 207:6 249:22 250:2,14,18 251:8 253:5,6 255:18,24 256:2,3,12 257:6

**researched** 49:15 81:5

**researcher** 71:16 73:13 80:7 104:18

**researcher-specific** 97:2

**researchers** 39:7 80:1,4,16 145:12 156:19,25 157:12,22 221:7 232:9

**researching** 45:24

**respect** 251:4,6

**respond** 7:13 8:12 204:11

**responded** 151:14

**respondent** 205:3 229:4 259:9

**respondent's** 143:15 147:4

**respondent-driven** 198:6,15

**respondents** 184:19 192:14,15 203:18,24 204:3 205:10 206:23 207:17 208:1 229:3 259:19

**responding** 229:3

**response** 8:9,19 119:10,11,14,16, 17,18,20 120:2 146:25 152:21 215:4 229:16

**responses** 11:13 149:8 214:22

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**rest** 87:23 130:20,21 166:18

**restrictions** 123:13

**restrictive** 235:17

**result** 171:9

**results** 70:11 71:1 114:6 122:12
147:14,21 148:2,7,15 149:19
151:10 155:11 160:16 166:22
177:16,20,21 178:8 186:2 201:3,7
205:19 210:4 216:25 231:19
232:22 233:2,5,6 236:5 248:15,18
250:15 253:4 257:15

**retained** 5:16,17 6:5,8

**return** 78:19

**returning** 98:8

**review** 19:2,4 29:11 36:8 46:1,13
47:5,11,15,20,23 48:2,6,10,16,18
61:20,22,24 62:12,17,20 63:3,11,
13,15,17,19,23 65:1,12,15 66:9,10
71:7 73:6 78:15,16 80:4,8,19
83:14,21,22,23 84:21 85:2,21
114:20 120:18 251:2 252:24,25

**reviewed** 9:18 66:14,18,21,23
67:1,7,11 69:24 70:3 71:5,22
72:12,14,16,19,22 73:1,15,23
75:13,17 76:8 79:4 253:6

**reviewer** 66:4,5

**reviewers** 48:8

**reviewing** 258:18

**reviews** 64:16 70:18

**risks** 81:10,11 116:14

**role** 31:21 73:4 196:2 201:23 239:5

**romantic** 41:5 111:4,10 122:14
147:16 161:13

**roundtable** 38:22 40:10,12,14,24
43:3,8,13,19,22 49:8 156:15
184:13

**roundtables** 41:25

**routes** 74:19

**Rule** 10:20

**run** 32:12 52:1

---

**S**

---

**sample** 17:25 18:2,3, 22:4,6 41:13

89:18 95:11 120:24 121:2 126:21
130:13,19 131:8 132:4,22 133:4
148:24, 149:25 151:7 152:6 154:7
159:8,9 160:4,17 168:18 171:8,11
174:15,19,21,23,25 175:1,3,6,8,9,
14 176:7,15,17,18,20,21,23,24,25
177:1,5,6,14 178:23 180:18 187:1,
9,12,16,18,19,25 189:5,14 190:1,6,
7,8,10,12,14,24 191:1,3,9,15,25
192:6,25 193:3,11,22,23 194:3,7,8,
11 199:9 204:16 205:7,11,22
206:1,2,4,15,20,24 207:5,9,14
208:8 209:10 213:7 214:14 221:4
226:25 227:2,7 235:1 237:17,24,25
238:5 239:10 241:8,19,20 242:4
243:1,11,12 250:3 257:5

**sampled** 192:22

**samples** 97:24 137:21 152:2
165:12 166:11,15 170:8 171:10
177:17,22,24 178:9 180:10 189:18,
21 206:18 217:3,7 219:15 232:24
233:7 238:24 239:3 240:12 242:2,
18 252:12 255:17 257:3,8

**sampling** 187:25 188:8,13,14,15,
17 189:1,17,19,20 190:18 191:19,
20,23 192:1,3,5 198:6,12,16
204:15,20 205:14 254:12

**sandwich** 259:13

**scale** 125:19 128:23 147:12

**scales** 127:19,23

**Scholar** 33:19

**scholarly** 63:18 195:16

**scholarship** 30:17

**school** 18:14,19,20 21:11 33:19

**schools** 18:5,11,16,17,21,23
20:22

**science** 26:5,10,13,20 69:4,6,16,
18,21,23 70:1 138:6 166:12 173:14
197:1 257:16

**sciences** 33:19 34:1 128:21
129:16 131:14,25 158:7 244:9
257:17

**scientific** 68:21,22 162:1 163:5
165:3,15 182:12,13,20,22 183:2,4,
6,7,8,14,15 222:19,22,23 223:3,6,
14,17,20 224:4,9,21,23 225:1,3,5,
6,11,12,16,17,18,21 226:7,8,11
243:14,16,21,23,24 244:3,4,6
258:3,12,17 260:8

**scientist** 225:13

**scientists** 69:12 166:15,25 257:9

**scope** 55:12 131:24 143:23
209:19,20

**score** 157:17

**search** 52:1,7 67:21 78:19,25
79:12,16,19,21 80:13 82:24
109:18,20,22,25 150:24 151:1,2
175:7 209:8

**searches** 46:4 79:2,11 80:13
162:18

**secondary** 18:13,20 51:7

**sections** 91:17

**seed** 198:9

**seeds** 198:7

**segment** 172:14 180:22 215:25

**select** 17:25 18:1,3 115:15 118:19,
21 189:14 190:25

**selected** 18:2,4 20:22 34:14 43:23
115:17 175:22 176:1 187:2,3,7,21
188:4,9,12 190:8 198:7 204:3

**selection** 28:5 32:4 34:22 35:3
187:8,9

**selectively** 202:11,12

**selects** 116:10

**self-defined** 104:25

**self-reporting** 129:5

**semester** 117:25 118:9,15 133:11

**semester's** 118:3

**semesters** 122:25 123:5

**semi-nude** 142:22 202:23 210:12
211:1

**send** 13:18 29:8 113:9,16 114:2,3
205:21 213:22

**sender** 105:18

**senders** 105:6,9,20,24 106:7

**sending** 12:15 15:1 87:17 126:2,9
153:11 179:2,14 211:2 235:15
247:19 251:22 252:2 255:8 259:13

**senior** 213:25

**sense** 63:10 68:4,7 85:19 132:24

---

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**sentence** 160:20 161:13 205:9 206:23 207:3 208:19 231:1 247:23

**sentences** 98:21

**separate** 28:12 32:22 76:9 80:25 97:9 114:11 143:8

**series** 7:10

**serve** 170:10

**served** 42:7

**service** 64:17

**serving** 152:21

**set** 38:8 73:11 122:4 138:6 171:14 172:19,21,22 223:2,21 224:5,7 225:13

**sets** 157:18

**setting** 32:20

**seven-page** 111:7

**sex** 67:1 78:3 85:14 100:5,11,16, 20 104:6 126:9,12 129:10 144:15, 16 146:4,8,15 147:9,15 148:2,4,11, 15 152:6 165:1 200:23,24 201:3,7 230:5 231:8

**sext** 199:16,17 259:4,5,7

**sexted** 199:15

**sexting** 12:6,8,9,10 37:11,13 38:1, 10,13,17,19,21 39:5,6,9,13,25 40:9 41:4,7,10,12,15,19,22 43:5,9,20,22 44:3,6,9,24 45:5,7,8,10,25 46:4,8, 14,22,24 48:10,16,17 49:2,6,10,18, 20 50:8,22,23,24 51:4,8,17,20 52:3,23 53:11 54:6,21 55:4,5,8,15 57:10,12,24 58:5 60:13 66:20 71:9 73:18,19 75:5 76:17,23 77:15,16, 17,20,23 78:2,17 79:18,24 80:10, 11,17,20,25 81:4,6,9,14,19 82:3,9, 16,18 84:9 85:1,21 88:20,22 89:20, 23 92:13 95:6,9 96:15 103:17,20 107:16 110:8 111:3,9,25 112:7,14, 21 122:13 126:16,19 127:3,13,23 129:21,25 130:1,13 132:10,14 133:6,19,25 137:11 138:16,18,20 139:2 140:7,11 141:4 142:5,11 143:25 150:7,14 152:2 154:17 155:7,8 156:16 162:2,5,17,22 163:4,6,13,15 165:4,16 168:24 169:11,20 178:12,15,24,25 184:13 185:7,14,15,20,25 186:3,8 192:11 194:15,21 199:13,21 201:16 205:17 206:10,11 213:6,11 214:5,

12 215:16 216:13 220:24 224:11 227:20,22 232:2,13,20 246:5,9 247:2,18 251:15,17 258:25

**Sexting,'** 40:18

**sexual** 13:13,16,18 14:3,10,12,15 15:1 78:23 84:18,21 85:3,7 99:22 100:2,4,11,13 101:4,7,23 103:9,10 104:2,5 114:3 136:22 140:8,12 150:9,16 163:4 229:20 232:3 247:19 251:22 259:7,21

**sexually** 99:1,3,6,9,12,14,15,19 100:18,19,21,23,25 101:1,2,5,8,11, 13,24 102:18,20,24 103:4,19,22 104:1,3,4,12,16,17,21,23 105:17, 19,22 124:12,19 125:2,14 136:11, 25 142:17,20 143:6,8,9 144:5 147:2 200:5,6,9,14,17 203:9,16,19, 21 227:13 228:16,25 229:2,6,7,11, 14,17 232:6 233:10,13,18,24,25 235:2,4 236:6 247:17 248:13 252:3

**sexually-explicit** 12:11 87:17 89:6 98:18,24 101:20,21 102:23 103:14 105:2,5,16 106:5,8,25 107:6,19 122:16 124:17,18,24 125:16 126:3 134:14,24 136:3,19 137:16 143:1 160:24 178:12,19 179:3,15 180:2 201:25 203:5 211:19 213:22 218:18 219:10 221:16,23 222:8 224:15, 227:20 228:1,5,8 229:22 232:7,19 233:16 234:4 235:9 236:14 237:23 248:5 251:15 255:9

**sexually-suggestive** 100:6,7 104:20 144:17 146:18,23 147:3 199:18 202:22 203:4 205:21

**share** 91:5

**shared** 124:9 185:10,14

**shift** 183:20

**shirt** 102:9,13,19

**show** 29:1 114:6 246:7

**showed** 178:10

**showing** 99:21,25 104:15 144:18 146:19 147:5 166:7

**shown** 104:24 242:18 251:13,21 252:1

**shows** 147:14 154:1

**sic** 118:4 131:15 237:18

**sign** 120:12

**signed** 114:17

**significance** 195:22,25

**significant** 74:4,5,9 154:1 196:10, 207:25 208:3,8 243:4

**significantly** 196:19,21 214:16

**similar** 81:2 119:23 131:21 145:5 148:22 166:5,7,8 171:7,23 233:7 236:21

**similarity** 63:7

**similarly** 43:2 128:7

**simple** 132:1 157:9 187:12,16,18

**simplified** 17:11

**single** 127:21,25 128:5,12 130:19

**single-item** 127:14,15

**site** 117:3

**six-point** 147:12

**size** 159:9 176:20,23,24 177:2 241:19,20 242:4 243:11

**skills** 17:22 19:21 20:1,2

**Slightly** 159:25

**small** 154:7 167:10 169:23 235:1

**smaller** 20:17,18 233:8

**snapshot** 55:10 61:4,8 112:7

**snapshots** 59:3

**snowball** 80:2 198:13,14,15 199:2

**social** 24:6 69:4,5,12,16,18,21,23 70:1 128:21 129:14,15 130:3 131:13,24 138:5 158:7 166:12,14, 15,24 173:14 197:1 244:9 257:8, 16,17

**socially-constructed** 37:22

**society** 25:23 98:6

**software** 56:18

**solely** 137:13 164:6 170:23 252:18,21,23 253:15

**solicitation** 18:6,24

**solo** 144:16 146:10,15

**someone's** 52:18

**Sona** 115:22

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**sort** 102:24 104:20 144:6 165:13 167:23 168:7 172:25 216:4,5 222:10,12 223:17 226:21 234:24 240:16 241:3 252:19 260:12

**sought** 6:16

**sound** 20:2 64:11 70:8,10,21 255:4

**sounds** 21:6, 22:18 65:13 86:2 99:22 116:2 157:19

**source** 105:22

**sources** 52:7 56:14 72:11 76:2,4 165:22,24 171:7 253:2,10,13

**South** 151:16 152:15 154:9

**southern** 169:2 236:24 238:19

**spam** 203:1

**speak** 10:2 35:21 86:8 173:25 259:19

**speaking** 41:10

**special** 237:20

**specialize** 16:24

**specific** 82:20 90:11 94:6 109:25 247:16

**specifically** 25:15 54:20 74:25 81:19 85:5 89:24 106:10 107:23 142:5,7 152:1 153:3 174:12 191:6 192:13 206:19 207:9 251:10

**spectrum** 225:25

**Speech** 86:13 87:6

**spell** 9:10

**spelled** 93:8

**spent** 94:13

**spoke** 10:6 86:10 174:2 244:17

**spoken** 11:10

**spread** 97:22

**stage** 83:24

**standard** 21:24 25:13 69:5 102:24 114:13 120:1

**standardized** 21:9,12,16 22:9

**standing** 99:7

**standpoint** 167:20 239:9

**stands** 230:1

**Stark** 9:20 94:23 95:22,23,25 108:2,3,8,20,22 109:2 110:14

**Stark's** 108:1,5 110:1

**start** 82:7,13 84:23 108:4 156:6 234:3

**started** 7:19 18:13,19 35:20,24 36:3 112:14 159:21 201:16

**starts** 160:14 198:3

**stashed** 74:17

**state** 6:11 9:7 29:9,11 39:9 113:21 177:11

**stated** 138:22 159:7 230:9,14 250:17

**statement** 9:20 89:15 94:23 138:12 230:13,19

**statements** 149:3

**States** 5:11,12 19:5 22:12 75:25 115:8 132:4 141:6 148:25 150:2 161:25 162:6,23 163:13 164:5,11 165:6,17 166:19 202:2 206:6 218:18 224:14

**stating** 23:2 229:13

**statistical** 26:3 48:21 128:1 167:4, 5,20,23 179:10 181:23 215:11,14 216:2 240:6 241:4 252:7

**statistically** 156:5,7,8 168:12,14

**statistics** 50:1 75:24 155:25 158:24 234:13,15

**status** 152:10

**stay** 98:15

**steps** 192:7 224:3

**stick** 46:19

**Stills** 140:14

**stone** 13:7

**straightforward** 7:5 215:24

**stranger** 203:1

**strategy** 198:6

**stratification** 208:14,21 209:7

**stratified** 204:22,25 207:17 208:1, 4

**stratify** 208:10

**strength** 254:10

**strike** 90:23 160:10 183:19 189:5 203:17 210:7 211:22 213:20 215:5 226:16,17 228:13 229:15 234:2

**strong** 32:5 154:2 197:25 254:14, 15,16

**stronger** 235:24

**strongly** 31:17 128:5

**struggled** 112:16

**student** 31:4,6 56:1,2 57:10,12 62:13,21 82:17 85:11 117:25 133:2

**students** 19:12 20:22 31:24 32:2, 7,10,12,21 40:19 44:4 56:8,9 57:3, 15,21 58:25 110:20 114:10 115:4, 6,10 120:25 121:16,19 127:8 130:15 133:7 134:2,9 137:8 152:20 160:23 164:10 177:12,14 217:12 225:24 238:21

**students'** 41:5 111:4,10 112:2

**studied** 48:25 49:2,3,6,10,13,14 76:20 82:2 132:23 206:14 213:25

**studies** 22:24 23:10 32:16,17 33:8 35:18 37:3 39:13 47:6,11,15 48:10, 16 50:22 51:8 54:19,21,25 55:1,3, 5,7,11,12,13,15,21,25 56:3,5,8,20 57:8,14,16,17,20,24 58:2,4,5,16, 59:18,20, 60:22,25 61:2,12 69:1 72:9 76:24 77:3,6,7,9,14,17,20,22, 23 81:7 82:6,11,20,22 84:24 85:18 96:12 106:10,13,16 107:14,16 108:11,12,16,18,19,21 110:18,20 115:21, 119:24 120:2,19 136:8 137:20,24 138:7 143:4 152:10,16, 25 153:4 154:25 155:4,15 156:1 160:12 161:24 162:5 163:3,17,23 164:5 165:21 166:7 167:8,10,16 168:23,25 169:6,10,14 170:5,7,9, 15,24 171:3 172:16 175:19,22,23, 25 176:1 177:17,20,21,24 178:1,2, 3,8,15,16,17,22,25 179:9,17,19 180:4,12,17,18 186:16,18,20 193:13,16 203:11 207:25 213:14 215:24 216:16,18,19 217:1,2,8,18 218:19 223:9 224:1,23 226:24 227:10,14 228:3,7,15 229:24 230:8,15 231:10 232:8,18,24 233:2,8,9,12,14,20,23 234:7,17 235:8,10,21 236:7,20,22,23,25 237:1,9,19,21,24 238:4,10,12,16, 23 239:5,10 240:22 241:1,7,18 242:3,9,25 243:3,6,7,8,12 244:3

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

245:2 246:18 248:16 250:21 251:13,18 252:1,19,22 253:7 254:22 259:1,18

**study** 14:17 17:13,19,23,25 19:6,8, 21,24 22:11 23:1,8 24:13 30:20 31:2,4, 36:5,6 42:7,10,11,12 44:8 45:25 47:19 53:4 55:23 56:10,16, 19 57:10 58:23 59:6,10,13,14,24 60:1,2,4,10,15,19 61:5 74:13 78:1, 5,7,10 83:21 84:1,2,3 109:7,16 112:15,19 113:4,23 114:8,16,23 115:18,22 116:3,5,8,11,15,18 118:20,23,24 119:16,21 120:12,13 121:4,20,22 125:6 126:9 127:1,13 128:11 130:5,12,25 133:1,5 134:8 136:12,20 137:22 142:18 144:1,3,8 145:12,13 147:8 148:24 149:7,19 150:20,23,25 152:14 154:10,12,22, 24 160:10 162:13 164:7 166:13 169:1,12,13 174:12,13,15 175:11 176:14,17,21,25 177:5 178:4 179:1,12,14 181:16 183:12,23 184:1,18 185:5,19 187:21 189:6,9 191:6,10 192:25 193:4,12,25 194:11 196:3 198:10 199:21 202:3, 4,5,19 205:23 207:4,22,24 209:13, 18,20,21 210:5,18 212:6 213:1 218:9 220:24 224:21 225:5,7,18 228:13,20,22 229:25 231:1,5 232:23 234:9 235:11,13,19 236:4, 8,11,24 238:19,21 243:9 244:1 245:6 246:5,10,12,17,23,25 247:4, 10,21 248:16,17 249:2,9,16 250:4, 13 257:22,25 260:13

**study's** 143:6,8

**studying** 18:9 20:8 30:22 36:24,25 38:13,15 44:23,24 54:14 76:17 82:15 199:1

**stumbling** 70:19

**style** 126:17 132:12

**subcategories** 145:9

**subdivision** 27:13

**subheading** 199:13

**subject** 42:18

**submit** 66:9 73:5 83:25

**submitted** 29:12 36:1 70:20 83:10

**submitting** 66:3,7,10

**subsection** 147:22 148:19

**subsequent** 22:20

**subsequently** 40:23

**substance** 10:3,5,12

**substantially** 242:10

**suburb** 20:15

**sufficiently** 22:4

**suggest** 130:6,8

**Suggesting** 100:20

**suggestions** 250:7

**suggestive** 100:19,21,24 101:1,24 104:4,16,22 143:8 200:9

**summarize** 90:5,9

**summarized** 160:14

**summarizes** 59:19

**summarizing** 59:6,9

**supervising** 85:11

**supervision** 17:16 31:18

**supervisor** 18:2

**support** 239:19

**suppose** 35:22 79:7 168:17 204:9 205:1 256:14

**supposed** 64:14 87:23 168:4

**Surbey** 140:14

**surfacing** 70:10

**surmising** 206:16

**surprised** 132:3 181:10,14

**survey** 56:17,18 67:1,2 116:12,24, 25 117:1,2,17 120:4,7 121:6 123:1, 6,11 124:6 125:3 128:20 129:1,2 144:1 146:13,20 151:6,14 154:16 201:3,7 202:9,15,16 203:23 205:19 212:23 248:15 251:13 252:19 254:20

**survey's** 122:15

**surveys** 66:25 67:2,3 169:25 203:18 204:5,8,9,11,17 251:20 252:23 255:10,16,22 256:7

**suspect** 135:22 160:7 256:2

**Swinton** 5:6,10 15:4 53:18 85:23 86:7 97:8 144:23 145:1 147:18,21 158:19 173:16,23 256:17 257:2

259:6 260:4,20

**Swinton's** 92:1

**sworn** 5:3

**syllabus** 62:20

**system** 18:14 28:23 56:22 66:9 115:21 254:19

**systems** 21:11,12 115:22,23

--- T ---

**Table** 113:18,19 114:5 126:11 147:24 148:1 247:9,13

**taking** 138:9 153:8 172:24 252:10

**talk** 10:12,22 11:25 33:6, 41:18 53:7 87:2 120:25 127:11 140:6,11 164:15 234:12

**talked** 9:16 10:14 35:12 89:15 126:1,15 129:4 160:15 246:14 257:18

**talking** 8:13 16:3 23:9 30:6 50:24 54:6 67:12 81:1,12 120:10 143:18 156:9 163:8,22 168:15 169:23 188:5,8 237:15

**tapped** 48:16

**target** 18:8 20:7 188:10,11 189:3 190:10 199:9

**targeting** 189:2

**tasks** 32:14 56:12,15

**teach** 24:3,4,8,11,21 31:17 33:13

**teacher** 62:13

**teachers** 28:22 62:4,5

**teaching** 24:1 25:4,6,23 27:19,23, 25 28:5,8,14,16,24 29:2,16,20 30:16,17,20 31:2,4 61:25 62:1,2,3, 12,16,17,19,20

**team** 57:3

**Tech** 67:1 201:3,7

**technical** 123:21

**technically** 170:19

**techniques** 28:7,10,13 29:18 31:3 48:21 205:14

**technology** 36:11 37:5 247:11

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**teen** 178:5 201:9 209:16 211:23 254:7,25

**teenage** 214:6

**teens** 145:8 201:4,8 210:15,18 211:8,12 212:20 214:7

**telephone** 186:25 210:1 249:6

**tempted** 75:3

**ten** 13:24 53:5 57:3

**ten-page** 15:8

**tentative** 250:15,19,23 251:1

**tenure** 62:9

**term** 12:19 18:7 19:4 23:18 26:3 43:11 49:15 62:8 63:15 67:14 70:4 84:19 87:14 89:22 90:10 96:22,23 97:2 102:22 103:5,22 104:13 105:1 121:7 143:20 147:4 157:9 171:6,17 174:24 191:23,24 192:1 196:25 197:22 200:6,9 203:13,20 206:15, 16 207:5,14 221:8 222:2,3 227:13 228:1 229:18 232:2,8,16 233:11, 16,18 243:25 244:11,12,18,20,22, 24 245:1 247:17 257:18 258:7,11, 24 259:23 260:12,14,15,17

**termed** 103:10 119:11,13

**terminology** 16:11 27:15 142:25 145:23 231:7 250:9 251:6

**terms** 5:23 63:17 78:19,22,25 79:12,18 91:20,24 145:21 146:25 202:21 220:3 228:17 235:20,23 248:7 250:2 251:6 259:20

**tested** 22:7

**testified** 5:4

**testify** 9:4

**testimony** 10:13 258:6

**testing** 191:3

**tests** 23:7

**text** 12:16,17 13:13,16,18 14:10, 12,13,14 35:21 40:18 67:8,10 98:17,23 105:4,15 106:24 107:6 112:25 113:7,9,16 114:2 124:16,17 128:22,24 160:25 178:18 181:3 221:15,23 222:5,6,7 227:19 228:21 229:19 236:14 255:8

**texting** 35:18 41:4,12 44:9 111:2, 9, 112:25 122:13 125:10 130:13

**texts** 129:10

**theme** 19:23

**theoretical** 50:10 76:5

**theoretically** 132:3,8 171:3

**theories** 132:2

**theory** 33:6,7 68:5,8,11,18,19 69:3, 74:6,10,11 132:6,17,18 251:3

**There'd** 214:20

**Thin** 183:22,25

**thing** 22:15 74:21 81:12 86:19 113:3 123:21 127:11 129:3 143:4 157:25 196:21 198:25 208:18,21 227:18 237:7,8 252:11 258:23

**things** 10:15,17 17:13,21 29:2,15, 18 41:9 46:15 47:20,23,24 50:2 56:7,14 59:12 67:7 70:9 74:16 75:13 78:18 79:3,4 81:15,16 83:1 84:14 85:6,15 99:16 102:1,15 108:10 110:5 112:20 113:2,22 118:6,10 132:1 134:5 143:25 153:1 156:2,6,11 159:4 168:13,18 175:19 181:11 192:20 195:8 202:13 217:11 220:21 221:10 223:13 228:11 237:7 247:14 252:25 256:9 259:3

**thinking** 60:21 76:9 102:24 119:19 143:20 175:21,25

**thinks** 143:14

**thought** 16:4 88:24 106:21 118:14 129:11 145:13,16 155:22 179:17 180:4 205:2 206:21,22 224:25 236:8 239:14

**three-year-old** 18:18

**throw** 123:19,23

**tied** 172:22

**til** 24:17 84:7

**time** 8:16,22 18:10 39:11, 42:12,15 43:22 44:6 47:18 59:17 85:25 86:1 103:18 106:19 107:12,24 116:20 117:18 125:6 126:4 127:21 129:20, 23 131:15 134:13 148:12 170:14, 16 173:17 174:11 175:2 177:4 186:8 220:21 245:19,22

**times** 32:17 53:22 80:18 81:17 95:15 148:13

**tipping** 172:8,10

**title** 111:7,9

**titled** 15:9 150:14 183:25

**today** 5:15,20 9:15 11:20 47:1 221:11

**today's** 98:6

**told** 116:13 240:6 256:5

**top** 40:17 41:5 44:9 92:22 93:9,12 164:8 174:13 198:4

**topic** 13:11 48:3 73:17 82:19,21 128:5,14 161:24 162:16 196:10 209:16 249:4 251:12

**topless** 104:25

**total** 92:7,16 93:24 236:22,23

**totally** 249:3

**touch** 52:20 76:15

**town** 20:14

**track** 62:9

**trail** 78:9

**transcript** 260:24

**translate** 226:4

**transmission** 12:10,12,13,14,15

**transmitted** 12:18 142:20 160:24 211:19

**transmitting** 89:5

**trend** 206:22

**trends** 179:19

**trouble** 130:1

**TRU** 204:9,12

**TRU'S** 204:5,8,17

**true** 35:2 37:25 90:21 108:6 187:7, 9 215:6

**truncated** 56:24

**trust** 70:2,4

**turn** 61:16 148:1 210:3

**turned** 99:25

**type** 16:24 21:7 25:12 30:18 57:4 62:24 66:7 67:5,16,18,25 68:2,14 69:1,7 79:15 89:5 129:3 132:7 136:18 149:10,11 151:13 152:11 156:23 157:21 166:12 178:24 180:19 183:12 185:7 186:3 188:20

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013                                  Index: types..Wayne

206:4 235:3 236:5 249:8 250:4,12

**types** 10:14,16 17:13,18,20 24:3 29:1,15,18 30:3,12 40:5 44:4 56:15 67:13 68:24 69:9 76:2 79:15,20 81:14,15 85:6,15 103:3,9 112:20, 22 128:21 138:8 142:6,21 144:14 149:15 175:10 179:14,17,19,20 181:13 223:5 235:14 239:13 240:11 247:13

**typical** 12:23,24 33:3 118:9 119:18 138:5 213:13 244:9 250:18

**typically** 22:5 66:6 69:16 167:19 197:12

---

**U**

**U.K.** 20:10 21:23 22:2,10,16,23

**U.S.** 96:13,14 98:10,13 160:22 170:23 177:17,25 178:9 180:10 184:20 187:4 191:12 193:5, 194:12 204:23 217:3 232:24

**ultimately** 28:25 29:13 64:1

**umbrella** 60:10

**unable** 110:10

**under-inclusive** 155:5,22 170:25

**underestimation** 218:25

**undergo** 188:20

**undergraduate** 31:19 41:13 162:14 164:10 177:12

**undergraduates** 148:24 149:4,6 150:2 161:25 162:6,12,17,22,24 163:2,5,10,13,15 164:4 165:12 170:2 233:8

**underlining** 132:2

**underlying** 171:12

**underreporting** 129:13 130:6

**understand** 7:11,21 8:6 9:1 30:11 33:17 48:23 82:13 103:25 164:16 206:8 218:3 219:25 228:19 259:20, 21,23

**understanding** 50:10 75:14

**understood** 7:17 99:4 116:2 154:12

**undertaken** 69:9

**underwear** 100:8

**unique** 243:2

**United** 5:11,12 19:5 22:12 75:25 115:7 132:4 141:5 148:25 150:2 161:25 162:6,23 163:13 164:5,11 165:5,17 166:19 202:2 206:6 218:18 224:14

**universities** 69:11 110:20 114:14 170:6 238:10

**university** 16:10 24:5 28:23 69:17, 19 73:4 115:7,11,13 136:2 137:9 141:5,7 151:15 152:21 160:7,9 216:20 227:2 236:24 238:20 239:6 240:12

**unknown** 161:11

**unplanned** 178:5 201:9 209:16 254:7,25

**unsuccessfully** 74:20

**unwanted** 57:9,11 85:14

**updated** 15:25

**upper** 239:22

**upward** 252:6

**urge** 86:17

**useless** 120:14

---

**V**

**vague** 156:16

**valid** 166:23

**validation** 64:2,8,9 66:14 236:10

**valuable** 247:1,4,6

**values** 211:1 217:9,10

**variables** 133:15 221:2

**variance** 142:25

**variation** 258:24

**variations** 128:19

**varied** 178:15 237:11

**varies** 251:17

**variety** 32:14 50:2 64:18 78:21

**vein** 81:2

**venue** 70:16 73:24 74:8

**verbal** 8:8

**verbiage** 87:18,19

**verification** 168:7

**verify** 187:8 208:14,16

**version** 15:22

**versions** 24:11

**versus** 5:13 16:16 67:25 185:17 214:5

**video** 124:18,24 125:16 134:24 136:3 137:16 144:12,13 147:10 148:3,12 199:19 203:4 210:12 211:1 213:23 224:15 259:11,12

**videos** 103:8 122:16 126:3 147:16 179:22

**Views** 165:1

**violence** 84:18 85:4,5

**visit** 208:25 209:2

**visual** 98:18,24 99:4,21 101:20,21 102:23 103:14 105:2,5,16 106:25 107:7,19 124:25 142:20 143:1 160:24 162:2 163:6 165:4,16 178:12,19 200:15 201:25 219:10 221:16,24 222:8 224:20 228:2,5,8, 21 229:22 232:7,19 233:16 234:4 235:9,14 237:23 251:16 255:9

**vitae** 15:6,9,15,22

**Vogel** 140:14

**voluntary** 175:16

**volunteer** 119:20,24 120:2 175:13,25

**volunteered** 123:10,17 204:4,17

**volunteers** 204:16

---

**W**

**wait** 8:11

**waive** 260:22,25 261:1

**wanted** 27:21 33:18 35:9 76:14 82:17,18 87:5 88:17 118:19,22,23 131:16 140:3 159:5 193:8 229:24

**Wayne** 21:14 115:13 123:6,9 133:1,7 134:2 135:22 141:8 152:17 164:18 166:4 237:1

Free Speech Coalition, et al. v The Honorable Eric H. Holder, Jr.
Drouin, Michelle on 04/26/2013

**ways** 64:15 65:13 68:8 97:1 121:25 122:3 127:20 129:1 142:17 203:15

**weaknesses** 193:21,25 194:1

**wearing** 100:8

**Web-based** 198:6

**website** 116:12 208:25 209:2,17, 22

**week** 52:11

**weight** 69:24,25 205:5 216:4,5,8, 10,12,13 235:24 240:25 241:3,6,9

**weighted** 204:23 205:4 206:20 207:17 208:2,6,12 241:2

**weighting** 208:16,22 209:10 226:21,23 227:3,8

**Weisskirch** 95:3,5 109:3,8,9 162:12

**who've** 65:6

**wholly** 55:11

**Wolak** 145:6 246:11

**woman's** 102:10 104:15

**women** 92:15 150:8, 151:15 152:7, 15 153:11,13 159:9 163:21 166:2 170:1 174:17 237:16

**wondered** 243:1

**word** 49:4,13 63:12 87:14 89:21 90:9 129:2 137:21 144:5 159:22 173:10 177:2 181:1,19 182:2,7 220:19 238:8 245:3,5,7,8,20 250:11 255:2,19

**wording** 37:25 104:22

**words** 8:6 63:13 79:16,17,20 97:16 124:20 136:25 143:19 163:11 164:3 190:17 194:10 203:21 205:6, 18 228:14,25 230:20,21 250:10

**work** 15:20 32:2,21 39:12 40:13 43:12 46:2,17 49:25 55:12,25 56:2 57:19 63:21,22 64:2,3 70:16 71:24 72:4 73:12 78:11 80:25 82:3 85:7,9 90:14 91:9,22 93:24 94:16,21 103:4 105:8,9,10,23 108:24 112:17 118:1 182:14 196:9,10,24 245:4,6 252:10

**worked** 57:14

**working** 36:3 46:17 58:15,17,23 72:24 73:2

**works** 11:2 85:8

**world** 205:13

**worth** 23:3,4,6,7,11 118:1 212:4

**write** 15:16,18,24 82:17 89:14 90:24 91:2,14 92:4,9 95:10 157:19 224:22 257:20

**writer** 70:15 197:19,25

**writes** 197:3

**writing** 15:19 84:23 124:22 197:14,15,18,20 207:4,12 244:17 245:16 251:1 256:13 260:10,11

**written** 9:18,20 13:7 22:20 194:21 197:24 205:25 208:19,22 245:23, 24,25 248:2

**wrong** 49:13 254:2

**wrote** 91:17 92:11 93:6 95:13,16 103:18 106:20 107:3,10,12,24 114:15 139:13 155:9 195:3 196:7 197:9 200:1 207:2 236:9 244:20,24

---

**Y**

---

**year** 13:20 18:10,11 20:9,10,11,23 36:2 41:16 44:14,20 84:1 184:14 210:19,21 211:11,12,16

**years** 13:22, 23:24 35:23 36:4,9 47:19 55:21 70:18 73:21 84:2 157:6 212:4,11,12

**yield** 257:14

**yields** 257:15

**York** 139:12

**young** 12:5,8,9,10,11,21,22,23,25 13:3,6 37:11,12 38:1,10,13 39:18, 24 40:9 41:8,11,12,15,22 42:5 43:10,20,21 44:6,24 45:8,10 46:22, 24 48:11 49:2,6,11,18,20 50:8,22, 23,24 51:5,8,17,21 52:3,23 54:7,21 55:4,6,8,15 57:25 58:6 60:13 66:21 73:18,19 75:5 76:17 77:15,16,18, 20,24 78:2,17 80:10,17 81:4,6,19 82:4,9,18 84:10,25 85:21 88:20,21 89:18,20,23 92:13 95:6,9,11 96:15, 22,23,25 97:1,3,13,16,24 98:2,11, 16,22 105:4,14 106:2,23 107:5,16, 17 108:14 126:19 127:1,3 130:16, 23,24 131:1,3,10 132:14 137:15 140:12 149:1,5,6,22 150:1,7,15 151:14 153:10,13 162:5 163:4

164:12 165:5,17 168:24 169:4,5, 11,19 170:9,23 177:15 178:11,18 181:2 185:6 192:11 194:15,21 201:4,8,24 208:7 210:11,21 211:5, 12,24 212:6,7,9,15,20,22 213:12 214:5,11,12 215:4,16 218:17 219:9 221:15,22 222:4 224:12,13 225:25 234:19,22 236:1,13 237:22 251:14, 21 252:2 255:7

**younger** 159:20 213:9

**youth** 38:19 39:4 40:8 80:20,25 186:4,7 213:5,11 218:17 246:4,9 248:4

---

**Z**

---

**Zimmerman** 83:19 194:23

# Free Speech Coalition v. Holder

## Deponent:  **Marc Zimmerman, PhD**
## Taken:  **4/29/2013**





and Video Conferencing Center

**Established in 1972**

Your Certified Shorthand Reporters Since 1972

623 West Huron Street

Ann Arbor, Michigan  48103

Phone:  (734) 761-5328  Fax:  (734) 761-7054

mail@huron4deps.com    www.huron4deps.com

**Conference Rooms & On-Site parking available at no additional cost.**

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

---

**Page 1**

1   UNITED STATES DISTRICT COURT
2   FOR THE EASTERN DISTRICT OF MICHIGAN
3
4   FREE SPEECH COALITION,
5   ET AL,                    Civil Action No.
6                             2:09-cv-4607
7       Plaintiff,
8   vs.
9   HOLDER,
10
11      Defendant.
12  - - - - - - - - - - - - /
13  Pages 1-246
14
15      The Deposition of Marc A. Zimmerman, Ph.D.,
16  taken pursuant to Notice in the above-entitled cause
17  at 623 West Huron Street, Ann Arbor, Michigan, on
18  April 29, 2013, at 8:30 a.m., before Carol Marie
19  Hicks, CSR-3345, Notary Public in and for the County
20  of Livingston.

---

**Page 2**

1   APPEARANCES:
2       LORRAINE R. BAUMGARDNER
3       BERKMAN, GORDON, MURRAY & DeVAN
4       55 Public Square, Suite 2200
5       Cleveland, Ohio 44113-1949
6       216.781.5245
7       lbaumgardner@bgmdlaw.com
8           Appearing on behalf of the Plaintiff.
9
10      NATHAN M. SWINTON
11      U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
12      20 Massachusetts Avenue, NW
13      Washington, DC 20001
14      202.305.7667
15      nathan.m.swinton@usdoj.gov
16          Appearing on behalf of the Defendant.
17
18
19
20
21
22
23
24
25

---

**Page 3**

1           INDEX TO EXAMINATIONS
2   Witness                        Page
3   MARC A. ZIMMERMAN, Ph.D.
4       EXAMINATION BY MR. SWINTON              4
5
6
7              EXHIBITS
8   Deposition Exhibits                Page
9   ZIMMERMAN EXHIBIT 1  Dr. Zimmerman's curriculum    23
10                       vitae
11  ZIMMERMAN EXHIBIT 2  Dr. Zimmerman's expert        89
12                       report
13  ZIMMERMAN EXHIBIT 3  Article entitled Sexting       95
14                       Among Young Adults
15  ZIMMERMAN EXHIBIT 4  Article entitled Innovative   151
16                       Recruitment Using Online
17                       Networks
18  ZIMMERMAN EXHIBIT 5  Article entitled Sexting,     197
19                       Substance Use, and Sexual
20                       Risk Behavior in Young
21                       Adults
22  ZIMMERMAN EXHIBIT 6  Document entitled Sex and     213
23                       Tech, Results from a Survey
24                       of Teens and Young Adults
25  (Attached.)

---

**Page 4**

1   Ann Arbor, Michigan
2   April 29, 2013
3   At or about 8:30 a.m.
4           MARC A. ZIMMERMAN, Ph.D.,
5   having first been duly sworn, was examined and testified
6   on his oath as follows:
7              EXAMINATION
8   BY MR. SWINTON:
9   Q   Good morning, Dr. Zimmerman.
10  A   Good morning.
11  Q   My name is Nathan Swinton.  I'm the attorney with
12      the United States Department of Justice.  I
13      represent the United States in a case called Free
14      Speech Coalition versus Holder, which is currently
15      pending in the Eastern District of Pennsylvania.
16      Are you currently retained; have you currently
17      retained counsel?
18  A   No.
19  Q   So Ms. Baumgardner is not your counsel today?
20  A   No, she's retained me.
21  Q   Okay.  Have you ever had your deposition taken
22      before?
23  A   No.
24  Q   Well, I will be asking you a series of questions, to
25      which you're under oath to provide full and complete

---

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

---

Page 5

1   answers.  If you do not understand any question,
2   please let me know before you respond, and I will
3   explain or rephrase the question; is that okay?
4   A   Yeah.
5   Q   If you answer a question, I'll assume that you
6   understood the question, okay?
7   A   Yeah.
8   Q   Did you take an oath before we started this morning?
9   A   Yes.
10  Q   Did you understand the nature of the oath?
11  A   Yes.
12  Q   The oath requires you to fully answer each question,
13  to the extent that you can.  If you're not sure of
14  an answer, or don't have a complete answer, then you
15  must still answer the question, to the extent you
16  can.
17  A   Okay.  And I shouldn't nod, right, 'cause you
18  can't --
19  Q   That's true.  The court reporter can only record our
20  words, so please answer each question with a verbal
21  response.
22  A   Okay.
23  Q   Please also wait to allow me to finish asking the
24  question before you answer, and that way we can
25  avoid talking over one another.

---

Page 6

1   A   Okay, I'll try.
2   Q   Okay.
3   I'm from the East Coast originally, so. . .
4   Q   Okay.  I'll plan to take breaks about every 90
5   minutes.  If you need a break at any time before
6   that, please let me know.  The one thing I ask is
7   that you finish responding to a question before we
8   take a break.
9   A   Sure.
10  Q   From time to time Ms. Baumgardner may object.  After
11  her objection, I'm going to ask you to go ahead and
12  answer the question, unless she instructs you not
13  to; is that okay?
14  A   Yeah.
15  Q   Have you taken, or do you intend to take, any
16  medication that would affect your ability to testify
17  accurately and honestly today?
18  A   No.
19  Q   Okay.  Can you please state your full name, for the
20  record.
21  A   Mark, with a "c," M-a-r-c, Alan, A-l-a-n, Zimmerman,
22  one "n."
23  Q   Okay.  So that's, Z-i-m-m-e-r-m-a-n.
24  A   Correct.
25  Q   What did you do to prepare for your deposition

---

Page 7

1   today?
2   A   I reread my papers.  What else did I do?  I looked
3   up some things on the internet, like percentage of
4   people who use the internet in the age group, not
5   that I may not remember the number off the top of my
6   head.
7   I talked to these guys; you know,
8   obviously, they called me to ask me to do this.
9   They asked me to write, I think, the report that you
10  may have gotten, it's a two-page kind of summary of
11  the project and what I think for extrapolation, so I
12  did a little bit of work for that.
13  I, you know, kinda thought about what
14  I was going to say, in terms of what points I might
15  want to make about my study.  What else did I do?  I
16  think that's about it.
17  Q   Okay.  Did you review the reports of any other
18  experts in this case?
19  A   And I read Stark's report.
20  Q   Okay.  Other than Ms. Baumgardner and people with
21  her firm, have you spoken with anybody else about
22  the deposition today?
23  A   Well, I told my wife.
24  Q   Okay.
25  A   I mean, I told people I was being deposed, you know,

---

Page 8

1   but I didn't really talk about much, 'cause most of
2   my friends are not academics, and they don't know
3   what I would be talking about anyway.  So I said it
4   was about a study that I had done, and they, these
5   guys found the study, and asked me to be here,
6   so. . .
7   Q   Okay.  I want to talk a little bit about your
8   background.  Do you consider yourself to have an
9   area of expertise?
10  A   I guess I'm supposed to say, "yes," because I'm an
11  academic.  My career has actually been pretty
12  eclectic in many ways, some people might say, but
13  when somebody asks, "What's your area expertise," if
14  I should just ask you directly, is adolescent health
15  and development, is really kind of where I focus
16  most of my research and most of my career.
17  Q   And how to you define adolescent?
18  A   Well, that's also a good question.  I typically
19  define it as the second decade of life, 10 to 20,
20  but there are lots of -- there's some evidence that,
21  obviously, brain development, all that sort of
22  thing, that adolescence actually goes maybe to 25,
23  and then that's certainly an adult transitional
24  period, which I also study.
25  So I study the development of kids,

---

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                          4/29/2013

Page 9

1    basically, into that early adulthood period, so, I
2    guess, I would say, 10 to about 25, even though the
3    journal I edit, I take only papers that are 10 to
4    20, unless it's about the transition to adulthood.
5    So that they look at predictors in that age group
6    to, like, let's say how you'll end up.  But they
7    look at when you were 15, and some factors there,
8    and then said, Oh, and, look, he became a U.S.
9    attorney, you know, who are those people, that would
10   count, but if it's beyond 20, I don't.  But when I
11   do my own research, 10-to-25-ish.
12   Q   Okay.  What qualifications do you think that you
13       have to make you an expert in adolescent health and
14       development?
15   A   What kind of qualifications do I have.  Oh jeez.
16   Well, mainly, I'm a research psychologist, a Ph.D,
17   from one of the top, arguably the top five Ph.D.'s
18   in psychology in the country, at the University of
19   Illinois, where a lot of these, a lot of people,
20   who, like, invented statistical methods, and that
21   sort of thing, were from.
22              And, you know, I had a master's
23   degree before that.  And I've been doing this since,
24   well, when I got into graduate school, and if you
25   count two years of sort of figuring things out, so

Page 10

1    and you count that, that was in 1983, so that's,
2    like, 30 years of doing this.  And I've been at the
3    University of Michigan since 1989, so that's 24
4    years here at maybe the best social science,
5    behavioral science university, arguably, in the
6    country.
7              So I'm around all these people, who
8    are really smart, like Eric, Eric Volz, who is a
9    co-i on this project that we may be talking about
10   later.  And I've had lots of experience publishing
11   peer-reviewed articles, everything from survey
12   research, to interventional research, where we try
13   to make change, and study that.
14             My Ph.D. is in, what was called at
15   the time, personality and social ecology, so we were
16   interested in both how people interacted in the
17   environment, but also measurement, and how do you
18   measure something that you can't put on a scale and
19   weigh or measure with a tape measure, like attitudes
20   and beliefs.  And so I think I've been doing this
21   for a long time.  I'm a gray hair.  I'm a
22   silverback.  What else would qualify me?  I think
23   all those things qualify me.
24   Q   Why did you become interested in adolescent health
25       and development?

Page 11

1    A   That's an interesting question.  Jeez, I didn't know
2    you were going to ask me about my older, you know,
3    my biography, I just thought more recently.
4              Well, you know, it was really
5    fortuitous.  My dissertation was about psychological
6    empowerment and how people felt control and agency
7    in their lives, and how that related to other
8    factors, like health, and mental health in
9    particular.  And then I moved to Washington D.C,
10   where I worked, first, at American University for
11   two years, and then I was a Congressional fellow in
12   the Office of Technology Assessment, which is now a
13   defunct agency, but was a sister agency of Congress,
14   like the GAO and Library of Congress.
15             And I had a friend of mine, who I
16   went to graduate school with, and he was a little
17   older than me, so we overlapped a couple years, then
18   he left and went to a school, the University of
19   Maryland in Baltimore County.  And we played
20   softball together, and we were friendly, and I
21   called him.  I said, "Hey, I moved to Washington,
22   you know, let's have lunch."
23             So we had lunch, and we chatted about
24   ways that we could collaborate; he's one of the
25   smartest people I've ever known.  This is probably

Page 12

1    more detail than you want, but, fortuitously, he
2    called me up one day and said, "I have an
3    opportunity for us to potentially collaborate."  I
4    said, "What's that"?  And he said, "Well, the
5    National Institute on Drug Abuse, I have a contact
6    there, who let me know that they were interested in
7    high school dropout, or kids at risk and drug use."
8    So we decided, 'cause he had some contacts in
9    Baltimore with school dropout, with the school
10   system, that we got a list of kids, who had dropped
11   out of school over the last previous five years.
12   And we made a proposal to study those guys, and look
13   at outcomes, and they were adolescents at the time.
14   And so we, I started getting into the
15   adolescent literature, which I hadn't done before.
16   And that was 1986, '87, right around that period of
17   time, and that was the beginning of it.
18             And really what happened was it all
19   took off when we found that not all kids with a risk
20   factor that would predict an outcome, specifically
21   single parenthood, was not related necessarily to
22   poor outcomes, you know, growing up in a
23   single-mother household.  And that sort of just
24   threw everything in disarray, 'cause I believed our
25   data, you know.  It was limited in some ways, but it

3 (Pages 9 to 12)

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 13

1     was very unique in other ways, and led me to this
2     world of adolescent resiliency and looking at
3     factors that predict positive outcomes even in the
4     face of risk.
5            And then that was sort of the
6     beginning of my adolescent research, and, you know,
7     we kind of, just everything has developed since
8     then. I've been funded by NIDA, basically, almost
9     every year since. I've been funded since,
10    University of Michigan, continuously by NIDA,
11    National Institute on Drug Abuse, NIDA, which is
12    NIH, which is federal government, since 1994, so I
13    think I'm a NIDA researcher.
14    Q   In reviewing some of the articles you've published,
15        it seems like you've looked a lot at adolescence and
16        different risk factors that they face; is that one
17        facet of the body of work you've done?
18    A   Well, ironically, while I'm looking at the
19        importance of positive factors in kids' lives, I
20        often did that in the context of risk, right, which
21        is a criticism of the field, because, like, well, if
22        they're resilient, why do you have to look at risk?
23           Well, resilience only works in the
24        context of risk, 'cause you grow up affluent, and
25        things are kinda taken care of for you, and whatnot,

Page 14

1     you know, doesn't mean you're going to have a great
2     outcome; I mean, you could have all sorts of
3     problems. But somebody, who succeeds in that
4     context, is different than somebody, who succeeds in
5     a context of growing up in poverty or growing up in
6     a context where there's lots of violence around you
7     all the time, and that sort of thing, so, yes, I
8     study risk.
9            In fact, I've studied, you know, the
10    populations I've studied are people, who were at
11    risk for high school dropout. And the subsequent
12    study, the one I just described, actually was about
13    people, who were at risk of school dropout, but we
14    wand to now study them before they dropped out to
15    see if we could find predictors of dropout. And one
16    of the main questions was, does drug use lead to
17    dropout, or does dropout lead to drug use, you know,
18    increased drug use. You're going to ask me what the
19    result was, right?
20    Q   I am interested. What was the result of that study?
21    A   You are? Well, it was actually complex, that
22        actually drug use led to school apathy, and it was
23        school apathy that actually led to dropout, so it
24        was not quite direct, so it kinda depended.
25    Q   Okay.

Page 15

1     A   Which is the way researchers do everything. What we
2         do is we try to understand the complexity of life.
3         Nothing is really quite so simple.
4     Q   Sure.
5     A   And that's what we do, is we try to understand the
6         complexity of life.
7     Q   So you've looked at adolescent development and risk
8         factors and resiliency; are there any other main
9         facets of adolescent development that you've looked
10        at in your studies?
11    A   Well, the outcomes we typically look at are
12        substance abuse, and, by that, I mean alcohol,
13        tobacco, marijuana, and other drugs, just in the
14        lower class. And I say that, because there's
15        relatively few kids actually do drugs other than,
16        illicit drugs other than marijuana, interestingly
17        enough. I mean, some do cocaine, some do LSD, some
18        do pills, and that all that stuff, but it's very low
19        rates, in my data and national data. Marijuana and
20        alcohol are a different story. Now, of course,
21        alcohol is illegal for them as well, but not an
22        illegal substance in the same way, and the same with
23        tobacco, for that matter. And then we studied
24        violent behavior.
25           We also study, you know, what

Page 16

1     psychologists call, internalizing and externalizing.
2     Externalizing are the delinquency, violence, so
3     nonviolent delinquency, burning houses and
4     non-interpersonal violence are stealing things.
5     Then there's the violent behavior, which is, you
6     know, shooting people, stabbing people, getting into
7     fights, gang fights, all those sort of things, and
8     then there's the substance abuse that we're talking
9     about. Those are sort of the externalizing
10    behaviors. And it might also include school
11    dropout, you know, things like that.
12           And then the other side of it is
13    internalizing behaviors, and that's usually mental
14    health basically. It's things like anxiety,
15    depression, loneliness, you know, all those sort of
16    even fuzzier things.
17    Q   I see that, I know you are the chair of the --
18    A   Of behavioral health education.
19    Q   Correct. But you also teach classes in the
20        psychology department.
21    A   No, actually, I don't teach any class -- in fact, I
22        hardly teach any classes at all at the university.
23    Q   Okay.
24    A   Partly because I'm chair of my department, so I
25        get -- we have, in the School of Public Health

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                              4/29/2013

Page 17

1  there's a three-course load; we have to teach three
2  classes, and do independent studies.  I do lots of
3  those, which are working individually, one on one,
4  with students.  I have one course, because I'm
5  chair, and then I have one course, because I edit a
6  journal, Youth & Society, which you might eventually
7  get to, I don't know.  I guess that leads to my
8  expertise in youth, right?
9          And then I teach a course, I've
10  taught a course in research methods.  And then
11  recently, because of the, just the teaching, you
12  know, issues in the department, which I won't go
13  into all the gory details, but when a faculty member
14  leaves, there's changes, or, you know, gets a new
15  different assignment at the university, or
16  something, it disrupts the teaching program, like
17  who is going to teach what classes.  So I filled in
18  for this class, and I got somebody else to teach my
19  methods class.
20          So for the last three years I've been
21  teaching a course on, basically, socializing
22  doctoral students.  It's an introductory seminar for
23  doctoral students to get them, sort of their heads
24  into what it means to have a Ph.D., so learning
25  about the, you know, the peer-reviewed publication

Page 18

1  process, learning about grant proposal writing,
2  learning about mentorship and how to use or
3  recognize abuse of that, how to think conceptually
4  about their research, how to write clearly and sort
5  of in an expository writing, those sorts of things.
6          Before that, by the way, is research
7  methods; do I need to go into more detail about what
8  that is, or is that pretty clear?  It's basically
9  all the stuff we're going to talk about.
10  Q   Yeah.  Yeah.  I think I have a good understanding of
11      it for present purposes.
12  A   Okay.
13  Q   I was interested, in thinking a little bit about
14      your testimony in this case, do you consider
15      yourself to be an expert in sexting at all?
16  A   Nobody is really an expert in sexting, actually, is
17      one of the things that we found out.  I think there
18      are some, a very small number, in the United States,
19      who have done more research than we have.  We've not
20      done a lot of research in this; we did, really, that
21      one study.  But one of the reasons that motivated us
22      to actually include the questions in the
23      questionnaire was because there was very little
24      about sexting out there, number one; and, number
25      two, we wanted to know if it was related to sort of

Page 19

1  other kinds of behaviors.
2          And it was all during the period in
3  time, and it's really out of the news a little bit,
4  but it was sort of motivated by what was in the news
5  about kids who would sext, and then their friends,
6  it would go viral, and, you know, yada, yada, yada.
7  And it was really during that time, so what exact
8  years did we actually do that study?  Probably three
9  or four years ago the study was funded.
10          It was actually funded through the
11  stimulus.  Part of the stimulus -- all that stimulus
12  went to all different directions, and one of the
13  directions was National Institutes of Health, you
14  know, for projects that were ready to go.  So the
15  NIH said, Well, we have an influx of money, we want
16  to get this money out there, because you'll hire
17  people, and that's a good thing.  We ended up hiring
18  people, and, you know, we actually also sent the
19  money out to people, who filled out the
20  questionnaire, and that sort of thing.
21          And so it was during that period of
22  time that sexting was in the news.  And when we sat
23  around talking about, okay, well, we have, when we
24  do research, typically you get funded to do, you
25  know, let's say, these 30 questions, or 80

Page 20

1  questions, but when you have somebody filling out a
2  questionnaire on the internet, you can ask 120
3  questions.  You can always ask more than you sort of
4  negotiated.  You can't ask less.  And so we added
5  some questions about sexting, and thought, well,
6  this would be interesting.  It's a pertinent
7  population, because they're young adults, obviously,
8  very sexually active, engaging potentially in
9  sexually risky behaviors, and is sexting something
10  that is risky?
11          And, you know, especially being an
12  old guy, I'm thinking, like, you know, sexting, you
13  know, like, wow, this is really, you know,
14  interesting behavior, because, you know, when I grew
15  up, there were no cell phones, there were pay
16  phones, you know.  I mean, you don't see people --
17  in fact, sometimes you walk around New York City you
18  can see a payphone in the subways, and whatnot, and
19  I've taken pictures of them, 'cause my kids are,
20  like, you know, what's that?  You know, they know
21  now, but when they were little they're, like, what's
22  a phone doing in the middle of here, in the middle
23  of nowhere, 'cause they didn't get it.
24          So, anyway, so sexting was a new
25  phenomenon that's kind of growing out of all this,

HURON REPORTING SERVICE   huron4deps.com
and Video Conferencing Center   734-761-5328
Established in 1972

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                        4/29/2013

---

Page 21

1    you know, explosion of technology that we have, and
2    that's why we asked the question.
3              Are their people who are more expert?
4    Probably; who have done more studies, or looked at
5    this more in depth, you know, in multiple different
6    ways, 'cause that's the way you do research, is, you
7    know, one study itself doesn't do that.
8              There's, for example, there's a
9    national conference called Sex Tech, and I forgot
10   the woman's name who sort of organized it, sort of a
11   private citizen.  She may have an appointment, but
12   she's not really a faculty member, she may have like
13   an adjunct appointment.  And it's basically all
14   around, the whole focus is all around using
15   technology to get people to engage in safer sex.  So
16   I would bet that there are people, who either go to
17   that conference, or she may have a better handle on
18   sexting.
19             Having said that, there's not a lot
20   of research on it, so there's not that many people
21   who know about it, you know, and a lot of the
22   studies that I've been on it are way more convenient
23   samples than ours, which is why we also thought this
24   would be an interesting opportunity to look at.
25             (Discussion off the record.)

---

Page 22

1    Q   So you said that some people were more experts than
2        others in sexting; are there any names that come to
3        mind?
4    A   Not really, because it's such a new area, and, you
5        know, the person, who runs this Sex Tech conference,
6        might actually know, you know, 'cause she's in that
7        world, way more than I am, and I don't remember her
8        name.
9    Q   Okay.
10   A   I'm sorry, I just don't remember her name.  I could,
11       at a break, make a phone call and ask and see.
12             MR. BAUMGARDNER:  That's okay,
13       Doctor.
14   BY MR. SWINTON:
15   Q   I can do all that, try to find it.
16   A   Right.  Right.
17   Q   I'm curious.  I know you said that, you know, you
18       didn't grow up with a cell phone, obviously, and all
19       that; have you ever sent a sext message yourself?
20   A   No.
21   Q   So you don't have any personal experience with
22       sexting.
23   A   No.  No.  And I don't think my kids have.
24   Q   Okay.
25   A   But I don't know that for sure.  It's certainly, if

---

Page 23

1    they have, it hasn't gone viral, 'cause I might have
2    heard of that.
3    Q   I'm sure you're happy about that, right?
4    A   Yeah, very happy about that.  Actually, I don't
5        think either one of my kids did.
6    Q   Okay.
7    A   I have to say, frankly, I don't quite get it, but,
8        you know, there's lots of stuff I don't get.
9    Q   I'm going to hand you a document.  We'll mark this
10       as an exhibit.
11   A   Oh, I'm actually touching exhibits.  This is really
12       like television.  Did you write that down?  You have
13       to do everything I say?
14             (Zimmerman Deposition Exhibit No. 1
15             was marked for identification.)
16   Q   This exhibit is Zimmerman 1.
17   A   This is my vitae.  I know this.
18   Q   Dr. Zimmerman, I just handed you a document labeled
19       Zimmerman 1.
20   A   Okay.
21   Q   This is the curriculum, I say "vitae," you "vitae"?
22   A   Yeah, vitae, CV.
23   Q   Latin, okay.
24   A   Yeah, you learn Latin.
25   Q   And I believe it's just the previous ten years,

---

Page 24

1    correct; it's dated February 2013, but it just goes
2    back to ten, or it's labeled "Previous Ten Years"
3    in the upper right-hand corner, correct?
4    A   Yeah, I don't know why.
5    Q   I believe --
6    A   I don't know why it did that, frankly.  I have to
7        check that out.  I wouldn't have done that.  I don't
8        think -- I don't know.  Oh, it might be because
9        that's what you asked for.  You didn't want my whole
10       big thing, that's why.
11             MR. BAUMGARDNER:  Do you have a
12       second exhibit?
13             MR. SWINTON:  We do.
14   BY MR. SWINTON:
15   Q   I specifically just wanted to look at the one that's
16       the previous ten years, so I just wanted to make
17       sure we have the same document.
18   A   Right, right, right, yeah.
19   Q   Perfect.  I was interested in, if you can turn to
20       page three, and this is a list of the articles
21       you've published.
22   A   Okay.
23   Q   I just had a couple of questions about these.  First
24       one is I see, on some of the articles, your name is
25       listed first.

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 25

1  A   Um-hum.
2  Q   **And on other ones, where there are multiple authors,**
3     **your name is listed second, or third, or fourth.**
4  A   Seventh, or last.  That's interesting.  Now, in
5     fact, the American Psychological Association has
6     guidelines for author, order of authorship on an
7     article, how much you contributed.  And more and
8     more peer-reviewed journals are actually requiring
9     you to indicate that you've made a substantive
10    contribution, which is sort of interesting also,
11    because this has actually become an issue in the
12    business, because I think some people are ripped off
13    and some people are throwing bones, meaning some
14    people do some work and are not included, and how
15    come, and people have made noise about that, and
16    then people have been discovered that, well, you
17    didn't do anything, how come you're an author?
18 Q   **Okay.**
19 A   So there's been some guidelines.  That's the
20    American Psychological Association.  It's not a
21    legal document.  It's sort of more an ethics,
22    thinking about, okay, this is what you want to do.
23    Having said all that, you know, I'm a professor, I
24    don't give short answers.
25                At this point in my career, when I

Page 26

1     work with a student, even if I do a little bit more
2     of the work, I let them be first author, 'cause, for
3     example, if they're working on my research, it's
4     automatically, that's my data, right, and I've
5     conceptualized it.  And if I'm the leader of the
6     grant, even if I have co-investigators with me, I
7     almost always do, I always do, I can't think of
8     another one where I have not, you know, they're
9     still borne out of my ideas, they get developed with
10    their input and whatnot, so I'm an author on all
11    things that I'm involved in.
12                Sometimes, when working specifically
13    with a student, who's doing their dissertation, for
14    example, I might kind of direct where they go, but
15    then they really take the ball and run with it, so,
16    you know, that's your paper, you're first author,
17    and I, you know, basically mentor them through the
18    process; other times a colleague might do that.
19                And, as a senior person, again, a
20    gray hair, I, you know, tend to be more loose with
21    giving up.  Like, if I did equal work, I'd almost
22    always give it to somebody else first.  It's just,
23    you know, the nature of where I am in my career
24    versus where they are to be more helpful.
25                So first author is, in the behavioral

Page 27

1     sciences, social behavioral sciences, first author
2     is, these are your ideas, even if it's not your
3     data, right, these are your ideas, you've done the
4     bulk of the work, and you've carried it through.
5  Q   **Okay.**
6  A   In the medical literature, the opposite is true, you
7     would often put your student first, or a postdoc, or
8     a fellow, or something like that, first, but the
9     senior author is the last author.  And then in
10    between kinda depends, usually like, what I do, just
11    in my own style of doing it, if there's four of us
12    doing a paper together, we talk about who's going to
13    take the lead, they'll be the first author, and then
14    what the order of authors is going to be, to define
15    what kind of work we expect, and then we say, okay,
16    that's our default.
17                And as we write the paper, if it
18    changes, we have to talk about it, so maybe
19    somebody, who was going to be second, ended up
20    getting too busy or something, and they become
21    fourth, because they didn't do much as they thought.
22                So in the medical journals being last
23    author is probably, in some ways, is basically
24    saying that you're the senior guy, but it's the
25    prestigious place to be, 'cause it means that you

Page 28

1     have an operation going, and that you have other
2     people doing some of the, you know, heavy lifting,
3     if you will.  But you've done all of the sort of
4     background infrastructure, creating all the
5     opportunities, gotten the data, gotten the funding,
6     led the process.  You know what I mean?  Is that
7     clear?
8  Q   **Yeah.**
9  A   So being first or last is probably the most
10    prestigious, and that in between it's how much
11    contribution you've made.
12 Q   **It also depends, on a certain extent, to which type**
13    **of journal you're publishing in.**
14 A   To some extent.  The medical journals, you know, you
15    tend to be last.  And in the behavioral science
16    journals, if you've done the lead work, then you
17    tend to be first.
18 Q   **Okay.**
19 A   And in the medical journals, the first one probably
20    does the most work, but the last one, for that
21    paper, but the last one does all the infrastructure
22    work to make that paper possible.  You see the
23    difference?
24 Q   **I do.  Yeah, thank you.**
25 A   So I can go through, for example, like the first

7 (Pages 25 to 28)

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                          4/29/2013

Page 29

1   three there, first student, student, junior
2   colleague, all the way down, and, anyway, in terms
3   of first.
4   Q   On this same page, actually, I was just interested
5       in a term that I'm not as familiar with, not being
6       in academia, so you have the label "refereed
7       articles"; is refereed articles the same as peer-
8       reviewed?
9   A   Peer-reviewed, yeah.
10  Q   And I know you mentioned that --
11  A   I could change that, but I've always use "refereed".
12  Q   But they're synonymous.
13  A   They're synonymous.
14  Q   And I was interested, I know you also mentioned that
15      you, teaching classes on this for the students who
16      are pursuing their Ph.D.'s, and what is this, tell
17      me more about what the peer-review concept, or the
18      referred-article concept, is in academia.
19  A   Well, I could certainly do that.  I've probably, you
20      know, as editor of Health Education and Behavior,
21      which is a journal for the Society for Public Health
22      Education, which is the premiere society for the
23      department that I'm chair of in public health, sort
24      of the behavioral science of public health, health
25      education.

Page 30

1           I was the editor for that for 13
2   years, and now I'm editor of Youth & Society, and so
3   I've probably been the referee for over 3,000
4   articles, actually.  And when I think about that,
5   it's like -- somebody asked me this once, that's why
6   it's in my head, 'cause, depending on the journal,
7   when I first started, I was getting about 150
8   articles a year, but by the time I was done there
9   were over 300, and the current one is about 225, so
10  if you add up all those numbers and you can do the
11  math.
12          In any event, a peer-reviewed journal
13  is basically, what an editor does, what I do, is I
14  send the journal article that somebody submits
15  independently, I don't solicit; sometimes there is,
16  and I can describe that if you want.  But,
17  typically, you write an article, or write a research
18  article, or a thought piece, or a review article, or
19  something, for the academic literature, and then you
20  send it to the appropriate audience, or the audience
21  you think is the most appropriate for the article.
22          And, you know, there's all sorts of,
23  you know, ideas, and that's something I teach in my
24  class I was talking about, about, well, how do you
25  know which journal to send it to?  And there's lots

Page 31

1   of factors that go into it.  One, is you've studied
2   the population that that journal is interested in.
3   Another one, is you want this audience to see some
4   of those ideas, 'cause they don't usually read this
5   kind of article, because most people, who do that
6   kind of work, publish over there, so they want to
7   publish in this one.
8           Sometimes you go for prestige,
9   'cause, you know, the more prestigious journals are
10  the ones that'll get noticed.  You typically want to
11  go into journals that are what's called indexed, so
12  that, when people search an article, it's in that
13  database.  If it's not indexed, it's not in that
14  database.
15  Q   Okay.
16  A   There's a few journal articles that I've published
17      like that.  There's Health Promotion Practice, which
18      is another journal of the Society for Public Health
19      Education I told you about, I don't think that's
20      indexed yet, or I think -- it's a relatively new
21      journal, and it takes a few years to get indexed.
22      Anyway, I won't go into that detail.
23          So what the editor does is, once you
24  select your journal, you then send your article
25  there.  Sometimes people write a very long

Page 32

1   introductory letter, which I read, skim.  I barely
2   read those, it doesn't really matter, 'cause I don't
3   care what they think about whether it fits.  I read
4   it and whether it fits.
5           And over the weekend, in fact, some
6   of the people sent to my journal, which is the
7   second decade of life, sent to my journal studies of
8   24-year-olds.  And I said, "Sorry, that doesn't even
9   fit, I'm not even going to send it out."  Not all
10  editors do this, but many do, they do a first
11  screening of does it fit, does it rise to the level
12  that you would at least consider it being published
13  if other people agreed.
14          I will sometimes reject a paper, or
15  not even send it out for review, if it doesn't even
16  come close methodologically, or, you know, it's
17  talking about something that's, you know, just not
18  sound either theoretically or methodologically.  And
19  I skim the article, I don't read them super
20  carefully to do that, but I skim it and I get a
21  sense of it.  So it's a relatively low bar, but
22  there is a bar, right?
23          And part of the reason I do that is
24  because reviewers are very difficult to get.  I
25  mean, you know, you're asking people to do something

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 33

1  for free and it takes some time.  It's part of the
2  business, but it's still little something like that.
3          So then I send it out to three
4  people.  And I send it out to -- not all journals
5  send it out to three people.  I actually recently
6  sent out a review back on a paper where it was sent
7  to five people.  I don't know why they sent it to
8  five people, 'cause you'll get as many opinions as
9  you send it out to, really.  It's actually quite
10  amazing when people agree.  It's kinda nice when
11  people agree.  And those decisions are really quite
12  easy, but part of my job, as an editor, is to kind
13  of referee the reviewers.  So you send it out to
14  three reviewers, typically, most journals are
15  sending out to three reviewers, and you wait for
16  them to give their comments on the paper.
17          They usually write a review, so they
18  write sometimes two paragraphs and sometimes five
19  pages, and some of them talk about, you know, you
20  missed a period and a comma, and others don't look
21  at it at that level of detail at all.  Sometimes,
22  when it's not a first English speaker, they might
23  just make a comment, "Get an English speaker to edit
24  this," and stuff.
25          And then they make a judgment about

Page 34

1  that paper, whether it should be accepted with minor
2  revisions, accepted with major revisions, or
3  rejected, or, you know, different journals have
4  different categories.  And the two journals I had
5  had actually different categories.
6          Some journals, the first one I did,
7  Health Education and Behavior, has, not only do they
8  rate at the end what is your conclusion, but there
9  were all these other ratings that were done about
10  the theory, the methods, the writing style, the
11  organization, and then, in the final analysis,
12  what's your judgment.
13          In the new journal, I don't do all
14  those, because, in the end, if you're not putting
15  that in your review, you know, it's, like, what am I
16  going to count, like you have a four, so we gave it
17  a three, I mean, and I wasn't doing all that
18  calculation.  I was reading the qualities of what
19  they said and what their bottom line was, 'cause
20  that often helped me read between the lines, 'cause
21  when somebody rejects a paper, they are usually
22  somewhat polite, but they say, "reject," right?
23          And so, you know, sometimes they're
24  not polite, and I don't ask them back, right, 'cause
25  I don't like that.  I think people should be

Page 35

1  respectful.  But that's basically the process.
2          Then what happens is you get your
3  reviews back, and the editor either tells you to
4  accept it, you know, and that's only happened to me
5  once.  I sent a journal article in and they sent it
6  back to me and said, "Congratulations, we're
7  accepting your article."  It was a pretty good
8  journal.  Somebody actually called me, who knew it
9  was my paper, who was one of the reviewers.  He
10  said, "Oh, yeah, I've reviewed that paper."  I said,
11  "Great, thanks, I had no idea.  Tell me, they're not
12  letting me do any revisions, what should I do?
13  Should I call them and say can I just read it
14  through one more time"?  And, basically, this is
15  very early in my career, he said, "No, are you
16  kidding, you should be done with it and move on."
17  But that rarely, rarely, rarely happens.  That
18  happened once, in all of the papers you see here.
19          More typically, it's revise and
20  resubmit, here's the issues that we have, and you
21  have to revise it, addressing some of the issues
22  that they raise.  And sometimes they're all over the
23  place, and sometimes they're lamebrain, and
24  sometimes they're right on, you know, and you read
25  them and you think, oh, God, you know, these guys

Page 36

1  are just hideous, they don't get it.  And then you
2  read back through the paper, and you see why they
3  didn't get it, because typically it's 'cause you
4  didn't do a good enough job explaining something or
5  you left something out, right, but your initial
6  reaction is that.
7          Then you revise it, you send it back
8  in, and you explain what you changed and how you're
9  responsive.  And you're a little fawning, Oh, there
10  was terrific comments, really made it a better
11  paper.  And then the editor either sends it back out
12  or decides for him or herself whether or not that's
13  good enough.
14          And I would say, when I edit an
15  article, I'd say probably at least half go out a
16  second time, maybe more.  Maybe it's more like
17  75 percent I send to some of the reviewers again.
18  If one reviewer says accept with minor revisions,
19  another one says accept with major revisions, I'll
20  probably send it to this person, not this person,
21  right?  I'll send it to the major revision person,
22  not the other person.
23          And that's the process, and it's
24  excruciating sometimes.  I mean, I have probably
25  about 20 percent of my articles that I, not that

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

## Page 37

1 I've written, but that I have been the editor for,
2 25 percent, maybe a quarter of them, I send out
3 again and they have to do another round of
4 revisions, so, you know, one in four does two,
5 sometimes three revisions. There's always some last
6 things, but sometimes there's substantive revisions.
7 A lot of, you know, about 65,
8 75 percent, they do their revision, I send it out to
9 reviewers, the reviewer say, Oh, that's really good,
10 I'm ready to accept it, but there's a couple little
11 things, there's a whole other class, there's about
12 the largest number that happens to, they have to do
13 a little bit more, but it's more clarification kind
14 of stuff, or cutting a table out, or minor stuff,
15 but it gets accepted. And then there's, like I
16 said, 25 percent that actually have to maybe redo
17 analyses, that could happen too. Longwinded way of
18 telling you that it's a long arduous process that
19 takes months.
20 Q   And the benefits of this process, it sounds like,
21     it's fair to say, are that you receive feedback both
22     on your methods and the way that you explained your
23     study from other people who are qualified in some
24     way in the --
25 A   That's right. That's right. And I try to find

## Page 38

1 somebody, who has a methodological expertise and
2 then somebody who has a substantive expertise. So
3 if I got a sexting paper, for example, I may not
4 have somebody who says I'm a sexting expert, but
5 they might say I'm an expert in, you know, internet
6 and technologies and technological communications,
7 and that sort of thing, and I might pick that
8 person.
9 If it was a survey study, I'd pick
10 somebody who, you know, had some -- most everybody
11 has some kind of survey experience. If they did
12 some fancy statistical method, I'd try to find
13 somebody who has that fancy statistical method.
14 Q   Do you ever rely on nonpeer-reviewed sources in your
15     line of work?
16 A   In terms of what I write? Yeah, you know, we often
17 do, because there's a lot of government reports that
18 are not peer-reviewed. And we're often saying,
19 like, yeah, youth violence is a problem, and it's a
20 public health problem, and it is the number one
21 cause of death for African American kids. It's the
22 number two cause of death for all kids. And
23 violence is the top three or four for almost all
24 ages until you get very old, so, you know, those
25 data are not peer-reviewed. Those data are not

## Page 39

1 necessarily also perfect studies, but it's the best
2 we have. And it's the national data that the
3 federal government puts out there, so, yes, we do
4 that.
5 And sometimes, like in this instance
6 on this case, there's so little out there that we
7 actually, you know, had some papers that were not
8 peer-reviewed. And occasionally, rarely, but
9 occasionally, in my case, but occasionally you'll
10 see people will cite newspaper articles. Are those
11 peer-reviewed? They are in a sense, in a
12 journalistic sense, but they're not in the sense I
13 just described, right?
14 Q   Sure.
15 A   So, yes, that's not an uncommon practice at all,
16 really.
17 Q   Is it more common where there's a lack of
18     information to rely on nonpeer-reviewed sources?
19 A   I'm not so sure that's true, because, again, if it's
20 a federal government report, that's not necessarily
21 peer-reviewed, and, you know, there's a lot of that
22 out there. You tend to see more citations of less,
23 you know, nongovernmental, nonpeer-reviewed things
24 when there's less literature about it at all to give
25 you any sense of what's going on, you know.

## Page 40

1 When you're doing the first study of
2 it's kind, you know, you're looking under the rug
3 for things, because you want to sort of put it into
4 context. I mean, it's nice that you don't, because
5 then it's a really unique contribution, and that's
6 the criteria, is it a unique and significant
7 contribution. If you don't reach those two things,
8 especially in my journal, if I read something and I
9 think this is, like, old stuff, we know this
10 already, why do we need to spend anymore journal
11 pages on this, or it's not something new or
12 interesting twist to it, you know, it doesn't have a
13 chance.
14 So, you know, that's a good thing,
15 but it's a bad thing, because you have nothing to
16 base it on. You have nothing to kind of juxtapose
17 what you're doing and why you're doing it. And
18 that's always good, because you want to, our
19 business is all about programmatic research. It's
20 all about one study building on another and a body
21 of evidence, you know.
22 I mean, I've been thinking about that
23 a lot. I mean, this is why Silver was so good at
24 predicting the outcome, is what he did is he took
25 all these surveys and he used the surveys as the

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                           4/29/2013

Page 41

1    data.  I don't think he collected any data on his
2    own.  He looked at the surveys, looked at their
3    standard of error, and had an algorithm for figuring
4    out, well, if this is the range of surveys, that's
5    my sample, then the range of outcomes could be this,
6    and if I calculate, you know, error variance and all
7    that, this is what I'm guessing, and he had a
8    probability.  And as he got closer and closer, he
9    got closer and closer to his probability; I mean,
10   this is why he's a star, 'cause he predicted it to
11   the "T."
12   Q    You just used a phrase that I wanted to ask you
13        about, I think you said "standard of error"; is this
14        the same thing as a margin of error?
15   A    Yeah, right, it is.  Statistically speaking, it's a
16        slightly different thing, but it is.  You're going
17        to ask me the formula, I'm not going to be able to
18        give that to you, but, yes, a standard error is what
19        the plus and minus margin is based on.  It's the
20        fundamental piece that is used to calculate it.
21   Q    And the plus or minus margin of, what?
22   A    Of error of your estimate.
23   Q    Okay.
24   A    So in the polling, which is not peer-reviewed, by
25        the way, in the polling for the presidential

Page 42

1    election, you know, they'll say plus or minus, this
2    is the error rate that we think we are.  So when
3    they say it was too close to call, two or three
4    percentage points is too close to call, they usually
5    say, because it can go in either direction.
6            And what you do is plus or minus,
7    right, so if, you know, 20 percent are saying "X"
8    and it's plus or minus two percent, then 95 percent
9    confidence interval, and 95 percent probability that
10   you will not make a type one error, is 18 to 22, but
11   the mean is 20, and that's what we're going to
12   report.  The 95 confidence interval is one in 20
13   chance of making type one error, which is a
14   false-positive.
15   Q    So, in other words, with a 95 percent confidence
16        interval and a margin of error of plus or minus two,
17        when the estimate is 20 percent, you're 95 percent
18        certain that the result is between 18 and 22; is
19        that correct?
20   A    Um-hum.  Yes.
21   Q    It's been awhile since I've taken statistics, so I'm
22        trying to refamiliarize myself with these concepts.
23   A    Beside, you're an attorney.  You don't pay attention
24        to this stuff in the same way.
25   Q    A lot of attorneys say we don't do math.  I try to

Page 43

1    do some math at times, but I don't like that
2    attitude.
3    A    I didn't mean to disparage the profession.  It's
4         just, I mean, it's what I do for a living.  It's not
5         what you do for a living.
6    Q    Correct.
7    A    That's what I mean.
8    Q    Sure.  Confidence interval was another term I've
9         read that I'm interested in hearing more about from
10        you.  So the confidence interval is the percentage
11        at which you are certain that the result will fall
12        within this particular range; is that correct?
13   A    Yeah, sure.  Yes.
14   Q    Is there a better way to say that?
15   A    I don't know.  You know, I'm hesitating partly
16        because it kinda depends what you're studying.  You
17        know, when you're looking at a relationship between
18        two variables, 'cause, like, in the polling that
19        they do like for the presidential election, or
20        whatever, there's not two variables.  It's, like,
21        this is what we estimate people are predicting are
22        going to vote, and then this is why we think the
23        outcome is going to be within that range.
24            When you look at it for between two
25        variables, you're going to say, is that correlation?

Page 44

1    And it could be eight variables, 12 variables,
2    right?  Is that correlation, or the association
3    among those variables, is it within that 20 percent,
4    within that 95 percent confidence interval, which is
5    one in 20 that you'll say that it's significant
6    when, in fact, it isn't.
7    Q    And is a 95 percent confidence interval the optimal
8         confidence interval?
9    A    It's the paradigmatic one.  It's the one we all hang
10        our hat on; however -- I mean, in a way, I'm going
11        to shoot myself in the foot here -- however, there's
12        lots of debates; in fact, a former chair of our
13        philosophy department talks about, it's the 0.05
14        level, "p" is less than 0.05.  That's the paradigm.
15        That's the gold standard.  That's what we all have
16        used.  And so we continue to use it, because
17        somebody came along and said that's the one we
18        should use, but a lot of people try to sneak in and
19        talk about 0.01 as, so that's the 90 percent
20        confidence interval.
21            And, frankly, when you think about
22        it, if you were going to bet on a horse, go to the
23        race track, and you were 90 percent confident that
24        this horse was going to win, not that you're a
25        gambling person, not you personally, but the general

HURON REPORTING SERVICE   huron4deps.com
and Video Conferencing Center   734-761-5328
Established in 1972

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 45

1   person, you know, you would say I think I'll bet on
2   it, you know, or if I'm 95 percent confident that,
3   if I go that way, or 90 percent confident if I go
4   that way it's going to take twice as long, I'm going
5   to go this way, right, even though that'll cut my
6   time even further if I could go that way, but I'm 95
7   percent sure, or 90 percent sure, or 85 percent
8   sure. But for some reason we use 0.05, because
9   that's what we tolerate, and that was, long ago,
10  somebody, and I don't know the history of that, has
11  created that as the magic number.
12  Q   And when you say, "we," you mean people in academia.
13  A   Behavioral scientists, statisticians. It's more
14  behavioral scientists. Statisticians are numbers
15  people, and, you know, we're substantive. And I
16  don't mean that they're not substantive, I didn't
17  mean to say that.
18         But we are interested in the
19  association of, for example, parental support and
20  youth violence, and so how do we know there isn't an
21  association? Well, the field has accepted
22  95 percent, so if my correlation is in between that
23  95 confidence interval, I can now talk about it
24  legitimately, it's acceptable. But I can still, one
25  in 20, I have a five percent of actually being

Page 46

1   wrong, hence the importance, and this is what I
2   really stress in my classes, hence the importance of
3   multiple studies, right?
4          And so you look at multiple studies,
5   and if five studies have found the range to be, you
6   know, in that 25 percent confidence interval, then
7   you can probably more confidently, I would say, more
8   confidently, say that parental support is correlated
9   with violent behavior, negatively presumably, right;
10  more support, less violent behavior.
11         A single study, while I write about
12  that, I'm adding to the literature, you know, is
13  sometimes, you know, well, let's get more evidence
14  for that. It might depend on how you measure it,
15  might depend some issues about your sample. Every
16  sample could be, you know, questioned.
17         In fact, that's another point I make
18  in my methods class, and, that is, there's no
19  flawless studies. There are no perfect studies.
20  And that's why programmatic research is so
21  important, right, because every study is -- you
22  could shoot holes in every study, because it might
23  be the way you answer the question, your response
24  rate, your statistical technique; I mean, there's
25  all sorts of things that, you know, are addressed.

Page 47

1          In fact, as an editor, one of the
2   things that I require is a discussion of study
3   limitations and why it's not a fatal flaw of the
4   study, so, you know, I do that in my studies, too;
5   if you read my paper, you saw that.
6   Q   The limitations usually seems like it's the last
7   section of an article describing a study.
8   A   Typically. I have to say, I try not to do this. I
9   may not always succeed, but I don't like to look
10  back and read what I've done, 'cause it's kinda like
11  Woody Allen. I don't know if you know this, but
12  Woody Allen doesn't look back at his movies. He
13  said, I guess, he did it once, and it was like he
14  was horrified. And, actually, I did the same thing.
15         I looked back at one of my papers,
16  because people seemed to be misquoting me, and then
17  I looked back, and I'm, like, oh, I understand now
18  why they misquoted me, why they're misquoting me,
19  because they're not really misquoting me, even
20  though that's not what I meant. So I subsequently
21  wrote some other papers about that, but what I also
22  became, and I think with my students that I'm
23  notorious for this, is I'm pretty stickler for what
24  words you actually put on the piece of paper, and
25  they don't always get why. So, you know, I don't

Page 48

1   really look back.
2          But I try to not have the limitations
3   at the end, because I don't want someone to leave
4   reading the paper with, oh, the limitations. And I
5   tell that to my authors, too, when I say, okay, add
6   limitations, but, I think you might agree, that's
7   almost my language, I think you might agree, it
8   might be better to end with a summary of what the
9   contribution of the paper is rather than on the bad
10  note of what the limitations are, because all
11  studies have limitations. All studies have
12  limitations.
13  Q   Sure. It's a stylistic choice about how you write
14  your article.
15  A   Right. Exactly. Sorry if I'm talking too much.
16  Q   Nope. Another term you use, that I've come across
17  and was interested in finding out more about, is
18  sample of convenience, and I think you used that in
19  reference to some of the studies you've done, the
20  population of the study was a sample of convenience;
21  what is a sample of convenience?
22  A   Well, you know, I have a different attitude about
23  this than, what I call, strict constructionists. In
24  the law profession, a strict constructionist around
25  the Constitution is what did they really mean when

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

1  they wrote the damn thing?  "They," the founding
2  fathers, and the darn thing, the Constitution, which
3  is really wonderful, is, you know, there are, and
4  I've had this attitude for a long time, you know, a
5  strict constructionist statistician, for example,
6  would say these are the assumptions that we must
7  make to use these statistics, and, if you don't have
8  those assumptions, you cannot do those statistics.
9          The field and the journal articles in
10  the United States and around the world are filled
11  with violations of those assumptions.  I could
12  probably pick up the most prestigious journals that
13  exist and show you that those assumptions are
14  missed.
15          And one of the reasons why is because
16  statistics, some of the multivariate statistics and
17  parametric statistics, which are used to sort of
18  take from your sample and assume that you have some
19  population that you're referring to, they're robust
20  against many of the assumptions.  If you have too
21  many, it's not so good, but, you know, if there's,
22  you know, a few, one thing wrong, one assumption
23  that's incorrect, then you could probably overcome
24  that and it's not the end of the world, okay?
25  That's what I'm referring to as a strict

1  constructionist.
2          One of them, for example, is
3  something called multivariate normality, that all
4  the variables are normally distributed.  Well, you
5  know, that's very rare.  I mean, the strict normal
6  distribution is where the mean, the median, and the
7  mode, and it's the perfect bell curve.  Data don't
8  come out that way.  We're human beings, you know, it
9  doesn't usually come out that way, because you can't
10  have the whole population.  You're always stuck with
11  some way to get data from people that hopefully
12  represents the population you want to know something
13  about.  There is no perfect sample frame, there just
14  isn't.
15          Even if you knocked on every door in
16  the neighborhood, you know, people might not be
17  home, so you have to have algorithms, well, if
18  they're not home, what do you do?  When you go door
19  to door, there's a whole protocol that you use.
20  You're looking for the man of the household, and you
21  knock on the door, there's no man there, what do you
22  do?  You go to the next house.  If you get 'em, you
23  go to the next block.  And there's all sorts of
24  algorithms, but there's all sorts of problems, and
25  there's always limitations, and stuff happens,

1  right?
2          You could be in a neighborhood where
3  there's very few male head of households, then what
4  do you do?  Then all of a sudden there's a little
5  hole in your geographic distribution of your date,
6  right?  You live with that.  You have to live with
7  that, 'cause, you know, we're limited by our sample
8  frame, and -- you know what that is, right?
9          We used to do random digit dial.
10  Well, random digit dialing doesn't work so well,
11  especially these days, because of cell phones.  I
12  don't know what your area code is, but I bet it's
13  not (202).  Is (202) Washington D.C.?
14  Q   It is, yeah.
15  A   I used to live there.  I can't tell you how many
16  people I know that I call them, I'm, like, where did
17  you used to live, which is where they got their cell
18  phone, they never changed their number, 'cause it
19  doesn't matter anymore.  That was different when I
20  was your age, right?  I mean, people had landlines
21  and that's where they lived, and then you could do
22  random digit dialing, but there are lots of
23  limitations with that as well.
24          Mail surveys are notoriously not
25  doing it.  So we were left, in terms of the study,

1  and I've kind of anticipated some of your questions
2  later, so we were left with, you know, let's try
3  this different method, because, going forward,
4  phones are going to be less likely, 'cause people
5  will look at their phone, they'll see they don't
6  recognize the number, and they're not going to
7  answer it, you know, so which is also a new
8  technology, right?  Even at home they can do that:
9  I don't know who that is.  I mean, my mentor, I have
10  to start talking into his answering machine for him
11  to pick up the phone, 'cause if he doesn't recognize
12  the number, he says now he's getting used to
13  recognizing my area code, but, you know, anyway,
14  it's an interesting phenomenon.
15          I don't know why I kinda went into
16  this.  This is what happens to me when I lecture
17  sometimes, too, but, you know, methodologically, you
18  know, we have strict constructionist, and we have
19  people, who are a little bit loser, and the reality
20  is somewhere in between.  The ideal is virtually
21  impossible, I might even argue impossible, 'cause
22  let's say you did random digit dialing, what about
23  people who don't have phones?  You can't generalize
24  to them.
25  Q   When you said the ideal of obtaining the perfect

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 53

1  sample --
2  A   The perfect sample, the perfect study, which is,
3      again, why, which is where the train of thought was
4      going, which is exactly why this idea of
5      programmatic research and the idea of multiple
6      studies, I mean, that's when we get confident.
7              When we have multiple studies more or
8      less saying the same thing, and even if there's a
9      range, you can actually look at those studies and
10     calculate the standard error of that range, and the
11     variation of that range.  That's what Silver did,
12     right?
13             So think about this for a minute.
14     It's a little bit different, and it's hard for me to
15     get to the Ph.D. students, so, I mean, you're a
16     smart person, obviously, but you don't even think in
17     these ways, but, you know, these guys try to think
18     in these ways.  When we have a variable, let's say
19     sexting; you know, let's say we asked about sexting
20     and we asked not yes, no, but we asked the question
21     of, you do it a little bit, you do it a little bit
22     more, you do it about average, you do it a little
23     bit more than average, you do it a lot, on a scale
24     of one to five.
25             Well, there's going to be a range of

Page 54

1      people who give that score, so you can get a mean
2      across people.  So you have 100 people and they've
3      answered this question, and the mean would represent
4      is the best number to represent that 100.  It might
5      be a number that none of them have, but it's the
6      best number that represents the central tendency of
7      that group.
8              Then there's the measure of
9      variation, which is variance, what's the variance
10     around that number?  And if there's zero variance,
11     everybody has that number, which is impossible,
12     because we're human beings, right?  The variation
13     across that is, we typically call it standard
14     deviation, and, you know, that's the variation
15     around that mean, and that kinda gives you the sense
16     of that variable in that population.
17  Q   I wanted to go back when you were talking about the
18      importance of having multiple studies and how that
19      can bolster you trying to determine a prevalence
20      rate, correct, right?
21  A   Um-hum.
22  Q   Multiple studies can bolster the --
23  A   Prevalence rates are also just the correlations or
24      the findings, right?  Again, you know, the study
25      that we actually did in sexting, we were less

Page 55

1      interested in the prevalence of sexting than we were
2      with does this relate to, you know, mental health
3      problems or psychological, or does it relate to sex
4      risk.
5  Q   Sure.
6  A   That was our question, really.  But, yes, your
7      answer is "yes."
8  Q   Let me ask it in a different context.  If you had,
9      say you had ten studies that all were trying to
10     determine the prevalence rate for young adults and
11     marijuana use, and the range of prevalence rates
12     spanned, you know, maybe 20 --
13  A   From zero to 100.
14  Q   Well, maybe a little bit more --
15  A   20 to 50.
16  Q   Yeah, somewhat like a limited set, and they were,
17     you know, spread out over that range, what would you
18     do to, would you be able to make an estimate of the
19     prevalence rate of marijuana use among young adults?
20  A   This is not work that I do, but there is an approach
21     to do what you just described.  And I'm pretty sure,
22     although he's never shared it, this is what Silver
23     has done, is he looks at the range of opinions, of,
24     you know, how you're going to vote, he looks at
25     everybody's studies, and there's going to be some

Page 56

1      better than others, but the range will come out
2      there, and then he knows their standard error, or
3      their plus or minuses, and he has some algorithm
4      that he's used to, and I don't think it's magical, I
5      haven't looked it up, to calculate that, so the
6      answer is, "yes."
7              Now, back up for a minute, is how
8      many studies do you need to make a good estimate,
9      and what are the qualities of the studies?  When
10     people do literature reviews, and they're doing
11     literature reviews to actually get at some sense of
12     what is the range based on these studies, they do
13     they have some criteria they use to select them.
14             They might, for example, not include
15     any nonpeer-reviewed articles, and that's typical,
16     actually.  I don't think anybody would do a sexting
17     study at this point, because there's just too few
18     studies, right?  And, you know, when Silver did his
19     thing, it might have been, you know, there might
20     have been 20, or 15, or 10 studies, or polls.
21             When people do these kinds of
22     reviews, there's usually, you know, tens, maybe
23     hundreds of studies that they then glean to say
24     we've picked the cream of the crop, the best ones
25     methodologically based on these criteria.  And even

HURON REPORTING SERVICE   huron4deps.com
and Video Conferencing Center   734-761-5328
Established in 1972

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 57

1    if they may only do 30 of those, they're sort of
2    cherrypicking the tops, and then they're making an
3    estimate from that.
4  Q  Okay.
5  A  Does that make sense?
6  Q  It does.  Are there other criteria that someone
7     would look at, other than whether the article is
8     peer-reviewed?
9  A  Well, yeah, and it depends on what they're doing.
10    So if they're looking at the effectiveness of an
11    intervention, let's say, of a strategy, of a change
12    strategy, they might pick only ones that have done,
13    you know, a controlled experiment.  They won't look
14    at sort of a qualitative assessment, or they won't
15    look at a one-sided analysis.  They'll say, We're
16    going to get rid of all those; we're only going to
17    look at the ones that have a randomized controlled
18    design.
19         Rarely are there that many that are
20    randomized control designs.  So what they do is they
21    try to say control group designs.  If they don't
22    have those, or very many of those, they end up with
23    only five of those, they might expand their criteria
24    so they can have a larger data set to look at.  Then
25    they talk about that, well, we didn't have very many

Page 58

1    that had the top of the line kind of design, so this
2    might be eliminated, but this is what we know at
3    this moment.
4  Q  But it sounds like the important thing is that, when
5     you're selecting the studies, is to have some sort
6     of criteria and make sure each of the studies you
7     selected meets those criteria.
8  A  Correct.  And those criteria, like I said, could
9     vary.  If it's a survey study, it might be a study
10    that doesn't include people with blue hair, or it's
11    a study, studies have to be at least samples of 200
12    or more, or something.  It can't be so unique that,
13    it's not just your own friends that you include to
14    get an assessment of, you know, how wonderful you
15    are.  You know what I mean?  So there would be
16    different criteria about how representative the
17    sample might be, or, you know, something like that.
18 Q  I wanted to go back.  I think I asked this question.
19    I just wanted to make sure I understood your answer.
20    So what to you, in the way that you may not be a
21    strict constructionist, what to you is a sample of
22    convenience?
23 A  Well, I mean, I'm saying I'm not a strict
24    constructionist, but I like to think myself closer
25    to that side than, you know, the complete

Page 59

1    convenience side.  And, you know, it's sort of like,
2    it's kind of like the supreme court justice, and I
3    don't remember who it was -- maybe you do, or you
4    do, I don't know -- who said, "I don't know what
5    pornography is, I can't define it, but I know it
6    when I see it."  So I know a convenience sample when
7    I see it.
8         I would argue, though, from a strict
9    constructionist point of view that every sample has
10    some convenienceness attributes.  So a very
11    convenient sample would be you just asking the
12    people that it's easy to get, that you see during
13    the day, or you sit on the street corner; there's no
14    sort of sense of it's some kind of systematic
15    approach, right?  I mean, there's systematic samples
16    that a strict constructionist would say, That's a
17    convenient sample.  Well, yeah, it's a convenient
18    sample.
19         Telephone surveys are convenient
20    samples, strictly speaking, because if you're using
21    the telephone, you gotta have a telephone, and who
22    are the people who don't have telephones, right?  If
23    they're randomly represented in the population,
24    doesn't really affect you so much, but if they tend
25    not to have money, they tend to be poor people, then

Page 60

1    you have a sample that's not representing those
2    people.
3         You know, behavioral science is an
4    interesting thing.  People think, oh, it's a soft
5    science, it's easy.  It's actually more difficult,
6    because we have to defend it more.  You know, if we
7    were doing something like, you know, the principles
8    of a material, you know, it's easy.
9         When I was talking to my friends, who
10    are my softball teammates, they're astronomers, I'm,
11    like, How do you know that that's all there are, you
12    know, metals, couldn't we discover metal out there?
13    They're, like, What, are you crazy?  We know the
14    atomic weight of things, Marc.  I said, Well, how do
15    you know about that star that's, like, you know,
16    four billion miles away or 100 billion light years
17    away?  Well, spectormetry, and we know what
18    different colors would be relating to the periodic
19    table, so we know that's an iron planet, we know
20    that one is made of this, and we know these
21    characteristics.  We may not be exactly right, but
22    that's how we know.
23         Well, people, I mean that's
24    impossible.  And, you know, you do a door-to-door
25    survey, well, what about the hermits who don't live

HURON REPORTING SERVICE   huron4deps.com
and Video Conferencing Center   734-761-5328
Established in 1972

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                    4/29/2013

---

**Page 61**

1  in the world?  You could argue, well, they're really
2  special different people anyway, and I would argue
3  that, but a strict constructionist would say you
4  gotta get some of them in your sample, right,
5  because, otherwise, it's not a strictly random
6  sample.
7          So everything is how far from that
8  are you willing to live with to make, you know, and
9  so I live with it somewhat further away than others.
10  My studies, I built my career on this study up in
11  Flint, you know, that was, you know, a very unique
12  sample.  It was 850 kids, who had a "B" average or
13  lower, but, basically, what I would say, in the
14  convenience sample, is this is who it relates to; it
15  relates to urban kids, who are not doing well in
16  school.  Actually, it relates to urban kids, who are
17  not the best students in the school, you know, so
18  it's a little broader.
19          So what I do is, even when I have a
20  very convenient sample, which I don't usually have
21  very, very convenient samples -- I don't do the
22  street corner type stuff -- what I do is I just make
23  sure, if that's my sample frame, that's who I'm
24  going to generalize to, and I try not to generalize
25  to everybody else, right?  And I try to be careful

**Page 62**

1  about that.
2          One of the things I say is, The
3  limitation of our study is this.  To go to the
4  sexting paper, you haven't asked me, you might, I
5  would say our sample, because the way we sample it,
6  it relates to only young adults who use a computer,
7  who are connected to internet, right?
8          I would argue that those are,
9  however, the people, who are more likely to sext.  I
10  mean, those things are correlated, those things are
11  highly correlated.  Cell phone, texting, in general,
12  computer connection, those things are correlated.
13  There's very few people who don't do both.  My wife
14  does both and she still has the Spock Star Trek flip
15  phone and she texts and she uses the internet,
16  so. . .
17  Q  But it's fair to say you should, it's important to
18     understand the sample frame, as best as you can, and
19     to be careful not to generalize the findings --
20  A  Beyond that.
21  Q  -- beyond the frame.
22  A  Right.  You could sometimes make a case for why you
23     think that frame is more representative than just
24     that frame, and I would, for our study, honestly.  I
25     wouldn't go too widely beyond, but it's probably --

**Page 63**

1  and there's reasons for that.  One, is the way we
2  did our sampling.  In other words, we started with
3  people, who use the internet, but we could have very
4  easily gotten people who didn't use the internet,
5  right, or didn't use the cell phones, or don't use
6  those things, you know, and we corrected for that.
7          So I actually would say ours goes a
8  little bit beyond, you know.  In terms of is it the
9  perfect sample?  No.  But, actually, we're going to
10  use the technique again.  It's a great way to get a
11  national sample.
12  Q  And just so I'm clear on the sample of convenience,
13     it sounds like what you're saying is that there's
14     almost like a spectrum.
15  A  Yes.
16  Q  And so at one end is the perfect random sample
17     and --
18  A  Which is almost impossible to attain.
19  Q  Almost impossible, so just depends on where your
20     study falls along that spectrum.
21  A  That's right.
22  Q  It depends on how convenient the sample was.
23  A  Exactly.  A very convenient sample, for example,
24     would be, and there's a lot of criticism in the
25     literature, would be a sample of Psych 100 students,

**Page 64**

1  right?  I've done one study with that, maybe two, in
2  my career.  One was my dissertation, another one was
3  something it was appropriate for.
4          If you're interested in, you know,
5  undergraduates, that is the population.  I tend to
6  not be so interested in undergraduates, which is why
7  I don't sample that, but if you do, if you are, that
8  might be an appropriate place to go.  I would argue,
9  though, if you want to go to classes, don't go just
10  to psychology classes, go to economics and go to
11  engineering, so you can get a range of kids there,
12  too, but. . .
13  Q  Because even within an undergraduate population --
14  A  There's variation, right.  That's right.
15  Q  So when you said that the samples of undergraduate
16     psychology classes are very convenient, does that
17     mean, if a person had findings from that type of a
18     sample, they should be careful not to generalize
19     beyond undergraduate students in psychology classes?
20          MR. BAUMGARDNER:  Objection.  You can
21     go ahead and answer.
22  A  It would depend on the question.  If you were
23     studying how a brain operates, right, for a person
24     who is of a range of normal intelligence and, you
25     know, abilities, you know, not necessarily the 32 on

HURON REPORTING SERVICE    huron4deps.com
and Video Conferencing Center    734-761-5328
Established in 1972

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 65

1   the ACT kind of person, but somebody who is
2   functioning well, and that's what you're studying,
3   like memory processes, you could generalize beyond.
4   You wouldn't be able to generalize to somebody with
5   Alzheimer's, or somebody my age, because we just
6   have more wires that cross and whatnot, so I
7   wouldn't even say carte blanche what you said was
8   necessarily true.
9                (Discussion off the record.)
10  BY MR. SWINTON:
11  Q   If there was a prevalence rate of marijuana use
12      among young adults, for example, based on a study of
13      undergraduates in psychology classes, is that
14      prevalence rate generalizable only to undergraduates
15      in psychology classes?
16               MR. BAUMGARDNER: Objection.  Go
17      ahead.
18  A   Strictly speaking, probably, but you could probably
19      make a case, depending on what university you're at
20      and how many Psych 100 classes you've collected data
21      from, whatnot, yes.  What happens is, at least this
22      is also what I do with my own work, is I try to make
23      a logical rationale for why it might either be an
24      underestimate or an overestimate, or why it might be
25      an accurate estimate.

Page 66

1                So in the example of marijuana use
2   for kids, you know, or -- I say kids, for young
3   adults in college -- I think you could probably say
4   it's generalizable to kids in college, but you,
5   know, it might be an underestimate, I don't know.  I
6   don't know the answer to that question.  I'm going
7   to give you a quiz when we're over, by the way.
8                (Discussion off the record.)
9   BY MR. SWINTON:
10  Q   One more question about some terminology, the term
11      response rate; what is a response rate?
12  A   Response rate is also not always clear.  I'm trying
13      to think of, in my class, how I defined response
14      rate.  I mean, strictly speaking, the response rate
15      is the number of people you've got to answer you,
16      whatever way you're doing it, telephone, whatever,
17      divided by the size of your sample frame; however,
18      sometimes that sample frame is not known exactly.
19               And in terms of telephone surveys,
20      for example, you know, if you're doing random digit
21      dialing and you call Fred's Pizza, but you don't
22      want to talk to a business, does that count as a
23      response, non-response, irrelevant?  And so what you
24      tend to do is -- even response rates are:  We made
25      this many phone calls; this many were irrelevant;

Page 67

1   this many we reached, you know.  And so what's the
2   response rate from the number of people reached is
3   different than the response rate from the number of
4   phone calls I made.
5                So, for example, if I know I'm going
6   to make 300 phone calls, and I end up with 10
7   people, my response rate would be 0.03, I think, if
8   I did the math right.  But if the other 250 were all
9   the businesses that I just happened to be calling,
10  you know, or whatever, then my response rate might
11  be 10 over 40, or 10 over 20, you know, or 10 over
12  12.  So the response rate -- but, strictly speaking,
13  it's responses divided by sample frame.
14  Q   And is it an important measure to have when you're
15      looking at a study?
16  A   Sometimes, when you can.  Sometimes you don't know
17      exactly what the response rate is because of the
18      nature of the study that you've done, but response
19      rates are important, yes.
20  Q   And so what do they tell you about the way the study
21      was conducted?
22  A   They can tell you how representative your sample is
23      of your sample frame, but I wouldn't say that not
24      knowing a response rate would mean the study is not
25      useful.

Page 68

1   Q   If there is a non-response rate, is there a number
2       that, a certain percentage, that you look for that's
3       optimal, like there was with the confidence
4       interval?
5   A   Well, again, it depends on your method.  I mean, you
6       know, acceptable for phone surveys these days?
7       20 percent.  I mean, that's one of the reasons why
8       we did our study, because that's, you know, one in
9       five people that you get on the phone?  I mean,
10      people don't want to talk to you on the phone for a
11      survey 10 minutes, 15 minutes.
12               I mean, I don't know how many phone
13      calls you ever got like that.  Sometimes you don't
14      know why they're calling; you know, there's a lot of
15      distrust about research.  There's all sorts of
16      reasons why people don't respond, you know, but 20,
17      25 percent is about as good as you can get with
18      telephone surveys these days.
19               Mail surveys, if you get 50 percent,
20      you could probably publish that.  So response rates
21      vary.  I mean, I don't know that I want to go on
22      record as saying what's the ideal response rate.  It
23      kind of depends on your method.
24               And I have to say our method, you
25      know, we don't know the response rate necessarily,

HURON REPORTING SERVICE   huron4deps.com
and Video Conferencing Center   734-761-5328
Established in 1972

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 69

1     but that doesn't mean what we have isn't useful and
2     representative of some population, right? I don't
3     think that not knowing a response rate makes a study
4     irrelevant. And I think you could probably find
5     lots of examples in the literature where that was
6     the case. I'll just stop there.
7   Q   Okay. Another thing I wanted to ask you about was
8     using secondary sources. In your field, when you're
9     drawing a conclusion about something, is it
10    important to -- let me ask the question in a
11    different way. In your field, in behavioral
12    sciences, is it important to verify that secondary
13    sources are properly using primary source material?
14        MR. BAUMGARDNER: Objection. Can you
15    just define "secondary sources," 'cause I know that
16    has kind of a meaning in a legal context, just to
17    make sure that --
18  A   I could tell you what it means -- tell me what you
19    really mean.
20  BY MR. SWINTON:
21  Q   I'm thinking a secondary source would be, an example
22    would be a study that you didn't perform, so if you
23    were looking at an article about a study that you
24    weren't involved in in any way.
25  A   Okay. 'Cause, in our field, is people who do and

Page 70

1     analyze Uniform Crime Report data. Do you know what
2     that is?
3   Q   I don't.
4   A   The FBI estimates, you know, crime in the United
5     States, and where do they get the data? I mean,
6     they actually, police chiefs are supposed to report
7     the data. Well, not all police chiefs always report
8     the data. They don't have really any way to make
9     them do that. So they get the data back from the
10    police chiefs, who send it to them by the date that
11    they're supposed to get it. And you can imagine the
12    difference of those data across different places.
13        That data, by the way, response rates
14    are not necessarily known or calculated. That
15    Uniform Crime Report is data that guides all sorts
16    of policies in the United States, and in the states
17    individually, and I don't think locally probably,
18    'cause people only care about local data. Something
19    else about a national data set that's sort of
20    interesting, is it may not represent any community
21    where you're actually doing work. But, anyway, that
22    data set now exists, and is available,
23    de-identified, of course, and people analyze that
24    data. That's called secondary data analysis, in my
25    business.

Page 71

1         Primary data analysis is when you
2     collect the data yourself and then analyze the data.
3     My study of the Flint kids, I told you, since 1994,
4     the first four years has now been made public at the
5     ICPSR, which is housed at the University of Michigan
6     in the Institute for Social Research, and anybody
7     who analyzes that data that is basically going to be
8     doing secondary data analysis.
9         So when you say that, that's what I'm
10    talking about, and lots of people do that. Lots of
11    people also then look at other peoples' research to
12    make a case for their own research. That's another
13    source, another way maybe you might be thinking of,
14    and we all do that. We have to do that. That's
15    part of our science, because, what I was saying to
16    you before about, you know, how does your science
17    add and make a significant contribution, but how
18    does it also relate to what we know.
19  BY MR. SWINTON:
20  Q   Sure.
21  A   Your philosophy person would say, well, that means
22    we're always going to be limited by what we know
23    because we're always looking at what we already
24    know, and there's actual truth to that. And this is
25    why Thomas Kuhn wrote the book Structure of

Page 72

1     Scientific Revolutions, because he said, when
2     knowledge really gets developed, is when we come to
3     a dead end with our knowledge, right?
4         I don't think we'll run into that
5     problem. That was certainly true of the physical
6     sciences. I don't think we'll so much run into that
7     problem with human beings, because there's new
8     technologies; we're starting to map the brain. I
9     mean, I think the next generation is going to be
10    able to look at parts of the brain and behavior.
11    We're not there yet, necessarily. But, anyway, so
12    now ask your question given that you know my context
13    of what you mean.
14  Q   Yes, I was wondering, when you're looking at
15    somebody else's research, what are the types of
16    things that, when you're looking at someone else's
17    research, are there certain things you do before you
18    incorporate that into your own work?
19  A   Yeah. I mean, what I do is I look at what other
20    people have done and I try to add to that knowledge
21    in a new and significant way that is incremental,
22    you know. And sometimes it's very small, and you
23    have a harder time publishing those kinda studies,
24    you have to go to pretty specialty journal, and
25    sometimes it's very large. And I actually think the

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 73

1   sexting paper is a very large, is very large,
2   because there's so little out there. That's what I
3   was saying to you before.
4          So, yes, we often will look at what
5   exists, what's our knowledge, as we know it, as best
6   we know it now, and why is my study gonna add to
7   that knowledge. And if I can't make that case, I
8   don't get published; bottom line, you won't get
9   published.
10         They'll be times where I'll ask my
11  authors, you know, you have to make a stronger
12  rationale for what's the unique contribution of this
13  paper. People loved it, they thought you did good
14  methods, they thought it was interesting, but they
15  wondered whether or not it's very good. You know,
16  sometimes they'll say, I'll get all that, and the
17  person will say "reject" because it's too
18  incremental, it's not enough of a new contribution,
19  a new addition to the literature.
20         So the behavioral sciences, I mean,
21  this is what we do. It's kind of what you guys do
22  as lawyers, too; you look at case law and you,
23  judges are making decisions based on prior case law;
24  isn't that what precedent is? It's a similar
25  concept, right?

Page 74

1   Q   Do you look at the methods used by other
2       researchers?
3   A   Of course, absolutely. And, again, if there's a
4       huge field, I'll only pick the ones that are really
5       good, and if it's a narrow field, I'll pick whatever
6       is out there to make my case, right? And I don't
7       often go to popular press and popular context. I'll
8       go to federal government type stuff all the time,
9       nonpeer-reviewed. But when it's so narrow, that's
10      all there is, you know, it helps make a case for why
11      we need to do our systematic study, right?
12         In fact, we did that to get funding,
13      right? Nobody's ever really done this. Now, we
14      didn't do it for sexting. Our question, as I told
15      you before, wasn't specifically for sexting. It was
16      for, you know, substance use, and using this
17      methodology, to see how well we could do, if we do
18      this relatively new technique, which we're going to
19      have to do, and there's going to be more and more
20      studies that are going to go in this direction,
21      guaranteed, guaranteed. It's expensive, though, and
22      it's time-consuming.
23         Anyway, so we kinda made a case to do
24      it, based on the fact that a lot of other survey
25      methodology has very limited sample frames, and who

Page 75

1   can you generalize to, and all those issues, even
2   though that might be the best science we have. You
3   know, a strict constructionist might say, Then you
4   shouldn't do it. But if we held ourselves up to
5   that standard, you know, we wouldn't have cars,
6   honestly, we wouldn't have cars, 'cause when I
7   started driving in cars, there were no seat belts.
8   Q   So I'm interested still, when you're looking at
9       other research, the types of evaluations that you're
10      making; so if you're looking at findings from
11      another study, do you evaluate the way that they
12      chose their sample?
13  A   Absolutely.
14  Q   What types of things are you looking for there?
15  A   How representative or how broad is the sample frame
16      that they use or how narrow, right? If they only
17      studied blue-haired and blonde-eyed people, then I'd
18      say, okay, that's interesting, but we're going to
19      study green-haired and purple-eyed people, and so
20      that's a contribution, that's adding to the
21      literature.
22         And we would make a case with why we
23      think they're different, right, other than their
24      hair color, or whatever. Then we would sort of say,
25      building on that, and if we found something similar,

Page 76

1   we'd start saying, well, maybe this is something
2   about this age group or about people, who have
3   different colored hair, you know, whatever. But,
4   yeah, we would think about the qualities of the
5   study, the qualities of the sample and the sample
6   frame.
7          It wouldn't matter if the person
8   overgeneralized, it wouldn't even matter to me. I
9   want to know what did they find, given their narrow
10  sample. And then I would say, okay, you know, where
11  do we go from there. So, you know, just 'cause they
12  generalize doesn't mean I have to generalize.
13  Having said that, I would say our sample is darn
14  good, really, darn good, in general. And we've
15  published a lot of papers out of it, and we've made
16  that case.
17  Q   When you're looking at other research, if another
18      study is using a term that is the same or analogous
19      to a term you're using in your studies, do you look
20      at the way that that other research defined that
21      term?
22  A   Absolutely, all the time.
23  Q   If it wasn't the same definition, what types of
24      things are you looking for?
25  A   Well, again, you know, it would really depend, but

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 77

1   you know, sometimes we want to broaden it, sometimes
2   we want to narrow it. If they say substance use is
3   marijuana and cigarettes, we might say, time out,
4   there is a lot of alcohol use, too, we're going to
5   add alcohol use, and that's something that we're
6   going to add to the literature on this, that was too
7   narrow a definition of substances.
8           Sometimes we'd say that's too broad,
9   we need to be more narrow, we need to be more
10  precise in our language, we need to have multiple
11  items rather than a single item. Whatever it is,
12  there's not a clear-cut answer to that question. It
13  really depends on the research question you have,
14  what other people have done, and if you can do it
15  better, or do it differently enough that it adds to
16  what we know. Sometimes, you know, you don't want
17  to just say, well, that guy's an idiot and they
18  didn't know what they were doing. That was the
19  limitation of their study, one that we're going to
20  address.
21  Q   If the definitions aren't precisely the same between
22      a study you're doing and a past study, but you still
23      want to compare those two studies, can you still
24      make that comparison?
25  A   Again, it depends, you know. I wouldn't make a

Page 78

1   comparison with my study, for example, and a study
2   of elderly, people in nursing homes, right? So the
3   sample has to be somewhat the same, the same age
4   range.
5           We're often caught in a problem of
6   some studies, you know, go from 18 to 29, and we
7   have 18 to 24, right? And so sometimes you look at
8   prevalence estimates of 18 to 29, and then you say,
9   well, you know, we're only going 18 to 24, is our
10  sample more or less likely to have that behavior
11  that we're interested in? And if it's more likely,
12  then, and we can make a case for that, we're, like,
13  okay, we're good.
14          If it's less likely, like marriage,
15  for example, you're probably more likely to get
16  married from 24 to 29 than you are from 18 to 24,
17  and we're looking at marriage, and we know the
18  prevalence rate from 18 to 29 is, let's say,
19  12 percent, then we probably have a smaller
20  percentage in our sample of 18-to-24-year-olds. So
21  if we were doing a study, we might want to
22  oversample them, 'cause we're probably going to get
23  less than 12 percent, so we have enough to do
24  statistical analysis, because you have to have a
25  certain number for statistical power so you don't

Page 79

1   make the opposite of a type one error; you want to
2   avoid type two error, which is not finding
3   relationship when there really is one. And if you
4   don't have a large enough sample, you will maybe say
5   there's no relationship here when, in fact, there
6   is. And, you know, depending on your question,
7   that's a more important, you know, error to make
8   than the type one error.
9           If you're a physician, you'd rather
10  make -- you don't want any false-positives, right?
11  You want, okay, let's say we want a very sensitive
12  test, and they'd say, okay, now we know you might
13  have it, we'll do some more tests to definitively
14  get there, but this cutoff, we don't want to make a
15  mistake and say you don't when you really do, right?
16          For behavioral scientists, our stakes
17  aren't that high. That's why we go with the
18  95 percent confidence rule, because our science is
19  soft, because people are a pain in the neck, a quote
20  I use in my methods class, because all sorts of
21  things affect us, right? All sorts of things.
22          The way you respond to a question
23  today might be very different than the way you
24  respond to a question in a month, right, you know,
25  depending on what happens, in the world, in your

Page 80

1   life, and what you ate that day, how well you feel;
2   I mean, so many things that kinda go into it. So,
3   you know, the answer to your question, it's hard to
4   answer your questions in a way that will be
5   satisfying to you, or you, I don't know, you know,
6   because our science is, I don't know, it's not,
7   there aren't algorithms, per se. There are
8   statistical algorithms, but you kinda do what you
9   can. And I can give you lots of examples of
10  that.
11          When you try to work in the community
12  and try to see if this program is going to work to
13  reduce youth violence versus others, and then you
14  have a shooting where a seven-year-old kills a
15  seven-year-old; I mean, that screws everything up,
16  but what are you going to do, you can't stop that,
17  or you're trying to study something and what happens
18  in Boston happens; I mean, what are you gonna do?
19  Do you just say, Oh, well, we can't know anything.
20  Well, of course, not, you know, so you do the best
21  you can. And you have some standards, and we have
22  standards.
23  Q   So I want to go back to one scenario you raised, is
24      maybe two studies you're looking at the same type of
25      behavior, but they define the age range differently,

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 81

1    **so, for example, you're talking --**
2  A  18 to 29 versus 18 to 24.
3  Q  **Exactly.**
4  A  What do you do?
5  Q  **Yeah, is it fair to say that, at minimum, you should**
6    **recognize that there's a difference in age range and**
7    **try to formulate some sort of explanation for why**
8    **the results are similar or why they're dissimilar?**
9  A  Yeah.
10 Q  **So the important thing is to identify the difference**
11   **and to explain --**
12 A  Exactly, is to recognize it, be straightforward
13   about what you're doing, and make a logical case for
14   why looking at this is, you know, valuable or useful
15   or, you know, provides a rationale.  In my study we
16   only do that, 'cause we do look at some of the
17   adolescent literature, because there was so little
18   of it, and because some of our group may still be
19   adolescents; I mean, you know, they're 18,
20   19-year-olds, 20-year-olds; I mean, they're still
21   adolescent in some ways.  They're really different
22   than 12-year-olds, no doubt about it.  They're a lot
23   more similar to 17-year-olds.  They're out of high
24   school.
25       So we didn't think we were making a

Page 82

1    huge leap.  We weren't comparing them to, you know,
2    preschoolers, and we're not comparing them to people
3    like me, you know.  I mean, I imagine, if you ask
4    people like me, you know, there's a lot of us, who
5    don't even know how to use their phone to send a
6    text, to send a picture, I mean, in a text.  I mean,
7    like my mother is older than me, has no idea.  She
8    texts, she gets them, but she has no idea how to do
9    it, right?  18, 24-year-olds, you know.
10       I mean, you probably, your age, you
11   probably hear people say, well, you know, if you
12   need to know how to do it, ask your 15-year-old kid,
13   right?  And you probably make jokes in the office
14   about, well, we need to get a high-schooler in here
15   to figure this out for us, right?  It's the same
16   thing.
17       And so if, for example, 18 to 29 was
18   a study, and they found "X" prevalence rate of
19   sexting, let's say, I would argue that our data is
20   probably even more similar to what the actual
21   prevalence rate is, because 24 to 29 may not do so
22   much sexting.  I have to say that's probably a
23   little less true today than it might have been even
24   five years ago, because, you know, people are aging
25   into adulthood, who are very familiar with

Page 83

1    computers; I mean, in a way that's very different
2    than the way I am.  I mean, I would ask my son, I
3    say, I don't understand sometimes the language
4    they're using in the manuals, you know, but it's the
5    way they think.
6  Q  **So in sticking with the same idea about making**
7    **comparisons between two studies that might have one**
8    **thing different; so, for example, if there are two**
9    **studies that are looking at, say, "drug use" as the**
10   **phrase, but they define the phrase "drug use"**
11   **somewhat differently, again, is it fair to say that**
12   **the important thing is, when making that comparison,**
13   **is that you acknowledge that there's a difference in**
14   **definition and try to explain why the results may be**
15   **different as a result of that definition?**
16 A  Yes.
17 Q  **Okay.**
18 A  You're doing well.
19 Q  **I think, once again, as with Friday, I went slightly**
20   **over the 90-minute threshold for a break, so maybe**
21   **this is a good stopping time.**
22       (Break was taken.)
23 Q  **Dr. Zimmerman, I want to ask you a few questions**
24   **about the present lawsuit, Free Speech Coalition**
25   **versus Holder; are you familiar with this case?**

Page 84

1  A  Again, just what I told you in the beginning; I
2    didn't even know it was the Free Speech Coalition.
3    I didn't who the, I guess they would be the
4    plaintiffs, and Holder -- oh, Holder is the Attorney
5    General, right, so I guess I could have figured that
6    out.  I thought it would have said "U.S.
7    Government," but I guess he's representing the U.S.
8    Government, so it's always the Attorney General it's
9    against, right?
10 Q  **Not always.  It depends on the lawsuit.**
11 A  Okay.  So that's news.
12 Q  **Okay.  What else do you know about the case?**
13 A  I think what I told you, that I know that your
14   clients, 'cause when, you know, your law firm
15   contacted me, they told me that, you know, I did
16   this sexting study, and would I be interested in
17   being an expert witness.  And I said, What for?  And
18   they told me that it was, our clients are saying
19   that this law is too broad, and the federal
20   government is saying the law is not too broad, and
21   your data -- and that some judge, I don't know
22   whether it was the appellate court, or I don't know
23   where it was, referred it back to you guys -- you
24   guys, I don't know who, you guys, but I assume you
25   guys -- and said we needed to do some more research

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 85

1    about how many people this might affect.
2            And Bill, I think, contacted me and
3    had discovered it, or somebody in your law firm, who
4    said, who's the original person who contacted me,
5    said we had to do that, and we discovered your paper
6    on sexting, and, you know, would you be interested
7    in being an expert.  And I told them, well, I'd be
8    interested, but you might not want me, because I've
9    never done this before, so I don't know what I'm
10   doing in that regard, because I'm an academic; an
11   academic, who doesn't do expert witnessing, but I'm
12   sure there's lots of them that do.
13           I should have called a friend of
14   mine, just come to think of it, who does this a lot,
15   but he's not an academic really, but, anyway.
16   Q   Who serves as an expert witness a lot.
17   A   Yeah.  Yeah.  In cases for competency to stand
18   trial.  Interesting stuff.
19   Q   Yeah.
20   A   But, anyway, so that's about the extent of my
21   knowledge.  I don't know any of the details.
22   Q   Okay.  Did you write all of your expert report
23   yourself?
24   A   Um-hum.
25           MR. BAUMGARDNER:  You have to answer

Page 86

1    verbally, Doctor.
2    A   Yes, with a little caveat.  I asked somebody, who
3    works for me, to look up the number of people in
4    that age range in the United States, the 30-million
5    number, 30 million, plus or minus, but, yes, I wrote
6    it otherwise myself.  I got a little bit of
7    information by asking them to provide it for me.
8    BY MR. SWINTON:
9    Q   By asking this other person, who works for you.
10   A   Yeah, yeah, yeah.
11   Q   Okay.  How long did it take you to complete your
12   expert report?
13   A   How long did it take me to complete it?  Oh jeez, I
14   don't know; a few hours, you know.  You read my
15   paper.  If you count the time, 'cause you guys asked
16   me to do it, and I had to get some sense of, well,
17   what do you want me to do, right?  I couldn't just
18   build a house, I didn't know how big the house had
19   to be, right, so, okay, what do you want?
20           They wanted me to stick with that,
21   and they asked me to make an extrapolation, and, you
22   know, so I'd say probably a couple, three hours kind
23   of thing.  I did it a couple times, you go back
24   through it.  I told you about my obsession with
25   words.  Maybe I wasn't -- I do that, but I'm not

Page 87

1    always so careful, anyway.  Imagine how bad it would
2    be if I wasn't.
3    Q   So altogether it took you about three hours to put
4    together the expert report.
5    A   Probably.  I'm guessing now.  I don't really know,
6    'cause I didn't really time it, 'cause I'm not being
7    paid by the hour.
8    Q   Sure.  And you are being paid to provide the expert
9    report, correct?
10   A   Yes.
11   Q   Were you asked to assume any facts to be true for
12   purposes of your report?
13   A   Assumed any facts to be true?  No.  I wouldn't do
14   that, anyway.  I have integrity, after all.
15   Q   Are you familiar with any of the experts in this
16   case?
17   A   No.  When I saw Stark's report, I saw that there was
18   somebody else, who had gotten to be sexting, that
19   Drouin.
20   Q   Correct.
21   A   I don't know her, but I looked her up on the web.
22   She's pretty young.  I feel bad for her, having to
23   do all this, but also really exciting for her.
24   Probably a real feather in her cap that she was
25   deposed for this.  And then I looked up Stark.

Page 88

1    Q   Okay.
2    A   But those are the only two people, other than me,
3    that I know are involved in the case.
4    Q   So you've never heard of, I think her name is Dr.
5    Michelle Drouin, from Indiana Purdue, Fort Wayne?
6    A   Before this, no.
7    Q   And had you ever heard of Dr. Philip Stark?
8    A   No.  Now, that one I probably should have, because
9    he's a chair of a department, and all that kind of
10   stuff, but, no.
11   Q   Okay.  And I know Dr. Drouin has written previously
12   on sexting, but you had never come across her in
13   your work on sexting.
14   A   No, little embarrassed to say.  Now, that might be
15   because of sample differences and whatnot, because I
16   think she looked at -- did she look at young adults?
17   I didn't look up her research.  I didn't even
18   investigate her.  And I did that on purpose, at this
19   point.  Maybe I should have.  I will, when this is
20   done, but I didn't feel like I should kind of do
21   that.
22   Q   I believe she conducted two studies looking at
23   sexting among students at her university in
24   psychology classes.
25   A   Right.

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                          4/29/2013

Page 89

1   Q   But you had never come across her.
2   A   No, because, again, you know, we -- yeah, no.
3   Q   Okay.
4           (Zimmerman Deposition Exhibit No. 2
5           was marked for identification.)
6   Q   I hand you a document marked Zimmerman Exhibit 2.
7   A   Okay. And now we go into this.
8   Q   Get my documents in order here. Dr. Zimmerman, I
9       just handed you a document marked Zimmerman Exhibit
10      2. At the top, it's entitled Expert Report,
11      Submitted by Marc A. Zimmerman, Ph.D; I believe it's
12      three pages long, correct?
13  A   Yes.
14  Q   And this is the expert report you submitted for this
15      case.
16  A   Yes.
17  Q   And in this expert report you estimate the number of
18      young adults ages 18 to 24, who have sent a sext
19      message, correct?
20  A   Yes.
21  Q   And you also estimate the number of young adults
22      ages 18 to 24, who have received a sext message,
23      correct?
24  A   Yes.
25  Q   And your estimates are based on a study that you

Page 90

1       published in 2012, correct?
2   A   Yes.
3   Q   And in that study you obtained prevalence rates for
4       both sending and receiving sext messages among young
5       adults, correct?
6   A   Yes.
7   Q   I wand to look at paper two of your report. And the
8       first sentence, in the first paragraph, you say, "We
9       believe results our results," and I think the
10      results you are referring to there are the results
11      from your 2012 study, "are nationally representative
12      of young adults who use the internet," correct?
13  A   Um-hum.
14          MR. BAUMGARDNER: "For several
15      reasons."
16  BY MR. SWINTON:
17  Q   "For several reasons." And then, in the last
18      paragraph, you apply that the results of the 2012
19      study to data from the U.S. Census Bureau. Was the
20      data you were taking from the U.S. Census Bureau
21      information about the number of young adult
22      nationwide who use the internet?
23  A   No.
24  Q   It was just the number of young adults nationwide,
25      correct?

Page 91

1   A   Between 18 and 24-years-old.
2   Q   Between 18 and 24.
3   A   That was the data point that I asked my colleague to
4       get.
5   Q   Okay. So your study's conclusions were limited to
6       the number of young adults who use the internet.
7   A   Correct.
8   Q   But you applied those percentages to the number of
9       young adults nationwide.
10  A   Correct.
11  Q   Do you know how many young adults ages 18 to 24
12      nationwide do not use the internet?
13  A   The studies that have been done say that, what's the
14      percentage, I think it's like 75 to 80 percent; it's
15      a very large percentage. It's not 100 percent. And
16      I did not correct for that.
17  Q   Okay. So is it fair to say that your number
18      estimates, for example, the 30,672,088 people, or,
19      excuse me, the number estimates, for example --
20  A   Nine-million-two.
21  Q   Correct.
22  A   The 9.2, rounding, and the 12.5 include people who
23      may not use the internet.
24  Q   Correct, yeah.
25  A   Yes, let me give a caveat here. The sampling

Page 92

1       strategy started with people who use the internet,
2       because of the way we sampled, the way we did the
3       RDS sampling. We were doing RDS, which is a
4       technique that is not necessarily using the
5       internet. We then said, let's apply this to the
6       internet, because, in this population, so many
7       people are connected; however, because of the way we
8       did it, it's very possible, albeit somewhat
9       unlikely, but possible that people, who responded
10      after we started with people, who absolutely use the
11      internet, you know, presumably a lot, that there
12      might be people down the line who use it a little
13      bit less, right.
14          So they may have heard about, like, I
15      don't use the internet very much, but their friend
16      said, you know, if you do this, you can get some
17      money. So they might say, oh, okay, I'll go on, and
18      I'll get ten bucks; I'll get 20 bucks, and then I'll
19      get more money if I nominate additional friends.
20          So the variation of use could vary,
21      but you definitely have to have used the internet to
22      have filled out the questionnaire, okay? That
23      doesn't mean you're necessarily a regular user; you
24      could have used your roommate's computer, or you
25      could have gone to the library to do it.

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 93

1  Q   You could have used the internet for the first time
2      to fill out the questionnaire.
3  A   Exactly.  Possible.  I'll give it to you; that's
4      unlikely.  It's unlikely it was the first time you
5      did it, was to fill out our questionnaire, but
6      possible.
7  Q   Okay.  So is it possible that the numbers you
8      estimate are too high?
9  A   It's possible.  Yeah, it's possible it's too low.
10 Q   I wanted to ask you one more question while we're on
11     the expert report, and this is on page one.  In the
12     last paragraph on the page under the subheading
13     Defining Sexting, you say, "We defined," and, again,
14     I think you're referring to your 2012 study here,
15     "sexting as sexually suggestive photos or messages
16     through cell phones or other media."
17 A   Um-hum.
18 Q   So is your estimate of sexting, when you make an
19     estimate of sexting, are you defining sexting to
20     include both photos and messages?
21 A   Well, we don't separate them, so the answer is, yes.
22 Q   Okay.
23 A   We can't have separated them.  We said, "Have you
24     sexted," and then we defined sexting, and there it
25     was.

Page 94

1  Q   Okay.  And so when you say "messages" here, do you
2      mean text messaging?
3  A   Yes.
4  Q   And the content of the message, is it words only?
5  A   No, it actually -- we said, "photos," but I think
6      the wording was also videos.  If you give me the
7      paper, I can doublecheck.
8  Q   Sure.
9  A   But later?
10 Q   Yeah.
11 A   Okay.
12 Q   We'll probably bring that up later.  I was just
13     curious, for your expert report, I wanted to be
14     clear on how you were defining sexting.  So you're
15     defining it to mean, you say here, both photos or
16     messages, and --
17 A   It would probably should say "and messages."
18 Q   Okay.
19 A   So it's not just -- I have to look at the paper.  I
20     don't know.
21 Q   Okay.
22 A   I don't remember whether it should be "and" or "or."
23 Q   Okay.
24 A   I think it had to have a photo.
25 Q   Okay.

Page 95

1  A   And then sometimes has words and sometimes it
2      doesn't have words, right.  So I don't know, at the
3      moment, but at the break I can look at the paper and
4      tell you.
5  Q   Okay.  Well, yeah, why don't we just take a look at
6      that now.  I just want to make sure I'm clear on
7      this, so we'll mark the third exhibit.
8              (Zimmerman Deposition Exhibit No. 3
9              was marked for identification.)
10 Q   Dr. Zimmerman, I just handed you a document marked
11     Zimmerman Exhibit 3.  This is a six-page article
12     entitled Sexting Among Young Adults, and you are one
13     of the co-authors of this article, correct?
14 A   Correct.
15 Q   I think the definition of sexting is on page two.
16 A   It is.
17 Q   And it's under the heading Measures, subheading
18     Sexting.  You say, "Using definitions provided by
19     the Pew Internet and American Life Project, we asked
20     participants whether they had ever sexted,"
21     parenthetical, "i.e, sent a sexually suggestive nude
22     or nearly nude photo video of themselves to someone
23     else using their cell phones."
24 A   Correct.  So the answer to the question earlier
25     would be "and."

Page 96

1  Q   Okay.
2  A   Not "or."  See, carefulness of language I had
3      mentioned before.  So that would be, it had to have
4      a photo or a video, so there could be words or not
5      words, so that should say "and."
6  Q   So, in other words, a sext would not be a message
7      with just words.
8  A   It wouldn't be a text that had sexually explicit
9      things in it; it would be a photo.
10 Q   Or video.
11 A   Or video, yeah.
12 Q   So a sext is a message sent by cell phone with
13     either a video or a photograph.
14 A   Correct.
15 Q   And I want to stay on the article from 2012.
16 A   Okay.
17 Q   And ask you some questions about that.  I think we
18     touched on this a little bit before, but let me ask
19     it again; why did you become interested writing
20     about sexting?
21 A   That's a good question.  Basically, we had the study
22     that we were doing that was not about sexting at
23     all.  It was really about, can we use respondent-
24     driven sampling to get a national sample of youth,
25     about youth defined as this age group,

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 97

1    18-to-24-year-olds, so young adults, that would
2    match a national sample done in a different method.
3         And a previous paper, we decided that
4    we were darn close on a lot of the measures, and we
5    think we got a national representative sample;
6    certainly one that would be in the series of studies
7    that somebody might review for national
8    representation how much this has actually happened.
9         The sexting issue kind of came up as
10   we were putting together a questionnaire.  I think
11   sexting, at the time, was starting to get a lot more
12   use and press and attention.  And we were doing a
13   study of internet use and internet norms and sort of
14   internet.  And one of the questions we were looking
15   at is, you know, when people put pictures on their
16   Facebook pages, does that create a norm that you
17   would do more alcohol than if you didn't have that,
18   right; this is one of the questions that came out.
19        So part of that came out of this idea
20   that sexting was just, more or less, taking off; I
21   mean, no pun intended.  It was already happening,
22   but I think there was something recently in the
23   newspapers about a teenager, who had had a sexually
24   explicit picture, photo of hers, that went viral,
25   'cause she broke up with her boyfriend or something;

Page 98

1    I don't exactly remember.  It might have been
2    actually the very person who helped me with that one
3    little piece of information in my report, who sort
4    of also raised the question, and I said, Let's ask
5    some questions about that and see.  So it wasn't
6    something that was driving; it was one of those sort
7    of, well, we're asking people questions anyway, we
8    could ask these questions in four questions or so,
9    and, actually two, and let's just do it, and we
10   we'll see what we find.
11        No one's really done a lot of this
12   work on sexting, so we thought this would add to the
13   literature, this would be a contribution, a
14   significant contribution.  We'd have a large sample,
15   a somewhat representative sample.  And it's an age
16   group that is very sexually active; I mean, clearly,
17   as we age, you know, this is the period of time
18   where sexual activity sort of starts to really take
19   off.  And then so we thought, well, if it's going to
20   happen, it's going to happen in this population.
21   It's probably happening outside, but we thought we'd be
22   able to detect something here, because the sexual
23   behavior is high, and the dating, and all of the
24   kinds of things that you do around, that would drive
25   you potentially to be sexting, is happening, so we

Page 99

1    said, let's do it, so it was sort of almost
2    fortuitous.  It was not intentional, really, for the
3    study.
4    Q  So the purpose of the study was not necessarily to
5       obtain a nationwide estimate on the prevalence of
6       sexting.
7    A  No, the initial study was to get a nationwide
8       prevalent estimate of substance abuse.  Actually,
9       strictly speaking, it's use, not abuse.  Abuse, in
10      clinical terms, psychiatric terms, is a very defined
11      definition that we do not get at.  We ask, for
12      example, in the last 30 days, how many times have
13      you smoked a marijuana cigarette; how many alcoholic
14      drinks have you had; how many cigarettes have you
15      smoked; you know, those sort of questions.  You
16      know, I don't think it's abuse, necessarily, if a
17      21-year-old has, you know, two drinks a week for a
18      month, right; I mean, that's not abuse, so it's more
19      use, but we have that continuum, again, to go back
20      on that.
21           So the original intent of the study
22      was to look at internet users and their affects and
23      how that might relate to their substance use, and if
24      we can use this RDS technique to get similar
25      estimates of use, prevalence use, in other national

Page 100

1    studies.  And we did a study that we published on
2    comparing it to the, it's a national study of drug
3    abuse, the National Household Study on Drug Use, I
4    forget the name of it.
5    Q  I believe the acronym is NSDUH.
6    A  Very good.
7    Q  Is that right?
8    A  That is right.  So what's it stand for?
9    Q  You know, I'd have to look that up.
10   A  I got to ask you a question.  Sorry.
11        MR. BAUMGARDNER:  You got him to
12   answer it, that's even more.
13   A  Exactly.  And that's done by SAMHSA, which is the
14      Substance Abuse Mental Health Administration.  It's
15      an HHS agency; you know about that.
16   BY MR. SWINTON:
17   Q  Um-hum.
18   A  So our results were similar to that, which added to
19      our confidence that we have something here.
20   Q  So when you were doing the sexting study, was there
21      a national study that looked at the prevalence of
22      sexting that you were intending to compare your
23      results to?
24   A  No, not that we had known of at the time.
25   Q  Okay.

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 101

1    A   Honestly, I think we probably have the best data on
2        that at the moment.
3    Q   Okay.
4    A   And, you know, I mean there are some limitations, as
5        I talked to you about before, but it's probably
6        about the best data there is out there.
7    Q   So your data on the prevalence of sexting among
8        young adults, 18-to-24-year-olds, is the best out
9        there.
10   A   Currently, right now, published, or published at
11       that time.  There could have been stuff that
12       happened in the last two years that I'm not as aware
13       of.  It's not really my wheelhouse, so I haven't
14       kept up with this literature, whereas I have, more
15       or less, with the substance use literature, 'cause
16       that's in my wheelhouse, and violence, and that sort
17       of stuff.
18   Q   Just so I'm clear, you didn't perform this study, or
19       write this article in any way because of the current
20       litigation, correct?
21   A   Correct.  Yeah, I had no idea that this current
22       litigation was going on until I got a phone call
23       from the law firm asking me to do this.
24   Q   Okay.
25   A   So it was completely and absolutely independent.  I

Page 102

1        was surprised that somebody actually read the paper.
2    Q   Okay.  I thought maybe we could turn to talking a
3        little bit about RDS.  I know we've kind of
4        mentioned it in passing so far.  RDS stands for
5        respondent-driven sampling, correct?
6    A   Correct.
7    Q   This is a method for selecting participants in a
8        study, correct?
9    A   Um-hum.
10   Q   And RDS itself has been around, how long has RDS
11       itself been around, as a method?
12   A   Ask Eric Volz.  Not long.  I don't really know, so
13       I'm talking a little bit out of turn, maybe I
14       shouldn't, but I'm pretty sure that there were
15       groups of people, who are interested in studying
16       very difficult populations to reach, like gay men in
17       particular.  I think it came out of CAPS, the Center
18       for AIDS Prevention Studies.
19           I think some of their work was, how
20       do we estimate behaviors in this population?
21       Typically, it was very convenient samples, to go
22       back to the conversation, ones that I've actually
23       done, where there were studies where you went to
24       places where people, who were homosexuals, would
25       frequent, bars, or, you know, clubs, and things like

Page 103

1        that.
2            Some people went to ZIP codes of
3        cities, because, you know, that's where high
4        concentrations might be living.  But, of course,
5        like Greenwich Village, which is known as one area,
6        or the Castro in San Francisco, were not, you know,
7        they're not 100 percent, by any means, not even
8        close.  So they were all very flawed approaches.
9            And there was a technique, this is
10       like a snowballing technique, when I first read
11       about it.  This is something that people have used
12       years and years and years ago, but was sort of
13       thrown out as, like, no, this is just people who
14       know each other and it's just, you know, you're just
15       capitalizing on people that know each other and you
16       have a very narrow sample; hence, the current
17       iteration of this is where you correct for that,
18       which is what we did, and that's why we go from a
19       sample of 3,000 to 800, that sort of thing.
20           So the technology for doing RDS is
21       newer and better.  And, actually, if you really want
22       to know about RDS, Eric would be the person to have
23       come here and talk to him about it.  And like all
24       methods, you know, there are the acolytes and there
25       are the critics.  And we try to figure out the best

Page 104

1        way we can to get a sense of behavior and behavioral
2        correlates, and, I mean, how do you do you that, you
3        know.
4    Q   Yeah.  You used a word in there, "snowballing"; is
5        snowballing the same thing as RDS?
6    A   No, no, it's not the same thing, but it was
7        reminiscent to me of that, that how do you identify
8        leaders in a community?  That's research I did
9        30-plus years ago.  And, you know, somebody said,
10       what you do is you ask a person, and then you ask
11       the next person, and then after a while everybody
12       keeps pointing to the same group of people you know
13       you got it.
14   Q   Okay.
15   A   And, of course, if you sample that way, it wouldn't
16       be necessarily the best way to do it, but this is
17       really pretty different than that, but the process
18       is, you start with what's called seeds; you've read
19       about this.
20   Q   Um-hum.
21   A   You're up on it.
22   Q   I have.
23   A   So you know that you start with seeds; you have them
24       nominate people, they have them nominate people, and
25       so forth down the line.  And Heckathorn, who has

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 105

1    sort of really much more further developed this at
2    the University of San Diego, University of
3    California-San Diego, I think that's where he is,
4    who Eric studied with, basically says, once you
5    reach about eight generations, which they count that
6    as this person nominates this person, that person
7    nominates that person, so each level of nominating
8    the next level; he estimated that, if you got to
9    eight, you basically saturated the population, which
10   is pretty interesting. It's kind of the idea of two
11   degrees of separation, or, what is it, Six Degrees
12   of Separation with Kevin Bacon?
13   Q   Right.
14   A   It's pretty amazing how you can do that and how
15   quickly that happens. And it was pretty interesting
16   how, you know, even though the way we started, we
17   ended up with quite an interesting range of people,
18   but, in some cases, we also ended up with a little
19   too many of one group, because they kinda figured it
20   out and really started telling everybody about it;
21   it's sort of an interesting thing.
22   Q   You mentioned it before, that RDS is used to reach
23       the hidden or hard-to-reach populations, the example
24       you used are gay men; why are those populations hard
25       to reach?

Page 106

1    A   Well, because there's no clear sampling frame, to go
2    back to our earlier conversation. There's no clear
3    sampling frame for gay men; I mean, what is that?
4    You know, fortunately we don't live in a society
5    where if you're gay you have to register, and then
6    you could pick people out from the registry. There
7    is no such registry. I mean, in fact, you know,
8    some people will go to gay organizations, but not
9    all gay men go to gay organizations; you know, they
10   don't all go to bars; you know, there are straight
11   people go to gay bars; straight people work in
12   organizations, right?
13       I want to make it clear I'm not
14   making a value judgment here of any kind. I'm just
15   saying that there's no easy sample frame, and so,
16   therefore, the criticism of any sample or study that
17   you did of gay men behavior, gay male behavior,
18   right, would be flawed, or is flawed, which makes it
19   even more important that you have multiple studies
20   going in different ways and different directions.
21   And if they're all starting to say the same thing,
22   then that's when you get confidence to come back on
23   that conversation, right? So they're hard to reach,
24   because they're not easily captured in an easy
25   sample frame, right?

Page 107

1        I mean, you could argue that IV drug
2    users are the same. There might be some reasons
3    that we're interested in IV drug-users' behavior.
4    Well, how do you do that? An anthropologist would
5    say you have to hang out on the street and get more
6    in-depth and whatnot. A survey researcher is posed
7    with the problem of, how do I get as representative
8    a sample as I can, right? And one way is this RDS
9    approach.
10       This is sort of a relatively new
11   technology that seems to be working. Some people
12   disagree, but enough people agree. Part of it is
13   because we also know that it's limited. How do we
14   get representative samples if it's going to be
15   limited?
16       I would argue to you
17   18-to-24-year-olds, you could go to college campuses
18   and try to sample college campuses around the
19   country, and you'd have a pretty good sample. But I
20   don't know what the rates of college attendance is,
21   but it's lower, significantly lower, than using the
22   internet, right? And so we didn't want to do that,
23   but we wanted that population. Well, how do you get
24   them? They don't live all in a same area. You
25   couldn't go to a ZIP code and maybe have a high

Page 108

1    opportunity of hitting. You could go to bars,
2    'cause it is true that that age group, although you
3    wouldn't get, the 18-to-20-year-olds tend to go to
4    bars more often than people my age, but not
5    necessarily. I mean, where they're hanging out, who
6    knows, right? So, in a way, you could argue that
7    they are a harder to reach subpopulation of our
8    society.
9        We thought, for that age group, the
10   internet is probably as good or better way than
11   almost any other way we could do it, 'cause they're
12   certainly not going to answer the telephone to do a
13   survey, we know that, right?
14   Q   Is RDS a good method to use if the target population
15       isn't hard to reach?
16   A   Is not? Well, that was part also of our motivation
17   for doing the study. We didn't really make a case
18   that this was a hard-to-reach population, in the
19   sense of IV drug users or gay men. Hard to reach,
20   that might be the wrong words to use, actually, in
21   terms of precise words; you know, maybe it's a
22   population that doesn't have a relatively, I don't
23   want to say easy, a relatively broad sampling frame
24   to use, right?
25       And so we really argued that, well,

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 109

1    you know, this is a population that wouldn't
2    necessarily be characterized as that, but it's not
3    really clear what that would be; you know, because
4    they aren't the hard to reach without a sampling
5    frame, right, or a unique part of the population.
6            You know, you want to study women,
7    for example, with lupus -- I mean, there might be
8    lupus directories, actually, so I take that one
9    back -- or men with this, that, or the other thing,
10   or whatever, you know, it's hard, how do you sample
11   that population.
12           And what you try to do is you get as
13   large a population as you can, because obviously the
14   larger the population, the larger your sample, the
15   more chance you have of it being representative,
16   because, if you get so large, you have them all, and
17   then it's no longer a sample, it's the population;
18   then you don't have to have error statements, or
19   anything, then you have the population.
20           Well, that's an impossible thing to
21   do; I mean, the Census doesn't even do that, right?
22   And there's lots of debates about that as well. So
23   one of the things that we argued in our
24   peer-reviewed grant is that, is this a technique
25   that we could use for the general population as

Page 110

1    well, especially since the internet is getting ever
2    more accessible to everybody; I mean, the rates of
3    that, from the Pew studies, are like 90 percent of
4    people have access. They may not have it in their
5    house, they may not use it all the time, but the
6    number is like 90 percent, or 90-something percent;
7    I mean, it's shocking to me, frankly, you know. And
8    it's true going worldwide. That's why it's a
9    phenomenon that we are just now getting a handle on.
10           I mean, we see what goes on with it;
11   horrible things go on with it. Some people argue
12   that it was the internet that sort of started the
13   revolution that's going on in the Middle East,
14   right? I mean, it's why the Chinese really control
15   it, because they know it can be really an organizing
16   tool. So we know very little about it, but we do
17   know that a lot of people use it.
18   Q   Right.
19   A   Hence, we said, well, since all of these other
20   methods are flawed, we know this one might not be as
21   flawed, or it might be flawed in different ways, is
22   this a viable way to make it happen?
23           And we thought it would be a really
24   cheap way to make it happen, frankly, and it ended
25   up, we learned so much about it, it ended up being

Page 111

1    quite expensive, but I think our lessons learned
2    will help make it cheaper. But it can be expensive,
3    because, you know, there's all sort of issues that
4    kinda come up that we didn't anticipate.
5    Q   So to be precise, we could call the method of
6        sampling you used web-based RDS, correct?
7    A   Correct.
8    Q   That's different than RDS.
9    A   Yes, that's correct. That's correct. But it's
10       similar.
11   Q   Okay.
12   A   In that, you start with seeds; you ask them to
13       nominate people, and you ask them to nominate
14       people, and you ask them to nominate people; and
15       then, Eric Volz, working with Heckathorn, have a
16       method for then estimating the similarity within a
17       generation, and we've corrected for that. In fact,
18       the algorithm that we describe in here, he created.
19   Q   So I want to go through this process, because it's
20       something that I had never heard about before
21       reading your report, so maybe if we could start with
22       seed selection. So as I understand it, you
23       recruited seeds using an online Facebook
24       advertisement, correct?
25   A   Correct.

Page 112

1    Q   So what did that advertisement say?
2    A   Oh gosh, I don't exactly remember, but it had to be
3        something short and quick and stuff. It said
4        something, like, it was the University of Michigan,
5        you want to make an extra buck, you know, contact
6        us, kinda thing.
7            What we did, is we actually had a
8        consultant, who had done some of this RDS work in
9        San Francisco at CAPS, where some of this was sort
10       of starting to develop for the gay population. I
11       don't know how much Heckathorn was involved with
12       them or not, frankly.
13           And we sat down and we said, how
14       should we divide up the United States, how do we do
15       this to try to get as nationally a representative
16       sample as we can. So we used Census data to find
17       out where larger percentage of African Americans or
18       Latinos might be. We used regions of the United
19       States. We had first tried to use one set of
20       regions, and we had to get a little bit broader,
21       because we didn't have the funding to get too
22       nuanced, so we actually had, I think -- I forget how
23       many regions we had, frankly. I don't know if we
24       describe it in this paper; we do in the other paper.
25           I think it was a three-by-three table

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD
4/29/2013

Page 113

1  possibly, nine cells, and it was white, African
2  American, Latino. We picked those three, because
3  those are the largest ethnic groups in the United
4  States; you know, not that white isn't an ethnic
5  group, and not that any one of those groups are
6  monolithic; I mean, we also recognized that
7  limitation.
8          Then we picked the West, the East,
9  Southeast, I think the Midwest might have been in
10  two parts -- no, so the West was one part, so one,
11  two, three, four? Now I'm not remembering. I'm not
12  remembering exactly, but, basically, we sort of cut
13  it up in that area, and I think we picked those
14  because the Census data was broken down by those
15  areas, so it was an area that the United States
16  used, it wasn't just made up in our own heads.
17          And then we used those areas to say,
18  okay, what percentage African Americans, and then we
19  said, okay, the Southeast has more African Americans
20  than the west, so we'll have two more seeds that are
21  African American to make sure that we reach down and
22  get some more African Americans here than here to be
23  representative of the United States.
24          That was the reason that we did that
25  process, so that we would make sure that we sampled

Page 114

1  people where they were, so that it would be at least
2  somewhat represent the distribution of the
3  population of the United States.
4  Q   And that table that you're referring to, or the
5      chart, you said you created that based on U.S.
6      Census data, right?
7  A   Yes.
8  Q   So that wasn't something that had been used
9      previously.
10         MR. BAUMGARDNER: Objection.
11  A   I don't know. I'd be surprised if it wasn't used
12      for some purpose, but I don't know whether it was
13      used for RDS or not.
14  BY MR. SWINTON:
15  Q   Do you know if it's been used since your study for
16      RDS?
17  A   No, I don't.
18  Q   Okay. And if we could go back to the Facebook ad,
19      just for one second. I was interested, did you
20      target particular population of Facebook users?
21  A   No.
22  Q   So anybody who uses Facebook would have seen your
23      ad?
24  A   Yes. Again, you're making me remember three or four
25      years ago. I think what we did was we actually paid

Page 115

1  for those ads, and, as soon as we filled our cell,
2  we closed the ad in that area. And Facebook has a
3  thing where they know where, I guess, IP addresses
4  are, or something, so they could close it down in a
5  region so that only people who would still see it
6  were in another region or another IPS address area.
7          And what we did was, for example, we
8  wanted three seeds in the southeast, who are African
9  American, well, once we got our third African
10  American seed, if a fourth one came along, we said,
11  Sorry, closed; in fact, we took the ad down, we
12  would take the ad down. Once we filled up that row,
13  or that column, however you do it, we took the ad
14  down.
15          If it was the third African American
16  seed, but there was still a couple white seeds that
17  were still open, we left the ad up. But if an
18  African American came along, we said, Sorry, thanks,
19  we're finished, you know, we don't need you anymore
20  kind of thing.
21  BY MR. SWINTON:
22  Q   Was your ad visible to people who access Facebook
23      using their mobile phone application?
24  A   I don't know. I don't know. I'm hesitating, 'cause
25      I'm not sure Facebook had the mobile phone app at

Page 116

1  the time. But if they did, I see no reason why they
2  wouldn't have opinion able to. We would have
3  thought of that.
4  Q   Okay.
5  A   But I don't know for sure. I could probably make a
6      phone call and find out for sure.
7  Q   So you said that Facebook was able to determine
8      where the user was located based on their IP
9      address. So if a person was traveling with their
10      laptop and a person who -- if a person from the East
11      Coast was traveling with their laptop, but was
12      accessing Facebook from California at the time they
13      saw your ad, would Facebook have registered that
14      user as living in California?
15  A   I think so, 'cause I think your IP address is when
16      you connect to the internet. I think so. I don't
17      think we got too many of those kind of situations.
18      I mean, we could have gotten a resident of
19      California, who now lives in New York; you know, if
20      they were an undergraduate and they are going to
21      school at Cornell, but they're from LA, that could
22      have happened. But I don't think the situation you
23      described could have happened.
24          In other words, if I take my laptop
25      to Atlanta and I kind of sign in to the internet

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 117

1    there to access my Facebook page, the IP address is
2    where I am, I think. I'm not sure. See, that's
3    something you guys would know, your age group would
4    know.
5  Q   So the example I'm thinking of is someone, who lives
6    in New York, but was vacationing in California and
7    went on Facebook and saw your ad.
8  A   And they would count as a West Coast person instead
9    of an East Coast person? I don't think so.
10 Q   And why not?
11 A   Because the IP address.
12 Q   Okay.
13 A   'Cause they would sign on to the IP address, they
14   would be in California at the time, right? And then
15   they would be a California person, but then we had
16   some screening questions after that, where they had
17   to be between 18 and 24, and they were thrown out if
18   they weren't, right?
19       You know, I don't really remember
20   what we did in the situation you're saying, 'cause
21   then you're saying, well, if their IP address was
22   New York, or was California, and they did it then,
23   wouldn't you know, or would you know you may have
24   included an East Coast person in your study. I
25   don't know the answer to that question.

Page 118

1  Q   Okay.
2  A   You know, we were really careful and really, like,
3    obsessive almost. I can't believe we didn't figure
4    that out or think about that. There might have been
5    some screening questions that I'm not remembering.
6    We did ask them their ethnicity, their age. And if
7    they answered certain ways, we would immediately
8    throw them out if they didn't fill our -- after the
9    seeds, we didn't care anymore. And, by the way,
10   that's true. You should know that this was only for
11   the seeds, because we wanted to seed in the right
12   area.
13 Q   Right.
14 A   So, you know, I don't know. The answer is, I don't
15   know the answer.
16 Q   So just to verify, you don't recall if there were
17   screening questions for seed selection based on
18   region of the country.
19 A   Screening questions, which is, once you sort of
20   agree to do it, you pop open the survey, then you
21   start, and before you start you get the screening
22   questions; the answer to your question is, yes. I
23   don't remember. I don't know for sure.
24 Q   Okay.
25 A   I do think we asked them for their address. I mean,

Page 119

1    I do know we asked them for their address, because
2    we've done some neighborhood stuff, so we do know
3    where they live. So if they went to California and
4    then gave us a New York address, and we counted them
5    against California, I think we would have caught
6    that. I think we would have caught that.
7        These are the issues -- this is an
8    example of an issue, that, while we thought this was
9    going to be a really cheap way to do it, ended up
10   being a very expensive way to do it, because we had
11   a lot of doublechecking that went on around these
12   kind of things, and that might have been one of
13   them.
14       I have to say, to be honest with you,
15   Jose Bauermeister was in charge of those levels of
16   details that I wasn't really paying attention to. I
17   mean, I was, in the broad strokes, but this specific
18   question, that's why I don't know the answer.
19 Q   Okay. Just to stick with the Facebook ad, I was
20   interested in knowing the amount of time that it was
21   visible. So you said that --
22 A   That varied. It depended how long -- I'm sorry, I
23   talk over you.
24 Q   Keep going. I think you're answering my question.
25 A   Yeah. Yeah. As I said, we left it up until that

Page 120

1    seeded cell was full. It wasn't a cell, there were
2    multiple cells because we wanted -- every region had
3    some seed of those three ethnic groups. And we left
4    it open as long as there was a seed to be had, and
5    we closed it as soon as there was not.
6  Q   Do you know --
7  A   How long that was. Yeah, I don't know.
8  Q   Okay.
9  A   I don't know. I don't know if we even kept that
10   record, honestly. We probably did, because we're
11   trying to see if this is a useful method for doing a
12   national study. And we knew we wouldn't be able to
13   do a national study of people 18 and older, because,
14   you know, my mother doesn't have a Facebook page,
15   right? So we knew that it wasn't going to be for
16   everybody, right?
17 Q   Right. But the ad was visible, within a particular
18   cell, the ad was visible only as long as you still
19   needed seeds in that cell.
20 A   Correct, or not seeds in that cell, seeds in that
21   column, seeds in that region. Seeds in that region,
22   would be the way to say it, because, you know, if we
23   had everybody but one African American, let's say,
24   from the West, that ad stayed up, and then if you
25   came on -- we must have a screening question for

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                           4/29/2013

## Page 121

1   ethnicity -- and if you said you were white, we
2   said, Thank you very much.  And if you said you were
3   black, we'd say, Bingo, you're it.
4   Q   So I know you selected 22 seeds.
5   A   Is that right?  I was trying to remember that.  22
6   seeds, so what number of cells did we have?  That's
7   interesting.  Okay, go on.  You remember more than I
8   do.
9   Q   I think you say in your study, actually.
10  A   In this study.
11  Q   Yeah, in the article you say you selected 22 seeds.
12  A   What did we say in terms of the cells; did we see
13  that in here?
14          MR. BAUMGARDNER:  Here's the
15  paragraph, I think.
16  A   All right, go on.
17  BY MR. SWINTON:
18  Q   My question was, how many people, and I think -- my
19  question is --
20  A   How many seeds per --
21  Q   How many people responded to the ad to be seeds?
22  A   That would get your response rate question that you
23  were asking for before, at least for seeds.  I don't
24  know the answer to that question, I'm sorry.  It
25  might be known, but I don't know it off the top of

## Page 122

1   my head.  I'd have to look.  I don't know.
2           It's a complex question, because we
3   could have gotten a response from a cell that's
4   full.  The white person from the West, for example,
5   you know, we may have gotten 30 of those, and we
6   only needed three, so we were done, right; and then
7   we may have gotten more had we left it up, right,
8   so, anyway.
9   Q   And do you recall the total number of cells that you
10  had?
11  A   That's what I'm trying to remember, and I'm trying
12  to think, okay, we had 22 seeds.  I mean, we brought
13  this consultant in, spent two days, two days kind
14  of figuring out what would be the best way to do
15  this.  And, I'm serious, I don't remember the
16  outcome, 'cause if we had 22 seeds, and I know we
17  had black, white, and Latino, so how many regions
18  did we have?
19          We basically had to look at what
20  budget we had, what sample we wanted; these were all
21  sort of the variables that were coming into it.  So
22  not all the cells had equal numbers in them, right?
23  So we might have had only, because there's fewer
24  blacks, let's say -- and I'm making this up at the
25  moment, just as an example of making it up.  I'm not

## Page 123

1   making up my answers, you know what I mean.
2           MR. BAUMGARDNER:  It's a
3   hypothetical.
4           THE WITNESS:  A hypothetical, thank
5   you.
6   A   If there was only one black person, or one only
7   black seed we needed in the West, then that would
8   have only one, but maybe in the West we had three
9   whites.  I'm pretty sure we may have had West,
10  Midwest, Northeast, Southeast, so we may have only
11  had four cells, so it was a three-by-four table, I
12  think.  I'm not positive about that.
13  BY MR. SWINTON:
14  Q   Okay.
15  A   And I think we used those that the federal
16  government has used in the past, so that we could
17  get the Census estimates based on that; do you see
18  what I mean?  And, again, I don't specifically
19  remember what that detail was and which one of their
20  regional examples we used.  I'm sorry, I just don't
21  remember that.
22  Q   Were you involved in the seed selection process?
23  A   I was in those meetings, yes, and that's why I'm a
24  little embarrassed to say I don't remember.
25  Q   Okay.

## Page 124

1   A   But we were extremely thoughtful, painstakingly so,
2   I have to say, to try to get -- because we knew that
3   RDS is all about starting with as good a population
4   as you can, right, and as representative, with 22
5   people, as you can possibly get, so that what they
6   would then, you know, document.
7           We also knew, by the way, that people
8   of color would be a little bit less likely, fewer
9   generations, to, not only respond, but to give us
10  many generations deep, so we oversampled some of
11  them in the cells.  I do remember that.  But the
12  specific details that you're asking me about, I'm
13  sorry, I don't remember.
14  Q   Is there any significance to the number 22 for
15  purposes of having seeds?
16  A   No, it was probably more driven by budget than
17  anything.  We had this much money that we could
18  spend on incentives, and, if we started with too
19  many, given how many generations, we wouldn't have
20  the budget, so. . .
21  Q   If I remember correctly, in one of your previous
22  studies, you also 22 seeds.
23  A   It was the same data.
24  Q   Okay.
25  A   It was from the virtual network -- what was it

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                    4/29/2013

Page 125

1  called. The Virtual Network Study, I think it was
2  called. The Virtual Network Study, which was this
3  funded project, of which sexting was part, of which
4  the substance use data was from, so 22 isn't a magic
5  number. That's the number that we had started with,
6  that we had decided to do. We were one of the first
7  people to do such a study, trying to get a national
8  sample.
9  Q  I see.
10 A  As far as I know, at the time we got funded. It may
11    be different now. They haven't published data, as
12    far as I know.
13 Q  Okay. So I understand the seed selection process,
14    and now if we could kind of walk through the
15    referral process. Once somebody is a seed, how can
16    they then refer the study to their friends and
17    acquaintances?
18 A  Well, we went through a couple iterations about
19    that. At first, we said to them, Give us their
20    name, and we'll send them an invitation. And that
21    didn't work so well, because they weren't willing to
22    give us their names. And the ones that did, then
23    we'd contact them, and they're, like, How'd you get
24    my name? Who are you? Is this the federal
25    government? We're, like, No, we're not the federal

Page 126

1  government. We're funded by the feds, but we're not
2  the federal government, we're University of
3  Michigan, but they're still, like, no way.
4        So what we ended up doing is we said,
5  Why don't you tell your friends to contact us, and,
6  if they do, we'll pay them $20 to fill out the
7  questionnaire, and we'll pay you $10 more if they do
8  it; you know, again, we're trying an incentivized
9  system.
10       It's not unusual to pay people for
11 participation; I mean, that's pretty typical to do
12 that. And we thought we were doing this
13 innovatively enough. And, quite frankly, it was
14 part of the stimulus, and even though it's a little
15 bit of money, we wanted to get money out. We were
16 trying to be socially conscious and address those
17 issues at the same time of doing the study, and, you
18 know, helping do the study.
19       So people could nominate, or they
20 could get paid for up to -- we first did three,
21 nominate up to three people, you'll make 20 and
22 another three, and we didn't get very many hits.
23 Then we changed, and said, Okay, instead of
24 contacting us, you contact those three, have them
25 contact us, and it didn't really hit.

Page 127

1        Then we upped it up to, you can
2  nominate as many as you want, and if you get five,
3  you can make another $50, we're going to give you
4  $10 if five of your friends fill out the
5  questionnaire. If seven do, we're only going to
6  give you five, 50, so they could make 70. So we
7  actually also found the point where people were
8  motivated to start doing it; you know, 50 wasn't
9  enough, 70 was, so sort of interesting phenomenon,
10 actually.
11       Just as an aside, there was a
12 researcher, who was here, he's now at Harvard, and
13 he's done national studies. He's been doing studies
14 about -- he's very well known for doing comorbidity
15 studies. His name is Ron Kessler. He's done
16 studies where he looks at the comorbidity of
17 substance use and psychiatric diagnosis, right, and
18 that was really big in the time.
19       And he also had trouble with, well,
20 what about my nonrespondents, 'cause that's always
21 the issue in our research, right, to come back to
22 our earlier conversation, is what about the
23 nonrespondents. And if you don't have any sense of
24 who they are, how do you know how representative
25 your sample can be? The nonrespondents may be just

Page 128

1  the same people you don't have, and so it's
2  representative, or they might be all the people who
3  are paranoid because of the drugs they use and
4  you're getting a biased sample.
5        And it was sort of an interesting
6  thing what he did, is he then -- and I don't know if
7  he's ever published it, but I saw him give a talk
8  before he left here, he was here still. And what he
9  did is he called the nonrespondents, went back to
10 the nonrespondents, basically, and said, say -- they
11 gave them like, I don't know, $50 for the survey --
12 they said, If we gave you $100, would you do it?
13 No. How about 200? Nope, no, not interested. How
14 about 500? Okay, you got me, right? So he actually
15 tried to see where it was, and he offered people
16 money, he got a grant to do this, and so some people
17 made $500 to do this survey evidently.
18       And then he looked at the people that
19 he bribed. I mean, again, I put that in quotes,
20 bribed. I mean, he didn't really bribe them, but
21 wanted to see at what point -- because, what he's
22 trying to do, is sample his nonrespondents, and then
23 he wanted to see how do they look compared to the
24 respondents that he got. And he found no
25 differences, that they were really, they were just

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

## Page 129

1    like the people.  They were just people that don't
2    like to do surveys, for whatever reason, but
3    everybody had a price.  It was sort of an
4    interesting little thing that he did.  Again, I
5    don't know if he ever published it.  So I don't know
6    why I told you that story, but. . .
7  **Q**  **There was an economic motivation for people to**
8    **participate in your surveys.**
9  **A**  Right.  We live in an economically-motivating
10   society.
11  **Q**  **Would a wealthier person have had less incentive to**
12    **participate in your survey if that person didn't**
13    **need the gift cards?**
14  **A**  I don't think that would matter for
15   18-to-24-year-olds, honestly.  I mean, you know,
16   when you think about, you know, I don't know, a
17   Kennedy going to school, I don't think he's going to
18   decide or not decide because of $70, right?  I don't
19   think he's going to say, I don't need the money, I'm
20   not going to do it.  He might do it just 'cause this
21   could be fun.  I don't think that would be the case.
22         I'd be more worried about the much
23   lower end of the population than the higher end of
24   the population.  You know, I mean, you could argue
25   that the more affluent will try to get as much money

## Page 130

1    as they can, and, why not, this would be an easy way
2    to make 70 bucks.  And if they're coming from a
3    background where money is a big driver in their
4    families, their parents might say, Why didn't you do
5    that for $70, for goodness sake; it took an hour of
6    your time, all you do is tell some friends.  So I
7    don't know that would be a good argument.
8         Now, access to the internet, you
9    know, in our population, how many Native Americans
10   are in our study?  You know, they're less than one
11   percent of the U.S. population; we probably don't
12   have too many of them, honestly, we probably don't.
13   I don't remember.  I'm sure it was so small, it was
14   probably in an "other" category.
15         So I would be more concerned with the
16   lower end, that maybe, you know, we might not have
17   them, but I would also argue that, you know, for
18   sexting, the lower end probably don't have cell
19   phones, or might not be using cell phones in this
20   way, might be behaving really different, anyway, but
21   I'm talking about the much lower end of people,
22   right?
23         So I don't think the monetary
24   incentive really had much effect one way or the
25   other.  I do believe that that's probably true,

## Page 131

1    because it's not so much money, right, but it's just
2    enough to get their attention, you know what I mean?
3    And they didn't necessarily know it when they
4    went -- although maybe we did put that in, that you
5    could make some extra money on the ad:  Want to do a
6    study, make some extra money, click on that.
7  **Q**  **So the original Facebook advertisement for**
8    **recruiting seeds --**
9  **A**  I think it did.  I don't remember exactly.  I think
10   we did.  I think we may have put it there.  We had
11   to tell them up front very early on; you know,
12   that's a requirement of the Institutional Review
13   Board, our Human Subjects Protection.  I don't know
14   if we put it in the ad or not.  They may have
15   required us to put it in the ad as well.
16  **Q**  **So any concern about undersampling people on the**
17    **lower economic side would have been because those**
18    **people don't necessarily have access to technology,**
19    **certain technologies.**
20  **A**  Or easy access to the internet, and so maybe they
21   see it today, but, you know, it's, like, well, I'm
22   not going to come to the library again to use the
23   internet, 'cause I'm working all the rest of the
24   week, so forget that; it's possible.
25         I don't remember the range of the

## Page 132

1    socioeconomic status of people, but, as I recall, it
2    was not super narrow, but I'm sure the tails were
3    probably not included, right; you know, the tails
4    may not have been included; it's possible.  But I
5    think the tail that would be more likely than the
6    higher tail would be the lower tail.
7  **Q**  **Okay.**
8  **A**  But I would say we have probably pretty good swath
9    of the middle, really good swath of the middle.
10  **Q**  **Were most of the participants referred in the study**
11    **to friends using computers?**
12  **A**  I don't know.  Ask the question again.
13  **Q**  **So there are different ways a person could have**
14    **referred the study to a friend, correct?**
15  **A**  Right.
16  **Q**  **You could have posted a link on your Facebook page.**
17  **A**  Yes.
18  **Q**  **You could have sent an email with the link.**
19  **A**  Correct.
20  **Q**  **I could have told somebody in person.**
21  **A**  Correct.  Probably less likely, because the link
22   would be such a pain in the neck, frankly, so it's
23   probably easier to have sent it in an email, 'cause
24   then you can just click on it, and people know that.
25  **Q**  **So it's probable that most of the referrals were**

**HURON REPORTING SERVICE**
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Page 133

1   made via electronic --
2   A  I think that would be safe to say, although I don't
3      really know that, but I think that would be safe to
4      say.
5   Q  Okay.  You didn't keep track of the way referrals
6      are made in the study.
7   A  I don't think we had a question about that, no,
8      'cause we assumed it was going to be, more or less,
9      on the web.
10  Q  Okay.  Once somebody took the study once, were they
11     able to access it and take it a second time?
12  A  Well, you're a pretty smart guy.  What happened was
13     we found that that could be possible, right, because
14     it's, like, how do we know?  You know, you do a
15     random digit dialing, how do you know it's not the
16     same person who picks up the phone and says, oh,
17     yeah, right, it's me; again, I mean, it's the same
18     problem.
19          I remember talking to somebody about
20     how I would never, you know, send something on the
21     internet with my credit card, oh my gosh, anybody
22     could get it.  You know, this person, who was --
23     this is just when e-commerce was starting, so this
24     was like 10, 15 years ago -- he said, Are you
25     kidding?  Like, when they swipe your card, or do it

Page 134

1   on paper, you don't think it's pretty easy just to
2   write down that number when they go to the bathroom,
3   and they can write down the number and then they
4   have your number, what's the difference?  Well,
5   yeah, I guess that's true, right?  Similarly here.
6        But what did we do?  Well, IP
7   addresses.  But this is one of the reasons why it
8   got very expensive, this is one of the biggest
9   reasons, is we were double-checking our data.
10       And we actually wrote a paper on how
11  strict the definition you want to use for whether or
12  not people were, you know, cheating, how often did
13  people cheat.  And you could tell sometimes, 'cause
14  they're not very good cheaters, right; they start
15  answering the questionnaires exactly the same way,
16  or they're coming from the same IP address, and, you
17  know, all of a sudden they're a completely different
18  kind of person.
19       I don't remember all the details, but
20  what we ended up doing was checking every single
21  person in this way, and so we had some sense of
22  whether it was the same IP address and whatnot.  And
23  then we did a paper, and don't ask me the details of
24  this paper, but it, basically, you know, if you
25  limited it to only one IP address per person, well,

Page 135

1   you know, you could have your friend over, who said,
2   Fill it out right now before you go home, or it
3   could be your roommate.  Those could be legitimate.
4   But if you threw them out, what would happen to the
5   sample and how would things differ?
6        And we found that you didn't have to
7   be super strict about that, that it didn't happen as
8   much as you think, and you didn't have to be super
9   strict.  I think it was about 20 percent, but don't
10  hold me to that either; in other words, "it" being
11  where we weren't completely sure it was a completely
12  different person, one in five.  And then there were
13  different things we did that occasionally we did
14  throw people out.  You know, you could tell -- there
15  was some ways we could tell, and I'd have to ask the
16  graduate student, who worked on the study.  I don't
17  know if she's on this paper or not.
18       But her job that summer was to do
19  exactly this, was to do exactly this, was to
20  double-check all these kinds of things.  And she
21  actually became very sleuth-like about it, in terms
22  of time, when they did it, their IP address.  There
23  were different ways that we did it.  Did we catch
24  100 percent?  No, I doubt it.  Did we catch enough
25  where we're pretty comfortable with the data?

Page 136

1   Absolutely.
2   Q  And when you did catch a participant, who you had
3      reason to believe was the same person, was a
4      duplicate, you threw that person's data out?
5   A  The second one, not the first one.
6   Q  Okay.
7   A  And we have no reason to believe that they lied on
8      the data.  We just figured that they were just
9      trying to get another $150 or another $70 to make it
10     150, that's the only thing.
11  Q  Right.
12  A  They probably saw it as being easy money, right?
13  Q  Right.
14  A  I mean, super easy money, 20 bucks.  They spend a
15     half an hour on the questionnaire and make 20 bucks,
16     then they get to refer four more people, who they
17     can tell how to cheat, you know.  But it wasn't as
18     easy as it seemed.  It was possible, but not as easy
19     as you might think.  We did have our ways of
20     detecting.
21  Q  Okay.  We spoke earlier about the spectrum of sample
22     of convenience and ideal, platonic random sample;
23     where on that spectrum does the sampling methods
24     used for your study fall?
25  A  You know, I had a feeing you were going to ask me

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

## Page 137

1   that. When I gave that example, I knew you were
2   going to come back to this. I don't know quite how
3   to say it. I would say better than average. I
4   mean, what are the anchors? The gold standard,
5   which nobody gets; you know, people on the street
6   corner. Average might be, I would say, maybe below
7   average would be, unless -- well, I would say above
8   average. I would say above average. You know, I'd
9   say, given that our confidence in it being somewhat
10  representative and our catching, and all that kind
11  of stuff, I'd say probably far above average.
12          I think that this is a technique
13  that, when I do another study, I'm going to use this
14  technique. That's how confident I am in it, that I
15  would do it again. I learned some lessons, in terms
16  of how to catch people, or, more importantly, how to
17  get the seeds. I mean, we took bets at the
18  beginning. You know, I don't know if you've had any
19  friends who had babies, and I've never done this,
20  but, you know, where you guess when the baby is
21  going to be born, and you put a pool in. It's kind
22  of stupid, but we did the same thing, not stupid,
23  but how long it would take to fill it up, you know,
24  to get our sample of 3,000, which is what we were
25  shooting for.

## Page 138

1           And we thought, like, okay, this is
2   the timing for things, we were going to get there in
3   two months. It took longer, because we faltered in
4   the beginning. The next time, I think we'll get
5   there in two months potentially, because after a
6   while it was really difficult to stay up because
7   there was so many people who were coming in,
8   because, well, you know, one becomes five, five
9   becomes 25, 25 becomes 125, and, you know, times 22,
10  right, so it goes pretty fast pretty quickly.
11          Some die, some of those generations
12  die; you know, we get to somebody, they stop
13  referring. And some, we had to cut off; we
14  basically said we're not going to go deeper than
15  this on any one of them. And if that was the case,
16  or if one died before we kinda got a certain number,
17  and I don't remember exactly our decision rules, we
18  would re-open it and add for a period of time. We
19  didn't reopen it ad nauseam, so -- I'm trying to
20  think.
21          We talked about whether we would do
22  it that way or whether we would just let one keep
23  going to get our end. I don't remember what we did,
24  now that I'm saying this out loud. I don't remember
25  that. But I would say that our sample, given that

## Page 139

1   it matches up with Census data pretty well, not 100
2   percent, but pretty well, and it matches up with the
3   National Drug Use data, that we have a pretty good
4   national sample. And I'm really confident that we
5   have a sample of those who use the internet. I'm
6   really confident of that.
7           MR. SWINTON: I think this might be a
8   good stopping point.
9           (Break was taken from 11:25 to 11:55 a.m.)
10  BY MR. SWINTON:
11  Q   Dr. Zimmerman, did you speak with anybody about the
12      deposition during the break we just had?
13  A   No.
14  Q   Okay. I wanted --
15  A   Well, maybe. I mean, does it count that I told my
16      secretary that I was still in the deposition? It
17      wasn't about the content, but it -- that doesn't
18      count, does it?
19  Q   No, that's fine.
20  A   Okay.
21  Q   I wanted to circle back and talk a little more about
22      the sampling method you used for your study on
23      sexting. Now, in your article you discuss the
24      number of participants, so, for example, on page
25      two, at the top --

## Page 140

1           MR. BAUMGARDNER: This is Defendant's
2   Exhibit 3?
3   BY MR. SWINTON:
4   Q   ZX 3, page two, on the second column at the top, you
5       say, "The full sample," and, in parentheses, you
6       have "N= 3,447."
7   A   Um-hum.
8   Q   What is that number; what was the full sample?
9   A   That's the number of people that responded to our
10      questionnaire. And then we weight it, as we say
11      later, based on some factors, and so it becomes a
12      smaller sample, because if you're in -- you know,
13      there's a whole science about weighting in
14      questionnaires, and it's not my forte. This is what
15      Eric Volz was there for, 'cause it is sort of his
16      things. It's something epidemiologists do very
17      much, because they're trying to get the best
18      estimates possible, right?
19          So weighting basically says, if you
20      are overrepresented in a sample, we're going to
21      discount your answer, like multiply your answers by
22      0.05 or something, and so it reduces the sample.
23      But that's then the idea it's weighted and takes
24      into considerations some of the biases that may be
25      possible so that you can get to the error rate we

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 141

1  talked about way before, okay?
2          So this is the full sample of all the
3  people who respond to our questionnaire, and then we
4  take into account, you know, the nesting of the
5  variable, I mean of the people within a particular
6  generation.
7  **Q   So when you weight the number of participants,**
8      **you're not actually excluding anybody's data from**
9      **the results --**
10 A   No.
11 **Q   -- using the weighting.**
12 A   It's an algorithm where you weight their variables
13     in a different way, yeah.
14 **Q   So after you weighted it, you said you had 827, the**
15     **number equaled 827, correct?**
16 A   Right.
17 **Q   And from that, you performed an attrition analysis.**
18 A   Um-hum.
19 **Q   Which is discussed on page three of Zimmerman**
20     **Exhibit 3.**
21 A   Right.
22 **Q   And the attrition analysis you are removing people**
23     **from the sample, correct?**
24 A   Correct, because they may have missing data, right?
25     So they may have skipped a sexting question, for any

Page 142

1  number of reasons:  They didn't see it, they didn't
2  feel comfortable answering it; you know, those are
3  probably the two biggest reasons.  Probably skipping
4  it accidentally is usually it.  There's no reason
5  why they wouldn't answer this, but they would answer
6  questions about marijuana use.
7          I don't know how long this law has
8  been in effect.  I don't know if they would have
9  even known about this law, you know, but there were
10 already reporting of illicit behaviors that could
11 end them up in, you know, trouble, felonous
12 behavior.  So my bet is they just happened to skip
13 it, or what happens a lot of times, is they fill
14 out as much of the questionnaire as, you know, maybe
15 half of it, and they figure, okay, if I do half,
16 I'll get the money, or they've stopped and forget to
17 go back, or they -- there's all sorts of reasons why
18 people may have skipped the item.
19         I doubt that there's very many who
20 would have skipped it, given the rest of the
21 questions.  So the attrition analysis is for the
22 people who didn't answer the variables in the study.
23 So here we want to see how might our sample for this
24 particular analysis be biased from our larger
25 sample.

Page 143

1  **Q   And you had 67 people had missing data about**
2      **sexting, correct?**
3  A   Right.
4  **Q   Out of 827.**
5  A   Right.
6  **Q   And you have some information about --**
7  A   By the way, excuse me for interrupting, but when
8      it's less than 10 percent attrition, sometimes
9      people say don't even bother.  I don't believe that.
10     I think it's always useful to know how the people
11     didn't respond; it goes back to that other study I
12     was talking about, so that's why we did it.  But
13     this is a very acceptable range of either
14     nonresponse or missing data, or whatever.
15 **Q   Okay.  And there's some information about the 67**
16     **participants who had missing sexting data; for**
17     **example, more of them were males, more were**
18     **non-sexually active participants, et cetera.  Did**
19     **you re-weight the data based on --**
20 A   No.  Based on these data, no.
21 **Q   So you didn't re-weight the data based on the**
22     **participants with missing sexting data.**
23 A   No.
24 **Q   And is that something that's typically done in your**
25     **field?**

Page 144

1  A   Typical, yes.  You don't re-weight because of some
2      missing variables in the study, especially if it's
3      less than 10 percent.
4  **Q   Okay.**
5  A   What you typically would do is, you wouldn't weight,
6      you would do missing data analysis.  There are
7      algorithms that you can use to -- the word is lost,
8      left my mind for the moment -- but where you fill in
9      the missing data with information that you have on
10     the people who have data.  And you look at the
11     variables that they don't have, or variables that
12     they do have, and see what somebody like them would
13     have said, and then you use that.  And
14     there's multiple -- imputation.  You would impute
15     the data.  You wouldn't re-weight the data, you
16     would impute the data.  And then there's different
17     ways to do that.  You typically do that in
18     longitudinal studies.  You don't typically do that
19     in survey studies with only 10 percent missing data
20     or less.
21 **Q   So if it's 10 percent or less, you don't typically**
22     **impute the data for the attrition analysis.**
23 A   No.  And usually the differences are not huge, and
24     we didn't think they were huge in this case either.
25 **Q   Okay.  Another thing you did is -- strike that.  One**

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                          4/29/2013

Page 145

1    thing you did is you looked at your sample and
2    certain demographic characteristics; so, for
3    example, you looked at the proportion of males, the
4    proportion of females, and the breakdown by race or
5    ethnicity, correct?
6    A   Yes.
7    Q   Did you find that your sample had the same
8    demographic characteristics --
9    A   As a national sample?
10   Q   -- as a national population?
11   A   You know, I looked at that the other day, and it was
12   darn close.  We had a little bit more people, and I
13   don't know statistically what it was, but there were
14   more people -- I looked at this in, I think, in the
15   Northeast, than there are in the population, in our
16   sample, than there are in the population.  And we
17   had fewer people from the West in our sample than
18   there in the normal population, but, for the most
19   part, demographically it was actually pretty
20   similar.
21       I don't remember the exact results.
22   You know, it's sort of funny, I remember that the
23   male-female was almost exactly the same.  It was
24   sort of scary how close it was.  It was less than
25   one percentage point similarity.

Page 146

1        The ethnic groups, I think, were
2    within the range, but I don't remember.  But when we
3    compared it, we were pretty satisfied, at that time,
4    and that paper.  We probably cite it in here, so you
5    can go read it, and they'll be a quiz later.
6    Q   What's the range that you just referred to?
7    A   The range, that 95 percent confidence interval that
8    we've talked about that plus or minuses within the
9    error.  You could take two samples and they're never
10   going to be perfect.  That's why I was so shocked
11   they were so close.  I think they were, like, within
12   0.03, 0.03 percent, in terms of gender.  That's what
13   sticks in my head that jumped out.
14       In terms of other ethnic groups, I
15   don't really remember, but I think they were all
16   within the range of, you know, that error rate.
17   Q   Do you recall what the error rate specifically was
18   for this study?
19   A   No, I don't.  I don't.
20   Q   But there was an error rate?
21   A   Well, you know, we didn't do this in a prevalence
22   way, which is why we didn't actually calculate it,
23   but the answer is, there's always an error rate.
24   There's always an error rate, right?
25   Q   Okay.

Page 147

1    A   It can be known, but because we weren't specifically
2    interested in prevalence of sexting, we didn't
3    calculate it, so I don't know what it is.
4    Q   So you didn't mention an error rate in your article,
5    in other words.
6    A   Correct.
7    Q   What do you mean that an error rate can always be
8    known?
9    A   Well, you know that, if you have the data, you can
10   calculate it, right?  The error rate is a little bit
11   different than the confidence interval necessarily.
12   The standard deviation is your error rate in your
13   sample, right?  And so, if we know the mean, if you
14   can calculate a mean, you can calculate standard
15   deviation, because you know the variance around that
16   mean, and so that's your error rate for your sample,
17   and that's known.  And I don't know that we reported
18   that here.  I just don't know.
19       This was percentages, so it's
20   slightly different than just means, but I just don't
21   remember if we report it here or not, but it's
22   knowable, because we have the data.
23   Q   Okay.
24   A   Could I calculate it?  Could I figure it out?
25   Probably, we could.  But I don't know if we reported

Page 148

1    it here.  I won't take our time to look it up, but,
2    if you want, I will.
3    Q   One thing I was interested in is, on page five of
4    Exhibit 3, second column in the first paragraph
5    that's on the top of the second column, you have a
6    sentence, it says, "Second, owing to our sampling
7    methods, some racial and educational groups were
8    under-represented and our results may not be
9    generalizable to the" --
10   A   Where are we?
11       MR. BAUMGARDNER:   Yeah, I'm sorry.
12   BY MR. SWINTON:
13   Q   Page five.
14   A   Yeah.
15   Q   The second column.
16       MR. BAUMGARDNER:   Can you just point
17   it out on the page.
18       MR. SWINTON:   It's right under the
19   table.
20       MR. BAUMGARDNER:   Oh, okay.  All
21   right.
22   A   So there I'm being a little bit more circumspect,
23   because of all the things we talked about earlier,
24   right, about no sample is perfect, right?
25   Q   Just for the record, so we have it, this is the

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 149

1   sentence that says, "Owing to our sampling methods,
2   some racial and educational groups were
3   under-represented and our results may not be
4   generalizable to the YA population as a whole."
5   A   Right.  Right.
6   Q   And so go on, you're saying here that some of the
7   groups are under-represented.
8   A   We are saying exactly what I said before, which is
9   that every sample has limitations, every study has
10   some limitations of one kind or another.  And in
11   this example, we are also limited.  So, for example,
12   we may not have very many Native Americans in our
13   sample, right?  In terms of -- I don't know what our
14   rates were of these groups, of the four main groups,
15   but, you know, note that we didn't start with any
16   Asian seeds, but we -- I don't think we didn't start
17   with any Asian seeds -- but we ended up with Asian
18   Americans in our sample.
19        So the bottom line is there could be
20   that some groups, because we don't have that perfect
21   random sample, were not completely represented.  And
22   if I had that table, comparing to our national data
23   to the Census data, I'd be able to answer your
24   question more precisely, that we might have been, on
25   one of the groups, outside of that 95 percent of

Page 150

1   plus or minus kind of thing.  And, you know, you can
2   do a statistic to test that, and I don't remember
3   what those were.
4        I can say confidently, though, we
5   don't have a wildly crazy sample here.  I'm pretty
6   confident that we don't have a wildly crazy sample.
7   Could you poke holes in some pieces of it?  I would
8   agree, as I already did, in the record for
9   perpetuity, now again, in two different records.
10   Q   Those holes would be under-representation of certain
11   racial and educational groups.
12   A   Possibly, yeah.  For example, I think the
13   educational groups is, our sample is slightly more
14   educated than the population.  Now that I'm thinking
15   about it, that was one that, our sample had more
16   college students, or some college, than the general
17   population, so our group is a little bit more
18   educated.  Higher SES, remember what you said,
19   presumably, what you said before, not necessarily.
20   But we know education is correlated with
21   socioeconomic status, that's what SES says.
22        And so, like I was saying before, if
23   we have any distribution of economic tails, it's
24   probably the lower end, for that fact that I just
25   told you.  So I think that's what we mean by

Page 151

1   educational groups.  We have not as many people who
2   are not in high school, or had not completed high
3   school, for example.
4   Q   It might help, maybe we could look at the Census
5   data, and I think --
6   A   Did you have that paper?
7        (Zimmerman Deposition Exhibit No. 4
8        was marked for identification.)
9   A   This is the table I think I was looking at.
10   Q   Just, for the record, I just handed you a document
11   marked Zimmerman Exhibit 4.  It's an article
12   entitled Innovative Recruitment Using Online
13   Networks, and you are a co-author of this paper,
14   correct?
15   A   Yes.
16   Q   So, I believe, the table is on the third page of
17   this article, that might be helpful.
18   A   Yep, Table 1, that's what I'm talking about.
19   Q   It has Census data.
20   A   Look at that, I remembered sex almost exactly; I did
21   remember it was 0.03.  That's amazing.
22   Q   So the information in the middle column, since this
23   was all --
24   A   The middle column is the weighed data, so I think
25   that's what we're going to pay attention to.

Page 152

1   Q   And because both articles were based on analyses of
2   the same data, we can just look at Table 1 in this
3   article, correct; we don't have to go back and look
4   at the data in the 2012 article, in determining the
5   representation of the population of the study,
6   correct?
7   A   Yes, I think that is correct.  I'll just
8   double-check, but I think the answer is, yes.  We
9   actually had two less respondents, so I don't know
10   why we have had two less respondents, but I would
11   say, yes, that's correct.
12   Q   Just to be sure, why don't we compare the answers in
13   Table 1 on page four of Defendant's Exhibit 3.
14   A   To the Census data --
15   Q   Yeah, to the Census data in Defendant's Exhibit 4.
16   A   Okay.
17   Q   So, for example, the under Race, the black or
18   African American percentage in the sexting study was
19   five percent, and in the 2010 U.S. Census it's
20   12.6 percent.
21   A   Correct.
22   Q   And you don't recall what your margin of error was.
23   A   No, but I would be surprised if that wasn't outside
24   the margin of error, so that's one of the examples
25   of maybe ethnic groups were not as well represented.

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 153

1    But I don't remember that exactly, but it would be
2    surprising to me if that would not be out of the
3    range.
4    **Q   So that was probably outside of the margin of error.**
5    A    Um-hum.  By the way, when we're looking at Table 4,
6    just for the record -- I mean on page four, Table
7    1 -- from the sexting study, this is not exactly the
8    same sample as that one, because this is only the
9    760, so these are the people with some missing data
10   on the variables; whereas, this is the sample,
11   that's just the description of the sample which
12   exists, but if they didn't answer a question, they
13   might not be in this data.
14            **MR. BAUMGARDNER:**  When you say,
15   "this," why don't you specify which table.
16   A    The table in the Bauermeister, et al., study, ZX 4,
17   includes our sample.  The table that we're looking
18   at in the sexting study, Gordon-Messer, et al., is
19   only those people that had the data for whom
20   analyses were done, or the ones that we did the
21   analysis on for that paper, the sexting paper,
22   right?  So that's why -- making it confusing.  Do
23   you understand what I'm saying?
24   **BY MR. SWINTON:**
25   **Q   I do.  Which set of data were your conclusions in**

Page 154

1    **your sexting studies based on?**
2    A    Based on page four of the sexting study.
3    **Q   Okay.**
4    A    So why don't we look at that.
5    **Q   Correct.  Okay.  That seems like a good idea to me.**
6    **And so what we just looked at was the black, African**
7    **American, population.  In the sexting study, it was**
8    **five percent, and in the U.S. Census data --**
9    A    It was 12.6.
10   **Q   -- it was 12.6.  So there the difference was 7.6**
11   **percentage points, and you thought that probably is**
12   **outside the standard of error.**
13   A    Again, I'm guessing.  I didn't do the calculation,
14   but, you know, educated guess.
15   **Q   Okay.  Can look at a couple others.  So Hispanic/**
16   **Latino in the sexting study was 8.9 percent, and in**
17   **the U.S. Census data it was 16.3 percent.**
18   A    Um-hum.
19   **Q   So do you think it's likely that was outside the**
20   **margin of error?**
21   A    Again, you know, probably.  Maybe not, but probably.
22   **Q   And the difference there is, if I'm doing my math**
23   **correctly, 7.4 percent.**
24   A    That's right.  And then, as long as you're doing it,
25   go the other way, too, with the Asian Americans.

Page 155

1    **Q   Sure.  So in the sexting study --**
2    A    That's what explains it, is we have a larger number
3    of Asian Americans than the general population.
4    **Q   The sexting study, you had 11.2 percent, and in the**
5    **U.S. Census data it's 4.8 percent.**
6    A    Right.
7    **Q   Okay.  So those are some of the disparities in the**
8    **racial demographics.  And then, I think, you also**
9    **mentioned education, so in the --**
10   A    We don't really have it broken down in the Table 1
11   of the sexting paper, but if you look at it in the
12   other paper, just comparing those, you can see we
13   have very few people with less than an eighth-grade
14   education, comparatively.
15   **Q   Right.**
16   A    And sometimes it's not just the difference between
17   the two, but it's the percentage of the difference
18   given the total kinda thing, right?  So 0.01 versus
19   1.9 might actually be a bigger difference
20   statistically than five to 12.5, just as an example.
21   **Q   Because 0.01 is such a small number.**
22   A    Yeah.
23   **Q   And a small proportion of 1.9.**
24   A    Exactly.  That's the key, it's proportionate.  And
25   you can see also that we have a little higher

Page 156

1    educated people in our sample, which you could
2    argue, and I would, and this is why I think the
3    peer-reviewed process accepted it, was that, because
4    we're interested in internet use, who are the people
5    more likely to use the internet?  And they are
6    probably also the more likely people to be using
7    cell phones for sexting, because they have the more
8    highfalutin phones that make that relatively easier
9    to do.
10            My wife can do it on her cell phone,
11   as old as it is, but it's not as easy as an iPhone,
12   you know, I mean, or much less expensive.  You know,
13   smart phone, it's really easy, take a picture and
14   send it, right?  And so the bias that we think we
15   have in our sample is actually, I would argue, would
16   be probably working against our percentages
17   potentially, right, because we are getting the
18   people who are actually doing it, so by not
19   including them -- let me say it a different way.  By
20   not including people who are less likely to text,
21   you know, what we're trying to generalize to is the
22   more appropriate population, I guess, is what I'm
23   trying to say.
24            It was like what I was saying before,
25   it depends on who you want to generalize to, right?

HURON REPORTING SERVICE   huron4deps.com
and Video Conferencing Center   734-761-5328
Established in 1972

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 157

1    So if we're generalizing to people who use
2    technology, I'm more confident in that than, you
3    know, broadening it to, you know, everybody, but
4    that's kind of what we're saying here.  Does that
5    make sense?
6  Q   Yeah, so it's fair to say that this target
7    population for your sexting study was people who use
8    technology frequently.
9  A   Well, it was actually for internet.  It was a
10   virtual network study, so it was for people who use
11   the internet.
12 Q   So that the sexting study, the target population was
13   people who frequently use the internet.
14 A   I wouldn't use the word "frequently" in that
15   sentence.
16 Q   Okay.
17 A   'Cause I don't know how much they used it, but it's
18   for people who use the internet, and for people who
19   use social networking sites on the internet.
20 Q   So you weren't looking at people who don't use the
21   internet.
22 A   Probably not.  That's not where we started.  And, as
23   I said earlier, I think we probably didn't get very
24   many people who don't use the internet to do our
25   study, because you had to fill out the questionnaire

Page 158

1    on the internet; it was the only way to do it.
2  Q   And the target population wasn't people who use
3    social networks.
4  A   The target population for the virtual network study,
5    correct; however, we started with people who used
6    social networking sites, right?  But it's very
7    possible that, as you went down in a generation from
8    that seed, that one of their friend's friend's
9    friend had a friend, who doesn't use social
10   networking sites, and got an email and clicked on it
11   and did it; that's certainly possible.
12 Q   What do you mean when you say that results may not
13   be generalizable?
14 A   I teach my students to always be circumspect in
15   their language.  If you say, These are
16   generalizable, you open yourself up to having to
17   defend an undefendable position.  So use tentative
18   language, and you're safe, you're safer.  And so
19   maybe we can't, but maybe we can, right?
20        It's a lot easier to defend that than
21   it is to say, It is generalizable, 'cause then you
22   have a different level of -- you have a different
23   level of evidence, right?  And so we use softer
24   language to not get too far from our data, right?  I
25   try to teach my students to stay somewhat close to

Page 159

1    their data.  I'll just leave it at that.
2  Q   So in this instance, instead of saying, Our results
3    are not generalizable, you said, Our results may not
4    be generalizable.
5  A   Right.  What are I getting at?  I'm not sure -- I'm
6    leaving the possibility open that they could be
7    generalizable.  I still think, even though, some of
8    the things we just pointed out, I still think that
9    our rates are probably close, within that 95 percent
10   confidence interval, once we have enough data to
11   calculate it.  I will be shocked if our data isn't
12   in that 95 percent confidence interval, eventually.
13        We don't know the answer to that yet,
14   but, I have to tell you, what I was more surprised
15   at is how little it happened, you know.  I mean, I
16   thought we would have even higher rates than this,
17   frankly.
18 Q   And the rates are the comparison between the sample
19   population from your study with the U.S. Census.
20 A   No, I'm just saying the rates of what we found
21   sexting in our sample, I was actually surprised that
22   it was as low as it was.  I thought it would have
23   been higher.
24 Q   Okay.  Okay.
25 A   For all the reasons that I said, you know, but it

Page 160

1    was still pretty high.  I mean, if it was very low,
2    we couldn't have done these analyses, because we
3    would have had too few people, right?  It goes back
4    to that statistical problem.
5        What that number would have been, I
6    don't know.  If we had 10 percent, we probably would
7    have done it, but it wouldn't have been as
8    interesting.  But I would be surprised if it isn't
9    one in three young adults who are doing some of this
10   behavior, one in four, but, again, who knows.  We
11   don't know yet for sure, definitively.  We never
12   know, really.
13 Q   I wanted to ask you a question back on your drug use
14   study, which I think we said was Zimmerman Exhibit
15   4.
16 A   Zimmerman Exhibit 4, oh, okay.
17 Q   The innovative recruitment.
18 A   Yeah, let's look at that, sure.  Isn't there another
19   table in there?
20 Q   I think that was the only one.  So on that same page
21   with the table, page 836, second column, under the
22   heading Data Analytic Strategy, you talk about the
23   95 percent confidence interval when you were
24   estimating whether the data --
25 A   -- of substance use?

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 161

1   Q   Yeah, matched the national prevalence estimates.
2       Now, can you remind me again, how did you arrive at
3       the 95 percent confidence interval?
4   A   I'll answer that in just a second.
5               MR. BAUMGARDNER: Take your time if
6       you need to review the report.
7   A   There was a table that I saw, in maybe a different
8       paper, that compares it to the national study. Was
9       that another paper? Might have been a subsequent
10      paper to this.
11              Anyway, back to your question, how
12      did we calculate the confidence interval. The
13      actual algorithms, I don't remember, but you use,
14      you know, the weighted data, and you -- how do you
15      compute the prevalence -- you know, I didn't do
16      that, so I don't know. I'll just say I don't know.
17      I don't know how we did that. It's pretty standard,
18      but I have to think about that for a minute, right?
19      Let me think about that. I'll come back.
20  BY MR. SWINTON:
21  Q   Okay.
22              MR. BAUMGARDNER: I mean, you can
23      take your time right now, if that would be helpful.
24              MR. SWINTON: Limit it to making
25      objections, right?

Page 162

1               MR. BAUMGARDNER: No, but I'm telling
2       him, if he needs more time, you certainly weren't
3       going to press him for an answer without letting him
4       think about it.
5               MR. SWINTON: Okay.
6               THE WITNESS: Yeah, okay.
7   A   What you do is you get your standard error of your
8       estimate, which is a statistical information based
9       on your standard deviation and your mean and your
10      sample size, and then you calculate the plus and
11      minus like you would in a survey.
12  BY MR. SWINTON:
13  Q   Right.
14  A   And then you say, okay, so here's our confidence at
15      95 percent confidence interval. What I'm surprised
16      about is why that's here. I don't remember the
17      study. You probably have other papers, right?
18      We'll get to it? Do you have the paper where
19      actually there's a table of the relationship, I mean
20      our sample and the national sample of study from
21      SAMHSA?
22  Q   I don't --
23  A   You don't have that study.
24  Q   No, this is the only study I think you cited in your
25      expert report.

Page 163

1   A   Okay.
2   Q   About the drug use.
3   A   Wonder where I saw that. I'm just looking at her,
4       not that we had talked about it. I just happened to
5       look in that direction. That's why I turned this
6       way immediately.
7               I don't know where I saw that. There
8       was another paper that we actually had a table, I
9       thought we had a table. Maybe it was a table that
10      we ended up not including because they asked us to
11      take it out or something. I think it's reported
12      here on 837, right, where our confidence interval
13      is. And it shows you the 95 percent confidence
14      interval, you know, for example, alcohol use,
15      62.4 percent, confidence interval 59.1 to 65.7,
16      right? And that's calculated on the issues. That's
17      what that's telling you, that's what the CI is,
18      that's what we're saying.
19  Q   Okay.
20  A   Okay?
21  Q   So you don't have the confidence intervals in your
22      sexting study, though, correct?
23  A   Correct. Because, again, that wasn't a study about
24      sexting prevalence.
25  Q   Okay.

Page 164

1   A   Right? But we, obviously, could calculate it, and I
2       didn't calculate it. Maybe I should have calculated
3       it before we came here today.
4   Q   So the confidence interval is ascertainable for the
5       sexting data, it just wasn't listed in your article.
6   A   Correct.
7   Q   And the margin of error is also ascertainable, it
8       just wasn't included in your article on sexting.
9   A   Correct.
10  Q   Okay.
11  A   Correct.
12  Q   And so, when we look at page 837 where you just
13      pointed out, and the confidence interval for alcohol
14      use, for example, is 59.1 to 65.7, that's the same
15      thing as a margin of error, basically.
16  A   Correct. Basically, yes. That's the 95 percent
17      confidence interval. That's that, say, if it falls
18      in there, then we are 95 percent sure that we got
19      it.
20  Q   Okay.
21  A   That we're confident that the number that, you know,
22      our standard of error isn't so crazy that we're
23      outside of that range. Make sense?
24  Q   It does. And that information wasn't included in
25      your sexting report, because, in your sexting

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 165

1   article, you weren't trying to determine the
2   prevalence of sexting.
3   A   Correct, we weren't trying to see -- because our
4   study was not designed for sexting.  Our study was
5   designed for, you know, alcohol use, so we had
6   specifically that charge, that we said we were going
7   to look at how representative our data are for
8   substance use, but you could do it for sexting; I
9   mean, you could do it for sexting.
10          I don't remember, but there's
11  probably missing data on those as well, for all the
12  reasons we talked about before.  We could do it, but
13  we weren't doing that.  We wanted to know if sexting
14  was related.  Actually, what we were really
15  interested in was sexting related to risky sex
16  behavior; do people, who do this, do other risky
17  sex?
18          I have to say, the bottom line is,
19  what we found, which was, again, surprising to me,
20  but maybe because I'm a silverback, a gray hair, is
21  that it apparently has become part of the dating
22  process.  I mean, it's kind of strange to me, but
23  that's what our data, in that sexting study, sort of
24  suggests, that it's -- we concluded it's not
25  aberrant behavior and that it seems, because you're

Page 166

1   not more or less likely to have more partners, or do
2   anything more promiscuously, or get more likely to
3   engage in, you know, risky behaviors, you know,
4   without condoms or whatnot, that sexting must be
5   just part of the process and not really related to
6   anything else.
7   Q   One thing I'm interested in, we looked at this a
8       little bit earlier, was the definition of sexting.
9       So in your 2012 sexting study, I know we looked at
10      this together earlier, you define sexting as sent
11      a --
12          MR. BAUMGARDNER:   This is from --
13          MR. SWINTON:   This is from Zimmerman
14      Exhibit 3.
15  A   Exhibit three?  Oh yeah.  I got it.
16  BY MR. SWINTON:
17  Q   Your sexting study.  Second page, second column,
18      under Measures.
19  A   Yeah.
20  Q   So the definitions for sexting is sending a sext is
21      sending a sexually suggestive nude or nearly nude
22      photo or video of themselves to someone else and
23      receiving a sext is receiving a sexually suggestive
24      nude or nearly nude photo.  Did you define sexting
25      any more specifically than the definitions provided

Page 167

1   here?
2   A   No.
3   Q   Okay.
4   A   And those are similar to what other people have
5       used.  And we thought they were pretty
6       straightforward and that would be it, so, yes.
7   Q   Okay.  And as we clarified earlier, this does not
8       include any message that contained only written
9       content.
10  A   Yes.
11  Q   What do you mean by "sexually suggestive"?
12  A   I forgot what his name is, Weiner, Weiner's photo;
13      in other words, there was no genitalia, but he was
14      in his underwear; that's sexually suggestive, right?
15          I mean, it's a slippery slope, what's
16      sexually suggestive.  For some people, standing here
17      in a tie is sexually suggestive; being in a uniform,
18      right?  I mean, that's not what we mean.  We do mean
19      something a little bit more lascivious.  That's what
20      we meant, but, you know, it's in the eyes of the
21      beholder, right?  Somebody might say a man without a
22      T-shirt, without a shirt on, fully clothed below the
23      waist, is sexually suggestive, and they might have
24      said "yes" on that, it's possible.  We don't know.
25          Nude, we would think that most people

Page 168

1   would think that was without any clothes on.  But
2   sexually suggestive, it goes back to you know what
3   pornography is when you see it, right?  What's
4   pornography?  I don't know.  But I think, what we
5   were in meaning was a coy-looking, or a picture of
6   you in your underwear, things like that.
7   Q   So it could be somebody, who was fully clothed, but
8       was poised in a sexual manner.
9   A   One could potentially have interpreted this question
10      that way.  I would guess that would be a minority,
11      very small minority, because we said "nude or
12      sexually suggestive," so I think it would have to be
13      more than being in a uniform; although, again, for
14      some people, that could be, you know, sexually
15      suggestive.
16  Q   It could be a fully-clothed woman, who's showing her
17      cleavage.
18          MR. BAUMGARDNER:  Objection.  Go
19      ahead, you can answer.
20  A   I have to say, you know, I'm not going to get in the
21      business of, you know, what somebody thinks is
22      sexually suggestive.  We use the language other
23      people have used to be consistent with that.  We
24      kind of looked and said, okay, well, this is a weird
25      thing -- not a weird, "weird" is not the right

42 (Pages 165 to 168)

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

1    word -- but this is a vague term, sexting, what
2    exactly is it.  So we looked and saw, tried to see
3    what other people would do.
4             I would, but I don't know, 'cause I
5    don't know about sexting until this, right?  And the
6    whole idea of it, could cleavage be?  For some
7    people, you know, it's kinda like pornography, some
8    people will say cleavage is pornography, right?  I
9    mean, I know people who would say anything -- some
10   people would say it's pornographic to be showing
11   your hair.  So that's a slippery slope that I'm not
12   sure I want to go down.
13   BY MR. SWINTON:
14   Q   Okay.  And just to clarify, your study didn't take
15       account of the number of sexts -- let me phrase this
16       question a little bit differently.  When people said
17       they sext, your study didn't take account of the
18       type of sext that they sent, correct, so, in other
19       words --
20   A   Correct.  So we don't know if it was a picture of
21       themselves in underwear, or if it was a picture of
22       themselves nude, or with somebody else.
23   Q   And your study also did not take account of the
24       frequency of sexting, correct?
25   A   Correct.  So if they did it once, they would say

1    "yes" to this.
2    Q   Or if they received a message, a sext, at one point
3        in time.
4    A   And if it was once, they would say "yes" to this.
5    Q   To one time in their life.
6    A   Right.  I can tell you, for behavior, the best
7        predictor of future behavior is past behavior, so
8        whether you received this is sometimes not under
9        your control.  But having sent it, chances are, you
10       sent one, you probably sent another, or you
11       certainly increased the probability that you would
12       send another, right?
13   Q   And your study did not measure the number of or the
14       proportion of mass sext messages.  So if I sent a
15       sext message to multiple people, that would be a
16       mass sext?
17   A   Oh, mass, no "t," m-a-s-s.
18   Q   Correct.  Yeah.
19   A   I thought you were saying "mast."  I'm, like, what's
20       a "mast"?
21            MR. BAUMGARDNER:  I thought it was
22       "masked."
23   BY MR. SWINTON:
24   Q   That's fine.  It's my Washingtonian accent.
25   A   Spokane accent of yours.  We have no idea.

1    Q   Okay.
2    A   No, we don't know.  We didn't ask them that
3        question, did you send in order to receive a sext to
4        more than one person at a time.  That's what you're
5        asking me.
6    Q   Right.
7    A   Don't know.
8    Q   And for receipt of a sext, you also didn't measure
9        the number of second-hand sexts received, correct?
10   A   Correct.
11   Q   So a person --
12   A   So if somebody sent you one, and you sent it to me,
13       we don't know if that happened, or if it just was
14       directly sent to me.  We don't know that, that's
15       correct.
16   Q   Okay.
17   A   That's curious that you would be asking me that,
18       'cause I think it would hurt your case.  But,
19       anyway, go on.  I talk too much.
20   Q   So we talked before about the order of authors on an
21       article, and you kind of described to me the basic
22       practice when there are multiple authors, so here I
23       see you're the fourth author listed.
24   A   Correct.
25   Q   What was your specific involvement in writing this

1        article?
2    A   Extreme.  I was involved at the very beginning.
3        Alison Grodzinski was, she might have been the one
4        who sort of mentioned the idea of sexting in the
5        first place.
6             Deborah, we tasked Deborah, who we
7        had hired as part of this; another advantage, is
8        that we hired a person.  We hired several people
9        because of this funding, which is exactly what it
10       was supposed to do.  But we hired her, she was the
11       project director, and we were working with her to
12       work on this paper, and Jose and I worked pretty
13       closely with her analytically.
14            I'm last author, because this is a
15       medical journal.  The Journal of Adolescent Health
16       is the primary journal; in fact, I think it's called
17       the official journal, of The Society for Adolescent
18       Medicine, so -- Adolescent Health and Medicine, I
19       think, is the official title of what the society is
20       called.  And it was a medical journal, so I was last
21       author, so in keeping with what we talked about
22       before.
23            Debbie did all the primary writing
24       and initial analyses, working closely with Jose, and
25       I was the PI of the whole project, principal

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 173

1   investigator, of the whole project.  I worked with
2   Debbie on the analysis as well, very closely.  She
3   would actually do the analysis, we would look at the
4   results, we would talk about the results, we would
5   re-do some analyses based on the results, for one
6   reason or another.
7            I'm sure we talked about whether we
8   should use the full data or the weighted date.  We
9   decided to go with weighted because of this idea of
10  prevalence, to get at that.  So I was involved with
11  basically every word that's on the page, and the
12  analyses, and the conceptualization of it.  That's
13  why I'm senior author on it.
14  **Q   Okay.  Okay.  I'd like to go back to Zimmerman**
15  **Exhibit 4, which is your study on Innovative**
16  **Recruitment Using Online Networks.**
17          **And as we've touched on before, this**
18  **article was looking at drug use among young adults,**
19  **and finding prevalence rates, and then comparing**
20  **that information with a study that was performed on**
21  **the national level to see how well RDS sampling**
22  **methods matched up with that national study.  And I**
23  **think we talked about before the national study, the**
24  **abbreviation is NSDUH, and that's the National**
25  **Survey on Drug Use and Health.**

Page 174

1   A   Yeah, thank you.  Very good.
2   **Q   So why was it important to have the data from the**
3   **national study?**
4   A   Because that is a study that people look to as sort
5   of a gold standard, because it's a national study
6   that, you know, uses -- you remember that continuum;
7   again, it's not perfect, there's lots of flaws and
8   problems with it, but it's in that direction, and
9   recognized to be in that direction, and a study
10  sanctioned by the federal government as being in
11  that direction.  And so we thought we'd use that as,
12  more or less, a gold standard.
13          You know, are there others that we
14  could have used?  You know, there's Monitoring the
15  Future, but there's some problems with that.  We
16  thought this was the best national study to kind of
17  compare it to.
18  **Q   So what were the criteria you were looking at in**
19  **trying to find the gold standard study?**
20  A   One that was widely accepted as a national
21  representative sample, with all it's warts and
22  pimples, and that was basically it.  And this is one
23  that people have used in the past.
24  **Q   And accepted by who?**
25  A   The field, substance use researchers.  We've seen

Page 175

1   comparisons made to it in the past saying how well
2   their sample matches up to national studies, and
3   whatnot.  So really academics, people who do
4   research in the field.  I'm not in the field of, you
5   know, practitioners or policymakers, so I don't know
6   to what extent they use it, but I would imagine they
7   would also use it a lot.
8   **Q   So you looked at different information that gave you**
9   **confidence that this was one of the best national**
10  **studios on drug use among young adults.**
11  A   Yes.
12  **Q   Okay.  And the results of your comparison were that**
13  **the different types of use of drugs that you**
14  **measured were very similar to the information and**
15  **findings in the national study, with the exception**
16  **of cigarette use, correct?**
17  A   Yep.  I must have looked at a first draft and they
18  told us to get rid of the table, because, you know,
19  these are the data I was looking at in this other
20  paper I was looking at.  But, yes, that was the one
21  thing, and that's because, we think -- was this
22  where you're going to go?
23  **Q   Please, go ahead.**
24  A   Of course, you want me to talk.  The more I talk,
25  the better it is for you, right?

Page 176

1   **THE WITNESS:**  Did you get that, too?
2   I guess you have to get everything I say, don't you?
3   I pity the person that has to read this.
4   A   Yeah, because our sample is a little bit more
5   educated, and we know that people who use cigarettes
6   are a little bit less educated.  You know, that
7   might not have been true 30, 40 years ago, but we've
8   gotten to the point where cigarettes are not a very
9   popular thing anymore, right?  And so more educated
10  people know this, they're getting the message, they
11  get it.  They understand that it's delayed effects.
12  They understand all these kind of things.  So higher
13  SES people tend to not smoke cigarettes, because
14  they also have, I don't know, they have
15  knowledge to not do it.
16          Maybe they don't think the same way
17  about marijuana or alcohol, I don't know why.  But I
18  think there's a push across America and across,
19  you know, both policies, across feds and states, and
20  all that sort of thing, so that didn't surprise us.
21          What actually surprised us more was
22  that our sample was actually pretty good for
23  everything else.  And alcohol use, which is actually
24  more ubiquitous, was pretty chose, too.
25  **Q   Well, I know we don't have a table in this document,**

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 177

1   but the summary of the comparison is on 837.
2   A   Yeah.
3   Q   On cigarette use it looked like your study found
4       lower rates of cigarette use than national, the
5       NSDUH study.
6   A   Uh-hum.
7                MR. BAUMGARDNER:   You have to answer
8       verbally, Doctor.
9   A   Yes.
10               THE WITNESS:   Thank you for keeping
11      reminding me.
12  BY MR. SWINTON:
13  Q   Your study found 19.9 percent, correct?
14  A   I'm just looking for the data so I can say, "yes."
15      Yes.
16  Q   The last sentence.
17  A   Yeah, yeah, I see it.
18  Q   And the NSDUH study was 35.8 percent, correct?
19  A   Correct.
20  Q   So your study found a lower percentage.
21  A   Right.  A significantly lower percentage, per your
22      language; a statistically significantly lower
23      percentage.
24  Q   So I just wanted to clarify, if you could go back to
25      your expert report, which we marked Zimmerman

Page 178

1       Exhibit 2.
2   A   ZX 2.
3   Q   ZX 2.
4   A   Yeah.
5   Q   Second page.
6   A   Did I say something that was not right?  I said,
7       "Tobacco."
8   Q   You said "Our study participants reported more
9       cigarette use."
10  A   That's just an error.  Where do I say --
11  Q   It's kind of in the middle of the paragraph, in a
12      parenthetical.
13  A   That's just an error.  That should be "less
14      cigarette use."
15  Q   Okay.
16  A   I, obviously, did this late at night or something,
17      or, I don't know why, but I made a mistake.
18  Q   Okay.
19  A   I actually thought I checked, 'cause I was doing
20      that, and I just must have read it wrong.
21  Q   Yeah, I wanted to make sure I wasn't missing
22      anything.
23  A   No.  No, you're not.  Thank you.  Can we put that on
24      the record to be corrected?
25  Q   I think it's on the record, yeah.

Page 179

1                MR. BAUMGARDNER:   It just is.
2                THE WITNESS:   Good.  Thank you.
3   BY MR. SWINTON:
4   Q   I think you're set.  Going back to the online
5       virtual network study of drug use, were you looking
6       for the results of your study to come within a
7       certain range of the NSDUH findings when you take
8       into comparisons?
9   A   No, we just wanted it to fall within the margin of
10      error.
11  Q   And the margin of error for the NSDUH study, or the
12      margin of error?
13  A   We wanted to see if our data were similar to those
14      data, so we did just basically a t-test comparing
15      the two.  So it's a little bit more complicated than
16      saying what you just said, 'cause the statistical
17      test takes into account the variation of the two
18      samples, and compares the mean and standard of
19      deviation across the two samples.  So it's not just
20      is it within that range, but is our standard error
21      within the standard error of them taking into
22      account the mean and variation around that mean.
23               I'm not trying to obfuscate here, but
24      do you know what I mean?  So it wasn't like, does
25      our number fall in that number, because it has to do

Page 180

1       with also the distribution of this number -- my left
2       hand to my right hand -- it has to do with the
3       distribution of what our data were and the
4       distribution of what their data were; do you see
5       what I mean?
6   Q   So you were comparing margins of error?
7   A   In a sense.  I mean, the exact algorithm, a
8       mathematician would have to tell you how that works.
9       But what you're really comparing is two
10      distributions, right?  And we never have a
11      population distribution, really, for all the things
12      we talked about before.  So we take the sample that
13      we think is a little bit closer to that gold
14      standard and we say, How close is ours to that?  And
15      so you overlap the two distributions.
16               And if they're very far apart, they
17      would be a statistically significant difference.  If
18      they're closer, there would not be, and that's what
19      we're finding in the main.  And because the
20      variation of this, of one sample, maybe overlap, but
21      outside of the variation of the other sample, and
22      that sample may have some variation outside of the
23      range.  The question is, do they overlap
24      sufficiently to not be statistically different?
25  Q   Okay.

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 181

1   A   And we did those analyses and they are not
2       different.
3   Q   Okay.
4   A   Except for cigarette use, in the direction that we
5       have now stand corrected.
6   Q   So it wasn't as simple as saying, Okay, our study
7       found of 62.4 percent of alcohol use, and the NSDUH
8       study found, you know, 64 percent, and so,
9       therefore, our findings are similar.
10  A   Yes, you'd say that, but it's because of the
11      statistical test that you've done.
12  Q   Okay.  Because you ran the algorithm?
13  A   Right.  Exactly.
14  Q   So the algorithm is what helped you determine that
15      the results of the RSD (sic.) sample population --
16  A   RDS.
17  Q   I'm sorry, RDS.
18  A   The RDS with the NSDUH.  I forgot we're talking to
19      somebody from Washington, so it's all about
20      acronyms, but, yes, yes, I think you have that
21      right.
22  Q   So let me just see if I can state it correctly, so I
23      can remember this.  So you ran an algorithm in
24      making your comparison, correct?
25  A   Correct.

Page 182

1   Q   And running that algorithm gave you confidence that
2       the sample population using RDS was similar to the
3       population from the national study.
4   A   Correct.
5   Q   Okay.  And I don't think I used only but one acronym
6       in that sentence, so . . .
7   A   That's very good.
8   Q   If we could turn back to your expert report.
9   A   Are you going find another mistake in it?
10  Q   Which is Exhibit 2.
11  A   I would have made it longer, but they only wanted
12      the two pages, keep it short.  More space for
13      errors.  Go on.
14  Q   So I was interested, you mentioned that, you know,
15      you say, "We believe our results are nationally
16      representative of young adults who use the internet
17      for several reasons," and you list three of them in
18      this paragraph.
19  A   Um-hum.
20  Q   And so the third one is you point to two other
21      studies on sexting, correct?
22  A   Um-hum.
23          MR. BAUMGARDNER:  You have to answer
24      verbally.
25  A   Yes.

Page 183

1   BY MR. SWINTON:
2   Q   How did you become aware of the two studies that you
3       mention that you compared your data to?
4   A   Whenever we do research, you know, whenever we're
5       going to write a journal article based on some data
6       we've collected, we search the internet, or we
7       network with people who may have done this before.
8           Usually we search the internet;
9       there's databases to search.  There's all sorts of
10      databases.  MEDLINE is probably where we would
11      start, you know.  And when you don't find much in
12      MEDLINE, you start going to other databases, and
13      PsycINFO, that kind of thing.  There's a lot of
14      overlap between these.
15          Some might get some more things on
16      the edges, but there's a lot of overlap in a lot of
17      these databases, ever more so.  And, frankly, now
18      you just go on Google Scholar and search things and
19      things pop up, so that's what we do.
20          And then we see a title, and we say,
21      Oh, that might be relevant; then we read the
22      abstract, and we say, Oh, that is relevant; then
23      we'll get the article and then we'll read the
24      article.  I have not read every single article
25      that's, you know, listed, that we list; many I have,

Page 184

1       but not all of them.
2   Q   I'm sorry, every article you list where?
3   A   That we cite, that we cite in the sexting paper.
4   Q   Okay.
5   A   I don't always read every one.  If I'm first author,
6       I'm more likely to.  Senior author, I'm more likely
7       to work with other people.
8   Q   Okay.  So I'm thinking specifically of the two
9       articles you reference in your expert report.
10      There's one in Benotsch, I believe, is the name from
11      2012, and there's one from 2008, The National
12      Campaign to Prevent Teen and Unplanned Pregnancy.
13      Did you find these articles using the same searching
14      methods you just described?
15  A   I didn't search it, so I don't know for sure, but I
16      would be shocked if it was any other way.
17  Q   Okay.  Who did the search?
18  A   Probably either Alison or Deborah of the two
19      authors.
20  Q   Okay.
21  A   One of those two probably did the search.
22  Q   Alison and Deborah were your co-authors on the
23      sexting --
24  A   Co-authors.  Deborah was the first author on the
25      sexting paper, Deborah Gordon-Messer, or Alison

HURON REPORTING SERVICE   huron4deps.com
and Video Conferencing Center   734-761-5328
Established in 1972

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 185

1  Grodzinski. I'm guessing they probably pulled up
2  some of this literature.
3  Q   Okay.
4  A   I mean, they probably pulled up many things, and we
5  talked about what they were, and we tried to place
6  our data in the field, like you always do. And I
7  recall that there was an incredibly, a derth of this
8  kind of studies, this kind of data.
9  Q   And this of data --
10  A   Which got us very excited, 'cause it meant we were
11  one of the first ones to be doing anything.
12  Q   And "by this kind of data," you mean --
13  A   On sexting.
14  Q   And prevalence rates of sexting.
15  A   Right, and sort of bigger studies on sexting, yeah.
16  Q   Okay. So when was that search run looking for
17  articles on sexting?
18  A   Oh jeez, when did this come out? '12. Probably a
19  few months before this actually came out.
20  Q   Okay.
21  A   You know, when you search things now, they aren't
22  gonna, say, come out in print. Things are published
23  before print now, and they're available on search
24  engines, so I'm sure we did it right before we
25  submitted this for publication.

Page 186

1  Once we submitted it, it sometimes
2  depends whether or not you go back to the literature
3  and update it. Journal of Adolescent Health is
4  actually pretty good at turn-around time. So I
5  don't think we researched it again to see if there's
6  anything new in between when we tried submitted it
7  to when we revised it and resubmitted it, I don't
8  think we searched again.
9  Q   So the search for other articles on sexting
10  prevalence would have occurred some time in early
11  2012.
12  A   Yes.
13  Q   Okay. And did you search again for articles on
14  sexting prevalence when writing your expert report?
15  A   No, I didn't.
16  Q   Okay.
17  A   Are there more recent ones, do you know?
18  Q   You know, I think there are other articles on
19  sexting, but it's not my --
20  A   It's possible, now that I'm looking at this. I may
21  need to change my answer.
22      (Break was taken.)
23  A   I might have asked Alison, when I asked her to give
24  me the 30 million, 'cause I'm seeing that we didn't
25  cite Benotsch, so I take this back. I probably, and

Page 187

1  it's, like, this is what happens when you get to be
2  old. I do these things, and I'm only remembering
3  things I only absolutely have to remember, and
4  sometimes I don't even remember those. I mean, it's
5  scary. And I don't think I have Alzheimer's.
6      But, you know, it's like I did this
7  three months ago, and chances are, now that I've
8  just looked at the citations here, that I might have
9  asked Alison, I said, Alison, can you update me with
10  anything else that's been going on about sexting,
11  and then she may have given me these, and then
12  that's why I cited them here, right?
13      I didn't ask her to write this. She
14  probably gave them to me, and then I looked at it,
15  and I said, Here's what it is, or I may have
16  searched something on the web and there was a report
17  about it or something, but, you know, that's
18  probably what happened.
19      So I did do some research; you know,
20  once I was given this assignment, I was given the
21  research, because I wanted to see if there was
22  anything in between. But I'm pretty confident that,
23  when we submitted this article, and from when it
24  came out, we didn't do more research on that. Do
25  you follow what I'm saying? So I may have done some

Page 188

1  more for this task, being the report that I was
2  asked to write by the law firm.
3  Q   You didn't do any follow-up research for purposes of
4  your article, in other words?
5  A   Correct.
6  Q   But you did do some searching for purposes of doing
7  your expert report?
8  A   It looks like I did now; you know, earlier I said,
9  "no," so don't prosecute me for this, please. It
10  looks like I probably did, since that was not cited
11  here, and we would have, because it's an obvious one
12  that we would have. So, yes, I did probably get
13  some, I just don't remember.
14      It's been a rough three months, four
15  months, actually. Whole year has been very
16  difficult, lots of things going on at work. And,
17  you know, this is just one of those things. And I
18  may have asked Alison to do some of this stuff, then
19  got the materials, wrote this thing up, and sent it
20  to them.
21  Q   Do you recall looking at any other studies on
22  sexting for purposes of your expert report?
23  A   No. I would have included it, I think. I would
24  have included it. I'm a straightforward guy. I
25  wouldn't have sort of hidden some stuff. I don't

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                          4/29/2013

Page 189

1    really have a dog in this fight.  You know, my only
2    dog in the fight is that I stand by my research,
3    that's my dog in the fight, so. . .
4  Q   Okay.  Did you try to find the gold standard of
5    studies determining the prevalence rate of sexting
6    for purposes of making your comparison in your
7    expert report?
8  A   I think I tried to see if there were other studies
9    that we could compare, not necessarily -- well,
10   compare to or see how ours -- I want to be careful
11   about how I say this.  What we did in the other
12   ones, we literally wanted to compare it, because,
13   you know, we're saying, okay, if this is the gold
14   standard, and I think a lot of people, while not a
15   perfect standard, but on that continuum closer to
16   better than worse, that, you know, we were doing
17   that comparison.
18           In this case, what I was doing is not
19   necessarily comparison to a gold standard, but
20   trying to see what other people have also estimated
21   to see how much more confident I might be that our
22   estimates are within the ballpark.
23           And so that's a little bit different
24   kind of comparison; not to a gold standard, but
25   going back to that other stuff I was talking about

Page 190

1    regarding, you know, having multiple studies
2    pointing in the same direction gives you confidence
3    that you have something that you're close to the
4    answer, or have some sense of what it is, and that's
5    what this was for.  So it was that kind of
6    comparison, not a gold standard comparison.
7           I don't think there's a gold standard
8    at this point yet of sexting.  I think we're going
9    to get there, as this becomes more an issue out
10   there.  Although, it's been in the news more lately,
11   frankly, so maybe it'll wane and be nothing, we
12   don't know.  Although, I just read a sexting study,
13   for the journal I edit, from South Korea.
14           It's irrelevant to this study,
15   otherwise I would have said, oh, I got to read this
16   more.  But somebody just sent it in, and I just sent
17   it out for review, and, at that point, I don't
18   really read them super carefully.  I read them to
19   make sure that they're in the ballpark, I think, as
20   I told you before, and that there's nothing really
21   egregious about it, and it certainly passed that
22   must technology.  But when I was reading it, I was
23   thinking should I really read this super carefully
24   before the deposition, because I just did it over
25   the weekend.

Page 191

1           So I think it's still out there, but,
2    you know, who knows.  I don't know if they'll do
3    that.  I mean, maybe, given this case, maybe, given
4    some other things, it'll become a national issue
5    that we'll want to know the answer to.  Maybe some
6    of these national studies that are being done,
7    they'll ask them.
8           You know, the CDC does these national
9    studies also, YRBS, Youth Risk Behavior Survey, and
10   the BRFS, Behavior Risk Survey, which is adults, and
11   those have lots of problems with them.  But those,
12   again, are used for all sorts of policy decisions,
13   and pointed to all the time, not peer-reviewed.
14   Just another example, like the Uniform Crime Report.
15   And I bet you YRBS has sexting in it now.  I'd be
16   surprised if it doesn't.  Might be worth doing some
17   work there.
18           I mean, the bottom line is it's not
19   zero, you know.  The question is, how big is it?
20   But, I mean, I would say, you know, if I'm not
21   accurate, if we're not accurate 30 percent, I doubt
22   that it's lower than 10 percent, and it could be
23   higher.  And it could get to be more, who knows; you
24   know, we'll never know.  But, anyway, go on, you
25   have questions.  You didn't ask me anything, I keep

Page 192

1    talking.  That's really bad.
2  Q   Going back to the comparison you're making to the
3    existing literature on sexting, you said you wanted
4    to situate your findings from your sexting study
5    within the existing literature to see if it was
6    similar.
7           MR. BAUMGARDNER:  Objection.  Go
8    ahead.
9  BY MR. SWINTON:
10 Q   Is it fair to say that you wanted to situate the
11   findings from your sexting study within the existing
12   literature?
13 A   Ask the question again.  I'm sorry.
14 Q   Is it fair to say that, when you were making your
15   comparison between the findings from your sexting
16   study and the --
17 A   These other guys.
18 Q   -- two studies you mention in your expert
19   report, you wanted to compare the findings from your
20   sexting study to other findings of studies that were
21   already in existence?
22 A   Correct.
23 Q   Were you looking to come within a certain range of,
24   a percentage range, of other findings?
25 A   No, but, yeah.  I mean, no, but, yes.  I mean, I

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 193

1  didn't have a predefined range, but if they said
2  theirs was, like, three percent, and mine was 30,
3  that would have raised some eyebrows to me.  When
4  they said theirs was 20 or 25, and mine is 30, that
5  doesn't.
6         Where would my eyebrows have not been
7  raised?  I don't know.  I didn't do a statistical
8  test, it was just a binocular test; two eyes looking
9  at the data, looking at where we were.  I was
10 actually a little surprised that we were as close as
11 we were.
12        The samples are not exactly
13 comparable, there's all sorts of problems with their
14 comparison.  But, again, what I do, when I try to
15 think logically about what I find, because, again, I
16 advocate that everybody's studies, everybody's,
17 everybody's -- underline that three times, getting
18 more pages -- is flawed.  There's no study that's
19 done perfectly.
20        So then the question is, well, so
21 what do we know?  You know, these are data, these
22 are facts that exist, so how do we know, how do we
23 have confidence in that, and to what extent is it
24 somewhat can go in other places.
25        So what we do is what I just did

Page 194

1  here; I mean, I went right back to my wheelhouse.  I
2  went right back to what I know, what I know to
3  convince myself that my data has some veracity, some
4  validity.  And so one of the things we do is we do
5  that, and it's in the ballpark.  And I don't know
6  what would be not be out of the ballpark.  I would
7  say, you know, like, three percent, 10 percent.  I
8  often do that in my research class, too, is I talk
9  about extremes, that's really easy.  Where it gets
10 really hard is, where's that gray area?  You know,
11 it's really easy to say, three percent and
12 30 percent, those are different, you know, you worry
13 about that, but 30 percent and 23 percent?  I'm not
14 so sure that's so different; you know what I mean?
15        And, again, if you did the study
16 where you looked at all the different samples, you
17 had enough samples to do it, to sample it, you could
18 actually have a 95 percent confidence interval, but
19 that's what it's all about.  It's all about the
20 probability that this is close enough, right?
21 Because our science is not exact.  I mean, we depend
22 on statistics, and so we try to get exacting by how
23 we measure things and how we get our sample; you
24 know, we try to get really good sample frames.
25        This RDS is a creative sample frame

Page 195

1  for this kind of work at this moment.  In ten years,
2  we won't be having this conversation, this won't be
3  any part of it.  This is going to become -- I bet
4  this is going to become a very standard practice,
5  and we're going to have lots more studies about this
6  that we'll be able to estimate.  Unfortunately, we
7  are where we are.
8  Q  When you make the comparison between the results of
9     your study and other studies, is it fair to say that
10    it gives you more confidence the more number of
11    other studies there are that have conclusions
12    similar to the findings in your study?
13 A  These are long questions.  Maybe my mind is
14    drifting.  Say that again.  I don't think I could
15    disagree with what you just said, but it makes me
16    think, like, why would you be asking, it seems like
17    an obvious answer, so I just need you to ask it
18    again.
19 Q  Sure.  I'm actually thinking of something I think I
20    recall you saying earlier this morning, so I want to
21    make sure I'm remembering this point correctly.  I
22    believe you said that, when you make a comparison
23    between the findings from your own study and other
24    studies, it makes you more confident in your own
25    findings the greater number of similarities there

Page 196

1  are.
2  A  Correct.
3  Q  Meaning, the greater number of studies there are
4     that have similar findings to your findings.
5  A  Correct.
6  Q  So the more studies there are that have similar
7     findings to yours, the more confident you feel in
8     your own findings.
9  A  Correct.
10 Q  So, in this case, you compared your findings to two
11    other studies.
12 A  Correct.
13 Q  And was that enough to give you confidence in your
14    own findings for sexting?
15 A  Well, it would have been, would I be more
16    comfortable -- another way maybe to ask it, would I
17    be more comfortable if there were 30 studies that I
18    could compare to, or if there was some kind of gold
19    standard everybody agreed that this was sort of, you
20    know, or at least used in some way, like the SAMHSA
21    study?  Yeah.  You have what you have, and you have
22    to start somewhere.  Do I wish I had more studies?
23    Yes.
24           These two studies similar to mine, I
25    think that's a good start.  I don't have any reason

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 197

1  to believe that they did something weird and kinda
2  get their sample to be that number; I know I didn't.
3  And so I think that this is probably where the
4  number probably is. If we have ten more studies,
5  I'll answer that question more confidently.
6  Q  You touched briefly on some of the sampling methods
7     that the other studies used, so I just wanted to ask
8     you a few questions about those.
9              (Zimmerman Deposition Exhibit No. 5
10             was marked for identification.)
11 Q  Dr. Zimmerman, I just handed you a document marked
12    Zimmerman Exhibit 5, and it's an article titled
13    "Sexting, Substance Use, and Sexual Risk Behavior in
14    Young Adults," by Eric Benotsch, and a few other
15    authors.
16 A  Yes.
17 Q  Do you recall how the sample was selected in the
18    survey?
19 A  No, that's actually what I was looking at.
20 Q  I believe it's described on the second page under
21    Methods.
22 A  Yeah.
23          MR. BAUMGARDNER: Take a minute to
24    review it, Doctor.
25 A  Yeah. Okay, so these were students in undergraduate

Page 198

1  class. Now, let me anticipate your question --
2          MR. BAUMGARDNER: Why don't you let
3     him ask his question. Have you had a chance to read
4     through it?
5          THE WITNESS: Um-hum. I mean, I can
6     see that it was undergraduate psych class.
7          MR. SWINTON: Ms. Baumgardner, you're
8     limited to objections only, right?
9          MR. BAUMGARDNER: Yeah, but I just
10    wanted him to be responsive to your question.
11         MR. SWINTON: Okay.
12         MR. BAUMGARDNER: So we can move
13    things along.
14         MR. SWINTON: Okay, but it's okay if
15    he speaks, as long as it's not anything privileged
16    or protected, correct?
17         MR. BAUMGARDNER: Understood.
18         MR. SWINTON: Okay.
19 A  Go on. Don't fight now. Come on, be nice. I get
20    it. I get it.
21 BY MR. SWINTON:
22 Q  My question was if you recalled the method of
23    sampling for this study, and have you refreshed your
24    memory on that?
25 A  Yes.

Page 199

1  Q  And it's correct that this study, or the sample was
2     selected by choosing or selecting undergraduate
3     students enrolled in psychology classes at a
4     university in the mid-Atlantic region of the United
5     States, correct?
6  A  Um-hum.
7          MR. BAUMGARDNER: You have to answer
8     verbally, Doctor.
9  A  Yes. Yes.
10         MR. BAUMGARDNER: Is it okay if I
11    tell him to do that?
12         MR. SWINTON: That's fine.
13 A  It was probably VCU, but go on.
14 BY MR. SWINTON:
15 Q  That's my suspicion as well. This is a sample of
16    convenience, correct?
17 A  Well, they're interested in young adults. And
18    what's interesting is that they had a sample of
19    18-to-25-year-olds, so it's unusual. I think, if
20    you went to a psychology class at the University of
21    Michigan, you would get a range of
22    18-to-20-year-olds, so it's interesting that they
23    have a little bit older adults in this sample.
24         Now, having said that, a sampling of
25    convenience, they're studying something that is

Page 200

1  particularly relevant for an undergraduate
2  population, so it doesn't seem completely out of the
3  realm to say let's collect data from the
4  university's sample, but it does have lots of
5  limitations, 'cause they're only people who are
6  going to school, they're only people who are going
7  to that school, they're only people taking that
8  class, so, you know, there are clearly limitations.
9          Some universities require psychology
10 as an introductory, as a required course. Of all
11 the LS&A type, liberal arts and science types,
12 that's the biggest college at the University of
13 Michigan, so you're actually getting a pretty good
14 representation of LS&A type students. You're not
15 getting any engineers, you're not getting graduate
16 students, you're not getting students in the nursing
17 school, so it's limited. But it is an appropriate
18 question for the population, because you're
19 interested in sex behavior, they're young adults,
20 they're going to college. So is it as bad -- on the
21 continuum, I would rate it as a little bit below
22 average, but I wouldn't rate it all the way down to
23 the bottom. Makes sense?
24 Q  Yeah, it does.
25 A  You're so earnest when you're either paying

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 201

1    attention.  Either you're trained very well or
2    you're really listening.  I'm not sure which it is.
3              THE WITNESS:  Did you put that in
4    there?  I guess you have to.
5    A   Go on.
6    BY MR. SWINTON:
7    Q   Are there any other limitations in the sampling
8        method?
9    A   You know, you could argue that, well, they got
10   course credit, so, you know, they're not really
11   doing it voluntarily.  And it's a little bit
12   different than when you just pay somebody, that's
13   voluntarily, but you could argue, well, you're
14   enticing people.
15             This is something even more relevant,
16   because, if they don't pass the class, they might
17   not get their degree, so they have to do it.  They
18   don't have to do this one, and there are ways for
19   them to get out, so that's another limitation.  It
20   says it was one of several ways.  I think they're
21   trying to make the case that this was a relatively
22   food sample for what it is.
23   Q   So that the caveat is for what it is.
24   A   Sure.
25   Q   And what is --

Page 202

1    A   Well, undergraduate psychology students, all the
2    things I just said.  The sample frame are
3    undergraduates at this university in psychology
4    classes.  If psychology is not required, you can
5    major in anthropology and never take psychology,
6    it's more limiting than that.
7              If you're at University of Illinois,
8    it doesn't matter what you major in at LS&A, so that
9    would make it a broader sample, so I don't know that
10   total context; however, sexting is particularly
11   relevant to this population, one would think:  They
12   are probably on cell phones, they probably have
13   smartphones, they have access to the internet, and
14   they are sexually active.  We know all those things
15   are probably true, so, in that sense, it's an
16   appropriate sample, albeit somewhat limited.
17             You know, when I read these, when I
18   looked at these, now I'm recalling, I looked at a
19   sample probably, and stuff, but I didn't look at the
20   whole paper.  I didn't look at their theories or
21   what analyses.  I was looking at the prevalent
22   stuff, 'cause that was my charge, just for the
23   record.
24   Q   Do you remember what specific parts of the study you
25       looked at?

Page 203

1    A   Yeah, yeah, the methods.  The methods and the
2    specific prevalence results.  The reason why I
3    mention that is, like, they probably noted that, in
4    their limitation section, in fact, there it is, "The
5    data for this study were collected from a
6    convenience sample of college students in the
7    mid-Atlantic region, unquote, quote-unquote, right?
8    "Generalization to other populations and geographic
9    areas may not be justified."  They're doing a good
10   job to identify the flaw in their study, right?
11   Q   They're essentially saying somebody looking at our
12       study needs to recognize that it was a sample of
13       college students in this particular class in this
14       part of the country.
15   A   Right.
16   Q   Okay.
17   A   At this university, yeah, which is not unlike what I
18   did, right?  Our sample is somewhat limited, right,
19   we talked about that before.
20   Q   So do you remember looking at that when you were
21       comparing the results of your sexting study to this?
22   A   Yeah, because there's so little data that I -- yes,
23   I'm sure I did.  I don't remember that, at the
24   moment, but I'm sure I noticed that.
25             I was basically looking for anything

Page 204

1    that would at all get to an example that I can say,
2    you know, rather than being out here in the ocean
3    alone, there's another life raft, basically; it's
4    another data point.  Yes, it's limited, but what
5    does that look like?  Yes, this one is limited; what
6    does that look like?  This one is limited; what does
7    that look like?  And, as I was saying, we all have
8    limitations of some kind.
9              I think my sample is probably a
10   little bit better than theirs, because we have
11   people who are not just in college.  We have an
12   oversample of college students, but people who use
13   the internet are probably more likely to be in
14   college, and we didn't sample them through college.
15   They got to us in a different way, right?
16             So, in some ways, it might be pretty
17   comparable, in other ways not comparable.  So, you
18   know, you do the best you can with the information
19   and the data that are available and that are out
20   there.
21   Q   I wanted to look on page 309 of the article we've
22       been talking about.  There's Table 1, which is in
23       the top left-hand corner.
24   A   309?
25   Q   Yeah, page 309.

HURON REPORTING SERVICE   huron4deps.com
and Video Conferencing Center   734-761-5328
Established in 1972

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                      4/29/2013

Page 205

1    A   Top left-hand corner, okay.
2    Q   It's Table 1.
3    A   Okay.
4    Q   Called "Sample Demographic Characteristics."
5    A   Okay.
6    Q   So this lists the demographic characteristics of
7        this sample selected.  So a few lines I wanted to
8        review.  I think, for female, it says 66 percent of
9        the sample was female, correct?
10   A   More female than mine, yeah.
11   Q   And 65 percent of the sample were freshmen in
12       college, correct?
13   A   Um-hum.
14   Q   And, again, you have to answer with words.
15   A   Yes.
16   Q   And 20 percent were members of a fraternity or
17       sorority, correct?
18   A   Yes.
19   Q   Did you look at this demographic breakdown when you
20       were making your comparison?
21   A   In terms of year in school, I don't think we did do
22       year at school, did we?  I'd have to look back.  Can
23       I look back?
24   Q   Sure.
25   A   Am I allowed to do that, now that I have it in front

Page 206

1        of me?  I think it was just level of education, and
2        it was, like, some college, but we didn't get what
3        year they're in, because, again, we did not sample
4        by college, right, so it was less relevant for us
5        about what grade you were in.  We just wanted to
6        know if you had some college.  We don't have Greek
7        membership, we don't have year in school; at least
8        not in our report, not in our data that we reported
9        here.  I don't remember if we actually have it in
10       the data set, but we didn't report it, which makes
11       me think we don't.
12   Q   And the characteristics listed in Table 1 that we
13       just reviewed are characteristics of the sample size
14       from this study, correct?
15   A   From the Benotsch study.
16   Q   So these are characteristics of the sample from
17       undergraduate psychology class at this particular
18       university, correct?
19   A   Yeah.  They have to do, like, maybe three or four of
20       these things, this is why I hesitated, three or four
21       experiments they have to participate in, or studies.
22       They get to choose them, so there could be another
23       study that have more men than women and this just
24       happens to be one that they signed up for; you know,
25       I don't know how it works at that university.

Page 207

1        So I wouldn't say that this is
2        representative or -- I don't know how representative
3        this is.  I don't know one way or the other, given
4        your statement of all students taking psychology at
5        this university.  I suspect it's close.
6    Q   But we can say that these are characteristics of the
7        sample from this study, from the sexting study, at
8        their university, correct?
9    A   Yes.  Yes.  Where you going?  How comparable is that
10       to our sample?
11   Q   Please continue.
12   A   In some ways, it is; in some ways, it isn't.  At
13       some level you have to think about, in terms of
14       comparability of the sample, of this sample to other
15       samples, my sample to whatever else exists out
16       there, you know, how exacting is that?
17           You also have to step back and say,
18       is there a reasonable, or plausible, or
19       theoretical, theoretical explanation for why, for
20       example, men or women would be different on this
21       behavior, in particular sexting.  Why would African
22       Americans, or Latinos, or white people, or Asians,
23       or any ethnic group, be different?  Why would
24       people, with different kinds of educations, be
25       different for this behavior?  That's, to me, the

Page 208

1        more important question than whether or not these
2        two samples are exactly the right match, do you know
3        what I mean?
4            And so, because I made a different
5        judgment than you're maybe making, I wasn't as
6        worried about the comparability of the samples, as
7        long as they were the right age range, because I
8        think this behavior is not unique to a particular
9        group of people, other than perhaps ones who use the
10       internet versus who don't.
11           And when I say, "internet," I say
12       that because we talked about before in terms of, if
13       you're using the internet, the chances are you're
14       also more likely to have a smartphone that takes
15       pictures easily, and you text, and you're in a
16       generation that texting is big.  I mean, I work a
17       lot in lower-income communities and cell phones are
18       even ubiquitous than access to the internet.
19           So I don't have any reason to
20       believe, based on the characteristics of the sample,
21       other than the age, that that should be different,
22       'cause I think that's where you're going.  But,
23       anyway, it doesn't matter.  Go on.  I just wanted to
24       make sure I got that out.
25   Q   This is a helpful explanation.  So the

HURON REPORTING SERVICE   huron4deps.com
and Video Conferencing Center   734-761-5328
Established in 1972

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

1    characteristics you were focused on, for purposes of
2    making your comparison, were the age range and
3    computer use; is that correct?
4  A   More age range than even computer use, but, yes. I
5    would say, yes, to your question, but probably more
6    about the age range.  That's what's more important
7    here, I think.
8  Q   And the age range needed to match up.
9  A   As close as possible.
10 Q   Okay.
11 A   They're not going to ever be exact, right?
12   Sometimes they are.  We picked 18 to 24, actually,
13   because that does match up with a lot of age ranges,
14   'cause you'll see, in national studies, they'll say,
15   you know, 15 to 18, 18 to 24, 24 to 30, so we tried
16   to pick a category that people would see, in the age
17   range, by it doesn't always match up; to wit, this
18   has kids up to 25, right?
19 Q   Do you recall if the Benotsch study measured
20   computer use by the sample participants?
21 A   I don't, no, but I can assure you that, if they're
22   college undergraduates, they're using the computer.
23   They have to.  I mean, I think so much is on the
24   computer, so much is on the internet, so much that
25   they have to access goes through that, that I'd be

1    shocked.  But I don't know if they did or not, do
2    you?  Do you have that answer?
3  Q   I don't believe that they.
4  A   I don't think so but, oh my gosh.  I mean, I know
5    that you can't be an undergraduate here without
6    access.  I mean, that seems almost impossible,
7    because everything, I mean you're getting email
8    messages.  Our syllabi are on the internet; I mean,
9    they're not even paper anymore.  You know, I think
10   the whole expectation is, is that.  Affluent kids,
11   semi-affluent kids, are going to school with
12   computers now, you know.  There's computers
13   everywhere.
14 Q   Do you know specifically about the prevalence of
15   computer use at the undergraduate university that
16   was discussed?
17 A   At VCU?  Well, we don't know what the university is.
18 Q   Correct.
19 A   I would be shocked if VCU isn't in the twenty-first
20   century either.  I have some colleagues there, and I
21   would be surprise.  Maybe not.  But I would be
22   surprised if it's not, you know, heavy.
23 Q   But you don't have any first-hand knowledge about
24   that.
25 A   Do not.

1  Q   Okay.
2        (Break was taken.)
3  Q   Dr. Zimmerman, did you speak with anybody during the
4    break about your deposition?
5  A   No.
6  Q   About the case?
7  A   No.  Would you count what we said?  No.
8  Q   We were looking at the Benotsch article, which we
9    had marked Zimmerman Exhibit 5.  Did you look at the
10   definitions of sexting when you were making your
11   comparison?
12 A   No.
13        MR. BAUMGARDNER:  Can you point to --
14 A   Probably right there on page 309?
15 BY MR. SWINTON:
16 Q   I believe the definition is on 308, it's the very
17   last paragraph of the page.
18 A   Right, right, right.  So this is slightly different,
19   Benotsch sample.  This is a lower bar, right?  They
20   have sexually explicit or suggestive photos.  We
21   included nude.  Right?  I did not look at that.
22 Q   Okay.  And so you read the definition in the
23   Benotsch survey as being more expansive than the
24   definition you used in your sexting study.
25 A   Well, we said nude or sexually explicit, so I would

1    say ours is probably a little bit more expansive
2    than perhaps theirs.
3  Q   Okay.
4  A   You know, it's possible that -- well, yeah, it's
5    possible it could have gone the other way, 'cause if
6    you ask the question nude first, then they might
7    think sexually explicit has to be nude or near nude,
8    and they might be less likely to have said it, so it
9    could go either way.
10        But there's an example of, you know,
11   the way you ask the questions, you elicit different
12   kinds of responses.  I don't think this is different
13   enough to have caused a problem, in terms of
14   comparison, though.
15        And it's very possible I did look at
16   it, I just don't remember.  I didn't kind of do a
17   full review, because I was trying to keep it short,
18   and stay close to my own study, which was, again, my
19   charge, but this wouldn't have given me pause,
20   frankly, in terms of comparing them, but not exactly
21   the same question.
22 Q   When you were making your comparison did you make
23   notes at all?  When you were making comparisons
24   between your sexting study and other studies --
25 A   Did I make notes?

HURON REPORTING SERVICE   huron4deps.com
and Video Conferencing Center   734-761-5328
Established in 1972

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 213

1  Q  When you were writing your expert report, did you
2     take any notes?
3  A  Maybe.  I don't have them.  I mean, I might have
4     scribbled on a pad as I was reading through this
5     one, and, you know, saying, okay, this has got that,
6     I can put this one in there, so I will, and I put it
7     in there.  And, you know, I'm sure I didn't save
8     that paper, you know, 'cause I put it here.
9  Q  So your expert report is the only document that
10    memorializes the work you did in preparing the
11    report.
12 A  Memorializes?  So does this -- well, I was thinking
13    about some points I wanted to make a case
14    for this, and I do that by either writing it or
15    putting it in a word document, 'cause that helps me
16    remember, but I don't have anything other than that
17    kinda stuff.
18 Q  Okay.
19 A  And if I'm recalling correctly, I'm hitting on most
20    of the things I wanted to make sure I said.
21            (Zimmerman Deposition Exhibit No. 6
22            was marked for identification.)
23 Q  I wanted to show you one more document.  This is
24    Zimmerman Exhibit 6.
25 A  Let me guess, this is going to be The National

Page 214

1     Campaign.  Actually, I could kind of tell.  I'm
2     pretty sure I remember seeing a very dark thing when
3     I did it myself, when I saw this, too.
4  Q  Dr. Zimmerman, I just handed you a document marked
5     Zimmerman Exhibit 6.
6  A  Yes.
7  Q  This is a 19-page document called "Sex and Tech,
8     Results from a Survey of Teens and Young Adults,"
9     correct?
10 A  Right.
11 Q  And this is one of the studies you compared the
12    results of your sexting study to.
13 A  Correct.
14 Q  Do you recall the sampling method from this survey?
15 A  No.  Where is it?
16 Q  I believe it's on page five under the heading About
17    the Survey.
18 A  They hired a company to their analysis, or do
19    their data collection.  And they estimate, what I
20    said, was about 90 percent of teens and young adults
21    are online.  This is pretty typical, yeah.
22 Q  One of the sentences said, "Respondents for this
23    survey were selected from among those who have
24    volunteered to participate in TRU's," T-R-U, "online
25    surveys."

Page 215

1  A  Right.
2  Q  Are you familiar with TRU?
3  A  No, I'm not.  I was driven by the next sentence.
4  Q  Okay.  And the next sentence says, "Respondents were
5     stratified according to the U.S. Census and the data
6     have been weighed to reflect the demographic
7     composition of teens and young adults," correct?
8  A  Um-hum.
9  Q  You need to answer with words.
10 A  Yes.  Yes.  Yes.
11 Q  What does it mean that "The respondents were
12    stratified according to the U.S. Census"?
13 A  That's similar to what I was talking to you about
14    before.  When we were looking about the comparisons
15    to national data and the Census data, and remember
16    we had five percent African American, but there's
17    12.6 in the population.  They stratified, they
18    wanted to make sure that they got 12.6 percent
19    African Americans, so they would probably have done
20    whatever they did samplingwise to make sure that
21    they had the appropriate percentages for whatever --
22    they said "demographic characteristics," so I would
23    imagine they're referring to age, sex, and
24    ethnicity.  There could be other ones.  There could
25    be socioeconomic, or whatever.  I don't know what

Page 216

1     exactly they did, but typically it's the first three
2     I said.
3  Q  Okay.  And you don't know what the demographic
4     characteristics were here that they used in the
5     stratification process.
6  A  No, but you could probably guess by looking at the
7     questionnaire; for example, the age range and male/
8     female were for sure there, but, no, the answer is,
9     no.  I didn't do this study.
10 Q  The second half of that same sentence says, "The
11    data have been weighed to reflect the demographic
12    composition of teens and young adults"; do you know
13    how --
14 A  They weighted?
15 Q  -- how the data was weighted?
16 A  No, I do not.
17 Q  Is there a typical way that data would be weighted
18    in the way that it's being referred to here?
19 A  Well, I can only assume, if they're a professional
20    survey organization, that they're using standard
21    acceptable weighting schemes.  I mean, you know, I
22    would imagine, like anything, you could cheat and
23    weight it so that it comes out better for whatever
24    you're looking for.
25            They probably didn't have a dog in

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 217

1   the fight here either.  I don't know why they would
2   weight it any one way or the other, so I can only
3   assume that they did it appropriately.  It's not a
4   peer-reviewed study, but they are a reputable
5   company, I assume.  I don't actually don't know who
6   they are, but I would assume that they, or I did
7   assume, that they are a reputable company and
8   weighted it appropriately.
9   Q  But you had never heard of the National Campaign to
10      Prevent Teen and Unplanned Pregnancy.
11  A  Oh, no, I've heard of them, but I haven't heard of
12      TRU.
13  Q  Okay.  So you never heard of TRU before.
14  A  Right.  That doesn't mean they're not a very well
15      known famous group.  And I've heard of Cosmopolitan
16      magazine.  I think they were the other group that
17      was involved in it, Cosmogirl.com.
18  Q  Right.
19  A  I think that's Cosmopolitan.  I'm not sure.
20  Q  And you assumed that the stratification and
21      weighting methods were correct.
22         MR. BAUMGARDNER:  Objection.  Go
23      ahead.  You may answer.
24  A  Yeah, I have no reason to believe that they weren't.
25

Page 218

1   BY MR. SWINTON:
2   Q  The last sentence in this paragraph that we've been
3      looking at says, "Respondents do not constitute a
4      probability sample," correct?
5   A  Correct.
6   Q  What is a probability sample?
7   A  That goes back to that perfect random sample where
8      every person has an equal chance to be selected, and
9      so not everybody has an equal chance to be selected
10      'cause not everybody has access to the internet.
11      They might not be selected for this study if it was
12      based on that.
13         So probability sample is that
14      everybody in the sample has an equal chance of being
15      selected.  The extent to which they don't was partly
16      the extent to which your sample is unrepresentative,
17      right?  So if somebody, who is a hermit, and lives
18      in the mountains and away from where our sampling
19      strategy might be going door to door, they will not
20      be able to be in the sample, because they're off the
21      grid and living out in the woods, right?  So that
22      person didn't have an equal chance of getting in as
23      someone who lived in the city.
24         We typically -- and that's a real
25      example, right?  And we typically sort of say, well,

Page 219

1   that's so rare, it doesn't matter, we're close
2   enough.  That's where I was saying that gold
3   standard of that perfect study is never done; it
4   can't be.  There's more than one person like that
5   off the grid and whatnot.  And those people are
6   different than the people who are on the grid,
7   right, just as one example.
8         So a probability sample is, if it's
9   not a probability sample, then, strictly speaking,
10  it is by definition a convenience sample, but
11  convenience sample have a range of how convenient
12  they are.  I don't know all the details about how
13  they did their survey.  Again, I picked these
14  studies because they were studies about sexting,
15  they were somewhat recent.  One was a peer-reviewed
16  article.  This one is sort of more of a national
17  study.  We have so little that I was looking for
18  things that could potentially help me be convinced
19  that my data were somewhat true.
20  Q  And in that search you only found these two studies.
21         MR. BAUMGARDNER:  Objection.
22  A  I don't remember, honestly.  I don't remember.  Had
23  I found more, I think I would have included them, so
24  I think the answer is, yes, but I don't know for
25  sure.

Page 220

1   BY MR. SWINTON:
2   Q  Okay.  So to the best of our recollection, you found
3      only these two studies when you were searching for
4      studies to compare your results to.
5   A  Yes.  And I most certainly would not have hidden
6      studies, were there more, that didn't help make my
7      case, 'cause that's not how I operate or the kind of
8      work that I do.
9   Q  Going back to the sampling method for this survey,
10      "The respondents" -- and, again, I'm on page five,
11      this is language you've already looked at -- but
12      "The respondents of this survey were selected among
13      those who have volunteered to participate in TRU's
14      online surveys," correct?
15  A  Yes.
16  Q  So as I understand it, the way this works is that
17      people volunteer to participate in these online
18      surveys and are part of a pool of possible
19      participants and they're then selected for
20      particular surveys; is that correct?
21  A  I don't know.  I don't know enough about them.  I do
22      know that there are companies that have a sample
23      frame of United States people, and that you can hire
24      them to go out to those people, collect data from
25      them, and they'll do it all for you, and then

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 221

1  they'll send you the data.
2        I don't know if TRU does that or not,
3  frankly.  But if they do, those data are considered
4  useful for this kind of purpose.  They usually are
5  pretty careful about what they're doing, because
6  this is their business.  And if they don't do a good
7  job, then people aren't going to use them; it's just
8  like anything.
9        I'd be a little surprised if these
10 two organizations, Cosmo and the national group,
11 would pick a fly-by-night, but you never know.  I
12 have no idea.  And by "volunteer," by the way, my
13 study was also volunteer, so that's the same.  No
14 one's forcing them to do it.  That's what
15 "volunteer" means.
16 Q  So it's possible that the people on the TRU survey
17    were being compensated also.
18 A  It's possible.
19 Q  Assuming that the TRU method described on page five
20    is the same as the other volunteer --
21 A  Internet-based survey samples?
22 Q  That you just described, so these are internet-based
23    survey samples, companies that run these, and you're
24    familiar with certain organizations that do that,
25    correct?

Page 222

1  A  Yeah, I couldn't name you one, but I do know there
2     are ones that do that.
3  Q  Okay.  Assuming that TRU is similar to the
4     organizations that do these online studies that
5     you're familiar with, where do those survey methods
6     rank on our continuum of samples of convenience with
7     the platonic ideal of the perfect probability
8     sample?
9  A  You know, I can't answer that, because I'm sure
10    there's a lot of variability and a lot of
11    competition among them.  And they argue that mine
12    was better than theirs, and ours is bigger, and ours
13    can do this, and ours can do that; you know, I don't
14    know.
15        I'm going to guess, educated guess,
16    that, if they're led by survey researchers, who have
17    gone into this business, that they're probably
18    pretty good, but I really have no way -- I have no
19    basis to judge that, other than sort of some
20    assumptions I'm making.
21 Q  And you similarly, it would, therefore, be fair to
22    say that you're not able to say where the TRU online
23    survey falls on that spectrum either, correct?
24 A  Correct, but you bet, when I leave here tonight, I'm
25    going to definitely look it up.  I somehow think it

Page 223

1  may come up with again.  So, no, I don't.  I don't
2  know who they are, and I don't know where in that
3  spectrum it would come.
4  Q  So you're unable, given what you know right now,
5     you're unable to evaluate the survey method that TRU
6     employed for this particular sexting study.
7        MR. BAUMGARDNER: Objection.
8  A  Correct.
9        MR. BAUMGARDNER: Go ahead.
10 A  Correct.
11 BY MR. SWINTON:
12 Q  Okay.  Are you able to evaluate the survey method
13    that TRU employed for this particular sexting study?
14 A  Isn't that what you just asked?
15 Q  It's a variation of it.
16 A  What was the first --
17 Q  Let me ask it one more time.
18 A  Actually, I'm shocked that they were two different
19    questions.
20 Q  I think they were stated slightly differently.  Let
21    me just ask it one more time.
22 A  Okay.
23 Q  Given what you know now, are you able to make an
24    evaluation of the survey methods TRU employed for
25    this sexting study?

Page 224

1        MR. BAUMGARDNER: Objection.
2  A  No.
3  BY MR. SWINTON:
4  Q  Okay.
5  A  Given what I know now, can I make a judgment about
6     them?  No, I don't have enough details.
7  Q  Did you make any evaluation about TRU's survey
8     methods when you were writing your expert report?
9  A  No.
10 Q  I'm going to turn back to your expert report.  I
11    just have a few more questions about that.  You have
12    it ready to go?
13 A  Yeah, yeah, yeah.
14 Q  The first one is something you said earlier in our
15    conversation.  You said that you doubt that the
16    percentage of young adults who text nationwide is
17    less than 10 percent; do you remember saying that?
18 A  Yes.  I'm not sure I quite said it the way you said
19    it, but, yes.  Yeah.
20 Q  What gives you confidence that the prevalence of
21    sexting among young adults nationwide is greater
22    than 10 percent?
23 A  My study, and these other studies, and that we're
24    using different methods and we're getting similar
25    results.  A lot of them are you know, have some

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 225

1    problems with their sampling strategy.  The TRU
2    study was people who use the internet.  Our data was
3    use the internet, and, low and behold, the results
4    are really pretty similar.  And, you know, I kinda
5    lowered that number; you know, why I can be
6    confident, is because 90 percent have access to
7    internet.
8            I think, in this survey, they have
9    either -- cell phone use is also ubiquitous.  And I
10   would be surprised, you know, given that the
11   replication is happening, even though these samples
12   are not all perfect, that we're getting similar
13   things; that the chances of us doing our studies and
14   finding the same result, if that result isn't close
15   to truth, you know, gets ever more tenuous if we
16   keep finding the same thing.  I mean, after all, how
17   many times do you have to bang your head against the
18   wall to know it hurts.  And same thing here, how
19   many times do you have to keep doing the same study?
20           Now, am I 100 percent confident at
21   this point, given the state of the field?  No.  But
22   the reason why I came up with the 10 percent is
23   because I'd be surprised, even given what we have to
24   date, that it'd be as low as that, given how many
25   people are on it, given how, what we're finding,

Page 226

1    what other people are finding.
2    Q   And that, and "given what we know," when you say
3        that, you're referring to your study, and then the
4        Benotsch study, and the National Campaign study.
5    A   Yes.  Yes.  And the other studies that we may have
6        cited in the study that got me here in the first
7        place, the sexting study.  I don't remember if we
8        connect to those.  I think we do, but there were so
9        few then; it was only teens at that point, right?
10       Yes.  So the answer, I guess, to your question is,
11       yes, with a few caveats with the ones that we cited
12       here.  And you can see we sort of point to the
13       limited research on sexting and --
14              MR. BAUMGARDNER:  And you're talking
15       about Exhibit 3, just to make the record clear.
16              THE WITNESS:  Right, I am referring
17       to Exhibit 3.
18   A   For example, Ferguson, we cite here, found that 20
19       percent of participants reported engaging in
20       sexting; it was a study of primarily Hispanic young
21       women.  So 20 percent is in the ballpark, as far as
22       I'm concerned, for what we found, 30, 20.  That was
23       a pretty unique sample.  Ours is a little bit
24       broader, you expect a little bit larger number.
25       This was only women, only Latinos.  So the answer to

Page 227

1    your question is, yes, with the addition of these,
2    the ones that may have been reported in here.
3    BY MR. SWINTON:
4    Q   The ones that may have been reported in the
5        Zimmerman Exhibit 3?
6    A   Right, ZX 3.
7    Q   Okay.  In the last paragraph on page two of your
8        expert report, you say that, "Although such
9        extrapolation is sometimes tenuous, because a
10       specific estimate based on one sample can capitalize
11       on the error present in any study," what do you mean
12       by that, by that phrase?
13   A   That's consistent with what I was telling you about
14       one study can't make the whole story, and so you
15       need a body of research to kind of have more
16       confidence, because you do need different methods,
17       because any sample frame is not perfect.  So if you
18       have a different sample frame, they're finding the
19       same results, and so forth and so on, and asking the
20       questions slightly differently, and they all start
21       pointing in the same direction, that's what I was
22       sort of -- it was same thing I was telling you about
23       before about may -- I mean, I'm not going to argue
24       that this is a definitive answer, by any stretch of
25       the imagination.  But I am saying that, you know, we

Page 228

1    have some confidence, given the points I made, and,
2    you know, I'm nervous extrapolating, for all the
3    things that you're getting at.
4            There's 30 million people in this age
5    range; you know, does my sample represent all
6    30 million of those people?  No.  Does it represent
7    28 million or three million?  You know, somewhere in
8    that range, and I think closer to the 28 than closer
9    to the three, frankly, you know.  So would these
10   numbers be just, depending -- it's hard to do that
11   kind of extrapolation.
12           I would not have done it, had I not
13   been asked to do it, necessarily, for this task.
14   But I'd still think you can do it as an exercise to
15   get a sense of how many people might be doing this
16   behavior, and this starts getting us to an estimate.
17           And then, you know, I was saying, if
18   we were off by 50 percent, which I have no basis --
19   I mean, I picked such a high number, 'cause I have
20   no real basis to know how far off are we, but let's
21   say we doubled it and it shouldn't have been
22   doubled, it's still, extrapolate from that; you
23   know, it's still in the millions.  So that's kind of
24   where I went, and that was my logic in thinking.
25           And that's why I then discounted it

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 229

1    the extra 50 percent, 'cause one study is tenuous;
2    you know, perhaps we captured a population that just
3    happens to be doing it twice as much as any other
4    sample would be doing it, that's kinda what I'm
5    saying.
6              And a point estimate, in our
7    business, is very, very difficult.  When we're
8    asked, well, what about my son, what about this,
9    that or the other thing; well, I'm a researcher, I
10   do population, you know, analyses, and I can't
11   predict an individual.
12             I can say the probability of that
13   individual, given this information, the probability
14   is they might, but there's all sorts of other
15   factors that we didn't collect.  There's genetic
16   factors.  There's the relationship that person has
17   with all sorts of people in their lives that, you
18   know, may be different than what we've collected
19   here, but probability is that this is gonna happen
20   in that case, but nobody in a survey business would
21   predict an individual.  What we're looking at is
22   probabilities in a population.
23             So, you know, if you ask me, at the
24   end of the day, what do I think the real rate is of
25   sexting?  If we've overestimated it, and it's

Page 230

1    possible we did, I doubt that we were off by a
2    factor of two.  But let's say it's 30 percent, and,
3    then it's 15 percent, so I discounted it more, and
4    that's where I came up with the number of 10 percent
5    earlier.  That'd be like even less than 50 percent.
6    And I don't think our data, and the way we did our
7    study, is so different; partly because I have no
8    reason to believe that African Americans, or whites,
9    are more or less likely to do this, right?
10             So some of the data that didn't match
11   up with the Census track, you know, I don't have any
12   theoretical reason to think that one group would be
13   more or less to do it than another.  There might be,
14   but, at this point, the sciences on this topic is so
15   new, we don't really know.
16             We had some idea that maybe girls and
17   boys might be doing it differently, you know, but
18   our data on males and females was the same as the
19   national data.  So, I mean, I think, when you sort
20   of peel it all away, you know, the number is
21   probably between 20 and 30 percent, if we're at the
22   high end.  We might not even be at the high end.
23             And here's another thing, is, as time
24   goes on, the numbers are gonna increase, because the
25   other thing is, it's really important to know, is

Page 231

1    that we're only talking about 18-to-24-year-olds.
2    This study was published in '12.  We already have a
3    whole group of our kids who would not have been in
4    our study, and there's a whole new group coming in,
5    who where sexting might be more or less happening.
6              And I don't know if laws or news or
7    parents or, you know, is gonna change things because
8    of these horrific things that have happened about it
9    going viral, whether that'll decrease or increase it
10   or just make it more careful.  But at the end of the
11   day, this is a behavior that's, you know, maybe not
12   as widespread as marijuana use, but I think it's
13   getting in that direction, given these flawed
14   studies; you know, I would say that, in my heart of
15   hearts, you know, and even if it's 10 percent, but
16   we know it's more than that.
17             It's part of dating now.  And you
18   know what I think is happening, what's gonna happen,
19   is there's going to be a population norm around not
20   doing this and not sharing with other people,
21   because it's going to be one of those intimate
22   things about kissing and telling, you're not going
23   to kiss and tell.  I mean, there are guys who have
24   sex with a woman and then everybody knows it, and
25   there are guys who have sex with a woman and nobody

Page 232

1    knows it, and vice versa, women with men.  And I
2    think this is just part of that process.  And we
3    hear about the viral stuff that goes viral, but
4    that's just what we hear about, we don't know.
5              Sexual behavior in the United States,
6    we're a very puritanical society.  And I've learned
7    an incredible amount through this study, and my
8    colleague, who actually runs a sex lab here where he
9    studies this kind of behavior, and just in general,
10   not just sexting.  And it's an interesting field
11   that is opening up in a way that didn't exist
12   growing up.  You know, just watching television
13   today, I mean I remember watching something, it was
14   like 15 years ago, it was like the boyfriend and
15   girlfriend slept together with the parents in the
16   house in a TV show.  I grew up with Leave it to
17   Beaver, where the husband and wife didn't even sleep
18   in the same bed.  So I think sexting is going to
19   become a normative behavior.  And I think our data
20   right now are going to be, in the end,
21   underestimates of what it's gonna actually be.
22             Where you didn't go is, you know, are
23   people gonna, you know, tell me the truth, 'cause
24   maybe they won't, because they'll be too
25   embarrassed, or they don't want to know, or they

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                          4/29/2013

Page 233

1    don't want to kiss and tell.
2            Same thing with marijuana use.  What
3    do we do about marijuana use?  We're not testing
4    everybody.  In the Monitoring the Future studies,
5    and all these national studies that exist on
6    marijuana use, you know, they're basically depending
7    on people telling the truth.  And so what we
8    probably have is an understatement.
9            And, you know, that's something, in
10   behavioral sciences, that we kind of have to live
11   with, because there's only one way to get that,
12   right, that's reasonable, that's feasible.  We could
13   follow every human being around and see what they
14   do; not feasible, right?
15           There's actually been some studies
16   about smoking that makes people believe it is, but,
17   again, it goes back to how many other studies show
18   that the data is about 40 percent, you know.  If
19   people are not telling us the truth, that's the best
20   we have.  We can be pretty confident it's at least
21   40 percent, right?  Chances are it's more.
22   Q   Just to clarify, do you have any data to suggest
23   that people are being dishonest when responding to
24   questions about sexting?
25   A   No.  No data on that.  And there's some data on drug

Page 234

1    use, they're called pipeline studies.  And what they
2    do is they randomly assign people to two groups:
3    One, where they provide saliva samples, and then
4    they're told they will be tested, and another group
5    they don't do that with, randomly assigned.  And
6    then they compare their response to drug use, right?
7            These are mostly done with kids and
8    around tobacco, we can test your tobacco.  So we're
9    going to ask you a bunch of questions, but we'd like
10   to, saliva, and there's no difference.  The
11   hypothesis would be, if you know you're being
12   tested, you're going to tell the truth, so these
13   guys are true, telling the truth.  And these guys
14   were probably lying, if they are not telling the
15   truth.  These other guys, who are not being tested,
16   will underestimate.  And they don't, they're the
17   same.
18           So there's other studies like that
19   where, you know, people are reporting their
20   substance use.  If you can guarantee it's anonymous,
21   and all those sort of things, you can, within a
22   range, expect that they're telling the truth.  You
23   know, if you ask them how many marijuana cigarettes
24   they smoke, and, you know, they may not be telling
25   you a lie on purpose, but they might remember they

Page 235

1    smoked five times, when really they smoked eight
2    times, or ten times, it would have gotten in a
3    different category, right, but they're smokers.
4            We don't know about sexting, but it's
5    a similar kind of behavior, right?  And I have to
6    tell you, you know, I didn't know it was against the
7    law until I was called, and I bet you there's a lot
8    of people who don't know.  So I think they are
9    probably being somewhat truthful, I think they are.
10   Q   Are you aware of any evidence to suggest that the
11   number, as time goes on, the number of young adults
12   sexting is increasing?
13   A   I have no data on that.  We have no idea.  We really
14   have no idea.
15   Q   Okay.
16   A   Whether it's increasing or decreasing.  What I was
17   saying is, it was just purely conjecture on my part,
18   given what I've studied and know, so, in a way, I'm
19   talking out of turn.
20   Q   Okay.  And just to go back to the line here in your
21   expert report on page two, "Although such
22   extrapolation is sometimes tenuous," is the
23   extrapolation that you're doing in your expert
24   report tenuous?
25   A   It's sometimes tenuous.  I would say almost all

Page 236

1    extrapolation is tenuous, and so what you have to do
2    is defend having done it.  I did not do it very
3    carefully, which is why I discounted myself
4    50 percent in the next line, which is why I said,
5    okay, so even if we're not right, even if you take
6    out, you know, out of the 30 million, the sum who
7    may never use the internet, that my sample may not
8    be representative to; even if you take out, so the
9    most affluent people, because they don't need the
10   money, from my sample; even if you do all those
11   things, there's still a very wide swath of people
12   that are a whole lot like the people we collect the
13   data about.
14           If African Americans do it less than
15   white people, given the bias in my sample with fewer
16   of them, then we may have a slightly overestimated
17   number, which is why I've discounted it.  If, you
18   know, Latinos do it a little bit less, you know; I
19   mean, the percentages are very small, so it won't
20   have a huge effect, which is, again, that's why I
21   was very liberal in saying, if I was 50 percent off,
22   but we're talking about seven percent.
23           And so if it's, you know, if they do
24   it twice as much, we're still only talking a very
25   small percentage of the total population out of that

59 (Pages 233 to 236)

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                          4/29/2013

Page 237

1   group, the difference between them, but of the
2   group, it's seven percent of 12 percent, right, and
3   so that's what you decide to kind of go to.
4        So, you know, it's not a definitive
5   study, so that's why I said it's sometimes tenuous,
6   or is tenuous, 'cause this is not a definitive
7   study, 'cause I can't make an estimate of what
8   30 million people are not part of my sample.  I can
9   make some guesses, so that's why I did the
10  discounting business.  So I sort of did it very
11  straightforwardly, and then I kind of went further
12  out.  But, you know, go to 70 percent, still talking
13  millions of people.
14  Q  And the discounting you're referring to is where you
15     say, "Even if our estimates are off by as much as
16     50 percent."
17  A  Correct.
18  Q  So is your estimates the pure application of the
19     prevalence rate from the sexting study to the Census
20     to the discounted application?
21  A  Ask that question again.
22  Q  The estimate in your expert report, you give two
23     different sets of numbers.  The first set is where
24     you apply the prevalence rate to the data from the
25     Census Bureau.

Page 238

1   A  Oh, I see what you're saying.
2   Q  And the second set is where you've discounted it.
3   A  It's from the Census number.  I mean, it's from my
4      percentages.
5   Q  Okay.
6   A  It's one in the same, in a way.  So what I basically
7      was saying here is, if my estimate of 30 percent of
8      having sexted was only 15 percent, what would that
9      number be, and it would be 4.6 million, right?
10        So there could be two corrections;
11  one, is, okay, let's say our sample is only
12  representative of 25 million, so five million have
13  to come out of the equation.  So now it's 30 percent
14  of 25 million, not 30 percent of 30 million, right,
15  per example.  That would be one point of correction.
16  Then the other point of correction would be our
17  estimate.
18        And if I just take it down to
19  50 percent, I was sort of giving a very rough, do
20  both of those things and this is about where you
21  might end up, 15 percent of a smaller sample, and
22  you'd still end up with 4.6.
23        If you discounted it by more, it's --
24  you know, the numbers are big.  You know, I don't
25  know if a million people, relative to the United

Page 239

1   States, you know, is not very big; it's 1/300th,
2   less than 1/300th, right?  So in that respect, it
3   isn't very big.  But a million people is a lot of
4   people, right, on another hand, so it depends on the
5   context.
6        Try to get a million people in the
7   football stadium here, it won't happen.  That's a
8   lot of people.  There was something else I just
9   wanted to make a point about in terms of about this,
10  but maybe I'll come back to it.  I forget what it
11  was.  So discounting from my percentage to the
12  30 million.
13  Q  So to go back to my original question, it's fair to
14     say that your extrapolation in our expert report is
15     tenuous.
16        MR. BAUMGARDNER:  Objection.  You
17  gotta read the whole sentence.  You just keep
18  plucking that first part out.
19  A  No, I mean, knowledge is tenuous; I mean, really, if
20  you really kind of want to really peel it all away.
21  Is it tenuous?  I mean, what do I mean by tenuous?
22  I mean, it's not definitive.  I don't mean tenuous
23  in the terms that it's a bad estimate.  It's just
24  not definitive, right?
25        So is it not definitive?  Absolutely,

Page 240

1   it's not definitive, for all the reasons we've
2   talked about.  Do I fairly make it?  Again, let's
3   say we were off by, you know, two-fold; let's say it
4   was three-fold, 10 percent; let's say the rate was
5   really only 10 percent, not 30 percent; and let's
6   say, you know, you have to discount five million
7   people out of the Census, it's still 2.5 million
8   people, right?
9        So, again, I don't know what a magic
10  number is with that.  But, you know, to me, that's a
11  lot of young adults that we'd have to deal with if
12  they're doing stuff that -- imagine it's that kind
13  of number who are, you know, drinking and driving at
14  high speeds late at night; we have laws about that,
15  right?
16        I mean, anyway, but that's a judgment
17  that, obviously, I make, as a social scientist,
18  about how big a problem is too big a problem to
19  ignore, right?  We spend all sorts of money on, you
20  know, very rare diseases to try understand them,
21  schizophrenia being one of them, one percent of the
22  population.  But it's so extreme that we want to
23  understand it, because we need to understand it, for
24  whatever reasons.
25        You know, this is a relatively

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 241

1  innocuous behavior, I think, which is why it happens
2  a lot, and I don't think it happens as little as 10
3  percent.  There's no evidence that we have that it
4  happens that little.
5          And the other thing that's really
6  important for me is we're only talking
7  18-to-24-year-olds; you know, Weiner, that was his
8  name, right, who might run for mayor, I think both
9  he and the person he sexted were both over, out of
10 that range.
11         So there's also probably, I'm going
12 to guess, a nontrivial number of people outside this
13 range, who also are texting, or sexting, but
14 maybe -- I don't know.  I'm speaking out of turn on
15 that.  But on this, I would say whatever you,
16 however you want to spin this, it's a nontrivial
17 number.  It's a nontrivial number.  I'm pretty
18 confident about that, based on my data, based on
19 others, and what little has been done.
20 **BY MR. SWINTON:**
21 **Q   And the word "trivial," does that have any special**
22 **meaning within the field of behavioral sciences?**
23 A  Yeah, it means that it's a behavior that's worth
24 trying to understand because it can have other
25 social and behavioral consequences.  You know, if

Page 242

1  it's trivial, well, who cares how many people blow
2  their nose at noon?  That's trivial.
3          So when I say nontrivial, I mean it's
4  probably significant enough to warrant attention,
5  that's what I mean, right?  And sometimes that's
6  because of the number of people, and sometimes
7  that's because of the kind of behavior it is.
8          And one of the reasons why we did
9  this study is because we thought -- we didn't even
10 think about the number of people.  I mean, I
11 honestly, when I thought about this, it was that,
12 which is what the study is about, not the prevalence
13 rates, right, is, do people who sext, are they, you
14 know, kind of sex maniacs?  And I don't mean that
15 necessarily in a negative way, but are they people
16 who are having sex with multiple people?  You know,
17 are these the guys who are spreading disease?  You
18 know, it doesn't take very many.  You know, HIV
19 epidemic was tracked town to one typhoid Mary
20 person, you know, why it started spreading around
21 the world the way it did; somebody, who was very
22 promiscuous, who was having sex with many people
23 across many continents.  And, you know, if sexting
24 is related to that kind of behavior, it's not
25 trivial, right?  Even if it's two percent of the

Page 243

1  population.
2          What we're actually finding is that
3  it's not related to that kind of behavior.  They
4  were not more likely or less likely to have number
5  of, different sex partners, or that sort of thing,
6  which leads me to believe that it's probably very
7  ubiquitous behavior, because there aren't that many
8  people who sleep with 3,000 people in the world,
9  right?
10         This is probably just part -- I mean,
11 before this all came up, I started telling people
12 about this study, and to me, what I've learned from
13 this, what I take from it, as a behavioral
14 scientist, is that it looks like this is just part
15 of the dating process.
16         When I was a kid, you know, affluent
17 families, didn't have to be very affluent, but less
18 than poorer families, sometimes had two, if they had
19 teenagers, they got a second telephone line because
20 they spend so much time on the telephone, often with
21 people they might be dating.  This is just the new
22 way of doing this.
23         My daughter doesn't like, talking
24 about her earlier, she doesn't like to talk on the
25 phone very much.  She sends thousands of texts a

Page 244

1  day -- a month, not a day.  You know, I mean, it's a
2  much better way to kind of reach her and connect
3  with her.  It is the way people are doing their
4  lives these days.  My wife and I were just talking
5  about it yesterday, unbeknownst to this, I mean,
6  unrelated to this.  It's just the way it is, right?
7          How many texts do you even send?  I
8  mean, it's not that far to go to the next step,
9  especially among a group of people who are becoming
10 independent, out of the house, you know, exploring
11 themselves sexually, all those sorts of things.  I
12 mean, not that they're not sexual before 18, they
13 are, quite a lot, but this is even bigger.  Anyway,
14 I go on with a lecture.  You didn't ask me
15 questions, and my client is probably, like, Shut up
16 already, hoping it gets to 3 o'clock before I say
17 too much.
18 **Q  I actually don't have anymore questions for you at**
19 **the moment.**
20 A  What does that mean?
21 **Q  We're not quite done, but I don't have anymore**
22 **questions.**
23         MR. BAUMGARDNER:  Okay.
24         MR. SWINTON:  I think it's a little
25 after 2:30.

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

Page 245

1          MR. BAUMGARDNER:  Just to clarify,
2    what do you mean "at the moment"?
3          MR. SWINTON:  I didn't know if you'd
4    ask any and I'd have redirect.
5          MR. BAUMGARDNER:  No, I have no
6    questions.
7          (The deposition concluded at 2:30 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 246

1              CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN    )
3                         ) SS
4    COUNTY OF LIVINGSTON )
5        I, Carol Marie Hicks, Certified Shorthand Reporter,
6    a Notary Public in and for the above county and state, do
7    hereby certify that the above deposition was taken before
8    me at the time and place hereinbefore set forth; that the
9    witness was by me first duly sworn to testify to the
10   truth, and nothing but the truth, that the foregoing
11   questions and answers made by the witness were duly
12   recorded by me stenographically and reduced to computer
13   transcription; that this is a true, full and correct
14   transcript of my stenographic notes so taken; and that I
15   am not related to, nor of counsel to either party nor
16   interested in the event of this cause.
17
18
19
20          Carol Marie Hicks
21          CSR 3345 Notary Public,
22          Livingston County, Michigan
23   My Commission expires:  September 4, 2016
24
25

62 (Pages 245 to 246)

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

| A | | | | |
|---|---|---|---|---|

**abbreviation**
173:24
**aberrant**
165:25
**abilities**
64:25
**ability**
6:16
**able**
41:17 55:18 65:4
72:10 98:22 116:2
116:7 120:12
133:11 149:23
195:6 218:20
222:22 223:12,23
**above-entitled**
1:16
**absolutely**
74:3 75:13 76:22
92:10 101:25
136:1 187:3
239:25
**abstract**
183:22
**abuse**
12:5 13:11 15:12
16:8 18:3 99:8,9,9
99:16,18 100:3,14
**academia**
29:6,18 45:12
**academic**
8:11 30:19 85:10
85:11,15
**academics**
8:2 175:3
**accent**
170:24,25
**accept**
35:4 36:18,19
37:10
**acceptable**
45:24 68:6 143:13
216:21
**accepted**
34:1,2 37:15 45:21
156:3 174:20,24
**accepting**
35:7
**access**
110:4 115:22 117:1
130:8 131:18,20
133:11 202:13

208:18 209:25
210:6 218:10
225:6
**accessible**
110:2
**accessing**
116:12
**accidentally**
142:4
**account**
141:4 169:15,17,23
179:17,22
**accurate**
65:25 191:21,21
**accurately**
6:17
**acknowledge**
83:13
**acolytes**
103:24
**acquaintances**
125:17
**acronym**
100:5 182:5
**acronyms**
181:20
**ACT**
65:1
**Action**
1:5
**active**
20:8 98:16 143:18
202:14
**activity**
98:18
**actual**
71:24 82:20 161:13
**ad**
114:18,23 115:2,11
115:12,13,17,22
116:13 117:7
119:19 120:17,18
120:24 121:21
131:5,14,15
138:19
**add**
30:10 48:5 71:17
72:20 73:6 77:5,6
98:12 138:18
**added**
20:4 100:18
**adding**
46:12 75:20

**addition**
73:19 227:1
**additional**
92:19
**address**
77:20 115:6 116:9
116:15 117:1,11
117:13,21 118:25
119:1,4 126:16
134:16,22,25
135:22
**addressed**
46:25
**addresses**
115:3 134:7
**addressing**
35:21
**adds**
77:15
**adjunct**
21:13
**Administration**
100:14
**adolescence**
8:22 13:15
**adolescent**
8:14,17 9:13 10:24
12:15 13:2,6 15:7
15:9 81:17,21
172:15,17,18
186:3
**adolescents**
12:13 81:19
**ads**
115:1
**adult**
8:23 90:21
**adulthood**
9:1,4 82:25
**adults**
3:14,21,24 20:7
55:10,19 62:6
65:12 66:3 88:16
89:18,21 90:5,12
90:24 91:6,9,11
95:12 97:1 101:8
160:9 173:18
175:10 182:16
191:10 197:14
199:17,23 200:19
214:8,20 215:7
216:12 224:16,21
235:11 240:11

**advantage**
172:7
**advertisement**
111:24 112:1 131:7
**advocate**
193:16
**affect**
6:16 59:24 79:21
85:1
**affluent**
13:24 129:25
210:10 236:9
243:16,17
**African**
38:21 112:17 113:1
113:18,19,21,22
115:8,9,15,18
120:23 152:18
154:6 207:21
215:16,19 230:8
236:14
**age**
7:4 9:5 51:20 65:5
76:2 78:3 80:25
81:6 82:10 86:4
96:25 98:15,17
108:2,4,9 117:3
118:6 208:7,21
209:2,4,6,8,13,16
215:23 216:7
228:4
**agency**
11:6,13,13 100:15
**ages**
38:24 89:18,22
91:11
**aging**
82:24
**ago**
19:9 45:9 82:24
103:12 104:9
114:25 133:24
176:7 187:7
232:14
**agree**
33:10,11 48:6,7
107:12 118:20
150:8
**agreed**
32:13 196:19
**ahead**
6:11 64:21 65:17
168:19 175:23

192:8 217:23
223:9
**AIDS**
102:18
**al**
1:5 153:16,18
**Alan**
6:21
**albeit**
92:8 202:16
**alcohol**
15:12,20,21 77:4,5
97:17 163:14
164:13 165:5
176:17,23 181:7
**alcoholic**
99:13
**algorithm**
41:3 56:3 111:18
141:12 180:7
181:12,14,23
182:1
**algorithms**
50:17,24 80:7,8
144:7 161:13
**Alison**
172:3 184:18,22,25
186:23 187:9,9
188:18
**Allen**
47:11,12
**allow**
5:23
**allowed**
205:25
**altogether**
87:3
**Alzheimer's**
65:5 187:5
**amazing**
33:10 105:14
151:21
**America**
176:18
**American**
11:10 25:5,20
38:21 95:19 113:2
113:21 115:9,10
115:15,18 120:23
152:18 154:7
215:16
**Americans**
112:17 113:18,19

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972

huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 2

113:22 130:9
149:12,18 154:25
155:3 207:22
215:19 230:8
236:14
**amount**
119:20 232:7
**analogous**
76:18
**analyses**
37:17 152:1 153:20
160:2 172:24
173:5,12 181:1
202:21 229:10
**analysis**
34:11 57:15 70:24
71:1,8 78:24
141:17,22 142:21
142:24 144:6,22
153:21 173:2,3
214:18
**Analytic**
160:22
**analytically**
172:13
**analyze**
70:1,23 71:2
**analyzes**
71:7
**anchors**
137:4
**Ann**
1:17 4:1
**anonymous**
234:20
**answer**
5:5,12,14,14,15,20
5:24 6:12 46:23
52:7 55:7 56:6
58:19 64:21 66:6
66:15 77:12 80:3
80:4 85:25 93:21
95:24 100:12
108:12 117:25
118:14,15,22
119:18 121:24
140:21 142:5,5,22
146:23 149:23
152:8 153:12
159:13 161:4
162:3 168:19
177:7 182:23
186:21 190:4

191:5 195:17
197:5 199:7
205:14 210:2
215:9 216:8
217:23 219:24
222:9 226:10,25
227:24
**answered**
54:3 118:7
**answering**
52:10 119:24
134:15 142:2
**answers**
5:1 25:24 123:1
140:21 152:12
246:11
**anthropologist**
107:4
**anthropology**
202:5
**anticipate**
111:4 198:1
**anticipated**
52:1
**anxiety**
16:14
**anybody**
7:21 56:16 71:6
114:22 133:21
139:11 211:3
**anybody's**
141:8
**anymore**
40:10 51:19 115:19
118:9 176:9 210:9
244:18,21
**anyway**
8:3 20:24 29:2
31:22 52:13 61:2
70:21 72:11 74:23
85:15,20 87:1,14
98:7 122:8 130:20
161:11 171:19
191:24 208:23
240:16 244:13
**apart**
180:16
**apathy**
14:22,23
**app**
115:25
**apparently**
165:21

**APPEARANCES**
2:1
**Appearing**
2:8,16
**appellate**
84:22
**application**
115:23 237:18,20
**applied**
91:8
**apply**
90:18 92:5 237:24
**appointment**
21:11,13
**approach**
55:20 59:15 107:9
**approaches**
103:8
**appropriate**
30:20,21 64:3,8
156:22 200:17
202:16 215:21
**appropriately**
217:3,8
**April**
1:18 4:2
**Arbor**
1:17 4:1
**arduous**
37:18
**area**
8:9,13 22:4 51:12
52:13 103:5
107:24 113:13,15
115:2,6 118:12
194:10
**areas**
113:15,17 203:9
**arguably**
9:17 10:5
**argue**
52:21 59:8 61:1,2
62:8 64:8 82:19
107:1,16 108:6
110:11 129:24
130:17 156:2,15
201:9,13 222:11
227:23
**argued**
108:25 109:23
**argument**
130:7
**arrive**

161:2
**article**
3:13,15,18 25:7
30:14,17,18,18,21
31:5,12,24 32:19
35:5,7 36:15 47:7
48:14 57:7 69:23
95:11,13 96:15
101:19 121:11
139:23 147:4
151:11,17 152:3,4
164:5,8 165:1
171:21 172:1
173:18 183:5,23
183:24,24 184:2
187:23 188:4
197:12 204:21
211:8 219:16
**articles**
10:11 13:14 24:20
24:24 29:7,7 30:4
30:8 31:16 36:25
39:10 49:9 56:15
152:1 184:9,13
185:17 186:9,13
186:18
**arts**
200:11
**ascertainable**
164:4,7
**Asian**
149:16,17,17
154:25 155:3
**Asians**
207:22
**aside**
127:11
**asked**
7:9 8:5 21:2 24:9
30:5 53:19,20,20
58:18 62:4 86:2
86:15,21 87:11
91:3 95:19 118:25
119:1 163:10
186:23,23 187:9
188:2,18 223:14
228:13 229:8
**asking**
4:24 5:23 32:25
59:11 86:7,9 98:7
101:23 121:23
124:12 171:5,17
195:16 227:19

**asks**
8:13
**assessment**
11:12 57:14 58:14
**assign**
234:2
**assigned**
234:5
**assignment**
17:15 187:20
**association**
25:5,20 44:2 45:19
45:21
**assume**
5:5 49:18 84:24
87:11 216:19
217:3,5,6,7
**assumed**
87:13 133:8 217:20
**Assuming**
221:19 222:3
**assumption**
49:22
**assumptions**
49:6,8,11,13,20
222:20
**assure**
209:21
**astronomers**
60:10
**ate**
80:1
**Atlanta**
116:25
**atomic**
60:14
**Attached**
3:25
**attain**
63:18
**attendance**
107:20
**attention**
42:23 97:12 119:16
131:2 151:25
201:1 242:4
**attitude**
43:2 48:22 49:4
**attitudes**
10:19
**attorney**
4:11 9:9 42:23 84:4
84:8

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

**attorneys**
42:25
**attributes**
59:10
**attrition**
141:17,22 142:21
143:8 144:22
**audience**
30:20,20 31:3
**author**
25:6,17 26:2,10,16
26:25 27:1,9,9,13
27:23 171:23
172:14,21 173:13
184:5,6,24
**authors**
25:2 27:14 48:5
73:11 171:20,22
184:19 197:15
**authorship**
25:6
**automatically**
26:4
**available**
70:22 185:23
204:19
**Avenue**
2:12
**average**
53:22,23 61:12
137:3,6,7,8,8,11
200:22
**avoid**
5:25 79:2
**aware**
101:12 183:2
235:10
**awhile**
42:21
**A-l-a-n**
6:21
**a.m**
1:18 4:3 139:9

_____
**B**

**B**
61:12
**babies**
137:19
**baby**
137:20
**back**
24:2 33:6 34:24

35:3,6 36:2,7,11
47:10,12,15,17
48:1 54:17 56:7
58:18 70:9 80:23
84:23 86:23 99:19
102:22 106:2,22
109:9 114:18
127:21 128:9
137:2 139:21
142:17 143:11
152:3 160:3,13
161:11,19 168:2
173:14 177:24
179:4 182:8 186:2
186:25 189:25
192:2 194:1,2
205:22,23 207:17
218:7 220:9
224:10 233:17
235:20 239:10,13
**background**
8:8 28:4 130:3
**Bacon**
105:12
**bad**
40:15 48:9 87:1,22
192:1 200:20
239:23
**ball**
26:15
**ballpark**
189:22 190:19
194:5,6 226:21
**Baltimore**
11:19 12:9
**bang**
225:17
**bar**
32:21,22 211:19
**barely**
32:1
**bars**
102:25 106:10,11
108:1,4
**base**
40:16
**based**
41:19 56:12,25
65:12 73:23 74:24
89:25 114:5 116:8
118:17 123:17
140:11 143:19,20
143:21 152:1

154:1,2 162:8
173:5 183:5
208:20 218:12
227:10 241:18,18
**basic**
171:21
**basically**
9:1 13:8 16:14
17:21 18:8 21:13
26:17 27:23 30:13
35:1,14 61:13
71:7 96:21 105:4
105:9 113:12
122:19 128:10
134:24 138:14
140:19 164:15,16
173:11 174:22
179:14 203:25
204:3 233:6 238:6
**basis**
222:19 228:18,20
**bathroom**
134:2
**Bauermeister**
119:15 153:16
**Baumgardner**
2:2 4:19 6:10 7:20
22:12 24:11 64:20
65:16 69:14 85:25
90:14 100:11
114:10 121:14
123:2 140:1
148:11,16,20
153:14 161:5,22
162:1 166:12
168:18 170:21
177:7 179:1
182:23 192:7
197:23 198:2,7,9
198:12,17 199:7
199:10 211:13
217:22 219:21
223:7,9 224:1
226:14 239:16
244:23 245:1,5
**Beaver**
232:17
**becoming**
244:9
**bed**
232:18
**beginning**
12:17 13:6 84:1

137:18 138:4
172:2
**behalf**
2:8,16
**behaving**
130:20
**behavior**
3:20 15:24 16:5
20:14 29:20 34:7
46:9,10 72:10
78:10 80:25 98:23
104:1 106:17,17
107:3 142:12
160:10 165:16,25
170:6,7,7 191:9
191:10 197:13
200:19 207:21,25
208:8 228:16
231:11 232:5,9,19
235:5 241:1,23
242:7,24 243:3,7
**behavioral**
10:5 16:18 26:25
27:1 28:15 29:24
45:13,14 60:3
69:11 73:20 79:16
104:1 233:10
241:22,25 243:13
**behaviors**
16:10,13 19:1 20:9
102:20 142:10
166:3
**behold**
225:3
**beholder**
167:21
**beings**
50:8 54:12 72:7
**beliefs**
10:20
**believe**
23:25 24:5 88:22
89:11 90:9 100:5
118:3 130:25
136:3,7 143:9
151:16 182:15
184:10 195:22
197:1,20 208:20
210:3 211:16
214:16 217:24
230:8 233:16
243:6
**believed**

12:24
**bell**
50:7
**belts**
75:7
**benefits**
37:20
**Benotsch**
184:10 186:25
197:14 206:15
209:19 211:8,19
211:23 226:4
**BERKMAN**
2:3
**best**
10:4 39:1 54:4,6
56:24 61:17 62:18
73:5 75:2 80:20
101:1,6,8 103:25
104:16 122:14
140:17 170:6
174:16 175:9
204:18 220:2
233:19
**bet**
21:16 44:22 45:1
51:12 142:12
191:15 195:3
222:24 235:7
**bets**
137:17
**better**
21:17 36:10 43:14
48:8 56:1 77:15
103:21 108:10
137:3 175:25
189:16 204:10
216:23 222:12
244:2
**beyond**
9:10 62:20,21,25
63:8 64:19 65:3
**bias**
156:14 236:15
**biased**
128:4 142:24
**biases**
140:24
**big**
24:10 86:18 127:18
130:3 191:19
208:16 238:24
239:1,3 240:18,18

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

**bigger**
155:19 185:15
222:12 244:13
**biggest**
134:8 142:3 200:12
**Bill**
85:2
**billion**
60:16,16
**Bingo**
121:3
**binocular**
193:8
**biography**
11:3
**bit**
7:12 8:7 18:13 19:3
26:1 37:13 52:19
53:14,21,21,23
55:14 63:8 86:6
92:13 96:18 102:3
102:13 112:20
124:8 126:15
145:12 147:10
148:22 150:17
166:8 167:19
169:16 176:4,6
179:15 180:13
189:23 199:23
200:21 201:11
204:10 212:1
226:23,24 236:18
**black**
121:3 122:17 123:6
123:7 152:17
154:6
**blacks**
122:24
**blanche**
65:7
**block**
50:23
**blonde-eyed**
75:17
**blow**
242:1
**blue**
58:10
**blue-haired**
75:17
**Board**
131:13
**body**
71:25

13:17 40:20 227:15
**bolster**
54:19,22
**bones**
25:13
**book**
71:25
**born**
137:21
**borne**
26:9
**Boston**
80:18
**bother**
143:9
**bottom**
34:19 73:8 149:19
165:18 191:18
200:23
**boyfriend**
97:25 232:14
**boys**
230:17
**brain**
8:21 64:23 72:8,10
**break**
6:5,8 22:11 83:20
83:22 95:3 139:9
139:12 186:22
211:2,4
**breakdown**
145:4 205:19
**breaks**
6:4
**BRFS**
191:10
**bribe**
128:20
**bribed**
128:19,20
**briefly**
197:6
**bring**
94:12
**broad**
75:15 77:8 84:19
84:20 108:23
119:17
**broaden**
77:1
**broadening**
157:3
**broader**

61:18 112:20 202:9
226:24
**broke**
97:25
**broken**
113:14 155:10
**brought**
122:12
**buck**
112:5
**bucks**
92:18,18 130:2
136:14,15
**budget**
122:20 124:16,20
**build**
86:18
**building**
40:20 75:25
**built**
61:10
**bulk**
27:4
**bunch**
234:9
**Bureau**
90:19,20 237:25
**burning**
16:3
**business**
25:12 33:2 40:19
66:22 70:25
168:21 221:6
222:17 229:7,20
237:10
**businesses**
67:9
**busy**
27:20

_____
**C**
**c**
6:21
**calculate**
41:6,20 53:10 56:5
146:22 147:3,10
147:14,14,24
159:11 161:12
162:10 164:1,2
**calculated**
70:14 163:16 164:2
**calculation**
34:18 154:13

**California**
116:12,14,19 117:6
117:14,15,22
119:3,5
**California-San**
105:3
**call**
16:1 22:11 35:13
42:3,4 48:23
51:16 54:13 66:21
101:22 111:5
116:6
**called**
4:13 7:8 10:14
11:21 12:2 21:9
31:11 35:8 50:3
70:24 85:13
104:18 125:1,2
128:9 172:16,20
205:4 214:7 234:1
235:7
**calling**
67:9 68:14
**calls**
66:25 67:4,6 68:13
**Campaign**
184:12 214:1 217:9
226:4
**campuses**
107:17,18
**cap**
87:24
**capitalize**
227:10
**capitalizing**
103:15
**CAPS**
102:17 112:9
**captured**
106:24 229:2
**card**
133:21,25
**cards**
129:13
**care**
13:25 32:3 70:18
118:9
**career**
8:11,16 25:25
26:23 35:15 61:10
64:2
**careful**
61:25 62:19 64:18

87:1 118:2 189:10
221:5 231:10
**carefully**
32:20 190:18,23
236:3
**carefulness**
96:2
**cares**
242:1
**Carol**
1:18 246:5,20
**carried**
27:4
**cars**
75:5,6,7
**carte**
65:7
**case**
4:13 7:18 18:14
39:6,9 62:22
65:19 69:6 71:12
73:7,22,23 74:6
74:10,23 75:22
76:16 78:12 81:13
83:25 84:12 87:16
88:3 89:15 108:17
129:21 138:15
144:24 171:18
189:18 191:3
196:10 201:21
211:6 213:13
220:7 229:20
**cases**
85:17 105:18
**Castro**
103:6
**catch**
135:23,24 136:2
137:16
**catching**
137:10
**categories**
34:4,5
**category**
130:14 209:16
235:3
**caught**
78:5 119:5,6
**cause**
1:16 5:17 8:1 12:8
12:24 13:24 20:19
20:23 21:6 22:6
23:1 26:2 27:25

30:6 31:4,9 32:2
33:8 34:19,20,24
36:3 38:21,22
41:10 43:18 47:10
51:7,18 52:4,11
52:21 69:15,25
70:18 75:6 76:11
78:22 81:16 84:14
86:15 87:6,6
97:25 101:15
108:2,11 115:24
116:15 117:13,20
122:16 127:20
129:20 131:23
132:23 133:8
134:13 140:15
157:17 158:21
169:4 171:18
178:19 179:16
185:10 186:24
200:5 202:22
208:22 209:14
212:5 213:8,15
218:10 220:7
228:19 229:1
232:23 237:6,7
246:16
**caused**
212:13
**caveat**
86:2 91:25 201:23
**caveats**
226:11
**CDC**
191:8
**cell**
20:15 22:18 51:11
51:17 62:11 63:5
93:16 95:23 96:12
115:1 120:1,1,18
120:19,20 122:3
130:18,19 156:7
156:10 202:12
208:17 225:9
**cells**
113:1 120:2 121:6
121:12 122:9,22
123:11 124:11
**Census**
90:19,20 109:21
112:16 113:14
114:6 123:17
139:1 149:23

151:4,19 152:14
152:15,19 154:8
154:17 155:5
159:19 215:5,12
215:15 230:11
237:19,25 238:3
240:7
**Center**
102:17
**central**
54:6
**century**
210:20
**certain**
28:12 42:18 43:11
68:2 72:17 78:25
118:7 131:19
138:16 145:2
150:10 179:7
192:23 221:24
**certainly**
8:23 22:25 29:19
72:5 97:6 108:12
158:11 162:2
170:11 190:21
220:5
**CERTIFICATE**
246:1
**Certified**
246:5
**certify**
246:7
**cetera**
143:18
**chair**
16:17,24 17:5
29:23 44:12 88:9
**chance**
40:13 42:13 109:15
198:3 218:8,9,14
218:22
**chances**
170:9 187:7 208:13
225:13 233:21
**change**
10:13 29:11 57:11
186:21 231:7
**changed**
36:8 51:18 126:23
**changes**
17:14 27:18
**characteristics**
60:21 145:2,8

205:4,6 206:12,13
206:16 207:6
208:20 209:1
215:22 216:4
**characterized**
109:2
**charge**
119:15 165:6
202:22 212:19
**chart**
114:5
**chatted**
11:23
**cheap**
110:24 119:9
**cheaper**
111:2
**cheat**
134:13 136:17
216:22
**cheaters**
134:14
**cheating**
134:12
**check**
24:7
**checked**
178:19
**checking**
134:20
**cherrypicking**
57:2
**chiefs**
70:6,7,10
**Chinese**
110:14
**choice**
48:13
**choose**
206:22
**choosing**
199:2
**chose**
75:12 176:24
**CI**
163:17
**cigarette**
99:13 175:16 177:3
177:4 178:9,14
181:4
**cigarettes**
77:3 99:14 176:5,8
176:13 234:23

**circle**
139:21
**circumspect**
148:22 158:14
**citations**
39:22 187:8
**cite**
39:10 146:4 184:3
184:3 186:25
226:18
**cited**
162:24 187:12
188:10 226:6,11
**cities**
103:3
**citizen**
21:11
**city**
20:17 218:23
**Civil**
1:5 2:11
**clarification**
37:13
**clarified**
167:7
**clarify**
169:14 177:24
233:22 245:1
**class**
15:14 16:21 17:18
17:19 30:24 37:11
46:18 66:13 79:20
194:8 198:1,6
199:20 200:8
201:16 203:13
206:17
**classes**
16:19,22 17:2,17
29:15 46:2 64:9
64:10,16,19 65:13
65:15,20 88:24
199:3 202:4
**clear**
18:8 28:7 63:12
66:2 94:14 95:6
101:18 106:1,2,13
109:3 226:15
**clearly**
18:4 98:16 200:8
**clear-cut**
77:12
**cleavage**
168:17 169:6,8

**Cleveland**
2:5
**click**
131:6 132:24
**clicked**
158:10
**client**
244:15
**clients**
84:14,18
**clinical**
99:10
**close**
32:16 42:3,4 97:4
103:8 115:4
145:12,24 146:11
158:25 159:9
180:14 190:3
193:10 194:20
207:5 209:9
212:18 219:1
225:14
**closed**
115:2,11 120:5
**closely**
172:13,24 173:2
**closer**
41:8,8,9,9 58:24
180:13,18 189:15
228:8,8
**clothed**
167:22 168:7
**clothes**
168:1
**clubs**
102:25
**Coalition**
1:4 4:14 83:24 84:2
**Coast**
6:3 116:11 117:8,9
117:24
**cocaine**
15:17
**code**
51:12 52:13 107:25
**codes**
103:2
**collaborate**
11:24 12:3
**colleague**
26:18 29:2 91:3
232:8
**colleagues**

210:20
collect
71:2 200:3 220:24
229:15 236:12
collected
41:1 65:20 183:6
203:5 229:18
collection
214:19
college
66:3,4 107:17,18
107:20 150:16,16
200:12,20 203:6
203:13 204:11,12
204:14,14 205:12
206:2,4,6 209:22
color
75:24 124:8
colored
76:3
colors
60:18
column
115:13 120:21
140:4 148:4,5,15
151:22,24 160:21
166:17
come
22:2 25:15,17
32:16 48:16 50:8
50:9 56:1 72:2
85:14 88:12 89:1
103:23 106:22
111:4 127:21
131:22 137:2
161:19 179:6
185:18,22 192:23
198:19 223:1,3
238:13 239:10
comes
216:23
comfortable
135:25 142:2
196:16,17
coming
122:21 130:2
134:16 138:7
231:4
comma
33:20
comment
33:23
comments

33:16 36:10
Commission
246:23
common
39:17
communications
38:6
communities
208:17
community
70:20 80:11 104:8
comorbidity
127:14,16
companies
220:22 221:23
company
214:18 217:5,7
comparability
207:14 208:6
comparable
193:13 204:17,17
207:9
comparatively
155:14
compare
77:23 100:22
152:12 174:17
189:9,10,12
192:19 196:18
220:4 234:6
compared
128:23 146:3 183:3
196:10 214:11
compares
161:8 179:18
comparing
82:1,2 100:2
149:22 155:12
173:19 179:14
180:6,9 203:21
212:20
comparison
77:24 78:1 83:12
159:18 175:12
177:1 181:24
189:6,17,19,24
190:6,6 192:2,15
193:14 195:8,22
205:20 209:2
211:11 212:14,22
comparisons
83:7 175:1 179:8
212:23 215:14

compensated
221:17
competency
85:17
competition
222:11
complete
4:25 5:14 58:25
86:11,13
completed
151:2
completely
101:25 134:17
135:11,11 149:21
200:2
complex
14:21 122:2
complexity
15:2,6
complicated
179:15
composition
215:7 216:12
compute
161:15
computer
62:6,12 92:24
209:3,4,20,22,24
210:15 246:12
computers
83:1 132:11 210:12
210:12
concentrations
103:4
concept
29:17,18 73:25
concepts
42:22
conceptualization
173:12
conceptualized
26:5
conceptually
18:3
concern
131:16
concerned
130:15 226:22
concluded
165:24 245:7
conclusion
34:8 69:9
conclusions

91:5 153:25 195:11
condoms
166:4
conducted
67:21 88:22
conference
21:9,17 22:5
confidence
42:9,12,15 43:8,10
44:4,7,8,20 45:23
46:6 68:3 79:18
100:19 106:22
137:9 146:7
147:11 159:10,12
160:23 161:3,12
162:14,15 163:12
163:13,15,21
164:4,13,17 175:9
182:1 190:2
193:23 194:18
195:10 196:13
224:20 227:16
228:1
confident
44:23 45:2,3 53:6
137:14 139:4,6
150:6 157:2
164:21 187:22
189:21 195:24
196:7 225:6,20
233:20 241:18
confidently
46:7,8 150:4 197:5
confusing
153:22
Congratulations
35:6
Congress
11:13,14
Congressional
11:11
conjecture
235:17
connect
116:16 226:8 244:2
connected
62:7 92:7
connection
62:12
conscious
126:16
consequences
241:25

consider
8:8 18:14 32:12
considerations
140:24
considered
221:3
consistent
168:23 227:13
constitute
218:3
Constitution
48:25 49:2
constructionist
48:24 49:5 50:1
52:18 58:21,24
59:9,16 61:3 75:3
constructionists
48:23
consultant
112:8 122:13
contact
12:5 112:5 125:23
126:5,24,25
contacted
84:15 85:2,4
contacting
126:24
contacts
12:8
contained
167:8
content
94:4 139:17 167:9
context
13:20,24 14:4,5,6
40:4 55:8 69:16
72:12 74:7 202:10
239:5
continents
242:23
continue
44:16 207:11
continuously
13:10
continuum
99:19 174:6 189:15
200:21 222:6
contributed
25:7
contribution
25:10 28:11 40:5,7
48:9 71:17 73:12
73:18 75:20 98:13

98:14
control
11:6 57:20,21
110:14 170:9
controlled
57:13,17
convenience
48:18,20,21 58:22
59:1,6 61:14
63:12 136:22
199:16,25 203:6
219:10,11 222:6
convenienceness
59:10
convenient
21:22 59:11,17,17
59:19 61:20,21
63:22,23 64:16
102:21 219:11
conversation
102:22 106:2,23
127:22 195:2
224:15
convince
194:3
convinced
219:18
Cornell
116:21
corner
24:3 59:13 61:22
137:6 204:23
205:1
correct
6:24 16:19 24:1,3
42:19 43:6,12
54:20 58:8 87:9
87:20 89:12,19,23
90:1,5,12,25 91:7
91:10,16,21,24
95:13,14,24 96:14
101:20,21 102:5,6
102:8 103:17
111:6,7,9,9,24,25
120:20 132:14,19
132:21 141:15,23
141:24 143:2
145:5 147:6
151:14 152:3,6,7
152:11,21 154:5
158:5 163:22,23
164:6,9,11,16
165:3 169:18,20

169:24,25 170:18
171:9,10,15,24
175:16 177:13,18
177:19 181:24,25
182:4,21 188:5
192:22 196:2,5,9
196:12 198:16
199:1,5,16 205:9
205:12,17 206:14
206:18 207:8
209:3 210:18
214:9,13 215:7
217:21 218:4,5
220:14,20 221:25
222:23,24 223:8
223:10 237:17
246:13
corrected
63:6 111:17 178:24
181:5
correction
238:15,16
corrections
238:10
correctly
124:21 154:23
181:22 195:21
213:19
correlated
46:8 62:10,11,12
150:20
correlates
104:2
correlation
43:25 44:2 45:22
correlations
54:23
Cosmo
221:10
Cosmogirl.com
217:17
Cosmopolitan
217:15,19
counsel
4:17,19 246:15
count
9:10,25 10:1 34:16
66:22 86:15 105:5
117:8 139:15,18
211:7
counted
119:4
country

9:18 10:6 107:19
118:18 203:14
county
1:19 11:19 246:4,6
246:22
couple
11:17 24:23 37:10
86:22,23 115:16
125:18 154:15
course
15:20 17:4,5,9,10
17:21 70:23 74:3
80:20 103:4
104:15 175:24
200:10 201:10
court
1:1 5:19 59:2 84:22
coy-looking
168:5
co-author
151:13
co-authors
95:13 184:22,24
co-i
10:9
co-investigators
26:6
crazy
60:13 150:5,6
164:22
cream
56:24
create
97:16
created
45:11 111:18 114:5
creating
28:4
creative
194:25
credit
133:21 201:10
crime
70:1,4,15 191:14
criteria
40:6 56:13,25 57:6
57:23 58:6,7,8,16
174:18
criticism
13:21 63:24 106:16
critics
103:25
crop

56:24
cross
65:6
CSR
246:21
CSR-3345
1:19
curious
22:17 94:13 171:17
current
30:9 101:19,21
103:16
currently
4:14,16,16 101:10
curriculum
3:9 23:21
curve
50:7
cut
45:5 113:12 138:13
cutoff
79:14
cutting
37:14
CV
23:22

_____ D _____

damn
49:1
dark
214:2
darn
49:2 76:13,14 97:4
145:12
data
12:25 15:19,19
26:4 27:3 28:5
38:25,25 39:2
41:1,1 50:7,11
57:24 65:20 70:1
70:5,7,8,9,12,13
70:15,18,19,22,24
70:24 71:1,2,2,7,8
82:19 84:21 90:19
90:20 91:3 101:1
101:6,7 112:16
113:14 114:6
124:23 125:4,11
134:9 135:25
136:4,8 139:1,3
141:8,24 143:1,14
143:16,19,20,21

143:22 144:6,9,10
144:15,15,16,19
144:22 147:9,22
149:22,23 151:5
151:19,24 152:2,4
152:14,15 153:9
153:13,19,25
154:8,17 155:5
158:24 159:1,10
159:11 160:22,24
161:14 164:5
165:7,11,23 173:8
174:2 175:19
177:14 179:13,14
180:3,4 183:3,5
185:6,8,9,12
193:9,21 194:3
200:3 203:5,22
204:4,19 206:8,10
214:19 215:5,15
215:15 216:11,15
216:17 219:19
220:24 221:1,3
225:2 230:6,10,18
230:19 232:19
233:18,22,25,25
235:13 236:13
237:24 241:18
database
31:13,14
databases
183:9,10,12,17
date
51:5 70:10 173:8
225:24
dated
24:1
dating
98:23 165:21
231:17 243:15,21
daughter
243:23
day
12:2 59:13 80:1
145:11 229:24
231:11 244:1,1
days
51:11 68:6,18
99:12 122:13,13
244:4
DC
2:13
dead

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 8

72:3
**deal**
240:11
**death**
38:21,22
**debates**
44:12 109:22
**Debbie**
172:23 173:2
**Deborah**
172:6,6 184:18,22
184:24,25
**decade**
8:19 32:7
**decide**
129:18,18 237:3
**decided**
12:8 97:3 125:6
173:9
**decides**
36:12
**decision**
138:17
**decisions**
33:11 73:23 191:12
**decrease**
231:9
**decreasing**
235:16
**deep**
124:10
**deeper**
138:14
**default**
27:16
**defend**
60:6 158:17,20
236:2
**Defendant**
1:11 2:16
**Defendant's**
140:1 152:13,15
**define**
8:17,19 27:14 59:5
69:15 80:25 83:10
166:10,24
**defined**
66:13 76:20 93:13
93:24 96:25 99:10
**defining**
93:13,19 94:14,15
**definitely**
92:21 222:25

**definition**
76:23 77:7 83:14
83:15 95:15 99:11
134:11 166:8
211:16,22,24
219:10
**definitions**
77:21 95:18 166:20
166:25 211:10
**definitive**
227:24 237:4,6
239:22,24,25
240:1
**definitively**
79:13 160:11
**defunct**
11:13
**degree**
9:23 201:17
**degrees**
105:11,11
**delayed**
176:11
**delinquency**
16:2,3
**demographic**
145:2,8 205:4,6,19
215:6,22 216:3,11
**demographically**
145:19
**demographics**
155:8
**department**
2:11 4:12 16:20,24
17:12 29:23 44:13
88:9
**depend**
46:14,15 64:22
76:25 194:21
**depended**
14:24 119:22
**depending**
30:6 65:19 79:6,25
228:10 233:6
**depends**
27:10 28:12 43:16
57:9 63:19,22
68:5,23 77:13,25
84:10 156:25
186:2 239:4
**deposed**
7:25 87:25
**deposition**

1:15 3:8 4:21 6:25
7:22 23:14 89:4
95:8 139:12,16
151:7 190:24
197:9 211:4
213:21 245:7
246:7
**depression**
16:15
**depth**
21:5
**derth**
185:7
**describe**
30:16 111:18
112:24
**described**
14:12 39:13 55:21
116:23 171:21
184:14 197:20
221:19,22
**describing**
47:7
**description**
153:11
**design**
57:18 58:1
**designed**
165:4,5
**designs**
57:20,21
**detail**
12:1 18:7 31:22
33:21 123:19
**details**
17:13 85:21 119:16
124:12 134:19,23
219:12 224:6
**detect**
98:22
**detecting**
136:20
**determine**
54:19 55:10 116:7
165:1 181:14
**determining**
152:4 189:5
**DeVAN**
2:3
**develop**
112:10
**developed**
13:7 26:9 72:2

105:1
**development**
8:15,21,25 9:14
10:25 15:7,9
**deviation**
54:14 147:12,15
162:9 179:19
**de-identified**
70:23
**diagnosis**
127:17
**dial**
51:9
**dialing**
51:10,22 52:22
66:21 133:15
**die**
138:11,12
**died**
138:16
**Diego**
105:2,3
**differ**
135:5
**difference**
28:23 70:12 81:6
81:10 83:13 134:4
154:10,22 155:16
155:17,19 180:17
234:10 237:1
**differences**
88:15 128:25
144:23
**different**
13:16 14:4 15:20
17:15 19:12 21:5
34:3,4,5 41:16
48:22 51:19 52:3
53:14 55:8 58:16
60:18 61:2 67:3
69:11 70:12 75:23
76:3 79:23 81:21
83:1,8,15 97:2
104:17 106:20,20
110:21 111:8
125:11 130:20
132:13 134:17
135:12,13,23
141:13 144:16
147:11,20 150:9
156:19 158:22,22
161:7 175:8,13
180:24 181:2

189:23 194:12,14
194:16 201:12
204:15 207:20,23
207:24,25 208:4
208:21 211:18
212:11,12 219:6
223:18 224:24
227:16,18 229:18
230:7 235:3
237:23 243:5
**differently**
77:15 80:25 83:11
169:16 223:20
227:20 230:17
**difficult**
32:24 60:5 102:16
138:6 188:16
229:7
**digit**
51:9,10,22 52:22
66:20 133:15
**direct**
14:24 26:14
**direction**
42:5 74:20 163:5
174:8,9,11 181:4
190:2 227:21
231:13
**directions**
19:12,13 106:20
**directly**
8:14 171:14
**director**
172:11
**directories**
109:8
**disagree**
107:12 195:15
**disarray**
12:24
**discount**
140:21 240:6
**discounted**
228:25 230:3 236:3
236:17 237:20
238:2,23
**discounting**
237:10,14 239:11
**discover**
60:12
**discovered**
25:16 85:3,5
**discuss**

139:23
**discussed**
141:19 210:16
**discussion**
21:25 47:2 65:9
  66:8
**disease**
242:17
**diseases**
240:20
**dishonest**
233:23
**disparage**
43:3
**disparities**
155:7
**disrupts**
17:16
**dissertation**
11:5 26:13 64:2
**dissimilar**
81:8
**distributed**
50:4
**distribution**
50:6 51:5 114:2
  150:23 180:1,3,4
  180:11
**distributions**
180:10,15
**District**
1:1,2 4:15
**distrust**
68:15
**divide**
112:14
**divided**
66:17 67:13
**DIVISION**
2:11
**Doctor**
22:13 86:1 177:8
  197:24 199:8
**doctoral**
17:22,23
**document**
3:22 23:9,18 24:17
  25:21 89:6,9
  95:10 124:6
  151:10 176:25
  197:11 213:9,15
  213:23 214:4,7
**documents**

89:8
**dog**
189:1,2,3 216:25
**doing**
9:23 10:2,20 20:22
  26:13 27:11,12
  28:2 34:17 40:1
  40:17,17 51:25
  56:10 57:9 60:7
  61:15 66:16,20
  70:21 71:8 77:18
  77:22 78:21 81:13
  83:18 85:10 92:3
  96:22 97:12
  100:20 103:20
  108:17 120:11
  126:4,12,17 127:8
  127:13,14 134:20
  154:22,24 156:18
  160:9 165:13
  178:19 185:11
  188:6 189:16,18
  191:16 201:11
  203:9 221:5
  225:13,19 228:15
  229:3,4 230:17
  231:20 235:23
  240:12 243:22
  244:3
**door**
50:15,18,19,21
  218:19,19
**door-to-door**
60:24
**doublecheck**
94:7
**doublechecking**
119:11
**doubled**
228:21,22
**double-check**
135:20 152:8
**double-checking**
134:9
**doubt**
81:22 135:24
  142:19 191:21
  224:15 230:1
**Dr**
3:9,11 4:9 23:18
  83:23 88:4,7,11
  89:8 95:10 139:11
  197:11 211:3

214:4
**draft**
175:17
**drawing**
69:9
**drifting**
195:14
**drinking**
240:13
**drinks**
99:14,17
**drive**
98:24
**driven**
96:24 124:16 215:3
**driver**
130:3
**driving**
75:7 98:6 240:13
**dropout**
12:7,9 14:11,13,15
  14:17,17,23 16:11
**dropped**
12:10 14:14
**Drouin**
87:19 88:5,11
**drug**
12:5,7 13:11 14:16
  14:17,18,22 83:9
  83:10 100:2,3
  107:1 108:19
  139:3 160:13
  163:2 173:18,25
  175:10 179:5
  233:25 234:6
**drugs**
15:13,15,16 128:3
  175:13
**drug-users**
107:3
**duly**
4:5 246:9,11
**duplicate**
136:4
**D.C**
11:9 51:13

_____
**E**
**earlier**
95:24 106:2 127:22
  136:21 148:23
  157:23 166:8,10
  167:7 188:8

195:20 224:14
  230:5 243:24
**early**
9:1 35:15 131:11
  186:10
**earnest**
200:25
**easier**
132:23 156:8
  158:20
**easily**
63:4 106:24 208:15
**East**
6:3 110:13 113:8
  116:10 117:9,24
**Eastern**
1:2 4:15
**easy**
33:12 59:12 60:5,8
  106:15,24 108:23
  130:1 131:20
  134:1 136:12,14
  136:18,18 156:11
  156:13 194:9,11
**eclectic**
8:12
**ecology**
10:15
**economic**
129:7 131:17
  150:23
**economically-mot...**
129:9
**economics**
64:10
**edges**
183:16
**edit**
9:3 17:5 33:23
  36:14 190:13
**editor**
29:20 30:1,2,13
  31:23 33:12 35:3
  36:11 37:1 47:1
**editors**
32:10
**educated**
150:14,18 154:14
  156:1 176:5,6,9
  222:15
**education**
16:18 29:20,22,25
  31:19 34:7 150:20

155:9,14 206:1
**educational**
148:7 149:2 150:11
  150:13 151:1
**educations**
207:24
**effect**
130:24 142:8
  236:20
**effectiveness**
57:10
**effects**
176:11
**egregious**
190:21
**eight**
44:1 105:5,9 235:1
**eighth-grade**
155:13
**either**
21:16 23:5 32:18
  35:3 36:11 42:5
  65:23 96:13
  135:10 143:13
  144:24 184:18
  200:25 201:1
  210:20 212:9
  213:14 217:1
  222:23 225:9
  246:15
**elderly**
78:2
**election**
42:1 43:19
**electronic**
133:1
**elicit**
212:11
**eliminated**
58:2
**else's**
72:15,16
**em**
50:22
**email**
132:18,23 158:10
  210:7
**embarrassed**
88:14 123:24
  232:25
**employed**
223:6,13,24
**empowerment**

11:6
ended
 19:17 27:19 105:17
  105:18 110:24,25
  119:9 126:4
  134:20 149:17
  163:10
engage
 21:15 166:3
engaging
 20:8 226:19
engineering
 64:11
engineers
 200:15
engines
 185:24
English
 33:22,23
enrolled
 199:3
enticing
 201:14
entitled
 3:13,15,18,22
  89:10 95:12
  151:12
environment
 10:17
epidemic
 242:19
epidemiologists
 140:16
equal
 26:21 122:22 218:8
  218:9,14,22
equaled
 141:15
equation
 238:13
Eric
 10:8,8 102:12
  103:22 105:4
  111:15 140:15
  197:14
error
 41:3,6,13,14,18,22
  42:2,10,13,16
  53:10 56:2 79:1,2
  79:7,8 109:18
  140:25 146:9,16
  146:17,20,23,24
  147:4,7,10,12,16

152:22,24 153:4
154:12,20 162:7
164:7,15,22
178:10,13 179:10
179:11,12,20,21
180:6 227:11
errors
 182:13
especially
 20:11 40:8 51:11
  110:1 144:2 244:9
essentially
 203:11
estimate
 41:22 42:17 43:21
  55:18 56:8 57:3
  65:25 89:17,21
  93:8,18,19 99:5,8
  102:20 162:8
  195:6 214:19
  227:10 228:16
  229:6 237:7,22
  238:7,17 239:23
estimated
 105:8 189:20
estimates
 70:4 78:8 89:25
  91:18,19 99:25
  123:17 140:18
  161:1 189:22
  237:15,18
estimating
 111:16 160:24
et
 1:5 143:18 153:16
  153:18
ethics
 25:21
ethnic
 113:3,4 120:3
  146:1,14 152:25
  207:23
ethnicity
 118:6 121:1 145:5
  215:24
evaluate
 75:11 223:5,12
evaluation
 223:24 224:7
evaluations
 75:9
event
 30:12 246:16

eventually
 17:6 159:12
everybody
 38:10 54:11 61:25
  104:11 105:20
  110:2 120:16,23
  129:3 157:3
  196:19 218:9,10
  218:14 231:24
  233:4
everybody's
 55:25 193:16,16,17
evidence
 8:20 40:21 46:13
  158:23 235:10
  241:3
evidently
 128:17
exact
 19:7 145:21 180:7
  194:21 209:11
exacting
 194:22 207:16
exactly
 48:15 53:4 60:21
  63:23 66:18 67:17
  81:3,12 93:3 98:1
  100:13 112:2
  113:12 131:9
  134:15 135:19,19
  138:17 145:23
  149:8 151:20
  153:1,7 155:24
  169:2 172:9
  181:13 193:12
  208:2 212:20
  216:1
EXAMINATION
 3:4 4:7
EXAMINATIONS
 3:1
examined
 4:5
example
 21:8 26:3,14 28:25
  38:3 45:19 49:5
  50:2 56:14 63:23
  65:12 66:1,20
  67:5 69:21 78:1
  78:15 81:1 82:17
  83:8 91:18,19
  99:12 105:23
  109:7 115:7 117:5

119:8 122:4,25
137:1 139:24
143:17 145:3
149:11,11 150:12
151:3 152:17
155:20 163:14
164:14 191:14
204:1 207:20
212:10 216:7
218:25 219:7
226:18 238:15
examples
 69:5 80:9 123:20
  152:24
exception
 175:15
excited
 185:10
exciting
 87:23
excluding
 141:8
excruciating
 36:24
excuse
 91:19 143:7
exercise
 228:14
exhibit
 3:9,11,13,15,18,22
  23:10,14,16 24:12
  89:4,6,9 95:7,8,11
  140:2 141:20
  148:4 151:7,11
  152:13,15 160:14
  160:16 166:14,15
  173:15 178:1
  182:10 197:9,12
  211:9 213:21,24
  214:5 226:15,17
  227:5
exhibits
 3:7,8 23:11
exist
 49:13 193:22
  232:11 233:5
existence
 192:21
existing
 192:3,5,11
exists
 70:22 73:5 153:12
  207:15

expand
 57:23
expansive
 211:23 212:1
expect
 27:15 226:24
  234:22
expectation
 210:10
expensive
 74:21 111:1,2
  119:10 134:8
  156:12
experience
 10:10 12:21 38:11
experiment
 57:13
experiments
 206:21
expert
 3:11 9:13 18:15,16
  21:3 38:4,5 84:17
  85:7,11,16,22
  86:12 87:4,8
  89:10,14,17 93:11
  94:13 162:25
  177:25 182:8
  184:9 186:14
  188:7,22 189:7
  192:18 213:1,9
  224:8,10 227:8
  235:21,23 237:22
  239:14
expertise
 8:9,13 17:8 38:1,2
experts
 7:18 22:1 87:15
expires
 246:23
explain
 5:3 36:8 81:11
  83:14
explained
 37:22
explaining
 36:4
explains
 155:2
explanation
 81:7 207:19 208:25
explicit
 96:8 97:24 211:20
  211:25 212:7

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 11

**exploring**
244:10
**explosion**
21:1
**expository**
18:5
**extent**
5:13,15 28:12,14
85:20 175:6
193:23 218:15,16
**externalizing**
16:1,2,9
**extra**
112:5 131:5,6
229:1
**extrapolate**
228:22
**extrapolating**
228:2
**extrapolation**
7:11 86:21 227:9
228:11 235:22,23
236:1 239:14
**extreme**
172:2 240:22
**extremely**
124:1
**extremes**
194:9
**eyebrows**
193:3,6
**eyes**
167:20 193:8
**e-commerce**
133:23

———————
        F
———————
**face**
13:4,16
**Facebook**
97:16 111:23
114:18,20,22
115:2,22,25 116:7
116:12,13 117:1,7
119:19 120:14
131:7 132:16
**facet**
13:17
**facets**
15:9
**fact**
14:9 16:21 20:17
25:5 32:5 44:6,12

**46:17 47:1 74:12**
74:24 79:5 106:7
111:17 115:11
150:24 172:16
203:4
**factor**
12:20 230:2
**factors**
9:7 11:8 13:3,16,19
15:8 31:1 140:11
229:15,16
**facts**
87:11,13 193:22
**faculty**
17:13 21:12
**fair**
37:21 62:17 81:5
83:11 91:17 157:6
192:10,14 195:9
222:21 239:13
**fairly**
240:2
**fall**
43:11 136:24 179:9
179:25
**falls**
63:20 164:17
222:23
**false-positive**
42:14
**false-positives**
79:10
**faltered**
138:3
**familiar**
29:5 82:25 83:25
87:15 215:2
221:24 222:5
**families**
130:4 243:17,18
**famous**
217:15
**fancy**
38:12,13
**far**
61:7 102:4 125:10
125:12 137:11
158:24 180:16
226:21 228:20
244:8
**fast**
138:10
**fatal**

**47:3**
**fathers**
49:2
**fawning**
36:9
**FBI**
70:4
**feasible**
233:12,14
**feather**
87:24
**February**
24:1
**federal**
13:12 39:3,20 74:8
84:19 123:15
125:24,25 126:2
174:10
**feds**
126:1 176:19
**feedback**
37:21
**feeing**
136:25
**feel**
80:1 87:22 88:20
142:2 196:7
**fellow**
11:11 27:8
**felonous**
142:11
**felt**
11:6
**female**
205:8,9,10 216:8
**females**
145:4 230:18
**Ferguson**
226:18
**fewer**
122:23 124:8
145:17 236:15
**field**
13:21 45:21 49:9
69:8,11,25 74:4,5
143:25 174:25
175:4,4 185:6
225:21 232:10
241:22
**fight**
189:1,2,3 198:19
217:1
**fights**

**16:7,7**
**figure**
82:15 103:25 118:3
142:15 147:24
**figured**
84:5 105:19 136:8
**figuring**
9:25 41:3 122:14
**fill**
93:2,5 118:8 126:6
127:4 135:2
137:23 142:13
144:8 157:25
**filled**
17:17 19:19 49:10
92:22 115:1,12
**filling**
20:1
**final**
34:11
**find**
14:15 22:15 37:25
38:12 69:4 76:9
98:10 112:16
116:6 145:7
174:19 182:9
183:11 184:13
189:4 193:15
**finding**
48:17 79:2 173:19
180:19 225:14,16
225:25 226:1
227:18 243:2
**findings**
54:24 62:19 64:17
75:10 175:15
179:7 181:9 192:4
192:11,15,19,20
192:24 195:12,23
195:25 196:4,4,7
196:8,10,14
**fine**
139:19 170:24
199:12
**finish**
5:23 6:7
**finished**
115:19
**firm**
7:21 84:14 85:3
101:23 188:2
**first**
4:5 11:10 24:23,25

**26:2,16,22,25**
27:1,7,8,13 28:9
28:17,19,25 29:1
29:3 30:7 32:10
33:22 34:6 40:1
71:4 90:8,8 93:1,4
103:10 112:19
125:6,19 126:20
136:5 148:4 172:5
175:17 184:5,24
185:11 186:6
212:6 216:1
223:16 224:14
226:6 237:23
239:18 246:9
**first-hand**
210:23
**fit**
32:9,11
**fits**
32:3,4
**five**
9:17 12:11 33:7,8
33:18 45:25 46:5
53:24 57:23 68:9
82:24 127:2,4,6
135:12 138:8,8
148:3,13 152:19
154:8 155:20
214:16 215:16
220:10 221:19
235:1 238:12
240:6
**flaw**
47:3 203:10
**flawed**
103:8 106:18,18
110:20,21,21
193:18 231:13
**flawless**
46:19
**flaws**
174:7
**Flint**
61:11 71:3
**flip**
62:14
**fly-by-night**
221:11
**focus**
8:15 21:14
**focused**
209:1

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                4/29/2013

| | | | | |
|---|---|---|---|---|
| **follow** | 49:1 | 132:14 135:1 | 106:3,5,8,9,9,11 | 39:24 41:18 54:1 |
| 187:25 233:13 | **four** | 158:9,9 | 106:17,17 108:19 | 66:7 80:9 91:25 |
| **follows** | 19:9 27:11 34:16 | **friendly** | 112:10 | 93:3 94:6 124:9 |
| 4:6 | 37:4 38:23 60:16 | 11:20 | **gender** | 125:19,22 127:3,6 |
| **follow-up** | 71:4 98:8 113:11 | **friends** | 146:12 | 128:7 186:23 |
| 188:3 | 114:24 123:11 | 8:2 19:5 58:13 60:9 | **general** | 196:13 237:22 |
| **food** | 136:16 149:14 | 92:19 125:16 | 44:25 62:11 76:14 | **given** |
| 201:22 | 152:13 153:6 | 126:5 127:4 130:6 | 84:5,8 109:25 | 72:12 76:9 124:19 |
| **foot** | 154:2 160:10 | 132:11 137:19 | 150:16 155:3 | 137:9 138:25 |
| 44:11 | 188:14 206:19,20 | **friend's** | 232:9 | 142:20 155:18 |
| **football** | **fourth** | 158:8,8 | **generalizable** | 187:11,20,20 |
| 239:7 | 25:3 27:21 115:10 | **front** | 65:14 66:4 148:9 | 191:3,3 207:3 |
| **forcing** | 171:23 | 131:11 205:25 | 149:4 158:13,16 | 212:19 223:4,23 |
| 221:14 | **frame** | **full** | 158:21 159:3,4,7 | 224:5 225:10,21 |
| **foregoing** | 50:13 51:8 61:23 | 4:25 6:19 120:1 | **Generalization** | 225:23,24,25 |
| 246:10 | 62:18,21,23,24 | 122:4 140:5,8 | 203:8 | 226:2 228:1 |
| **forget** | 66:17,18 67:13,23 | 141:2 173:8 | **generalize** | 229:13 231:13 |
| 100:4 112:22 | 75:15 76:6 106:1 | 212:17 246:13 | 52:23 61:24,24 | 235:18 236:15 |
| 131:24 142:16 | 106:3,15,25 | **fully** | 62:19 64:18 65:3 | **gives** |
| 239:10 | 108:23 109:5 | 5:12 167:22 168:7 | 65:4 75:1 76:12 | 54:15 190:2 195:10 |
| **forgot** | 194:25 202:2 | **fully-clothed** | 76:12 156:21,25 | 224:20 |
| 21:9 167:12 181:18 | 220:23 227:17,18 | 168:16 | **generalizing** | **giving** |
| **former** | **frames** | **fun** | 157:1 | 26:21 238:19 |
| 44:12 | 74:25 194:24 | 129:21 | **generation** | **glean** |
| **formula** | **Francisco** | **functioning** | 72:9 111:17 141:6 | 56:23 |
| 41:17 | 103:6 112:9 | 65:2 | 158:7 208:16 | **go** |
| **formulate** | **frankly** | **fundamental** | **generations** | 6:11 17:12 18:7 |
| 81:7 | 23:7 24:6 44:21 | 41:20 | 105:5 124:9,10,19 | 19:6,14 21:16 |
| **Fort** | 110:7,24 112:12 | **funded** | 138:11 | 26:14 28:25 31:1 |
| 88:5 | 112:23 126:13 | 13:8,9 19:9,10,24 | **genetic** | 31:8,11,22 36:15 |
| **forte** | 132:22 159:17 | 125:3,10 126:1 | 229:15 | 42:5 44:22 45:3,3 |
| 140:14 | 183:17 190:11 | **funding** | **genitalia** | 45:5,6 50:18,22 |
| **forth** | 212:20 221:3 | 28:5 74:12 112:21 | 167:13 | 62:3,25 64:8,9,9 |
| 104:25 227:19 | 228:9 | 172:9 | **geographic** | 64:10,10,21 65:16 |
| 246:8 | **fraternity** | **funny** | 51:5 203:8 | 68:21 72:24 74:7 |
| **fortuitous** | 205:16 | 145:22 | **getting** | 74:8,20 76:11 |
| 11:5 99:2 | **Fred's** | **further** | 12:14 16:6 27:20 | 78:6 79:17 80:2 |
| **fortuitously** | 66:21 | 45:6 61:9 105:1 | 30:7 52:12 110:1 | 80:23 86:23 89:7 |
| 12:1 | **free** | 237:11 | 110:9 128:4 | 92:17 99:19 |
| **fortunately** | 1:4 4:13 33:1 83:24 | **future** | 156:17 159:5 | 102:21 103:18 |
| 106:4 | 84:2 | 170:7 174:15 233:4 | 176:10 193:17 | 106:1,8,9,10,11 |
| **forward** | **frequency** | **fuzzier** | 200:13,15,15,16 | 107:17,25 108:1,3 |
| 52:3 | 169:24 | 16:16 | 210:7 218:22 | 110:11 111:19 |
| **found** | **frequent** | | 224:24 225:12 | 114:18 121:7,16 |
| 8:5 12:19 18:17 | 102:25 | _____ | 228:3,16 231:13 | 134:2 135:2 |
| 46:5 75:25 82:18 | **frequently** | **G** | **gift** | 138:14 142:17 |
| 127:7 128:24 | 157:8,13,14 | **gambling** | 129:13 | 146:5 149:6 152:3 |
| 133:13 135:6 | **freshmen** | 44:25 | **girlfriend** | 154:25 168:18 |
| 159:20 165:19 | 205:11 | **gang** | 232:15 | 169:12 171:19 |
| 177:3,13,20 181:7 | **Friday** | 16:7 | **girls** | 173:9,14 175:22 |
| 181:8 219:20,23 | 83:19 | **GAO** | 230:16 | 175:23 177:24 |
| 220:2 226:18,22 | **friend** | 11:14 | **give** | 182:13 183:18 |
| **founding** | 11:15 85:13 92:15 | **gay** | 25:24 26:22 33:16 | |
| | | 102:16 105:24 | | |

186:2 191:24
192:7 193:24
198:19 199:13
201:5 208:23
212:9 217:22
220:24 223:9
224:12 232:22
235:20 237:3,12
239:13 244:8,14
**God**
35:25
**goes**
8:22 24:1 63:7
110:10 138:10
143:11 160:3
168:2 209:25
218:7 230:24
232:3 233:17
235:11
**going**
6:11 7:14 11:2 14:1
14:18 17:17 18:9
23:9 27:12,14,19
28:1 32:9 34:16
39:25 41:16,17
42:11 43:22,23,25
44:10,22,24 45:4
45:4 52:3,4,6 53:4
53:25 55:24,25
57:16,16 61:24
63:9 66:6 67:5
71:7,22 72:9
74:18,19,20 75:18
77:4,6,19 78:9,22
80:12,16 98:19,20
101:22 106:20
107:14 108:12
110:8,13 116:20
119:9,24 120:15
127:3,5 129:17,17
129:19,20 131:22
133:8 136:25
137:2,13,21 138:2
138:14,23 140:20
146:10 151:25
162:3 165:6
168:20 175:22
179:4 182:9 183:5
183:12 187:10
188:16 189:25
190:8 192:2 195:3
195:4,5 200:6,6
200:20 207:9

208:22 209:11
210:11 213:25
218:19 220:9
221:7 222:15,25
224:10 227:23
231:9,19,21,22
232:18,20 234:9
234:12 241:11
**gold**
44:15 137:4 174:5
174:12,19 180:13
189:4,13,19,24
190:6,7 196:18
219:2
**gonna**
73:6 80:18 185:22
229:19 230:24
231:7,18 232:21
232:23
**good**
4:9,10 8:18 18:10
19:17 35:7 36:4
36:13 37:9 40:14
40:18,23 49:21
56:8 68:17 73:13
73:15 74:5 76:14
76:14 78:13 83:21
96:21 100:6
107:19 108:10,14
124:3 130:7 132:8
132:9 134:14
139:3,8 154:5
174:1 176:22
179:2 182:7 186:4
194:24 196:25
200:13 203:9
221:6 222:18
**goodness**
130:5
**Google**
183:18
**GORDON**
2:3
**Gordon-Messer**
153:18 184:25
**gory**
17:13
**gosh**
112:2 133:21 210:4
**gotta**
59:21 61:4 239:17
**gotten**
7:10 28:5,5 63:4

87:18 116:18
122:3,5,7 176:8
235:2
**government**
13:12 38:17 39:3
39:20 74:8 84:7,8
84:20 123:16
125:25 126:1,2
174:10
**grade**
206:5
**graduate**
9:24 11:16 135:16
200:15
**grant**
18:1 26:6 109:24
128:16
**gray**
10:21 26:20 165:20
194:10
**great**
14:1 35:11 63:10
**greater**
195:25 196:3
224:21
**Greek**
206:6
**Greenwich**
103:5
**green-haired**
75:19
**grew**
20:14 232:16
**grid**
218:21 219:5,6
**Grodzinski**
172:3 185:1
**group**
7:4 9:5 54:7 57:21
76:2 81:18 96:25
98:16 104:12
105:19 108:2,9
113:5 117:3
150:17 207:23
208:9 217:15,16
221:10 230:12
231:3,4 234:4
237:1,2 244:9
**groups**
102:15 113:3,5
120:3 146:1,14
148:7 149:2,7,14
149:14,20,25

150:11,13 151:1
152:25 234:2
**grow**
13:24 22:18
**growing**
12:22 14:5,5 20:25
232:12
**guarantee**
234:20
**guaranteed**
74:21,21
**guess**
8:10 9:2 17:7 47:13
84:3,5,7 115:3
134:5 137:20
154:14 156:22
168:10 176:2
201:4 213:25
216:6 222:15,15
226:10 241:12
**guesses**
237:9
**guessing**
41:7 87:5 154:13
185:1
**guidelines**
25:6,19
**guides**
70:15
**guy**
20:12 27:24 133:12
188:24
**guys**
7:7 8:5 12:12 35:25
53:17 73:21 84:23
84:24,24,25 86:15
117:3 192:17
231:23,25 234:13
234:13,15 242:17
**guy's**
77:17

_____

**H**

**hair**
10:21 26:20 58:10
75:24 76:3 165:20
169:11
**half**
36:15 136:15
142:15,15 216:10
**hand**
23:9 89:6 180:2,2
239:4

**handed**
23:18 89:9 95:10
151:10 197:11
214:4
**handle**
21:17 110:9
**hang**
44:9 107:5
**hanging**
108:5
**happen**
37:17 98:20,20
110:22,24 135:4,7
229:19 231:18
239:7
**happened**
12:18 35:4,18 67:9
97:8 101:12
116:22,23 133:12
142:12 159:15
163:4 171:13
187:18 231:8
**happening**
97:21 98:21,25
225:11 231:5,18
**happens**
35:2,17 37:12
50:25 52:16 65:21
79:25 80:17,18
105:15 142:13
187:1 206:24
229:3 241:1,2,4
**happy**
23:3,4
**hard**
53:14 80:3 105:24
106:23 108:15,19
109:4,10 194:10
228:10
**harder**
72:23 108:7
**hard-to-reach**
105:23 108:18
**Harvard**
127:12
**hat**
44:10
**head**
7:6 30:6 51:3 122:1
146:13 225:17
**heading**
95:17 160:22
214:16

Free Speech Coalition v. Holder
Marc Zimmerman, PhD
4/29/2013

heads
17:23 113:16
health
8:14 9:13 10:24
11:8,8 16:14,18
16:25 19:13 29:20
29:21,23,24,24
31:17,18 34:7
38:20 55:2 100:14
172:15,18 173:25
186:3
hear
82:11 232:3,4
heard
23:2 88:4,7 92:14
111:20 217:9,11
217:11,13,15
hearing
43:9
heart
231:14
hearts
231:15
heavy
28:2 210:22
Heckathorn
104:25 111:15
112:11
held
75:4
help
111:2 151:4 219:18
220:6
helped
34:20 98:2 181:14
helpful
26:24 151:17
161:23 208:25
helping
126:18
helps
74:10 213:15
hereinbefore
246:8
hermit
218:17
hermits
60:25
hesitated
206:20
hesitating
43:15 115:24
Hey

11:21
HHS
100:15
Hicks
1:19 246:5,20
hidden
105:23 188:25
220:5
hideous
36:1
high
12:7 14:11 79:17
81:23 93:8 98:23
103:3 107:25
151:2,2 160:1
228:19 230:22,22
240:14
higher
129:23 132:6
150:18 155:25
159:16,23 176:12
191:23
highfalutin
156:8
highly
62:11
high-schooler
82:14
hire
19:16 220:23
hired
172:7,8,8,10
214:18
hiring
19:17
Hispanic
154:15 226:20
history
45:10
hit
126:25
hits
126:22
hitting
108:1 213:19
HIV
242:18
hold
135:10
Holder
1:9 4:14 83:25 84:4
84:4
hole

51:5
holes
46:22 150:7,10
home
50:17,18 52:8
135:2
homes
78:2
homosexuals
102:24
honest
119:14
honestly
6:17 62:24 75:6
101:1 120:10
129:15 130:12
219:22 242:11
hopefully
50:11
hoping
244:16
horrible
110:11
horrific
231:8
horrified
47:14
horse
44:22,24
hour
87:7 130:5 136:15
hours
86:14,22 87:3
house
50:22 86:18,18
110:5 232:16
244:10
housed
71:5
household
12:23 50:20 100:3
households
51:3
houses
16:3
How'd
125:23
huge
74:4 82:1 144:23
144:24 236:20
human
50:8 54:12 72:7
131:13 233:13

hundreds
56:23
Huron
1:17
hurt
171:18
hurts
225:18
husband
232:17
hypothesis
234:11
hypothetical
123:3,4

_____
I
_____

ICPSR
71:5
idea
35:11 53:4,5 82:7,8
83:6 97:19 101:21
105:10 140:23
154:5 169:6
170:25 172:4
173:9 221:12
230:16 235:13,14
ideal
52:20,25 68:22
136:22 222:7
ideas
26:9 27:2,3 30:23
31:4
identification
23:15 89:5 95:9
151:8 197:10
213:22
identify
81:10 104:7 203:10
idiot
77:17
ignore
240:19
illegal
15:21,22
illicit
15:16 142:10
Illinois
9:19 202:7
imagination
227:25
imagine
70:11 82:3 87:1
175:6 215:23

216:22 240:12
immediately
118:7 163:6
importance
13:19 46:1,2 54:18
important
46:21 58:4 62:17
67:14,19 69:10,12
79:7 81:10 83:12
106:19 174:2
208:1 209:6
230:25 241:6
importantly
137:16
impossible
52:21,21 54:11
60:24 63:18,19
109:20 210:6
imputation
144:14
impute
144:14,16,22
incentive
129:11 130:24
incentives
124:18
incentivized
126:8
include
16:10 18:22 56:14
58:10,13 91:22
93:20 167:8
included
25:14 117:24 132:3
132:4 164:8,24
188:23,24 211:21
219:23
includes
153:17
including
156:19,20 163:10
incorporate
72:18
incorrect
49:23
increase
230:24 231:9
increased
14:18 170:11
increasing
235:12,16
incredible
232:7

**incredibly**
185:7
**incremental**
72:21 73:18
**independent**
17:2 101:25 244:10
**independently**
30:15
**INDEX**
3:1
**indexed**
31:11,13,20,21
**Indiana**
88:5
**indicate**
25:9
**individual**
229:11,13,21
**individually**
17:3 70:17
**influx**
19:15
**information**
39:18 86:7 90:21
  98:3 143:6,15
  144:9 151:22
  162:8 164:24
  173:20 175:8,14
  204:18 229:13
**infrastructure**
28:4,21
**initial**
36:5 99:7 172:24
**innocuous**
241:1
**innovative**
3:15 151:12 160:17
  173:15
**innovatively**
126:13
**input**
26:10
**instance**
39:5 159:2
**Institute**
12:5 13:11 71:6
**Institutes**
19:13
**Institutional**
131:12
**instructs**
6:12
**integrity**

**87:14**
**intelligence**
64:24
**intend**
6:15
**intended**
97:21
**intending**
100:22
**intent**
99:21
**intentional**
99:2
**interacted**
10:16
**interested**
10:16,24 12:6
  14:20 18:13 24:19
  29:4,14 31:2 43:9
  45:18 48:17 55:1
  64:4,6 75:8 78:11
  84:16 85:6,8
  96:19 102:15
  107:3 114:19
  119:20 128:13
  147:2 148:3 156:4
  165:15 166:7
  182:14 199:17
  200:19 246:16
**interesting**
11:1 20:6,14 21:24
  25:4,10 40:12
  52:14 60:4 70:20
  73:14 75:18 85:18
  105:10,15,17,21
  121:7 127:9 128:5
  129:4 160:8
  199:18,22 232:10
**interestingly**
15:16
**internalizing**
16:1,13
**internet**
7:3,4 20:2 38:5
  62:7,15 63:3,4
  90:12,22 91:6,12
  91:23 92:1,5,6,11
  92:15,21 93:1
  95:19 97:13,13,14
  99:22 107:22
  108:10 110:1,12
  116:16,25 130:8
  131:20,23 133:21

**139:5 156:4,5**
**157:9,11,13,18,19**
**157:21,24 158:1**
**182:16 183:6,8**
**202:13 204:13**
**208:10,11,13,18**
**209:24 210:8**
**218:10 225:2,3,7**
**236:7**
**internet-based**
221:21,22
**interpreted**
168:9
**interrupting**
143:7
**interval**
42:9,12,16 43:8,10
  44:4,7,8,20 45:23
  46:6 68:4 146:7
  147:11 159:10,12
  160:23 161:3,12
  162:15 163:12,14
  163:15 164:4,13
  164:17 194:18
**intervals**
163:21
**intervention**
57:11
**interventional**
10:12
**intimate**
231:21
**introductory**
17:22 32:1 200:10
**invented**
9:20
**investigate**
88:18
**investigator**
173:1
**invitation**
125:20
**invo**
15:20
**involved**
26:11 69:24 88:3
  112:11 123:22
  172:2 173:10
  217:17
**involvement**
171:25
**in-depth**
107:6
**IP**
115:3 116:8,15

**117:1,11,13,21**
**134:6,16,22,25**
**135:22**
**iPhone**
156:11
**IPS**
115:6
**iron**
60:19
**ironically**
13:18
**irrelevant**
66:23,25 69:4
  190:14
**issue**
25:11 97:9 119:8
  127:21 190:9
  191:4
**issues**
17:12 35:20,21
  46:15 75:1 111:3
  119:7 126:17
  163:16
**item**
77:11 142:18
**items**
77:11
**iteration**
103:17
**iterations**
125:18
**it'd**
225:24
**it'll**
190:11 191:4
**IV**
107:1,3 108:19
**i.e**
95:21

**J**
**jeez**
9:15 11:1 86:13
  185:18
**job**
33:12 36:4 135:18
  203:10 221:7
**jokes**
82:13
**Jose**
119:15 172:12,24
**journal**
9:3 17:6 28:13

**29:21 30:6,12,14**
**30:25 31:2,16,18**
**31:21,24 32:6,7**
**34:13 35:5,8 40:8**
**40:10 49:9 72:24**
**172:15,15,16,17**
**172:20 183:5**
**186:3 190:13**
**journalistic**
39:12
**journals**
25:8 27:22 28:14
  28:16,19 31:9,11
  33:4,14 34:3,4,6
  49:12
**judge**
84:21 222:19
**judges**
73:23
**judgment**
33:25 34:12 106:14
  208:5 224:5
  240:16
**jumped**
146:13
**junior**
29:1
**justice**
2:11 4:12 59:2
**justified**
203:9
**juxtapose**
40:16

**K**
**keep**
119:24 133:5
  138:22 182:12
  191:25 212:17
  225:16,19 239:17
**keeping**
172:21 177:10
**keeps**
104:12
**Kennedy**
129:17
**kept**
101:14 120:9
**Kessler**
127:15
**Kevin**
105:12
**key**

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                    4/29/2013

Page 16

155:24
**kid**
82:12 243:16
**kidding**
35:16 133:25
**kids**
8:25 12:7,10,19
13:19 15:15 19:5
20:19 22:23 23:5
38:21,22 61:12,15
61:16 64:11 66:2
66:2,4 71:3
209:18 210:10,11
231:3 234:7
**kills**
80:14
**kind**
7:10 8:15 9:15 13:7
20:25 26:14 27:15
31:5,6 33:12
37:13 38:11 40:2
40:16 52:1 58:1
59:2,14 65:1
68:23 69:16 73:21
86:22 88:9,20
97:9 102:3 105:10
106:14 115:20
116:17,25 119:12
122:13 125:14
134:18 137:10,21
149:10 150:1
157:4 165:22
168:24 171:21
174:16 176:12
178:11 183:13
185:8,8,12 189:24
190:5 195:1
196:18 204:8
212:16 214:1
220:7 221:4
227:15 228:11,23
232:9 233:10
235:5 237:3,11
239:20 240:12
242:7,14,24 243:3
244:2
**kinda**
7:13 13:25 14:24
27:10 33:10 43:16
47:10 52:15 54:15
72:23 74:23 80:2
80:8 105:19 111:4
112:6 138:16

155:18 169:7
197:1 213:17
225:4 229:4
**kinds**
19:1 56:21 98:24
135:20 207:24
212:12
**kiss**
231:23 233:1
**kissing**
231:22
**knew**
35:8 120:12,15
124:2,7 137:1
**knock**
50:21
**knocked**
50:15
**know**
5:2 6:6 7:7,13,25
8:2 9:9,22 11:1,2
11:4,22 12:6,22
12:25 13:6 14:1,9
14:17 15:25 16:6
16:11,15,17 17:7
17:12,14,25 18:25
19:6,14,18,25
20:11,12,13,13,14
20:16,20,20,20
21:1,5,7,21,21
22:5,6,6,17,17,25
23:8,17 24:4,6,8
25:23 26:8,16,17
26:20,23 28:2,6
28:14 29:10,14,20
30:22,23,25 31:9
32:16,17,25 33:7
33:19 34:3,15,23
35:4,24,25 37:4,7
38:5,10,16,24
39:7,21,23,25
40:2,9,12,14,21
41:6 42:1,7 43:15
43:15,17 45:1,2
45:10,15,20 46:6
46:12,13,16,25
47:4,11,11,25
48:22 49:3,4,21
49:22 50:5,8,12
50:16 51:7,8,12
51:16 52:2,7,9,13
52:15,17,18 53:17
53:19 54:14,24

55:2,12,17,24
56:18,19,22 57:13
58:2,14,15,17,25
59:1,4,4,5,6 60:3
60:6,7,8,11,12,13
60:15,15,17,19,19
60:20,22,24 61:8
61:11,11,17 63:6
63:8 64:4,25,25
66:2,5,5,6,20 67:1
67:5,10,11,16
68:6,8,12,14,14
68:16,21,25,25
69:15 70:1,4
71:16,18,22,24
72:12,22 73:5,6
73:11,15 74:10,16
75:3,5 76:3,9,10
76:11,25 77:1,16
77:16,18,25 78:6
78:9,17 79:6,7,12
79:24 80:3,5,5,6
80:19,20 81:14,15
81:19 82:1,3,4,5,9
82:11,12,24 83:4
84:2,12,13,14,15
84:21,22,24 85:6
85:9,21 86:14,14
86:18,22 87:5,21
88:3,11 89:2
91:11 92:11,16
94:20 95:2 97:15
98:17 99:15,16,17
100:9,15 101:4
102:3,12,25 103:3
103:6,14,14,15,22
103:24 104:3,9,12
104:23 105:16
106:4,7,9,10
107:13,20 108:13
108:21 109:1,3,6
109:10 110:7,15
110:16,17,20
111:3 112:5,11,23
113:4 114:11,12
114:15 115:3,19
115:24,24 116:5
116:19 117:3,4,19
117:23,23,25
118:2,10,14,14,15
118:23 119:1,2,18
120:6,7,9,9,14,22
121:4,24,25 122:1

122:5,16 123:1
124:6 125:10,12
126:8,18 127:8,24
128:6,11 129:5,5
129:15,16,16,24
130:7,9,10,16,17
131:2,3,11,13,21
132:3,12,24 133:3
133:14,14,15,20
133:22 134:12,17
134:24 135:1,14
135:17 136:17,25
137:2,5,8,18,18
137:20,23 138:8,9
138:12 140:12
141:4 142:2,7,8,9
142:11,14 143:10
145:11,13,22
146:16,21 147:3,9
147:13,15,17,18
147:25 149:13,15
150:1,20 152:9
154:14,21 156:12
156:12,21 157:3,3
157:17 159:13,15
159:25 160:6,11
160:12 161:14,15
161:16,16,17
163:7,14 164:21
165:5,13 166:3,3
166:9 167:20,24
168:2,4,14,20,21
169:4,5,7,9,20
171:2,7,13,14
174:6,13,14 175:5
175:5,18 176:5,6
176:10,14,17,19
176:25 178:17
179:24 181:8
182:14 183:4,11
183:25 184:15
185:21 186:17,18
187:6,17,19 188:8
188:17 189:1,13
189:16 190:1,12
191:2,2,5,8,19,20
191:24,24 193:7
193:21,21,22
194:2,2,5,7,10,12
194:14,24 196:20
197:2 200:8 201:9
201:10 202:9,14
202:17 204:2,18

206:6,24,25 207:2
207:3,16 208:2
209:15 210:1,4,9
210:12,14,17,22
212:4,10 213:5,7
213:8 215:25
216:3,12,21 217:1
217:5 219:12,24
220:21,21,22
221:2,11 222:1,9
222:13,14 223:2,2
223:4,23 224:5,25
225:4,5,10,15,18
226:2 227:25
228:2,5,7,9,17,20
228:23 229:2,10
229:18,23 230:11
230:15,17,20,25
231:6,7,11,14,15
231:16,18 232:4
232:12,22,23,25
233:6,9,18 234:11
234:19,23,24
235:4,6,6,8,18
236:6,18,18,23
237:4,12 238:24
238:24,25 239:1
240:3,6,9,10,13
240:20,25 241:7
241:14,25 242:14
242:16,18,18,20
242:23 243:16
244:1,10 245:3
**knowable**
147:22
**knowing**
67:24 69:3 119:20
**knowledge**
72:2,3,20 73:5,7
85:21 176:15
210:23 239:19
**known**
11:25 66:18 70:14
100:24 103:5
121:25 127:14
142:9 147:1,8,17
217:15
**knows**
56:2 108:6 160:10
191:2,23 231:24
232:1
**Korea**
190:13

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 17

**Kuhn**
71:25

---

**L**

**LA**
116:21
**lab**
232:8
**label**
29:6
**labeled**
23:18 24:2
**lack**
39:17
**lamebrain**
35:23
**landlines**
51:20
**language**
48:7 77:10 83:3
96:2 158:15,18,24
168:22 177:22
220:11
**laptop**
116:10,11,24
**large**
72:25 73:1,1 79:4
91:15 98:14
109:13,16
**larger**
57:24 109:14,14
112:17 142:24
155:2 226:24
**largest**
37:12 113:3
**lascivious**
167:19
**late**
178:16 240:14
**lately**
190:10
**Latin**
23:23,24
**Latino**
113:2 122:17
154:16
**Latinos**
112:18 207:22
226:25 236:18
**law**
48:24 73:22,23
84:14,19,20 85:3
101:23 142:7,9

**188:2 235:7**
**laws**
231:6 240:14
**lawsuit**
83:24 84:10
**lawyers**
73:22
**lbaumgardner@...**
2:7
**lead**
14:16,17 27:13
28:16
**leader**
26:5
**leaders**
104:8
**leads**
17:7 243:6
**leap**
82:1
**learn**
23:24
**learned**
110:25 111:1
137:15 232:6
243:12
**learning**
17:24 18:1,2
**leave**
48:3 159:1 222:24
232:16
**leaves**
17:14
**leaving**
159:6
**lecture**
52:16 244:14
**led**
13:1 14:22,23 28:6
222:16
**left**
11:18 36:5 51:25
52:2 115:17
119:25 120:3
122:7 128:8 144:8
180:1
**left-hand**
204:23 205:1
**legal**
25:21 69:16
**legitimate**
135:3
**legitimately**

**45:24**
**lessons**
111:1 137:15
**letter**
32:1
**letting**
35:12 162:3
**let's**
9:6 11:22 19:25
46:13 52:2,22
53:18,19 57:11
78:18 79:11 82:19
92:5 98:4,9 99:1
120:23 122:24
160:18 200:3
228:20 230:2
238:11 240:2,3,4
240:5
**level**
32:11 33:21 44:14
105:7,8 158:22,23
173:21 206:1
207:13
**levels**
119:15
**liberal**
200:11 236:21
**library**
11:14 92:25 131:22
**lie**
234:25
**lied**
136:7
**life**
8:19 15:2,6 32:7
80:1 95:19 170:5
204:3
**lifting**
28:2
**light**
60:16
**Limit**
161:24
**limitation**
62:3 77:19 113:7
201:19 203:4
**limitations**
47:3,6 48:2,4,6,10
48:11,12 50:25
51:23 101:4 149:9
149:10 200:5,8
201:7 204:8
**limited**

**12:25 51:7 55:16**
71:22 74:25 91:5
107:13,15 134:25
149:11 198:8
200:17 202:16
203:18 204:4,5,6
226:13
**limiting**
202:6
**line**
34:19 38:15 58:1
73:8 92:12 104:25
149:19 165:18
191:18 235:20
236:4 243:19
**lines**
34:20 205:7
**link**
132:16,18,21
**list**
12:10 14:20 182:17
183:25 184:2
**listed**
24:25 25:3 164:5
171:23 183:25
206:12
**listening**
201:2
**lists**
205:6
**literally**
189:12
**literature**
12:15 27:6 30:19
39:24 46:12 56:10
56:11 63:25 69:5
73:19 75:21 77:6
81:17 98:13
101:14,15 185:2
186:2 192:3,5,12
**litigation**
101:20,22
**little**
7:12 8:7 11:16
18:13,23 19:3
20:21 26:1 33:2
36:9 37:10,13
39:6 51:4 52:19
53:14,21,21,22
55:14 61:18 63:8
73:2 81:17 82:23
86:2,6 88:14
92:12 96:18 98:3

**102:3,13 105:18**
110:16 112:20
123:24 124:8
126:14 129:4
139:21 145:12
147:10 148:22
150:17 155:25
159:15 166:8
167:19 169:16
176:4,6 179:15
180:13 189:23
193:10 199:23
200:21 201:11
203:22 204:10
212:1 219:17
221:9 226:23,24
236:18 241:2,4,19
244:24
**live**
51:6,6,15,17 60:25
61:8,9 106:4
107:24 119:3
129:9 233:10
**lived**
51:21 218:23
**lives**
11:7 13:19 116:19
117:5 218:17
229:17 244:4
**living**
43:4,5 103:4
116:14 218:21
**Livingston**
1:20 246:4,22
**load**
17:1
**local**
70:18
**locally**
70:17
**located**
116:8
**logic**
228:24
**logical**
65:23 81:13
**logically**
193:15
**loneliness**
16:15
**long**
10:21 31:25 37:18
45:4,9 49:4 86:11

**HURON REPORTING SERVICE**
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                    4/29/2013

86:13 89:12
102:10,12 119:22
120:4,7,18 137:23
142:7 154:24
195:13 198:15
208:7
**longer**
109:17 138:3
182:11
**longitudinal**
144:18
**Longwinded**
37:17
**look**
9:5,7,8 12:12 13:22
15:11 21:24 24:15
33:20 43:24 46:4
47:9,12 48:1 52:5
53:9 57:7,13,15
57:17,24 68:2
71:11 72:10,19
73:4,22 74:1
76:19 78:7 81:16
86:3 88:16,17
90:7 94:19 95:3,5
99:22 100:9 122:1
122:19 128:23
144:10 148:1
151:4,20 152:2,3
154:4,15 155:11
160:18 163:5
164:12 165:7
173:3 174:4
202:19,20 204:5,6
204:7,21 205:19
205:22,23 211:9
211:21 212:15
222:25
**looked**
7:2 13:15 15:7,9
21:4 41:2,2 47:15
47:17 56:5 87:21
87:25 88:16
100:21 128:18
145:1,3,11,14
154:6 166:7,9
168:24 169:2
175:8,17 177:3
187:8,14 194:16
202:18,18,25
220:11
**looking**
13:2,18 40:2 43:17

50:20 57:10 67:15
69:23 71:23 72:14
72:16 75:8,10,14
76:17,24 78:17
80:24 81:14 83:9
88:22 97:14 151:9
153:5,17 157:20
163:3 173:18
174:18 175:19,20
177:14 179:5
185:16 186:20
188:21 192:23
193:8,9 197:19
202:21 203:11,20
203:25 211:8
215:14 216:6,24
218:3 219:17
229:21
**looks**
55:23,24 127:16
188:8,10 243:14
**loose**
26:20
**LORRAINE**
2:2
**loser**
52:19
**lost**
144:7
**lot**
9:19,19 13:15
18:20 21:19,21
37:7 38:17 39:21
40:23 42:25 44:18
53:23 63:24 68:14
74:24 76:15 77:4
81:22 82:4 85:14
85:16 92:11 97:4
97:11 98:11
110:17 119:11
142:13 158:20
175:7 183:13,16
183:16 189:14
208:17 209:13
222:10,10 224:25
235:7 236:12
239:3,8 240:11
241:2 244:13
**lots**
8:20 10:10 14:6
17:2 23:8 30:25
44:12 51:22 69:5
71:10,10 80:9

85:12 109:22
174:7 188:16
191:11 195:5
200:4
**loud**
138:24
**loved**
73:13
**low**
15:18 32:21 93:9
159:22 160:1
225:3,24
**lower**
15:14 61:13 107:21
107:21 129:23
130:16,18,21
131:17 132:6
150:24 177:4,20
177:21,22 191:22
211:19
**lowered**
225:5
**lower-income**
208:17
**LSD**
15:17
**LS&A**
200:11,14 202:8
**lunch**
11:22,23
**lupus**
109:7,8
**lying**
234:14

—— M ——

**M**
2:10
**machine**
52:10
**magazine**
217:16
**magic**
45:11 125:4 240:9
**magical**
56:4
**Mail**
51:24 68:19
**main**
14:16 15:8 149:14
180:19
**major**
34:2 36:19,21

202:5,8
**making**
42:13 57:2 73:23
75:10 81:25 83:6
83:12 106:14
114:24 122:24,25
123:1 153:22
161:24 181:24
189:6 192:2,14
205:20 208:5
209:2 211:10
212:22,23 222:20
**male**
51:3 106:17 216:7
**males**
143:17 145:3
230:18
**male-female**
145:23
**man**
50:20,21 167:21
**maniacs**
242:14
**manner**
168:8
**manuals**
83:4
**map**
72:8
**Marc**
1:15 3:3 4:4 60:14
89:11
**margin**
41:14,19,21 42:16
152:22,24 153:4
154:20 164:7,15
179:9,11,12
**margins**
180:6
**Marie**
1:18 246:5,20
**marijuana**
15:13,16,19 55:11
55:19 65:11 66:1
77:3 99:13 142:6
176:17 231:12
233:2,3,6 234:23
**mark**
6:21 23:9 95:7
**marked**
23:15 89:5,6,9 95:9
95:10 151:8,11
177:25 197:10,11

211:9 213:22
214:4
**marriage**
78:14,17
**married**
78:16
**Mary**
242:19
**Maryland**
11:19
**masked**
170:22
**mass**
170:14,16,17
**Massachusetts**
2:12
**mast**
170:19,20
**master's**
9:22
**match**
97:2 208:2 209:8
209:13,17 230:10
**matched**
161:1 173:22
**matches**
139:1,2 175:2
**material**
60:8 69:13
**materials**
188:19
**math**
30:11 42:25 43:1
67:8 154:22
**mathematician**
180:8
**matter**
15:23 32:2 51:19
76:7,8 129:14
202:8 208:23
219:1
**mayor**
241:8
**mean**
7:25 14:1,2 15:12
15:17 20:16 28:6
32:25 34:17 36:24
40:4,22,23 41:9
42:11 43:3,4,7
44:10 45:12,16,17
46:24 48:25 50:5
50:6 51:20 52:9
53:6,15 54:1,3,15

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

58:15,23 59:15
60:23 62:10 64:17
66:14 67:24 68:5
68:7,9,12,21 69:1
69:19 70:5 72:9
72:13,19 73:20
76:12 80:2,15,18
81:19,20 82:3,6,6
82:10 83:1,2
92:23 94:2,15
97:21 98:16 99:18
101:4 104:2 106:3
106:7 107:1 108:5
109:7,21 110:2,7
110:10,14 113:6
116:18 118:25
119:17 122:12
123:1,18 126:11
128:19,20 129:15
129:24 131:2
133:17 136:14
137:4,17 139:15
141:5 147:7,13,14
147:16 150:25
153:6 156:12
158:12 159:15
160:1 161:22
162:9,19 165:9,22
167:11,15,18,18
167:18 169:9
179:18,22,22,24
180:5,7 185:4,12
187:4 191:3,18,20
192:25,25 194:1
194:14,21 198:5
208:3,16 209:23
210:4,6,7,8 213:3
215:11 216:21
217:14 225:16
227:11,23 228:19
230:19 231:23
232:13 236:19
238:3 239:19,19
239:21,21,22,22
240:16 242:3,5,10
242:14 243:10
244:1,5,8,12,20
245:2
**meaning**
25:13 69:16 168:5
196:3 241:22
**means**
17:24 27:25 69:18

71:21 103:7
147:20 221:15
241:23
**meant**
47:20 167:20
185:10
**measure**
10:18,19,19 46:14
54:8 67:14 170:13
171:8 194:23
**measured**
175:14 209:19
**measurement**
10:17
**measures**
95:17 97:4 166:18
**media**
93:16
**median**
50:6
**medical**
27:6,22 28:14,19
172:15,20
**medication**
6:16
**Medicine**
172:18,18
**MEDLINE**
183:10,12
**meetings**
123:23
**meets**
58:7
**member**
17:13 21:12
**members**
205:16
**membership**
206:7
**memorializes**
213:10,12
**memory**
65:3 198:24
**men**
102:16 105:24
106:3,9,17 108:19
109:9 206:23
207:20 232:1
**mental**
11:8 16:13 55:2
100:14
**mention**
147:4 183:3 192:18

203:3
**mentioned**
29:10,14 96:3
102:4 105:22
155:9 172:4
182:14
**mentor**
26:17 52:9
**mentorship**
18:2
**message**
22:19 89:19,22
94:4 96:6,12
167:8 170:2,15
176:10
**messages**
90:4 93:15,20 94:1
94:16,17 170:14
210:8
**messaging**
94:2
**metal**
60:12
**metals**
60:12
**method**
38:12,13 52:3 68:5
68:23,24 97:2
102:7,11 108:14
111:5,16 120:11
139:22 198:22
201:8 214:14
220:9 221:19
223:5,12
**methodological**
38:1
**methodologically**
32:16,18 52:17
56:25
**methodology**
74:17,25
**methods**
9:20 17:10,19 18:7
34:10 37:22 46:18
73:14 74:1 79:20
103:24 110:20
136:23 148:7
149:1 173:22
184:14 197:6,21
203:1,1 217:21
222:5 223:24
224:8,24 227:16
**Michelle**

88:5
**Michigan**
1:2,17 4:1 10:3
13:10 71:5 112:4
126:3 199:21
200:13 246:2,22
**middle**
20:22,22 110:13
132:9,9 151:22,24
178:11
**Midwest**
113:9 123:10
**mid-Atlantic**
199:4 203:7
**miles**
60:16
**million**
86:5 186:24 228:4
228:6,7,7 236:6
237:8 238:9,12,12
238:14,14,25
239:3,6,12 240:6
240:7
**millions**
228:23 237:13
**mind**
22:3 144:8 195:13
**mine**
11:15 85:14 193:2
193:4 196:24
205:10 222:11
**minimum**
81:5
**minor**
34:1 36:18 37:14
**minority**
168:10,11
**minus**
41:19,21 42:1,6,8
42:16 86:5 150:1
162:11
**minuses**
56:3 146:8
**minute**
53:13 56:7 161:18
197:23
**minutes**
6:5 68:11,11
**misquoted**
47:18
**misquoting**
47:16,18,19
**missed**

33:20 49:14
**missing**
141:24 143:1,14,16
143:22 144:2,6,9
144:19 153:9
165:11 178:21
**mistake**
79:15 178:17 182:9
**mobile**
115:23,25
**mode**
50:7
**moment**
58:3 95:3 101:2
122:25 144:8
195:1 203:24
244:19 245:2
**monetary**
130:23
**money**
19:15,16,19 59:25
92:17,19 124:17
126:15,15 128:16
129:19,25 130:3
131:1,5,6 136:12
136:14 142:16
236:10 240:19
**Monitoring**
174:14 233:4
**monolithic**
113:6
**month**
79:24 99:18 244:1
**months**
37:19 138:3,5
185:19 187:7
188:14,15
**morning**
4:9,10 5:8 195:20
**mother**
82:7 120:14
**motivated**
18:21 19:4 127:8
**motivation**
108:16 129:7
**mountains**
218:18
**move**
35:16 198:12
**moved**
11:9,21
**movies**
47:12

**multiple**
21:5 25:2 46:3,4
53:5,7 54:18,22
77:10 106:19
120:2 144:14
170:15 171:22
190:1 242:16
**multiply**
140:21
**multivariate**
49:16 50:3
**MURRAY**
2:3
**M-a-r-c**
6:21
**m-a-s-s**
170:17

_____
N
**n**
6:22 140:6
**name**
4:11 6:19 21:10
22:8,10 24:24
25:3 88:4 100:4
125:20,24 127:15
167:12 184:10
222:1 241:8
**names**
22:2 125:22
**narrow**
74:5,9 75:16 76:19
77:2,7,9 103:16
132:2
**Nathan**
2:10 4:11
**nathan.m.swinto...**
2:15
**national**
12:5 13:11 15:19
19:13 21:9 39:2
63:11 70:19 96:24
97:2,5,7 99:25
100:2,3,21 120:12
120:13 125:7
127:13 139:3,4
145:9,10 149:22
161:1,8 162:20
173:21,22,23,24
174:3,5,16,20
175:2,9,15 177:4
182:3 184:11
191:4,6,8 209:14

213:25 215:15
217:9 219:16
221:10 226:4
230:19 233:5
**nationally**
90:11 112:15
182:15
**nationwide**
90:22,24 91:9,12
99:5,7 224:16,21
**Native**
130:9 149:12
**nature**
5:10 26:23 67:18
**nauseam**
138:19
**near**
212:7
**nearly**
95:22 166:21,24
**necessarily**
12:21 39:1,20
64:25 65:8 68:25
70:14 72:11 92:4
92:23 99:4,16
104:16 108:5
109:2 131:3,18
147:11 150:19
189:9,19 228:13
242:15
**neck**
79:19 132:22
**need**
6:5 18:7 40:10 56:8
74:11 77:9,9,10
82:12,14 115:19
129:13,19 161:6
186:21 195:17
215:9 227:15,16
236:9 240:23
**needed**
84:25 120:19 122:6
123:7 209:8
**needs**
162:2 203:12
**negative**
242:15
**negatively**
46:9
**negotiated**
20:4
**neighborhood**
50:16 51:2 119:2

**nervous**
228:2
**nesting**
141:4
**network**
124:25 125:1,2
157:10 158:4
179:5 183:7
**networking**
157:19 158:6,10
**networks**
3:17 151:13 158:3
173:16
**never**
51:18 55:22 85:9
88:4,12 89:1
111:20 133:20
137:19 146:9
160:11 180:10
191:24 202:5
217:9,13 219:3
221:11 236:7
**new**
17:14 20:17,24
22:4 31:20 34:13
40:11 52:7 72:7
72:21 73:18,19
74:18 107:10
116:19 117:6,22
119:4 186:6
230:15 231:4
243:21
**newer**
103:21
**news**
19:3,4,22 84:11
190:10 231:6
**newspaper**
39:10
**newspapers**
97:23
**nice**
33:10 40:4 198:19
**NIDA**
13:8,10,11,13
**night**
178:16 240:14
**NIH**
13:12 19:15
**nine**
113:1
**Nine-million-two**
91:20

**Nobody's**
74:13
**nod**
5:17
**noise**
25:15
**nominate**
92:19 104:24,24
111:13,13,14
126:19,21 127:2
**nominates**
105:6,7
**nominating**
105:7
**nongovernmental**
39:23
**nonpeer-reviewed**
38:14 39:18,23
56:15 74:9
**nonrespondents**
127:20,23,25 128:9
128:10,22
**nonresponse**
143:14
**nontrivial**
241:12,16,17 242:3
**nonviolent**
16:3
**non-interpersonal**
16:4
**non-response**
66:23 68:1
**non-sexually**
143:18
**noon**
242:2
**Nope**
48:16 128:13
**norm**
97:16 231:19
**normal**
50:5 64:24 145:18
**normality**
50:3
**normally**
50:4
**normative**
232:19
**norms**
97:13
**Northeast**
123:10 145:15
**nose**

242:2
**Notary**
1:19 246:1,6,21
**note**
48:10 149:15
**noted**
203:3
**notes**
212:23,25 213:2
246:14
**Notice**
1:16
**noticed**
31:10 203:24
**notorious**
47:23
**notoriously**
51:24
**NSDUH**
100:5 173:24 177:5
177:18 179:7,11
181:7,18
**nuanced**
112:22
**nude**
95:21,22 166:21,21
166:24,24 167:25
168:11 169:22
211:21,25 212:6,7
212:7
**number**
7:5 18:18,24,24
37:12 38:20,22
45:11 51:18 52:6
52:12 54:4,5,6,10
54:11 66:15 67:2
67:3 68:1 78:25
86:3,5 89:17,21
90:21,24 91:6,8
91:17,19 110:6
121:6 122:9
124:14 125:5,5
134:2,3,4 138:16
139:24 140:8,9
141:7,15 142:1
155:2,21 160:5
164:21 169:15
170:13 171:9
179:25,25 180:1
195:10,25 196:3
197:2,4 225:5
226:24 228:19
230:4,20 235:11

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                4/29/2013

Page 21

235:11 236:17
238:3,9 240:10,13
241:12,17,17
242:6,10 243:4
**numbers**
30:10 45:14 93:7
122:22 228:10
230:24 237:23
238:24
**nursing**
78:2 200:16
**NW**
2:12

—————————
**O**
—————————
**oath**
4:6,25 5:8,10,12
**obfuscate**
179:23
**object**
6:10
**objection**
6:11 64:20 65:16
69:14 114:10
168:18 192:7
217:22 219:21
223:7 224:1
239:16
**objections**
161:25 198:8
**obsession**
86:24
**obsessive**
118:3
**obtain**
99:5
**obtained**
90:3
**obtaining**
52:25
**obvious**
188:11 195:17
**obviously**
7:8 8:21 20:7 22:18
53:16 109:13
164:1 178:16
240:17
**occasionally**
39:8,9,9 135:13
**occurred**
186:10
**ocean**
204:2

**offered**
128:15
**office**
11:12 82:13
**official**
172:17,19
**oh**
9:8,15 23:11 24:8
35:10,25 36:9
37:9 47:17 48:4
60:4 80:19 84:4
86:13 92:17 112:2
133:16,21 148:20
160:16 166:15
170:17 183:21,22
185:18 190:15
210:4 217:11
238:1
**Ohio**
2:5
**okay**
4:21 5:3,6,17,22
6:1,2,4,13,19,23
7:17,20,24 8:7
9:12 14:25 16:23
18:12 19:23 22:9
22:12,24 23:6,20
23:23 24:22 25:18
25:22 27:5,15
28:18 31:15 41:23
48:5 49:24 57:4
69:7,25 75:18
76:10 78:13 79:11
79:12 83:17 84:11
84:12 85:22 86:11
86:19 88:1,11
89:3,7 91:5,17
92:17,22 93:7,22
94:1,11,18,21,23
94:25 95:5 96:1
96:16 100:25
101:3,24 102:2
104:14 111:11
113:18,19 114:18
116:4 117:12
118:1,24 119:19
120:8 121:7
122:12 123:14,25
124:24 125:13
126:23 128:14
132:7 133:5,10
136:6,21 138:1
139:14,20 141:1

142:15 143:15
144:4,25 146:25
147:23 148:20
152:16 154:3,5,15
155:7 157:16
159:24,24 160:16
161:21 162:5,6,14
163:1,19,20,25
164:10,20 167:3,7
168:24 169:14
171:1,16 173:14
173:14 175:12
178:15,18 180:25
181:3,6,12 182:5
184:4,8,17,20
185:3,16,20
186:13,16 189:4
189:13 197:25
198:11,14,14,18
199:10 203:16
205:1,3,5 209:10
211:1,22 212:3
213:5,18 215:4
216:3 217:13
220:2 222:3
223:12,22 224:4
227:7 235:15,20
236:5 238:5,11
244:23
**old**
20:12 38:24 40:9
156:11 187:2
**older**
11:2,17 82:7
120:13 199:23
**once**
30:5 31:23 35:5,18
47:13 83:19 105:4
115:9,12 118:19
125:15 133:10,10
159:10 169:25
170:4 186:1
187:20
**ones**
25:2 31:10 56:24
57:12,17 74:4
102:22 125:22
153:20 185:11
186:17 189:12
208:9 215:24
222:2 226:11
227:2,4
**one's**

98:11 221:14
**one-sided**
57:15
**online**
3:16 111:23 151:12
173:16 179:4
214:21,24 220:14
220:17 222:4,22
**open**
115:17 118:20
120:4 158:16
159:6
**opening**
232:11
**operate**
220:7
**operates**
64:23
**operation**
28:1
**opinion**
116:2
**opinions**
33:8 55:23
**opportunities**
28:5
**opportunity**
12:3 21:24 108:1
**opposite**
27:6 79:1
**optimal**
44:7 68:3
**order**
25:6 27:14 89:8
171:3,20
**organization**
34:11 216:20
**organizations**
106:8,9,12 221:10
221:24 222:4
**organized**
21:10
**organizing**
110:15
**original**
85:4 99:21 131:7
239:13
**originally**
6:3
**outcome**
12:20 14:2 40:24
43:23 122:16
**outcomes**

12:13,22 13:3
15:11 41:5
**outside**
98:21 149:25
152:23 153:4
154:12,19 164:23
180:21,22 241:12
**overcome**
49:23
**overestimate**
65:24
**overestimated**
229:25 236:16
**overgeneralized**
76:8
**overlap**
180:15,20,23
183:14,16
**overlapped**
11:17
**overrepresented**
140:20
**oversample**
78:22 204:12
**oversampled**
124:10
**owing**
148:6 149:1
**o'clock**
244:16

—————————
**P**
—————————
**p**
44:14
**pad**
213:4
**page**
3:2,8 24:20 29:4
93:11,12 95:15
117:1 120:14
132:16 139:24
140:4 141:19
148:3,13,17
151:16 152:13
153:6 154:2
160:20,21 164:12
166:17 173:11
178:5 197:20
204:21,25 211:14
211:17 214:16
220:10 221:19
227:7 235:21
**pages**

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

1:13 33:19 40:11
89:12 97:16
182:12 193:18
**paid**
87:7,8 114:25
126:20
**pain**
79:19 132:22
**painstakingly**
124:1
**paper**
26:16 27:12,17
28:21,22 32:14
33:6,16 34:1,21
35:9,10 36:2,11
38:3 47:5,24 48:4
48:9 62:4 73:1,13
85:5 86:15 90:7
94:7,19 95:3 97:3
102:1 112:24,24
134:1,10,23,24
135:17 146:4
151:6,13 153:21
153:21 155:11,12
161:8,9,10 162:18
163:8 172:12
175:20 184:3,25
202:20 210:9
213:8
**papers**
7:2 9:3 35:18 39:7
47:15,21 76:15
162:17
**paradigm**
44:14
**paradigmatic**
44:9
**paragraph**
90:8,18 93:12
121:15 148:4
178:11 182:18
211:17 218:2
227:7
**paragraphs**
33:18
**parametric**
49:17
**paranoid**
128:3
**parental**
45:19 46:8
**parentheses**
140:5

**parenthetical**
95:21 178:12
**parenthood**
12:21
**parents**
130:4 231:7 232:15
**part**
19:11 32:23 33:1
33:12 71:15 97:19
107:12 108:16
109:5 113:10
125:3 126:14
145:19 165:21
166:5 172:7 195:3
203:14 220:18
231:17 232:2
235:17 237:8
239:18 243:10,14
**participant**
136:2
**participants**
95:20 102:7 132:10
139:24 141:7
143:16,18,22
178:8 209:20
220:19 226:19
**participate**
129:8,12 206:21
214:24 220:13,17
**participation**
126:11
**particular**
11:9 43:12 102:17
114:20 120:17
141:5 142:24
203:13 206:17
207:21 208:8
220:20 223:6,13
**particularly**
200:1 202:10
**partly**
16:24 43:15 218:15
230:7
**partners**
166:1 243:5
**parts**
72:10 113:10
202:24
**party**
246:15
**pass**
201:16
**passed**

190:21
**passing**
102:4
**pause**
212:19
**pay**
20:15 42:23 126:6
126:7,10 151:25
201:12
**paying**
119:16 200:25
**payphone**
20:18
**peel**
230:20 239:20
**peer**
29:7
**peer-review**
29:17
**peer-reviewed**
10:11 17:25 25:8
29:9 30:12 38:18
38:25 39:8,11,21
41:24 57:8 109:24
156:3 191:13
217:4 219:15
**pending**
4:15
**Pennsylvania**
4:15
**people**
7:4,20,25 8:12 9:9
9:19 10:7,16 11:6
11:25 14:10,13
16:6,6 19:17,18
19:19 20:16 21:3
21:15,16,20 22:1
25:12,13,14,15,16
28:2 31:5,12,25
32:6,13,25 33:4,5
33:7,8,10,11
34:25 37:23 39:10
43:21 44:18 45:12
45:15 47:16 50:11
50:16 51:16,20
52:4,19,23 54:1,2
54:2 56:10,21
58:10 59:12,22,25
60:2,4,23 61:2
62:9,13 63:3,4
66:15 67:2,7 68:9
68:10,16 69:25
70:18,23 71:10,11

72:20 73:13 75:17
75:19 76:2 77:14
78:2 79:19 82:2,4
82:11,24 85:1
86:3 88:2 91:18
91:22 92:1,7,9,10
92:12 97:15 98:7
102:15,24 103:2
103:11,13,15
104:12,24,24
105:17 106:6,8,11
106:11 107:11,12
108:4 110:4,11,17
111:13,14,14
114:1 115:5,22
120:13 121:18,21
124:5,7 125:7
126:10,19,21
127:7 128:1,2,15
128:16,18 129:1,1
129:7 130:21
131:16,18 132:1
132:24 134:12,13
135:14 136:16
137:5,16 138:7
140:9 141:3,5,22
142:18,22 143:1,9
143:10 144:10
145:12,14,17
151:1 153:9,19
155:13 156:1,4,6
156:18,20 157:1,7
157:10,13,18,18
157:20,24 158:2,5
160:3 165:16
167:4,16,25
168:14,23 169:3,7
169:8,9,10,16
170:15 172:8
174:4,23 175:3
176:5,10,13 183:7
184:7 189:14,20
200:5,6,7 201:14
204:11,12 207:22
207:24 208:9
209:16 219:5,6
220:17,23,24
221:7,16 225:2,25
226:1 228:4,6,15
229:17 231:20
232:23 233:7,16
233:19,23 234:2
234:19 235:8

236:9,11,12,15
237:8,13 238:25
239:3,4,6,8 240:7
240:8 241:12
242:1,6,10,13,15
242:16,22 243:8,8
243:11,21 244:3,9
**peoples**
71:11
**percent**
36:17,25 37:2,8,16
42:7,8,8,9,15,17
42:17 44:3,4,7,19
44:23 45:2,3,7,7,7
45:22,25 46:6
68:7,17,19 78:19
78:23 79:18 91:14
91:15 103:7 110:3
110:6,6 130:11
135:9,24 139:2
143:8 144:3,19,21
146:7,12 149:25
152:19,20 154:8
154:16,17,23
155:4,5 159:9,12
160:6,23 161:3
162:15 163:13,15
164:16,18 177:13
177:18 181:7,8
191:21,22 193:2
194:7,7,11,12,13
194:13,18 205:8
205:11,16 214:20
215:16,18 224:17
224:22 225:6,20
225:22 226:19,21
228:18 229:1
230:2,3,4,5,21
231:15 233:18,21
236:4,21,22 237:2
237:2,12,16 238:7
238:8,13,14,19,21
240:4,5,5,21
241:3 242:25
**percentage**
7:3 42:4 43:10 68:2
78:20 91:14,15
112:17 113:18
145:25 152:18
154:11 155:17
177:20,21,23
192:24 224:16
236:25 239:11

**percentages**
91:8 147:19 156:16
215:21 236:19
238:4
**perfect**
24:19 39:1 46:19
50:7,13 52:25
53:2,2 63:9,16
146:10 148:24
149:20 174:7
189:15 218:7
219:3 222:7
225:12 227:17
**perfectly**
193:19
**perform**
69:22 101:18
**performed**
141:17 173:20
**period**
8:24 9:1 12:16 19:2
19:21 33:20 98:17
138:18
**periodic**
60:18
**perpetuity**
150:9
**person**
22:5 26:19 36:20
36:20,21,22 38:8
44:25 45:1 53:16
64:17,23 65:1
71:21 73:17 76:7
85:4 86:9 98:2
103:22 104:10,11
105:6,6,6,7 116:9
116:10,10 117:8,9
117:15,24 122:4
123:6 129:11,12
132:13,20 133:16
133:22 134:18,21
134:25 135:12
136:3 171:4,11
172:8 176:3 218:8
218:22 219:4
229:16 241:9
242:20
**personal**
22:21
**personality**
10:15
**personally**
44:25

**person's**
136:4
**pertinent**
20:6
**Pew**
95:19 110:3
**phenomenon**
20:25 52:14 110:9
127:9
**Philip**
88:7
**philosophy**
44:13 71:21
**phone**
20:22 22:11,18
51:18 52:5,11
62:11,15 66:25
67:4,6 68:6,9,10
68:12 82:5 96:12
101:22 115:23,25
116:6 133:16
156:10,13 225:9
243:25
**phones**
20:15,16 51:11
52:4,23 63:5
93:16 95:23
130:19,19 156:7,8
202:12 208:17
**photo**
94:24 95:22 96:4,9
97:24 166:22,24
167:12
**photograph**
96:13
**photos**
93:15,20 94:5,15
211:20
**phrase**
41:12 83:10,10
169:15 227:12
**physical**
72:5
**physician**
79:9
**Ph.D**
1:15 3:3 4:4 9:16
9:17 10:14 17:24
29:16 53:15 89:11
**PI**
172:25
**pick**
38:7,9 49:12 52:11

57:12 74:4,5
106:6 209:16
221:11
**picked**
56:24 113:2,8,13
209:12 219:13
228:19
**picks**
133:16
**picture**
82:6 97:24 156:13
168:5 169:20,21
**pictures**
20:19 97:15 208:15
**piece**
30:18 41:20 47:24
98:3
**pieces**
150:7
**pills**
15:18
**pimples**
174:22
**pipeline**
234:1
**pity**
176:3
**Pizza**
66:21
**place**
27:25 35:23 64:8
172:5 185:5 226:7
246:8
**places**
70:12 102:24
193:24
**Plaintiff**
1:7 2:8
**plaintiffs**
84:4
**plan**
6:4
**planet**
60:19
**platonic**
136:22 222:7
**plausible**
207:18
**played**
11:19
**please**
5:2,20,23 6:6,19
175:23 188:9

207:11
**plucking**
239:18
**plus**
41:19,21 42:1,6,8
42:16 56:3 86:5
146:8 150:1
162:10
**point**
25:25 46:17 56:17
59:9 88:19 91:3
127:7 128:21
139:8 145:25
148:16 170:2
176:8 182:20
190:8,17 195:21
204:4 211:13
225:21 226:9,12
229:6 230:14
238:15,16 239:9
**pointed**
159:8 164:13
191:13
**pointing**
104:12 190:2
227:21
**points**
7:14 42:4 154:11
213:13 228:1
**poised**
168:8
**poke**
150:7
**police**
70:6,7,10
**policies**
70:16 176:19
**policy**
191:12
**policymakers**
175:5
**polite**
34:22,24
**polling**
41:24,25 43:18
**polls**
56:20
**pool**
137:21 220:18
**poor**
12:22 59:25
**poorer**
243:18

**pop**
118:20 183:19
**popular**
74:7,7 176:9
**population**
20:7 31:2 48:20
49:19 50:10,12
54:16 59:23 64:5
64:13 69:2 92:6
98:20 102:20
105:9 107:23
108:14,18,22
109:1,5,11,13,14
109:17,19,25
112:10 114:3,20
124:3 129:23,24
130:9,11 145:10
145:15,16,18
149:4 150:14,17
152:5 154:7 155:3
156:22 157:7,12
158:2,4 159:19
180:11 181:15
182:2,3 200:2,18
202:11 215:17
229:2,10,22
231:19 236:25
240:22 243:1
**populations**
14:10 102:16
105:23,24 203:8
**pornographic**
169:10
**pornography**
59:5 168:3,4 169:7
169:8
**posed**
107:6
**position**
158:17
**positive**
13:3,19 123:12
**possibility**
159:6
**possible**
28:22 92:8,9 93:3,6
93:7,9,9 131:24
132:4 133:13
136:18 140:18,25
158:7,11 167:24
186:20 209:9
212:4,5,15 220:18
221:16,18 230:1

possibly
113:1 124:5 150:12
postdoc
27:7
posted
132:16
potentially
12:3 20:8 98:25
138:5 156:17
168:9 219:18
poverty
14:5
power
78:25
practice
31:17 39:15 171:22
195:4
practitioners
175:5
precedent
73:24
precise
77:10 108:21 111:5
precisely
77:21 149:24
predefined
193:1
predict
12:20 13:3 229:11
229:21
predicted
41:10
predicting
40:24 43:21
predictor
170:7
predictors
9:5 14:15
Pregnancy
184:12 217:10
premiere
29:22
prepare
6:25
preparing
213:10
preschoolers
82:2
present
18:11 83:24 227:11
presidential
41:25 43:19
press

74:7 97:12 162:3
prestige
31:8
prestigious
27:25 28:10 31:9
49:12
presumably
46:9 92:11 150:19
pretty
8:11 18:8 35:7
47:23 55:21 72:24
87:22 102:14
104:17 105:10,14
105:15 107:19
123:9 126:11
132:8 133:12
134:1 135:25
138:10,10 139:1,2
139:3 145:19
146:3 150:5 160:1
161:17 167:5
172:12 176:22,24
186:4 187:22
200:13 204:16
214:2,21 221:5
222:18 225:4
226:23 233:20
241:17
prevalence
54:19,23 55:1,10
55:11,19 65:11,14
78:8,18 82:18,21
90:3 99:5,25
100:21 101:7
146:21 147:2
161:1,15 163:24
165:2 173:10,19
185:14 186:10,14
189:5 203:2
210:14 224:20
237:19,24 242:12
prevalent
99:8 202:21
Prevent
184:12 217:10
Prevention
102:18
previous
12:11 23:25 24:2
24:16 97:3 124:21
previously
88:11 114:9
price

129:3
primarily
226:20
primary
69:13 71:1 172:16
172:23
principal
172:25
principles
60:7
print
185:22,23
prior
73:23
private
21:11
privileged
198:15
probabilities
229:22
probability
41:8,9 42:9 170:11
194:20 218:4,6,13
219:8,9 222:7
229:12,13,19
probable
132:25
probably
11:25 19:8 21:4
27:23 28:9,19
29:19 30:3 36:15
36:20,24 46:7
49:12,23 62:25
65:18,18 66:3
68:20 69:4 70:17
78:15,19,22 82:10
82:11,13,20,22
86:22 87:5,24
88:8 94:12,17
98:21 101:1,5
108:10 116:5
120:10 124:16
130:11,12,14,18
130:25 132:3,8,21
132:23 136:12
137:11 142:3,3
146:4 147:25
150:24 153:4
154:11,21,21
156:6,16 157:22
157:23 159:9
160:6 162:17
165:11 170:10

183:10 184:18,21
185:1,4,18 186:25
187:14,18 188:10
188:12 197:3,4
199:13 202:12,12
202:15,19 203:3
204:9,13 209:5
211:14 212:1
215:19 216:6,25
222:17 230:21
233:8 234:14
235:9 241:11
242:4 243:6,10
244:15
problem
38:19,20 72:5,7
78:5 107:7 133:18
160:4 212:13
240:18,18
problems
14:3 50:24 55:3
174:8,15 191:11
193:13 225:1
process
18:1 26:18 28:6
35:1 36:23 37:18
37:20 104:17
111:19 113:25
123:22 125:13,15
156:3 165:22
166:5 216:5 232:2
243:15
processes
65:3
profession
43:3 48:24
professional
216:19
professor
25:23
program
17:16 80:12
programmatic
40:19 46:20 53:5
project
7:11 10:9 95:19
125:3 172:11,25
173:1
projects
19:14
promiscuous
242:22
promiscuously

166:2
Promotion
31:17
properly
69:13
proportion
145:3,4 155:23
170:14
proportionate
155:24
proposal
12:12 18:1
prosecute
188:9
protected
198:16
Protection
131:13
protocol
50:19
provide
4:25 86:7 87:8
234:3
provided
95:18 166:25
provides
81:15
psych
63:25 65:20 198:6
psychiatric
99:10 127:17
psychological
11:5 25:5,20 55:3
psychologist
9:16
psychologists
16:1
psychology
9:18 16:20 64:10
64:16,19 65:13,15
88:24 199:3,20
200:9 202:1,3,4,5
206:17 207:4
PsycINFO
183:13
public
1:19 2:4 16:25
29:21,23,24 31:18
38:20 71:4 246:6
246:21
publication
17:25 185:25
publish

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                    4/29/2013

31:6,7 68:20
**published**
13:14 24:21 31:16
32:12 73:8,9
76:15 90:1 100:1
101:10,10 125:11
128:7 129:5
185:22 231:2
**publishing**
10:10 28:13 72:23
**pulled**
185:1,4
**pun**
97:21
**Purdue**
88:5
**pure**
237:18
**purely**
235:17
**puritanical**
232:6
**purple-eyed**
75:19
**purpose**
88:18 99:4 114:12
221:4 234:25
**purposes**
18:11 87:12 124:15
188:3,6,22 189:6
209:1
**pursuant**
1:16
**pursuing**
29:16
**push**
176:18
**put**
10:18 27:7 40:3
47:24 87:3 97:15
128:19 131:4,10
131:14,15 137:21
178:23 201:3
213:6,6,8
**puts**
39:3
**putting**
34:14 97:10 213:15
**p.m**
245:7

_____
          **Q**
_____
**qualifications**

9:12,15
**qualified**
37:23
**qualify**
10:22,23
**qualitative**
57:14
**qualities**
34:18 56:9 76:4,5
**quarter**
37:2
**question**
5:1,3,5,6,12,15,20
5:24 6:7,12 8:18
11:1 21:2 46:23
53:20 54:3 55:6
58:18 64:22 66:6
66:10 69:10 72:12
74:14 77:12,13
79:6,22,24 80:3
93:10 95:24 96:21
98:4 100:10
117:25 118:22
119:18,24 120:25
121:18,19,22,24
122:2 132:12
133:7 141:25
149:24 153:12
160:13 161:11
168:9 169:16
171:3 180:23
191:19 192:13
193:20 197:5
198:1,3,10,22
200:18 208:1
209:5 212:6,21
226:10 227:1
237:21 239:13
**questioned**
46:16
**questionnaire**
18:23 19:20 20:2
92:22 93:2,5
97:10 126:7 127:5
136:15 140:10
141:3 142:14
157:25 216:7
**questionnaires**
134:15 140:14
**questions**
4:24 14:16 18:22
19:25 20:1,3,5
24:23 52:1 80:4

83:23 96:17 97:14
97:18 98:5,7,8,8
99:15 117:16
118:5,17,19,22
142:6,21 191:25
195:13 197:8
212:11 223:19
224:11 227:20
233:24 234:9
244:15,18,22
245:6 246:11
**quick**
112:3
**quickly**
105:15 138:10
**quite**
14:24 15:3 23:7
33:9,11 105:17
111:1 126:13
137:2 224:18
244:13,21
**quiz**
66:7 146:5
**quote**
79:19
**quotes**
128:19
**quote-unquote**
203:7

_____
          **R**
_____
**R**
2:2
**race**
44:23 145:4 152:17
**racial**
148:7 149:2 150:11
155:8
**raft**
204:3
**raise**
35:22
**raised**
80:23 98:4 193:3,7
**ran**
181:12,23
**random**
51:9,10,22 52:22
61:5 63:16 66:20
133:15 136:22
149:21 218:7
**randomized**
57:17,20

**randomly**
59:23 234:2,5
**range**
41:4,5 43:12,23
46:5 53:9,10,11
53:25 55:11,17,23
56:1,12 64:11,24
78:4 80:25 81:6
86:4 105:17
131:25 143:13
146:2,6,7,16
153:3 164:23
179:7,20 180:23
192:23,24 193:1
199:21 208:7
209:2,4,6,8,17
216:7 219:11
228:5,8 234:22
241:10,13
**ranges**
209:13
**rank**
222:6
**rare**
50:5 219:1 240:20
**rarely**
35:17,17,17 39:8
57:19
**rate**
34:8 42:2 46:24
54:20 55:10,19
65:11,14 66:11,11
66:12,14,14 67:2
67:3,7,10,12,17
67:24 68:1,22,25
69:3 78:18 82:18
82:21 121:22
140:25 146:16,17
146:20,23,24
147:4,7,10,12,16
189:5 200:21,22
229:24 237:19,24
240:4
**rates**
15:19 54:23 55:11
66:24 67:19 68:20
70:13 90:3 107:20
110:2 149:14
159:9,16,18,20
173:19 177:4
185:14 242:13
**ratings**
34:9

**rationale**
65:23 73:12 81:15
**RDS**
92:3,3 99:24 102:3
102:4,10,10
103:20,22 104:5
105:22 107:8
108:14 111:6,8
112:8 114:13,16
124:3 173:21
181:16,17,18
182:2 194:25
**reach**
40:7 102:16 105:5
105:22,25 106:23
108:7,15,19 109:4
113:21 244:2
**reached**
67:1,2
**reaction**
36:6
**read**
7:19 31:4 32:1,2,3
32:19 34:20 35:13
35:24 36:2 40:8
43:9 47:5,10
86:14 102:1
103:10 104:18
146:5 176:3
178:20 183:21,23
183:24 184:5
190:12,15,18,18
190:23 198:3
202:17 211:22
239:17
**reading**
34:18 48:4 111:21
190:22 213:4
**ready**
19:14 37:10 224:12
**real**
87:24 218:24
228:20 229:24
**reality**
52:19
**really**
8:1,15 10:8 11:4
12:18 15:3 18:16
18:20 19:3,7
20:13 21:12 22:4
23:11 26:15 32:2
33:9,11 36:10
37:9 39:16 40:5

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 26

| | | | | |
|---|---|---|---|---|
| 46:2 47:19 48:1 | 195:20 197:17 | 42:22 | 34:21 | **remembering** |
| 48:25 49:3 55:6 | 209:19 214:14 | **refer** | **relate** | 113:11,12 118:5 |
| 59:24 61:1 69:19 | **recalled** | 125:16 136:16 | 55:2,3 71:18 99:23 | 187:2 195:21 |
| 70:8 72:2 74:4,13 | 198:22 | **referee** | **related** | **remind** |
| 76:14,25 77:13 | **recalling** | 30:3 33:13 | 11:7 12:21 18:25 | 161:2 |
| 79:3,15 81:21 | 202:18 213:19 | **refereed** | 165:14,15 166:5 | **reminding** |
| 85:15 87:5,6,23 | **receipt** | 29:6,7,11 | 242:24 243:3 | 177:11 |
| 96:23 98:11,18 | 171:8 | **reference** | 246:15 | **reminiscent** |
| 99:2 101:13 | **receive** | 48:19 184:9 | **relates** | 104:7 |
| 102:12 103:21 | 37:21 171:3 | **referral** | 61:14,15,16 62:6 | **removing** |
| 104:17 105:1,20 | **received** | 125:15 | **relating** | 141:22 |
| 108:17,25 109:3 | 89:22 170:2,8 | **referrals** | 60:18 | **reopen** |
| 110:14,15,23 | 171:9 | 132:25 133:5 | **relationship** | 138:19 |
| 117:19 118:2,2 | **receiving** | **referred** | 43:17 79:3,5 | **rephrase** |
| 119:9,16 126:25 | 90:4 166:23,23 | 84:23 132:10,14 | 162:19 229:16 | 5:3 |
| 127:18 128:20,25 | **recognize** | 146:6 216:18 | **relative** | **replication** |
| 130:20,24 132:9 | 18:3 52:6,11 81:6 | **referred-article** | 238:25 | 225:11 |
| 133:3 138:6 139:4 | 81:12 203:12 | 29:18 | **relatively** | **report** |
| 139:6 146:15 | **recognized** | **referring** | 15:15 31:20 32:21 | 3:12 7:9,19 39:20 |
| 155:10 156:13 | 113:6 174:9 | 49:19,25 90:10 | 74:18 107:10 | 42:12 70:1,6,7,15 |
| 160:12 165:14 | **recognizing** | 93:14 114:4 | 108:22,23 156:8 | 85:22 86:12 87:4 |
| 166:5 175:3 180:9 | 52:13 | 138:13 215:23 | 201:21 240:25 | 87:9,12,17 89:10 |
| 180:11 189:1 | **recollection** | 226:3,16 237:14 | **relevant** | 89:14,17 90:7 |
| 190:18,20,23 | 220:2 | **reflect** | 183:21,22 200:1 | 93:11 94:13 98:3 |
| 192:1 194:9,10,11 | **record** | 215:6 216:11 | 201:15 202:11 | 111:21 147:21 |
| 194:24 201:2,10 | 5:19 6:20 21:25 | **refreshed** | 206:4 | 161:6 162:25 |
| 222:18 225:4 | 65:9 66:8 68:22 | 198:23 | **rely** | 164:25 177:25 |
| 230:15,25 235:1 | 120:10 148:25 | **regard** | 38:14 39:18 | 182:8 184:9 |
| 235:13 239:19,20 | 150:8 151:10 | 85:10 | **remember** | 186:14 187:16 |
| 239:20 240:5 | 153:6 178:24,25 | **regarding** | 7:5 22:7,10 59:3 | 188:1,7,22 189:7 |
| 241:5 | 202:23 226:15 | 190:1 | 94:22 98:1 112:2 | 191:14 192:19 |
| **realm** | **recorded** | **region** | 114:24 117:19 | 206:8,10 213:1,9 |
| 200:3 | 246:12 | 115:5,6 118:18 | 118:23 121:5,7 | 213:11 224:8,10 |
| **reason** | **records** | 120:2,21,21 199:4 | 122:11,15 123:19 | 237:22 239:14 |
| 32:23 45:8 113:24 | 150:9 | 203:7 | 123:21,24 124:11 | **reported** |
| 116:1 129:2 136:3 | **recruited** | **regional** | 124:13,21 130:13 | 147:17,25 163:11 |
| 136:7 142:4 173:6 | 111:23 | 123:20 | 131:9,25 133:19 | 178:8 206:8 |
| 196:25 203:2 | **recruiting** | **regions** | 134:19 138:17,23 | 226:19 227:2,4 |
| 208:19 217:24 | 131:8 | 112:18,20,23 | 138:24 145:21,22 | **reporter** |
| 225:22 230:8,12 | **recruitment** | 122:17 | 146:2,15 147:21 | 5:19 246:5 |
| **reasonable** | 3:16 151:12 160:17 | **register** | 150:2,18 151:21 | **reporting** |
| 207:18 233:12 | 173:16 | 106:5 | 153:1 161:13 | 142:10 234:19 |
| **reasons** | **redirect** | **registered** | 162:16 165:10 | **reports** |
| 18:21 49:15 63:1 | 245:4 | 116:13 | 174:6 181:23 | 7:17 38:17 |
| 68:7,16 90:15,17 | **redo** | **registry** | 187:3,4 188:13 | **represent** |
| 107:2 134:7,9 | 37:16 | 106:6,7 | 202:24 203:20,23 | 4:13 54:3,4 70:20 |
| 142:1,3,17 159:25 | **reduce** | **regular** | 206:9 212:16 | 114:2 228:5,6 |
| 165:12 182:17 | 80:13 | 92:23 | 213:16 214:2 | **representation** |
| 240:1,24 242:8 | **reduced** | **reject** | 215:15 219:22,22 | 97:8 152:5 200:14 |
| **recall** | 246:12 | 32:14 34:22 73:17 | 224:17 226:7 | **representative** |
| 118:16 122:9 132:1 | **reduces** | **rejected** | 232:13 234:25 | 58:16 62:23 67:22 |
| 146:17 152:22 | 140:22 | 34:3 | **remembered** | 69:2 75:15 90:11 |
| 185:7 188:21 | **refamiliarize** | **rejects** | 151:20 | |

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972

huron4deps.com
734-761-5328

97:5 98:15 107:7
107:14 109:15
112:15 113:23
124:4 127:24
128:2 137:10
165:7 174:21
182:16 207:2,2
236:8 238:12
**represented**
59:23 149:21
152:25
**representing**
60:1 84:7
**represents**
50:12 54:6
**reputable**
217:4,7
**require**
47:2 200:9
**required**
131:15 200:10
202:4
**requirement**
131:12
**requires**
5:12
**requiring**
25:8
**reread**
7:2
**research**
8:16 9:11,16 10:12
10:12 13:6 17:10
18:4,6,19,20
19:24 21:6,20
26:3 30:17 40:19
46:20 53:5 68:15
71:6,11,12 72:15
72:17 75:9 76:17
76:20 77:13 84:25
88:17 104:8
127:21 175:4
183:4 187:19,21
187:24 188:3
189:2 194:8
226:13 227:15
**researched**
186:5
**researcher**
13:13 107:6 127:12
229:9
**researchers**
15:1 74:2 174:25

222:16
**resident**
116:18
**resilience**
13:23
**resiliency**
13:2 15:8
**resilient**
13:22
**respect**
239:2
**respectful**
35:1
**respond**
5:2 68:16 79:22,24
124:9 141:3
143:11
**responded**
92:9 121:21 140:9
**respondent**
96:23
**respondents**
128:24 152:9,10
214:22 215:4,11
218:3 220:10,12
**respondent-driven**
102:5
**responding**
6:7 233:23
**response**
5:21 46:23 66:11
66:11,12,13,14,23
66:24 67:2,3,7,10
67:12,17,18,24
68:20,22,25 69:3
70:13 121:22
122:3 234:6
**responses**
67:13 212:12
**responsive**
36:9 198:10
**rest**
131:23 142:20
**resubmit**
35:20
**resubmitted**
186:7
**result**
14:19,20 42:18
43:11 83:15
225:14,14
**results**
3:23 81:8 83:14

90:9,9,10,10,18
100:18,23 141:9
145:21 148:8
149:3 158:12
159:2,3 173:4,4,5
175:12 179:6
181:15 182:15
195:8 203:2,21
214:8,12 220:4
224:25 225:3
227:19
**retained**
4:16,17,20
**review**
7:17 30:18 32:15
33:6,17 34:15
97:7 131:12 161:6
190:17 197:24
205:8 212:17
**reviewed**
29:8 35:10 206:13
**reviewer**
36:18 37:9
**reviewers**
32:24 33:13,14,15
35:9 36:17 37:9
**reviewing**
13:14
**reviews**
35:3 56:10,11,22
**revise**
35:19,21 36:7
**revised**
186:7
**revision**
36:21 37:8
**revisions**
34:2,2 35:12 36:18
36:19 37:4,5,6
**revolution**
110:13
**Revolutions**
72:1
**re-do**
173:5
**re-open**
138:18
**re-weight**
143:19,21 144:1,15
**rid**
57:16 175:18
**right**
5:17 12:16 13:20

14:19 17:8 22:16
22:16 23:3 24:18
24:18,18 26:4
27:3 32:22 34:22
34:24 35:24 36:5
36:21 37:25,25
39:13 41:15 42:7
44:2 45:5 46:3,9
46:21 48:15 51:1
51:6,8,20 52:8
53:12 54:12,20,24
56:18 59:15,22
60:21 61:4,25
62:7,22 63:5,21
64:1,14,14,23
67:8 69:2 72:3
73:25 74:6,11,13
75:16,23 78:2,7
79:10,15,21,24
82:9,13,15 84:5,9
86:17,19 88:25
92:13 95:2 97:18
99:18 100:7,8
101:10 105:13
106:12,18,23,25
107:8,22 108:6,13
108:24 109:5,21
110:14,18 114:6
117:14,18 118:11
118:13 120:15,16
120:17 121:5,16
122:6,7,22 124:4
127:17,21 128:14
129:9,18 130:22
131:1 132:3,15
133:13,17 134:5
134:14 135:2
136:11,12,13
138:10 140:18
141:16,21,24
143:3,5 146:24
147:10,13 148:18
148:21,24,24
149:5,5,13 153:22
154:24 155:6,15
155:18 156:14,17
156:25 158:6,19
158:23,24 159:5
160:3 161:18,23
161:25 162:13,17
163:12,16 164:1
167:14,18,21
168:3,25 169:5,8

170:6,12 171:6
175:25 176:9
177:21 178:6
180:2,10 181:13
181:21 185:15,24
187:12 194:1,2,20
198:8 203:7,10,15
203:18,18 204:15
206:4 208:2,7
209:11,18 211:14
211:18,18,18,19
211:21 214:10
215:1 217:14,18
218:17,21,25
219:7 223:4 226:9
226:16 227:6
230:9 232:20
233:12,14,21
234:6 235:3,5
236:5 237:2 238:9
238:14 239:2,4,24
240:8,15,19 241:8
242:5,13,25 243:9
244:6
**right-hand**
24:3
**ripped**
25:12
**rise**
32:11
**risk**
3:20 12:7,19 13:4
13:16,20,22,24
14:8,11,13 15:7
55:4 191:9,10
197:13
**risky**
20:9,10 165:15,16
166:3
**robust**
49:19
**Ron**
127:15
**roommate**
135:3
**roommate's**
92:24
**rough**
188:14 238:19
**round**
37:3
**rounding**
91:22

**row**
115:12
**RSD**
181:15
**rug**
40:2
**rule**
79:18
**rules**
138:17
**run**
26:15 72:4,6
185:16 221:23
241:8
**running**
182:1
**runs**
22:5 232:8

**S**

**s**
9:17 29:16
**safe**
133:2,3 158:18
**safer**
21:15 158:18
**sake**
130:5
**saliva**
234:3,10
**SAMHSA**
100:13 162:21
196:20
**sample**
41:5 46:15,16
48:18,20,21 49:18
50:13 51:7 53:1,2
58:17,21 59:6,9
59:11,17,18 60:1
61:4,6,12,14,20
61:23 62:5,5,18
63:9,11,12,16,22
63:23,25 64:7,18
66:17,18 67:13,22
67:23 74:25 75:12
75:15 76:5,5,10
76:13 78:3,10,20
79:4 88:15 96:24
97:2,5 98:14,15
103:16,19 104:15
106:15,16,25
107:8,18,19
109:10,14,17

112:16 122:20
125:8 127:25
128:4,22 135:5
136:21,22 137:24
138:25 139:4,5
140:5,8,12,20,22
141:2,23 142:23
142:25 145:1,7,9
145:16,17 147:13
147:16 148:24
149:9,13,18,21
150:5,6,13,15
153:8,10,11,17
156:1,15 159:18
159:21 162:10,20
162:20 174:21
175:2 176:4,22
180:12,20,21,22
181:15 182:2
194:17,23,24,25
197:2,17 199:1,15
199:18,23 200:4
201:22 202:2,9,16
202:19 203:6,12
203:18 204:9,14
205:4,7,9,11
206:3,13,16 207:7
207:10,14,14,15
208:20 209:20
211:19 218:4,6,7
218:13,14,16,20
219:8,9,10,11
220:22 222:8
226:23 227:10,17
227:18 228:5
229:4 236:7,10,15
237:8 238:11,21
**sampled**
92:2 113:25
**samples**
21:23 58:11 59:15
59:20 61:21 64:15
102:21 107:14
146:9 179:18,19
193:12 194:16,17
207:15 208:2,6
221:21,23 222:6
225:11 234:3
**sampling**
63:2 91:25 92:3
96:24 102:5 106:1
106:3 108:23
109:4 111:6

136:23 139:22
148:6 149:1
173:21 197:6
198:23 199:24
201:7 214:14
218:18 220:9
225:1
**samplingwise**
215:20
**San**
103:6 105:2 112:9
**sanctioned**
174:10
**sat**
19:22 112:13
**satisfied**
146:3
**satisfying**
80:5
**saturated**
105:9
**save**
213:7
**saw**
47:5 87:17,17
116:13 117:7
128:7 136:12
161:7 163:3,7
169:2 214:3
**saying**
27:24 38:18 42:7
53:8 58:23 63:13
68:22 71:15 73:3
76:1 84:18,20
106:15 117:20,21
138:24 149:6,8
150:22 153:23
156:24 157:4
159:2,20 163:18
170:19 175:1
179:16 181:6
187:25 189:13
195:20 203:11
204:7 213:5 219:2
224:17 227:25
228:17 229:5
235:17 236:21
238:1,7
**says**
36:18,19 38:4
52:12 105:4
133:16 140:19
148:6 149:1

150:21 201:20
205:8 215:4
216:10 218:3
**scale**
10:18 53:23
**scary**
145:24 187:5
**scenario**
80:23
**schemes**
216:21
**schizophrenia**
240:21
**Scholar**
183:18
**school**
9:24 11:16,18 12:7
12:9,9,11 14:11
14:13,22,23 16:10
16:25 61:16,17
81:24 116:21
129:17 151:2,3
200:6,7,17 205:21
205:22 206:7
210:11
**science**
10:4,5 28:15 29:24
60:3,5 71:15,16
75:2 79:18 80:6
140:13 194:21
200:11
**sciences**
27:1,1 69:12 72:6
73:20 230:14
233:10 241:22
**Scientific**
72:1
**scientist**
240:17 243:14
**scientists**
45:13,14 79:16
**score**
54:1
**screening**
32:11 117:16 118:5
118:17,19,21
120:25
**screws**
80:15
**scribbled**
213:4
**se**
80:7

**search**
31:12 183:6,8,9,18
184:15,17,21
185:16,21,23
186:9,13 219:20
**searched**
186:8 187:16
**searching**
184:13 188:6 220:3
**seat**
75:7
**second**
8:19 24:12 25:3
27:19 32:7 36:16
114:19 133:11
136:5 140:4 148:4
148:5,6,15 160:21
161:4 166:17,17
178:5 197:20
216:10 238:2
243:19
**secondary**
69:8,12,15,21
70:24 71:8
**second-hand**
171:9
**secretary**
139:16
**section**
47:7 203:4
**see**
14:15 16:17 20:16
20:18 22:11 24:24
28:22 31:3 35:18
36:2 39:10,22
52:5 59:6,7,12
74:17 80:12 96:2
98:5,10 110:10
115:5 116:1 117:2
120:11 121:12
123:17 125:9
128:15,21,23
131:21 142:1,23
144:12 155:12,25
165:3 168:3 169:2
171:23 173:21
177:17 179:13
180:4 181:22
183:20 186:5
187:21 189:8,10
189:20,21 192:5
198:6 209:14,16
226:12 233:13

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                    4/29/2013

238:1
**seed**
111:22 115:10,16
118:11,17 120:3,4
123:7,22 125:13
125:15 158:8
**seeded**
120:1
**seeds**
104:18,23 111:12
111:23 113:20
115:8,16 118:9,11
120:19,20,20,21
120:21 121:4,6,11
121:20,21,23
122:12,16 124:15
124:22 131:8
137:17 149:16,17
**seeing**
186:24 214:2
**seen**
114:22 174:25
**select**
31:24 56:13
**selected**
58:7 121:4,11
197:17 199:2
205:7 214:23
218:8,9,11,15
220:12,19
**selecting**
58:5 102:7 199:2
**selection**
111:22 118:17
123:22 125:13
**seminar**
17:22
**semi-affluent**
210:11
**send**
30:14,20,25 31:24
32:9,15 33:3,4,5,9
33:13 36:7,17,20
36:21 37:2,8
70:10 82:5,6
125:20 133:20
156:14 170:12
171:3 221:1 244:7
**sending**
33:15 90:4 166:20
166:21
**sends**
36:11 243:25

**senior**
26:19 27:9,24
173:13 184:6
**sense**
32:21 39:11,12,12
39:25 54:15 56:11
57:5 59:14 86:16
104:1 108:19
127:23 134:21
157:5 164:23
180:7 190:4
200:23 202:15
228:15
**sensitive**
79:11
**sent**
19:18 22:19 32:6,7
33:6,6,7 35:5,5
89:18 95:21 96:12
132:18,23 166:10
169:18 170:9,10
170:10,14 171:12
171:12,14 188:19
190:16,16
**sentence**
90:8 148:6 149:1
157:15 177:16
182:6 215:3,4
216:10 218:2
239:17
**sentences**
214:22
**separate**
93:21
**separated**
93:23
**separation**
105:11,12
**September**
246:23
**series**
4:24 56:12 97:6
**serious**
122:15
**serves**
85:16
**SES**
150:18,21 176:13
**set**
55:16 57:24 70:19
70:22 112:19
153:25 179:4
206:10 237:23

238:2 246:8
**sets**
237:23
**seven**
127:5 236:22 237:2
**Seventh**
25:4
**seven-year-old**
80:14,15
**sex**
3:22 21:9,15 22:5
55:3 151:20
165:15,17 200:19
214:7 215:23
231:24,25 232:8
242:14,16,22
243:5
**sext**
19:5 22:19 62:9
89:18,22 90:4
96:6,12 166:20,23
169:17,18 170:2
170:14,15,16
171:3,8 242:13
**sexted**
93:24 95:20 238:8
241:9
**sexting**
3:13,18 18:15,16
18:24 19:22 20:5
20:9,12,24 21:18
22:2,22 38:3,4
53:19,19 54:25
55:1 56:16 62:4
73:1 74:14,15
82:19,22 84:16
85:6 87:18 88:12
88:13,23 93:13,15
93:18,19,19,24
94:14 95:12,15,18
96:20,22 97:9,11
97:20 98:12,25
99:6 100:20,22
101:7 125:3
130:18 139:23
141:25 143:2,16
143:22 147:2
152:18 153:7,18
153:21 154:1,2,7
154:16 155:1,4,11
156:7 157:7,12
159:21 163:22,24
164:5,8,25,25

165:2,4,8,9,13,15
165:23 166:4,8,9
166:10,17,20,24
169:1,5,24 172:4
182:21 184:3,23
184:25 185:13,14
185:15,17 186:9
186:14,19 187:10
188:22 189:5
190:8,12 191:15
192:3,4,11,15,20
196:14 197:13
202:10 203:21
207:7,21 211:10
211:24 212:24
214:12 219:14
223:6,13,25
224:21 226:7,13
226:20 229:25
231:5 232:10,18
233:24 235:4,12
237:19 241:13
242:23
**sexts**
169:15 171:9
**sexual**
3:19 98:18,22
168:8 197:13
232:5 244:12
**sexually**
20:8,9 93:15 95:21
96:8 97:23 98:16
166:21,23 167:11
167:14,16,17,23
168:2,12,14,22
202:14 211:20,25
212:7 244:11
**shared**
55:22
**sharing**
231:20
**shirt**
167:22
**shocked**
146:10 159:11
184:16 210:1,19
223:18
**shocking**
110:7
**shoot**
44:11 46:22
**shooting**
16:6 80:14 137:25

**short**
25:24 112:3 182:12
212:17
**Shorthand**
246:5
**show**
49:13 213:23
232:16 233:17
**showing**
168:16 169:10
**shows**
163:13
**Shut**
244:15
**sic**
181:15
**side**
16:12 58:25 59:1
131:17
**sign**
116:25 117:13
**signed**
206:24
**significance**
124:14
**significant**
40:6 44:5 71:17
72:21 98:14
180:17 242:4
**significantly**
107:21 177:21,22
**Silver**
40:23 53:11 55:22
56:18
**silverback**
10:22 165:20
**similar**
73:24 75:25 81:8
81:23 82:20 99:24
100:18 111:10
145:20 167:4
175:14 179:13
181:9 182:2 192:6
195:12 196:4,6,24
215:13 222:3
224:24 225:4,12
235:5
**similarities**
195:25
**similarity**
111:16 145:25
**similarly**
134:5 222:21

simple
15:3 181:6
single
12:21 46:11 77:11
134:20 183:24
single-mother
12:23
sister
11:13
sit
59:13
sites
157:19 158:6,10
situate
192:4,10
situation
116:22 117:20
situations
116:17
Six
105:11
six-page
95:11
size
66:17 162:10
206:13
skim
32:1,19,20
skip
142:12
skipped
141:25 142:18,20
skipping
142:3
sleep
232:17 243:8
slept
232:15
sleuth-like
135:21
slightly
41:16 83:19 147:20
150:13 211:18
223:20 227:20
236:16
slippery
167:15 169:11
slope
167:15 169:11
small
18:18 72:22 130:13
155:21,23 168:11
236:19,25

smaller
78:19 140:12
238:21
smart
10:8 53:16 133:12
156:13
smartest
11:25
smartphone
208:14
smartphones
202:13
smoke
176:13 234:24
smoked
99:13,15 235:1,1
smokers
235:3
smoking
233:16
sneak
44:18
snowballing
103:10 104:4,5
social
10:4,15 27:1 71:6
157:19 158:3,6,9
240:17 241:25
socializing
17:21
socially
126:16
society
17:6 29:21,22 30:2
31:18 106:4 108:8
129:10 172:17,19
232:6
socioeconomic
132:1 150:21
215:25
soft
60:4 79:19
softball
11:20 60:10
softer
158:23
solicit
30:15
somebody
8:13 14:3,4 17:18
20:1 26:22 27:19
30:5,14 34:21
35:8 38:1,2,4,10

38:13 44:17 45:10
65:1,4,5 72:15
85:3 86:2 87:18
97:7 102:1 104:9
125:15 132:20
133:10,19 138:12
144:12 167:21
168:7,21 169:22
171:12 181:19
190:16 201:12
203:11 218:17
242:21
somewhat
34:22 55:16 61:9
78:3 83:11 92:8
98:15 114:2 137:9
158:25 193:24
202:16 203:18
219:15,19 235:9
son
83:2 229:8
soon
115:1 120:5
sorority
205:17
sorry
22:10 32:8 48:15
100:10 115:11,18
119:22 121:24
123:20 124:13
148:11 181:17
184:2 192:13
sort
8:21 9:21,25 12:23
13:5 14:7 16:7,9
16:15 17:23 18:4
18:25 19:4,20
20:3 21:10,10
25:10,21 28:3
29:23 38:7 40:3
49:17 57:1,14
58:5 59:1,14
70:19 75:24 81:7
97:13 98:3,6,18
99:1,15 101:16
103:12,19 105:1
105:21 107:10
110:12 111:3
112:9 113:12
118:19 122:21
127:9 128:5 129:3
145:22,24 165:23
172:4 174:4

176:20 185:15
188:25 196:19
218:25 219:16
222:19 226:12
227:22 230:19
234:21 237:10
238:19 243:5
sorts
14:2 18:5 30:22
46:25 50:23,24
68:15 70:15 79:20
79:21 142:17
183:9 191:12
193:13 229:14,17
240:19 244:11
sound
32:18
sounds
37:20 58:4 63:13
source
69:13,21 71:13
sources
38:14 39:18 69:8
69:13,15
South
190:13
southeast
113:9,19 115:8
123:10
space
182:12
spanned
55:12
speak
139:11 211:3
speaker
33:22,23
speaking
41:15 59:20 65:18
66:14 67:12 99:9
219:9 241:14
speaks
198:15
special
61:2 241:21
specialty
72:24
specific
119:17 124:12
171:25 202:24
203:2 227:10
specifically
12:20 24:15 26:12

74:15 123:18
146:17 147:1
165:6 166:25
184:8 210:14
specify
153:15
spectrometry
60:17
spectrum
63:14,20 136:21,23
222:23 223:3
Speech
1:4 4:14 83:24 84:2
speeds
240:14
spend
40:10 124:18
136:14 240:19
243:20
spent
122:13
spin
241:16
Spock
62:14
Spokane
170:25
spoke
136:21
spoken
7:21
spread
55:17
spreading
242:17,20
Square
2:4
SS
246:3
stabbing
16:6
stadium
239:7
stakes
79:16
stand
85:17 100:8 181:5
189:2
standard
41:3,13,18 44:15
53:10 54:13 56:2
75:5 137:4 147:12
147:14 154:12

161:17 162:7,9
164:22 174:5,12
174:19 179:18,20
179:21 180:14
189:4,14,15,19,24
190:6,7 195:4
196:19 216:20
219:3
**standards**
80:21,22
**standing**
167:16
**stands**
102:4
**star**
41:10 60:15 62:14
**Stark**
87:25 88:7
**Stark's**
7:19 87:17
**start**
52:10 76:1 104:18
104:23 111:12,21
118:21,21 127:8
134:14 149:15,16
183:11,12 196:22
196:25 227:20
**started**
5:8 12:14 30:7 63:2
75:7 92:1,10
105:16,20 110:12
124:18 125:5
157:22 158:5
242:20 243:11
**starting**
72:8 97:11 106:21
112:10 124:3
133:23
**starts**
98:18 228:16
**state**
6:19 181:22 225:21
246:2,6
**stated**
223:20
**statement**
207:4
**statements**
109:18
**states**
1:1 4:12,13 18:18
49:10 70:5,16,16
86:4 112:14,19

113:4,15,23 114:3
176:19 199:5
220:23 232:5
239:1
**statistic**
150:2
**statistical**
9:20 38:12,13
46:24 78:24,25
80:8 160:4 162:8
179:16 181:11
193:7
**statistically**
41:15 145:13
155:20 177:22
180:17,24
**statistician**
49:5
**statisticians**
45:13,14
**statistics**
42:21 49:7,8,16,16
49:17 194:22
**status**
132:1 150:21
**stay**
96:15 138:6 158:25
212:18
**stayed**
120:24
**stealing**
16:4
**stenographic**
246:14
**stenographically**
246:12
**step**
207:17 244:8
**stick**
86:20 119:19
**sticking**
83:6
**stickler**
47:23
**sticks**
146:13
**stimulus**
19:11,11,11 126:14
**stop**
69:6 80:16 138:12
**stopped**
142:16
**stopping**

83:21 139:8
**story**
15:20 129:6 227:14
**straight**
106:10,11
**straightforward**
81:12 167:6 188:24
**straightforwardly**
237:11
**strange**
165:22
**strategy**
57:11,12 92:1
160:22 218:19
225:1
**stratification**
216:5 217:20
**stratified**
215:5,12,17
**street**
1:17 59:13 61:22
107:5 137:5
**stress**
46:2
**stretch**
227:24
**strict**
48:23,24 49:5,25
50:5 52:18 58:21
58:23 59:8,16
61:3 75:3 134:11
135:7,9
**strictly**
59:20 61:5 65:18
66:14 67:12 99:9
219:9
**strike**
144:25
**strokes**
119:17
**stronger**
73:11
**Structure**
71:25
**stuck**
50:10
**student**
26:1,13 27:7 29:1,1
135:16
**students**
17:4,22,23 29:15
47:22 53:15 61:17
63:25 64:19 88:23

150:16 158:14,25
197:25 199:3
200:14,16,16
202:1 203:6,13
204:12 207:4
**studied**
14:9,10 15:23 31:1
75:17 105:4
235:18
**studies**
15:10 17:2 21:4,22
32:7 39:1 46:3,4,5
46:19,19 47:4
48:11,11,19 53:6
53:7,9 54:18,22
55:9,25 56:8,9,12
56:18,20,23 58:5
58:6,11 61:10
72:23 74:20 76:19
77:23 78:6 80:24
83:7,9 88:22
91:13 97:6 100:1
102:18,23 106:19
110:3 124:22
127:13,13,15,16
144:18,19 154:1
175:2 182:21
183:2 185:8,15
188:21 189:5,8
190:1 191:6,9
192:18,20 193:16
195:5,9,11,24
196:3,6,11,17,22
196:24 197:4,7
206:21 209:14
212:24 214:11
219:14,14,20
220:3,4,6 222:4
224:23 225:13
226:5 231:14
232:9 233:4,5,15
233:17 234:1,18
**studios**
175:10
**study**
7:15 8:4,5,24,25
10:13 12:12 14:8
14:12,14,20 15:25
18:21 19:8,9 21:7
37:23 38:9 40:1
40:20 46:11,21,22
47:2,4,7 48:20
51:25 53:2 54:24

56:17 58:9,9,11
61:10 62:3,24
63:20 64:1 65:12
67:15,18,20,24
68:8 69:3,22,23
71:3 73:6 74:11
75:11,19 76:5,18
77:19,22,22 78:1
78:1,21 80:17
81:15 82:18 84:16
89:25 90:3,11,19
93:14 96:21 97:13
99:3,4,7,21 100:1
100:2,3,20,21
101:18 102:8
106:16 108:17
109:6 114:15
117:24 120:12,13
121:9,10 125:1,2
125:7,16 126:17
126:18 130:10
131:6 132:10,14
133:6,10 135:16
136:24 137:13
139:22 142:22
143:11 144:2
146:18 149:9
152:5,18 153:7,16
153:18 154:2,7,16
155:1,4 157:7,10
157:12,25 158:4
159:19 160:14
161:8 162:17,20
162:23,24 163:22
163:23 165:4,4,23
166:9,17 169:14
169:17,23 170:13
173:15,20,22,23
174:3,4,5,9,16,19
175:15 177:3,5,13
177:18,20 178:8
179:5,6,11 181:6
181:8 182:3
190:12,14 192:4
192:11,16,20
193:18 194:15
195:9,12,23
196:21 198:23
199:1 202:24
203:5,10,12,21
206:14,15,23
207:7,7 209:19
211:24 212:18,24

**HURON REPORTING SERVICE**
and Video Conferencing Center
Established in 1972

huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                    4/29/2013

Page 32

214:12 216:9
217:4 218:11
219:3,17 221:13
223:6,13,25
224:23 225:2,19
226:3,4,4,6,7,20
227:11,14 229:1
230:7 231:2,4
232:7 237:5,7,19
242:9,12 243:12
**studying**
43:16 64:23 65:2
102:15 199:25
**study's**
91:5
**stuff**
15:18 18:9 23:8
33:24 37:14,14
40:9 42:24 50:25
61:22 74:8 85:18
88:10 101:11,17
112:3 119:2
137:11 188:18,25
189:25 202:19,22
213:17 232:3
240:12
**stupid**
137:22,22
**style**
27:11 34:10
**stylistic**
48:13
**subheading**
93:12 95:17
**Subjects**
131:13
**submits**
30:14
**submitted**
89:11,14 185:25
186:1,6 187:23
**subpopulation**
108:7
**subsequent**
14:11 161:9
**subsequently**
47:20
**substance**
3:19 15:12,22 16:8
74:16 77:2 99:8
99:23 100:14
101:15 125:4
127:17 160:25

165:8 174:25
197:13 234:20
**substances**
77:7
**substantive**
25:9 37:6 38:2
45:15,16
**subways**
20:18
**succeed**
47:9
**succeeds**
14:3,4
**sudden**
51:4 134:17
**sufficiently**
180:24
**suggest**
233:22 235:10
**suggestive**
93:15 95:21 166:21
166:23 167:11,14
167:16,17,23
168:2,12,15,22
211:20
**suggests**
165:24
**Suite**
2:4
**sum**
236:6
**summary**
7:10 48:8 177:1
**summer**
135:18
**super**
32:19 132:2 135:7
135:8 136:14
190:18,23
**support**
45:19 46:8,10
**supposed**
8:10 70:6,11
172:10
**supreme**
59:2
**sure**
5:13 6:9 15:4 22:25
23:3 24:17 39:14
39:19 43:8,13
45:7,7,8 48:13
55:5,21 58:6,19
61:23 69:17 71:20

85:12 87:8 94:8
95:6 102:14
113:21,25 115:25
116:5,6 117:2
118:23 123:9
130:13 132:2
135:11 152:12
155:1 159:5
160:11,18 164:18
169:12 173:7
178:21 184:15
185:24 190:19
194:14 195:19,21
201:2,24 203:23
203:24 205:24
208:24 213:7,20
214:2 215:18,20
216:8 217:19
219:25 222:9
224:18
**surprise**
176:20
**surprised**
102:1 114:11
152:23 159:14,21
160:8 162:15
176:21 191:16
193:10 210:21,22
221:9 225:10,23
**surprising**
153:2 165:19
**survey**
3:23 10:11 38:9,11
58:9 60:25 68:11
74:24 107:6
108:13 118:20
128:11,17 129:12
144:19 162:11
173:25 191:9,10
197:18 211:23
214:8,14,17,23
216:20 219:13
220:9,12 221:16
221:21,23 222:5
222:16,23 223:5
223:12,24 224:7
225:8 229:20
**surveys**
40:25,25 41:2,4
51:24 59:19 66:19
68:6,18,19 129:2
129:8 214:25
220:14,18,20

**suspect**
207:5
**suspicion**
199:15
**swath**
132:8,9 236:11
**Swinton**
2:10 3:4 4:8,11
22:14 24:13,14
65:10 66:9 69:20
71:19 86:8 90:16
100:16 114:14
115:21 121:17
123:13 139:7,10
140:3 148:12,18
153:24 161:20,24
162:5,12 166:13
166:16 169:13
170:23 177:12
179:3 183:1 192:9
198:7,11,14,18,21
199:12,14 201:6
211:15 218:1
220:1 223:11
224:3 227:3
241:20 244:24
245:3
**swipe**
133:25
**sworn**
4:5 246:9
**syllabi**
210:8
**synonymous**
29:12,13
**system**
12:10 126:9
**systematic**
59:14,15 74:11

———— **T** ————
**t**
41:11 170:17
**table**
37:14 60:19 112:25
114:4 123:11
148:19 149:22
151:9,16,18 152:2
152:13 153:5,6,15
153:16,17 155:10
160:19,21 161:7
162:19 163:8,9,9
175:18 176:25

204:22 205:2
206:12
**tail**
132:5,6,6
**tails**
132:2,3 150:23
**take**
5:8 6:4,8,15 9:3
26:15 27:13 45:4
49:18 86:11,13
95:5 98:18 109:8
115:12 116:24
133:11 137:23
141:4 146:9 148:1
156:13 161:5,23
163:11 169:14,17
169:23 179:7
180:12 186:25
197:23 202:5
213:2 236:5,8
238:18 242:18
243:13
**taken**
1:16 4:21 6:15
13:25 20:19 42:21
83:22 139:9
186:22 211:2
246:7,14
**takes**
31:21 33:1 37:19
140:23 179:17
208:14
**talk**
8:1,7 18:9 27:12,18
33:19 44:19 45:23
57:25 66:22 68:10
103:23 119:23
128:7 139:21
160:22 171:19
173:4 175:24,24
194:8 243:24
**talked**
7:7 101:5 138:21
141:1 146:8
148:23 163:4
165:12 171:20
172:21 173:7,23
180:12 185:5
203:19 208:12
240:2
**talking**
5:25 8:3 10:9 16:8
19:23 30:24 32:17

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                         4/29/2013

Page 33

48:15 52:10 54:17
60:9 71:10 81:1
102:2,13 130:21
133:19 143:12
151:18 181:18
189:25 192:1
204:22 215:13
226:14 231:1
235:19 236:22,24
237:12 241:6
243:23 244:4
**talks**
44:13
**tape**
10:19
**target**
108:14 114:20
157:6,12 158:2,4
**task**
188:1 228:13
**tasked**
172:6
**taught**
17:10
**teach**
16:19,21,22 17:1,9
17:17,18 30:23
158:14,25
**teaching**
17:11,16,21 29:15
**teammates**
60:10
**Tech**
3:23 21:9 22:5
214:7
**technique**
46:24 63:10 74:18
92:4 99:24 103:9
103:10 109:24
137:12,14
**technological**
38:6
**technologies**
38:6 72:8 131:19
**technology**
11:12 21:1,15 52:8
103:20 107:11
131:18 157:2,8
190:22
**Teen**
184:12 217:10
**teenager**
97:23

**teenagers**
243:19
**teens**
3:24 214:8,20
215:7 216:12
226:9
**telephone**
59:19,21,21 66:16
66:19 68:18
108:12 243:19,20
**telephones**
59:22
**television**
23:12 232:12
**tell**
29:16 35:11 48:5
51:15 67:20,22
69:18,18 95:4
126:5 130:6
131:11 134:13
135:14,15 136:17
159:14 170:6
180:8 199:11
214:1 231:23
232:23 233:1
234:12 235:6
**telling**
37:18 105:20 162:1
163:17 227:13,22
231:22 233:7,19
234:13,14,22,24
243:11
**tells**
35:3
**ten**
23:25 24:2,2,16
55:9 92:18 195:1
197:4 235:2
**tend**
26:20 28:15,17
39:22 59:24,25
64:5 66:24 108:3
176:13
**tendency**
54:6
**tens**
56:22
**tentative**
158:17
**tenuous**
225:15 227:9 229:1
235:22,24,25
236:1 237:5,6

239:15,19,21,21
239:22
**term**
29:5 43:8 48:16
66:10 76:18,19,21
169:1
**terminology**
66:10
**terms**
7:14 29:2 38:16
51:25 63:8 66:19
99:10,10 108:21
121:12 135:21
137:15 146:12,14
149:13 205:21
207:13 208:12
212:13,20 239:9
239:23
**terrific**
36:10
**test**
79:12 150:2 179:17
181:11 193:8,8
234:8
**tested**
234:4,12,15
**testified**
4:5
**testify**
6:16 246:9
**testimony**
18:14
**testing**
233:3
**tests**
79:13
**text**
82:6,6 94:2 96:8
156:20 208:15
224:16
**texting**
62:11 208:16
241:13
**texts**
62:15 82:8 243:25
244:7
**thank**
28:24 121:2 123:4
174:1 177:10
178:23 179:2
**thanks**
35:11 115:18
**That'd**

230:5
**theirs**
193:2,4 204:10
212:2 222:12
**theoretical**
207:19 230:12
**theoretically**
32:18 207:19
**theories**
202:20
**theory**
34:10
**they'd**
79:12
**thing**
6:6 8:22 9:21 14:7
19:17,20 24:10
38:7 40:14,15
41:14,16 47:14
49:1,2,22 53:8
56:19 58:4 60:4
69:7 81:10 82:16
83:8,12 86:23
103:19 104:5,6
105:21 106:21
109:9,20 112:6
115:3,20 128:6
129:4 136:10
137:22 144:25
145:1 148:3 150:1
155:18 164:15
166:7 168:25
175:21 176:9,20
183:13 188:19
214:2 225:16,18
227:22 229:9
230:23,25 233:2
241:5 243:5
**things**
7:3 9:25 10:23
13:25 16:4,7,11
16:14,16 18:5,17
26:11 37:6,11
39:23 40:3,7
46:25 47:2 60:14
62:2,10,10,12
63:6 72:16,17
75:14 76:24 79:21
79:21 80:2 96:9
98:24 102:25
109:23 110:11
119:12 135:5,13
135:20 138:2

140:16 148:23
159:8 168:6
176:12 180:11
183:15,18,19
185:4,21,22 187:2
187:3 188:16,17
191:4 194:4,23
198:13 202:2,14
206:20 213:20
219:18 225:13
228:3 231:7,8,22
234:21 236:11
238:20 244:11
**think**
7:9,11,16 9:12
10:20,22 13:13
18:3,10,17 22:23
23:5 24:8 25:12
26:7 30:4,21
31:19,20 32:3
34:25 35:25 40:9
41:1,13 42:2
43:22 44:21 45:1
47:22 48:6,7,18
53:13,16,17 56:4
56:16 58:18,24
60:4 62:23 66:3
66:13 67:7 69:3,4
70:17 72:4,6,9,25
75:23 76:4 81:25
83:5,19 84:13
85:2,14 88:4,16
90:9 91:14 93:14
94:5,24 95:15
96:17 97:5,10,22
99:16 101:1
102:17,19 105:3
111:1 112:22,25
113:9,13 114:25
116:15,15,16,17
116:22 117:2,9
118:4,25 119:5,6
119:24 121:9,15
121:18 122:12
123:12,15 125:1
129:14,16,17,19
129:21 130:23
131:9,9,10 132:5
133:2,3,7 134:1
135:8,9 136:19
137:12 138:4,20
139:7 143:10
144:24 145:14

146:1,11,15
149:16 150:12,25
151:5,9,24 152:7
152:8 154:19
155:8 156:2,14
157:23 159:7,8
160:14,20 161:18
161:19 162:4,24
163:11 167:25
168:1,4,12 171:18
172:16,19 173:23
175:21 176:16,18
178:25 179:4
180:13 181:20
182:5 186:5,8,18
187:5 188:23
189:8,14 190:7,8
190:19 191:1
193:15 195:14,16
195:19 196:25
197:3 199:19
201:20 202:11
204:9 205:8,21
206:1,11 207:13
208:8,22 209:7,23
210:4,9 212:7,12
217:16,19 219:23
219:24 222:25
223:20 225:8
226:8 228:8,14
229:24 230:6,12
230:19 231:12,18
232:2,18,19 235:8
235:9 241:1,2,8
242:10 244:24
**thinking**
18:13 20:12 25:22
40:22 69:21 71:13
117:5 150:14
184:8 190:23
195:19 213:12
228:24
**thinks**
168:21
**third**
25:3 95:7 115:9,15
151:16 182:20
**Thomas**
71:25
**thought**
7:13 11:3 20:5
21:23 27:21 30:18
53:3 73:13,14

84:6 98:12,19
102:2 108:9
110:23 116:3
119:8 126:12
138:1 154:11
159:16,22 163:9
167:5 170:19,21
174:11,16 178:19
242:9,11
**thoughtful**
124:1
**thousands**
243:25
**three**
17:1,20 19:8 24:20
29:1 33:3,5,14,15
34:17 37:5 38:23
42:3 86:22 87:3
89:12 113:2,11
114:24 115:8
120:3 122:6 123:8
126:20,21,22,24
141:19 160:9
166:15 182:17
187:7 188:14
193:2,17 194:7,11
206:19,20 216:1
228:7,9
**three-by-four**
123:11
**three-by-three**
112:25
**three-course**
17:1
**three-fold**
240:4
**threshold**
83:20
**threw**
12:24 135:4 136:4
**throw**
118:8 135:14
**throwing**
25:13
**thrown**
103:13 117:17
**tie**
167:17
**time**
6:5,10,10 10:15,21
12:13,17 14:7
19:3,7,22 30:8
33:1 35:14 36:16

45:6 49:4 72:23
74:8 76:22 77:3
83:21 86:15 87:6
93:1,4 97:11
98:17 100:24
101:11 110:5
116:1,12 117:14
119:20 125:10
126:17 127:18
130:6 133:11
135:22 138:4,18
146:3 148:1 161:5
161:23 162:2
170:3,5 171:4
186:4,10 191:13
223:17,21 230:23
235:11 243:20
246:8
**times**
26:18 43:1 73:10
86:23 99:12 138:9
142:13 193:17
225:17,19 235:1,2
235:2
**time-consuming**
74:22
**timing**
138:2
**title**
172:19 183:20
**titled**
197:12
**tobacco**
15:13,23 178:7
234:8,8
**today**
4:19 6:17 7:1,22
79:23 82:23
131:21 164:3
232:13
**told**
7:23,25 31:19 71:3
74:14 84:1,13,15
84:18 85:7 86:24
129:6 132:20
139:15 150:25
175:18 190:20
234:4
**tolerate**
45:9
**tonight**
222:24
**tool**

110:16
**top**
7:5 9:17,17 38:23
58:1 89:10 121:25
139:25 140:4
148:5 204:23
205:1
**topic**
230:14
**tops**
57:2
**total**
122:9 155:18
202:10 236:25
**touched**
96:18 173:17 197:6
**touching**
23:11
**town**
242:19
**track**
44:23 133:5 230:11
**tracked**
242:19
**train**
53:3
**trained**
201:1
**transcript**
246:14
**transcription**
246:13
**transition**
9:4
**transitional**
8:23
**traveling**
116:9,11
**Trek**
62:14
**trial**
85:18
**tried**
112:19 128:15
169:2 185:5 189:8
209:15
**trivial**
241:21 242:1,2,25
**trouble**
127:19 142:11
**TRU**
215:2 217:12,13
221:2,16,19 222:3

222:22 223:5,13
223:24 225:1
**true**
5:19 27:6 39:19
65:8 72:5 82:23
87:11,13 108:2
110:8 118:10
130:25 134:5
176:7 202:15
219:19 234:13
246:13
**truth**
71:24 225:15
232:23 233:7,19
234:12,13,15,22
246:10,10
**truthful**
235:9
**TRU's**
214:24 220:13
224:7
**try**
6:1 10:12 15:2,5
22:15 37:25 38:12
42:25 44:18 47:8
48:2 52:2 53:17
57:21 61:24,25
65:22 72:20 80:11
80:12 81:7 83:14
103:25 107:18
109:12 112:15
124:2 129:25
158:25 189:4
193:14 194:22,24
239:6 240:20
**trying**
42:22 54:19 55:9
66:12 80:17
120:11 121:5
122:11,11 125:7
126:8,16 128:22
136:9 138:19
140:17 156:21,23
165:1,3 174:19
179:23 189:20
201:21 212:17
241:24
**turn**
24:19 102:2,13
182:8 224:10
235:19 241:14
**turned**
163:5

Free Speech Coalition v. Holder
Marc Zimmerman, PhD

4/29/2013

Page 35

**turn-around**
186:4
**TV**
232:16
**twenty-first**
210:19
**twice**
45:4 229:3 236:24
**twist**
40:12
**two**
9:25 11:11 18:25
33:18 34:4 37:4
38:22 40:7 42:3,8
42:16 43:18,20,24
64:1 77:23 79:2
80:24 83:7,8 88:2
88:22 90:7 95:15
98:9 99:17 101:12
105:10 113:10,11
113:20 122:13,13
138:3,5 139:25
140:4 142:3 146:9
150:9 152:9,10
155:17 179:15,17
179:19 180:9,15
182:12,20 183:2
184:8,18,21
192:18 193:8
196:10,24 208:2
219:20 220:3
221:10 223:18
227:7 230:2 234:2
235:21 237:22
238:10 242:25
243:18
**two-fold**
240:3
**two-page**
7:10
**type**
28:12 42:10,13
61:22 64:17 74:8
79:1,2,8 80:24
169:18 200:11,14
**types**
72:15 75:9,14
76:23 175:13
200:11
**typhoid**
242:19
**typical**
56:15 126:11 144:1

**typically**
8:18 15:11 19:24
30:17 31:10 33:14
35:19 36:3 47:8
54:13 102:21
143:24 144:5,17
144:18,21 216:1
218:24,25
**T-R-U**
214:24
**T-shirt**
167:22
**t-test**
179:14

_____ **U** _____

**ubiquitous**
176:24 208:18
225:9 243:7
**Uh-hum**
177:6
**Um-hum**
25:1 42:20 54:21
85:24 90:13 93:17
100:17 102:9
104:20 140:7
141:18 153:5
154:18 182:19,22
198:5 199:6
205:13 215:8
**unable**
223:4,5
**unbeknownst**
244:5
**uncommon**
39:15
**undefendable**
158:17
**underestimate**
65:24 66:5 234:16
**underestimates**
232:21
**undergraduate**
64:13,15,19 116:20
197:25 198:6
199:2 200:1 202:1
206:17 210:5,15
**undergraduates**
64:5,6 65:13,14
202:3 209:22
**underline**
193:17

**undersampling**
131:16
**understand**
5:1,10 15:2,5 47:17
62:18 83:3 111:22
125:13 153:23
176:11,12 220:16
240:20,23,23
241:24
**understanding**
18:10
**understatement**
233:8
**understood**
5:6 58:19 198:17
**underwear**
167:14 168:6
169:21
**under-representa...**
150:10
**under-represented**
148:8 149:3,7
**Unfortunately**
195:6
**uniform**
70:1,15 167:17
168:13 191:14
**unique**
13:1 40:5,6 58:12
61:11 73:12 109:5
208:8 226:23
**United**
1:1 4:12,13 18:18
49:10 70:4,16
86:4 112:14,18
113:3,15,23 114:3
199:4 220:23
232:5 238:25
**universities**
200:9
**university**
9:18 10:3,5 11:10
11:18 13:10 16:22
17:15 65:19 71:5
88:23 105:2,2
112:4 126:2 199:4
199:20 200:12
202:3,7 203:17
206:18,25 207:5,8
210:15,17
**university's**
200:4
**Unplanned**

**undersampling**
184:12 217:10
**unquote**
203:7
**unrelated**
244:6
**unrepresentative**
218:16
**unusual**
126:10 199:19
**update**
186:3 187:9
**upped**
127:1
**upper**
24:3
**urban**
61:15,16
**use**
3:19 7:4 12:7 14:16
14:17,18,22 18:2
29:11 44:16,18
45:8 48:16 49:7
50:19 55:11,19
56:13 62:6 63:3,4
63:5,5,10 65:11
66:1 74:16 75:16
77:2,4,5 79:20
82:5 83:9,10
90:12,22 91:6,12
91:23 92:1,10,12
92:15,20 96:23
97:12,13 99:9,19
99:23,24,25,25
100:3 101:15
108:14,20,24
109:25 110:5,17
112:19 125:4
127:17 128:3
131:22 134:11
137:13 139:3,5
142:6 144:7,13
156:4,5 157:1,7
157:10,13,14,18
157:19,20,24
158:2,9,17,23
160:13,25 161:13
163:2,14 164:14
165:5,8 168:22
173:8,18,25
174:11,25 175:6,7
175:10,13,16
176:5,23 177:3,4
178:9,14 179:5

**unquote**
181:4,7 182:16
197:13 204:12
208:9 209:3,4,20
210:15 221:7
225:2,3,9 231:12
233:2,3,6 234:1,6
234:20 236:7
**useful**
67:25 69:1 81:14
120:11 143:10
221:4
**user**
92:23 116:8,14
**users**
99:22 107:2 108:19
114:20
**uses**
62:15 114:22 174:6
**usually**
16:13 27:10 31:4
33:17 34:21 42:4
47:6 50:9 56:22
61:20 142:4
144:23 183:8
221:4
**U.S**
2:11 9:8 84:6,7
90:19,20 114:5
130:11 152:19
154:8,17 155:5
159:19 215:5,12

_____ **V** _____

**vacationing**
117:6
**vague**
169:1
**validity**
194:4
**valuable**
81:14
**value**
106:14
**variability**
222:10
**variable**
53:18 54:16 141:5
**variables**
43:18,20,25 44:1,1
44:3 50:4 122:21
141:12 142:22
144:2,11,11
153:10

**variance**
41:6 54:9,9,10
147:15
**variation**
53:11 54:9,12,14
64:14 92:20
179:17,22 180:20
180:21,22 223:15
**varied**
119:22
**vary**
58:9 68:21 92:20
**VCU**
199:13 210:17,19
**veracity**
194:3
**verbal**
5:20
**verbally**
86:1 177:8 182:24
199:8
**verify**
69:12 118:16
**versa**
232:1
**versus**
4:14 26:24 80:13
81:2 83:25 155:18
208:10
**viable**
110:22
**vice**
232:1
**video**
95:22 96:4,10,11
96:13 166:22
**videos**
94:6
**view**
59:9
**Village**
103:5
**violations**
49:11
**violence**
14:6 16:2,4 38:19
38:23 45:20 80:13
101:16
**violent**
15:24 16:5 46:9,10
**viral**
19:6 23:1 97:24
231:9 232:3,3

**virtual**
124:25 125:1,2
157:10 158:4
179:5
**virtually**
52:20
**visible**
115:22 119:21
120:17,18
**vitae**
3:10 23:17,21,21
23:22
**voluntarily**
201:11,13
**volunteer**
220:17 221:12,13
221:15,20
**volunteered**
214:24 220:13
**Volz**
10:8 102:12 111:15
140:15
**vote**
43:22 55:24
**vs**
1:8

_____
         **W**
_____
**waist**
167:23
**wait**
5:23 33:15
**walk**
20:17 125:14
**wall**
225:18
**wand**
14:14 90:7
**wane**
190:11
**want**
7:15 8:7 12:1 19:15
24:9 25:22 30:16
31:3,6,10 40:3,18
48:3 50:12 64:9
66:22 68:10,21
76:9 77:1,2,16,23
78:21 79:1,10,11
79:11,14 80:23
83:23 85:8 86:17
86:19 95:6 96:15
103:21 106:13
107:22 108:23

109:6 111:19
112:5 127:2 131:5
134:11 142:23
148:2 156:25
169:12 175:24
189:10 191:5
195:20 232:25
233:1 239:20
240:22 241:16
**wanted**
18:25 24:15,16
41:12 54:17 58:18
58:19 69:7 86:20
93:10 94:13
107:23 115:8
118:11 120:2
122:20 126:15
128:21,23 139:14
139:21 160:13
165:13 177:24
178:21 179:9,13
182:11 187:21
189:12 192:3,10
192:19 197:7
198:10 204:21
205:7 206:5
208:23 213:13,20
213:23 215:18
239:9
**warrant**
242:4
**warts**
174:21
**Washington**
2:13 11:9,21 51:13
181:19
**Washingtonian**
170:24
**wasn't**
34:17 74:15 76:23
86:25 87:2 98:5
113:16 114:8,11
119:16 120:1,15
127:8 136:17
139:17 152:23
158:2 163:23
164:5,8,24 178:21
179:24 181:6
208:5
**watching**
232:12,13
**way**
5:24 15:1,22 18:6

21:6,22 22:7 29:2
37:17,22,24 41:25
42:24 43:14 44:10
45:3,4,5,6 46:23
50:8,9,11 58:20
62:5 63:1,10 66:7
66:16 67:20 69:11
69:24 70:8,13
71:13 72:21 75:11
76:20 79:22,23
80:4 83:1,2,5 92:2
92:2,7 101:19
104:1,15,16
105:16 107:8
108:6,10,11
110:22,24 118:9
119:9,10 120:22
122:14 124:7
126:3 130:1,20,24
133:5 134:15,21
138:22 141:1,13
143:7 146:22
153:5 154:25
156:19 158:1
163:6 168:10
176:16 184:16
196:16,20 200:22
204:15 207:3
212:5,9,11 216:17
216:18 217:2
220:16 221:12
222:18 224:18
230:6 232:11
233:11 235:18
238:6 242:15,21
243:22 244:2,3,6
**Wayne**
88:5
**ways**
8:12 11:24 12:25
13:1 21:6 27:23
53:17,18 81:21
106:20 110:21
118:7 132:13
135:15,23 136:19
144:17 201:18,20
204:16,17 207:12
207:12
**wealthier**
129:11
**web**
87:21 133:9 187:16
**web-based**

111:6
**week**
99:17 131:24
**weekend**
32:5 190:25
**weigh**
10:19
**weighed**
151:24 215:6
216:11
**weight**
60:14 140:10 141:7
141:12 144:5
216:23 217:2
**weighted**
140:23 141:14
161:14 173:8,9
216:14,15,17
217:8
**weighting**
140:13,19 141:11
216:21 217:21
**Weiner**
167:12 241:7
**Weiner's**
167:12
**weird**
168:24,25,25 197:1
**went**
11:16,18 19:12
52:15 83:19 97:24
102:23 103:2
117:7 119:3,11
125:18 128:9
131:4 158:7 194:1
194:2 199:20
228:24 237:11
**weren't**
69:24 82:1 117:18
125:21 135:11
147:1 157:20
162:2 165:1,3,13
217:24
**west**
1:17 113:8,10,20
117:8 120:24
122:4 123:7,8,9
145:17
**we'll**
23:9 72:4,6 79:13
94:12 95:7 98:10
113:20 125:20
126:6,7 138:4

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                    4/29/2013

162:18 183:23,23
191:5,24 195:6
**we're**
16:8 18:9 35:6
38:18 42:11 45:15
50:8 51:7 54:12
57:15,16 63:9
66:7 71:22,23
72:8,11 74:18
75:18 77:4,5,19
78:5,9,11,12,13
78:17,22 82:2
93:10 98:7 107:3
115:19 120:10
125:25,25 126:1,1
126:2,8 127:3,5
135:25 138:14
140:20 151:25
153:5,17 156:4,21
157:1,4 163:18
164:21,22 180:19
181:18 183:4
189:13 190:8
191:21 195:5
219:1 224:23,24
225:12,25 229:7
229:21 230:21
231:1 232:6 233:3
234:8 236:5,22,24
241:6 243:2
244:21
**we've**
18:19 56:24 76:14
76:15 102:3
111:17 119:2
146:8 173:17
174:25 176:7
183:6 204:21
218:2 229:18,25
240:1
**whatnot**
13:25 20:18 26:10
65:6,21 88:15
107:6 134:22
166:4 175:3 219:5
**wheelhouse**
101:13,16 194:1
**white**
113:1,4 115:16
121:1 122:4,17
207:22 236:15
**whites**
123:9 230:8

**wide**
236:11
**widely**
62:25 174:20
**widespread**
231:12
**wife**
7:23 62:13 156:10
232:17 244:4
**wildly**
150:5,6
**willing**
61:8 125:21
**win**
44:24
**wires**
65:6
**wish**
196:22
**wit**
209:17
**witness**
3:2 84:17 85:16
123:4 162:6 176:1
177:10 179:2
198:5 201:3
226:16 246:9,11
**witnessing**
85:11
**woman**
168:16 231:24,25
**woman's**
21:10
**women**
109:6 206:23
207:20 226:21,25
232:1
**Wonder**
163:3
**wondered**
73:15
**wonderful**
49:3 58:14
**wondering**
72:14
**woods**
218:21
**Woody**
47:11,12
**word**
104:4 144:7 157:14
169:1 173:11
213:15 241:21

**wording**
94:6
**words**
5:20 42:15 47:24
63:2 86:25 94:4
95:1,2 96:4,5,6,7
108:20,21 116:24
135:10 147:5
167:13 169:19
188:4 205:14
215:9
**work**
7:12 13:17 25:14
26:1,2,21 27:4,15
28:16,20,22 31:6
38:15 51:10 55:20
65:22 70:21 72:18
80:11,12 88:13
98:12 102:19
106:11 112:8
125:21 172:12
184:7 188:16
191:17 195:1
208:16 213:10
220:8
**worked**
11:10 135:16
172:12 173:1
**working**
17:3 26:3,12
107:11 111:15
131:23 156:16
172:11,24
**works**
13:23 86:3,9 180:8
206:25 220:16
**world**
13:2 22:7 49:10,24
61:1 79:25 242:21
243:8
**worldwide**
110:8
**worried**
129:22 208:6
**worry**
194:12
**worse**
189:16
**worth**
191:16 241:23
**wouldn't**
24:7 62:25 65:4,7
67:23 75:5,6 76:7

76:8 77:25 87:13
96:8 104:15 108:3
109:1 116:2
117:23 120:12
124:19 142:5
144:5,15 157:14
160:7 188:25
200:22 207:1
212:19
**wow**
20:13
**write**
7:9 18:4 23:12
27:17 30:17,17
31:25 33:17,18
38:16 46:11 48:15
85:22 101:19
134:2,3 183:5
187:13 188:2
**writing**
18:1,5 34:10 96:19
171:25 172:23
186:14 213:1,14
224:8
**written**
37:1 88:11 167:8
**wrong**
46:1 49:22 108:20
178:20
**wrote**
47:21 49:1 71:25
86:5 134:10
188:19

_____
**X**
_____
**X**
42:7 82:18

_____
**Y**
_____
**YA**
149:4
**yada**
19:6,6,6
**yeah**
5:4,7 6:14 18:10,10
23:4,22,24 24:4
24:18 28:8,24
29:9 35:10 38:16
38:19 41:15 43:13
51:14 55:16 57:9
59:17 72:19 76:4
81:5,9 85:17,17
85:19 86:10,10,10

89:2 91:24 93:9
94:10 95:5 96:11
101:21 104:4
119:25,25 120:7
121:11 133:17
134:5 141:13
148:11,14 150:12
152:15 155:22
157:6 160:18
161:1 162:6
166:15,19 170:18
174:1 176:4 177:2
177:17,17 178:4
178:21,25 185:15
192:25 196:21
197:22,25 198:9
200:24 203:1,1,17
203:22 204:25
205:10 206:19
212:4 214:21
217:24 222:1
224:13,13,13,19
241:23
**year**
13:9 30:8 188:15
205:21,22 206:3,7
**years**
9:25 10:2,4 11:11
11:17 12:11 17:20
19:8,9 23:25 24:2
24:16 30:2 31:21
60:16 71:4 82:24
101:12 103:12,12
103:12 104:9
114:25 133:24
176:7 195:1
232:14
**Yep**
151:18 175:17
**yesterday**
244:5
**York**
20:17 116:19 117:6
117:22 119:4
**young**
3:14,20,24 20:7
55:10,19 62:6
65:12 66:2 87:22
88:16 89:18,21
90:4,12,21,24
91:6,9,11 95:12
97:1 101:8 160:9
173:18 175:10

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                4/29/2013

182:16 197:14
199:17 200:19
214:8,20 215:7
216:12 224:16,21
226:20 235:11
240:11
**youth**
17:6,8 30:2 38:19
45:20 80:13 96:24
96:25 191:9
**YRBS**
191:9,15

**Z**
**zero**
54:10 55:13 191:19
**Zimmerman**
1:15 3:3,9,11,13,15
3:18,22 4:4,9 6:21
23:14,16,18,19
83:23 89:4,6,8,9
89:11 95:8,10,11
139:11 141:19
151:7,11 160:14
160:16 166:13
173:14 177:25
197:9,11,12 211:3
211:9 213:21,24
214:4,5 227:5
**Zimmerman's**
3:9,11
**ZIP**
103:2 107:25
**ZX**
140:4 153:16 178:2
178:3 227:6
**Z-i-m-m-e-r-m-a-n**
6:23

**$**
**$10**
126:7 127:4
**$100**
128:12
**$150**
136:9
**$20**
126:6
**$50**
127:3 128:11
**$500**
128:17
**$70**

129:18 130:5 136:9

**0**
**0.01**
44:19 155:18,21
**0.03**
67:7 146:12,12
151:21
**0.05**
44:13,14 45:8
140:22

**1**
**1**
3:9 23:14,16,19
151:18 152:2,13
153:7 155:10
204:22 205:2
206:12
**1-246**
1:13
**1.9**
155:19,23
**1/300th**
239:1,2
**10**
8:19 9:2,3 56:20
67:6,11,11,11
68:11 133:24
143:8 144:3,19,21
160:6 191:22
194:7 224:17,22
225:22 230:4
231:15 240:4,5
241:2
**10-to-25-ish**
9:11
**100**
54:2,4 55:13 60:16
63:25 65:20 91:15
103:7 135:24
139:1 225:20
**11.2**
155:4
**11:25**
139:9
**11:55**
139:9
**12**
44:1 67:12 78:19
78:23 185:18
231:2 237:2
**12-year-olds**

81:22
**12.5**
91:22 155:20
**12.6**
152:20 154:9,10
215:17,18
**120**
20:2
**125**
138:9
**13**
30:1
**15**
9:7 56:20 68:11
133:24 209:15
230:3 232:14
238:8,21
**15-year-old**
82:12
**150**
30:7 136:10
**151**
3:15
**16.3**
154:17
**17-year-olds**
81:23
**18**
42:10,18 78:6,7,8,9
78:16,18 81:2,2
81:19 82:9,17
89:18,22 91:1,2
91:11 117:17
120:13 209:12,15
209:15 244:12
**18-to-20-year-olds**
108:3 199:22
**18-to-24-year-olds**
78:20 97:1 101:8
107:17 129:15
231:1 241:7
**18-to-25-year-olds**
199:19
**19-page**
214:7
**19-year-olds**
81:20
**19.9**
177:13
**197**
3:18
**1983**
10:1

**1986**
12:16
**1989**
10:3
**1994**
13:12 71:3

**2**
**2**
3:11 89:4,6,10
178:1,2,3 182:10
**2.5**
240:7
**2:09-cv-4607**
1:6
**2:30**
244:25 245:7
**20**
2:12 8:19 9:4,10
36:25 42:7,11,12
42:17 44:3,5
45:25 55:12,15
56:20 67:11 68:7
68:16 92:18
126:21 135:9
136:14,15 193:4
205:16 226:18,21
226:22 230:21
**20-year-olds**
81:20
**200**
58:11 128:13
**20001**
2:13
**2008**
184:11
**2010**
152:19
**2012**
90:1,11,18 93:14
96:15 152:4 166:9
184:11 186:11
**2013**
1:18 4:2 24:1
**2016**
246:23
**202**
51:13,13
**202.305.7667**
2:14
**21-year-old**
99:17
**213**

3:22
**216.781.5245**
2:6
**22**
42:10,18 121:4,5
121:11 122:12,16
124:4,14,22 125:4
138:9
**2200**
2:4
**225**
30:9
**23**
3:9 194:13
**24**
10:3 78:7,9,16,16
81:2 82:21 89:18
89:22 91:2,11
117:17 209:12,15
209:15
**24-years-old**
91:1
**24-year-olds**
32:8 82:9
**25**
8:22 9:2 37:2,16
46:6 68:17 138:9
138:9 193:4
209:18 238:12,14
**250**
67:8
**28**
228:7,8
**29**
1:18 4:2 78:6,8,16
78:18 81:2 82:17
82:21

**3**
**3**
3:13 95:8,11 140:2
140:4 141:20
148:4 152:13
166:14 226:15,17
227:5,6 244:16
**3,000**
30:3 103:19 137:24
243:8
**3,447**
140:6
**30**
10:2 19:25 57:1
86:5 99:12 122:5

Free Speech Coalition v. Holder
Marc Zimmerman, PhD                                        4/29/2013

176:7 186:24
191:21 193:2,4
194:12,13 196:17
209:15 226:22
228:4,6 230:2,21
236:6 237:8 238:7
238:13,14,14
239:12 240:5
**30,672,088**
91:18
**30-million**
86:4
**30-plus**
104:9
**300**
30:9 67:6
**308**
211:16
**309**
204:21,24,25
211:14
**32**
64:25
**3345**
246:21
**35.8**
177:18

_____ **4** _____
**4**
3:4,15 151:7,11
152:15 153:5,16
160:15,16 173:15
246:23
**4.6**
238:9,22
**4.8**
155:5
**40**
67:11 176:7 233:18
233:21
**44113-1949**
2:5

_____ **5** _____
**5**
3:18 197:9,12
211:9
**50**
55:15 68:19 127:6
127:8 228:18
229:1 230:5 236:4
236:21 237:16

238:19
**500**
128:14
**55**
2:4
**59.1**
163:15 164:14

_____ **6** _____
**6**
3:22 213:21,24
214:5
**62.4**
163:15 181:7
**623**
1:17
**64**
181:8
**65**
37:7 205:11
**65.7**
163:15 164:14
**66**
205:8
**67**
143:1,15

_____ **7** _____
**7.4**
154:23
**7.6**
154:10
**70**
127:6,9 130:2
237:12
**75**
36:17 37:8 91:14
**760**
153:9

_____ **8** _____
**8.9**
154:16
**8:30**
1:18 4:3
**80**
19:25 91:14
**800**
103:19
**827**
141:14,15 143:4
**836**
160:21

**837**
163:12 164:12
177:1
**85**
45:7
**850**
61:12
**87**
12:16
**89**
3:11

_____ **9** _____
**9.2**
91:22
**90**
6:4 44:19,23 45:3,7
110:3,6 214:20
225:6
**90-minute**
83:20
**90-something**
110:6
**95**
3:13 42:8,9,12,15
42:17 44:4,7 45:2
45:6,22,23 79:18
146:7 149:25
159:9,12 160:23
161:3 162:15
163:13 164:16,18
194:18

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328