IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC., et al. | ) | Civil Action No. 2:09-cv-4607 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE MICHAEL M. BAYLSON |
| -vs- | ) | |
| | ) | PLAINTIFFS' MEMORANDUM IN |
| THE HONORABLE ERIC H. HOLDER, JR., | ) | OPPOSITION TO THE DEFENDANT'S |
| Attorney General, | ) | MOTION TO EXCLUDE TESTIMONY OF |
| | ) | MICHELLE DROUIN, MARC |
| Defendant. | ) | ZIMMERMAN AND DANIEL LINZ |
| | ) | |

INTRODUCTION

The government seeks to exclude the testimony of plaintiffs' experts– all leading scholars in their fields, two of whom have studied and examined the phenomenon of the non-commercial transmission of sexually explicit images by adults, and the third who has studied that subject, as well as the overbreadth in the amount of commercial dissemination of sexually explicit images on the internet.

At the outset, it is important to put in context the testimony of Plaintiffs' experts that the government seeks to exclude. This case is on remand from the Third Circuit for development of a record on, among other things, Plaintiffs' facial overbreadth claim.  In that regard, the court of appeals directed that Plaintiffs be given an opportunity to develop the record on the statutes' regulation of purely private conduct and on the degree to which the statutes burden speech that does not further the government's interest (e.g. depictions of performers who are obviously adults) to allow the evaluation of the statutes' overbreadth. *Free Speech Coalition v. Holder*, 677 F.3d 519, 538 (3rd Cir. 2012).

The overbreadth of a law regulating speech is normally shown by posing "reasonable but

challenging **hypotheticals** to determine the statute's sweep." *United States v. Stevens,* 533 F.3d 218, 235 (3rd Cir. 2008) (en banc) *aff'd* 559 U.S. 460 (2010). (emphasis added). *See Brown v. Entertainment Merchants Ass'n,* 131 S.Ct. 2729, 2736-37 (2011)*; Free Speech Coalition v. Ashcroft,* 535 U.S. 234, 247-48 (2002); *McCauley v. University of the Virgin Islands*, 618 F.3d 232, 251 (3rd Cir. 2010). In each of these cases, laws were struck down as being unconstitutionally overbroad–not on the basis of any evidentiary record created by the challenger–but on the basis of hypothetical applications demonstrating the breadth of the law at issue and the way it unconstitutionally burdened protected speech.  Here, Plaintiffs have gone far beyond what sufficed to cause the Supreme Court and the Third Circuit to strike down laws on overbreadth grounds.  They have set about creating an evidentiary record.

Thus, Plaintiffs have not simply relied on hypotheticals to demonstrate the statutes' overbreadth.  They have provided credible and compelling **evidence** showing their unconstitutional sweep.  Plaintiffs have produced the testimony of two professors who have conducted academic research on sexting–the practice of producing and exchanging sexually explicit imagery on cell phones and other devices between partners–and have reported their findings in peer reviewed articles.  Plaintiffs have also produced the testimony of an expert who has dedicated most of his three-decade career to the study of sexually explicit expression and whose testimony describes the amount of constitutionally protected sexually explicit expression depicting mature adults burdened by the statutes as well as the quantity of purely private expression subject to the criminal recordkeeping provisions at issue.

Plaintiffs' experts give the Court a sense of the vast amount of expression burdened by the statutes, based **not** on **the hypothetical**, but based on **evidence** gathered in the course of their

academic studies. It is in this context that the government's criticism of that testimony must be evaluated.

Specifically, Dr. Michelle Drouin and Dr. Marc Zimmerman have examined the prevalence of "sexting" by young adults and have expressed their respective opinions on its frequency. Dr. Daniel Linz has spent his three decade career studying sexually explicit images and their primary and secondary effects, and in the course of his research, examined hundreds of thousands of sexually explicit images. He has expressed opinions on the prevalence of child pornography versus adult sexually explicit images on the internet, the use of imagery in sexually explicit images of young looking performers, as well as the prevalence of non-commercial means by and through which adults may upload and transmit sexually explicit images.

The testimony of all three experts establishes the overbreadth of 18 U.S.C. §§ 2257 and 2257A.  As will be seen, the government's motion should be denied.

A.      DR. MICHELLE DROUIN

Dr. Michelle Drouin received her doctorate degree in experimental psychology from the University of Oxford, Oxford, England, nearly a decade ago. Since receiving her degree she has taught at Indiana University- Purdue University Fort Wayne, in the psychology department. Her CV is attached.

Over the course of her academic career, her research has been published in scholarly, peer reviewed  journals; she has written chapters for textbooks, instructor's manuals for psychology textbooks and given more than twenty professional presentations dealing with technology and relationship formation, her current area of research interest.

Dr. Drouin's scholarship and teaching have won her awards from her school, including

College Science Teacher of the Year, as well as awards for innovations in online teaching. Her dissertation was a distinguished finalist for the International Reading Association's Dissertation of the Year award.

With her research interest focused on technology, communication and human relationships, Dr. Drouin's study of student relationships and sexting, "Texting, sexting, and attachment in college students' romantic relationships," was published in 2012 in the journal *Computers in Human Behavior*, 28, 444-449. This peer reviewed publication explored how sexting and texting are related to the romantic relationships college students were involved in.

