# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREE SPEECH COALITION, INC., et al.** | ) | **Civil Action No. 2:09-4607** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **JUDGE MICHAEL M. BAYLSON** |
| -vs- | ) | |
| | ) | |
| **THE HONORABLE ERIC H. HOLDER, JR.,** | ) | |
| Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLAINTIFFS' POST-TRIAL BRIEF

J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio  44113-1949
(216) 781-5245
(216) 781-8207 (Facsimile)

KEVIN E. RAPHAEL (72673)
KER@Pietragallo.com
J. PETER SHINDEL, JR. (201554)
JPS@Pietragallo.com
PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200
(215) 981-0082 (Facsimile)

Attorneys for Plaintiffs

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

QUESTIONS FOR COUNSEL FOR CLOSING ARGUMENTS/ BRIEFS. . . . . . . . . . . . . . . xiii

THE STATUTES' SCOPE AND APPLICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Images Covered. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Producers Covered. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE STATUTES' REQUIREMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE REGULATIONS' REQUIREMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Creation and Maintenance of Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Statement Describing the Location of the Records. . . . . . . . . . . . . . . . . . . . . . . 5

    C.    Inspections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ACTIONABLE VIOLATIONS OF THE STATUTES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

BURDENS FREIGHTED ON THE PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    Plaintiffs Affiliated with the Adult Industry. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.    Members of the Free Speech Coalition. . . . . . . . . . . . . . . . . . . . . . . . . . 8

        2.    Marie Levine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        3.    Thomas Hymes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.    Plaintiff Photographers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.    Barbara Alper. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

i

**TABLE OF CONTENTS (cont'd)**

Page

    2.    Barbara Nitke . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    3.    David Steinberg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    4.    Dave Levingston . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C.    Plaintiff Sex Educators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    1.    Carol Queen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    2.    Betty Dodson and Carlin Ross . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    3.    Sinclair Institute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        a.    Burdens as primary producer . . . . . . . . . . . . . . . . . . . . . . . . . 24

        b.    Burdens as secondary producer . . . . . . . . . . . . . . . . . . . . . . . 24

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.     THE STATUTES ARE NOT NARROWLY TAILORED . . . . . . . . . . . . . . . . . . . . . 26

    A.    The Statutes Burden Substantially More Speech Than Is Necessary . . . . . . . . . . 26

    B.    The Statutes Are Unconstitutional As Applied to Plaintiffs Under Intermediate Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    C.    The Statutes Reverse the Constitutional Presumption Accorded Expression and Fail Intermediate Scrutiny under *Simon & Schuster, Inc. v. Members of the New York State Crime Board,* 502 U.S. 105 (1991). . . . . . . . . . . . . . . . . . . . 32

II.    THE STATUTES ARE UNCONSTITUTIONALLY OVERBROAD . . . . . . . . . . . . . 33

    A.    The Statutes Unconstitutionally Burden a Substantial Amount of Expression in Which the Persons Depicted Are Obviously Adults . . . . . . . . . . . . . . . . . . . . 34

    B.    The Statutes Burden a Substantial Amount of Private Expression . . . . . . . . . . . 35

**TABLE OF CONTENTS (cont'd)**

Page

      1.    Expression Created by Husbands and Wives in the Privacy of Their Homes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      2.    Sexting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      3.    Adult Social Networking Websites. . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      4.    Artistic, Educational, and Journalistic Expression. . . . . . . . . . . . . . . . 48

III.    THE STATUTES AND THEIR IMPLEMENTING REGULATIONS ARE UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT. . . . . . . . . . . . . . . 51

    A.    The Statutes and Regulations Permit Unconstitutional Warrantless Occupation of Private Property for the Purpose of Obtaining Information. . . . . . 51

    B.    The Statutes and Regulations Permit Warrantless Intrusions into a Person's Reasonable Expectation of Privacy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    C.    The Administrative Search Exception Does Not Apply. . . . . . . . . . . . . . . . . . . 58

    D.    Plaintiffs Have Standing to Challenge the Statutes and Regulations Under the Fourth Amendment, a Challenge that Is Ripe for Review. . . . . . . . . . . . . . . . . . . 61

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

## <u>TABLE OF AUTHORITIES</u>

Page

<u>CASES</u>

*Allinder v. State of Ohio*, 808 F.2d 1180 (6th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 61

*Amer. Lib. Ass'n v. Barr*, 956 F.2d 1178 (D.C.Cir., 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Amer. Lib. Ass'n v. Reno,* 33 F.3rd 78 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Amer. Lib. Ass'n v. Thornburgh,*
   713 F.Supp. 469 (D.D.C. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Annex Books, Inc. v. City of Indianapolis*, 333 F. Supp. 2d 773
   (S.D. Ind. 2004) *reversed on other grounds,*
   581 F.3d 460 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Brock v. Emerson Electric Co.*,
   834 F.2d 994 (11th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Brown v. Entertainment Merchants Ass'n,*
   131 S.Ct. 2729 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*City of Arlington v. FCC*, 133 S.Ct. 1863 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Connection Distributing Co. v. Gonzales,*
   Case No. 95 CV 1993 (N.D. Ohio). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Deja Vu v. Union Township*, 326 F.3d 791 (6th Cir. 2003)
   *reheard en banc*, 411 F.3d 777 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Dombrowski v. Pfister*, 380 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Donovan v. Dewey*, 452 U.S. 594 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 60

*Esteban v. Cook*, 77 F. Supp. 2d 1256 (S.D. Fla. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Flamingo Paradise Gaming, LLC v. Chanos,*
   125 Nev. 502 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Fort Wayne Books*, 489 U.S. 46 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**<u>TABLE OF AUTHORITIES (cont'd)</u>**

Page

*Free Speech Coalition v. Ashcroft*, 535 U.S. 234 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Free Speech Coalition, Inc. v. Attorney General*,
    677 F.3d 519 (3rd Cir. 2012 ). . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 26, 33-34, 51, 59, 60

*H.D.V.-Greektown, LLC v. City of Detroit*,
    568 F.3d 609 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Heffner v. Murphy*, 866 F.Supp.2d 358 (M.D. Pa. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Hodgins v. United States Dept. of Agriculture*,
    238 F.3d 421 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*J.J. Cassone Bakery, Inc. v. N.L.R.B.*,
    554 F.3d 1041 (D.C. Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*J.L. Spoons v. City of Brunswick*,
    49 F. Supp. 2d 1032 (N.D. Ohio 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Katz v. United,* 389 U.S. 347 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Kokkonen v. Guardian Life Ins. Co. of America*,
    511 U.S. 375 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Lawrence v. Texas*, 539 U.S. 558 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Lead Indus. Ass'n v. EPA*, 647 F.2d 1130 (D.C.Cir.1980). . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Lewis v. Alexander*, 685 F.3d 325 (3rd Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Lewis v. United States*, 385 U.S. 206 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Mail Contractors of America v. NLRB*, 514 F.3d 27 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**TABLE OF AUTHORITIES (cont'd)**

Page

*McCauley v. University of the Virgin Islands*,
    618 F.3d 232 (3rd Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*McLaughlin v. Kings Island*, 849 F.2d 990 (6th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Midwest Retailer Assoc., Ltd. v. City of Toledo,*
    563 F. Supp.2d 796 (N.D. Ohio 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 61

*Murnaghan v. Dept. of HHS*, No. 13-3038 (E.D. Pa. June 5, 2013). . . . . . . . . . . . . . . . . . . 28

*Near v. Minnesota*, 283 U.S. 697 (1931). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*New York v. Burger*, 482 U.S. 691 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59-60

*Newport News Shipbuilding and Dry Dock Co.*
    *v. Garett*, 6 F.3d 1547 (Fed. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Rakas v. Illinois*, 439 U.S. 128 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Ryba v. Matthews*, 404 F.Supp. 202 (E.D. Pa. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Salgado v. Kirschner*, 179 Ariz. 301,
    878 P.2d 659 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Shelby Cty. v. Holder,* No. 12-96 (U.S. June 25, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Simon & Schuster, Inc. v. Members of the New York*
    *State Crime Board,* 502 U.S. 105 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Swann v. Charlotte-Mecklenberg Bd. of Ed.*, 402 U.S. 1 (1971). . . . . . . . . . . . . . . . . . . . . . 52

*Tummino v. Hamburg*, 12-CV-763,
    2013 WL 1348656 (E.D.N.Y. Apr. 5, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*U.S. Dept. of Air Force v. Federal Labor Relations Authority*,
    952 F.2d 446 (D.C. Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

## <u>TABLE OF AUTHORITIES (cont'd)</u>

Page

*United States v. 4,432 Mastercases of Cigarettes*,
 448 F.3d 1168 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Herrold*, 962 F.2d 1131 (3rd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Jones*, 132 S. Ct. 945 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Knox,* 32 F.3d 733 (3rd Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Stevens,* 533 F.3d 218 (3rd Cir. 2008)
 (en banc) *aff'd* 559 U.S. 460 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35

*United States v. Stevens*, 559 U.S. 460 (2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 33, 35

*United States v. Williams*, 553 U.S. 285 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Windsor*, No. 12-307 (U.S. June 26, 2013). . . . . . . . . . . . . . . . . . . . . . . . 36, 62

*Vainisi v. C.I.R.*, 599 F.3d 567 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Walnut Brewery, Inc. v. Iowa Dep't of Commerce-Alcoholic
 Beverages Div.*, 775 N.W.2d 724 (Iowa Ct. App. 2009). . . . . . . . . . . . . . . . . . . . . . . . 29

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>CONSTITUTIONAL PROVISION</u>

United States Const., amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 22, 32, 51, 60, 61, 63

United States Const., amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 50-51, 55-57, 58-63

**TABLE OF AUTHORITIES (cont'd)**

Page

<u>STATUTES, RULES AND REGULATIONS</u>

8 U.S.C. § 1324a (b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8 U.S.C. § 1324a (e).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 2257. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 2257 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 33

18 U.S.C. § 2257 (a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

18 U.S.C. § 2257 (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2257 (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2257 (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S. C. § 2257 (e)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 2257 (f)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2257 (f)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2257 (f)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2257 (f)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 47

18 U.S.C. § 2257 (f)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 53

18 U.S.C. § 2257 (h)(2)(B)(v). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

18 U.S.C. § 2257 (i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 2257A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2-3, 4, 6, 11, 48, 60-62

18 U.S.C. § 2257A (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 33

18 U.S.C. § 2257A (a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES (cont'd)

Page

18 U.S.C. § 2257A (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2257A (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2257A (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S. C. § 2557A (e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 2257A (f)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2257A (f)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2257A (f)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2257A (f)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 47

18 U.S.C. § 2257A (f)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 53

18 U.S.C. § 2257A (g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

18 U.S.C. § 2257A (h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 2257A (i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 2257A (k). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

21 U.S.C. § 842 (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

49 U.S.C. § 521 (b)(2)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

21 C.F.R § 1140.14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

28 C.F.R. § 75.1 (c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 75.1 (c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 46

28 C.F.R. § 75.1 (c)(4)(v). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

28 C.F.R. § 75.1 (o). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## TABLE OF AUTHORITIES (cont'd)

Page

28 C.F.R. § 75.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 C.F.R. § 75.2 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 75.2 (a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 C.F.R. § 75.2 (a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 75.2 (a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 75.2 (a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 75.2 (d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

28 C.F.R. § 75.2 (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 75.2 (h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 57

28 C.F.R. § 75.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 75.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

28 C.F.R. § 75.5 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 54

28 C.F.R. § 75.5 (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 C.F.R. § 75.5 (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 C.F.R. § 75.5 (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 C.F.R. § 75.5 (g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 C.F.R. § 75.6 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

28 C.F.R. § 75.6 (b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 75.6 (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 C.F.R. § 75.8 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

x

### TABLE OF AUTHORITIES (cont'd)

Page

28 C.F.R. § 75.8 (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 C.F.R. § 75.8 (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 C.F.R. § 75.8 (d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 C.F.R. § 75.8 (f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 C.F.R. § 75.9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

70 Fed. Reg.  29614. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

70 Fed. Reg. 29620. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 61

70 Fed. Reg. 29621. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

73 Fed. Reg. 77436. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

73 Fed. Reg. 77437. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 47

73 Fed. Reg. 77438. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

73 Fed. Reg. 77439. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

73 Fed. Reg 77440. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

73 Fed. Reg. 77443. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

73 Fed. Reg. 77449. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Me. Rev. Stat. tit. 22, § 1555-B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Me. Rev. Stat. tit. 28-A, § 706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

N.Y. Pub. Health Law § 1399-cc (McKinney). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Oregon Administrative Rule 845-006-0335. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## <u>TABLE OF AUTHORITIES (cont'd)</u>

Page

<u>MISCELLANEOUS</u>

33 Charles Alan Wright & Charles H. Koch, Jr. Federal Practice
      & Procedure: Judicial Review § 8363 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Reference Manual on Scientific Evidence,* 2d Ed. (Federal Judicial Center 2000) . . . . . . . . 41, 42

**QUESTIONS FOR COUNSEL FOR CLOSING ARGUMENTS/ BRIEFS**[1]

1.     Issues on remand.

     a.     First Amendment facial overbreadth

     b.     First Amendment overbroad as applied

     c.     Fourth Amendment facial unconstitutional

     d.     Fourth Amendment unconstitutional  as applied

2.     Some key issues for decision:

     a.      Is the statute overbroad by requiring all performers to document their age without any distinction between youthful looking performers and performers who are clearly adults?  If so, what age cut-off would be proper?  Is there a reasonably compelling alternative anywhere in the record? . . . . . . . . . . . . . . . . . . . . . . . . . . . **28, 34-35**

     b.      Is the statute overbroad by including purely personal depictions , such as husband and wife sexually explicit images or teen or adult "sexting," within the scope of the law?  Is it relevant that sexting did not exist when statue was enacted?  If so, does the law require judicial action to strike the statute down? . . . . . . . . . . . . . . . . **2, 14, 36**

     c.     On the record keeping issue, are the records required any more onerous for the business of the plaintiffs than other regulations existing in our country as required by Congress or regulatory agencies?  Is the testimony of various witnesses that the recordkeeping "chills" their First Amendment rights a reason to strike down the statute? Is their interpretation of this requirement reasonable? How compared to health regulations? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9, 11, 13, 16, 19**

     d.     Inspection without notice.  Although this may be the most problem some aspect of the regulations, even if the regulations are overbroad, are the plaintiffs entitled to relief? Is there expectation of privacy in these types of records? . . . . . . . . . **56, 61**

     e.     Is there any difference of review of allegations of unconstitutionality of regulations adopted by the Department of Justice, as opposed to statutory language enacted by Congress?  Considering the Supreme Court's recent decision in *FCC v. Arlington*, does the record support striking down any of the regulations, as opposed to holding the statute unconstitutional? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

---

[1]  Plaintiffs have listed page numbers for passages in the brief that address the Court's questions; there may be additional passages that discuss the issue, but those cited here discuss particular details of the question posed.

