**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC. et al., | ) | Civil Action No. 2:09-4607 |
| | ) | |
| Plaintiffs, | ) | Judge Michael M. Baylson |
| | ) | |
| v. | ) | |
| | ) | |
| THE HONORABLE ERIC H. HOLDER, JR., | ) | |
| Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S POST-TRIAL BRIEF**

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

    I.     THE CLAIMS OF PLAINTIFFS THOMAS HYMES AND CAROL QUEEN
           SHOULD BE DISMISSED FOR LACK OF JURISDICTION ............................ 2

    II.    JUDGMENT SHOULD BE ENTERED FOR DEFENDANT ON PLAINTIFFS'
           AS-APPLIED FIRST AMENDMENT CLAIMS .................................................. 5

           A.     The Third Circuit Already Decided that Intermediate Scrutiny Applies,
                 and that the 2257 Requirements Directly Advance the Government's
                 Important Interests and Leave Open Ample Alternative Channels for
                 Communication .................................................................................... 5

           B.     The 2257 Requirements Are Narrowly Tailored as Applied to
                 Plaintiffs ............................................................................................. 6

                 1.     An Age Verification Requirement that Applies Universally to All
                       Depictions that, if They Included Children, Would Be Child
                       Pornography Is Reasonable ............................................................ 7

                 2.     No Plaintiff Qualifies for an Exemption from 2257 Based on the
                       Ages of Individuals Appearing in Their Work ............................. 10

                 3.     Alper Has Not Raised an As-Applied Claim Based on the
                       Notion that She Is Engaged in Purely Private Production of
                       Sexually Explicit Images .............................................................. 12

                 4.     No Plaintiff Is Entitled to an Exemption Based on Specific
                       Burdens Imposed by §§ 2257 or 2257A or Their
                     Implementing Regulations ............................................................ 13

                   4.     No Plaintiff Is Entitled to an Exemption Based on the
                       Artistic, Journalistic, or other Social Value of Their Work .......... 20

                   5.     The Court's Determination that a Particular Plaintiff Is
                     Credible Does Not Entitle that Plaintiff to an Exemption ........... 21

    VI.   THE COURT SHOULD ENTER JUDGMENT FOR DEFENDANT ON
           PLAINTIFFS' FIRST AMENDMENT OVERBREADTH CLAIM ................... 23

           A.     Plaintiffs Bear the Burden to Establish Substantial Overbreadth as
                 Well as a Realistic Danger that, Absent Facial Invalidation, Third Parties'
                 Expression Will Be Chilled .................................................................. 23

           B.     The First and Second *Gibson* Factors Do Not Weight in Plaintiffs'
                 Favor .................................................................................................. 26

                 1.     The Plainly Legitimate Sweep of 2257 Is Vast ............................ 26

                 2.     Plaintiffs have not established a prevalence of "clearly
                     mature adults" in sexually explicit images .................................. 28

        a.   A Vast Amount of Sexually Explicit Images Includes Individuals Who Are Youthful or Very Youthful in Appearance ........................................................... 28

        b.   Plaintiffs Have Not Succeeded in Providing a Quantification of Sexually Explicit Depictions of "Clearly Mature" Individuals .................................................. 32

        c.   The Premise that 2257 Is Invalid As Applied to Any Depiction that Include "Clearly Mature" Individuals Is Itself Flawed.................................................................... 33

    3.   Plaintiffs Have Not Established a Prevalence of "Purely Private" Communications Containing Sexually Explicit Images ........................................................................... 34

        a.   There Are Millions of Publicly Available Sexually Explicit Images on the Internet, and None of These Publicly Available Images Qualify as Private ....................... 34

        b.   Plaintiffs Have Not Succeeded in Providing a Quantification of the Amount of Purely Private Communications, Such as Sexts, that Contain Depictions of Sexually Explicit Conduct, as Defined in the 2257 Regulatory Scheme ................................................. 35

    4.   There Is No Realistic Danger that Purely Private Communications Are in Any Way Affected by 2257.................. 39

  C.   The Third and Fourth *Gibson* Factors Do Not Support Plaintiffs' Overbreadth Claim..................................................................... 41

V.   DEFENDANT IS ENTITLED TO JUDGMENT ON ANY FACIAL FOURTH AMENDMENT CLAIM........................................................... 42

VI.   PLAINTIFFS' AS-APPLIED FOURTH AMENDMENT CLAIM SHOULD BE DISMISSED FOR LACK OF JURISDICTION .......................... 45

  A.   Plaintiffs Have Not Established Standing to Seek Injunctive Relief as to Future Inspections .......................................................... 46

  B.   Plaintiffs Have Not Established that Their As-Applied Fourth Amendment Claim Is Ripe....................................................... 53

VII.   THE INSPECTIONS THAT OCCURRED IN 2006 AND 2007 DID NOT VIOLATE THE FOURTH AMENDMENT ........................................ 54

  A.   The 29 Past 2257 Records Inspections Either Did Not Involve Entry onto Private Premises or Entry Was Consensual ........................... 56

  B.   To the Extent the Fourth Amendment Was Implicated by any of the Past Inspections, Those Inspections Were Reasonable............................. 60

    1.   The Inspections Should Be Upheld Under the Administrative Subpoena Standard................................. 61

2. The Inspections also Qualify as Valid
Administrative Searches ............................................................. 62

3. In the Alternative, the Inspections Should Be Upheld as
Reasonable Based on the Totality of the Circumstances .............. 64

CONCLUSION ....................................................................................................... 65

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*181 South Inc. v. Fischer*,
 454 F.3d 228 (3d Cir. 2006) ........................................................................... 24

*Aiello v. City of Wilmington*,
 623 F.2d 845 (3d Cir. 1980) ...................................................................... 24, 25

*Alexander v. United States*,
 509 U.S. 544 (1993) ........................................................................................ 19

*Am. Library Ass'n v. Reno ("ALA")*,
 33 F.3d 78 (D.C. Cir. 1993) ............................................................. 5, 9, 10, 17

*Ashcroft v. ACLU*,
 535 U.S. 564 (2002) ........................................................................................ 25

*Babbitt v. United Farm Workers Nat'l Union*,
 442 U.S. 289 (1979) .......................................................................................... 3

*Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*,
 715 F.3d 631 (7th Cir. 2013) .......................................................................... 45

*Boliden Metech, Inc. v. United States*,
 695 F. Supp. 77 (D.R.I. 1988) ........................................................................ 44

*Borden v. Sch. Dist. of Twp. of E. Brunswick*,
 523 F.3d 153 (3d Cir. 2008) ........................................................................... 26

*Broadrick v. Oklahoma*,
 413 U.S. 601 (1973) .............................................................................. 24, 25, 26

*Brown v. City of Pittsburgh*,
 586 F.3d 263 (3d Cir. 2009) .................................................................. 14, 21, 23

*Byers v. Intuit, Inc.*,
 564 F. Supp. 2d 385 (E.D. Pa. 2008) ................................................................ 2

*Clapper v. Amnesty Int'l USA*,
 133 S. Ct. 1138 (2013) ................................................................................. 2, 47

*CMR D.N. Corp v. City of Philadelphia*,
 703 F.3d 612 (3d Cir. 2013) ........................................................................... 43

*Connection Distrib. Co. v. Reno*,
   154 F.3d 281 (6th Cir. 1998) ........................................................................ 27

*Connection Distrib. Co. v. Holder*,
   557 F.3d at 321 (6th Cir. 2009) .............................................................. passim

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ...................................................................................... 3

*Daubert v. Merrill Dow Pharm, Inc.*,
   509 U.S. 579 (1993) ............................................................................... 36, 38

*Davis v. FEC*,
   554 U.S. 724 (2008) ................................................................................. 3, 46

*Dole v. Trinity Indus., Inc.*,
   904 F.2d 867 (3d Cir. 1990) ........................................................................ 44

*Donovan v. Lone Steer, Inc.*,
   464 U.S. 408 (1984) .................................................................................... 44

*Dunn-McCampbell Royalty Interest, Inc. v. NPS,*,
   112 F.3d 1283 (5th Cir. 1997) ..................................................................... 14

*Faustin v. City, Cnty. of Denver*,
   268 F.3d 942 (10th Cir. 2001) ....................................................................... 3

*Finley v. City of Philadelphia*,
   No. 11-1205, 2011 WL 3875371 (E.D. Pa. Aug. 31, 2011) ..................................... 59

*Fort Wayne Books, Inc. v. Indiana*,
   489 U.S. 46 (1989) ...................................................................................... 19

*Free Speech Coal., Inc. v. Attorney Gen.*,
   ("FSC II"), 677 F.3d 519 (3d Cir. 2012) ............................................................ passim

*Free Speech Coal., Inc. v. Holder*,
   ("FSC I"), 729 F. Supp. 2d 691 (E.D. Pa. 2010) ................................................. passim

*Free Speech Coal., Inc. v. Holder*,
   No. 9–4607, 2012 WL 6059189 (E.D. Pa. Dec. 5, 2012) ..................................... 47

*Free Speech Coal. v. Gonzales*,
   406 F. Supp. 2d 1196 (D. Colo. 2005) ......................................................... 5, 9

*Freeman v. Corzine,*
629 F.3d 146 (3d Cir. 2010) ............................................ 2, 46, 47

*Friedman v. Market St. Mortg. Corp.,*
520 F.3d 1289 (11th Cir. 2008) ........................................ 6

*Gibson v. Mayor & Council,*
355 F.3d 215 (3d Cir. 2004) ........................................ 25, 26, 41

*Gladstone Realtors v. Vill. of Bellwood,*
441 U.S. 91 (1979) ............................................ 2

*Griffin v. Sec'y of Veterans Affairs,*
288 F.3d 1309 (Fed. Cir. 2002) ........................................ 14

*Hire Order Ltd. v. Marianos,*
698 F.3d 168 (4th Cir. 2012) ........................................ 14

*Holder v. Humanitarian Law Project,*
130 S. Ct. 2705 (2010) ........................................ 4

*In re Paoli R.R. Yard PCB Litig.,*
35 F.3d 717 (3d Cir. 1994) ........................................ 36

*INS v. Delgado,*
466 U.S. 210 (1984) ........................................ 55

*Johnson v. City & Cnty. of Phila.,*
665 F.3d 486 (3d Cir. 2011) ........................................ 7, 8

*Katz v. United States,*
389 U.S. 347 (1967) ........................................ 55

*Laird v. Tatum,*
408 U.S. 1 (1972) ........................................ 3

*Lewis v. United States,*
385 U.S. 206 (1966) ........................................ 59

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ........................................ 2

*Marcavage v. Borough of Lansdowne,*
826 F. Supp. 2d 732 (E.D. Pa. 2011) ........................................ 43

*Marshall v. Barlow's, Inc.*,
  436 U.S. 307 (1978) ............................................................................. 44, 55

*Maryland v. Macon*,
  472 U.S. 463 (1985) ............................................................................. 55

*Massachusetts v. Oaks*,
  491 U.S. 576 (1989) ............................................................................. 40

*Members of City Council v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) ............................................................. 8, 25, 40, 41

*Minnesota v. Olsen*,
  495 U.S. 91 (1990) ............................................................................... 49

*Morissette v. United States*,
  342 U.S. 246 (1952) ............................................................................. 19

*N.Y. State Club Ass'n., Inc. v. City of New York*,
  487 U.S. 1 (1988) ................................................................................. 24

*Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*,
  647 F.3d 202 (5th Cir. 2011) ................................................................ 3

*New York v. Ferber*,
  458 U.S. 747 (1982) ............................................................................. 20

*NVE, Inc. v. Dep't of Health & Human Servs.*,
  436 F.3d 182 (3d Cir. 2006) ........................................................... 14, 43

*Patel v. City of Los Angeles*,
  686 F.3d 1085 (9th Cir. 2012) ............................................................. 57

*Pub. Serv. Co. v. U.S. EPA*,
  509 F. Supp. 720 (D. Ind. 1981) ......................................................... 44

*R.J. Reynolds Tobacco Co. v. FDA*,
  696 F.3d 1205 (D.C. Cir. 2012) ........................................................... 14

*Regan v. Time, Inc.*,
  468 U.S. 641 (1984) ............................................................................. 41

*Renne v. Geary*,
  501 U.S. 312 (1991) ............................................................................. 46

*Salvation Army v. Dep't of Cmty. Affairs*,
 919 F.2d 183 (3d Cir. 1990) ........................................................................ 3

*Schneckloth v. Bustamonte*,
 412 U.S. 218 (1973) .................................................................................. 55

*Sec'y of State v. Joseph H. Munson Co.*,
 467 U.S. 947 (1984) .................................................................................. 24

*See v. City of Seattle*,
 387 U.S. 541 (1967) .............................................................................. 45, 61

*Shoemaker v. Handel*,
 795 F.2d 1136 (3d Cir. 1986) .................................................................... 54

*Sibron v. New York*,
 392 U.S. 40 (1968) .............................................................................. 42, 53

*Tennessee v. Garner*,
 471 U.S. 1 (1985) ...................................................................................... 64

*United States v. Albertini*,
 472 U.S. 675 (1985) .............................................................................. 14, 21

*United States v. Barton*,
 633 F.3d 168 (3d Cir. 2011) ...................................................................... 43

*United States v. Cerri*,
 753 F.2d 61 (7th Cir. 1985) ...................................................................... 59

*United States v. Claus*,
 No. 11-1412, 2012 WL 120081 (3d Cir. Jan. 17, 2012) ............................ 55

*United States v. Jones*,
 132 S. Ct. 945 (2012) ................................................................................ 55

*United States v. King*,
 No. 09-1434, 2010 WL 438417 (3d Cir. Feb. 8, 2010) .............................. 48

*United States v. Lockett*,
 406 F.3d 207 (3d Cir. 2005) ...................................................................... 55

*United States v. Marcavage*,
 609 F.3d 264 (3d Cir.2010) ...................................................................... 43

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) ................................................................ 7, 8

*United States v. Mitchell,*
  652 F.3d 387 (3d Cir. 2011) ...................................................... 43, 64, 65

*United States v. Price,*
  558 F.3d 270 (3d Cir.2009) ................................................................ 55

*United States v. Sczubelek,*
  402 F.3d 175 (3d Cir. 2005) ............................................................... 64

*United States v. Sheehan,*
  512 F.3d 621 (D.C. Cir. 2008) ........................................................... 19

*United States v. Thomas,*
  713 F.3d 165 (3d Cir. 2013) ............................................................... 46

*United States v. Thriftimart, Inc.,*
  429 F.2d 1006 (9th Cir. 1970) ............................................................ 57

*United States v. Watson,*
  No. 04-1573, 2007 WL 2234610 (3d Cir. Aug. 3, 2007) ...................... 55

*United States v. Williams,*
  553 U.S. 285 (2008) .......................................................................... 24

*United States. v. Whispering Oaks Residential Care Facility, LLC,*
  673 F.3d 813 (8th Cir. 2012) ............................................................. 44

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
  454 U.S. 464 (1982) ............................................................................ 2

*Virginia v. Hicks,*
  539 U.S. 113 (2003) .......................................................................... 24

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ................................................................... passim

*Warshak v. United States,*
  532 F.3d 521 (6th Cir. 2008) ............................................................. 54

*Wash. State Grange v. Wash. State Republican Party,*
  552 U.S. 442 (2008) .......................................................................... 43

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ........................................................................ 47

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ...................................................... 4, 46

**Statutes**

5 U.S.C. § 706 .......................................................................... 14, 43

18 U.S.C. § 2256 ......................................................................... 8, 27

18 U.S.C. § 2257 ....................................................................... passim

18 U.S.C. § 2257A ..................................................................... passim

21 U.S.C. § 374(a) ........................................................................... 57

29 U.S.C. § 657(a)(1) ..................................................................... 43

29 U.S.C. § 666(f) ........................................................................... 44

**Regulations**

28 C.F.R. § 75.2 ......................................................................... passim

28 C.F.R. § 75.5 ................................................................... 17, 43, 59

28 C.F.R. § 75.6 ..................................................................... 16, 17

28 C.F.R. § 75.7 ............................................................................. 16

28 C.F.R. § 75.8 ............................................................................. 16

70 Fed. Reg. 29609 ....................................................................... 15

70 Fed. Reg. 29613 ....................................................................... 18

70 Fed. Reg. 29620 ....................................................................... 49

73 Fed. Reg. 77445-46 ................................................................. 18

**Other Authorities**

*Ideal versus Real Regulatory Efficiency: Implementation of Uniform Standards and 'Fine-Tuning' Regulatory Reforms*,
    37 Stan. L. Rev. 1267 (1985) ........................................................................................ 9

## INTRODUCTION

Three issues are before this Court on remand: (1) whether 18 U.S.C. §§ 2257 and 2257A and their implementing regulations ("the 2257 requirements") are narrowly tailored, under the First Amendment's intermediate scrutiny test, as applied to plaintiffs; (2) whether the 2257 requirements are substantially overbroad under the First Amendment in relation to their plainly legitimate sweep; and (3) whether plaintiffs are entitled to injunctive relief under the Fourth Amendment. At least two plaintiffs have failed to show that an actual case or controversy exists with respect to their claims because they are not engaged in any activity implicating the challenged statutes. Moreover, plaintiffs have also failed to show that an actual case or controversy exists with respect to their Fourth Amendment claim for injunctive relief, when the only examples of 2257 inspections that they can rely on occurred in 2006 and 2007 and there is no clear prospect that similar inspections will ever take place in the future.

