## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                                        |   |                              |
|----------------------------------------|---|------------------------------|
| FREE SPEECH COALITION, INC. et al.,    | ) | Civil Action No. 2:09-4607   |
|                                        | ) |                              |
| Plaintiffs,                            | ) | Judge Michael M. Baylson     |
|                                        | ) |                              |
| v.                                     | ) |                              |
|                                        | ) |                              |
| THE HONORABLE ERIC H. HOLDER, JR.,     | ) |                              |
| Attorney General,                      | ) |                              |
|                                        | ) |                              |
| Defendant.                             | ) |                              |
|                                        | ) |                              |

## DEFENDANT'S PROPOSED FINDINGS OF FACT

# TABLE OF CONTENTS

I.     PLAINTIFFS ......................................................................................................... 1

       A.     Adult Industry Plaintiffs ............................................................................ 1

              1.    Free Speech Coalition, Inc. ("FSC") .............................................. 1

              2.    Sinclair Institute .............................................................................. 2

              3.    Marie Levine .................................................................................... 5

              4.    Thomas Hymes .................................................................................. 7

       B.     Photographer Plaintiffs .............................................................................. 9

              1.    American Society of Media Photographers ("ASMP") .................... 9

              2.    Barbara Alper .................................................................................. 11

              3.    David Levingston ............................................................................. 13

              4.    Barbara Nitke .................................................................................. 15

              5.    David Steinberg ............................................................................... 18

       C.     Sex Educators and Sexologists ................................................................ 19

              1.    Betty Dodson and Carlin Ross ....................................................... 19

              2.    Carol Queen .................................................................................... 23

II.    PREVALENCE OF YOUTHFUL-LOOKING PERFORMERS IN  SEXUALLY
       EXPLICIT MATERIAL ....................................................................................... 25

       A.     Youthful-Looking Individuals Who Could Reasonably Be Confused
              As Minors ................................................................................................. 25

       B.     Quantity of Sexually Explicit Material Depicting Young and
              Youthful Performers ................................................................................. 26

       C.     Child Pornography is Vast and Has Ties to Legitimate Adult Websites ............. 31

       D.     Pubertal Maturation ................................................................................. 33

III.   PUBLICLY-AVAILABLE DEPICTIONS OF SEXUALLY-EXPLICIT
       CONDUCT ........................................................................................................... 35

IV.    DEPICTIONS OF SEXUALLY-EXPLICIT CONDUCT IN "PURELY PRIVATE"
       COMMUNICATIONS .......................................................................................... 35

V.     SEXTING ............................................................................................................. 36

VI.    THE DIFFICULTY OF FORMULATING AN EXCEPTION TO THE
       UNIVERSALLY-APPLICABLE 2257 REQUIREMENTS THAT DOES NOT
       INTRODUCE SUBJECTIVITY OR ALLOW FOR CIRCUMVENTION ................... 41

VII.   THE 2257 RECORDS INSPECTION PROGRAM OF 2006-2007 ................................ 42

       A.     Beginning and Termination of the 2257 Records Inspection Program ................. 42

B.     A Prior Version of the Regulations Was in Effect in 2006 and 2007 ................... 43

C.     Scope of Producers Subject to Inspection in 2006 and 2007 ............................... 43

D.     Inspection Procedures ......................................................................................... 45

E.     The Role of Various Requirements in the Regulatory Scheme ........................... 51

## I.      PLAINTIFFS

### A.      Adult Industry Plaintiffs

#### 1.      Free Speech Coalition, Inc. ("FSC")

1.      FSC is a trade association for the adult entertainment industry.  Douglas
Testimony, Tr. June 3, 118:22-24.  FSC currently has around 800 members.  *Id.* at 74:25 – 75:1.
Some, though not all, of these members are engaged in the production of adult films, adult
websites, adult magazines, and other material containing sexually explicit depictions, and in the
distribution of adult products.  *Id.* at 119:4-17.  These members may qualify as primary
producers, secondary producers, or, often, both.  *Id.* at 122:7-21.  The Chair of FSC's Board of
Directors, Jeffrey Douglas, is a lawyer and is also neither a primary producer nor a secondary
producer.  *Id.* at 64:4-5;121:21-23.

2.      FSC is neither a primary producer nor a secondary producer and does not itself
keep records pursuant to § 2257.  *Id.* at 121:13-17.  Nevertheless, Douglas testified at trial
regarding various burdens that he suggested were imposed by the 2257 regulations.  *Id.* at 92-
108.  However, other than plaintiffs Sinclair Institute and Marie Levine, no FSC member who is
subject to § 2257 testified regarding the actual nature or extent of the burdens that Douglas
described, nor did Douglas identify any FSC members in connection with any of these burdens.[1]
The record is devoid of any information about the ages of performers appearing in sexually
explicit depictions produced by such members.

3.      Other than plaintiffs Sinclair Institute and Marie Levine (stage name, Nina
Hartley, Levine Testimony, Tr. June 5, 37:18-19), FSC has identified former plaintiff David

---

[1] The only client that Douglas identified was FSC member David Conners, but Douglas did not
purport to identify any burdens that Conners faces in connection with his compliance with 2257.
Douglas admitted he had not visited Conners' website in his capacity as Conner's attorney,
Douglas Testimony, Tr. June 3, 131:22-24, nor was he familiar with the details of whether
Conners uses a third party custodian, *id.* at 132:10-16.

Conners (stage name, Dave Cummings) and Vivid Video as FSC members that produce sexually

explicit material.  Douglas Testimony, Tr. June 3, 125:4-7; 123:12-15; Def's Ex. 57, at 625.

4.      Both  Conners and Vivid Video have used a significant number of young

performers in their work. The information provided by Conners indicates 47% of the individuals

in his films are 25 or younger. Def's Ex. 48, at 7-11.  Conners' DVD covers also contain images

consisting of partial body parts, such as images only of an individual's genitals.  Douglas

Testimony, at 129; Def's Ex. 47; *see also* Douglas Testimony, at 93-94 (indicating it is common

for box covers to contain images of "just the genitals"). For Vivid Video, 41% of performers in

the sample of 25 DVDs that FSC provided were 25 or younger and 57% were 29 or younger.

Def's Ex. 314A.

5.      Of the 27 adult film producers that were inspected by the 2257 inspection team in

2006 and 2007, four were FSC members at the time this case was filed.  *Id.* at 136:5-24.

### 2.      Sinclair Institute

6.      Plaintiff Townsend Enterprises is a company in North Carolina, doing business as

the Sinclair Institute, which produces sexually explicit videos and images.  Wilson Testimony,

Tr. June 3, 196: 14-24; 197:21-23.  Phil Harvey Enterprises ("PHE") founded the Sinclair

Institute in 1991.  Wilson Testimony, Tr. June 4 Tr. 26:1-9.  PHE owns several companies that

produce sexually-explicit material, such as Adam & Eve.  *Id.* at 28:4-10; Def's Ex. 128A-E.

7.      PHE controls Sinclaird.  Linda Diane Wilson, the employee at Sinclair in charge

of 2257 compliance, described PHE as a "sister company."  Wilson Testimony, Tr. June 3,

227:6-9.  The president of Sinclair, Patrick Smith, reports to Phil Harvey and David Groves, the

two highest-ranking people at PHE.  Wilson Testimony, June 4 Tr. 27:9-15; 26:10-16; 27:4-8.

Phil Harvey, the owner of PHE, is a majority shareholder in the Sinclair Institute.  Wilson

Testimony, Tr. June 3, 198:1-10.  PHE supervises Sinclair's 2257 compliance by conducting "fire drills" whereby PHE personnel would come in with an image from a video or catalogue and Ms. Wilson would have to produce all the required 2257 records for that image.  *Id.* at 224:2—225:3; 227:3-16.  Indeed, PHE employees trained Ms. Wilson in 2257 compliance, and she consults PHE employees when she has questions. Wilson Testimony, June 4 Tr. 29:17—30:23.  In addition, Ms. Wilson's paycheck comes from PHE, and PHE handles Sinclair's accounting, payroll, and order processing.  *Id.* 27:16—28:3. Moreover, Sinclair stores its 2257 records on a server that PHE purchased, which also contains the 2257 records of other PHE companies, such as Adam & Eve.  *Id.* 30:24—32:14.  And Sinclair sells Adam & Eve videos on its website.  *Id.* 28:22—29:8.

8.     The Sinclair Institute is both a primary and secondary producer of sexually explicit videos.  Wilson Testimony, Tr. June 3, 212:3-24.  Sinclair sells these videos through its two websites, www.sinclairinstitute.com and www.bettersex.com.  Wilson Testimony, Tr. June 4, 10:2-10; 13:16-21; Def's Exs. 122, 123.  It also sells these videos through its print catalogues.  Wilson Testimony, Tr. June 4, 24:13—25:21; Def's Exs. 129A-D.

9.     The sexually explicit videos for which Sinclair is a primary producer have included 18 and 19 year old performers.  Wilson Testimony, Tr. June 3, 232: 23 - 238:1; Def's Ex. 311.  Indeed, Ms. Wilson estimated that approximately 10% of the performers in these sexually explicit videos have been between the ages of 18-20, and 30% of the performers have been in their twenties.  Wilson Testimony, Tr. June 4, 5:4-18.

10.    Most of the sexually-explicit videos that the Sinclair Institute sells are videos created by other companies, for which Sinclair is a secondary producer.  Wilson Testimony, Tr. June 4, 9: 14—10:1.

11.     A substantial amount of these videos depict very young and youthful looking performers, and Sinclair markets these performers as being "young," "youthful," "18-year-old blond," "teen," "nubile," "school girl," "cheerleader," "fresh-faced newbies," "college freshman," and using other terms to highlight their relative youth.  Wilson Testimony, Tr. June 4, 14: 20—21:22; Def's Exs. 124-126.

12.     These videos, as all videos that Sinclair sells must, passed a review process and met the standard of what Sinclair wants to be associated with.  Wilson Testimony, Tr. June 4, 22:15—23:11.  Sinclair collects the IDs of all of the performers in these videos.  *Id.* at 23:16-25.

13.     Sinclair estimated that it spends approximately $75,000 a year to comply with § 2257 and corresponding regulations, as measured by the salaries that it pays to the employees engaged in 2257 compliance.  Wilson Testimony, Tr. June 3, 229:25 - 230:20.

14.     Sinclair made approximately $53 million in revenues from its sexually explicit videos from 2005-2009, Def's Ex. 133, and it has made approximately $8 million in revenues a year in recent years.  Wilson Testimony, Tr. June 4, 40:2-16.  These revenues do not include the revenues of PHE. *Id.* at 38:10-14.

15.     Other factors suggests that Sinclair does not face substantial burdens in complying with § 2257.  Sinclair maintains the IDs and model releases of the performers in its videos for business reasons other than § 2257.  Wilson Testimony, Tr. June 4, 8:13-18.  In addition, neither Ms. Wilson nor the other Sinclair employees who have responsibility for 2257 compliance spend their full time on 2257 compliance.  Wilson Testimony, Tr. June 3, 196:18-19; 197:5-10; 216:7-8; 229:8-24.  Moreover, Sinclair employs a heavily automated 2257 compliance system.  For example, Sinclair's electronic cross-referencing system automatically assigns a code to all images entered into a visual library, and this code connects the images to the corresponding

"documents that are required by 2257 to go along with that image." *Id.* at 215: 4-6.  And although Sinclair keeps hard copies of its 2257 documents in addition to keeping electronic files, *Id.* at 212: 15-20, this is not something required by the regulations.

### 3.     Marie Levine

16.     Plaintiff Marie Levine is an adult entertainer.  Levine Testimony, Tr. June 5, 36:6-11.  Levine began thinking that she wanted to perform in pornographic films when she was 17.  *Id.* at 56:24—57:1.  In 1982, she began working as a stripper in San Francisco.  *Id.* at 37:1-4.  In 1984, when she was 25, she appeared in her first pornographic film, "Educating Nina."  *Id.* at 37:7-15.  Levine's stage name is Nina Hartley. *Id.* at 37:18-19. Since 1984, she has performed in hundreds of pornographic film, and she is one of the most well-known pornographic actresses. *Id.* at 40:24 - 41:2.

