**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC. et al., | ) | Civil Action No. 2:09-4607 |
| | ) | |
| Plaintiffs, | ) | Judge Michael M. Baylson |
| | ) | |
| v. | ) | |
| | ) | |
| THE HONORABLE ERIC H. HOLDER, JR., | ) | |
|   Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |


**DEFENDANT'S ANSWERS TO COURT'S QUESTIONS OF JUNE 14, 2013**

**1.**    **Q:** This question identifies issues on remand.

    **A:** Defendant addresses these issues in depth in Defendant's Post-Trial Brief.

**2.a.**    **Q:** This question asks whether the statute's application of the age verification requirement regardless of a performer's apparent age is overbroad, whether a particular cut-off age would be proper, and whether there is a reasonably compelling alternative in the record.

    **A:** Plaintiffs have the burden of proof on this issue, and plaintiffs have failed to establish substantial overbreadth in this regard relative to the statute's plainly legitimate sweep. The application of the age verification requirement regardless of a performer's apparent age does not render the statute substantially overbroad because:
    (1) the plainly legitimate sweep of the statute is vast (there is a vast amount of depictions of sexually explicit conduct containing youthful-looking individuals);
    (2) individuals up to at least age 30 could be confused as minors;
    (3) depictions of youthful-looking individuals are intermingled with depictions of older individuals, within the same films and photographs and across all genres of sexually explicit material; and
    (4) plaintiffs have not put forth any reliable evidence regarding the quantity of sexually explicit depictions that are confined to images of "clearly mature" adults. *See also* Answer to Question #5.

    An alternative cut-off age would make the overall scheme less effective. Regardless of the specific age chosen as a cut-off age, there would be a range of error of several years in the determination of whether a particular individual is above or below that specific age. Thus, the question of whether the age verification requirement applied in a given instance would be left to the subjective evaluation of the producer, which would certainly lead to disputes and create

loopholes regarding whether the requirements applied in a particular instance, problems that Congress sought to avoid through a universal age verification system. In any event, the overbreadth analysis does not allow the Court to rewrite the statute to impose a specific cut off age. If the Court were to hold that the statute was substantially overbroad on this basis, all legitimate applications of the statute would also fall. The plainly legitimate sweep of the statute should preclude that result.

**For additional discussion, see Defendant's Post-Trial Brief, at 7-11, 26-34.**

**2.b.     Q:** This question asks whether the statute's application to purely personal depictions, such as husband and wife sexually explicit images or teen or adult "sexting," renders the statute overbroad, whether it is relevant that sexting did not exist when the statute was enacted, and if so, whether judicial action is required to strike down the law.

**A:** The statute's application (by its plain statutory language, as interpreted by the Third Circuit) to purely private depictions does not warrant facial invalidation of the statute as substantially overbroad. Plaintiffs have the burden of proof on this issue, and plaintiffs have failed to establish a substantial amount of "private, non-commercial depictions created and viewed by adults in their homes," *Free Speech Coal., Inc. v. Attorney Gen.* ("*FSC II*"), 677 F.3d 519, 538 (3d Cir. 2012), in relation to the statute's plainly legitimate sweep.

Indeed, plaintiffs have provided little if any evidence regarding the amount of purely private depictions of "sexually explicit conduct" within the meaning of §§ 2257 or 2257A. Instead, they largely rely on the existence of certain adult dating websites, some of which permit people to post images of themselves and browse images of others in an effort to find partners for casual sexual encounters. As the Third Circuit's reference to "private, non-commercial depictions created and viewed by adults in their homes" suggests, images posted to such websites—websites that are either publicly available or available to those who obtain non-exclusive membership access—are not purely private. Instead, if they depict sexually explicit conduct (an issue that plaintiffs provide no statistics or other quantitative information about), they are properly subject to the 2257 requirements.

As for the conclusions of plaintiffs' two sexting experts, Drs. Drouin and Zimmerman, their results do not relate to images covered by the statute. Instead, they rely on studies that include messages entirely outside the scope of §§ 2257 and 2257A, such as images limited to cleavage or breasts. The methodologies of these experts are also otherwise flawed, as explained by defendant's expert Dr. Stark.

Further still from the Third Circuit's definition of private are the erotic images plaintiff Barbara Alper took of herself and her now-husband; not only did Alper tender these images for publication in a Norwegian magazine, but she also profited monetarily from that publication, thereby making them commercial images. Tr. June 4, 235:24 – 236:15; Def.'s Ex. 13. These images also do not depict sexually explicit conduct within the meaning of §§ 2257 and 2257A. Accordingly, there is no evidence in the record that the amount of noncommercial, private depictions created and maintained by adults in their own homes is substantial.

Plaintiffs also have the burden, in an overbreadth challenge, to demonstrate a realistic danger that any third parties engaging in purely private communications involving sexually explicit depictions are chilled from engaging in such expression. They fail to meet this burden because (1) there is no evidence in the record regarding such a chill; (2) as a practical matter, purely private communications between a husband and wife, or transmitted by sext between a couple, would not come to the attention of the Government when implementing any enforcement or inspection regime under the statute; and (3) the Government does not interpret the statute to apply in the "purely private" context. Accordingly, the statute should not be held facially invalid on the basis that it applies to purely private depictions. Any claim regarding purely private depictions is more appropriately addressed on an as-applied basis, by someone with standing to raise such a claim.

Because facial invalidation is not warranted, the fact that sexting did not exist at the time of the statute's enactment is not relevant to an overbreadth analysis. As noted, plaintiffs fail to demonstrate the alleged overbreadth of the statutes based on sexting, and such a concern at best would give rise to an as-applied claim, by someone with standing to raise it. To the extent someone sought to claim that the requirements of the statute and implementing regulations do not take into account sexting or any other new development, the appropriate mechanism for raising such a claim is to submit a petition for amendatory rulemaking to the agency that promulgated the regulations (here, the Department of Justice). *See Auer v. Robbins*, 519 U.S. 452, 459 (1997); *South Hills Health System v. Bowen*, 864 F.2d 1084, 1095 (3d Cir. 1988) ("The threshold obstacle to our consideration of South Hills' argument in this case is that it has not filed a § 553(e) petition for rulemaking with the Secretary."). The agency's response to such a petition is reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 701-706. *See Auer*, 519 U.S. at 459.

**For additional discussion, see Defendant's Post-Trial Brief, at 34-42.**

**2.c.     Q:** This question asks whether the records required under §§ 2257 and 2257A are any more onerous with respect to the business conducted by the plaintiffs than other regulations in other contexts, whether the testimony of various witnesses that the recordkeeping "chills" their First Amendment rights is a reason to strike down the statute, whether plaintiffs' interpretation of the recordkeeping requirement is reasonable, and how it compares to health regulations.

**A:** Defendant has previously provided the Court with examples of other federal inspection schemes, which also include as part of their scheme statutory requirements to maintain certain records. *See* ECF No. 55 (brief filed on April 26, 2010). These include records pursuant to the Food, Drug, and Cosmetic Act, 21 U.S.C. § 373; the Consumer Product Safety Act, 15 U.S.C. § 2065; the Fair Labor Standards Act, 29 U.S.C. § 211; the Mine Safety Act, 30 U.S.C. § 813; the laws governing firearm dealers, 18 U.S.C. § 923; and the Occupational Safety and Health Act, 29 U.S.C. § 657. The recordkeeping requirements here are no more onerous than those. Significantly, the recordkeeping requirements in all of these schemes relate to the particular safety issues relevant in the contexts where the records are required. Here, the safety issue involves verifying the ages of individuals who are filmed while engaging in sexually explicit conduct to ensure they are at least 18 years old, and age verification records focus on precisely that issue.

The recordkeeping requirements are not onerous. The requirements are tailored to the verification of a performer's age, and ensuring that the age verification records for a particular product can be located once the product is publicly disseminated. The act of checking an individual's government-issued identification is not onerous. The act of copying that identification (which can be done by photographing it, scanning it, or photocopying it) is not onerous. The act of recording the date of production for the depiction (which is necessary to calculate the age of an individual at the time the depiction was created) is not onerous. The act of keeping a copy of the identification and record recording the date of production separate from other records is not onerous; this can be done simply by putting these documents in a separate computer file or file cabinet. The act of "cross-referencing," or keeping track of different names used by a particular performer and different depictions in which the performer appears, is not onerous; this can be done using a spreadsheet on a computer. No plaintiff has indicated any chill associated with these aspects of the 2257 recordkeeping requirements.

Some burdens that have been identified are irrelevant because they were not imposed by 2257. Alper and Nitke testified that they were prevented from publishing books containing images from before the statute went into effect together with images from after the statute went into effect; that reflects a misunderstanding of 2257. Dodson and Ross testified that they deleted images from their Genital Art Gallery, but 2257 did not require this deletion; this was due to a technological issue that led to the loss of the dates of production for those images. Some plaintiffs testified they would be unable to label every single photograph taken with their camera. That suggestion also reflects a misunderstanding of 2257. *See* Answer to Question #13. Some plaintiffs have indicated they were unaware that 2257 allows records to be kept in digital form and that they engage in procedures that are not required by 2257.

Jeffrey Douglas, an attorney representing the adult industry, provided hearsay testimony as to certain burdens that he believes exist in theory. But Mr. Douglas is not a producer or potential producer, and plaintiffs did not present the testimony of a single producer actually facing these alleged burdens who was subject to cross-examination about these issues.

To the extent that any plaintiff has testified regarding a chilling effect of the 2257 requirements, the concerns related to (1) listing one's home address on the 2257 label that a producer must affix to a work once it is publicly disseminated, (2) making one's records available 20 hours per week, and (3) the potential for criminal penalties. None of this testimony holds weight.

The statute requires 2257 records to be kept at a producer's "business premises or at such other place as the Attorney General may by regulation prescribe." 18 U.S.C. § 2257(c). Producers may therefore keep 2257 records at their business premises or at the premises of a third party custodian. 28 C.F.R. § 75.4. The plaintiffs who would list their home address are those who use their home address as their business address. Barbara Alper already makes her home/business address publicly available. David Levingston has a separate studio that would qualify as his business address. Thomas Hymes' home would be his business address if he were to resume active work at home on his Daily Babylon website. The 20 hour per week availability provision in 28 C.F.R. § 75.5(c)(1) does not require producers to remain in proximity to their records 20 hours per week, and it does not impose punishment for failing to do so. *See also*

Answer to Question #22. Plaintiffs claiming to be chilled by these provisions have the option to use a third party custodian instead, and their fear that they would face strict liability based on any errors by the third party custodian is unfounded. Some other recordkeeping/inspection regimes also include criminal penalties. *See, e.g.*, 21 U.S.C. § 333(a) (FDCA); 29 U.S.C. §§ 215(a)(5), 216(a) (FLSA). Courts have held that criminal penalties serve as legitimate deterrents, even where they might chill a certain amount of protected speech. The notion that the penalty in any particular case might be disproportionate to the violation committed is speculative and unripe.

**For additional discussion, see Defendant's Post-Trial Brief, at 14-20.**

**2.d.    Q:** This question asks if plaintiffs are entitled to relief regarding inspections without advance notice, and whether there is an expectation of privacy in 2257 records.

**A:** A facial Fourth Amendment challenge to 28 C.F.R. § 75.5(b), which indicates that "[a]dvance notice of record inspections shall not be given," is not properly before the Court because plaintiffs have not challenged the facial validity of the regulations under the Administrative Procedure Act, 5 U.S.C. §§ 701-706. Moreover, a facial Fourth Amendment challenge is unripe for the reasons explained in prior briefing, and the principle set forth in *Sibron v. New York*, 392 U.S. 40 (1968), suggesting that a Fourth Amendment claim can only be properly evaluated in light of its "concrete factual context." *Id.* at 59; *see FSC II*, 677 F.3d at 543.

In addition, plaintiffs have argued that the 2257 inspections are unconstitutional because past inspections were conducted without a warrant. The statutes and regulations cannot be struck down on their face on that basis because they do not prevent the Government from obtaining a warrant prior to inspection. With respect to their as-applied claim, plaintiffs attempt to seek injunctive relief based on inspections that occurred under a program that is no longer operating. Such a claim is jurisdictionally barred because at this stage, over five years after the prior program ended, the conduct of any future inspections is a matter of speculation. Moreover, the "advance notice" issue was not properly implicated in any prior inspection because the producers consented to the inspections that occurred, and the lead inspectors in some instances did provide advance notice when they determined that doing so would facilitate their ability to conduct an inspection.[1] The lead inspectors also gave producers notice of the violations that had been identified during the inspection and then gave them at least a week following the inspection to respond or cure those violations. *See* 28 C.F.R. § 75.5(c)(4); Lawrence Testimony, Tr. June 11, 116:12-16; Joyner Testimony, Tr. June 12, 94:24-95:6.

In addition, the question of whether advance notice is given is just one factor that may be relevant in the overall consideration of reasonableness under the totality of the circumstances of a specific case. *See, e.g., Wyman v. James*, 400 U.S. 309, 320 (1971) (six days written advance notice was one factor suggesting reasonableness of state welfare agency's home visit). Essentially, advance notice serves to reduce one's expectation of privacy. Other factors, such as

---

[1] Indeed, "advance notice" in the Fourth Amendment context often simply means announcing one's presence, identity, and purpose immediately prior to a search, as opposed to forcible or surreptitious entry. *See In re United State*s, 665 F. Supp. 2d 1210, 1222-23 (D. Or. 2009). In that sense, advance notice was provided at every inspection that occurred.

engaging in an activity in which the government has a particular regulatory interest (such as filming individuals engaging in sexually explicit activity, where the government's interest is in ensuring the individuals filmed are at least 18 years old), and knowing that records related to that government interest are therefore subject to inspection, play a similar role. *See Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989) (analogizing the diminished expectation of privacy of customs officers, based on the nature of their job, to motorists who are on notice regarding the location of a routine highway checkpoint, and to the welfare recipient in *Wyman*).

There is no rule in Fourth Amendment law that imposes advance notice as a free-standing requirement. Even if the Government were to obtain an administrative warrant prior to initiating a 2257 records inspection, obtaining a warrant does not typically entail providing advance notice – other than knocking and announcing one's presence at the time the warrant is executed. *See Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009) (explaining that exigent circumstances can relieve law enforcement of the knock-and-announce requirement).

Nevertheless, if the Court were to reach the theoretical question of the facial validity of 28 C.F.R. § 75.5(b), *Von Raab* suggests that it should take into account the producer's reasonable expectation of privacy before holding the regulation invalid. As the Court has already recognized, producers have no reasonable expectation of privacy in 2257 records, which are statutorily required to be maintained, and which consist of nothing except for copies of government-issued identification documents of the performers who are filmed, a date of production for the film, and perhaps other names and titles for the performer. These records do not contain any private business information such as financial data or trade secrets.

For all these reasons, the regulatory provision at 28 C.F.R. § 75.5(b) should not be struck down.

**For additional discussion, see Defendant's Post-Trial Brief, at 43-66.**

**2.e.** **Q:** This question asks whether the standards for reviewing regulations promulgated by the Department of Justice are different from the standards for reviewing statutes passed by Congress and whether the record supports striking down any regulations, particularly in light of *City of Arlington v. FCC*.

**A:** The standards for reviewing regulations, as opposed to statutes, may be different. The standards for reviewing a statute with respect to as-applied and facial First and Fourth Amendment claims have been set forth in Defendant's Post-Trial Brief. The standard for judicial review of federal regulations is set forth at 5 U.S.C. § 706; such review occurs when a plaintiff raises a challenge to a Final Rule pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and is based on the agency's rulemaking record. Judicial review of regulations pursuant to 5 U.S.C. § 706 allows a court to consider whether a regulation is "arbitrary, capricious, an abuse of discretion, or not in accordance with" a law other than the Constitution, or whether a regulation is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," before considering whether the regulation violates the Constitution. It is possible for a regulation to be held unconstitutional without invalidating the authorizing statute. *See FCC v. Fox Television*

*Stations, Inc.*, 556 U.S. 502, 515 n.3 (2009) (court may set aside an agency's regulation where it holds that the agency had adopted an unconstitutional (and thus erroneous) interpretation of an ambiguous statute). (As described in Defendant's Post-Trial Brief, plaintiffs have failed to establish the circumstances for such an action here.)

In *City of Arlington v. FCC*, the Supreme Court addressed the deference owed a federal agency under *Chevron U.S.A. Inc. v Natural Resources Defense Council, Inc.*, when interpreting an ambiguous statutory provision. The Court recognized that *Chevron* deference applies with equal force to an agency's interpretation of the scope of its own jurisdiction. *City of Arlington v. FCC*, 133 S. Ct. 1863, 1876 (2013). Plaintiffs have not challenged the Attorney General's interpretation of the scope of his authority to promulgate regulations under §§ 2257 and 2257A. *See* 18 U.S.C. § 2257(g) ("The Attorney General shall issue appropriate regulations to carry out this section."). However, nothing in *City of Arlington* would prevent a court from invalidating a regulation on its face (in an APA claim) or as applied, but upholding the authorizing statute, where the statute could be interpreted consistent with the Constitution, despite the agency's problematic interpretation in the regulation. As indicated in the Answer to Question #2(b), to the extent plaintiffs' claim is construed as an argument that the Attorney General should have amended the regulations, due to changed circumstances or otherwise, such a claim is properly brought only after the claimant has submitted a petition for amendatory rulemaking to the agency. *See Auer*, 519 U.S. at 459.

**3.    Q:** This question asks how the word "lascivious" plays a part in the constitutional analysis.

**A:** The word "lascivious" does not change the constitutional analysis in any way. Plaintiffs appeared to suggest in their summary judgment brief and in closing argument that the addition of the category of "lascivious exhibition of the genitals or pubic area" in the definition of "sexually explicit conduct" that triggers the 2257 requirements improperly expanded the scope of the 2257 requirements. However, just like depictions of the other categories of sexually explicit conduct covered by 2257, depictions of lascivious exhibition of the genitals or pubic area would constitute child pornography if the individuals appearing in those depictions were under 18 years old. *See* 73 Fed. Reg. 77432-77433. This Court already rejected plaintiffs' claim that the term "lascivious" was unconstitutionally vague, *FSC v. Holder*, 729 F. Supp. 2d 691, 742 (E.D. Pa. 2012), and the Third Circuit affirmed dismissal of this claim, noting that plaintiffs had abandoned it, *FSC v. Holder*, 677 F.3d 519, 545 (3d Cir. 2012). Accordingly, the scope of material covered by the term "lascivious" is not an issue before this Court on remand and plays no part in the constitutional analysis of whether the statutes are narrowly tailored as applied to plaintiffs, and whether the statutes are substantially overbroad on the basis of ages of individuals appearing in sexually explicit depictions or purely private noncommercial depictions created and viewed by adults in their homes.

Moreover, plaintiffs' implicit suggestion that the term "lascivious" encompasses a broader scope of material than the term "nude" is plainly incorrect. "Nude" and "lascivious" are not synonymous, but plaintiffs have not established that the term "lascivious" is broader than "nude." Plaintiffs rely on the decision in *United States v. Knox*, 32 F.3d 733 (3d Cir. 1994), as holding that genitals or the pubic area need not be nude in order to qualify as "lascivious." *Knox*

simply "decline[d] to create an absolute immunity for pornographers who pander to pedophiles by using as their subjects children whose genital areas are covered." *Id.* at 752. *Knox* recognized that an  image had to qualify as "lascivious," pursuant to the *Dost* factors, whether the genitals were covered or not. Thus, simple nudity was not sufficient. Moreover, clothing was a "factor militating against a finding of lasciviousness," even for images of children. *Id.* The Attorney General considered similar arguments in the 2008 Final Rule and explained that few clothed images would qualify as "lascivious" based on *Knox*. 73 Fed. Reg. 77440. The Third Circuit's remand in this case did not invite this Court to revisit this issue.

**4.**     **Q:** This question asks whether requiring photo identification for depictions where the names and ages of performers might not be known or difficult to obtain, such as images in the Genital Art Gallery maintained by Plaintiffs Ross and Dodson, images of gay men engaging in sexual activity on Fire Island, and images taken in Europe, imposes a burden that would require granting the relief sought by Plaintiffs.

     **A:**  No. Plaintiffs Dodson and Ross testified that they would like to post images of genitals submitted to their Genital Art Gallery (GAG) without checking identifications for the individuals submitting those images, even though they cannot tell the ages of individuals simply by looking at their genitals. Alper similarly testified that she would like to photograph gay men engaging in sexual acivity on Fire Island without checking the identification documents of those individuals, even though she would not otherwise be able to determine their ages. In both instances, the claimed concern was with allowing third parties to remain anonymous. Dodson and Ross testified that individuals submitting images to the GAG did not want to disclose their names or photo identification. *See* Tr. June 4, 201:2-12 (noting that the "whole point [of the GAG] was anonymity"). Alper testified that she has not asked men engaging in sex on Fire Island to provide their identification because she believes these individuals "want to remain anonymous." Tr. June 4, 233:3-7.

     This Court should not grant these plaintiffs their requested relief on this basis because, for one thing, it has previously dismissed plaintiffs' anonymous speech claim, *see* ECF No. 66 at 80 ("Accordingly, this Court declines to find that the constitutionality of " 2257 and 2257A is compromised by whatever burden on anonymous speech these statutes might impose."), and its ruling in this regard was affirmed by the Third Circuit, *see Free Speech Coalition, Inc. v. Holder*, 677 F.3d 519, 545 (3rd Cir. 2012) (holding that Plaintiffs abandoned their anonymous speech claim on appeal). Furthermore, all three circuit courts of appeals that have addressed the constitutionality of § 2257 are uniform on this point. *See Connection Distrib. Co. v. Holder*, 557 F.3d 321, 330 (6th Cir. 2009) (rejecting anonymous speech claim challenge to § 2257); *Am. Library Ass'n v. Reno*, 33 F.3d 78, 94 (D.C. Cir. 1994) (same).  Plaintiffs' contentions that §§ 2257 and 2257A burden the ability of third parties—including would-be submitters to the GAG and men engaged in anonymous sex on Fire Island—to engage in anonymous speech are thus not only plainly outside the scope of the Third Circuit's remand but also foreclosed by this precedent.

     Moreover, both of these claims highlight why §§ 2257 and 2257A should be upheld. These are both prime examples of contexts where producers *should* check individuals' identification before photographing them or posting an image of them online engaging in

sexually explicit conduct. Without checking a photo ID, there would be significant challenges in determining whether the individuals depicted in these images were 18 or older. For example, images submitted to the GAG depict only genitals, which do not provide enough information to determine an individual's age. Although some submitters state their age in an accompanying essay, Dodson and Ross have no means of verifying the submitter's age if they do not require an ID, particularly because they never see these individuals in person.

For her part, Alper would rely on her own subjective judgment to determine whether the various men having anonymous sex on Fire Island are not minors, based on her visual observation of these individuals in a publicly-accessible area that is not limited to persons of a certain age and where her view may be obscured by sand dunes, poor lighting, and other people engaged in sexual activity. In other words, the circumstances in all of these scenarios present an increased risk of misinterpreting a person's age when relying on visual inspection, a risk that is mitigated by obtaining photo identification.

Plaintiff Steinberg also testified that the magazine *Cupido* decided not to distribute an edition in the United States because of §§ 2257 and 2257A. However, there is no reason that foreign producers should be allowed to distribute depictions of sexually explicit conduct in this country without complying with the same age verification and recordkeeping requirements that United States producers must satisfy. *See* 73 Fed. Reg. 77442-77443 (recognizing that failing to impose this requirement on foreign producers could result in United States distributors becoming unwitting commercial distributors of child pornography).

5.      **Q:** This questions asks whether the evidence in the record allows a comparison of the amount of protected speech with no government interest (depictions of obvious adults), to the amount of speech which does implicate government interests (depictions of non-obvious adults), and what is the legal effect if the Court concluded there is no evidence, or minimal evidence, to allow this comparison.

**A: W**hile an exact quantification is not possible, the record does establish that there is a vast amount of sexually explicit material depicting young and youthful-looking individuals. Depictions of such individuals are not confined to a single category of sexually-explicit material (for example, "teen" pornography). Rather, evidence abounds that young and youthful-looking individuals are depicted across various categories of pornography.

For example, Dr. Dines estimated that the genre of "teen porn," which is only a portion of the sexually-explicit material containing young and youthful-looking individuals, accounted for 34% of the material available on the three most popular sites with pornographic images in the United States. Other methodologies she employed confirmed that "teen porn" is one of the top, if not the top, porn genres. Indeed, Dr. Linz and plaintiff Levine admitted that this genre is extremely popular.

Other categories of pornography contain a substantial amount of young and youthful-looking individuals. For example, even in the "MILF" or "mature" categories, the prevailing image is of an older performer engaged in sexual activities with teens or other young individuals. In addition, the evidence at trial showed that individuals approaching their 30s who are not trying

to appear younger could be confused as minors. Although there is no concrete evidence in the record of the proportion of sexually-explicit material depicting individuals under 30, between 34% and 87% of the performers of seven plaintiffs in this case have been under the age of 29. When one takes into account all of this evidence, it is reasonable to conclude that a vast amount, if not the majority, of performers in pornography are young and youthful-looking.

A precise numerical comparison of the amounts of depictions containing "obvious adults" with those containing "non-obvious adults" is not supported by the record. At trial, plaintiffs sought to establish the quantity of depictions limited to "clearly mature" adults based on their expert Dr. Linz's division of Google hit results for the terms "teen porn" and "porn." The division of the number of search results in Google for these two search terms has no bearing at all on the number of depictions of individuals of different ages. Google searches identify webpages containing certain words. A Google search for "porn" could yield millions of occurrences of the word "porn" in articles, blogs, and court decisions that contain no images whatsoever. Thus, plaintiffs' evidence fails to compare in any meaningful way "obvious adult" versus "non-obvious adult" images.

If the Court concludes that there is not enough evidence to compare the amount of depictions showing individuals in different age groups engaging in sexually explicit conduct, it should hold that plaintiffs have not met their burden of showing that the statutes are substantially overbroad and thus uphold the statutes. Sections 2257 and 2257A have a vast an plainly legitimate application to millions of youthful images publicly available online.

**For additional discussion, see Defendant's Post-Trial Brief, at 28-33.**

**6.**    **Q:** This question asks whether there is any precedent where a court struck down criminal penalties in a statute but held that civil penalties would be ok.

**A:** Defendant has not been able to identify any such precedent. On the other hand, the controlling precedent suggests that it would be inappropriate to hold a law unconstitutional, even on First Amendment grounds, solely because of the maximum penalty set forth in the law. Courts have held that criminal penalties serve a legitimate deterrent effect even where they chill some protected speech, and the appropriateness of a particular penalty cannot be resolved in the abstract, before an alleged crime has been charged and before any penalty has been sought or imposed.

**For additional discussion, see Defendant's Post-Trial Brief, at 18-19.**

**7.**    **Q:** This question asks whether there are any cases in which courts have upheld a photo identification or record-keeping requirement that distinguished between adults and minors.

**A:**  Age-verification requirements have been upheld in other contexts, including the sale of alcohol to minors.  *See, e.g.*, *McReynolds v. Wynn*, 216 F. App'x 747 (10th Cir. 2007) (dismissing due process challenge to Utah state law requiring all persons entering liquor stores to provide proof that they are twenty-one years or older)  Moreover, in the present case, certain plaintiffs themselves have stated that they have no objection to these requirements. *See* Alper

Testimony, Tr. June 4, 247:13-17 ("I don't see anything wrong with asking [subjects of photographs] to produce evidence [that they are eighteen or older].").

**8.      Q:** This question asks whether the application of §§ 2257 and 2257A to married couples and other couples in committed relationships is significant to the Court's First Amendment analysis and whether there is a privacy concern relevant to that analysis.

       **A:** The application of the statutes to married couples and other couples in committed relationships does not provide a basis for holding the statutes facially invalid under the First Amendment based on substantial overbreadth, for the reasons explained in the Answer to Question #2(b).[2] Because plaintiffs have not met their burden to establish that an overbreadth on this basis is substantial in relation to the statutes' plainly legitimate sweep, the Court need not consider whether any privacy concern of married or committed couples is implicated in the First Amendment overbreadth analysis.

       Should the Court reach this question, it should conclude that a claim based on privacy concerns would not fall under the First Amendment.[3] In any event, to the extent that couples in committed relationships may have a privacy interest in images created and maintained in their homes, the practical effect of the statutes on this interest is negligible. As the FBI agents who led 2257 inspections testified, the Government has never enforced § 2257 as to private couples, nor would the Government generally have reason to learn of the existence of images created and maintained by adult couples in their homes. Tr, June 12, 71:17-20.  *See also Connection Distributing*, 557 F.3d at 339 (concluding that the lack of any evidence of enforcement of § 2257 against private couples weighs against an overbreadth challenge to the statute). Whatever privacy interest exists in images that are truly private—i.e, created and maintained by adults in their own homes—is therefore not implicated by §§ 2257 and 2257A.

**9.      Q:** This question asks about the importance of census figures, and whether actual numbers of adults or minors is more or less relevant than percentages or not relevant at all.

       **A:** The overbreadth analysis requires that a plaintiff establish that invalid applications are substantial in relation to the statute's plainly legitimate sweep. Here, the universal application of statutes regardless of the apparent age of individuals depicted is reasonable, so neither census figures nor percentages are relevant. Moreover, even if percentages were relevant, census figures would not be. Nothing in the record establishes that there is a correlation between the number of individuals of a certain age in the U.S. population and the number of individuals at that age depicted engaging in sexually explicit conduct.

       To the contrary, the record suggests that young individuals are overrepresented in sexually explicit material, as compared to the U.S. population.  First, while Dr. Dines estimated

---

[2] No plaintiff has raised an as-applied challenge on this basis. *See* Defendant's Post-trial Brief at 12-13.

[3] Plaintiffs have not raised a privacy claim under the Fifth Amendment, pursuant to substantive due process principles, nor could they succeed in such a claim. There is no equivalent to the overbreadth doctrine for due process claims, which might allow plaintiffs to raise such a claim on behalf of third parties not before the Court.

that the proportion of "teen porn," which is focused on depicting young individuals between 18-19, in the three top porn websites was 34%, the census figures in Plaintiffs' Exhibit 39 indicate that the percentage of individuals in the 15-19 age group in the U.S. population in 2010 was 7.13%.  In addition, although the percentage of individuals in the U.S. population between the ages of 20-29 in 2010 was 13.8%, data for 7 Plaintiffs in this case shows that, on average, 52% of their performers have been between 18 and 29. Def's Ex. 314A.

**10.**     **Q:** This question asks whether the Court can put any kind of "gloss" on 2257 with respect to its application to purely personal activity, particularly in connection with the inspection issue.

   **A:** With respect to plaintiffs' First Amendment overbreadth challenge, plaintiffs presented no evidence of the statutes' application to purely private activity—particularly where much of what plaintiffs assert falls into this category are publicly available images. The Court can also take into account the fact that, even if the plain language of the statute applies to purely private depictions, as a practical matter, the Government is unlikely ever to become aware of depictions that are made by a private couple for personal use. That fact is relevant in the context of plaintiffs' overbreadth claim. Because the rationale behind expanding the boundaries of standing in the overbreadth context is that third parties might otherwise be chilled in their expression, plaintiffs mounting an overbreadth challenge bear the burden of establishing a "realistic danger" of such a chill. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Plaintiffs here cannot meet that burden because there is no realistic basis to assume that private couples engaged in private communications involving depictions of sexually explicit conduct are in any way chilled by the 2257 requirements.

   Plaintiffs' as-applied Fourth Amendment claim also does not implicate the potential application of § 2257 to purely personal activity, or what the Third Circuit referred to as "private, noncommercial depictions created and viewed by adults in their homes." *FSC II*, 677 F.3d at 539. Only one plaintiff, FSC, can bring an as-applied Fourth Amendment claim, based on its allegation that its members were subject to past inspections. Only four of its members—all commercial producers who maintain their records at commercial business premises—were among those subject to 2257 records inspections during the existence of the previous inspection program in 2006 and 2007. FSC members are generally members of the commercial adult entertainment industry, and the inspections that occurred in 2006 and 2007 were focused exclusively on the commercial adult entertainment industry. Thus, to the extent the Court determines that it has jurisdiction to evaluate an as-applied Fourth Amendment claim for injunctive relief, the Court is still limited to the consideration of a Fourth Amendment claim as applied to FSC members or the commercial adult entertainment industry. There is no basis to evaluate a Fourth Amendment claim as applied to any of the other plaintiffs, particularly plaintiffs who are not part of the adult entertainment industry. Nor is there any basis to evaluate a Fourth Amendment claim as applied to an individual who is not a commercial producer but who creates a private, non-commercial depiction for home viewing.

   In addition, defendant has explained that consideration of the facial validity of the DOJ regulations is inappropriate here since plaintiffs did not raise a challenge to the regulations under the Administrative Procedure Act, 5 U.S.C. §§ 701-706. However, to the extent the Court considers the facial validity of the inspection procedures set forth in 28 C.F.R. § 75.5, it should

take into account that at the time the regulations were promulgated, the Attorney General did not consider the requirements of §§ 2257 or 2257A applicable to purely private depictions. To the extent a claimant were to assert that the Third Circuit's holding regarding the application of the statutes to purely private conduct warrants amendment of the procedures set forth in § 75.5, the appropriate mechanism for such a claim would be a petition for amendatory rulemaking. *See Auer v. Robbins*, 519 U.S. 452, 459 (1997); *South Hills Health System v. Bowen*, 864 F.2d 1084, 1095 (3d Cir. 1988) ("The threshold obstacle to our consideration of South Hills' argument in this case is that it has not filed a § 553(e) petition for rulemaking with the Secretary.").

**For additional discussion, see Defendant's Post-Trial Brief, at 34-42, 59-60.**

**11.**     **Q:** This question asks whether the "narrow tailoring" requirement calls for the Court to attempt to identify an alternative means of preventing child pornography that would not affect expression by those with education/health/procreation purposes.

**A:** No. Under intermediate scrutiny, it would be inappropriate for the Court to attempt to identify the least restrictive alternative means. *FSC II*, 677 F.3d at 535 (quoting *Ward*, 491 U.S. at 798) (Under the "narrow tailoring" standard of intermediate scrutiny, the means chosen by Congress need not be "the 'least restrictive or least intrusive' means of furthering the government's substantial interest."). The fit between the challenged regulation and the asserted objective must "be reasonable, not perfect." *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010). Moreover, the asserted educational value of a work is irrelevant to whether it would qualify as child pornography if it depicted sexually explicit conduct involving an individual under 18, and the determination of whether something is "educational" is a subjective determination. If a blanket exception were created for depictions intended to have an educational purpose, a loophole would be created, allowing any producer to assert that his depiction had such a purpose. This subjectivity would also be likely to lead to disputes regarding whether the 2257 requirements apply to a particular depiction or not. The Third Circuit also did not suggest that the educational purpose of a work was an issue to be explored on remand.

**12.**     **Q:** This question asks whether plaintiffs suggest any alternative (except the age threshold) and whether there is any precedent where a Court has struck down a statute because it has an unreasonable age threshold.

**A:** Plaintiffs have not suggested a feasible alternative to the universal age-verification system, and there is none. As far as defendant can determine, plaintiffs' proposed alternative is that producers should be left to their own discretion in regard to whether they should check government-issued identification to verify ages of those they film engaging in sexually explicit conduct, and that they should not be required to keep age verification records or make the location of those records traceable once a depiction leaves the producer's custody and control. Such a proposal would not be as effective in serving the government's compelling interest in preventing the use of underage individuals in the creation of depictions of sexually explicit conduct, and in making it possible to locate age verification records for products that are publicly disseminated.

Defendant is not aware of any court that has struck down a similar statute because it has

13

an unreasonable age threshold.  Quite to the contrary, the Sixth Circuit held that establishing an age threshold instead of the universal-age verification system would protect the Government's interests less effectively.  *Connection Dist. Co. v. Holder*, 557 F.3d 321, 331 (6th Cir. 2009).

**For additional discussion, see Defendant's Post-Trial Brief, at 7-11.**

**13.**     **Q:** This question asks what the government's position is as to the requirements for "affixing" a 2257 statement in the following circumstances:

*a. still photos taken by a photographer, that are never developed or printed*
*b. still photos printed by a photographer, that never leave his possession*

**A:** No 2257 statement need be affixed while an image remains in the camera, remains undeveloped or unprinted, or remains in the photographer's sole possession. 28 C.F.R. § 75.8(f).

*c. still photos in a collection or in a single envelope passed around to acquaintances, clients, and friends*

**A:** A 2257 statement could be affixed to the back of each photo or otherwise included in the collection in a manner that it would stay together with the photos. 28 C.F.R. § 75.8(f).

*d. still photos printed and displayed in an art gallery*

**A:** A 2257 statement could be affixed to the back of the displayed image or frame. 28 C.F.R. § 75.8(f).

*e. printed photos collected in a book which is then published or available for downloading online*

**A:** A 2257 statement should be included on the first page after the front cover or on the page on which copyright information appears. 28 C.F.R. § 75.8(a).

*f. website portrayal*

**A:** A 2257 statement should be included on each webpage of the website that contains depictions of sexually explicit conduct. The statement can appear through a hypertext link on each such webpage through text stating "18 U.S.C. 2257 (and/or 2257A, as appropriate) Record-Keeping Requirements Compliance Statement," so that when this text is clicked or moused over, the 2257 statement appears in a new window or pop-up. 28 C.F.R. § 75.8(d).

*g. video of husband and wife having sex at home, without further distribution*
*h. husband and wife transmit by cellphone to each other*

**A:** No 2257 statement need be affixed while an image remains in sole possession of its creator and has not been made publicly available. Defendant continues to maintain that the 2257 requirements do not apply in the context of private non-commercial depictions crated and viewed by adults in their homes.

*i. This question asks if there are no regulations advising people about this, what is the legal effect of that.*

    **A:** The regulation governing the location of the 2257 statement is set forth at 28 C.F.R. § 75.8. The regulation must be interpreted in connection with the purpose of the labeling requirement to identify the location of 2257 records for a product once the product leaves the primary producer's sole possession. The regulation was promulgated based on the Attorney General's interpretation of the statutes as applying only to images produced for sale or trade. To the extent that a claimant asserts that regulation should be amended based on changed circumstances, he may submit a petition for amendatory rulemaking pursuant to § 553(e). The statutory requirement is not substantially overbroad in relation to its plainly legitimate sweep. The labeling requirement does not violate the First Amendment as applied to any plaintiff. Nor did the Third Circuit identify either of those issues as appropriate for further consideration on remand.

       **For additional discussion, see Defendant's Post-Trial Brief, at 16-17.**

**14.**    **Q:** This question asks whether the record allows a conclusion that in some instances, the FBI agents intruded into private portions of homes or offices in photographing where the 2257 materials were kept.

    **A:** No. The record at trial suggests that any entry by a member of the inspection team beyond the reception area of a business or threshold of a home, at the address listed by a commercial adult industry producer as the location where its records were maintained, was consensual.

       **For additional discussion, see Defendant's Post-Trial Brief, at 60-61.**

**15.**    **Q:** This question asks whether the availability of a third party custodian is a complete answer to the Fourth Amendment issues raised by the plaintiffs.

    **A:** Yes. Plaintiffs have no legitimate expectation of privacy in the 2257 records themselves. Maintaining records at a third party custodian would eliminate any possibility that a 2257 records inspection would involve even a consensual entry onto a plaintiff's premises. The notion that a producer would face strict liability as a result of a recordkeeping failure by a third party custodian is unfounded.

       **For additional discussion, see Defendant's Post-Trial Brief, at 19-20.**

**16.**    **Q:** This question asks whether the record sheds any light on the question of whether there is a reasonable expectation of privacy in 2257 records, and whether it makes a difference if the records depict only third persons or the producers themselves, in a situation where the producers keep the records in their own home.

    **A:** The record makes clear that, under the regulations promulgated in 2005, the 2257

records consisted only of government-issued identification documents, such as driver's licenses. Lawrence Testimony, Tr. June 11, 168:1-4. Under the current version of the regulations, the records should also include the date of production of the depiction to which the record relates. 28 C.F.R. § 75.2(a)(4). Producers do not have a reasonable expectation of privacy in this information. Producers do not have a reasonable expectation of privacy in their own driver's licenses if they have publicly disseminated sexually explicit depictions that they have created of themselves and are statutorily required to keep copies of their driver's licenses in their 2257 records. Such a question is not relevant to any issue before the Court since there is no indication any producer that was subject to a 2257 records inspection in 2006 or 2007 had produced a depiction of themselves engaging in sexually explicit conduct, and even if the Court considers a facial Fourth Amendment challenge, plaintiffs would bear the burden of establishing that the requirements were invalid in all of their applications, not just in applications involving producers creating sexually explicit depictions of themselves. *United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011).

**For additional discussion, see Defendant's Post-Trial Brief, at 61.**

**17.     Q:** This question asks who has the burden of proof on the Fourth Amendment issues.

**A:** With respect to a facial or as-applied Fourth Amendment claim, plaintiffs bear the burden of establishing that this Court has jurisdiction to consider such a claim at all. Here, defendant has argued that both facial and as-applied Fourth Amendment claims for injunctive relief are unripe, and that plaintiffs lack standing to seek injunctive relief for an as-applied claim. If plaintiffs were nevertheless to establish the Court's jurisdiction to consider a facial Fourth Amendment challenge, they would also bear the burden to establish that the statutory language, on its face, was unconstitutional in all of its applications. *United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011). With respect to an as-applied Fourth Amendment claim, plaintiffs bear the burden of establishing that a "search" occurred and that the entity or individual subject to search had a reasonable expectation of privacy in the area searched. *United States v. Stearn*, 597 F.3d 540, 551-52 (3d Cir. 2010). If plaintiffs were to succeed in establishing that a warrantless search occurred, the burden would shift to the Government to establish that an exception to the warrant requirement applies. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313-14 (1978). Consent is one possible exception that the Government might establish. *United States v. Claus*, No. 11-1412, 2012 WL 120081, at *3 (3d Cir. Jan. 17, 2012) (citing *United States v. Price*, 558 F.3d 270, 277 (3d Cir.2009); *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005)). The Government need not establish that the government agent notified individuals on the premises of their right to refuse entry in order to meet its burden to show a search was consensual. *Id.* at *3 n.5 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 231 (1973)).

**For additional discussion, see Defendant's Post-Trial Brief, at 43-66.**

**18.     Q:** This question asks what plaintiffs would identify in the record as demonstrating the facial invalidity of 2257 under the Fourth Amendment.

**A:** Nothing in the record could support a holding that 2257 was facially invalid under the Fourth Amendment. A facial challenge to 2257 under the Fourth Amendment must be based

solely on the statutory text. Plaintiffs would also have to establish that the law was unconstitutional in all of its applications. The details of specific inspections would not be relevant. The fact that the statutory text would allow for the Attorney General to seek an administrative warrant prior to initiating an inspection is alone sufficient to defeat a facial Fourth Amendment challenge.

**For additional discussion, see Defendant's Post-Trial Brief, at 43-46.**

**19.**    **Q:** This question asks what impact the burdensomeness of the regulations (relating to inspections?) has on the constitutional as applied (Fourth Amendment?) analysis.

**A:** Any burdens that the Court perceived with respect to inspections that occurred in 2006 and 2007 are not relevant to an as-applied Fourth Amendment claim seeking injunctive relief because there is no evidence that future inspections would impose similar burdens, and the Court therefore lacks jurisdiction over such a claim. Assuming that plaintiffs were able to establish jurisdiction over an as-applied Fourth Amendment claim seeking injunctive relief, the factors that would be relevant to an analysis of that claim would depend on the framework under which it is analyzed. The specific procedures followed or burdens imposed during an inspection would be irrelevant if the Court determined that any entry onto a producer's premises was consensual. On the other hand, under the administrative subpoena standard, the scope and relevance of the request to inspect records are factors. Here, the records inspections that occurred in 2006 and 2007 involved inspections of specific 2257 records that the lead inspector identified at the initiation of the inspection. The information that the inspection team reviewed during an inspection was relevant to the purpose of the inspection, to assess compliance with 2257. Under both the administrative search and totality of the circumstances standards, it is relevant that the inspections were conducted in a manner so as not to disrupt the producer's business, including conducting inspections during business hours and staying in whatever location the producer requested during the inspection. The process that the inspection team followed in checking requirements that were identified on the inspection team's checklist was reasonable. The requirements were derived from the regulations as they existed at the time, and were designed to further the overall 2257 recordkeeping scheme by ensuring proper age verification records were being maintained in a manner that facilitated being able to trace the location of the records once a product was released.

**For additional discussion, see Defendant's Post-Trial Brief, at 46-66.**

**20.**    **Q:** This question asks what justification the government offers for the statute authorizing inspection without notice in view of the fact that there is no motivation for destruction.

**A:** The statutes are silent regarding whether advance notice should be given prior to an inspection. *See* 18 U.S.C. §§ 2257(c), 2257A(c). Thus, even if the Court were to determine that inspections without notice were unreasonable, the statutes cannot be deemed facially invalid on that basis. A regulatory provision states that advance notice of record inspections shall not be given. *See* 28 C.F.R. § 75.5(b). Defendant has addressed this provision above in the Answer to Question #2(d). Moreover, even if producers have no motivation to destroy records if given advance notice of an inspection, they are likely to be more motivated to maintain complete

records in compliance with the requirements if they are not certain when an inspection might occur. If producers know they will receive advance notice, they are unlikely to be as diligent in examining performers' identification documents and maintaining records, and may in fact wait until they receive such notice to attempt to put their records in order. This would undermine the regulatory scheme, as it is imperative that producers check identifications before filming individuals engaged in sexually explicit conduct and maintain this information in an accessible form. The inspection of Real Wild Girls provides an example where, without 2257 records, the inspection team was not able to verify that the individuals appearing in the producer's films were 18 or older. The producer in that case did not have 2257 records and was not able to cure the identified violations following the inspection. Pl. Ex. 18; Joyner Testimony, Tr. June 12, 127:9-12. Producers are more likely to be diligent in verifying ages and in keeping their 2257 records in order without advance notice.

**For additional discussion, see Defendant's Post-Trial Brief, at 61-65.**

**21.    Q:** This question asks whether there is evidence that the potential for producers to fabricate records on a last minute basis, because of advance notice, is a practical threat.

**A:** Because an inspection program was in operation only for a brief period in 2006 and 2007, and only 29 inspections occurred during that period, there is no evidence available in the record regarding how producers might seek to circumvent the requirements if there were an expectation that advance notice would always be given. Defendant has further addressed the question of advance notice above in the Answers to Question #2(d) and #20. The Attorney General determined, during a notice and comment rulemaking process, to promulgate a regulation indicating that advance notice of an inspection shall not be given, and plaintiffs have not challenged that provision under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

**22.    Q:** This question asks what justification there is for the requirement that records be available 20 hours per week.

**A:** The relevant provision in 28 C.F.R. § 75.5(c)(1) indicates that, if a producer does not maintain normal business hours 40 hours per week, he may limit the hours during which his 2257 records are available to 20 hours per week, and if he does not maintain normal business hours 20 hours per week, he may specify any 20 hours per week that he prefers by notifying the inspecting agency regarding his preferred 20 hours per week. This provision was promulgated by the Attorney General in 2005 as an accommodation in response to comments during the rulemaking process. 70 Fed. Reg. 29613. The Attorney General responded to further comments on this issue by making available the option of maintaining records at a third party custodian rather than making records available at one's own business premises 20 hours per week. 73 Fed. Reg. 77445-46. The statute does not provide for any penalty based on a failure to remain in proximity to one's 2257 records 20 hours per week. In practice, if the lead inspectors did not find a producer at the address specified in a product's 2257 statement, they would return later or attempt to contact the producer in order to arrange a time for inspection.

**For additional discussion, see Defendant's Post-Trial Brief, at 17-18.**

18

**23.**    **Q:** This question asks what remedies the Court might employ if it determines the inspection plan is unreasonably burdensome.

**A:** The Court may not strike the statutory inspection provision on its face based on a determination that the "inspection plan" is unreasonably burdensome. The statutory provision states only that producers must make their 2257 records available for inspection at reasonable times. Congress thus delegated the task of specifying the details of an inspection program to the Attorney General, to promulgate by regulation. The statutory language cannot be deemed invalid in all its applications if inspections with an administrative warrant would be reasonable, or if inspections would be reasonable under a revised regulation.

The Court may not rewrite the regulations if it deems 28 C.F.R. § 75.5 invalid. As noted, the facial validity of the regulations is a matter properly raised through a claim under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and properly considered based on the rulemaking record. Plaintiffs have not raised an APA claim in this case. The remedy in an APA case when determining that a federal regulation is facially invalid is to set the regulation aside pursuant to 5 U.S.C. § 706 and remand to the agency for further proceedings consistent with the Court's opinion.

The Court may not retain jurisdiction over this case on the basis that inspections might be renewed at a later point. Such a notion would violate principles of ripeness. To the contrary, if the Court determines that it cannot evaluate future inspections based on the current record, it should dismiss plaintiffs' Fourth Amendment claim for lack of jurisdiction. Since a dismissal based on lack of jurisdiction would be without prejudice, a new claim could be filed if a new inspection program were to be implemented.

The Court may not issue an advisory opinion regarding past inspections that occurred in 2006 and 2007 under a program that is no longer in operation. The redressability prong of standing means that if injunctive relief would not remedy a plaintiff's claim, the plaintiff lacks standing to seek injunctive relief for that claim, and the claim must be dismissed for lack of jurisdiction.

**24.**    **Q:** This question asks whether, assuming the inspection program were having a "chilling" effect on individuals subject to 2257 while inspections were occurring, the testimony allows a finding that the suspension of the program has eliminated such a "chill."

**A:** While the lack of any current inspection program should lead the Court to hold it lacks jurisdiction over any Fourth Amendment claim, because there is no "concrete factual context" that can be evaluated regarding hypothetical future inspections, the statutory authorization of inspections in §§ 2257 and 2257A could theoretically still be relevant to the Court's evaluation of "chill" under the First Amendment. However, any chill based on the prospect of an inspection is not a basis for invalidating the statutes as facially overbroad or as applied to a specific plaintiff. A producer could avoid any chill by utilizing the third party custodian option, and the inclusion of a records inspection component in the 2257 recordkeeping scheme is perfectly reasonable. Defendant has also addressed the issue of "chill" above in the Answer to Question #2(c).

**For additional discussion, see Defendant's Post-Trial Brief, at 17-20.**

Dated this 1st day of July, 2013.       Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General
ZANE DAVID MEMEGER
United States Attorney
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ Kathryn L. Wyer
HÉCTOR G. BLADUELL
JAMES J. SCHWARTZ
NATHAN M. SWINTON
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW, Washington, DC
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendant*