```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA


FREE SPEECH COALITION, INC.,     )   09-cv-4607
et al,                           )
                                 )
          Plaintiffs,            )
                                 )
                                 )
     vs.                         )
                                 )
THE HONORABLE ERIC HOLDER, JR.,  )
in his Official Capacity as      )
Attorney General of the United   )
States,                          )   Philadelphia, PA
                                 )   June 3, 2013
          Defendant.             )   9:16 a.m.



                       TRANSCRIPT OF TRIAL
             BEFORE THE HONORABLE MICHAEL M. BAYLSON
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:       J. MICHAEL MURRAY, ESQUIRE
                          LORRAINE R. BAUMGARDNER, ESQUIRE
                          BERKMAN, GORDON, MURRAY & DEVAN
                          55 Public Square - Suite 2200
                          Cleveland, OH 44113-1949
                          615 Chestnut Street - Suite 1250
                          Philadelphia, PA  19105


For the Defendant:        KATHRYN WYER, ESQUIRE
                          HECTOR G. BLADUELL, ESQUIRE
                          JAMES J. SCHWARTZ, ESQUIRE
                          NATHAN MICHAEL SWINTON
                          U.S. DEPARTMENT OF JUSTICE
                          20 Massachusetts Avenue
                          Washington, D.C.  20530


Audio Operator:           N. MALAVE

Transcribed by:           DIANA DOMAN TRANSCRIBING
                          P.O. Box 129
                          Gibbsboro, New Jersey  08026-0129
                          Office:  (856) 435-7172
                          Fax:     (856) 435-7124
                          Email:   dianadoman@comcast.net



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
```

1                          I N D E X

2  WITNESSES:         COURT    DIRECT:   CROSS:  REDIRECT:  REDIRECT:

3  FOR THE PLAINTIFFS:

4  Eugene H. Mopsik  28    14(Mur)   46(Wye)

5                    39    35(Mur)

6                          41(Mur)

7  Jeffrey Douglas  109    63(Mur)  116(Wye)  141(Mur)

8                          112(Mur)

9  Michelle Drouin        142(Mur)  164(Swi)  192(Mur

10 Diane Wilson           195(Mur)  231(Bla

11 EXHIBITS:                              ID.    RECEIVED

12 FOR THE PLAINTIFFS:

13 P-130 Copy of Year End Issue, ASMP Bulletin    19       45

14 P-33A Series of Invoices and Payment Records   114      115

15 P-40   CV, articles and report of

16        Dr. Drouin                              168      168

17 P-74   Video                                   202      212

18 P-75   DVD                                     202      213

19 P-76   Video                                   202      213

20 P-77   Video                                   204      213

21 P-78   Video                                   205      213

22 P-79   Video                                   206      213

23 P-80   Video                                   206      213

24 P-81   Video                                   206      213

25 P-82   Video                                   206      213

| | EXHIBITS: (Cont'd) | ID. | RECEIVED |
|---|---|---|---|
| 1 | EXHIBITS:  (Cont'd) | ID. | RECEIVED |
| 2 | P-83   Video | 207 | 213 |
| 3 | P-84 to P-127   DVDs | 208 | 213 |
| 4 | P-74 to P-108   DVDs | 212 | 212 |
| 5 | P-119 to 127   DVDs | 212 | 212 |
| 6 | FOR THE DEFENDANT: | | |
| 7 | D-312 ASMP Model Release Tutorial | 50 | 50 |
| 8 | D-19   Answers to Interrogatories | 54 | --- |
| 9 | D-31G Images from Morey's Website | 56 | 57 |
| 10 | D-32   Images from Morey's Website | 61 | 56 |
| 11 | D-31B Images from Morey's Website | 61 | 56 |
| 12 | D-31C Images from Morey's Website | 61 | 56 |
| 13 | D-31H Images from Morey's Website | 61 | 56 |
| 14 | D-33   Page from Rosen's Website | 62 | 62 |
| 15 | D-57   FSC's Responses to Interrogs | 124 | --- |
| 16 | D-48   David Connors' Answers to Interrogs | 125 | --- |
| 17 | D-47   DVD cover | 128 | 129 |
| 18 | D-54   Comments on proposed rules | 136 | 137 |
| 19 | D-190   Dr. Ferguson's study | 168 | 168 |
| 20 | D-188   The National Campaign to Prevent | | |
| 21 | Teen & Unplanned Pregnancies | | |
| 22 | Sex & Tech Survey | 170 | 170 |
| 23 | D-189   Zimmerman paper | 172 | 172 |
| 24 | D-187   Associated Press/MTV Study | 174 | 175 |
| 25 | D-311   DVD | 234 | --- |

1

2     Murray had witness look through box of DVDs, then on page 213,

3     he admitted them as a group P-74 to 108 and P-119 to 127.

4

5

6

1                (The following was heard in open court at 9:16 a.m.)

2                     THE COURT:  Okay.  Good morning, everybody.

3                     ALL ATTORNEYS:  Good morning, Your Honor.

4                     THE COURT:  Please be seated.

5                     Okay.  We're here for the beginning of a trial on

6      certain limited issues as directed by the Court of Appeals in

7      the case, Free Speech Coalition versus Holder, Civil Action

8      2009-4607.

9                     So just -- I've seen counsel before, but just to say

10     hello and have everybody straight, Mr. Murray and Ms.

11     Baumgardner, you're representing the plaintiffs.

12                    MR. MURRAY:  Yes, we are, Your Honor.

13                    MS. BAUMGARDNER:   Yes, Your Honor.

14                    THE COURT:  Good morning.

15                    And then for the defendants, Ms. Wyer.

16                    MS. WYER:  Yes, Your Honor.

17                    THE COURT:  You're a familiar face here, but you're

18     joined by some colleagues who I'm not sure I've had the

19     pleasure meeting in person yet before.

20                    Mr. Bladuell.

21                    MR. BLADUELL:  Yes, Your Honor.  Good morning.

22                    THE COURT:  Good morning.  How are you?

23                    Mr. Schwartz.

24                    MR. SCHWARTZ:  Good morning, Your Honor.

25                    THE COURT:  All right.  Mr. Swinton.

Colloquy                                             6

1              MR. SWINTON:  Good morning, Your Honor.

2              MR. SWINTON:  Good morning, Your Honor.

3              THE COURT:  Okay.  Fine.  Now, just in -- in a

4    preliminary matter, we had a conference call last week that

5    was not recorded, and we went over some logistic matters which

6    I don't think we need to repeat, but there was one -- one or

7    two issues of substance that I just want to review.

8              The issue came up about deposition designations and

9    use of depositions.  There was one witness that the plaintiff

10   wanted to introduce by way of deposition to which the

11   defendant objected because there was a great deal of hearsay,

12   and -- was that Mr. Mosick, M-O-S-I-C-K?

13             MR. MURRAY:  Mr. Mopsik, Your Honor.

14             THE COURT:  Mopsik, okay.

15             And I think as a result of that discussion, Mr.

16   Murray, you agreed that you were going to call him as a live

17   witness, is that right?

18             MR. MURRAY:  I am indeed, Your Honor.

19             THE COURT:  Okay.  All right.  Now, the next issue

20   that came up concerning depositions concerned a Mr. Joiner,

21   who is a former special agent of the FBI, is that correct?

22   He's retired now or --

23             MS. WYER:  Yes, Your Honor.

24             MR. MURRAY:  Yes, Your Honor.

25             THE COURT:  -- is he still employed?

1              MR. MURRAY:  No, he's retired now, Your Honor.

2              THE COURT:  He's retired.  Okay.  So the issue was

3     whether the plaintiff could use parts of his deposition under

4     Rule 32, and without the benefit of having done any research

5     then or -- or even by now, I was under the impression that

6     that would depend on whether he would be characterized as a

7     managing agent under Rule 32, and I invited counsel to submit

8     any case authority on that, and I didn't make any specific

9     ruling on that.

10             But then Mr. Murray added that he thought he had the

11    right to use Mr. Joiner's deposition in any event because he

12    was more than 100 miles from the courthouse.

13             Is that right, Mr. Murray?

14             MR. MURRAY:  That is correct, Your Honor.

15             THE COURT:  All right.  Where does that stand, Ms.

16    Wyer?

17             MS. WYER:  Your Honor, we continue to object to the

18    designation of that transcript.  Mr. Joiner is going to be

19    appearing next week in this trial, so he does not qualify --

20             THE COURT:  Well, it's my --

21             MS. WYER:  -- as unavailable.

22             THE COURT:  It's my belief that under Rule 32 that

23    if there is a -- if there is a -- if there has been a

24    deposition taken by an opposing party, it can be admitted

25    under several different authorities, even if the party who --

1    who is the employer or the present or past employer of that

2    witness intends to call the party.

3         So I -- I'll look at this more carefully, but it's

4    my opinion that if -- if the plaintiffs took Mister -- Agent

5    Joiner's deposition, which I assume you did --

6         MR. MURRAY:  Yes.

7         THE COURT:  -- that -- well, if he's a managing

8    agent, there's no question they can use it, but if he's more

9    than 100 miles away, I think they can also use it because

10   they -- they're entitled -- they would be entitled to call him

11   in their own case.

12        And plaintiffs don't have to wait for the defendants

13   to call him.  They can call him himself, but since he's beyond

14   subpoena range, they can use his deposition or part -- or

15   certain parts of it.

16        That's my understanding of how Rule 32 works.

17        MS. WYER:  Your Honor, Rule 32 requires either that

18   the individual be a managing agent or officer, which Agent

19   Joiner is not because he is -- he was retired at the time the

20   deposition was taken.  So he clearly does not fall under Rule

21   32(a)(2) -- (a)(3).

22        THE COURT:  (A)(3).

23        MS. WYER:  He's --

24        THE COURT:  But what about (a)(4)?

25        MS. WYER:  He -- well, Your Honor, on -- we notified

1    plaintiffs' counsel on May 7th that Mr. Joiner was planning to

2    go on vacation.   We had understood that -- that plaintiffs

3    wanted to examine him at trial, and we indicated we were going

4    to have Mr. Joiner appear in our part of the case, and we --

5              THE COURT:  Yes, but he -- Mr. Murray wants to use

6    it as part of his case.

7              MS. WYER:  But the plaintiffs did not object at that

8    time that they needed him to appear in their half of the case.

9    There's nothing really that they would need to ask Mr. Joiner

10   in their half of the case that they cannot ask him live, and I

11   think the rules contemplate that live testimony is the

12   preferred form of testimony.

13             There's nothing that the plaintiffs cannot cross

14   examine him on next week that they could -- would want to ask

15   him about here.

16             THE COURT:  Well, wait, wait.

17             MS. WYER:  But --

18             THE COURT:  Well, wait a minute.  Wait.  32(a)(4)

19   says, "A party may use for any purpose the deposition of a

20   witness, whether or not a party, if the Court finds that the

21   witness is more than 100 miles from the place of trial unless

22   it appears that witness' evidence was procured by the party

23   offering the deposition."

24             Now, there's no allegation that that applies.  So

25   I -- I think it would be error for me to preclude the

1    plaintiff from using his deposition.

2            MS. WYER:  But, Your --

3            THE COURT:  So unless you have authority, like a

4    case, I'm going to overrule the objection and allow you to use

5    portions of his deposition.

6            Now, that still leaves us with the situation that

7    you've got to designate certain pages and lines, and the

8    Government has a chance to object.  Have you done that yet,

9    Mr. Murray?

10           MR. MURRAY:  Well, we propose to submit the entire

11   deposition.

12           THE COURT:  How long is it?

13           MS. BAUMGARDNER:  261.

14           MR. MURRAY:  261 pages, Your Honor.

15           THE COURT:  Well --

16           MR. MURRAY:  Well, it was a thorough examination of

17   very relevant issues --

18           THE COURT:  All right.

19           MR. MURRAY:  -- on the Fourth Amendment issues, Your

20   Honor.

21           THE COURT:  Okay.

22           MR. MURRAY:  That's why I think it was that lengthy.

23           THE COURT:  Well, have you had a chance yet to --

24   well, there's not -- there's not going to be any kind of

25   designation if he wants the whole thing.  Have you had a

1  chance to see where -- if you want to object to certain

2  portions?

3          MS. WYER:  We do want to object, Your Honor, and the

4  local rules require that when a party wants to designate parts

5  of a deposition, they're supposed to confer with the opposing

6  party and try to resolve the objections and then mark on the

7  designated transcript where the objections are --

8          THE COURT:  Well, that's right.

9          MS. WYER:  -- and that has not happened.

10         THE COURT:  Mr. Murray, when did you let Ms. Wyer

11 know that you wanted to use the entire deposition?

12         MR. MURRAY:  We filed a notice of designation last

13 week sometime, Your Honor.

14         THE COURT:  All right.  Okay.  Well, I'm going to

15 put off the resolution of this for maybe later in the day or

16 tomorrow morning, but --

17         MS. WYER:  Your --

18         THE COURT:  Yes.

19         MS. WYER:  Your Honor, we do have some cases, for

20 example, Young & Associates Public Relations vs. Delta

21 Airlines, 216 FRD 521 --

22         THE COURT:  Well, what's the citation again, so I --

23         MS. WYER:  216 FRD --

24         THE COURT:  Two?

25         MS. WYER:  216 FRD 521, in the District of Utah,

Colloquy                                12

1    where the --

2              THE COURT:  Well, I'll -- I'll read the case.  I

3    don't want to have argument right now.

4              MS. WYER:  Okay.

5              THE COURT:  Do you have any other citation?

6              MS. WYER:  There's -- well, Judge Hammond pointed

7    out in the Second Circuit case, <u>Napier vs. Bossard</u> (phonetic),

8    102 F2d --

9              THE COURT:  102 --

10             MS. WYER:  F2d 467.  He just pointed out that a

11   deposition transcript is the second best testimony, but where

12   possible live testimony should be used.

13             THE COURT:  Well, but that -- you may be right about

14   that, but that doesn't, in my mind, prevent a party from

15   taking available of Rule 32(a)(4).

16             All right.  Well, look, let's -- we'll delay the

17   resolution of this, but I'm inclined to allow it.  We can talk

18   about it more.

19             Okay.  Well, now, if there's no other housekeeping

20   matters, we'll now proceed to the opening statements.

21             But one thing.  I had said -- just about scheduling.

22   Today we're going to go about 12:20.  We have a Judges

23   meeting, and they're usually over by 1:45, so that's a little

24   longer lunch than I usually take.  Okay.  So we'll just keep

25   that in mind.

1              Just one second.

2         (Pause)

3              THE COURT:  Are you going to start using the

4    exhibits?  Who's your first witness going to be?

5              MR. MURRAY:  My first witness is going to be Gene

6    Mopsik, Your Honor.

7              THE COURT:  All right.

8              MR. MURRAY:  And I do -- and I'm only going to use,

9    I think, one exhibit with him.

10             THE COURT:  All right.  Okay.  Well, we'll get to

11   the -- all right.

12             MS. WYER:  Your --

13             THE COURT:  We've got -- I know you delivered a lot

14   of exhibits, but they're --

15             MR. MURRAY:  Yes.

16             THE COURT:  -- in the room next door.

17             MS. WYER:  Your Honor, regarding the designations,

18   there were also a number of other designations that plaintiffs

19   offered of experts.  The experts are also going to be

20   testifying, and --

21             THE COURT:  Well, I don't know about depositions

22   of -- you mean you want to use designations from their

23   experts?

24             MR. MURRAY:  We have designated small portions of

25   depositions of three of their experts, and we rely upon the

1    same rule.  They were there at the deposition.  The witnesses

2    are more than 100 miles away, and so we --

3              THE COURT:  All right.

4              MR. MURRAY:  We've designated those.

5              THE COURT:  Well, that's -- that's a little bit

6    different in my mind.  We'll -- we'll re -- let's -- we'll

7    revisit that later, also.

8              Okay.  All right.  Now we're ready for opening

9    statements.

10             MR. MURRAY:  Your Honor, by agreement, we're going

11   to waive opening statements.

12             THE COURT:  Okay.  All right.  Then call your first

13   witness.

14             MS. WYER:  Oh, Your Honor, the plaintiffs call Mr.

15   Gene Mopsik.

16             EUGENE HOWARD MOPSIK, PLAINTIFFS' WITNESS, SWORN

17             THE CLERK:  Please state your full name for the

18   record, spelling your last name.

19             THE WITNESS:  Eugene Howard Mopsik, M-O-P-S-I-K.

20             THE CLERK:  Thank you very much.

21                          DIRECT EXAMINATION

22   BY MR. MURRAY:

23   Q    Mr. Mopsik, what is your city of residence?

24   A    Philadelphia.

25   Q    And would you tell the Court what your current occupation

1    is, sir?

2    A    The executive director of the American Society of Media

3    Photographers.

4    Q    And that is one of the plaintiffs in this case?

5    A    Yes.

6    Q    And what is the American Society of Media Photographers?

7    A    The American Society of Media Photographers, known in the

8    trade as ASMP, is a 501(c)(6) trade association created to

9    advance the position of primarily working publication

10   photographers.

11   Q    How long has it been in existence?

12   A    Founded in 1944.

13   Q    And how many members, approximately, does it have?

14   A    Little over 7,000.

15   Q    And where are these members situated?

16   A    Primarily in 39 chapters around the United States with

17   about 250 foreign members.

18   Q    And can you tell the Court what kinds of photographers

19   are members, what range of Photographers?

20   A    ASMP members are involved in a broad range of genres of

21   photography, including, but -- but not exclusively, of

22   advertising, editorial, fine art, underwater, architecture,

23   sports, lifestyle.

24   Q    What about photojournalists, are they --

25   A    Photojournalism, I would include that as part of

1    editorial.

2    Q    Okay.  Now -- and what exactly is the mission of ASMP?

3    A    I'd say specifically to protect and promote the interests

4    of working publication photographers.

5    Q    And can you tell the Court, have you participated, your

6    organization, in the past in other cases involving First

7    Amendment rights or claims of First Amendment rights?

8    A    Yes, we have.  Specifically, the Rock and Roll Hall of

9    Fame case.  I don't know the, I guess, the actual name, but we

10   refer to it as the Rock and Roll Hall of Fame case.  I think

11   it's Rock and Roll Hall of Fame vs. Gentile, the Tiger Woods

12   case and University of Alabama.

13   Q    And did they all involve issues of photography and

14   relationship to First Amendment Rights?

15   A    Yes.

16   Q    And did the organization participate as an amicus by

17   filing briefs?

18   A    Yes.

19   Q    Okay.  Now, how long have you held the position of

20   executive director?

21   A    Ten years.

22   Q    Okay.  And are you, yourself, a photographer, sir?

23   A    I was a working photographer.  I made my living solely

24   from my photography for 32 years.

25   Q    And what kind of a -- photography did you do?  Describe

1    your career.

2    A    I was a -- I guess I started out shooting primarily

3    editorial work, but then moved to heavy industrial.  I shot

4    trucks, forklift trucks, heavy equipment for clients such as

5    Mack Truck, Hyster Company, Mitsubishi Fuso, Ingersoll Rand.

6    Q    Now, did you work out of your home, or did you have a

7    separate office?

8    A    My office was in my home, primarily because the space

9    that I needed to work in was so large that I would rent it on

10   a need basis, but my -- my primary offices were in my home.

11   Q    Okay.  Now, tell the Court what your duties are as the

12   executive director of ASMP.

13   A    Well, I'm the -- I'm the, again, the manager of -- of

14   what, for -- for many purposes, is a traditional trade

15   association, except that we have photographers as members,

16   which tend to be fairly nontraditional.

17        So I manage budgets.  I manage my staff.  I am charged

18   with effecting the policies and programs established by my

19   board of directors.

20   Q    And where is the national office of ASMP?

21   A    Our national offices are here in Philadelphia.  We own a

22   building on 2nd Street.

23   Q    Okay.  And you mentioned that there are some additional

24   chapters?

25   A    We have 39 chapters, basically, in -- in major

1    metropolitan areas around the country.

2    Q    Now, how does one become a member of ASMP?

3    A    There are different levels of membership.  The voting

4    membership of ASMP requires -- which would -- which is

5    currently designated as a general member.

6         Those members have to have proof of publication for a

7    period of three years.  They're required two general member

8    sponsors, and they have to make the majority of their earned

9    income from the sale or license of their images.

10   Q    Okay.

11   A    And we are the only photographers trade association with

12   that significant a threshold.

13   Q    Okay.

14        MR. MURRAY:  Your Honor, may I approach the witness

15   with an exhibit?

16        THE COURT:  Yes.

17   BY MR. MURRAY:

18   Q    Mr. Mopsik, I've placed in front of you what has been

19   marked as Plaintiff's Exhibit 130.

20        Let me put it on the ELMO so that everyone can see it.

21   A    It's a fabulous cover photo.

22        MR. MURRAY:  I'm sorry.  We -- this was on a short

23   time ago, Your Honor, but --

24        THE COURT:  Wait just a minute.  Give me one second.

25        (Pause)

1           THE COURT:  Well, I'm pressing the screen.  It says

2      full screen, evidence, plaintiff.

3           Let's see -- is this a -- is this a center city

4      view?

5           THE WITNESS:  That's a -- the Flatiron Building in

6      New York, Your Honor --

7           THE COURT:  Yes, okay.

8           THE WITNESS:  -- at 23rd Street.

9           THE COURT:  All right.  I -- yes, just put it on the

10     full screen.  All right.  I got it.  Okay.  Go ahead.

11     BY MR. MURRAY:

12     Q    Mr. Mopsik, can you identify what we have marked as

13     Plaintiff's Exhibit 130?

14     A    It's a copy of the year end issue of the ASMP Bulletin.

15     Q    And what is the ASMP Bulletin?

16     A    It's a five-time a year print publication that ASMP

17     produces as a member communication and communication to the

18     broader industry.

19     Q    And is it published in the regular course of the business

20     of ASMP?

21     A    It is.

22     Q    And does ASMP maintain this bulletin in the regular

23     course of its business?

24     A    We do.

25     Q    And do you, yourself, write an article in each one of

1    these bulletins?

2    A    Sadly, I do.  Every issue.

3    Q    Thank you.

4         MS. WYER:  Objection; hearsay.

5         THE COURT:  Overruled.

6    BY MR. MURRAY:

7    Q    Now, Mr. Mopsik, as the executive director of ASMP are

8    you acquainted with many of your members?

9    A    I am.

10   Q    And are you familiar with the work of many of your

11   members?

12   A    I am.

13   Q    And are you familiar with the business and professional

14   practices, generally, of the photographers who belong to the

15   ASMP as a result of your 32-year career?

16   A    I am.

17   Q    Can you tell the Court, is it common practice or not for

18   photographers who are members to require their subjects to

19   sign something known as a model release?

20   A    It's quite common and something that we recommend

21   specifically as part of our business practices.

22   Q    And why does ASMP encourage its members to use model

23   releases?

24   A    We're a professional organization, and our members are

25   charged with delivering work that ultimately is usable by our

1    clients where we are both, I guess, problem solvers and -- and

2    imaging professionals.

3         So when a photographer goes to a client, just part of the

4    job is just creating the image.  The other issues involve

5    rights and clearances and permissions, and it's important that

6    the photographer deliver a job to a client that he's then able

7    to use.

8    Q    And does ASMP offer any examples of model release forms

9    that can be used by its members?

10   A    On our website we have an adult release, a simplified

11   adult release, a minor release and a property release.

12   Q    And what do those all accomplish?

13   A    Ultimately, when properly executed, they give the

14   photographer the right to license those images for various

15   uses, to -- to license them to his client and then also

16   potentially to make use of them thereafter.

17   Q    And why is it important, if it is important at all, for

18   the -- your members to verify whether one of their subjects is

19   a minor or an adult?

20   Q    Well, it's important in order to have a properly executed

21   release, and if that release is not legally binding, then the

22   photographer is, I guess, acting in an unprofessional manner

23   and doing a disservice to his client by delivering work that

24   the client can't in fact use.

25   Q    And the form that you recommend for a model release for

1  minors, does that require parental signatures?

2  A     It requires parental signature, and in fact I believe on

3  the site we recommend having both parents sign.

4  Q     Now, among the genre of photographs that are shot by your

5  members do any of your members produce sexually explicit

6  expression?

7  A     Yes.

8  Q     Okay.  And can you give the Court some idea as to the

9  type of photographers who are your members who would do that

10  kind of work?

11           MS. WYER:  Objection; lack of foundation.

12           THE COURT:  Overruled.

13           MS. WYER:  And hearsay.

14           THE COURT:  Go ahead.

15           THE WITNESS:  Your Honor, I believe our members

16  would -- you're asking what types of -- where these images

17  might appear or how they might be used?

18  BY MR. MURRAY:

19  Q     Let me -- let me reframe the question.

20        Is there a category of photographer that would include

21  those who take sexually explicit photographs?

22  A     It -- it would cross into various -- I mean on one level

23  you might think that the most common place that would appear

24  would be in a fine art category.

25        At the same time photographers who are involved in

1   medical illustration might take sexually explicit images.

2   Photographers involved in documentary or editorial photography

3   might have images involving rape or other sexually explicit

4   activities.

5   Q    Well, are you familiar, for example, of any of your

6   members who do that kind of work overseas?

7   A    I am.  One -- one particular photographer named Jonathan

8   Torgovnik did a whole study, a book on Rwanda and rape victims

9   and their offspring, actually, and he set up a foundation to

10  benefit these people.  He currently lives in South Africa.

11         There are other photographers, Barbara Alper, one of

12  the plaintiffs in the case, Craig Morey, another photographer.

13         Tony Ward, a long-tme friend of mine, did a column for

14  many years in Penthouse of very sexually explicit black and

15  white images similar to the kinds of things that Geet Hudeen

16  (phonetic) or Helmut Newton would do.

17         There are other members, Ellen Von Onworth

18  (phonetic), Inez Van Lamsworthy, they shoot primarily high

19  end, very high end fashion work that would appear in consumer

20  publications, Vogue, Harpers, but they also do some work that

21  I believe could be viewed as sexually explicit.

22  Q    Do you have a member by the name of Ned Rosen?

23  A    We do, right.  His images -- I'm not a -- a friend of

24  Ned's.  I'm familiar with him only by looking at his work on

25  the -- on the website, but his work appears to be primarily

1    fashion and beauty, I would refer to it as, but -- but there

2    are some images that involve nudity.

3    Q    Okay.  Now, do you have any idea as to approximately how

4    many members within ASMP produce sexually explicit images?

5              MS. WYER:  Objection; hearsay.

6              THE COURT:  Overruled.

7              THE WITNESS:  When -- when ASMP was trying to

8    determine this question, we did a survey via email to our

9    members, and there were 400 -- approximately 400 respondents

10   who indicated that some portion of their work involved

11   sexually explicit images.

12             MS. WYER:  Your Honor, defendant objects to

13   admission of information about the survey.

14             Defendant requested, production of this survey

15   question and the responses and plaintiffs failed to produce

16   this information.

17             THE COURT:  Well, you know, I'm not-- you know, if

18   you're complaining about, you know, a lack of discovery, we

19   can deal with that.

20             I mean I think he's just saying that -- how many

21   total members do you have?

22             THE WITNESS:  A little over 7,000, Your Honor.

23             THE COURT:  Okay.  And how many -- did you send the

24   survey to all of your members?

25             THE WITNESS:  We sent it to our general members and

1    our associate members, not to our students.  So it went out to

2    approximately 6,000.

3                    THE COURT:  Okay.  And you got back 400?

4                    THE WITNESS:  We got back 400.

5                    THE COURT:  Okay.  All right.  Thank you.

6                    Overruled.

7    BY MR. MURRAY:

8    Q    Now, Mr. Mopsik, although I'm not going to ask you to

9    recite it, are you generally familiar with the requirements of

10   18 USC, Sections 2257 and 2257(a)?

11   A    Generally, yes.

12   Q    Okay.  Now, I'm going to ask you a question, and the

13   first part of it is I'm going to list some of the requirements

14   of the law, and them I'm -- after I've done that, then I'm

15   going to ask you a question about what I've just recited.

16        Do you understand so far?

17   A    I understand.

18   Q    Okay.  2257 and 2257(a) require a producer of a sexually

19   explicit image to, A, collect and make a copy of a Government

20   photo ID of each subject in the image; secondly, obtain and

21   record any name ever used by the subjects, including maiden

22   names, aliases, nicknames, stage names or professional name;

23   third, create a record of the date of the original production

24   of the image or depiction; fourth, organize the records

25   alphabetically or numerically, where appropriate, by the legal

Mopsik - Direct (Mur)                               26

1    name of the performer; fifth, index and cross reference the

2    records to each alias or other name used and to each title or

3    identifying number of the image.

4        Next the producer must include a copy of the depiction n

5    the records.  In addition to that, those records must be

6    maintained for seven years, and, finally, those records must

7    be segregated from the producer's other records.

8        Now, having those requirements in mind, and there will --

9    there will be some others that I will ask you about later, but

10   just those in mind, can you tell the Court with respect to

11   those requirements what burden, if any, those requirements

12   would impose upon your members who produce such images?

13            MS. WYER:  Objection; calls for hearsay.

14            THE COURT:  Well, the -- I mean the answer somewhat

15   speaks to the question.  I mean -- I mean it's clear that this

16   is what the -- the statute requires.

17            Now, if your answer -- if your question is for him

18   to repeat what you just said, we really don't need that.

19            MR. MURRAY:  No, it isn't, Your Honor.

20            THE COURT:  So I need -- and you need to rephrase

21   the question and -- because I think your question just said,

22   "Well, what burden does this impose?"

23            Well, these are all burdens.

24            MR. MURRAY:  I appreciate that, Your Honor.  Let me

25   reframe the question.

1            THE COURT:  All right.  Go ahead.

2      BY MR. MURRAY:

3      Q    Can you tell --

4            THE COURT:  So I'll sustain the objection to that

5      question.

6      BY MR. MURRAY:

7      Q    Can you tell the Court what problems your members would

8      encounter in complying with those requirements of the statute,

9      those members of yours who produce sexually --

10           THE COURT:  All right.  Now --

11     BY MR. MURRAY:

12     Q    -- explicit material?

13           THE COURT:  Now, that -- now this -- this may

14     require some foundation.  So I'd like to know whether the

15     witness himself has ever complied or attempted to comply with

16     this because he produced sexually explicit or what -- what's

17     the basis of what knowledge he has that would allow him to

18     answer the question.

19           Can you see if you can lay a foundation.

20           MR. MURRAY:  Sure, I can --.

21     BY MR. MURRAY:

22     Q    You, yourself, have not had to comply with this statute,

23     sir.

24     A    I have not.

25     Q    Okay.  Are you familiar, however, with the way

1    photographers of all genre run their businesses and keep

2    records?

3    A    I am.  I think that's the important issue here, Your

4    Honor.

5    BY THE COURT:

6    Q    Okay.  Well, I'll allow him to testify, based on his

7    personal experience as a photographer on what records

8    photographers usually keep or what you kept as a photographer.

9         But this is not an invitation for you to give an opinion

10   about what's happening to other photographers.  Do you

11   understand?

12   A    I understand.

13   Q    All right.  So based on your own personal experience as a

14   photographer.

15   A    So just as a little background, you know, along came the

16   digital revolution, and everything was supposed to be better,

17   faster and cheaper for photographers.

18   Q    Right, and then Kodak went down in flames.

19   A    Kodak went down in flames.

20   Q    Right.

21   A    And some other people came up, but -- but what's happened

22   is from a photographer's standpoint is that there have been

23   significant burdens imposed upon photographers from a

24   workflow, archiving and -- and management standard that didn't

25   exist prior to the digital revolution.

Douglas - The Court                                    29

1        And so now photographers must keep redundant copies of

2    files in multiple locations in order -- in case one hard drive

3    fails, they've got another hard drive somewhere else, or if

4    there's a fire.

5        They also need to figure out ways to -- just to store and

6    manage and archive all of these images.

7        When a photographer, a commercial photographer, goes out,

8    especially today when they're not limited by the length of a

9    roll of film, literally hundreds or thousands of images can be

10   created on any given assignment, regardless of the subject

11   material.  So there's an enormous burden after the fact in

12   dealing with those, in cataloging them in literally managing

13   that -- that content.

14       So as it -- now -- so can I relate to the statute or not,

15   Your Honor?

16   Q   Well, you can answer the question after you've -- if you

17   want to relate to the -- if you think relating to the statute

18   is appropriate, you can do so.

19   A   Well, I believe that having to establish a separate

20   database to cross reference and manage all of these images and

21   to have those labeled, I don't even know how in fact -- having

22   to maintain copies of them, getting aliases and former names.

23       That's not something that a photographer would routinely

24   acquire in the -- in the course of his job or as a -- as a

25   professional in getting a release from someone, you would have

1    them sign the release in their name.  You wouldn't be doing a

2    search for any other names they --

3    Q    Well --

4    A    -- might have.

5    Q    May I ask just a question.  But you started your answer

6    by drawing a distinction between film as a --

7    A    Uh-huh.

8    Q    -- as how photographers used -- have -- used to.

9    A    Right.

10   Q    You'd have film, and you'd either have a negative or a

11   print, right?

12   A    Correct.

13   Q    Those were the two -- only two options.

14   A    Right.

15   Q    Correct?  All right.  Now with digital photography you

16   have a digital image which --

17   A    Digital file.

18   Q    -- you can keep in -- in a storage disk, you can keep on

19   a camera up to a certain quantity, correct, and if you -- if

20   you use up all the media in the camera, then you have to

21   transfer it to a disk or some kind of digital storage,

22   correct?

23   A    Correct.

24   Q    All right.  Now, so are you saying, you know, when you

25   say you -- you want to talk about the statute, is the burden

1  of the statute different for film than it is for digital

2  photography, or is it the same?  I'm just asking you.

3  A    I would say that --

4  Q    I'm just curious.

5  A    Well, first of all --

6  Q    I don't know.

7  A    -- just about -- I mean from the professional side, Your

8  Honor, almost everyone, with few exceptions, is working

9  digitally, and -- and, again, a commercial photographer would

10 not store images in the disk on his camera for any further

11 length of time that he had to.

12     The -- the name of the game for the professional is to

13 get them out of the camera, into multiple storage, redundant

14 storage devices so that there's no opportunity then for file

15 corruption or loss of -- of data.

16     So you want to move that information out and -- and get

17 it into a, again, a redundant form.

18     On the film side I guess I point out the difference

19 between film and digital only because when I -- when I -- for

20 most of my career my job ended at the delivery of a

21 transparency, primarily, to my client.

22     I didn't do the print files.  I didn't do the output

23 files.  I didn't do color correction.  I didn't do any of that

24 post-production work as a photographer.  There were other

25 entities that did all that.

1    Today photographers are expected to do all of that work.

2    So not only do they create the image, they retouch the image,

3    they create the print, the output files for the printer, and

4    they then have to archive those images, and according to the

5    Library of Congress, every five to six years you have to

6    migrate your files to new storage media because in that amount

7    of time whatever you've had them on is now becoming, you know,

8    old news and -- and not viable.

9    Q    All right.  Now, let me ask you this question, if I may.

10   Let's -- I'm putting aside sexually explicit material.  Let's

11   say -- and you mentioned before that some photographers

12   take -- take fashion photos.

13   A    Uh-huh.

14   Q    All right.  And they -- if they are -- the subjects could

15   be movie stars, is that correct, where they could do models

16   posing in new dresses that are, you know, showcased

17   semiannually and --

18   A    Yeah.

19   Q    Now, if a photographer was doing that kind of work, the

20   photographer would mostly want to keep a record of the name of

21   the movie star or of the fashion model or of the designer, is

22   that correct or not?

23   A    He would identify those files in some manner, and whether

24   it would be identified as the subject or the job, in other

25   words, whether it would be Voque magazine, issue May,

Douglas - The Court                                  33

1    something or another or whether it would be Christie

2    Turlington (phonetic), da, da, da, I guess would be up to

3    the -- to the photographer.

4          I wouldn't -- I wouldn't argue that it would be good to

5    know the -- the name of the subject in the images.

6    Q    And, once again, staying away from this topic, but

7    let's -- talking about copyright laws for just a minute --

8    A    Uh-huh.

9    Q    -- sometimes a photographer will take a picture of

10   something that's protected by a copyright, is that right,

11   or --

12   A    Are we talking about --

13   Q    -- trade -- trade dress --

14   A    Are we talking about trade dress?

15   Q    Yes, trade dress.

16   A    Okay.

17   Q    Is that right?

18   A    So in that instance doesn't the photographer have to be

19   careful about the use of a -- of a photograph that depicts

20   something that's protected by trade dress?

21   A    The -- the issue arises, Your Honor, in the use, not the

22   taking.  So the photographer is free to --

23   Q    Agree.  Agreed, yes.

24   A    -- take the image.

25   Q    Okay.

1    A    And so the -- any -- again, I'm not a lawyer, but my

2    understanding is --

3    Q    Well --

4    A    -- that any issue that would arise would come from the

5    potential use --

6    Q    Okay.  But --

7    A    -- and how that might be used.

8    Q    -- just -- but for that reason doesn't the photographer

9    want to have records?  Because -- let me just give you an

10   example.

11       If a photographer, say, is invited to the private studio

12   of a designer and the designer says, "I'd like you to take

13   pictures of my new line of dresses, and I want to look at the

14   photographs.  They're not for publicity," okay?

15   A    Uh-huh.

16   Q    Would you agree that the photographer in that situation

17   is under a legal obligation not to disseminate those

18   photographs --

19   A    I would agree.

20   Q    -- if he was told they're for private use?  Is that

21   correct?

22   A    Correct.

23   Q    Now, on the other hand, if a designer is showing a dress,

24   a new dress, in the window of a department store, then -- then

25   anybody can come and look at it, and a photographer can take a

1    picture of that and could use it for what any -- any purpose

2    because there's been no privacy protection or no trade dress

3    protection?

4    A    I -- I guess.  In my thinking there could be a trademark

5    or -- or --

6    Q    Well, in -- in either or both of those situations would

7    the photographer in those situations want to keep a record of

8    the name of a designer who designed this dress?

9    A    He'd want to know, Your Honor, if he was free to make

10   additional use of that image.

11   Q    Okay.  Fine.  And that would pertain, whether it was

12   still or digital, correct?

13   A    Correct.

14   Q    All right.

15            THE COURT:  I'm sorry.  I just wanted to get his

16   views on those issues.  Thank you.

17   BY MR. MURRAY:

18   Q    And in terms of the differences between film and digital,

19   as between the two of them, when you go out on a photo shoot,

20   which version do you create a greater number of images?

21   A    Certainly under digital, or the more likely under digital

22   than -- than film simply because -- I mean when I would go out

23   to photograph trucks, I was limited by the number of four by

24   five holders I could carry and load in advance.  They held

25   sheet film, so, you know, I had maybe 50 holders, so that gave

1    me 100 sheets of film; otherwise, you're limited -- you are

2    limited by the, again, amount of actual, physical material.

3         Given the size of storage cards and -- and their volume,

4    it's a lot easier to carry an extraordinary amount of storage

5    space for digital material.

6    Q    And so as an example you might take how many digital

7    photos on a particular shoot for a subject?

8    A    Anywhere from hundreds to thousands --

9    Q    Now --

10   A    -- depending on the length of the day.

11   Q    Now, that -- that brings me to another requirement of

12   the -- of the law, and that is that a producer of an image of

13   a sexually explicit nature has to affix to every copy of the

14   image a statement describing the location of the records

15   required to be maintained.

16        My question is -- you just described how you might go out

17   and shoot 1,000 images of a particular person, whether they're

18   sexually explicit images or not, doesn't matter.

19             MS. WYER:  Objection.

20   BY MR. MURRAY:

21   Q    It's the same thing.

22             MS. WYER:  Objection.

23             THE COURT:  Let him finish the question.

24   BY MR. MURRAY:

25   Q    If you had to put a label on each one of those thousand

1    images of the kind I described, how would you do that?

2             THE COURT:  Right.  Now you --

3             MS. WYER:  Objection.

4             THE COURT:  -- object -- what?

5             MS. WYER:  Objection; leading question and

6    mischaracterizing the --

7             THE COURT:  Well, it's not leading.

8        The problem I have with the question, Mr. Murray, is

9    that this witness has not ever taken sexually explicit photos.

10   He said he doesn't do that.  So the only way he can know the

11   answer to this is what he's been told by members of his

12   association, and for that reason it seems to me it's not based

13   on personal knowledge, but hearsay.

14            MR. MURRAY:  Well, let me see if I can lay a --

15            THE COURT:  Maybe -- if I might -- am I wrong?

16            MR. MURRAY:  Well, let me see if I can lay a better

17   foundation --

18            THE COURT:  Go ahead.

19            MR. MURRAY:  -- Your Honor.

20   BY MR. MURRAY:

21   Q    As a photographer of 32 years who has used both film and

22   digital, are you familiar with the technology that is

23   currently available?

24   A    I am.

25   Q    And are you familiar with how the technology works on

1   digital images?

2   A    I am.

3   Q    And are you familiar with what the image looks like when

4   it's produced by a digital image?

5   A    I am.

6   Q    And are you able to explain how one would be able to add

7   written information, if one wanted to, to a digital image,

8   based on your knowledge of the technology?

9   A    To my understanding, most of that information today would

10  appear in what -- what photographers refer to as metadata,

11  which is information that wouldn't be visible upon opening the

12  file.

13       So if you opened an image in PhotoShop or in Bridge or

14  Lightroom or some other digital asset management program, this

15  data would require you to take additional actions in order to

16  view.  It's in sub-menus, file -- file information.

17       In regard to having that particular information appear

18  either on the -- in the live area or as part of every file, it

19  would require reformatting those images, in effect, to add --

20  it would -- it would involve taking the image, in effect,

21  pasting it onto another page to give you room below the image

22  to add the file information that -- or the identifying

23  information that's being requested.

24       And I don't -- personally, I don't know how that's easily

25  done, and I would view it as a burden when I had to deal with

Douglas - The Court                                    39

1    thousands of images, and it was another job that I had to do.

2                THE COURT:  All right.  Well, can I -- I'm just --

3    let me just -- let me just ask --

4                MR. MURRAY:  Sure.

5                THE COURT:  -- about this 'cause I'm -- I want to be

6    sure I understand your testimony.

7    BY THE COURT:

8    Q    Let's go back to they hypo I -- hypothetical I gave

9    you --

10   A    Right.

11   Q    -- a few minutes ago about the photographer who's asked

12   to go to a designer studio, and let's just say -- let's just

13   pick Ralph Lauren out because it's a common American designer.

14   A    Uh-huh.

15   Q    Okay.  So Ralph Lauren wants you to come and take

16   photographs of a line of dresses that he's thinking about for

17   next year.

18        You would agree -- and he wants you to take pictures of

19   those, but they're for his own personal use, and he makes that

20   clear to you, right?

21   A    Correct.

22   Q    And so you would agree that you need to protect those

23   photographs from being publicly disseminated, isn't that

24   right?

25   A    Right.

1    Q    So you would have to -- so if you used your digital

2    camera to take those pictures, you would want to label them in

3    a way, say, "Ralph Lauren, Private," correct, or something

4    like that because -- and then -- but you also got an

5    assignment from another --

6    A    Right.

7    Q    -- let's say pick Calvin Klein.    And Calvin Klein says,

8    "Look, my dresses are in the Lord & Taylor window.    I would

9    like you to take pictures of those so I can spread it around a

10   lot and show how great Lord & Taylor is showing my pictures."

11   Okay.

12       So let's assume that legally Calvin Klein doesn't have

13   any right to protect dissemination of that 'cause he wants it

14   disseminated.    Okay.

15   A    Right.

16   Q    So in the morning you go to Ralph Lauren, and you take

17   his pictures, and they're private, and in the afternoon you go

18   to Lord & Taylor and take Calvin Klein's pictures, but they

19   can be public.

20       Now, in your -- however you operate your digital storage

21   or your camera you've got to designate one versus the other,

22   isn't that correct?

23   A    And there is a way to do that.

24   Q    What -- how?

25   A    So in the metadata again --

Douglas - The Court                                    41

1    Q    Yes.

2    A    -- in the file info of those images you can create an

3    action that would allow you to put various comments.  You can

4    put the copyright status of them.

5         You can have a -- there's a comments field that you could

6    put those words that says that these images are not for public

7    display or these images are not for further use, and that can

8    be put into those files, but that's not information that

9    appears when you open up the image and view it.

10   Q    All right.  You --

11   A    You don't see that.

12   Q    If you -- if you were to print -- if you were to show the

13   image on -- on the back of a camera, you wouldn't see the

14   metadata.

15   A    You would not see that.  You wouldn't see it if you

16   opened it up on your monitor.

17   Q    Yes, right.

18   A    You -- but -- but in the trade --

19   Q    Yes.

20   A    -- okay, so it's known in th trade that if you're looking

21   for the copyright status of permissions related to an image,

22   then you would go to this file info.

23   Q    Okay.

24   A    And that's just trade practice.

25   Q    All right.

1           THE COURT:  Go ahead.

2    BY MR. MURRAY:

3    Q    Let's take a look back at Plaintiff's Exhibit 130, for

4    example.

5         We see you have a photograph on the second page of a

6    woman, and there is no -- there's nothing on the -- on the

7    image, for example, that would lead to be a 2257 label, but

8    there's nothing else on the image that actually explains

9    anything about how the photograph was taken, correct?

10   A    No.  The only thing that's there is a copyright notice

11   down in the lower left which is difficult to see, but --

12   Q    Now, if you were required on a photograph like this to

13   have on the photograph a written statement that the records

14   maintained by some lawful requirement are located at 27 Broad

15   Street, Philadelphia, Pennsylvania, where would you put that

16   on that photograph?

17           MS. WYER:  Objection; leading.

18           THE COURT:  It's not leading.  Overruled.

19           THE WITNESS:  Well, again, the issue is -- I'm not

20   familiar enough with the statute to understand whether or not

21   that wording would have to appear in what I would call the

22   live area of the image, which, to me, live area is the actual

23   image area or whether that would have to appear in a border

24   underneath the image.

25           But I mean that's -- it's going to go one place or

1    the other if that's where it has to appear, and I can't

2    imagine that Tamron or any other advertiser would not -- I

3    guess that's not the issue here, but they certainly -- it's

4    hard enough to get a photo credit.

5              MS. WYER:  Objection.

6              THE COURT:  Let him finish.

7              THE WITNESS:  To get any other information attached

8    to an image is -- is a struggle.

9    BY MR. MURRAY:

10   Q    Now -- and if this was a digital image in one of

11   thousands of digital images, how would one put some writing on

12   each image so that it can -- can be -- and the word under the

13   law is "prominently displayed."

14        How would you affix a written statement on the thousands

15   of digital images like this so that it would be prominently

16   displayed on each image?

17   A    Well, again, beyond the -- those fields that aren't

18   evident upon opening the image, personally I -- I don't know

19   how you would accomplish that task.

20   Q    Okay.  Let me ask you then about another aspect of the

21   law.

22        You explained, for example, that you worked -- you worked

23   out of your home?

24   A    I did.

25   Q    And did you ever leave your home?

1   A     Frequently.

2   Q     Did you leave your home to do shoots?

3   A     I went for protracted periods for scouting, or I'd go out

4   for a week, week and a half or longer, and then I would be out

5   for upwards of two weeks or longer on -- those were primarily

6   truck shoots in either California or Florida.

7   Q     Okay.  And can you tell the Court whether with respect to

8   the ASMP members, do any of them work out of their homes, as

9   opposed to some studio?

10  A     Many of them do.  They're --

11              MS. WYER:  Objection; hearsay.

12              THE WITNESS:  -- sole proprietors --

13              THE COURT:  Overruled.

14              THE WITNESS:  -- sole proprietors working in one and

15  two-man shops frequently, and they work out of their home.

16              Some of them have small studios, but there's a mix.

17  BY MR. MURRAY:

18  Q     Okay.  Now, the 2257 and 2257(a) require the producers of

19  sexually explicit images to make their records available for

20  inspection by the Attorney General or his designee during

21  normal business hours, and if the producer does not maintain

22  at least 20 normal business hours per week, the producer must

23  provide notice to the inspecting agency of the hours during

24  which records will be available for inspection, which in no

25  case may be less than 20 hours per week.

Mopsik - Continued Direct (Mur)                    45

1      Now, just taking you as an example as a photographer, had

2  you taken a sexually explicit photograph in addition to the

3  trucks that you were photographing, would you be in a position

4  to comply with that requirement.

5           THE COURT:  Well, Mr. Murray --

6           MS. WYER:  Objection.

7           THE COURT:  -- once again, this is just a

8  hypothetical.  He doesn't do this kind of work, and so he

9  doesn't have any personal experience.

10           I just -- I assume you're going to have other

11  witnesses who could testify to this from their own experience.

12           So I -- I don't think this is probative, be honest

13  with you.

14           MR. MURRAY:  That's all I have then, Your Honor,

15  thank you --

16           THE COURT:  All right.  Cross examine.

17           MR. MURRAY:  -- other than I would offer into

18  evidence Plaintiff's Exhibit 130.

19           THE COURT:  I'll admit it.

20           MR. MURRAY:  Thank you.

21           THE COURT:  Now -- by the way, counsel need to keep

22  track of their exhibits and which ones are admitted into

23  evidence.  Okay.  That's not my job.  So please keep a record.

24           That -- that exhibit will be admitted.

25           I'm happy to admit things as it goes along, or if

1    you want to keep a record what's used and then at the end of

2    your case say, "I move for the exhibit of -- admission of all

3    exhibits used," that's -- that's fine, too.  But please keep a

4    record yourselves.  Thank you.

5              All right.  Ms. Wyer, any questions?

6              MS. WYER:  Yes, Your Honor.

7                         CROSS-EXAMINATION

8    BY MS. WYER:

9    Q    Mr. Mopsik.

10   A    Good morning.

11             THE COURT:  Right into the microphone.  Thank you.

12             MS. WYER:  Yes.

13   BY MS. WYER:

14   Q    You testified that ASMP is a trade association for

15   working photographers, correct?

16   A    Correct.

17   Q    By "working photographer" you mean a photographer that

18   makes money and essentially makes a living from that activity,

19   correct?

20   A    Our voting members make their living from the sale or

21   license of their images.

22   Q    And you also testified that most photographers today use

23   digital photography, correct?

24   A    I would say that's correct.

25   Q    And today someone who qualifies as a working photographer

1  may also be making motion photography, such as -- meaning

2  video, correct?

3  A    Correct.

4  Q    In fact, more and more still photographers are crossing

5  over into motion photography, correct?

6  A    My words.

7  Q    And some ASMP members are exclusively motion

8  photographers, correct?

9  A    No.

10  Q    I refer you to the -- your deposition.

11       Do you recall being deposed in this case on March 19,

12  2013?

13  A    I do.

14  Q    And you swore to tell the truth at that deposition.

15  A    Correct.

16  Q    And you did tell the truth, correct?

17  A    I did.  I have no recollection of saying that all ASMP

18  photographers did motion work exclusively.

19  Q    Some.  I didn't -- some ASMP photographers do most of

20  their work --

21  A    Some ASMP.

22  Q    -- exclusively --

23  A    I agree to that, yes.

24  Q    Okay.

25  A    I thought you had just said all or exclusively.

1    Q    You testified that ASMP members have to go through an

2    application process to become a member, correct?

3    A    General members.  They all go through a process.  For

4    some the process is more rigorous than others.

5    Q    But that process does not involve evaluating the quality

6    of the applicant's work, correct?

7    A    Correct.

8    Q    And the question of whether a photographer's work is

9    artistic would be too subjective for an application process,

10   correct?

11   A    We don't evaluate on a -- we don't evaluate the quality

12   of their work.

13   Q    So the factors that you consider in determining whether

14   to admit someone as a member are, as you mentioned, proof of

15   publication, correct?

16   A    Proof of publication as, again, the income requirement

17   for general members, that they make the majority of their

18   earned income, and that they have two members sponsors, two

19   general member sponsors if they're applying for general

20   membership.

21   Q    ASMP's primary focus is in helping photographers with

22   their business practices and in regard to their intellectual

23   property rights, correct?

24   A    Information, education and advocacy are our primary

25   focuses.

1    Q    Unless that activity involves intellectual property

2    rights, correct, and business practices?

3    A    I'd say a lot of it involves intellectual property, but

4    there's also a lot of information regarding licensing, model

5    releases, general business practices, marketing, but it's

6    primarily on the business side, not the artistic side.

7    Q    You have explained about how photographers use model

8    releases, correct?

9    A    Correct.

10   Q    And photographers use model releases for commercial

11   purposes to acquire actual property rights for the images that

12   they are making, correct?

13   A    Correct.

14   Q    In other words, the model releases his or her rights in

15   the image of himself to the photographer, correct?

16   A    Generally that's the preferred manner, to release to the

17   photographer.

18   Q    And ASMP's website provides advice on obtaining model

19   releases, correct?

20   A    Correct.

21   Q    ASMP's website explains that persons younger than 18 can

22   in certain circumstances sign their own model release,

23   correct?

24   A    Correct.

25   Q    Well, I would like to show you Exhibit 312.

1                   THE COURT:  D-312?

2                   MS. WYER:  Three -- Defendant's Exhibit 312.

3                   THE COURT:  Go ahead.

4    BY MS. WYER:

5    Q    And let's -- do you recognize this document?

6    A    To the extent that I can see it, it's fairly generic,

7    what I'm looking at right now.

8    Q    Can we go to the next page?

9    A    Okay.

10   Q    Do you -- this document is part of ASMP's model release

11   tutorial, correct?

12   A    Correct.

13   Q    On the website.  And this document, as a sample, is

14   ASMP's suggested several model release for adults, correct?

15   A    Correct.

16                  MS. WYER:  I move to admit Exhibit 312 into

17   evidence.

18                  THE COURT:  Want to admit it?

19                  MS. WYER:  Yes.

20                  THE COURT:  Yes, admitted.

21   BY MS. WYER:

22   Q    Photographers don't always use --

23                  THE COURT:  Sometimes Judges say you can't admit it

24   an exhibit until you're putting on your own case, but on the

25   assumption you're going to put the case on, I'll be happy to

1   admit things throughout the trial for both sides.  Okay.

2           Now, this is the bottom, though.  It says 3013.  You

3   see that?

4           MS. WYER:  That's -- just to -- just to explain our

5   page and exhibit numbering system, we have -- is there a way

6   to scroll to look at the first page?  We have an exhibit --

7           THE COURT:  That says 312.

8           MS. WYER:  -- label 312, and then we've also used

9   def's exhibits in our Bates stamp page numbering so the

10  numbers on the pages indicate.

11          THE COURT:  All right.  Thank you.

12  BY MS. WYER:

13  Q    So photographers don't always use model releases,

14  correct?

15  A    I guess there are some circumstances where there are not

16  model releases, yes.

17  Q    In particular -- and you might not expect a photographer

18  to use a model release when they are engaging in editorial

19  work, correct?

20  A    Correct.

21  Q    Or when they are engaging in photojournalistic-type work.

22  A    Yeah, where possible, though, again, some courts have

23  ruled that images used on the covers of publications, even

24  though they may be editorial in nature are in fact advertising

25  uses, and so, therefore, wherever possible we encourage

1    photographers to get releases.

2    A    But ASMP does not require its members to report to it

3    regarding the use of model releases, correct?

4    A    We're a trade association.  We have no force over our

5    members to require them to do anything.

6    Q    And ASMP does not conduct any inspections to ensure that

7    its members are using model releases.

8    A    Correct.

9    Q    Model releases do not typically contain the performer's

10   date of birth, correct?

11   A    I notice -- I don't believe ours does, no, but we have

12   a -- again, we have an adult release, we have a minor release.

13   We have a simplified adult release.

14   Q    And your adult release, as shown in Exhibit 312, does not

15   contain any blank or space to put a date of birth, correct?

16   A    I can't see the entire form, but my recollection is

17   you're correct.

18   Q    The last page that you looked at did not have such a

19   blank, correct, the previous one?

20   A    Correct.

21   Q    And this page also does not have any place --

22   A    Correct.

23   Q    -- to put date of birth, correct?

24        And the photographers using a model release do not always

25   check the photo -- a photo ID to verify that the model is a

1   certain age before filling out the release, correct?

2   A    I guess.  I -- I don't --

3          MR. MURRAY:  Your Honor, I'm going to object.  I

4   mean if we're going to be limited to --

5          THE COURT:  I'll sustain.

6          MR. MURRAY:  -- personal knowledge.

7          THE COURT:  I don't know how he would know that.

8          THE WITNESS:  Yeah, how would I know?

9   BY MS. WYER:

10  Q    So you do not know whether photographers check photo IDs

11  before having models fill out model releases.

12  A    My -- my members are professionals.  They check releases

13  when they -- they check IDs when they need to check IDs.

14  Q    In other words, photographers would rely on their own

15  judgment regarding whether to check a photo ID, correct?

16  A    I would say largely, yes, they would rely on their own

17  good judgment.

18  Q    ASMP does not require its members to check photo IDs,

19  correct?

20  A    Asked and answered.

21  Q    Correct?

22  A    Asked and answered.

23  Q    I don't --

24  A    You asked the question previously.

25          THE COURT:  She said you're correct.

1   BY MS. WYER:

2   Q    And it is not always possible to determine a person's age

3   by visual inspection correct?

4   A    Correct.

5   Q    In response to the Government's discovery request in this

6   case ASMP identified Barbara Alper as an ASMP member who

7   produces sexually explicit images, correct?

8   A    Correct.

9   Q    And Barbara Alper is a plaintiff in this case, correct?

10  A    Correct.

11  Q    ASMP also identified the photographer, Craig Morey, as

12  photographer -- as an ASMP member who produces sexually

13  specific images, correct?

14  A    Correct.

15  Q    And ASMP referred the Government to the website,

16  www.moreystudio.com, correct?

17  A    I -- yeah, I mean I -- I didn't do it, but I presume you

18  were directed there.

19  Q    Let me show you Exhibit 19.

20       THE COURT:  Is this D-19?

21       MS. WYER:  Exhibit 19.

22       THE COURT:  D.

23       MS. WYER:  Defendant's Exhibit 19, yes.

24  BY MS. WYER:

25  Q    And let's look at page two to three.

1    And looking at interrogatory five and the answer on the

2    next page, the answer includes the website

3    www.moreystudio.com, correct?

4    A    Correct.

5    Q    ASMP did not identify any other ASMP members as producers

6    of sexually explicit material, correct?

7    A    I really don't know.  My -- my counsel was the -- that

8    document you were just referencing was Victor Perlman's

9    responses, I believe, not mine, and, again, I -- I wouldn't

10   know.

11   Q    ASMP has a find a photographer search engine on its

12   website, correct?

13   A    Correct.

14   Q    And the search engine lists various categories of

15   photographer -- of photography specialty, such as aerial,

16   animals or children, correct?

17   A    Correct.

18   Q    It does not include any category such as erotic or

19   sexually explicit, correct?

20   A    Correct.

21   Q    And this is because people have not made a significant

22   number of requests for photographers in those categories,

23   correct?

24   A    Probably correct.  We try to keep the site focused on the

25   most requested specialties or -- or subjects by art directors

1  and clients.

2  Q    But it -- it -- it's possible that some producers of

3  sexually explicit depictions are ASMP members, as we've

4  discussed, correct?

5  A    Correct.

6  Q    And in fact ASMP members may create sexually explicit

7  depictions that are part of the adult entertainment industry,

8  correct?

9  A    Correct.

10  Q    Nothing prevents someone who produces adult films from

11  being an ASMP member, correct?

12  A    Correct.

13  Q    Going back to Craig Morey, ASMP provided the Government

14  with copies of a certain number of Mr. Morey's model releases

15  and photo IDs that he keeps as records, correct?

16  A    I believe so.

17  Q    And as we discussed earlier, Mr. Morey has a website that

18  ASMP identified, correct?

19  A    Correct.

20  Q    And let me show you Exhibit 31G.  Do you recognize this

21  image?

22  A    I did not look at every submission, but I'm -- I'm

23  familiar with Mr. Morey's work.

24  Q    This was from Mr. Morey's website, correct?

25  A    Well, I can't see the URL, but I -- there it is.  Got it.

1    Q    Mr. Morey's website is actually a website where someone

2    can join for a fee and then gain access to what he calls

3    erotic photographs, correct?

4    A    Correct.

5    Q    And the website also has additional images created by Mr.

6    Morey that can be viewed for free, correct?

7    A    Correct.

8              MS. WYER:  The Government has marked for

9    identification Exhibits 31 and 32, all of which are from Mr.

10   Morey's website, and we move to admit those exhibits into

11   evidence.

12             THE COURT:  Any objection?

13             MR. MURRAY:  No objection, Your Honor.

14             THE COURT:  All right.  Admitted.

15   BY MS. WYER:

16   Q    You did not provide the Government with a copy of the

17   question that was sent out to ASMP members about whether they

18   create sexual images, correct?

19   A    I would refer to counsel.  I guess on advice of counsel

20   I -- did -- did we provide that or not?

21             THE COURT:  Well, what -- I don't understand the

22   question.

23             You -- is this a document request?

24             MS. WYER:  I asked him -- I asked Mr. Mopsik at his

25   deposition to produce this information.

1          THE COURT:  All right.  What did you ask him to

2    produce?

3    BY MS. WYER:

4    Q    I asked you at your deposition to produce the question

5    that was sent out that --.

6          MS. WYER:  He -- he testified regard -- he indicated

7    at the deposition for the first time that ASMP had done a

8    survey of its members and obtained the response that 400 --

9          THE COURT:  Right.  He got 400 responses.

10          MS. WYER:  And I asked Mr. Mopsik at that time to

11    produce a copy of that question that -- the survey that was

12    sent out.

13          THE COURT:  All right.  Well, do you know if your --

14    your organization or your -- your counsel produced the survey?

15          THE WITNESS:  I do not, Your Honor.

16          THE COURT:  Okay.

17    BY MS. WYER:

18    Q    And you do not know how the survey question was worded,

19    correct?

20    A    Specifically, no, I do not recall.

21    Q    You do not know exactly what kind of responses were

22    received.

23    A    Specifically, no.  I know that people indicated whether

24    or not they were involved in sexually explicit work.

25    Q    You do not know how that was defined, either in the

1   survey or in the response.

2   A    Correct.

3   Q    Other than the information that ASMP has provided about

4   Mr. Morey, you cannot provide the Court with any information

5   about the ages of individuals appearing in sexually explicit

6   work created by ASMP members, correct?

7   A    Correct.

8   Q    You have no way of requiring your members to identify the

9   ages of individuals appearing in sexually explicit work.

10  A    Correct.

11  Q    You have testified that ASMP members are burdened by the

12  requirements of 2257, correct?

13       But you -- you cannot identi- --

14  A    I would say to you that most of my members, quite

15  frankly, are wholly ignorant of the requirements of this

16  statute.

17  Q    So you cannot identify the number of ASMP members who

18  keep 2257 records.

19  A    Correct.

20  Q    You cannot identify the number of ASMP members who might

21  keep 2257 records in their home or use a third party custodian

22  to keep their records, correct?

23  A    Correct.

24  Q    You identified various categories of photography where

25  someone might create sexually explicit depictions, correct?

Mopsik - Cross (Wye)                    60

1   A    Correct.

2   Q    The only photographer in the photojournalist category

3   that you identified is Jonathan Targonik (phonetic), correct?

4   A    Torgovnik, correct.

5   Q    But that individual -- you aren't certain whether that he

6   actually creates images of sexually explicit content, correct?

7   A    Correct.

8   Q    In the editorial category you mentioned Tony Ward,

9   correct?

10  A    I did.

11  Q    Tony Ward is not an ASMP member, correct?

12  A    Not currently, no.  He was for many years.  He now

13  teaches at University of Pennsylvania.

14  Q    You've not identified any -- any ASMP members --

15       THE COURT:  Ms. Wyer, you could go on at great

16  length about all the things he doesn't know, which would be

17  true of any human being in the world.

18       I mean I think your cross should relate to what he

19  said he did know on -- on direct, which is really -- should be

20  focal point of the cross.

21       I mean his direct, I think, was very limited, and --

22  and I'm sure he doesn't know a lot about other things 'cause

23  he's said over and over again he doesn't -- he never did

24  sexually explicit movies, and he doesn't have any personal

25  experience, and I sustained.

1        And I don't -- I don't think you want to open the

2   door to redirect about something he doesn't have any knowledge

3   about, but -- so I'd like you to confine your cross to what he

4   does know about.

5        MS. WYER:  Thank you, Your Honor.  I was just -- I

6   believe Mr. Mopsik had asserted -- made assertions that there

7   were ASMP members who took sexually explicit photographs in

8   these categories, and I wanted to --

9        THE COURT:  Well, he -- he, yeah, but he -- he

10  thinks there were, but he doesn't have any details, and I

11  sustained your objection to his going into the statute 'cause

12  he doesn't have any personal knowledge of it.

13       So I mean the same rule applies.  If -- I think his

14  cross should be limited to things he does have personal

15  knowledge about as established on direct, which -- I mean he

16  has a lot of experience, but in terms of what the subject

17  matter of this case is I think his knowledge is limited.

18       Go ahead.

19  BY MS. WYER:

20  Q    Going back to the exhibits 31 and 32, could you let me

21  show you Exhibit 31B?

22       Do you recognize this image?

23  A    Actually, I've not seen that image, but --

24  Q    But this an image from Craig Morey's website, correct, or

25  you can --

 1   A    I'll take you at your word.

 2            THE COURT:  Well, no.  The issue is -- have you ever

 3   seen this before?

 4            THE WITNESS:  I haven't.

 5            THE COURT:  All right.  I don't think you can

 6   examine a witness, and this is a general rule of evidence, on

 7   a document he's never seen before.

 8            MS. WYER:  Okay.

 9   BY MS. WYER:

10   Q    Let me show you Exhibit 31C.  Have you seen this before?

11   A    No, I haven't.

12   Q    And let me show you 57.  Have you seen this image before?

13   A    No.

14   Q    You also testified that Ned Rosen was a ASMP member who

15   creates sexually explicit images, correct?

16   A    Correct.

17   Q    Let me show you Exhibit 33.  Do you recognize this page?

18   A    Yeah, I did look through Rosen's work, yeah.

19   Q    So this is a page from Ned Rosen's website, correct?

20   A    Correct.

21   Q    Could we look through the next?  Do you recognize this?

22   A    No.  I didn't go further.  So I'm not familiar with this

23   page.

24   Q    Could we look at the next page?

25            THE COURT:  All right.  What's the question?

1            MS. WYER:  I wanted -- I move to admit Exhibit 33

2    into evidence.

3            THE COURT:  All right.  Any objection?

4            MR. MURRAY:  No.  No objection, Your Honor.

5            THE COURT:  All right.  Admitted.

6            But now, what's the question?

7            MS. WYER:  I wanted to establish that -- I wanted to

8    admit the images associated with ASMP members.

9            THE COURT:  Okay.  Next question.

10           MS. WYER:  No further questions.

11           THE COURT:  All right.  Redirect?

12           MR. MURRAY:  No, thank you, Your Honor.

13           THE COURT:  All right.  Thank you very much.

14           THE WITNESS:  Thank you, Your Honor.

15           THE COURT:  You're excused.

16           Next witness, please.

17           MR. MURRAY:  Your Honor, at this time the plaintiffs

18   would call Mr. Jeffrey Douglas.

19           JEFFREY DOUGLAS, PLAINTIFFS' WITNESS, SWORN

20           THE CLERK:  Please state your full name for the

21   record, spelling your last name.

22           THE WITNESS:  Jeffrey, J-E-F-F-R-E-Y, last name

23   Douglas, D as in dog, O-U-G-L-A-S.

24           THE CLERK:  Thank you.

25                         DIRECT EXAMINATION

1    BY MR. MURRAY:

2    Q    Where is your city of residence, Mr. Douglas?

3    A    Los Angeles, California.

4    Q    And what is your current occupation?

5    A    I'm a criminal defense attorney.

6    Q    And where do you practice?

7    A    In California, southern California, primarily, but in

8    California.

9    Q    And how long have you been a practicing attorney?

10   A    I was sworn in in December of 1982.

11   Q    And do you have any current position with the plaintiff

12   Free Speech Coalition?

13   A    Yes.  I'm the chair of the board of directors of the Free

14   Speech Coalition.

15   Q    And how long have you held that position?

16   A    Since, I believe, 1995 continuously, with one exception.

17   There was one year where I was not the chair of the board.

18   Q    I guess technically the -- the actual name is Free Speech

19   Coalition, Inc. is the formal name --

20   A    I believe that's correct.

21   Q    -- of the plaintiff.  Okay.

22        What's your educational background?

23   A    I received undergraduate degree, associates of -- I mean

24   a bachelor of arts from the University of California at

25   Berkeley with a degree in rhetoric, and I received a <u>juris</u>

1    doctor from UCLA.

2    Q    Okay.  And then what did you do after graduating from law

3    school?

4    A    I started working as a law student for a law firm that

5    primarily handled criminal defense.  One of the attorneys

6    there also represented the adult entertainment industry, and I

7    worked first as a law clerk and then as a lawyer for that

8    firm.

9    Q    Okay.  And so did you become involved in representing

10   persons involved in the production of sexually explicit

11   expression?

12   A    Yes, from the beginning of my employment there.

13   Q    And that would have -- so from 1982?

14   A    Yes, and, again, as a law clerk in 1981.

15   Q    Okay.  And -- and what types of matters did you handle

16   for those type of clients?

17   A    I -- my representation was from the perspective of a

18   criminal defense attorney, so involved compliance with

19   existing laws and risk assessment in the areas, like

20   obscenity, that lacked clear understandable rules.

21   Q    By the way, I notice, in case anyone else notices, that

22   you're missing a lens in your --

23   A    Yes, sir.

24   Q    -- left glasses.  So -- so that no one wonders why that

25   is, would you explain it to the Judge?

1   A    Yes.  This is not a fashion statement.  I had cataract

2   surgery recently, and it's the process for the eye to stop

3   swelling so that they can give me a prescription.  In the

4   meanwhile I just do without.

5            THE COURT:  All right.  Well, I wish you a speedy

6   recovery.

7            THE WITNESS:  Thank you very much.  I should note on

8   similar lines, I'm a diabetic, and I have glucose, continuous

9   glucose monitor and the pump that rarely, but occasionally,

10  make beeping noises.  It is not a page or a phone or anything

11  like that.

12           THE COURT:  All right.  Well, if you want a break at

13  any time, just say so.

14           THE WITNESS:  I appreciate it.  I don't anticipate

15  any of that occurring, but thank you.

16  BY MR. MURRAY:

17  Q    All right.  Now, since 1982 have you continued

18  representing clients in the adult entertainment industry?

19  A    Yes, continuously.

20  Q    And a broad spectrum?  I mean how would you describe the

21  practice?

22  A    Pretty much every aspect of the creation of prerecorded

23  material through the ultimate distribution to a -- consumers,

24  so production, distribution, retailing, wholesale, internet,

25  in every fashion.

1     I do not represent any live performance businesses, but

2  other than that I think I represent every aspect of the adult

3  entertainment industry.

4  Q    And does that include representation concerning 18 USC

5  Sections 2257 and 2257(a).

6  A    Yes.

7  Q    And does that include compliance issues raised by those

8  laws?

9  A    Yes.

10 Q    And how long have you been practicing in that area of

11 2257?

12 A    I was practicing law before it was enacted in 1988 so

13 since its enactment it has been a part of my obligation to be

14 familiar with it in order to advise my clients.

15 Q    Okay.  And have you developed some intimate familiarity

16 with 2257 over the years as a result of that?

17 A    Yes.

18 Q    And have you developed some familiarity with its

19 evolution and history and its various changes?

20 A    Yes, I have.

21 Q    Now, you indicated that you first became associated with

22 the plaintiff Free Speech Coalition in '94, I think you said?

23 Or '91.  I'm sorry.

24 A    Well, I -- the organization was formed in 1991, and I

25 performed a service, not as a director, but I was the --

Douglas - Direct (Mur)                                    68

1    received a grant to write a project to track and analyze

2    obscenity, trial level obscenity prosecutions throughout the

3    United States.

4            I was elected to the board, I believe, in 1995.  May have

5    been 1994.

6    Q    Okay.  And so when was Free Speech Coalition formed,

7    actually?

8    A    1991.

9    Q    And what was the original purpose of the organization?

10   A    It was always seen as a trade association.  Initially,

11   the focus was a response to a federal targeting of the

12   manufacturers of sexually explicit product in a sting

13   operation that was subsequently revealed to be Woodworm, but

14   it was the execution of the search warrants that announced the

15   existence of Operation Woodworm on -- the magnitude was 30

16   manufacturers that led to the formation of the organization.

17   Q    And what -- what kind of a -- was this a criminal

18   investigation?

19   A    Yes.  The federal government had previously engaged in

20   targeting of portions of the industry, and this was the third

21   of those kind of investigations in targeting.  The previous

22   ones had resulted in numerous scores of indictments, as would

23   be the case with Operation Woodworm.

24   Q    And so during the 1980s, before the option of 2257, what

25   was the relationship between the -- the Government and the

1    Justice Department and the clients that you represented in the

2    industry?

3    A    Starting with Attorney General Edwin Meese the Federal

4    Government declared a war on -- on pornography and the adult

5    entertainment industry.

6        So the -- the first major attack on the industry was a

7    massive conspiracy indictment known as Miporn, an abbreviation

8    of Miami Pornography, where approximately 50 --

9              MS. WYER:  Objection; relevance, Your Honor.

10              THE COURT:  Yes.  Well, I think it's general

11    background, but it's of limited value, I think, so -- I don't

12    think we need to go into this in great detail.

13              This is before the statute was enacted.

14              MR. MURRAY:  Right, Your Honor, but I think it'll

15    shed light on how the statute came into being and what -- and

16    how it evolved.

17              THE COURT:  Well, I think -- if he wants to testify

18    to that, that's fine, but he doesn't have to go into detail

19    about this case in Miami.

20              MS. WYER:  Your Honor, the -- how the statute came

21    into existence isn't relevant to any issue before the Court.

22              THE COURT:  I -- it's a -- I'm going to let him

23    introduce very brief testimony just as background.

24              But get to the -- ask him, you know, specifically,

25    what was -- in your view what was the facts that led to the

1  enactment of the statute?

2              THE WITNESS:  As part of this --

3              THE COURT:  Is that okay?  You want to ask it --

4              MR. MURRAY:  That's fine, Your Honor.

5              THE COURT:  All right.  Go ahead.  Thank you.  I

6  appreciate it.

7              THE WITNESS:  As part of this announced adversary

8  relationship with adult entertainment the -- the Government

9  engaged in widespread indictments with limited success.  Then

10  there was a presidential commission on the topic --

11  BY MR. MURRAY:

12  Q    Attorney -- wasn't it Attorney General's commission?

13  A    Yeah, I guess the -- it was -- the first was

14  presidential.  The second one was that Attorney General's

15  commission on -- on pornography, known more casually as the

16  Meese Commission, and in that report there were a number of

17  recommendations -- there were majority report, minority report

18  that a recommendation in the majority report was that people

19  recording sexually explicit images should have the burden of

20  proof to establish that all performers were of age.

21        That recommendation ultimately led to -- directly to the

22  enactment of 18 USC 2257.

23              MS. WYER:  Your Honor, just for the record, I think

24  this is beyond the scope of the remand.

25              THE COURT:  Well, you move to strike?

1          MS. WYER:  Yes.

2          THE COURT:  All right.  Overruled.

3    BY MR. MURRAY:

4    Q    And then did the -- when did the first Act that -- when

5    was it first passed by Congress?

6    A    In 1988 it was -- 18 USC 2257 was codified in a rather

7    different version than currently exists.

8    Q    And was it enforced initially?

9    A    No.  Through -- there was a -- a challenge.  The lead

10   plaintiff was the American Library Association challenging the

11   constitutionality of the -- of the text of 2257.  In that --

12          MS. WYER:  Your Honor, lack of foundation.

13          THE COURT:  Yeah, this is -- I think this is all in

14   the prior briefing of this case.

15          MR. MURRAY:  Well, Your Honor, one thing that --

16          THE COURT:  I mean I'll let you, you know, he -- he

17   obviously has some expertise here, but if you -- I think we

18   can just bring out his conclusions, and then if we need

19   further detail, we can see what it is.

20          MR. MURRAY:  Well, let me ask --

21          THE COURT:  I don't want to preclude you from laying

22   a -- setting forth the background, but I think it should be

23   brief because the issue is the language of the statute, not

24   the background.

25          MR. MURRAY:  Yes, Your Honor.

1   BY MR. MURRAY:

2   Q     Mr. Douglas, I think the point that I'm trying --

3           THE COURT:   I mean -- and -- but under the remand I

4   think you're allowed to introduce evidence on what happened

5   after the statute, but I see very limited value of what

6   happened before the statute.

7   BY MR. MURRAY:

8   Q     What I'm wanting to ask you, Mr. Douglas, is can you tell

9   the Court when 2257 actually became enforced?

10  A     It -- it became enforceable in July 3, 1995 when two sets

11  of litigation finally came to a conclusion.

12          The first resulted in the statute being struck down as

13  unconstitutional because it created a rebutable presumption

14  material was child pornography, then Congress enacted what

15  they characterized as a restoration act or a saving act where

16  they eliminated the rebutable presumption, but for the first

17  time created criminal liability for not having the records

18  because of its original version.   There was no criminal

19  liability for having such records.

20          And in the course of a series of agreements with the

21  Government July 3, 1995 was agreed to as being the -- the

22  first date whereby an obligation was created to -- to have --

23  to create and maintain records.

24  Q     Okay.   What is the current purpose of the Free Speech

25  Coalition that you're the chairman of?

1    A    We are a trade association for people who make their

2    living in adult entertainment.

3         So there's an emphasis on education, on unity, on

4    lobbying, on public relations and, as our mission statement

5    says, as a last resort, litigation.

6    Q    And how has the organization evolved over the years that

7    you've been the chairman?

8    A    Well, not unlike the -- the previous witness, there's a

9    particular challenge in having a trade association made up of

10   people who are extraordinarily independent, and the idea of a

11   trade association of pornographers is a particularly

12   challenging one since groupthink and -- and joinder is not at

13   the heart of the -- the culture of creating pornography, but

14   the goal is to unite them.

15        And so over the years we provided increasing number of

16   service -- of services.  We've been increasingly relevant so

17   our membership has expanded sufficiently that we can now have

18   professional staff.

19        For instance, for the first eight years or more of my

20   involvement the budget was microscopic, and the only staff

21   person we had was an administrative person to essentially send

22   out invoices.

23             Now we are on our third or, depending how you count

24   it, fourth executor director.  She's now the chief executive

25   officer, and we are able to provide substantially greater

1    services.

2            THE COURT:  Just want to -- okay.  Go ahead.  Go

3    ahead.  Keep going.

4    BY MR. MURRAY:

5    Q    And so what kind of activities has Free Speech Coalition

6    been involved in in the last several years?

7    A    We lobby regularly in California and in Washington, D.C.

8    and in other states where issues arise intermittently.  We

9    provide educational services.  We coordinate the testing

10   protocol for blood-borne pathogens.

11        We, as I said, provide educational services by creating

12   email communication with as -- our members to advise them of

13   current news or issues of importance.

14        We provide a clearinghouse for information necessary to

15   deal with the kinds of problems that everyone in the media has

16   to deal with currently, intellectual property issues,

17   including, you know, so-called patent -- copyright controls, a

18   wide range of issues that -- that our members need.

19   Q    And what is your role as chairman of the board?

20   A    Of course, to chair our board of directors meetings which

21   occurs -- which occur five times a year, to participate in

22   committee meetings that are -- that are issue-based and to

23   help set the policies which the executive director and chief

24   executive officer execute.

25   Q    And approximately how many members are there?

1    A     About 800.

2    Q     And what categories of -- not categories of members, but

3    what kinds of activities are the various members involved in?

4    A     In every aspect of the creation of the material, that is,

5    writers, technicians, like camera people, lighting, sound, the

6    creative side, the photographers, the directors, the

7    producers, everyone involved in the creation of prerecorded

8    sexually explicit material, creators of nonrecorded, that is,

9    live distribution, and then everyone that sells, either on a

10   wholesale level or retail level, those materials down further

11   in the stream of commerce.

12   Q     Okay.  Are you a member yourself?

13   A     I am.  We have a lawyer category.

14   Q     And what historically has been Free Speech Coalition's

15   position on child pornography?

16   A     We are opposed to it, absolutely, as reflects our

17   members' very strongly held beliefs.

18   Q     And what is the collective view of your membership on

19   child pornography?

20   A     The adult industry --

21               MS. WYER:  Objection, Your Honor; hearsay.

22               THE COURT:  Overruled.

23               THE WITNESS:  The adult industry has always

24   expressed strong hostility towards child pornography as being

25   immoral and have -- we have encouraged the enforcement of laws

1  against the use of minors.

2          The essence of what we refer to as adult

3  entertainment is it's material that's created by adults for

4  adults.

5  BY MR. MURRAY:

6  Q    And what activities, if any, have been engaged in by Free

7  Speech Coalition to assist in the eradication of child

8  pornography?

9  A    The -- since child pornography does not arise from within

10 the adult entertainment industry and historically has not done

11 so, our efforts to -- to detect and deter child pornography

12 have been support of an organization that is separate from

13 Free Speech Coalition, the -- it's known as, get this right,

14 Associated Sites Advocating Child Protection.

15         It once had a slightly different name in it that was

16 specifically against child pornography, but the idea is to --

17 if there is -- if individuals believe that they are observing

18 images of minors, that there's a -- a method to report that to

19 encourage the -- the reporting and detection and to provide

20 a -- sort of an endorsement that the highest practices are

21 followed to prevent child pornography's distribution.

22         In the past the Free Speech Coalition has offered and

23 provided a cash reward for the detection and prosecution,

24 successful prosecution, of child pornography.

25 Q    Now, you indicated that you've been representing the

1   industry since 1982, is that correct?

2   A     Yes.

3   Q     So that's since before 2257 --

4   A     Yes.

5   Q     -- correct?  What was the industry's position on child

6   pornography back before 2257?

7   A     As long as I've been involved in representing the adult

8   industry, the adult industry has -- the members of the adult

9   industry have been opposed to child pornography, and within

10  the industry it has always been the industry standard, again,

11  long predating 2057 [sic] to check identification of those

12  models that were unfamiliar to the producers to confirm that

13  they were of age.

14        In other words, if a -- prior to 2257 if a performer had

15  performed a dozen times or a hundred times, they would not

16  seek the redundancy of checking the ID on the 101st time, but

17  when a model was new to a producer, the first thing that they

18  did was they would check the ID.  Most of the time pre-2257

19  they would record that also as part of the model release

20  process.

21        The model releases in their -- when I first came into the

22  industry in a rather unsophisticated form, but, nevertheless,

23  if was common, if not universal to have a -- well, it was

24  universal to have some statement by the model that they were

25  of age in the model release.

1   Q    Now, over the years -- some 30 years you've been

2   practicing in that area of law?

3   A    Yes.

4   Q    And how would you -- how many instances, approximately,

5   would you say over that period of time did it -- did it emerge

6   publicly that an underage performer had appeared in an adult

7   film?

8            MS. WYER:  Objection; hearsay.

9            THE COURT:  Well, do you have personal knowledge

10  about this?

11           THE WITNESS:  I have personal knowledge that --

12  well, whenever there was a report or rumor that someone

13  underage was in the industry, even prior to my participation

14  in the Free Speech Coalition, I would be actively involved in

15  the confirmation of the existence, of the nonexistence of

16  identification.  I would be consulted by clients and other

17  lawyers.

18           So while I wasn't there when the performer was born

19  so I wouldn't have personal knowledge of their age --

20           THE COURT:  Right.

21           THE WITNESS:  -- other than that, I have been

22  involved in every allegation, as far as I know, of an underage

23  performer by being shown ID or being referred to documents.

24  So that's --

25           THE COURT:  All right.

1              THE WITNESS:  I do believe I have personal

2      knowledge.

3              THE COURT:  I'll overrule the objection.

4              Limit it to your own personal knowledge.

5              You want to rephrase the question in terms of what

6      he personally has done.

7      BY MR. MURRAY:

8      Q    How many instances are you aware of over the years where

9      an allegation was made that an underage performer managed to

10     appear in an adult film?

11     A    Since 1986 when --

12             THE COURT:  Wait, wait.  The question's a little

13     confusing to me.

14             I think it ought to be separated as to what personal

15     experience he has had where the allegation's been made and

16     then personal experience he may have in determining whether

17     it's true or not.  The question is --

18             MR. MURRAY:  Yes.

19             THE COURT:  -- sort of mixes the two up.  I'll

20     sustain it but rephrase it, please.

21             MR. MURRAY:  All right.

22     BY MR. MURRAY:

23     Q    Tell the Court what experience you have personally with

24     respect to the question of whether underage performers have

25     appeared in an adult film.

Douglas - Direct (Mur)                    80

1   A      In 1986 a very popular performer, who worked under the

2   name of Traci Lords, was determined to have modeled for about

3   two and a half years, that is, since she was 15, underage.  It

4   was discovered just when she turned 18.

5       A -- at that point the -- it became headline news, and

6   there were allegations that there were another five performers

7   that were underage, and I participated, along with many of my

8   colleagues, in trying to ascertain to what extent these

9   allegations were true.

10      It became true that the woman performing under the name

11  of Traci Lords had acquired a valid -- had fraudulently

12  acquired valid identification which she brought to the State

13  of California and received official state documents that,

14  again, were valid but fraudulent.

15      The three other names emerged --

16          THE COURT:  Well, it -- it's hard to -- how could

17  they be fraudulent and also valid?

18          THE WITNESS:  That -- well, it -- that is, it was a

19  genuine California Department of Motor Vehicles issued ID.

20          THE COURT:  Okay.  So was -- I see.  All right.

21          THE WITNESS:  But she gave false information to

22  them --

23          THE COURT:  Okay.

24          THE WITNESS:  -- which is why the issued it.

25          THE COURT:  All right.  Thank you.

1          THE WITNESS:  The -- of the other names that emerged

2     shortly after the Traci Lords incident, one of them was

3     established to have performed underage.  Three others -- the

4     documentation that I saw and by by consensus amongst law

5     enforcement and other lawyers were that those other performers

6     were in fact of age.

7          THE COURT:  When you say "of age," you mean 18 or

8     over.

9          THE WITNESS:  They were 18.

10         THE COURT:  Okay.

11         THE WITNESS:  Or older.

12         Since that initial burst, I can think of four other

13    occasions where performers were alleged to be underage.  In

14    all of those occasions they, again, had produced what was

15    real, not forged, identification but acquired improperly,

16    either by using someone else's birth certificate or taking an

17    older sibling's identification.

18         Of those four at least one is still quite

19    controversial, that is, the -- it is unclear whether or not

20    the person performed underage or not.

21    BY MR. MURRAY:

22    Q    Now --so with respect to that handful that you've

23    described would the existence of 2257 have prevented those

24    instances?

25         MS. WYER:  Objection.

1          THE COURT:  Sustained.

2          MS. WYER:  Calls for speculation.

3    BY MR. MURRAY:

4    Q    Now, one question that the -- that the Court asked in

5    a -- in this case in a summary judgment order is whether

6    producers would readily hire mature-looking individuals,

7    producers of adult material, below the age 18 if there were no

8    recordkeeping requirement.

9          Can you answer that question, based on your extensive

10   knowledge and involvement with the industry?

11   A    Forcefully and with no doubt in my mind whatsoever it

12   would never happen.  The -- the producers have no incentive to

13   do that, have enormous disincentives to do that.

14         If 2257 were to disappear tomorrow, no sane producer

15   would knowingly use a minor.

16   Q    Why not?

17   A    It's, again, widely regarded as being immoral and wrong.

18   In addition, there are severe criminal sanctions, and the

19   consequences of inadvertently allowing a minor to be in a film

20   are absolutely devastating because the materials have to be

21   recalled and destroyed.

22         The process of recalling when it's contraband is -- is an

23   unresolvable problem.  If I have -- if, unbeknownst to me a --

24   a 17-year old appears in a film that I've produced, once I'm

25   made aware of it, I have to notify everyone that I sold it to

1   that such a thing exists.

2        They're not allowed to ship it.  They have to simply

3   destroy it, assuming that there's permission from law

4   enforcement to destroy what might be a -- a criminal

5   artifact -- evidence.

6        And so the producer has to give credit -- the seller has

7   to give credit to everyone who bought it from them, whether or

8   not that material has been sold, and there aren't necessarily

9   strong records as to how many units there are.

10        So a distributor or a producer may end up paying --

11   reimbursing customers significant amounts of -- well, they

12   will be necessarily significant amounts of money, but they may

13   be paying them for material that the never even received --

14   that they never purchased.

15        The consequences within the industry of an event like

16   that are enormous.  It -- it eliminates goodwill because of

17   all of the bad publicity and the cost.  Competitors will jump

18   on -- on that is a -- is a possibility.  It's just -- it's a

19   disaster, and there's no measurable benefit because if the --

20   the performer is assumed to be of age, there's no additional

21   benefit that the fact that they are underage, even the -- the

22   model release is not valid.

23        That is, if I knowingly use a 17-year old -- and, again,

24   apart from the criminal side, I can't legally distribute the

25   material once the person is known to be of age because I don't

1    have authorization to exploit their image.

2         There's -- there's -- as I said, there's no incentive.

3    There's enormous disincentives.  I mean it's 15 years'

4    mandatory minimum to knowingly use a minor.

5              But, again, even apart from that --

6              THE COURT:  Is it in California?

7              THE WITNESS:  No, that's under federal law.

8              THE COURT:  Okay.

9              THE WITNESS:  So -- and, again, there's no --

10   there's no economic advantage if -- if, you know, I thought

11   that this particular model was going to be a life-changing

12   person, and she showed up or he showed up at 17 years and --

13   and eight months, I might want to pay them $10,000 not to go

14   to anyone else and to come to me first once they turn 18, but

15   it -- it would be utterly mindless to use them before that

16   age.

17   BY MR. MURRAY:

18   Q    Now, Mr. Douglas, let's talk then about 2257 and 2257(a)

19   and the -- and the regulations.  And you've been involved as

20   an attorney in compliance issues with those statutes for how

21   many years?

22   A    Since 1988.

23   Q    And as chairman of the board of Free Speech Coalition

24   have you been involved in issues of compliance with respect to

25   2257?

Douglas - Direct (Mur)                              85

1  A    Because compliance with 2257 has always been such a

2  struggle from its inception, Free Speech Coalition has put on

3  seminars or participated in trade shows where within the trade

4  show there will be a -- a seminar sometimes focusing

5  particularly on 2257, often on something else.

6       But there's a question and answer period and there --

7  whether it is I or any other lawyer that we put up there, if

8  there's an opportunity to ask a lawyer a question, there'll be

9  questions about 2257.

10 Q    Okay.  Now -- and so are you familiar personally as a

11 result of that experience and interaction with the members and

12 interaction with your clients and advising clients and

13 everything else that you do, are you familiar with some of the

14 more problematic situations that result from attempts to

15 comply with 2257 and 2257(a)?

16 A    Yes, that has been a substantial part of my professional

17 life from the start.

18 Q    And can you tell the Court what some of the major

19 problems are in attempting to comply with the requirements of

20 those statutes and regulations?

21      MS. WYER:  Objection, Your Honor.  The -- Mr.

22 Douglas has admitted that the only basis for this knowledge is

23 information that --

24      THE COURT:  Well, the only --

25      MS. WYER:  -- told to him by other individuals.

1          THE COURT:  Just -- can you just speak right in the

2     microphone.  I'm having trouble.

3          MS. WYER:  I'm making a hearsay objection, Your

4     Honor, because Mr. Douglas has acknowledged that his basis for

5     testifying on this subject is information told to him by other

6     individuals, including his clients.

7          THE COURT:  Well, no, he -- this is more than

8     hearsay.  He's -- he a lawyer who has actively represented

9     people, and I think he should be entitled to describe -- in

10    connection with your activities as an attorney what issues

11    you've seen in -- with your clients' complying.

12          I think you can answer the question without

13    divulging the name of any clients.  We're not interested in

14    any privileged communications or confidential material.  Okay.

15    But I think --

16          THE WITNESS:  Thank you.

17          THE COURT:  I'll overrule the objection.

18          THE WITNESS:  The -- the difficulty in answering

19    that is -- is to essentially make it focused and succinct.

20          THE COURT:  Well, it's a very broad question.

21          THE WITNESS:  So I -- I can --

22          THE COURT:  I don't know if you can -- I'm

23    overruling the objection, but if you can put it into certain

24    categories, such as advising clients or is it representing

25    them in legal -- in litigation or in helping them comply with

1    the statute.

2                I mean I don't know exactly where he's had personal

3    experience.

4                But I think the question should be -- your answer

5    should be limited to your personal experience --

6                THE WITNESS:  Yes.

7                THE COURT:  -- without speculating or based on

8    hearsay.

9                THE WITNESS:  I will do that.

10                THE COURT:  Okay.

11   BY MR. MURRAY:

12   Q    For example, Mr. Douglas, have you been engaged from time

13   to time to actually go to the client and inspect all the

14   client's records in order to determine where there may be some

15   deficiencies?

16   A    Yes.  A regular part of my practice is to do exactly

17   that.

18                THE COURT:  So this would come in the category of

19   helping compliance.

20                THE WITNESS:  Correct.

21                THE COURT:  Or giving advice on compliance.

22                THE WITNESS:  Correct.  That is, a client will

23   believe that they are in compliance, or at least hope they're

24   in compliance, and will ask me to come and review their

25   records that sort of expert -- assuming my expert knowledge in

Douglas - Direct (Mur)                             88

1    it to show them where they are or are not compliant.

2              And I've done that numerous times.

3    BY MR. MURRAY:

4    Q    Okay.  Now -- and with respect to the problems that

5    you've encountered with clients and members' complying with

6    2257, can you talk about, for example, the issue of cross-

7    referencing?

8    A    Yes.

9    Q    Is that a -- is that a subject matter that is

10   particularly problematic, and, if so, would you explain to the

11   Court what the requirements are and how that becomes

12   problematic?

13   A    Once the initial identification and personal information

14   is acquired and stored in some retrievable form, one has to --

15              MS. WYER:  Your Honor, I want to make an objection

16   on the basis that on the one hand Mr. Douglas appears to be

17   representing himself as an expert when he was not designated

18   as --

19              THE COURT:  I don't think this is --

20              MS. WYER:  -- an expert on the --

21              THE COURT:  -- expert testimony.  Overruled.

22              MS. WYER:  He is also testifying about clients who

23   are not Free Speech Coalition members, which is irrelevant.

24              THE COURT:  I'll overrule the objection.

25              Go ahead.

1          THE WITNESS:  Once that initial data is created and

2     stored, it has to be cross-referenced pursuant to the statute

3     and the supporting regulations so it is retrievable by the

4     legal name of the performer, the performance that they were in

5     which one recording may generate numerous performances, as

6     defined, and also by any alternative name that they have ever

7     been -- that they have ever used and revealed.

8          Now, the way that I think I can do this best is if I

9     start with the -- with several different categories of record-

10    keepers  under the law.   So a producer, the person that is

11    what has been known as a primary producer, the person engaged

12    in the initial recording of the information, has the task of

13    getting high enough quality identification and -- and

14    recording it.

15         The cross-referencing is for the primary producer if

16    they are of a relatively small size, a relatively

17    straightforward one, because they have the -- the data, and it

18    essentially needs to go into a database so it's retrievable by

19    all these different a/k/a's.  One model will have, or actor,

20    actress may only have one -- one specified a/k/a.  Others will

21    have a half a dozen.

22         The -- then the producer, for the purposes of cross-

23    referencing the performance, every time that initial recording

24    is -- is repurposed, there has to be yet another designation.

25         So if the primary producer has websites where these

Douglas - Direct  (Mur)                          90

1    images are put, the producer must then record a URL of

2    internet address, as it were, as to where that performance

3    exists.

4              Now, because of the nature of sale and marketing,

5    a -- a scene that may be 20 minutes long involving four

6    performers could be split into scores of different

7    performances.

8              There may be a -- just a 15-second preview that is

9    placed in thousands of websites to advertise the material to

10   invite consumers to come back to the -- the manufacturer, or

11   the producer, I should say's, website.

12             Every time a five-second clip or a 15-second clip

13   that shows sexually explicit activity is -- is posed

14   somewhere, the manufacturer must include that in their

15   database as a separate title, as a separate URL portion of the

16   performance with a listing of the performers that are in it.

17             So in its most simple form the -- which is in the

18   hands of the primary producer, the cross-referencing can be

19   extraordinarily complicated if they're successful.

20             Then there are the wholesaler, who is a secondary

21   producer, and for them the cross-referencing burden is a

22   magnitude greater because they not only have the same burden

23   that the primary producer has, which is to extract the

24   information from the original document and record in a

25   database for cross-referencing all of its other placement, but

Douglas - Direct (Mur)                    91

1    a wholesaler is acquiring performances from scores of

2    different sources.

3              So if one performer has been in 30 different films

4    that the secondary is selling and those -- those 30 films come

5    from 10 different studios, they have to cross-reference

6    multiple studios, which the -- the primary producer does not

7    have the concern for.

8              The additional problem is that most, if not all, of

9    those secondary producers who are wholesalers, they have some

10   sort of advertising, some sort of website, so their -- or

11   potentially a -- a catalog for their customers to check.

12             The -- the catalog depiction is almost universally

13   the packaging, that is, the box cover, front or back.  And

14   because of the requirement under 2257 that records be

15   segregated, if a box cover depicts eight performers, and there

16   are 30 performers in the film, in the movie, when I acquire

17   the records from the producer, the producer does not have to

18   segregate the box cover from the title.  I do.

19             So I get a list of all of the performers in the

20   movie.

21             THE COURT:  You're not saying as a -- as a lawyer,

22   you're putting yourself --

23             THE WITNESS:  I'm sorry.

24             THE COURT:  -- in the position --

25             THE WITNESS:  If I were a secondary producer.

1          THE COURT:  Okay.

2          THE WITNESS:  I apologize for that.

3          THE COURT:  Yeah, that's all right.

4          THE WITNESS:  If I were a secondary producer, let's

5    say a distributor, that has -- that offers to retail outlets

6    tens of thousands of products, in the modern world the only

7    way that I can do that successfully is to have a website, and

8    on the website show the packaging with those tens of thousands

9    of items.

10         The problem arises that the packaging and the

11   records that I get from the source, the primary producer,

12   there's a discrepancy because my need is to only have the

13   image -- the records of the persons on the packaging engaging

14   in sexually explicit activity.

15         So there's a --

16   BY MR. MURRAY:

17   Q    And why is that your need?  Because of the segregation

18   requirement?

19   A    Because the -- the 2257 requires that I do not have

20   extraneous records in there.  So if there are six performers

21   in the movie and five performers on the packaging, I'm not

22   allowed to include the records of the sixth performer in my

23   records because they're not engaged in sexually explicit

24   conduct in the image that I am putting into the stream of

25   commerce.

1          And the problem is enormous.  It's essentially

2    insurmountable because it is rare that a movie has on its

3    cover all of the performers engaged in sexually explicit

4    activity that are in the movie.

5          And if they -- if -- and, for instance, it's commonplace

6    to have a -- the -- the most prominent well-known performer

7    who's in the movie on the packaging, whether or not they are

8    even engaged in a sexual role.  That is Nina Hartley, for

9    instance, very well known performer.  When her image appears

10   on a box, it sells tape.

11         She performs in nonsexual roles, as well as sexual roles.

12   If I'm a producer, even though she's in a nonsexual role,

13   it'll be starring Nina Hartley, and her picture will be

14   prominently placed.

15              But as a secondary producer I am not allowed to have

16   Nina Hartley's, you know, passport or driver's license in my

17   records because my obligation is to have the records only of

18   the item that I am putting on my website, which is the box

19   cover.

20              There are worse problems, of course.  There is a --

21   a number -- a substantial portion of the materials that are in

22   the stream of commerce are -- are DVDs that will have eight

23   hours of -- or 16 hours of performances, and they -- they will

24   encompass hundreds of performers.  And so on the box cover

25   there will be, you know, thumbnail size photographs of sexual

1    activity.  Often it's just the genitals.

2            As a -- a secondary producer, if I get records of 40

3    performers on a -- and there's a box cover with lots of little

4    pictures, the only thing I can do is hope that they have sent

5    me the right records.  I can't -- there's no realistic way for

6    me to confirm.

7            And since there are ethnic themes in movies where

8    it'll be, you know, all African-American performers or all

9    Asian performers, and I look at the box cover, and everyone

10   more looks like the right ethnicity, and then I get records

11   that show there's a driver's license of someone who appears to

12   not be Asian or African-American.

13           I have no way of knowing whether or not this is

14   accurate or inaccurate unless I were to actually pick up the

15   phone or send an email to the producer and say, "Is this

16   record the real deal," and given the magnitude, you know,

17   there are thousands of releases of DVDs every year, and -- and

18   a -- and a distributor has to carry most of them, certainly,

19   you know, a third of them.

20           It's this overwhelming difficulty to determine that

21   I have the right records in support of the image that I'm

22   putting on my website, and it's -- and this is a high

23   pressure, high volume, high changing industry.  You -- your

24   website does not stay the same for two months at a time.

25           THE COURT:  All right.  That -- that was a very long

Douglas - Direct (Mur)                          95

1    answer.

2              About how much longer will your direct --

3              MR. MURRAY:  A -- a fair -- a substantial amount.

4              THE COURT:  All right.  Can we take a 10-minute

5    recess right now?

6              MR. MURRAY:  Yes.  That'd be great, Your Honor.

7              THE COURT:  And then we'll come back, and we'll --

8    we'll go to about 12:20.  All right.

9              MR. MURRAY:  Thank you, Your Honor.

10             THE COURT:  Thank you.

11       (Recess taken, 11:18 a.m. to 11:33 a.m.)

12             THE COURT:  All right.  Let's continue the direct

13   examination.

14             MR. MURRAY:  Thank you, Your Honor.

15   BY MR. MURRAY:

16   Q    Mr. Douglas, I think we were talking about problems

17   that -- that you've been able to identify from your own

18   personal experience.  Let me move to another potential topic

19   on that subject.

20        Is there any problem that -- that you have found in your

21   experience associated with the -- the fact that even a minor

22   paperwork violation constitutes a felony?

23   A    Well, that's a -- yes, that's a -- an enormous burden

24   because any departure, no matter how minor, misalphabetizing,

25   for instance, is a felony.  Having the -- all the proper

1   documentation but not in a file folder at the right moment is

2   a -- is a violation.

3        So without any margin of error and with the vast number

4   of documents that have to be created and maintained,

5   especially, as I indicated before, a -- the middle man in

6   the -- in the distribution flow, perfection is the minimum

7   standard necessary to avoid committing felonies.

8   Q    Is there a problem with something called redundancy?

9   A    Well, yes.  The -- every time a performer performs for

10  the -- the primary producer, irrespective of how many times

11  they've performed before, you have to establish in identical

12  fashion that they are over -- that they are 18 years or older.

13       So if a performer has been performing for 20 years, they

14  are necessarily, mathematically, logically of age when they

15  perform before me today.

16       I have -- if I find a primary producer, I will have

17  checked the identification and ask for the other information

18  countless times, and, you know, on every occasion the

19  paperwork has to be recreated anew.

20       That -- that is certainly an -- an unnecessary burden

21  that can become quite a significant one when you have

22  repetitive performances by very successful performers.

23  Q    And have you represented retail outlets, as well?

24  A    Yes.

25  Q    And are you -- do you have experience in -- in advising

Douglas - Direct (Mur)                                    97

1   them with respect to their obligations under 2257?

2   A    They have -- yes.  They have similar problems that a

3   wholesaler has, that is, in -- for certainly the last decade a

4   retail outlet cannot be successful without having a website,

5   and the website is -- just like for a reseller, would have

6   packaging on it.

7        And so they have to have the correct records for the

8   packaging, even though they don't need the records for the

9   entire film.

10        And so they are required to acquire those records,

11   maintain those records, appropriately cross-reference the

12   records and the problem for a retailer -- the primary

13   difference between the problems for a retailer and the

14   wholesaler is the wholesaler has more resources.  They have a

15   much greater staff.

16        A typical retailer, you know, there'll be an owner and a

17   manager, and then minimum wage employees, and they don't have

18   the resources to contact the various manufacturers to say, "I

19   need only the records for the performers that are on the box,

20   and I don't know who they are."  So that becomes a big

21   problem.

22   Q    And by retailers, are you referring to businesses that

23   have brick and mortar stores and then also have a website?

24   A    Yes.  And I misspoke, because, of course, a retailer

25   could be one that does not have a physical location.  I was

1    thinking of a physical location that has as a supplement to

2    their operation a -- a website or perhaps a newsletter,

3    something where there is a republishing of the packaging where

4    there's sexually explicit material.

5    Q    And what about your retail clients that you've advised

6    with respect to brick and mortar stores?

7         What -- what do they have to do in -- are there any

8    problems associated with checking for the label?

9    A    Both wholesalers and retailers have, again, an enormous

10   problem with confirming the -- the labeling.

11        Material for a wholesaler comes in in vast quantities.

12   Cases of material come in, and, but for 2257, upon arrival

13   they would be broken down and distributed within the warehouse

14   into the -- the appropriate locations, whether it's certain

15   kind of magazine or a certain kind of toy or -- or a DVD.

16        But with 2257 if you are not a crazy risk taker, you have

17   to have someone there who's trained in 2257 to screen the

18   material as it comes in to confirm that all the labeling is

19   correct.  And even within one box of material from one source

20   there can be discrepancies in the labeling.

21        For instance, one of the requirements of 2257 is that for

22   a magazine the -- or book the label has to be in a particular

23   location.

24        So if the packages come in sealed multi-package use,

25   then, for instance, it's very common that -- that magazines

1  will be sold in a three-pack that's previously sealed.  It's

2  an important part of the marketing which I can explain if

3  anyone cares.

4      If you're a retailer and you get a package of three

5  magazines that's sealed in plastic, you can't check the label

6  unless you tear open the plastic and resell it -- reseal it.

7      Even apart from the packaging problem a very well-known,

8  respected publication for years and years had the appropriate

9  language on their labeling.

10      And then one day, for reasons that escape understanding,

11  they eliminated a necessary component to it.  Someone in the

12  art department decided it was too many words, and these were

13  sent out wholesalers and retailers.

14      Someone at -- at the loading dock had to check every one,

15  and you can't rely on the fact that for a decade they've done

16  it right because tomorrow they can do it wrong.

17      Now, that's just on for one kind of packaging.  On --

18  on -- because of the requirement that the font be the second

19  largest font that's on the packaging.  Having a easily

20  readable label on a DVD cover is not going to comply with the

21  law unless the -- the font size on the rest of the packaging

22  is -- has the appropriate ratio.

23      And there's just -- it's not realistic that a retail

24  outlet is going to train people to make sure that that's

25  correct and then to execute that training.  They're just not

1   going to look at every single package that comes in the door.

2   And, again, if you're talking about a wholesale.  Crazy.

3          THE COURT:  All right.  One second.

4      (Pause)

5          THE COURT:  Go ahead.

6   BY MR. MURRAY:

7   Q    Now, what about the -- is there a requirement that the --

8   that on a DVD the label appear for a particular duration?

9        Tell -- tell the Court about any problems that arise from

10  the labeling of the actual DVD itself, the content of the DVD.

11  A    When I'm talking about this, I'm talking about what a

12  consumer views when they put the -- the DVD into a machine to

13  view the -- the images, not the -- the actual -- what's marked

14  on the physical DVD itself, but what you see when you play it.

15       The law and regulations require that the label must be of

16  sufficient duration, not -- that's specified five seconds or

17  three seconds -- to be readily read or easily read, and that

18  is entirely subjective.  The -- because there's no rule, per

19  se, everyone has a different view of it.

20       So a manufacture feels, well, you know, three seconds is

21  more than enough time to read, "All records required by 18 USC

22  2257 and the related regulations are in the custody of

23  custodian of records."  Three seconds is more than enough.

24       Someone down the road has heard of a -- that that's not

25  enough time, and assuming that they check, go to the extent of

Douglas - Direct (Mur)                    101

1    checking the playing of it, then it's -- it doesn't meet

2    internal standards.

3        So a -- a large buyer of material, let's say something --

4    a company like PHE, which runs Abinee, this huge mail order

5    company, they have their own internal standards for how long

6    a -- a label has to be on the screen.  And there will be

7    competing standards amongst competing retail -- resellers.

8        And so a manufacturer has to, after making the subjective

9    determination that this is long enough, whatever that means,

10   satisfy customers that might not think it is long enough.

11             THE COURT:  Well, the statute doesn't make any

12   specific requirement for the time of exposure, does it?

13             THE WITNESS:  Correct, but --

14             THE COURT:  But do the regulations?

15             THE WITNESS:  The regulations just say that -- the

16   section isn't referred to at all.  The regulations say it has

17   to be of sufficient length, and apparently people have been

18   cited during inspections for having a label that didn't play

19   long enough.  That kind of thing just sends an incredible

20   chill.

21             THE COURT:  Well, nobody -- has anybody been

22   prosecuted for that?

23             THE WITNESS:  Nobody's been prosecuted for anything

24   under 2257, essentially with -- you know, there are a couple

25   of exceptions to that.

1        But part of the difficulty of compliance is that the

2   only thing that we know is what was in -- and we only know a

3   little bit of that.  More has emerged from this litigation, is

4   what has been written up as a violation in the 27 inspections.

5        That gives a clue, but that's by no means

6   definitive.  It's not determinative.  Tomorrow if the statute

7   would be enforced, could be that you discover that you

8   violated -- that, you know, you're indicted on the grounds

9   that your label was visible for only three seconds, and it

10  should have been longer.

11  BY MR. MURRAY:

12  Q    Now, you're familiar with the 20-hour week requirement

13  for being available for inspections?

14  A    Yes.

15  Q    And can -- can you tell the Court whether that, in your

16  experience with respect to all the experience you've had with

17  clients, whether that poses a problem.

18        THE COURT:  Once again, is that in the statute or

19  the regulations?

20        THE WITNESS:  Regulations.

21        THE COURT:  That's in the regulations.

22        THE WITNESS:  Yes.  The regulations require that the

23  records be available for inspection no less than 20 hours a

24  week during regular business hours, and if your regular

25  business hours don't conform to the regular typical business

Douglas - Direct (Mur)                     103

1    hours, you have to notify the inspecting agency, presumably

2    the FBI, when -- what 20 hours your records are going to be

3    available.

4          This is -- if you are not a, you know, a 9:00 to

5    5:00 business with multiple employees, it's -- it's

6    impossible.  There are a lot of one-person operations in -- in

7    this industry, people that run websites, you know, out of

8    their basement, people who are one-person producers.

9          There are all of the live performers who perform in

10   front of a camera, and all these people are supposed to be

11   available 20 hours a week.

12         Some people aren't home 20 hours a week,

13   particularly performers.  Many performers are not only

14   performers, but are active producers.  They have a website

15   that they use to promote their own material.

16         And they may be on the road seven months out of the

17   year, and they, to comply with the law, would have to hire an

18   employee to sit around their house waiting for an inspection

19   20 hours a week when, since 1995 there have been 27

20   inspections.

21         So you -- you're required to hire someone with the

22   knowledge that it is a virtual certainty that you will get no

23   benefit from hiring the person.  The only reason you're

24   spending that money is to comply with the law, and so --

25              THE COURT:  Is this like a --

Douglas - Direct (Mur)                               104

1          THE WITNESS:  -- most just don't comply.

2          THE COURT:  -- third party custodian you're

3     referring to?

4          THE WITNESS:  No, no, no.  I'm supposed to have

5     someone available to have my -- if I were a producer, I'm

6     supposed to have someone available 20 hours a week for an

7     inspection just in case the inspection happens.

8          And so if I'm not at home a predictable 20 hours a

9     week, that is, if I'm not at home, you know, Monday, Wednesday

10    and Friday for six and a third hours a day between, you know,

11    9:00 and 3:30, under the law I'd have to hire someone to be

12    available those specific times, notifying the FBI as to what

13    times those are, just in case an inspection happens.

14         And if I do not, if I don't inform the Department of

15    Justice, well, the FBI, I guess, I'm breaking the law, and if

16    there's a lightning strike and it turns out that there is an

17    inspection and I don't have someone there, I'm violating the

18    law.

19         I think I'm violating the law -- yeah, I think a

20    producer would violate the law even if there were no

21    inspection, that is, if an inquire were to -- made to me, ho

22    has been, you know, what hours have you been available for

23    inspection over the course of the last six months, and I

24    haven't been, then I've committed a crime.

25    BY MR. MURRAY:

Douglas - Direct (Mur)                                    105

1    Q    The -- the Court just mentioned third party

2    recordkeeping.

3         Did Free Speech Coalition in the process of commenting on

4    proposed regulations advocate for some form of third party

5    recordkeeping system?

6    A    Yes.  In --

7    Q    And did the -- and did the justice department adopt some

8    form of third party recordkeeping?

9    A    In part they did.  The -- there are two different forms

10   of third party recordkeeping that are possible under the

11   regulations.

12        One is where an -- an independent, sort of freestanding

13   third party recordkeeper, that is -- that's what they do for a

14   living is run a database that -- that has other people's

15   records.  And so they just stand in the place of having an

16   employee or other designee within one business, hold the

17   records.

18        The advantage of that is if someone has developed, you

19   know, good software -- so you don't have to reinvent the

20   wheel.  So if someone has a -- a really outstanding system for

21   maintaining the records, you employ them to hold the records

22   for you.  They're available 20 hours a week, and -- and so

23   that portion is solved.

24   Q    Okay.  Let -- let's stick with that --

25   A    Okay.

1    Q    -- portion before you get to the second one.

2    A    Right.

3    Q    Does that form of third party recordkeeping alleviate

4    the -- all of the problems, though, that you've described thus

5    far?

6    A    Well, the only problem that it addresses is the 20-hour

7    week, but, otherwise, all of the problems continue to exist

8    because the third party recordkeeper can only maintain records

9    that the -- that the producer provides them.  So all of the

10   issues about, you know, minor recordkeeping problems, about

11   getting the correct records for the correct film, all of those

12   problems exist.

13        But there's the additional problem which is if that third

14   party recordkeeper makes a mistake or has an electrical

15   failure or goes bankrupt, I'm the one who's committing the

16   felonies.  So --

17   Q    And is that because the regulation says that the

18   employment of a third party recordkeeper does not relieve the

19   producer of liability for any infractions?

20   A    It says so explicitly any -- in this case these

21   infractions are felony infractions, but yes.

22        And so the -- the act of hiring a third party

23   recordkeeper is an act of extreme faith that they will not

24   make a mistake, no matter how minor because then I become a

25   felon.

1        The Free Speech Coalition recommended, when we were

2    discussing third party recordkeeping that their -- that the

3    government be active in that process, that is, create

4    standards so that there would be a consistency throughout

5    the -- the field.

6        Again, if -- it's third party recordkeeping, and

7    they're -- they've created a database and my data is in their

8    hands, if they go out of business, I have to be able to

9    retrieve the records from them and either maintain it myself

10   or find another third party recordkeeper.

11       If they are using unique software, assuming -- and they

12   go out of business, assuming I can get it from them, I likely

13   am going to end up with a whole bunch of junk that is useless

14   for any other third party recordkeeper.

15       So our vision, we assume that the -- the federal

16   government would issue a series of standards by which third

17   party recordkeepers would have to comply.

18       The advantage -- and -- and our thought, this would be

19   highly advantages for the federal government so that instead

20   of having to go potentially to tens of thousands or hundreds

21   of thousands of locations to inspect, if there were four or

22   five licensed recordkeepers, then the agents could just go

23   there and stay there.

24       They would just go, you know, just go from one inspection

25   to another, rather than having to, you know, travel all across

1    the United States.

2         That did not happen.  So anybody who calls themselves a

3    third party recordkeeper can be a third party recordkeeper,

4    and as I said, it's just an act of faith to employ one, and I

5    generally advise people not to engage in acts of faith.

6         There's a second form of third party recordkeeping that's

7    envisioned by the regulations --

8    Q    And what is that?

9    A    -- where a -- an existing recordkeeper, that is, for

10   instance, a primary producer, agrees to act as the

11   recordkeeper for a customer of theirs.

12        So a brick and mortar retail outlet or an internet

13   website will say to a production company, will say to Douglas

14   Production Company, such thing I don't think exists, "I want

15   you to be my third party recordkeeper for all of the movies I

16   buy from you."

17        The problem with that is it makes cross-referencing

18   impossible.

19   Q    How so?

20   A    Because Douglas Production Company only has records it

21   can only cross-reference amongst Douglas Company Productions.

22   The retailer is buying from 20 or 40 or 100 different sources.

23        And so in order to have a performance by an actor who has

24   been in movies -- 20 different movies that I carry from six

25   different manufacturers, those manufacturers can't cross-

1   reference each other.  So I have all of the burdens of cross-

2   referencing.

3        And so, again, I get no real benefit because the -- the

4   holding of the driver's license or passport and personal

5   information form, that's the easiest part.  The hard part is

6   cross-referencing and multiple third party recordkeepers can't

7   cross-reference.

8   Q    Now, one of the things that that the Court asked in its

9   summary judgment order in this case was whether the plaintiffs

10  had any -- any evidence or -- or ideas that -- that could be

11  put out there as to what Congress -- what other options

12  Congress might have had or could have had or could have in

13  order to have a recordkeeping system that is less burdensome

14  than the one that you've described, and can you offer any?

15            MS. WYER:  Objection; relevance.

16            THE COURT:  Overruled.  I mean based on his

17  experience once again.

18            THE WITNESS:  The heart of the goal of 2257 is to

19  detect and deter child pornography by making -- putting the

20  burden on the creator, the necessity of proof of -- that the

21  performer is 18 years or older.

22            And the simple and elegant way to do that is to

23  require that at the point of the performance a copy of a valid

24  ID be created and maintained.  And, literally, that's all

25  that's necessary.

1          The -- everything that flows from cross-referencing,

2     labeling, those are simply traps for the unwary.

3          They do nothing to advance the goals of the

4     litigation -- of the legislation because, presumably, the idea

5     is to make sure that someone does not inadvertently put a

6     minor in a film because if they do it intentionally, 2257

7     isn't going to do any good.

8          If I am knowingly using a minor, I'm not going to

9     get a copy of their junior high school ID.  I'm going to break

10    the law.  I'm going to create child pornography.

11         So the focus of 2257 is to prevent the inadvertent,

12    and the inadvertent is prevented by getting a copy of the ID.

13         THE COURT:  Well, let me ask you a question, and

14    excuse me for interrupting, but there's evidence -- there are

15    allegations in the case that a number of performers don't use

16    their real name, is that correct?

17         THE WITNESS:  Yes.

18         THE COURT:  Correct.  And, therefore, you say a

19    valid driver's license, but how would a -- if a producer, say,

20    hired a performer and they said, "Well, my name is Jane Doe,"

21    all right, you would say, "Well, that's not your real name, is

22    it."

23         "Well, of course not.  Nobody's called, you know" --

24    "Well, I want -- I need to see your real name."

25         "Well, I don't want to give it to you."

1            What -- he can't hire that person?

2            THE WITNESS:  Correct.  They can't under --

3            THE COURT:  Now, suppose -- so she -- so suppose she

4    says, "All right.  Well, I'll -- I'll tell you," and she

5    gives -- she says her real name, "but I want to be called Jane

6    Doe."

7                "Fine."

8            But then that same actress then goes to another

9    producer and says, "My name is Judy Doe."

10           And he says, "Well, that's not your real name."

11               "Well, you're right."   They have the same dialog.

12           How does the producer know that he's getting a valid

13   driver's license if the person is actually using a pseudonym?

14           THE WITNESS:  Well, that's the case that currently

15   exists under 2257, right, that is --

16           THE COURT:  Yes.

17           THE WITNESS:  -- what you describe.  What I'm saying

18   is, is that the problem and the solution are both resolved by

19   the requirement of providing facially valid ID.

20           THE COURT:  Right.

21           THE WITNESS:  It doesn't -- it's not perfect

22   because --

23           THE COURT:  But doesn't --

24           THE WITNESS:  -- we have the experience of

25   fraudulent --

Douglas - The Court                                    112

1           THE COURT:  -- cross-referencing to some extent,

2    maybe not total, but to some extent help protect against that?

3           THE WITNESS:  I don't see that, that is, knowing --

4    if I were a performer, knowing that I was called Four Eyes

5    when I was in kindergarten --

6           THE COURT:  Yes.

7           THE WITNESS:  -- doesn't advance anything.  And if

8    it turns out that I, you know, provided everyone with the

9    same --

10          THE COURT:  Well, that's an assumption.

11          THE WITNESS:  Right, right, but let's go to the --

12   the harm part, that is, what 2257's supposed to prevent.  So a

13   performer who's 17 has ID that shows that they're 19, and they

14   go to six different producer and with each producer they offer

15   a different a/k/a, different stage name, but they are still

16   providing the correct -- the consistent fraudulently obtained

17   driver's license.

18          Once it's determined that, you know, the -- the

19   actor formerly known as Prince, whose real name is Jack Smith,

20   is underage, everyone looks to see their driver's license

21   for -- nobody cares that they are the performer once known as

22   Prince or something else.

23          They -- they track it by the identification

24   provided, and then everyone knows they're underage, and all of

25   the consequences flow from that.

Douglas - Direct (Mur)                                113

1    BY MR. MURRAY:

2    Q    Well, in the case of -- that you're describing where

3    someone goes to six different producers, those producers don't

4    cross-reference their records with each other, do they?

5    A    They -- they absolutely do not.

6    Q    And they're not required to, are they?

7    A    They -- they are not required to and they cannot.

8    Q    Okay.  So the cross-referencing has to do with a business

9    who has multiple images, and they all have to be cross

10   referenced.

11   A    Right.

12   Q    Okay.

13   A    And --

14           THE COURT:  And the cross-referencing is required by

15   the -- by the regulations --

16           THE WITNESS:  Correct.

17           THE COURT:  -- not by the statute.

18           THE WITNESS:  Correct.

19           THE COURT:  Okay.

20           THE WITNESS:  Correct.  And as I said, just all of

21   this is -- is unnecessary, and -- and you can see how it

22   emerges because, unlike any other form of regulatory activity

23   that I am aware of, this is the unique example of regulations

24   being created without dialog of the industry being regulated

25   by persons who are explicitly hostile to the industry that is

 1    being regulated so that when you have requirements that are,

 2    for instance, that the font size on packaging has to be no

 3    smaller than the second largest font size on the package

 4    itself, that can only occur when someone is just trying to

 5    come up with rules designed to trap people because it doesn't

 6    serve any purpose, and since, as I said, there is just this

 7    complete absence of dialog in the -- in the creation of these,

 8    with the industry being regulated, you -- you end up with

 9    hundreds of silly rules.

10    BY MR. MURRAY:

11    Q    Now, Mr. Douglas, let me turn to one last subject.

12         You mentioned that there came a time while you were

13    chairman of the Free Speech Coalition when there was an

14    awareness that certain inspections were being carried out by

15    the FBI --

16    A    Yes.

17    Q    -- under 2257?

18    A    Yes.

19    Q    And I want to show you what has been marked as -- if I

20    may approach, Your Honor --

21              THE COURT:  Yes.

22    BY MR. MURRAY:

23    Q.   -- Plaintiff's Exhibit 33A.

24    A    Yes.

25    Q    And can you identify that document, please?

1  A    Yes, 33A is a series of invoices and payment records from

2  10 of the -- I believe it's 10, but of entities that were

3  inspected during the period when inspections occurred the two

4  plus years that established their membership with the Free

5  Speech Coalition at the time of their inspection.

6  Q    I think there's actually 12 if you would count them.

7  A    Thank you.  I'll -- I will count.

8  Q    Okay.

9  A    I knew that was the right magnitude.

10 Q    So the documents and -- and I'm not going to go into all

11 the substance.

12     They're -- these are the invoices that show the

13 membership payments --

14 A    Yes.

15 Q    -- of the 12 members who at the time of the inspections

16 were members, is that correct?

17 A    Yes.

18 Q    Okay.  How many of these 12 members still remain members

19 today, however?

20 A    Four.

21 Q    And which ones are those?

22 A    Wicked Pictures, K-Beech, that's K, hyphen, B-E-E-C-H,

23 Darkside, and I'm forgetting the fourth.  I've got it here, if

24 I can --

25 Q    So 33B --

1   A    Is it all right if I flip this --

2   Q    -- which one is 33B?

3   A    I only have 33A in front of me.

4            MR. MURRAY:  If I can approach, Your Honor.

5            THE COURT:  Yes.

6   BY MR. MURRAY:

7   Q    Within the document.

8   A    Oh, I see.

9   Q    33B is --

10  A    Thank you.  Yeah, right.  Darkside, Diabolic, that's the

11  one I left out, K-Beech and Wicked Pictures.  Thank you.

12  Q    And have you checked before you came here to -- to verify

13  that they are -- that those four still remain as of today

14  active members of Free Speech Coalition?

15  A    They are current members in good standing of Free Speech

16  Coalition, all four.

17  Q    Okay.  Thank you very much, Mr. Douglas.

18           MR. MURRAY:  That's all I have, Your Honor.

19           THE COURT:  Okay.  Cross examine.  Let's get

20  started.  We got another 10 minutes before recess.

21           MR. MURRAY:  Except I would offer Plaintiff's

22  Exhibit 33 into evidence.

23           THE COURT:  Admitted without objection.

24                      CROSS-EXAMINATION

25  BY MS. WYER:

Douglas - Cross (Wye)                                117

1   Q    Mr. Douglas, in your direct testimony you listed many

2   impacts of child pornography on the adult entertainment

3   industry, correct?

4              MR. MURRAY:  Objection, Your Honor.

5              THE WITNESS:  I -- I don't believe I did.

6              THE COURT:  Well, that wasn't a question.  What's

7   the question?

8   BY MS. WYER:

9   Q    Well, that was the question.

10       You -- you identified impacts of child pornography and

11  child pornography laws on the adult entertainment industry,

12  correct?

13             THE COURT:  Well -- well, I recall he -- he referred

14  to child pornography.  Go ahead.  Next question.

15             He did that, correct?

16             THE WITNESS:  I testified -- I -- I testified what

17  the consequences are for a company if they inadvertently

18  create child pornography.

19  BY MS. WYER:

20  Q    Okay.  You did not explain about the impact of child

21  Pornography on children, correct, being portrayed in sexually

22  explicit material.

23  A    That is --

24             THE COURT:  Well, I don't --

25             MR. MURRAY:  Objection, Your Honor.  That's

1    irrelevant.

2              THE COURT:  -- think -- you know, I -- look, child

3    pornography is a -- a crime, as we all know, and the witness

4    discussed it on direct.

5              Now, if you want to ask some specific questions

6    about some of his testimony, you may, but I think they ought

7    to be focused.

8              MS. WYER:  I just wanted to make the point, Your

9    Honor, that child pornography laws only go into effect after

10   the child pornography is created, correct?

11             MR. MURRAY:  Objection --

12             THE WITNESS:  I don't understand the question.

13   BY MS. WYER:

14   Q    You cannot -- someone does not commit a child pornography

15   violation until the image is already created, correct?

16   A    The crime does not occur --

17             THE COURT:  Well, that's --

18             THE WITNESS:  -- until the crime occurs.

19             THE COURT:  Well -- all right.  Go ahead.  That's

20   his answer.

21   BY MS. WYER:

22   Q    You testified that Free Speech Coalition is a trade

23   association for the adult entertainment industry, correct?

24   A    Yes.

25   Q    The adult industry entertainment industry is made up of

Douglas - Cross (Wye)                                    119

1    people who consider themselves to members of the adult

2    entertainment industry, correct?

3    A    Yes.

4    Q    For the most part members of the adult entertainment

5    industry are involved in commercial production of sexually

6    explicit images, correct?

7    A    Yes.

8    Q    That includes producing adult films, correct?

9    A    Yes.

10   Q    And performing in adult films.

11   A    Yes.

12   Q    And operating adult websites.

13   A    Yes.

14   Q    And selling and distributing adult products.

15   A    Yes.

16   Q    And producing, selling and distributing adult magazines.

17   A    Yes.

18   Q    And the only requirement for joining Free Speech

19   Coalition is payment of membership dues, correct?

20   A    And being involved in the various items that you

21   described or support thereof.

22   Q    Support thereof, mean -- meaning --

23   A    If I'm -- if I'm a -- if I sell cabinets or boxes to the

24   adult industry, then I can join the adult industry's trade

25   association.

Douglas - Cross (Wye)                    120

1    Q    You're assuming -- you're basically -- you're saying that

2    you're assuming that someone who joins the Free Speech

3    Coalition feels an affiliation with the Free -- with the adult

4    entertainment industry, correct?

5    A    It's -- it's not a feeling.  It's -- it's a question of a

6    commercial relationship, that is, if -- if a person walking

7    down the hallway feels strongly that they support the free

8    distribution or the -- they support a healthy adult

9    entertainment industry but are not involved in the commercial

10   process whatsoever, we do not have a membership classification

11   for them, and they would not join.

12   Q    But --

13   A    They're welcome to donate money, and I can pass out a

14   website name, if you want, for donations.  But other than

15   that, you would not be a member.

16   Q    But the only requirement for joining is payment of dues,

17   correct?

18   A    And being in a category of membership that exists,

19   that -- that -- which is to say that you have a commercial

20   relationship.

21   Q    Under the Free Speech Coalition by-laws, failure to pay

22   dues within 30 days of the due date results in termination of

23   membership, correct?

24   A    I do not recall that.  If -- if that is in the by-laws,

25   that is not a component of the by-laws that we enforce.

Douglas - Cross (Wye)                    121

1    Q    But the only documentation you have of membership are

2    dues payments, correct?

3    A    Yes.

4    Q    You testified regarding the application of 2257 to Free

5    Speech Coalition members, correct?

6    A    Yes.

7    Q    And 2257 applies to both primary -- applies to primary

8    producers, correct?

9    A    It applies to primary producers, yes.

10   Q    And it applies to what the regulations call secondary

11   producers, correct?

12   A    Yes.

13   Q    Free Speech Coalition itself is not a primary producer,

14   correct?

15   A    It is not -- has no obligation to maintain any records as

16   either a primary or a secondary under the statute or

17   regulations, and we do not do so.

18   Q    Not all of Free Speech Coalition members are primary

19   producers, correct?

20   A    Correct.

21   Q    For example, lawyers such as yourself are not primary

22   producers, correct?

23   A    I am not a producer of any kind under 2257.

24   Q    And talent agents are not primary producers.

25   A    They are, actually, because the statute says that a

Douglas - Cross (Wye)                    122

1   primary producer is someone who arranges for or creates, and a

2   talent agent is certainly, arguably, someone that arranges for

3   the performance.

4   Q    Free Speech Coalition members include adult film

5   performers, correct?

6   A    Yes.

7   Q    Most performers also have websites and social media

8   sites, or they post images that fall under 2257, correct?

9   A    I think so, yes.

10  Q    So they are also primary producers --

11  A    Yes.

12  Q    -- correct?  Many Free Speech Coalition members are both

13  primary and secondary producers, correct?

14  A    Yes.

15  Q    A Free Speech Coalition member may create its own films

16  and also maintain a website where it advertises other films

17  for sale, correct?

18  A    Yes.

19  Q    And in that instance it would be both a primary and a

20  secondary producer, correct?

21  A    Yes.

22  Q    Free Speech Coalition has identified David Connors as a

23  Free Speech Coalition member who produces sexually explicit

24  depictions, correct?

25  A    Yes.

Douglas - Cross (Wye)                                    123

1    Q    And David Connors' stage name is Dave Cummings, correct?

2    A    Yes.

3    Q    Free Speech Coalition has identified Marie Levine as a

4    Free Speech Coalition member who has produced sexually

5    explicit depictions, correct?

6    A    Yes.

7    Q    And Marie Levine's stage name as Nina Hartley, correct?

8    A    Yes.

9    Q    Sinclair Institute is another Free Speech Coalition

10   member that creates sexually explicit depictions, correct?

11   A    Yes.

12   Q    And Vivid Video is another member that Free Speech

13   Coalition has identified as producing sexually explicit

14   depictions.

15   A    Yes.

16   Q    Wicked Pictures is another such member.

17   A    Yes.

18   Q    And Diabolic Video is another such member.

19   Q    Darkside Entertainment

20   A    Yes.

21   Q    And K-Beech.

22   A    Yes.

23   Q    But --

24           THE COURT:  This is all -- this is all out of the

25   plaintiff's trial brief.  I mean -- so this is all admitted.

Douglas - Cross (Wye)                    124

1    I'm not sure where you're going with this testimony.  This is

2    all -- this is what the plaintiff said in their trial brief,

3    all these people are members.

4              MS. WYER:  I just wanted to establish exactly which

5    member of Free Speech Coalition has identified.

6              THE COURT:  All right.  Well, it's not

7    objectionable, but it's -- it's sort of redundant.  Go ahead.

8    BY MS. WYER:

9    Q    So that's a total of eight members, correct?

10   A    I didn't count, but I think that's right.

11   Q    And in your deposition you also identified Met-Art as a

12   Free Speech Coalition member, correct?

13   A    Yes.

14   Q    And Met -- and Met-Art stands for Most Erotic Teens,

15   correct?

16   A    It has stood for many things over the years.  That is one

17   name that was designated.  It -- but it is not an acronym for

18   anything.

19   Q    Marie Levine and Sinclair Institute are plaintiffs in

20   this case, correct?

21   A    Yes.

22   Q    And David Connors used to be a plaintiff in this case,

23   correct?

24   A    Yes.

25   Q    And the Wicked, Diabolic, Darkside and K-Beech, as you

Douglas - Cross (Wye)                              125

1   testified, are members who were subject to records inspections

2   under 2257.

3   A    Amongst others, yes.

4   Q    Free Speech Coalition identified the work as David

5   Connors as an example of Free Speech Coalition members'

6   production of sexually explicit depictions, correct?

7   A    Yes.

8   Q    Let me show you Exhibit 57, Defendant's Exhibit 57.

9   A    I'm looking at it.

10  Q    Do you recognize this document?

11  A    I do.

12  Q    These are Free Speech Coalition's responses to

13  interrogatories, correct?

14  A    Yes.

15  Q    On page 625 --

16  A    Do I do that or does she?  Is there something I'm

17  supposed to do to turn 625?

18           MS. WYER:  Could you turn it to 625?

19           THE WITNESS:  Ah.  Okay.

20  BY MS. WYER:

21  Q    That's where you identified David Conners as a example of

22  Free Speech Coalition members' production of sexually explicit

23  depictions, correct?

24  A    Yes.

25  Q    David Cummings has provided information about the ages of

Douglas - Cross (Wye)                              126

1   the individuals performing in his sexually explicit films,

2   correct?

3   A    I believe so.

4   Q    Let me show you Defendant's Exhibit 48 at -- do you

5   recognize this document?

6   A    I mean I recognize an interrogatory.

7              THE COURT:  Well, this is Connors' --

8              THE WITNESS:  It's not mine, so I --

9              THE COURT:  Are you familiar with this document?

10             THE WITNESS:  Not really.

11             THE COURT:  All right.  See, you can't cross examine

12  him unless he's prepared and reviewed.  Next question.

13             MR. MURRAY:  Well, we move to admit the response

14  to -- Mr. Connors' response to interrogatory nine as a

15  vicarious admission.

16             THE COURT:  Okay.  He's a party plaintiff, right?

17             MS. WYER:  What?  Sorry?

18             THE COURT:  He's a plaintiff.

19             MS. WYER:  He is a former plaintiff, but he is a

20  member of Free Speech Coalition that Free Speech Coalition has

21  identified --

22             THE COURT:  Okay.  All right.

23             MS. WYER:  -- as an example.

24             THE COURT:  Well, you can -- you can't cross examine

25  the witness about it.

1              MS. WYER:  Okay.

2              THE COURT:  All right.  About how much longer will

3    your cross be, do you think?

4              MS. WYER:  More than a few minutes.

5              THE COURT:  All right.  Well, then we'll be -- we're

6    going to recess at this time, as I said, because of our

7    Judges' meeting today we won't resume until 1:45.  If I'm not

8    back then, it means the meeting is still going on, and I'm

9    sorry, but I need to attend the whole thing.  All right.  So

10   1:45.

11             I would ask that -- you're -- you're welcome to

12   cross examine him at whatever length you like.  I would ask

13   that you get into questions that challenge his direct.  I

14   think that's really the purpose of cross, so just think about

15   that as going to lunch hour.  Okay.

16             One second.

17        (Pause)

18             THE COURT:  All right.  There are so many exhibits.

19   If you know -- you don't have to do this right now, but if you

20   know what exhibit numbers you're going to use for particular

21   witnesses and you want to get me a list of it, we can have

22   them ready and so forth, but if you're going to show them all

23   on the screen, then it's fine.  Okay.  So -- all right.

24   Either -- either way will work.

25             Okay.  Thank you.  All right.  1:45.

Douglas - Cross (Wye)                                128

1          (Luncheon recess taken, 12:19 p.m. to 1:45 p.m.)

2          (Transcriber change)

3                         AFTERNOON SESSION

4              THE COURT:  Okay.  We're ready to proceed.  Please

5    be seated.  Okay.  Let's resume.  All right.  Mr. Douglas,

6    state your name for the record.

7              THE WITNESS:  Jeffery Douglas.

8              THE COURT:  All right.  You're still under oath.

9              THE WITNESS:  Yes, Your Honor.

10             THE COURT:  Proceed.

11                    CROSS-EXAMINATION (cont.)

12   BY MS. WYER:

13   Q    Mr. Douglas, you testified earlier on direct about --

14   about the regulations implementing the statutes and burdens

15   that the regulations impose, correct?

16   A    Yes.

17   Q    And one of the things you mentioned had to do with DVD

18   covers, correct?

19   A    Yes.

20   Q    On websites, correct?

21   A    Yes.

22   Q    Mr. Conners maintains a website, correct?

23   A    I believe so.

24   Q    Let me show you Exhibit 47.

25   A    Yes.

1   Q    Is this -- do you recognize this?

2   A    I think I was shown this or one like it during my

3   deposition.  That's my only familiarity with it.

4   Q    This is a DVD cover from Mr. Conners' videos, correct?

5   A    It appears to be.

6   Q    So this is an example of the DVD covers that you were

7   referencing, that you were talking about earlier, correct?

8   A    I made reference to DVD covers, and this appears to be a

9   DVD cover.

10  Q    Let's -- let me show you the next page.  This is another

11  example of a DVD cover like that, correct?

12  A    Yes.

13  Q    And the next, this is another example of a DVD cover,

14  correct?

15  A    It is.

16  Q    And in -- in the -- where I -- where I circled would be

17  an example of where an image on a DVD cover contains only

18  genitals, a picture of genitals, correct?

19  A    Yes.

20  Q    Let me show you now what is marked as Defendant's Exhibit

21  64-D.  This -- do you recognize this?

22  A    I do not.  I mean, I see what it is, what it says, but I

23  have -- I'm not familiar with it, as far as I know.

24           MS. WYER:  Let me interrupt myself and I wanted to

25  move to admit Exhibit 47 into evidence.

Douglas - Cross (Wye)                                    130

1          THE COURT:  Admitted without objection.

2     BY MS. WYER:

3     Q    So this is an image from Mr. Conners' website, correct?

4          MR. MURRAY:  Objection.

5     A    I don't know.

6          MR. MURRAY:  The witness said he hadn't seen it.

7          THE COURT:  Well, once again, I don't know the

8     purpose of showing the witness something he didn't write or

9     prepare or review or anything else.

10    BY MS. WYER:

11    Q    Are you familiar with David Conners' website?

12    A    I know it exists.  I --

13         THE COURT:  That doesn't lay a grounds for its

14    admissibility with him as a witness.  He has to have some

15    connection to the document.  I mean, if Conner -- if Mr.

16    Conners is a party, which I don't know as I'm sitting here,

17    maybe he is, it may be admissible without, you know, without a

18    witness as an -- as, you know, an admission of a party

19    opponent.  But I don't understand why you're questioning this

20    witness about all these different websites, unless you --

21    unless you want to use them to cross-examine him about

22    something he said.

23         MS. WYER:  Well, Mr. --

24         THE COURT:  But he has to have some connection to

25    the document.

Douglas - Cross (Wye)                    131

1        MS. WYER:  I wanted to question Mr. Douglas about

2    the way in which producers who are both -- who both produce

3    DVDs and have websites sell the DVDs on the websites, as an

4    example of what he was testifying about.

5        THE COURT:  Well, that might be appropriate if they

6    were clients of his, or that he has some personal familiarity

7    with, but you -- you haven't established that he has any

8    connection with Mr. Conners or Mr. Cummings that would make

9    that -- I mean, I instructed him when he started testifying on

10   direct, that he had to limit his testimony to areas in which

11   he had personal knowledge as having been a lawyer for a number

12   of people in this industry.  So your cross has to be similarly

13   confined.

14   BY MS. WYER:

15   Q    You testified earlier that Mr. Conners' stage name is

16   Dave Cummings, correct?

17   A    Yes.

18   Q    And Mr. Conners is a client of yours, correct?

19   A    Yes.

20   Q    And so you have personal knowledge that Mr. Conners has a

21   website, correct?

22   A    Yes, but I have not reviewed the website in my capacity

23   as his attorney, so I have -- the only familiarity I have with

24   the website would be whatever images that you put up there.

25   Q    You are familiar with the fact that Mr. Conners sells

Douglas - Cross (Wye)                                    132

1   DVDs through his website, correct?

2   A     Yes.

3   Q     So Mr. Conners would be an example of someone who is a

4   performer, who produces DVDs himself, and who also sells his

5   DVDs on a website, correct?

6   A     Yes.

7   Q     And Mr. Conners is both a primary and a secondary

8   producer, correct?

9   A     Yes.

10  Q     And Mr. Conners uses a third-party custodian for his

11  records, correct?

12  A     I don't know that.  He may.  I believe his -- I mean, let

13  me answer that fully accurately.  I believe that he keeps his

14  own records.  Whether he also in addition employs a

15  third-party record keeper, I do not know.  But I believe that

16  he maintains his own records, at least some of them.

17  Q     Free Speech Coalition provided model releases and photo

18  IDs for 25 DVDs produced by Vivid Video, correct?

19  A     I think so.

20  Q     You testified on direct regarding the membership status

21  of the companies that Free Speech Coalition had identified as

22  former or current members that were subject to 2257 records

23  inspections, correct?

24  A     Yes.

25  Q     And that testimony was based on the two statements that

Douglas - Cross (Wye)                          133

1   Free Speech Coalition has in its possession, correct?

2   A    And invoices, yes.  I saw some canceled checks as well.

3   Q    Let me show you Plaintiffs' Exhibit 33-C.

4   A    In the book or --

5   Q    It should be coming.

6   A    Okay.  Yep.  I see it's on its way.  Yes.  I'm looking at

7   it and I'm familiar with it.

8   Q    So up in the right-hand corner is the invoice date,

9   correct?

10  A    Yes, of 2 April, 2012.

11  Q    And the -- there's also a paid stamp with the date under

12  that, correct?

13  A    That's right, of July 5, 2012.

14  Q    And then in the body of the invoice, there's a

15  description called membership dues, correct?

16  A    Yes.

17  Q    And then over on the right, there's a column with an

18  amount, --

19  A    Of --

20  Q    -- a monetary amount, correct?

21  A    Yes, of $1,000.

22  Q    Now, let me show you Plaintiffs' Exhibit 33-I, and the

23  third page of that exhibit.  Actually, I wanted -- I'll just

24  go to the first page, sorry.

25  A    Okay.

Douglas - Cross (Wye)                        134

1    Q    And this invoice has an invoice date, but it does not

2    have a paid stamp on it, correct?

3    A    Correct.

4    Q    Indicating that there's no evidence that the invoice was

5    paid, correct?

6    A    This document does not reflect payment.

7    Q    Let me show you a document marked for identification as

8    Defendant's Exhibit 61.  Do you recognize this document?

9    A    I don't recall previously having seen the document, but

10   it appears to be a summary of --

11          MR. MURRAY:  Objection, Your Honor.  If he hasn't

12   seen it --

13          THE COURT:  Well, first of all, can he identify the

14   document?  He can answer that yes or no.

15          THE WITNESS:  The only thing I can do is read what

16   it says.

17          THE COURT:  All right.  The objection -- well, then

18   I don't under -- you know, I'm willing to be educated, but I

19   don't understand how you can cross-examine him about something

20   he's never seen before.

21          MS. WYER:  Your Honor, --

22          THE COURT:  He's not an expert.  He's here as a fact

23   witness.

24          MS. WYER:  This document is something that I

25   prepared as an assistance to the Court, in light of what the

Douglas - Cross (Wye)                    135

1   Court said about if there are voluminous records, it would be

2   helpful to have summaries.

3            THE COURT:  Yes.  This is summary.  Okay.  But --

4   fine.  But if there's something in here that you think

5   contradicts his direct examination, then you can make a

6   representation that this is an accurate summary of certain

7   records, and doesn't this conflict with your testimony on

8   direct, dah, dah, dah, dah, dah.  That, to me, would be

9   appropriate cross-examination, perhaps.  But you've got to

10  focus in on something that he said on direct.  Cross -- you

11  want to call him as a witness in your case, fine.  I'm sure

12  he'll be happy to come back.  But as -- cross has to be

13  limited to the scope of direct.  Now, you tell me where you're

14  going.

15           MS. WYER:  Well, in this instance, Your Honor, all I

16  wanted to do is, Mr. Douglas had testified regarding the two

17  statements.  I simply wanted to make this document available

18  to the Court for its convenience that summarizes the two

19  statements.

20           THE COURT:  Well, fine, but then it's not proper

21  cross for this witness.  I mean, you'll have to introduce it

22  as part of your case by whoever prepared it, unless you have a

23  stipulation.  But I don't see how it's proper cross for this

24  witness.  Now, you know, if you -- as I -- I don't mean to

25  repeat myself, but if you think this shows something

1    inconsistent with what he said on direct, I'll let you explore

2    that, but you've got to point to a specific piece of

3    information in this document which you represent is a summary.

4    BY MS. WYER:

5    Q    Mr. Douglas, you testified on direct regarding the

6    membership status and indicated that Darkside Entertainment

7    was currently a Free Speech Coalition member, correct?

8    A    Yes.

9    Q    And -- and that Dark -- and that Diabolic Video is

10   currently a Free Speech Coalition member?  And --

11   A    Yes.

12   Q    And that K-Beech is currently a Free Speech Coalition

13   member, correct?

14   A    Yes.

15   Q    And that Wicked Pictures is currently a Free Speech

16   Coalition member?

17   A    Yes.

18   Q    And those four companies were also Free Speech Coalition

19   members on the date this case was filed, correct?

20   A    Yes.

21   Q    Those were the only four companies that were subject to

22   2257 records inspections that were Free Speech Coalition

23   members on the date that this case was filed, correct?

24   A    Yes.

25   Q    You testified on direct regarding, again, the impact --

Douglas - Cross (Wye)                    137

1    the -- your interpretation of the regulations and how they

2    impact Free Speech Coalition members and/or clients, correct?

3    A    Yes.

4    Q    And during the rule making on the -- you're aware that in

5    2007 and 2008, the Department of Justice issued a proposed --

6    proposed rules implementing the statutory amendments of the

7    Adam Walsh Act, correct?

8    A    Yes.

9    Q    And a Free Speech Coalition member -- Free Speech

10   Coalition submitted comments on those proposed rules, correct?

11   A    Yes.

12   Q    I'm handing you what is marked as Defendant's Exhibit 54.

13   A    Thank you.

14   Q    Do you recognize this document?

15   A    I do.

16   Q    Is this a portion of the comments in which you

17   participated?

18   A    Yes.

19          MS. WYER:  Your Honor, I would move to Exhibit 54

20   into evidence.

21          THE COURT:  Admitted without objec --

22          MR. MURRAY:  May I have one moment, Your Honor?

23          THE COURT:  Any objection?

24          MR. MURRAY:  Yes, may -- I'm trying to locate my

25   copy of it.

1          THE COURT:  Are you familiar with this document?

2          THE WITNESS:  Yes, I am.

3          THE COURT:  Okay.

4          MR. MURRAY:  I just want to make sure it's what --

5          THE COURT:  Because you've read it before?

6          THE WITNESS:  I have.

7          THE COURT:  All right.  All right.  Well, you can --

8     what's --

9          MR. MURRAY:  Yeah, I have no --

10          THE COURT:  What's your question?

11          MR. MURRAY:  I'm fine with it, Your Honor.

12          THE COURT:  All right.  All right.

13          MR. MURRAY:  I just wanted to verify its --

14          THE COURT:  Admitted.  What's the question?

15          MS. WYER:  I simply wanted to admit that document

16     into evidence, Your Honor.

17          THE COURT:  Okay.

18     BY MS. WYER:

19     Q    Now, Free Speech Coalition testified that it currently

20     has -- I mean, you testified that Free Speech Coalition

21     currently has around 800 members, correct?

22     A    Yes.

23     Q    And in early 2005, Free Speech Coalition had around 750

24     members, around the same, correct?

25     A    Yes.  Did you say 2005?

1  Q    Yes.  Before the -- in early 2005, before --

2  A    The event, yes.  Yes.  Yes, that's -- that's about right.

3  Q    And then at that time, Free Speech Coalition was involved

4  in another litigation challenging 2257 in the District of

5  Colorado, correct?

6  A    Yes.

7  Q    And during that case, the pendency of that case, there

8  was a time when the Government agreed to stay enforcement of

9  the 2257 requirements against all Free Speech Coalition

10  members, correct?

11  A    No.  The Government agreed that a particular component,

12  the -- the regulation that called for secondary producers to

13  have -- to maintain records which was not supported by the

14  statute, that portion of enforcement was stayed pending the

15  judge's ruling that the secondary producer provision was

16  beyond the scope of the statute.

17  Q    And there was a cutoff date in the agreement, around

18  10 days after the agreement was made, by which any Free Speech

19  Coalition member who wanted to be -- by any producer who

20  wanted to be covered by the agreement, any -- there was a

21  cutoff date in the agreement so that any Free Speech Coalition

22  member who was a member by that date would be covered by the

23  agreement, correct?

24  A    Correct.

25  Q    And during the 10 days between when the agreement was

Douglas - Cross (Wye)                                140

1    made, approximately 10 days and that cutoff date,

2    approximately 2,000 producers joined the Free Speech

3    Coalition, correct?

4    A    About 1200 entities joined, because at the close our

5    membership was about 2,000.  So I believe it would have been

6    about 1200 that joined.

7    Q    And then after that agreement ceased, the Free Speech

8    Coalition membership members went back down to where it is

9    now, around 800, correct?

10   A    Yes.  There's a -- there's a -- an element to that that

11   requires some explanation, but -- but, yes.

12   Q    You testified that Free Speech Coalition members always

13   check photo IDs for their performers, correct?

14   A    I think what I testified to was that the people recording

15   the images always inspect.  I don't know that secondary

16   producers inspect the original of the ID.  I think that's

17   impossible.  But the primary producers do, yes.

18   Q    You agree that it is not possible to tell a person's age

19   by a visual inspection, correct?

20   A    Except -- the precise age, no.  The age range, yes.  That

21   is, I can distinguish between a 6-year-old and a 60-year-old

22   with relative ease.

23   Q    And Free Speech Coalition does not send out monitors to

24   adult film sets to verify whether they're checking photo IDs,

25   correct?

Douglas - Redirect (Mur)                    141

1   A      That's correct.

2   Q      Free Speech Coalition does not enter into contracts with

3   its members requiring them to check photo IDs, correct?

4   A      It is not a contract.  But the best practices which the

5   Free Speech Coalition promulgates encompasses the checking of

6   ID.

7              MS. WYER:  No further questions.

8              THE COURT:  All right.  Redirect.

9                    REDIRECT EXAMINATION

10  BY MR. MURRAY:

11  Q      Mr. Douglas, just a couple of questions.  Apart from the

12  invoices that were previously produced to the Government,

13  before you came here, did you verify with the office that the

14  four members that you're talking about are still active

15  members?

16  A      Yes, I did.

17  Q      Okay.  Now, you mentioned that there was a reason, an

18  explanation that probably should be combined with your answer

19  about the 1200 additional members that added up to 3,000, and

20  then ultimately went down to the 800.  Why don't you give us

21  that explanation.

22  Q      Organizationally, we were entirely unprepared for a

23  massive influx of new members, hundreds every day, and we made

24  a series of mistakes.  We hired an answering service to take

25  the information over the phone, and the only thing the

1    answering service was interested in was getting the credit

2    card number.  So we had payments from people or entities that

3    we had no means of contacting and did not, or there was the

4    information taken was incorrect or misrecorded, so we didn't

5    have telephone numbers, we didn't have addresses.  So we were

6    unable to contact many of the entities to seek renewal.

7             In addition, many of the entities that purchased a

8    membership did so unconcerned that every component of their

9    business needed to have a separate membership.  So if a -- for

10   instance, a chain of retail outlets buy -- under our rules, a

11   chain can become a member and cover all of their individual

12   stores.  But businesses that had a chain of seven were making

13   each seven bus -- each seven separate locations had their own

14   individualized membership.  In addition, there's been a

15   substantial contraction and consolidation within the industry

16   subsequent to.  So all those are factors in the -- in the

17   reduction of membership.

18   Q    Okay.  Thank you.  That's all I have.

19             THE COURT:  Recross?

20             MS. WYER:  No, Your Honor.

21             THE COURT:  All right.  Thank you very much.

22             THE WITNESS:  Thank you.  Should I --

23             THE COURT:  All right.  Next witness, please.

24             THE WITNESS:  -- leave the exhibits here, Your

25   Honor?

Drouin - Direct (Mur)                                143

1              MR. MURRAY:  Your Honor, at this time, the

2    plaintiffs would call Dr. Michelle Drouin.

3         MICHELLE DROUIN, PLAINTIFFS' WITNESS, SWORN

4              THE CLERK:  Please state your full name for the

5    record, spelling your last name.

6              THE WITNESS:  Michelle Adrian Drouin.  My last name

7    is spelled D-R-O-U-I-N.

8              THE COURT:  G-R-O --

9              THE WITNESS:  D, as in dog, R-O-U-I-N.

10             THE COURT:  Wait.  G-R-O-D --

11             THE WITNESS:  D, as in dog, R-O-U-I-N.

12             THE COURT:  Grodro -- no.  I still got that --

13   G-R-O --

14             THE WITNESS:  Let's start at the beginning.

15             THE COURT:  Yeah.

16             THE WITNESS:  D, D-R-O-U-I-N.  Drouin.

17             THE COURT:  Drouin.  All right.  Thank you.

18             THE WITNESS:  Yes.

19             THE COURT:  All right.  I missed that.

20             THE WITNESS:  Like Brewin with a D.

21             THE COURT:  Gotcha.  Thank you.

22             THE WITNESS:  Yes.

23                         DIRECT EXAMINATION

24   BY MR. MURRAY:

25   Q    And, Dr. Drouin, what is your -- so state your full name

1    for the record.

2    A     Michelle Adrian Drouin.

3    Q     And what city of -- is your residence in?

4    A     Fort Wayne, Indiana.

5    Q     Okay.  And what is your current occupation?

6    A     I'm an associate professor of psychology.

7    Q     At what university?

8    A     Indiana University, Purdue University, Fort Wayne.

9    Q     Okay.

10            MR. MURRAY:  Your Honor, may I approach the witness

11   and hand her an exhibit?

12            THE COURT:  Yeah.

13            THE WITNESS:  Thank you.

14   BY MR. MURRAY:

15   Q     Tell us what your educational background is, Dr. Drouin.

16   A     I received my undergraduate degree from Cornell

17   University, and then I went to Oxford University for graduate

18   school, where I obtained my Doctor of Philosophy, which is our

19   equivalent of PhD.

20   Q     Okay.  And when did you achieve your undergraduate

21   degree?

22   A     1996.

23   Q     And what was your degree in?

24   A     Psychology.

25   Q     Okay.  And what is your PhD in?

1   A     It's in experimental psychology.

2   Q     Okay.  And what has been your professional exper -- and

3   what -- I'm sorry, what year did you achieve your PhD?

4   A     2004.

5   Q     And what have you done professionally since 2004?

6   A     I attained an adjunct professor position at Indiana

7   University, Fort Wayne, in 2005.  I then attained a visiting

8   assistant professor -- a visiting professor position from 2005

9   to 2006.  A tenured track position then became available, and

10  I applied for it.  I got that position.  I was assistant

11  professor until 2012.  And in 2012, I was tenured and promoted

12  to associate professor.

13  Q     Okay.  And tell the Court what courses you teach and to

14  whom.

15  A     I teach a range of courses focused on developmental

16  psychology.  I teach undergraduates, primarily.  There are

17  sometimes some students who've already attained their

18  undergraduate degree who are members of my courses.  I teach

19  introductory psychology courses.  I teach an advanced course

20  in research methods where students study in my lab and learn

21  research methods.

22  Q     Okay.  Now, have you -- and if you look at Plaintiffs'

23  Exhibit 40 in front of you, --

24  A     Yes.

25  Q     -- I think -- can you identify that as a document that

Drouin - Direct (Mur)                                146

1  ultimately includes your CV in the back?

2  A    Yes.

3  Q    Okay.  And if you want to consult that, that's fine.

4  A    Okay.  Thank you.

5  Q    Can you tell the Court whether you've won any relevant

6  honors and awards?

7  A    I have.  I was the college science teacher of the year in

8  2008.  I have been recognized various times for my excellence

9  in teaching, including the faculty colloquium on excellence in

10 teaching.  I was a multi-disciplinary faculty scholar where I

11 collaborated with -- in a research project with other people

12 in my university who are not in my department.  I won the

13 DECCO award for innovative online teaching.  I was a

14 distinguished finalist for outstanding dissertation of the

15 year award when I submitted my dissertation.  That was from

16 the International Reading Association in 2005.  And all of the

17 years that I was studying, not writing my dissertation, at St.

18 Hilda's College, which is one of the colleges at Oxford

19 University, I had a merit scholarship.

20 Q    Okay.  And what are your professional memberships?

21 A    I'm a member of the American Psychological Association,

22 Division 2, the Midwestern Psychological Association.  I'm a

23 voting member of the Society for the Scientific Study of

24 Reading.  I'm a member of the International Reading

25 Association.

Drouin - Direct (Mur)                                    147

1    Q    And have you published -- I'm sorry, have you published

2    articles in journals?

3    A    Yes.

4    Q    Okay.  And are these peer review journals?

5    A    Yes.

6    Q    And approximately how many articles have you published?

7    A    I think 17 is my latest count of articles that are either

8    published or accepted in the process of publication.

9    Q    And in connection with our case, are any of them

10   particularly relevant to our case?

11   A    Yes.  I have two articles that have been published in the

12   Computers in Human Behavior Journal, two that are related

13   primarily on -- to sexting.

14   Q    Okay.  And you say that you have some other articles that

15   have been accepted, but are about to be published?

16   A    Yes.  Those are actually pedagogical research papers, so

17   not related to this trial.

18   Q    Okay.  And have you given presentations over the years?

19   A    I have, yes.

20   Q    And without cataloging all of them, would you describe

21   generally speaking what that consists of?

22   A    What the presentations consist of?

23   Q    Yes.

24   A    What do I do, or what was the work?

25   Q    The work.

Drouin - Direct (Mur)                                    148

1   A    I've given numerous presentations over the years,
2   primarily at the beginning of my career was focused on
3   literacy, so many of my presentations were focused on
4   literacy.  And then I became interested in sexting when I
5   started looking at texting, so my more recent publications are
6   related to sexting and the ways in which technology is
7   influencing the relationships among young adults.
8   Q    And does the curriculum vitae that is attached to
9   Plaintiffs' Exhibit 40, aside from the fact that it doesn't
10  include some of your most recent work, does it accurately
11  portray your education and experience and professional
12  qualifications?
13  A    Yes, although I have -- I have some things in the works.
14  I've been recently asked to do a book chapter and to serve on
15  an advisory board, and those things are not reflected in my
16  CV.
17  Q    And what -- what is the book chapter going to be about?
18  A    I've been asked to write a book chapter on sexting for
19  the Handbook of Psychology, Technology and Society.  Wiley-
20  Blackwell are the publishers.  And --
21  Q    And what is the other project?
22  A    -- the advisory board, there's a philanthropist out of
23  New York City who has a project called Children and Screens
24  and she heard of my work, and she contacted me to possibly
25  serve on her advisory board.

Drouin - Direct (Mur)                              149

1   Q    Now, tell the Court, what is -- your degree -- your PhD

2   is in experimental psychology?

3   A    That's correct.

4   Q    And what is that discipline?

5   A    In experimental psychology, we're primarily interested in

6   using experimental methods to study human behavior.  So it's

7   focused on research.

8   Q    Okay.  And are there any famous experimental

9   psychologists whose names we would readily recognize?

10  A    Yeah.  I mean in the broad sense, almost everything we do

11  now is experimental psychology.  It used to be a more limited

12  term.  B.F. Skinner would be someone who did experimental

13  psychology.  Albert Bandura is a famous experimental

14  psychologist.

15  Q    And what are your areas of research interest?

16  A    I'm interested in the effects of new technologies

17  primarily on communication and relationships, and I have a

18  secondary interest in pedagogy.  So the ways in which

19  technology affects the ways students learn.

20  Q     Now, what is the difference between experimental

21  psychology and practicing psychology?

22  A    A practitioner, I assume you mean a clinical --

23  Q    Yes.

24  A    -- psychologist?  A clinical psychologist would be

25  meeting with clients, doing therapy sessions; they would be

Drouin - Direct (Mur)                                    150

1    focused on the individual and leading them through therapy.

2    An experimental psychologist is -- their primary job is

3    research, and usually teaching is a component of it because

4    most people with PhD's who are doing research are associated

5    with universities or other such organizations where they would

6    be conducting research.

7    Q    Now, in connection with the courses that you teach, do

8    you teach them to undergraduates?

9    A    Yes, primarily.

10   Q    And do the courses that you teach include any instruction

11   on research methods that experimental psychologists use?

12   A    Yes.  In every course I teach, we have at least an

13   introduction to the experimental methods that people would use

14   to collect information about human behavior.

15   Q    Okay.  And are they fairly standard across the spectrum

16   of experimental psychologists?

17   A    The methods that we use?  Yes, I would say that they're

18   fairly standard.  They've evolved over the years, the methods

19   that we use, but as of now, we -- we all use similar methods.

20   Q    Okay.  Now, you mentioned that you started out doing

21   research on literacy?

22   A    That's correct.

23   Q    And just briefly tell the Court what that was about.

24   A    Okay.  So my PhD dissertation was looking at the emergent

25   literacy skills of children, 3-year-olds, and relating them to

Drouin - Direct (Mur)                                    151

1    children's later literacy attainment.  After that, I was

2    starting to look at text messaging and the effects of text

3    messaging on the language that people were -- were using in

4    their everyday lives, so text messaging and literacy.  And so

5    that's probably the scope of my work in a nutshell.

6    Q    And then how did that evolve into your interest in what

7    we're calling sexting?

8    A    When I was looking at texting and literacy, I started

9    getting interested in the content of the messages, not only

10   the language that people used within those messages, and so

11   sexting was a natural progression from that research.

12   Q    And just so that we are on the same page, when you use

13   the term sexting, generally what are you referring to?

14   A    I'm referring to the sending of sexually explicit text or

15   images.  I've separated them out in my research.  Sexually

16   explicit text or images via cell phone, primarily, but I've

17   asked about all different sorts of transmission.

18   Q    Now, were you invited to attend a roundtable that had to

19   do with that subject?

20   A    I was.  In 2010, I was invited to a roundtable at the

21   Microsoft office by a man named Andrew Harris and a woman,

22   Dana Boyd.  They were looking for people who were conducting

23   research in the field, and invited about 20 people who has

24   presentations that were relevant to furthering the

25   investigation of sexting.  I was the only psychologist that

                    Drouin - Direct (Mur)                    152

1    was invited to this roundtable.

2    Q    And what kinds of other experts were there?

3    A    Ethnographers.   There was a man there from -- an

4    associate from MTV.   The Associated Press and MTV Study had

5    come out at that time.   There were people who were associated

6    with the criminal justice system.   There were educators.

7    People who all had interest -- there were lawyers.   There were

8    two lawyers there who had interest in sexting.

9    Q    Okay.   Now, did you, in fact, then do a study of that

10   phenomenon?

11   A    Of sexting?

12   Q    Yes.

13   A    Yes.

14   Q    And when did you do the first -- the study.   When did you

15   do your first study on that subject?

16   A    I think I collected my data in 2009 in my first study.

17   Q    And what -- how did you go about conducting the study?

18   A    I conducted my study using the psychology department

19   research pool.   We -- everyone who takes introductory

20   psychology is part of the pool, and they can elect to either

21   take part in research or write an alternative research

22   assignment.   So I created an online survey, which I sent

23   through the ethics board for approval.   Once it was approved,

24   I posted it for people to take online.   They took the study,

25   and then I analyzed the results.

1    Q    Okay.  So the way you selected your sample, could you be

2    a little bit more descriptive?  Explain exactly how that

3    process worked.

4    A    So anyone who's a member enrolled in introductory

5    psychology has to, as part of the course requirements, either

6    participate in research, so various projects, I think standard

7    we usually have about five projects that they should

8    participate in each semester, or complete an alternative

9    research assignment.  Psychology department subject rules such

10   as these are standard across the country, Harvard, Yale,

11   Cornell; I mean, pretty much every school or psychology

12   department has psychology department research pools such as

13   this.  So that -- that was my population of interest.

14   Q    And is that an accepted methodology to select a sample

15   for purposes of social scientific research?

16   A    It is probably the most commonly used sampling method.

17   Q    By social --

18   A    Psychologists.

19   Q    Okay.  All right.  So -- and is there a name for that

20   type of sample?

21   A    You can call it a convenient sample.  I think that would

22   be the terminology that most people would use.

23   Q    And do social scientists regularly use that method in

24   drawing conclusions about their research?

25   A    They do.  Social scientists use this method all the time.

1    You -- you understand that every individual study is based on

2    a convenient sample, so eventually what you hope to find is a

3    convergence of evidence from several convenient samples.

4    Q    Okay.  Now, have you read Dr. Stark's report in this

5    case, the Government's expert, critiquing your -- your study?

6    A    I have.

7    Q    Okay.  And have you reviewed his criticism of your study

8    insofar as he suggests that it was -- that by not using a

9    random sample, that that undermines the reliability of your

10   study?

11   A    I have.

12   Q    And what is your response to that criticism?

13   A    I -- I don't believe that Dr. Stark understands what

14   social scientists do on a daily basis.  He -- he's looking at

15   a purely statistical standpoint, and from a purely statistical

16   standpoint, no study is perfect.  Every study has flaws.  So I

17   think he's basing his criticism only on statistical

18   boundaries.  But social scientists do this research all the

19   time.  This is the commonly used method, probably the most

20   commonly used method to gather information about human

21   behavior.

22   Q    Now, in addition --

23            THE COURT:  Would you do me a favor?  Pull the

24   microphone up.  Talk directly in front of it.

25            THE WITNESS:  Okay.  Is -- is that better?

Drouin - Direct (Mur)                          155

1          THE COURT:  Yeah.  A little bit.

2          THE WITNESS:  Okay.  Sorry.

3          THE COURT:  Go ahead.  I mean, I can hear you, but I

4     want to be sure everybody else can.

5          THE WITNESS:  Okay.

6          THE COURT:  Yeah.

7     BY MR. MURRAY:

8     Q    In addition to selecting the sample then --

9          THE COURT:  Keep your volume up a little bit, okay?

10         THE WITNESS:  Okay.

11         THE COURT:  Go ahead.

12         THE WITNESS:  I'll get closer.

13    BY MR. MURRAY:

14    Q    In addition to selecting the sample, did you -- well, let

15    me back up.  How many -- how many individuals ended up making

16    up the sample in your first study?

17    A    In my first study, after I excluded anyone who was not in

18    a committed relationship, I had 744 participants.

19    Q    Okay.  Explain that part of -- of the sample to the

20    Court.  How did you select the people who would be included in

21    the study from among the people who responded to the survey?

22    A    If they responded to the survey, they were included.  So

23    they -- they signed up to participate in the study.

24    Q    Okay.  And then how -- but you mentioned that you

25    excluded some?

Drouin - Direct (Mur)                          156

1    A    I did.  I excluded -- because my -- my first article was

2    focused primarily on sexting within relationships and how

3    attachment relates to sexting in relationships.  I excluded

4    everyone who indicated that they have never been in a

5    committed relationship.

6    Q    Okay.  And -- and what is it that you were trying to find

7    out about relationships and its connection with sexting?

8    A    I was trying to determine whether relationship patterns,

9    specifically avoidant attachment and anxious attachment, were

10   related to the frequency of sexting within romantic

11   relationships.

12   Q    And so what in your instrument did you ask that permitted

13   you to narrow the field?

14   A    I asked them had they ever been in a committed

15   relationship.

16   Q    And how many responded affirmatively to that?

17   A    744 of the 878.

18   Q    Okay.  784 of --

19   A    744 out of 878.

20   Q    Okay.  And so the instrument that you prepared then --

21   how did you prepare the instrument, by the way, that was used?

22   A    I used a standard measure of attachment.  I used the

23   experiences in close relationship scale, which is the most

24   commonly used scale.  Because there was no scale for sexting,

25   I devised my own questions.  I used the term sexually explicit

Drouin - Direct (Mur)                                     157

1    because that's a term that people are familiar with; it's on

2    DVDs and video games, as -- for the sexual content questions.

3    Q    Okay.  And so how many of the sample were men and how

4    many were women?

5    A    233 were men; 511 were women.

6    Q    And is that unusual, that there would be so many more

7    women in this survey?

8    A    That's fairly common, too, that you find women are more

9    likely to take these surveys.

10   Q    And did that have any effect on your belief in the

11   validity of your results?

12   A    It did not.  I did a gender analysis of sexting behavior,

13   and there were no differences in overall frequency for the men

14   and women, and I had a sizeable sample with 233 men.  Had it

15   been two men, then it would have been questionable.  But with

16   this number of men, I was fairly confident that they were --

17   the results I found were real.

18   Q    And what was the specific question you asked about

19   sexting?

20   A    I asked the frequency with which they sent sexually

21   explicit text messages, and the frequency with which they sent

22   sexually explicit picture and video messages to relationship

23   partners.

24   Q    Okay.  And what were the results of your study?

25   A    In my study, I found that approximately 40 -- or 54

Drouin - Direct (Mur)                        158

1   percent of the people who had been in committed relationships,

2   because that was my sample, had sent sexually explicit or

3   indicated that they had sent sexually explicit picture or

4   video messages to their most significant relationship partner.

5   Q    Okay.  Now -- and was your study published?

6   A    Yes, it was.

7   Q    And where was it published?

8   A    <u>Computers in Human Behavior</u>.

9   Q    And was it published in a peer review journal?

10  A    It was.

11  Q    And is your article part of Plaintiffs' Exhibit 40?

12  A    Yes, it is.

13  Q    And just for the record, why don't you identify what

14  Plaintiffs' Exhibit 40 is in its entirety?

15  A    It's my statement, my two articles as attachments, and my

16  CV.

17  Q    Okay.  When you say your statement, do you mean your

18  expert report?

19  A    I do.

20  Q    Okay.  Now -- all right.  Now, did you do a follow-up

21  study, Dr. Drouin?

22  A    I did.

23  Q    And can you tell the Court when you did the follow-up

24  study?

25  A    I collected data in fall of 2011.

Drouin - Direct (Mur)                    159

1   Q    And can you describe the methodology that you used for

2   the follow-up study?

3   A    The methodology was very simple.  I used again the

4   psychology department research pool.  I put an online study up

5   for people to sign up for.  And then when I had a sufficient

6   number of participants to do my data analyses, I exported the

7   data and did my data analyses.

8   Q    By the way, when you had posted and solicit persons to

9   participate in the survey, how did you frame the name of the

10  survey?

11  A    I tried to make the name of the survey rather general, so

12  for the first one it was texting in relationships.  For the

13  second survey, it was social media and sexual behavior.

14  Q    Okay.  Now -- and what was the response rate on your

15  follow-up study?

16  A    Again, the response rate is -- whomever signed up for the

17  study participated, so response rates aren't calculated.

18  Q    And how many made up the sample on that follow-up study?

19  A    253.

20  Q    And what was the breakdown for men and women?

21  A    This time I had more even distribution; I had 105 men and

22  148 women.

23  Q    And then did you also create an instrument associated

24  with this particular follow-up study?

25  A    I did.

1    Q    And what -- what did that instrument consist of?

2    A    I was exploring three things in this study.  It was meant

3    to serve as a baseline for researchers and other people who

4    were developing initiatives with -- with young adults and

5    sexting, so I was concerned with content of messages, the

6    transmission medium, and the relationship context in which the

7    transmission of these messages occurred.

8              So with regard to content of messages, I asked them

9    to delineate the type of content that they had sent, for those

10   who indicated that they had ever sent a sex picture or text to

11   a partner.  So there were categories of sexually suggestive,

12   like clothed, nearly nude, nude, a solo sex act, and I gave

13   the example of masturbation, and sex with another person who

14   was not the partner.

15   Q    Now, you mentioned the first study had to do with people

16   in a committed relationship, correct?

17   A    It did.

18   Q    And did you vary the sec -- the follow-up study to

19   include more than that?

20   A    I did.  I looked at relation -- people who are in

21   committed relationships, casual sexual relationships, and also

22   cheating relationships.  Let me just add that in the first

23   study, I did also collect data, but I never published it

24   because I -- I haven't had time to publish it, but on casual

25   sexual relationships, too, I did collect data in the first

Drouin - Direct (Mur)                                    161

1    study.

2    Q    Okay.  And then what is it that you ask the persons about

3    those relationships to qualify them at the beginning of the

4    instrument?

5    A    I ask them if they had ever had a committed relationship

6    partner or a casual sex partner or a cheating partner, and I

7    gave descriptions of what that would mean.  So, for example,

8    for a committed relationship, I then had them think about --

9    think about your most significant either current or past

10   committed relationship, this would be a person with whom you

11   shared an intimate relationship, like a serious boyfriend or

12   girlfriend, and would not be just a casual fling or person

13   with whom you were involved only sexually.  So I gave

14   descriptors such as that for each category of relationship.

15   Q    Okay.  And then the -- what was the first question that

16   the instrument asked about sexting images?

17   A    They were asked whether or not they had sent sex pictures

18   or videos.  It was a frequency scale, a 6-point Likert scale,

19   from 1/never to 6/very frequently.

20   Q    And -- and then what were the follow-up questions?

21   A    The follow-up questions concerned the content and the

22   medium.  So after they -- for anyone who indicated that they

23   had sent those types of pictures more than never, they were

24   asked to indicate what type of content they had ever sent to

25   that sexual partner.  So the content areas that I had just

Drouin - Direct (Mur)                    162

1    explained, nearly nude, nude, masturbation, et cetera, and

2    then they were asked via what medium had they sent those

3    images.  And I asked them Facebook, text message, Twitter, or

4    email.

5    Q    Okay.  And what were the results of this follow-up study?

6    A    The results were that between 37 and 49 percent of people

7    in different types of relationships had said they had sent

8    sexually explicit pictures or videos to their relationship

9    partners.

10   Q    Okay.  And was this study published as well?

11   A    It was.

12   Q    And where was this study published?

13   A    Again, Computers in Human Behavior.

14   Q    And was it peer reviewed as well?

15   A    It was.

16   Q    And was there a breakdown that you're able to share with

17   the Court on the -- when it came to answering the specific

18   questions about content?  What -- what were the percentages,

19   for example?

20   A    Yes.  Okay.  Yes, I can.  And the -- I'll just remind

21   everyone that these were broken down by the type of

22   relationships, so they had to indicate first that they had had

23   that type of relationship in order to get to the frequency

24   questions about sending that type of content.

25              So we had almost about one in five who said they had

1   sent a picture or video of themselves in a solo sex act to

2   relationship partners, of all the people who had sent that

3   type of message.  But when you looked at people who had been

4   in that type of relationship, then you have about 10 percent,

5   for example, who had sent a solo sex act picture or video to

6   their relationship partner across the relationship types.

7          With regard to nudity, you have almost about one in

8   five.  In some cases, it's one in ten for cheating partners,

9   who had sent pictures of themselves nude to relationship

10  partners.  Sex with another person was rare, but not

11  nonexistent.  Nearly nude was the most common.  We had about

12  35 percent of those who had been in committed partnerships

13  saying that they had sent that type of message; about

14  30 percent of cheating partners, and about 20 percent of

15  casual sex partners.

16  Q    Now, in addition to those two studies, were you able to

17  form an opinion about the prevalence of sexting among young

18  adults ages 18 to 24, based on those studies and any other

19  information?

20  A    Yes, I was.

21  Q    And what -- how did you go about arriving at that

22  estimate; what information did you consider?

23  A    I used the results from my study, the results from a

24  study from Ferguson, the results from the National Campaign to

25  Prevent Teen and Unplanned Pregnancy survey, the results of

1    the MTV and Associated Press survey, and the results of the

2    survey provided by Zimmerman and colleagues, Zimmerman,

3    Gordon, Messer, Bauermeister.

4    Q    Okay.  And is that an accepted methodology in the field

5    of experimental psychology for drawing conclusions from --

6    drawing broader conclusions from data?

7    A    It is.  It is the acceptable.  What you hope to see is a

8    convergence of evidence, and you want to take into account any

9    deviations that you see.

10   Q    Okay.  And do social scientists and experimental

11   psychologists across the country use that method in drawing

12   general conclusions?

13   A    Yes, they would.  And there is a formal -- once we have

14   more studies, people can conduct what's formally called a

15   meta-analysis.  So you would probably need more studies to do

16   it.  But that would be the formalized method of trying to find

17   a convergence of evidence.

18   Q    Now, did you review Dr. Stark's criticism of the method

19   by which you arrived at your estimate across the United

20   States?

21   A    I did.

22   Q    And what is your response to -- to his criticism of the

23   method that you just described?

24   A    I don't think it's valid.  People use a method of

25   comparing -- I was asked to extrapolate.  I did extrapolate.

1    There's a purely statistical extrapolation, which is what I

2    think he refers to in his document.  And then there's

3    extrapolation based on existing evidence, and your opinion of

4    what you're seeing, and I found a convergence of evidence.

5    And he didn't take into account what would be a normal

6    scientific method in the social science field.

7    Q    Now, based on your studies and these others that you have

8    listed, what is your opinion as to the percentage of young

9    adults ages 18 to 24 in the United States who have sent text

10   messages involving sexually explicit visual depictions?

11   A    I estimate that approximately one-third of young adults

12   18 to 24 have sent sexually explicit visual depictions.

13   Q    Okay.  And if -- and based on census data that's

14   available to you, what does that estimate -- translate into

15   numbers?

16   A    It translates into about 10.2 million young adults.

17   Q    Okay.  Thank you.  That's all I have.

18            MR. MURRAY:  Thank you, Your Honor.

19            THE COURT:  All right.  Cross-examine.

20                      CROSS-EXAMINATION

21   BY MR. SWINTON:

22   Q    And, Dr. Drouin, you testified that approximately

23   one-third of young adults nationwide have sent text messages

24   with sexually explicit visual depictions, correct?

25   A    Yes.

Drouin - Cross (Swi)                                166

1    Q    And this translates into approximately 10.2 million young

2    adults, when you apply your percentage to census data, right?

3    A    Correct.

4    Q    And you relied on six studies about sexting to reach your

5    conclusion, correct?

6    A    Yes.

7    Q    And you've noted that the definitions of sexting have

8    varied across studies, correct?

9    A    They have.

10   Q    Dr. Drouin, I'd like you to take another look at

11   Plaintiffs' Exhibit 40, and specifically page 14.

12   A    Okay.

13   Q    And this should be under the heading, "2.2.2 Prevalence

14   of Sexting."

15   A    Yes.

16   Q    So, Dr. Drouin, one of the things you asked participants

17   in this study was whether they had sent sex pictures or

18   videos, correct?

19   A    Correct.

20   Q    And you further delineated the types of images that had

21   been sent by the type of conduct depicted, correct?

22   A    Yes.

23   Q    So you asked about nude images, nearly nude, engaged in a

24   sex act with another person?

25   A    Correct.

1    Q    And engaged in a solo sex act with an example of

2    masturbation.  And you also asked about images where the

3    person was in a sexually suggestive pose, but clothed.

4    A    Yes.

5    Q    And the example for the latter was cleavage showing,

6    correct?

7    A    Yes.

8    Q    And, Dr. Drouin, you also noted in this study that the

9    inconsistencies in the ways various studies have defined

10   sexting makes comparability among the studies nearly

11   impossible, correct?

12   A    Yes.  Lounsbury said that, but yes, I did cite that

13   statement in my article.

14   Q    And that's one of the reasons why you delineated --

15   that's why you delineated your -- your research in this study

16   by the type of conduct depicted, correct?

17   A    I did.  I -- I delineated it so that I could have more

18   information about the type of conduct that was being sent.

19   Q    Did you determine whether the prevalence -- whether the

20   prevalence statistics vary by content?

21   A    No.  I just wanted to see more of what the content was.

22   It wasn't to determine whether the prevalence statistics

23   varied by content.

24   Q    Dr. Drouin, on the same exhibit, if we could turn to I

25   believe it's page 7.  That should be your first study.

1   A    Yes.

2   Q    And it's under Section 2.3.2, "Texting and Sexting

3   Practices."

4   A    Yes.

5   Q    So, Dr. Drouin, one of the things you measured in this

6   study was how many participants had sent a sexually explicit

7   picture and video message to relationship partners, right?

8   A    Correct.

9   Q    And you didn't provide a definition for sexually

10  explicit, right?

11  A    I did not, but sexually explicit is a commonly used term.

12  Q    So, for example, you don't know how many of the

13  respondents sent an image of intercourse, right?

14  A    I do not, no.

15  Q    Or of masturbation?

16  A    No.

17  Q    Or only of breasts?

18  A    No.

19  Q    Or only of cleavage?

20  A    No, but the assumption is that if they've seen sexually

21  explicit on video games or movies, they usually indicate some

22  type of pornographic content.

23  Q    Dr. Drouin, I'd like to show you what has been marked as

24  Defendant's Exhibit 190.

25          MR. SWINTON:  Your Honor, if I may approach the

Drouin - Cross (Swi)                                169

1    witness to hand her this?

2             THE COURT:  Yes.

3             THE WITNESS: Thank you.

4    BY MR. SWINTON:

5    Q    Dr. Drouin, do you recognize this document?

6    A    I do.

7    Q    And what do you recognize it to be?

8    A    This is Ferguson's study that I referenced in my

9    statement.

10   Q    So this is one of the studies you considered when making

11   your estimate?

12   A    It was.

13           MR. SWINTON:  Your Honor, I hereby move to admit

14   Defendant's Exhibit 190 into evidence.

15           THE COURT:  All right.  Admitted without objection?

16   Do you object?

17           MR. MURRAY:  No objection, Your Honor, but I forgot,

18   and I'd like to move Exhibit 40 into evidence before I forget.

19           THE COURT:  All right.  Admitted.  40 will be

20   admitted.  Do you object to this?

21           MR. SWINTON:  No objection.

22           THE COURT:  All right.  Admitted.

23   BY MR. SWINTON:

24   Q    So, Dr. Drouin, if you could turn to the page that's

25   marked Bates 1908.

1    A    Yes.

2    Q    And this is under the heading, "Materials."

3    A    Yes.

4    Q    I'll just draw a little line here and focus in on a

5    particular passage.  So, Dr. Drouin, this study asked

6    respondents how frequently they sent "erotic or nude

7    phonographs of myself (sexting) to another person and received

8    nude/erotic photographs from another person," right?

9    A    Yes.

10   Q    And the study didn't further define the word erotic,

11   right?

12   A    I don't remember that it did, no.

13   Q    And it also didn't further define the word nude, correct?

14   A    No.  I don't think so.

15   Q    So, again, you don't know how -- from looking at this

16   study, how many of the respondents sent images of intercourse?

17   A    No, I don't.

18   Q    Or of masturbation?

19   A    No, I don't.

20   Q    Or images only of breasts?

21   A    No, I don't.

22   Q    Or images only of cleavage?

23   A    I don't, but erotic or nude doesn't sound like only of

24   cleavage, but I don't -- I don't know for sure what the

25   respondents interpreted.  But these are only of themselves, so

1    it doesn't include anything that people would have sent that

2    was not of themselves.

3    Q    Dr. Drouin, I'm going to hand you another document.  This

4    has been marked as Defendant's Exhibit 188.

5              MR. SWINTON:  And, Your Honor, if I may approach?

6              THE COURT:  Yes.

7              THE WITNESS:  Thank you.

8    BY MR. SWINTON:

9    Q    Dr. Drouin, do you recognize this document?

10   A    I do, yes.

11   Q    And what do you recognize it to be?

12   A    This is the National Campaign to --

13             THE COURT:  What is it?  Sorry.

14   A    The National Campaign to Prevent Teen and Unplanned

15   Pregnancies, Sex and Tech Survey.

16   Q    And this is one of the studies you relied upon when you

17   were making your estimate, correct?

18   A    It was, yes.

19             MR. SWINTON:  Your Honor, I move to admit

20   Defendant's Exhibit 188 in evidence.

21             THE COURT:  Admitted.

22   BY MR. SWINTON:

23   Q    So, Dr. Drouin, if we could turn to the page marked Bates

24   1886.

25   A    Yes.

1    Q    And specifically look at the section labeled "Definition

2    of Terms."

3    A    Yes.

4    Q    So, Dr. Drouin, this study asked respondents whether they

5    had sent sexually suggestive pictures or videos, correct?

6    A    Yes.  And they defined it, yes.

7    Q    Yeah, and it defined those types of images as "semi-nude

8    or nude personal pictures/video taken of oneself and not found

9    on the Internet or received from a stranger (like spam), et

10   cetera."

11   A    Correct.

12   Q    And the study didn't further define the word semi-nude,

13   correct?

14   A    It did not.

15   Q    And it also didn't define the word nude, correct?

16   A    It did not.

17   Q    So then you don't know -- you don't know how many of the

18   respondents sent images of intercourse, right?

19   A    I do not.

20   Q    Or of masturbation?

21   A    I do not.

22   Q    Or only of breasts?

23   A    I do not.

24   Q    Or only of cleavage?

25   A    I do not.

1   Q    Dr. Drouin, I'm going to show you one more document.

2   This has been marked as Defendant's Exhibit 189.

3           MR. SWINTON:  Your Honor, if I may approach?

4           THE COURT:  Yep.

5           THE WITNESS:  Thanks.

6   BY MR. SWINTON:

7   Q    So, Dr. Drouin, do you recognize this document?

8   A    I do.

9   Q    And what do you recognize it to be?

10  A    This is the Zimmerman paper that I referenced in my

11  report.

12  Q    So you relied on this study when making your estimate,

13  right?

14  A    I did.

15          MR. SWINTON:  Your Honor, I hereby move to admit

16  Defendant's Exhibit 189.

17          THE COURT:  All right.  Admitted.

18  BY MR. SWINTON:

19  Q    And, Dr. Drouin, if you could turn to the page that's

20  marked Bates 1902.

21  A    Yes.

22  Q    And this is under the heading "Measures," subheading

23  "Sexting."

24  A    Yes.

25  Q    Now, this study asks respondents whether they had ever

1    sexted, correct?

2    A    I don't -- yes, it did.

3    Q    And it defined sexting as sending a "sexually suggestive

4    nude or nearly nude photo of themselves to someone else,"

5    correct?

6    A    Using their cell phones, yes.

7    Q    And the study didn't further define sexually suggestive,

8    correct?

9    A    They did not.

10   Q    Or nearly nude?

11   A    They did not.

12   Q    So you don't know how many of the respondents sent images

13   that were of intercourse, correct?

14   A    I do not.

15   Q    Or masturbation?

16   A    I do not.

17   Q    Or only of breasts?

18   A    I do not.

19   Q    Or only of cleavage?

20   A    No.

21   Q    Doctor, I'm going to hand you one more document.  This

22   has been marked as Defendant's Exhibit 187.

23            MR. SWINTON:  If I may approach?

24            THE COURT:  Yes.

25            THE WITNESS:  Thanks.

1    BY MR. SWINTON:

2    Q    Dr. Drouin, do you recognize this document?

3    A    I do.

4    Q    And what do you recognize it to be?

5    A    This is the Associated Press/MTV study on sexting.

6    Q    And this is one more study that you considered when

7    making your estimate, correct?

8    A    It was, yes.

9         MR. SWINTON:  Your Honor, I hereby move to admit

10   Defendant's Exhibit 187 into evidence.

11        THE COURT:  Admitted.

12   BY MR. SWINTON:

13   Q    Dr. Drouin, if you could please turn to page 1876.

14   A    Yes.

15   Q    And this is under the heading "Sexting."  This study

16   asked respondents whether they had been involved in "Some type

17   of naked sexting," correct?

18   A    Correct.

19   Q    And it didn't define naked sexting, right?

20   A    No, but it -- I think naked is a pretty clear term.

21   Q    So, again, you don't know how many respondents sent

22   images of intercourse, correct?

23   A    I don't.

24   Q    Or of masturbation?

25   A    I don't.

Drouin - Cross (Swi)                                    176

1    Q    Or only of breasts?

2    A    I don't.

3    Q    Or only of cleavage?

4    A    Well, only of breasts or only of cleavage would not be

5    naked.

6    Q    So someone whose breasts are showing is not naked?

7    A    Someone whose breasts are showing is not naked.

8    Q    And is that how it's defined in the study here?

9    A    It says any type of naked sexting.

10   Q    Okay.  And, Dr. Drouin, your estimate is of the number of

11   young adults who have sent sexually explicit images, correct?

12   A    My first study, yes.

13   Q    I'm sorry, I was referring to the estimate in your expert

14   report.

15   A    Let me check my wording.  "Involving sexually explicit

16   visual depictions."

17   Q    And you didn't define the term sexually explicit in your

18   expert report, correct?

19   A    I did not.

20   Q    And, in fact, your definition of sexually explicit

21   encompasses all of the definitions of sexting that were used

22   in the six studies you relied upon in your report, right?

23   A    They did.

24   Q    And, Dr. Drouin, you also did not delineate your estimate

25   in your expert report by the type of sexually explicit conduct

1    depicted, correct?

2    A    I did not.

3    Q    So when you estimate that 10.2 million young adults have

4    sent sexually explicit images, you don't know how many of

5    those images depict intercourse, right?

6    A    That's correct.

7    Q    Or masturbation?

8    A    That's correct.

9    Q    Or are images only of breasts?

10   A    That's right.

11   Q    Or images only of cleavage?

12   A    That's right.

13   Q    And, Dr. Drouin, your estimate also wasn't limited only

14   to people who have sent images of themselves, correct?

15   A    It was.  All -- all of those studies are talking about

16   images of themselves.  So, yeah, none of these studies have

17   considered images that people have sent that have been of

18   other people.

19   Q    So all six studies were measuring images that had -- that

20   were depicting only -- that were depictions of the sender

21   only?

22   A    In -- in many of the studies, as I recall, they -- they

23   asked specifically of yourself.  Of yourself.

24   Q    Okay.  And just a second ago, I think you said that all

25   the studies did.  Is that -- is that the case?

1   A    I would say that as I recall, the studies -- most of the

2   studies said of yourself.  I -- mine did not.  But most of the

3   other studies did.

4   Q    Okay.  So, Dr. Drouin, I'd like to turn your attention

5   back to the last document we looked at, which was Defendant's

6   Exhibit 187.

7   A    Yes.

8   Q    And that line that we read previously said, "3 in 10

9   young people report having been involved in some type of naked

10  sexting," correct?

11  A    That's correct.

12  Q    And then the next line down says, "1 in 10 have -- has

13  shared a naked image of themselves," correct?

14  A    Yes.

15  Q    And naked sexting could be images sent of anyone,

16  correct?

17  A    I guess, yes.

18  Q    And naked images of themselves means an image of the

19  sender, correct?

20  A    That's correct.  I would assume so.  I didn't write the

21  survey, but I assume so.

22  Q    But you relied upon this survey when you were making your

23  estimate?

24  A    I did, yes.

25  Q    Now, Dr. Drouin, a person could send a sexually explicit

1   image to more than one recipient, correct?

2   A    That's correct.

3   Q    And you don't know how many of the 10.2 million people in

4   your estimate sent images to multiple recipients, correct?

5   A    I don't.

6   Q    Dr. Drouin, you also did not make an estimate in your

7   expert report about how frequently people sent sexually

8   explicit images, right?

9   A    I did not.

10   Q    And your estimate also isn't limited to people who are in

11   romantic relationships, right?

12   A    No, it's not.

13   Q    Or who have been in romantic relationships?

14   A    It's not.

15   Q    Dr. Drouin, you considered a total of six studies on

16   sexting to make your estimate?

17   A    That's correct.

18   Q    And two of these studies are ones that you conducted

19   yourself, as you previously explained.  You had research goals

20   for each of these studies, I assume?

21   A    I did.

22   Q    And it's fair to say that the primary research goal in

23   each study was not to determine the prevalence of sexting

24   among all young adults?

25   A    That's correct.

Drouin - Cross (Swi)                                         180

1    Q    And other than the two studies you've already previously

2    discussed, you haven't published any other studies on sexting,

3    right?

4    A    No, but I have a presentation that I just presented on

5    sexting, and I have a manuscript in progress.

6    Q    And as you also previously discussed, the participants in

7    the two studies you conducted and have published were

8    undergraduate students at Indiana Purdue, Fort Wayne

9    University, right?

10   A    That's correct.

11   Q    And they were all undergraduate students in introductory

12   psychology classes?

13   A    They were.

14   Q    And a third study you considered used a sample of 207

15   women enrolled at a Hispanic-serving university in the

16   southern region of the United States, right?

17   A    Ferguson study, yes.

18   Q    And 199 of these participants out of 207 characterized

19   themselves as being Hispanic, correct?

20   A    I believe so.

21   Q    And, Dr. Drouin, you cannot make a reasonable scientific

22   estimate about the prevalence of sexting among all young

23   adults in the country based only on these three studies,

24   right?

25   A    Based only on those three studies, since they were done

1   primarily with undergraduates, I -- I would want more

2   information, which I did gather.

3   Q    And, in fact, you said that you cannot generalize the

4   prevalence of sexting among all undergraduate students based

5   only on these three studies, correct?

6   A    Based only on these three studies.  I would probably want

7   one more study.  But I'd be looking still for a convergence of

8   evidence.

9   Q    And, again, you also considered three studies that were

10  not limited to undergraduate students, right?

11  A    I did, yes.

12  Q    And across all six of the studies, the lowest prevalence

13  rate was 20 percent, right?

14  A    That's correct.

15  Q    And the highest of the six prevalence rates was

16  54 percent?

17  A    That's correct.

18  Q    And your estimate in your expert report is where you

19  believed there was a convergence of the six prevalence rates?

20  A    That's correct.

21  Q    And this is what you called a convergence of evidence?

22  A    Correct.

23  Q    And as you've previously explained, to determine that

24  there was a convergence of evidence, you looked at the six

25  studies and determined what you felt they said collectively,

1  right?

2  A    I -- I tried to see what they said collectively, yes.

3  Q    And you've also previously defined the convergence of

4  evidence as being a belief, right?

5  A    I don't know that that's the way I defined it, but you're

6  looking at the evidence, looking to see whether the results

7  converge.

8  Q    So I just want to make sure I have this straight.  Have

9  -- are you saying that you've never previously defined the

10 convergence of evidence as being a belief?

11 A    I don't know if I said that.  What I'm saying is, you

12 look at -- you look at the results to see if they converge.

13 Q    And, Dr. Drouin, you didn't perform a meta-analysis

14 before writing your expert report, right?

15 A    I did not perform a meta-analysis.  With this number of

16 studies, it would have been impractical.

17 Q    And you also didn't perform any calculations to arrive at

18 your estimate of 33 percent, correct?

19 A    Calculations, no, not direct.

20 Q    And you didn't weight the data in any sort of

21 mathematical way, right?

22 A    There is no way to weight the data when you're

23 considering these different studies.

24 Q    And, in fact, you said that you considered all six

25 studies equally, right?

1    A    I did.

2    Q    And, Dr. Drouin, the research you do on human behavior is

3    social science research, right?

4    A    It is.

5    Q    And the point of social science research is to contribute

6    to a theory, right?

7    A    It is.

8    Q    And this is a different type of research than polling?

9    A    It is.  It's different than polling.

10   Q    And in polling, the primary purpose is to determine how

11   often something is occurring, right?

12   A    I don't know that that's always the -- I don't do

13   polling, so I don't know what the primary reason to do polling

14   is.

15   Q    So you've never -- so you can't say what the primary --

16   let me back up one second.  So you -- your testimony is that

17   you don't know what the primary purpose of polling is?

18   A    I -- I do not conduct polls, so I wouldn't -- I don't

19   know.  I suppose that they're looking at something, but I

20   don't conduct polls, so I don't know what drives their --

21   their questions.

22   Q    And are you saying that the primary purpose of polling is

23   not to determine how often something's occurring?

24   A    I don't think I said that.

25   Q    Okay.  So that's not your testimony today?

Drouin - Cross (Swi)                    184

1    A    You said that I said something was not.  No, I didn't --

2    I don't think I said that.

3    Q    Okay.

4    A    I don't know what the primary person -- purpose of

5    polling is.  I don't do polling, so I don't know what the

6    primary purpose is when they poll.

7    Q    Okay.  So, Dr. Drouin, you testified that you don't know

8    what the primary purpose of polling is, right?

9    A    I do not do polls, so I don't know what the primary

10   purpose of polling is.

11   Q    So I just wonder -- I want to ask you a few questions.

12   You --

13           THE COURT:  Well, when you say polling, what exactly

14   do you mean?  You mean verbally asking people -- you said a

15   questionnaire, is that right?

16           THE WITNESS:  A questionnaire, yes.  I had a

17   question --

18           THE COURT:  Yeah.  Polling would be what, like

19   calling people up on the phone or interviewing them?

20           MR. SWINTON:  Yeah, something -- something like the

21   Gallup Poll or the pew research poll.

22           THE COURT:  All right.  Where you go and approach

23   people and -- that's what you understand polling is?

24           THE WITNESS:  Okay, yes, that's what I understand

25   polling is, like the Gallup Poll.

1          MR. SWINTON:  Sure.

2          THE COURT:  And you don't do that?

3          THE WITNESS:  I don't do that, no.

4   BY MR. SWINTON:

5   Q    And you don't know what the -- what the primary goal of

6   polling is?

7   A    You -- you led with the question asking me is my goal to

8   study human behavior.  Yes, that's my goal.  So their goal may

9   be the same.  I'm not sure what their goal is.  Maybe they

10  want to study human behavior, just like I do.  I don't know

11  what is the primary behavior driving polling.

12  Q    Now, Dr. Drouin, do you remember that you gave a

13  deposition in this case in April; don't you?

14  A    I do.

15  Q    And that was on April 26th?

16  A    Yes.

17  Q    And at that deposition, I asked you a series of

18  questions?

19  A    Yes.

20  Q    And Ms. Baumgardner was also present?

21  A    She was.

22  Q    And before you answered those questions, you were sworn

23  by the court reporter to tell the truth, weren't you?

24  A    Yes.

25  Q    And, in fact, you did tell the truth?

1    A     Yes.

2    Q     And that's the same oath that you took today, correct?

3    A     Yes.

4    Q     So, Dr. Drouin, I'm going to read an excerpt from your

5    deposition, and I'd like you to please follow along to make

6    sure that I'm reading correctly.  This is at page 68.

7    A     Okay.

8    Q     Start at line 3.  Oh, I'm sorry, I think it's page 64.

9          (Pause)

10   Q     68.  Sorry, we don't have the page numbers on the --

11   A     Thank you.

12   Q     So, Dr. Drouin, this is page 68, starting at line 3, and

13   this is your answer:  "So the research that I do, I'm looking

14   at human behavior in the broader sense, so I'm usually trying

15   to contribute to theory in some way.  The driving force of my

16   research is to build upon developmental or, in a broad sense,

17   human theory, theory about the ways that humans might interact

18   or humans might communicate.  So what you have then is usually

19   you begin with some examination of a theory and where it might

20   fit in.  What -- I'm distinguishing that from polling data,

21   which may just be interested in prevalence.  So the primary

22   goal of that type of research, again broadly used, is to see

23   how often something is occurring, and it's actually -- the

24   goal of it is not to relate to it -- relate it to or build

25   upon any particular theory of human development or interaction

1    or whatever theory, the goal of that is just to look at

2    prevalence.  And it's not -- it's a different -- I'm not going

3    to say that it isn't a scientific approach, so it's a

4    different scientific approach."

5    A    That's correct.

6    Q    Dr. Drouin, making estimates about prevalence data is not

7    something that's commonly done in social science research,

8    correct?

9    A    Making estimates about prevalence data?  No, we do, yes.

10   Q    So your -- so -- so you're saying that making estimates

11   about prevalence data is something that's commonly done in

12   social science research?

13   A    In social science research, we may make estimates about

14   prevalence data, yes.  But that's not usually the primary goal

15   of social science research.

16   Q    Okay.  So, Dr. Drouin, again, I'd like to remind you that

17   you took a deposition in this case in April.

18   A    Yes.

19   Q    And you testified under oath to tell the truth, and you

20   did tell the truth, correct?

21   A    I did, yes.

22   Q    And, again, you took that same oath today?

23   A    I did, yes.

24   Q    So if you could turn in the transcript to page 138 and

25   start at line 3 -- I'm sorry, we can start on page 137, line

25.  And, again, please follow along and let me know if I'm

not reading something correctly.  "Question:  How many would

you need?  Answer:  Probably six.  Question:  Six?  Answer:

No, the actual number -- if not asked to make an estimation --

making estimations about prevalence data is not something

that's typically done in social science research, so there's

no set amount of studies from my perspective that you would

need, to make these types of estimates."

         And, Dr. Drouin, you've never made estimates about

the prevalence of a behavior other than sexting, right?

         MR. MURRAY:  Objection, Your Honor, and I would move

to strike it.  It's not at all inconsistent with anything she

just said.

         THE COURT:  Yes.  Sustained.

         MR. SWINTON:  Your Honor, she previously said making

estimates about --

         THE COURT:  Well, it's argumentative.  You can argue

that, but I don't think it's proper cross.

         MR. SWINTON:  Okay.

BY MR. SWINTON:

Q    Dr. Drouin, you've never made estimates about the

prevalence of behavior other than sexting, right?

A    I've made -- I'm sure I made some kind of estimates about

texting data as well.  I can't recall.

Q    And, in fact, the only estimate you've made about the

Drouin - Cross (Swi)                               189

1    prevalence of sexting nationwide is the one that's in your

2    expert report, right?

3    A    Yes.  I indicated to you when we had our deposition that

4    I think that's the only estimate, aside from any media

5    interviews I may have given after the sexting work came out.

6    Q    And, Dr. Drouin, you estimate in your expert report that

7    the number of young adults who have sent sexually explicit

8    messages is "approximately 33 percent," right?

9    A    I believe so, or approximately one-third.  Approximately

10   one-third is my wording.

11   Q    And the word approximately as used in your report is not

12   a statistical margin of error, right?

13   A    No, it is not.

14   Q    And there's no number range associated with that word,

15   correct?

16   A    There isn't.

17   Q    And, in fact, approximately isn't a word you've used

18   before in any of your own studies, right?

19   A    Oh, I'm not sure.  It seems like a word that I would have

20   used, but --

21   Q    It's not a word you've ever used when reporting the

22   findings in any of your studies, correct?

23   A    I think approximately is a word that I would have used in

24   reporting the findings, but I -- I can't be certain unless I

25   had all of my research articles.

1    Q    Can you think of any study where you've used the word

2    approximately when reporting your findings?

3             THE COURT:  Well, look, this -- you know, everything

4    is -- in this kind of area is approximate.  Nobody can be

5    exact.  I'm not sure --

6             MR. SWINTON:  I guess the point is, Your Honor,

7    she's attaching this word approximately to the number value in

8    her estimate, and we just want to determine what exactly --

9             THE COURT:  Well, she said --

10            MR. SWINTON:  -- that word approximately means.

11            THE COURT:  She said approximately.  She just

12   testified approximately is something she would frequently use,

13   which I can understand because you can't be -- this is not

14   like a scientific formula.

15            MR. SWINTON:  Okay.

16   BY MR. SWINTON:

17   Q    Dr. Drouin, you also state that you hold your opinion "to

18   a reasonable degree of scientific certainty," correct?

19   A    Yes.

20   Q    And this is not a phrase you ever recall using before in

21   your work, right?

22   A    No.

23   Q    And, in fact, this isn't a phrase that's typically used

24   in the social sciences?

25   A    I don't know if it's typically used in the social

Drouin - Cross (Swi)                                    191

1    sciences.  I -- I haven't seen it.

2    Q    And you said previously that you used this word -- this

3    phrase in your report because it seemed like the appropriate

4    legal term to use?

5    A    Yes.

6    Q    And, in fact, it was a term suggested to you by the

7    attorneys for the plaintiffs, wasn't it?

8    A    We -- I think we had that discussion.  I don't remember

9    exactly how it came into my brain.

10             MR. SWINTON:  No further questions.

11             THE COURT:  Okay.  All right.  Before redirect, I

12   would just like to ask a couple questions.

13             THE WITNESS:  Okay.

14             THE COURT:  Do you have any knowledge, Doctor, from

15   either reading anything or talking to counsel, of what the

16   issues are in this case?

17             THE WITNESS:  Limited.  I have limited knowledge of

18   the issues in this case.

19             THE COURT:  What's your understanding?

20             THE WITNESS:  I understand that there's a statute,

21   2257, that is requiring people to make documentation of the --

22   I think the age -- you have to take a driver's license.  I

23   heard a little bit of the testimony while I was in the court.

24             THE COURT:  Okay.  Then you were in the courtroom

25   this morning?

1              THE WITNESS:  I was in the courtroom for about two

2      hours --

3              THE COURT:  Okay.

4              THE WITNESS:  -- this morning.

5              THE COURT:  Okay.  All right.  Do you -- as you're

6      sitting here, --

7              THE WITNESS:  Yes.

8              THE COURT:  -- do you see any relevance between your

9      study about text -- sexting and the issue in this case as

10     you've described it?

11             THE WITNESS:  I do.  I see the relevance in that

12     people are sending this in personal relationships, so I was

13     asked to provide estimates of how many people are just sending

14     it as private communication.  And if that is a relevant issue

15     in this case, then I think my work is relevant.

16             THE COURT:  Okay.  Do you have any knowledge if any

17     of the participants in any of your surveys were minors, that

18     is, under 18?

19             THE WITNESS:  If they were minors, they had to be

20     excluded from analyses.  So there are some people who take

21     undergraduate classes who would be minors, and we exclude them

22     by birth date before analysis.

23             THE COURT:  All right.  That would depend on their

24     own responses as to their age?

25             THE WITNESS:  It would be, yes.

1          THE COURT:  You didn't do any checking of their

2    honesty?

3          THE WITNESS:  I don't.  Their survey data is not

4    collected to their -- connected to their names, so their

5    survey data is completely anonymous.  Afterwards they fill out

6    their names, but there'd be no way for me to cross reference

7    their names to their survey data.

8          THE COURT:  Okay.  Okay.  Thank you.  All right.

9    Redirect?

10                     REDIRECT EXAMINATION

11   BY MR. MURRAY:

12   Q    Dr. Drouin, just kind of following up what the -- what

13   the Court was asking you about, if -- if you were to assume

14   that a person who actually sent -- an adult who sent a

15   sexually explicit image of himself by means of a cell phone

16   were required to, under this statute, maintain records of his

17   own ID, put a label on the image that is being sent, telling

18   where the records could be maintained, which presumably would

19   be that person's home, since it emanates from the home, and

20   was required to send a notice to the attorney general or his

21   designee of the 20 hours a week that one would have to be

22   present, available to be -- have those records inspected,

23   would you think if that is the requirement of the law, that

24   your study would be relevant to those issues?

25                MR. SWINTON:  Your Honor, objection.  Beyond the

Drouin - Redirect (Mur)                                    194

1    scope of the witness' expertise.

2              THE COURT:  I'm sorry, what's the reason?

3              MR. SWINTON:  Your Honor, it's beyond the scope of

4    her expertise.  She has no knowledge of this law.

5              THE COURT:  No.  Well, it relates to my --

6              MR. SWINTON:  It's also beyond the scope of the

7    cross.

8              THE COURT:  It relates to my question.  Overruled.

9    A    I don't believe that people would be keeping records like

10   that if they're transmitting them via cell phones.

11   Q    Now, you were asked on cross-examination about the

12   frequency with which these images were sent --

13   A    Yes.

14   Q    -- by persons.  Did your first study address that issue?

15   A    I did.  I asked frequency in both studies.

16   Q    And if you would turn to page 447 of your first study in

17   Plaintiffs' Exhibit 40, can you tell the Court what the

18   breakdown was for sending sex pictures -- I'm sorry, is that

19   your first or second report?

20   A    That's my first report, and it -- it was just an

21   abbreviation.

22   Q    Okay.

23   A    They were asked about sexually explicit pictures or

24   videos.  But I abbreviated to sex pictures.

25   Q    Okay.  And what -- just -- just take us across the board

Drouin - Redirect (Mur)                                    195

1   on that.  What were the percentages of those who had very

2   rarely, rarely, occasionally, often, and very often sent sex

3   pictures?

4   A    14.8 percent indicated that they had very rarely sent

5   sexually explicit pictures or videos to their committed

6   partner; 79 or 10.6 percent indicated that they rarely sent

7   such pictures or videos to their partner; 21.9 indicated that

8   they had occasionally sent such pictures or videos to their

9   partner; 5.4 percent indicated that they often sent these

10  types of videos or pictures to their partner, and 1.5 percent

11  indicated that they very often sent these sexually explicit

12  pictures or videos to their partner.

13  Q    And so what was the total percentage of those who had

14  done -- who had sent such sex pictures at least occasionally

15  as opposed to rarely or very rarely?

16  A    Approximately 29 percent.

17  Q    Okay.  Thank you.

18             MR. MURRAY:  That's all I have, Your Honor.

19             THE COURT:  All right  Recross?

20             MR. SWINTON:  No, Your Honor.

21             THE COURT:  All right.  Thank you very much.

22             THE WITNESS:  Thank you.

23             THE COURT:  You're excused.  Next witness, please.

24             MR. MURRAY:  Yes, Your Honor.  At this time, the

25  plaintiffs would call Diane Wilson.

1           MR. SWINTON:  Your Honor, if I may approach the

2     bench to --

3                THE COURT:  Yes, sure.

4           MR. SWINTON:  -- grab the transcript.

5                THE COURT:  Yes.

6         DIANE WILSON, PLAINTIFFS' WITNESS, SWORN

7                THE CLERK:  Please state your full name for the

8     record and spell your last name.

9                THE WITNESS:  Linda Diane Wilson, W-I-L-S-O-N.

10               THE CLERK:  Thank you very much.

11                          DIRECT EXAMINATION

12    BY MR. MURRAY:

13    Q    Ms. Wilson, would you please state what city you're from.

14    A    I live in Durham, North Carolina.

15    Q    Okay.  And tell the Court what your current occupation

16    is.

17    A    I am the office manager and property manager at Sinclair

18    Institute in Hillsborough, North Carolina.

19    Q    Okay.  And is that -- is the corporate name for that

20    entity known as Townsend Enterprises, Incorporated?

21    A    Yes, d/b/a Sinclair Institute.

22    Q    And is that a plaintiff in this case?

23    A    Yes.

24    Q    Okay.  And how long, approximately, have you been serving

25    in the capacity of office manager for that company?

1    A    Since I started in August of 2005.

2    Q    Okay.  And generally speaking, what are your duties as

3    the office manager?

4    A    I see to the needs of the employees in the building, as

5    far as making sure they have what they need to do their job.

6    I manage the vendors that we hire to take care of the systems

7    on our property, so the HVAC people, the landscape folks, the

8    housekeepers, and that kind of thing.  And I also keep our

9    2257 records.

10   Q    Okay.  And where is Sinclair -- I'm sorry, let me back

11   up.  What is your educational background?

12   A    I have a bachelor's degree from the University of North

13   Carolina at Chapel Hill.

14   Q    And what year did you achieve that degree?

15   A    1991.

16   Q    What was your major?

17   A    Art.

18   Q    Okay.  And where is the Sinclair Institute located?

19   A    At 402 Millstone Drive in Hillsborough, North Carolina.

20   Q    And would you tell the Court what Sinclair Institute is?

21   A    Yes.  We're the world's largest producers and

22   distributors of adult sexual education and health media.

23   Q    Okay.  And how long has Sinclair Institute been doing

24   that kind of work, approximately?

25   A    I believe we became Townsend Enterprises in 1991.

1    Q    Okay.  And is there an association between your company

2    and another entity known as PHE?

3    A    Yes.

4              THE COURT:  P-P-A --

5              MR. MURRAY:  PHE, Your Honor.  PHE.

6    A    PHE.  We're like a sister company.  The person that

7    started PHE, our company emerged out of that company,

8    recognizing the market that we serve, and the owner of that

9    company is a majority shareholder in Sinclair Institute.

10   Q    Okay.  Now, does Sinclair Institute produce adult films

11   or --

12   A    Yes, we do.

13   Q    -- DVDs now, I guess?

14   A    Yes.

15   Q    Okay.  And so it is a primary producer of those?

16   A    Yes.

17   Q    Okay.  And how long has Sinclair been producing sex

18   education films?

19   A    I believe in 1991, when we first started, we licensed

20   someone else's footage in the very beginning.  But probably

21   since before 1995, we've been producing our own explicit

22   education films.

23   Q    Now, has Sinclair received any awards for its sex

24   education films?

25   A    We've received numerous awards for our videos, some of

1   them from specific entities that give awards to folks in our

2   field, and some from film societies who recognize the quality

3   and value of the films that we produce.

4   Q    I see.

5            MR. MURRAY:  If I may approach, Your Honor?

6            THE COURT:  Yes.

7   BY MR. MURRAY:

8   Q    I want to hand you what's been marked as Plaintiffs'

9   Exhibit 109, which I will display on the screen, and ask you

10  if you can identify that.

11  A    This discusses our mission.

12  Q    Is this a document that is created

13       by the Sinclair Institute?

14  A    Yes.  We provide this information on our website.

15  Q    And does it explain what kind of company you are and what

16  kind of product you sell?

17  A    Yes, it does.

18  Q    And I notice on the second page of Plaintiffs' Exhibit

19  109, there is a heading known as advisory council.  Do you see

20  that there?

21  A    Yes.

22  Q    And can you tell the Court what -- what role -- what is

23  the advisory council for Sinclair Institute?

24  A    The advisory council is made up of professionals in the

25  field of adult human sexuality.  Some of them are researchers;

1    some of them are professors; some of them are clinicians.  We

2    have -- we are in professional organizations.  We share

3    membership with these folks in professional organizations,

4    largely to gain wisdom about the topics that we address in our

5    videos.  Some of these people participate in webinars on our

6    website, and some of these people have appeared in our videos

7    as experts in the specific topics that we discuss in our

8    videos.

9    Q    And what is the role that these members of the advisory

10   council play with respect to the content of the DVDs that are

11   produced by Sinclair Institute?

12   A    From what I understand, because we, you know, because we

13   value accuracy and relevancy in -- in our field, we interact

14   with these people through professional organizations and

15   professional relationships, in order to gain information that

16   is considered correct and -- for our educational videos.  Am I

17   answering the question?

18   Q    Yes.  Thank you.

19            MR. MURRAY:  Your Honor, I'd offer 109 into

20   evidence.

21   BY MR. MURRAY:

22   Q    Do you -- so there are -- are there standards, in fact,

23   that are set for your sex education videos?

24   A    Yes.  Our company overall uses the term sex positive to

25   describe what we do.  We are interested in mature adult sexual

1   health and education.  We want to ensure that none of our

2   content would be in any way exploited or humiliating to

3   anyone.  So we also value the aesthetic content of what we do.

4   Q    Now, can you tell the Court, are most of the people who

5   appear in the Sinclair produced films or DVDs under the age of

6   30 or over the age of 30?

7   A    I would say over the age of 30.

8            THE COURT:  Over?  You said over?

9            THE WITNESS:  Yes.

10  BY MR. MURRAY:

11  Q    And are any of them married couples who appear in your

12  films?

13  A    Yes.

14  Q    Okay.  Now -- and are there any performers, to your

15  knowledge, in any of the films that actually appear in the

16  sexually explicit scenes in your films young enough looking

17  that they could possibly be confused as someone under the age

18  of 18?

19  A    I would say absolutely not.

20  Q    Okay.  Now, tell the Court what the difference, if any,

21  is between the performers in the DVDs and people who are

22  depicted on the covers, the front covers of your DVDs.

23  A    Yes.  Typically the performers in our DVDs are engaged in

24  explicit acts with each other to educate the viewer on the

25  basics of adult sex that they may be interested in.  On the

1    front of our DVD, we typically use models in non-explicit

2    photo shoots.  It's really more appropriate for the cover of

3    the DVD.  The images might be suggestive, but they're all --

4    they're almost, in my memory, almost all of them are -- these

5    images for the cover are comprised of models in our photo

6    shoots that we do.  On the back of the DVD cover, often there

7    are pictures of the individual couples in the film; one or two

8    of them are typically shown on the back and perhaps a picture

9    of one of the experts in the film.

10   Q    And how are -- you mentioned the photo -- there are photo

11   shoots to get the models for the front of the cover?

12   A    Yes.

13   Q    Explain how that happens.

14   A    Well, we go to a modeling agency and hire models, and we

15   rent locations and we hire a photographer, and our producer

16   goes with our creative director and we take certain photos of

17   these individuals.  Sometimes they're holding hands, sometimes

18   they're hugging, sometimes they may be in a swimming pool.

19   We're trying to show closeness amongst these couples in -- in

20   the content of the images that we acquire on photo shoots.

21   Q    Okay.  Now, Ms. Wilson, I want to show you what has been

22   marked as --

23            MR. MURRAY:  May I approach, Your Honor?

24            THE COURT:  Yes.

25   BY MR. MURRAY

1    Q    I want to show you, for example, what's been marked as

2    Plaintiffs' Exhibit 74.  Can you identify what that is?

3    A    Yes.  This is one of our videos called "The Better Sex

4    Guide to Great Oral Sex."  This is the Sizzle Series, which is

5    developed for a market where it's a little bit, I guess,

6    hotter, we would say.  The models on the front are from a

7    photo shoot that we've done, and we have compliance for those.

8    And then the models on the back, these are also from a photo

9    shoot in my -- to my memory, and these are two of our experts

10   that appear on the back.

11   Q    Let me just see if I can do this in a way that -- without

12   spending too much time, let me show some of these as you're

13   testifying.  Exhibit 75, is that another one of your videos?

14   A    Yes, it is.

15   Q    Okay.  Actually, that one's a DVD, correct?

16   A    Yes.

17   Q    And that's entitled "Provocative Sex Play?"

18   A    Yes.

19   Q    Now, let's take a look at Exhibit 76.  Is that one of

20   your -- Sinclair's videos?

21   A    Yes.  That's the "Best of the Better Sex" collection, the

22   Sizzle edition.

23   Q    And the persons depicted on the front, are those

24   performers in the films?

25   A    They are models from the photo shoot of non-explicit,

1    completely non-explicit sex.

2    Q    And then on the back, there's some information that is

3    contained about the film, is that correct?

4    A    Yes, and that's a -- I happen to know that this is one of

5    the couples that are in our films.

6    Q    And by couples you mean this is a married couple?

7    A    To --

8    Q    Oh, I'm sorry, this is a couple that -- that's depicted

9    in this --

10   A    I believe they're actually in this -- in the footage of

11   this film, yes.  They're in our -- in some of the footage from

12   the "Better Sex" collection, which is --

13   Q    And then there's a -- a quote from a Dr. Colon, who's on

14   the advisory council, is that correct?

15   A    Yes, Eli Colon.

16   Q    And he explains what some of the educational value of

17   this film is?

18   A    Yes.

19           MR. BLADUELL:  Objection.  Leading.

20   BY MR. MURRAY:

21   Q    Plaintiffs' Exhibit 77, is that another film by --

22   educational film by your company?

23   A    I recognize that, yes.

24   Q    And that's "The Art of Orgasm?"

25   A    Yes.

1    Q    And, again, the people depicted on the front cover, are

2    they --

3    A    They are models from a photo shoot.

4    Q    And on the back, is there additional information by

5    members of your advisory council?

6    A    Yes.

7    Q    And it indicates "10 real couples guide you through an

8    intimate journey."  So they're -- this would be a film that

9    had 10 couples who were real couples, in other words, genuine

10   people?

11   A    Yes.  Many of our performers are married couples.

12   Q    Plaintiffs' Exhibit 78 is another one of your films, is

13   it not?

14   A    Yes, it is.

15   Q    Entitled "Turn-ons, How to Please Your Partner?"

16   A    Yes.

17   Q    And, again, are the people on the front cover performers

18   or models?

19   A    They are models from a non-explicit photo shoot.

20   Q    Okay.  And then on the back, what -- what can you tell

21   us?

22   A    These are the same two people that appear on the first

23   one that you showed in the picture together, and I believe

24   they are models, and then there are the pictures of two of our

25   members of our advisory council.

1    Q    Okay.  Now, you mentioned that -- and here's a good

2    example, Plaintiffs' Exhibit 79.  That's Volume 2 of

3    "Turn-ons;" is that another one of your films?

4    A    Yes, it is.

5    Q    And, again, you have -- those are two models?

6    A    Yes, they are.

7    Q    And when you say they're in a non-explicit pose, is that

8    what you mean, that there was no actual sexually explicit

9    conduct being depicted?

10   A    We don't have any explicit conduct in any of our photo

11   shoots at all, only the moving images, the video that we use.

12   Q    Now, did there come a time when you learned, however,

13   that the 2257 requirement was expanded to include simulated

14   sex acts?

15   A    Yes.

16   Q    And did that cause a change in the way that you kept

17   records for even the people on the covers?

18   A    Yes.  We started treating simulated sex as explicit, I

19   want to say it was July 2008 or 6.  The dates are escaping me

20   right now, but it did change, because initially we had only

21   looked at their IDs, and now we were required to keep copies

22   of their IDs.  And we, at our company, because we don't want

23   there to be any confusion at all, we treat -- we now, as of

24   that ruling, we started treating any simulated, like this

25   looks like it could be two couples in a live film with

1  everything, we treat it as if it's explicit, so we keep all

2  the records that we would be required if it were explicit

3  material.

4  Q    Okay.  Plaintiffs' Exhibit 80, is that another one of

5  your videotapes?

6  A    Yes, it is.

7  Q    Okay.  Plaintiffs' Exhibit 81.

8  A    That is one of your videos, yes.

9  Q    And, again, on the back you have some information by

10  members of your advisory council?

11  A    Yes, and a picture of one of the married couples that are

12  actually in the footage, or that we have used in footage.  A

13  lot of these are compilations, so it's -- it gets a little

14  confusing.

15  Q    Okay.  Let's take a look at Plaintiffs' Exhibit 82.  Is

16  that one of your videos?

17  A    Can I see the title of that, please?

18  Q    Yes.  I'm sorry.  "The Couples' Guide to Great Sex Over

19  40?"

20  A    Yes.  That is one -- that is one of our videos from --

21  that we sell, and I don't know the production date.  It was

22  before I started working, so my knowledge of the content is --

23  but those look more like the couples that are in our films.

24  Q    Okay.  And if you look at the back, it describes this as

25  a film, "Enjoy the best sex of your life after 40."

1    A    Yes.

2    Q    And it says, "Many people mistakenly believe that after

3    40 or 50, their sex drives will decline."  That kind of

4    information?

5    A    Yes.

6    Q    You have quotes back here from somebody named Phil, aged

7    69, "Sex keeps me young."

8    A    Yes.  A large majority, I believe, of our customers are

9    probably over the age of 40.

10   Q    And then again there's information about members of your

11   advisory council?

12   A    Yes.  Our advisory council members do change over time.

13   Sometimes because of different changes in their life, they'll

14   ask to be off, and then we'll add more, you know,

15   professionals are frequently retiring and that kind of thing.

16   So the advisory board has not been static over the period of

17   time we have been in a relationship with them.  But I do

18   recognize those people as having been on our advisory board.

19   Q    And then, again, is Plaintiffs' Exhibit 83 another one of

20   Sinclair's DVDs?

21   A    Yes, it is.

22   Q    And is that the one entitled "A Couple's Guide to Great

23   Sex Over 40, Volume 2?"

24   A    Yes.

25   Q    And, again, similar information on the back as was

1   depicted on the previous exhibit?

2   A    Yes.

3   Q    Now, if -- so that we might be able to speed this up, Ms.

4   Wilson, would you mind just taking a quick look at all the

5   remaining DVDs in this box which go from Plaintiffs' Exhibit

6   84 through Plaintiffs' Exhibit 127, and confirm that these are

7   a collection of the sex education DVDs that Sinclair Institute

8   has produced?

9   A    Yes.  Those -- those are videos and DVDs that we would be

10  considered the primary producer for.

11  Q    And they are all educational films of -- similar to the

12  ones that we've looked at before?

13            MR. BLADUELL:  Objection, Your Honor, leading.

14            THE COURT:  Overruled.

15  A    Yes, they're all educational films.

16            MR. MURRAY:  Your Honor, at this time, I would offer

17  into evidence Plaintiffs' Exhibits 74 through 109 -- I'm

18  sorry, through 127.  May I have those --

19            THE COURT:  Yes.

20            MR. MURRAY:  -- offered in evidence?

21            THE COURT:  Yep.

22            MR. MURRAY:  Thank you.

23            MR. BLADUELL:  We just want to clarify if it's --

24            THE COURT:  You object?

25            MR. BLADUELL:  Objection.

1          THE COURT:  Well, he's just marking them as

2     exhibits.

3          MR. BLADUELL:  Okay.

4          UNIDENTIFIED SPEAKER:  Some of the things on your

5     exhibit list are --

6          THE COURT:  Wait.  Just -- just a minute.  Sir, --

7          MR. MURRAY:  No, I'm sorry.  Let me -- let me revise

8     that statement.

9          THE COURT:  All right.  Go ahead.

10          MR. MURRAY:  I think that is not correct.  First of

11     all, I just -- for the record, 109 I would like to offer into

12     evidence.

13          THE COURT:  Okay.

14          MR. MURRAY:  And then I --

15          THE COURT:  Well, that was with the prior witness.

16          MR. MURRAY:  That was with this witness.  That was

17     the information from the --

18          THE COURT:  Oh, right.  109?

19          MR. MURRAY:  Yes.

20          THE COURT:  All right.  Any objection?

21          MR. BLADUELL:  No objection, Your Honor.

22          THE COURT:  All right.  Admitted.

23          MR. MURRAY:  And then I do want to offer these DVDs

24     into evidence, Your Honor, but I'll do that at a more

25     convenient time when I can verify --

1          THE COURT:  All right.

2          MR. MURRAY:  -- that I've accurately recited their

3   numbers.  But my goal, Your Honor, was to not bother the Court

4   with going through every single one.  I can do that, if

5   there's going to be an objection, but I'm hoping that there

6   won't be.

7          THE COURT:  Okay.

8   BY MR. MURRAY:

9   Q    Now, Ms. Wilson, does Sinclair Institute, in all the time

10  that you've been there, have any interest whatsoever in using

11  underage performers in its films?

12  A    Absolutely none.

13  Q    Does Sinclair have a position on child pornography or

14  using underage performers?  What is your position?

15  A    Well, I would say anyone associated with our company,

16  we're a company interested in adult human sexuality and in

17  helping adults have more fulfilled sex lives.  We feel very

18  strongly that anything exploitive involving a minor would be

19  -- you know, not only is it illegal, but it's unethical and

20  it's just not what we do.

21  Q    Now, to your knowledge, has Sinclair always checked IDs

22  for the performers in its explicit films?

23  A    Yes.

24  Q    Now, you mentioned that you have a role in complying with

25  2257 and 2257A at Sinclair, is that correct?

1    A    That's correct.

2    Q    And what is your role?

3    A    Well, now I actually create our primary producer's

4    documents that we're required to keep.  I didn't always do

5    that.  There was someone else who worked there before me who

6    kept those records, but I was very aware of -- of what they

7    were doing.  And I keep the secondary producer's records.  And

8    what that involves, as a primary producer is, collecting

9    copies of the IDs, creating statements of compliance that are

10   signed by someone who was on the site when the film was made,

11   who is basically testifying to the statement that is made

12   there, that -- that all of our records are in compliance with

13   the statute.

14         We create a cast list that lists the real name and

15   the aliases of the people involved.  And then we convert those

16   documents -- now that we're allowed to do it electronically,

17   we keep paper copies and we keep electronic documents that we

18   file in a computer program that ties the documents to the

19   visuals that we use.  And as secondary producers, we do not

20   create those documents, but we have to request, collect, and

21   store, and have ready for inspection those documents that

22   would be from other people who produce these things, but we

23   sell their products.

24   Q    All right.  So just so that we're clear, you're a primary

25   producer of the DVDs and videos that we've just identified, is

1   that correct?

2   A    Yes.

3   Q    Okay.

4   A    And the packaging that would be on -- that we would

5   create for the product that we sell that isn't a DVD.

6   Q    Okay.

7             MR. MURRAY:  And, Your Honor, at this time, I would

8   offer into evidence Plaintiffs' Exhibits 74 through 108, and

9   then 119 through 127, which are the DVDs that she has just

10  identified.

11            THE COURT:  All right.  Any objection?

12            MR. BLADUELL:  No objection, Your Honor.

13            THE COURT:  All right.  Admitted.

14  BY MR. MURRAY:

15  Q    All right.  So you mentioned that you are a secondary

16  producer as well.  Tell the Court how that happens to be the

17  case.

18  A    When we choose to sell another producer's or creator's

19  products, any image that we use to sell those products has to

20  -- when we publish that image, we become a secondary producer

21  of that image.  So if we request -- if our art department

22  requests 100 images from Wicked Pictures, for example, we'll

23  choose the images that we would like to use to put in our

24  catalog or on our website, and then we enter those into our

25  visual library system and tie them to the documents that we've

1    requested.

2    Q    Now, you had -- you had testified about your films that

3    you produce and the fact that most of the performers are over

4    the age of 30, and that none of them could be confused as

5    minors.  With respect to the products that you sell in your

6    capacity as a secondary producer, do those include some films

7    or DVDs where younger looking actors and actresses do appear?

8    A    Yes.

9    Q    And can you give the Court an example of how that happens

10   to be in your inventory?

11   A    We sell those products in our catalog and on our website,

12   and so the DVD cover, which is typically the image that's

13   used, not exclusively, but typically would have an image

14   perhaps of a woman who was of a younger age than the DVDs that

15   we produce, because there is a small portion of what we sell

16   that -- that the people are younger that appear on the covers,

17   that are actually in the films.

18   Q    Okay.  Now, tell the Court how you go about complying

19   with respect to the issue of cross referencing and what is

20   involved in that in your job as the record keeper for 2257 and

21   2257A.

22   A    It's very complicated.  Every time we use an image that

23   -- in our catalog, in a flyer, in a letter, or on our website,

24   we have to record that instance of use.  The only way that we

25   can record that instance is by giving that image an individual

1    bar code.  Bar code is really sort of a misnomer; it's just

2    really a number.  We just say bar code.

3         We have a visual library system that now we have

4    access to, where when we enter the visuals in this library

5    system, that number is generated.  And so now every -- and

6    it's also connected to the documents that are required by the

7    2257 to go along with that image.  The use, if it's in our

8    catalog, has to be recorded.  And let's say, for example, our

9    catalog is the December catalog, that catalog also has an

10   individual piece code, so that bar code has to be tied to that

11   piece code and to those documents.

12        There was a time when we didn't use electronic

13   documents, and so I actually did this all manually with paper

14   documents and with symbols and things so that -- but now we

15   are doing it through our visual library.  We -- if we use that

16   image again in the January catalog, it has to be documented

17   again.

18        The catalogs are also published online.  We have to

19   document that -- that electronic use.  If we use the image in

20   an email, that also has to be documented.  And all of those

21   instances of documentation have to be tied back to the IDs,

22   the certificate of compliance, the cast list, if it is indeed

23   a DVD and, of course, the aliases, the real names of all of

24   the people that are involved.  It is a mountain of documents.

25        Some films have as many as 100 performers if they're

1   a compilation.  We like to be able to use multiple images

2   throughout the life of a product, so if we use more than one,

3   it's the same again over and over and over for each image that

4   we use.  It has to be tied back to those documents.

5   Q    And is that a time consuming process for you?

6   A    It now takes up about half of my job, about 20 hours a

7   week.

8   Q    Now, do you encounter any problems along the way in

9   accomplishing the record keeping requirements?

10  A    We do.  Because we sell other people's work, we have to

11  contact them in order to get these documents.  Sometimes that

12  can -- they can answer us back within a couple of days.  I've

13  waited as long as two months to get the proper documents.

14           We have a computer program that is sort of the

15  beginning of the structure of this thing, where the review --

16  because the films are all reviewed, the review is entered, and

17  until all of those documents are in place, we -- the program

18  will not allow our inventory system to order these products.

19  So I have to -- I have to examine -- I have to get all of the

20  documents, which can take a couple of days, it can take a

21  week, it can take a month, it can take two months, holding us

22  up from being able to sell the film that we've already

23  approved through our -- what we feel like are very rigid

24  standards in our review process.

25           We get them.  Then I have to examine them and make

1    sure that they're all in order and that they meet our

2    requirements, which are probably as strict as anyone in the

3    industry's, as far as -- you know, we just don't allow things

4    to go through that just aren't in perfect order, you know.  If

5    something -- you know, if an ID, if you can't see it so well,

6    and I can't look at that ID and determine that that date says

7    -- you know, that birthday and that it jives with the

8    production date, then we just won't carry the film.  The

9    documents -- I cannot certify the documents unless they would

10   meet the same standards that we require for our own primary

11   documents.

12             I also -- loading this stuff into the computer is

13   always instantaneous.  There are a lot of people using this

14   database at the same time or using this -- I'm not very

15   technical minded, but the pipe that the data goes through, and

16   depending on how many people are using it, it could -- I could

17   sit and -- you know, I could load an image and try to get a

18   bar code for it, and I can sit and watch this wheel spin, you

19   know, sometimes five minutes; sometimes it could be 10

20   seconds.  There's no -- I could only give an estimate of about

21   how much time it takes to do any of these things because the

22   time varies, depending on who we're dealing with, and we deal

23   with a lot of different companies, and we probably -- I

24   believe we've estimated we publish about 10,000 images a year.

25   Q    Okay.  Now, you mentioned that you have catalogs.  How

Wilson - Direct (Mur)                                         218

1    many catalogs do you publish each year?

2    A    We publish 14 catalogs; twelve 32-page catalogs, one

3    64-page catalog, and one 48-page catalog.

4    Q    And do they all have images on them?

5    A    They do.  I estimate eight to ten images per page.

6    Q    Okay.  So that would result in thousands of images?

7    A    Yes.  When you add the catalogs, the letters, the emails,

8    the wholesale catalog, the wholesale sale sheets, the flyers,

9    then if you add those images being reproduced on our website,

10   because we put our catalog online, for example, we would like

11   someone who sees something in a mailing to be able to go to

12   our website and see the exact same thing so that there's

13   continuity and they know what they're getting, that's where

14   our estimate of about 10,000 images a year  that have these

15   unique numbers that have to be tied back to these documents.

16   Q    So the -- the flyers, the email -- I'm sorry, the flyers,

17   the letters, the catalogs, begin as hard copies that are sent

18   out to people?

19   A    Yes.

20   Q    And then on -- and so do you have to account for record

21   keeping for every image on every one of those hard copies that

22   you send out?

23   A    Yes, we do.

24             MR. BLADUELL:  Objection.  Leading.

25             THE COURT:  Overruled.

1   A    Every image --

2              THE COURT:   It is leading, but it's -- it's not

3   prejudicial.   Go ahead.

4   A    Every image that we use that we and the folks that advise

5   us are required to keep these kinds of records on, we keep

6   those records.   And that includes our product packaging and,

7   you know, which includes the DVD packaging, that kind of

8   thing.

9   Q    Okay.   So then what happens; you say these catalogs and

10  letters go up on your website as well?

11  A    Yes.

12  Q    Okay.   And then so those images are put up on the

13  website?

14  A    We put them on the website, and then we have to log the

15  electronic use of those, so that that's just another form of

16  the cross referencing.   It's for the electronic use.   Every --

17  every use, whether it's electronic and printed matter, it has

18  to be documented.

19  Q    Well, can you give us an example of a single image, how

20  many times might you have to account for that single image in

21  terms of a new record-keeping event?

22  A    Every single time.   Every -- every physical printed piece

23  that we produce, whether it's a DVD cover, called the sleeve,

24  whether it's a catalog, a flyer, a letter, has a unique

25  number, and if I use the same image more than one time, then

Wilson - Direct (Mur)                                    220

1    I've got to document it every time I use it.  So I might use

2    it in Catalog 36-A, I might use it in Catalog, you know,

3    ET110-B, but it's the exact same image.  But I have --

4              THE COURT:  When you say an image, are you talking

5    about a still photo or a video, or both?

6              THE WITNESS:  A still photo.  There's a statement --

7              THE COURT:  Well, let me -- let me just -- I'm not

8    an expert in these regulations, so let me -- I mean, maybe --

9    let's say we have a man named John Jones and he wants to be an

10   actor in your videos, okay?  So you get his personal data,

11   when he was born, and you have a driver's license.  Let's say

12   you've gone through that.  So you have a record of that.

13              Now, you're saying that the way the regulations

14   work, that every -- so you may take his photograph once, let's

15   just say you -- you assume you take it once, and let's say

16   it's nude, so it's sexually explicit, all right, as you may --

17   that's defined.  All right.  Now, you may use that in 100

18   different videos, is that correct?

19              THE WITNESS:  That's correct.

20              THE COURT:  Or -- and you may use it in all your

21   catalogs, too?

22              THE WITNESS:  That's correct.

23              THE COURT:  All right.  So you're saying that --

24   what are your obligations, as you understand them, under the

25   cross-referencing regulations?

1            THE WITNESS:  That every single time I use that

2    image, I have to have a record of it.  So --

3            THE COURT:  What -- mean that you've used it --

4    let's say that you've used it --

5            THE WITNESS:  That we've published --

6            THE COURT:  -- in the catalog in March 2013, it was

7    used there and it was used in a video in January 2012, is that

8    right?

9            THE WITNESS:  That's right.

10            THE COURT:  Okay.

11            THE WITNESS:  Any time -- you know, the image in the

12    DVD --

13            THE COURT:  It's the same image, but you're saying

14    every time you use it, you must keep a record of that?

15            THE WITNESS:  That is correct.

16            THE COURT:  All right.  Okay.

17    BY MR. MURRAY:

18    Q    And so you do keep a record every single time that you

19    use an image, is that what you're telling the Court?

20    A    Yes, we do.

21    Q    Okay.

22    A    It's like a giant spider web.

23    Q    Okay.  Now, in addition to keeping those records, has

24    2257 and 2257A had any effect on any of your artistic and

25    marketing decisions?

1    A    Yes.

2    Q    Give us some examples of that.

3    A    One of the reasons that we have photo shoots and continue

4    to have photo shoots, now that we're in the age of the

5    Internet and photography is readily available for purchase

6    online, we don't -- we can't use any of that photography, that

7    stock photography for several reasons.  Some of it might be

8    rights that the individual creator of the image that we'd like

9    to purchase, but it's because we don't have any -- we don't

10   have any records -- some people in certain industries aren't

11   required to keep the kinds of records that we require.  So,

12   you know, we can't go to istock.com and buy a picture of

13   people where, you know, it might be suggestive that they could

14   have -- you know, where somebody could say, well, that's

15   simulated sex because their pelvises are touching and we don't

16   know if they're masturbating each other or whatever.  We can't

17   do that.  We have to create our own images so that we have the

18   documents there.  And -- and it's quite a great expense, the

19   photo shoots.

20           Also, we understand that we are not allowed to take

21   an explicit image and in any way soft -- crop it or soften it

22   for a different catalog or a different market without, once

23   again, almost recreating that image anew electronically.  So

24   here I've gone to the trouble to format an image for our

25   visual library and connect it to all the documents, and now I

1    would like to take that image and just show from here up and

2    put that in a catalog.

3              THE COURT:  From here up, you're indicating, what,

4    your chin --

5              THE WITNESS:  Where it would no longer --

6              THE COURT:  Your chin up?

7              THE WITNESS:  -- be obvious that it was an

8    explicit --

9              THE COURT:  Okay.  All right.

10             THE WITNESS:  -- however you might think of that.

11             THE COURT:  So you just show the face, like from the

12   shoulders up.

13             THE WITNESS:  Yep.

14   A    That can't be as easily done as just saying, I want to do

15   that, and then have the artist create that in Photoshop.  It

16   has to go back through that whole process of being

17   reintroduced into the visual library and connected back to the

18   visual.  And if you recall, that can take, you know, a little

19   while, or it could take quite a while, depending on how fast

20   the equipment is working that day.  So typically we opt,

21   because the burden of this is pretty heavy, we opt wherever we

22   can to not do this thing that's going to take even more time.

23   So it restricts us creatively as far as what we feel that we

24   can do.

25   BY MR. MURRAY:

1    Q    Now, do you have at Sinclair Institute something you call

2    2257 fire drills?

3    A    We do.

4    Q    And would you tell the Court what that is?

5    A    A fire drill is when someone comes into my record-keeping

6    department and shows me an image, and I then have to produce

7    all of the records that are required -- that we require by law

8    to accompany that image; I have to show who the people are, I

9    have to show the ID, the aliases.  If it's -- if it's an image

10   of someone that's advertising a DVD, maybe it's a still shot

11   from the DVD, then of course I'm going to provide the cast

12   list, the scene list, the certificate of compliance.  If --

13   you know, if it's from another company, it would be, you know,

14   someone else's documents that I've collected for that.

15        And so they come in and -- and deliberately sort of

16   try to trick me a little bit.  They look at the -- you know,

17   I've gotten some really wild sort of images like, I'm like,

18   oh, no, I just can't remember where that's from.  But because

19   of the way that -- because of our awareness that we're going

20   to have to do this at any moment, there's enough information

21   there for me to go and retrieve those documents.

22        And so it's a way that we test ourselves to make

23   sure that I am always understanding which of these images that

24   we are, you know, required to keep these records on, and I

25   would say it's probably about 75 percent of what we put in our

Wilson - Direct (Mur)                          225

1    catalogs are images that require this record keeping, and, you

2    know, it's just a way we test ourselves.

3                THE COURT:  All right.  About how much longer do you

4    have with -- for direct on this witness?

5                MR. MURRAY:  Maybe about 10, 15 minutes, Your Honor.

6                THE COURT:  Okay.  Can we take a five-minute recess

7    right now?

8                MR. MURRAY:  Yes, of course.

9                THE COURT:  All right.  I'd like to finish this

10   witness today, if possible.

11               MR. MURRAY:  Sure.

12               THE COURT:  Okay.  Thank you.

13          (Recess at 3:57 p.m. to 4:08 p.m.)

14               THE COURT:  Okay.  Just one second.  Ladies and

15   gentlemen, let me say I'd like to finish this witness.  Now,

16   we have been requested not to have court past 5:00 for

17   security reasons and overtime, in light of the budget

18   situation.  So I'd like to finish this witness.

19               Now, it's been a very lengthy direct.  If necessary,

20   she may have to come back tomorrow if we're still on the

21   stand.  I don't know how long you gentlemen will be.  But if

22   that's the case, then we'll probably break around quarter of

23   five, if she's going to have to come back tomorrow anyway.

24   But if we can finish her by five, that would be ideal.  Okay.

25   Is that all right with you?

1           MR. BLADUELL:  That's fine, Your Honor.

2           THE COURT:  All right.  Well, I have a criminal

3    hearing at 4:30, but I can keep them waiting a little bit.  So

4    we'll probably have to adjourn at quarter of five anyway.

5    Okay?  All right.  All right.  Okay.

6           Counsel, you think you'll be about 15 minutes?

7           MR. MURRAY:  Not even that, Your Honor.  I'm --

8           THE COURT:  How long will your cross be?  Do you

9    have any idea?  I mean, I don't want to cut you down because

10   her direct was very lengthy.  Maybe you'd rather -- if you

11   don't think you can finish, maybe you'd rather start tomorrow

12   morning so you can go over your notes and -- do you have any

13   preference?

14          MR. BLADUELL:  That's fine, Your Honor.

15          THE COURT:  What?

16          MR. BLADUELL:  That's fine, Your Honor.  We can

17   start tomorrow with her.

18          THE COURT:  Would that be better?

19          MR. BLADUELL:  Sure.

20          THE COURT:  All right.  Then let's do that.  So --

21   all right.  Then we ought to be able to start that at 4:30.

22   All right.  So let's finish the direct, and then we'll adjourn

23   for the day.  Okay?

24          MR. MURRAY:  Yes.

25          THE COURT:  All right.  Thank you.  Go ahead.

1    BY MR. MURRAY:

2    Q    Ms. Wilson, I just want to make sure we're clear on this.

3    Who does -- when you talk about the fire drills, is that an in

4    -- is that within your own company?

5    A    Actually, someone from PHE, who we are associated with,

6    we have --

7              THE COURT:  That's your sister company?

8              THE WITNESS:  It's our sister company, yes.

9    A    They come over.  They've been doing this longer than we

10   have, I guess, you know, that -- and they have more people in

11   their department.  Actually, I probably have the most

12   expertise on this in my building, so it would really require

13   someone from outside to come in.  But it is from within our --

14   our -- I know this person that does this; she works in a

15   different building.

16   Q    And is the purpose to duplicate what an FBI inspection

17   might look like?

18   A    Basically, that's the way that I understand it.  I would

19   imagine that if the F -- if the FBI came to check our records,

20   they would bring images with them of our published material,

21   and I would need to show them the records for that.  And so

22   that's what they -- that's what they do, and it --

23   Q    And how long does -- do these fire drills take; how many

24   minutes or hours of your time?

25   A    Typically, several hours.  Three hours, usually.

1  Q    Now -- and have you always passed, or have you failed?

2  A    I've always passed 100 percent.

3  Q    Okay.  Good.  Let me ask you this, Ms. Wilson.  Do you

4  believe that the burdens of 2257 and 2257A that you've

5  described are necessary to prevent your company from using

6  underage performers in your films?

7  A    Absolutely not.

8         MR. BLADUELL:  Objection, Your Honor.  It calls for

9  speculation.

10        THE COURT:  I'm going to allow her to testify.  It's

11 in the form of lay opinion, but the witness is very

12 knowledgeable about the industry and what -- the burdens this

13 puts on her company.  So I'll overrule the objection.

14 A    We would get --

15 Q    So explain --

16        THE COURT:  Yeah, continue -- continue with your

17 answer.

18 A    We care very much about -- we don't want anyone to be

19 exploited.  We are an adult company.  Our -- our own products

20 are created for adults.  We're a legitimate company.  We only

21 do business with legitimate companies.  There would -- we

22 would just be -- it would be like we had gone insane one day

23 if we were to -- we don't desire to use underage people.

24        We check everyone's ID.  IDs were checked before

25 this law came about, from what I understand.  We weren't

1    required to keep a copy of the ID of our models in our photo

2    shoots back then.  Now we are.  But, you know, we're entering

3    into legal contracts with these people for the rights to what

4    we pay -- to use what we pay for.  But we are in no way

5    associated with exploiting minors, nor do we want to in the

6    future.

7    Q    Now, apart from you, who else is involved in spending

8    time on behalf of Sinclair to comply with 2257 and 2257A?

9    A    We have two full-time graphic artists who spend about

10   20 percent of their time writing these images into this

11   particular code-generating and document storage system so that

12   we can have a unique number to cross reference.  Then there

13   are several other employees in the building, three others, I

14   believe, who are involved in using our images electronically.

15   Those graphic artists create the art, and then the catalog

16   team uses it to publish the catalog, and the artists lay out

17   the catalog, and then the web team uses those images to put up

18   on the web, and so they're the ones that record the electronic

19   use.  And I think we estimated it was about five percent of

20   their job time taken.  So half of mine, 20 percent of two

21   artists, and then there's the maintenance of, you know, and

22   upkeep of the equipment that we use to store all of this

23   that's also involved.

24   Q    And what is your most accurate estimate then, taking into

25   account all those salaries, of how much it costs each year for

Wilson - Direct (Mur)                                            230

1   Sinclair to create and keep these records for 2257?

2   A    About seven --

3            MR. BLADUELL:  Objection.  Lack of --

4   A    About $75,000 a year.

5            MR. BLADUELL:  -- foundation.  Lack of foundation.

6            THE COURT:  You've -- that's an actual calculation

7   you've made?

8            THE WITNESS:  Based on information from our

9   accounting department and what I know of half of my salary,

10  what I was able to get from the W-2s that were provided by our

11  accounting department, and my knowledge of how much time these

12  people spend doing this work.  We also spend time educating

13  every new employee -- I don't even think that was calculated

14  into this -- every new employee that comes into our company

15  about what this means, how important it is.  So even if people

16  are not directly involved in the keeping of these records or

17  the maintaining of the cross references, everyone in our

18  building knows the meaning of this, the seriousness of this.

19  So --

20  BY MR. MURRAY:

21  Q    And then there was -- in addition to the approximate

22  $75,000 a year in employee salaries, was there other expenses

23  associated with converting from paper to electronic?  I think

24  you mentioned that that happened at a certain point?

25  A    Yes.  I believe there was a ruling that allowed us to

1    also keep electronic references.  Heretofore, everything had

2    been done on paper, and there were just file cabinets and file

3    cabinets and file cabinets of information.  And so in order

4    for Sinclair Institute to keep our information on the server

5    that is shared with PHE, our software had to be reprogrammed

6    to accept our images and partition them from the other images,

7    because we don't want anyone using our images but us so that

8    we can keep control over the way that we document these

9    records.  That's how important it is to us.  And our

10   accounting department, along with our sys admin department

11   estimated about $12,000 for the cost of that reprogramming of

12   the software so that we could have access to the electronic

13   system.

14   Q    Okay.  Thank you very much.

15             MR. MURRAY:  That's all I have, Your Honor, on

16   direct examination.

17             THE COURT:  All right.  Well, do you want to start

18   the direct (sic)?  We can go another 10 minutes.  Or would you

19   rather start in the morning?  It's up to you.

20             MR. BLADUELL:  Yeah, I would rather start a couple

21   of minutes now, Your Honor.

22             THE COURT:  Go ahead.  Continue.

23                         CROSS-EXAMINATION

24   BY MR. BLADUELL:

25   Q    Good afternoon, Ms. Wilson.

Wilson - Cross (Bla)                                    232

1    A    Hi.

2    Q    During direct examination, you were shown covers of

3    videos of Sinclair Institute, correct?

4    A    That's correct.

5    Q    And all of the covers that you were shown were of videos

6    that Sinclair Institute produces itself as a primary producer,

7    correct?

8    A    That is correct.

9    Q    You were not shown any images of videos that Sinclair

10   Institute sells on their website for which it is a secondary

11   producer, correct?

12   A    That is correct.

13   Q    The videos from Sinclair Institute for which it is a

14   primary producer contain sexual intercourse, correct?

15   A    Yes, they do.

16   Q    And oral sex?

17   A    Yes.

18   Q    And anal sex?

19   A    Yes.

20   Q    And masturbation?

21   A    Yes.

22   Q    And Sinclair Institute has employed performers who are

23   18 years old in those productions, correct?

24   A    I know that we have performers between the ages of like

25   20 and 60.  The majority of our performers are probably over

Wilson - Cross (Bla)                    233

1    the age of 30.  I cannot tell you with 100 percent accuracy if

2    anyone has ever appeared in our DVD that was 18 years old,

3    probably because I haven't been with the company that long.

4    I've been with the company almost eight years.  We've been in

5    business since 1991.

6             I also was not required to keep the primary records

7    of our company for a good long while, since I've been doing

8    this, I was the secondary.  But -- so there was another person

9    that did that, and when she left I took over that part of the

10   job.  So there -- there are some of our productions that I am

11   not as familiar with as others.  I do know that my company has

12   never -- we don't do anything illegal, but I can't tell you

13   with certainty that we have used a performer or not who was 18

14   years of age in a video production.

15   Q    You are the person from Sinclair Institute who is

16   responsible for 2257 compliance, correct?

17   A    That is correct.

18   Q    You have also -- Sinclair Institute has also used

19   performers who are 19 years old in its primary productions,

20   correct?

21   A    In our photo shoots.  I'm not familiar personally with a

22   19-year-old in our productions without looking at the database

23   of information.  If I had that in front of me, I could tell

24   you yes or no.

25   Q    Okay.

1    A    It would take a little while to look through all the

2    records, but I could tell you, and would be happy to do that.

3    I'm just unable to do that right here.

4    Q    Okay.  You -- Sinclair Institute produced a video,

5    "Provocative Sex Play," correct?

6    A    That sounds like a title of ours, yes.

7    Q    And you were shown this video during direct examination,

8    correct?

9    A    I recognize it as one of our videos, yes.

10   Q    And during discovery, you produced model releases for

11   performers appearing in this video?

12   A    I didn't understand the second word that you said.

13   Q    The model releases.

14   A    Could you just ask me the question again?

15             THE COURT:  What is that?  What --

16   BY MR. BLADUELL:

17   Q    Sinclair Institute produced model releases for this

18   video, "Provocative Sex Play," correct?

19   A    I am sure we have them and probably produced them, if

20   that's what was required by our -- by the questions that I was

21   asked, yeah.

22   Q    And you -- Sinclair Institute also produced IDs for

23   performers in this video, correct?

24   A    We provided ID for all the videos that we were requested

25   to provide them for, and I -- because of -- in part because of

Wilson - Cross (Bla)                                235

1    the tremendous burden of keeping all of this paperwork, what I

2    did was provide those documents.  I didn't take the time to

3    examine each one because, believe me, they've already been

4    examined many, many, many times.

5    Q    Sinclair Institute also produced a cast list for video --

6    for those videos, correct?

7    A    Yes.

8    Q    Let me show you Exhibit No. 311, please.

9              MR. BLADUELL:  Your Honor, may I approach the

10   witness?

11             THE COURT:  Yes.  All right.  Well, it's on the

12   screen.  Can you see it?

13             THE WITNESS:  I would rather look at paper, if you

14   have it.  Thank you.

15             THE COURT:  Yeah.

16   BY MR. BLADUELL:

17   Q    Ms. Wilson, do you recognize this document as a cast list

18   for "Provocative Sex Play?"

19   A    It looks very familiar, yes.  It looks like one of ours.

20   Q    And at the top of that cast list, there is a date of

21   production?

22   A    Yes, the first date of production.  This is a

23   compilation, obviously.  The first date of production was May

24   21st, 2002.  That would mean that the oldest footage in the

25   film was from that date.

1   Q    And produced December 15, 2008, that would be the date of

2   the video, Sex Play -- "Provocative Sex Play" was produced,

3   correct?

4   A    Yes.

5   Q    Now, below that, you have the names of the performers in

6   -- in this video, correct?

7   A    That's right.

8   Q    And one of the performers is Ashley Jade Sommersill?  You

9   can look at this --

10  A    Ashley Jade Sommersill, yes.

11  Q    Correct.  And her date of birth is September 14, 1983?

12  A    That's correct.

13  Q    And she appeared in the video, "Toys for Better Sex,"

14  correct?

15  A    That's correct.

16  Q    And that was produced on May 21st, 2002?

17  A    That's correct.

18  Q    And her stage name is Gianni?

19  A    That is correct.

20  Q    And you -- you can calculate the age by using those two

21  dates, correct?

22  A    That's correct.

23  Q    And the date -- her date is -- her date of birth is 18,

24  correct?

25  A    That is correct.

1   Q    Okay.  Now, if we go to the next performer, Alano

2   Jackman, you see his name in that document?

3   A    I do.

4   Q    And Dominique Price Garson?

5   A    Yes.

6   Q    And -- and "Sexplorations, Volume 1," was the video in

7   which Dominique Price Garson appeared, correct?

8   A    That's correct.

9   Q    And that was produced on January 17th, 2005?

10  A    That's correct.

11  Q    And the date of birth of Dominique Price Garson is 19 --

12  19 years old, correct?

13  A    That is correct.

14  Q    Now, if we go to another performer, you see the name

15  Jamie Cook, correct?

16  A    Yes.

17  Q    And Ms. Jamie Cook's date of birth is October 27, 1983,

18  correct?

19  A    Correct.

20  Q    And she appeared in "Enjoying Guilty Pleasures," correct?

21  A    Correct.

22  Q    And that was produced February 3rd, 2003?

23  A    Correct.

24  Q    And that would make her 19, correct?

25  A    19, yes, correct.

1    Q    Now, if we can flip through the second page of this

2    Exhibit No. 311, you see that there's -- there are a couple of

3    IDs for this -- for some of these performers?

4    A    Yes.

5    Q    And there's also model releases?

6    A    Yes.

7    Q    I'm sorry, there's -- there's only -- there's a -- so

8    there's model releases for these performers that we discussed?

9    A    Yes.

10   Q    Okay.

11         MR. BLADUELL:  Your Honor, I move to admit Exhibit

12   311 into evidence.

13         THE COURT:  All right.  Admitted.  All right.  It's

14   time to stop, --

15         MR. BLADUELL:  Okay.

16         THE COURT:  -- unless you have one or two more

17   questions about this exhibit.

18         MR. BLADUELL:  That's -- that's okay.

19         THE COURT:  Okay.  All right.  We'll resume tomorrow

20   morning.  Thank you.  Okay.  By the way, you're under

21   examination, so as I said to the other witnesses, overnight if

22   you want to have dinner with counsel or anybody else, you're

23   welcome to, but please do not discuss your testimony.  Okay?

24         THE WITNESS:  I understand.

25         THE COURT:  All right.  Thank you.

1      (Court adjourned)

2                              * * * * *

3

4

5

6

7

8                    C E R T I F I C A T I O N

9          We, the court approved transcribers, certify that

10   the foregoing is a correct transcript from the official

11   electronic sound recording of the proceedings in the

12   above-entitled matter.

13

14

15   _____

16   TARA MARTIN                 DATE:   June 11, 2013

17

18

19   _____

20   ROXANNE GALANTI

21   DIANA DOMAN TRANSCRIBING

22

23

24