UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC., et al., | ) | 09-CV-4607 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Philadelphia, PA |
| THE HONORABLE ERIC H. HOLDER, JR., in his Official Capacity as Attorney General of the United States, et al., | ) ) ) ) | |
| | ) | June 4, 2013 |
| Defendant. | ) | 9:13 a.m. |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MICHAEL M. BAYLSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff Free Speech Coalition, Inc.: | J. MICHAEL MURRAY, ESQUIRE LORRAINE R. BAUMGARDNER, ESQUIRE BERKMAN, GORDON, MURRAY & DEVAN 55 Public Square Suite 2200 Cleveland, OH 44113-1949 |
| For the Defendant: The Honorable Eric H. Holder, Jr. | HECTOR G. BLADUELL, ESQUIRE KATHRYN WYER, ESQUIRE NATHAN MICHAEL SWINTON, ESQUIRE JAMES J. SCHWARTZ, ESQUIRE U.S. DEPT. OF JUSTICE CIVIL DIVISION 20 Massachusetts Avenue Washington, DC 20530 |
| Audio Operator: | U. HEVENER |
| Transcribed by: | DIANA DOMAN TRANSCRIBING P.O. Box 129 Gibbsboro, New Jersey 08026-0129 Office: (856) 435-7172 Fax: (856) 435-7124 E-mail: dianadoman@comcast.net |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

2

1                          I N D E X

2   WITNESSES:          THE COURT   DIRECT   CROSS   REDIRECT   RECROSS

3   FOR THE PLAINTIFF:

4   Linda Diane Wilson      37                  4/Bla

5   Carol Queen            91       49/Mur   77/Swi   99/Mur   104/Sch

6   Stephen Steinberg   111, 116   105/Mur  137/Sch  153/Mur

7   Carlin Ross            185      155/Mur  176/Bla  191/Mur

8   Betty Dodson                    194/Mur  202/Sch

9   Barbara Alper      229, 243     217/Mur  232/Sch  241/Mur  248/Sch

10  Thomas Hymes           265      251/Mur  257/Wye

11  EXHIBITS:

12  FOR THE PLAINTIFFS:                             Ident.   Evid.

13  P-43  Photograph                                         229

14  P-45  Video, Self-Loving                                 174

15  P-46  Video, Viva La Vulva                               174

16  P-47  Video, Celebrating Orgasm                          174

17  P-50  Video, The Orgasm Doctor                           174

18  P-51  Image from Genital Art Gallery                     174

19  P-52  Video page from dodsonross.com                     174

20  P-61  Photographs                                        135

21  P-62  Photographs                                        135

22  P-63  Photographs                                        135

23  P-64  Daily Babylon website                              157

24  P-117 Video, Betty Dodson's Body Sex Workshop            174

25  P-118 Betty Dodson, Her Life of Sex and Art              174

| | (Index/Exhibits continued) | Ident. | Evid. |
|---|---|---|---|
| | FOR THE DEFENSE: | | |
| | D-77    Printout from DailyBabylon.com | | 260 |
| | D-122   Printout of the SinclairInstitute.com | | 13 |
| | D-123   Printout of BetterSex.com | | 14 |
| | D-124   Printout of movies | | 21 |
| | D-125   Printout of movies | | 21 |
| | D-126   Printout of movies | | 21 |
| | D-128A-C   Unidentified document | | 36 |
| | D-129A-D   Movie catalog | | 25 |
| | D-133   Townsend-Sinclair video sales, 2005-2009 | | 133 |
| | D-148 to D-155 Photographs | | 152 |
| | D-168   Photograph | | 152 |

                     Wilson - Direct (Bla)                    4

1            (The following was heard in open court at 9:13 a.m.)

2            ALL COUNSEL:  Good morning, Your Honor.

3            THE COURT:  Okay.  Are we ready to continue?

4            MR. MURRAY:  Yes, we are.

5            THE COURT:  Witness here, please?

6            MR. MURRAY:  Yes.

7            THE COURT:  Good morning.  Ms. Wilson.  All right.

8    Everyone be seated.  Okay.  Good morning.

9            THE WITNESS:  Good morning.

10           THE COURT:  State your name for the record.

11           THE WITNESS:  Linda Diane Wilson.

12           THE COURT:  All right.  You're still under oath.

13   Have a seat.  Thank you.

14           MR. BLADUELL:  May I --

15           THE COURT:  Go ahead.

16           MR. BLADUELL:  -- proceed, Your Honor?

17           THE COURT:  Yes.

18                   CONTINUED DIRECT EXAMINATION

19   BY MR. BLADUELL:

20   Q    Good morning, Ms. Wilson.

21   A    Good morning.

22   Q    Ms. Wilson, you testified that in the video, <u>Provocative</u>

23   <u>Sex Play</u>, there were 18-year-old -- 18 years old and 19 years

24   -- performers that are 18 years old and 19 years old, correct?

25   A    That's where we were when we left off yesterday.

1    Q    Now, Sinclair has had more individuals within the age

2    range of 18 and 20 in its videos, correct?

3    A    Yes.

4    Q    In fact, you've estimated that ten percent of the sexually

5    explicit depictions that Sinclair has produced have been of

6    individuals between the ages of 18 and 20, correct?

7    A    I believe that that figure in my head is based on our

8    photo shoots and our videos, not just our videos.

9    Q    Okay.

10   A    The majority of our people in our videos are 30 years or

11   above.

12   Q    And you've also estimated that 30 percent of individuals

13   appearing in your depictions, in Sinclair's depictions are in

14   the ages of 20 to 29.

15   A    I believe ten percent 18 to 20.

16          THE COURT:  What percent?

17   A    Ten percent 18 to 20, 30 percent 20 to 29, and then 40

18   percent in their 30s, and then the rest in their like 40s, 50.

19   BY MR. BLADUELL:

20   Q    So ten percent in their 40s.

21   A    No.  I think more than ten percent in their 40s.

22   Q    Okay.  Well, that's not what you've stated in

23   interrogatories, correct?

24   A    You just asked me if ten percent of our -- of the people

25   in our videos or 30 percent of people in our videos were

Wilson - Direct (Bla)                                6

1    between the ages of 20 and 29.

2    Q    Well, I --

3              THE COURT:  Well, just a minute.  Did she

4    specifically answer interrogatories or the company did?

5              MR. BLADUELL:  The company.

6              THE COURT:  Okay.

7              MR. BLADUELL:  But --

8              THE COURT:  Are they different?

9              MR. BLADUELL:  It was --

10             THE COURT:  Well, show it to her.

11             MR. BLADUELL:  Okay.  Let me pull up Exhibit number

12   132, please.

13   BY MR. BLADUELL:

14   Q    Ms. Wilson, this is the interrogatory responses for

15   plaintiff, Sinclair Institute, correct?

16   A    Correct.

17   Q    And your name is at the bottom of this document, Exhibit

18   132?

19   A    Yes.  That's correct.

20   Q    And you helped answer these interrogatories, correct?

21   A    That is correct.

22   Q    Now, if we go to interrogatory number 9, you see, Ms.

23   Wilson, in interrogatory number 9, that it's asking you to give

24   a breakdown of the ages of performers?

25   A    Yes.  I see that.

1    Q    And you've estimated ten percent between 18 to 20?

2    A    Yes.

3    Q    And --

4    A    Thirty percent in their 20s, 40 percent in their 30s, ten

5    percent over 40, and --

6              THE COURT:  How's that different than --

7    A    -- ten percent over 50.

8              THE COURT:  How's that different than her testimony?

9              MR. BLADUELL:  Your Honor, I believe that she said

10   more of ten percent in their 40s.  So that was a contradictory

11   part.

12             THE COURT:  This is not a memory quiz.  That's not

13   a --

14             THE WITNESS:  I believe I was a little confused --

15             THE COURT:  Just a minute.  That's not a

16   contradiction.

17             THE WITNESS:  -- by your question.  You had several

18   questions at once there.

19             MR. BLADUELL:  I just want --

20             THE COURT:  If that's the most serious contradiction

21   you have --

22             MR. BLADUELL:  No, Your Honor.

23             THE COURT:  -- we're going to be here for like a

24   month.  Okay?  That's absurd.

25             MR. BLADUELL:  I just wanted to make the record

1    clear.

2              THE COURT:  That's absurd.  Move -- next --

3              MR. BLADUELL:  Next question.  Okay, Your Honor.

4    BY MR. BLADUELL:

5    Q    Now, it is correct to say that the Sinclair Institute does

6    not restrict performers in its videos to people over 25?

7    A    No.  We do not restrict our performers to the ages of over

8    25.

9    Q    As long as a performer is 18 years old, he can be employed

10   by Sinclair in its videos, correct?

11   A    All of our -- the people in our videos and our photo

12   shoots are adults 18 and over.

13   Q    Okay.  Now, Sinclair Institute maintains IDs and model

14   releases of these performance for business reasons other than

15   2257, correct?

16   A    That's correct.

17   Q    These IDs and model releases are part of the contract that

18   you have with its performers.

19   A    Yes.  We want to make sure that it's very clear that we

20   have rights to the pictures that we take and to the footage.

21   Q    Besides selling videos such as Provocative Sex Play, which

22   is a video that Sinclair itself creates, Sinclair also sells

23   sexually explicit videos from other companies.

24   A    That's correct.

25   Q    For example, Sinclair sells videos from Wicked Pictures?

                              Wilson - Direct (Bla)                    9

1    A     That's correct.

2    Q     And a company called Sweet Center?

3    A     Yes.  That's correct.

4    Q     And a company called Platinum Media?

5    A     That's correct.

6    Q     And Pulse Pictures?

7    A     Yes.

8    Q     And, in fact, the majority of the videos, sexually

9    explicit videos that Sinclair sells are videos from other

10   companies, correct?

11   A     I don't know the exact number.  We sell many videos from

12   other companies, but I'm afraid I don't know the exact

13   breakdown of that.  I'm unable to tell you that with certainty.

14   Q     Are you able to tell -- you're not able to tell us that

15   the number of sexually explicit videos from other companies

16   that Sinclair sells is more than the ones that Sinclair itself

17   creates?

18   A     Over a period of time, yes.  I think that's true.  Yes.

19   Q     Okay.  Now, do you remember that Sinclair has estimated

20   that it has produced 160 videos?

21   A     That we are the primary producer of?

22   Q     Correct.

23   A     That sounds about right.

24   Q     And that you -- that you carry an additional 1,600 titles

25   for which you're a secondary producer?

1   A     Over a period of time, yes.

2   Q     And Sinclair sells these videos in the website,

3   SinclairInstitute.com, correct?

4   A     SinclairInstitute.com, it's quite different from

5   BetterSex.com, and BetterSex.com would be where you would find

6   the majority of movies that we sell that come from other

7   companies where we would be the second --

8               THE COURT:  One second.  What is that called?

9               THE WITNESS:  BetterSex.com.  It's another website

10  that we do E-commerce on.

11  BY MR. BLADUELL:

12  Q     Let me show you Exhibit number 122, please.  Ms. Wilson,

13  this is -- you've seen this document before, correct?

14  A     Yes, I have

15  Q     And this is a printout of the SinclairInstitute.com,

16  correct?

17  A     That's correct.

18  Q     And it has -- it displays some movies, correct?

19  A     Yes.  I see Three Thumbs there.

20  Q     And in your website, there's a search box where one can

21  enter words and search for that?

22  A     Search for --

23  Q     For the words.

24  A     For performers, for adult videos.  Search terms are

25  changing all the time.

1    Q    Okay.

2    A    It's really quite a dynamic business running a website.

3    So --

4    Q    Okay.

5    A    -- I don't know what search terms are available to an

6    individual, because I have never searched our website.

7    Q    Okay.  Now, you've seem this document, Exhibit 122, that

8    it says search results for young, correct, right in the middle?

9    A    In the search box.

10   Q    Well, in the search box, there's young, the word young.

11   A    Search results for young.  I do --

12   Q    Okay.

13   A    -- see that now.  Yes.

14   Q    And it displays some videos.

15   A    Yes, and Nina Hartley shows up, which is unusual, because

16   she's -- I think she's probably in her 40s, late 40s.

17   Q    You're aware that Nina Hartley is a plaintiff in this

18   case?

19   A    I think I heard that in court yesterday.  Yes.

20   Q    And you're familiar with some of these titles, for

21   example, Teach Me?

22   A    Yes.  I remember seeing this when we were in the

23   deposition.

24   Q    That's something that you sell on Sinclair's website?

25   A    Yes.

1    Q    And if we see the next page, it has more titles.  You're

2    familiar with the title, <u>Bush</u>, correct?

3    A    Yes.

4    Q    And underneath that, <u>Wet and Nasty Amateurs</u>?

5    A    Yes.

6    Q    If we go to the next page, please.  You're familiar with

7    <u>Pig and Five Strap-On Love Story</u>?

8              THE COURT:  Well, I don't -- what's the

9    significance --

10              THE WITNESS:  Yes.

11              THE COURT:  -- if she's familiar with some of these?

12              MR. BLADUELL:  I just want to admit the document.

13              THE COURT:  Well, if the document is admitted,

14    they'll all be in --

15              MR. BLADUELL:  Okay.

16              THE COURT:  -- in the record.  I don't know if you --

17    what point you're trying to make that she's familiar with some

18    of them but not others, or if you want to ask her if she's

19    familiar with all of them, you can do that.  What's the point

20    of asking her about specific movies?  That's what I don't

21    understand.

22              MR. BLADUELL:  Well, I just -- I just wanted to make

23    sure that she's -- that she has -- that she's familiar with

24    some of these movies, so I can get it admitted.

25              THE COURT:  Are you familiar with all these movies on

1    this?

2              THE WITNESS:  If this genuinely is our website, I

3    would have pretty recent memory of most of them, because we try

4    to have --

5              THE COURT:  There you.

6              THE WITNESS:  -- the most current stuff on the --

7              THE COURT:  There's no point of asking her about

8    individual ones if she's familiar with the whole thing, right?

9              MR. BLADUELL:  Okay.  Your Honor, then I move to

10   admit exhibit number --

11             THE COURT:  Admitted.

12             MR. BLADUELL:  -- 122.

13             THE COURT:  Admitted.  Any objection?

14             MR. MURRAY:  No objection, Your Honor.

15             THE COURT:  Admitted.  There you go.

16             MR. BLADUELL:  And if we -- let's go to Exhibit 123,

17   please.

18   BY MR. BLADUELL:

19   Q   Ms. Wilson, do you recognize this as a printout of

20   BetterSex.com?

21   A   Yes.  This is our other website.

22   Q   And are you familiar with some of the titles that appear

23   on this document?

24             MR. MURRAY:  Your Honor, we have no objection to the

25   admission of this exhibit --

 1              THE COURT:  Okay.

 2              MR. MURRAY:  -- without any testimony by our witness.

 3              THE COURT:  Okay.  You want it admitted?

 4              MR. BLADUELL:  So then I would move to admit it,

 5    please.

 6              THE COURT:  Admitted.  Next question.

 7    BY MR. BLADUELL:

 8    Q    Now, I'm going to show you exhibit number 124A, please.

 9              THE COURT:  What is the search -- wait a minute.

10    What is the search term in 123?

11              MR. BLADUELL:  Oh.

12              THE COURT:  What's the significance of this exhibit

13    in your mind?

14              MR. BLADUELL:  Oh, Your Honor, we just wanted to

15    provide a printout of the BetterSex.com, which is another --

16              THE COURT:  Is there a search term there or no?

17              MR. BLADUELL:  There's no search term there.

18              THE COURT:  All right.  Okay.  Go ahead.

19    BY MR. BLADUELL:

20    Q    Ms. Wilson, do you recognize Exhibit 124?

21    A    Yes.

22    Q    And that's --

23    A    The video, The Babysitter, Volume 3.

24    Q    That's another movie that you sell?

25    A    Yes, it is.

1    Q    And the company is Sweet Center?

2    A    Yes.

3    Q    If we go to the second page of this Exhibit 124, there is

4    a description underneath the movie.

5              MR. BLADUELL:  If we can highlight that.

6    BY MR. BLADUELL:

7    Q    And I'm going to read the first sentence.

8              "Hunky man who is happily married to sensual

9    successful Zoey, but when he locks eyes with her new

10   babysitter, blonde 18-year-old Chastity, the two are instantly

11   smitten."

12             Correct?

13   A    That's correct.

14   Q    That's the description that appears on Sinclair's website.

15   A    I believe this is BetterSex.com, but yes.

16   Q    Well, then let's --

17   A    Was it not?  I mean, I don't think that matters really,

18   but --

19   Q    Okay.  Let me show you another exhibit, 124 -- 124B.  Does

20   the movie, Wet and Nasty Amateurs --

21   A    Yes.

22   Q    -- you're familiar with?

23   A    Yes.

24   Q    Okay.  And if we go to the second page, it has -- just

25   like the first movie, has a description there.

1           MR. BLADUELL:  If we can highlight the description,

2     please?

3     BY MR. BLADUELL:

4     Q     If we read the third sentence --

5           "Young, 18-plus, fresh faced gymnast, Trinity, and

6     her big man on campus, Bo, engage in positions even we've never

7     seen, peaking at both male and female ejaculation.  Just as

8     wild, a youthful Santa Claus penetrates his sexy (inaudible)

9     climax under the Christmas tree".

10          Correct?

11    A     Correct.

12    Q     Exhibit number 124C.  This is a movie called <u>University of</u>

13    <u>Austin</u>, and -- yes?

14    A     Yes.

15    Q     And the company that produced it is Adam & Eve Pictures?

16    A     Yes.

17    Q     And if we go to the next page of this exhibit, there's a

18    description, a title at the top.

19          MR. BLADUELL:  If we can highlight it -- highlight

20    that.

21    BY MR. BLADUELL:

22    Q     And the first sentence is "Better Sex brings you another

23    school girl 18-plus adult movie", correct?

24    A     That's correct.

25    Q     If we go to exhibit number 124F.  The title of this movie

1    is <u>18 and Dangerous</u>?

2    A     Yes.

3    Q     Sold on your website.

4    A     On BetterSex.com, yes.

5    Q     Okay.  And you see there that it has a description

6    underneath.

7    A     "Bodacious Shirley, 18-plus blond", in <u>18 and Dangerous</u>.

8    Yes.

9    Q     Okay.  Now, let's go to 124J.  This movie is called <u>The</u>

10   <u>Romance Collection, three pack</u>?

11   A     That's correct.

12   Q     And this is a proprietary title of the Sinclair Institute.

13   A     In this -- on this particular video, I can't remember if

14   the films, <u>Cabin Fever</u>, <u>The Hottest Bid</u>, and <u>The Voyeur</u> were

15   actually filmed by us or if we licensed them and put our name

16   on them, but I can assure you everyone in the cast is over 18.

17   Q     Okay.  But you see on the top corner, it says Sinclair?

18   A     That's right.  We sell it under our name.

19   Q     Okay.

20   A     But this has been around a while before my time, I

21   believe.  So --

22   Q     And if we go to the next page of this Exhibit 124J, if we

23   focus on the first paragraph, we see on the third line, "The

24   arrival of a young 18-plus handyman."

25   A     Yes.  I see that.

1    Q    Let's go to Exhibit 124M.  This is an image from

2    BetterSex.com, your website.

3    A    I'm not familiar with it, but I know that we carry <u>My</u>

4    <u>Daughter's Boyfriend 2</u>.

5    Q    Okay.  And if we go through the next page, that's another

6    image from My Daughter's Boyfriend as it appears on your

7    website?

8    A    That's what it says.  Yes.

9    Q    With a young man behind a woman?

10   A    Yes.

11   Q    And then if we go to the next page, there's a description.

12   If we can highlight the description of the movie.  The first

13   sentence describes, "A college freshman gets lucky with both

14   mother and daughter"?

15   A    Yes.

16   Q    Okay.  If we go to 124R, this is another image that

17   appears on your website, correct?

18   A    It looks -- it looks like it does.

19   Q    Okay.  From --

20   A    I'm just not familiar with it.

21   Q    From the movie, <u>My Daughter's Boyfriend, Volume 3</u>.

22   A    I know we carry that film.  Yes.

23   Q    And if we see the description on the next page, the first

24   line is, "Sexual attraction so taboo, it begs to be broken",

25   and then a couple of lines below --

1          "Blond Chastity seduces why stable boy, Seth,

2     schooling him in all pleasure and intense intercourse

3     positions.  Seth gives his college best, bringing his nubile

4     partner to scream in orgasm".

5          Correct?

6     A    That's correct.

7     Q    All right.

8          MR. BLADUELL:  Let's go to exhibit number 125U,

9     please.

10    BY MR. BLADUELL:

11    Q    You've seen this movie before, Ms. Wilson, correct?

12    A    That's correct.

13    Q    Petite Co-Eds II?

14    A    Yes.

15    Q    And then there's -- there's a description for this movie

16    as well on your website?

17    A    I see it there below.

18    Q    Yeah.

19    A    It's fuzzy, bus --

20    Q    And the first line is, "Over three hours of fresh-faced

21    newbies all under five-one, a hundred pounds, and sporting

22    beautiful, natural breasts", correct?

23    A    That's correct.

24    Q    Now, if we go to exhibit 125 -- 126A.  Ms. Wilson, Exhibit

25    126A is a title called My Mother's Best Friend, correct?

1    A    Correct.

2    Q    And this is the cover of the picture.

3    A    Yes.

4    Q    Of the -- of the film.

5    A    Yes.

6    Q    And then if we go to the second page and we see the

7    description that appears on your website of this movie, it

8    says --

9              "The redhead busy cougar in training flirts with a

10   shy, young 18-plus man, arousing the suspicion of his mean

11   stepfather.  Ever resourceful, Darla uses her special sexual

12   skills to calm down step dad while keeping her target in

13   range".

14             Correct?

15   A    That's correct.

16             THE COURT:  Do you know -- I mean, is -- who writes

17   the copy?  Who writes this material?  Does the producer do that

18   or Sinclair do that or -- if you know.

19             THE WITNESS:  If it's --

20             THE COURT:  Don't guess.

21             THE WITNESS:  If it's our film, I'm sure someone from

22   our company writes the copy.  If it is a nonproprietary film, I

23   wouldn't know who put -- who writes the copy.

24             THE COURT:  All right.  Does your company have any

25   policy that when you use a word like young, you then put in

1    parenthesis 18-plus?

2              THE WITNESS:  Not one that I'm aware of, but it

3    wouldn't surprise me, because we are very concerned with our

4    customers understanding that we do not carry any kind of

5    exploitive -- it's only adult films.

6              THE COURT:  All right.  Thank you.

7    BY MR. BLADUELL:

8    Q    And if I can show you 126B?  That is the cover of <u>Bush</u> --

9    <u>Bush II</u>?

10   A    Yes, it is.

11   Q    And you've seen -- you've seen this before, correct?

12   A    Yes.

13   Q    And then if we go to the description --

14             THE COURT:  Well, this, once again, has the word

15   young (18-plus), an adorable Jessie.  Is that the --

16             THE WITNESS:  Yes.

17             THE COURT:  All right.  Well, I think you've made

18   your point.  I don't know how many more of these you want to

19   show.

20             MR. BLADUELL:  Okay.  Well, Your Honor, at this time,

21   I will move to -- Exhibits 124, 125, 126 contain printouts of

22   all these.

23             THE COURT:  All right.  Any objection to their

24   admission?

25             MR. MURRAY:  No objection.

1            THE COURT:  They're all admitted.  I just want to

2    note for the record, I mean, I think -- at least it's obvious

3    to me that some of the performers -- the pictures of the

4    performers appear to be adults clearly, but some of them are

5    very young, particularly some of the women portrayed here are

6    very young, and I just want to make that an observation for

7    future reference for me or any reviewing Court, that I think to

8    the extent the Government's theory depends on the fact that the

9    producers of these materials often use young looking women,

10   that I think that that is shown by the number of photographs

11   that are in these exhibits.

12            All right.  Next question.

13            MR. BLADUELL:  Thank you, Your Honor.

14   BY MR. BLADUELL:

15   Q    Ms. Wilson, before the Sinclair Institute sells movies

16   from other companies, there's a review process that goes on?

17   A    That's correct.

18   Q    And you hire professional film reviewers to review the

19   contents of the films, correct?

20   A    That's correct.  Since I've been there, I know that the --

21   the external reviewer is a professional film reviewer.

22   Q    For example, you've worked with a reviewer called Jay

23   Lorenz?

24   A    That's correct.

25   Q    And he's not a Sinclair employee, correct?

1   A      No.   We pay him for review.   He works at different

2   universities.   He's taught film, that kind of --

3   Q      Now, these reviewers write a review, and they either

4   recommend you to accept or reject the film based on the

5   standards Sinclair has established regarding what it wants to

6   be associated with, correct?

7   A      That is correct.

8   Q      If Sinclair sells a movie, it's a movie that has been

9   accepted as meeting the standards of what Sinclair wants to be

10  associated with, correct?

11  A      Yes.

12  Q      Now, and for the videos that you sell from other

13  companies, you collected IDs and model releases from the

14  primary producer, correct?

15  A      That's correct.

16  Q      And you collected IDs and model releases for all the

17  people in the video, correct?

18  A      That's correct.

19  Q      Not just the people appearing on the cover?

20  A      Some studios include nonsex cast members.   I know Wicked

21  typically does.   When they're not there, it's -- you know, I

22  sort of wouldn't know whether there are nonsex cast members or

23  not, but yes.   I mean, every -- everyone who is in the film in

24  an explicit capacity is listed on the cast list, and we have

25  their IDs.

1    Q    And some -- some of the companies for which you sell

2    movies provide you a password to access their computer site so

3    you can get their 2257 records?

4    A    Yes.  Wicked has a 2257 -- an FTP site where I can get the

5    cast lists, but the signed certificates of compliance don't

6    come to me that way.

7    Q    But that makes it easier to get the records if you get

8    them directly from them, correct?

9    A    Not necessarily.  It depends on if the FTP site is working

10   or not.  It depends on if the FTP client software is working or

11   not, how fast the download process is.  Sometimes it's easier

12   if they just send us a disk in the mail.

13   Q    I see.  Now, if we go to exhibit number 129, please.  This

14   is a cover of one of your print catalogs, correct?

15   A    Correct.

16   Q    And in your print catalogs, you sell movies, sexually

17   explicit films, correct?

18   A    That's correct.

19   Q    And other products.

20   A    And other products.

21   Q    And if we go to the second page of this Exhibit 129,

22   that's another page of your catalog, correct?

23   A    Correct.

24   Q    And you see that you have some of the movies that we've

25   seen before.  For example, on the top, My Mother's Boyfriend?

Wilson - Direct (Bla)                         25

1   A     Yes.

2   Q     Okay.  Then if we go to the next -- the next page for

3   Exhibit 129A.  That's another page of your catalog?

4   A     Yes.

5   Q     And I think 129A or 129B, that's another --

6   A     Yes.

7   Q     And if we go to the second page, we see references to the

8   titles, Teach Me on the lower lefthand corner --

9   A     Yes, we can.

10  Q     -- and Bush --

11  A     Yes.

12  Q     -- that we've seen?  Okay.  Exhibit 129C.  That's another

13  of your -- of your catalogs, correct?

14  A     That's correct.

15  Q     And Exhibit 129D, it's another catalog from the Sinclair

16  Institute, correct?

17  A     That's correct.

18  Q     And if we go to the last page of this exhibit, 129D, we

19  see on the top right-hand corner that you're advertising The

20  Babysitter III.

21  A     That's correct.

22        MR. BLADUELL:  Your Honor, I move in to admit

23  Exhibits 129A through D.

24        THE COURT:  Admitted.

25  BY MR. BLADUELL:

1    Q    Ms. Wilson, yesterday on direct testimony, you referred to

2    Phil Harvey Enterprises as a sister company, correct?

3    A    Yes.

4    Q    And Phil Harvey Enterprises is also known as PHE.    That's

5    the abbreviation, correct?

6    A    That's correct.

7    Q    And you also testified that Sinclair was founded by Phil

8    Harvey Enterprise employees, correct?

9    A    That is right.    Yes.

10   Q    And Phil Harvey is the president of PHE, correct?

11   A    Yes.    He owns the majority of the company.

12             THE COURT:    He does what?    He --

13             THE WITNESS:    He owns the majority --

14             THE COURT:    Majority?    Okay.

15             THE WITNESS:    -- of the company, and he founded the

16   company in the early '70s.

17   BY MR. BLADUELL:

18   Q    And you're also -- you also know Peggy Ottinger (sic)?

19   A    Peggy -- Peggy Ettinger (phonetic) --

20   Q    Ettinger.    I'm sorry.

21   A    -- was the president of Sinclair Institute up until a

22   couple years ago when she retired.

23   Q    And she was a PHE employee before that?

24   A    She was a PHE employee before that.

25   Q    And you also -- you also are familiar with David Groves,

1    correct?

2    A     Yes.

3    Q     And he was -- he's a PHE employee?

4    A     Yes.  He's the highest ranking person on site at PHE in

5    Phil's absence.  That's correct.

6    Q     He's the CEO of PHE, correct?

7    A     I'm not sure of his exact title.  I just know that he is

8    the boss when Phil is not on the property.

9    Q     Okay.  Now, the Sinclair Institute has a president,

10   correct?

11   A     We do.

12   Q     And that president is Patrick Smith?

13   A     That's correct.

14   Q     And Mr. Smith reports to Phil Harvey, correct?

15   A     To Phil Harvey and David Groves.  Correct.

16   Q     And your paycheck comes from PHE, correct?

17   A     That's correct.  We -- the accounting and payroll are done

18   through PHE.  Yes.

19   Q     Okay.  So Sinclair's accounting is run by PHE?

20   A     Yes.  We -- the accounting office for our company is in

21   the PHE building.  I'm sure there must be some arrangement with

22   them to handle our -- our accounting.

23   Q     And your payroll is also run by PHE?

24   A     That's correct.

25   Q     And your -- your -- the processing of your orders is also

1    run by PHE?

2    A     They do our fulfillment and our call center is there.

3    Yes.

4    Q     And PHE owns another company called Adam & Eve, correct?

5    A     Adam & Eve, yes.

6    Q     And for you, PHE and Adam & Eve are basically the same

7    thing when you refer to them.

8    A     I don't think that would be wrong to say.  There are

9    several other flanker companies, but Adam & Eve is probably the

10   biggest one under the PHE umbrella.  Yes.

11   Q     Okay.  Now, if we go to Exhibit 128E, please.  Ms. Wilson,

12   you've seen this document before, correct?

13   A     It looks like a page from the Adam & Eve website.

14   Q     Okay.  And if we focus on the bottom print, what's written

15   there, you see the Adam & Eve logo?

16   A     Yes, I do.

17   Q     And you see that it lists as the custodian of records Phil

18   Harvey from PHE?

19   A     Yes.

20   Q     Okay.

21   A     Of the records at their building, not our building.

22   Q     Okay.  And you see some -- the first movie that we see

23   here, Cheerleaders 2?

24   A     Yes.

25   Q     That's a movie that Adam & Eve produces, correct?

1   A     It -- I see the Adam & Eve logo there.  Yes.

2   Q     And that's a movie that you also sell on Sinclair's

3   website, correct?

4   A     It is likely that we would.  I'm not a hundred percent

5   sure.  I'm sure if we could go to the website and look it up,

6   we might find it.

7   Q     Okay.  Well, let me show you Exhibit 124E.  That's --

8   A     That is -- that's it, Cheerleaders 2 on our website.

9   Q     Okay.  Now, for this film, before you sell it, you go

10  through the review process that we described before, correct?

11  A     That's right.

12  Q     And this movie passed the standard of what Sinclair wants

13  to be associated with, correct?

14  A     That's correct.  That would involve a lot of different

15  factors including the quality of the video, the consensuality

16  of the sex, the adult nature of the sex, that kind of thing.

17  Q     Now, the -- you're the -- you're the person responsible

18  for 2257 compliance at Sinclair, correct?

19  A     That's correct.

20  Q     And the person who trained you to do this job was Gina

21  Phelps?

22  A     Yes.  She trained me to do the -- to use the software when

23  our company was in -- when we paid to have it programmed so

24  that we could keep our records there.  She trained me to use

25  that software, and she has also helped me to understand some of

1   the nuances of the visuals that require the recordkeeping and

2   that don't -- because it's quite a nuanced sort of thing.

3   Q    And Gina Phelps is a PHE employee?

4   A    She is.  Yes.

5   Q    And the person above Gina Phelps is Chad Davis?

6   A    Correct.

7   Q    And he's also -- he oversees compliance for 2257 at PHE?

8   A    That's correct.

9   Q    And he also oversees Sinclair's compliance for 2257.

10  A    I don't -- I don't -- he -- I don't really think that's --

11  he's not our custodian of records.  Patrick is our custodian of

12  records, and I handle the compliance, and if I have questions,

13  I can ask -- I -- they are available as resources to me.  I

14  don't know that it would be correct to say that he oversees our

15  compliance.

16  Q    So when you have questions about --

17  A    I don't really know what you mean by that, I think.

18  Q    Okay.  Let me clarify.  When you have questions about 2257

19  compliance, the person that you -- you talk to are Chad

20  Davis --

21  A    That's correct.

22  Q    -- at PHE.

23  A    That's correct.

24  Q    Now, you've also testified on direct that PHE at some

25  point bought a server to store its 2257 records?

1   A     That's correct.

2   Q     And in this server, PHE stores the 2257 records for Adam &

3   Eve?

4   A     That's correct.

5   Q     And Sinclair records of 2257 are also stored in this

6   server, correct?

7   A     Yes.  Now they are.  Yes.

8   Q     And you have access to the 2257 records from Adam & Eve,

9   correct, from your computer?

10  A     That's correct.

11  Q     And if you want to sell a title from Adam & Eve, you would

12  go to your computer and extract the 2257 records for that

13  movie, correct?

14  A     If I were asked to produce the records, I would.  The --

15  Adam & Eve certifies its own 2257 records, and so if -- if we

16  carry that title, I know that the records are there, and I can

17  see them in our visual library system, because there are places

18  for the documents and it's highlighted and then the cast is

19  listed is and, you know, they -- you can't put a visual in the

20  system unless the -- all the IDs have been certified and that

21  kind of thing.

22          So when our artists go to use the images to sell one

23  of their films, basically, all the records are visible in our

24  visual library system, because, like I said, no image would

25  even be able to be loaded into the program until the records

1    are certified --

2    Q    Okay.

3    A    -- and we share that with them, and if we carry an Adam &

4    Eve film, that would be available to us.

5    Q    And in this server, there's also 2257 documents for other

6    companies that PHE owns, correct?  Like AdamMale?

7    A    Yes.  That -- visuals and the documents would be there as

8    well.  That's correct.

9    Q    And is Temptations also a company that --

10   A    Temptations Parties.  They're actually in our building.

11   They've moved over to our building.

12   Q    Okay.

13   A    And any records for any titles that they carry would --

14   would also be on that server.  Yes.

15   Q    Now, you've also testified about Sinclair counsel of

16   advisors during direct, correct?

17   A    That's correct.

18   Q    Now, this counsel is not involved in making strictly

19   production decisions about Sinclair movies, correct?

20   A    That's correct.

21   Q    They are -- they just serve as advisors to be -- talk in

22   your videos, correct?

23   A    They're our professional colleagues who we consult if we

24   want to deal with some subject matter for people who maybe are

25   getting older and they have, you know, issues with their health

1    that interfere with their sex lives, we would go to our

2    advisory counsel perhaps to discuss the kinds of -- the needs

3    of those people, because they would best know, and we would use

4    that as advice when we create content for our video.

5    Q    But the head of production of Sinclair is Kathy Brummet

6    (phonetic)?

7    A    That's correct.

8    Q    And she's the one who makes the decisions on productions

9    of the films, correct?

10   A    Yes.  Not the only person over the years, but -- but yes.

11   Q    And when Phil Harvey comes to Sinclair, she some -- he

12   sometimes talks to Kathy Brummet?

13   A    That's correct.

14   Q    And this counsel is not involved in making any kind of

15   decisions as to the videos that Sinclair sells from other

16   companies, correct?

17   A    One in 20 of Sinclair's films up until just -- just a few

18   months ago was -- one in 20 like randomly was sent to an

19   outside therapist.  So in addition to the reviews that Jay

20   Lorenz does, we had a randomized system where a film would just

21   be pulled out and sent to a separate -- like a therapist for

22   review outside.

23            So in that capacity, those -- you know, those people

24   would influence whether we -- whether we use a particular film

25   or not, and if Jay has any questions about anything, he tells

1  -- he tells us in the review that this should be run by the

2  therapist is usually the way that he puts it, because he -- you

3  know, they are the ones who are the experts on what is

4  considered healthy and sex positive, and if there's any

5  question, it gets sent to a therapist.

6  Q    But not -- they don't comment on every movie that you

7  sell.

8  A    No.

9  Q    And these counsel members are paid to appear in your

10  videos, correct?

11  A    I wouldn't know anything about the financial relationship

12  between our advisory counsel and our company.

13  Q    So you're not -- you're not aware that they are

14  compensated for appearing in your videos?

15  A    I know that they do appear in our videos, but I don't see

16  any paychecks, and I've never discussed with anyone in my

17  company what the relationship is as far as finances go between

18  our advisory counsel and our company.  I mean, you know, I

19  could guess that they're paid, but that -- it would just be a

20  guess, but they're not paid to be on our advisory counsel.

21  It's a professional relationship where, you know, we support

22  them, they support us.

23  Q    So your testimony is that you don't know if they get paid

24  to appear on your videos.

25  A    I don't know.  I would have -- I could have guessed at one

1    point that they did, but it would have been a guess.

2    Q    But you provide these counsel members gift basket -- gifts

3    -- gift baskets with your products so they can raise money in

4    their institutions, correct?

5    A    Yes.  We are a member of different professional

6    organizations with professional sex therapists and researchers,

7    and so like AASECT is one of them, and so we would make a gift

8    basket with our products in it and send it to their conference,

9    and they could offer that as a prize in a raffle for their

10   student members or at their luncheon or something like that.

11   That's what those things are about.

12   Q    Okay.  Now let's go to Exhibit number 135, please.  Ms.

13   Wilson, this is Plaintiff Sinclair's answers to defendant's

14   second set of interrogatories?

15   A    Yes.

16   Q    You've seen this document before?

17   A    Yes.  It looks familiar.

18   Q    You provided information to help answer these

19   interrogatories, correct?

20   A    That's correct.

21   Q    And if we go to interrogatory number 21, we see that it

22   asked you, "For each year since --" 1998 --

23   A    1988?

24   Q    -- "1988, state the gross revenues you have received from

25   your production of visual depictions of sexually explicit

1   conduct", correct?

2   A    Yes.   That's what the question is.   Yes.   Now let's go to

3   Exhibit 133, please.   Ms. Wilson, this document is titled

4   Townsend-Sinclair video sales, 2005 through 2009?

5   A    Yes.

6            MR. BLADUELL:   By the way, Your Honor, I want to -- I

7   forgot to move into evidence Exhibits 128 --

8            THE COURT:   All right.   Admitted.

9            MR. BLADUELL:   -- A through C.

10           THE COURT:   Admitted.

11           MR. BLADUELL:   -- and I think that's the only one.

12   And --

13           THE COURT:   All right.   All exhibits you've used have

14   been -- will be admitted.   There's --

15           MR. BLADUELL:   Okay.

16           THE COURT:   There's no objection.   All right?   So the

17   record is clear.   Both counsel have an obligation to object if

18   they want to object to an exhibit.   Otherwise, I'm going to

19   assume there's no objection.   The witness has testified about

20   them.   The exhibit -- at the end of your case, both sides, you

21   can say that you move for the admission of all exhibits that

22   were used, and I -- without objection, I'll grant it.

23           So you don't have to worry about it unless there's an

24   objection.   Okay?

25           MR. BLADUELL:   Okay.   Thank you, Your Honor.

1    BY MR. BLADUELL:

2    Q    And this -- this is the answer you provided to

3    interrogatory number 21, the gross revenues?

4    A    This is -- that's from our accounting department.  Yes.

5    Q    Okay.  And in 2005, it says that you make $11 million?

6             THE COURT:  Well, that speaks for itself.  You don't

7    have to read the numbers.  What's the question?

8             MR. BLADUELL:  Just -- I'm just going to move to

9    admit it.

10            THE COURT:  All right.  Admitted.

11            MR. BLADUELL:  I have no further questions at this

12   time, Your Honor.

13            THE COURT:  All right.  Now, I may have a couple --

14   leave that on the screen.  I have a couple questions for the

15   witness.  All right.

16   BY THE COURT:

17   Q    Are the -- are the companies that you mentioned Adam & Eve

18   and Better Sex and Sinclair, are their sales all included in

19   this document that's now on the screen, which is Exhibit 33?

20   A    No.  They would not be.

21   Q    They would be in addition to these, is that right?

22   A    Yes.  This -- these would be just Townsend.

23   Q    Okay.  Do you have any knowledge what the gross sales

24   would be of the other companies such as Better Sex and Adam &

25   Eve?

1    A    Well, Better Sex is our website.

2    Q    Okay.

3    A    So that's a -- that's part of Sinclair, and --

4    Q    But you -- but that's a revenue earner, isn't it?

5    A    Yes.  Yes.  BetterSex.com is -- is a website owned by

6    Sinclair, and the revenues from that would be included in these

7    figures.

8    Q    That would be included.

9    A    That's correct.

10   Q    Okay.  What about Adam & Eve?

11   A    No.  Not at all, and I would have no way of knowing what

12   their sales figures are unless they announce them.

13   Q    Who gets -- who owns Adam & Eve?

14   A    Phil Harvey.

15   Q    Okay.  But now, you're the compliance officer for all

16   these companies, is that correct?

17   A    No.

18   Q    No?

19   A    Only for Sinclair Institute, and that includes -- we are

20   Townsend Enterprises doing business as Sinclair Institute --

21   Q    Right.

22   A    -- and our websites are SinclairInstitute.com and

23   BetterSex.com.

24   Q    Okay.

25   A    Adam & Eve is a completely separate company.

1   Q    You have nothing to do with Adam & Eve?

2   A    Nothing at all.

3   Q    Do they have a separate compliance officer, if you know?

4   A    That's correct.  Gina Phelps --

5   Q    I see.

6   A    -- who trained me to use the software.

7   Q    She trained you?

8   A    That's correct.

9   Q    All right.  But you don't have any knowledge of their

10  operations?

11  A    Very little --

12  Q    All right.  Okay.

13  A    -- as far as their revenues and that kind of thing.

14  Q    Okay.  All right.  Now, you testified yesterday that you

15  estimated the cost of compliance with 2257, given the amount of

16  time it takes you and the other people, at approximately

17  $75,000 --

18  A    A year.

19  Q    -- is that correct?

20  A    Yes.  Per year.

21  Q    Is that a generally consistent number over the years or

22  does it vary?

23  A    It's based on what the employees that are doing the work

24  are paid, and it doesn't include figures that would have to do

25  with what it costs to program the software, that kind of thing,

1    but I would say it's -- it's fairly consistent.

2    Q    Okay.  Now, this document here, Exhibit 33, stops at 2009.

3    Do you -- without guessing, do you have any knowledge how these

4    -- how the gross sales numbers compute for 2010, 2011, and

5    2012?

6    A    Yes.  They're less.

7    Q    They're less?

8    A    That's correct.

9    Q    All right.  Do you have any idea why or how much --

10   A    Competition in the market.

11   Q    What?

12   A    How much less?  Probably one, 2 million.

13   Q    One what?

14   A    One or 2 million.

15   Q    Less?

16   A    At least.  Yes.

17   Q    Okay.  All right.  And do you have any idea why without

18   guessing?

19   A    I think it's attributed to probably the recession and

20   competition in the market.

21   Q    Okay.

22   A    That's the general consensus --

23   Q    Okay.

24   A    -- I think.

25   Q    All right.  Now, next question.  Now, I'm -- I'm in no way

Wilson - The Court                    41

1    a computer software expert.  I assume you have a computer

2    system that you use in your company, is that correct?

3    A    Yes.

4    Q    All right.  Now, you spoke yesterday about the cross

5    referencing issue and about how that was a burden, is that

6    correct?

7    A    That's correct.

8    Q    All right.  Now, I would like to just ask -- make -- try

9    and understand your testimony by asking you this question.

10   Let's say you have a male actor who is going to perform in one

11   of your videos.  All right?  And he gives you his driver's

12   license or whatever, and he's clearly an adult, and so we don't

13   have an issues about appearances and all, let's say he's 35

14   years old.  All right?

15   A    Okay.

16   Q    Okay.  Now, so you make a record.  You photocopy his

17   driver's license, and let's say his name is John Smith, and

18   you'll open a hard copy file and you'll put a copy -- it will

19   say John Smith, and you'll put a copy of his driver's license

20   and perhaps an employment agreement, a model's release, and

21   similar legal documents in that file, is that right?

22   A    That's right.

23   Q    And you'll keep that in a permanent place --

24   A    That's correct.

25   Q    -- correct?  All right.  Now, I assume you'll also enter

Wilson - The Court                               42

1    the name John Smith in your computer, that you would have a

2    computer field for the names of actors, is that correct?

3    A    That's right, and -- and an electronic document with a

4    copy of that ID.

5    Q    Okay.  Now, what I don't -- what I'm not sure I

6    understand.  Let's say that John Smith then performs a scene,

7    an explicit sexual scene.  Let's say he does five scenes.  Now,

8    as I understand from other witnesses, those five scenes could

9    appear in one movie, in five movies, or 500 movies, is that

10   right?

11   A    That is right.

12   Q    And it's customary in the industry that a actor or actress

13   would -- would perform a scene, and it could be repeated and

14   spliced and copied and used multiple times, correct?

15   A    That is correct.

16   Q    All right.  Now, what I don't -- what I don't -- what I'd

17   like to know is if you have a computer record of John Smith and

18   that he is legally qualified under 2557 and you've done all the

19   requirements, why is it a problem every time you use that --

20   any one of those five scenes with John Smith, you just can't

21   generate a computer field showing that it was move -- it was

22   used in whether it's five movies or 50 movies or 500 movies?

23   A    Well, those 500 movies all have their separate documents.

24   Q    Right.  And they would all show that John Smith --

25   A    And they all have to be filed and made available --

1    Q     Well --

2    A     -- and they all have to be cross --

3    Q     -- but this is all a computer record.  It's all done

4    electronically, isn't it?  You're not creating 500 --

5    A     Well, the --

6    Q     Let me just finish, and I'll let you finish too.  You

7    don't create paper files every time you film a new movie or you

8    -- or you advertise a movie for sale, do you?

9    A     Every title that we carry, if -- if we hired John to be in

10   -- in our movie and the movie is called Loving Couples and we

11   use that footage next year in a movie called Loving Couples II,

12   new paperwork has to be created.  A new scene -- every time the

13   footage gets used under a different title, new paperwork has to

14   be created.

15   Q     What -- when you say paper, you're talking about a --

16   using a hard piece of paper?

17   A     Yes.

18   Q     What --

19   A     As the primary producer, we would be required to -- to

20   create the document.

21   Q     What kind of document do you create?

22   A     We create a certificate of compliance with the date of

23   production and a signature of the -- a person that was on site

24   that is certifying that all of -- all of this is within 2257

25   regulations, that these proceedings were done legally according

1   to 2257 and signed.  Then we would have to have a cast list and

2   we also have a scene list, and then that has to be loaded --

3   well, we used to do it all on paper, but now we're allowed to

4   load electronic documents.  So I would take those documents and

5   put them on a scanner and make a PDF of them and then load them

6   into the electronic system so that I could, you know, access it

7   as opposed to walking over to a file cabinet and getting the

8   paper, but as the primary producer, the document has to be

9   created in the first place.  It's not like the computer does

10  that by itself.

11  Q    Well, when you create the document, don't you type it onto

12  a computer?  Don't you type it onto a computer screen?

13  A    Yes.

14  Q    All right.  And you can file it electronically, can you

15  not?

16  A    That's right, but as primary producers, we keep paper

17  documents as well.

18  Q    Is it your position that you have to have a paper

19  document?

20  A    I am told that we have to have paper documents.  We

21  keep --

22  Q    So --

23  A    -- paper documents as well as --

24  Q    So -- go ahead.  Finish your sentence.

25  A    We keep paper documents as well as electronic records.

1    Only recently did -- were we told by our legal advisors that

2    electronic recordkeeping was allowed.  If -- but let's pretend,

3    if we -- even if we didn't, you know, so that I can help you

4    understand what actually goes on, even if we didn't keep paper

5    records, the records have to be created, and they have to be

6    uploaded into a computer program, which is not an instantaneous

7    thing.

8              I -- if we make Loving Couples I, I put the

9    electronic documents into the computer program, and then the

10   visuals that we're going to use for Loving Couples I are all

11   loaded, and they get individual numbers.  The IDs for the film

12   Loving Couples and the names of the cast members are all listed

13   there.

14             If we make Loving Couples II, that becomes another

15   record entirely where I, once again, start off with the title

16   Loving Couples II.  I create the documents on the computer for

17   that film, which would include the certificate of compliance,

18   the cast list, and the scene list.  Those are uploaded into the

19   slots prepared for that, and then the cast of Loving Couples II

20   is listed, and so I'm sitting there, and I type John Smith's

21   name in, and it pops up and becomes a part of the record.

22             So, you know, in the old days, I would have had to

23   make -- go to the copy machine and make a copy of John Smith,

24   and now it's done electronically, but it's not necessarily a

25   faster process.  It just takes less space as far as how many

Wilson - The Court                        46

1    metal file cabinets we have in our office.

2    Q    Okay.

3    A    If we make Loving Couples III, the whole process begins

4    again.

5    Q    Right.

6    A    Brand new documents.

7    Q    All right.  Now, okay.  So are -- is your testimony that

8    now that you've given this advice that you were allowed to have

9    electronic records, that you're no longer making an extra paper

10   set?

11   A    As primary producer, we do make a paper set.

12   Q    Do you believe you have to or you just do it, if you know?

13   A    We are told to --

14   Q    Don't guess.  What?

15   A    We're told to do it.  I'm told to do that.

16   Q    You need a paper set?

17   A    Well, in order for our producer to sign the document, it

18   has to be a piece of paper.

19   Q    Well, are you familiar with an electronic signature?

20   A    We are.  We -- I don't use them though.

21   Q    But you could, could you not?

22   A    Perhaps I could.

23   Q    Have you looked into that?

24   A    I haven't.

25   Q    All right.  All right.  Now, the next question I have, I

1   think you were asked on direct examination.  Let's say a

2   Government agent came to your office once, and just so we don't

3   have an issues, suppose they had a warrant and they wanted to

4   see what records you have of John Smith as an actor.  Okay?

5   And you had done what you say you do, that every time you

6   prepare a moving, Loving Couples I, II, or III, you prepare a

7   new file for that movie and you record that a scene involving

8   John Smith is part of that movie, correct, even -- and it could

9   be the same scene in all three movies, right?

10  A    That's correct.

11  Q    Okay.

12  A    And the visuals that we would use to market that movie in

13  our catalogue, in a flyer, in an e-mail, and on our website,

14  any of those visuals have an individual number, and that number

15  has to be cross-referenced back to all of these records so that

16  I can tell the FBI agent where that image that he has in his

17  hand has appeared in every printed piece --

18  Q    But your -- yeah.

19  A    -- or electronic use that we've ever created in our

20  business.

21  Q    Okay.  But that's exactly right, that by -- because you've

22  entered John Smith in -- as an actor in every one of those

23  movies, if the agent came with this warrant and one of the John

24  Smith records, you could then put on your screen -- you could

25  bring up on your screen a list of all the movies in which any

1    scene in which John Smith was an actor was portrayed, right?

2    A     That is right.

3    Q     And if you wanted to, you could then print it out and give

4    it to the agent.

5    A     That's correct.

6    Q     If the agent wanted it electronically, you could also copy

7    what's on your screen and email it to the agent, correct?

8    A     That's correct.

9               THE COURT:  All right.  Thank you.  All right.  Now

10   let's have redirect.  And by the way, any time I ask questions,

11   if counsel want to object, I'm not offended.  Go ahead. All

12   right.

13              MR. MURRAY:  I have no -- no redirect, Your Honor.

14              THE COURT:  No redirect?  Okay.  All right.  Thank

15   you very much.  You're excused.  Next witness, please.

16              MR. MURRAY:  Your Honor, we call plaintiff Carol

17   Queen.

18              THE COURT:  Okay.  Swear the witness, please.

19              THE CLERK:  Raise your right hand.

20              CAROL QUEEN, PLAINTIFF'S WITNESS, SWORN

21              THE CLERK:  Please be seated.  Please state your full

22   name and spell your last name for the record.

23              THE WITNESS:  My name is Carol Ann Queen, Q-U-E-E-N.

24                           DIRECT EXAMINATION

25   BY MR. MURRAY:

1    Q    All right.  And, Ms. Queen, state your residence, city.

2    A    I live in San Francisco, California.

3    Q    Okay.  And what is your current profession?

4    A    I'm a sexologist.  I have two main roles in this.  I'm the

5    director of the Center for Sex and Culture, and as an adjunct

6    to that, I do lecturing and -- and writing, and I'm also the

7    staff sexologist at Good Vibrations in the Bay area and have

8    been there under many job titles, but sexologist is my most

9    recent and current one.

10   Q    What is a sexologist, by the way?

11   A    A sexologist is a person who academically studies

12   sexuality.  So I have a Ph.D. in sexology, and my work includes

13   academic as well as more popular work.

14   Q    Okay.  And what -- tell me what the company, Good

15   Vibrations is.

16   A    Good Vibrations is a sex toy, book, video, and product

17   company originally founded by one of the sex therapists in the

18   1970s.  It was initially to be a company that women could feel

19   comfortable shopping in and was an all women's company for

20   quite a long time.

21   Q    And does it have retail stores?

22   A    It has I believe six retail stores at this point.

23   Q    And does it also have a website?

24   A    There's a website, goodvibes.com.

25   Q    Okay.

1            THE COURT:  What's it called?

2            THE WITNESS:  Goodvibes.com.

3    BY MR. MURRAY:

4    Q    Now, are you also associated with some museum there?

5    A    The Good Vibrations Antique Vibrator Museum is a stand

6    alone room in the Polk Street Good Vibrations in San Francisco,

7    and it contains roughly a hundred vibrators ranging from the

8    late 1890s, we think, to the early 1970s.

9    Q    And what is your role in connection with those?

10   A    I'm the curator of the Antique Vibrator Museum, and I

11   represent it and larger Good Vibrations to the public and the

12   press.

13   Q    And then you mentioned the Center for Sex and Culture?

14   A    Right.

15   Q    And what is that?

16   A    That is a nonprofit in San Francisco that I co-founded

17   with my partner.  It is a library, archive, gallery, sex

18   education, and cultural events center.

19   Q    Okay.  And when was that founded?

20   A    That was founded in about 1990.  2000.  I'm so sorry.

21   Q    Okay.  Now, you mentioned your Ph.D. in sexology.  What --

22   what is your undergraduate education?

23   A    I have a Bachelor of Science in sociology -- pardon me --

24   and a year of graduate school in sociology as well --

25   Q    And --

1    A    -- which I then transferred over to sexology.

2    Q    Where did you achieve your Bachelors degree?

3    A    Bachelors is from University of Oregon, as is that one

4    year of graduate school.

5    Q    Okay.  Now, and how old are you, if I might ask?

6    A    Fifty-five.

7    Q    Okay.  Now, have you authored any publications on the

8    subject of human sexuality?

9    A    I have.  I have 13 authored or edited books in print, 12

10   or 13.  There's two editions of one of them, and I have a

11   number of stories, essays, and related kinds of writings and

12   anthologies.  At last count, there were about 75 or 80 of

13   those, and also journal and magazine articles.  I'm not sure

14   how many of those I have published.

15   Q    And have any of them been published in peer review

16   journals?

17   A    Yes.  A couple of them have.

18   Q    What journals?

19   A    I believe one of them is called Journal of Women and

20   Sexuality, and also, there is Journal of Bisexuality, which I

21   believe to be peer reviewed.

22   Q    And have any of your publications been translated into

23   other languages?

24   A    I have had some of the books and I'm not sure how many of

25   the -- the essays and stories published in other countries.  I

1  know at least that there is one in Dutch, and I know there's
2  one in Chinese.
3  Q    Okay.  And tell the Court what some of the books are that
4  you've authored or compiled.
5  A    My first book was called Exhibitionism for the Shy and was
6  a sexual self-help book for people who felt as though they
7  wanted to be more comfortable in their sexuality.  My next one
8  was called Real Live Nude Girl, Chronicles of Sex-Positive
9  Culture, and that's a series of personal essays and commentary
10  about sexuality and the sexuality communities.  My third book
11  was called The Leather Daddy and the Femme.  It's a novel, and
12  then I have published as an editor a -- or co-editor a book
13  called PoMo Sexuals, which is personal essays by people who
14  don't feel as though they belong on either end of the gender or
15  sexual orientation spectrum.  So nonbinary ways of people
16  thinking about themselves and living in the world, and in
17  addition, a couple of volumes of Best by Sexual Erotica II
18  called Five Minute Erotica and More Five Minute Erotica, very
19  short erotic stories, one called Whipped, which was about
20  female dominance, and I'm trying to think if there's been
21  anything else.
22  Q    Now, are any of these books taught at universities?
23  A    PoMo Sexuals is on the syllabus at some universities,
24  particularly in gender studies and sexuality studies kinds of
25  programs, as is, in some cases, Real Live Nude Girl.

1    Q    Now, have you yourself performed in sex education films?

2    A    I have had two roles in sex education films, one as a

3    performer showing people how the explicit acts are done, and

4    one as a talking head or explaining role.  So I've had both of

5    those kinds of responsibilities.

6    Q    And approximately how many of those films have you

7    participated in as a performer as opposed to a talking head?

8    A    As a performer as opposed to a talking head, over a half

9    dozen.  As a talking head, probably another four or five.

10   Q    And how old were you when you first appeared in such a

11   film?

12   A    My first film was in 1988.  It was Latex and Lace, a

13   women's safer sex video, and I was 29.

14   Q    Okay.  And what was the age range of the other performers

15   in the various films that you've participated?

16   A    In that case, I believe that I was the youngest person in

17   the film.  The age range in the other films I've been involved

18   with has been over 18, although I don't know the exact age of

19   the performers younger than me, all the way up to about 60, I

20   think.

21   Q    Okay.  And what is the age range of the majority?

22   A    The age range of the majority, both in -- in terms of me

23   and the time period in which I was performing and also the

24   people -- my peers in the movies, generally in their 30s.

25   Q    Okay.  When you would participate in these films, did you

Queen - Direct (Mur)                          54

1    have to provide photo IDs?

2    A     Yes.

3    Q     Okay.  Did you do any of these films for Sinclair

4    Institute, by the way?

5    A     I think that I am in one to four of Sinclair Institute's

6    movies, although I'm not sure of the number.  I know I did two

7    shoots with them, and there may be more than -- more than the

8    two movies, that -- as Diane just described.

9    Q     Now, and over what period of time?  You said the first one

10   was 1988.  Of all of the films that you've participated in

11   either as a perform or as an educator, what is the range of

12   years?  '88 to what?

13   A     1988, and I believe the last one was 2011.

14   Q     Okay.  Now, do you also as part of your professional

15   activities do something that is referred to "collage art"?

16   A     I am a collage artist.  It's a sideline, but I do do --

17   make art and out of other images.

18   Q     Well, let's --

19   A     So bringing them together.

20   Q     Yeah.  Why don't you give the Court -- let's talk about

21   what is the definition of collage art?

22   A     Okay.  Collage is -- is materials that have been taken

23   from other sources, usually -- in my case, I use paper mostly,

24   paper, scissors, and glue, putting the images that you find

25   together in a new way, and in my particular case, I will use

1    often explicit images or nudes and reinterpret them and make a

2    new piece of art out of the images that I have collected

3    together.

4    Q    Okay.  Is another name for that type of art

5    appropriationist art?

6    A    My understanding is that that's one of the ways it's

7    referred.  Yes.

8    Q    And is this collage art or appropriationist art a

9    recognized genre in art?

10   A    It is a recognized genre.  It's -- it's history and best

11   -- it's best understood by academics as being something that

12   was in the dadaist or surrealist line of -- of art, history

13   from the early part of the 20th century onward.

14   Q    Okay.  And have you ever displayed or shown these collage

15   artworks that you've --

16   A    I have.  I've had a half a dozen gallery shows or other

17   kinds of public shows of a few all the way to most of my

18   artworks.

19   Q    And how many of these do you create approximately a year?

20   A    It depends on the year.  In some cases, there will be as

21   many as a half dozen, even maybe more, but ordinarily, I do at

22   least one or two a year.  It depends upon the amount of time

23   that I have to go and make art.  It's not something that I can

24   do every day.  It has to be in a particular time frame.

25   Q    And you mentioned that some of them are explicit.  Are you

1    referring to sexually explicit?

2    A    I am.

3    Q    So --

4    A    I use genitals and nude bodies in some of the pieces that

5    I do.

6    Q    Okay.  Now, you're familiar with 2257, are you not?

7    A    I am familiar with it.  Yes.

8    Q    Now, when you create this collage art, you are making a

9    production, correct?

10   A    I'm making a visual depiction, yeah.  A piece of art.

11   Q    Now, how -- if you include sexual images that you have

12   collected from other sources, how would you go about complying

13   with 2257?

14   A    Well, that's actually a matter of concern.  I really

15   can't.  I can sometimes determine what the date of publication

16   is of the work that I'm cutting out or tearing out of another

17   magazine or something like that to make a new piece of art.  I

18   have no clue if I were even to reach out to those people saying

19   that I needed to see their 2257s, whether they would allow me

20   to do it.  It's part of -- it's actually a concern of mine that

21   doesn't stop me from making the art but has stopped me from

22   publishing it actually.

23   Q    Well, how would you go about -- so if I understand, you

24   collect these sexual images from what types of sources?

25   A    They could be from porn magazines.  There's a book of

1  images of women's vulvas that I use and take images of the

2  vulvas out of that.  I'm looking for a comparable book about

3  penises, and I haven't found one, but I would use it if I had,

4  and I make art pieces that have some cultural commentary

5  associated with them I think would be safe to say.

6  Q    And how would you begin to collect photo IDs from the

7  people depicted in those images?

8  A    Well, unless there were a way for me to determine who the

9  person was in the image, which sometimes I can do.  Sometimes I

10 recognize a person in a porn magazine say, but not always, or

11 unless there were a way for the publisher that makes the book

12 of vulvas to share their information with me, if they even have

13 it.  I don't actually know whether they have it, whether they

14 have such IDs.  I don't -- I don't know how I would begin to do

15 that.  If I knew who a performer was, I could I suppose reach

16 out them and send them an e-mail, but other than that, I just

17 don't know.

18 Q    So when you create this collage art, you don't have any

19 2257 records associated with it?

20 A    I do not.  I never have, and I can't imagine how I could

21 reliably get them.

22 Q    And do you place the 2257 label on the work then?

23 A    No.  No.  I couldn't do that.

24 Q    And what has that -- how has that affected your collage

25 art?

1    A    Well, in terms of the making of the art and the -- the

2    sharing it with people as -- as a piece of art, showing it to

3    -- showing a piece of art to a person, that has not stopped me

4    from doing either of those things.  I would like to publish

5    these into a book, and I'm just very concerned.  I haven't

6    taken any steps to do this largely because of this issue that

7    we're discussing.

8    Q    Okay.  Now, by the way, have you ever been a member of the

9    Free Speech Coalition?

10   A    I have been a member of the Free Speech Coalition.  If I

11   remember to send in my -- my annual re-up, I am a member now,

12   but I am not sure, but I have been in the past on more than one

13   occasion.

14   Q    And have you ever been on their board of directors?

15   A    I served on their board of directors in the mid/late '90s.

16   I believe the year was 1997, although I am not positive about

17   that, for one year.

18   Q    Now, could you describe the work you do at Good Vibrations

19   with -- in a little bit more detail?  What exactly are your

20   duties?

21   A    My duties at Good Vibrations are to oversee and conduct

22   trainings of staff members, very specifically the people who

23   will do customer service who -- whose job it is to go up to a

24   person in a store or answer a phone in the customer service

25   center and say hello, can I help you, what are you looking for

1    and that kind of thing, so that they can understand sexuality,

2    talk about it comfortably, make an informed and comfortable

3    environment for the shopper.  So that's one.

4              Another piece of my work is to represent the company

5    and sexuality in general to the public and the press, which

6    means that say Men's Health and Cosmo will contact me one week.

7    I fully expect to be asked questions about human papilloma

8    virus this week.  That's what I'll probably be doing in my

9    e-mail this week as part of that work.

10   Q    All right.

11   A    And I represent the Antique Vibrator Museum, as I've told

12   you, and I have a subtitle that I am company historian, and

13   that basically means that I've been around longer than anyone

14   else in the company, and if anyone needs to know something

15   about the past history of the company, which is significant and

16   interesting in many ways, then I'm the go-to person for those

17   questions.

18   Q    Now, the Center for Sex and Culture is separate from Good

19   Vibrations?

20   A    That's correct.

21   Q    And where is that located again?

22   A    That's in San Francisco as well.

23   Q    Okay.  And that's the nonprofit that you talked about?

24   A    That's correct.

25   Q    Okay.  And I think -- did I ask you -- and if I didn't --

1   and if I did, I apologize -- does it maintain a library?

2   A    The Center for Sex and Culture has a library.  That's

3   right.  That's one of our --

4   Q    And what's in your library there?

5   A    We've got -- I think we've got about 7,000 volumes on the

6   wall right now.  We've got some more in storage, and we collect

7   everything from academic works including some of the

8   foundational texts of sexology like the Kinsey Reports and

9   things even further back than that, contemporary academic

10  things like the Journal of Sex Research and other academic

11  works.  We don't have any subscriptions to anything, but we get

12  a lot of donations, some medical sexology journals, things like

13  that, as well as pop culture works, how to have better sex in

14  various ways by various authors over various decades.

15  Q    Does your library include sexually explicit materials?

16  A    It does.  Sexually explicit material both in terms of art,

17  photography, and that sort of thing as well as porn magazines.

18  We've got a collection of videos and DVDs, although those are

19  not available right now.  They're in storage.

20  Q    Now, do you maintain a -- an art type gallery as well as

21  the center?

22  A    One of the walls of our large room, one -- one has books

23  on it, and the other wall is an art gallery which changes out

24  once a month or every two months.  Depends.  Usually, it's a

25  single artist or two artists together being displayed.  Once or

1    twice a year, we have group shows that have as many as probably
2    30 artists I would guess at the most.
3    Q     And are -- and are any of the -- the works in the gallery
4    sexually explicit?
5    A     They are often, although not always, sexually explicit.
6    Sometimes we have photographs, sometimes paintings or other
7    kinds of created art, and sometimes even collage.
8    Q     And do you offer any sexual education classes at the
9    center?
10   A     We do.  We have sex ed. classes arranging from very
11   didactic and lecture based to experiential couple based, here,
12   try this out, folks kinds of classes for people, adults of
13   every orientation and interest that we can find resources for.
14   It's part of the point of the sex and culture to be as broad in
15   our understanding of sexuality as we can.
16   Q     Now, are you at the center involved in something that is
17   called the Masturbatathon?
18   A     Yes.
19               THE COURT:  Master -- sorry?
20               MR. MURRAY:  Masturbatathon.
21               THE COURT:  Yes.  Okay.
22   BY MR. MURRAY:
23   Q     And would you tell the Court how that came about?
24   A     Sure.  The Masturbatathon originally was part of Good
25   Vibrations National Masturbation Month, which was created in

Queen - Direct (Mur)                                        62

1    1995 by a group of people within -- I was one of them -- and PR
2    people and so forth to protest the firing of Surgeon General
3    Joycelyn Elders for having said one thing about masturbation,
4    one we thought sensible thing about masturbation, and we
5    thought that it was shocking that such a thing could occur,
6    that people obviously needed to be more comfortable about this
7    topic, and we thought we could help them do that by talking
8    about masturbation to the press, to the public in this playful
9    yet serious way called the National Masturbation Month, which
10   is still being celebrated.

11            And a couple of years later, we added the
12   Masturbatathon.  The Masturbatathon was both a consciousness
13   raising thing and an attention getter for the press for the
14   whole purpose of Masturbation Month, and it is, just like a
15   walkathon, you would ask appropriate people in your life
16   whether they would sponsor you to do a charity fundraising
17   event, except instead of walking or biking, in this case, it's
18   masturbating, and you come back to your friend later and say I
19   had 12 orgasms or I masturbated for two hours or whatever it
20   might have been, and the point of the Masturbatathon was
21   specifically to get people to speak about masturbation to one
22   another in a way that was not overly sexualized and also to
23   normalize the practice and to talk to the press about this,
24   because the press liked this idea a lot, and --
25   Q    Where did you hold these?

1    A    We held them nowhere really.  They were private events.  A

2    person would ask their friends.  They would have a pledge

3    sheet.  They would fill it out.  They would go home and

4    masturbate if that's where they generally masturbated, and then

5    they would contact their friends again, collect their pledges,

6    remit them, and what Good Vibrations did with the money is send

7    a hundred percent of it on out to charities that we chose.  So

8    when people asked about it, people would say and, by the way,

9    this charity this year is the Boston Women's Health Collective

10   or whatever it was, and then that would happen and then it

11   would be over for the year, and we would do it again the

12   following May.  When this --

13   Q    What -- let me just interrupt.

14   A    So.

15   Q    So then --

16   A    I'm so sorry.

17   Q    Then when -- when did it occur that the center became

18   involved in it?

19   A    The Center for Sex and Culture started doing these -- I

20   think the first one was in May 2001, and we found a venue.  We

21   didn't have our own venue yet as a center.  We had just been

22   created, but we found a venue.  We rented it.  We announced we

23   were going to do a live Masturbatathon as opposed to the -- the

24   private kind that had been already going on, and people who

25   wanted to go to the Masturbatathon could come to the group

1    space so that it had a sort of a sex club environment, but

2    there was no interaction or intercourse between the

3    participants.  It was all masturbation.

4    Q    And how many of these have you held over the years

5    approximately?

6    A    We have not held one every single year since that time,

7    but most years.  I think we've held about 11 of them.

8    Q    And were any of them put up on the internet in a form of

9    live stream?

10   A    A handful of them were live stream.  I'm going to say

11   about five of them, I believe, or six of the total number, and

12   we didn't always have a venue that was appropriate to live

13   stream.  So we haven't done all of them.  It took a while to

14   get the group of people together who were our crew, but the

15   same crew was our live stream and crew each time.

16   Q    And so on those occasions when you would live stream the

17   event, did that trigger, as far as the center was concerned,

18   2257?

19   A    As far as we were concerned, live streaming, even though

20   we weren't publishing it permanently, called us -- called upon

21   us to have to do 2257 compliance, and as a small community-

22   based nonprofit that's all volunteer, we did what we could to

23   make compliance happen, copying IDs, getting 2257 releases, and

24   so forth.

25   Q    Okay.  Now, let's talk about the ones then that were live

 1    streamed.  Take us through one of those sessions and describe

 2    them, the ones that were live streamed.

 3    A    So depending on the day, we would have the -- the crew

 4    come in and set up whatever they needed to -- to live stream.

 5    I'm not a technical person.  So I will -- I will do this on a

 6    lay level explanation.  The computer that it would be streamed

 7    through would be connected up with the cameras, and we would

 8    set up one -- generally, it was a space that had three rooms.

 9    So one room would be set up as the place where people who

10    wanted to go to live screaming could go.

11             No one else got to go into that room unless they had

12    filled out the correct paperwork and given us their ID.  So

13    people who didn't choose to be on camera initially couldn't

14    wander in there and couldn't get on camera accidentally.  We

15    were -- we had guards at the door, and people had wrist bands

16    on of different colors so we could tell who was who.

17             Another room would have had people in it who didn't

18    want to be on live camera and didn't want to have the chance of

19    stumbling into the wrong room.  It was a private room.  There

20    were no cameras at all there, and -- because some people wanted

21    to be private and public at the same time, if that makes sense.

22             And the final room was a room where both the

23    refreshments were and where I held what was sort of a talk

24    show.  I interviewed participants at the Masturbatathon for the

25    -- for the live stream.  So this was also a camera equipped

1   room.  I interviewed participants.  I talked about

2   masturbation.  I would interview special guests, if we had any.

3   Sometimes there would be authors or film performers.  One of

4   our special guests one time was Nina Hartley, who I know is

5   part of this proceeding.

6          And so I would talk about masturbation, describe what

7   was going on in the rooms if nobody was on film at the time,

8   because people could opt in and opt out.  So there wasn't

9   always masturbation for the people in web land to look at.  So

10  instead, we would talk about it during that time.  So there

11  would be a full day or a full session of the stream, but it

12  wouldn't always be explicit.  Sometimes it would be explicit.

13  Sometimes it would be me talking.

14  Q   And what was the process for checking the IDs as people

15  came in?

16  A   Our most trusted volunteer would be at the entryway.  You

17  couldn't get into the space.  It was actually at the top of a

18  flight of stairs.  So people would be ranged down the stairs

19  waiting to -- to check in.  They would have to show their ID,

20  sign a release saying they knew they were coming into a

21  sexually related environment, and then if they wished to be

22  part of the live stream, we would send them to the next desk

23  with the next trusted volunteer who would take a photocopy or

24  scan of -- or digital picture in some cases, digital camera

25  picture, of their ID, give them the 2257 associated form to

1    fill out that -- that had that language on it, and that

2    included, among other things, their aliases, other names.

3            That was sometimes a point of confusion, because

4    ordinarily when people fill out this -- these forms, they're

5    people in the adult entertainment industry who -- who know what

6    all of their different names that they may have used have been.

7    People from the sexuality community or people who are just

8    curious about this don't necessarily know about that.  So we

9    had people filling them out with married names and nonmarried

10   names and different things like that.

11           We did our best to respond to the law as we

12   understood it, and then once somebody had given us that

13   material, they could get the band that allowed them to go into

14   the room where the cameras were.

15   Q    And how many participants generally speaking would you

16   have when you would live stream it?

17   A    At the height of the live streamed Masturbatathon, we

18   think -- I think we had 200 people in the room, but not all of

19   those people wanted to be part of the public live stream.  So I

20   think the height there was 50 to 70.

21   Q    And what was the age range of the people who participated

22   in these Masturbatathons?

23   A    The age range was 18 or over through the 20s, 30s, 40s,

24   and 50s, into the 60s.  I think there may have been one

25   participant in his 70s.

1    Q    And what was the age range of the vast majority of the

2    participants?

3    A    The vast majority of the people were in their 30s and 40s.

4    Q    And what percentage would you estimate was under the age

5    of 25 that participated?

6    A    My best estimate is 10 to 12 percent.

7    Q    Okay.  Was there anybody who participated in the

8    Masturbatathons who you observed who could conceivably be

9    confused as being a minor?

10   A    When people are around 20 years old, it can be hard to

11   tell visually whether someone is under 18 or over 20.  That's

12   generally not the case, but it can be the case.  I didn't see

13   anyone who flagged my concern in that way, but that question --

14   not your question is irrelevant, but that was irrelevant at the

15   Masturbatathon, because we carded all the people who walked in

16   including the guy who was over 70.

17   Q    With respect to all the people, the vast majority, the 90

18   percent or so I think you said that were over 25, was there any

19   way that any of them could be confused as being younger than

20   18?

21   A    I don't believe so, but we checked all of their ID

22   regardless.

23   Q    Okay.  Now, so the live streaming of this event would go

24   up on the internet, is that correct?

25   A    Right.

1    Q    And how would people access it?

2    A    People would have heard about it either through the press

3    ahead of time or through our list and website, and we would

4    have at that point put a code or a click through button where

5    people would be able to go and get the -- it's -- it's like you

6    -- you look at YouTube now on a computer screen.  There would

7    be a screen that would pop up.  We didn't do it through YouTube

8    I should say, but -- but somebody in the group of people who

9    knew a lot more than I do about technical things knew how to

10   make that occur.

11          It didn't always work properly.  There were times

12   when -- and I was the person there going and checking e-mail

13   from time to time to see if anything was -- was problematic.

14   There was at least one year when half of the life stream didn't

15   even work, but we tried.

16   Q    And did you make a permanent recording of it?  Did you

17   make a copy of the live streaming?

18   A    The reason that we would do a live stream rather than

19   filming the Masturbatathon specifically had to do with our

20   concerns about 2257 and how we may not be a large enough entity

21   to properly keep the paperwork.  We do keep that paperwork from

22   the live streams, but we haven't -- we didn't -- we chose not

23   to make a permanent record ourselves or to potentially utilize

24   it further in ways because of this concern.

25   Q    Well, were you aware of the requirement of the law that at

1   least some copy of the image be made to be put with the

2   records?

3   A     We were not aware of that requirement of the law.

4   Q     Okay.  So you didn't do it?

5   A     Didn't do it.

6   Q     Okay.  Now, were you able to -- were you aware of the

7   requirement of putting a label on the -- on the image that

8   would explain where the 2257 records were kept?

9   A     I announced that on the live stream.  That's how -- that's

10  how we did that.

11  Q     Well, hold on.  Were you aware that a label was required?

12  A     I wasn't aware in terms of a live stream.

13  Q     Okay.

14  A     I certainly was aware that if you kept -- if you made a

15  video, that it was required to be language on the video, on the

16  -- on the box label as well, and part of the problem with our

17  thinking this through was that there's supposed to be a

18  permanent address of records, but we've had four locations in

19  the last ten, 12 years.  And so I didn't understand how there

20  would be a way for us to do that, because we're not at the same

21  location all the time.

22  Q     So did you put a label up on the live webcast or written

23  announcement of where the 2557 --

24  A     Not a written announcement.  A verbal announcement.

25  Q     Well, tell me how you did that.

1   A    I stood there in front of the camera and explained that we

2   were -- we were complying with 2257 to the best of our ability,

3   and the way we were doing it was by taking IDs and getting --

4   everyone here is over 18 and we are signing releases and we

5   have them here.

6   Q    Now, given your experience with the live streaming of the

7   Masturbatathons, when is the last time you live streamed one?

8   A    I believe our last live stream was 2010.

9   Q    Okay.  And would you like to do another live stream

10  Masturbatathon in the future?

11  A    I would like to do another live stream.  We always get

12  complaints when we don't do them.  There were our -- I guess

13  our handful of fans out there who miss the opportunity to do

14  that, but we have two problems at the moment.  One of them is

15  that the current room isn't large enough to successfully

16  separate an on-camera area and an off-camera area.  We care

17  very much about the privacy of the people who don't want to be

18  on camera, and so the room just doesn't really lend itself to

19  it, and we also are concerned about the 2257 question and

20  increasingly so the more we find out about it.

21  Q    Okay.  So are you saying that if in the future you can

22  locate a suitable room, would you allow the 2257 concern to

23  prevent you from having it?

24  A    We would need to do I feel more research and gain more

25  information than we have in the past in order to see how we

1    could successfully comply.

2    Q    Now, do you also have a -- a photo club at the center of

3    some kind?

4    A    Yes, we do.  It's not active at the moment, although we

5    could activate it again in the future, and I imagine that we

6    will, and it was active at the center from about 2005 or '06, I

7    believe, and often on, and I believe our last meeting was last

8    summer.

9    Q    And what was the photo club?

10   A    The photo club was a group of new photographers or new

11   erotic photographers -- some of them were experienced

12   photographers -- who wanted to branch into erotic content in

13   the work that they did, and they would join the club and come

14   to monthly -- usually monthly -- meetings held by more

15   experienced photographers, particularly, more experienced

16   erotic photographers who would teach them a class focusing

17   generally on whatever the erotic photographer's specialty was.

18   One person was really good at lighting.  One person was very

19   good with working with models or posing them, different things,

20   and then there would be an erotic photo shoot as part of the

21   club.

22        And then models would be brought in to be the

23   participants in a shoot, although they wouldn't photograph each

24   other.  It would be models that -- that agreed to be in the

25   shoot.  Those models, of course, filled out 2257 paperwork,

1    which we also retain, and the photographers had to sign a

2    release with us saying that unless they themselves got 2257

3    releases from the models in question, that they were not to

4    publish any of the pictures they took at that time.  They could

5    also make side arrangements to hire the models themselves if

6    they wished, but we talked to the -- to the photographers from

7    the get-go about 2257 releases, and most of them had never

8    heard of these releases, had no idea that there was a level of

9    paperwork that was required beyond just checking an ID.

10   Q    And were some of these photo shoots involving nudity and

11   explicit sex?

12   A    Oh, yeah.  All -- all of them had at least partial nudity,

13   if not full nudity.  Some of them had explicit sex from solo

14   sex and masturbation to toy use to couple.  There's -- there

15   are a couple of pairs of models in the bay area who are life

16   partners who will also do modeling together for such things.

17   So a couple would come in and go through whatever kind of

18   sexual response they wanted to to get the photographers

19   comfortable with working with live people moving around and --

20   and actually having sex.

21   Q    And does the center maintain a collection of some of those

22   photos?

23   A    The center doesn't -- the center actually owns a couple of

24   the photos that we acquired from a couple of the photographers

25   that we either did not have any explicit content to them or

1   that we knew had been 2257 as part of our art collection that
2   we hold, part of our archive really, but we don't have any --
3   we don't have the full range of those materials.  Those are
4   owned by the photographers, and we don't do anything with them
5   at present that would look like a publication, again, for the
6   same reason that we are a small entity without a paid person to
7   be in charge of all of this material, all the 2257 releases and
8   so forth.  We would, for example, like to do an erotic photo
9   club calendar say as a fundraiser, but we're just concerned
10  about this.  So we haven't chosen to do it.
11  Q    When you say this, you're concerned about what that has
12  presented you from doing it?
13  A    I'm sorry.  That was unclear.  We're concerned about --
14  about our being able to fully comply with 2257 legal
15  requirements, and having a product like that out in the world
16  would we feel be another level of publication that we're just
17  concerned about.
18  Q    Okay.  Are you saying you're unwilling to take the risk?
19  A    Yes.  For the time being, it seems too risky a thing to
20  do --
21  Q    Now --
22  A    -- particularly because it's -- it would be in the name of
23  the center, and we all have a duty of care, because it's our
24  nonprofit.
25  Q    Now, you mentioned the press.  Does the press show up at

1   any of the Masturbatathons that were live streamed?

2   A    We have had press at the Masturbatathons more than once.

3   I'm sure that at least -- at least one or two members of the

4   press were present at each one.  In a couple of cases, there

5   were more than that, but -- but a small number of press members

6   attend.

7   Q    And did you --

8   A    Some --

9   Q    I'm sorry.

10  A    I'm so sorry.  Sometimes there -- sometimes there isn't

11  any -- anything but a writer or blogger going into the room to

12  experience it, and then they make a written representation of

13  it later, but sometimes there are people who want to bring in

14  photographers or videographers.

15  Q    And when that happens, do you explain to the press

16  anything about the requirements of 2257?

17  A    Yes.  I tell them that they need to make sure that they

18  bring along releases that will be 2257 compliant and that

19  they're going to be responsible as press members who are going

20  to publish any images outside of our control to -- to be

21  compliant with that, and most of the members of the press don't

22  know what 2257 is.  They need to be explained that there's a

23  special law having to do with a particular kind of image.  They

24  need to go and sometimes check legal if they have a large

25  enough publication that has a legal department.

1          In my experience, they have told me in some cases at

2    least that legal didn't know about it.  So they have to do some

3    research, and then the people who wind up showing up need to

4    show us that they have a 2257 release with them or else they

5    need to tell us at the door that they're not going to do any

6    explicit photography.

7    Q    And --

8    A    I'm not positive whether they've all complied with that,

9    but we ask them to state that to us.

10   Q    And have any of them succeeded then in taking photos --

11   A    It's --

12   Q    -- under those conditions?

13   A    It's my knowledge of at least one appearance of images

14   from a Masturbatathon in the press.  It was in San Francisco

15   Weekly.  There may have been more than I'm not familiar with,

16   but I do know about that one.

17   Q    And were there members of the press who, upon being

18   advised of 2257, elected not to participate?

19   A    There certainly have been members of the press who elected

20   not to bring a photographer or a videographer when I've told

21   them about this regulation, and I think there may have been

22   members of the press who just had their editor say oh, never

23   mind.

24          MR. MURRAY:  Okay.  Thank you very much.  I have

25   nothing further, Your Honor.

1        THE WITNESS:  You're quite welcome.  Thank you.

2        THE COURT:  Okay.  All right.  Cross-examine.

3                        CROSS-EXAMINATION

4   BY MR. SWINTON:

5   Q    Good morning, Ms. Cross (sic).

6   A    Good morning.

7   Q    I mean Ms. Queen.

8   A    That's okay.

9   Q    On direct examination, you went into length and discussed

10  one of the events that you hold at the master -- at the Center

11  for Sex and Culture, which is the Masturbatathon.

12  A    Right.

13  Q    While it hasn't been an annual event, it's occurred I

14  think you said about 11 times since 2001?

15  A    Roughly that.  Yeah.

16  Q    And you held one this year, 2013, in May.

17  A    That's correct.

18  Q    And one of the aspects of the Masturbatathon is that

19  sexual intercourse is strictly forbidden at a Masturbatathon.

20  A    That's correct.

21  Q    You had some discussion on direct examination that those

22  -- that a certain number of Masturbatathons were live stream to

23  the internet.

24  A    That's right.

25  Q    And you discussed that in order to accommodate the live

Queen - Cross (Swi)                                    78

1   streaming, you really needed two separate rooms.

2   A     Yes.

3   Q     One for those who wanted to be on the live stream and

4   appear on the internet --

5   A     Right.

6   Q     -- and one for those who wanted to participate but not be

7   on the internet.

8   A     Right.

9   Q     Now, the internet broadcast of any of these

10  Masturbatathons was contemplated to simply be a one-time event.

11  A     That's correct.

12  Q     And neither you nor the center recorded it so that it

13  could be shown at a later time.

14  A     To my knowledge.

15  Q     And to your knowledge, it has never been re -- none of the

16  Masturbatathons that appeared on the internet have been

17  rebroadcast.

18  A     To my knowledge.

19  Q     And, in fact, you've sort of described this live

20  broadcast, the purpose of it as being effervescent.

21  A     Yes.   That's a word I used.

22  Q     There really was no intent by you or the center to

23  permanently capture the likenesses of any of the participants

24  at the Masturbatathon.

25  A     That's right except in -- in the case that -- that the IDs

1   were photographed or -- or scanned.

2   Q    Right.  And you discussed that sometimes people come to

3   take pictures at the -- at the Masturbatathon, for example, the

4   media.

5   A    Right.

6   Q    And -- but neither you nor the center have copies of

7   pictures that were taken at the Masturbatathon.

8   A    At this point, I have copies of pictures in the deposition

9   material that was returned to me by the attorneys, because you

10  had brought them to our deposition, but other than that, I

11  don't have any copies of those items, and I don't believe that

12  they're kept by anyone at the center.

13  Q    And you've never posted any of these pictures, any picture

14  of the Masturbatathon, either yourself or on the center

15  website.

16  A    I actually can't tell you for sure whether anyone has

17  posted anything on the center website.  I'm not familiar with

18  the entirety of that website.  It's done by volunteers.  I know

19  that I have not done that myself, and I don't know for a fact

20  that anyone has.

21  Q    And as far as participants for the Masturbatathon, you

22  would allow an 18-year-old to attend and participate in a

23  Masturbatathon if they presented appropriate identification.

24  A    If they presented ID and they understood they were coming

25  into a sexual environment.  We'd make sure they knew that they

1    were entering such an environment.

2    Q    And you discussed part of the process of checking IDs on

3    direct examination.

4    A    That's right.

5    Q    And you said you would use volunteers to do that process?

6    A    Our trusted volunteers.

7    Q    And the actual process of checking just the individual ID

8    you've described as taking less than a minute.

9    A    Checking the ID, less than a minute.  Working -- coming in

10   and having the ID scanned and filling out paperwork would take

11   longer than that.

12   Q    Right.  And for the people who -- for the years that you

13   live streamed it, you got model releases for the people who

14   wanted to be on that internet broadcast.

15   A    That's correct.

16   Q    Now, you check IDs at the Masturbatathon every year

17   regardless of whether it appears on the internet.

18   A    That's generally the practice.  Yeah.

19   Q    Yeah.  And you would check IDs for a Masturbatathon even

20   without the requirements of 2257.

21   A    Because it's a sexually-related environment, yes.

22   Q    You would also get model releases for people who wished to

23   appear on an internet broadcast in the absence of 2257.

24   A    I would imagine that we would, although the -- the fact of

25   2257 is what made us understand that we would need those

1    releases.

2    Q    Okay.  You described that the largest number that you can

3    remember is about between 50 and 70 people being on the live

4    stream.

5    A    That's my recollection.

6    Q    And you believe the smallest number of participants was

7    about 30.

8    A    That's right.

9    Q    Now, compliance with 2257 has never prevented you from

10   hosting a Masturbatathon.

11   A    No.  It hasn't prevented us from hosting a Masturbatathon.

12   Q    Now, you talked a little bit about this, but starting in

13   2011, you moved the venue of the Masturbatathon.

14   A    That's right.

15   Q    And as a result of your move, the venue that you chose was

16   too small to accommodate live streaming.

17   A    With a degree of comfort that we would like to bring to

18   the people who come to the event, yes.

19   Q    And that's basically because there just wasn't enough room

20   to have, as you discussed, two separate rooms to keep everybody

21   apart.

22   A    Yes.

23   Q    So the 2011 Masturbatathon was not live streamed.

24   A    It was not live streamed.

25   Q    And --

1    A    We haven't been live streamed since -- since then.

2    Q    Okay.  And that includes the 2012 --

3    A    And '13.  That's right.

4    Q    And even though those didn't appear on the internet, you

5    still checked IDs for -- for those three past -- three most

6    recent --

7    A    Yes.  That's my --

8    Q    -- Masturbatathons.

9    A    That's my understanding.

10   Q    Okay.  You on direct examination discussed that media

11   outlets have shown an interest in your Masturbatathons.

12   A    That's right.

13   Q    And, in fact, media photographers have come and taken

14   pictures.

15   A    That's right.

16   Q    And one of the media outlets you're aware of that came to

17   take pictures was the San Francisco Weekly.

18   A    Yes.

19   Q    I'd like to show you Defendant's Exhibit 113.  Now, you've

20   seen this picture before, correct?

21   A    Yes.  You showed it to me when we were doing the

22   deposition.

23   Q    And what is it?

24   A    It is a picture of two people masturbating, and it appears

25   to be at the venue that the Masturbatathon was held that year.

1   So I don't have much doubt that it's from the Masturbatathon.

2   Q    Okay.  And it accurately and fairly shows how the

3   Masturbatathon appeared that year?

4   A    A small subset of it, yes.

5   Q    Yes.  And you see that part of this picture, the top bar

6   of this picture shows that it's from the San Francisco Weekly

7   website.

8   A    Yes.  That's right.

9   Q    Okay.  I'd also like to show you Defendant's Exhibit 114.

10  Do you recognize that?

11  A    That is also a group of people who were there to perform

12  at the Masturbatathon, and they're calling them Team Lusty

13  Lady.

14  Q    Okay.  And that was -- as you described, this was one of

15  those group of people who were getting together and -- for

16  charity and had sponsors to participate.  Do you recall?

17  A    Actually, no.  These -- these women were there to perform.

18  Mostly what they did was exotic dancing, I believe.  If I

19  remember correctly, they work at -- at a peep show and have

20  exotic dancing and pole dancing as part of what they do, and we

21  had one stage in -- in the public room of the Masturbatathon so

22  that we could have entertain -- live entertainment.

23  Q    And --

24  A    And those women were there to do that.

25  Q    And they actually performed at the Masturbatathon.

1    A     That's right.

2    Q     And that picture fairly and accurately represents how they

3    appeared at the Masturbatathon that year.

4    A     I would say so.  I think the two on the left of the image

5    that looked more clothed were probably not quite as clothed

6    when they did their performance, but generally, that's -- I

7    remember the Cheerios t-shirts, I guess.

8    Q     Okay.  And as part of their performance, they took off

9    those clothes, correct?

10   A     Yes.

11   Q     They appeared --

12   A     Or started without them and performed.

13   Q     And they were ultimately nude when they --

14   A     Nude or -- nude or very scantily clad.  Sometimes

15   erotically clad folks are not nude, but --

16   Q     Okay.

17   A     -- they perform in that way.

18   Q     Okay.  I'd like to show you Defendant's Exhibit 115.  Do

19   you recognize that?

20   A     I do.  That's in the room where the -- what I've referred

21   to as a talk show like entity is held.

22   Q     And this picture fairly and accurately represents how that

23   room appeared at that particular Masturbatathon.

24   A     At that time, yes.  That's right.

25   Q     You discussed on direct examination that you work for Good

1    Vibrations.

2    A    That's right.

3    Q    But as part of Good Vibrations, you have no responsibility

4    for their -- whatever compliance they have with 2257.

5    A    That's correct.  I don't have any relationship with that

6    part of the company at all.

7    Q    Okay.  You also discussed that you appear -- you have in

8    the past, up until I believe you said 2011, appeared in some

9    sex therapy videos --

10   A    Right.

11   Q    -- both as a performer and also as a talking head.

12   A    That's right.

13   Q    But as far as those videos were concerned, you had no role

14   in checking Ids for the performers in that video.

15   A    No.  I didn't have a role in checking the IDs

16   specifically.  I in certain cases in the later talking heads

17   ones sometimes had a responsibility looking for participants,

18   but I wasn't the person who did the compliance either on set or

19   off.

20   Q    And neither you nor your center is responsible for the

21   2257 compliance for those sexual education videos?

22   A    No.  The Center for Sex and Culture has no relationship to

23   those videos.

24   Q    And you don't have to store those records at the center?

25   A    No.

1   Q    In your direct examination, you also discussed the photo

2   class --

3   A    That's right.

4   Q    -- that the center holds, and you discussed it's a process

5   of process of bringing experienced photographers together with

6   novel or new photographers.

7   A    Right.

8   Q    And that the class uses models.

9   A    That's right.

10  Q    And I believe you -- you've estimated that the club has

11  used approximately 30 models for its photo classes?

12  A    Yeah.  That's my best guess.

13  Q    Okay.  And you -- you checked IDs for those models at that

14  the photo club used?

15  A    I personally didn't check IDs generally, but they were --

16  the IDs were checked, and the paperwork was left with us.

17  Q    Okay.  And you got model releases for those models that

18  appeared for the photo club.

19  A    Yes.

20  Q    And even in the absence of 2257, you would still get model

21  releases for models that might appear to, you know, have their

22  picture taken with the photo club.

23  A    That's right.  In particular, for the photo club, we're

24  trying to teach them best practices.  So that would certainly

25  be part of it.

1    Q    Okay.  Now, this photo club is currently inactive.

2    A    Right now, it's inactive.  That's right.

3    Q    And it's inactive due to a lack of interest by people in

4    the group, correct?

5    A    There was some attrition in people in the group, and so

6    the people who were running it decided to give it a rest.

7    Q    And the last time a meeting of the photo club was held was

8    last summer.

9    A    Yeah.  I think it was last August, although it might have

10   been July.

11   Q    And as we sit here today, there are no current plans to

12   hold a new meeting of the photo club.

13   A    No, although at any point, if anyone were to say that they

14   wanted to be responsible for reconvening it, we would be glad

15   to do it.

16   Q    You also discussed your collage art --

17   A    That's right.

18   Q    -- that you do.  One might call it erotic art, is that

19   accurate?

20   A    Some of the pieces I certainly think of as erotic art.

21   Not all of them, but some of them.

22   Q    Okay.  It's been at least a year and a half since you

23   actually produced a piece of the collage art that you talked

24   about on direct.

25   A    That's correct.

1    Q     And one reason, I think as you discussed, that you haven't

2    created any new art is you simply haven't had the time.

3    A     I hope to have an art making weekend this summer.  Yes.  I

4    haven't had the time.

5    Q     Okay.  And another reason you haven't done any new erotic

6    art is you simply haven't had the artistic inspiration to do

7    so.

8    A     Combined with the time.

9    Q     Right.  But part of it is you just haven't been so

10   inspired to -- to try to make a new piece of art.

11   A     I haven't made the time that would allow the inspiration

12   to flow anyway.  Yeah.

13   Q     Okay.  That -- but that being said, Section 2257 has never

14   prevented you from actually creating a piece of art when you

15   were moved to do so.

16   A     That is correct.

17   Q     And when you have had an opportunity and created some art,

18   Section 2257 has never prevented you from showing a piece of

19   your art in an art gallery.

20   A     No.  Only publishing.

21   Q     On direct, you discussed how the Center goes about with

22   its compliance with 2257.  The volume of material that you

23   maintain at the Center for Sex and Culture for this -- for the

24   compliance of 2257, you would estimate it as a little less than

25   a thousand pages.

1    A    That's my estimation.  Yes.

2    Q    So just to flesh that out, it's a little less than a

3    filing cabinet full.

4    A    It's I would say less than a file drawer full.

5    Q    Okay.  And you would estimate maybe a stack nine to 12

6    inches?  Is that --

7    A    Something like that.

8    Q    Of the -- and then that represents all of the 2257

9    compliance materials that the center has.

10   A    Something like that.  Yes.

11   Q    Now, you personally spend about ten to 12 hours annually

12   dealing with 2257 compliance?

13   A    That's right.  We do the -- the compliance -- this is

14   during the live stream years actually that I'm talking about,

15   and, of course, there was some time associated with preparing

16   for this -- this case, but ordinarily, it's at least ten hours

17   of presence at the Masturbatathon, and then at least two hours

18   of filing afterwards.

19   Q    So for the past -- at least the past three years, you have

20   spent little to no time dealing with 2257 compliance.

21   A    Only in terms of making sure that we knew where those

22   items were at any given time if things had to be moved around

23   in the filing system.

24   Q    Neither you nor the center has been subject to a search

25   pursuant to 2257.

1    A     That's correct.

2    Q     And you're not aware of anyone who's been subject to a

3    search pursuant to 2257.

4    A     I'm not directly familiar with anyone who has had a 2257

5    search.  That's right.

6    Q     And neither you nor the center has ever been threatened

7    with prosecution under 2257.

8    A     And hopefully, we will keep it that way.  No.  We've never

9    been threatened with prosecution.

10   Q     Okay.  And you do not know anyone personally who has been

11   threatened with prosecution under 2257.

12   A     No.  I don't personally know anyone.

13   Q     You -- you have a concern that 2257 might apply to

14   individuals in their private sex lives.

15   A     That is a concern that I have.  It's true.

16   Q     And you also believe that most individuals basically have

17   no clue about the very existence of 2257.

18   A     That is also something I believe.

19   Q     Now, it's difficult to tell the age of a specific person

20   just by looking at them, correct?

21   A     It can be.

22   Q     Yeah.  And that is why -- one of the reasons why the

23   center checks IDs, because you just can't tell someone's age

24   necessarily by looking at them.

25   A     That's correct.  We don't -- we don't rely on a visual

1   inspection.

2   Q     Having those IDs allows you to be more confident about the

3   person's age and allowing them to participate in sexually

4   explicit activities.

5   A     That's right.

6   Q     And this is especially true since you've said that with a

7   proper ID, you would allow an 18-year-old to participate in one

8   of your Masturbatathons.

9   A     If they were aware of where they were going and wanted to

10  be there, yes.

11            MR. SWINTON:   That's all I have, Your Honor.

12            THE COURT:   All right.   A couple questions I have

13  before redirect, if any.

14  BY THE COURT:

15  Q     You're -- in all the activities that you've described in

16  your testimony today, you appear to be careful that you want to

17  limit these activities to people who are 18 or older, is that

18  right?

19  A     That's right.

20  Q     Is that because of a legal requirement or personal choice

21  on your part?

22  A     Well, really, both.   Certainly, there's a legal

23  requirement, and it's pretty incontrovertible.   There's also

24  the fact that this is a culture in which adulthood and -- and

25  the kind of sexual explorations associated with adulthood begin

1    at 18 not just legally, but also culturally.  I'm not saying

2    that no one under 18 has sex, but that's not the -- that's not

3    the work either educationally or culturally that -- that I do.

4    We're an adult --

5    Q    Right.

6    A    -- organization, and my work is adult related.

7    Q    Now, in your expert -- in your experience and a lot of

8    expertise in these fields, you've seen changing -- and I'm sure

9    you've studied changing tests -- changing tastes as far as sex

10   is concerned, correct?

11   A    I think it's fair to say.  Yeah.

12   Q    All right.  And it's obvious sort of, but just from a

13   Judge's point of view, we've learned in law school that less

14   than a hundred years ago, a book like James Joyce's Ulysses was

15   banned from the United States, correct?

16   A    That's right.

17   Q    All right.  And as we look today at what's available in

18   terms of, you know, discussions of sex and things like that,

19   that seems pretty -- seems hard to believe, is that correct?

20   A    I -- that's fair to say.

21   Q    Okay.  Now, we've also read or at least I've read and I'm

22   sure it's in the common press, that -- and we had a witness

23   yesterday who talked about sexting, S-E-X-T --

24   A    Right.

25   Q    -- X-T-I-N-G.

1    A    Right.

2    Q    That is, using cell phones to send sexual messages and

3    that this had gained a great deal of interest among young

4    people, is that correct?

5    A    It is my understanding that it's a fairly common or at

6    least commonly accepted thing --

7    Q    All right.

8    A    -- among young people.

9    Q    And that would be true for young people under age 18 as

10   well as over age 18.

11   A    It sure would, and I have a real concern about that.

12   Q    Okay.  Now, you live in California, correct?

13   A    That's right.

14   Q    Now, totally aside from the requirements of 2257, and I

15   know you're not a lawyer, but are you aware of any state laws

16   in California that prevent you in your artistic endeavors from

17   having people under 18 participate in any of your activities

18   you've described here today?

19   A    I'm not familiar -- well --

20   Q    And --

21   A    -- 18 --

22   Q    -- if you don't know, you can say you don't know.

23   A    Here's what I -- here's what I think I know.  18 is the

24   age of consent in California, and so if I'm talking about the

25   kind of endeavor that I discussed as the Masturbatathon, that's

1    going to be a sexually related and sexually explicit

2    environment that I would understand people under 18 not to be

3    legally allowed in.  That -- that's my understanding.

4    Q    Okay.  Because of the California State law.

5    A    Federal as well, but I --

6    Q    Well --

7    A    -- my understanding is that in California, 18 is the age

8    of majority, and I would assume that it's a State -- that it

9    would be a State regulation as well.

10   Q    All right.

11   A    I may be incorrect about that, but that is my assumption.

12   Q    Okay.  Are you aware of any state in which it is the -- it

13   is an age under 18 that is the age of consent or permission to

14   engage in sexual activities in a public nature?

15   A    It has been my understanding over the last 20 years or so

16   that there are other states -- I couldn't name them with

17   assurance to you -- that had younger than 18 ages of consent in

18   some cases, only if the young person was getting married.

19   Q    Okay.  Now, you talked about your collage work and that --

20   do you -- do you -- would you have an artistic interest in

21   including sexually explicit depictions in your collage work?

22   Is that something you would like to do if it were not for 2257

23   and the difficulties of compliance?

24   A    I would certainly -- I would certainly -- I do -- I do

25   still already include some sexually explicit depictions from

1    time to time, but I would be interested in publishing them.

2    Q     Okay.

3    A     Something that I haven't pursued.

4    Q     Because of 2257 or other reasons?

5    A     Because of 2257.  Specifically because of 2257.

6    Q     Now, do you have any interest in including any depictions

7    of people under 18 in your collage work?

8    A     That --

9    Q     Sexually explicit.

10   A     That would not be an interest of mine.  No.

11   Q     All right.  Even if they were like 17 years 10 months?

12   A     If I knew they were 17 years 10 months, I would not

13   include them in my collage art.

14   Q     You would not, because --

15   A     I would not.

16   Q     -- of the law.

17   A     Because of the law and because as a sexologist and sex

18   educator, I'm -- I'm well aware even when morays change, that

19   this is also a fraught question, and it is a personal comfort

20   level as well as a legal awareness for me to keep adult

21   sexuality adult.  Does that make sense?

22   Q     And I assume that you -- you weren't asked at all about

23   child pornography in this case, but I -- there has been other

24   testimony about it, but I assume you believe that's something

25   that is appropriately illegal.

1    A     I believe that that is appropriately --

2    Q     Okay.

3    A     Yes.

4    Q     All right.  Now --

5    A     Absolutely right.

6    Q     But -- so your -- your -- and I'm asking these questions,

7    because one of the things that Judges sometimes have to think

8    about is line drawing and whether --

9    A     Right.

10   Q     -- a line has been drawn in an appropriate place or not.

11   Okay?

12   A     Right.

13   Q     And it sometimes can be a difficult question.  But if I

14   understand your testimony, you're comfortable with the line

15   being drawn at 18, that if a person is above 18, they should be

16   allowed to participate in the activities that you get involved

17   in, but if they're under 18, they should not.

18   A     That's right.

19   Q     Okay.  Do you know other people in your field who disagree

20   with that and who think that 17 or 16 or 15 is okay?

21   A     I know that there are people in my field who have talked

22   about 16 being a more appropriate age of consent.  I certainly

23   don't know of anyone who has talked about that in the context

24   of say a sexually related event like the one that I described.

25   So I think really, what they're talking about is a situation

1    where 16 would be the legal age of consent --

2    Q    Okay.

3    A    -- to sex.

4    Q    All right.  Now, let's get back to sexting for a minute.

5    You -- because there seems to be some evidence that -- and I'll

6    use the word children, under 18 are sexting, and sometimes,

7    that includes graphic, sexually explicit images of themselves

8    perhaps to each other.  Are you aware of instances like that?

9    A    I'm aware of that.  I'm aware of consensual -- discussion

10   of this happening consensually, and I'm also aware of it

11   unfortunately happening nonconsensually.

12   Q    All right.  And sometimes it appears to be happening with

13   third parties, that is, a boy and a girl may have -- who are

14   dating may have done it with each other, and sometimes, they'll

15   then include a third person.  Are you aware that that's -- is

16   sometimes occurring --

17   A    I'm not --

18   Q    -- in this age of cell phones?

19   A    When you're saying this, are you referring to including a

20   third person in the sex or are you referring to sending the

21   image onto a third person?

22   Q    Sending the image of the two of them to a third person.

23   A    Yes.  Yes.

24   Q    All right.

25   A    I'm familiar with this --

1    Q    All right.

2    A    -- kind of case too.

3    Q    Now, is that a concern of yours?

4    A    It's a concern to me for two reasons.  One, before

5    somebody turns 18 and begins to be able to maturely make

6    decisions about how they want to be depicted on the internet in

7    perpetuity --

8    Q    Yes.

9    A    -- at least as of now, those kinds of images could show

10   back up later and affect their ability to get a job, et cetera.

11   So that is of concern to me, and -- and I try to talk -- when

12   I'm talking to college students, I try to talk about this

13   actually.

14   Q    Yes.

15   A    But the other reason is because some percentage of that

16   material is being made by people and of people who are under

17   18, and that I think officially makes it child pornography,

18   whether they had any idea that that's what they were making,

19   and, of course, then when that leaves the couple relationship,

20   because these are love tokens now often, when that leaves the

21   couple relationship, then it has entered the legal world of

22   child pornography that people can't see, own, trade, et cetera.

23   So it becomes damaging and dangerous not only to them, but

24   potentially, to others because of the way the laws are.

25   Q    All right.  Now, you have you thought -- well, that's --

1          THE COURT:  Okay.  That's all the questions I have.

2    All right.  Redirect, Mr. Murray?

3                       REDIRECT EXAMINATION

4    BY MR. MURRAY:

5    Q    Let's follow up on the sexting issue.  Apart from persons

6    under the age of 18, the culture and the media has reported

7    there have been cases of the kids, the 16, 17 --

8    A    Right.

9    Q    -- year olds doing this with each other, you're also aware

10   that adults over the age of 18 and certainly young adults up to

11   age 30 and even beyond are sexting to each other.

12   A    When they can figure out how to use a cell phone, yes.

13   Q    Okay.  And in that case, we're talking about taking a

14   photograph, an explicit photograph, it might be of one person,

15   it might be of two persons, and sending it to each other by

16   means of a cell phone --

17   A    Right.

18   Q    -- is that correct?

19   A    Right.

20   Q    Okay.  Are you aware that 2257 would require in that

21   situation each of those persons to collect IDs, make

22   photocopies of the IDs, keep them in their house, put a label

23   on the image that they just sexted showing their address where

24   the 2257 records can be maintained, and that they would then

25   have to send a letter to the FBI telling them which 20 hours a

1   week they would be available to have those records checked?

2   Are you aware that 2257 requires that?

3                    THE COURT:  You object?

4                    MR. SCHWARTZ:  Yeah.  I'm going to object to this

5   question.

6                    THE COURT:  Overruled.  You can answer.  It's

7   somewhat argumentative, but you can answer.  Go ahead.

8   A     While -- while I don't know that were I giving a lecture

9   to college students talking about this, I would have laid all

10  of those requirements out, I certainly believe that 2257

11  regulations don't exempt personal explicit pictures.  I don't

12  know that there's anything in the language of the law that

13  exempts such things.  So I have to assume that they are

14  included.

15  BY MR. MURRAY:

16  Q     Okay.  Do you know anybody in that situation who's

17  complying with 2257 under those circumstances?

18                    MR. SCHWARTZ:  Objection.  That calls for

19  speculation.

20                    THE COURT:  Overruled.

21  A     I don't know of anyone who on a private level thinks that

22  this is applicable to them.  As I think I've referenced, there

23  are people in the erotic art world and in the journalism world

24  who don't even understand that these laws might apply to them.

25  So while it's true this is -- what I'm about to say is

1    speculation, it's an educated level of speculation.  I don't

2    believe the average American knows that this law exists.

3    BY MR. MURRAY:

4    Q    And do you think that if the average American knew that

5    they could be charged and convicted of a felony if they were

6    even an adult sending a sexually explicit message from

7    themselves to their intimate partner over a cell phone without

8    keeping the records, do you think that that would have a

9    chilling effect on how many of these messages they would send?

10          MR. SCHWARTZ:  Your Honor, that certainly calls for

11   speculation.

12          THE COURT:  It's really speculation, but I'll allow

13   her to answer it anyway.

14   A    Because people do these kinds of private communications,

15   understanding them to be private at least in their minds, to

16   tell you the truth, I don't know that it would have a chilling

17   effect, but I think that it would be extremely surprising and

18   concerning to people to hear that this were the case.

19   BY MR. MURRAY:

20   Q    Okay.  Now, let's talk about your collage art.  You say

21   that 2257 is preventing you from publishing it, is that

22   correct?

23   A    That's right.

24   Q    Well, what makes you think that -- that you can create it

25   and show it at a gallery without complying with 2257?

1    A    That's an extremely good question, and the fact is I don't

2    know that I can legally --

3    Q    Well --

4    A    -- do those things, but I do know that once something is

5    published and -- and accessible forever, that that ups the

6    ante.

7    Q    Well, if you knew that 2257 applied to you at the point at

8    which you actually produced the collage art that contains

9    sexually explicit images, would that deter you from creating

10   it?

11           MR. SCHWARTZ:  Your Honor, this question was asked

12   and answered.

13           THE COURT:  Well, you know, is it your -- let's take

14   Renoir.  He painted a lot of nude women.  Are you saying that

15   if the Metropolitan Museum of Art publishes an art book with a

16   nude Renoir in it, that they have to put a 2257 notice in

17   there?

18           MR. MURRAY:  Well, only if the nude were created

19   after 2009, but if they put up --

20           THE COURT:  Well, Renoir is not -- Renoir is not a

21   very good example.  Are you saying modern artists --

22           MR. MURRAY:  Yes.

23           THE COURT:  -- and if their work hangs at a museum,

24   that would apply?

25           MR. MURRAY:  Absolutely, because the artist, if it's

1    of a real live -- a real human being, and if it's explicit or

2    nude, and therefore showing the genitals, ever since 2009, the

3    statute applies.  They have to keep the records, and they have

4    to put a label on the -- on the artwork, and if it's displayed

5    without that label, someone has committed a crime under 2257.

6              THE COURT:  Okay.  All right.  Any further questions?

7              MR. MURRAY:  Yes.

8    BY MR. MURRAY:

9    Q    The -- I want to make it clearer on the Masturbatathon.

10   Is 2257 having an adverse influence or not on your willingness

11   to live stream any future Masturbatathon?

12             MR. SCHWARTZ:  Objection.

13             THE COURT:  Well, I think --

14             MR. SCHWARTZ:  She asked and answered this on direct.

15             THE COURT:  I'll sustain that, because that was not

16   brought up by cross I don't think.

17             MR. MURRAY:  Well, then that's all I --

18             THE COURT:  I mean, she answered that.

19             MR. MURRAY:  No.  That's -- I agree, Your Honor.  I'm

20   sorry.

21             THE COURT:  Any recross?

22             MR. MURRAY:  That's all I have.

23             MR. SCHWARTZ:  Briefly.

24                        RECROSS-EXAMINATION

25   BY MR. SCHWARTZ:

1  Q    You send text messages, correct?

2  A    I do.

3  Q    Okay.  But you yourself have never sent an image of

4  yourself to a significant other via text?

5  A    Strangely enough, I have not.

6  Q    Okay.  And you don't know for certain anyone who has

7  personally sent a sexually explicit image?

8  A    I really presume that I know plenty of people in my life,

9  but I don't know any specific incident that I could label with

10  a person.  No.  So now.

11  Q    And your knowledge of sexting comes from word of mouth?

12  A    Word of mouth and the media largely.  I'm sure that at

13  least one of the conferences I've attended in the last couple

14  of years has had a session on sexting.  So there's a bit of

15  academic work associated with that as well.

16            MR. SCHWARTZ:  That's all, Your Honor.

17            THE WITNESS:  Thank you.

18            THE COURT:  Okay.  Thank you very much.

19            THE WITNESS:  Thank you.

20            THE COURT:  You're excused.  Okay.  We'll take a ten-

21  minute recess until quarter of, and then we'll go to 12:25, and

22  we'll just have an hour for lunch today.  Thank you.

23       (Recess taken, 11:31 a.m. to 11:44 a.m.)

24            THE COURT:  Okay.  Please be seated.  Okay.  Next

25  witness, please.

1          MR. MURRAY:  At this time, the plaintiffs call the

2     plaintiff, David Steinberg.

3          THE CLERK:  Raise your right hand.

4          DAVID STEINBERG, PLAINTIFF'S WITNESS, SWORN

5          THE CLERK:  Please be seated.

6          THE COURT:  All right.

7          THE CLERK:  Please state your full name and spell

8     your last name for the record.

9          THE WITNESS:  My full legal name is Steven David

10    Steinberg, S-T-E-I-N-B-E-R-G.  I generally go by my middle

11    name, David.

12                        DIRECT EXAMINATION

13    BY MR. MURRAY:

14    Q    And what city do you reside in, Mr. Steinberg, or cities?

15    A    San Francisco.

16    Q    Okay.  And what is your current profession?

17    A    I'm a photographer, journalist, editor, and publisher of

18    erotic materials.

19    Q    Okay.  And what is your educational background?

20    A    I have a Bachelors degree in mathematics from Oberlin

21    College.  I did a year of graduate study in political science

22    at Princeton University but didn't get a degree.

23    Q    Where's Oberlin College?

24    A    Outside of your home town of Cleveland.

25    Q    Okay.  And what year did you achieve your Bachelors degree

1    in mathematics?

2    A    1965.

3    Q    Now, during the course of your career, have you authored

4    articles on human sexuality?

5    A    Yes.  I've written about sexuality in general.  Most

6    commonly, I wrote a monthly column on sex and gender issues

7    called "Comes Naturally" for 15 years.  I wrote 158 monthly

8    columns for that and have done other articles as well.

9    Q    What was the publication that you did that for?

10   A    Originally, I wrote "Comes Naturally" for a magazine

11   called <u>Spectator</u>, which is a weekly magazine in the

12   San Francisco Bay area.  Eventually, I also distributed what I

13   wrote online, and when <u>Spectator</u> eventually went out of

14   business, I continued to write for my online audience.

15   Q    When did you begin your career as a writer of -- on the

16   subject of human sexuality?  What year approximately?

17   A    In the late 80's.  Maybe '91.  I'm actually not sure when

18   that -- I think it was '91.

19   Q    It's been a long time then?

20   A    Yes.

21   Q    Okay.  What other publications have some of your articles

22   appeared in that you can recite?  For example, did they appear

23   in <u>Playboy</u>?  Have you had any articles in <u>Playboy</u>?

24   A    I had an article in the <u>Playboy Advisor</u>.  I published in

25   -- well, lots of -- I maintained a blog for a while for the

1    San Francisco Chronicle, Boston Weekly, a lot of alternative

2    weeklies, Libido magazine, which was an art literary magazine

3    dealing with sexuality, Cupido magazine, who I also work for in

4    other capacities in Norway publishes my writing regularly.

5    There's a long list of journals that I've published in.

6    Q    Now, have you also edited any books of photography related

7    to human sexuality?

8    A    Yes, I have.

9    Q    And what was the first book that you edited in that genre?

10   A    The first book was called Erotic by Nature.  The subtitle

11   was A Celebration of Life, of Love, and of our Wonderful

12   Bodies.  It was published in 1988.

13   Q    Okay.  And would you describe what that book consisted of?

14   A    That book was a mixture of photo -- mostly, it was

15   photography and fictional short stories.  It also included some

16   drawings and some poetry.

17   Q    What kinds of photographs appeared in it?

18   A    These were black and white art photographs ranging from

19   what I would call erotic and sensual but including some that

20   were more sexual or what I would call sexually explicit.

21   Q    So they're -- they involve nudity and sexual explicitness

22   in some of these photos?

23   A    Yes, in many of them.

24   Q    Okay.  And what kind of photographers submitted to this

25   book?

1    A    A wide range of art photographers.  I believe there were

2    61 contributors to the book as a whole.  At the -- at the time,

3    it was the only book that I knew of, which is why I wanted to

4    publish it, that addressed sexuality in an open and I thought

5    thoughtful and emotionally mature way.

6    Q    And what -- what was the age range of the persons depicted

7    in these nude or sexually explicit poses, if you recall?

8    A    I -- a wide range from 18 onto people who were in their

9    50s and 60s.

10   Q    Okay.  Now, you mentioned Cupido magazine.  What is Cupido

11   magazine?

12   A    Cupido is a monthly magazine that has existed now for

13   close to 30 years in Norway.  It is an intelligent and erotic

14   magazine that combines journalism and sex education pieces with

15   visual material and fiction that's erotic in nature.

16   Q    And does it include photographs that are sexually

17   explicit?

18   A    Yes, it does.

19   Q    And photographs that are nude exhibitions of the genitals?

20   A    Yes.

21   Q    Okay.  And what -- do you have a relationship to that

22   magazine?

23   A    Yes.  I've been their U.S. photo representative for --

24   well, over 20 years now, I guess, almost 25 years.

25   Q    And what does it mean to be their U.S. photo

1   representative?

2   A    I met the publisher and editor of Cupido in 1988 shortly

3   after Erotic by Nature was published.  They admired my book and

4   for a while, distributed it in Scandinavia and said look, you

5   seem to know the kind of photographer -- you seem to know the

6   photographers doing the kind of work that we would like to

7   publish in Cupido; we're having trouble finding those

8   photographers; would you represent us and sort of broker the

9   work of American photographers for publication in Cupido.

10  Q    And did you agree to do so?

11  A    Yeah.

12  Q    And how have you gone about doing that over the years?

13  A    Well, I have a network of photographers that I have met

14  through the time that I was putting Erotic by Nature together

15  and sort of by word of mouth, and as the word got out that I

16  was working for this magazine that would publish this kind of

17  work and did a responsible job of reproducing the work and paid

18  decently well, I met more and more photographers who were

19  interested in submitting work to the magazine.

20  Q    And is there a genre that is associated with this type of

21  photography, a name for it?

22  A    I've coined the term fine art, sexual photography,

23  although I should make clear, Cupido doesn't only publish

24  sexual photography, which to me means photographs of people

25  being sexual, but also what I would call erotic photography,

1    but the -- the genre of people who are trying to address the

2    subject matter of sexuality from a fine art point of view,

3    which is something that most people don't even know exists and

4    which I've made a project of trying to publicize and

5    demonstrate to people I've come to call fine art sexual

6    photography.

7    Q    Okay.  Now, you're familiar with 2257?

8    A    More and more.  Yes, I am.

9    Q    Okay.  And can you tell the Court whether 2257 has

10   prevented you from embarking on any particular project with

11   Cupido?

12   A    Yes, it has.

13   Q    And would you explain to the Court what that project was

14   and how 2257 impacted it?

15   A    Cupido is primarily a Norwegian magazine.  For a time in

16   the '90s, it also had a Danish and a Swedish edition, and at

17   that time, I started to try to persuade the editors to publish

18   an English language edition that could be distributed in the

19   United States as well as to English speaking people around the

20   world, and eventually, the publisher got excited about this

21   project and began to think about what it would really mean.  I

22   was going to be the editor of the magazine, and was the idea --

23   the American editor.  We would take the Norwegian magazine.

24   We'd translate it into English, maybe make some adaptations to

25   an American audience and then hopefully distribute it in the

1    United States.

2    Q    What happened?

3    A    As I began more aware of 2257, largely from my involvement

4    in this case actually, I became aware that 2257 would present

5    serious legal problems for this project, namely, that it would

6    be illegal to sell it in this country in retail outlets because

7    there's no way that Cupido could meet 2257 requirements.  Maybe

8    half of the photographers who appear in the magazine are

9    European.  They don't maintain records according to 2257

10   standards, and although my understanding is that the magazine

11   -- that somebody from the United States could subscribe to the

12   magazine in Norway and have it mailed to them from Norway

13   without running afoul of 2257, there's no way that book stores,

14   stores that distribute magazines, places like say Good

15   Vibrations --

16   BY THE COURT:

17   Q    Well, can I interrupt?  This magazine, it's published in

18   Norway, you said?

19   A    That's right.

20   Q    Correct?  Do you know that all of the people depicted are

21   over age 18 or not?

22   A    I don't know.

23   Q    You don't know that?

24   A    I don't know what -- well, there's two issues.  One, the

25   age of consent in Norway is 16.

1   Q     Is 16.

2   A     And I don't know what -- I believe that's right.   I

3   shouldn't say that with a hundred percent certainty.

4   Q     Well, do you know --

5   A     I know that --

6   Q     -- that all the people in that magazine are over 16?

7   A     Yeah.   Presumably.

8   Q     Well, when you say presume, you mean they look over 16?

9   A     I don't know what procedures Cupido has to make sure that

10  they're compliant with Norwegian law.

11  Q     Do you know?

12  A     The only -- the only thing I know about is that during my

13  time of working with Cupido, there were people in Norway who

14  challenged -- it may be that Norway is 18.   They challenged one

15  photograph that I had submitted to them, not my own photograph,

16  but of a photographer that I represented, thinking that the

17  woman in the photograph looked underage to them.

18  Q     Was it a man or woman?

19  A     A woman.

20  Q     Yes.

21  A     So I got a frantic phone call from the publisher saying

22  people are saying this and we have to prove that she is of age.

23  Cupido does not require me --

24  Q     When you said this -- the publisher in Norway called you?

25  A     Yes.

1   Q    Now, he wanted to be assured that she was of age.

2   A    More than be assured.  He had to demonstrate to the Court

3   in Norway proof that she was of age.

4   Q    And what -- of age is what age?

5   A    I'm really not sure.  It might be 18.  It might be 16.  I

6   don't know.

7            THE COURT:  Well, Mr. Murray, I mean, I'm happy to

8   hear his testimony, but legally, are you taking the position

9   that a magazine produced in a foreign country that has no age

10  requirement is -- can be published in the United States without

11  any regard to any State laws or Federal law?

12           MR. MURRAY:  No.  Not at all, Your Honor.  On the

13  contrary.  What we're suggesting is that --

14           THE COURT:  Because I thought your -- the basis of

15  the other witnesses was well, we're sure people are 18.  We

16  agree with 18 as a dividing line.

17           MR. MURRAY:  Yes.

18           THE COURT:  Now, this witness is saying he wants --

19  he was thinking of importing the magazine from a country where

20  16 is the dividing line.

21           MR. MURRAY:  No, Your Honor.  That was not the --

22  that was not what we were trying to suggest.

23           THE COURT:  Well, that's the fact.

24           MR. MURRAY:  Well, if I can develop it.  I don't --

25           THE COURT:  Yes.  Go ahead.  Go ahead, but, I mean, I

Steinberg - Direct (Mur)                    114

1   -- I'm not sure what this -- fine.  I'll shut up and listen.

2   Go ahead.

3              MR. MURRAY:  Okay.

4   BY MR. MURRAY:

5   Q    Mr. Steinberg, do you understand that under U.S. law, 18

6   is a legal age?

7   A    Yes.

8   Q    And you're a photographer, is that correct?

9   A    Yes.

10  Q    Okay.  And when you -- and you take photographs of

11  sexually explicit images, do you not?

12  A    I do.

13  Q    And do you make sure that every person that you've ever

14  photographed in that situation is over the age of 18?

15  A    Yes.

16  Q    Okay.  And do you make sure that any photographs of that

17  kind that you send to Cupido is of adults?

18  A    Yes.

19  Q    Okay.  Now, the project, as I understand it, was that you

20  were going to help them publish a magazine in the United States

21  that would comply with U.S. law, correct?

22  A    Yes.

23  Q    And that would mean that every person in the magazine

24  published in the United States would have to be at least 18 or

25  older if they were in a sexual pose, correct?

1   A     Yes.

2   Q     But it would also mean that in order to publish a U.S.

3   version of Cupido limited to images of people who were adults,

4   in order to do that under U.S. law, under 2257, you would have

5   to get from Norway the photo IDs of any of the European

6   participants who were photographed, correct?

7   A     That's correct.

8   Q     And would you be able to do that?

9   A     Well, no.  There was -- there -- presumably, photographers

10  in Europe when they are photographing their models have their

11  own ways of assuring themselves that their models are of

12  whatever age is required.  I don't -- I don't know all the

13  details, but I'm guessing that European countries do not have

14  stringent requirements comparing to 2257.

15        So although it would be possible to publish a

16  magazine in which if anybody questioned the age of anybody in

17  the magazine, proof could be obtained showing that that person

18  was over 18, that's quite different from satisfying the

19  requirements of 2257.

20  Q     Okay.  And so as a consequence of that, did the project

21  involving publishing a U.S. edition of Cupido of images of

22  adults over the age of 18 occur or not occur?

23  A     At that point, the publisher was no longer interested.

24  BY THE COURT:

25  Q     Well, how is it different from 2257?  If you get -- if you

1   were able to get photo documentation of the -- that all of the

2   people depicted were over 18, isn't that what 2257 requires?

3   A    Well, I wish that that was all that 2257 requires, but

4   2257 requires, as has been testified here, complicated

5   procedures of how you help maintain these files, how they're

6   cross-referenced.  So in order to be able --

7   Q    Well, okay.

8   A    -- to put a statement --

9   Q    Okay.  Well, once you --

10  A    -- here's where the 2557 files are kept, they're kept in

11  this office in Oslo, Norway, it would require them to do a

12  whole lot more than just be able to demonstrate --

13  Q    Well --

14  A    -- that there are people over 18.

15  Q    -- is this going to just be the same magazine that was

16  published in Norway, or you were going to publish a separate

17  magazine for the United States?

18  A    I don't know what they were --

19  Q    Well, isn't that important?

20  A    It was important.  I --

21  Q    And you don't know the answer to that, do you?

22  A    I think that I --

23  Q    Well, do you -- go ahead.

24  A    I think that what they were talking about is hoping to do

25  a magazine that was essentially the same as the Norwegian

1    edition.   They had this issue between their Norwegian and their

2    Danish editions, because the laws in Denmark were somewhat

3    different, and for a while, they tried to do different content,

4    but in the end, they were -- it -- they -- my understanding was

5    that they wanted to get to a point where, for example, the

6    visual content in the magazine in Norway would be the same as

7    the visual content in the United States.

8    Q    Well, then it would include 16 and 17-year-olds.

9    A    No.  I think they were willing to -- they weren't -- they

10   would not have the slightest problem with restricting it to

11   people over 18 if that was what was required.

12   Q    Did you have a specific discussion about that?

13   A    No, but they're not particularly interested in young -- I

14   mean, I -- it --

15   Q    Go ahead.

16   A    -- just would not be a problem to them.  They don't need

17   to have 16-year-olds in their magazine to make the magazine

18   successful.

19   BY MR. MURRAY:

20   Q    In any case, the -- the magazine project that would have

21   been in the U.S. would have involved complying with 2257,

22   correct?

23   A    Yes.  It would have had to had a 2257 statement in it to

24   be sellable in the U.S.

25   Q    Okay.

Steinberg - Direct (Mur)                    118

1          THE COURT:  Well, that's just inconsistent with what

2     he just said.  He didn't have any idea.  He has no recollection

3     of discussing it.

4     BY MR. MURRAY:

5     Q    Well, did you discuss 2257 with the publisher?

6     A    Yeah.  I did.  I mean --

7          MR. SCHWARTZ:  Objection, Your Honor.  This is

8     calling for hearsay.

9          THE COURT:  But didn't you just say a few minutes ago

10    that it would have been the same magazine, and it would have

11    included 16 and 17-year-olds, because that's --

12         THE WITNESS:  Well, let me --

13         THE COURT:  -- age of consent in Norway?

14         THE WITNESS:  Let me be clear.  I did not have a

15    specific conversation about him, about --

16         THE COURT:  Right.

17         THE WITNESS:  -- how they would accomplish this.

18         THE COURT:  Okay.

19         THE WITNESS:  But what I did say to him was that, you

20    know, you need to be aware that if you want to sell this

21    magazine in the United States, you will have to be able to put

22    this statement in the magazine so that the retail outlets are

23    not violating the law by selling it.

24         THE COURT:  Go ahead.

25    BY MR. MURRAY:

1    Q    What -- what was the next book of photos that you

2    published or edited after Erotic Nature?

3    A    The next book that I did was called Photo Sex, Fine Art

4    Sexual Photography Comes of Age.

5    Q    And when did you publish that?

6    A    That was I believe 2003.

7    Q    And what kind of book was that?

8    A    This was a book of black and white fine art photography by

9    a number of different photographers depicting sexuality in many

10   different ways.

11   Q    And did that include any of your own photographs?

12   A    Yes.  Out of 150-odd pictures, six of them were mine.

13   Q    And what was the artistic message in that book?

14   A    The -- the point of this book was to say there are fine

15   art photographers who consider human sexuality a legitimate

16   subject for photography.  They're doing an amazing body of

17   work, and this book will be a showcase for that work.

18   Q    And so what kind of images appeared in that book?

19   A    These were all black and white fine art photography

20   ranging from photographs of people kissing to photographs of

21   people having intercourse, the full range of human sexuality.

22   The premise of the book was that each photo in the book,

23   regardless of the type of sexuality it was portraying, spoke --

24   was presenting sexuality in one way or another.

25   Q    Okay.  And now, when did you yourself become a

Steinberg - Direct (Mur)                                    120

1    photographer?  How long have you been doing it?

2    A    I started doing sexual photography in 1999.

3    Q    Okay.  And have you been doing it ever since?

4    A    I have.

5    Q    Okay.  And do your photos appear in other books besides

6    your own?

7    A    Yes, they have.

8    Q    And can you give us an example of that?

9    A    Oh, I'd have to -- can I consult notes here?

10   Q    Sure, if there's something that will refresh your

11   recollection.

12   A    I've appeared in a number of other books sometimes as

13   cover photos for books.  For example, there was a book called

14   Ripe Fruit, which was a collection of erotic fiction involving

15   older people, and one of my photos appeared on the cover of

16   that.  Some of my books have -- my photos have appeared in sex

17   education books as graphics.  There was a book called Sexual

18   Secrets by Marty Klein that did a number of my -- used a number

19   of my photos, a book called Sexual Pleasure, another education

20   book by Barbara Keesling that used a number of my photos

21   inside.

22   Q    Did there -- did you specialize or do you specialize in

23   any particular type of fine art photography?

24   A    I specialize in photos that show people that are not what

25   the culture typically acknowledges as people who are sexually

1  desirable or attractive.  So I emphasize older people, heavier

2  people, people with disabilities.  The -- one of the messages

3  of my photography that I -- is that we are all worthwhile

4  attractive sexual people, not just young glamorous people that

5  we tend to see in advertising, on TV, in the movies, and so on.

6  Q    Okay.  Now, in the course of your photography, have you

7  photographed couples in sexual acts?

8  A    That's what I do.  I photograph couples.  What I try to

9  think of is regular folks usually at home being sexual in

10 nontheatrical, nonglamorous ways just like regular -- like

11 regular people do.

12 Q    And how do these people come to you?

13 A    Originally, I became intrigued with the project of trying

14 to capture something emotionally honest about sexuality on film

15 and persuaded a couple of friends to model for me, to pose for

16 -- I don't pose people, but to be my subjects.  After I did

17 that work, we -- it produced a number of photographs that we

18 were pretty excited about.  Cupido was excited and published me

19 and encouraged me to do more.  I showed some of the prints from

20 my first photo shoot to a bunch of other friends who were

21 enthusiastic about getting me to photograph them.

22        Gradually, I began to have my work shown in art

23 shows, erotic art shows, and as people learned about my work,

24 the network of people who were interested in being photographed

25 by me grew.  Generally, I find my models not by soliciting

1    them, but by people who come to me and say would you be

2    interested in photographing me and my partner.

3    Q    Have you won any awards as a result of your photography?

4    A    I have.  Let's see, in 2010, I was named erotic

5    photographer of the year by Leydig Trust in London.  In 2012, I

6    was one of the original five -- group of five artists that were

7    given the name Erotic Masters by the Seattle Erotic Art

8    Festival.

9    Q    Now, when you photograph couples, where do you -- where do

10   you photograph them?  I think you might have started out saying

11   in their homes.

12   A    I generally photograph people at -- at home.  The -- what

13   I'm interested in in my photography is the intimacy and the

14   connection, emotional connection that happens between people.

15   I'm not interested in people being glamorous.  I'm not

16   interested in the details of who's doing what to whom.  To me,

17   the most important part about sexuality is the intimacy and the

18   connection that it makes possible between two people.

19          So that's what I am interested in, and I feel like

20   the best way to photograph people in that way is where they are

21   most comfortable, and so I prefer to shoot them at home.  I

22   don't pose them.  I don't give them things they're supposed to

23   do.  I try to make them comfortable with the admittedly unusual

24   situation that they're going to be sexual with a third person

25   present with a camera in his hand, and I try to work with them.

1    I meet with them ahead of time.  We talk.  The point is for

2    them to be comfortable with me so that they can relax and be

3    natural in my presence, and hopefully, I can then capture some

4    of that on film.

5    Q    And where do you -- where do you do your own work then

6    after you've left the shoot?  Do you have an outside office or

7    where is your home base?

8    A    I have two homes, one in Santa Cruz, California and one in

9    San Francisco, and my San Francisco apartment is partially a --

10   it's partially home and partially my office.

11   Q    So you set aside a room to do your work there?

12   A    Yes.

13   Q    Okay.  Do you maintain regular business hours as a

14   photographer there?

15   A    No.  Not really.

16   Q    Okay.  And do you live alone?

17   A    I do.

18   Q    Now, did you also publish a book called <u>Divas of</u>

19   <u>San Francisco</u>?

20   A    I did.

21   Q    And what is that about?

22   A    That is a book of portraits of transsexual women that I've

23   come to know through a club in San Francisco called Divas of

24   San Francisco.

25   Q    And how long was that project?

Steinberg - Direct (Mur)                    124

1    A    I think the first photos I did were in 1993, and the book

2    was published I think 2008.

3    Q    Okay.  And did that book include any -- any sexual images?

4    A    Not that I would consider sexual images.  There are I

5    think 59 photos in that book.  Four of those photos are full

6    body nudes.  They -- I don't consider them sexual photos.  On

7    the other hand, they do show the genitals of the people in the

8    photos, and so I suppose they could be called lascivious,

9    although I never have the slightest idea what that means.

10   Q    Now, in the course of your work as a photographer taking

11   pictures of people engaged in sexual acts, do you maintain

12   records under 2257?

13   A    I do.

14   Q    And how do you go about collecting these records?

15   A    At the time when I photograph couples, I have them sign

16   the model release, and also, I photograph their ID.

17   Q    Okay.  Do you have any interest in taking sexual pictures

18   of minors under the age of 18?

19   A    No.

20   Q    Okay.  Now, and where do you keep the 2257 records?

21   A    The hard copies are in a file cabinet, and then I also

22   transcribe the information into a database, which I keep on my

23   computer.

24   Q    But are the records kept at your residence?

25   A    They're kept at my residence/office in San Francisco.

1  Q    What is your understanding of the labeling requirement of
2  2257?
3  A    Well, my understanding is evolving.  As is true of many
4  artists, I, I think, have been naive about the requirements of
5  2257.  What I'm understanding from the process of being
6  involved in this case is that I'm now required to put a 2257
7  statement on every -- I work on film.  I don't do digital
8  photography.  So when I have, for example, proofs of photos
9  that are taken at a shoot, I might take 750 to 1,000
10 photographs in a shoot.  I obtain four-by-six proof prints from
11 the lab that does my work, which I then share with the models
12 for them to be able to choose photos that they want me to print
13 in a more finished way for them.
14          My understanding now is that any time that I make a
15 set of proofs for -- for my subjects, that I'm required to have
16 a 2257 statement on every one of those proofs, for example.
17 Q    And how would you do that?
18 A    I don't know how I would.  I suppose I would have to -- if
19 I put a -- if -- my understanding is that it must be
20 prominently displayed.  So to -- you know, some photographers
21 put a copyright notice on the face of their photo, which seems
22 to me it defaces the photo, but --
23          THE COURT:  It seems what, the copyright notice?
24          THE WITNESS:  That it defaces the photo.
25 A    You know, you're trying to create a beautiful image, and

1    now all of a sudden, it's supposed to say copyright so-and-so.

2    I don't put copyright notices on my photos for that reason.

3            My understanding is that to be prominently displayed

4    on a four-by-six photograph, I would somehow have to figure out

5    how to put the wording onto that -- I don't know how I would do

6    that.  I suppose I could have a sticker, but the sticker, in

7    order for it to be legible, would probably cover half the

8    photo.  I really don't --

9            THE COURT:  You're talking about four-by-six inches.

10           THE WITNESS:  Yeah.  You know, those are the proofs

11   that I -- that I use.

12   A    I suppose it might be possible to put it on the back of

13   the photo, but I don't know if that would be -- I don't think

14   that that would be considered prominently displayed.

15   BY MR. MURRAY:

16   Q    Now, if you did put it on the front of the photo, would it

17   -- what would that do to the integrity of the photo?

18   A    Well, I think it would -- I mean, I really think it would

19   cover what, a third of the photo or half the photo.  I mean, it

20   would just be ridiculous.  It would be impossible for my

21   subjects to review the photos with this big sticker on the

22   front of it with all -- with all this wordage.

23   Q    And then when they -- after they review the 750 or 1,000

24   possibilities, do they then select ones that they want you to

25   create in larger form?

1    A    Yes.   They -- that's generally what we do is I exchange

2    with them.   Basically, I -- I work with -- with subjects in two

3    ways.   If they do not want me to publish their photos or

4    display their photos in art shows, then they pay me to do a

5    photo shoot with them, but in general, what I prefer is to do

6    an exchange with them where in return for me doing this for

7    them for free, they allow me to make use of the photos in those

8    ways.

9    Q    And then when they select the ones they want, how big are

10   those prints?

11   A    Those are my -- that's up to them, but I'd say eight-by-

12   ten prints or 11-by-14 prints.

13   Q    Okay.   And --

14   A    Eight-by-ten would be what they would want most commonly.

15   Q    And do you regularly put a 2257 label on those eight-by-

16   ten prints when you give them to your customers?

17   A    No.   I've never done that.

18   Q    Now, I want to show you some exhibits, Mr. Steinberg.   I

19   just want to make sure I recite the correct number here.

20        MR. MURRAY:   And I'm going to do it by the ELMO, Your

21   Honor, if I can.

22   BY MR. MURRAY:

23   Q    I'm displaying, Mr. Steinberg, a --

24        THE COURT:   What exhibit number --

25        MR. MURRAY:   Exhibit --

1          THE COURT:  -- is this?

2          MR. MURRAY:  This is exhibit -- Plaintiff's Exhibit

3     60.

4     BY MR. MURRAY:

5     Q    Can you identify that photograph, Mr. Steinberg?

6     A    It's one of my photographs.

7     Q    And is the next one of your photographs as well?

8     A    Yes.

9     Q    Next page?  And are these of some of the couples that you

10    talked about taking those photographs?

11    A    Yes.

12    Q    And --

13    A    This one is sideways, but yeah.

14    Q    Is that another -- the third page, is that one of your

15    photographs --

16    A    Yes.

17    Q    -- as well?

18    A    Turn that the other way.

19    Q    And is that gentleman one of the persons you photographed?

20    A    Yes, he is.

21    Q    And is that another couple that you photographed?

22    A    Yes.

23    Q    And is that yet another couple that you photographed?

24    A    Yes.

25    Q    And these photographs were taken in their homes?

1    A    Yes, generally speaking.  Occasionally, people have some

2    reason they don't want me to photograph them at their homes,

3    and sometimes they come to my place or we work out another

4    site.

5    Q    What about this photograph?  Is that one of yours?

6    A    Yes, it is.

7    Q    And is that of another couple that you photographed?

8    A    Yeah.  The woman in this photograph I believe was 63 when

9    I photographed her, and the man was 67.

10   Q    And then when you are finished with a photo shoot like

11   this, as you've indicated, you at least give the couple prints

12   of your photographs for their own private use?

13   A    Yes.

14   Q    And you may also ask them for permission to publish their

15   photo elsewhere?

16   A    Yes.

17   Q    And is that another one of your photographs?

18   A    Yes.

19   Q    And is that another couple that you photographed?

20   A    Yes.

21   Q    And is that yet another couple that you photographed?

22   A    Yes.

23   Q    Now, I want to show you what has been marked as

24   Plaintiff's Exhibit 62, and I won't go through every page of

25   it, but do you have a website?

Steinberg - Direct (Mur)                    130

1   A     I do.

2   Q     What's it called?

3   A     I guess it's called EroticbyNature.

4   Q     Okay.

5           THE COURT:  What's it -- I'm sorry?

6           THE WITNESS:  Eroticbynature.  That's also the name

7   of the first book that I did.

8   BY MR. MURRAY:

9   Q     And are there images that you photographed on your

10  website?

11  A     Yes.

12  Q     And does Plaintiff's Exhibit 62 represent those images?

13  A     Presumably, that -- yeah.  These are photos from -- I

14  recognize from the website.

15  Q     Okay.  And then next I want to show you what has been

16  marked as Plaintiff's Exhibit 61.

17          MR. MURRAY:  And, in fact, let me approach the

18  witness, Your Honor, and just have him affirm.

19  BY MR. MURRAY:

20  Q     That all of the photographs in Exhibit 61, those are your

21  photographs?

22  A     That's a lot of photos, but yes.  They look like they are.

23  Q     And then I want to show you what has been marked as

24  Plaintiff's Exhibit 63 and ask you if this is a spreadsheet

25  showing information about all of the photographs that we've

                        Steinberg - Direct (Mur)                131

 1   just gone over.

 2   A     Appears to be.   Yes.

 3   Q     And is this what we provided to the Government in

 4   discovery?

 5   A     It looks like that.   Yes.

 6   Q     And you recorded the -- from 1999 all the way to 2012, the

 7   -- the shoots that you did of people in sexually explicit

 8   poses?

 9   A     That's right.

10   Q     And did you record the dates of birth?

11   A     Of the people in the photos, yes.

12   Q     And therefore, their ages?

13   A     Yes.

14   Q     And have you done -- have you counted them up from that

15   spreadsheet to tell us how many for the -- how many total

16   photographs -- shoots were there on this spreadsheet?

17   A     I'm not sure how many shoots there were.   There were 260

18   people --

19   Q     That's what I meant.

20   A     -- involved in the shoots.

21   Q     260 individual people whose images you photographed?

22   A     Yes.

23   Q     And did you count from your spreadsheet how many of the

24   260 were over the age of 25?

25   A     I did.

Steinberg - Direct (Mur)                              132

1   Q     And how many were there?

2   A     229, which is 88 percent.

3   Q     And did you count how many on the spreadsheet were over

4   the age of 30?

5   A     Yeah.  It was 198, 76 percent.

6   Q     And did you count how many were between the ages of 30 and

7   39?

8   A     There were 82, which is 32 percent.

9   Q     And how many were over 40?

10  A     116, which is 45 percent.

11  Q     And what was the oldest person on this group?

12  A     The oldest person was 72, I believe.

13  Q     And were there numerous people in their 60s on this list?

14  A     Yes.

15  Q     And numerous people in their 50s?

16  A     Yes.

17  Q     And in their 40s?

18  A     Yes.

19  Q     And out of the 260, can you tell how many of them were

20  under 20, the age of 20?

21  A     Under 20.  No.  I didn't -- I didn't count those

22  separately.  I don't -- I don't -- I don't have that.

23  Q     Well, let's look to the first page.  Are you able to read

24  that or do I need to zoom it in for you?

25  A     Yeah.  If you don't make it too small.  I'm pretty blind.

1   Well, none -- none in that list.

2   Q    Okay.  Any in that list so far?

3   A    No.

4   Q    Okay.  Let's go to page 2.

5   A    You're talking about under 20?

6   Q    Under 20.  Yes.

7   A    So that would be 19 or 18 on here.

8   Q    Yes.

9   A    No.  None there.  Nope.

10  Q    Okay.  That's the second page.  Let's go to the third

11  page.

12  A    Okay.  None there.  Not yet.

13  Q    Let's go to page 4.

14  A    There's one person who's 19.

15  Q    And that's on the fifth line -- sixth line?

16  A    Sixth line.  Uh-huh.

17  Q    All right.  So you found one person under 20.  Anything --

18  any others on that page?

19  A    Keep going.  I can't see the bottom.  No.  That's all

20  there.

21  Q    Let's go to the next page.  Any so far?

22  A    And none -- none in the top half.  No.

23  Q    How about on this page?

24  A    No.  None.  There's one person who's 19.

25  Q    There is one?

```
1    A    There is one.  I don't know.

2    Q    Ah, yes.

3    A    Yeah.

4    Q    Right there?

5    A    That's it.

6    Q    Okay.  So that's the second one.

7    A    Right.

8    Q    And then on this page so far?

9    A    No.  No.

10   Q    And then finally, on the last page?

11   A    No.  So I guess it's two out of that last.

12             THE COURT:  I think we're going to have to take a

13   recess.  Is this a good breaking point?

14             MR. MURRAY:  Yes.  Yes.  In fact, I think I'm done,

15   Your Honor, but I was going to ask for a minute to confer.

16             THE COURT:  All right.  Well, you can check your

17   minutes.  All right.  But I have a conference call in another

18   case.  So that's why I want to recess now.  So we'll see you at

19   1:30.  All right.  Thank you.

20             THE CLERK:  All rise.

21        (Recess taken, 12:26 p.m. to 1:30 p.m.)

22             THE COURT:  All right.  Mr. Steinberg, please.  Okay.

23   Were you -- you still have another question or two?

24             MR. MURRAY:  Yes, Your Honor.

25             THE COURT:  Go ahead.
```

1  BY MR. MURRAY:

2  Q    Mr. Steinberg, going back to Plaintiff's Exhibit 63, just

3  in the interest of being particularly careful, did we find on

4  closer inspection one more 19-year-old on the second last page,

5  right about there?

6  A    Oh, yes.  I see that.  There is another one.

7  Q    So there were a total of three rather than two.

8  A    Three.  That's right.

9  Q    Now, as a result of your experience in recruiting other

10  photographers, compiling books of photographs created by other

11  photographers, can you tell the Court whether -- how many you

12  estimate -- how many fine art photographers that you know who,

13  like you, create images of ordinary people engaged in sexually

14  explicit conduct?

15  A    There -- there are quite a few.  I have worked with --

16  now, the books that I've edited, Photo Sex was sexually

17  explicit conduct.  Erotic by Nature was broader than that, but

18  I would say of the fine art erotic photographers, I personally

19  know maybe 150, 200 photographers that do that work.  The

20  number of people doing sexually imagery specifically is smaller

21  but is substantial.

22  Q    And what if you include nudity?

23  A    Yes.  If you include nudity, then certainly, there are

24  hundreds.  I mean, nude photography has been an established

25  genre in American photography since the 1930s.

Steinberg - Direct (Mur)                    136

1              MR. MURRAY:  Thank you.  I would just offer into

2      evidence --

3              THE COURT:  Well, Mr. Murray, is it your position

4      that nude people are covered by 2257, just being nude?

5              MR. MURRAY:  As long as the genitals are exposed,

6      yes.

7              THE COURT:  All right.  Well, I'm not sure --

8              MR. MURRAY:  That's the way I read the -- the <u>Dost</u>

9      case, the Justice Department's preamble and their explanation.

10             THE COURT:  The statute says lascivious exhibition of

11     the genitals or public area.

12             MR. MURRAY:  Yes.

13             THE COURT:  It has to be lascivious.

14             MR. MURRAY:  But even the Third Circuit's decision in

15     <u>U.S. v. Knox</u> held that even a clothed genital can be a

16     lascivious exhibit --

17             THE COURT:  That is true.

18             MR. MURRAY:  -- of a genital.

19             THE COURT:  It has to be lascivious.

20             MR. MURRAY:  Yes.  Yes.

21             THE COURT:  Whatever that means.

22             MR. MURRAY:  Well, I think --

23             THE COURT:  Okay.

24             MR. MURRAY:  -- to be safe, anybody who shows a nude

25     genital better -- better collect the records, because the -- if

Steinberg - Cross (Sch)                    137

1   they're wrong, it's a five-year potential prison sentence.

2   So --

3            THE COURT:  Okay.

4            MR. MURRAY:  But I would offer into evidence, Your

5   Honor, Plaintiff's Exhibit 61, 62, and 63.

6            THE COURT:  Yes.  All right.  Admitted.

7            MR. MURRAY:  Thank you.

8            THE COURT:  All right.  Cross-examine.

9                         CROSS-EXAMINATION

10  BY MR. SCHWARTZ:

11  Q    Good afternoon, Mr. Steinberg.

12  A    Good afternoon.

13  Q    You were just talking about erotic photographers that you

14  know, and one of those erotic photographers that you're aware

15  of is a photographer by the name of Craig Morey.

16  A    Yes.

17  Q    As you discussed on direct, you classify the subjects of

18  your erotic and your sexually explicit photographs as being

19  regular people.

20  A    Yes.

21  Q    And they're not fashion models.

22  A    Right.

23  Q    And they're not the type of professional models you might

24  see say like Playboy.

25  A    Right.

1    Q    In fact, as you said, the goal of your photography is to
2    make a statement about what people are really like.
3    A    Yes.
4    Q    And part of that is because you want your art to be of
5    regular people because there's such a prevalence of youthful
6    and perfect looking people in mainstream media.
7    A    That's correct.
8    Q    When you do a photo shoot for sexually explicit material,
9    you take a picture of the driver's license of the model,
10   correct?
11   A    Yes.
12   Q    And even in the absence of 2257, you still would take a
13   picture of the driver's license of a model --
14   A    Yes.
15   Q    -- that you're using.  You also execute a model release
16   when you do a photo shoot.
17   A    Yes.
18   Q    And the purpose of that is it allows you to use that
19   picture for commercial purposes once you're done.
20   A    Correct.
21   Q    And even in the absence of 2257, you would still execute a
22   model release.
23   A    That's right.
24   Q    And it's difficult to estimate a person's age just by
25   looking at them, isn't it?

1    A    Yes.

2    Q    Some people look older than they are.  Some people look

3    younger than they are.

4    A    Certainly.

5    Q    And regarding the subject of your photography, you

6    certainly don't rule out taking pictures of younger couples.

7    A    That's true.

8    Q    And you would not rule out taking pictures of a couple,

9    both of whom are 18, as long as they provided you with proper

10   identification.

11   A    Right.  As long as I could be certain that they were over

12   18.

13   Q    And that's why you check their IDs, to make sure they're

14   over 18.

15   A    Exactly.

16   Q    Because you have no interest in getting involved in child

17   pornography.

18   A    That's correct.

19   Q    As -- as you discussed on direct examination, over the

20   course of your career, you've taken sexually explicit pictures

21   of people of many different ages.

22   A    Yes.

23   Q    And as part of your involvement in this case, do you

24   recall that you figured out the numbers of people you've

25   photographed of those different ages?

Steinberg - Cross (Sch)                 140

1   A     Yes.

2   Q     Okay.  I'm going to show you Exhibit 147.

3   A     Okay.

4   Q     And do you recognize these?

5   A     That's the interrogatories.  Yes.

6   Q     These are the -- these are the interrogatories you

7   answered as part of your involvement in the case.

8   A     Yes.

9   Q     Okay.  I'm going to turn to page 5, which is interrogatory

10  number 9, and you'll see there that there's a question asking

11  for the breakdown of the age ranges that you've done, and just

12  so it's clear on the record, because I think it was a little

13  confusing when you were testifying on direct, the category of

14  people 19 to 20 years old you show in this response is four.

15  A     Right.

16  Q     And the people 21 to 25 is 52.

17  A     Right.

18  Q     And the people between 26 and 30 is 41 people.

19  A     Yep.

20  Q     Okay.  Now I'm going to show you Plaintiff's Exhibit 63.

21  You --

22          MR. SCHWARTZ:  I'm actually going to approach, Your

23  Honor, and give him a copy.

24  BY MR. SCHWARTZ:

25  Q     I think it will be easier if you're able to flip through

Steinberg - Cross (Sch)                    141

1   it.

2   A    Okay.

3   Q    Do you recognize that as the exhibit you were talking

4   about --

5   A    Earlier?

6   Q    -- earlier in your direct testimony?

7   A    Yes.  I think this is a different list.  I -- it's been a

8   little bit confusing, because -- because I'm here and I didn't

9   have access to my computer.  The numbers that I was counting up

10  that I recited in direct testimony I think came from a slightly

11  different list than this one.  So --

12  Q    And I -- and I understand, and --

13  A    Or this one is different from the one that you were just

14  talking about from the interrogatory.

15  Q    So the numbers in the interrogatories are slightly

16  different from --

17  A    Right.

18  Q    -- exhibit --

19  A    Right.

20  Q    -- Plaintiff's Exhibit 63, but do you recognize 63 as what

21  you were just referring to with Plaintiff's counsel?

22  A    The --

23  Q    This --

24  A    The --

25  Q    This one in front of you.

Steinberg - Cross (Sch)                                    142

1    A     This one, yes.  That's right.

2    Q     Yes.  It's number 63, just in case there's confusion.

3    When I say 63, that's that chart.

4    A     We're talking about this one.  Okay.

5    Q     Yep.  Now, if you'd count four columns over, you see that

6    it's labeled shoot.

7    A     Yep.

8    Q     Okay.  And that -- can you just explain to the Court what

9    a shoot number is?

10   A     Well, I think that -- what that means, a consecutive

11   listing of photo shoots that I've done.

12   Q     Okay.  Now, I'd like you to go down and look at photo

13   shoot number one.

14   A     Okay.

15   Q     And that includes two people, and they were ages 25 and

16   39, correct?

17   A     That's correct.

18   Q     Okay.  Now, if you could drop down to photo shoot 35.

19   A     Okay.

20   Q     That includes individuals who are ages 25 and 73, correct?

21   A     That's correct.

22   Q     Okay.  And photo shoot 48?

23   A     Okay.

24   Q     And that's just one individual who is 22 years old.

25   A     Yes.  That's right.

1    Q    And photo shoot 79.

2    A    Okay.

3    Q    Again, that's also just one individual, but that one was

4    21 years old.

5    A    That's correct.

6    Q    Okay.  If we drop down to photo shoot 91 --

7    A    Right.

8    Q    -- that includes two individuals, one age 19 and one aged

9    37.

10   A    That's right.

11   Q    Going to just a few down to 95.

12   A    Okay.

13   Q    That's two individuals, age 21 and 28.

14   A    Right.

15   Q    A few more down, photo shoot 110.

16   A    Okay.

17   Q    That includes two individuals, ages 21 and 53.

18   A    Right.

19   Q    Now, when you do a photo shoot, you collect everybody's

20   IDs at the same time, correct?

21   A    Yes.

22   Q    And you keep all those records for each photo shoot

23   together.

24   A    Yes.

25   Q    Now, on Exhibit 63, there's also another column where the

1   model's identification is shown.

2   A    Yes.

3   Q    And mostly, what it appears in Exhibit 63 is the state of

4   the driver's license --

5   A    That's right.

6   Q    -- that is shown.

7   A    Mostly, it's driver's license.  Occasionally, it's

8   passports that I use.

9   Q    And, for example, if we go down to shoot number 210 --

10  A    Okay.

11  Q    -- that says Ireland, correct?

12  A    Yes.

13  Q    And that's because what you used there was an Irish

14  passport.

15  A    That's correct.

16  Q    And the next column over from where it says Ireland,

17  that's that model's actual birthday.

18  A    That's correct.

19  Q    And then the column after that, December 29, 2009, that

20  was the date of the photo shoot.

21  A    That's right.

22  Q    And then you conveniently put the exact age that that

23  makes him on that day, and here, that person was 28.

24  A    That's right.

25  Q    Now I'm going to show you what has been marked as Exhibit

Steinberg - Cross (Sch)                    145

1    119A.  It will pop up on the screen for you.

2              MR. SCHWARTZ:  19 -- okay.

3    BY MR. SCHWARTZ:

4    Q    Do you recognize that?

5    A    It looks like one of my model releases.

6    Q    And this is one of the model releases you keep in the

7    ordinary course of your business, correct?

8    A    Yes.

9    Q    Okay.  If we turn to the second page, that's a copy of the

10   form of the identification that you used as part of the model

11   release.

12   A    Okay.

13   Q    Correct?

14   A    Yes.

15   Q    Yes.  And this -- the ID on the second page is a passport,

16   correct?

17   A    Yeah.

18   Q    And, in fact, I think if you look closely, you can see it

19   is a Passport from Ireland.

20   A    Yes.

21   Q    Now, do you recognize this as the ID relating to shoot

22   number 210 that we looked at in Exhibit 63?

23   A    Well, I think so.  I've only -- as far as I know, I've

24   only used an Irish passport for ID once.  So I think it's the

25   same one.

1   Q    You think it's the same one?  In fact, if you look on

2   there, both -- they both say Ireland.

3   A    Right.

4   Q    And both the passport and your chart indicate the same

5   birthday.

6   A    Right.

7   Q    And they both have a surname that starts with M.

8   A    Right.

9   Q    Both the spreadsheet and your -- and the passport.

10  A    Okay.

11  Q    And both the first name on the spreadsheet and the

12  passport start with S.

13  A    Okay.

14  Q    So I think it stands to reason that this is the ID that

15  you used for shoot 210.

16  A    Yes.

17  Q    Okay.  I'm now going to show you what's been marked as

18  Defendant's Exhibit 120C.  Do you recognize that?

19  A    I do.

20  Q    Is that one of your pictures?

21  A    Yes, it is.

22  Q    Do you remember taking that picture?

23  A    I do.

24  Q    Okay.  And that picture fairly and accurately represents

25  how the people that appeared on that day?

1   A    Yes.

2   Q    Do you recall that the -- that the man, the male in this

3   picture in 120C is also the person who signed the release in

4   119A

5   A    Yes.

6   Q    It's the -- it's the same person.

7   A    I remember the shoot.

8   Q    Okay.

9   A    Yes.

10  Q    And again, just to connect all the dots, he's the person

11  from shoot 210 in Exhibit 63.

12  A    That's correct.

13          THE COURT:  What was shoot 210?

14          MR. SCHWARTZ:  The person appearing in this

15  picture --

16          THE COURT:  Right.

17          MR. SCHWARTZ:  -- correlates to shoot 210 in Exhibit

18  -- Plaintiff's Exhibit 63.

19  A    He's the guy who had the Irish passport.

20  BY MR. SCHWARTZ:

21  Q    Yes.

22  A    Yes.

23  Q    Yes.  So he's -- this also correlates with the model

24  release in Exhibit -- Defendant's Exhibit 119A, which is this

25  person's model release and identification.

 1                    THE COURT:  Okay.

 2    BY MR. SCHWARTZ:

 3    Q    The last time you published a book with sexually explicit

 4    images was back 2003, correct?

 5    A    That's right.

 6    Q    And you haven't edited a book for publication containing

 7    sexually explicit images since then?

 8    A    That's right.

 9    Q    Now, you would agree with me that there's really no

10    objective criteria to determine what is art.

11    A    That's --

12                    MR. MURRAY:  Excuse me.

13    A    -- certainly true.

14                    MR. MURRAY:  Objection, Your Honor.  I'm sorry.  I

15    couldn't hear the question.  Could it be repeated?

16                    MR. SCHWARTZ:  I'll repeat.

17                    THE COURT:  Yes.

18    BY MR. SCHWARTZ:

19    Q    You would agree with me that there is no objective

20    criteria for people to determine what is art.

21    A    Well, there's been a great debate about what is and is not

22    art.  There are many people who think they have objective

23    criteria about art, but I would agree with you that it is a

24    subjective term.

25    Q    And the point of your art is not for it to be sexually

1    arousing.

2    A    Yes, and, in fact, if you ask me what I think is

3    significant about something being art or what I would call a

4    fine art sexual photograph, that would be the point, that it's

5    one thing to take a photo of sexual activity for the purpose of

6    arousing somebody, which I think is legitimate, but it's a

7    different project to take a photo of people being sexual where

8    the artist is making his or her own statement about sexuality.

9    In fact, A.D. Coleman, who is a photography critic for the --

10   what used to be the New York Times and The Village Voice once

11   said that what created sexual art in his mind was where the

12   photographer has something to say other than oh, look, sex is

13   happening and we get to watch.

14            So the photographer has a point of view that they are

15   either consciously or unconsciously expressing through their

16   photography.

17   Q    And despite that, it is possible that someone looking at

18   your artwork could find it sexually arousing.

19   A    It's possible, but that's not the purpose of the

20   photograph.

21   Q    Sure.

22   A    People could find a photograph of a hammer sexually

23   arousing.  Some people do.

24   Q    I'd like to show you Defendant's Exhibit 168G.  Do you

25   recognize that photo?

1    A     I do.

2    Q     Is that one of your photographs?

3    A     No.  It's one of Barbara Alper's photographs.

4    Q     And do you recognize that as being Barbara Alper's

5    photograph?

6    A     Well, it says so --

7    Q     Okay.  And was it --

8    A     -- underneath.  So

9    Q     Did you have it in one of the book that you published?

10   A     Yes.  That's in <u>Photo Sex</u>.

11   Q     I am now going to show you what's been marked as

12   Defendant's Exhibit 148.  This is another photograph of yours,

13   correct?

14   A     Yes, it is.

15   Q     And just by looking at it, that -- just by looking at that

16   picture, you can't tell how old the people are, can you?

17   A     No.  I wouldn't be able to.

18   Q     I'm going to show you exhibit -- Defendant's Exhibit 149.

19   Do you recognize that as one of your pictures?

20   A     Yes.

21   Q     And just by looking at that picture, you can't tell how

22   old the person is in that picture.

23   A     That's correct.

24   Q     I'm going to show you Exhibit 150.  Again, this is one of

25   your pictures, correct?

1    A     Yes.

2    Q     And just by looking at it, you can't tell how old those

3    people are.

4    A     That's correct.

5    Q     Exhibit 151.  Do you recognize that also as one of your

6    photos?

7    A     Yes.

8    Q     And one of the reasons why it's difficult to tell how old

9    the people are in this picture is the main subject of the

10   picture is completely shrouded, correct?

11   A     Yes.

12   Q     I'm going to show you plaintiff's -- Defendant's Exhibit

13   152.  Do you recognize that picture?

14   A     Yes.  That's one of my photos.

15   Q     And again, just by looking at it, you can't tell how old

16   those people are.

17   A     That's correct.

18   Q     Defendant's Exhibit 153.

19   A     That's one of my pictures.

20   Q     And do you recognize that as one of the pictures you

21   discussed in your direct examination?

22   A     In my direct examine -- one of the pictures I discussed?

23   Q     Of -- of the diva -- one of the diva pictures.

24   A     Yes.  That's one of the pictures.

25   Q     And, again, just by looking at it, you can't tell how old

Steinberg - Cross (Sch)                          152

1    that person is.

2    A     That's correct.

3    Q     Let me show you Defendant's Exhibit 154.  Do you recognize

4    that?

5    A     Yes.  One of my pictures.

6    Q     And again, just by looking at it, you can't tell how old

7    they are.

8    A     That's correct.

9    Q     Okay.  One more.  Defendant's Exhibit 155.  Do you

10   recognize that as one of your pictures?

11   A     Yes.

12   Q     And just by looking at it, you can't tell how old those

13   people are?

14   A     That's correct.

15         MR. SCHWARTZ:  Your Honor, I'm going to move into

16   evidence Defendant's 148 through 155 and Defendant's 168.  And

17   if I have -- might have one moment to confer.

18   BY MR. SCHWARTZ:

19   Q     And just one more picture.  Hopefully, we'll get up the

20   right one.

21         MR. SCHWARTZ:  This is also Defendant's Exhibit 168G,

22   Bates number 001756.  Bates 001756.

23   BY MR. SCHWARTZ:

24   Q     Do you recognize that picture?

25   A     Yes.

Steinberg   Cross (Sch)/Redirect (Mur)            153

1   Q    Is that one of your pictures?

2   A    No.

3   Q    Does that picture appear in your book that you edited?

4   A    It's in Photo Sex.

5   Q    Okay.  And who --

6   A    That's --

7   Q    Who is the photographer?

8   A    Barbara Nitke is the photographer.

9   Q    Okay.  And you -- and you recognize that picture from

10  being from your book?

11  A    Yes.

12       MR. SCHWARTZ:  Okay.  That's all I have, Your Honor.

13  Thank you.

14       THE COURT:  All right.  Redirect?

15       MR. MURRAY:  Yes, Your Honor.

16                   REDIRECT EXAMINATION

17  BY MR. MURRAY:

18  Q    Mr. Steinberg, you were asked a number of questions about

19  whether looking at certain depictions, whether just by looking

20  at the depictions, you could tell how old the person was.

21  A    That's correct.

22  Q    Okay.  I want to show you, for example, the first picture

23  in Plaintiff's Exhibit 61.  That's one of your photos, is that

24  correct?

25  A    Yes.  I can't see the whole photo the way you've got it,

Steinberg - Redirect (Mur)                    154

1    but yes, it is.

2    Q     Now can you see the whole photo?

3    A     Yes.   Thank you.

4    Q     I gather that just by looking at the picture, you cannot

5    tell us the precise age of these people, correct?

6    A     That's correct.

7    Q     Can you tell by looking at the picture whether they're

8    under the age of 18?

9    A     I think you can.

10   Q     And are they?

11   A     Hardly.   No.

12   Q     And how about the next picture of yours?   Do you know the

13   precise age of those people just by looking at the picture?

14   A     No.

15   Q     Can you tell whether or not they're under the age of 18 or

16   above the age of 18 just by looking at the picture?

17   A     I would say with some certainty that they're definitely

18   over 18.

19   Q     Okay.   How about this picture, which is the third one?

20   Can you tell whether or not those people are over the age of

21   18?

22   A     I think you can.   Yes.   They definitely are.

23   Q     And I'm not going to belabor it by going through every one

24   of them, but is it the case that in the vast, vast majority of

25   all the photographs that you've taken, can you tell just by

1    looking at the photographs that the subjects are over the age

2    of 18?

3    A    I think for many or most of my photographs, you could say

4    with certainty that they're over 18, and for other photographs,

5    you would want some evidence about that.

6                MR. MURRAY:  That's all I have.  Thank you, Your

7    Honor.

8                THE COURT:  Recross?

9                MR. SCHWARTZ:  No, Your Honor.

10                THE COURT:  All right.  Thank you, Mr. Steinberg.

11   Next witness, please.

12                MR. MURRAY:  Your Honor, we will now call the

13   plaintiff, Carlin Ross.

14                THE CLERK:  Raise your right hand.

15                Carlin ROSS, PLAINTIFF'S WITNESS, SWORN

16                THE CLERK:  Please be seated.  Please state your full

17   name and spell your last name for the record.

18                THE WITNESS:  My name is Carlin Ross.  That's

19   R-O-S-S.

20                         DIRECT EXAMINATION

21   BY MR. MURRAY:

22   Q    And Ms. Ross, tell the Court what city you live in.

23   A    New York City.

24   Q    Okay.

25                THE COURT:  How do you spell your first name?

 1            THE WITNESS:  Carlin, C-A-R-L-I-N, like George
 2    Carlin.
 3    BY MR. MURRAY:
 4    Q    And what is your current occupation?
 5    A    I'm a sex educator.
 6    Q    Okay.  And how long has that been the case?
 7    A    For the past six years.
 8    Q    Okay.  And what is your educational background?
 9    A    I have a J.D. from Brooklyn Law School.
10    Q    And --
11    A    I'm an attorney.
12    Q    And what did you do by way of undergraduate education?
13    A    I got a B.A. in political science from SUNY Stony Brook.
14    Q    And what year did you graduate with that degree?
15    A    1991.
16    Q    And when did you graduate from law school?
17    A    1998.
18    Q    Okay.  And then did you become admitted to the bar?
19    A    Yes.
20    Q    Of what state?
21    A    New York.
22    Q    And did you practice law at all?
23    A    I did.
24    Q    And just tell the Court a little bit about what your
25    employment history has been before you became a sex educator.

1    A    Sure.  After I graduated law school, I became general

2    counsel of an internet company, an internet service provider

3    that I took public, and then we raised a billion dollars on

4    Wall Street and cashed out, and I was able to pursue my

5    passion, which was female sexuality.

6    Q    Okay.  And when did that begin?  What year?

7    A    2004.

8    Q    Okay.  And what -- what exactly did you do in 2004 to get

9    into this field?

10   A    I had an idea of creating a web property for women on

11   female sexuality, and I just was talking about it and I was

12   still practicing, and I got a call from a New York Times

13   reporter and who was very interested in professional women

14   moving into the sex industry.  So I sat down and we did an

15   interview, and I was kind of outed.  So the front page of the

16   New York Times February I think 24th, 2004 was my picture.

17   First two words were my name.

18         So then I kind of went on an odyssey to kind of what

19   do I want to do in sex, and that's how I met Betty Dodson, who

20   is my business partner.

21   Q    Okay.  And so when did you meet Betty Dodson?

22   A    In 2006.

23   Q    And, by the way, how old are you now?

24   A    I am 40.

25   Q    Okay.  Have you authored a book on the subject?

1    A    I have.

2    Q    And what is the name of the book?

3    A    How to Make a Girl Come.

4    Q    Okay.  And when is that -- when was that published?

5    A    This past February, 2013.

6    Q    Now, tell the Court who Betty Dodson is.

7    A    Betty Dodson is an author.  She had an international best

8    seller, but what she's best known for is she started the sex

9    positive feminist movement.  So as some women were fighting for

10   equal pay, she was fighting for equality in the bedroom and

11   sexual rights in addition to contraception and all of those

12   things, but about women connecting to their bodies.  So it was

13   heavy body image and kind of female sexual liberation.

14   Q    Okay.  And do you know how -- and do you still work with

15   Betty Dodson?

16   A    Yes.

17   Q    Is she still your business partner?

18   A    She is.

19   Q    How old is Betty now?

20   A    Betty is 84 years old.

21   Q    Okay.

22   A    Years young, I should say.

23   Q    And tell the Court the work that you do.

24   A    So I'm editor and chief of the website.  So I run the

25   website from a technical perspective, and then we have 25

1    bloggers.  So I manage all of their writing.  I work with

2    Betty.  We released her memoir.  I also produce the films that

3    we -- we released and just manage all the -- I'm basically

4    taking all things Betty Dodson, making it digital.

5    Q    Okay.  And what is the philosophy that you and Betty

6    Dodson communicate?

7    A    Our philosophy is that masturbation is the foundation of

8    all human sexuality and that to kind of -- you have to connect

9    to your body and appreciate your sex organ.  We find -- we've

10   traveled the world globally, and the number one issue that kind

11   of blocks normal sexual development is genital shame.  So our

12   -- our thing is about connecting to your sex organ,

13   appreciating it, connecting to your body and then being able to

14   connect to a partner and have intimacy and positive

15   relationships.

16   Q    Okay.  And you mentioned that you have videos or DVDs.

17   What kind of DVDs do you create, you and Betty?

18   A    The majority of our work is just female masturbation.

19   Q    Okay.  And where do you create these videos?

20   A    Most of them are shot in Betty's livingroom.

21   Q    Okay.  And she lives where?

22   A    She lives at 121 Madison Avenue.

23   Q    But I mean she's in New York City too?

24   A    She's in New York City.  Yes.

25   Q    Okay.  And is that where business records are maintained

1   for those films and the website?

2   A    Yes.

3   Q    And do you maintain 2257 records?

4   A    Yes.

5   Q    And are those maintained in her apartment or residence?

6   A    Yes.

7   Q    Okay.  Now, and generally speaking, what are the ages of

8   the performers in the DVDs that you and Betty have created?

9   A    There's a range.  I think we had one 21-year-old woman,

10  but it's from 25 to 84.  Betty appeared in one video.  So I

11  know 75 percent of the women who appeared on videos are 25 and

12  older.

13  Q    Okay.  Do you and Betty have any interest whatsoever in

14  using minors in any of the sexually explicit videos that you

15  create or produce?

16  A    No.

17  Q    Now, I want to show you on the monitor what has been

18  marked as Plaintiff's Exhibit 45.  Can you identify that?

19  A    Yeah.  I believe that's the video Betty first produced,

20  "Self Loving".

21  Q    And is that a picture of Betty Dodson on the back --

22  A    That is --

23  Q    -- as she existed then?

24  A    Yes.

25  Q    And can you describe what the nature of this video is?

Ross - Direct (Mur)                           161

1    A    Sure.  Betty did a workshop for 25 years.  It was an

2    extension of the consciousness raising that was done during the

3    feminist movement when women would get together in a circle and

4    talk first person about their lives.

5         So Betty had the idea of doing sexual consciousness

6    raising.  So she put together a workshop.  It's a two-day

7    workshop, and this kind of documents what that would have been

8    like if you were participating in a workshop.

9    Q    And does it indicate how old the performers were?

10   A    I don't think so.

11   Q    Well just take your time.

12   A    All right.

13        THE COURT:  What's the exhibit number again?

14        MR. MURRAY:  This is 93, Your Honor.

15   A    Oh, yeah.  I see.  Okay.

16        MR. MURRAY:  45.  I'm sorry.  45.

17   A    Twenty-eight to 60.

18   BY MR. MURRAY:

19   Q    And is this an educational film?

20   A    Yes.

21   Q    I want to show you what's been marked as Plaintiff's

22   Exhibit 46 and ask if you can identify that.

23   A    Yes.  That was her next film, Viva La Vulva.

24   Q    And approximately when was that created?

25   A    In the nine -- I think '98.  Yes.

Ross - Direct (Mur)                                      162

1    Q      And again, was that a Ms. --

2             MR. BLADUELL:  Objection.

3    BY MR. MURRAY:

4    Q      -- Betty Dodson video?

5             MR. BLADUELL:  Objection, Your Honor.  There's a lack

6    of foundation as to these questions.

7             THE COURT:  Overruled.

8    A      Excuse me?  I'm sorry.

9    BY MR. MURRAY:

10   Q      Is that a Betty Dodson video?

11   A      Yes.

12   Q      And is this offered currently on your website?

13   A      Yes.

14   Q      As is -- was Plaintiff's Exhibit 45, is that something

15   that you current offer on your website?

16   A      Yes.

17   Q      And you're familiar with all of the Betty Dodson films?

18   A      Yes.

19   Q      And you tell the Court what this film generally is about?

20   A      This is a film that Betty did kind of -- kind of like an

21   anniversary video of all the work she had done, and she had

22   women come in and they did several of the rituals she does in

23   her workshop, and it was kind of celebrating, you know, 25

24   years of her work.

25   Q      And does this indicate what the ages of the women who

Ross - Direct (Mur)                              163

1    appeared in this film are?

2    A    Yes.

3    Q    What were their ages?

4    A    Twenty-five to 68.

5    Q    I want to show you what's been marked as Plaintiff's

6    Exhibit 47.  Can you identify that?

7    A    Yes.  That's Celebrating Orgasm, her next film.

8    Q    Again, by Betty Dodson, your partner?

9    A    Yes.

10   Q    And what is that film about?

11   A    This was women showing Betty like their masturbation

12   technique.  So she would film each woman as she would

13   masturbate.

14   Q    And does this indicate how old the women were who were in

15   this film?

16   A    Yes.

17   Q    What are their ages?

18   A    Twenty-six to 62.

19   Q    And is this an educational film?

20   A    Yes.

21   Q    Is it offered on your website?

22   A    Yes, it is.

23   Q    Plaintiff's Exhibit 50, can you identify what that is?

24   A    Yeah.  This is her late -- second to latest film, The

25   Orgasm Doctor.

1  Q    And it says below that -- can you read that?

2  A    Uh-huh.

3  Q    What does it say?

4  A    Two -- "Two private hands-on sex coaching sessions with

5  Betty Dodson demonstrating her latest method."

6  Q    Okay.  And on the back, is there a picture of Betty again?

7  A    Yes.  That's Betty.

8  Q    Is this a video that you offer on your website?

9  A    Yes.

10  Q    And what is the nature of this video?

11  A    Betty took her workshops, which was with a group of women,

12  and now she offers private sessions where she works one on one

13  with client.  So these are women that have orgasm issues,

14  whether a result of a sexual trauma or just never had an orgasm

15  before, and so she'll work with them hands-on to show them how

16  to let go of kind of shame and guilt and touch themselves and

17  kind of work that towards an orgasm.

18  Q    And then the film depicts that?

19  A    Yes.

20  Q    I want to show you what's been marked as Plaintiff's

21  Exhibit 117 and ask you if you can identify that.

22  A    Yes.  That's our latest film, <u>Betty Dodson's Body Sex</u>

23  <u>Workshop</u>.  This is a remake of <u>Self Loving</u>.  So we put together

24  a workshop today to get it on high-def and film it with the

25  latest greatest.  So this is a remake.

1   Q    And is this offered on your website as well?

2   A    Yes.

3   Q    And is this an educational film?

4   A    Yes.

5   Q    And then finally, on films, I want to show you Plaintiff's

6   Exhibit 118 and ask if you can identify that.

7   A    Yes.  This is <u>Betty Dodson, Her Life of Sex and Art</u>.

8   Q    And who created this one?

9   A    This was produced by Mark Schoen.  He directed and Betty,

10  and Betty had -- has traveled with a lecturer, because she

11  started her career as a fine artist, and her art kind of takes

12  you through the -- the beginning of the sexual revolution and

13  the rise of feminism.  So this is kind of her stand up with her

14  having a Power Point with all the visuals and her telling the

15  stories of her journey becoming a fine artist and a feminist

16  and then a sex educator.

17  Q    And is that kind of an educational documentary about

18  Betty?

19  A    Betty's life, yes.

20  Q    Now, in connection with the explicit videos that are

21  produced by Betty and you, do you attempt to comply with 2257?

22  A    Yes.

23  Q    And you're familiar with 2257?

24  A    Yes.

25  Q    And with respect to these DVDs, how do you go about

1   complying with the law?

2   A    Well, you know, photo IDs, signed releases, having, you

3   know, everything labeled right, keeping them in the foyer a

4   certain amount of steps from the front door, all those

5   regulations.

6   Q    Okay.  And the records are maintained where?

7   A    At Betty's apartment.

8   Q    Okay.  Now, with respect to the videos that we put in

9   front of you, could any of the performers in the video be

10  confused as someone under the age of 18?

11  A    No.

12  Q    Now, what other types of information is on your website

13  besides the ability to sell a product?

14  A    We have our blogs, which is text-based content.  So we

15  have writers write a first person about their -- their

16  lifestyle choices.  So that's text-based content.  That's free.

17  Then we have Betty's research product -- project, which was the

18  Genital Art Gallery.

19  Q    Well, we're going to get to that in a minute.

20  A    Okay.

21  Q    Let's stick with the front of the --

22  A    Okay.

23  Q    When you go on the website, what's the URL?  What's it

24  called?

25  A    Dodsonandross.com.

1   Q    Okay.  So when you go on there, is there some information

2   that one can access without any payment?

3   A    Yes.

4   Q    And is any of that information -- does any of that

5   information include explicit sexual images?

6   A    No.

7   Q    Okay.  And on that part of the website, what kind of

8   information is there?

9   A    We discuss sexuality.  We do a weekly YouTube video

10  podcast where Betty and I will talk for about five to seven

11  minutes about a topic, about a question that came in off the

12  site.  So Betty answers sex questions, and that kind of becomes

13  the engine of the site, because we need to know what -- what

14  information people are looking for.

15       So the questions are very important.  That's a very

16  highly trafficked part of the site, and then we -- Betty writes

17  sex features, which are like long form essays on different

18  topics based on what people are looking for, and then we have

19  our bloggers who blog about their personal experiences.

20  Q    Okay.  Now, on that part of the website, there are some

21  exhibits that actually are marked as Government exhibits, which

22  I'm sure they will show you, where there were questions posed

23  by teenagers, 14 years old, 16 years old, 17-year-olds, or

24  comments posted by those teenagers, and Betty provided some

25  information.  Explain that part of the website and why that is

1    there.

2    A    Well --

3              MR. BLADUELL:  Objection, Your Honor; lack of

4    foundation.

5              THE COURT:  Overruled.

6    A    It's not illegal to answer a sex question.  It's illegal

7    to show a child images, but, you know, 15 to 25-year-olds

8    account for half of all new STD cases.  A third of --

9              THE COURT:  What kind of cases?

10             THE WITNESS:  STD cases.

11             THE COURT:  Okay.

12   A    And a third of all --

13             THE COURT:   Sexually transmitted diseases.

14   A    Yeah.  So 15 and 25-year-olds account for half of all new

15   STDs.  They also account for a third of all HIV cases.  So our

16   feeling is we will comply with the law, but these -- they're

17   having sex.  Our philosophy is we would hope that they would

18   engage in outercourse, and that's what we encourage, and put

19   intercourse off until college, because the risk is too high,

20   and most likely, the young woman is not going to experience an

21   orgasm, but when they're having sex and they're looking for

22   information, we at least want to give them the facts, because

23   we want them to be safe and we want them to be healthy.

24   BY MR. MURRAY:

25   Q    Okay.  Now, can any of -- can anybody though go beyond

1   that front page and access explicit images without doing

2   something else?

3   A    No.

4   Q    Okay.  And do you permit anyone under the age of 18 to

5   access any of the explicit images?

6   A    No.

7   Q    Okay.  And so if you want to go further into the website

8   where some of the explicit material is found, what does one

9   have to do?

10  A    You have to have a credit card.  It's behind a pay wall,

11  which is the industry standard, because you have to say you're

12  18, click, and then put in your credit card information.

13  Q    Okay.  And then what's on that and how much does it cost

14  to enter?

15  A    Well, it's by clip.  So some of the clips are as little as

16  $3, and then some of the clips are as much as $30.

17  Q    Okay.  So once you get onto that part of the website, then

18  what -- and we'll get to the Genital Art Gallery in a minute,

19  but what else is on that part of the website?

20  A    On the -- the pay?

21  Q    Yes.

22  A    The Genital Art Gallery.

23  Q    And what about -- where do I look for the videos?

24  A    And that's -- yeah.  All the videos are there.

25  Q    Okay.  Now, do you and Betty have something that is called

1    the Genital Art Gallery?

2    A    We do.

3    Q    Okay.  And do you know when approximately that was

4    originally created or approximately when?

5    A    I believe 1998.

6    Q    Okay.  And do you know what its purpose is?

7    A    The purpose is that most people think there's something

8    wrong with their genitals.  The number one question we get is

9    am I normal.  So the purpose was to show that there's a range

10   of genital styles.  Some men are circumcised.  Some men aren't.

11   Some are small.  Some are large.  Some have larger, you know,

12   testicles.  Some don't.  And with women, there's a whole range

13   of looks to -- to the labia, to colors, to browns, to purples,

14   to pinks.  So it was kind of to heal genital shame.

15   Q    And what are the requirements?  How does it work exactly?

16   A    You click on the site, and, you know, now we have to have,

17   you know, the ID and everything.  So that kind of stuff, but

18   before, you would submit images of your genitals and then a sex

19   essay about your sexuality, something about yourself personal,

20   and then you would submit it to the site, and then I would go

21   in and review it and then publish it to the site.

22   Q    And what would your review consist of?

23   A    Well, you know, kind of -- I mean, the basics in the

24   beginning would be just formatting, to make sure everything was

25   formatted correctly.  Then you're looking at the images, yeah,

and make sure something is in keeping with our brand.  You know, we're a feminist brand.  I don't want crude things.  I don't want minors.  You know what I mean?  You want to keep things sex positive.  So I would review to make sure.  I want healthy sexuality.

Q    And you say that there were essays that had to be submitted with this?

A    Yes.

Q    And what kinds of topics did you expect the essays to cover?

A    People would talk about their relationship to their bodies.  They would talk about the first time they had an orgasm.  They would talk about how they masturbate.  They could be someone that's older talking about how they rediscovered their sexuality after giving birth or menopause or things like that.

Q    And then you would post the image?

A    Yes.

Q    And the essay or just the image?

A    Yeah.  No.  Yeah.  With the essay together.

Q    Okay.

A    We wanted it to have context.

Q    Now, did the Genital Art Gallery communicate, in your view, a serious educational message?

A    Yes.  I believe so, because --

1   Q    And what is that message?

2   A    That all genitals are beautiful and that there's a range

3   and that you can find something that looks like you, which is

4   very healing, because pornographic content, there's an

5   aesthetic, and the majority of performers get labiaplasty and

6   they bleach to make things pink.  So because we don't have sex

7   ed in our schools and we've had ten years of abstinence only,

8   when you look at pornography, the young girls, they write in

9   and they go that doesn't look like me, there's something wrong.

10  So our whole thing was to say no, you're just different.

11  Q    Now, I want to show you on the ELMO, what we call the

12  ELMO, Plaintiff's Exhibit 51 --

13  A    Yes.

14  Q    -- and ask you if you can identify that.

15  A    That's a submission to the Genital Art Gallery.

16  Q    And is that a representative sample of what comes in?

17  A    Yes.

18  Q    And that happened to be somebody who says that at the age

19  of 77, many people would consider me unable to get sexually

20  excited, is that correct?  That's --

21  A    That is correct.

22  Q    -- how the essay begins?

23  A    Uh-huh.

24  Q    While I'm here, I should have shown you Plaintiff's

25  Exhibit 52 so that we would have that covered.  What is that?

Ross - Direct (Mur)                              173

1    A     That's the video page, shows all the clips that are

2    available for purchase.

3    Q     On your website?

4    A     Yes.

5    Q     Now, was anonymity at all important to the people who were

6    submitting materials for the Genital Art Gallery?

7    A     Very much so, because these are real citizens.  They have

8    careers, jobs, and families, and also, having a database of

9    people's licenses sitting around, you know, for identity theft,

10   it's just not something you'd feel comfortable, I think, as an

11   average person submitting a license to a website.

12   Q     So there came a time when the --

13             MR. BLADUELL:  Objection, Your Honor.

14             THE COURT:  Overruled.

15   BY MR. MURRAY:

16   Q     There came a time when 2257 was amended and expanded to

17   cover not only actual sexual acts, but lascivious exhibition of

18   the genitals and simulated lascivious exhibition of the

19   genitals, and did you become aware of that change in the law at

20   some point?

21   A     Yes.

22   Q     And did that change in the law cause you to determine

23   whether it would have an effect upon the Genital Art Gallery?

24   A     Yes.  I was a little worried, because there are criminal,

25   you know, penalties, jail time, and when Betty and I started

1    first working together, we merged our websites.  So I took a

2    database that she had of images and just poured it over, and so

3    I couldn't prove dates, and I know there was cutoffs in the

4    law.  So I was a little uneasy about having all the images up,

5    because, you know, there's no precedent.  I don't know what

6    lascivious means as it's interpreted in the Courts.

7    Q    And it was your understanding that if the images had been

8    created after a certain date, they would be covered by the law?

9    A    Yes.

10   Q    And did I understand you to say that there were some

11   images as to which, because of the conversion, you would not be

12   able to prove the date of creation?

13   A    Yes.

14   Q    And so what did you do about those images?

15   A    Well, I mean, Betty and I talked about it, and we decided

16   to, you know, pull them from the site.

17   Q    And so did you remove those images from the site?

18   A    We did.

19   Q    And approximately how many images did you remove from the

20   Genital Art Gallery?

21   A    I think about -- I think we had 2,000, and there -- there

22   are two or 300 that remain.  So I guess about 17, 1,800 images

23   that we -- that we pulled.

24   Q    And was that a direct result of the change in law of 2257

25   and 2257(a)?

1    A    Yes.

2    Q    Now, then thereafter, what else did you do from that point

3    forward in order to obtain additional images for your Genital

4    Art Gallery and still comply with the law?

5    A    Well, we had to, you know, put a new page requesting a

6    scanned copy of a photo ID and a signed release.

7    Q    And what happened to the number of submissions that were

8    coming in?

9    A    They just stopped almost completely.

10   Q    Okay.  What was the normal number of submissions you

11   generally received prior to that?

12   A    We'd get about ten a week.

13   Q    Okay.  And so maybe over 500 a year?

14   A    Yes.

15   Q    And since you imposed that requirement, how many have you

16   gotten with people submitting their photo IDs along with their

17   genital pictures?

18   A    I think we -- two or three.

19   Q    Over the past how many years?

20   A    2009?  Four years, I guess.

21   Q    Okay.  So in terms of the Genital Art Gallery then, it now

22   consists of instead of the 2,000 images, approximately how many

23   images?

24   A    I think it's like between two and 300.

25              MR. MURRAY:  Okay.  Your Honor, I would offer into

Ross - Direct (Mur)/Cross (Bla)                    176

1    evidence Plaintiff's Exhibit 51, 52, 118, 117, 50, 47, 46, and

2    45.

3                  THE COURT:  Okay.  Couple -- oh, cross-examine.  Go

4    ahead first.

5                              CROSS-EXAMINATION

6    BY MR. BLADUELL:

7    Q    Good afternoon, Ms. Ross.

8    A    Hi, Hector.

9    Q    You testified on direct that 75 percent of the performers

10   in your videos were women over 25, correct?

11   A    Correct.

12   Q    But there are some of them that have been under 25,

13   correct?

14   A    Correct.

15   Q    And you identified one that was 21, correct?

16   A    Correct.

17   Q    Now, are you familiar with the title <u>Orgasmic Women</u>?

18   A    Yes.

19   Q    And in that video, the women at the end of the video tell

20   their ages?

21   A    Yes.

22   Q    And one of them says she's 21?

23   A    Yes.

24   Q    And another one says she's 23?

25   A    Yes.

1    Q    And another one says she's 24?

2    A    Uh-huh.  Yes.

3    Q    And another one says she's 25.

4    A    Uh-huh.  Yes.

5    Q    And you've also said that the Genital Art Gallery has

6    included depictions of people from as young as 20 years old,

7    correct?

8    A    Correct.

9    Q    Now, in the Genital Art Gallery, before 2009, you didn't

10   require IDs of the people, correct?

11   A    Correct.

12   Q    And what you used to determine their ages was your own

13   perception from looking at their genitals of how old they were,

14   correct?

15   A    Looking at the -- and reading their essay.

16   Q    Okay.

17   A    You can glean a lot from how someone writes, grammar, what

18   they're talking about.  Yes.

19   Q    But you're not an expert in looking at someone's genital

20   and determining how old they are, correct?

21   A    Yes.  Correct.

22   Q    And the essay that you require them to write, you didn't

23   require them to state the age that they were, correct?

24   A    Correct.

25   Q    In fact, let me show you Exhibit 44I.  This is a document

Ross - Cross (Bla)                                           178

1    from your website, correct?

2    A     Correct.

3    Q     And the title is How to Celebrate Your Cock?

4    A     Correct.

5    Q     And these are the guidelines that you established for

6    their essays, correct?

7    A     Correct.

8    Q     And they don't require them to state their age, correct?

9    A     Correct.

10   Q     And at the bottom, you tell them the last sentence, that

11   you're not going to publish their -- their names or their

12   e-mail addresses, correct?

13   A     Correct.

14   Q     And if I can go to Exhibit 44J.  And this is the -- the

15   guidelines that you provide women submitting to the Genital Art

16   Gallery, correct, for essays.

17   A     Correct.

18   Q     And you similarly not require there that they state their

19   age, correct?

20   A     Correct.

21   Q     And you similarly tell them that if they submit something,

22   you're not going to publish their names, correct --

23   A     Correct.

24   Q     -- or their initials --

25   A     Correct.

Ross - Cross (Bla)                               179

1    Q    -- of their e-mail address?  Is that correct?

2    A    Correct.

3    Q    Okay.

4    A    Oh, sorry.

5    Q    I'm sorry.  And you've -- you stated that after 2009, you

6    deleted some of the images from the Genital Art Gallery,

7    correct?

8    A    Correct.

9    Q    Because they all involved depictions -- closeups of the

10   genitals, correct?

11   A    Correct.

12   Q    But you're aware though that the statute applies to

13   lascivious exhibitions of the genitals, correct?

14   A    Correct.

15   Q    The statute doesn't say all exhibitions of the genitals,

16   correct?

17   A    Correct.

18   Q    Now, if we go to Exhibit number 117A, please.  This is

19   another page from your website, correct?

20   A    Correct.

21   Q    And this is a page from your website where you allow

22   people to pay for -- to purchase videos, correct?

23   A    Yes.

24   Q    And in some of these -- some of these are closeups of

25   genitals, correct?

Ross - Cross (Bla)                                    180

1    A    Yes.

2    Q    And they don't show the person's face, correct?

3    A    Yes.

4    Q    Now, if we go to the second page of this Exhibit 117A,

5    this is also closeups of genitals, correct?

6    A    Correct.

7    Q    That don't show the person's age, correct?

8    A    Yes.

9    Q    And in some of these pictures, the women's genitals have

10   shaved pubic hair, correct?

11   A    Partially, yes.

12   Q    If you see Manual Skills, Vulva Play at the lower

13   right-hand corner.

14   A    Yes.

15   Q    You would not be able to tell me from that picture how old

16   that person is with absolute certainty.

17   A    No.  I can't.

18   Q    And you would not be able -- if you -- if we go to the

19   third page, there's another closeup on the top right-hand

20   corner of two people engaging in intercourse, correct?

21   A    Correct.

22   Q    And you cannot tell me the ages of those people.

23   A    No.

24   Q    Now, if we go to Exhibit 118A, please.  These are

25   depictions from your Genital Art Gallery.

Ross - Cross (Bla)                                     181

1    A      Correct.

2    Q      You're not going to be able to tell me the ages of any of

3    these people, right?

4    A      No, but if someone has a genital piercing, you have to be

5    18 to be pierced.  So I can see that they're of majority.

6    Q      So you're assuming that they're complying with the law,

7    correct?

8    A      Correct.

9    Q      You don't know if they are under 18.

10   A      Well, I know these women personally, but yes.  I see what

11   you're saying.

12   Q      No -- no one -- no one looking at it could know.

13   A      Yes.  Correct.

14   Q      Exhibit number 18B.  Does this have -- the images of

15   genitals appear on your Genital Art Gallery, correct?

16   A      Correct.

17   Q      And Exhibit 118C.  That's also another page of the Genital

18   Art Gallery?

19   A      Correct.

20   Q      And Exhibit 118D.  That's also another page from your

21   Genital Art Gallery, correct?

22   A      Correct.

23   Q      Now, let me show you Defendant's Exhibit 36, please.  Ms.

24   Ross, you remember looking at this picture before, correct?

25   A      I do.  Yes.

Ross - Cross (Bla)                    182

1    Q    I showed this to you in deposition, correct?

2    A    Correct.

3    Q    And I asked you what was the age of the men depicted in

4    here, correct?

5    A    Correct.

6    Q    And you told me --

7         MR. MURRAY:  Objection, Your Honor.  He shouldn't be

8    trying to impeach her from her deposition before he elicits the

9    testimony in the first place.

10        THE COURT:  Well, he's -- overruled.  He's asking her

11   -- what was the testimony at the deposition?

12   BY MR. BLADUELL:

13   Q    You told me that the person was seven -- could be -- could

14   appear 17, correct?

15   A    Correct.

16        THE COURT:  Overruled.

17   BY MR. BLADUELL:

18   Q    Now, Ms. Ross, were you here this morning during Mr.

19   Steinberg's examination?

20   A    For half of it, yes.

21   Q    Okay.  Do you remember that he testified about this

22   picture?

23   A    No.  I didn't see that.

24        THE COURT:  I'm not sure if she -- anybody sitting in

25   the back.

1    A     I can't see back there.  I mean, it was -- yeah.

2          THE COURT:  I'm not sure anybody in the back can see

3    -- can see the exhibits on the computer screen.

4    BY MR. BLADUELL:

5    Q     But your testimony here is that this person looks to you

6    like he could be 17.

7    A     Sure.

8    Q     And it's difficult to tell in this instance whether he's a

9    minor or not, correct?

10   A     Correct.

11   Q     And let me show you Exhibit number 120C.  This is exactly

12   the same picture that I showed you before, correct?

13   A     Correct.

14   Q     Except that it's somewhat a different color --

15   A     Uh-huh.

16   Q     -- correct?

17   A     Correct.

18   Q     And that it has a label above the head of the -- the man,

19   correct?

20   A     Correct.

21   Q     Ms. Ross, you would agree with me that it's difficult to

22   look at someone and determine their age, correct?

23   A     Sometimes, yes.

24   Q     And there is a lot of factors that could influence how old

25   a person looks, correct?

Ross - Cross (Bla)                                      184

1    A    Correct.

2    Q    Like race could be a factor, correct?

3    A    Correct.

4    Q    You -- you agree with me that people of color could look

5    younger than they are, correct?

6    A    I don't know -- I don't know that.  I would think people

7    of color might look older, but --

8    Q    Or could look older than they are.

9    A    Yes.

10   Q    It depends on the person.

11   A    Yeah.  Of course.  Yes.

12   Q    But race could be a factor.

13   A    Yes.

14   Q    And breast implants could be a factor, correct?

15   A    Correct.

16   Q    They could make a woman look older than she really is,

17   correct?

18   A    Correct.  But don't you have to be a certain age to get

19   breast implants?  No?

20          THE COURT:  Well, you have to wait for the next

21   question.

22          THE WITNESS:  Oh, sorry.

23          THE COURT:  You might remember that from law school.

24          MR. BLADUELL:  I have nothing further, Your Honor.

25          THE COURT:  Let me just ask some questions --

1          THE WITNESS:  Uh-huh.

2          THE COURT:  -- just to make sure.

3    BY THE COURT:

4    Q    Some of the photographs that you have -- have been shown

5    here as exhibits you've put on the websites that you've

6    described without ever meeting the people, is that correct?

7    A    Correct.

8    Q    That is, you solicit people to send in photographs, is

9    that correct?

10   A    Yes.  It's all virtual.

11   Q    Now, do you require when they send in the photograph, that

12   they send proof of their age or it's only if you decide that

13   you want to use the photograph or not at all?

14   A    Well, we require that now since the law has changed, but

15   before, we didn't require anyone to send in their age.

16   Q    All right.  When you say the law changed, you're talking

17   about the 2009 change?

18   A    Correct.

19   Q    Okay.  So before that, you did not require -- well, before

20   that, what did you require people to send in if they sent a

21   photo?

22   A    A photo and the sex essay.  That was really all we asked.

23   It was kind of a trust situation, anonymity and trust, and --

24   Q    Okay.

25   A    -- you know, Betty's brand is such a positive, authentic

Ross - The Court                                186

1    brand --

2    Q     All right.

3    A     -- that it kind of attracts certain people.

4    Q     All right.  So after 2009, you now require a photo and

5    what?  And documentation?

6    A     And a signed release.

7    Q     Well, what about any -- do you require any documentation

8    about age?

9    A     Well, yes.  They have photo ID.  They have to scan a copy,

10   and then they have to sign a release where they say I'm 18

11   and --

12   Q     Okay.

13   A     -- you know.

14   Q     So they send you a -- you require a photo ID, but you

15   don't know what -- you've never seen the person live, correct?

16   A     No.  No.

17   Q     So we've had some testimony from people who produce movies

18   where the actor -- the producer actually sees the actor and

19   then can compare the photo to the person who's presenting it so

20   they have a reasonably good idea if it's the same person in the

21   photo ID.  You understand that?

22   A     Yes.

23   Q     Now, you don't do that.  You just ask for the person to

24   send a photo, send a photo ID.

25   A     Yes.

1    Q    All right.  But you don't know if the person who actually

2    sent it in is, in fact, the same person who's represented in

3    the photo ID.

4    A    Oh, no.  No.

5    Q    You're taking their word for it.

6    A    Well, I guess.  I mean, we're a global brand.  We're in

7    every -- the site is in every country in the world.

8    Q    Right.

9    A    So it's like a global audience.  So there's really no way

10   for us to have each person come and meet with us.  It's a

11   totally --

12   Q    No.  I understand --

13   A    -- different than video.  Yeah.

14   Q    But even if somebody was in New York City, you wouldn't

15   require them to come to you in person.  You would take their

16   photo and their representation that this is -- I'm -- let's say

17   it's John Smith.  I'm John Smith, and they present to you a

18   driver's license with John Smith and a --

19   A    Sure.

20   Q    -- birth date showing they're at least 18.  That would be

21   sufficient.

22   A    Well, yeah.  Kind of like buying an airline ticket.  You

23   know what I mean?  That's kind of the same thing until you show

24   up.  I get that there's a second.

25   Q    Right.  Right.  Okay.  Now, you don't require -- you'll

1    take -- will you take any kind of photo ID or does it have to

2    be --

3    A    It has to be, you know, a passport or a license --

4    Q    Like a --

5    A    -- or a State --

6    Q    -- Government issued --

7    A    Yes.

8    Q    -- ID?

9    A    Absolutely.

10   Q    Okay.  All right.  Now, do you -- do you personally

11   approve of -- this is a personal thought.  Do you personally

12   approve of the concept that your photos should be limited to be

13   people 18 or older?

14   A    Yes.  No.  I mean, we are not about minors.  We're a sex

15   positive brand.

16   Q    Okay.

17   A    I have no problem with that.

18   Q    All right.  And you've heard -- you -- maybe you were in

19   the courtroom when the last witness testified.  I asked some

20   questions about it.  So you're aware at least from the Popular

21   Press that there are a lot of young people under the age of 18

22   who appear to be engaging in sexual activity --

23   A    Yes.

24   Q    -- is that correct?  All right.  But you are in favor of

25   laws, whether they're local, State, or Federal, that do not --

Ross - The Court                              189

1    that prohibit depicting children under age 18 in explicitly

2    sexual activity, is that correct?

3    A    Correct.

4    Q    Okay.  All right.  Now, do you -- now, in -- in this

5    question, I might -- if you want to call upon your legal

6    training to answer it, you may, but I'd just like your views on

7    this issue.

8         To the extent that the -- I'd like you to divide this

9    law into two parts.  One is the requirement that a person who's

10   going to be depicted in a sexually explicit photograph present

11   proof of their age to the producer, whoever is going to do it,

12   as you do now.

13   A    Yeah.  Of course.

14   Q    All right?  As question number one, and question number

15   two is whether you see any -- whether you think that in and of

16   itself is burdensome on a producer as opposed to the

17   regulations about keeping the photographs, maintaining records,

18   and the cross-referencing, and the possibility of a search

19   without a warrant.  Do you understand my question?

20   A    Yeah.  I do, and I have no problem with complying with

21   2257 when we produce a film and keeping the records.  I don't

22   think it's burdensome at all.  I comply with it.  People in the

23   industry we know comply with it.

24        I think the issue becomes when -- it becomes like all

25   this red tape, and then there are a change in regulations.  You

Ross - The Court                                    190

1    don't know what to do, and no one wants to go to jail, you

2    know, and so it's not clear, and then it becomes it has to be

3    this many feet from the door, and it can quiet free speech, and

4    I just feel as an educator, the reason why we're so into having

5    these images of the genitals, because when you make it have to

6    comply with 2257, then you can -- you're limited to adult

7    talent, and adult talent, it's entertainment and they're

8    performers.  It's like, you know, looking at a fashion magazine

9    and all women look like that.  No.  That's a specific segment

10   of the population, and that's a specific thing.

11           So as an educator, I feel like my hands are bound,

12   because now that means I'll have to only have adult stars that

13   I'm working with that I have the records and complying, because

14   they know the game and it's easy, and because of that, now I

15   have every image look the same instead of showing different

16   races, different labia styles.

17           So that -- to the second half, I think it is

18   burdensome in the --

19   Q    You mean with the second half being the second part of my

20   question.

21   A    Yes.

22   Q    All right.  So you don't find it burdensome to require

23   somebody who wants their genitals to appear in any of your

24   websites or the other things you produce --

25   A    I have no problem with the films.  With this specific

1   Genital Art Gallery, there's an issue with it, because it's not

2   someone's face.  You know, it's just an image of their

3   genitals, and I --

4   Q    Well, but you do have an issue with 2257 as to that or you

5   don't?

6   A    As it regulates the Genital Art Gallery and lascivious

7   genitals, I do have a problem with it, because I think as an

8   educator, we need to look at real images of real genitals.

9   Q    All right.  Because the -- because there, you're not

10  depicting anyone's face.  It's just the genitals.

11  A    Yes.

12  Q    All right.  But you don't think it's burdensome for a

13  movie producer to require an actor to present their proof of

14  age?

15  A    No.

16          THE COURT:  All right.  Thank you.  All right.

17  Redirect?

18          MR. MURRAY:  Yes.  Thank you, Your Honor.

19                       REDIRECT EXAMINATION

20  BY MR. MURRAY:

21  Q    And following up on the Court's question, the problem with

22  2257 and 2257(a) as it applies to the Genital Art Gallery is

23  what with respect to whether you're getting any submissions?

24  A    Well, yeah.  It's quieted free speech.  People don't

25  submit.  We don't get them.  So we have this older archive, but

1    you kind of want to keep your project going.  You know what I

2    mean?  You want to have more and more people submitting.

3    Q    And why won't people submit photo ID when they're

4    submitting just a picture of their genitals?

5    A    Because I can link their name to the genitals, which means

6    I have their face.  In the age of social media, I think

7    everyone is kind of scared that -- you know, I mean, we've had

8    people, like friends that made submission.  You know, one of my

9    bloggers works at NASA, and he's deathly afraid that someone

10   will find out that, you know, that's him, because I think that,

11   you know, you're afraid of getting fired, or if you're a

12   teacher or any of these, you know, industries, it's just hard.

13   There's a threat.  I think there's a risk.

14   Q    Now, you were asked on cross-examination whether it is

15   true that you cannot always tell the age of a person just by

16   looking at that person.

17   A    Correct.

18   Q    You recall that?

19   A    Yes.

20   Q    Can you generally tell for most people just by looking at

21   them whether they're over the age of 18, whether they're of the

22   age of majority?

23   A    I believe so.  Yes.

24   Q    Okay.  Is there anybody in this courtroom, for example,

25   that just by looking at them, you think you would confuse as

Ross - Dodson - Direct (Mur)                    193

1    someone under the age of 18?

2    A    I think everyone here is -- well, maybe.  Sorry.  You look

3    kind of young and the woman in the back looks kind of young,

4    but everyone else looks of majority and clearly older to me.

5    Q    Is it your -- if someone is over the age of 25, do you

6    think you can generally just by looking at the person tell

7    whether they're a minor or over the age of majority?

8    A    I believe so.

9         MR. MURRAY:  Okay.  Thank you, Your Honor.  That's

10   all I have.

11        THE COURT:  Recross?

12        MR. BLADUELL:  No, Your Honor.

13        THE COURT:  All right.  Thank you very much.

14        THE WITNESS:  Thank you.

15        THE COURT:  Next witness, please.

16        MR. MURRAY:  Your Honor, the plaintiffs at this time

17   would call the plaintiff, Betty Dodson.

18        THE COURT:  Okay.

19        THE CLERK:  Raise your right hand.

20        BETTY DODSON, PLAINTIFF'S WITNESS, SWORN

21        THE CLERK:  Please be seated.  Please state your full

22   name and spell your last name for the record.

23        THE WITNESS:  Betty Dodson, D-O-D-S-O-N.

24        THE COURT:  Go ahead.

25                       DIRECT EXAMINATION

1    BY MR. MURRAY:

2    Q    Ms. Dodson, what city do you live in?  What city do you

3    live in?

4    A    New York City.

5              THE COURT:  Pull the microphone right in front of

6    your mouth, please.  Thank you.

7              THE WITNESS:  You're welcome.

8    BY MR. MURRAY:

9    Q    And tell the Court what your profession is and has been

10   over the years.

11   A    Well, I started out as a fine artist.  I had a career -- a

12   full career in fine art, and then I segued to sex education as

13   a feminist.

14   Q    And what kind of fine art did you create?

15   A    Classical.  Classical nudes, renaissance.

16   Q    And then that segued into becoming a sex educator, you

17   said?

18   A    Exact -- yeah.  Correct.

19   Q    And how long have you been a sex educator?

20   A    Since the '70s.

21   Q    Okay.  And how old are you now?

22   A    Eight-four.

23   Q    Okay.  And so how -- for how many years have you been a

24   sex educator?

25   A    I can't count, but since -- you know, 70, 80, 90, to, you

1    know, 2013.

2    Q    Okay.

3    A    Anyone got a calculator?

4    Q    And why don't you describe for the Court what your career

5    has been, what kinds of things you've done as a sex educator

6    over the past quarter of a century.

7    A    To segue from fine art to teaching about sex was basically

8    done with workshops, and I use what they call the consciousness

9    raising format of the feminist movement.  I'd had a lot of

10   sexual experiences thanks to the revolution.  We had a sexual

11   revolution in this country.  People have forgotten evidently,

12   but it was very open and very -- very safe and very

13   enlightening, and I would say the bulk of my information is

14   based on experience versus reading books.  It's hard to learn

15   about sex by reading a book.  It's better to do it.

16          So I had women get together, and this is the

17   consciousness raising format, and we would sit in a circle and

18   we would share our stories, in other words, whatever what was

19   going on our life, first person.  The personal was -- it turned

20   out the personal was very political.  It wasn't just my

21   problem.  It was -- we all had the same problem.

22   Q    Okay.  And in addition to workshops, what did you do?

23   A    That was basically it.  I mean, that was -- I did that for

24   many years, and then later on, I started doing -- well, then I

25   went to -- then I got a degree in sexology.

Dodson - Direct (Mur)                    196

1    Q    Okay.  And then did you then move into the area of doing

2    videos?

3    A    Yes.  I -- first I wrote books, and then I segued over to

4    -- because in order to teach anything, you really need a

5    visual, and it's true.  A picture is worth a thousand words.

6    So from the visual, I then started writing, and my books

7    combined art, writing and words.  So I learned to write, and I

8    have a book that's actually international best seller on the

9    marketplace to this day.

10   Q    What's it called?

11   A    Sex for One.

12   Q    And what --

13   A    My expertise is masturbation.  No one talked about it.  No

14   one wanted to deal with it.  It's something most everyone does,

15   but we don't acknowledge it, and I believe that it is the

16   foundation for all of human sexual activity.

17   Q    And when did you author that book?  How long has that book

18   been in publication?

19   A    Well, first, I did it in 1974, and then a mass marketer

20   took it over in 1986.

21   Q    Okay.

22   A    And then it was all over, and then it had many, many

23   foreign countries, lots of foreign editions.  I lost count.

24   Q    Okay.  Have you authored other books or articles?

25   A    Oh, many.  Yes.

1   Q    Can you give us some additional examples that come to
2   mind?
3   A    The next book was <u>Orgasms for Two</u> to help people have
4   partner sex that was mutually orgasmic.  Unfortunately, we're
5   still using the male model of sexual response for women, and it
6   doesn't work for us.
7   Q    Ok.  And what other books have you authored?
8   A    Those two, and then many -- of course, many articles.
9   Q    And where have your articles been published?  What kinds
10  of places?
11  A    Women's magazines, men's magazines.  I mean, I could -- I
12  could go and look for the list, but it's many, many magazines.
13  It's any magazine that would publish an article about sex.
14  Q    Okay.  And have you spoken?  Have you -- do you have
15  speaking engagements?
16  A    Yes.  Yes.  I have lectured frequently.
17  Q    And where have you traveled to lecture?
18  A    Well, I'm very popular in Scandinavia.  As advanced as
19  they are, they still want my information.
20  Q    Okay.  And across the United States, have you given
21  lectures?
22  A    Yes.  Yes, I have.  I've been -- I run workshops, and I've
23  lectured in New York, Chicago, L.A., San Francisco.  I even
24  stopped off in Wichita, which is my home town, and shook things
25  up a little.

1    Q    And did you then begin producing sexually explicit videos

2    as a teaching mechanism?

3    A    Yes, I did.

4    Q    And when did you begin that approximately?

5    A    That was in the '90s.

6    Q    Okay.  And what kind of videos -- we've seen some in

7    evidence, but why don't -- from your perspective, what kind of

8    videos did you create?

9    A    The first one I did was to document the -- the workshop.

10   I called it The Body Sex Workshop, and that was the Self Loving

11   video I saw you looking at.

12   Q    Okay.

13   A    And that was just documenting something I had been doing

14   for years.

15   Q    And what was the educational message of that video?

16   A    That was once again, the format of the feminist movement,

17   sitting in a circle, consciousness raising, and I added nudity

18   to it, because everybody has terrible, terrible body images.

19   We all think there's something very wrong with us, and this is

20   a very serious problem for women.  In order for them to be

21   sexual or to enjoy their bodies, they have to learn to like

22   them.

23            So we would find out when we would sit in the circle

24   and everybody was nude, that we all were beautiful in one form

25   or another, and I knew that from fine art, from looking at

1    nudes, drawing the nude.  The nude body is extraordinary.

2    Q    Okay.  And then what other videos did you produce after

3    that first one?

4    A    Oh, darling, give me a hand here, because I'm old and it's

5    hard to remember.

6    Q    Okay.  Well, generally speaking, why don't you describe

7    what the educational aspects were of the collection of videos.

8    A    It's basically the same thing.  It's accepting your body,

9    accepting your genitals, learning to have an orgasm first with

10   yourself so that you have something to share with a partner.  I

11   mean, men are well meaning and all that, but they really don't

12   know how we function, and you have to find out from the woman

13   what she prefers, but if she's never touched her own body, she

14   doesn't know.  So this is how I teach basic.

15   Q    Okay.  Now, you're familiar with 2257, the statute, 2257?

16   A    Oh, are you kidding?  I'd like to forget it.

17   Q    And do you collect IDs in connection with --

18   A    Yeah.  Yeah.

19   Q    -- your videos?

20   A    Yeah.  Of course I did.

21   Q    And do you maintain them in your residence?

22   A    Yes.

23   Q    And is -- where are the videos produced?

24   A    In my -- in my apartment.  That's where I do my

25   productions.  That's where I have done my workshops.  When I

1    was an artist, I had a studio someplace else.

2    Q    Now, I want to ask you about the website that you have,

3    and on it, I want to ask you about the Genital Art Gallery.

4    A    Yeah.   I consider that a research project.

5    Q    Tell the Court about how that Genital Art Gallery came

6    into being, what its purpose is.

7    A    Well, the purpose is always -- of course, I knew that the

8    women all thought they were genitally deformed.   This is a very

9    personal thing for me.   I thought I was genitally deformed

10   until I was 35 years old.   Now, that's a serious handicap for

11   any woman to live through, and then I was struggling to have an

12   orgasm with partner sex, because I thought it had to be

13   vaginal.   We're still stuck in the dark ages when it comes to

14   female sexuality, and I'm sick of it and I'm going to fight it

15   until I -- last breath.   Eight-four, I'm just getting started.

16   Q    So tell us about the purpose of the Genital Art Gallery

17   though.

18   A    It's to let people know there is a vast variety of

19   appearances for both vulvas and penises.   I now know that the

20   young men have as many problems as the young women, thinking

21   that their dicks are not big enough.

22   Q    Okay.   And so the idea was to have these images posted so

23   that there would be a variety for people to see?

24   A    Absolutely, and I also invited people to talk about their

25   first sexual experience, the first time they masturbated, and

1   any information that they wanted to share.

2   Q    Okay.  And you're familiar with the fact that in about

3   2009, the law changed to require the collection of photo IDs

4   for both --

5   A    It -- it ended the gallery.  It was over, because the

6   whole point was anonymity.  I mean, if some guy is -- you know,

7   is the head of a company or he's an educator or his wife

8   doesn't know he -- you know, he took a picture of his -- of his

9   dick and he wants to send it to me because it's thrilling for

10  him to display his genitals and to find out that he, indeed, is

11  normal.  Ha ha ha ha.  So he doesn't want to give me his

12  driver's license.

13  Q    And so what has happened to the Genital Art --

14  A    It's -- it's finished as far as I'm concerned.

15           MR. MURRAY:  Okay.  Thank you very much.  That's all

16  I have.

17           THE COURT:  All right.  Cross, please.

18           THE WITNESS:  I just want you to know that I've been

19  at a terrible disadvantage throughout this whole thing, because

20  my new hearing aids were not working and David loaned me his,

21  and now I can hear.  I have no idea what's gone on beforehand.

22  So --

23           THE COURT:  Well, you can --

24           THE WITNESS:  -- take it away.

25           THE COURT:  You can sit in the jury box if that will

Dodson - Cross (Sch)                                    202

1   help you hear better.

2              THE WITNESS:  The who?

3              THE COURT:  In those seats over there if that will --

4   if that will help you hear better.

5              THE WITNESS:  Oh, really?

6              THE COURT:  Yeah.

7              THE WITNESS:  I didn't know that.

8              THE COURT:  Well, now you know.

9              THE WITNESS:  Now you tell me.

10             THE COURT:  All right.  I didn't know you couldn't

11  hear.  All right.  Go ahead.

12             THE WITNESS:  Okay.

13                       CROSS-EXAMINATION

14  BY MR. SCHWARTZ:

15  Q    Good afternoon, Ms. Dodson.

16  A    Hi.

17  Q    You testified that you have a website called

18  dodsonross.com, correct?

19  A    Correct.

20  Q    And you provided the Government with the username to -- to

21  access this website, correct?

22  A    Say it again.

23  Q    You provided the Government with the username so that we

24  could access this website.

25  A    Yes.  Yes.

1    Q    And you also provided the Government with a password to

2    access the website.

3    A    Yeah, and I hate those things.  I can never -- I always

4    forget them.  I hope at some point we let go of that.

5    Q    So, Ms. Dodson, I'd like to show you a binder of documents

6    that are marked as Defendant's Exhibit 44.

7           MR. SCHWARTZ:  Your Honor, if I may approach the

8    witness with the binder?

9           THE COURT:  Yes.

10   A    44?  It's a blank page, honey.

11   BY MR. SCHWARTZ:

12   Q    So, Ms. Dodson, behind the tab that's labeled 44 are a

13   number of screen shots from dodsonross.com.

14   A    I have no idea what you're talking about.  Oh.  Screen

15   shots.  Cute.

16   Q    So each screen shot is individually labeled by letter, and

17   if you can just take a minute to go through all of the letters

18   that are behind number 44.

19   A    You'll have to come up here and point.  I have no idea

20   what you're dealing with here.  Oh, this is part of the

21   gallery.

22   Q    Yeah.  There's one shot per tab, per letter tab, if that

23   makes sense.

24   A    You're going to go through the whole gallery?

25   Q    There's just --

1    A    Ooh.  Oh, it's been so long since I've seen it.

2    Q    Well, I'd just like you to take a look at the -- at the

3    exhibits with the letter tabs behind number 44, and just let me

4    know if you recognize the documents.

5    A    I have to go back.  Oh, and I think I have three peni

6    here.

7    Q    So if you -- if you could keep going --

8    A    More?  Turn --

9    Q    -- to the next one.

10   A    This is weird.  Oh, that's a bad shot.  I can't tell what

11   it is.

12   Q    But that image -- that image is from dodsonross.com,

13   correct?

14   A    Evidently.  It's a very poor photograph.

15   Q    And if you could keep going through the letter tabs, Ms.

16   Dodson --

17   A    Oh.

18   Q    -- and just let me know if you --

19   A    Okay.  You want me to keep going?

20   Q    Yes, please.

21   A    I'm revisiting the gallery.  You know, since this 2257

22   came up, I just don't go there anymore.  Well, you can't even

23   tell what that is.  Do you want me to keep going?

24   Q    Yes, please, all the way until you get to number 45.

25   A    You've got a lot of tabs here, kid.  That's all grainy.

1    Can't see what that is.  This is better.  You know, it's

2    interesting.  The penises are always better than the vulvas.

3    They're -- they're easier to photograph.  We're very

4    complicated, women.  I have no idea what this is.

5              I mean, these are not professional photographers.

6    These are people photographing themselves.  Okay.  Same guy,

7    three shots, happy, penis, happy life.  That's not a bad

8    slogan, happy penis, happy life.  Ours is better orgasms,

9    better world.

10             Is that enough?

11   Q    Are you to number 45?

12   A    Oh, honey, you don't want me to go through all of these,

13   do you?

14   Q    I just want to make sure they're from your website.

15   A    Is there something specific you have in mind?

16   Q    If any one looks like it's not from your website.

17   A    And they're such little images.  Are we at the page you

18   were looking for?

19   Q    Yeah.  I believe -- I believe we're through all of them.

20   So, Ms. Dodson, those are all images from dodsonross.com,

21   correct?

22   A    Well, yeah.  It says so.

23   Q    Okay.

24   A    I'm hard pressed to see them given my visual difficulties.

25   These are so little.  I'd have to have a magnifying glass.

1  Q     And Ms. Dodson, as we heard earlier, the Genital Art

2  Gallery contains depictions of genitals only, correct?

3  A     Pardon?

4  Q     The Genital Art Gallery, it contains images only of

5  genitals, correct?

6  A     Yes.

7  Q     So there are no faces shown, correct?

8  A     Nothing.  No.

9  Q     And, in fact, in your essay guidelines for the gallery,

10  you instruct people to take pictures only of their genitals --

11  A     Yes.

12  Q     -- and maybe their hands.

13  A     Well, yes.  A woman has to separate her outer lips so you

14  can see what's inside.

15  Q     But you do not instruct people to show images of -- of

16  their faces.

17  A     No.

18  Q     And Ms. Dodson, your main concern about complying with

19  2257 is how it will affect the Genital Art Gallery, correct?

20  A     Well, yeah, because people aren't submitting anymore.

21  Q     And you've mentioned that you've also produced videos and

22  DVDs with sexually explicit conduct, right?

23  A     Yes.

24  Q     But you no longer produce these videos, right?

25  A     No.  We've done -- we did one.  I'm -- you know, I'm kind

1    of out of that business now.  Everything is going to be online.

2    I'm not going to be doing DVDs.  It's an old technology.  It's

3    finished, gone, over with.

4    Q    So your decision to no longer produce videos and DVDs has

5    nothing to do with 2257, correct?

6    A    It has nothing to do with 22 -- it's just a dead medium.

7    Q    And Ms. Dodson, on your website, there's also a sex shop,

8    correct?

9    A    Yes.

10   Q    And this is where you sell sex toys, books, and videos?

11   A    Uh-huh.

12   Q    And people can pay to purchase these products?

13   A    Yes, they can.

14   Q    And your website also has a section called Ask Betty,

15   correct?

16   A    Yes.

17   Q    And that --

18   A    My favorite.

19   Q    That's where people can write into you with questions.

20   A    Yes.  I do ten to 20 questions a day.  It's my -- I can't

21   help myself.  I just -- these kids are out there lost.  Lost.

22   They don't have any idea where to turn other than porn, which

23   is entertainment for men.  It has very little to do with women.

24   So they -- these young women all want to know am I having an

25   orgasm, how can I tell, what is it like.

1    Q    And so you write responses when people write in with

2    questions.

3    A    Yes, I -- I do.

4    Q    And then you post both the questions and answers to your

5    website.

6    A    Some of them.  Not all of them.

7    Q    And when you write responses for the Ask Betty feature,

8    sometimes you encourage people to go to the sex shop and buy a

9    particular product, right?

10   A    Yeah.

11   Q    And sometimes you provide -- sometimes you provide a

12   direct link to the particular item in the sex shop in your

13   response in the column?

14   A    I don't think -- no.  Not -- I would just say check it

15   out, go to -- go to the, you know, sex store, the shop online.

16   Q    And people have written you -- written you with questions

17   about sex who say they are 17 years old, correct?

18   A    I don't understand.

19   Q    Some of the people who have written to you with a question

20   for the Ask Betty column, they've said that they're -- in their

21   letter, they'll say that they're 17 years old, correct?

22   A    Not always.  Some of them --

23   Q    There have been some who have said they're 17?

24   A    Not that I recall.

25   Q    Okay.

1    A     Eighteen, 20, 30.  People don't mention their names -- age

2    always.

3    Q     And Ms. Dodson, I'd like you to now review the documents

4    in the binder that are behind the tab 45, and again, these are

5    followed by -- each image has a letter tab.

6    A     Oh, these are the Q&A.  All right.  I'm here.  This is too

7    little.  I can't read the type.

8    Q     I just want to make sure that each one is from your

9    website.  So if you can just go to each one.

10   A     I don't think you'd try to trick me.  If you say it's from

11   my website, it is.

12   Q     I just want you to verify it.

13   A     Okay.  That's a very common one.  Yeah.  Yep.  Is this a

14   great website or what?  Oh, come on.  You should be reading

15   this, everybody.  Can I say what you're looking at?  Yeah.

16   Yeah.  Yeah.  That's from the web -- definitely from the

17   website.

18   Q     So, Ms. Dodson, you recognize all those images to be from

19   your website, correct?

20   A     Absolutely.

21   Q     Ms. Dodson, it can be difficult to tell the exact age of a

22   person just by looking at them, correct?

23   A     Say it slower.

24   Q     Sure.  It can be difficult to tell the exact age of

25   someone just by looking at them, right?

Dodson - Cross (Sch)                                    210

1   A      Yeah.

2   Q      And some --

3   A      You would never think I'm 84.

4   Q      Some people look younger than what -- what their real age

5   is, correct?

6   A      And they look older than what their real age is.  Yes.

7   Q      And sometimes people can do things to their body like have

8   cosmetic surgery that might also affect the way that they look,

9   correct?

10  A      Yes.

11  Q      So, for example, one thing a woman might do to her vagina

12  is surgically remove the inner lips, correct?

13  A      Oh, that -- we're against that.  That's ridiculous.

14  Q      And this procedure is called the clam shell look?

15  A      Well, that seems to be the preference.

16  Q      And another thing a woman might do is bleach her anus,

17  right?  Bleach her anus?

18  A      Yes.  That's terrible.

19  Q      A woman might also dye her anus?

20  A      This is mostly done in the porn industry.  This is not

21  done regularly.  Regular women don't do this.

22  Q      A woman might also remove pubic hair, correct?

23  A      Yeah.  They're into that definitely.

24  Q      And they might remove moles.

25  A      Remove --

1    Q    Moles.

2    A    Moles?  Yes.

3    Q    Stretch marks?

4    A    Yes.

5    Q    And the purpose of all these procedures is to make a woman

6    look younger in appearance, correct?

7    A    Evidently.

8    Q    And, Ms. Dodson, you have no special expertise in

9    determining a person's age based on visual observation, right?

10   A    No.  Well, other than years and years of experience.

11             MR. SCHWARTZ:  Okay.  No further questions.

12             THE COURT:  Redirect?

13             MR. MURRAY:  No, Your Honor.  Thank you.

14             THE COURT:  Thank you very much.  You're excused.

15   All right.  We'll take a ten-minute recess.

16             THE WITNESS:  Is that it?

17             THE COURT:  I'd like to go to quarter of 5:00 if

18   possible.  Thank you.  All right.

19             MR. MURRAY:  We're actually moving very, very

20   quickly, Your Honor.  We may -- we could run out of witnesses.

21   We're going to finish much sooner than we anticipate.

22             THE COURT:  I'm not --

23             MR. MURRAY:  I hope that makes you happy.

24             THE COURT:  I'm not -- well, I want to give everybody

25   time to present their case.  Well, do you have another witness?

1         MR. MURRAY:  Yes.  Yes.

2         THE COURT:  All right.  How many more do you have for

3    this afternoon?

4         MR. MURRAY:  I have two that I can call still today.

5         THE COURT:  All right.  Well, okay.  Let's see where

6    we are.  Do you have any depositions to read or -- where do we

7    stand on that issue?

8         MR. MURRAY:  Only on the -- we have -- we have asked

9    the Government to identify whether it will adhere to its

10   objections in the Agent Joyner (phonetic) deposition or not,

11   and we're waiting to -- to hear back from them.

12        THE COURT:  Okay.  All right.  But you intend to

13   introduce the whole deposition --

14        MR. MURRAY:  I do, Your Honor.

15        THE COURT:  -- subject to any objection.

16        MR. MURRAY:  Yes.

17        MS. WYER:  Wait.

18        THE COURT:  All right.  I'm not --

19        MS. WYER:  I didn't hear what was going on, Your

20   Honor.

21        THE COURT:  I asked where we stand on the deposition

22   that the plaintiffs want to introduce of Agent Joyner, and Mr.

23   Murray said he was waiting to hear back about your objections,

24   but I'm happy for you -- I'm glad you are having a discussion

25   about it, but I'm -- you know, part of my job is ruling on

1   objections.  So if you can't agree, we can move it into

2   evidence, and we can go over the objections one by one, and

3   I'll rule as we go along.  I don't see a need to read the

4   entire deposition into the record.  We'll just introduce it.

5           MR. MURRAY:  No, Your Honor.  I was just going to

6   submit it, and you can read it at your -- at your convenience.

7           THE COURT:  Well, but subject to any --

8           MR. MURRAY:  Yes.

9           THE COURT:  I want to have a ruling on objections.

10  Yes.  Yes.  Ms. Wyer?

11          MS. WYER:  Your Honor, I have some additional

12  authorities regarding introducing an entire deposition

13  designation when a witness is going to be present at the trial.

14          THE COURT:  All right.  Can you give me -- can you

15  write the citations down on a piece of paper and give them to

16  me?

17          MS. WYER:  Yes.

18          THE COURT:  All right.  Well, when I come back, why

19  don't you do that.  Okay?  And we'll consider that.

20          All right.  Well, are you -- when -- well, since

21  you're saying you're moving along, do you have any estimate now

22  of when -- as to when you would rest?

23          MR. MURRAY:  Yes, Your Honor.  We think we can finish

24  with all but one witness who we've -- who's scheduled for

25  Friday.  We think we should finish tomorrow some time.

Colloquy                                            214

 1              THE COURT:  All right.  Well, then I'd like the
 2    Government to be prepared to start your testimony on Thursday.
 3              MS. WYER:  Your Honor, we -- we have scheduled all --
 4    the travel of our witnesses, and we were not planning to have
 5    them ready until the first one appearing on Friday.
 6              THE COURT:  All right.  Here's --
 7              MS. WYER:  It's very difficult.  There are people
 8    coming from California, from Houston.  It's very difficult to
 9    find hotel reservations here in Philadelphia, Your Honor.
10              THE COURT:  Well, I can understand that.  I don't
11    want to make it difficult for anybody.  Do you have any
12    witnesses coming from Washington?  They could certainly come up
13    tomorrow so they could testify on Thursday.
14              MS. WYER:  We don't, Your Honor.  Everyone is coming
15    from -- there are some on the east coast, but I --
16              THE COURT:  Well, look, I don't want -- what I'd like
17    you to do is think about your team.  Mr. Murray says they're
18    going to rest tomorrow.  Now, you have a couple experts to
19    testify as --
20              MR. MURRAY:  Yes.
21              THE COURT:  One of them is on Friday, correct?
22              MR. MURRAY:  No.  I -- we have one more plaintiff who
23    we had scheduled for Friday morning who's coming in Thursday
24    night.
25              THE COURT:  Okay.

1          MR. MURRAY:  And we were going to do one of their

2    experts on Friday out of order.

3          THE COURT:  Right.

4          MR. MURRAY:  We -- and then next week, we were going

5    to do two of my experts while they -- at the same -- during

6    their case.

7          MS. WYER:  Your Honor, I mean, as -- as I think

8    plaintiff's counsel is indicating, they are actually not

9    resting tomorrow, because they have three other witnesses that

10   they're planning to put later --

11         THE COURT:  Right.

12         MS. WYER:  -- for their own convenience.

13         THE COURT:  You're absolutely right about that.  I'm

14   just trying to keep things moving.  What I'd like your team to

15   do in view of what Mr. Murray just said about moving very

16   quickly is to see if -- I don't want to lose a whole day this

17   week that we could have testimony.  So I would really like to

18   see if you could possibly call some of your witnesses and tell

19   them the Judge would like them to be here Thursday.  I don't

20   want anybody to have a heart attack or to lose their job or to

21   lose their marriage, but if some people who are scheduled to

22   come next week could come on Thursday, I think that would be a

23   very good idea, and I would appreciate it.

24         So just make -- just discuss it and think about it.

25   I would appreciate it.

1          I'm aware you're both going to be taking witnesses

2     out of order.   That's not unusual.   In a jury trial -- in a

3     nonjury trial, it happens all the time.   So that's never a

4     problem.

5          Let me just say Thursday, however, we're going to

6     start a little bit late, because I have proceedings in another

7     case that will take from 9:00 to 10:00.   So -- from 9:30 to

8     10:00 or possibly 10:15.   So we'll have a little late start on

9     Thursday.

10         On Friday, I have a personal commitment that I'm

11    going to have to be out from like 11:45 until at least 2:00,

12    maybe 2:15 or 2:30.   So unfortunately, it's going to be two

13    hours out in the middle of the day, but I'll still have all the

14    morning and the rest of the afternoon.

15         I don't know -- as you may recall, when we changed

16    the schedule, I told you I was going to start a jury trial on

17    Monday that I thought would only take two days.   That case may

18    take two and a half to three days.   So we may lose next

19    Wednesday as a trial day or part of it.   I don't know yet.   I'm

20    not sure I'll know for sure until it happens.   It's a very

21    contentious jury trial.   On the other hand, it could settle and

22    go away, but I -- at the moment, it's still on.

23         So those are some of the reasons why I would like to

24    fill Thursday with some trial testimony.   Okay?   So just see

25    what you can do, and we'll talk about it when we're done with

Alper - Direct (Mur)                    217

1    the other witnesses.  So I'll be back in ten minutes, and then

2    we'll go until quarter of 5:00 or until your two witnesses are

3    done.

4               All right.  Thank you.

5               MR. MURRAY:  Thank you.

6          (Recess taken, 3:14 p.m. to 3:30 p.m.)

7               THE COURT:  Okay.  Next witness, please.

8               MR. MURRAY:  Yes, Your Honor.  At this time, the

9    plaintiffs would call the plaintiff, Barbara Alper.

10              THE CLERK:  Raise your right hand.

11              BARBARA ALPER, PLAINTIFF'S WITNESS, SWORN

12              THE CLERK:  Please be seated.  Please state your full

13   name and spell your last name for the record.

14              THE WITNESS:  Barbara Alper.  Last name, A-L-P-E-R.

15                       DIRECT EXAMINATION

16   BY MR. MURRAY:

17   Q    Ms. Alper, tell the Court what your profession is.

18   A    I'm a professional photo journalist.  I work for different

19   publications.  I've worked for the New York Times for ten

20   years.  I worked for American Lawyer Magazine for ten years,

21   Los Angeles Times.  I work with Newsday, for example.

22   Q    Please hold the microphone close to you.

23   A    Okay.  Is this better?

24   Q    Yes.  That's fine.  And what is your -- where do you work

25   out of?  Your home or do you have an office?

1    A    I work out of my home office.

2    Q    And what is your educational background?

3    A    I have a Bachelors degree in social work from Michigan

4    State University, and I studied photography at MIT in Boston.

5    Q    And what years were you studying photography at MIT?

6    A    1975, '76.

7    Q    Okay.  And what year did you graduate from Michigan State?

8    A    1971.

9    Q    Okay.  And how old are you?

10   A    Sixty-three.

11   Q    Okay.  And for how many years have you been a

12   photographer?

13   A    Over 30.  Actually, closer to 35 years.

14   Q    Okay.  And could you tell the Court what kind of work

15   you've done?  I know you've just described some of the

16   employers you've had, but tell the Court what kind of work

17   you've done over the years in your field.

18   A    My work is pretty varied.  My assignment work can range

19   anything from doing portraits, lawyer portraits, people.  I

20   photograph food.  I photograph gardens, fashion, and I also

21   have my own personal fine art projects.  I do underwater

22   photography where I photograph people swimming with dolphins.

23   I did a series on the Gulf War in 1991, and I photographed -- I

24   photograph currently orchids, and I also photograph lifestyles

25   and sexual subcultures.

1    Q    Okay. and could you tell the Court some of the places

2    where your work has been exhibited?

3    A    I've exhibited nationally and internationally.  I've

4    exhibited at the New York Public Library.  I've exhibited in

5    Finland, at the museum in Finland, at the -- I'm drawing a

6    blank -- at Finot galleries in France, Belgium, and Germany,

7    and at a major exhibition in Belgium, at Lehigh University, the

8    International Center of Photography in New York and -- and

9    galleries as well in New York, California.  I also exhibited in

10   Sidney, Australia at the Australian Center of Photography, for

11   example.  There's a longer list.

12              THE COURT:  One second.  One second.

13              THE WITNESS:  Is it possible to get some water?

14   Empty.

15              MR. MURRAY:  Yes.

16              THE COURT:  Sarah, would you mind getting --

17              MR. MURRAY:  No.  I've got it, Judge.

18              THE COURT:  Oh, are you?  Thank you.

19              MR. MURRAY:  I can -- I can do it.

20              THE WITNESS:  Oh, great.  That's good.

21         (Pause)

22              THE COURT:  Go ahead.  Sorry.

23   BY MR. MURRAY:

24   Q    And, Ms. Alper, in addition to having exhibitions, do any

25   institutions have collections of your work?

1    A    My work is -- I think I left off the Victorian Albert

2    Museum in London also exhibited, and I'm in their collection.

3    I'm in the collection at the New York Public Library, the

4    Bibliothèque nationale in Paris, International Center of

5    Photography in New York.  What am I leaving out?  I know I've

6    got --

7    Q    Those are examples?

8    A    There is -- yeah.  There is a longer list.

9    Q    Have you published any books or catalogs?

10   A    I have -- I'm in a book called public -- catalog book

11   called Desire that accompanied a show in Finland.  I'm in a

12   book called Sex in New York City.  I'm in David Steinberg's

13   book, Photo Sex, and I've published in Japan, recently in a

14   Chinese art magazine.

15   Q    Okay.  And tell the Court about your involvement with

16   sexually explicit images.  What is that work?

17   A    I photographed -- I'm -- as I said, I'm a photo journalist

18   and documentary photographer, and I photographed in clubs in

19   New York, in California, at the Safer Planet Sex Ball in

20   London, and in clubs and bars in Bangkok, Thailand.

21   Q    Okay.  And are some of those images of nudity and sexually

22   explicit?

23   A    Yes.

24   Q    And have any of that -- has any of that body of work been

25   collected by anyone?

1    A    Yes.   The New York Public Library purchased 20 images from

2    that work, and the Bibliothèque nationale in Paris also has

3    purchased the work, and -- where else?

4    Q    Okay.  Those are examples?

5    A    Yeah.

6    Q    Now, in addition to -- to -- so explain what you mean by

7    taking images at club scenes.  Let's talk about that in a

8    little bit more detail.

9    A    There -- in the early '80s when I started this work, there

10   would be parties as S&M clubs, and then there would be parties

11   also at other -- there was a party at a disco called Danceteria

12   where they took over the top floor of -- of the club and had

13   parties, and I was invited to photograph --

14   Q    Okay.

15   A    -- at them.

16   Q    And did you do so?

17   A    I did.

18   Q    And I want to show you what has been marked as Plaintiff's

19   Exhibit 43, and ask you if you can identify the photograph on

20   the first page of that document.

21   A    Yes.

22   Q    And tell the Court when that was taken and where.

23   A    That was taken in 1981 at the Hellfire Club in New York.

24   Q    And is that part of the body of work that you were talking

25   about?

Alper - Direct (Mur)                    222

1    A    Yes.

2    Q    And what about the second page of Plaintiff's Exhibit 43?

3    Is that another image of yours?

4    A    Yes, it is.

5    Q    And would you explain that one?

6    A    That was taken also at the Hellfire Club in New York.

7    Q    And what was the purpose of your photographing these type

8    of images?

9    A    I'm interested in sexual behavior, and I believe that

10   people have the right to be and do what they feel they are

11   comfortable with or what their drives are as long as they're

12   consenting adults and they're --

13   Q    And was the purpose of this photograph informative,

14   educational, artistic?  Among those categories, how would you

15   describe it?

16   A    It -- I consider it part of my artistic body of work.  It

17   is documentary.  My work has always sort of crossed over into

18   different lines.  So it's artistic, and it's documentary.

19   Q    And then this next photograph, tell the Court about that.

20   A    This was taken in Bangkok in a club.

21   Q    And the next one?

22   A    This was in New York at the Hellfire Club.

23   Q    And the next one.

24   A    This was at Danceteria.

25   Q    And the next one.

1  A    That was taken in New York at a club called Lucky Cheng's,

2  and I was actually on assignment for a French magazine at the

3  time.

4  Q    Now, were these depictions of people who you asked to pose

5  or were they just depictions of what you saw happen?

6  A    No.  No.  This is all work of what I see happening.  I

7  don't pose people.

8  Q    And what -- what about this next photo?

9  A    This was taken at a party at the Safer Planet Sex Ball in

10  London.

11  Q    And what about this next one?

12  A    At the Hellfire Club in New York.

13  Q    And what about this one?

14  A    I think that was taken at Danceteria.  I'm not positive.

15  Q    And this one?

16  A    Hellfire Club.

17  Q    Now, when you were visiting these clubs and taking these

18  pictures, did you go around collecting or checking IDs?

19  A    No, I didn't, but I will say that at the -- when I was on

20  assignment for the French magazine at Lucky Cheng's, I had to

21  ask people's permission to photograph them while they were

22  doing what they were doing, but I was -- all these clubs are

23  adult only, and IDs are checked at the door in order to get

24  into the club to begin with.

25  Q    And so did you seek permission or releases from the people

Alper - Direct (Mur)                               224

1    that you depicted in these documentary photographs?

2    A    The only time I asked permission was at Lucky Cheng's.

3    Otherwise, I was allowed and invited to photograph.  So I

4    didn't need to ask permission.

5    Q    Do you have any interest, by the way, in filming any minor

6    engaged in sexually explicit activity?

7    A    I have absolutely no interest in minors, and I'm totally

8    opposed to it.

9    Q    Okay.  Was there any doubt in your mind when you took

10   these photographs that the people that you were depicting were

11   adults?

12   A    No.  I had no doubt.

13   Q    Now, in addition to this type of work, have you also

14   photographed or been asked to photograph couples?

15   A    Yes.  I also photograph couples making love as well as

16   individuals.

17   Q    Okay.  And --

18   A    Excuse me.

19   Q    -- when did you do that work, that type of work?

20   A    I've done that throughout interspersed with my other work

21   over the years.

22   Q    Okay.  And are you familiar with the requirements of 2257?

23   A    I am.

24   Q    And are you familiar with the requirements of obtaining

25   photo identification if you're going to create an image of a

1    sexually explicit nature?

2    A    Yes, I am.

3    Q    And how has that affected your work with respect to

4    photographing couples?

5    A    It has seriously affected the work, because nobody wants

6    to give up their anonymity by having to have their ID

7    photographed and made available -- excuse me -- made available

8    to the -- for Government inspection.

9    Q    Now, are you married?

10   A    I am married.

11   Q    And how long have you been married?

12   A    I've been married since September.

13   Q    Okay.  And have you yourself taken any photographs of you

14   and your husband of a sexually explicit nature?

15   A    Yes.  I have photographed my husband and myself in

16   sexually explicit behavior.

17   Q    And was that for your own private enjoyment and --

18   A    Well, that's for -- that's -- I consider that also part of

19   my body of work.  So yes.  I would -- I've had it -- I've had

20   it published, and I would -- it's part of my body of work.  It

21   also stems from part -- besides enjoying doing it, it's to fill

22   in where I have difficulty getting couples to allow me to

23   photograph them because of the restrictions of 2257.

24   Q    And showing you then the remaining photographs in

25   Plaintiff's Exhibit 43.  Would you identify that photograph?

1    A     Yes.  That's my husband and myself.

2    Q     And the next page?

3    A     As well.

4    Q     And the next page.

5    A     That's also.

6    Q     And are there others in the photo shoot that you took that

7    were not included in this?

8    A     There are others in that shoot as well as other -- other

9    shoots that I've done.

10   Q     Of you and your husband?

11   A     Yes.

12   Q     And have you done any of your husband alone?

13   A     Yes.

14   Q     And what kind of shoots have those been?

15   A     Masturbation.

16   Q     Okay.

17   A     Nude.

18   Q     Now, when you did those, did you need to check your photo

19   ID to figure out how old you and your husband were?

20   A     I did not.

21   Q     Now, is there another body of work that you would like to

22   do in New York City but have not been able to accomplish?

23   A     Yes.

24   Q     And would you tell the Court what that -- and would this

25   be in your capacity as a photo journalist, a documentary

Alper - Direct (Mur)                           227

1    journalist, or an artistic photographer?

2    A    All of the above.

3    Q    Tell the Court what project you would like to do.

4    A    There is a community of adult gay men who have anonymous

5    sex in public, out in -- outdoors, and because it's anonymous

6    sex, obviously, I can't be asking them for their IDs to be made

7    available to prove their age to the Government.

8    Q    And where is this?

9    A    This is -- there are different areas in New York.  There's

10   one on Fire Island.

11   Q    Okay.  And -- and can you describe for the Court how this

12   -- how this came about that there is this area where that

13   activity occurs?

14   A    There's -- one -- I've been going out to this area for 20

15   years, and there's an area between two communities.  It's a --

16   the one community is primarily -- it's known as a gay -- the

17   gay area of Fire Island, and there is the dunes and there's the

18   woods, and people go out to meet other men and fool around.

19   Q    And why do you want to photograph this as a photographer

20   and as a journalist?

21   A    Because it's an area of sexual behavior that I find

22   interesting, and I think I want to document it.

23   Q    And how does 2257 stand in the way of your documenting

24   this phenomenon?

25   A    Well, they're having anonymous sex, and it makes it

1    impossible for me to go up and ask them for photo IDs to keep

2    on record and make available to the Government if the

3    Government decided to come and inspect my records.

4    Q    Now, is there any other body of work that you feel is

5    constrained by 2257?  Any other body of work that you would

6    like to pursue?

7    A    Additional photographing of couples.

8    Q    Okay.

9    A    That's the other.

10   Q    All right.  And is there a compilation --

11   A    As well as -- as well as nudes and -- nudes.

12   Q    Now, if you were to compile a book of the photographs that

13   you took in the '80s and early '90s, would you be able to get

14   photo IDs for the people depicted in them?

15   A    That would be impossible --

16   Q    Okay.

17   A    -- to have to go back, one, to -- we're talking about

18   going back 30 years and/or going to London, San Francisco, or

19   Bangkok to try to find people, and even if I could find anyone,

20   I doubt that anyone would be willing to give their ID to,

21   again, you know, reveal who they are and give up their

22   anonymity.  It's not --

23   Q    And --

24   A    My work isn't about the individual people and trying to

25   identify individual people.  It's about behavior.

1    Q    And what is it about 2257 that you think implicates the

2    problem of collecting those IDs?  What project would you pursue

3    that might be constrained by your inability to collect those

4    IDs?

5    A    Well, I'm not quite sure of the question.  I want to

6    publish a book of the -- my complete body of work, and so

7    combining work from pre-1995 with post-1995, my understanding

8    of the law means that I would have to go back and get IDs for

9    all the people pre-1995 in order to publish a complete

10   compilation of my work.

11           MR. MURRAY:  Okay.  Thank you.  That's all I have,

12   Your Honor, other than to offer into evidence Plaintiff's

13   Exhibit 43.

14           THE COURT:  All right.  Let me just ask a question

15   and make sure I understand your testimony before the cross.

16   BY THE COURT:

17   Q    You're interested it seem -- if I understand your

18   testimony, and at least part of your artistic work is being in

19   places where you can observe people in sexually explicit

20   conduct, is that correct?

21   A    Yes.

22   Q    They may be having intercourse or performing other kinds

23   of sexual acts with either members of the same sex or members

24   of the opposite sex, is that correct?

25   A    Yes.

1    Q    All right.  And in this sense, that would be something

2    that you would probably not see in an everyday situation out on

3    the street or in the public -- in obviously public places.  Is

4    that generally correct?

5    A    Yes.

6    Q    So you have to go to places where people are likely to be

7    performing those kind -- that kind of conduct such as these

8    clubs that you mentioned in New York City or in Bangkok or on

9    Fire Island, is that correct?

10   A    Yes.

11   Q    All right.  Now, you also said that you have no interest

12   in photographing minors, correct?

13   A    Yes.

14   Q    All right.  And is that because that's what the law is, or

15   personally, you don't view that as something that you don't

16   want to do or both or something else?

17   A    I just -- I'm against it.  I don't think it's right.  It's

18   not only the law, but it's something that I don't feel right

19   about.

20   Q    Okay.  All right.  Now, so when you go to these clubs or

21   other locations where people are engaged in this kind of

22   sexually explicit conduct, you don't -- as you testified, you

23   don't have any way to check their age, correct?

24   A    Correct.

25   Q    All right.

1    A    The --

2    Q    Now, but have you had situations where they could be under

3    18, just visually, it's -- it could be -- they're young

4    looking?  I mean, did you ever have a situation where you

5    wanted to photograph somebody but there was a question in your

6    mind as to whether the -- one or more of the individuals was

7    under 18?

8    A    No.

9    Q    Why -- why -- how can you say that so definitively?

10   A    One, because I'm photographing in clubs where IDs are

11   taken at the door, and you have to be over 18 in -- or maybe

12   even 21 because there's drinking to even be allowed into the

13   club.  So they weren't allowing any minors in.  So I would have

14   no reason to suspect that anybody was a minor.

15   Q    Okay.  Now, how about on Fire Island where you're out in

16   the open?

17   A    This is an adult community.  There aren't teenagers

18   walking around there.

19   Q    Well, teenager is a loose term, because an 18 or 19-year-

20   old is a teenager --

21   A    Correct.

22   Q    -- by definition.  I'm talking about under 18.

23   A    Right.

24   Q    So how -- I mean, how can you be so sure that none of the

25   people you want to photograph are under 18?

Alper - Cross (Swi)                    232

1   A    As I said, this is an adult community.  There aren't

2   teenage -- there aren't younger -- the people that I know out

3   there are older.  They're adults.  I don't know any under 21

4   who are there, period.

5            THE COURT:  All right.  All right.  Cross-examine.

6                      CROSS-EXAMINATION

7   BY MR. SWINTON:

8   Q    Good afternoon, Ms. Alper.

9   A    Good afternoon.

10  Q    Wanted to follow up on the Court's questioning and ask you

11  a few questions about the Fire Island images you talked about

12  before, the images you'd like to take on Fire Island.  This

13  place that you described as being a location where anonymous

14  sex is taking place, there isn't a fence around it, correct?

15  A    Correct.

16  Q    And it isn't like the S&M clubs that you were discussing

17  earlier, right?  Like there's not a bouncer.

18  A    Correct.  I mean, you have to take a ferry to get to the

19  island.

20  Q    But there's not someone at some sort of entrance --

21  A    No.

22  Q    -- checking IDs.

23  A    No.

24  Q    And your belief is that the only reason people are having

25  anonymous sex won't allow you to take their picture is because

1  they don't want to give you valid photo identification?

2  A    Can you --

3  Q    Is it your belief that the only reason people who are at

4  this location having anonymous sex wouldn't want you to take

5  their picture is because they don't want to provide you with

6  valid photo identification?

7  A    Yes, and because they want to remain anonymous.

8  Q    And you've actually never asked anybody having anonymous

9  sex on Fire Island if you could take their picture, correct?

10 A    I know enough people there who participate in the

11 anonymous sex to know that this would absolutely be forbidden.

12 Q    So the answer to my question is no?

13 A    And your question was?

14 Q    You never actually asked anybody having anonymous sex if

15 you could take their picture?

16 A    I have talked to people who have participated in anonymous

17 sex and know that they will not allow me -- they won't show

18 their ID to have it photographed by me.

19 Q    And, Ms. Alper, you also testified that you took pictures

20 of sexually explicit conduct at certain clubs in the 1980s and

21 '90s, correct?

22 A    Yes.

23 Q    And these clubs are for people 21 years and older?

24 A    Yes.

25 Q    And access to the club was restricted by people at the

Alper - Cross (Swi)                    234

1   door checking IDs, right?

2   A     Yes.

3   Q     And because the club employees were checking IDs at the

4   door, you assume that the age limits are being enforced, right?

5   A     Correct.

6   Q     So you yourself never checked IDs.

7   A     That's correct.

8   Q     And when you were taking pictures of people at S&M clubs,

9   did you ever photograph anyone under the age of 25?

10  A     I don't know.

11  Q     And, in fact, you don't know whether anybody was under the

12  age of 25, because you weren't checking IDs, right?

13  A     Yes.

14  Q     And, Ms. Alper, you stopped taking pictures at S&M clubs

15  in 1995 because the club shut down, right?

16  A     That's not accurate.  The clubs were actually shut down

17  much earlier than that.  They were shut down in the early '80s.

18  Q     Okay.  And that's when you stopped taking pictures at the

19  clubs because they were shut down?

20  A     Yes.

21  Q     And they shut down because of the AIDS crisis, correct?

22  A     I think that's probably a fair assumption.

23  Q     Now --

24  A     That was the early to the mid-'80s somewhere.  I'm not

25  exact -- not exactly when the clubs were closed.

1    Q    Okay.  And some of the images you took at S&M clubs were

2    exhibited at art galleries, right?

3    A    Yes.

4    Q    And they were for sale at the art galleries?

5    A    Yes.

6    Q    And Ms. Alper, since 1995, the only sexually explicit

7    images you've taken are ones of you and your husband, correct?

8    A    No.

9    Q    There are other images you've taken since 1995?

10   A    Yes.

11   Q    Sexually explicit images?

12   A    Yes.

13   Q    The images of you and your husband were taken in your

14   home, correct?

15   A    Not only in my home.  No.

16   Q    And you took images of you and your husband on about ten

17   different occasions?

18   A    I can't be specific as to how many times.

19   Q    Was it approximately ten?

20   A    Honestly, I can't say.

21   Q    And these images were mostly taken about the last five

22   years or so, right?

23   A    Pretty much.  Yeah.

24   Q    And some of the images of you and your husband were

25   published in a Norwegian magazine, correct?

Alper - Cross (Swi)                                 236

1   A     Yes.

2   Q     And the name of that magazine is Cupido?

3   A     Cupido.

4   Q     Cupido.  And, Ms. Alper, you recall that your attorney

5   sent the Government information about your gross revenues from

6   the publication of sexually explicit images in Cupido, is that

7   correct?

8   A     I -- I believe so.  I don't know.

9   Q     Do you recall that you sold images to Cupido in 2010 for

10  $360?

11  A     I can't be sure of the exact amount, but if that's what it

12  says, yes.

13  Q     And those images that were sold in 2010 were images of you

14  and your husband, right?

15  A     Yes.

16  Q     Ms. Alper, it's fair to say that it's difficult to tell

17  the age of a person just by looking at them, right?

18  A     Yes.

19  Q     And this is because people age differently?

20  A     Sure.

21  Q     Ms. Alper, I'd like to show you a photo that we looked --

22  that you looked at previously with plaintiff's counsel.

23           MR. SCHWARTZ:  If we could pull up Plaintiff's

24  Exhibit 43, and go to the third page of this exhibit.  There we

25  go.

Alper - Cross (Swi)                               237

1    BY MR. SCHWARTZ:

2    Q    So, Ms. Alper, you recognize this to be a picture you took

3    at an S&M club, correct?

4    A     No.

5    Q    You recognize this to be a picture you took at a club in

6    Bangkok?

7    A    Correct.  It was actually a bar.

8    Q    And you don't know the exact age of the woman depicted in

9    the photograph who's kind of kneeling down, correct?

10   A    Correct.

11   Q    And part of the reason that it's difficult to tell the

12   exact age of the woman is because you weren't checking IDs at

13   this club, right?

14   A    Right.

15   Q    And another reason is -- it's difficult to tell the exact

16   age of this woman is because her face is partially obscured,

17   correct?

18   A    Yes.

19        MR. SCHWARTZ:  And if we could go to the next page in

20   this exhibit.

21   BY MR. SCHWARTZ:

22   Q    And, Ms. Alper, this is another image of sexually explicit

23   conduct that you've taken, correct?

24   A    Yes.

25   Q    And do you know the exact age of the woman depicted who

1    appears to be spanking the man?

2    A     No.

3    Q     And part of the reason that it was difficult to tell the

4    age of this woman is because you weren't checking IDs, right?

5    A     Yes, but again, this was taken at the Hellfire Club where

6    you had to be over age in order to get in, plus based on the

7    body shapes of these people, they're older.

8    Q     And, Ms. Alper, you don't have any special training in

9    determining a person's age based on visual appearance alone,

10   correct?

11   A     Correct.

12   Q     Now, Ms. Halper, you mentioned that you'd like to produce

13   a book containing a compilation of photographs that you've

14   taken?

15   A     Yes.

16   Q     And some of the pictures you'd like to include in that

17   book are sexually explicit images that you've previously taken.

18   A     Correct.

19   Q     And a lot of these are -- or these are the sexually

20   explicit images that you took before the 2257 recordkeeping

21   requirements took effect in 1995.

22   A     Yes.

23   Q     So you believe that 2257 prevents you from including the

24   pre-1995 sexually explicit images in any compilation.

25   A     Correct.

1    Q    And this is because you don't have photo IDs for the

2    performers.

3    A    I don't have photo IDs for people I've photographed after

4    1995, and if I combine them with images taken after 1995, I

5    would need to have IDs for all those people photographed before

6    1995.

7    Q    And you haven't contacted a publisher about putting

8    together a compilation, correct?

9    A    I have -- I have shown the work to people who are

10   connected with publishers who are starting to help me edit the

11   work to present to -- for publication.

12   Q    But you never contacted a publisher specifically.

13   A    I think, actually, I did contact one a while back.

14   Q    Do you recall the date?

15   A    Not exactly.  No.

16   Q    Was it in two --

17   A    Within the last couple years.

18   Q    Okay.  So you -- you're testifying today that you have

19   contacted a publisher about producing a compilation of your

20   photographs, is that correct?

21   A    Yes.

22   Q    Okay.  Ms. Alper, do you remember being deposed in this

23   case?

24   A    Yes.

25   Q    And you were deposed by my colleague, Ms. Wyer, isn't that

Alper - Cross (Swi)                                240

1   right?

2   A    Yes.

3   Q    And this was in March 2013?

4   A    Yes.

5   Q    And Ms. Baumgardner was also present, correct?

6   A    Yes.

7   Q    And before you answered questions at your deposition, you

8   were sworn by the court reporter to tell the truth, weren't

9   you?

10  A    Yes.

11  Q    And you did tell the truth.

12  A    Yes.

13  Q    And that's the same oath that you took today.

14  A    Yes.

15  Q    So, Ms. Alper, I'm going to read from a page of your

16  deposition.  This is page 46.  I'd like you to follow along and

17  make sure that I'm reading correctly, please.  Page 46, line 5,

18  the question is --

19  Q    "Have you contacted any publisher about a specific project

20  that would involve a compilation such as you have described?"

21       The answer --

22  A    "Not yet."

23  A    Not yet.  Right.

24  Q    Now, Ms. Alper, you've also mentioned that you'd like to

25  photograph sexually explicit images of other couples, correct?

1   A    Yes.

2   Q    And you say that they are not willing to give you their

3   photo IDs in order to be photographed.

4   A    Yes.

5   Q    But, in fact, the number of people have said -- said this

6   to you is less than ten, correct?

7   A    I can't be exact.

8   Q    And you've never had a publisher tell you that they won't

9   publish depictions of couples having sex because of 2257,

10  correct?

11  A    That's correct.  That's not been discussed.

12            MR. SCHWARTZ:  No further questions, Your Honor.

13            THE COURT:  Okay.  Redirect?

14                    REDIRECT EXAMINATION

15  BY MR. MURRAY:

16  Q    Ms. Alper, I think you were about to say something about

17  the answer you gave in the deposition about not yet contacting

18  the publisher.

19  A    Right.  I had -- at the time of the deposition, I'd

20  forgotten that through a friend of mine who is a friend of --

21  of someone who works with a publishing company had suggested I

22  contact her, and so through an e-mail exchange.  That was the

23  -- pretty much the extent of the contact.  I hadn't shown her

24  -- them any complete body of work.  So that's --

25  Q    Did you remember that at the time of your deposition?

Alper - Redirect (Mur)                    242

1    A     No.

2    Q     Okay.  Now, you were asked questions about whether or not

3    you can tell the exact age of a person by looking at the, and

4    you said no, you can't, correct?

5    A     Yes.

6    Q     Okay.  Do you believe, however, that generally speaking,

7    by looking at people, you can generally tell whether they're

8    over the age of majority, over 18?

9    A     Yes.

10   Q     Is there -- if you look around, at least the front part of

11   this courtroom, is there anybody here that you would be -- find

12   confusing as to whether they're an adult or a minor?

13   A     No.

14   Q     But could you -- could you guess the exact ages of anybody

15   in the front part of this courtroom?

16   A     I -- I could start guessing.  I don't want to embarrass

17   anyone.

18   Q     But you couldn't tell their exact age.

19   A     No.

20   Q     But you could tell that they're obviously not under 18?

21   A     Correct.

22            MR. MURRAY:  That's all I have.  Thank you, Your

23   Honor.

24            THE COURT:  Well, two questions.  Well, two topics.

25   BY THE COURT:

1   Q    With regard to the photographs of you and your husband

2   that you referred to as sexually explicit, you -- some of those

3   were taken before you were married last September, is that

4   correct?

5   A    Yes.

6   Q    Okay.  Did you intend to publish some of them when you

7   took them?

8   A    I take pictures without thinking of that intent.   I

9   photograph because I'm interested in photographing.

10  Q    Well, did you -- you're -- you're aware of 2257 because of

11  your work, is that correct?

12  A    Yes.

13  Q    All right.  When you actually took the pictures of your

14  husband and -- they were -- they're all digital?

15  A    Yes.

16  Q    All right.  Did you at that time make any effort to comply

17  with 2257?

18  A    Pictures of my husband and myself?

19  Q    Yeah.

20  A    Even though before I -- we were -- we were living --

21  Q    Whether before you were married or after you were married.

22  A    We were living to -- no.

23  Q    All right.  Now, but then you -- I thought you said on

24  direct that you have -- since taking the pictures, you have

25  published some of them of you and your husband.

Alper - The Court                                244

1    A      Yes.

2    Q      All right.

3    A      In a foreign publication.

4    Q      In a what?

5    A      Foreign publication.

6    Q      Okay.  So there was no need to comply with 2257.

7    A      Correct.

8    Q      All right.  But you haven't sought to have them published

9    in the United States.

10   A      Not yet.

11   Q      All right.  If you were to do that, would you comply with

12   2257 or not or --

13   A      It --

14   Q      -- if you know?

15   A      It makes me uncomfortable, because not only am I

16   publishing pictures of my husband and myself, but I'm also

17   having to give out our address, because the address of where

18   the records are being stored is my home, our home.

19   Q      Okay.

20   A      So that's extremely uncomfortable.

21   Q      All right.  But do -- well, let me ask you this question.

22   Do -- even though it makes you uncomfortable, would you do it,

23   or have you thought about whether you would do it or has that

24   been a reason why you haven't published them in the United

25   States?

1    A    That's not the reason I haven't published them in the
2    United States, and I guess that's something I'm going to have
3    to confront at the time that they are published.
4    Q    Okay.  So you haven't formed any opinion or course of
5    action about that yet.
6    A    No, I haven't.
7    Q    All right.  Now, you said earlier in response to one of my
8    questions that you were opposed to photographing -- doing your
9    work as you've described it here today of people who are under
10   18, correct, and you thought it was not right?  As well as
11   being illegal, you thought it was improper, right?
12   A    Correct.
13   Q    Now, are you -- would you agree that there are some people
14   under 18 and perhaps who are very well sexually developed,
15   whether male or female, who want to do this kind of work,
16   appear in sexually explicit photographs or movies, because --
17   if only because of the economic advantage, that they get paid
18   -- they could get paid probably more doing that than doing
19   something else?
20   A    I'm not aware of any --
21   Q    You're not aware of that --
22            MR. MURRAY:   Your Honor --
23   A    I -- one, I'm not --
24            THE COURT:   What?
25            MR. MURRAY:   I know you said we could object --

Alper - The Court                    246

1              THE COURT:  Yes.

2              MR. MURRAY:  -- even to your questions, but I do

3      think -- well, that's all right.

4              THE COURT:  If you want to object, say objection.

5      I'll rephrase the question.

6              MR. MURRAY:  Well, I'm interested in her answer too

7      now.

8              THE COURT:  Well, I don't know.

9      BY THE COURT:

10     Q    Do you want me to rephrase the question?  Do you

11     understand the question?

12     A    One, I don't work with professional actors.  So when you

13     talk about people who want to do sexually explicit image -- who

14     want to be photographed sexually explicitly because it's

15     monetarily lucrative, those are not people that I'm interested

16     in photographing anyway --

17     Q    Okay.

18     A    -- whether of --

19     Q    All right.  So you're -- okay.

20     A    So I wouldn't come across that.

21     Q    All right.

22     A    There could very well be people who are interested in

23     doing that who are under age.  I'm not interested in

24     photographing them.

25     Q    All right.  Do you think there is a social value in the

Alper - The Court                                    247

1   laws against photographing children under the age of 18 in

2   sexually explicit situations?

3   A    Yes.

4   Q    All right.  Do you believe that Section 2257 serves that

5   social value?  Aside from the regulations that have to do with

6   recordkeeping --

7   A    I --

8   Q    -- and things like that.

9   A    I think there are already existing State and Federal laws

10  that prohibit child pornography that take care -- that -- that

11  cover those instances and insure that photographers --

12  professional photographers will not be doing child pornography.

13  Q    Well, but isn't one way professional photographers can

14  make sure they're not photographing juveniles, people under 18,

15  is by asking them to produce evidence of how old they are?

16  A    Yes.  I don't see anything wrong with asking them to

17  produce evidence.

18  Q    Okay.  Thank you.

19  A    But I think that's separate from 2257.

20            THE COURT:  Okay.  Thank you.  Any questions?

21            MR. SCHWARTZ:  Your Honor, if I may on redirect?

22            THE COURT:  Yes.

23            MR. SCHWARTZ:  Recross.  Excuse me.

24                      RECROSS-EXAMINATION

25  BY MR. SCHWARTZ:

1    Q    Ms. Alper, in response to the Court's questions, you

2    testified that you object to providing your home address on

3    photographs, is that correct?

4    A    Correct.

5    Q    Now, Ms. Alper, you also have a profile for your business

6    on a website called Yelp, correct?

7    A    Yeah.

8    Q    And Yelp is a publically available website where people

9    can search for services in a particular area.

10   A    Of course.

11   Q    So -- and you -- you have that profile for your business

12   on Yelp so that people will see your business if they're

13   looking for a photographer.

14   A    That's correct.

15   Q    So, Ms. Alper, I'd like to show you Defendant's Exhibit

16   10.

17            MR. SCHWARTZ:  If you can pull that up.

18   A    Yeah.

19   BY MR. SCHWARTZ:

20   Q    And do you recognize this document?

21   A    I do.

22   Q    What do you recognize it to be?

23   A    It's a Yelp posting of my photography business.

24   A    And so this is a true and accurate reflection of your

25   business profile on Yelp?

Alper - Recross (Sch)                                    249

1    A    Yeah, but that has nothing -- that's -- I don't -- I'm not

2    advertising my sexual imagery or posting images of myself and

3    my husband or any other sexual images in connection with my

4    commercial photo journalistic editorial work that I do for, you

5    know, newspapers, corporations --

6              THE COURT:  But that is --

7    A    -- universities.

8              THE COURT:  Is that your home address?

9    A    Yes, it is.

10   BY MR. SCHWARTZ:

11   Q    And that's your home address in the upper left-hand

12   corner of the page, is that right?

13   A    Yeah.

14   Q    Okay.  And that's the address that you use for your

15   business as well?

16   A    Yes.

17             MR. SCHWARTZ:  Okay.  No further questions, Your

18   Honor.

19             THE COURT:  Okay.  Thank you.  You're excused.  Next

20   witness?

21             MR. MURRAY:  Your Honor, may I just ask one follow-

22   up --

23             THE COURT:  Yes.  Sorry.  Go ahead.

24             MR. MURRAY:  -- to make sure that the record is

25   clear?

1                   FURTHER REDIRECT EXAMINATION

2    BY MR. MURRAY:

3    Q     When you said that you wouldn't want to have your home

4    address on the label on the images, explain the difference

5    between that and posting your home address for your --

6    A     Right.

7    Q     -- photo journalism professional.

8    A     With -- as I understand with 2257, you have to post with

9    every photograph where the records are being kept.  So the

10   records are being kept at my home.  So if they were attached to

11   photographs of myself and my husband or anybody else I'm

12   photographing, then it is showing myself and my home address.

13   Q     In a sexual pose.

14   A     In a sexual pose.

15   Q     Do you have any --

16   A     And that makes me -- that's uncomfortable.  That's

17   completely separate from my advertising my photography

18   business.

19             MR. MURRAY:  Thank you.

20             THE COURT:  Okay.  Thank you.  All right.  Thank you

21   very much.  Next witness?

22             MR. MURRAY:  Your Honor, at this time, the plaintiffs

23   would call plaintiff Thomas Heinz.

24             THOMAS HYMES, PLAINTIFF'S WITNESS, SWORN

25             THE CLERK:  Please state your full name and spell

1    your last name for the record.

2             THE WITNESS:  Tom Hymes, H-Y-M-E-S.

3                      DIRECT EXAMINATION

4    BY MR. MURRAY:

5    Q    And what is your city of residence, Tom Hymes?

6    A    Van Nuys, California.

7    Q    And, Mr. Hymes, what is your current occupation?

8    A    I'm a senior editor at Adult Video News, AVN.

9    Q    Okay.  And how long have you held that position?

10   A    Currently, since 2009.  I was first employed there in

11   1999.

12   Q    And why don't you tell the Court what your background is

13   going back to your education.

14   A    I went to Amherst in Boston.  I did not graduate.  Then I

15   went back to New York and studied theater and acting, and then

16   I came out to Los Angeles and continued to pursue that and

17   writing, and then segued into -- I was offered a job to write

18   at AVN, and then they started this magazine called AVN Online,

19   and I previously had no interaction with the adult

20   entertainment whatsoever, and I -- I took it, and -- and then I

21   eventually became the editor in chief of the magazine, and then

22   my career has continued in adult.

23   Q    So how long -- so you've been a journalist in the --

24   focusing on adult entertainment for how long?

25   A    Since 1999.

1    Q    And --

2    A    So for 14 years.

3    Q    And what does AVN stand for?

4    A    Adult Video News.

5    Q    Okay.

6    A    It's called AVN Media Network now.

7    Q    And have you worked for other journals that --

8    A    I worked for XBIZ.  I was the publisher at XBIZ for a

9    couple of years.  Yes.

10   Q    And is that another publication that covers news relating

11   to the adult industry?

12   A    It is a competitor media company in the adult industry.

13   Q    Okay.

14   A    A trade media company.

15   Q    All right.  So you've been a journalist in this field for

16   how many years then?

17   A    About 14.

18   Q    Okay.  And among other issues, have you covered 2257?

19   A    I have.

20   Q    Okay.  Have you written about it?

21   A    I have.

22   Q    And have you spoken about it?

23   A    I have.

24   Q    Okay.  In addition to your activities as a journalist for

25   these publications, do you also have a website --

1    A    I do.

2    Q    -- of your own?

3    A    Yes.

4    Q    And what is the name of that website?

5    A    It's called DailyBabylon.com.

6    Q    And when did you first create that website?

7    A    Some time in 2009.

8    Q    And what was the original purpose of that website?

9    A    The original purpose was to create a -- a commercial

10   enterprise with partners that reflected art interests not just

11   in the -- the adult entertainment industry, but other issues,

12   cultural and -- and artistic and -- and things of interest to

13   us, but included in that would have been our -- you know, our

14   current area of expertise, which was sexuality in the adult

15   industry.

16   Q    And did you, in fact, launch that website at some point?

17   A    We did.

18   Q    And approximately when did you launch it?

19   A    In 2009.  I don't remember the exact month.

20   Q    And how successful was it?

21   A    Well, it was not successful, because our core group of

22   people -- this was after, of course, the recession and we were

23   trying to make something happen, and there were three partners,

24   me and another write colleague of mine, and then a third

25   partner who was going to run the business and be our CEO.  We

1    would create or acquire the content, my -- Kathee Brewer, my

2    partner and me, and then the other partner would take care of

3    the business.

4            The business partner couldn't follow through.  His

5    own business fell apart.  He couldn't follow through with this

6    venture.  Kathy and I kept it up as long as we could, but we

7    didn't have any really resources or money.  So we had to go --

8    I was working freelance at the time, but it wasn't sustaining

9    me.  I had to go and get a job.

10   Q    Okay.  And so you've been full-time employed ever since?

11   A    Yes.

12   Q    And what became of Daily Babylon?

13   A    Well, Daily Babylon still exists.  It entered a period --

14   a moribund period.  It never went offline except for -- I had a

15   bad accident.  I was in the hospital.  I thought I had

16   reregistered it, but I didn't.  So Go Daddy took it offline,

17   but as soon as I got out of the hospital, I realized it.  I

18   re-upped.  I just registered it for another two years.  So it

19   still exists.

20   Q    Okay.  And are you now the only person involved in it?

21   A    I am.

22   Q    And do you work out of your home for it?

23   A    I do.

24   Q    Okay.  And I want to show you what's been marked as

25   Plaintiff's Exhibit 64 and ask you if you can identify that

1    document, sir.

2    A    That's the whole page.

3    Q    Of your website?

4    A    Of Daily Babylon, correct.

5    Q    And let me ask you this.  What -- what type of information

6    do you currently host on the Daily Babylon?

7    A    Currently, I'm just posting up sporadically when I have

8    time.  I posted something up a few days ago and then about --

9    last week I posted up something.  I'm keeping it going now,

10   because I have to move it from the Joomla platform to a

11   WordPress platform.  I need to redesign the site.  It's a full

12   on website right now that was built to -- to be like a full

13   media site.  But I'm one person.  So I need to pare it down,

14   keep it essentially the same but make it more manageable so

15   that I can run it myself, and I'm in the process of doing that.

16   Q    And are you still going to cover the adult industry in

17   this?

18   A    I want to.

19   Q    Okay.  Now, in connection with that kind of work, you --

20   you are familiar with 2257 and 2257(a).

21   A    I am.

22   Q    And can you tell the Court how those statutes, if at all,

23   affect your plans for what you want to do with Daily Babylon?

24   A    They -- I'm doing everything I can -- I'm avoiding 2257

25   completely with this website.  So, in fact, they do not affect

1   me, because I have made the decision -- the necessary decision

2   that I need to avoid them.

3   Q    Well, so when you say they haven't affected you, does that

4   mean that there are not things that you would like to publish?

5   A    They're -- they're literally chilling my expression.

6   There's things I will not do.  There's images I will not post.

7   There's places I will not go, because I am not interested or

8   willing to trigger 2257.

9   Q    Well, are those places and are those images things that

10  you want to post and would post but for 2257?

11  A    Yes.

12  Q    And explain to the Court what some of those images are and

13  how they would relate to the editorial content of the Daily

14  Babylon.

15  A    Well, the -- the site -- I don't envision the site to be

16  like a "porn site", but I write about the industry.  I'm a

17  writer, plus I go to trade shows.  I go to clubs.  I like to --

18  I would take photographs that I would use.  So I want to

19  illustrate my stories, or I might be in a place where I want to

20  use images that -- and acquire images.

21        I don't -- you know, I don't know exactly where I

22  would want to go, but where I would want to go and the types of

23  images that I would want to post up on the site would

24  definitely trigger 2257 and also 2257(a).

25  Q    And so why are you unwilling to post those images and just

1    comply with those statutes?

2    A    Because -- my reasons are because I am not -- I work out

3    of home, a small little apartment.  I'm married.   I have a

4    9-year-old son.  I'm not willing to have a warrantless search

5    where FBI agents are taking pictures of the interior of my

6    apartment, and also, more importantly, I'm not able to comply

7    with 2257, because I still need a day job.  So I need to go to

8    work, and that means I could very well not be at home at the

9    time of an inspection, and that's extremely problematic for me.

10   Q    And so you have chosen to avoid using any of the images

11   that you would otherwise use?

12   A    I have.

13            MR. MURRAY:  That's all I have.  Thank you, Your

14   Honor, other than to offer into evidence Plaintiff's Exhibit

15   64.

16            THE COURT:  Cross-examine.

17                         CROSS-EXAMINATION

18   BY MS. WYER:

19   Q    Hello, Mr. Hymes.

20   A    Hi.

21   Q    You have never produced sexually explicit material,

22   correct?

23   A    No.

24   Q    You have never created or kept records under 2257 or

25   2257(a), correct?

1    A    No.  Correct.

2    Q    And you have testified that since you began working in the

3    adult entertainment industry, you have spent most of your

4    career at one -- one or another of the large adult

5    entertainment media outlets, correct?

6    A    Correct.

7    Q    And you are currently working full-time at AVN as a senior

8    editor, correct?

9    A    Correct.

10   Q    And you work 60 or 70 hours a week for AVN, correct?

11   A    At a minimum.

12   Q    And then you also testified that for a brief period in

13   2009, you and two partners had attempted to establish a new

14   project by launching Daily Babylon, correct?

15   A    Correct.

16   Q    This was supposed to be a new business that would allow

17   you to make money and would actually support you independently,

18   correct?

19   A    Correct.

20   Q    You launched this website in April 2009, correct?

21   A    Correct.

22   Q    But by -- you testified that by the end of 2009, both

23   partners had left, and Daily Babylon was no longer an active

24   project, and that's in the sense that you had intended,

25   correct?

1   A     In the original -- in the original sense.

2   Q     And your partner that had been the CEO, his business fell

3   apart, correct?

4   A     His other business, yes.

5   Q     And the other partner left.

6   A     Well, she continued to post with me and then just got

7   really busy too.  She still to this day says she'll post, but

8   she has so many projects and is really business.  She's a close

9   friend, and she's a colleague, and so we'll see.

10  Q     And so at the end of 2009 is when you started again to

11  work at AVN, correct?

12  A     Yes.

13  Q     And once you started working at AVN again, you no longer

14  had very much time, and you were unable to continue actively

15  working on Daily Babylon.

16  A     I was -- it entered some dry periods, but I maintained the

17  website, and I also maintained the -- the e-mail address

18  associated with it.  So there's many businesses where the way

19  that they contact me is through my Tom@DailyBabylon address.

20  I've kept Daily Babylon alive to the extent I have been able

21  to, because I am not willing to let it go, and I'm not going

22  to.

23  Q     So you pay the -- whatever fees necessary to keep it

24  online.

25  A     Yes.

Hymes - Cross (Wye)                    260

1    Q    But you have no definite plans to quit your job at AVN.

2    A    I do not.

3    Q    Let me show you Exhibit 77.  I'll just -- I'll just hand

4    you a copy since it's multiple pages and you can -- do you

5    recognize this?

6    A    Yes.

7    Q    This is a printout of -- actually, if you go through it,

8    it's a printout of different tab sections from Daily Babylon.

9    A    Well, it's -- it's the page.  It looks like it's -- it's

10   actually still the home page.  This is what the home page looks

11   like except for the bottom part is missing.

12   Q    Okay.  So because of the way that it printed out.  So if

13   you -- if you look at the -- along the top --

14            MS. WYER:  First I'll move to admit Defendant's

15   Exhibit 77.

16   BY MS. WYER:

17   Q    So along the top are different tabs, correct?

18   A    Correct.  Yes.

19   Q    Home, Culture and Society, Legal Politics, Pink Card,

20   Money, Adult Biz., correct?

21   A    Yes.  Yes.

22   Q    'Tude --

23   A    Yes.

24   Q    -- and About Babylon, correct?

25   A    Correct.

1    Q    So page 1 of Exhibit 77, which is Bates stamp 924, that's

2    the top of the home page of Daily Babylon, correct?

3    A    The tabs?

4    Q    This first page is -- the top is --

5    A    Yeah.  It's the top part of the home page.

6    Q    Yes.  And if you look at the next page, it's double-sided,

7    that's --

8    A    Oh.

9    Q    -- continuing on of the home page.  So there's -- those

10   three pages consist of a printout --

11   A    Okay.

12   Q    -- of the home page, correct?

13   A    All right.  Got you.

14   Q    And then on -- let's see -- page 4, which is Bates stamp

15   927, is the top of the Culture and Society tab, which is the

16   second tab, correct?

17   A    Correct.  Yes.

18   Q    And if you look at that, the top of that page, you see

19   that the first story is -- which is -- the first story on that

20   page is the most recently posted story, correct?

21   A    At the time this was copied.  I think I posted up a few

22   stories since then.  So --

23   Q    This was copied on May 16th, 2013.

24   A    All right.

25   Q    So at that time, May 16, 2013, which is two weeks ago or

1   so, the most recent story was dated April 19, 2011, is that

2   correct?

3   A    I'll take your word for that.  I don't recall, but -- but

4   I have no reason to dispute that.

5   Q    The most recently posted story would appear at the top.

6   A    That's fine.  This -- it says that.  So that's correct.

7   Q    And then the next most recently posted story was posted on

8   April 5, 2011, is that right?

9   A    Correct.

10  Q    And then the one before that was posted October 7, 2009,

11  is that correct?

12  A    Correct.

13  Q    And if we go to Bates stamp 930, that is the top of the

14  third tab, which is Legal Politics, correct?

15  A    Where am I looking?  Sorry?

16  Q    Do you see at the bottom, there's --

17  A    Oh, Politics & Law?

18  Q    Yes.

19  A    Yeah.  Okay.

20  Q    So at the top of the third page, which is the third tab on

21  the website, Legal Politics, which is titled Politics & Law,

22  correct?

23  A    Correct.

24  Q    And the most recently posted story on that page as of

25  May 16, 2013 was August 29, 2009, correct?

1    A     Correct.

2    Q     And then if we go to Bates stamp 933, that is the top of

3    the fourth tab on the Daily Babylon website, which is Pink

4    Card, correct?

5    A     Correct.

6    Q     And the most recently posted story on that page as of

7    May 16, 2013 was July 31, 2009, correct?

8    A     Correct.

9    Q     And if you go to Bates stamp page 936, that is the top of

10   the fifth tab, which is Money, correct?

11   A     Yes.

12   Q     The most recently posted story on that page as of May 16,

13   2013 was April 9, 2011, correct?

14   A     Correct.

15   Q     And the most recent story before that one was posted

16   October 27, 2009, correct?

17   A     Yes.

18   Q     And then if we look at Bates stamp page 939, that is the

19   sixth tab, Adult Biz, correct?

20   A     Yes.

21   Q     And the most recently posted story on that page is

22   April 22, 2011, correct?

23   A     Yes.

24   Q     And the story posted before that, the most recently posted

25   story before that is dated August 4, 2009, correct?

Hymes - Cross (Wye)                                      264

1    A     Yes.

2    Q     And then if we look at Bates stamp page 941, that is the

3    -- one, two, three, four, five, six -- seventh tab titled

4    'Tude, correct?

5    A     (No audible response).

6    Q     And the most recently posted story there is April 20,

7    2011, correct?

8    A     Yes.

9    Q     And the one before --

10          THE COURT:  How much -- how much longer do you think

11   you're going to be?  Because it's quarter of 5:00, and if we

12   can avoid the witness coming back tomorrow, I'd like to --

13          MS. WYER:  I -- I'm not exactly sure.  I think it

14   probably would not take more than 20 minutes.  I'm not sure.

15          THE COURT:  Well, as I said, we -- I really don't

16   want to stay that late.  I'm not sure where you're going with

17   this, just because if this is admissible in evidence, all these

18   dates are going to be in the document.  I mean, I'm not sure

19   what all these -- what you're trying to prove, frankly, by

20   this, all these questions about the entries here --

21          MS. WYER:  Well --

22          THE COURT:  -- and the dates.

23          MS. WYER:  -- these are going to the fact that there

24   are no recent posts.  It has to do with standing.

25          THE COURT:  Well, okay.  Well, I mean, it's obvious

1    they're -- you know, they're spread out.  There aren't very

2    many in the last few years, but I want to ask another question.

3    BY THE COURT:

4    Q    You said that 2257 chills your expression, is that right?

5    A    That is correct, sir.

6    Q    All right.  Well, how do you explain the thousands of

7    other pornography producers who are all over the internet and

8    put out movies and videos and magazines, and they comply with

9    2257, and they put out whatever they want to?

10   A    They obviously have the resources or -- and are attempting

11   to be in compliance with 2257, similar -- similarly to if our

12   original idea had taken flight, we abide by the law.  We would

13   have attempted to do that as well.  It is my current situation.

14   Q    You said because it's your economic situation, you can't

15   comply?

16   A    It's my economic -- it's partially my economic.  Yes.

17             THE COURT:  All right.  Well, I don't want to cut

18   this short if you all think it's important.  Are you able to

19   come back here tomorrow morning?

20             THE WITNESS:  I am.

21             THE COURT:  All right.  Well, then let's adjourn

22   today, and we'll resume tomorrow at 9:15.  Okay.  Thank you.

23             THE WITNESS:  Thank you, sir.

24             MS. WYER:  Your Honor --

25             THE COURT:  All right.  Now, once again, Mr. Hymes,

266

1    as I said with other witnesses, because you're under

2    cross-examination, I'm going to direct you not to discuss this

3    case or your testimony with any of the lawyers involved or

4    other witnesses.

5              THE WITNESS:  Yes, sir.

6              THE COURT:  Okay?  All right.  Thank you.  All right.

7    Let's just go off the record for a minute.  Just about --

8         (Proceedings concluded at 4:41 p.m.)

9                        *  *  *  *  *

10              C E R T I F I C A T I O N

11         I, Maureen Emmons, court approved transcriber,

12    certify that the foregoing is a correct transcript from the

13    official electronic sound recording of the proceedings in the

14    above-entitled matter.

15

16    _____      Date:

17    MAUREEN EMMONS

18    DIANA DOMAN TRANSCRIBING

19