UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA


FREE SPEECH COALITION, INC.,     )   09-cv-4607
et al,                           )
                                 )
          Plaintiffs,            )
                                 )
                                 )
     vs.                         )
                                 )
THE HONORABLE ERIC HOLDER, JR.,  )
in his Official Capacity as      )
Attorney General of the United   )
States,                          )   Philadelphia, PA
                                 )   June 5, 2013
          Defendant.             )   9:10 a.m.


                      TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE MICHAEL M. BAYLSON
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:        J. MICHAEL MURRAY, ESQUIRE
                           LORRAINE R. BAUMGARDNER, ESQUIRE
                           BERKMAN, GORDON, MURRAY & DEVAN
                           55 Public Square - Suite 2200
                           Cleveland, OH 44113-1949
                           615 Chestnut Street - Suite 1250
                           Philadelphia, PA  19105


For the Defendant:         KATHRYN WYER, ESQUIRE
                           HECTOR G. BLADUELL, ESQUIRE
                           JAMES J. SCHWARTZ, ESQUIRE
                           NATHAN MICHAEL SWINTON
                           U.S. DEPARTMENT OF JUSTICE
                           20 Massachusetts Avenue
                           Washington, D.C.  20530


Audio Operator:            JANICE LUTZ

Transcribed by:            DIANA DOMAN TRANSCRIBING
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-0129
                           Office:  (856) 435-7172
                           Fax:     (856)  435-7124
                           Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

I  N  D  E  X

|  |  |  |  |  |  |
| --- | --- | --- | --- | --- | --- |
| WITNESS:<br>PLAINTIFF'S WITNESS: | THE<br>COURT | DIRECT | CROSS | REDIRECT | RECROSS |
| Tom Hymes | 25 |  | 9(Wye) | 19(Mur)<br>29(Mur)<br>33(Mur) | 32(Wye) |
| Mary L. Levine | 65 | 35(Mur) | 50(Bla) | 75(Mur) | 81(Bla) |
| David B. Levingston |  | 83(Mur) | 100(Bla) | 124(Mur) |  |
| Adriana Vecchio |  | 141(Mur) |  |  |  |

| EXHIBITS MARKED: |  | IDENT. | EVID. |
| --- | --- | --- | --- |
| 85A through |  |  |  |
| 85C | Website images |  | 58 |
| 307 | Website images |  | 59 |
| 65 through |  |  |  |
| 68 | Nude photographs |  | 99 |
| 90B | Photographs |  | 116 |
| 89A | Model release |  | 120 |

1           (The following was heard in open court at 9:10 a.m.)

2                THE COURT:  Good morning, everyone.  Okay.  Please

3      be seated.

4                MR. MURRAY:  Good morning, Your Honor.

5                THE COURT:  Good morning.  All right.  Mr. Murray,

6      just tell us what we have in store for today and how long you

7      think it will be.  I won't hold you to it, I just want to get

8      an idea.

9                MR. MURRAY:  Yes, Your Honor.  After the current

10     witness is finished, we will then call a plaintiff, Marie

11     Levine, and then we will call a plaintiff, David Levingston.

12     And those are the only witnesses that we have left until

13     Friday morning.  I did call -- made some calls last night to

14     see if we could scrounge up the people who we put in the next

15     week and we couldn't.  So we have two additional witnesses,

16     and then we have one last witness Friday morning, together

17     with Gail Dines, their expert Friday, is my understanding.

18     And that's what we --

19               THE COURT:  Well, how long -- approximately how long

20     will the witnesses today take?

21               MR. MURRAY:  I don't think -- I wouldn't be

22     surprised if we're done by noon, Your Honor.  I'm not sure.

23     You know, and you said you wouldn't hold it to -- hold me to

24     it, but I don't see any reason whey they're lengthy.

25               THE COURT:  Well, are you all planning to stay in

Colloquy                                          4

1   Philadelphia tomorrow, or are you going back to Washing --

2             MR. MURRAY:  Yes, I -- we are.

3             THE COURT:  Are you going back to Washington, or you

4   don't know yet?

5             MS. WYER:  We're staying.

6             MR. BLADUELL:  We're staying.

7             THE COURT:  All right.  Do you have those cases

8   written down on the dep --

9             MS. WYER:  Yes, Your Honor.

10            THE COURT:  Now, do you still want to submit a

11   separate brief?

12            MS. WYER:  I have that, also.

13            THE COURT:  Okay.  Good.  You have one at least for

14   my law clerk?

15            MS. WYER:  Yes.

16            THE COURT:  Thank you.

17            All right.  Because I'm going to look at this today,

18   and I may want to have some discussion about it.  I have

19   another conference in another case at 12:30, so we're going to

20   have to break then if we don't -- if we haven't finished.  But

21   since I -- since I had planned tomorrow to be here, if I'm not

22   in court, I -- I think I'm going to rule on the joinder

23   deposition issue and I'm -- and I probably want to read it.

24   Do we have a copy of that transcript?  Or is it --

25            MR. MURRAY:  We have it to offer, Your Honor.  We

1    have it with us, yes.

2              THE COURT:  All right.

3              MR. MURRAY:  And --

4              THE COURT:  Now, if I allow it, at least in part, do

5    you have objections to certain portions of it that -- for

6    hearsay or other reasons?

7              MS. WYER:  Yes, Your Honor.

8              THE COURT:  Have you communicated those objections

9    to Mr. Murray?

10             MS. WYER:  The objections are in the transcript for

11   the most part.

12             THE COURT:  Well, the general rule is that you only

13   make objections at a deposition of the form of the question.

14   Did you have agreement to make general objections as well?

15             MS. WYER:  I don't think we made a specific

16   agreement, so I --

17             THE COURT:  Well, if you --

18             MS. WYER:  -- I do have other -- I do have --

19             THE COURT:  I mean, as I understand the rule, and as

20   I practiced it when I was a lawyer, if a party wants to offer

21   a deposition at a trial, the opposing party has -- generally

22   has the right to impose -- to make substantive objections that

23   were not made at a deposition.  Have you determined -- I mean,

24   I'll first tell you whether I'm going to allow it, but even if

25   I were to allow it in part, you'd still have the right to make

1    those objections.  Do you know what -- which questions, if

2    any, you want to object to?  Or you don't know yet?

3                MS. WYER:  Yes, Your Honor, because there -- there

4    were really the same questions repeated over and over again.

5    So I -- I know the basis --

6                THE COURT:  So all your objections would be in the

7    transcript?

8                MS. WYER:  I think I may have additional objections,

9    but they -- they would be -- they would apply to a lot of the

10   transcript, but they would be the same objections over and

11   over again.  But I can --

12               THE COURT:  All right.  Okay.  For example, hearsay

13   -- hearsay is generally not objectionable at a deposition, but

14   it could be objectionable at a trial, unless it was admissible

15   under an exception to the hearsay rule.  So that's just one

16   example of where there could still be an objection by the

17   Government, even if I were to allow part of the transcript.

18               All right.  So I'm going to just try and come to a

19   agreement about this -- come to a ruling on this, so we --

20   let's see where we go, because I want to have some time to

21   read your memo and look at some of the cases.  So we may want

22   to have some discussion about that this afternoon.  Okay?

23               MR. MURRAY:  And we have -- Your Honor, in -- in

24   reviewing it, we also will submit some alternative basis for

25   its admission, which I could recite right now, in case Your

1    Honor wants to --

2                THE COURT:  You mean citations?

3                MR. MURRAY:  Other portions of the rule and the

4    rules that would permit it.  And cite --

5                THE COURT:  Oh, all right.  Well, if it's -- if

6    you're -- we can do that when we have an argument about it.

7    But let me -- I'll look at this first as soon as I can.  And

8    it may be we'll take a longer lunch break, so I can have my

9    conference in the other case and consider this, and then

10   you'll come back and we can discuss it.

11               Okay.  All right.  Mr. Hymes, please.  Because if I

12   allow the deposition, or any part of it, my intention would be

13   to read it tomorrow.

14               MR. MURRAY:  That would be fine, Your Honor.  And --

15               THE COURT:  All right.  Now, let me ask you one --

16   I'm sorry, we're still on discovery.  Let me find out about

17   Friday.  So have you decided who's going to go first?

18               MR. MURRAY:  We -- we were going to put our last

19   plaintiff on Friday.

20               THE COURT:  All right.  What's that name?

21               MR. MURRAY:  Barbara Nitke.

22               THE COURT:  N-I --

23               MR. MURRAY:  N-I-T-K-E.

24               THE COURT:  And about approximately how long would

25   she take?

1            MR. MURRAY:  Again, not -- you know, 45 minute

2    direct, Your Honor.  I --

3            THE COURT:  All right.

4            MR. MURRAY:  I don't expect it to be lengthy.

5            THE COURT:  All right.  Okay.  All right.  And then

6    -- well, who are your two witnesses for Friday, the

7    Government?

8            MS. WYER:  We have one witness for Friday, Gail

9    Dines.

10           THE COURT:  D-I --

11           MS. WYER:  -- N-E-S.

12           THE COURT:  All right.  You did a report on it?

13           MS. WYER:  Right.

14           THE COURT:  Right.  All right.  How long do you

15   estimate that testimony, direct?

16           MR. SCHWARTZ:  Your Honor, the direct between an --

17   it could take an hour, maybe between an hour, hour-and-a-half.

18           THE COURT:  All right.  Okay.  Those are the only

19   two witness -- I thought there was one more witness for

20   Friday, no?

21           MS. WYER:  Well, we -- we have our paralegal.

22           THE COURT:  Right.  Well, she might testify

23   Thursday, tomorrow?

24           MS. WYER:  Yes.

25           THE COURT:  About the summary?

1            MS. WYER:  Correct.

2            THE COURT:  Yes.  Well, let's do that.  All right.

3    The only issue Friday -- and the reason I'm asking is I have

4    this -- it's -- I have -- I'm performing a wedding.  I have

5    close friends, and this has been arranged long before this

6    trial, and I feel a commitment to show up.  So, as I said

7    yesterday, that's approximately like 11:40 to 2:00.  So we'll

8    just work around that.  But it sounds like we'll be able to

9    get everybody in.

10           Okay.  All right.  Thank you.

11           All right.  State your name for the record, please.

12           THE WITNESS:  Tom Hymes.

13           THE COURT:  All right.  And you're still under oath.

14           THE WITNESS:  Yes, sir.

15           THE COURT:  Proceed.

16                         CROSS-EXAMINATION

17   BY MS. WYER:

18   Q    Good morning, Mr. Hymes.

19   A    Good morning.

20   Q    So yesterday you testified that -- we were looking at

21   your website and we were observing, essentially, that as of

22   May 13, 2013, there were a few postings that were put up in

23   2011.  And otherwise, all of the postings were from 2009,

24   correct?

25   A    That is incorrect.  We -- that's what we discussed

1    yesterday, but there had been postings since then in 2013.

2    Q    But as of May 13, 2013 --

3    A    Correct.

4    Q    -- that was correct?

5    A    Correct.

6    Q    And then since that time, as you kind of referenced

7    yesterday, there have been two additional posts, correct?

8    A    I -- I think so, yeah.

9    Q    And both of those were made -- one of those was made on

10   May 18th, correct?

11   A    I don't recall.

12   Q    And one was on June 1st, this last Saturday?

13   A    I -- I believe so.

14   Q    And both of those were made after you appeared at a

15   deposition in this case, correct?

16   A    That is correct.

17   Q    Now, you have testified that you are chilled in producing

18   -- producing depictions of sexual explicit conduct, correct?

19   A    That is correct.

20   Q    You are a writer, correct?

21   A    That is correct.

22   Q    So your -- what you -- what you would do on this website

23   is primarily write articles, correct?

24   A    Primarily, but not only.  Because I also take

25   photographs.  In my current job, on occasion, I always take my

1    camera on assignment.  And if there's no other photographers

2    around and there's something of interest, I'll shoot those.

3    They're sometimes published.  And it would be my intent as

4    well to do the same thing on my -- on Daily Babylon.

5              So it's not only using other people's images, but I

6    would want to be able to use my own if they're relevant to the

7    story.

8    Q    But what you are interested in doing is illustrating the

9    stories that you write, correct?

10   A    Well, you know, primarily.  But it could be the other way

11   around, where I take photographs and then the written word is

12   -- is a subsidiary to the photographs.  That could happen

13   easily as well.

14   Q    Your work until now has consisted of writing articles,

15   correct?

16   A    That's my primary profession, yes.

17   Q    And you have a -- you are primarily thinking that you

18   would post images that you get as promotional material from

19   people advertising what you would be writing about?

20   A    That's -- that's one aspect of my 2257 concern that

21   marketing materials or banners that I might want to use, or

22   advertise that -- that type of stuff would include -- could

23   include images that trigger 2257.  That's -- that is, of

24   course, a concern.

25   Q    So 2257 does not have any impact on the content of what

1    you write, correct?

2    A    On my written word?  No.  No.  2257, I don't believe,

3    refers to written content.

4    Q    You have made this blog.  Many other people have created

5    blogs and write things on the internet, correct?

6    A    Correct.

7    Q    And you consider yourself a journalist, correct?

8    A    Yes.

9    Q    You did not go to any school to study journalism,

10   correct?

11   A    I did not.

12   Q    You do not have a license to practice journalism,

13   correct?

14           MR. MURRAY:  Objection, Your Honor.  It assumes that

15   there is a license one can get to practice journalism.

16           THE COURT:  Yes.  You don't need a license to be a

17   journal -- I'll take judicial notice of that.  We have freedom

18   of writing for journalists, for sure.

19   BY MS. WYER:

20   Q    And you do not consider everyone who -- who has a blog or

21   posts articles on the internet to be a journalist, correct?

22   A    I do not.

23   Q    And in order to determine whether someone is a

24   journalist, in your mind, you would have to go and look at

25   that particular article and see if it meets certain whatever

1  undefinable criteria that you have, correct?

2  A    Yes.  It might be more than one article that one would

3  use to assess whether an individual is a full fledged serious

4  journalist.

5  Q    So there are no objective general criteria that you can

6  define that would identify -- that would distinguish what you

7  do from another poster on the internet?

8  A    Well, this is obviously a point of contention for

9  individuals and lately for the courts as well to determine

10  who's a journalist, who is not a journalist, what is

11  journalism.  It's kind of up in the air.

12  Q    Now, the potential depictions that you think you might

13  someday post on your blog if you were ever to go back to

14  working on your blog in -- with any frequency, you don't know

15  right now what articles those depictions would be

16  illustrating, correct?

17  A    I do not.

18  Q    So you don't -- you can't really predict what types of

19  depictions you may want to post with those articles?

20  A    I'm not sure that that's entirely correct.  I couldn't

21  say specifically.  I couldn't point to a particular

22  photograph.  I don't know what events I'm going to go to.  But

23  I could tell you with some certainty that they would include

24  events say at clubs or at trade shows, which could very well

25  -- would likely include the type of content that would trigger

1    2257.

2              So there is a very high likelihood that among the

3    myriad types of content that I would want to and intend to

4    post to Daily Babylon would include 2257 triggering content if

5    I were to -- to do that.  That -- that would be what I would

6    want to do.

7    Q    In terms of the specific images that you might want to

8    use, you don't know the identities of any performers who might

9    appear in those images, correct?

10   A    I could not tell you that at this point in time, of

11   course.

12   Q    And you don't know the ages of those individuals,

13   correct?

14   A    Of individuals I don't know?  No.

15   Q    You do not have a problem with primary producers checking

16   IDs of performers before creating an image of them engaged in

17   sexually explicit conduct, correct?

18   A    To the contrary.

19             MR. MURRAY:  Object -- objection, Your Honor.

20             THE COURT:  What?  You object?

21             MR. MURRAY:  Yes.  Whether he has a problem with

22   that or not is irrelevant to the --

23             THE COURT:  Well, it's -- no, overruled.  I think

24   it's appropriate cross-examination.  You may answer.  I had

25   asked similar questions to other witnesses.  Go ahead.

1          THE WITNESS:  I -- I don't have a -- a problem with

2    that.

3          THE COURT:  All right.  You do not have a problem?

4          THE WITNESS:  I absolutely do not.  To the contrary,

5    I believe that they should keep those records.

6          THE COURT:  That they should what?

7          THE WITNESS:  To check the identity of performers

8    and keep those records.

9          THE COURT:  And keep the records?

10          THE WITNESS:  Absolutely.

11   BY MS. WYER:

12   Q    And you --

13          THE COURT:  And by -- you mean identity, including

14   the age?  Having some documentary proof of their age?

15          THE WITNESS:  Primary producers, yes.

16   BY MS. WYER:

17   Q    And if you were to take your own photograph and post it

18   on the website, you would be a primary producer, correct?

19   A    If I were to do that, yes, I would be.  If I'm taking my

20   own photograph, and it includes 2257 triggering content, I'm a

21   primary producer.

22   Q    And in terms of secondary producers, there can -- you --

23   you are aware from your experience in the adult entertainment

24   industry that there can be several intermediaries between a

25   primary producer and the ultimate location where an image

1    appears, correct?

2    A    I'm not sure I understand.  You mean --

3            THE COURT:  Well, if you don't -- wait, wait, if you

4    don't understand the question --

5            THE WITNESS:  I don't understand the question.

6            THE COURT:  All right.  Rephrase the question.

7    BY MS. WYER:

8    Q    You are aware that a primary producer can convey an image

9    to one secondary producer, correct?

10   A    Yes.

11   Q    And then that producer can convey the image someone else,

12   correct?

13   A    Yes.

14   Q    And so ultimately there could be a number of steps from

15   the primary producer to where an image ultimately shows up,

16   correct?

17   A    Theoretically, yes.  And -- yes.  Yes.

18   Q    And you are aware that because of that, it can be

19   difficult to trace the origin of a final image back to where

20   it was created, correct, if there were indication that --

21   where records were?

22           MR. MURRAY:  Objection.

23           THE COURT:  Yes.  I don't -- can you rephrase that?

24   I don't -- I'm not sure I gather that -- I don't know if the

25   witness -- did you understand the question?

1          THE WITNESS:  I'm -- I need it to be rephrased, I'm

2    sorry.

3    BY MS. WYER:

4    Q    You are aware that a -- in order for a secondary producer

5    to -- in order for someone looking at a website -- well, let

6    me start by saying -- you don't have a -- it's not burdensome

7    for you to post a 2257 statement on your website, correct?

8    A    I have to shift my -- okay.  That's a different question.

9    Is -- it is burdensome.  I've already testified to that, I

10   believe.

11   Q    But the mere putting up the statement on the website is

12   not burdensome?

13   A    You mean affixing onto a website a link to -- the

14   affixing of a link is not in and of itself terribly

15   burdensome.

16          THE COURT:  Well, you say a link.  I think what the

17   question asks you about is just putting a 2257 notice, say, on

18   the -- on the home page of your website?

19          THE WITNESS:  Oh, I'm sorry, Your Honor.

20          THE COURT:  Is that what you -- is that your

21   question?

22          MS. WYER:  Yes.

23   BY MS. WYER:

24   Q    Well, but it is a link because in most cases websites

25   have one link on their site that goes -- goes to the 2257

1    statement.  So wherever you are in the site, you can click on

2    this link and it takes you to --

3              THE COURT:  So it's a notice with a link?

4              THE WITNESS:  Yeah, it's a link to a notice.

5              THE COURT:  A link to a notice?

6              THE WITNESS:  Yeah.  So, I mean -- so the notice

7    itself presents certain problems for me.  Putting the actual

8    link on the site is not problematic.  That's just a -- a

9    technical function.

10             THE COURT:  But you -- when you say you have a

11   problem, it's not a logistical problem?  It's not a computer

12   problem?

13             THE WITNESS:  No, it's not a logistical problem, no.

14             THE COURT:  It's something you object to --

15             THE WITNESS:  Right.

16             THE COURT:  -- generally?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  Okay.

19   BY MS. WYER:

20   Q    And you are aware that the regulations provide a third-

21   party custodian option, correct?

22   A    Yes, I am.

23   Q    And you are aware that if someone goes to your website,

24   if there is a sexually explicit depiction and there is no link

25   to the location of records, it would be difficult to find the

1    source of the records, correct?

2              MR. MURRAY:  Objection, Your Honor.

3              THE COURT:  Overruled.  Do you understand the

4    question?

5              THE WITNESS:  If there -- if I went to a website and

6    there's image -- yeah, I'm -- and there was no link, there was

7    no 2257, that it -- that that doesn't automatically conclude

8    that you couldn't find where the images were from, but you

9    wouldn't be able to find it from a statement that no longer

10   exists on that site.

11   BY MS. WYER:

12   Q    And you would agree with me that you cannot determine

13   someone's age by looking at a photograph, correct?

14   A    Their exact age, correct.

15             MS. WYER:  Nothing further.

16             THE COURT:  All right.  Redirect.

17                      REDIRECT EXAMINATION

18   BY MR. MURRAY:

19   Q    Mr. Hymes, would you explain then what the problem is

20   that you have with the notice that is not logistical?

21   A    Well, the -- the notice is a part of the entire 2257

22   regulatory scheme.  So it's not the -- the notice, per say,

23   that I have a problem with, but if I'm putting the statement

24   -- if I enter into the 2257 universe, then everything that is

25   a part of those regulations I am legally required to abide by.

 1    And I am a scrupulously law-abiding individual.  So if I don't

 2    feel that I can abide by a law, I'm not going to break it.

 3    And that's the discrimination that I've made.  So it's not

 4    specifically the statement, but it's everything that comes

 5    with 2257 that I don't believe I can put myself, my family at

 6    risk by entering it, so I avoid it.

 7    Q    And what information would you have to put on the

 8    statement in your case?

 9    A    I'd have to put my home address for -- in particular.

10    That's the most -- probably the most problematic.  And I'm not

11    willing to enter into the third-party because I'm still a

12    criminal risk.  And I -- I'm still a criminal risk.

13    Q    You mean a third-party custodian?

14    A    Oh, yes, sir.

15    Q    Now, you mentioned that --

16         THE COURT:  Wait, I don't -- why -- why does the

17    third-party situation create a criminal risk for you?

18         THE WITNESS:  Well, if they make a mistake, I'm

19    still criminally liable.  And to me, the -- the regulations

20    are there, but there's no -- I don't -- you know, I don't know

21    that there are any real industry standards with -- or any set

22    standards with respect to third-party -- third parties who are

23    holding -- you know, who are taking care of -- of regulations.

24    I don't believe that that -- that industry has -- has

25    developed the standard.

1          So it's -- yeah, if -- if I'm still going to jail if

2     they make a record-keeping mistake, that's problematic.

3     BY MR. MURRAY:

4     Q    Are you aware of the provision in the regulation that

5     specifically states that the use of a third-party custodian

6     does not relieve the producer of liability for any violations

7     of the statute?

8     A    I am, sir.

9     Q    Okay.  And you're not willing to assume the risk of

10    mistakes made by the third-party custodian in that

11    circumstance?

12    A    Correct.

13    Q    Now, you were asked whether you've had a problem with --

14    well -- well, let me back -- you were asked if you had a

15    problem with the ID being checked by the primary producer, and

16    you indicated you don't have a problem with primary producers

17    checking IDs; is that correct?

18    A    I do not.

19    Q    As someone who's covered the adult industry for many

20    years, what is your understanding what the industry practice

21    has always been in that regard?

22    A    In regard to checking that -- that primary producers

23    check IDs when they shoot.  And -- and in this industry that

24    is universal, if not, you know, 100 percent.  Not only for --

25    for age, but because they need to -- they're -- these are

1    commercial products then.  If they're going to sell them,

2    there needs to be a chain of copyright custody, and they --

3    and they need to show those and prove those.  And -- and it's

4    all a part of the record-keeping that comes with being a

5    primary producer.  And a part of that, of course, is the age

6    of the performer.

7    Q    And are you saying that apart from 2257, the industry has

8    always checked IDs, to your knowledge?

9    A    To my -- to my knowledge, sir, yes.

10   Q    Now, then you were asked once the -- once the image gets

11   from the primary producer down the stream of commerce, you

12   were asked a question about whether -- how anyone down the

13   stream of commerce would know where the 2257 records were

14   maintained.  Do you recall being asked that?

15   A    Yes.

16   Q    To the extent that someone purchased from a secondary

17   producer, for example, a DVD created by a primary producer,

18   would the statement not be on the DVD that the customer got?

19   A    Yes.  Yes, sir.

20   Q    And let me ask you this, Mr. Hymes.  This 2257 applies to

21   the entire universe of sexual images as you understand it?

22   A    Yes, sir.  Pretty much, yeah.

23   Q    And --

24   A    2257 and 2257(a).

25   Q    Yes.  And apart from a primary producer checking an ID

1    and verifying in each case that the people appearing in the

2    depiction are above the age of majority, can you think of

3    anything else that 2257 would accomplish?  All the other

4    requirements of 2257 that any of the other requirements would

5    accomplish in preventing producers from using underage actors

6    and actresses?

7              MS. WYER:  Objection.  It calls for a speculation.

8              THE COURT:  Overruled.

9              THE WITNESS:  I'm sorry, I saw her stand up.  Can --

10   can you just repeat it?

11   BY MR. MURRAY:

12   Q    Yes.

13   A    Okay.

14   Q    You've acknowledged that you're fine with primary

15   producers checking IDs because they've always done it,

16   correct?

17   A    Yes.

18   Q    2257 imposes a number of other requirements, however,

19   correct?

20   A    Uh-huh.

21   Q    Can you tell the Court, based on your experience, whether

22   those other additional burdens of 2257 do anything to prevent

23   the use of underage persons by primary producers?

24   A    No, I don't believe they do.

25   Q    And what kind of burdens do they add to someone like you,

1    who would be a secondary producer with respect to material

2    that came from the primary producer?

3    A    All -- all of the requirements and -- and burdens of --

4    of the record-keeping and the added burden of being under a --

5    a potential criminal prosecution with potential jail term for

6    a first violation of five years for a record-keeping error.

7    Those are -- it's -- it's the imposition of the criminal

8    penalties for record-keeping for a scheme that, in my opinion,

9    does not meet its goals that I have a real problem with.

10   Q    Now, you were asked whether or not you can tell the exact

11   age of someone just by looking at their picture?

12   A    Yes.

13   Q    Can you tell me whether or not in the vast majority of

14   cases, by looking at a photograph of a person depicted,

15   whether you can tell whether that person is over the age of

16   majority or not in the vast majority of cases?

17   A    I believe in the vast majority that you -- you can tell

18   that -- yes, I think that you can.  Yeah.

19   Q    And for people who are over the age of 25, do you believe

20   that by looking at them or looking at their images, one can

21   tell whether or not they are over the age of majority?

22   A    I believe, by and large, the answer to that is yes.

23   Q    Okay.

24        MR. MURRAY:  That's all I have.  Thank you, Your

25   Honor.

1          THE COURT:  All right.  Re -- recross?

2          MS. WYER:  No.  No, Your Honor.

3          THE COURT:  No questions?

4          MS. WYER:  No questions, Your Honor.

5          THE COURT:  All right.  Just one second.

6                        EXAMINATION

7    BY THE COURT:

8    Q    Your understanding under the regulations for the 2257

9    notice that -- that you could have one notice with a link on

10   your home page and that would satisfy the statute of the

11   regulations?  Or would you need a separate notice on every

12   depiction that was somewhere within your website, if you -- if

13   you know?  I don't want you to guess.

14   A    Well, my -- my understanding is that -- my understanding

15   is that the -- the notice is supposed to directly refer to the

16   images on their, so that when the investigator comes, they'll

17   know where to go to find the records that they need to find.

18   Can I elaborate on this for a second, Your Honor?

19   Q    Sure.  Yes.

20   A    My under -- my observation -- and I do this a lot.  This

21   is my job.  I go and I -- I obviously don't check records

22   because I don't do inspections, but I check statements all the

23   time.  And --

24   Q    On -- on the internet?

25   A    On the internet, on websites.  In fact, this morning I

1    did that, went to some of the most trafficked web -- adult

2    websites on this planet.  And in my opinion, including the

3    largest tube sites, none of them are, with their statements,

4    incompliant -- compliant.  What they do is they have pages

5    that are simply lists of primary producers where they got the

6    content from.  My understanding is -- is that they're supposed

7    to keep the records, either them or a third party.  But that's

8    not what's --

9    Q    You mean, the primary producers who are -- whose

10   detections are on the secondary --

11   A    On it.  But there's no way to know which images those

12   lists of producers relate to.  It's just simply impossible.

13   And when you go from page to page and you click on the 2257 --

14   because, by law, they put the little 2257 link on every page

15   -- it goes to the same exact list of producers, no matter what

16   content is being displayed on that page.

17   Q    Well, we've had a lot of depictions shown as exhibits in

18   this trial here.

19   A    Uh-huh.

20   Q    But not every depiction has a 2257 notice on it.

21   A    No, because what they do is they just abrogate them in

22   one link at the bottom of the page.  And for the life of me, I

23   don't see how that is -- if that will help the Government in

24   any way, shape, or form.  Also, I don't think it is consistent

25   with the regulations.  They're supposed to either keep the

1  records or have a third party.

2  Q    Now, if you have a video -- say, a <u>Youtube</u> video for,

3  let's just say, a movie, you can't put the 2257 notice on

4  every --

5  A    On every frame.

6  Q    -- on every -- every frame?

7  A    No, no, but that's not required for videos.  For videos,

8  you're just supposed to put a statement 2257 -- and they all

9  do this -- at the beginning of the move.  I think you can also

10  put it at the end.

11  Q    Okay.

12  A    And they're always there.

13  Q    All right.  They're -- okay.

14  A    Yeah.  Yeah.

15  Q    So you're -- what you're talking about are still -- still

16  images?

17  A    Yes, exactly.  Yes.

18  Q    But you think -- well --

19  A    Well, no, sometimes -- sometimes they're videos, but

20  you'll go to the page and it will be any number of images,

21  ads, videos.  There's no way to know, even from that video,

22  because I don't -- I think often the -- the little videos

23  won't have them on there.  The -- the link will be on the

24  page.

25  Q    Well, are you saying this is a confusing issue for people

1   in this industry, or --

2   A    I cannot --

3   Q    -- or it's -- or it's ignored -- or it's --

4   A    I cannot speak to why they're doing that.

5   Q    All right.  Well, to you --

6   A    I don't know.

7   Q    I mean, you have a lot of experience here?

8   A    Yeah.

9   Q    Do you think the regulations are ambiguous?  Or it's

10  confusing?  Or people don't understand it?  Or they don't

11  think it's being enforced, so they really don't care?  Or it's

12  -- or --

13  A    I -- I think --

14  Q    Or none of the above?  All of the above?  Or something

15  else?

16  A    I think it's a combination of those.  And I think that

17  you're last one is -- is unfortunately the case.  There

18  haven't been inspections now for how many years?  Since 2006,

19  I believe.  So it's eight, nine years.  I mean, it's --

20  complacency -- complacency sets in.  But, you know, 2257 is a

21  consistent topic.  We write about it, we hold seminars at

22  every trade show.  So it's not they're aware.  And they --

23  they do them.  I'm just -- I just think that it's extremely

24  problematic out there.

25  Q    All right.

1      THE COURT:  Do anybody have anymore questions as a

2  result of my questions?

3      MR. MURRAY:  Yes, Your Honor.

4      THE COURT:  Go ahead, Mr. Murray.

5                    REDIRECT EXAMINATION

6  BY MR. MURRAY:

7  Q    Mr. Hymes, you are familiar with the regulations?  You've

8  read them?

9  A    Yes, sir.

10 Q    I want to direct your attention to section 75.8 of the

11 regulation.  You're familiar with that one?

12 A    I need to refresh myself, sir.

13 Q    You've seen that --

14 A    75A, yes.

15 Q    Okay.  So according to the regulation, when it comes to

16 books, magazines, and periodicals, the statement has to appear

17 on the first page that appears after the front cover or on the

18 page in which copyright information appears, correct?

19 A    Correct.

20 Q    When it comes to a film or videotape which contains the

21 end credits, the statement referred to shall be presented at

22 the end of the end titles or final credits, and shall be

23 displayed for a sufficient duration to be capable of being

24 read by the average viewer, correct?

25 A    Correct.

1    Q    And any other film or videotape shall contain the

2    required statement within one minute from the start of the

3    film or videotape and before the opening scene, and shall

4    display the statement for a sufficient duration to be read by

5    the average viewer, correct?

6    A    Correct.

7    Q    And then when it comes to a computer site or service or

8    web address containing a digitally or computer-manipulated

9    image, visual image, or picture, shall contain a required

10   statement on every page of a website on which a visual

11   depiction of an actual human being engaged in actual or

12   simulated sexually explicit conduct appears, correct?

13   A    Correct.

14   Q    And such computer site or service or web address may

15   choose to display the required statement in a separate window

16   that opens upon the viewers clicking or mousing over the

17   hypertext link that states the statement, correct?

18   A    That is correct.

19   Q    But your understanding is that has to appear on every

20   page, correct?

21   A    Yes.  Yes.

22   Q    Now, in the Youtube situation, if an American citizen

23   posts -- can post things on Youtube, correct?

24   A    Yes.

25   Q    Or on tube sites of other kind, correct?

1    A    That's correct.

2    Q    And a citizen from his home could actually post on -- on

3    a tube site a sexually explicit image of himself and/or his

4    partner; isn't that true?

5    A    That is correct.

6    Q    And under this regulation, when that citizen does that,

7    in order to comply with 2257, that citizen should put a -- a

8    label on the image that is being posted on the tube site;

9    isn't that true?

10   A    According to these regulations, I believe, yes.

11             MS. WYER:  Objection.  That --

12   BY MR. MURRAY:

13   Q    And that --

14             THE COURT:  You object?

15             MS. WYER:  Yes, Your Honor.

16             THE COURT:  Overruled.

17   BY MR. MURRAY:

18   Q    And that citizen from his home then would be required to

19   keep the records at his or her home, correct?

20   A    Yes.

21   Q    And is this on the 2257 statement that is being put out

22   there in the world, his or home address?

23   A    Yes.

24   Q    Now, when it -- then there's a section about digital

25   video disks containing multiple depictions being a single

1    matter for which the State may be located in a single place

2    covering all depictions on the DVD, correct?

3    A    Right.   Correct.

4    Q    And then the last thing, for all other categories not

5    otherwise mentioned in this section -- and for example, we

6    haven't gotten to photographs yet, have we?

7    A    Right.

8    Q    That says, "The statement is to be prominently displayed

9    consistent with the manner of display required for the

10   aforementioned categories," correct?

11   A    That's what it says.   I'm not exactly sure what that

12   means.

13   Q    But that's what would apply to photographs?

14   A    Yes.   Okay.

15             MR. MURRAY:   I believe that's all I have on that

16   subject.

17             THE COURT:   All right.   Recross.   Yes, Ms. Wyer.

18                         RECROSS-EXAMINATION

19   BY MS. WYER:

20   Q    Just one question, Mr. Hymes.   You are aware that a

21   secondary producer can actually contract with the primary

22   producer for the primary producer to act as the third-party

23   custodian, correct?

24   A    I actually was not aware of that.   So if the -- if the

25   primary producer can hold the records, then -- for the

1   secondary producer, that's fine.  Then -- then that's -- that

2   falls within the regulatory scheme.

3                MS. WYER:  Nothing further, Your Honor.

4                THE COURT:  All right.  Thank you.

5                Mr. Hymes, thank you very much.  All right.  You're

6   excused.

7                THE WITNESS:  Yes, sir.  Thank you.  Your Honor --

8                MR. MURRAY:  No, no, I have one -- Your Honor, may I

9   have a followup on that one?

10                THE COURT:  All right.  Yes.  Go ahead, one more

11  question.

12                THE WITNESS:  I spilled some water here.

13                THE COURT:  What?  You want some water?

14                THE WITNESS:  No, no, I spilled it.

15                THE COURT:  That's okay.

16                THE WITNESS:  Okay.

17                THE COURT:  It's only water.  It will dry.

18                        REDIRECT EXAMINATION

19  BY MR. MURRAY:

20  Q    You're familiar with the paragraph H of one of the

21  regulations that permits a third-party record-keeper?

22  A    Yes.

23  Q    And it does say, does it not, that a primary or secondary

24  producer may contract with a nonemployee custodian to retain

25  copies of the records that are required under this part.  Such

1    custodian must comply with all obligations related to records

2    that are required by this part.   And such a contract does not

3    relieve the producer of his liability under this part,

4    correct?

5    A    Correct.

6    Q    Is that the problem that you were addressing before about

7    your concern that if you employed a third-party custodian and

8    they made a mistake, you would still be on the hook?

9    A    Yes, sir.

10   Q    Now, with respect to using a primary producer as your

11   custodian of record, which you said you didn't realize could

12   be done, if you had several primary producers who submitted

13   product to you for which you were a secondary producer --

14   A    Uh-huh.

15   Q    -- you would have to be the one that would do the cross-

16   referencing?

17   A    Absolutely.

18   Q    Because each -- because the two primary producers don't

19   work with each other, do they?

20   A    That's absolutely correct.

21   Q    So the cross-referencing requirement could not be

22   satisfied by allowing the primary producers to be your record-

23   keepers?

24   A    Absolutely not.   In no way, shape, or form could that

25   happen.

 1                    MR. MURRAY:  Thank you.  That's all I have, Your

 2      Honor.

 3                    THE COURT:  All right.  Thank you.

 4                    THE WITNESS:  Thank you, sir.

 5                    THE COURT:  Okay.  Your next witness, please.

 6                    MR. MURRAY:  Yes, Your Honor, at this time we would

 7      call the plaintiff, Marie Levine.

 8                    THE WITNESS:  Sorry about the water.

 9                    UNIDENTIFIED COUNSEL:  Well, it's not in the chair.

10                    THE CLERK:  Please raise your right hand.

11                    MARIE L. LEVINE, PLAINTIFF, SWORN

12                    THE CLERK:  State your full name for the record and

13      spell your last name.

14                    THE WITNESS:  Marie L. Levine, L-E-V-I-N-E.

15                    THE CLERK:  Thank you very much.

16                    THE WITNESS:  I see what you mean, Tom.

17                    THE COURT:  Yes.  All right.  Mr. Hymes said some

18      water spilled.  Are you okay?

19                    THE WITNESS:  Yes, it did.

20                    THE COURT:  Okay.

21                    MR. MURRAY:  Your Honor, I have a Kleenex.  May I

22      approach?

23                    THE COURT:  Is it on the seat?  Yes?

24                    THE WITNESS:  No, not -- it's just a large lake.

25                    THE COURT:  Okay.

1        (Pause)

2    BY MR. MURRAY:

3    Q    All right.  Ms. Levine, would you tell the Court what

4    your city of residence is?

5    A    Los Angeles, California.

6    Q    And what is your current profession?

7    A    I'm an educator and an entertainer.

8    Q    Okay.  And what kind of an entertainer are you?

9    A    I'm an adult entertainer.

10   Q    And what kind of an educator are you?

11   A    I'm an adult sex educator.

12   Q    And what is your educational background?

13   A    I have a bachelor of science degree in nursing from San

14   Francisco State University, Class of '85.

15   Q    Okay.  And did you graduate with or without honors?

16   A    I graduated magna cum laude.

17   Q    Okay.  And did you go on and obtain a license as a

18   registered nurse?

19   A    I did.

20   Q    From what state?

21   A    California.

22   Q    Okay.  Now, you've indicated that you're an adult

23   entertainer.  When did you first become involved as a -- an

24   adult entertainer?

25   A    1982.

1   Q    And in what capacity?

2   A    As a stripper.

3   Q    Okay.  And where was that?

4   A    San Francisco.

5   Q    How old are you now?

6   A    I am 54.

7   Q    Okay.  And did you then begin appearing in adult films?

8   A    I did in 1984.

9   Q    And how old were you when you appeared in your very first

10  adult film?

11  A    Twenty-five.

12  Q    And do you recall who the first producer was of the film?

13  A    Absolutely.  Juliet Anderson.

14  Q    And do you recall what the name of the film was?

15  A    Educating Nina.

16  Q    And who is Nina?

17  A    Nina is my stage name.

18  Q    And what is the full name of your stage name?

19  A    Nina Hartley.

20  Q    Okay.

21  A    H-A-R-T-L-E-Y.

22  Q    And at the time that you began in the adult film-making

23  industry in 1984, in your first production, did the producer

24  check your ID?

25  A    Yes.

Levine - Direct(Mur)                                          38

1   Q    And verify that you were of age?

2   A    Yes.

3   Q    Okay.  And did you observe the producer checking the IDs

4   of any other performers?

5   A    I did.

6   Q    Now, in the -- in the 1980s -- in the 1980s,

7   approximately -- and these were sexually explicit films?

8   A    Yes, they were.

9   Q    And approximately how many sexually explicit films did

10  you appear in in the -- in the mid '80s?

11  A    Between '84 and 1990, approximately 200.

12  Q    Okay.  And for how many different production companies?

13  A    Oh, well over a dozen different ones.

14  Q    Okay.  And in every single instance in the 1980s that you

15  would appear in a sexually explicit film, would -- among these

16  dozen or more companies, what -- what, if anything, was their

17  practice about checking IDs to verify ages?

18  A    They would check the ID when I filled out the model

19  release.

20  Q    Okay.  And did they check out the IDs of other

21  performers?

22  A    Yes.

23  Q    And was that true of every single company in the industry

24  insofar as you personally observed in the 1980s?

25  A    Everyone that I worked for, they did this.

1    Q    And was that standard practice?

2    A    It was.

3    Q    Okay.  And they also had you sign model releases?

4    A    They did.

5    Q    Okay.  And this was all before 2257 even came into being;

6    is that correct?

7    A    It was, yes.

8    Q    Okay.  Now, during the 80s, when you were producing

9    -- working as a model in these sexually explicit films, did

10   any of the producers for whom you worked have any interest at

11   all in using minors?

12   A    Absolutely not.

13   Q    And what was the position of the part of the industry

14   that you were familiar with with respect to the use of minors?

15   A    The general --

16              MR. BLADUELL:  Objection, Your Honor.  It assumes

17   facts not in evidence.

18              THE COURT:  Well, it's hearsay, but it's not

19   admitted for the truth -- I'll -- I'll admit it not for the

20   truth of the matter asserted, but that's what she was told.

21   Overruled.  Is -- that was the basis of your objection?

22              MR. BLADUELL:  Yes, Your Honor.  She could possibly

23   not have any knowledge of everything that's happening in the

24   industry, only that what she experienced.

25              THE COURT:  Well, I think it's relevant as to what

1    she was told was going on.  So I'll admit it for that purpose.

2            THE WITNESS:  We would speak among -- about this

3    amongst ourselves, and the general consensus was that anybody

4    using minors should be covered in honey and tied to an ant

5    hill.  Not fun.

6    BY MR. MURRAY:

7    Q    So there was strong opposition to it?

8    A    Very strong.  Many of the people in the business are

9    parents, and they feel very strongly that the use of minors is

10   reprehensible.

11   Q    Okay.  Now, over the years can you tell the Court how

12   your career evolved?

13   A    Yes.  I started out as a dancer, and I made the sideways

14   move into movies; finished my college education and went into

15   adult entertainment full-time.  And by the mid '90s I had

16   expanded my portfolio to also include educational films,

17   specifically, deliberately educational, not merely

18   entertainment.

19            And from there I started speaking at universities,

20   understudies classes, film classes, feminism classes.  And I

21   also talked to doctors who were going to be therapists and

22   speak to them about sexual health and literacy and the

23   importance of that.

24   Q    And did -- did your career result in you becoming one of

25   the more well-known actresses?

1    A    It did.  Partly because of my longevity and partly

2    because I've always been outspoken.  I've always spoke

3    -- spoken to the press, to the public about my experiences as

4    a performer, both from a feminist perspective as well as a

5    civil liberties perspective.

6    Q    And did -- and so did you engender a fan base, so to

7    speak?

8    A    Yes, I have a very large fan base that goes around the

9    world.

10   Q    Okay.  Now, tell the -- the Court -- you started to talk

11   about your -- your sex education part.  How important is the

12   educational component to your career to you?

13   A    Well, the educational component is very important to me

14   personally because one of the dictates that nurses are called

15   upon to fulfill, of course, is what we call teaching education

16   and role modeling.  And so I'm discovered, and our culture of

17   sexuality is sick, and sick people need a nurse's care.  So

18   besides any fun that I may have had at my job, my primary

19   mission is to help lessen sexual fear and pain and isolation

20   in the world through education and movies.

21   Q    And explain to the Court how you have accomplished your

22   goal of being a sex educator.  What have you done?

23   A    Well, I've spoken out publicly about sex and sexuality

24   since 1984.  I was the first woman in adult entertainment to

25   seek out opportunities to speak to the public -- the greater

1    public about it because the political discourse of the mid

2    '80s was very volatile around the issue of adult entertainment

3    and could it be feminist and was it exploitative, and did it

4    demean the people who made the movies.

5              And there is -- they were talking about us a lot,

6    but no one was talking to us, the actual performers.  And so I

7    took it upon myself to get out there and speak as a member of

8    the community that was being talked about but not spoken to.

9    And it is a continuing -- one of the best things about my job

10   is I get to help people figure out what's best for themselves

11   and their feelings.

12   Q    And what -- what visual DVDs or other creations did you

13   make to help educate the public on issues of sexuality --

14   adult public?

15   A    I have helped create -- I've co-produced and performed in

16   a 38-volume series of sex education DVDs from the company Adam

17   and Eve, collectively called <u>The Nina Hartley Sex Guides</u>.  And

18   they are explicit and informational at the same time.

19   Q    And what do they -- and when did you create these?  Over

20   what period of years?

21   A    Between 1995 and 2010.

22   Q    And can you tell the Court what the general format of

23   each of these 38 DVDs?

24   A    They're actually pretty -- all very straight up.  Each

25   one starts with a -- a lecture about today's topic.  And then

1    the middle section is a demonstration -- explicit

2    demonstration with me and a -- and a demonstration partner

3    about the topic de jour, where we speak directly to the

4    audience.   And a third section is a fantasy scene that if

5    everything went exactly as you wished, here's how it might

6    look.

7    Q    And is that the explicit part?

8    A    They're all -- the second two sections are both explicit.

9    Q    Okay.  And what are some of the topics covered in your

10   lectured series -- in your volume of --

11   A    Well --

12   Q    -- educational videos?

13   A    -- I can go to what some of the most popular -- some of

14   the most popular points are oral sex for both genders.  My Sex

15   During Pregnancy tape actually is quite popular, believe it or

16   not.  How To Have Group Sex, How To Strip For Your Partner,

17   Erotic Bondage, to name a few.

18   Q    All right.  Now, have you authored a book?

19   A    I have.  It's called Nina Hartley's Guide To Total Sex.

20   Q    And --

21   A    And it is not explicit; only in words, no pictures.

22   Q    Okay.  And when -- when did you author that book?

23   A    2006.

24   Q    Okay.  And is it still available for sale?

25   A    It is.

Levine - Direct(Mur)                                          44

1    Q     Okay.  And tell the Court what you currently are doing.

2    A     I currently continue to perform in videos, I lecture, I

3    have a website that I run, and I have toys that I sell, and I

4    sometimes write the occasional advice column for money.  I had

5    a long-running Ask Nina blog that went on for over year that

6    was not explicit, at least words explicit, but not visually

7    explicit.  And I just continue to go out there and talk,

8    again, about sex and sexuality and sexual expression for men

9    and women.

10   Q     Now, I want to show you on the camera what has been

11   marked as Plaintiff's Exhibit 69 and ask if you can identify

12   that?

13   A     That looks like a page from my website.  Yes, it is.

14   Q     Okay.  And tell the Court what -- how your website works

15   and -- and what people can access.

16          THE COURT:  Exhibit --

17          MR. MURRAY:  I'm sorry, 69, Your Honor.

18          THE COURT:  All right.

19          THE WITNESS:  My website primarily has an archive of

20   the live weekly shows that I have done since 2002 or '3.

21   There is a store component where I sell -- where I seel toys

22   and movies that other people have produced.  But the content I

23   personally produce is not for sale except as a membership to

24   my site.

25   BY MR. MURRAY:

1   Q     And would you explain what those are?  You mentioned some

2   live -- what -- live shows?

3   A     Yes.  As part of the perks of membership, once a week I

4   do a live streaming video show.  And my members can log into

5   that and watch and type on the screen and interact with me in

6   that way.  And that is -- that's been going on since about

7   2002 or '3.

8   Q     And what -- where are you producing the show?

9   A     I produce them in my home.

10  Q     And what kind of shows are they?

11  A     They're sexually explicit.  If I'm by myself, I'm nude

12  and talking and masturbating.  And if I have a guest, we are

13  talking and engaging in sexual activity with each other.

14  Q     And is there an educational component to these?

15  A     There often is because it's live and we get questions

16  from -- I'll be in the middle of something, someone will ask a

17  question about what we're doing or something we have done in

18  the past, and we'll stop and -- and answer it.

19  Q     And then you mentioned that you archive these?

20  A     I do.  I believe there is a section on the site where you

21  can, you know, look at older shows.

22  Q     And, for example, if you'll look at the second page of

23  Exhibit 69, could you explain that page?

24  A     Yes.  Sometimes in our business we do what is called

25  content exchange.  So -- where we -- everyone involved, the

1    cameraman and the performers donate their labor.  And in

2    exchange for donating our labor, I get content for my site,

3    and they get content for their site, and everybody goes home

4    happy.

5    Q    And the third page, is this an example of your archived

6    lessons?

7    A    Yes.  Yes, it is.  Some of them are also archived content

8    exchange sheets, but anything with the X's on the background

9    is definitely my show.

10   Q    And who are the guests that you invite to participate in

11   your live shows?

12   A    They are other adult performers who are already in the

13   business and have expressed an interest in working with me.

14   Q    Now, as a result of your production of the collection of

15   videos that you made over the years and the live shows that

16   you do on a weekly basis, have you become familiar with 2257?

17   A    I have, yes.

18   Q    And can you tell the Court how you attempt to comply with

19   2257 with respect to the explicit material that you create?

20   A    Well, every time I have a guest on the show, I take a

21   copy of their ID.  They fill out a 2257 declaration and sign a

22   model release for whatever it is that we do that day.  And

23   then I keep -- I keep the hard copies and have a file -- a

24   file cabinet that I use to house the records.

25   Q    And where -- where is there a file cabinet?

1    A    It's in my home.

2    Q    Okay.  And then do you also create an electronic copy of

3    those records?

4    A    I do.  I scan all the IDs and 2257 forms and convey those

5    to my web master.

6    Q    And can you tell the Court have you encountered any

7    problems with respect to compliance with 2257?

8    A    I have.  I've had difficulty getting the electronic to

9    sync up with the paper.  I'm not an Excel spreadsheet expert.

10   And so that's been problematic for me.

11   Q    What about the cross-referencing requirement?

12   A    That is very difficult for me.  I am a performer, I'm not

13   a secretary.

14   Q    Okay.  And can you tell the Court whether or not you have

15   any particular concerns about 2257 and how it would apply to

16   you?

17   A    Where do I start?  For the most part, I was very

18   concerned for a number of years that I had to put my home

19   address on the front of my website when I was both the primary

20   keeper of records and the producer.  And I've since changed

21   website management, and I now have a third-party producer, a

22   keeper of records.

23             THE COURT:  You have a third-party?

24             THE WITNESS:  I have a third-party keeper of records

25   now.

1   BY MR. MURRAY:

2   Q    So you keep the originals in your home, but then send an

3   electronic copy to the web master?

4   A    Yes.  So they have -- they have proof of age of all the

5   people that I provide them images of.

6   Q    Okay.  And is there anything else about 2257 that

7   particularly bothers you?

8   A    Yes, there is.  Thank you for asking.  My biggest problem

9   with 2257 is that it specifically puts sexual speech in a

10  separate category that is more heinous and more --

11            THE COURT:  Sex and?

12            THE WITNESS:  Sexual -- sexual speech in a separate

13  category from other speech.  It presumes criminal intent

14  simply because we are creating sexual speech.  It assumes that

15  we are criminals before the fact.  It -- my understanding of

16  our system was that we were innocent until proven guilty.  So

17  someone has to suspect I might have used a minor, create that

18  charge, and come and make me prove I did not use a minor.

19  2257 says that I have to declare before the fact, I'm not a

20  criminal.  No, I'm really not a criminal.  And no other form

21  of speech has this litigation that presumes criminality or

22  criminal intent without proof.

23            And I find that very, very problematic.  I am being

24  -- I am being singled out for my profession.  I am being

25  treated differently because of my profession.  And more

1   importantly, I am considered suspect because of my profession,

2   and I resent that.

3   BY MR. MURRAY:

4   Q    Now, is there anything about 2257 that in any way --

5   well, back up.  Without 2257, would you continue to check IDs

6   of your guests and other performers?

7   A    Oh, of course.

8   Q    Okay.  And is there any aspect of 2257 that in your

9   opinion does anything to prevent you from using minors that

10  you weren't already doing?

11  A    It does not because they can present me with whatever ID

12  that they have.  And so these days I look at a passport, I

13  look at -- at a driver's license, and they look -- they looked

14  legitimate to me.  I do not use people who are very young

15  because I don't prefer those people as partners, but I'm still

16  -- I'm still assuming that the ID they give me is correct and

17  not a fraudulent ID.  It is not out of the realm of history

18  for someone who is not yet age of majority to have gotten

19  their hands on a false ID and come to our business and

20  presented it to a producer who has then used that person

21  unknowingly who -- who is not of majority.

22  Q    Okay.  Thank you.

23         MR. MURRAY:  I would offer into evidence Plaintiff's

24  Exhibit 69, Your Honor.  And otherwise, I have no further

25  questions.

1            THE COURT:  All right.  Cross-examine.

2                       CROSS-EXAMINATION

3     BY MR. BLADUELL:

4     Q     Good morning, Ms. Levine.

5     A     Good morning.  Thank you.

6     Q     You've -- you've testified that you have a website called

7     Nina.com, correct?

8     A     Yes.

9     Q     And some of the web shows that appear in Nina.com, you

10    produce them at your studio, correct?

11    A     Correct.

12    Q     Because you have a studio that's separate from your

13    house, correct?

14    A     Yes.

15    Q     And these web shows that you record contain sexually

16    explicit material, correct?

17    A     Yes.

18    Q     And in these web shows you have performed with people as

19    young as 21, correct?

20    A     Yes.

21    Q     And, in fact, you've performed with more than 15

22    performers between the ages of 21 and 25 in your web shows,

23    correct?

24    A     Approximately, yes.

25    Q     Now, I'm going to show you Exhibit 88E, please.  Okay.

1    So, Ms. Levine, you recognize Exhibit 88 to be one of your --

2    as you mentioned, one of your web shows?

3    A    I do.

4    Q    And that performer is Bree Olson?

5    A    Yes, it is.

6    Q    And she was 21 when that happened?

7    A    Approximately.

8    Q    Okay.

9    A    It's been a number of years.

10   Q    And did you -- can you read the description below the --

11   the web show?  Is that -- that's a description that appears

12   in --

13              THE COURT:  Well, it's very small type.  I mean --

14   BY MR. BLADUELL:

15   Q    Okay.  We're going to -- we're going to --

16   A    I can -- I can -- it's what's considered girl copy.  It's

17   cute, flirty language saying how much fun I'm going to have,

18   and how pretty is she, and, boy, don't you want to watch it.

19   Q    So that it is a -- a description to incite sexual

20   arousal, correct?  It's not --

21   A    Yes, certainly.  Oh, there it is.  Yes.

22   Q    It's not educational -- it's not part of your educational

23   video, correct?

24   A    It is not specifically educational.  It's educational by

25   accident.

1   Q    Okay.  And if we go -- let's see the -- the image.

2   That's -- your hand is at the corner of the --

3   A    Yes, that's my hand.

4   Q    And you have a whip, correct?

5   A    I do.

6   Q    Okay.  Now, your -- your testimony is that you have

7   -- have you ever performed in your web shows with individuals

8   under 21?

9   A    Probably not.

10  Q    Okay.  But you don't rule out performing with individuals

11  that are 18 to 20 for your web shows, correct?

12  A    I don't.

13  Q    Now, you -- Ms. Levine, you don't personally manage the

14  website Nina.com, correct?

15  A    Correct.

16  Q    A company called Premium Cash does it for you, correct?

17  A    Correct.

18  Q    And that's a company that manages several adult websites,

19  correct?

20  A    Yes, about 10, I think.

21  Q    And this company is in Canada, correct?

22  A    It is.

23  Q    And this company serves as your custodian of 2257

24  records, correct?

25  A    It is.  It does.

1    Q    And you have a revenue-sharing agreement with them,

2    correct?

3    A    I do.

4    Q    And as part of this revenue-sharing agreement, they link

5    sexually explicit content to your site, correct?

6    A    The do.

7    Q    And you -- you've also said that the revenues that you've

8    -- that you had from 2009 to -- 2005 to 2009 were

9    approximately $180,000 from Nina.com?

10   A    Yes.

11   Q    And those revenues have increased after your contract to

12   Premium Cash, correct?

13   A    Correct.

14   Q    And you don't derive the primary source of your income

15   from Nina.com, correct?

16   A    It is a substantial portion of my income.

17   Q    But you also derive income from performing --

18   A    I do.

19   Q    -- as an adult performer, correct?

20   A    Yes.

21   Q    Now, Premium Cash, you said that they link content to

22   your site, correct?

23   A    They do.  It is standard industry practice.

24   Q    Okay.  And let's go to Exhibit 86C, please.  Ms. Levine,

25   you recognize this printout as something from -- images from

1    your site, correct?

2    A    No, this is -- may be a website, but it's not my site.

3    Q    So it's a -- it's a link -- it's content that Premium

4    Cash has linked to your site, correct?

5    A    I would say yes.

6    Q    You have allowed Premium Cash, as the manager of your

7    site, to link content to your site?

8    A    Yes.

9    Q    It is not something that happens without your consent?

10   A    Correct.

11   Q    Now, the women depicted in this document -- and if we go

12   to the next page, so you can -- now, you -- you've seen this

13   before, correct?

14   A    Yes.

15   Q    And if we go to the next page when you're done with this

16   page.

17   A    Okay.

18   Q    Now, these are all women that are younger than you,

19   correct?

20   A    Most assuredly.

21   Q    You're 54 years old, correct?

22   A    Yes.

23   Q    And most of these women are in their 20s?

24   A    I would assume so, yes.

25   Q    And as part of this revenue sharing agreement with

1    Premium Cash, when people log into the sites, you expect to

2    receive some revenue from it?

3    A    If they log into my site and then go from there and spend

4    money elsewhere on Premium Cash, I will get a -- a commission

5    of some sort, and visa versa.  You know, say, someone enters

6    the Premium Cash site through another performer's site and

7    then comes over to my site and buy's something, she will get a

8    commission.

9    Q    Okay.  Now, let's go, please, to Exhibit 86B.  Ms.

10   Levine, this is -- these are other -- this is another link

11   that Premium Cash links to your site, correct?

12   A    Yes.  Yes.  It says my link at the top.

13   Q    And you also get -- you expect to get some revenue if

14   someone links -- if someone goes to your site and then clicks

15   on these sites, correct?

16   A    Yes, I do.

17   Q    And at the bottom there's some teen cams over there,

18   correct?

19   A    Yes.

20   Q    And the person --

21   A    Right opposite MILF cams.

22   Q    And there's also -- there's several different types of

23   cams, correct?

24   A    Yes, there are.

25   Q    And the person can click on those cams and be directed to

1    another site, correct?

2    A    Yes.

3    Q    Now, if we go to Exhibit 86D.  Now, these are images from

4    the teen cams' link through your site, correct?

5    A    Yes.

6    Q    You also expect to receive some revenue from these teen

7    cam if people go through your website to these teen cams?

8    A    Yes, it's standard practice.

9    Q    And just looking at the pictures that appear on -- on

10   this page -- just looking at the pictures, you cannot for sure

11   say that all of them are over 18?

12   A    Correct.

13             THE COURT:  What's this exhibit number again?

14             MR. BLADUELL:  86D, Your Honor.

15   BY MR. BLADUELL:

16   Q    Ms. Levine, you've also testified that you began

17   performing -- performing as a -- a stripper in 1982?

18   A    Correct.

19   Q    And you were 23 --

20   A    Correct.

21   Q    -- when that happened?  Your -- your first porn movie you

22   did in -- when you were 25?

23   A    Correct.

24   Q    But you also started thinking about becoming an adult

25   film actress when you were 17, correct?

1    A    Correct.

2    Q    And throughout your career in the adult industry, you

3    have performed with many teens, correct?

4    A    I wouldn't have a number on it, but certainly some of

5    them have been 18 and 19.  It just stands to --

6    Q    You've worked with performers who are recent high school

7    graduates, correct?

8    A    I have.

9    Q    Let's go to Exhibit 85C.

10   A    So classy.

11   Q    Ms. Levine, you've seen this document before?

12   A    I have.

13   Q    And it's a -- it's a website Cougarscravekittens, right?

14   A    Yes.  Yes, it is.

15   Q    And if we go to the -- the last page, please, Exhibit

16   85C.  Are the -- let's just flip through the pages.

17   A    This is 85C?

18   Q    Yeah.  And let's go to the next page, please.  And the

19   next -- so the next page is the one I'm looking for.

20   A    Oh, it is me.

21   Q    That's a -- that's a depiction of you, correct?

22   A    It is.

23   Q    With Ms. Alanah Rae?

24   A    I guess that's her name.

25   Q    And she was around the age of 18, 19 at that time?

1    A    Yeah.

2    Q    It's not uncommon to see teens performing in pornography,

3    correct?

4    A    It's not uncommon to see women who have recently reached

5    the age of majority in adult films.

6    Q    And if -- I'm going to show you Exhibits 85A to -- 85A,

7    please.  These are also site from the -- these are also images

8    from the same site, correct?

9    A    It does look that way, yes.

10   Q    And 85B.  Same -- same website?

11   A    It does it appear to be similar.

12            MR. BLADUELL:  Okay.  I'll move them into evidence,

13   85A through 85C.

14            THE COURT:  All right.  Admitted.

15   BY MR. BLADUELL:

16   Q    Ms. Levine, you also testified that whenever you've

17   performed in adult movies, they have checked your ID, correct?

18   A    Correct.

19   Q    And that you have seen producers checking the ID of other

20   people, correct?

21   A    I have.

22   Q    But there is sometimes that this exchange of IDs happens

23   and you're not there to see it, correct?

24   A    Correct.

25   Q    Sometimes you're outside the room where producers are

1    supposedly checking the IDs of the other performers, correct?

2    A    Correct.  But it doesn't really matter because they can't

3    produce a movie legally unless they collect an ID of everybody

4    in the movie, whether or not I witness personally.

5              THE COURT:  So you rely on the primary producers to

6    do the checking?

7              THE WITNESS:  Well, yes, they don't want to go jail.

8    And they want to have a -- they also want a part they can

9    legally sell.

10   BY MR. BLADUELL:

11   Q    If we go to Exhibit 307, please.  This is another -- this

12   is the same image from the site before where you were

13   performing with Alanah Rae in a website called Porn.com?

14   A    Looks like me.  Oh, there's my name.

15   Q    And you didn't know that this video was posted in this

16   other site, correct?

17   A    No.  Once I -- once I make a movie, I have no control

18   over where it goes.

19   Q    And it can be posted in many, many other sites?

20   A    Once I sign the model release -- well, the movie was

21   never my property, but once I sign the model release, I have

22   absolutely no -- no performer has any say over what happens to

23   product after they have signed the release.

24   Q    Okay.

25             MR. BLADUELL:  Move into evidence 307.

1    BY MR. BLADUELL:

2    Q    And let's go -- Exhibit 306, please.  Ms. Levine, Exhibit

3    306 is a printout of a website called <u>Bravo Tube</u>, correct?

4    A    Yes, it is.

5    Q    And in the -- in the center of the picture you're

6    performing with other performers?

7    A    I am.

8    Q    And one of the performers is Tara Lynn Fox?

9    A    Yes, it is.

10   Q    And she's 19?

11   A    She is.

12   Q    And that's something that she told you, correct?

13   A    Yes.  And I never forget because she was the first

14   performer I worked with who was younger than my breast

15   implants.

16   Q    Now, Ms. Levine, there are other images on this site,

17   correct?

18   A    Yes.

19   Q    And there's one at the left of a -- of a woman holding a

20   man's penis, correct?

21   A    Yes.

22   Q    And you cannot tell me that she's clearly over 18,

23   correct?

24   A    Correct.

25   Q    And there's another image on the right, from -- from the

1    top to the bottom, the third one.

2    A    Yes.

3    Q    You cannot tell me that that individual is clearly over

4    18, correct?

5    A    Correct.

6    Q    Now, let's go to -- admit into evidence 306.  If we go to

7    Exhibit 87 now, please.  This is another image of you

8    performing in a -- in a sexual explicit video?

9    A    Yes.

10   Q    And you're -- you're aware of what Redtube is correct?

11   A    I know it's what they call a tube site.  It's one of the

12   more popular ones.

13   Q    And in a -- in a tube site you have a lot of videos that

14   are free pornography, correct?

15   A    Stolen, but, yes.  Free to the viewer, but not free to

16   us.

17   Q    Okay.  Now, before performing with this person, you

18   didn't -- you didn't know him, correct?

19   A    No.

20   Q    And --

21   A    And I haven't seen him since.

22   Q    You've never seen him since?

23   A    No.

24   Q    It's not uncommon in the pornography industry not to know

25   all of the performers, correct?

1            THE COURT:  There's a lot -- there's double

2    negatives in that question.  Rephrase it, please.

3    BY MR. BLADUELL:

4    Q    It is --

5            MR. BLADUELL:  I'm sorry, Your Honor, that's --

6    that's true.

7    BY MR. BLADUELL:

8    Q    It is common in the adult industry not to know all of the

9    performers in that industry, correct?

10   A    Oh, absolutely.

11   Q    It is a vast --

12   A    I often meet someone for the first time when I am working

13   with them.

14   Q    It is a vast industry, correct?

15   A    It has gotten much bigger.

16           MR. MURRAY:  Objection, Your Honor.

17   BY MR. BLADUELL:

18   Q    That has grown since you -- since you started on it in

19   1984, it has grown exponentially, correct?

20   A    Absolutely.

21   Q    And you -- you will also agree with me that young women

22   are welcoming pornography, correct?

23   A    Yes.

24   Q    And -- and several -- in fact, several young women have

25   asked you for advice in getting into the pornography industry,

Levine - Cross (Bla)                                             63

1    correct?

2    A    They have.  I have often been a mentor to women seeking

3    information about getting into adult film.

4    Q    Some of them have been 19 years old, correct?

5    A    Oh, yes.

6    Q    One of them was Tara Lynn Fox, that one --

7    A    She was already in the business actually.  She did not

8    ask.  I met her on the set that day, so she had been in the

9    business for -- not quite sure how long, but a few months.

10   Q    So women also in the business that are 19 years old ask

11   your advice about going forward in the business, correct?

12   A    They do.  They see that I've lasted as long as I have,

13   and I am not dead or crazy or on drugs, and I seem to have an

14   okay life, and they'd like to know how to do that.

15   Q    Now, you're considered a -- let's say a MILF in adult

16   industry language, correct?

17   A    Yes, a MILF, a cougar, or now it's called mature.

18   Q    And that's a term that is -- applies to women over 35

19   when you say that people consider attractive, correct?

20   A    Yes.  Although now, it's crazy, MILF has been lowered

21   down to 29-year-olds.  Which is crazy because at 29 you cannot

22   have a -- you cannot have an age-majority child.  But, yes,

23   pornography is weird that way.

24   Q    Okay.  But you would agree with me that most women enter

25   the adult industry in their 20s rather than when they're over

Levine - Cross (Bla)                                    64

1   35, correct?

2   A    Yes, I would say that.

3   Q    And it could be -- it would be more difficult for women

4   over 35 to go -- go into the pornography industry and make a

5   living for themself?

6   A    It would depend on the person and how -- consider how

7   attractive she is and how hard she wants to work.

8   Q    But you once said in an interview that if you would have

9   been -- if you would have entered the adult industry as a

10  MILF, rather than at 25, it would have been harder for you to

11  be successful in the industry?

12  A    It was certainly not as impossible to be as successful

13  because I have a 30-year career.  And if I started at 35, I'd

14  only have a 20-year -- God, barely 20-career.  So it's just --

15  yeah, it's those 10 years of build up of good will and -- and

16  experience do matter.

17  Q    Okay.  Now, you -- you also agree with me -- and we've

18  seen some pictures -- that you cannot tell someone's exact age

19  from an image, correct?

20  A    Well, exact age, never.

21  Q    And sometimes you cannot even tell from one -- some of

22  the images that we saw if the person is over 18, correct?

23  A    Correct.

24  Q    Now, with respect to the requirements of checking IDs and

25  keeping the records, you think that that's something perfectly

1   reasonable for --

2   A    It is.

3   Q    -- for primary producers, correct?

4   A    Absolutely.

5   Q    And you have never had a project that you've wanted to do

6   that you have decided not to do because of 2257, correct?

7   A    Correct.

8           MR. BLADUELL:  I have nothing further at this time,

9   Your Honor.

10          THE COURT:  All right.  Redirect.

11          Well, let me just ask a couple questions.

12                            EXAMINATION

13  BY THE COURT:

14  Q    The -- some of the images that were shown here while you

15  were testifying -- and we've had some of them in prior days --

16  used the word teens, T-E-E-N-S, correct?

17  A    Correct.

18  Q    All right.  And would you say that that is a fairly

19  common term that is used advertising pornographically explicit

20  sexual scenes that -- with young performers?

21  A    Well, certainly, for people whose preference is -- for

22  people whose preference is watching young women, teen would

23  certainly be a -- a attractive word.

24  Q    Okay.  All right.  Now, we know that teens refers to

25  teenagers, correct?

1    A    Correct.

2    Q    And a teenager could be anyone from 13 to 19, correct?

3    A    Correct.

4    Q    Okay.  Now -- and I'm not asking you for conjecture, but

5    I'm asking you if you know this from your personal experience

6    and your knowledge as having been in this industry for many

7    years.  Is the use of the word "teens" designed to attract

8    people who want to view -- want to attract viewers who are

9    interested in viewing younger looking people?

10   A    Absolutely.

11   Q    Okay.  Is it ever a concern of your -- on your part --

12   has it ever been a concern of your part that in doing so, some

13   of these people who are -- some of these viewers are

14   interested in looking at children as young as possible, and

15   including children under 18?

16   A    I don't know the motivation -- I don't know if the people

17   would wish they could see actual minors, but it is -- I would

18   not doubt that some viewers prefer looking at 18 and 19-year-

19   olds and they're pretending they might be younger than that.

20   That's a thought process, that's not an actual action.

21   Q    Okay.  Is there any reason why the industry doesn't say

22   young-looking adults instead of teens?

23   A    No.  It's a commercial product, so, you know, bigger,

24   bouncier, better, younger, stronger, older, MILFier, you know,

25   last longer, new packaging.  It's -- it is a commercial --

1    it's a commercial product, so they're using advertising

2    language that's going to try to draw the audience that they're

3    looking for.

4    Q    Does the use of the term "teens", based on your -- and

5    I'm asking all this on -- based on your experience, not -- and

6    if -- and I don't -- I'm not asking you to speculate.  I don't

7    want you to speculate.  But does the use of the word "teens"

8    in your mind attract -- let me -- let me rephrase the

9    question.  Does the fact that there's a lot of advertising of

10   sexually explicit material using the word teens -- does that

11   create a market for young, youthful looking performers to get

12   jobs in the industry?

13   A    There's always been a market for youthful looking

14   performers -- you know, performers in the industry.  So using

15   the word "teen" isn't creating more of a market.  There's

16   always been a market for young-looking adults.  That's always

17   been a -- that -- that way that producers can stay this side

18   of the law and use people over the age of majority, and then

19   have the added financial benefit of having a youthful looking

20   person.  So what people at home do with that image, you know,

21   I don't know.  So --

22   Q    Okay.  Well, let me -- let me ask you this.  And I -- I

23   don't mean to suggest that this is something that I'm -- I'm

24   just really asking.  Have you ever seen any of these

25   advertisements saying teens (18-19) to make it clear --

1   A     Oh, gosh, no.

2   Q     -- that they're -- legally they're adults?

3   A     No, I have not.

4   Q     You've never seen that?

5   A     Correct.

6   Q     All right.  Have you ever seen as an advertising phrase

7   younger, youthful-looking adults?

8   A     No, I have not.

9   Q     It's always the word "teens"?

10  A     Yes.

11  Q     Does that create in your mind, based on your experience

12  again, any danger that sexually -- and as a prelude to this

13  question, you would agree that there can be teenagers 13

14  through 17 who are sexually well-developed, males and females;

15  is that correct?

16  A     Yes, that's correct.

17  Q     Okay.  So is -- does the fact that there's a demand for

18  youthful looking performers in this industry create some

19  danger that 13 to 17-year-olds are going to want to try and

20  get jobs because they can make a lot more money doing this

21  than probably acting as -- you know, or getting a job as a

22  waitress or something like that?  Does that -- do you

23  understand my question?

24  A     A great danger, no.  Most people don't want to be in

25  adult films.  It would be horrific for them.  And they do not

1    seek it out, and they would never seek it out.  Impressions of

2    the camera changes everything forever.  And as --

3    Q    Well, but there are a lot of -- well, I don't understand

4    that answer because there are a lot of youthful looking

5    performers, young men and women, in these exhibits that we've

6    seen.  So they must be interested in working in the industry.

7    A    Yes, but they can't do it until they're 18.

8    Q    Well, I -- I understand they can't legally do it --

9    A    Right.

10   Q    -- until 18, but because there's a demand for youthful

11   looking performers, have you seen any danger that -- that

12   girls and boys -- and I use that term purposely -- under 18

13   will try to get -- try to pass as being 18 or older?

14   A    I wouldn't say it's impossible.  We have one -- we have

15   one documented case of that, Traci Lords, who -- who came into

16   the business in the '80s using a false ID and was under age

17   when she started making movies.  And when she was 17, it came

18   out to light that she had used a false ID and she obviously

19   left the business that very day.

20   Q    So false IDs are a risk?

21   A    Yes, with -- with or without 2257.  2257 has nothing to

22   do with IDs, and so -- how many people have gotten IDs and

23   they go drinking?

24   Q    All right.  Now -- now you're aware, because we've had

25   some testimony about this as well, that sometimes sexually

1    explicit films, videos, et cetera, are produced outside the

2    United States; is that correct?

3    A    Yes.

4    Q    And in some of those countries using performers under the

5    age of 18 can be legal, correct?

6    A    Correct.

7    Q    We had some testimony, for example, that some European

8    countries 16 is -- anything above 16 is legal?

9    A    Right, but those movies are not legally sold here because

10   the age of majority -- the physical copy are not likely to be

11   sold here because the age of majority in our country is 18.

12   Q    All right.  But sometimes videos that have been produced

13   outside the United States are shown in the United States; is

14   that correct?

15   A    I would think they would probably through the internet,

16   yes.

17   Q    They're what?

18   A    They're probably through the internet and be shown here

19   that way.

20   Q    Yes.  So do you see that -- now, do you know -- and I

21   know you're not a lawyer, but do you know whether that's

22   illegal under 2257 or any other law to -- for someone to put

23   an internet video available on the internet with a performer

24   that is under 18?  If you know.  I'm not asking you to guess.

25   A    I -- I don't know.

1    Q    You don't know.  All right.  Is that -- have you ever

2    concern -- heard about a concern about that?

3    A    I've never heard, but I have a concern about it.  That's

4    one of the problems of the internet is this -- there's no

5    barred entry.  So an image goes on the internet and we don't

6    know where it's produced, we don't know under what

7    circumstances or conditions it was produced.  And that has

8    always been a problem with me philosophically with the

9    internet because there is -- there is no way to know.

10            And one thing about my business -- the business

11   placed in Los Angeles is there is a blog entry.  We have to

12   keep records, we have to pay them, we have to let them know

13   what they're doing.  They have to sign a release.  And so it

14   is a safer way to make adult movies.  And the internet,

15   anybody can put up anything.

16   Q    All right.  Now, we've also had testimony this week that

17   -- and you said something similar -- that once a performer

18   performs in a video or a movie or a DVD, whatever, that the

19   performer really has no control over how that is used

20   subsequently, correct?

21   A    Correct.  And it says so in the model release.  It says

22   that I, the model, have -- have no say.

23   Q    All right.  And -- and we had also testimony that one

24   scene -- one sexually explicit scene can be used in like 10,

25   20, or 50 different movies?

 1    A    Oh, yes.

 2    Q    And for videos?

 3    A    Oh, yes.  I've had that happen to me.

 4    Q    Okay.  And is it possible, in your experience, or has it

 5    happened in your experience, that a scene which you have

 6    knowledge has been spliced -- and we use that term about

 7    getting these different separately shot scenes into one video

 8    -- has been used with a -- another scene that was taken

 9    outside the United States and had in it a performer who

10    arguably was under 18?

11    A    It certainly could happen.  It's not to my knowledge that

12    it's happened, but in what they call a compilation tape, which

13    is what you're describing --

14    Q    Is that what they're called, compilation tapes?

15    A    Compilation.  So a scene from movie A, scene from movie

16    C, you know, and they put them together.  So it's certainly

17    possible.

18    Q    Okay.  Now, do you know -- and I'm asking you these

19    questions because you have a lot of experience in this, but do

20    you know any way that can be prevented or precluded?  Because

21    -- and my prelude to that question is that you're -- as I

22    understand your testimony, you're opposed to the industry --

23    this industry in the United States using children under the

24    age of 18 in sexually explicit, right?

25    A    Oh, I am.  Oh, yes, I am.

Levine - The Court                                          73

1   Q    Okay.  So do you know any way to prevent this compilation

2   tape, where it would have U.S. made scenes, where everybody is

3   over 18 -- assuming they're applying the law -- but it would

4   include people under 18 because in certain countries that

5   could be legal?

6   A    Well, my understanding -- and I'm not a distributor of

7   adult films -- my understanding is that if I purchase a scene

8   from somebody, it has to come with paperwork, air quotes.  So

9   paperwork meaning photo ID of the model and a model release.

10  And the photo ID would have to be a passport showing the

11  person's date of -- date of birth.  And so a -- if I was an

12  American distributor or a person creating a compilation tape,

13  if -- would see that ID, you know that they can't use a scene

14  because it would not be legal here in the United States.

15  Q    All right.  Now, my next question has to do with what is

16  referred to as child pornography, which we know is very

17  heavily penalized by State and Federal laws, correct?

18  A    Yes, and they should be.

19  Q    And I assume -- and according to your testimony, that

20  you're very much opposed to children being in --

21  A    Absolutely.

22  Q    -- pornographic films?

23  A    Yes.

24  Q    All right.  Now, there's a -- do you see any line between

25  a person who -- say -- let me ask you this question.  You

1   know, most Federal Judges have had people accused of child

2   pornography as -- in a criminal case.  And if they're

3   convicted, the penalties are very severe, as I'm sure you

4   know.  Despite that, there is still a large amount of child

5   pornography going on on the internet.  And although it's not

6   as easily accessible as adult pornography.  Do you have any

7   knowledge from your experience as to why this happens?

8   A    Why people want to view child pornography?

9   Q    Well, there's still -- well, one reason, it would seem to

10  be, there's still a demand for this material?

11  A    Well, people who are pedophiles have their sexual

12  orientation turned toward people who are very young.  And the

13  viewing -- you know, I believe you can think whatever you

14  want, but you don't get to look at pictures of children in

15  sexual situations because that's a crime.

16  Q    Right.

17  A    And so for me, child pornography is evidence of a crime,

18  it's not porn.

19  Q    Well, crime is actually possession or trading of

20  material.  Looking itself is not criminal.  But that's a

21  technical point.  But do you see any danger -- well, let me --

22  let me -- strike that.  Do you see there being any value in

23  the -- strike that again.  2257, and as you may know, is a law

24  passed by Congress.

25  A    Yes.

1    Q    But then after that, the Department of Justice has

2    prepared regulations which interpret the law and provide more

3    details.  Are you familiar with that?

4    A    Yes.

5    Q    Have you ever read the regulations?

6    A    No, not all of them.

7    Q    Have you read some of them?

8    A    Yes.

9    Q    Okay.  Do you, in your -- as far as your own work is

10   concerned as both an educator and a performer, as you've

11   testified, draw any distinction between the complying with the

12   statute and complying with the regulations?

13   A    No, I don't know the difference between complying with

14   the statute versus complying with regulations.

15   Q    You don't see any difference?

16   A    I don't know what that -- I don't know -- I mean --

17   Q    Okay.  You don't -- okay.

18   A    So I -- I know that I keep records that prove that

19   everyone that I've worked with has been of age.  So I don't

20   know if that's a statute of the regulation.

21   Q    Okay.  All right.  Fair.  That's fair.  All right.

22        THE COURT:  Okay.  That's all the questions that I

23   have at this time.  All right.  Now, redirect.

24                    REDIRECT EXAMINATION

25   BY MR. MURRAY:

1   Q    Ms. Levine, the -- is it the case that in the history of

2   the adult industry, the instances of underage 16 or 17-year-

3   olds actually use -- succeeding in using fake IDs to enter the

4   industry has been pretty rare?

5   A    It's been very rare.  I know one documented case.  And

6   back in my early career I heard hearsay about two other women.

7   Q    Has the -- has it ever been a substantial or a serious

8   problem in the industry that underage people will try to pawn

9   themselves off as adults?  Has that ever been a serious

10  problem?

11  A    Serious?  Absolutely not, no.

12  Q    Now, when the -- you mentioned the advertising of the --

13  the teen genre of the films.  18 and 19-year-olds are

14  teenagers, correct?

15  A    Correct.

16  Q    And is that what it's referring to?

17  A    Yes.

18  Q    And has it been your experience that on the box covers

19  there's always a statement, even on those, all models are over

20  the age of 18?

21  A    Yes.  And that -- that was actually put into place on

22  video box covers before 2257.

23  Q    So is it customary that all of the producers who create

24  material for that particular niche, even thought they may call

25  their material teen whatever, the -- the actual product always

1   has a statement that all models are over 18?

2   A    Yes.

3   Q    That's been universal, hasn't it?

4   A    Yes.

5   Q    Okay.  And has it been -- to your knowledge in the

6   market, regardless of how it's been received by the -- the

7   customers that -- that you're saying you don't have specific

8   knowledge of -- has it always been the purpose, as you

9   understand it, of that advertising to communicate the message

10  that you're talking about 18 and 19?

11  A    Yes.

12  Q    And that's been the intent of the commercial messages?

13  A    Yes.

14  Q    Now -- and, in your opinion, does 2257 do anything to

15  prevent the use of minors in the teen type genre --

16  A    No.

17  Q    -- that wasn't already being done by the producers?

18  A    In my opinion, absolutely not.

19  Q    Now, you were asked whether you can always tell if

20  someone is over the age of 18.  And, obviously, the answer is

21  no, correct?

22  A    Correct.

23  Q    Would you tell the Court whether or not in the vast

24  majority of cases you can look at an image of someone and

25  determine whether that person is over the age of majority or

1   not?

2   A     The vast majority?  I don't know if I'd say vast

3   majority.   More people in porn look over 18 than under 18.

4   But I couldn't give you a percentage.

5   Q     Would you say that anyone over the age of 25 -- an image

6   of anybody at least 25 years old or older is not likely to be

7   confused with someone under 18?

8   A     Likely not, unless she was of small stature.

9   Q     Now, do you see anybody in this room who you would expect

10  is under the age of 18?

11  A     No.

12  Q     But do you know the precise ages of everybody in this

13  room?

14  A     I do not.

15  Q     Now, you were asked a lot of questions on cross-

16  examination about the money that you were making and the

17  profit sharing with your -- your partner and the images that

18  you produced, are you doing anything wrong, as far as you

19  know?

20  A     As far as I know, I'm not.

21  Q     Are you doing anything illegal?

22  A     As far as I know, no.

23  Q     Are you accustomed to being cross-examined about all your

24  images?

25  A     No.

1          MR. BLADUELL:  Objection, Your Honor.  Relevance.

2          THE COURT:  Overruled.

3    BY MR. MURRAY:

4    Q    And do you believe that you're exercising any First

5    Amendment rights with what you do?

6    A    Absolutely I do.

7    Q    Well, explain that.

8    A    Well, sexuality is a very important part of most people's

9    lives and experiences, and it is very important in our culture

10   that is so erotiphobic and so tied up in a knot over sexual

11   expression that we don't even teach our young people the right

12   word for their bodies.  We do not teach young people how to

13   protect themselves against pregnancy, disease.  We keep them

14   ignorant, which makes them vulnerable to predation.  It makes

15   them vulnerable to disease and pregnancy and all the things

16   that go with that.  And all because we're so scared of sex

17   that we mustn't let any young people know about.

18          Mother Nature is wiser than we.  And whether or not

19   children receive education around sexuality, whether or not

20   they receive accurate information about sexuality, at some

21   point in their lives they'll be interested in this sex thing.

22   And so having sexual speech be legal is really important

23   because sexuality is very important.  And explicit material is

24   important because it's where we house our sexual dreams.  And

25   as -- as silly and stupid as much pornography might be -- and

1    I do not say that it's not -- the really important message in

2    it is that no one dies.

3            In mainstream Hollywood, if you look at movies -- if

4    someone crosses a sexual line -- especially the woman crosses

5    the sexual line, something bad has to happen to her.  And in

6    porn or adult entertainment nobody dies at the end, no one has

7    gone to jail, no is put to a mental institution, no one has

8    lost their job.  And so it's important, I think, for people to

9    be able to view and read sexual speech so they know that

10   they're not alone, that they're not crazy, that they are not

11   somehow alone or crazy.

12           Sexuality is a really important part of people's

13   lives, and we suppress sexual speech and sexual knowledge at

14   our peril.  I think our statistics on teen pregnancy and STDs

15   hold -- hold the truth to that, that ignorance does not help

16   anybody.  And sexual ignorance is particularly harmful.  Just

17   as credit ignorance puts people into ruin, sexual ignorance

18   can put people into ruin.  And as a nurse and a health

19   professional, it's really important that we keep sexual speech

20   legal, even if it's distasteful or silly or ugly.

21           There's lots of adult material I find distasteful

22   and ugly and something that I wouldn't watch.  And so as a

23   performer, I have to know that -- was it made legally?  Did

24   they agree?  Did they consent?  Were they paid?  Did they

25   understand what they were doing?  Were they of age?  Of

1    course, you have to consent -- you have to be of age to

2    consent, we understand that.  And the -- the content is less

3    important for me than under -- the condition under which it

4    was made.  Because loss of speech is horrific, we don't ban

5    the Bible, despite how much violence has come from that,

6    sexual or otherwise; we don't ban the Koran.  You know, so

7    it's important that we keep sexual speech legal, even when it

8    makes us uncomfortable.

9              THE COURT:  Okay.  Thank you.

10             MR. MURRAY:  That's all I have.  Thank you, Your

11   Honor.

12             THE COURT:  Recross?

13                         RECROSS-EXAMINATION

14   BY MR. BLADUELL:

15   Q    Ms. Levine, you understand that 2257 does not prevent the

16   production of pornography, correct?

17   A    Correct.

18   Q    2257 deals with checking IDs of performers; that's one

19   part, correct?

20   A    Yes.

21   Q    And keeping records?

22             THE COURT:  Well, I think she understands that.

23   That's -- I don't think that's -- was the focus of the

24   redirect.

25             MR. BLADUELL:  Nothing further.

```
 1                THE COURT:  You don't have anything else?  All

 2    right.

 3                MR. BLADUELL:  No.

 4                THE COURT:  All right.  Thank you very much.

 5                THE WITNESS:  Thank you.

 6                THE COURT:  All right.  You say you have one more --

 7    one more witness this morning?

 8                MR. MURRAY:  Yes, Your Honor.

 9                THE COURT:  We'll take a 10 minute recess and then

10    we'll come back.

11                MR. MURRAY:  Thank you.

12          (Recess taken, 10:52 a.m. to 11:09 a.m.)

13                THE COURT:  Okay.  You're ready for the next

14    witness?

15                MR. MURRAY:  Yes, Your Honor.  Plaintiffs call the

16    plaintiff David Levingston.

17                DAVID BERTRAM LEVINGSTON, PLAINTIFF, SWORN

18                THE CLERK:  State your full name for the record and

19    spell your last name.

20                THE WITNESS:  David Bertram Levingston, L-E-V-I-N-G-

21    S-T-O-N.

22                THE CLERK:  Thank you very much.  You may have a

23    seat.

24                THE COURT:  L-E-V-I-N-G --

25                THE WITNESS:  -- S-T-O-N.
```

 1              THE COURT:  -- S --

 2              THE WITNESS:  -- T-O-N.

 3              THE COURT:  Livingston [sic].  Thank you.

 4              THE WITNESS:  Levingston.

 5              THE COURT:  Levingston, sorry.

 6              THE WITNESS:  Yeah.

 7              THE COURT:  Thank you.

 8                    DIRECT EXAMINATION

 9    BY MR. MURRAY:

10    Q    Good morning, Mr. Levingston.  What -- tell the Court

11    what city is your residence?

12    A    Springfield, Ohio.

13    Q    And please speak directly into the microphone and keep

14    your voice up, if you wouldn't mind.

15    A    Yes.

16    Q    Have you been a photographer ever?

17    A    Pretty much my whole life.

18    Q    And whole old is your whole life now?

19    A    I'm 61.

20    Q    What's your educational background?

21    A    I have a bachelor of science degree in journalism from

22    Ohio University and did graduate work in sociology.

23    Q    And where did you do your graduate work?

24    A    At Ohio University.

25    Q    Did you achieve a graduate degree?

1   A    No.

2   Q    Now, when did you first become interested in photography?

3   A    I was a sophomore in high school.

4   Q    And what happened?

5   A    I checked the -- the encyclopedia of photography out of a

6   library and read it all the way through, and taught myself to

7   develop film and make prints and became a photographer.

8   Q    And did you actually do any photography in high school?

9   A    Yes.  After about a year of taking pictures, I took some

10  of my pictures to the local daily newspaper and they hired me

11  as a photographer.  I was 16 at the time.

12  Q    Now, tell the Court what your professional background has

13  been and your employment history.

14  A    Well, I worked for newspapers -- for several different

15  newspapers for several years before and after being drafted

16  into the Army back in the bad old days when we had a draft.

17  Q    Well, begin there, after -- after college or -- or during

18  those years.  Take us through your career.

19  A    Okay.  That first job was the Newark Advocate in Newark,

20  Ohio.  And I was working there when I started college, and

21  then was drafted after my freshman year of college and spent

22  two years in the Army.  And --

23  Q    What years were those?

24  A    '71 to '73.

25  Q    Where were you stationed?

1    A      Germany.

2    Q      Okay.

3    A      And when I came back, I went back to college and got a

4    job with another daily newspaper and worked there while I was

5    working my way through college.  After getting the degree in

6    journalism and doing a couple of years of studying of

7    sociology and realizing that that wasn't going to be a career

8    for me, I applied for and got a job with the Federal

9    Government as a photo journalist in Columbus, Ohio.

10   Q      Where in Columbus?

11   A      It was at that time called Defense Construction Supply

12   Center.  I think the name has changed over the years, but

13   that's what it was called when I worked there.  I was there

14   about five years and got a -- a job as -- promotion as the

15   editor of a base newspaper at the Newark Air Force Base in

16   Newark, Ohio.  And I worked there for 15 years.  After about a

17   year as the editor, I was made the chief of the Public Affairs

18   Office.  And --

19   Q      And what was this entity?

20   A      The Newark Air Force Base.

21   Q      Okay.  And where was that?

22   A      Newark, Ohio.

23   Q      Okay.  Go ahead.

24   A      After about 15 years there -- well, during that time --

25   at the end of that time the -- the base was closed through the

1    BRAC process.

2    Q    What's the BRAC process?

3    A    Base Realignment and Closure.  It -- it's a process used

4    to select and close bases -- military bases.  And during the

5    -- the base closure, I was the person in charge of

6    communicating to the workforce what was happening to them,

7    which for many of them this was the worse thing that ever

8    happened in their lives.  And I think that's the high point of

9    my career.  I did that job, and we had no workplace violence

10   and no suicides during the base closure.  And that's almost

11   unheard of in a -- in a base closure.

12            At the end of that time, the work I did there had

13   been noticed and I was offered a job at Wright-Patterson Air

14   Force Base in the Air Force Material Command Headquarters,

15   where I worked the rest of my Government career of about 10

16   years as -- primarily as the Deputy Chief of Media Relations

17   for Air Force Material Command.

18   Q    And when did you retire from your work with the Federal

19   Government?

20   A    About six years ago.

21   Q    Now, in addition to your career in the Federal Government

22   and as a photo journalist in the various newspapers, is there

23   another form of photography that you have taken and advanced?

24   A    Well, I've done pretty much everything that's possible to

25   do with photography.  That's the -- the job was a job, and

1      photography is -- is what I do.  It's who I am.

2              I am a photographer who held a different job.  I

3      have owned a small-town portrait studio.  I've worked for

4      magazines and other publications during those years.  And I've

5      photographed the nude pretty much through most of that time,

6      starting when I was in college.  And about -- well, in 2002, I

7      basically discovered what I was supposed to be doing as a

8      photographer.  And that's photographing nudes in nature.  And

9      since 2002, that's been the primary focus of my work.

10     Q     And when you say photographing nudes in -- in nature, is

11     this fine art photography you're talking about?

12     A     I like to think that it is, yes.

13     Q     And what -- what kind of portraits are you talking about

14     doing in nature?

15     A     Well, I -- I seem to have a natural talent for

16     integrating the female figure into a natural environment.  And

17     I -- I believe there are reasons that's a significant artistic

18     statement.  It's not a new idea of mine, but I -- I do believe

19     that our ideas of what constitutes beauty are derived from the

20     female figure.  And, therefore, the things in nature that we

21     call beautiful are in some way related to the female figure.

22     And I seem to have a -- a natural talent for integrating the

23     figure into those natural environments and showing that

24     relationship.

25     Q     And the -- the models that you use, are they all of legal

1    age, over the age of 18?

2    A    Yes, always.

3    Q    And do you have any interest at all in using any models

4    who are minors?

5    A    Quite the contrary.  I prefer older models.

6    Q    Okay.  And are you opposed to using minors in sexual

7    images?

8    A    Absolutely.

9    Q    Now, has any of your work been exhibited?

10   A    Frequently in many places, yes.

11   Q    And what are some of the places where your work has been

12   exhibited?

13   A    In shows in galleries in Florida, in Vermont, California,

14   Los Angeles, Chicago, Detroit, the Lexington Art League Annual

15   Nude Show, the Kinsey Institute.  I have -- working a current

16   show that's up right now at the Kinsey Institute.  And I've

17   been shown in Chicago, and have a show opening there on June

18   15th.  Many other places; I've been shown in Europe as well.

19   Q    Now, how do you obtain your -- your subjects?

20   A    Most of them are people I know.  I meet -- I find models

21   through some of the modeling sites online, but primarily

22   models tend to find me.  I'm fairly well known for my work in

23   the community with people who do this kind of work.  And often

24   the models will see what I do and want to be part of it and

25   contact me.

1   Q    And do you have a studio?

2   A    I do.

3   Q    And where is that?

4   A    In Dayton, Ohio.

5   Q    Okay.  And do you work out of the studio or out of your

6   home?

7   A    Both.  As I said, most of my work is done outdoors.

8   So --

9   Q    Okay.  And where do you keep any records that you

10  accumulate in your business?

11  A    Both places, but primarily right now at the studio.

12  Q    Okay.  And how big is that studio?

13  A    It's a pretty good sized -- I don't -- I don't know the

14  exact square footage, but it's a good sized --

15  Q    How often are you there?

16  A    A couple times a month.

17  Q    Is there someone there keeping regular hours at that

18  studio?

19  A    No.

20  Q    Now -- so you shoot out in nature; is that correct?

21  A    Mostly.

22  Q    And do you shoot digitally or on film?

23  A    These days digitally.

24  Q    And --

25  A    Of course, I've been doing this since before digital,

1    but, you know --

2    Q    Okay.  And -- so tell the Court what happens at a

3    particular shoot.  Take -- take us through the shoot of a

4    model out in nature.

5    A    Okay.  Usually, I like to shoot at dawn.  So we start

6    around 4:00, 5:00 in the morning, depending on when the sun's

7    coming up.  And I collect the model and my gear and we go to a

8    -- a location outdoors that is a place that we expect to be

9    private and not disturbed and wander around in the woods or

10   the deserts or wherever this happens to be, until I see a

11   place that seems to me to require a female figure to be added

12   to the photograph, and I'll send a model to the spot that I

13   want her to be in and take some pictures.

14   Q    And then how many -- how many images do you create at a

15   given shoot?

16   A    There's no set number.  It varies greatly, but it's not

17   uncommon for it to be several thousand, because we'll do a

18   number of different places in the course of a day.

19   Q    Okay.  Now, have you published any book of your work?

20   A    Yes, I have published a book.

21   Q    And what's the name of the book?

22   A    The Figure in Nature.

23   Q    Okay.  Showing you on the screen a copy of Plaintiff's

24   Exhibit of -- not a copy, actually, Plaintiff's Exhibit 66.

25   Can you identify that?

1    A    Yes.  That's my -- the cover of my book.

2    Q    And what have you published inside that book?

3    A    Photographs of nudes in natural settings.

4    Q    And I see that was published in '05?

5    A    That's right.  I need to do something new.  This -- this

6    is all older work.

7    Q    But that's an example -- just goes through some of the

8    examples.  These are all your photographs?

9    A    Yes.

10   Q    That one?

11   A    Yes.

12   Q    That one?

13   A    Yes.

14   Q    That one?

15   A    Yes.

16   Q    And these are what you call photographs in nature?

17   A    Yes.

18   Q    What is the artistic message of these photographs?

19   A    Well, I don't know.  I -- I like to make beautiful

20   photographs.  I -- I think that beauty is a good thing and

21   -- so when I've created something beautiful, I've, in some

22   small way, added to the sum total of beauty in the world, and

23   that's not a bad thing.  Also, there -- there can be a -- I

24   like the viewer to bring their own interpretation, but I think

25   that many of the photographs do show the relationship of the

1    figure and the natural environment and gets to that idea that

2    we derive our -- our definition of beauty from the female

3    figure.

4            THE COURT:  Just let me interrupt you.  I just want

5    to be sure I understand your legal position about this,

6    because assuming that one would say these are not lascivious,

7    these were made in 2005.  So you're saying that when they were

8    made in 2005, they were subject to the statute, but they --

9    they would not be after 2009?

10           MR. MURRAY:  Actually, no, Your Honor.  I'm just

11   giving the background right now of the kinds of photographs he

12   takes and then I'll move in to what happened as --

13           THE COURT:  Okay.  All right.

14           MR. MURRAY:  -- as his career progressed.

15           THE COURT:  Okay.  Thank you.

16   BY MR. MURRAY:

17   Q    Now, there came a time, Mr. Levingston, when in 2009 --

18   well, first of all, are you familiar with 2257?

19   A    I -- somewhat, yes.

20   Q    Okay.  And are you familiar with the fact that in about

21   2009 the law was expanded to include simulated sexual acts as

22   well as lascivious exhibition of the genitals?

23   A    Yes.  Actually, I -- I really wasn't aware of 2257 until

24   2257(a).  And I became aware of it, it could apply to my work.

25   2257 does not apply to my work.

1    Q    Okay.  Well, actually, 2257 is what is -- in '09, it now

2    included lascivious exhibition of the genitals, and then

3    2257(a) included simulated?

4    A    Yes.

5    Q    Okay.  Now, can you tell the Court whether 2257 and

6    2257(a) and its potential applicability to lascivious

7    exhibition of the genitals and to its potential application to

8    simulate its sexuality has had any affect on your work?

9    A    Yes, it is.  I -- I do some work that has some erotic

10   content.  And I'm very concerned about not crossing the line

11   in the 2257(a) material when I do that work, which was not a

12   concern before 2009.

13   Q    Now -- and do you -- did your work include -- beyond the

14   -- the images in your book, did your work include images of

15   women where their genitals were displayed?

16   A    Sometimes.  I don't believe that there's any part of the

17   human body that is shameful and should always be hidden.  And

18   I -- I know that sometimes models would -- would have a

19   different view of that.  I always would tell my models if

20   there's anything you don't want photographed, don't point it

21   at the camera.  But I -- I really am only looking at what pose

22   is effective in getting the -- the message that I'm trying to

23   get of the relationship, what -- what makes an artistic,

24   beautiful composition.  And I don't really care what is seen

25   or what is not seen of a body in --

1    Q    But does your -- do -- did some of your images show the

2    genitals?

3    A    Yes.

4    Q    Now, did you create a calendar?

5    A    I do that every year.

6    Q    I'm showing you what's been marked as Plaintiff's Exhibit

7    67.  Is that a version of your calendar?

8    A    Looks like it.

9    Q    And does your calendar include photographs of women who

10   are nude?

11   A    Yes.

12   Q    And do some of those women who are nude have their pubic

13   hair and genitals exposed?

14   A    Sometimes.  It can happen.  It's not something I -- I

15   seek to do or not do.

16   Q    I want to show you what's been marked as Plaintiff's

17   Exhibit 65.  Can you describe what that photograph is?

18   A    Yes.  That's a picture from my nurse series.  I was

19   inspired to work on this series after seeing Richard Prince

20   exhibit at the Guggenheim in New York City.  He had a set of

21   nurse paintings.  He was actually photographing the covers of

22   nurse romance novels and blowing them up nine feet tall and

23   painting on them.  And I was very -- they were very, very

24   powerful.  They were disturbing, and they stuck with me.  And

25   I -- I kept thinking about those paintings and about the

1    strength and the power of the nurse icon in society, that they

2    -- they help us and they hurt us.  They're intimate and

3    anonymous at the same time.  And there's all this sexual

4    energy around nurses.  But I can use that.  That's -- that's

5    something I can make some photographs that have some power.

6    Q     Do you have a website?

7    A     I do.

8    Q     And was this on your website at one point?

9    A     It was.

10   Q     And is it still on your website?

11   A     No, I took it down after 2257(a) took effect.

12   Q     Is that because you were worried that it would be

13   regarding simulated sadomasochism?

14   A     That's why I took it down, yes.

15   Q     Now, on your website -- showing you Plaintiff's Exhibit

16   68.  Do you have a name for your website?

17   A     A website these days is DaveLevingston.com, but I also

18   used exposedforshadows has been a name I've used over the

19   years.  And it's -- I still use it on the website.

20   Q     And does your website publish some of the photos that

21   you've taken involving nudity?

22   A     Yes, it does.

23   Q     And has your website ever included images of nudity that

24   included depictions of pubic hair and genitals of your models?

25   A     It does happen from time to time.

1    Q    Now, since you became aware of 2257(a) and its

2    applicability to simulated sex and what someone would regard

3    as lascivious exhibition of the genitals, what have you done,

4    if anything, to -- well, first of all, do you comply with

5    2257?

6    A    No.  It doesn't apply to my work.

7    Q    And why doesn't it apply to your work?  In other words,

8    what have you done to make sure that it doesn't apply to your

9    work?

10   A    Well, 2257 has never applied to my work and never will.

11   2257(a) could apply.  And what I've done is tried to be very

12   careful to avoid producing images that might fall under

13   2257(a).

14   Q    Is it effective the way you shoot your models?

15   A    Absolutely.  I have to be thinking about that all the

16   time.  If a -- if a model happens to pose with her hand

17   between her legs, which could happen innocently, I will tell

18   her to not do that because someone could interpret that as

19   being sexual activity.  That -- that's just one example.  But

20   I'm -- I'm careful to try to avoid anything that might fall

21   under the law.

22   Q    Well, why wouldn't you just comply with 2257 and maintain

23   records?

24   A    Well, there are a number of reasons.  I -- I, frankly, do

25   not think I'm capable of maintaining the records according --

1   I don't understand how the records are supposed to be

2   maintained.  It -- it's incomprehensible to me.  And,

3   therefore, I'm sure that if I tried to maintain them, I would

4   mess it up.  I'm not good with record-keeping.

5            I'm also not willing to be subject to warrantless

6   searches.  And I consider that a serious violation of my

7   constitutional rights, simply because I'm expressing myself as

8   an artist, now I would have to be willing to allow warrantless

9   searches of my home or studio unannounced.  And I can't be

10  available 20 hours a week, as the law requires, to allow those

11  inspections.  I would never be able to leave.  I could never

12  do my work if I had to stay around and wait for an inspector

13  to possibly show up at my home.

14           I'm also not willing to publish my home address and

15  name out there on the internet for any nut job with an AK-47,

16  who might be offended by what I do, to come and attack my

17  -- me and my family.  I feel it's unsafe.

18  Q    Are you familiar with the fact that if you did comply

19  with 2257, you would have to put a -- a label on each one of

20  your images?

21  A    That's what I understand.

22  Q    And would you -- how would you do that with respect to,

23  say, the 2 or 3,000 digital images that you take in a given

24  shoot?

25  A    I have no idea how I can do that.  I don't know how it's

1    even possible.

2              THE COURT:  Excuse me one minute.

3         (Pause)

4              THE COURT:  Go ahead.

5    BY MR. MURRAY:

6    Q    Are you aware that the law would permit you to use a

7    third-party record-keeper so you wouldn't have to keep them at

8    your home?

9    A    I'm aware of that.

10   Q    And why wouldn't you do that?

11   A    Well, for one thing, it would cost money.  And I don't

12   make any money from my photography.  I suppose if I wanted to

13   shoot pornography, I could.  But there is no market of any

14   significance for the kind of work that I do.  Also, I'm not

15   willing to take the risk of a third-party not doing the job

16   properly and me being criminally liable for that.

17   Q    Now, are there any particular projects beyond the shoots

18   that you currently do that you were interested in doing that

19   you have refrained from doing because of 2257(a)?

20   A    Yes.  I -- I have work in the permit collection of the

21   Kinsey Institute and have -- as I mentioned, have work being

22   shown there right now.  And I have a -- a friend who is a

23   former prostitute who's now an author.  And she is interested

24   in a project where she and I would interview and photograph

25   former and current prostitutes about their experience working

1   as a prostitute.  I cannot imagine a -- a way that we could do

2   that without the photographs possibly crossing the line into

3   2257(a).

4              The Kinsey Institute, incidentally, is interested in

5   this project and thinks it could be something valuable to add

6   to their archives.  But I will not begin that project while

7   this law is in effect.  It would prevent me from doing it

8   properly or without having to -- to submit to all the

9   requirements of the record-keeping that I'm not willing to do.

10  Q    Do you make sure that anyone that you photograph is above

11  the age of 18?

12  A    I do.

13  Q    And how do you make sure of that for anybody who -- well,

14  how do you make sure of that?

15  A    Well, if I don't know they're above 18, I would check

16  their ID.  Since this law came into effect, I always check ID,

17  and I make a copy of the ID.

18  Q    Okay.  Have you ever used anyone under age?

19  A    No.

20  Q    And do you have any desire to ever use anyone under age

21  in your nude photos?

22  A    Never.

23             MR. MURRAY:  That's all I have, Your Honor, other

24  than to offer into evidence Plaintiff's Exhibits 65, 67, 68,

25  and 66.

 1            THE COURT:  All right.  They've been admitted.

 2    Cross-examine.

 3                        CROSS-EXAMINATION

 4    BY MS. BLADUELL:

 5    Q    Good morning, Mr. Levingston.

 6    A    Good morning, Hector.

 7    Q    It is correct to say that today you don't produce any

 8    work falling under 2257 or 2257(a), correct?

 9    A    I endeavor to not do that, yes.

10    Q    And you have -- well, you've testified on direct that you

11    have a wide range of interest in photography, correct?

12    A    That's true.

13    Q    In 2002, you started focusing on taking pictures of -- of

14    nude women in nature, correct?

15    A    That's true.

16    Q    Currently, however, you are focusing on two projects that

17    do not involve photographing nude women, correct?

18    A    I have two projects underway, in addition to doing nudes,

19    yes.

20    Q    And one of these projects is documenting the environment

21    in old news rooms, correct?

22    A    I'm sorry.

23    Q    One of these projects that you're focusing on right now

24    is documenting the environment in old news rooms?

25    A    It's a project interviewing and doing portraits of people

1    who worked in newspapers in the olden days when I was doing

2    that.

3    Q    And that involves traveling around, photographing, and

4    interviewing people who worked in the old news rooms?

5    A    Yes.

6    Q    This project is not going to involve nudes, correct?

7    A    That's correct.

8    Q    The second project, you would describe it as

9    photographers today as a reaction to digital photography?

10   A    Well, the second project is photographers who use old

11   processes -- alternative processes often making their own

12   materials and -- and photographing with usually Nineteenth

13   Century photographic processes.  It's a similar project in

14   interviewing and photographing them and talking with them

15   about why they do that kind of work.

16   Q    And this project also is not going to involve any nudes,

17   correct?

18   A    No, it could, but it's not a primary reason for the

19   project.  Some of those photographers shoot nudes so that --

20   that could enter into it through that.

21   Q    So you would be -- you would include the picture that

22   takes of nude, right?

23   A    Yes.

24   Q    But you would not take pictures of them posing nude,

25   correct?

1    A    No.  It depends on what they look like.  Not likely.

2    Actually, one of my models is one of those photographers,

3    so --

4    Q    So she could be?

5    A    Right.

6    Q    But you don't have any plans right now to photograph her

7    nude, correct?

8    A    Actually, yes, next week.

9    Q    This one?

10   A    That -- that particular model is going to model for me

11   next week.

12   Q    In connection with this project?

13   A    No.

14   Q    This is something -- another project that you have?

15   A    Yes.  Correct.

16   Q    Now, of course, you're concentrating on the projects, but

17   as you've testified, you're not completely done doing nude

18   work, correct?

19   A    I don't think I ever will be.

20   Q    And, in fact, you're no longer using models for your

21   primary photo work, correct?

22   A    I'm not using models for these other two projects.

23   Q    And you've changed the direction of your work and you're

24   no longer seeking new models, correct?

25   A    Well, I do seek new models.

1    Q    Mr. Levingston, you have a profile in <u>Model Mayhem</u>,

2    correct?

3    A    Yes.

4    Q    And if I can show you Exhibit -- I'm going to show you

5    this document, DL-15.  It's -- it's something that you saw in

6    your deposition?

7    A    Right.

8              MR. BLADUELL:  And we can see the first two -- the

9    first three sentences highlighted on the screen.

10   BY MR. BLADUELL:

11   Q    The first four?

12   A    Yes.

13   Q    Okay.  So this document says -- this is your docu -- this

14   is your profile --

15   A    Yes.

16   Q    -- of <u>Model Mayhem</u>, correct?

17   A    Yes, it is.

18   Q    And <u>Model Mayhem</u> is a place where you would contact new

19   models?

20   A    Yes.

21   Q    And here, you say, "I am no longer using models for my

22   primary photo work.  I have changed the direction of my work.

23   I'm no longer seeking new models.  The bulk of my new work

24   does not involve models"?

25   A    Yes.

1    Q    There --

2              MR. MURRAY:  Objection, Your Honor.  Unless he means

3    the last sentence of the last paragraph.

4              THE WITNESS:  Yes, there's more on there.

5              MR. BLADUELL:  We -- we've --

6              THE COURT:  Well, wait, wait, wait.  Just include

7    the next paragraph.

8    BY MR. BLADUELL:

9    Q    Yeah.  "I plan to continue to shoot some new models using

10   many models I've worked with, but this is no longer the main

11   thing I'm doing with the photography"?

12   A    Right.

13   Q    And that's accurate, correct?

14   A    No.

15   Q    You've decided after this -- after you posted this, you

16   decided to --

17   A    No, the -- the purpose of this statement is to discourage

18   new models from contacting me.

19   Q    But you -- but you stated this in your Model Mayhem?

20   A    True.  Correct.

21   Q    Okay.

22   A    I've -- I've always had a statement on Model Mayhem

23   designed to keep models from contacting me, because there are

24   many, many models that I have no interest in that would

25   contact me almost on a daily basis.

1   Q    Now --

2   A    So I put up a -- a profile to discourage that.

3   Q    The reason that your new work does not involve new models

4   is that you've decided to concentrate on the two projects,

5   journalism and alternative process photographers, correct?

6   A    Those are projects I'm concentrating on, but not to the

7   exclusion of shooting nudes.

8   Q    But that's the reason -- the reason why your new work is

9   not going to involve new models is because you are

10  concentrating on these two new projects, correct?

11  A    No.  No.

12  Q    Mr. -- Mr. Levingston, did you take a deposition in this

13  case?

14  A    I did.

15  Q    In -- in March?

16  A    Yes.

17  Q    And this was in Ohio?

18  A    Yes.

19  Q    And your attorney was there?

20  A    Yes.

21  Q    And you took an oath to tell the truth?

22  A    Yes.

23  Q    And you told the truth?

24  A    I did.

25  Q    Now, let me show you page 138 of your deposition

1     transcript.

2              MR. BLADUELL:  And if we can highlight lines 3 to

3     18.

4     BY MR. BLADUELL:

5     Q    And I'm going to read it for the record.

6     Q    "And is it accurate what is in this document that the

7     bulk of my new work does not involve new models?

8     A    Yes.

9     Q    And the reason for that is that the projects that you're

10    interested in doing, the ones that you described before about

11    journalism and the funerals do not involve depiction of

12    models?

13    A    It's journalism and alternative process photographers.

14    Q    I'm sorry, thank you for correcting me.

15    A    Yes, nobody gets naked in those pictures.

16    Q    Did you decide to shift attention to those projects

17    because it was burdensome to the nude models?

18    A    No."

19             MR. MURRAY:  Objection, Your Honor.  There's nothing

20    inconsistent with -- between that and what he just said.

21             THE COURT:  Overruled.

22    BY MR. BLADUELL:

23    Q    Now, let me ask --

24    A    May I -- may I point out --

25             THE COURT:  Well, let him answer the question.

1          THE WITNESS:  The -- the question the -- my new

2    work.  You were asking me about my new projects.  And, yes,

3    they do not involve nude models.  But I'm also doing other

4    work that I've been doing for 12 years that does include nude

5    models.  That's the distinction here.

6    BY MR. BLADUELL:

7    Q    You talked about being approached by a former prostitute

8    on direct?

9    A    Yes.

10   Q    And -- to work on a project involving -- potentially

11   involving sexual explicit depictions?

12   A    Potentially, yes.

13   Q    And you were approached by this person in 2012?

14   A    I think it was in 2012.

15   Q    And you've -- you've talked to this person a few times

16   about this project, correct?

17   A    Many times.  She's a friend.

18   Q    But this book is in a conceptual stage, correct?

19   A    And I didn't --

20   Q    This -- this project --

21   A    I didn't say it would be a book; it's a project.

22   Q    Okay.  I'm sorry.

23   A    The final form is -- is undetermined.

24   Q    This project is nowhere near specific at this point,

25   correct?

1    A    That's correct.

2    Q    This project can take many forms, correct?

3    A    It could.

4    Q    And you don't have any plans right now to take pictures

5    for this project, correct?

6    A    No, because of 2257(a).

7    Q    And, in fact, if the book includes photographs, you don't

8    know if the photographs will be subject to 2257 or 2257(a),

9    correct?

10   A    I think it's quite possible some would be.

11   Q    But you don't know at this point?

12   A    No.

13   Q    And you're probably not going to include the names of the

14   -- of the prostitutes that you're going to interview in this

15   book, correct?

16   A    That's one of the issues.  We would have to promise to

17   protect their identities.  And that would be impossible while

18   complying with 2257(a).

19   Q    But the question was, you're not going to publish the

20   names in the book itself, correct?

21   A    I don't know that there'll be a book, again.

22   Q    Or in the project?

23   A    No, their names would most likely not be included unless

24   they were willing to have them included.

25   Q    Now, you've -- you've -- you do not keep 2257 records,

1    correct?

2    A    I do not.

3    Q    But you have a -- a studio in Ohio -- in Dayton, Ohio,

4    correct?

5    A    Yes.

6    Q    And in this studio you keep IDs and model releases of

7    your models?

8    A    Yes.

9    Q    And you share this studio with two other photographers,

10   correct?

11   A    I do.

12   Q    And one of these photographers is a commercial

13   photographer that doesn't do nudes, correct?

14   A    That's true.

15   Q    And one of them does nudes?

16   A    Yes.

17   Q    Now, when you travel for -- for work, these photographers

18   that are in the studio do not go with you to do the -- on your

19   shoots, correct?

20   A    No.

21   Q    And the photographer in there that does commercial work,

22   he doesn't travel often, correct?

23   A    He does travel.

24   Q    For -- for work?

25   A    I -- I really don't know his schedule, but he does

1    travel.  I know he's been on several trips since he's been in

2    the studio.

3    Q    You're married, correct, Mr. Levingston?

4    A    I am.

5    Q    When you go shoot nudes, does your wife travel with you?

6    A    No.

7    Q    And you keep the model -- the model releases and the ID

8    in a desk drawer in your studio?

9    A    I do.

10   Q    This desk drawer is not locked?

11   A    It is not.

12   Q    When you -- when you photograph nude models, you take a

13   picture of their ID, correct?

14   A    These days, yes.

15   Q    And you keep it in your computer?

16   A    Yes.

17   Q    Taking a picture of the ID is not burdensome, correct?

18   A    No.

19   Q    And keeping that ID in your computer is not burdensome

20   either?

21   A    No.

22   Q    Now, you've -- you've produced material with -- nude --

23   nude material with women 18 and above, correct?

24   A    Yes.

25   Q    And you've produced a very small amount of material from

1    2005 to 2009 that you think would have been subject to

2    2257(a)?

3    A    Yes.

4    Q    Now, you say that you stopped doing sexually explicit

5    work after 2257(a) took effect, correct?

6    A    I've never done sexually explicit work, but simulated.

7    Q    Simulated?

8    A    Yes.

9    Q    And you are aware that 2257(a) took effect on March 18,

10   2009?

11   A    Yes.

12   Q    Let's go, please, Exhibit 90C.  Mr. Levingston, you

13   recognize this exhibit as a list that you provided the

14   Government --

15   A    Yes.

16   Q    -- of your models, the models that you have shot in

17   sexually explicit -- simulated sexually explicit depictions?

18   A    Yes.

19   Q    And the first photo shoot on this list is November 18,

20   2009?

21   A    Yes.

22   Q    And that was obviously after March 19, 2009?

23   A    Yes.

24   Q    When 2257(a) took effect?

25   A    Yes.

1    Q    If we go to the second page of this Exhibit 90C.  Those

2    are -- and then the third page.  And the fourth page.  So

3    there are 18 models -- there are 18 photo shoots listed here,

4    correct?

5    A    Yes.

6              THE COURT:  One second.

7         (Pause)

8              THE COURT:  Okay.  Just -- just one second.

9              MR. BLADUELL:  Sure.

10        (Pause)

11             THE COURT:  All right.  Here, just one minute.  I

12   have a motion for a temporary restraining order in another

13   case, so just -- well -- can counsel come up, please.

14        (Pause)

15             THE COURT:  Go ahead.

16   BY MR. BLADUELL:

17   Q    Let's go to the first page of Exhibit 90C, please.  So

18   this -- Mr. Levingston, so that we can understand this

19   document, this is a list that you provided the Government of

20   the photo shoots involving sexually explicit -- simulated

21   sexually explicit conduct between 2005 and 2009, correct?

22   A    Right.

23   Q    And one of the -- item 6 at the bottom -- why don't --

24   the model listed there has a date of birth of 7/27/1983?

25   A    Yes.

1    Q    And the photo shoot was December 9, 2008?

2    A    Yes.

3    Q    Does that make her 23?

4    A    If you -- if that is good math.  I'm not good at it.

5    Q    Okay.  Well, let's go to --

6              MR. MURRAY:  Objection, Your Honor.

7    BY MR. BLADUELL:

8    Q    Let's go to the fourth page of this Exhibit 90C.  The

9    fifth page, I'm sorry.  You recognize this picture, Mr.

10   Levingston?

11   A    Yes, I think so.

12   Q    It's one of the ones you took?

13   A    Probably.

14   Q    And you see up top that it has a number, number 6?

15   A    Yes.

16   Q    And you -- you've provided this to the Government?

17   A    Did I?  I -- maybe.  I -- I won't swear to that.

18   Q    If you go to --

19   A    You asked for a lot of stuff.  I don't remember all of

20   it.

21   Q    But this is a picture that you took?

22   A    I think so.

23   Q    If we go to the second page of this Exhibit 90C.  In

24   number 8, the date of -- the date of birth is 8/27/87?

25   A    Yes.

1    Q    And the shoot day was 12/22/09?

2    A    Yes.

3    Q    And we can calculate the age with those two --

4    A    Right.

5    Q    -- with those two dates?  So Mr. Levingston, aside from

6    your simulated work that you feel would have been covered by

7    2257(a), you have produced nude photographs of women who are

8    18 years old, correct?

9    A    Women who are 18 years old?

10   Q    Who are -- yeah, who are -- who are 18?

11   A    It's possible, but very unlikely.  There may be a -- a

12   model or two that was 18, but not very many.  That doesn't

13   happen often.

14   Q    And you've -- you've produced nude photographs of women

15   19 years old, correct?

16   A    That's possible, also.

17   Q    You don't know for sure?

18   A    No, I don't.

19   Q    Okay.  Let's go to Exhibit 90B.  And if we go to the

20   second page of this Exhibit 90B.  Mr. -- Mr. Levingston, you

21   -- as you said, we requested a lot of pictures?

22   A    Yes.

23   Q    And you've provided a lot of pictures, correct?

24   A    Yes.

25   Q    Is this one of the ones that you provided?

1    A    I believe -- well, I -- I'm not sure where you got it,

2    but it is one of my pictures.

3    Q    It is one of your pictures.  And let's go to the next

4    one, please.  That's another one of your pictures --

5    A    Yes, it is.

6    Q    -- correct?  And the third one, that's another one of

7    your pictures --

8    A    Yes.

9    Q    -- correct?

10             THE COURT:  Well, do you have a position whether

11   these are covered by the statute?

12             MR. BLADUELL:  I'm just -- I'm just establishing the

13   ages of performers.  Oh, do -- does the Government have a

14   position?

15             THE COURT:  Yes.

16             MR. BLADUELL:  I don't think I can give a definitive

17   answer as to --

18             THE COURT:  You what?

19             MR. BLADUELL:  I don't think I can speak to the

20   Government as to that right now.

21             THE COURT:  Okay.  All right.  Go ahead.  Would it

22   depend on whether they were produced before 2009 or after

23   2009?

24             MR. BLADUELL:  Well, yes, Your Honor, the -- I mean,

25   the -- the regulations specify what -- when the pictures were

1    taken.  And there's a day when they would apply -- when the

2    regulations would apply and would not apply.

3                 THE COURT:  Okay.

4                 MR. BLADUELL:  This -- this particular picture is --

5    I'm not -- if we go to the first page of this exhibit, we can

6    see when they were taken.  And if they included conduct that

7    would have been subject to the statute, then it would have.

8                 THE COURT:  All right.

9    BY MR. BLADUELL:

10   Q    So this -- this first page is a table, correct?

11   A    Yes.

12   Q    And it lists dates of birth and shoot dates, correct?

13   A    Yes.

14   Q    Okay.  And you've identified the pictures after this --

15   after this page that you've taken, correct?  The --

16   A    Yes.

17   Q    Okay.

18                 MR. BLADUELL:  I move to admit 90B.

19   BY MR. BLADUELL:

20   Q    Now, the model releases that you provided the Government

21   included the age of the performer?

22   A    Yes.

23   Q    Or I'm sorry, the age of the model?

24   A    Yes.

25   Q    And they contain the date of the shoot, correct?

1    A    Yes.

2    Q    Now, if we go to Exhibit 89C, this is a photo ID from

3    Florida, correct?

4    A    It appears to be, yes.

5    Q    You recognize the person in this ID?

6    A    Yes, I think I do.

7    Q    It's a -- it's a model that you have -- you have done

8    pictures of --

9    A    I -- I worked with --

10   Q    -- you have taken pictures of?

11   A    I worked with her one time, yes.  I can only say that

12   because it's Florida, and I -- yeah.

13   Q    Okay.  And if we go to the second page.  It's a model

14   release, correct?

15   A    Yes.

16   Q    From you?

17   A    Yes.

18   Q    And it states that she's 18?

19   A    Yes.

20   Q    Now, the date of birth is 12/21/1990?

21   A    Yes.

22   Q    And the model release is September 1, 2009?

23   A    Yes.

24   Q    Now, this -- this woman had just turned 18 a couple of

25   months before you -- she signed the release, correct?

1    A    Is that right?  Or was she about to turn 19?  I'm not

2    sure.

3    Q    Now, let's -- if we go back to 90B, on this table you see

4    a number 11?

5    A    Yes.

6    Q    And the date of birth is 12/21/1990?

7    A    Yes.

8    Q    And the shoot date is 9/1/09?

9    A    Yes.

10   Q    And if we go to the last -- the last page of this Exhibit

11   89.  Let's go back to -- let's go back to the first page of

12   90B.  And let's just continue going through the papers -- the

13   pages, please.  The next one.  No.  Yeah.  The next one.

14   Number 11.  Yes.  And you recognize this as a picture that

15   you've taken?

16   A    Yes.

17   Q    And is that the model that I showed you the ID of?

18   A    Yes, it is.

19   Q    Now, in this photo shoot you took more than this picture,

20   correct?

21   A    Yes.

22   Q    You took probably thousands of pictures?

23   A    Possibly.  I don't think it was that -- that many on that

24   particular shoot, but --

25   Q    If we go to Exhibit 89B, please.  This is a -- you

1    recognize this to be an ID of -- of one of your models?

2    A    Yes, I think so.  I don't recognize the -- the model, I'm

3    sorry.

4    Q    Okay.  And if we go to the second page.  A model release

5    from you, correct?

6    A    Yes.

7    Q    And the date of birth is 5/30/1987?

8    A    Yes.

9    Q    Current age 19?

10   A    Yes.

11   Q    And if we go back to the first page of this Exhibit 89B.

12   And we -- we focus in on the date -- date of birth.  It says

13   May 30, 1987?

14   A    Yes.

15   Q    Now, if we go back to Exhibit 90B.  And we see number 7

16   here on this table?

17   A    Yes.

18   Q    And the date of birth is 5/30/1987?

19   A    Yes.

20   Q    And if we go to the next page of this Exhibit 90B.  And

21   so -- yeah.  And that's a picture that you took?

22   A    Yeah.  Yes, it is.

23   Q    And do you recognize that it's a model that I showed you

24   the ID of?

25   A    No, I don't.  I don't --

1   Q    You think it's different?

2   A    I -- I think it's different.

3   Q    It's a -- it's a different model?

4   A    Yeah.  I know her.  I know who that is.  I don't

5   recognize the picture on that passport, and so I'm -- I'm not

6   sure if it's the same person.

7   Q    The -- okay.  Next, go to 89A, please.  This is -- do you

8   recognize the model?

9   A    Yes.

10  Q    And the second page is a model.  This is Exhibit 89A.  Do

11  you recognize a model release?

12  A    Yes.

13           MR. BLADUELL:  I move that into -- Exhibit 89A into

14  evidence.

15  BY MR. BLADUELL:

16  Q    Mr. Levingston, you've also photographed women nude

17  before they went to college, correct?

18  A    Yes.

19  Q    You don't restrict the models that you photograph nude to

20  people over 25?

21  A    No, I do not.

22  Q    You work with models of all ages, as long as they're

23  reasonably fit?

24  A    Well, adults, yes.

25  Q    18 and above?

1    A    Yes.

2    Q    Let's go to Exhibit 91A, please.  Okay.  So 91A is a

3    photo you've taken?

4    A    Yes.

5    Q    And 91B is a photo you've taken?

6    A    Yes.

7    Q    And 91C?

8    A    Yes.

9    Q    These photographs are representative of your nude work?

10   A    Yes.

11   Q    You don't consider that these photographs are subject to

12   2257 or 2257(a)?

13   A    I do not.

14   Q    And you took these pictures in approximately 2009?

15   A    No, those --

16   Q    Oh, I'm sorry, strike that.  2012?

17   A    Yes.

18   Q    And, of course, that was after 2257(a) --

19   A    Yes.

20   Q    -- was enforced?

21   A    Yes.

22   Q    So you have not stopped producing nudes because of

23   2257(a) or 2257 -- 2257(a)?

24   A    No, I have not.

25   Q    These models in these exhibits, 91A, 91B, 91C, are all in

1   their mid 20s?

2   A    Not all.  I think, you know, you had one picture there

3   with four models.  And one of those models is in her 30s and

4   has several kids.

5   Q    Okay.  The other ones around 90 -- I'm sorry --

6   A    Mid -- mid 20s.

7   Q    -- the other ones are around 20?

8   A    Mid 20s.

9   Q    Let's go to Exhibit 90A, please.  Mr. Levingston, you

10  testified on direct that you took this picture, correct?

11  A    Yes.

12  Q    And that after 22 -- after 2257(a) became effective, you

13  removed this picture from your website?

14  A    Yes.

15  Q    And do you believe that this picture depicts sadistic

16  behavior?

17  A    No.

18  Q    But you removed it because other people told you that it

19  could be interpreted?

20  A    I felt that some people could feel that this was

21  simulated sadomasochistic behavior.

22  Q    But you, yourself, do not --

23  A    I do not --

24  Q    -- believe that this is --

25  A    I do not believe that.  I -- I disagree with that point

1    of view, but I'm erring on the side of caution because there's

2    felony involved here.

3    Q    Now, let's go back to Exhibit 91A, please.

4    A    Incidentally, that model is in her mid 40s, since you're

5    focusing on age of models.

6    Q    You do not -- I'm sorry, Exhibit 91A, Mr. Levingston, if

7    someone is looking at that picture, that person is not going

8    to be able to say the exact age of those models, correct?

9    A    Correct.

10   Q    And if you don't know these models, you would not be able

11   to tell their age, correct?

12   A    I can tell they're over 18.

13   Q    But you would not be able to detect their exact age,

14   correct?

15   A    No.

16   Q    And, Mr. Levingston, you would agree with me that

17   sometimes it is difficult to tell apart a 17-year-old and a

18   19-year-old, correct?

19   A    Yes.

20   Q    And the way not to confuse 17-year-olds and 18 -- 18-

21   year-olds and 19-year-olds -- I'm sorry, let me start again.

22   The way not to confuse 18-year-olds -- years old and 19-year-

23   olds with minors is checking their ID?

24   A    Yes.

25   Q    Now, your book <u>The Figure of Nature</u> was introduced into

1    evidence, correct?

2    A    Yes.

3    Q    And you don't believe that those pictures in there are

4    subject to the statutes, correct?

5    A    No.  And, of course, they were all produced long before

6    the statute took effect.

7    Q    Do you feel that some of them would be subject to the

8    statutes?

9    A    No.

10   Q    If -- had the statute been enforced?

11   A    No.

12         MR. BLADUELL:  No further questions, Your Honor, at

13   this time.

14         THE COURT:  All right.  Redirect?

15                    REDIRECT EXAMINATION

16   BY MR. MURRAY:

17   Q    Mr. Levingston, you were shown what I think was

18   Government Exhibit 900.  Maybe not.  90D, I'm sorry.  There

19   was a photo -- an Exhibit 90, I guess, that showed a list of

20   18 photo shoots that you provided to the Government.  Do you

21   remember that list?

22   A    Yes.

23   Q    Okay.  And those were a list of the photo shoots that you

24   had done between -- the latest of which was '09 and previously

25   that had images that were -- were -- that you regarded to be

1    simulated sexual conduct?

2    A    That I -- I felt could be interpreted that way.

3    Q    And are those the kinds of images that you no longer

4    take?

5    A    Yes.

6    Q    And is 2257(a) the only reason that you no longer take

7    those kinds of images?

8    A    Yes.

9              MR. MURRAY:  Thank you.

10             THE COURT:  Recross?

11             MR. BLADUELL:  No recross, Your Honor.

12             THE COURT:  All right.  Thank you.

13             All right.  Thank you.

14             THE WITNESS:  Thank you, sir.

15             THE COURT:  Okay.  All right.  It's 12:20.  We have

16   no more witnesses, right?

17             MR. MURRAY:  That's correct, Your Honor.

18             THE COURT:  All right.  I -- I want to address the

19   issue of the Joyner deposition today.  Do you need some time

20   to look over the memo in cases that Ms. Wyer presented this

21   morning?

22             MR. MURRAY:  Yes, but not long.  But I --

23             THE COURT:  Well, I do.  What?

24             MR. MURRAY:  No, I do, Your Honor, but I don't need

25   very long.  I -- I also want to submit to you the alternative

1    grounds upon which we would --

2              THE COURT:  Yes.  Well, we're going to have a -- a

3    discussion about this.

4              MR. MURRAY:  Yes.

5              THE COURT:  The question is when to do it.  So --

6              MR. MURRAY:  Whenever you want.  I'm -- I mean --

7              THE COURT:  Well, I'm thinking about 2:00 or 2:30.

8    What's your -- would you want to put the paralegal on about

9    the summary exhibit today or tomorrow?

10             MR. MURRAY:  We're prepared to do it today, if

11   that --

12             THE COURT:  I would rather do it today for a lot of

13   reasons that have nothing to do with this case.  Can we do it

14   -- so let's do this.  I have some other things pending.  Let's

15   reconvene at 2:30.  And I may be stuck on this TRO.  If I

16   can't turn to this case immediately, I'll do it as soon as I

17   can.  And -- so then we'll have the discussion about the

18   Joyner deposition, and we'll then have the testimony about the

19   paralegal -- by the paralegal about the admission of the

20   summary.  Is that all right?

21             MR. MURRAY:  That be great, Your Honor.

22             THE COURT:  All right.  So I'll see you all at 2:30.

23             Janice, would you ask the lawyers in the TRO case to

24   come in, please.

25             (Recess taken, 12:15 p.m. to 3:12 p.m.)

1          THE COURT:  Okay.  Good afternoon.  One second.

2     (Pause)

3          THE COURT:  Okay.  All right.  Thank you for your

4     patience.  All right.  As I understand it, we have two issues

5     on the table this afternoon.  One is the issue of Agent

6     Joyner's deposition, which the plaintiffs want to introduce in

7     its entirety, and the Government objects.  And then the other

8     would be the summary prepared by a Government paralegal -- I'm

9     sorry, I don't know the young lady's name, but we'll get it in

10    a minute -- and whether that's admissible or not; is that

11    correct?

12         MS. WYER:  Yes, Your Honor.

13         THE COURT:  That's what we're here for?

14         MR. MURRAY:  Yes.

15         THE COURT:  Okay.  All right.  Now, Mr. Murray, why

16    don't you start by telling what reasons you believe the Joyner

17    deposition should be admissible.

18         MR. MURRAY:  Yes, I will, Your Honor.

19         THE COURT:  And I guess Rule 32 is our guidepost?

20         MR. MURRAY:  It is.  We have relied up until now

21    upon Rule 32(a)(4), which provides that we can use a

22    deposition for any purpose of a witness if the witness is more

23    than 100 miles from the place of hearing or trial.  On its

24    face, the rule is clear.  If -- if we just go by what the

25    plain language of the rule is, Agent Joyner is more than 100

1    miles away.  We have the deposition.  The Government fully

2    represented him.  And -- and the rule --

3              THE COURT:  All right.  But -- but there are some

4    cases, included some of the ones cited by the Government, that

5    where it's clear that a witness is going to appear at trial,

6    the witness is not unavailable.  And this whole rule is about

7    the witness being unavailable.

8              Now, most of those cases, I grant you, is where the

9    same party that is going to call the witness live also wants

10   to use the deposition.  And now, some Judges have said you

11   can't do that.  What I -- what I did see immediately is where

12   it was the opposing party that wants to use the deposition

13   before the witness appears live, which is what your situation

14   is.

15             MR. MURRAY:  Yes.  And --

16             THE COURT:  All right.

17             MR. MURRAY:  And I just think that the plain

18   language of the rule applies here.  I don't think those cases

19   should control the outcome here.  They're not binding on this

20   Court, obviously.  The other thing is --

21             THE COURT:  Well --

22             MR. MURRAY:  -- the type of witness we're talking

23   about is a little bit different from the ones they were

24   talking about, which brings me to the alternative basis upon

25   which we could introduce the deposition, which, I think, also,

1    gives color to why it would be appropriate for Agent Joyner's

2    testimony to be admitted by way of deposition.

3            If we look at Rule 32(a)(2), it says that any party

4    may use a deposition to contradict or impeach the testimony

5    given by the deponent as a witness.  I'm not relying on that.

6    But the next language says, "Or for any purpose allowed by the

7    Federal Rules of Evidence."  When you go to the Federal Rules

8    of Evidence 801, you find that hearsay does not apply; that it

9    is not hearsay to introduce the admission of a party opponent,

10   as Your Honor, knows only too well.

11           And the way the rule defines an opposing party

12   statement now under the Federal Rules of Evidence 801(d)(2),

13   it states as follows.  "It is not hearsay if the statement is

14   offered against an opposing party and" -- and I would rely on

15   (B) and (C) -- "is (1) the party manifested that it adopted or

16   believed to be true (C) was made by a person whom the party

17   authorized to make a statement on the subject."

18           Now, we're talking about FBI Agent Joyner.  And his

19   testimony in his deposition was that he was the person who was

20   charged by the Government with setting up the inspection

21   program.  And he did set up the inspection program.  And he

22   was the who defined it and decided it how it was going to be

23   carried out.  And then he carried it out largely by himself.

24   He had another agent with him who did some of the inspections.

25   He did, by far, the vast majority of the -- of the

1    inspections.

2             Now, the Government, in its motion for summary

3    judgment, filed a declaration by Agent Joyner.  And they are

4    relying upon Agent Joyner as their representative for purposes

5    of what happened during those inspections.  They have also

6    indicated by way of a declaration that they have in their

7    exhibit list for today for the trial, a declaration of Agent

8    Joyner in which, again, they affirm that they regard him to be

9    their representative for purposes of what happened.

10            THE COURT:  Well, do you at all rely on 32(a)(3),

11   that Agent Joyner is a managing agent?

12            MR. MURRAY:  We would like to, Your Honor.  The

13   problem we have with that is that he is a retired agent.

14   And --

15            THE COURT:  But he was --

16            MR. MURRAY:  Yes, he was clearly --

17            THE COURT:  Well, wasn't he in charge of this search

18   program --

19            MR. MURRAY:  Yes.

20            THE COURT:  -- at the time?

21            MR. MURRAY:  At the time that he was employed by the

22   FBI, he was clearly entitled -- and he was clearly in charge

23   of --

24            THE COURT:  Well, the rule applies to -- it says

25   who, when deposed, was the party's managing agent.

1           MR. MURRAY:  Yes.  And -- and so we -- I'm sorry,

2   yes, we do rely upon that for the same reasons that -- that we

3   regard it to be an admission that is admissible under Rule

4   801.  So, yes, we rely upon --

5           THE COURT:  Okay.

6           MR. MURRAY:  -- Rule 32(a)(2) and Evidence Rule 801.

7   We rely upon 32(a)(3) for the same reasons that we think 801

8   applies.  And we rely upon 32(a)(4)(B).  And the last piece of

9   evidence to demonstrate that they have adopted him as their

10  representative and have manifested their agreement with his

11  testimony on what this was all about is the memorandum that

12  they just filed.  Because on the last page they say as to a

13  reason why we shouldn't put in the deposition is because

14  they're going to call him as a witness.

15          And they say Mr. Joyner will testify for defendant

16  regarding the inspections that he participated in pursuant to

17  18, U.S.C., Section 2257.  This is the same topic on which

18  plaintiffs wish to examine Mr. Joyner and which was addressed

19  at Mr. Joyner's deposition.  And thus, they think it would be

20  inefficient for him to be presented by deposition as well as

21  by live testimony.

22          To be honest with you, if you're talking about

23  efficiency, one of the reasons I would prefer to introduce the

24  deposition is to spare the Court with what would ultimately

25  otherwise be a five or six hour cross-examination to duplicate

1   everything that occurred at the deposition.

2           THE COURT:  Well, let me just say that if I agree

3   with you and I admit it, the Government can still call him as

4   a witness.

5           MR. MURRAY:  Yes.

6           THE COURT:  But -- and you can use the deposition to

7   impeach him if you want, but I'm not going to allow five or

8   six hours to repeat what -- what you've already covered in the

9   deposition.

10          MR. MURRAY:  And -- and I wouldn't do it.  I would

11  simply --

12          THE COURT:  So -- so I think you ought to be on

13  notice, Mr. Murray, that if I agree with you about the

14  deposition, it's going to necessarily restrict your cross --

15  your cross.

16          MR. MURRAY:  Yes.  Unless he deviates from something

17  that he said.

18          THE COURT:  Of course.

19          MR. MURRAY:  Yes.  No, I mean, that -- in fact,

20  that's one of the reasons --

21          THE COURT:  But we're not going to have repetition.

22  All right.  So, in a way, it may shorten the trial.

23          MR. MURRAY:  That was one of the reasons why we

24  wanted to do it, Your Honor, is because other --

25          THE COURT:  All right.  I'm going to let the

1  Government do whatever they want because they're not bound by

2  that.  But your cross would be restricted.

3          MR. MURRAY:  Yes.  Yes.  No, I understand that.

4          THE COURT:  Okay.  Well, Ms. Wyer, I'd like your

5  response.  And I'm -- I understand your position on

6  unavailability and you do have some case support for it as

7  something -- slightly different circumstances, but I'd most of

8  all like your reaction to 32(a)(2) and 32(a)(3).

9          MS. WYER:  Your Honor, first of all, I'd just point

10  out that the Holbrook case is exactly on point because that

11  involved a case --

12          THE COURT:  Well, the Holbrook case, I thought, was

13  where it was in -- the same party wanted to introduce it.

14          MS. WYER:  No, Your Honor, that was where the

15  plaintiff wanted to introduce the witness and the -- introduce

16  the deposition, and the defendant was going to call the

17  witness -- the individual as a witness.

18          THE COURT:  All right.  Okay.

19          MS. WYER:  So in regard to (a) -- (a)(3), Mr. Joyner

20  was not the Department of Justice's officer, director,

21  managing agent, or designee at the time of the deposition,

22  which was on April --

23          THE COURT:  Well, wasn't he still employed at the

24  time of the deposition?

25          MS. WYER:  No, he was not, Your Honor.  He retired

1   several years ago.

2              THE COURT:  He had already retired?

3              MS. WYER:  Excuse me?

4              THE COURT:  He had already retired?

5              MS. WYER:  Yes, Your Honor.

6              THE COURT:  Okay.

7              MS. WYER:  So (a)(3) is clearly inapplicable, Your

8   Honor.  In regard to whether Mr. Joyner -- I think we have to

9   look at the nature of the statements that plaintiffs are

10  trying to admit through this deposition.  It kind of goes to

11  the objections that we would have otherwise, even outside the

12  context of Rule 32.  I think one set of statements in there is

13  simply where plaintiff's counsel is reading things from the

14  FBI reports and Mr. Joyner is agreeing to the accuracy of what

15  was read.

16             To the extent plaintiffs are seeking to admit that

17  information, I think the reports themselves are being admitted

18  into evidence.  There's no reason that Mr. Joyner's agreement

19  with the reading of those -- that material needs to be

20  admitted into evidence.  There are --

21             THE COURT:  Well, are those documents that he's

22  reading from -- are they already exhibits in the trial, or

23  will they be?

24             MS. WYER:  Yes, Your Honor.  And we've already

25  stipulated to the admission of those documents.

1          THE COURT:  All right.

2          MS. WYER:  There are also a subset of those

3    documents, which are the inspection reports for the

4    inspections that occurred, where Mr. Joyner was not even

5    present during those inspections.  So Mr. Joyner has no

6    personal knowledge regarding anything that happened during

7    those inspections.  Everything that -- when he -- when Mr. --

8          THE COURT:  Well, then you're saying that a lot of

9    his testimony is based on hearsay?

10         MS. WYER:  For those inspections it's all hearsay,

11   Your Honor -- Your Honor, for those, which are -- we have a

12   list in our exhibit list that itemizes which inspections were

13   conducted by Agent Joyner and which were conducted by Agent

14   Lawrence.  So that's another set of material in the deposition

15   transcript that is entirely inadmissible.  And then there's a

16   third category, where Mr. Murray -- plaintiff's counsel, is

17   essential asking Mr. Joyner, as a retired FBI agent, to agree

18   to various characterizations of the law and hypotheticals

19   regarding the law.

20         Now, Mr. Joyner, as an FBI agent implementing this

21   inspection program, was relying on -- on direction that he got

22   from FBI legal counsel.  Mr. Joyner was not interpreting the

23   statutes and interpreting the regulations himself.  He was

24   operating under instructions.  And if he had any questions

25   about what to do, he would have gone to his authority and

1    asked.  So he -- he is not authorized to make speculation

2    about what would have happened under different circumstances.

3    Another type of thing that plaintiff's counsel is trying to --

4    was trying to get Mr. Joyner to admit to was, in particular,

5    whether areas of the premises where the inspections occurred

6    were opened to the public or not.

7              Now, Mr. Joyner does not -- there was no foundation

8    for that kind of information.  To the extent that plaintiff's

9    counsel is seeking to rely on -- on the photographs of the

10   inspections, those photographs are contained in the reports.

11   So I -- I think it's simply plaintiff's counsel is trying to

12   get this deposition admitted for inappropriate purposes.  All

13   of the -- all of those statements about the legal

14   interpretation, I think, would -- would be inadmissible as

15   improper opinion because those are all -- require a kind of

16   legal expertise that Mr. Joyner simply does not have, and no

17   one in the FBI authorized him to speak on those matters.

18             THE COURT:  Okay.  All right.  All right.  Well,

19   thank you.  Here's what we're going to do.  If this was a jury

20   trial, I would read the transcript to decide this.  And --

21   because there's no other way.  I mean, you both have arguments

22   and I -- I think it may depend -- it may be that some -- some

23   of the testimony is admissible and some of it is not.  Some of

24   it may qualify under 801 and some may not.  Some may be

25   excluded as hearsay, some may be opinions -- legal opinions.

1    So I -- I'm not convinced that this is an all-or-nothing

2    situation.  So I'm going to read the transcript tomorrow and

3    I'll -- when I come back Friday morning, I may have marked it

4    up and this is admissible, this is not.  And that will be my

5    best judgment of what I ought to do.  Is the transcript -- is

6    it in these -- any of these boxes back here?  Or did you

7    submit it before?  Or do one of you want to give me a copy?

8              MR. MURRAY:  We have it here to submit, Your Honor.

9              THE COURT:  All right.  Could you hand it up and

10   I'll -- I don't know any other way to resolve it.  What about

11   exhibits that were shown to him?  Are they attached to the

12   transcript or --

13             MR. MURRAY:  No, Your Honor, but I really don't

14   think -- and they are -- we can -- we have those, but I don't

15   think you'll need to actually see them --

16             THE COURT:  All right.  Fine.

17             MR. MURRAY:  -- in order to understand the --

18             THE COURT:  Well, let me look at it without the

19   exhibits.

20             MR. MURRAY:  -- the testimony.  And --

21             THE COURT:  And we'll go from there.  Okay?

22             MR. MURRAY:  And, Your Honor, if you're not going to

23   do this until tomorrow, I will be glad to go back and see if I

24   can exclude some of the passages and --

25             THE COURT:  Well, I would welcome that.

 1                    MR. MURRAY:  -- and share that with Ms. Wyer --

 2                    THE COURT:  Yes.

 3                    MR. MURRAY:  -- so that you don't have to read the

 4      whole thing.  I'll address some of --

 5                    THE COURT:  All right.  Do you want to fax it to --

 6                    MR. MURRAY:  We'll email it to you.

 7                    THE COURT:  -- my chambers tomorrow morning?

 8                    MR. MURRAY:  Yes.  Yes.  We will -- and we'll email

 9      it to Ms. Wyer later today some passages that we'll exclude to

10      address --

11                    THE COURT:  All right.

12                    MR. MURRAY:  -- some of her objections and maybe

13      lighten the burden.

14                    THE COURT:  Well, that's a -- that would be a good

15      idea.  And then -- okay.  All right.  I mean, it is 270 some

16      pages, so --

17                    MR. MURRAY:  Yes.  It was a long day, Your Honor, I

18      assure you.

19                    THE COURT:  -- that would be -- that would be a good

20      idea.  Okay.

21                    MR. MURRAY:  And -- and we do have the other

22      excerpts at some point that we may want to address of the --

23      the other three witnesses, the shorter excerpts.

24                    THE COURT:  Okay.  All right.  All right.  Thank

25      you.  So that's what we're going to do with this.

1            All right.  Now, Ms. Wyer, do you want to present

2     the summary that you want to introduce and call your witness?

3                 MS. WYER:  Yes, Your Honor.  Mr. Swinton will.

4                 THE COURT:  Okay.  All right.  Go ahead.  Okay.

5                 MR. SWINTON:  For the record, Your Honor, we had

6     previously provided the Court with a copy of Defendant's

7     Exhibit 309, which was the second declaration of Adriana

8     Vecchio.  And --

9                 THE COURT:  No, wait.  Is your exhibit 309?

10                MR. SWINTON:  It is, yes.

11                THE COURT:  All right.  Is it in the boxes back

12    here?

13                MR. SWINTON:  It -- Your Honor, if you'll hold on

14    for one second, we -- we've amended this declaration and

15    submitted now Defendant's Exhibit 314.

16                THE COURT:  34 -- all right.  Just -- just hand it

17    up to me.

18                MR. SWINTON:  And the table that is attached is

19    Attachment A.

20                THE COURT:  Okay.  All right.  Just let me read

21    this.

22         (Pause)

23                THE COURT:  All right.  So it's -- is it Exhibit A

24    that you object to?

25                MR. MURRAY:  Yes, Your Honor.

1          THE COURT:  All right.  And what is the basis of the

2    objection?

3          MR. MURRAY:  We wanted an opportunity to just --

4          THE COURT:  I'm sorry.

5          MR. MURRAY:  All we really wanted to do was have an

6    opportunity to ask some questions of Ms. Vecchio, so that we

7    had a better --

8          THE COURT:  All right.  Well, let's call her to the

9    stand.

10         MR. MURRAY:  Yes.

11         THE COURT:  All right.

12         MR. SWINTON:  Sure.  And the Government calls

13   Adriana Vecchio, Your Honor.

14         THE COURT:  Okay.

15         MR. MURRAY:  And, Your Honor, just as a matter of

16   efficiency, we have no objection to you submitting the

17   declaration and then just letting me ask my questions about

18   them, if you -- if you don't want to do a whole direct

19   examination.

20         THE COURT:  Well, that's what we're going to do now.

21         MR. MURRAY:  Okay.

22         THE COURT:  I'm going to take the declaration and

23   you're going to ask the questions.  And then we'll allow for

24   any redirect.

25         THE CLERK:  Please raise your right hand.

1              ADRIANA VECCHIO, PLAINTIFF'S WITNESS, SWORN

2              THE CLERK:  Please state your full name for the

3    record and spell your last name.

4              THE WITNESS:  Adriana Vecchio, V, as in Victor, E-C-

5    C-H-I-O.

6              THE CLERK:  Thank you very much.

7                        DIRECT EXAMINATION

8    BY MR. MURRAY:

9    Q    Ms. Vecchio, thank you very much.  I've read your

10   declaration and I just have a few questions about it.  And if

11   you -- do you have it in front of you by any chance?

12   A    I do not.

13             THE COURT:  Well, do you have an extra?  You can

14   look at mine.

15             MR. SWINTON:  We have a copy for her, Your Honor.

16   If you can just give us one second.

17             THE COURT:  All right.

18        (Pause)

19             THE WITNESS:  It's in the manilla folder of D-5.

20   BY MR. MURRAY:

21   Q    Well, perhaps I can just use the ELMO then, Your Honor.

22             THE COURT:  All right.

23             THE WITNESS:  That's fine.

24   BY MR. MURRAY:

25   Q    All right.  Now, Ms. Vecchio, you were given a number of

1    records to review and to analyze statistically, correct?

2    A    Correct.

3    Q    Okay.  And you were given the records that we had

4    provided in discovery, for example, for Vivid Video, correct?

5    A    Correct.

6    Q    And then you tabulated the -- the records to determine

7    the calculation of the ages of all the performers and then you

8    created the chart, correct?

9    A    Well, I actually used the chart to calculate the ages,

10   but, yes.

11   Q    Okay.  And I just want to make sure of a couple things.

12   What was provided was 25 DVDs produced by Vivid Video; is that

13   correct?

14   A    Yes, those were provided, along with identification and

15   release forms that included dates and date of birth.

16   Q    Right.  And -- and this was provided by us in the course

17   of discovery proceedings, correct --

18   A    Yes.

19   Q    -- by the plaintiffs?  And you understood that in the

20   course of the discovery proceedings, we provided, for example,

21   records in some cases spanning a time frame from January 1,

22   2005 to December 31, 2009?  Did you understand that?

23   A    Yes.

24   Q    Okay.  And so in the case of -- but in the case of Vivid,

25   we've provided 25 DVDs and their accompanying records?

1    A    Yes.

2    Q    Okay.  But you recognize -- and it's not your fault, and

3    I'm not being in any way critical.  I thought you did a good

4    job.  You recognize that that's not the entire universe of

5    records and DVDs that Vivid Video produced, correct?

6    A    Correct.

7    Q    Okay.  Now, in the case of Mr. Morey (phonetic), again,

8    you were provided with copies of IDs and model releases for

9    some 30 of his models, correct?

10   A    Yes.

11   Q    And that was, again, pursuant to a limited discovery that

12   we provided on behalf of the ASMP?

13   A    Yes.

14   Q    Okay.  And you recognize, however, that, again, that is

15   not the entire universe of -- of the images that he has

16   created and posted on his website, correct?

17   A    Yes.

18   Q    Okay.  Now, in the case of Dodson and Ross, there was

19   provided 20 IDs and model releases.  Do you know how many

20   videotapes that covered?

21   A    I do not.  I used the releases to identify the

22   performances that they were in.  I categorized them by age.  I

23   didn't pay much attention to the performances that were

24   listed, except to add them to the chart.

25   Q    Okay.  So -- and you've been present at this trial all

1   along?

2   A    Yes.

3   Q    Okay.  So you know that we've introduced as exhibits a

4   total of six DVDs produced by Betty Dodson?  Do you recall

5   that?

6   A    That sounds correct.

7   Q    Okay.

8   A    I'm not sure of the exact number.

9   Q    All right.  But you do not know whether the -- the 20 IDs

10  and model releases that you analyzed cover the entire universe

11  of performers in all six of those DVDs, correct?

12  A    Not for sure, no.

13  Q    Okay.  And, again, that's not your fault.  This was

14  discovery.  We provided you certain things that were

15  requested, and I just want to make sure that you understand

16  I'm not being critical of you.  Then, when it comes to Mr.

17  Levingston, we provided you with some 270 IDs and model

18  releases, correct?

19  A    Yes.  Well, sets that were identifiable, yes.

20  Q    Yes.  And were any of them of men?  Did you happen to

21  notice whether any of the model releases covered men?

22  A    They could have.  The names were redacted.  I was only

23  given initials.

24  Q    Okay.

25  A    And I don't recall by looking at the photos --

1    Q     Okay.

2    A     -- to be honest.

3    Q     Now, let's go to Sinclair Institute.  You were provided

4    with complete information about 24 of their DVDs, correct?

5    A     Yes.

6    Q     Okay.  And, again, everything we gave you, you completely

7    and thoroughly and accurately analyzed, correct?

8    A     Correct.

9    Q     Okay.  But you saw that in the trial we're actually able

10   to offer a total of 45 DVDs from Sinclair?

11   A     That sounds right.  I'm not, again, sure of the exact

12   number.

13   Q     All right.  And so, again, the universe of performers

14   appearing in the 45 videos is a little bit greater than the

15   ones that you were able to analyze, correct?

16   A     To be honest, with Sinclair I wouldn't be sure.  There

17   was a lot of similar performers across all of the DVDs.  We

18   could have covered the universe of their performers.

19   Q     Okay.  You have no way of knowing?

20   A     No, I have no way of knowing.

21   Q     Now -- then I just want to make sure I understand your

22   chart, and I think I do.  Taking Betty Dodson, for example.

23   Of the IDs that you analyzed, there were 20 performers, and 25

24   percent of them were either 25 years of age or younger,

25   correct?

 1    A    Correct.

 2    Q    So that would have been five?

 3    A    Correct.

 4    Q    Okay.  Now, then you analyzed a percentage of performers

 5   29 and under, correct?

 6    A    Correct.

 7    Q    And so that was 45 percent, correct?

 8    A    Correct.

 9    Q    But that includes the 25 percent who were under 25?

10    A    It does.

11    Q    Okay.  So the actual number -- the percentage of

12   performers that were between the ages of 26 and 29 would be 20

13   percent?

14    A    I believe so.  I'd have to -- I believe so, yes.

15    Q    I mean, it makes sense because if --

16    A    Yes.

17    Q    -- if you add 20 percent to 25, you come up --

18    A    Right.

19    Q    -- with 45?

20    A    Right.

21    Q    Okay.  So -- and I won't do the math on all the other

22   ones, but that's what we would do to compute those numbers all

23   the way down the road?

24    A    Yes, that would be consistent down -- down the road.

25    Q    Okay.  And then so if I also understand your chart, in

1    the case of Dodson, for example, 75 percent of the performers

2    were at least 26 years of age or older?

3    A    Yes.

4    Q    And many of them were older than 30 and older than 40,

5    correct?

6    A    Correct.

7    Q    And in the case of Mr. -- of Ms. Levine, some 76 percent

8    of the performers in -- in her DVDs that you examined were at

9    least the age of 26 or older?

10   A    Correct.

11   Q    And in the case of Mr. Levingston, at least 56 percent

12   were 26 years of age or older?

13   A    Just shy of 56 percent, yes.

14   Q    I'm sorry, I stand corrected.  And in the case of the

15   Nitke, I guess 63 percent were at least 26 years of age?

16   A    Just shy of that, yes.  Or -- yes.  I'm sorry, 63

17   percent.

18   Q    And in the case of Sinclair Institute, according to your

19   analysis, some 79 percent --

20   A    Roughly.

21   Q    -- of their performers are at least 26 years of age and

22   older?

23   A    Roughly that, yes.

24   Q    And then in the case of Vivid -- even in the case of

25   Vivid, some almost 60 percent of their performers are at least

1    26 years of age or older; is that correct?

2    A    Correct.

3    Q    Okay.  Thank you very much for clearing up the few

4    questions that I had.

5              MR. MURRAY:  That's all I have, Your Honor.

6              THE COURT:  All right.  Okay.  Well, do you still

7    object to the --

8              MR. MURRAY:  No, no, no.

9              THE COURT:  Okay.

10             MR. MURRAY:  I just wanted to have --

11             THE COURT:  All right.

12             MR. MURRAY:  -- the clarification.

13             THE COURT:  All right.  Well, thank you very much.

14             Do you have any questions?

15             MR. SWINTON:  No, Your Honor.

16             THE COURT:  Okay.  All right.  Well, so the

17   exhibit's admissible.  All right.  Thank you.  All right.

18   Anything else logistically or otherwise?

19             MR. MURRAY:  Unless you wanted to address the issue

20   of those experts.  I do have one -- one case citation I can

21   give you that -- that permits the same rule -- the same 100

22   mile rule to apply to opponent's experts as well.

23             MS. WYER:  Your Honor, plaintiffs have never

24   indicated they wanted to call defendant's experts in their

25   case in chief.  I don't understand --

1              THE COURT:  You can't do that.  You want to call the

2    plaintiff's expert?

3              MR. MURRAY:  No, Your Honor.

4              THE COURT:  You want to use the -- a deposition of

5    the plaintiff's expert in your case?

6              MR. MURRAY:  No.

7              THE COURT:  Oh, the defendant's expert?

8              MR. MURRAY:  We have -- we have submitted excerpts

9    from the depositions of their witnesses -- their experts under

10   the same rule on the ground that we have a right to introduce

11   those excerpts because Rule 32 applies entirely.

12             THE COURT:  All right.  What's the case you rely on?

13             MR. MURRAY:  The case is -- it's <u>Nichols, II vs.</u>

14   <u>American Risk Management, Inc.</u>, United States District Court

15   for the Southern District of New York, 2000 West Law, 9728.

16             THE COURT:  97282?

17             MR. MURRAY:  Yes.

18             THE COURT:  All right.  Just a minute.

19        (Pause)

20             THE COURT:  All right.  Are you familiar -- have you

21   read this case, Ms. Wyer?

22             MS. WYER:  The <u>Nichols</u> --

23             THE COURT:  Yes.

24             MS. WYER:  -- case?  No, I have not, Your Honor.

25             THE COURT:  All right.  Well, I can -- I can give

1    you my iPad, you can read it.  But it seems to hold what Mr.

2    Murray said.

3            But who is the expert?

4            MR. MURRAY:  There was a -- short passage from Dr.

5    Dines, a short passage from Dr. Vero, and a short passage from

6    Dr. Wallach.

7            THE COURT:  All right.  They're all going to testify

8    live?

9            MR. MURRAY:  Yes.  Yes, as part of their case.

10           THE COURT:  But why -- why can't you wait and use it

11   as cross-examination if they don't say the same thing on

12   direct?

13           MR. MURRAY:  Well, certainly I could, Your Honor,

14   but we think it is substantive evidence that supports our

15   case, and so we wanted to offer it as --

16           THE COURT:  All right.

17           MR. MURRAY:  -- part of our case in chief.

18           THE COURT:  Could you -- I don't want to make this

19   burdensome but how -- how lengthy are these deposition

20   excerpts?

21           MR. MURRAY:  They're just a page -- a couple pages

22   each; two or three pages each.

23           THE COURT:  You think you could get a copy of and

24   bring it in Friday morning and I could --

25           MR. MURRAY:  We have it here.

1           THE COURT:  -- look at it in hard copy, or bring it

2    in tomorrow, or fax it, or -- or do you have it there?

3           This is an opinion by Magistrate Judge Andrew Peck,

4    who's a pretty knowledgeable Judge about discovery.  And he --

5    he cites some other cases where this -- this has been allowed.

6    But he agrees that it doesn't come up very often because

7    usually the expert comes to trial, and the closing party

8    prefers to do it by cross-examination, but he allowed it in

9    this case.

10          MR. MURRAY:  I have the excerpts here, Your Honor,

11   that we were --

12          THE COURT:  All right.  Well, could you hand them up

13   and I'll --

14          MR. MURRAY:  Yes.

15          THE COURT:  -- rule on it Friday morning.  Okay.

16   All right.  I think that's a better way to do it.  Okay.  Now

17   -- all right.  There's nothing else.  Now, I have a topic that

18   I want to bring up.  And this is the topic of settlement.  And

19   I'm purposely doing it in open court because I know that this

20   is a case that is being closely followed by people in this

21   industry.  And it's of concern to them, and I recognize that.

22   And it -- it's my belief, having listened to a lot of

23   testimony and having read a lot of briefs in this case and

24   having been educated by the Third Circuit in their opinion,

25   that it is -- it is clear to me that the -- and you may

1    disagree with this.

2          Both of you may disagree, but one thing that came

3    clear in this testimony and, I think, shows the value of

4    having live testimony that we're just deciding summary

5    judgment motions in a case like this, is that the regulations

6    are at the heart of a lot of the problems that the people in

7    this industry have.  And several of the witnesses said this.

8    As a matter of fact, all of them that were asked, I think,

9    agreed that none of them wanted to have people under 18

10   participate in any of their explicit sexual positions --

11   depictions.  And that they fully agreed with at least the

12   policy behind the congressional statute.

13         I think -- and I am not, by what I'm about to say,

14   in any way indicating how I'm going to rule in this case.  I

15   have not decided that.  I don't intend to decide it until all

16   the testimony is done and I've given you a chance to argue.

17   But I -- I think that the plaintiffs on one hand have got to

18   consider that they have an uphill battle in getting me or any

19   Appellate Court to declare this statute unconstitutional on a

20   facial basis.  And I -- and I say that even though, Mr.

21   Murray, I think you're a fine lawyer and you did your -- and

22   you -- you argued a lot of the issues that I had decided in

23   the Third Circuit.

24         And although they agreed with you on some, they

25   disagreed with you on basically many of your -- most of your

1    substantive arguments about the facial invalidity of a

2    statute.  But they did remand on all issues -- and you were

3    right about that.  They remanded on all issues, included your

4    claim, the facial invalidity of the -- of the Fourth -- under

5    the Fourth Amendment, but that's -- that's another issue.  But

6    everything was remanded.

7            But, you know, I -- I think in view of the Sixth

8    Circuit, the D.C.  Circuit and the fact that the Supreme Court

9    has denied certiorari, that the -- I think your prospects on

10   this statute are -- are a real uphill battle.  And I'm not

11   sure that that is really the essence of your -- of your case,

12   at least from the testimony of your witnesses.  I think they

13   are most concerned about the onerous nature of the

14   regulations.

15           So I -- what I would like to ask you all to think

16   about is that this case could be settled by the plaintiffs

17   withdrawing their claim of facial invalidity -- facial

18   unconstitutionality, and that the Government would consider to

19   rewrite the regulations, and to simplify them and to give

20   consideration to reducing some of the regulations that the

21   witnesses have testified are the most onerous; particularly

22   about the record-keeping, about the warrantless searches.

23           As I look at the statute, the statute does not

24   require warrantless searches.  It gives the -- it says the

25   Attorney General may by regulation prescribe and shall make

Colloquy                                    154

1    such records available for inspection at all reasonable times.

2    That leaves some room as to whether warrantless searches were

3    required by the -- by the statute.  I don't think they were.

4    But they are part of the regulations, and I upheld that.  But

5    that's one of the issues that has been remanded.

6              And as some of the witnesses have said, it's a sore

7    point with them.  And in view of the fact that the Government

8    hasn't done any searches in the last six years approximately,

9    I wonder whether they're -- they're giving up anything by

10   agreeing to have regulations that would provide for advance

11   notice of any kind of inspection of records.

12             Same thing with the complaints about the intrusion

13   on privacy.  And this is a difficult area, I agree.  But the

14   question is whether the Government would be willing to

15   consider regulations that would exempt certain types of

16   completely private and noncommercial use of these videos, just

17   as Congress created exception for certain kinds of commercial

18   use for -- and I know, Mr. Murray, this was another point you

19   raised in the Third Circuit, that they disagreed with you

20   with, but I just wonder whether that is a -- an area that

21   there could be some compromise on.

22             Now, I'm aware, as I just said in the last case, of

23   the Supreme Court subpoenaing in Arlington.  I think that once

24   again, you know, the -- the plaintiffs have a burden here of

25   showing that the regulations are overly burdensome, that they

1    make the statute as applied unconstitutional, but they have

2    had some testimony that is -- at least I think is credible in

3    terms of the people stating what their belief is and what

4    their practices have been.  Whether it's legally sufficient, I

5    don't know.  But I think that this is something that should be

6    considered.

7          Now, as far as the procedure goes, what I would like

8    to recommend to you, Mr. Murray, and you don't have to do

9    this, but I would like you -- I don't think it will take you

10   and your colleague or your clients very much time -- and,

11   obviously, you'd want to discuss this with them -- is I would

12   like you -- I would like to see -- if you want to do this.

13   Maybe neither of you are interested.  And if that's the case,

14   that's fine, we'll go ahead and I'll decide everything and let

15   the chips fall where they may.

16         But what I would like to recommend is that promptly

17   -- and since we have a day off tomorrow, I'm hoping you might

18   spend -- be willing to spend some time on this tomorrow with

19   your clients and either -- whether by telephone or whatever --

20   is come up with a -- a reasonable, realistic list of the parts

21   of the regulations that you find the most objectionable, the

22   most burdensome, and the least necessary to prevent child

23   pornography -- to prevent people under 18 from participating

24   in this.

25         All of your clients said they have no problem with

1    the -- getting the photo IDs and -- and maintaining them.  So,

2    to me, clearly, that should be part of the regulation.  So

3    there ought to be a -- and then I -- so there has to be some

4    -- some documentation.  But propose something that would

5    lessen the burdensomeness.  And now that we -- one of your

6    witness -- I think Ms. Wilson said she didn't know you could

7    have electronic records.  The -- the regulations clearly allow

8    for electronic records.  I don't know -- personally know how

9    long that's been in there, but it's certainly there now.

10          So there's no need for any of these people to keep

11   -- except for that one piece of -- maybe the model release and

12   the actual photo ID, everything else can be digital, can be

13   electronically stored.  And we all know how that has changed

14   discovery in litigation in general.  And there's no reason why

15   you can't lessen the burden on your clients who are in this

16   industry.

17          And I add -- because it's also obvious from the

18   testimony -- but you don't need testimony to figure this out

19   -- that adult pornography has become a huge industry.  And as

20   I asked one of the witnesses, you know, what was prohibited in

21   the United States as little as 50 years ago is now on the

22   internet all over and depicted and -- it used to be just

23   written that was salacious or was considered explicit could be

24   banned.

25          Now, that -- that kind of legal principle has been

1    completely abandoned by -- I don't know any Judge that would

2    ban a written book because of the language that was used.  And

3    we have visual depictions that are all over the place.

4    They're on the internet.  Some you have to pay for, and a lot

5    of them are free.  And it shows -- and there's a great demand

6    for this.

7           So there are many people in the United States who

8    think this is terrible, but there are equally many who think

9    it's good and they -- because they use it, and they

10   participate in it, or they observe it and they pay for it.

11   And that's the reality for -- for better or worse.  So -- and

12   that has to be a factor here.  So I would like you to come

13   -- suggest that you come up with this list and that you

14   transmit to counsel for the Government.  And on the

15   Government's side, I would like you to have an open mind about

16   this and talk to your superiors.

17          And I know that the Justice Department is a

18   bureaucracy.  I was part of it for awhile, and I know that

19   none of you here in this courtroom would have any authority to

20   agree to this.  But I would like you to talk to your superiors

21   and tell them that you -- the Judge would like you to -- would

22   like them to seriously consider this as a way of settling this

23   case.  Otherwise, you're -- you know, I don't know how this is

24   going to end up.

25          I'm going to do my best, but, obviously, there's

Colloquy                                    158

1   going to be another appeal.  Maybe the Supreme Court will take

2   the case, maybe they won't.  But the -- if -- if they review

3   the regulations and a simplification of them and a reduction

4   of the burdensomeness of some of them that have been presented

5   by this testimony would foreclose future litigation in this

6   area, the present case and future litigation.

7          I think that would be a public service because you

8   -- the Justice Department has many areas, including child

9   pornography, obviously, that are very important and deserve

10  your full attention and your -- the full weight of your law

11  enforcement authority.  Whereas, this is, I think, in some

12  areas something that has become such a part of everyday life

13  for many people that consideration ought to be given to coming

14  to a legal resolution of this at least.

15         And -- now, let me say this.  I am not in the

16  business of writing regulations.  I'm not -- I have no

17  experience in it, and I don't have expertise.  But I would

18  have to say about these regulations here, part 75, that I

19  think a lot of them are difficult to read and for a layperson

20  to understand.  They're very, very comprehensive, and they're

21  not what I would call plain language that, I think, could be

22  used to achieve the same goals.

23         So I would urge you to give some -- if the

24  plaintiffs are willing to give you this list of regulations

25  that they find the most offensive, I would ask you to, in good

1    faith, discuss it, and if your superiors would allow you to,

2    to engage in a dialogue with plaintiff's counsel.

3              Now, I do not want to be part of that dialogue.

4    Because this is a nonjury case, I don't think I can in any way

5    help you negociate a settlement.  If you were seriously --

6    both seriously interested in a settlement along the lines that

7    I'm suggesting, or any other way, I would make available one

8    of our Magistrate Judges, because in this district that's what

9    we use Magistrate Judges for primarily is to settle cases.

10   But I'm not -- I'm only going to do that if you're both

11   committed and both interested and both intent on working

12   towards a regulation -- a resolution.

13             Another alternative would for me to be appoint or

14   suggest an independent mediator.  But that -- that would

15   require payment because I'm not going to ask anybody to do

16   this for free.  There are a lot of people who I know who I

17   think could be very good at it, if for any reason you'd want

18   to use a Magistrate Judge.

19             Now, there's one other wrinkle that I don't know the

20   answer to.  Because this is a published regulation, I don't

21   think that the plaintiffs could dictate an outcome because it

22   would have to go through the regulatory framework.  And it

23   would be subject to comments.  And there could be a third

24   party out there that could be -- for example -- I don't know

25   this would happen, but we have a group of Congressmen --

1    Congressmen and women who are amicus parties here.

2         And if the Justice Department were to embark down

3    this road of settlement that I'm suggesting, it's possible

4    that that group or a similar group -- they could be private

5    citizen -- would want to get into the regulatory appeal

6    process and object to it or put in their own two cents.  And

7    it could be that it could end up something different than the

8    plaintiffs want it to.

9         Even though there would be a revision, it may not be

10   exactly what you had in mind, but you might be stuck with it.

11   I don't know how that would work out.  And I'm not sure I

12   could retain jurisdiction over this issue because appeals from

13   these regulations generally go to the -- just the Circuit

14   Court of the District of Columbia, as I understand the

15   process.  But I -- I could be wrong about that.

16        Okay.  I'm not asking for any comment now.  I'm

17   saying this for what I see as a possible road to resolution

18   that would eliminate some expense on both sides, would provide

19   certainty, to a large extent, subject to what I said about the

20   wrinkly of the final administrative agency rule-making

21   process.  But I think it is something you should consider.

22        Okay.  Thank you very much.

23        MR. MURRAY:  Your Honor, may we approach the bench

24   one -- for one moment?

25        THE COURT:  You mean at sidebar?

1                  MR. MURRAY:  Yes.

2                  THE COURT:  Yes, but -- and bear in mind that

3        there's a risk I may repeat it for the record, because I don't

4        -- I want to do everything in this case in open court.

5                  MR. MURRAY:  Yes.

6                  THE COURT:  But sure, you can come up.  Do you want

7        your colleagues here or no?  (No audible response)  You could

8        all come up, too.

9             (Off the record discussion at sidebar)

10                 THE COURT:  This is off the record.

11            (Off the record discussion at sidebar)

12                 THE COURT:  Okay.  All right.  Well, the discussion

13       at sidebar did not concern precisely what I'm talking about.

14       What I am talking about, just to be clear, is that the

15       plaintiffs, if they're interested, would start this dialogue

16       by having specific topics, such as record-keeping, private in-

17       home videos.  Those are the two that stick out in my mind.

18       The third would be warrantless searches or advance notice of

19       search -- reasonable advanced notice of search.  Those are the

20       three items.  And you can just say these are the topics we'd

21       like to see change.  Or you could submit a little squib of

22       some proposed mechanism.  I'd leave that up to you.

23                 I am not talking about an amendment to the statute.

24       That would require Congressional action.  Under the separation

25       of powers, I have no power to even suggest that as a means of

1    settling cases.  That's completely up to Congress.  I'm

2    talking about the Justice Department changing the regulations.

3    Okay?

4          So if that's the line you want to go down, I would

5    strongly recommend that the -- that the Department consider

6    your suggestions and tell your superiors that the Judge thinks

7    this is a viable and reasonable way to settle this litigation

8    and most likely end this type of litigation, at least for the

9    foreseeable future.

10          All right.  Thank you very much.  I'll see you

11   Friday morning at 9:15.

12          ALL COUNSEL:  Thank you, Your Honor.

13        (Proceedings concluded at 4:04 p.m.)

14

15                     C E R T I F I C A T I O N

16

17          I, Brenda Boulden, court approved transcriber,

18   certify that the foregoing is a correct transcript from the

19   official electronic sound recording of the proceedings in the

20   above-entitled matter.

21

22

23   _____   June 13, 2013

24   BRENDA BOULDEN

25   DIANA DOMAN TRANSCRIBING