UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC., et al, | ) | 09-CV-4607 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE HONORABLE ERIC HOLDER, JR., in his Official Capacity as Attorney General of the United States, | ) | |
| | ) | Philadelphia, PA |
| | ) | June 7, 2013 |
| Defendant. | ) | 9:26 a.m. |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MICHAEL M. BAYLSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          J. MICHAEL MURRAY, ESQUIRE
                             LORRAINE R. BAUMGARDNER, ESQUIRE
                             BERKMAN, GORDON, MURRAY & DEVAN
                             55 Public Square - Suite 2200
                             Cleveland, OH 44113-1949
                             615 Chestnut Street - Suite 1250
                             Philadelphia, PA  19105

For the Defendant:           KATHRYN WYER, ESQUIRE
                             HECTOR G. BLADUELL, ESQUIRE
                             JAMES J. SCHWARTZ, ESQUIRE
                             NATHAN MICHAEL SWINTON
                             UNITED STATES DEPARTMENT OF JUSTICE
                             20 Massachusetts Avenue
                             Washington, D.C.  20530

Audio Operator:              N. MALAVE

Transcribed by:              DIANA DOMAN TRANSCRIBING
                             P.O. Box 129
                             Gibbsboro, New Jersey  08026-0129
                             Office:  (856) 435-7172
                             Fax:     (856) 435-7124
                             Email:   dianadoman@comcast.net

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                              I N D E X

2

3                    VOIR DIRE   DIRECT   CROSS   REDIRECT  RECROSS

4      WITNESSES:

5      FOR THE GOVERNMENT:

6        Gail Dines           7(Sch)  19(Sch)  70(Mur)129(Sch)   --

7

8      FOR THE PLAINTIFF:

9        Barbara Nitke         --    131(Mur) 152(Wye)184(Mur) 185(Wye)

10

11     EXHIBITS:                                        IDENT.  EVID.

12     P-70      Photograph, "Jack at Home"             143     151

13     P-71      Photograph from Nitke's website        144     151

14     P-72      Nitke's book, American Ecstasy         144     151

15     P-73A     Photograph taken at SM event           145     151

16     P-73B     Photograph taken at SM event           145     151

17     D-97      Nitke's model list                     157     157

18     D-100     Nitke's 2257 form                      159     159

19     D-101     Nitke's model release form             158     159

20     D-112A -

21     D-112E    Photographs from Nitke's website       160     161

22

23

24

25

Colloquy                                                                                           3

1          (The following was heard in open court at 9:26 a.m.)

2                    THE COURT:  Good morning, everyone.  I'm sorry to be

3     late.

4                    MR. MURRAY:  Good morning, Your Honor.

5                    MS. WYER:  Good morning, Your Honor.

6                    MR. SCHWARTZ:  Good morning.

7                    THE COURT:  Okay.  Have a seat, please.  The first

8     thing I want to say is that I read the deposition -- the

9     deposition excerpts of the experts, Mr. Murray, that you had

10    handed up.  Now, let me just -- and that would be Dr. Dines,

11    Mr. Wolok and Ms. -- Dr. Burrow (phonetic).  Is the Government

12    going to -- they're all -- are they all going to testify?

13                   MR. SCHWARTZ:  Yes, they'll all be here, Your Honor.

14                   THE COURT:  Okay.  All right.  Well, Mr. Murray, I'm

15    going to sustain the objection to that.  Let me just tell you

16    why.  These are just excerpts from a deposition.  I could not

17    tell, from reading what you gave me, in what context this

18    testimony was given.  And I don't think it's fair to the

19    Government or -- and I would -- the same rule would apply to

20    any witness, any party in any trial to just pick out of an

21    expert's deposition, which is really taken for purposes of

22    expediting trials, for giving parties the ability to

23    understand a party's position and an expert's testimony.

24         That's why we have expert depositions allowed in the

25    Federal Rules.  For example, in Pennsylvania, you're not

Colloquy                                    4

1   allowed to take depositions of experts before trial.  So I

2   understand there are some judges that have allowed

3   admissibility of expert depositions by the opposing party in

4   some cases.  But in my discretion, I think it's a bad idea in

5   this case.  It's totally out of context, and it's not

6   prejudicial to you.

7           These people are all going to testify, and you can

8   cross-examine them, and if they say something different than

9   they said at their deposition, you can introduce this portion

10  that you gave me.  So I'm going to exclude it from your --

11  from the presentation as part of your case.  But I think

12  that's the right result in this case.

13          Secondly, I've read much of the deposition of Agent

14  Joyner, but I don't -- I'll go through that with you,

15  probably, this afternoon when we have more time.  I'd rather

16  proceed to the witnesses who are going to testify live.

17          Who's going to be the first witness?

18          MR. SCHWARTZ:  By agreement with the parties, the

19  defendants are going to call Dr. Gail Dines to the stand.

20          THE COURT:  Okay.  Now -- all right.  Well, have the

21  doctor come up to the stand.

22          MR. SCHWARTZ:  Gail?

23          THE COURT:  Now, I sent you all a letter that I now

24  have Tuesday available for testimony because the other case is

25  going to be -- it's going to start and be completed on Monday,

Colloquy                                                              5

1    99 percent.

2              MR. SCHWARTZ:  Yes, and --

3              THE COURT:  And where do we stand on that issue?

4              MR. SCHWARTZ:  We have at least one witness, Mr.

5    Wolok, who will be here on Tuesday, and hopefully, another

6    witness, one of the FBI agents, will also be available on

7    Tuesday.

8              THE COURT:  All right.

9              MS. WYER:  Your Honor, I just wanted to clarify

10   whether we have the entire day Tuesday and also --

11             THE COURT:  Except for a lunch break --

12             MS. WYER:  -- and --

13             THE COURT:  -- which may be a little longer than

14   usual.  But, yes, we can start at 9:15 and take the whole day,

15   except for a lunch break.  I may have a guilty plea at some

16   point in the afternoon.  I forget.  But that won't take long,

17   either.

18             MS. WYER:  And -- and do we also have Wednesday or

19   is that unclear?

20             THE COURT:  Yes.  Oh, yes, Wednesday, Thursday --

21             MS. WYER:  All day Wednesday.

22             THE COURT:  -- and Friday.

23             MS. WYER:  Okay.

24             THE COURT:  Yes.  If possible, I would like to

25   complete the testimony Friday, but I have Monday -- Friday, I

```
1    -- it depends on what happens in this lung transplant case

2    that I have.  I scheduled the preliminary injunction hearing

3    for Friday.  There is -- I can't say, with any assurance,

4    whether it will happen on Friday or how long it will take, but

5    I may have to do some of it on Friday, just because the rule

6    requires that I have a hearing within ten days.  So that I may

7    not have all of Friday available for this case, but if -- I am

8    intent on completing the testimony in this case no later than

9    Monday.

10             MS. WYER:  We -- we are --

11             THE COURT:  So -- yes?

12             MS. WYER:  -- we are certain that we can finish it

13   by Monday.  We have one witness who must wait until that --

14   Monday, the 17th to appear.  He can't appear earlier.

15             THE COURT:  What witness is that?

16             MS. WYER:  Dr. Burrow, one of our experts.

17             THE COURT:  Who?

18             MS. WYER:  Dr. Burrow, one of our experts.

19             THE COURT:  Oh, he can't -- he's not available until

20   Monday?

21             MS. WYER:  Correct.

22             THE COURT:  All right.  All right.  How about the

23   plaintiffs?  Do you -- what's your witness schedule like?

24             MR. MURRAY:  We have --

25             THE COURT:  You have one today, right?
```

1              MR. MURRAY:  We have our last plaintiff today, and

2       then we just have two experts that we're weaving into there.

3              THE COURT:  Okay.  So they can be accommodated

4       Tuesday, Wednesday, Thursday or Friday?

5              MR. MURRAY:  Yes.

6              THE COURT:  All right.  Good.  All right.  Thank

7       you.  I appreciate that.  Okay.  All right.  So let's proceed.

8       Swear Dr. Dines in please?

9              COURTROOM DEPUTY:  Please raise -- raise your right

10      hand, please?

11             DR. GAIL DINES, PLAINTIFF'S WITNESS, SWORN

12             COURTROOM DEPUTY:  Please state your full name for

13      the record, spelling your last name.

14             THE WITNESS:  Gail Dines, D-I-N-E-S.

15             COURTROOM DEPUTY:  Thank you very much.

16             THE WITNESS:  Thank you.

17             THE COURT:  It's D-I-N-E-S?

18             THE WITNESS:  D-I-N-E-S, yes.

19             THE COURT:  Yes, go ahead.  Thank you.  All right.

20      Proceed.

21                             VOIR DIRE

22      BY MR. SCHWARTZ:

23      Q    Good morning, Ms. Dines.

24      A    Hello.  How are you?

25      Q    I'm good.  Can you please tell the Court what your

Dr. Dines - Voir Dire (Sch)                                    8

1    educational background is?

2    A    Yes.   I have a bachelors and a Ph.D. in sociology from

3    the University of Salford in England.

4    Q    And what professional associations have you belonged to?

5    A    The American Sociological Association, the American

6    Studies Association, the New England Women Studies Association

7    and the National Women Studies Association.

8    Q    And can you please describe your job history?

9    A    Yes.   I am a Professor of Sociology at Wheelock College.

10   I started there in 1986 as an adjunct professor.   I then

11   became an assistant professor in 1990.   I got tenure in 1997

12   and became a full tenured professor in 2000.

13   Q    And where is Wheelock College?

14   A    In Boston.

15   Q    And what were your responsibilities at those various

16   positions?

17   A    Okay.   As a professor, obviously, to teach courses, to

18   grade students, to develop curriculum, and since 2002, I have

19   been Chair of the American Studies Department, and there,

20   basically what you do is, you run a department.   You run

21   curriculum.   You run the faculty.   You hire.   You fire.   And

22   you make sure that you schedule classes on time.

23   Q    And, as Chair, what -- specifically, what areas of study

24   are you the Chair of?

25   A    Okay.   I'm Chair of three majors, American Studies,

1    Political Studies and Global -- Political Science and Global

2    Studies and Media Studies and Communication.  There's three

3    majors in my department.

4    Q    And those responsibilities you've described apply to each

5    of those areas?

6    A    Yes.  Yes.  And I have directors who report to me from

7    each of the majors.

8    Q    And you said, at one point, you taught undergrad courses?

9    A    Yes.  I teach two courses a semester.  And also, in the

10   spring and -- in the fall and spring, I teach graduate

11   courses, as well.

12   Q    And you still teach undergrad courses?

13   A    Yes, I teach undergrad.

14   Q    And what are the courses that you teach?

15   A    I teach -- in the summer, I teach a graduate course on

16   Media Literacy.

17   Q    I'm sorry, undergrad.

18   A    Oh, undergrad.

19   Q    What undergrad courses are you teaching?

20   A    I teach Sociology of Minority Groups, Women Culture and

21   Society and Feminist Theories.

22   Q    Okay.  And you said you teach graduate courses?

23   A    Yes.

24   Q    What graduate courses do you teach?

25   A    I teach Media Institute, which is really a media literacy

1    course, every summer.

2    Q    And what degree do people who take your graduate course

3    get?

4    A    Masters.

5    Q    In?

6    A    Any number of fields, Psychology, Human Development,

7    Social Work.  It basically feeds many of the courses.

8    Q    Okay.  Can you describe what -- specifically what your

9    area of study is?

10   A    Yes.  I am a sociologist, specifically a qualitative

11   sociologist, and my area of research is studying both the

12   effects of pornography and the political economy of

13   pornography, which is basically, understanding how it

14   functions as a business.

15   Q    You said that you are qualitative sociologist.  Is there

16   another type of sociologist?

17   A    Yes, quantitative sociology.

18   Q    And what's the difference between the two?

19   A    Quantitative is more statistically based, where

20   basically, one follows the methodologies that are more

21   empirically, statistically based.  A qualitative sociologist

22   is somebody who, basically, rather than coming out with

23   statistics around map of content, what they do is, they tend

24   to build a more nuanced, macro-analysis of what's actually in

25   the media that you're studying.

1    Q    And why is that distinction important?

2    A    Because you don't -- you're not statistically based when

3    you are actually doing a content analysis in qualitative

4    sociology.  What you're more interested in is what's actually

5    in the images.  How do the images work as a structured whole?

6    What is the relationship between different people in the

7    images?  For example, in pornography what we're looking at in

8    qualitative sociology is, what are the sex acts, who is being

9    treated like what, who's doing what to whom, what is being

10   said, what are the actual ways in which verbal and non-verbal

11   behavior is being communicated.

12   Q    And do you currently do sociological research?

13   A    I do.

14   Q    And how do you do sociological research generally?  How

15   would a sociologist generally do research?

16   A    Well, there's many ways you do it.  I mean, very key to

17   doing any sort of research is a concept we call Methodological

18   Triangulation, which means that you have a question, a

19   research question, and the way you get at that research

20   question is through coming at through many different research

21   angles, so that you do four or five different methods,

22   depending on what your research question is.  And then you see

23   what picture emerges from your research, because the argument

24   is that no one method is perfect, so you need to, sort of,

25   combine methods.

1    Q    And how much of your career has been dedicated to the

2    study of pornography?

3    A    All of my career.  My entire academic career has been

4    devoted to the study of pornography.

5    Q    And how long has that been?

6    A    That is over 25 years.

7    Q    Okay.  And why do you choose to study pornography?

8    A    Well, I believe that pornography is a particular genre of

9    media that has a powerful effect on how people think about the

10   world, how it shapes their sexual identities, their gender

11   identities, the way it shapes cultural norms, cultural values.

12   So I am particularly interested in the way that media shapes

13   behavior, and pornography, I would argue, is a particularly

14   profound and compelling form of media in the way that it

15   shapes our notions around sexuality.

16   Q    And those -- the methods you said to do sociological

17   research, are those standard methods in -- in your field of

18   study?

19   A    Absolutely.  I follow the standard protocols of

20   Qualitative Content Analysis, and when I do Political Economy,

21   I also follow the protocols.  I mean you have methods set up,

22   and there's methodologies, and there's basically protocols

23   that you follow, yes.

24   Q    How do you use your sociological methods to study the

25   Internet pornography industry?

1   A    The industry?

2   Q    Yes.

3   A    The way one studies the industry, particularly, is again,

4   using Methodological Triangulation.  You interview people who

5   work in the industry.  You also, especially, that's key is,

6   you follow the industry press.  So, in this case, there's two

7   particular major industry presses, which is <u>XBIZ</u>, which

8   basically follows the pornography industry, lots of different

9   articles that generally follow the industry, and also <u>Adult</u>

10  <u>Video News</u>, which is another business press.  You also read

11  articles outside of the pornography industry, so what you do

12  is, you try to cull as much information as you can from as

13  varied sources as possible, so you get a picture of what the

14  industry looks like.

15  Q    And how do you use sociological methods to study the

16  content of Internet pornography?

17  A    Okay.  So particularly, Qualitative Content Analysis is,

18  what you do is you decide what your body of data is going to

19  be.  And then what you do is you really immerse yourself in

20  your data, which means that you spend an enormous amount of

21  time, at first, just going through the data, in this case,

22  going through what's on Internet pornography.

23          You then stand back, and you develop what's called a

24  typology, and you try to figure out, how do you make sense of

25  this mass of data?  So a typology is basically developing

1  categories.  Then what you do, from the third stage, is you

2  develop a rough section of categories.  You then go back to

3  your data to see if, indeed, those categories that you have

4  developed in the first place meet what you're looking at

5  again.  And then you keep refining and refining your typology

6  until eventually, the data you're looking at makes sense in

7  terms of the typologies that you have developed.

8  Q    Okay.  And do you interact with the pornography industry

9  to assist with your research?

10  A    Yes.  I interview people in the industry.  I also have

11  many contacts within the industry who regularly tell me what's

12  going on.  Uh-huh.

13  Q    And how do you remain current on sexually explicit

14  material on the Internet?

15  A    Well, first of all, reading, looking at the Internet,

16  constantly immersing myself in what's in Internet pornography

17  and, of course, reading the academic journals is crucial.

18  That's the second way.  And also regularly reading <u>XBIZ</u> and

19  <u>Adult Video News</u>.  So again, Methodological Triangulation,

20  pulling from as many sources as I can.

21  Q    Have you published any peer review articles?

22  A    Yes, I've published eight.

23  Q    And in what peer review journals have those been

24  published in?

25  A    I'll give you examples.  I've published in the <u>Yale</u>

1    <u>Journal of Law</u> on Feminism.  I've published in the journal,

2    <u>Violence Against Women</u>.  I've published in the journal, <u>Race,</u>

3    <u>Class and Gender</u>.  I've published in the journal, <u>Family</u>

4    <u>Violence and Sexual Assault Bulletin</u>, and I've published in

5    the journal, <u>Humor</u>.

6    Q    And have you published any textbooks on media studies?

7    A    Yes.  I am the co-editor of <u>Gender, Race and Class in the</u>

8    <u>Media</u>, which is about to go into its fourth edition in

9    January, 2014.  It is Safe Publications, one of their best

10   selling media textbooks, probably, in the world today.

11   Q    And what level of study uses that textbook?

12   A    That's basically for upper level graduates, upper level

13   undergraduate and graduate courses.  It's taught across both.

14   Q    Have you published any academic books in the area of

15   pornography?

16   A    Yes.  I published, <u>Pornography: The Production and</u>

17   <u>Consumption of Inequality</u> with Routledge Press, which is an

18   academic press, which basically, you sign a contract that is

19   contingent upon them sending it out for peer review.  And the

20   second book that I've published is <u>Pornland: How Porn Has</u>

21   <u>Hijacked Our Sexuality</u>, which is by Beacon Press, which is

22   kind of the premier press for academics who want to write a

23   thoughtful, reflective book, but that is for the general

24   public.  So Beacon Press is kind of the premier press, yes.

25   Q    And just -- just so there's no confusion, the <u>Pornland</u>

Dr. Dines - Voir Dire (Sch)                    16

1   book wasn't -- was not peer reviewed?

2   A    No.  You don't peer review with a trade publication.

3   Q    Okay.  That was just a book that was published

4   academically?

5   A    Well, yes, it's a book published by a very, very

6   respected -- probably the most respected trade press in the

7   country, but it's not -- your contract is not contingent upon

8   peer review.  It is contingent upon the editors agreeing to

9   it.

10  Q    Okay.  Have any of your books been translated into

11  foreign languages?

12  A    Pornland has been translated into Polish, Chinese,

13  Croatian, and at the moment, we're negotiating Spanish, as

14  well.

15  Q    Okay.  Aside from your classroom work, have you given

16  lectures on the topic of pornography?

17  A    Yes.  I lecture extensively, both in the United States

18  and all over the world, yes.

19  Q    What professional organizations have you lectured to?

20  A    Well, first of all, many of my lectures are to

21  universities.  I'm invited in to give university-wide

22  lectures.  I would say I do between 15 and 25 of those a year.

23  Also, I lecture, specifically, to people, medical experts,

24  doctors, pediatricians, nurses organizations, therapist

25  organizations, psychologists and legal bodies.  I just

Dr. Dines - Voir Dire (Sch)                    17

1   recently lectured to the Hispanic Bar Association in Florida.

2   And so, basically, the gamut of experts.

3   Q    Okay.  And what topics have you lectured on?

4   A    Specifically, lecturing on both the business of

5   pornography, also the content of pornography and the effects

6   of pornography.

7   Q    Okay.  Are there -- are there any other areas of

8   sociological research that you study, other than pornography?

9   A    Basically, no, that's -- that's what I do.  No.

10  Q    Have you consulted with any foreign countries?

11  A    Yes.  I have consulted with ministers in Norway, in

12  Iceland, Scotland, Ireland.  I am about to address the House

13  of Commons next week in England.

14  Q    Okay.  And what did you do when you were working with

15  Iceland?

16  A    Okay.  I was invited by the Minister of the Interior,

17  because they decided that they would like to think about

18  reframing their laws on pornography.  So they asked me to come

19  in and to speak with the Minister of the Interior, the

20  Minister of Education, the Minister of Health and, also, with

21  the police bodies and the legal bodies to explain to them how

22  pornography works.  My job was to devise a map of the

23  industry, and also to explain how it works as an industry.

24  Q    Okay.  Have you won any awards in your field?

25  A    Yes.  I won the "Meyers Human Rights Award" for my book

1    <u>Gender, Race and Class in the Media</u>.  I've also won "Teacher

2    of the Year" at my college.  I've won "Scholar of the Year",

3    and I've won "Senior Scholar of the Year".

4    Q    Okay.  Have you appeared on any television shows to

5    discuss pornography?

6    A    Yes.  I'm a regular on BBC, on NPR, on CNN, on NBC, on

7    Canadian Broadcasting Company.  I was just on BBC, Whales last

8    week.  I was on Sky Television, which is an international

9    television, and basically, every major television network in

10   this country and in the Western World --

11   Q    And --

12   A    -- and Australia, regularly.

13   Q    -- and why were you brought on those television shows?

14   A    As an expert on pornography.

15   Q    Okay.

16          MR. SCHWARTZ:  Your Honor, at this time, we tender

17   Dr. Dines as an expert in the field of Sociological Analysis

18   of how the Internet pornography industry functions and the

19   content of Internet pornography.

20          THE COURT:  Okay.  All right.  Mr. Murray, do you

21   want to voir dire her on qualifications?

22          MR. MURRAY:  No, Your Honor, I'll just wait for --

23          THE COURT:  Okay.

24          MR. MURRAY:  -- cross altogether.

25          THE COURT:  All right.  Well, you may proceed.  And

1    she qualifies as an expert.

2              MR. SCHWARTZ:  Thank you, Your Honor.

3              THE WITNESS:  Thank you.

4                        DIRECT EXAMINATION

5    BY MR. SCHWARTZ:

6    Q    Dr. Dines, what are the different ways pornography can be

7    consumed today?

8    A    Well, obviously, there's magazines, hard copy.  There's

9    DVDs.  There's TV, cable.  But I think anyone who studies

10   pornography would argue that in the last few years, it's

11   mainly all shifted to the Internet, that the vast majority of

12   consumers, most of whom are men, now interface with

13   pornography through the Internet.

14   Q    Okay.  And based on your research of the industry, do you

15   have an opinion on the future of the print pornography

16   industry?

17   A    Well, basically, it's virtually dead.  And my assumption

18   is that, in a few years, it will be completely gone, yes.  I

19   mean, you might have a few small companies, but in terms of

20   actual economics, it doesn't figure anywhere when you look at

21   the map of the porn industry.

22   Q    Okay.  And prior to your report and involvement in this

23   particular case, what had your research into the Internet

24   pornography industry developed as to current trends in the

25   industry?

Dr. Dines - Direct (Sch)                          20

1   A    Well, one of the first things I was looking at was what

2   has happened in the move from, sort of, <u>Playboy</u>, <u>Penthouse</u>,

3   <u>Hustler</u> days of print through to the Internet.  So my research

4   has specifically been on the changes in the content.  And what

5   one has found in research and both in empirical studies is

6   that it has become much more cruel, much more violent, much

7   more body punishing.

8        And in fact, the only real empirical study published

9   on post-Internet pornography content in the journal <u>Violence</u>

10  <u>Against Women</u> in 2010 found that over 90 percent of scenes in

11  the top selling DVDs and movies had some form of either

12  physical, sexual or verbal violence against the woman.  So

13  that was over 90 percent of the scenes.

14  Q    Okay.  And --

15       MR. MURRAY:  Your Honor, I'm going to move to strike

16  that testimony as irrelevant to the constitutionality of 2257,

17  unless this is going to be regarded as a content-based statute

18  that is somehow hostile to the content of the materials.

19       THE COURT:  Well, the Third Circuit has clearly

20  ruled that this was -- they affirmed my finding that this was

21  not a content-based statute.  So I don't think we need to go

22  into that.

23       MR. SCHWARTZ:  Okay.  And -- and I --

24       THE COURT:  I mean, I'm not going to strike it

25  because --

1              MR. SCHWARTZ:  Okay.

2              THE COURT:  -- it's all background.

3              MR. SCHWARTZ:  Okay.

4              THE COURT:  I really think you ought to focus on the

5    issues posed by the remand of the Third Circuit.

6              MR. SCHWARTZ:  Okay.

7    BY MR. SCHWARTZ:

8    Q     How does the mainstream Internet pornography industry

9    work today?

10   A     Okay.  So let me give you an example of what happened

11   when I was researching my book three years ago and the changes

12   today.  When I was researching my book three years ago, if I

13   put porn into Google, I would come up with paid porn sites.

14   Today, when you put porn into Google, you come up with what

15   are called free porn sites, the tube sites they're called.

16   They have become today the gateway into the entire porn

17   industry.

18              Unless you are an aficionado of pornography and know

19   exactly what site you're going to, anybody from an 11 year old

20   boy through to an 80 year old man, when they put pornography

21   into Google, they're going to come up with the free porn

22   sites.  Then you get into the free porn sites, and that is

23   your gateway to the rest of the porn world.

24   Q     Okay.  Generally, when you get to these websites, how are

25   -- how is the content organized?

1    A    When you first meet it, and you meet these images, you're

2    kind of -- it looks chaotic and overwhelming, but actually,

3    for example, PornHub.com, which is one of the most visited

4    porn websites in the world, on the left, you have 61

5    categories.  And then you can -- they're ordered, all of those

6    thousands, millions, how many videos are on PornHub, who

7    knows, are actually organized by categories.  So you click on

8    one of those 61 categories.

9    Q    Okay.  And are you familiar with the genre known as

10   amateur pornography?

11   A    Yes.  Amateur pornography is one of the categories along

12   with -- would you like -- along with anal, along with Asian

13   porn, along with Ebony porn, just all those types, teen porn.

14   And amateur porn is actually not amateur porn.  It's a

15   category named by the industry.  When the pornography industry

16   talk about amateur porn, what they mean is pornography made by

17   porn professionals made to look like it's made by amateurs.

18   So amateur porn is actually a niche market produced by the

19   porn industry.

20              MR. MURRAY:  Your Honor, I'm going to move to strike

21   that, unless a better foundation is laid for that.

22              THE COURT:  Well, why don't you -- I'll give you a

23   chance to lay a foundation.  I mean, how does she know that?

24   BY MR. SCHWARTZ:

25   Q    How are you aware that -- in your study and your

1   research, how are you aware that -- you know, have you

2   researched the amateur pornography?

3   A     Yes, well, how -- first of all, they talk about it on

4   XBIZ and Adult Video News, and if you go into the charts in

5   Adult Video News, they have a section called amateur, and

6   underneath that section, they name which companies are

7   producing the amateur pornography.  So they don't have

8   individual names under them.  They have the names of the

9   actual pornography companies.  So it's a niche market, and

10  they tell you who's producing it.

11  Q     And those producers are --

12  A     Porn industry.

13  Q     -- pornography --

14  A     Yeah.

15  Q     -- porn industry producers?

16  A     Yes, porn industry producers.

17              THE COURT:  Well, how -- how do you know that, that

18  they're --

19              THE WITNESS:  Because I know the names of the porn

20  industry producers, so I can tell you, and I -- then I go into

21  the companies, and I check.

22              THE COURT:  All right.  I'll deny the motion to

23  strike.  But you can explore this on cross and renew your

24  motion, if you like.

25  BY MR. SCHWARTZ:

Dr. Dines - Direct (Sch)                              24

1   Q    And, as you described it, is -- based on your

2   understanding of the porn industry and the research you've

3   done, is amateur porn a revenue stream for porn producers?

4   A    Like every single category, absolutely.

5   Q    Now, you were contacted by the Department of Justice

6   about providing a report for this case?

7   A    Yes, I was.

8   Q    And what were you asked to do?

9   A    I was asked to do two things, particularly, provide a map

10  of content -- well, actually, three things -- provide a map of

11  content --

12           THE COURT:  Well, wait.  Just speak a little slower,

13  please?

14           THE WITNESS:  I'm sorry.  It's my English.  We speak

15  quickly in England.  I apologize.

16           THE COURT:  Well, just speak a little slower.  Just

17  repeat what you said.  But you're speaking very quickly, and I

18  want to be able to understand your testimony.

19           THE WITNESS:  Okay.  I'm sorry.

20           THE COURT:  But you have to slow down.  Okay?

21           THE WITNESS:  I apologize.  Okay.

22           Three things, number one, provide a map of the

23  content; number two, have a look at that genre called teen

24  porn or that genre, particularly, that has very youthful --

25           THE COURT:  Well, what was the first thing about --

1    what about content?

2                    THE WITNESS:  A map of the industry, the content.

3                    THE COURT:  A map of the industry.  Okay.

4                    THE WITNESS:  Yes, sort of what's in it, what's out

5    there.

6                    THE COURT:  All right.  And the second was --

7                    THE WITNESS:  Was looking at --

8                    THE COURT:  -- about teen -- about teen porn?

9                    THE WITNESS:  -- teen porn, where you have very

10   youthful images, yes, that genre.  That's a sub-genre.  And

11   thirdly, to try and collect some data as to what percentage of

12   pornography on the Internet actually fits into that genre

13   called teen porn.

14   BY MR. SCHWARTZ:

15   Q    And based on your training as a sociologist, how does one

16   attempt to develop a map of content?

17   A    Again, one immerses oneself in the pornography.  So I

18   spent many, many hours, basically, on -- basically on the tube

19   sites.  So I would go into the tube sites and just follow

20   wherever the tube sites took me.  So I would click on a video,

21   follow the video, follow the pop-ups, follow the

22   advertisements and just spend hours and hours and hours going

23   through all the pornography.

24   Q    And based on your training as a sociologist, how did you

25   answer the question regarding the prevalence of teen

1  pornography?

2  A    Well, what we did again was Methodological Triangulation,

3  which is, we looked four different ways through Word Tracker,

4  Google Trends, Advance Google Search, and what we did was to

5  try and find out what percentage of pornography on the

6  Internet is that called teen porn.

7  Q    Okay.  And prior to your report, did you have any

8  experience with Section 2257?

9  A    I'd heard about it through the pornography industry and

10  obviously reading the porn press, but I can't say I was that

11  familiar with it.  I knew, basically, what it was, but I'd

12  never written about it or researched it.

13  Q    Okay.  Now, earlier, you discussed the difference between

14  qualitative and quantitative studies, how is that difference

15  relevant to the study of Internet pornography?

16  A    I would say that if you were coming out with a

17  quantitative study, you would be more statistically based on

18  content.  But over the last 15 years, that has kind of gone

19  out of fashion in media research today.  When you go through

20  most of the media journals today, what you find is qualitative

21  content analysis, not quantitative in media studies.

22         And the reason for that is there's been what's

23  called Paradigm Shift, where paradigms that were developed in

24  Europe has now kind of been imported into the United States of

25  America, and they stress qualitative content analysis, as

1  opposed to quantitative.

2  Q    Okay.  As part of the materials you reviewed for your

3  report, you reviewed Section 2257?

4  A    I did.

5  Q    And as part of preparation for your testimony today, you

6  reviewed Section 2257A?

7  A    Yes.  After the deposition, yes.

8  Q    So I think you discussed that the main way that consumers

9  access Internet pornography today is through these tube sites?

10 A    Uh-huh, yes.

11 Q    Do these tube sites represent a change in how users

12 access pornography over the last few years?

13 A    I would say it's been a revolution in the porn industry,

14 moving away from going straight into a paid porn site, into

15 the tube sites, which as I say, then they open up -- imagine

16 it as a portal that once you get into there, it opens up the

17 whole world of both free porn and paid porn.  And you get to

18 the paid porn sites via the free porn, which of course, is --

19 the job of a paid porn site is to monetize traffic that's

20 going to go to free porn to paid porn.  So that is a goal, is

21 to monetize the traffic into paid porn.

22 Q    Have you had an opportunity to view tube sites?

23 A    Many, many times, yes.

24 Q    Can you describe what a tube site is?

25 A    Yes.  It's -- again, it's a free porn site.  You go in,

1    and there's lots and lots and lots of images of very explicit,

2    hardcore sex, and then when you go on the left -- on some

3    sites, on the left are the categories; on some sites, on the

4    top are the categories.  You then click on a category, for

5    example, teen porn, anal porn, Asian porn, and then it takes

6    you into another site, under the page, on the free porn site

7    where all of the images are basically tagged with the category

8    that you've just put in.

9    Q    And where does the content from a tube site come from?

10   A    Well, a lot of it is pirated, actually, from paid porn

11   sites.  We know that.  Also, a lot of paid porn sites upload

12   their own material as a way to, basically, act as an

13   advertisement and as a teaser to get you to their site.  And,

14   also, some people, individuals, upload their own, as well.

15   Q    And what's the goal of uploading a video to a free tube

16   site?

17   A    The goal of uploading it is that somebody will click onto

18   it, okay, that it will become heavily watched, at which point,

19   you can then have advertisements next to it, so every time

20   someone clicks on your site -- your video, you get paid

21   because the advertisement comes up.  But the real goal, the

22   sort of end -- the pot of gold at the end of the rainbow is

23   to, somebody clicks on your video, then clicks on something

24   else and immediately gets sent into a paid porn site and joins

25   the paid porn site.  That's what happened to me when I was

1    doing the research on teen porn.  By click three, I'm at a

2    paid porn site, with a membership form.

3    Q    Okay.  And I think you described that the tube sites are

4    sort of -- are organized into categories or genres?

5    A    Uh-huh.

6    Q    Can you give some examples of what those categories and

7    genres are?

8    A    Ebony porn, anal porn, teen porn, tiny tits porn, MILF

9    porn, all of those kinds of -- yes, those are the examples --

10   lesbian porn, et cetera.

11   Q    Now, based on your knowledge of the industry and your

12   research, do you have an opinion on how these tube sites have

13   affected the ability to verify the ages of performers?

14              MR. MURRAY:  Objection, Your Honor. She's not going

15   to --

16              THE COURT:  Well, you can answer yes or no.  Do you

17   have that opinion?

18              THE WITNESS:  Absolutely, yes.

19   BY MR. SCHWARTZ:

20   Q    And --

21              THE COURT:  Well, why don't you lay a foundation?

22   And then you can ask her the opinion.  I'll overrule the

23   objection.  And this is all subject to a motion to strike,

24   based -- after cross-examination, Mr. Murray.  I'm not making

25   any final ruling until I hear her whole testimony.  Go ahead.

Dr. Dines - Direct (Sch)                              30

1    BY MR. SCHWARTZ:

2    Q    What is the basis of your opinion regarding how tube

3    sites have affected the ability to verify ages?

4    A    Okay.  Over the past few years, what has happened is

5    money has moved from -- in pornography, from the point of

6    production to the point of distribution.  So what you have now

7    are a very few companies that control distribution, which is

8    where the money is.  So let me give you an example of a

9    sweatshop production because that's what it's like.  On the --

10            MR. MURRAY:  Objection, Your Honor, this is not

11   responsive to that question.

12            THE COURT:  Yes.  Well --

13            THE WITNESS:  I'm explaining the --

14            THE COURT:  -- sustained.  I don't -- sweatshops are

15   -- I don't want to go into -- you're saying a sweatshop like

16   with --

17            THE WITNESS:  I'm trying to -- yes, it's kind of

18   small, very, very small production.

19            THE COURT:  Well, you're going to have to come up

20   with -- you mean a sweatshop where people work for low wages?

21            THE WITNESS:  Yes.

22            THE COURT:  I don't really --

23            THE WITNESS:  Then I can use another term.

24            THE COURT:  I don't see the connection, but I'll let

25   -- she can answer.  Let me hear her -- what the analogy is.  I

1    really don't --

2              THE WITNESS:  Okay.

3              THE COURT:  -- see where that's getting us.

4              THE WITNESS:  Okay.  So what you have is small

5    production houses dispersed over a lot of L.A., because that's

6    where a lot of it's made.  Then what happens is, they -- they

7    upload from all of these small production places -- they

8    upload it onto Youporn or whatever, and then, it is the owners

9    of the free porn sites that make the money from the

10   distribution.

11             Now, in the beginning, when the Internet first

12   struck, anyone with a camcorder could make money.  You made

13   pornography.  You put it on your own website, and basically,

14   money was just flowing in in the first few years.  What

15   happened, as it became monopolized and corporatized, the porn

16   sites got owned by a group, particularly, called Manwin,

17   M-A-N-W-I-N, which is in Luxembourg.  They control most of the

18   distribution.  So what's happening is --

19             MR. MURRAY:  Your Honor, I'm going to object.

20   Again, this is -- there's no foundation for this kind of

21   testimony.

22             THE WITNESS:  Yes, there --

23             THE COURT:  Well, I want to hear -- first of all,

24   I'm going to strike the reference to a sweatshop.  I don't

25   think that's helpful.  But I'm going to let her answer the

1   question and give her a chance to establish what her

2   foundation and give you a chance to make sure you qualify that

3   she has a foundation for this opinion.  Okay.

4           MR. SCHWARTZ:  Right.

5           THE COURT:  And you can only ask one question at a

6   time, but, Mr. Murray, you reserve your motion to strike.  Go

7   ahead.

8   BY MR. SCHWARTZ:

9   Q    So you were describing what the basis -- how you come to

10  a knowledge about age verification --

11  A    Okay.

12  Q    -- and how tube sites affects that?

13  A    So anyone who is familiar with the porn business press

14  will tell you that what they're talking about all the time is

15  they're losing money like crazy and a lot of people are going

16  out of business.

17          THE COURT:  They're losing money?

18          THE WITNESS:  Yes.

19          THE COURT:  Who are losing money?

20          THE WITNESS:  The production side is losing money.

21  What is happening is that it is very now to make money from

22  the production side, because as I've said, the revenue is

23  going to the -- from the distributor.  So what I am saying is

24  that because a lot of you're having small production houses in

25  L.A., they come and go.  They literally -- a lot of them don't

1   last very long.

2            So now, what I would argue, is that given there's so

3   few -- a lot of them don't stay around too long, how are you

4   going to do age verification when you can't trace them because

5   they've closed down?

6            THE COURT:  All right.  How much -- what personal

7   knowledge do you have -- let's just take your opinion about

8   production sites.

9            THE WITNESS:  Yes.

10           THE COURT:  A production site is where somebody has

11   a facility, say it's a studio or an office where they --

12           THE WITNESS:  A condo.

13           THE COURT:  Let me just finish, okay, and then

14   you'll get your chance.

15           THE WITNESS:  Uh-huh.  Okay.  Sorry.

16           THE COURT:  Somebody has a room or a studio --

17           THE WITNESS:  Uh-huh.

18           THE COURT:  -- or maybe they rent a hotel room.

19           THE WITNESS:  Uh-huh.

20           THE COURT:  Is that right?  That's -- first, they

21   need a location, right?

22           THE WITNESS:  Exactly.

23           THE COURT:  All right.  Unless they film outdoors,

24   then they can use the outdoors for filming, right?

25           THE WITNESS:  Uh-huh.

1          THE COURT:  Just say yes or no.

2          THE WITNESS:  Yes.  I'm sorry, yes.

3          THE COURT:  Okay.  Then the next thing is they need

4    actors or actresses, is that correct?

5          THE WITNESS:  Yes.

6          THE COURT:  All right.  And they have to -- so they

7    pay for people to perform these -- these sex acts on camera,

8    right?

9          THE WITNESS:  Exactly.

10         THE COURT:  And they need a cameraman and video

11   equipment, correct?

12         THE WITNESS:  Exactly.

13         THE COURT:  Are there any other expenses of which

14   you're aware?

15         THE WITNESS:  That's probably the low level -- no,

16   the lowest level you do.

17         THE COURT:  Okay.  All right.  And then they -- then

18   the idea is they need to get a revenue stream for their

19   production --

20         THE WITNESS:  Yes.

21         THE COURT:  -- is that correct?

22         THE WITNESS:  Yes.

23         THE COURT:  All right.  Now, what's the basis for

24   your opinion that they lose money?

25         THE WITNESS:  The basis is that virtually every -- I

 1   mean, article that you're reading about today in the business

 2   press and the mainstream is how pornography is suffering,

 3   especially since 2008.  So this is not just my view.

 4              THE COURT:  Okay.

 5              THE WITNESS:  This is basically what is the common

 6   view.

 7              THE COURT:  But it's based on -- it's based on what

 8   you've read?

 9              THE WITNESS:  Of course.

10              THE COURT:  Okay.

11              THE WITNESS:  Yes.

12              THE COURT:  All right.  Okay.  So that's the -- do

13   you want to ask any other questions about the -- that's what I

14   mean by a foundation.  How does she have a basis for these

15   opinions, and she's just said, it's based on what she's read,

16   right?

17              MR. SCHWARTZ:  Yes.

18              THE COURT:  Now, do you want to supplement that at

19   all?

20   BY MR. SCHWARTZ:

21   Q    In creating your opinion, do you have any other further

22   knowledge about how the distribution system works?

23   A    Yes.

24              THE COURT:  Well, wait, we were first talking about

25   production.

 1              MR. SCHWARTZ:  Oh, no.

 2              THE WITNESS:  Production -- okay.

 3              THE COURT:  Do you have any other basis for your

 4    opinion that producers are losing money?

 5              THE WITNESS:  The only other basis I have are the

 6    people who I -- who are my contacts in the industry who are

 7    telling me consistently -- constantly that actually a lot of

 8    them are going bankrupt, yes.

 9              THE COURT:  Okay.

10              THE WITNESS:  That's what I, also, get.

11              THE COURT:  All right.

12              MR. SCHWARTZ:  And --

13              THE COURT:  Okay.  All right.  So -- okay.

14    BY MR. SCHWARTZ:

15    Q    You -- you also discussed a -- a concentrated

16    distribution system.

17    A    Yes.

18    Q    What is the basis of your knowledge for the opinions you

19    had regarding that concentration of distribution?

20    A    Again, everything that I have read on XBIZ on Adult Video

21    News and in Appetizing Age and in all of the magazines and

22    speciality journals that talk about the business, they talk a

23    lot about Manwin.  You will see, whenever you look at anything

24    to do with pornography, Manwin, —A-N-W-I-N, run by Fabian

25    Thylmann, comes up all the time.

1              MR. MURRAY:  Objection, Your Honor.

2              THE WITNESS:  That's what I've read.

3              THE COURT:  Well, this is -- I'm going to let her

4    testify.  And you're free to object, but it's overruled.  This

5    is her opinion, based -- and she's telling you what the source

6    is.  Now, whether it's sufficient or not is a legal question,

7    but I'm going to let her testify, and I will consider giving

8    you an opportunity to make a motion to strike when it's all

9    done, and I may reserve decision on it, depending.  But go

10   ahead.  I'm going to allow her to testify, as long as she

11   sticks to pornography and not talks about sweatshops, all

12   right, which is not a helpful --

13             MR. SCHWARTZ:  Right, and again, that was -- she was

14   just trying to --

15             THE COURT:  -- not a helpful metaphor.

16             MR. SCHWARTZ:  Okay.

17             THE COURT:  Go ahead.

18   BY MR. SCHWARTZ:

19   Q    So based on the basis that you've discussed regarding

20   dispersion of production and concentrated distribution

21   systems, do you have an opinion on how that has affected age

22   verification in the industry -- in the pornography industry?

23   A    Yes.  Because most of the people at this point -- the

24   point of distribution have -- very few of them have ever been

25   on a porn set.

1            THE COURT:  Have very few, what?

2            THE WITNESS:  Very few of them ever step foot on a

3    port set.

4            THE COURT:  Well, how do you know that?

5            THE WITNESS:  It -- well, there was a very long

6    article in The New Yorker on Manwin, again, and they

7    interviewed -- it was about five, six pages -- and one of the

8    things that the head of Manwin said was, I have never set foot

9    on a porn set.  So what happens is, because of dispersion of

10   production and the concentration of distribution and because

11   of the dissociation between production and distribution, the

12   people often never meet each other.  The producers don't --

13           THE COURT:  So you're saying -- by a porn set, you

14   mean a place of production?

15           THE WITNESS:  A place of production.

16           THE COURT:  All right.

17           THE WITNESS:  So often, the two never meet each

18   other.  The distributors often never meet the producers.  So

19   absent any age verification, how is any distributor going to

20   know that anything they load onto their site has -- if the

21   person is 18 or above?  There's no way, because they're not on

22   the porn set.

23           THE COURT:  Well --

24   BY MR. SCHWARTZ:

25   Q    Now --

1            THE COURT:  Wait, just one second.  When the

2    producer -- the producer wants to get the material

3    distributed, is that correct?

4            THE WITNESS:  Yes, exactly.

5            THE COURT:  All right.  So the producer, this is

6    usually done by a video with these -- is that correct?

7            THE WITNESS:  Video, yes.

8            THE COURT:  All right.  And -- and video can be

9    uploaded on the Internet, correct?

10           THE WITNESS:  Yes, onto one of the porn tubes.

11           THE COURT:  Okay.  So when the producer wants to

12   send one of its video to a distributor, they would normally do

13   it by -- by emailing the --

14           THE WITNESS:  I presume Internet uploading, yes.

15           THE COURT:  Some Internet?

16           THE WITNESS:  Yeah, yeah.

17           THE COURT:  All right.  Now, the producer has to

18   include the 2257 notice, isn't that right?

19           THE WITNESS:  Well, actually, if you go onto some of

20   these tube sites, what they say is that we try to verify 2257,

21   but we can't do it all, and we trust the producers are doing

22   it.  So the distributors are not verifying every video that

23   comes up.

24           THE COURT:  Well, wait -- wait.  You're jumping

25   ahead.

Dr. Dines - Direct (Sch)                                40

1              THE WITNESS:  I'm sorry.

2              THE COURT:  My question is, as you understand 2257

3    and the industry --

4              THE WITNESS:  Uh-huh.

5              THE COURT:  -- does the producer include a 2257

6    notice on the video that the producer sends to the

7    distributor, if you know?

8              THE WITNESS:  I would --

9              THE COURT:  If you don't know, say you don't know

10   and don't guess.

11             THE WITNESS:  I don't know --

12             THE COURT:  You don't know?

13             THE WITNESS:  -- if it's definite, 100 percent.  No,

14   I don't know.

15             THE COURT:  Okay.  She doesn't know that.  All

16   right.

17             THE WITNESS:  I don't know that for 100 percent, no.

18             THE COURT:  Next question.

19   BY MR. SCHWARTZ:

20   Q    In the research you've done over the last 25 years,

21   you've had an opportunity to view a lot of different types of

22   pornography?

23   A    Yes.

24   Q    And in that process, you've watched a lot of different

25   videos?

1    A     Genres, yes.

2    Q     And you have seen many different types of women appearing

3    in these different videos on the Internet?

4    A     Uh-huh.  I'm sorry, yes.

5    Q     Okay.  Based on your previous and ongoing research of

6    pornography, do you have an opinion regarding the predominant

7    physical appearance of women performing sexually explicit

8    material in Internet pornography?

9    A     Yes.  Across all genres, all 61 genres listed, the, sort

10   of, overriding image is of a youthful looking woman, often

11   very curvaceous.  They tend to have often surgically enhanced

12   breasts, lacking any body hair, which includes underarm hair,

13   leg hair and public hair.  Also, they have very, sort of, done

14   up hair, coiffed hair and a lot of makeup.  That's pretty much

15   the standard, youthful image of the women across all the

16   genres.

17   Q     Okay.  And what sort of impact does that physical

18   appearance have on the ability to determine the age of that

19   performer?

20   A     Well, it kind of disguises what age they are, because a

21   lot of makeup, done up hair, augmented breasts, it's -- it's

22   hard, because the usual markers that you would look at which

23   is, you know, face, body, et cetera have been artificially

24   changed and enhanced.

25   Q     What is the -- based on your research, what's the most

Dr. Dines - Direct (Sch)                                    42

1   popular of these free tube sites in the United States?

2   A    PornHub, Redtube, XNXX, those are the very popular ones,

3   Youporn.

4   Q    And you've had an opportunity to go and visit these

5   websites?

6   A    Extensively.

7   Q    Okay.  And the same things -- you've described, sort of,

8   tube sites in general, how they work.  These are the same?

9   A    They're pretty much generic and formulaic, yes.

10  Q    Okay.  When you went to the PornHub website, how many

11  categories were there on --

12  A    61.

13  Q    And you've previously described what those categories

14  are.  When you went to visit PornHub and the other tube sites,

15  did you have an opportunity to view images and videos in

16  different categories?

17  A    Yes.  I looked at -- across categories such as anal,

18  Asian, MILF, teen.  I looked across the whole range.  And I

19  found that image across the whole range.  The only one that

20  was slightly different was the MILF category, which is short

21  for, mothers I'd like to fuck.  There you have a woman who

22  looks slightly older.  And she's often paired with a younger

23  looking, either, male or female.

24  Q    And just to be clear, what -- what was it that you

25  observed that was common to all these genres?

Dr. Dines - Direct (Sch)                                    43

1    A    Youthful looking women.

2    Q    Okay.  And are those observations consistent with your

3    work on Internet pornography as a whole --

4    A    Yes, those are --

5    Q    -- not just limited to the tube sites?

6    A    Well, yes, because the tube sites then take you to the

7    paid sites, and what happens is when you -- they look very

8    similar, yes.

9    Q    Now, you mentioned a category that you find on these tube

10   sites called teen porn.

11   A    Yes, teen porn.

12   Q    Have you had the opportunity to research the teen porn

13   genre?

14   A    Yes, for many years.

15   Q    And what have you done?

16   A    I've spent many years watching the progression of how

17   these images work, doing a map of the teen porn sites, a

18   typology.  I've written about three articles about them.  And

19   I've lectured to doctors, organizations, medical

20   organizations, nurses, psychologists, therapists and,

21   specifically, a lot of child protection organizations around

22   the effects and the images on the teen porn sites.

23   Q    Okay.  And does this teen porn genre appear on most of

24   the tube sites?

25   A    Every -- every tube site I've been on, the teen porn --

1    Q     Okay.

2    A     -- genre appears.

3    Q     Is there an equivalent -- so teen porn, what sex -- when

4    you refer to teen porn, what sex does that usually refer to as

5    far as male or female?

6    A     It's female --

7    Q     Okay.

8    A     -- always.

9    Q     Is there an equivalent to this very youthful female

10   category called teen for a male performer?

11   A     Yes.  In gay porn, it's called Twinks.

12   Q     Okay.

13         THE COURT:  How do you spell that?

14         THE WITNESS:  T-W-I-N-K-S, Twinks.  That's what the

15   category name is if you go into a gay porn site.

16   BY MR. SCHWARTZ:

17   Q     So how do the physical characteristics of a performer in

18   the teen genre differ from the physical characteristics of the

19   youthful looking female performer that you've described?

20   A     Okay.  It's pretty striking, actually, because first of

21   all, in place of the, sort of, curvaceous bodies and the big

22   breasts, you have very slim looking females.  They're very

23   petite.  They've got very little makeup on.  Their hair is not

24   done.  They're often in pigtails, ponytails.  They're hairless

25   like all women.  They've got no body hair.

Dr. Dines - Direct (Sch)                    45

1        THE COURT:  Well, like -- hair was what?

2        THE WITNESS:  No body hair.  But their hair on their

3   head is often done in a ponytail or a pigtail, like a school

4   girl.  And they've got small, very small, very petite bodies.

5   They look very different, basically, to the map of what the

6   women look like in the other genres.

7   BY MR. SCHWARTZ:

8   Q    Okay.  And what other techniques are used to make female

9   teen performers look very youthful?

10  A    Well, they'll -- often they'll put them with props of

11  childhood, so you'll have them with teddy bears, lollipops.

12  They'll have Disney figures in the background.  They'll have

13  bedding with cartoon characters on.  They'll have bobby socks,

14  Mary Janes, school uniforms, braces on their teeth, all the

15  basic props of childhood --

16  Q    Okay.

17  A    -- are surrounding them.

18  Q    I'm going to show you Exhibit 175, which is the report

19  you've prepared in this case, and specifically, Appendix 5,

20  which appears at defendant's Bates number 001841.

21  A    That's my report.

22       THE COURT:  This is her report.  We're waiting for

23  an exhibit?

24       MR. SCHWARTZ:  Yes, it's coming up.

25       THE WITNESS:  Oh.

 1            THE COURT:  Yes, okay.

 2            THE WITNESS:  Okay.  Yes, it --

 3   BY MR. SCHWARTZ:

 4   Q    Is what I am showing you in this appendix, is this an

 5   example of what you were just describing?

 6   A    Yes.

 7            THE COURT:  On this page -- it says page 27 at the

 8   bottom?

 9            MR. SCHWARTZ:  Yes.

10            THE WITNESS:  Yes.

11            MR. SCHWARTZ:  Defendant's -- the Bates number is

12   001841.

13            THE WITNESS:  This is -- this is very typical, small

14   breasts, hair looking natural, not done up, very little makeup

15   and a petite body.  That would particularly key you in that

16   you are in the genre of teen porn, given what she looks like,

17   yes.

18   BY MR. SCHWARTZ:

19   Q    Okay.  And if we could go to the next page of the report?

20   Is that another example --

21   A    Yes.

22   Q    -- of what you were describing?

23   A    The bobby socks, the pink, to suggest childhood, the pink

24   cushion, the bunches, the sort of pigtails in her hair, the

25   whole sort of pastel colors, which you don't normally see,

1   again, light makeup, small breasts, cartoon figure on her

2   t-shirt, all of those things.

3   Q     Okay.

4   A     These are kind of the standard methods used, yes.

5   Q     Okay.  And with -- what generally accompanies a teen --

6   if you see a video -- a link for a video to pull up the video,

7   what accompanies the video?

8   A     Well, when you go into the teen porn sites, what comes up

9   will be teasers.  So you'll have many of those images, and

10  then accompanying each one is a text, which kind of explains

11  to the viewer what's happening.  Now, what's interesting, and

12  again, when you know you're in the teen porn genre site is

13  generally speaking, in mainstream -- in the other genres, they

14  refer to women as bitches, whores --

15              MR. MURRAY:  Your Honor, excuse me.  There is no

16  question to which this monologue is responsive.

17              THE COURT:  All right.

18              MR. MURRAY:  I think a different question --

19              THE COURT:  Okay.

20              MR. MURRAY:  -- should be put.  She already answered

21  the question before.

22              THE COURT:  All right.  Keep your answers shorter,

23  and then you can --

24              MR. SCHWARTZ:  All right.

25              THE WITNESS:  Okay.

1            THE COURT:  -- ask another question.

2    BY MR. SCHWARTZ:

3    Q    How -- so you indicated there was text to these videos?

4    A    Yes.

5            THE COURT:  I'm not -- I think that's a better way

6    to proceed.

7            MR. SCHWARTZ:  Yes, and I agree, Your Honor.

8            THE COURT:  So we have specific questions and short

9    answers.

10           MR. SCHWARTZ:  I agree.

11           THE WITNESS:  So -- I'm sorry.

12           THE COURT:  Go ahead.

13   BY MR. SCHWARTZ:

14   Q    That's okay.  So, as the Judge has said, try -- just

15   think about the question I'm asking, and then I'll ask more

16   questions once you've answered the one I've asked.

17   A    Okay.  So there's text, yes, sorry.  I'm sorry.

18   Q    Yes.  So there's text.  How -- how does that text

19   describe, in the teen porn genre, the video that accompanies

20   it?

21   A    Okay.  So compare -- well, it's very clear.  It says

22   something like, this little cutie or this sweetheart or this

23   little innocent, whereas -- which stands out from the other

24   genres where they refer to the women in terms of bitches,

25   whores and sluts.  So in that genre, they -- they define and

1    refer to the women or the girls very differently than they do

2    in regular genres.

3    Q    Okay.

4    A    It's very stark, the different language.

5    Q    And you discussed earlier that the goal of these tube

6    sites is to attempt to monetize traffic.  How do these tube

7    sites, like PornHub, monetize traffic in the teen porn genre?

8    A    Okay.  So I can give you an example of what I did.  I

9    clicked on teen porn in PornHub.  Immediately, I get an array

10   of videos come on the page.  I clicked on one.  I put it in my

11   report exactly how I did it.  And then I clicked on one which

12   was five minutes long.

13         As that is playing, I'm getting pop-ups from lots of

14   paid sites, Little Darlings, Daddy's Sweetheart.  I clicked on

15   one of those.  Immediately, you get into a paid porn site,

16   which has, sort of, about ten or 15 teasers.  I clicked on one

17   of those, which has something like, this little cutie's on her

18   first ever sex experience.  I clicked on that.

19         You get about 20 to 30 seconds of that, and then

20   immediately up comes a membership page, and if you want to

21   watch more, you have to join the membership page, which is

22   about $30 a month per site.  And then what's offered there is

23   a bundle of other similar sites, if you join that.

24   Q    All right.  Now, you discussed earlier what types of

25   things you've done with the teen porn genre.  You've written

Dr. Dines - Direct (Sch)                                    50

1    articles about the teen porn genre?

2    A     Yes.

3    Q     And you've talked to professional groups about the teen

4    porn genre?

5    A     Yes.  Specifically child protection agencies, as well,

6    yes.

7    Q     And what -- when you went to talk about it, what -- what

8    sort of interaction was there with you and the people you

9    talked to?

10   A     Well, there was a discussion about, you know, what effect

11   could this possibly have in the real world around how it

12   constructs notions of normalizing young looking, very youthful

13   looking women or children as legitimate sex objects for male

14   use.  So there was a lot of concern in the child protection

15   services that this is some --

16              MR. MURRAY:  Objection, Your Honor.  This is

17   irrelevant.

18              THE COURT:  Overruled.

19   BY MR. SCHWARTZ:

20   Q     You can keep --

21   A     Can I continue?

22   Q     Yes, yes.

23   A     Their concern was that it's chipping away at the cultural

24   norms that define children as off-limits to male -- to adult

25   male sexual use.

1        THE COURT:  Well -- well, go ahead.

2        MR. SCHWARTZ:  Okay.

3   BY MR. SCHWARTZ:

4   Q    Now, aside from the teen porn genre that you've

5   discussed, are there other genres of Internet pornography that

6   you've come across that also use very youthful performers?

7   A    Yes.  There are many, many names, as in my report, peedo,

8   teen porn, teen sex, school girl sex, college sex, young porn,

9   young tits, small tits.  There's a whole array of others that

10  actually use very similar looking, very youthful looking

11  girls, yes.

12  Q    Okay.  But you mentioned college porn.  What do the girls

13  look like in college porn?

14  A    College porn is the one subset I would say where you tend

15  to get more curvaceous looking females.  They look young and

16  inexperienced, but generally speaking, they look a little bit

17  more like most of the women in pornography.  They don't strike

18  you so starkly as the girls do in the teen porn genre.

19  Q    Now, I'm going to show you Appendix 3 from your report,

20  which is Exhibit 175, and the Bates number on that is 001839.

21        MR. SCHWARTZ:  And if we could enlarge that a bit?

22        THE WITNESS:  Yes.

23  BY MR. SCHWARTZ:

24  Q    Do you recognize that document?

25  A    Yes.  Those are the PornHub categories.  Along your left

1   are the 61 categories.

2   Q    And where did this image come from?

3   A    This image came -- this was a screen shot taken from

4   PornHub.com.

5   Q    Okay.  And as you see on there, one of the categories is

6   the MILF category?

7   A    Yes.

8   Q    Did you have an opportunity to explore that category?

9   A    I did.  I went into the MILF categories and spent a long

10   time, again, coming up with a typology of the images.

11   Q    And what -- based on what you did in your research, what

12   commonalities did you find in these MILF?

13   A    There were generally two narratives that I found.  The

14   first one was a MILF, an older woman, is having sex with,

15   either, a younger boy, who looks younger, or a younger girl.

16   That was one.  Or the second narrative or, sort of, storyline

17   I found was that she, basically, seduces a younger girl that

18   she then delivers to a male, who -- and then the three of them

19   have sex together.  But her job was to seduce the younger girl

20   to deliver to the male in the video.

21   Q    Okay.  And also, from your report, I want to show you

22   what was Appendix 1 at Bates number 001837.

23   A    Yes.

24   Q    Do you -- what is that?

25   A    This is where you can go into -- in PornHub, you can put

Dr. Dines - Direct (Sch)                          53

1    in different types of searches, and this is where you can get

2    multiply-typed videos.  That means that they have both MILF

3    and teen in the tagging actually on the website.  And these

4    were the examples that I've just explained, where, often, the

5    older woman is kind of delivering to the man, a younger

6    looking woman.

7    Q    Okay.  Now, based on the research that you did for this

8    particular case, you created several tables and figures for

9    your report --

10   A    Yes.

11   Q    -- reflecting aspects of Internet pornography.

12   A    Uh-huh.

13   Q    Okay.

14   A    Yes, I'm sorry.  Yes.

15   Q    Now, I would like to bring up what, in your report, is

16   Table 2, which is also Defendant's Exhibit 180.  Okay.  Can

17   you tell me what the name of this is?

18   A    Yes.  This is "Analysis of Word Tracker Search from SEO

19   Book Website".

20   Q    And can you describe this table for the Court?

21   A    Yes.  What this, basically, is doing -- what the job of

22   Word Tracker to do is to tell you the frequency of certain

23   search terms.  So what we looked at was the frequency of the

24   search terms, teen sex, teen porn, teen pussy, pre-teen porn.

25   And what you find here is the numbers, you know -- for

1    example, teen sex was 115,000 daily estimated searches.   And

2    then we took the top ten searches.   Now, what Word Tracker and

3    other --

4    Q    And so you -- what -- you said that this Word Tracker

5    tracks websites.   What websites does it track?

6    A    Well, you can use it for any websites.   We particularly

7    used it to actually track searches.   And what we used it to do

8    was to track the searches for teen sex, teen porn, et cetera.

9    Q    And does it -- does it pull that information from any

10   other websites, any search websites?

11   A    Well, basically, it looks at three major websites.   It

12   looks at Google, Yahoo and Bong -- Bing, sorry.

13   Q    And so how did you use the Word Tracker to create the

14   chart?

15   A    Well, what we did is, we put in -- we went into the porn

16   tubes and looked at how the teen porn videos are multiply-

17   tagged, the names they put them, and we found that teen porn,

18   teen sex, pre-teen porn were the names in the free porn sites.

19   So then we put those in, and we came up -- we figured out

20   which were the top ones.   And we just kept putting in until we

21   got the higher statistics.   And what you see here -- I mean,

22   there was many, many more terms we could have put in, but we

23   just kept these to keep it simple that these were the top ten

24   terms.

25   Q    And on there, there's a line item that says, estimated

1   overlap among categories.  What does that mean?

2   A     What that means is that sometimes, you might have a video

3   that's got teen pussy porn or teen porn, and it will be the

4   same one.  So what we wanted to do was to make sure that we

5   were not double counting.  We wanted to give the Court a

6   conservative estimate.

7   Q     Okay.

8   A     So we basically subtracted double tagged videos.

9   Q     Now, on this chart, there is also other terms for the

10  ones that are on there, MILF, gay, lesbian, Asian.  Why did

11  you use those terms?

12  A     We used them as a point of comparison, because what we

13  wanted to show was that if you look at the net total of teen

14  porn, it's nearly half a million searches a day.  The next

15  biggest category for searches is MILF, which is, you know,

16  nearly 300,000.  So you can see, it's quite a bit lower.  And

17  all of the others are quite considerably lower than teen porn.

18  So what comes out from this table is clearly, teen porn and

19  all the allied terms, teen sex, incest porn, tiny tits,

20  they're actually the largest search engine -- search term.

21             THE COURT:  One question.  What's the relationship

22  between the largest number which performed three -- oh, I'm

23  sorry, that's the date.

24             THE WITNESS:  Yes.  That's the date.

25             THE COURT:  This is March 23, 2013.

1          THE WITNESS:  Yes, that's the day he accessed it.

2          THE COURT:  All right.  Okay.  I couldn't -- all

3    right.  Okay.

4    BY MR. SCHWARTZ:

5    Q     Now --

6          THE COURT:  So let me be sure I understand this.  So

7    you used Google as your search engine?

8          THE WITNESS:  No.  It's Word -- it's Word Tracker.

9    It's actually a --

10          THE COURT:  Okay.

11          THE WITNESS:  -- facility in SEO Book websites.

12    It's a search engine or optimization website.

13          THE COURT:  Okay.

14          THE WITNESS:  It's what marketers would use if

15    they're trying to figure out what are the major search --

16          THE COURT:  Okay.

17          THE WITNESS:  -- terms.

18          THE COURT:  All right.

19    BY MR. SCHWARTZ:

20    Q     And as --

21          THE COURT:  So --

22          MR. SCHWARTZ:  I'm sorry.

23          THE COURT:  -- so the first -- the total, just over

24    a million-ninety thousand, that's the word porn appearing.  Is

25    that the number times -- the word porn appeared?

1              THE WITNESS:  Right.  That's the word porn appears

2       by itself.  Okay.

3              THE COURT:  Okay.  All right.  Thank you.  Okay.

4              THE WITNESS:  And the rest is the actual terms.

5       BY MR. SCHWARTZ:

6       Q    And just to clarify for the --

7              THE COURT:  So basically, what your data shows is

8       that the nine categories that you have listed here with such

9       terms as teen and daughter and college are about almost half

10      of the total?

11             THE WITNESS:  Yes.

12             THE COURT:  Okay.

13             THE WITNESS:  From this method, yes.

14      BY MR. SCHWARTZ:

15      Q    And again, this -- the Web Tracker is finding out that

16      information, the search terms, from the major search engines,

17      Yahoo, Bing and Google?

18      A    The big three search engines, yes.

19      Q    Okay.  Now, as far as the bottom four categories, why

20      didn't you use any other categories for this?

21      A    Well, we could have used all 61 categories from PornHub,

22      but they were much smaller, so we thought it would just,

23      basically, be too much information to make sense of.  Why not

24      just show you the biggest -- the four biggest ones, because we

25      know that MILF, gay porn, lesbian porn and Asian porn are the

1    largest ones.

2    Q     Now, you used the term, allied terms.  What does that

3    mean?

4    A     That's a term you use so that when somebody's looking for

5    teen porn, there's multiple terms that Word Tracker told us to

6    look for.  So people looking for teen porn will also put in,

7    for example, pre-teen porn or incest porn or peedo porn.  What

8    Word Tracker does is, it basically alerts you to all the

9    connected words -- allied terms, because there's not just one

10   term that people put in when they're looking for teen porn.

11   Q     And what about other -- when people search for MILF?  Are

12   there allied terms for MILF?

13   A     Not that we could find, no.  Basically, if you're looking

14   for MILF, you put in MILF --

15   Q     And --

16   A     -- or maybe mature.  That was the only other one.  But

17   the rest is pretty much, you put that in, that's what you get.

18   Q     Okay.  Now, I'd like to show you Table 3 from your

19   report, which is Defendant's Exhibit 181.  Can you tell me the

20   name of this table?

21   A     Yes.  This is total Google hits for various key words.

22   Q     And can you describe this table for the Court?

23   A     Yes.  What we're looking for here is the number of pages

24   on the websites, okay, that have these terms in them -- that

25   have these number of pages with teen sex in it, teen porn,

1    teen pussy, tiny tits, and what you see is in millions.  For

2    example, in teen sex, you've 61 million pages.  Teen porn,

3    you've got 57 million pages.  The net total, again, was 220

4    million -- many --

5    Q    And just -- and just to clarify, these are terms that you

6    put into Google?

7    A    Yes, again, going from the free porn sites to figure out

8    which are the most popular ones.

9    Q    And on the chart, those terms are in quotation marks.

10   Why did you do that?

11   A    Because if you don't -- if you put in teen sex, not in

12   quotations, you're going to get everything that's got teen in

13   the word and sex in the word.  You want to make sure that you

14   just have teen sex.

15   Q    Now, when you get to the bottom, there's a total, and

16   there's a net total.  What is the difference between those

17   two?

18   A    Again, we took out those that were double counting, so

19   that we were giving you a conservative estimate of the number

20   of pages.

21   Q    And what conclusions can you draw from this table?

22   A    Well, you can see, if we take 152 million pages with

23   those terms, you can see, compared to gay porn, it's much,

24   much higher, right, so this is the single, biggest category.

25   Again, the teen porn and the allied terms have more pages on

1  Google than any other type of pornography.

2  Q    Now, are there any limitations with this particular

3  table?

4  A    Well, I think there's limitations with all areas of

5  research.  You're always getting, sort of, estimates,

6  especially around pornography, so this is, again, why we did

7  the Methodological Triangulation.  What we tried to see was,

8  if we're using lots of different methods, are we coming up

9  with a consistent story, with consistent pictures.  And this

10  is, indeed, what we found.  We were coming up with consistent

11  pictures, whether we were using Word Tracker, Google, Advanced

12  Google Search or whatever.  The consistent was that teen porn

13  and allied terms are -- looks like the single biggest

14  category.

15  Q    Okay.  And specifically, for this table, simply using

16  Google to come up with these numbers, are there any

17  limitations to that?

18  A    Well, the problem with porn, when you put porn in, and

19  you come up with that number, what you're getting is

20  everything that's ever had porn in it.  So you're getting

21  every newspaper article.  You're getting every book that's

22  ever been written in Academia or non-Academia.  I'm sure in

23  that over one billion, my work appears in there.  So, really,

24  that figure tells you very little information about how much

25  porn there is on the Internet.  That's not a reliable way to

1    do it.  We did that just to show the Court the numbers, but to

2    make clear that you don't know what you're catching.  It's

3    like fishing; you don't know what you're pulling in.

4    Q     So why would you use a table like --

5    A     Just as one example of Methodological Triangulation.

6    Q     Okay.  Now, I'd like to show you Table 4, which is

7    Defendant's Exhibit 182.  Can you tell me what the name of

8    this chart is?

9    A     Yes, this is "Google Hits Within Popular Porn Domains".

10   Q     And what is a domain?

11   A     A domain is a website, a branded website.

12   Q     And how did you create this table?

13   A     Okay.  So what we did is, we looked at what are the top

14   visited porn websites in the country.  And it turns out that

15   the top visited is PornHub, XNXX and Redtube.  And PornHub is

16   40th most visited porn site in the U.S.  XNXX is the 76th most

17   visited porn site.  And Redtube is the 80th most visited porn

18   site.

19   Q     And when you are talking about those site ranks, does

20   that refer to all websites or just porn websites?

21   A     No, all websites.

22   Q     So PornHub is the 40th most popular website in general?

23   A     In general, in general.

24   Q     Okay.  So you were telling us how you created the chart?

25   How did you do that?

1    A    Well, we looked around at different areas to say what are

2    the most popular websites, and again, these are what came up.

3    Q    And then, once you found the popular websites, what did

4    you do for this table?

5    A    Well, then what we wanted to do was, we wanted to search

6    within these websites how often these terms came up, teen,

7    college, school girl, et cetera, to see what percentage of

8    pages within these websites have those terms in.

9    Q    So if we look at the table, what does the row across,

10   what does total hits mean?

11   A    Okay.  So pages -- so, for example, in PornHub, there's

12   5.8 million pages.  Okay.

13   Q    Well, specifically, yeah, if you'd highlight it?

14   A    Oh, I'm sorry.  I'm sorry.  The total hits.

15   Q    There -- sorry about that.

16   A    Okay.  It means, there's 25 million pages in PornHub, 23

17   million pages in XNXX, 3.68 million pages in Redtube, adding

18   up to 52.58 million pages in those websites.

19   Q    Okay.  And so then if we drop down, what does it mean,

20   going across the row, for that row called, "Teen"?

21   A    Okay.  So basically, what you're looking at is the number

22   in millions of pages in PornHub, 5.8 million that have teen in

23   it.  The number in XNXX, Redtube, et cetera.  The total is 14

24   million pages, which tells you that it's 27.5 percent of all

25   pages across the three most popular free porn sites have teen

1    porn in it.

2    Q    And can you describe why you used those additional terms

3    under teen?

4    A    Yes, what we wanted to do again was to show that that's

5    -- because people search with allied terms, we wanted to

6    capture all of the most important terms, and what we came up

7    with were these five terms, and what we found was that when

8    you add them all up together, right, it's not actually 27.5

9    percent of pages have teen in, it's actually 34.2 percent have

10   pages in them that have either teen or allied terms in them.

11   Q    Okay.

12   A    So you're looking at over a third of pages in the top

13   visited porn websites in the U.S.

14   Q    And you described in other tables how you avoided double

15   counting.  How did you avoid double counting in this chart?

16   A    The way you avoid it is you put all in in capital

17   letters, so you put young porn, all college porn, and then

18   that just throws back at you what the double counting is.

19   Q    With, when you're using the Google facility?

20   A    When you're using this particular software, yes.

21   Q    Again, why does this chart include other terms down at

22   the bottom, anal, MILF, amateur, lesbian, gay?

23   A    For comparative purposes.  We wanted to show that, for

24   example, across all three top tube sites, anal is 25.9 percent

25   of pages; MILF is 22.7 percent of pages, which shows you, it's

1   considerably lower than the 34.2 percent of pages, which has,

2   either, teen porn or allied terms in it.

3   Q    And why didn't you use any of the other terms?

4   A    Well, again, we could have used all 61, but they were

5   much lower, and we didn't want to overwhelm the Court with

6   data that didn't seem to be that important.

7   Q    Okay.  And you describe that, in the total hits column,

8   the total number of pages, across these three websites is

9   52.58 million?

10  A    Yes.

11  Q    Now, that 52.58 million is not the total number of pages

12  on the Internet with sexually explicit material?

13  A    No, nowhere near.

14  Q    Okay.  So what is the significance of using the three

15  highest ranked porn websites for this analysis?

16  A    Because those tell you what are the most trafficked.  You

17  see, when you think about the Internet and the vast amount of

18  information and data on there, what's important is not what's

19  out there, but what is the most trafficked.  What do people

20  see?  This is what people see.  So although we're talking

21  about 52 million, which is, of course, not that many compared

22  to the billions of pages, these are the most trafficked porn

23  pages and websites in the U.S.  Also, what this tells you, it

24  does not tell you about the actual paid porn sites.  So we're

25  just looking at the very -- the most trafficked three porn

1  sites in the country.

2  Q    Okay.  Now, I'm going to show you Table 5, which is

3  Defendant's Exhibit 183.  Can you tell the Court what the name

4  of this table is?

5  A    "Comparative Growth Rates of Top Pornography Genres,

6  Based on Google Trend Search Interest Index".

7  Q    So how did you create this table?

8  A    Well, what we did is, we used Google Trends, which allows

9  you to both measure the volume of searches and, also, to

10  measure the changes over time.  And what we found here is that

11  the biggest single genre that has grown over time from 2004 to

12  2013 is teen porn.  It has increased 215 percent.

13  Q    Now, I'd like to show you Figure 1 from Defendant's

14  Exhibit 175, which is Bates number 001833.

15           MR. SCHWARTZ:  If we could make that a little

16  bigger?  All right.

17  BY MR. SCHWARTZ:

18  Q    What -- what is this figure?

19  A    This is actually from PornMD, which is a porn website,

20  and within it, it has a facility where you can look for the

21  most searched terms, really, worldwide.  So this is an example

22  of the most searched terms in the United States of America.

23  Number one is MILF, and number two is teen, and number three

24  is college.

25  Q    And how did you create this figure?

1    A    We actually didn't create this.  This is a screen shot.

2    This was already up there.  We just took the screen shot.

3    Q    And what other information did you --

4              THE COURT:  What exhibit number is this?

5              MR. SCHWARTZ:  This is -- this is within Defendant's

6    Exhibit 175, which is her report.  It's at page 19 of the

7    report.

8              THE COURT:  Okay.

9              MR. SCHWARTZ:  But also Bates --

10             THE COURT:  Page 19.  All right.  Go ahead.

11             MR. SCHWARTZ:  Okay.

12   BY MR. SCHWARTZ:

13   Q    When you were doing your research, what other information

14   did you learn from the analysis gathered by PornMD?

15   A    Okay.  That in the United States of America, Teen Porn is

16   the number one searched porn site, porn term in 13 states.

17             THE COURT:  In 13 states?

18             THE WITNESS:  13.  13, according to PornMD.

19   BY MR. SCHWARTZ:

20   Q    Now, I'm going to show you Figure 2, which is Defendant's

21   Exhibit 176.  I'll just make that a little bigger.  There we

22   go.  What is this figure?

23   A    This, basically, is the frequency of the five top porn

24   genres for a five year period.  So if you look, you can see --

25   and this is scored out of 100 by the way, so that's your

1   baseline.  So if you see, for example, MILF, you can track

2   over time how often searched it is.  And then, what you get

3   from this, is you see that teen porn, at this moment, is the

4   third most searched term, just teen porn, using that word

5   alone.

6   Q    And how did you create this chart?

7   A    You basically put your terms into the left-hand side,

8   there, and what you come -- and it comes up with, and it shows

9   you different figures.  And what we found when we put lots of

10  different terms in that these were the top five.

11  Q    And what website did you use to create these?

12  A    Well, again, we went through the --

13  Q    I mean, the chart, as a whole, what -- what facility --

14  A    This is Google Trends.

15  Q    Okay.  And how did you come up with the terms that you

16  used in this chart?

17  A    Again, going into different porn hubs and tube sites to

18  see what are the most searched terms, and then we would put

19  them in, and we would check, indeed, to see if they were the

20  most searched terms, and then what you see here are the five

21  that came out as the most searched terms.

22  Q    Now, if we could do a side by side of this figure and

23  table -- Table 5, which is Defendant's 183.  Now, Figure 2 is

24  essentially a visual -- visual representation of the data

25  that's in --

1    A    Of Table 5.

2    Q    -- Table 5, correct?

3    A    Yes, that's exactly right.

4    Q    Okay.

5    A    That's showing you what Table 5 is.

6    Q    Now, I'd like to show you Defendant's 178.

7    A    I need it bigger.

8    Q    Yes.  Now, what is this figure?

9    A    This is the frequency of the five top terms used to

10   search for teen porn, five year period.  So what we did here

11   was that we took the top search -- allied search terms, once

12   again, so that was teen porn, teen sex, young porn, teen

13   pussy, young pussy.  Those were the top five search terms.

14   Q    And how did you create this chart?

15   A    Again, we went to the tube sites, pulled out various

16   terms, plugged them in to see, indeed, which ones came out.

17   Q    And what were you plugging those terms into?

18   A    Into the left-hand side, which basically tells you what

19   the frequency is.

20   Q    And what website or what facility were you --

21   A    Google Trends, sorry.

22   Q    And what conclusions can you draw from this chart?

23   A    Well, what's interesting, if you look at teen porn, okay,

24   it's by far the largest one, the blue line.  But if you were

25   to add up teen sex, young porn, teen pussy, young pussy, it

1   would, in fact, be much, much higher.  Okay.  So when you take

2   all the Allied Terms, it would be much higher than the blue

3   line.

4   Q    Okay.  And how does that information relate to the Figure

5   2 that we just looked at?

6   A    That actually, you're probably looking at more than 215

7   percent growth over the period of time we're talking about.

8           MR. SCHWARTZ:  That's all I have at this time, Your

9   Honor.

10          THE COURT:  All right.  We'll take a short recess,

11  no more than ten minutes, and then we'll have recross.  Now,

12  let me just find out, because I'm sorry, I have this

13  commitment that I mentioned before in the middle of the day.

14  Without holding it to you, can you give me a rough estimate of

15  your cross?  I mean, the direct was a little over an hour, and

16  you're welcome -- I'm not going to put a time limit on you,

17  but I just want to get an idea.

18          MR. MURRAY:  I would hope it would be shorter than

19  that.

20          THE COURT:  Okay.  Now, do you think there's a

21  chance you could -- I have to leave at quarter to 12:00.  If

22  you think you can finish in 45 minutes, that's great, but I'm

23  not going to press you to it.  But that's when I'm -- I'm just

24  going to let you know, that's when I'm going to get up and get

25  out.  Now, we have another witness for today, is that right?

1                 MR. MURRAY:  Yes.

2                 THE COURT:  That's your fact witness.  About how

3      long will the direct on that be?

4                 MR. MURRAY:  Well, that's one of the plaintiffs,

5      actually, Barbara Nitke.

6                 THE COURT:  The plaintiff, yes.  About how long will

7      that be, the direct?

8                 MR. MURRAY:  Half an hour.

9                 THE COURT:  Okay.  So we should have plenty of

10     time --

11                MR. MURRAY:  Yes.

12                THE COURT:  -- this afternoon.

13                MR. MURRAY:  Yes.

14                THE COURT:  All right.  So if I'm back here by 2:15,

15     then we should have enough time, if you haven't finished the

16     cross or if you want to redirect, and I may have some

17     questions.  So you may have to stay past the lunch hour.

18                THE WITNESS:  Okay.

19                THE COURT:  And then we'll go on with the fact

20     witness, and I just need a little bit of time to cover the

21     deposition of Joyner.

22                MR. MURRAY:  Yes.

23                THE COURT:  Okay.  All right.  So we'll adjourn at

24     quarter to 12:00.  Thank you.  I'll be back no later than

25     11:00, ten minutes.  Thank you.

1          (Recess, 10:46 a.m. to 10:58 a.m.)

2                    THE COURT:  Okay.  Cross-examination?

3                    MR. MURRAY:  Thank you, Your Honor.

4                              CROSS-EXAMINATION

5     BY MR. MURRAY:

6     Q     Good morning, Dr. Dines.

7     A     Good morning.

8     Q     You would agree with the statement that you are an anti-

9     pornography advocate, would you not?

10    A     Yes, I would agree with that.

11    Q     In fact, you have a website, do you not?

12    A     I do.

13    Q     And even on your website -- I'm going to place this on

14    the ELMO.  This is a page from your website, is it not?

15    A     Yes, this is it.

16    Q     Correct?

17    A     Uh-huh.

18    Q     And even at the very top of your website, you're listed

19    as an anti-porn activist, correct?

20    A     Lecturer, author, scholar, activist, yes.

21    Q     Okay.  Well, it says, anti-porn activist, doesn't it?

22    A     Yes, that's true.

23    Q     Now, for example, you participated in sponsoring or

24    helping to form an activist group known as "Stop Porn

25    Culture", correct?

1    A    Well, it's actually an education group aimed at raising

2    educational awareness.  We do activist work, but our prime

3    goal is educational, not activist.

4    Q    My question, though, was simply this, you are, in fact,

5    one of the people who helped form that group known as "Stop

6    Porn Culture", isn't that true?

7    A    Yes, that is true.  That is true.

8    Q    And, in fact, you participated in sponsoring a Stop Porn

9    Culture Conference at Wheelock College that occurred in June

10   of 2010, did you not?

11   A    Correct.

12   Q    Okay.  And you described that conference on your website,

13   at one point, did you not?

14   A    I think -- I assume so.  I don't remember, but yes, I

15   assume so.

16   Q    I'm showing a page from what's been marked as Plaintiff's

17   Exhibit 131.  Is this not a page from your website or blog?

18   A    Yes.

19   Q    And in it, you are talking about the Stop Porn Culture

20   Conference that you sponsored at Wheelock College in June of

21   2010, correct?

22   A    Correct.

23   Q    And among other things, you state in there, "Welcome to

24   the Stop Porn Culture Conference of 2010.  We are thrilled to

25   host these two days of key notes and workshops and to provide

1   a space where we can discuss the harmful effects of an

2   industry that saturates our society with masogonistic and

3   racist images.   In this room, we have women and men who are

4   activists, anti-violence experts, academics, anti-racist

5   educators, students and citizens who feel deep in their gut

6   that something is wrong with the culture.   Everywhere we look,

7   we see what it means to live in pornified culture, where the

8   images, themes and stories of porn seep into our every day

9   lives, whether it be teen sexting or Miley Cirus doing a pole

10  dance.   The dominant discourse around sex and sexuality has

11  been hijacked by the pornographers", correct, that's what you

12  wrote?

13  A     Yes, that's correct.

14  Q     And that's what you believe, correct?

15  A     Yes.

16  Q     And then you wrote, "We come together this weekend to

17  share ideas and discuss strategy, and we do this because we

18  recognize that we need to build a robust movement that takes

19  on this predatory industry.   This weekend you are amongst

20  friends.   It is not often that those of us opposed to porn

21  find a place where we can feel welcome", correct?

22  A     That's correct.

23  Q     Now, one of the things that you've done to familiarize

24  yourself with the adult industry is, you attended an expo

25  known as the Adult Entertainment Expo that occurs annually in

1   Las Vegas every year, did you not?

2   A    I did.

3   Q    And you attended it once, I think, in about 2008?

4   A    2008.

5   Q    Okay.  You also, however, wrote an article in The

6   Guardian about the 2011 expo -- Adult Entertainment Expo that

7   was occurring in Las Vegas, did you not?

8   A    I did.

9   Q    And, in fact, in that article that you wrote for The

10  Guardian, you commented on a seminar that was being put on at

11  that expo, correct?

12  A    Yes, I did.

13  Q    And you, by attending at the 2008 expo, these are

14  business people, actors, entertainers.  They all get together,

15  and they share information like you would normally expect at a

16  convention, correct?

17  A    And Academics, yes.

18  Q    They have Academics.  They have lawyers giving seminars,

19  explaining legal issues, isn't that true?

20  A    And marketing, yes.  Yes.

21  Q    Okay.  And you wrote a piece about a seminar that was

22  going to be presented at that convention, entitled -- the

23  seminar was entitled, In the Company of Women --

24  A    Uh-huh.

25  Q    -- didn't you?

Dr. Dines - Cross (Mur)                    75

1    A    Yes.

2    Q    Okay.  You didn't attend the seminar, did you?

3    A    I actually attended a very similar seminar in 2008.  I

4    think it was even called the same thing, so I knew what the

5    seminar was, because I attended one previously, yes.  That --

6    Q    Did you attend the one in 2011, ma'am?

7    A    No, not the one in 2011.  No.

8    Q    So you don't know what exactly was said or wasn't said at

9    that 2011 --

10   A    No.

11   Q    -- seminar, do you?

12   A    I don't know what was said exactly.

13   Q    And yet, you went on and wrote an article about that

14   seminar, and I quote, you wrote in The Guardian, "One of the

15   seminars at this years expo is called In the Company of Women.

16   Here, Academics will mix with pornographers to share ideas on

17   how to develop niche products targeted to women.  I'm sure

18   there will be lots of talk about how women can be empowered by

19   watching porn, because the pornographers, being the savvy

20   businessmen they are, like nothing more than telling women

21   that porn is actually good for them.  This is their trick and

22   one we must resist if we want to resist the plasticized,

23   formulaic and generic images of the pornographers with an

24   authentic sexuality based on our own experiences, longings and

25   desires."

1          That's what you wrote, isn't it?

2     A    Exactly.

3     Q    Okay.  Now, you wrote an opinion piece in the <u>Houston</u>

4     <u>Chronicle</u> several years ago entitled, "So What Do You Give Our

5     Societies Most Influential Pimp" --

6     A    Uh-huh.

7     Q    -- you remember that?

8     A    Yes, of course.

9     Q    And the person you were referring to as society's most

10    influential pimp at that time was Hugh Hefner, correct?

11    A    Yes.

12    Q    Now, in 2011 -- in fact, let me just put up, for a

13    moment, on the machine, your CV, which is one of the

14    Government exhibits.  This is a version of your Curriculum

15    Vitae, is it not?

16    A    Uh-huh.  That's correct.

17    Q    And on one of the pages you list that one of your

18    activities was "The Great Porn Debate" at Cambridge University

19    in England in February of 2011, correct?

20    A    That's correct.

21    Q    And you participated in that debate, did you not?

22    A    I did.

23    Q    And, at that debate, the motion before the audience was

24    "This House Believes That Pornography Does a Good Public

25    Service"?

Dr. Dines - Cross (Mur)                    77

1   A    Yes.

2   Q    And, of course, you took the position that that motion

3   should fail, because your side said that pornography does not

4   do a good public service, correct?

5   A    Yeah.  The three speakers on my side said that, yes.

6   Q    Okay.  Now, as it turned out, your side lost the debate?

7   A    Yes, we did.

8   Q    Okay.  And then you later said, did you not, that the

9   reason that your opponents won that debate because the Chamber

10  consisted mostly of 18 to 22 year old males who are using

11  pornography on a regular basis --

12  A    Yes.

13  Q    -- isn't that correct?

14  A    That's exactly right.

15  Q    Now, you have been criticized by other scholars who have

16  reviewed your work, have you not?

17  A    Yes, some.  Yes.

18  Q    For example, there is a Professor Ronald Weitzer at

19  George Washington University who has been critical of your

20  scholarship, has he not?

21  A    He certainly has.

22  Q    And he wrote an essay entitled, "Pornography, the Need

23  for Solid Evidence", correct?

24  A    He did.

25  Q    And he took the position that your book entitled Pornland

1    was poorly researched and in strong opposition to the existing

2    body of legitimate research on pornography, correct?

3    A    Yes.

4    Q    Now, you mentioned Iceland as being one of the places

5    where you went to help advise on the subject of pornography?

6    A    Well, to consult more -- to consult with the Minister of

7    the Interior.

8    Q    And, in fact, on one of the pages of your website, you

9    describe some exciting news that was occurring in Iceland --

10   A    Uh-huh.

11   Q    -- correct?

12   A    Yes.

13   Q    And you said Iceland is drafting legislation to limit

14   access to violent porn.  "Stop Porn Culture" has organized a

15   letter of support signed by the local contingent of various

16   people, correct?

17   A    Correct.

18   Q    And you wrote, "A progressive country, Iceland believes

19   that porn violates women's civil rights, undermines gender

20   equality, and that Icelanders have a collective interest in

21   protecting their children from the predatory porn industry,

22   which they view as a form of cultural imperialism", correct?

23   A    That's correct.

24   Q    And you agree with those sentiments, do you not?

25   A    I do agree with those.

1    Q     Pardon me?

2    A     I do.  I wrote them, and I stand by them.

3    Q     And in fact, you regard the pornography industry to be a

4    capitalist industry, correct?

5    A     Yes.

6    Q     And it has many of the -- of the vices that you would

7    regard capitalism to have, correct?

8    A     Well, it has the same business plans, and it works in the

9    same way.  I mean, as a sociologist, I wouldn't call it vices.

10   I would say business plans and methods of strategy, niche

11   marketing, et cetera.

12   Q     Well, do you have opposition to capitalism in general?

13   A     I would call myself a critical sociologist, which

14   basically critiques the way in which capitalism distributes

15   wealth to a small percentage of the population.  Yes, that, I

16   do critique.

17   Q     Okay.  And so, you have a view that capitalism creates

18   many problems?

19   A     Yes.

20   Q     Okay.  Now, it is true, is it not, that when one looks at

21   your CV, one will see that it is filled with anti-pornography

22   books, articles, opinion pieces and presentations, correct?

23   A     I would actually say it's filled with some scholarship

24   that is very critical from a, sort of, critical paradigm of

25   how pornography industry operates.  I would put it more in

Dr. Dines - Cross (Mur)                    80

1  that way.  So it's more scholarly.  Some's scholarly; some's

2  opinion.

3  Q    Well, for example, this is a page from your resume, isn't

4  it, or your CV?

5  A    Yeah, that is me.

6  Q    And the books that you've published include the one in

7  2010, <u>Pornland: How Porn Has Hijacked Our Sexuality</u>, correct?

8  A    Correct.

9  Q    Well, that's certainly an anti-porn book, isn't it?

10 A    Well, I would say it is a book based on scholarship that

11 is critical of how the porn industry operates in our society.

12 That would be, I would say, a more accurate description of the

13 book.

14 Q    In 1998, you wrote a book entitled, <u>Pornography: The</u>

15 <u>Production and Consumption of Inequality</u>, correct?

16 A    I did.  I co-wrote that.

17 Q    And I won't go through all of them, because the Court has

18 got them, but many of your peer reviewed articles have titles

19 in them that, certainly, one would interpret as an anti-

20 pornography position, wouldn't you agree with that?

21 A    No, not only -- no.  In academic scholarship, that would

22 be seen as a critical paradigm looking at pornography.  In the

23 opinion pieces, you're correct, but in the actual peer

24 reviewed, it's not quite put in those terms, no.

25 Q    Well, how about the peer reviewed article in 1998 that's

1   entitled, <u>King Kong and the White Woman: Hustler Magazine and</u>

2   <u>the Demonization of Black Masculinity</u>.

3   A     Yes.

4   Q     You don't regard that title to suggest an anti-

5   pornography position?

6   A     No.  It's actually applying critical race theory to how

7   porn represents images of black masculinity.

8   Q     Okay.  Then you've written some book chapters, correct?

9   A     Correct.

10   Q     For example, in 2004, you wrote <u>Unmasking the Pornography</u>

11   <u>Industry: From Fantasy to Reality</u>, correct?

12   A     Correct.

13   Q     You think that's a title that would suggest an opposition

14   to the pornography industry?

15   A     No.  I would argue it's a political economy, which is a

16   bonafide paradigm within sociology, which is exploring the

17   business plan of the pornography industry.  I don't think it's

18   anti or pro, actually.  I think it's a critical analysis.

19   Q     Okay.  And you don't think there's anything about that

20   title that suggests an opposition to pornography, is that your

21   testimony?

22   A     No, not in the title.  No.

23   Q     Okay.  How about the one in 2003, <u>Pornography in a</u>

24   <u>Pornographic Culture: Eroticizing Domination and</u>

25   <u>Subordination</u>?  Would you regard that to be a neutral title?

Dr. Dines - Cross (Mur)                    82

1    A    I would argue that it's a title that is critical, again,

2    of pornography in the way it constructs images of masculinity

3    and femininity.

4    Q    Not a title that suggests an anti-pornography stance?

5    A    Not in the scholarship world, no.

6    Q    In your opinion pieces, you also have some titles that

7    deal with pornography, correct?

8    A    I do.  Most of them are.

9    Q    For example, <u>Porn is in Rude Health</u>, 2012, correct?

10   A    Yes, but you don't get to title.  In opinion pieces, I

11   don't get to title them.  The editors title them.

12   Q    Okay.  Do you disagree with any of these titles?

13   A    Well, I wouldn't have put porn is in rude health.  That

14   would not have been my choice for a title, no.

15   Q    Okay.  All right.  So let's talk a little bit about the

16   filed of sociology, because you've indicated that there are,

17   in fact, two branches of sociology, correct?

18   A    Two methodological branches.  There's many more

19   paradigms, but there's two methodological branches, yes.

20   Q    Right.  And -- and you are a sociologist by training and

21   by your --

22   A    Degrees.

23   Q    -- degrees.  Okay.  And you indicated that the two

24   branches of Sociological Methodology are quantitative and

25   qualitative, isn't that correct?

1    A    For methodological purposes, yes.

2    Q    And you indicated that the qualitative is the one that

3    analyzes the images, for example, and their content to

4    determine what effect they might have on various issues.

5    A    No, not effect -- not effect.

6    Q    Okay.  All right.  Well, then let me -- let me ask it

7    differently.

8    A    Okay.

9    Q    The qualitative branch of sociology is more concerned

10   with developing maps of images?

11   A    Exactly.

12   Q    Okay.  Whereas the quantitative branch of sociology is

13   the statistical side of sociology, correct?

14   A    Correct.

15   Q    And you are a qualitative sociologist, not a quantitative

16   sociologist, isn't that true?

17   A    When it comes to content analysis, yes.

18   Q    And at this point in your career, you do not do

19   statistics, correct?

20   A    No.

21   Q    Correct?

22   A    Correct, yes.

23   Q    Okay.  And in fact, you've never before been qualified by

24   any Court as an expert witness, have you?

25   A    No, no.

Dr. Dines - Cross (Mur)                                    84

1    Q    Now, in this case, you were asked to see if you could

2    find any data that explored the degree to which searches such

3    as teen porn were popular on Google, correct, that was one of

4    your tasks?

5    A    That was one of my tasks.

6    Q    And to come up with statistical evidence -- you were

7    asked, to come up with statistical evidence to see the degree

8    to which people put teen porn into Google, and related terms,

9    to see how popular teen porn pages are on the Internet,

10   correct?

11   A    Uh-huh.  Yes.

12   Q    Okay.  And when you were talking about coming up --

13   coming up with that kind of statistical evidence, you're into

14   quantitative sociology now, aren't you?

15   A    Well, you're into both.  You actually need to know the

16   map of the porn industry in order to understand what search

17   terms and how to operational your data into a more statistical

18   form.  So you need, actually, a mixture of both.

19   Q    Well, my question is, whether or not -- isn't it true

20   that when you're talking about coming up with that kind of

21   statistical evidence, you are into quantitative sociology,

22   isn't that true?

23             MR. SCHWARTZ:  Objection.  She answered his

24   question.

25             THE COURT:  Overruled.  Can you answer the question?

1           THE WITNESS:  You know what, I don't think you'd

2      call it quantitative sociology, because it's not really

3      statistical evidence.  You've got software, and you feed terms

4      in, and they spit back the statistics at you.  So in many

5      cases, you're not really producing quantitative data.  The

6      software is doing it for you.

7      BY MR. MURRAY:

8      Q    Dr. Dines, you will recall that you and I had the

9      pleasure of meeting awhile back at a deposition, correct?

10     A    Yes.

11     Q    And I did take your deposition on April 23rd --

12     A    Yes.

13     Q    -- of this year.  And, of course, as you know, the way

14     the deposition worked, you were placed under oath and answered

15     questions that I posed to you, correct"

16     A    Yes.

17     Q    And you had your counsel there, correct?

18     A    Correct.

19     Q    Okay.  And you had an opportunity after the deposition

20     to, actually, read it carefully and make any corrections

21     necessary to the transcript, correct?

22     A    I did, yes.

23     Q    And you made certain corrections, and then you actually

24     signed the deposition, signifying your agreement with the

25     content of the deposition, other than the corrections that you

Dr. Dines - Cross (Mur)                          86

1    made, correct?

2    A    Yes.

3    Q    Okay.  Now, at page 38 of your deposition, it is true, is

4    it not that I asked this series of questions, and you gave

5    this series of answers, at line three --

6    A    Line three.

7    Q    -- "Question: Now, so other than asking you to do

8    research into the question of youthful looking performers, was

9    there any other assignment you were asked to carry out?"

10        And your answer was, "Yes.  I was asked -- I was

11   asked to see if I could find any data that explored the degree

12   to which searches such as teen porn were popular to Google,

13   and I was asked to come up with a probable for statistical

14   evidence to see the degree to which people put teen search --

15   teen porn into Google and how popular teen porn pages are on

16   the Internet.  That was what I was asked to do, as well."

17        "Question: And when you're talking about coming up

18   with that statistical evidence, now, you're into quantitative

19   sociology, correct?"

20        And your answer was, "Exactly."

21        Wasn't that your answer?

22        MR. SCHWARTZ:  Your Honor, I would -- I'm just going

23   to object.  This is not inconsistent --

24        THE COURT:  Overruled.

25        MR. SCHWARTZ:  -- with what she was testifying to.

Dr. Dines - Cross (Mur)                    87

1          THE COURT:  Overruled.

2     BY MR. MURRAY:

3     Q    Wasn't that your testimony?

4     A    Yes.

5     Q    And that's not your area of expertise, is it?

6     A    No, quantitative sociology is not.  No.

7     Q    And so that's why, for this part of your project, you

8     brought in Dr. David Levy from the University of

9     Massachusetts?

10    A    I did.

11    Q    And the good news was, it was easier for you to do that,

12    because he's your husband, right?

13    A    He lives in the same house as me, yes.

14    Q    Okay.  But he is not, actually -- I mean, he's a

15    professor at the University of Massachusetts, correct, in the

16    Business School?

17    A    Yeah, he's Chair of the Management Department of the

18    Business School.  Yes.

19    Q    Okay.  But he doesn't teach statistics, either, does he?

20    A    No.

21    Q    And he's not a statistician by profession, either, is he?

22    A    No.

23    Q    Okay.  Now -- now, you were provided, you indicated on

24    direct examination, with a copy of 2257, the statute at issue

25    in this case, correct?

1   A    Yes.

2   Q    And you were, after the deposition, provided with a copy

3   of 2257A --

4   A    Uh-huh.

5   Q    -- which is also at issue in this case, correct?

6   A    Correct.

7   Q    And you would have had some familiarity with, at least,

8   2257A, even before you were engaged by the Government as a

9   result of some of the work that you had done about the adult

10  entertainment industry, correct?

11  A    I would say it was very minimal actually, yes, but I had

12  heard of it.

13  Q    Now, it's true -- so you understand that the statute

14  requires that any producer of any book, magazine, periodical,

15  film, videotape, digital image, digitally or computer

16  manipulated image of an actual human being, a picture or any

17  other matter that contains sexually explicit images, has to

18  comply with the recordkeeping requirements of that statute,

19  correct?

20  A    Correct.

21  Q    And you are aware that that means that whoever produces

22  such an image has to examine an identification document of

23  every person in that image to show that person's name and date

24  of birth?

25  A    Uh-huh.  Sorry, correct.  Yes.

1    Q    Okay.  And you're aware that any producer has to -- of

2    that image has to maintain records of all --

3    A    Yes, correct.

4    Q    -- that information, correct?

5    A    Correct.

6    Q    And you're aware that they have to put a label on each

7    image, describing where the records are maintained, correct?

8    A    Correct.

9    Q    And you're aware that any producer of that type of sexual

10   image has to make the records available for inspection by the

11   Government within a reasonable time, is that correct?

12   A    That's correct.

13   Q    And you're aware that if the person refuses to permit the

14   Government agent to come into his premises, to inspect the

15   records, that that's a violation of the law, correct?

16   A    Correct.

17   Q    You understood?  You understand that?

18   A    Yes, I understand what you're saying.  Yes.

19   Q    Okay.  Now, and you are aware that the requirements of

20   2257 apply to private, non-commercial sexual images, just as

21   completely as it applies to commercially produced images?

22   A    Yes.  That's -- if that's what you say, yes.

23   Q    Well, you understood that?

24   A    Yes.

25   Q    That's -- you assumed that yourself --

Dr. Dines - Cross (Mur)                    90

1    A    I mean, that's what I assumed.

2    Q    -- by reading the statute, correct?

3    A    Uh-huh.  Uh-huh.  Yes.

4    Q    Okay.  And you've indicated that there are varied genres

5    of commercially produced sexually explicit material, and I

6    think you mentioned there was some 61 that you were able to

7    find on Google, correct, or on --

8    A    No.  PornHub.com.

9    Q    -- PornHub?

10   A    Yes.

11   Q    And your focus, at least in part, was on the genre known

12   as teen porn and its related terms, correct?

13   A    Correct.

14   Q    And you've indicated that there are numerous other

15   genres, such as MILF, correct?

16   A    Correct.

17   Q    Such as Cougars?

18   A    Uh-huh.

19   Q    Are you familiar with the --

20   A    That, actually, I don't think appears on PornHub, if I'm

21   correct.

22   Q    Okay.  But you're familiar with Cougar films?

23   A    Yeah, no, I'm familiar with it, but I don't think it's a

24   separate genre on PornHub.  Yeah, but I'm familiar with it.

25   Q    Well, in the industry it's a separate genre, though,

1    isn't it?

2    A    Yes.  Yes, in the industry.

3    Q    The genre of Cougars --

4    A    Yes.

5    Q    -- correct?

6    A    But it doesn't appear on PornHub as a separate genre.

7    Q    That's fine.  Housewives, that -- that's another genre,

8    isn't it --

9    A    Not on PornHub --

10   Q    -- in the industry?

11   A    -- but, yes, in the -- in the industry.

12   Q    Okay.  But PornHub doesn't list that genre?

13   A    Not if I'm correct, no.  I don't remember it.

14   Q    And PornHub doesn't list the genre of Cougars, is that

15   what you're saying?

16   A    I don't think so.  I don't remember it, no.

17   Q    And does it list the genre of Mature?

18   A    I think it did, yes.

19   Q    Does it list the genre of Granny Porn?

20   A    No, I didn't see Granny Porn.

21   Q    You're familiar that there is a genre known as Granny

22   Porn --

23   A    I am certainly --

24   Q    -- in the industry?

25   A    -- familiar with that, yes.

Dr. Dines - Cross (Mur)                              92

1   Q     Okay.   Now, you have said, in your report, have you not
2   -- and I'll put it up on the screen, if you don't recall this
3   -- that, "Teen porn accounts for a significant proportion of
4   the total online pornography, accounting for between one-
5   quarter and one-third of the material on the most popular
6   websites, depending upon the scope of the definition."
7         Isn't that what you said in your report?
8   A     Yes, that's what I said.
9   Q     And you've pretty much repeated that here?
10  A     Yes.
11  Q     Isn't that correct?
12  A     That is correct.
13  Q     Well, then you would agree, would you not, that that
14  means that anywhere from 67 percent to 75 percent of the
15  material online does not fall within that broad genre,
16  including its related terms, isn't that true?
17  A     I wouldn't take that exact statistic, because when you go
18  into the MILF, which is also very popular, they're often
19  coupled with very youthful looking characters.   So I don't
20  have the statistics, but I would suggest it's probably lower
21  than you're suggesting, because MILF does tend to link to teen
22  or young, youthful looking males and females.   So I would
23  probably say it's a bit lower than what you're saying.
24        THE COURT:   But as in a matter of pure subtraction,
25  what he said is correct?

1            THE WITNESS:  Yes, pure subtraction.  Yes, but --

2            THE COURT:  Okay.

3            THE WITNESS:  -- yes, I would agree.

4   BY MR. MURRAY:

5   Q    Well, in fact, at page 60 of your deposition, nearer to

6   the bottom of the page --

7            THE COURT:  But I think what she said, just in all

8   fairness, Mr. Murray, is that the teen related sites were the

9   largest single category, is that correct?

10           THE WITNESS:  Yes, that's exactly what I said.

11           MR. MURRAY:  I understand that, but -- but I just

12  want to --

13           THE COURT:  All right.  But as a matter of

14  subtraction, you are correct.

15           THE WITNESS:  Yes.

16  BY MR. MURRAY:

17  Q    And in fact, at page 60 of your deposition, you were

18  asked this question, and you gave this answer, "Okay.  Well,

19  that's fine, but I just want to make sure that I'm

20  understanding your report, because when you say between one-

21  quarter and one-third of the material online falls into this

22  genre of teen porn, is it not correct to conclude that 67

23  percent to 75 percent does not fall within that particular

24  genre", and your answer was, "Yes", correct?

25           MR. SCHWARTZ:  Objection, Your Honor, she's --

Dr. Dines - Cross (Mur)                                94

1              THE COURT:  That's what she said.

2              MR. SCHWARTZ:  There's no contradiction here.

3              THE COURT:  You said that?

4              THE WITNESS:  I -- I said that, yes.

5              THE COURT:  Yes, all right.  Overruled.

6    BY MR. MURRAY:

7    Q    And then if we look at Figure 1 on your report, which was

8    put up on the screen --

9    A    Yeah, I just need to get it.  Yes.  Okay.  Yes.

10   Q    That was the ten most common search terms on porn sites

11   in the United States of America, correct?

12   A    Correct.

13   Q    And the most popular search term in the United States of

14   America was MILF, correct?

15   A    Yes.

16   Q    Not teen.  Teen was second, not first?

17   A    Teen was second.

18   Q    And, in fact, when you went to Figure 2, the frequency of

19   top five porn term genres for the five year period '08 to '13,

20   the most popular was MILF, correct?

21   A    Correct.

22   Q    The second most popular was gay porn, correct?

23   A    Correct.

24   Q    And the third most popular was teen porn, isn't that

25   true?

1   A    Teen porn without the allied terms, but once we put

2   the --

3   Q    According to this chart, was that the third most popular,

4   teen porn?

5   A    Without the allied terms, yes.

6   Q    I understand that.  And in fact, if you look at Figure 3,

7   the frequency of top porn genres for the five year period

8   worldwide, again, MILF was number one and teen porn and gay

9   porn were pretty much neck and neck for second, correct?

10  A    Again, teen porn without the allied terms.

11  Q    And in fact, the MILF chart looked like it was about

12  twice the popularity, at least according to this chart, of the

13  teen porn, correct?

14  A    But that's not accurate in terms of even -- we have not

15  added in, because we couldn't -- this did not allow us to do

16  -- to add in the allied search terms.  So you're only getting

17  a slice of teen porn here.  You're not getting the full

18  picture.

19  Q    Well, I think you indicated that the -- that if you go

20  with just teen porn, you capture about 27 to 28 percent, and

21  if you add in the allied terms, then you get up to maybe 34

22  percent, you remember that?

23  A    35 percent, yes.  Yes.

24  Q    Okay.  So we're talking about the difference between 28

25  -- about six percent of the points?

1   A     Yes.  But that probably changes the nature of that graph

2   when you factor in that six percent.

3   Q     Yes, but it isn't going to cause teen porn to overtake

4   MILF, is it?

5   A     I actually would need to redo the graph to make that

6   comment.  I can't make that answer here without access to the

7   graph.

8   Q     Well, take back -- take a look at Figure 2 again.  That's

9   the popularity in the United States, correct?

10  A     Figure 2, five genres, yes, MILF is the red.  I -- teen

11  porn is -- I would say that if you were to add in --

12  Q     Well, excuse me, my only question is -- again, Figure 2

13  is the --

14  A     Yes, that's correct.

15  Q     -- most popular genres in the United States for that five

16  year period, correct?

17  A     Yes.

18  Q     Okay.  And MILF was number one.  Gay porn was number two,

19  and then teen porn, without its related terms, was number

20  three, correct?

21  A     Yes.

22  Q     And teen porn, without its related terms, looks to be

23  approximately one-half of the popularity of MILF, correct, on

24  this chart?

25  A     On this chart.

1   Q    And so if you were to add in the related terms associated

2   with teen, it still wouldn't be sufficient to overtake MILF as

3   the most popular genre, isn't that pretty clear from looking

4   at this chart?

5   A    You know what, because this is scored out of 100, and

6   it's not numbers, I really -- I can't answer that, to be

7   honest with you.

8   Q    Okay.

9   A    I would need to redo the chart.

10  Q    You also said, on page  -- actually, you testified on

11  direct examination that the same type of chart, the same type

12  of, I think it was -- was this Google Trends, this one, the

13  one that we were just looking at?

14  A    Yes, we're looking at Google Trends.

15  Q    You also said that Google Trends yielded information that

16  in 13 states, teen and its related terms or teen was the most

17  popular, correct?

18  A    That's not Google Trends.

19          MR. SCHWARTZ:  Objection, Your Honor, she's -- he's

20  mischaracterizing the evidence.

21          THE COURT:  Overruled.

22          THE WITNESS:  Yeah, that was PornMD.

23  BY MR. MURRAY:

24  Q    Oh, I'm sorry.  I thought that you indicated that --

25  A    No, it was PornMD.

1  Q    -- at the same time that you were talking about Figure 1,

2  you indicated that in addition, there were 13 states that --

3  A    Yes, Figure 1.  Yeah, sorry, Figure 1.  But not from --

4  that's different.  That's not Google Trends.  That's PornMD.

5  Q    Okay.  Well, then -- and I was asking you what Figure 1

6  was.

7  A    Oh, I'm sorry, I thought you said through Google Trends.

8  I apologize.

9  Q    I -- my mistake.

10  A    Yes, that's right.

11  Q    I was trying to verify the source of Figure 1, and now,

12  you've confirmed that it was PornMD, did you say?

13  A    Yes, PornMD, not Google Trends.

14  Q    Okay.  And then you said, on direct examination, that

15  that same analysis permitted you to draw the conclusion or

16  they reported that in 13 states, teen was the most popular --

17  A    Yes.

18  Q    -- do you recall that?

19  A    Yes.

20  Q    But again, if we do the math, that means in 37 states,

21  some genre other than teen was number one, correct?

22  A    Yeah, MILF and then teen in most of the other states,

23  yes.

24  Q    And so in the United States as a whole, MILF was number

25  one, according to that analysis, and in 37 out of 50 states,

1  something other than teen was the most popular search term,

2  correct?

3  A     That would be correct.

4  Q     Okay.  Now, you would certainly agree, Dr. Dines, that

5  there is an enormous quantity of sexually explicit material

6  produced in the United States that are of adults?

7  A     Yes.

8  Q     Okay.  And isn't it the case that the best opinion you

9  can give us is that if the question is posed as to the

10  quantity, the percentage of the universe of sexually explicit

11  images of adults, produced in the United States, your best

12  estimate as to the percentage of that material that depicts

13  adults who are youthful looking enough to be confused as

14  possibly minors is approximately one-third?

15  A     One-third, yes.

16  Q     Okay.  So I want to make sure that we repeat that.

17  A     Yes, one-third.

18  Q     In your opinion --

19              MR. SCHWARTZ:  Objection.

20              THE COURT:  Overruled.

21  BY MR. MURRAY:

22  Q     Out of the enormous quantity of sexually explicit images

23  of adults produced in the United States, your best estimate as

24  to the percentage of that material that is of adults who are

25  youthful looking enough to be confused as possibly minors is

Dr. Dines - Cross (Mur)                              100

1    approximately a third?

2    A    No, actually, that's not what I'm saying.

3    Q    Okay.

4    A    What I'm saying is --

5    Q    That's fine.  I think you've answered the question.

6              MR. SCHWARTZ:  Your Honor, I request that she be

7    allowed to complete the question.

8              THE COURT:  Well, she can explain.  Do you want to

9    explain?

10             THE WITNESS:  Okay.  What I'm saying is of the most

11   traveled websites.

12             THE COURT:  The most traveled websites.  Okay.

13             THE WITNESS:  Right, not of the -- not of the whole

14   universe of stuff that is produced that a third of the pages

15   and of the searches are of teen.

16   BY MR. MURRAY:

17   Q    Just so that we're clear, I want to show you your

18   question and answer that you gave in your deposition to make

19   sure that you agree that that was indeed, as I'm sure it was,

20   a truthful answer.

21             "Question: And of that enormous" -- well, "Question:

22   But you would agree that there is an enormous quantity of

23   sexually explicit materials produced in the United States that

24   are of adults, would you not?"

25             "Answer: I would."

1            "Question: And of that enormous quantity of sexually

2       explicit images of adults produced in the United States, do

3       you have any data at all as to what percentage of that

4       material are of adults who are youthful looking enough to be

5       confused as possibly minors."

6            And then you said, "Let's go back to my charts.  My

7       answer to that would be, when you look at Table 3 -- okay, go

8       to Table 4.  These are the Google hits within popular

9       pornography domains.  Now, if you go to PornHub, which is the

10      40th ranked site in the United States, but the top visited

11      site in the world; XNXX, which is the second top visited porn

12      site; Redtube, which we find through the statistics is that,

13      with the three most popular porn sites in the world, 34 -- two

14      percent of the pages have teen porn.  That's the only

15      statistic that I can offer.  So it would be approximately

16      around a third of the pornography top rated porn sites, the

17      top visited -- which is a search looking for girls or boys,

18      that is the only real statistic that I can actually offer."

19           And that's what you said here, isn't it?

20           MR. SCHWARTZ:  Objection, Your Honor.  Objection.

21           THE WITNESS:  Yes, that's --

22           MR. SCHWARTZ:  This is improper.

23           THE COURT:  Yes, well, he's just asking her if

24      that's what she said in her deposition.

25           MR. SCHWARTZ:  But he's attempting to use it as

1    impeachment.  It's not a proper impeachment, because it's not

2    contradictory with anything she said on the stand.

3              THE COURT:  Well, that's for me to decide later.

4    Overruled.

5              THE WITNESS:  No, that's exactly what I'm saying

6    now.  I'm saying the same thing now.

7    BY MR. MURRAY:

8    Q    Okay.  All right.  I understand.

9              THE COURT:  Well, now, let her answer.  Answer the

10   question.

11             THE WITNESS:  I'm saying exactly the same thing now.

12   What I'm saying is, is that of the top visited, a third --

13   that's all we can tell from those charts.  I cannot give you

14   any other figures outside of that, because of the enormity of

15   the data that exists, but when you go to the main traveled

16   websites, that's what comes up.

17   BY MR. MURRAY:

18   Q    Okay.  And -- and so fine -- so what you're saying is,

19   that's the best answer you can give, given the data that you

20   have available to you?

21   A    Yes.

22   Q    Thank you.

23             THE COURT:  All right.  If you have -- is that the

24   -- are you done?

25             MR. MURRAY:  No, I'm not, Your Honor.

1        THE COURT:  All right.  Well, we're going to break

2   then.

3        MR. MURRAY:  Okay.

4        THE COURT:  All right.  I'm going to do my best to

5   be back by 2:00.  Okay.  So let's resume at 2:00.

6        MR. MURRAY:  Yes, Your Honor.

7        THE COURT:  If I'm a couple minutes late, it's

8   because of the traffic or something else.

9        MR. MURRAY:  Your Honor, we understand completely.

10  Don't -- I mean, don't hurry.

11       THE COURT:  Okay.  Thank you very much.  All right.

12  We're in recess until 2:00.

13       (Luncheon recess, 11:36 a.m. to 2:00 p.m.)

14                       AFTERNOON SESSION

15       THE WITNESS:  Gail Dines.

16       THE COURT:  You're still under oath.  Proceed, Mr.

17  Murray.

18       MR. MURRAY:  Thank you, Your Honor.

19  BY MR. MURRAY:

20  Q    Dr. Dines, you've been teaching at Wheelock College for

21  about 25/26 years?

22  A    Yes, that's correct.

23  Q    And -- and Wheelock is where?

24  A    In Boston, Massachusetts.

25  Q    And how big a school is it?

Dr. Dines - Cross (Mur)                                    104

1   A    I think it's between 700 to 1,200.  1,500 would be

2   counting all undergraduates and part-timers.

3   Q    And what are the majors that are offered there?

4   A    The majors are Arts and Science majors, which include

5   Psychology, Human Development, American Studies, Media

6   Studies, Women Studies, which is part of the American Studies

7   Department, Education, Social Work, Child Life, a whole array

8   of professional and Arts and Science majors.

9   Q    And how many full-time members of the faculty are --

10  A    I think about 60.  I've never actually counted.

11  Q    60?

12  A    I would say about that.

13  Q    So it's a relatively small school?

14  A    Yes, a small, private, liberal arts college.

15  Q    Now, and what are the courses that you currently are

16  teaching?

17  A    Sociology of Minority Groups and Feminist Theories, and

18  in the summer, I teach a graduate course called Media Madness,

19  which is media literacy class.

20  Q    So the two courses that you mentioned before, those are

21  taught to undergraduates --

22  A    Yes.

23  Q    -- during the school year?

24  A    Yes.

25  Q    And those are the only courses you teach currently during

1    the school year?

2    A    Yes, because I'm Chair.  Chairs typically get course

3    releases.

4    Q    And you're Chair of what department?

5    A    The American Studies Department.

6    Q    Okay.  And how many faculty members are there in that

7    department?

8    A    Well, if you include the faculty members that are full-

9    time in that department, and that I draw from -- from other

10   departments, probably about 15.

11   Q    And how many are just full-time in that department?

12   A    I think three.

13   Q    Okay.  Now, you mentioned that you get a lot of your

14   information about the adult industry from XBIZ and AVN, do

15   you --

16   A    Amongst other places, yes.

17   Q    Okay.  And both of those are newspapers and online type

18   media that -- that devote a lot of attention to covering the

19   adult industry?

20   A    They would be called -- yeah, the business -- sort of the

21   business manuals of the -- yes.  Yes.

22   Q    So you've read articles by Tom Hymes, for example?

23   A    Yes.

24   Q    And you know him?

25   A    Yes.  I mean, I know most of them.  Yeah, I read them

1    regularly.

2    Q    Okay.  And you know he's a plaintiff in this case or

3    didn't you know that?

4    A    I did see his name, yes.

5    Q    Okay.  And -- so you've read articles that he's written

6    over the years?

7    A    Oh, sure, yes.  I mean, I couldn't recite to you which

8    ones, but I mean, I read it regularly.

9    Q    And you know Mark Kearns, as well?

10   A    Yes, I know Mark Kearns.

11   Q    And he's written for AVN for many years?

12   A    For many, many years, yes.

13   Q    Okay.  Now, you also mentioned that you have many

14   contacts in the industry?

15   A    I do.

16   Q    And -- and tell us who those are?

17   A    I can't give you their names.  They won't allow me to

18   speak their names.  They're scared to come forward.  But I can

19   tell you what they do in the industry and how long they've

20   worked there.  I can give you that information.  I cannot

21   disclosed their names, because they have asked me not to

22   disclose their names.  And I work on that assumption that I

23   wouldn't disclose their names.

24   Q    Well, how many are there that you're talking about?

25   A    I'm talking, I would say, the ones that I speak to

1    regularly, about five, and then I get information from other

2    people who call me who are in the industry, but it's all done

3    on the basis of anonymity because that's -- they're nervous

4    about coming forward.  Some of them have even left the

5    country.

6    Q     Because they talked to you?

7    A     No, because they're scared of the pornography industry.

8                THE COURT:  Because of what?

9                THE WITNESS:  They're scared of retribution from the

10   pornography industry if their names come forward that they

11   tell me what has happened, yes.  And they don't just talk to

12   me, by the way.  They've been talking to other people, as

13   well.  I'm not the only person that they've been talking to.

14   BY MR. MURRAY:

15   Q     Okay.  So you have five contacts that are currently in

16   the adult industry that feed you information?

17   A     No.  I would say -- I would say that three of them have

18   left, and two of them are currently in the industry.

19   Q     Well, tell us those two, at least, the ones that are

20   currently in the industry.

21   A     No, I can't mention their names.  I'm sorry.

22   Q     So you refuse to provide that information?

23   A     I do, yes.

24   Q     Your familiar with Dr. Daniel Linz, aren't you?

25   A     Yes.  Oh, yes, of course.

Dr. Dines - Cross (Mur)                                    108

1    Q     And you know that for many years, he's been a recognized

2    authority on the subject of the primary effects of sexually

3    explicit media?

4    A     Yeah, he did some of the primary research in the '70s and

5    the '80s.  Yes, he was well known in that field then.

6    Q     Now, you mentioned that in an earlier point of your

7    direct examination, you brought up the name of Manwin, do you

8    recall that?

9    A     M-A-N-W-I-N, yes, Manwin.

10   Q     And I may have not gotten this right, but I thought I

11   understood you to say that you believe that they are merely a

12   distributor, as opposed to a producer?

13   A     Well, from --

14   Q     Did I -- did I get that right?

15   A     I don't know if that's -- I might have said that, but I

16   wouldn't say that's exactly what they are.  I would say,

17   they're primarily a distributor.  I would qualify that.

18   Q     Well, they -- do you know that they also own production

19   companies?

20   A     Yes, I do.  I do.  I can probably name some of them, as

21   well.

22         (Pause)

23             THE COURT:  Go ahead.  Sorry.

24   BY MR. MURRAY:

25   Q     I thought you made mention of the fact that you were of

1   the view that Manwin, as a distributor, would not be familiar

2   with the procedures that were followed by those who were

3   producing the sexually explicit material.  Did I misunderstand

4   you?

5   A    No.  I would suggest that the top -- from what I can

6   gather, the top strata of Manwin, who -- particularly Fabian

7   Thylmann, who owns it and the other couple, that they,

8   themselves, who actually run it, would not be.  I assume that

9   some of the lower level, who maybe work for presses and own

10  some of the others might have been, but on the whole, we have

11  had this separation of distribution from production, where

12  some of them have never been on an actual -- they've actually

13  been quoted as saying that, we've never been on a porn set.

14  Q    Is it your testimony that you agree that Manwin owns some

15  production companies?

16  A    Yes.

17  Q    And therefore, actually, is also in the business of

18  producing sexually explicit imagery?

19  A    Yes.

20  Q    And it's your testimony that the people at the top of

21  Manwin would have no information about the manner in which the

22  production companies do business, is that your testimony?

23  A    My testimony is that the magazine, The New Yorker that

24  wrote the magazine article about Manwin, quoted one of the

25  heads of Manwin as saying, he had never been on a porn set, so

1    that is my testimony.

2    Q    Okay.  Well, do you have any reason to doubt that they

3    are fully familiar with the business practices carried out by

4    the production companies that they own?

5    A    I have no evidence to say, either, yes or no.  I have not

6    done any research on that, so I wouldn't be able to answer

7    that.

8    Q    Well, are you trying -- but were you trying to suggest in

9    your direct examination that they would not have some

10   information about how their production companies verify the

11   age of performers?

12   A    Yes.  I would suggest that given what I've read,

13   specifically, there, that some of them, especially the higher

14   echelons, who are not on porn sets, would not have any

15   familiarity with what goes on in a porn set.  I can't speak to

16   all of Manwin.  They have over 700 employees.  I can't speak

17   to all of the 700 employees.  I can only speak to the higher

18   strata.

19   Q    But you don't have any personal knowledge that the higher

20   ups in Manwin are ignorant of the procedures that are followed

21   by their production companies when it comes to verifying the

22   ages, do you?

23   A    No.  I only have what I've read in the -- about on what

24   they've been interviewed.

25            THE COURT:  Wait, just, speak closer to the

1    microphone.  What did you say?

2              THE WITNESS:  I'm sorry?

3              THE COURT:  Speak closer to the microphone.

4              THE WITNESS:  All I can tell you is what my

5    knowledge is, is what they have stated to journalists about

6    them not ever being on a porn site.  That's the only knowledge

7    I have.

8    BY MR. MURRAY:

9    Q    Right.  That says nothing about whether they are fully

10   familiar with the business practices with respect to verifying

11   ages at the production level, does it?

12   A    All it says is they've never been on a business -- on a

13   porn set.

14   Q    And from that --

15   A    Draw whatever conclusions from that, that I don't know.

16   Q    Well, but you drew the conclusion that that, therefore,

17   means that they don't know what the procedure is for verifying

18   ages, isn't that what you said?

19   A    I would assume -- I would assume that if you've never

20   been on a porn set, and you've never actually seen the

21   processes that go on by your own eyes, then you're not that

22   familiar with what happens.  That's what I would assume, yes.

23   Q    Now, you had said, I believe that -- and in your report,

24   that in tube sites, content is uploaded not only by a

25   professional, commercial ventures, but by individuals, as

Dr. Dines - Cross (Mur)                                112

1    well, from time to time, correct?

2    A    Yes, that's correct.

3    Q    And some of the image are simply uploaded by average

4    citizens who have no commercial interest in loading it,

5    just --

6    A    No, I couldn't assume that.  I couldn't assume that.  I

7    know they've been uploaded by individuals.  I cannot assume

8    they have no commercial interest in that.

9    Q    Okay.  Well, you're not disputing -- you're not denying

10   the fact that there may be individuals who upload sexually

11   explicit images on tube sites solely for private, non-

12   commercial purposes to share those images?

13   A    I assume if they want privacy, they wouldn't upload it

14   onto a tube site.  I would assume they'd upload it onto a

15   private website.  That would be my assumption.

16   Q    Okay.  I'm asking a different question.

17   A    Okay.  I'm sorry.  I misunderstood.

18   Q    Are you able to deny that an average citizen might want

19   to post a sexual image on a tube site to share with like-

20   minded citizens, without seeking a profit?

21   A    I would say that is possible, yes.  Absolutely.

22            THE COURT:  You think what is?

23            THE WITNESS:  I would say it's possible, yes.

24   BY MR. MURRAY:

25   Q    Well, in fact, as I said, at page three of your report,

1    you refer to -- you make a distinction, do you not, between

2    images that are uploaded by both individuals and professional

3    pornography producers, don't you?

4    A    Yes, that's correct.

5    Q    Okay.  And in fact, you indicate, on the next page, that

6    content can be uploaded onto sites by any registered member of

7    the tube site through what is called the "Content Partner

8    Program", correct?

9    A    Correct.

10   Q    And you say membership is free, correct?

11   A    Correct.

12   Q    And you say members can include non-professional

13   individuals who upload their personal material, isn't that

14   what you wrote?

15   A    Yes, but that doesn't mean it's not for profit.

16   Q    Well, the rest of the sentence -- let's read the whole

17   sentence.

18   A    Okay.

19   Q    "Membership is free.  Members can include non-

20   professional individuals who upload their personal material or

21   affiliated web masters who upload material to direct traffic

22   to their paid sites", correct?

23   A    Correct.

24   Q    So you were drawing a distinction between the affiliated

25   web masters, who are posting to get traffic to their sites so

1    that they can make a profit, and the non-professional

2    individuals who were uploading their personal material?

3    That's the distinction you made in your report, isn't it?

4    A    Yes, but I think you're misunderstanding my distinction,

5    actually.  The web masters are making profit by bundling

6    together a number of sites.  Individuals are making profit by

7    uploading their own stuff and hoping that somebody hits on it

8    and then gets driven to a paid website or gets enough hits so

9    that someone will buy advertising space next to it.  What I

10   didn't -- the distinction was not about profit versus

11   nonprofit.  The distinction was web masters who work as

12   affiliates and bundle together versus individuals who may be

13   uploading one or two of their own --

14              THE COURT:  Well, let me ask a question.  Do you

15   have a position whether there are some private individuals who

16   are just working on their own, whether it's a man or a wife or

17   a man and a woman who have a sexual relationship, may want to

18   put a video of themselves performing a sex act on one of the

19   tube sites, for example?

20              THE WITNESS:  Oh, yes.  Yes.

21              THE COURT:  That happens, right?

22              THE WITNESS:  Yes.

23              THE COURT:  So they don't have any profit motive at

24   all?

25              THE WITNESS:  No, they -- I'm saying that they could

Dr. Dines - Cross (Mur)                          115

1   or they couldn't.  I'm saying that --

2              THE COURT:  Well, you're not saying definitively

3   that everybody has a profit motive?

4              THE WITNESS:  No.  But I'm saying that profit can be

5   -- is made.  If you put a website up of yourself having sex

6   and somebody clicks on it, you're making money.

7              THE COURT:  Well, wait.  You get -- you don't have

8   to have a website.  You can make a video of yourselves, and

9   then --

10             THE WITNESS:  Yeah.  Put it --

11             THE COURT:  Just let me finish the question.

12             THE WITNESS:  Yeah.

13             THE COURT:  You can make a video of yourself and

14   your sex partner or married partner, whichever, and you could

15   email it to one of the tube sites, just as a video.  Can you

16   do that?

17             THE WITNESS:  Yes.

18             THE COURT:  And they might -- and they would run it

19   if it was sent in?

20             THE WITNESS:  Yeah, maybe; maybe not.

21             THE COURT:  Maybe not.  It's up to the tube site

22   whether to do it?

23             THE WITNESS:  Yeah.

24             THE COURT:  So they're not interesting in selling

25   anything?  They just --

1                THE WITNESS:  No, not at all.

2                THE COURT:  Let --

3                THE WITNESS:  I'm sorry.  I'm sorry.  I don't mean

4     to interrupt you.  Sorry.  Go ahead.

5                THE COURT:  According to your testimony, then,

6     they're not interested in selling anything; they just want to

7     see themselves or have other people see them having sex,

8     right?

9                THE WITNESS:  No, they're not selling it.  They're

10    putting it on, and if it gets hits, then money gets sent to

11    them.  You don't sell it.

12               THE COURT:  Well, automatically?

13               THE WITNESS:  Yes.  Because, especially, if you get

14    a lot of hits, what happens is, that the real estate, which is

15    what they call the web site --

16               THE COURT:  Well, wait, how do you -- who pays them

17    the money?

18               THE WITNESS:  The website owner, Manwin.

19               THE COURT:  Are you sure of that?

20               THE WITNESS:  Yes, yes, that's how it works.  Yes.

21               THE COURT:  All right.  Okay.

22               THE WITNESS:  Yes.  Yes, I'm positive of that.

23    BY MR. MURRAY:

24    Q    Are you saying that an individual cannot post on a free

25    porn tube site, not for profit, just because he or she wants

Dr. Dines - Cross (Mur)                          117

1    to do it, that -- that --

2    A    No, I'm not saying that.  I'm saying that is absolutely

3    possible.

4              THE COURT:  No.  What you just said to me -- now,

5    let me make sure I understand this.

6              THE WITNESS:  Okay.

7              THE COURT:  That if a couple send in, on their own,

8    to a tube site --

9              THE WITNESS:  Uh-huh.

10             THE COURT:  -- a video of them having sex, and the

11   tube site puts it on its website --

12             THE WITNESS:  Yes.

13             THE COURT:  -- that the tube site will then send

14   that couple money?

15             THE WITNESS:  Yes.

16             THE COURT:  You're -- always, as a matter of fact,

17   all the time?

18             THE WITNESS:  Well, from every -- well, I assume if

19   you say to the --

20             THE COURT:  Well, wait, don't assume anything.  Just

21   answer my question.

22             THE WITNESS:  Yes.  The way it works -- the business

23   model --

24             THE COURT:  Well, how do you know that?

25             THE WITNESS:  Because that's what the business model

1    is.  If you go on --

2                THE COURT:  Well, have you seen -- do they have an

3    agreement?

4                THE WITNESS:  They have an agreement.

5                THE COURT:  This couple has no contract.  They've

6    just sent the video.

7                THE WITNESS:  They have a membership agreement.

8                THE COURT:  No, they don't.

9                THE WITNESS:  They do.

10               THE COURT:  You're assuming things that are not in

11   my question.  Now, just --

12               THE WITNESS:  No, you have to join.

13               THE COURT:  -- just listen.  A man and a wife, let's

14   assume they're married --

15               THE WITNESS:  Uh-huh.

16               THE COURT:  -- they make a video of themselves,

17   okay.  They use a -- like a little camera.  All right.  And

18   then they email it to, say, PornHub, okay.

19               THE WITNESS:  Yes.

20               THE COURT:  And PornHub puts it on the PornHub

21   website.

22               THE WITNESS:  Uh-huh.

23               THE COURT:  No, don't say uh-huh.  Say yes or no.

24               THE WITNESS:  Yes.  Sorry.  Yeah.  Yeah.

25               THE COURT:  Okay.  They have -- there's -- they have

Dr. Dines - Cross (Mur)                    119

1    no contract with PornHub, do you understand that?

2              THE WITNESS:  Yes.

3              THE COURT:  They have no website.  Do you understand

4    that?  All they've done is they've taken the video, and

5    they've emailed it to PornHub.

6              THE WITNESS:  Yes.

7              THE COURT:  Now, do you know whether PornHub would

8    then send them money?

9              THE WITNESS:  Yes, they would.

10             THE COURT:  How do you know that?

11             THE WITNESS:  Because they would have to become a

12   member of PornHub.  Okay.

13             THE COURT:  How do you know that?

14             THE WITNESS:  Because it says here --

15             THE COURT:  Well, then PornHub would -- then PornHub

16   has a requirement that they have to become a member --

17             THE WITNESS:  Yes.

18             THE COURT:  -- before they --

19             THE WITNESS:  They upload it.

20             THE COURT:  Well, that's not in my hypothetical.  My

21   hypothetical is they just send it in, and PornHub uses it.  I

22   didn't say anything about a membership.

23             THE WITNESS:  Okay.  Can I -- then I'll -- I can

24   only answer what I know.

25             THE COURT:  What?

1          THE WITNESS:  I can only answer what I know from

2     reading Manwin and the PornHub --

3          THE COURT:  No, I don't want you to guess or

4     conjecture.

5          THE WITNESS:  I'm not guessing.  I'm not

6     conjecturing.

7          THE COURT:  Now, I didn't say anything about a

8     membership.

9          THE WITNESS:  Okay.  You cannot upload onto some of

10    the porn sites unless you're a member.  You cannot upload.

11    You can't just upload.  No, you have to become a member.

12         THE COURT:  So if this couple were to email -- does

13    PornHub have an email address?

14         THE WITNESS:  Yes, for members.

15         THE COURT:  So this couple -- oh, it's only for

16    members?

17         THE WITNESS:  Uh-huh.

18         THE COURT:  Well, that's the first time you said

19    that.

20         THE WITNESS:  Well, I'm sorry, I thought I said that

21    a few times.  I apologize.

22         THE COURT:  So you can't just -- your testimony,

23    based on your knowledge is that a man and a woman are a --

24    let's say they're a married couple, they can -- if they were

25    to email to -- a video of themselves to PornHub, it would be

Dr. Dines - Cross (Mur)                    121

1   bounced back?  It would not reach PornHub unless they became a
2   member of PornHub?
3            THE WITNESS:  Yes.
4            THE COURT:  You're sure of that?
5            THE WITNESS:  May I read my report where I said
6   that?
7            THE COURT:  No, I just want -- answer my question --
8            THE WITNESS:  Yes.
9            THE COURT:  -- yes or no?
10           THE WITNESS:  Unless you are a member, then you
11   would probably not get it onto PornHub.
12           THE COURT:  All right.  All right.  Well, you didn't
13   say that before.  All right.
14           THE WITNESS:  I thought I did.  I'm sorry.
15           THE COURT:  Thank you.  Go ahead.
16   BY MR. MURRAY:
17   Q    And are you saying that if a man and a wife -- and
18   membership is free, isn't it?
19   A    Yes, in most cases.
20   Q    Okay.  So and what information is required --
21   A    I don't know.  I've never joined to upload a video.
22           THE COURT:  All right.  Now, here's the other
23   question I have.  Would PornHub -- if you know -- don't
24   speculate.
25           THE WITNESS:  Yeah, uh-huh.

1              THE COURT:  Would PornHub require this married

2     couple who sent the video to have put a 2257 notice on their

3     video?

4              THE WITNESS:  My answer to that is if you go on

5     Manwin PornHub --

6              THE COURT:  No, I'm not asking you about Manwin.

7              THE WITNESS:  I can only tell you what they say.  I

8     can't -- I don't run Manwin.  I'm sorry.

9              THE COURT:  All right.  Then you don't know the

10    answer to my question.

11             THE WITNESS:  I do know the answer.  I'm telling you

12    what's on Manwin.

13             THE COURT:  Well, my answer doesn't include Manwin

14    at all.  It just says, if they send the video to PornHub, and

15    they become a member, would PornHub require them to put a 2257

16    notice on the video?  You can answer that yes or no or you

17    don't know.

18             THE WITNESS:  I do know, and I'm afraid I can't

19    answer yes or no.  I do know --

20             THE COURT:  You do know, what?

21             THE WITNESS:  I do know, and I'm afraid it's not yes

22    or no.  I'd have to expand that answer.  I'm sorry.

23             THE COURT:  All right.

24             THE WITNESS:  I can't answer under those conditions.

25             THE COURT:  Okay.  Thank you.  Next question -- your

1   -- go ahead.

2   BY MR. MURRAY:

3   Q    There are many free porn tube sites, are there not?

4   A    Yes.

5   Q    Okay.

6   A    They're all free.

7   Q    Okay.  You don't know what information one has to give,

8   for example, to join as a member of PornHub, correct?

9   A    No, I don't know.  I don't know.

10   Q    You don't know whether you've got to give them an address

11   where they can even send money, do you?

12   A    I don't know what the membership looks like, no.

13   Q    So you have no basis for saying that every time a couple

14   becomes a member of PornHub and uploads a sexually explicit

15   image that, if someone hits on it, they're going to get money.

16   You have no way of knowing that, do you?

17   A    For 100 percent for every couple, no, of course, I don't.

18   Q    Okay.  And there are other tube sites where you can post

19   without even becoming a member, isn't that true?

20   A    I assume so, yes.  I'm not aware of those, but I assume

21   they exist.

22   Q    And so it is true, is it not, that an individual can post

23   on a free porn tube site, not for profit, just because he or

24   she wants to share the image?

25   A    Yes.

1    Q    Okay.

2              THE COURT:  Well, that's different than what you

3    said before in my recollection, but that's your testimony that

4    there are porn sites where a couple can send them a video, and

5    the website will post it without them becoming a member and

6    without charging them anything, is that right?

7              THE WITNESS:  He asked me about --

8              THE COURT:  What?

9              THE WITNESS:  He asked me about PornHub.  My answer

10   was for PornHub.

11             THE COURT:  Right.

12             THE WITNESS:  Now, you're asking me about other

13   websites.

14             THE COURT:  Right.

15             THE WITNESS:  My answer to that is, yes, of course

16   there are other websites.  PornHub is not one of them.

17             THE COURT:  Okay.  Now, do you know if these other

18   free porn sites which would do that require the couple sending

19   the material in to have a 2257 notice on it?

20             THE WITNESS:  I don't know about all the others, but

21   I can tell you about Manwin-owned.  But I can't tell you about

22   the others, no.

23

24             THE COURT:  All right.  Okay.

25   BY MR. MURRAY:

Dr. Dines - Cross (Mur)                                    125

1    Q    But in the event that a person, a couple were to upload a

2    sexual image of themselves on a tube site, not for profit,

3    just to share it with someone, you do agree that under 2257,

4    they would be required to collect IDs of himself and his wife

5    and maintain records of them, correct?

6    A    Yes.

7    Q    And they would be required to make those records

8    available for Government inspection at an appropriate time,

9    correct?

10   A    Yes.

11   Q    And they would be required to allow Government agents to

12   enter their home, if that's where they kept their records, to

13   look at those records, correct?

14   A    Yes.

15   Q    And when they posted the image of himself or herself or

16   them on the tube site, they would be required under 2257 to

17   put a label on the image, identifying where the records are

18   maintained, correct?

19   A    No.

20   Q    You say no?

21   A    No.  There's some sites where you're not required to put

22   that label on.

23   Q    No, I'm saying, by 2257 --

24              MR. SCHWARTZ:  Your Honor --

25   BY MR. MURRAY:

1    Q    -- requires that.

2    A    No, I'm saying -- oh, 2257 does?  I'm sorry, yes.  Yes.

3    The site doesn't.  The 22 --

4    Q    Okay.  That's what I'm asking.  The law requires them --

5    A    Yes, the law does.

6    Q    -- to put that label on it?

7    A    I'm sorry.  I misunderstood.  I thought you meant a site.

8              MR. SCHWARTZ:  Your Honor, I just -- you know, this

9    has gone on for awhile.  I mean, I would place an objection as

10   to --

11             THE COURT:  Well, even if the witness didn't

12   understand the questions or she is testifying from

13   speculation, rather than actual knowledge, she has not been

14   consistent throughout this, in my view.  Now, it's a narrow

15   point compared to the rest of her direct and cross-

16   examination, but I'm going to allow Mr. Murray to continue,

17   briefly.

18             THE WITNESS:  Am I allowed to say anything?

19             THE COURT:  No, you have to wait for the next

20   question.  Your -- Government counsel can ask you redirect.

21             THE WITNESS:  Okay.

22             MR. MURRAY:  Thank you.

23   BY MR. MURRAY:

24   Q    Okay.  So no, I wasn't talking about the policy of the

25   website.  Are you saying under 2257, they're supposed to put

1    the label on, right?

2    A    No, under 2257 -- yes.  That, I -- that, yes.

3    Q    Okay.

4    A    Yes, I'm sorry.  I misunderstood.  I thought you meant

5    under the website.

6    Q    No, no, I understand.  And if that person doesn't -- does

7    not maintain 20 regular business hours, then that person has

8    to sent a letter or a notice to the Government telling them

9    when that person will be available in his or her home, 20

10   hours a week for inspections, correct?

11   A    Yes, that's what you said previously.

12   Q    And you agree with that?

13   A    Uh-huh.

14   Q    Okay.  Can you answer verbally, for the record?

15   A    Sorry.  I'm sorry, yes.  Yes, I can.

16   Q    That's okay.  Now, I want to ask you just a few more

17   questions on a related topic.  Let's talk about other ways to

18   communicate images, other than by uploading to tube sites.

19   You're aware, for example, that there are private, non-

20   commercial, sexual images that are created in the United

21   States?

22   A    Yes.

23   Q    And, for example, you're aware that professional

24   photographers are commissioned by couples, husbands and wives,

25   to create photographs of them that involve sexual images,

Dr. Dines - Cross (Mur)                                    128

1    correct?

2              MR. SCHWARTZ:  Objection, Your Honor.  This is

3    outside the scope of direct.  It's also outside the scope

4    of --

5              THE COURT:  Yes, I think it is.  It's really

6    collateral to what her testimony was.

7              MR. MURRAY:  But she is an expert, Your Honor, and

8    -- and it seems to me --

9              THE COURT:  Yes, I know, but it's really --

10             THE WITNESS:  In the pornography industry, not in

11   photography.

12             THE COURT:  It's not -- just wait for the question,

13   please.  All right.  I'm going to sustain the objection.  If

14   you want to rephrase it.  It has to relate to something she

15   said on direct.

16             MR. MURRAY:  Okay.

17   BY MR. MURRAY:

18   Q    You're familiar with -- in fact, you have some -- some

19   experience or expertise in the field of sexting, don't you?

20             MR. SCHWARTZ:  Objection, Your Honor.

21             THE WITNESS:  No, no expertise at all.

22             THE COURT:  No.  Sustained.  That -- that is totally

23   beyond the scope.

24             THE WITNESS:  I have no expertise -- I've read

25   articles, but I have no expertise.

1        THE COURT:  All right.  If I'm speaking, would you

2   please wait until I'm done?

3        THE WITNESS:  Oh, I'm sorry.

4        THE COURT:  The objection is sustained.

5   BY MR. MURRAY:

6   Q    So you don't have any information, then, as an expert

7   about the extent to which private non-commercial, sexual

8   images are shared with other adults?

9        THE COURT:  Well, wait a minute, she didn't say

10  that.  All right.  I'm saying that your recent couple of

11  questions are beyond the scope of direct.  She's already

12  testified about private communications, and the record will

13  speak for itself.

14  BY MR. MURRAY:

15  Q    In connection with your study of the Internet, you are

16  familiar with, in addition to tube sites, you're familiar with

17  social networking sites where sexual images are posted?

18       THE COURT:  Well, that's again, beyond the scope of

19  direct.  It really is.

20       THE WITNESS:  I'm sorry, what did you say?

21       THE COURT:  No, no.  I'm talking to Mr. Murray.

22       THE WITNESS:  Oh.

23       THE COURT:  Sustain.  Sustain the objection.

24  BY MR. MURRAY:

25  Q    So the only part of the Internet that you have studied is

1    the tube sites for purposes of sexual images?

2    A    No, no.  The tube sites and the paid porn websites.

3    Q    Okay.

4    A    Yes.

5    Q    But the other -- any other aspect of the Internet that

6    might or might not contain sexual images is outside of --

7    A    Yes, is outside my --

8    Q    -- what you studied?

9    A    -- actual area of expertise, yes.

10   Q    Okay.

11              MR. MURRAY:  Then, Your Honor, I don't have any

12   further questions, and thank you very much.

13              THE COURT:  All right.  Okay.  Redirect?

14                      REDIRECT EXAMINATION

15   BY MR. SCHWARTZ:

16   Q    Dr. Dines, you were asked on cross-examination about

17   several categories of pornography including mature, Cougar and

18   Granny Porn?

19   A    Yes.

20   Q    Are you familiar with those genres of porn?

21   A    Yes, I'm familiar with them.

22   Q    Okay.  And why didn't any of those categories appear on

23   your figures and tables that you submitted with your report?

24   A    Because many of them don't appear on the free porn sites,

25   and if they do, they have very few hits, so they were not

Dr. Dines - Redirect (Sch)                               131

1   worth including, because they were not in the top ten.

2   Q    Okay.  And you have described, both on direct and cross,

3   the teen genre of pornography.

4   A    Yes.

5   Q    Okay.  And this is actually only a subset of what you

6   discussed as youthful looking female performers that are on

7   the Internet?

8            MR. MURRAY:  Objection.  It's leading, Your Honor.

9            THE COURT:  Yes, sustained.  Rephrase the question.

10  BY MR. SCHWARTZ:

11  Q    Based on your -- withdrawn.

12           MR. SCHWARTZ:  I have nothing further, Your Honor.

13           THE COURT:  Any recross?

14           MR. MURRAY:  No thank you, Your Honor.

15           THE COURT:  All right.  Thank you, Doctor.

16           THE WITNESS:  Thank you.

17      (Witness excused)

18           THE COURT:  All right.  Next witness, please?

19           MR. MURRAY:  Yes, Your Honor --

20           THE COURT:  That completes the testimony of the

21  Government -- of this witness, so we'll go back to your

22  presentation of your case.

23           MR. MURRAY:  Thank you, Your Honor.  At this time,

24  the plaintiffs would call the plaintiff, Barbara Nitke.

25           COURTROOM DEPUTY:  Please raise your right hand.

1          BARBARA NITKE, PLAINTIFF'S WITNESS, SWORN

2          COURTROOM DEPUTY:  Please state your full name for

3    the record, spelling your last name.

4          THE WITNESS:  Whew, I'm nervous.  Sorry.  Barbara

5    Nitke, -I-T-K-E.

6          COURTROOM DEPUTY:  Thank you very much.  Please have

7    a seat.

8          THE WITNESS:  Thank you.

9                      DIRECT EXAMINATION

10   BY MR. MURRAY:

11   Q    Good afternoon, Ms. Nitke.  Would you please tell the

12   Court what your city of residence is?

13   A    New York City.

14   Q    And what's your educational background?

15   A    I have two years of college.

16   Q    Okay.  And what is your current occupation?

17   A    I'm a photographer.

18   Q    Okay.  Do you also teach anywhere?

19   A    I teach a class at School of Visual Arts.

20   Q    Okay.  And can you tell the Court how long you've been a

21   photographer?

22   A    Since 1980.

23   Q    Okay.  And tell the Court what currently occupies your

24   time, primarily, as a photographer?

25   A    I do corporate photography, portraiture work for a lot of

1    big law firms in New York.  And I also work on television

2    shows.  I'm starting "Project Runway" tomorrow.  And I've

3    worked a lot on "Law and Order", "David Letterman", "Dr. Oz

4    Show", "Blue Bloods".  I don't know, a lot of shows.

5    Q    What do you do for those television shows?

6    A    I do their still photography.

7    Q    And what does that consist of?

8    A    While they're shooting the show, I'm on set, usually

9    right next to the camera crew, and I have a still camera

10   that's in a box, called a blimp, that keeps my camera quiet,

11   and I shoot along with the camera crew.  I shoot still shots

12   that are used to publicize the shows.

13   Q    And where do these still shots then appear to publicize

14   the shows?

15   A    TV Guide or various TV blogs.  If there's an article

16   written about an actor who's in a show, they might use one of

17   my pictures.

18   Q    Okay.  Now, how did your career begin as a photographer?

19   A    My first job was in 1982.  It was on the set of "Devil

20   and Ms. Jones, Part 2".  It was an X-rated movie, and I did

21   the still photography for that show -- that movie.

22   Q    Okay.  Now, can you tell the Court, has your work been

23   exhibited in places, your body of work?

24   A    Yes, it has.  And I have a list.

25   Q    Okay.

Nitke - Direct (Mur)                                    134

1    A    I was afraid I would forget.  So my work has been shown

2    in New York City; New Orleans; Provincetown, Massachusetts;

3    Portland, Maine; Norway; Finland; San Francisco and San Diego.

4    Q    And has your work been added to any collections?

5    A    Yes.  I've just been included in the Kinsey Institute,

6    and I'm also in the New Hampshire Institute of Art, the

7    Finnish Museum of Photography and the Leather Archives and

8    Museum in Chicago.

9    Q    Okay.  And is the body of work that is collected in those

10   establishments, do any of them deal with sexual images?

11   A    They all do.

12   Q    Okay.  Now, has your work been published in addition to

13   being collected and exhibited?

14   A    Yes.  I've published two books of my work.  Kiss of Fire

15   was published in 2003 by a German publisher, and I just, last

16   year, published American Ecstasy myself.  And I've also --

17   it's been -- my work has been published in a lot of magazines.

18   It's been included in scholarly books.  I've been -- it's been

19   written up in The New York Observer, Harper's Magazine, The

20   Village Voice, The New York Press, The Huffington Post in

21   Italy, and there's a long list.

22   Q    Now, let's go back, then, to 1982.  You indicated that

23   you began your career doing still photographs for a sexually

24   explicit film?

25   A    Yes.

1   Q    And the name of that film was?

2   A    "Devil and Ms. Jones, Part 2".

3   Q    Did that film achieve some degree of notoriety and

4   recognition in the industry?

5   A    It was a very famous film, actually.  It was reviewed in

6   Variety, the mainstream publication.  It was described as

7   having Modigliani overtones.  Another critic compared it to

8   Jean-Paul Sartre's "No Exit".

9   Q    Okay.  And what was your role as a photographer on the

10  set of "Devil and Ms. Jones, Part 2"?

11  A    Well, it's really the same as my role is today on

12  mainstream television shows.  I was next to the camera crew,

13  with my camera in a blimp, photographing the scenes as they

14  were shot, which would be used for publicity for the movies.

15  Q    Okay.  And then, did you continue doing that kind of work

16  for adult film makers?

17  A    I did.  I worked on hardcore adult pictures up until the

18  late 1980s in New York.

19  Q    Okay.  And what -- how many producers would you estimate

20  you did that work for?

21  A    I don't know.  I worked for just about -- I worked for

22  everyone that was shooting in New York in the 1980s.

23  Q    Okay.

24  A    I'm not sure, that may be 20 or 30 producers.

25  Q    Okay.  And can you tell the Court, did you have an

1    opportunity, in working for those 20 or 30 producers to

2    observe what, if anything, they did to verify the ages of

3    their performers?

4    A    Yes, I did.

5    Q    And what was -- was there a common practice that you

6    observed?

7    A    They -- they all -- there were variations on how they did

8    it, but often, the most common practice was, they would have

9    the actor or actress would hold up two pieces of ID next to

10   their face, like their driver's license and one other piece of

11   ID.  They would hold it like this.  And then they would be,

12   either, photographed or videotaped, you know, clearly showing

13   their face, with the two pieces of ID.

14   Q    Did -- was there any producer that didn't check IDs to

15   verify ages?

16   A    Not that I know of.

17   Q    Okay.  And what was the -- and this was well before 2257

18   ever went into effect?

19   A    Oh, yes.

20   Q    Okay.  And can you tell the Court whether or not, in

21   those years, in the 80s, the adult film producers for whom you

22   worked had any interest, to your knowledge, in using anyone

23   underage?

24   A    Well, not only did they not have an interest, I think

25   they would have been appalled.  I mean, that -- usually

1  someone underage just went against everybody's morale values

2  in the industry.  They -- it's just something they wouldn't

3  tolerate.

4  Q    So you -- you took these kind of photos on adult film

5  sets for how many years approximately?

6  A    On adult film sets from '82 to -- well, no to '94.

7  Q    Okay.

8  A    12 years, and then I think, after that, there were a

9  couple of random movies that I worked on.

10 Q    And what happened to cause you to not do that kind of

11 work anymore?

12 A    The industry moved out to L.A., and I -- I just -- I'm a

13 New Yorker.  I just didn't want to go to L.A., so I stayed.

14 Q    Okay.  And then did you begin to do another type of work?

15 A    I did.  In the early '90s, fetish porn movies became

16 popular, and there were some companies in New York that were

17 shooting those types of movies, so I went to work for them.

18 Q    Okay.  And can you describe that body of work?

19 A    You mean the artwork that I did on those sets?

20 Q    Yes.

21 A    What I did was -- well, I was hired to do as I've

22 described, to be with the camera crew, shooting what they were

23 shooting, but I also created a body of artwork, while I was

24 there, which I also did with the hardcore movies, where I shot

25 images for myself, as an art project, in addition to doing the

Nitke - Direct (Mur)                                    138

1   work I was hired to do.

2   Q    Okay.  Now, did there come a time when you did a body of

3   work, I think you mentioned something called, Kiss of Fire?

4   A    Uh-huh.

5   Q    Can you tell the Court about that body of work?

6   A    Kiss of Fire is a body of work that I started shooting in

7   1994, and it's a romantic view of sadomasochism, and in that

8   body of work, I photograph private couples who do BDSM as

9   their personal expression.  So I went into their homes

10  privately and photographed them as an art project.

11  Q    And how did you get introduced into that community to

12  begin with?

13  A    A friend of mine brought me to a meeting at the

14  Eulenspiegel Society in New York, which is a BDSM -- a very

15  large BDSM group, and he introduced me to the people there.

16  And I started going -- they have weekly meetings, and I

17  started going to their meetings.

18  Q    And then how did it come about that you began taking

19  photographs?

20  A    Well, I -- I knew from the -- I knew, immediately, that I

21  wanted to photograph the people, but I wasn't sure what the

22  art project would be.  I wasn't sure what I wanted, you know,

23  what I wanted to say, artistically.  So I went to meetings at

24  the Eulenspiegel Society for about six months, and then I

25  formulated my idea of what the project would be, which would

1    be to show BDSM as an expression of love between people who

2    are committed couples.  And then once I had formulated it in

3    my mind, I started to talk to the people at the Eulenspiegel

4    Society about whether they would let me photograph them.  And

5    it took about six months before -- another six months before

6    anyone would seriously consider letting me do that.

7    Q    And for how long a period of time did you work on that

8    project, would you estimate?

9    A    That was 1994 until about 2000, so about six years.

10   Q    Now, after that project, what was your next major art

11   project?

12   A    After that, I did a body of work called Illuminata, and

13   it's also in the BDSM community, but I moved more into -- I

14   began to get to be interested in the more extreme practices

15   that people had, and I was delving a little deeper into other

16   reasons why people do BDSM as a practice.  And I saw -- I

17   began to realize that people -- they were describing out of

18   body states, and they would have almost religious or spiritual

19   feelings in their scenes, and so I wanted to capture that in

20   my pictures.  And I switched over -- I changed from black and

21   white to color film, and I -- and I started doing a body of

22   work that was more about the individual than about couples.

23   Q    Okay.  Now, in -- in both of those instances, the 1994 --

24   and how many -- I'm sorry, how many years did that go on?

25   A    That was 2000 to 2007.

1   Q    So between '94 and 2007, you were photographing

2   participants in the BDMS --

3   A    BDSM.

4   Q    -- or BDSM community?

5   A    Yes.

6   Q    And what does that stand for?  What is that an acronym

7   for?

8   A    I always have trouble with this.  It's -- BD is bondage

9   discipline.  DS is dominant submission, and SM is

10  sadomasochism.

11  Q    Okay.  Now, so between 1994 and 2007 --

12  A    Uh-huh.

13  Q    -- in 1995, 2257 went into effect, did you -- were you

14  aware of that around that time?

15  A    I was aware of it.

16  Q    Okay.  And did there come a time, then, after July of '95

17  when you began attempting to comply with 2257?

18  A    I began complying with it as soon as I heard about it.

19  Q    Okay.  And we'll talk about that in a -- in a few

20  minutes.  But then, what happened after '07?  Between '07 and

21  currently, what -- what kinds of projects, if any, involving

22  sexual images or potential bondage or sadomasochistic images,

23  do you have any projects since then?

24  A    Yes.  In 2008, I began a project that was originally

25  called, The Polysexuals, but has -- I've since renamed it.

1     It's called, <u>Smooth Hotel</u>.  And it's -- it involves a fair

2     amount of light bondage activity, and it's more aimed as a

3     kind of fashion, art statement.

4     Q    Okay.  And do you continue to do that?

5     A    Yes.

6     Q    All right.  Now, and -- and in all of that work between

7     1994 and the present that dealt with the BDSM community, did

8     that community have any interest in inviting minors into their

9     fold?

10    A    Absolutely not.

11    Q    And did you have any interest in photographing anyone who

12    was not of legal age?

13    A    No, I did not.

14    Q    So, tell the Court, how did you go about complying with

15    2257, once you became aware that it would apply to some of

16    your body of work?

17    A    I -- I got a compliance form, which is a -- just a form

18    that lists the person's name and -- excuse me -- asks them to

19    list all of the aliases that they have ever used, their

20    address, their contact information, and it also has a space

21    where you can write in their driver's license number or their

22    passport number, and then they sign it.  I think at the

23    bottom, it's they sign under penalty of perjury that what they

24    have written above is correct.  And then I -- so I have them

25    fill out that form.  I also have them fill out my usual model

Nitke - Direct (Mur)                                        142

1    release, and then I -- originally, I would have them give me a

2    Xerox of their driver's license or passport or -- well, I

3    guess those were the two we used.  And then later on, I

4    started just taking a picture of their photo ID.

5    Q    And then, where would you maintain these records?

6    A    In my home.

7    Q    And did you comply with the labeling requirement at any

8    point?  Well, let me back up.  Do you have a website?

9    A    I have a website.

10   Q    And do you post a 2257 label on your website?

11   A    Yes.  I have a label that where -- I forget the language,

12   but I have that label on there, and then there's a click where

13   you -- where you click, and you get my home -- my name, phone

14   number, home address listing where the records are kept.

15   Q    So anybody in the world can go on your website, and

16   because of the 2257 label, they'll know where your home

17   address is?

18   A    Correct.

19   Q    Now, how many photos do you usually take -- let me back

20   up.  You -- you started out doing black and white.  Then you

21   went to color.  Did there come a time when you went to

22   digital?

23   A    Yes.  I went to digital -- I started gradually shifting

24   over to digital around 2005/2006, in that time frame.

25   Q    And when you do a shoot digitally, what is the range of

1    the number of shots that you take in a shoot?

2    A    A lot.  I -- I shoot -- I probably shoot a thousand

3    images in a photo shoot.

4    Q    Okay.  And when you're shooting an image that might be

5    covered by 2257 or 2257A, do you put a label on each one of

6    the thousands of images that you take in that shoot?

7    A    No.  I mean, how would you do that?

8    Q    Okay.  So you don't know how you would comply with that

9    requirement, if that's one of the requirements of the law?

10   A    No.  Well, first of all, no, I don't know how -- I have

11   no idea how you could do that, but my understanding is that if

12   you -- that the images that I publish are the ones that I have

13   to create the filing system for and all of that.

14   Q    Okay.  So it you were to come to learn that the law

15   actually required you to place the 2257 label on every single

16   image that you create, would that pose a problem for you?

17   A    Well, I think it's an impossibility, isn't it?  I don't

18   know how you would do that.

19   Q    Okay.  Now, by the way, do you maintain 20 hours a week,

20   regularly, at your home?

21   A    No, because I'm out working.

22   Q    Okay.  I want to show you some exhibits, Ms. Nitke, to

23   have you identify them, for the record.

24   A    Okay.

25   Q    And let me begin with what we've marked as Plaintiff's

1    Exhibit 70, and can you identify that photograph?

2    A    Well, it's sideways.

3    Q    Oh, I'm sorry.

4    A    Thank you.  Yes, it's titled, "Jack, at Home".

5    Q    And which body of work does this come from, do you know?

6    A    It's part of Kiss of Fire.

7    Q    Okay.  And is that another one of your Kiss of Fire

8    photographs?

9    A    Yes, it is.

10   Q    And is that another one?

11   A    Yes.

12   Q    So this was work done between '94, I think you said, and

13   2000?

14   A    That's correct.

15   Q    And you would have collected photo IDs for some of these

16   persons after '95, correct?

17   A    Yes.

18   Q    Now, and what is the artistic message that you're trying

19   to communicate by these photographs that you've created?

20   A    Well, the first group, the black and white ones, are part

21   of Kiss of Fire, and that work is about -- it's a romantic

22   view of sadomasochism.  It's about people who express love

23   through this form of sex.  And the second group that we're

24   seeing now that are in color are more about people who --

25   like, this -- this young man is -- he's married to -- you can

1  barely see the woman on the right of the frame.  She's blurry.

2  That's his wife.  But he's -- he explores extreme sensation in

3  order to heighten his sexual pleasure, and he's interested in

4  pushing boundaries.  And they do that together, and that's

5  what that photo is about.

6  Q    All right.  So that's Exhibit 70.  Let me show you

7  Exhibit 71 and ask you if this would be from your website?

8  A    Yes.

9  Q    And these are photographs that include some images from

10  the days when you were shooting still pictures of the adult

11  films?

12  A    That is correct.

13  Q    And these can still be found on your website?

14  A    Yes.

15  Q    Then this -- Plaintiff's Exhibit 72, is that your book?

16  A    That's -- that's my second book, American Ecstasy.

17  Q    And what does that book document, Ms. Nitke?

18  A    It's a behind the scenes view of making porn movies in

19  New York in the 1980s.

20  Q    And that was published when?

21  A    In October of 2012.

22  Q    Now, let's talk about that book for a moment.  Well,

23  before we do that, so that we'd only have to bring -- bring

24  you back to the -- bring me back here, what is Plaintiff's

25  Exhibit 73B?

1   A    That's a -- that's a shot from an SM event, where I was

2   the official photographer.

3   Q    And which body of work does that represent?

4   A    That's -- that's work that I did as community service in

5   the SM community.  I would -- I would volunteer to be their

6   photographer at various events.  It was kind of just a way of

7   paying back to them.  Well, these are -- these are from my --

8   like that shot is one that I consider I might possibly

9   publish, so that's part of Illuminata.

10  Q    Okay.  All right.  And then, finally, just to identify

11  it, what is Plaintiff's Exhibit 73A?  What does that

12  represent?

13  A    That's a photograph from Kiss of Fire.

14  Q    And that -- again, those are the years of '94 to 2000?

15  A    That's correct.  That was the work with the private

16  couples.

17  Q    Now, let's talk about, for a moment, the book that you

18  published last year, which is this one, American Ecstasy?

19  A    Yes.

20  Q    Is that the book that you wanted to publish?

21  A    Not originally, no.

22  Q    And what was the book that you wanted to publish?

23  A    The original book was called Voyeur, and it would have

24  covered my entire sexual art career, sexual art photography

25  career.  So it would have spanned from 1982 through 2007.  It

1   would have covered all four of those bodies of work.

2   Q    And why -- did 2257 have any effect on why you weren't

3   able to publish that volume?

4   A    Yes.  My understanding of 2257 is that if you have work

5   in the same body, in the same book that falls under the law

6   that's after 1995, then any work that was created earlier,

7   also -- you have to apply 2257, also, to that work, is my

8   understanding.

9   Q    Okay.  And let's make sure that -- that we break this

10  apart.  The images that you ultimately published in Kiss of

11  Fire, were they all taken prior to 2257 going into effect in

12  July of 1995?

13  A    Kiss of Fire was mostly after --

14  Q    I'm sorry, Ecstasy.  I -- I misspoke.

15  A    Yeah.  American Ecstasy was all before '95.

16  Q    Okay.  And, in fact, if you take a look at the page that

17  -- I guess it's not going to be able to --

18  A    No.

19  Q    Let me do it this way, Ms. Nitke.  Do you have a

20  statement in there, on the -- one of the early pages --

21  A    Yes.

22  Q    -- that reads, "All models were over the age of 18 at the

23  time of the creation of the images in this book.  All images

24  contained herein are exempt of the provisions of 18 U.S.C.

25  Section 2257, because they were created prior to July 3,

1    1995", correct?

2    A    Correct.

3    Q    Okay.  So it was your understanding -- and -- and, of

4    course, you didn't -- when you took these photographs between

5    1982 and '94, when you were on set, you weren't the one

6    collecting the IDs, obviously?

7    A    No, I was not.

8    Q    And so, you didn't have IDs for the people depicted in

9    this -- in this book?

10   A    I did not.  I had model releases from the people, but not

11   IDs.

12   Q    All right.  Now, so then you had a body of work that you

13   created after July of 1995 when 2257 became effective,

14   correct?

15   A    Correct.

16   Q    And as to that body of work, you have the IDs?

17   A    I do.

18   Q    Okay.  But it was your understanding that if you wanted

19   to publish today, in say 2013, you wanted to publish images

20   that include images after '95 and before '95 in the same

21   book --

22             MS. WYER:  Leading, Your Honor.

23             THE COURT:  It is leading.  Sustained.

24   BY MR. MURRAY:

25   Q    What is your understanding as to what you would have to

1    do if you had published all the images that you published in

2    this book, together with images that you created after '95?

3    A    My understanding is that I would have to have the people

4    in the images before 1995 in that book fill out a compliance

5    form, list all of their aliases, and that I would also have to

6    get a copy of their driver's license or their passport.

7    Q    And was that something that you would be able to do?

8    A    I -- I felt -- I didn't try.  I felt that I couldn't do

9    it.  Some of the people have passed away.  Other people, I'm

10   just so far out of touch with that I didn't think I could find

11   them.

12   Q    Okay.  Now, in connection with your compliance with 2257,

13   and now, 2257A, can you tell the Court what problems, if any,

14   you encounter in fulfilling your obligations under the law?

15   A    Well, yes.  I -- for one thing -- well, for one thing,

16   just putting together the filing system, as I understand --

17   I'm always confused by this law, but as best as I understand

18   it, putting together the filing system is very time consuming.

19        And it's three different sets of -- of documents

20   that have to be cross-referenced back to each other, so you

21   have to have a file that lists every alias of everybody, and

22   then, within the alias, you have a different document for

23   every depiction that lists the real name of that person in

24   that alias, and then you have to have a file of the real names

25   that refer back to their aliases and every photograph they've

1    ever been in.

2              And then you have your main file, you know, that has

3    the documentation for each shot.  So every time that I change

4    my website, I have to go back through all those three files

5    and recreate all the documents that refer back to the -- to

6    the photographs, if I put new ones up.  And then, when I

7    published Kiss of Fire, I created those documents for the

8    book, and that's very time consuming.  So that's one of the

9    problems.  And it -- and it inhibits me, really, from being

10   able to freely change my website around, because I have to

11   think of the ordeal of doing all the documentation.

12             And another thing that I think is very worrisome is

13   because of doing so much work in the BDSM community where the

14   -- I just feel that the people have given me an incredible

15   amount of trust.  I mean, they've allowed me -- these are not

16   public performers.  And they've allowed me into their private

17   life.  They've entrusted me with secrets about themselves, and

18   -- and in addition to that, I have to ask them for a copy of

19   their driver's license and their home address, and all -- you

20   know, all their information, their date of birth that has to

21   be filed, that has to be available to people to inspect, that

22   would be available to, I suppose, to anyone who broke into my

23   home.  I mean, it's just more -- it's just -- it feels very

24   invasive and wrong to the people I'm photographing.  And I

25   feel that it puts them in danger.

Nitke - Direct (Mur)                    151

1          They're a stigmatized group of people, because they

2     have alternative sex lives, and they often have problems

3     where, if they're going through a divorce, the -- the ones

4     party will come into Court and say, well, my husband's a

5     sadist or something and shouldn't be allowed to see the kids.

6     So they suffer, sometimes, in divorces.  There have been

7     instances where people lose their jobs because --

8               MS. WYER:  Your Honor, I think this is beyond the

9     scope of the question.

10              THE COURT:  Well, I think she's already answered the

11    question.  She's -- well, if you want to ask a follow-up --

12              MR. MURRAY:  Sure.

13              THE WITNESS:  Oh, all right.  Sorry.

14              THE COURT:  -- I think she's going into unnecessary

15    detail.

16              THE WITNESS:  Okay.

17    BY MR. MURRAY:

18    Q    Can you just, briefly, describe the problems that you

19    think 2257 poses to the subjects that you take who are in that

20    lifestyle, within -- in --

21              THE COURT:  Well, she's already given some examples.

22              THE WITNESS:  Yeah.

23              THE COURT:  Do you have any other incident --

24    knowledge --

25              THE WITNESS:  No, I just think it's --

1          THE COURT:  -- that isn't what you already

2     testified?

3          THE WITNESS:  No.  I think it just puts them at

4     risk.

5          MR. MURRAY:  May I have one moment, Your Honor?

6          THE COURT:  Yes.

7          MR. MURRAY:  Your Honor, I would offer into evidence

8     Plaintiff's Exhibits 70, 71, 72, 73A and 73B.

9          THE COURT:  All right.  Without objection, admitted.

10        (Plaintiff's Exhibits 70 - 72, 73A and B admitted into

11    evidence.)

12         THE COURT:  By the way, that reminds me, I would

13    appreciate it if counsel is keeping a list of the exhibits

14    that have been admitted so that when you rest, each side,

15    you'll be able to give me a list.

16         Okay.  Cross-examine?

17                    CROSS-EXAMINATION

18    BY MS. WYER:

19    Q    Good afternoon, Ms. Nitke.

20    A    Hi.

21    Q    You testified that you have -- over the course of your

22    career, you have undertaken several projects involving

23    depictions of sexually explicit material, correct?

24    A    Yes, correct.

25    Q    The first project involved taking photographs of adult

1    film sets.  And that project took place between 1982 and 1981,

2    correct?

3    A    1991.

4    Q    1991.

5    A    Yes.

6    Q    And the in around 1991, the hardcore porn industry moved

7    to Los Angeles, and you no longer took those photos, correct?

8    A    Correct.

9    Q    And you have no taken any photos of the hardcore porn

10   industry since that time, correct?

11   A    No.  There have been a couple of random movies that I've

12   worked on since then.

13   Q    And then in -- between 1991 and 1994, you were involved

14   in the fetish porn film set project, correct?

15   A    Correct.

16   Q    And then you stopped working on fetish porn sets, because

17   your rates had gone up too much, and they couldn't afford you

18   anymore, correct?

19   A    I forgot I did -- yeah, correct.

20   Q    And then you began your project photographing members of

21   the BDSM community, and the -- the black and white -- you

22   first began with your black and white series, which was from

23   1994 to 2000, correct?

24   A    That is correct.

25   Q    And that -- you photographed around 150 people during

1   that period?

2   A    Yes.

3   Q    And then you switched over to color film and began the

4   Illuminata project, correct?

5   A    Correct.

6   Q    And that took place -- and it also involved members of

7   the BDSM community, correct?

8   A    Yes.

9   Q    And that took place between 1990 or 2000, you said, and

10  2007, correct?

11  A    Correct.

12  Q    So and then you finished that project?

13  A    More or less.  It might have gone into 2008, but yes.

14  Q    And you have not photographed -- that was around six

15  years ago, correct, when you finished that project?

16  A    Yes.

17  Q    And then, after you finished the Illuminata project in

18  2007 or 2008, you started your new current project called,

19  Smooth Hotel, correct?

20  A    Correct.

21  Q    And you see this project as moving into a new realm of

22  photography, correct?

23  A    Correct.

24  Q    And this project is not really focused on the BDSM

25  community?

1   A    It is, to a degree.  I'm not -- I'm not sure how to

2   answer because I -- there are some practitioners of BDSM that

3   are involved in that project and some not.  It's kind of a

4   bridge between the mainstream world and the BDSM world.

5   Q    And so, now, you're involved in this project, but after,

6   presumably, at some point, you'll finish this project, and

7   you'll move onto another project, correct?

8   A    One hopes.

9   Q    And that could involve a different group of people that

10  you might photograph, correct?

11  A    Yes.

12  Q    And you don't know, yet, who those people might be?

13  A    I don't know yet, no.

14  Q    You have indicated that you believe some of your <u>Smooth</u>

15  <u>Hotel</u> pictures implicate 2257, correct?

16  A    Well, I never really know.  I think -- I think it

17  depends, really, I mean -- actually, that raises a point.  One

18  of my problems is that I don't know what's covered by 2257.

19  So I think it's kind of in the eyes of the beholder.  So I --

20  I don't know how to answer that.

21  Q    And you are -- you have identified some photographs that

22  you are keeping 2257 records for, correct?

23  A    Yes.  Just in case, yes.

24  Q    And those photographs involve around 20 individuals,

25  correct?

1    A    Correct.

2    Q    And those individuals are models that you have selected

3    for this project?

4    A    Yes.

5    Q    People who you think would look good in the photographs

6    that you are interested in taking?

7    A    Yes.

8    Q    Earlier in this case, you provided us with a list of

9    models, correct?

10   A    Yes.

11   Q    And these were models appearing -- the list consisted of

12   models appearing in the work that you have identified as

13   implicating 2257?

14   A    Yes, correct.

15   Q    And the list was for the time period, January 1, 2005 to

16   December 31, 2009, correct?

17   A    Yes -- yes, I think so.  That -- there was a period of

18   time that I believe you, the Judge, asked for, and I believe

19   that was the period of time.

20   Q    Let me show you Defendant's Exhibit 97.

21   A    It's gonna be here?

22   Q    Yeah.

23   A    Okay.

24        MS. WYER:  Okay.  Maybe, let's see both -- both

25   pages side by side so she can see both of them?

Nitke - Cross (Wye)                                157

1   BY MS. WYER:

2   Q     Do you recognize this?

3   A     Yes.

4   Q     This is the model list that you gave us that I was just

5   describing, correct?

6   A     Yes.

7   Q     This is the -- this is actually the same copy that we're

8   looking at at your deposition.  Can you -- do you recognize

9   that?

10  A     I guess so, yes.

11  Q     Do you remember how I -- we wrote the numbers down the

12  side?

13  A     Oh, I didn't remember that, but okay.

14              MS. WYER:  I'd move to admit this document.

15              THE COURT:  All right.  Admitted without objection.

16        (Defendant's Exhibit 97 admitted into evidence)

17  BY MS. WYER:

18  Q     So, as the numbers on the side indicate, there are 27

19  models list here, correct?

20  A     Correct.

21  Q     And they're -- the models on the first page through B.W.,

22  we -- we identified as part of the Illuminata project,

23  correct?

24  A     Yes, that's correct -- correct.

25  Q     And the models from number 17, D.P., at the bottom of the

Nitke - Cross (Wye)                                        158

1   first page, through the second page, were a part of <u>Smooth</u>

2   <u>Hotel</u>'s project, correct?

3   A    That's correct.

4   Q    And then, R.K., number ten, on the first page, they

5   appeared in both, and we can tell that because it has the

6   <u>Polysexuals</u> shoots listed there?

7   A    Oh, yes, correct.

8   Q    And of the <u>Smooth Hotel</u> models, R.K. was 45 when you

9   photographed him or her in 2008?

10  A    That's correct.

11  Q    And D.P., number 17, was 21 the first time you

12  photographed him or her?

13  A    Yes, correct.

14  Q    And then he or she was 22 the second time you

15  photographed them?

16  A    Correct.

17  Q    And L.L., the next individual, was 26?

18  A    Correct.

19  Q    And M.T. was 24?

20  A    M.T.?  Well, I'll take your word for it.  Correct.  Okay.

21  Q    And then, there was -- there's another M.T. right after

22  that, and that person was 26?

23  A    I mean, I'm not adding it.  I'm -- I'm taking your word

24  for it, but yes.

25  Q    But you can -- you would be able to calculate it, because

                              Nitke - Cross (Wye)                    159

1    the date of production minus the date of birth would be the

2    age.

3    A    Right, so 2008 from -- so this is 25, right, or 24.

4    Okay.  Right, yes.

5    Q    And then A.O. was 23?

6    A    That's correct.

7    Q    And C.M. was 23?

8    A    That's correct.

9    Q    And J.W. was 22?

10   A    Correct.

11   Q    And A.H. was 24?

12   A    Correct.

13   Q    And L.C. was 24?

14   A    Correct.

15   Q    Let me show you now Defendant's Exhibit 101.  Do you

16   recognize this?

17   A    Yes.

18   Q    This -- this is an example of the model form release --

19   the model release form that you use, correct?

20   A    Correct.

21   Q    But this form does not include a date of birth on the

22   form, correct?

23   A    That's correct.

24   Q    And let me show you, now, Defendant's Exhibit 100.  Do

25   you recognize this?

Nitke - Cross (Wye)                              160

1    A     Yes.

2    Q     So this is the special 2257 form that you use, correct?

3    A     Yes.

4              MS. WYER:  I'd move both 101 and 100 into evidence.

5              THE COURT:  Admitted.

6          (Defendant's Exhibits 100 and 101 admitted into evidence)

7    BY MS. WYER:

8    Q     And this Exhibit 100, the 2257 form does include a date

9    of birth, as you testified earlier, correct?

10   A     Yes.

11   Q     And the photo identification number?

12   A     Yes.

13   Q     Let me show you a hundred -- Exhibit 112A.  This is from

14   your website, BarbaraNitke.com, correct?

15   A     Yes.

16   Q     And this -- this part of the site shows photographs from

17   your hardcore porn set project, correct?

18   A     Yes, correct.

19   Q     And that's what became the book, American Ecstasy?

20   A     Yes.

21   Q     And 112B, also from that project, correct?

22   A     Yes, correct.

23   Q     And then 112C, shows an individual wrapped in Saran Wrap?

24   A     Correct, correct.

25   Q     And that's from your Illuminata project?

1    A    Yes.

2    Q    And 112D, also from your website?

3    A    Correct.

4    Q    From the Illuminata project?

5    A    Yes.

6    Q    And 112E, also from your Illuminata project?

7    A    Correct.

8              MS. WYER:  Let's -- can we just flip through?

9    BY MS. WYER:

10   Q    That's Illuminata?  This -- these black and white ones

11   are from your -- the Kiss of Fire project, correct?

12   A    Yes.

13   Q    And so going back to that back photograph, I don't know

14   what number -- the one just before?  This shows an individual

15   that you cannot identify any physical features from the

16   photograph at all, correct?

17   A    Correct.

18   Q    Because the individual is entirely covered in some rubber

19   suit?

20   A    Yes.

21   Q    Okay.  Let's go to 112.  This is where the Smooth Hotel

22   photographs start, correct?

23   A    Yes.

24   Q    And it's not clear, from your website, which ones you

25   have identified as implicating 2257?

Nitke - Cross (Wye)                                162

1    A    That's correct.

2              MS. WYER:  I move to admit all of these into

3    evidence.

4              THE COURT:  Admitted.

5         (Defendant's Exhibits 112A through 112E admitted into

6    evidence)

7    BY MS. WYER:

8    Q    You -- you keep your records, your 2257 records in paper

9    format, correct?

10   A    Yes.

11   Q    You were not aware that 2257 allows records to be kept in

12   digital format, is that correct?

13   A    Yes.  My understanding was it had to be physical, paper

14   files.

15   Q    And you actually keep four sets of identical records,

16   correct?

17   A    I have an original and three copies, yes.

18   Q    And you put one set in your business files, is that

19   right?

20   A    Yes.

21   Q    And then one set goes in your 2257 files?

22   A    Yes.

23             THE COURT:  Excuse me.

24        (Discussion off the record)

25             THE COURT:  Go ahead.

Nitke - Cross (Wye)                                    163

BY MS. WYER:

Q    And you also have two additional sets of 2257 records?

A    I do.

Q    But you are aware that 2257 does not actually require these duplicate copies of all the records, correct?

A    Yes.  I have -- do you want me to elaborate or do you --

Q    Well, you -- you have a second set, because you think inspectors might take the first set with them if they came to inspect your records, is that right?

A    That -- just in case, yes.

Q    And you -- as you testified earlier, you -- where you keep your 2257 records in a banker's box in a closet in your apartment, correct?

A    Correct.

Q    And the box -- you only put the records in the box that correspond to work that you've published, is that correct?

A    Yes, that's correct.

Q    But those -- but you also keep 2257 records for work that you might publish, correct?

A    Yes.

Q    And you keep them in your business records, correct?

A    Yes, because if they're not published, I -- I haven't set up the three filing systems, yet.

Q    And every time you take photos down or put them up on your website, you -- you reorganize all of your files,

Nitke - Cross (Wye)                                    164

1    correct?

2    A    Correct.

3    Q    And you -- you take the 2257 records for the photos that

4    you've taken -- taken down from your website out of the box?

5    A    I put them back in the file.

6    Q    In -- in the business files?

7    A    Yes.

8    Q    And then you take the 2257 records for the photos that

9    you put on the website into the box?

10   A    Correct.  Is that not how you're supposed to do it?  I

11   don't --

12        THE COURT:  Well, I'm not -- I don't -- I'm not

13   allowed to give legal advice.

14        THE WITNESS:  Oh.  Oh, okay.

15        THE COURT:  I just make rulings.  Thank you.

16        THE WITNESS:  Sorry.

17   BY MS. WYER:

18   Q    And you don't -- you don't use a spreadsheet to do your

19   indexing, you -- correct?  You don't do, like a --

20   A    No.

21   Q    -- you don't keep a spreadsheet on your computer to do

22   that cross-referencing and indexing?

23   A    No.

24   Q    You -- you do this all with cards of some kind?

25   A    Yes, 8 ½ by 11 sheets of paper.

1    Q    And it's time consuming to locate when you're -- when

2    you're looking for the records that need to go into the boxes.

3    It's time consuming to locate the 2257 records in your

4    business files to put the right ones in the box, correct?

5    A    Yes.  And -- yes, and also, the cross-referencing takes

6    up a lot of time, in my opinion.

7    Q    Because you did that -- do that with the cards or paper

8    things that you were talking about?

9    A    Right.

10   Q    And you -- you do this reorganization of your box every

11   time you -- you change your website, but that -- that is not

12   every day, correct?

13   A    Correct.

14   Q    It's more like every -- at most, every few months, is

15   that right?

16   A    It -- it just depends.  You know, sometimes, I change it

17   more frequently, and sometimes, I don't.

18   Q    You testified that your 2257 statement on your website

19   has your home address, correct?

20   A    Yes.

21   Q    But your apartment is also your office, is that right?

22   A    Yes.

23   Q    And that is also your business address, correct?

24   A    Yes.

25   Q    And you actually designate 18 percent of your apartment

1    as a home office, correct?

2    A    That's correct.

3    Q    On your taxes?

4    A    Yes.

5    Q    You -- you believe that 2257 allows inspections to occur

6    anytime of the day or night, is that right?

7    A    That's my understanding.

8    Q    But you have never canceled any plans in order to stay in

9    proximity to your records, correct?

10   A    Correct.  I'd be out of business if I did that.

11   Q    And you have -- you have never decided not to leave your

12   apartment in order to stay with your records, correct?

13   A    Correct.

14   Q    You -- when you were taking photographs of individuals in

15   the BDSM community, you did this primarily at conferences,

16   correct?

17   A    No.  I -- I did the conferences as a volunteer activity,

18   just to kind of pay back the kindness of people who had been

19   very trusting -- who trusted me a lot.  It was a favor back to

20   the community.  Most of the images I shot were either in their

21   homes or there was a club -- there were a couple of clubs that

22   I used to use during the day when they -- when they were

23   closed.

24   Q    You would -- you would check the IDs of those

25   individuals, before you would take their picture, correct?

1    A    Yes.

2    Q    And you -- you testified that you had never intentionally

3    created a sexually explicit depiction of a minor, is that

4    right?

5    A    Absolutely.

6    Q    And without 2257, you would check IDs, if you had any

7    question about an individuals age, is that right?

8    A    I absolutely would, because that's -- there's so much at

9    stake for -- on a moral level and -- and I could go to jail.

10   I mean, there's just a huge amount at stake for -- for me

11   getting that wrong.

12   Q    But otherwise, if you didn't feel you had a question

13   about age, you would not check the ID?

14   A    That's correct.  For an older person, there would be no

15   reason to check their ID.

16   Q    You would not be comfortable taking a photo of a couple

17   having sex in public, if you could not see -- if you could not

18   determine their age?

19            THE COURT:  Well, that's a question with a double

20   negative.  Can you --

21            MS. WYER:  Okay.

22            THE COURT:  -- rephrase it, please?

23   BY MS. WYER:

24   Q    You would not be comfortable taking a photo of a couple

25   having sex in public if they --

Nitke - Cross (Wye)                                    168

1            MS. WYER:  -- I don't -- I'm not sure how to ask it

2     with the --

3            THE COURT:  Well, maybe you want to divide it into

4     two parts.

5     BY MS. WYER:

6     Q    If -- if you were -- if a couple was having sex in

7     public, they could be difficult to -- their ages could be

8     difficult to identify, because of the circumstances, correct?

9            MR. SCHWARTZ:  Objection, Your Honor.

10           THE COURT:  Overruled.

11           MR. SCHWARTZ:  It's irrelevant to her testimony.

12           THE COURT:  Overruled.  Do you understand the

13    question?

14           THE WITNESS:  I think I understand the question.

15           THE COURT:  Do you ever -- have you ever taken

16    pictures of -- photos of people having sex in public?

17           THE WITNESS:  No.  I think that's illegal.

18           THE COURT:  Well, do you have any -- okay.  I don't

19    want you to incriminate yourself.  Do you have any interest in

20    doing that?

21           THE WITNESS:  No.

22           THE COURT:  All right.  Well, then, I think it's

23    hypothetical, right?

24           THE WITNESS:  Do you mean, if I was walking down the

25    street, and I happened to have my camera?

1                THE COURT:  Yes.

2                THE WITNESS:  And I saw a couple having sex?

3                THE COURT:  Yes, would you be --

4                THE WITNESS:  I would not, no --

5                THE COURT:  -- interested in photographing them?

6                THE WITNESS:  -- because, first of all, I -- I don't

7     know who they are.  Secondly, I -- I do think that they would

8     be at risk of being arrested for that, and I don't want to be

9     involved.

10               THE COURT:  Well, we've had other testimony in the

11    case that there are some places in the United States where

12    people have sex out in the open.

13               THE WITNESS:  Oh.

14               THE COURT:  Have you ever photographed people doing

15    that?

16               THE WITNESS:  Yes, but not people that I don't know,

17    and not out in --

18               THE COURT:  You know who they are?

19               THE WITNESS:  -- the open, publicly.

20               THE COURT:  You know who they are?

21               THE WITNESS:  Yes.

22               THE COURT:  All right.

23               THE WITNESS:  But it would be, like, out --

24               THE COURT:  Do you -- do you comply with 2257 when

25    you do that?

Nitke - Cross (Wye)                                    170

1              THE WITNESS:  Oh, yes.

2              THE COURT:  Next question.

3    BY MS. WYER:

4    Q    But in order to get a sense of your views on what would

5    be necessary to be sure about someone's age, I wanted to ask,

6    would you -- you would not feel comfortable taking a

7    photograph of people engaged in sexual conduct in public, if

8    you did not know them, and you could not see them very well?

9    A    Absolutely, correct.  In the BDSM world, it's a small

10   subculture where people know each other or you -- you can ask

11   someone who they are.  So, and I'm comfortable in that

12   environment, and I'm comfortable in the porn world, where it's

13   also a very small community, and people know each other.  So,

14   you know, if there's an odd person that you don't know, you

15   would ask someone else who they are.  And I'm comfortable in

16   that environment, where there's a certain amount -- it's just

17   a close environment.  It's a community.  People are familiar

18   and know each other.

19   Q    And you -- your own knowledge of the porn industry is

20   from 1980 -- from a few decades ago, correct?

21   A    Actually, back to the '70s, but yes, correct.

22   Q    And you're not currently involved in the porn industry

23   today?

24   A    Not today, no.  Could be tomorrow.

25   Q    You -- when you do a project -- an art project that

1    you've described, the finished product is often a book,

2    correct?

3    A    Well, it has been in two cases, a book.  The finished

4    product might also be a show in a gallery.

5    Q    And your book, Kiss of Fire, was published in 2003,

6    correct?

7    A    Correct.

8    Q    That was the finished product of your black and white

9    BDSM photographs, correct?

10   A    Of Kiss of Fire, yes.

11   Q    And that book included a 2257 statement, correct?

12   A    Yes, correct.

13   Q    And your book, American Ecstasy, as you had testified

14   earlier, was photos from the first period that you were taking

15   the hardcore porn set photographs, correct?

16   A    Correct.

17   Q    And that was before you -- before 2257 went into effect,

18   correct?

19   A    Yes.

20   Q    And that book was published in 2012?

21   A    Yes.

22   Q    And that book had statements inside indicating that it

23   was exempt from 2257, because of the photographs were taken

24   before 1995, correct?

25   A    Yes.

1    Q    And you have testified you believe you cannot publish a

2    book that contains sexually explicit photos from before 1995

3    and from after 1995 in the same volume, correct?

4    A    My understanding is that if -- if I mixed the two groups

5    of photos, I would have to have 2257 records for the earlier

6    work, also.

7    Q    So you believe that you would have to go back and get

8    photo IDs for individuals shown in the pre-1995 photographs,

9    correct?

10   A    Yes.

11   Q    Now, you think you could publish the same compilation in

12   two volumes, if it were divided, right on the line, 1995 pre

13   to 2257, and after 2257?

14   A    I believe so, yes.

15   Q    As long as there are two separate, physical volumes?

16   A    That's what I believe, yes.

17   Q    And your website, BarbaraNitke.com includes sexually

18   explicit photographs from the American Ecstasy series of

19   photographs?

20   A    Yes, correct.

21   Q    And it also includes photographs from periods after 1995,

22   correct?

23   A    Correct.

24   Q    On the same website, correct?

25   A    Yes.

1    Q    And you have a 2257 statement on your website, correct?

2    A    Correct.

3    Q    You did not go back and obtain photo IDs from individuals

4    shown in the photographs that were taken before 1995 that are

5    on your website, correct?

6    A    That is correct.   What I have in my 2257 files for those

7    sections of the website is a statement that the photo was

8    taken before 1995.

9    Q    And you don't believe that that could work for a book?

10   A    I was told it would not work.

11   Q    Okay.

12   A    I wished it would.

13   Q    And you were --

14          MS. WYER:  And could we just see Exhibit 4?  Can we

15   move to 75.2?

16          THE COURT:  Well, have you ever read these?

17          THE WITNESS:  No.

18          THE COURT:  Well, I don't think it's appropriate to

19   cross-examine any witness on something they've never seen

20   before.  I mean, you can argue this, but what -- what --

21          MS. WYER:  Okay.

22   BY MS. WYER:

23   Q    It is your knowledge that you cannot determine a person's

24   age by a visual inspection, correct?

25   A    I think in a lot of cases that's true, not always.

Nitke - Cross (Wye)                                    174

1    Q    And in some of your BDSM photographs, people are wearing

2    masks or hoods, correct?

3    A    Correct.

4    Q    And those outfits and other outfits that they might wear

5    obscure their face or their body, correct?

6    A    Yes.

7    Q    So if someone looking at -- were looking at that

8    photograph, it would be difficult to identify the age of those

9    individuals, correct?

10   A    If you -- yes, for the viewer.  Yes.

11            MS. WYER:  No further questions.

12            THE COURT:  All right.  I want to ask a couple of

13   questions.  I -- I take it, from your testimony, that you

14   agree -- well, first of all, you have no interest in

15   photographing people under the age of 18 in sexually explicit

16   situations, is that correct?

17            THE WITNESS:  Yes.

18            THE COURT:  Okay.  And I also assume, from your

19   testimony, that you agree that checking the identification of

20   -- of people is an appropriate thing to do to make sure you're

21   not photographing somebody under the age of 18, is that

22   correct?

23            THE WITNESS:  Yes.

24            THE COURT:  Now, you're -- if 2257 were around, you

25   -- would you use your judgment about whether somebody had a

1    look that they -- they were so young looking, they could be

2    under 18, would you check everybody's identification?

3            THE WITNESS:  I -- I would not -- I would check

4    their identification, but I would not just rely on that,

5    because I don't trust that.  People can get a fake driver's

6    license, so --

7            THE COURT:  So what do you do?

8            THE WITNESS:  I would know the -- I mean, I would

9    find out about them.

10           THE COURT:  So you would do some independent

11   investigation?

12           THE WITNESS:  Yes.

13           THE COURT:  Okay.

14           THE WITNESS:  I would go far beyond just looking at

15   a --

16           THE COURT:  Okay.  All right.

17           THE WITNESS:  Yeah.

18           THE COURT:  Now, you've testified about the -- and I

19   don't want to put words in your mouth, but if I understand,

20   you don't object to the concept behind 2257, that it's

21   appropriate to ask for and inspect identification of people

22   who perform in sexually explicit photos to make sure they are,

23   in fact, 18 or over, correct?

24           THE WITNESS:  I don't know how to answer that,

25   because I do object to 2257.  I don't object to knowing that

1    the person I'm photographing is over 18.  Is that what

2    you're --

3              THE COURT:  Well, why do you object to 2257?

4              THE WITNESS:  I think it's invasive, and I think

5    it's -- I think it's a harassment thing.  I think it shames

6    people about their sexual lives.

7              THE COURT:  All right.  But you would -- and is one

8    reason you object to it is because you -- you used to do this

9    yourself, and you would do it anyway?

10             THE WITNESS:  Yes.

11             THE COURT:  Right?  Okay.

12             THE WITNESS:  Yes.

13             THE COURT:  Are you aware of anybody in the adult,

14   you know, entertainment business or adult photography,

15   sexually explicit photography, who is not as careful as you

16   were and as you would be, and not as --

17             THE WITNESS:  I'm not aware --

18             THE COURT:  What?

19             THE WITNESS:  Yeah.  I'm not aware of anyone who

20   wouldn't -- who --

21             THE COURT:  As far as you know, everybody is --

22   would be as careful as you are in terms of not employing

23   somebody under 18?

24             THE WITNESS:  Yes, absolutely.

25             THE COURT:  All right.  Now, the next question is

Colloquy                                    177

1    that you testified to some of your problems of keeping records

2    required by 2257?

3                    THE WITNESS:  Yes.

4                    THE COURT:  All right.  Now, I want to ask you a

5    question that may seem off topic, but I'm going to ask it

6    anyway, I assume you pay taxes, right?

7                    THE WITNESS:  Yes, I do.

8                    THE COURT:  All right.  Now, do you do your own tax

9    returns or do you have an accountant or somebody else who does

10   them?

11                   THE WITNESS:  I have an accountant who does them.

12                   THE COURT:  Okay.  Now, but in order to -- I assume,

13   like, at the beginning of every year, you assemble your

14   records -- your business records from the prior year so you

15   can give them to your accountant, is that correct?

16                   THE WITNESS:  I do.

17                   THE COURT:  So, I assume you write checks?

18                   THE WITNESS:  I do.

19                   THE COURT:  And you keep check stubs?

20                   THE WITNESS:  Yes.

21                   THE COURT:  And you give those to your accountant?

22                   THE WITNESS:  No.  I -- I have an electronic, you

23   know --

24                   THE COURT:  You have an electronic banking account?

25                   THE WITNESS:  -- what do you call it?  Accounting

Colloquy                                178

1    system, yes.

2              THE COURT:  So what do you do, email that to your

3    accountant or copy it or print it out or how do you --

4              THE WITNESS:  Yes, right.

5              THE COURT:  -- how do you get it to your accountant?

6              THE WITNESS:  Well, what I do is I -- I do my

7    bookkeeping throughout the year, and then at the end of the

8    year, I get all the numbers together, and I send that to my

9    accountant.

10             THE COURT:  When you say you do your bookkeeping,

11   just describe to me what kind of bookkeeping you have.

12             THE WITNESS:  Every check I write, I enter into a

13   program.

14             THE COURT:  Do you have a software program?

15             THE WITNESS:  I have a software program.

16             THE COURT:  Which one do you have?

17             THE WITNESS:  Account Edge.

18             THE COURT:  Account Edge.  Okay.  So that's where

19   you keep record of your income?

20             THE WITNESS:  Yes.

21             THE COURT:  And you keep record of your expenses?

22             THE WITNESS:  Yes.

23             THE COURT:  Now, sometimes, you get bills that you

24   pay?

25             THE WITNESS:  I do.

```
 1                THE COURT:  You get invoices from people?  Do you

 2       keep a copy -- do you keep the invoice when you pay it?

 3                THE WITNESS:  I do.

 4                THE COURT:  Do you mark it paid or something to

 5       indicate that you paid it?

 6                THE WITNESS:  I mark it paid, and I put it in the

 7       file.

 8                THE COURT:  And you also enter it in your -- into

 9       your software program, right?

10                THE WITNESS:  Yes.

11                THE COURT:  Okay.  And do you get all of your income

12       in by checks or do you get it by credit card or by cash?

13                THE WITNESS:  Usually, checks.

14                THE COURT:  All right.  Do you ever get some income

15       by cash?

16                THE WITNESS:  I do.

17                THE COURT:  All right.  And do you enter that into

18       your software program?

19                THE WITNESS:  I do.

20                THE COURT:  Okay.  Do you give the person who gave

21       you the cash a receipt?

22                THE WITNESS:  Yes.

23                THE COURT:  Do you keep a copy of the receipt?

24                THE WITNESS:  Usually not; I probably should.

25                THE COURT:  Okay.  Do you -- do you have some
```

Colloquy                                                    180

1    expenses you pay cash for?

2              THE WITNESS:  I do.

3              THE COURT:  All right.  Like you may go out --

4              THE WITNESS:  Cabs.

5              THE COURT:  -- like for a meal --

6              THE WITNESS:  Yeah.

7              THE COURT:  -- or parking, you would pay cash for

8    that, right?

9              THE WITNESS:  Yes.

10             THE COURT:  Sometimes, you may pay with credit card?

11             THE WITNESS:  Yes.

12             THE COURT:  And you get them -- do you get a paper

13   copy of your credit card statement every month or do you get

14   it electronically?

15             THE WITNESS:  Paper copy.

16             THE COURT:  All right.  Do you keep that?

17             THE WITNESS:  I do.

18             THE COURT:  Do you give that to your accountant?

19             THE WITNESS:  No.

20             THE COURT:  Well, are some of those things on your

21   credit card business expenses?

22             THE WITNESS:  I have a separate business credit

23   card.

24             THE COURT:  All right.  Well, for your business

25   credit card, do you give that -- do you get those statements

Colloquy                                    181

1    in paper copy?

2              THE WITNESS:  I get them in paper copy.

3              THE COURT:  All right.  Do you give those to your

4    accountant?

5              THE WITNESS:  No, I give him the numbers.  I just

6    have those on file.

7              THE COURT:  Well, how do you -- do you enter the

8    numbers into your software program?

9              THE WITNESS:  Yes.

10             THE COURT:  Okay.  And how long have you had this

11   software program?

12             THE WITNESS:  Well, that one's only a couple of

13   years old.  I had Quicken before that.

14             THE COURT:  You had Quicken.  All right.  You like

15   this one better?

16             THE WITNESS:  Yeah.

17             THE COURT:  Any reason why?

18             THE WITNESS:  Yeah.

19             THE COURT:  A brief reason or --

20             THE WITNESS:  I'm on a -- I am a Mac user, and

21   Quicken doesn't really support the new Mac's --

22             THE COURT:  Okay.

23             THE WITNESS:  -- operating system.

24             THE COURT:  Okay.  Fine.  All right.  And do you --

25   have you ever been audited by Internal Revenue?

Colloquy                                          182

 1              THE WITNESS:  No.

 2              THE COURT:  All right.  Now, you also -- you live in

 3     New York, so you pay New York State Income Taxes, also?

 4              THE WITNESS:  Yes.

 5              THE COURT:  And you also pay taxes to New York City?

 6              THE WITNESS:  Yes.

 7              THE COURT:  And you probably have, like, a

 8     professional license fee that you have to pay to New York for

 9     the privilege of doing business, anything like that or no?

10              THE WITNESS:  No.

11              THE COURT:  Okay.  Do you collect sales tax?

12              THE WITNESS:  I do.

13              THE COURT:  All right.  How do you keep records of

14     that?

15              THE WITNESS:  In the same software.

16              THE COURT:  All right.  How do you pay the State --

17     the income -- strike that.  How do you pay the state sales tax

18     that you collect over to the State of New York?

19              THE WITNESS:  On -- I pay it online.

20              THE COURT:  You pay it online?

21              THE WITNESS:  Uh-huh.

22              THE COURT:  That is, you have an account with New

23     York State, correct?

24              THE WITNESS:  Yes.

25              THE COURT:  Do you have any employees?

Colloquy                                                    183

1              THE WITNESS:  No.

2              THE COURT:  Okay.  Do you have -- are there any kind

3     of contractors who work for you on occasion?

4              THE WITNESS:  Yes.  I have photo assistants.

5              THE COURT:  Okay.  How do you pay them?

6              THE WITNESS:  By check.

7              THE COURT:  They give you a bill?

8              THE WITNESS:  Yes.

9              THE COURT:  And then you write them a check?

10             THE WITNESS:  I do.

11             THE COURT:  Do you -- are your checks printed out

12    electronically, also?

13             THE WITNESS:  They're in my printer.  I print them

14    through my printer.

15             THE COURT:  So you print the checks, and then you

16    mail them to the person -- the payee, correct?

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.  And so you have a printer where

19    -- and does the printer print the envelopes?

20             THE WITNESS:  Yeah, I have, you know, a printer --

21             THE COURT:  All right.  Yes.

22             THE WITNESS:  -- hooked up to my computer.

23             THE COURT:  Yes.  Do you find it burdensome that you

24    have to keep all these records?

25             THE WITNESS:  Of course.

1            THE COURT:  Oh, okay.  Is it any more or less

2    burdensome than keeping the 2257 records?

3            THE WITNESS:  Hmm.  That's a very good question.

4    No, I don't -- I view it differently.

5            THE COURT:  Why?

6            THE WITNESS:  Because, I think as a citizen, it's my

7    duty to pay my taxes and to -- it's part of my participation

8    in being a citizen of this country, and I'm proud to do that.

9    The 2257 law, I just don't feel is part of my duty as a

10   citizen.  I feel that it's a burden upon my free speech.  I

11   think it's -- I think it's a situation, which I've said

12   before, which stigmatizes people's sex lives.  I -- I don't

13   think it serves any kind of good function.  I think paying

14   taxes does, but I don't think this law serves any -- any

15   function, other than to make it very difficult for people who

16   work in the sexual arena to do their work.

17           THE COURT:  Okay.  Thank you.  All right.  So, Mr.

18   Murray, you're welcome to redirect, including any questions

19   that I asked.

20                      REDIRECT EXAMINATION

21   BY MR. MURRAY:

22   Q    Ms. Nitke, you brought up on cross-examination and

23   perhaps, I should have asked this myself on direct, but you

24   mentioned on cross-examination some difficulty you have

25   understanding the circumstances under which your depictions do

1    or do not fall within 2257 and 2257A, do you recall that --

2    A    Yes.

3    Q    -- being asked?  Do you have -- explain the difficulty

4    that you have when it comes to determining whether an image,

5    for example, falls within the definition of simulated

6    sadomasochism?

7              MR. WYER:  Your Honor, I object that this is outside

8    the scope, because the vagueness challenge has already -- is

9    not before the Court.

10             THE COURT:  Well, I -- I'm sorry?  I didn't hear --

11   what's the basis for your objection?

12             MR. WYER:  Well, the vagueness challenge that the

13   plaintiffs originally raised is no longer before the Court at

14   this stage.

15             THE COURT:  Overruled.  You can answer.  Do you

16   understand the question?

17             THE WITNESS:  Yes.  One of my problems is that the

18   wording of the law says, sadomasochistic abuse, and I don't --

19   I object to the word abuse, but I also don't know what that

20   means, and when something's simulated, I don't know how the

21   viewer feels.  I don't know whether they think someone's being

22   abused or -- yeah, I just -- it's just very confusing.  I

23   mean, how do you -- you know, if you were simulating

24   something, the viewer might think it's real.

25   BY MR. MURRAY:

1    Q    So how do you, then, determine whether to collect the

2    2257 records or not when you're photographing someone with

3    ropes or recently, of the kind of pictures that we've seen?

4    A    What I've been doing with those shoots is I just usually

5    collect it, unless I feel that, really, there's just no

6    question.  But if I feel there might be a question as to

7    whether there is some form of sadomasochism going on, then I

8    just collect the documents.

9    Q    Okay.

10           MR. MURRAY:  That's all I have, Your Honor.  Thank

11   you.

12           THE COURT:  All right.  Recross?

13                      RECROSS-EXAMINATION

14   BY MS. WYER:

15   Q    I just wanted to make -- to clarify something or was not

16   sure whether it was clear.  Your testimony earlier was that

17   you would check IDs if you had -- in the absence of 2257, you

18   would check IDs if you had a question about the person's age,

19   correct?

20   A    Correct.

21   Q    And you would not check IDs if you did not think you had

22   a question about that person's age?

23   A    Correct.

24           MR. WYER:  No further questions.

25           THE COURT:  Okay.  Thank you.  All right.  Thank

1    you.  You're excused.

2             THE WITNESS:  Okay.  Thank you.

3        (Witness excused)

4             THE COURT:  Okay.  I now want to turn to the Joyner

5    -- there are no more live witnesses today, right?

6             MR. MURRAY:  That's correct, Your Honor.

7             THE COURT:  All right.  I now want to turn to the

8    Joyner deposition, and first of all, let me say that I agree

9    with Mr. Murray to a point that some of the testimony is

10   admissible under 801(d)2, but the only subsection of that that

11   I think is applicable here is subsection (d) -- D for dog --

12   which reads, "was made by the party's agent or employee on a

13   matter within the scope of that relationship and while it

14   existed."

15           Now, Agent Joiner is an FBI agent, and in my view,

16   the portions of his deposition which relate to what he did or

17   of what he had personal knowledge as an FBI agent in

18   connection with the issues in this case would be admissible

19   under that rule.  And I have gone through the deposition, and

20   I'm using Ms. Baumgardner's list on page one.  Now, I want to

21   say I only got to page 170, but I found a good deal of

22   repetition of other questions, other than what I think is

23   admissible that were the subject of the examination.

24           And I'm not being critical, Mr. Murray, but I don't

25   think -- there are two areas, in particular, in which I have

1    concluded that the questions were not proper -- would not be

2    proper for admission into the trial evidence.  I'm not being

3    critical of your asking the questions during the deposition,

4    but -- and those two -- there are two areas, and I think most,

5    if not all of them, were the subject of Ms. Wyer's objections.

6          The first area is that you kept asking him whether

7    he would be allowed to do the same conduct without a search

8    warrant.  Now, Agent Joyner stated, under his testimony, that

9    to his mind, this was an inspection.  It was not a search.

10   Now, whether he's right or not about that, that's a legal

11   issue, but that was his view of the matter, that he was doing

12   inspections.  He was not doing searches.

13         And then you asked him a lot of questions about,

14   well, suppose -- I don't recall the exact one, but you -- one

15   of your questions was -- and it's a good question -- is, well,

16   suppose you came in for an inspection to look at the records,

17   and you saw a dead body, could you, you know, report this as a

18   possible murder?  I don't if it was that, but you asked him

19   something about whether you saw evidence of another crime,

20   could he deal with it.

21         That's a very interesting question that judges have

22   to deal with occasionally, but it's not a question on which

23   he, in my view, fits into subsection (d).  That's not -- his

24   opinion about what he would have done when he had a search is

25   not something that was within the scope of his relationship.

Colloquy                                                189

 1   That is, that's a legal issue, and that might depend on FBI

 2   policies.  It may depend on different Circuit Court rulings

 3   and where the actual search took place, because I'm not sure

 4   the Supreme Court has ever actually ruled on that

 5   definitively.

 6          And I don't think though, his answers to those

 7   questions are admissible as to what would have happened if

 8   this was a search or if they'd had a search warrant or whether

 9   he could do it without a search warrant, because in his mind,

10   this was a records inspection.  And in his mind, that's

11   different than a search -- either a search without a warrant

12   or a search with a warrant.  So it raises a whole host of

13   collateral issues that only exist in criminal law.

14          The second area that you kept asking him about that

15   I don't think is proper for admission into the trial testimony

16   is the whole question of his -- whether certain conduct was a

17   felony.  Now, it's clear that the statute describes some of

18   the misconduct under the statute as a felony.  But whether

19   something would be a felony in a specific case rests on a

20   whole host of questions, and it's not within the purview of an

21   FBI agent to determine whether somebody can be prosecuted for

22   a felony.  That's the function of officials within the

23   department of justice or the United States Attorney in a

24   particular district throughout the United States.

25          And I can tell you from personal knowledge that

1    different U.S. Attorneys have different views about what

2    should be prosecuted as a felony.  So and furthermore, as far

3    as I know, felony prosecutions require evidence of felonious

4    intent.  And I know very few prosecutors or U.S. Attorneys who

5    would view a failure to keep a certain type of record to have

6    sufficient felonious intent to warrant prosecuting somebody

7    for a felony.

8            And furthermore, as I recall the evidence in this

9    case, there is no evidence that anybody was ever prosecuted

10   for a felony, as a result of not having these records.  Maybe

11   I'm wrong about that.  Ms. Wyer, are you familiar with any

12   prosecution -- felony prosecution for not having records?

13           MS. WYER:  Your Honor, we are aware of a small

14   number of prosecutions, but I have no idea about the details

15   of them, at all.  I only know that they are in the database as

16   this -- this charge, this history.

17           THE COURT:  Well, would they be for the simple

18   failure to have a certain record when an inspection was made,

19   if you know?

20           MR. WYER:  Not -- not in the course of an

21   inspection, no.

22           THE COURT:  All right.  So I have, therefore, as

23   I've gone through this, up to page 170, followed those

24   rulings.  So I'm going to read to you what I've concluded.

25   I'm going to go line by line.  Now, as I've said, I got a

1    little worn out after page 170, and I didn't finish it.

2              So I'm going to ask Ms. Baumgardner if, at your

3    convenience, what I would like you to do is to -- there's not

4    much left, but I'd like you to follow my rulings, and revise

5    the designations from page 173 to 273 to exclude what I said

6    should be excluded, and only to include what I think should be

7    included.

8              MS. BAUMGARDNER:  Yes, Your Honor.

9              THE COURT:  Now, I can either read this or you can

10   make the revisions yourself.  But I went through them.  I'll

11   read them to you, if you want me to do that.  Do you have your

12   list there?

13             MS. BAUMGARDNER:  I don't, but I'll write it down.

14             THE COURT:  All right.  Okay.  All right.  And let

15   me just go by the page number, so, page six, okay; page eight,

16   okay; page 11, okay; page 14, okay; page 16, okay.  Now, page

17   16 -- no.  Yes, page 16, line 21, is okay to page 20 -- wait a

18   minute -- is okay only to -- wait a minute.  I'm sorry.

19             And by the way, I think, as far as the

20   unavailability, as I read the case law, I think a judge

21   sitting in a trial would have discretion as to rule about

22   that, because the cases are not altogether clear, and there

23   aren't any Appellate cases either.  But I think on that point,

24   on the testimony of Agent Joyner, at to what he personally did

25   in the situations you asked him about, I'm going to allow

1    that, because I think that it will just might save time in the

2    actual court hearing, so he doesn't have to repeat that,

3    because I certainly think that would be admissible.

4            If he was here in court, he could testify to what he

5    did.  Both sides could have asked him about it, on specific

6    searches.  So I'm going to allow that, and then, Ms. Wyer,

7    when he is here, if you want to supplement the testimony that

8    he gave in his deposition as to his personal activity during

9    one of these searches, you can do that, and you can ask

10   additional cross, Mr. Murray, but -- so in that regard, I'm

11   admitting it.

12           All right.  Now, page 16, I'm allowing from line 21

13   over to page 20, line five -- line six.  Then, pick up again

14   at page 21, line six, and I'll allow to page 23, line seven --

15   no, no.  No, I'm sorry.  I'm sustaining the Government's

16   objection to page 21, line six through page 23, line 17.  All

17   right.  Then, page 24, line five, that should go up to page

18   35, line eight.  I think the additional two pages are

19   appropriate for fullness of the topic.  Then page 37 is okay.

20   Page 42 is okay.  Page 44 is okay.  Page 52, line ten to page

21   54, line -- hold on -- page 52, line ten goes to page 54, line

22   14.  And then after that, you can pick up at page 56, line 15.

23   And you would go to page 59, line 21.  So I'm excluding --

24   there's a couple pages in there I'm excluding for the reasons

25   I stated.

Colloquy                                        193

1          Page 63 is okay.  Page 72, line 17 is okay, but only

2    to page 75, line 25, and then pick up again at page 78, line

3    one through the end on page 84.  Then page 88, line eight

4    continues through page 91, line ten.  That's okay.  Page 93 is

5    okay.  Page 95 is okay.  All right.  Page 96, line 25,

6    continues to page 104, line ten.  Then pick up again at page

7    107, line one through page 110, line nine.  Then pick up

8    again, page 110, line 22 over to page 112, line 21.  So I've

9    excluded some pages in there.

10          Page 114 is okay.  Page 115, objection sustained.

11   Page 116, objection sustained.  Page 118, objection sustained.

12   Page 120, okay.  Page 124, line 16 is okay only through page

13   130, line two.  Page 135 is okay.  Page 150, line six is okay

14   to line 19.  Then pick up again at page 155, line nine through

15   page 156, line 13.  156, line 22 to 159, line 12.  Page 160,

16   line eight to page 164, line 18.  Page 165, line 21 through

17   167, line ten.

18          So whatever I didn't say was included would then be

19   excluded in that.

20          MS. BAUMGARDNER:  Your Honor, would you mind

21   repeating just that last part?

22          THE COURT:  Yes.  Okay.  Page 150, line six through

23   page 150, line 19.  Then pick up, line 155, line nine through

24   156, line 13.  Then 156, line 22 to 159, line 12.  160, line

25   eight to 164, line 18.  165, line 21 through 167, line ten.

1            MS. BAUMGARDNER:  Thank you.

2            THE COURT:  Okay.  And then if you'll revise the

3    remaining ones, then I'll look at them when we reconvene on

4    Monday and do that.  Okay.

5            MS. BAUMGARDNER:  I will.  I have one question.

6    Page 72, I didn't get the line.

7            THE COURT:  Page 17 --

8            MS. BAUMGARDNER:  72.

9            THE COURT:  Seven, zero?

10           MS. BAUMGARDNER:  Seven, two.

11           THE COURT:  Seven, two.

12           MS. BAUMGARDNER:  Line --

13           THE COURT:  Just let me check.  What I think I said

14   was line 17 --

15           MS. BAUMGARDNER:  Oh.

16           THE COURT:  Hold it.

17           MS. BAUMGARDNER:  But only through --

18           THE COURT:  Let me just check it.

19           MS. BAUMGARDNER:  -- 75, line five?

20           THE COURT:  All right.  72, line 17 --

21           MS. BAUMGARDNER:  To 75, line five?

22           THE COURT:  Goes to page 75, line 25.

23           MS. BAUMGARDNER:  Line 25.

24           THE COURT:  And then pick up again at page 78, line

25   one through to the end.

1          MS. BAUMGARDNER:   Okay.   Thank you.

2          THE COURT:   Okay.   All right.

3          MR. MURRAY:   Your Honor, may I just, for purposes of

4     the record, we would then ask that the Court regard as a

5     proffer for the record, all of the portions of the deposition

6     that are being excluded, so that they would be -- we would

7     proffer those as -- that as testimony that we would, if

8     permitted, would have been offered into evidence in terms --

9          THE COURT:   Of course.

10         MR. MURRAY:   -- of the deposition.

11         THE COURT:   Well, you -- by having them on your

12    designation sheet --

13         MR. MURRAY:   Yes.

14         THE COURT:   -- but you want to make this an exhibit?

15    That would be fine.   You know, I mean, it's like offering

16    evidence, and I've excluded it.

17         MR. MURRAY:   Yes.

18         THE COURT:   So it's preserved for appeal.

19         MR. MURRAY:   Yes.   And so we appreciate that, Your

20    Honor.

21         THE COURT:   And by the way, I am not, in any way,

22    precluding you from arguing that these inspections are

23    searches, but I thought it was not -- you know, I thought it

24    was argumentative to keep asking the agent, well, what would

25    you have done if this had been a search; what would you have

Colloquy                                    196

1    done, you know -- well, did this person commit a felony when

2    you found something missing or something not adequate.  That,

3    I don't think is proper testimony for an FBI agent to give.

4    That's the basis of my ruling.

5              Okay.  Anything else for this afternoon?  Okay.

6    What time do you want to start Tuesday morning?

7              MR. SCHWARTZ:  Well, Your Honor, we can start at

8    9:15, and then we'll --

9              THE COURT:  All right.  9:15, as usual?

10             MR. SCHWARTZ:  Yeah.

11             THE COURT:  Okay.  See you then.  Have a nice

12   weekend, everyone.

13             MR. SCHWARTZ:  Thank you, Your Honor.

14             MR. MURRAY:  Thank you.

15        (Proceedings concluded at 4:01 p.m.)

16                          *  *  *

17

18

19

20

21

22

1                  **C E R T I F I C A T I O N**

2

3

4           I, Jacqueline M. Mullica, court approved

5    transcriber, certify that the foregoing is a correct

6    transcript from the official electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9

10

11

12    _____          June 14, 2013

13    JACQUELINE M. MULLICA

14    DIANA DOMAN TRANSCRIBING

15

16

17

18

19

20

21

22

23

24

25