UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC., et al, | ) | 09-CV-4607 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE HONORABLE ERIC HOLDER, JR., in his Official Capacity as Attorney General of the United States, | ) ) ) ) | |
| | ) | Philadelphia, PA |
| | ) | June 11, 2013 |
| Defendant. | ) | 9:21 a.m. |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MICHAEL M. BAYLSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs: | J. MICHAEL MURRAY, ESQUIRE<br>LORRAINE R. BAUMGARDNER, ESQUIRE<br>BERKMAN, GORDON, MURRAY & DEVAN<br>55 Public Square - Suite 2200<br>Cleveland, OH  44113 |
| For the Defendant: | KATHRYN WYER, ESQUIRE<br>HECTOR G. BLADUELL, ESQUIRE<br>JAMES J. SCHWARTZ, ESQUIRE<br>NATHAN MICHAEL SWINTON<br>U.S. DEPARTMENT OF JUSTICE<br>20 Massachusetts Avenue<br>Washington, D.C.  20530 |
| Audio Operator:<br>Transcribed by: | NELSON MALAVE<br><br>DIANA DOMAN TRANSCRIBING<br>P.O. Box 129<br>Gibbsboro, New Jersey  08026<br>Office:  (856) 435-7172<br>Fax:     (856) 435-7124<br>E-mail:  dianadoman@comcast.net |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Defense: | | | | |
| Janis Wolak | 19(Sch) | 50(Mur) | 81(Sch) | |
|   (Voir Dire) | 11(Sch) | | | |
| Stephen Lawrence | 87(Wye) | 170(Mur) | | |


| COLLOQUY: | | PAGE |
|---|---|---|
| Reference: | Regarding previous objections | 82 |


| EXHIBITS: | | IDENT | EVID |
|---|---|---|---|
| D-225 | review form | 104 | 115 |
| D-228 | final progress report | 125 | 126 |
| D-226 | summary of inspections | 126 | 127 |

1          (The following was heard in open court at 9:21 a.m.)

2          THE COURT:  Good morning.

3          ALL COUNSEL:  Good morning.

4          THE COURT:  Welcome back.  Okay, please be seated.

5          First of all, before we start with the witness, let

6    me just go over some scheduling things with you.  Okay, what

7    are the -- I appreciate your getting witnesses for today.

8          Who -- who are the -- I'd just like to know who the

9    witnesses are going to be this week so I get an idea of

10   approximately how much time you'll need, but this is the

11   priority, and then we have some scheduling issues for today.

12   Okay, today is June 11th -- okay, yes, Ms. Wyer?

13         MS. WYER:  Today we have Janis Wolak --

14         THE COURT:  Who's -- is it the Government's witness?

15         MS. WYER:  Yes, Government's witness.

16         THE COURT:  What's his name?

17         MS. WYER:  Janis Wolak.

18         THE COURT:  All right.

19         MS. WYER:  And Stephen Lawrence.

20         THE COURT:  Stephen Lawrence?

21         MS. WYER:  Yes.

22         THE COURT:  All right.  Anyone else?

23         MS. WYER:  No.  But I think that could take --

24         THE COURT:  Do you have any --

25         MS. WYER:  -- a significant amount of time.

Colloquy                                                    4

1                THE COURT:  -- witnesses today, Mr. Murray?

2                MR. MURRAY:  No, Your Honor.

3                THE COURT:  All right, so we have two witnesses

4      today?

5                MS. WYER:  Yes.

6                THE COURT:  All right.  Then what about tomorrow?

7                MS. WYER:  Tomorrow we have Charles Joyner.

8                THE COURT:  Agent Joyner --

9                MS. WYER:  Yes.

10               THE COURT:  -- former Agent Joyner.

11               MS. WYER:  Yes.

12               MR. MURRAY:  And we have Dr. Zimmerman for tomorrow,

13     correct?

14               THE COURT:  Doctor?

15               MR. MURRAY:  Dr. Zimmerman.

16               THE COURT:  Oh, Zimmerman, okay.  All right, now,

17     how long will Ms. Wallace (sic) take -- just on direct?  About

18     approximately?

19               MR. SCHWARTZ:  I would say not more than an hour

20     probably.

21               THE COURT:  All right.  And Mr. Lawrence?

22               MS. WYER:  I think that could take two to three

23     hours.

24               THE COURT:  Two to three hours?

25               MS. WYER:  Yes.

1                THE COURT:  All right.  Agent Joyner?

2                MS. WYER:  About the same.

3                THE COURT:  Okay.  Dr. Zimmerman?

4                MR. MURRAY:  I would think 45 minutes for his

5        direct --

6                THE COURT:  All right.

7                MR. MURRAY:  -- an hour at the outset.

8                THE COURT:  All right.  Then on Thursday the 13th

9        what do we have -- on then?

10               MS. WYER:  We currently do not have anything

11       scheduled for the 13th, if we don't run over with Mr. Joyner

12       and Mr. Zimmerman.

13               THE COURT:  All right, no other witnesses?

14               MR. MURRAY:  Not for Thursday, Your Honor.

15               THE COURT:  All right, how about for Friday?

16               MS. WYER:  On Friday plaintiffs have Dr. Lenz.

17               MR. MURRAY:  Dr. Lenz is currently scheduled for

18       Friday.

19               THE COURT:  About how long will he be?

20               MR. MURRAY:  An hour on his direct --

21               THE COURT:  Okay.

22               MR. MURRAY:  -- or probably less.

23               THE COURT:  And does the Government have any

24       witnesses?

25               MS. WYER:  We do not.  We actually had moved -- we

1   moved one of our witnesses from Friday to Monday.

2                THE COURT:  That's the one who's unavailable Friday?

3                MS. WYER:  No, so we now have two witnesses

4   scheduled for Monday, the following Monday, the 17th.

5                THE COURT:  Who are those?

6                MS. WYER:  That is Phillip Stark --

7                THE COURT:  And?

8                MS. WYER:  -- and Frank Biro.

9                THE COURT:  How do you spell the last name?

10               MS. WYER:  B-I-R-O.

11               THE COURT:  Okay.  How long will they take about?

12               MS. WYER:  I would say maybe an hour on direct for

13   Dr. Stark and maybe an hour and a half for Dr. Biro.

14               THE COURT:  Okay.  All right.  Okay, all right, here

15   is what -- well, first of all, let me just talk about today.

16   At approximately 11:30 -- we're going to have to take a long

17   lunch hour starting at around 11:30.

18               The reason is that every year I speak with a group

19   of student from Beijing, China who are here with a Temple

20   University Exchange Program.  It's been going on for a while

21   and they come into Court.

22               They're with Judge Strawbridge now observing a trial

23   and then I give them a little talk, we have a discussion about

24   the Federal Rules of Civil Procedure and just how they're

25   developed and what they do and they have -- they usually have

1    a bunch of questions so that generally takes about an hour.

2              That's at approximately at 11:30 and we'll take a

3    lunch break, and then I have a guilty plea which will take no

4    more than a half hour.

5              So why don't you schedule the plea for 12:30, okay,

6    and we'll take a break from like 11:30 until like 1:00, okay?

7    But that should not be a problem getting all of these

8    witnesses in, okay?

9              All right, now, here is the schedule that I intend

10   to follow on the wrapping up of this trial.  When we're done

11   with the testimony on Friday, which apparently is going to be

12   a short day, my intention is to at that time give you my

13   impression of various witnesses.

14             I do that generally in every non-jury matter that I

15   have and I will go through most, if not all, of the witnesses

16   and tell you what importance I think they have in the case,

17   whether I saw any problems in what they had to say or did not

18   say, and just give you an evaluation of it..

19             And I do that because I think it's important for

20   counsel to know as the fact finder where I'm heading in terms

21   of finding the facts because in view of the history of this

22   case, I don't -- I don't think it would be fair to either of

23   you or your clients for me to keep silent about this and have

24   you write -- you know, pages and pages of briefs about why

25   this witness should be believed because they said this and why

1     that witness didn't say that or they were wrong or they

2     shouldn't be believed or they're so forth, and this will

3     include the fact witnesses and the experts, and that's done

4     for your -- to streamline the post-trial briefing, which I

5     will get to in a minute.

6            Then on Monday, after the two witnesses who are

7     scheduled for Monday are completed, I'll do the same for those

8     two witnesses.  Now, however, in addition to that, on Friday,

9     after I'm finished giving you the evaluation -- and I may not

10    cover everything and of course you're free to dispute what I

11    conclude or what I infer and point out that I'm wrong, but I

12    -- we -- we're not waiting for a written transcript of this

13    trial to adjudicate it, okay?

14           We are very comfortable working with the audio

15    transcripts.  Now, if one of you wants to order a written

16    transcript, that's fine, I have no problem, and if you get to

17    the Third Circuit, they'll probably require it.  But I don't

18    require it and I'm not going to wait for it.

19           If you think I should have it, then you'd better

20    order it quickly so that I do have it while we're -- while

21    we're working on the adjudication.  So as a result -- and so

22    my little discourse on Friday after we're done the testimony

23    will include my raising the questions that I think are most

24    important for resolution on remand and I intend to be pretty

25    -- my intent is to be focused on the questions that were posed

1   by the remand, and not to re-argue things that were already

2   decided by the Third Circuit.

3           And the purpose -- the reason for that is that on

4   Monday, after I give you my evaluation of those two witnesses,

5   I would then like to have closing arguments from counsel, and

6   I intend to leave a -- you know, a couple hours at least for

7   that to give you a chance to answer the questions I will have

8   posed on Friday, to tell me that I don't have the right

9   questions, to tell me that I'm not going in the right

10  direction and why, and to offer whatever else you think I

11  should deal with in the adjudication.

12          So, it's an open session for you to be advocates for

13  your clients.  Then I'm going to allow a short period for

14  final briefs, with the plaintiff going first, then the

15  defendant, and then a short reply brief by the plaintiff, but

16  that briefing has to be completed by July 10th.

17          And the reason for that, just to be very candid, is

18  that I -- first of all, as you may recall when the case was

19  remanded, I said that I was going to try and do this quickly.

20  Now, it hasn't been as quick as I had thought I could do, but

21  I think you've been very cooperative and very diligent at

22  adhering to deadlines that I've set.

23          But one of the reasons is that the young lady who's

24  sitting in front of me, Sarah Solo (phonetic), who has been my

25  Law Clerk on this case from the outset, she is leaving from me

1    sometime in the latter part of July and is going to be a Clerk

2    for Justice Bryer, who requires her to start by the end of

3    July.  So I'm very happy for her, but this is an important

4    factor in why I'm going to decide -- I intend to issue

5    whatever I'm going to write about this by the end of July, so

6    that's why -- so this briefing schedule basically allows for

7    three weeks, three weeks and two days.

8            So, I'm going to ask you to think about the dates

9    you want to do the final brief and in my mind, this case has

10   already been extensively briefed and I do not need any of you

11   to start from ground zero.

12           I think your brief -- I mean, you're welcome -- I'm

13   not -- I'm tempted -- I was tempted to put a page limit on it,

14   but I'm not going to do that, but I'm really interested in

15   your focusing on the precise cases that you think answer or I

16   should use in determining the adjudication based on the

17   remand.

18           So, I just wanted to give you a heads up that that's

19   the plan and that's the schedule.  And on Monday, when we are

20   done the closing argument, we'll then decide what are the

21   specific dates by which the closing briefs will be filed.

22   Okay, thank you for listening.

23           So we'll go from now until when the Chinese students

24   are here, which I'm told will be approximately 11:30 or two

25   hours.  I doubt we can get -- maybe we can get finished Ms.

1    Wallace and perhaps maybe you'd rather do that and then we'll

2    take Mr. Lawrence after lunch.  So is Ms. Wallace here?

3              MR. SCHWARTZ:  Yes.

4              THE COURT:  All right, let's have her come in.

5              MR. SCHWARTZ:  The defense calls Janis Wallace --

6    Wolak.

7         (Pause in proceedings)

8              THE CLERK:  Please raise your right hand.

9              JANIS WOLAK, DEFENSE WITNESS, SWORN

10             THE CLERK:  Please be seated.  State your full name

11   and spell your last name for the record.

12             THE WITNESS:  It's Janis Wolak, W-O-L-A-K.

13             THE COURT:  W-O-L --

14             THE WITNESS:  A-K.

15             THE COURT:  Thank you.  J-A-N-I-C-E?

16             THE WITNESS:  No, I-S.

17             THE COURT:  I-S?

18             THE WITNESS:  Yes.

19                        DIRECT EXAMINATION

20   BY MR. SCHWARTZ:

21   Q    Good morning, Ms. Wolak.

22   A    Good morning.

23   Q    Can you give the Court your educational background?

24   A    Yes.  I have a bachelor's degree --

25             THE COURT:  Pull the microphone closer and keep your

1    voice up, please.

2          THE WITNESS:   Sure.   I have a bachelor's degree in

3    sociology that I got in 1970 from New College in Sarasota,

4    Florida; I have a law degree from Southwestern University in

5    Los Angeles that I got in 1978; and then I have a master's

6    degree in sociology from the University of New Hampshire,

7    where I currently work.

8    BY MR. SCHWARTZ:

9    Q    And what year was the master's in sociology?

10   A    1996 I believe.

11   Q    Can you describe what professional associations you

12   belong to?

13   A    Yes.   I belong to the International Society for the

14   Prevention of Child Abuse and Neglect, and the American

15   Professional Society on Child Abuse and Neglect, and the

16   American Professional Society on Child Abuse.

17   Q    Do you do journal reviews?

18   A    Yes.

19   Q    And can you explain what that is?

20   A    In my field, I work in an academic research group and in

21   my field, we publish our -- the results of our research in

22   academic journals.   Peer review is the process.   When you

23   submit a paper, other people review it to comment on the

24   methodological rigor and other aspects of the paper.

25   Q    And describe what is your field.

1   A    I work in a research group called the Crimes Against

2   Children Research Center.  Most of the researchers in our

3   center are either psychologists or sociologists and most of

4   our work is in the field of child maltreatment.  I myself do a

5   lot of research that involves internet related child sexual

6   exploitation crimes is my area of speciality.

7            And in our research group, our whole focus is on

8   children as victims of crimes, children being defined as age

9   17 and younger.

10  Q    All right.  Have you ever appeared as an expert witness

11  before?

12  A    No, I have not.

13  Q    Can you please describe your work history starting with

14  when you were receiving your masters in sociology?

15  A    I started working as a research assistant for Dr. David

16  Finkelhor, who is the Director of the Crimes Against Children

17  Research Center.  At the time I began around 1995 actually our

18  research center didn't exist yet.

19           After I finished my master's degree and found out

20  that I had a talent for research, it was coincidently at the

21  same time our research group was formed, and so I started

22  working there as a research scientist and I have continued

23  working there since 1998, which is when our research center

24  began.

25  Q    And what is your current title?

1    A      I'm a senior researcher.

2    Q      And what are your current responsibilities?

3    A      I am a hundred percent -- I work a hundred percent on

4    research projects, so it's my responsibility first of all to

5    find my own research funding, because it's all funded through

6    grants, and I'm -- I design and manage and report the results

7    of various research projects, and basically I am in most cases

8    completely responsible for both acquiring the project and

9    overseeing it.

10          Although almost every project I have, I also am

11   collaborating with colleagues and there are projects where we

12   are subcontractors so we're reporting to or doing work under

13   the auspices of another research group organization.  So,

14   every project is a little different.

15   Q      Okay.  And where is the Crimes Against Children Research

16   Center?

17   A      We're located at the University of New Hampshire and

18   we're actually part of the university.

19   Q      Okay.  And what is the focus of your research currently?

20   A      Well currently I have three projects.  Two of them focus

21   on child pornography and then a third focuses on child

22   abductions.

23          The child pornography projects that I have currently

24   are -- one is funded by the Department of Justice, the Office

25   of the Victims of Crime, and it's a project to look at the

1    responses of the criminal justice system to victims who are

2    pictured in child pornography because there's certain

3    differences between those victims and the effects of the fact

4    that they were photographed and in some cases their

5    photographs are being distributed on the internet so there's a

6    great concern about that.

7          And then I'm working on another project with

8    computer scientists at the University of Massachusetts, and

9    that is a project -- they have developed software that law

10   enforcement uses to monitor peer-to-peer networks for child

11   pornography images, and I'm working with them to fine tune

12   those tools so that we can more directly target certain types

13   of offenders, and also to start to be able to measure the

14   amount of child pornography that is in peer to peer networks,

15   and also the patterns of different types of child pornography

16   trading that happens in those networks.

17         And then I have one prior project that it's ended,

18   although I'm still writing some papers from that, that also

19   involves child pornography, and that was a large national

20   study of law enforcement agencies.

21         It was -- well we had a national sample of law

22   enforcement agencies and we did this study over three time

23   periods in the year 2000, 2006, and 2009 where we surveyed

24   agencies about arrests for among internet related crimes,

25   child pornography possession, distribution, and child

1    pornography production.

2              And we in that project conducted very detailed

3    interviews with law enforcement investigators about specific

4    crimes and about the characteristics of offenders, in crimes

5    that had identified victims -- the characteristics of victims,

6    and also the characteristics of the crimes themselves.

7    Q    And what was the name of that study?

8    A    That was the National Juvenile Online Victimization

9    Survey, and as I said, there were three -- what we call three

10   different waves of the study.  We did it at three -- at three

11   different time points.

12   Q    Okay.  And have you published any peer review articles in

13   the area of child pornography?

14   A    Yes.  I've published articles in the Journal of

15   Pediatrics, in child maltreatment, in a journal called Sexual

16   Abuse which is a journal -- a research journal, and I've

17   published quite a few bulletins -- those are peer-reviewed

18   journals, and I've also published bulletins and reports, some

19   on our own website.

20   Q    And generally what were the topics of the articles and

21   bulletins that you are publishing?

22   A    Well, so far all of our publications have to do with the

23   National Juvenile Online Victimization Study, or most of them

24   have to do with that, and they basically follow the changes

25   that we saw in arrests and in characteristics of crimes during

1    the three time periods that that study was done.

2    Q    Have you given presentations on the topic of child

3    pornography?

4    A    Yes.

5    Q    And why were you invited to give those presentations?

6    A    Well, I've given presentations on our research in front

7    of a number of organizations.  For example, there's an

8    organization called the Association for Treatment of Sexual

9    Abusers.

10        This is a North American organization of

11   psychologists who both treat and do research about sexual

12   offending.  I gave a preliminary address at their national

13   conference a couple of years ago.

14        I have spoken in front of  the US Sentencing

15   Commission and the National Association of Sentencing

16   Commissions about our data regarding sentencing and child

17   pornography crimes.

18        I've spoken in front of the American Academy of

19   Pediatrics about our findings about child pornography

20   production, and also in front of the International

21   Professional -- International Society to Prevent Child Abuse

22   and Neglect on that same topic.

23        I've spoken to a number of national and

24   international symposiums.  Symposiums aren't so much specific

25   organizations but groups that are called together to try to

1    understand what we know on certain topics.

2              So for example, an FBI round table, the National

3    Center for Missing and Exploited Children; the Counsel for

4    Baltic States in both London and Stockholm.

5              I've spoken to an organization called ECPAT that

6    especially focuses on children who are victimized by

7    prostitution and child pornography.  I've spoken to that

8    organization in Bangkok.  There may be others listed on my

9    resume --

10   Q    And --

11   A    -- but that's -- oh, the Office of Victims Of Crime --

12   that's another symposium that I -- that I've spoken.

13   Q    Okay.  And how do you get the funding for your research?

14   A    So far our projects are funded largely by the US

15   Department of Justice and by the National Science Foundation.

16   Q    And is the process for getting funding -- is that a

17   competitive process?

18   A    Yes.  Yes.

19   Q    Can you describe that briefly?

20   A    Organizations issue solicitations and we respond to their

21   solicitations with proposals, and those proposals for both the

22   National Science Foundation and the Department of Justice are

23   then reviewed by peer reviewers and rewarded.

24   Q    And you have received those awards --

25   A    Yes.

Wolak - Direct (Sch)                                      19

1    Q     -- at your center?

2    A     Yes.

3    Q     Okay.

4          MR. SCHWARTZ:  Your Honor, at this time defendants

5    tender Ms. Wolak as an expert in the field of child

6    pornography, the characteristics of child pornography,

7    production and distribution of child pornography, and internet

8    crimes against children.

9          THE COURT:  Okay, any questions on qualifications?

10         MR. MURRAY:  No, I'll wait for my cross --

11         THE COURT:  Okay.

12         MR. MURRAY:  -- generally, Your Honor.

13         THE COURT:  All right, I'll allow her to testify as

14   an expert in those fields.

15                       DIRECT EXAMINATION

16   BY MR. SCHWARTZ:

17   Q     Ms. Wolak, you were contacted by the Department of

18   Justice about providing a report in this case?

19   A     Yes, I was.

20   Q     Okay.  And what were you asked to do?

21   A     I was asked to respond to a report by Dr. Daniel Lenz.

22   Q     And did you have an opportunity to review that report?

23   A     Yes.

24   Q     And why were you asked to critique Dr. Lenz's report?

25         MR. MURRAY:  Objection, Your Honor.  I don't know

1    how she would know what they had in their mind.

2              THE COURT:  Yes, sustained.  I mean, you want to

3    know -- I mean why -- because you asked her to do it, I guess

4    that's the answer.

5    BY MR. SCHWARTZ:

6    Q    What were the goals of your report that you prepared for

7    this case?

8    A    Well, I reviewed what Dr. Lenz stated about the quantity

9    of child pornography that's available on the internet, and

10   also about the nature of the images that are the content of

11   child pornography.  Those were the main two focuses of my

12   response.

13   Q    Okay.  And what sources did Dr. Lenz cite in his report?

14   A    Well, he cited our own research in the report, and he

15   also cited other reports about child pornography that I was --

16   that I am familiar with.

17   Q    Okay.  As part of your preparation for your testimony

18   today, did you review Dr. Lenz's CV?

19   A    Yes, I did.

20   Q    And do you recall his area of study?

21   A    Well, his area of study is communications, and it appears

22   from his CV that he  has done a lot of work in the impact of

23   exposure to various kinds of media, including adult

24   pornography and media violence.

25   Q    In your experience researching in the field of child

1   pornography, what, if any, research are you aware of done by

2   Dr. Lenz in the field of child pornography?

3   A    Well, until I saw his CV, I wasn't aware of any research

4   that he had done in the meetings I've been to and in the -- my

5   own keeping up with literature, I've never come across any

6   research that he has done.

7         From his CV, I see that he wrote a book chapter in

8   2001 on the topic of child pornography, and I did review that.

9   It looked -- it looked as if it was a synopsis of what was

10  known up until that point about the -- about child

11  pornography.

12        But I'm not aware of -- and I didn't see anything on

13  his CV that shows that he's done any actual research himself

14  on that topic or any work since the book chapter that he

15  wrote.

16  Q    Can you please describe the age ranges of child

17  pornography?

18  A    Yes.  Child pornography -- the child pornography statutes

19  -- the Federal statutes apply to age 17 and younger.

20  Q    Okay.  And how are those age ranges broken down?

21  A    Well, most people, when they discuss child pornography,

22  they break images down into two groups -- the younger

23  children, prepubescent children who do not yet have any

24  characteristics of sexual maturity; and then pubescent and

25  adolescent victims who have -- you know, have sexual

1    development.

2    Q    Okay.  And what are the different crimes associated with

3    child pornography?

4    A    There are three basic crimes: the possession and

5    distribution, which are often associated with each other, and

6    also the production of child pornography which has to do with

7    photographing victims.

8    Q    In his report, Dr. Lenz referred to the 2010 report to

9    Congress by the National Strategy for Child Exploitation

10   Prevention and Interdiction.  Are you familiar with that

11   report?

12   A    Yes, I am.

13   Q    And what did that report tell Congress?

14   A    Well, when it -- in the focus on child pornography and

15   that report --

16            MR. MURRAY:  Your Honor, I'm going to object to

17   the --

18            THE COURT:  Yes.

19            MR. MURRAY:  -- question.

20            THE COURT:  I mean, I wrote about that report in my

21   first opinion.  I don't think we need to go into it.

22            MR. SCHWARTZ:  Okay.

23            THE COURT:  I mean, it speaks for itself.  I mean,

24   if she wants to highlight something and tie it into her

25   opinion in this case she can do it, but I don't think we need

1    a recitation of what's in the report.

2                MR. SCHWARTZ:  Okay.

3                THE COURT:  Sustained.

4                MR. SCHWARTZ:  Okay.

5    BY MR. SCHWARTZ:

6    Q    With your center, the Crimes Against Children Research

7    Center, how do they go about gathering information about child

8    pornography?

9    A    Well, in our National Juvenile -- every study is a little

10   different.  In our National Juvenile Online Victimization

11   survey, we created a mail survey that was sent to a national

12   sample of law enforcement agencies, and the sample was

13   somewhat complex.

14               I can go into detail if someone wants but I think

15   the main thing I'll say about it is it included State, local

16   and Federal agencies, and as part of the sample, it included

17   all of the agencies that we knew of that specifically focused

18   on child pornography and on internet related child sexual

19   exploitation crimes.

20               And so that included certain units of the FBI,

21   certain units of the US Postal Inspection Service, and also

22   there is a network of internet crimes against children task

23   forces that's funded by the Department of Justice, and all of

24   those task forces were included in our sample.

25               And then we had a system for creating -- doing a

1  random sample of all the other law enforcement agencies out

2  there so we both captured everything that we used that's

3  specialized in that, and then sampled the other agencies that

4  are out there so that we made sure to capture cases that they

5  were seeing also.

6  Q    And when you talk about law enforcement, does that

7  include prosecutor?

8  A    Yes.  For our last study -- not for every wave but in our

9  last study, we also interviewed prosecutors.  Now, we didn't

10 have a random sample of prosecutors; we asked when we

11 interviewed law enforcement investigators, we asked them for

12 the names of prosecutors that prosecuted those specific cases.

13         And also when we interviewed prosecutors, we did a

14 more general interview, it was not about one specific case

15 they had handled, but we did a general interview and we

16 focused on the issues that come up when they're prosecuting

17 child pornography cases.

18 Q    And earlier you discussed that you gather arrest data.

19 A    Yes.

20 Q    What does that mean?

21 A    We ask if law enforcement agencies in our mail survey

22 have made arrests for certain types of crimes in a certain

23 time period.  For example, in our last wave we asked if they'd

24 made arrests for possession or distribution of child

25 pornography or child pornography production during the

1    calendar year 2009, and if they said yes, we asked them to

2    give us information about specific cases and contact

3    information for the investigator who handled those cases.

4    Q    And -- I'm sorry, go ahead.

5    A    Well, I just want to say, it sounds a little simple to

6    say that we sent a mail survey out.  We sent several waves of

7    the mail survey out because each time you send a mail survey,

8    you get maybe 15 or 20 percent responses, and then we called

9    agencies that didn't respond to collect the data over the

10   telephone.

11         So, we had about an 85 percent response rate to the

12   mail survey.  And then we called law enforcement investigators

13   and scheduled interviews with them at their convenience about

14   specific cases that they had handled.

15   Q    And how many times did you send out the survey?

16   A    We sent out a mail survey.  We sent out a postcard that

17   said if you've completed this, thank you, if you haven't,

18   please do it, and then we sent I believe two other waves of

19   the mail survey, and then we began to call agencies to remind

20   them and sometimes we also faxed them to remind them.

21   Q    And what years did you send out the surveys?

22   A    Well, we were looking at -- like the last survey is a

23   good example, we were looking at calendar year 2009, so we

24   began our mail survey early in 2010 and we collected data over

25   a 12 month period.  I believe it was March, 2010 through

 1   March, 2011 when we wrapped up data collection, and that's

 2   pretty analogous for each of the other two data --

 3   Q    And --

 4   A    -- our time -- our data collection --

 5   Q    -- you said --

 6   A    -- time periods.

 7   Q    And you said there's two other.  What years were the two

 8   other --

 9   A    The first --

10   Q    -- data collections done?

11   A    -- one actually went from July 1st, year 2000, through

12   June 30th, 2001, and then the second time point was 2006 when

13   we were collecting data -- when we were asking police about

14   arrests during that time frame.

15   Q    Okay.  And in these questionnaires, what age range

16   breakdowns did you do in the questionnaire for the law

17   enforcement?

18   A    Well, when you're talking about child pornography, we

19   actually had -- we had a pretty complicated telephone

20   interview that we did.  It was programmed onto a computer --

21          MR. MURRAY:  Your Honor, I'm going to object.  It's

22   not really responsive to this more specific question that was

23   asked.

24          THE COURT:  Overruled, but I think this should be

25   brief --

1            MR. SCHWARTZ:  Yes.

2            THE COURT:  -- and we ought to get to the point.

3            MR. SCHWARTZ:  Yes.

4            THE WITNESS:  Okay.

5            MR. SCHWARTZ:  Okay.

6            THE WITNESS:  We -- when we were interviewing about

7    cases of child pornography production, we asked a series of

8    questions about the victims including the age of the victim.

9    When we were interviewing police about child pornography

10   possession, we asked the police about the content of the

11   images that -- that the suspects possessed, and we asked them

12   specifically were there any pictures that showed children in

13   certain age ranges and the age ranges I believe were zero

14   through two, three through five, six through 12, and then 13

15   to 17.

16           THE COURT:  What?  Two to five, six to 12 and what?

17           THE WITNESS:  13 to 17.

18   BY MR. SCHWARTZ:

19   Q    In the current computer age, how is child pornography

20   circulated?

21   A    Well, just about any way that a photograph can be

22   transmitted or posted is a way that child pornography can be

23   circulated.  Probably the biggest source of child pornography

24   or the most public -- publicly circulated source is on peer to

25   peer networks.

1          But child pornography is also sent via email, it is

2     posted on image boards which operate a little bit like

3     bulletin boards, it is sent in closed groups that are created

4     on certain -- through certain internet applications, and it is

5     also available through websites including commercial websites

6     that require payment for access.

7     Q     Okay.  Can you please describe generally what a peer to

8     peer network is?

9     A     Yes.  This is a very simplistic description.  A peer to

10    peer network is a way that people can trade electronic files

11    with each other for free and relatively anonymously, and these

12    peer to peer networks are very large, they're global, there's

13    several of them.

14          It's very easy to join a peer to peer network.  You

15    simply download the software on your computer.  Part of the

16    downloading software is it involves creating a shared folder

17    where you want to trade electronic files, you have things that

18    you want to make available to other people, you put them in

19    the folder.

20          And also, every peer to peer network has a means of

21    searching for what's available in other network members'

22    shared folders, and so that's how people would search for

23    electronic files that they're interested in that would also be

24    downloaded into their peer to peer -- into their shared

25    folders.

1          Most people are familiar with peer to peer networks

2     because there's a lot of copyright issues with people sharing

3     music and television shows and videos of movies and things

4     like that.  But child pornography and pornography featuring

5     adults is also shared on those networks.

6     Q    And how is a peer to peer network distinguishable from

7     other types of networks?

8     A    Well, a peer to peer network is public.  Anyone can join.

9     Anyone can access files and it's relatively anonymous.  Most

10    of the other ways the child pornography is traded on the

11    internet require membership in a group or some sort of insider

12    knowledge, for example, how to access a particular website.

13    Q    How does child pornography get distributed on a peer to

14    peer network?

15    A    Someone simply uploads files that they have into a shared

16    folder, or someone -- and that's how a person would distribute

17    it.  If a person wanted to acquire it, they would use whatever

18    search mechanism a peer to peer network has to look for files.

19    Most -- it varies from network to network, but the simplest

20    explanation is it's like using any search engine.

21          There are some terms that are specific to child

22    pornography like "Lolita" would be a term, but it's very easy

23    to acquire files simply.  I should say most child pornography

24    files have very long descriptive titles that tell you exactly

25    what the file contains, and so simply searching for a

1    particular age group and particular sex acts in most cases

2    will get a response of a long list of file titles that the

3    searcher might be interested in.

4    Q    All right.  And going back to the research that you've

5    done, based on your research of arrest data, what are the age

6    ranges of child pornography that are found when people are

7    arrested for possessing child pornography?

8    A    Well, when we've asked police, what we have found is that

9    most people -- and it's around 80 percent, have pictures in

10   the six to 12 age range, and that also about two thirds of

11   people have pictures in the 13 to 17 year old age range.

12           And smaller percentages of people have -- like a

13   minority of people have images of people -- of children

14   younger than six.  So, most people have a fairly wide range of

15   age ranges that could cover both images of prepubescent and

16   pubescent children.

17   Q    And just so the Court --

18           THE COURT:  And these are people arrested or --

19           THE WITNESS:  Yes.

20           THE COURT:  -- convicted or -- in the survey?  What?

21           THE WITNESS:  Arrested.

22   BY MR. SCHWARTZ:

23   Q    And just so -- for the Court's knowledge, do you ever

24   look at the images of child pornography?

25   A    No.

1    Q      And --

2    A      There are no exceptions for researchers, so our

3    information is based on what law enforcement investigators

4    tell us, and also some of the research I'm doing now with

5    computer scientists at the University of Massachusetts, all of

6    that is based on a system that the police have of digital

7    identifiers that identify child pornography images, and there

8    are some descriptions.

9            There's the titles of these files and they're -- and

10   the police have described those files, but we never look at

11   the images.  That would be illegal.

12   Q      But the people you survey, they have had the opportunity

13   to --

14   A      The police, yes, in the course of criminal

15   investigations, they have looked at the images, and we do ask

16   them when they're answering our questions to have the case

17   files there so they can specifically refer to that case.

18   Q      In your role at the Crimes Against Children Research

19   Center do you research trends and growth rates of the types of

20   child pornography produced?

21   A      Yes.

22   Q      And what has your research shown regarding the largest

23   area of growth in child pornography production?

24   A      Well, when we -- and this is our National Juvenile Online

25   Victimization study -- our arrest study I'll call it, we found

1    that between the year 2000 and the year 2009, there was a jump

2    in the number of adolescent victims that we were finding.   In

3    our first study in the year 2000, less than half -- I think it

4    was -- it was close to half, about 47 percent of victims were

5    adolescents, and in our last study it was I think around 70

6    percent of victims were adolescents.

7    Q    When you interview law enforcement for your surveys, what

8    methods are those law enforcement officials to find, track and

9    arrest the producers and possessors of child pornography?

10   A    Well, another big change has been how these cases come to

11   the attention of the police because early on in 2000 it was

12   mostly reports or the police were investigating child sexual

13   abuse cases and coming across images.

14        Now the police have developed ways to monitor child

15   pornography images in peer to peer networks and so there's

16   been a very big jump in what the police call proactive

17   investigations.

18        They are going out and looking for offenders, and

19   mostly they are using software that monitors what can be found

20   in peer to peer networks.

21   Q    And what limitations, if any, are faced by the law

22   enforcement officers in their efforts to pursue child

23   pornography?

24   A    Well, the peer to peer monitoring software has found so

25   many cases that it's almost a triage system where the police

1    have to have a method for deciding who they're going to arrest

2    out of the possible targets out there.  They can't arrest

3    everybody because what the monitoring software will tell them

4    is this person has certain images that we know are child

5    pornography -- were they won't even say this person, I

6    shouldn't say that.

7              They'll say this IP address has -- is sharing these

8    files that we know to be child pornography.  Then what the

9    police have to do is when they decide to pursue a target, they

10   have to issue a subpoena to an internet service provider to

11   find out who this IP address is attached to, they have to

12   acquire a search warrant so they can go look at the computer,

13   they have to do regular investigation work to find out who was

14   actually using that computer and who downloaded or was trading

15   images on it.

16             They have to do forensic examinations of the

17   material that's on the computer and all of those things take a

18   lot of time and resources.  So in general, the police are

19   picking certain offenders rather than being able to go after

20   every suspect.

21   Q    Okay.  Now, you indicated that you speak with prosecutors

22   about their work prosecuting child pornography?

23   A    Yes.

24   Q    Okay.  What specifically do you discuss with those

25   prosecutors?

 1   A     Well, we've done our study.  We did interviews with our

 2   last National Juvenile Online Victimization study of

 3   prosecutors, but also at the meetings I go to, there are often

 4   prosecutors there who are discussing their work.  And so from

 5   that, I have learned what the issues are regarding presenting

 6   and, you know -- presenting cases, what sorts of --

 7   Q     Well, how do --

 8   A     -- issues come up.

 9   Q     And how do prosecutors go about making a child

10   pornography case?

11   A     Well --

12               MR. MURRAY:  Objection, Your Honor.

13               THE COURT:  I don't really see why that's relevant.

14   I mean, they go about it like any other case.  They gather

15   evidence and they put witnesses in front of the Grand Jury and

16   they have agents do investigation.

17               MR. SCHWARTZ:  Well, there -- Your Honor, there is

18   -- there are certain --

19               THE COURT:  I mean, she's not a prosecutor and you

20   are but it's -- you know, we all know it's a crime --

21               MR. SCHWARTZ:  Sure.

22               THE COURT:  -- and there are cases so I just don't

23   know where this is going --

24               MR. SCHWARTZ:  Okay.

25               THE COURT:  -- in terms of the opinion she's going

1    to give.

2              MR. SCHWARTZ:  Okay.  Well, let me try one other

3    question.

4    BY MR. SCHWARTZ:

5    Q    Based on your discussions with prosecutors and how they

6    go about their cases, what difficulties do they face in

7    charging child pornography cases?

8    A    Well, they --

9              MR. MURRAY:  Objection.

10             THE WITNESS:  The largest difficulty is --

11             MR. MURRAY:  Your Honor, I made an objection.  I

12   don't know that I was heard.

13             THE COURT:  Oh, I'll overrule it.  I'll listen to it

14   but I'll -- but go ahead, give your testimony.

15             THE WITNESS:  Prosecutors have to charge specific

16   images and one of the major difficulties can be proving the

17   age of a child in an image because particularly when images

18   show adolescence, it can be difficult to distinguish a

19   sexually mature 13 or 14-year-old from an 18 or 19-year-old

20   who's an adult.

21             So what prosecutors often do is charge images of

22   prepubescent children because as I said, most suspects who

23   were arrested have images of both.  When you're charging the

24   image of a prepubescent child it's not so much of an issue of

25   is this a victim who's under 18.

1          MR. SCHWARTZ:  All right.

2          THE COURT:  Well, just so everybody knows, the over

3   -- and this is in this courthouse, not just with me, in the

4   overwhelming majority of cases of child pornography, the

5   defendant stipulates that the image is of a minor and I've had

6   -- I've had one case where the defendant did not stipulate but

7   it was obvious that these were young children -- you know,

8   five and under.

9          So I say that for what it's worth but, I mean, she's

10  right that you -- if there's no stipulation then you have to

11  prove that the image is of a minor.

12         MR. SCHWARTZ:  Right.

13  BY MR. SCHWARTZ:

14  Q    What can law enforcement do with images they find to help

15  verify ages of victims?

16         MR. MURRAY:  Objection, Your Honor.

17         THE COURT:  Overrule.

18         THE WITNESS:  Well, there's a program run by the

19  National Center for Missing and Exploited Children that law

20  enforcement -- it's called the Child Victim Identification

21  Program and many law enforcement agencies all across the

22  country -- I think in our last survey it was about 80 percent

23  of the cases had been submitted to the Child Victim

24  Identification Program.

25         Basically a law enforcement agency will send in a

1    secure way the images that are found in a particular case, and

2    there is an automated system for reviewing those images to

3    determine two things.  First of all, are these images that we

4    have seen before or are they new, so possibly there are

5    victims that have not been previously identified, and also do

6    we know who the victims are in these cases.

7              THE COURT:  Now, let me just ask a question.  And,

8    Mr. Murray, as I've said before, every one of the witnesses

9    that you've called has stated unequivocally that they are

10   opposed to employing people under 18 in sexually explicit work

11   product that they produce, isn't that correct?

12             MR. MURRAY:  Absolutely, Your Honor.

13             THE COURT:  All right.  Now, the next question is

14   that most of them who -- at least I think all of them who were

15   asked and therefore most of them have agreed that it is

16   appropriate to secure photo documentation from somebody who's

17   going to be employed in one of their sexually explicit photos

18   so they can be sure the person that they're employing is 18 or

19   over, isn't that correct?

20             MR. MURRAY:  They've testified that yes, they will

21   check ID's --

22             THE COURT:  And you don't --

23             MR. MURRAY:  -- absolutely.

24             THE COURT:  -- you don't dispute the Constitution --

25   well, do you dispute the constitutionality of 2257 to the

1    extent that it requires that photo documentation to be -- that

2    they produce or secure it in the first instance?

3              MR. MURRAY:  Well, yes, because you cannot -- 2257

4    doesn't really allow you to separate that from all the other

5    burdens so it is not --

6              THE COURT:  Well, it's because --

7              MR. MURRAY:  -- for example --

8              THE COURT:  Okay, but you don't object to it, at

9    least as to youthful looking performers, would that be

10   correct?

11             MR. MURRAY:  Yes.  We wouldn't object to a

12   congressional requirement that said check ID's for youthful

13   looking actors and actresses.  But our problem is 2257 does

14   way much more than that.

15             THE COURT:  Well, I understand that.  Okay.  So what

16   Mr. Murray said, who's counsel for the plaintiffs here, is

17   that all of the people who've testified in this case on behalf

18   of the plaintiff who are producers of sexually expressive

19   videos have said that they are not interested in hiring

20   anybody who's under 18.  Are you aware of that as a general

21   matter before I said that?

22             THE WITNESS:  Am I --

23             THE COURT:  You're aware that there's a lot of

24   sexually explicit material on the internet and on news stands

25   and things like that, correct?

1          THE WITNESS:  Yes.

2          THE COURT:  All right.  And are you aware that at

3     least -- or maybe -- well, let me ask -- maybe you're getting

4     there and I don't mean to interrupt your testimony but I'm

5     trying to get what I think is important, that many producers

6     and all the producers who have testified in this trial have

7     said they're not interested in hiring anybody under 18 so and

8     several of them said they -- even if this law wasn't there,

9     they would satisfy themselves before hiring somebody that they

10    were 18 or over, okay?  Are you aware of that before I said

11    this, or not?

12         THE WITNESS:  I think what I'm aware of -- and it's

13    not -- I'm not at all an expert in the adult pornography

14    industry -- is that there are many scrupulous producers of

15    adult pornography, but I would wonder if there are other much

16    less scrupulous --

17         THE COURT:  Okay.  All right, so --

18         THE WITNESS:  -- producers --

19         THE COURT:  So --

20         THE WITNESS:  -- who would produce commercial

21    material.

22         THE COURT:  Okay.  All right.

23         THE WITNESS:  That would be my question.

24         THE COURT:  Okay.  All right.

25         Go ahead.

1                MR. SCHWARTZ:  And, Your Honor, just so you're

2       aware, we're sort of in an odd procedural standpoint in that

3       obviously Ms. Wolak was brought forth to counter what we

4       anticipate Dr. Lenz saying about the prevalence of child

5       pornography --

6                THE COURT:  And he hasn't testified yet.

7                MR. SCHWARTZ:  -- and he hasn't testified yet so --

8                THE COURT:  Okay.  And you know his report and

9       you're anticipating it, which is --

10               MR. SCHWARTZ:  Yes.

11               THE COURT:  -- which is proper.

12               MR. SCHWARTZ:  Right.

13               THE COURT:  I'm going to allow her to testify but --

14               MR. SCHWARTZ:  And it's -- you know, again, we're

15      not --

16               THE COURT:  Okay.

17               MR. SCHWARTZ:  -- it's not much.  We're going to be

18      done quickly.

19               THE COURT:  All right.  But nobody disputes that

20      child pornography is criminal and that it is a problem because

21      of the -- and I've said this many times as have many other

22      Judges, the problem is child pornography and why the penalties

23      are so high and the Sentencing Commission has said this as

24      well, is that there needs to be a deterrent against anyone

25      having a demand for child pornography because as long as

1    there's a demand, then there are going to be people who are

2    willing to get these children to pose for these pictures.

3          If there was no demand, it would dry up.  But

4    because there's a demand -- and a lot of the photographs are

5    produced overseas, isn't that right?  Do you know?

6          THE WITNESS:  All of our research only has to do

7    with producers here.

8          THE COURT:  Producers in the United States?

9          THE WITNESS:  Right.

10          THE COURT:  Oh, okay.

11          THE WITNESS:  And frankly, nobody knows for example

12   how many victims are pictured in all the images that are

13   floating around out there when those pictures were produced or

14   how many are duplicates.

15          THE COURT:  Okay.

16          THE WITNESS:  There's a lot that people don't know.

17          THE COURT:  All right.

18          THE WITNESS:  So it could be that many are produced

19   in other places, but there's no research that specifically can

20   say what is produced where.

21          THE COURT:  Okay.

22          Go ahead.

23   BY MR. SCHWARTZ:

24   Q    So we were talking about the Child Victim Identification

25   Program at the National Center for Missing and Exploited

1    Children and you discussed that images are submitted by law

2    enforcement?

3    A    Correct.

4    Q    Okay.  How many images have been submitted to the Child

5    Victim Identification Program for screening?

6    A    Well, according to their information since the program

7    started in 2002, about 80 million images have been screened by

8    them, and they also said that during 2011, it was about 17

9    million images were screened.

10             Now again, these wouldn't be -- a lot of these would

11   be duplicate images probably, but that's how many have been

12   submitted by law enforcement and screened.

13   Q    And has there been any research to determine what

14   percentage that 80 million represents of the total child

15   pornography that can be found online?

16   A    There's no way to know that that I know of.

17   Q    Now, how does the Child Victim Identification Program

18   identify its victims -- the victims that have been submitted

19   -- the pictures?

20   A    Yes.  Well, they have a large automated system and they

21   know -- the last I looked, it was between two and 3,000

22   victims I believe that had been identified.  In other words,

23   they knew who these children were and they knew what happened

24   to them.

25             Often what happens when the police submit images,

1    it's a case where for example they know -- they know an

2    offender was sexually abusing children and they know the same

3    person had a large collection of child pornography.  One thing

4    they often want to know was was this person photographing the

5    children he was victimizing.

6             So often, that's how they determine an unidentified

7    victim; they realize oh, there are new images here, we haven't

8    seen them before, and yes, these are the victims in this child

9    sexual abuse case.

10   Q    And through that process, are they able to identify the

11   ages of the victims?

12   A    Yes.

13   Q    Does the Child Victim Identification Program release any

14   statistics regarding the data it has gathered from the

15   screening process?

16   A    They've cited statistics at a number of different points

17   in time.  For example, there was actually a research brief

18   that was filed in a case where of the identified victims, they

19   pointed out that more than half had been photographed as

20   adolescents.

21            And I think most of their statistics, because as I

22   said, they update them at various time points, it's about 50%

23   of their victims have been photographed as adolescents.

24   Q    Now, in your research and in your knowledge, is there any

25   way to estimate how much child pornography exists?

1    A    I don't think there is any way to do that now, and I'm

2    not sure there ever will be because it can be distributed and

3    is distributed through so many different venues.  On the

4    internet, you would have to know every single place that it

5    was being posted or distributed.

6           And then the other big issue is you have to identify

7    what is child pornography and what isn't, and that in itself

8    is also difficult.  Files may be labeled as if they're child

9    pornography, yet not be.

10          Files may be labeled as if there something else, and

11   they contain child pornography.  It's a very -- it's very

12   difficult to pin down in any way exactly how many images are

13   out there and how many places you can find them.

14   Q    In his report, Dr. Lenz cites to a 1992 study to suggest

15   that most child pornography is made by those who know the

16   victims, and he refers to this as homemade child pornography,

17   and thus does not appear in a commercial context.

18          Based on your knowledge and research, do you have an

19   opinion regarding this division between homemade and

20   commercial child pornography?

21   A    Well, anything that's written in 1992 is completely out

22   of date because the internet really wasn't a factor until the

23   mid-to late 1990s in the distribution of child pornography as

24   far as I know.

25          It might have been just beginning at that time point

1   but it was later in the decade that the internet became a huge

2   factor.  I'm not sure it makes sense to make -- when you're

3   talking about production of child pornography, the taking of

4   the pictures, I'm not sure it makes sense to make a

5   distinction between commercial and home made.

6           In certainly almost every case we have seen, the

7   producer who's taking the pictures knows that victim,

8   sometimes as a family member, sometimes in other contexts.  I

9   have seen cases where offenders were paying kids to pose,

10  usually young teenagers.

11          But again, it wasn't the kind of commercial that you

12  would -- commercial enterprise that you would analogize to any

13  other commercial photography or modeling or anything like that

14  that's on any sort of a big scale, that I know of.  Although

15  there have been some fake modeling agency cases that have had

16  many, many victims.

17          And again, it's usually one person, sometimes

18  paying, sometimes not.  But I guess the distinction is between

19  seeing something as a crime and a legitimate -- you know,

20  commercial enterprise.

21          Also, in terms of accessing images, there are

22  commercial websites defined as websites that you have to pay

23  money to access, but most of the circulation that I know of,

24  most of the cases, people either are in a group that's

25  circulating images, or they're acquiring images for free

1    through peer to peer networks.

2    Q    And you just mentioned that you're aware of there are

3    ways to access child pornography through an actual commercial

4    website.  How does one do that?

5    A    Well, the main source of information that I know of is

6    the internet Watch Foundation that monitors -- for the

7    European union -- monitors websites and they have reported the

8    number of web --

9              MR. MURRAY:  Your Honor, I'm going to object.  I

10   think this is hearsay upon hearsay at this juncture.

11             THE COURT:  Well, how -- what's your familiarity

12   with this?  What's it called?  Internet Watch?

13             THE WITNESS:  The Internet Watch Foundation.

14             THE COURT:  What is your personal experience with

15   that?

16             THE WITNESS:  I know some of the people who work

17   there, but also, they post reports on their website and I read

18   those just as part of keeping up on my knowledge --

19             THE COURT:  Okay, all right --

20             THE WITNESS:  -- about the field.

21             THE COURT:  -- I'll overrule the objection.

22             THE WITNESS:  So in their last report, I believe

23   they reported finding about 9,500 web pages that contained

24   child pornography and about a quarter of those were commercial

25   websites that you had to pay for access to and they described

1    -- as far as I know there are really two ways that you find

2    your way to those websites.

3              One is in you're in some sort of a group, and

4    actually that's the main way, you have to be in some sort of a

5    group because the pathways -- you have to know usually

6    specific links to get to those websites and they were

7    describing certain websites that if you were to access it as a

8    member of the general public, you would find adult --

9    legitimate adult pornography, but you might -- but if you had

10   access through a specific link, that the same hosting

11   organization would have a link that hosted through to child

12   pornography.

13             They analogized it to a member of the general public

14   signing on to amazon.com and gets one webpage where if you're

15   a member of amazon.prime, you get another different web page,

16   and that's how -- they were saying that's how those websites

17   work.

18   Q    In his report, Dr. Lenz also states that age verification

19   requirements overburden commercial producers of legal adult

20   pornography because child pornography is an insubstantial part

21   of the overall commercial pornography market and because most

22   is transferred through peer to peer networks.

23             Based on your knowledge and research into child

24   pornography and peer to peer networks, do you have an opinion

25   about this conclusion?

Wolak - Direct (Sch)                                      48

1   A     I don't think anybody knows what proportion of child

2   pornography -- or what the ratio of child pornography to adult

3   material is out there.  I would certainly say that the amount

4   of child pornography that's on the internet is not

5   insubstantial.

6          I think it's very clear that there are millions of

7   images probably circulating on peer to peer networks.  The

8   amount of child pornography that's circulating in other

9   sources is really unknowable because it's so hard to tap into

10  those sources.

11  Q     In his report, Dr. Lenz also opines that sources of

12  private, noncommercial, sexually explicit expression or

13  sexting include Facebook, Twitter, Instagram, private forums,

14  image sharing services, streaming video and read it

15  (phonetic).  Do you recall that statement?

16  A     Yes.

17  Q     Do you have an opinion of whether these forms of

18  communication can also be used to transmit child pornography?

19  A     Yes --

20  Q     And --

21  A     -- they can and --

22  Q     I'm sorry.

23  A     -- generally when people are transmitting child

24  pornography, which is illegal, they're going to use more

25  private sources.  So for example, they're going to use a

Wolak - Cross (Mur)

1    service that has a way of -- that's not open to the public.

2    But aside from that, any -- any way that a photograph can be

3    transmitted or posted on the internet can be used for child

4    pornography.

5    Q    And how are these sort of social networks, how does --

6    how does that differ from a peer to peer network?

7    A    Well, most of those cases are going to have a private

8    page and there are members who have access to that private

9    page.

10              MR. SCHWARTZ:  Your Honor, that's all I have at

11   this time.  I would like to introduce Exhibit 210, which is

12   Dr. -- Mrs. Wolak's CV, and 211, which is her expert report.

13              THE COURT:  All right, they'll be admitted.

14              MR. MURRAY:  Your Honor, no, I would object to -- I

15   have no problem with the CV, but I would object to the report.

16              THE COURT:  Oh yes, the report, no, I'm sorry --

17   which is the CV?

18              MR. SCHWARTZ:  The CV's 210.

19              THE COURT:  Yes, that's admitted.  No, the report

20   does not come into evidence.

21              MR. SCHWARTZ:  Okay.

22              THE COURT:  Sustained.  All right, thank you.

23              We'll have cross-examination.

24                        CROSS-EXAMINATION

25   BY MR. MURRAY:

Wolak - Cross (Mur)

1    Q     Good morning, Ms. Wolak.

2    A     Good morning.

3    Q     The -- you have a master's degree in sociology, I

4    believe?

5    A     Yes.

6    Q     And so you do not have a Ph.D in sociology?

7    A     Correct.

8    Q     Okay.  Now, the fact that you didn't have a Ph.D made it

9    somewhat difficult for you to get promoted initially when you

10   were first employed at the University?

11   A     What it --

12              MR. SCHWARTZ:  Objection.  Relevance.

13              THE COURT:  Overruled.

14              THE WITNESS:  What it meant was at one point I was

15   appointed as a research assistant professor.  I have -- I

16   couldn't get promoted because I don't have a Ph.D that is

17   associated with a specific department at the university, so I

18   switched tracks from the professorial track to the research

19   scientist track, and I do qualify.  I have a terminal degree

20   -- terminal legal degree and so I qualified as a research

21   scientist.

22   Q     Okay.  And so that's --

23   A     To get a promotion, right.

24   Q     Right.  And then you were given the title of senior

25   research assistant?

Wolak - Cross (Mur)

1   A    I'm a senior researcher.  Our organization is not very

2   hierarchical so --

3   Q    But that is your title?

4   A    That is my title, yes.

5   Q    Okay.  And is it true that everyone else in the

6   department has a Ph.D?

7   A    Yes.

8   Q    Okay.  Now, and I think you've indicated you've not been

9   qualified as an expert in any case before today?

10  A    Correct.

11  Q    Okay.  And the focus of your research over the past

12  several years has been on child pornography and child abuse,

13  particularly related to the internet, is that correct?

14  A    Yes.

15  Q    And your research has not been focused on sexually

16  explicit images involving adults, correct?

17  A    Yes, correct.

18  Q    Okay.  Now, in your report, you state that it can be

19  difficult to distinguish teens aged 17 and younger from 18 and

20  19 year olds who are legally adults, correct?

21  A    Yes.

22  Q    Okay.  Now, you would agree that there is a substantial

23  amount of child pornography that involves very young children

24  who are prepubescent?

25  A    Yes.

Wolak - Cross (Mur)

1   Q    Even as young as three years old you've seen, correct?

2   A    I haven't seen it but I'm aware of it, yes.

3   Q    And I don't mean seen in the -- you've come across

4   evidence that even young children as young as three have been

5   involved in prosecutions for child pornography, correct?

6   A    Yes.

7   Q    Now, you would agree that young children, say ten years

8   and younger, are not going to be confused as adults?

9   A    Yes.

10  Q    Okay.  And it's easy to identify a sexual image of

11  children ten years and younger as being child pornography,

12  correct?

13  A    Yes, as long as there's no sexual development in terms

14  of --

15  Q    Right.

16  A    Right, physical sexual development.

17  Q    And actually a majority of 11 and 12 year old children,

18  not all but a majority of 11 and 12 year old children aren't

19  going to be confused as adults, correct?

20  A    Probably a majority but that -- but knowing what

21  percentage of children reach puberty and the state -- and then

22  the different stages of sexual development is outside of my

23  area of expertise.

24  Q    Well, would you agree that a majority of 11 and 12 year

25  old children are not going to be confused as adults?

Wolak - Cross (Mur)

1    A    I would agree that the majority of 11 and 12-year-old

2    children have certainly not reached full sexual maturity so

3    that they would be confused with adults.

4    Q    Okay.  Now, all right, so let's talk about the arrests

5    for child pornography possession that you have studied.  You

6    have in fact published some articles about that, have you not?

7    A    Yes.

8    Q    Okay.  And one of the articles that you published in

9    April of 2012 was Trends in Arrests for Child Pornography

10   Possession, the Third National Juvenile Online Victimization

11   Study, correct?

12   A    Yes.

13   Q    And in that article -- and you were one of the authors of

14   that article, correct?

15   A    Yes.

16   Q    Along with Dr. Finkelhor, who is the head of your

17   department, correct?

18   A    Yes.

19   Q    And Dr. Mitchell (phonetic), who is another colleague of

20   yours?

21   A    Yes.

22   Q    And one of the things that you said in that report is

23   that the content of child pornography -- well, let me back up.

24   This was an article that compared what the situation was

25   between 2000 and 2009, the trends, correct?

Wolak - Cross (Mur)

1    A    Yes.

2    Q    And one of the things that you noted in your report in

3    terms of the content of child pornography possessed by

4    arrested offenders, you said, "Most arrested offenders had

5    images of children ages six to 12, images of girls and images

6    that depicted sexual penetration of a child," correct?

7    A    Yes.

8    Q    And for example, you indicated that of all the arrested

9    child pornography possessors who had images ages six to 12, 87

10   percent in 2009 of those arrested for child pornography

11   possession had images of children ages six to 12, correct?

12   A    Yes.

13   Q    And that's actually up from 86 percent in 2006 and 83

14   percent in 2000, correct?

15   A    Yes, but that's not a statistically significant

16   difference, so it's about the same.

17   Q    Right, it's a slight increase but I understand you're

18   saying it's not a big enough increase to reach the level of

19   statistical significance.

20   A    Correct.

21   Q    Okay.  Well, but 87 percent of the people who were

22   arrested had images of children in that age group of six to 12

23   that you agreed most of whom could not be confused as adults

24   in that age group, correct?

25   A    Well, one of the -- there's actually --

Wolak - Cross (Mur)

1    Q    Well, can you answer the question --

2              THE COURT:  Well answer yes or no and then you can

3    explain.

4              THE WITNESS:  Can you repeat the question please?

5              MR. MURRAY:  Yes.

6    BY MR. MURRAY:

7    Q    I think you've agreed that if they're ten years old and

8    younger, children are not going to be confused with adults,

9    correct?

10   A    Yes.

11   Q    Okay.  And you also agree that most 11 and 12 year olds

12   are not going to be confused as adults, but there may be some,

13   correct?

14   A    Correct.

15   Q    Okay.  So all I'm saying is that in that age category, 87

16   percent of those arrested were arrested with images of

17   children in the age group of six to 12, the vast majority of

18   whom could not be reasonably confused as adults, isn't that a

19   fair conclusion?

20   A    The reason I'm hesitating is that the children who are

21   portrayed in child pornography or not necessarily

22   representative of all the children who are out in the

23   population, but probably that is the case.

24   Q    So probably the answer to my question is yes?

25   A    Yes.

Wolak - Cross (Mur)

1    Q    Now, in fact, isn't it true that one of the group of

2    people with a pathologic condition who would be interested in

3    child pornography would be pedophiles, correct?

4    A    Yes.

5    Q    And that is a recognized aberration even defined by DSM-4

6    or DSM-5 -- whichever volume they're up to now, correct?

7    A    Yes.

8    Q    And the definition of a person who has that pathology is

9    what?

10   A    A pedophile has a sexual interest in prepubescent

11   children.

12   Q    And prepubescent children are children who would not

13   ordinarily be confused with adults --

14   A    Correct --

15   Q    -- correct?

16   A    -- no sexual development.

17   Q    Okay.  Now, you mentioned on direct examination that a

18   certain percentage of the people arrested for child

19   pornography possession had images of individuals ages 18

20   through 17, is that correct?

21   A    Yes, based on the information that we received from

22   investigators who worked on those cases.

23   Q    Now, it's true, is it not, that -- it is true that those

24   people also had images of younger children for the most part?

25   A    In many cases, yes.

Wolak - Cross (Mur)

1    Q    In most cases, wouldn't you agree that the people who

2    were arrested who had images of 13 to 17-year-olds also had

3    images of younger  --

4    A    Yes.

5    Q    -- including prepubescent children?

6    A    Yes, over 80 percent --

7    Q    Okay.

8    A    -- had images of younger.

9    Q    Now, in addition, the information that you got, the ages

10   that you just recited, at least the 13 to 17-year-olds, came

11   from your telephone interviews with investigators that you

12   spoke with after you sent out your survey in the mail,

13   correct?

14   A    Yes.

15   Q    And he didn't ascertain from his investigators how they

16   were able to determine the ages of the children who were

17   depicted and particularly the ones that they said were 13 to

18   17, correct?

19   A    Yes.

20   Q    And so you weren't able to verify that information,

21   correct?

22   A    No, we simply asked the question and accepted the answer

23   that they gave.

24   Q    Now, I'm not sure that you ended up disagreeing with Dr.

25   Lenz on this, but let me -- let me make sure that I understand

Wolak - Cross (Mur)

1    your testimony.  It is true, is it not, that much of the child

2    pornography that exists is made by family members or

3    acquaintances of the victim?  Isn't that true?

4    A    Yes.

5    Q    Okay.  And in fact, that's something that you report

6    about in your literature as well, is it not?

7    A    Yes.

8    Q    You wrote an article along with Dr. Finkelhor and Dr.

9    Mitchell entitled Trends in Arrests for Child Pornography

10   Production, correct?

11   A    Yes.

12   Q    Earlier when we looked at your article -- it's almost the

13   same title but it was Trends in Arrests for Child Pornography

14   Possession, correct?

15   A    Yes.

16   Q    So you broke it down into two articles, the child

17   pornography possessors, and then the child pornography

18   producers, correct?

19   A    Right, they're very different crimes.

20   Q    Okay.  And that was April, 2012 as well, was it not?

21   A    Yes.

22   Q    Okay.  And on page two of your article, you make a

23   distinction -- it was interesting -- between child pornography

24   produced by adult perpetrators and some images that are

25   created by teenagers of each other, correct?

Wolak - Cross (Mur)

1    A    We made a distinction between images produced by adults

2    who photographed minors and minors who photographed

3    themselves.  Usually they were not photographing each other.

4    Q    Okay.  So and in fact I think you have a little box on

5    page two defining what are youth-produced sexual images,

6    correct?

7    A    Right.

8    Q    Okay.  All right so when you look at this part of your

9    article that I'm pointing to, in terms of adult produced

10   images, you say in 2009 compared to cases of youth produced

11   images, cases of adult produced images were more likely to be

12   perpetrated by a family member, and you said 51 percent of

13   adult produced image cases versus six percent of youth

14   produced, correct?

15   A    Correct.

16   Q    And so you found that a majority of the adult produced

17   images were done by family members, correct?

18   A    Yes.

19   Q    And you also found that a majority of those had victims

20   younger than 12 years of age, correct?

21   A    Yes.

22   Q    And then -- and then apart from family members, the other

23   half, the other population of victims, arrested in 2009 were

24   acquaintances of victims, correct?

25   A    Correct.

Wolak - Cross (Mur)

1   Q    So almost a very high percentage of the images of child

2   pornography that were produced, at least looking at 2009, were

3   of either family members or acquaintances, correct?

4   A    Yes, and that's typical of child pornography production

5   and of sexual abuse in general that you find with the youngest

6   victims it's a family member because at that point, you have a

7   lot of -- you have a lot of -- those are the family members

8   who have a lot of control and access to very young victims.

9        And then when children reach adolescence, most of

10  the abusers tend to be acquaintances, and acquaintances, it's

11  a -- it's a broad term and in most cases it's adults that are

12  known in some aspect of the child's life.

13       It can be, for example, the sorts of coaches, youth

14  group leaders, priest cases that we've seen a lot of publicity

15  about.  It can be neighbors.

16  Q    Okay.

17  A    And in some cases, it is other youth.

18  Q    All right.  So just so that it's clear on the record what

19  your answer to my question is, the vast majority of cases do

20  include either family members or acquaintances?

21  A    Yes.

22  Q    Okay.  Now, it is true, is it not, that you mentioned

23  prosecution of child pornography cases.  That's something you

24  studied as well, correct?

25  A    Yes.

Wolak - Cross (Mur)

1   Q    And you would agree that the percentage of child

2   pornography cases that are successfully prosecuted is

3   extremely high?

4   A    Yes.

5   Q    Okay.  And I think you would agree one of the reasons for

6   that is that most child pornography possessors who are

7   arrested have lots of images, not just a couple, correct?

8   A    Yes.  It's particularly true with the peer to peer cases

9   that we see a lot of now because that's generally how the

10  police decide who to pursue.  They pursue people who have a

11  lot of images.  They have a choice and they tend to know what

12  people have in their shoulders.

13  Q    Right.  But the point --

14  A    And so they make their decisions --

15  Q    Yes.

16  A    -- based on that.

17  Q    But you would agree that the most people who are arrested

18  for child pornography have lots of images that they've

19  possessed, correct?

20  A    The only reason I'm hesitating is some people have huge

21  numbers of images, some people have smaller quantities of

22  images, and I can't remember the exact statistics from our

23  last study about how many people had how many images.  But

24  certainly a lot of arrested offenders have great quantities of

25  images, meaning thousands.

1   Q    Okay.

2   A    And sometimes more.

3   Q    Okay.  Now, and you're aware of no -- your research

4   uncovered no acquittals of child pornography processing cases

5   that actually went to trial?

6   A    I don't think we found any acquittals.  If we did, it was

7   only one or two.

8   Q    Okay.  Now, you mentioned that the charges that were

9   brought against people who produced or possessed child

10  pornography were that -- production of child pornography,

11  possession of child pornography, sometimes they were charged

12  with child abuse of some kind -- molestation, correct?

13  A    Correct.

14  Q    One of the things that you didn't mention is any charges

15  brought under 2257.  To your knowledge, none of these

16  prosecutions for child pornography included charges that they

17  violated the 2257 law, to your knowledge?

18  A    To my knowledge.  We didn't specifically ask, but nobody

19  ever mentioned to that, to my knowledge.

20  Q    And you have no evidence whatsoever to suggest that any

21  of these child pornography arrestees, whether they were

22  producers or possessors, ever complied with the requirements

23  of 2257, you have no evidence to suggest that, do you?

24  A    Again, we didn't ask but it was not something that ever

25  came up, to my knowledge.

Wolak - Cross (Mur)

1  Q    Okay.  Now, let's talk a little bit about how child

2  pornography is distributed.  You testified that the -- that

3  the most common way that it's circulated is on peer to peer

4  networks, correct?

5  A    Yes.

6  Q    Okay.

7  A    Again, there's so many ways that it can be distributed,

8  but to my knowledge, the most common way is your to peer

9  networks.

10 Q    Okay.  And so in that sense, you agree with Dr. Lenz's

11 conclusion that that's the most common way that it is

12 circulated, correct?

13 A    I think that is probably the case.

14 Q    Okay.  Now, in fact, let's take a look at your article on

15 the subject, going back to the Trends in Arrests for Child

16 Pornography Possession.  In the abstract itself, you write "In

17 2009, a substantial proportion of arrests for child

18 pornography offenders used peer to peer -- P2P file sharing

19 technology to access contraband images," correct?

20 A    Yes.

21 Q    And you actually give us a good definition of what peer

22 to peer file sharing networks mean, correct?

23 A    Well, I hope it's a good definition.  It's not a very

24 technical definition.

25 Q    Okay.  And what you write is basically that "It's a

Wolak - Cross (Mur)

1  sharing network that allows users to search for and download

2  electronic files directly from other computers.  The

3  participants download software that connects them to a network

4  of users.

5        They upload files into folders for sharing with

6  others in the network and use search terms to find files to

7  download.  Media attention has focused on copyright violations

8  when music and videos are exchanged in file sharing networks,

9  but users also share pornography legally and illegally,"

10  correct?

11  A    Yes.

12  Q    Now.  There's a -- is there a name of the software that

13  you can download -- something called Granella (sic)?

14  A    There is -- there are several major peer to peer

15  networks.

16  Q    And --

17  A    One of them is called Gnutella.

18  Q    I'm sorry, Gnutella.  Okay, so an individual who wants to

19  access peer to peer networks can obtain Gnutella software to

20  download on his computer?

21  A    Not exactly.  You -- different -- you download different

22  network applications to access specific networks, so if you

23  wanted to access Gnutella, you would download software that

24  has a different name.

25        I'm not sure what's the most current, I think

Wolak - Cross (Mur)

1   there's something called Shariza.  It used to be Lime Wire,

2   but there was a legal case that shut them down, but I think

3   there is sort of an informal version of Lime Wire.  I'm not

4   really up to date with all the applications that people use

5   but basically there's several networks and networks have

6   different ways that you can -- different types of software

7   that you can download to access those networks.  And the

8   software has different names, usually within the network

9   itself.

10  Q    Okay.  So and that's different -- does your university

11  and your department have a website?

12  A    Yes.

13  Q    Okay.  So I don't need to download a peer to peer file

14  sharing network in order to access your website, do I?

15  A    No.

16  Q    I can go on --

17  A    Peer to peer --

18  Q    -- thank you -- I can go on Google and simply type in

19  your website address and it will come up, is that correct?

20  A    Correct.

21  Q    But I generally can't go on google unless I have that

22  additional application you described and access these peer to

23  peer networks, correct?

24  A    What you can do is you can google Gnutella or Bit Torrent

25  or Aries, which are some of the major networks, and you will

Wolak - Cross (Mur)

1    get information that will tell you how to access them --

2    Q    Okay.

3    A    -- and they'll direct you to a website --

4    Q    Right.

5    A    -- and you can download the website from there.

6    Q    But once I get on the peer to peer networks, now I can

7    access these files that another computer user has on his hard

8    drive, correct?

9    A    In his shared folder, not on his hard drive.

10   Q    And that's different from going on what we generally

11   think about when you go on websites to buy products or search

12   for retail goods -- that kind of thing, correct?

13   A    Correct, in that those are generally hosted on servers

14   and when you're using a peer to peer network, you're going

15   directly to another person's shared folder, an individual --

16   you're bypassing.  There are no servers involved.

17   Q    Okay.  And of course most producers, although you're not

18   necessarily familiar with this as an expert, but just

19   generally speaking, whether you're producing adult videos or

20   selling widgets, you're going to want people to be able to

21   access your website just by going on google and finding your

22   website and then being able to order product, correct?

23   A    Well, the virtue -- I can't really answer that question

24   yes or no.  The virtue of peer to peer to a lot of --

25   Q    Well, I'm asking about a different --

Wolak - Cross (Mur)

1    A    Okay.

2    Q    -- I'm not asking about peer to peer.  My question is if

3    you're a producer of widgets or adult movies or any other

4    product and you want to attract people to your website, people

5    can go on your website through Google and they can buy -- they

6    can make orders and byproducts, correct?

7    A    Right, if they want to pay --

8    Q    Okay.

9    A    -- for it.

10   Q    Now, and peer to peer I think you've indicated, that's

11   one of the ways that people were pirating movies, for example,

12   copyrighted, correct?

13   A    Correct.

14   Q    And that was one of the ways that people were able to

15   pirate and download music that you would otherwise have to pay

16   for if you did it legally, correct?

17   A    Correct.

18   Q    You mentioned the 80 million -- did you call them images

19   that were in the -- in the database?

20   A    Yes.

21   Q    But you were --

22   A    Well -- I'm sorry -- they weren't in a database.  My

23   understanding is -- I should let you finish your question.

24   Q    Yes.  You mentioned the 80 million pages I guess is what

25   you said.  What did you say was 80 million?

Wolak - Cross (Mur)

1    A    I believe what I said was that the National Center for

2    Missing and Exploited Children states that they have screened

3    80 million images from -- that they have received from law

4    enforcement agencies to determine if they can -- if the

5    victims in those images have been identified.  They match them

6    -- they have a large database, I don't know how many images

7    are in their database, but they have an automated program that

8    screens the images that law enforcement submits against what

9    is in their --

10   Q    Okay.  And you --

11   A    -- database.

12   Q    -- were careful to point out that this was not 80 million

13   images of different people.

14   A    Correct.

15   Q    That this included lots of duplicates of the same person?

16   A    Well, in general it's one of those things that we don't

17   know --

18   Q    Well, does it --

19   A    -- but --

20   Q    -- include duplicates of the same person -- the 80

21   million, isn't that what you said?

22   A    I'm assuming -- I am assuming that out of 80 million

23   images, there are many duplicates, and, certain victims are

24   actually known on the internet and have been photographed over

25   long periods of time, so some victims, there are many images

Wolak - Cross (Mur)

1   of that particular victim.  Also, it's a little -- one of the

2   reasons it's so hard to quantify child pornography --

3   Q    Excuse me, I think you've answered the question.

4   A    Okay.

5   Q    Let me pose a different one, if you don't mind, because I

6   want to follow up.  Then you I thought said something about

7   two to 3,000 victims had actually been identified by this

8   method?

9   A    That's my understanding, yes.

10  Q    Okay.  Now, and you mentioned the fact that you have no

11  way of estimating the total quantity of child pornography,

12  correct?

13  A    Correct.

14  Q    Okay.  You also mentioned something about a commercial --

15  a study done by an organization of commercial websites that

16  yield 9,500 webpages, do you recall that testimony?

17  A    The Internet Watch Foundation.

18  Q    Yes.  It is true, is it not, that there's no evidence

19  that that aspect of what was found by that watch group was

20  traced to United States servers, correct?

21  A    Correct.  Their website did not state anything about it

22  being traced to US servers.

23  Q    I mean, there was no evidence that US servers were

24  involved in that -- in those 9,500 webpages, correct?

25  A    As far as I know from the report.

Wolak - Cross (Mur)

1    Q    Okay.  Now, we've talked about earlier the fact that

2    children ten years and younger are not going to be confused as

3    adults.  Let's go to the other end of the spectrum.  You would

4    agree and hold the common sense opinion, would you not, that

5    adults who are at least 25 years or older are generally not

6    going to be confused as someone who is 17 years old or

7    younger?

8              MR. SCHWARTZ:  Objection.

9              THE COURT:  Overruled.

10         (Pause and proceedings)

11             THE WITNESS:  The issue for me for answering that

12   question is simply that we're talking about in child

13   pornography or in pornography, what we're often talking about

14   is naked bodies, and I simply don't know how likely it is that

15   a person in a pornographic image who's 25 could look younger.

16             For one thing, sexual attributes can be manipulated

17   in film, so I can't really answer that question.  I mean, in

18   most cases, if you're talking about people on the street, yes.

19   But I'm not so certain when it comes to sexually explicit

20   images.

21   Q    Doctor, you are --

22   A    I'm not a doctor, by the way.

23   Q    I'm sorry, you're right.  I apologize.  Ms. Wolak, you

24   were kind enough to allow me to take your deposition back on

25   April 30th of this year, correct?

Wolak - Cross (Mur)

1    A    Yes.

2    Q    And you were put under oath and I asked you questions and

3    you gave answers, correct?

4    A    Yes.

5    Q    And there was a court reporter that took all of the

6    answers down?

7    A    Yes.

8    Q    And you were there with I believe Mr. Schwartz was

9    representing you at that deposition?

10   A    Yes.

11   Q    And is it not true that at page 53 of your deposition and

12   continued on to page 54, i.e. ask you the following question

13   and you gave the following answer.

14           "Question:  Well, do you have an opinion on the

15   subject?  Is it your opinion or not that adults who are at

16   least 25 years or older are generally not going to be confused

17   as somebody who was 17 years old or younger?"

18           And your answer was, "I have the common sense

19   opinion that most people have that yes, that is the case.

20   However, I am being deposed as a researcher and as a

21   researcher I have a very sort of empirical take on these kinds

22   of questions and so as a researcher I would say I haven't read

23   any of the literature, if there is literature on the topic."

24           That was your answer, correct?

25   A    Yes.

Wolak - Cross (Mur)

1          MR. SCHWARTZ:  Your Honor, I'm going to object

2     because it's nothing consistent with anything she said on the

3     stand.

4          THE COURT:  Overruled.

5     BY MR. MURRAY:

6     Q    And then on page 58 you were asked the following question

7     and you gave the following answer.

8          "Question:  Okay, and I think we agree, although you

9     weren't necessarily basing it on any independent research

10    you've done, that adults who are at least 25 years or older

11    are generally not going to be confused as minors 17 and

12    younger, correct?"

13         And your answer was, "Well, I said I agreed in a

14    common sense way that most people would agree with that

15    statement, but it's not something I have any expert knowledge

16    about," correct?

17    A    Correct.

18    Q    Okay.  And for example, looking around this room, you

19    would have no difficulty concluding that all of the people in

20    this room are adults rather than minors, correct?

21    A    Well, yes, but as I said, again, this is a context in

22    which it's likely that no one would be a minor.

23    Q    Okay.  Well --

24    A    And as I said previously, I don't really have empirical

25    knowledge about the likelihood that someone in a sexually

Wolak - Cross (Mur)

1   explicit image who was 25 would be mistaken for someone who

2   was 17 --

3   Q    I understand.

4   A    -- which is a different context.

5   Q    But just looking around the room, you wouldn't need to be

6   an expert to come to the conclusion that the people in this

7   room -- while you wouldn't be able to ascertain their exact

8   ages, are over 18?

9   A    Correct.

10  Q    Okay.  Now, you have not researched the quantity of

11  sexually explicit images of adults, correct?

12  A    Yes, correct.

13  Q    And so don't have any information as to that quantity,

14  correct?

15  A    Correct.

16  Q    And therefore, you cannot tell us from your expertise, of

17  the entire universe of sexual images available on the

18  internet, what percentage is actually of child pornography,

19  you can't give us that percentage, can you?

20  A    No, I cannot.

21  Q    Okay.  And you also cannot tell us what percentage of the

22  universe of sexual images of adults on the internet is all of

23  youthful looking persons who could be confused as minors 17

24  years old or younger?

25           MR. SCHWARTZ:  Objection.  Outside the scope.

Wolak - Cross (Mur)

1        THE COURT:  Overruled.  Do you understand the

2    question?

3        THE WITNESS:  I think I do.

4        THE COURT:  Okay.

5        THE WITNESS:  Why don't you repeat it.

6        MR. MURRAY:  Yes, let me repeat it.

7    BY MR. MURRAY:

8    Q    You cannot tell us as an expert what percentage of the

9    universe of sexual images of adults is of person who are

10   youthful looking enough to be confused as minors 17 years old

11   or younger, correct?

12   A    Correct.

13   Q    Okay.  Now, you have testified I think on direct

14   examination that the various methods for the circulation of

15   adult images can be used to disseminate child pornography,

16   correct?

17   A    Correct, although --

18   Q    Such as Facebook, Twitter?  I mean, one could use that to

19   disseminate illegal images as well as lawful images, correct?

20   A    Correct, you could.

21   Q    Okay.  Now, in that regard, you do know that however

22   individuals who are adults do convey sexual images by various

23   private means, correct?

24   A    Yes.

25        MR. SCHWARTZ:  Objection.

Wolak - Cross (Mur)

1          THE COURT:  Overruled.

2    BY MR. MURRAY:

3    Q    For example, you've heard of social networking sites such

4    as Adult Friend Finder, correct?

5    A    Yes, I have.

6    Q    Okay.  And you're aware that adults can go on social

7    networking sites and can post sexual images of themselves to

8    share with like minded persons, correct?

9    A    Yes.

10   Q    Okay.  And they can do so by sexting, which is something

11   you wrote about as to teenagers, correct?  As to children?

12   A    Yes --

13   Q    Did you not write about sexting as to young people?

14   A    Yes.

15   Q    Okay.  You also know that adults 18 years old and above

16   send sexual images to each other from time to time by means of

17   a cell phone and we call that sexting, correct?

18   A    Yes, that's a different definition than we used in our

19   research but yes.

20   Q    Okay.  All right.  And so in terms of -- in terms of

21   rebutting Dr. Lenz's report, you read the part of his report

22   in which he indicates that in his opinion, many millions of

23   adult Americans exchange sex depictions and images by means of

24   cell phones and emails for their own private purposes?

25   A    I read that, yes.

Wolak - Cross (Mur)

1    Q    Okay.  And you don't have any basis for contradicting

2    that statement, do you?

3    A    My only basis would be I don't think there's any way of

4    knowing how many people do that, but I don't have any basis in

5    my own research.

6    Q    Okay.  So you don't have any basis upon which to dispute

7    that it's in the millions?

8    A    My basis would be I don't believe it's been measured.

9    Q    Well then you wouldn't have any basis to dispute that

10   it's in the -- in the millions, would you, one way or the

11   other?

12            THE COURT:  The question is not whether you agree

13   with it, the question is do you have any basis to dispute it.

14            THE WITNESS:  Well, my basis for dispute would be I

15   don't believe that it is possible to measure it and make

16   statements like that accurately.  I would agree there's a lot

17   probably.

18            MR. MURRAY:  Okay.

19   BY MR. MURRAY:

20   Q    Oh, one last thing.  Your expertise permits you to agree

21   I think and to say that child pornography is generally

22   produced by people who are intentionally creating it?

23   A    Correct.

24   Q    They're deliberately using children in sexual images,

25   correct?

Wolak - Cross (Mur)

1    A    Well, the complication is with things like the youth

2    produced images that we have encountered.  For example, when

3    you asked if I had heard of Adult Friend Finder, one of the

4    ways that I've heard of that is that I know of cases where --

5              MR. MURRAY:  Your Honor, I'm going to ask --

6              THE WITNESS:  -- underage --

7              MR. MURRAY:  -- that the witness --

8              THE WITNESS:  Okay.

9              MR. MURRAY:  I'm going to ask to strike this --

10             THE COURT:  Yes, you have to answer yes or no, and

11   then you can explain.

12             THE WITNESS:  Okay.

13             THE COURT:  Repeat the question.

14   BY MR. MURRAY:

15   Q    You have studied prosecutions for child pornography,

16   correct?

17   A    Yes.

18   Q    And child pornography production, correct?

19   A    Yes.

20   Q    And you have indicated that they have a high success rate

21   of prosecution, correct?

22   A    Yes.

23   Q    And in fact, you couldn't think of a single time when

24   there had been a trial and an acquittal, correct?

25   A    No, but there have been cases that were dropped --

Wolak - Cross (Mur)

1  Q    Okay.

2  A    -- but again, not very many.

3  Q    The prosecutions that you're familiar with and that

4  you've studied are of people who are deliberately using

5  children in sexual images, isn't that true?

6  A    Yes.

7  Q    Okay.  And these are people who are not complying, to

8  your knowledge, with 2257, are they -- isn't that true?

9  A    As far as I know, that statute has never come up or

10  complying with that statute has never come up.

11          MR. MURRAY:  That's all I have.

12          Well, may I have one moment, Your Honor --

13          THE COURT:  Yes.

14          MR. MURRAY:  -- to confer before --

15          THE COURT:  Sure.

16      (Pause in proceedings)

17          MR. MURRAY:  That's all I have.  Thank you very

18  much.

19          THE COURT:  All right.

20          Let me ask you this.  I know photography is not your

21  expertise, but are you generally aware that with digital

22  photography a person can change the image once they take a

23  picture of say of a live person, you then want to change the

24  picture, the -- there's technology and you can do that?

25          THE WITNESS:  Sure.

Wolak - Cross (Mur)

1          THE COURT:  Okay.  Now, are you ever aware in any of

2  your studies that a individual has taken a picture of somebody

3  who's an adult but let's say a younger looking adult, and

4  tried to manipulate the picture, the photograph, to make the

5  person look even younger?

6          THE WITNESS:  We --

7          THE COURT:  And I'm not -- I don't want you to

8  speculate.

9          THE WITNESS:  Yes.

10          THE COURT:  I want to know if you're aware of this

11  happening in any of your studies.

12          THE WITNESS:  I am aware and we have asked in child

13  pornography possession cases whether offenders had any

14  computer generated -- or morphed sometimes they're called --

15  images.

16          THE COURT:  What are they called?

17          THE WITNESS:  Morphed.

18          THE COURT:  M-O-R-P-H-E-D?

19          THE WITNESS:  Yes.

20          THE COURT:  What does that mean?

21          THE WITNESS:  They took an image and then added

22  someone's head to it.  For example, sometimes we've had cases

23  where an offender will take a picture of an adult and then a

24  picture of a child and put the child's head on the adult

25  image.

1           THE COURT:  Do you have any knowledge of the

2    prevalence of that?

3           THE WITNESS:  With child pornography possession

4    cases, it's very low.  In the cases we've -- arrest cases

5    where we've asked did they have any such images, I can't

6    remember the exact percentage -- I would have to look it up,

7    but it's only in cases where people have a large quantity of

8    other images also and a fairly small percentage of time, the

9    police will say yes, they also had these morphed or computer

10   generated --

11          THE COURT:  Are you aware --

12          THE WITNESS:  -- images.

13          THE COURT:  -- of any instances where the morphed

14   photo results -- not the head -- not the head being transposed

15   but the body or the naked body made to look younger?

16          THE WITNESS:  I can't think of any cases like that.

17   In most of the cases, there have been a very small number of

18   child pornography production cases that involved morphed

19   images.  I can give you a couple -- a scenario that I can --

20   that I can remember.

21          A stepfather who was creating images by using an

22   adult body and putting his stepdaughter's head on the body.

23   And in those cases, you had an identifiable child and an

24   arrest was made.

25          THE COURT:  All right.

1              Redirect?

2              MR. SCHWARTZ:  Very briefly, Your Honor.

3                        REDIRECT EXAMINATION

4    BY MR. SCHWARTZ:

5    Q     On cross examination you were asked about Adult Friend

6    Finder?

7    A     Yes.

8    Q     How did you become aware of Adult Friend Finder in your

9    research?

10   A     Well, I was going to say that we've also done a lot of

11   research about child sexual abuse cases that had an internet

12   component, and we have had cases of young adolescents -- 13

13   and 14-year-old girls who had been advertising themselves on

14   websites like Adult Friend Finder, lying about their ages.

15   Q     Thank you.

16              MR. SCHWARTZ:  Thank you, Your Honor, I have nothing

17   further.

18              THE COURT:  All right.

19              Recross?

20              MR. MURRAY:  No, Your Honor, thank you.

21              THE COURT:  Okay, thank you very much.

22              THE WITNESS:  You're welcome.

23          (Witness excused)

24              THE COURT:  Okay, well it's 11:15.  I'm not sure

25   it's worthwhile starting a next witness, Mr. Lawrence.  If we

1    were to resume say at 1:15, is there any problem completing

2    his testimony say by 4:30?

3              MS. WYER:  I'm not entirely sure.  I think that

4    would be fine, Your Honor.

5              THE COURT:  Well, do you want to start for ten

6    minutes?

7              MS. WYER:  We can wait.

8              THE COURT:  All right.  Okay, we'll let's start for

9    ten minutes.

10             MS. WYER:  No, I mean we can wait until after.

11             THE COURT:  All right.  Okay.  Well, why don't you

12   be back at 1:00, and but there may be a slight delay in

13   getting started, okay?

14             Yes, sir?  Mr. Murray?

15             MR. MURRAY:  Your Honor, since were about to go with

16   Agent Lawrence, just as a housekeeping matter, we would offer

17   into evidence Plaintiff's Exhibits 1 through 32 and would tell

18   the Court that the Government and the plaintiffs have agreed

19   that even though they are marked as plaintiff's exhibits, we

20   should regard them as joint exhibits.

21             THE COURT:  You should what?  Sorry?

22             MR. MURRAY:  Regard them as joint exhibits.

23             THE COURT:  Oh, joint exhibits, okay.  Okay, fine.

24   Okay, these are the exhibits that were used during his

25   deposition, sec correct?

1          MR. MURRAY:  Agent Joyner's deposition, yes.

2          THE COURT:  Yes, all right.  Okay.  All right, so

3     we'll adjourn now until 1:00, okay?  All right, you can label

4     your papers there.  We don't need the tables for what's going

5     to happen.  Well, I take that back.  When we have the guilty

6     plea, I think we're going to need a little bit of space.  If

7     you can put the papers over to one side, that might be a good

8     idea.

9          MR. MURRAY:  Your Honor, since we have a minute or

10    two, would you like to hear Ms. Baumgardner's report on the

11    task that you had assigned her --

12         THE COURT:  Yes, thank you.

13         MS. BAUMGARDNER:  Yes, Your Honor, I attempted to

14    follow your instructions here and I --

15         THE COURT:  One second.

16         Yes, on the record.

17         Yes, go ahead.

18         MS. BAUMGARDNER:  Okay.  May I approach?

19         THE COURT:  Yes.

20         MS. BAUMGARDNER:  I will give you -- and I've

21    provided a copy of this to the Government.

22         THE COURT:  Okay.  All right, so this is the revised

23    selections from Agent Joyner's deposition incorporating my

24    holdings and then as to the pages after 170, following my

25    ruling and -- is that correct?

Colloquy                                      84

 1              MS. BAUMGARDNER:  That's correct, Your Honor, but

 2     I --

 3              THE COURT:  And then the last -- the last part looks

 4     as to where I sustained the objections, is that right?

 5              MS. BAUMGARDNER:  Correct.  I listed everything that

 6     I thought -- trying to be faithful to your instructions about

 7     what you would sustain --

 8              THE COURT:  All right, thank you.

 9              MS. BAUMGARDNER:  -- and let in, following 170 on.

10     But I did want to bring to your attention, because I was

11     trying to take careful notes of what you said, but two places

12     in the deposition transcript prior to page 170, there was

13     mention -- there was a question about whether a warrant would

14     be required in that situation.  You did not sustain the

15     objection, I think properly so.  I think they were kind of

16     spoken more --

17              THE COURT:  All right, what page is that?

18              MS. BAUMGARDNER:  And I've written them down for you

19     and I'll give them to you, but page 53, line 11 to line 21 --

20              THE COURT:  All right, 53.

21              MS. BAUMGARDNER:  You had indicated here that what

22     would come in was page 52, line ten --

23              THE COURT:  Right.

24              MS. BAUMGARDNER:  -- to page 54, line 14.  I think

25     if you begin reading on page 52 and read the follow up to

 1    it --

 2              THE COURT:  All right, okay.

 3              MS. BAUMGARDNER:  -- it should be included but I

 4    just wanted to bring it to your attention again.

 5              THE COURT:  Yes, all right, no, okay, I'm reading

 6    that now so I would -- yes, I would overrule any objection as

 7    to that little section there.

 8              MS. BAUMGARDNER:  Okay.  And the --

 9              THE COURT:  And what's the next one?

10              MS. BAUMGARDNER:  The other place is page 109, line

11    13 to page --

12              THE COURT:  109, line 13.

13              MS. BAUMGARDNER:  -- to page 110, line one.

14              THE COURT:  All right, no that I should have

15    sustained.  So 109, 13 I would add to the list of objections

16    sustained.  I'll put that as the first entry on that list.  I

17    think we ought to mark this -- do you want to mark this as an

18    exhibit so we have it?

19              MS. BAUMGARDNER:  Sure.

20              THE COURT:  All right, what's your next number?

21              MS. BAUMGARDNER:  That would be 136.

22              THE COURT:  P-136?

23              MS. BAUMGARDNER:  Correct.

24              THE COURT:  Okay.  All right, so page 109, line 13

25    over to page -- all right, well I'm just going to go down to

Colloquy                                                      86

1    line 24 because then it changes the topic to -- into records,

2    so I'll allow that.  So we go 109, line 13 to 109, line 24.

3    Objection sustained.

4            MS. WYER:  Your Honor, shouldn't that be at least to

5    page 110, line one?

6            THE COURT:  Well, there is --

7            MS. WYER:  -- because the next --

8            THE COURT:  He's showing him a photograph.

9            MS. WYER:  Well, not in line 25 because that's just

10   a -- the same question with respect to the records that the

11   previous question was with respect to the area.

12       (Pause in proceedings)

13           THE COURT:  Well, it starts at 107, line two.  All

14   right, well I'll tell you what, all right, the objection

15   that's sustained is from -- I'm going to allow pages 107, line

16   two through to page 110 -- strike that.

17           No, I'm going to stick with 107, line two should go

18   to page 109, line 12.  All right, then where it should pick up

19   again is where the question says -- 110 -- all right, so then

20   the objection is sustained from page 109, line 13 through 110,

21   line one, because then the question goes back to asking the

22   witness to look at page 216 of whether it's a picture, and

23   then I'll sustain the objection to page 110, line ten through

24   page 110, line 21, and then the -- okay?

25           That's the ruling.  Okay, we'll resume at 1:00.

1    Thank you.

2            (Recess, 11:20 a.m.)

3            (On the record, 1:23 p.m.)

4            THE COURT:  Okay, sorry we're a little late.  Okay,

5    all right, we're ready for the next witness, Agent Lawrence?

6            MS. WYER:  Defendant calls Special Agent Stephen

7    Lawrence.

8            THE CLERK:  Please raise your right hand.

9            STEPHEN G. LAWRENCE, DEFENSE WITNESS, SWORN

10           THE CLERK:  Please state your full name and spell

11   your last name for the record.

12           THE WITNESS:  Stephen G. Lawrence, it's spelled

13   S-T-E-P-H-E-N, last name is L-A-W-R-E-N-C-E.

14                      DIRECT EXAMINATION

15   BY MS. WYER:

16   Q    Special Agent Lawrence, what is your current position?

17   A    I'm currently a supervisory special agent in the Los

18   Angeles Division of the FBI.  I currently supervise a squad

19   that investigates public corruption.

20   Q    And when did you start working at the FBI?

21   A    I became employed as a special agent in June of 1996, 17

22   years ago.

23   Q    What did you do before that?

24   A    Prior to my employment with the FBI, I was a certified

25   public accountant and in both public accounting and private

1    industry and worked in both tax and financial regulatory

2    audits.

3    Q    Where are you stationed currently?  I think you mentioned

4    Los Angeles.

5    A    Yes, ma'am, Los Angeles.

6    Q    And could you tell us briefly what your assignments have

7    been at the FBI since you started?

8    A    In 1996 I was initially assigned to the Miami Division.

9    For approximately four and a half to five years I worked

10   primarily white collar crimes -- a variety of white collar

11   crime matters.

12          I transferred to Los Angeles in early 2001.  I was

13   assigned to a public corruption squad.  Then I was transferred

14   to a counterintelligence matter -- or counterintelligence

15   squad.

16          I worked there for approximately three years and

17   then became a supervisor of that squad for two years, and then

18   transferred to the Crimes Against Children Unit in for FBI

19   headquarters.

20          I was still stationed in Los Angeles at the time.

21   During that 18 month period, I worked on the 2257 program, and

22   after that ended, helped to stand up a Child Sex Tourism

23   Initiative in Southeast Asia.

24          Upon the conclusion of that assignment, I was

25   transferred back to Los Angeles, worked counterintelligence

1    matters until June of 2010 when I was assigned to my current

2    assignment.

3    Q    Could you describe when and how you were assigned to the

4    2257 inspection team?

5    A    Yes, ma'am.  Headquarters had posted for -- applications

6    for the 2257 program where they were seeking qualified

7    applicants to oversee this new initiative that they were

8    starting.

9         I applied along with a number of other applicants

10   and the position was structured so that we reported directly

11   to headquarters, but we were assigned physically in Los

12   Angeles.

13   Q    At the time that you were assigned, was there already a

14   2257 inspection team in place?

15   A    Yes, ma'am.  There were -- there were several contractors

16   who were retired FBI agents who had already been hired, as

17   well as one supervisory special agent who was in place.

18   Q    And what -- when was that?

19   A    I started on the team in January of 2007 -- yes, in

20   January of 2007.

21   Q    What was the structure of the team?

22   A    The team consisted of two supervisory special agents,

23   myself and Supervisory Special Agent Charles Joyner, and we

24   have four to five contract employees that worked under us, and

25   then we reported to the Crimes Against Children Unit at

1    headquarters.

2            There was another supervisory special agent who was

3    our liaison and oversaw the program, and then above that

4    agent, that supervisor was a unit chief who was ultimately

5    responsible for the program.

6    Q    What was the 2257 inspection team's relationship to the

7    Los Angeles Field office?

8    A    Well, first we had a separate off-site, so we were

9    physically separate from the Los Angeles field division.   We

10   operated independently from the Los Angeles division.   We did

11   receive some administrative support from them such as computer

12   support, some administrative report -- support, sorry, and we

13   still maintained access to the Los Angeles division, but our

14   reporting structure was that we reported directly to

15   headquarters.

16   Q    Are you familiar with how producers were selected to be

17   subject to 2257 records inspections?

18   A    Yes, I am.

19   Q    And how did that occur?

20   A    We used a random number generator to select producers for

21   inspection from a database that we had compiled.

22   Q    Were you involved in compiling the data to put into the

23   database?

24   A    Yes, I was.

25   Q    Was that on ongoing process?

1    A     Yes, ma'am, it was.

2    Q     And how was that list of producers in the database

3    compiled?

4    A     When I initially joined the team, there were

5    approximately 300 or so producers that were in this

6    spreadsheet and it was basically an Excel spreadsheet.  By the

7    time the program had ended, the list had gotten up to about

8    1,200 and we were in the process of adding more.

9            The way we populated that was from a variety of

10   sources.  We attended several adult industry sponsored

11   conventions, both in Las Vegas and Los Angeles, in which we

12   would walk around and obtain publically available business

13   cards and other promotional materials that would identify

14   needs of producers and addresses and things like that.

15           We also looked online on the internet, and then

16   there was also a Los Angeles Times article published sometime

17   during 2007 that listed all the commercial producers of

18   pornography in the San Fernando Valley.

19   Q     Were there any criteria that you applied to for including

20   a producer on the list?

21   A     Yes.  We were only focused on producers of commercially

22   -- of commercial pornography.

23   Q     Was geography a criteria?

24   A     No, ma'am.  We would include a US-based producer

25   regardless of where they were located in the United States.

1   Q    Did you have an understanding regarding whether secondary

2   producers were subject to 2257 records inspections?

3   A    Yes, I did have an understanding and our -- and that

4   understanding was that those secondary producers would be

5   excluded from our inspections.

6   Q    How were they excluded?

7   A    Well, if they ended up in our database and if they were

8   selected for an inspection and during the pre-inspection

9   review if we at some point identified them as a secondary

10  producer, they would be -- they would be excluded.

11          If for some  reason if we went out to actually

12  conduct an inspection and we learned at that point that a

13  particular product -- or that the company was actually a

14  secondary producer of a particular title, then we would

15  exclude that from -- from the inspection if they were able to

16  produce evidence to prove that.

17  Q    And just to be clear, when I say secondary producers, do

18  you understand the meaning of that within the 2257 regulatory

19  scheme?

20  A    Yes, ma'am.

21          THE COURT:  Well, just to be clear, I mean, do you

22  recall now what the -- what's included within the secondary

23  producer category?

24          THE WITNESS:  I wouldn't be able to cite it

25  verbatim.  I did carry a copy of the statute and the

1   regulations with me during my assignment on the 2257 program,

2   but just in summary, it was basically those companies that

3   didn't -- that were not responsible for the production or the

4   filming and hiring of performers and the filming of the

5   pornography and the -- you know, the editing and things like

6   that.

7           They would be companies that, you know, like for a

8   website, for example, might have a link to Wicked or Playboy

9   or something like that where they would link to a video from

10  those primary producers.

11          THE COURT:  Would that include the tube sites -- so

12  called tube sites?

13          MS. WYER:  Your Honor, we'll get to that.

14          THE COURT:  Oh, all right, fine, well I'll withdraw

15  the question.  Go ahead.

16  BY MS. WYER:

17  Q    Did you review a producer's work before including it on

18  the database?

19  A    Yes.  We tried -- we tried to, you know, in putting a

20  producer on the database, we would do a preliminary assessment

21  to see if they appeared to be a primary producer or secondary

22  producer.

23  Q    And what was your understanding of the types of sexually

24  explicit conduct that were covered by the statute -- by the

25  requirements?

1    A    We were -- we only focused on products that contained

2    actual human beings engaged in actual sexual activity.

3    Q    Was it your understanding that a producer should be

4    included if they only made images of erotic nudes?

5    A    No, we did not include those types of producers.

6    Q    As far as you know, was there any effort to include on

7    the list people who were exclusively still photographers?

8    A    No, there was not at all.

9    Q    Did you make any effort to include on the list people who

10   had published books of sexual photography?

11   A    No, not at all.

12   Q    Did you visit bookstores or libraries to try to identify

13   people who had published books containing images of sexually

14   explicit conduct?

15   A    No, ma'am, we did not.

16   Q    Did you make any effort to include on the list people who

17   had exhibited sexually explicit photographs in galleries or

18   museums?

19   A    No, we did not.

20   Q    Did you visit galleries or museums to try to identify

21   people who had exhibited sexually explicit photographs?

22   A    No, we did not.

23   Q    And why was that?

24   A    Because it's not what we were focused on.  We were

25   focusing only on commercially produced pornography.

1   Q    As far as you know was there any effort to include in the

2   database individuals who had uploaded videos to a tube site?

3   A    No, there was no focus on that and I'm not sure that the

4   so-called tube sites were really even a popular thing six

5   years ago.

6   Q    So did you visit any tube sites online to try to identify

7   people who were uploading sexually explicit videos?

8   A    No, not that I recall, no.

9   Q    And what -- why not?

10  A    Because they would have -- if we did look at those sites,

11  we would have deemed them to be secondary producers, to the

12  best of my recollection, and it would --

13  Q    Well, did you know what a tube site was in 2007?

14  A    Well, as I indicated before, I'm not sure that they were

15  popular back then and I don't recall knowing what those were

16  when we were doing the 2257 program.

17  Q    As far as you know, was there any effort to include in

18  the database individuals who had uploaded photographs or

19  videos on a social networking or dating website?

20  A    No, there was not.

21  Q    Did you visit any sexual networking websites or dating

22  websites to try to identify such individuals?

23  A    No, we did not.

24  Q    And why was that?

25  A    Because again, we were focused only on pornography that

1    had been produced for commercial sale -- DVDs and things like

2    that and, you know, dating websites and things like that did

3    not fit our criteria.

4    Q    Were any producers on the -- in the database individuals

5    who made videos of themselves having sex for their own private

6    use?

7    A    No.

8    Q    Based on your experience identifying producers, do you

9    think it would be possible to identify individuals who made

10   photographs or videos of themselves for private use?

11             MR. MURRAY:  Objection, Your Honor.

12             THE COURT:  I'll sustain it.  First of all, it's a

13   compound question, and by saying whether it's possible or not,

14   you know, the old proverb is anything's possible, so can you

15   rephrase the question, please?

16             MS. WYER:  Yes, Your Honor.

17   BY MS. WYER:

18   Q    Based on your experience identifying producers, do you

19   think it would be practical to attempt to identify individuals

20   who made photographs or videos of themselves for their own

21   private use?

22             MR. MURRAY:  Objection, Your Honor.  He's not been

23   identified as an expert witness.

24             THE COURT:  I'll overruled the objection.  He -- you

25   know, he accumulated a good deal of experience as a result of

1    this assignment.  Overruled.

2              THE WITNESS:  In that situation, no, it would not be

3    practical, the reason being if someone made a videotape for

4    their own private use, we, meaning the Government, would not

5    be aware of that videotape if they made it for their own

6    private use.

7    BY MS. WYER:

8    Q    And what if they emailed such an image to their partner

9    or spouse?

10   A    Again, we would not be aware of it.

11   Q    And what if they sent such an image by text message to

12   their partner or spouse?

13   A    We would not become aware of it.

14   Q    Now, what about if they posted such an image to the

15   internet?

16   A    Well, then we would presumably become aware of that at

17   some point because it would be publicly available.

18   Q    But if an image is not posted to the internet or

19   otherwise made public, do you think it would be feasible to

20   include such images within the scope of records inspections

21   under 2257?

22             MR. MURRAY:  Objection, Your Honor.

23             THE COURT:  No, overruled.

24             THE WITNESS:  Could you repeat the question?

25   BY MS. WYER:

1    Q    If an image is not posted on the internet or otherwise

2    made public, do you think it would be feasible to include such

3    images in 2257 records inspections?

4    A    No, because we were only looking for publically available

5    material.

6    Q    You mentioned that at the end when the program ended

7    there were around 1,200 producers in the database.  Was it

8    your understanding that --

9              THE COURT:  1,200?

10             MS. WYER:  1,200.

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Okay.

13   BY MS. WYER:

14   Q    Was it your understanding that if the program had

15   continued, the number of producers in the database would have

16   continued to rise?

17   A    Yes, I know that for a fact.

18   Q    And how do you know that?

19   A    Because at the time the program ended, I was personally

20   involved in expanding the database to include webpages and

21   internet producers and we -- I was in discussions with a

22   third-party software company that provides security software

23   to the Department of Justice.

24             And just for the Court's education, they put a

25   software out that prevents DOJ employees from accessing

1    prohibited websites from their Government issued computers,

2    and I had contacted the company to find out if I could obtain

3    a list of websites from them that they could categorize as

4    pornography websites, and we were in discussions with the

5    General Counsel of that company, which had agreed to provide

6    us with the list of websites that they had categorized as

7    pornography websites.

8    Q    How many additional producers do you think would have

9    been added through that process?

10   A    The number of websites that were categorized as

11   pornography websites back in 2007 was 1.2 million.

12   Q    And do you know whether all of those sites would have

13   qualified as producers?

14   A    No, there's no way to tell because we never actually saw

15   the list.  The program was ended before we obtained the list.

16   The intention was, once we obtained the list, was to filter

17   out those websites that we knew would not fit our criteria.

18   Q    Do you think if the database had expanded to that extent,

19   would it be feasible to continue to operate the inspection

20   program in the same way that it had been operated until that

21   time?

22            MR. MURRAY:  Your Honor --

23            THE COURT:  That's a hypothetical.  Sustained.  You

24   can rephrase it.

25   BY MS. WYER:

1  Q    If the -- based on your experience as a supervisory

2  special agent running the inspections that occurred in 2006

3  and 2007, do you believe that there would have been changes to

4  the procedures of the inspection program if the pool of

5  producers had substantially increased?

6            MR. MURRAY:  Objection.

7            THE COURT:  I don't know how he can answer that.

8  It's a -- it's speculative.

9            MS. WYER:  Well --

10           THE COURT:  I mean, it's purely speculative.  He has

11 no way of knowing.

12           MS. WYER:  Well, Your Honor, if it's purely

13 speculative, then we submit that the relevance of these

14 inspections to plaintiff's claim for injunctive relief is

15 unripe.

16           THE COURT:  Yes, well, I agreed with you once upon a

17 time but I think I was chastised and reversed on that.

18           MS. WYER:  Will, not on -- not on the ripeness

19 point, Your Honor, but --

20           THE COURT:  I mean, I think that's -- because I

21 haven't read my opinion in a long time but I think I agreed,

22 you know, that this was not a justiciable claim but I think

23 when the Third Circuit reversed it, there's an implicit -- you

24 know, possibility that that is a live issue, even though they

25 haven't conducted any searches in six years.

1              MS. WYER:  Well, just to clarify for the record,

2     Your Honor, at the time the Third Circuit considered a Fourth

3     Amendment claim, it was not in the record, the fact that no

4     inspections had taken place since 2007 and that the inspection

5     program had ended was not in the record at that time so the

6     Third Circuit did not consider that.

7              THE COURT:  Do you agree with that, Mr. Murray?

8              MR. MURRAY:  Your Honor, you've written a new

9     opinion on this whole -- they filed a new motion to dismiss,

10    we fully briefed it, and you wrote an opinion --

11             THE COURT:  Right.

12             MR. MURRAY:  -- dealing with all these issues

13    shortly before --

14             THE COURT:  That's right.

15             MR. MURRAY:  -- you know, just a few months ago.

16    They're all I think ruled on by Your Honor.

17             THE COURT:  I think that's a live issue -- it's an

18    issue, I mean, I'm not saying how I'm going to decide it, but

19    the problem with the question is that this witness is not in

20    charge of the FBI, nor is he the Attorney General, so I don't

21    know how he could speculate what was going to happen in the

22    future.

23             MS. WYER:  Your Honor --

24             THE COURT:  I mean, do you know why the program --

25    do you have personal knowledge of why the program was

1    terminated?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Well, can we hear?

4              Are you going to ask him that?

5              MS. WYER:  I was planning to ask him that at a later

6    point, yes.

7              THE COURT:  All right, well maybe you can come back

8    to this question at that time, but I think the way the

9    question is it's speculative as to if it had continued, what

10   would happen.  I don't know how -- okay, I'll sustain the

11   objection.  Next question.

12   BY MS. WYER:

13   Q    Were there already specific inspection procedures in

14   place when you joined the inspection team?

15   A    Yes, there were.

16   Q    Did you rely on written procedures that you were supposed

17   to follow for an inspection?

18   A    Yes, we did.  We relied on obviously the statute, the

19   regulations, and the checklist that had been prepared and the

20   checklists were prepared directly from the regulations.

21   Q    Let me show you Defendant's Exhibit 224.  Do you

22   recognize this document?

23   A    Yes, I do.

24   Q    And what is it?

25   A    It's an inspection checklist that the supervisor or the

1    lead inspector would utilize in conducting the inspections.

2    Q    Do you know who created this checklist?

3    A    I don't know exactly but it was prepared by someone at

4    the FBI headquarters, I would presume within the Office of

5    General Counsel.

6    Q    And is this a fair and accurate representation of the

7    checklist?

8    A    Yes, ma'am.

9             MS. WYER:  Defendant moves to admit Exhibit 224.

10             MR. MURRAY:  Your Honor, I don't have any objection

11    but I would note that this is duplicative of Plaintiff's

12    Exhibits 1 to 32, which is a joint exhibit so --

13             THE COURT:  Yes, I thought we were going to use the

14    plaintiff's numbers.

15             MR. MURRAY:  I mean, it's within -- we have all --

16    all the inspection reports from beginning to end have now been

17    introduced.  This is a page from one of them --

18             THE COURT:  Well --

19             MR. MURRAY:  -- and I don't object to that --

20             THE COURT:  Yes.

21             MR. MURRAY:  -- but I would just point out, it

22    clutters the record.

23             THE COURT:  Well, just as a matter -- I'm not going

24    to stop you from doing it but as a matter of housekeeping, I

25    think it would be better to just use the same document

1    throughout.  But if you want to ask him this, that's fine.

2              MS. WYER:  Okay.  I --

3              THE COURT:  If that's how you're prepared to

4    proceed, go ahead.

5              MS. WYER:  Thank you, Your Honor.

6    BY MS. WYER:

7    Q    And let me show you Defendant's Exhibit 225.  Do you

8    recognize this document?

9    A    Yes, I do.

10   Q    And what is this?

11   A    This is a review form that was utilized by the contract

12   employees in reviewing the products that were selected for

13   inspection.

14             MS. WYER:  And let the record reflect that this is

15   from Robert Hill (phonetic) and there are numerous similar

16   documents in the inspection reports.

17   BY MS. WYER:

18   Q    Is this a fair and accurate representation of the review

19   form?

20   A    Yes, it is.

21   Q    Now, in the review form, what do the citations at the end

22   of each numbered paragraph mean?

23   A    Those are references to the statute -- 2257 statute, as

24   well as the Code of Federal Regulations.

25   Q    And in paragraph two of the review form where it states

1    -- where there is a reference to 2256(2)(A)(i) through (4),

2    does that specify the type of conduct that would make it

3    subject to the 2257 requirements?

4    A    Yes, it does.

5    Q    And is that what this inspector team relied on when

6    reviewing a producer's material before an inspection?

7    A    Yes, ma'am.

8    Q    Could you describe the initial steps that would be taken

9    after a producer was randomly selected as the subject of a

10   2257 records inspection?

11   A    Yes, ma'am.  We would open a case file and then either

12   Agent Joyner or myself, depending on who the particular

13   inspection was assigned to, would go online and covertly

14   purchase a product -- or I'm sorry, purchase a -- I'm sorry,

15   let me back up.

16           We would go online, identify videos or DVDs that

17   were produced by the producer that were -- that was selected,

18   and then would covertly purchase those DVDs either directly

19   from the producer or other various third party websites.

20   Those DVDs would be mailed to a covert Post Office box.  Once

21   we would receive them, we would basically hand them to the

22   contract employees and then they would review the DVDs and

23   fill out the checklist.

24   Q    And was there something created through that process?

25   A    Yes.  In addition to the checklist that we just reviewed,

1    there was a spreadsheet, a compilation of all the performers

2    that were identified by the contractors in reviewing the

3    different DVDs.

4    Q    And what was the purpose of the pre-inspection review

5    process?

6    A    Well, there were several purposes.  Number one, it was to

7    ensure that the producer that had been selected for inspection

8    was subject to 2257.  It was to -- in reviewing the product or

9    the videos, it was to determine that they had complied with

10   2257 by including the required statements and it was to

11   identify all the performers that were included in the various

12   videos that had been selected for inspection.

13           So and all of that was done to minimize the time

14   that we spent in conducting an actual onsite inspection and

15   minimize any -- any interference with the producer's business.

16   Q    Were the sample products that you obtained all publically

17   available material?

18   A    Yes, ma'am, they were.

19   Q    And were they all commercial in nature?

20   A    Yes, ma'am, they were.

21   Q    And the FBI -- well, you already explained that the FBI

22   would actually purchase the sample products in order to

23   conduct this pre-inspection review?

24   A    Yes, ma'am, we did.

25   Q    So did the contractors follow the checklist and the

1    review form that we were looking at earlier when carrying out

2    the pre-inspection review?

3    A    Yes, ma'am, they utilized that checklist at every

4    inspection.

5    Q    And did you also use the checklist and review form when

6    carrying out inspections?

7    A    Yes, ma'am.

8    Q    Looking at the second page of the checklist, Defendant's

9    Exhibit 224, numbers six through nine, are these the

10   procedures that you were supposed to follow when initiating an

11   inspection?

12   A    Yes, ma'am, they are.

13   Q    So what are you supposed to do when initiating the

14   inspections?

15   A    Well, when we -- in summary, when we arrived at the

16   business location, we would go in -- they had a -- well, we

17   would go into the business and generally in a reception area,

18   ask for the owner or whoever was in charge of business,

19   identify ourselves, and explain why we were there.

20         And then once -- once all that was taking care of,

21   we would ask them where they would want us to set up so that

22   we could conduct the on site inspection.

23   Q    Did you give the producer anything at that time?

24   A    Yes.  We would always hand them a spreadsheet -- the

25   spreadsheet that had been prepared during the pre-inspection

1    process, and the spreadsheet would list all of the videos that

2    were subject to the 2257 inspection, as well as a list of all

3    the performers that had been provided and it would detail what

4    records we were specifically looking for.  And then I believe

5    it was in March of 2007, we also started handing them a letter

6    that would explain the process.

7    Q    And what was the purpose of providing the producer with

8    the spreadsheet?

9    A    The purpose was to identify from them exactly what

10   records we were interested in -- in looking at.

11   Q    And where did the form of the letter that you later

12   started providing come from?

13   A    It came from FBI headquarters and it was done in

14   conjunction or in consultation with the Department of Justice.

15   Q    Do you recall which inspection was the first one that you

16   went to where a letter was provided?

17   A    I don't believe -- I don't recall if it was used on the

18   second -- or I'm sorry, my first inspection, which was Dead

19   Men Hanging, but it was -- I know I've produced it on the

20   second inspection which was Angry -- Angry Young Man.

21   Q    Now, going back to Defendant's Exhibit 224, looking at

22   the second page, number ten, for the record it reads, "If

23   access to the records is denied, the lead inspector will

24   advise the producer that a court order can be obtained which

25   will compel the producer to provide access to the records, and

1    that failure to comply with the order could result in an

2    arrest for contempt.  If the producer persists in denying

3    access, the lead inspector will leave the producer's

4    facilities and seek a court order in conjunction with the

5    local US Attorney's Office."  What was your understanding of

6    paragraph ten of the checklist?

7    A    Basically my understanding was that once we identified

8    ourselves and explained the reason why we were there, if the

9    producer indicated that he or she did not want to provide us

10   with access to the records, we would explain to them that we

11   could, as articulated here on the checklist, we can go get a

12   court order compelling them to provide access.

13          And if they fail to comply with that court order,

14   then they could be subject to arrest.

15   Q    Did that ever occur?

16   A    It never occurred on any of the inspections that were

17   completed by the 2257 program.

18   Q    Was that -- and why was that?

19          MR. MURRAY:  Objection.  How would he know why in

20   every single --

21          THE COURT:  The question is why?

22          MR. MURRAY:  Yes.

23          MS. WYER:  Well, I think my initial question was too

24   vague when I asked did that ever occur --

25          THE COURT:  All right.

1          MS. WYER:  -- so I wanted to --

2          THE COURT:  Well, rephrase the question.

3    BY MS. WYER:

4    Q    Well, first of all, on what basis in your understanding

5    would a court order be obtained?

6          MR. MURRAY:  I object, Your Honor.

7          THE COURT:  Overruled.

8          THE WITNESS:  I'm sorry, can you repeat the

9    question?

10   BY MS. WYER:

11   Q    Do you know on what basis you would have attempted to

12   obtain a court order?

13   A    Well, it was necessary -- well first of all, prior to

14   that we would have contacted our headquarters -- the Crimes

15   Against Children Unit, as well as the Office of General

16   Counsel, consulted with the Department of Justice, and then

17   going to the local US Attorney's Office since it was written

18   in the statute -- you know, kind of depends on whatever

19   district we were in as to whether they would seek an ex parte

20   court order or ask us to swear out an affidavit in support of

21   the search warrant.

22   Q    And in your understanding, what does paragraph ten mean

23   regarding what the inspection team would do if the producer

24   denied access to records?

25         THE COURT:  Well, did any producer deny access?

1              THE WITNESS:  No, sir, they did not.

2              THE COURT:  Well, isn't that a hypothetical?  I

3     mean, unless -- were you given instructions what to do if

4     somebody denied access?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  Well, then let's consider that the

7     question, what were the instructions?

8              THE WITNESS:  We were instructed to notify FBI

9     headquarters, advise them of the situation, they would consult

10    with the Office of General Counsel and Department of Justice,

11    and then once we got further instructions from them, we would

12    go to present the matter to the local US Attorney's Office for

13    whatever district we were in, and that it was up to them as to

14    whether they would seek an ex parte court order or go the

15    route of the search warrant.

16             THE COURT:  All right.  But that never came up?

17             THE WITNESS:  No, sir, it did not.

18    BY MS. WYER:

19    Q    And did it ever happen that a producer expressed

20    reluctance to grant access to their 2257 records?

21             MR. MURRAY:  Objection, Your Honor.  First of all,

22    he wasn't present at all 29 --

23             MS. WYER:  If that --

24             MR. MURRAY:  -- so --

25             THE COURT:  Well, limit it to his personal

1    knowledge.

2    BY MS. WYER:

3    Q    Well, in the inspections, you were the lead inspector.

4    Did it ever happen that a producer expressed reluctance to

5    grant access to their 2257 records?

6             MR. MURRAY:  I object to that, Your Honor, on form.

7    How would he know whether they were reluctant or not?

8             MS. WYER:  I asked if they expressed reluctance.

9             THE COURT:  Overruled.

10            THE WITNESS:  If I remember the question, did any

11   producer express reluctance when allowing us access to the

12   records.  No, they did not.

13   BY MS. WYER:

14   Q    What was your understanding of --

15   A    I'm sorry, can I clarify that?  On the inspections where

16   I was the lead inspector, I do not recall anyone expressing

17   any reluctance.

18   Q    What were you supposed to do in your understanding if no

19   one was present at the time -- at the address where you went

20   at the time you attempted to initiate an inspection?

21   A    We would -- if nobody was at the business location or at

22   a location, we would attempt to re-contact or go back to the

23   location to make contact.

24   Q    What do you -- is there -- did you ever attempt to

25   forcibly enter a producer's premises if they were not there at

Lawrence - Direct (Wye)                                113

1    the time?

2    A    Absolutely not.  We -- you know, we would -- we had two

3    instances where nobody was present at the address listed in

4    the 2257 statement and through investigation and whatnot, we

5    eventually made contact with someone, but we never under any

6    circumstances forced our way in or attempted to enter a locked

7    location where no one was present.

8    Q    Now, number 11 on the checklist indicates that the

9    inspection should be conducted so as not to unreasonably

10   disrupt the operations of the producer's establishment.  How

11   was that requirement implemented?

12   A    When we went out to a particular location, we would

13   number one, try to go in with as few cars as possible versus

14   you know, a search or an arrest where everyone would bring

15   their own vehicle.

16        And when we arrived at the location, the lead

17   inspector and maybe one of the contract employees would enter

18   the business where we would identify ourselves.  We would be

19   in professional business attire such as what I am wearing

20   today.

21        Raid jackets were never worn.  We were, you know,

22   very respectful and courteous.  Once they -- once the producer

23   or whoever was in charge told us where to set up, we would

24   carry in our equipment.  We were really just kind of self-

25   contained.  We brought our own paper, our own copiers --

1    everything that we would need to conduct the inspections.  And

2    because we had done a lot of work ahead of time, you know, we

3    could wait for the producers to give us the records, we would

4    do our business and leave.

5    Q    So backing up a little bit, how was it determined where

6    the inspection team would set up?

7    A    We would ask the producer or whoever was in charge where

8    they wanted us to set up.

9    Q    And then how did you access the records that you had

10   identified?

11   A    We had handed the producer the spreadsheet listing the

12   products that we were interested in inspecting and they would

13   go -- have to go retrieve those records for us.

14   Q    To the extent that you remember, did the team ever look

15   through the producer's 2257 files itself in order to locate

16   specific records that it wanted to inspect?

17   A    As a matter of normal procedure, no.  I believe there was

18   one inspection where the records were in the possession of

19   another company and once he granted us access, he pointed to

20   the boxes in the filing cabinet where the records were and

21   allowed us -- he just said, you know, if we have them, they're

22   in there.

23   Q    What did the team do once the producer provided the

24   specific records that have been identified?

25   A    Once we obtained or once we were provided with the

1    records that we were requesting, the contractors would go

2    through and verify that the records complied with the 2257

3    statute and regulations such as, you know, give the producer

4    -- have copies of identification for all the performers, was

5    that identification legible.  We would look at the dates of

6    birth to verify that everybody was -- you know, of legal age,

7    et cetera.

8    Q    Was the team utilizing something to give this process?

9    A    Yes, ma'am, they would utilize the checklist that we

10   viewed earlier.

11   Q    Do you mean the review form?

12   A    Yes, ma'am, the second checklist, the review -- the

13   review form, yes.

14          MS. WYER:  And just to be clear on the record, I

15   think I should move to admit defendant's Exhibit 225, just so

16   that it's clear what document.

17          THE COURT:  It's admitted.

18   BY MS. WYER:

19   Q    What happened when a member of the team found violations

20   in regard to one of the records that they were reviewing?

21   A    They were to bring it to the attention of the lead

22   inspector and we would look at it, make sure that we

23   concurred, and then we would discuss the potential violation

24   with the producer.

25          In the instances where it was a situation that could

1    be cured on the spot, then we would ask the producer to cure

2    it or -- you know, fix it on the spot.

3            And by that, let me just explain, if we had an

4    illegible driver's license where we couldn't see the image of

5    the performer or the driver's license wasn't legible for some

6    reason, if the producer had another copy of that driver's

7    license for that same performer, albeit in a different video,

8    we would allow them to provide us with a better copy and in

9    that instance, we would not -- that would not count as a

10   violation.

11   Q    And what else would happen during an inspection?

12   A    Well, we would -- at the conclusion, once the contract

13   employees were finished their checklist and finished reviewing

14   all the records, we would sit down and discuss the violations

15   that we did find with the producer, and they generally had a

16   week to provide responses and try to cure those.

17           One other thing that I did not mention a few minutes

18   ago, after we walked in and identified ourselves and asked

19   them where to set up and things like that, at the beginning of

20   the inspection, we would ask them where do you keep your 2257

21   records, and they would show us where, and under the statute

22   they were required to keep it separate from their regular

23   business records.

24           And we would take photographs of where they stored

25   their records, and we would take a photograph of where

1    -- whatever room or whatever area they had asked us to conduct

2    the inspection in prior to us going into the room.

3    Q    And did you take any other photographs?

4    A    Yes.  At the end of the inspection, we would -- we would

5    take a photo of the room after we left it, and that was just

6    to document for liability purposes that, you know, we didn't

7    trash the room or anything like that.

8              One other photo that we routinely took was a photo

9    of the outside of the building showing the address, et cetera.

10   Q    And what was the purpose of the exterior photograph?

11   A    Just for documentary purposes.

12   Q    During the period that you were conducting 2257

13   inspections, did you have an understanding of the segregation

14   requirement?

15   A    Yes, I did.

16   Q    And did you have an understanding of the purpose of that

17   requirement?

18   A    Yes, I did.

19   Q    And what was that?

20             MR. MURRAY:  Objection.  That's a question of law

21   and the Attorney General promulgating regulations, Congress

22   passing the statute --

23             THE COURT:  Repeat the question again?  I'm sorry.

24             MS. WYER:  I asked whether Agent Lawrence had an

25   understanding of the purpose of the segregation requirement.

 1            THE COURT:  Well, have you read the segregation

 2     requirement yourself?

 3            THE WITNESS:  I had read the regulation --

 4            THE COURT:  In total?

 5            THE WITNESS:  Yes.  Yes, sir.

 6            THE COURT:  Well, do you recall if any superiors of

 7     yours gave you special instructions on the segregation

 8     requirement?

 9            THE WITNESS:  It wasn't a superior but we did some

10     training from our Office of General Counsel shortly after I

11     had joined into the program and it was even during that

12     training or discussions and in reading the statute that I came

13     to understand why the segregation rule existed.

14            THE COURT:  All right, well I think that the

15     segregation rule is in the regulations, not the statute.

16            THE WITNESS:  Okay.

17            THE COURT:  Okay.

18            MS. WYER:  Well, the reason I ask is because to the

19     extent it's relevant, Agent Lawrence could have special

20     knowledge on how that requirement related to the inspections

21     and the inspection process.

22            THE COURT:  Well, you can ask him that -- you know,

23     in your mind, how did the segregation rule operate in terms of

24     your examination of the documents.  Does that make it easier

25     or harder or how did you find that most people had complied

1    with the segregation rule?

2              THE WITNESS:  Yes, sir.  I don't remember any

3    producer that did not keep separate records, or at least not

4    on the inspections that I conducted.

5              THE COURT:  So in that sense it made it easier for

6    you because you could ask them for the 2257 records and they

7    were separate and the producer didn't have to go through a

8    whole bunch of other records and neither did you.

9              THE WITNESS:  Exactly, yes.

10             THE COURT:  Go ahead, next question.

11        (Pause and proceedings)

12             THE COURT:  I didn't mean to cut you off but that's

13   -- but if you want to ask another question, that's fine.

14   BY MS. WYER:

15   Q    Well, I also wanted to ask in terms of the things that

16   you had identified as a violation when you were conducting the

17   inspection, based on your understanding of the segregation

18   requirement, would it have been a violation if a producer ever

19   kept 2257 records for work that had not yet been published

20   together with 2257 records for work that had already been

21   published?

22             MR. MURRAY:  Objection.

23             THE COURT:  Well, once again, did you have actual

24   experience of that?  I want to avoid hypotheticals, and that's

25   the same reason why I sustained your objections to a lot of

1    the deposition questions and Agent Joyner.  I think that the

2    questioning should be focused on what he did when he did the

3    inspection and what he found there, and whether it made it

4    easier or harder or any problems that he ensued rather than

5    hypotheticals about what the regulations say in the abstract,

6    because we all know what they say.

7              MS. WYER:  Well, we know what they say but it seems

8    relevant to me --

9              THE COURT:  But let me -- let me put it this way.

10   Because one of the claims of a plaintiff is that the statute

11   is -- and is as applied unconstitutional, and the way the

12   statute was enforced, at least during the period while the

13   regulations were in effect, could be relevant on this as

14   applied to claims.

15             I think it's relevant to bring out on the factual

16   record and one reason we're having this trial, is how the

17   inspections were conducted and whether they posed any

18   hardships or difficulties or issues when they took place.  So

19   I think that the focus should be on what actually happened.

20   BY MS. WYER:

21   Q    During the period that you were conducting 2257

22   inspections, did you have an understanding of the 2257

23   labeling requirement?

24   A    Yes, I did.

25   Q    And what was your understanding regarding labels for

1    DVDs?

2    A     My understanding was that the DVD had to have the

3    required language on the box cover of the DVD and depending on

4    the type of DVD, it would have to have somewhere either at the

5    beginning or at the end, a 2257 statement as required under

6    the regulation.

7    Q     And what was your understanding regarding labels for

8    pictures that appeared on a website?

9    A     My understanding was that -- and again, we're talking

10   about pictures that fit our criteria, that were commercially

11   available that included actual persons engaged in actual

12   sexual activity.  My understanding was that they had to

13   contain a link to the required 2257 statement.

14   Q     And what was your understanding of whether the labeling

15   requirement facilitated the inspection process?  Did the label

16   -- did having the 2257 statement on a product make it easier

17   to conduct that inspection?

18             MR. MURRAY:  Objection, Your Honor.

19             THE COURT:  Overruled.

20             THE WITNESS:  I'm not sure I follow your question

21   there.

22   BY MS. WYER:

23   Q     Did the address on the --

24   A     Oh, yes, okay.  Yes, it did make it easier obviously

25   because we know exactly where the records were supposed be

1  kept and it gave us at least a starting point in most cases to

2  go and find the producer and where the records were kept.

3  That wasn't always the case, but at least it gave us a

4  starting point.

5  Q    And in your experience with the inspections that you

6  conducted, did the team ever ask to see earlier drafts or

7  versions of work that had later been published in order to

8  determine whether a label appeared in those early versions?

9  A    No, we were not -- sorry -- we were not interested in

10  draft material.  We were only interested in looking at

11  products that had been released for public consumption.

12          We were not -- we didn't go back and look at videos

13  or photographs that had been -- you know, that were in draft

14  or, you know, were in the editing phase or anything like that.

15  We were only interested in whether the product had the

16  required 2257 language attached to it once it had been

17  released.

18  Q    And going back to the segregation issue, do you recall

19  whether you were ever issued a violation finding based on the

20  fact that a producer might have kept some 2257 records

21  together with other 2257 records?

22  A    I don't recall off the top of my head having issued that

23  kind of violation.  I do remember we had a few instances where

24  a producer would keep other business records mixed in with

25  their 2257 records and it was just simply a mistake on their

1    part.  It was a misunderstanding on their part.

2            And what I mean by that is they might have included

3    a model release form in with their 2257 records and that model

4    release form was not required by the 2257 statute or the

5    regulations and therefore was -- should not have been kept

6    with the "2257 records."

7            That was considered other business records, so we

8    would simply advise them and they would take it out.  But that

9    was -- that was the only time that I recall we had any

10   instance of other -- other business records.

11   Q    And --

12   A    I'm sorry -- with regard to your -- because you asked

13   something about 2257 records in with other 2257 records, we

14   would -- I think this goes back to my earlier answer about

15   looking at draft forms and things like that.

16           In certain situations a producer might have a

17   contract with a certain performer and they might produce a

18   film every two weeks and it takes some time from -- from, you

19   know, the time that you rent a location, by the time you hire

20   performers, by the -- the time you film the actual film, and

21   then do all of your post-editing production and then get it --

22   the box label and marketing and all that stuff, all of that

23   takes time so it's a continuing process.

24           So, there could have been times where a producer

25   might have a folder for -- you know, performer A and performer

1    A might have appeared in several different videos.  If the

2    producer gave us records that were relevant to the film that

3    we were looking for but also included records for an upcoming

4    soon to be released film, we weren't interested in looking at

5    those other records.

6            We were only focused on the records that were

7    relevant to the film that had been selected for inspection.

8    Would we have issued some kind of a violation or argued that

9    they were in violation of having other 2257 records mixed in?

10   No.

11           As long as they were 2257 records, it didn't matter.

12   But we only focused on those records that pertained to the

13   films that we had selected for inspection.

14   Q    During the period that you were conducting 2257 records

15   inspections, did you have an understanding of 2257's cross

16   referencing requirement?

17   A    Yes, I did.

18   Q    And what was your understanding of what that required?

19   A    The cross-reference system in summary just required a

20   producer to keep track -- basically a spreadsheet would

21   suffice or other -- like a list or database that would keep

22   track of a performer -- stage name, true name, what films they

23   appeared in, et cetera.

24   Q    Do you recall any instance where you -- or was it your

25   understanding that the spreadsheet had to be kept together

1   with the records?

2   A     No.   From what I remember, in most instances the cross-

3   reference system was just like an Excel spreadsheet or another

4   computer program that the producer would keep on a -- on a

5   computer.

6   Q     I will show you Defendant's Exhibit 228.   Do you

7   recognize this document?

8   A     Yes, I do.

9   Q     And what is it?

10  A     It's what we call the final progress report that we

11  submitted to the Crimes Against Children Unit.

12              MS. WYER:   And could we see both pages of it side by

13  side, please?

14              THE WITNESS:   And it was basically just a summary of

15  all of the inspections that we had conducted from the start of

16  the 2257 program until the time it ended.

17  BY MS. WYER:

18  Q     Sir, does this document identify all of the inspections

19  that took place?

20  A     Yes, it does.

21  Q     And is this a fair and accurate representation of the

22  final progress report?

23  A     Yes, ma'am, it is.

24              MS. WYER:   The defendant moves this document into

25  evidence, Exhibit 228.

1    THE COURT:  It's admitted.

2  BY MS. WYER:

3  Q    What was the first inspection that you led?

4  A    The first inspection that I led was Dead Man Hanging on

5  March 13th, 2007.

6  Q    Now let me show you Plaintiff's Exhibit 11.  Let's go to

7  I think page four of where the original document starts.  Do

8  you recognize this document?

9  A    Yes, I do, that's the cover page of my final inspection

10  report.

11  Q    And did you prepare a report for every inspection that

12  you led?

13  A    Yes, I did.

14    MS. WYER:  These reports have already been admitted

15  into evidence.

16  BY MS. WYER:

17  Q    Let me show you Defendant's Exhibit 226.  Do you

18  recognize this document?

19  A    Yes, I do.

20  Q    Could you describe what it is?

21  A    It's a summary that I did not prepare but it's a summary

22  of all of the inspections and it lists the producer, the

23  inspection date, who the lead inspector was, where the

24  inspection occurred, whether advance notice was provided to

25  the producer, whether a pre-inspection letter was provided,

1    and by that I mean the letter that we would have provided to

2    the producer once we walked into their business, where the

3    inspection -- the work area -- what work area we conducted the

4    inspection in, what photos were taken, the number of DVDs that

5    were selected for inspection, and the number of performers

6    that had been identified in those videos, the approximate time

7    as to when the -- how long it took us to conduct the

8    inspection, and then whether the records were found at the

9    customer address.

10   Q    Custodian?

11   A    I'm sorry -- custodian address.

12   Q    Did you have a chance to compare the information in this

13   document to the inspection reports that you prepared for the

14   inspections that you led?

15   A    Yes, I did.

16   Q    And does the information in this chart fairly and

17   accurately reflect the information in those reports?

18   A    Yes, it does.

19   Q    With respect to the inspections that you led?

20   A    Yes.

21          MS. WYER:  Your Honor, I've created this document as

22   a summary for the Court's convenience and I moved to admit --

23          THE COURT:  All right, any objection?

24          MR. MURRAY:  I have no objection, Your Honor.

25          THE COURT:  Yes, all right, admitted.

 1              MS. WYER:  Okay.

 2    BY MS. WYER:

 3    Q    Agent Lawrence, are all of the inspections that you led

 4    listed on this chart with your name identified as lead

 5    inspector?

 6    A    I'd have to --

 7              MS. WYER:  And we need to see that.

 8         (Pause in proceedings)

 9    BY MS. WYER:

10    Q    But you typed this already?

11    A    Yes, the copy I saw earlier, I did.

12    Q    And then do you -- can you tell us how many inspections

13    total you were the lead inspector for?

14    A    Eight or nine.

15    Q    In your experience, were the same procedures utilized for

16    each inspection?

17    A    The same procedures were utilized, yes.

18    Q    And did the application of the procedures vary depending

19    upon the circumstances?

20    A    Yes, they did.

21    Q    Was it your understanding that you had some discretion to

22    adjust the procedures that you followed in response to the

23    particular circumstances?

24    A    Yes, we had some discretion.

25    Q    Can you explain when you were able to adjust -- make

1   adjustments?  I mean, is there anything that you can say

2   generally when you make adjustments or should be --

3   A    Well, for example, probably the biggest item that comes

4   to mind would be if we identified a Post Office box and we had

5   to -- and we couldn't find the producer.

6        In other words, the records are not going to be at

7   the Post Office box, so we would have to obtain the form that

8   they made with that Post Office location and then we would

9   re- contact the individual listed and explain to them what we

10  were doing and make arrangements to meet so that we could

11  review records.

12       Another instance would be if an inspection was to

13  take place in a residence which we wouldn't necessarily know

14  until we showed up at the residence, and if nobody was home,

15  we would have to contact the owner subsequently to make

16  arrangements to conduct the inspection.

17  Q    You've already identified the Dead Men Hanging inspection

18  as the first one you conducted.  Let me show you Plaintiff's

19  Exhibit 32 starting at page 3336 and flipping through -- let's

20  go to the -- to the next one.

21       Let us know when we come to the room where the team

22  reviewed the records.

23  A    I believe it's the next photo.

24       (Pause in proceedings)

25  Q    It's 3344 is the exact page.

Lawrence - Direct (Wye)                               130

1          THE COURT:  Do you want to show him the hard copy or

2    go onto something else until we find it?

3          MS. WYER:  Yes, I'll just give him the hard copy.

4          THE COURT:  Go ahead.

5          THE WITNESS:  Oh, there it is right there.

6    BY MS. WYER:

7    Q    Now, was this the room where the team reviewed the

8    producer's records in this instance?

9    A    Yes, it is.

10   Q    Why did you use that room?

11   A    This particular producer was located in an executive

12   suite building which was shared with a number of other

13   businesses.  This room, from what I remember, was like a break

14   room that was just utilized by other businesses in the

15   building, et cetera.

16          I asked the producer where he wanted us to set up

17   and this was the room that he took us to.  In the other photo

18   -- previous photo, you can see that photo is his office.  I

19   mean, it was a one-room office and you can see that it was

20   just a table with maybe two folding tables.  There was

21   absolutely no way that we would have been able to conduct any

22   inspection in there.

23   Q    Do you know who had access to this space where you sat to

24   conduct the inspection?

25   A    No, ma'am, I never asked.

1    Q    Did the producer bring the records that you had

2    identified to this conference room or break room?

3    A    Yes, ma'am.  And those particular records were actually

4    located in that plastic file box that you see on the table in

5    the previous photo.

6    Q    Did the producer indicate when you initiated this

7    inspection that he thought you should obtain a warrant?

8    A    No, ma'am.

9    Q    Did he express any reluctance to proceeding with an

10   inspection?

11   A    No, ma'am, he indicated no reluctance at all and I

12   remember having a conversation with him just about the porn

13   industry and his -- his overhead and cost of producing videos

14   and just how tight his net margin was and whatnot, so he -- he

15   was rather forthcoming, but provided no -- no indication that,

16   you know, he was reluctant to supply the records.

17   Q    And did any of --

18              THE COURT:  Did anybody where you went to see the

19   records refuse to turn them over?

20              THE WITNESS:  No, sir, they did not.

21              THE COURT:  Well, what was the time lag for the --

22   there's some that you gave advance notice to according to your

23   chart, is that correct?

24              THE WITNESS:  Depending upon the particular

25   circumstances of each inspection.

1          THE COURT:  What was the reason why you gave advance

2     notice when you did?

3          THE WITNESS:  In certain situations, and I believe

4     it was the next inspection that I conducted, some producers

5     did not have a pure business location.  They would, you know,

6     maybe they would have records or maybe they would list that

7     Post Office box as the -- concerning the record address.

8          Others have the residence where they wouldn't be

9     home during normal business hours.  Other people would be out

10    of town.  I mean, the circumstances would just vary.

11         THE COURT:  So the advance notice resulted from the

12    fact that you had contacted them initially and they didn't

13    have the records where you thought they might be -- where they

14    were supposed to be.  Is that --

15         THE WITNESS:  Yes, sir.  Either the records were not

16    where they were supposed to be or nobody was available at the

17    location, but I just want to clarify one thing.  When we talk

18    about advance notice, it was advance notice that an inspection

19    was going to occur.  It was not advance notice of what records

20    were going to be inspected.

21         THE COURT:  Okay.  All right.  Now, for those where

22    there was no advance notice -- are you getting to this?  I

23    would like to know did you have a certain procedure, like did

24    you knock on the door or identify -- are you going to ask him

25    these questions or not?

1            MR. MURRAY:  And, Your Honor, I'm going to ask him

2    on cross.  I would ask maybe Your Honor to withhold some of

3    his questions until --

4            THE COURT:  All right, I'll wait then.  All right,

5    fine.  Go ahead.

6            MR. MURRAY:  Then I think a lot of that will be

7    cleared up on cross.

8            THE COURT:  Okay, go ahead.

9    BY MS. WYER:

10   Q    Okay, did any member of your team enter for this Dead Men

11   Hanging inspection, did any member of the team enter the

12   interior of the office to take a photograph?

13   A    No, ma'am.  On the previous picture you can see that the

14   photograph is clearly taken from the exterior hallway.  The

15   office was too small to really take a photo within the office.

16   I mean, you can see the entire length of the office.

17            If you'll notice on the right side of the picture,

18   you'll see the exterior door jamb in the wall of the exterior

19   hallway over here.  And then there's a computer on the left-

20   hand side and you can see underneath that computer.  There is

21   a -- there's a corner there.

22            That's the back wall.  Now, we may have stepped into

23   the office to talk to him, you know, when we were talking

24   about violations or just talking about the porn industry

25   because it was -- you know, there were other businesses.  I

Lawrence - Direct (Wye)                      134

1   don't remember the particular circumstances but we didn't sit

2   in his office to conduct the inspection.

3   Q    Now, do you remember your next inspection -- Angry --

4   according to the chart -- would that be Angry Young Men?

5   A    Yes, ma'am.

6   Q    Angry Young Man?

7   A    Angry Young Man -- yes, ma'am, I remember it well.

8   Q    Did you contact the producer before conducting this

9   inspection?

10  A    Not initially.  We initially drove down to San Diego and

11  the records listed a Post Office box so we went to the Post

12  Office box, obtained the form, which led us to another Post

13  Office box.

14       That second Post Office box, the form there listed a

15  contact number for the producer.  We contacted the producer.

16  He notified us that the 2257 records were actually being

17  maintained by a third party at the first Post Office box

18  location.

19       The producer contacted us again and notified us and

20  advised us that his attorney told him that it was best if we

21  conduct the inspection at his studio, so we made arrangements

22  that at some point in the future I would contact him because

23  he lived close by the studio.

24       I would contact him before hand when the inspection

25  was to occur so that he could meet us at the studio.  And we

Lawrence - Direct (Wye)                                    135

1    couldn't conduct the inspection that day because too much time

2    had already, you know, transpired.

3    Q    Did that producer indicate he thought you should obtain a

4    warrant before the inspection?

5    A    No, ma'am, and he had spoken to his attorney as well and

6    nobody contacted us to indicate that they thought we needed to

7    get a warrant or anything like that.

8    Q    And did he express any reluctance to allow the inspection

9    to proceed?

10   A    No, ma'am, not to the best of my recollection.

11   Q    Now let me show you Plaintiff's Exhibit 32, starting on

12   page 3279 and continuing.  Do you recall where you reviewed

13   the records for this inspection?

14   A    Yes, ma'am.  It was -- I recall a table or something

15   located in the business or in the studio area.

16           MS. WYER:  And may I approach to let him see the

17   hard copies of these photos?

18           THE COURT:  Sure.  Well, I really think this can

19   move a lot faster.  I mean, we're just looking at photographs

20   of office buildings.  I can't really envision of significance

21   of this, to be honest.  I mean, these were all normal office

22   buildings, is that right, where you looked at the records?

23           THE WITNESS:  No, sir, they weren't all normal --

24   what I could consider normal office buildings.

25           THE COURT:  All right, well --

1          THE WITNESS:  I mean, this was a --

2          THE COURT:  Well, why don't you concentrate on the

3     ones that were not a normal office.  Would that make some

4     sense?  Because this -- I think we're spending a lot of time

5     on something that's not -- I'm failing to grasp the

6     significance of this.  He went to look at records and in every

7     instance, you went, you were shown records, if not the first

8     time, the second time.  Is that right?

9          THE WITNESS:  Yes, sir.  And --

10          THE COURT:  And they gave you a place to sit down

11     and look at the records?

12          THE WITNESS:  Each and every time we asked where

13     they wanted us to set up and they directed us where they

14     wanted us to sit and review the records.

15          THE COURT:  All right.  I'm having trouble with why

16     photographs of tables and chairs is going to add to anybody's

17     understanding of this case, to be honest.

18          MS. WYER:  I --

19          THE COURT:  I'll tell you what.  Let's take a ten

20     minute recess --

21          MS. WYER:  Okay.

22          THE COURT:  -- and why don't you then work with the

23     witness and see if you can expedite this?  I mean, I don't

24     want to foreclose you from making a record, I really don't.

25          MS. WYER:  Well --

1          THE COURT:  But I think the last 20 minutes could be

2     compressed to like two minutes so, you know --

3          MS. WYER:  Well, one thing I wanted to demonstrate,

4     Your Honor, is that each inspection did have its own unique

5     circumstances.  I think that's important for --

6          THE COURT:  Well, I mean --

7          MS. WYER:  -- evaluating the claims here.

8          THE COURT:  -- yes, but he can testify what the

9     range was.  I mean, maybe one was a dirty garage.  I mean,

10    we've been looking at office tables and desks.  I'd like you

11    to sort of be able to compress this into a group and give the

12    exhibit numbers and say are these the circumstances in which

13    you looked at the records.

14         I don't see the need to go through it one by one

15    like this, to be perfectly honest.  But we'll take a ten

16    minute recess and let's see if you can see of a way of

17    compressing this so you can introduce your exhibits, but we

18    can shorten the testimony of something that I think is very

19    non-controversial.

20         Would you have any objection to that, Mr. Murray?

21         MR. MURRAY:  Not at all, Your Honor.

22         THE COURT:  All right, thank you.

23         All right, so we'll be back in ten minutes and then

24    we'll try and complete the witness if possible, or at least

25    the direct.  How much more direct?  Well, I'll ask you that

1    when you come back, how much more direct there is.  All right,

2    thank you.

3          (Recess, 2:41 p.m.)

4          (On the record, 2:55 p.m.)

5          THE COURT:  Are you ready to proceed?  All right,

6    please be seated.

7    BY MS. WYER:

8    Q    Agent Lawrence, I -- was there something unusual about

9    the Angry Young Man inspection that you recall?

10   A    Well, there were a couple of things other than the one

11   Post Office box leading to a second Post Office box and then

12   having to notify the producer and come back a second day,

13   there was an issue where once we had identified that their

14   website contained images that were allegedly surreptitiously

15   taken in showers and in locker rooms and military bases, at

16   least that's what the website purported them to be.

17   Q    And how did that affect the inspection process?

18   A    Well, it -- the procedures were the same.  We still

19   followed the same procedures that we had for the 2257 program,

20   but it kind of raised a concern because a surreptitious

21   recording of actual military members on actual military bases

22   would be considered -- or would be illegal, so it opened up

23   that avenue that we at least had to do some investigation to

24   determine whether -- whether that had actually occurred or

25   not.

1  Q    Did it affect the photographs?  I mean, looking through

2  the photographs that we saw, were there photographs that

3  related to that issue?

4  A    Yes.  During the course of the inspection, and I don't

5  remember exactly how the conversation went or how it came up,

6  but during the course of the inspection, we did take

7  photographs which included photographs of a raised shower of a

8  mock doctor's office, of a mock locker room, et cetera, that

9  then the producer had indicated were used in filming at least

10 some of the videos that had been selected for inspection.

11 Q    Do you recall how it happened that you (inaudible)

12 photographs?

13 A    I don't recall exactly but again, it would have been

14 during the course of the inspection and he -- you know, we

15 were working at a table in the back room so we would have seen

16 -- you know, this raised shower and these locker rooms and

17 things like that, so it would have been -- it would have come

18 up in the normal course of conversation -- when we see all

19 these -- what appear to be studio sets -- were these used in

20 filming your videos, et cetera.

21        And so we -- we took photographs of these areas to

22 document that we did follow up on people verifying that a

23 criminal activity had not taken place and the producer was

24 present throughout the inspection and at no time did he object

25 to us taking those photographs.

1    Q    And was that the -- okay, now going to the list if

2    inspections in Exhibit 226, were some of these inspections

3    that you participated in or led, did they -- did they occur at

4    storage units?

5    A    Yes.  Some of the inspections occurred at a variety of

6    places depending on -- you know, the particular inspection

7    and, you know, these were only the eight or nine that I

8    conducted.  We conducted inspections in storage units, the

9    studio at the Angry Young Man, a couple of residences, et

10   cetera, so just the locations varied.

11   Q    And in each of these instances, how was it determined

12   where you would conduct the inspection?

13   A    It was determined simply by asking the producer -- once

14   we identified ourselves and explained why we were there, we

15   would ask them, hey, where's the best place for us to set up

16   or where would you like us to set up our equipment so that we

17   can conduct the inspection, and in each and every instance,

18   they would tell us where to sit.

19   Q    Was Don Goo an inspection, for example, where you --

20   where the records were in the possession of a company who had

21   not originally created the videos at issue?

22   A    Yes, Don Goo was an instance where -- and I'd have to

23   look at the actual inspection report where it's spelled out

24   and articulated, but the records ended up being in possession

25   of a third party.

1           And once we notified that third party about the

2    inspection, they directed us to the storage unit where the

3    records were located, pointed to the file cabinets that

4    belonged to Don Goo and where they thought the records might

5    be located and we went through those.

6           I believe that was the instance that I had referred

7    to earlier where we actually went through the records.  And

8    then there were some other records back at their corporate

9    office that were in some boxes.

10   Q    And how did it happen that you -- that they went to the

11   corporate office?

12   A    The third party had them stored there.  I don't recall,

13   you know, exactly why they were there but the third party who

14   was in possession of the records at that time directed us to

15   that location.

16   Q    Did he invite you to look at those records back at the

17   office?

18   A    Yes, and in each and every instance on the inspections

19   that I led, we were -- you know, we didn't -- first of all, we

20   asked where they wanted us to sit and where the records were,

21   et cetera, et cetera, and we never forced our way in or, you

22   know, threatened anyone with arrest or anything like that.  I

23   mean, it was a very cordial, very respectful procedure.  And

24   at the time, the industry for --

25                MR. MURRAY:  Your Honor, I'm going to object.  This

1   is way beyond the scope.  He's answered the question and now

2   he's engaged in --

3              THE COURT:  Yes, I think that's right.

4              Ask another question.

5   BY MS. WYER:

6   Q    And in that instance, did you ever find the records that

7   you had identified as the subject of the inspection for the --

8   this was the Don Goo business?

9   A    I'd have to look at that particular inspection report or

10  the summary.  I don't recall off the top of my head.

11             MS. WYER:  Can you put Exhibit 226 up?  That first

12  page.

13        (Pause in proceedings)

14             THE WITNESS:  No -- to answer your question, no, the

15  records were not found at the custodian address.

16  BY MS. WYER:

17  Q    Could you -- do you recall the inspection that occurred

18  at JT Video?

19  A    Yes, I do.

20  Q    And could you briefly describe any unique circumstances

21  regarding that inspection?

22  A    Very briefly, we identified the custodian address as a

23  residence.  We attempted to make contact with the producer.  I

24  had made telephonic contact with him.  He indicated at the

25  time that he was scheduled to leave town for like ten days so

1    I made arrangements with him to conduct the inspection the

2    morning after he got back.

3           I did not tell him what records were being inspected

4    obviously.  The following day we learned from a reporter --

5    and I don't remember exactly who -- but learned that the

6    producer of JT Video had contacted a reporter who ran a blog

7    and had indicated on his blog that we had contacted him and we

8    would conduct an inspection -- you know, in the future.

9           We decided that we would go out and conduct the

10   inspection that night so I contacted the producer for JT

11   Video, I told him we'd like to conduct the inspection that

12   night.  He agreed to meet us at his apartment.  We went in, we

13   conducted the inspection.

14          We were in and out within an hour and did not take

15   video -- or I'm sorry, did not take photographs during that

16   particular inspection just out of privacy concerns.  It was a

17   very small apartment.

18   Q    So why did that particular instance raise privacy

19   concerns?

20   A    Because it was such a small apartment, we would not be

21   able to take a photograph of where his 2257 records were

22   stored without capturing half his apartment and it wasn't --

23   you know, it wasn't necessary to document it, so we just opted

24   on the side of not taking the photograph.

25   Q    And do you recall the inspection of Bockis (phonetic)

 1   Video?

 2   A    I do.  Can you pull that up on the summary?

 3   Q    That's on the next page.  Did this inspection -- did you

 4   notify the producer in advance or contact the producer in

 5   advance before conducting this inspection?

 6   A    No, I don't believe it was necessary.

 7   Q    And did this inspection occur at an office location?

 8   A    Yes, in Sun Valley, California.

 9   Q    So could you explain in an instance like this -- in this

10   particular instance, if you recall, exactly how you went and

11   initiated contact with the producer?

12   A    Yes.  In a situation where a producer would have a

13   location that they were holding during normal business hours,

14   we would -- the team and I would go to that location, I would

15   have initiated contact with the owner by walking into the

16   business and if they had a general reception area, just, you

17   know, waiting there for the owner to come out and I'd identify

18   myself.

19         In this particular instance we -- I would have given

20   him the spreadsheet listing the videos and the performers that

21   we were seeking the records for.  I would have given him the

22   letter and I would have asked him where he wanted us to set

23   up.  In this particular instance, he asked us to set up in a

24   break room that we used as a work area.

25         I did not ask him -- you know, who has access to

1   this room, who uses it, or anything like that.  He directed us

2   to use that room.

3   Q    So when you -- in an office like that, did you -- is the

4   first initial area where you walked in an area where anyone

5   could enter the premises?

6   A    Normally, yes.  Depending upon the layout of the

7   business, but normally we would walk in and they would have

8   some kind of a general reception area where somebody from the

9   public -- you know, would be able to enter such as a Fed Ex

10  delivery or UPS or mailman or something like that.  That's

11  generally the area that we would stand in.

12  Q    And -- okay, do you recall the inspection of Shooting

13  Star Video, also known as Authentic?

14  A    Yes, I do.

15  Q    And did this inspection occur at a residence?

16  A    Yes.  In this particular instance, what I remember, the

17  business was no longer in existence and the records had been

18  sold, but the owner was able to get the 2257 records back.

19  Because it was at a residence, which I seem to recall we

20  didn't realize that until we showed up for the inspection, we

21  made contact with the owner and agreed to meet them back at

22  the residence at some point, which in this case would have

23  been on August 22nd, 2007.

24  Q    And did -- do you recall where the review of the records

25  took place?

1    A    Yes.   It took place in the kitchen at a big, square

2    table.   I remember it because it was a very nice house.

3    Q    And did the team do anything inside the premises other

4    than sit at that table and review the records?

5    A    The only other thing that we would have done, again, in

6    conjunction with normal procedures, was we did take a

7    photograph of the kitchen table both before and after we did

8    the -- or conducted the inspection.

9    Q    And in this instance you mentioned that the former owner

10   had retrieved the records from another location before the

11   inspection occurred?

12   A    Yes, ma'am.   I believe it was -- I believe -- and I'd

13   have to look at the actual inspection report, it should be

14   articulated in there, but I seem to recall he had a copy of

15   the records in a storage unit.

16   Q    Do you recall the inspection of Alex Lord's (phonetic) --

17   A    Yes, I do.

18   Q    And where did this inspection take place?

19   A    This inspection took place in South Florida in

20   conjunction with three other inspections that we conducted.

21   What we did was we waited until we had a number of inspections

22   and then we could conduct them in one geographical location.

23   And then we flew out -- flew the team out with all of our

24   equipment and conducted these four inspections.

25   Q    And in this instance did you contact the producer in

1   advance?

2   A      No.  We showed up, realized it was a residence, knocked

3   on the door and somebody was home -- the producer was actually

4   home.  We identified ourselves, explained why we were there,

5   asked him where he would like us to set up and he directed us

6   to what I believe was his dining room table.

7   Q      And then all of the inspections that we've discussed so

8   far, did any of the producers indicate that they thought you

9   should obtain a search warrant before the inspection?

10  A      No, ma'am.  As I testified earlier, during any of the

11  inspections that I led and any of the inspections that I may

12  have been present for but not in a lead capacity, I did not,

13  and no one indicated, that we should obtain a warrant.

14  Q      Did any of them express reluctance to allow the

15  inspection to proceed?

16  A      No, ma'am, no one to the best of my recollection

17  expressed any reluctance, and had they done that, I would have

18  documented that in the inspection report.

19  Q      Now, the final inspection that you were the lead

20  inspector for was Gus-Pro Productions (phonetic).  What was

21  unique about that inspection?

22  A      That was one of the other inspections that took place in

23  South Florida.  Initially a Post Office box was listed as the

24  custodian of record.  We attempted to make contact with the

25  individual listed on the form.

Lawrence - Direct (Wye)                                          148

1              They were reluctant -- well, it turned out that it

2      was the producer's mother from what I remember who didn't want

3      to explain things to us.   Through a number of phone calls both

4      with the mother and father, it turns out that the producer was

5      living in Thailand and had the 2257 records with him there.

6      Q    So how did the inspection proceed in that context?

7      A    In that particular instance, we allowed the producer to

8      email the records to us via email, and which he did sometime

9      thereafter.

10     Q    So did that inspection involve entering any premises at

11     all?

12     A    Other than my office, no.   No, that inspection was

13     completed at my office.

14     Q    Now, what -- generally what happened after an inspection

15     was completed?

16     A    Generally if -- once we vacated the location -- the

17     inspection location, be it a residence or a business location,

18     we would go back to our office and the contract employees

19     would finish up their inspection paperwork and then the lead

20     inspectors would start drafting an inspection report.

21             If there were any violations, we would give the

22     producers about a week to provide a response, provide

23     documentation that would cure the violation.   We would still

24     document it, we would indicate that they provided records in

25     response to the violation -- or to the finding, I should say.

1              And then once the report was completed, we would

2       compile it and then a copy was sent to the Crimes Against

3       Children Unit back at FBI headquarters and we would place a

4       copy in our case file, and then we would send a copy to the US

5       Attorney's Office for whatever district the inspection had

6       been completed in.

7       Q    Did you or other members of the team have any involvement

8       with the US Attorney's Office's decision regarding whether to

9       prosecute any of the violations that were identified?

10      A    No, ma'am, we never do.

11      Q    Now, what do you know about is there a 2257 inspection

12      program currently in operation?

13      A    No, there is not.

14      Q    And when did the program cease?

15      A    It was the fall of 2007.  I don't have the exact date but

16      it was like September or October of 2007.  I believe it was

17      the Sixth Circuit had issued an opinion indicating that they

18      had found that the 2257 was unconstitutional or something like

19      that, and we received instructions from our headquarters both

20      from the Crimes Against Children Unit and the Office of

21      General Counsel to cease and desist on all inspections until

22      further notice.

23      Q    And were you aware at any time after that whether that

24      Sixth Circuit decision was overturned?

25      A    I didn't keep -- didn't really keep track of it.  What

1    happened was eventually in early 2008 --

2              MR. MURRAY:  Objection, Your Honor.  He's answered

3    the question.

4              THE COURT:  Yes.  Next question.  He said he's not

5    aware.

6    BY MS. WYER:

7    Q    Describe how the -- what happened to the inspection

8    program after you ceased conducting inspections.

9    A    Well, we're holding all inspections in abeyance.  We

10   continued finishing up the inspection reports we had already

11   completed inspections on and the contractors continued viewing

12   material that had already been purchased, et ceteram, because

13   we were not sure what the outcome was going to be.

14             And DOJ had not indicated whether they were going to

15   appeal and all that, so we continued on until we received

16   instructions from FBI headquarters that the program was going

17   to be shut down and we were going to be assigned to stand up a

18   Child Sex Tourism Initiative in Southeast Asia.

19   Q    And do you recall when that occurred?

20   A    I don't recall the exact date but it was January or

21   February of 2008, somewhere around there.

22   Q    And since that time are you aware of any -- any effort to

23   resume inspections under 2257?

24   A    No, I am not aware of any discussions.  I have not heard

25   anything about re-instituting the 2257 program.

1    Q    Based on your experience and your involvement in the 2257

2    inspection program, did you have an impression regarding the

3    nature of performers that appeared in the content that the

4    inspection team reviewed?

5              MR. MURRAY:  Objection, Your Honor.  He's not been

6    identified as an expert witness and --

7              THE COURT:  Well, I'm not -- based on your

8    experience can you answer the question?

9              THE WITNESS:  Could you repeat the question, please?

10   BY MS. WYER:

11   Q    Based on your experience with the 2257 inspection

12   program, do you -- do you have an impression regarding the

13   general youthfulness of performers or what age they generally

14   appear to be?

15             MR. MURRAY:  Objection.

16             THE COURT:  Well, I mean, is that something that

17   appears in any of your reports?

18             THE WITNESS:  Well, I -- it appears in the reports

19   insofar as dates of birth of the performers who are listed in

20   our inspection --

21             THE COURT:  All right, well she's not asking about

22   the dates of birth, she asking about appearances -- did you

23   notice anything about appearances.

24             THE WITNESS:  Well, I could say that in a number of

25   the films that were selected --

1          MR. MURRAY:  Objection, Your Honor.

2          THE COURT:  Well, I'm going to -- is this something

3     that you actually recall?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  All right.  Overruled.

6          THE WITNESS:  And I know what procedures were used.

7     When we were selecting videos -- let me -- let me back up.

8     Certain producers that were selected kind of -- for lack of a

9     better word -- specialized in certain genre, so they might

10    gear their production towards videos that included younger

11    performers.

12         It might include titles, for example, Young Lolitas,

13    volume whatever, or College Age Babes, volume, you know,

14    whatever or Barely Legal, volume, you know, whatever.  In

15    those cases when we were selecting videos for inspection, we

16    were trying to select titles that indicated those videos might

17    or should -- should contain younger looking performers.

18         Certain producers didn't necessarily gear themselves

19    towards that genre.  Some producers such as Playboy or Wicked

20    might -- you know, gear themselves towards other -- other

21    videos, in which case we would still try to find titles that

22    contained younger looking performers, but it wasn't always the

23    case and so we would just have to do the best that we could.

24    BY MS. WYER:

25    Q    Now, based on what you have described, you have

1    experience with the process of determining whether a producer

2    is in compliance with the 2257 requirements as they existed in

3    2007, so I wanted to ask you based on that experience, whether

4    you think the inspection process would be effective if there

5    were changes to the requirements from what you were dealing

6    with back in 2007.

7            (Transcriber change)

8                THE COURT:  Then I'll sustain the objection.

9                MS. WYER:  Well, Your Honor, this -- this witness

10   has particular -- a particular ability to --

11               THE COURT:  But it's speculative.

12               MS. WYER:  I don't think it's speculative, Your

13   Honor.  This is based on the process that this witness knows

14   about, the process of conducting an inspection.  And I wanted

15   to ask, in particular, how he views it from an enforcement

16   perspective or from an inspection perspective, if there

17   were --

18               THE COURT:  Well, his superiors told him to stop the

19   inspection program.

20               MS. WYER:  And I wanted to ask it, based on his

21   experience from the perspective of having conducted

22   inspections, for example, how a requirement, where there was

23   an age cut-off would be -- would affect the inspection

24   process.

25               THE COURT:  Well, there -- well, is that something

1    you think you can answer, based on your experiences, having

2    done these inspections?

3              THE WITNESS:  I think I could.

4              THE COURT:  And do you express that in any of your

5    reports?

6              THE WITNESS:  Well, it wasn't -- we didn't have an

7    age cut-off in existence at the time the 2257 inspections were

8    conducted.  So it wasn't listed in any of the --

9              THE COURT:  Well, I'm not sure there's an age cut-

10   off now, either.

11             THE WITNESS:  No, there's not.  So we didn't address

12   it in the reports, because it didn't exist.  I can say from an

13   enforcement --

14             MR. MURRAY:  Objection, Your Honor.

15             THE COURT:  Well, what do you mean by an age cut-

16   off?

17             MS. WYER:  Well, as -- as the requirements existed

18   at the time the inspection program was in effect but, did it

19   apply universally to all depictions of sexually explicit

20   conduct.  The plaintiffs, here, have -- appear to be making a

21   suggestion that the requirement should only apply to a subset

22   of those depictions.  So, I wanted to --

23             THE COURT:  To what?

24             MS. WYER:  A subset of those depictions, depending

25   on what age a person appears to be.  And I wanted to --

1              THE COURT:  Well, let me -- 2257 required a producer

2      to secure photo documentation of all performers, is that

3      correct?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  And you were aware that, because of the

6      child pornography laws that -- because of that, the producers

7      were, at least, only supposed to employ people who were 18 or

8      older, right?

9              THE WITNESS:  Yes, sir, they were --

10             THE COURT:  Right.

11             THE WITNESS:  -- supposed to.

12             THE COURT:  Right.  Do you have -- as a result of

13     being an FBI agent, do you have any experience with false

14     identifications or phony -- excuse me -- phony

15     identifications?

16             THE WITNESS:  God bless you.

17             THE COURT:  Thank you.

18             THE WITNESS:  I would not consider myself an expert.

19     We've had -- I've had investigations where someone has used

20     fake identification.

21             THE COURT:  Well, in the course of doing any of

22     these inspections, did you come across any photo

23     documentations of the people who had been employed by the

24     producers that appeared to be false or phony or otherwise

25     questionable?

1          THE WITNESS:  We -- we had two instances.  One

2     involved a -- from what I remember, a Thailand -- or a

3     performer from Thailand, whose age initially appeared that she

4     was under 18 but upon subsequent investigation, we realized it

5     was based on a, I believe, it was a Buddhist calendar, and

6     once we converted it, she was of legal age.

7          There was a second instance where we had received a

8     complaint from the boyfriend of a performer, who had indicated

9     she was under 18, and over the period of about eight months,

10    had appeared in 20 -- 20 films.  We were in the process of

11    following up on and trying to verify that information, when

12    the program was shut down.

13         THE COURT:  So it was never resolved?

14         THE WITNESS:  Yes, sir, that's correct.

15         THE COURT:  Is it easy to tell if a photo

16    documentation of a person's age is false or is it -- is that a

17    difficult topic for an investigator?

18         THE WITNESS:  That was one of the issues that we

19    encountered, and moreover, it was actually one of the issues

20    that I had raised with my headquarters and the Office of

21    General Counsel in that I wanted to add a procedure where,

22    once we obtained copies of the photo identification, I wanted

23    to run the driver's license numbers to verify that the

24    documentation that we had been provided was actually authentic

25    and was not fraudulent.

1              THE COURT:  Okay.  The question -- the problem I

2     have with the question is that, law establishes the borderline

3     at age 18.  18 and above is legal; under 18 is illegal, is

4     that right?

5              MS. WYER:  Yes.

6              THE COURT:  What?

7              MS. WYER:  Yes, Your Honor.

8              THE COURT:  Okay.  So -- and I don't -- Mr. Murray,

9     I don't understand your case as making any claim that it's

10    unconstitutional for Congress, in the child pornography laws

11    or in any other law, to have made the dividing line at age 18.

12             MR. MURRAY:  No.  No, we have not made such a claim.

13             THE COURT:  Okay.  So that's not an issue here.  The

14    issue is whether, as I understand it, the statute and the

15    regulations are unconstitutionally overbroad, because they

16    require this very heavy documentation across the board and

17    even as to people who are obviously adults.  That's your

18    position, right?

19             MR. MURRAY:  That's one of our arguments, Your

20    Honor.

21             THE COURT:  One of your arguments.  So I don't know

22    how your question to this witness helps answer that issue.

23             MS. WYER:  Well, Your Honor, I think it's directly

24    on point, because it -- it goes to why the universal

25    verification requirements are a reasonable way of addressing

1    Congress's concern that they're narrowly tailored.  The

2    universal nature prevents certain loopholes.  It prevents the

3    kinds of things that Agent Lawrence would explain if I asked

4    him this question.  If I don't ask him this question --

5              THE COURT:  Well --

6              MS. WYER:  -- he won't be able to explain that.

7              THE COURT:  Well, let me see if I can put the

8    question in a different light, not that your question is

9    necessarily wrong, but the -- we've had a lot of testimony in

10   this case that many of the performers in these sexually

11   explicit movies are, obviously, adults, you would agree with

12   that, correct?

13             THE WITNESS:  I would -- I would agree, yes.

14             THE COURT:  From having -- from the time that you

15   looked at a lot of the --

16             THE WITNESS:  Over 18, yes.  Yes.

17             THE COURT:  I mean, it's obvious that some of them

18   could be 40 or 50 or even 60, maybe not a majority, but there

19   are at least some performers who are clearly over 18, isn't

20   that -- from visual inspection?

21             THE WITNESS:  Yes, sir.  That's an accurate

22   statement.

23             THE COURT:  All right.  Now, let me ask you another

24   question.  I don't know how familiar you are with digital

25   photography, but are you aware that photographs taken

1    digitally can be manipulated and can be altered after they've

2    been taken and before they're made into images on a video or

3    on a digital production?

4              THE WITNESS:  Yes, sir, I am aware of that

5    capability.

6              THE COURT:  Do you have any -- have you had any

7    expertise in that as an investigator?

8              THE WITNESS:  No, sir.

9              THE COURT:  All right.  In your inspections, did you

10   come across any photos or videos that you saw that you could

11   tell had been digitally altered after the photograph was

12   taken?  For example, we -- I don't know if you were here this

13   morning when this lady testified that she had come across a

14   photograph of a -- where a stepfather had taken a picture of

15   someone over 18, and then after it was taken had transposed a

16   photograph of a much younger person on top of a mature body.

17   Do you remember that?  Were you here for that?

18             THE WITNESS:  Yes, sir, I heard that testimony.

19   Yes, sir.

20             THE COURT:  As an investigator, do you have any

21   experience in that?

22             THE WITNESS:  I personally do not, no, sir.

23             THE COURT:  All right.  Do you believe that if

24   Congress -- well, here's the thing, you know, Mr. Murray, as

25   the plaintiff, you have the burden of proof in these

1   proceedings.  And one of the issues that is in front of me is

2   whether the statute is narrowly tailored.  That's clearly one

3   of the remand issues.

4           So you're objecting to this question, but my

5   question to you is, you know, what are you going to argue that

6   because this rule applies across the board without making any

7   distinctions, other than 18 years, that that's why it's

8   facially overbroad, as a matter of law?

9           MR. MURRAY:  Your Honor, first of all, I don't agree

10  that we have the burden of proof on narrow tailoring.  The

11  Government always has the burden of proof under the

12  Intermediate Scrutiny Test.  But my objection doesn't really

13  go to that.  The problem I have is, this isn't the right

14  witness for that question.  He's not an expert.

15          THE COURT:  Well, an expert can answer, but he did

16  these inspections, and what the Government is trying to elicit

17  is that -- is whether, based on his experience in having done

18  these inspections, that if there was -- given the fact that

19  the statute says 18 is the dividing line, that if the

20  inspection in the regulatory scheme was limited to people who

21  were, say, under 25, whether that would be satisfactory or

22  efficient and productive in curtailing child pornography.

23          MR. MURRAY:  Right, and I don't --

24          THE COURT:  All right.  I'm going to rephrase your

25  question to that.  Did you understand what I just said?

1          MR. MURRAY:  But, Your Honor, my problem -- my

2     problem --

3               THE COURT:  Do you want me to rephrase it?

4               THE WITNESS:  If you could just ask it again?

5               THE COURT:  What?

6               MR. MURRAY:  -- my problem with that question,

7     again, is he's not the right witness to ask that, because --

8               THE COURT:  Well, but that's --

9               MR. MURRAY:  -- he's just -- you know, he's an FBI

10    agent --

11              THE COURT:  Okay.  Well -- all right.

12              MR. MURRAY:  -- who --

13              THE COURT:  All right.  Well --

14              MR. MURRAY:  But I -- I mean, I have no problem with

15    the question being --

16              THE COURT:  All right.

17              MR. MURRAY:  -- being answered --

18              THE COURT:  Okay.

19              MR. MURRAY:  -- in this case.

20              THE COURT:  Well, that's how I am going to rephrase

21    the question, and your objection is noted and overruled, but

22    you can make a motion to strike and allege, in whatever form

23    you want, that it's in error.  But here's the question,

24    assuming that the law that Congress passed about child

25    pornography says that sexually explicit photographs and videos

1  of people under 18 is illegal, is classified as child

2  pornography, if the regulatory scheme for keeping records only

3  applied to performers who were under 25, would you see

4  problems in that from a law enforcement point of view, as a

5  FBI agent?

6            THE WITNESS:  Absolutely.

7            THE COURT:  Well, explain why.

8            THE WITNESS:  Here's why, and being only one of two

9  FBI agents who have ever overseen these -- these inspections,

10  I have, you know, some experience in viewing these and trying

11  to conduct these inspections.  The problem that I see, from a

12  logistical standpoint is -- well, it's a couple of areas.

13      Number one, some of the videos that we selected in our

14  inspection, the contract employees were not able to capture a

15  facial image of the performer.  So in the inspection reports,

16  even in the redacted ones, you will see them listed as

17  unidentified male or unidentified female.

18            In that instance, the review would not be able to

19  ascertain the age of the performer or to determine whether

20  they were -- they were 25 or under 25, simply by looking at,

21  you know, whatever body part may appear in the video.

22            When we would go to the producer in that instance

23  and say, we need the ID for this particular performer who, you

24  know, we don't have a facial image, they may very well tell

25  us, well, that performer was over 25.  There's no way for us

1   to verify that if the photo identification doesn't exist in

2   the file.  The --

3            THE COURT:  Well, did you find files where there was

4   no photo identification?

5            THE WITNESS:  I -- I can't recall off the top of my

6   head, but I don't remember -- it -- it -- I mean --

7   BY MS. WYER:

8   Q    You're -- you're explaining what you think, based on your

9   experience --

10  A    Yes.  If the --

11  Q    -- would happen if there was a 25 year old cut-off?

12  A    Yes.

13           THE COURT:  Yes, but you're -- you're presupposing

14  that there was no photo identification in the producer's

15  files, whereas I thought that your testimony was that there

16  was always photo identification.

17           THE WITNESS:  Well, there was always supposed to be

18  identification --

19           THE COURT:  Yes.

20           THE WITNESS:  -- but my understanding is if --

21           THE COURT:  But and you also testified that you're

22  not an expert.  Some of those could be phony or false, but you

23  couldn't tell that?

24           THE WITNESS:  Correct.  But if -- if the regulation

25  was changed so that there was, like, a 25 age cut-off, I would

1    assume that that would imply the producers would not be

2    required to maintain documentation for someone over 25.

3              THE COURT:  Right.

4              THE WITNESS:  And from an enforcement standpoint, if

5    we went out, and we only had a body part that was captured,

6    and couldn't tell how old that individual was -- I mean, you

7    know, I'm not an expert at telling 18 year old and 24 year old

8    or 26 year old body parts -- if -- if that photo ID isn't on

9    file, I, from an enforcement standpoint or from inspection

10   standpoint, would not be able to say that the producer was in

11   compliance with 2257 if they weren't required to have that

12   documentation.  Does that make sense?

13             THE COURT:  All right.  Well, suppose the cut-off

14   was age 30 or 35 or 40?

15             THE WITNESS:  Well, I would -- I would argue that --

16             THE COURT:  I mean, does there come a point -- and

17   we've seen some sexually explicit photographs of people who

18   appear to me to be well over 50 or 60 in them.

19             THE WITNESS:  Well, I would -- I would counter that

20   in certain ethnicities, the Asian culture, for example, that

21   they are --

22             MR. MURRAY:  Your Honor, now, he's really trying to

23   be an expert.

24             THE COURT:  Well, he's -- no, he's not.

25             THE WITNESS:  No, I --

1            THE COURT:  Overruled.

2            THE WITNESS:  That based -- based on my experience,

3    some Asian women tend to look younger than they are.  So

4    again, it would be a situation where we would go out to -- to

5    conduct an inspection, and we may have captured a facial image

6    of an Asian performer.  And we ask the producer, well, where's

7    the -- the photo ID for this performer, who appears to be 20,

8    and they could counter, well, they were 28 or they were 30 or

9    they were 31, so we didn't collect it.  How am I going to

10   verify that?

11           THE COURT:  All right.  Let me ask you another

12   question.  And this gets back to the ability of digital

13   photographs to be altered.  We all know or at least there's

14   been testimony that some males and females under 18 can be

15   very sexually developed, more than -- much more than average,

16   is that correct?

17           THE WITNESS:  Yes, sir.  Yes, sir.

18           THE COURT:  And if you -- would it be possible for a

19   dishonest producer to hire somebody under 17 -- under 18,

20   rather, who was attractive in a sexually explicit movie,

21   because their body was so well developed, but then, after

22   filming them in a sexually explicit performance, before

23   publishing it, transposed their face and their head and put on

24   an older looking person on this younger person's body.  Would

25   that concern you, from a law enforcement investigator point of

1    view, the possibility of that?

2              THE WITNESS:  I suppose that's a possibility in

3    today's technology -- with today's technology.  I suppose that

4    could be a concern for us.

5              THE COURT:  All right.  Next question.

6    BY MS. WYER:

7    Q    For the record, I want to ask this witness, Agent

8    Lawrence, how did the universal application of the age

9    verification and recordkeeping requirements assist you with

10   conducting your 2257 inspections?

11             MR. MURRAY:  Objection, Your Honor.

12             THE COURT:  All right.  Overruled.

13             THE WITNESS:  It -- it made it -- it simplified it,

14   because it was a universal rule that all the producers knew

15   that they had to -- or all the U.S. based producers knew that

16   they had to comply with so when we went in and asked for the

17   records, the producers knew that they were supposed to have

18   them, at least on the inspections that we conducted.  It -- it

19   just -- it made it easier.  If we had loopholes or -- or

20   exceptions where records weren't required, it would have just,

21   quite honestly, created a quagmire as far as these

22   inspections.

23             THE COURT:  Created, what, sorry?

24             THE WITNESS:  A quagmire.  It just -- it would have

25   just gummed up the process, the inspection process.

1              THE COURT:  Okay.

2    BY MS. WYER:

3    Q     And why is that?

4    A     Well, because --

5              THE COURT:  Well, I think he explained it, but go

6    ahead.  Can you --

7              THE WITNESS:  Yeah, it would have caused -- it had

8    -- it would have had the potential for creating a number of

9    disputes between the inspection team and the producers.  In

10   other words, we could have asked for identification, and the

11   producer said -- would, of course, said, it's not required.

12   There's an exception here -- an exception there, whatever.

13   And then, we would have had to conduct a thorough

14   investigation to try to verify that.  It just -- it would have

15   made the inspection process much longer, much more difficult

16   and probably, would have resulted in the producer having to

17   provide more documentation.

18   BY MS. WYER:

19   Q     Now --

20             THE COURT:  Well, no, let me ask another question.

21   Can you tell me what these photo documentations that you

22   found, what -- how they were created?  Is this something that

23   somebody can do with a -- you know, just a digital camera?

24             THE WITNESS:  Just the photo identification?

25             THE COURT:  Yes, the ones you saw in the records.

1          THE WITNESS:  A majority of them were driver's

2     licenses issued by whatever state the performer was from or

3     military ID or, you know, some other form of government issued

4     identification.

5          THE COURT:  Did you insist on any professionally

6     taken photographs, you know, where they have to go to a

7     photographic studio and pay, you know, some money to --

8          THE WITNESS:  We -- we never demanded anything, Your

9     Honor.

10          THE COURT:  Okay.  Go ahead.

11    BY MS. WYER:

12    Q    Did you -- for the age verification documents, did you

13    rely on government issued identification?

14    A    We relied on the copies of the government issued

15    identification that were provided to us, yes.

16    Q    In your experience conducting inspections in 2006 and

17    2007, were most of the records kept in paper format?

18    A    Just for clarification, I was only on the team in 2007.

19    Q    Oh, sorry.

20    A    But my understanding and -- and from what I saw, the

21    records obtained during previous inspections, yes, all of

22    those were in -- well, a majority of them were in paper

23    format.  Some were provided to us in digital format.

24    Q    Do you think -- as one of the two inspectors involved and

25    who conducted these inspections, would you be able to say with

1    any certainty how an inspection program that might be

2    implemented in the future would be conducted?

3                MR. MURRAY:  Objection, Your Honor.  This was the

4    question that was --

5                THE COURT:  Yes, sustained.

6                MR. MURRAY:  -- sustained five minutes ago.

7                THE COURT:  No, that -- I'm not going to go there.

8    That's --

9                MS. WYER:  Well, Your Honor, I'm just asking him if

10   he -- if he also believes that it would be speculative to

11   opine on that issue.

12               THE COURT:  Oh, all right.  I didn't understand.

13               MR. MURRAY:  Your Honor, could I hear the question,

14   again, then, because I still don't --

15               THE COURT:  Yes.

16   BY MS. WYER:

17   Q    Well, under -- I am simply asking, do you think it would

18   require speculation to describe how a future inspection

19   program might be conducted, at this stage, if an inspection

20   program were now to be -- to be implemented at this point, in

21   2013?  Do you think it would be a matter of speculation how

22   that inspection program would be carried out?

23               MR. MURRAY:  Objection.

24               THE COURT:  Overruled.

25               THE WITNESS:  Yes, it would be.  The -- the statute

1   has changed.  The technology has advanced.  You know, so

2   there's -- there's just a number of factors that would go into

3   devising whatever form and fashion a new 2257 program would --

4   would take.

5            MS. WYER:  No further questions.

6            THE COURT:  All right.  Cross-examine.

7                      CROSS-EXAMINATION

8   BY MR. MURRAY:

9   Q    Agent Lawrence, you just got done saying the statute has

10  changed.  What makes you think the statute that was in

11  existence as of 2007 is not the same statute that's in

12  existence today?

13  A    The -- I am aware that the statute changed in, I think,

14  it was 2006.

15  Q    Yes.

16  A    Yes.  And the regulations that we were following, that

17  the checklists were -- I was referring to, when I made my

18  comment, was the checklists that we used were derived from the

19  regulations almost word for word.  And to the best of my

20  knowledge, the regulations have not changed.

21  Q    Okay.  So, the -- so your statement that the -- in

22  response to the question as to whether it's speculation that a

23  new program would differ, one of your answers -- your answer

24  said that it would because the statute has changed.  Do you

25  remember just saying that a few minutes ago?

1    A    Yes, but there's a number of factors, as I indicated.

2    Q    Isn't that what you said?

3    A    Yes, sir.

4         THE COURT:  Yes, he did say that.

5    BY MR. MURRAY:

6    Q    Okay.  But I just want to be clear, the statute that was

7    in effect, at the time that you did your inspections, is the

8    statute that became effective July 27, 2006, correct?

9    A    I would have to look back --

10        THE COURT:  Well, let's assume that, yes, I think

11   you're right.

12        THE WITNESS:  Okay.  I -- I would have to look back

13   and compare our checklist and the copy of the statute that I

14   carried around with me to answer your question with 100

15   percent certainty.

16   BY MR. MURRAY:

17   Q    Well, I will represent to you that the statute that is in

18   effect today is this one that became effective July 27, 2006.

19   And if -- and if you assume that to be true, every one of your

20   inspections occurred after July 27, 2006, correct?

21   A    Yes, sir.

22   Q    Okay.  And you will notice that the current version of

23   the statute includes, under the parts that are unlawful -- do

24   you see under F, which describes the -- what -- what is

25   prohibited?

1    A    Yes, sir.

2    Q    And do you see the number five -- that F-5 makes it

3    unlawful for any person to whom subsection A applies to refuse

4    to permit the Attorney General or his or her designee to

5    conduct an inspection under subsection C, do you see that?

6    A    Yes, sir.

7    Q    And you know that, F-5, was added to the statute in July

8    of 2006, wasn't it?

9    A    If you say it was, then, yes.

10   Q    Okay.  Well, let me show you the version that was in

11   effect prior to 2006.

12   A    I believe you, sir.

13         MS. WYER:  Objection, Your Honor, argumentative and

14   -- and --

15         THE COURT:  No, it's not.  Overruled.

16         MS. WYER:  -- legal opinion -- improper opinion,

17   Your Honor.

18   BY MR. MURRAY:

19   Q    Now, I want to show you Plaintiff's Exhibit 31C and ask

20   you if you can recognize this document, sir?

21   A    Yes, sir.  That appears to be the copy of the letter that

22   would have been provided to the producer once we appeared at

23   their business location and identified ourselves, explaining

24   why we were there.  And we would have handed them this letter

25   along with the spreadsheet that I can see through the second

1    page, identifying all the records that were subject to

2    inspection.

3    Q    All right.  So you -- this is a letter that you signed,

4    do you see that?

5    A    Yes, sir.

6    Q    Okay.  And this happens to be a letter that was dated

7    March 26, 2007, correct?

8    A    Yes, sir.

9    Q    And it happens to be one of the inspections that you were

10   the lead --

11   A    Yes, sir.

12   Q    -- inspector on, and that was the angry one, correct?

13   A    "Angry Young Man", yes, sir.

14   Q    And the first thing that you did when you showed up at

15   the door -- how many -- how many Government agents did you

16   show up with?

17   A    Just one.  I --

18   Q    You and a contractor?

19   A    -- I was it -- I was it.

20   Q    Okay.

21   A    And the contractors are just that.  They're contract

22   employees.  They are not -- you know, they're not agents --

23   special agents.  I just want to make -- I just wanted to make

24   that clarification.

25   Q    Well, they were there in an official capacity as an agent

1    -- as a contractor --

2    A    They were an agent of the Government, but --

3    Q    You've got to let me finish the question.  As a

4    contractor for the Government, correct?

5    A    Yes, sir.

6    Q    Okay.  And so how many people, representing the

7    Government of the United States, usually appeared with you to

8    do an inspection?

9    A    It varied, depending on the inspection and how many

10   videos had been selected for inspection.

11   Q    Well, what was the range?

12   A    We only had four or five contractors at the height of the

13   program, so at the most, only five would have shown up.

14   Q    Including you?

15   A    No, the lead inspector would have been the sixth person.

16   Q    Okay.  So you're saying that six representatives from the

17   United States Government, on any given inspection, might have

18   shown up to enter those premises, is that correct?

19   A    Yes, sir.

20   Q    Okay.  Now, this -- and the very first thing that you did

21   when you would get there, would -- you would show them your

22   badge so that they knew that you were an FBI agent, correct?

23   A    Yes, sir.

24   Q    And then you would -- you would explain that you're there

25   to do an inspection under the statute, correct?

1    A     Yes, sir.

2    Q     And you would hand them this letter, in just about every

3    case, except maybe one or two?

4    A     Yes, sir.

5    Q     Okay.  And this letter indicated to them, and -- and they

6    would have an opportunity to read it, if they wanted to,

7    correct?

8    A     Yes, sir.

9    Q     And, in fact, you would advise them, right at the very

10   beginning, that the Federal Bureau of Investigation is

11   conducting an inspection of records, in this case, maintained

12   by "Angry Young Man", correct?

13   A     Yes, sir.

14   Q     And that the recordkeeping requirements, you would cite

15   the statutes that were involved, correct?

16   A     Well, I -- I don't remember exactly what I would have

17   said, but --

18   Q     Well, look at the letter -- in the letter.

19   A     Well, what's documented in the letter may have very well

20   been different from what I said in that, I might have

21   summarized it.

22   Q     I'm sorry.  I didn't mean orally.  I meant that the

23   letter advises them --

24   A     Yes, sir, the letter advises them.

25   Q     -- that you are there to ensure compliance with the

1    recordkeeping requirements of Title 18, 2257, correct?

2    A    Yes, sir.

3    Q    And that you -- the letter tells them that violations of

4    18 U.S.C. Section 2257 are subject to criminal penalties,

5    correct?

6    A    Yes, sir.

7    Q    Okay.  And then, the letter explains what the

8    requirements of the law generally are, correct?

9    A    Yes, sir.

10   Q    And then it says, in this paragraph here, "Pursuant to

11   these laws and regulations, the FBI is authorized to enter

12   your place of business, without delay", correct?

13   A    Yes, sir.

14   Q    And then you tell them, in this letter, "It is a criminal

15   violation of Federal law to delay or obstruct the FBI from

16   conducting the inspection", correct?

17   A    Yes, sir.

18   Q    And that's what's in the letter, the very first thing

19   that you give them when you show up, correct?

20   A    Yes, sir.

21   Q    So the letter advises them that they would be committing

22   a crime, if they didn't let you in to inspect the records.

23   Isn't that what we just read?

24   A    Well, the letter indicates that, yes, sir, however --

25   Q    Okay.

1    A    -- in this particular one, you will recall that they knew

2    that the inspection was coming.  In fact, the producer had

3    contacted his attorney prior to us showing up to conduct the

4    inspection.

5    Q    Right.  But this letter tells them, also, that whatever

6    else they knew, that it would be a crime if they, in any way

7    delayed or refused to permit you to enter their premises to do

8    the inspection, correct?

9    A    Yes.  But in -- in this particular case, we had already

10   made arrangements to conduct the inspection.  And during our

11   conversation, there was no indication that -- either from the

12   producer or his attorney that -- that he felt we needed to get

13   a warrant.

14   Q    Right.  Well, did they have any -- did you have any

15   indication from them that they were unaware of the fact that

16   if they refused to permit you to enter their premises to do

17   the inspection, they'd be committing a crime?

18   A    I'm sorry, sir, could you repeat that question?

19   Q    Are you suggesting that they were unaware that it would

20   be a crime for them not to let you in to do the inspection?

21   A    I am not suggesting anything.  I would assume that if

22   they're producers in this industry, they were well aware of

23   what the 2257 requirements were.

24   Q    Right.  And so, they would be aware that they couldn't

25   demand a search warrant, correct?

1   A    I didn't write the law, sir, but yes.

2   Q    Okay.  And in fact, you didn't -- whenever you showed up

3   at one of these premises, you never said to them, you do not

4   have to let me in, and if you -- in fact, you have the right

5   to ask me to get a search warrant.  You didn't advise them of

6   that, did you?

7   A    I wasn't required to and did not, sir.

8   Q    Okay.  And in fact, the only advice you gave them, in

9   writing, was that they couldn't refuse, correct?

10               THE COURT:  Well, he said that several times

11  already.

12               MR. MURRAY:  Okay.

13  BY MR. MURRAY:

14  Q    Now -- all right.  So let me -- let me back up, then, and

15  ask you -- and by the way, the regulation -- well, back up.

16  In January of '07 is when you became involved, correct?

17  A    Yes, sir.

18  Q    And in order to make sure that you knew what you were

19  doing, you familiarized yourself with the statute and the

20  implementing regulations, correct?

21  A    Yes, sir.

22  Q    And you even took a copy of the statute and the

23  regulations with you when you did the inspections so that you

24  would have something to consult with, correct?

25  A    Yes, sir.

1  Q    And the regulations that you were operating under are

2  virtually the same, when it comes to inspections, as the

3  regulations that are currently in effect?

4            MS. WYER:  Objection, Your Honor.  There are other

5  changes to the regulations.  I mean, this question is too

6  complicated.

7            THE COURT:  Overruled.  Can you answer the question?

8            THE WITNESS:  Could you repeat the question?

9  BY MR. MURRAY:

10  Q    The regulation under which inspections occurred, which

11  were in effect in May of 2005, are virtually identical, with a

12  few minor word changes, to the regulations that are currently

13  in effect, when it comes to inspections, are they not?

14  A    I don't know what the -- if -- if there are any changes,

15  I am unfamiliar with the regulation since I stopped

16  participating in the program.

17  Q    Okay.  Well, then -- then we can point that out to the

18  Court, without getting your testimony on it.  But you knew

19  that, at the time that you did the inspections, under the

20  regulation, you were authorized to enter without delay, at

21  reasonable times, any establishment of a producer where

22  records were maintained, correct?

23  A    Yes, sir.

24  Q    And you knew that you could do that without a search

25  warrant, correct?

1    A    Yes, sir.

2    Q    And you knew you could do it without any probable cause

3    to believe any crime had been committed, correct?

4    A    Yes, sir.

5    Q    And you knew you could do that without giving advance

6    notice that you were going to come in and do the inspection,

7    correct?

8    A    Yes, sir.

9    Q    And you knew that if the records were maintained at

10   someone's residence, you were authorized by the regulation to

11   enter there without a warrant and probable cause and without

12   advance notice, as well, there, too, correct?

13   A    We were authorized, and in particular situations, we

14   showed up at a residence and knocked on the door, we were

15   never denied entry.

16   Q    But the regulation applied to residences, as well as

17   business premises, correct?

18   A    Yes, sir.

19   Q    Okay.  And the regulation said that you could do it

20   during normal business hours, 9:00 a.m. to 5:00 p.m., correct?

21   A    I believe it also stated or reasonable times -- or at any

22   reasonable times, yes.

23   Q    Sure.  Actually, you could do it at any time, if the

24   producer was open and filming sexually explicit material,

25   correct?

1    A    I suppose, although I would argue that we wouldn't have

2    necessarily showed up during a filming.

3    Q    Very well.  And if the -- and if the person whose records

4    you're seeking to inspect does not maintain 20 business hours

5    a week, then that person has to give notice to the inspecting

6    agency of the 20 hours a week that he or she will be

7    available, correct?

8    A    That's what's in the regulation, yes, sir.

9    Q    Okay.  And the -- the regulation that you operated under

10   provided that you would present your credentials, explain your

11   purpose and identify the records you would be inspecting,

12   correct?

13   A    Yes, sir.

14   Q    And then, it also authorized you to make copies of any of

15   the records, correct?

16   A    Yes, sir.

17   Q    And you did so?  You made copies of the records that you

18   examined in each and every one of the cases that you actually

19   were able to inspect records, correct?

20   A    Yes, sir.

21   Q    Okay.  It also provided the regulation that you could

22   employ any other investigative prerogatives, did it not?

23   A    I would have to look at the regulation exactly, but --

24   Q    Okay.  And it also provided that you could seize any

25   evidence of a felony that you observed while you were there,

1    didn't it?

2    A    Again, I would have to look at the regulation, but I'm --

3    I do know from my training as an FBI agent that, as long as we

4    have a lawful presence, and under the Plain View Doctrine, if

5    we observed any evidence of a -- of a crime, we would be able

6    to seize it.

7    Q    And you were actually investigating whether these

8    producers were complying with a criminal law, correct?

9    A    It was -- it was under Title 18, which is the -- you

10   know, where criminal statutes appear, yes, sir.

11   Q    Well, you actually, again, just pointed out the language

12   you used in -- in the letter, "The purpose of this inspection

13   is to ensure compliance with the recordkeeping requirements of

14   the statute", correct?

15   A    Yes, sir.

16   Q    So, if you were there to ensure compliance with that

17   statute, you were there to investigate whether that criminal

18   statute was being complied with or not, correct?

19          THE COURT:  Well, to say it better, failure to

20   comply can be a crime, is that correct?

21          THE WITNESS:  That's the way the law was written,

22   yes, sir.

23   BY MR. MURRAY:

24   Q    In other words, this was not a civil type statute that

25   you were doing inspections on, correct?

1    A    We treated it as a regulatory inspection.

2    Q    But it was, in fact, a criminal statute, not a civil

3    statute?

4              THE COURT:  Well, we're getting -- we're not going

5    to argue that, okay.  There are some statutes, believe it or

6    not, that are both, and this may be one of them.  But it is

7    clear that a failure to comply can be prosecuted as a crime.

8    BY MR. MURRAY:

9    Q    And in fact, in every single case where you found and

10   noted a violation, you forwarded it to the U.S. Attorney's

11   Office to determine whether -- so that they could determine

12   whether they wanted to bring a criminal prosecution, correct?

13   A    No, sir.  We forwarded the report to the Department of

14   Justice so that they could determine what they wanted to do

15   with the violations and whether they wanted to come up with a

16   system of possibly civil penalties, instead of trying to seek

17   criminal prosecution.  The reality of this was that, we were

18   going to be hard pressed to find any local U.S. Attorney's

19   Office to criminally prosecute someone for an administrative

20   paperwork error.

21   Q    Is it true or not true that you forwarded the information

22   in the reports and the violations that you found to the local

23   U.S. Attorney's Office?

24             THE COURT:  Well, he just said he did.  He forwarded

25   it to the Department of Justice.  Is that your testimony?

1              THE WITNESS:  Yes.  And that included our Crimes

2     Against Children Unit at headquarters, the Department of

3     Justice and the local U.S. Attorney's Office, in the district

4     in which the inspection had occurred.

5     BY MR. MURRAY:

6     Q    Right.  And I thought you testified on direct examination

7     that it would be up to those local U.S. Attorneys who received

8     those reports, as to whether to prosecute any of the

9     violations that you found?  Didn't you say that on direct

10    examination?

11    A    Yes, sir, as a matter of protocol, we provided the

12    reports to the local U.S. Attorney's Office to decide what

13    they wanted to do.

14    Q    And you couldn't prevent them from prosecuting, if they

15    chose to, could you?

16              THE COURT:  Well, I'll take judicial notice of that.

17              THE WITNESS:  Should I answer that?

18    BY MR. MURRAY:

19    Q    Now, I believe in the end, you were the lead inspector in

20    a total of eight inspections?

21    A    That sounds about right, yes, sir.

22    Q    Okay.  And it is true that all eight of them were done

23    without a search warrant?

24    A    Yes, sir.

25    Q    And they were all based on a random selection process,

1   correct?

2   A    Yes, sir.

3   Q    And so they were not based on any probable cause to

4   believe that a crime had been committed?  That was not the

5   basis for the inspection, correct?

6   A    Correct.

7   Q    They weren't even on the basis of a reasonable suspicion

8   that a crime had been committed.  That was not the basis upon

9   which you carried out this inspection, correct?

10  A    Correct.  We never assumed any crime had been committed.

11  Again, we were operating from a regulatory inspection

12  viewpoint.

13  Q    Then -- and I think in, maybe, two -- all but two cases,

14  you conducted the inspection without advance notice, the eight

15  that you did?

16  A    I would have to look at the summary, but that -- that's

17  fine.  I know some we -- we did not conduct without advance

18  notice that an inspection was going to occur.

19  Q    Okay.  Now, I want to go through -- and I won't go

20  through all of them -- but I want to go through one example of

21  an inspection report with you.  And then I may have some

22  questions about individual, and just to pick the first one

23  that -- in order, I'm showing you what has been marked as

24  Plaintiff's Exhibit 2, which is an inspection of Bacchus, and

25  that's one that you were the lead investigator on, correct?

1    A     Yes, sir.

2    Q     And there was a standard protocol, I think you indicated,

3    that preceded the inspection, as well as the standard protocol

4    that you carried out during the inspection, correct?

5    A     Yes, sir.

6    Q     And that had been created by Agent Joyner and others,

7    before you arrived on the scene, correct?

8    A     Yes, sir.  In conjunction with the Crimes Against

9    Children Unit at headquarters, and the Office of General

10   Counsel for the FBI and the Department of Justice.

11   Q     Okay.  So these had been standardized before you got

12   there?

13   A     Yes, sir.

14   Q     Okay.  And also the reporting protocol had been

15   standardized before you arrived, is that right?

16   A     The -- the format, yes, sir.

17   Q     Okay.

18   A     And the protocol of mailing the -- or providing copies,

19   yes, sir.

20   Q     Okay.  And so you have a -- the first page was the date

21   of the inspection and the identity of the person inspected,

22   correct?

23   A     Yes, sir.

24   Q     And then, in each instance you have a table of contents,

25   which lists everything in the -- in the folder?

1    A     Yes, sir.

2    Q     And it's the exact same format for each -- each one of

3    these, correct?

4    A     Yes, sir.

5    Q     And then Tab 1, for example, is the inspection report, in

6    this case, filled out by you, correct?

7    A     Yes, sir.

8    Q     And in this case, for example, the report, the inspection

9    was done on July 23rd of '07, correct?

10   A     Yes, sir.

11   Q     And then, you summarize what happened at the inspection,

12   correct?

13   A     Yes, sir.

14   Q     And then the -- the second tab, has your actual findings,

15   correct?

16   A     Yes, sir.

17   Q     And in this case, for example, you indicate that the

18   Internet website didn't contain the statement, correct?

19   A     Yes, sir.  It didn't contain the -- the link.

20   Q     And then you cite the statute and every part of the

21   regulation that would be violated under those circumstances,

22   correct?

23   A     Yes, sir.  And in this stated all the applicable

24   citations that were -- were applicable to that finding.

25   Q     Okay.  And -- and then there was a place for the

1    producer's response to be indicated, correct?

2    A    Yes, sir.

3    Q    And that was standard in every one of these, correct?

4    A    Yes, sir, if they provided a response.

5    Q    Right.  And then also standard in every single one of

6    these, when -- when the Court has another opportunity to look

7    at them all, he will find a page that has pre-inspection

8    procedures and inspection procedures, correct?

9    A    Yes, sir.

10   Q    And in each case, the pre-inspection procedures are

11   virtually the same, correct?

12   A    Yes, sir.

13   Q    And then, in each case, the inspection procedures are,

14   essentially, the same?

15   A    Essentially, yes, sir.

16   Q    Okay.  You record, in this case, that the inspection

17   began at 11:00.  You're identified as the lead inspector.  In

18   paragraph four, we know that you provided the owner with the

19   letter that you and I just went over, correct?

20   A    Yes, sir.  I'm sorry, the -- the letter that you showed

21   me, I believe, was -- was it for this particular --

22   Q    No.

23   A    Okay.

24   Q    But isn't it true that every single letter that you

25   provided --

Lawrence - Cross (Mur)                                          189

1   A    It was a form letter, yes.

2   Q    -- was the same in content?

3   A    Yes.

4   Q    Okay.

5   A    Yes.

6   Q    Okay.  Then I -- it'll be in evidence, and I'm not going

7   to belabor the Judge to go over each letter.  They're all the

8   same, aren't they?

9   A    Yes, sir.

10  Q    Okay.  So he was provided with that letter, and then the

11  standard operating procedure was, you would take digital

12  photographs of the business before the inspection, correct?

13  A    Yes, sir.

14  Q    You would take photographs of where the 2257 records were

15  stored, correct?

16  A    Yes, sir.  And let me just clarify, when we -- when I

17  write digital photographs were taken of the business, it was

18  -- generally what I am referring to and what we are referring

19  to in the report is a front -- a photo of the front of the

20  business, showing the address, yes, sir, not -- not photos

21  throughout the business.

22  Q    I understand.

23  A    Okay.

24  Q    So you -- you would take a photo of the front, and then

25  you would also take some photos of the inside of the business?

1   A    Yes, sir.

2   Q    Okay.  For example, you would take a photograph of where

3   they stored the 2257 records, correct?

4   A    Of the filing cabinet or file box, yes, sir.

5   Q    And that would be inside a particular room, correct?

6   A    Yes, sir, although we -- I think the photos would tend to

7   just be primarily the file cabinet, and not the entire room.

8   Q    And then you would take a -- a picture of the working

9   area, where you and the other representatives of the

10  Government occupied, correct?

11  A    Yes, sir, that's standard protocol.  We do that on every

12  -- you know, on -- for regulatory purposes.

13  Q    Then you would examine all the records that were

14  pertinent to your investigation, correct?

15  A    Yes, sir.  They were brought to us by the producer.

16  Q    And you would -- you and your contractors would examine

17  them page by page, correct?

18  A    The contractors were primarily responsible for comparing

19  the photo identification with -- with the pre-inspection

20  records, et cetera.

21  Q    And then you would make copies -- you brought your own

22  copy machine, and you made copies of the records that you had

23  examined, correct, you and the contractors?

24  A    Yes, sir.

25  Q    And then you would identify the time that the inspection

1    concluded, correct?

2    A    Yes, sir.

3    Q    And then you would take digital photographs of the

4    working area prior to leaving, so you could demonstrate that

5    you hadn't damaged it, correct?

6    A    Correct.

7    Q    And that was the standard protocol in -- in all of these,

8    correct?

9    A    Yes, sir.

10   Q    Okay.  Now, the other standard protocol -- and by the

11   way, you indicated that you had ordered some merchandise in

12   advance from the producers?

13   A    Yes, sir.  During the pre-inspection process, Agent

14   Joyner or I, whoever was the lead inspector, would identify

15   products or videos that had been produced by the producer, and

16   we would covertly purchase those products from -- from the

17   Internet.

18   Q    When you say you would covertly purchase them, weren't

19   they offered to any member of the public?

20   A    They were, but we -- just for whatever reason, we used

21   credit cards that were in -- under alias names.

22   Q    Which is the standard practice in an FBI criminal

23   investigation, as well?

24   A    It depends on the nature of the investigation.

25   Q    If you don't want the target of your investigation to

1   know that the FBI is looking at you, then you use names that

2   would cause them not to believe that it's the Government,

3   correct?

4   A    Yes, sir, and the purpose for us using the alias

5   identification here was, with advances in technology, we did

6   not want to, because it -- we did not want it to come back or

7   we did not want someone to have the ability to know exactly

8   what videos had been selected for inspection.  So if I had

9   purchased it with my FBI Government credit card, number one,

10  that would have created all kinds of issues, administratively,

11  because headquarters would have seen that I was purchasing

12  porn.  And the use of alias ID prevented that administrative

13  problem from occurring.  So -- so I think it was --

14  Q    But it also -- it also prevented the -- the target from

15  knowing that the FBI was inquiring, correct?

16  A    That was a byproduct of the process.  The primary purpose

17  was, because, we didn't want to be using our FBI issued

18  Government credit cards.

19  Q    Even on an assignment that you'd been authorized?

20  A    Even if we work for the FBI, sir.

21  Q    Anyway, the information that was gathered and resulted in

22  viewing these films was put in your -- in an FD-302, correct?

23  A    Yes, sir.

24  Q    And that's the thing that -- that's the kind of report

25  that you create during the course of any of your criminal

1    investigations, when you interview witnesses or make other

2    surveillance observations, that kind of thing, correct?

3    A    It is a standard form that existed back in 2007, and --

4    and for years -- we've sort of since changed it -- but it was

5    a standard form used to document interviews and other items

6    that made -- or other -- other events that may become

7    testimonial in nature and would include if an agent was

8    involved in a Bureau automobile accident, which was

9    administrative in nature, and we had to interview the other

10   driver.  That interview ended up on a 302.

11   Q    Did you use the 302s in your criminal investigations?

12   A    Yes, sir.

13   Q    Now, okay, then -- again, I don't want to belabor the

14   point about the photographs but for example, those are cabinet

15   areas that you photographed with files hanging up, correct?

16   A    Yes, sir, and you can see there's four drawers on the

17   top, and the one drawer on the bottom that would have been

18   pulled open to demonstrate that that is where the 2257 records

19   were maintained.

20   Q    And then there's the photograph of a desk that you've

21   seen before?

22   A    I believe that photo was taken for purposes of the -- I'd

23   have to look at that.

24   Q    Is it a -- well, what I'm asking is, is it a photograph

25   of an area that you, as an FBI agent and other Government

1    representatives observed while you were occupying these

2    premises?

3    A    Well, we were in the premises -- yes, sir, obviously.

4    Q    And the same is true of this room, where -- where you

5    actually inspected the records?

6    A    That's the break room that we used to conduct the

7    inspection.

8    Q    Now, this was a private business establishment, correct?

9    A    Yes, sir.

10   Q    And these were private areas within that establishment,

11   isn't that true?

12   A    I didn't ask who had access to those areas, but I would

13   presume --

14   Q    Well, you're a trained -- you're a trained FBI agent,

15   aren't you?

16   A    Yes, sir.

17   Q    And one of the things you do is investigate facts and

18   draw conclusions and inferences, correct?

19   A    Yes, sir.

20   Q    And when you -- sometimes you even do that for purposes

21   of procuring an application for a search warrant, correct?

22   A    Yes, sir.

23   Q    And as a trained FBI agent, you knew, when you went into

24   these premises that the areas that we just mentioned were

25   areas that were private and not accessible to any John Q.

1    member of the public, you knew that, didn't you?

2    A    Yes, sir.

3    Q    Now, the next item, then, after the photographs -- and

4    this may not be the correct order, but you have it on Tab 7,

5    the checklists, and again, this was standard for every one of

6    these, correct?

7    A    Yes, sir.

8    Q    And what you did was, each of your film reviewers used

9    this checklist pre-inspection, correct?

10   A    Both pre and during the inspection, yes.

11   Q    Right.  Well, this one happens to be the pre-inspection

12   product review, correct?

13   A    Well, this -- this part of the form was the pre-

14   inspection, and then there's the actual part that contains the

15   part that they fill out during the inspection.

16   Q    Right.

17   A    Yes.  Okay.

18   Q    And I'm going to get to that.

19   A    Okay.

20   Q    I can only look at one page at a time.

21   A    No, I understand.  I understand.

22   Q    So what you have is 2257 applies to all of these various

23   types of images, correct?

24   A    Yes, sir.

25   Q    And a book, a magazine, periodical, film, videotape and

1    even a picture, correct?

2    A    Yes, sir.

3    Q    Okay.  And then a checkmark is placed at the -- to

4    designate the item that you're looking at or your contractor

5    agent is looking at, correct?

6    A    Yes, sir.

7    Q    And then you list the sexual acts portrayed?

8    A    Yes, sir.

9    Q    And then, you have other questions that are to be

10   answered by the -- by the contractor, correct?

11   A    Yes, sir.

12   Q    And those other questions that follow are basically the

13   regulation requirements, and whether, in fact, they were being

14   complied with, as far as he could pre-inspection, correct?

15   A    Yes, sir.

16   Q    Okay.  And then -- and I won't go over all of those.  The

17   Judge will -- His Honor will be able to read them for himself,

18   but the point is, you -- you had a pretty exhaustive list of

19   all of the substantive requirements of the regulations?

20   A    Yes, sir.

21   Q    Okay.  And then after that was done, on the scene, for

22   example, this particular contractor would be in charge of

23   reviewing the records for this particular videotape, correct?

24   A    Yes, sir.

25   Q    I'm sorry, and that's another pre-inspection.  That was

1   done for every single item that -- that you purchased,

2   correct?

3   A    Yes, sir.

4   Q    And then, there should be a place for the post-

5   inspection.  Ah.  So then, you get to the -- finally, to a

6   page that has on-site inspection review, correct?

7   A    Yes, sir.

8   Q    And, again, it goes through every single -- pretty much

9   every single requirement that is contained in the regulations,

10  and the determination is made as to whether or not they have

11  all been complied with, correct?

12  A    Yes, sir.

13  Q    And then, once that's done, there is actually, written

14  up, something called findings, as to whether or not you found

15  any violations, correct?

16  A    Correct.  And I just wanted to clarify that in -- on your

17  last question, a determination was made by the contractor as

18  to what they interpreted whether the product complied or not.

19  Q    Right.  And then --

20  A    And then we would -- we would verify it.

21  Q    Right.

22  A    Right.

23  Q    And I think you indicated that they would bring it to

24  you, and you would confirm it one way or the other?

25  A    Yes, sir.

1    Q    And then you would -- the -- the report goes in the

2    various findings that you recited in your report?

3    A    Yes, sir.

4    Q    Okay.  And so that was the procedure that was followed in

5    each one of the eight inspections that you did, correct?

6    A    Yes, sir.  That was actually the process that was

7    followed for all 29 inspections.

8    Q    Exactly.  Now, I'm not going to go through that with each

9    one of these, but I want to focus on a couple of the things.

10   The next one I have for you is Plaintiff's Exhibit 4.  You did

11   the Alexis Lordes inspection, did you not?

12   A    Yes, sir.

13   Q    And that was the one in Miami, Florida, correct?

14   A    Yes, sir.

15   Q    Okay.  And this was one of the inspections that was done

16   at somebody's home, correct?

17   A    Yes, sir.

18   Q    And this is the one, if I'm not mistaken -- was this the

19   one where -- where the -- you called the person in advance?

20   A    I would have to look at the inspection report.  If you

21   could maybe turn to the -- where it shows the time of the

22   inspection and all that, I might recollect.

23   Q    Let's go there.

24   A    Okay.

25   Q    I'm sorry.  I thought I had these -- okay.  This is your

1    inspection report indicating that it was done in his residence

2    in Miami, and -- and you found three potential violations,

3    correct?

4    A    Yes, sir.

5    Q    Okay.  And just, for the record, one of the findings was

6    that not every single page containing a visual depiction on

7    their website contained the statement, correct?

8    A    Yes, sir.  From what I remember, every webpage didn't

9    have a link to the 2257 statement.

10   Q    Right.  That's what you say.  That's one of the

11   violations, correct?

12   A    Yes, sir.

13   Q    And then you indicate a very limited cross-reference

14   system was in place?

15   A    Yes, sir.

16   Q    And that was another finding that you made, correct?

17   A    Yes, sir.

18   Q    And then you cited the various regulations.  And then

19   here's one, you found a violation because the 2257 statement

20   was not displayed for a sufficient duration in "Poolside Fun"

21   because it was only displayed for 4.5 seconds and 3.0 seconds

22   for one of the other films, correct?

23   A    Yes.  Three seconds for the "Proper Spa Treatment".

24   Q    Okay.  And you cited the portions of the regs that --

25   that say that for any electronic display of the notice, the

1    notice must be displayed for a sufficient duration to be

2    capable of being read by the average viewer, correct?

3    A    Yes, sir.

4    Q    And you, apparently, determined that looking at the

5    statement for four and a half seconds or three seconds wasn't

6    sufficient duration to comply with the requirements of 2257,

7    correct?

8    A    Correct, and I would have had a discussion with the

9    producer at the time.

10   Q    Okay.

11            THE COURT:  All right.  Do you think you're going to

12   finish in the next 15 minutes or if not, I think we're going

13   to have to stop.

14            MR. MURRAY:  I don't think I can finish in 15

15   minutes.

16            THE COURT:  Okay.  All right.  I mean, I don't want

17   to rush you, so we're going to adjourn at this point until

18   tomorrow morning.  Now, Agent, because you're under cross-

19   examination, I am going to ask you not to discuss this case or

20   your testimony with any of the attorneys or any other

21   witnesses, okay?

22            THE WITNESS:  Yes, sir.

23            THE COURT:  I mean, I'm not preventing you from

24   talking to them about something else, but you should not

25   discuss your testimony, okay?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  All right.  Okay.  So we'll resume

3    tomorrow at 9:15?

4          MR. SCHWARTZ:  Yes.  Thank you, Your Honor.

5          THE COURT:  All right.  Thank you very much.

6      (Proceedings concluded at 4:24 p.m.)

7                          * * *

8              **C E R T I F I C A T I O N**

9

10          We, Diane Gallagher and Jacqueline Mullica,

11   court approved transcribers, certify that the foregoing is a

12   correct transcript from the official electronic sound

13   recording of the proceedings in the above-entitled matter.

14

15

16   _____

17   DIANE GALLAGHER

18

19   _____        _____

20   JACQUELINE MULLICA                       DATE

21   DIANA DOMAN TRANSCRIBING

22

23

24

25