UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


FREE SPEECH COALITION, INC.,   )  09-cv-4607
et al,                         )
                            )
        Plaintiffs,     )
                            )
                            )
    vs.                     )
                            )
THE HONORABLE ERIC HOLDER, JR.,  )
in his Official Capacity as   )
Attorney General of the United  )
States,                   )  Philadelphia, PA
                            )  June 12, 2013
        Defendant.      )  9:15 a.m.


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MICHAEL M. BAYLSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:      J. MICHAEL MURRAY, ESQUIRE
                     LORRAINE R. BAUMGARDNER, ESQUIRE
                     BERKMAN, GORDON, MURRAY & DEVAN
                     55 Public Square - Suite 2200
                     Cleveland, OH 44113-1949
                     615 Chestnut Street - Suite 1250
                     Philadelphia, PA  19105


For the Defendant:      KATHRYN WYER, ESQUIRE
                     HECTOR G. BLADUELL, ESQUIRE
                     JAMES J. SCHWARTZ, ESQUIRE
                     NATHAN MICHAEL SWINTON, ESQUIRE
                     U.S. DEPARTMENT OF JUSTICE
                     20 Massachusetts Avenue
                     Washington, D.C.  20530


Audio Operator:        U. HEVENER/K. FURPHY

Transcribed by:        DIANA DOMAN TRANSCRIBING
                     P.O. Box 129
                     Gibbsboro, New Jersey  08026-0129
                     Office:  (856) 435-7172
                     Fax:     (856) 435-7124
                     Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

I N D E X

| WITNESSES: | COURT: | DIRECT: | CROSS: | REDIRECT: | RECROSS: |
|---|---|---|---|---|---|
| FOR THE DEFENDANT: | | | | | |
| Stephen G. Lawrence | 53 | | 7(Mur) | 49(Wye) | 60(Mur) |
| Charles R. Joyner | 118 | 66(Wye) | 97(Mur) | 125(Wye) | 129(Mur) |
| FOR THE PLAINTIFFS: | | | | | |
| Mark Zimmerman | 161 | 131(Mur) | 145(Swi) | 167(Mur) | |

| EXHIBITS: | | ID. | RECEIVED |
|---|---|---|---|
| FOR THE PLAINTIFFS: | | | |
| P-41 | CV and Article of Zimmerman | 134 | 145 |
| P-214 | Study Reviewed by Zimmerman | 150 | 161 |
| P-315 | Article by Zimmerman | 154 | 161 |

1      (The following was heard in open court at 9:15 a.m.)

2              THE COURT:  Good morning, everyone.

3              ALL ATTORNEYS:  Good morning, Your Honor.

4              THE COURT:  Okay.  Everyone be seated, please.

5              All right.  Couple comments on different points

6  before we start the testimony.  First of all, Mr. Murray, I

7  was wrong yesterday, and you corrected me appropriately, on

8  the narrowing tailoring.  That issue is certainly the burden

9  of the Government.  The Supreme Court has been explicit about

10  that so I -- I misspoke.

11              I don't know what the law is on the Fourth Amendment

12  issues and who would have the burden on that.  That's

13  something we can discuss later.

14              The second thing I want to clarify is that the --

15  Ms. Wyer is correct when she said that the inspection issue

16  had not been in the record at the time that I dismissed the

17  first complaint, and that was not in my decision.  It was not

18  in the Third Circuit's decision, nothing about the inspection

19  issue.

20              The -- it is also correct that the defendants --

21  that it is in the amended complaint that was filed after the

22  Third Circuit remand, and that the defendants moved to dismiss

23  it, and I denied the motion to dismiss.

24              But because it's in the amended complaint and I

25  denied the motion to dismiss, I think the issue of rightness

1   is one of the issues that is now in front of me.  Now, how we

2   deal with that is not something I want to discuss right now,

3   but I -- I just want to clarify that, as well, that I think

4   rightness is -- is at issue here.

5          The next thing has to do with expert reports.  It's

6   my understanding that the rule in the Third Circuit is that

7   expert reports are primarily for discovery, and that they are

8   not admissible in evidence when the expert testifies and

9   probably not -- when the expert does not testify, there is a

10  mixture of decisions about what use can be made of expert

11  reports in summary judgment motions, but that doesn't apply

12  here.

13         If -- so yesterday I think I was correct in

14  sustaining the objection to the admission of the expert

15  report.  If I have inadvertently admitted other expert

16  reports, I intend to correct that 'cause I do not think the

17  reports should be part of the record.  They should not be part

18  of the trial record.

19         They're part of the case record, and if anybody

20  thinks that what I do is erroneous, of course, they are part

21  of the overall record that can be raised on appeal.

22         As far as exhibits generally, what I would like to

23  happen, and if you -- since we're not having court tomorrow,

24  this is a -- you have some time, and you're welcome to come in

25  here 'cause I don't -- I doubt I'll be using the courtroom at

1   all, or if -- if so, every little.

2          I would like, together with a list of the exhibits

3   that have been admitted, if you could -- each side would get

4   the paper copy of the exhibits, which I have back here in

5   these boxes, and attach that to the list of exhibits so it

6   would be admitted, that would help us expedite our

7   adjudication in the case, and also it might be helpful on the

8   closing argument.

9          But there have been so many documents marked as

10  exhibits, I think relatively few have actually been admitted

11  so I would, therefore, appreciate it if you could -- if you

12  could do that.  Make the list of admitted exhibits and then

13  attach them in sequential order of the ones that have been

14  admitted, and we'd have a separate group of those.

15         Lastly, today I've got another speaking engagement

16  that I committed to long before this trial was scheduled, and

17  we're going to recess around 11:45 and resume at 1:15.

18         Okay.  Anything either of you need to raise?  Yes,

19  Ms. Wyer.

20         MS. WYER:  Yes, Your Honor.  In regard to the

21  exhibits, we -- as we mentioned before the trial in that

22  telephone conference we had, we have exhibits that we want to

23  admit without a sponsoring witness --

24         THE COURT:  Right.

25         MR. MURRAY:  -- so at some point --

Colloquy                                                    6

1          THE COURT:  Is that by agreement, or is there

2    disputes?

3          MS. WYER:  There may be disputes regarding -- I'm

4    not sure.  We -- we --

5          THE COURT:  Well, then we --

6          MS. WYER:  -- stipulated to authenticity of the

7    documents that are website printouts, but there may be

8    other --

9          THE COURT:  Well, you know, if there are disputes,

10   I'll have to rule on it.  We -- but I'd like to do that maybe

11   Friday when -- Monday I -- I have other things going on

12   Monday, and so on Monday I would like to complete the two

13   witnesses that we have and then have time for the oral

14   arguments.

15          So I'd like to take care of any other issues on

16   Friday.  Okay.

17          MS. WYER:  Okay.  Uh-huh.

18          THE COURT:  'Cause Friday I should have a

19   substantial amount of time.

20          MS. WYER:  Okay.

21          THE COURT:  Yes.  Mr. Murray, anything you want to

22   raise?

23          MR. MURRAY:  No, Your Honor.   Thank you.

24          THE COURT:  Okay.  All right.  Let's continue the

25   cross-examination of Agent Alexander -- Agent Lawrence, excuse

1   me.

2            STEPHEN G. LAWRENCE, DEFENDANT'S WITNESS, PREVIOUSLY

3            SWORN

4                    CONTINUED CROSS-EXAMINATION

5   BY MR. MURRAY:

6   Q    Agent Lawrence, when we adjourned last night, we were

7   talking about the inspection that was done of Alexis Lords.

8   Do you recall that?

9   A    Yes, sir, I do.

10   Q    And that was done at a residence address.  Do you recall

11   that?  At his home.

12   A    Yes, sir.  That was the address that was listed in the

13   2257 statement.

14   Q    Right.  And -- and according to your report the

15   inspection began at 11:15 a.m., and this was one of the

16   inspections where you provided the letter that -- that we went

17   over yesterday, correct?

18   A    Yes, sir.

19   Q    And you took the photographs.  You made the copies of all

20   the records that you examined, correct?

21   A    Yes, sir.

22   Q    And you left at about 2:45 p.m., correct?

23   A    Yes, sir.

24   Q    So we're talking about you were in this person's home

25   from 11:15 -- so what is that, about three hours, three and a

1    half hours?

2    A    I'm sorry.  What time did the inspection start, sir?

3    Q    11:15 to 2:45.

4    A    Yes, sir.  Approximately three and a half hours.

5    Q    If my math is correct.  And the photographs that you had

6    taken included a photograph of the actual residence, correct?

7    A    That's the front of the residence, yes, sir.

8    Q    David's showing it on the screen.

9         You photographed a file cabinet that had records inside

10   of them, is that correct?

11   A    Yes, sir.

12   Q    And that file cabinet belonged to the -- to the owner,

13   correct?

14   A    I don't know who the filing cabinet belonged to, sir.  It

15   was located in the room where he directed us to.

16   Q    But it didn't belong to the Government.

17   A    Correct.

18   Q    Okay.  And then the photograph -- I guess the dining room

19   is where you and the other contract agents reviewed and

20   examined the records, correct?

21   A    Yes, sir.  That is where he directed us to sit.

22   Q    Okay.  And I think yesterday we went over the -- the

23   violations that you noted, so I won't repeat that.

24        Moving as quickly as I can, I want to briefly discuss

25   Plaintiffs' Exhibit 6, which was your investigation of the

1   producer known as Angry, correct?

2            THE COURT:  This is P-6?

3            MR. MURRAY:  Yes, Plaintiffs' Exhibit 6, Your Honor.

4            THE WITNESS:  It was our inspection of Angry Young

5   Man.

6   BY MR. MURRAY:

7   Q    Yes.  And that was an inspection that you wrote a report

8   about, is that correct?

9   A    Yes, sir.

10  Q    And one of the things that you discovered during the

11  course of your investigation of this company was that they

12  claim to have movies that contain surreptitious recordings

13  made in locker rooms and showers on actual military bases,

14  correct?

15  A    During the inspection of Angry Young Man, when we were

16  attempting to identify videos and other products that were

17  produced by the company, we came across their website, which

18  was perfectly available, and on the website it contained

19  videos that purported to have been surreptitiously recorded on

20  military bases of actual military members.  Yes, sir.  Yes,

21  sir.

22  Q    And so you took that information and -- and determined

23  that it was a potential violation of another criminal statute,

24  correct?

25  A    I documented that, yes, sir.

1   Q     And ultimately you turned that information over to

2   another agency of the federal government, did you not?

3   A     The Naval Criminal Intelligence Service, yes, sir.

4   Q     You discovered during your inspection that in fact there

5   were locker rooms and bathrooms in the building that you were

6   in, correct?

7   A     There were studio sets in the studio of Angry Young Man

8   that accounted for some of the videos that were selected for

9   inspection, not all of them.

10  Q     And in fact you and your other contract agents viewed

11  those areas inside this business, correct?

12  A     Yes, sir, we did.

13  Q     And in fact you had photographs taken of those areas of

14  the inside of this business, correct?

15  A     Yes, sir.  With -- with the owner present we did take

16  photographs.

17  Q     And you were also advised that 90 percent of the

18  performers appearing in the movies were active military

19  personnel, correct, by the owner?

20  A     Yes, sir.

21  Q     And you --

22  A     I don't specifically recall, but that's in the report,

23  yes, sir.

24  Q     Okay.  And once you -- and that information caused you to

25  also consult with the United States Naval Criminal

1    Investigative Service to determine whether those soldiers

2    might be violating the Uniform Code of Military Justice,

3    correct?

4    A    Correct.

5    Q    And you also then found a total of seven violations by

6    Angry Young Man, correct?

7    A    Yes, sir.

8    Q    And among the violations that you found, number three is

9    that the producer does not maintain at least 20 normal

10   business hours per week, and normal business hours were not

11   posted, correct?

12   A    Yes, sir.  That's what's in the report.

13   Q    And -- and what that means when you say, "Business hours

14   were not posted," that means that the producer didn't provide

15   notice to the inspecting agency of the hours during which

16   they'd be available, which in no case could be less than 20,

17   correct?

18   A    Correct.

19   Q    And then you also found that there was no cross reference

20   system in place at the time of inspection.

21   A    Yes, sir.

22   Q    You also found that there was no data production for one

23   of the -- one of the movies, correct?

24   A    Yes, sir, that's correct.

25   Q    And that's required by the regulations, correct?

1    A    Correct.

2    Q    Now, just to be clear as to what areas you were

3    inspecting, this was a private business enterprise, correct?

4    A    Yes, sir.

5    Q    And can you tell me whether that is part of the premises

6    that you viewed and photographed?

7    A    Yes, sir.  I -- I believe -- yes, it was.

8    Q    And, clearly, that was someplace where the general public

9    does not generally have access to, right?

10   A    Correct.  That particular photograph was taken because

11   the 2257 records required by the statute and regulations were

12   contained in that red binder on the table.

13   Q    Hmm?

14   A    That photo was in the lieu of a filing cabinet.

15   Q    Well, you mean the -- this is -- if you distinguish from

16   some of the other photos where you took the picture of the

17   filing cabinet where the records were --

18   A    Correct.  Yes, sir.

19   Q    Okay.  So this is the place where the records were

20   maintained by the proprietor?

21   A    Yes, sir.

22   Q    But among other things that you photographed were some

23   various names and phone numbers that are on that chart,

24   correct?

25   A    Yes, sir.

1    Q     And, of course, those weren't part of the 2257 records,

2    were they?

3    A     No, sir.

4    Q     Now -- and then the -- the other photographs that you

5    took, which aren't the greatest on this case, this is a

6    photograph of an area of the -- the business that -- that is

7    what?

8    A     That, I believe, was the work area that the owner

9    directed us to use sort of in the -- the rear of the business.

10   Q     And, again, not a place where the public is invited to

11   sit and do their work, is it.

12   A     I don't know, sir.  That's where the owner directed us to

13   sit.

14   Q     Well, again, as a trained FBI investigator who draws many

15   inferences from the evidence that you examine isn't it true

16   that you're able to conclude that this was an area that the

17   public does not generally have access to?

18   A     Sir, it was a studio.  I don't know who comes and goes in

19   and out of that building.

20   Q     So it's your testimony that you don't know whether or not

21   any member of the public could walk into that building and --

22   and go into that area without being invited and sit there?

23         Is that your testimony?

24   A     I'm just saying I don't know for a fact if I wanted to be

25   hired for a movie by Angry Young Man, if I couldn't just walk

1    in, and if he was in the back, walk -- walk to the back of

2    that business to talk to him about appearing in one of his

3    movies.

4         I don't know who he invited or who he allowed.  I don't

5    remember the specific layout of that particular business.

6    Q    But you would agree that whoever would have access to

7    there would be there by invitation of the proprietor.

8    A    I would say generally, yes.

9    Q    As opposed to members of the general public who come into

10   a retail store, for example, to browse around and look at

11   merchandise, correct?

12   A    Yes, sir.

13   Q    You took a picture of the -- the bathroom area, is that

14   correct?

15   A    Yes, sir.  That was one of the -- I seem to recall that

16   was one of the scenes appearing in one of their movies.  They

17   showed some bathroom scenes.

18   Q    So that was an area where they -- it was like a studio

19   part, correct?

20   A    Yes, sir.

21   Q    Now let's take a look at Plaintiffs' Exhibit 7 which is

22   another inspection that you conducted as the lead inspector in

23   this case of an entity known as Authentic, correct?

24   A    Yes, sir.

25   Q    And you did that one on August 22, 2007, correct?

Lawrence - Continued Cross (Mur)                    15

1   A    Yes, sir.

2   Q    In San Clemente, California, correct?

3   A    Yes, sir.

4   Q    And in this case, again, you wrote the report, correct?

5   A    Yes, sir.

6   Q    And in the -- and then you wrote the -- the part of the

7   document that described the inspection, correct?

8   A    Correct.

9   Q    And the inspection began at 12:40 p.m., correct?

10  A    Correct.

11  Q    And this inspection was done, again, at the residence of

12  Michael -- you don't even list his last name, but of that

13  person, correct?

14  A    At the invitation of -- of the individual, yes, sir.

15  Q    The inspection was done in a private residence.

16  A    At his invitation, yes, sir.

17  Q    Okay.

18  A    'Cause he had to retrieve the records from a storage unit

19  and asked us to meet him at his residence.

20  Q    And the -- you provided him with a letter that we've gone

21  over, the very same template?

22  A    Yes, sir.

23  Q    Which advised him that if he delayed or obstructed, it

24  would be a criminal violation, correct?

25  A    The standard form letter, yes, sir.

1    Q     You took photographs before you conducted your

2    examination of the records, correct?

3    A     Yes, sir.  Should have been the exterior of the house and

4    then the kitchen table.

5    Q     You -- you and your contract inspectors examined the

6    various records pertaining to 2257 that you requested,

7    correct?

8    A     The records that were listed on the spreadsheet we

9    provided him, yes, sir.

10    Q     In other words you went in, and you explained that you're

11    there to inspect records, and you are identifying which

12    records you want to examine by giving him the spreadsheet,

13    correct?

14    A     Same exact procedures that we followed in every other

15    inspection, yes, sir.

16    Q     Okay.  And then you made copies of those private records

17    that you examined, correct?

18    A     We made copies of the identification records that were

19    required to be maintained under 2257, yes, sir.

20    Q     And you took those with you.

21    A     Yes, sir, we did.

22    Q     And in that case -- and then you took photos again at the

23    end, correct?

24    A     We took a photo of the kitchen table that we had used to

25    document it for liability purposes that we had caused no

1    damage.

2    Q    Okay.  And that inspection lasted approximately two

3    hours, a little less, 12:40 p.m. to 2:30 p.m., is that

4    correct?

5    A    According to the report, yes, sir.

6    Q    And how many government agents were on the premises at

7    that residence for three [sic] hours?

8    A    If you handed me the report, I'd be able to tell you.

9    I'd have to look at the inspection checklists.

10   Q    Oh, so we -- if we -- we can find that information just

11   by looking at the report ourself.

12   A    Okay.

13   Q    Is that what you're saying?

14   A    You should be able to, yes, sir.

15   Q    Okay.  And then just to complete the picture, this is the

16   private residence that you occupied during those two hours and

17   50 minutes?

18   A    I don't particularly remember this -- the outside of this

19   residence, but if that's the photo that was in the report,

20   then yes, sir.

21   Q    This -- this is the -- the Authentic Extreme Reality, is

22   that correct?

23   A    Yes, sir.

24   Q    And this is the location inside the residence where --

25   A    That is --

Lawrence - Continued Cross (Mur)                    18

1    Q     -- the inspection?

2    A     Yes, that's the square kitchen table that I referred to

3    yesterday.

4    Q     Okay.  So that's -- that was in the kitchen.

5    A     A breakfast nook kitchen area, yes, sir.

6    Q     Now, let's take a look at -- quickly, Plaintiffs' Exhibit

7    11, which is Dead Man Hanging, correct?

8    A     Yes, sir, Dead Man Hanging.

9    Q     And that was an inspection done on March 13, 2007,

10   correct?

11   A     Yes, sir.

12   Q     And, again, you were the lead inspector, correct?

13   A     Yes, sir.

14   Q     And in that case, again, you followed the same procedure

15   of -- that we've seen before, correct?

16   A     Yes, sir.

17   Q     That one began at 10:50 a.m., correct?

18   A     Yes, sir.

19   Q     And, again, you took the photographs that we've been

20   talking about.  You examined the records.  You made copies of

21   the records, and then you took photographs before you leave,

22   correct?

23   A     Correct.

24   Q     And that investigation or inspection lasted about an hour

25   and 10 minutes, correct?

1   A    I can't see the time, sir, that the inspection ended.

2   Q    You see it began at 10:50, correct?

3   A    Yes, sir.

4   Q    And you see it ended at 12:00?

5   A    Yes, sir.  Approximately an hour and 10 minuets.

6   Q    And in terms of any findings that you made, that was one

7   of, if I'm not mistaken, where there were no findings --

8   A    If you --

9   Q    -- does that sound right?

10  A    If you go back to the bottom of this page right here?

11  Q    Yes, they had no violations, it says, at the very bottom?

12  A    I'm seeing a blank screen.

13  Q    Okay.  Go to the very bottom.  Let me --

14  A    I'll take your word for it, sir.

15  Q    Let me approach, just so that there's no mistaking.  The

16  ELMO has its limits.

17  A    Yes, sir.  It was ultimately determined there were no

18  2257 violations.  There was one issue that the producer was

19  able to cure while we were there.

20  Q    And then in terms of the photographs, you took a

21  photograph of the outside of the premises, correct?

22  A    Yes, sir.

23  Q    You took a photograph of the door leading to the

24  premises?

25  A    Yes, sir, and that -- I believe that door shows the

1    general -- like a general lobby area right there.

2    Q    And then --

3    A    That was the door of his office.  That's the break room,

4    kitchen area-type room that he directed us to use.

5    Q    And, again, that's a -- so that's like a little

6    conference room or a break room that was on this business

7    premises, correct?

8    A    This was an executive suite that was shared by numerous

9    businesses.  Do I don't know exactly whose room this was.  I

10   believe it was for use by all the businesses in the building.

11   Q    All right.  So it was an office building, and -- and

12   people might have rented individual suites, and then they get

13   access to a conference room that -- that they could use --

14   A    Yes, sir.

15   Q    -- was that your conclusion?

16   A    That -- that was my conclusion.

17   Q    And that's not an unusual situation, is it.

18   A    I've -- I've seen it before.

19   Q    But the -- you would agree that that conference room is

20   there for the use of the tenants who share the right to use

21   that conference room.

22   A    I did not ask the owner who normally had access to or use

23   of the room or who rented or anything like that.  I merely

24   asked him --

25   Q    But you're a -- you're a trained investigator, aren't

1   you?

2   A     Yes, sir.

3   Q     You are trained to observe facts, and draw conclusions

4   from those facts, correct?

5   A     Yes, sir.

6   Q     And isn't it true that as a trained investigator the

7   conclusion that you would draw is that the most likely

8   conclusion is that this was a room that was available to the

9   tenants who rented space and had the right to use that room.

10        Isn't that your best --

11  A     That would be a reasonable conclusion, yes, sir.

12  Q     Now let's take a look at Plaintiffs' Exhibit 13, which is

13  the report of the inspection that you did of Don Goo

14  Enterprises on May 22, 2007, correct?

15  A     Yes, sir.

16  Q     And, again, you were the person who created the report.

17  A     Yes, sir.

18  Q     Okay.  And this particular inspection was conducted in a

19  storage facility, correct?

20  A     Yes, sir.  After some investigation, as was the case on a

21  number of these inspections, it took us awhile to track down

22  where the records might be.

23  Q     And so you ultimately learned that these 2257 records

24  were maintained by this producer in a locked private storage

25  area that he had rented, correct?

1  A     I believe that's incorrect.  The records were not

2  maintained by a producer.

3        I'd have to look at the 302 in that report, but the

4  records were -- were maintained by a third party company that

5  I believe had taken over the -- the records of the producer,

6  and I -- I'd have to look at the --

7  Q     It was a successor in interest in this business.

8  A     Yes, sir.

9  Q     Okay.  And so the successor in interest who took over the

10  business maintained the 2257 records in a private locked

11  storage area that was rented, correct?

12  A     He maintained it in a storage facility that I presume the

13  company rented.  He had -- the company had no idea what 2257

14  was.

15  Q     Well, my question was where the records were.

16  A     Sure, sure.  I'm sorry.

17  Q     The records were in a storage area of the kind that we're

18  all familiar with where companies actually rent out storage

19  spaces that you can access and put your stuff in and lock it,

20  correct?

21  A     Yes, sir.  If I remember correctly, this particular

22  company had -- when they take over a -- a business and have to

23  take over records and other assets, they rent various storage

24  units and put the -- put the items in there until resolution

25  of whatever matter is going on.

1   Q    Fine.   And that's where the 2257 records were that you

2   ultimately examined, correct?

3   A    After making contact with the company or at -- we

4   initially made contact with the producer who led us to this

5   company.

6   Q    Sir, is that where -- all I'm asking you --

7   A    They --

8   Q    -- is that where you examined the records?

9   A    That's where we attempted to examine the records.

10       You asked me if the records were there.   They were not

11  there.   We did not find the records.

12  Q    Well, your -- if you look at your findings, your finding

13  was, number one, there was no cross reference system found at

14  the time of the inspection, correct?

15  A    Correct.

16  Q    You also found that the 2257 records were not separately

17  maintained from other records of the business which were mixed

18  in with the 2257 records, correct?

19  A    Correct.

20  Q    Well, then, you must have found some 2257 records.

21  A    We did find some 2257 records.   We didn't find the ones

22  that we were looking for.

23       If you'll recall from yesterday, there were some -- I

24  made reference to us being directed to go through some filing

25  cabinets in a storage unit.   This is that inspection.

1          The individual from the company who was assisting us

2    opened the storage unit, pointed to two -- two or three filing

3    cabinets and said, "If they're there, they're in those

4    cabinets."

5    Q    And did you examine those cabinets?

6    A    At the direction of the business owner or whatever

7    position he was, we -- we went through the cabinet looking for

8    the records --

9    Q    So you --

10   A    -- and we were unable to find them.

11   Q    So you searched through that cabinet?

12   A    We looked through that cabinet at the direction of the

13   person from the company, yes, sir.

14   Q    And you found some 2257 records were in that -- one of

15   those cabinets, correct?

16   A    Yes, sir, along with other business records, and we

17   promptly realized that we were -- we were not going to be able

18   to find what we were looking for and left the storage unit.

19   Q    And noted that one of the violations was this failure to

20   comply --

21   A    Yes, sir.

22   Q    -- with the certification.

23   A    Yes, sir.

24   Q    Okay.  Now, your report indicates that the inspection

25   began at 11:00 a.m., is that correct?

1    A    Yes, sir.

2    Q    It also indicates that you provided the individual who

3    was there with the letter that we talked about in the past,

4    correct?

5    A    Yes.  Yes, sir.

6    Q    And you took the photographs and left there about 1:30,

7    correct?

8    A    Yes, sir, which included travel time from the storage

9    unit back to the main office so that we could look at some

10   boxes in the -- in the upper floor.

11   Q    And this is the storage facility that you went to,

12   correct?

13   A    Yes, sir.

14   Q    And, again, this is a photograph that is among

15   Plaintiffs' Exhibits 31, and this is the inside of the -- of

16   the storage area, correct?

17   A    Yes, sir.

18   Q    And the next photograph, which is part of Plaintiffs'

19   Exhibit 31, is the filing cabinet with a drawer open, and

20   there is business records contained therein, correct?

21   A    Yes, sir.

22   Q    Now, you would agree that that private storage area was

23   not accessible to the general public.

24   A    Yes, sir.

25   Q    Finally, let's take a look at -- just for this part of

1   our examination -- Plaintiffs' Exhibit 28, which is the

2   inspection report for J.T. Video, correct?

3   A    Yes, sir.

4   Q    Which you did on May 31, 2007, correct?

5   A    Yes, sir.

6   Q    And this was done by you, correct --

7   A    Yes.

8   Q    -- as lead inspector?

9   A    Yes, sir.

10  Q    And this was another one where you did the inspection at

11  a private residence.

12  A    That was the address that was listed in the 2257

13  statement, yes, sir.

14  Q    Well, my question isn't what address is listed.  My

15  question is did you do the inspection at a private residence.

16  A    Well, we -- we went to conduct the inspection at the

17  address listed in the 2257 statement, sir.

18           THE COURT:  Well, the question is do you know when

19  you got there if that was a private residence.

20           THE WITNESS:  When we arrived there, that's when we

21  realized it was a private residence.

22  BY MR. MURRAY:

23  Q    Now -- and I think this was the one that you contacted

24  the person by telephone in advance, correct?

25  A    Yes, sir.

1    Q    And you made a -- an appointment with him.

2         First of all, you learned that he doesn't maintain

3    regular business hours and does not spend 20 hours a week on

4    the business, correct?

5    A    Correct.

6    Q    And so you made a arrangement to meet with him, I guess,

7    about 11 days, 11 or 12 days after you talked to him, correct?

8    A    I initially contacted him with the intent of conducting

9    the inspection like that day or -- or the following day.

10        He advised me that he was headed out of town --

11   Q    Agent, all I'm asking you is did you ultimately agree

12   with him that you would come out and do an inspection about 12

13   days after that conversation?

14   A    To accommodate his travel, yes.

15   Q    Okay.  And then shortly after making that arrangement

16   with him, you learned that this individual sent an email to

17   a -- to a media outlet that -- I'm sorry.

18        He -- he posted on his -- on his internet blog the fact

19   that he was going to be subjected to an inspection, correct?

20   A    I believe he had contacted a reporter who had an internet

21   blog, and the reporter put it on his blog.

22   Q    Okay.  And that came to your attention, correct?

23   A    Yes, sir.

24   Q    And once you learned that, instead of waiting until June

25   11th, as per your agreement with this individual, you decided

1   that you were going to do the inspection that very day that

2   you learned that, correct?

3   A    We -- yes, sir.

4   Q    Is that correct?

5   A    Yes, sir.

6   Q    And -- and that, therefore, you did the inspection on May

7   31, 2007, correct?

8   A    Yes, sir, after we contacted him and asked him to meet us

9   at his residence, yes, sir.

10            THE COURT:  Would you say that again?  You contacted

11   him first?

12            THE WITNESS:  Yes, sir.  We contacted him.  He

13   was -- he was not at home.  We contacted him and asked him to

14   meet him at his residence, you know, like in an hour or two.

15   I forget the exact nature of the conversation.

16   BY MR. MURRAY:

17   Q    And did you explain to him that -- that you had decided

18   not to go along with your agreement because he had posted

19   something on -- on a blog?

20   A    I don't remember the exact conversation.  I -- I would

21   have explained to him that we just wanted to conduct the

22   inspection that day.

23   Q    And, by the way --

24            THE COURT:  He wanted you to wait till June 11th?  Is

25   that the date?

1             THE WITNESS:  Yes, sir, because he was traveling.

2    He -- he was leaving the next day and indicated he wouldn't --

3    he would prefer to wait.

4    BY MR. MURRAY:

5    Q    And, by the way, up until this inspection of all the ones

6    that we've gone through, this is the -- the first one where

7    there was advance notice given that we talked about that you

8    left?

9    A    I would need a minute to look at the -- the summary.

10           No, sir.  Actually, I -- I believe it was my second

11   inspection --

12   Q    Okay.

13   A    -- Angry Young Man where we -- down in San Diego.  He had

14   a post office box listed that led us to another post office

15   box --

16   Q    Right.

17   A    -- and then led us back to the first post office box.

18           So we had to contact him.  His attorney --

19   Q    Right.  No, I understand.

20   A    Okay.  You remember that?

21   Q    So this is the second one.

22   A    I -- I don't know if this was the second one.  It was

23   another one where advance notice was -- was provided, was

24   necessary.

25   Q    Well, you have a defendant's exhibit in front of you, do

1    you not?

2    A    Yes, sir.  I'm trying to listen to you and -- and read it

3    at the same time.

4    Q    Okay.  Well, if you take a look at page two of that

5    exhibit --

6    A    This would appear to be the third, 'cause Don Goo was --

7    was -- had some advance notice, as well.

8    Q    So there were -- of the eight that you did, five were

9    done without advance notice, and three were done with some

10   advance notice.

11   A    Advance notice that a -- well, wait a minute.  Let me --

12   I'm sorry.

13        There were apparently five that -- I'm sorry, you -- I

14   think you said five that did not have advance notice?  Five

15   did have advance notice.

16   Q    Of your eight?

17   A    Yes, sir.  They were Angry Young Man, Don Goo, J.T.

18   Video, Authentic Extreme and Ghost Pro.

19   Q    And in each of those instances the advance notice was not

20   about which particular records you were going to use, is that

21   correct?

22   A    Correct.

23   Q    And the advance notice that was given in those instances

24   was because of your law enforcement needs to contact somebody

25   to figure out where actually the records are, correct?

1   A     It was -- it was due to a variety of factors.   Office

2   boxes were -- were listed.   Records were maintained in private

3   residences, et cetera.

4       So we -- we had to go through various means to reach out

5   and contact people to find out exactly where the records were

6   and then make a appointments with them so that we could sit

7   down and review the records.

8   Q     Right.   So those contacts were made to facilitate your

9   ability to carry out the inspection, correct?

10  A     Yes, sir.

11  Q     Okay.   So -- so you then went to -- getting back to the

12  inspection of Video, J.T., you then went to this gentleman's

13  apartment that evening, correct?

14  A     Yes, sir.

15  Q     And --

16  A     If I recall from -- from that particular one, he had

17  indicated he was working and wouldn't be home until that hour.

18  Q     Okay.   If you turn to -- your attention to your report of

19  the inspection procedures, this inspection began at

20  approximately 8:00 p.m. in the evening, correct?

21  A     Yes, sir.

22  Q     And this was an inspection where you provided him with a

23  letter that had the exact same content of the letter that you

24  and I went over, correct?

25  A     Yes, sir.

1    Q    And you examined the records in his private residence,

2    correct?

3    A    Yes, sir.

4    Q    And you made copies of all the records, the 2257 records

5    that you examined, correct?

6    A    Yes, sir, of the seven performers --

7    Q    And then --

8    A    -- that were being inspected.

9    Q    And so you were there in his house -- his apartment for

10   about an hour from 8:00 to 9:00 p.m., correct?

11   A    Yes.  I believe it was myself and one contract inspector.

12   Q    Okay.  And --

13   A    And no -- no photos were taken during this inspection,

14   just for privacy reasons.

15   Q    You did, however, follow up after the inspection to take

16   notice of what else he posted on a blog, did you not?

17   A    I documented it in our final inspection report, yes, sir.

18   Q    So you actually included in your inspection report the

19   various posts that -- that he put up about this process,

20   correct?

21   A    Yes, sir.  And I believe -- I -- I would have to see the

22   previous page.

23        Was this put under producer?  Yeah, producer's response

24   to findings.

25   Q    And so there's a total of three blog posts that this

1    person put out that you retrieved from his blog and --

2    A    It was the --

3    Q    -- put it in the report, correct?

4    A    It was a reporter's blog, I believe.

5    Q    I'm sorry.  It wasn't his blog?  It was a reporter's

6    blog?

7    A    That's what I remember.  I -- I may be mistaken on that,

8    but I -- I don't remember that it was his blog.

9    Q    And in terms of your findings, you found that it was a

10   violation because he listed the post office box as the address

11   for the location?  That was one finding?

12   A    Yes, sir.

13   Q    And you also found that there was a violation because he

14   didn't maintain at least 20 normal business hours per week,

15   and he didn't send in to the FBI the notice as to which hours

16   he would be available, correct?

17   A    He did not notify whoever he was supposed to that he was

18   not maintaining 20 hours, that's correct.

19   Q    Okay.  Well, the regulation that was cited there and

20   quoted is, "To the extent that the producer does not maintain

21   at least 20 normal business hours per week, producers must

22   provide notice to the inspecting agency of the hours during

23   which records will be available for inspection, which in no

24   case may be less than 20 hours per week," correct?

25   A    Yes, sir.

1  Q    And you noted that there was a violation for failure to

2  comply with that requirement.

3  A    Yes.

4  Q    Correct?

5  A    Yes, sir, because he -- he told me that he didn't

6  maintain 20 hours.

7  Q    Now -- and in fact he quoted from his blog that the

8  reason he didn't use his physical address for the records is

9  he never felt comfortable using his home address, correct?

10 A    Correct.

11 Q    You testified, Agent Lawrence, on direct examination that

12 if a husband and wife made a video, sexually explicit video of

13 themselves, in their home, in private, that would not be

14 something that would come to your attention.

15      Do you recall that testimony?

16 A    Yes, sir, I do.  We would never become aware of it.  We

17 would never be aware of it.

18 Q    Okay.  And I think you indicated that -- something

19 similar to the fact that if someone were to send a sexually

20 explicit message, known as a sext, by text message to his or

21 her partner, that's another instance of the production of a

22 sexual image that would not come to your attention, correct?

23 A    Correct.

24 Q    Okay.  Now -- and you said that's because it was in -- it

25 would have been in private, and you wouldn't be able to detect

1   it, basically, correct?

2   A    Well, we don't, you know, as far as sexting, we don't

3   monitor that.  You know, I don't know what the technology is

4   there or what would be required, but that would presumably

5   require a warrant or some kind of court order, and as far as

6   emails and things like that, that's, again, would require a

7   court order.

8        So it's not -- and it was outside the purview of what we

9   were looking at, which was commer- --

10  Q    Well, your testimony was that --

11  A    -- commercial pornography.

12  Q    -- it would never come to your attention, I thought.  You

13  couldn't ever discover it.

14  A    Unless there was a court order which we weren't involved

15  in.  I'm -- I'm sorry, I'm coming from a criminal background.

16  Q    Was it your testimony --

17  A    Personal --

18  Q    -- that you --

19  A    Personal --

20  Q    -- that that would never come --

21  A    Yes, sir.

22  Q    You wouldn't be able to detect that.

23  A    Yes, sir.

24  Q    Okay.  Yes.  And -- and you mentioned the warrant

25  requirement.

1      You have been an FBI agent for many years and have had

2  training on the Fourth Amendment, correct?

3  A    Yes, sir.

4  Q    And training on the requirements that have to be present

5  for obtaining a search warrant, correct?

6  A    Yes, sir.

7  Q    And -- and the requirements of probable cause.  You've

8  had training on that, correct?

9  A    Yes, sir.

10  Q    And you get continuing training on any developments,

11  particularly any important Supreme Court decisions on -- in

12  that area of the law?

13  A    Yes, sir.

14  Q    Okay.  And you, yourself, have many times, I would assume

15  and you'll tell me if I'm wrong, been the applicant for search

16  warrants?

17  A    Several times, and I also approve them, and I've

18  participated in them and have supervised them.

19  Q    Okay.  And a large number of them over the years,

20  correct?

21  A    I wouldn't say a large number, but several.

22  Q    Okay.  And so you know, for example, that ordinarily, to

23  enter areas, private areas of a business premises that are not

24  generally accessible to the public, if you're doing a criminal

25  investigation ordinarily, you would need a search warrant,

1    correct?

2              MS. WYER:  Relevance, Your Honor.

3              THE COURT:  Well, I'm going to overrule the

4    objection and give Mr. Murray some leeway to make a record of

5    what the difference was, if any, between a inspection of

6    records and a search pursuant to a search warrant.

7              I mean we'll do this -- we're not going to repeat

8    this with Agent Joyner but --

9              MR. MURRAY:  No.

10             THE COURT:  -- I'll let you ask the question so you

11   can make a record about this.

12             THE WITNESS:  I'm sorry, sir.  Could you repeat the

13   question?

14   BY MR. MURRAY:

15   Q    Ordinarily when you're doing -- conducting a criminal

16   investigation and you want to search private business premises

17   and areas of those premises that are not open to the general

18   public, unless you have exigent circumstances or some

19   voluntary consent, ordinarily you would need to get a search

20   warrant, correct?

21   A    If we have probable cause to believe that the

22   instrumentalities related to criminal activity are secreted

23   somewhere in a, you know, a building or a residence or

24   something like that, we would have to get a search warrant in

25   pursuit of a criminal investigation.

1    Q    Yes.  And -- and you'd have to -- you said you'd have to

2    have probable cause to get it, correct?

3    A    Yes, sir.

4    Q    And you'd also have to have the probable cause and the

5    warrant to actually examine records, business records, that

6    were maintained on the premises that you're searching,

7    correct?

8    A    Yes, sir.

9    Q    Okay.  Now, I want to get back, though, to your testimony

10   about how you would not be able to discover the private video.

11        I take it that many -- you've indicated that you're --

12   you do a lot of investigation now of public corruption.

13   A    Yes, sir.

14   Q    And you used to do a lot of investigation of white collar

15   crime, correct?

16   A    Yes, sir.

17   Q    And a lot of the public corruption cases that you

18   investigate, they don't always occur in public, those crimes,

19   do they?

20   A    Correct.

21   Q    In fact, if -- if you got a public official paying

22   somebody a bribe, chances are they're going to do it in

23   secret, correct?

24   A    You'd be surprised, sir, but yes.

25   Q    Okay.

1   A     Normally.

2   Q     And so -- and -- and the same is true of your white

3   collar crime investigations.  They don't just openly do it out

4   in the open.

5         They do it to try to not get detected, correct?

6   A     Generally, yes, sir.

7   Q     Okay.  So one of the things that happens is you might get

8   a tip that gives you an ability to investigate a white collar

9   crime or a public corruption crime, correct?

10  A     Yes, sir.

11  Q     Okay.  Now, every -- you or some other agent of the

12  Government could get a tip that someone is violating 2257 by

13  sending images over his or her cell phone.

14        That could happen, couldn't it?

15  A     I'm -- I'm sorry.  Could you repeat that question?

16              THE COURT:  Well, this is a different --

17              MS. WYER:  Calls for speculation, Your Honor.

18              THE COURT:  This is different.  This is -- anything

19  is possible.  You can ask him if that -- if he's aware that

20  that ever happened, but we're, I think, going into

21  hypotheticals.

22              The world of possibilities is not appropriate --

23              MR. MURRAY:  All right.  I'll move on --

24              THE COURT:  -- is not appropriate cross.

25              MR. MURRAY:  -- Your Honor, to a different question.

1          THE COURT:  You can argue something like that.

2     BY MR. MURRAY:

3     Q    The -- now, I want to make one thing clear, though.

4          When you say that you wouldn't -- it wouldn't come to

5     your attention if someone in the privacy of his home created a

6     sexual image, you're not suggesting that you would recommend

7     that anybody violate a federal criminal law, are you?

8          THE COURT:  Well, he didn't -- he never said --

9     suggested such a thing.

10    BY MR. MURRAY:

11    Q    And you wouldn't, would you?

12    A    I'm not sure I follow your question, sir.

13    Q    Well --

14         THE COURT:  That's really not a proper question.

15         MR. MURRAY:  Okay.

16         THE COURT:  It's argumentative.

17    BY MR. MURRAY:

18    Q    If -- if in fact the husband and wife that you

19    discussed --

20         THE COURT:  Sometimes FBI informants and cooperating

21    witnesses participate in criminal activity.  They wear a wire

22    or something like that.

23         That -- it's a real -- really misleading question

24    so -- thank you.

25         MR. MURRAY:  Well, let me move on, Your Honor,

1    then -- and --

2                THE COURT:  Okay.

3    BY MR. MURRAY:

4    Q    It is true, however, that if the husband and wife in your

5    situation that you described took it upon themselves to comply

6    with 2257 when they made their sex video and sent a notice to

7    the FBI as to the 20 hours per week that they would be

8    available for you to inspect their records, then it would come

9    to your attention, wouldn't it.

10   A    If we're notified by the public of something like that,

11   I -- I assume, yes, sir.

12   Q    And you've indicated --

13   A    But it --

14   Q    -- that the regulations require a producer to give that

15   notice in the event that that producer doesn't maintain normal

16   business hours, correct?

17               THE COURT:  Well, the regulations speak for

18   themselves.

19               You can ask the witness if he's ever experienced

20   such a thing, not all the hypotheticals that could arise in

21   the abstract because what the --

22               MR. MURRAY:  Well, I -- I appreciate that, Your

23   Honor.

24               THE COURT:  -- regulations say.

25               MR. MURRAY:  And I'll move on, although I will say

1    that I think that the question that he was answering in the

2    first place was hypothetical, would something like that have

3    come to his attention.

4            So I -- I suppose -- but that's -- I -- I have no

5    problem, Your Honor.  I'll move on.

6            THE WITNESS:  We only -- as I --

7    BY MR. MURRAY:

8    Q    There's no question --

9    A    Okay.

10   Q    -- in front of you, sir.

11   A    Fine.

12           THE COURT:  Yes, just wait for the next question.

13   Ms. Wyer can have a chance for redirect if she wants.

14   BY MR. MURRAY:

15   Q    One of the things that -- that you said was that the

16   universal age requirement made it easier for you to

17   investigate compliance with 2257.

18       Do you recall that testimony?

19   A    Yes, sir.

20   Q    And I think you said if it applied to only persons who

21   were under the age of 25, in some cases you might have to do

22   further investigation in the event that you encountered a

23   producer who said, "I don't have a record for so and so

24   because she was over 25," correct?

25   A    Yes, sir.  It would make things a little more

1   complicated.

2   Q    Okay.  But that's true of -- of many things about the

3   constitutional rights that we have.  They frequently make it

4   more difficult for you as an FBI agent to investigate matters

5   and to come to a proper conclusion, correct?

6   A    I wouldn't say that the Constitution complicates things.

7   We -- we have various situations that we encounter, and we,

8   you know, we -- we act within the law and --

9   Q    Sure.

10  A    -- and go forward, you know.

11  Q    But it would -- your job would be easier, for example, if

12  you didn't need probable cause to get a warrant, wouldn't it?

13              MS. WYER:  Objection, Your Honor.

14              THE COURT:  Well --

15              MS. WYER:  This is argumentative.

16              THE COURT:  Wait.  Repeat the question again.

17  Sorry.

18  BY MR. MURRAY:

19  Q    Your job as an investigator would be easier if the

20  standard for getting a search warrant was less than probable

21  cause.

22              THE COURT:  Well, can you answer that?

23              THE WITNESS:  Could you repeat the question?

24              THE COURT:  It's a very broad question.  I mean --

25              MR. MURRAY:  Your Honor, I'm just --

1           THE COURT:  But it -- it depends whether probable

2    cause is required.  That's -- it's really argumentative.

3           If probable cause is required, that's what he's --

4    that's what he has to get.  But as he said, and it's the law,

5    there are some circumstances where reasonable suspicion will

6    suffice, and there are other circumstances where you don't

7    need a warrant.

8           MR. MURRAY:  Well, Your Honor, he was permitted

9    to -- to speculate and give testimony about how much more

10   difficult it would be in the event that this statute only

11   required the maintaining of records for persons who were under

12   25.

13          THE COURT:  Yes, that's right.

14          MR. MURRAY:  And it seems to me that they're -- so

15   that for example, if the Constitution required that the

16   statute be struck down because it's -- it goes beyond -- it is

17   not narrowly tailored, and that would make his job more

18   difficult, it seems to me I'm entitled to cross examine him

19   and make the point that the Constitution and the rights that

20   we all have as citizens under the Fourth Amendment, the Fifth

21   Amendment, the Sixth Amendment do make it more difficult for

22   the Government --

23          THE COURT:  All right.

24          MR. MURRAY:  -- to carry out their investigation.

25          THE COURT:  I -- I think that may be proper

1    argument.  But you can ask the witness relating to his -- he

2    did testify about the age restriction, and he thought that it

3    was assisting him in investigation that there was a age

4    requirement of 18.

5              Wasn't that your testimony yesterday, is that

6    correct?

7              THE WITNESS:  Yes, sir, and -- and that --

8              THE COURT:  And then if it was a higher age, it

9    would pose some investigative problems to you.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  All right.

12             THE WITNESS:  Yes, sir.  The universe --

13             THE COURT:  And you're welcome to cross examine him

14   to -- thoroughly on that aspect of his direct.

15             What you were asking before, in my opinion, is

16   abstract and is more appropriate for argument.

17   BY MR. MURRAY:

18   Q    Agent, one example that you cited was an instance in

19   which the video that you might be looking at had one of the

20   performers who -- whose body parts but not face was shown.

21        Do you recall that?

22   A    Yes, sir.

23   Q    Okay.  In the movies that you've seen I think you'll

24   agree that that is a very rare occurrence, isn't it, that most

25   of the actors and actresses that you see in the films that you

1    were reviewing, you see their full bodies and their faces

2    during the course of the movie.

3         Wouldn't you agree with that?

4    A    I would say maybe most, but certainly not all.

5         There are fetish films where people wear leather masks.

6    Performers routinely would cover their face because they don't

7    want to be seen, all making identification rather difficult.

8    Q    Is it true that in the movies that you viewed in the

9    course of this investigation that nearly all the performers,

10   you could see their faces and -- and their bodies?

11   A    I would say a -- that's a fair assessment.

12   Q    Okay.  Now -- and the other thing that you indicated in

13   your direct examination is that one of the things that you

14   tended to try to do was to focus on the youthful-looking

15   actors and actresses when that was something that could be

16   done.

17   A    Yes, sir.

18   Q    Okay.  And you have no reason to believe that if the

19   requirement of the statute applied to people 25 and younger,

20   that the producers would not keep records of the youthful-

21   looking actors and actresses.

22   A    I'm sorry.  Could you repeat that question?

23   A    You have no reason to believe that the producers wouldn't

24   go ahead and keep the records of anybody that was youthful

25   looking, even if the statute only required them to keep

1  records for people under 25, do you?

2              MS. WYER:  Calls for speculation and using double

3  negatives, Your Honor.

4              THE COURT:  Overrule the objection.

5              Can you answer the question?

6              THE WITNESS:  I'm going to need you to repeat that

7  one more --

8  BY MR. MURRAY:

9  Q.   Okay.

10 A.   -- one more time.

11 Q    Do you have any reason to believe that the producers

12 whose records you were inspecting, for example, wouldn't keep

13 the records for their youthful looking actors and actresses,

14 even if the statute had the cut-off at age 25?

15 A    That they would not keep --

16 Q    Yes.

17 A    -- records for the youthful looking -- oh, well, I'm --

18 then your question is assuming if there's a 28-year old

19 performer who looks younger, would the producer keep those

20 records?

21 Q    You have -- let me rephrase the question.

22     You don't have any reason to believe that the producers

23 who are making these films would not have on hand records of

24 all of their 18, 19, 20, 21 and 22 and 23 and 24-year old

25 actors and actresses if the law had the cut-off at 25, do you.

1    A     The producers, I would presume, would keep what's

2    required by law.

3    Q     Okay.  And -- and one of the reasons that you come to

4    that conclusion is that the producer would be risking criminal

5    prosecution if he didn't comply with the law, correct?

6    A     Correct.

7    Q     Okay.  Now, isn't it true -- well, if the cut-off were

8    25, then the universe of documents would -- that you would be

9    required to and able to inspect would be smaller, correct?

10   A     If the cut-off was 25, the universe of documents we were

11   looking at, presumably, yes.

12   Q     Okay.  And the FBI has limited resources, correct?

13   A     Yes, sir.

14   Q     Okay.  You have to prioritize your investigations,

15   correct?

16   A     Yes, sir.

17   Q     Okay.  Wouldn't you agree that an argument -- that you

18   could make an argument that if the cut-off were age 25, it

19   would actually be more efficient for you as an FBI agent in

20   focusing on actors and actresses who truly were youthful

21   looking.

22           MS. WYER:  Objection; confusing question, Your

23   Honor.

24           THE COURT:  Well, it's -- it's really speculative,

25   but can you answer the question?

1            THE WITNESS:  I -- I think I'm starting to follow.

2            No, I don't think it would be easier.  Having --

3    BY MR. MURRAY:

4    Q    You could make an argument that it was.

5    A    I'm not sure I could.  I -- as I -- as I tried to make an

6    argument yesterday, it would complicate things because it

7    would open the door to disputes with producers, that I thought

8    a performer looked 24 or 25 and the producer thought he or she

9    looked 29 or 30.

10        And then we would get into a dispute, and it would

11   actually make the inspection process much longer.

12   Q    And wouldn't you agree that would be a rare occurrence?

13        Wouldn't you expect that to be a rare occurrence --

14   A    No -- no, sir.

15   Q    -- that you'd have an argument like that?

16   A    Not necessarily.  The age --

17            MR. MURRAY:  May I have a moment, Your Honor?

18            THE COURT:  Yes.

19        (Pause)

20            MR. MURRAY:  That's all I have.  Thank you, Your

21   Honor.

22            THE COURT:  Okay.  Redirect.

23                    REDIRECT EXAMINATION

24   BY MS. WYER:

25   Q    Good morning, Agent Lawrence.

1    A    Good morning.

2    Q    Going back to yesterday when Mr. Murray was first asking

3    you about the statute and the regulations in effect at the

4    time that the inspections were occurring, were you aware of

5    what version of the statute, the regulations that you were

6    following had been promulgated under?

7    A    I don't specifically remember.  We just followed the --

8    the regulations and -- and the checklists which were derived

9    from the regulations in -- in place at the time.

10   Q    And did you later learn that the regulations that you

11   were following in 2007 were promulgated under a previous

12   version of the statute?

13   A    Yes, ma'am, I did.

14   Q    In regard to the letters that you provided to producers

15   starting in approximately March 2007, when you would hand a

16   letter to a producer, would you quote from the letter or

17   recite the language in the letter that Mr. Murray was asking

18   you about?

19   A    No, ma'am.  I -- I never read the letter to -- to someone

20   when I handed it to them.

21   Q    Do you know if the producer read that part of the letter

22   before directing you to the area where the producer wanted you

23   to sit during the inspection?

24   A    I don't remember specifically.  I know that the whole

25   process took a short period of time.  We'd walk in, identify

1    ourselves, explain why we were there, provide them with the --

2    the letter and the list.

3        And normally they were more interested in the -- the

4    spreadsheet containing the video and the names to see what

5    records we were looking for.

6    Q    Did you rely on the FBI Office of General Counsel to

7    provide guidance if you had any question on the meaning of the

8    regulations?

9    A    Yes, ma'am.

10   Q    Now, going to the specific inspections that Mr. Murray

11   was asking you about, in Angry Young Man inspection how did

12   you come to see those sets?

13   A    We -- from what I recall of that particular inspection we

14   were directed to use a table in the back of the -- the

15   business.  So it certainly plain that all of the sets were in

16   plain view.

17       While we were conducting our inspections, we were like

18   next to a shower, and there was a medical, mock doctor's

19   office and lockers and -- and things like that.

20   Q    So the producer asked you to use that area.

21   A    Yes.

22            MR. MURRAY:  Objection, Your Honor.  This is

23   leading.

24            THE COURT:  Well, it is slightly leading, but it's

25   redirect.

1          I'll overrule the objection.

2          THE WITNESS:  We worked in the area that the

3  producer asked us to sit.

4  BY MS. WYER:

5  Q    Now, in the Don Goo inspection that Mr. Murray was asking

6  you about did the failure to comply with the segregation

7  requirement in that instance make it more difficult to conduct

8  the inspection?

9  A    Well, the -- the -- we had to go through all the records

10  that were in the possession of the -- of the company that had

11  taken over Don Goo, and so we had to go, you know, go through

12  the file cabinets and the boxes that we were directed to, so

13  it did make it a little more difficult, certainly more time

14  consuming.

15  Q    Now, in the -- now, going to the J.T. Video inspection,

16  just to clarify the record, was the address at the residence,

17  that individual's residence, the address listed on the 2257

18  statement in that instance?

19  A    No, and I believe I misspoke during cross.

20        The address listed on the 2257 statement was a P.O. box,

21  and when I contacted the owner of J.T. Video, he indicated the

22  records were maintained at his residence, and that's when we

23  made arrangements for us to conduct the inspection 11, 12 days

24  later at his residence.

25  Q    And when you later contacted the -- the owner and

Lawrence - The Court                                53

1    indicated you wanted to conduct the inspection that day, did

2    he express any objection to that plan?

3    A    No, ma'am.  He explained that he was still at work.  He

4    had an errand or something to run with -- with someone else,

5    'cause I remember he asked if -- he was with a friend or

6    another party, and he asked if they could come along, and I

7    said it was completely up to him.  It was his -- his

8    residence.

9         And we made arrangements to meet at 8:00 p.m. at his

10   residence which was convenient for him.

11   Q    And, finally, did you ever experience an instance of a

12   private couple sending in a notification to the FBI and

13   alerting it to the hours when --

14   A    No.

15   Q    -- the private couple's video would be available for

16   inspection?

17   A    No, ma'am.  I'm unaware that we've ever received such

18   notification.

19             MS. WYER:  No further questions.

20             THE COURT:  I have a couple questions that either

21   one of you can then follow up.

22   BY THE COURT:

23   Q    All right.  As an FBI agent, I think you said before, you

24   received training and how to conduct searches pursuant to

25   search warrants, is that correct?

1    A    Yes, sir.

2    Q    And you also have done training of other agents in that

3    same topic, is that correct?

4    A    I have -- I've supervised the -- the agents, yes.

5    Q    Were the inspections that you did, as you've testified to

6    in this case, pursuant to a search warrant?

7    A    No, sir.

8    Q    From an investigator's point of view how were these --

9    were these different than you would conduct a -- a search

10   pursuant to a search warrant?

11   A    I'm glad you asked that.

12   Q    What?  All right.  Well, how were they different?

13   A    Okay.  They -- they were materially different.

14        Under the inspection process we walked in in business

15   suits, normally into a lobby, identified ourselves, explained

16   why we were there, asked where they wanted us to sit, had the

17   records brought to us, took photos for, you know, the front of

18   the business of the -- usually the filing cabinet or the area

19   where the records were kept and the area that we were

20   worked -- the area that we worked.

21        Then we -- we used a copier to make our own copies, and

22   we left.

23        With a search warrant --

24   Q    Did you offer to pay or pay for the copies?

25   A    No, sir.  We -- we made -- we brought our own copiers.

1    Q    You bring your own copier.

2    A    Yes, sir.

3    Q    All right.  Go ahead.

4    A    Yes.  With the execution of a search warrant we --

5    Q    And now I'm talking about an execution of a search

6    warrant for -- for records.  I'm not talking about drugs or

7    guns --

8    A    Okay.

9    Q    -- or things like that.

10   A    Well, I guess it would be a hypothetical then 'cause we

11   didn't get a -- we didn't use a search warrant to conduct any

12   of these --

13   Q    No.  Have you ever done -- have you ever seized records

14   pursuant to a search warrant?

15   A    You mean like just business documents?

16   Q    Yes.

17   A    Oh, absolutely.

18   Q    Okay.  That's what I'm talking -- I'm not -- I know

19   you're not getting a search warrant for drugs or guns or

20   contraband or for people, you know, hidden away.

21        I'm talking about -- so I'm rephrasing the question

22   slightly.

23        So I'd like you to compare this, what you did in this

24   case, which you referred to as an inspection, and how that

25   would differ from searching for records and seizing records

Lawrence - The Court                                   56

1    when you have a search warrant for records.

2    Q      Okay.   Generally, we treat search warrants the same, but

3    for like a white collar crime and -- and I'll just use a -- a

4    healthcare fraud case, it's somewhat similar, where we're

5    looking for business records.

6           If it's a -- regardless of whether it's a business or --

7    or a residence, normally agents would wear raid jackets to,

8    you know, identify themselves as law enforcement officers.   We

9    would -- if it's a residence, we do a knock and announce.

10          If it's a business, we would walk in and, you know,

11   identify -- identify ourselves, ask people to step away from

12   the computers, congregate the employees in a -- in a specific

13   area so that we could identify them.

14          And then we would come in with a photographer and take

15   photos of every area of the business, or if it's a residence,

16   we would photograph every room in the residence.

17          We would take a sketch of the business or the residence,

18   and then we would put signs -- label each room A, B, C, D, et

19   cetera.

20          And then we would have agents go in and conduct a search

21   in those areas that, you know, where -- where the documents

22   that we were looking for might be secreted to include

23   computers, and the --

24   Q      And the agent -- you would -- would the agents do that

25   themselves, or will you ask the proprietor or the owner to

1   guide you or both?

2   A    It -- it depends.

3   Q    Okay.

4   A    But we would do normally both.  We -- we would ask.

5   Q    But would you rely solely on what the owner or the

6   proprietor told you as to the location of records?

7   A    It depends on the nature of the investigation, but, you

8   know, unfortunately, people under investigation aren't always

9   truthful, and so they might direct us to one area where some

10  of the documents might be, but for our purposes we would still

11  want to go ahead and search the remainder, even if it was a

12  cursory search.

13  Q    All right.  Well, in this case, in these inspections that

14  you've been discussing here today, did you rely exclusively on

15  what the owner or the person in charge gave you, or did you

16  conduct an independent search for other records or look for

17  other places there might be records?

18  A    Oh, no, sir.  We didn't have a search warrant so we

19  didn't have any lawful means to conduct any type of a -- a

20  search.

21  Q    My question, did you rely entirely on what the person

22  gave you as the records for 2257?

23  A    Absolutely.

24  Q    Okay.  Now, the next question I have.

25       There's been a lot of discussion and questions about the

1    concept of notice, and you testified that in some of the

2    inspections that you conducted there was advance notice of

3    certain duration and in other there was no advance notice, is

4    that correct?

5    A    Yes, sir.

6    Q    All right.  Now, I'd like to know what -- can you -- and

7    you conducted eight inspections altogether?

8    A    Yes, sir.

9    Q    Could you just estimate the volume, the range of volumes

10   of documents, like a half a box or a full file cabinet or

11   anything in between?

12        What -- what was like the lowest and the highest, if you

13   can recall?

14   A    If you'll give me a minute, I'll just look at this

15   summary here.

16        It -- it varied from producer to producer.  If --

17   Q    No, I understand that.  I'd like to know the lowest

18   versus the highest.  If -- as you recall.  I'm not looking

19   for --

20   A    Sure.

21   Q    -- anything exact.  I'm just looking for an estimate.

22   A    Estimate would be -- well, the smallest I can -- I can

23   recall is the red binder that we saw in Angry Young Man.  It

24   was just a -- a simple three-ring binder, versus a couple of

25   filing cabinets or several -- several filing cabinets --

1    Q    Okay.

2    A    -- full of -- of files.

3    Q    All right.  Now, based on your experience as an

4    investigator, sometimes people have been known to try to

5    destroy evidence when they know police or FBI agents are

6    coming.  That -- that correct?

7    A    Yes, sir.

8    Q    All right.  In this case there'd be no motive to destroy

9    records because the requirement is that you keep records.  So

10   if anyone were to destroy records, they'd be shooting

11   themselves in the foot, so to speak, is that correct?

12   A    Yes, sir.

13   Q    So did you see any risk here that by -- by not giving

14   advance notice there was any risk that anybody would be

15   destroying records?

16   A    Not necessarily -- not -- not destroying records, but

17   maybe cleaning up their records to, you know -- if their cross

18   reference system isn't done or their -- they don't have copies

19   filed away for their movies and -- and things like that.

20        I mean it would give them an opportunity to -- to clean

21   up the records, but certainly not destroy them.

22   Q    Okay.  Did you see -- do you see any -- see any

23   opportunity, say, for someone who didn't keep records at all,

24   say, if they had advance notice of, say, 24 hours, that they

25   could manufacture new records for all the sexually explicit

Lawrence - Recross (Mur)                                    60

1    movies they had made, say, in the 24 hours between notice

2    being given and FBI agents arriving for an inspection?

3        Is that a -- in your experience as -- as an investigator,

4    is that a realistic threat or possibility?

5    A    It's a possibility, but the likelihood of that is, I

6    would think, somewhat low.

7    Q    Okay.  All right.  That's all the questions I have.

8              THE COURT:  Mr. Murray, do you want to ask some

9    questions of the follow-up?

10             MR. MURRAY:  Yes, I do.

11             THE COURT:  And then, Ms. Wyer, you're welcome to

12   ask yours.

13                        RECROSS-EXAMINATION

14   BY MR. MURRAY:

15   Q    Agent Lawrence, the questions that you were asked about

16   the differences between the procedure you would follow in the

17   event that you had a search warrant and the procedure that you

18   followed here, I want to ask you a couple questions about

19   that.

20       Here, of course, in this instance you didn't have a

21   search warrant, obviously, correct?

22   A    Correct.

23   Q    What you had was a statute and regulation -- and a set of

24   regulations, the regulations particularly, that gave you

25   authority to enter premises without delay and without a

1   warrant, correct?

2   A    Correct.

3   Q    And it gave you authority to inspect records while on the

4   premises without a warrant, correct?

5   A    Correct.

6   Q    Okay.  Now, if -- if you didn't have that statutory

7   authority at all, but you wanted to examine those very same

8   records, what would you have had to do?

9           THE COURT:  What he had to do if he wanted to look

10  at the records.

11          MR. MURRAY:  Yes.

12          THE WITNESS:  Well, we would have had to track down

13  the records and either, depending on the situation, if -- if

14  headquarters had asked us to follow the procedure of getting a

15  search warrant, then we'd have to go and try to get some kind

16  of a search warrant, although it would be difficult in that if

17  the address provided in the 2257 statement was a post office

18  box, how do you search a post office -- I mean we could have

19  presumably searched the post office box and not found

20  anything, but it would have -- would have certainly made the

21  process much more difficult.

22  BY MR. MURRAY:

23  Q    Right.  You would have -- to accomplish what you were

24  able to accomplish under the authority of 2257 on these eight

25  inspections you would have had to go get a search warrant

1  to -- to authorize you to enter and examine those records,

2  correct?

3  A    Correct, although I -- I just want to revise what I just

4  said.

5       It wouldn't have made it more difficult.  It just would

6  have made the inspection process longer.

7  Q    No, I --

8  A    Okay.

9  Q    I appreciate that.

10 A    Okay.

11 Q    But -- but the point was that you would have needed to

12 get a warrant to accomplish it the other way, correct?

13 A    If not for the statutory authority, yes, sir.

14 Q    Okay.  Now -- and then the last question I have related

15 to the redirect, did you encounter anybody in your eight

16 inspections who indicated that they were unaware that the

17 statute authorized and the regulations authorized the FBI to

18 come in without a warrant and inspect the records?

19      Did you find anybody who didn't know that?

20 A    I don't recall specifically.  Just don't remember.

21          MR. MURRAY:  That's all.

22          THE COURT:  All right.  I have one more question.

23          In your own personal experience have you ever done

24 any inspections of records similar to this in another context,

25 aside from 2257?  And I'm not including search warrants.

1          THE WITNESS:  Yes, sir.  I -- I'm a certified public

2     accountant, and prior to my appointment with the FBI I used to

3     do regulatory inspections.

4          THE COURT:  Of what?  Not of your own clients.

5          THE WITNESS:  No.  I used to work for a CPA firm

6     that had contracted with the government, and we would do

7     regulatory inspections of banks that had taken over

8     government-seized assets, and they were managing those assets,

9     and -- and we would have to go in and -- and ensure compliance

10    with the -- with the requirements of the contract and -- and

11    things like that.  That's just one example.

12         THE COURT:  Did those regulations require advance

13    notice, or could you do that without notice, if you recall?

14         THE WITNESS:  We pretty much -- it was a multi-

15    million dollar situation so we -- we actually had a semi-

16    permanent office there --

17         THE COURT:  Oh, so you --

18         THE WITNESS:  -- so it was a little --

19         THE COURT:  -- were on site.

20         THE WITNESS:  It was a little -- little different,

21    yeah.

22         THE COURT:  Okay.

23         THE WITNESS:  But the -- the audits and inspections

24    conducted by CPAs --

25         THE COURT:  Right.

1              THE WITNESS:  -- are usually done, you know, with --

2      with some advance notice, but it's --

3              THE COURT:  So --

4              THE WITNESS:  -- a different ball game.

5              THE COURT:  But as an -- as an FBI agent this was

6      the only situation where you did an inspection of records

7      without a search warrant.

8              THE WITNESS:  Yes, sir, and to the best of my

9      knowledge this is the only situation in which the FBI acts in

10     any regulatory inspection capacity, as opposed to like the ATF

11     where they'd go in and conduct inspections of gun dealers on a

12     regular basis.

13             THE COURT:  Okay.  All right.  Okay.  Thank you.

14             All right.  Any other questions?

15             MS. WYER:  No, Your Honor.

16             THE COURT:  All right.  Thank you very much.

17             MR. MURRAY:  No, Your Honor.

18             THE COURT:  Okay.  Next witness.

19             MS. WYER:  Your Honor, we call Charles Joyner.

20             THE COURT:  Okay.

21             CHARLES R. JOYNER, DEFENDANT'S WITNESS, SWORN

22             THE CLERK:  You may be seated.

23             Please state our full name and spell your last name

24     for the record.

25             THE WITNESS:  Charles R. Joyner, J-O-Y-N-E-R.

1            THE COURT:  Okay.  Agent Joyner, you may know this,

2   but I just want to say for the record at an earlier part in

3   this case I admitted into evidence portions of your deposition

4   with the understanding that those would be included because

5   they were testimony you had already given under oath.

6            So -- and that -- those things that were covered in

7   your deposition that were introduced will not be repeated

8   here.  So I think counsel have agreed to work around what's

9   already been read.

10           Okay.  You may proceed.

11           MS. WYER:  Your Honor, just to clarify, I -- my

12  understanding was that that applied to the cross-examination

13  but not to the direct examination.

14           THE COURT:  Well, I'll allow you to cover the -- but

15  I don't want, you know, complete repetition of things he said

16  before.  I mean he testified to a number of these inspections

17  in some detail.

18           So I -- I don't -- if you have limited questions,

19  that's fine, but I don't want to go over the same material

20  over.

21           MS. WYER:  Yes.

22           THE COURT:  I don't want to repeat the same

23  testimony.

24           MS. WYER:  Okay.  Yes, I've tried to consolidate

25  things and streamline --

1          THE COURT:  Good.

2          MS. WYER:  -- the questioning.

3          THE COURT:  Okay.  Thank you.

4                    DIRECT EXAMINATION

5    BY MS. WYER:

6    Q    Mr. Joyner, what is your current job?

7    A    I'm retired from the FBI, and I do consulting now.

8    Q    And how long did you work for the FBI?

9    A    I started in 1987 and retired in October of 2011.

10   Q    Could you describe briefly what your assignments were at

11   the FBI?

12   A    Initially I was assigned to Los Angeles.  I worked

13   primarily violent crimes, major offenders.  I was on the

14   Select Team for several years.  I then was the principal

15   firearms instructor.  I became a supervisor in 2001 in charge

16   of training in critical incidents.

17   Q    And what did you do before you joined the FBI?

18   A    I worked for the CIA.

19   Q    Where do you live currently?

20   A    In Houston, Texas.

21   Q    Could you describe when and how you were assigned to the

22   2257 Inspection Team?

23   A    In May of 2006 I had a special agent in charge approach

24   me and tell me that I would be in charge of creating this

25   program.

1   Q    What were your responsibilities in -- in regard to the

2   program?

3   A    I was supposed to identify the independent contractors,

4   to train them, to identify office space, to procure equipment

5   and supplies, to research the law, talk to partners and

6   develop policy and procedures.

7   Q    So you -- did you start this process before any

8   inspections had actually occurred?

9   A    Yes, ma'am.

10   Q    Did you actually set up the program?

11   A    Yes, I did.

12   Q    And who -- what direction did you get or -- or what

13   did -- what direction did you get from other components in

14   doing this task?

15   A    I conferred with DOJ.  We spoke to the U.S. Attorney's

16   Office in Los Angeles.  We spoke to other law enforcement

17   agencies and then just research.

18   Q    In regard to legal policy, who was overseeing that aspect

19   of the program?

20   A    Primarily Office of General Counsel with the FBI.

21   Q    Did the -- who did the team report to?

22   A    My boss was Allen Nanavaty -- that's spelled

23   N-A-N-A-V-A-T-Y -- who was a unit chief at FBI Headquarters.

24   Q    And did the team have any relationship with FBI

25   investigational activities?

1   A      No.

2   Q      Was there anything -- was that a policy in place at the

3   time that it would be separate?

4   A      The inspections are going to be separate from any

5   investigations.   That's -- that's true.

6   Q      Now, at the time you were setting up the program was

7   there -- how was it decided that producers would be selected

8   for inspection?

9   A      It was going to be by a random selection process.

10  Q      And how was the pool of producers from which the random

11  selection was made formed?

12  A      Originally it was a list that was compiled by analysts at

13  FBI Headquarters, and then through our work that list

14  continued to expand.

15  Q      Were you involved in compiling the list?

16  A      I was, yes.

17  Q      And initially how many -- how many producers were on the

18  list that you received from headquarters?

19  A      I believe it was approximately 300.

20  Q      Were you -- how did you go about identifying additional

21  producers to add?

22  A      Just through research, through attendance at conferences,

23  through speaking to other agencies we were able to develop

24  other -- other companies.

25  Q      And were there any criteria that you used to identify

1   producers?

2   A    They had to meet the guidelines of 2257 or be subject to

3   2257.

4   Q    And what was your understanding at what was required?

5   A    It had to be an actual sexual act, and it had to be

6   involved in interstate commerce.

7   Q    So does that mean you were limiting the producers to

8   commercial producers?

9   A    Yes, ma'am.

10  Q    And was the focus on a particular industry?

11  A    It was on the adult industry, primarily DVDs, internet.

12  Q    Did you have an understanding of the distinction between

13  primary producers and secondary producers?

14  A    Yes, we did.

15  Q    And what was your understanding?

16  A    The primary producer's the one that actually is involved

17  in the hiring and making of the movie.  The secondary producer

18  may be somebody who edits or markets it or some other

19  involvement, but the primary producer's the one who actually

20  hires and makes the film.

21  Q    Did you have an understanding regarding whether secondary

22  producers were subject to the 2257 inspections?

23  A    We were told secondary producers would not be inspected.

24  Q    And you already indicated your understanding of the types

25  of sexually explicit conduct involved.

Joyner - Direct (Wye)                                    70

1        Was -- was it your understanding that a producer should

2   be included if the only images that he created were erotic

3   nudes?

4   A    That would not be included.

5   Q    As far as you know, was there any effort to include on

6   the list people who were exclusively still photographers?

7   A    No, ma'am.

8   Q    And did you make any effort to include on the list people

9   who had published books of sexual photography?

10  A    No, ma'am.

11  Q    Did you visit bookstores or libraries to try to identify

12  individuals who had published books of sexual photography?

13  A    No, ma'am.

14  Q    Did you make any effort to include on the list people who

15  had exhibited sexually explicit photographs in galleries or

16  museums?

17  A    No, ma'am.

18  Q    Did you visit galleries or museums to try to identify

19  such individuals?

20  A    No, ma'am.

21  Q    And why was that?

22  A    That wasn't the focus of 2257.  Again, it had to be a

23  sexually explicit act that's involved in interstate commerce.

24  Q    And was it outside the industry that you were focused on?

25  A    Yes, ma'am.

Joyner - Direct (Wye)                                    71

1   Q    And as far as you know, was there any effort to include

2   in the list or -- or -- was this a -- what form was this list

3   of producers in?

4   A    Goes on an Excel spreadsheet, and it was also in a

5   digital format.

6   Q    So was there any effort to include in the spreadsheet

7   individuals who had uploaded videos to a tube site?

8   A    No.

9   Q    Did you know of the existence of tube sites at that time?

10  A    I don't know if that was even occurring at that time.  I

11  wasn't familiar with it, no.

12  Q    And as far as you know, was there any effort to include

13  on the spreadsheet any individuals who had uploaded

14  photographs or videos on a social networking website or adult

15  dating website?

16  A    No.

17  Q    And was there any effort to include on the list

18  individuals who made videos of themselves for their own

19  private use?

20  A    No.

21  Q    So do you recall how many producers were on the -- in the

22  spreadsheet by the time the inspection program ended?

23  A    I don't.  I think it was in the neighborhood of two to

24  3,000.

25  Q    Do you -- was it your understanding that if the program

1   had gone forward, the number of producers would have continued

2   to increase?

3   A    Yes, ma'am.

4   Q    Now, could you describe the initial steps that would be

5   taken after a producer was randomly selected for inspection by

6   the random number generator?

7   A    After a producer had been selected, product from that

8   producer would be ordered.  The product would be provided to

9   the independent contractors for review.

10       They had a checklist.  They'd go down the checklist as

11  they're reviewing the product to ensure that the product was

12  subject to 2257.

13       They do all the preliminary -- preliminary work that they

14  could, that they'd screen snapshots of the performs' faces,

15  and once they'd completed that and the checklist, would then

16  go on site to conduct the inspection.

17  Q    Were the sample products that you acquired all publicly

18  available materials?

19  A    Yes, ma'am.

20  Q    Were they all commercial in nature?

21  A    Yes, ma'am.

22  Q    And what was your understanding of the purpose of this

23  pre-inspection review process?

24  A    There are several.  One is just for efficiency, also to

25  minimize the inconvenience to the producer so we're there as

1   little time as possible, to ensure that the product did come

2   under the purview of 2257.

3   Q    Did you also try to identify the location of the records

4   through that process?

5   A    Yes.  The 2257 statement should also list the physical

6   location where the records were being maintained.

7   Q    Let me show you Defendant's Exhibit 225.

8        Do you recognize this document?

9   A    Yes, ma'am.

10  Q    And who created this document?

11  A    James Paulson (phonetic).

12  Q    I mean this --

13  A    Oh.  The original document was -- the final draft was

14  completed by Erin Zacker (phonetic), Office of General

15  Counsel, FBI.

16  Q    And is this the checklist that you were referring to a

17  minute ago?

18  A    Yes, ma'am.

19  Q    So did you rely on the FBI's Office of General Counsel to

20  provide guidance if you had any question about the

21  interpretation of 2257 or the regulations?

22  A    Yes, we did.

23  Q    Did the inspection team rely on this review form when

24  conducting inspections?

25  A    Yes, ma'am.

1    Q    Now, let me show you Defendant's Exhibit 226.

2             MS. WYER:  And permission to approach.

3    BY MS. WYER:

4    Q    Do you recognize this document?

5    A    Yes, I do.

6    Q    Does this document list the inspections that you

7    conducted as lead inspector?

8    A    Yes, it does.

9    Q    And does it also include other information about those

10   inspections based on the inspection reports that you prepared

11   for each inspection?

12   A    Yes, ma'am.

13   Q    How many inspections did you conduct as lead inspector

14   or -- taking into account that Agent Lawrence conducted eight

15   inspections, and one inspection was conducted by -- was led by

16   a third supervisor special agent, Agent McGuire (phonetic).

17   So that was nine.

18   A    I conducted 20.

19   Q    Could you -- in regard to the inspections that you

20   conducted did a significant number occur at a business office

21   location?

22   A    Yes, ma'am.

23   Q    And could you describe how you would initiate an

24   inspection when it took place at a business location?

25   A    We'd go to the reception area.  I'd identify myself as an

Joyner - Direct (Wye)                                        75

1    FBI agent, show my credentials, explain the reason that we're

2    there.

3         Would have an Excel spreadsheet that showed all the

4    product that had been reviewed and the performers and advise

5    the nature and the purpose of the 225 [sic] inspection.

6    Q    Was the reception area that you entered a space that

7    anyone -- any member of the public could have entered?

8    A    Yes, ma'am.

9    Q    And was it -- so it was a open -- a space that was open

10   to the public.

11   A    Yes, ma'am.

12   Q    Did you -- what was the purpose of providing the producer

13   with the spreadsheet at the time you initiated the -- the

14   inspection?

15   A    The 2257 inspection is restricted to the product that we

16   reviewed.

17   Q    And did the -- that spreadsheet identify the specific

18   records --

19   A    Yes, ma'am.

20   Q    -- that you wanted to review?

21   A    Yes, ma'am.

22   Q    Did you later provide anything else at the time you

23   initiated that inspection?

24   A    I believe it was in March 2007 we'd also provide a letter

25   that had been compiled by OGC, Office of General Counsel.

1    Q    And does that mean that you conducted at least nine

2    inspections without providing such a letter?

3    A    Nine personally or --

4    Q    Yes, sir.

5    A    -- nine total?  Looking at the dates on this, it would

6    have been eight or nine, correct.

7    Q    And did the inspections that you conducted without

8    providing a letter include Diabolic Thing Productions?

9    A    Yes, it did.

10   Q    And did it include Dark Side Entertainment?

11   A    Yes, ma'am.

12   Q    And did the inspections you conducted without providing a

13   letter include K-Beech?

14   A    Yes, ma'am.

15   Q    And did they also include Wicked Pictures?

16   A    Yes, ma'am.

17   Q    Was one of those four -- actually, the first inspection

18   that you conducted.

19   A    Yes, Diabolic was the first inspection.

20   Q    Do you remember that inspection?

21   A    I do.

22   Q    And could you describe what happened when you first

23   initiated the inspection at Diabolic?

24   A    We entered the reception area.  I identified myself to

25   the receptionist, and she said that she needed to contact the

1    owner, and she did.

2         And she had a lengthy conversation with him where it was

3    pretty much along the lines of, "You know, seriously,

4    seriously, it's the FBI.  I'm not joking.  It's the FBI."

5         And so finally he came and peeked around the corner, but

6    he did come down to talk to us.

7    Q    And did you -- so how did the inspection proceed at that

8    point?

9    A    We spoke to the owner.  We showed him the list of the

10   products that we had reviewed.  He took us back to the room

11   where the 2257 records were stored.  He had another employee

12   there pull up the information for us, and we began our

13   inspection.

14   Q    Did -- how did -- how was it determined where you would

15   stay or sit during -- when you conducted that inspection?

16   A    The owner decided that.

17   Q    Now, when you did begin providing letters at the

18   beginning of an -- an inspection starting in March 2007, did

19   you discuss the contents of the letter with the producer at

20   the time?

21   A    No, we didn't go into detail about the letter.  We did

22   the same preamble that we've always done for inspections which

23   is to provide the formation, the -- the Excel spreadsheet to

24   tell him the nature of the inspection, and then we also

25   presented him with the letter.

1    Q    Did you verbally recite the language in the letter that

2    states, "The FBI is authorized to enter your place of business

3    without delay"?

4    A    I did not.

5    Q    And did you verbally recite the language stating, "It is

6    a criminal violation of federal law to delay or obstruct the

7    FBI from conducting an inspection"?

8    A    I did not.

9    Q    And do you know whether in any particular instance a

10   producer who received such a letter read it carefully and read

11   that language before the inspection actually started?

12   A    I don't know if they would have read it carefully or not.

13   Q    Did -- in any instance when you initiated an inspection

14   did a producer indicate that he thought you should obtain a

15   warrant before the inspection?

16   A    No.

17   Q    And in any instance did a producer express reluctance to

18   allow the inspection to proceed?

19   A    No.

20            MR. MURRAY:  Your Honor, again, just to be

21   consistent, I object because "reluctance" is so vague.

22            THE COURT:  Yes.  Well, he's asking -- she's asking

23   about specific instances of what happened or did not happen.

24            All right.  Go ahead.  We're only going to do this

25   once.

Joyner - Direct (Wye)                                    79

1          MS. WYER:  Yeah, I combined it all.

2    BY MS. WYER:

3    Q    Did you have the impression that for those inspections

4    where you gave a producer a letter along with the spreadsheet

5    listing the records, that the letter had any impact on the

6    producer's willingness to allow you to conduct the inspection?

7              MR. MURRAY:  Objection, Your Honor.

8              THE COURT:  Well, any visible impact that you

9    observed.

10             THE WITNESS:  No, ma'am, there's no visible impact.

11   BY MS. WYER:

12   Q    Now, in general, how is it determined where the

13   inspection team would set up?

14   A    That was determined by the owner or the representative of

15   the company.

16   Q    Did the producer sometimes indicate that he wanted the

17   team to stay in the reception area of the business?

18   A    Yes.

19   Q    Did that occur at the All Good Video inspection?

20   A    It did.

21   Q    And let me show you -- and all Good Video inspection, for

22   the record, is Plaintiffs' Exhibit 5.

23        Now, are the photographs -- let me show you Plaintiffs'

24   Exhibit 32, page 3269.

25        Are these photographs pictures of the reception area of

1   All Good Video where you conducted that inspection?

2   A    Yes, ma'am.

3   Q    And was Shanes World Studios another inspection where the

4   producer indicated you should stay in the reception area

5   while -- while reviewing the records?

6   A    Yes, ma'am.

7   Q    And let me -- and for the record, that inspection report

8   is Plaintiffs' Exhibit 25.

9        Are the photographs you're now looking at, Plaintiffs'

10  Exhibit 32, pages 3454 and 3455, are those photographs

11  pictures of the reception area at Shanes World Studios where

12  you reviewed the records for that inspection?

13  A    Yes, it is.

14  Q    And was the agency another producer that indicated you

15  should stay in the reception area while conducting an

16  inspection?

17  A    Yes, ma'am.

18  Q    Reviewing the records.

19       And for -- for the record, that is Plaintiffs' Exhibit 1.

20       And looking at Plaintiffs' Exhibit 1, page 25, is it

21  indicated in the photo log there that the front reception area

22  is where the inspection -- where the review of records

23  occurred?

24  A    Yes, ma'am.

25  Q    Now, in the photographs marked as Plaintiffs' Exhibit 32,

Joyner - Direct (Wye)                                    81

1    pages 3258 and 3259, is that the reception area for that

2    business where the producer indicated you should review the

3    records?

4    A    I don't remember the agency location, what it looked

5    like, so I -- I can't tell you if that's at the agency or not.

6    Q    But if those records correspond to the photo log, would

7    that indicate that that was the --

8    A    Yes, ma'am.

9    Q    -- reception area?

10   A    That -- that would be the same as indicated in the photo

11   log, yes, ma'am.

12   Q    And what about the inspection at K-Beech, which is

13   Plaintiffs' Exhibit 14?

14        Do you -- do you remember that inspection?

15   A    I do.

16   Q    And do you remember the layouts of that office?

17   A    I recall K-Beech being a large open room.  Once you

18   walked in, it was just a -- an open room with desk and file

19   cabinets.

20   Q    And did -- could anyone -- could any member of the public

21   enter that space?

22   A    That large room's connected to the front door, so yes,

23   ma'am, you could walk directly into that large room.

24   Q    What would someone, for example, delivering a package

25   just entered that same space?

1   A     Yes, ma'am.

2   Q     And is that space the location where the inspection team

3   reviewed the records?

4   A     It was.

5   Q     And if other producers had similarly asked you to conduct

6   the review of records in the -- in the public reception area

7   of the business, is that you would have done?

8   A     Yes.  We went wherever they told us to go.

9   Q     Now, how did you access the records that you wanted to

10  review?

11  A     We would provide him with the Excel spreadsheet, and then

12  they would pull those records and provide them to us.

13  Q     Were the -- were there any instances where the producer

14  would simply provide copies of his 2257 records, and then you

15  would take them with you and review them later?

16  A     Yes.  There is at least one in which they had it in a

17  digital format, so we provided the producer with CDs, and they

18  burned the images onto our DVDs to take back, and we reviewed

19  those at our office.

20  Q     Do you recall which inspection that was?

21  A     I believe that was Private.

22  Q     For the record that's -- inspection report is Plaintiffs'

23  Exhibit 21.

24        And if you look at page 1963, does that -- looking at

25  that, does that verify that that was where that occurred?

Joyner - Direct (Wye)                          83

1    A     Yes, ma'am.

2    Q     So how did it happen that in that instance the producer

3    simply downloaded the digital files onto CDs?

4    A     They mentioned that all of their 2257 records were in a

5    digital format, and they were going to download them for us.

6    We had CDs with us, so we provided him with the CDs.

7          They downloaded them, and we took those back to our

8    office base.

9    Q     Did you give them the option of doing that?

10   A     Yes.

11   Q     And were there other instances when you gave the producer

12   the option of providing -- of downloading his records onto

13   CDs, rather than having you review the records in the office

14   space?

15   A     It was up to them.  If they had it in that format,

16   whatever was preferable by them.

17   Q     So do you recall providing the option to other producers?

18   A     Yes, ma'am.

19   Q     Do you remember the inspection of Temptations?

20   A     Not specifically.

21   Q     What -- is there something that would refresh your

22   recollection?

23   A     Okay.  I see it now.  Yes.

24   Q     Is that sufficient to refresh your recollection, or do

25   you need something else?

1    A      Based on this I do recall that inspection.

2    Q      Okay.  Do you recall how that inspection occurred?

3    A      Like others, it was randomly selected, reviewed the

4    product.

5           We went to the location that was listed on the 2257 as

6    the location of the records, and it was a different company, I

7    believe.  This shows Gentleman's Video.

8    Q      So in that instance did you actually ever go to the

9    Temptations office in the course of conducting that

10   investigation?

11   A      I'd have to see the file.  We went to whatever location

12   was listed on the 2257.

13   Q      Would the -- so that is -- let's -- let's just forward

14   through to the first page of that report.

15   A      Okay.

16   Q      And does that refresh your recollection about the

17   inspection that occurred?

18   A      It does.

19   Q      So in that instance did you actually ever go to the

20   Temptations' office premises in the course of that inspection?

21   A      No, the company that was selected was Gentleman's Video.

22   That was the address listed on the 2257 statement, and as we

23   were there, the -- the Gentleman's -- at Gentleman's Video

24   address was listed as custodian of records for the

25   Temptations.

1      I'm sorry.  Reverse of that.  The custodian of records

2  for the Gentleman's Videos was at the Temptations' address.

3  Q    I think it was the other way around, but, anyway, just

4  that --

5  A    Okay.

6  Q    -- with the information regarding this inspection appear

7  in the report that you completed.

8  A    I'm sorry.  Say that again, please.

9  Q    Would the -- would the description of the inspection that

10  occurred that appears in the report be accurate in regard to

11  what happened?

12  A    Yes, ma'am.

13  Q    So in your experience were the same procedures utilized

14  for each inspection?

15  A    Yes, ma'am.

16  Q    Did the application of the procedures vary, depending on

17  the circumstances in some ways?

18  A    Each inspection was unique in some way.

19  Q    Was -- during the period when you were leading 2257

20  records inspections was it your understanding that you had

21  some discretion to adjust the inspection procedures in

22  response to particular circumstances?

23  A    Yes, ma'am.

24  Q    For example, did you sometimes provide advance notice to

25  producers --

1   A     Yes, ma'am.

2   Q     -- before an inspection occurred?

3         Did those occur at the Silver Star inspection?

4   A     Yes, it did.

5   Q     And do you recall how that happened?

6   A     The address listed on the 2257 turned out to be a

7   residence.  I had gone to the residence a couple of times, was

8   never able to find somebody home.

9         So was able to get a number for the producer, and I

10  called him and set up a time to meet him at his home.

11  Q     Are you -- are you sure that that's --

12  A     No, I'm sorry.  That's a different one.  I need better

13  glasses.

14  Q     Well, is there -- why don't you just -- just --

15  A     Okay.  Silver Star -- that's a different.  That's

16  Moonlight, was Moonlight.

17        Silver Star had been purchased by New Tech (phonetic),

18  and New Tech had stored their records in a vault.

19  Q     And so why did you provide advance notice in that

20  instance?

21  A     The -- the vault was in facilities of Iron Mountain.  You

22  cannot get into that without the owner being there.  So we'd

23  have to meet with them to go to the vault and for them to open

24  the vault.

25  Q     Did other inspections that you led take place at

1   residences?

2   A    There were some, yes, ma'am.

3   Q    And did this occur in two inspections that you led in

4   Florida?

5   A    Yes, ma'am.

6   Q    Do you -- do you recall which inspections those were?

7   A    Yes, it was Real Wild Girls and Pony Boys.

8   Q    And why did those inspections occur at residences?

9   A    That was the address located on the 2257 statement.

10  Q    And when you initiated an inspection at a residence, did

11  you -- where did you -- how did -- how did that occur?

12  A    It'd been the same as a business.  We'd knock on the

13  door, identify ourselves and the nature and scope of the

14  inspection.

15  Q    Did you enter in the residence during the time when you

16  were initiating -- when you were identifying yourself?

17  A    Absolutely not.

18  Q    And so at what point would you enter in the residence, if

19  ever?

20  A    Once they invited us in.

21  Q    What was your understanding of what you were supposed to

22  do if you were attempting to initiate an inspection, and no

23  one was present at the address when you arrived?

24           THE COURT:  Well, did that ever occur?

25           THE WITNESS:  Yes, sir.  Yes, Your Honor.

1          THE COURT:  Go ahead.

2          THE WITNESS:  If -- if nobody was at the residence,

3    then it was back to the Moonlight situation, whether we make

4    attempts to come back or identify the location of the owner,

5    then eventually call the owner and set up a time to schedule

6    the inspection.

7    BY MS. WYER:

8    Q    And did it ever happen at a business address when no one

9    was present when you first --

10   A    Yes, ma'am.

11   Q    And what did you do in those -- in that instance?

12   A    Same thing, where originally we try a couple times.  I

13   believe I talked to some of the neighboring businesses to see

14   what their normal work hours were and then finally would place

15   a phone call to the owner to set up a time.

16   Q    Do you recall which inspection you were describing?

17   A    The one for a business?

18   Q    Yeah.

19   A    I believe that was Dark Side.

20   Q    Did you ever attempt to forcibly enter a particular

21   premises if no one was present at the time you arrived?

22   A    No, ma'am.

23   Q    During the period you were conducting 2257 inspections

24   did you have an understanding of the segregation requirement?

25   A    I did.

1    Q    And in your experience conducting inspections did the

2    segregation requirement help with the inspection process?

3    A    Yes, ma'am.

4    Q    And how did it help?

5    A    It's less material for us to look through, and it

6    certainly helps the producer 'cause then it's less information

7    that we have access to.

8         So it minimizes the paperwork we have to look at.

9    Q    During the period when you were conducting 2257

10   inspections did you have an understanding of the 2257 labeling

11   requirement?

12   A    Yes, ma'am.

13   Q    And did the -- in your experience did the labeling

14   requirement help the inspection process?

15   A    Yes, ma'am.

16   Q    And how -- how did it help?

17   A    Without that we would not know the location where the

18   records were stored.

19   Q    During the period you were conducting 2257 inspections

20   did you have an understanding of the cross-referencing

21   requirement?

22   A    Yes, ma'am.

23   Q    And what was your understanding of what that required?

24   A    The cross-referencing requirement was that for every

25   performer you had to have true name, maiden name, aliases,

1  stage names.

2  Q    And could the producer -- how should a producer, in your

3  understanding, maintain that information?

4  A    They can maintain it in any format they chose.  Most of

5  it had some sort of data system that they maintained the cross

6  reference system.

7  Q    Were they able -- were they -- in your understanding were

8  they allowed to keep that data system separate from the actual

9  records?

10 A    Yes, ma'am.

11 Q    And in your experience conducting 2257 inspections did

12 the cross-referencing requirement help with the inspection

13 process?

14 A    Yes, ma'am.

15 Q    And how did it help?

16 A    If a particular product listed a performer by a stage

17 name, that allowed us to research the stage name to other

18 stage names and then, of course, the true name.

19 Q    And when -- when would that be?  When would you do that

20 during the inspection?

21 A    That was part of the inspection process.  As we're

22 reviewing the photo ID, we'd also look at the cross reference

23 system, and that would tie in the -- the various names used by

24 that performer.

25 Q    Now, in the -- in the course of implementing the 2257

Joyner - Direct (Wye)                                         91

1    records inspection program and beginning to conduct the

2    inspections did you become aware that there was some anxiety

3    in the adult industry regarding the inspection process?

4    A    Yes.   Prior to the inspections I'm sure there was a great

5    deal of anxiety.

6    Q    Did you make ny effort to communicate with the adult

7    industry, outside the specific instructions that you

8    participated in, regarding the inspections?

9    A    Yes, ma'am.

10   Q    And how did that occur?

11   A    Initially there was a meeting at headquarters where

12   various producers and attorneys were invited to FBI

13   Headquarters to meet to discuss the inspection process.

14        We had a second meeting in 2007 with a lot of the same

15   representatives.  It's unusual for the FBI, but I was allowed

16   to speak with the industry.  I was allowed to speak at the

17   XBIZ conference, to grant interviews and to field questions

18   from people in the industry.

19   Q    Going back to the meeting at FBI Headquarters in

20   Washington, what as the purpose of that meeting, in your

21   understanding?

22   A    Part of it was to alleviate some of that anxiety, but

23   also to seek the input from the producers, to provide them

24   with the information of the inspections to date and the items

25   that we're finding, some of the consistent findings that --

Joyner - Direct (Wye)                                            92

1    that we have for violations, to share information.

2    Q    And what was the purpose of your participation on the

3    XBIZ panel that you mentioned?

4    A    Again, it was to provide information on the inspection

5    process so they understood the process if they were inspected,

6    to answer any questions they may have about the inspections.

7    Q    Do you have any basis for knowing whether these efforts

8    were helpful to the adult industry?

9              MR. MURRAY:  Objection, Your Honor.

10             THE COURT:  Well, it would be hearsay, wouldn't it?

11   How would he know, telling what someone told him?

12             Objection sustained.

13   BY MS. WYER:

14   Q    So what -- what information did you try to convey to the

15   adult industry during these communications?

16   A    So there's an understanding of the inspection process, so

17   there's an understanding of the violations that we were

18   finding so that those could be corrected and addressed.

19   Q    Did you also provide any information regarding how to

20   facilitate the inspection process?

21   A    Yes, ma'am.

22   Q    Such as?

23   A    One of the things I would mention is -- as we're going

24   through this is that they chose where we should work, and that

25   we certainly appreciated it if that they had a conference

1  table or a room that we could spread out our equipment, and

2  also access to bathrooms would be helpful.

3      But just generally how they could help us, and then by

4  helping us, we can get out of their hair that much more

5  quickly.

6  Q   During the time that you led 2257 inspections did you

7  become aware of performers who might be under 18 based on

8  their appearance?

9  A   Yes, ma'am.

10 Q   Were some of those performers identified during the pre-

11 inspection process?

12 A   Yes, ma'am.

13 Q   And were you able to determine in all cases whether the

14 performers were at least 18?

15 A   No, ma'am.

16 Q   And when were you not able to make that determination?

17 A   If the producer did not have any records for those

18 performers.

19 Q   So based on your experience, leading 2257 records

20 inspections, do you think 2257 is an effective mechanism?

21         MR. MURRAY:  Objection, Your Honor.

22         THE COURT:  Well, sustained as to -- it's a -- I

23 don't know what you mean by "ineffective."

24         MS. WYER:  An -- I meant "an effective."

25         THE COURT:  What?

1           MS. WYER:  An effective.  "Do you think it's

2    effective?"

3                THE COURT:  Well, I -- well, you object to that?

4                MR. MURRAY:  Yes, I object to --

5                THE COURT:  Yes.

6                MR. MURRAY:  -- that question.

7                THE COURT:  Yes, I sustain it, but you can ask him

8    other or different kinds of questions that may be relevant on

9    that -- on that point.  That's -- it's the law, I mean.

10               But I think you can ask him based on his experience

11   if he, you know, if he found any problems with it or he, you

12   know, any issues that arose about the inspection itself.

13               Is that helpful?  I mean I don't know what you mean

14   by -- I think the sentence -- I think the question's too

15   broad, and it invites his opinion, rather than -- and I think

16   what he should testify to is his knowledge from his

17   experience.

18               I think that's the same test I applied in -- in the

19   issues about his depositions.  So I'm just trying to be

20   evenhanded here.

21               MS. WYER:  Well, I'll just move on, Your Honor.

22   BY MS. WYER:

23   Q    What happened after an inspection took place, in general?

24   A    Immediately, while we're still at the location, I would

25   compile a list for the producer of any violations that we

1    found so they would have a chance to rectify those.

2          Once I got back to my office, I'd start compiling my

3    report, and at least a week, I'd wait at least a week for the

4    producer to respond to any violations.  And then I would

5    include that in my report to headquarters, any violations and

6    any actions of the producers to correct those violations.

7    Q    Did you or any other member of the inspection team -- do

8    you also provide that report to anyone else?

9    A    DOJ got a copy, also.

10   Q    And did you provide the report to the U.S. Attorney's

11   Office --

12   A    Yes.

13   Q    -- as part of DOJ?

14         Did you or any other member of the team have any

15   involvement with any decisions that the U.S. Attorney's Office

16   made in regard to how to respond to the findings in any

17   inspection report?

18   A    No, ma'am.

19   Q    Are you aware whether there is currently a 2257 records

20   inspection program in operation?

21   A    I don't believe there is.

22   Q    Do you -- are you aware of the program that you were

23   involved in having stopped at some point?

24   A    Yes, ma'am.

25   Q    How did that occur?

Joyner - Direct (Wye)                              96

1   A     After the -- I believe it was the Sixth Circuit Court

2   initial decision that the law was unconstitutional, we were

3   directed by headquarters to continue to review product but not

4   to conduct any more inspections.  And that was in late 2007.

5        In February 2008 we were instructed to go ahead and

6   release the independent contractors, and at that point the

7   inspection process ended.

8   Q     And at that point was the program completely disbanded?

9   A     Yes, ma'am.

10  Q     And where -- what happened?

11       What did your -- what happened to your position?

12  A     Prior to the end of the 2257 I had been tasked with

13  creating another program, the Child Sex Tourism Program.  So

14  at that point I just worked full tie on the Child Sex Tourism

15  program.

16  Q     And are you aware of any plans to start a new inspection

17  program?

18  A     No, ma'am.

19            MS. WYER:  No further questions.

20            THE COURT:  Okay.  Cross examine.

21            Well, I -- I've got about another 10 or 15 minutes.

22  Do you want to start now, Mr. Murray --

23            MR. MURRAY:  Sure.

24            THE COURT:  -- or would you rather --

25            MR. MURRAY:  I'll be glad to start, Your Honor.

1          THE COURT:  All right.  Go ahead.

2                     CROSS-EXAMINATION

3    BY MR. MURRAY:

4    Q     Good morning, Agent Joyner.

5    A     Good morning, Mr. Murray.

6    Q     As the Judge said, I will not be spending as much time

7    with you as I did before, and I will do my best to avoid

8    repeating any of the questions that we've already asked you.

9          But in connection with what you have said on direct

10   examination today, you had authority under 2257 and the

11   regulations to enter the premises where the records were

12   maintained without delay, correct?

13   A     Yes, sir.

14   Q     Okay.  And you then had authority to inspect the 2257

15   records on the premises, correct?

16   A     Yes, sir.

17   Q     Okay.  Now, you indicated that no one, I think, asked you

18   for a warrant when you went to an inspection site, correct?

19   A     That's correct.

20   Q     Okay.  Now, you did not advise them, did you, that they

21   were within their rights to decline to permit you to carry out

22   an inspection, did you?

23   A     I did not.

24   Q     Okay.  And in fact, if anything, you told them or would

25   have told them that the law entitles you to carry out such an

1   inspection, correct?

2   A    That never came up, but, yes, you're correct that it

3   would entitle me to carry out the inspection.

4   Q    Okay.  And then it is also true, is it not, that you

5   didn't encounter anybody who was, to your knowledge, unaware

6   of the requirement of 2257 and the regulations, that they

7   permit you to come in and inspect the records, did you.

8   A    I wouldn't know their knowledge of the law.

9   Q    No one expressed to you the belief that you didn't have

10  the right to come in and inspect their records, did they?

11              MS. WYER:  Hearsay, Your Honor.

12              THE WITNESS:  That's correct.

13              THE COURT:  No.  Overruled.

14  BY MR. MURRAY:

15  Q    And in fact one of the reasons that you attended the

16  trade show that you described was to put out the word as to

17  what 2257 and the implementing regulations entitle you to do,

18  correct?

19  A    That's correct.

20  Q    Okay.  So you wanted everybody who might be a potential

21  target of an inspection to know that the law entitled you to

22  enter without delay and inspect the records, correct?

23              MS. WYER:  Mischaracterizing former testimony.

24              THE COURT:  I'm sorry?

25              MS. WYER:  That's mischaracterizing his direct

1    testimony, Your Honor.

2                THE COURT:  No.  It's cross-examination.  Overruled.

3                THE WITNESS:  I'm sorry.  Can you repeat the

4    question?

5    BY MR. MURRAY:

6    Q    You wanted everyone in the industry that you were

7    speaking with to know that 2257 and the regulations entitled

8    you to appear at their premises and enter and inspect the

9    records.  You wanted them to know that, didn't you?

10   A    Yes, sir.  We wanted them to know all aspects of the law,

11   that's correct.

12   Q    Okay.  And you have no reason to believe that the people

13   that you inspected didn't realize your entitlement to be

14   there, correct?

15   A    I don't know their thoughts or their knowledge, but I had

16   no reason to believe otherwise.

17   Q    Okay.  Now, you testified on direct examination about the

18   inspection of Diabolic, I think being the very first

19   inspection that you carried out?

20   A    Yes, sir.

21   Q    I'm showing you what's been marked as -- and it's in

22   evidence as Plaintiffs' Exhibit 12.

23        This in fact is the regular -- the inspection report of

24   Diabolic in July 24th of 2006, correct?

25   A    Yes, sir.

1   Q    The very first one you did.

2   A    Yes, sir.

3   Q    Now -- and you're the one who completed the report, is

4   that correct?

5   A    Yes, sir.

6   Q    And in that inspection you -- you inspected performers --

7   a total of 208 performers were identified as appearing in 23

8   DVDs, is that correct?

9   A    Yes, sir.

10  Q    And you inspected all of the records pertaining to those

11  208 performers, correct?

12  A    Yes, sir.

13  Q    And you had a inspection procedure that you included in

14  this report and then ultimately in every report that you

15  completed, correct?

16  A    That's correct.

17  Q    And you find that you began the inspection at 10:50 a.m.,

18  is that correct?

19          MS. WYER:  Your Honor, this is repeating what Mr.

20  Murray has already asked Mr. Joyner.

21          THE COURT:  Well, I think so, but -- did you cover

22  this one in his deposition?

23          MR. MURRAY:  I was just responding to a couple of

24  the questions on -- on direct, Your Honor.

25          THE COURT:  All right.  Well, try not to repeat.

1    You know, if you want to ask a few questions, I'll let you do

2    it.

3    BY MR. MURRAY:

4    Q    This particular inspection lasted over six -- six and a

5    half hours or seven hours, thereabouts, is that correct?

6    A    Yes, sir.

7    Q    It is -- is it true -- let me just -- I'm sorry, just so

8    that we're clear where you were when you inspected.

9         That was one of the areas that you photographed in

10   Diabolic?

11   A    Yes, sir.

12   Q    And that was another office area that you photographed,

13   is that correct?

14   A    I believe it's the same office, yes, sir.

15   Q    And you photographed the staircase in that inspection?

16   A    Yes, sir.

17   Q    And then a hallway up there.

18   A    Yes, sir.

19   Q    Okay.  Now, you identified a total of four inspections

20   that you did where you examined the records in what you called

21   the reception area of the business.

22        Do you recall that?

23   A    Yes, sir.

24   Q    Okay.  And I thnik the first one you identified was All

25   Good Video, Plaintiffs' Exhibit 5.

1        Is that one of the ones that you were referring to?

2   A    Yes, sir.  That was conducted in the reception area.

3   Q    And that was an inspection that you did on August 16,

4   2006, is that correct?

5   A    Yes, sir.

6   Q    Now, I want to show you the photographs that you took of

7   that area.  I want to make sure that you understand it.

8        And this is from Plaintiffs' Exhibit 31 -- I'm sorry, 32,

9   beginning at Bates stamp 3266, and let me show you.

10       Is this a picture of the -- what you're calling the

11  reception area?

12  A    Yes, sir.

13  Q    And it consisted of a desk and an area in front of the

14  desk, is that correct?

15  A    That's correct.

16  Q    And were any members of the public present in that

17  reception area when you examined the records?

18  A    Yes, sir.  People were coming and going throughout that

19  inspection.

20  Q    And where did they go?

21  A    Either they came in the reception area and then left, or

22  they came to the reception area and continued back.

23  Q    Okay.  Well, were these -- some of them employees?

24  A    I don't know.  I do remember talking to the owner, Rita,

25  because I was nervous that so many people were coming in and

1    asking what we're doing, and I thought it was creating a

2    disturbance for her.

3        And I said, "Are you sure you don't want us to do this

4    somewhere else?"

5        And she said, "No, I'd rather you stayed here."

6        But there were people coming in and see us in suits,

7    looking through records, and a lot of them would come and go.

8    Q    Did any of them examine the records while you were there?

9    A    No, sir.

10   Q    Did any of them approach the reception area and ask

11   whether they could examine any private records of the business

12   enterprise when you were there?

13   A    No, sir.

14   Q    Now, this is a photograph of what area of the premises?

15   A    I'd have to look at a photo log.  My assumption is it's

16   somewhere where the 2257 records are stored.

17   Q    And so you did go into that area that is depicted on this

18   photo and -- in order to see where the -- the records were

19   maintained?

20   A    Yes, sir.

21   Q    And then did you go into the area depicted on this

22   photograph, which is page 3272 of Plaintiffs' Exhibit 32?

23   A    I personally would not have gone in.  Whoever took the

24   photographs obviously did.

25   Q    Okay.  And that's a photograph of various boxes and --

1    and also it looks like a -- a desk area.

2    A    Yes, sir.

3    Q    And then on the next Bates stamp page in that same

4    exhibit do you see a photograph of -- of an area that has a

5    bunch of binders and records, is that correct?

6    A    Yes, sir.

7    Q    And that certainly was not an area accessible to the

8    general public without an invitation, was it?

9    A    I would think not.

10   Q    Now, I want to show you one of the -- the next

11   photographs in that same series of Plaintiffs' Exhibit 32

12   which began on Bates stamp number that I previously said.

13        Is that another picture of the reception area?

14   A    Yes, sir.

15   Q    And who's that person sitting behind the desk?

16   A    That's Jim Paulson, one of the independent contractors.

17   Q    And do you know whether or not -- did you -- did you

18   observe anyone being invited by the owner, any general member

19   of the public being invited to come in and sit behind the

20   reception desk?

21   A    No, sir.

22        THE COURT:  We -- I think we're going to take --

23   you're going to be a little while longer.  I'm not going to

24   rush you, so -- so we're going to take a luncheon recess now

25   till 1:15.  Okay.

1          Now, Agent -- or Mr. Joyner, you're retired.

2          THE WITNESS:  Yes, sir.

3          THE COURT:  The rule in this courthouse is that when

4    a person's under cross-examination, a witness like yourself,

5    that they not discuss their testimony of the case with anyone

6    else while you're -- we have a recess --

7          THE WITNESS:  Okay.

8          THE COURT:  -- for cross-examination.  Okay.

9          THE WITNESS:  Yes, Your Honor.

10         THE COURT:  So if you -- you can have lunch with

11   the -- your former colleagues, but please do not discuss the

12   case or your testimony.  Okay.

13         THE WITNESS:  Okay.  Yes, Your Honor.

14         THE COURT:  All right.  Thank you very much.

15         Okay.  One-fifteen.  Thank you.

16      (Luncheon recess taken, 11:35 a.m. to 1:17 p.m.)

17                      AFTERNOON SESSION

18         THE COURT:  Please be seated.  Okay.

19         Ready to begin?  Continue the cross-examination?

20         All right.  Mr. Joyner, state your name for the

21   record.

22         THE WITNESS:  Charles R. Joyner.

23         THE COURT:  You're still under oath.

24         THE WITNESS:  Yes, sir.

25         THE COURT:  Proceed with the cross.

Joyner - Cross (Mur)                                    106

1    BY MR. MURRAY:

2    Q    Agent Joyner, we were talking when we left off about

3    the -- the inspections that you did where you testified on

4    direct examination that the agents were in the reception area

5    to examine the records.

6         Do you recall that subject matter?

7    A    Yes, sir.  They weren't agents.  They were independent

8    contractors.  They were retired agents.

9    Q    Yes, but they were --

10   A    Yes, sir.

11   Q    Well, they were contract agents for the federal

12   government, were they not?

13   A    Yes, sir.

14   Q    Okay.  I mean they were -- I didn't mean to suggest that

15   they were still -- they were retired FBI agents, correct?

16   A    Yes, sir.

17   Q    And the FBI hired them as independent contractors to

18   assist the FBI in carrying out this mission, correct?

19   A    Yes, sir.

20   Q    Okay.  Now, the next exhibit that you talked about as

21   occurring in the reception area was the inspection that you

22   did of Shanes World on May 7, 2007, correct?

23   A    Yes, sir.

24   Q    And that is Plaintiffs' Exhibit 25.

25        And just looking at your report you indicate where the

Joyner - Cross (Mur)                                107

1    inspection was done and then you have the summary, correct?

2    A    Yes, sir.

3    Q    And one thing I noticed, you indicate that you ordered --

4    as you said, you ordered merchandise from the internet,

5    correct?

6    A    Yes, sir.

7    Q    And then you reviewed those videos, correct?

8    A    Yes, sir.

9    Q    And there were a total of 124 performers identified as

10   appearing in the 10 DVDs?

11   A    (No audible response)

12   Q    Correct?

13   A    Yes, sir.

14   Q    Okay.  But then you say here, "Prior to the inspection

15   contract inspectors printed several still photographs of each

16   performer's face from different camera angles," correct?

17   A    Yes, sir.

18   Q    So they were able to photograph the face of the 124

19   performers from various camera angles to assist in your

20   inspection, correct?

21   A    Yes, sir.

22   Q    And that was done so that during the inspection the still

23   photographs could be compared with the performer

24   identification on the government IDs, correct?

25   A    That's correct.

1    Q    Okay.  Now -- but getting to the area where the

2    inspection occurred I want to show you the photographs from

3    Plaintiffs' Exhibit 32 that are applicable to the Shanes World

4    inspection, and those photographs begin on Bates stamp number

5    3449.

6         And all your photograph efforts begin with a photograph

7    like this where you took a picture of the name of the entity

8    that you were inspecting, correct?

9    A    That's correct.

10   Q    Okay.  Now, the -- the picture that is on page 3451 is of

11   the outside of the building, correct?

12   A    That's correct.

13   Q    And I don't know whether it's -- one of those two

14   addresses -- one of those two doors is the one for Shanes

15   World, correct?

16   A    Yes, sir.

17   Q    Okay.  I guess it's the 9744 door, correct?

18   A    Yes, sir.

19   Q    Okay.  Now, if you look at page 3453, there's a

20   photograph of several file cabinets, correct?

21   A    Yes, sir.

22   Q    And one of the file cabinets is slightly open, correct?

23   A    Yes, sir.

24   Q    And there were records inside there, correct?

25   A    You can see the file photos inside, yes, sir.

1    Q    Now, where -- this isn't the reception area, is it?

2    A    No, I don't believe so.

3    Q    That's the place where they stored the 2257 records?

4    A    Yes, sir.

5    Q    And as you indicated, on each occasion you would -- you

6    and/or the photographer would go into that room and take a

7    photograph of where the records were stored, correct?

8    A    That's correct.

9    Q    Okay.  So then it must be the next photograph on the very

10   next Bates stamp page, that would be what you called the

11   reception area?

12   A    Yes, sir.

13   Q    And there was a -- there was basically some couches

14   there, and you sat there, and the -- you and the other

15   representatives sat and inspected and examined the records, is

16   that correct?

17   A    Yes, sir.

18   Q    Again, this was not a retail store, correct?

19   A    I don't know if they sold any product directly from that

20   store or not.

21   Q    Right.  But I -- I mean it wasn't like a CVS or a grocery

22   store or a book store.

23   A    No, sir.

24   Q    Okay.  Now, let's then go to the next exhibit that you

25   mentioned, doing a -- an examination in what you called a

1   reception area was of the agency, Plaintiffs' Exhibit 1,

2   correct?

3   A    Yes, sir.

4   Q    And that was an inspection that you did on August 20,

5   2007, is that correct?

6   A    Yes, sir.

7   Q    Okay.  And, again, you made the report that now appears

8   on page seven of that exhibit, correct?

9   A    Yes, sir.

10  Q    And, again, one of the things we find is that you ordered

11  videos or DVDs from the internet, correct?

12  A    That's correct.

13  Q    And viewed the videos and found 63 total performers

14  appearing in the six DVDs, correct?

15  A    Yes, sir.

16  Q    And prior to the inspection the contract inspectors

17  created several still photographs of each performer's face

18  from different camera angles, correct?

19  A    Yes, sir.

20  Q    Of all 63 performers.

21  A    Yes, sir.

22  Q    Now, going then to the photographs from Plaintiffs'

23  Exhibit 32, those photographs for this inspection begin on

24  Bates stamp page 3254, and, again, we see the -- the

25  photograph of the name, correct?

1   A     That's correct.

2   Q     Okay.  And then we see -- this is the agency, and then we

3   see, again, the outside of this particular building, correct?

4   A     That's correct.

5   Q     And there are two -- two doors, correct?

6   A     That's correct.

7   Q     Okay.  And the next page is a closer picture of that,

8   correct?

9   A     Yes, sir.

10  Q     Then the third page is 3257, is a photograph of a file

11  cabinet with two drawers substantially open, and one can see

12  records inside each of those drawers, correct?

13  A     You can see manilla folders inside, yes, sir.

14  Q     Okay.  And this, again, was an area where they stored the

15  2257 record?

16  A     Yes, sir.

17  Q     And so you and/or other government representatives

18  entered that area and took that photograph, is that correct?

19  A     Yes, sir.

20  Q     And then I think I understood you to say that the next

21  photograph is actually of the reception area, correct?

22  A     I'd have to see the photo log, but, yes, sir, that looks

23  like it.

24  Q     And what you're calling a reception area consists of --

25  there are two chairs that are -- at least two chairs, and

1    there is a -- a desk, correct?

2    A    Yes, sir.

3    Q    And there's papers on that desk, correct?

4    A    Yes, sir.

5    Q    And there -- it looks like some kind of a --

6              MS. WYER:  Your Honor --

7    BY MR. MURRAY:

8    Q    -- fax machine on the desk, correct?

9              MS. WYER:  Relevance --

10             THE WITNESS:  That's correct.

11             MS. WYER:  -- Your Honor.  The -- Mr. Joyner has

12   testified that -- I can't hear you.  What?

13             MS. WYER:  This is not relevant, Your Honor.  I mean

14   either it's a reception area --

15             THE COURT:  Well --

16             MS. WYER:  -- or it's not.

17             THE COURT:  -- I -- I think its relevancy, candidly,

18   is marginal, but I'm going to allow Mr. Murray to make a

19   record.

20             This is cross-examination.  It may have to do with

21   the witness' recollection and things like that.  So I'm

22   purposely giving him a great deal of latitude.

23             Overruled.

24   BY MR. MURRAY:

25   Q    And if you look at the next photograph, we might -- it's

Joyner - Cross (Mur)                                          113

1  actually a clearer picture of what that area looked like,

2  correct?

3  A    Yes, sir.

4  Q    Okay.

5  A    Now, you're not suggesting as a trained FBI agent who

6  investigates things that members of the public were given

7  access to that desk area or to the records that were

8  maintained in that file cabinet, are you?

9  A    Members of the public may have had access to the room.  I

10  don't know if they'd have access to the file cabinets unless

11  they're an employee.

12  Q    Generally speaking, when one enters a business premises

13  that has a reception area, one would go up to the reception

14  person and indicate what that person wants, correct?

15             MS. WYER:  Objection.

16             THE WITNESS:  I agree.

17  BY MR. MURRAY:

18  Q    And then the --

19             THE COURT:  Over -- overruled.

20  BY MR. MURRAY:

21  Q    -- the person in the reception area would -- would decide

22  whether that person's request can be accommodated, correct?

23  A    Yes, sir.

24  Q    And if the -- if the reception determined that there was

25  no reason for that person to be there, they might politely

1    say, "Well, I'm sorry, sir, but, no, you can't see this

2    person, so come back some other time," correct?

3    A    Yes, sir.

4    Q    Okay.  In other words, there's a limited invitation to a

5    member of the public to enter the reception area of a

6    business, correct?

7    A    Correct.

8    Q    Okay.  Now, the last instance that you identified of a

9    reception area was Plaintiffs' Exhibit 14, which was the

10   inspection of K-B -- Erotic Angel, K-Beech, Inc., correct?

11   A    Yes, sir.

12   Q    And, again, you were the one who wrote the report,

13   correct?

14   A    That's correct.

15   Q    And, again, in the inspection summary we see that -- that

16   based on your internet purchase, you reviewed videos and a

17   total of 89 performers, correct?

18   A    That's correct.

19   Q    And, again, prior to the inspection the contract

20   inspectors printed several screen captures of each performer's

21   face from different camera angles, correct?

22   A    Yes, sir.

23   Q    Now, going to the photos on Plaintiffs' Exhibit 32,

24   beginning with Bates stamp 3374, we see the first page, of

25   course, is the picture you take of the title of the business

1    that you're inspecting, correct?

2    A    That's correct.

3    Q    Okay.  And the next page shows the outside of the

4    business premises with the name of the company, correct?

5    A    Yes, sir.

6    Q    And then we have a close-up of the door entering the

7    business, correct?

8    A    Yes, sir.

9    Q    And we can see, can we not, that on that door is a sign

10   that says "no solicitors," correct?

11   A    Yes, sir.

12   Q    Then we have a picture of their 2257 statement, correct?

13   A    That's correct.

14   Q    And then we finally have a picture of the room that you

15   say you carried out the examination of the records, correct?

16   A    Yes, sir.

17   Q    And that's a room that has file cabinets basically

18   surrounding the perimeter of the room, correct?

19   A    That's correct.

20   Q    And you notice that -- that there are various signs on

21   those -- in that room on the filing cabinets that says --

22   A    I could read it when you backed it up a little bit.

23   Q    -- "authorized personnel only."

24   A    Yes, sir.

25   Q    Back -- this -- the last photograph might show that in a

1    little clearer form.

2        Do you see that there's a sign that says "authorized

3    personnel only," correct?

4    A    Yes, sir.

5    Q    Okay.  And -- and does this photograph show the area

6    that -- that the examination of the records occurred at?

7    A    Yes, it does.

8    Q    At this table with -- with the chair behind it and a

9    bunch of records on top of the -- the desk?

10   A    Yes, sir.

11   Q    And, again, you would agree with me that the access to

12   that room would be limited to people who have a legitimate

13   reason to be there, correct?

14   A    This was a large open space once you walked in, and there

15   were people that came and went as we were doing the

16   inspection.

17       I don't know who they were or what their business was

18   with K-Beech.

19   Q    But you would agree it's an area where there would be a

20   limited invitation extended to people from the public to come

21   in and transact business.

22   A    Yes, sir.

23   Q    Now, I want to go back just for one moment to Plaintiffs'

24   Exhibit 5, which was the first of the four you identified, and

25   that was the inspection of All Good Video.

1        Do you recall that testimony?

2    A    Yes, sir.

3    Q    And if we look at the inspection summary there, we can

4    see that, again, in that case you ordered videos from the

5    internet, reviewed them and came up with a total of 127

6    performers, correct?

7    A    (No audible response)

8    Q    Let me approach you.

9    A    Okay.

10   Q    It's at the bottom of the page.

11       You were able -- you identified a -- a total of 127

12   performers in those videos, correct?

13   A    Yes, sir.

14   Q    And, again, in each case the -- prior to the inspection

15   the contract inspectors printed several still photographs of

16   each performer's face from different camera angles, correct?

17   A    Yes, sir.

18   Q    So in each of these examples they were able to

19   photograph, that we've been through the face from -- and this

20   was from the video they would photograph, correct?

21   A    That's correct.

22   Q    There were a total of -- of the 29 inspections, a total

23   of six of them were conducted at residences, isn't that true?

24   A    I'd have to look.  That sounds about right, but I'd have

25   to go through the list.

1    Q     Okay.

2              MR. MURRAY:  That's all I have, Your Honor.

3              THE COURT:  All right.

4              Redirect.

5              MS. WYER:  Mister --

6              THE COURT:  Wait.  I wanted to ask a couple of

7    questions --

8              MS. WYER:  Okay.

9              THE COURT:  -- before you start, and then both of

10   you can --.

11   BY THE COURT:

12   Q     When you went to the homes, the residences that you've

13   testified to, was there space there for you to examine the

14   records that -- within the house?

15   A     There was, depending on the inspection.  One, they had us

16   do it right there in the living room.  At another one he took

17   us to the spare bedroom to do the inspection there.

18   Q     Some people worked out of their home.  I mean -- and

19   I'm -- the questions I ask you are based on your actual

20   knowledge, so if you don't know, just say you don't know.

21   A     Yes, Your Honor.

22   Q     Do you know if any of those homes were also the business

23   location of the person, that is, they -- they operated their

24   business out of their homes?

25   A     The only thing that would indicate that it was is if they

Joyner - The Court                                    119

1  listed that address as the location for the 2257 records.

2  Q    Well, but could you tell when you went there if it was

3  also the office for their business?

4  A    No, Your Honor.

5  Q    What?

6  A    No, Your Honor.

7  Q    You couldn't tell one way or the other.

8  A    No, sir.

9  Q    Okay.  Did any of those people where you went to their

10  homes say to you that their business location was somewhere

11  else, but they chose to keep their records in their -- in

12  their home?

13  A    No, Your Honor.

14  Q    You never had that conversation.

15  A    No, sir.

16  Q    All right.  Next question.  Is -- did any of them ask you

17  to look at the records outside the house, like in the garden

18  or the garage or put them in your car or anything like that?

19  A    At the Moonlight inspection he kept the records in his

20  garage, and we looked at the records in his driveway.

21  Q    In the driveway, outside.

22  A    Yes, sir.  Or -- or inside the garage.  We either --

23  parts in the garage or in the driveway.

24  Q    All right.  Was -- did the garage have a car in it, or

25  was it empty except for records?  Or if you know.

1    A    I remember it was a mess, but I can't recall if there's a

2    car in it or not.

3    Q    Was there a space to sit down and look at records?

4    A    No.

5    Q    Did he bring a table out and chairs?  What happened?

6    A    No.  I think we -- we ended up working off the -- the

7    tailgates of the vehicles, of our vehicles.

8    Q    So you stood, and you -- you put the records on the back

9    of the car, and you stood there with your colleagues and look

10   at the records on the top of the car.

11   A    I believe so, yes, sir.

12   Q    Okay.  Did you object to that at all or --

13   A    No, Your Honor.

14   Q    Did you ask that he provide you with a chair and a table

15   or not?

16        You didn't have that conversation.

17   A    No, Your Honor.

18   Q    How long did it take you to look at those records?

19   A    I'd have to go back, to the report.  I think it was

20   probably an hour to two hours.

21   Q    Okay.  I'm going to ask you a question I asked Agent

22   Lawrence.

23        Of all the -- can you give me a range of a volume of

24   records of the -- of -- as you recall, and I know it was seven

25   years ago -- of the volume was of the records you looked at?

Joyner - The Court                                          121

1    Like what was the smallest and what was the largest?

2    A    It would be --

3    Q    Just approximately.

4    A    It'd be dependent upon the size of the producer.  The

5    smallest we looked at may have been two items or two products.

6    Q    You mean two pieces of paper or --

7    A    Two file folders, yes, sir.

8    Q    Two file -- so like an inch thick?

9    A    Oh, no, no.  the file folder would contain a copy of the

10   photo ID and perhaps some of the cross-reference information.

11   Q    Okay.  Two -- two small folders.

12   A    Yes, sir.

13   Q    And what would be the largest?

14   A    The larger producers were pulling records for maybe over

15   100 performers, and it's the same thing, that --

16   Q    That would take several file cabinets as we've seen in

17   the photos?

18   A    Yes, sir.

19   Q    Okay.  All right.  Now, did -- do you recall -- did any

20   of the inspections you did take place in a third party

21   inspection -- a third party location?

22   A    Yes, Your Honor.

23   Q    All right.  How many of those were third parties?

24   A    I'd have to look.  Just off top of my head --

25   Q    Or approximately, if you recall.

1   A     Three to four that I did, that I conducted.

2   Q     Okay.  Now, I think the record will show that the

3   regulations allowing for third party custodians were adopted

4   in 2008.  That was after you did your -- your last search was

5   in 2007, is that correct?

6   A     That's correct, yes, sir.

7   Q     All right.  So did you -- well, do you know if that's

8   correct or not, that the regulations allowed for a third party

9   custodian before 2008?

10  A     I don't know.  Our practice was to allow third party

11  storage.

12  Q     Do you know -- I didn't -- I haven't looked at those

13  letters in detail.

14        Do you know if any of the letters or -- allow for third

15  party custodians, or when you went to these meetings of the

16  adult industry, did you ever tell them verbally that third

17  party custodians were permissible?

18  A     Yes, Your Honor.  I do specifically remember telling them

19  that that was permissible.

20  Q     Okay.  All right.  And did -- who were the third party

21  custodians?  Do you remember?

22  A     The example I always use would be attorneys, but the --

23  the ones I recall, one would be Iron Mountain.

24  Q     Okay.  That was a third party?

25  A     Yes, sir.  And I believe one of the other inspections,

1   they listed another company as their custodian of records.

2   Q    Now, in the third party inspections did that -- did

3   you -- did that always occur with advance notice?

4   A    No, sir.  If -- 'cause we'd go --

5   Q    Now, does -- if the party had designated a third party in

6   its 2257 notice, you went directly to the third party.

7   A    Yes, Your Honor.

8   Q    Without any advance notice.

9   A    Yes, Your Honor, that's correct.

10  Q    Did you have any problem in getting access from the third

11  party at any time?

12  A    No, sir.

13  Q    All right.  Did you see any problems in the third party

14  custodian situation?

15  A    No, Your Honor.

16  Q    All right.  Did you ever come across any situation of

17  missing evidence, of missing documents, like a performer that

18  was listed, but there was no photo documentation?

19  A    Yes, Your Honor.

20  Q    Was that -- how many times did that happen?

21  A    That was not infrequent, and there was at least one

22  company that had absolutely no records of any of the

23  performers.

24       A few of the other companies were missing some of the

25  documentations or some of the photo IDs.

1    Q    Okay.  Were there any what I would call technical

2    violations in the -- in the paperwork that were corrected

3    while you were at the -- at the inspection?

4    A    Yes, Your Honor.

5    Q    What would be an example of that?

6    A    One that was corrected while we're there?

7    Q    Yeah.

8    A    One was that they were missing a photo ID, and they were

9    able to call another company and get that photo ID delivered

10   while we were still there.

11       There may have been a -- an issue with the cross-

12   referencing system, and they were able to correct that while

13   we were there.

14   Q    Did you find any evidence where you -- as an experienced

15   investigator, you got the impression that somebody had created

16   documentation that may not have been accurate or bona fide?

17   A    As a rule, no.  There was one occasion where the ID was

18   from another country.

19       They used the Buddhist calendar, and that Buddhist

20   calendar indicated the performer was underage.

21   Q    All right.  I think Agent Lawrence testified about --

22   A    Okay.

23   Q    -- that yesterday.

24       Did you go on any inspections with him together or --

25   A    Initially, when he first came to the program, we did.

1   Q    Okay.   All right.   That -- was that the only example of

2   a -- of a basically, you know, a questionable identifi- --

3   photo ID --

4   A    Yes, Your Honor.

5   Q    -- the Buddhist calendar?

6   A    Yes, Your Honor.

7   Q    All right.   Did you find in any situations where there

8   was advance notice that the party for -- who was in charge of

9   the documents had used the delay between the -- your first

10  notice and your actual coming to create false evidence?

11  A    No, Your Honor.

12  Q    Or to clean up their evidence?

13  A    No, Your Honor.

14  Q    All right.

15  A    And our goal was that they have good records.   So if

16  they're making good records, that's wonderful.

17  Q    Okay.

18          THE COURT:   All right.   Redirect.

19                   REDIRECT EXAMINATION

20  BY MS. WYER:

21  Q    Mr. Joyner, when you would go to a producer's business

22  premises, and the inspection of records would take place in a

23  certain location, such as a reception area, you would also --

24  what -- what other components to the inspection were there?

25          I mean you -- you also went in, took a photograph in the

Joyner - Redirect (Wye)                                    126

1   business premises, correct?

2   A     Yes.  So the procedures that we took once we entered the

3   businesses?  Is that what you're asking?

4   Q     I just basically wanted to get to the photograph point.

5         Was there anything other than taking a photograph where

6   you would leave the location of where you were reviewing the

7   records?

8   A     Unless one of the -- the people there had to use the

9   restroom and they allowed us to, then that would be another

10  occasion when they would leave that area, but other than that

11  and the take of photographs of the 2257, no, we wouldn't

12  wander through the buildings.

13  Q     And how long would it take for someone to go and take a

14  photograph of the location where the records were stored?

15  A     They would be escorted by somebody from the company to

16  show them that area, so less than a minute.

17  Q     You -- you were asked in cross-examination about language

18  in the description of the inspections that indicated that

19  the -- during the pre-inspection review process the

20  contractors made still photographs of each performer's face.

21        Could you determine in every instance from looking at the

22  performer's face whether the performer was over 18, 18 or

23  over?

24  A     From looking at the photo?  No, ma'am.

25  Q     And the Judge asked you about a -- a instance where a

1    producer had no 2257 records at all.

2         Could you describe how that situation related to the

3    inability to determine the performer's ages from their --

4    looking at them?

5    A    That was Real Wild Girls, and those videos were typically

6    shot during spring break or some other type of activity, and

7    most of those, if not all of those, were very young-looking,

8    but he had no ID for any of the performers.

9    Q    Did you -- so were you able to determine during that

10   inspection whether the performers in the videos were 18 or

11   over?

12   A    No, ma'am.

13   Q    And just -- just to be clear, what was the inspection

14   where you did -- reviewed records involving the Buddhist

15   calendar?

16   A    I believe that was Robert Hill Releasing Company.

17   Q    So that was -- was the second inspection that you led?

18   A    Yes, ma'am.

19              MS. WYER:  No further questions.

20              THE COURT:  Recross.

21              MR. MURRAY:  Just one matter --

22              MS. WYER:  Oh, wait.  Oh, wait.  Yes.  I think I'm

23   done, yes.

24              THE COURT:  Are you --

25              MS. WYER:  I'm done.

1            THE COURT:  Do you have another question or no?

2            MS. WYER:  I'm done.

3            THE COURT:  Okay.

4            MS. WYER:  Oh, wait.

5            THE COURT:  Take your time.

6            MS. WYER:  I just have one --

7            THE COURT:  Do you want a recess, and we'll -- to

8    look over your notes or --

9            MS. WYER:  I -- I remembered what I was going to

10   ask.

11           THE COURT:  I don't want to rush anybody.  All

12   right.

13   BY MS. WYER:

14   Q    In regard to the, for example, the K-Beech inspection

15   where you testified that the location where you conducted the

16   inspection was the same room that you entered upon entering

17   the business, did -- in that inspection did you access any of

18   the filing cabinets that Mr. Murray pointed out that were

19   labeled "authorized personnel only"?

20   A    No, ma'am.

21   Q    Did you access any other location within that room that

22   someone would not normally access if they were entering the

23   business for -- as a member of the public?

24   A    No, ma'am.

25   Q    And in the inspection at the agency where Mr. Murray was

1    asking you about the area with the desk that is identified in

2    the photo log as a reception area, did you access the filing

3    cabinets in that photograph?

4    A    No, ma'am.

5    Q    And did you access anything else in that reception area

6    that would not be accessible to a member of the public

7    entering the business?

8    A    No, ma'am.

9              MS. WYER:  And that's all I have, Your Honor.

10             THE COURT:  Okay.  Recross.

11                      RECROSS-EXAMINATION

12   BY MR. MURRAY:

13   Q    Agent Joyner, you were asked what you did after entering

14   the business in terms of taking photographs.  I just want to

15   make sure that we don't forget.

16       The other thing you did was bring in a copy machine,

17   correct?

18   A    Yes, sir.  We need to bring in one or two copiers.

19   Q    And those -- and you use those copying machines while you

20   were on the premises to make copies of the records that you

21   were examining, correct?

22   A    Yes, sir.

23   Q    Okay.  Did you -- in any of your inspections that you

24   did, did you ever see a member of the public come in with a

25   copying machine, get records from the proprietor and start

1    copying them?

2    A     No, sir.

3    Q     Thank you.

4              THE COURT:  Okay.  All right.  Thank you.

5              All right.  That completes former Agent Joyner.

6              All right.  Now, we have one last witness today, and

7    that's --

8              MR. MURRAY:  Yes.

9              THE COURT:  -- Dr. Zimmerman?

10             MR. MURRAY:  Yes.  The plaintiffs would call

11   Doctor --

12             THE COURT:  All right.  Well, just wait a minute.

13             MR. MURRAY:  Oh.

14             THE COURT:  How -- about how long is his direct?

15             MR. MURRAY:  I would say 30 minutes, if, you know --

16             THE COURT:  All right.  I'd like to take a 10-minute

17   recess.

18             MR. MURRAY:  Oh, sure.

19             THE COURT:  Is that all right?  And then we'll

20   probably go straight through till we're done.

21             MR. MURRAY:  Thank you, Your Honor.

22             THE COURT:  Okay.  Thank you.

23        (Recess taken, 1:48 p.m. to 2:02 p.m.)

24             THE COURT:  Okay.  Okay.  Next witness.

25             MR. MURRAY:  Your Honor, the plaintiffs call Dr.

1   Mark Zimmerman.

2            MARK ZIMMERMAN, PLAINTIFFS' WITNESS, SWORN

3            THE CLERK:  Please be seated and please state your

4   full name and spell your last name for the record.

5            THE WITNESS:  Mark Zimmerman, Z-I-M-M-E-R-M-A-N.

6                      DIRECT EXAMINATION

7   BY MR. MURRAY:

8   Q    Dr. Zimmerman, would you tell the Court what your current

9   occupation is?

10  A    I'm a professor in the School of Public Health at the

11  University of Michigan and chair of the Department of Health

12  Behavior, Health Education.  I also have appointments in the

13  Department of Psychology and in the Center for Research

14  Human -- Center -- Center for Human Growth and Development.

15  Thank you.

16  Q    Tell the Court what your educational background is.

17  A    I have a bachelor's degree in psychology from the

18  University of Massachusetts.  I have a master's degree in

19  interdisciplinary studies from the University of Oregon, and I

20  have a PhD from the University of Illinois.

21  Q    And what is your PhD in?

22  A    Psychology.

23  Q    And is that -- is that experimental psychology or --

24  A    Well, the area was called personality and social ecology,

25  and so it was focused on measurement and community change,

Zimmerman - Direct (Mur)                                    132

1   community-based research.

2   Q    Now, would you tell the Court what your academic

3   employment experience has been since achieving your PhD?

4   A    I was a visiting professor at the American University for

5   two years.  I then was a congressional fellow for the Office

6   of Technology Assessment which was a sister agency of

7   Congress, and then after that I went to the University of

8   Michigan in 1989 and have been there ever since.

9   Q    And what has been the progression of your career at the

10  University of Michigan?

11       That's in Ann Arbor?

12  A    Yes, yes.  My -- the rest of my career?

13  Q    Yes.

14  A    Well, I entered as an assistant professor in a tenure

15  track position, and I obtained tenure five years later, so

16  that would be 1995, '94, '95, and became a professor about

17  five years after that.

18  Q    And what kind of courses have you taught at the

19  University of Michigan over the years?

20  A    I taught a course on research methods most of my career

21  there.  I taught a course on health promotion.  I taught a

22  course for doctoral students and helping them adjust to what

23  it means to be a PhD.

24  Q    Have you won any fellowships and awards?

25  A    I won the Distinguished Contribution Award to Division 27

Zimmerman - Direct (Mur)                           133

1   of the American Psychological Association called the Division

2   for SCRA, Society for Community Research and Action, and I

3   also won the Distinguished Contribution Award for the Society

4   for Public Health Education.

5   Q    Have you published any articles in peer-reviewed

6   journals?

7   A    Yes, I've published about 150 to date.

8   Q    Okay.  And in what kinds of journals have your 150

9   articles been published?

10       Give me some examples of journals.

11  A    Yeah, the names of journals?

12  Q    Yes.

13  A    The American Journal of Public Health, the American

14  Journal of Community Psychology, Health Education and

15  Behavior, Youth and -- Journal of Youth and Adolescence,

16  Journal of Research on Adolescence.

17  Q    Have you, yourself, been a referee to review, peer review

18  articles?

19  A    I'm -- I've been an editor.  I was an editor for 13

20  years, the longest serving editor for a journal for the

21  Society of Public Health Education called Health Education

22  Behavior, formerly Health Education Quarterly.  I did that for

23  13 years.

24       And then by the year -- might have been a year hiatus,

25  and Stage Publications asked me to be editor for Youth and

1   Society.

2   Q    Okay.  And have you edited any books or written any book

3   chapters?

4   A    The number, I -- I'd like to say, "Look, it's right here

5   in front of me," but, yes, I've written many -- many book

6   chapters and edited two books.

7   Q    Okay.  Now, Doctor, in front of you is a copy of what we

8   have marked as Plaintiffs' Exhibit 41.

9        Does that contain a copy of your curriculum vitae that

10  covers the last 10 years of your career?

11  A    Yes.  I'm only hesitating because it doesn't have an

12  indicator of what -- if you're talking about my CV --

13  Q    Yes.

14  A    -- yes, that's in front of me.

15  Q    Okay.

16  A    And, yes, it's the last 10 years.

17  Q    All right.  And is it an accurate portrayal of your 10

18  years from, say, 2003 to February of 2013?

19  A    Unless somebody reads it in some other way, yes, it is.

20  Q    Okay.  Now, tell the Court, what has your area of

21  research focused on over the years?

22  A    Health and development, mostly, including the transition

23  to young adulthood.

24  Q    Okay.  And can you tell the Court, generally speaking,

25  what kinds of research you've done over the years on that --

1    in that area?

2    A    Well, we study -- my work focuses on resiliency, which is

3    looking at youth who are at risk, what are some of the factors

4    that help them overcome that risk and relatively succeed in

5    life, and we've looked at risk scores, substance use, sexual

6    risk behaviors, violent behaviors, mental health outcomes --

7    Q    Okay.  And --

8    A    -- that sort of things.  That's been the focus of my

9    work.  I've done lots of other kinds of things that people ask

10   me to help them with.

11   Q    Now, you mentioned that you're now the chair of your

12   department?

13   A    Yes.

14   Q    And how big is that department in terms of faculty

15   members?

16   A    We have currently 18, soon to be 20, tenure track

17   faculty, another five or seven research faculty, so about 25

18   to 30, depending on the year and the flux of people changing

19   job, that sort of thing.

20   Q    And how long have you been the chairman of that

21   department?

22   A    Ten years.

23   Q    Okay.  And what are your duties as the chair of the

24   department, generally?

25   A    Oh, jeez, well, really, I'm basically the administrator

1   for the department so I address issues that involve faculty,

2   that involve staff, involve students.

3         It's my job to make sure that the trains run on time, so

4   to speak, or that the classes are offered and we have the

5   appropriate people teaching the classes, that faculty are

6   supported to do their research and to be as effective as they

7   can be to make sure that staff are happy and doing their jobs.

8         And so it runs the gamut from having to relieve people of

9   their duties to helping people get promoted.

10  Q    Now, tell the Court what the reputation is of the

11  University of Michigan when it comes to the area of your

12  expertise and -- and the area that you study.

13  A    Well, according to the rankings, if you believe those

14  rankings in the U.S. World News, or whatever it's called, the

15  University of Michigan school has been ranked number four for

16  the last couple, three, four years, and the Psychology

17  Department is typically in the top one or two, maybe three.

18  Q    Now, you recently conducted a study that included some

19  questions about sexting, is that correct?

20  A    Yes.

21  Q    Okay.  And can you tell the Court how that study evolved?

22  A    We had an idea to test out a respondent-driven sampling

23  technique using -- to study actually substance use and virtual

24  networks, score the virtual network study, and as part of that

25  study we -- we included some questions about sexting because

1    at the time of the study, which was right about -- was part of

2    the stimulus package.  It was one of our several ready

3    projects, if you will.

4        Part of the stimulus was -- went to -- some of the

5    funding went to NIH Group -- product -- projects.  We have

6    this project going, ready to go, and so we submitted it, and

7    sexting was in the news for one reason or another.

8        One of the people we worked said, "We should include a

9    question about this in our survey and do some research on it."

10       And I said -- as the director of the project I said,

11   "That's a good idea, won't take very much time to include it,"

12   and so we did.

13   Q    Okay.  And tell the Court then over what period of time

14   did you conduct this study.

15   Q    It was a two-year study.  We actually collected the data

16   at the beginning of the second year.  It took us some time to

17   hire people, to get through the Institutional Review Board

18   review process, set up all the -- the procedures for paying

19   people to participate in the survey, and so it took some time

20   to set everything all up.

21       But then we actually got into the field probably about

22   eight months or nine months into the first year, and then we

23   collected data over about a four-month, five-month period.

24   Q    And then did you publish an article outlining your

25   results?

Zimmerman - Direct (Mur)                    138

1    A    Yes.

2    Q    And was that published in a peer-reviewed journal?

3    A    Yes.

4    Q    What journal was that published in, and what was the year

5    in which it was published?

6    A    Are you referring to the sexting paper in particular?

7    A    Yes.

8    Q    The year was '12, I think, is when it came out in print.

9    I'm looking at it right here.  I think it was '12, from the

10   Journal of Adolescent Health, which is the journal for the

11   Society for Adolescent Health in Medicine.

12   Q    And is that --

13   A    This was their premier journal.

14   Q    Now, you mentioned something about respondent-sampling.

15   Would you explain to the Court how you acquired your sample

16   for this survey?

17   A    We identified four regions in the United States because

18   we wanted to make sure that we didn't just collect data from

19   one state or one region.

20        So we wanted to reach as wide a population as we could,

21   and then we selected 22 individuals and from three ethnic

22   groups, white, African-American and Latino, and we had a

23   consultant help us think about how many people of which

24   ethnicity should be in each cell, given census data about the

25   people who live in those four regions.

1      And the four regions were northeast to southeast, midwest

2  and west.

3  Q    Okay.  And then -- so then what happened to ultimately

4  accomplish getting a -- a suitable sample of respondents?

5      What did you do then?

6  A    What -- what do you mean?

7  Q    How did you actually then get the respondents?

8  A    Oh, okay.  What we did is we -- we did a -- a Facebook

9  ad.  We had an ad that basically said, "You want to

10 participate in this study, contact us."

11     Then if they contacted us, we then screened them to see

12 if they fit a profile that we were looking for.  We wanted to

13 make sure that they were in the right ethnicity for the seed

14 that we wanted to start with, and we wanted to make sure that

15 they were the right age range, and then we -- I wanted to make

16 sure that they had access to the internet.

17 Q    Now, is this an accepted methodology for achieving a

18 sample in your field of work?

19 A    Yes.  It's -- it's been of -- really the originator of

20 this particular approach, although it's built on a -- an

21 existing methodology that had some problems with it until

22 Hagathorne came along in 1997, I think it was, when he

23 introduced a way to address the bias that is introduced when

24 you have one individual introducing his friends or her friends

25 and then so forth down the line.

1    Q    And ultimately how many participants did you include then

2    in the -- in the survey?

3    A    I don't remember the exact number, although it's probably

4    right here -- 3,447.

5    Q    Okay.  And then was that reduced in some way?

6    A    Yes, and that number I have to look up here.  I think it

7    was 828 was the weighted sample size.

8    Q    And what was the reason for weighting the sample size?

9    A    The -- the bias that's introduced by people knowing one

10   another within a generation, within a seed, can introduce --

11   can over-sample a particular kind of behavior of -- of any

12   kind.

13        We were most interested, as I said, when we started with

14   substance abuse.  So we wanted to correct for that.  So

15   those -- this was a mechanism for correcting for that.

16   Q    Okay.  And is there -- and that -- and is that an

17   accepted method of correcting that in your field of endeavor?

18   A    Yes.

19   Q    Okay.  And so -- and then you -- did you try to match the

20   sample up demographically by any accepted method?

21   A    We then tried to -- we tried to match it up only with our

22   seeds.

23   Q    Okay.

24   A    But the subsequent sample could develop in any way that

25   it was going to develop, and so it was the -- the seed

Zimmerman - Direct (Mur)                    141

1  started.  They had their friends.  Their friends nominated

2  their friends and so forth down the line.

3  Q    Now -- and then you created an instrument consisting of

4  various questions for the respondents to answer?

5  A    Correct.

6  Q    Okay.  And what were the questions that you asked the

7  respondents about sexting?

8  A    We basically asked two questions about sexting.  One was,

9  "Have you" -- and the exact wording I may get wrong so I may

10 have to look.  Am I allowed to look?

11 Q    Sure.

12 A    Okay.  "Have you sent any sexually suggestive, nude or

13 semi-nude photos or videos of yourself" --

14 Q    And then what was --

15 A    -- "and if you sent it or have you received them from

16 somebody you know?"

17 Q    Okay.  And what were the results of your instrument and

18 what -- and what were the results of the answers to those

19 questions?

20 A    We had 30 percent of the sample said they had sent them,

21 and 40.8 percent said they had received them.

22 Q    Okay.

23 A    And if I can just read for the record --

24 Q    Sure.

25 A    It's the -- what we sent was, "Send the sexually

1    suggestive, nude or nearly nude photo or video of themselves

2    to someone else."

3    Q    Okay.  Now, did you do anything to test the results of

4    not only that question but your other questions and compare

5    them to some national survey that had been done by a different

6    method?

7    A    Yes, we compared it to -- I don't remember the -- the

8    initials or the name off the top of my head right now.

9         But we -- we compared -- in a different study we compared

10   these -- our results because it was sort of the main goal of

11   this was if we did a respondent-driven sampling approach,

12   would we have a sample that looked like a -- a national

13   sample, and it was the national sample from SAMSHA, the

14   Substance Abuse Administration, and forget what the letters

15   are for, too.  I'm sorry about that.  It'll come to me as we

16   talk, I'm sure.

17        It's a federal agency that does a national household

18   survey on drug abuse, and that's basically the acronym, but I

19   don't remember exactly what it is.

20        And we compared our results to the national results, and

21   we literally did -- did test comparisons, and our results were

22   the same except for smoking, so for marijuana, alcohol,

23   barbiturates, I think LSD, cocaine, crack, a range of

24   substances that we looked at.

25   Q    Now, with respect to the sexting questions, in addition

1    to ascertaining prevalence, was there any other purpose for

2    asking those questions?

3    A    Well, actually, we didn't even do it for prevalence.

4    We -- we weren't -- that wasn't a goal of ours, and we -- we

5    reported that.  That's why I know the numbers I just gave you.

6         We really looked at -- the question was, "Does sexting --

7    is that related to risky sexual behavior?  Is it related to

8    mental distress?"  Those are our two main questions, and --

9    Q    What was your hypotheses on that?

10   A    My -- there was no debate in -- in the research team, but

11   my hypothesis was, and I think they generally agreed me, that

12   the people who used -- who did sexting would be more likely to

13   have more sexual partners, would be more likely to be engaged

14   in more risky behaviors.

15        And because of the risk that somebody might feel about

16   having sex with themselves or having to receive something,

17   'cause the risk of maybe it going viral, we thought that it

18   would also have a negative effect on their mental health.

19   Q    And what did you actually find after you did the -- the

20   research?

21   A    That it was not related.  We did not support our

22   hypotheses that there was no association between sexting and

23   the other variables.

24   Q    Now, after you -- having done that -- that research were

25   you able to extrapolate into the nation as a whole for the age

Zimmerman - Direct (Mur)                              144

1  group that you were testing?

2  A    Well, sure.  I -- yes, we did, you know, if our sample is

3  nationally representative, then we -- and there are 30 million

4  plus, a few more than that, but about 30 million 18 to 24-year

5  olds --

6  Q    I'm sorry.  I never did ask you.  Is that the age group

7  that you were testing, 18 to 24?

8  A    Yes.

9  Q    Okay.  Continue.

10  A    Thirty -- so 30 million, 30 percent would be nine million

11  people, and for the 30 percent who sent and 41 percent,

12  ballpark figure, about 12 million would be people who

13  received.

14  Q    And do you have an opinion as to whether or not that is a

15  reasonably accurate estimate of the number of young adults

16  between the ages of 18 and 24 nationwide who have received or

17  sent those type of sext messages?

18  A    Well, this is where we get in in a little bit of a

19  slippery slope because, you know, there's -- so sample is

20  perfect, and -- and this random respondent-driven sampling --

21  sampling approach is not perfect, for sure.

22       We also had the requirement that you have that access to

23  and the internet.  So there are some indications, but I think

24  as I -- as I did in my -- my report that I submitted, if you

25  discounted what I estimated by 50 percent, if we were off by

1    that much and I don't think we are, it's still 4.5 million or

2    six million, respectively, for sent or received.

3              MR. MURRAY:  That's all I have, Your Honor, other --

4    other than introducing into evidence Plaintiffs' Exhibit 41,

5    which would consist of his CV and a copy of the published

6    article in the Journal of Adolescent Health.

7              THE COURT:  All right.  That will be admitted.

8              All right.  Cross examine.

9                        CROSS-EXAMINATION

10   BY MR. SWINTON:

11   Q    Good afternoon, Dr. Zimmerman.

12   A    Hi.

13   Q    So you've estimated that about 30 percent of 18 to 24-

14   year olds nationwide have sent a sex message, correct?

15   A    Correct.

16   Q    And just remember, you have to --

17   A    Yes, yes.

18   Q    -- answer verbally.

19   A    Right, right.

20   Q    And you also estimated that about 41 percent have

21   received a sex message, right?

22   A    Yes.

23   Q    And as part of your expert report, you applied those

24   percentages to the 2010 census data, correct?

25   A    Correct.

Zimmerman - Cross (Swi)                              146

1   Q    And as you mentioned on direct, your estimate about the

2   prevalence of sexting is based on a study that you conducted

3   with three colleagues, correct?

4   A    Correct.  There was actually more than three.  Only

5   three -- yes, correct.

6   Q    With -- with some of your colleagues.

7   A    Yeah, right.

8   Q    So, Dr. Zimmerman, I think you have this document in

9   front of you, but we'll pull it up on the screen, anyway.

10        This is what's been marked as Defendant's Exhibit 189,

11  which has been previously admitted into evidence, and you just

12  have the plaintiffs' copy, I think, in front of you.

13        And this is -- this is the study that you performed on

14  sexting, right?

15  A    Correct.

16  Q    So if we could turn to Bates page 1902, and I'd just like

17  to look at the paragraph that's under the heading "Measures

18  Sexting."

19  A    Okay.

20  Q    And as you said on direct, your study asked respondents

21  whether they had ever sexted using cell phones, right?

22  A    Yes.

23  Q    And you define "sexting" as sending a sexually suggestive

24  nude or nearly nude photo or video of themselves to someone

25  else, correct?

Zimmerman - Cross (Swi)                           147

1   A      Correct.

2   Q      And your study didn't further define "sexually

3   suggestive," correct?

4   A      Say that again?

5   Q      Your study didn't provide a further definition of what is

6   sexually suggestive, correct?

7   A      Correct.

8   Q      And it also didn't provide a definition for what is

9   nearly nude.

10  A      Correct.

11  Q      So your study didn't measure how many respondents sent

12  images of intercourse, correct?

13  A      Correct.

14  Q      And it also didn't measure the number of respondents who

15  sent images of masturbation.

16  A      Correct.

17  Q      Or images only of breasts.

18  A      Correct.

19  Q      Or images only of cleavage.

20  A      Correct.

21  Q      And then the same would be true for respondents who

22  reported receiving sext messages, correct?

23  A      Correct.

24  Q      And your study also wasn't limited to people who were in

25  romantic relationships, correct?

1    A    Correct.

2    Q    So the sexts could have been sent or received by people

3    who are not romantically involved in any way.

4    A    It's possible.

5    Q    And your study also wasn't limited to sexting only

6    between two people, correct?

7    A    What do you mean?

8    Q    So, for example, a person could send a sext to multiple

9    recipients, right?

10   A    Correct.

11   Q    And your study wasn't limited to just people who are only

12   sending a sext to one other person.

13   A    Correct.  We have no way of knowing whether they sent it

14   to more than one person.

15   Q    Okay.  And then, finally, your study didn't measure how

16   frequently people sent sexts, correct?

17   A    Correct.

18   Q    And, Dr. Zimmerman, you said that one of the reasons you

19   believe the results of your sexting study to be nationally

20   representative is that they're similar to the results of two

21   other sexting studies, correct?

22   A    Well, other sexting studies in general, but it's --

23   specifically you're referring to the two I referred to, so

24   yes.

25   Q    And those are the two that you mentioned in your expert

1    report.

2    A    Correct.

3    Q    And so, Dr. Zimmerman, I'd like to show you one of those.

4    It's marked as Defendant's Exhibit 188.

5         And is this one of the studies you compared the results

6    of your study to?

7    A    Sure.  Yes.

8    Q    And if we could turn to Bates 1886, and if we could pull

9    out the top paragraph.

10        So this study asked respondents whether they had sent

11   sexually suggestive pictures or videos, correct?

12   A    Correct.

13   Q    And it define these text of images as semi-nude or nude

14   personal picture, slash, video taken of oneself and not found

15   on the internet or received from a stranger, like spam, et

16   cetera, correct?

17   A    Correct.

18   Q    And the study didn't define "semi-nude," right?

19   A    Not that I know of.

20   Q    And it didn't define "nude," correct?

21   A    Again, not that I know of.  I have not seen the original

22   question, so I don't know.

23   Q    Okay.  So, again, you don't know from this study how many

24   respondents sent images depicting intercourse, right?

25   A    Correct.

1    Q    Or masturbation.

2    A    Correct.

3    Q    Or only breasts.

4    A    Correct.

5    Q    Or only a cleavage.

6    A    Correct.

7    Q    And then, again, the same is true for respondents who

8    reported receiving sext messages.

9    A    Correct.

10   Q    Now, Dr. Zimmerman, I'm going to show you a document

11   that's been marked as Defendant's Exhibit 214.

12        And do you recognize this document?

13   A    Yes.

14   Q    And is this the other study that you compared the results

15   of your study to?

16   A    Yes.

17   Q    If we could go to Bates 2142 and pull out that bottom

18   paragraph on the lower right-hand column.

19        So, Dr. Zimmerman, this study asked whether participants

20   had ever engaged in sexting, correct?

21   A    Correct.

22   Q    And it defines "sexting" as sending or receiving sexually

23   explicit or suggestive photos via text message, correct?

24   A    Correct.

25   Q    And it didn't define "sexually explicit," right?

Zimmerman - Cross (Swi)                              151

1    A    Again, not that I know of.

2    Q    And it also didn't define "suggestive," right?

3    A    Correct.

4    Q    But presumably a suggestive photo is something different

5    than a sexually explicit photo.

6    A    Presumably.

7    Q    And, again, you don't know from this study how many

8    respondents sent images depicting intercourse, correct?

9    A    Correct.

10   Q    Or images of masturbation.

11   A    Correct.

12   Q    Or images only of breasts.

13   A    Correct.

14   Q    Or images only of intercourse -- of cleavage.  Excuse me.

15   A    Yes, correct.

16   Q    And, again, the same is true for respondents who reported

17   receiving sexts.

18   A    Correct.

19   Q    And, Dr. Zimmerman, this study -- I guess if we could go

20   back to the first page of it.

21       This study used 763 participants from a public university

22   in the mid-Atlantic region, right?

23   A    Correct.

24   Q    And these were all students enrolled in undergrad --

25   undergraduate psychology classes, right?

Zimmerman - Cross (Swi)                    152

1    A    Correct.

2    Q    And you've previously described samples of undergraduate

3    students in introductory psychology classes as being very

4    convenient samples, correct?

5    A    I think I characterized it a little bit differently than

6    that.  I think I said it would depend on the research

7    question, whether or not how convenient it would be.

8         For example, if it was a study about undergraduates, it

9    would probably be less than a convenient sample, given the

10   requirements of taking psychology classes in a university and

11   that sort of thing, but in some instances it might be a

12   community sample.

13   Q    So it's fair to say that sample populations of

14   undergraduate students in psychology classes are

15   representative only of undergraduate populations, correct?

16   A    Well, yes.  I'm hesitating because, you know, not all

17   universities are the same.  Some are more representative than

18   others in terms of what the population would be.

19        For example, some university intro psychoanalysis might

20   have 25-year olds in them.  That's likely in someplace like

21   University of Michigan.  You'd be more like to see in a -- in

22   a commuter kind of school.

23        So, in general, it's probably true that it's related to

24   people who are going to college and who were majoring in

25   something like the social sciences.

1   Q     And -- and if a person conducting a study wanted to have

2   a representative sample of undergraduate populations of the

3   entire university, it would be preferable to have the studies

4   include students from other disciplines, other than

5   psychology, correct?

6   A     Yeah, I think that's true.

7   Q     Now, Dr. Zimmerman, as you mentioned on direct, for your

8   study you used a method of sampling called respondent-driven

9   sampling or RDS to recruit your participants, correct?

10  A     Yes.

11  Q     And the initial participants who you recruited are called

12  seeds, is that right?

13  A     Correct.

14  Q     And all the seeds were recruited online.

15  A     Correct.

16  Q     And so what -- what you used to sample your population is

17  something known as web-based RDS.

18  A     Correct.

19  Q     And web-based RDS is something that's been used as a

20  sampling strategy just in the last few years, correct?

21  A     Correct.

22  Q     And this is the first time you ever used web-based RDS

23  for your sampling method.

24  A     Correct.

25  Q     And, Dr. Zimmerman, as you mentioned, the goal of your --

1    of your research wasn't to measure the prevalence of sexting,

2    correct?

3    A    Correct.

4    Q    Instead, you were examining the relationship between

5    sexting and person's sexual behavior and well-being.

6    A    Correct.

7    Q    And in fact the initial goal of your study was unrelated

8    to sexting altogether, right?

9    A    Correct.

10   Q    And you were trying to get a nationwide prevalence

11   estimate of substance abuse.

12   A    Correct.

13   Q    And you did in fact obtain prevalence rates for substance

14   use among young adults, right?

15   A    Correct.

16   Q    And you did this using the same sample population you

17   used in your sexting study.

18   A    Yes.

19   Q    And that was the one that was selected using the web-

20   based RDS.

21   A    Correct.

22   Q    So, Dr. Zimmerman, I'm going to show you a document

23   that's been marked as Defendant's Exhibit 315.

24        Do you recognize this document?

25   A    Yes.

1    Q    And is this the article where you describe the results of

2    your survey on young adult drug use?

3    A    Yes.

4    Q    Now, as you mentioned, you compared the prevalence rates

5    from your study on drug use to the prevalence rates for the

6    study that was run by the National Survey on Drug Use and

7    Health, is that correct?

8    A    Yes, I think that's what it was called.

9    Q    That's the one that you referred to earlier as --

10   A    Yeah, I didn't know the -- National Study of Drug Use --

11   the NSDUH.

12   Q    And they're the ones that are affiliated with SAMHSA.

13   A    Yes.

14   Q    And if we could go to page 30 -- Bates 3023 and call out

15   the paragraph under the heading "Alcohol and Other Drug

16   Prevalence Rates."

17   A    Uh-huh.

18   Q    So, Dr. Zimmerman, again, as you mentioned, the

19   prevalence rates for the use of some types of drugs were

20   similar between your study and the NSDUH study, correct?

21   A    Correct.

22   Q    But, again, you mentioned that two studies had different

23   rates for cigarette use.

24   A    Correct.

25   Q    So I think that's mentioned in the last sentence in the

Zimmerman - Cross (Swi)                        156

1   paragraph.   The prevalence rate for cigarette use from your

2   study was 19.9 percent?

3   A      Correct.

4   Q      And from the NSDUH study it was 35.8 percent.

5   A      Correct.

6   Q      So there was a 15.9 percentage point difference for

7   cigarette use between the two studies.

8   A      Correct.

9   Q      And you compared the prevalence rates of drug use that

10  you got from your study to the NSDUH study because you wanted

11  to see how nationally representative your results were.

12  A      Correct.

13  Q      And you chose the NSDUH study because you considered it

14  to be the gold standard of national drug use studies.

15  A      A gold standard.

16  Q      But in the sexting context there is no gold standard

17  national study, correct?

18  A      Correct.

19  Q      So instead, you compared the results of your sexting

20  study to the two studies that we looked at earlier.

21  A      Correct.

22  Q      And those are the studies, the sext and text study and

23  the study of the undergraduate students.

24  A      Correct.

25  Q      And you made these comparisons of the results from your

Zimmerman - Cross (Swi)                    157

1    sexting study to the results of the two other studies to make

2    sure that your prevalence rate from your study was within the

3    ballpark, correct?

4    A    Yes.

5    Q    So is it fair --

6    A    I wouldn't quite characterize it that way.  It was in the

7    ballpark?

8         I mean I think as I described to during the deposition,

9    I -- we, as behavioral scientists, often look at our study to

10   see how it matches up with other people's findings as a way to

11   establish a pattern of evidence, and that's based on the idea

12   that there is no perfect study in -- in any case.

13        The -- it's almost an impossibility to do the perfect

14   study for all sorts of reasons I don't want to get into.

15        So I wouldn't say I was using our data to -- as then

16   being the standard.  I was trying to identify what other

17   people found to see how close we were to what other people

18   found.

19        So I -- I wasn't thinking about it as a standard upon

20   which -- like a benchmark.  There's a subtle difference, but

21   it's, I think, an important one.

22   Q    And I think you've also said previously that you wouldn't

23   have extrapolated the results of your sexting study to the

24   U.S. Census data if you hadn't been asked to do so for this

25   case, correct?

1    A     That is correct.

2    Q     And if we could go -- I think it's the same document,

3    same page.

4          And you also noted in the drug use study that your online

5    RDS sampling method resulted in under-representation of people

6    with lower education and also certain racial minority groups,

7    right?

8    A     Correct.

9    Q     And you further stated that, and I think this is a direct

10   quote, "It's vital to have knowledge that persistent racial,

11   slash, ethnic and socio-economic disparities and computer

12   access and use frequency," correct?

13   A     Correct.

14   Q     And if we could go back to Defendant's Exhibit 189, and,

15   Dr. Zimmerman, this is your study again on sexting and Bates

16   page 1905.

17         If we call up the top paragraph on the right-hand column.

18         So, Dr. Zimmerman, you said something similar in your

19   sexting study about your sample population, correct?

20   A     Correct.

21   Q     You said that some racial and educational groups were

22   under-represented in your sample.

23   A     Correct.

24   Q     And you went on to say that because of these under-

25   representations your results may not be generalizable to the

1    YA, which I think stands for young adult, population as a

2    whole.

3    A    Correct.  You're going down the -- can I just also point

4    out that --

5    Q    Actually --

6    A    Okay.

7    Q    -- I want to move on to one other area --

8    A    Okay.

9    Q    -- before we're done.

10   A    All right.

11   Q    So most of your research is focused on adolescent health

12   and development, correct?

13   A    Yes.

14   Q    And -- and one of your main areas of research, as you

15   described, has been substance use and abuse by adolescents,

16   correct?

17   A    Correct.

18   Q    So you don't consider yourself to be an expert in

19   sexting, do you?

20   A    No.

21   Q    And you haven't done any other studies on sexting than

22   the one that was discussed in your expert report, correct?

23   A    Correct.

24   Q    And -- and, Dr. Zimmerman, you said on direct that even

25   if your estimate is discounted by 50 percent, the prevalence

Zimmerman - Cross (Swi)                                    160

1   rate would be significant, right?

2   A    Correct.

3   Q    But the number, 50 percent, it's not a confidence

4   interval, correct?

5   A    Correct.

6   Q    It's not a margin of error?

7   A    Correct.

8   Q    And you didn't provide a confidence interval or a margin

9   of error for your sexting study, right?

10  A    I didn't here, but I can now.

11  Q    Okay.  And, again I think as you pointed out on direct,

12  the prevalence rates from your sexting study was for young

13  adults, ages 18 to 24, who use the internet, correct?

14  A    Uh-huh, correct.

15  Q    And, again you applied this percentage to the census data

16  for 18 to 24-year olds.

17  A    Correct.

18  Q    But the census data you used wasn't limited to 18 to 24-

19  year olds who use the internet, right?

20  A    Correct.

21  Q    And you didn't include the number of 18 to 24-year olds

22  nationwide who use the internet in your expert report, right?

23  A    Correct.

24  Q    And you didn't correct your estimate to limit it to young

25  adults who use the internet.

1    A     That was the 50 percent correction.

2    Q     So the 50 percent discount was --

3    A     Was based on those -- each of those kinds of issues.  I

4    was not -- I did not do it in a precise manner, but that was

5    the idea of a 50 percent discount.

6    Q     Okay.

7              MR. SWINTON:  Your Honor, at this time I have no

8    further questions.

9              I would move to admit Defendant's Exhibits 214 and

10   315.

11             THE COURT:  All right.  Admitted.

12             All right.  I have a couple questions.

13   BY THE COURT:

14   Q     Why did you select an group of 18 to 24?

15   A     There -- there was a -- both a conceptual and the

16   practical reason.

17         The practical reason was our Institutional Review Board

18   would have required, if we had collected data from individuals

19   under 18, to get parental written consent, which we thought,

20   doing an internet study, would be virtually, no pun intended,

21   impossible.  The --

22   Q     Because these -- the people who are under 18 and text,

23   send these kind of texts, don't tell their parents.

24   A     Well, I don't know about that, but because if we were to

25   advertise, let's say, in -- in Facebook, and a 14-year old

1    said, "Yeah, I'd like to participate in the study," we'd have

2    to contact their -- that 14-year old's parent or guardian and

3    get written consent to allow them to participate in the study.

4    Q    Why is that?

5    A    Because the Institutional Review Boards at our

6    university, and all universities, and required by the federal

7    government, there are regulations for studying humans, what's

8    called human subjects.  And so that's what the Institutional

9    Review Board is, it's --

10   Q    Well, what -- what do those regulations say about

11   studying humans under 18?  If you know.

12   A    Yeah, well, specifically I don't know what the law says,

13   but when there are people under 18, we are required to get

14   written consent from parents.

15   Q    You mean the university requires that or federal law,

16   state law, regulations, what?

17   A    It's a federal -- a federal law.  I'm pretty sure it's

18   federal law, but then the -- the universities are required to

19   implement that with an institutional review board.

20   Q    Is that because universities get a lot of money from the

21   federal government?

22   A    Exactly.

23   Q    Is that why?

24   A    It's basically the -- that's exactly right.

25   Q    So they have to adhere to federal regulations?

1   A    Correct.

2   Q    How do you know -- how did you verify that all the people

3   in your study were in fact between 18 and 24?

4   A    That's a very good question.  We -- they could have lied

5   to us.  We did ask a couple of questions throughout the

6   questionnaire to see if they would continue and remember their

7   lie.

8        So we would ask them if they were under 18, and later ask

9   them their birthday, and if their birthday did not match up

10  to, you know, being at least 18 --

11  A    Yeah.

12  Q    -- it popped up, and they would -- we would say, "Sorry,

13  thank, you."

14  Q    How was the survey distributed?  By mail?

15  A    Internet.

16  Q    Internet.

17  A    It was an internet survey.

18  Q    Okay.  So you had no way of verifying what somebody's age

19  was.

20  A    Other than -- that's correct, other than what I just

21  described.

22  Q    Well, how did you get the names of the -- you used this

23  by email on the internet?

24  A    We had an -- Facebook has -- had an ad, and we posted

25  that, and the -- usually Facebook has how old somebody is, and

1    so we told them we only wanted 18 to 24 -- that ad to appear

2    only in 18, 24-year olds.

3    Q    Right.

4    A    That person could have lied there and said --

5    Q    But the age -- the age a person puts on Facebook is

6    what -- what the person puts down, but Facebook doesn't check

7    whether it's accurate or not, does it.

8    A    Correct.  Correct.

9    Q    All right.  So you have no way of knowing, really,

10   whether the -- your group of 18 to 24 were in fact between 18

11   and 24.

12   A    Yeah.  Well, like I said, we had some checks on that, but

13   it's possible --

14   Q    Well, the checks was an internal one.  You asked -- first

15   you asked somebody how old they were, and then you asked the

16   birthday.

17        So if they lied about both, then you had no way of

18   determining --

19   A    Correct.

20   Q    -- they were lies, right?

21   A    Correct.

22   Q    What happened if they said they were 18, but their

23   birthday revealed they were under 18?

24   A    We would have to report that to our Institutional Review

25   Board, and then it was a, you know, a -- an error in our

1   approach because we said we only collect data from 18-year

2   olds.

3   Q    Did you just discard that answer?

4   A    Yes.  We would then be required to, and we would discard

5   that answer.

6   Q    Okay.  How about over 24?  How do you know that some

7   people who participated were not over 24?

8   A    Same thing.

9   Q    'Cause you weren't interested in 25-year old responses,

10   right?

11   A    Correct.

12   Q    Were you interested in knowing how many people -- in --

13   what were you trying -- well, strike that.

14        As a result of this survey, what conclusions did you

15   reach, that sexting was prevalent?

16   A    Well --

17   Q    Or something else?

18   A    We weren't really interested in the prevalence of

19   sexting.  We wanted to see -- given the number of people in

20   our sample who do sext, were they any more or less likely to

21   be engaging in risky sexual behavior or having any kind of

22   psychological stress as a result of that.

23   Q    Did you reach any conclusions as a result of this survey?

24   A    Yes.

25   Q    Which is what?

1    A    That sexting was unrelated to risky sexual behaviors

2    defined as things like multiple partners, frequent --

3    frequency, using a condom, depression, anxiety.

4    Q    So there was no correlation between sexting and engaging

5    in risky sexual behavior, is that right?

6    A    No significant correlation.

7    Q    There was some, but not -- was not statistically

8    significant.

9    A    Correct.

10   Q    Okay.  Did you draw any conclusions from that?

11   A    Well, a couple of conclusions.  One is that sexting

12   appears to be just part of the modern relationship, so we

13   presumed, and that, again, we didn't do it for prevalence, but

14   there was a sizeable number of kids, young adults, who engaged

15   in this -- in sexting.  It's not a rare instance, basically.

16   Q    Are you aware of any studies that -- that gather data on

17   sexting by human beings under 18?

18   A    There are some studies that I did note -- did see in --

19   in doing my report, but I did not include those because they

20   were a different age group than our group.

21        And I think the -- if I recall correctly, the -- the

22   rates were not that different than what we're finding.  The

23   rates have been pretty consistently in the in the 20 to -- 20

24   to 30 percent.

25   Q    Okay.

1          THE COURT:  All right.  Are those -- that's the end

2    of my questions.

3          Redirect.

4          MR. MURRAY:  Thank you, Your Honor.

5                    REDIRECT EXAMINATION

6    BY MR. MURRAY:

7    Q    Dr. Zimmerman, there was a point in the cross-examination

8    when you were being shown that passage from one of the

9    articles, and you said that you wanted to explain something.

10         Do you remember what you wanted to explain, and would you

11   do it now?

12   A    I don't remember --

13   Q    Okay.

14   A    -- what it is I wanted to explain.  I'm sorry.

15   Q    That's okay.  You also said that you could do a margin of

16   error now, even though you didn't do one -- what did you mean?

17   A    Well, I asked one of my colleagues if they could give me

18   a margin of error just because I realized that that might be

19   useful information.

20         And when we -- he broke it down by a male and a female,

21   and he broke it down by total sample and the weighted sample,

22   and the ranges were -- and I don't have it in my head 'cause

23   it's actually in my suitcase -- there -- about 23 percent was

24   the low end -- and this is the 95 percent confidence

25   interval -- the 90 -- 23 percent was the low end and 34

Zimmerman - Redirect (Mur)                    168

1   percent.

2        So I think for -- for boys, young men, the -- the plus or

3   minus was about five points from what we found, and for young

4   women it was about three points, plus or minus, what we found.

5   Q    And that was to a 95 percent confidence level?

6   A    Correct.

7   Q    Okay.  Now, you also indicated that the sample, by

8   definition, could not include young adults who did not have

9   access to the internet, correct?

10  A    Correct.

11  Q    Do you know what -- do you know what percentage of young

12  adults in that age group do have access to the internet?

13  A    Well, the -- the Pew estimates are in the 90s.  The Pew

14  Charitable Trust has done some of this work, and they've

15  estimated about 90 percent of people have access.

16       Now, the disparity in access is how easily accessible,

17  right?  So some people have access in their homes, and other

18  people have to go to the library to have access, but when

19  they've done their surveys, most people have some access.

20       So it's entirely possible, as probably was the case, and

21  we had people in our sample who were at the lower end of the

22  socio-economic status, based one education, and so they're

23  basically the 18 to 24-year olds and have not finished high

24  school yet, for example.

25       They may have said, "Well, gee, I could make some money

1   here, pretty easy money, just filling out a questionnaire."

2   They may have gone to the library to fill it out and told

3   their friends about it to make their -- their quota and get

4   paid for the -- the offer that we made for them to fill out

5   the questionnaire.

6   Q   Okay.  But in terms of -- of the representative nature of

7   your -- of your sample, by not -- by limiting it to young

8   adults who use the internet what percentage of the population

9   in that age group would be excluded from that sample?  What's

10  the --

11  A   Again, I don't know the exact number, but probably about

12  10 percent.

13  Q   Okay.

14          MR. MURRAY:  May I have one moment, Your Honor?

15          THE COURT:  Sure.

16      (Pause)

17          MR. MURRAY:  That's all I have.  Thank you, Your

18  Honor.

19          THE COURT:  One second.

20      (Pause)

21          THE COURT:  All right.  Any recross?

22          MR. SWINTON:  No, Your Honor.

23          THE COURT:  Okay.  All right.  Thank you, Doctor.

24          Okay.  If I understand correctly, that completes our

25  testimony for today?

1          MR. MURRAY:  Yes, it does, Your Honor.

2          THE COURT:  Okay.  So we have nothing tomorrow, and

3    Friday morning we have one witness who is -- looking for my

4    notes -- Dr. Linz, right?

5          MR. MURRAY:  That's correct, Your Honor.

6          THE COURT:  All right.  And about how -- his direct

7    is about an hour?

8          MR. MURRAY:  I would -- I would estimate that, Your

9    Honor.

10         THE COURT:  Okay.  All right.  I'd like to start at

11   10:00, if that's okay.

12         MR. MURRAY:  Sure.

13         THE COURT:  Ten a.m.

14         MR. MURRAY:  Yes.

15         THE COURT:  All right.  And then -- but on Monday

16   we'll start early.  We'll start at 9:15.  Now --

17         MR. MURRAY:  Could I ask you, do you have -- still

18   have that preliminary injunction hearing for Friday, as well,

19   of this week or --

20         THE COURT:  It's unclear.  I have a scheduling order

21   at 4:30 today.  I'm going to find out.

22         The one young -- the girl, the girl, the first

23   plaintiff, is getting her transplant right now, apparently,

24   and there's a second plaintiff who I don't know the status of,

25   but in the meantime, the -- the Organ Transplant Board changed

1    its procedure somewhat so I -- I don't know how that's going

2    to change things.  But I'm going to do this first, and I'll

3    set that for 11 -- for like 11:30 so to give you plenty of

4    time.

5           But the other thing -- but, actually, I may make it

6    a little bit later 'cause the other thing I want to do when

7    Dr. Lin is done is, I said before, give you some preliminary

8    evaluations of the witnesses who've testified.

9           I intend to go through them witness by witness,

10   and -- and then I'm going to have some questions that I will

11   read into the record and also give you copies of -- of

12   questions that I would like to be the focus of the closing

13   argument that we have on Monday.  So you can think about that.

14          And I want to emphasize.  I'm not looking for case

15   citations.  I'll give you a chance to file briefs.

16          I'm really more interested in your telling me how

17   you agree or disagree with my evaluation of witnesses, if you

18   do, but to some extent I'm -- I'm making at least preliminary

19   findings of fact so I -- not -- not conclusory findings, but

20   I'm giving you some evaluation of what weight I intend to give

21   to the witnesses so I can -- and I invite your comments on

22   that when we have the closing arguments on -- on Monday.

23          But I'm not -- I don't -- I don't want anybody to

24   feel compelled to spend the weekend in the library getting

25   cases because I will -- you'll have an opportunity to file

Colloquy                                      172

1    briefs and -- and also complete your arguments on the schedule

2    that I indicated that would be allowed.

3            So one of the other things I'd like you to do is to,

4    if you can come to an agreement on the briefing schedule with

5    the plaintiff getting a reply brief, and having the last brief

6    filed by July 10th.

7            Now, have you -- have you -- would you like to have

8    access to the courtroom tomorrow to look at the exhibits?

9            MR. SCHWARTZ:  Just to address that, Your Honor, for

10   the defendants, anyways, we actually have an entire 'nother

11   set --

12           THE COURT:  Okay.

13           MR. SCHWARTZ:  -- so our plan is to do as you ask,

14   but we don't need to disturb --

15           THE COURT:  Okay.

16           MR. SCHWARTZ:  -- your complete set.  We'll use

17   ours.  We'll pull out the exhibits.  We'll have --

18           THE COURT:  Okay.

19           MR. SCHWARTZ:  -- have them in order and -- so

20   that's our plan.

21           THE COURT:  Thank you.  All right.

22           Mr. Murray what about you?  And, of course, this can

23   be supplemented by whatever's introduced on Monday.

24           MR. SCHWARTZ:  Right.  We just need -- we will need

25   access to the courtroom 'cause our exhibits are here.  We just

1    don't need to mess with your set.

2            THE COURT:  Well, we'll -- Ms. Lutz is here, and you

3    can arrange that with her.

4            MR. SCHWARTZ:  Okay.  Great.

5            THE COURT:  I don't think I have anything else in

6    court tomorrow, so -- generally the courtroom's locked when

7    we're not using it.  So make arrangements with Ms. Lutz to

8    get -- to have access, you know, any time you want.

9            MR. SCHWARTZ:  Great.  Thank you.

10           THE COURT:  Yes, sir.

11           MR. MURRAY:  And, Your Honor, I'm not sure I'm fully

12   clear on what is going to be most helpful to you.  What is it

13   that you would like us to provide to you?

14           THE COURT:  What I would like to do is have a -- one

15   set of the exhibits that have been introduced into evidence in

16   numerical order with a cover list saying what the exhibits

17   are.

18           They don't have to be tabbed, unless they already

19   have tabs on them.  They don't have to be in the notebook, but

20   there -- there have been so many more exhibits marked than

21   were actually introduced, and I'd like to have your -- and, of

22   course, counsel are in charge of their exhibits.

23           So I assume you've been keeping a record of what's

24   been admitted, and so I'd like to get a copy of what has been

25   admitted.

Colloquy                                    174

1           Now, if you would like access to what's in back of
2      me here, that's fine.
3           MR. MURRAY:  Yes, I think that's what we'll -- we'll
4      need, Your Honor.
5           THE COURT:  All right.  So work that out with Ms.
6      Lutz when you're coming over here, and you can just -- when
7      you're done, you can just give her that set like in a -- in a
8      folder or in a redwell or a couple of redwells, whatever --
9      whatever it is.
10          MR. MURRAY:  Your Honor, in that regard it might
11     make sense for us then to offer some more exhibits into
12     evidence right now.
13          THE COURT:  Okay.
14          MR. MURRAY:  At least the ones that we don't think
15     are controversial so that we can -- we don't -- we would offer
16     into evidence Exhibit 37 and its subparts and --
17          THE COURT:  Any objection?
18          MR. SWINTON:  We do object to the admission of this.
19          THE COURT:  What is 37?
20          MR. MURRAY:  This is the declaration of our
21     associate and the snapshots of all the -- of the various
22     websites that were accessed, and I thought we had an agreement
23     that -- that those could -- that those were authentic and
24     didn't need a witness.  So I guess the -- maybe the
25     objection --

Colloquy                                      175

1          THE COURT:  Well, authenticity is, of course, one

2     aspect, but, you know, the rules of evidence prescribe what

3     can be admitted --

4          MR. MURRAY:  Yes.  No, I understand that.

5          THE COURT:  -- without a witness.

6          MR. MURRAY:  So if they have other objections to

7     that, then perhaps we will have to wait on that.  I don't

8     know.

9          But we would offer it into evidence right now, Your

10    Honor.  We think it's relevant.  We think it's --

11         THE COURT:  What -- what is -- oh, 30 -- can I see

12    it, 'cause I -- I have not accessed all these boxes back here.

13    I've been looking at the exhibits --

14         MR. MURRAY:  I can show you the -- show it appears

15    on our list, Your Honor.

16         THE COURT:  I'm sure it does.  37 is the declaration

17    of William Livingston.  He was one of the witnesses.

18         MR. MURRAY:  No.  No, he's actually an associate in

19    our law firm --

20         THE COURT:  Oh.

21         MR. MURRAY:  -- who accessed all those websites

22    which the Government has agreed --

23         THE COURT:  All right.  Well --

24         MR. MURRAY:  -- are authentic.

25         THE COURT:  -- why don't Government counsel look at

1   this, and we'll discuss it further on Friday.  Okay.

2               MR. SWINTON:   Yeah, that -- that's fine, Your

3   Honor.

4               THE COURT:  All right.  Anything else?

5               MR. MURRAY:  Your Honor, I think that's all that we

6   can do then until we --

7               THE COURT:  All right.

8               MR. MURRAY:  -- until we --

9               THE COURT:  Well, I -- what I would like to do --

10  what I'd like both sides to do, if you have other exhibits

11  that you think are admissible without a witness, I'd like you

12  to trade those exhibit numbers, say, tomorrow morning so you

13  can look at it, and if you can't reach agreement, then I'll

14  rule on them on Friday.  Okay.

15              MR. MURRAY:  Yes.  Actually, we've already done

16  that.  I think we --

17              THE COURT:  Okay.

18              MR. MURRAY:  we've exchanged those.

19              THE COURT:  All right.  So see what's agreeable or

20  not agreeable.  But authenticity is obviously one important

21  aspect, but beyond that they could be admissible or not

22  admissible, depending on, you know, origin or what they are

23  offered -- for what purpose they're offered.

24              Okay.  All right.  So then we're in recess now until

25  Monday morning -- until, excuse me, Friday morning at 10:00

Colloquy                                    177

1    a.m.   Okay.

2              MR. MURRAY:   Thank you, Your Honor.

3              THE COURT:   All right.   Thank you.

4         (Proceedings concluded at 3:00 p.m.)

5                         *  *  *  *  *

1              C E R T I F I C A T I O N

2

3

4              I, Tara Martin, court-approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11   _____     _____

12   TARA MARTIN                          DATE

13   DIANA DOMAN TRANSCRIBING