```
                  UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF PENNSYLVANIA

FREE SPEECH COALITION, INC.,    )   09-CV-4607
et al,                          )
                                )
          Plaintiffs,           )
                                )
                                )
     vs.                        )
                                )
THE HONORABLE ERIC HOLDER, JR., )
in his Official Capacity as     )
Attorney General of the United  )
States,                         )   Philadelphia, PA
                                )   June 14, 2013
          Defendant.            )   10:04 a.m.


                    TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE MICHAEL M. BAYLSON
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          J. MICHAEL MURRAY, ESQUIRE
                             LORRAINE R. BAUMGARDNER, ESQUIRE
                             BERKMAN, GORDON, MURRAY & DEVAN
                             55 Public Square - Suite 2200
                             Cleveland, OH 44113-1949


For the Defendant:           KATHRYN WYER, ESQUIRE
                             HECTOR G. BLADUELL, ESQUIRE
                             JAMES J. SCHWARTZ, ESQUIRE
                             NATHAN MICHAEL SWINTON, ESQUIRE
                             UNITED STATES DEPARTMENT OF JUSTICE
                             20 Massachusetts Avenue
                             Washington, D.C.  20530

Audio Operator:              ULI HEVENER

Transcribed by:              DIANA DOMAN TRANSCRIBING
                             P.O. Box 129
                             Gibbsboro, New Jersey  08026-0129
                             Office:  (856) 435-7172
                             Fax:     (856) 435-7124
                             Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
```

1                          I N D E X

2

3                DIRECT      CROSS    REDIRECT    RECROSS

4    WITNESSES:

5    FOR THE GOVERNMENT:

6      Dr. Daniel Linz          3          41         71          73

7

8    EXHIBITS:                                    IDENT.  EVID.

9    P-42      FBI agent's Connection case article

10             (minus the attachments)             77      80

11   P-39      2010 U.S. Census Table              81      81

12   P-114 &

13   P-115     Defendant's discovery responses     81      81

14   P-112     Discovery responses                 82      82

15   P-113     Data, amount of 2257 prosecutions   82      82

16   P-111     Justice Department report to Congress 82    82

17   P-110     Letter from Department of Justice   82      82

18   P-133     Foreign law notice                  82      83

19   G-40      Dodson report                       84      84

20   G-63 & 64 Screen shots                        84      84

21   G-88      Screen shots                        85      85

22   G-91E     Screen shots                        85      85

23   G-116     Screen shots                        85      85

24   G-117B&C  Screen shots                        85      85

25   G-188E-I  Screen shots                        85      85

1    INDEX:   (continued)

2    EXHIBITS:                                        IDENT.  EVID.

3    G-127      Sinclair Institute Video Covers        85      85

4    G-137A     Plaintiff documents                    85      85

5    G-160 -

6    G-172      Images                                 85      86

7    G-192      Google search result variations        86      86

8    G-223      Not identified herein                  --      86

9    G-229 -

10   G-305      Screen shots                           86      86

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dr. Linz - Direct (Mur)                                    4

1          (The following was heard in open court at 10:04 a.m.)

2                   THE COURT:  Okay.  Good morning.

3                   MR. SCHWARTZ:  Good morning, Your Honor.

4                   MR. MURRAY:  Good morning, Your Honor.

5                   MS. WYER:  Good morning, Your Honor.

6                   THE COURT:  Okay.  Please be seated.  Okay.  The

7    hearing in that transplant case has been off.  That's now been

8    settled.  So I'm yours as long as we need to.  So we have one

9    witness this morning, is that correct?

10                  MR. MURRAY:  That is correct, Your Honor.

11                  THE COURT:  Okay.  Let's proceed.

12                  MR. MURRAY:  Your Honor, the plaintiffs call Dr.

13   Daniel Linz.

14                  COURTROOM DEPUTY:  Please raise your right hand.

15                  DR. DANIEL LINZ, PLAINTIFF'S WITNESS, SWORN

16                  COURTROOM DEPUTY:  Please be seated.

17                  THE WITNESS:  Thank you.

18                  COURTROOM DEPUTY:  Please state your full name and

19   spell your last name for the record.

20                  THE WITNESS:  My name is Daniel Linz, L-I-N-Z.

21                            DIRECT EXAMINATION

22   BY MR. MURRAY:

23   Q    And would you tell the Court what is your city of

24   residence?

25   A    I live in Santa Barbara, California.

1   Q     And what is your current occupation?

2   A     I am a professor of communication at the University of

3   California, Santa Barbara.

4   Q     Tell the Court what your educational background is?

5   A     Well, I received my undergraduate degrees in psychology

6   and sociology from Northern Kentucky University.  From there,

7   I went to the University of Wisconsin, Madison, where I

8   completed a master's degree in sociology and a Ph.D. in

9   psychology.  Then, from that point, I went to UCLA where I was

10  employed for approximately two years and then onto the

11  University of California, Santa Barbara.

12  Q     And tell the Court what your experience has been as a

13  university professor over the years?

14  A     Well, I had a variety of teaching and research

15  responsibilities and administrative responsibilities.

16  Throughout the years, I chaired the Law and Society Program at

17  the University of California, Santa Barbara.  I also have been

18  a full professor at the university for, now, approximately 20

19  years.  In addition, I have served as the Director of the

20  Survey Research Center and also as the Director of Graduate

21  Studies of the Department of Communication.

22  Q     Okay.  Now, what -- what have your areas of focus been

23  over the years?

24  A     I would describe my area as primarily sex and the

25  judiciary.

1   Q    Okay.  And can you tell the Court -- and if you look in

2   front of you, there is Plaintiff's Exhibit 38, which has your

3   CV in it.  Can you tell the Court what kinds of courses you

4   have taught over the years?

5   A    In the Department of Communication, I've taught courses

6   such as the Effects of Mass Media on the Individual,

7   Communication Law, Sex Media and the Judiciary, the Design and

8   Analysis of Surveys, Interpreting Sociolegal Research, Law and

9   Social Science, Media Law, Psychology in the Legal System,

10  Seminar on Speech and Violence, Seminar on Juries and Justice,

11  Research Methods in Communication, Applications in Advance

12  Research Methods and Law and Policy as Used in Justice and as

13  Media.

14  Q    Now, have you won any honors and awards and if so, can

15  you mention a few of them?

16  A    I have won a number of honors or received a number of

17  awards for my research.  For example, in 2012, my work was

18  honored as the top paper in "InterGroup Communication".  This

19  paper had to do with traffic stops, police traffic stops,

20  ethnicity, accent and extensive policing.  In 2011, I received

21  a Top Paper Award for the National Communication Association

22  in the sub-area of communication and law for a paper entitled,

23  "Indecency in the 21st Century: Revisiting the Assumption of

24  the Regulation of Indecent Broadcasting".

25              That same year, in the International Communication

Dr. Linz - Direct (Mur)                                      7

1    Association, the communication law and policy division, I

2    received Best Paper Award for a paper entitled, "The Secondary

3    Effects Doctrine Since Alameda: An Empirical Reexamination of

4    the Justifications for Laws Limiting First Amendment

5    Protection".

6              In 2009, I received an award from the National

7    Communication Association, Top Scholarship and Freedom of

8    Expression for a paper entitled "Erotic Dancing, Liquor and

9    Crime: An Empirical Critique of Virginia Statute Changes

10   Restricting Liquor Sales in Adult Entertainment".  In 2007, I

11   received an award from the National Communications

12   Association, Top Freedom of Expression Scholarship for a paper

13   entitled, "Evaluating the Potential Secondary Effects of Adult

14   Video/Book Stores in Indianapolis, Indiana".

15             In 2006 -- and I can stop at any point.

16   Q    Well, that's -- I think you can stop here, and the rest

17   of them are in your CV.  Can you tell the Court, have you

18   published any articles in any peer reviewed journals?

19   A    Yes, I have.

20   Q    And can you tell the Court approximately how many peer

21   reviewed journal articles have you published?

22   A    Peer reviewed, sir, journal articles, probably in the

23   neighborhood of 50, and then an additional 50 articles in the

24   -- an additional 50 published works that would include

25   chapters or other proceedings.

1    Q    And can you tell the Court what some of your publications

2    are with particular emphasis on those that have anything to do

3    with media, communication, erotic expression, sexually

4    explicit expression, any -- any involving that kind of work?

5    A    Yes.  Most recently, in press, working from most recent

6    to least recent, we've just published an article entitled

7    "Predators, Porn and Peers: Predicting Parent Underestimation

8    of Their Children's Risky Internet Experiences", in the

9    journal, Computer Mediated Communication.  I've just published

10   a chapter in 2013 entitled, "The Internet and Aggression:

11   Motivation, Disinhibitory and Opportunity Aspects".  We just

12   published another chapter in a volume that is edited by the

13   American Psychological Association entitled, "Sexuality and

14   Pornography".

15   Q    And that was this year?

16   A    That was this -- that was this year in the APA

17   Educational Psychology Handbook.  Those would comprise the

18   publications for this year.  Last year, for example, I

19   published, "Effects of Sexually Oriented Messages on the

20   Individuals and Communities: A History of Challenging

21   Assumptions in the Courtroom" in an edited volume entitled

22   Application of Communication Research in Courtroom Litigation.

23        Other related articles would include a 2011

24   publication, "Indecency in the 21st Century", published in the

25   Free Speech Year Book.  Another in 2011, "Contributions to the

1   Contents of" -- perhaps this is not that relevant.  Let me

2   move to the next publication in 2010, "The Secondary Effects

3   Doctrine Since Alameda: An Empirical Reexamination of the

4   Justification for Laws Limiting First Amendment Protection".

5          Further then, an article co-authored by Yao and

6   Mahood in 2009 entitled, "Sexual Priming, Gender Stereotyping

7   and Likelihood to Sexually Harass: Examining the Effects of

8   Playing Sexually Explicit Video Games".  Further in 2009, a

9   piece entitled, "Pornography is Not Addictive and Does Not

10  Lead to Violence Against Women" in a book entitled, Addiction:

11  Opposing Viewpoints.  Beyond that, Paul and Linz, 2008, "The

12  Effects of Exposure to Virtual Child Pornography on Viewer

13  Cognitions and Attitudes Towards Deviant Sexual Behavior".

14         Beyond that, Encyclopedia of Psychology and Law, in

15  2007, "Pornography" -- colon or comma -- "The Effects of

16  Exposure To".  Beyond that, in 2007, "Testing Supreme Court

17  Assumptions in California v. LaRue: Is There Justification for

18  Prohibiting Sexually Explicit Messages in Establishments that

19  Sell Liquor".  Beyond that, in 2006, "Peep Show

20  Establishments, Police Activity, Public Place and Time: A

21  Study of Secondary Effects on San Diego, California".

22         Beyond that, 2004, "An Examination of the Assumption

23  That Adult Businesses are Associated with Crime in Surrounding

24  Areas", a secondary effects study in Charlotte, North

25  Carolina.  Further, in 2002, "Men's Behavior Toward Women

1    After Viewing Sexually Explicit Films: Degradation Makes a

2    Difference".  Beyond that, 2001, "Government Regulation of

3    Adult Businesses Through Zoning and Anti-Nudity Ordinances:

4    Debunking the Legal Myth of Negative Secondary Effects".

5            Beyond that, 2001, "Child Pornography", a chapter in

6    the Handbook of Law and Social Science: Youth and Justice.

7    Q    Why don't you tell us a little bit about what that

8    chapter was about?

9    A    That chapter was a summation of the social science

10   research on the availability of the prosecution and the

11   possible effects of exposure to child pornography as of 2000

12   -- the year 2000, essentially.

13   Q    Okay.  And -- and without going through the whole thing,

14   what is the earliest date that you published a peer reviewed

15   article on the subject of sexually explicit material?  And

16   maybe go to page 12 of your -- 12 and 13?

17   A    Well, as early as 1982, I published an article entitled,

18   "Scientific Research on Pornography and Violence: The

19   Implications for American Law" in The Bulletin of the British

20   Psychological Society.  That would constitute, I think, as my

21   first publication in the area.  And then throughout that time

22   in the 1980s, publications such as, "Using Psychological

23   Research on Violent Pornography to Inform Legal Change", 1984;

24   1984, again, "Basis of Liability for Injuries Produced by

25   Media Portrayals of Violent Pornography"; 1984, "Sexual

1   Violence in the Media"; 1984, "The Effects of Multiple

2   Exposures to Film Violence Against Women"; 1986, "The Question

3   of Pornography: It is Not Sex but Violence That is an

4   Obscenity in Our Society".

5   Q     And then go to the preceding page and just give us a few

6   in the mid to late '80s.

7   A     You're making me feel extremely old, Mr. Murray.  "The

8   Findings and Recommendations of the Attorney General's

9   Commission on Pornography: Do the Psychological Facts fit the

10  Political Theory?", published in The American Psychologist in

11  1987.  A book published in 1987, The Question of Pornography:

12  Research Findings and Policy Implications.  Also in 1987,

13  "Sexual Violence in the Mass Media: Sexual Psychological

14  Implications".  1987, as well, "The Attorney General's

15  Commission on Pornography: The Gap Between Findings and

16  Facts".

17  Q     All right.  I think that gives us a pretty good picture.

18  Have you -- Dr. Linz, have you engaged in any journal

19  refereeing, yourself?

20  A     Yes, I have.

21  Q     And can you tell us a little bit about that work?

22  A     That work involves blindly, and that is to say with no

23  knowledge to author of the article, reviews for editors of

24  scientific journals who may publish work in the area of social

25  science and sex.

1   Q    Now, does the CV that is in front of you that is part of

2   Plaintiff's Exhibit 38 pretty well accurately portray your

3   professional background and experience as of, I guess, March

4   of 2013?

5   A    Yes, it does.

6   Q    Okay.  Now, have you done, then -- you've published, it

7   looks like, over 30 years in the area of sexually oriented

8   material, is that correct?

9   A    That is correct.

10  Q    Now, have you, over those years, studied or done any

11  research on, for example, the primary effects of such

12  materials?

13  A    I've done a significant amount of research in that area.

14  Q    Okay.  Tell the Court a little bit about the research

15  that you've done in connection with the primary effects of

16  sexually explicit expression.

17  A    Primarily, we've been involved in looking at the effects

18  of exposure to the various types of pornography through an

19  experimental paradigm, whereby men, for example, are exposed

20  to pornographic material from one type or another content, and

21  then, we examine the effects of that exposure on attitudes

22  towards women, attitudes towards sexual assault and a variety

23  of other outcome variables.  We've been particularly

24  interested in the question of violent pornography or violent

25  depictions -- depictions of violence against women over the

1    years.

2    Q    Okay.  Now -- and during the 30 plus years that you've

3    been doing that, has that caused you to be in a position where

4    you've had to view sexually explicit images?

5    A    Yes.

6    Q    And could you describe to the Court, in some measurable

7    way, that works for you, the type and quantity of images that

8    you have viewed as part of your work over the years?

9    A    Well, over the years, as the technologies have changed,

10   I've viewed printed material in addition, then, to videotaped

11   material, DVD material, then, ultimately, the material that

12   appears, at this point, on the Internet.  That has included

13   the examination of millions of pornographic images.

14   Q    Okay.  Now, during the 30 plus years that you have been

15   reviewing sexually explicit material, have you ever

16   encountered actual child pornography being distributed through

17   the various commercial distribution channels that you have

18   accessed?

19   A    No, I have not.

20   Q    Okay.  Now, Dr. Linz, in this case, you were asked to

21   arrive at certain estimates of data, is that correct?

22   A    That is correct.

23   Q    And were you asked, for example, to estimate the quantity

24   of actual child pornography that does exist, compared to the

25   quantity of all sexually explicit images that are available,

1   commercially?  Was that one of the questions that you

2   examined?

3   A    Yes.

4   Q    Were you also asked to arrive at an estimate of the

5   quantity of sexually explicit expression depicting persons who

6   could reasonably be confused as minors, based on their

7   apparent ages, compared to the quantity of sexually explicit

8   expression depicting persons who are obviously above the age

9   of majority?  Did you examine that question?

10  A    Yes.

11  Q    And finally, were you asked to estimate the quantity of

12  private non-commercial sexually explicit expression shared by

13  citizens by various means?

14  A    Yes, I was.

15  Q    Now, in connection with the first two questions, that is,

16  the quantity of child pornography versus the rest of the

17  universe, and the quantity of confusing material versus non-

18  confusing material, did you ask the Free Speech Coalition to

19  carry out certain Google searches to help you arrive at that

20  estimate in addition to the information that you had,

21  yourself?

22  A    Yes, I did.

23  Q    Okay.  Now, and are the Google searches that were

24  conducted at your request in Appendix A in your report in this

25  case?

1    A    Yes, they are.

2    Q    Okay.  Now, Dr. Linz, I've put on the screen the page

3    that begins your Appendix A, do you see that?

4    A    Yes, I do.  However, it is slightly blurry.

5    Q    Okay.  But there should be a hard copy of Plaintiff's

6    Exhibit 38 in front of you, and if you would -- if you would

7    prefer to turn to Appendix A there, that would be easier for

8    you to read.  But was one of the search terms that you asked

9    to be searched, the search term, MILF?

10   A    Yes, it is, M-I-L-F.

11   Q    And when that search term was entered on Google, how many

12   hits were there?

13   A    454 million.

14   Q    Then, did you have a search done on a search term known

15   as teen pron?

16   A    Yes, I did.  That's teen pron, P-R-O-N.

17   Q    And can you explain -- then we'll get to some other

18   search terms -- but why was that one of the search terms that

19   you used?

20   A    Because I was interested in attempting to have Google

21   eliminate for me the possibility of teen pornography or child

22   pornography.

23   Q    Okay.  And how many hits did that search yield?

24   A    28,000,600.

25   Q    Now, did you also include the term, child pron?

1    A     Yes, I did.

2    Q     And how many hits did that yield?

3    A     3,090,000.

4              THE COURT:  How do you spell it again, sorry?

5              THE WITNESS:  P-R-O-N.  Child, P-R-O-N.

6              THE COURT:  So child pron?

7              THE WITNESS:  Pron, correct, sir.

8              THE COURT:  And what was the --

9    BY MR. MURRAY:

10   Q     And --

11             THE COURT:  -- what was the number of that?

12             THE WITNESS:  3,090,000.

13             THE COURT:  What's the term pron indicate, P-R-O-N?

14             THE WITNESS:  Well, that -- that term is used,

15   because Google is very sensitive about the possibility of

16   typing in the term child porn, so this is used as a surrogate

17   to allow for the widest possible search.  They -- and then

18   allow, also, for the possibility of --

19             THE COURT:  Well, what would happen if someone would

20   type in child porn, if you know?

21             THE WITNESS:  I have never typed in the term child

22   porn.

23             THE COURT:  Okay.  But you've read that -- that it

24   gets --

25             THE WITNESS:  Yes, I'm cautious -- I'm cautious

1    about doing so, because I have read that Google has certain

2    restraints in that regard.

3              THE COURT:  Has certain what?

4              THE WITNESS:  Restraints in that regard.

5              THE COURT:  Restraints, that if someone types in

6    child porn, they don't process the search or you don't know?

7              THE WITNESS:  Yes, that's my -- that is my

8    understanding.

9              THE COURT:  Okay.

10   BY MR. MURRAY:

11   Q    In any case, this was the search term you used when you

12   were looking to see if there was any metadata that would come

13   up that would -- that might lead somebody to child

14   pornography?  I mean, you weren't looking for actual images,

15   were you?

16   A    No.  No, sir.

17   Q    What were you looking for?

18   A    I was -- I was looking for any citation that Google may

19   have to child pornography.

20   Q    And in connection with that, what were some of the

21   searches that came up?

22   A    Well, the first thing that came up was child pornography

23   as defined by Wikipedia; then another article involving a

24   deacon of a church, so-called busted, for storing child

25   pornography; another article involving hundreds arrested in a

Dr. Linz - Direct (Mur)                                    18

1   child porn bust; another involving a scam accusing you of

2   viewing child pornography, it's entitled; another including

3   Maryland man sentenced in child porn case; another including

4   woman arrested in San Fernando Valley child porn case.

5   Q    All right.  Well, that -- that gives us a good sampling.

6               THE COURT:  Can I ask one other -- did you type in

7   the word, teen porn?

8               THE WITNESS:  I typed in both teen porn and teen --

9   and yes, I did, in response to your question, teen porn.

10              THE COURT:  Well, your -- as I understand it, you

11  first said you typed in the term, teen pron, P-R-O-N, is that

12  correct or not?

13              THE WITNESS:  No.  I typed in the term teen porn.

14  BY MR. MURRAY:

15  Q    Well, no, Dr. Linz, the Court is referring to the fact

16  that the first entry --

17  A    Oh, in the first entry, yes, that is true.

18              THE COURT:  You typed in teen pron?

19              THE WITNESS:  Yes.  And --

20              THE COURT:  That's where you got 28.6 million hits,

21  right?

22              THE WITNESS:  That is correct, sir.

23              THE COURT:  And now my question is, did you, at any

24  time, type in the term, teen porn?

25              THE WITNESS:  Yes, Your Honor, I did.

Dr. Linz - Direct (Mur)                                    19

1        THE COURT:  All right.  You want to ask him about

2    that or --

3        MR. MURRAY:  Yes.  I'm -- I'm going chronologically.

4        THE COURT:  Okay.  Sorry.  Go ahead.

5    BY MR. MURRAY:

6    Q    And was there any search term for kid pron?  Do you see

7    that, Doctor?

8    A    Yes.  Yes, there is, on page 13.

9    Q    Yes.  And what were the hits for kid pron?

10   A    Approximately two million.

11   Q    Now, let's get to the next page, and this is what the

12   Court was asking you about, did you also use a search term of

13   teen porn?

14   A    Yes, I did.

15   Q    And how many hits did you get when you caused that search

16   term to be entered?

17   A    136,000,000.

18   Q    And did you also cause to be entered, the term, porn, 18

19   year old?

20   A    Yes, I did.

21   Q    And how many hits did that yield?

22   A    78,000,400.

23   Q    And then, did you also cause someone to do a search with

24   the search term, porn?

25   A    Yes, I did.

Dr. Linz - Direct (Mur)                    20

1    Q    And how many hits did that yield?

2    A    1,360,000,000.

3    Q    Did you also cause the search term, porno -- porno to be

4    used?

5    A    Yes, I did.

6    Q    And how many hits that did yield?

7    A    808,000 -- no, excuse me, 808,000,000.

8    Q    And then sex pics, was that another search term?

9    A    Yes, it was.

10   Q    And how many hits did that yield?

11   A    237,000,000.

12   Q    And then, this is another search of the term, porn?

13   A    That is correct.

14   Q    And that yielded?

15   A    1,360,000,000 results.

16   Q    Okay.  And then, finally, on the term, porn, sex, how

17   many did that yield?

18   A    211,000,000.

19   Q    Now -- now, in addition to those searches on Google, and

20   in addition to the studies and experience and research you've

21   done over the past three decades, what else did you do, in

22   this case, to help estimate the quantity of child pornography

23   compared to the entire commercial universe of sexually

24   explicit images?

25   A    Well, I attempted to form a ratio of the term -- search

1    terms, including, for example, child porn as a numerator, and

2    the term porn as a denominator.

3    Q    And what else did -- what other research did you do, or

4    articles or data did you look at to inform you of the extent

5    to which there is child pornography out in the universe?

6    A    I looked at what I considered to be the most credible

7    articles and most recent research in this area, including an

8    article by Collins in 2007, articles by Dr. Finkelhor and his

9    research group and Dr. Wolak in 2005.  I also examined a

10   number of FBI and other reports.

11   Q    Okay.  And then what about additional reports relating to

12   peer to peer networks, did that also add to your universe of

13   information that you had to make this estimate?

14   A    Yes, it did.

15   Q    And tell the Court about some of the research that you

16   accessed on that subject?

17   A    In some of the articles that I reviewed, among those that

18   I consider most credible is an article by Janis Wolak, David

19   Finkelhor, Kimberly Mitchell and Lisa Jones.  This is an

20   article in which they examine two points in time, 2000 to 2001

21   and 2006, a national sample of law enforcement agencies in

22   which they examine arrests for child pornography production.

23          I also examined the scientific report, "Child

24   Pornography Possessors: Trends in Offender and Case

25   Characteristics" by Janis Wolak and David Finkelhor.  And this

1    article reports on the results from a national study that are

2    relevant to -- that is relevant to understanding pornography

3    -- child pornography possession.

4    Q    Okay.  Did you also examine any government reports, if

5    you'd look at paragraph eight, if it refreshes your

6    recollection?

7    A    Yes.  I examined a report to Congress, August, 2010 to

8    the U.S. -- from the U.S. Department of Justice, which was an

9    examination of training via peer to peer networks in images

10   that could possibly be child pornography.

11   Q    And what is your understanding of the role of peer to

12   peer networks in the -- in the dissemination of child

13   pornography?

14   A    My research has -- from my research, I have concluded

15   that the primary means by which child pornography is

16   transported from user to user is through these so-called peer

17   to peer networks.

18   Q    And what are peer to peer networks?

19   A    They are individual computers that are linked with one

20   another through the Internet, which individual users can share

21   files.  It might be images.  It might be music.  It might be

22   movies or anything that can be computer encoded.  And then

23   rather than go through a particular server, as would be the

24   case if one was accessing commercial pornography, it's

25   instead, the group of users connected to one another in a

Dr. Linz - Direct (Mur)                                    23

1    network.

2    Q    Okay.

3              THE COURT:  And there's software available that

4    facilitates this, is that correct?

5              THE WITNESS:  Yes, Your Honor, that is correct.

6    BY MR. MURRAY:

7    Q    And is there something called Gnutella?  Is that a --

8    A    There's a number of such packages available.  Gnutella is

9    one of them.

10   Q    Okay.  What are some of the others that come to mind if

11   -- is there something called LimeWire?

12   A    That is correct.

13   Q    Okay.  And -- okay.  And so how is that peer to peer

14   network, then, to be distinguished from the mainstream Web?

15   A    Well, your -- your network is a link of -- or a linkage

16   of millions, perhaps, of individual computers and these

17   individual computers serving as their own servers, in effect.

18   It's not a main server that -- that distributes and handles

19   traffic among one central source or disseminates it from the

20   webpage in a way that would traditionally be defined if we

21   were to look at something like Google.  And when we do a

22   Google search, we're primarily coming up with web pages.

23   We're not coming up with the images that might be available in

24   peer to peer networks.

25   Q    Okay.  Now, Dr. Linz, based on all of the data that

1    you've described, the Google searches, the research that

2    you've just described, that you did recently, plus the 30

3    years plus of experience you've had studying sexually explicit

4    images, viewing them and doing research on them, what is your

5    opinion as to the quantity of actual child pornography that is

6    out there, compared to the entire universe of, let's say,

7    commercially available sexually explicit images?

8    A    My opinion is that child pornography is a very

9    insubstantial portion of the overall commercial pornography

10   market.

11   Q    Okay.  And by insubstantial, what -- what do you mean by

12   that, in terms of a range of percentages?

13   A    Well, I would say that quite nearly 99 percent of the

14   material that is available is not child pornography.

15   Q    Now, does that mean that there's not substantial

16   quantities of child pornography?

17   A    No, it does not.

18   Q    Okay.  You were just comparing it to the rest of the

19   universe?

20   A    That is correct.

21   Q    I mean, how big is the commercial pornography or sexually

22   explicit universe, based on your experience?

23   A    Well, the universe is extremely vast.  If we're talking

24   about the Google searchable universe, for example, we have

25   used, as a possible delineator the several billion mark that I

1    had mentioned to you before -- or the over one billion mark

2    that I mentioned to you before.  If we were to include in

3    that, however, that universe, all of the other sexually

4    explicit images that people share with one another across all

5    of the forms of communication that now are electronically

6    based, it is a vast, vast universe of material.

7    Q    Okay.  Now, I want to turn to the second question that

8    you were asked to study, and that is, the question of -- and I

9    want to make sure that I identify this with precision.  The

10   quantity of sexually explicit expression depicting persons who

11   could reasonably be confused as minors, based on their

12   apparent ages, compared to the quantity of sexually explicit

13   expression, depicting persons who are obviously above the age

14   of majority.  Now, in addition to -- well, tell the Court what

15   -- before telling us what your opinion is, what are all the

16   sources of information that you had that helped you inform

17   that opinion?

18   A    Well, I -- I primarily relied on three sources.  One is

19   my personal experience as a social scientist over the last 30

20   years, reviewing sexually explicit material.  The third -- the

21   second, rather, is research articles undertaken by -- or

22   research projects, I should say, undertaken, and the results

23   of which are published by authors such as Janis Wolak and

24   David Finkelhor, and then in addition to that, I attempted to

25   calculate a ratio from the Internet searches that we discussed

1    before.

2    Q     Now, in terms of the Google search, and you -- we showed,

3    on the screen, all of the searches and their results, did Mr.

4    Bladuell help us in discovering an error in one of your

5    calculations in your report?

6    A     Yes, he did.

7    Q     Okay.  And can you explain to the Court -- and have you

8    corrected that error?

9    A     Yes, I have.

10   Q     Okay.  And what -- what was the error that you made?

11   A     On -- on page six of my report, paragraph two, I indicate

12   a ratio of two percent that was associated with the -- the

13   term, teen porn, 28,000,6000 as a numerator and porn as the

14   denominator, 1,360,000,000.  I should not have used the term,

15   teen porn --

16   Q     Pron, you mean?

17   A     -- but instead, used the term, teen pron, there, which

18   would have yielded a different -- or the number that I put in

19   -- I'm sorry.  Let me -- can we refer back to the --

20   Q     Yes.

21   A     Can we refer back to the point where I obtained the

22   28,000,600?

23   Q     Yes, let's -- let's clear this up.  You put in -- you had

24   a search done of something called, teen pron, and that yielded

25   28,000,600 hits, correct?

1    A     That is correct.

2    Q     And you erroneously used that number for your numerator,

3    is that what you're saying?

4    A     That is correct.  What I wanted to use, instead, was the

5    teen porn numerator.

6    Q     Okay.  And when we get to that numerator, we discover, as

7    Mr. Bladuell pointed out to me, and then me to you, that that

8    was the one that yielded 136,000,000, correct?

9    A     That -- that is correct.

10   Q     Okay.  And then when you use that as the numerator, what

11   is the percentage that you arrive at in terms of, just based

12   on that Google search, as to the -- what we're calling the

13   ambiguous or confusing material?

14   A     That would be closer to a ten percent.

15   Q     Okay.  Now --

16            THE COURT:  What was the denominator, again?

17            THE WITNESS:  The denominator is porn.

18            THE COURT:  Porn?

19            THE WITNESS:  Yes.

20            THE COURT:  Is the 1.3 --

21            THE WITNESS:  Yes.

22            THE COURT:  1.350 billion?

23            THE WITNESS:  Yes --

24            THE COURT:  Okay.

25            THE WITNESS:  -- Your Honor.

1    BY MR. MURRAY:

2    Q    Okay.  Now, so, Doctor, including the vast quantity of

3    material that you have viewed over the years, together with

4    the research that you did and together with the Google

5    searches that you used, what is your best estimate as the --

6    as to the amount of material, sexually explicit material

7    available, particularly commercially, that depicts youthful

8    enough looking actors and actresses to be confused as minors,

9    compared with the amount of material of sexual images of that

10   kind that depict persons who are clearly above the age of

11   majority?

12   A    It is my opinion that the quantity of sexually explicit

13   expression, depicting persons who could be reasonably thought

14   of to be minors, based on their apparent ages versus the

15   quantity of sexually explicit expression depicting people who

16   are obviously adults is very small.

17   Q    Okay.  Now, we heard from Dr. Dines, who did her own --

18   actually, I guess she explained that her husband did some of

19   the same type of Google searches for her that she, then,

20   evaluated for her opinion.  And she used various Google

21   searches, including teen porn and what she called allied

22   terms, such as cheerleaders, daughter, a number of related

23   terms.

24        And ultimately, it was her opinion -- the best

25   opinion that she could come up with was that, on the question

1  of what percentage of the material out there is of youthful

2  looking enough people to be confused as minors compared to the

3  amount that would not be confused as minors, she came up with

4  about a third.  Now, do you have an opinion as to whether,

5  assuming that her data came up with a third of the images

6  falling into the category of teen porn or college type porn,

7  whether that would mean that all one third of that material

8  would be confusing?

9  A    Yes, I have.

10  Q    And what is your opinion on that?

11  A    My opinion is that of that one-third, only a very small

12  percentage would actually be confusing.

13  Q    And why is that?

14  A    Well, because the search terms would yield thousands, if

15  not millions, of images that would be, in fact, plainly

16  obvious as adults.  In addition to the variety of her -- for

17  example, entering the search term, daughter -- the variety of

18  Internet hits that would yield a variety of images that

19  wouldn't be considered pornographic at all.

20  Q    Now, but just taking her -- her one-third number, and

21  reducing that to the logical conclusion that if one-third is

22  confusing, then that would mean that two-thirds of the images

23  available commercially that depict sexually explicit images,

24  depict people who are obviously adults.  Do you have an

25  opinion as to whether or not you agree that the percentage

Dr. Linz - Direct (Mur)                                30

1    that falls into that category is at least two-thirds?

2    A    I do.

3    Q    And what is your opinion?

4    A    My opinion is that two-thirds, at least, is a reasonable

5    estimate of the amount of material that does not fall into the

6    possibly confusing category.

7    Q    Now, Doctor, you were last asked to estimate for us the

8    quantity of private sexual images that are shared by citizens

9    by various means.  Now, first of all, in -- in connection with

10   that question, can you tell us what the available technologies

11   are today for that kind of image to be transmitted from one

12   citizen to another on a personal basis?  What are the

13   technologies that would permit that?

14   A    Well, I think that generally the technologies can be

15   divided into several categories.  One -- one is the personal

16   communications that occur via, let's say, one's cell phone or

17   the medium of the telephone or what we once called telephone,

18   which might include Facebook and InstaGram and Twitter and a

19   variety of other sources, including, perhaps, other

20   communication sources like Skype which would be person to

21   person communications in, you know, essentially real time, but

22   not necessarily in which people are talking to each other,

23   communicating images to one another.

24            The -- the next form would be email.  Those would be

25   the -- the millions of messages, if not billions of messages

1  and attachments to those messages in the form of images or

2  files or files with images in them, that are communicated one

3  person to another or one person to many across the Internet.

4          And then the third might be what I might refer to as

5  the public or personal forums in which there are a number of

6  image and streaming -- video streaming services available

7  whereby people can specifically make their image and their

8  behavior -- sexually explicit behavior, in particular,

9  available to other adults throughout the United States.

10  Q    Now, if you would turn -- you have an Appendix B to your

11  report, do you not?

12  A    I do.

13  Q    And does that consist of data that my law associate

14  provided you as to searches that we conducted?

15  A    It does.

16  Q    And would you -- and did you take that data into account

17  in arriving at your opinion?

18  A    I did.

19  Q    And can you explain to the Court what that data

20  essentially is?  If you could summarize it without really

21  going over it line by line?

22  A    This is an examination of some of the video or image --

23  video streaming or image sites that I've referred to in the

24  final category of material, sites that are termed, for

25  example, "Adult Friend Finder" or "Horny Matches" or "Adam for

1    Adam", "X-Dating", "Adult Space", "Affairs Club", "Hook Up",

2    "Amateur Match" --

3    Q    And what are --

4    A    -- "Let's Bang", a variety of video streaming services in

5    which individuals post their own image and their own sexual --

6    sexually explicit depictions.

7    Q    And are -- and are those posted by just regular citizens?

8    A    Well, I don't know if they're citizens or not --

9    Q    Well, regular folk?

10   A    -- but they are pretty regular folk.

11   Q    Okay.  And are these posted in a commercial context or

12   just as a personal venue?

13   A    These are personal sites.  These are people that are

14   looking for other friends who have common sexual interests.

15   Q    And are they sexually explicit in many cases, these

16   images?

17   A    Yes, they are.

18   Q    And let me show you what has been marked as Plaintiff's

19   Exhibit 37 and ask you if you can describe what that exhibit

20   is?

21   A    This is the visual printout of many, if not all, of the

22   individual sites for sharing friend information of a sexually

23   explicit nature that is provided in the appendix.

24   Q    In your Appendix B?

25   A    That is correct.

Dr. Linz - Direct (Mur)                           33

1   Q     And have you reviewed the content of Plaintiff's Exhibit

2   37?

3   A     Yes, I have.

4   Q     And is that something that you're taking into account in

5   estimating your -- in giving us your estimate?

6   A     Yes, it is.

7   Q     Now, I want to show you what has been marked --

8             THE COURT:  Does he have to see all of those?  But

9   I'm sure he's looked at them before.

10            MR. MURRAY:  This is the hardest part of the

11  trial --

12            THE COURT:  Yes, you're right.

13            MR. MURRAY:  -- is getting this stuff to the Court.

14            THE COURT:  You're right.

15  BY MR. MURRAY:

16  Q     Showing you, and I'm not going to ask you to go through

17  it page by page, but showing you what has been marked as

18  Plaintiff's Exhibit 116, a five volume set of documents, is

19  that something that you reviewed --

20  A     Yes, it is.

21  Q     -- recently?  And -- and could you just tell the Court

22  what it is, without -- again, I don't want the -- all the

23  detail, but --

24  A     This is a pictorial examination of examples from each of

25  the sites that are listed in -- in Plaintiff's Exhibit 37.

1    Q     Okay.

2    A     This is a more detailed, graphic exhibition of each of

3    the -- many of the individuals.

4    Q     Yeah, it's not all of the sites, is it, on Appendix B?

5    It's just a --

6    A     No, it is not.

7    Q     Okay.  Now, Dr. Linz, taking all of the information into

8    account that you have described, including your own

9    professional experience over the three decades, the research

10   that you've done, the examination of the exhibits that you've

11   conducted, do you have an opinion, to a reasonable degree of

12   professional certainty, as to the quantity of private citizens

13   or private persons who post or share sexually explicit images

14   by one of the means that you have described for non-commercial

15   purposes, just for their own personal purposes?

16   A     Yes.  It is my opinion that millions -- tens of millions,

17   if not more, adult Americans exchange sex depictions and

18   images -- sexually explicit images by these means.  These are

19   not individual economic enterprises, but these are people who

20   choose to share their sexual interests with other persons.

21   Q     Now, in the images that you've reviewed, did you find

22   whether or not any of these people who are posting these

23   images, in the ones you viewed, put a 2257 label on their

24   images?

25   A     None of those images included 2257.

1    Q    Okay.

2              MR. MURRAY:  May I have one moment, Your Honor?

3              THE COURT:  Sure.

4         (Pause)

5              MR. MURRAY:  Your Honor, that's all I have, other

6    than I would offer into evidence Plaintiff's Exhibit 37,

7    excluding the report.  Well, we would take his report off of

8    it -- I'm sorry.  That's Plaintiff's Exhibit 38.  And then we

9    would offer Plaintiff's Exhibits 37 and 116.

10             THE COURT:  All right.  Admitted, without objection.

11             MR. BLADUELL:  Your Honor?

12             THE COURT:  Yes.

13             MR. BLADUELL:  We do have an objection to --

14             THE COURT:  To which one?

15             MR. BLADUELL:  -- Exhibit 37, the last documents

16   that he testified about.  We were planning to talk about that

17   later, after the examination -- examination.

18             MS. WYER:  And 116.

19             THE COURT:  All right.  Well, I'll withhold ruling

20   on 37.

21             MS. WYER:  And 116.

22             MR. BLADUELL:  Oh, and --

23             THE COURT:  What about 116?

24             MR. BLADUELL:  -- and -- yeah.  And Exhibit 116, as

25   well.

                              Colloquy                          36

1            THE COURT:  All right.  Can I just see 37 for one

2     second?  Well, the top of 37 is the declaration of William

3     Livingston, who, of course, has already testified.

4            MR. MURRAY:  No, Your Honor.

5            MR. BLADUELL:  Oh, no, Your Honor.

6            THE COURT:  Oh, no, he -- he did not --

7            MR. MURRAY:  That's our associate, who --

8            THE COURT:  That's your -- I'm sorry.  I'm confusing

9     him with --

10            MR. MURRAY:  And -- and at least, there's a

11     stipulation --

12            THE COURT:  -- I'm confusing that with Levington.

13            MR. MURRAY:  Yes.

14            THE COURT:  My mistake.  He's not -- okay.

15            MR. MURRAY:  There is, at least, a stipulation as to

16     the authenticity of all of those documents.

17            THE COURT:  Right.

18            MR. BLADUELL:  Correct.  Now -- yeah.

19            THE COURT:  All right.  Now -- okay.  Have any of

20     these already been used as exhibits or not?

21            MR. MURRAY:  No.  This was the first --

22            THE COURT:  I mean, the -- the attachments in here.

23            MR. MURRAY:  No.

24            THE COURT:  Okay.

25            MR. MURRAY:  No.  This was the witness --

1              THE COURT:  All right.  Well, I won't rule until you

2    have cross-examined him, and so -- let me just ask one

3    question or a couple of questions.  Have you -- it sounds

4    like, from your publications, that you've looked into the

5    issue of child pornography?

6              THE WITNESS:  That is correct, sir.

7              THE COURT:  Okay.  And you recognize that child

8    pornography is -- you know, possession of it is a crime in

9    most states and in Federal Government, correct?

10             THE WITNESS:  Yes, I do.

11             THE COURT:  Okay.  And are you also aware -- we've

12   had a lot of testimony in this case that people who were in

13   the adult entertainment industry generally -- or not

14   generally, at least all of the witnesses who appeared in this

15   case, universally agree that the performers in adult

16   pornography should be 18 or older, is that -- do you

17   understand that?

18             THE WITNESS:  Yes, I do, Your Honor.

19             THE COURT:  All right.  Do you agree with that?  I

20   mean, do you think that's a --

21             THE WITNESS:  Yes, I do, Your Honor.

22             THE COURT:  -- a good -- think that's a good

23   dividing line?

24             THE WITNESS:  I do, indeed, sir.

25             THE COURT:  Okay.  Now, you're aware of -- and I

Colloquy                                    38

1    forget, because -- and I know you said your specialty was sex

2    and the judiciary, but I didn't -- but you're not a lawyer, or

3    are you?

4              THE WITNESS:  No, Your Honor, I'm not a lawyer.

5              THE COURT:  All right.  Okay.  Now, do you -- are

6    you familiar, at all, with law enforcement efforts to

7    investigate and prosecute people who traffic in child

8    pornography?

9              THE WITNESS:  I am familiar through my research.

10             THE COURT:  Okay.  All right.  Now, do -- are you

11   aware of the statutes involved in this case, which we've been

12   referring to as 2257?

13             THE WITNESS:  Yes, I have reviewed them.

14             THE COURT:  And one part of that statute requires

15   people who are involved as producers of adult pornography to

16   keep photo documentation to secure and then keep photo

17   documentation records that their actors and actresses are over

18   18, are you aware of that?

19             THE WITNESS:  I am aware, sir.

20             THE COURT:  All right.  Do you think that's a good

21   rule?  Do you have an opinion as to whether that's a good rule

22   to prevent child pornography?

23             THE WITNESS:  I understand why the rule has been

24   implemented.  Are you asking about whether I feel it's over

25   burdening?

                              Colloquy                              39

1              THE COURT:  Well, you can tell me whatever you think

2       about it.

3              THE WITNESS:  I think that the -- I think that, in

4       theory, the -- the rule, when originally conceived, might have

5       been useful.

6              THE COURT:  Okay.  All right.  Now, you had -- in

7       one of your Google search statistics, you indicated that teen

8       porn, the term, teen porn, got a return of 136,000,000, is

9       that correct?

10             THE WITNESS:  That is correct.

11             THE COURT:  And then when you put in porn, 18 year

12      old, you got a return of 78.4 million, is that correct?

13             THE WITNESS:  Well, it sounds correct, Your Honor.

14      I may have to review that.

15             THE COURT:  Well, can you review it right now?

16             THE WITNESS:  Yes, I'm looking at it.  That was for

17      the term, again, that -- porn, 18 years old?

18             THE COURT:  Yes.

19             THE WITNESS:  Yes, Your Honor, 78,000,000.

20             THE COURT:  78.4 million.  And when you had used the

21      word, teen pron, P-R-O-N, you got 28.6 million, right?

22             THE WITNESS:  That is correct, Your Honor.

23             THE COURT:  Okay.  Now, do you see -- based on your

24      expertise and your experience, do you see any significance to

25      the fact that by using the word -- by using the word, teen

Colloquy                                    40

1  porn, as opposed to porn, 18 year old, and teen pron, that you

2  got significantly higher hits, that is, you got approximately

3  double of what you got from porn, 18 year old by making the

4  term, teen porn?

5            THE WITNESS:  Do I note any significance there?

6            THE COURT:  Yes.

7            THE WITNESS:  Or with -- perhaps, is that

8  percentage, the 136 million versus the 78 million --

9            THE COURT:  It's not a percentage; it's a number.

10           THE WITNESS:  Or that -- that ratio --

11           THE COURT:  Yes.

12           THE WITNESS:  -- is that of --

13           THE COURT:  Right.

14           THE WITNESS:  -- of interest to me?

15           THE COURT:  Yes.

16           THE WITNESS:  I would have to think about it.  It

17  could -- could be of interest.

18           THE COURT:  Well, does it indicate to you, in any

19  way, that the use of the word teen is attractive to people who

20  are interested in looking at pornography?

21           THE WITNESS:  Yes, it does.

22           THE COURT:  All right.  Do you have any other

23  evidence on that topic from your experience and research?

24           THE WITNESS:  Regarding what --

25           THE COURT:  Use of the word teen, T-E-E-N?

1              THE WITNESS:  What I've reported here, Your Honor.

2     Nothing in addition to what I've reported here.

3              THE COURT:  You mean just the number of hits?

4              THE WITNESS:  Yes, that is --

5              THE COURT:  All right.  Thank you.  All right.

6     Cross-examine?

7                          CROSS-EXAMINATION

8     BY MR. BLADUELL:

9     Q    Good morning, Dr. Linz.

10    A    Good morning.

11    Q    Dr. Linz, this is not the first time that you have

12    testified on behalf of the adult industry, correct?

13    A    That is correct.

14    Q    You had -- in fact, in the vast majority of cases where

15    you have offered expert testimony before, you have testified

16    on behalf of strip clubs and other adult businesses that were

17    challenging a law or regulation, correct?

18    A    That is correct.

19    Q    And generally, in those cases, the Government had adopted

20    a regulation and citing as justification the secondary effects

21    of these adult businesses, and -- correct?

22    A    That is correct.

23    Q    And you came in, and you offered -- you testified, and

24    you offered the opinion that the Government studies citing the

25    secondary effects were flawed, correct?

1    A    Yes, that is correct.

2    Q    And you concluded that these adult businesses generally

3    do not have the alleged secondary effects that the Government

4    claimed, correct?

5    A    Well, more precisely, my claim is they are no better or

6    no worse, often, than other businesses in the community.

7    Q    In fact, one of your articles is titled, as mentioned in

8    your CV, "Government Regulation of Adult Businesses Through

9    Zoning and Entering Nudity Ordinances: Debunking the Legal

10   Myth of Negative Secondary Effects", correct?

11   A    That is correct.

12   Q    And in some of these cases that you've previously

13   testified, Mr. Murray was the lawyer representing the adult

14   businesses, correct?

15   A    That is correct.

16   Q    Now, Dr. Linz, in the cases that you've testified before,

17   you were not qualified by the Court to offer an opinion on the

18   prevalence of child pornography, correct?

19            MR. MURRAY:  Objection, Your Honor.  It assumes that

20   there was an issue that required a Court to rule on whether he

21   was qualified for that.

22            MR. BLADUELL:  Well, Your Honor, this goes --

23            THE COURT:  Can you rephrase the question?

24   BY MR. BLADUELL:

25   Q    In the -- in the cases where you testified before, there

1   was no issue about the prevalence of child pornography,

2   correct?

3   A    Generally, that is correct, yes.

4   Q    And you were not qualified by the Court to offer an

5   opinion in those cases about the prevalence of child

6   pornography?

7   A    Well, they weren't cases about child pornography.

8              THE COURT:  All right.  I think he's answered that.

9   BY MR. BLADUELL:

10  Q    And you were not qualified in those cases by the Court to

11  offer an opinion on the prevalence of young looking performers

12  in Internet pornography, correct?

13             THE COURT:  Well, that's the same thing as child

14  pornography, I think.  He --

15             MR. BLADUELL:  Well -- okay.  I'll move on.

16             THE COURT:  I mean, if -- I think he's qualified as

17  an expert.  I mean, I don't know what relevance it is as to

18  what he testified to in prior cases.

19             MR. BLADUELL:  Well, the fact that the issues were

20  different than in this case.

21             THE COURT:  Yes, but I'm not interested in his

22  opinions in other cases.  I'm interested in his opinion in

23  this case.

24             MR. BLADUELL:  Right.

25             THE COURT:  Go ahead.

1    BY MR. BLADUELL:

2    Q    Dr. Linz, you've also submitted, previously, a report on

3    behalf of the Free Speech Coalition, correct?

4    A    That is correct.

5    Q    Approximately eight years ago, you submitted a report

6    prepared -- arguing that there was no relationship between the

7    presence of adult businesses and crime and other secondary

8    effects in the community, correct?

9    A    It was a review of studies had been undertaken by

10   ourselves and others on the relationship between adult

11   businesses and secondary effects.

12   Q    And you were provided compensation by the Association of

13   Club Executives?

14   A    That is correct.

15   Q    And that's a trade organization for strip clubs?

16   A    They own a variety of adult entertainment associations or

17   entertainment venues, I should say.

18   Q    Okay.  Well, let's go to the topics that you were asked

19   to testify about in this case.  One of them was the quantity

20   of sexually explicit expression depicting adults versus the

21   quantity of child pornography, correct?

22   A    That is correct.

23   Q    Now, before doing research for this report that you

24   submitted in this case, you had not conducted research on the

25   quantity of sexually explicit expression depicting adults

Dr. Linz - Cross (Bla)                    45

1    versus the quantity of child pornography, correct?

2    A    Well, I have authored a chapter in child pornography and

3    then -- and a peer reviewed article on virtual child

4    pornography, and that caused me to examine this question.

5    Q    But my question was, on the specific issue of the -- of

6    comparing the quantities, you had not focused on that in your

7    previous articles, correct?

8    A    That is correct.

9    Q    Now, the other topic that they ask you to offer an

10   opinion about was the proportion of child pornography that

11   depicts older adolescents, correct?

12   A    That is correct.

13   Q    And you had not previously conducted research on this

14   specific issue on the -- of the quantity of this type of

15   pornography, correct?

16   A    That is correct.

17   Q    And you have no publications on this topic either,

18   correct?

19   A    Well, again, I do have publications in the area of child

20   pornography, and --

21   Q    But on the quantity?

22   A    But the quantity, no.

23   Q    Now, aside from child pornography, with it just 18 and

24   below, they also ask you to offer an opinion on the quantity

25   of pornography depicting adults that could be confused as

1    minors, correct?

2    A    That is correct.

3    Q    And on this specific topic, about the quantity of this

4    expression, you had not conducted a study of -- of that

5    proportion before, correct?

6    A    Not before, no.

7    Q    Now, they also ask you to render an opinion on the

8    quantity of private, non-commercial sexually explicit

9    expression, for example, sexting on cell phones, posting on

10   adult websites, home produced erotic videos and photos, erotic

11   fan fiction, attachment to emails, et cetera, correct?

12   A    That is correct.

13   Q    And you had not previously conducted research on this

14   specific issue, correct?

15   A    That is correct.

16   Q    And you have never attempted to quantify the amount of

17   sexual expression through sexting, correct?

18   A    That is correct.

19   Q    Now, you offer some estimations on the proportions of

20   child pornography to pornography and proportions of teen

21   pornography to pornography in general, correct?

22   A    That is correct.

23   Q    And we saw that Appendix A of your report, which is

24   Exhibit 195, contains search terms for different types of

25   terms, correct?

1   A    That is correct.  Did you refer to that as Exhibit --

2   it's Exhibit 38, right?

3   Q    I think it's -- yeah, it's a different number of -- so

4   Plaintiff's Exhibit 38 --

5   A    That is correct.

6   Q    -- Appendix A?

7   A    Yes.

8   Q    And just -- just so the record is clear, you didn't type

9   in these words yourself in Google, correct?

10  A    No, I did not.

11  Q    This is something that Jeffrey Douglas from the Free

12  Speech Coalition did, correct?

13  A    That is correct.

14  Q    And then he provided you the pages -- the first page of

15  each search result, correct?

16  A    That is correct.

17  Q    And you didn't see the other pages that were -- that were

18  the results of those searches, correct?

19  A    That is correct.

20  Q    And when you typed in the terms, teen porn or teen pron,

21  there were no quotation marks around that term, correct?

22  A    That is correct.

23  Q    Now, when you got the results -- when you got those

24  pages, you didn't actually go into Google to verify that the

25  number of results for each page were -- were accurate,

1    correct?

2    A    Accurate in what sense?

3    Q    That they were the same numbers.

4    A    No, I did not.

5    Q    Now, if we go to Appendix A, and we go to the search that

6    you conducted for porn, we see that there are approximately

7    1.3 billion sites in the search results, correct?

8    A    That is correct.

9    Q    Now, this search contains a lot of different sites, not

10   only sites that contain images of pornography, correct?

11   A    That is correct, yes.

12   Q    There are sites here that could contain no images of

13   pornography, correct?

14   A    There would be some sites that would contain --

15   Q    Okay.

16   A    -- for example, reports or newspaper articles or other

17   forms of information regarding --

18   Q    And books -- books about pornography?

19   A    Those would come up, as well.

20   Q    Perhaps, your articles, talking about -- discussing

21   pornography would be included?

22   A    Hopefully so.

23   Q    Blogs talking about pornography would be included in

24   these 1.3 billion pages, presumably?

25   A    Yes, less frequently, but they could be included.

1   Q     And -- and you know -- do you know the proportion -- you

2   don't know the proportion of books related to pornography that

3   are included in this search, correct?

4   A     Are you referring to books that don't contain images, per

5   se, for entertainment purposes or as personal exchange, but

6   are scientific or other commentary?

7   Q     Correct.

8   A     No, I can not.

9   Q     You don't know that --

10           THE COURT:  Your universe is what you would call

11   images of sexually explicit activity, is that right or no?

12           THE WITNESS:  Yes, I think that that's an accurate

13   description.

14           THE COURT:  All right.  So if, like, if a painter

15   just painted nudes like Renoir did, you wouldn't include that?

16           THE WITNESS:  Well, in -- if --

17           THE COURT:  Or would you?

18           THE WITNESS:  -- if you type the word porn in, it

19   has been my experience that Renoir is not included.

20           THE COURT:  Okay.

21           THE WITNESS:  Or that nudes are not included.

22           THE COURT:  Okay.

23           THE WITNESS:  Typing in the term --

24           THE COURT:  Now, how about Robert Mapplethorpe?

25   He's a photographer --

1            THE WITNESS:  It --

2            THE COURT:  -- famous photographer who took pictures

3    of nude men and women?

4            THE WITNESS:  -- it is possible that those would be

5    included, both, as images and in reference to the obscenity

6    prosecution that he was involved in or that --

7            THE COURT:  Well, why would he be included and

8    Renoir would not be?

9            THE WITNESS:  Because there has been the allegation

10   that the material that Mapplethorpe has been involved with

11   would -- has -- has been obscene.  So there's a lot of

12   commentary, for example, on that.  There's also the case that

13   these are images that are sexually explicit.  And many people

14   may find them, in fact, to be entertaining and would be

15   included in a variety of venues other than Mapplethorpe's

16   catalogue.

17           THE COURT:  Right.  Well, you would -- would you

18   include a picture of a nude man or woman just standing alone,

19   say, full body -- full frontal nudity to be obscene?

20           THE WITNESS:  Would I consider that?

21           THE COURT:  Yes.

22           THE WITNESS:  Well, I'm not a --

23           THE COURT:  Or is it in your -- is it included in

24   your data?

25           THE WITNESS:  It's -- it's --

1          THE COURT:  Would that be -- would you consider that

2    sexually explicit, to include it in the data?

3          THE WITNESS:  I -- I would consider it -- I would

4    certainly say it comes up in the data.  Whether or not I

5    consider it to be sexually explicit, I think that full frontal

6    nudity would be sexually explicit, yes.

7          THE COURT:  Okay.  Just a single man or a single

8    woman, just standing there and being photographed nude?

9          THE WITNESS:  It would depend on the context of, you

10   know, so that it could, of course, be an artistic production.

11   I don't want to, necessarily, get into it, because I'm not

12   qualified to do so.

13         THE COURT:  No, I'm just asking you whether that

14   kind of material is included in your database?

15         THE WITNESS:  I would say, generally not.

16         THE COURT:  All right.

17   BY MR. BLADUELL:

18   Q    But just -- just so that there is no confusion, you --

19   you used this 1.3 billion hits for porn, correct, in your --

20   in your division?

21   A    Yes.

22   Q    And those -- those pages that are tagged with porn could

23   include pages that have no images, correct?

24   A    That is correct, but these are -- but these are meta tags

25   that people apply.  And generally, someone dealing in a

1   Picasso or -- or in a Renoir are not going to tag the material

2   as porn.  Okay.

3   Q    So but I could -- I could put up a page on Google and tag

4   it as porn, correct?

5   A    That is correct.

6   Q    And that page could contain no images, correct?

7   A    That is correct.

8   Q    It could -- it could be a news report.  It could -- it

9   could be a book, correct?

10  A    That is correct.

11  Q    And that would be included in that division that you did,

12  correct?

13  A    That is correct.

14  Q    So this is -- the proportions that you're calculating are

15  not proportions of only actual images of sexually explicit in

16  nature, correct?

17  A    Well, that is correct.  It's for both the denominator and

18  the numerator.  So whatever --

19  Q    All right.  For --

20  A    -- whatever problems occur here, occur in --

21        THE COURT:  Let me just ask another -- if I can

22  understand this.  If there was a page titled porn stars, and

23  it had a face of a porn star, but no -- nothing else, just a

24  facial photo, that would be included, correct?

25        THE WITNESS:  That would be included, yes, Your

Dr. Linz - Cross (Bla)                                53

1   Honor.
2                THE COURT:  All right.  Okay.
3   BY MR. BLADUELL:
4   Q    Now, we -- you also offered the opinion that child
5   pornography is a very small proportion of the overall
6   pornography market, correct?
7   A    That is correct.
8   Q    And the primary basis for your conclusion was the
9   division of Google hits, correct?
10  A    Well, I'd say that I rely on three things.  One is my
11  personal scientific experience over the 30 years.  The other,
12  research conducted by others, including Dr. Finkelhor, whose
13  work I rely upon, and then the ratios that -- that I have
14  through my Google -- through these Google searches have
15  formed.
16  Q    Okay.  But you -- you put -- in your report, you put the
17  specific conclusion that 99 percent of commercial pornography
18  sites involve adults, rather than children, correct?
19  A    That is correct.
20  Q    And that 99 percent, the primary basis for that was the
21  division of -- of Google hits that show that .002 was child
22  pornography, correct?
23  A    That is correct.
24  Q    Okay.  And just to be clear again, to arrive at your --
25  at your proportions, you didn't actually review all of the

Dr. Linz - Cross (Bla)                    54

1    sites that showed up in the Google hits, correct?

2    A    Well, I reviewed everything that is included in Exhibit

3    116 in the -- the appendix to Exhibit 38.

4    Q    And I'm asking about the Google hits.  You didn't review

5    the Google hits, correct?

6    A    Only those that were provided on the first page --

7    Q    On the first page?

8    A    -- did I review -- yes.  Did I look at additional -- no,

9    I did not.

10   Q    Okay.  Now, you were talking about child porn -- the

11   search that you conducted for child pron, that's in Exhibit

12   38, Appendix A, page 12.  And you said that you conducted

13   pron, because putting in child porn could have some

14   consequences for you, because child porn is illegal, correct?

15   A    That is correct.

16             THE COURT:  No, no, I thought he said -- it was more

17   than that.  I thought he said that Google won't execute a

18   search for child porn --

19             MR. BLADUELL:  Okay.

20             THE COURT:  -- because Google knows it's illegal,

21   just like everybody else does.  So if you write in child porn,

22   you'll basically -- they will -- nothing will happen, is that

23   correct?  If you -- but you don't know for sure, because you

24   didn't do it.

25             THE WITNESS:  I do not know for sure, because --

1          THE COURT:  Well, that's my understanding.

2          THE WITNESS:  -- I don't like to enter that search

3    term.

4    BY MR. BLADUELL:

5    Q    Okay.  Well, see here in Appendix A, that below the

6    results, it says, "Results for child" -- "Including results

7    for child porn", correct?

8    A    That is correct.

9          THE COURT:  I'm just curious, have you ever asked an

10   FBI agent to do that?  I mean --

11         MR. BLADUELL:  Oh, no.  No, Your Honor, we haven't.

12         THE COURT:  -- I mean, they could do it as a matter

13   of investigation, but I've read, in other context, that if you

14   put in child porn, Google will not execute the search, nor

15   will any other search engine.

16         MR. BLADUELL:  Okay.

17         THE COURT:  Go ahead.

18   BY MR. BLADUELL:

19   Q    But, of course, if -- if someone has a page containing

20   child pornography, that person has a strong incentive not to

21   tag the page as containing child pornography, correct?

22   A    The -- the person would not tag the page as child

23   pornography?

24   Q    The person would have an incentive not to tag it as child

25   pornography, because child pornography is a serious crime,

1    correct?

2    A    Well, I -- I don't think that the person would, in fact,

3    use this form of communication.  I think that it would

4    probably be peer to peer, and there would be a number of terms

5    that are used there, familiar to consumers of child

6    pornography.

7    Q    Okay.  Let's assume that someone has a page that's

8    available through Google, correct, about pornography, correct?

9    And that person is going to, for some reason, include images

10   of child pornography.  That person has an incentive not to tag

11   that page with the term, child pornography, because it would

12   be discoverable that that person could have child pornography

13   there, correct?  You agree with that?  It's a --

14   A    I don't know about incentive.  That is -- is difficult

15   for me to -- I think that -- I'm willing to assume that most

16   people are interested in avoiding breaking the law.

17              THE COURT:  Well, let me just ask you this, because

18   I and most other Federal judges have child pornography cases,

19   and they are always computer related, so a lot of times the

20   way the evidence is found is because they have put in a search

21   term that they have heard through the grapevine or from others

22   that is a way to access child pornography.  Have you -- were

23   you aware of that yourself or not?

24              THE WITNESS:  Yes, I am, Your Honor.

25              THE COURT:  Okay.  All right.  So it's not -- and

1    it's not necessarily the term, child porn.   There are other

2    search terms that these people who want to find child

3    pornography have learned to employ that will get them to a

4    site where they can look at child pornography.   Are you aware

5    of that?

6                 THE WITNESS:  Yes, I am, Your Honor.

7                 THE COURT:  All right.   Now, I don't know where you

8    want to go with that, if anything.   I just wanted to make that

9    clear that you -- that the way I --

10                MR. BLADUELL:  Well, I --

11                THE COURT:  -- the way I heard, from these cases, is

12   that you can get child pornography on your computer, if you

13   want it, and you use other search terms.   But using child porn

14   won't get you -- will be rejected.

15   BY MR. BLADUELL:

16   Q    But you -- you would agree with me that not every page

17   actually containing child pornography would result in this --

18   would show up in this result, correct?

19   A    Would there be pages with child pornography that would

20   not show up in such a search?  Yes.

21   Q    In fact, this -- this calculation that you made for child

22   porn would not include the pornography that is available

23   through peer to peer networks, correct?

24   A    I would say for the most part, no.

25   Q    Now, your opinion is that there is a very small

Dr. Linz - Cross (Bla)                    58

1   percentage of child pornography in commercial pornography, is

2   that correct?

3   A    That is correct.

4   Q    And in your report, you rely on statements by Kenneth

5   Lanning, correct?

6   A    That is correct.

7   Q    And Kenneth Lanning is a former FBI agent?

8   A    That is correct.

9   Q    And you're -- you're relying on his report from 1992?

10  A    That is correct.

11  Q    That's more than 20 years old?

12  A    That would be my calculation.

13  Q    And at the time that you relied on his statements, you

14  didn't know that Mr. Lanning had published a report in 2010,

15  correct?

16  A    That -- that is -- when I relied on the '92 statements,

17  that is correct.

18  Q    Okay.  And your -- in your report, you rely on Mr.

19  Lanning to make a distinction between commercial pornography

20  and homemade pornography, correct?

21  A    That is correct.

22  Q    And that distinction does not take into account the

23  effect that the Internet has had on the distribution of child

24  pornography, correct?

25  A    I -- I don't know Mr. Lanning's most recent conclusions.

Dr. Linz - Cross (Bla)                          59

1   Q    Well, let me show you Exhibit 195.  Exhibit 195 is a

2   study titled --

3              MS. WYER:  194.

4              MR. BLADUELL:  I'm sorry, yes, 194.

5              MR. SWINTON:  Thank you.

6              THE COURT:  194?

7              MR. BLADUELL:  194.

8   BY MR. BLADUELL:

9   Q    This is a study entitled, "Child Molesters and Behavioral

10  Analysis for Professionals Investigating the Sexual

11  Exploitation of Children", correct?

12  A    That is correct.

13  Q    And if we go to the second page, this is a fifth edition,

14  2010, Kenneth Lanning, former Supervisory Special Agent,

15  Federal Bureau of Investigations?

16  A    That is correct.

17  Q    Now, the report that -- that you used is the one from

18  1992, a previous version, correct?

19  A    That is correct.

20  Q    Now, if we go to the next -- page 82 of this exhibit, we

21  see, at the top, when he's talking about commercial versus

22  homemade --

23  A    Yes, I see that.

24  Q    -- that he says, "Child pornography can be divided into

25  two subcategories.  They can take commercial and homemade",

1    correct?

2    A    That is correct.

3    Q    And that's a statement that you incorporated into your

4    report?

5    A    That is correct.

6    Q    But you did not incorporate the second statement, "The

7    distinction between these subcategories, however, has become

8    increasingly unclear with online production and distribution",

9    correct?

10   A    That was not included in his '92 report.

11   Q    And if we go to the last paragraph of this page, and we

12   concentrate on the middle sentence, it says, "Although

13   commercial child pornography is not openly sold in brick and

14   mortar stores anywhere in this country, homemade child

15   pornography is continually produced, swapped and traded in

16   almost every community in the United States, primarily via the

17   Internet", and if we -- correct?

18   A    That is correct, yes, sir.

19   Q    And if we go to the last sentence of this paragraph, it

20   says, "There is, however, a connection between commercial and

21   homemade child pornography.  Often, homemade child pornography

22   is sold or traded and winds up on commercial child pornography

23   websites or in magazines, movies and videos.  These visual

24   images are often reproduced and circulated again and again,

25   sometimes for profit", correct?

1    A    That is correct.

2    Q    Now, you also said that you relied on studies by Dr.

3    Finkelhor and Janis Wolak, correct?

4    A    That is correct.

5    Q    And you are aware that Janis Wolak testified in this

6    case?

7    A    Yes, I am.

8    Q    And you believe that those studies are credible?

9    A    I -- I admire her work very much.  I think she's a pretty

10   good scientist.

11   Q    Now, you said -- when talking about the proportions of

12   teen pornography to pornography, you said that there are going

13   to be websites included in there that don't have any images,

14   correct?

15   A    That is correct.

16   Q    But we know that there are some websites included in this

17   search that are going to have primarily images, correct?

18   A    They will have images.  The notion, primarily, is

19   difficult, but there will -- there will be images with it,

20   yes.

21   Q    Okay.  Well, let's take, for example, one of the -- if we

22   go to 130 -- Exhibit 38, and we go to the -- the search for

23   teen porn.  That's page 14.

24   A    Uh-huh.  Yes.

25   Q    The first -- the first hit in there is PornHub, correct?

Dr. Linz - Cross (Bla)                                    62

1    A    That is correct, yes.

2    Q    Now, you're familiar with the website, PornHub, correct?

3    A    I am.

4    Q    I mean, that website primarily has images of a sexually

5    explicit nature, correct?

6    A    That is correct.

7    Q    That website is not going to have books about

8    pornography?

9    A    That, I might quibble with.  It -- that website runs very

10   deep, and there may, in fact, be publications associated with

11   pornography accessible through that site.  But the problem is

12   always that there additional links that can be accessed

13   through PornHub, and at what point do you not call it PornHub

14   anymore?

15   Q    Okay.  But -- but in the main site of PornHub, you

16   wouldn't expect to see scholarly articles discussing

17   pornography, correct?

18   A    That is correct.

19   Q    It's going to be mostly, 95 percent images, correct?

20   A    It's going to be primarily images, yes.

21   Q    Okay.  Now, if we -- PornHub is a website that you use

22   for your -- for your research, correct?

23   A    That is correct.

24   Q    You often begin with PornHub, and then you continue onto

25   the pages that are linked through PornHub, correct?

Dr. Linz - Cross (Bla)                          63

1   A     That is correct.

2   Q     Redtube is another website like PornHub that has millions

3   of -- thousands of primarily images, correct?

4   A     Yes.  Red -- red, R-E-D-T-U-B-E.  Redtube, yeah.

5   Q     Now, if we go to Appendix B of your report, Plaintiff's

6   Exhibit 38, we see a table in Appendix B, and you testified

7   that this table was provided by someone from Mr. Murray's

8   office, correct?

9   A     Yes, that was --

10  Q     You didn't create this?

11  A     -- William Livingston.  No, I did not.  He -- he created

12  that.

13  Q     Okay.  Now, if we go to -- if we go to the page --

14  there's one page in here that PornHub is included, correct?

15  A     That is correct.

16  Q     And it says that there is video categories in PornHub?

17  A     That is correct.

18  Q     And one of the video categories is MILF?

19  A     That is correct.

20  Q     And next to MILF, there's a number of 6,974?

21  A     That is correct.

22  Q     And that's primarily images, correct, associated with

23  MILF?

24  A     Yes, that's my assumption.

25  Q     And there is another category called, Mature?

1   A    That is correct.

2   Q    And there's a -- and that -- that category has 2,019

3   images, correct?

4   A    Correct.

5   Q    Now, if we go to the second line, there's a category for

6   teen in here in PornHub, correct?

7   A    That is correct.

8   Q    And that has 16,800 images, correct?

9   A    That is correct.

10  Q    Which is more than MILF and Mature combined, correct?

11  A    That is correct.

12  Q    Now, do you agree with me that PornHub is a commercial

13  site, correct?

14  A    Primarily, yes.

15  Q    And you would also agree with me, Dr. Linz, that there's

16  -- there's no question that teen porn is extremely popular,

17  correct?

18  A    Correct.

19  Q    Now, let's talk about the opinion on the amount of

20  private communications.  You -- you testified that the mediums

21  on which sexually explicit material could be transmitted are

22  -- are many, correct?

23  A    That is correct.

24  Q    Including Facebook, Twitter, InstaGram, image boards,

25  streaming videos, correct?

1    A    That is correct.

2    Q    Now, through -- through all of these mediums, you can

3    also transmit child pornography, correct?

4    A    That is correct.

5    Q    Any --

6    A    Well, in -- in the case of Facebook, for example, they --

7    they -- my investigation suggested they are continually

8    screening for that kind of material, as do many of the other

9    larger sites.  However, through an email, for example, it

10   might be quite possible to disseminate the material.

11   Q    Any -- any medium that could be used to transmit an adult

12   image -- an adult sexually explicit image can be used to

13   transmit child pornography, correct?

14   A    Directly, yes.

15   Q    Now, you say, relying on Appendix B, that there are many

16   images sexual in nature being transmitted by people in these

17   sites, correct?

18   A    Yes, that is correct.

19   Q    You -- you don't know the proportion of the -- of the

20   images that are transmitted, you don't know the proportion

21   that are only sexual intercourse, correct?

22   A    That are only sexual intercourse?  I -- I -- depending on

23   how that defined, no, I have not conducted such a count.

24   Q    And you do not know the proportion that it's only

25   masturbation, correct?

Dr. Linz - Cross (Bla)                              66

1    A     That is correct.

2    Q     And you don't know the proportion that it's only the

3    showing of breasts, correct?

4    A     That is correct.

5    Q     And you don't know the proportion that could be just

6    images of cleavage, correct?

7    A     That is correct.

8    Q     You don't know the proportion that it could be people

9    kissing, correct?

10   A     That is correct.

11   Q     And we -- we don't know the proportion of images that are

12   only sent to one other person, correct?

13   A     That -- that is correct.

14   Q     Now, are you aware that in some of these sites, it is

15   possible to make money out of sending sexually explicit

16   depictions?

17   A     I would say that that's possible, but for the most part,

18   these are personal communications.

19   Q     But we don't -- so we don't know the proportion of people

20   that are making money out of these sites, correct?

21   A     That is correct.

22   Q     Now, you -- you also testified about Facebook, correct?

23   A     That is correct.

24   Q     And you have a Facebook account, correct?

25   A     I do, but I -- I only have my son and daughter as

1    friends.

2    Q    Okay.  But you -- are you familiar that in Facebook, you

3    can put a picture on your wall, correct?

4    A    That is correct.

5    Q    And that picture will be seen by your friends, if you

6    have your settings for that images to be seen by your friends,

7    correct?

8    A    That is correct.

9    Q    But you also know that Facebook has a function for you to

10   send messages to individual people, correct?

11   A    That is correct.

12   Q    And you can attach images to that, correct?

13   A    That is correct.

14   Q    And if someone sends one picture through Facebook to his

15   wife, for example, no one else was going to -- is going to see

16   that depiction, correct?

17   A    Theoretically.

18   Q    Dr. Linz, you -- your opinion is that a very small

19   percentage of pornographic images available online contain

20   depictions of individuals that could be confused as minors,

21   correct?

22   A    Correct.

23   Q    And you draw this conclusion from the proportions that

24   you conducted of teen porn to porn, correct?

25   A    That's one of the sources, and my personal scientific

1    experience and other people's research.

2    Q    Now, I just want to be clear, you're not suggesting, Dr.

3    Linz, that people who are 18 -- not only people who are 18 and

4    19 years old depicted in teen porn could be perceived as

5    minors by the viewers of the images, correct?

6    A    I'm not sure that I understand the question.

7    Q    You're not suggesting that only the people that are 18

8    year olds and -- well, let me -- let me just take a step back.

9    You agree with me that in teen porn, in that genre, it's

10   primarily devoted for people around the ages of 18, 19,

11   correct?

12   A    18, 19, yeah, I would say so, in that area.

13   Q    Okay.

14   A    20.

15   Q    20?  And you're not suggesting that only those people 18

16   to 20 depicted in teen porn or that genre are the only ones

17   that could be confused as minors, correct?

18   A    They -- I don't know.  I -- I'm still unclear on the

19   question.

20   Q    Okay.  People over 20 --

21   A    Maybe -- state in the affirmative, maybe, rather than

22   in --

23   Q    Okay.  People -- people over 20 could be -- that are

24   depicted in teen porn images could be confused as minors,

25   correct?

1   A    Not so likely.

2   Q    You -- you would not agree with me that some -- some

3   people over 25 could be confused -- could be perceived as

4   minors by the viewers?

5   A    It's possible, but it's a very small percentage.

6   Q    I mean, you're -- you are aware of research that

7   demonstrates that models in teen pornography, barely legal

8   pornography who are 25 years and older, can be perceived as

9   substantially younger than 18, correct?

10  A    I -- I'm aware of the fact that there is an attempt to

11  make them look young, but whether or not they are perceived as

12  such, I -- I have my doubts about it.

13  Q    Okay.  Well, in fact, Dr. Linz, you testified that you

14  authored a study that was -- an article that was, "The Effects

15  of Exposure to Virtual Child Pornography on Viewer Cognition

16  and Attitudes Towards Deviant Sexual Behavior"?

17  A    That is correct.

18  Q    And you were co-author with Bryant Paul?

19  A    That is correct.

20  Q    Well, let me show you -- and you can see it in front of

21  you, correct?

22  A    That is correct.

23  Q    And this study, in the first paragraph, you say, "Virtual

24  child pornography includes two distinct yet related forms of

25  sexually explicit content.  The first of these involves

1    computer generated images in which a child's head is digitally

2    placed onto the body of an adult who is involved in some form

3    of sexually explicit conduct.  The second type of virtual

4    child pornography involves depictions of adults over the age

5    of 18, the age of legal consent in the United States, who are

6    portrayed as being younger than 18 years of age.  This genre

7    is often called "barely legal" pornography because models

8    appear to be under or just barely over the age of legal sexual

9    consent."

10           Now, if we go to page three of your article, the

11   section called "Cognitive Schemas and Barely Legal

12   Pornography", you report, here, in your article, that "Barely

13   legal pornography contains depictions of females who, despite

14   appearing to be under the legal age of sexual consent, seem

15   particularly sexually suggestive or promiscuous.  Though in

16   reality the models in these depictions are at least 18 years

17   old, previous research reported in the alcohol literature has

18   demonstrated that models who are 25 years old or older can be

19   perceived as substantially younger than 18 by media

20   consumers."

21   A    That is correct.

22           MR. BLADUELL:  I have no further questions at this

23   time, Your Honor.

24           THE COURT:  Redirect?

25           MR. MURRAY:  Yes, just a few, Your Honor.

1                        REDIRECT EXAMINATION

2    BY MR. MURRAY:

3    Q    Dr. Linz, you were asked questions about whether the 1.36

4    billion hits for porn could include hits that do not relate to

5    particular images, correct?

6    A    That is correct.

7    Q    Some of them could relate to articles, for example?

8    A    It's possible, yes.

9    Q    Okay.  Is the same true, though, when you take the search

10   term, teen porn?  Will that also yield some hits that don't

11   include images?

12   A    Yes, it would.

13   Q    Okay.  So whatever the effect is, it will -- it will be

14   an effect on both the numerator and the denominator?

15   A    That is correct.

16   Q    Now, you were mentioning that there are search terms that

17   are used by people to access child pornography.  You remember

18   that testimony?

19   A    Yes, I do.

20   Q    Okay.  And is that -- is that on peer to peer networks

21   that you're referring to or other --

22   A    I am referring, primarily, to peer to peer networks.

23   Q    Okay.  The other thing that I wanted to ask you about is

24   the 2010 Lanning article that you were shown.  You hadn't seen

25   that before, correct?

1   A     No, I had not.

2   Q     But you did see and cite the works by Janis Wolak,

3   correct?

4   A     That is correct.

5   Q     And Ms. Wolak testified in this courtroom and -- and I

6   think her testimony was that she agreed that -- that a very

7   substantial majority of the child pornography that was

8   produced is of people who are either related, acquaintances or

9   known to the -- to the perpetrator.

10            MR. BLADUELL:   Objection.

11  BY MR. MURRAY:

12  Q     Do you agree or disagree?

13            THE COURT:   Overruled.

14  BY MR. MURRAY:

15  Q     Do you agree with that?

16  A     Yes.

17  Q     Okay.  Now, in terms of the question on the private

18  images, you indicated that the websites that you referred to

19  in your report and that are depicted in Plaintiff's Exhibit 37

20  and 116, do not include 100 percent of images that are

21  sexually explicit, is that correct?

22  A     Do not include 100 percent of --

23  Q     That 100 percent of --

24  A     -- all possible sexual --

25  Q     No.  There are images that are posted on those -- on

Dr. Linz - Redirect (Mur)                    73

1    those sites.  Not every single image that is posted on those

2    sites is sexually explicit?

3    A    That is correct.

4    Q    Okay.  What is -- is there a -- can you estimate the

5    quantity, though, in terms of millions or not of sexually

6    explicit images that are posted on those sites?

7    A    My estimate is there are hundreds of millions.

8    Q    Okay.

9              MR. MURRAY:  That's all I have.  Thank you.

10             THE COURT:  Recross?

11                       RECROSS-EXAMINATION

12   BY MR. BLADUELL:

13   Q    Dr. Linz, you're aware that Ms. Wolak testified that in

14   sites like Friend Finder, you could have -- she has found 13

15   and 14 year olds that are posing as 18 year olds?

16             MR. MURRAY:  Objection, Your Honor, that is not

17   accurately reporting what she said about that.

18             THE COURT:  Well, do you -- well, who are you

19   referring to?

20             MR. BLADUELL:  Janis Wolak.

21             THE COURT:  Well, you don't know what -- have you

22   read her report?

23             THE WITNESS:  I have read a previous report. I don't

24   know what she testified to, however.

25             THE COURT:  All right.  Well, I'll allow you to ask

Dr. Linz - Recross (Bla)                    74

1    -- do you understand the question?

2              THE WITNESS:  Not exactly, but perhaps you could try

3    again.

4    BY MR. BLADUELL:

5    Q    Okay.  Are you aware that Janis Wolak, through her

6    research, found that 13 and 14 year olds had accounts in

7    Friend Finder and were posing as people over the age of 18.

8    A    I do not doubt that that occurs.

9              MR. BLADUELL:  No further questions, Your Honor.

10             THE COURT:  Okay.  Thank you.  All right.  Thank you

11   very much, Dr. Linz.

12             THE WITNESS:  Thank you, Your Honor.

13       (Witness excused)

14             THE COURT:  Okay.  All right.  That's all the

15   testimony we have for today, right?

16             MR. MURRAY:  It is, Your Honor, yes.

17             THE COURT:  Okay.  Now, what I would like -- I

18   assume you're -- you're looking forward to going home today

19   for the weekend, and I'm -- so I'm not going to take a lunch

20   break.  What I would like is about 20 minutes to get my notes

21   in order, and then I'm going to come back, and I'm going to

22   give you my initial impressions of the various witnesses and

23   testimony that I have been presented with.  And then we're

24   going to give you your written list of questions for -- for

25   you to think about for a closing argument.  Okay.

1          And now, this -- the findings that I make, this will

2     be the one part of this whole trial where I think having a

3     written record would be useful.  So I'm going to order for one

4     week delivery.  If anybody wants it more quickly than that,

5     you're going to have to order it and pay for it.  That's our

6     standard turn around time.  But I'm going to ask for a written

7     record of the findings that I am going to make, so you can

8     have that.  Okay.  So we'll resume, like, around 12:15.  Thank

9     you.

10          (Recess, 11:48 a.m. to 12:18 p.m.)

11          THE COURT:  Okay.  Have a seat, please.  All right.

12     The first thing I want to say is, I want to compliment

13     counsel, as I have tried to do throughout this case on very

14     outstanding preparation under tight deadlines and very

15     expeditious and efficient presentation in Court, and I thought

16     everybody -- all of you were very professional and well

17     prepared, and you had ironed out a lot of issues about

18     admissibility of exhibits and things like that, which judges

19     always appreciate.  And I -- but that one raises the last

20     question about that one exhibit you wanted to raise an

21     objection to.  Was it P-37?

22          MR. SWINTON:  That's right, Your Honor.  It's

23     Plaintiff's Exhibit 37 and also 116 and 42.  I think we wanted

24     to point out for the Court a difference between the screen

25     shots which are contained in that exhibit versus the screen

1    shots that defendant are trying to admit.  The screen shot --

2              THE COURT:  Well, 37 is the one in that big booklet

3    that Dr. Linz referred to, right?

4              MR. MURRAY:  Yes.  Do you want me to hand it up,

5    Your Honor?

6              THE COURT:  No, I looked at it.

7              MR. SWINTON:  The screen shots that defendants have

8    offered -- that we intend -- that we intend to move into

9    evidence, without a sponsoring witness, are offered just for

10   the mere fact that these screen shots were taken from certain

11   websites.  On the contrary -- or in contrast, the screen shots

12   exhibit offered by plaintiffs in the exhibits we just

13   referenced are offered for truth content.

14             So, for example, they have cited -- or provided

15   articles on sexting, where a relationship coach has been

16   interviewed and talks about how his or her clients are

17   engaging in textual or the sending of text messages or images

18   in relationships.  And it's -- from the briefing before trial,

19   it appears that plaintiffs are offering this to demonstrate

20   the prevalence of sexting, for example, or the prevalence of

21   the use of certain adult-themed websites to exchange --

22             THE COURT:  Right.

23             MR. SWINTON:  -- images.  So we object to the use of

24   those exhibits for -- for those purposes.  We object on the

25   grounds of relevance and also on the grounds that they

1   hearsay.

2            THE COURT:  All right.  Well, there's certainly

3   hearsay in it, but I don't think it's admitted for the truth

4   of the matter asserted.  I mean, there's a lot of promotional

5   material in there and things like that, but I'm going to admit

6   it for just so the plaintiffs can have a reference of a lot of

7   material that's available on the Internet, and that's either

8   explicitly sexual depictions or -- or references to that,

9   things like that.

10           MR. SWINTON:  Okay.  And -- and we understand that,

11  Your Honor, and in exchange, we'd ask that -- that you also

12  admit the screen shots that we've offered as exhibits.

13           THE COURT:  Well, I'll admit them, too.  They also

14  have some deficiencies in terms of what they may depict or not

15  depict, and a lot of them are very sketchy, but I'll admit

16  them into evidence, but I think they have low weight in terms

17  of the issues that are involved here.

18           MR. SWINTON:  Okay.

19           THE COURT:  Okay.  Thank you.

20           MR. MURRAY:  There are a couple of other exhibits.

21           THE COURT:  Yes.

22           MR. MURRAY:  We can take them up now or later,

23  whichever is --

24           THE COURT:  Yes, are there still issues?  Let's do

25  it first.

1        MR. MURRAY:  Yes.  We wanted to introduce

2   Plaintiff's Exhibit 42, which is a declaration of an agent by

3   the name of Kristi Witsman, with certain exhibits.  She was a

4   Government agent who did a study of, actually, Adult Friend

5   Finders for purposes of the <u>Connection</u> case.  And it was

6   introduced into evidence by the Government and by stipulation,

7   and we would propose that her information is admissible under

8   801, for example.  It's an -- you know, it's an admission by a

9   party.

10       THE COURT:  Well, why isn't it -- you say her

11  declaration was admitted by stipulation?

12       MR. MURRAY:  Yes, yes.  And -- and --

13       THE COURT:  Well, then it would be -- it would be

14  part of the evidence.

15       MR. MURRAY:  Yes.

16       THE COURT:  Okay.

17       MS. WYER:  That --

18       MR. MURRAY:  No, not -- by stipulation in the -- in

19  a different case, not this case.

20       THE COURT:  Oh.  Do you object?

21       MR. MURRAY:  In other words, Your Honor, what

22  happened is, she was hired by the Federal Government when we

23  were litigation the <u>Connection</u> case that --

24       THE COURT:  Oh.

25       MR. MURRAY:  -- that led to the Sixth Circuit.  And

1    one of the issues was the extent to which --

2            THE COURT:  What's the number?

3            MR. MURRAY:  42.

4            THE COURT:  And what's her name again?  Sorry.

5            MR. MURRAY:  Kristi Witsman.  And one of the issues

6    in that case was the extent to which the people who personally

7    posted images on Adult Friend Finders, what their age range

8    was.  And she did an analysis of that, and -- and it turns

9    out, I think, there's about 90 -- 97 percent of the people

10   were at least 21 years of age or older.  And so, we wanted --

11   we seek to admit into evidence the Government's own study that

12   they offered through --

13           THE COURT:  Can I look at that?

14           MR. MURRAY:  Yes.

15           THE COURT:  Is it back -- it's probably back here,

16   but I haven't looked through these boxes yet.  All right.

17   Does the Government object to this?

18           MR. SWINTON:  Your Honor, these are the -- we

19   object, again, because this is offered to show the prevalence

20   of the use of these websites to exchange private, non-

21   commercial images.  And again, we don't think that that's what

22   this declaration shows.  So we object to the use for which

23   they're intending to admit that.

24           THE COURT:  Well, of course, this declaration was

25   taken in 2005, which is eight years ago.  All right.  Well,

Colloquy                                        80

1    are you objecting because it's hearsay or it's old or it's not

2    relevant or all of the above?

3               MR. SWINTON:  On relevance grounds.

4               MS. WYER:  All of the --

5               THE COURT:  What?

6               MS. WYER:  All of the above.

7               MR. SWINTON:  Well, all of the above, but mostly on

8    relevance grounds.

9               THE COURT:  Well, Mr. Murray, I think you have a lot

10   of other testimony about the prevalence of this and about the,

11   you know, percentages of different things.  The problem I have

12   with this, this is like several hundred pages long, and you

13   know, all the witness -- all this declarant is doing is

14   attaching images from the Adult Friend Finder website, is that

15   correct, and then she's making a calculation?

16              MR. MURRAY:  Yes, she made some calculations to

17   determine what percentage of the images that she found were of

18   persons who were either 18, 19 or 20, and what percentage were

19   over the age of 21, and she concluded that the overwhelming

20   majority, 95 -- between 94 and 97 percent were of persons who

21   were over the age of 21.

22              THE COURT:  All right.  I'll admit just the

23   declaration, but I mean, the -- I don't think the exhibits

24   need to be part of the record.

25              MR. MURRAY:  That's fine, Your Honor.

Colloquy                                                   81

1              THE COURT:  All right.

2              MR. MURRAY:  The other exhibits that we would offer

3     are 34, 35 and 36, which I don't think the Government is

4     objecting to.  That's simply the prior version of the reg, the

5     current version of the reg and the statutes.

6              MS. WYER:  Well, those are simply legal materials.

7     They're not really factual exhibits.  I'm not sure --

8              THE COURT:  Yes.  That's -- yes.

9              MR. MURRAY:  I mean, I don't care one way or the

10    other, but --

11             THE COURT:  No, they shouldn't be marked as

12    exhibits.  You can use them or give me copies.

13             MR. MURRAY:  We would offer Exhibit 39 is the U.S.

14    Census Table for 2010, Your Honor.  I don't know that there

15    was an objection to that.

16             MR. SWINTON:  No, no objection.

17             THE COURT:  Okay.  Admitted.

18             MR. MURRAY:  Then Exhibit -- Exhibits 114, 115 are

19    defendant's discovery responses.  I don't think there is

20    objections to those.

21             MR. SWINTON:  No objection.

22             THE COURT:  All right.

23             MR. MURRAY:  Exhibits 110, 111 and 112 and 113 are

24    also -- I don't know whether they object to those, but we

25    would offer those.

1              MS. WYER:  Which ones?  I mean --

2              MR. MURRAY:  112 through 115.

3              MS. WYER:  Plaintiffs did not identify which

4    exhibits they were going to offer so we're just looking at

5    them.

6              THE COURT:  When you said 112 -- 110 to 113.

7              MR. MURRAY:  I'm sorry, Your Honor, let me -- let me

8    back up.  114 and 115 now have been admitted without

9    objection.

10             THE COURT:  They're admitted.  They're the discovery

11   responses.

12             MR. MURRAY:  Yes.  112 is another discovery

13   response, so I assume there's no objection --

14             THE COURT:  All right.  So that will be --

15             MR. MURRAY:  -- to that.

16             THE COURT:  -- admitted also.

17             MR. MURRAY:  113 is data that they provided in

18   discovery concerning the -- how many 2257 prosecutions there

19   have been over the years.  I don't know whether they object to

20   that or not.

21             MS. WYER:  Well, we object on relevance grounds.

22             THE COURT:  No, I'll admit that.

23             MR. MURRAY:  And then 110 -- I'm sorry, 111 is the

24   Justice Department's report to Congress that was required by

25   2257.

1           THE COURT:  I'll admit that.

2           MR. MURRAY:  And then 110 was a letter from the

3    Department of Justice dated December 7, 2011 directed to a

4    Congressman who had inquired about the enforcement efforts.

5           THE COURT:  All right.  I'll admit that.

6           MR. MURRAY:  And then finally, Your Honor, 133 is --

7    I'm sorry, 132 is the thing we filed, oh, several days ago,

8    under Civil Rule 44, where we gave notice of foreign law,

9    because we did the research, and we discovered that the age of

10   consent for these purposes in Norway is actually 18.  And so

11   we would offer that -- you may recall there was that question

12   about --

13          THE COURT:  Yes, I recall.  All right.  It's

14   admitted.

15          MR. MURRAY:  And -- and I think that's all the

16   exhibits, Your Honor, that we had.

17          THE COURT:  Okay.  Where do we stand on getting the

18   set of documents that have been admitted?  Ms. Baumgardner?

19          MS. BAUMGARDNER:  As of -- as of Thursday, Your

20   Honor, they're all done behind you.  There are two sets.

21          THE COURT:  Oh, they're in the folders there?

22          MS. BAUMGARDNER:  Correct.

23          THE COURT:  Okay.  Thank you very much.  How about

24   the Government's?

25          MS. WYER:  We -- we -- I think we have our -- we

Colloquy                                                    84

1    also have exhibits we wanted to admit, Your Honor.

2              THE COURT:  You want to go through those now?  Where

3    are the ones that were admitted?  All right.  Okay.  Well,

4    just if you don't mind, when we're done, just put them in the

5    back here, okay, next to the plaintiff's exhibits.

6              MS. WYER:  We had Exhibit 40.

7              THE COURT:  Sorry?

8              MS. WYER:  Exhibit 40.

9              THE COURT:  Four, zero?

10             MS. WYER:  Yeah.

11             THE COURT:  Yes.

12             MS. WYER:  Yes.  I believe that's material from a

13   plaintiff's website and --

14             THE COURT:  Any objection?

15             MR. MURRAY:  Your Honor, I've got to find the right

16   list.  We have so many lists, Your Honor, with --

17             THE COURT:  Well, we can do this later or we can do

18   it Monday, if you prefer.

19             MR. MURRAY:  I found it.  Yeah, I didn't think we

20   had any objection to 40.

21             THE COURT:  All right.

22             MR. MURRAY:  That's just a Dodson exhibit, am I

23   right?

24             MR. SWINTON:  Right.

25             MS. WYER:  Yes, yes.

1            MR. MURRAY:  Yeah, well, that's fine.

2            MS. WYER:  Exhibits 63 and 64 which are screen

3    shots.

4            MR. MURRAY:  Yeah, we did not include that in our

5    list of objections.

6            THE COURT:  Well, I thought I admitted those just

7    before the recess?

8            MS. WYER:  88 which is also screen shots from a

9    plaintiff.

10           THE COURT:  All right.  Same ruling.  Admitted.

11           MR. MURRAY:  Yeah, we were fine with that.

12           MS. WYER:  Exhibit 91.

13           THE COURT:  Nine, one?

14           MS. WYER:  Yes.  That's also from a plaintiff --

15    91E.

16           MR. MURRAY:  That's fine.  We don't object.

17           MS. WYER:  91E -- 91E.

18           MR. MURRAY:  I'm sorry?

19           MS. WYER:  91E is the specific page we were moving.

20    And 116 and 117B and E.  Those are also from plaintiffs.  And

21    118E through I.  And --

22           MR. MURRAY:  No objection to any of those, Your

23    Honor.

24           THE COURT:  All right.  Admitted.

25           MS. WYER:  127, video covers from the Sinclair

1    Institute.  And then we have 137A, which is a document from a

2    plaintiff.

3              MR. MURRAY:  No -- no objections.

4              MS. WYER:  Then we have 160 through 172, which

5    are --

6              THE COURT:  150 to --

7              MS. WYER:  160 through 172, which are all images.

8              MR. MURRAY:  No objection.

9              MS. WYER:  And then, 192.  This is a document that

10   shows variation in how Google hits -- how Google search

11   results show up, that every day, you can get a different

12   number.  If you put in the same search term on a different

13   day, you would get a different number.

14             MR. MURRAY:  No objection, Your Honor.

15             THE COURT:  All right.

16             MS. WYER:  Then 223.

17             THE COURT:  Two, two, three?

18             MS. WYER:  Yes.

19             MR. MURRAY:  No objection.  I think it's already in,

20   to be honest with you, but no objection.

21             MS. WYER:  Okay.  And then 229 through 305, which --

22             THE COURT:  229 through --

23             MS. WYER:  305, and that comprises our --

24             THE COURT:  What are those?

25             MS. WYER:  -- screen shots.  Those are all screen

Colloquy                                      87

1    shots from --

2              THE COURT:  Oh, screen shots.  All right.

3              MS. WYER:  -- websites that plaintiffs have cited,

4    primarily.  If I misspoke, the exhibits for 117 are 117B and

5    C.  Is that what I -- I'm not sure what I said.

6              THE COURT:  You said 117B and E.

7              MS. WYER:  And -- oh, I meant C.

8              THE COURT:  C?

9              MS. WYER:  It's 117B and C, and then 118E through I.

10             THE COURT:  All right.

11             MS. WYER:  And that was all.

12             THE COURT:  All right.  Thank you.  All right.  If

13   there are any others, and you've missed them, we can cover

14   that on Monday.  All right.  Now, as I've started to say, I

15   compliment counsel on being very well prepared, and -- and

16   having this trial move smoothly.

17             The facts that I think are important here are ones

18   that I will indicate that I, you know, specifically mention,

19   but I can't make any claim that in the, perhaps, 30 minutes

20   that this might take that I'm going to include every fact that

21   I think is important, and I certainly reserve the right to

22   amend this, but I've been taking a lot of notes and reviewing

23   my notes almost daily, and coming, you know, to some

24   conclusions about what things are more relevant than others.

25             And then, that's what I'm about to do.  And I -- in

1    terms of credibility, I thought all the witnesses that

2    testified here were honest.  I mean, I don't think there's any

3    witness who was lying that I would disbelieve their testimony

4    completely.  But, as I go through the witnesses, I'm going to

5    indicate some areas where I thought that, either because of

6    their expertise or their background, that some of their

7    testimony deserves more weight than other things.

8              Now, you're not bound, of course, to agree with what

9    I say.  And if you think there are other things that I have

10   omitted, you are certainly welcome to include them in your

11   briefing.  And if you think I've made a mistake in my analysis

12   of a witness, you're certainly free to argue that, as well.

13             I'm going to make reference to the amended

14   complaint, and I want to particularly compliment plaintiff's

15   counsel for a very detailed amended complaint.  And it really

16   provided a guide and a road map to a lot of the testimony that

17   was, in fact, introduced.  There's a very high correlation

18   between the allegations in the amended complaint, going

19   witness by witness, and what the actual testimony was.

20             Now, initially, the lead plaintiff, the Free Speech

21   Coalition, is a bona fide trade association.  I think that it

22   has described itself and its memberships, in general, very

23   well in paragraphs 18 through 20.  The witness, Jeffrey

24   Douglas, who was called -- he's an attorney -- and is now the

25   president of Free Speech Coalition, I thought he had a lot of

1    expertise in the background of the industry, the legal

2    problems that the industry has faced, how they deal with them.

3          I think there is an intention by the organization,

4    itself, to be law abiding, to explain laws to its members, to

5    provide educational programs, to make sure that the people who

6    engage in conduct and in businesses covered by the adult

7    entertainment industry are advised of the law and that they

8    have -- are going to, you know, trouble and expense in

9    retaining counsel to bring this litigation and have, I think,

10   very sincere beliefs about what they do and what their members

11   do and why it's important.

12         In that regard, I want to say that I was very

13   impressed with the sincerity of all of the plaintiff's fact

14   witnesses and their desire to express themselves in matters of

15   sex, and that they are clearly exercising and expressing their

16   views and their practices in conformance with the First

17   Amendment.  And this aspect of their lives and their

18   livelihood deserves great weight.

19         I think it is very important that people recognize

20   that the concept of Free Speech and the First Amendment

21   applies to things much broader than just being able to get on

22   a podium and start talking about what you want to say or what

23   you want to think, and that it extends to the workplace.  It

24   extends to hobbies.  It extends to activities that not every

25   American finds of interest or, in fact, some Americans would

Colloquy                                      90

1    find very repulsive.

2              It is very obvious that the treatment of sex, the

3    depiction of sex -- of sexual acts in literature, in movies,

4    in art has changed dramatically over the last century and,

5    probably, very dramatically in the last ten years, largely as

6    a result of the Internet.

7              Sex is not only about entertainment.  It's also

8    about health.  It's about pleasure.  It's about procreation.

9    It's about fostering relationships between husbands and wives

10   or same-sex couples.  It's also about people who are dating or

11   have social relationships, and they don't know whether they

12   want to become married or they want to have a committed

13   relationship, and sex -- sexual activities give them a chance

14   to try that and let them decide for themselves whether they're

15   going to be compatible and whether they want to have a long-

16   term commitment.

17             The depiction of sex in both language and images

18   makes some very people very comfortable and other people very

19   uncomfortable.  A free society, in my view, should be able to

20   accommodate both.  Tolerance of the public display of sex is

21   changing.  And, as I said before, we now see things in

22   commercial movie theaters that never would have been tolerated

23   when I was a young lawyer, you know, in the '60s or the '70s.

24             We now have the rating system that the motion

25   picture industry has designed, and of course, they have R

1   movies that, supposedly, you have to be over 18 or accompanied

2   by an adult, and we all know that that is often violated.  The

3   movies that a lot of people in the adult entertainment

4   industry produce are not in regular commercial theaters, but

5   there are specialized theaters, but sometimes, they're rated

6   R, or I think there's another rating of Y or a rating of X,

7   and they might be sent into a commercial theater with a rating

8   like that, and they would have sexually explicit scenes.

9           And we all know, also, that the priorities of law

10  enforcement have changed.  The Supreme Court's own treatment

11  of pornography has changed.  It's my view that obscenity is

12  still a concept that is not covered by the First Amendment,

13  but that the definition of obscenity has changed dramatically

14  over the years.

15          And I made reference to this with one witness, and

16  I'll just mention it here in passing that a -- a very famous

17  work of literature like James Joyce's Ulysses was, at one

18  time, banned by the Government from entering the United States

19  until a district judge, I believe in the 1930s or maybe

20  slightly before that, overturned that ban and held that it

21  should be admitted.  So the Judiciary does have a role -- an

22  important role in guaranteeing the freedoms that our

23  Constitution promises to our citizens.

24          Now, at the same time, and I make reference to this

25  very briefly because the Third Circuit has, I think, covered

1   this completely, that child pornography is an evil practice,

2   and that Congress has gone to great lengths to ban it and to

3   make its possession or trafficking a very serious felony.  And

4   all of the witnesses that were called in this case, I think,

5   without any exception, agreed with that that child pornography

6   is something that deserves to be precluded from general --

7   from any kind of access, and that its possession and

8   trafficking is criminal.

9          And I think this case -- the record in this case

10  made one or two refinements in that by showing that, in child

11  pornography, there are two general categories.  One is the

12  very depictions of the sexual organs of very young children,

13  sometimes being manipulated or molested, and those are very

14  unnatural poses for a young child to be in.  And I think

15  that's, you know, the core of most of the child pornography

16  criminal prosecutions that Federal judges see.

17         But there's another aspect, and that is the

18  pubescent or young teens or pre-puberty teens.  And that is

19  also -- comes within the legal definition of child

20  pornography.  And in some instances, it touches upon some of

21  the testimony here in this case.  It's my tentative view that

22  child pornography is a type of obscenity that is still not

23  protected by the First Amendment, but I think that other adult

24  pornography is no longer considered obscene, at least as far

25  as it concerns human beings.  But when it involves children,

1    by definition under the age of 18, it is no longer adult

2    pornography.  It's then child pornography, and it's not

3    protected by the First Amendment.

4              In deciding and determining the weight to be given

5    to the testimony of the various witnesses, I am going to give

6    great weight to what their beliefs and practices were in their

7    personal activities and their personal practices with regard

8    to sex and their practices of sex.  And I also think it's

9    relevant, and this is just a general comment, that most of the

10   witnesses called by the plaintiff were involved in adult

11   pornography on a business -- in a business relationship kind

12   of way, that is, they were either performers or producers,

13   primary producers, secondary producers or if not producers,

14   they were then writing about adult pornography as part of

15   making a living.

16             There was one witness, my recollection, Barbara

17   Alper, who did testify to some personal depictions with a

18   gentleman who she had been in a relationship with and recently

19   married.  And I could be wrong about this, but I think her

20   testimony was the only one from the plaintiffs, from which

21   there was no economic involvement, no economic, either,

22   motivation or economic -- receipt of income, things like that.

23   And I think that there is some difference.

24             Now, I want to point out that a number of the

25   plaintiff's witnesses testified that they interacted with

Colloquy                                94

1    other people who did not have any economic motive, who -- and

2    for example, Betsy Dodson and Ms. Ross who testified that a

3    lot of the people that they interacted with, they had no

4    economic motive.  They didn't expect any money.  They didn't

5    want to get any money.  They were involving in the graphic and

6    explicit depiction of sexual activity out of pleasure or

7    because of their own First Amendment belief that it's

8    something that they thought was important for their

9    expression.

10         All right.  Now, with those general comments, I want

11   to go and talk about some of the individual -- or probably all

12   of the individual witnesses.  The first witness the plaintiffs

13   called was Eugene Mopsik, who is, I believe, the president or

14   executive director of the American Society of Media

15   Photographers.

16         Now, he had a great deal of experience, and I

17   thought was a very credible witness about how photographers

18   take their  work product, how they store it, how they keep it,

19   how that has changed in the digital age, as opposed to when

20   all photographers only used film.  But he was not personally

21   involved in sexually explicit photography, but I think there

22   were a number of things he said that would transfer over to

23   sexually explicit photography, such as the model release he

24   talked about that was common when photographers took pictures

25   of people.

1         And he also had some information as a result of

2    having taken a survey about photographers who did sexually

3    explicit work.  And as I recall, he said that there were about

4    400 out of his 7,000 members that do produce sexually explicit

5    images, which is a fairly small percentage of the membership.

6    But I thought his testimony was a good background.

7         The amended complaint discusses another individual,

8    Michael Barone, in paragraphs 23, 24 and 25, but he did not

9    testify, as nor did plaintiff, David Conners, paragraphs 26

10   and 27.  The next -- now, the next witness who was called, I

11   believe, was Ms. Wilson of Sinclair Institute.  Now, she was a

12   very knowledgeable person.  And the Sinclair Institute is

13   largely, if not totally, devoted towards sexually explicit

14   image productions and would qualify as both a primary and

15   secondary producer, I believe.

16        She talked about and described their work that it's

17   mostly for educating adults about sexual health and sexual

18   fulfillment, which of course, are valid things.  A lot of the

19   graphic images that were shown to her, either on direct or on

20   cross-examination, I thought showed that their work product

21   also had a commercial aspect that it was designed for people

22   who were interested in seeing sexual -- explicit sexual

23   activities on videos or on the Internet, and you know, I

24   thought that, as to those, any educational value was

25   secondary.

1          I reached that conclusion from some of the titles

2    that were used, which were titillating and designed to attract

3    customers who would pay to look at these because they had some

4    erotic -- they would have some erotic to them.  Ms. Wilson had

5    a very impressive recollection and knowledge of the details of

6    how these movies were produced.  A lot of the production

7    details were -- I thought were appropriately introduced to

8    give a good picture of how somebody goes about doing this,

9    what the various aspects of the business are, the production

10   of it, how you comply with 2257, some of the difficulties and

11   burdens in complying with 2257, the efforts that have to be

12   made and things of that nature.

13          She gave a lot of testimony about their desire to

14   stay law abiding by only using people 18 or older, but she did

15   testify that there was a lot of emphasis on youthful looking

16   performers and that she understood that they had to be over

17   18.  The one area of her testimony where I don't give great

18   weight was her describing the burden of the recordkeeping.  As

19   I recall, she indicated that she had made a calculation of

20   what the cost was in terms of her own time and how that

21   translated in her salary and the fact of some other people's

22   times who worked there.  And as I recall, she came up with a

23   figure of $75,000 a year.

24          I don't think that is a huge financial burden on a

25   company that had several million dollars of revenue, as she

1    also testified to.  And she didn't make any distinctions

2    between the cost of the regulation of complying with 2257, as

3    opposed to the cost of any other regulations that all

4    companies have that do business in the United States,

5    including paying taxes, hiring accountants to keep financial

6    records, complying with health laws.

7          Most businesses have to have a health inspection.

8    They have to have sanitary facilities.  They're subject to

9    local and state regulators coming in and making sure they have

10   handicap access, that they have bathrooms for the public.  All

11   sorts of things are being done in this country to insure the

12   health and welfare of our citizens.  And I do not find that

13   her testimony about the burdens of complying with 2257 to be

14   anything out of the ordinary.

15         I also thought her testimony about the recordkeeping

16   was vague, and she, I think, hesitated to admit that

17   electronic records were permissible.  And she finally, as I

18   recall, at the very end, admitted that yes, now, we're using

19   electronic records, but she still wouldn't admit that it was

20   easier.  She said it was still a burden.  And I think that is

21   something that I need to take into account.

22         So her testimony was covered in the description of

23   Sinclair Institute, which was paragraphs 31 and 32 of the

24   amended complaint.  There was no testimony from the C.I.R.

25   Distribution, which was paragraphs 33 and 34.  The next

1     witness, I believe, was Carol Queen.  She is described in

2     paragraphs 37 and 38.

3           She talked mainly, but not exclusively, about

4     masturbation as a sexual activity that she thought deserved

5     more attention, that giving people a -- strike that -- that

6     removing any onus of perversity or of criminality or anything

7     else about masturbation would be pro-health and helping people

8     come to deal with their sexuality and to decrease the stigma

9     that sometimes surrounds masturbation.

10          She had been involved in some movies and videos.

11    She had also put on web streaming masturbate-a-thons, which

12    were described in paragraph 38 of the amended complaint.  I

13    thought, in a general manner, that she was credible, and she

14    explained, in some detail, that 2257, by requiring people who

15    perform in her movies to document that they are 18 or over,

16    did -- and the fact that there were going to be records of

17    their activity deterred some people from being willing to

18    participate in the activities that she described, and that she

19    had no interest in hiring anyone that was under 18.

20          But she was forced, because of the law, to get

21    documentation of the people she did hire.  And because of that

22    requirement, some people were reluctant or unable to do so --

23    were reluctant or unwilling to give her their photo IDs

24    because it could possibly become publicly available, and they

25    wanted to keep their involvement in masturbation private.

1    That's what I understood was an important part of her

2    testimony.  The next witness -- and I think her testimony

3    deserves weight as an example of what some people might call

4    an unusual sexual expression, but a number of other people

5    find helpful in coming to terms with their own sexual

6    practices.

7           The next witness was David Steinberg.  He is

8    described in paragraphs 44 and 45 of the amended complaint.  I

9    thought what distinguished him and what he said was, he was a

10   photographer, and he is most interested in taking depictions

11   of ordinary people involved in sexual activities.  And he

12   compared this to a lot of the other video producers, the major

13   video producers, whose names we have in this record, who

14   produce the kind of videos that are often available on the

15   Internet for purchase, where they're primarily shooting very,

16   you know, well developed, beautiful sexual people, the women

17   who are very well developed, men who are, as well, muscular

18   and who have, you know, very good bodies in the colloquial

19   sense.

20          Whereas, he is much more interested in a wide range

21   of people, and I think he said that most people don't look

22   like all those porn stars, that most people have very much

23   more ordinary looks, but they have an interest in seeing

24   sexual activity among people who look like them, who don't

25   look like porn stars.  They look like ordinary people.  And he

1     has been committed to photographing these people and writing

2     about them.

3              And he thinks that this is something that is very

4     relevant and that is needed by ordinary looking people.  I use

5     that phrase not in any demeaning sense, but just to show a

6     physical distinction from the type of person who is in the

7     mainstream of sexually explicit videos.

8              The next witness was described in paragraphs 50 and

9     51 was Carlin Ross, and she was followed by Betty Dodson.  And

10    they are both -- they are business partners.  Betty Dodson has

11    been involved in sex, sex training, sex education for a much

12    longer than Carlin Ross, who is much younger, I think about

13    half the age of Betty Dodson.  And they testified about their

14    activities in sex education.  But the distinctive part of

15    their testimony was their discussing what they described as

16    the Genital Art Gallery.  And this is described in paragraph

17    51 of the amended complaint.

18             And this allows adults to submit photos of their

19    genitalia anonymously, and they were describing those for a

20    number of years, but they have stopped doing this.  They

21    thought it was important, and in some ways, their testimony

22    resembled -- their motivation resembled David Steinberg that a

23    lot of people feel that they can't engage in active sex

24    because they don't have attractive looking genitals.

25             And that they wanted to have this genital art

Colloquy                                    101

1   gallery to show that there are a lot of people who also have

2   genitals that are very ordinary looking or not particularly

3   unique that would be exposed in the usual adult movie, and

4   that they thought this was an appropriate part of sex

5   education and in interesting ordinary people in seeing these

6   photos so that ordinary people with ordinary genitals would

7   know they could have an exciting or a satisfying sex life

8   themselves.

9           And I feel that they showed that this was a very

10  relevant and valid expression of their First Amendment

11  interest in this topic, and their needing to feel the ability

12  to express themselves.  I believe they also testified that

13  they had had some problems because when 2257 came in and was

14  being enforced, that their insistence on getting photo

15  identification from people who sent in their genitalia met to

16  a lot resistence, and they had to eliminate a lot of their

17  images of genitalia that had been submitted anonymously.  And

18  they eventually closed down their Genital Art Gallery, I think

19  that I recall the testimony.

20          The next witness was Barbara Alper who is described,

21  generally, in paragraphs 35 and 36 of the amended complaint.

22  She testified to a lot of personal activity.  She is a

23  commercial photographer.  She also does fine art photography.

24  She also has a personal life in which she depicts herself and,

25  as I indicated earlier, a man with whom she had a relationship

Colloquy                                    102

1    and later married in photographs.  She had testified that a

2    number of the other people -- that normally the people she ran

3    across to, had -- had, sometimes, reluctance to appear in her

4    photography and her work -- her other artwork, because she

5    insisted on having their photo identification.

6         She testified that she -- that although she wanted

7    to comply with the law and always have people who were 18 and

8    over, but she couldn't always be sure that people she

9    photographed were over 18.  She testified to one activity

10   where she had an interest in photographing gay men engaged in

11   sexual activity on Fire Island, and she had done so, but she

12   didn't -- well, she was unable to comply with 2257 in doing

13   this, because she was just taking video -- I think it was

14   video, rather than still photos of men, and she didn't know

15   what their names were and didn't have the option of asking

16   them for an identification to show they were 18 or older.  She

17   thought they all looked over 18, but I think she agreed, on

18   cross-examination, that she could not be sure they were over

19   18.

20        And the next witness was Marie Levine, whose stage

21   name is Nina Hartley.  The corresponding paragraphs of the

22   amended complaint for her are 46 and 47.  She's had many years

23   of experience in the adult entertainment industry as both a

24   performer, as an educator, as an author.  She testified

25   credibly and broadly to her activities.  I believe that she

Colloquy                                                    103

1   was the only witness for the plaintiff who used a third-party

2   custodian to comply with 2257.  And she testified as to why

3   she did that.  It was some expense, but once again, I put low

4   weight to her -- and I'm not sure she complained about the

5   expense, but I don't put any high burden on somebody who is in

6   this business to make an income, to make a living, to earn

7   some money from it, as having to undergo expenses from the

8   recordkeeping or employing a third-party custodian.

9          And I certainly think that in this one instance,

10  comparing this to the dangers of child pornography, I think

11  the recordkeeping expenses are worth it.  That is a valid --

12  that it's not -- that it's not unconstitutional for Congress

13  to have set up a scheme that requires people who are in this

14  business to spend some money to keep records.

15         When we get to the questions, I'll ask the question

16  of whether as applied to purely personal activities whether

17  there should be a different test.  But for people who are in

18  the adult entertainment industry to make money, I do not

19  believe that this is any evidence that the law is

20  unconstitutional.  Now, the next witness is David Levington.

21  I sort of got off track there, because I meant to just be

22  factual findings.  But I just wanted to tell you, that's one

23  area where I think that there is no unconstitutional burden.

24         All right.  The next witness was David Levington.

25  He is described in the amended complaint in paragraphs 48 and

1    49.  He had, once again, a somewhat different professional

2    involvement than the other witnesses.  He was a photographer

3    who takes mostly photography for purposes of artistic use and

4    has -- he's a journalist by training.  But and then he worked

5    for the Government for awhile.  And he is most interested in

6    taking pictures of human beings in nature.  And we saw a lot

7    of his photographs, some of which are nudes.

8            And he takes, sometimes, 2,000 or 3,000 photos at a

9    shoot, and he feels that he is really not subject to 2257,

10   that he -- as I recall it, he does not photograph sexually

11   explicit activity.  And he did not think that photographing

12   nude women was subject to 2257.  But he was aware of 2257, and

13   I think he testified that that because of it, he had not taken

14   some pictures that he would like to take, but that could be

15   construed as subject to 2257.

16           So in that sense, the existence of the statute

17   chilled his -- what he thought should be his freedom of taking

18   any kind of photographs that he wants.  And he also didn't

19   want to be available for the 20 hour per week regulation about

20   recordkeeping.  So he had some problems with that, as well and

21   testified to those.

22           The next witness was Barbara -- no, wait.  Mr. Hymes

23   came in.  He's described at the beginning of the amended

24   complaint, 29 to 30, but my recollection is that he testified

25   somewhere in the middle.  I don't mean to omit him.  Let's

1   just talk about him for a minute.  Mr. Hymes is described in

2   29 and 30.  He's a journalist.  And he has a website, as well,

3   called "Daily Babylon".

4          And he was very critical of 2257, and he feels that

5   he can't afford the administrative costs to comply with it,

6   and therefore, he doesn't comply with it.  He does not,

7   normally, put visual depictions on his website, because he

8   doesn't want to violate 2257, but he would like to.  So he

9   really confines himself more to verbal descriptions.  And he's

10  afraid of criminal prosecution under 2257 and feels that it's

11  a great burden on him that curtails what he would like to be

12  doing on his website.

13         All right.  Now, we come to Barbara Nitke.  She is

14  described in paragraphs 41 and 42 of the amended complaint.

15  If I recall correctly, she was the last factual witness that

16  the plaintiffs called.  I thought she was a very credible

17  person and has also divided her work between artistic

18  photographs that are not sexually explicit and also some

19  sexually explicit conduct as depicted, including exhibition of

20  genitals, which she publishes on her website.

21         She testifies that she works out of her home, that

22  that's where she keeps her 2257 records, that the fact that

23  she has to be around for a possible inspection causes --

24  requires her to be home more than she would like.  She has

25  trouble going -- she has fears about going away, because if an

1    inspection were to come about suddenly, she wouldn't be there,

2    and she could be liable for prosecution.

3         She also had told about the problem that she has

4    with pre-1995 photos, as well as post-1995 photos.  And that

5    puts a burden on her, and she feels that she is not able to

6    function as freely and as openly as she would like to be

7    because of 2257.  She talked about how some of her work

8    involves sadomasochistic activities, and she's uncertain

9    whether that was covered by 2257.

10        She is the one witness that anyone asked about the

11   comparison between the recordkeeping required by 2257 and

12   other -- and tax records, and I'm the one who asked her those

13   questions.  And I think she was unable to or unwilling to

14   testify whether one was burdensome than the other.  But she

15   did explicitly and specifically say that she thought taxes

16   were appropriate.  She didn't mind paying taxes.  But she

17   thought 2257 was an infringement on her rights, and that she

18   did mind keeping the records about 2257.  And that was a

19   distinction that she brought out very forcefully.

20        Okay.  Now, let me say a few other things about the

21   FBI agents who testified for the Government.  As with the

22   other witnesses, I thought they were credible.  I thought they

23   described honestly what they were assigned to do and what they

24   did.  I thought that they had a very technical approach to

25   2257.

Colloquy                                                 107

1          They had this checklist, which, as I recall, they

2     did not prepare, but they -- they may have had some input into

3     it.  But they used it.  And it was nitpicking in a lot of

4     respects, in terms of -- and as I recall, there was only one

5     person they visited who didn't have any records who they

6     thought should have.  But there were a number of people who

7     did have the records.

8          And then they went through the records, and what I

9     would call the mainstream requirement of the record said,

10    having a photo and an ID of the performer, they had.  But

11    sometimes, they were critical of the photograph or critical of

12    some other small details relating to the photo ID that the

13    subject of the search was able to amend very quickly.

14         They agreed with me, a question I asked, that as

15    compared to searches by search warrants, such as drugs or

16    other evidence of crime and guns that, where FBI agents and

17    all law enforcement agents, who, with the search warrants, are

18    entitled to knock and enter immediately, because there's a

19    high risk of destruction, but there was no risk of destruction

20    with 2257 records.

21         And when I asked them whether there was any risk of

22    fabrication that could come about by giving someone advance

23    notice, I thought they said that that was remote.  There was

24    really no opportunity that if they were required to give 24-

25    hour notice, at least, they thought, and I think -- and I find

1   this a fact that there is little opportunity for anyone in

2   this business to fabricate these records, if they weren't

3   keeping them in the regular course of business.

4          There could be some opportunity for somebody to

5   organize them a little better or to go over them and, maybe,

6   cure some missing pieces, but to do wholesale fabrication with

7   24-hour notice, I think, is remote.  I think that the

8   inspection aspect of this case, which was not part of the

9   original complaint and is only brought about by the amended

10  complaint, is the most troublesome from the regulatory point

11  of view.  And you'll see when I come to the questions, I have

12  questions about the legal effect of having regulations which

13  are arguably overbroad, as opposed to a statute, which may or

14  may not be overbroad.  But that's something that can be

15  covered in the argument on Monday or in the briefing.

16         And I have -- well, let me pass that for the moment.

17  There is also some aspects of the FBI testimony, particularly

18  where individuals worked out of their home, as I recall their

19  testimony, there were a few individuals where the agents said

20  that when they went there, that is was a home, and as far as

21  they could see, the individual whose records were being

22  inspected, also worked out of the home.

23         And there were some examples from the photographs,

24  where they took photographs, where the photographs were of

25  private parts of the home that were not strictly limited to

1    where the records were.  Now, this may -- it's not clear to me

2    that this may have been where the FBI agents were taken by the

3    home owner.  Now, there was one home owner who had them look

4    at the records outside of his garage, his or her garage, as I

5    recall.

6           But there were other home owners who welcomed the

7    agents into their home, and I think in some instances, they

8    looked at them in a living room, but in other instances, they

9    were taken to another part of the home where photographs were

10   taken.  So I have some questions whether that raises any

11   burdensomeness or privacy concerns or other concerns that

12   should be covered by the argument.

13          Okay.  Now, dealing with the experts -- one second.

14   Okay.  Now, before I get to the experts, we've had a lot of

15   testimony -- well, some of what I'm about to refer to comes

16   from expert testimony.  We had a lot of testimony on two

17   topics -- well, really, three topics.  One is sexual activity

18   -- well, it's really two topics -- sexual activity that is

19   completely personal in nature.  The most obvious example of

20   this is husband and wife.  And the testimony has shown that

21   there are or could be husbands and wives who, for personal

22   reasons, want to take video of themselves having sex.

23          Now, as I understand 2257, if they did that in their

24   own home, and they kept it in their own home, and it had no

25   further distribution, I doubt that 2257 is applicable.  But if

1    they were to send it to a tube site to be put on Redtube or

2    PornHub, then arguably, 2257 is impacted.  That is, they would

3    have to supply a photo ID of themselves attesting that they're

4    over 18, even though it may be obvious that they're over 18.

5          And the tube site would have to put the 2257 notice

6    -- it's unclear to me -- but presumably, the husband and wife

7    may have to put the 2257 notice on their video before they

8    sent it to the tube site.  And for sure, it would be, then,

9    the tube site would have to put it on the video, but it may be

10   covered by the tube sites general 2257 notice.  I'm not sure

11   about that.

12         So that is one area of concern.  But there is

13   clearly evidence on the record that this is a fact, that this

14   -- this is happening, and not only happening with husbands and

15   wives, but it happens with committed couples, both gay couples

16   and heterosexual couples of various stages of commitment.

17   They may be living together.  They may be going steady,

18   whatever that means these days.  They may be engaged.  They

19   may just be exploring each other sexually to see if they want

20   to have a more permanent relationship.  But it exists.

21         The second area, which we've had a lot of testimony

22   about is the youthful looking person, and also -- and closely

23   related to that is the concept of the teen, T-E-E-N, because

24   by definition, a teen could be either under 18, that is, a

25   person 13 to 17 or they could be 18 or older, that is, 18 or

Colloquy                                                        111

1    19.

2              And just remembering what our witness this morning,

3    Dr. Linz, testified, one fact that he said that I thought was

4    relevant, and I'm only pointing this out in particular,

5    because it's so recent, is that when he did his statistics on

6    Google searches, and he compared, and he got -- and as I

7    recall his numbers -- well, I wrote it down.  Just a minute.

8    When he did teen, 18 or 19, he got, as I recall, 76 million

9    hits, but when he did -- no, he did porn, 18 or 19, he got 76

10   million hits, but when he did teen porn, he got double that --

11   almost double that amount.

12             Now, that, to me, is one fact of some in the record

13   that shows a great deal of usage of the word teen in the

14   promotion and the advertising of sexually explicit material by

15   tube sites, by video sites, by others, Sinclair Institute, as

16   well, who maintain that they're doing this, primarily, for

17   education and health.  But inferentially, I think that a lot

18   of the people who access their sites are doing it for their

19   erotic content, and I think the facts are obvious that the use

20   of the word teen is designed to attract people to view these

21   sites or to buy the videos because they're interested in very

22   younger looking performers.  And I think that is an important

23   fact in this case that cannot be ignored.

24             All right.  Now, I'm going to get to the experts.

25   All right.  Concerning Dr. Drouin, she was one of the early

1   witnesses here, D-R -- I'm not sure I'm pronouncing her name

2   right.  She was the young lady from Minnesota, I think, and

3   Dr. Zimmerman.  I thought their testimony was similar.  They

4   testified extensively to the growing and very high usage of

5   new computer devices, computer-related mobile devices, mobile

6   phones, iPads, other kinds of tablets that did not exist when

7   the statute was enacted, that enable people to send messages

8   to each other that have some sexual content.  And this is

9   generally referred to as sexting, S-E-X-T-I-N-G.

10          And they testified that based on their surveys and

11   their studies that this was a very prevalent activity among

12   young people and older people, as well, but also among young

13   people.  And I think they said that there was no way of

14   knowing how much of it was done by people under 18 or people

15   over 18, and that people who did this, even though they were

16   technically subject to 2257 that none of them were adhering to

17   it, that they were ignoring it.

18          What conclusions could be drawn from that, I'll

19   leave for the argument or the briefing.  I don't -- I found

20   them credible, but I am not sure what weight is attached to

21   that testimony, and because I think that this testimony is in

22   a different category than the testimony of the use of the word

23   teen and the use of young adult images that are in the other

24   types of sexually explicit adult entertainment, and that the

25   Third Circuit has said or shown that the 2257 is content

Colloquy                                    113

1    neutral and have instructed me to particularly pay attention

2    to the narrow tailoring prong of the unconstitutional as

3    applied test.

4           So it may be, but this is something I leave for

5    Monday, it may be that the plaintiffs take the position that

6    because we now have technology that allows millions of people

7    to be involved in sending sexually explicit, graphic images

8    that are subject to 2257, but they don't know about or care

9    about or pay attention to 2257, that that's another reason why

10   it should be struck down as unconstitutional as applied.

11   That's a question.  So I invite counsel to discuss that on

12   Monday.

13          As far as Dr. Linz is concerned and Ms. Wolak -- did

14   I pronounce that correctly -- who was a Government witness a

15   couple days ago, they testified, once again, to the prevalence

16   of this, as well.  They testified to -- I think Ms. Wolak, in

17   particular, testified to the -- from her point of view, the

18   attractiveness of the pubescent or pre-puberty young adult

19   that is under 18 to producers of pornography, and the -- and

20   that the danger of doing -- that 2257, as I recall her

21   testimony, served a strong value in requiring producers to

22   make sure that their performers were 18 or older, because

23   there was a lot of interest in using children under 18 who

24   were not sexually mature, but who were obviously prepubescent

25   and pre-puberty, and nonetheless, they were often targets of

1    producers, and that 2257 is valuable in that respect.

2         That, in my mind, is different from a lot of the

3    other testimony where we were talking about well developed --

4    sexually well developed children, that is, who were under 18

5    but could easily pass for being over 18, and therefore, 2257

6    served a value as to them by -- by producers being required to

7    make sure they were over 18, even though they looked over 18.

8         So we've got a legal -- what I see here is, we have

9    a legal barrier, so to speak, is 18 or above; it's 17 or

10   below.  On the day someone becomes 18, they become legal.

11   Before that, they're not legal.  And by the way, this reminds

12   me of a movie I saw.  I don't mean to digress, but it makes a

13   point.  It's the movie about Hustler magazine, the founder of

14   Hustler magazine that I saw.  It's an R-rated movie, and it

15   doesn't have any explicit sex, but it talks about explicit

16   sex.  And I think we all know that Hustler magazine portrays

17   explicit sex.

18        But in the opening scenes of the movie, the man who

19   -- and I'm blanking on the names here -- but the very well

20   known actor who plays the publisher of Hustler, before he

21   started Hustler is running a bar, and he has -- a young lady

22   comes in and wants to be a strip-teaser in the bar.  And he

23   asks her point-blank, you know, and the dialogue is very

24   colorful, as only Hollywood can make it, but he asks her very

25   point-blank, you know, I gotta know, are you 18, are you legal

1    age?  And she hems and haws and says, well, you know, I'm this

2    close, and she puts her two fingers up, you know, like it's an

3    itty bitty difference, like, maybe it's a day or two.  And I

4    think she says, at one point, well, before anybody finds out,

5    I'll be over 18, something like that.  I forget the dialogue.

6         But it points out both the problem for the producer.

7    It points out the legitimacy of the 18 or over rule.  It

8    points out the burden on people who want to do work that is

9    restricted to people over 18, and the enticement of doing it

10   because it could be a lot of money.  And the young lady in the

11   movie, I think she needed this job.  And being -- probably

12   being a stripper, because she had a very well -- she was very

13   pretty, had a very well developed body, that was probably, you

14   know, a very good -- probably be a very good, well paying job

15   for her, better than being a waitress or something else.  I'm

16   not sure she was ready to go to law school.

17        But that pointed -- I thought that graphically

18   pointed out the issue that I face in this case, you, as

19   advocates face, and the reviewing courts face and did face

20   before and sent back to me for exploring a record -- and for

21   making a record.  And that's what we've been doing.

22        The last witness is Dr. Dines.  Two points about Dr.

23   Dines.  I thought some of her statistics were valuable.  I

24   thought that her percentages had validity.  I thought they

25   made some valid points.  I thought that she was very biased

1   against the pornography industry, and I will take that into

2   account.  I think she made an improper assumption, in a lot of

3   her testimony that everybody who was in that industry was in

4   it to make money, and that economic motivation was the only

5   motivation, and I think that her feelings about that are

6   belied by the testimony.

7           Okay.  All right.  Now, I'm going to retire with my

8   law clerk, Sarah, and I'm going to go over my notes to see if

9   there's anything else I need to say.  I'm going to come back

10  in with my questions, which I am going to give you in writing,

11  and I'm going to file them.  They'll be of record.  And then

12  we're going to adjourn.  Okay.  Thank you for your patience.

13  Just give me another ten minutes.  Okay?

14          MR. SWINTON:  Thank you, Your Honor.

15      (Recess, 1:32 p.m. to 1:59 p.m.)

16          THE COURT:  Let's go on the record.  Okay.  Here are

17  the questions.  We're going to file them, so they'll be of

18  record.

19          MR. MURRAY:  Thank you, Your Honor.

20          THE COURT:  Now, what I was -- I'd like to start at

21  9:15.  There's only two witnesses.  And then I would like to

22  say that each side will have an hour for your argument.  Okay.

23  And maybe a little bit of time for you to put forth -- and

24  then maybe a little bit of time for you to start to -- and I'm

25  not sure we can cover all of these in an hour, but it's up to

1  you how you want to spend the hour, but you -- maybe we'll

2  have a briefing schedule.

3           Are you talking about briefs yet or --

4           MR. BLADUELL:  We did.

5           MS. WYER:  We would rather keep it --

6           THE COURT:  I don't need to know now, but you're

7  free to go first, the plaintiffs, and then the defendants,

8  only you get a shorter time frame for it.

9           MR. MURRAY:  We were suggesting to them, and so far,

10  maybe they don't want to, we thought maybe if we did

11  simultaneous briefs, and then each side get to reply to that,

12  it might even be a better way to --

13           THE COURT:  If that's what you want to do.

14           MR. MURRAY:  But I don't think we -- we don't have

15  an agreement on it, but we'll continue to talk, and if not,

16  we'll come up with a schedule and an agreement, unless you

17  would prefer the normal way.

18           THE COURT:  No, that's fine.

19           MR. MURRAY:  If your preference is that we do it;

20  they do it in reply --

21           THE COURT:  Yes, my -- my preference is that the

22  plaintiff would go first.

23           MR. MURRAY:  Then that's --

24           THE COURT:  And not just because you have the

25  burden, but --

1           MR. MURRAY:  That's what we'll do then.

2           THE COURT:  -- you had the -- you know, you are the

3      moving party on the record.

4           MR. MURRAY:  Then that's what we'll do.

5           MS. WYER:  Are we in agreement on that schedule,

6      then?

7           MR. MURRAY:  It's pretty good, but let us --

8           THE COURT:  Do you want to agree on page limits?

9      I'm not going to enforce page limits, but it might be a good

10     idea for you to agree on it, but I don't want to give you page

11     limits, and then have tiny type, and I'll need my magnifying

12     glass to read it.  Or you want to agree to a word limit?

13     Think about it.

14          MR. MURRAY:  We will, Your Honor.

15          THE COURT:  I don't normally put page limits, okay,

16     but I'd like it to be an hour each on the arguments.

17          MR. MURRAY:  Okay.  Thank you so much.

18          MS. WYER:  About the exhibits, we have a box that

19     has both the exhibits admitted before today and the ones we

20     just moved in.

21          THE COURT:  Yes.

22          MS. WYER:  But they're not in sequential order, like

23     for each -- each set of those are sequential, but they're not

24     all marked so --

25          THE COURT:  Well, I'd really rather have them in

1    sequential order.

2                    MR. MURRAY:  Right.

3                    MS. WYER:  So would you -- we could --

4                    THE COURT:  Even if you delay it until Monday.

5                    MS. WYER:  Okay.

6                    THE COURT:  All right.  I'd rather have them in

7    sequential order.

8                    MS. WYER:  Okay.

9                    THE COURT:  Have a very nice weekend.

10                   MR. SWINTON:  Thank you, Your Honor.

11                   MS. WYER:  Thank you, Your Honor.

12                   MR. MURRAY:  You, too, Your Honor.

13                   MR. BLADUELL:  Thank you.

14           (Proceedings concluded at 2:01 p.m.)

15                              * * *

16

17

18

19

20

21

22

23

24

25

1          **C E R T I F I C A T I O N**

2

3

4          I, Jacqueline M. Mullica, court approved

5    transcriber, certify that the foregoing is a correct

6    transcript from the official electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9

10

11

12    _____          June 20, 2013

13    JACQUELINE M. MULLICA

14    DIANA DOMAN TRANSCRIBING

15

16

17

18

19

20

21

22

23

24

25