UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


FREE SPEECH COALITION, INC.,      )
et al.,                           )   Case No. 09-CV-4607
                                  )
              Plaintiffs,         )
        vs.                       )
THE HONORABLE ERIC HOLDER, JR.,   )
in his Official Capacity as       )   Philadelphia, PA
Attorney General of the United    )   June 17, 2013
States, et al.,                   )   9:16 a.m.

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MICHAEL M. BAYLSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:          J. MICHAEL MURRAY, ESQUIRE
                             LORRAINE R. BAUMGARDNER, ESQUIRE
                             BERKMAN, GORDON, MURRAY & DEVAN
                             55 Public Square - Suite 2200
                             Cleveland, Ohio 44113-1949


For the Defendant:           KATHRYN WYER, ESQUIRE
                             HECTOR G. BLADUELL, ESQUIRE
                             JAMES J. SCHWARTZ, ESQUIRE
                             NATHAN MICHAEL SWINTON, ESQUIRE
                             U.S. DEPARTMENT OF JUSTICE
                             20 Massachusetts Avenue
                             Washington, D.C. 20530


Audio Operator:              NELSON MALAVE

Transcriber:                 DIANA DOMAN TRANSCRIBING
                             P.O. Box 129
                             Gibbsboro, NJ  08026
                             Phone: 856-435-717
                             Fax:   856-435-7124
                             Email: Dianadoman@comcast.net




Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

1                             I N D E X

2    WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

3    FOR THE GOVERNMENT

4    Dr. Biro            14(Bla)   44(Mur)   62(Bla)   69(Mur)

5      Voir Dire          3(Bla)

6    Dr. Stark           77(Swi)   96(Mur)  113(Swi)  115(Mur)

7      Voir Dire         71(Swi)

8    CLOSING STATEMENTS BY:                    PAGE

9      Mr. Murray                              123

10     Ms. Wyer                                149

11   EXHIBITS:                                 ID.    EVIDENCE

12   All Exhibits used in open Court                  122

1          (The following was heard in open court at 8:50 a.m.)

2                  THE COURT:  I hope you had a nice weekend.  Today

3     looks like our last day of trial.  So, once again, I

4     appreciate everybody being so prepared.  Please be seated.

5     And call your next -- now we're going to have -- the

6     Government's going to call two witnesses today?

7                  Mr. BLADUELL:  Yes, Your Honor.

8                  THE COURT:  All right.  Let's go.

9                  Mr. BLADUELL:  The Government calls Dr. Francis Biro

10    to the stand.

11                 THE CLERK:  Raise your right hand,

12                 FRANCIS BIRO, GOVERNMENT WITNESS, AFFIRMED

13                 THE CLERK:  Please state your full name for the

14    record, spelling your last name.

15                 THE WITNESS:  Francis Michael Anthony Biro, B-I-R-O.

16                 THE CLERK:  Thank you very much.

17                 THE COURT:  Janice -- one second.

18         (Pause)

19                 THE COURT:  Go ahead.

20                        VOIR DIRE EXAMINATION

21    BY MR. BLADUELL:

22    Q     Good morning, Dr. Biro.

23    A     Good morning.

24    Q     Dr. Biro, could you tell us where do you work?

25    A     I work at Cincinnati Children's Hospital Medical Center.

1   Q     And can you briefly describe your educational background?

2   A     Undergraduate was at Drexel, medical school was at

3   Harvard Medical.  I completed a combined residency in internal

4   medicine and pediatrics at the University of Rochester.  And I

5   did a fellowship in adolescent medicine at Boston Children's.

6                THE COURT:  What kind of medicine?

7                THE WITNESS:  Adolescent medicine, sir.

8   BY MR. BLADUELL:

9   Q     And are you Board Certified?

10  A     I am Board Certified in internal medicine, in pediatrics

11  and in adolescent medicine.

12  Q     And what is your position at the University of Cincinnati

13  Children's Hospital?

14  A     So at the Children's Hospital, I'm the director of

15  adolescent medicine.  And at the University of Cincinnati I'm

16  a professor of pediatrics.

17  Q     Okay.  And how long have you been the director of the

18  Division of Adolescent Medicine?

19  A     On and off, approximately 10 years.  In the past -- in

20  the immediate past, six to seven years.

21  Q     How long have you been a professor at the University of

22  Cincinnati?

23  A     I believe I've been a professor probably 16 or 18 years.

24  I'd have to look at my CV to be exact.

25  Q     Well let's go -- it's Exhibit Number 173.  Attachment A.

1  Is on the screen in front of you is that an accurate -- is

2  that your CV?

3  A    Yes, it is.

4  Q    Okay.

5  A    Fourteen years a professor.  Thank you.

6  Q    Okay.

7         Mr. BLADUELL:  Your Honor, I move to admit Exhibit

8  173A, just that part.

9         THE COURT:  Admitted.

10  BY MR. BLADUELL:

11  Q    And, Dr. Biro, what are your duties as the director of

12  the division of adolescent medicine?

13  A    I administrate the division, and also serve as a senior

14  faculty member for the institution.  I perform clinical

15  duties, both inpatient and outpatient.

16         I teach residents, medical students and fellows.

17  And I conduct research.

18  Q    Would you tell us about the overall reputation of the

19  Department of Pediatrics at the University -- at the

20  Cincinnati Children's Hospital?

21  A    Cincinnati Children's Hospital has been ranked number

22  three in the country in the residency program.  It's also

23  ranked number three in the country.

24  Q    Okay.  And what would you consider your areas of

25  expertise?

1   A     My areas of expertise are, of course, in adolescent

2   medicine, but within the field of adolescent medicine

3   specifically puberty and sexually transmitted infections.

4   Q     Okay.  And can you describe what puberty is, pubertal

5   maturation?

6   A     Pubertal maturation is a series of events that include

7   the development of secondary sexual characteristics, that is

8   breast development, and pubic hair development, but it's also

9   the maturation of the brain, it's the changes in body

10  composition.  Going through the pubertal growth spurt and

11  maturation of various organs in the body.

12            THE COURT:  And that's what you call puberty itself?

13            THE WITNESS:  Puberty itself, most people say that

14  the onset of puberty is the development of secondary sexual

15  characteristics.  But before that there are changes in the

16  brain that bring about these changes.

17            THE COURT:  You call that prepuberty?  What do you

18  call it?

19            THE WITNESS:  I think that I would go with puberty

20  being once there's the manifestations of secondary sexual

21  characteristics.  So breast development or public hair

22  development.

23            THE COURT:  All right.  Go ahead.

24  BY MR. BLADUELL:

25  Q     And what is the relationship, you know, pubertal

1    maturation and chronologic age?

2    A    There's a range in chronologic ages of the different

3    pubertal events.  The onset of puberty in boys and girls are

4    defined, but the different stages within pubertal maturation

5    there's also standard textbooks that provide ages for those

6    ranges.

7    Q    Okay.  As part of pubertal maturation do you use

8    something called a Tanner Scale?

9    A    It had been called for decades the Tanner Scale.  We now

10   call them sexual maturity ratings, but, yes.  And those are

11   stages in the development of the sexual characteristics,

12   secondary sexual characteristics.

13               For example, breast stage one and pubic hair stage

14   one are prepubertal.  Breast stage five, public hair stage

15   five are late pubertal, at the adult range.

16   Q    And over the years has the Tanner Scale been revised?

17   A    I and several other groups of investigators have

18   recommended various modifications.  And so that one of the

19   papers that I had published suggested that before the

20   appearance of pubic hair in boys there is an increase in

21   testicular volume, and that's now relegated as the initial

22   onset of pubertal maturation.

23   Q    As part of your duties at the Division of Adolescent

24   Medicine, do you see patients?

25   A    Yes, I do.

1    Q    And can you describe briefly what interactions you have

2    with patients?

3    A    I see patients, both inpatient setting, that is, those

4    who have been admitted to the hospital, and I also see

5    patients in the outpatient setting.  Typically in a unit we

6    call the Teen Health Center.

7              I provide primary care in the Teen Health Center.

8    Most of the visits would be around annual physicals or sports

9    physicals, or issues around reproductive health, such as

10   sexually transmitted infections or contraception.

11   Q    Okay.  And what are the age ranges in general of your

12   patients?

13   A    Although most of my patients are within the ages of 12 to

14   20 or 21, I've seen patients as young as nine or ten, and I've

15   gone up to around age 25 or a little bit older.

16   Q    Have you done research in the area of pubertal

17   maturation?

18   A    Yes.

19   Q    Can you briefly describe the research that you have done

20   in this area?

21   A    So among other activities of research, I've followed

22   three large longitudinal data sets.  One in boys and two in

23   girls, where we recruited these, at the time, children,

24   followed them either every six months or every 12 months.  In

25   one of the studies for three or three and a half years.  In

1    the second study for ten plus years.  And in the current

2    study, that's ongoing, eight plus years.  And it's ongoing, so

3    there's -- we continue to see them beyond eight years.

4    Q    Okay.  Now have you been able to, in some of these

5    studies, draw any conclusions?

6    A    So in the boys' study, one was that we had this extra

7    pubertal stage, if you would, that had not been described.

8    And we also in that study noted that there was uncertainty

9    around genital staging in boys.

10            In fact, we discontinued doing genital staging

11   because it was so unreliable.  In the -- both of the girls'

12   study, in the first girls' study we reported that

13   approximately one-half of the girls, 47 percent, I believe,

14   had regression in their pubertal status reported during the

15   course of the study.

16            And in this most recent one --

17            THE COURT:  I don't understand what this means.

18            THE WITNESS:  I'm sorry.

19   BY MR. BLADUELL:

20   Q    Doctor, can you please describe what --

21            THE COURT:  Is he talking about something relating

22   to his background or what he does, or some opinion he has in

23   the case?

24            MR. BLADUELL:  This all goes to the qualifications.

25   His research in the area of pubertal maturation.

1          THE COURT:  Okay.  Well he's using -- it's not clear

2     to me what he's talking about.

3          MR. BLADUELL:  Okay.

4     BY MR. BLADUELL:

5     Q    So, Dr. Biro, you've said that you've conducted some

6     studies in the area of pubertal maturation.

7     A    Yes, sir.

8     Q    And that area of pubertal maturation is to assess the

9     stage -- in that research, you assess the stage that different

10    individuals, that your patients are, correct?

11    A    Yes.

12    Q    And you were saying that some individuals undergo

13    regression in stage -- in pubertal maturation?

14    A    Yes.  In other words --

15    Q    Can you describe what the regression of pubertal stage

16    is?

17    A    Yes.  So that in the most recent study, one out of five

18    girls appear to have pubertal breast development, but when

19    seen six to 12 months later, appeared not to have breast

20    tissue whatsoever.  And in the second large study, when we

21    compared the information from the girls that we assessed

22    through looking at their apparent breast stage, that half of

23    the girls in that study comparing an earlier visit to a later

24    visit, appeared to go backwards in what their breast stage

25    was.

1    Q     And does that regression affect the apparent ages of

2    these individuals?

3    A     Yes.  It would.

4    Q     And how would they affect them?

5    A     Because you have -- we have standards defined around the

6    different individual stages.  And so if somebody regresses

7    from, let's say stage three breast development, to stage two

8    breast development, you'd say that, well, that individual

9    appeared to be -- you know, have appropriate breast maturation

10   from -- for somebody who's 11 or 12 years old, and now they

11   have the appropriate breast maturation for somebody who's ten

12   to eleven years old.

13   Q     So it would make them -- it would make them look younger?

14   A     It would make them appear younger, yes.

15   Q     Now besides the maturation stages, are there other

16   factors that are used to determining someone's -- assess

17   someone's age?

18   A     Yes.

19   Q     Can you describe your experience studying those factors?

20   A     So that, for example, we have standards for how tall

21   somebody should be at a given age.  And so you can look at

22   somebody's height and then take it back to this table and see

23   where the average age would be for that particular height.

24         There are changes that occur -- well, of course, in

25   the bone age, although we do assess that, you can't see that

1   from a physical examination.  There are changes that occur in

2   the body fat percentage.  For example, in young women, in

3   girls, it increases as one goes through pubertal maturation,

4   and the body fat distribution also changes.

5            So that as a girl goes through puberty, her hips

6   widen, and fat is preferentially deposited in her buttocks and

7   in her thighs.  And, again, we've published on those data as

8   well.

9   Q    Have you received any awards for your work in pubertal

10  maturation?

11  A    Yes.  I've received several national awards.  I received

12  an award looking at a concept called, Pathways Through

13  Puberty, that girls who have breast development before pubic

14  hair development, might have a profile that would increase

15  their subsequent risk of breast cancer.

16           And in the second one, it was looking at our most

17  recent culprit, and that their maturing at a younger age and

18  their hormonal profile associated with that onset of earlier

19  puberty.

20  Q    Are you a member of  professional organizations?

21  A    Yes.  Several.

22  Q    Can you give us some of them?

23  A    I'm a member of the Society for Adolescent Health and

24  Medicine.  North American Society for Pediatric and Adolescent

25  Gynecology.  The American Pediatric Societies -- Pediatric

1    Academic Societies, I'm sorry.

2              And American College of Physicians, as well, of

3    course.

4    Q    Have you published peer review journals -- articles in

5    journals?

6    A    Yes, I have.

7    Q    And approximately how many of them?

8    A    I've published over a hundred original articles that have

9    been peer reviewed.  And probably 50 or 60 review articles

10   that have been peer reviewed, as well as chapters for

11   textbooks and monographs.

12   Q    And do these articles describe pubertal maturation?

13   A    Um --

14   Q    And do you comment on -- I'm sorry.  Let me strike that.

15   Do these articles comment on pubertal maturation assessment?

16   A    About 40 to 50 of the original articles are around

17   puberty.  And around 50 or so articles are around adolescents

18   and sexually transmitted infections.

19   Q    Have you served as an expert witness before?

20   A    Yes, I have.

21   Q    And can you describe the instances where you've served as

22   an expert witness?

23   A    In 1996, <u>Connections v. Screeno</u> (phonetic), and in 1988

24   or '89 I was asked by the local district attorney's office on

25   a rape case involving an adolescent.

1    Q    And where was -- can you describe the <u>Connections</u> case

2    was about in 1996?

3    A    I was asked to review the images that were published in a

4    series of adult oriented magazines.

5    Q    And overall what was your -- what opinions did you give

6    in that case?

7    A    I commented that there were, one, that assessing age by

8    the changes associated with puberty is difficult, and there's

9    a degree of uncertainty.  And that these were a few images

10   that I thought were depicting people under the age of 21.

11   Q    Okay.

12        MR. BLADUELL:  Your Honor, at this time, the

13   Government tenders Dr. Francis Biro as an expert in the fields

14   of pediatrics, adolescent medicine and pubertal maturation.

15        THE COURT:  Okay.  Any questions on qualifications?

16        MR. MURRAY:  No, Your Honor.  Not at this time.

17        THE COURT:  All right.  I'll allow him to testify as

18   an expert in those fields.

19                      DIRECT EXAMINATION

20   BY MR. BLADUELL:

21   Q    Dr. Biro, you've already described the changes that occur

22   during puberty.  Now my question is, do these changes vary

23   from individual to individual?

24   A    Yes.  The --

25   Q    And can you describe what this variation entails?

1    A    Yes.   The onset of puberty, the age of onset of puberty,

2    we call the relative timing of puberty maturation.   Some

3    mature early, some mature late.

4         There is also a concept called temporal, which

5    reflects the rate of change one goes through puberty.   And

6    this temporal can be defined by the onset of secondary sexual

7    characteristics, to a particular pubertal markers such as the

8    age of menarche or first menstrual period.

9         And that for young ladies typically that's called

10   the temporal period, going from breast stage two until the age

11   of menarche.

12   Q    And overall when is the age when girls achieve full

13   pubertal maturation?

14   A    According to the more classic literature that has been

15   published in the past 20 years, that girls complete full

16   pubertal maturation 14 to maybe 16 years of age.   We published

17   a paper two years ago that noted that the onset of puberty,

18   though, appears to be about a year earlier that had been

19   defined previously.

20        And we are still following those girls to see

21   whether those later milestones are achieved according to what

22   the classic times were, or whether they're occurring at

23   younger ages.

24   Q    And when you say that they're at full pubertal maturation

25   is appearing in younger ages in girls, what do you mean by

1   that?

2   A     The onset of breast development is occurring about 11 to

3   12 months younger then it had been in papers published 20

4   years ago.

5   Q     And are you aware of studies suggesting that the full

6   pubertal maturation can appear before age -- mid to mid-teen

7   years?

8   A     I'm sorry, could you repeat the question?

9   Q     Are you aware of research establishing that full pubertal

10  maturation, or that maturation could occur in girls at a

11  younger age?

12  A     Yes.  Our paper suggests that breast development is

13  occurring earlier.  It actually corresponds with a paper that

14  was produced in Copenhagen by the Copenhagen Puberty Study,

15  which also noted a decrease in one year of age.

16  Q     Okay.  And what about full pubertal maturation in boys?

17  A     The literature in boys is a -- it appears that boys are

18  maturing a little bit earlier.  The papers that have been

19  published have not been completely consistent in how much that

20  age of pubertal maturation has advanced.

21  Q     Now what are in -- can you describe the relationship

22  between pubertal maturation and chronologic age?

23  A     So most time -- we give age ranges of the onset of

24  puberty, as well as age ranges for these various milestones.

25  So there's a correlation, it's a rough correlation, but there

1    is a correlation between these various milestones.

2    Q    So in your opinion, pubertal maturation can be used as

3    one factor in determining the age of individuals?

4    A    It can be used as one factor, but the determination of

5    somebody's chronologic age from pubertal maturation is, at

6    best, an inexact science.

7    Q    Okay.  And what other factors besides pubertal maturation

8    stage can experts use in trying to determine someone's age by

9    visual inspection?

10   A    So that with pubertal maturation, there's also several

11   other changes that do occur, including height, and adult

12   stature.  Including body composition with -- in young men,

13   typically an increase in lean body mass.  In young women,

14   typically a greater increase mass in fat mass than lean body

15   mass.

16           In body fat distribution, so that in young men and

17   adult men more body fat around the waist.  In young women and

18   adult women, more body fat in the buttocks and the thighs,

19   until women get to be of a more adult age, in which there

20   starts to be an increase in the central body fat.

21   Q    Now in your view, is it difficult for a maturation expert

22   such as yourself to determine someone's age by visual

23   inspection?

24           THE COURT:  By what?  By face --

25           MR. BLADUELL:  By visual --

1              THE COURT:  Visual inspection.

2              THE WITNESS:  I think that it is difficult to do,

3     yes.

4     BY MR. BLADUELL:

5     Q    And can you describe why it is your opinion that this is

6     difficult?

7     A    It's difficult because one has to try to take into

8     context all of these changes.  That, for example, when we see

9     somebody who is relatively short, our mind automatically

10    refers back to what would be an appropriate age for that

11    height.

12             And, again, in medicine we have height tables for

13    different ages.  That it's difficult because of when you're

14    looking at things such as skin elasticity, sort of the lack of

15    wrinkles or folds in the skin that if somebody is out in the

16    sun excessively, or has photosensitive skin, that there's

17    going to be increased number of wrinkles.

18             There's a lot of different factors that sort of play

19    into this.

20    Q    And in your view, what is the degree of uncertainty among

21    maturation experts with respect to determining someone's age

22    by visual inspection?

23    A    It depends in part on the age of the individual.  And

24    those who are in their teen years, there's going to be some

25    uncertainty, one to three, maybe a little bit more in those

1    who are young adults, it probably expands to two to five

2    years.

3    Q    And do you expect that average people without training

4    and experience in maturation assessment would have difficulty

5    in determining someone's age by visual inspection?

6              MR. MURRAY:  Objection, Your Honor.  I don't think

7    he's been qualified to be an expert on the question of other

8    people's ability to ascertain apparent --

9              THE COURT:  Well, how familiar are you with the

10   views of, say, your peers in this profession?

11             THE WITNESS:  So I'm probably relegated as one of

12   the national experts in puberty.  And the assessment of

13   puberty.  And my peers who also are involved in these

14   projects, there's been at least two national meetings where

15   they deferred to my methods of assessment to their own.

16             So they, among a group of pubertal maturation

17   experts, they consider me to have greater expertise.

18             THE COURT:  Well are you familiar with other

19   writings and other studies in the field?

20             THE WITNESS:  Yes, I am, Your Honor.

21             THE COURT:  I'll overrule the objection.

22   BY MR. BLADUELL:

23   Q    Dr. Biro, so the question was, in your opinion would you

24   expect someone, the average person, without training and

25   experience in maturation assessment, to have difficulty in

1    determining someone's age by visual inspection?

2    A    I would.  And the reason I respond that way is because

3    it's not just being involved in these three projects, but all

4    sorts of other projects with having, you know, developed the

5    protocols for maturation assessment in my projects as well as

6    other investigator's projects, conducting several thousand

7    examinations directly, that I have a degree of difficulty.

8         I have also had the opportunity in seeing the

9    participants in these projects over the course of, you know,

10   studies lasting from three and a half to ten or more years, to

11   be able to look at all these changes as they occur in real

12   time with all these individuals.

13        And seeing them frequently there's -- some young

14   ladies in some of the projects I've seen 14 or 15 times, for

15   example.  And so that I can see sort of all these changes that

16   are occurring at the same time, and I would think that that

17   would be difficult to do with somebody who has less exposure

18   then that.

19        And I believe that Dr. Tanner himself probably did

20   not perform as many examinations as I have.  And certainly

21   hasn't published regarding as many observations as I have.

22   Q    And when you're referring to Dr. Tanner, is that the

23   person that developed the Tanner Scales that you talked about

24   before?

25   A    Yes.  A colleague of mine, who I've interacted with

1    multiple times before his death.

2    Q     Okay.  Now you've talked a little bit about the patients

3    that you see and the difficulties that you have in determining

4    their age.  Have you seen in your practice children that look

5    older than they are?

6    A     Yes.

7    Q     And can you give us briefly a description of the patients

8    that you've seen that look older then they are?

9    A     So I can think of several individuals, and one that's

10   rather striking is a young lady who matured earlier than her

11   peers.  And by the age of 12 was fully physically mature.

12          In addition to that, she dressed rather

13   provocatively, and like a young adult, and I think that, you

14   know, now at the age of 14, I would think that most people

15   would think of her in her late teens or perhaps even a little

16   bit beyond that.

17   Q     So in your experience with patients, would you say that

18   it's unusual for 15 or 16 years old to look over 18?

19   A     I think that they could adopt makeup, or hairstyles, or

20   styles of dress that would make them appear a little bit older

21   then they actually were.

22   Q     Okay.  And, I mean, in your experience, would someone

23   that is 25 years old, could that person also look under 18?

24   A     I think that in the same way -- and we've seen this in

25   movies, in which people depict much younger people, especially

1    if the movie is taking somebody through various ages in their

2    life where they appear to be teenagers, yet they might be in

3    their twenties or so.  But I've also seen people who dress in

4    the styles that you would expect a teenager to dress, and

5    might use hairstyles or clothing, and, again, makeup to make

6    themselves appear younger then they actually are.

7    Q    Okay.  Now is there a relationship between pubertal

8    maturation and brain development of teenagers?

9    A    So there had been a couple of papers that have commented,

10   actually, on the increasing disparity between the onset of

11   pubertal maturation and brain development.

12          So there's a part of the brain that develops in the

13   late school aged child, eight, nine, ten years old, the locus

14   ceruleus (phonetic) and the strata -- blocking on the name of

15   it.  I'm sorry.  It's another part of the hypothalamus.  And

16   this is effectively the reward center of the brain.

17          And that the prefrontal cortex, which is the last

18   part of the brain to mature, matures in young women between

19   the ages of 18 and 20, in young men between the ages of 20 and

20   23.

21          And this prefrontal cortex is the executive part of

22   the brain.  It modulates the amount of emotion that we put

23   into our thoughts and into our communication.  It also acts as

24   sort of that superego, the don't do this, because there are

25   some consequences of it.  And, of course, the other thing that

Biro - Direct (Bla)                                23

1    happens to the adolescent brain is that the brain begins to be

2    more future oriented.  So that one is aware that the current

3    day behavior might have some impact on subsequent development.

4            But in the early maturing, especially the early

5    maturing girl, there's a disparity between what physically she

6    looks like, and what her brain is capable of -- of dealing

7    with.

8    Q    So what is the significance of this disparity between the

9    timing of pubertal maturation and the timing of brain

10   maturation?

11   A    Well, for example, your reward center says do it, and

12   your executive center doesn't function yet.  The other thing

13   is that, for example, in the early maturing girl, we know from

14   several different studies and, including studies that we've

15   published, that the earlier maturing girl is maturing before

16   both boys and girls, because boys mature a little bit later,

17   and the early maturing girl is at a special risk for some of

18   these behaviors.

19           Such as earlier initiation of sexual intercourse.

20   Earlier age of acquisition of sexually transmitted infections.

21   Greater likelihood of being a pregnant teenager.  Greater

22   involvement in tobacco and substance use.  Lower academic

23   achievement.  I could go on.

24   Q    And is that because the brain is not fully mature at that

25   age?

1    A    Well part of it we believe is that with -- especially

2    with girls this off timing, is that their peer group is

3    interacting with them as they appear, what they look like to

4    them.  And so if you're 12 or 13 and you appear to be 16,

5    you're -- people are going to interact with you like you're

6    16, not that you're 12 or 13.  But your brain cannot really

7    process, just because you appear to be older, doesn't mean

8    that your brain -- the parts of the brain mature earlier and

9    they don't.

10   Q    And are you aware of research showing the tendency to

11   engage in risky behaviors because of this disparity?

12   A    Right.  Yes.  And several people have published in this

13   area, including myself.  We've published several articles

14   looking at risk and acquisition of sexually transmitted

15   infections in girls.  Especially -- and so the early maturing

16   girl, again, is at greater risk.

17   Q    Okay.  Dr. Biro, in connection with this case, were you

18   asked to review some sexually explicit images?

19   A    Yes, I was.

20   Q    Okay.  And can you -- and how many -- approximately how

21   many images were you asked to review?

22   A    Approximately 150.

23   Q    And what's your understanding of where those images came

24   from?

25   A    They -- the images came from you.  And you said that they

1   were images from the plaintiffs.  You did not say that this

2   was an exclusive collection that you had.  You just said that

3   this was some of the images.

4   Q    Okay.  And what is your overall assessment of how old the

5   people appearing in the images looked?

6   A    Of the images that you provided to me, it appeared that

7   about half were in their twenties or younger.

8   Q    Okay.  And were you asked to do something more specific

9   with these images?

10  A    I was asked to catagorize them into various groups.  And

11  one group was a group of images representing young women who

12  could be younger than 18.  Another group was -- the second

13  group was a group that, not that they were, by the way, not

14  that they were, but that they could be under 18.

15       The second group was a group of young ladies, which

16  I did not think were under 18, but might be confused by others

17  as being under the age of 18.

18       And then a third group in which I felt that there

19  weren't enough visual cues to be able to establish the age of

20  the person in question.

21  Q    And were there also men in those images?

22  A    Yes.

23  Q    Okay.  Now let's -- let me show you Exhibit Number 316,

24  Dr. Brio.  Dr. Biro, do you recognize Exhibit Number 316?

25  A    Yes, I do.

1   Q    And can you describe what Exhibit 316 is?

2   A    So in Section 1, it's those who could be confused as

3   minors, although they could be over the age of 18.

4   Q    So are these the images that you were talking about when

5   you were asked to classify?

6   A    I apologize.  Yes.  These are the images.

7   Q    Okay.  And in number one that we see on our screen, the

8   images that you put in the category of could be confused by

9   minors, although they may be over 18, correct?

10  A    Yes.

11  Q    And is that an accurate reflection of those images?

12  A    Yes.

13  Q    And if we go to the second page.  This is another

14  category of images?

15  A    Yes.

16  Q    And can you describe what this category means?

17  A    This is -- this represents a group of images that I

18  evaluated, where although I did not believe any of the models

19  were under 18, that they might be confused by others as being

20  under 18.

21  Q    And why could they be confused by others and not you as

22  being under 18?

23  A    Well because I was looking at a number of different

24  factors, which included, for example, the relative proportions

25  of the hip to the waist.  So this waist-hip ratio.  I was

Biro - Direct (Bla)                    27

1    looking at the body fat distribution.  I was looking at, if

2    they were bent or folded, whether there were -- how their skin

3    reacted to those lines of stress.  And I was looking at the

4    amount of subcutaneous fat tissue.  I was looking at the

5    maturation of the face.  As the face goes, through puberty,

6    there are also changes.

7         The face actually gets larger relative to the head.

8    The head actually doesn't increase in size after about age

9    nine or ten, but the face continues to grow, and there's

10   certain parts of the face, specifically the forehead, the

11   nose, and the chin that continues to get a little bit larger

12   as you get into your adult years.

13   Q    And you expect the average person without your training

14   and experience to be able to reliably assess those factors in

15   determining someone's age?

16   A    I believe that it would be more difficult for somebody

17   else to be able to do that.

18   Q    And let's move on to the third page of this Exhibit 316.

19   Is that -- could you describe what this category means?

20   A    This category was a group of models that I wasn't given

21   -- I didn't feel that I had enough visual cues in order to

22   provide a reliable estimate of how old they were.

23   Q    Okay.  Now I'm going to show you some of this --

24   pictures, so that we can get a sense of how you conducted your

25   assessment.

1            In Exhibit Number -- if we go back to the first

2     category, those that could reasonably be confused for minors.

3            And we go to exhibit Number 165G.  Dr. Biro, do you

4     recognize this image?

5     A     Yes.  I recognize this image.

6     Q     And is this one of the images that you reviewed?

7     A     Yes.

8     Q     And can you tell us what your opinion about the apparent

9     age of this person is?

10    A     I thought that this was one of the depictions that could

11    be confused as being under the age of 18.  Oh, this person

12    could be over 18, that she could be confused as under 18.

13    Q     And why do you say that?

14    A     Okay.  So if you take a look at her breasts, you can see

15    with the shadowing that she has a separate elevation of the

16    central part of the breast.  The scientific terms for those

17    are aureola and papilla.  So this is the classic example of

18    Tanner's stage breast four.

19            It is also true that some woman never advance to

20    breast stage five.  But still, this image is of breast stage

21    four.  She's shaved her pubic hair, except for a narrow strip

22    in the middle, so that it makes it difficult to say that she's

23    anything beyond pubic hair stage three.

24            She has a relatively tubular body shape, that is,

25    that there's not much in the way of hips relative to the

1    waist.  And, again, that would be more consistent with a

2    teenager then with an -- somebody 18 years or older.  And it

3    may be genetic, but her chin is rather small.  And, again,

4    that -- and that's one of the things that makes it confusing,

5    because that could be genetic in part, but again that chin is

6    smaller then one would expect with an adult.

7              There's relatively little subcutaneous fat in this

8    young lady.

9    Q    And when you say that, where are you looking?

10   A    I'm looking at the arms, I'm looking, you know, the upper

11   arms, the forearms, I'm looking at the hands.  And also

12   there's little fat distribution that's in the thighs as well.

13   Q    And, I'm sorry, you commented on the pubic hair?

14   A    Yes, I did.

15   Q    Okay.  What was your --

16             THE COURT:  Can I just ask a question?  You used the

17   term teenager.  Is that a term of art in your field?

18             THE WITNESS:  So teenager in our field refers,

19   specifically to the chronologic age.  So it's going to be

20   teenagers, probably the common definition of what you would

21   call a teenager, 13 to 19 years of age.

22             We when we refer to adolescent, adolescent can

23   either refer to the overall group of teenagers, or it could

24   involve the social behaviors of a group of teenagers.

25             THE COURT:  Well is there an agree -- in your

1    profession, is there agreed upon range that applies to the

2    term adolescent, or not?

3              THE WITNESS:  No, there's not.

4              THE COURT:  Okay.  But a teenager could be anyone

5    between 13 and 19, that is the years that includes the word --

6    the letters teen, T-E-E-N?

7              THE WITNESS:  Yes.

8              THE COURT:  Okay.  All right.  Go ahead.  I'm sorry.

9    BY MR. BLADUELL:

10   Q    And, Dr. Biro, based on all your training and experience,

11   will you be confident -- 100 percent confident that this

12   person is over the age of 18?

13   A    I'm not confident that she's over 18, nor am I confident

14   that she's under 18,  I think that she could be confused with

15   somebody under the age of 18.

16             MR. BLADUELL:  Okay.  Now let's move on to Exhibit

17   Number 164E, please.

18   BY MR. BLADUELL:

19   Q    Dr. Biro, do you recognize this image?

20   A    Yes, I do.

21   Q    And what do -- what was your assessment of the apparent

22   age of the person depicted in this picture?

23   A    Again, I thought this was a young lady who could be

24   confused as minor, although she could be over the age of 18.

25   Q    And can you briefly explain why you say that?

1   A    Okay.  So she has relatively modest breast development.

2   That could be because she's thin, but it could also be because

3   she's younger.

4           She has pubic hair four development.  It could be

5   because she's shaved, or it could be because that is her pubic

6   hair maturation.

7           She has -- you can see sort of along her left side

8   her ribs are well-defined.  There's very little subcutaneous

9   fat.  Again, it could be somebody who's relatively thin.  In

10  the -- one of the striking things you can see that, although

11  it could be genetic, she has a relatively underdeveloped chin.

12          Lastly, although in this young lady her hips are a

13  little bit wider then in the previous young lady, she still

14  doesn't have probably the proportion of hips relative to waist

15  that you would expect with an adult.

16  Q    And can you be confident that this person is, just by

17  looking at the person, over 18?

18  A    I can't be confident that she's over 18, nor could I be

19  confident that she's under 18.

20  Q    Okay.

21          MR. BLADUELL:  Now let's go to Exhibit Number 168.

22  And that's -- 168, page 80.  Okay.

23  BY MR. BLADUELL:

24  Q    Dr. Biro, did you review images in the book that I'm

25  holding in my hand, Photo Sex?

Biro - Direct (Bla)                          32

1    A    You provided me several PDF images from that book.

2    Q    Okay.  And I'm going to --

3         MR. BLADUELL:  Permission to approach the Bench,

4    Your Honor.

5         THE COURT:  Yes.

6    BY MR. BLADUELL:

7    Q    Dr. Biro, I'm going to show you page 80 of the book <u>Photo</u>

8    <u>Sex</u> by David Steinberg.  There is a depiction in there.  Yes?

9    A    Yes.  I reviewed this pic -- this photograph.

10   Q    And can you -- what was your opinion about the apparent

11   age of the individuals depicted in this?

12   A    Well it's an adult male that's in the background.  But in

13   the foreground is a young lady.  We can't tell that she has

14   any public hair at all.  I mean, she could have shaved her

15   pubic hair, or she might not have had any pubic hair.

16        There's little subcutaneous fat.  And from what we

17   can sort of see of her waist and her hips, that she has narrow

18   hips relative to her waist.  Again, one of the -- there's been

19   people publish that some racial and ethnic groups might be

20   more difficult to be able to assess then other groups.

21        And Asian women are in that group that might be --

22   leading to some of this difficulty.  But I thought that she

23   could reasonably be confused as a minor.  I can't say that she

24   is under 18, or that she is over 18.

25        MR. BLADUELL:  And that's Exhibit 168G, for the

1    record.

2                 THE COURT:  168D, for dog?

3                 MR. BLADUELL:  G, G.  168G.

4                 THE COURT:  G?  Thank you.

5                 MR. BLADUELL:  And let's go to 167C -- I'm sorry

6    167F.

7    BY MR. BLADUELL:

8    Q    Dr. Biro, do you recognize this image?

9    A    Yes, I do recognize this image.

10                MR. BLADUELL:  And if we go to -- can we go to 125U.

11   BY MR. BLADUELL:

12   Q    Dr. Biro, is Exhibit 125U the same image as 167F?

13   A    If that was the image that you just showed me, yes.

14   Q    Yes.  And you also commented on this image and assessed

15   it for the ages of those appearing in the box cover, correct?

16   A    Yes.

17   Q    And did you also review this particular URL?

18   A    Yes, I did.

19   Q    And what was your assessment of the ages of the

20   individuals appearing in this cover?

21   A    So as we discussed just a few minutes ago, that one looks

22   at somebody's height, and that one automatically relegates

23   that to a chronologic age.  And as I said, in medicine, we

24   know that when somebody comes in, we put the percentile

25   height, and if it's lower then we would expect it, we then

Biro - Direct (Bla)                                    34

```
 1   look at as the -- what the age is for somebody who's the 50
 2   percentile for that height.
 3             And, typically, I mean, these young ladies are
 4   chosen -- selected because they're both short, and they also
 5   have low body mass.
 6   Q    And how do you know that?
 7   A    It describes it as such.  And I had --
 8   Q    And where, in this -- in the URL?
 9   A    It's in the URL.  Yes.
10   Q    And what -- how does it describe them?
11   A    For example -- for example, the genre is younger women.
12   And it says "All under five foot one inches and 100 pounds."
13   So these are young ladies who were likely selected because of
14   those attributes.
15             MR. BLADUELL:  Let's go to Exhibit Number 161D
16   please.
17   BY MR. BLADUELL:
18   Q    Dr. Biro, do you recognize this image?
19   A    I recognize this image.
20   Q    And in what category do you put this image?
21   A    I put this in the second category, I believe it was
22   paragraph 19 in my report.
23   Q    Okay.
24   A    And this would be those that could potentially be
25   confused by minors.  Although I do not believe that they're
```

1    under the age of 18.  In Eve, for example, somebody might be

2    drawn to that she has small breasts, and might assume because

3    of that that she is somewhat younger than she actually is.

4         But one can see that her hips are much wider

5    relative to her waist.  And that this is likely somebody who

6    is over the age of 18, but could be confused by somebody who

7    just looks at this and does A more cursory examination, or

8    doesn't take into account some of these other factors.

9    Q    Okay.

10        MR. BLADUELL:  And if we could go to 164J.

11   BY MR. BLADUELL:

12   Q    Do you recognize this image, Dr. Biro?

13   A    I do.

14   Q    Okay.  and what category do you put this person?

15   A    I thought that this, again, could be a young lady who

16   might be confused as an adolescent.  I did not feel that she

17   was under the age of 18.

18   Q    And what are the things that you can see that you would

19   think that average people would not see?

20   A    Okay.

21   Q    In determining their age.

22   A    So, again, her breast development is breast stage five,

23   so it's fully mature.  So, you know, it's -- she has somewhat

24   more modest breasts than some of the other models.  It's

25   completely consistent with adult maturation.  Again, she

1    shaves, so that she's -- one could misinterpret that as pubic

2    hair three, or four.

3          She's got -- again, you can take a look, her hips

4    are greater then her waist, much greater then her waist.  And

5    she's got enough subcutaneous fat that -- around the

6    umbilicus, that you can sort of see that she's developing both

7    subcutaneous fat, and a little bit more central adipose.

8          MR. BLADUELL:  Now lets go to Exhibit Number 160,

9    please.

10   BY MR. BLADUELL:

11   Q    Dr. Biro, is this another image that you were asked to

12   review?

13   A    Yes.

14   Q    And what category did you put this image in?

15   A    So we're talking about the person who's sort of facing

16   towards us.  And I felt that there was probably -- I didn't

17   feel that I had enough visual cues in order to make an

18   accurate assessment of this person's age.

19   Q    And why didn't you have cues?

20   A    Part of it is because she's behind the performer, or the

21   model, or the person in the foreground of the photograph.  And

22   so it takes away a lot of the cues that I sort of examine,

23   that I look at in trying to assess the age.

24   Q    What would you need to look at?

25   A    I mean, I -- if she could be standing up, that would be

1    helpful, without anybody obstructing views that you could take

2    a look at, again, take a look at what the hip ratio is

3    relative to the waist.  Take a look at the breast maturation,

4    take a look at the pubic hair maturation.

5            Get a better look at her overall face.  It -- take a

6    look at whether there's wrinkles, or lines of force along the

7    skin.  And you can't -- we have a hard time seeing any of

8    those in this.

9    Q    Can you be confident that this person is over 18?

10   A    I have no confidence in -- I can't be confident this

11   person is under 18, or over 18.  I can't make a determination.

12           MR. BLADUELL:  Let's go to 162D, please

13   BY MR. BLADUELL:

14   Q    Dr. Biro, do you recognize those images?

15   A    I recognize these images.

16   Q    And what category do you place those images in?

17   A    I felt that there weren't enough visual cues to really

18   assign any age to these people.

19   Q    And why was that?

20   A    It's -- you're not seeing the rest of the body, you're

21   just seeing the vulva and immediate media files in these

22   people, and that's all.

23   Q    Is it your opinion that you cannot determine a person's

24   age just by looking at this isolated part of the body?

25   A    I would say that the middle one is probably over the age

1  of 18, because of hardware that she's had inserted, to people

2  who consent for that procedure.  But that's the only thing I

3  could say.

4  Q    Okay.

5         MR. BLADUELL:  Let's go to 164N, please.

6  BY MR. BLADUELL:

7  Q    Do you recognize this image?

8  A    I do.

9  Q    And what category do you put this image in?

10  A    I, again, said that if -- it was -- I felt that I was not

11  able to determine the ages of these models.  In part because

12  there's distortion of the images, because it's, I'm assuming a

13  fisheye lens that was used for this photograph.  So there's a

14  distortion of a lot of the body parts.

15  Q    And let's go to --

16         THE COURT:  Can I interrupt for one second.  Are you

17  at all familiar with digital photography?

18         THE WITNESS:  Your Honor, I know the term, I know

19  some of the things that are capable.  I have not sort of --

20         THE COURT:  All right.  Have you ever come across

21  examples where there's a photo that has been taken and then

22  the photo has been touched up, or manipulated in some way?

23  For example, that someone who is younger, they can be made to

24  look older, and vice versa by use of digital -- the ability of

25  a digital photograph to be altered by someone after the image

Biro - Direct (Bla)                                      39

1    is taken?

2              Only if you know.  Don't speculate.

3              THE WITNESS:  I -- I don't know.  But if I could be

4    allowed just a moment's speculation, would be that I --

5              THE COURT:  Well you can't speculate.

6              THE WITNESS:  Okay.  I'm sorry.

7              THE COURT:  All right.  Go ahead.  Next question.

8              MR. BLADUELL:  Let's go 162G.

9    BY MR. BLADUELL:

10   Q    Is this another image that you were asked to evaluate,

11   Dr. Biro?

12   A    Yes.

13   Q    And can you describe this image for the record?

14   A    It's a young man who's holding his penis and having some

15   device against that penis.  You see his medial portion of his

16   thighs, you can see his hands, you can see his penis.  You

17   really can't see much else.

18   Q    You're not confident that this person is over 18?

19   A    I would have no way of being able to give you the age of

20   this person.

21   Q    All right.

22              MR. BLADUELL:  And, finally, let's go to Exhibit

23   Number 168E.

24   BY MR. BLADUELL:

25   Q    Do you recognize this image, Dr. Biro?

1    A     I do recognize this image.

2    Q     And what category did you place this image in?

3    A     Although I am fairly certain about the young lady in the

4    foreground, the young man I think would be difficult to be

5    able to give an exact age on him.  I base this on the fact

6    that he doesn't have well-defined musculature, which is

7    something that one has in the late teens and early twenties.

8          That he is completely clean shaven, but he does have

9    sideburns there.  I -- he doesn't have much in the way -- he

10   has good skin elasticity, and I'm gray green color blind, so I

11   interpret it that he had red hair, and that he is very fair

12   skinned.

13         And that -- so I would have expected more wrinkles

14   in somebody who is older, but I felt uncertain being able to

15   label him as being under 18, or over 18.  I'm unable to make

16   that determination.  There's certain cues that tell me that he

17   should be under 18.  There's certain cues that I have that

18   tell me that he should be over 18.  I am at a loss.

19   Q     Okay.  Now, Dr. Biro, you're aware that of the law at

20   issue in this case, correct?

21   A     Yes, sir.

22   Q     And you're aware that Section 2257 requires producers of

23   sexually explicit material to check the ID's of their

24   performers, correct?

25   A     Yes, sir, I am.

Biro - Direct (Bla)                          41

1   Q    Regardless of their age?

2   A    Yes.

3   Q    Do you think this is an effective system to allow for the

4   determination of the person's age?

5              MR. MURRAY:  Objection, Your Honor.  He's not an

6   expert on policy or law.

7              THE COURT:  Yes.  I'll sustain the objection.  You

8   can rephrase the question in terms of his expertise.

9   BY MR. MURRAY:

10  Q    Well based on your expertise, and your testimony about

11  the difficulties of assessing age by visual inspection, would

12  you -- you would think that requiring ID's for the performers

13  in sexually explicit depictions is a good way to deal with the

14  uncertainty, in determining someone's age by visual

15  inspection?

16  A    I think that it's possible for somebody who's 17 years of

17  age to be able to apply effective makeup and hairstyle to make

18  themselves appear in their mid-twenties, if they so choose.

19              And I believe that the opposite can also be an

20  effect, that somebody could dress themselves, or use makeup or

21  hairstyles to make themselves appear younger.  So even though

22  I said that, you know, there's a degree of uncertainty around

23  establishing age by looking at all these cues, that somebody

24  who's making themselves appear younger or older will expand

25  that degree of uncertainty.

Biro - Direct (Bla)                                    42

1    Q    And based on your experience and your training, in your

2    view would a law that sets -- what's your view on the efficacy

3    of a rule that requires producers of sexually explicit

4    material to check ID's for individuals who, for example, look

5    under 18 -- or under 25?

6    A    So I am a pediatrician and --

7                MR. MURRAY:  Objection, Your Honor.  Again, the --

8                THE COURT:  Sustained.  I don't know what you mean

9    by efficacy.  I mean, does he think it's important to find out

10   the age of someone who is -- from a medical point of view, do

11   you think it's important to check the age of someone who is

12   appearing in sexually explicit images?

13               THE WITNESS:  Your Honor, again, because I am a

14   pediatrician, I -- even if there's only one case or two cases

15   in a hundred, and somebody who could be mistaken who was in

16   there 17 and trying to appear older, as a pediatrician it's

17   part of what we strive for is to protect the health and the

18   rights of minority age people, of children.

19   BY MR. BLADUELL:

20   Q    And would a law -- would a law that requires the

21   producers of sexually explicit material only to check ID's of

22   people who look at a certain age, 25 or under, would that be

23   effective in protecting minors?

24               MR. MURRAY:  Objection, Your Honor.

25               THE COURT:  Well, sustained.  I think that's beyond

1    his expertise.  What the effect of -- it depends how it's

2    enforced.  I mean, I don't think that's a medical -- you can

3    ask him from a medical point of view other questions if you

4    want.

5           But I think they ought to be phrased so he's

6    answering as a pediatrician, and not just as a citizen or --

7    BY MR. BLADUELL:

8    Q    Okay.  Well from a medical point of view, if the law were

9    that producers only had to check ID's of individuals who look

10   under 18, would that be a difficult assessment to make for

11   people without experience in maturation assessment?

12          MR. MURRAY:  Objection.

13          THE COURT:  That, I'll let him answer.  But this is

14   from your viewpoint as a pediatrician.

15          THE WITNESS:  With my years of experience and all

16   the studies that I've conducted, I have a degree of

17   difficulty.  The medical literature suggests that it is

18   extremely difficult, especially if one only uses isolated

19   parts of the human anatomy, such as breast development.  And

20   that, if it's difficult for me to be able to -- to find

21   performers between the ages of 18 to 25, I would say that the

22   difficulty would have to be greater in other people.

23          MR. BLADUELL:  Your Honor, I move Exhibits 1 -- 316,

24   and all of the exhibits that appear in that summary into

25   evidence.

1          THE COURT:  Okay.

2          MR. BLADUELL:  And I have no further questions at

3   this time.

4          THE COURT:  All right.  Admitted.  All right.

5   Cross-examine.

6                    CROSS-EXAMINATION

7   BY MR. MURRAY:

8   Q    Dr. Biro, you've been at the U of C for almost all of

9   your professional career, is that correct?

10  A    Yes, sir.

11  Q    Okay.  Have you ever been in private practice?

12  A    No, sir.

13  Q    Now you spend how much of your time, let's say in the

14  last five years, actually seeing patients?  What percentage of

15  your time is devoted to actually seeing patients?

16  A    This past year, I've spent over 40 percent of my time

17  seeing patients.  In the past five years it's varied, probably

18  25 percent to 45 percent.

19  Q    Okay.  And you see patients on both an outpatient basis

20  -- actually primarily on an outpatient basis, isn't that true?

21  A    Yes.  Although this year I spent quite a bit of time on

22  an inpatient basis, as well.

23  Q    Because every once in a while you're required to do a

24  rotation in the hospital?

25  A    Yes.

Biro - Cross (Mur)                               45

1    Q    Okay.  But that's not something that you do regularly, is

2    it?

3    A    Those expectations are regular, yes.

4    Q    Well how many times a year, for example?

5    A    This year and last year were a little bit different than

6    most other years, but typically I've been on inpatient for a

7    full month, or two, two-week blocks.  And that's probably been

8    pretty consistent over the -- that's been the minimum over the

9    past five years.

10   Q    Okay.  So 11 months out of the year the patients that you

11   see are on an outpatient basis?

12   A    I do inpatient and outpatient, at the same time.  When I

13   do an inpatient, my work week goes up to 75, 80 hours a week.

14   It's not a 40-hour work week.

15   Q    Eleven months of the year you're doing only outpatient?

16   A    Yes.

17   Q    Okay.  And the vast majority of your patients are

18   adolescents, isn't that true?

19   A    Yes.

20   Q    And in fact, of the patients that you've seen who are

21   over the age of 21, at least in the past couple of years, only

22   about five to seven percent of the people that you've seen as

23   a medical doctor were over the age of 21, isn't that true?

24   A    Yes, that is true.

25   Q    And 75 to 80 percent of your patients are 19 years old

Biro - Cross (Mur)                                    46

1   and younger, correct?

2   A    Yes.  I'd have to look at the exact -- yes, I believe

3   that to be roughly --

4   Q    Now you would agree that pubertal maturation is not an

5   exact science ,is it?

6   A    No, it is not.

7   Q    And in fact, medical science doesn't study puberty and

8   pubertal maturation as a way of figuring out how old a person

9   is, isn't that true?

10  A    That is true.

11  Q    Now on your direct examination you estimated the ages of

12  some of the persons depicted in images produced by some of the

13  plaintiffs in this case, correct?

14  A    Yes, correct.

15  Q    And you did so as well when you wrote your report, didn't

16  you?

17  A    Yes.

18  Q    And you used, among other things, changes associated with

19  pubertal maturation to make these estimates, did you not?

20  A    They were -- yes, those were incorporated in those

21  decisions.

22  Q    And those, in turn, were based upon, among other things,

23  the Tanner Maturation Scale, correct?

24  A    Yes, that is true.

25  Q    And in fact your Attachment B to your report gives a

1    chart which pretty much duplicates the Tanner Maturation

2    Scale, does it not?  With maybe some minor revisions that you

3    added to it?

4    A    Yes.

5    Q    And in fact, in connection with your review of males

6    depicted in these photos that you considered, you used Tanner

7    Pubic Hair Staging system for estimating -- helping you to

8    estimate the ages of the males, correct?

9    A    Yes.

10   Q    And for females you used Tanner's Pubic Hair Staging

11   system as well as one factor in helping you to estimate the

12   ages, correct?

13   A    Yes.  One of several factors.

14   Q    And then for female breast staging system you used a

15   modification of Tanner's system, isn't that true?

16   A    Yes.

17   Q    And I think you indicated that Dr. Tanner -- well who was

18   Dr. Tanner?

19   A    Dr. Tanner --

20   Q    Just so the record is clear.  Go ahead.

21   A    Dr. Tanner was a physician living in Boston -- London,

22   I'm sorry.  Living in London, who studied a group of young men

23   and young women.  The studies that were utilized to provide

24   the standards for pubertal assessment were living in an

25   orphanage outside of London.

1          And he took photographs of these people, and then

2    lined up the photographs and designated what stage they were

3    on the basis of the photographs.

4    Q    And then he came up with what you pediatricians, or

5    people in the field of pubertal maturation call the Tanner

6    Scale?

7    A    He borrowed the system actually from Reynolds and Vines

8    who had published it back in the forties.  But he utilized

9    some of their scales.  And then they became known in this

10   country as the Tanner Stages.

11   Q    Okay.  Now you are familiar with the journal known as

12   Pediatrics, are you not?

13   A    Yes, I am.

14   Q    And in fact that is a peer reviewed journal, is it not?

15   A    Yes, it is.

16   Q    As a matter of fact, it is the hallmark journal of the

17   American Academy of Pediatrics, isn't it?

18   A    Yes.

19   Q    And in fact you have published several articles yourself

20   in that journal, isn't that true?

21   A    Yes.

22   Q    I want to show you what has been marked -- what was

23   marked in your deposition exhibit as Plaintiff's Exhibit 013

24   and what I've now marked as Plaintiff's Exhibit 137.  And you

25   see that that is a copy of a letter that was published in that

1    peer review journal known as Pediatrics, in December of 1998,

2    correct?

3    A    Yes.

4    Q    And that was a letter from two physicians, including Dr.

5    Tanner himself, correct?

6    A    Yes.

7    Q    And in that letter, it was -- the title of it was,

8    "Misuse of Tanner Puberty Stages to estimate chronological

9    age."  Correct?

10   A    Yes, it is.

11   Q    And the letter goes on to recite that one of them had

12   been involved as an expert in several U.S. Federal cases

13   involving child pornography, correct?

14   A    Yes.

15   Q    And then go on to say:

16         "In these cases the staging of sexual maturation,

17   the Tanner Stage, has been used not to stage maturation, but

18   to estimate probably chronological age.  This is a wholly

19   illegitimate use of Tanner Staging.  No equations exist

20   estimating age from stage, and even if they did, the degree of

21   unreliability in the staging, the independent variable, would

22   introduce large areas into the estimation of age.  The

23   dependent variable.  Furthermore, the unreliability of the

24   stage rating is increased to an unknown degree by improperly

25   performed staging.  That is not at a clinical examination, but

Biro - Cross (Mur)                                      50

1    through non-standardized, and thus unsuitable photographs.

2              "Therefore, we wish to caution pediatricians and

3    other physicians to refrain from providing expert testimony as

4    to chronological age based on Tanner Staging, which was

5    designed for estimating development or physiologic age for

6    medical, educational and sports purposes.  In other words,

7    identifying early and late maturer's.  The method is

8    appropriate for this, provided chronologic age is know.

9              "It is not designed for estimating chronologic age

10   and, therefore, not properly used for this purpose."

11             Is that correct?

12   A    Yes, sir.

13   Q    And that's what Dr. Tanner wrote, correct?

14   A    Yes, it is.

15   Q    Now one of the things you mentioned that -- before I

16   forget it, you were talking about how the brain matures in

17   human beings later than -- than puberty, correct?

18   A    What I said was that there were parts of the brain,

19   actually puberty --

20   Q    Yes.

21   A    -- puberty only comes about because of maturation of the

22   LH-RH pulse generator, which is part of the hypothalamus, and

23   that's what the onset of puberty is.  But, yes, the prefrontal

24   cortex matures after pubertal maturation begins, or probably

25   even after it ends.

1  Q    Right.  And that actually happens even after the age of

2  18, correct?

3  A    Yes.

4  Q    And that's the part of the brain that helps us control

5  our impulses, and helps us conform our conduct to the law,

6  correct, for example?

7  A    I would assume that the latter part of your statement is

8  correct.  Certainly the first part of your statement is

9  correct.

10 Q    Okay.  And you're familiar -- are you familiar with the

11 fact that that's the one of the very reasons that the United

12 States Supreme Court declared that the death penalty could not

13 be imposed on persons under the age of 18, because of the late

14 development of their -- the brain -- the part of the brain

15 that controls their impulses?

16         MR. BLADUELL:  Objection, Your Honor.

17         THE COURT:  Overruled.  Did you understand the

18 question?

19         THE WITNESS:  I was not aware that that's why the

20 death penalty was not, but it makes perfectly good sense to

21 me.

22 BY MR. MURRAY:

23 Q    Okay.  Anyway, that was just an aside.  Let me get back

24 to your testimony, and your report in particular.  In your

25 report, and I'll show it to you if you need to see it.  But in

1    your report at paragraph 11, on page 3, if you happen to have

2    your report in front of you.

3    A    I do.  Thank you.

4    Q    You state as follows.

5            "Pubertal maturation typically impacts the apparent

6    ages of teenagers.  Those in their mid to late teens who have

7    achieved full pubertal maturation can easily appear to be in

8    their twenties."

9            Correct?

10   A    Yes, sir.

11   Q    Okay.  And by mid to late teens, you're referring ages 15

12   or 16 to ages 19, correct?

13   A    Yes, sir.

14   Q    And I think you indic -- you really meant to say can

15   easily appear to be in their early twenties?  Wasn't that what

16   you indicated that you should have written?

17   A    Certainly the statement can easily appear to be in their

18   early twenties would be accurate.

19   Q    Okay.  Now then in paragraph 15 of your report, on page

20   four, you write:

21           "In my view, there is a degree of uncertainty about

22   the visual determination of a person's age, plus or minus two

23   to five years.  That is, despite relevant training, experts in

24   maturation assessment may be off with specific maturation

25   stage, and this could lead to a degree of uncertainty of one

1   to three years for assessment of age in teens and young

2   adults.  And two to five years in assessment of somewhat older

3   adults."

4           Correct?

5   A    Yes, sir.

6   Q    Okay.  So when it comes to teens and young adults, the

7   margin of error is around one to three years, correct?

8   A    Yes.

9   Q    And when it comes to older adults, the margin of error is

10  two to five years, correct?

11  A    Yes.

12  Q    So if I understand correctly what you're saying is, if

13  we're talking about teenagers and young adults, that would

14  mean that if someone is actually 19 years old, you might

15  confuse that person as anywhere from 16 to 22 years old,

16  giving a one to three year margin for error?

17  A    If they're not trying to make -- make themselves appear

18  younger or older.  Yes.

19  Q    Okay.  But that's what you mean by that margin of error,

20  one to three years, correct?

21  A    The one to three years is without trying to make

22  themselves appear differently, yes.

23  Q    Just by looking at them, in other words?  In their

24  natural state.

25  A    Yes, sir.

1   Q    Okay.  And then when it comes to older adults, you're

2   saying the margin of error is two to five years.  So, for

3   example, if we have somebody who's 50 years old, someone might

4   estimate their age anywhere between 45 and 55, if you use the

5   maximum five-year margin for error, correct?

6   A    Right.  I guess I wasn't thinking about some people --

7   when I wrote this, I wasn't thinking about 50 and 60 year

8   olds, I was thinking more about 30 and 40 year olds.

9   Q    Okay.  But the same thing would apply to a 50 year olds

10  as 40 year olds, wouldn't it, the same margin of error?

11  A    I think when you get up to, let's say, age 60, I think

12  that there would be even a little bit more degree of

13  variability, simply because --

14  Q    Sure.              ,

15  A    -- there's a bigger of percentage.

16  Q    Sure.  I mean you could take a 60-year-old who's trim and

17  fit and has taken good care of himself, or herself and you

18  might say, I think that -- I think she's 50 years old, rather

19  than 60?

20  A    Yes.  At that age, yes.

21  Q    Okay.  But you're not going to confuse her for somebody

22  who's under the age of 18?

23  A    No, you're not.

24  Q    Okay.  Now let's talk bout the area of confusion.  You

25  would agree, would you not, that generally speaking children

1    who are 12 years of age and younger are not going to be

2    confused as adults.  Isn't that true, who are at least 18 or

3    over?

4    A    Generally, I believe that to be true, yes.

5    Q    Okay.  And you would agree that even most 13 year olds,

6    not all, but most 13 year old children are not going to be

7    confused as adults who are age 18 or over, as a general rule,

8    correct?

9    A    As a general rule, yes.

10   Q    And I think you would even agree that most 14 year old

11   children as a general rule will not be confused as adults,

12   although some could be, correct?

13   A    Correct.  As you get older, as you start increasing the

14   age the -- the likelihood -- you know, if you think of it sort

15   of as a distribution, like a bell-shaped curve, that curve

16   begins to -- as the age goes up, that curve begins to

17   encompass 21 with greater likelihood.

18   Q    Well let's be precise.  Do you agree with the statement

19   that most 14 year olds will not be confused as adults?

20   A    Most 14 year olds -- most 14 year olds would not be

21   confused.

22   Q    Okay.  Now let's go to the other end of the spectrum.

23   Would you agree that as a general matter, adults who are 25

24   years old and above, are not, generally speaking, going to be

25   confused as minors aged 17 or below?

Biro - Cross (Mur)                          56

1   A    So I would agree that is generally true.  But not always
2   true.
3   Q    Okay.  So, generally speaking, the age range where there
4   could be confusion as to whether a person under 18 is an
5   adult, and whether a person over age 18 is actually a minor,
6   the general age range of confusion would be ages 15 to 24,
7   generally speaking?
8   A    Generally speaking, that is true, if you're looking at
9   generalities.
10  Q    And, in fact, if you were to go up to the age of 30 on
11  the -- on that end of the spectrum, that would capture nearly
12  everyone who could conceivably be confused as being under the
13  age of 18, wouldn't it?
14  A    That would encompass many more than just 24 or 25, yes.
15  And most, the vast majority.
16  Q    Okay.  Now let's talk a little bit about the -- and just
17  looking around the courtroom, you can see -- how many people
18  in this courtroom do you see, as you just look out here, that
19  you think would be -- might be confused as someone under the
20  age of 18?
21  A    Well there's one person in the courtroom that I'd have to
22  look at more closely.
23  Q    I was hoping you would say that.  Could you point her
24  out?
25  A    It's the young lady in the second row.

Biro - Cross (Mur)                              57

1    Q    Good.  That happens to be my law partner's young

2    daughter.  So she'll be happy to know that.  But, otherwise,

3    everyone else in the courtroom would not be confused as

4    someone under the age of 18, would you agree with that?

5    A    On casual inspection, no.  But there's at least one or

6    two people who might possibly be confused.

7    Q    Okay.  So one or two people out of about, I don't know,

8    20 or so people in the courtroom, just approximately?

9    A    Yes, sir.

10   Q    And apart form those one or two people, you don't need to

11   be -- you wouldn't need to be an expert to make that same

12   assessment, would you?

13   A    I don't believe so.

14   Q    Okay.  Now let's talk about -- you gave testimony on

15   direct examination about the -- the <u>Connection</u> case.  And that

16   was also a case involving 2257, correct?

17   A    Yes, sir.

18   Q    And you testified in that case in Federal Court in

19   Cleveland in 1996, correct?

20   A    Yes, sir.

21   Q    Okay.  And in that case, you studied what were known as

22   swingers magazines?

23   A    Yes, sir.

24   Q    Okay.  And those swinger's magazines included sexually

25   explicit images throughout the pages of those magazines of

                          Biro - Cross (Mur)                    58

1    various people, correct?

2    A    Yes, sir.

3    Q    And you studied a total of eight of those magazines,

4    correct?

5    A    Yes, sir.

6    Q    Okay.  By the way, when you wrote your report in that

7    case, though, you were under a very serious misunderstanding

8    about the age of majority, weren't you?

9    A    Yes, sir.

10   Q    You were under the impression that the age of majority is

11   21, at the time you wrote your report, correct?

12   A    Yes.

13   Q    And you later learned that it's actually 18 and younger

14   -- or 18 is the age of majority, correct?

15   A    I've learned a lot in the past 17 years.

16   Q    Okay.  As we all have.  Thank you, Doctor.  The -- so you

17   studied those eight magazines with the purpose in mind of

18   doing what you did in the courtroom today, ascertaining

19   whether any of the persons depicted in those magazines,

20   estimating what their ages were, correct?

21   A    Yes, sir.

22   Q    Okay.  And in that case, if I'm not mistaken, you came to

23   the conclusion that there were maybe a few images where you

24   were unsure -- where the person depicted might be under the

25   age of 21.  Do you recall that?

1  A    Yes, I do.

2  Q    Okay.  But you also came to the conclusion that the vast

3  majority of the photos that were depicted in those eight

4  sexually explicit magazines depicted persons who were

5  obviously over 21 years of age.  Isn't that true?

6  A    Yes, sir.

7  Q    And in fact, many of the photographs that you reviewed in

8  that case obviously depicted persons in their thirties,

9  forties, and even fifties, isn't that true?

10  A    I haven't seen those in the 16 years or 17 years since

11  the case.  And I have to confess, I recall that most of them

12  were adults, and some of them were middle-aged adults.  Many

13  of them from memory.

14  Q    Yes.

15  A    Were middle-aged adults.  But it's been years since I've

16  seen those images.

17  Q    And I appreciate that.  Let me help refresh your

18  recollection, Doctor, by showing you the transcript of the

19  proceeding that occurred on April 8th, 1996 in the Connection

20  case at which you testified.

21        And in your testimony, in Federal Court in

22  Cleveland, I believe -- and isn't it true that you were asked

23  these questions, and gave these answers?

24        "Q    So isn't it true, sir, that the vast majority

25  of the photographs that you reviewed in all of these magazines

1    depicts people who are obviously over 21 years of age?"

2             And your answer was:

3    "A   That is true."

4             "Q   And in fact many of the photographs that you

5    reviewed obviously depict people in their thirties, and

6    forties, and even fifties, correct?"

7             And your answer was:

8    "A   That is correct."

9             "Q   And as to the vast majority of photographs

10   depicting people who are obviously over 21, you don't need a

11   photo identification to come to that conclusion that they are

12   over 21, do you?

13   A    I do not.  No."

14            "Q   And you wouldn't expect that anyone else would

15   need a photo identification to come to that conclusion as to

16   the vast majority of the people depicted in these magazines,

17   correct?"

18            And your answer was:

19   "A   I agree."

20            Is that your testimony in Federal Court in

21   Cleveland?

22            MR. BLADUELL:  Objection, Your Honor.  No -- in no

23   way inconsistent with what Dr. Biro testified.

24            THE COURT:  The question is, did you give that

25   testimony?

1          THE WITNESS:  I did provide that testimony, yes.

2    BY MR. MURRAY:

3    Q    All right.  Now you've testified in direct examination,

4    and I think you included in your report the fact that you

5    reviewed approximately 150 individuals who appeared in

6    plaintiffs' images provided by the Government, correct?

7    A    Correct.

8    Q    And that roughly 50 percent of the images are relatively

9    young individuals who appear to be in their late teens or

10   early twenties, correct?

11   A    Yes, sir.

12   Q    Okay.  So you would agree that roughly 50 percent of the

13   images were not of relatively young individuals who appear to

14   be in their late teen or early twenties?

15   A    Yes, sir.

16   Q    Okay.  And I think you indicated you don't know how the

17   Government selected those images, correct?

18   A    Correct.

19   Q    And you don't know whether it was an exhaustive list, or

20   just a partial list of the plaintiffs' images, correct?

21   A    Correct.

22   Q    Okay.  And so you don't know whether as to any particular

23   plaintiff what you had a opportunity to review is or is not a

24   representative sample of that plaintiff's body of work,

25   correct

1    A    Correct.

2    Q    And so you have no information as to what percentage of

3    that particul -- of a particular plaintiff's entire body of

4    work is of adults who could not be confused as minors, for

5    example?

6    A    Correct.

7    Q    Okay.  Now, and you're not an expert on the subject of

8    sexually explicit materials generally, are you?

9    A    No, I am not.

10   Q    Okay.  Or the quantity of such materials that are

11   commercially produced, correct?

12   A    No, I'm not.

13   Q    Okay.  So you have no information to give us as to the

14   percentage -- what percentage of the universe of sexually

15   explicit images of adults are of persons youthful looking

16   enough to be confused as minors?

17   A    No, I don't.

18   Q    Okay.

19            MR. MURRAY:  That's all I have.  Thank you, Your

20   Honor.

21            THE COURT:  Any redirect?

22            MR. BLADUELL:  Yes, Your Honor.

23                      REDIRECT EXAMINATION

24   BY MR. BLADUELL:

25   Q    Dr. Biro, you were asked in cross-examination about an

1    article or a letter that Dr. Tanner wrote to some journal,

2    correct?

3    A    Yes, sir.

4    Q    And in that letter Dr. Tanner said -- criticized the use

5    of maturation stages to determine chronologic age?

6    A    Yes, sir.

7    Q    Okay.  Now do you know how Dr. Tanner develops the stages

8    of maturation stage?

9    A    Yes.

10   Q    And can you explain to us, how did he develop his stages?

11   A    Yes.  He took photographs of the young ladies on, I

12   believe an annual basis, but I don't know the exact interval.

13   They were living within the orphanage, and then after

14   collecting several years worth of photographs, lined up the

15   photographs and then categorized what maturation stage they

16   were in.

17   Q    And approximately how many subjects did Dr. Tanner use to

18   develop the stages?

19   A    I believe it was around 120.  I mean, it's -- one could

20   look it up.

21   Q    One can look it up.  Now in your years of experience

22   conducting maturation assessments and examining patients,

23   would you say that you have reviewed more -- that you have

24   examined more patients then Dr. Tanner did for developing

25   those Tanner Stages?

1    A    Yes, sir.

2    Q    And approximately how many more?

3    A    Between the three major studies and the two ancillary

4    studies that I've been involved with, it's well over 5,000

5    examinations.

6    Q    And in each -- and these examinations you were -- you

7    knew the person's age, correct?

8    A    In the vast majority of the time, yes.

9    Q    And you were able to compare that person's age to their

10   -- your clinical evaluation of their maturation stage,

11   correct?

12   A    Yes, sir.

13   Q    Now just to be clear for the record.  In your examination

14   of plaintiffs' images, did you only use the Tanner Stages of

15   maturation assessment?

16   A    No, sir.

17   Q    And what other factors did you use besides the Tanner

18   Maturation Stages?

19   A    I used several of the things which I knew changed with

20   pubertal maturation, and I've published in peer review

21   journals these changes.  These changes include, waist height

22   ratio, waist to hip ratio, about body composition, about body

23   fat distribution.  And one that I've not published on, but

24   looking at these skin folds and skin elasticity and how that

25   changes as one gets older.

1    Q    Now have you had conversations with Dr. Tanner about

2    refinements to the Tanner Maturation Stages?

3    A    Yes, sir.

4    Q    And what have you -- what have those conversations been

5    about?

6              MR. MURRAY:  Objection, Your Honor, that would be

7    hearsay.  Just conversations.

8              THE COURT:  You say the question is how do they come

9    about?

10             MR. BLADUELL:  Why were they -- what did you tell

11   Dr. Tanner about the stages?

12             THE COURT:  I'll overrule the objection.  Sir, you

13   can testify to what you said to Dr. Tanner, but you can't

14   testify to what he said back to you.

15             THE WITNESS:  Dr. Tanner and I actually exchanged

16   letters to each other.  And I described to him the -- for

17   example, in the boy's study, I described to him that there was

18   a six-month period before the appearance of pubic hair that

19   demonstrated that the young man was in pubertal maturation.

20             And I asked him his thoughts about the validity of

21   that finding, and would he go forward and -- would he, if he

22   had that data, go forward and publish it.

23   BY MR. BLADUELL:

24   Q    And have your suggestions about refinement to the Tanner

25   Stage been adopted?

1    A    Yes.

2    Q    And how so?

3    A    For example, the textbooks prior to publishing that

4    article talked about either genital staging, or pubic hair

5    staging in boys as the initial manifestation of puberty, but

6    after publication of that article, most textbooks say in fact

7    it is now generally accepted that there is a period of time in

8    which there's an increase in testicular volume before the

9    appearance of pubic hair.

10   Q    Now you were also asked, Dr. Biro, about paragraph 15 of

11   your report.  Which was exhibit 173.  About the degree of

12   uncertainty in determining someone's age one to three years

13   for younger adolescents, and two to five years for somewhat

14   older adolescents, correct?

15   A    Yes, sir.

16   Q    Now is that degree of uncertainty, one to three years,

17   for younger adolescents, and two to five years for older

18   adolescents, the degree of uncertainty among maturation

19   experts?

20   A    I would believe so.  I've not conducted a study asking my

21   colleagues what they feel the degree of uncertainty is.

22   Q    But you have known of studies that make note of this

23   discrepancy among maturation experts in determining this stage

24   of maturation, correct?

25   A    Yes, sir.

1    Q    Now would you expect the degree of uncertainty to be

2    larger for average people, than maturation experts?

3    A    I would expect that to be true.  I don't know that to be

4    true.  But I would expect that to be true.

5    Q    Okay.  You also were asked as to whether people over the

6    age of 25 would not be confused for minors, correct?

7    A    Yes, sir.

8    Q    Do you remember that?

9    A    Yes, sir.

10   Q    And you said that that would not be always true?

11   A    Yes, sir.

12   Q    And can you explain why you said that that would not be

13   always true?

14   A    I think that, you know, if somebody was not trying to

15   appear younger or older, there would be a given degree of

16   uncertainty.  But I believe that, you know, actors and

17   actresses often try to appear younger or older.  We've seen

18   this actually in movies in which somebody can rather

19   convincingly look several years different than what their true

20   biologic age is.  So the degree of uncertainty expands if

21   somebody wants it to expand, if somebody wishes to appear

22   young or older then they actually are.

23   Q    Okay.  Would checking someone's driver's license would be

24   more reliable to determine whether that person is over a

25   particular age, then relying on visual inspection?

1   A    It would be more valid, certainly, yes.

2   Q    And you were also asked about your experience in sexually

3   -- reviewing sexually explicit depictions, correct?

4   A    Yes, sir.

5   Q    Now you mentioned that as part -- in your -- as a

6   profession at the University of Cincinnati, you conduct -- you

7   taught some courses, correct?

8   A    Yes, sir.

9   Q    And was that -- one of those courses in human sexuality?

10  A    Yes, sir.

11  Q    And can you describe how -- what happened in these

12  courses of -- in human sexuality?

13  A    So I was co-director of the course, I provided some

14  lectures for the medical students.  I also conducted small

15  group sessions for a group of 10 or 12 students.  I did that

16  for several years.

17          And that course discussed sexual health throughout

18  the life span, as well as normal and atypical sexual

19  behaviors.

20  Q    And did you review sexual explicit material as part of

21  that course work?

22  A    Our first session, actually, was showing pornographic

23  video for an hour and a half to the medical students, to try

24  to desensitize them, so that they would feel more comfortable

25  with discussing these images, yes.

1    Q    Now you were also asked about looking at people in this

2    room could be confused about their ages, correct?

3    A    Yes, sir.

4    Q    Now comparing the individuals in this room to the images

5    that you saw for this report, would you say that the

6    individuals that you saw in your report are on average younger

7    than the individuals in this room?

8    A    Yes, I believe that to be true.

9            MR. BLADUELL:  No further questions, Your Honor.

10            THE COURT:  Any recross?

11                    RECROSS-EXAMINATION

12    BY MR. MURRAY:

13    Q    Doctor, on redirect you were asked whether or not you

14    would expect the margin of error for estimating ages to be

15    greater in the case of persons other than experts like you in

16    the field.  Do you recall that?

17    A    Yes, sir.

18    Q    Okay.  You, however, have no way of knowing, and do not

19    have any information, for example, about how experienced adult

20    film producers are in gauging the ages of people who come to

21    them seeking to appear in their films, correct?

22    A    I have no idea.

23    Q    Okay.  So you don't know whether that would be true of

24    them based on their experience with all the actors and

25    actresses who appear in their films, do you?

1    A     No, I do not.

2    Q     And you don't know whether it would be true of

3    photographers who have experience in being attuned to the age

4    ranges of their subjects, do you?

5    A     No, I do not.

6    Q     Okay.

7              MR. MURRAY:  That's all I have.  Thank you, Your

8    Honor.

9              THE COURT:  Thank you, Doctor.  All right.  We'll

10   take a ten-minute recess at this time.  Thank you.  It will

11   probably be more like 15 minutes.  About how long will the

12   direct be on the next witness?

13             MR. SWINTON:  About a half hour, Your Honor.

14             THE COURT:  Okay.  All right.  Very good.

15        (Recess taken, 10:56 a.m. to 11:19 a.m.)

16             THE COURT:  All right.  We're ready to proceed with

17   the next witness.

18             MR. SWINTON:  And, Your Honor, defendant calls Dr.

19   Phillip Stark.

20             THE COURT:  Okay.  When we're all done this witness,

21   we'll then have a short luncheon recess, or whatever you want

22   to do, and then we'll have the oral arguments after that.

23   Okay?

24             THE CLERK:  Raise your right hand.

25        PHILIP BRADFORD STARK, GOVERNMENT WITNESS, AFFIRMED

1          THE CLERK:  For the record, state and spell your

2    land name.

3          THE WITNESS:  Philip Bradford Stark, S-T-A-R-K.

4                    DIRECT EXAMINATION

5    BY MR. SWINTON:

6    Q    Good morning, Dr. Stark.

7    A    Good morning.

8    Q    Can you describe for the Court your educational

9    background?

10   A    I have a bachelor's degree in philosophy from Princeton.

11   I'm a law school dropout.  I have a PhD in geophysics from the

12   University of California, San Diego.

13          THE COURT:  You what?  Sorry.

14          THE WITNESS:  A PhD in geophysics from --

15          THE COURT:  Geophysics?

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.

18          THE WITNESS:  From the University of California, San

19   Diego.  And post doctoral training in statistics at the

20   University of California, Berkeley.

21   BY MR. SWINTON:

22   Q    And what do you currently do?

23   A    I'm a professor of statistics and chair for the

24   Department of Statistics at the University of California,

25   Berkeley.  And I'm also affiliated faculty in designated

1  emphasis and computational science and engineering.

2  Q    And when did you begin teaching statistics courses?

3  A    1988.

4  Q    And do you currently teach statistics courses?

5  A    Yes, I do.

6  Q    What courses do you teach?

7  A    I teach a variety of courses at all levels from

8  undergraduate introductory courses for psychology, sociology

9  business and economic students, to core courses for a major

10 that are more technical, master's level statistics courses for

11 both students who are studying for masters in statistics, or

12 students in other departments, including social sciences and

13 engineering who need some statistics, and PhD level courses in

14 statistics, which are typically for bio-statistician's or

15 statisticians.

16 Q    And you mentioned that you're the -- currently the chair

17 of the Statistics Department at Berkeley?

18 A    Yes, I am.

19 Q    And when did you become chair?

20 A    I've been chair for about a year.  I was vice chair for a

21 year before that.

22 Q    And what does the role of chair entail?

23 A    It's partly of the running the operation from

24 establishing the budget, fund raising, deciding what areas we

25 should be hiring new faculty in, figuring out which courses to

1    teach, what courses to trim.

2              Trying to understand the direction the field is

3    going in in order to stay at the top.  And my personal goal as

4    chair is to reclaim the number one position from Stanford.  We

5    used to be number one until recently.

6    Q    Now are you an accredited professional statistician?

7    A    Yes, I am.  I have accreditation from the American

8    Statistical Association.

9    Q    And what does it mean to be an accredited professional

10   statistician?

11   A    It's just a badge that I have a level of skill and

12   experience in ongoing education contributing to the field.

13   Q    Do you belong to any other professional organizations?

14   A    Yes, I do.  I belong to the Institute of Physics.  I

15   belong to the Bernoulli Society, which is an international

16   statistical association.  I belong to the Institute of

17   Mathematical Statistics.

18   Q    And have you written any articles on statistics or

19   statistical methods?

20   A    Yes, I have.

21   Q    And approximately how many articles have you written?

22   A    I think I have about 125 publications in all, and all but

23   a very small number, you know, are -- have statistical

24   content.  They're either developing new statistical methods or

25   applying statistics to some substantive field.

1   Q    Were any of these articles in peer reviewed publications?

2   A    Yes.  I think seventy-four of my publications were peer

3   reviewed.

4   Q    And have you ever published in the fields of social

5   science or public policy?

6   A    Yes.

7   Q    And have you ever written any textbook, or textbook

8   chapters on statistics?

9   A    Yes, I've written an undergraduate introductory textbook

10  on statistics.

11  Q    Have you ever served on the editorial board of a peer

12  review journal?

13  A    Yes, I've been on the editorial boards of four journals.

14  Q    Have you ever won any rewards for your work?

15  A    Yes.  I had a National Science Foundation post doctoral

16  fellowship.  I had --I was a presidential young investigator,

17  a Miller Research Professor, and I've won some awards for my

18  work on election auditing.

19        The most recent one was from the Chancellor's Award

20  for Public Service for Research in Public Interest.

21  Q    And, Dr. Stark, have you ever served as a consultant in a

22  lawsuit before?

23  A    Yes, I have.

24  Q    And approximately how many times have you been such a

25  consultant?

1   A    A couple of dozen.

2   Q    Have you ever served as a testifying expert?

3   A    Yes, I have.

4   Q    And on approximately how many occasions have you done so?

5   A    It's on the order of 20.  I've -- those weren't all --

6   they didn't result in testimony.  I mean, some cases disappear

7   before even the report gets written.

8         Some settle after a report is written.  I haven't

9   testified nearly that many times.

10  Q    Have you ever served as an expert report for the

11  Department of Justice?

12  A    Yes, I have.

13  Q    And on approximately how many number of occasions have

14  you done so?

15  A    I think I've worked on about six or seven cases for the

16  Department of Justice, that's resulted in testimony.  And one

17  case before this one.  I've written reports in a couple of

18  others.

19  Q    Have you ever served as an expert for a party who is

20  adverse to the Federal Government in litigation?

21  A    Yes.  Several times.  Actually I'm currently involved in

22  a matter that's adverse to the Federal Government.

23  Q    On the number of occasions where you served as an expert

24  in litigation, have you ever not been qualified as an expert?

25  A    No, I've been qualified in the State and Federal Court,

1    and never not been qualified.

2    Q    Have you ever testified before any legislative bodies?

3    A    Yes, I have.  I testified to the U.S. House of

4    Representatives subcommittee on the census regarding use of

5    survey sampling to adjust the census for undercount.

6             I've testified to the California Senate Committee on

7    natural resources regarding sampling to estimate abalone

8    populations.  And I've testified to both the California Senate

9    and the California Assembly on the use of sampling to check

10   election integrity, and verify that notes were tabulated

11   accurately.

12   Q    And, Dr. Stark, in the present lawsuit are you being

13   compensated for your work?

14   A    Yes, I am.

15   Q    And what is your hourly rate for your work in this case?

16   A    $1,200

17   Q    And is that amount commensurate with what you've charged

18   for serving as an expert witness in other cases?

19   A    That's been my rate for all clients since January.

20             MR. SWINTON:  Your Honor, at this time, the

21   defendant hereby tenders Dr. Stark as an expert in the field

22   of statistics.

23             THE COURT:  The field of?

24             MR. SWINTON:  Statistics.

25             THE COURT:  Okay.  All right.  Cross-examine on

1    qualifications?

2              MR. MURRAY:  No, Your Honor.

3              THE COURT:  All right.  You may proceed as an

4    expert.

5                        DIRECT EXAMINATION

6    BY MR. SWINTON:

7    Q    And, Dr. Stark, in your research have you ever used

8    statistics to estimate a prevalence rate before?

9    A    Yes, I have.

10   Q    And when you've estimated a prevalence rate, are there

11   any key considerations to take into account?

12   A    Yes.  If you're in a situation where you can't afford to

13   do a complete census, or a census is impractical, and you need

14   to base an estimate on a sample, there's three primary

15   ingredients to consider.

16             One is the sampling frame, one is the method by

17   which the sample is drawn, and the other is the response rate.

18   So I can explain those, if you'd like.

19   Q    So if we take the first one first, what is a sampling

20   frame?

21   A    The sampling frame is the part of the population or the

22   group of individuals or units that you are actually able to

23   draw a sample from.  Typically, when you're talking about

24   people, it's difficult to enumerate everyone in the group that

25   you'd actually like to study, but you might have a list that's

1    available that overlaps with the population that you'd like to

2    study largely.

3            It's the list from which you actually draw the

4    sample, is the sampling frame.  Typically a sampling frame

5    isn't going to be an exact match to the population you care

6    about, it will be somewhat over inclusive and somewhat under

7    inclusive.

8    Q    And if -- is it possible to extrapolate from the sample

9    population, if there is such a mismatch?

10   A    It introduces bias, the mismatch between the frame and

11   and the population.  The extent of that bias depends on the

12   extent of the mismatch.  To the extent that the thing you care

13   about agrees between the frame and the population you're

14   sampling from, bias is less of an issue, but it can disagree

15   substantially, it could bias your estimate substantially.

16   Q    And the second factor you mentioned was the sample

17   selection, and I think you said random sample.  What is a

18   random sample?

19   A    Random sampling is the touchstone for sampling methods.

20   It's the gold standard, it's the only one that you can

21   actually make quantitative statements about the

22   representativeness and reliability of the results from the

23   sample.

24           Random in this context is a term of art.  In

25   ordinary parlance people talk about random, they use it

1  synonymously with haphazard, like I heard the most random

2  thing today, or ran into this random person.

3           That's not what random is for the purpose of random

4  sampling.  Random sampling involves deliberate stirring, you

5  actually have to introduce randomness.  So to make an analogy

6  to understanding -- picking out whether a pot of soup is too

7  salty, the most efficient way to do it is you stir the soup

8  and then you taste a tablespoon.

9           So the stirring and then taking a tablespoon amounts

10  to taking a random sample of the soup.  But you have to

11  deliberately stir it, that's the randomness.

12  Q    So when you're studying humans, how do you ensure that

13  you're selecting a random sample?

14  A    Well you can't really stir people up -- well not

15  literally.  So what you typically do is assign an identifier

16  to everybody in the sampling frame, and you stir up the

17  identifiers.

18           Now how do you stir the identifiers?  You typically

19  make a list on a computer and use the computer to draw a

20  random sample from the list.  And then those people whose

21  identifiers are drawn, you go and find them and seek to

22  interview them.

23           It's quite analogous to stirring and taking a

24  spoonful.

25  Q    Is a random sample something different from a sample of

1   convenience?

2   A    Yes.  A sample of convenience isn't a random sample, it's

3   one of the kinds of things that's drawn in distinction to a

4   random sample.  A sample of convenience is typically taking

5   those members of the population that are easily accessible to

6   you for whatever reason.

7        It might be because they present themselves to you,

8   they volunteer.  It might be because they're in your

9   classroom.  It might be for some other reason.  But that's a

10  distinction.

11  Q    Is it possible to extrapolate to a broader population

12  from a sample of convenience?

13  A    Well you can do it.  The problem is that you can't figure

14  out how wrong you're likely to be.  You can't make any sort of

15  rigorous imprint.  So if you assume that the population is

16  like your sample, there's no way to know how far off your

17  estimate is likely to be.

18       There's no way to construct a margin of error, or a

19  confidence interval, or anything like that.  There's no way to

20  quantify the uncertainty.

21  Q    And I think the third factor you mentioned in making a

22  presence estimate is response rate.  What's a response rate?

23  A    Especially if we're talking about taking a sample of

24  people, like a sample survey, not everyone who you select in

25  the random sample will be willing to talk to you, or you might

1    not be able to find them at all.

2              To the extent that people are unwilling to give

3    data, or you're unable to get data from them, that can

4    introduce bias into the results.  The -- especially if they

5    tend to differ from the people -- from -- differ with regard

6    to the characteristic that you care about from the -- you

7    know, from the people who are willing to respond to the

8    results.

9              That introduces something called non-response bias.

10   Q    And is there an optimal number for a response rate?

11   A    Well you'd like to get 100 percent.  In a lot of

12   situations you an get 100 percent.  But when you're dealing

13   with people, it's typically hard to get 100 percent.  There

14   will typically be some non-response.

15             There's no bright line.

16   Q    Is there an acceptable threshold for a response rate?

17   A    There is.  People publish recommendations for this in the

18   Federal Judicial Center Reference Manual on Scientific

19   Evidence, the chapter of Survey Sampling says that if the

20   response rate is above 90 percent, you can generally treat the

21   results of the survey is reliable.  It then goes down a scale

22   of various percentages like 75 to 90, and 50 to 75, saying you

23   need more and more skepticism.

24             And below 50 percent, I think it essentially says

25   that it's not suitable for making quantitative estimates.

1   Q    And, Dr. Stark, are you aware of something called the

2   margin of error?

3   A    Yes.

4   Q    And what's a margin of error?

5   A    Margin of error is a way of quantifying the uncertainty

6   in your estimate having to do with the luck of the draw.

7   Because you're drawing the sample at random, the luck of the

8   draw enters.  I mean, if I were trying to estimate the

9   average, for the sake of argument, age of people in this room,

10  since we're talking about age, I might take five people at

11  random, compute their average age, and that would give me an

12  estimate of the average age of the people in the room.

13          But if I repeated that procedure, I would probably

14  get a different -- I wouldn't get exactly the same five

15  people, I'd get a slightly different estimate of the average

16  age.  The margin of error takes that variability from -- in

17  the sample into account to establish what the uncertainty is

18  due to the luck of the draw.

19          But it's quantifying the error that's coming from

20  the fact that I'm basing things on a random sample.

21  Q    Are you aware of something called a confidence interval?

22  A    Yes.

23  Q    And what's a confidence interval?

24  A    It's related to the margin of error.  It's another way of

25  quantifying the uncertainty that comes from the luck of the

Stark - Direct (Swi)                              83

1   draw.  So a confidence interval is a range of numbers that's

2   constructed in such a way that it has a known large

3   probability of containing the true value of the thing that

4   you're trying to estimate.

5           Again, the probability there is coming from the

6   random -- the randomness of the sample.  It has to be a random

7   sample, or it's not a confidence interval.

8   Q    So is it possible to have a margin of error or confidence

9   interval if there's no random sample?

10  A    No, it's possible to go through the motions of computing

11  the numbers as if the sample were random, but the

12  interpretation is completely different, because the margin of

13  error's trying to quantify the luck of the draw from random

14  sampling.  The confidence interval is trying to quantify

15  probability that comes from the random sampling.

16  Q    And, Dr. Stark, have you reviewed the expert report of

17  Dr. Michelle Drouin in this case?

18  A    Yes, I have.

19  Q    And have you reviewed the estimate she makes about the

20  prevalence of sexting among 18 to 24 year olds nationwide?

21  A    Yes, I have.

22  Q    And do you have an opinion about the statistical basis

23  for that estimate?

24  A    Yes.  I don't see a statistical basis for the estimate.

25  Q    And what's the basis for your opinion in that regard?

1    A    Well the two studies that are her primary evidence were

2    based on undergraduates enrolled in the psychology class at a

3    Midwestern university.

4         They were students who volunteered in return for

5    course credit.  It's not -- because that -- that's a sample of

6    convenience.  They were students who were available to her for

7    the study.  They were students who volunteered on some basis.

8    It's not clear whether they would be representative of other

9    students in the same class.

10        It's even less clear that they would be

11   representative for the students at the same university in

12   different kinds of courses, or students at other universities,

13   or young adults as a whole for the nation.

14   Q    And these problems that you've identified with Dr.

15   Drouin's studies of undergraduate psychology students, would

16   those be present in any study using undergraduate psychology

17   students?

18        If we were talking about something that had to do with

19   human biology where there's reason to believe that people are

20   quite similar, for example, if you were doing a study on

21   reaction time or something -- something like that, then there

22   might be a biological basis for concluding that students in

23   other places, or young adults as a whole are similar to the

24   sample you get as a sample of convenience in an undergraduate

25   psychology class.

1        But for something involving social behavior, I think

2   that there is big differences between students in different

3   majors, even within the same university, and geographic

4   differences, and I don't see -- there's no -- there's no

5   biological basis for making that generalization, and there's

6   no statistical basis for making the generalization, since the

7   sample isn't a random sample.

8   Q    And, Dr. Stark, are you aware that Dr. Drouin compared

9   the results of the studies of undergraduate psychology

10  students to three other studies that weren't limited to

11  undergraduate students?

12  A    Yes, sir.

13  Q    And are you aware that her estimate about the prevalence

14  of sexting nationwide, is based on where she determined that

15  there was a convergence of the evidence from these six

16  studies?

17  A    Yes.  I'm aware of that.

18  Q    And is a convergence of the evidence a statistical

19  method?

20  A    No.  I haven't heard that phrase used as a term of art in

21  anything to do with science or statistics.

22  Q    Can you form a reliable estimate by considering

23  prevalence estimates from six different studies?

24  A    If the studies themselves were reliable, if they were

25  well-grounded, then combining information from them would make

1    sense, and in principal could give you a more reliable

2    estimate.  But if none of them is grounded, the fact that they

3    agree doesn't mean very much.  I could give you a story as an

4    analogy.

5    Q    Sure.

6    A    Suppose we want to know how tall the Emperor of China is,

7    we've never see him, so we decide to collect a bunch of

8    evidence.  We ask a million Chinese how tall the emperor is.

9    Everybody gives us a number.  For the sake of argument, let's

10   say that on average they say he's five foot nine, and that

11   almost everybody gives an answer that's between five foot

12   eight and five foot ten.

13        So we have convergence of the evidence that the

14   height is between five eight and five ten.  If I'm

15   interpreting correctly what Dr. Drouin meant.  The problem is

16   that the Emperor lives in the Forbidden City, and nobody's

17   every seen him.

18        So we have an awful lot of evidence, but none of it

19   is grounded.  The fact that it converges doesn't tell us

20   anything new.

21   Q    And, Dr. Stark, do you recall whether the definition of

22   sexting was the same across all six studies that Dr. Drouin

23   considered?

24   A    My recollection is that it was not.

25   Q    And does the lack of similarity in definition effect the

1  reliability of her estimate?

2  A    It certainly complicates the matter of making an estimate

3  of -- according to any single definition.  If you took

4  sexually suggestive to be an inclusive category that included

5  sexually explicit, then it might be possible to get an

6  estimate for sexually suggestive.  But if you're mixing

7  sexually suggestive and sexually explicit together, I don't

8  see how you can get an estimate for sexually explicit.

9  Q    Now, Dr. Stark, I'm going to show you a document that's

10  been marked as Defendant's Exhibit 203.  Have you seen this

11  document before?

12  A    I'm sorry, I'm looking at this?

13  Q    Yeah.

14  A    I've seen that page before.

15  Q    An I believe this is a study that both Dr. Drouin and Dr.

16  Zimmerman relied on in their -- in making their prevalence

17  estimates.

18        MR. SWINTON:  If we could turn to page five of the

19  study, which is Bates Number 2035, and cull out the first two

20  paragraphs under the heading about the survey?

21  BY MR. SWINTON::

22  Q    Dr. Stark, these paragraphs say that the survey was

23  fielded online to a total of 1,280 respondents.  It was

24  conducted by Tru, a global leader in research on teens and

25  twenty something's.

1          The second paragraph says that:

2          "Respondents for this survey were selected from

3     among those who have volunteered to participate in True's

4     online surveys.  And that respondents were stratified

5     according to the U.S. Census, and the data had been weighted

6     to reflect the demographic compositions of teens and adults."

7          Now, Dr. Stark, based on this information can you

8     make a determination about whether this survey is a reliable

9     estimate of the nationwide prevalence of sexting?

10    A    Well the -- that disclaimer paragraph says twice that it

11    isn't a random sample.  It says first that it was volunteers,

12    so that's a sample of convenience.

13         And then it repeats it at the bottom that it's not a

14    probability sample.  A probability sample and random sample

15    are synonymous.  So it's very difficult to know whether this

16    really is representative.  There's no reason that it should

17    be, since it isn't a random sample.  And there's no way to

18    quantify how far from representative it's likely to be,

19    because it isn't a random sample.

20         I don't know what the response rate is.  I don't

21    know how the people were solicited to volunteer.  I don't know

22    how many were involved in actually answering this, but I do

23    know that they weren't a random sample in the first place.

24    Q    And, Dr. Stark, have you reviewed the expert report of

25    Dr. Mark Zimmerman in this case?

1    A     Yes, I have.

2    Q     And have you reviewed the estimate that he makes about

3    the prevalence of sexting among 18 to 24 year olds nationwide?

4    A     Yes, sir.

5    Q     And do you have an opinion about the statistical basis

6    for his estimate?

7    A     Again, I don't think it has a statistical basis.

8    Q     And what's the basis for your opinion?

9    A     Well the method that he used to select the sample is

10   called respondent driven sampling.

11            THE COURT:  Say that slowly.

12            THE WITNESS:  Respondent driven sampling.  Or RDS.

13   And it is a form of a sample of convenience.  It's a

14   complicated method, it's an interesting method.  But it's kind

15   of like fishing.  Where you fish for candidates for your

16   survey with $20 bills, and then you ask them -- you pay them

17   to go do more fishing for you by paying them for other people

18   whom they recruit.

19            This is a little bit like holding out the spoon and

20   seeing what soup jumps into it.  There's not any particular

21   reason that this should give a representative sample.  It's

22   not -- it's certainly not a random sample.

23   BY MR. SWINTON:

24   Q     And, Dr. Stark, are you aware that Dr. Zimmerman obtained

25   prevalence rates for the use of certain types of drugs from

1    the participants he selected using RDS?

2    A    Yes.

3    Q    And are you aware that many of the drug use prevalence

4    rates were very similar to prevalence rates from a highly

5    regarded national survey on drug use?

6    A    Yes.

7    Q    And does the similarity in these rates increase the

8    reliability of the findings from Dr. Zimmerman's sexting

9    study?

10   A    No, I think it cuts the other way.  If the estimates

11   hadn't agreed, that would have been a red flag that his est --

12   that his other variables were likely to be unrepresentative,

13   as well.  But the fact that it agrees on one measure, doesn't

14   give you any confidence that it agrees on other measures.

15           There's a very famous examples -- counter examples

16   to that assumption.

17   Q    And what are those counter examples that you mention?

18   A    Well one of the ones that gets discussed in statistic

19   classes a lot is from Shere Hite's study on women and love

20   from the 1980's, I think.  She took a nationwide survey and

21   had roughly 5,000 respondents, if I recall correctly.

22           Those respondents matched -- the women matched the

23   national demographics of women quite accurately in terms of

24   their age distribution, their ethnicity, their income

25   distribution, where they lived whether it was urban, suburban

1    or rural.  So it was a beautiful match to the demography, but

2    for the quantity that she was actually interested in, which

3    was people's happiness and satisfaction in their

4    relationships, it was way off.

5            Because the thing that she was trying to measure was

6    related to people's propensity to respond to the survey.

7    Q    Dr. Stark, are you aware that Dr. Zimmerman weighted and

8    stratified the data in the sexting study to make it more

9    similar to the demographic characteristics in the national

10   population?

11   A    Yes.

12   Q    And does this weighting and stratification increase the

13   reliability of Dr. Zimmerman's sexting findings?

14   A    It might, it might not.  It's sort of impossible to tell.

15   The fact that the demographics didn't match in the first

16   place, is an indication that his sample wasn't represent --

17   the sample itself wasn't representative of the -- of young --

18   U.S. young adults.

19           Whether the, you know, adjustment of the data after

20   the fact to try to bring the demographics in line helps or

21   hurts, is hard to know.  But even if the demographics had

22   agreed, the example of Hite's study on women in love shows

23   that matching the demographics doesn't give you any kind of

24   guarantee that you match on the characteristic that you're --

25   that you care about, the reason that you're doing the study.

1   Q    And are you aware that Dr. Zimmerman offered to discount

2   his estimate by as much as 50 percent to demonstrate that the

3   number of people sexting nationwide is large, even if his

4   estimate isn't precise?

5   A    Yes.

6   Q    And is there a statistical basis for this type of

7   discounting?

8   A    Well if he had started with a random sample, then he

9   could have done the discounting in order to construct a

10  confidence interval, so that we could have high confidence

11  that the true value the true prevalence of sexting is above

12  that lower number that he gives.

13        But since the sample he started with isn't a random

14  sample, there's no way to know how much you have to discount

15  it in order to get a conservative estimate of the rate of

16  sexting.

17        It might be 50 percent, it might be 90 percent, it

18  might be 99 percent, there's no way to know.

19  Q    And, Dr. Stark, I'm going to show you a document that's

20  been marked as Plaintiff's Exhibit 37-HHHH.  Do you recognize

21  this document?

22  A    I recognize this page, yes.

23        MR. SWINTON:  If we could call out the summary

24  paragraph at the top middle of the page?

25  BY MR. SWINTON:

1  Q    So, Dr. Stark, this summary paragraph says that for the

2  study data were collected through an on-line questionnaire in

3  Swedish administered through the Swedish web portal

4  Passager.se.  Out of the total sample of 1,828 participants,

5  almost a third, both men and women, reported to have engaged

6  in cybersex.

7           Now, Dr. Stark, can you use the findings from this

8  study to reliably estimate the number of Americans who are

9  engaging in cybersex?

10  A    Only if you assume that Americans as a whole are like

11  that subset of the Swedish population that uses this web

12  portal, and assuming that this accurate represents what

13  happens at that web portal.

14           MR. SWINTON:  And if we could go to the second page

15  of this study.  And if we could call out the paragraph in the

16  left-hand column that starts with the word "Mostly."

17  BY MR. SWINTON:

18  Q    Dr. Stark, this paragraph says that:

19           "Mostly cybersex is a real time event involving two

20  persons who are typing each other messages using a chat client

21  like ICQ or Microsoft Messenger.  In other cases, a couple may

22  find or create themselves a chat room in cyberspace where this

23  interaction takes place.

24           "Some even exchange pictures or short movies of

25  themselves, or erotic pictures and movies found on the web to

1   accompany the otherwise text based communication."

2          Dr. Stark, do you know form this study the amount of

3   cybersex that involved the exchange of images?

4   A    No.  This suggests that it's a small fraction of it, but

5   it doesn't give any quantitative estimate.

6          MR. SWINTON:  And if we could go to the third page

7   of this study and call out the paragraph under the heading

8   procedures.

9   BY MR. SWINTON:

10  Q    And this paragraph says that the questionnaire was

11  launched through a Swedish portal site called Passager, and

12  that a banner was placed on the website for approximately two

13  weeks and appeared randomly on the portal, as well as on its

14  sub-sites.  There was no way to control where the banner would

15  appear.

16         And it was not possible to predict for whom the

17  banner would show.  Thus, for all practical purposes, its

18  appearance was truly random according to the Passager

19  administrators.  So, Dr. Stark, is this an example of the

20  random sample that you were discussing earlier?

21  A    Possibly, sort of.  It's hard to tell.  From the

22  description, it sounds like they're confusing haphazard with

23  random.  That just because it's unpredictable doesn't mean

24  that it's equally likely for any given individual -- any

25  individual page view to include the banner or not.

1          But even if you grant that it was displayed at

2     random, that's not a guarantee that the people who respond to

3     the ad correspond to a random sample of those people who used

4     the portal during that two-week period.

5          It's certainly a very different sampling frame from

6     the Swedish population or the U.S. population.

7     Q    Dr. Stark, I'm going to show you another document, this

8     one's been marked as Plaintiff's Exhibit 37-PPPP.  Do you

9     recognize this document?

10    A    I've seen this page, yes.

11         MR. SWINTON:  And if we could cull out the first two

12    paragraphs in the article below the image.

13    BY MR. SWINTON:

14    Q    So this is a Today Show tech blog post that's summarizing

15    the findings of a sexting study.  And the last sentence in the

16    first paragraph says:

17         "That nearly one in five Americans who have a smart

18    phone say that they have used it for sexting.  Sharing

19    explicit photos or text messages with others."

20         It says that this -- in the second paragraph it says

21    that:

22         "The survey was commissioned by Lookout Mobile

23    Security and was conducted using a Harris Interactive Poll."

24         So, Dr. Stark, do you have a sufficient amount of

25    information from this blog post to reliably estimate the

1    prevalence of sexting nationwide?

2    A    No.  Not from this post alone.  I would need to

3    understand in detail how Harris Interactive does its polling.

4    How it solicits its -- the group of people for the sample,

5    what the response rate was, so forth and so on.

6    Q    And do you have enough information from this blog post to

7    know the types of images that participants in the study were

8    exchanging?

9    A    No.  It says explicit, but it looks like explicit photos

10   and text messages are being lumped together, so it's not

11   possible to know what fraction of those were -- had to do with

12   explicit images.

13              MR. SWINTON:  Your Honor, at this time I have no

14   further questions.  We move to admit Defense Exhibit 197 from

15   Bates page 2898 to 2968, which is the Curriculum Vitae of Dr.

16   Stark.

17              THE COURT:  It will be admitted.  Okay.  Cross-exam.

18                      CROSS-EXAMINATION

19   BY MR. MURRAY:

20   Q    Dr. Stark, I think you indicated -- did I understand you

21   to say that your hourly rate is $1,200 an hour?

22   A    Yes, sir.

23   Q    Okay.  And is that the same for trial as it is for

24   preparing your report?

25   A    Yes, sir.

Stark - Cross (Mur)                                    97

1    Q    Okay.  And then do you charge for travel time as well?

2    A    I typically try to use the travel time to do work related

3    to the case and charge for that fraction that I'm on task, so

4    I read documents on the flight, things like that.

5              I am uncomfortable charging for time that I'm doing

6    something else.

7    Q    And how long has that been your rate?  You mentioned, I

8    think, only since January?

9    A    I raised my rate from $1,000 to $1,200 on January 1st.

10   Q    Okay.  Now if I understand your testimony today, you were

11   primarily focused upon the studies that Dr. Drouin and Dr.

12   Zimmerman did?

13             And giving us the benefit of your criticisms of the

14   conclusions that they tried to draw from them, is that an

15   accurate statement of at least part of what you testified to?

16   A    Yes, I think that my testimony has been largely about

17   what there were -- I understand the reports to have relied on.

18   Q    Okay.  Now you haven't studied the subject yourself, have

19   you?  Sexting.

20   A    Sexting?  No I have not.

21   Q    You've heard about it, though?

22   A    Yes.

23   Q    It's been in the news?

24   A    Yes.

25   Q    Okay.  Do you remember ever seeing that Samsung

1    commercial with the -- with the wife and the two kinds sending

2    the husband off to his trip, and the wife clicks the -- her

3    phone with his smart phone and says, you better not open this

4    on the plane?  Have you seen that commercial?

5    A    I actually don't watch television.

6    Q    Okay.  All right.  But you certainly have no reason to

7    believe that sexting is an isolated phenomenon, just based on

8    the reports that you've seen, correct?

9    A    No.

10            MR. SWINTON:  Objection, Your Honor.

11            THE COURT:  Overruled.

12            THE WITNESS:  I don't have an opinion.

13   BY MR. MURRAY:

14   Q    Okay.  Now it is true that both Dr. Drouin and Dr.

15   Zimmerman's studies were published in peer reviewed journals,

16   correct?

17   A    Yes.  I think one might have been in press at the time

18   that it was attached to this, but I think they were both in --

19   yes.

20   Q    Okay.  And I think that your main criticism, if I

21   understood it correctly, was their use of convenience samples,

22   or in the case of Dr. Zimmerman a form of convenience sample

23   known as a respondent driven sample, as distinguished from a

24   random sample, correct?

25   A    My main criticism is using samples of that type to

1    extrapolate from their study population to all U.S. young

2    adults.

3    Q    And that's because they didn't use a random sample, but

4    instead used either a convenience sample, or a form of a

5    convenience sample known as a respondent driven sample,

6    correct?

7    A    Yes.  Generalizing beyond their sample is problematic

8    because of the nature of the sample.

9    Q    Okay.  And if I understand correctly, you're saying that

10   no reliable conclusions then can be drawn from any study,

11   unless it came from a random sample survey, is that correct?

12   A    No, sir.  That's not what I intended to say.

13   Q    Okay.  Does Gallup generally use random samples in their

14   surveys?

15   A    Yes.  It does.

16   Q    And does Harris generally use random samples in their

17   surveys?

18   A    My understanding is that some of the Harris polls use

19   random samples, and some use samples of convenience, depending

20   on what the mode of interview is.

21   Q    Okay.  Now you were asked about Plaintiff's Exhibit

22   37-PPPP.  And that is a report that was publicized about a

23   Harris Interactive Survey, correct?

24   A    Yes, sir.

25   Q    Now you would at least agree with me that Harris is a

1   respected pollstering company, correct?

2   A    Yes, they are.

3   Q    And they've been around for many, many years, correct?

4   A    Yes, sir.

5   Q    Have you ever used them for -- in any research that

6   you've done?

7   A    No, I have not.

8   Q    Have you ever reviewed any of their surveys in connection

9   with any of your research?

10  A    I'm not sure what you mean by reviewed.

11  Q    Look at their -- actually seen any of their surveys and

12  results?

13  A    Well in this particular case, I looked up how the Harris

14  Interactive poll was done.  It's not a random sample, it's a

15  sample of convenience.  It's designed to be something that's

16  fast and cheap to get a, you know, to get a quick look which

17  has an unknown accuracy.

18          It's very different --

19  Q    How did you look it up?

20  A    I'm sorry?

21  Q    How did you look it up?

22  A    I went to Harris's website and explored their description

23  of their data products and the services that they offer.

24  Q    Well did they on their website, say, report this study?

25  A    I don't specifically recall that study, but the Harris

1    Interactive poll is a tool that they make available to people

2    to get quick inexpensive answers to questions.

3    Q     Well is it your testimony that the website says that

4    their Harris Interactive poll never uses random sampling?

5    A     I don't recall specifically.  I -- my general

6    recollection is that it is not based on a random sample.

7    Q     And that their website makes that representation?

8    A     I found the information online.

9    Q     Okay.

10   A     Yes.

11   Q     But you didn't find any information about specifically

12   whether the survey in Plaintiff's Exhibit 37-PPPP was a random

13   sample or not, or did  you?

14   A     Honestly, right now, I don't recall.

15   Q     In any case, the Harris Interactive poll indicated that

16   nearly one in five Americans who have smart phones say they

17   have used it for sexting, sharing explicit photos or text

18   messages with others, correct?

19   A     Yes, sir, that's what it says.

20   Q     It also indicates that the biggest age group for sexting

21   are 18 to 34 year old men, 32 percent.  And 35 to 44 year old

22   women, 25 percent.

23             MR. SWINTON:  Your Honor, as we noted on Friday, we

24   object to this exhibit coming in as evidence, because this is

25   hearsay.

1         THE COURT:  Overruled.  It's cross-examination.  Do

2    you understand the question?

3         THE WITNESS:  I see that there on the page, yes.

4    BY MR. MURRAY:

5    Q    Okay.  And the poll was of 2,097 adults, correct?

6    A    That's what it says, yes.

7    Q    And it says that more than a quarter of adults admitted

8    "taking or receiving explicit photos with their smart phones."

9    Correct?

10   A    Yes.

11   Q    But as expected 18 to 13 year old smart phone owners send

12   or receive explicit pictures and/or videos much more than

13   their older counterparts, with 40 percent doing so, correct?

14   A    That's what it says, yes.

15   Q    And yet it's still not just for the very young, because

16   even one in ten people age 55 and older with smart phones said

17   they also sexted, correct?

18   A    Yes, sir.

19   Q    And then they also said that when it came to videos

20   instead of just pictures, 11 percent of Americans said they

21   record explicit videos on their phones?

22   A    Yes, sir.

23   Q    Now let me ask you something.  There's going to be a

24   presidential election in 2016, correct?

25   A    I think so.

1    Q    Okay.  Without doing a random sampling poll, can you tell

2    me with some degree of certainty that in that election

3    millions of voters will vote for the Republican candidate?

4    A    Yes.

5    Q    And can you tell me that without doing a random sample

6    polling that millions of Americans will vote for the

7    Democratic candidate?

8    A    Yes.  That's not a statistical conclusion, that's just

9    commonsense.

10   Q    Well but it's statistics, it's millions of people are

11   going to vote for the Republican candidate, isn't that a

12   number?  Isn't that a quantity?

13   A    There's two different senses of the word statistics.

14   There's statistics, as in numbers that get reported in the

15   press, baseball scores, things like that.  And then there's

16   statistics, the discipline, the scientific study of data and

17   so forth.  So it's statistic in the first sense, it's a

18   number.

19        But it's not statistics in the second sense, it's

20   not data based, it's commonsense, it's not the application of

21   the rules of statistics.

22   Q    Well and yet Gallup and Harris are paid lots of money

23   every presidential election year to do random sample polling

24   in order to quantify with great precision who's going to vote

25   for whom, don't they?

1  A    They're paid large amounts of money to attempt to

2  quantify it.  I'm not sure that the precision always turns out

3  to be that great.  And, yes, they're paid to do polls taking

4  random samples.

5  Q    Okay.  But if the question at issue were whether or not

6  millions of people are going to vote for the Republican

7  candidate, you wouldn't need to do a random sample survey to

8  arrive at a reliable conclusion, would you agree with that?

9  A    I could arrive at something that I feel quite confident

10 about as an ordinary human being without taking a random

11 sample, and doing Statistics, with a capital S, but that

12 conclusion is not a Statistical, with a capital S, conclusion.

13       I can't quantify the uncertainty in that in any

14 statistically meaningful way.  But, yes, as a commonsense

15 proposition, I'm quite confident that millions of people will

16 vote for both parties.

17 Q    Okay.  Now I want to ask you something about your report,

18 Doctor.  In it, and this is page five of your report.  Do you

19 see that you have a section in your report that quotes the

20 reference guide on survey research in the Federal Judicial

21 Center Reference Manual on Scientific Evidence?

22 A    Yes, sir.

23 Q    And I think you referenced that manual in your direct

24 testimony on direct examination?

25 A    Yes, sir.

1    Q    And one of the things that that reference guide for the

2    Federal Judicial Center states, according to your report, is

3    that:

4                "Quantitative values computed from samples of

5    convenience should be used as rough indicators rather than as

6    precise quantitative estimates."

7                Correct?

8    A    Yes, sir.

9    Q    Now I'm going to get back to them in a minute.  But do

10   you see that just before the quote that I just read to you,

11   you have three dots?

12   A    Yes.

13   Q    And is that because you omitted language that preceded

14   that quote?

15   A    It's intended to be an ellipsis mark, yes.

16   Q    Okay.  I want to show you from the -- well you cite pages

17   242 to 244 of that, correct?

18   A    Yes, sir.

19   Q    I want to show you page 244 of that manual.  Do you see

20   that it's the reference manual on scientific evidence?

21   A    Yes, sir.

22   Q    And just looking at the cover page, it's the second

23   edition, which is 2000.  The year 2000?

24   A    Yes.

25   Q    And that's the one that you were quoting from?

Stark - Cross (Mur)                              106

1   A     I believe so.

2   Q     We can put it back up there.

3   A     I have a couple of different copies of this at home.

4   Q     You see 2000, reference guide?

5   A     Yes.

6   Q     Okay.  Now if you look at page 244 where that quote about

7   quantity came, the manual says this, does it not?

8             "Although probability samples..."

9             And I'm reading from the first -- actually the

10  second -- the new paragraph.

11            "Although probability sample surveys often are

12  conducted in organizational settings, the recommended sampling

13  approach and the academic and Government publications on

14  surveys probability sample surveys can be expensive when

15  in-person interviews are required, and the targeted population

16  is disbursed widely, or qualified respondents are scarce."

17            Correct?

18  A     Yes, sir.

19  Q     It then goes on to say then:

20            "A majority of the consumer surveys conducted for

21  Lanham Act litigation, present results from non-probability

22  convenience samples.  They are admitted into evidence based on

23  the argument that non-probability sampling is used widely in

24  marketing research, and that 'results of these studies are

25  used by major American companies in making decisions of

Stark - Cross (Mur)                                        107

1  considerable importance.'"

2  A    Yes, sir.

3  Q    And that's all true, isn't it?

4  A    To the best of my knowledge that's true.

5  Q    So major American companies make big economic decisions

6  based on convenience samples, according to that article,

7  correct?

8  A    They risk their money on the basis of a convenience

9  sample.

10  Q    Now getting back then to the part of the quote that you

11  did have in your report, it says here:

12          "Quantitative values computed from samples of

13  convenience should be viewed as rough indicators, rather then

14  as precise quantitative estimates."

15          Correct?

16  A    Yes, sir.

17  Q    So according to the Federal Judicial Center that you're

18  quoting, a convenience sample can give us some valuable

19  information as a rough indicator, so long as we're not

20  concerned with precise quantification, isn't that true?

21  A    I think it says that it -- valuable, I didn't see in the

22  quote.  Rough, I don't know exactly what rough means.  But

23  that's what the words say.

24  Q    Well that's what you quoted from that Federal manual,

25  correct?

1    A    I didn't quote the piece about rough estimates, you

2    brought up the piece about rough estimates.

3    Q    Rough indicators.

4    A    Oh rough -- I'm sorry rough indicators.  Yes rough

5    indicators.

6    Q    Didn't you quote that part?

7    A    Yes.

8    Q    Okay.  So just for example, the question isn't the

9    precise number of Americans who are sexting, but just a rough

10   indication of it, then samples of convenience, according to

11   that document, might be able to give us some information on

12   that subject, correct?

13   A    Again, the problem is that there's no way to quantify the

14   likely error in making the estimate on the basis of a sample

15   of convenience.  So the word rough doesn't say that it's good

16   to within 10 percent, 20 percent, 50 percent, 90 percent.

17            It's not a quantitative statement, and there's no

18   way to make a quantitative statement on the basis of a sample

19   of convenience.

20   Q    So you disagree then with -- with what you just quoted,

21   that a convenience sample shouldn't have used as a rough

22   indicator, rather than as a precise quantitative estimate?

23   A    I agree with the quotation.  The issue is, what does

24   rough mean?

25   Q    Okay.  Well I'm not asking you for a definition of rough,

1   but I'm just asking whether you agree that according to the

2   manual that you cite convenience samples can be viewed as

3   rough indicators of the question that is being examined?

4   A    Yes, sir I agree that that's what it says.

5              MR. SWINTON:  Asked and answered, Your Honor.

6              THE COURT:  Overruled.

7   BY MR. MURRAY:

8   Q    Now there was one other thing about your report that I

9   found somewhat interesting.  And that is when you were talking

10  about Dr. Drouin's report, you had a whole paragraph there

11  about your own experience at various universities, in various

12  capacities for more than 36 years, is that correct?

13  A    Yes, sir.

14  Q    And how you had taken courses at seven universities and

15  lectured at many others, and taught in various universities.

16  Is that correct?

17  A    Yes, sir.

18  Q    And then you said:

19              "Firsthand experience tells me that on the whole

20  psychology majors are not exactly like philosophy majors,

21  physics majors, math majors, et cetera, and that students at

22  one university are not exactly like the others."

23              You see all that?

24  A    Yes, sir.

25  Q    Now you're one university professor, correct?

1    A    I am.

2    Q    And if one were trying to answer the question of whether

3    or not undergraduate majors in philosophy, and physics, and

4    math, and economics are the same or different on various

5    matters, you would need to sample more than one person,

6    wouldn't you?

7    A    I think that it's not the right way to frame the issue.

8    Q    Well if --

9    A    The issue is --

10   Q    Could you answer that question?  If I wanted to find out

11   the answer to the question of whether or not psychology majors

12   are not exactly like philosophy majors, for example, I would

13   need to ask more then one person in my survey, would I not?

14   A    You would need to ask more then one student.  You would

15   need to have experience with more than one student.  You can't

16   see that there's a difference between the students unless

17   you've seen more then one student.

18   Q    Well if I wanted to know what university professors who

19   had had experience in a wide range of universities believed

20   about whether or not philosophy majors are the same as

21   economics majors with respect to certain attitudes, could I

22   rely upon a sample of one university professor in order to

23   arrive at that answer?

24   A    If you wanted to do an opinion poll of university

25   professors, you would need to do an opinion poll of university

1    professors.

2    Q    Right.  And a sample of one, would not do would it?

3    A    A sample of one would not give a reliable estimate of

4    what university professors as a whole think.  You would need a

5    random sample of university professors, if you were interested

6    in the distribution of their opinions.

7    Q    Now let me ask you this, Doctor, the -- you had mentioned

8    that you testified for the -- you've worked for the Department

9    of Justice before, correct?

10   A    Yes, sir.

11   Q    In I can't remember how many cases, but at least a

12   couple, correct?

13   A    Yes, sir.

14   Q    Okay.  And one of the cases that you worked on was in the

15   COPA case, the Child Online Protection Act --

16   A    Yes, sir.

17   Q    -- challenge?

18   A    In fact, I think it was tried in -- not before Your

19   Honor, but in this District Court.

20            THE COURT:  Judge Reed.  Yes.

21            THE WITNESS:  Yes, sir.

22   BY MR. MURRAY:

23   Q    Correct?  And you were asked by the Government in that

24   case to do a study of the quantity of sexually explicit

25   material available on the web, and to determine the extent to

1    which filters could be used to block that material.  Was that

2    essentially what you were asked to do?

3    A    Yes.

4    Q    Okay.  And that took a lot of work to do that, didn't it?

5    A    Yes.

6    Q    And just -- can you just give us an estimate as to how

7    much that work cost to get the answer to that question?

8    A    I have no idea.

9    Q    Was it hundreds of thousands of dollars?

10   A    I'm sure it was.

11   Q    Okay.  And how much money would it cost to do a properly

12   constructed random sample, approximately, of adults in the

13   United States on the question of the prevalence of sexting?

14            MR. SWINTON:  Objection, Your Honor, this is

15   irrelevant and speculative.

16            THE COURT:  Well he -- if you have any idea, you can

17   answer.

18            THE WITNESS:  There are many ways one could go about

19   doing it.  One would be to piggyback it onto one of the

20   regular probability samples that's done, like the National

21   Research Center at the University of Chicago conducts roughly

22   annual general societal surveys, which have been used to

23   measure online behavior.

24            So adding a question or two to that survey would be

25   a very inexpensive way to go about -- to go about doing it.

Stark - Redirect (Swi)                                    113

1   BY MR. MURRAY:

2   Q    Well then let me ask you this.  In this case, did the

3   Government ask you to conduct such a survey so that the

4   quantity of adult Americans who in fact do engage in sexting

5   could be reliably and precisely ascertained?

6   A    No, they did not.

7             MR. MURRAY:  May I have a moment, Your Honor?

8             THE COURT:  Sure.

9        (Pause)

10        MR. MURRAY:  I have no further questions.  Thank you.

11            THE COURT:  Any redirect?

12            MR. SWINTON:  Just a few questions, Your Honor.

13            THE COURT:  Yes. Go ahead.

14                    REDIRECT EXAMINATION

15  BY MR. SWINTON:

16  Q    Dr. Stark, I'd just like to take one more look at

17  Plaintiff's Exhibit 37-PPPP.  And this is a, as we discussed

18  on direct, this is a Today's Show tech blog post summarizing

19  the survey that was commissioned by Lookout Mobile Security.

20            Now, Dr. Stark, do you know just on the basis of

21  this blog post whether this was a random sample?

22  A    No.

23  Q    And do you know on the basis of this blog post how

24  sexting was defined in the survey?

25  A    No, sir.

1   Q    And what does it mean that the survey was sponsored by

2   Lookout Mobile Security?

3   A    I suspect they thought it would help their business to

4   have some information out there.  My understanding of what

5   Lookout Mobile Security does is provide the ability to locate

6   or wipe the contents of your cell phone if it gets lost.

7   Presumably, if it's generally believed that this a big

8   problem, that would be good for their business.  At least

9   their stock.

10  Q    And you were also asked on cross-examination about

11  samples of convenience, and particularly you looked at an

12  excerpt from your expert report discussing that.

13          If you were to use a sample of convenience in a

14  study, or in making an estimate, would you want to explain why

15  you were using such a sample of convenience?

16  A    I would want to explain why it wasn't practical or

17  possible to do something better.  I would include disclaimers

18  explaining that it's not possible to generalize the results

19  reliably.

20          I believe that Dr. Drouin included such disclaimers

21  in her research papers.

22  Q    And I think you were also asked about on cross the two

23  different types of statistics, kind of in the numerical sense,

24  then also more in the scientific sense.  Is a Google search a

25  way of getting a statistic in the scientific sense?

1    A    I guess it depends on the Google search.  But in general,

2    it's a lower case statistic, it gives you a number but --

3    Q    So --

4    A    Could you be more --

5    Q    Just looking at the number of Google hits, is that

6    statistics in the scientific sense?

7    A    If you're trying to measure something about Google, you

8    might be able to get information about Google from running

9    queries and finding out how many hits Google reports.  But

10   that's a different question from whether the number that

11   Google reports bears much relationship to what's out there on

12   the web.

13         I'm not quite sure whether I'm answering your

14   question.

15   Q    I think that's fine.

16         MR. SWINTON:  No more questions, Your Honor.

17         THE COURT:  All right.  Any recross?

18         MR. MURRAY:  Yes, Your Honor.  And I would ask

19   permission to reopen the cross to just ask one question that I

20   forgot to ask while I was --

21         THE COURT:  Sure.  Not a problem.

22                     RECROSS-EXAMINATION

23   BY MR. MURRAY:

24   Q    I forgot to ask you, Doctor, about the section in your

25   report where you also quote sampling techniques from Cochran

1    (phonetic) in 2002, do you see that reference?

2    A    Yes, sir.

3    Q    And he says:

4         "About the only way of examining how good a sample

5    of convenience may be is to find the situation in which the

6    results are known, either for the whole population or for a

7    random sample, and make such -- and make comparisons.  Even if

8    a method appears to do well in one such comparison, this does

9    not guarantee that it will do well under different

10   circumstances."

11        Do you see that?

12   A    Yes, sir.

13   Q    Now and you did mention that Dr. Zimmerman did do that by

14   comparing the answers that he got on drug use to the answers

15   that were given on that subject in a random sample recognized

16   study, do you recall that?

17   A    I'm not sure whether the comparison was to a random

18   sample, but he did make such a comparison between two studies

19   for that variable.

20   Q    Okay.

21   A    But there was no opportunity for him to make a comparison

22   between the sexting rate, the variable of interest, and a, you

23   know, a solid study on that topic.  Because to my

24   understanding, there was no such solid study on that topic to

25   make the comparison with.

1    Q    No, I understand that.  But if you compare the answers

2    that you got on the questions of drug use, to the answers that

3    were obtained on a recognized national study that was done

4    appropriately, that will give you some indication as to

5    whether or not, at least on those questions, your sample is

6    representative, won't it?  Isn't that what this author says?

7    A    On the issue of drug use.

8    Q    Okay.

9    A    Not on the issue of something else.

10   Q    Okay.  Now you mentioned that the survey that was done by

11   the Harris Interactive poll was commissioned by a company that

12   has a particular business reason in terms of some application

13   that it offers, correct, on its technology?

14   A    Yes.

15   Q    Okay.  And so a company in the United States that wants

16   to make money oftentimes wants to find out how many potential

17   customers there are out there for a particular product of its,

18   correct?

19   A    Yes, absolutely.

20   Q    And so they sometimes commission a study like the one in

21   Plaintiff's Exhibit 37-PPP (sic) to get information about, for

22   example, how many people in America are sexting?

23   A    Yes.

24   Q    So that they can make some marketing decisions about

25   whether or not it's a big enough market, for example, and

1    enough potential customers to invest a sum of money in trying

2    to reach those people, correct?

3    A     Yes.

4               MR. MURRAY:  That's all I have.

5               THE COURT:  Okay.  All right.  Thank you, Doctor.

6               THE WITNESS:  Thank you very much.

7               THE COURT:  Okay.  First of all, I would like to

8    give you a break and take one myself.  But I'd like to keep it

9    short.  Is a half hour enough time before we have the

10   closings?

11              COUNSEL:  Yes, for us it is, Your Honor.

12              THE COURT:  So we'll resume at 1:00.  Now what I

13   would like to do is give each side 45 minutes.  You don't have

14   to take 45 minutes, but you're welcome to -- if you want to

15   reserve -- I have another hearing in a criminal case at 2:30,

16   that's one reason, but you're going to have briefing.  And let

17   me just explain -- because I've rethought about the briefing.

18   And this is how I would like it to go.

19              Now if you want to -- I would rather have 45 minutes

20   basically for you to set forth your view of what I should do

21   with the facts and as the law, but I would prefer -- and I'm

22   not going t dictate it, I'm not going to interrupt you, but I

23   would prefer that you focus most of your time on the facts.

24              Because you're going to have the opportunity to

25   brief the law, and I'm not going to put any page limits on

Colloquy                                                    119

1    your initial brief.  But here's my thought of where the

2    briefing should go, and it's different then before.

3           Because I thought about it over the weekend.  I

4    would like you both to file simultaneous briefs on all the

5    issues.  And I think that -- and when you argue, you're

6    welcome to tell me that any of my factual findings were wrong,

7    or I should reconsider them, or things like that.

8           But if you don't argue -- and you're welcome to put

9    that in your brief as well.  But I would prefer that you let

10   me know as part of the oral argument proposed factual findings

11   that you think are unsupported by the evidence.

12          Now if I said somebody was honest and you think they

13   were liars, that's going to be hard to convince me that I'm

14   wrong about that, because I think that's something that's

15   completely in my discretion, just like it is with a jury.

16          But if you think I overemphasized something, or I

17   left something out, I would like to know that.  The law is

18   something that I would anticipate would be fully developed in

19   your briefs.  And we'll do simultaneous briefing on all the

20   issues.

21          Now as far as the reply briefs go, here's how I've

22   decided it should be.  The Government has the burden of proof,

23   in my view, on the First Amendment issues, and the plaintiffs

24   have the burden of proof on the Fourth Amendment issues.

25          MS. WYER:  Your Honor?

Colloquy                           120

1             THE COURT:  Let me just finish.  So that's what the

2     law is clearly about, narrow tailoring.  So the reply brief,

3     the Government should deal with the First Amendment issue.

4     And on the reply -- and the plaintiffs deal with the Fourth

5     Amendment issue.  That would make the most sense to me.  Now

6     if anybody -- Ms. Wyer, do you have any violent objections to

7     that?

8             MS. WYER:  Well I just wanted to point out that on

9     the overbreadth claim, the plaintiffs clearly bear the burden

10    on that claim.

11            THE COURT:  Well I don't think that's the law.

12    There's a case called the Redden case -- on the overbreadth, I

13    don't know that that's right.  I think it's more appropriate,

14    given what the Third Circuit did, for the Government to file a

15    reply brief -- on the opening brief, you're welcome to take

16    any position you want.  Okay?

17            But on the reply brief, I would like the Government,

18    the reply brief to be limited to the First Amendment issues,

19    and the plaintiffs' reply brief to be limited to the Fourth

20    Amendment issues.

21            And I'm going to provide a fairly short time for the

22    reply brief, and I'm going to limit it to 15 pages.  All

23    right?  Because I -- and I'm going to shorten the time I had

24    in mind.

25            What I have in mind for timing, and if you have

Colloquy                                          121

1    personal problems, or things like that this is unreasonable,

2    now is the time to speak up.  Or if you want to think about it

3    with your colleagues on recess and we can -- when we come back

4    at 1:00, you an let me know if this poses some hardship on

5    you.

6              All right.  I would like the initial briefs to be

7    filed by Friday, June 28th.  Okay?  And I would like the reply

8    briefs to be filed -- now if that is a problem, I could extend

9    that to, you know, Monday, July 1st.  But I would rather have

10   them on Friday.

11             As far as the reply briefs go, I would like them to

12   be filed by Friday July 5th.  But if there was a real

13   hardship, I could deal with July 8th.  Okay?  That's how I

14   think the briefing should go.  So talk to your colleagues, and

15   we'll take a recess now and we'll resume at 1:00.  Okay?

16             MS. WYER:  Your Honor just one more thing?  We

17   wanted to move two additional Exhibits into evidence.

18             THE COURT:  To what?

19             MS. WYER:  We have two additional Exhibits we just

20   wanted to move into evidence.

21             THE COURT:  Exhibits?

22             MS. WYER:  Yeah, they're already among the Exhibits

23   we originally identified but --

24             THE COURT:  All right.  Well look I would prefer --

25   every exhibit that has been used has been admitted.  It's just

1    a question of compiling a list and having a copy.  Okay?  So

2    that's -- I think that's the most expeditious way to do it.

3              MS. WYER:  We just wanted to move Exhibits 14 and 15

4    into evidence.

5              THE COURT:  Fine.  I'll admit anything that's been

6    used in open Court.  Thank you.  And I'll extend the same to

7    the plaintiffs when we come back.  All right.  So we'll resume

8    at 1:00.  Thank you.

9         (Recess taken, 12:25 p.m. to 1:06 p.m.)

10             THE COURT:  Please be seated.  Janice, we'll -- I

11   promised to give 45 minutes to each side, so we'll be about an

12   hour and a half.  So if the lawyers in the criminal case come,

13   just tell them to wait outside or so.  Okay?

14             All right.  Have you discussed at all or do you have

15   any views about the briefing schedule?

16             MR. MURRAY:  We're fine with the early schedule

17   you --

18             THE COURT:  All right.  June 28th and July 1st for

19   the reply briefs.  Is that all right with the Government?

20             MR. MURRAY:  July 5th.

21             THE COURT:  July 5th.  Yes.  Excuse me.  July 5th.

22   All right.  And we'll follow what I said about the reply brief

23   on the issues limited to 15 pages each.  I'm not going to put

24   any of this in an order.

25             Okay.  All right.  Mr. Murray?

1          MR. MURRAY:  Thank you, Your Honor.  May it please

2     the Court, the first thing I want to do on behalf of my law

3     partner Ms. Baumgardner, and all of our clients, is thank the

4     Court for its careful attention to the evidence.

5          It has been a true pleasure appearing in front of

6     Your Honor, I've got to tell you, and I know you've given

7     serious consideration to this and we all thank you for that.

8          THE COURT:  I am, and I'm still doing it.  I want to

9     thank you for being very well-prepared and representing your

10    clients in the best tradition of the law and advocacy.  And

11    it's obviously you're an expert in this field, and I think

12    I've learned a lot.  And I have not yet decided how I'm coming

13    out, but I'm interested in hearing what you have to say.

14    Thank you.

15         MR. MURRAY:  Thank you, Your Honor.  And I also want

16    to tell you your staff has been most gracious and we feel most

17    welcome and hospitable.

18         THE COURT:  Well that's the way it ought to be.

19         MR. MURRAY:  And I also want to give a special

20    thanks to your law clerk Sarah (phonetic), who I know has

21    worked tirelessly on this case.

22         THE COURT:  Yes.  She's still working on it.

23         MR. MURRAY:  And is going to continue to do.

24         As you have stated several times, this case is a

25    serious one involving serious First and Fourth Amendment

Murray - Closing                         124

1    issues.  And it's interesting, I think the timing of the trial

2    is auspicious as well.  Because more than once, Your Honor has

3    mentioned the efforts to ban James Joyce's novel <u>Ulysses</u>.

4                And yesterday it was Bloomsday.

5                THE COURT:  Right.  And the Rosenbach Museum here in

6    Philadelphia every year sponsors a reading of the whole novel.

7                MR. MURRAY:  Yes.

8                THE COURT:  And my wife and I are always one of the

9    readers.

10               MR. MURRAY:  Wonderful.

11               THE COURT:  And have been for many years.

12               MR. MURRAY:  Well then and so --

13               THE COURT:  So I'm very familiar with it.

14               MR. MURRAY:  Yes.  And so the timing of the trial

15   was auspicious as well.  At the outset, I want to emphasize

16   that if the Court strikes down 2257 and 2257(a), Congress will

17   not be without a remedy.

18               They can fix it, they can repair it.  They can pass

19   a much more narrowly tailored and less burdensome scheme

20   requiring at least commercial producers, who are primary

21   producers of sexual images, to check ID's and to verify that

22   they're particularly youthful employ -- performers are of age.

23               It would be somewhat similar to the I-9 requirement

24   for employers when it comes to immigration.  So this is not a

25   situation, Your Honor, where, if we were to prevail, that

1  we're suggesting that Congress could never pass a more

2  narrowly tailored, properly less burdensome law.  And no doubt

3  they probably would attempt to remedy it.

4         I want to begin as the Supreme Court teaches us in

5  Stevens, with a clear delineation of the scope of the Statute

6  in terms of the images that it covers.  Because you can't talk

7  about narrow tailoring or overbreadth without first getting an

8  understanding of how broad the language is.

9         We know that any image that depicts actual or

10  simulated sex acts of any kind are covered, masturbation,

11  sadistic or masochistic abuse, and lascivious exhibition of

12  the genitals, or pubic area all are covered by the Act.

13         And we're talking about any image.  Photographs,

14  pictures, websites, films, videos.  And it's important to

15  recognize just how broad the concept of lascivious exhibition

16  of the genitals and pubic hair is.  The very first Court to

17  consider 2257, and actually struck it down when it was first

18  passed because it created an unconstitutional presumption,

19  dealt with what was meant by lascivious exhibition of the

20  genitals.

21         And that Judge wrote that when he parsed it, he

22  ultimately concluded:

23         "It is fair to conclude that any frontal nude image

24  of a person in what might otherwise be called an erotic pose,

25  is likely to be included as lascivious."

1          So I think it's fair to say that any nude image of

2    an erotic nature, as opposed to perhaps a nude image in a

3    medical textbook on anatomy, but if you're talking about

4    erotic photos or images of nude people, that it's fair to

5    conclude those people are at risk of it being a lascivious

6    exhibition of the genitals.

7          And it's even broader then that.  Because U.S. v.

8    Knox, the Third Circuit has already held that lascivious

9    exhibition of the genitals does not require nudity.  And that

10   the clothed genitals can come within that term lascivious

11   under this very definition in the child pornography laws.

12         And the Department of Justice has adopted that very

13   proposition in their interpretation of lascivious exhibition

14   of the genitals in their preamble to the most recent iteration

15   of the regulations.

16         They specifically reject the notion that nudity is

17   required as a precondition of a -- of an image coming within

18   the term lascivious exhibition.  And so we know how broad that

19   term is.

20         Similarly, when it comes to simulated sex acts, and

21   simulated masturbation, and simulated sadomasochism, the

22   Justice Department in its preamble at page 77-440, again,

23   emphasizes that nudity is not necessarily required in order

24   for something to come within the meaning of simulated sex.

25         They say the producer of the depiction may arrange

1    the camera or the body positions to avoid depicting uncovered

2    genitals, breasts or buttocks, yet still cause harm to the

3    putative child by having him or her otherwise realistically

4    appear to be engaging in sexually explicit conduct.

5           And so when they apply to images of adults, you

6    don't even have to have nudity for purposes of simulated sex.

7    And so that's just how -- that's how broad the sexual images

8    are that are covered by the law.  Now in terms of the coverage

9    of the Statute, Your Honor, that is equally broad, and the

10   Third Circuit has so held.

11          Whoever, anybody, whoever produces any book,

12   magazine, periodical, film, videotape, digital image,

13   digitally or computer manipulated image, picture or other

14   matter which has the sexual images -- and this is the

15   interstate commerce part that Your Honor asked about -- so

16   long as it contains a sexual image created after November of

17   '90 and is produced in whole or in part with materials which

18   have been mailed or shipped in interstate or foreign commerce.

19          Now it is -- that's no limitation at all.  The

20   interstate commerce.  The is not a typical statute that says

21   you got to actually transport the offending image across state

22   lines.  The only requirement is that the equipment that you

23   use to take the picture or to create the film had to be in

24   part made from materials that passed interstate commerce.

25          And I can't imagine a single creation of a single

1    image that can be accomplished by the use of equipment and

2    technology, that has not been produced in whole or in part

3    with materials which have been mailed or shipped in interstate

4    commerce.

5           So that's no limitation at all.  And the Third

6    Circuit made it clear that it applies to every creation of an

7    image, including private, non-commercial images, even those

8    created by a husband and wife in the privacy of their own

9    home.

10          And so that's how broad it is.  And as Your Honor

11   asked in one of the questions, it is true that when the

12   Statute was first enacted in '88, sexting did not exist, the

13   internet was just on the horizon.  We didn't have Facebook, we

14   didn't have Twitter, we didn't have all the technologies that

15   are now available that citizens of the United States use to

16   share information with each other, including sexually explicit

17   images.

18          But the Statute covers them all.  And as we'll be

19   seeing, it renders the Statute substantially overbroad as a

20   consequence.

21          Now the Third Circuit was pretty clear that the

22   intermediate scrutiny test, I should say they were pretty

23   clear in what they wanted to hear about in terms of the narrow

24   tailoring part of the intermediate scrutiny test.  Which of

25   course as Your Honor is correct, the Government bears the

Murray - Closing                     129

1    burden of proving that the Statutes are constitutional under

2    intermediate scrutiny, and under the narrow tailoring test.

3         And the Third Circuit was pretty clear, we cannot

4    accurately compare the amount of -- and this was on their

5    narrow tailoring discussion.

6         "We cannot on this record, motion to dismiss,

7    accurately compare the amount of plaintiff's constitutionally

8    protected speech that does not implicate the Government's

9    interest in protecting children.  For example, speech

10   involving performers who are obviously adults, to the amount

11   of plaintiff's speech that implicates the Government's

12   interest.  Example, speech involving performers who are not

13   obviously adults.  This comparison is essential to our narrow

14   tailoring analysis."

15        And so that's the question -- one of the many

16   questions -- several questions that they wanted us to answer

17   by this record.

18        And it seems to me, Your Honor, that the record is

19   abundantly clear that under that test the, Statutes flunk

20   narrow tailoring.

21        We had two experts who opined on that very question.

22   We had the Government's expert, Dr. Dines, and we had Dr.

23   Linz, the plaintiff's expert.  Dr. Dines was of the view that

24   one-third of the commercially produced material would be in

25   the confusing area.

1            Which means that two-thirds of it is non-confusing

2    material, where it's apparent that the performers are

3    obviously adults.  Dr. Linz puts the percentage much higher

4    than 67 percent.  And, of course, we had Dr. Biro's testimony

5    that is totally consistent with that, because he agrees, look,

6    ages 12 to 13 and younger, nobody's going to confuse them as

7    adults.

8            That's not what the Statute was directed at.  And

9    generally speaking people over the age 25 are not going to be

10   confused as minors, with some limited exceptions.  And so the

11   confusing range, according to Dr. Biro, is basically ages 14

12   to 24.

13           And so that's pretty consistent with what the

14   analysis of both experts, when you put that together with

15   them.  So we have a situation where the only thing the record

16   shows right now is that at least two-thirds of the

17   commercially produced, sexually explicit material, is of

18   people who are obviously adults when you look at the material.

19           And probably it's higher then that.  But by any

20   version of narrow tailoring, no matter how you define it,

21   whether it's under the Redden test, whether it's under Ward,

22   the Rock versus -- the rock concert case, whether it's the

23   Third Circuit's opinion in this case.

24           The question is, does the Statute burden

25   substantially more constitutionally protected speech then is

Murray - Closing                                          131

1   necessary?  Now matter how you cut it, if it burdens at least

2   two-thirds of the regulated speech unnecessarily, based on the

3   Third Circuit's formulated test, I don't know how anyone could

4   come to the conclusion that it is narrowly tailored.

5           It flunks every narrow tailoring test that one can

6   imagine.  It doesn't do any better when you take it to the as

7   applied standard as well.  When you look at particular

8   plaintiffs.  There, the Third Circuit wrote and I'll quote:

9               "That the statute may be narrowly tailored..."

10              Interesting that they said may, not for certain, but

11  --

12              "... may be narrowly tailored as applied to a

13  particular plaintiff, if the particular plaintiff produces

14  'depictions of predominantly youthful looking performers.'"

15          So the question is, in any given plaintiff's body of

16  work, does it predominantly depict youthful looking

17  performers, or does it predominantly depict person who are

18  obviously adults?

19          And for that, one of the things we can turn to is

20  the Government's analysis -- and we can't do it at the moment.

21  But I'll do it orally.  You may recall they have a chart that

22  their paralegal prepared, based on some of the discovery

23  materials.

24          Betty Dodson --

25              THE COURT:  Does that have an exhibit number?

1            MR. MURRAY:   Yes.   That's Defendant's Exhibit 314A.

2      Betty Dodson, as a plaintiff.   Seventy-five percent of her

3      material is of persons over the age of 25.   Even 55 percent of

4      her material is of persons over the age of 30.   Even Marie

5      Levine, 67 percent -- 66 percent of her material is of persons

6      over the age of -- of 25.   And even -- almost 60 percent is

7      over 30.

8            Mr. Levingston, 56 percent of his images are of

9      persons over 25.   They analyzed Barbara Nitke, and there were

10     63 percent of her images over the age of 25.   Sinclair

11     Institute, again, for their primary producer materials.

12     Seventy-nine percent over the age of 25.   Almost 67 percent

13     over the age of 30.   Vivid Entertainment, now this one is

14     significant, Your Honor, because Vivid is one of the major

15     producers of adult films.   And they provided a rep -- you

16     know, some sampling of their material.   And they do

17     exclusively the adult films.

18           Not necessarily for educational value, but just the

19     adult films.   And even in their case, 60 percent of their

20     images were of persons over the age of 25.   Which, again, is

21     -- it seems to me very significant.

22           They didn't provide any figures for David Steinberg

23     or for Barbara Alper.   But when you look at Barbara Alper's

24     body of work, which is in evidence, nearly all of it is, of

25     obvious adults.   And David Steinberg's body of work is now in

1    evidence.

2           And he calculated it as follows.  And anybody can

3    check his arithmetic, because the exhibit is in evidence from

4    which he gained it.  Eighty-eight percent of the images he

5    produced are of people over 25.  Seventy-six percent of the

6    images are of people over 30.  And even 45 percent are of

7    people over 40.  There were only three people that he had ever

8    depicted who were age 19.

9           And so clearly the -- as applied challenges of those

10   plaintiffs are meritorious as well.  Now let's talk briefly

11   about the overbreadth question.  Because, again, the Third

12   Circuit gives us two paths by which to determine whether this

13   Statute is unconstitutionally overbroad.  Each of them

14   independent.  If one of them is met, it's overbroad.

15          But if the other one is met it's also overbroad.

16   The first test is the same one pretty much is narrow -- narrow

17   tailoring.  Namely, how much material out there is of obvious

18   adults, compared to how much material is out there of youthful

19   looking actors and actresses who could be confused as minors.

20          And the same evidence that supports a finding of

21   unconstitutionality under narrow tailoring, supports the same

22   finding on the overbreadth as well.  But there's a second way

23   that the Statute would be overbroad.

24          And that is, plaintiff should be permitted to

25   develop the record as to whether the statutes are

1    unconstitutionally overbroad, based on their purported

2    regulation of purely private conduct.

3           And that's an independent, separate path to

4    unconstitutionality.  Now this record -- keep in mind, Your

5    Honor, and we'll reiterate this again in our briefs.

6    Overbreadth usually isn't determined because people have in

7    evidence.  When you go back and you read Stevens, they thought

8    it overbroad based on examples given by amicus in the Supreme

9    Court as to how it would apply.

10          And the Third Circuit talks about how in determining

11   overbreadth you have to come up with reasonable

12   hypothetical's.  This is one of the rare cases where we

13   actually put in evidence at the trial Court record of

14   overbreadth rather than just give hypothetical examples.

15          And so we put in all this evidence of sexting.  And,

16   yes, they complain that the -- that the studies weren't done

17   by random sample, and they complain that the definitions used

18   were not a perfect match with the Statute.

19          But the one thing those surveys and the other

20   evidence shows, is there are millions of young adults, let

21   alone adults over the age of 24, which have sent or received a

22   sexually explicit sext message.

23          Yes there are other messages that are sexually

24   suggestive, nude, or nearly nude that might not be captured

25   under the Statute, but one thing is clear is that there is a

1    substantial amount of it.   It's got to be in the millions of

2    just young adults.

3            And then we had Dr. Linz come in.   And he's been

4    studying this stuff for 30 years.   And we showed him all the

5    massive evidence that we have accumulated in Plaintiff's

6    Exhibit 37 and Plaintiff's Exhibit 116.   And he confirms tens

7    and tens of millions of Americans are sharing sexually

8    explicit images on the various means that technology now makes

9    available.   Including the social networking sites, that when

10   you see them, the millions and millions of numbers that they

11   confirm are accruing on, you know, a weekly basis, it's just

12   enormous.

13           And then you add to that these other tech -- I got

14   to show you just a couple -- well the Elmo's is not on.   Just

15   a couple of examples, Judge, of what the record shows on some

16   of these -- here's something called Face Time.   And this is a

17   new technology, and we've all maybe seen it on TV.

18            But you can actually go on your computer now and

19   see the other person at a distant location.   And these Face

20   Time computer links are now being used for couples who are

21   separated, the husband is on one place, the wife is in

22   another, and now they're having phone sex where they actually

23   depict it to each other, so they take advantage of technology

24   to, you know, continue their intimate relationship when

25   they're away from each other.

Murray - Closing                              136

1          It's there.  It's all over the place.  This

2    instaporn, is amazing.  This instagram, people share images

3    with each other, again, in a private -- private way.  The more

4    graphic photos show people masturbating.

5          While others -- over 135,000 photos.  So what

6    happens is, when we go on this Instagram, and you tag terms

7    such as SEXtagram, instaporn, it summons up tens of thousands

8    of images of genitalia and nude or nearly naked men and women

9    posing provocatively in their beds, in bathrooms, or with a

10   partner in a similar state of undress.  These are private

11   citizens.

12         These aren't commercial producers.  Then there's

13   information about the rise of virtual sex, there's a Skype --

14   this is unbelievable, Your Honor.

15         The Skype, there's a product out that the husband

16   can have one device with him, while he's away from home, and

17   the wife can have another one, and then they can go on this --

18   on this Wii technology, and they can actually engage in

19   virtual sex by these images to each other.

20         These are husbands and wives.  So the -- and there's

21   more in Plaintiff's Exhibit 37.

22         THE COURT:  Just one question.  I understand your

23   argument about husband and wives.  But what would you -- where

24   would you draw a line?  Do you have to be formally married?

25   Suppose it's a common law marriage?  Suppose they're going

1    steady?  Suppose they're engaged, or they're just casual

2    acquaintances?

3             MR. MURRAY:  It's all constitutionally protected,

4    Your Honor.  If you go back to --

5             THE COURT:  Well how about Vivid, is that

6    constitutionally protected too?

7             MR. MURRAY:  Well it's constitutionally protected

8    speech.  I mean, no one disputes that.

9             THE COURT:  No, I understand that.  But you're

10   saying they should be exempt from the law because they're --

11   if they -- if Vivid -- if a husband -- I understand -- your

12   strongest argument, and it is a strong argument, is the

13   husband and wife.

14            And your next strongest is a committed couple.

15   Maybe they're not married.  But suppose a husband and wife

16   agree to perform for Vivid.  And they had sex and then Vivid

17   was selling their videos all over the country.  Is it still

18   protected?

19            MR. MURRAY:  It's not --

20            THE COURT:  Should the -- is the law

21   unconstitutional as applied to them?

22            MR. MURRAY:  Yes, but not because it's private

23   speech anymore.  The -- you go back to the other way.

24            THE COURT:  Well how do you draw the line?  You're

25   asking me -- I mean, I can just say Congress got this all

1   messed up, it's unconstitutional.  But I think the Third

2   Circuit would expect me to also have some rational explanation

3   of where a line could be drawn that is constitutional.

4            MR. MURRAY:  And I think it's drawn when it comes to

5   this branch of overbreadth, it's got to be non-commercial,

6   it's got to be personal expression shared by one citizen with

7   another, doesn't have to be a married couple.  But that's why

8   these social networking sites are important because --

9            THE COURT:  So it's just one-on-one.  One male and

10  one female?  Or could it be two males or two females, but

11  suppose there were three people involved?

12           MR. MURRAY:  As long as it's private, non-commercial

13  expression by everyday --

14           THE COURT:  Okay.

15           MR. MURRAY:  -- or everyday citizens who are not --

16           THE COURT:  Okay.

17           MR. MURRAY:  -- doing it for money, but are just

18  sharing it with like-minded people, I think that's what the

19  Third Circuit means when it walks about private conduct.

20           THE COURT:  Okay.

21           MR. MURRAY:  And you don't have to be married, but

22  it's -- but it certainly affects married couples.  But it

23  seems to me that -- because think about it, Your Honor, when

24  you look at these images and you see the millions of people

25  who are posting personal images of a sexually explicit nature

1   on the websites, not making any money, when you know the

2   millions of people who are sexting with each other, Skyping,

3   all the other suggestions, this law applies to them.

4           It absolutely, under the Third Circuit's opinion,

5   applies to them.  And that means that all these American

6   citizens have to make and keep copies of their ID's, of their

7   own ID's and of their partners.  They have to keep all the

8   other records.

9           They got to put a label on the image before they

10  post it.  Before they send it on their cell phone.  Before

11  they Skype it to the husband and wife, telling the Government

12  where the records are that can be found that the Government is

13  entitled to search.

14          And they got to send a letter to the FBI or the

15  Justice Department identifying the 20 hours per week they will

16  be available for inspection.  That's what this law, as

17  written, requires.  And, yes, it's massively violated.  You

18  won't find any in Plaintiff's Exhibit 37 and 116, you won't

19  find any of these couples or these individuals who post these

20  pictures of themselves, who put a label -- they don't know

21  about it, but it applies to them.

22          And if it's ever enforced and if -- and if the word

23  ever gets out just how broad this law is, who knows what

24  American citizens would do.  But the point is, the law on its

25  face as determined by the Third Circuit applies to those many

1  millions of Americans who aren't in it for the money, have a

2  personal reason to share their images with each other.

3          And it just seems to me, Your Honor, that under the

4  Third Circuit's test, the statute cannot survive an

5  overbreadth challenge.

6          Let me turn to the Fourth Amendment for a minute.

7  We have to begin with the Supreme Court's decision last year

8  -- last term in U.S. v. Jones.  Which held that when the

9  Government installed a GPS device on the undercarriage of a

10 Jeep at a time when it was parked in a public lot, and simply

11 recorded where it went.  That was a search that violated the

12 Fourth Amendment.

13         And the Government argued it didn't even implicate

14 the Fourth Amendment, because the defendant there they said

15 had no reasonable expectation of privacy in either the area of

16 the Jeep, which didn't even belong to him, it belonged to his

17 wife, where they put the device.

18         Nor did he have any reasonable expectation of

19 privacy in where that Jeep went on the public roadway.  The

20 Court rejected that, and said it didn't have to even reach

21 that issue, because it was sufficient that the Government

22 intruded on an occupied private property for the purpose of

23 obtaining information.

24         And if you do that, whether you have a reasonable

25 expectation of privacy or not, the Fourth Amendment applies,

1    and the warrant and probable cause requirement applies.

2            Now, here, in every single instance of the 29 of the

3    -- actually there might have been one where because the guy

4    was overseas, the records were mailed in.  But 28 inspections,

5    the Government agents, under the authority of a Federal

6    Statute and regulations, occupied and intruded upon private

7    premises, and acquired physical possession of private records

8    that they didn't own, for the purpose of obtaining

9    information.

10           According to _Jones_, that's a search.  According to

11   _Jones_, the Fourth Amendment applies.  They did it without a

12   warrant, without probable cause.  They made copies of these

13   records.  They clearly -- they took photographs of the inside

14   of these places.  They occupied these places for many hours.

15   And you can't escape the fact, it seems to me, that under

16   _Jones_, that, by definition, is a search.

17           And unless the Administrative Search Exception

18   applies, which I'll get to momentarily, they needed a warrant,

19   and they needed probable cause.

20           Now -- and, you know, they made -- they made much

21   mention of the fact that in three of the places that they said

22   that they inspected the records in the reception area, and in

23   one place in a -- in a larger room.

24           Your Honor, these were not retail stores, these were

25   business premises, they, to the extent that a member of the

1   public had a limited invitation to come in and ask the

2   receptionist, can I see so-and-so, or I have some business to

3   transact, these agents weren't acting as members of the

4   public.

5          No member of the public could have come in and said

6   under color law, I demand that you provide me a place inside

7   your premises where I can examine your business records, even

8   though I have no connection to you.

9          Logee Sales (phonetic) the Supreme Court's decision

10  in 1979, and we'll give you the citation in the brief, or

11  actually I can give it to you right now, Your Honor.  Even a

12  retail store does not give up its constitutional rights to

13  privacy, and that was the case where the town justice went in

14  and there was a warrant.

15         The warrant turned out to be bad, and the Government

16  says, well, wait a minute, there was no reasonable expectation

17  of privacy in a retail store anyway.  And the Supreme Court

18  said, no, no, no, no.  The town justice and the police were

19  not there as customers, they didn't pay for watching the films

20  -- it was an obscenity case -- and so they didn't give up

21  their reasonable expectation of privacy.

22         But these weren't retail stores.  If you look at

23  every photograph in Plaintiff's Exhibit 32, it's all there.

24  There's no place that they occupied that wasn't a place that

25  was private and not available for any John Doe to walk in and

1   just sit there.

2           It just -- the pictures are truly worth a thousand

3   words each in this case.  And, remember, they inspected at no

4   fewer than six homes or residences.  Out of the 28

5   inspections, six of them were done at home.  And they took

6   possession of private records.  And Special Agent Lawrence

7   admitted, without any qualification, that without the

8   authority of 2257 to enter without delay and inspect the

9   records, the only way the FBI could have done what they did

10  was by getting a search warrant.

11          Now as Your Honor pointed out, once they got a

12  search warrant, they might have been able to be a little bit

13  more heavy-handed then they were.  They could have worn their

14  raid jackets.

15          But he admitted that they couldn't have accomplished

16  what they did without a search warrant, if it weren't for

17  2257.  There was a clear expectation of -- reasonable

18  expectation of privacy in these records.  They recorded the

19  name, address, alias's, nicknames of all the performers.

20          There had to be attached to it a copy of the image.

21  In a sense, what we're talking about is, a list of the names,

22  addresses, date of births and nicknames of their employees.

23  The people that they employed.  Any business would regard a

24  list of its employees as a private business record.

25          There's a Sixth Circuit case McLaughlin v. Kings

Murray - Closing                     144

1    <u>Island</u>, 849 Fed 2d 990, Sixth Circuit (1988).  OSHA form 200,

2    required to be completed by employers on a Government form.

3    They had a reasonable expectation of privacy in it.  And they

4    cite a whole bunch of cases where, even in the case where the

5    records that are maintained are required by some statute, it

6    still satisfies the reasonable expectation of privacy test.

7             And the Sixth Circuit struck down a regulation that

8    permitted a warrantless inspection of the form 200.  It's a

9    case almost right on point, except that in our case we have

10   First Amendment implications as well.

11            Third party record keeper doesn't cure the problem,

12   Your Honor.  First of all, very few people are using them.

13   And there's good reason for that, and that's because they're

14   costly, but more importantly, as we saw, the regulation says

15   that if -- it doesn't exempt the producer from criminal

16   liability, if the record keeper who's the third party makes a

17   mistake.

18            And so people are afraid to do it.  And, remember,

19   there's not a scienter requirement for the prohibition for the

20   first part of the Statute.  2257(f) says:

21            "It shall be unlawful, (1) for any person to whom

22   subsection (a) applies..."

23            That's the record keeping requirement.

24            "...to fail or create...

25            Excuse me.

1        "...to fail to create or maintain the records as

2    required by the law or any regulation."

3        Every other provision, the next three provisions

4    requires knowingly to do something.  But if you don't keep the

5    records properly, in the first place, that's it.  They don't

6    even have to prove that you knowingly didn't keep the records.

7    And so they're not going to take the chance of subjecting

8    themselves to criminal liability.  In any case, it's still an

9    invasion of the Fourth Amendment, because in that case it's

10   the producer's agent.

11       And so all that happens is if they go into the

12   private premises of the third-party custodian, they're not

13   only violating the producer's Fourth Amendment rights by going

14   into its agent's premises, they're also violating the

15   third-party record keeper Fourth Amendment rights.

16       And of course it's the producer's records that are

17   being examined.  So -- and the last thing is, you know, it --

18   if it were an answer to the Fourth Amendment problem, that if

19   you didn't want the Government to be able to search your home

20   or your premises for particular objects or records, you could

21   avoid that result by giving custody to them to some third

22   party.

23       That would be the effect of upholding this under the

24   Fourth Amendment.  So it's just no answer.  Finally, Your

25   Honor, the administrative search exception clearly does not

1    apply.   We have Judge Rendell's concurring opinion, which lays

2    out the test.

3          The majority did not in any way disagree with her

4    analysis.   All the majority said was, okay, but since we were

5    on a motion to dismiss, let's wait and see what the record

6    shows before we totally decide that the administrative search

7    exception doesn't apply.

8          But there's no evidence to overcome the two points

9    that Judge Rendell made.   Number one, this is not a closely

10   regulated industry.   It's actually no industry at all, when

11   you think about the breadth of the coverage, and who all is

12   covered by this Statute.

13         But even if it were limited to the adult industry,

14   that's not a pervasively regulated industry.   And one of the

15   reasons it isn't is because of the First Amendment.   The First

16   Amendment imposes many limitations on the regulation of this

17   industry that are not imposed upon the regulation of other

18   industries.

19         And the industries that they're talking about are

20   mines, and junkyards, and places like that.   So we're not a

21   closely regulated industry here.   And, furthermore, they have

22   to show, even if it were, that a dispensing with the warrant

23   requirement is necessary or essential to the regulatory

24   program.

25         And Your Honor asked the perceptive questions on

1    that one of both agents.  Do you really need to be able to

2    come in without the advance notice that you might require of

3    you use some other process?

4              And they said no.  There's no risk that the records

5    are going to be destroyed.  That doesn't do -- that's the

6    worst thing somebody could do.  Nor is there any risk that

7    they could manufacture records on short notice that weren't

8    there.

9              And I think it was Agent Joyner who said the most

10   that could happen is that they might clean up their records a

11   little bit.  And he says that would be a wonderful result,

12   because that's what they want.

13             So it's impossible for the Government to argue that

14   they could meet that element of the administrative search

15   question.  And, finally, the ripeness and standing arguments

16   that the Government continues to make fall for all of the

17   reasons outlined in your order of December 5th, 2012 on the

18   exact same set of facts that we're presented with on this

19   record.

20             They've given us no new evidence.  It was all in

21   that motion.  They have the affidavit explaining how many

22   searches, when they stopped, why they stopped, the fact that

23   there's no new program.  And I won't repeat it, because it's

24   all in Your Honor's opinion.  But in each and every instance

25   Your Honor pointed out the heavy burdens that remain.

1          That give us standing and ripeness.

2          THE COURT:  Mr. Murray, you've got five minutes

3     left.

4          MR. MURRAY:  Okay.  So I'll finish up and save four

5     minutes for rebuttal.  If I can.  But --

6          THE COURT:  Okay.

7          MR. MURRAY:  -- the one last point I'd want to make

8     on the ripeness is that, if you look at the reg, the current

9     reg and the one that was in effect in '05, they're identical,

10    except for little word changes that really were done to

11    correct grammar and syntax.

12         The current reg on how you conduct the inspections,

13    is in all virtual respects identical to the reg that was in

14    effect in '05.  And if you read that reg, they have to do it

15    the same way.  It's not like they can come up with a brand new

16    idea.  If they follow the reg, they would do virtually the

17    same thing that they did.

18         Because the reg lays out all of the things that they

19    did, and commands them to do it.  So we're talking about, you

20    know, when they decide to reinspect, and our people have to be

21    available 20 hours a week, they'll do it exactly the same way.

22         So just, Your Honor, we would request that you

23    declare -- this is a declaratory judgment, and injunction, but

24    we certainly believe we're entitled to a declaration that the

25    statutes and regs are unconstitutional under both the First

1    and Fourth Amendments.  And we also think we're entitled to an

2    injunction against their enforcement.  Thank you.

3              THE COURT:  Thank you.  All right.  Ms. Wyer?

4              MS. WYER:  May it please the Court.  Your Honor no

5    one here disputes the fact that sexually explicit images of

6    adults can be protected expression under the First Amendment.

7    But that is not the question in this case.

8              The requirements that plaintiff's are challenging do

9    not ban these images that they're talking about.  And instead,

10   all that they do is regulate those who choose to use actual

11   human beings in creating those images.

12             In doing so, 2257 serves as a prophylactic measure

13   to prevent the creation of child pornography.  Which as Your

14   Honor -- in this posture, Your Honor's questions, every

15   plaintiff in this case has affirmed that they abhor.  And to

16   put these requirements in place in a way that there is means

17   of finding age verification records for a film, for example,

18   once that film -- once the creator of that film releases it

19   out into the world, and it travels further down the

20   distribution chain.

21             As Your Honor has recognized, there are a limited

22   number of issues remanded to this Court for factual

23   development, and I will go through the as applied and facial

24   First Amendment claims and as applied Fourth Amendment claim.

25   I first want to note, starting with the as applied First

Wyer - Closing                                    150

1   Amendment claim, that is the only claim where the narrow

2   tailoring issue is part of the analysis.  There is no narrow

3   tailoring prong in the overbreadth analysis.

4         So the Third Circuit's remand on the as applied

5   First Amendment claim was very narrow.  It recognized already

6   that the 2257 requirements directly advanced the Government's

7   important interest, and it did not invite this Court to

8   revisit that issue.

9         Under the narrow tailoring analysis, Mr. Murray

10  mentioned the question that the Third Circuit asked relating

11  to the relative ages of the performers.  And for ease of

12  analysis, these plaintiffs can be broken into three groups.

13  First, there are the adult industry plaintiff's, which include

14  Free Speech Coalition, Sinclair Institute, Marie Levine and

15  Thomas Hymes.

16        Second are the photographer, what you could call the

17  photographer plaintiffs, which include American Society of

18  Media Photographers, David Steinberg, Barbara Nitke, Barbara

19  Alper and David Levingston.

20        Finally, there are the plaintiffs who claim to be

21  engaged primarily in an educational activity, which consists

22  of Betty Dodson and Carla Moss, and also Carol Queen.

23        Now starting with the adult industry plaintiffs, I

24  think the Court properly recognized that the burdens that

25  those plaintiffs might face due to 2257 compliance are not

Wyer - Closing                                    151

1    terribly significant when you take into account that they are

2    clearly engaged in commercial production of sexually explicit

3    expression, and compliance with these requirements is a

4    justified cost of doing business when your business involves

5    filming individuals engaged in sexual acts.

6            In addition, we have heard testimony that the

7    performers in this industry are predominantly youthful.  The

8    evidence regarding specific plaintiffs only confirms that none

9    of these plaintiffs -- when you look at the Third Circuit's

10   opinion on narrow tailoring, what you see is the Third Circuit

11   was asking the question whether an exemption could be created

12   for a particular plaintiff on the basis that that plaintiff

13   employs performers that no reasonable person could conclude

14   were minors.

15           And what it was looking at are the previous opinions

16   in other cases that identified as a possible exception to the

17   universal application of the requirements, something like an

18   illustrated sex manual for the elderly, where it's a product

19   that only uses individuals who could not be confused for

20   minors.

21           So that kind of thing could be taken out of the

22   whole 2257 regulatory scheme.  But none of the plaintiffs in

23   this case present an elderly sex manual situation.  The Court

24   was correct in recognizing in its findings that even Sinclair

25   Institute, which purports to be educational, uses a

1    significant number of youthful looking performers in its

2    videos.

3            And the numbers that we saw were over 20 percent

4    were 25 or younger, and 34 percent 29 or younger.  And the

5    titles of these videos, as Your Honor recognized, show an

6    intent to draw those seeking sexual titillation, and used

7    terms such as teen porn, that appeared to be drawing in

8    individuals who are looking for young looking performers.

9            The other Free Speech Coalition members that

10   plaintiffs identified, also show use of young performers.  The

11   Free Speech Coalition identified David Connors as one of its

12   members.  And 47 percent of the performers he identified are

13   25 or younger.  Vivid Video, which plaintiffs mentioned, 41

14   percent of the performers were 25 or younger.

15           And so it may not be a majority, it may not be 60

16   percent, but it is a significant enough amount that it is

17   definitely not in the elderly sex manual category.  And that

18   was the category that I think the Third Circuit was really

19   looking at.

20           Marie Levine, 24 percent were 25 or younger, and 40

21   percent were 29 or younger.  And Thomas Hymes is also part of

22   the adult industry on the media side.

23           For Thomas Hymes, I think the Court should look at a

24   jurisdictional issue.  Because Mr. Hymes makes -- had wanted

25   originally back in 2009, to create the Daily Babylon website,

1   but since that time he really has not actively maintained that

2   website.

3         And that -- it has nothing to do with 2257, it's

4   simply because he -- his career just didn't go the way he

5   wanted, and he's back working 60 or 70 hours at AVN, and he

6   simply has not time at this point to be involved in that

7   website, in the way that he had wanted.

8         Mr. Hymes also presents a situation which I think

9   really carries across all of the plaintiffs, where he has no

10  way of predicting what ages of performers he might use in the

11  future.  He has never -- he has never been a producer of

12  sexually explicit images before.

13        He doesn't know what performers he might want to

14  include in images that he uses -- might use in the future to

15  illustrate his articles.

16        So it's not-- so going back to the standard of the

17  elderly sex manual situation, you'll also have to take into

18  account that it's not simply a question of looking at the data

19  of the ages of performers that were used in the past, you also

20  have to look at the nature of the work, and whether the ages

21  can be cabined in some way that you have some way of

22  predicting with certainty that that is the age that is going

23  to be used in the future.

24        So we have these numbers for these adult industry

25  plaintiffs, which show a substantial number of young looking

1    performers, and there's no way of predicting whether that

2    number might not increase in the future.

3            But all of these plaintiffs have confirmed that they

4    have nothing against using young looking performers, they're

5    to trying not to use young looking performers.  So, again,

6    this is a very different situation from the elderly sex manual

7    category.

8            Now turning to the photographer plaintiffs.  In

9    regard to the ASMP and its members, the Court correctly noted

10   that even if we fully credit ASMP's survey results as

11   identifying 400 out of 7,000 ASMP members who take sexually

12   explicit photographs, that is a very small percentage of

13   ASMP's total membership.

14           But the numbers could be even more, because the

15   actual question that was used in the survey is not in the

16   record.  And nor are the survey results.  We simply do to know

17   what the respondents might have -- what question they were

18   answering, or what they were thinking when they responded to

19   that survey.

20           Or whether their images even fall under sexually

21   explicit depictions that would be subject to 2257.  Looking --

22   Mr. Mopsie (phonetic) testified in this case, but he

23   identified no more than a handful.  He certainly didn't

24   identify 400 ASMP members who were engaging in works showing

25   sexually explicit conduct subject to 2257.  And on the whole,

Wyer - Closing                                        155

1    such photographers, I think Mr. Mopsie acknowledged, did not

2    share any particulars defining characteristics, aside from the

3    fact that they photograph real people engaged in sexual acts,

4    or lascivious display of the genitals.

5            And, indeed, Mr. Mopsie acknowledged that some ASMP

6    members today are likely members of the adult industry, and

7    who -- category of working photograph, which is ASMP member

8    definition, overlaps with the adult industry category.

9            Adult industry film makers can be and may be in the

10   future become members of ASMP.  The only member of ASMP

11   actually identified as an exemplar of a photographer subject

12   to 2257, other than Barbara Alper, is Craig Morey.

13           But Morey himself is a perfect example of the

14   overlap between photography, on the one hand, and pornography

15   on the other.

16           Mr. -- if you look at evidence submitted into the

17   record about Mr. Morey's website, you see that at -- so

18   residents paid memberships to the website in order to view

19   images of young female models in erotic poses showing genitals

20   and engaging in masturbation.

21           It's hard to distinguish what you see on that

22   website from what you see on a website like Marie Levine,

23   which has the very same structure of membership in order to

24   look at images.

25           And I'll get to the age breakdown in a minute for

1    that.  We heard from David Steinberg that, regardless of a

2    photographer's intent in taking an image, there's no objective

3    criteria that distinguish what might be considered art, from

4    what might be considered mainstream pornography.

5           There's no way to define a category, if you were

6    trying to carve out a category of material that could be

7    exempted.  But it's impossible to do that just by saying, it's

8    art.

9           And of course we know that the artistic, or

10   journalistic, or educational nature of an image has nothing to

11   do with whether that image qualifies as child pornography.

12   It's simply the age of the performer that's the relevant and

13   determinative factor.

14          It's also clear from the record and the evidence we

15   heard, that fine art photographers are, like Barbara Alper,

16   Barbara Nitke, and David Steinberg, are engaged in commercial

17   activity when -- not only in other photography that they do,

18   but also when they are making their art.

19          We heard evidence that Barbara Alper has sold her

20   work -- her art work to magazines, to museums, and to

21   libraries.  And David Steinberg and Barbara Nitke have

22   published books of their works.  David Remingston and others

23   have exhibited in galleries.  And the rule when you exhibit a

24   work in a gallery is that that work is for sale, and the

25   artist certainly hopes that that work will be purchased.

1          And when Barbara Alper, which Your Honor identified

2    as the only plaintiff who had engaged in any kind of private

3    acts -- photographic or production activity.  When she

4    photographed herself and her future husband engaged in sexual

5    activity, she also ended up selling some of those images to

6    the Norwegian Magazine <u>Cupido</u>.

7          So none of these photographer plaintiffs are

8    engaging in non-commercial conduct when they're making their

9    images that are subject to 2257.

10         Now focusing on the Third Circuit's question in

11   regard to the photographer category.  The evidence, again,

12   does not demonstrate that any of these photographs fall into

13   the adult sex manual category, or use only obviously mature

14   models.

15         And going back to the question of what obviously

16   mature means.  I think the evidence in this case establishes

17   that 25 is not any kind of a magic number when it comes to who

18   might be considered obviously mature.

19         We have heard from Dr. Linz, who acknowledged that

20   people over 25 could also be confused as minors.  We've heard,

21   as we'll point out more clearly in the briefing, we heard

22   Carlin Ross talk about that photograph where the young --

23   where the man is -- that Dr. Biro also discussed that the

24   Irish looking man with the Irish passport in that photograph,

25   she identified that individual as 17 years old.

1              In fact, we know from the evidence that we've gotten

2     that that individual was 28 years old.  So someone as old as

3     28, we know from the evidence we've heard here, that a

4     28-year-old can be confused with someone under 18.

5              And Dr. Biro said that the range of confusion can be

6     extended based on the attempts that the individual makes to

7     make himself or herself look younger or older.

8              So when we're talking about who is obviously mature,

9     there's no magic cutoff number there.  So going through the

10    plaintiff in the photographer category.  We have in the record

11    evidence that plaintiff has provided about Craig Morey, who is

12    the only ASMP member that we have seen in -- that we really

13    have any information about, other than Barbara Alper.

14             He, as I mentioned, produces photographs that a

15    large number of very youthful looking females, and 61 percent

16    of the sample were individuals aged 25 or younger, and 87

17    percent were 29 or younger.

18             And we actually heard Dr. Biro testify this morning

19    about how youthful those individuals appear.  Now looking at

20    Barbara Alper's work, we heard her discuss how she does her

21    art work projects and stages, and her current project Smooth

22    Hotel primarily uses models in their early twenties.  I think

23    only one of the individuals that she provided information

24    about in that project is over 25 or 26.

25             And a sample including some of her earlier works

Wyer - Closing                           159

1    shows that 35 percent of those individuals were 25 or younger,

2    and 45 percent were 29 or younger.

3          Dr. -- David Steinberg's photo shoot charts, Mr.

4    Linz mentioned it does include individuals as young as 19.

5    And when you're looking at images in the way that David

6    Steinberg is photographing, when there's often couples, he's

7    photographing couples having sex.  So I think it's significant

8    to point out that there are many instances going through the

9    photo shoot list where you can see that even though one half

10   of the couple is older, the other half is significantly

11   younger.

12         So you see a 37 year old with a 19 year old.  A 39

13   year old with a 25 year old.  And a 73 year old with a 25 year

14   old.

15         For David Levingston, the information we received

16   has led to the result that 44 percent of his nude models were

17   25 or younger, and 60 percent were 29 or younger.

18         And, again, the same -- the same caveat applies, in

19   that none of these photographer plaintiffs suggest that they

20   would limit the ages of performers in future work to some

21   higher cutoff point than 18.

22         Barbara Nitke acknowledged that, after she finishes

23   her cinema projects, she doesn't know what her future project

24   will be.  So I think -- so it would be difficult to

25   extrapolate based on what she's done in the past, what age

1    range of individuals will appear in her future projects.

2           David Steinberg has acknowledged that he would not

3    -- he would not refuse to photograph an 18 year old couple

4    engaging in having sex, if he had the opportunity to do so.

5    And David Levingston testified that the work that he

6    anticipates might be subject to 2257, if he had -- if he were

7    less careful about the poses that his models engaged in.

8           These would be the same models that he's already

9    photographing in those -- so, again, we don't know for certain

10   what age range of models he might use.  And Barbara Alper has

11   admitted that she does not know what the ages of the

12   individuals that she might photograph on Fire Island.

13          Now the category that I mentioned, the educators.

14   To a large extent, it should be noted both Dodson and Ross,

15   and Carol Queen, are seeking to raise an anonymous speech

16   claim on behalf of third parties who they believe -- they are

17   trying to encourage to send in, or participate in activities

18   involving images of sexually explicit conduct, such as Dodson

19   and Ross's Genital Art Gallery and Carol Queen's Masturbate-A-

20   Thon.

21          But the question of third parties' interest in

22   engaging in anonymous speech is not properly before the Court

23   on remand, because the Third Circuit has already disposed of

24   that claim in its opinion.

25          The question also considered that with respect to

Wyer - Closing                    161

1    Carol Queen there is also a standing issue that still needs to

2    be analyzed.  Because Carol Queen testified that she has not

3    -- she's not recorded the Masturbate-A-Thon for the past three

4    years, and that has nothing to do with 2257.

5           Again, it's simply because she is not using a venue,

6    perhaps she feels that is practicable to divide up the space

7    to have part of the space have a live streaming component.

8    She also acknowledged that the photo club that she describes

9    is inactive, and she is not engaging in artwork, she has not

10   participated in artwork that she described for the past one

11   and a half years.

12          And all of these individuals, again, have testified

13   that they do not restrict ages of the participants in the

14   Genital Art Gallery, or the Masturbate-A-Thon, on any other

15   component of their work.

16          Again, this is simply not an elderly sex manual

17   situation.  Somewhat unrelated to the ages of individuals

18   appearing in their work, all of the plaintiffs that we have

19   seen here have attempted to identify burdens associated with

20   2257 compliance.

21          But the burdens they have identified do not entitle

22   any of these plaintiffs to an exemption from the requirements.

23   Again, the -- we agree with the Court's assessment --

24          THE COURT:  Okay.  Well what -- let me ask you about

25   the husband and wife situation.  Now I know you argued in the

1    Third Circuit that this Statute was not intended to apply to

2    them, and that issue should be ignored.

3           But the Third Circuit, referring the adoption of

4    constitutional avoidance, acknowledged your argument, but

5    rejected it.  What do you think I should do now that we have a

6    factual record?  Do you suggest that I can revisit that, or I

7    should continue to ignore it?  Mr. Murray says the fact that

8    it applies, shows that it's overbroad per se, to -- that it

9    applies to husband and wives.

10          If they were to transmit to each other on a cell

11   phone and they don't comply with 2257, that's a crime.  Now

12   you argued three years ago that that's -- that I should ignore

13   it, that it should be products for sale.

14          You argued again in the Third Circuit, they clearly

15   rejected your issue.  What do I do about that?

16          MS. WYER:  Okay, Your Honor.  Yes.  Well the -- I

17   was trying to address the as applied question in that claim,

18   so in regard to that issue, it's significant that there is no

19   plaintiff in this case raising an as applied claim on the

20   basis that they are --

21          THE COURT:  But you're saying this is an as applied

22   claim, or an overbreadth claim?

23          MS. WYER:  Well I'm saying that in this case it

24   cannot be viewed as an as applied claim, because there's no

25   plaintiff with standing to raise such a claim, and there's no

1   plaintiff who claims to be raising such a claim.

2             THE COURT:  Well I think Barbara Alper raised it.

3   She said this was a -- this man -- that before they were

4   married they had sex that they transmitted images, and they

5   continued to do it after they got married.

6             MS. WYER:  Well I think the answer to that is that

7   her -- she doesn't stand as a individual who is raising that

8   as a basis for her as applied claim, she's --

9             THE COURT:  But she is.  But she's raising it.  Mr.

10  Murray -- wait a minute.  Mr. Murray, as counsel, he's raised

11  -- he's taking that testimony, and he's saying that shows how

12  this is overbroad, whether its facial or as applied, either

13  way, or both.  Now what is your answer?

14            MS. WYER:  I think that claim is not in the

15  complaint.

16            THE COURT:  And you -- if you'd rather brief it,

17  that's fine.  But this is an issue I need to know the

18  Government's position on.

19            MS. WYER:  Well, first of all, I would say that that

20  claim, an as applied claim based on being a member of a

21  private couple, is not in the complaint, it's never been

22  identified until --

23            THE COURT:  Wait, wait.  But you raised it on

24  appeal, the Third Circuit rejected your -- and now we have

25  testimony.

Wyer - Closing                                              164

1              MS. WYER:  That was in the context of the

2      overbreadth, so that was in the context of overbreadth.  So I

3      will address that question in regard to overbreadth.  And the

4      answer is, what we would say is that it should wait for an as

5      applied challenge by someone who is actually raising that

6      claim.

7              I don't think that claim is properly before the

8      Court as an as applied challenge in this case.  In regard

9      to --

10             THE COURT:  Well you would agree that I'm bound by

11     whatever the Third Circuit said.  I mean, you could have asked

12     for certiorari, but you didn't, so I'm -- so I'm bound by that

13     rule.

14             MS. WYER:  In regard --

15             THE COURT:  By that holding.  Yes.

16             MS. WYER:  That doesn't require a particular result.

17     I think what is significant there is that an overbreadth

18     claim, that rationale -- rationale for an overbreadth claim is

19     the idea that it would chill third parties not before the

20     Court.

21             And the Court -- so the significant point there is

22     that we have heard testimony from Agent Lawrence, for example,

23     who has acknowledged that there is no way that people who are

24     engaging in truly private conduct, like a private couple

25     making a home video, or engaging in sexting, or a truly

Wyer - Closing                          165

1   private communication, there's no evidence that that activity

2   has been chilled, for one thing.  And there's no reason to

3   expect that that activity is being chilled, or would be

4   chilled.

5          And so the rationale, the underlying rationale for

6   an overbreadth claim does not justify a holding the Statute

7   facially invalid just on the basis of this private activity.

8   And any overbreadth has to be measured against the plainly

9   legitimate speech of the Statute.

10          And the overbreadth -- that's why I mentioned before

11  that it's the plaintiffs that have the burden to establish

12  overbreadth, because overbreadth means that you're striking

13  down a law, you're leaving noting standing in regard to this

14  law.  You're making it invalid as applied even to perfectly

15  legitimate applications like the entire adult industry would

16  then be relieved from checking driver's licenses, if this law

17  is struck down.

18          So I think that -- the plainly legitimate sweep of

19  the statute has to be taken into account when you're trying to

20  assess whether, even under the Third Circuit's interpretation,

21  whether the -- whether the existence of private couples making

22  home videos justifies striking down this law on its face.

23          And in terms of quantification, we have --

24          THE COURT:  Well you're correct, in that that

25  argument -- that holding of the Third Circuit was in

1    connection with the narrow tailoring issue.  Not the facial

2    overbreadth.

3            MS. WYER:  But I think it's overbreadth.

4            THE COURT: Go ahead.  What?

5            MS. WYER:  Isn't it overbreadth?

6            THE COURT:  No.  It's on page 30 and 31 of the slip

7    opinion, which is where they're talking about as applied and

8    narrow tailoring.  Well I think both of you ought to address

9    that in your briefs.  Go ahead.

10           MS. WYER:  Okay.  So well I'll just -- well, okay,

11   I'll come back to this --

12           THE COURT:  You've got 15 minutes.

13           MS. WYER:  Okay.  I'll -- I will -- I guess I will

14   address the issue of the burdens in briefing, and I'll go onto

15   overbreadth.

16           I did just want to mention in regard to some of

17   these requirements, the plaintiffs, some of the burdens that

18   they are describing are not burdens that the Statute or

19   regulations are imposing.  It's based on their

20   misunderstanding of the requirements.

21           So, for example, the labeling requirement, there's

22   nothing in the Statute or regulations that requires -- I think

23   a fair reading of those requirements would not lead one to

24   have to attach a label to an image at the very instant that

25   it's created.

1       And there has to be some assessment of, when does

2  that image -- when does that label have to be attached?  And

3  the rational interpretation of that is, because the labeling

4  requirement is what tells people where the records are located

5  once that production is sent out into the world.

6       The requirement attaches at the point when the image

7  goes outside the producer's control.  So it doesn't mean you

8  have to, as soon as you snap the shutter on a digital camera,

9  but obviously it would be impossible to attach a label at that

10 very instant.

11      So there has to be some way of taking commonsense

12 and reality into account when you're interpreting that.  It

13 doesn't mean that the regulation is invalid, simply because

14 you can imagine some absurd way of applying it that is

15 physically impossible.

16      So going to overbreadth, the Third Circuit's

17 identified two possible -- two factual questions for this

18 Court to look at.  One of those has to do with the ages of the

19 individuals appearing in sexually explicit images, and then

20 the other one has to do with private depictions.

21      And in both of those instances, as I was explaining,

22 the -- the other side of the question is the plainly

23 legitimate sweep of the Statute.  And here the plainly

24 legitimate sweep of these requirements is vast.  We agree with

25 the Court's view that there is -- that the evidence that has

1    been presented shows a strong demand for very youthful looking

2    performers in sexually explicit films and videos.

3         We have testimony from Gail Dines (phonetic) that

4    teen porn is a very popular category in pornographic

5    compilations and sites.  We have Daniel Linz -- plaintiffs

6    expert Daniel Linz, acknowledging the same thing.  And we have

7    presented the Court in the evidence that we presented, the

8    screen shots that we presented bolster and confirm what Gail

9    Dines' testified, that it's not only in categories that are

10   identified as teen porn where youthful looking performers

11   appear.

12        Even in a category labeled, MILF, Gail Dines

13   testified about the scenarios, and in those kinds of videos

14   where it's a mother with a daughter's boyfriend, or, I don't

15   remember the other one, but it involved something where an

16   older woman, in most cases, is with a younger man, or vice

17   versa.

18        And so that category is not somehow removed from the

19   plainly legitimate sweep of the Statute, that category is part

20   of the plainly legitimate sweep the Statute, because the

21   prevalence of youthful looking performers transcends across

22   virtually every group of sexually explicit images on the

23   internet.

24             THE COURT:  You have ten more minutes.

25             MS. WYER:  Plaintiffs, again, may have proposed --

1    there seems to be  some thought of a cutoff age.  But as I was

2    mentioning, 25 is not a magic number.  And no plaintiff - it's

3    significant, I think that no plaintiff has testified that the

4    requirements would be less burdensome if there was a cutoff

5    age, such that the requirements applied only to some of their

6    work and not all of it.

7         And in the universe -- the question of whether the

8    plain legitimate sweep of the Statute also has to take into

9    account the relative burdens of having a universal

10   requirement, versus trying to introduce the subjectivity that

11   would be involved if you try to establish a cutoff age based

12   on the appearance of how someone looks when you take their

13   picture.

14        Is it really easier, or less burdensome to try to

15   figure out in every instance whether someone is a certain age,

16   such as 25, and you -- we heard Agent Lawrence testify that

17   having a cutoff date like that would actually do nothing,

18   other than lead to case-by-case disputes, and make the whole

19   process he -- as he put it, gum the whole process up.

20        Because you would constantly be having this question

21   about, does the picture make someone look a certain age?  Do I

22   think that person is a certain age?  Well will the inspectors

23   think that that person is that age?  So it introduces numerous

24   levels of complexity and subjectivity into the entire process.

25        What we have now, and what other Courts have

1    recognized as effective is a universal requirement.  All that

2    is required is that you check the ID of everyone.  And why --

3    why introduce additional difficulties and burdens into that

4    regulatory scheme that is something clear people, can follow

5    it.

6          There's no -- but I think, while the important point

7    there is that substantial overbreadth, the categories that the

8    Third Circuit identified do not rule out, or do not entirely

9    address what the plainly legitimate sweep is, because if

10   universal age verification is reasonable, as it is, that means

11   that the everything encompassed within that universal age

12   verification is within the plainly legitimate sweep.

13         Going to the private issue.  The Third Circuit's

14   question on the private issue.  The point to make there is

15   that plaintiffs have introduced, have tried to encompass

16   within their category of private communications, things that

17   do not -- that should be subject to the requirements, because

18   they are not truly private, and they are not -- there's no

19   evidence about what percentage of that material is even

20   non-commercial.

21         All of these dating websites, all of these social

22   networking sites, those are locations where publicly available

23   images are posted to the internet.  And when something is

24   posted to the internet, our position is that that is not

25   private.  That is exactly why the requirements legitimately

1    apply.

2              And the -- again, should try --

3              THE COURT:  Yes.  But does that apply to a mobile

4    communication?  And, you know, a Face Time between a husband

5    and wife or --

6              MS. WYER:  Well that is -- I think that is not -- I

7    mean, this is purely hearsay --

8              THE COURT:  I mean, I understand your argument about

9    the --

10             MS. WYER:  -- evidence --

11             THE COURT:  -- internet, and that has some logic to

12   it.  But what do you do about -- look, this whole -- what the

13   plaintiffs call sexting, or even just a message, a mobile

14   message between a husband and a wife.  That technology did not

15   exist when the Statute was passed, or I think the regulations.

16   Now what do I do with the plaintiffs' argument about that?

17             MS. WYER:  About that, I think the answer is to wait

18   for an as applied challenge from someone who is seeking to

19   engage in sexting, and feels -- has some claim to feel

20   chilled.

21             Again, I think this falls within the situation where

22   there's no evidence of any chill.  There's no -- there's no

23   reliable quantification of that activity.

24             We don't have any -- we have not seen a single sext

25   in this case.  The definitions of the things that Drouin and

1   Zimmerman were trying to measure included cleavage.  Cleavage

2   is not even subject to the 2257 requirements.  And for all we

3   know all the images --

4              THE COURT:  We had some of the actual witnesses, I

5   think, testify to, you know, their sending cell phone

6   messages.  Am I wrong about that?

7              MS. WYER:  I don't recall that happening.

8              THE COURT:  All right.

9              MS. WYER:  I don't recall anything like that.

10             THE COURT:  Then I'll make a question mark about

11  that.  All right, go ahead.

12             MS. WYER:  Even if one -- even if all of the

13  plaintiffs testified, that's 12 individuals, that doesn't show

14  a prevalence of that activity.

15             THE COURT:  Okay.  Do you want to talk about --

16  you've got five minutes.  Do you want to talk about the Fourth

17  Amendment, briefly?

18             MS. WYER:  The Fourth -- with respect to the Fourth

19  Amendment, the ripeness issue is a significant issue on that

20  claim because --

21             THE COURT:  So you think that's alive, even though I

22  denied your motion to dismiss?

23             MS. WYER:  Yes.  Because Your Honor said at the time

24  that you were denying it when we had the hearing on the issue,

25  that you would be willing -- that you would revisit that issue

1    later, and I think now is later.  So that issue is ripe, so to

2    speak, for a decision at this point.

3           And the plaintiffs' burden from that stage, that was

4    the motion to dismiss stage.  At the trial stage, their burden

5    to establish ripeness and standing is greater at this stage of

6    the case.  But --

7           THE COURT:  Yes.

8           MS. WYER:  -- the photographs that occurred in the

9    past, there are material differences to even if those

10   inspections provide a -- actually context for what the

11   situation was in 2006 and 2007.  Now we have -- digital

12   technology has advanced so much since that time, the scope of

13   the requirements has changed.  Now it applies to lascivious

14   exhibition of the genitals.

15          In 2007, it did not.  And so that brings in a whole

16   realm of new images.  If the -- the number of producers is far

17   greater than what the FBI thought when it had 300 producers in

18   its database, by the end of that time it was looking into the

19   prospect of trying to monitor over a million.  And, at this

20   point, it could be even greater.

21          So what we did see in those inspections were

22   inklings of how an inspection program might -- might vary in

23   the future.  We have, even then when it was not really

24   allowed, the agents were not -- did  not have a problem with

25   third party custodians.  Now that is an established thing that

Wyer - Closing                                    174

1   the regulations allow.  And there's no evidence in the record

2   on how many producers use that.

3        We do know that David Conners uses a third-party

4   custodian.  We know that Marie Levine uses a third-party

5   custodian.  There -- the digital technology, in the Pure Play

6   inspection that occurred, that -- that's from the producer has

7   simply downloaded all of its records onto a CD and gave it to

8   the agents and they took it back to their office to review.

9        When -- now in 2013, or the future when they are

10  looking at how to implement a new inspection program, if that

11  ever happens, how do we know?  It's pure speculation as Your

12  Honor has recognized during the agent's questioning.

13       It's pure speculation that the FBI -- whether the

14  FBI would establish as the way things would happen, that every

15  time the records are on digital form, just give me a CD with

16  those records.

17       And Agent Joyner -- what we do know from the

18  inspections that -- that the evidence shows that the agents

19  were completely accommodating to the producers at every step.

20  They did not -- they sat where they were told to sit.  They,

21  if the -- they waited on the threshold of the residence until

22  they were invited in.

23       Whenever they could not find a producer, they did

24  not hold anyone to an arbitrary 20 hour per week, you have to

25  be present, and otherwise you're -- we're going to write it up

Colloquy                                          175

1    as a violation.   Instead on the occasions when they could not

2    locate the producer, they made every effort to make

3    arrangements.

4            They gave advance notice when the situation

5    required.  And there's no basis given those facts and the very

6    limited nature of the inspections where the -- really the only

7    object of those inspections were the 2257 records themselves.

8    And Your Honor's holding in the first round of the case that

9    there is no expectation of privacy in those records, has

10   continued to be valid and nothing in the Third Circuit's

11   opinion questioned that holding.

12           THE COURT:  Okay.  I think you're done.  You have

13   one more sentence?

14           MS. WYER:  Well in sum, Your Honor, we ask the Court

15   to uphold the validity of --

16           THE COURT:  Okay.  All right.  I want to mention one

17   issue, and this is -- and I may not be stating this in the

18   exact proper way.  What we faced here with a Statute and with

19   regulations.  Now I know -- I think I know how the Supreme

20   Court has stated a Court should review a Statute.

21           And also how it should review regulations.  And as

22   far as regulations, we have a very recent case, Arlington,

23   Texas v. The FCC.  Which I've read quickly.

24           So one of the things you may want to address in your

25   brief, because the regulations, in my mind, have more to do

Colloquy                                                      176

1    with the Fourth Amendment then the First Amendment, is whether

2    there's any different standard of review, or construction, or

3    deference, or anything like that.

4             I would welcome some at least discussion, or stating

5    your view about that issue.  Okay?  All right.  I want to

6    thank all of you for being very diligent, and very

7    well-prepared.  You have each represented your clients very

8    well.

9             This is a fascinating case.  It's an important case,

10   I think.  And it's a case that obviously we have spent a lot

11   of time and energy on, but I think that's what we're here to

12   do.

13            So I'll look for your briefs.  We'll look for the

14   opening briefs on Friday, June 28th.  And we'll look for the

15   reply -- I would add that, if you can get them filed, say, you

16   know, like by three or 4:00 that day, or even earlier, that

17   would be welcome, rather then midnight.

18            But we'll take them when we get them.  And then the

19   reply brief is limited, as I've indicated, will be due on

20   Friday, July 5th.  Okay?  All right.  So thank you very, very

21   much.  All right.  We're in recess, and I'll be back in ten

22   minutes for the criminal case.

23            (Proceedings concluded at 2:30 p.m.)

1

2                        C E R T I F I C A T I O N

3    I, Josette Jones, court approved transcriber, certify that the

4    foregoing is a correct transcript from the official digital

5    audio recording of the proceedings in the above-entitled

6    matter.

7

8    --------------------------------          -----------------

9    JOSETTE JONES                             DATE

10   DIANA DOMAN TRANSCRIBING