More particularly, recognizing that text messaging had begun to dominate the means by which young adults communicated (and exceeded voice telephone calls), Dr. Drouin thus sought to explore the relation between texting, sexting– the transmittal of sexually explicit photos or videos via text messaging–  among college students, and attachment within their romantic relationships. She hypothesized, based on previously published scientific literature, it would be relatively common, and its frequency would be related to attachment styles.

To conduct her study, she surveyed 744 undergraduate students' relationship attachments at her university, who participated in the study for research credit, and asked the participants about the frequency with which they sent text messages, sexually explicit text messages, and sexually explicit pictures and video messages.

The result of her study, consistent with her hypotheses, was that of the students who responded that they had been in a committed relationship,  54% percent of those participants had sent a sexually explicit picture or video to their relationship partner.

Thus, the snapshot captured by Dr. Drouins' research shows that well over half of the

young adults who participated in the study had sent, via cell phone, a sexually explicit picture or video to their partners.

The following year, Dr. Drouin and a colleague conducted a follow-up study that examined the frequency of sending different types of sexually explicit pictures and video messages to their relationship partners among young adult college students.

Using the same techniques, her second scientific study of sexting found that nearly half of those in a committed relationship indicated they had sent a sexually explicit photograph to their partner. Of the young adults who reported having a casual relationship, 37% had sent a sexually explicit text or picture message, and 45% of those in a cheating relationship had sexted their cheating partner. While cell phones comprised the most prevalent means of sending the images, other means, such as Twitter, email or Facebook, were also used.

When the two samples were examined together, approximately one half of the students indicated they had sent a sexually explicit picture or video.

Dr. Drouin's survey of the scientific literature on sexting revealed that other studies had found, as her studies did, that sexting is a common phenomenon. A peer reviewed, published study of sexting among female Hispanic college students found that fully twenty percent of the study's subjects had sent erotic or nude photographs of themselves to others. *See* Ferguson, C.J, *Sexting Behaviors Among Young Hispanic Women: Incidence and Association with Other High-risk Sexual Behaviors.* Psychiatr.Q. 2011 82:239.

Data from national surveys she reviewed confirmed the frequency of sexting. Specifically, her review of a study jointly done by the Associated Press and MTV, as well as a study by the National Campaign to Prevent Teen and Unplanned Pregnancy consistently showed

5

that approximately one- third of young adults have been involved in sexting sexually explicit visual depictions to others.

The difference between the results of her study and the national studies, and the higher percentage of sexting that she found, she determined was likely due to the sample differentiation. Specifically, her studies examined sexting among those within a committed relationship, where the texting rates were more prevalent. The national surveys to which she compared her results did not so limit the respondents.

Accounting for these differences, Dr. Drouin employed the scientific process of looking at observable instances of behavior, gathered the available information from the social science literature, and expressed an opinion, based on census data related to the college age population, that approximately one-third of the young adults aged 18 to 24, have sent messages involving sexually explicit depictions, a figure that translates to 10.2 million young adults in the country.

B.    DR. MARC ZIMMERMAN

Dr. Marc Zimmerman is a tenured professor in the University of Michigan School of Public Health's Department of Health Behavior and Health Education, and has taught there since 1989. He currently chairs the department. His CV is attached.

Dr. Zimmerman has received the Distinguished Fellow Award from the Society of Public Health Educators, an award for Distinguished Contribution to Theory and Research Award from the American Psychological Association, and has received the School of Public Health's Excellence in Research Award from the University of Michigan.

He has been awarded research grants from the Centers for Disease Control, the National Institute on Drug Abuse, the National Institutes of General Medical Science, the National

Institute on Alcoholism and Alcohol Abuse, the Ruth Mott Foundation, the National Institute for Child Health and Human Development and from the State of Michigan.

Dr. Zimmerman is a recognized expert in the field of adolescent[1] health and development, a field in which he has published 87 scholarly, refereed articles.[2]  In addition to the publication of those articles, he has edited or written nine books and book chapters, and was an invited author to contribute to the the Encyclopedia of Adolescence.

Dr. Zimmerman has, in the past, served on the editorial board of two journals in his field, including service for thirteen years as the editor of *Health Education and Behavior*. Currently, he serves as a member of the editorial board of three academic journals, including his position as editor of the journal *Youth and Society*.

Last year, Dr. Zimmerman was the lead investigator in a published article in the *Journal of Adolescent Health*, "Sexting Among Young Adults," an effort to examine sexting by young adults and its association with their sexual behavior and psychological well-being.

Noting that the prevalence of sexting had already been documented by existing surveys, his  research study was designed to examine the relationship between sexting and health behaviors associated with it, including mental health and sexual behavior. His study found

---

[1] Dr. Zimmerman defines an adolescent to be someone in the second decade of life, i.e., from 10 to 20 years of age.

[2] A refereed article is the same as a peer reviewed article. Dr. Zimmerman explained the peer review process as consisting of a short, initial review by the journal editor, and if the proposed article is not theoretically or methodologically deficient, it is sent to three reviewers for comments about whether it should be accepted. Oftentimes, reviewers' comments warrant either major or minor revisions to the article, or less often, outright or rejection. Most articles typically require some revisions, and after they are made, the article is again sent out for a second review before being published. Tr. 29-37.

sexting is unrelated to sexual risk behavior or psychological well-being.

Dr. Zimmerman's study employed a nationwide sample of participants that were obtained using a research method known as respondent-driven sampling. *See* Volz,E., Heckathorn,DD. *Probability based estimation theory for respondent driven sampling*. J. Off. Stat. 2008: 24:79. Under that method, the initial participants in the study nominate others to participate who, in turn, nominate others, until approximately eight generations of nominations have taken place. At that point, the sample population is saturated. Dep. of Zimmerman at 104-5.

In this study, the initial seeds responded to a Facebook advertisement. Of the individuals who responded to the advertisement, 22 were ultimately selected based on their race/ethnicity and the region of the country in which they lived to ensure that the referral networks were diverse and not concentrated in any particular geographic area. The remainder of the sample was recruited by the initial seeds, and then by the individuals whom they recruited until a sample of more than 3,400 young adults was obtained.

Then, because the participants were linked by the recruitment chains, and therefore correlated,  a statistical weighing was done to correct for that effect, which resulted in a final analytical sample of 827 young adults participants in the study.

The Pew Foundation's definitions of sexting were employed in the study, and participants were asked questions about their lifetime sexting behavior– whether they had ever sent a sexually suggestive nude or nearly nude photograph or video of themselves to someone else via cell phone, and whether they had ever received such an image or video.

Dr. Zimmerman's research showed that sexting is a prevalent behavior among young adults. His study found that thirty percent of the young adults had sent a sext, and forty-one

percent had received a sext. What is more, consistent with Dr. Drouin's conclusions, Dr. Zimmerman's findings suggest that sexting often involves reciprocal behavior and that that most young men and women reported sharing sexts within a dating relationship.

The results of his study are nationally representative. The sampling strategy was weighted to remove recruitment bias, and his data correlated with that of a different study on substance abuse that employed a similar recruitment model. In addition, the results of Dr. Zimmerman's study were similar to other national studies undertaken on the same subject– sexting– that employed different sampling techniques.

Dr. Zimmerman was then able to extrapolate his findings based on U.S. census information, and opine that approximately 9.2 million young adults have sexted, and that 12.5 million received a sext. Even conservatively assuming that his estimates were off by half, he opined that that would still leave 4.6 million young adults who have sexted and 6.3 million who have received a sexually explicit photo or video via text message.

C.     DR. DANIEL LINZ

Dr. Daniel Linz is among the nations foremost scholars on sexual expression and its effects, both primary and secondary. A tenured professor in the Department of Communications at the University of California, Santa Barbara, Dr. Linz has also served as a professor in the University's Law and Society Program, as the Communication Department's Director of Graduate Studies, as well as the Director of the University's Survey Research Center. His CV is attached.

His scholarly research as well as the research that he has supervised, have won numerous awards from the International Communication Association, the National Communication

Association, the Center for Successful Parenting, and the American Psychological Association.

His scholarship has been funded with grants awarded by a host of institutions, including the National Institute of Justice, the California Public Health Department, the National Science Foundation, the National Institutes of Mental Health, as well as the Veteran's Administration.

Indeed, over the course of his career, Dr. Linz has published more than 100 peer-reviewed articles, eleven of which have been reprinted by publishers ranging from the University of Chicago Press to West Group.

The range of subjects of his scholarly publications is vast, and embraces studies of children's internet behavior and parental underestimation of risky internet experiences, to sexuality and pornography, to indecency and broadcast regulation, and to the secondary effects of adult entertainment businesses.

Dr. Linz has also published scholarly articles that explore child pornography, gender stereotyping and the effect of sexually explicit video games on the likelihood of sexual harassment, the effect of exposure to pornography, the desensitization to sexualized violence, and accounting for context in measuring television violence.

Many of the articles Dr. Linz has authored on the subject of the effects of sexually oriented and violent entertainment were groundbreaking empirical studies that examined attitudes after one was exposed to sexually explicit materials, that is, the primary effect of the expression. In the context of examining secondary effects of adult expression, as well as other research,  Dr. Linz has employed statistical analysis to explore and describe the relationship between the presence or absence of crime in the area of an adult business, police encounters with Latinos and Whites, as well as parental underestimation of children's internet useage, among

10

other subjects.

As a result of the subjects on which he researches and publishes, over the course of his career, Dr. Linz estimates he has viewed hundreds of thousands of sexually explicit images in books, videos and on the internet.

In this case, Dr. Linz was asked to render an opinion on the quantity of sexually explicit expression depicting adults versus child pornography available on the internet. He was also asked to opine about the quantity of sexual expression depicting persons who could reasonably be confused as minors based on their apparent age, versus the quantity of who are obviously adults. Dr. Linz was also called on to render an opinion as to the quantity of private, non-commercial sexually explicit expression that is available on the internet.

Relying on the available social science literature, Dr. Linz noted that the commercial production of child pornography in the United States accounts for a small percentage of that which is created, since most is produced by those who have access to the specific victims. Indeed, he notes that because the risks of producing child pornography are so high, the commercial child pornographic material distributed in the United States is smuggled in by pedophiles, because the risk for a commercial dealer carrying it are too great. Indeed, in reaching his conclusion, Dr. Linz relied in part on a report authored by Supervisory Special Agent Kenning Lanning of the FBI's Behavioral Science Unit, which noted, "child pornography in the United States is primarily a cottage industry run by pedophiles and child molesters." Agent Lanning reaffirmed that statement in his 2010 report. *See* Gov't Mtn in Limine, Linz Ex. Part 2, at p. 31.

Dr. Linz confirmed the validity of his opinion that the commercial production, i.e., that

motivated by profit, of child pornography is an insignificant portion of the market, and quantified

his observation by using a measure of regulatory efficiency identified in McGovern and Krasno,

"Mesauring Overbreadth," published on the Social Science Research Network's working paper

series.

The formulation identified by McGovern and Krasno that Dr. Linz employed evaluates

the quantity of expression that is inappropriately burdened by the statute as compared with the

amount of expression that is appropriately burdened. To make that calculation, Dr. Linz

employed a series of Google searches that searched the World Wide Web for terms associated

with child pornography, the appropriately burdened expression, and of pornography in general,

which is inappropriately burdened speech.

Specifically, Dr. Linz used the search term meta-tagged  "child pron" [sic] (Google will

not return actual results for a search of "child porn"), and compared the number of the search

results with those compared with "porn." The ratio of those terms yielded a result of 0.002227, or

0.227%.  Moreover, Dr. Linz noted that the results did not yield any possible child pornography

images. The results of this calculation reinforced his own observation and experience that

commercial child pornography comprises a relatively small amount of information on the

internet.

Dr. Linz also examined the literature concerning the distribution of child pornography

and opined that peer-to-peer networks and not commercial websites, are the most frequent means

by which child pornography images are distributed, a conclusion that is shared withe Janis

Wolak, the government's expert. *See* Report of of Janis Wolak at 1.("It is true that P2P [peer-to-

peer] networks are probably the biggest sources for public access to child pornography and that

the amount of child pornography found on such networks probably exceeds that which can be obtained from commercial sources.).

In addition, Dr. Linz expressed an opinion, based on his experience in viewing hundreds of thousands of sexually explicit images in the course of his career and his review of the scientific literature, that the vast majority of pornographic material in the commercial domain involves persons who are not likely to be confused as minors. More specifically, Dr. Linz again examined the results of Google search for terms associated with older adolescents, "teen porn" and calculated that the ratio of hits of that term to that of "porn" represented 0.0210, or just slightly more than 2%. Stated differently, according to Dr. Linz's analysis, a full 98% of the search results would not reflect images of individuals who would be confused with minors.

Finally, Dr. Linz opined that the quantity of private, non-commercial sexually explicit expression is vast, and identified the various technological means and services, including sexting on cell phones, postings on adult dating websites, home-produced erotic videos and photos, erotic fan fiction, attachments to emails, Facebook, Twitter, Reddit, Instagram, Imageboards (e.g., 4chan, Futaba Channel), streaming video (e.g., Youtube, Vimeo, BlipTV, Ustream), private or semi-private/public forums, image sharing services (e.g., imgur), and live streaming (e.g., Skype, private webcam, Openbroadcaster), by which citizens could exchange and post sexually explicit images, and that millions of private citizens engage in that practice.

LAW AND ARGUMENT

THE TESTIMONY OF DRS. DROUIN, ZIMMERMAN AND LINZ IS
ADMISSIBLE BECAUSE EACH HAS SPECIALIZED KNOWLEDGE TO AID
THE COURT, AS FACTFINDER, TO UNDERSTAND THE EVIDENCE AND
DETERMINE THE OVERBREADTH OF THE STATUTES AT ISSUE AND
EACH OF THEIR OPINIONS IS BASED ON RELIABLE SCIENTIFIC
PRINCIPLES, SUFFICIENT DATA, PROPERLY APPLIED TO THE FACTS
OF THIS CASE.

Federal R. Evid. 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the
trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the
case.

*Id.*

Under the Rule, and the Supreme Court's decision in *Daubert v. Merrill Dow
Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Third Circuit has explained that the duty of a
district court judge is to act, "as a gatekeeper, preventing opinion testimony that does not meet
the requirements of qualification, reliability and fit from reaching the jury." *Schneider ex rel.
Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

But the concern reflected in *Daubert* and the Rule to prevent *juries* from being exposed to
expert opinions that do not meet those requirements is less severe when the Court is the
factfinder. Thus, "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case

such as this where a district court sits as the trier of fact in place of a jury." *Gibbs v. Gibbs,* 210 F.3d 491, 500 (5th Cir.2000).  *See also Alco Industries, Inc. v. Wachovia Corp.,* 527 F.Supp.2d 399, 2007 WL 3341469 (E.D.Pa.2007) *(quoting In re Salem,* 465 F.3d 767, 777 (7th Cir.2006) ("Where the gatekeeper and the factfinder are one and the same-that is, the judge-the need to make such decisions prior to hearing the testimony is lessened."); *Clark v. Richman,* 339 F.Supp. 2d 631, 648 (M.D. Pa. 2004) ("[v]igorous cross-examination [and] presentation of contrary evidence" will provide the best means of attacking Sreckovich's report, *see Daubert,* 509 U.S. at 595, 113 S.Ct. 2786, as opposed to the court's conducting a line-by-line analysis of the report now. If the court examined the report now as plaintiffs urge, the court's determinations regarding the veracity, reliability, or weight of isolated statements in the report would be without the benefit of the context to be provided by other evidence, the context in which the report as a whole must be considered.")*.*

Indeed, as a judge of this Court recently held:

> Based on the fact that we are called upon to act both to decide the questions presented in this motion and ultimately to find the facts at issue in this case, we will defer ruling on this motion for the present. Within the context of trial, we will hear testimony and argument as necessary on the issues presented in this motion and rule as appropriate at that time. "Vigorous cross-examination and presentation of contrary evidence will provide the best means" of determining the extent to which Mr. Posusney's opinion should be admitted and considered in this matter. *Id.* (quoting *Clark,* 339 F.Supp.2d at 648–49 (citations and quotations omitted)). Accordingly, the Defendant's Motion to Exclude the Expert Testimony of John S. Posusney, P.E. is denied without prejudice to Defendant's argument at trial about what weight, if any, the expert testimony should be given.

*Trojecki v. United States*, Case No. 11-5379, 2013 WL 797943 (E.D. Pa. Mar. 5, 2013)(Perkin, U.S.M.J).

What is more, "Rule 702 reflects 'a liberal policy of admissibility' for 'any evidence

15

which has the potential for assisting the trier of fact.'" *Lugo v. Farmer's Pride*, No. 07-0749,

2011 WL 2550376 (E.D. Pa. 2011) (Baylson, J.)(citation omitted); *United States v. Comite*, 2006

WL 3791340 (E.D. Pa. 2006)(Baylson, J.).

      The Third Circuit similarly has noted that the bar for the admission of an expert's opinion

is not a high one:

> The grounds for the expert's opinion merely have to be good, they do not have to
> be perfect. The judge might think that there are good grounds for an expert's
> conclusion even if the judge thinks that there are better grounds for some
> alternative conclusion, and even if the judge thinks that a scientist's methodology
> has some flaws such that if they had been corrected, the scientist would have
> reached a different result.

*In re Paoli Railroad Yard PBC Litigation*, 35 F.3d 717, 744-45 (3rd Cir. 1994). Accordingly, it

held there:

> we think that the primary limitation on the judge's admissibility determinations is
> that the judge should not exclude evidence simply because he or she thinks that
> there is a flaw in the expert's investigative process which renders the expert's
> conclusions incorrect. The judge should only exclude the evidence if the flaw is
> large enough that the expert lacks "good grounds" for his or her conclusions."

*Id*. at 746. *Accord  Maden v. A.I. DuPont Hosp. for Children of the Memours Foundation*, 264

F.R.D. 209, 217 (E.D. Pa.2010)(Bayleson, J.).

      In this case, there should be little question that the bar of Rule 702 has been cleared by a

substantial margin, that each of the requirements of the Rule are satisfied, and that the experts'

opinions are not only admissible, but compelling.

      A.    <u>The Testimony of the Plaintiffs' Experts is Helpful</u>.

      The testimony of each of the three experts Plaintiffs intend to call to testify will be

helpful to the Court in determining whether or not the challenged statutes are unconstitutionally

overbroad.

Each of the experts is a leader in their respective fields, and has published peer reviewed scholarly articles regarding sexually explicit communication, which is the subject matter of this litigation. Specifically, Dr. Drouin and Dr. Zimmerman are two of the nations leading researchers and scholars on the topic of sexting by young adults, a behavior that implicates the challenged statutes.

Dr. Linz has published scholarly articles for more than thirty years on topics relating to sexually explicit expression, and in the course of his scholarly activities, has viewed hundreds of thousands of sexually explicit images in various media, including images that appear on the internet. Dr. Linz is well-versed in statistical analysis and his opinions on the quantity of non-commercial, sexually explicit images transmitted by adults on various websites, and the quantity of child pornography versus adult pornography available on the internet indisputably will assist the Court in assessing the burdens that 2257 and 2257A impose on speakers.

The government's main argument is that Dr. Drouin's testimony should be excluded because her study of sexting includes images and depictions that fall outside of the statutes. Its argument is flawed, and the very statutes at issue prove the point.

The record keeping requirement of §2257 applies to anyone who produces any visual depiction of actual "sexually explicit conduct." Section 2256 of Title 18, United States Code, defines "sexually explicit conduct," in pertinent part, as actual . . .sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; masturbation; sadistic or masochistic abuse; lascivious exhibition of the genitals or pubic area of any person. *Id.*

17

Section 2257A goes further and imposes record keeping requirements on anyone who produces an image that contains one or more visual depictions of *simulated* sexually explicit conduct. As a result, images that *simulate* sexual intercourse, *simulate* masturbation, *simulate* sadistic or masochistic abuse or *simulate* the lascivious exhibition of the genitals or pubic region are brought within the scope of the law.

As the court recognized in *American Library Ass'n v. Thornburgh*, 713 F.Supp. 469 (D.D.C. 1989), *vacated sub nom., Amer. Lib. Ass'n v. Barr,* 956 F.2d 1178 (D.C.Cir., 1992), in considering a challenge to the initial version of the statute, the law's reach is broad:

> The key term is of course "lascivious," which has been upheld by courts in challenges that it is constitutionally too vague. *See, e.g., Hamling v. United States,* 418 U.S. 87, 112–21, 94 S.Ct. 2887, 2904–10, 41 L.Ed.2d 590 (1974). In addition, courts have held that factors used to determine whether an image is "lascivious" include whether the pose is "sexually suggestive" or "designed to elicit a sexual response in the viewer," among other factors. *See, e.g., United States v. Dost,* 636 F.Supp. 828, 832 (S.D.Cal.1986); *aff'd sub. nom. United States v. Wiegand,* 812 F.2d 1239 (9th Cir.1987). <u>Thus, it is fair to conclude that any frontal nude image of a person in what might be otherwise be called an "erotic" pose is likely to be included as "lascivious."</u>

*Id*. at 474 (emphasis added).

What is more, nudity is not required for an image to fall within the law. The Third Circuit has held that clothed images can constitute the "lascivious exhibition of the genitals or pubic area of any person," and bring an image within the statutes' definitions. *United States v. Knox,* 32 F.3d 733, 737(3rd Cir. 1994).

> We hold that the federal child pornography statute, on its face, contains no nudity or discernability requirement, that non-nude visual depictions, such as the ones contained in this record, can qualify as lascivious exhibitions, and that this construction does not render the statute unconstitutionally overbroad.

*Id.* at 737. *See also Id.* at 744 ("Knox attempts to read a nudity requirement into a statute which

has none."). As a result, even clothed images are within the bounds of the statute.

Finally, the regulations promulgated by the Justice Department inform how broad the swath of images covered by the statute is. Under the regulations, "simulated sexually explicit conduct" means "conduct engaged in by performers in a visual depiction that is intended to appear as if the performers are engaged in actual sexually explicit conduct, and does so appear to a reasonable viewer." 28 C.F.R. 75.1 (o).

The Justice Department, in the preamble to the regulation that adopted that definition, went on to explain that the definition did not require nudity as a preconditions of its applicability. It examined three versions of state laws that similarly prohibited simulated sexual conduct, and rejected the two versions that required nudity as a precondition of its application. It stated:

> The other two definitions, which require the actual depiction of nudity, are overly restrictive in that a child may be exploited in the production of a visual depiction of simulated sexually explicit conduct even if no nudity is present in the final version of the visual depiction. The producer of the depiction may arrange the camera or the body positions to avoid depicting uncovered genitals, breasts, or buttocks yet still cause harm to the child by having him or her otherwise realistically appear to be engaging in sexually explicit conduct.

73 Fed. Reg. 77436. Thus, as applied to constitutionally protected adult images burdened by the expansion of the record keeping requirements to simulated sexually explicit conduct, sexual images are covered by the regulation even if the performers are not completely nude.

Similarly, in considering what constitutes the "lascivious exhibition of the genitals or pubic area" the Justice Department concluded that the factors set out by the district court in *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987), *aff'd*, 813 F.2d 1231 (9th Cir. 1987), a child

19

pornography case, with the exception of age, should be applied to images of adults.[3]

The Department rejected comments to the proposed regulation that the *Dost* factors were

vague and "not readily transferable to an adult. . .." Accordingly, "[i]f the acts depicted would

fall within any of the remaining *Dost* factors [other than age] if they were performed by a minor,

one who produces actual sexually explicit conduct must comply with the record keeping

requirements." 73 Fed. Reg 77440.

The breadth and scope of the regulations was also elucidated by its comments on the

Third Circuit's decision in *Knox.* Specifically, the Department stated:

> The images at issue in *Knox* were lasciviously displayed. Although the genital
> were clothed in that case, they were covered by thin, opaque clothing with an
> obvious purpose to draw attention to them, were displayed by models who spread
> or extended their legs to make the pubic and genital region entirely visible to the
> viewer and were displayed by models who danced or gyrated in a way indicative
> of adult sexual behavior.

*Id*.

The statutes and regulation thus broadly apply to constitutionally protected adult

simulations of sexually explicit conduct even without nudity, and to constitutionally protected

erotic images that include the exhibition of the genitals, even when covered. S*ee Dost*, *supra.*

There is, therefore, no basis for the government to claim that the images embraced by Dr.

Drouin's study "clearly extended" beyond the reach of the statute.

---

[3] The *Dost* court noted that, as applicable, the following ought to be considered in determining whether an image was a lascivious exhibition of the genitals or pubic area: "1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity; 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; 4) whether the child is fully or partially clothed, or nude; 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Id*. at 832.

Specifically, Dr. Drouin's initial study asked the participants whether they had sent a "sexually explicit picture and video message," language that dovetails with that of the challenged statutes. Her second study asked whether the content of the sexts were nude, nearly nude, engaged in a sex act with another person, engaged in a solo sex act or were in a sexually suggestive pose, but clothed.

Dr. Zimmerman's study, which the government similarly claims is not helpful or relevant because his study did not limit it subject to images covered by the statute, explored sexts, which were defined as a sexually suggestive nude or nearly nude photo or video of themselves or someone else.

Thus, when one compares the terms of the statutes with the terms Dr. Drouin and Dr. Zimmerman employed in their three studies, the overlap is not, as the government claims, questionable. To the contrary, the overlap is, of not complete, extremely substantial, and their studies and opinions each provide relevant, admissible and compelling evidence of the laws' overbreadth.

At most, the government's argument goes to the weight of the evidence, and not its admissibility for, given the breadth of the definitions employed in the challenged statutes and given the penalties that can be imposed for violating its terms, speakers will be chilled and will steer clear of borderline expression.

The government similarly argues that Dr. Linz's testimony concerning the quantity of private, non-commercial sexually explicit expression is not helpful and is the product of unreliable methods. Again, the argument goes to the weight of the evidence, not its admissibility. For, there can be no doubt that whether, how often,  and in what context adult citizens send

sexually explicit text images to one another is relevant information and bears directly on the issues raised in this case.

Likewise, the quantity of non-commercial sexually explicit expression adults engage in is acutely relevant to the reach of the challenged statutes, and Dr. Linz's testimony on that subject would assist the Court, as the factfinder.  *Cf. Clark v. Richman,* 339 F.Supp. 2d 631, 648 (M.D. Pa. 2004) ("[v]igorous cross-examination [and] presentation of contrary evidence" will provide the best means of attacking Sreckovich's report").

Because the subjects of each expert's testimony would be helpful to the Court, the governments' motion should be denied.

B.    The Experts' Testimony is Based on Sufficient Facts and is the Product of
      Reliable Principles and Methods.

The testimony of each of the Plaintiffs' experts is reliable and is based on sufficient facts and reliable principles and methodologies. More specifically, Dr. Drouin's and Dr. Zimmerman's research was the subject of peer review before each of their studies was published in respected behavior and health journals, respectively.[4] Dr. Linz's opinions are grounded on more than thirty

_____

[4]The Court in *Daubert* noted that peer review was a strong indicia of a methodology's reliability:

> [S]ubmission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. *See* J. Ziman, Reliable Knowledge: An Exploration of the Grounds for Belief in Science 130-133 (1978); Relman & Angell, How Good Is Peer Review?, 321 New Eng.J.Med. 827 (1989). The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

*Id*. at 593-94.

years of experience, and employed methods nearly identical to that which the government's

expert, Gail Dines, employed. The government's arguments on these points lack merit.

      1.    <u>Dr. Drouin's Opinions Are Reliable and Admissible</u>.

The government claims that Dr. Douin's conclusion that a third of the young adults in the

country have sexted is not admissible because she does not explain the connection between her

literature review and her conclusion.

To the contrary, Dr. Drouin's deposition testimony unambiguously demonstrated the care

she took in reaching her conclusions. At the outset, she acknowledged that her own two studies,

standing alone, were not a sufficient basis upon which to extrapolate her data to a nationwide

basis. Dep. at 165. Rather, to make a generalized conclusion about the prevalence of sexting

nationwide among college students, she examined whether other studies showed a convergence

of data, "which is what social scientists do." Tr. 166. She explained:

> Social scientists take samples from their particular area and they're looking at
> some phenomenon. And although they don't say definitively that these apply to
> the rest of the United States, they would say this is what I found and I think it
> probably applies pretty generally, because I don't' see anything that would make
> these results seem like they can't be included, they not valid for any reason.
>
> And then in a larger picture, what social scientists might do, is something called a
> meta analysis. So in a meta analysis, you take research that's been conducted in
> multiple places and you compare what they've found. And you put all the data
> into kind of one statistical– you do one kind of statistical method on all of the
> data, to see, well, can we generalize these finding. Meta analyses are usually
> prevalent in fields that are non-emerging because you need a number of studies.
>
> So at this point, my best estimates are based on a small amount of studies that
> alone may or may not be generalizable. But when you are looking at them all
> together, then you see kind of a convergence of evidence.

Tr. 166-67. Dr. Drouin expressly disclaimed any subjective determination that was based on her

23

own personal "comfort level," Dep. of Drouin at 173, and opined that her calculation was based on the data and her experience and knowledge conducting social science research. *Id.*

To refute her opinion, as well as that of Dr. Zimmerman, on widespread prevalence of sexting, the government champions the declaration of its expert, Philip Stark, a professor of statistics, who contends that absent some probability sample, the conclusions that Dr. Drouin and Zimmerman reached are not supported.

But that contention merely sets up a "battle of the experts" for the factfinder; it does not make her opinion or Dr. Zimmerman's opinion any less admissible.

Dr. Drouin's results are reliable and employed reliable methods used in the field. Her testimony is admissible.

       2.    <u>Dr. Zimmerman's Opinions are Reliable and Admissible</u>.

The government similarly argues that the grounds for Dr. Zimmerman's confidence in his opinion about the prevalence of sexting nationwide is "tenuous," and therefore, not admissible. But the government's point shows, on its face, that its focus is on the weight to give the opinion, not its admissibility.

Specifically, the government posits that Dr. Zimmerman's conclusion is drawn, in part, on a study that employed a "convenience sample" from a university, which he described as being limited in nature. But convenience samples, whatever their limits, are not only recognized as an accepted survey method according to the Reference Manual on Scientific Evidence promulgated by the Federal Judicial Center, such surveys are "sufficiently reliable to be admitted into evidence and accorded substantial weight." *Kinetic Concepts, Inc. v. Bluesky Med. Corp*., 2006 WL 6505346,  (W.D. Tex. 2006), citing *Nat'l Football League Properties, Inc. v. New Jersey*

*Giants*, 637 F. Supp. 507, 515 (D. N.J. 1986).

The government also suggests that the second study on which Dr. Zimmerman based his opinion is unsound because it stratified and weighted its data to make it nationally representative, and that Dr. Zimmerman did not know which methods were used. But that is no basis upon which to discard his opinion. Rather, *Daubert* and the Rule are clear that the appropriate inquiry is whether the expert's method to reach his conclusion are reliable, and social scientists routinely review and rely on published literature in the field to reach their conclusions. *See* Dep. of Zimmerman at 56. Dr. Zimmerman pointed out that the company performing the study "probably didn't have a dog in the fight," and there would be no reason tho believe it would weigh the data inappropriately such that it would be inappropriate to rely on it. Dep of Zimmerman at 216-17.

His opinion are reliable and employed reliable methods used in the field. Dr. Zimmerman's testimony is admissible.

3.      <u>Dr. Linz's opinions are reliable and admissible</u>.

The government argues that Dr. Linz's opinions are not admissible because his evaluation of the Google hits and the preparation of a ratio analyzing the quantity of expression is not reliable.

To the contrary, not only is Dr. Linz's methodology appropriate, it is virtually the same method that the government's expert, Dr. Gail Dines, employed in preparing her expert report to render an opinion. Specifically, Dr. Dines visited free porn tube sites and obtained search terms, and then plugged those terms into a "Google trends search interest index" to ascertain the popularity of the sexually oriented search terms that she had obtained. Dep. of Dines at 79.

Indeed, the government's argument, again, goes to the weight of the evidence, not its

admissibility as it tacitly acknowledges, for each of argument that appears at pages 11-13 of its brief reflect nothing more than its contention that "there are strong reasons to conclude these [Google] hits bear no relationship to the actual amount of child pornography, commercial or otherwise, available online." Br. at 12.

The same holds true with respect to Dr. Linz's opinion on the production and transmission of child pornography, claiming that a great deal of the information on which he relied is outdated. That is an argument that goes to the weight for the factfinder to give the opinion, not the admissibility of it in the first instance.

Finally, the government argues Dr. Linz's opinion on the vast amount of private, non-commercial sexually explicit expression on the internet is unreliable, because his opinion is not based on any reliable methodology. To the contrary, Dr. Linz's reached his conclusions by canvassing the internet sites and services available to adults.  But, an expert opinion can be based on personal observations as well, and Dr. Linz's thirty year history of scholarship on sexual imagery, his review of hundreds of thousands of sexually explicit images over the course of his career, render him uniquely able to opine on this subject. *Cf. Kumho Tire Co. Ltd. v. Charmichael*, 526 U.S. 137, 155 (1999)(recognizing expert opinon can be based on personal observations); *ProtoComm Corp. v. Novell Advanced Servs., Inc.*, 171 F. Supp. 2d 473, 480 (E.D. Pa. 2001)(personal knowledge and experience sufficient to qualify expert testimony).

CONCLUSION

For all of the foregoing reasons, the government's motion in limine should be denied.


Date: May 22, 2013                           Respectfully submitted,


                                             /s/ J. Michael Murray
                                             J. MICHAEL MURRAY (0019626)
                                             jmmurray@bgmdlaw.com
                                             LORRAINE R. BAUMGARDNER (0019642)
                                             lbaumgardner@bgmdlaw.com
                                             BERKMAN, GORDON, MURRAY & DeVAN
                                             55 Public Square, Suite 2200
                                             Cleveland, Ohio  44113-1949
                                             (216) 781-5245 / (216) 781-8207 (Facsimile)

                                             KEVIN E. RAPHAEL (72673)
                                             KER@Pietragallo.com
                                             J. PETER SHINDEL, JR. (201554)
                                             JPS@Pietragallo.com
                                             PIETRAGALLO GORDON ALFANO BOSICK
                                              & RASPANTI, LLP
                                             1818 Market Street, Suite 3402
                                             Philadelphia, Pennsylvania 19103
                                             (215) 320-6200 / (215) 981-0082 (Facsimile)

                                             Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2013, the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
LORRAINE R. BAUMGARDNER (0019642)
BERKMAN, GORDON, MURRAY & DeVAN

KEVIN E. RAPHAEL (72673)
J. PETER SHINDEL, JR. (201554)
PIETRAGALLO GORDON ALFANO BOSICK
 & RASPANTI, LLP

Attorneys for Plaintiffs