3.      How does the word "lascivious" play a part in the constitutional analysis? . . . . . . . . . **1, 19**

4.      Concerning the genital art gallery, photos without faces, and the testimony that one plaintiff wanted to take videos of gay men engaging in sexual activity on Fire Island, in both of which situations, the names and ages of the actors would not be known, is this restriction enough of a burden to require a finding in favor of the plaintiffs? If these were the only two instances in the record where plaintiffs felt an artistic need to make images of explicit sexual activity but could not get the identification of the actors or their ages, is restricting such activity unconstitutional? Same question as to desire of a plaintiff or a citizen to include European people as to whom no age or name is known, in depictions distributed in the United States? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15, 17, 18, 20, 22, 24, 50**

5.      The Third Circuit on remand held that this Court should compare the amount of protected speech with no government interest (depictions of obvious adults), to the amount of speech which does implicate government interests (depictions of non- obvious adults). Can that comparison be made based on the evidence of record in this case? If so, results? If the Court concludes there is no evidence, or minimal evidence, to allow this comparison, what is the legal affect? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27-29**

6.      Any precedent where a court struck down the criminal penalties in a statute but held that civil penalties would be okay? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

7.      Any precedent where the adult/minor distinction re photo documentation and/or recordkeeping was upheld?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

8.      Of what significance is the fact that the statute applies to married couples and couples who are in committed relationships? Is there a privacy concern that should inform the First Amendment analysis?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

9.      What is the importance of percentage figures as to the U.S. population? In other words, is the actual number of adults or minors affected by 2257 more or less relevant than percentages, or not relevant at all? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28, 40**

10.     Respecting the Third Circuit's holding that it could not adopt any doctrine of constitutional avoidance, does the remand and the evidence of record on the remand, including the inspection issue which was not in the record previously, allow the Court to put any kind of "gloss" on 2257, particularly since there is testimony that it was not intended by the Justice Department to cover purely personal activity?

        a.      Activity not for sale or trade?

        b.      Only activity in interstate commerce? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

11.     Accepting that 2257 restricts expression by some interested in depictions of sexual activity made for education/health/procreation purposes, does narrow tailoring require the Court to look at alternative means to prevent child pornography, and if so, what alternatives have been suggested in the record that would be effective? . . . . . . . . . . . . . . . . . . . . . . . . . . **4, 9, 11**

12.     Do the plaintiffs suggest any alternative (except the age threshold) and is there any precedent where a Court has struck down a statute because it has an unreasonable age threshold.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11, 28**

13.     What is the government's position as to the requirements for "affixing" the 2257 statement on the following:

        a.      Every still photo taken by a photographer, even if never developed or printed?

        b.      Every still photo that is printed by a photographer but never leaves the photographer's possession?

        c.      Still photos that are in a collection or in a single envelope and are passed around to acquaintances, clients, and friends?

        d.      Still photos printed and displayed in an art gallery?

        e.      Printed photos that are collected in a book which is then published or available for downloading online?

        f.      Website portrayal?

        g.      Video of husband and wife having sex at home, without further distribution.

        h.      Husband and wife transmit by cellphone to each other?

        i.      If there are no regulations advising people about this, what is the legal effect of that?
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5, 46**

14.     Concerning the FBI inspection program, does the record allow a conclusion that in some instances, the FBI agents intruded into private portions of homes or offices in photographing where the 2257 materials were kept? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **52**

15.     Is the availability of a third party custodian a complete answer to the Fourth Amendment issues raised by the plaintiffs? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10, 57**

16.     Does the record shed any light on the issue previously raised of whether there is a reasonable expectation of privacy in the 2257 records?

a.    If they  only depict third persons? If they depict individuals who are keeping the records in their own home and the depictions are of the homeowners themselves. . . . . . **56**

17.    Who has the burden of proof on the Fourth Amendment issues? . . . . . . . . . . . . . . . . . . **58**

18.    What in the record do the plaintiffs assert demonstrates facial invalidity of 2257 under the Fourth Amendment? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **52**

19.    What impact does the burdensomeness of the  regulations have on the constitutional as applied analysis?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

20.    What justification does the government offer for the statute authorizing inspection without notice in view of the fact that there is no motivation for destruction? . . . . . . . . . . . . . . **61**

21.    Is there evidence  that the potential for producers to fabricate records on a last minute basis, because of advance notice, is a practical threat? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **61**

22.    What justification  is there for the 20 hour requirement? . . . . . . . . . . . . . . . . . . . . . . . . **61**

23.    If the inspection  plan is unreasonably  burdensome:

a.    Can the judge rewrite the regulations?

b.    Must the statute be struck down entirely?

c.    Can the Court retain jurisdiction  in the event the inspections are to ever be renewed at a later point in time?

d.    Does the judge have discretion  to find the regulations  where unreasonable but in view of the fact that they have not been enforced  for the last seven years, decline to issue a preliminary  injunction at this time? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **52**

24.    Assuming the inspection  program was having a "chilling" effect on individuals subject to 2257 while inspections were occurring,  does the testimony  allow a finding that the suspension  of the inspection program has eliminated  that threat in that such individuals are no longer "chilled" as the possible threat of resumption  enough to continue the "chilling" affect? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **62**

On June 14, 2013, the Court submitted questions to the parties regarding key issues for its decision in this case.  Plaintiffs have noted those passages in their brief that address the Court's inquiries and have provided an index of the questions and the pages on which some of those passages can be found. *Supra* at xiii.

## THE STATUTES' SCOPE AND APPLICATION

The Third Circuit remanded Plaintiffs' challenges to 18 U.S.C. §§ 2257, 2257A and their implementing regulations under the First and Fourth Amendments for the development of an evidentiary record and an evaluation of their constitutionality.  *Free Speech Coalition, Inc. v. Attorney General*, 677 F.3d 519 (3rd Cir. 2012 ).

As *United States v. Stevens* teaches, we must begin by delineating the scope of the challenged statutes.  559 U.S. 460, 130 S.Ct. 1577, 1587 (2010) ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers.") (citation omitted).

### A.      Images Covered

18 U.S.C. § 2257 applies to any image that depicts actual sexual acts, bestiality, masturbation, sadistic or masochistic abuse, or the lascivious exhibition of the genitals or pubic area; this latter category[2] has been interpreted to include "any frontal nude image of a person in what might otherwise be called an 'erotic' pose." *Amer. Lib. Ass'n v. Thornburgh*, 713 F.Supp. 469, 474 (D.D.C. 1989), *vacated sub nom., Amer. Lib. Ass'n v. Barr,* 956 F.2d 1178 (D.C.Cir., 1992). It includes non-nude images as well. *United States v. Knox,* 32 F.3d 733, 737(3rd Cir. 1994); 73 Fed. Reg. 77440.

18 U.S.C. § 2257A extends the recordkeeping requirements to depictions of *simulated* sexual conduct. Under the regulations promulgated by the Department of Justice, that means "conduct

---

[2]  See Question 3.

engaged in by performers in a visual depiction that is intended to appear as if the performers are engaged in actual sexually explicit conduct, and does so appear to a reasonable viewer." 28 C.F.R. § 75.1 (o).

The Department of Justice has rejected the notion that simulated sexual images must include nudity; rather, it determined that "a visual depiction of simulated sexually explicit conduct even if no nudity is present" triggers 18 U.S.C. § 2257A. 73 Fed. Reg. 77436.

### B.    Producers Covered

"Whoever produces" a sexual image must comply with the statutes.  They are, therefore, all encompassing.

The Third Circuit rejected the notion that the statutory language could be construed to confine the laws' reach to commercially produced expression or as the government proposed, expression that is "intended for sale or trade." *Free Speech Coalition*, 677 F.3d at 538.  It found that the statutes apply to "private, noncommercial depictions created and viewed by adults in their homes." *Id*.[3]

### THE STATUTES' REQUIREMENTS

The statutes require anyone who produces a covered visual depiction to create and maintain individually identifiable records for every person in the depiction.  18 U.S.C. §§ 2257 (a); 2257A

---

[3]    See Question 2.b. The statutes here had their genesis in the 1986 Attorney General's Commission on Pornography–published twenty-seven years ago, before the ubiquity of cell phones and the internet.  As recognized by the Supreme Court this past week, data compiled to support laws that began with laudable objectives  must nevertheless bear "a logical relation" to present day needs when they bump up against constitutional imperatives. *Shelby Cty. v. Holder,* No. 12-96, slip op. at 21-24 (U.S. June 25, 2013)*.* Here, even the original "data" offered to support a far less bloated statutory and regulatory scheme than is at issue here, was wobbly, at best. *See Free Speech Coalition, Inc. v. Attorney General*, 677 F.3d 519, 546 (3rd Cir. 2012) (Rendell, J., concurring).  Now the law applies to vast quantities of protected speech shared by adults through technologies that did not exist back then.

(a). Producers are to ascertain, "by examination of an identification document containing such information," the performer's name and date of birth, all other names ever used by the performer, including maiden names, aliases, nicknames, stage, or professional names, and record the identifying information "as prescribed by regulation." 18 U.S.C. §§ 2257 (b); 2257A (b).

Producers must maintain the records on their business premises or in their homes for seven years and must make the records available to the Attorney General for inspection at all reasonable times. 18 U.S.C. §§ 2257 (c); 2257A (c).

They must also affix a statement describing where the records are located "in such manner and in such form as the Attorney General shall by regulations prescribe." 18 U.S.C. §§ 2257 (e); 2257A (e).

It is a crime to fail to create or maintain the records required by statute or "by any regulation promulgated under [them]." 18 U.S.C. §§ 2257 (f)(1), 2257A (f)(1). In contrast to the other statutory offenses, failure to create or maintain the records is a ***strict liability offense***; ***scienter is not an element***.

It is also a crime for any person knowingly to make a false entry or fail to make an appropriate entry in any record required by the statutes or "any regulation promulgated" thereunder, 18 U.S.C. §§ 2257 (f)(2), 2257A (f)(2), and for any person knowingly to fail to comply with the requirement pertaining to the affixing of a statement to his expression describing where the records are located. 18 U.S.C. §§ 2257 (f)(3); 2257A (f)(3).

In terms of distribution, the statutes make it a crime for anyone knowingly "to sell or otherwise transfer" a sexually explicit visual depiction that does not have the statement describing the location of the records affixed to it.  18 U.S.C. §§ 2257 (f)(4); 2257A (f)(4).

As for inspections, the statutes make it a crime for any producer to refuse to permit the Attorney General or his designee to conduct an inspection.  18 U.S.C. §§ 2257 (f)(5); 2257A (f)(5).

Violations of the statutes are punishable by a term of imprisonment, a fine, or both.  18 U.S.C. §§ 2257 (i); 2257A (i).

18 U.S.C. § 2257A contains an exemption from the statutory requirements for commercial producers of Hollywood films containing depictions of simulated sexually explicit conduct and lascivious exhibition of the genitals or pubic area and instead, allows them simply to submit a certification to the Attorney General that they keep records in the ordinary course of business containing their performers' names, addresses, and birth dates.  18 U.S.C. § 2257A (h); 28 C.F.R. § 75.9.[4]

## THE REGULATIONS' REQUIREMENTS[5]

### A.    Creation and Maintenance of Records

Producers of sexual images must examine a government-issued picture identification document of every person depicted in the image prior to creating the expression.  28 C.F.R. § 75.2 (a)(1).  The producer must make a copy of the document examined.  *Id.*

A copy of the expression must also be kept.  *Id.* When the depiction is published on the

---

[4] See Question 11.

[5]    See Question 2.e.    A court does not defer to a regulatory agency in reviewing a constitutional challenge to a regulation. *J.J. Cassone Bakery, Inc. v. N.L.R.B.*, 554 F.3d 1041, 1044 (D.C. Cir. 2009) ("Turning to Cassone's due process argument, we note that, in contrast with other aspects of a Board decision, which we review deferentially, *see Mail Contractors of America v. NLRB*, 514 F.3d 27, 31 (2008), 'a reviewing court owes no deference to the agency's pronouncement on a constitutional question.' *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1173-74 (D.C.Cir.1980). In other words, we entertain Cassone's due process claim *de novo*. See 33 Charles Alan Wright & Charles H. Koch, Jr. Federal Practice & Procedure: Judicial Review § 8363, at 256 (2008) ('Courts are free to conduct *de novo* review of an administrative resolution of a constitutional issue').") *City of Arlington v. FCC*, 133 S.Ct. 1863 (2013) does not in anyway alter this precedent.

4

internet, the records must include the url associated with the depiction. *Id.* For live performances on the internet, the records must include a copy of the depiction with running-time sufficient to identify the person depicted. *Id.*

The producer must maintain a record of any maiden name, alias, nickname, stage, or professional name ever used by the person depicted. *Id.* at § 75.2 (a)(2). The producer also must create a record of the original date of production of the expression. *Id.* at § 75.2 (a)(4).

The records must be organized alphabetically by legal name of the performer–or numerically, where appropriate. *Id.* at § 75.2 (a)(3);(d). They must be cross-referenced or indexed to each alias or other name used by the person depicted, and to each title or identifying number of the book, magazine, film, videotape, digital image, picture, url, or "other matter." *Id.* They must be segregated from all other records. *Id.* at § 75.2 (e).

Both primary producers–who actually create the expression–and secondary producers–who assemble or publish the expression for commercial distribution–must maintain these records, indices, and cross-references. *Id.* at § 75.1 (c)(1), (2); § 75.2 (a).

The records are to be kept for seven years from the date of creation or amendment. *Id.* at § 75.4. The regulations allow a producer to contract with a third-party recordkeeper, but provide that "such a contract does not relieve the producer of his liability under this part." *Id.* at § 75.2 (h).

## B.     Statement Describing the Location of the Records[6]

Producers must affix to "every copy" of their expression–including "picture[s]"–a statement that contains the address where the "records required by [the statutes] may be made available." *Id.* at § 75.6 (a), (b)(3). The statement must be printed in typeface no less than 12-point type or no

---

[6] See Question 13.

smaller than the second largest typeface on the material. *Id.* at § 75.6 (e).  For electronic displays of the statement, it must be displayed "for a sufficient duration and of sufficient size to be capable of being read by the average viewer." *Id.*

The regulations specify where the statement must be located for each type of expression:

1. Books, magazines, and periodicals: on the first page after the front cover or page where the copyright information is contained, *id.* at § 75.8 (a);

2. Films or videotapes with end credits: at the end of the end titles or final credits, *id.* at § 75.8 (b);

3. Other films or videotapes: within one minute from the start of the film and before the opening scene, *id.* at § 75.8 (c);

4. Computer website or service: on every page of the website (it may appear by a hyperlink that states "18 U.S.C. 2257 [and/or 2257A, as appropriate] Record-keeping Requirements Compliance Statement."), *id.* at § 75.8 (d);

5. For all other material: the statement is to be "prominently displayed." *Id.* at § 75.8 (f).

The statutes and regulations allow no exception to compliance with this requirement. The statutes direct that "***whoever produces***" a visual depiction "shall cause to be affixed to ***every copy of any matter***" the required statement.  18 U.S.C. §§ 2257 (e)(1); 2557A (e)(1) (emphasis added). *See also* 28 C.F.R. § 75.6 (a) (likewise providing that the producer "shall cause [the statement] to be affixed to every copy of the matter."); 73 Fed. Reg. 77449 ("If any entity operates a Website that contains thousands of pages of sexually explicit conduct, then those entities are required by law to display thousands of disclosure statements.").

6

### C.     Inspections

Government agents may enter any "establishment" of a producer "without delay and at all reasonable times" to inspect the records "for the purpose of determining compliance with the record-keeping requirements of the Act and any other provision of the Act." *Id.* at § 75.5 (a).  "Advance notice shall not be given." *Id.* at § 75.5 (b).  No search warrant or probable cause is required.

The inspections are to occur between 9:00 a.m. and 5:00 p.m. or "for inspections to be held at the place of business of a producer, any other time during which the producer is actually conducting business relating to producing a depiction of actual sexually explicit conduct." *Id.* at § 75.5 (c).  Producers who do not maintain at least 20 normal business hours per week must give notice to the inspecting agency of the hours that the records will be available for inspection, which in no case may be less than 20-hours per week. *Id.*

The government may copy the records and may seize any evidence of the commission of any felony.  *Id.* at § 75.5 (e), (g).

## ACTIONABLE VIOLATIONS OF THE STATUTES

Between July 24, 2006 and September 19, 2007, the FBI conducted 29 inspections.  They reported a number of violations to the Department of Justice and the U.S. Attorney's office for potential prosecution.

The violations referred to the Department of Justice for potential prosecution included: (1) failure to maintain an adequate or up-to-date cross-reference system; (2) failure to maintain the records in alphabetical order; (3) failure to maintain an identification document of sufficient legibility;  (4) failure to maintain an identification document on which the date of birth was readily determined (document used Buddhist calendar); (5) failure to display the 2257 compliance statement

7

on a website for a sufficient duration to be read by an average viewer; (6) failure to list the apartment number of the producer's condominium in the address listed in the 2257 compliance statement; and (7) failure to give notice of the hours when the records were available for inspection when the producer did not maintain at least 20 normal business hours. Plaintiffs' Ex. 1-30.

**BURDENS FREIGHTED ON THE PLAINTIFFS**[7]

### A.     Plaintiffs Affiliated with the Adult Industry

#### 1.     Members of the Free Speech Coalition

Jeffrey Douglas is the Chairman of the Board of Directors of the Free Speech Coalition, the trade association representing the adult industry, and a criminal defense attorney in Southern California.  He is knowledgeable about the adult industry and has represented various members of that industry in every aspect since he began practicing law in 1982.  Douglas has studied 18 U.S.C. § 2257 from its inception and has advised many clients on its requirements.

Douglas explained that the Free Speech Coalition and its members universally condemn child pornography. They are dedicated to its eradication, offering rewards for tips used in successfully prosecuting it.  For years, it has been an industry practice to check identification documents and secure a model release from adult film performers.  In thirty years of involvement with the industry, Douglas testified that he knows of only a handful of cases in which underage performers appeared in sexually explicit productions.  Each was able to gain access by use of a real, but nonetheless, fraudulent identification document.

Using minors in a production has devastating consequences for a producer. It exposes it to criminal prosecution under the child pornography laws, requires it to recall all the material and to

---

[7] See Question 19.

destroy it, to notify everyone to whom it was sold that it is contraband, to follow the procedures for recalling contraband, and to provide credit for the material to all to whom it was sold.  It eliminates good will between the producer and its customers and gives a leg up to the producer's competitors.

Douglas outlined the various burdens and snares in the obligations imposed by the statutes and regulations.

He explained that in contrast to other regulatory schemes, a minor paperwork violation under the statutes constitutes a felony.  *See e.g.,* 8 U.S.C. § 1324a (b)(6), 8 U.S.C. § 1324a (e) (immigration recordkeeping provisions); 21 U.S.C. § 842 (c) (controlled substances recordkeeping provisions); 49 U.S.C. § 521 (b)(2)(B) (commercial motor vehicle safety recordkeeping provisions).[8]  For instance, not having the records properly alphabetized or having photo identification placed in the wrong file are felonies.  As Douglas put it, "perfection is the minimum standard to avoid committing a felony."

Douglas explained the vagaries of cross-referencing and the particular impossibilities it poses for wholesalers of such material, or retailers who wish to promote the material in their stores by use of a website. He described the redundancy of requiring producers to demand photo identification over and over from performers who have appeared in a producer's films for many years.  He testified about the problems created for a retailer who is saddled with the responsibility of assuring that all of its materials contain the proper label that is compliant with the regulations' requirements on print and digital materials. He explained the difficulties imposed by the requirement that the producer be available at least 20-hours per week for an inspection of his or her records on one-person operations, like Plaintiff Tom Hymes, who operate a website, or performers who offer live webcam shows, like

---

[8]  See Questions 2.c and 11.

Plaintiff Marie Levine, and identified the reasons why the third-party recordkeeping option provides no relief from that requirement.

As for third-party recordkeepers, Douglas explained why that option simply did not help.[9] First and foremost, the regulation provides that producers remain criminally liable for the mistakes of the recordkeeper with whom they contract.

Beyond that, a third-party recordkeeper does not and cannot relieve the burdens for many producers. For instance, it might seem logical for a primary producer who creates and keeps records pertaining to its expression to serve as a third-party custodian of records for wholesalers or retailers who sell the primary producer's expression on their websites. The problem is that the retailer and wholesaler must prepare indices and cross-references for all the expression offered on their websites. 28 C.F.R. § 75.2(d). They cannot simply use the cross-reference or index system of the primary producer because the primary producers' own indices and cross referencing system for *their* materials will be different than the cross referencing system pertaining to materials offered on the wholesaler's or retailer's website–which will include material from multiple primary producers. In order to comply, the website operator will have to prepare and keep current its own cross reference system of performers' names and titles–defeating any advantage of using primary producers as third-party recordkeepers.

Douglas also described various important issues left unsettled with regard to third-party recordkeepers. For example, how is a producer to retrieve its records if a third-party recordkeeper goes out of business? And in that circumstance, what happens if the third-party recordkeeper has used software for maintaining and indexing a producer's records that is incompatible with that used

---

[9] See Question 15.

by the producer?  Are there any standards for third-party recordkeepers that would allow a producer to be given some assurance–beyond a leap of faith–that its records are being kept properly?

A reasonable alternative to 18 U.S.C. § 2257, Douglas offered, would be a simple requirement that primary producers check and keep ID s, a requirement that would be sufficient to prevent the inadvertent use of underage performers, a longstanding practice followed by the industry in any event. The additional regulatory burdens, Douglas explained, had nothing to do with the prevention of child pornography.[10]

### 2.    Marie Levine

Plaintiff Marie Levine–known professionally as Nina Hartley– graduated cum laude from San Francisco University's nursing program and has produced a 40-volume educational series on human sexuality titled *Nina Hartley's Guide to Sex.* She speaks at universities and other fora to doctors, therapists, and others on sexual literacy and health. Levine explained that sexual speech was an important part of the conversation about human sexuality and sexual health; she cautioned that we suppress it at our peril, even when it offends.

---

[10]  Douglas's testimony provides evidence on Questions 2.c, 11, and 12 regarding the statutes' burdens and alternatives.

Douglas's testimony also provides insight regarding Question 6. As his testimony makes clear, there are no civil penalties for violations of the statutes or regulations–as there are in other recordkeeping regimes.  The only case law addressing whether a court can strike down criminal statutes, but leave civil penalties intact, involves laws that contained both.  *See e.g., Flamingo Paradise Gaming, LLC v. Chanos*, 125 Nev. 502 (2009) (court severed the portion of the Nevada Clean Air Act that imposed criminal sanctions, but left the civil penalties of the law intact).

Plaintiffs' Ex. 113 reflects how little-used the statutes are as a basis for prosecution. The United States Attorneys Criminal Caseload statistics indicate that between 2002 and 2012, nearly 4,000 cases were filed for offenses under 18 U.S.C. § 2252A, Certain Activities Relating to Material Constituting or Containing Child Pornography.   For that same time period, only nine cases were filed for offenses under 18 U.S.C. § 2257. As of the end of September 2012, no cases had ever been filed for an offense under 18 U.S.C. § 2257A.

Levine first achieved fame as a performer in adult films, a career she began at age 25 in 1984 in "Educating Nina." Between 1984 and 1990, she appeared in roughly 200 films produced by more than a dozen producers.  In each instance–long before the statutes at issue here were in effect– the producer checked her ID and required her to complete a model release.  The same was true of all the other performers who appeared in the films with her.

Levine explained that producers in the adult film industry–many of whom are parents–find the use of minors in adult films to be reprehensible. The actual appearance of underaged performers in commercially produced sexually explicit expression has been rare and was only accomplished by use of a fake ID. She pointed out that the statutes at issue fail to prevent that circumstance.

Levine produces sexually explicit lessons intended to be both educational and entertaining that are livestreamed on her website, "Nina.com,"and available for viewing by website members, who pay a fee to allow them access to all portions of the website.  Plaintiffs' Ex. 69. After the lessons are livestreamed, they are archived on the website.

Levine collects identification documents, including her own, and prepares a 2257 form that includes other names used and the date of production for each lesson that she produces. She maintains the paper copies for safekeeping in a file cabinet in her home and sends the records in digital format to her website operator who serves as a third-party recordkeeper to avoid having to provide her home address in the 2257 compliance statement–which she had previously listed. Roughly 60% of the performers in her lessons are older than 30; less than 25% are under the age of 26.  Defendant's Ex. 314.  While Levine has made a good faith effort at complying with the regulations, she does not understand all that they require and does not know the difference between what the statutes require and what the regulations require. By using a third-party recordkeeper she

has traded the risk posed by posting her home address on her website with the risk that her third-party recordkeeper will  not properly comply with the requirements, making her subject to criminal prosecution.

### 3.    Thomas Hymes

Thomas Hymes is a journalist who has covered the adult industry for many years.  In 2009, he created a website, DailyBabylon.com, with two partners, on which he hoped to provide articles on a wide range of artistic and cultural issues–particularly in the context of the adult industry. Plaintiffs' Ex. 64.  His vision of the website as a money-making venture was tempered by the recession and the exit of one of his partners who had been assigned to tend to the business aspects of the website.  Nonetheless, the website continues to exist as a non-money-making venture, on which Hymes has posted content sporadically.  He plans to move the content to a more manageable platform that will allow him to post content more easily.

Since his website is more a labor of love than a money-making venture, Hymes cannot devote the time and money needed to comply with 18 U.S.C. § 2257.  He runs the website from his home where he lives with his wife and young son, and therefore, does not want to list his home address on his website in the 2257 compliance statement or permit inspections of his records there.  Nor is Hymes financially able to hire a third-party recordkeeper, an option that in any event, would leave him like Marie Levine, vulnerable to criminal prosecution if the person he entrusted with his records made a mistake. He is not willing to assume that risk.

Hymes, therefore, has refrained from using any images on his website that might trigger the recordkeeping requirements.[11]  This, of course, hampers the effectiveness of his reporting on the

---

[11]  See Question 2.c.

13

adult industry and of illustrating the stories he posts about it, including the use of marketing materials provided to him by the subjects of his articles.  It also has limited him in obtaining advertising since many of the advertisements geared to a readership interested in the adult industry contain images that would trigger the recordkeeping requirements.

### B.    Plaintiff Photographers

Plaintiffs Alper, Nitke, and Steinberg are photographers whose work depicts actual sexual conduct. Plaintiff Levingston's photography focuses on nudes.  They are joined  by the American Society of Media Photographers, whose members' work includes sexual imagery.  (Eugene Mopsik, ASMP's Executive Director, testified that in response to an informal email survey, 400 members indicated that their work involved sexually explicit imagery. See Plaintiffs' Ex. 130 at p.16).  None of these Plaintiffs' work depicts minors; the bulk of their work depicts persons who are clearly adults.

### 1.    Barbara Alper

Barbara Alper is a recognized commercial photographer whose fine art photography hangs in museums around the world. She is a member of Plaintiff American Society of Media Photographers, Inc. Her work includes depictions of sexual sub-cultures in the adult-only clubs of New York City, London, and Bangkok during the 1980s and photos of couples making love. She has also created sexually explicit self-portraits of herself and her husband and taken photos of her husband masturbating; these photos were created for their own private use,[12] although three were published in a Norwegian magazine on human sexuality. Plaintiffs' Ex. 43.

The requirement that Alper obtain photo identification from married couples before

---

[12]  See Question 2.b.

photographing their sexual intimacy has affected her ability to pursue this body of expression: private couples do not want to surrender their anonymity as a condition of creating a photograph of their intimacy.  Alper likewise does not want to affix a statement listing her home address on the private sexual images of her and her husband.

The recordkeeping obligations have also restrained Alper's documentary work.  She wants to document a community of gay men who arrange trysts and engage in sex outdoors on Fire Island as part of her fine art and editorial work.  However, Alper cannot ask them for the requisite records and therefore, is precluded from taking their photographs.

Alper would like to publish a compilation of her work that includes her photography from the 80s and 90s as well as her more current sexually explicit expression. The regulatory requirements prevent her from doing so, however.  While the regulations exempt compilations that republish previously produced images, the exemption is limited to those compilations in which "the entirety of the conduct depicted" was produced prior to July 3, 1995.  Thus, to include her pre-1995 sexually explicit photographs with her later work in the new compilation she wants to publish, Alper is required to obtain identification documents from the subjects of her photos taken in the 80s and 90s in New York, London, Bangkok, and San Francisco; Alper has testified that is impossible.  She is, therefore, precluded by the statutes from publishing a compilation that includes a complete range of her sexually explicit expression.[13]

###    2.    Barbara Nitke

Barbara Nitke, who is an equally accomplished photographer and artist, has confronted many of the same restraints that Alper faces.  Nitke's work has focused on private individuals in the

---

[13]  See Question 4.

BDSM community, who engage in sadomasochistic acts as part of a loving and committed sexual relationship with their partners. Plaintiffs' Ex. 70-73B.  Specifically, she was welcomed by the membership of the Eulenspiegel Society,[14] an education and support group for the BDSM community, and was invited into their homes and to their events to photograph their sexual experiences.  Nitke described the community as a close-knit group of adults who knew each other well.

 Because Nitke's work artistically documents their sexual practices, it is subject to 18 U.S.C. § 2257.  She has described the careful measures she follows in attempting to comply with the recordkeeping requirements, including re-organizing her paper records for cross-referencing (which she keeps in her home) every time that she makes changes to her website on which many of the images are published–although she confessed that she is confused by the law's requirements.[15]

Nitke explained that for each shoot, she takes thousands of images; she has no idea how to go about putting the 2257 label on "every copy" of each "picture," as is required.  Moreover, her work as a free lance photographer makes it nearly impossible for her to be available 20-hours per

---

[14]  The Eulenspiegel Society's website describes its philosophy, need for privacy, and the genesis of its unusual name. http://www.tes.org/main/about.php

[15]  See Question 2.c. Nitke's confusion about what the regulations require was mirrored by her fellow plaintiffs.  Her understanding that her records had to be maintained in paper format, dated back to earlier regulations implementing 18 U.S.C. § 2257.  In 2005, the regulations were amended to allow records to be kept in digital format. 70 Fed. Reg. 29614, 29620. Prior to 2005, the regulations required that the documents be maintained in paper format.

Nitke's confusion on this point is understandable.  On December 18, 2008, in the preamble to the ***current*** regulations, the DOJ identified one of the significant changes to the current regulations as "permit[ting] records to be maintained digitally." 73 Fed. Reg. 77437. The DOJ had, in fact, proposed  that the records be maintained in hard copy, but in response to public comment, changed the proposed regulation's requirement–permitting them to be maintained in digital format. *Id.* 73 Fed. Reg. 77443.

week for an inspection of her records at her home.

Nitke wished to publish a book she had tentatively titled, *Voyeur,* that contained her entire body of sexual art photography.  She was precluded from doing so by the same problem that Barbara Alper encountered: by including her pre-1995 work with her post-1995 work, Nitke would have been required to obtain photo identification documents for the subjects of her pre-1995 work in a newly published compilation. That simply was not possible since some of the subjects were deceased.[16] Instead, Nitke published, *American Ecstasy*, a volume of work limited to her photos taken on adult film sets prior to July 3, 1995.

Nitke also explained the difficulty she has in determining whether images fall under the statutes.  She does not know how to determine what qualifies as sadistic or masochistic abuse, much less ***simulated*** sadistic or masochistic abuse. Currently, she is creating images for a project that she calls "Smooth Hotel" which depicts "light bondage" as a fashion-art statement. Because the risk of guessing wrong is met by the potential of criminal prosecution, Nitke complies with the requirements for every image for which she has any doubt.

Nitke explained that she objects to the use of minors in sexually explicit expression on moral grounds and always checks identification because there is "so much at stake" –both on a moral level and legally. Nevertheless, she feels great trepidation about collecting identification documents from her models because she fears their privacy might somehow be breached, with devastating personal consequences for them.

### 3.   David Steinberg

David Steinberg is a writer and photographer who explores human sexuality in both genres, openly and thoughtfully.  His photography captures ordinary people–not normally featured in

---

[16]  See Question 4.

17

commercial sexual imagery and many of whom are older, disabled, and obese–engaged in sexual intimacy. Plaintiffs' Ex. 60-62. Eighty-eight percent of his models are more than 25 -years old, while 76% are more than 30-years old. His work has been used in sex education books and has earned him honors and awards as a fine art erotic photographer.  Steinberg estimates that he knows between 150 and 200 fine art photographers who take sexually explicit photographs, including those that might be considered as containing lascivious exhibition of the genitals or the pubic area.

Steinberg obtains photo identification documents from his models and keeps a spreadsheet of his work. Plaintiffs' Ex. 63. He, like Barbara Nitke, takes 700 to 1,000 photos during a shoot. He prints out hundreds of 4 x 6 proof prints to allow his models to select a photo for enlargement as a portrait.  Requiring him to prominently display the requisite 2257 statement on each of his proofs would not only be a time-consuming and burdensome task, but would compel him to place a label that would obscure much of each image and adversely affect the integrity and artistry of the image.

Steinberg is the United States representative for *Cupido*, a Norwegian magazine which contains sexually explicit articles and photography.  He and the publisher of *Cupido* wished to produce and distribute an English version of the magazine.  When Steinberg explained the requirements of 18 U.S.C. § 2257, however, the plans came to a halt; many of *Cupido's* photographs are produced by European photographers who do not keep government-issued photo identification documents of their models. Steinberg and *Cupido* would, therefore, be unable to comply with the recordkeeping requirements.[17]

Steinberg, like Nitke and Alper, does not have separate business premises, but keeps his records in his San Francisco apartment, making him subject to the FBI's inspection of his records

---

[17] Norway prohibits the production of sexually explicit expression depicting persons under the age of 18.  Plaintiffs' Ex. 132.  See Question 4.

there.

### 4.    Dave Levingston

Plaintiff Dave Levingston is a photographer by avocation.   Since his early days as a photographer, Levingston has been interested in photographing female nudes, which he views as the source of our concept of beauty. Now retired from his career as Deputy Chief of Media Relations for Wright-Patterson Air Force Base, he pursues photography full time.  Levingston's work has been displayed in Europe and in the United States, including at the Kinsey Institute.  His models are all older than 18-years of age and span the years from early 20s to 63.  Levingston currently works only with  models whom he knows and has used in past photography sessions in creating his photos of nudes.

While Levingston checks photo identification documents to make sure his models are not minors, he has never kept records under 18 U.S.C. § 2257, which up until March 18, 2009, did not apply to the lascivious exhibition of the genitals or pubic area or simulated sexual conduct.  Fearing that some of his nude work might fall under these new requirements, *see e.g.,* Plaintiffs' Ex. 65-68, Defendant's Ex. 90, Levingston began to censor his work because he is unable to comply with the recordkeeping burdens and is unwilling to submit to warrantless searches of his studio and private records.[18]  For example, he has told models not to pose with their hands between their legs. He is uncertain what is covered by the statutes–especially in terms of the lascivious exhibition of the genitals.[19]

Levingston takes thousands of photos each shoot. Thus the labeling requirement would exact

---

[18]  See Question 2.c.

[19]  See Question 3.

impossible demands on him.  Moreover, the requirement that Levingston be available 20-hours per week for inspection would require him not to leave the vicinity of his studio–another impossibility since he travels to create his art.  *See* Plaintiffs' Ex. 66.  And because he pursues his art not as a profession but as a hobby, he cannot afford to hire a third-party recordkeeper, nor is he willing to take the risk of being criminally liable for any mistakes made by the recordkeeper in complying with the statutes' and regulations' confusing set of demands.

Recently, Levingston was approached about a project documenting the lives of former prostitutes, in which the Kinsey Institute was interested and wanted to add to its archives.  But because the photographs would be expected to contain sexual imagery depicting people for whom privacy and anonymity are paramount and who no doubt would be unwilling to turn over identification for government inspection, the project was shelved.[20]

### C.   Plaintiff Sex Educators

Carol Queen, Betty Dodson, Carlin Ross, and the Sinclair Institute are devoted to educating adults about human sexuality and sexual health in various ways, all of which include the production of visual depictions of sexual conduct.

#### 1.   Carol Queen

Carol Queen, a sociologist, sexologist, and feminist sex educator, is the Director of the Center for Sex and Culture and works as the staff sexologist at Good Vibrations, a sex toy company founded by women and owned by women.  Queen's commentary and academic work on sexuality have been widely published.  She has appeared in a number of sex education videos.

The statutes here at issue have posed substantial impediments to various aspects of Queen's

---

[20]  See Question 4.

work.  One of the important messages that she, as a sex educator–together with others– feels strongly about is masturbation as a healthy and accepted sexual practice.  In the wake of former Surgeon General Jocelyn Elder's firing for suggesting that masturbation should be included as part of sex education, Good Vibrations sponsored a "masturbate-a-thon," intended to be a serious yet playful protest of Elder's firing.  People were asked to raise money and awareness, much like in charity walk-a-thons, by getting pledges in support of their masturbatory activity.

Continuing the event, the Center for Sex and Culture began staging live masturbate-a-thons, which were live-streamed on the internet along with commentary by Queen and others.  Queen explained that the event was restricted to adults–88% to 90% of the participants were 25-years of age of older with the vast majority being in their 30s and 40s.  Participants were given the choice of appearing on camera or not being filmed.  Photo identification documents and 2257 forms were obtained from those who went into the area where the activity was live-streamed.  The records are kept at the Center for Sex and Culture, which is largely operated by volunteers.

While Queen testified that she did her best to comply with 18 U.S.C. § 2257, she knew of no way to "affix" the statement to the live-stream footage, so she appeared periodically and verbally announced where the records could be found.  Queen was unaware that the regulations required her to make a copy of some of the footage of the livestream and keep that copy as part of the records. 28 C.F.R. § 75.2.  Moreover, she testified that a number of the members of the press who came to cover the event were unaware of 18 U.S.C. § 2257, and when Queen explained its requirements to them, many of them checked with their legal departments who were similarly unaware of the law. Some of them elected not to take photos or videos because of the law's requirements.

Queen also creates collage art, a form of appropriationist art with its genesis in Dadaism. She

21

cuts out erotic images from photos and other sources, which depict genitals, and sexual conduct, and glues them onto paper in artistic arrangements to create a new image.   Queen's work has been displayed at multiple galleries.   Queen explained that it is impossible to collect the records for the sexually explicit images that she uses to make her art, and thus, is unable to comply with the statute. *See Amer. Lib. Ass'n v. Reno,* 33 F.3rd 78, 93 (D.C. Cir. 1994) (acknowledging that application of the recordkeeping requirements raises a serious First Amendment problem as applied to appropriationist artists).   Moreover, for many of the images, she is unable to determine their dates of production.   For these reasons, Queen has refrained from publishing her art.[21]

Queen testified that as part of the Center for Sex and Culture's programming, the Center organized an amateur erotic photo club.   Experienced photographers provided instruction in photo shoots depicting nudity and sexual conduct.   As part of their instruction, the members were taught about the requirements of 18 U.S.C. § 2257.   Because the Center is a small entity with limited funding and no staff available to shoulder the burden of additional recordkeeping, the Center refrained from publishing its photo club members' photos, although Queen explained that the Center had wanted to publish a calendar featuring its photo club members' photography as a means of fundraising.

### 2.    Betty Dodson and Carlin Ross

Betty Dodson is a celebrated feminist sex educator who through her decades-long career has championed healthy female sexuality, which she holds includes education on masturbation, orgasm, and body image.   Carlin Ross is Dodson's business partner and fellow educator with whom she has produced DVDs and with whom she operates a popular website.   Plaintiffs' Ex. 45-52, 117-18.

---

[21]   See Question 4.

Dodson and Ross testified that genital shame is the number one impediment to a healthy sex life and that masturbation is the foundation of all human sexuality. To address these issues, they host workshops and offer content on their website that, among other things, includes instructional videos. The ages of the women in their videos range from 21 to 83, with 75% being older than 25-years of age.

On the portion of their website that is restricted to adults by use of a pay wall, Dodson and Ross host a genital art gallery, which was created in 1998. The purpose of the gallery was two-fold: (1) it allowed persons to submit depictions of their genitals and to view others' depictions of their genitals to help them come to an understanding that there was a wide-range of "normal" as opposed to the images seen in commercially produced adult films, and (2) it allowed Dodson to add to her own body of research regarding variation in the appearance of genitalia.

Persons submitting images of their genitalia were required to submit essays regarding their sexual experience, which were also posted to the gallery. *See* Plaintiffs' Ex. 51. Ross explained that she would screen the images and essay to make sure they were in keeping with the website's sex positive view and emphasis on healthy sexual relationships with an individual's body. Anonymity was important to assure that a person's career or life in the community was not threatened by participation in the gallery.

In 2009, when 18 U.S.C. § 2257 was extended to the "lascivious exhibition of the genitals and pubic area," the gallery became all but defunct. In order to comply with the recordkeeping requirements, Dodson and Ross had to insist that people submitting their images and essays provide a scanned copy of their photo identification as a condition of publication. Only two or three people since 2009 have complied with that requirement.

23

Prior to 2009, the gallery contained 2,000 images.  When the law was extended to cover depictions of genitals, Ross was forced to remove roughly 1,700 images from the gallery because she did not have a record of their date of production, nor the requisite photo identification documents for those images.  The law, therefore, snuffed out many, many images produced by private citizens that was important to them and others.[22]

### 3.    Sinclair Institute

Sinclair Institute is both a primary and secondary producer.

### a.    Burdens as primary producer

Sinclair Institute is the world's largest producer of sex education and sexual health materials and has received numerous awards for the materials it has produced. It has produced sexually explicit instructional videos for adults on a range of sexual topics from oral sex to solutions for ejaculatory control, with a focus on sexual issues for aging adults. Plaintiffs' Ex. 74-108, 119-27. The expression Sinclair Institute produces and offers is shaped and guided by an advisory council composed of clinicians and other professionals in the field of human sexuality. Plaintiffs' Ex. 109.

The adults depicted in Sinclair's expression are decidedly mature; nearly 80% of the persons depicted in its films and on its DVD box covers are 26-years old or older, while 66% are 30-years old or older–with more than one-quarter of their performers being at least 40-years old.  Defendant's Ex. 314.  Dian Wilson, Sinclair Institute's officer manager and the employee responsible for its compliance with 2257, explained that most of the persons depicted in its films, many of whom are married couples, are over the age of 30. Nonetheless, Sinclair must comply with the statutes' and regulations' demands with regard to these palpably mature adults.

---

[22]  See Question 4.

### b.    Burdens as secondary producer

Sinclair Institute also operates a website on which it publishes articles on sexual health and education and offers for sale the DVDs it has produced as well as DVDs of other producers.  It is a secondary producer with regard to the DVD box covers of the expression produced by others that it displays on its website and must maintain records for them.  The same is true for the catalogues and other materials it produces that include these images.

Ms. Wilson summarized the painstaking steps that she follows in assuring that Sinclair Institute complies with the statutes and regulations. She explained that Sinclair previously kept all of its records only in paper format as the law required, but when the regulations were changed to permit records to be kept in digital format, Sinclair converted them to digital format and now stores them on a visual library system.

For each image containing sexual content from the DVDs it offers for sale on its website, in its printed catalogues, and in emails and other promotional materials, Sinclair's graphic artists place a bar code on the image so that it can be cross-referenced as the regulations require.  Each image is thereby associated with a list of all persons depicted in it, the title of where the image appears–be it, DVD, catalogue, or url of Sinclair's website–, the photo identification documents of all persons depicted, the aliases and other names of all persons depicted, and the image's date of production–all of which must be inputted into the visual library system.

Sinclair Institute publishes 14 catalogs per year: one with 64-pages, one with 48-pages, and twelve with 32-pages. Each page has approximately 8 images.  So the Institute's annual catalogues contain more than 3,900 images for which it must maintain documents and which it must cross

reference.  All of these images are published on its website, so it must maintain and cross-reference records for the website images as well. Sinclair Institute also prints and distributes flyers, sell-sheets, and emails.   In its role as secondary producer, Sinclair Institute must maintain records and index roughly 10,000 images per year.

## ARGUMENT

## I.     THE STATUTES ARE NOT NARROWLY TAILORED.

### A.     The Statutes Burden Substantially More Speech Than Is Necessary.

Under intermediate scrutiny, the government bears the burden of establishing that the statutes at issue do not "'burden substantially more speech than is necessary' (i.e. the statute must be narrowly tailored)." *Free Speech Coalition,* 677 F.3d at 535 *quoting Ward v. Rock Against Racism*, 491 U.S. 781, 791, 798-800 (1989).

The Third Circuit explained:

Narrow tailoring is satisfied where the statute at issue does not "burden substantially more of Plaintiffs' speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 700, 109 S.Ct. 2746. Thus, the issue before us is whether the Statutes burden substantially more of Plaintiffs' speech than is necessary to further the government's legitimate interest in protecting children.  The question is particularly difficult here because we are reviewing a motion to dismiss and have before us only the allegations and the exhibits in the complaint, orders issued in the action, and other matters of public record.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

In sum, on this record we cannot accurately compare the amount of Plaintiffs' constitutionally protected speech that does not implicate children (e.g. speech involving performers who are obviously adults) to the amount of Plaintiffs' speech that implicates the government's interest (e.g., speech involving performers who are not obviously adults).  This comparison is essential to our narrow tailoring analysis, and Plaintiffs must be afforded the opportunity to conduct discovery and develop a record supporting their claim that the Statutes burden substantially more speech than is necessary.

*Id.* at 536-37.

The record now permits that comparison, and the government comes up wanting in sustaining its burden on this critical point.[23] The evidence establishes that the statutes burden a substantial amount of expression that depicts individuals who are obviously adults and could not be confused as minors.

The testimony of Defendant's own experts describes the breadth of constitutionally protected expression affected.  Defense expert Dr. Gail Dines was asked whether she had any data regarding the quantity of sexually explicit expression produced in the United States that depicted adults who are youthful-looking enough to possibly be confused as minors.  She testified that based on her research of the most trafficked commercial sexually explicit websites, her "best opinion" was that it constituted one-third of all sexually explicit images–leaving 67% as expression depicting performers for whom there is no confusion regarding their adulthood.

Plaintiffs' expert Dr. Daniel Linz, testified that he agreed with Dines's testimony that the percentage of sexually explicit expression in which the performers could not reasonably confused as minors was ***at least*** 67%, but testified that he believed the percentage was actually higher.  Linz testified that approximately 90% of commercially produced sexually explicit expression depicted performers who could not be confused as minors.

Defendant's expert Dr. Biro's testimony also supports the conclusion that a substantial majority of expression is unnecessarily burdened.  The theory behind the statutes is that by requiring producers of sexually explicit expression to check photo identification of their performers, they will be prevented from inadvertently or recklessly using minors in the production of that expression.  The

---

[23]  See Question 5.

statutes also theoretically establish a ready mechanism for law enforcement to determine the age of a performer about whom  the officer has some doubt.  As the Third Circuit's analysis indicates, the statutes' target is expression depicting youthful-looking performers about whom there might be some confusion as to whether they fall above or below the age of 18.

Dr. Biro testified that generally-speaking, the age range where there might be confusion as to whether someone **under** 18 might appear to be an **adult**, or whether someone **over** 18 might appear to be a **minor**, was between the ages of 15 and 24--roughly 14% of the U.S. population. Plaintiffs' Ex. 39. He agreed that generally speaking, 12- and 13- year olds will not be confused as adults, and most 14-year olds will not be confused as adults, either.  He further testified that generally speaking, someone who is 25-years old or older will not be confused as someone who is 17-years old or younger, and that nearly everyone who has reached the age of 30 will not be confused as a minor.

Dr. Biro explained that for teens and young adults, the degree of uncertainty in assessing someone's chronological age based on his or her appearance was between one and three years.  So a 19-year old could appear to be anywhere from 16-years old to 22-years old. Based on Dr. Biro's testimony, most expression depicting individuals who are 25-years old or older and almost all expression depicting individuals who are 30-years old or older is unnecessarily burdened by the statutes, a population that constitutes 66% of the U.S. population and 59% of the U.S. population, respectively.[24]  Plaintiffs' Ex. 39.

---

[24]  See Questions 2.a. and 9.  As for cases that have struck down a law because it has an unreasonable age threshold (Question 12), this Court is, of course, very familiar with *Murnaghan v. Dept. of HHS*, No. 13-3038 (E.D. Pa. June 5, 2013), enjoining enforcement of the Under-12 Rule of Policy 3.7 of the Organ Procurement and Transplantation Network.  *See also Tummino v. Hamburg*, 12-CV-763, 2013 WL 1348656 (E.D.N.Y. Apr. 5, 2013) (finding "the invocation of the

(continued...)

By any conceivable definition of "substantial" for purposes of the narrow tailoring test and whichever figure is used–67% or 90%–the statutes burden substantially more speech than necessary to further the government's legitimate interest of protecting children.  Under the Third Circuit's formulation of the narrow tailoring question, the law cannot survive.

### B.     The Statutes Are Unconstitutional As Applied to Plaintiffs Under Intermediate Scrutiny.

Plaintiffs' as-applied challenges yield the same conclusion.

 With regard to Plaintiffs' as-applied challenges, the Third Circuit instructed:

[I]f one of the Plaintiffs employs performers that ***no reasonable person could conclude were minors***, then that plaintiff may be able to demonstrate that the Statutes burden substantially more of that plaintiffs' speech than is necessary to protect children from exploitation...On the other hand, if any of the Plaintiffs ***produces depictions of predominantly youthful-looking performers***, then the Statutes ***may*** be narrowly tailored as to those Plaintiffs.

*Id.* at 537 (emphasis added).

---

[24](...continued)
adverse effect of Plan B on 11-year-olds is an excuse to deprive the overwhelming majority of women of their right to obtain contraceptives without unjustified and burdensome restrictions."); *Salgado v. Kirschner*, 179 Ariz. 301, 306-07, 878 P.2d 659, 664-65 (1994) (finding "it is unreasonable to allocate treatment [liver transplants] within a service category solely on the basis of age."); *Esteban v. Cook*, 77 F. Supp. 2d 1256, 1257 (S.D. Fla. 1999) (finding Medicaid limits on coverage of mobility devices for individuals older than 21-years of age imposed an unreasonable limitation based on age).

Further regarding Questions 2.a and 7, see 21 C.F.R. § 1140.14 (providing that no age verification is required for sale of tobacco products for any person over the age of 26); N.Y. Pub. Health Law § 1399-cc (McKinney) (providing that with regard to the sale of tobacco products, "identification need not be required of any individual who reasonably appears to be at least twenty-five years of age...."); Oregon Administrative Rule 845-006-0335 (requiring age verification if person appears to be under the age of 26 for sale of alcohol); Me. Rev. Stat. tit. 28-A, § 706 (prohibiting sale of alcohol to anyone under the age of 27 unless age verified by photo identification); Me. Rev. Stat. tit. 22, § 1555-B (same re: tobacco); *Walnut Brewery, Inc. v. Iowa Dep't of Commerce-Alcoholic Beverages Div.*, 775 N.W.2d 724, 730 (Iowa Ct. App. 2009) (" [A] licensee does not have to request identification when the age of the patron is known or reasonably beyond question.").

The evidence establishes that none of the Plaintiffs produce depictions of predominantly youthful-looking performers.  Again, not only has the government failed to shoulder its burden with regard to narrow tailoring, the evidence it has offered demonstrates the statutes' overreaching.

Defendant's Ex. 314 provides a simple summary of the evidence regarding the individual plaintiffs.  Adriana Vecchio, a government paralegal, prepared a summary chart of the ages of models depicted in some–but not all–of Plaintiffs' expression. Ms. Vecchio admitted that she did not have information for the universe of the models depicted in Plaintiffs' expression, but based her chart on model releases and 2257 records provided by the Plaintiffs in discovery for depictions created between January 1, 2005 and December 31, 2009.  Her chart reflects the following–keeping in mind that Dr. Biro, the government's expert, testified that generally most adults who have reached the age of 25 cannot be confused as minors:

1.　　Roughly 80% of the performers in expression produced by Sinclair Institute were 26-years of age or older with nearly 40% between the ages of 30 and 39 and 27% being 40-years old or older;

2.　　Roughly 76% of the performers depicted in Marie Levine's expression were 26-years of age or older with nearly 48% between the ages of 30 and 39 and almost 12% being 40- years old or older ;

3.　　75% of the performers depicted in the expression of Betty Dodson and Carlin Ross were 26-years of age or older with 25% between the ages of 30 and 39 and 30% being 40-years old or older;

4.　　63% of the models in Barbara Nitke's expression were 26-years of age or older with 42% being 40-years old or older and 10% between the ages of 30 and 39;

30

5.      56 % of Levingston's models–based on information culled from his model releases and photo identification documents and may have included models who were not the subject of his nude portraiture–were 26-years of age or older with 23% between the ages of 30 and 39 and close to 17% being 40-years old or older.

Indeed, the chart reflected that based on documentation provided by Vivid Video, a major producer of adults films, nearly 60% of Vivid's performers were more than 25-years old.

The chart did not provide any summary data for Plaintiffs Steinberg or Queen, although their 2257 records were also produced to the government in discovery.  Steinberg's records reflect that 88% of his models were over the age of 25 while 76% were over the age of 30 and 45% were over the age of 40. Plaintiffs' Ex. 63. Carol Queen's undisputed testimony was that only 10-12% of the persons depicted in the livestream masturbate-a-thons were under the age of 25. .

Plaintiff Alper had no 2257 records or model releases for her photography of clubs in the early 80s and 90s.  She testified that she took photos at over-21 clubs that enforced their policy by checking ID s at the door. As for the photos she took of herself with her husband, she is 64 years old; no reasonable person could dispute that her husband is a mature adult by simply examining the photo.  A sample of Alper's photos is set forth in Ex. 43.[25]

The percentage of Plaintiffs' expression–88%, 80%, 76%, 75%, 63%, 60%, 56%– depicted persons who, by Dr. Biro's measure, would not be confused as minors.  **None** of the Plaintiffs produced depictions of "predominantly youthful-looking performers," which is the only

---

[25]  Dr. Biro, who was asked to examine 150 sexually explicit visual images selected by the government from images produced by Plaintiffs in discovery, did not include any of Alper's photos in his list of images which he identified as including a person who might be a minor–although he did identify one of her photos as depicting a model for whom he did not have enough visual cues to make any determination about age.

31

circumstance identified by the Third Circuit in which the statutes **_might_** be considered narrowly tailored.

Should any doubt remain, however, Plaintiffs have produced a considerable body of their sexually explicit expression–allowing this Court to see for itself–that the substantial majority of the images in Plaintiffs' work depicts people who "no reasonable person could conclude were minors." See Plaintiffs' Ex. 43, 45-47, 50-52, 60-109, 117-27.  The evidence, therefore, demonstrates that the statutes are not narrowly tailored to further the government's interest in protecting children from exploitation, but unlawfully burdens a substantial quantity of constitutionally protected expression depicting mature adults.

### C.  The Statutes Reverse the Constitutional Presumption Accorded Expression and Fail Intermediate Scrutiny under _Simon & Schuster, Inc. v. Members of the New York State Crime Board,_ 502 U.S. 105 (1991).

One last issue regarding narrow tailoring deserves mention.  Plaintiffs Levine and Nitke explained that apart from the burdens imposed on them by the statutes, they found it particularly objectionable that the statutes presume they will produce child pornography absent a criminal statute requiring that they check the photo identification of everyone depicted in their expression. Levine observed that the law essentially assumes that her expression is criminal and requires her to prove that it is not.

They make an important point. The original statute was struck down for creating an unconstitutional presumption.  The current statutes create an equally unconstitutional, if not more invidious one: they presume that Plaintiffs' expression is unprotected  and require Plaintiffs to prove that it is not, by collecting proof of age of their subjects. The statutes effectively and definitively reverse the presumption that the First Amendment confers on all expression. _Fort Wayne Books_, 489

32

U.S. 46, 67 (1989) ("presumption [is] that expressive materials are protected by the First Amendment"); *Stevens*, 130 S.Ct. at 1591; *United States v. Stevens,* 533 F.3d 218, 224 (3rd Cir. 2008) (en banc) *aff'd* 559 U.S. 460 (2010); *Near v. Minnesota*, 283 U.S. 697, 721 (1931).

Moreover, the government is wrong when it casts the legitimate aim of the statutes in terms of the universe of "sexually explicit material that, if it involved underage individuals, would qualify as child pornography" for purposes of measuring their narrow tailoring. Memorandum in Support of Defendant's Motion for Summary Judgment (Doc. No. 177-1) at 38. Rather, *Simon & Schuster, Inc. v. Members of the New York State Crime Board,* 502 U.S. 105,120 (1991), instructs that the same interest satisfying the ***first prong*** of intermediate scrutiny–here, the suppression of child pornography–must serve as the interest by which the statute is evaluated under the ***second prong*** of the test–that being, narrow tailoring. When the extent of the protected expression burdened by the statutes is measured against the quantity of speech constituting actual child pornography, which is their legitimate focus, they cannot survive.[26]

## II.    THE STATUTES ARE UNCONSTITUTIONALLY OVERBROAD.

The Third Circuit also remanded this case for development of a record on Plaintiffs' claim that the statutes are unconstitutionally overbroad:

> Congress enacted the Statutes to protect children from sexual exploitation. The Statutes, though, apply to more than those producers who sexually exploit children. They mandate compliance by "[w]hoever produces" sexually explicit depictions regardless of the performers' actual or apparent ages. *See, e.g.*, 18 U.S.C. §§ 2257(a),

---

[26] Dr. Daniel Linz testified that he estimated that child pornography constituted only about 1% of all sexually explicit images.

Moreover, the testimony of Defendant's expert, Janis Wolak, established that most child pornography is traded on peer to peer networks. The statutes burden a vast quantity of expression beyond this underground trade, burdening DVDs, photos, and the universe of material on the Internet.

2257A(a). Plaintiffs assert that a "vast quantity" of protected sexually explicit depictions include performers who are "clearly mature adults" that "could not be mistaken for children." Pls.' Br. at 41. The degree of the asserted overbreadth is obviously the critical determination, but Plaintiffs were never afforded the opportunity to conduct discovery or develop a record from which we could determine this degree. Without some notion of both the amount of speech that implicates the government's interest in protecting children (e.g., depictions of performers who reasonably could be minors based on their apparent ages) and the amount of speech that is burdened but does not further the government's interest (e.g., depictions of performers who are obviously adults), we cannot intelligently weigh the legitimate versus problematic applications of the Statutes.

Moreover, Plaintiffs should be permitted to develop the record as to whether the Statutes are unconstitutionally overbroad based on their purported regulation of purely private conduct. Plaintiffs assert that the Statutes are substantially overbroad because they burden the entire universe of constitutionally protected expression involving sexually oriented images of adults–including private, noncommercial depictions created and viewed by adults in their homes.

*Id.* at 538. The court identified two independent paths by which unconstitutional overbreadth could be established.

A.     **The Statutes Unconstitutionally Burden a Substantial Amount of Expression in Which the Persons Depicted Are Obviously Adults.**[27]

The first path identified is similar to the inquiry under the narrow tailoring prong of intermediate scrutiny discussed above, and requires an examination of "the amount of speech that implicates the government's interest in protecting children (e.g., depictions of performers who reasonably could be minors based on their apparent ages) and the amount of speech that is burdened but does not further the government's interest (e.g., depictions of performers who are obviously adults)." *Free Speech Coalition*, 677 F.3d at 538.   The evidence discussed above at pp. 27-32 provides robust support for the conclusion that the statutes are overbroad on their face.

The extent of the statutes' overbreadth is substantial. Using  Defendant's expert's estimate,

---

[27]  See Question 2.a.

the amount of constitutionally protected expression lying beyond the boundaries of the statutes' legitimate scope–expression depicting adults who cannot be confused as minors– is twice the amount of the expression falling within the statutes' legitimate sweep. Using Plaintiffs' expert's estimate, 90% of all commercially produced sexually explicit expression is impermissibly burdened.  Thus, like the statute in *Stevens*, whose "impermissible applications... far outnumber[ed] any permissible ones," the statutes here must be struck down.

### B.    The Statutes Burden a Substantial Amount of Private Expression.

The second independent path identified by the court for establishing the statutes' overbreadth requires an examination of the amount of private, noncommercial expression that is burdened by the statutes' regulation. *Id.* In this regard, the court rejected the narrowing construction proposed by the government and emphasized that "the plain language of the Statutes makes clear that they apply broadly to all producers of actual or simulated sexually explicit depictions regardless whether those depictions were created for the purpose of sale or trade." *Id.* at 539.[28]  It directed that a record be developed on this point.[29]

---

[28]  See Question 10.  The statutes provide that they apply to all visual depictions "produced in whole or in part **with materials** which have been mailed or shipped in interstate or foreign commerce, or is shipped or transported or is intended for shipment or transportation in interstate or foreign commerce." 18 U.S.C. §§ 2257 (a)(2); 2257A (a)(2) (emphasis added).  The interstate commerce requirement, therefore, does not in any way restrict the statutes' application to private expression.

[29]  As Plaintiffs explained in their trial brief, a law's overbreadth is conventionally measured by "pos[ing] reasonable but challenging hypotheticals to determine the statute's sweep." *United States v. Stevens,* 533 F.3d 218, 235 (3rd Cir. 2008) (en banc) *aff'd* 559 U.S. 460 (2010).  *Cf. United States v. Williams*, 553 U.S. 285, 301-02 (2008) (rejecting "fanciful" hypotheticals as evidence of overbreadth). *See also, Brown v. Entertainment Merchants Ass'n*, 131 S.Ct. 2729, 2736-37 (2011); *Free Speech Coalition v. Ashcroft*, 535 U.S. 234, 247-48 (2002); *McCauley v. University of the Virgin Islands*, 618 F.3d 232, 251 (3rd Cir. 2010).  Plaintiffs here have provided evidentiary support for the breadth of the statutes' applications.

1.   **Expression Created by Husbands and Wives in the Privacy of Their Homes**[30]

The record shows that married couples create a substantial quantity of sexually explicit imagery in their bedrooms for their own private use.

Plaintiff Barbara Alper testified that she has photographed herself with her husband and has photographed her husband masturbating as part of their sexual relationship. She has published three of the photos, but the rest remain private expressions of her relationship with her spouse.

Barbara Nitke testified that she created portraits for many married couples in the BDSM community. Some couples allowed her to publish the images, but many did not–keeping their portraits a private expression of their sexual love.

David Steinberg also testified that much of his work depicted husbands and wives who invited him into their homes to capture their sexual intimacy on camera. Like Alper and Nitke, Steinberg has published some of the images, but a number remain unpublished, private portraits.

Plaintiffs' Ex. 37 contains additional evidence of the prevalence of the production of sexual imagery in the lives of ordinary American married couples.

Instagram, a photo-sharing application, lists among its "most popular" images, photos of genitalia and adults who are "nude–or nearly naked–... posing provocatively in beds, in bathrooms, or with a partner in a similar state of undress." Plaintiffs' Ex. 37 VVV at p. 467. Judy Kuriansky, a clinical psychologist, offers: "There are more people than you would imagine who live next door

---

[30]   See Question 2.b See also, n.3, *supra*, which discusses the need for the evidence supporting the regulation to match up with present day needs. See also Question 8. In this regard, the statutes most certainly implicate sexual practices of consenting adults–including married couples and couples in committed relationships– in the course of their private lives. *Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *United States v. Windsor*, No. 12-307, slip. op. at 19 ( U.S. June 26, 2013).

to you or down the block that have at least taken pictures of themselves having sex.... It's more common than you think." Plaintiffs' Ex. 37 XXX at 482-83. Bethany Marshall, a relationship expert, likewise observed: "It's fairly common, even if it's with your own little camera at home [for couples to make sex tapes]." *Id.* at 483.

Companies have developed technology that allows husbands and wives living apart to continue to enjoy sexual relations over Skype. Plaintiffs' Ex. 37 YYY at p. 485; Plaintiffs' Ex. 37 ZZZ at p. 491. "Amelia," age 33, a British proponent of the technology, explained its worth and importance:

> My partner has been working in America for the past six months and we've been communicating by Skype. But there is only so long you can keep a spark going in a relationship without physical contact. These gadgets have really injected new life into our calls. The brilliant thing is that it is not just purely a masturbatory experience. We can control each other's device by moving our own–and it's that element that makes it so good. We feel so connected, even though we are on the other side of the world.

*Id.* at 492.

Plaintiffs' Ex. 37 UUU at p. 466 describes "Facetime Sex Chat" as another way for couples in long distance relationships to enjoy sexual intimacy. The company states: "We have interviewed hundreds of couples with iPhones and other smart phones. Many said they've tried Facetime Sex chat and love it. Others say they haven't but are very interested." *Id.*

In fact, one study by Plaintiffs' expert, Dr. Michelle Drouin, found that one in four persons in a committed relationship who sent a sexually explicit photo message did so because his or her partner was far away. Plaintiffs' Ex. 40, M. Drouin, et al., "Let's talk about sexting, baby: Computer-mediated sexual behaviors among young adults," Computers in Human Behavior at 4.

A healthy number of adult Americans, therefore, produce sexual imagery as part of their

marital relationship. For this reason alone, the statutes are overbroad.  *See* Plaintiffs' Ex. 114, Defendant's Supplemental Responses to Plaintiffs' First Set of Admissions at 10 (admitting there is no exception to the applicability of the statutes and implementing regulations on the sole basis that a visual depiction is a "portrait of an adult married couple [created] at their request.")

**2.     Sexting**

It is not just husbands and wives who share sexual images with one another, however. Millions of Americans produce and "transfer" sexually explicit images on their cell phones and mobile devices to one another–a practice known as sexting. As the Third Circuit recognized, this body of expression produced by private citizens in their homes is subject to the recordkeeping provisions under the plain terms of the statutes.  *See* Plaintiffs' Ex. 114, Defendant's Supplemental Responses to Plaintiffs' First Set of Admissions at 4 (admitting there is no exception to the applicability of the statutes and implementing regulations on the sole basis that a depiction "depicts its 'creator' and the creator 'transfers such depiction to another using a multimedia messaging service'"–also known as sexting).

Plaintiffs produced the testimony of two expert witnesses who conducted independent research on sexting as part of their areas of study and reported their findings in peer-reviewed journals.  Their studies revealed that a substantial number of young adults between the ages of 18 and 24 sent sexual imagery to a partner on their cell phones.

Michelle Drouin, Ph.D., a tenured professor at Indiana University-Purdue University, Fort Wayne, received her doctorate in experimental psychology from Oxford University. Using methodologies accepted in the field of social science, Drouin studied sexting among 744 students enrolled in Introduction to Psychology at IU-PU, whose ages spanned from 18 to 36 and who

represented more than 48 different majors.  The study focused on those students who had been in a committed relationship and questioned them about the frequency with which they sent "sexually explicit picture and video messages" within their most committed relationship.  Their responses revealed that 54% of the study's participants had sent a sext to their partner.

Drouin then conducted a follow-up study–again using methodologies accepted in her discipline–to examine sexting in young adults further.  This study revealed that 37% to 41% of the participants had send a sexually explicit photo to a partner in a committed relationship, in a casual relationship, or in a cheating relationship.  One in five of the respondents had sent a nude photo to his or her partner; one in ten had sent photos of a solo sex act (e.g. masturbation).

Marc Zimmerman, the Chair of the Department of Health Behavior and Health Education at University of Michigan, ranked as one of the top three programs in the country, also studied sexting behavior in young adults. His study, sponsored by the National Institute of Health and reported in the Journal of Adolescent Health, the premier journal of adolescent health and medicine, collected data on sexting in conjunction with data on substance use in young adults between the ages of 18 and 24.

Using a survey methodology known as respondent driven sampling, an accepted methodology in Dr. Zimmerman's field, Zimmerman collected data from 3,447 participants. He then weighted the group to derive a sample size of 828 respondents.  From this sample, he found that 30% responded affirmatively to a question asking them if they had ever sent "a sexually suggestive nude or nearly nude photo or video of themselves to someone else" on their cell phones; more than 40% had received such a message from someone they knew.  The study led Zimmerman and his co-authors to conclude that sexting appears to be part of the modern relationship between young adults,

39

unrelated to risky sexual behavior–a result that Zimmerman had not anticipated.

The data collected on substance use by young adults in that same study replicated that of a national study conducted by SAMSA and therefore, Zimmerman concluded that the sample in his study was a representative national sample.

Dr. Drouin and Dr. Zimmerman were asked to provide an estimate of the prevalence of sexting among young adults, based on their own research and the research of others on sexting, and to extrapolate that estimate to U.S. Census data.  Drouin estimated that one-third of young adults between the ages of 18 and 24 have sent a sext and that based on U.S. Census data, 10.2-million adults in this age group have done so.  Dr. Zimmerman estimated that 30% of young adults have sent a sext, while 41% have received one.  His extrapolation using U.S. Census data was that 9-million young adults between the ages of 18 and 24 have sent a sext while 12-million have received one.  Zimmerman noted, however, that even if his estimates were off by as much as 50% the number of young adults engaging in sexting was still considerable.[31]  Importantly, Drouin's and Zimmerman's estimates were limited to only a segment of the population–young adults 18 to 24 years old.  Add the number of adults 25-years of age or older who sext, and the number climbs significantly.

The government has tried to discredit the relevance of Drouin's and Zimmerman's studies and testimony by  arguing that the definitions of sexting in their studies did not perfectly match the definitions of images covered by the statutes–although Drouin's first study used the term, *sexually explicit,* to describe the imagery about which the study asked.  And Drouin's second study found that 20% of the participants had sent an image of complete nudity while 10% had sent an image of a solo sext act–imagery covered by the statutes.

_____

[31] See Question 9.  Plaintiffs maintain that both the percentage and actual numbers of adults affected are relevant.

The point is, however, that Drouin's and Zimmerman's studies–which were undertaken independently of this litigation, thus adding to their credibility, *Reference Manual on Scientific Evidence,* 2d Ed. (Federal Judicial Center 2000) at 237–establish that a sizeable percentage of Americans produce and exchange sexually explicit imagery and nude images that include the genitals.  Their definitions of sexting included substantial material covered by the statutes. That the studies' description of that imagery does not perfectly match the language of the statute does not diminish their value or relevance here.

The government has also criticized the methodologies of Drouin's and Zimmerman's studies as "unreliable," notwithstanding the fact that they were published in peer-reviewed journals. To this end, the government introduced the testimony of Dr. Philip Stark, a statistician, who testified that because the studies did not employ random probability samples and their estimates of the prevalence of sexting were not based on random probability samples, their estimates of sexting's prevalence were not precise quantitative statements, used in the field of statistics.

The government's criticism of the studies as falling short of statistical precision overlooks the task at hand. The Third Circuit remanded for the development of an evidentiary record on the amount of private expression implicated by the statutes in order to evaluate whether the amount is "substantial"–not to discern a "precise quantitative statement" regarding the amount of that expression.  Drouin's and Zimmerman's studies provide the very type of evidence that the court of appeals requested, and it demonstrates that substantial numbers of people create sexual imagery as part of their sexual relationships.

On cross-examination, Dr. Stark agreed that sexting was not an isolated phenomenon and further agreed that it would be wholly unnecessary to conduct a survey using random probability

41

samples to draw a reasonable conclusion about whether large numbers of people engage in certain conduct–voting for a particular party's candidate for President, for example.

As for Stark's criticism of Drouin's and Zimmerman's use of "convenience samples" versus random probability samples, he substantiated his claim that convenience samples were unreliable by quoting a passage from the Federal Judicial Center's *Reference Manual on Scientific Evidence.* He admitted, however, that he had omitted an important portion of that passage from the Manual acknowledging their usage and worth.  The Manual states:

> A majority of the consumer surveys conducted for Lanham Act litigation present results from nonprobability convenience samples. They are admitted into evidence based on the argument that nonprobability sampling is used widely in marketing research and that "results of these studies are used by major American companies in making decisions of considerable consequence."

*Id.* at 244 (footnote omitted) (citation omitted).

Drouin's and Zimmerman's studies and testimony provided valuable evidence in showing that a substantial amount of speech was covered by the statutes. They indicate that millions of Americans between the ages of 18 and 24 engage in private sexually explicit expression.

But Drouin's and Zimmerman's academic research and testimony is not the only evidence Plaintiffs offered on the prevalence of sexting.  Dr. Linz, Plaintiffs' expert who has studied sexually oriented material throughout his career, testified about the development of technologies that allow individuals to produce and share sexually explicit messages with one another, including cell phones.

Plaintiffs' Ex. 37, which Linz reviewed and used as part of the basis for his conclusion, offers further evidence of the prevalence of sexting.  For instance, Plaintiffs' Ex. 37 PPP at p. 443 sets forth the results of a Harris Interactive Poll commissioned by a cell phone security company that reports that more than one-quarter of adults admitted taking or receiving explicit photos with their cell

phones; 40% of adults between the ages of 18 and 34 have done so.

Plaintiffs' Ex. 37 QQQ at p. 446 is an article from AARP regarding sexting "among the 50-plus set."

Plaintiffs' Ex. 37 RRR, Ex. 37 SSS, Ex. 37 TTT at pp. 451, 455, and 460, respectively, discuss particular cell phone applications providing security for a person's sexts.

Plaintiffs' Ex. 37 BBBB, Ex. 37 CCCC, Ex. 37 DDDD, and Ex. 37 EEEE at pp. 501-04 demonstrate that national television commercial campaigns–a good indicator of pop culture–make reference to sexting in promoting the sales of cell phones.

The unclassified reports of FBI employee misconduct leaked to CNN reflect that employees of the FBI have been disciplined for sending nude photos of themselves via cell phone.  Plaintiffs' Ex. 37 FFFF at pp. 508, 511; Plaintiffs' Ex. 37 GGGG at p. 513, "FBI Sexting: Leaked Disciplinary Report Details Bureau Employees Behaving Badly," (quoting FBI Assistant Director Will as acknowledging a "rash of sexting" among FBI employees).

Sexting has found its way into the court system–both in criminal and civil cases.  *See Miller v. Mitchell*, 598 F.3d 139 (3rd Cir. 2010) (suit seeking injunction against district attorney for threatening to bring charges against teens under child pornography law if they did not attend an education program he designed regarding sexting); *A.H. v. State*, 949 So.2d 234 (Fla. App. 1st Dist. 2007) (16-year old defendant and her 17-year old boyfriend charged with violations of child pornography laws on the basis of naked photos they took of themselves and emailed); *In re J.P.*, 2012-Ohio-1451 (Ohio App. 11th Dist. 2012) (13-year old charged with disseminating materials harmful to minors after she sent nude photographs of herself to a juvenile male); *State v. Canal*, 773 N.W.2d 528 (Iowa 2009) (18-year old defendant prosecuted for knowingly disseminating obscene

material to a minor when he sent 14-year old a photo of his penis at her request).

Moreover, sexting has made its way into other judicial proceedings as evidence of infidelity, *McLean v. Sullivan-McLean*, FA114049528S, 2013 WL 951370 (Conn. Super. Ct. Feb. 7, 2013), as the basis for disciplinary sanctions, *Disciplinary Counsel v. Detweiler*, 2013-Ohio-1747 (Ohio Sup. Ct., May 2, 2013) and as the basis of a defense in criminal proceedings. *Rudzavice v. State*, 10-12-00300-CR, 2013 WL 1188924 (Tex. App. Mar. 21, 2013). Private images created of sexual intimacies have also been the subject of proceedings prompted when an ex-partner uses them to seek revenge for a break-up. *Taylor v. Franko,* 2011 WL 2746714 (D. Hawaii) (July 12, 2011); *Voth v. Marsh*, Case No. 2009-L-009522, Circuit Court of Illinois County; *Jacobs v. Seay,* Case No. 13-13626CA02, Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida; *Toups v. GoDaddy.com*, D130018-C, 260th Jud. Dist. Texas (class action).

### 3.      Adult Social Networking Websites

Another avenue where adults share their homemade sexual imagery is adult dating websites and social networks.   Dr. Linz  testified about the numerous online forums where adults post or upload sexually explicit messages to other adults.  They operate like many other online forums where adults share their photos as a means of communication with others of like interests or as part of personal messages sent to explore potential romantic relationships.  *See e.g.,* pinterest.com**;** match.com.

Most follow a similar protocol.  For instance, AdultFriendfinder, one of the largest and oldest adult dating websites, is "open to people from all walks of life with one thing in common - the desire to share their sexuality." Plaintiffs' Ex. 37 N at p. 210.  Members are invited to post explicit photos, share amateur videos, and connect for webcam chats. *Id.*  According to the website, it has more than

41-million members with 110 million visits per month. *Id.* Millions of images that contain depictions of sexual conduct covered by that statutes here at issue are posted for no purpose other than to "share their sexuality." Plaintiffs' Ex. 116 H (Vol. 4 of 5).  In fact, seven years ago in *Connection Distributing Co. v. Gonzales,* Case No. 95 CV 1993 (N.D. Ohio), a prior challenge to the constitutionality of 18 U.S.C. § 2257, Defendant filed the declaration of a government computer forensic specialist who attested that she had conducted various searches of AdultFriendfinder, a site she described as depicting sexually explicit conduct, and found tens of thousands of personal messages responsive to specified search parameters.  Plaintiffs' Ex. 42.

Each of the millions of adults who send sexually explicit photo messages on their phones or who post a personal message on an adult dating website like AdultFriendfinder–and there are many others[32]–must comply with the statutes' recordkeeping requirements.

So when Jane Doe creates a sexually explicit video message to send to her husband on her cell phone or as an attachment to an email or to upload as a personal message to an adult website, she must first inspect her own driver's license to verify that she is an adult.  She must then make a

---

[32] *See e.g.* Plaintiffs' Ex. 37 A at p. 1 (Alt - 2,007,247 members), Plaintiffs' Ex. 37 B at p.49 (Adult Space -24 million visits per month); Plaintiffs' Ex. 37C at p.52 (Be Naughty ); Plaintiffs' Ex. 37 D at p.67 (Swinger Zone Central); Plaintiffs' Ex. 37 E at p.72 (I Want U - 21,165 visitors per month); Plaintiffs' Ex. 37 R at p. 82 (Up for It - 6.1 million visitors per month); Plaintiffs' Ex. 37 G at p.91 (Hook Up); Plaintiffs' Ex. 37 H at p. 99 (XXX Blackbook); Plaintiffs' Ex. 37 I at p. 117 (Sex in Your City); Plaintiffs' Ex. 37 J at p. 134 (Amateur Match); Plaintiffs' Ex. 37 K at p. 142 (Horny Matches -11 million visits per month); Plaintiffs' Ex. 37 L at p. 164 (Get It On); Plaintiffs' Ex. 37 M at p. 176 (Ashley Madison - 11 million visits per month); Plaintiffs' Ex. 37O at p. 238 (Let's Bang); Plaintiffs' Ex. 37 P at p. 256 (Naughty Connect- 3,013,960 members); Plaintiffs' Ex. 37 Q at p. 266 (Adult Match Doctor); Plaintiffs' Ex. R at p. 286 (X Dating); Plaintiffs' Ex. 37 S at p. 314 (Flirt- 3.5 million visits per month); Plaintiffs' Ex. 37 T at p. 325 (Adam4Adam- 3.2 million visitors per month); Plaintiffs' Ex. 37 U at p. 334 (Collar me- 8.1 million visits per month).

And like the expression posted to AdultFriendfinder, the images are explicit and fall under the statutes' definition of sexually explicit conduct.  *See* Plaintiffs' Ex. 116 A - K.

copy of her driver's license, create a record listing her maiden name and all other names she uses, and a record of the "date of the production" of her video message.

Before sending her message, Jane must "affix" a statement to it, appearing within one minute from the start of her video message and before "the opening scene," which lists the address (it cannot be a P.O. Box) where the copy of her driver's license and other required records are located–presumably her home.  The affixed statement must be of sufficient duration and size to be capable of being read by the average viewer.  *See* Plaintiffs' Ex. 114, Defendant's Supplemental Responses to Plaintiffs' First Set of Admissions at 7 (admitting there is no exception to the applicability of the statutes and implementing regulations on the sole basis that a visual depiction "has been 'insert[ed]...on an online social networking service or website.'")

If Jane posts her message to an adult social networking website or by any other means, the statutes require that it contain this statement identifying her home address.  This brings up an important detail about the labeling requirements as they apply to adult websites that allow individuals to post their sexually explicit content on them.[33]

When an adult social networking website publishes sexually explicit content produced and uploaded to it by its members, it operates as a secondary producer–since it did not actually produce the imagery itself.  Title 28 C.F.R. § 75.1 (c)(2) defines "secondary producer" to include persons who "otherwise manage[] the sexually explicit content of a computer site or service" that contains a sexually explicit image. The statutes and regulations specifically exclude from the definition of "produces," however,  activities constituting only the "transmission, storage, hosting, formatting, or translation (or any combination thereof) of a communication." 18 U.S.C. § 2257 (h)(2)(B)(v); 18

---

[33]  See Question 13.

U.S.C. § 2257A (g); 28 C.F.R. § 75.1 (c)(4)(v).

The website may take the position–and it appears many of them do–that it does not "manage" the sexually explicit content of the site since the content is produced by its members and does no more than transmit, store, host, or format its members' sexually explicit messages. Therefore, it is not a secondary producer subject to 18 U.S.C. § 2257.

The DOJ's preamble to the regulations gives support for this position.  In response to "thousands of comments" complaining that application of the recordkeeping provisions would be unfeasible as applied to adult networking sites and would invade user privacy, the DOJ responded: "[M]ost social networking sites would appear not to be covered by the statute and the rule under the definition of 'produces' in section 2257 (h)(2)(B)(v) and § 75.1 (c)(4)(v)."  73 Fed. Reg. 77437.

*Importantly, however, the DOJ made clear that the person posting the expression to the website–like our Jane Doe–must comply with the recordkeeping and labeling requirements*, noting:

> However, one who posts sexually explicit activity on "adult" networking sites may well be a primary or secondary producer.  Users of social networking sites may therefore be subject to the proposed rule, depending on their conduct.

73 Fed. Reg. 77437-38. *See also* 73 Fed. Reg. 77439 (noting that the original producer of a video posted to a tube  site must "affix a disclosure notice" to it.)

Thus while the adult dating website or tube site may argue that it is a host rather than a producer, that does not relieve Jane Doe of her obligations.  Her expression must have a statement affixed to it which lists her home address. The website, nonetheless, is in jeopardy for selling or transferring Jane's message without the statement affixed to it if it charges a membership fee to grant access to the images. 18 U.S.C. §§ 2257 (f)(4); 2257A (f)(4).

Moreover, Jane must keep a copy of her driver's license, record of all the names she uses, and date of production, together with a copy of her video message. She must segregate these records from any other records and prepare an index of them by legal name, aliases, and title of the depiction.

Since Jane has created her message for her purely personal use and to share with other like-minded adults and is not in a "business relating to producing a depiction of actual sexually explicit conduct," she must send a notice to the FBI, advising it of the hours that her records are available for inspection at her home, which in no case may be less than 20-hours per week.

If the FBI arrives at her doorstep to inspect the records, Jane must permit the inspection or face criminal prosecution for a felony.

### 4.     Artistic, Educational, and Journalistic Expression

These same requirements apply to all artistic, educational, and journalistic expression. While 18 U.S.C. § 2257A provides an exemption for mainstream Hollywood productions or television broadcasts containing depictions of simulated sexual conduct, there is no exception when sexually explicit visual depictions appear in artistic, educational, or journalistic expression. In addition to the works of Plaintiffs Nitke, Alper, and Steinberg, the artistic expression of photographers and painters whose work depicts human models (all of whom are obviously mature adults) engaged in sexual conduct is subject to the federal criminal recordkeeping laws. *See* Plaintiffs' Ex. 37 V at pp. 341-43 (Sex in Art)[34]; Plaintiffs' Ex. 37 W at pp. 344-46 (Barbara DeGenieve's Panhandler Project); Plaintiffs' Ex. 37 X at p. 347 (Art Nude, Erotic and Bondage photographic prints); Plaintiffs' Ex. 37 Y at pp. 348-55 (The Nu Project); Plaintiffs' Ex. 37 Z at pp. 356-57 (The Art of Loren Cameron); Plaintiffs' Ex. 37 AA at p. 358 (Eros Arts); Plaintiffs' Ex. BB at pp. 359-61 ("*Big Nudes*.

---

[34] The Declaration of William Livingston to which the exhibits are attached provides the url where the entirety of the expression can be viewed, including videos and documentaries.

Controversial Helmut Newton exhibition is a must-see for fashion faithful & photography lovers");
Plaintiffs' Ex. 37 CC at p. 362 (Paul Knight - Intimate couples); Plaintiffs' Ex. 37DD at pp. 363-64
("NYPH09: Controversial Photographers"); Plaintiffs' Ex. 37 EE at p. 365 (Feel Me LA); Plaintiffs'
Ex. 36 FF at pp. 366-68 (Paintings displayed on erotic-fine-arts); Plaintiffs' Ex. 37 GG at p. 369
(David Rolin); Plaintiffs' Ex. 37 HH at p. 370-72 (Kevin Loreaux); Plaintiffs' Ex. 37 II at p. 373;
Plaintiffs' Ex. 37 JJ at pp. 374-75 (K.Leo); Plaintiffs' Ex. 37 KK at pp. 376-78 (erotic rarities
depicting erotic paintings); Plaintiffs' Ex. 37 LL at p. 379 (Igor Amelkovich); Plaintiffs' Ex. 37 MM
at p. 380 (photographic paintings of Tom Gallant); Plaintiffs' Ex. 37 NN at p. 381 (photorealistic
paintings of Betty Tomkins); Plaintiffs' Ex. OO at p. 382 (Mark I. Chester);  Plaintiffs' Ex. 37 PP
at pp. 383-84 (Tony Ward).

    The educational expression created by Plaintiffs Dodson and Ross, the Sinclair Institute, and
Carol Queen as well as news stories and documentaries that publish images of the sexual abuse
behind the prison walls of Abu Ghraib and documentaries and important visual commentaries
depicting and examining sexual crimes are subject to the same requirements. *See* Plaintiffs' Ex. 37
QQ at p. 385 ("The Ghosts of Abu Ghraib"); Plaintiffs' Ex. 37 RR at p. 386 ("Standard Operating
Procedure"); Plaintiffs' Ex. 37 SS at p. 387 ("Inside Abu Ghraib"); Plaintiffs' Ex. 37 TT at pp. 388-
90 ("A Scream for Silence"); Plaintiffs' Ex. 37 UU at p. 391 ("War Babies"); Plaintiffs' Ex. 37 VV
at pp. 392-94 ("Calling the Ghosts: A Story about Rape, War, and Women"); Plaintiffs' Ex. 37 WW
at pp. 395-96 ("Bought and Sold: An Investigative Documentary on the International Trade in
Women"); Plaintiffs' Ex. 37 XX at p. 397 ("Sri Lanka's Killing Fields"); Plaintiffs' Ex. 37 YY at
p. 398 ("Sri Lanka's Killing Fields War Crimes Unpunished"); Plaintiffs' Ex. 37 ZZ at p. 399 ("Raw
Deal: A Question of Consent"); Plaintiffs' Ex. 37 AAA at p. 400-01 ("Whore's Glory"); Plaintiffs'

Ex. 37 BBB at p. 402 ("Pasolini Prossimo Nostro"); Plaintiffs' Ex. 37 CCC at pp. 403-04 ("The

Greatest Silence - Rape in the Congo"); Plaintiffs' Ex. DDD at p. 405-07 ("Men Behind the Sun");

Plaintiffs' Ex. 37 EEE at pp. 408-13 ("Salò, or The 120 Days of Sodom"); Plaintiffs' Ex. 37 FFF at

pp. 414-16 ("Casualties of War"); Plaintiffs' Ex. 37 III at p. 424 ("Boys Don't Cry"); Plaintiffs' Ex.

37 JJJ at p. 425 ("Disturbing New Photos From Abu Ghraib"); Plaintiffs Ex. 37 KKK at pp. 426-28

("The Abu Ghraib Pictures");   Plaintiffs' Ex. 37 LLL at pp. 429-31 ("The Abu Ghraib Prison

Photos"); Plaintiffs' Ex. 37 MMM at pp. 432-35 ("Libyan rebels say captured cell phone videos

show rape, torture"); Plaintiffs' Ex. 37 NNN at pp. 436-37 ("Nigeria Rape Video: Footage of Brutal

Attack on Woman Outrages Nation"); Plaintiffs' Ex. 37 OOO at pp. 438-42 ("Inside the Anonymous

Hacking File on the Steubenville 'Rape Crew'").

Artists and journalists must obtain photo identification from their adult subjects as a

condition of creating this important and compelling expression.  And if, like Barbara Alper with

regard to the adult men having sex on Fire Island, they cannot obtain a driver's license or passport

from the subject of their work, they are barred from creating it.[35]

Try as it might, the government simply cannot avoid the fact that an enormous body of

expression with absolutely no connection to child pornography falls under and is ensnared by the

statutes' net.

In the face of this record, the government argues that the Court should decline to strike the

law down as unconstitutionally overbroad, but should wait to take care of its constitutionally

problematic applications on a case-by-case basis.  However, the court of appeals remanded for the

development of a record on the amount of private expression burdened by the statutes and a ruling

---

[35]  See Question 4.

on the plaintiffs' claim of facial overbreadth.  Plaintiffs have adduced evidence on the issue. It would

be wholly at odds with that remand, for this Court to decline to decide the issue on the ground that

it should be decided on a case-by-case basis.

Plaintiffs' evidence establishes that the laws' overbreadth is massive and renders the statutes

and regulations unconstitutional under the First Amendment.

## III.    THE   STATUTES   AND   THEIR   IMPLEMENTING   REGULATIONS   ARE UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT.

### A.    The Statutes and Regulations Permit Unconstitutional Warrantless Occupation of Private Property for the Purpose of Obtaining Information.

In *United States v. Jones*, 132 S. Ct. 945 (2012), the Supreme Court held that "a Fourth

Amendment search ... occurs where the government unlawfully, physically occupies private property

for the purpose of obtaining information." *Free Speech Coalition,* 677 F.3d at 543. In *Jones*, the

government installed a GPS tracking device on the underbody of a Jeep owned by the defendant's

wife while it was parked in a public parking lot. 132 S.Ct. at 947.  The government argued that

installation of the device did not implicate the Fourth Amendment because the defendant had no

reasonable expectation of privacy in the area of the Jeep accessed by the government nor any in the

location of the Jeep on a public road.  *Id.* at 950.  The Court held that it need not reach the issue

regarding reasonableness of the defendant's expectation of privacy with respect to either concern;

it was sufficient, the Court concluded, that the government had intruded on and had occupied private

property for the purposes of obtaining information.  *Id.*

Under *Jones*, there is no question that the inspections here violated the Fourth Amendment.

In every instance (save for one in which the government agreed to accept records by email from a

producer  who  was  overseas),  the  government  under  the  authority  of  a  federal  statute  and

51

regulations,[36] occupied and intruded upon private premises and searched through private records for the purpose of obtaining information–all without a warrant or probable cause. They entered residences and private areas of businesses[37] to which the public did not have access, took photographs, and occupied the premises for hours at a time. They examined records, took possession of them, and made copies. The regime under which they operated violated the Fourth Amendment under *Jones*.[38]

### B.   The Statutes and Regulations Permit Warrantless Intrusions into a Person's Reasonable Expectation of Privacy.

The inspections also violated the line drawn in *Katz v. United States* against intrusions into a person's "reasonable expectation of privacy." 389 U.S. 347, 360 (1967) (Harlan, J., concurring)

Specifically, the evidence–consisting of the inspection reports, inspection letters, and photographs (Plaintiffs' Ex. 1-32) and the testimony of the two lead FBI agents, Stephen Lawrence

---

[36] With regard to Question 23, a court cannot rewrite the regulations. *Ryba v. Matthews*, 404 F.Supp. 202, 205, 206 (E.D. Pa. 1975); *Vainisi v. C.I.R.*, 599 F.3d 567, 572 (7th Cir. 2010); *Newport News Shipbuilding and Dry Dock Co. v. Garett*, 6 F.3d 1547, 1558 (Fed. Cir. 1993); *U.S. Dept. of Air Force v. Federal Labor Relations Authority*, 952 F.2d 446, 452 n.6 (D.C. Cir. 1991) ("[I]t is the executive branch, not the judiciary, which wields rulemaking power under our constitutional regime and must be held accountable for it. Courts cannot rewrite regulations at will to avoid conflicts with underlying statutes.") *See also, Stevens,* 130 S.Ct. at 1592 (noting the Court "will not rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain, and sharply diminish Congress's incentive to draft a narrowly tailored law in the first place.").

Moreover, a court abuses its discretion in declining to enjoin an unconstitutional law. *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 619 (6th Cir. 2009). A court may retain jurisdiction to ensure compliance with a settlement agreement if compliance with the agreement is made part of a dismissal order, *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381 (1994) or to ensure compliance with or modify injunctive relief. *Swann v. Charlotte-Mecklenberg Bd. of Ed.*, 402 U.S. 1, 21 (1971); *Dombrowski v. Pfister*, 380 U.S. 479, 492 (1965).

[37] See Question 14.

[38] See Question 18.

and Charles Joyner– revealed that the agents entered six private residences to perform inspections of 2257 records. They also  entered multiple private areas of business premises to which the general public was not given access–private offices, filing cabinets, employee break rooms, locked file rooms–in performing the inspections.

      With the exception of a few inspections, a team of between three and seven agents appeared at the home or office of the producer without advance notice.  When the agents arrived, they presented the producer (with a few exceptions) with a letter advising him or her that the FBI was conducting an inspection of records to insure compliance with 18 U.S.C. § 2257, that the statute required the producer to make such records available at all reasonable times, that violations of the statute were subject to criminal penalties, that the FBI was authorized to enter the premises without delay, and that it was a criminal violation to delay or obstruct the FBI from conducting the inspection. Plaintiffs' Ex. 31.  As noted above, it is unlawful under the statutes to refuse to permit an inspection. 18 U.S.C. §§ 2257 (f)(5); 2257A (f)(5).

      In the course of the inspection, the FBI took photographs of the exterior of the premises and various interior areas documenting where the records were maintained and where the agents examined the records. Plaintiffs' Ex. 32. These photographs show that the FBI entered personal offices, employee break rooms, office conference rooms, and studios.   The agents gained access to locked rooms where the records, which included private information about the performers depicted, were stored as well as closed file cabinets. The photos taken during record inspections at residences capture home offices, file cabinets, a dining room table, and the inside of an attached garage.

      After taking photos of the inspection site, the agents examined the producer's 2257 records. The FBI either searched through the producer's records and removed those it wished to examine or

told the custodian of records which records it wanted to examine and had him or her pull out the records and bring them to the inspection team.   A team of agents examined the records and completed an on-site inspection review. For many inspections, the team of agents was on the premises for more than five or six hours.  During each of the inspections, the agents made copies of all of the 2257 records for the items that they had selected with a portable copy machine.  At the end of the inspection, the agents took a photo of the area where the records were examined.

If as a result of the inspection the agents found violations of 18 U.S.C. § 2257, they would provide a copy of their findings regarding violations of the law to the owner or custodian of records and give him or her  a week to rectify the deficiencies. Any actions the producer took to correct the violations were noted in the 2257 inspection report.  A week or two after the inspection, the report of the violation would be sent to the Department of Justice and the local United States Attorney's office for determination of whether a prosecution should be initiated.

Thus, in every single search, government agents entered private premises not accessible to the public for the purpose of gathering information about whether the producer was in "compliance with the record-keeping requirements of the Act and any other provision of the Act." 28 C.F.R. § 75.5 (a).  Agent Lawrence admitted, without qualification, that without the authority conferred by 18 U.S.C. § 2257 to enter the premises without delay and to inspect the records, the *only* way the FBI could have carried out the very activities they engaged in would be by obtaining a search warrant based on probable cause.

With regard to four of the searches, the government has suggested that they occurred in areas to which general members of the public had access–in contrast to offices, break rooms, and file rooms to which they clearly did not. But the occupation and activities of the agents in those

54

areas–reception areas and a large room where inventory was stored–far exceeded the limited access

extended to the public at large. Thus, even in these areas, the agents' presence unreasonably invaded

private premises.

*Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319 (1979), is instructive on this point. Rebuffing the

government's claim that an inspection conducted in a retail store by a town justice and an

investigator of the store's inventory did not implicate the Fourth Amendment, the Court wrote:

> [T]he State raises a different theory from the one advanced in its opposition to the
> petition for certiorari and on which it had relied in the state courts. The suggestion
> is that by virtue of its display of items at issue to the general public in areas of the
> store open to them, petitioner had no legitimate expectation of privacy against
> government intrusion, see *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d
> 387 (1978), and that accordingly no warrant was needed. But there is no basis for the
> notion that because a retail store invites the public to enter, it consents to wholesale
> searches and seizures that do not conform to Fourth Amendment guarantees. See
> *Lewis v. United States*, 385 U.S. 206, 211, 87 S.Ct. 424. 427, 17 L.Ed.2d 312 (1966).
> The Town Justice viewed the films, not as a customer, but without payment a
> member of the public would be required to make. Similarly, in examining the books
> and in the manner of viewing the containers in which the films were packaged for
> sale, he was not seeing them as a customer would ordinarily see them.

442 U.S. at 328-29; *see also, Midwest Retailer Assoc., Ltd. v. City of Toledo,* 563 F. Supp.2d 796

(N.D. Ohio 2008)*.* Like the town justice and investigator in *Lo-Ji Sales,* the FBI agents acted not as

clients or customers of the business on the premises. Business invitees are not welcome to occupy

reception areas for hours, are not welcome to set up portable copiers there, are not welcome to take

photos of the businesses' interiors, and are not welcome to page through, examine, and copy the

business's records.

The photographs taken during the inspections tell the story. Plaintiffs' Ex. 32. They show

private business areas posted with signs reading "authorized personnel only" and "no solicitors,"

employee break rooms, individual offices, and private conference rooms. They show areas of five

private residences–kitchen nooks and dining room tables–where a team of government agents set up operation for hours at a time.

The records inspected by the agents were private business records containing personal information about the producers' performers and models.[39] They included names, addresses, aliases, nicknames, dates of birth, and other personal information commonly found in employee personnel files.  The records amounted to an employee roster containing names–including stage names, by whom many of the performers are known– addresses, dates of birth, and the titles of the productions in which the performers appeared.

In *McLaughlin v. Kings Island*, the Sixth Circuit Court of Appeals found that records similar to those at issue here–which were required to be kept pursuant to an OSHA regulation–were private records in which the business had a reasonable expectation of privacy. 849 F.2d 990, 995-96 (6th Cir. 1988).  There, an OSHA compliance officer went to Kings Island amusement park to conduct an investigation of an employee health complaint relating to fog used in theatrical productions that he claimed irritated his eyes and upper respiratory system. *Id.* at 991-92.  The compliance officer requested to see the business's OSHA Form 200s, comprising a log of all reportable occupational injuries and illnesses for the past three years, to review them for hygienic and environmental problems in general. *Id.* at 992. Kings Island refused to provide the officer with all of its Form 200s, and consented only to inspection of premises and records relating to the employee complaint. *Id.* OSHA issued a citation to Kings Island for not producing all the records requested and ordered immediate abatement by their production. *Id.*

The Sixth Circuit held that the regulation authorizing access to the records without a warrant

---

[39]  See Questions 2.d., 16.

was unconstitutional under the Fourth Amendment. *Id.* at 997. In doing so, the court rejected the government's argument that "there is only a minimal expectation of privacy in records required by law to be maintained and produced." *Id.* at 995. The court explained:

> [T]he concept of "required records" is not synonymous with the absence of a privacy interest. We agree with the recent holding of the Eleventh Circuit, in a case directly on point, that employers have a reasonable expectation privacy interest in the records in question, even though the employer is required by law to keep them. *Brock v. Emerson Electric Co.*, 834 F.2d 994 (11th Cir. 1987). "[M]any employers kept records regarding injuries and illness prior to the enactment of OSHA. The fact that this information must now be compiled in a particular format does not serve to strip away a company's attendant privacy interest in that information." *Id.* at 996.

*Id.* Such is true of the 2257 records subject to inspection here; many producers keep records with their performers' private personal information–like legal names, stage names, and addresses–for independent business reasons and did so before the enactment of 18 U.S.C. § 2257.

The provision of the regulations allowing producers to contract with a non-employee custodian to keep the records, 28 C.F.R. § 75.2 (h), is no palliative to the unconstitutional intrusions permitted by the statutes and regulations.[40] In the first place, none of the Plaintiffs other than Marie Levine uses a third-party recordkeeper; very few commercial producers do. And certainly the millions of Americans who create private sexually expression would not.

Secondly, the regulation while allowing producers to contract with a third-party the custodian and requiring the custodian to comply with all the recordkeeping requirements, provides that "such a contract does ***not*** relieve the producer of his liability under [the statutes.]" (emphasis added).[41]

---

[40] See Question 15.

[41] Jeffrey Douglas, the Chair of the Free Speech Coalition, testified that the Coalition had, in fact, advocated for the third-party recordkeeper provision, but had asked that the DOJ create standards for persons undertaking that task and suggested that the government license four or five businesses to serve as custodians who could then constitute a type of clearinghouse where the DOJ
(continued...)

Plaintiffs Tom Hymes and Dave Levingston explained that under the current regulatory scheme, they are simply not willing to take the risk of going to jail if the person whom they hire to keep their records does not properly comply with the law or goes out of business, nor can they afford the expense.  Only Plaintiff Marie Levine uses a third-party recordkeeper.  For her, the quandary was whether to publish her home address in the statement required to be affixed to all of the expression she produces–a risky proposition for a popular adult film star (imagine any Hollywood film star doing so)–or to trust a third party to properly keep her records. She opted for what appeared to be the less threatening choice, albeit one that still presents a risk of consequential harm.

Thirdly, the third-party recordkeeper option does not remedy the Fourth Amendment problems in that it still allows an invasion of the producer's agent's premises and allows an invasion of the producer's records that the third-party custodian maintains in addition to an invasion of the third-party recordkeeper's premises.

**C.     The Administrative Search Exception Does Not Apply.**

That leaves the administrative search exception.  The government carries the burden of establishing that the administrative search exception applies.  *Allinder v. State of Ohio*, 808 F.2d 1180, 1187 (6th Cir. 1987); *United States v. Herrold*, 962 F.2d 1131, 1137 (3rd Cir. 1992) (government bears burden of proof in demonstrating warrantless search is permissible under exception to Fourth Amendment warrant requirement).[42]  It has failed to meet that burden here.

Judge Rendell's concurring opinion in this case examined the administrative search exception

---

[41](...continued)
could go to request and examine age verification records.  That suggestion apparently gained no traction.

[42]  See Question 17.

and concluded that it did not apply. *Free Speech Coalition*, 677 F.3d at 548-50 (Rendell, J., concurring).  The majority did not disagree with the concurrence's fundamental analysis of the administrative search exception, but ruled that a resolution of the question should await development of the record. *Id.* at 544-45.

In determining whether the administrative search exception applies, the threshold matter is whether the law at issue targets businesses within a "pervasively regulated" industry where the expectation of privacy is sufficiently diminished by a history of government oversight. *New York v. Burger*, 482 U.S. 691, 701 (1987).[43]  The "regulatory presence" must be sufficiently comprehensive and defined so "that the owner of ***commercial property*** cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan v. Dewey*, 452 U.S. 594, 600 (1981). (emphasis added).

The inspection regimen in the statutes and regulations at issue here is not limited to commercial premises but applies to private homes as well; the record discloses that inspections were conducted in six residences.  Thus, for that fundamental reason alone, the administrative search exception cannot apply.

Nor are the recordkeeping inspections limited to a specific industry, let alone one that is part of a "closely regulated industry."  The inspection provisions apply to a vast assortment of disparate producers of expression–artists, free lance photographers and journalists, sex educators and therapists, lovers–some of whom create non-commercial expression, and none of whom are part of

---

[43] *See United States v. 4,432 Mastercases of Cigarettes*, 448 F.3d 1168, 1176 (9th Cir. 2006) listing closely regulated industries subject to the warrantless administrative search exception: liquor distribution; sale of sporting weapons; stone quarrying and mining; automobile junkyards; veterinary drugs; transportation of hazardous materials.

any industry, much less a closely regulated one.  Yet the statutes apply to all producers of expression–whether private, non-commercial or otherwise–and authorize warrantless searches of their homes and studios.

However, even if the intrusion were confined to the commercial premises of producers of sexually explicit expression, it would fail under *Burger* because they, too, are not part of a closely regulated industry; the First Amendment prevents that very circumstance.  *J.L. Spoons v. City of Brunswick*, 49 F. Supp. 2d 1032, 1040 (N.D. Ohio 1999); *See also, Deja Vu v. Union Township*, 326 F.3d 791, 806 (6th Cir. 2003) *reheard en banc*, 411 F.3d  777 (6th Cir. 2005);[44] *Annex Books, Inc. v. City of Indianapolis*, 333 F. Supp. 2d 773, 787-89 (S.D. Ind. 2004) *reversed on other grounds,* 581 F.3d 460 (7th Cir. 2009).

But even if that threshold could be cleared, the government has failed to establish that warrantless searches are justified under other *Burger* requirements for administrative searches.  Judge Rendell observed:

> [T]he warrantless inspection regime created by sections 2257 and 2257A is not necessary to further the statutes' purpose. This is not a case where the government must conduct random, unannounced inspections of a business premises to ensure health and safety (as, for example, in the case of mine inspections, *see Donovan v. Dewey,* 452 U.S. 594, 603, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (noting the "notorious history of serious accidents and unhealthful working conditions" in the mining industry)).

*Free Speech Coalition*, 677 F.3d at 549. *Hodgins v. United States Dept. of Agriculture*, 238 F.3d 421 (6th Cir. 2000) (noting administrative search exception requires showing that "the object of the search ... can be quickly hidden, moved, disguised, or altered beyond recognition so that only a surprise inspection could be expected to catch the violations" and not needed where  violations are

---

[44]  The *en banc* court did not reach the merits of the Fourth Amendment issue.

difficult to conceal or correct in a short time); *Allinder*, 808 F.2d at 1187-88 (same); *Midwest Retail,*

563 F.Supp 2d at 807 (same).

The record fully supports Judge Rendell's analysis. When questioned about the effect of

providing advance notice of the inspections, both Agents Lawrence and Joyner admitted there was

little risk that a producer could use the delay to create false evidence, and no risk that they would

destroy any evidence. Thus, no justification exists for warrantless searches under the administrative

search exception. *See Heffner v. Murphy*, 866 F.Supp.2d 358, 380-81 (M.D. Pa. 2012).[45]

### D.    Plaintiffs Have Standing to Challenge the Statutes and Regulations Under the Fourth Amendment, a Challenge that Is Ripe for Review.

And finally, the government has attempted to resuscitate its arguments that Plaintiffs do not

have standing to challenge the statutes and implementing regulations under the Fourth Amendment

and that their claims are not ripe for review. This Court rejected those arguments in denying

Defendant's Motion to Dismiss in Part on the same set of facts[46] presented here. Memorandum re:

Motion to Dismiss in Part (Doc. No. 117).

The current regulation is substantively the same as the prior regulation promulgated in 2005.

Compare 28 C.F.R. § 75.5 with the prior version at 70 Fed. Reg. 29620-21. Any future inspections

will have to be at least as intrusive as the inspections that were conducted under the current

---

[45]   See Questions 2.d., 20, 21, and 22.

[46]   As summarized by this Court, those facts are: "[T]he FBI conducted a total of 29 inspections over a 14-month period between July 2006 and October 2007; the FBI's Section 2257 program was terminated in 2007 after the Sixth Circuit found the statute invalid under the First Amendment (that decision was reversed by the Sixth Circuit en banc in 2009, but no new inspection program was initiated); there is no team currently in place at the FBI that is directed to conduct Section 2257 inspections; and no funding has been allocated for the purpose of conducting inspections pursuant to Section 2257. (Nanavaty Decl. ¶¶ 8-11) (ECF 92)." Memorandum re: Motion to Dismiss in Part (Doc. No. 117) at 5.

regulation's predecessor, for the regulation specifically controls how the inspections are to be conducted and mandates that they be carried out in the same way.

It matters not that the Attorney General has no current inspection program in place. Defendant is obligated to enforce 18 U.S.C. §§ 2257, 2257A and their implementing regulations. Congress specifically directed in 18 U.S.C. § 2257A (k):

> On an annual basis, the Attorney General shall submit a report to Congress–
>
> (1) concerning the enforcement of this section and section 2257 by the Department of Justice during the previous 12-month period; and
>
> (2) including–
>
>> (A) the number of inspections undertaken pursuant to this section and section 2257....

Plaintiffs, of course, have no choice but to continue to comply with the law.[47]  The issue is therefore ripe for adjudication. *Lewis v. Alexander*, 685 F.3d 325, 341 (3rd Cir. 2012); *see also United States v. Windsor*, No. 12-307, slip op. at 7-9 (U.S. June 26, 2013).

---

[47]  See Question No. 24.

## CONCLUSION

Plaintiffs respectfully request that this Court, on the evidentiary record before it, declare 18 U.S.C. §§ 2257, 2257A and their implementing regulations unconstitutional under the First and Fourth Amendments, on their face and as applied, and enjoin their operation and enforcement.

Respectfully submitted,


Dated: July 1, 2013                    /s/ J. Michael Murray
                                       J. MICHAEL MURRAY (0019626)
                                       jmmurray@bgmdlaw.com
                                       LORRAINE R. BAUMGARDNER (0019642)
                                       lbaumgardner@bgmdlaw.com
                                       BERKMAN, GORDON, MURRAY & DeVAN
                                       55 Public Square, Suite 2200
                                       Cleveland, Ohio  44113-1949
                                       (216) 781-5245
                                       (216) 781-8207 (Facsimile)

                                       KEVIN E. RAPHAEL (72673)
                                       KER@Pietragallo.com
                                       J. PETER SHINDEL, JR. (201554)
                                       JPS@Pietragallo.com
                                       PIETRAGALLO GORDON ALFANO BOSICK &
                                       RASPANTI, LLP
                                       1818 Market Street, Suite 3402
                                       Philadelphia, Pennsylvania 19103
                                       (215) 320-6200
                                       (215) 981-0082 (Facsimile)

                                       Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2013, the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
LORRAINE R. BAUMGARDNER (0019642)
BERKMAN, GORDON, MURRAY & DeVAN

KEVIN E. RAPHAEL (72673)
J. PETER SHINDEL, JR. (201554)
PIETRAGALLO GORDON ALFANO BOSICK
 & RASPANTI, LLP

Attorneys for Plaintiffs