With respect to plaintiffs' as-applied First Amendment claims, the evidence adduced at trial establishes that no plaintiff is entitled to an exemption from the universal application of the 2257 requirements. All plaintiffs who produce sexually explicit depictions use young and youthful-looking individuals in their work, and none can predict who will appear in their work in the future. As applied to these plaintiffs, a universal rule applying to all depictions of "sexually explicit conduct"—all depictions, in other words, that would qualify as child pornography if an individual under 18 appeared in them—is a reasonable fit.

As for their attempt to invalidate the statutes under the First Amendment's overbreadth doctrine, plaintiffs have failed to establish that any invalid applications of the 2257 requirements are sufficiently substantial to overcome their vast legitimate sweep, with respect to the large quantity of youthful looking individuals across all genres of pornography, and of publicly

available sexually explicit depictions across the Internet. Plaintiffs have also failed to establish that the 2257 records inspections that occurred violated the Fourth Amendment. Judgment should be entered for defendant on all claims.

## ARGUMENT[1]

### I.   THE CLAIMS OF PLAINTIFFS THOMAS HYMES AND CAROL QUEEN SHOULD BE DISMISSED FOR LACK OF JURISDICTION

As a threshold matter, at least two plaintiffs should be dismissed for lack of jurisdiction. As the Supreme Court has recently emphasized, "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) (internal quotation omitted); *accord Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472-76 (1982). As the party invoking federal jurisdiction, a plaintiff bears the burden of proof and persuasion regarding its existence. *Freeman v. Corzine*, 629 F.3d 146, 153 (3d Cir. 2010) (emphasis added) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))). Because the elements of jurisdiction "'are not mere pleading requirements but rather an indispensable part of the plaintiff's case,'" this burden grows greater at each successive stage of litigation. *Byers v. Intuit, Inc.*, 564 F. Supp. 2d 385, 399-400 (E.D. Pa. 2008) (quoting *Lujan*, 504 U.S. at 560-61). At the trial stage, this burden is heaviest of all, and a plaintiff must adduce evidence in order to establish the facts that would be necessary for jurisdiction to exist.  *Id.*; *Lujan*, 504 U.S. at 561 (citing *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979)).

---

[1] The background, statutory and regulatory framework, and procedural history of this case have been set forth in prior briefing, including Defendant's Memorandum in Support of Summary Judgment and Statement of Undisputed Material Facts, and Defendant refers the Court to those descriptions rather than repeating them here. Defendant attaches hereto Proposed Findings of Fact, as well as specific answers to the Court's questions of June 14, 2013.

An essential element of Article III jurisdiction is the requirement that a plaintiff "have standing to sue." *Clapper*, 133 S. Ct. at 1146. The standing requirement "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* The inquiry is thus "especially rigorous" where, as here, reaching the merits of a plaintiff's claims would force the court to decide whether an "action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 1147 (internal quotation omitted).

To establish Article III standing, a plaintiff must demonstrate an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* A plaintiff "'must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006)). Where a plaintiff seeks injunctive relief from a law that has never been enforced against him, this "pre-enforcement plaintiff" must demonstrate "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Even in the First Amendment context, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). Accordingly, this Court has already recognized that "'there must be a real and immediate threat of enforcement against the plaintiff'" for a First Amendment challenge to be justiciable. *Free Speech Coal., Inc. v. Holder* ("*FSC I*"), 729 F. Supp. 2d 691, 740 (E.D. Pa. 2010) (quoting *Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 192 (3d Cir. 1990)).

Under this rule, a plaintiff lacks standing when not engaged in conduct that implicates the challenged statute. *See, e.g., Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209

(5th Cir. 2011) (charitable organizations lacked standing to raise First Amendment challenge to statutory subsection where their method of fundraising did not implicate that subsection); *Faustin v. City, Cnty. of Denver*, 268 F.3d 942 (10th Cir. 2001) (plaintiff lacked standing to seek injunctive relief in challenge to sign-posting ordinance because it had been determined that plaintiff's practice of holding signs without posting them did not implicate the ordinance). In accord with these principles, the Third Circuit found standing lacking when a plaintiff established "no more than a 'possibility'" that it would one day reenter the market in which it claimed its former competitor violated antitrust laws. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 302 (3d Cir. 2012). "'Such some-day intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of . . . actual or imminent injury.'" *Id.*

Here, no plaintiff is in a situation like that in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010), where the plaintiffs pointed to the government's "charg[ing] [of] about 150 persons" with violating the requirements at issue, as a basis for their credible threat of prosecution. *See id.* at 2717. Two plaintiffs in particular stand out as having failed to establish a case or controversy. Thomas Hymes has never engaged in conduct subject to the 2257 requirements. His claim that he would like to become a producer of sexually explicit material revolves around a website that he actively maintained only for a brief period in 2009 while he was working freelance and considering an independent career. When that project failed, he returned to work at AVN, one of the adult entertainment media outlets, and his website became moribund for reasons unrelated to § 2257. Hymes' recent posting of a few stories is not credible as an indication that he actually has a concrete plan to resurrect his website project. *See* Proposed Findings of Fact ¶¶ 28-39. Similarly, Carol Queen is not engaged in any of the activities she

identified as subjecting her to the requirements of 2257. She has not livestreamed her

Masturbateathons for the past three years due to a change in venue unrelated to § 2257, her photo

class has shut down, and her collage art work has stopped.[2] *See id.* ¶¶ 111-119. Both Hymes and

Queen should therefore be dismissed as plaintiffs at this stage without reaching the merits of

their claims.

## II.    JUDGMENT SHOULD BE ENTERED FOR DEFENDANT ON PLAINTIFFS' AS-APPLIED FIRST AMENDMENT CLAIMS

### A.    The Third Circuit Already Decided that Intermediate Scrutiny Applies, and that the 2257 Requirements Directly Advance the Government's Important Interests and Leave Open Ample Alternative Channels for Communication

The Third Circuit already upheld this Court's prior ruling that §§ 2257 and 2257A are

content neutral, and must be evaluated under intermediate scrutiny, not strict scrutiny. *Free*

*Speech Coal., Inc. v. Attorney Gen.* ("*FSC II*"), 677 F.3d 519, 535 (3d Cir. 2012) ("[W]e

conclude that the Statutes are content neutral."). Under intermediate scrutiny, a statute should be

upheld as long as it "(1) advances a 'substantial' governmental interest; (2) does not 'burden

substantially more speech than is necessary' (i.e., the statute must be narrowly tailored); and (3)

leaves open 'ample alternative channels for communication.'" *Id.* (quoting *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 791 (1989)).

The Third Circuit also already held (again upholding this Court) that the first and third

prongs of intermediate scrutiny are satisfied. In regard to the first prong, the Third Circuit

concluded that "[t]he Statutes clearly advance a substantial government interest – protecting

---

[2] Queen has not raised an as-applied First Amendment claim on the ground that she is a collage artist. Am. Compl. ¶¶ 37-39. Rather, her claim is based solely on her alleged activities as a "sociologist, sexologist and feminist sex educator." *Id.* ¶ 37. The record is undeveloped regarding the possible application of § 2257 to her collages, none of which are in the record. In any event, there is no indication that she is currently actively engaged in any collage work.

children from sexual exploitation by pornographers." *Id.*[3] Indeed, the court agreed with the Sixth

Circuit that the 2257 requirements directly advance the government's asserted interest by

> combat[ting] child pornography in at least four specific ways: (1) they ensure that primary producers of sexually explicit expression confirm the ages of their performers prior to filming; (2) they permit secondary producers that publish the depictions to verify that the performers were not children; (3) they prevent children from passing themselves off as adults; and (4) they aid law enforcement and eliminate subjective disputes with producers over whether the producer should have verified the age of a particular performer.

*Id.* (citing *Connection*, 557 F.3d at 329-30).

In so holding, the Third Circuit specifically rejected plaintiffs' arguments that "the

government failed to demonstrate that the Statutes advance that particular interest or that the

problems identified are real, not conjectural." *Id.* at 535-36 & n.12. To the contrary, the court

held "that the government adequately demonstrated that the Statutes advance the substantial

interest of protecting children." *Id.* at 536 (upholding this Court's ruling).

In regard to the third prong of intermediate scrutiny, the Third Circuit recognized that,

while "[t]he Statutes regulate recordkeeping and labeling procedures," they "do not ban or

otherwise limit speech." *Id.* at 535 n.13. Accordingly, the Third Circuit held that "the Statutes

leave open ample alternative channels for communication." *Id.* (upholding this Court's ruling).

The first and third prongs of the intermediate scrutiny analysis at issue in this case are

therefore satisfied, and the Third Circuit "in no wise directed the district court to reexamine" any

of its conclusions with respect to those issues, "nor did the panel postpone the resolution of

---

[3] There is no doubt whatsoever that this interest qualifies as substantial. *New York v. Ferber*, 458 U.S. 747, 757 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."); *Connection*, 557 F.3d at 329 ("No one disputes that the government's interest in protecting children is 'substantial.'"); *Am. Library Ass'n v. Reno* ("*ALA*"), 33 F.3d 78, 88 (D.C. Cir. 1993) ("Appellees concede, as they must, that the Government has a significant – indeed compelling – interest in the prevention of child pornography."); *Free Speech Coal. v. Gonzales*, 406 F. Supp. 2d 1196, 1206 (D. Colo. 2005), ("It does not appear to be disputed that the government interest put forward – preventing child pornography – is significant.").

th[ese] issue[s] pending further discovery on remand." *See Friedman v. Market St. Mortg. Corp.*, 520 F.3d 1289, 1294 (11th Cir. 2008).

### B.    The 2257 Requirements Are Narrowly Tailored as Applied to Plaintiffs

The only question before this Court, with respect to plaintiffs' as-applied First Amendment challenge, is the second prong of the intermediate scrutiny analysis – whether the 2257 requirements are "narrowly tailored" as applied to each plaintiff. Under the "narrow tailoring" standard of intermediate scrutiny, the means chosen by Congress need not be "the 'least restrictive or least intrusive' means of furthering the government's substantial interest." *FSC II*, 677 F.3d at 535 (quoting *Ward*, 491 U.S. at 798). The "narrow tailoring" prong is satisfied "where the statute at issue does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 536 (quoting *Ward*, 491 U.S. at 799). Under this standard, §§ 2257 and 2257A should be upheld if the government's interests "'would be achieved less effectively" if the requirements did not apply to the speech at issue in the case. *Johnson v. City & Cnty. of Phila.*, 665 F.3d 486, 492 (3d Cir. 2011) (quoting *Ward*, 491 U.S. at 799). The Third Circuit has explained that, in intermediate scrutiny, the fit between the challenged regulation and the asserted objective must "be reasonable, not perfect." *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010).

### 1.    An Age Verification Requirement that Applies Universally to All Depictions that, if They Included Children, Would Be Child Pornography Is Reasonable

The Third Circuit remanded the narrow tailoring issue, with respect to plaintiffs' as-applied claims, to allow plaintiffs the opportunity to develop the record regarding the amount of plaintiffs' speech that either does or does not implicate the government's interests, with specific reference to whether the individuals appearing in plaintiffs' work were "obviously adults." *FSC*

*II*, 677 F.3d at 537. But the narrow tailoring analysis in an as-applied context involves more than counting performers in particular age ranges. It involves determining whether providing an exception for a particular plaintiff would make the 2257 requirements generally less effective.

The 2257 requirements apply universally to all depictions of sexually explicit conduct created after a certain date, where the term "sexually explicit conduct" matches the definition of images that would be child pornography if a child were depicted. *Compare* 18 U.S.C. § 2257(h)(1), 2257A(h)(1), *with id.* §§ 2251, 2252, 2256(2)(B)(8) (all referencing definition of "sexually explicit conduct" in 18 U.S.C. § 2256(2)(A)). This perfect fit between the definition of the depictions subject to regulation and the scope of depictions that could be child pornography is similar to the fit that the Third Circuit has approved in other cases. *See Marzzarella*, 614 F.3d at 98 (regulation of firearms without serial numbers fit the government's interest in "preserving the ability of law enforcement" to trace and identify the source of a firearm used in a crime); *Johnson*, 665 F.3d at 493 (city ordinance banning all signs on public street poles "'respond[ed] precisely to the substantive problem" that the City was targeting (signs on street poles) (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984)).

The universality of the requirements, applying to *all* depictions of "sexually explicit conduct" created after a specified date, without regard to the apparent or actual age of the persons depicted, is reasonable because any other alternative would introduce "an ineffectual subjectivity" into the regulatory scheme. *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 331 (6th Cir. 2009) (en banc). As plaintiffs concede, no one can determine an individual's exact age based on the individual's appearance. Indeed, Dr. Biro, an expert in pubertal maturation, testified that, among experts in his field, there is a degree of uncertainty of between one and five years in determining the age of an individual by visual inspection, and that the degree of uncertainty

8

would be greater for people without training and experience in pubertal maturation, or if people attempt to look younger or older than they are. Tr. June 17, 18:23-20:24, 53:12-22, 67:5-22. If producers were required to check age verification documents only when they thought there was uncertainty regarding whether the individual was an adult or a minor, producers would have to rely on their subjective judgment in applying that requirement. It would be difficult for these producers to reliably assess the ages of performers without checking performers' identification documents. Tr. June 17, 27:13-17. That by itself would render the requirements less effective, as other courts that have considered past challenges to these requirements have agreed. *See Connection*, 557 F.3d at 331-32 (recognizing that exceptions based on subjective determinations made by the regulated parties themselves would undermine the requirements' purpose); *ALA*, 33 F.3d at 90 ("The entire point of the Act is to prevent subjective determinations of age by implementing a uniform procedure that applies to all performers."); *Free Speech Coal*, 406 F. Supp. 2d at 1207 (quoting prior Sixth Circuit panel's opinion that "universal requirement of age disclosure, regardless of the apparent age of an individual in a visual depiction, is critical to the government's interest in ensuring that no minors are depicted in actual sexual conduct").

That conclusion is confirmed by the testimony of one of the lead inspectors, SSA Lawrence, who explained that creating exceptions would "gum[] up the . . . inspection process" because subjective exceptions could be used as loopholes and could lead to disputes with producers regarding whether an exception did or did not apply in a particular instance. Tr. June 11, 166:7-167:17. Thus, the universality of the requirements in fact enhances their effectiveness by preventing such disputes. *See* Howard Latin, *Ideal versus Real Regulatory Efficiency: Implementation of Uniform Standards and 'Fine-Tuning' Regulatory Reforms*, 37 Stan. L. Rev. 1267, 1270 (1985) (explaining that attempts to tailor regulations to particularized circumstances

9

may ignore "actual decisionmaking costs and implementation constraints" that could make such attempts less effective than a uniform approach).

Moreover, a requirement that applied only when a depicted individual was below a specific age, such as 25, would introduce the same subjectivity problem. Producers would still be faced with the difficult question of whether a particular individual was older or younger than the cut-off age. Biro Testimony, Tr. June 17, 43:8-22. As SSA Lawrence testified, any cut-off age would tend to lead to disputes between law enforcement and producers because a records inspector may think an individual in a film appears under 25 while a producer may not have thought so at the time the film was created. Tr. June 11, 161:23-165:10; Tr. June 12,  48:17-49:16.

No other court has suggested that 2257 is automatically invalid whenever applied to individuals above a certain age. Instead, the only application that any other court has identified as potentially unconstitutional was "'an illustrated sex manual for the elderly,'" which "not only *confined itself* to self-evidently mature models but also did not permit the depiction of isolated body parts." *Connection*, 557 F.3d at 336 (quoting *ALA*, 33 F.3d at 90) (emphasis added). However, as the Sixth Circuit noted, there was no evidence "that this third-party situation even exists." *Id.*

In this case, the Third Circuit did not quarrel, in general terms, with the government's explanation that "a uniform rule is necessary because sexually explicit images of adults often cannot be distinguished from images showing minors and such a rule eliminates subjectivity as to which performers' ages must be verified." *FSC II*, 677 F.3d at 537. However, with respect to plaintiffs' as-applied challenges, the court noted that, in the absence of discovery, this argument was "in the abstract and may not necessarily apply to all Plaintiffs." *Id.* Citing the "sex manual

for the elderly" hypothetical from *ALA*, the court suggested that "if one of the Plaintiffs employs performers that no reasonable person could conclude were minors, then that plaintiff *may* be able to demonstrate that the Statutes burden substantially more of that plaintiff's speech than is necessary to protect children from sexual exploitation." *Id.* (emphasis added).

> **2.      No Plaintiff Qualifies for an Exemption from 2257 Based on the Ages of Individuals Appearing in Their Work**

As indicated in the Proposed Findings of Fact, no plaintiff confines their production to sex manuals for the elderly that depict only "self-evidently mature models" and also "d[o] not permit the depiction of isolated body parts." *Connection*, 557 F.3d at 336. Indeed, all plaintiffs who have produced sexually explicit materials in the past have used young individuals, including individuals under the age of 25. *See* Proposed Findings of Fact for plaintiffs ASMP (member Morey), FSC (members Conners, Vivid Video), Dodson & Ross, Levine, Sinclair Institute, Levingston, Nitke, Steinberg.

Indeed, several plaintiffs have employed significant percentages of individuals under 25 and under 29. Based on information provided in discovery, defendant calculated the ages of the performers appearing in the depictions of 7 plaintiffs (Dodson & Ross, Levine, Levingston, Morey (ASMP), Nitke, Sinclair Institute , and Vivid Video (FSC)).  Between 21% and 61% of these individuals were under the age of 25, and between 34% and 86% were under the age of 29. Def's Ex. 314A.

In addition, information provided by David Conners, an FSC member and former plaintiff, indicates that 47% of the performers in his films were 25 or younger. Def's Ex. 48, at 7-11. And Linda Diane Wilson, the person in charge of § 2257 compliance at the Sinclair Institute, estimated that approximately 10% of the performers in the videos for which Sinclair is a primary producer are between the ages of 18-20, and 30% are in their twenties. Tr. June 4, 5:4-18.

Dr. Biro examined approximately 150 images produced by plaintiffs without being provided with information identifying the ages of the individuals depicted. Tr. July 17, 24:17-25:3. His overall assessment of the images was that about half of the depicted individuals were "in their twenties or younger." Tr. July 17, 25:6-7. He identified individuals in the work of Conners (FSC), Morey (ASMP), Rosen (ASMP), Levingston, Nitke, Steinberg, Sinclair Institute, and Dodson & Ross who could be confused as minors. Def's Ex. 316; Tr. June 17, 28:3-36:7. He also identified depictions produced by Alper, Dodson & Ross, Levine, Levingston, Nitke, Steinberg, and the Sinclair Institute, where there is not enough information to make a reliable estimate of the person's age or whether they were over 18.  Def's Ex. 316; Tr. June 17, 36:8-40:18.

Moreover, as some plaintiffs have acknowledged, the sexually explicit material that any of these plaintiffs might produce in the future will not be confined to depictions of elderly individuals. For example, Levine indicates she would not rule out performing with an 18-year-old in one of her webshows, Tr. June 5, 52:10-12, and Steinberg indicates he would likely photograph an 18-year-old couple having sex if he had the opportunity to do so, Tr. June 4, 139:5-18. Nitke does not know what her next photography project might be, so she cannot predict who might appear in those photographs, much less their ages. Tr. June 7, 155:5-13. The sexually explicit images that Hymes might wish to use to illustrate a story depend on the story's contents, which cannot be predicted in advance. *See* Tr. June 4, 256:21-23; June 5, 14:7-14.

This unpredictability is further evidence that the requirements are narrowly tailored as applied to these plaintiffs. The requirements would become unworkable if their application to a specific producer changed from project to project or film to film depending on the age ranges of people that that producer happened to be filming during any given time period.

**3.** **Alper Has Not Raised an As-Applied Claim Based on the Notion that She Is Engaged in Purely Private Production of Sexually Explicit Images**

No plaintiff has raised an as-applied claim on the basis that the plaintiff is engaged in purely private production of sexually explicit depictions for personal use in their own home. As described above, in regard to plaintiffs' as-applied challenge, the Third Circuit focused solely on the possibility that a plaintiff might produce work akin to a "sex manual for the elderly." At closing argument, the Court questioned whether plaintiff Barbara Alper had raised an as-applied claim involving purely private depictions. The record does not support that notion. Alper describes herself in the proposed Amended Complaint that was before the Third Circuit, and that was ultimately filed in this case, as a "commercial photographer." Am. Compl. ¶ 35. At trial, Alper acknowledged that she was a working photographer, and ASMP has identified her as one of its members, who consist of photographers who make their living from their photographic work. Mopsik Testimony, Tr. June 3, 54:5-10.  Alper also testified that she had taken photographs of herself and her (future) husband—an assertion that was not included in the Amended Complaint. However, Alper described these photographs as part of her "body of work" as a photographer, and she sold some of these photographs for publication in the Norwegian magazine *Cupido*. Tr. June 4, 225:17-20, 235:24-236:15. Moreover, there is no evidence that any of the photographs Alper has taken of herself and her husband are subject to §§ 2257 or 2257A. Certainly, the examples that appear in the record would not qualify as depictions of sexually explicit conduct. The basis for Alper's as-applied claim is that she feels the 2257 requirements chill her work as a photographer, not that they chill her private communications with her husband. In sum, Alper's as-applied claim is equivalent to those of the other photographer plaintiffs, and should be rejected for the same reasons.

**4.**    **No Plaintiff Is Entitled to an Exemption Based on Specific Burdens Imposed by §§ 2257 or 2257A or Their Implementing Regulations**

Plaintiffs' challenge to the regulatory provisions implementing §§ 2257 and 2257A should also be rejected. Indeed, no First Amendment facial challenge to any regulatory provision is before the Court. [4]

First, the Third Circuit's opinion did not suggest that a particular regulatory requirement within the 2257 scheme could be so burdensome with respect to a specific plaintiff as to justify invalidating the requirement as applied on First Amendment grounds. To the extent particular plaintiffs have cited specific burdens, there are few if any indications that those burdens have hindered plaintiffs' production of sexually explicit depictions. Moreover, there are significant difficulties inherent in the notion that each provision of the 2257 scheme should be evaluated independently as applied to each plaintiff, with the potential result that the 2257 requirements would apply piecemeal, with some parts inapplicable to some individuals and other parts inapplicable to others. The Third Circuit has therefore held that the "'validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case.'" *Brown v. City of Pittsburgh*, 586 F.3d 263, 280 n.17 (3d Cir. 2009) (quoting *Ward*, 491 U.S. at 801); *see also United States v. Albertini*, 472 U.S. 675, 688 (1985) ("The First Amendment does not bar

---

[4] As defendant has previously noted, a facial challenge to the regulations, as opposed to the statutes, could properly be brought only pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which limits a court's review to the administrative (or here, rulemaking) record. *NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 185 (3d Cir. 2006); *see also Hire Order Ltd. v. Marianos*, 698 F.3d 168, 170-71 (4th Cir. 2012) (facial challenge to ATF regulation governed by APA); *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1217-1218 (D.C. Cir. 2012) (considering a First Amendment challenge to FDA regulations under the APA, based on the administrative rulemaking record); *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1317 (Fed. Cir. 2002) (facial challenge to VA regulation was governed by APA); *Dunn-McCampbell Royalty Interest, Inc. v. NPS*, 112 F.3d 1283, 1287 (5th Cir. 1997) (facial challenge to NPA regulations was governed by APA). Plaintiffs have not brought an APA challenge here.

application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests.").

To the extent the Court deems an analysis of regulatory burdens relevant to any plaintiff's as-applied First Amendment claim, no plaintiff has identified specific burdens that might render the 2257 requirements an unreasonable fit as applied to that plaintiff.[5] Certainly, no plaintiff has identified an onerous financial burden associated with 2257 compliance. The only plaintiff that indicated that it spends money to comply with 2257 was Sinclair Institute, which identified the annual cost as $75,000. However, as this Court suggested, that amount is not significant in comparison with the several millions of dollars in revenues that Sinclair Institute earns from its production of sexually explicit material. Tr. June 14, 96:17-97:6; Def's Ex. 133. The relatively minor expense of complying with 2257 is a justified cost of doing business when Sinclair is in the business of selling sexually explicit videos, many of which depict youthful looking performers. Tr. June 14, 96:1-17.

In addition, some of the burdens that certain plaintiffs identified derive from their mistaken understanding of 2257's requirements. Both Alper and Nitke testified that § 2257 prevented them from publishing books containing sexually explicit photographs taken before 1995 together with photographs taken after § 2257 went into effect. But they are simply wrong

---

[5] The Chair of FSC's Board of Directors, Jeffrey Douglas, recited a number of possible difficulties that he believed could arise under the 2257 regulatory scheme. However, Douglas is not a producer subject to §§ 2257 or 2257A, and he had no personal knowledge of these issues. Rather, he was testifying based solely on his own asserted interpretation of the 2257 requirements as well as information he had received from others, including clients who were never identified and whom defendant had no opportunity to locate during discovery or cross-examine at trial. Douglas's testimony on those issues should be stricken as inadmissible hearsay. In the alternative, it should be disregarded since nothing in the record demonstrates that any of the issues Douglas raised results in any significant burden to any significant number of FSC members.

on that point. In fact, nothing in the 2257 requirements prohibits these plaintiffs from publishing such a book, nor would they require these plaintiffs to create new 2257 records for photographs taken before § 2257 went into effect. *See* 28 C.F.R. § 75.2(a) (requirements apply to images of actual sexually explicit conduct "made after July 3, 1995"); 70 Fed. Reg. 29609 (DOJ "imposes no obligations on producers concerning sexually explicit depictions manufactured prior to [July 3, 1995]").[6]

Nitke also described elaborate measures that she undertook to maintain her 2257 records, most of which are entirely unnecessary in order to comply with § 2257. Section 2257 allows records to be kept in digital format all in one place. Nothing requires Nitke to repeatedly rearrange her records in different files based on what is currently displayed on her website. Likewise, nothing requires Nitke to repeatedly revise her cross-referencing system in paper format where she could simply keep a spreadsheet on her computer and add titles and performers to the spreadsheet as she produces more material.

### 28 C.F.R. § 75.8 (labeling of photographs)

Similarly, Levingston testified to his mistaken belief that he must put a 2257 label on each digital image that he takes during a photo shoot, which could be over a thousand images. Tr. June 5, 97:18-21. However, the 2257 requirements do not require photographers to undertake the impossible task of labeling every single digital image created with their camera, as soon as they press the shutter button. While neither the statute nor the regulations provide specific labeling directions for photographers, a digital image uploaded to a website need not be uploaded

---

[6] Though the basis for Alper's and Nitke's confusion on this point is unclear, plaintiffs may attempt to rely on 28 C.F.R. § 75.7 for this misinterpretation. But § 75.7 merely indicates that a producer could not label a book as entirely exempt from § 2257 unless all images in the book were in fact created prior to the effective date of §§ 2257 or 2257A. A book may contain images created before and after the effective date, but it would then not bear a § 75.7 exemption statement; instead, the label would then have to comply with 28 C.F.R. § 75.6 with respect to the post-effective-date images.

with a label already attached; rather, the label can appear on the website, accessible through a

link on each webpage that contains sexually explicit images. 28 C.F.R. § 75.8(d). Similarly, a

photograph in a book need not be inserted into the pages of that book with a label already present

in the image itself; rather, the regulations indicate the label should appear on the title or

copyright page of the book. *Id.* § 75.8(a). And a film need not contain labels while it is still in the

video camera; rather, the label is to be added to the front or end credits, which presumably would

occur towards the end of the postproduction process, as the film is about to be publicly released.

*Id.* § 75.8(b), (c). These details in the regulations are consistent with the clear purpose of the

labeling requirement as identifying the location of 2257 records to those who might view a

sexually explicit depiction *after it has been made publicly available*. As for photographs

displayed in art galleries or museums, the D.C. Circuit suggested long ago that there is no reason

2257 would not allow a label to be attached to the back of the displayed photograph. *ALA*, 33

F.3d at 93.

### 28 C.F.R. § 75.6(b)(3), (f) (inclusion of address in 2257 label)

Levingston also testified that he does not want to produce material subject to § 2257A

because he does not want to publish his home address in a 2257 label. Tr. June 5, 97:5-17.

However, nothing in the record explains why Levingston could not list his studio address since

that is already where he keeps his model release records. *Id.* 89:3-1. Indeed, §§ 2257 and 2257A

contemplate that the records will be kept at a producer's "business premises." 18 U.S.C.

§§ 2257(c), 2257A(c). Alternatively, the regulations allow the address of a third party custodian

to be listed. 28 C.F.R. § 75.6(f).

### 28 C.F.R. § 75.5(c)(1) (20 hour/week availability of records)

Both Hymes and Levingston have referenced the provision in 28 C.F.R. § 75.5 that those

producers who do not maintain regular business hours should identify 20 hours per week when their records would be available for inspection. These plaintiffs appear to view this provision as requiring a producer to stay in proximity to his 2257 records, at the specified location, for 20 hours every week. However, § 75.5(c)(1) has never been enforced in accord with that understanding. To the contrary, the Attorney General adopted this provision, back in 2005, as an accommodation to those producers that indicated they did not maintain regular business hours. 70 Fed. Reg. 29613. In 2008, the Attorney General adopted a third party custodian option in a further effort to respond to concerns expressed during rulemaking. 73 Fed. Reg. 77445-46.

Of course, neither §§ 2257 nor 2257A allows for punishment based solely on a producer's failure to remain in proximity to his records 20 hours per week. Instead, the statutory penalty could only be based on a producer's refusal to allow an inspection that is conducted at a reasonable time in accord with statutory and regulatory requirements. 18 U.S.C. §§ 2257(f)(5), (c), 2257A(f)(5), (c). If no inspection is attempted, no violation of §§ 2257(f)(5) or 2257A(f)(5) can occur. Moreover, the SSAs that led inspections during the 2006/2007 inspection program testified that even when they attempted to initiate an inspection but found the producer absent, they did not treat this as a "refusal" to allow an inspection; rather, they would simply come back later or attempt to contact the producer to arrange a time for inspection. Tr. June 11, 112:21-23, 113:2-7; June 12, 86:6-16, 87:21-88:6.

**<u>Criminal penalties</u>**

Some plaintiffs indicated that, while no aspect of the age verification or recordkeeping requirements was particularly burdensome, their concern was that an inadvertent recordkeeping failure could result in a criminal penalty of a fine and/or up to five years imprisonment. *See* 18 U.S.C. §§ 2257(i), 2257A(i). Of course, the statutory provisions do not require that every

regulatory violation be prosecuted, nor that every prosecution result in a five-year prison sentence. There is no precedent for holding a statute unconstitutional under the First Amendment based solely on the severity of the maximum penalty set forth in the statute, before the plaintiff has even been charged with a violation. To the contrary, courts have recognized the deterrent effect of a criminal penalty as a legitimate end, even in the First Amendment context where any such penalty "'will induce some tendency to self-censorship and have some inhibitory effect on the dissemination of [protected] material.'" *Alexander v. United States*, 509 U.S. 544, 556-57 (1993) (quoting *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 60 (1989)). Plaintiffs cannot claim to be reasonably chilled based on their apparent expectation that, in the event they were to violate the statute and be prosecuted for that violation, a Court would impose a penalty that is disproportionate to the crime committed. That expectation is unfounded and does not provide a valid basis to hold 2257 unconstitutional as applied to any plaintiff.

### Allegation that Third Party Custodian Error Would Impose Strict Liability

Some plaintiffs indicated that they were unwilling to take advantage of the third party custodian option because of their understanding that they would, in effect, face strict liability for any 2257 violation that the third party custodian committed. Plaintiffs' argument that the statutory provisions improperly impose strict liability was considered and rejected in the original proceedings before the Court, and the Third Circuit affirmed this Court's ruling on that issue on appeal. As defendant explained during those earlier proceedings, "[s]trict liability is generally disfavored in criminal law, particularly with respect to cases that implicate the First Amendment," so the fact that the statutory text omits a mens rea requirement "'will not be construed as eliminating that element from the crimes denounced.'" *United States v. Sheehan*, 512 F.3d 621, 629 (D.C. Cir. 2008) (quoting *Morissette v. United States*, 342 U.S. 246, 263

(1952)). Certainly, there is no basis for interpreting a DOJ regulation as imposing strict liability on a producer that uses a third party custodian when strict liability would not apply if the producer were maintaining the records itself.

### 5.  No Plaintiff Is Entitled to an Exemption Based on the Artistic, Journalistic, or other Social Value of Their Work

The Third Circuit did not suggest that any plaintiff might be entitled to an exemption from 2257 for any reason other than the ages of its performers (if those ages suggested that a plaintiff fell into the "elderly sex manual" category). And no plaintiff has suggested that the artistic, journalistic, or educational value of his or her work entitles that plaintiff to an exemption from 2257. Thus, no claim on this basis is properly before the Court. However, to the extent the Court might consider the question relevant, no exemption on this basis is appropriate. Anyone might claim to be a journalist, artist, or educator because the criteria for identifying such individuals are, again, subjective. Hymes Testimony, Tr. June 4, 12:4-11, 12:20-13:11; Steinberg Testimony, Tr. June 4, 148:19-24. Granting a plaintiff's as-applied challenge on this basis would create a loophole in the requirements, allowing other producers to decide for themselves whether the depictions they create or distribute are sufficiently "artistic" or "journalistic" that they need not ensure that their performers are adults, even if the performers appear underage.

And of course, when it comes to child pornography, it simply does not matter how artistic a film or photograph is, if it portrays children engaged in sexually explicit conduct. The Supreme Court has recognized that "a work which, taken on the whole, contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography." *New York v. Ferber*, 458 U.S. 747, 761 (1982). Indeed, it is absolutely "irrelevant to the child who has been abused whether or not" the image recording the child engaged in sexually explicit conduct "has a literary, artistic, political or social value." *Id.* (internal quotation, alteration, and

ellipsis omitted).

A system that would introduce subjective assessments, allowing loopholes and circumvention, would certainly be less effective than the current universal requirement. Moreover, the ultimate harm that is risked by opening a loophole is that a child may be exploited in the creation of child pornography. At that point, the damage has been done, and any benefit from a prophylactic measure such as the 2257 requirements is eviscerated. On the other hand, the current universal requirement does not prohibit any plaintiff from creating sexually explicit expression but merely requires that the plaintiff verify the ages of performers before doing so.

### 6.   The Court's Determination that a Particular Plaintiff Is Credible Does Not Entitle that Plaintiff to an Exemption

The Court has suggested that it finds plaintiffs credible in their assertions that they have no intention to produce child pornography. But a plaintiff cannot prevail in a First Amendment challenge based on the notion that that particular plaintiff would never cause the harm that a law is intended to prevent. The Third Circuit recognized this in *Brown*, when it rejected the plaintiff's attempt to "focus[] narrowly on her own individual activity, asserting that [she should prevail] because her advocacy in front of clinics has always been peaceful." 586 F.3d at 280 n.17. The court recognized that "Brown's behavior is not the relevant benchmark for a generally applicable regulation," and that the "'validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case.'" *Id.* (quoting *Ward*, 491 U.S. at 801); *see also United States v. Albertini*, 472 U.S. 675, 688 (1985) ("The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests.").

A judgment for a plaintiff based on nothing more than a credibility assessment would invite every producer of sexually explicit material to file a separate lawsuit so that his or her own credibility could be judicially evaluated. Such a prospect would render 2257 unworkable, and such a scheme would certainly be less effective than the universally applicable system currently in place. Moreover, applying the requirements to plaintiffs who would never intentionally create child pornography still helps to prevent their inadvertent use of underage performers. Plaintiffs like Alper and Dodson and Ross testified that, without 2257, they would not check age verification documents before taking a sexually explicit photograph or posting a sexually explicit image of someone's genitals online. Indeed, Alper seeks to take sexually explicit photographs of individuals she does not know, under circumstances where it would be difficult to determine whether the individuals are adults, considering that the individuals' faces and other body parts might be obscured while in the act of having sex, and there might be inadequate lighting in the "dunes" and "woods" where Alper described these activities as occurring. And Dodson and Ross admitted that it is impossible to tell someone's age from a picture of that person's genitals, or even by looking at the person live. Tr. June 4, 177:19-21, 209:24-210:6. Indeed Ross believed that a 28-year-old man in one of Steinberg's sexually explicit photographs was 17. Ross Testimony, Tr. June 4, 181:23-183:20; Def's Exs. 36, 120C; *see also* Tr. June 4, 147:2-25 (Steinberg admitting man depicted in Def's Ex. 120C was 28 years old at the time the photograph was taken).

Applying the requirements to plaintiffs also serves numerous other legitimate government interests: It allows secondary producers to assure themselves that plaintiffs have checked performers' ages and have records of having done so, even though the secondary producers did not have the opportunity to check an individual's identification at the time the original image

was created; it allows a viewer of such material to have some level of reassurance that the material being viewed is not child pornography; it also allows law enforcement to trace the location of age verification records, once a plaintiff makes an image publicly available, through the required 2257 label on the depiction; it prevents law enforcement from having a dispute with a plaintiff over the question of whether the plaintiff should have made a 2257 record for a particular performer or not; and it provides an efficient means for a plaintiff to dispel any question that may arise about the age of a performer. *FSC II*, 677 F.3d at 535 (citing *Connection*, 557 F.3d at 329-30).

In sum, none of the possible rationales for any plaintiff's claim to exemption justify any deviation from a uniform requirement. Defendant is entitled to judgment with respect to plaintiffs' as-applied First Amendment claims.

## VI.   THE COURT SHOULD ENTER JUDGMENT FOR DEFENDANT ON PLAINTIFFS' FIRST AMENDMENT OVERBREADTH CLAIM

Plaintiffs have not met their burden to establish substantial overbreadth, as would be required to hold §§ 2257 and 2257 facially invalid as to all applications. A statute may be struck down on its face only if it "*cannot* be applied consistently with the Constitution." *Brown v. City of Pittsburgh*, 586 F.3d 263, 269 (3d Cir. 2009) (internal quotation omitted).  In other words, a law may be struck down only if it is "unconstitutional in every conceivable application," or it seeks to "prohibit such a broad range of protected conduct that it is constitutionally 'overbroad.'" *Id.* (internal quotation omitted).  The Third Circuit in this case recognized that plaintiffs' facial challenge does not assert that the 2257 requirements are unconstitutional in every conceivable application but instead relies solely on a theory of overbreadth. *FSC II*, 677 F.3d at 537-38.

### A.     Plaintiffs Bear the Burden to Establish Substantial Overbreadth as Well as a

**Realistic Danger that, Absent Facial Invalidation, Third Parties' Expression Will Be Chilled**

The rationale behind the overbreadth doctrine is that, even when a statute is constitutional as applied to the plaintiff, its "'very existence'" may have a chilling effect on others not before the court, causing them "'to refrain from constitutionally protected speech or expression.'" *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). This doctrine allows a court to alleviate burdens on protected speech, but only where the harm that is caused by invalidating a law that Congress enacted to address real evils can be justified. For when a statute is deemed facially invalid, even otherwise legitimate applications of the statute are "totally forbidden"— leaving the harms originally identified by Congress to continue unabated until such time in the future when a new law might be enacted. *Broadrick*, 413 U.S. at 613; *see United States v. Williams*, 553 U.S. 285, 292 (2008) (recognizing the "obvious harmful effects" of "invalidating a law that in some of its applications is perfectly constitutional"); *Aiello v. City of Wilmington*, 623 F.2d 845, 855 (3d Cir. 1980) ("[F]acial invalidation is not a finely honed scalpel in the hands of a judicial surgeon but a broad-blade instrument, which must be applied with restraint."). Thus, the Third Circuit in this case warned that "[d]eclaring a statute unconstitutional on overbreadth grounds is 'strong medicine' and should be used 'sparingly and only as a last resort.'" *FSC II*, 677 F.3d at 537 (quoting *Broadrick*, 413 U.S. at 613). And the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292 (citing *Broadrick*, 413 U.S. at 615); *see also 181 South Inc. v. Fischer*, 454 F.3d 228 (3d Cir. 2006) (rejecting overbreadth challenge to state regulation because *Broadrick*'s "substantial" standard could not be met). Striking down a law is inappropriate when there is a "core of easily identifiable" conduct that the statute can constitutionally regulate. *Sec'y of State v. Joseph H.*

*Munson Co.*, 467 U.S. 947, 964-67 (1984)

Plaintiffs "bear[] the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (quoting *N.Y. State Club Ass'n., Inc. v. City of New York*, 487 U.S. 1, 14 (1988)); *see also Ashcroft v. ACLU*, 535 U.S. 564, 584 (2002) (rejecting plaintiffs' overbreadth challenge because they failed to show that statute's overbreadth was "'not only . . . real, but substantial as well'" (quoting *Broadrick*, 413 U.S. at 615)). Moreover, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

The Third Circuit has identified four factors relevant to the overbreadth analysis: "(1) the number of valid applications of the statute, (2) the historic or likely frequency of conceivably impermissible applications, (3) the nature of the activity or conduct sought to be regulated, and (4) the nature of the state interest underlying the regulation." *FSC II*, 677 F.3d at 537-38 (internal quotation omitted). The Third Circuit has applied these factors in prior cases, upholding the challenged law.

In *Aiello*, the court rejected an overbreadth challenge to state restrictions on the off-duty conduct of firemen because "the facial overbreadth of these rules, if any, fades significantly when compared with their otherwise legitimate sweep." *Aiello*, 623 F.2d at 856. In *Gibson v. Mayor & Council*, 355 F.3d 215 (3d Cir. 2004), the court rejected an overbreadth challenge to a directive that required police officers to "be truthful and forthright at all times," even though the plain language of the directive potentially applied to any context, including communications between father and son or husband and wife, because the scenarios of supposedly

unconstitutional applications advanced by the plaintiff were "more than slightly unrealistic." *Id.*
at 226. The court emphasized that "an invalid application that is far-fetched does not deserve as
much weight as one that is probable," and held that "the number and weight of permissible
applications far outweigh the possible invalid applications, if not in number, then certainly in
kind." *Id.* at 226-27 (internal quotation omitted). Significantly, the court did not look to the
number of occurrences of parents lying to children, or police officers lying to their spouses, but
to the realistic probability that the directive would ever be applied in such a context. *See id.*

In a third case where the Third Circuit applied what it called the "*Gibson* factors,"
*Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153 (3d Cir. 2008), it also upheld the
regulation at issue, which prohibited faculty participation in student-initiated prayer. *Id.* at 166.
The court pointed to "numerous valid applications" of the regulation, and the school district's
compelling interest in avoiding Establishment Clause violations, as justification for its ruling,
noting that "any concern about overbreadth may 'be cured through case-by-case analysis of the
fact situations to which [the regulation's] sanctions, assertedly, may not be applied.'" *Id.*
(quoting *Broadrick*, 413 U.S. at 615-16).

**B.      The First and Second *Gibson* Factors Do Not Weigh in Plaintiffs' Favor**

The questions that the Third Circuit identified in this case as appropriate for evidentiary
development on remand implicate the first and second *Gibson* factors. The Third Circuit
recognized that there were two grounds that plaintiffs had identified as potentially rendering the
2257 requirements substantially overbroad: (1) their contention that a "'vast quantity' of
protected sexually explicit depictions include performers who are 'clearly mature adults' that
'could not be mistaken for children,'" and (2) their contention that "the Statutes are
unconstitutionally overbroad based on their purported regulation of purely private conduct." *FSC*

*II*, 677 F.3d at 538. The evidentiary record does not support facial invalidation of the 2257 requirements on either of these grounds.

### 1.    The Plainly Legitimate Sweep of 2257 Is Vast

With respect to the first *Gibson* factor, the plainly legitimate sweep of the 2257 requirements is undeniably vast. In each instance where the requirements apply, the government legitimately seeks to ensure that producers verify in advance that their performers are adults because, if they were not, the production at issue would exploit children and qualify as illegal child pornography. *Compare* 18 U.S.C. § 2256(2)(A), *with* 18 U.S.C. §§ 2257(h)(1), 2257A(h)(1) (cross-referencing § 2256(2)(A)). Indeed, the Sixth Circuit previously concluded that "the overwhelming majority of applications of § 2257 do not offend" the First Amendment. *Connection*, 557 F.3d  at 335-42; *accord Connection Distrib. Co. v. Reno*, 154 F.3d 281, 292 (6th Cir. 1998).  Moreover, as discussed with respect to plaintiffs' as-applied claims, the uniform application of the 2257 requirements serves to enhance their effectiveness by eliminating subjective determinations, which could lead to inadvertent mistakes or disputes over whether the requirements should have been followed in a particular instance. However, as discussed in greater detail below, even crediting plaintiffs' theory that the requirements are invalid as applied to depictions of "clearly mature adults" or "purely private conduct,"[7] the plainly legitimate sweep of the requirements remains vast, and plaintiffs have not adduced countervailing evidence that establishes that any overbreadth on either ground could be deemed "substantial."

### 2.    Plaintiffs have not established a prevalence of "clearly mature adults"

---

[7] The Government continues to maintain that the statutory language in §§ 2257 and 2257A does not reflect an intent to apply the requirements in the context of "private, noncommercial depictions created and viewed by adults in their homes." *FSC II*, 677 F.3d at 538. Leaving such images outside the scope of the 2257 regulatory scheme does not interfere with the otherwise universal application of the requirements because, as one of the lead inspectors testified, such images would by definition be confined to the private use of the individuals depicted and their intimate associates and thus would not come to the attention of the Government in the first place.

**in sexually explicit images**

    **a.**    **A Vast Amount of Sexually Explicit Images Includes Individuals Who Are Youthful or Very Youthful in Appearance**

The record shows that a vast quantity of sexually explicit depictions includes youthful-looking individuals. In addition to specific categories intended to depict youthful looking individuals who could be confused as minors, the vast majority of other sexually explicit materials depicts youthful looking individuals as to whom the requirements of §§ 2257 and 2257A have a plainly legitimate application.

To begin with, the category of "teen porn," which depicts very youthful-looking individuals, appears throughout Internet websites focused on sexually explicit content. On the most popular and most trafficked pornography websites PornHub, XNXX, and Redtube, images that are identified as including "teens" and associated terms appear on between 27.5 to 34.2 percent of the pages in those sites. Dines Testimony, Tr. June 7, 62:5-63:10; Def's Ex. 182. The same methodology yields far lower amounts of images identified as "MILF." *Id.* 63:21-64:2. Teen porn is not only prevalent in regard to the quantity of images available online, in an absolute sense, but is also the most popular category sought by viewers of pornography. Dines Testimony, Tr. June 7, 55:9-20, 57:7-18; Def's Exs. 180, 181. Indeed, this category is growing in popularity. Dines Testimony, Tr. June 7, 65:2-12 (searches for teen porn have increased 215% from 2004 to 2013); id. 68:6-69:7 (taking allied terms in to account, such as "teen sex," "young porn," "teen pussy," and "young pussy," would probably yield an even greater increase in the popularity of the teen porn genre).

Plaintiff Levine admits that "[i]t's not uncommon to see women who have recently reached the age of majority in adult films." Tr. June 5, 58:2-5. Dr. Linz also agrees that "teen

porn" is extremely popular. Tr. June 14, 64:15-18. Indeed, Linz found that the number of images associated with "teen porn" (16,800) in Pornhub.com, the most popular pornographic site in the United States, exceeded the amount of images associated with "MILF" (6,974) and "mature" (2,019) porn combined. Tr. June 14, 63:5-64:11.

Teen porn is itself only a subset of the material that includes youthful-looking individuals who could be confused as minors. Other genres of pornography include youthful-looking individuals as well. Indeed, Internet pornography in general focuses on women who are youthful looking, often with characteristics that disguise their actual age, such as surgically enhanced breasts, shaved pubic hair, coiffed hair, and a lot of makeup. Dines Testimony, Tr. June 7 41:5-24. Even the genre known as "MILF" or "mature" includes youthful-looking individuals in scenarios such as an older woman seducing or having sex with a younger male or female. Dines Testimony, Tr. June 7 52:5-20; *see also* Def's Exs. 260-284 (examples of mature performers appearing with youthful looking males and females, compiled from a list provided by plaintiffs in discovery of websites claimed to support their overbreadth claim); Def's Exs. 85C, 87, 88, 169, 170, 172, 306, and 307 (images of Marie Levine and David Conners, two "mature" FSC members, performing with teens and other young individuals); Def.'s Ex. 124A, 124D, 124F, 124K, 124M, 124N, 124Q, 124T, 124U, 124W, 124Y, 125B, 125I, 125M, 125V, 126A, 126F (Sinclair Institute videos depicting older men and women performing with teens and other young men and women).

Even individuals in their late twenties can be youthful-looking enough to be confused as minors. Dr. Biro testified that individuals up to 30 years of age could reasonably be confused as minors, particularly if they attempt to look younger. Tr. June 17, 56:10-15, 67:5-22. Indeed, Dr. Linz reported in one of his articles that research has demonstrated that viewers of "barely legal"

pornography perceive models who are 25 years old or older as substantially younger than 18. Tr. June 14, 70:10-21. Even models over 25 in regular sexually explicit depictions who are not trying to appear younger can be confused as minors. For example, as described above, when Plaintiff Carlin Ross was shown a sexually-explicit photograph of a 28-year old man taken by Plaintiff Steinberg, without being told the man's age, she stated that the man appeared to be 17. Ross Testimony, Tr. June 4, 181:23-183:20; Steinberg Testimony, Tr. June 4, 147:2-25.  Even Dr. Biro, who examined the same photograph without knowing the man's age, could not say with confidence that the man was over the age of 18. Tr. June 17, 39:22—40:18 ("There's certain cues that tell me that he should be under 18. There's certain cues that I have that tell me that he should be over 18. I am at a loss.").[8]

  Although there is no concrete estimate of the amount of pornography depicting individuals in their twenties, there is evidence suggesting that the amount is vast. For example, countless sexually-explicit images from a wide array of sources, including images produced by Plaintiffs and FSC and ASMP members, depict young and youthful-looking performers who could reasonably be confused as minors.[9]  That most of the sites that Premium Cash, the operator

---

[8] Dr. Biro examined Def's Ex. 168E, which is the same picture in Def's Ex. 120C and Def's Ex. 36.

[9] *See* Def's Exs. 31-32 (Morey screenshots Part I); 33A-J (Rosen screenshots); 47 (Conners DVD covers); 85A-C (Cougarscravekittens); 86B-D (sites linked to nina.com); 87 (Redtube); 124-126 (Sinclair Institute videos); 128 (Adam & Eve videos); 129 (Sinclair Institute catalogues); 229A, 229D (18xgirls); 229B-229C, 231A-231G (First Time Video girls); 230 (bitchcrawler); 233A-233D (lethalpass); 234 (moms bang teens); 235 (Pornhub screenshots); 236A (AVN screenshots); 236C (Porn XXX facebook page); 236D (pornstars models facebook page); 236E (Wicked facebook page); 289 (All Good Video screenshots); 291A-E (Bacchus – Filmco videos); 292A-C (Adult.com videos); 293A-C (Darkside Entertainment screenshots); 294A-G (Diabolic screenshots); 295A-I (Don Goo screenshots); 296 (Erotic Angel dba K-Beech screenshots); 297A-C (Evasive Angel screenshots); 298A-D (Ghost Pro – Fifth element screenshots); 299A-B (JT Video screenshots); 300 (Moonlight Entertainment screenshots); 300 (Moonlight Entertainment screenshots); 301 (Private dba Pure Play media screenshots); 302 (Robert Hill screenshots); 303 (RWG screenshots); 304 (Shane's World screenshots); 305A-C (Wicked screenshots).

of Plaintiff Levine's website, links to her site are of women in their twenties reveals the profitability of sexually explicit depictions of youthful looking women. Levine Testimony, Tr. June 5, 54:11-24; Def's Ex. 86C. Indeed, Levine testified that employing youthful-looking performers brings financial benefits to producers of sexually explicit depictions. Levine Testimony, Tr. June 5, 67:18-20. Most women in pornography enter the industry in their twenties, and by 29 they are already considered "MILFs", "cougars," or "mature." Levine Testimony, June 5 Tr. 63:15-64:2.  With respect to the material produced by plaintiffs in this case, between 34% and 86% of the performers of several plaintiffs have been under the age of 29.  Def's Ex. 314A.

Of course, there is also a great deal of child pornography distributed online. Child pornography can be transmitted through any medium that could be used to transmit a sexually explicit image, such as e-mail, image boards, commercial websites and internet applications. Wolak Testimony, Tr. June 11, 27:21-28:6; Linz testimony, Tr. June 14, 64:19-65:14. Child pornography is continually produced, swapped and traded in almost every community in the United States, primarily via the Internet. Def's Ex. 194; Linz Testimony, Tr. June 14, 60:12-18. Often, homemade child pornography is sold or traded and winds up on commercial child pornography websites or in magazines, movies and videos. These visual images are often reproduced and circulated again and again, sometimes for profit. Def's Ex. 194; Linz Testimony, Tr. June 14, 60:19-61:1. Indeed, child pornography has been linked to legitimate commercial adult websites. Wolak Testimony, Tr. June 11, 46:22 - 47:1-17.

People arrested for possession of child pornography often possess images of pubescent children. According to Wolak, two thirds of those arrested for possession of child pornography have images in their possession of minors between 13 and 17 years old. Wolak Testimony, Tr.

June 11, 30:4-16. Moreover, the percentage of child pornography victims who were adolescents, as opposed to prepubescent children, increased from 47% in 2000 to 70% in 2009. *Id.* 31:18-32:6. Wolak testified, based on her research into the prosecution of child pornography crimes, that "it can be difficult to distinguish a sexually mature 13 or 14-year-old from an 18 or 19-year-old who's an adult." *Id.* 35:18-20. As a result, prosecutors often base child pornography charges on images of prepubescent children even where the same defendant also possessed child pornography depicting adolescents. *Id.* 35:5-25.

> **b.**  **Plaintiffs Have Not Succeeded in Providing a Quantification of Sexually Explicit Depictions of "Clearly Mature" Individuals**

Plaintiffs' evidence does not demonstrate a prevalence of "clearly mature" individuals in sexually explicit images, in comparison to the vast amount of youthful-looking individuals appearing in this material.

Dr. Linz's estimate that only 10% of sexually explicit material involves individuals who could be confused as minors is unreliable. His estimate is based primarily on a division of the number of Google "hits," or search results, that he obtained by searching for the term "teen porn" (136,000,000) by the number of hits he obtained from searching for the term "porn" (1.3 billion). Linz Testimony, Tr. June 14, 27:6-23. But a Google search for the word "porn" will yield books, articles, blogs, and other webpages that contain no sexually explicit images at all. Linz Testimony, Tr. June 14, 48:5 - 53:2; *see also* Dines Testimony, Tr. June 7, 60:15-61:3 (explaining a search for the term porn would identify webpages that contain no images).[10] Accordingly, Linz's calculation does not estimate the proportion of actual "teen porn" images in relation to "porn" images. Linz Testimony, Tr. June 14, 52:14-17. In contrast, Dines conducted

---

[10] While Linz suggested that the same would be true of the phrase "teen porn," nothing in the record demonstrates that there are an equal number of textual references to "teen porn" and to "porn" on the Internet. As the more general term, "porn" is likely to appear more frequently than the phrase "teen porn."

searches on pornographic websites that are known to contain sexually explicit images. Def's Ex. 182; Dines Testimony, Tr. June 7, 61:6- 65:1; Linz Testimony, Tr. June 14, 62:2-63:4.[11]

Linz also appeared to suggest that 2257 need not apply to any images on the Internet, based on the notion that there is no child pornography on the Internet. Dr. Linz cited no authority for that notion, and it is directly contradicted by the testimony of Ms. Wolak, an expert in online child pornography, who cited a recent report finding "about 9,500 web pages that contained child pornography," with a quarter of those sites being commercial websites that one had to pay to access. Tr. June 11, 46:2-47:17. On the whole, Linz's testimony does not meet the standard for reliability or relevance under *Daubert v. Merrill Dow Pharm, Inc.*, 509 U.S. 579, 591 (1993), and should not be considered by the Court in its overbreadth analysis.[12]

### c.     The Premise that 2257 Is Invalid As Applied to Any Depictions that Include "Clearly Mature" Individuals Is Itself Flawed

A simple numeric comparison of "youthful" versus "clearly mature" individuals in sexually explicit images does not adequately account for other factors that bear on the validity of the requirements' application. As already explained in connection with plaintiffs' as-applied claim, it would be impracticable to impose the 2257 requirements on only a subset of producers or images based on the ages of performers. The fact that a sexually explicit depiction includes a performer of a particular age therefore does not render the 2257 requirements invalid as applied to that depiction, that depiction's producer, or that performer. As already explained, the uniform application of the requirements, regardless of the apparent age of an individual performer, is

---

[11] Linz also failed to take into account the significant variation in the number of Google hits one could get over time.  For example, calculating the proportion with the number of Google hits for these terms that one could get if one does the search on another day yields the significantly higher proportion of 28% "teen porn" hits.  *See* Def's Ex. 192.

[12] This Court previously indicated that it would take Defendant's Motion to Exclude Plaintiffs' Expert Testimony under advisement and consider it as a Motion to Strike after all testimony had been concluded. Order of May 28, 2013 (ECF No. 190). For the record, defendant renews his motion to strike this testimony.

necessary to achieve the government's substantial interests without introducing an "ineffectual subjectivity" that creates the potential for loopholes and circumvention. *Connection*, 557 F.3d at 331 (rejecting the argument that § 2257 was overinclusive because it applied to performers over 30, as Congress's intention in enacting the statute was to remove subjectivity in age verification).

To the extent plaintiffs have identified sexually explicit images that contain "clearly mature" individuals, those individuals are intermingled with more youthful-looking individuals in the same depictions, on the same websites or portions of websites, and in the work of the same producers. *See* Def's Exs. 260-284. Plaintiffs have not identified any producers of "sex manuals for the elderly," who *only* produce images in which *all* individuals are sufficiently mature that no one could ever mistake them for minors, and who *never* include images of isolated body parts in their work. The hypothetical posited by other courts as a potential exception to the uniform 2257 requirements, *see FSC II*, 677 F.3d at 537; *see also Connection*, 557 F.3d at 336, remains purely hypothetical. In short, plaintiffs have failed to establish substantial overbreadth based on the apparent ages of individuals appearing in depictions of sexually explicit conduct.

### 3.      Plaintiffs Have Not Established a Prevalence of "Purely Private" Communications Containing Sexually Explicit Images

#### a.      There Are Millions of Publicly Available Sexually Explicit Images on the Internet, and None of These Publicly Available Images Qualify as Private

The core of plaintiffs' overbreadth challenge—that the 2257 requirements purportedly encompass a substantial amount of purely private communication—was wholly unsustained at trial. It is indisputable that a vast amount of sexually explicit depictions is produced for sale or trade and made publicly available. Indeed, most if not all plaintiffs in this case who themselves create sexually explicit material do so as part of a commercial endeavor and provide public access to their work on the Internet. Members of the adult entertainment industry, such as FSC

members Sinclair Institute, Levine, and Conners, sell sexually explicit DVDs or videos that can be purchased and downloaded directly from the Internet, and run websites where individuals can view some sexually explicit material for free and pay to access other material online. Photographers such as Alper, Levingston, Nitke, and Steinberg publish books, exhibit work for sale in galleries, and sell individual images for public display in museums or libraries or in magazines and other publications. Nitke, Levingston, Steinberg, and ASMP member Craig Morey also have websites providing access to such images, and Morey sells access to certain sexually explicit images on his website, using a website membership business model similar to that used by Levine or Conners. Mopsik Testimony, Tr. June 3, 57:5-7; Levine Testimony, Tr. June 5, 44:19-45:7. The record contains many other examples of publicly available sexually explicit images. *See* Def's Exs. 229-305. Some sexually explicit images that appear on websites are accessible for free. Others require paid subscriptions. As with any Internet content, some images that are accessible to viewers for free nevertheless generate revenues through advertisers that post ads on the website, or through "click-through" links, such as those described by Levine. Levine Testimony, Tr. June 5, 54:25-56:8; Linz Testimony, Tr. June 14, 66:14-21; Dines Testimony, Tr. June 7, 25:17-24, 27:11-21, 28:15-25, 29:1-2. Nothing in the record provides a basis for any finding regarding how many freely accessible images are commercial or noncommercial in nature.

   Sexually explicit images that do not generate revenue are also properly subject to 2257 if they are posted online for public consumption. Such images do not qualify as "private." Indeed, a significant amount of sexually explicit material that plaintiffs attempt to categorize as "private" is in fact publicly available on the Internet and thus falls within the plainly legitimate sweep of the 2257 requirements. Tube sites such as PornHub contain millions of publicly available

sexually explicit images. Dines Testimony, Tr. June 7, 62:9-18; Def's Ex. 182. Sites that plaintiffs identify as "dating," "hookup," or "social networking" sites also include publicly available sexually explicit material. Pl. Exs. 37, 116. As plaintiffs' own evidence shows, even where such a site requires member registration prior to accessing certain content, registration is open to any member of the public. *Id.* And indeed, Wolak testified that her research had identified cases where young adolescents, 13- and 14-year-old girls, were participating in social networking sites such as Adult Friend Finder. Wolak Testimony, Tr. June 11, 81:5-14. The posting of sexually explicit images on these websites is not an act of private communication between two adults involved in an intimate relationship and does not fall outside the plainly legitimate sweep of §§ 2257 and 2257A.

> **b.     Plaintiffs Have Not Succeeded in Providing a Quantification of the Amount of Purely Private Communications, Such as Sexts, that Contain Depictions of Sexually Explicit Conduct, as Defined in the 2257 Regulatory Scheme**

Plaintiffs failed to set forth in the record any evidence of actual private, noncommercial depictions of sexually explicit conduct created and viewed by adults in their homes. Instead, plaintiffs primarily rely on testimony of two experts, Michelle Drouin and Marc Zimmerman, who purport to quantify the occurrence of "sexting" – sending sexually suggestive messages from one individual directly to another by cell phone or other electronic device. But the estimates provided by Drouin and Zimmerman provide no basis for evaluating the quantity of sexts or other private, noncommercial communications that contain "sexually explicit" images within the meaning of 2257 and 2257A. Because, as described below, neither Drouin nor Zimmerman provides any insight into the amount of private, noncommercial images that, based on their content, would be covered by 2257 and 2257A, their testimony should be excluded from the

Court's overbreadth analysis.[13] *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not

relate to any issue in the case is not relevant and, ergo, non-helpful." (internal quotation

omitted)); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (holding that "even

if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be

excluded if it is not scientific knowledge *for purposes of the case*").

Significantly, the various studies Drouin and Zimmerman conducted or relied on each

described sexting in a different way.[14] All of these studies, moreover, included images depicting

only breasts or cleavage – which would not qualify as "sexually explicit" for purposes of §§

2257 or 2257A – in their analyses. Yet only one of these studies differentiated among the types

of content depicted, such as images of intercourse, masturbation, breasts, or cleavage.

Consequently, neither expert was able to identify how many images, out of all those included in

their estimates, actually met the definition of "sexually explicit" applicable to 2257 and 2257A

(such as images of intercourse or masturbation), and how many (such as images of breasts or

cleavage) did not. Tr. June 3, 177:4-13; Tr. June 12, 147:11-23.

Furthermore, neither of the estimates was limited to people in romantic relationships, nor

did either measure the frequency with which people sent such images or how many people

---

[13] Dr. Linz also testified that "millions" of Americans exchange sexual images through electronic means and adult dating sites. Linz testimony, Tr. June 14, 65:15-18. However, Linz has never conducted any research on this topic. *Id.* 46:7-18. His opinion seems to be based solely on the fact that there are a number of mechanisms by which adults *could* exchange such depictions. In addition, like Drouin and Zimmerman, Linz has no information regarding the proportion of any such images that might depict "sexually explicit conduct" within the meaning of §§ 2257 and 2257A. *Id.* 65:19-66:13.  He also does not know the proportion of people making money through these images. *Id.* 66:14-21.

[14] *See, e.g.*, Def.'s Ex. 187 at 001876 (reporting number of respondents "involved in some type of naked sexting"); Def.'s Ex. 188 at 001886 (defining "sexually suggestive" images to mean "semi-nude or nude personal pictures"); Def.'s Ex. 189 at 001902 (defining sext as "a sexually suggestive nude or nearly nude" image); Def.'s Ex. 190 at 001908 (asking whether respondents had sent "erotic or nude photographs").

included in their estimates had sent "mass sexts," i.e., images sent to multiple recipients.[15]  Tr,

June 3, 179:4-13; Tr., June 12, 147:24 – 148:17. In addition, neither expert used a reliable

methodology for measuring the prevalence of sexting nationwide.  Drouin considered six

different studies, three of which used students enrolled in undergraduate psychology classes at

certain universities, that had prevalence rates ranging from 20% to 54%, and she based her

estimate on where she believed there to be a "convergence of the evidence" or "what [the

studies] said collectively." Tr. June 3, 181:10-182:12. As explained in the testimony of Dr. Philip

Stark, however, this methodology is not a statistical method and does not ensure that Drouin's

estimate is nationally representative because none of the studies Drouin used were themselves

reliably representative of a national population. Tr. June 17, 85:18 – 86:20. Zimmerman's

estimate is similarly the product of unreliable methodology. His own sexting study, which forms

the primary basis of his estimate, used a convenient sampling method known as respondent-

driven sampling, rather than random sampling, to select participants, a method that is analogous

to "fishing" for participants using gift cards as bait. Tr. June 17, 89:12-22. Although Zimmerman

weighted his data and also noted that prevalence rates for drug use from his sample were similar

to rates from a nationwide study, the fact that his sample aligns with national data in regard to

drug use has no bearing on whether the sample is a reliable national estimate in the context of

sexting.[16] *Id*. 90:7 – 91:25. This lack of a reliable methodology is an additional basis on which

---

[15] Despite her testimony to the contrary, it is evident that Drouin's estimate was also not limited
to people who had sent images of themselves. Three of the six studies Drouin considered—
including the two that she personally conducted—were not so limited. Tr. June 3, 177:14 –
178:25.  Drouin offered no explanation at trial for why her estimate should be construed to
include only people who sent images of themselves, especially in light of the fact that she
considered all six studies "equally." Tr. June 3, 182:25 – 183:2.

[16] To illustrate this point, Dr. Stark recounted a well-known study on women and their happiness
and satisfaction in relationships in which the demographics of the sample population closely
matched the demographics of the national population, but there was a significant disparity
between the two with regard to the issue being examined in the study.  Tr., June 17, 90:18 – 91:6.

the Court should reject the estimates provided by Drouin and Zimmerman. *See Daubert*, 509

U.S. at 590 (holding that to be reliable, an expert opinion "must be derived by the scientific

method" and "supported by appropriate validation—i.e., 'good grounds'").[17]

      Plaintiffs also appear to rely on various internet website screenshots and other materials,

*see* Pls.' Exs. 37 and 116,[18] to demonstration the purported prevalence of private,

noncommercial exchanges of sexually explicit images, but their reliance in this regard is

misplaced. As an initial matter, both Plaintiffs' Exhibits 37 and 116 consists largely of hearsay—

in many instances multiple layers of hearsay—and therefore were not admitted for the truth of

the matter asserted.  Tr. June 14, 77:2-9. Moreover, even if these materials were considered for

their purported truth content, they nonetheless fail to shed any light on the amount of "private,

noncommercial depictions created and viewed by adults in their homes" that are covered by §§

2257 and 2257A.  *See FSC II*, 677 F.3d at 538. Most of the documents related to sexting, for

example, make no distinction between text-only messages and messages with visual depictions.

*See, e.g.*, Pls.' Ex. 37-PPP, QQQ, TTT, VVV, BBBB, CCCC, DDDD, HHHH. And even where

a document is limited to visual depiction only, it is far from clear that the types of images

described or displayed fall within the purview of 2257 and 2257A.  *See, e.g.*, Pls.' Ex. 37-QQ,

RR, SS, TT, UU, VV, WW, XX, YY, AAA, BBB, CCC, DDD, EEE, FFF, GGG, HHH, JJJ,

---

[17] As indicated *supra* note 11, defendant renews his motion to strike this testimony. *See* Order of May 28, 2013 (ECF No. 190).

[18] Plaintiffs also seek to rely on the declaration of Kristi Witsman, a computer forensic specialist for the Department of Justice, who submitted that document in 2005 in conjunction with a prior lawsuit challenging 2257. *See* Pls.' Ex. 42. The Court has already ruled that the attachments to that declaration are inadmissible. Tr. June 14, 80:9-24. The Court also cast doubt as to the relevance of any information contained in the declaration, given that it was written eight years ago. *Id*. 79:24-80:2. Nevertheless, the information contained in the declaration pertains only to the number of people who purported to access certain websites and lacks any information about whether these persons exchanged sexually explicit images that are or could be subject to the requirements of §§ 2257 and 2257A. As such, this exhibit has no bearing on the Court's overbreadth analysis.

LLL, MMM, NNN, OOO, RRR, SSS, UUU, VVV, WWW, XXX, EEEE, IIII, JJJJ.

The remainder of Exhibits 37 and 116 consists of screenshots of adult dating websites and various artistic works. To the extent 2257 and 2257A apply to images on these sites, they are plainly not private images "created and viewed by adults in their homes," *FSC II*, 677 F.3d at 538. Instead, these images have been posted to websites accessible by members of the general public or by persons who obtain a non-exclusive membership to access the website. They are therefore irrelevant to the Court's inquiry into the quantity of private, noncommercial depiction to which 2257 and 2257A apply.

### 4.      There Is No Realistic Danger that Purely Private Communications Are in Any Way Affected by 2257

Even if plaintiffs had succeeded in quantifying the amount of "private, noncommercial depictions created and viewed by adults in their homes," *FSC II*, 677 F.3d at 538, they have not shown that 2257 should be held facially invalid on this basis. Again, the plainly legitimate sweep of 2257 encompasses a vast amount of publicly available sexually explicit material produced by the adult industry and others and posted on the Internet. The underlying rationale for an overbreadth claim does not support striking down the 2257 requirements, including all of their valid applications. While the Third Circuit has held that the plain language of the statutes do not distinguish between publicly available and purely private images, this Court can still take into account the fact that, as a practical matter, an image that is truly private is unlikely ever to come to the attention of the Government (or anyone other than the couple that privately shares such an image). Indeed, the record does not contain a single example of a truly private image – such as a sext, homemade video kept in a married couple's home, or image sent by e-mail – presumably because plaintiffs were unable to find any. SSA Lawrence testified regarding the methods that the FBI used to identify producers subject to 2257 and indicated that these methods would not

identify any private communications of this kind. Lawrence Testimony, Tr. June 11, 96:18-98:5.

Given that purely private communications are private and are for that reason very unlikely to be subject to 2257 inspections or 2257 enforcement measures of any kind, there is no basis to assume that individuals are being chilled in such expression, nor is there any evidence in the record regarding any such chill. That fact is relevant to the determination of whether any overbreadth in this context could qualify as "substantial" in a manner that could warrant facial invalidation. Under the Supreme Court's standard, facial invalidation is inappropriate unless there is "a realistic danger" that the third parties engaging in the protected expression at issue are being chilled from engaging in such expression. *Taxpayers for Vincent*, 466 U.S. at 800-801; *see also Massachusetts v. Oaks*, 491 U.S. 576, 584 (1989) (plurality) ("Overbreadth is a judicially created doctrine designed to prevent the chilling of protected expression. An overbroad statute is not void *ab initio*, but rather voidable, subject to invalidation notwithstanding the [criminal] defendant's unprotected conduct out of solicitude to the First Amendment rights of parties not before the court.").

Here there is no realistic danger of such a chill. This case is similar to *Regan v. Time, Inc.*, 468 U.S. 641 (1984), where the Court considered the constitutionality of a statute that prohibited reproductions of currency unless they were published. The plaintiff, a publisher, sought to raise an overbreadth claim on the ground that the publication requirement, by its plain language, would prohibit "Polaroid snapshots of children holding currency," in addition to other hypothetical applications. *Id.* at 651 n.8 (plurality). However, a plurality of the Court rejected such a claim because "[t]here is no evidence that the Government has ever, or will ever, interpret the statute" to apply in such contexts. *Id.* The plurality emphasized that "[i]t is important to remember that the overbreadth doctrine operates as an exception to the normal rules of standing"

and that it is therefore "up to the party invoking the doctrine to demonstrate 'a realistic danger' that the [challenged law] will significantly compromise recognized First Amendment protections of parties not before the Court.'" *Id.* (quoting *Taxpayers for Vincent*, 466 U.S. at 801). This case is also similar to *Gibson*, where the Third Circuit denied an overbreadth challenge because there was no realistic possibility that police officers would be disciplined based on lies told to their children or spouses. *Gibson*, 355 F.3d at 226. As in those cases, plaintiffs have failed to establish that the existence of private communications including sexually explicit images presents a situation where the overbreadth doctrine can properly be invoked. There is therefore no justification for applying the "strong medicine" of facially invalidating the statutes on this basis.

### C.    The Third and Fourth *Gibson* Factors Do Not Support Plaintiffs' Overbreadth Claim

The third and fourth *Gibson* factors do not weigh in favor of an overbreadth holding. The activity subject to regulation—production of depictions of sexually explicit conduct that, if they included minors, would qualify as child pornography—is not mere speech; it is an activity that involves filming real people engaging in sexual acts. The government interest in ensuring that producers of such material take the simple precaution of checking the ages of the individuals who appear in such work, and keep records having done so, is compelling. Indeed, if the prophylactic measures set forth in §§ 2257 and 2257A fail, the gravest consequence is not that other statutory provisions (those that criminalize child pornography possession and distribution) will be violated; it is the risk that children will be harmed through their exploitation in the creation of sexually explicit material. Once that harm occurs, it cannot be undone, even if the producer is ultimately prosecuted for violation of child pornography laws.

In sum, plaintiffs have not established that the 2257 requirements are overbroad, nor have they demonstrated that any overbreadth, if it exists at all, could be deemed "substantial," either in

an absolute sense or relative to the requirements' vast and plainly legitimate sweep as to sexually explicit images.

## V.     DEFENDANT IS ENTITLED TO JUDGMENT ON ANY FACIAL FOURTH AMENDMENT CLAIM

As defendant has previously argued, the Third Circuit's remand did not contemplate that a facial Fourth Amendment challenge would continue to be at issue in this case. The Third Circuit relied heavily on *Sibron v. New York*, 392 U.S. 40 (1968), a case in which the Supreme Court refused to address the facial constitutionality of the statute at issue and instead emphasized that the "concrete factual context of the individual case" was necessary to address an *as-applied* claim. *See id.* at 59, 62.[19] However, even if this Court were to consider a facial Fourth Amendment challenge to §§ 2257 and 2257A, it should deny such a challenge.

A facial challenge would necessarily be limited to the statutory text. "'A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case.'" *Marcavage v. Borough of Lansdowne*, 826 F. Supp. 2d 732, 739-40 (E.D. Pa. 2011) (quoting *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir.2010)). Moreover, in a facial challenge, plaintiffs bear the heavy burden of establishing that "'no set of circumstances exists under which the [challenged] Act would be valid.'" *CMR D.N. Corp v. City of Philadelphia*, 703 F.3d 612, 623 (3d Cir. 2013) (quoting *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (en banc)). In other words, plaintiffs would have to establish that "'the law is unconstitutional in all of its applications.'" *United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

---

[19] This Court indicated in its Order denying summary judgment that it agreed with defendant on this issue. However, the Court subsequently suggested that it had reconsidered that decision. Defendant continues to maintain that no facial Fourth Amendment claim is before the Court, but for the sake of efficiency will not repeat prior briefing on that issue.

The statutes here state that producers shall make their 2257 records "available to the Attorney General for inspection at all reasonable times." 18 U.S.C. §§ 2257(c), 2257A(c). This language easily comports with the Fourth Amendment. Indeed, a facial Fourth Amendment claim can be rejected without any analysis of exceptions to the warrant requirement because under this plain statutory language, a records inspection could occur pursuant to an administrative subpoena or an administrative warrant.

A useful comparison here is the statutory language of OSHA, which authorizes the Secretary of Labor "to enter without delay and at reasonable times" any workplace in order to conduct an inspection of the premises. 29 U.S.C. § 657(a)(1). Unlike §§ 2257 or 2257A, OSHA purports to authorize actual entry into and inspection of business premises, not simply inspection of records that are, under the same provision, statutorily required to be kept.[20] Yet in *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978), the Court  recognized that the statutory language in OSHA would allow the Secretary to obtain an ex parte administrative warrant, either as a general matter or on a case-by-case basis after a business owner had refused to allow entry. *Id.* at 316; *see also Boliden Metech, Inc. v. United States*, 695 F. Supp. 77, 81 (D.R.I. 1988) (recognizing EPA's authority under Toxic Substances Control Act to obtain ex parte administrative warrants even though statute was silent on the question); *Pub. Serv. Co. v. U.S. EPA*, 509 F. Supp. 720, 723 (D. Ind. 1981) (same, in regard to Clean Air Act). The Court reached that conclusion even though OSHA provides for criminal penalties for those who give advance notice of an inspection

---

[20] The statutory language in OSHA is similar to the regulatory language in 28 C.F.R. § 75.5(a), part of the DOJ regulations implementing §§ 2257 and 2257A. As defendant has previously noted, a facial challenge to the DOJ regulations, as opposed to the statutes themselves, could properly be brought only pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which limits a court's review to the administrative (or here, rulemaking) record. *NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 185 (3d Cir. 2006). Plaintiffs have not brought an APA challenge to the regulations. However, even if they had done so, a facial Fourth Amendment challenge would be baseless for the same reasons explained here.

without the Secretary's authorization. *See Barlow's, Inc.*, 436 U.S. at 317-18 (citing 29 U.S.C. § 666(f)). Thus, under *Barlow's*, plaintiffs are precluded from raising a facial challenge on the basis that §§ 2257 or 2257A authorize warrantless searches.

Any facial challenge should also be rejected because the statutory authorization of records inspections in §§ 2257 and 2257A can be analyzed under the framework applicable to administrative subpoenas. Indeed, the Third Circuit has previously distinguished subpoenas for records from inspections of premises in the OSHA context, recognizing that "[r]equiring that an employer produce for the Secretary's inspection records that by law he must keep for her use is hardly equivalent to undertaking a comprehensive plant inspection." *Dole v. Trinity Indus., Inc.*, 904 F.2d 867, 873 (3d Cir. 1990). It is well established that an administrative subpoena does not require a warrant and is analyzed under a general reasonableness standard. *See Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984); *United States. v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 816 -817 (8th Cir. 2012).

The situation here is analogous to that addressed by the Seventh Circuit in *Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631 (7th Cir. 2013). There, the court construed statutory and regulatory language that similarly imposed recordkeeping requirements and authorized the government to inspect and copy records on request. *See id.* at 645. The court noted that the records inspections at issue did not involve "government inspectors themselves open[ing] file cabinets and examin[ing] computer hard drives," but instead simply "require[d] mine operators to allow [Mine Safety and Health Administration ("MSHA")] inspectors to review and keep copies of the records." *Id.* Thus, even though "the Mine Safety Act does not expressly refer to  MSHA's document review power as the power to issue an 'administrative subpoena,' the authority the Act confers upon MSHA amounts to an administrative subpoena in

substance." *Id.* at 646. The court held that the government's requests to inspect records pursuant to the Mine Safety Act comported with Fourth Amendment requirements for administrative subpoenas because the requests were "'sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.'" *Id.* (quoting *See v. City of Seattle,* 387 U.S. 541, 544 (1967)).

Here, to the extent the Court were to consider the question based on the statutory language alone, a request to inspect the very records that §§ 2257 and 2257A require is, as a matter of law, sufficiently limited in scope, relevant in purpose, and specific in directive. Again, plaintiffs cannot meet their burden to show that the statutes' records inspection provision is invalid in all possible applications. Judgment on any facial Fourth Amendment challenge should be entered for defendant.

## VI.   PLAINTIFFS' AS-APPLIED FOURTH AMENDMENT CLAIM SHOULD BE DISMISSED FOR LACK OF JURISDICTION

As defendant has previously explained, only 29 inspections have taken place pursuant to the 2257 requirements, under an inspection program that was operated by the FBI for a limited period in 2006 and 2007 and was then terminated before this case was ever filed. While four of the 27 producers that were inspected are FSC members, neither FSC nor any other plaintiff can establish jurisdiction to seek injunctive relief as to future action, based on those past inspections that occurred in a time when the scope of 2257 was different, digital recordkeeping was not as common, third party custodians were not permitted by the regulations, and the government had formulated an inspection scheme with the idea that the number of producers was in the hundreds, not in the millions. If the Court were to evaluate whether each of the 29 inspections that occurred in 2006 and 2007 comported with Fourth Amendment requirements, its 29 holdings would not justify an injunction as to future inspections under a program that, for all we know, could look

very different from the program that briefly existed in the past. Rather, the result would simply be 29 advisory opinions about particular circumstances that may never recur. *United States v. Thomas*, 713 F.3d 165, 168 (3d Cir. 2013) ("A judicial decision rendered in the absence of a case or controversy is advisory, and federal courts lack power to render advisory opinions.").

 Defendant has described above plaintiffs' burden to establish jurisdiction at this stage. *See Freeman*, 629 F.3d at 153. This heightened burden to establish an Article III "case or controversy" applies to both standing and ripeness. *See Renne v. Geary*, 501 U.S. 312, 315-16 (1991). Here, plaintiffs have not met their burden with respect to either standing or ripeness.

### A. Plaintiffs Have Not Established Standing to Seek Injunctive Relief as to Future Inspections

 A plaintiff "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis*, 554 U.S. at 734 (internal quotation omitted). Thus, a plaintiff seeking injunctive relief must establish that he is "under a threat" of suffering the injury that he alleges. *ZF Meritor, LLC*, 696 F.3d at 301. It is well established, as confirmed by the Supreme Court in *Clapper*, that, for injunctive relief, the asserted injury "'must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 133 S. Ct. at 1147 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). The Court rejected the notion that an "objectively reasonable likelihood" of future injury was sufficient. *Id.* at 1146. Moreover, a plaintiff must show, not that some speculative future injury might be redressed, but that its *asserted* injury would be "redressable by a favorable ruling." *Id.* at 1147.

 This Court has previously suggested that plaintiffs have standing because theoretically, based on the pleadings and the statutory framework alone, any plaintiff could be subject to an inspection under 18 U.S.C. §§ 2257 or 2257A at an undetermined point in the future. *FSC III*,

2012 WL 6059189, at *3. However, as discussed above, the very premise of the Third Circuit's remand was that the statutory framework alone was insufficient to evaluate a Fourth Amendment challenge, and that such a challenge required examination of the "concrete factual context" of an inspection that had actually occurred. *FSC II*, 677 F.3d at 543-44. Nothing in the record establishes that, if a new inspection program were initiated, any future inspection under that program would take place in the exact same concrete factual context as any of the inspections that occurred back in 2006 and 2007. Plaintiffs have thus failed to adduce any evidence of a "certainly impending" future injury redressable by injunctive relief. *Freeman*, 629 F.3d at 153 (emphasis added) (internal quotation omitted).

Among the factual details that the Third Circuit identified as potentially relevant here are: "when and where" an inspection occurred, the "specific information the government reviewed," whether the government complied with applicable regulations during the inspection, whether the producer had an objective expectation of privacy in the particular area and effects searched, the "frequency and extensiveness" of inspections under the program in effect at the time, whether the producer whose records were inspected was "engaged in commercial activities within a particular industry," and whether the inspection involved a "common-law trespass," which is itself a "fact-intensive inquiry." *FSC II*, 677 F.3d at 544-46.

The "where" of an inspection is one detail that cannot be predicted based on the record of the 29 inspections that occurred in 2006 and 2007. Indeed, even among those inspections, there was no uniformity in the locations where inspections occurred. Some inspections occurred at the locations identified in the 2257 label appearing on a producer's video or website. In many of those instances, the locations were business premises while in other instances, they were residences that may also have been business addresses. Within the category of "business

premises," some inspections occurred in a business's reception area or other entry area while one occurred in a shared space that was not within the producer's office. Some inspections did not occur at the locations identified in the 2257 label. Some of those occurred at business premises, others at storage units, and others at residences that, again, may also have been business addresses. Thus, even if a future inspection might resemble one of the 29 past inspections, the question would still be, which one? The analyses of reasonable expectation of privacy and common law trespass might depend on that question, but the only answer that the past inspections provide—other than the fact that it was always the producer that determined where the team would set up and how the records would be provided—is that the circumstances varied. That fact alone is fatal to plaintiffs' standing because, even if the Court were to conclude that a "search" occurred at a particular inspection, and that the Fourth Amendment required a warrant for that particular search, such a holding could not possibly apply to every one of the 29 inspections that occurred in the past. *Cf. United States v. King*, No. 09-1434, 2010 WL 438417, at *5 (3d Cir. Feb. 8, 2010) ("To establish standing, the party contesting the legality of the search bears the threshold burden of establishing that he or she had a reasonable expectation of privacy in the property searched and the item seized.") (citing *Minnesota v. Olse*n, 495 U.S. 91, 96-97 (1990)).

The circumstances of particular future inspections are even more likely to vary, even if the general procedures of a future program resembled the procedures used in the past. One reason for this is that, in 2006 and 2007, the regulations in effect did not allow producers to keep their 2257 records with third-party custodians, whereas now they do. *Compare* 28 C.F.R. § 75.2(h), *with* 70 Fed. Reg. at 29620. While one of the lead inspectors testified that the team informally accepted the use of third party custodians even in 2006 and 2007, the express

authorization of that option in the regulations could lead to an increase in its use.[21] At least one

plaintiff, Marie Levine, who is also a FSC member, now keeps her 2257 records with a third-

party custodian, as permitted by the current regulations; that custodian's address, in Montreal,

Canada, appears on the 2257 statement on Levine's website. Levine Testimony, Tr. June 5,

52:13-25. FSC member Conners also lists a third party custodian's address on the 2257 statement

on his website. Def's Ex. 64A, E, F. Neither Levine nor any other FSC member using a third

party custodian could assert a reasonable expectation of privacy or common law trespass with

respect to any inspection of records kept with the third party custodian.

But it is far from certain that future inspections would follow the same procedures used in

2006 and 2007. In fact, there is good reason to think they might not. One indication of how

procedures might change is that, even during the old program, three inspections took place at

FBI offices because the producer had either downloaded the relevant 2257 records from the

producer's digital files onto a CD provided by the inspection team (Private, Pl. Ex. 21), had

provided paper copies of the records to the FBI (Temptations, Pl. Ex. 26), or had emailed copies

of the records to the FBI from Thailand (Ghost Pro, Pl. Ex. 16). As one of the lead inspectors

testified, if a producer kept its 2257 records in digital form, the inspection team would give the

producer the option of downloading the specific 2257 records that the team had selected for

inspection onto a CD that the team would provide, so that the team could review the records back

at its offices. Joyner Testimony, Tr. June 12, 82:13-83:18. In 2006 and 2007, the team found that

most records were kept in paper form. Lawrence Testimony, Tr. June 12, 16:16-23. However, the

regulations plainly allow records to be kept in digital form, see 28 C.F.R. § 75.2(f), and in the

---

[21] Plaintiffs at trial attempted to discount the third party custodian option on the theory that
producers would face strict liability for any recordkeeping error that a third party custodian
might make. As discussed above, there is no basis to assume that any provision of §§ 2257 or
2257A imposes strict liability.

five years since 2007, it is likely that more 2257 records are being kept in digital form. *See* Wilson Testimony, Tr. June 3, 230:23-231:14 (describing conversion of Sinclair Institute's 2257 records from paper to digital form).

In combination with that significant possibility is the fact that, if a new inspection program were to be established at some point in the future, the government would be aware that the number of potential candidates for an inspection would be far greater than the 300 producers that the FBI originally identified when setting up the prior program in 2006. Indeed, by the end of 2007, the FBI had recognized that there were potentially over a million additional producers of online images of sexually explicit conduct that it had not yet identified. Lawrence Testimony, Tr. June 11, 99:8-17. That number has likely increased over the past five years since the Internet has only expanded during that time. Moreover, the scope of producers today, unlike during the prior inspection program, would include secondary producers as well as primary producers, and would include producers of material that consists solely of lascivious exhibition of the genitals or pubic area. In 2006 to 2007, the producers that had been identified were all members of the commercial adult entertainment industry; indeed, the methods that the lead inspectors used to identify producers during that period included collecting names of producers at adult industry trade shows, and using a newspaper article that had a map of adult industry producers in the Los Angeles area. Not surprisingly, the majority of inspections during that period occurred in Chatsworth, California (the heart of the adult industry), and nearby cities. There is no reason to think the same would be true today, when it is far more likely that producers would be identified primarily through the Internet.

Given these changes, it is not reasonable simply to assume that the Attorney General would go about establishing an inspection program in the exact same way he did before, with a

team of inspectors located in the Los Angeles area going out in person, as a group, to the addresses listed on 2257 statements. After all, an inspection program could be carried out in a very different manner. An inspection of 2257 records could be conducted by requesting at the outset that the producer download copies of specific digital records onto a CD. Such a request could be made without ever visiting a producer's place of business, or if the Attorney General determined that the records should be requested in person, the requests could be made by a single inspector without ever going beyond the public reception area of a business or the front door threshold of a residence.[22] If the "where" of future inspections were thus limited, the arguments that plaintiffs seek to make now regarding reasonable expectation of privacy, or whether a common law trespass occurred, would necessarily have no relevance.

There are other possibilities as well. If the Attorney General decided to establish a new 2257 records inspection program, he could adopt a policy of seeking an ex parte administrative warrant before initiating an inspection. In that event, plaintiffs certainly could not raise any challenge based on the premise of a "warrantless search." Again, nothing in the statues or regulations prevents the Attorney General from adopting such a policy. Indeed, during the prior inspection program, inspectors understood that if a producer denied entry, they were supposed to contact FBI Headquarters for further instructions, which according to the checklist that they followed, could include seeking an administrative warrant or other court order. Lawrence

---

[22] At trial, plaintiffs' counsel attempted to make much of the fact that the inspections that took place in 2006 and 2007 usually (though not always) included a photograph of the location where 2257 records were stored. It is clear that, in taking these photographs, the FBI inspection team was simply attempting to be thorough in documenting a producer's compliance with the segregation requirement set forth in 28 C.F.R. § 75.2(e). It was undoubtedly within the FBI's discretion to include such a photograph as part of the inspection process, particularly when all evidence indicates that the producers readily agreed to such photographs, and the process of taking such a photograph took only a minute and was in no way intrusive. However, nothing in the regulations *requires* that such a photograph be part of the inspection process. It would be equally within the Attorney General's discretion to inspect 2257 records without taking a photograph of the location where records were kept.

Testimony, Tr. June 11, 108:21-111:15. Because no producer ever denied access to its 2257 records, or in any way expressed reluctance to allow access, this situation never arose. In any event, the notion that a future inspection program would involve warrantless inspections is nothing more than an assumption at this stage, and the Court should not rule on the constitutionality of an inspection program based solely on an assumption, particularly where the Attorney General has never had occasion to consider how to design an inspection program that extended to producers outside the adult industry or that was likely to involve primarily digital records. As this Court has already recognized, it is a matter of sheer speculation how a future program might operate.

Plaintiffs have therefore not met their burden to adduce evidence that a future inspection would necessarily be the same as any of the inspections that occurred in 2006 or 2007. In light of the Third Circuit's holding in remanding this case that a "concrete factual context" is necessary to evaluate whether a particular inspection comports with Fourth Amendment requirements, the mere fact that a statute is involved here does not mean that plaintiffs' as-applied Fourth Amendment claim is redressable. In other words, enjoining inspections that would repeat the "concrete factual context" of past inspections (which have not occurred for over five years) would not redress a future injury because there is a reasonable prospect that a future inspection program would be different anyway for reasons that have nothing to do with this case.[23]

Significantly, in *Sibron*, the case on which the Third Circuit relied, the Court limited its analysis to "the reasonableness of the searches and seizures which underlie these two convictions," and there was a direct connection between that issue and the remedy sought in that case—the overturning of those convictions on the basis that the evidence obtained through those

___
[23] Even if a future inspection program were similar to the one in the past, it would not be possible to predict which of the 29 inspections a future inspection might resemble. Each inspection had its own concrete factual context. Pl. Exs. 1-30.

searches and seizures should have been excluded. *See Sibron*, 392 U.S. at 62. Here, on the other hand, there is a fatal disconnect between the various inspections that occurred in the past and the remedy of enjoining potentially different inspections in the future. Plaintiffs cannot possibly meet their burden to establish that any defects in past inspections would be redressed through injunctive relief.[24]

### B.   Plaintiffs Have Not Established that Their As-Applied Fourth Amendment Claim Is Ripe

For similar reasons, plaintiffs cannot meet their burden to establish that an as-applied claim challenging future inspections of uncertain parameters is ripe. "The Fourth Amendment is designed to account for an unpredictable and limitless range of factual circumstances, and accordingly it generally should be applied after those circumstances unfold, not before." *Warshak v. United States*, 532 F.3d 521, 528 (6th Cir. 2008) (en banc). In order to establish that an as-applied Fourth Amendment challenge to future inspections is ripe, plaintiffs bear the burden to show that there is a "concrete factual context" for these possible future inspections, but, as discussed, the conduct and circumstances of future inspections are a matter of pure speculation. This situation is similar to that considered in *Warshak*, where the Sixth Circuit noted that the government had sought Warshak's e-mail communications from Internet Service Providers twice in the past, yet concluded that Warshak's attempt to assert a claim with respect

---

[24] Plaintiffs previously argued that they have standing to assert their Fourth Amendment claim because they face "compliance costs" as long as the statutes are in effect. *FSC III*, 2012 6059189, at *4. However, plaintiffs' obligations to maintain records in accord with §§ 2257 and 2257A and their implementing regulations will in no way be affected if the Court were ultimately to hold that one or more of the inspections that previously occurred violated Fourth Amendment requirements. Such a holding would not redress an asserted injury of "compliance costs"—including an assertion (which no plaintiff here actually makes) that the plaintiff is staying at the location of his or her 2257 records 20 hours per week solely in order to make the records available for inspection. The only potential impact is that future inspections identical to those that were held unconstitutional (which there is no indication would ever occur in the first place) would be enjoined.

to future such requests was unripe because the details of any future request for e-mails that the government might make were not yet known. *Id.* at 527 ("Nor can we rely on *previous* government searches of Warshak's e-mails to hypothesize the factual context of the next search."); *cf., Shoemaker v. Handel*, 795 F.2d 1136, 1143 (3d Cir. 1986) (upholding warrantless urine testing scheme for jockeys but holding jockeys' as-applied privacy claims were unripe). In sum, this Court should dismiss plaintiffs' as-applied Fourth Amendment claim for lack of jurisdiction.

## VII.   THE INSPECTIONS THAT OCCURRED IN 2006 AND 2007 DID NOT VIOLATE THE FOURTH AMENDMENT

To the extent the Court proceeds to analyze the concrete factual contexts of the 29 inspections that occurred in 2006 and 2007, it should hold that those inspections were consistent with the Fourth Amendment. A Fourth Amendment analysis is only triggered when a "search" or a "seizure" occurs. In remanding a Fourth Amendment claim to this Court, the Third Circuit identified two ways in which a past 2257 inspection might involve a "search" within the meaning of the Fourth Amendment. First, the facts might indicate that the producer had "an objective expectation of privacy in the searched areas and effects." *FSC II*, 677 F.3d at 544 (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)). Second, under the Supreme Court's recent decision in *United States v. Jones*, 132 S. Ct. 945 (2012), a "fact-intensive inquiry" might demonstrate that "a common-law trespass occurred during [one] of the alleged searches." *FSC II*, 677 F.3d at 544.

Of course, there are other considerations relevant to the analysis here. A "consensual encounter" between the government and a citizen does not implicate the Fourth Amendment. *INS v. Delgado*, 466 U.S. 210, 215 (1984). Moreover, the mere fact that a government agent sets foot on privately-owned property is not sufficient to qualify as a "search" under either *Katz* or *Jones*. For example, a government agent's entry into the reception area or other publicly accessible area

of a business does not implicate the Fourth Amendment under either standard. *See, e.g., Maryland v. Macon*, 472 U.S. 463, 469 (1985) (holding that a bookseller had no reasonable expectation of privacy "in areas of the store where the public was invited to enter and to transact business"); *accord United States v. Watson*, No. 04-1573, 2007 WL 2234610, at *3 (3d Cir. Aug. 3, 2007). In addition, a government agent's entry into premises beyond the area that is publicly accessible does not implicate the Fourth Amendment if that entry is consensual. *United States v. Claus*, No. 11-1412, 2012 WL 120081, at *3 (3d Cir. Jan. 17, 2012) (citing *United States v. Price*, 558 F.3d 270, 277 (3d Cir.2009); *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005)). The government agent need not notify individuals on the premises of their right to refuse consent in order for consent to be deemed voluntary. *Claus*, 2012 WL 120081, at *3 n.5 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 231 (1973)).

These factors were in play in the Supreme Court's decision in *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978). There, while the OSHA inspector had initially entered a "customer service area," the Court ultimately held that a warrant was required only because the inspector had sought to inspect a "nonpublic area" of the business, and the business owner had refused entry. *See id.* at 309-10, 314-15 ("The critical fact in this case is that entry over Mr. Barlow's objection is being sought by a Government agent."). And again, in *Barlow's*, the inspector sought to inspect the business premises, not simply records that the business was statutorily required to maintain. *See id.* at 309 (inspector sought "to search the work area" in order "to inspect for safety hazards and violations of OSHA regulations").

### A.     The 29 Past 2257 Records Inspections Either Did Not Involve Entry onto Private Premises or Entry Was Consensual

In the 29 inspections that occurred here, two (Temptations, Ghost Pro) did not involve any entry onto the producer's premises whatsoever. The others were all initiated in one of three

ways: by entering a business's public reception area, by approaching the front door of a residence, or by contacting a producer in advance and arranging a meeting. At the time that the lead inspector first met the producer in person, he would explain the nature and purpose of the records inspection and provide the producer with a list of the specific 2257 records that the team had selected for inspection. In none of those 27 instances did that initial contact implicate the Fourth Amendment. And as a result of that contact, in each instance, the person contacted voluntarily agreed to allow a 2257 records inspection to proceed. In no instance did the person contacted refuse to allow the inspection or indicate that the inspection team should first obtain a warrant. Indeed, the lead inspectors testified that none of these individuals expressed any reluctance when allowing the inspection, and there is no evidence in the record that could contravert the inspectors' testimony.

At trial, plaintiffs' counsel attempted to suggest, when cross-examining the lead inspectors, that a letter that the lead inspectors began to provide in March 2007 amounted to coercion by containing language advising the reader that "the FBI is authorized to enter your place of business without delay" and that "[i]t is a criminal violation of federal law to delay or obstruct the FBI from conducting the inspection." *See* Pl. Ex. 31. However, there is no evidence in the record indicating that any producer read one of these letters before agreeing to allow an inspection to proceed. Neither of the two lead inspectors was able to recall any instance where a producer read the letter before agreeing. In a similar situation, the Ninth Circuit held that the existence of similar language in notice letters that were provided to managers of businesses prior to FDA inspections did not make the managers' consent involuntary. *United States v. Thriftimart, Inc.*, 429 F.2d 1006, 1010-11 & n.5 (9th Cir. 1970) (observing that it was "unlikely" that the managers had read the notices). Nor did statutory language that made it a crime to refuse

entry to an FDA inspector seeking to conduct a warehouse inspection under 21 U.S.C. § 374(a). *Thriftimart*, 429 F.2d at 1010 n.5.

Here, once the producer agreed to allow the inspection to proceed, the lead inspector would ask the producer where the inspection team should stay while reviewing the 2257 records that were identified on the list that the lead inspector had provided. If the producer indicated that the team should remain in the publicly-accessible reception area, or in the driveway of a residence, that is where the team would remain. The producer would then bring the specified records to the team at that location. Again, once the producer had consented to the records inspection, the team's actions in setting up at the place where the producer directed it to stay while reviewing the records did not implicate the Fourth Amendment. Even where the producer directed the team to use an internal break room or conference room, the team's use of that area could not qualify as common law trespass since the use occurred with the producer's consent.

These 2257 record inspections were similar to the inspection that was at issue in *Patel v. City of Los Angeles*, 686 F.3d 1085 (9th Cir. 2012). *Patel* involved an ordinance that required hotel operators to maintain guest registry information and make it available for government inspection. *Id.* at 1086-87. The Ninth Circuit held such an inspection did not involve common law trespass because the registry information could—if the hotel operator so chose—be maintained and made available for inspection in the hotel's reception area, which "is by nature public, not private." *Id.* at 1090. The court further observed that

> the intrusion imposed by the ordinance is limited. The Patels make no claim that they have been or will be physically dispossessed of any property. No "seizure" of property is inherent under the ordinance, nor is it to be expected. The ordinance is concerned with obtaining access to information and provides several options as to the form in which the hotel operator keeps the information. Nothing in the ordinance provides that the hotel operator cannot keep the information available for its own use at the same time that a police officer may be inspecting it. If it is kept electronically or if duplicate records are maintained, both the hotel operator and the police officer may be able to have access to

58

the information at the same time. The ordinance also specifically provides that any inspection "shall be conducted at a time and in a manner that minimizes any interference with the operation of the business."

*Id.* at 1089-90. The Ninth Circuit concluded that the inspection in that case were reasonable under the totality of the circumstances. *Id.* at 1090.

The fact that some inspections occurred at residences does not change the analysis. When the lead inspector initiated an inspection at a residence, he would knock on the door and remain outside the residence while explaining the nature and purpose of the inspection and providing the list of specific records that had been selected for inspection. Neither the lead inspector nor the rest of the team would enter the residence unless or until they were invited inside. Lawrence Testimony, Tr. June 12, 15:11-19; Joyner Testimony, Tr. June 12, 87:15-20.  Moreover, in most of these instances (Moonlight, Real Wild Girls, Alexis Lords, Pony Boy), the inspection team went to the address listed on the 2257 label on a producer's DVD or website as the location where 2257 records were kept. Other than Moonlight (where the producer had gone out of business, the lead inspector contacted him in advance to arrange a meeting time, and the inspection took place in the producer's garage and outside in his driveway), the fact that these producers listed residences as the location of their 2257 records, together with the fact that these were all commercial producers in the adult industry, suggests that they were operating a commercial business out of their home. In addition, the record indicates the owner of JT Video was also operating a business out of his home, although he worked during the day at a different job, and the 2257 labels of his DVDs listed a P.O. Box, rather than his apartment, as the location where 2257 records were kept. "When used as a place of business, the home has the same status under the Fourth Amendment as any other place of business." *United States v. Cerri*, 753 F.2d 61, 64 (7th Cir. 1985) (citing *Lewis v. United States,* 385 U.S. 206, 211 (1966)). In *Cerri*, the

court followed this principle when upholding a warrantless inspection that occurred at a residence pursuant to a statute authorizing inspections of firearms dealers. *See id.* Here, inspections that took place at a producer's residence that was also the producer's business address, for purposes of his commercial production of sexually explicit material, should be evaluated in the same way as the other inspections at commercial premises.

Other than reviewing the 2257 records, the inspection team usually made copies of the records using its own portable copier and paper. These copies were authorized by the DOJ regulation, 28 C.F.R. § 75.5(e). There is no evidence in the record suggesting that any producer asserted a possessory interest in these copies, nor would there be any reasonable basis for such an assertion, given that the records that were copied consisted simply of government-issued identification documents for performers. Thus, the fact that the team made copies of these records did not implicate the Fourth Amendment. *See Finley v. City of Philadelphia*, No. 11-1205, 2011 WL 3875371, at *3 (E.D. Pa. Aug. 31, 2011).

Finally, a member of the inspection team usually (though not always) took photographs of the location where the team had reviewed the 2257 records, before and after the inspection, as well as the file cabinet or area where the producer kept his 2257 records. The purpose of the first photographs was to document that the inspection team had not damaged the premises during the inspection. The purpose of the second photograph was to document that the producer kept his 2257 records separate from regular business records, in accord with 28 C.F.R. § 75.2(e). In some instances, the second photograph was taken from outside the producer's office (Dead Men Hanging) or in the same front area where the lead inspector had first entered the business (K-Beech). In one instance, where the 2257 records inspection took place in a producer's very small apartment, the lead inspector determined that no photographs would be taken, due to privacy

concerns. Lawrence Testimony, Tr. June 11, 143:14-24. All indications are that, to the extent a member of the inspection team entered a nonpublic area of a producer's premises in order to photograph the 2257 records location, the entry was consensual. At most, the entry constituted a minimal intrusion that lasted about a minute. Joyner Testimony, Tr. June 12, 126:13-16. Thus, the act of taking these photographs either did not implicate the Fourth Amendment at all, or was reasonable under the totality of circumstances.

### B.      To the Extent the Fourth Amendment Was Implicated by any of the Past Inspections, Those Inspections Were Reasonable

Even if the Court does not agree that the 29 inspections that occurred in 2006 and 2007 were consensual in every instance, the inspections were nevertheless reasonable under the Fourth Amendment. The evidence at trial confirms that the only records that the inspection teams inspected, during the 29 inspections that occurred, were records that a producer maintained pursuant to § 2257. These records consisted of the government-issued age verification documents, such as driver's licenses, provided by performers. Lawrence Testimony, Tr. June 11, 168:1-4. As this Court has properly held, producers do not have a reasonable expectation of privacy in these records. *FSC I*, 729 F. Supp. 2d at 747. This Court correctly explained that these records "do not entail confidential communications or files, and they cannot be classified as being a producer's 'private papers.' To the contrary, they are copies of records and files that are compiled, maintained, and kept according to statutes and regulations that are known to and followed by plaintiffs, and that contain information that enables authorities to verify the ages and identities of performers in depictions of sexually explicit conduct." *Id.* at 748-49 (footnote omitted). The records inspections can be upheld as reasonable under any of three different analytical frameworks: (1) under the administrative subpoena standard, (2) under the administrative inspection exception to the warrant requirement, or (3) under the totality of the

circumstances.

**1.     The Inspections Should Be Upheld Under the Administrative
Subpoena Standard**

As discussed above, the Seventh Circuit has recently pointed out in a similar context that

when an inspection program is aimed at inspecting nothing but records that the government

requires certain businesses to maintain, it can appropriately be analyzed under the Fourth

Amendment requirements for administrative subpoenas even if the statutory language does not

refer to the inspection as involving an administrative subpoena. *See Big Ridge, Inc.*, 2013 WL

1776633, at *14. Under that standard, a request by the government to inspect records comports

with the Fourth Amendment as long as the request is "'sufficiently limited in scope, relevant in

purpose, and specific in directive so that compliance will not be unreasonably burdensome.'" *Id.*

(quoting *See,* 387 U.S. at 544).

When applied to the past inspections that occurred here, this standard is easily met. As

described in the FBI reports and by the lead inspectors at trial, the 29 past 2257 inspections were

limited to specific 2257 records that the team identified to the producer at the outset of the

inspection. The number of records inspected was proportionate to the size of the producer and

was in no instance excessive. The inspection team reviewed those records in order to determine

whether the producers were in compliance with the age verification requirements set forth in §

2257 and its implementing regulations, as they then existed. That purpose was directly relevant

to the government's compelling interest in ensuring that producers of images depicting real

people engaged in sexually explicit conduct verify the ages of the people engaging in this

conduct. And the inspections were conducted in a manner designed to minimize any disruption

to producers' businesses—including engaging in extensive preparation work in advance of the

inspection so that the team could finish the inspection itself as efficiently as possible, and

allowing the producer to select the location where the team would stay while reviewing the 2257 records and how the requested  records would be provided. The past inspections should be upheld on this basis as a matter of law.

## 2.    The Inspections also Qualify as Valid Administrative Searches

The prior 2257 inspections can also be upheld pursuant to the administrative search exception to the warrant requirement. This Court has already analyzed the inspection regime under that standard and properly concluded that the inspections contemplated by the 2257 statutory and regulatory framework qualify for this exception. *FSC I*, 729 F. Supp. 2d at 751. Following the Third Circuit's remand, the record now before the Court confirms that all FSC members who were subject to 2257 records inspections were commercial producers who create and sell videos and other material containing visual depictions of sexually explicit conduct as part of the adult entertainment industry. *See* Pl. Exs. 12 (Diabolic), 3 (Darkside), 14 (K-Beech), 29 (Wicked). All the inspections of these producers took place at commercial premises during normal business hours. *Id.*

As this Court previously explained, "for over three decades the creation, production, and distribution of sexually explicit expression has been the subject of extensive federal regulation aimed at protecting children from sexual exploitation." *FSC I*, 729 F. Supp. 2d at 753. Due to a "steadily strengthening web of initiatives," "producers of sexually explicit expression"—and certainly those in the commercial adult entertainment industry—"have been on notice for some time that, when it comes to ensuring the performers in their expression are adults, they will be subject to various forms of government oversight, including inspection of age-verification records." *Id.* There can be no question that the adult industry is closely regulated with respect to the age of their performers, particularly given the compelling government interest not only in

apprehending those who have created child pornography in the past but, even more so, in preventing child pornography from being created in the first place. Once a child has been used to make sexually explicit images, it is simply too late to protect that child from harm. Given that the age verification requirements have been in effect for over thirty years, it can be no surprise to the adult industry that government regulation will take the form of prophylactic measures designed to ensure age verification occurs in a context where sexually explicit material is being produced.

The Court's prior application of the "three-prong test to determine if a warrantless inspection of a pervasively regulated activity survives constitutional scrutiny" continues to be valid. *FSC I*, 729 F. Supp. 2d at 753. It is undisputed that "the government has a substantial interest in preventing the sexual exploitation of children in the production of sexually explicit expression, and this interest informs the age-verification requirements at issue here." *Id.* at 754. Moreover, "warrantless entrance onto a producer's premises to inspect the required records is necessary to further the regulatory scheme." *Id.* As the Court previously observed, "by not requiring advance notice or a warrant, the inspection program encourages producers to follow the age-verification procedures regularly and in advance of the production of the depictions, and deters the possibility of fabrication or after-the-fact compilation of such information." *Id.* Finally, the inspection procedures, as described in the regulations and as followed in practice, provide a "constitutionally adequate substitute for a warrant." *See id.* at 754. The FBI inspection teams attempted to follow a regular protocol in accord with the regulations, to the extent possible given variations in the circumstances they encountered. They selected producers for inspection using a random number generator, initiated the inspections during regular business hours, displayed their credentials at the outset of inspections, explained the purpose and limited nature of the inspections, identified the statutory authority for conducting the inspections, provided a

list of the specific 2257 records they wished to inspect, and took measures to minimize any disruption to the producer's business operations. In sum, the inspections should be upheld as a matter of law as valid warrantless administrative searches.

>            **3.      In the Alternative, the Inspections Should Be Upheld as Reasonable Based on the Totality of the Circumstances**

The Third Circuit has also recognized that a warrantless search may be upheld under the "totality of the circumstances," even where it does not qualify as an administrative search. *United States v. Mitchell*, 652 F.3d 387, 403 (3d Cir. 2011) (applying "totality of the circumstances" test after confirming the test was a proper analytical framework because "'the balancing of competing interests" is "the key principle of the Fourth Amendment'" (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985))); *United States v. Sczubelek*, 402 F.3d 175, 184-87 (3d Cir. 2005) (concluding that the warrantless DNA testing of a probationer was reasonable because the blood test was a "minimal" intrusion, the plaintiff probationer had a lowered expectation of privacy, and the government had a compelling interest in the testing scheme). The "totality of the circumstances" test balances "on the one hand, the degree to which the search intrudes upon an individual's privacy and, on the other, the degree to which the search is needed for the promotion of legitimate governmental interests." *Mitchell*, 652 F.3d at 402 (internal quotation and alteration omitted).

For the same reasons described above, the 2257 inspections that took place in 2006 and 2007 were reasonable under the totality of the circumstances. The intrusion on a producer's privacy, involving only an inspection of specific 2257 records that producers are required to maintain for the very purpose of being inspected, was minimal to nonexistent. On the other hand, the inspections promoted legitimate governmental interests by ensuring that the 2257 age verification requirements were being followed, and, by their example, encouraging compliance

throughout the industry. Accordingly, these prior inspections may also be upheld as reasonable in light of the totality of circumstances in which they occurred.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of defendant.

Dated this 1st day of July, 2013.             Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General
ZANE DAVID MEMEGER
United States Attorney
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ Kathryn L. Wyer
HÉCTOR G. BLADUELL
JAMES J. SCHWARTZ
NATHAN M. SWINTON
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Washington, DC
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.1.2(8)(b), I hereby certify that the foregoing Memorandum has been filed electronically and is available for viewing and downloading from the ECF system. I further certify that the foregoing document was served via ECF on counsel of record for plaintiffs in the above-captioned case.

Dated: July 1, 2013                           /s/
                                              Kathryn L. Wyer