17.     Levine produces sexually-explicit webshows that are available on her website nina.com.  Levine Testimony, Tr. June 5, 44:14-24.  In these webshows, Levine engages in masturbation or in sexual activities with other performers in the adult industry.  *Id.* at 45:10-13; 46:10-13.  Only people who buy a membership to her site can access these webshows.  *Id.* at 44:14-24*.*  She also sells sex toys and movies produced by others on her website.  *Id.*

18.     Levine has performed with women as young as 21 in her webshows.  Levine Testimony, Tr. June 5, 50:18-20; Def's Ex. 88.  Almost a quarter of performers Levine has appeared with in sexually explicit material have been under 25.  Def's Ex. 314.  Levine does not rule out performing with individuals between the ages of 18 and 20 in her webshows.  Levine Testimony, Tr. June 5, 52:10-12.

19.     Levine does not personally manage her website.  A company called Premium Cash, which is located in Canada, manages her website and acts as Levine's custodian of 2257

records.  Levine Testimony, Tr. June 5, 52:13-25.  Levine has a revenue-sharing agreement with Premium Cash whereby this company links other sexually explicit material to her site.  *Id.* 53:1-6.  Levine derives revenue from the sites that Premium Cash links to her site.  *Id.* 54:25 - 56:8.

20.     Most of the women appearing in the sites linked to Levine's site are in their twenties, and there are also "teen cams" linked to Levine's website.  Levine Testimony, Tr. June 5, 53:24 - 55:20; Def's Exs. 86B, 86C, and 86D.  Looking at these "teen cams," Levine could not state that all of the performers were over 18.  Levine Testimony, Tr. June 5, 56:9-12.

21.     From 2005-2009, Levine's gross revenues from her website were approximately $180,000.  Levine Testimony, Tr. June 5, 53:7-10.  Levine's revenues increased after Premium Cash started managing her website.  *Id.* 53:11-13.

22.     Despite the fact that Levine uses Premium Cash as her custodian of 2257 records, and that she sends these records electronically to Premium Cash, Levine Testimony, Tr. June 5, 47:2-5, Levine keeps hard copies of the records in a file cabinet in her home.  *Id.* 46:23 - 47:1.

23.     Section 2257 has not prevented Levine from doing any project she has wanted to do.  Levine Testimony, Tr. June 5, 65:5-7.

24.     Levine's major concern with 2257 is that, in her view, the law presumes that she is "a criminal before the fact."  Levine Testimony, Tr. June 5, 48:12-22.  Other than this, Levine has experienced some difficulty organizing the 2257 paperwork because "she is not a secretary." *Id.* 47:6-13.  But Levine would check IDs of the performers in her webshows even in the absence of 2257.  *Id.* 49:4-7.  Levine stated that requiring primary producers to check the IDs of their performers and keep records is perfectly reasonable.  *Id.* 64:24-65:4.

25.     During her career as an adult actress, Levine has performed with teenagers who recently graduated from high school.  Levine Testimony, Tr. June 5, 57:2-8; Def's Ex. 85C.

Levine stated that it is not uncommon to find "women who have recently reached the age of majority in adult films." *Id*. 58:2-5. *See* Def's Exs. 85A, 85B. Moreover, Levine admitted that young women are welcome in pornography, i*d*. 62:21-23, and that she has given advice to young women seeking to enter the adult industry or moving forward in the industry. *Id*. 63:2-14.

26.     Some of the videos in which Levine performs with teens have ended up on tube sites such as porn.com, Bravo tube, and Red Tube. Def's Exs. 87, 306, 307. Levine stated that after she records a sexually explicit video for another producer she does not have any control over where the video ends up. Levine Testimony, Tr. June 5, 71:16-21. These tube sites contain sexually explicit images of other young women whom Levine could not identify as clearly over 18. *Id*. at 60:16—61:5.

27.     Levine admitted that the word "teen" in pornography is used to attract viewers interested in looking at younger looking people. Tr. June 5, 66:4-20. Employing youthful-looking performers brings financial benefits to producers of sexually explicit depictions. *Id*. 67:18-20.

### 4.     Thomas Hymes

28.     Thomas Hymes identifies himself as a journalist in the adult entertainment industry. Tr. June 4, 251:23-25; Tr. June 5, 12:7-11. Hymes did not study journalism in school and acknowledges that many people create blogs and write things on the Internet, and the question of whether a particular blogger qualifies as a journalist, or even what is journalism, is "kind of up in the air." Tr. June 5, 12:4-11, 20 to 13:11.

29.     Since 2009, Hymes has been a senior editor at Adult Video News ("AVN"), a trade media company within the adult industry. Hymes Testimony, Tr. June 4, 251:7-8. Since 1999, he has held positions either at AVN or at its competitor XBIZ, another trade media

company in the adult industry.  *Id.* at 251:17 - 252:6-14. His current job at AVN involves working 60 or 70 hours a week, at a minimum.  *Id*. at 258:10-11.

30.     Hymes has never produced sexually explicit material or kept records pursuant to 2257.  Hymes Testimony, Tr. June 4, 257:21 - 258:1.

31.     In April 2009, while Hymes was not employed by either AVN or XBIZ, but was working freelance, Hymes, together with two partners, launched a website, DailyBabylon.com, that was intended as a commercial enterprise.  Hymes Testimony, Tr. June 4, 252:24-253:19, 254:8, 258:12-21.  This project was not successful, and as a result Hymes took his current full-time job at AVN in 2009.  *Id*. at 253:21-254:11.  Since 2009, the Daily Babylon website has been "moribund."  *Id*. at 254:13-14.

32.     Other than the postings that occurred while the website was first in existence in 2009, a handful of posts were added in 2011, and since then, no posts were added until after Hymes was deposed in this case, and shortly before he was scheduled to appear at trial.  *See* Def's Ex. 77; Hymes Testimony, Tr. June 4, 260:7-264:8; Hymes Testimony, Tr. June 5, 9:20-10:16.

33.     Hymes claims that, if not for 2257, he would post sexually explicit images on DailyBabylon to illustrate stories what he writes; he also speculated that, even though he is a writer, he could "easily" take sexually explicit photographs himself and post them on the website.  Hymes Testimony, Tr. June 5, 11:8-16.

34.     However, Hymes has no time to maintain the website, given his full-time job at AVN, so for the past several years, his involvement with the site has consisted of nothing more than paying a registration fee and maintaining an email address. Hymes Testimony, Tr. June 4, 259:13-260:2.

35.     Even if Hymes were to redesign the DailyBabylon website, as he suggested at trial he would like to do, he does not know "exactly where [he] would want to go" or "the types of images that [he] would want to post up."  Hymes Testimony, Tr. June 4, 256:21-23.  Hymes also does not know the identities of individuals that might appear in images he might want to post, or the ages of those individuals.  Hymes Testimony, Tr. June 5, 14:7-14.

36.     Hymes testified that primary producers should check age verification documents for performers and should keep records of having done so, and he acknowledged that if he were to take photographs himself and post them on his website, he would be a primary producer.  Hymes Testimony, Tr. June 5, 14:15-15:21.

37.     Hymes acknowledged that the act of posting a 2257 label on a website is not technologically difficult.  Hymes Testimony, Tr. June 5, 18:7-13.

38.     Hymes acknowledged the existence of a third party custodian option, that provides an alternative to keeping 2257 records in his own possession, but indicated a concern that he could be subject to penalties based on recordkeeping errors of a third party custodian.  Hymes Testimony, Tr. June 5, 20:10-21:12.

39.     The only aspect of the 2257 requirements that Hymes considers burdensome is the penalty provision.  Hymes Testimony, Tr. June 5, 24:4-9.

**B.      Photographer Plaintiffs**

      **1.      American Society of Media Photographers ("ASMP")**

40.     ASMP is a trade association primarily for working photographers, meaning photographers who make money from the sale or license of their photographic work.  Mopsik Testimony, Tr. June 3, 15:6-10; 46:14-21.  ASMP has a little over 7000 members, primarily in 39 chapters around the United States, but also including around 250 foreign members.  *Id.* at

15:13-14.  ASMP members include both still and motion (i.e., video) photographers, and some ASMP members do motion work exclusively.  *Id.* at 46:25 – 47:23.

41.    According to ASMP's Executive Director, Mopsik, in the course of this litigation, ASMP circulated a survey asking members to indicate if they produced sexually explicit images and received 400 responses.  *Id.* at 24:3-11.  However, neither the survey question nor the responses are in the record, nor are any of the 400 individuals identified.  Thus, there is no way to know whether any of these individuals create images subject to § 2257.  *Id.* at 58:18-25 – 59:1-2.  The record is also devoid of any information regarding the ages of individuals appearing in any such images.  *Id.* at 59:3-7.

42.    ASMP members may create work that is part of the adult entertainment industry, and members of the adult entertainment industry may also be ASMP members. *Id.* at 56:6-12.

43.    Other than plaintiff Barbara Alper, ASMP identified Craig Morey as a member who creates sexually explicit depictions.  *Id.* at 54:11-25 – 55:1-4.  Morey, runs a website containing erotic images of nude young women, some engaging in masturbation.  *Id.* at 56:13-25 – 57:1-7; Def's Exs. 31, 32.  Some of these images can be viewed for free and others are available to those who pay a membership fee.  Mopsik Testimony, Tr. June 3, 57:5-7.

44.    While photographers sometimes use model releases to obtain licensing rights for their photographs, they do not always use model releases, particularly when engaging in editorial or photojournalistic work.  *Id.* at 51:13-25 – 52:1-8.  The practice of using a model release does not require checking the age of the model, and ASMP's suggested release form does not record the model's age.  *Id.* at 52:9-17.   Indeed, models need not be 18 to sign a model release.  *Id.* at 49:21-24.

45.    Today, most photography is created in digital format.  Mopsik Testimony, Tr.

June 3, 28:15-17; 46:22-24.  Digital files allow comments to be added in the metadata of a photograph, recording information such as copyright or trademark information about an image or the subject of an image, and it is common trade practice to record such information in that manner.  *Id.* at 40:25 - 41:1-24.

### 2. Barbara Alper

46.     Plaintiff Barbara Alper has been a professional photographer for approximately thirty-five years.  Alper Testimony, Tr. June 4, 217:17 – 218:13.  Alper took sexually explicit photographs at sadomasochism ("S&M") and similar clubs in the 1980's.  *Id.* at 220:18-20; 221:9-17. These images were not restricted to mature-looking individuals.  *See, e.g.*, Pls.' Ex. 43 at 3.

47.     Although Alper maintains that she "had no doubt" that the people she photographed were all adults, Alper Testimony, Tr. June 4, 224:9-12, she made no effort to verify their ages herself and instead relied upon the fact that the clubs advertised themselves as being restricted to people 18 and older or 21 and older.  *Id*. 231:10-14.

48.     Many of the images Alper took at these clubs were later sold, including some images that were displayed at art galleries.  *Id*. 221:1-3; 235:1-4.

49.     Alper discontinued this line of work when the clubs shut down in the 1980's for reasons unrelated to 2257.  *Id.* 234:14-25 (indicating that the clubs shut down due to the AIDS crisis).

50.     In addition to S&M images, Alper has also taken erotic images of herself and her now-husband as part of her "body of work."  *Id*. 225:17-20.

51.     Alper sold some of these erotic images in 2010 to a Norwegian publication called *Cupido* for $360.  *Id*. 235:24 – 236:15; Def.'s Ex. 13.

52.     While Alper has characterized the images as being "sexually explicit," Alper Testimony, Tr. June 4, 225:13-16, none of the images she offered at trial show conduct covered by 2257 or 2257A, *see* Pls.' Ex. 43 at 11-13 (depicting kissing, nipple pinching, and nipple touching).[2]

53.     Alper's primary concern with 2257 is that it precludes her from publishing a compilation of her sexually explicit work, which would contain pre-1995 images for which she lacks photo IDs together with other images taken after 2257 was in effect.  Alper Testimony, Tr. June 4, 229:1-19.

54.     The extent to which Alper has actually pursued such a project is uncertain.  Alper's testimony on this issue has been inconsistent.  Despite unequivocally stating at her deposition that she had not contacted a publisher concerning a compilation, *id.* at 240:19-23, Alper testified at trial that she had at some point in the past two years emailed a friend of a friend who is affiliated with a publisher.  *Id.* 241:19-24.

55.     Despite admitting that she "see[s] nothing wrong with asking [persons depicted in sexually explicit images] to produce" age-verification records, *id.* 247:13-17, Alper claims that 2257 has prevented her from photographing gay men engaged in anonymous sex in an outdoor public space on Fire Island.  *Id.* 227:4 – 228:3.  Alper's certainty that this part of Fire Island is "an adult community," *id.* 231:15 – 232:4, is belied by the fact that there is no photo ID check or any other mechanism for restricting access to it, *id.* 232:10-23.

56.     Alper has no special training in determining a person's age on visual appearance

---

[2] Alper also suggests that she has taken small number of pictures of people other than her and her husband engaged in some form of sexual conduct.  Alper Testimony, Tr. June 4, 224:13-21; 235:6-12. However, she has provided no further information about these purported images, including whether they were sold for commercial profit and whether the conduct depicted falls within the purview of 2257 and 2257A.

alone.  Alper Testimony, Tr. June 4, 238:8-11.

57.     Alper testified Compliance with 2257 "makes me uncomfortable, because not only am I publishing pictures of my husband and myself, but I'm also having to give out our address, because the address of where the records are being stored is my home, our home." Alper Testimony, Tr. June 4, 244:15-18.  But Alper provides her home address on the Yelp profile for her photography business.  *Id.*at 248:22 – 249:15.

### 3.     David Levingston

58.     Plaintiff David Levingston is a professional photographer.  Levingston Testimony, Tr. June 5, 83:16-17.  He started his career working for newspapers, and then worked as a photographer and chief of public affairs in military bases until retiring from the federal government six years ago.  *Id.* at 84:12 - 86:20.

59.     In 2002, Levingston started focusing on photographing nude women in nature. *Id.* at 100:13-15; 87:6-9.  Levingston does not believe that either § 2257 or § 2257A applies to his photographs of nude women in nature, and these statutes have not stopped him from producing these photographs.  *Id*. at 96:10-11; 121:2-24; Def's Exs. 91A, 91B, 91C.

60.     Levingston currently produces no work falling under § 2257 or § 2257A. Levingston Testimony, Tr. June 5, 100:7-9.

61.     Although Levingston stated that he "prefer[s] older models," Levingston Testimony, Tr. June 5, 88:5, most of his models have been under 29 years old.  The identification cards and model releases that Levingston produced in discovery revealed that 44% of his models have been under the age of 25, and 60% have been under the age of 29.  Def's Ex. 314.  He has photographed nude models as young as 18 and before they enter college.  Levingston Testimony, Tr. June 5, 117:2-120:18; Def's Ex. 89A, 89B, 89C, Ex. 90B.

62.     Levingston agrees that it is difficult to tell apart a 17 year old from a 19 year old, and that the way not to confuse 18 year olds and 19 year olds with minors is checking their IDs. Levingston Testimony, Tr. June 5, 123:16-24.

63.     Although Levingston occasionally shoots nude women, he is currently focusing on projects that do not involve nudes.  *Id*. at 100:16 - 101:15.

64.     Besides producing photographs of nude women in nature, Levingston produced a small amount of simulated sexually explicit photographs from 2005 to 2009.  *Id*. at 110:25 - 111:3; Def's Ex. 90C.  Levingston claimed that he has stopped producing simulated sexually explicit photographs after § 2257A took effect on March 18, 2009.  Levingston Testimony, Tr. June 5, 96:7-13.  However, he did a sexually explicit photo shoot on November 18, 2009.  *Id*. at 111:4-24; Def's Ex. 90C.

65.     In addition, although Levingston claimed that he took down a photograph from his website because others could interpret is as falling under § 2257A, Levingston does not believe that this photograph falls under the statute.  Levingston Testimony, Tr. June 5, 122:9 - 123:2; Def's Ex.  90A.[3]

66.     Levingston does not take photographs falling under § 2257A because he is "not good with record-keeping" and does "not think that he's capable of maintaining records" according to the statute.  Levingston Testimony, Tr. June 5, 96:24 - 97:4.  Moreover, he does not want to be subject to records inspections because he "can't be available 20 hours a week" and he is not "willing to publish [his] home address out there on the internet for any nut job with an AK-47, who might be offended by what I do, to come attack" him and his family.  *Id*. at 97:5-17.

---

[3] Levingston said that he is interested in doing a project potentially engaging sexually explicit photographs of former and current prostitutes about their experience.  Levingston Testimony, Tr. June 5,  107:7-12; 98:20-25.  Levingston believes some of these photographs could implicate § 2257A.  *Id*. at 99:1-3.  However, the project is in a conceptual stage, and it is unclear whether it would involve any photographs subject to § 2257A.  *Id*. at 107:18—108:12.

Levingston also believes that he has to put a 2257 label on each one of his images. *Id*. at 97:18-21.

67.     Levingston keeps the records associated with her models in his studio in Dayton, Ohio, *id*. at 89:3-11.  When Levingston is traveling to do photography, the two other photographers in his studio or his wife, who do not travel with him, could facilitate a records inspection. *Id*. at 109:9-20; 110:3-6.

68.     Levingston keeps IDs and model releases in a drawer in his studio, Levingston Testimony, Tr. June 5, 110:7-9.  He also stated that keeping photographs of his model's IDs in his computer is not burdensome.  *Id*. at 110:12-21.

### 4.     Barbara Nitke

69.     Barbara Nitke is a photographer who does still photography for corporate clients and for television shows and also produces work independently that she exhibits in galleries and publishes in magazines and books. Nitke Testimony, Tr. June 7, 132:25-134:21.  Her independent work involves depictions of sexually explicit conduct.  *Id*. 134:9-11.

70.     Nitke has undertaken a number of different independent projects since she began photographing in 1982 and has undertaken these projects one at a time, in succession.  Her first project involved photographing individuals on adult hardcore pornography film sets, overlapping with her still photography work for the producers on those film sets. *Id.* at 135:9-18, 137:23-138:1. That project continued through around 1991, when the adult hardcore industry moved from New York to California.  *Id*. at 152:25-153:5.  That project resulted in a book, American Ecstasy, published in 2012. *Id*. at 145:9-21. Nitke then did similar work on fetish porn movie sets, until around 1994.  *Id.* at 137:14-138:1, 153:13-19.

71.     From 1994 until about 2000, Nitke undertook a project, which she calls Kiss of

Fire, that involved photographing people engaged in BDSM

(bondage/discipline/dominance/submission/sado-masochism) practices.   Nitke Testimony, Tr.

June 7, 138:6-10, 139:7-9.  For that project, Nitke used black and white film. *Id.* at 139:20-21.

That project resulted in a book, also called Kiss of Fire, published by a German publisher in

2003. *Id.* at 134:14-15.

72.     Her next project, which she called Illuminata, used color film and explored a

different aspect of BDSM practices. *Id.* at 139:12-22.  She continued the Illuminata project from

2000 to 2007. *Id.* at 139:24-25.

73.     During that period, in around 2005 or 2006, Nitke shifted over to using digital

photography. *Id.* at 142:23-24.

74.     Some of Nitke's BDMS photographs show people wearing masks or hoods or

other outfits that obscure their face or body, increasing the difficulty that a viewer of the

photograph might have in determining the ages of depicted individuals.  *Id.* at 173:23-174:10.

75.     From 2008 until the present, Nitke has been engaged in a new project that she

calls Smooth Hotel, involving depictions of light bondage activity.   Nitke Testimony, Tr. June 7,

140:24-141:5.  Nitke has identified around 20 models as appearing in photographs that she has

taken for the Smooth Hotel project that she believes may implicate 2257.  *Id.* at 155:21-156:7.

Of the Smooth Hotel models for whom age information is available in the record, one is 45 and

the other ten are between 21 and 26. *Id.* at 158:8-159:14; Def's Ex. 97.  Eight of the 11 (72.7%)

are 25 or younger, and 10 of the 11 (90.9%) are 29 or younger. *Id.*[4]

76.     Nitke cannot identify the ages of future models she might use.  She anticipates

that after she finishes the Smooth Hotel project, she will move on to another project, which may

_____

[4] Nitke also provided information for 19 individuals in the form of identification documents,
model releases, and 2257 forms; for those individuals, 37% were 25 or younger, and 47% were
29 or younger. Def's Ex. 314 at 3, 314A.

involve a different group of subjects.  Nitke Testimony, Tr. June 7, 155:5-11.  Nitke does not

know at this time who might appear in the photographs that she might take in the future as part

of a new, as-yet-undetermined project.  *Id.* at 155:12-13.

77.    Nitke's regular model release form does not identify a model's date of birth.

Nitke Testimony, Tr. June 7, 159:15-23; Def's Ex. 101.  The 2257 form that she uses for

sexually explicit work does include the model's date of birth.  Nitke Testimony, Tr. June 7,

159:24-160:12; Def's Ex. 100.

78.    Nitke maintains a website, barbaranitke.com, where she posts photographs from

her different projects, including American Ecstasy, Kiss of Fire, Illuminata, and Smooth Hotel.

Nitke Testimony, Tr. June 7, 160:13-162:1; Def's Exs. 112A - 112E.  Her website contains a

2257 statement listing her business address, which is also her home address, as the location of

her 2257 records.  Nitke Testimony, Tr. June 7, 165:18-24. Nitke designates 18% of her

apartment as a home office for tax purposes.  *Id*. at 165:25-166:4.

79.    Nitke keeps her 2257 records in paper form because she does not know that these

records can be kept in digital form.  *Id.* at 162:8-14.  Nitke keeps four sets of 2257 records even

though only one set is required.  *Id.* at 162:15-17, 1563:4-6.

80.    Instead of simply filing any 2257 records that she produces in her 2257 file at the

time she creates those records, she first files them in her business files and then spends time

locating 2257 records in her business files in order to transfer them to her 2257 file whenever she

uploads a new image onto her website. *Id.* at 164:8-10, 165:1-5.

81.    When she removes an image from her website, she removes the 2257 records for

that image from her 2257 file and puts them back in her business files. *Id.* at 163:24-164:7.

82.    Nitke also has a cross-referencing system that she does not maintain using a

digital spreadsheet but instead constructs anew manually on paper whenever she reorganizes her 2257 files. *Id.* at 149:19-150:6; 164:21-25.

83.     Nitke wanted to publish a book containing photographs from her American Ecstasy project along with other sexually explicit photographs that she took after 1995, and for which she has 2257 records, but she believed that, in order to publish such a book, she would need to obtain 2257 records for the (pre-1995) American Ecstasy photographs. *Id.* at 172:1-10. However, Nitke recognizes that she could publish the same group of photographs in two separate volumes, and that she can publish photographs from both pre-1995 and post-1995 projects together on the same website. *Id.* at 172:11-173:8.

### 5.     David Steinberg

84.     David Steinberg is a photographer who photographs couples in the act of having sexual intercourse.  Steinberg Testimony, Tr. June 4, 121:6-11.  His sexual photography is a source of income for him.  *Id.* at 127:1-8.  He has exhibited his work in galleries and published it in books. *Id.* at 119:3-12; 120:5-21; 121:18-25; 123:18-24.

85.     Steinberg testified that there are no objective criteria to determine what is art and that, despite his intent, his sexually explicit photographs could be sexually arousing.  Steinberg Testimony, Tr. June 4, 148:19-25 – 149:20.

86.     Steinberg does not restrict his photography to clearly mature models. He testified that he would take sexually explicit pictures of a couple, both of whom were eighteen years old, so long as they provided appropriate identification.  Steinberg Testimony, Tr. June 4, 139:5-18. He also testified that he has actually taken sexually explicit photographs of people as young as 19 years old.  *Id.* at 140:9-16.  Additionally,  Steinberg has also photographed couples having sex where one half of the couple was mature but the other half was very youthful, for example a 25-

year-old having sex with a 73-year-old, or a 21-year-old having sex with a 53-year-old. *Id.* at 142:12-25 – 143:1-18.

87.     Steinberg has not published or edited a book with sexually explicit materials since 2003. Steinberg Testimony, Tr. June 4, 148:3-8.

88.     He also testified about a failed project for which he hoped to help publish a version of a Norwegian magazine which contains sexually explicit material in the United States. *Id.* at 110:9 – 111:15. However, as the Court pointed out during testimony, it is not an infringement on Steinberg's First Amendment rights to require a foreign company or foreign photographers to comply with United States laws in order to publish sexually explicit materials in the United States. *Id.* at 113:7 – 11.

89.      Steinberg keeps the hard copies of his Sec. 2257 files in a file cabinet in his office and he is able to transcribe the information into a database on his computer. Steinberg Testimony, Tr. June 4, 124:20-25.

### C.     Sex Educators and Sexologists

#### 1.     Betty Dodson and Carlin Ross

90.     Plaintiffs Betty Dodson and Carlin Ross describe themselves as sex educators. Ross Testimony, Tr. June 4, 156:4-5; 194:9-13. Dodson has been a sex educator since the 70s. Dodson Testimony, Tr. June 4, 194:9-13. Ross has produced several sexually-explicit videos where women engage in masturbation. Ross Testimony, Tr. June 4, 161:17 - 165:7. Ross became a sex educator six years ago. *Id.* at 156:6-7. Previously, Ross practiced law in New York City. *Id.* at 156:8 - 157:5. Ross began working with Dodson in 2006. *Id.* at 157:21-22.

91.     The ages of individuals depicted in Dodson and Ross's sexually explicit DVDs have ranged from 21 to 68. Ross Testimony, Tr. June 4, 160:7—163:18. One of the DVDs they

produced was "Orgasmic Women," where several women between the ages of 21 and 25 appear engaging in masturbation. *Id.* at 176:12 - 177:4. *See* Def's Ex. 116.

92.     Dr. Francis Biro, an expert in pubertal maturation, examined this DVD and concluded that two of these young women, Dacy and Ramona, could be confused as minors. Def's Ex. 316, p.2.

93.     The Sinclair Institute sells the video "Orgasmic Women" on their website, where it is described as featuring a "young (18+) white student climax[ing] with her clit massager …" Def's Ex. 124P.

94.     Dodson and Ross have stopped producing DVDs because this is a "dead medium." Dodson Testimony, Tr. June 4, 208: 7-16. Their decision to stop producing DVDs has nothing to do with § 2257. *Id.* at 207:4-6.

95.     Dodson and Ross operate the website www.dodsonandross.com. Ross Testimony, Tr. June 4, 166:23-25. In this website, Dodson and Ross sell access to sexually explicit video clips, which range in price from $3 to $30. *Id.*. at 169:13-16. The website actually shows a scene of each video clip. Def's Ex. 117A.

96.     Ross admitted that she could not tell the ages of the individuals appearing on her website in which the depictions were of genitals alone. Ross Testimony, Tr. June 4, 179:18 - 180:23.

97.     Indeed, Dr. Biro noted that there was not enough information in some of these images to make a reliable estimate of the person's age. Def's Exh. 316, p. 3 (*see* Def's Ex. 162G "Male Masturbation with vibrators, and Def's Ex. 162H "Shelly Celebrating Orgasm).

98.     The website also has a sex store where Dodson and Ross sell sex toys, books, and the sexually explicit DVDs that they have produced over the years.  Ross Testimony, Tr. June 4, 162: 10-16; 207:7-13.

99.     The website also has a section where Dodson answers sex questions submitted by readers.  Ross Testimony, Tr. June 4, 167:7-14.   Teenagers between the ages of 14 and 17 have submitted some questions to Dodson in this section.  *Id*. at 167:20 - 168:8; *see* Def's Exs. 45A-T. Dodson sometimes encourages the readers to buy products for sale on the sex shop.  Dodson Testimony, Tr. June 4, 208:7-16.

100.     The website also features a Genital Art Gallery ("GAG"), which consists of images of genitals submitted by the public.  Dodson started the GAG in 1998.  Ross Testimony, Tr. June 4, 170:3-5.  The purpose of the GAG was to "heal genital shame" by showing a variety of real genitals.  *Id*. at 170:6-14.

101.     According to Ross, in "pornographic content, there's an aesthetic, and the majority of performers get labiaplasty and they bleach to make things pink."  *Id*. at  172:4-6. Dodson stated that procedures such as labiaplastly, which is removing the inner lips of the vagina, is done in pornography to make women look younger, "reminiscent of a pre-pubescent girl."  Def's Ex. 117B; Dodson Testimony, Tr. June 4, 210:7—211:7.

102.     When Dodson partnered with Ross, they merged their websites and posted the images of the GAG on their new website (dodsonandross.com).  Ross Testimony, Tr. June 4, 173:22—174:4.

103.     When § 2257 was amended to cover lascivious exhibition of the genitals, Dodson and Ross believed that all images in the GAG produced after 2009 were subject to § 2257.  Ross Testimony, Tr. June 4, 174:7-9.

104.    Due to a technical issue resulting from the merging of Dodson's and Ross's websites to create dodsonandross.com, they could not determine the date of creation of some of the images in the genital art gallery.  *Id.* at 173:22 - 174:13.

105.    Although Ross recognized that § 2257 was amended to cover lascivious exhibition of the genitals, as opposed to all exhibition of genitals, *id*. at 179:5-17, she and Dodson decided to remove from the GAG all images for which they could not determine their date of creation.  *Id.* at 174:14-18.  Ross estimated that they removed 1,800 images from the GAG because they could not determine their date of creation.  *Id*. at 174:19-23.  There are currently between two to three hundred images remaining on the GAG.  *Id*. at 174:21—23.

107.    Before § 2257 was amended in 2009 to include lascivious exhibition of the genitals, Dodson and Ross did not require people submitting photos to the GAG to submit a photo identification; rather, people would only submit a picture of their genitals and an essay.  Ross Testimony, Tr. June 4, 185:11-24.

108.    The essay guidelines Dodson and Ross provided for people making submissions to the GAG did not require people to state their age.  *Id*. at 177:22—178:20.  *See* Def's Exs. 44I, 44J.  Ross explained that she relied on the essays and how the genitals looked to determine if the ages of the people submitting pictures to the GAG.  Ross Testimony, Tr. June 4, 177:9-15.

109.    Dodson and Ross admitted that they cannot determine someone age by just looking at a picture of that person's genitals.  Ross Testimony, Tr. June 4, 177:19-21, 180:25—181:13.  Moreover, Dodson and Ross admit that it is difficult to determine a person's age by visual inspection.   Dodson Testimony, Tr. June 4, 209:24—210:6.  Indeed, Ross confused a man 28 years of age appearing in one of Plaintiff Steinberg's sexually explicit photographs with a minor.  Ross Testimony, Tr. June 4, 181:23 - 182:15; Def's Ex. 36; Def's Ex. 120C.  *See*

Steinberg Testimony, Tr. June 4, 147:2-25 (Steinberg admitting man depicted in Def's Ex. 120C was 28 years old); ; Pl. Ex. 63, at 7 (shoot 210 involved 28-year-old Irish man); Def's Ex. 119A (Irish passport).

109.     Ross testified that § 2257 is not "burdensome at all" and that she has no problem complying with it when they produce a film.  Ross Testimony, Tr. June 4,. 189:20-23.

110.     Dodson and Ross object to § 2257's application to the GAG because they have received fewer submissions to the GAG when they started asking people to send a copy of their ID.  *Id*. at 175:7-9.  However, in their essay guidelines, Dodson and Ross assure submitters that they will not publish their names or their e-mail addresses.  *Id*. at 178:10-25.  *See* Def's Exs. 44I and 44J.

### 2.     Carol Queen

111.     Plaintiff Carol Queen is a sexologist who is the founder and director of the Center for Sex and Culture ("the Center") in San Francisco.  Queen Testimony, Tr. June 4, 49:4-6.

112.     The Masturbate-a-thon is an event that the Center has held almost every year since 2001.  Queen Testimony, Tr. June 4, 77:13-17. Participants in the Masturbate-a-thon ranged in age from 18 or over to as old as 70.  *Id.* at 67:21-25.  While approximately ten to twelve percent of people who have participated in the Masturbate-a-thon were under 25, *id.* at 68:4-6, the Center would allow an 18 year old to participate in the Masturbate-a-thon as long as the individual had appropriate identification.  *Id.* at 79:21-25 – 80:1.

113.     The Masturbate-a-thon came under the requirements of Sec. 2257, for a time, because the Center was live streaming sexually explicit content to the internet.  Queen Testimony, Tr. June 4, 64:8-13.  However, Queen has described the intent of the live streaming was to be effervescent.  *Id.* at 78:19-21.  These broadcasts were not recorded by the Center

because there was no intent to permanently capture the images of the participants and no intent to ever rebroadcast a prior Masturbate-a-thon.  *Id.* at 78:9-25 – 79:1.

114.    The Masturbate-a-thon has not been live streamed since 2010, not due to any requirements of Sec. 2257, but rather because the Masturbate-a-thon changed venues in 2011 and the current venue is not large enough to support a live stream broadcast.  Queen Testimony, Tr. June 4, 77:25 – 78:1-8; 81:12-25 – 82:3.

115.    Compliance with Sec. 2257 has never prevented Queen or the Center from hosting a Masturbate-a-thon.  *Id.* at 81:9-11.

116.    As for the Center's photo club, Queen testified that the club has been inactive for a year due to disinterest of the members, not Sec. 2257, and that there are no current plans to resume the photo club.  *Id.* at 72:2-8; 87:1-15.

117.    Queen has not composed a piece of erotic art work in a year and a half.  Queen Testimony, Tr. June 4, 87:16-25.  This hiatus is also not due to the requirements of 2257, but rather a lack of time and artistic inspiration on the part of Queen.  *Id.* at 57:22-25 – 58:1-4; 88:1-20.

118.    During the Masturbate-a-thon, it takes less than a minute to check a participants identification.  Queen Testimony, Tr. June 4, 2-9.  Also, the Center has less than 1,000 pages of materials related to compliance.  *Id.* at 88:21-25 – 89:1-7.  Queen only spends 10-12 hours annually dealing with Sec. 2257 compliance, and that is only in the years when the Center live streams the Masturbate-a-thon.  *Id.* at 89:11-18.

119.    Queen has spent little to no time over the last three years doing anything to comply with Sec. 2257, as the Masturbate-a-thon has not been on the internet since 2010.  *Id.* at 88:19-24.

120.    Queen has never sent a sexually explicit text, nor does she even know anyone who has sent a sexually explicit text.  Queen Testimony, Tr. June 4, 104:1-15.

## II.    PREVALENCE OF YOUTHFUL-LOOKING PERFORMERS IN     SEXUALLY EXPLICIT MATERIAL

### A.  Youthful-Looking Individuals Who Could Reasonably Be Confused As Minors

121.    People as old as 30 years old could reasonably be confused as minors.  Biro Testimony, Tr. June 17, 56:10-15.  Although people between the ages of 25 and 30 would "generally" not be confused as minors, some could be, especially if they are trying to appear younger.  *Id.* at 67:5-22.

122.    People above the age of 25 depicted in sexually explicit material could be confused as minors, even if they are not trying to appear younger.  First, research conducted by Plaintiff's own expert, Dr. Daniel Linz, reported that individuals older than 25 depicted in "barely legal" pornography could be confused for minors:

> Barely legal pornography contains depictions of females who, despite appearing   to be under the legal age of consent, seem particularly sexually suggestive or     promiscuous. Though in reality the models in these depictions are at least 18     years old, previous research in the alcohol literature has demonstrated that models     who are 25 years old or older can be perceived as substantially younger than 18    by media consumers.

June 14 Tr. 70:10-21.  Second, when Plaintiff Carlin Ross was shown a sexually-explicit photograph of a 28-year old man taken by Plaintiff Steinberg, without being told the man's age, she stated that the man appeared to be 17.  Ross testimony, Tr. June 4, 181:23 - 183:20; Def's Ex. 36, Def's Ex. 120C.  *See* Steinberg Testimony, Tr. June 4, 143:25 - 144:24, 146:17 - 148:1 (Plaintiff Steinberg identifying Def's Ex. 120C as one of his photographs and stating that the man depicted in the photograph was 28 years old at the time the photograph was taken); Pl's Ex. 63, p. 7 (showing that shoot 210 involves a 28 year old Irish man); Def's Ex. 119A (Irish passport and model release of man depicted in Def's Exs. 36, 120C, and 168E).  Even Dr. Biro,

who examined the same photograph without knowing the man's age, could not say with confidence that the man was over the age of 18.  Biro Testimony, Tr. June 17, 39:22 - 40:18 ("There are certain cues that tell me that he should be under 18.  There's certain cues that I have that tell me that he should be over 18.  I am at a loss.").[5]

123.    The photograph of the man produced by Plaintiff Steinberg that Plaintiff Ross, and even Dr. Biro, confused with a depiction of a minor is not an example of "barely legal" or "teen" pornography, and the man was not trying to appear younger.  Indeed, Plaintiff Steinberg photographs "regular people," as opposed to the "youthful and perfect looking people in mainstream media" and magazines such as Playboy.  Steinberg testimony, Tr. June 4, 137:17—138:7.

124.    Images of isolated body parts do not provide enough information for people to determine a person's age.  Biro testimony, Tr. June 17, 43:8-19; 36:8 – 38:3; 39:8 – 21; Def's Ex. 160; Def's Ex. 162D; Def's Ex. 162G; Def's Ex. 316, p. 3.

125.    Plaintiffs agreed that it is impossible to tell someone's age by a simple visual inspection or by a depiction of isolated body parts.  Mopsik Testimony, Tr. June 3, 54:2-4.; Douglas Testimony, Tr. June 3 140:18-22; Queen Testimony, Tr. June 4, 90:19-21; Steinberg Testiomony, Tr. June 4, 138:24-25 – 139:1; Ross Testimony, Tr. June 4, 177:19-21.

B.  Quantity of Sexually Explicit Material Depicting Young and Youthful Performers

126.    A substantial amount of the performers for which Plaintiffs produced identification cards and model releases in discovery are under 25 and under 29 years of age.

a.  Dodson & Ross: 25% of their performers are 25 and under, and 45% are 29 and under.  Def's Ex. 314A

b.  Levine: 23.8% of her performers are 25 and under, and 40.3% are 29 and under.  Def's Ex. 314A.

---

[5] Dr. Biro examined Def's Ex. 168E, which is the same picture in Def's Ex. 120C and Def's Ex. 36.

c. Levingston: 44% of his models are 25 and under, and 60% are 29 and under.  Def's Ex. 314A

d. Morey (ASMP): 61.2% of his models are 25 and under, and 86.6% are 29 and under.  Def.'s Ex. 314A.

e. Nitke: 36.8% of her performers are 25 and under, and 47.3% are 29 and under.  Def's Ex. 314A.

f. Sinclair Institute: 21.1% of its performers are 25 and under, and 34% are 29 and under.  Def's Ex. 314A.  In addition, 10% of performers are between 18-20, and 30% are in their twenties.  Wilson testimony, June 4 Tr. 5:4-18.

g. Vivid Video (FSC): 41% of its performers are 25 and under, and 57.3% are 29 and under.  Def's Ex. 314A.

h. Connors (FSC): 47% of his performers are under 25.  Def's Ex. 48.

127.    The Sinclair Institute, as a secondary producer, sells many videos depicting young and youthful looking individuals who could be confused as minors.  Def's Exs. 124-126.

128.    Dr. Biro concluded that roughly half of the 150 images from Plaintiffs that he examined were of individuals "in their twenties or younger."  Biro Testimony, Tr. June 17, 24:17—25:7.

129.    David Connors (FSC), Craig Morey (ASMP), Ned Rosen (ASMP), David Levingston, Barbara Nitke, David Steinberg, Sinclair Institute, and Dodson & Ross have produced depictions of individuals who could be confused as minors.  Def's Ex. 316.

130.    Barbara Alper, Dodson & Ross, Marie Levine, David Levingston, Barbara Nitke, David Steinberg, and the Sinclair Institute, have produced depictions where there is not enough information to make a reliable estimate of the person's age.  Def's Ex. 316.

131.    Across all genres of pornography, the overriding image is of a youthful looking woman.  Dines testimony, Tr. June 7, 41:9-11.

132.    Countless sexually-explicit images from a wide array of sources, including images produced by Plaintiffs and FSC and ASMP members, depict young and youthful-looking performers who could be reasonably confused as minors.[6]

133.    Even in the category of MILF pornography, which focuses on depicting older women, the predominant images are of young men and women engaging in sexual activities with older women.  Dines testimony, Tr. June 7, 52:8-20.

134.    MILF pornography, and other pornography dedicated to older individuals, often includes young and youthful looking individuals who could be confused for minors.

   a.   Plaintiff Sinclair Institute, a member of the Free Speech Coalition, sells many sexually explicit videos depicting older adults engaged in sexual relations with teens and other youthful looking individuals.  *See* Def.'s Ex. 124-126.

   b.   Two other members of the Free Speech Coalition, David Connors and Plaintiff Marie Levine, often perform with teens and young adults (under 25).  Def's Exs. 85C, 87, 88, 169, 170, 172, 306, and 307.

   c.   Websites that Plaintiffs provided to show a prevalence of mature performers in pornography (i.e. "mature/granny porn") depict younger individuals having sex with these mature performers.  *See* Def's Ex. 234 (moms bang teens); Def's Ex. 260-284.

135.    One of the categories in pornography primarily devoted to depicting very young individuals (between the ages of 18-20) is "teen porn."  Linz testimony, Tr. June 14, 68:9-14.

136.    A search for the term "teen" across the three most popular and trafficked pornographic sites in the United States (Pornhub, XNXX, and Redtube), revealed that 27% of the

---

[6] *See* Def's Exs. 31-32 (Morey screenshots Part I); 33A-J (Rosen screenshots); 47 (Conners DVD covers); 85A-C (Cougarscravekittens); 86B-D (sites linked to nina.com); 87 (Redtube); 124-126 (Sinclair Institute videos); 128 (Adam & Eve videos); 129 (Sinclair Institute catalogues); 229A, 229D (18xgirls); 229B-229C, 231A-231G (First Time Video girls); 230 (bitchcrawler); 233A-233D (lethalpass); 234 (moms bang teens); 235 (Pornhub screenshots); 236A (AVN screenshots); 236C (Porn XXX facebook page); 236D (pornstars models facebook page); 236E (Wicked facebook page); 289 (All Good Video screenshots); 291A-E (Bacchus – Filmco videos); 292A-C (Adult.com videos); 293A-C (Darkside Entertainment screenshots); 294A-G (Diabolic screenshots); 295A-I (Don Goo screenshots); 296 (Erotic Angel dba K-Beech screenshots); 297A-C (Evasive Angel screenshots); 298A-D (Ghost Pro – Fifth element screenshots); 299A-B (JT Video screenshots); 300 (Moonlight Entertainment screenshots); 300 (Moonlight Entertainment screenshots); 301 (Private dba Pure Play media screenshots); 302 (Robert Hill screenshots); 303 (RWG screenshots); 304 (Shane's World screenshots); 305A-C (Wicked screenshots).

pages in these sites were tagged as containing teen porn, and 34% were tagged with teen or an allied term (young, college, schoolgirl, and daughter). Dines testimony, Tr. June 7, 61:9 - 63:11; Def's Ex. 182. In comparison, 22.7% of pages were tagged with the term "MILF." *Id.* "Teen" was the top porn genre as determined by this search. *Id.*

137.    A search using the Search Engine Optimization (SEO) Website found that "teen porn" and allied terms constitute almost half of the web searches for "porn," while searches for "MILF" constitute slightly less than a third of all searches for porn. Def's Ex. 180; Dines testimony, Tr. June 7, 53:15—58:17.

138.    A search conducted in Google trends revealed that searches for "teen porn" have grown 215% from January 2004 to February 2013, whereas searches for "MILF" have actually decreased 17.4% over the same time period. Def.'s Ex. 183; Dines testimony, Tr. June 7, 65:2-12.

139.    Pornmd.com, a website from the pornography industry, reports that the top porn search terms in the United States are "MILF," "teen," and "college," and that "teen" is the top search term in 13 states. Def's Ex. 175; Dines testimony, Tr. June 7, 65:5 - 66:18.

140.     Teen porn is extremely popular. Linz testimony, Tr. June 14, 64:15-18.

141.    The number of images associated with "teen porn" (16,800) in Pornhub.com, the most popular pornographic site in the United States, is more than the amount of images associated with "MILF" (6,974) and "mature" (2,019) porn combined. Linz testimony, Tr. June 14, 63:5—64:11.

142.    "It's not uncommon to see women who have recently reached the age of majority in adult films." Levine testimony, Tr. June 5, 58:2-5

143.    Levine has performed with several teens and other youthful-looking individuals. Levine testimony, Tr. June 5, 57:2-8; Def's Exs. 85C, 87, 306, 307.

144.    Based exclusively on a division of the Google hits for the term "teen porn" (136,000,000) by the term "porn" (1.3 billion), Dr. Linz opined that 10% of pornographic material constitutes "teen porn."  Linz testimony, Tr. June 14, 27:6-23.

145.    Dr. Linz's methodology is not reliable because the number of Google hits for the term "porn" includes books, articles, blogs, and other items that may contain no sexually explicit images.  Linz testimony, Tr. June 14, 48:5 - 53:2.  *See also* Dines testimony, Tr. June 7, 60:15-25 – 61:1-3.  (Dines explaining a search for the term porn would gather many things that do not contain images).

146.    Linz did not estimate the proportion of actual "teen porn" images in relation to "porn" images.  Linz testimony, Tr. June 14, 52:14-17.

147.    Linz's calculation is not reliable because the number of Google hits for the terms "teen porn" and "porn" can vary significantly, leading to a significantly different proportion of "teen porn" Google hits.  Def's Ex. 192.

148.    The pornographic websites that Dr. Dines used to arrive at her estimate that 34% of pornographic material on those sites was comprised of "teen porn" (Pornhub, Redtube, and XNXXX) primarily contain sexually explicit images and will not include scholarly articles or news reports.  Def's Ex. 182; Dines testimony, Tr. June 7, 61:6-25 – 65:1; Linz testimony, Tr. June 14, 62:2—63:4.

149.    Across all genres of internet pornography, the predominant image is one of a youthful looking woman.  Dines testimony, Tr. June 7, 41:5-16; 42:24-25 – 43:1-8.

150.    "Teen porn" is only a subset of the sexually-explicit material depicting young and youthful looking performers who could be confused as minors.  Dines testimony, Tr. June 7, 44:17-25 – 45:1-17.  Young and youthful-looking individuals are prevalent in MILF porn.  Dines testimony, Tr. June 7, 52:8-20; *See* Def.'s Ex. 124-126; Def's Exs. 85C, 87, 88, 169, 170, 172, 234, 260-284, 306, and 307.  In addition, individuals older than teens could be confused for minors.  Biro Testimony, Tr. June 17, 56:10-15, 67:5-22; Linz testimony, Tr. June 14, 70:10-21; Ross testimony, Tr. June 4, 181:23 - 183:20; Steinberg testimony, Tr. June 4, 143:25 - 144:24, 146:17 - 148:1; Biro testimony, Tr. June17, 39:22—40:18.

C.   Child Pornography is Vast and Has Ties to Legitimate Adult Websites

a.   Janis Wolak

151.    Child pornography can be transmitted or posted any way that a photograph can, *e.g.*, email, image boards, commercial websites and internet applications.  Wolak Testimony, Tr. June 11, 27:21-25 – 28:1-6.

152.    Based on research done by the Crimes Against Children Research Center, approximately two thirds of people arrested for possession of child pornography have images of children in the 13-17 year old range.  *Id.* at 30:8-11.  Additional research performed in 2009 revealed that 70 percent of child pornography victims were adolescents.  *Id.* at 32:1-6.

153.    The Child Victim Identification Program at the National Center for Missing and Exploited Children has determined that approximately 50 percent of the victims it has been able to identify were photographed as adolescents.  *Id.* at 43:13-23.

154.    Child pornography has been linked to legitimate commercial adult websites.  *Id.* at 46:22 - 47:1-17.

155.    Research done by the Crimes Against Children Research Center has revealed young adolescents (13 and 14 year old girls) have been lying about their age and advertising themselves on adult dating websites like Adult Friend Finder.  *Id.* at 81:8-14.

b.  Dr. Daniel Linz

156.    Plaintiff's expert, Dr. Linz, has never been qualified as an expert to testify about the prevalence of child pornography or of youthful-looking performers in pornography.  Linz Testimony, Tr. June 14, 41:25—43:7.

157.    Linz has not previously conducted research on the quantity of child pornography depicting adults vs. the quantity of child pornography.  *Id.* at 44:23 - 45:8.

158.    Linz has not previously conducted research on the proportion of child pornography that depicts older adolescents.  *Id.* at 45:9-16.

159.    Linz has not previously conducted research on the proportion of pornography depicting individuals who could be confused as minors. *Id.* at 45:23-46:6.

160.    Linz has not previously conducted research on the quantity of private, non-commercial sexually explicit expression.  *Id.* at 46:7-18.

161.    Linz testified that 99% of pornographic material is not child pornography.  Linz testimony.  *Id.* at 24:13-14.

162.    Linz's testimony that 99% of pornographic material is not child pornography is unreliable.  This estimate is primarily based on the division of Google hits for "child pron" (3,090,000) by the number of Google hits for "porn" (1.3 billion).   *Id.* at 53:16-23; 15:25 - 16:3, 19:23 - 20:2.  Conducting a Google search for "child pron" would not identify actual child pornography images available online.  The Google hits for "child pron" included Wikipedia pages and articles about arrests for child pornography.  *Id.* at 17:22 - 18:4.  People maintaining a

web page with child pornography will not tag that page as containing child pornography.  *Id.* at 55:19—56:16.  People looking for child pornography online would use terms other than "child porn."  *Id.* at 56:2—57:14.  Linz' calculation does not include child pornography in peer-to-peer networks.  *Id.* at 57:21-24.

163.    Child pornography is continually produced, swapped and traded in almost every community in the United States, primarily via the Internet.  Linz Testimony, Tr. June 14, 60:12-18; Def's Ex. 194.

164.    There is a connection between commercial and homemade child pornography. Often, homemade child pornography is sold or traded and winds up on commercial child pornography websites or in magazines, movies and videos.  These visual images are often reproduced and circulated again and again, sometimes for profit.  Linz Testimony, Tr. June 14, 60:19—61:1.

165.    Child pornography can be transmitted through every medium that could be used to transmit any sexually explicit image.  *Id.* at 64:19—65:14.

D.  Pubertal Maturation

166.    Girls complete pubertal maturation between the ages of 14 and 16.  Biro Testimony, June 17 Tr. 15:12-16.  However, girls and boys are maturing at a younger age.  Biro Testimony, Tr. June 17, 15:14—16:20.

167.    Pubertal maturation occurs before the prefrontal cortex of the brain fully matures. Biro Testimony, Tr. June 17, 22:7—23:3.  The prefrontal cortex is the executive part of the brain that modulates emotions.  The disparity between pubertal maturation and brain development can lead teenagers to adopt risky sexual behaviors.  Biro Testimony, Tr. June 17, 23:8—24:16.

168.     It is difficult for experts in pubertal maturation to determine someone age by visual inspection.  Biro Testimony, Tr. June 17, 17:21—18:19.

169.     Among maturation experts, there is a degree of uncertainty of approximately 1 to 3 years in determining the age of teenagers.  Biro Testimony, Tr. June 17, 18:23-25.  In young adults, the degree of uncertainty is 2 to 5 years.  Biro Testimony, Tr. June 17, 18:23—19:2. These degrees of uncertainty would be larger for people without training and experience in maturation assessment.  Biro Testimony, Tr. June 17  19:23—20:24.  These degrees of uncertainty could be larger if people try to make themselves look younger or older.  Biro Testimony, Tr. June 17, 53:12-22, 67:5-22. Race and ethnicity may also increase the uncertainty in trying to determine someone's age. *Id.* 32:18-20.

170.     Factors that can be used to assess a person's age by visual inspection include maturation stage, height, body composition, body fat distribution, skin elasticity, wrinkles, hip to waist ratio, and changes in a person's face.  Biro Testimony, Tr. June 17 17:2—18:19; 26:23—27:12.

171.     It would be very difficult for average people without training and experience in maturation assessment to reliably assess the factors that can be used to determine someone's age by visual inspection.  Biro Testimony, Tr. June 17, 27:13-17.

172.     Children 12 to 14 years old who are fully physically mature can appear to be in their late teens or early twenties.  Biro Testimony, Tr. June 17, 21:9-16.

173.     Teenagers 15-16 could make themselves appear over 18.  Biro Testimony, Tr. June 17, 21:17-21.

174.     People 25 years of age can make themselves appear under 18. Biro Testimony, Tr. June 17, 21:24—22:6.

175.    The requirement that producers of sexually explicit depictions check the ID of their performers to ensure that they are over 18 is a good mechanism to deal with the uncertainty in determining someone's age by visual inspection.  Biro Testimony, Tr. June 17, 41:10-25; 67:23—68:1.

176.    If producers of sexually-explicit material only had to check the identifications of performers who looked to be under a certain age, it would be difficult for producers to ascertain whether the performers are under that cut-off age.  Biro Testimony, Tr. June 17, 43:8-22.

### III.    PUBLICLY-AVAILABLE DEPICTIONS OF SEXUALLY-EXPLICIT CONDUCT

177.    Linz testified that there are many sexual images being transmitted by adult through adult sites.  Linz Testimony, Tr. June 14, 65:15-18

178.    Linz does not know the proportion of images transmitted by adults through adult sites that would fall under § 2257 or § 2257A.  *Id.* at 65:19—66:13.

179.    Linz does not the proportion of people sending sexual images through adult sites that are making money from those images.  *Id.* at 66:14-21.

180.    There are minors in adult dating sites, such as Friend Finder, that pose as adults. *Id.* at 74:5-8.

### IV.    DEPICTIONS OF SEXUALLY-EXPLICIT CONDUCT IN "PURELY PRIVATE" COMMUNICATIONS

181.    SSA Lawrence explained there would be no practical way for the government to identify individuals who had created a sexually explicit videotape or photograph for their own private use, in order to determine whether such individuals were complying with the 2257 requirements  or not. Lawrence Testimony, Tr. June 11, 96:18-98:5.

182.    E-mailing a sexually explicit image to a partner or spouse, or sending such an

image by text message, would not make it any more feasible to include such images within the scope of any government compliance efforts, such as 2257 records inspections.  *Id.*  Only if such an image were posted on the Internet, and were thus available for viewing by individuals other than an intimate partner or spouse, would it be likely that the government might become aware of such images.  *Id.*

### V.    SEXTING

183.    Dr. Michelle Drouin is an associate professor of psychology at Indiana University, Purdue University, Fort Wayne (IPFW).  Drouin Testimony, Tr. June 3, 144:2-8.

184.    She estimated that approximately one-third of young adults nationwide ages 18-24—or 10.2 million young adults, based on recent census data—have sent a text message involving a sexually explicit visual depiction.  *Id.* at 165:7-16.

185.    Drouin reached this estimate by relying on two sexting studies she conducted using students enrolled in introductory psychology classes at IPFW,  *id.* at 152:14 – 153:13; 159:1 – 162:9, as well as four other studies she did not conduct herself, *id.*  at 163:23 – 164:3. These studies defined sexting in a variety of non-uniform ways.  See*, e.g.,* Def.'s Ex. 187 at 001876 (reporting number of respondents "involved in some type of naked sexting"); Def.'s Ex. 188 at 001886 (defining "sexually suggestive" images to mean "semi-nude or nude personal pictures"); Def.'s Ex. 189 at 001902 (defining sext as "a sexually suggestive nude or nearly nude" image); Def.'s Ex. 190 at 001908 (asking whether respondents had sent "erotic or nude photographs"); *see also* Drouin Testimony, Tr. June 3, 166:16 – 167:23; 168:5-19; 170:5-12; 172:5-14; 174:1-12; 175:16-21.

186.    Drouin did not define the phrase "sexually explicit" for purposes of her estimate,

and she testified that the phrase encompasses all of the various definitions from the six studies she considered.  Drouin Testimony, Tr. June 3, 176:18-24.

187.    Only one of the studies Drouin considered attempted to ascertain the number of respondents who had sent images based on the type of content depicted, such as images of intercourse, masturbation, only breasts, or only cleavage.  *Id.* at 166:16 – 167:23.

188.    For the remaining five studies, Drouin does not know the proportions of participants who sent images containing these types of content.  *Id*. at 168:12-22; 170:16 – 171:3; 172:18 – 173:1; 174:13-21; 175:22 – 176:10.

189.    Drouin cannot identify the proportions of young adults included in her estimate by the type of content depicted, including images of intercourse, masturbation, only breasts, or only cleavage.  *Id.* at177:4-13.

190.    Drouin's estimate also included people who had sent images of persons other than themselves, people who had sent images to multiple recipients, and people who sent images to people other than those who were in or had been in a romantic relationship at the time the image was sent.  *Id.* at 177:14 – 179:15.

191.    Although the prevalence rates for sexting from the six studies she considered ranged from 20% to 54%, Drouin arrived at her estimate of approximately one-third because it was where she believed there was a convergence of the evidence.  *Id*. at 181:13-23.  In so doing, Drouin did not perform any calculations, meta analyses, or weighting of the data; instead, she "look[ed] at the results to see if they converge[d]" and "tried to see what [the studies] said collectively."  *Id*. at 181:24 – 182:24.

192.    Drouin testified that her use of the word "approximately" does not constitute a statistical margin of error nor is there any number range associated with it.  *Id*. at 189:7-17.

38

193.    Dr. Marc Zimmerman is the chair of the Department of Health Behavior, Health Education at the University of Michigan.  Zimmerman Testimony, Tr. June 12,  131:10-15.

194.    Zimmerman estimated that 30% of young adults ages 18-24, or 9 million people, have sent sext messages with images, and that 41% of people in the same age group, or about 12 million people, have received such images.  *Id.* at 144:2-13.

195.    Zimmerman's estimate is primarily based on a study he helped conduct using respondent-driven sampling (RDS), whereby the initial participants were recruited via online advertisements on the Facebook website and were rewarded with gift cards both for taking a survey and for recruiting other people to partake.  *Id.* at 139:8-16.

196.    Despite stating in his study that the results of his survey "may not be generalizable to the population as a whole," *id.* at 158:21 – 159:3, Zimmerman justified the participants he recruited using RDS as being nationally representative because he weighted the sample size and because the prevalence rates for certain types of drug use from his sample were similar to the rates from a national study.  *Id.* at 140:6-18; 142:7-24.

197.    Zimmerman compared the results of his study with the results from two other studies, including one that measured the prevalence of sexting among 763 students enrolled in undergraduate psychology classes at a public university in the mid-Atlantic region.  *Id.* at 151:19 – 152:1.  Noting that his "sampling approach is not perfect, for sure," Zimmerman offered to discount his estimate by 50 % to demonstrate that the number of young adults sending or receiving sext messages with images is still large.  *Id.*  at 144:22 – 145:2.

198.    To measure the prevalence of sexting, Zimmerman asked respondents whether they sent a "sexually suggestive nude or nearly nude photo or video of themselves to someone else."  Zimmerman Testimony, Tr. June 12,  146:23 – 147:2.  The study did not further define

"sexually suggestive" or "nearly nude."  *Id*. at 147:2-10.

199.    The two other sexting studies to which Zimmerman compared the results of his survey defined sexting differently.  *Id*. at 149:13-22 (defining "sexually suggestive pictures or videos" as "semi-nude or nude personal pictures/video taken of oneself and not found on the internet or received from a stranger (like spam), etc").  *Id.* at 150:19-24 (defining sexting as "sending or receiving sexually explicit or suggestive photos via text message").

200.    Given these definitions, Zimmerman does not know from any of the surveys how many respondents sent or received images of intercourse, how many had sent or received images of masturbation, how many had sent or received images of only breasts, and how many had sent images of only cleavage.  *Id*. at 147:11-23; 149:23-9; 151:7-18.

201.    Zimmerman's study also was not limited to people who were in romantic relationships and did not exclude people who sent images to multiple recipients.  *Id*. at 147:24 - 148:14.  Nor did his study measure how frequently respondents sent images by text message.  *Id*. at 148:15-17.

202.    Dr. Philip Stark is the chair of the Department of Statistics at the University of California, Berkeley, and an accredited professional statistician.  Stark Testimony, Tr. June 17, 71:23-25; 73:6-13.

203.    Stark testified that there are three key elements to making a reliable estimate about the prevalence of something:  (1) a sampling frame—the segment of the population from which a sample is drawn—that significantly overlaps with the population that is being studied; (2) a random sample, which involves deliberately introducing randomness into selecting the sample; and (3) a high response rate from participants.  *Id*. at 77:10 – 81:25.

204.    Dr. Stark testified that Drouin had no statistical basis for her estimate regarding

the prevalence of sexting because none of the six studies she relied upon were reliably representative of the national population. *Id*. at 83:19 – 86:4.

205.    According to Stark, the three studies she relied upon consisting of students enrolled in undergraduate psychology classes were likely not representative of all students in the same class, let alone other students at the same university or other universities. *Id*. at 84:1-25.

206.    Stark testified that another study relied upon by Drouin similarly was not national representative, noting that it had two disclaimers stating that it was not a probability sample. *Id*. at 88:10-23.

207.    Furthermore, Stark noted that the lack of a consistent definition of sexting among the six studies "complicates the matter of making an estimate" because some studies might be more inclusive than others. *Id*. at 87:2-8.

208.    Stark testified that Zimmerman's estimate was equally flawed describing Zimmerman's RDS method of recruiting participants as a non-random form of a sample of convenience similar to "fish[ing] for candidates . . . with $20 bills."  Stark Testimony, Tr. June 17, 89:12-22.

209.    Stark noted the fact that the prevalence rates for drug use from Zimmerman's sample were in many respects similar to those in a national study did not have any bearing on whether his sample was nationally representative in the context of sexting. *Id*. at 90:7 - 91:6 ("[T]he fact that [the study] agrees on one measure, doesn't give you confidence that it agrees on other measures.").

210.    Stark rejected Zimmerman's assertion that weighting the data from his study made it more nationally representative. *Id*. at 91:12-18 ("The fact that the demographics didn't match in the first place, is an indication that his sample wasn't . . . representative of . . . U.S.

young adults."); id. 19-25 ("[M]atching the demographics doesn't give you any kind of guarantee that you match on the characteristic . . . that you care about . . . .").

211.    Stark countered the notion that Zimmerman's offer to discount his estimate by 50% should increase the confidence in that figure, observing that because Zimmerman lacked a random sample to begin with, "there's no way to know how much you have to discount it in order to get a conservative estimate of the rate of sexting."  *Id*. at 92:6-18.

## VI.    THE DIFFICULTY OF FORMULATING AN EXCEPTION TO THE UNIVERSALLY-APPLICABLE 2257 REQUIREMENTS THAT DOES NOT INTRODUCE SUBJECTIVITY OR ALLOW FOR CIRCUMVENTION

212.    Imposing a specific age as a cut-off point beyond which producers would not be required to comply with 2257 requirements would itself introduce difficulties and inefficiencies into the regulatory scheme.  Lawrence Testimony, Tr. June 11, 162: 8-12.

213.    When creating the pre-inspection reports, it is possible to find performers whose faces do not appear in the sexually explicit video selected for inspection, thus they would be listed as unidentified female or male.  *Id.* at 162:13-17.  The pre-inspection report would, thus, not be able to identify whether the unidentified individual was over or under a specific cut-off age, *e.g.*, 25 years old.  *Id.* at 162:18-21.

214.    If an inspection team asked a producer to provide records for the unidentified performer without the facial image, the producer could claim the performer was over 25, and, therefore, it was unnecessary to keep records on that individual.  *Id.* at 162:22-25.  In that instance, the inspectors would have no way to verify the age of the performer since the information was not collected.  *Id.* at 162:25 – 163:1-2; 164:4-12.  This could lead to disputes between the inspection team and the producer.  *Id.* at 167:7-9.

*215.*    A system with a cut off age would like lead to longer, more difficult inspections,

and likely force producers to provide more documentation.  *Id.* at 167:14-17.

216.    Even pushing the age cut-off as high as 30 or 40 could still create difficulties and loopholes as some ethnicities can appear much younger than they actually are.  *Id.* at 164:13-21; 165:2-9.

217.    Universal application of 2257 simplified the inspection process and provided consistency for producer, who knew exactly what records they were responsible to maintain.  *Id.* at 166:13-22.

### VII.    THE 2257 RECORDS INSPECTION PROGRAM OF 2006-2007

### A.    Beginning and Termination of the 2257 Records Inspection Program

218.    In 2006, the FBI was tasked to set up and operate a program to conduct periodic regulatory inspections of producers' 2257 records.  June 12 Tr., pp. 66:23-67:11. Pursuant to that program, 29 inspections occurred between July 24, 2006, and September 19, 2007.  Def's Ex. 228.  In September 2007, the inspection team was directed to cease inspections due to the Sixth Circuit panel decision in *Connection Distributing Co. v. Holder*. Lawrence Testimony, Tr. June 11, 149:14-22; Joyner Testimony, Tr. June 12, 96:1-4. In February 2008, the inspection program was terminated. Joyner Testimony, Tr. June 12, 96:5-7.  The record contains no evidence of any plan either to resurrect a 2257 records inspection program that might be similar to the previous one or to establish a different form of regulatory 2257 records inspections. Joyner Testimony, p. 96:16-18.

### B.    A Prior Version of the Regulations Was in Effect in 2006 and 2007

219.    The regulations in effect during the existence of the 2257 inspection program were those issued in 2005. 70 Fed. Reg. 29607, 29619 (2005) (promulgating amendments to 28 C.F.R. §§ 75.1 *et seq.*). The regulations implementing the statutory changes made by the 2007

Adam Walsh Act had not yet been issued. *See* 73 Fed. Reg. 77432 (issuing revised regulations at 28 C.F.R. §§75.1 *et seq.* to implement Adam Walsh Act amendments on December 18, 2008). The FBI checklists that were prepared and used during these inspections were based on the 2005 regulations. *Compare* Def's Ex. 225 (citing regulatory provisions), *with* 70 Fed. Reg. 29607, 29619 (2005).

### C.   Scope of Producers Subject to Inspection in 2006 and 2007

220.   The producers whose 2257 records were potentially subject to inspection under the 2006/2007 program were limited to primary producers who were part of the commercial adult entertainment industry.  Lawrence Testimony, Tr. June 11, 91:19-92:20, 93:23-94:5; Joyner Testimony, Tr. June 12, 69:7-11.  All 27 producers that were inspected during the time the 2257 inspection program was operating were companies in the adult industry, though some had gone out of business or been sold to other companies before the inspection occurred. Def's Ex. 228; Pl. Exs. 1-29. Secondary producers were not included.  Tr. June 11, 92:1-20; Tr. June 12, 69:12-23.

221.   "Lascivious exhibition of the genitals or pubic area" was not covered by 2257 until after the 2008 regulations were promulgated.  *See* 73 Fed. Reg. at 77433. Thus, depictions of erotic nudes were not included. Lawrence Testimony, Tr. June 11 94:3-5; Joyner Testimony, Tr. June 12, 70:1-4.  Depictions of simulated, as opposed to actual, sexually explicit conduct were also not included. 73 Fed. Reg. at 77435. Professional photographers outside of the adult industry were not included. Lawrence Testimony, Tr. June 11, 94:6-25; Joyner Testimony, Tr. June 12, 70:5-25.

222.   Individuals who may have posted images on adult dating websites or social networking websites were not included. Lawrence Testimony, Tr. June 11 p. 95:17-96:3; Joyner

Testimony, Tr. June 12, 71:12-16.

223.     The FBI agents who attempted to compile a list of producers subject to 2257 records inspections during this period were unaware of the existence of Internet tube sites in 2006 or 2007 and made no attempt to include material from such sites on their list. Lawrence Testimony, Tr. June 11, 95:1-16; Joyner Testimony, Tr. June 12, 71:6-11.[7] Individuals who made videos of themselves for their own private use were not included. Joyner Testimony, Tr. June 12, 71:17-20.

224.     By the time the 2257 inspection program ended in 2008, around 1200 producers had been identified as meeting the specified criteria and subject to records inspections, but there was a possibility that up to 1.2 million more producers—all on the Internet—might have been added to the list if the program had not ended. Lawrence Testimony, Tr. June 11, 98:14-99:17.  It is unknown how many more producers might have been added to the list if the 2257 inspection program had continued to operate during the five years from 2008 until the present.  There is no indication in the record of how the inspection program might have changed if the number of producers had increased so substantially, or if producers other than members of the commercial adult industry had been included. The Court has recognized that the question of what would have happened if the program had continued is a matter of speculation. Tr. June 11, 102:9-10.

D.     **Inspection Procedures**

225.     Throughout the existence of the 2257 records inspection program, the inspection team made every effort to accommodate and minimize burdens on producers. Pl. Exs. 1-29. The first lead inspector assigned to the program, Supervisory Special Agent Joyner, went so far as to speak on a panel at a conference organized by one of the major adult industry trade media outlets

_____

[7] The record does not indicate whether tube sites containing pornography existed in 2006 or 2007, or to the extent they existed, how they compared to the large pornography tube sites in existence today.

in an attempt to alleviate the adult industry's concerns once the inspections began. Joyner

Testimony, Tr. June 12, 91:15-18, 92:2-6, 92:14-93:5.  Two meetings were also convened at FBI

Headquarters in Washington, DC, where members of the adult industry had the opportunity to

meet and communicate with FBI officials regarding the inspection process. Joyner Testimony,

Tr. June 12, 91:6-92:1.

226.    As it existed in 2006 and 2007, the 2257 records inspection program operated by

using a random number generator to select the producers to be inspected from a list, which the

FBI had compiled and continued to expand. Joyner Testimony, Tr. June 12, 68:6-14. The

inspections were meant to be separate from any investigational activity of the FBI. Joyner

Testimony, Tr. June 12, 67:24-68:2-5.

227.    In carrying out 2257 records inspections, the inspection team followed written

checklists that set forth procedures and specified the regulatory requirements so that the

contractors reviewing the records could verify 2257 compliance. *See* Lawrence Testimony, Tr.

June 11, 102:19-105:7; Joyner Testimony, Tr. June 12, 72:10-12; Def's Exs. 224, 225.

228.    Once a producer was selected for inspection using a random number generator,

the team would obtain a sample of material from that producer that was subject to 2257. Joyner

Testimony, Tr. June 12, 72:7-12.  The team would then use that sample to undertake a pre-

inspection review process in order to verify that that producer was subject to 2257; identify the

location where the producer's 2257 records were located, based on the 2257 label that was

supposed to appear on a DVD or website; and prepare a list of specific records that the team

wanted to review during the inspection.  Lawrence Testimony, Tr. June 11, 105:8-106:12; Joyner

Testimony, Tr. June 12, 72:10-73:6; Def's Ex. 225.

229.    This process was intended to "minimize the time [the team] spent in conducting

an actual onsite inspection and minimize any interference with the producer's business."
Lawrence Testimony, Tr. June 11, 106:13-15; *accord* Joyner Testimony, Tr. June 12, 72:22-
73:2.

230.     When the inspection team was able to locate a producer's records based on the
address information contained in the producer's 2257 label, the team would typically initiate an
inspection at that address without advance notice. At the outset of an inspection at a producer's
business premises, the lead inspector would enter the reception area of the premises, explain why
the team was there, and provide the producer with the list of records that the team wanted to
inspect. Lawrence Testimony, Tr. June 11, 107:8-108:4-10, 144:12-145:11; Joyner Testimony,
Tr. June 12, 74:23-75:21. The reception area of a business was a space that was open to the
public. Joyner Testimony, Tr. June 12, 75:6-11; Lawrence Testimony, Tr. June 11, 145:3-11.

231.     Beginning sometime in March 2007, the lead inspector would usually hand a
letter to the producer when initiating an inspection. Joyner Testimony, Tr. June 12, 75:24-25.
The lead inspector did not recite the contents of the letter, and there is no evidence in the record
indicating that any producer read the letter before agreeing to allow the records inspection to
proceed, or that the letter had any visible impact on the producer's willingness to allow the
inspection.  Joyner Testimony, Tr. June 12, 77:17-78:12, 79:3-10.  No producer indicated that he
thought the FBI should obtain a warrant before proceeding with the records inspection.
Lawrence Testimony, Tr. June 11, pp. 147:7-13, 177:9-13.  Joyner Testimony, Tr. June 12,
78:13-16. No producer expressed any reluctance to allow the records inspection to proceed.
Lawrence Testimony, Tr. June 11, 147:14-18; Joyner Testimony, Tr. June 12, 78:17-19.

232.     The lead inspector would then ask the producer where the producer wanted the
team to set up to conduct the review of 2257 records.  Lawrence Testimony, Tr. June 11, 107:20-

22, 114:5-8, 140:11-18; Joyner Testimony, Tr. June 12, 77:14-16. The team would set up in that

location. Lawrence Testimony, Tr. June 11, 114:9-22; Joyner Testimony, Tr. June 12, 79:12-15.

In several instances, the producer indicated that the inspection team should review 2257 records

while remaining in the reception area of the business, and the team did so. Joyner Testimony, Tr.

June 12, 79:16-81:11, 102:24-103:5; Pl. Exs. 5 (All Good Video), 25 (Shane's World Studios), 1

(The Agency), at 25; Pl. Ex. 32 at 3269 (All Good Video), 3454-3455 (Shane's World Studios),

3258-3259 (The Agency).

      233.    In another instance, involving the producer K-Beech, the front door of the

business opened into a large open room, which was the same room where the producer kept 2257

records and where the team remained for the inspection. Joyner Testimony, Tr. June 12, 81:12-

82:4; Pl. Exs. 14 (K-Beech).

      234.    If any other producer had asked the team to conduct its review of 2257 records in

the reception area, the team would have done so. Joyner Testimony, Tr. June 12, 82:5-8.  In

another inspection, involving the producer Dead Men Hanging, the producer directed the team to

use a conference room outside the producer's office, in a shared space. Lawrence Testimony, Tr.

June 11, 130:11-17, 23-25.

      235.    In some instances, the address listed on the 2257 label on a producer's DVD or

website turned out to be a residence, and the inspection team therefore initiated the inspection at

the residence. Joyner Testimony, Tr. June 12, 86:25-87:9.  Where a producer lists an address on

a 2257 label that is a residence, it may also be the producer's business address. Joyner

Testimony, Tr. June 12, 118:22-119:15.  On occasions where the address on the 2257 label was a

residence, the lead inspector would knock on the door or ring the doorbell of the residence, and

identify himself and the nature and scope of the inspection while remaining outside on the

doorstep. Joyner Testimony, Tr. June 12, 87:12-17.  The inspection team would not enter the residence until the individual who opened the door invited them inside.  Joyner Testimony, Tr. June 12, 87:18-20.  In inspections that occurred at a residence, the team would also review record in the location chosen by the individual who was present. In the Moonlight inspection, the team did not enter the residence, aside from the garage where the producer kept his 2257 records, and reviewed the records in the garage and driveway of the residence. Joyner Testimony, Tr. June 12, 119:16-120:11.

236.    In most instances the producer would bring the records identified on the list to the team for its review. Lawrence Testimony, Tr. June 11, 114:9-22; Joyner Testimony, Tr. June 12, 82:9-12. In one instance, the individual providing access (who was not the original producer) indicated that the team should look through a filing cabinet in order to attempt to locate the specified records.  Lawrence Testimony, Tr. June 11, 114:17-22. In another instance, where a producer (Private) had all its 2257 records in digital format, the producer copied the relevant records onto CDs provided by the inspection team, and the inspection team reviewed those records back at its office. Joyner Testimony, Tr. June 12, 82:13-83:10; Pl. Ex. 21, at 1963. The lead inspector gave other producers the same option if they kept their 2257 records in digital format. Joyner Testimony, Tr. June 12, 83:11-18.

237.    The team would generally remain in the location where the producer indicated it should review the 2257 records. One exception was that a member of the team might ask and be allowed to use the restroom. Joyner Testimony, Tr. June 12, 126:8-10.  The only other exception was that, at some point, one member of the team would ask to photograph the file cabinet or other location where the 2257 records were stored, in order to document that the records were segregated from other business records. Lawrence Testimony, Tr. June 11, pp. 116:17-23, 190:2-

7; Joyner Testimony, Tr. June 12, 126:4-12. The team member would be escorted by someone from the company, and the process of photographing the records location would take less than a minute. Joyner Testimony, Tr. June 12, 126:13-16.

238.    In the Dead Men Hanging inspection, no member of the team entered the producer's office in order to take a photograph; the records were visible from the office doorway. Lawrence Testimony, Tr. June 11, 133:10-16.

239.    A member of the team would also photograph the location of the premises where the producer had directed the team to stay while reviewing the records, to document that that area was not damaged during the inspection.  Lawrence Testimony, Tr. June 11, 117:4-7.  On one occasion, where the 2257 records were located at an individual's small apartment, the team did not take a photograph due to privacy concerns. Lawrence Testimony, Tr. June 11, 143:14-24; Pl. Ex. 28 (JT Video). The team also did not take a photograph during the records inspection for Ghost Pro Productions because the producer in that instance e-mailed the records from Thailand. Pl. Ex. 16.

240.    While the lead inspectors were generally guided by the procedures set forth in the regulations and checklists, their application of those procedures varied depending on the circumstances, and the inspectors understood themselves to have some discretion to adjust the inspection procedures in response to particular circumstances. Lawrence Testimony, Tr. June 11, 128:18-24; Joyner Testimony, Tr. June 12, 85:19-23.

241.    In accord with that understanding, the lead inspectors sometimes provided advance notice to producers regarding an inspection, particularly where they believed that advance notice would facilitate their ability to connect with the producer and complete the records inspection. Joyner Testimony, Tr. June 12, 24-86:24; Lawrence Testimony, Tr. June 11,

pp. 112:21-23, 113:2-7. This occurred in instances where the team determined that the 2257 records were not located at the address identified in the 2257 label on the producer's DVD or website, and the team thus had to undertake additional efforts to locate the records and complete the inspection. Lawrence Testimony, Tr. June 11, pp. 129:3-11, 132:1-10, 134:8-135:2, 142:22-143:13; Joyner Testimony, Tr. June 12, 24-86:24 Pl. Ex. 6 (Angry Young Man), 13 (Don Goo), 24 (Silver Star/NuTech), 28 (JT Video).

242.    It also occurred in instances where no one was present at the time the team attempted to initiate an inspection at the location identified in the 2257 label. Joyner Testimony, Tr. June 12, 86:6-16, 87:21-88:6; Pl. Ex. 19 (Moonlight). If no one was present at the time the team attempted to initiate an inspection, the inspection team might also simply return at a later time. Lawrence Testimony, Tr. June 11 112:21-23, 113:2-7. The team never attempted to forcibly enter a producer's premises. Joyner Testimony, Tr. June 12, 88:20-22.

243.    Once a producer provided the team with the records that it had identified, the team would review the records for 2257 compliance according to the regulatory specifications identified on the review form checklist. Lawrence Testimony, Tr. June 11, pp. 114:25-115:13. If a potential violation was identified, the team would notify the lead inspector, who would discuss it with the producer. Lawrence Testimony, Tr. June 11, pp. 115:19-24. If the producer could cure the situation on the spot, he would do so, and no violation would be recorded. Lawrence Testimony, Tr. June 11, pp. 115:25-116:10. At the end of the inspection, the team would discuss any violations that had been identified with the producer, and the producer was generally given a week to respond and try to cure the violations. Lawrence Testimony, Tr. June 11, 116:12-16; Joyner Testimony, Tr. June 12, 94:24-95:6.

244.    The lead inspector would prepare a report regarding the inspection and would

provide the report to FBI Headquarters and the local United States Attorney's Office. Lawrence Testimony, Tr. June 11, 138:13-17; Joyner Testimony, June 12 Tr., 95:2-12. The team was not involved in any decisions regarding whether to take enforcement action based on violations described in the reports. Joyner Testimony, June 12 Tr., 95:14-18.

245.    If a producer had denied access to its 2257 records, the inspection team might have sought a search warrant. Id. 108:21-111:15. However, that situation never arose. Id. 111:16-17. Indeed, both SSAs who acted as lead inspectors testified that, as far as they recall, no producer expressed reluctance when providing access to its 2257 records. Lawrence Testimony, Tr. June 11, 112:15-17.

**E.      The Role of Various Requirements in the Regulatory Scheme**

246.    Based on their experience with the inspection process, the SSAs who served as lead inspectors testified regarding how various requirements in the 2257 regulations operated, and how they facilitated the inspection process. The segregation requirement in the 2257 regulations facilitated inspections because neither the producer nor the inspection team would need to look through a producer's business files in order to find the relevant records. Lawrence Testimony, Tr. June 11, 118:22-119:9; Joyner Testimony, Tr. June 12, 89:1-8. However, there was no restriction on a producer keeping 2257 records for material that was still in draft form or in an editing phase together with other 2257 records for material that had already been publicly released. Lawrence Testimony, Tr. June 11, 123:12-124:13. "As long as they were 2257 records, it didn't matter. But [the inspection team] only focused on those records that pertained to the films that we had selected for inspection." Lawrence Testimony, Tr. June 11, 124:11.

247.    The labeling requirement facilitated inspections because the label identified the location where the team could find the records, or at least provided a starting point for that effort.

Lawrence Testimony, Tr. June 11, pp. 121:14-122:4; Joyner Testimony, Tr. June 12, 89:13-18. The team only looked at labels on material that had been publicly released. It was not interested in determining whether earlier drafts of materials or work that had never been published contained a 2257 label. Lawrence Testimony, Tr. June 11, 122:5-17.

248.   The cross-referencing regulation required a producer to keep a spreadsheet, list, or database of some kind that kept track of a performer's name, stage name, and what films the performer had appeared in. Id. 124:19-23. Such a spreadsheet did not need to be kept together with 2257 records but could be kept separately on a producer's computer. Lawrence Testimony, Tr. June 11, pp. 124:24-125:5; Joyner Testimony, Tr. June 12, 90:2-10. The cross-referencing requirement facilitated inspections because it could help the inspection team identify the true name of a performer. Joyner Testimony, Tr. June 12, 90:11-24.

249.   The SSAs also testified that they could not always tell, based on the initial pre-inspection product review, whether the individuals appearing in a producer's films were 18 or older. Joyner Testimony, Tr. June 12, 126:25-127:8. In the inspection of the producer Real Wild Girls, that was the case because the individuals in the producer's videos were very young looking. Joyner Testimony, Tr. June 12, 127:5-8; Pl. Ex. 18. In that inspection, the producer had no 2257 records, and as a result, the inspection team was never able to determine whether the individuals in the videos were minors or adults. Joyner Testimony, Tr. June 12, 127:9-12.

Dated this 1st day of July, 2013.                Respectfully submitted,

                                                 STUART F. DELERY
                                                 Acting Assistant Attorney General
                                                 ZANE DAVID MEMEGER
                                                 United States Attorney
                                                 ANTHONY J. COPPOLINO
                                                 Deputy Director, Federal Programs Branch

                                                 /s/ Kathryn L. Wyer

HÉCTOR G. BLADUELL
JAMES J. SCHWARTZ
NATHAN M. SWINTON
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW, Washington, DC
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendant*