**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| FREE SPEECH COALITION, INC. et al. | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE HONORABLE ERIC H. HOLDER, JR. | : | 09-4607 |
| | : | |
| Defendant. | : | |


**Baylson, J.**                                                                                     **July 18, 2013**


### MEMORANDUM:  FINDINGS OF FACT AND CONCLUSIONS OF LAW


The extent to which the adult porn industry utilizes young-looking performers is the central fact issue in the trial of this case. The attraction of males to younger women is not a new story. Mozart focused on this theme in several of his operas. In The Magic Flute, Papageno, the lonely bird-catcher, wonders how he is ever going to meet someone who will become his wife. When a woman dressed as an old hag expresses some interest in him, in a raspy, elderly voice, Papageno expresses revulsion; but when this woman later sheds her outer garments, revealing a very youthful and pretty soprano, they fall in love and prance off to the famous tunes of "Pap, Pap . . . Pap, Pap . . . Pap, Pap, Pap . . ."  Mozart used the same theme in Don Giovanni, where the nobleman seduces a naïve young lady, Zerlina, and in the Marriage of Figaro, where the Count is attracted to the young chamber-maid, Susannah.  In literature, Faust was enamored of Margaret; Dante celebrated the youthful Francesca Da Rimini; and Hawthorne created Hester

1

Prynne, heroine of <u>The Scarlet Letter</u>.  But we need not go back several hundred years for these metaphors. In <u>Lolita</u>, Vladmir Nabakov used the same theme to great notoriety, but also to great acclaim. His hero, Humbert Humbert's opening line, "the fire in my loins," set the tone for his enchantment with a nymphet.

Plaintiffs are a group of adult pornography producers, photographers, artists, and educators, who devote substantial time and energies to the creation of erotic and sexually explicit works. They seek a declaratory judgment and an injunction against the enforcement of 18 U.S.C. § 2257 and 2257A ("the Statutes") and their corresponding regulations, which impose recordkeeping, labeling, and inspection requirements on producers of sexually explicit media. Plaintiffs contend the Statutes and their corresponding regulations run afoul of the First and Fourth Amendment because they burden an excessive amount of speech and allow for unreasonable, warrantless inspections.

In June 2012, the Court held an 8-day bench trial during which 21 witnesses presented live testimony and over 300 exhibits were entered into evidence. (ECF 197-206, 208, 210, 212, 214).  The Court made detailed findings of fact (ECF 212), and the parties submitted lengthy post-trial briefs. (ECF 216-219). For the reasons that follow, the Court has concluded the government largely succeeded in defending the constitutionality of the Statutes. Namely, the Court finds Sections 2257 and 2257A and their corresponding regulations to be constitutional under the First Amendment, both as-applied and facially.  It also finds the Statutes and regulations to be constitutional under the Fourth Amendment, except for in one regard – the allowance of inspections at the residences of producers, without prior notice, cannot be justified on this record. Nonetheless, the Court declines to issue an injunction under the Fourth

Amendment, either as-applied or facially, because it finds the prospect of future inspections too remote to justify such relief.

## I.  Procedural History

Plaintiffs filed this lawsuit in 2009, seeking both a declaratory judgment and an injunction. They alleged Sections 2257 and 2257A, and their corresponding regulations, violated their rights under First, Fourth, and Fifth Amendments of the United States Constitution, and were also unconstitutionally vague. The Government moved to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and this Court granted the motion, dismissing the Complaint in its entirety. Free Speech Coal., Inc. v. Holder, 729 F. Supp. 2d 691, 746 (E.D. Pa. 2010). Regarding Plaintiffs' First Amendment claim, the Court held the statutes and regulations were content-neutral and survived intermediate scrutiny, because they are a narrowly tailored means for Congress to effectuate its goal of combating child pornography. Regarding the Fourth Amendment claim, the Court held Plaintiffs have no reasonable expectation of privacy in the records they are required to maintain under the Statutes, and that the inspections amount to constitutionally valid administrative searches. The Court also dismissed Plaintiffs' Fifth Amendment and vagueness challenges.

### a.  Third Circuit Decision

The Third Circuit affirmed in part and vacated and remanded in part.  Free Speech Coal., Inc. v. Attorney Gen. of the U.S., 677 F.3d 519, 543 (3d Cir. 2012). It affirmed this Court's dismissal of the portions of Plaintiffs' claim under the First Amendment (Count I) alleging the Statutes unconstitutionally suppress anonymous speech, impose a prior restraint on protected expression, and unconstitutionally impose strict liability for failing to maintain the requisite records. Id. at 533-36.  None of those issues are before the Court on remand.  The Third Circuit

also affirmed several of this Court's judgments regarding Plaintiffs' as-applied First Amendment challenge (Count I) – namely, that Sections 2257 and 2257A are content neutral laws, that intermediate scrutiny is the appropriate standard of review, and that under intermediate scrutiny, the Statutes pass the first and third prongs of the test because they further a compelling government interest and leave open ample alternative channels of communication. Id.  Only the second prong of the intermediate scrutiny test, which speaks to narrow tailoring, is before the Court presently.  Id. Finally, the Third Circuit affirmed this Court's dismissal of Plaintiffs' allegations that the Statutes violate equal protection of the laws (Count II), are unconstitutionally vague (Count III), and violate the privilege against self-incrimination (Count V).  Id. at 545.

The Third Circuit vacated this Court's dismissal of Plaintiffs' First and Fourth Amendment claims in their entirety, because it held Plaintiffs should be afforded the opportunity to conduct discovery and further develop the record on the issues of whether the Statutes burden more of Plaintiffs' speech than necessary to further the government's interest, whether they burden a significant amount of speech beyond the Statutes' "plainly legitimate sweep," whether they intrude on a reasonable expectation of privacy, and whether they authorize a valid administrative search program. The Third Circuit also held Plaintiffs should be afforded leave to amend their Complaint and add allegations about inspections brought against them in the past.

Accordingly, the effect of the Third Circuit's decision is that the following issues are to be explored on remand:

(1) for Plaintiffs' as-applied claim under the First Amendment (Count I), whether the Statutes are narrowly tailored as to Plaintiffs;

(2) for Plaintiffs' facial over-breadth claim under the First Amendment (Count I), whether the Statutes unreasonably burden a substantial amount of protected speech; and

(3) for Plaintiffs' facial and as-applied claims under the Fourth Amendment (Count IV), whether the inspections amount to "searches" either because they intrude on areas in which there is a reasonable expectation of privacy or because they involve "common-law trespass"; and if so, whether the inspections fall under the administrative search exception to the Fourth Amendment's warrant requirement.

### b. District Court on Remand

Following the Third Circuit's remand, Plaintiffs filed an Amended Complaint on June 29, 2012, adding a new Paragraph 20. (Amended Complaint) (ECF 84). Paragraph 20 now stated that "[s]everal of Free Speech Coalition's members have been subject to inspections pursuant to 18 U.S.C. § 2257"; that "[i]n each instance, a team of FBI agents came to the member's private business premises, without a warrant or prior notice . . . [and] entered areas of the business premises not open to the public"; and that "[i]nspections have also been made by FBI agents of producers who are not members of Plaintiff Free Speech Coalition, and in two instances, upon information and belief, inspections were conducted at private residences of the producers because that is where their records were maintained." (Id. ¶ 20).

After the Amended Complaint was filed, the government moved to dismiss Plaintiffs' claims under the Fourth Amendment for lack of subject matter jurisdiction. (ECF 28).  It contended Plaintiffs did not have the requisite standing to request an injunction under the Fourth Amendment because they could not show they faced a real and immediate threat of constitutionally unreasonable inspections. Additionally, the government argued, Plaintiffs' Fourth Amendment claims were not ripe. (ECF 92).

The Court denied the government's motion.  (ECF 113 & 117). With respect to standing, the Court held Plaintiffs faced a sufficient enough possibility of future injury as a result of the

plain operation of the Statutes that the Court's subject matter jurisdiction was satisfied. Sections 2257 and 2257A impose record-keeping requirements on producers and authorize the Attorney General to undertake "inspection [of such records] at all reasonable times." See 18 U.S.C. §§ 2257(c) & 2257A(c).  This created the possibility for inspections in the imminent future. Consistent with the Third Circuit's holding, the fact that no inspections had been conducted since 2007 did not wash away Plaintiffs' standing, the Court held, "because as long as Section 2257 is in force, the searches could be resumed at any moment." (Memorandum at 6) (ECF 117); see also id. ("A change in FBI priorities, or a new FBI director, or a new Attorney General, could summarily negate the policies attested to in Agent Nanavaty's affidavit. The Court cannot ignore the potential impact of a congressional statute."). A second reason Plaintiffs had standing to seek an injunction under the Fourth Amendment is that they had "suffered and are continuing to suffer significant compliance costs under the statute." (Id. at 8).

With respect to ripeness, the Court held the "direct impact of the statute on the regulated entities and their potential for prosecution if they choose not to comply establishes ripeness" under the governing Third Circuit test. (Id. at 14). While the government had argued that the inspections in 2006 and 2007 could not provide the Court a factual basis on which to assess Section 2257's constitutionality going forwards, because future searches might be different from those in the past, the Court held it could not "preclude the threat that at least some of the Plaintiffs will undergo future inspections under Section 2257 resembling those in the past." (Id. at 15).  Accordingly, Plaintiffs were afforded an opportunity to develop a record about the inspections that had occurred in 2006 and 2007 and to demonstrate that there was sufficient justification for an injunction going forwards.

After discovery concluded, both parties filed Motions for Summary Judgment. Plaintiffs moved for summary judgment on two of their claims: first, that the Statutes are unconstitutionally overbroad under the First Amendment on their face; second, that the Statutes and regulations are unconstitutional under the Fourth Amendment. (ECF 144). The government moved for summary judgment on these same two claims, as well as on Plaintiffs' as-applied claim under the First Amendment. (ECF 177). After reviewing the cross motions in some detail, the Court concluded there were material disputes of fact in the record as to all three claims, and that summary judgment was therefore unwarranted as to either party. (ECF 185 & 186).

## II.  Summary of Evidence Presented at Trial

At trial, Plaintiffs presented testimony from twelve fact witnesses, all of who are named Plaintiffs in the case, and from three experts. Plaintiffs' fact witnesses included producers of pornographic films and sexually explicit photography, as well as artists, educators and journalists. The government presented testimony from two FBI agents and four experts.[1]

### a.  Plaintiffs' Fact Witnesses

Eugene Mopsik, the Executive Director of the American Society of Media Photographers ("ASMP"), an organizational plaintiff, testified for Plaintiffs about the burdens that Sections 2257 and 2257A impose on commercial photographers. Mopsik explained that because of the rise of digital media, photographers are no longer constrained "by what they can carry" and instead have the ability to produce thousands of images at a single photo shoot. However, the

---

[1] This Opinion will cite to the audio recordings that have been prepared for the trial proceedings in this case, which have been electronically uploaded to this Court's CM–ECF filing system and are available under the Docket for Civil Action No. 09-4607. No written transcript exists, resulting in substantial savings in cost and a significant reduction in paper usage. If one of the parties seeks to appeal this Court's judgment, however, it will likely need to order a full or partial written transcript. The Federal Rules of Appellate Procedure require that if a party seeks "to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a [written] transcript of all evidence relevant to that finding or conclusion." Fed. R. App. P. 10(b)(2).

understanding in the industry is that Section 2257 requires that records be maintained for – and statements about the location of the records be affixed to – every photograph of sexually explicit content taken at a shoot. This is a significant burden. While photographers commonly store information such as whether a photograph is copyrighted in the photograph's "metadata," Mopsik explained, the regulations require that Section 2257 statements be prominently affixed to the exterior of the photograph itself. Mopsik had no idea how a photographer could comply with that particular requirement. (Audio File 6/3/13 A.M. at 0:28-0:34, 0:41-0:47) (ECF 197).

Additionally, Mopsik testified that it is common practice in the commercial photography industry to require that models sign "model releases," authorizing the photographer to license the images taken and to make use of them thereafter. ASMP encourages its members to use model releases. To ensure that the model release is a valid contract, photographers commonly check the model's identification to ensure he or she is at least 18 years old. This testimony by Mopsik suggested that Sections 2257 and 2257A do not make photographers do anything they weren't already doing to ensure their models are adults – they only impose additional, unnecessary record-keeping burdens on photographers. (Id. at 0:19-21).

Four other commercial photographers testified as fact witnesses for Plaintiffs. These were David Steinberg, Barbara Alper, David Levingston and Barbara Nitke.

David Steinberg is a "fine arts sexual photographer" who has edited and published books of erotic photography. He also takes erotic photographs for adult couples, who either pay him directly or allow him to reproduce their images in his collections. Steinberg testified that over the last several years, his focus has been depicting older people and people with disabilities in sexual encounters, to convey the message that we are all beautiful beings with the capacity for intimacy. (Audio File 6/4/13 A.M. at 2:18-2:43, 2:51-2:53) (ECF 199).

Steinberg maintains Section 2257 records for his commercially reproduced images and for the images he prints for private clients. (Id. at 2:46). He stores the records in a filing cabinet in an apartment he owns, which he also uses as an office. (Id. at 2:44). Steinberg testified that Section 2257 burdens him because it requires he maintain records for all of his photographs, even though "most" of his subjects could be told "with certainty" that they are over 18. (Audio File 6/4/13 P.M. at 0:24) (ECF 200). The Statutes also have prevented him from publishing a U.S. edition of the Norwegian magazine, Quipido, because he would be unable to obtain the necessary 2257 records for the European models depicted. (Audio File 6/4/13 A.M. at 2:20-2:40) (ECF 199). Finally, one regulation with which Steinberg does not comply at all is the requirement that he affix a Section 2257 label prominently to his explicit photographs. He believes this would "deface" his work. (Id. at 2:47-2:48).

Barbara Alper also testified for Plaintiffs. She is a commercial photographer who has documented sexual subcultures throughout the world since 1981. One of her bodies of work focuses on individuals in "S&M" clubs engaging in simulated and actual sexual activity. She has published this work in printed collections and exhibited it for sale in art galleries. The persons in Alper's S&M-club photographs are candid individuals rather than models, and she did not ask for model releases or photo identification from them. Nonetheless, Alper stated she had "no doubt" these subjects were 18 or older, because the clubs had been restricted to persons of that age and IDs had been checked at the door. (Audio File 6/4/13 P.M. at 1:43-1:58) (ECF 200).

Over the years, Alper also has photographed couples making love, including herself and her husband. She has published some of the photographs of herself and her husband for commercial return, including in Quipido magazine. (Id. at 1:55-1:57, 2:12-2:13).

Alper testified to several ways the Statutes suppress her artistic endeavors. First, they have "seriously affected" her ability to photograph couples in intimate settings, because private citizens do not wish to make their identifications available for government inspection. (Id. at 1:55-1:57). Additionally, the Statutes are preventing Alper from pursuing a documentary project on Fire Island, New York, where she would photograph members of an adult, gay community engaging in anonymous sex. Section 2257 is an obstacle to this project because the intended subject matter – anonymous sex – is fundamentally at odds with the collection of photo identification of the subjects. (Id. at 2:00). Finally, the Statutes are preventing her from publishing a compilation of her works, because she is unable to obtain identification from the subjects of her works that she created in the 1980s. (Id. at 2:02-2:04).

David Levingston is a third photographer who testified for Plaintiffs. His specialty is depicting female nudes in the natural environment. Levingston's photographs have been exhibited at shows, institutes and galleries around the world, and he has published them in a book, "The Figure in Nature." Levingston does not comply with Sections 2257 and 2257A, and he does not believe he is capable of doing so. He stated the record-maintenance requirements are "incomprehensible" to him, and the need to be available for inspection 20 hours a week would undermine his ability to go on photo shoots. (Audio File 6/5/13 A.M. at 1:42-2:06) (ECF 201).

Levingston expressed frustration that since 2009, he has had to tailor his work to avoid triggering Sections 2257 and 2257A. When he shoots models, he is now careful not to capture them in poses that could be regarded as simulated sexual conduct. Levingston also has removed certain photographs from his website, for fear they would be seen as simulated sadomasochism and thus fall under Section 2257A. He is refraining from pursuing a photo-documentary project

of former prostitutes because he "cannot imagine" how he would avoid "crossing the line into 2257A." (<u>Id.</u>).

Barbara Nitke was the fourth photographer who testified for Plaintiffs. Over her career, she has photographed sexually explicit behavior in a number of settings – in the 1980s, she took photos behind the scenes at adult film shoots; in the mid-1990s, she began photographing private individuals engaged in sadomasochistic sex; and in 2008, she embarked on a project that depicts sexual bondage as a fashion art statement. Nitke has published her 1980s works in a book, and she exhibits all of her collections on her website. She stores Section 2257 records for her works that post-date the Statutes in her home. (Audio File 6/7/13 P.M. at 0:28-0:43) (ECF 204).

Nitke related that the burdens associated with maintaining records under Section 2257 are considerable. First, she is not home 20 hours a week for potential FBI inspections, as the regulations require. Second, she has to produce "three different sets of documents" for every sexually explicit depiction she takes, and the documents have to be cross-referenced back to each other. This is labor and time intensive, Nitke related, and it inhibits her from updating her website. Nitke also testified that she would like to publish a printed compilation of her work from the 1980s through the present, but she believes she cannot do so because Section 2257 would require that she provide records for the images that predate the Statutes, which she does not have. (<u>Id.</u> at 0:55-0:59).

The next category of witnesses to testify for Plaintiffs was individuals who work as sexologists, sex educators and journalists. Carol Queen, the director of the Center for Sex and Culture in San Francisco, is a publisher of self-help books and a designer of adult sex-education programs. (Audio File 6/4/13 A.M. at 1:04) (ECF 199). One activity she has helped organize through the Center is a "masturbate-a-thon," at which members of the public congregate to

masturbate together.  The purpose of the masturbate-a-thon, Queen explained, is to dispel the stigma associated with masturbation.   The Center has hosted eleven masturbate-a-thons since 2001 and has live-streamed about six of them.  Only persons 18 and over can participate, and volunteers check IDs at the door. (Id. at 1:23-1:29).  Queen related that whenever the Center has live-streamed the event, it has required participants in the live-streaming room to fill out Section 2257 paperwork.  (Id.).   But one reason the Center hasn't live-streamed the masturbate-a-thon since 2010, Queen testified, is because complying with 2257 is so cumbersome.   (Id. at 1:36).

Carlin Ross and Betty Dodson are also sex educators who testified for Plaintiffs. They are business partners who produce educational films about sex and maintain a website, dodsonandross.com, dedicated to sexuality and genitalia.   The website offers a weekly podcast about sexual topics, a features column by Dodson, and for paid subscribers, a "genital art gallery." (Audio File 6/4/13 P.M. at 0:29, 0:39-0:43) (ECF 200).  According to Ross, the gallery was launched in 1998 with the goal of exhibiting a wide "range of genital styles," so that persons could realize there is nothing wrong with their sexual anatomy.   (Id.).

The primary burden Section 2257 imposes on Dodson and Ross is with respect to its effect on the genital art gallery.   When the gallery was launched, submissions were anonymous – persons would send in a photograph of their genitals and an accompanying essay, and Ross would determine whether to upload the submission. (Id. at 0:43-0:45).   The gallery accumulated over 2,000 images. But when Section 2257A was amended to include "lascivious displays" of genitals, Dodson and Ross had to require that submitters provide identification and fill out 2257 forms.   Submissions ground to a halt. Moreover, Ross and Dodson had to remove all but 200-300 images from the gallery because they lacked records of the dates of production as well as the necessary 2257 paperwork.   Overall, Ross and Dodson testified, Section 2257A has effectively

ended the genital art gallery and prevented it from achieving its purpose of displaying a broad range of genitalia. (Id. at 0:47-0:50).

Thomas Hymes testified for Plaintiffs as a journalist of the adult entertainment industry. He operates a website, www.dailybabylon.com, where he posts reports about the industry. Although he initially started the website in 2009 with the intent of deriving commercial revenue from it, he now operates the site for personal, expressive purposes. (Audio File 6/4/13 P.M. at 2:30-2:34) (ECF 200). Hymes testified that there are images he will not upload – from trade shows, clubs, and other venues in the adult entertainment industry – because he is worried about triggering Sections 2257 and 2257A. (Id. at 2:37-2:39). Hymes does not otherwise comply with Section 2257, and he does not believe he has the capacity to do so because he cannot be home for 20 hours a week. (Id. at 2:40). Section 2257 is "literally chilling [his] expression," Hymes stated, because it is stopping him from taking sexually explicit images and posting stories to go with them. (Id. at 2:38).

Several individuals who work in or with the commercial pornography industry also testified for Plaintiffs – Marie Levine, Linda Wilson, of the Sinclair Institute, and Jeffrey Douglas, Chairman of the Free Speech Coalition.

Marie Levine, known as "Nina Hartley" by trade, is a performer, sex educator, and producer of adult entertainment. She began appearing in adult films when she was 25 years old and continues to do so presently, at age 54. Levine operates a website, www.ninahartley.com, to which she uploads weekly "web-shows" containing sexually explicit performances by her and others. Paid subscribers to the website can view the current web-show as well as those in the archives. (Audio File 6/5/13 A.M. at 0:40-0:55) (ECF 201).

Levine maintains Section 2257 records for every guest performer in her web-shows. (Id. at 0:55). She testified to the general burdens that this imposes on her – e.g., the administrative hassle of "sinking up" electronic and paper records, the time involved in carrying out the necessary cross-referencing – and to her moral opposition to being presumed she is a "criminal" because she produces adult content. (Id. at 0:56-0:58). For a number of years, when she stored 2257 records at her home, she also feared publishing her address on her website. Levine no longer has this fear because she now uses a third-party custodian. (Id.).

Linda Wilson was a second representative of the commercial pornography industry who testified for Plaintiffs. She is the officer manager of the Sinclair Institute, a for-profit corporation that produces educational films depicting explicit sexual activity. (Audio File 6/3/13 P.M. at 1:25-1:28) (ECF 198). According to Wilson, Sinclair is "the world's largest producer[] and distributor[] of adult sexual education and health media." (Id. at 1:27). Because its videos are targeted at adult audiences, Sinclair typically uses adults over age 30 as its performers, some of who are married couples. (Id. at 1:33). Sinclair also sells pornographic films produced by third-parties on its website and in catalogues. (Id. at 1:50).

Sinclair maintains records under Section 2257 for all of the sexually explicit depictions it creates or sells – from its videos, to the photo covers for its videos, to the movies it sells as a secondary distributor, to the images printed in its catalogues. This yields a "mountain of documents." (Id. at 1:57). Wilson spends 20 hours a week – roughly half of her job – maintaining records under Section 2257. (Id. at 1:58). Altogether, the company spends approximately $75,000 a year complying with the Statutes. (Id. at 2:18-2:20). It occasionally has "fire drills" to rehearse producing records for a government inspector. (Id. at 2:10). The most burdensome part

of the regulations, according to Wilson, is the cross-referencing requirement, particularly for the products Sinclair sells as a secondary producer/distributor. (Id. at 1:54-1:57, 2:03-2:07).

Jeffery Douglas, Chairman of the Board of the Free Speech Coalition ("FSC"), also testified for Plaintiffs.  FSC is the lead Plaintiff in this case. It is a trade association that represents businesses and individuals who produce adult-oriented materials, often containing actual and/or simulated sexually explicit content.  (Audio File 6/3/13 A.M. at 1:22) (ECF 197).  FSC's members include large-scale producers of commercial pornography, such as Vivid Video, Wicked Pictures, K Beech, and Dark Side.  (Id. at 2:42-2:45).

Since 1988, Douglas has worked as an attorney in the adult entertainment industry, advising clients about Section 2257. Accordingly, he has significant personal knowledge about the compliance issues associated with 2257. (Id. at 1:20-1:22).  Douglas testified that the Statutes impose onerous burdens on secondary producers of sexually explicit products – distributors have to collect information from primary producers; they have cross-reference the appearances of any model in a work they sell across all other appearances by that model in other works they sell; and they have to hire "screeners" at their warehouses to make sure the labels on the products they receive from primary producers are in the correct location. Douglas also testified that the 20 hour/week requirement is difficult for primary producers to comply with, because they are often in the field on photo shoots. The ability to use a third-party custodian is not a panacea, because if the custodian makes a mistake, the producer is still criminally liable.  (Id. at 1:52-2:22). Further, Douglas explained that before 2257, "it was universal" for producers in the adult entertainment industry to use model releases and to have "some statement of age" in the release. (Id. at 1:37). Regardless of the Statutes, "no sane producer would knowingly use a minor" because there are criminal sanctions involved, the materials have to be recalled and destroyed, and the model

release would be invalid. (Id. at 1:43-1:46). Accordingly, similar to Mopsik, Douglas suggested Section 2257 is not forcing primary producers in the pornography business to do anything they wouldn't already do – that is, ensure their subjects are at least 18 years old – but is merely imposing unnecessary costs on producers.

### b. Plaintiffs' Expert Witnesses

Plaintiffs also presented testimony from three expert witnesses.  Two of those experts, Dr. Michelle Drouin and Dr. Marc Zimmerman, testified primarily about the practice of "sexting," the sending of text messages containing sexually explicit depictions over cell phones and similar devices.  Dr. Drouin, an associate professor at Indiana University, testified that based on two surveys she undertook of students in her undergraduate psychology courses, using "convenience samples," as well as her review of six published studies, she estimates 33% of adults ages 18-24 in the United States engage in sexting of "sexually explicit visual images." That translates into 10.2 million young adults. (Audio File 6/3/13 P.M. at 0:30-0:48, 0:50) (ECF 198).  Dr. Drouin did not provide a definition of "sexually explicit images," nor could she estimate how many of the images being exchanged are of intercourse, masturbation, breasts, cleavage, or anything else. (Id. at 1:02).[2]  Dr. Zimmerman, a professor at the University of Michigan, testified that based on an online survey he conducted using Facebook and "respondent driven sampling," he estimates 30% of adults aged 18-24 nationwide have sent a sext message and 41% have received one. (Audio File 6/14/13 P.M. at 0:40-0:47, 0:50-0:51) (ECF 210). Even discounting his estimate by 50%, that translates into 4.5 and 6 million young adults, respectively.

---

[2] She could not define the term "sexually explicit images" (with respect to her estimate that 33% of adults exchange such images) because the surveys and studies she relied on to arrive at that estimate had not used a uniform definition of sext messages, and only one of the surveys she considered attempted to ascertain the number of sext messages sent based on the type of content depicted. (Id. at 0:54-1:02). Moreover, most of the surveys and studies she relied on had included "nude" and "nearly nude" images in their definitions of sexting. (Id. at 0:52).

(Id. at 0:52).  Dr. Zimmerman could not estimate how many of the images being exchanged are of intercourse, masturbation, breasts, cleavage, or anything else. (Id. at 0:54-0:56).[3]

Dr. Daniel Linz, a professor at U.C. Santa Barbara, testified for Plaintiffs about the relative quantities of sexually explicit expression on the internet. Dr. Linz conducted a study for this case by asking a representative of FSC to conduct "google searches" for him, using search terms he provided.  FSC then gave Dr. Linz screenshots of the results, and from that information, combined with a review of other "credible research," Dr. Linz arrived at several estimates. (Audio File 6/14/13 at 0:17-0:19, 0:26-0:27) (ECF 212). First, he estimated that "nearly 99%" of commercially available, sexually explicit images on the internet are not child pornography. (Id. at 0:31).  (He explained that the universe is "extremely vast"; the Google-searchable universe of commercial pornography contains over 1 billion results). Second, he estimated that only about 10% of commercial, sexually explicit depictions on the internet show individuals who could reasonably be confused as minors. The rest of the depictions show persons who are obviously above the age of majority. (Id. at 0:33-0:38). Finally, Linz estimated that "tens of millions of adult Americans" post or share sexually explicit images of themselves with others, for purely non-commercial purposes. They share such images through technologies such as e-mail, real-time communications services (e.g., Skype), and social networking sites. (Id. at 0:47-0:48).

### c.  Government's Expert Witnesses

The government offered testimony from four expert witnesses, each of whom covered a different topic. Dr. Gail Dines, a professor at Wheelock College, testified about the quantity of commercial pornography on the internet that shows youthful-looking performers. Dr. Dines is a sociologist with extensive experience in studying and writing about pornography on the internet.

---

[3] His survey included "sexually suggestive nude or nearly nude photo or video" in its definition of sexting. (Id.).

She related that of the 61 genres of pornography available on "pornhub," a popular tube site[4] for commercial pornography, the "overriding image is of a youthful-looking woman." (Audio File 6/7/13 A.M. at 0:41-0:43) (ECF 203). This image pervades even those genres that purport to focus on older looking women, such as "MILF" porn. (Id. at 0:43, 0:54-0:56).[5] Additionally, Dr. Dines testified that the largest genre of pornography on tube sites is "teen porn," accounting for approximately one-third of those sites' material. (Id. at 1:07-1:09). Images in the teen porn genre tend to show models with little to no body hair, slim figures, and props such as teddy bears, pigtails, and pom-poms, to suggest youthfulness and even childhood. (Id. at 0:45-0:48). Dr. Dines testified that teen porn is not only the largest genre of pornography on the internet in terms of total quantity, but also one of the most sought-after genres of pornography. SEObook, a website which reports the frequency of searches for specific terms or keywords, shows there are approximately 500,000 searches a day for "teen porn" and similar entries, compared to 1 million searches a day for the term "porn." (Id. at 0:57-1:00).  Google trends, a website which also provides information on search term frequency, indicates searches for "teen porn" have grown 215% between 2004 and 2013. (Id.).

Next, Janis Wolak, a senior researcher at the University of New Hampshire, provided expert testimony for the government on the proportion of child pornography in the United States

---

[4] From the testimony at trial, it appears that "tube sites" are adult content websites that host a broad range of sexually explicit depictions, including professionally made videos and user-generated videos that are uploaded by subscribers to the site.  Tube sites function as "portals" to much of the pornography on the internet because they are accessible by anyone and they offer a considerable amount of content for free. As individuals click through the free content, they will eventually arrive at entry-ways to paid-pornography websites, which they can only access by paying to become a subscriber or member. (Audio File 6/7/13 A.M. at 0:27-0:29).

[5] "MILF" is an acronym that stands for "mother I'd like to f*ck." Dr. Dines found that the two most popular types of videos in the "MILF" genre on pornhub are videos in which a woman is seducing a young girl to deliver her to a man, and videos in which an older woman is engaging in sexual activity with a younger girl or boy. Both types of videos thus contain not only mature-looking adults, but also youthful-looking performers. (Audio File 6/7/13 A.M. at 0:55).

that depicts pubescent adolescents (youths aged 13-17) as opposed to pre-pubescent children. Based on a survey she conducted of law enforcement agencies, Wolak estimated that two-thirds of persons arrested for child pornography were in possession of images of pubescent adolescents. Thus, the notion that child pornographers prefer pre-pubescent, very youthful-looking children, is incorrect. Wolak also testified that it is virtually impossible to estimate the total amount of child pornography in the United States, as Plaintiff expert Dr. Linz had done, because the most abundant sources of child pornography are peer-to-peer networks, and the amount of material on those networks is not quantifiable. (Audio File 6/11/13 A.M. at 0:28-0:43) (ECF 206).

Third, the government offered the testimony of Dr. Frank Biro, M.D., of the Cincinnati Children's Hospital.  Dr. Biro's field of expertise is adolescent medicine and the science of pubertal maturation. He testified that based on his studies and clinical experiences, he has found that the age of the onset of puberty for girls and boys varies, as does the "tempo," or rate, of pubertal maturation. (Audio File 6/17/13 at 0:05, 0:16-0:18) (ECF 214). The classic literature suggests that girls reach full pubertal maturation at about 14-16 years of age, but Dr. Biro has published literature suggesting that full maturation for girls is actually occurring earlier. (Id. at 0:19). Further, Dr. Biro testified that determining one's age by visual inspection alone is an inexact science. Several pubertal markers can offer clues to one's age – breast development, pubic hair development, body composition, height, chin development – but these need to be considered collectively and they do not always point to the same conclusion. (Id. at 0:20-0:22). Even maturation experts will have a 2-5 year margin of error when trying to ascertain the age of a young adult, Dr. Biro estimated, and that margin is greater for members of the public. (Id. at 0:22-0:25).

Dr. Biro testified that he has worked with female patients who at age 12 had reached full physical maturity and thus appeared to be older than they actually were. He also stated that with make-up and dress, 15 and 16 year-olds could commonly appear to be older than 18. (Id. at 0:25-0:27). Meanwhile, Dr. Biro believed the converse is also true – persons over age 25 frequently appear to be under 18, especially when applying certain make-up and dress. (Id. at 0:28).

Dr. Biro reviewed 150 sexually explicit images produced by Plaintiffs to prepare his expert testimony for this case. (Id. at 0:32). He grouped them into several categories. One category was images in which the age of the subject could not be established based on physical inspection alone. For several such images, Biro illustrated for the Court why a determination of age was impossible, even for a person with his expertise. (Id. at 0:51-0:59).

Finally, Plaintiffs introduced testimony from Dr. Philip Stark, Chair of the Department of Statistics at the University of California, Berkeley.  Dr. Stark testified that random sampling is "the gold standard" in statistical analysis. Random sampling is what enables an expert to extrapolate a measurement derived from a sample of the population to the population as a whole, and to provide a margin of error or confidence interval for that extrapolation. Because Plaintiffs' experts Dr. Drouin and Dr. Zimmerman used samples of convenience and respondent-driven sampling to measure the prevalence of sexting, rather than random sampling, Dr. Stark stated there was no reliable way to extrapolate their findings to the general public. (Audio File 6/17/13 at 1:45-2:12) (ECF 214).

### d.  FBI Agents

Stephen Lawrence, a supervisory agent with the FBI, and Charles Joyner, a retired supervisory FBI agent, testified for the government about the inspections program used between

July 2006 and September 2007 for enforcement of the Statutes.  Plaintiffs also introduced excerpts from Agent Joyner's deposition in their case in chief. (See Pl. Ex. 136).

### i.  Creation of the Inspections Program

In May 2006, Agent Joyner was instructed by his superiors to create a program at the FBI for enforcing Sections 2257 and 2257A.  The team was to be based in Los Angeles, and it would report to FBI headquarters in Washington, D.C.  Over the next few months, Joyner built the inspections program from the ground up – he hired four retired agents to work as independent contractors, found office space, developed a list of producers regulated by the Statutes, and created protocols for carrying out inspections.  (Joyner Dep. at 39-40). The first inspection occurred on July 24, 2006, and between then and September 19, 2007, a total of 29 inspections were executed. (Def. Ex. 226; Joyner Dep. at 42).   In January 2007, Agent Lawrence joined Joyner as the secondary supervisory agent for the Section 2257 program.  Besides Joyner and Lawrence, all other members of the team were independent contractors.[6] (Audio File 6/11/13 P.M. at 0:04-0:05) (ECF 206).

After consulting with FBI headquarters and the Justice Department, Agent Joyner made several important decisions about the contours of the inspections program.  First, he determined that only primary producers of commercially-distributed materials would be inspected. Secondary retailers of such materials – who are involved in the circulation and sales of sexually explicit depictions but not in the creation of the original content – would be left out.  (Id. at 0:08-0:10). Second, there would be no efforts to include still photographers or producers of sexually explicit books in the inspections program. (Id. at 0:12). Third, there also would be no efforts to

---

[6] FBI agent Ken McGuire was initially tasked with starting up the inspections program alongside Agent Joyner. But McGuire "couldn't break away from his other duties," and so he did not become a full-fledged member of the inspections program. He participated in one or two inspections at the outset, but otherwise had little involvement. He was not deposed and did not testify in this case. (Joyner Dep at 41).

include private citizens who exchanged sexual depictions with one another, or who uploaded such depictions to "tube sites" or social networking sites, in the program. (Id. at 0:13-0:15). Agent Lawrence testified that even had the FBI wanted to enforce the Statutes against private persons exchanging depictions with others, there would have been no way to generate a list of such individuals.[7]  (Id. at 0:16-0:17). Fourth, there would be no efforts to include entities that depicted erotic nudes in the inspections program.  (Id. 0:11-0:12).

### ii.  Selection of Producers to be Inspected

Agent Joyner constructed a database of primary producers who fell under the criteria outlined above. He did this by attending trade shows, researching on the internet, and using information provided by FBI headquarters.  When Agent Lawrence joined the team in early 2007, he recalled there being about 300 entities on the list.  By late 2007, the list had grown to 1,200 producers.  (Id. at 0:17).

A random selection process was used to select entities from the list for inspections.  After a producer was identified, the independent contractors would purchase and review that producer's products, using a checklist, in order to ensure the products fell under the purview of the Statutes. (Id. at 0:26-0:30; see Def. Ex. 225).

### iii.  The Typical Inspection

If the producer passed pre-inspection preview, some combination of Agent Joyner, Agent Lawrence, and the four independent contractors, would travel to the location listed on the producer's Section 2257 statement for where its records were stored.  Members of the team wore

---

[7]  Agent Lawrence conceded that if private persons uploaded sexually explicit materials to public webpages, the FBI could conceivably have tracked down their identities.  But he testified that the FBI had no interest in inspecting such individuals – rather, the goal was to inspect only producers of pornographic materials for commercial sale. (Id.).

business attire rather than raid jackets for these inspections, and never numbered more than six persons. (Audio File 6/11/13 P.M. at 0:30, 0:40, 2:12-2:13).

Typically, the FBI team would enter the reception area of the producer's place of business, identify themselves, and hand over a spreadsheet containing the materials for which Section 2257 records were being requested. (Id. at 0:30-0:32). In March 2007, the FBI team also began handing over a letter informing the producer that he would be subjected to criminal penalty if he did not cooperate. (Id. at 0:31-0:32).

The producer would instruct the FBI team where to sit for the review of records. (Id. at 0:40-0:41, 1:16). Agent Joyner testified that in four of the 29 inspections, the FBI team reviewed Section 2257 records in a reception-type area. But even in these "reception area" inspections, the record shows the FBI gained access to restricted areas of the business premise in order to view where the Section 2257 records were stored. Photographs from one such inspection show an FBI team member sitting behind the receptionist's desk, looking at what appears to be a company computer.  (Pl. Ex. 32 at 3276 & 3277). Photographs from another show open filing cabinets. (Id. at 3257). Photographs from a third show rows of filing cabinets with the words "authorized personnel only" on them. (Id. at 3379).

Six of the 29 inspections occurred at residential premises. In those instances, the producer instructed the FBI team to sit in areas such as a dining room, kitchen, or spare bedroom. (Audio File 6/11/13 P.M. at 1:32-1:36 (ECF 206); Pl. Ex. 32 at 3299 (dining room)). On one residential inspection, the producer directed the FBI agents to conduct their review of records in the garage and driveway – which the FBI did, using the tailgates of their cars. (Audio File 6/12/13 P.M. at 0:17-0:20 (ECF 210); Pl. Ex. 32 at 3405).

In the remaining inspections, all at business premises or premises of third party custodians, the producer directed the FBI to review Section 2257 records in locations such as a conference room, lunch room, personal office, or a storage room. (Pl. Ex. 32 at 3306, 3387 (lunch rooms), 3340 (conference tables), 3334 (personal office), 3369 (rented storage space)). During many such inspections, the FBI appears to have gained access to private materials of the company or its employees – such as a white board with information on it, documents taped to the wall near an employee's desk, or items on an employee's desk. (Id. at 3282 (white board); 3305, 3318, 3418 (documents on wall and items on desk).

After being directed where to sit for the review of records, the FBI team would carry in copy machines, make copies of the records, and begin inspecting the records. In nearly all of the inspections, Agents Lawrence and Joyner testified that the producer retrieved the Section 2257 records for the FBI agents using the spreadsheet the FBI had provided. (Audio File 6/11/13 at P.M. 0:40-0:42) (ECF 206). On one occasion, the producer pointed to a pile of boxes containing many different types of records and told the agents to look for what they wanted. (Id. at 0:42. 1:23).[8] On another occasion, the producer told the agents he could email everything electronically from overseas, and the FBI team permitted this to occur. (Id. at 1:37).[9]

---

[8] This occurred during the inspection of Don Goo Enterprises, which had been taken over by Pacific Business Capitol Corp. by the time of the inspection.  Pacific Business had rented a storage unit for its records, where it kept Don Goo's records under Section 2257.  The representative from Pacific Business told the agents it did not know where the 2257 records were located and so authorized the agents to look through the various materials in the storage unit. (Audio File 6/11/13 at P.M. at 1:23-1:24 (ECF 206); see also Def. Ex. 226).

[9] This occurred during the inspection of Ghost Pro.  When the FBI team went to the location listed on the Section 2257 statement, they found it was a post office box. The person listed on the form at the post office box was the producer's mother.  She put the agents in touch with the producer, who indicated he was in Thailand but had all of the 2257 records with him electronically.  He emailed the records to the FBI agents. (Audio File 6/11/13 at P.M. at 1:36-1:37 (ECF 206); Pl. Ex. 21).

The quantity of records reviewed at the inspections varied from one binder's worth of materials to several filing cabinets full of documents. (Audio File 6/12/13 A.M. at 1:13) (ECF 208).

The independent contractors used a Review Form to determine whether the records were in compliance with the Statutes and regulations. (Audio File 6/11/13 P.M. at 0:43) (ECF 206). If they found a problem, they would inform the producer on the spot and give him an opportunity to correct it. Even after the search ended, producers were usually given about a week to cure defects. (Id. at 1:38). Finally, the team would write up a Progress Report about the inspection and send it to FBI headquarters, the Department of Justice, and the U.S. Attorney's Office. (Id.).

The inspections varied in length.  Some took all day and others took only a few hours. For example, the inspection of Diabolic Video Production, which occurred on July 24, 2006, lasted from 10:50 a.m. until 5:30 p.m.  (Def. Ex. 226).  The inspection of Robert Hill Releasing Co., which occurred on August 1, 2006, also took the whole day – from 9:40 a.m. until 4:30 p.m. (Id.). Meanwhile, the inspection of K-Beech Inc., which occurred on December 14, 2006, lasted from only 10 a.m. through 11:15 a.m. (Id.).

Agent Lawrence distinguished the inspections under the Section 2257 program as "materially different" from those that would normally take place pursuant to a search warrant in an investigation involving business records.  He explained that the latter searches are much more intrusive and broader in scope. In inspections under the Section 2257 program, the agents wore business suits, asked where to sit, took photographs of the exterior of the building, the area where the agents sat, and the area where the records were kept, and made photocopies of the Section 2257 records given to them by the producers. In searches pursuant to a search warrant for a healthcare fraud case, by way of example, agents would normally wear raid jackets, enter

the premises and congregate any employees, take photos of "every area of the business" or "every room in the residence," and search any areas where the documents might be located, including on computers. In the Section 2257 inspections, the agents relied exclusively on what the producers gave them as the records to be searched. In searches pursuant to a search warrant, the agents would not rely on the testimony of the individuals on the premises but would search all areas where the records could reasonably be located.  (Audio File 6/12/13 A.M. at 1:08-1:12) (ECF 208).

### iv.  Section 2257 Violations

According to a document compiled by the FBI on February 22, 2008, 86% of the producers inspected had some type of Section 2257 violation. (Def. Ex. 228).   But only one producer was found to lack Section 2257 records altogether – the rest were at least attempting to comply with the Statutes. (Audio File 6/12/13 P.M. at 0:22) (ECF 210). The FBI's reports from the individual inspections show that many of the "violations" documented were technical and superficial in nature, such as not displaying a Section 2257 statement for a sufficient duration at the beginning of a film or not properly indexing the records. (Audio File 6/14/13 A.M. at 2:00-3:00 (ECF 12); Pl. Ex. 4; Pl. Ex. 5).  Agent Joyner testified that on only one occasion did the FBI find what they believed was a falsified document, when they uncovered a picture of an ID with the performer's birthday written according to the Buddhist calendar. (Audio File 6/12/13 P.M. at 0:23) (ECF 210).

### v.  Photographs of Premises

The FBI team always took photographs during an inspection. When the team arrived, it photographed the exterior of the premises, such as the driveway or front door of the building. Next, the team photographed the Section 2257 records themselves and the location where they

were stored. Usually, this meant taking a picture of closed binders or filing cabinets.  (Audio File 6/11/13 P.M. at 0:45-46) (ECF 206). But at times, this meant taking a picture of a personal office where private information was exposed. One photograph, for instance, shows a whiteboard next to a filing cabinet with a list of names and phone numbers on it. (Pl. Ex. 32 at 3282). After the inspection of records was complete, the FBI team took photographs of the area where it had conducted the review. The purpose of these final photographs was to ensure the agents had not made any damage to the producers' premises. (Audio File 6/11/13 P.M. at 0:45-46) (ECF 206).

### vi.  Advance notice

Agent Lawrence testified that of the eight inspections he led, five involved advance notice being given to the producer. But he also testified that advance notice was given for law enforcement needs – e.g., to contact a producer to find out where his records were located, or to make an appointment to obtain the records. (Audio File 6/11/13 P.M. at 1:03-1:15, 1:25-1:28 (ECF 206); Audio File 6/12/13 A.M. at 0:38-0:40 (ECF 208)).

Agent Joyner was aware of no situation in which a party that was given advance notice used the time delay to create false evidence or to "clean up" their evidence. (Audio File 6/12/13 P.M. at 0:24) (ECF 210). Agent Lawrence also thought the possibility was "somewhat low" that a producer would be able to manufacture new Section 2257 records for all the sexually explicit movies they had made in 24 hours, if they were given advance notice and did not otherwise maintain records.  (Audio File 6/12/13 A.M. at 1:14-1:15) (ECF 208).  But he did think advance notice could theoretically give people an opportunity to "clean up" the records. (Id. at 1:15).

### vii.  Testimony about Prophylactic Nature of Regulatory Scheme

Agent Lawrence testified, in response to a question by the Court, that he believed the universal age requirement in Sections 2257 and 2257A was necessary for the effective

enforcement of the Statutes. If the scheme were to apply only to performers under the age of 25, for instance, Agent Lawrence believed the FBI would often be unable to ascertain whether records were being appropriately kept.  For videos or images where performers' faces couldn't be seen or where the performer was youthful-looking, the FBI might ask the producer for the model's Section 2257 paperwork and the producer could just say the model was over age 25. The FBI would have no way of knowing whether or not that was true.  Thus, Agent Lawrence believed the universal nature of the record-keeping requirement simplified compliance. Producers knew they were supposed to have records and would provide them when asked. Any loopholes in the regime would open the door for continual disputes with inspection teams. (Audio File 6/11/13 P.M. at 1:55-2:00) (ECF 206).

### viii.   Termination of Section 2257 Inspections Program

Agent Lawrence testified that the Section 2257 inspections program was shut down in September or October of 2007.  (Audio File 6/11/13 P.M. at 1:39-1:40) (ECF 206).  The Sixth Circuit had issued an opinion indicating they found the Statutes were unconstitutional, and Agents Lawrence and Joyner received instructions from headquarters to cease inspections until further notice.  In early 2008, the Justice Department informed them it was shutting down the program altogether. (Id. at 1:40-1:41).  Agent Lawrence was aware of no discussions or plans to reinstitute the program. (Id. at 1:42).

### III.    Factual Findings and Evaluation of Evidence

Reviewing the evidence presented at trial, the Court reaches the following factual findings as to the First and Fourth Amendment issues in the case. These findings supplement those stated on the record at the conclusion of testimony on Friday, June 7, 2013.

### a.  First Amendment Issues

1. *Credibility of Plaintiffs' Testimony:* The majority of Plaintiffs (all except for Sinclair Institute, Channel 1 Releasing, and certain unnamed members of Free Speech Coalition), and all Plaintiffs who testified as witnesses except for Sinclair, are "niche" players in the adult entertainment industry with unique and often creative approaches to sexually explicit conduct.  These individuals testified, credibly, that it is their sincere belief that the use of sexually explicit material is a valued artistic endeavor and also serves valued educational motives. At the same time, the overwhelming nature of Plaintiffs' involvement in the adult pornography industry is commercial – virtually every witness for Plaintiffs was involved in some form of sale or distribution for income of sexually explicit depictions. Additionally, what these individuals find meaningful at a personal level can often be purchased or used by consumers in different ways.  Once the work is distributed to third parties, it may serve other, less noble purposes.

2. Considering both the direct and cross examinations of Plaintiffs' witnesses, the Court concludes that while each was credible, the cross examination testimony deserves more weight. The direct examination testimony was confined to the Plaintiffs' own views of their work, while the cross examinations, which involved the effective use of exhibits related to each Plaintiff, showed that Plaintiffs did consistently use young-looking performers and that almost all of their work had a commercial or profit motive.

3. *Pervasiveness of Youthful-Looking Performers in Pornography in General:* Youthful-looking performers are ubiquitous in the adult entertainment industry and there is a significant market for pornographic materials depicting such individuals. Some of the most popular categories of commercial pornography, such as "teen porn," "college porn" and

"twinks" (gay teen porn), are popular precisely because they depict women and men who appear to be 18, 19 or 20 years old, or younger.

The word "teen" has particular draw to consumers of pornography – one of Plaintiff's experts, Dr. Linz, very significantly related there is nearly *double* the amount of material on the internet tagged as "teen porn" (136 million hits) as compared to the amount of material tagged as "porn, 18 year old" (78 million hits).  Plaintiff Marie Levine admitted that employing youthful-looking performers brings financial benefits to producers of sexually explicit depictions and that she derives revenue from providing links to sites which portray such performers. (Audio File 6/5/13 A.M. at 1:03-1:08, 1:22-1:25) (ECF 201).

Moreover, the youthful-looking performer is pervasive across pornography genres. As Dr. Dines' testimony demonstrated and as the "screenshots" that the government introduced as exhibits make clear, such performers appear in "MILF" porn and granny porn, even though the latter genres theoretically focus on showing older-looking adults. (Audio File 6/7/13 A.M. at 0:41-0:43 (ECF 203); Def. Exs. 264B-H, 267G-I, 273B).

4. *Inclusion of Youthful-Looking Performers in Plaintiffs' Work:* There is no evidence that any Plaintiff is an exclusive producer of sexually explicit depictions of "clearly mature" adults. Rather, on cross-examination by the government during which Plaintiffs were shown images of their own work, every Plaintiff-producer who testified admitted he or she has used models ages 18-24 years old. So despite Plaintiffs' professed interest in not employing women or men aged 17 or younger, the evidence is irrefutable that Plaintiffs *are* interested in using youthful-looking performers.[10]

---

[10] Sinclair's testimony is representative. On direct examination, Linda Wilson was asked whether any performers in Sinclair's films were young enough looking such that they could be "possibly confused" as someone under 18, and she answered "absolutely not." (Audio File 6/3/13 P.M. at 1:33).  But on cross,

For example, Sinclair Institute admitted that 10% of the models in its videos are ages 18 to 20 (Def. Ex. 132 at7);  David Steinberg admitted that 12% of the models in his works are ages 18-24 (Audio File 6/4/13 P.M.);  Marie Levine admitted she has used models ages 21-25 in her web-shows and that her website offers access to third-party sites, with which she revenue-sharing arrangements, that show young-looking models (Audio File 6/5/13 A.M.); and Barbara Nitke admitted 8 out of 20 models in her works between 2005 and 2009 were under age 25 (Def. Ex 97).    According to Defendant's analysis of Plaintiffs' depictions, which is part of the record in this case, between 21% and 61% of the performers in a cross-section of depictions by seven Plaintiffs (Dodson and Ross, Levine, Levingston, photographer Craig Morey (a member of ASMP), Nitke, Sinclair, and Vivid Video (a member of FSC)) were under the age of 25. (Def. Ex. 314A).  Dr. Biro was given 150 images produced by Plaintiffs to review, and concluded that roughly half of them showed individuals "in their early to mid-twenties or younger." (Audio File 6/17/13 at 0:32-0:33) (ECF 214).

Moreover, many Plaintiffs testified that although they intended that all of the performers in their works be age 18 or older, they could not always tell from looking at an individual performer, whether he or she was of majority age.

5.    *"Chilling Effects" of Statutes on Plaintiffs' Speech:*  After all of Plaintiffs' testimony, there is evidence of only two artistic endeavors that have been made practically impossible by the Statutes, because those endeavors require the subjects of the art to have the opportunity to remain anonymous. First, Dodson and Ross's "genital art gallery" has been effectively shut down by Sections 2257 and 2257A, because average individuals are not willing to upload pictures of their genitals to the internet if they have to reveal their identities. Second, Barbara

---

she admitted that for the covers of its DVDs, Sinclair purposefully uses younger-looking, professional models. (Id. at 1:34-1:35).

Alper's photo-journalism project on Fire Island has been blocked by Sections 2257 and 2257A, because her intended subject matter is anonymous sex.[11]

Granted, Plaintiffs also testified about expressive endeavors they wish to pursue that are now more challenging or more costly because of the Statutes. However, unlike the genital art gallery and the Fire Island photo project, these endeavors have not necessarily been made impossible because of the Statutes. For instance, Carol Queen stated one reason her Center hasn't live-streamed a "masturbate-a-thon" since 2010 is that the Center is worried about its ability to maintain 2257 paperwork. David Levingston testified that he avoids taking images that could be construed as "simulated" sexual activity, because he does not want to comply with Section 2257A. Thomas Hymes avoids posting images that would require him to comply with Section 2257. And David Steinberg testified that it would be very difficult for him to publish a U.S. edition of Quipido magazine, because he would have to obtain 2257 statements for European models. While all of this testimony demonstrates an arguable "chilling" effect the Statutes are having on Plaintiffs – by making certain expression more costly or burdensome to produce – it did not demonstrate that such forms of expression were being blocked altogether.[12]

---

[11] The Third Circuit held Plaintiffs' claim that the Statutes preclude the right of anonymous speech under the First Amendment had been waived, because that claim was initially dismissed by this Court (see ECF 66) and Plaintiffs "did not include any argument with respect to [it]" on appeal, Free Speech Coal., 677 F.3d at 545. The government contends that any claim of anonymous speech should not be part of this trial. In view of the overall disposition, the Court need not rule on this issue.

[12] While Barbara Nitke and Barbara Alper both testified that they are unable to publish compilations of their photographic works because such compilations would include images from before the Statutes were in effect, and for which they do not have copies of their subjects' identifications, Plaintiffs appear to be misunderstanding the Statutes and their corresponding regulations. The Statutes' record-keeping requirements apply only to images of actual sexually explicit conduct (except for lascivious exhibitions of genitals or pubic areas) "made after July 3, 1995" and to images of lascivious exhibitions of genitals or pubic areas "made after March 18, 2009." 28 C.F.R. § 75.2(a). Therefore, images created by Nitke and Alper before 1995 do not require Section 2257 paperwork. While the regulations provide a wholesale exemption for compilations of works that contain only images that are themselves exempt, id. § 75.7 (providing that such books or compilations can be produced without any Section 2257 statement), that

6.  *Evidence Related to Private Sexual Depictions by Plaintiffs:*  There is no evidence that any Plaintiff produces purely noncommercial sexual depictions or maintains records for such depictions. Only one Plaintiff testified to producing private depictions at all – Barbara Alper, who takes sexually explicit photographs of herself and her husband. But she also admitted that she has published those pictures commercially in Quipido magazine. And she does not maintain records for those images.  Thus, the Amended Complaint did not refer to private depictions when pleading Plaintiffs' as-applied challenge under the First Amendment and no Plaintiff attempted to use private depictions as evidence of their as-applied burden when testifying at trial.

7.  *Expert Testimony:*  Of the experts, the Court gives greater weight to the testimony of the government's witnesses as compared to Plaintiffs' witnesses.

First, the statistical data of Dr. Dines was more methodologically rigorous than that presented by any of Plaintiffs' experts.  As explained above, it showed that "teen porn" accounts for approximately one-third of the material on pornography tube sites, that it is one of the most frequently – if not the most frequently sought – genres of pornography, and that it has grown by over 200% between 2004 and 2013.

The Court also found the testimony of Dr. Biro, the pediatrician, to have significant weight, because he pointed out quite effectively that young adults go through different rates and patterns of physical development.  Dr. Biro explained that 12, 13 and 14 year olds can appear to be much older than they are because they may experience early sexual and physical maturation.  From a scientific standpoint, his testimony offered justification for Section 2257's prophylactic sweep, because it demonstrated the inability to determine chronological

---

does not mean that compilations of the sort Nitke and Alper describe cannot be printed.  Rather, Nitke and Alper would simply have to provide Section 2257 documentation and labels for the images created after July 3, 1995 and March 18, 2009, but not for the images created before those dates.

age from visual inspection. Plaintiffs did not have effective cross-examination of this witness.

Meanwhile, the testimony of Plaintiffs' experts is much less probative. Dr. Linz's estimates of the quantity of child pornography in the United States, the quantity of pornography where the ages of the models is "confusing," and the quantity of sexually explicit material exchanged by private adults, suffered from several shortcomings. He based the first two estimates on simple Google searches, which are an imprecise way of measuring what he was trying to capture. A Google search shows the total number of pages on the internet tagged with the entered search-term. The results of a Google search for "porn," "teen porn," or "child porn," therefore, would include pages with pornographic images as well as pages with articles or writings about pornography. Estimating the quantity of child pornography through a Google search is particularly fraught with problems because as Dr. Linz admitted, most child pornography is exchanged on peer-to-peer networks rather than posted on the internet, and even if it is on the internet, it is often not tagged. (Audio File 6/14/13 at 0:29) (ECF 212). Further, Dr. Linz's estimate of the quantity of privately-exchanged sexual depictions was over-inclusive because it swept in postings to social networking sites, many of which are not private forums.

As to Dr. Drouin and Dr. Zimmerman, the expert statistician called by the government, Dr. Stark, showed why their estimates about the prevalence of "sexting" were not worthy of weight. Namely, Drs. Drouin and Zimmerman obtained their measurements through using "convenience samples" and "RDS," rather the preferred method of random sampling. Even if the Court were to overlook this problem, the more fundamental issue with Drs. Drouin and Zimmerman's testimony is that it did not provide information on the

quantity of "sext" messages that fall within the Statutes' scope. Neither expert testified as to how many sext messages being exchanged contain images of intercourse, masturbation, or a "lascivious display" of genitals, as opposed to nudity or other sexually suggestive poses. Only the former types of images, however, fall under the Statutes and trigger the record-keeping requirement.   Thus, while Plaintiffs intended for Drs. Drouin and Zimmerman to help prove the Statutes' over-breadth by showing the amount of private speech that it unreasonably burdens, neither expert offered testimony accomplishing that task.

In sum, the Court relies on Dr. Linz's cross examination for some findings, but it rejects all of Plaintiffs' experts' conclusions.

8.  *Requirement of Verifying Performers' Ages by Checking Photo Identification:*   Most Plaintiffs stated they have no desire to depict individuals under 18 in their works and would continue to request identification from models without Sections 2257 and 2257A, to ensure they were over age 18 and that their model releases were thus valid. But some Plaintiffs suggested that without 2257, they would not necessarily request IDs from every model – only from those they suspected to be under age 18. (Audio File 6/4/13 P.M. at 2:05-2:07 (ECF 200) (Barbara Alper stated she had not verified the ages of the individuals in her S&M club photographs because she had no reason to suspect they were underage); id. at 0:52 (Carlin Ross stated she did not check IDs for individuals who used to upload to the gallery, but rather inferred their age based on their submissions and essays).

The Court finds the requirement to request and maintain copies of performers' photo identifications is not uniquely onerous or burdensome on producers, but is consistent with other record-keeping requirements mandated by federal, state and local governments.  For instance, the federal government requires that every U.S. employer fill out and maintain a

record of an "I-9 Form" for each employee, which verifies the identity and employment authorization for that individual.  In filling out the I-9, the employer must examine the employee's identity documents. Other federal laws require that employers make and keep records of their employees' wages, hours and conditions of employment, as well as of their premises' occupational safety, and to permit inspectors from the Department of Labor to inspect these records on demand. See 29 U.S.C. §§ 211(a)-(c) (records required by Fair Labor Standards Act); 29 U.S.C § 657(c) (records required regarding occupational safety). Manufacturers of foods, drugs, and consumer products have to maintain certain records and permit inspectors to access them to ensure compliance with federal safety standards. 21 U.S.C. §§ 350(c), 373-374 (manufacturers of foods and drugs); 15 U.S.C. § 2065 (manufacturers of consumer products). Federal, state and local governments all require that employers maintain records of their revenues and expenses for tax-filing purposes.

### b.  Fourth Amendment

1. *Plaintiffs' Standing to Bring As-Applied Fourth Amendment Claims:*  No Plaintiff who testified had personally experienced an inspection under the Statutes in the past.  The Free Speech Coalition represented that four of its members had been subjected to inspections in 2006 and 2007, but it did not present any testimony about those inspections. (Audio File 6/3/13 A.M. at 2:32-2:34).   However, several Plaintiffs testified that they maintain the records called for by Sections 2257 and 2257A. Under the Court's analysis in a prior ruling, this confers upon those Plaintiffs standing under Article III to bring as-applied challenges under the Fourth Amendment. (ECF 117). Namely, three Plaintiffs testified that they maintain Section 2257 records in their homes (Betty Dodson, David Steinberg, and Barbara

Nitke), one testified that she uses a third-party custodian (Marie Levine), and one testified that it stores records on its business premises (Sinclair Institute).[13]

2. *Potential for Future Inspections:*   The testimony made clear that since early 2008, the inspections program at the FBI has been completely shut down and there have been no discussions or plans to restart it.   (This is important for the Court's determination as to whether an injunction is justified under the Fourth Amendment, a point to which this Opinion returns later).

3. *Physical Intrusions into Areas Where There is an Expectation of Privacy:* The testimony from the FBI agents showed, without question, that the inspections effectuated in 2006 and 2007 involved physical intrusions by government agents into areas in which there is a reasonable expectation of privacy.   This was true both for the inspections at business premises, as well as for those at residential locations. The inspections at business premises, including those where records were reviewed in the reception area, involved physical entry by agents into internal offices, supply rooms, kitchens, and conference rooms, where members of the public were not admitted.   At times, private materials and items were exposed to the agents in these areas – such as documents hanging on the wall or numbers written on a white board. With respect to the residential searches, they too involved physical entry by officers into parts of homes not open to the public, such as kitchens, dining rooms, and garages.

4. *Inspections at Third-Party Custodian's Location*:   There was at least one inspection at the premises of a third-party custodian, which occurred at a storage space being rented by the

---

[13] There who two Plaintiffs who do not appear to maintain Section 2257 records at all: Thymes Hymes and David Levingston. They may lack standing to bring as-applied Fourth Amendment claims.  However, it is not necessary for the Court to rule specifically on this issue in view of its conclusion that even for those Plaintiffs who do have standing to bring as-applied Fourth Amendment claims, they have failed to show they are entitled to injunctive relief.

custodian.  This inspection, too, involved exposure by the agents to items in which there was an expectation of privacy – because the Section 2257 records were mixed in with other business records being stored at that location.

5. *Advance Notice:*  Advance notice was given on several occasions – not out of nicety to the producer, but to effectuate law enforcement goals and ensure the producer was actually home.  There is no evidence that when it was given, advance notice undermined the integrity of the searches.  The FBI agents testified they believed it would be very difficult if not impossible to fabricate the records required by the Statutes in a 24-hour period.

## IV.  Legal Analysis

### a.  First Amendment As-Applied Claim

As stated <u>supra</u>, the Third Circuit remanded Plaintiffs' as-applied claim under the First Amendment for adjudication under the intermediate scrutiny standard. Intermediate scrutiny generally involves a three-pronged inquiry – whether a law's purpose is legitimate, whether its means are narrowly tailored to its end, and whether it leaves open ample alternative channels of communication. <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989); <u>Free Speech Coal.</u>, 677 F.3d at 535. The Third Circuit affirmed this Court's finding that as a matter of law, the first and last prongs are satisfied. <u>Id.</u> at 535-36. Thus, only the second prong of the intermediate scrutiny test is before the Court presently.

To determine if a law is narrowly tailored in an as-applied context, the essential question a court must answer is whether it burdens substantially more speech of the regulated party than necessary to effectuate the law's purpose.  <u>See</u> <u>Turner Broad. Sys., Inc. v. FCC</u>, 512 U.S. 622, 662 (1994) ("Narrow tailoring in this context [of a content-neutral regulation] requires, in other words, that the means chosen do not 'burden substantially more speech that is necessary to

further the government's legitimate interests.'" (internal citation omitted)); Ward, 491 U.S. at 799 n.7 ("[T]he essence of narrow tailoring" is "focus[ing] on the source of the evils the [government] seeks to eliminate . . . without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils").  The law need *not* be the least-restrictive means of effectuating its underlying purpose if "the means chosen are not substantially broader than necessary to achieve the government's interest." Id. at 800.  Rather, what is required "is a 'fit' between the legislature's ends and the means chosen to accomplish those ends . . . a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989) (internal quotation marks and citation omitted).

Accordingly, the question before the Court with respect to narrow-tailoring is "whether the Statutes burden substantially more of Plaintiffs' speech than is necessary to further the government's legitimate interest of protecting children." Free Speech Coal., 677 F.3d at 536. The government bears the burden of proof on this inquiry. See Turner, 512 U.S. at 665 ("[T]he Government still bears the burden of showing that the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'") (internal quotation omitted).

After close consideration of the evidence presented at trial and admitted into the trial record, the Court concludes the government has shown by a preponderance of evidence that the Statutes do not burden substantially more of Plaintiffs' speech than is necessary to further the government's interest in combatting child pornography.

First, the government demonstrated effectively that no one Plaintiff is an exclusive producer of sexually explicit images of "clearly mature adults." The Third Circuit hypothesized that if certain Plaintiffs did meet this description, the Statutes might be overbroad as applied to them.[14] Free Speech, 667 F.3d at 537 (holding that "if one of the Plaintiffs employs performers that no reasonable person could conclude were minors," such as for "'an illustrated sex manual for the elderly,'" the Statutes might be unconstitutional as-applied to that Plaintiff (citing Am. Library Ass'n v. Reno, 33 F.3d 78, 90 (D.C. Cir. 1994)); Connection Distrib. Co. v. Holder, 557 F.3d 321, 336 (6th Cir. 2009) (en banc) (holding the law might be unconstitutional as applied to a magazine that "confined itself to self-evidently mature models [and] also did not permit the depiction of isolated body parts"); Am. Library Ass'n, 33 F.3d at 90 ("We agree with appellees' suggestion that certain applications of the record-keeping requirements may well exceed constitutional bounds, an illustrated sex manual for the elderly being an obvious example."). But no Plaintiff's depictions are confined to clearly mature adults. Rather, as reviewed above, every Plaintiff conceded on cross-examination that its commercially-distributed depictions include youthful-looking performers. No Plaintiff even identified a genre of its works – such as a collection of images or movies – confined to depicting clearly mature adults. And no Plaintiff testified that his or her works going forwards would be confined to such a population of performers.

Plaintiffs rebut that the *relative* quantities of young-looking and old-looking performers across their works matters a great deal – and because Plaintiffs use more clearly mature adults than youthful-looking adults, the Statutes impose unjustified burdens on them. Citing the government's calculations, Plaintiffs highlight that roughly 80% of the performers in Sinclair's

---

[14] Note, this was the only means by which the Third Circuit contemplated Plaintiffs might prevail in proving a lack of narrow tailoring in their as-applied challenge. Free Speech Coal., 677 F.3d at 519.

productions were 26 years old or greater; roughly 76% of the performers in Levine's productions were 26 or older; 75% of the performers in Dodson and Ross's productions were 26 or older; and 63% of the models in Nitke's work were 26 or older.  (See Pl. Post Trial Br. at 30). These figures prove a lack of narrow tailoring, Plaintiffs argue, because the government's own expert, Dr. Biro, testified that persons over age 25 generally could not be confused as minors. (Id.).

Plaintiffs' argument fails for several reasons. To begin with, Plaintiffs mischaracterize Dr. Biro's testimony.  Dr. Biro stated that the margin of error for determining a person's age – *when done by an expert* – is 1 to 3 years for teens and 2 to 5 years for young adults. He agreed that as a result, the "age range of confusion" is typically 15 to 24 years old. But Dr. Biro qualified that these are only general margins of error and there are certainly 13 and 14 year olds, some of whom he has encountered in his clinical experience, who could be confused as adults. Dr. Biro also stated that these margins of error would be greater were it members of the public, rather than experts in pubertal maturation, attempting to make age determinations. And he explained that with makeup and dress, the possibility for confusion of one's age is enhanced. (Audio File 6/17/13 at 0:22-0:28) (ECF 214).

Further, even if the Court were to assume that age 26 was the typical age at which individuals could not be confused as minors, this still would not make the Statutes unreasonable as applied to Plaintiffs. To be narrowly tailored, the fit between a regulation's effect and its stated objective must be "reasonable, not perfect." United States v. Marzzarella, 614 F.3d 85, 98 (3d Cir. 2010).  Here, the fit between the Statutes' effect on Plaintiffs and its goal of combatting child pornography is reasonable because every Plaintiff that produces sexually explicit depictions uses a considerable number of youthful-looking performers and derives commercial revenue from these depictions, and the burden associated with record-keeping is a justifiable cost

of doing business.   Ms. Wilson, of the Sinclair Institute, testified that Sinclair spends approximately $75,000 a year on Section 2257 compliance. (Audio File 6/3/13 P.M. at 2:18-2:20) (ECF 198). This is not an unreasonable sum for the world's "largest producer" of adult sex education media, which makes millions of dollars in revenues from sexually explicit materials every year.  (Id. at 1:27-1:28; Def. Ex. 133 & Audio File 6/4/13 A.M. at 0:48-0:50) (ECF 199) (relating that Sinclair made $53 million in revenues from its sexually explicit videos from 2005-2009)). Even for Plaintiffs who are smaller, more niche players in the adult entertainment industry, there is no evidence that the costs of recordkeeping are disproportionate considering the revenues they derive from such activities. Barbara Nitke conceded the costs of complying with the Statutes are "different" from, but not necessarily greater than, the costs associated with filing her taxes with the IRS.  (Audio File 6/7/13 P.M. at 1:35-1:41) (ECF 204).

As stated above, the Court finds the requirement to inspect and maintain records of performers' identifications is comparable to and consistent with other federal, state and local record-keeping requirements incumbent on employers. See supra (citing record-keeping requirements that pertain to employees' work eligibility, to wages, hours, conditions of employment, to occupational safety, to product safety, and to employers' revenues and expenses). The additional burdens associated with cross-referencing and with affixing labels to depictions are not so great so as to change that conclusion. Many Plaintiffs who complained of significant burdens under the Statutes appear to be misunderstanding the regulatory provisions, using outdated record-keeping systems, or declining to take advantage of the ability to use third-party custodians.[15]

---

[15] For instance, several photographers complained of the need to maintain Section 2257 records for every image captured on a camera or printed as a proof. But the regulations do not appear to require a label affixed until a photograph is made publicly available. See 28 C.F.R. § 75.8(a)-(f).  Barbara Nitke testified to maintaining a cumbersome system of paper records, including a paper cross-referencing document,

Moreover, the government demonstrated the universality of the record-keeping requirement is justified as applied to Plaintiffs because any alternative rule would introduce subjectivity into the regulatory scheme and lessen its effectiveness.  See Ward, 491 U.S. at 799 ("[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" (internal citation omitted)). For instance, if Plaintiffs had to maintain records only for persons who appear to be 25 years old or under, this would leave Plaintiffs to rely on their own judgment in determining whose identifications to check.  Not only would the efficacy of the Statutes be reduced – as Plaintiffs would surely make *some* errors in estimating performers' ages – but as Agent Lawrence testified, anything less than a universal requirement would invite disputes between Plaintiffs and law enforcement and complicate the inspections process. (Audio File 6/11/13 P.M. at 2:00) (ECF 206)). See Free Speech Coal., 677 F.3d at 535 (recognizing the Statutes "combat child pornography" by "eliminat[ing] subjective disputes with producers over whether the producer should have verified the age of a particular performer"); Connection Distrib. Co., 557 F.3d at 329-330 (finding the Statutes to be narrowly tailored because they create "a compliance system . . . [without] subjective disputes with producers over whether a model's apparent age should have triggered an age-verification check"). In the past, courts have upheld prophylactic measures under narrow-tailoring review precisely because a more targeted measure, such as a 25-year old identification check, would introduce uncertainty and enforcement difficulties. Hill v. Colorado, 530 U.S. 703, 729 (2000) ("[T]he statute's

---

which she needs to rearrange every time she updates her website. (Audio File 6/7/13 P.M. at 0:57-0:59) (ECF 204). She was apparently unaware that the Statutes allow for electronic record-keeping. 28 C.F.R. § 75.2(f) ("Records required to be maintained under this part may be kept either in hard copy or digital form . . . ."). Carol Queen, Thomas Hymes and David Levingston stated they do not have the capacity to personally maintain any sort of records system, but they ignore the possibility for using a third-party custodian.  Id. § 75.4.  And as explained above, Nitke and Alper appear to misunderstand the regulations' requirements regarding compilations of work. See supra note 12.

prophylactic aspect is justified by the great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement within the 8–foot boundary. Such individualized characterization of each individual movement is often difficult to make accurately. A bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself."); Fed. Election Comm'n v. Nat'l Right to Work Comm., 459 U.S. 197, 209 (1982) (holding, in the context of a statute regulating campaign contributions by corporations and labor unions, that the Court will not "second guess a legislative determination as to the need for prophylactic measures" given the compelling interest of preventing corruption).

Second, the Statutes are narrowly-tailored as to Plaintiffs not only because Plaintiffs employ considerable numbers of young-looking performers in their works but also because no Plaintiff has demonstrated he or she is a producer of purely private, sexually explicit communications.  As the government correctly points out, no Plaintiff referred to the Statutes' burden on his or her private communications in the Amended Complaint when pleading his or her as-applied challenge.  (Def. Post Trial Br. at 13). But even putting the pleadings to the side, no Plaintiff demonstrated at trial that he or she produces sexually explicit depictions for purely private purposes or maintains records for such private depictions. While Barbara Alper testified that she has taken explicit photographs of herself and her husband, she conceded she sold some of these photographs for publication in a Norwegian magazine.  See supra.  In sum, there is no evidence in the record of any burden that the Statutes impose on Plaintiffs whatsoever, with respect to the Statutes' application to purely private sexual depictions.

Finally, the Court recognizes there is evidence of two specific projects contemplated by Plaintiffs that will, admittedly, be barred by the Statutes. These are Dodson and Ross' genital art gallery and Barbara Alper's Fire Island project. But the Court concludes this is a reasonable cost given Congress' underlying objective of eliminating child pornography. Plaintiffs Nitke and Alper testified to not being able to publish printed compilations of their works because those books would include pre-1995 and post-1995 images together, and Nitke and Alper only have records for the latter. But as explained, that is a misunderstanding of the Statutes and regulations. See supra note 12.  Plaintiff Steinberg testified that to print a U.S. edition of Quipido Magazine, he would have to require foreign photographers to comply with U.S. laws and provide him with Section 2257 documentation.  This might be a nuisance, but it is not an infringement of his First Amendment rights.

### b.  First Amendment Facial Claim

The Third Circuit also remanded Plaintiffs' facial claim under the First Amendment, directing this Court to determine whether the Statutes are overbroad in their general application to the public. The standard for measuring a law's overbreadth under the First Amendment is whether "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks and citation omitted). Facial invalidation is "strong medicine that is not to be casually employed," United States v. Williams, 553 U.S. 285, 293 (2008) (internal quotation marks and citations omitted); "invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects. . . . [This is why] we have vigorously enforced the requirement that the statute's overbreadth  be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep," id. at 292. In the

Third Circuit, courts typically consider four factors in making the determination as to overbreadth: (1) "the number of valid applications" of the statute; (2) the "historic or likely frequency of conceivably impermissible applications"; (3) "the nature of the activity or conduct sought to be regulated"; and (4) "the nature of the state interest underlying the regulation." Gibson v. Mayor & Council of the City of Wilmington, 355 F.3d 215, 226 (3d Cir. 2004) (citing Aiello v. City of Wilmington, 623 F.2d 845, 860 (3d Cir. 1980) (Sloviter, J., concurring in part and dissenting in part)).

Unlike inquiries as to narrow tailoring, for which the government bears the burden of proof, plaintiffs bear the burden of demonstrating a law's facial overbreadth. See Virginia v. Hicks, 539 U.S. 113, 122 (2003) (placing the "burden of demonstrating . . . substantial overbreadth" on the claimant); N.Y. State Club Ass'n v. City of N.Y., 487 U.S. 1, 14 (1988) ("To succeed in its [facial-overbreadth] challenge, [the plaintiff] must demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally.").

The Third Circuit hypothesized two manners in which the Statutes might be facially overbroad. First, it concluded they could be overbroad in their application to sexually explicit depictions of "'clearly mature adults' that 'could not be mistaken for children.'" Free Speech Coal., 677 F.3d at 538. The Third Circuit directed this Court to consider "both the amount of speech that implicates the government's interest in protecting children (e.g., depictions of performers who reasonably could be minors based on their apparent ages) and the amount of speech that is burdened but does not further the government's interest (e.g., depictions of performers who are obviously adults)," and to "weigh the legitimate versus problematic applications of the Statutes," on remand. Id. Second, the Third Circuit hypothesized the Statutes

46

could be overbroad "based on their purported regulation of purely private conduct." Id. Again, it directed this Court to consider the amount of "private, noncommercial depictions created and viewed by adults in their homes" burdened by the Statutes, and to consider whether the burden on such private communications is substantial in relation to the Statutes' plainly legitimate sweep. Id.

### i.  Statutes' Application to Depictions of Clearly Mature Adults

After close consideration of the evidence adduced at trial, the Court finds Plaintiffs have failed to demonstrate facial overbreadth with respect to the Statutes' application to depictions of clearly mature adults. First and most importantly, Plaintiffs presented no evidence at trial demonstrating there even exist bona fide, compartmentalized genres of commercial pornography dedicated to depicting mature adults, exclusively.  The sub-genres of pornography that purport to focus on mature-looking adults – such as MILF porn and granny porn—also include significant numbers of young-looking performers. Dr. Dines testified that based on her analysis of the MILF pornography category on "pornhub," the predominant image was *not* of two clearly mature adults engaging in sexual activity with one another but rather, of young men or young women engaging in sexual activities with older women. (Audio File 6/7/13 A.M. at 0:55) (ECF 203). During discovery, Plaintiffs provided the government a list of websites they claimed supported their overbreadth claim in that they focused on clearly mature individuals.  But as the government demonstrated through taking screen-shots of these websites and moving them into evidence, these websites show an abundance of young-looking performers. (Def. Ex. 273B (screenshot from "porno tube – grannies" website, showing young-looking females); Def. Exs. 264C-F (screenshots from "youporn – mature sex porn tubes" website, showing young-looking performers); Def. Exs. 267G-I (screenshots from "redtube – granny sex videos" website,

showing youthful-looking women); Def. Ex. 266D (screenshot from "spankwire- Milf porn tube" website, showing a youthful-looking male).  Even Marie Levine, the Sinclair Institute, and David Steinberg, three Plaintiffs who testified to having educational and artistic commitments to depicting mature adults, conceded they have generated or sold materials depicting older men and women performing alongside young-looking individuals.   (Def Exs. 122 & 126A (Sinclair Institute); Pl. Ex. 63 (Steinberg); Def. Ex. 85 C (Levine)).

Second, the scope of the Statutes' "plainly legitimate sweep" is vast. Using Dr. Dines' estimate that approximately one-third of commercial pornography on the internet depicts "teens" – which she cautions is under-inclusive, because it only captures pornography tagged with the keyword "teen" or an allied term, while other pornography could and likely does include young-looking performers as well – that is a vast amount of depictions that falls under the Statutes' plainly legitimate sweep. Even Dr. Linz's (methodologically weak) estimate that ten percent of commercial pornography depicts teens yields a considerable number of depictions Congress was properly trying to regulate. Meanwhile, expert witness Janis Wolak related that approximately two-thirds of persons arrested for possessing child pornography were in possession of images of teenagers between the ages of 13 and 17 years. Wolak's testimony demonstrates that child pornographers have an appetite for viewing the very population Congress was seeking to protect in enacting the Statutes, thus underscoring the compelling interest behind the Statutes' plainly legitimate sweep. (Audio File 6/11/13 A.M. at 0:28-0:43) (ECF 206).[16]

---

[16] The Court also notes that these percentage figures, estimating the proportion of commercial pornography that depicts teens, offer an incomplete picture of the Statutes' plainly legitimate sweep. Congress's goal in enacting the Statutes was to protect the sizable population of minors in the United States who, without age-verification and record-keeping requirements, could become subjects in sexually explicit depictions and thus victims of child pornography. The U.S. Census Bureau shows that as of 2010, there are 22 million adults ages 15-19 in the United States.  (Pl. Ex. 39). Assuming two-fifths of that group is adults ages 18 and 19, that yields approximately 13 million minors ages 15-17.  These are all

Finally, for the reasons discussed above, the Statutes' prophylactic nature is justified because even though they may reach depictions of mature adults, any more targeted record-keeping requirement, i.e., a record-keeping requirement applying only to individuals who appear to be age 25 or younger, would introduce subjectivity, uncertainty and immeasurable enforcement difficulties into the regulatory scheme. Dr. Biro demonstrated – and nearly all Plaintiffs conceded – that a person's age cannot be determined by visual inspection alone. The general age range of confusion is 15 to 24 years old, but even individuals younger and older can be mistaken for adults or minors, respectively. This is especially true when persons apply make-up and dress to try to appear older or younger.  Congress' judgment that a universal record-keeping requirement was necessary to effectuate its interest of combatting child pornography was reasonable.   Although some depictions that do not implicate the government's interest, because they depict only mature individuals, will be burdened, Congress was justified in concluding that any effort to unburden that speech by narrowing the record-keeping requirement could undermine the Statutes' efficacy altogether, unleashing producers to make subjective age determinations and leaving law enforcement with no reliable means of policing these decisions. See Am. Library Ass'n, 33 F.3d at 90 ("The Government must be allowed to paint with a reasonably broad brush if it is to cover depictions of all performers who might conceivably have been minors at the time they were photographed or videotaped. . . . The Act . . . burdens only that protected speech necessary to advance the Government's interest in preventing child pornography. . . . [I]t is essential to Congress's design that the Act impose its recordkeeping requirements on all performers who appear in sexually explicit materials.").

---

individuals who could be used as performers in sexually explicit depictions were the Statutes not in place, and who are thus protected by the Statutes' operation.

Without a strong and robust regime for policing the ages of performers, there would be incentives on both sides of the equation to use minors as performers in sexually explicit depictions. On the employer-side, the record accumulated in this case shows there is a high commercial value associated with the young-looking performer. On the employee side, there are undoubtedly minors who do not contemplate becoming doctors, lawyers or hedge fund zillionaires, and would be attracted to the financial benefits available in the adult pornography industry. The burden must be on the producer to verify that all performers and subjects in its depictions are of age. Congress's determination that the most effective way of imposing that obligation on producers – and of ensuring their compliance – was through a universal record-keeping law, was reasonable. Moreover, as explained above, the labors and costs associated with complying with Sections 2257 and 2257A are not of a different degree or order of magnitude than the labors and costs associated with other record-keeping requirements incumbent on employers under federal, state and local law.[17]

### ii. Statutes' Application to Purely Private, Noncommercial Communications

The question of whether the Statutes are overbroad in their burdening of purely private, noncommercial communications is more difficult, given the high protection afforded such communications under the First Amendment and the Fifth and Fourteenth Amendments' Due Process Clauses. That said, the Court concludes Plaintiffs have failed to prove substantial

---

[17] Furthermore, the possibility of doctoring or manipulating digital depictions is another factor justifying the universal age-keeping requirement in the Statutes. Given contemporary technologies in film and in photography, a producer could easily hire a minor under age 18 and dress up the image to make the performer appear older. Alternatively, the producer could create a depiction that shows the performer's body parts, without including his or her face or head. If the record-keeping requirement applied only to performers who appeared to be a particular age, say age 25, federal inspectors could be misled from even perceiving the need to verify the ages of performers in such doctored images. Law enforcement's ability to police the production of child pornography would be undermined. Sections 2257 and 2257A avoid this pitfall by imposing a record-keeping requirement as to every performer.

overbreadth with respect to the Statutes' application to private communications for two reasons – first, they have failed to show there exists a substantial amount of private communications that even fall under the Statutes' scope; second, they have failed to show an actual burden or chilling of such communications caused by the Statutes, such that the "strong medicine" of facial invalidation is justified.

As an initial matter, the Court begins by noting that it is controlled by the Third Circuit's holding, in its remand decision, that the word "producer" in Sections 2257 and 2257A extends to individuals who produce sexually explicit depictions even for purely private, noncommercial purposes. Free Speech Coal., 677 F.3d at 538-39. On appeal, the government argued otherwise – it contended "producer" means only individuals or entities that generate sexually explicit depictions intended "for sale or trade." See Brief of Appellee, Free Speech Coal., Inc. v. Attorney Gen. of the U.S, 677 F.3d 519 (2012) (No. 10-4085), 2011 WL 1760472 at *49-55. While the government defined "intended for sale or trade" to include pornography posted for free to a publicly-accessible website, such as an adult social networking site, or distributed for free through internet file-sharing," it defined the term to exclude images "not posted on the Internet, but kept for the producer's or a couple's own personal, private use." Id. at *50-51.  The former images "becom[e] a potential commodity" once they are uploaded because they are then capable of being traded and circulated to "an indeterminate number of people," the government explained, and were therefore intended by Congress to be encompassed by the record-keeping requirements. Id. The latter images, which were "create[d] and maintain[ed]" by adult couples for their personal use at home," could not become commoditized and were not intended to be encompassed. Id. Thus, the government's position was that depictions exchanged solely between private parties, without commercial exchange and without the possibility for commoditization,

are exempt. To support its limiting construction of the Statutes, the government cited the statutory text, which refers to "sexual performers," "place[s] of business," and other terms that connote sale or trade, the preamble to the 2008 regulations, which states the Statutes are "limited to pornography intended for sale or trade," see 73 Fed. Reg. 77,432, 77,456 (Dec. 18, 2008); and the history of enforcement, which for twenty years, did not include any enforcement effort vis-à-vis a private individual producing sexually explicit depictions purely for his or her own use. See Brief of Appellee, 2011 WL 1760472 at *50-58.

The Third Circuit rejected the government's limiting construction, holding "limiting constructions are not available where they require 'rewriting, not just reinterpretation' of the statute." Free Speech Coal., 677 F.3d at 539 (internal citation omitted). It found "the plain language of the Statutes makes clear that they apply broadly to all producers of actual or simulated sexually explicit depictions regardless of whether those depictions were created for the purpose of sale or trade," because nowhere in the Statutes is the word "producer" defined as limited to a maker of depictions intended for sale or trade. Id. The court also reasoned that the "plain text of the Statutes setting forth their broad scope must trump any conflicting statement contained within the preamble to the regulations," id., as well as any promises of prosecutorial discretion, id. at n.15.

Based on the factual record now developed, if this Court could analyze the issue on a clean slate, it would endorse the view presented by the government on appeal that depictions made for purely private, noncommercial uses are not – and never were intended to be – captured by the Statutes. The government consistently has rejected any interpretation of the Statutes that would cover such depictions. Agents Lawrence and Joyner, the individuals who established and operated the enforcement program at the FBI during the only years it was in existence, testified

there never was any government interest in enforcing the record-keeping requirements vis-à-vis persons producing images for private use. Moreover, the methods of communicating sexually explicit depictions between private persons have been made possible by technologies that did not exist at the time the Statutes were passed and arguably, could not have been contemplated by Congress. Further, the government's proposed construction of "producer," as being limited to one who makes an image intended for sale or trade, would accomplish the goals expressed by Congress – it would enable the government to impose record-keeping requirements on large-scale industry players, such as pornography film producers and photographers, as well as on niche players and even private individuals who choose to upload their depictions to the internet for public viewing.

That said, this Court cannot interpret Sections 2257 and 2257A on a blank slate.  It is bound by the Third Circuit's determination that "producer" reaches private persons – be they husbands-and-wives, persons in dating relationships, or strangers exchanging information to potentially date one another – who produce and share sexually explicit depictions with each other for private, noncommercial purposes.

Still, the Court declines to find Plaintiffs have succeeded in their burden of proving facial overbreadth as a result of the Statutes' applications to private depictions.  First, Plaintiffs have not proven there is a considerable quantity (or any quantity) of sexually explicit depictions, exchanged privately and not for sale or trade, that falls under the Statutes' scope.  Drs. Drouin and Zimmerman testified for Plaintiffs about the prevalence of sext messaging, but they could not provide information on the quantity of images being exchanged that contain "sexually explicit conduct" as defined by the Statutes – i.e., that contain depictions of intercourse, masturbation, bestiality, sadistic or masochistic abuse, or "lascivious exhibitions" of genitals or

pubic areas. See 18 U.S.C. § 2257(h)(1); 18 U.S.C. § 2256(2)(A).  The studies Drouin and Zimmerman conducted and relied upon to arrive at their estimates about sexting had not defined "sexually explicit" images in a uniform way, and only one of these studies differentiated among the types of context depicted at all.  Thus, neither expert could determine how many sext messages being exchanged between private persons actually fall within the Statutes' scope.  The frequency of sext messaging is irrelevant for Plaintiffs' overbreadth challenge, however, if every sext message were to contain images of breasts, cleavage and nudity that fall short of "lascivious" exhibitions of genitals.  Plaintiffs' additional evidence about technologies through which adult couples exchange sexually explicit content– e.g., "instaporn" and "snapchat"– similarly suffers from this shortcoming. (Pl. Exs. PPP, SSS, TTT, VVV).[18]

Moreover, Plaintiffs' evidence concerning the posting of sexual images to social networking sites also does not provide the Court a sense of the quantity of private speech that is improperly burdened by the Statutes.  Again, Plaintiffs provide no information whatsoever about the proportion of such postings that contain depictions of "sexually explicit" conduct as defined by the Statutes. Further, many of these postings are not fairly classified as "private" communications in the first place – because the social networking sites are publicly accessible.

The second reason Plaintiffs have not proven overbreadth with respect to private communications is that they have not demonstrated any actual burden on individuals who engage in such communications, or any realistic probability of enforcement as to such persons.

---

[18] Plaintiffs have also submitted evidence about technologies that enable couples to witness each other engaging in sexual activities in real time, such as Facetime and Skpe. (Pl. Exs. UUU and YYY). Again, there is no specification in the record about the frequency of use of these technologies to depict content – such as masturbation – that would fall under the Statutes' scope, as opposed to depict content – such as cleavage – that would not.  Thus, this evidence does not have considerable probative value for Plaintiffs' overbreadth claim. Moreover, it is unclear that the use of these technologies by private individuals would trigger Sections 2257 and 2257A even under the Third Circuit's construction, because real-time activities being viewed over electronic channels, but not recorded or captured in any permanent format, may not fall under the definition of a "depiction."

To show facial overbreadth, a plaintiff must show there is a substantial amount of speech actually being burdened or chilled by a law which in turn does not implicate the government's interest underlying that law. "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984). Rather, there must be "a realistic danger" that third parties will be chilled from engaging in protected expression, because the law could conceivably be applied to their conduct. Id. at 801 ("In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds."); see also Regan v. Time, Inc., 468 U.S. 641, 651 & n.8 (1984) (rejecting an overbreadth claim because there was "no evidence the Government has ever, or will ever, interpret the statute" to apply in the context suggested); Gibson, 355 F.3d at 227 n.5 ("While these scenarios lend marginal support to Gibson's overbreadth claim, they do little to advance the reality of the frequency or likelihood of the directive's invalid application. . . . [T]hese myriad hypothetical situations . . . just do not persuade us that the WPD has applied, or will apply, the directive impermissibly with any degree of frequency.").

The need for a plaintiff to demonstrate an actual chilling or burdening of speech – based on a realistic threat of the statute's application as to that speech – is particularly true in the context of child-pornography legislation.  In United States v. Williams, the Supreme Court rejected plaintiffs' argument that a statute criminalizing the pandering and solicitation of child pornography was facially overbroad because it could hypothetically apply to an individual who turns child pornography over to the police. The Court held this objection was a "fanciful hypothetical[]." Williams, 553 U.S. at 301. It was aware of "no [such] prosecution" and could

"hardly say, therefore, that there is a 'realistic danger' that [the law] will deter such activity." <u>Id.</u> at 302. In <u>Connection</u>, the Sixth Circuit assumed – as the Third Circuit did here – that Sections 2257 and 2257A apply to private communications. But it rejected a facial overbreadth claim precisely because there was no evidence of any actual chilling to date, nor any likely to occur in the future. <u>See</u> <u>Connection Distrib. Co.</u>, 557 F.3d at 339-40 ("[I]t is hard to understand who is being hurt by resisting the plaintiffs' call to invalidate the statute on its face. The middle-aged couple is not likely to be chilled by the statute. Over twenty years and numerous administrations, the statute has never been enforced in this setting, and the Attorney General has publicly taken the position that he will not enforce the statute in this setting."). The Eleventh Circuit reached a similar result in a case concerning a child pornography law, where the defendant raised the hypothetical of the law's application to an adult couple making a home video. <u>United States v. Dean</u>, 635 F.3d 1200, 1206 (11th Cir. 2011) ("At oral argument, Dean suggesting the following as an example of overbreadth: home-made videotapes of sexual intercourse produced by a consenting adult couple, when at least one of the participants was so youthful in appearance to 'appear to be' a minor. . . . Dean has not carried his burden to establish that, even if all such home-videos were protected, but subject to criminalization, prohibition of these videos would demonstrate substantial overbreadth in an absolute sense or relative to the statute's legitimate sweep.").

Here, as in <u>Connection</u>, Plaintiffs have presented no evidence of any private communications that are actually being chilled by the Statutes. No Plaintiff witness stated he or she produces sexually explicit depictions for purely private purposes, or that he or she was being deterred from producing such depictions because of the record-keeping requirement. No Plaintiff witness, including Plaintiffs' experts, testified that in the general population at large, sexting or

other methods of privately exchanging sexual depictions are being curbed by the Statutes. To the contrary, several witnesses for Plaintiffs stated they do not think private persons even know about the Statutes' existence or have any sense they are technically (under the Third Circuit's construction) required to comply with them when they send each other sexually explicit content. (See Audio File 6/4/13 A.M. at 2:12-2:13) (ECF 199) (testimony of Carol Queen, stating "I don't believe that the average American knows that this law exists"). Meanwhile, Agents Joyner and Lawrence reiterated the position taken by the government in this litigation and in other cases that it has no interest in enforcing the Statutes as to purely private communications and that it would have no conceivable way of even doing this – because it would have no knowledge of those private communications in the first place.

The Supreme Court's recent decision in United States v. Stevens, 130 S. Ct. 1577 (2010), does not change the analysis. In Stevens, the Court struck down a law prohibiting depictions of "animal cruelty" as facially overbroad despite the government's contention during litigation that the law would only be enforced as to crush videos and depictions of animal fighting. The Court found other hypothetical applications were realistically possible – for instance, as to depictions of hunting or to the "humane slaughter of a stolen cow" – and accordingly, determined the law was unconstitutionally overbroad. Id. at 1588-90. But one of the factors leading the Court to such a conclusion was the history of inconsistent enforcement of the statute at issue; the petitioner himself had been indicted for selling videos of dogfighting, while the government had initially stated it would only apply the statute to depictions of extreme cruelty.  Id. at 1591 ("This prosecution is itself evidence of the danger in putting faith in government representations of prosecutorial restraint. When this legislation was enacted, the Executive Branch announced that it would interpret § 48 as covering only depictions "of wanton cruelty to animals designed to

appeal to a prurient interest in sex." . . . No one suggests that the videos in this case fit that description."). Here, the government has maintained a consistent position for over 20 years (since Section 2257 was first enacted in 1988) that the Statutes will not be applied as to private communications, and there is nothing to suggest they have wavered from this stance. The fact of the matter is that the government could not enforce the Statutes as to private communications *even if it desired to do so*, because as Agent Lawrence explained, it would have no way of knowing of the existence of such communications. (See Audio File 6/12/13 A.M. at 0:44-0:46).

Additionally, this case is distinguishable from Stevens because of the subject matter at issue. In Stevens, the underlying statute dealt with the protection of animals. Here, the underlying statutes deal with the protection of human beings – namely, adolescent minors who could fall victim to child pornography. The undersigned, as is true for most U.S. District Court judges, has presided over a number of child pornography prosecutions. Although many defendants concede the illegality of the material they are charged with possessing, the images are made a part of the record. In one jury trial presided over by the undersigned, there was no such concession and the images were shown to the jury.

The utterly depraved nature of child pornography is so revolting to a civilized society that there are no comparisons. It is absolutely devoid of merit or justification. The revulsion of Congress to the practice must be respected by judges; the dangers of its possession and circulation must be treated with the utmost sensitivity. A court should tread most carefully in considering facial challenges to anti-child pornography laws. A judge should invalidate such a law only if there is a "realistic danger that the statute [] will significantly compromise recognized First Amendment protections," Taxpayers for Vincent, 466 U.S. at 801, due to the "likely frequency of conceivably impermissible applications," Gibson, 355 F.3d at 226. There is no

such showing in this case. See generally New York v. Ferber, 458 U.S. 747, 756 (1982) ("[L]aws directed at the dissemination of child pornography run the risk of suppressing protected expression by allowing the hand of the censor to become unduly heavy. . . . [H]owever, we are persuaded that the States are entitled to greater leeway in the regulation of pornographic depictions of children."); United States v. Malloy, 568 F.3d 166, 175 (4th Cir. 2009) ("Because of the surpassing importance of the government's interest in safeguarding the physical and psychological wellbeing of children, the government has greater leeway to regulate child pornography that it does other areas.").

This does not leave a hypothetical private couple – who does in fact feel their First Amendment rights are being unreasonably curbed by the Statutes' record-keeping requirements – without a remedy.  Such individuals could bring an as-applied challenge. See Connection Distrib. Co., 557 F.3d at 339-40 ("[W]e do not mean to suggest that a couple potentially affected by this hypothetical application of the law could not bring a declaratory-judgment action or an as applied challenge to the law today, whether in their own names or as an anonymous John and Jane Doe. . . . [E]ven if this track record does not suffice to give the hypothetical couple peace of mind, they have a remedy – a John and Jane Doe as-applied challenge to the law, together with attorney fees if they win.").

### c.   Fourth Amendment Claims

Plaintiffs allege the Statutes and their companion regulations violate the Fourth Amendment both "on their face and as applied," because they "authorize unreasonable warrantless searches and seizures."  (Amended Complaint ¶ 74) (ECF 84).  Initially, this Court granted the government's motion to dismiss Plaintiffs' Fourth Amendment claims in their entirety under Fed. R. Civ. P. 12(b)(6), finding Plaintiffs failed to show they had a reasonable

expectation of privacy in the areas being inspected and regardless, the inspections amounted to constitutionally valid administrative searches. Free Speech Coal., 729 F. Supp. 2d at 746. The Third Circuit vacated that portion of this Court's decision. It held "[c]ourts generally must consider the concrete factual context when determining the constitutional validity of a warrantless search." Free Speech Coal., 677 F.3d at 543. On remand, the Third Circuit directed this Court to consider two questions:  first, whether the inspections authorized by the Statutes amount to "searches" that implicate the Fourth Amendment, either because they intrude on areas in which there is a "reasonable expectation of privacy" under Katz v. United States, 398 U.S. 347, 360 (1967) (Harlan, J., concurring), or because they involve "common-law trespass" under United States v. Jones, 132 S. Ct. 945, 949 (2012); and second, whether the inspections authorized by the Statutes fall under the administrative search exception to the Fourth Amendment's warrant requirement. See Free Speech Coal., 677 F.3d at 543-45.

Before turning to those questions, the Court revisits the issue of Plaintiffs' standing. The government has devoted considerable pages in its Post-Trial brief to this matter. As the government notes, Plaintiffs have requested two forms of relief for their Fourth Amendment claims – a declaratory judgment that the Statutes and their corresponding regulations are unconstitutional under the Fourth Amendment, both facially and as-applied, and an injunction against future enforcement of the Statutes and their corresponding regulations. (Amended Complaint at 32) (ECF 84).  The government contends, as it did at an earlier stage of this litigation, that Plaintiffs lack standing to request injunctive relief under the Fourth Amendment because they cannot point to a "certainly impending" injury that would be redressed by an injunction, given that the FBI's inspections program was shut down in 2008. (Gov't Post-Trial Br. at 47).

For the reasons discussed in this Court's Memorandum of December 5, 2012 (ECF 117) and reviewed supra, the Court denies the government's contentions as to Plaintiffs' lack of standing. The plain operation of the Statutes – which instruct Plaintiffs to maintain records and to make them available to inspection by the Attorney General "at all reasonable times," 18 U.S.C. § 2257(c) – creates enough of a threat of future inspections that Plaintiffs have standing to request injunctive relief. (Whether Plaintiffs are actually *entitled* to an injunction, because they have shown the threat of future enforcement sufficient to warrant such relief, is a separate matter, which the Court resolves below).

This case is distinguishable from Clapper v. Amnesty International USA, in which the Supreme Court recently held a group of plaintiffs lacked standing to request an injunction under the Fourth Amendment. 133 S. Ct. 1138, 1148 (2013). In Clapper, the federal statute at issue authorized searches of parties *other* than the plaintiffs themselves. Id. at 1148 ("Section 1881a expressly provides that respondents, who are U.S. persons, cannot be targeted for surveillance under § 1881a."). The plaintiffs attempted to show they had standing to challenge the law because there was a reasonable likelihood their communications with the regulated parties would be intercepted. The Court found that injury too speculative and conjectural to confer standing. Id. at 1148 ("[R]espondents' theory necessarily rests on their assertion that the Government will target *other individuals*—namely, their foreign contacts."); id. at 1150 ("[R]espondents can only speculate as to whether *their own communications* with their foreign contacts would be incidentally acquired"). Here, in contrast, Plaintiffs themselves are the entities regulated by the Statutes, as they are made subject to inspections by the Attorney General "at all reasonable times." Furthermore, the statute in Clapper required the government to first obtain authorization from the Foreign Intelligence Surveillance Court ("FISC") before conducting surveillance

operations. Id. (explaining that Section 1881a mandates that the government obtain the FISC's approval before conducting a search and "respondents can only speculate" as to whether the FISC would grant it).   Here, in contrast, Sections 2257 and 2257A empower the Attorney General to conduct inspections without prior authorization from any governmental body, thus making the possibility for future injury to Plaintiffs less contingent on a "speculative chain of possibilities." Id.

Accordingly, the Court again rejects the government's standing arguments and proceeds to consider Plaintiffs' Fourth Amendment claims on the merits.

### i.   Whether the Inspections Authorized by the Statutes Are "Searches" Implicating the Fourth Amendment

The first question before the Court on remand, as directed by the Third Circuit, is whether the inspections authorized by the Statutes amount to "searches" that implicate the Fourth Amendment. Based on the record developed at trial regarding the inspections effectuated in the past, the Court concludes the answer is yes.

First, nearly all of the 29 inspections undertaken in 2006 and 2007 extended to areas in which there was a "reasonable expectation of privacy." Katz, 398 U.S. at 360. During the inspections at business locations, FBI agents gained access to private offices, storage rooms, filing cabinets, and desks, in order to view and photograph the locations where Section 2257 records were stored. These areas contained personal information and items (e.g., one FBI photograph shows a whiteboard with names and numbers on it) and were not accessible by the public. See Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 329 (1979) (holding that just because "a retail store invites the public to enter" does not mean it "consents to wholesale searches" of its property). During the inspections at residential locations, FBI agents gained access to and spent several hours inside of kitchens, dining rooms, and home offices. Again, these were areas not

exposed to the public and in which personal articles were kept. Even at the inspection that occurred at a location rented by a third-party custodian, the agents were exposed to other business records that had been mixed in with the producer's Section 2257 records. Altogether, the Court has little trouble concluding the vast majority of inspections carried out under the Statutes, at least in 2006 and 2007, involved the intrusion by government agents into areas in which there was a reasonable expectation of privacy. Although there may not be any reasonable expectation of privacy in the records themselves, there is such an expectation in the places where the inspections took place.[19]

Second, nearly all of the inspections effectuated in 2006 and 2007 involved common law trespasses that would trigger the Fourth Amendment under Jones, 132 S. Ct. at 945.  In Jones, the Supreme Court held that when government agents "physically occup[y] private property for the purpose of obtaining information" without consent, this amounts to a "search" implicating the Fourth Amendment. Id. at 949; see also United States v. Knotts, 460 U.S. 276, 286 (1983) (Brennan, J., concurring) (holding when the government "engage[s] in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitution a violation of the Fourth Amendment").  The physical occupation that amounted to a "search" in Jones was the attaching of a GPS device to a privately-owned vehicle by the FBI, without the owner's actual or implied authorization. Id. at 952. Here, FBI agents committed even clearer

---

[19] It appears that for three of the 29 inspections, FBI agents did not enter a business, residential or third-party custodian's premise.  Rather, in these instances, the producer emailed or provided copies of his or her Section 2257 records to the FBI and the agents reviewed those records at their L.A. office. (Gov't Post-Trial Br. at 50) (citing the inspections at Private, Temptations, and Ghost Pro, and Pl. Exs. 21, 26, and 16). Plaintiffs contend these searches implicated the Fourth Amendment nonetheless because there is a reasonable expectation of privacy in the records themselves. The Court need not resolve the issue, however, because it finds the majority of the 29 inspections involved the entry by FBI agents into rooms and areas in which there was a reasonable expectation of privacy under Katz.  This is sufficient to permit Plaintiffs to proceed with their facial and as-applied Fourth Amendment claims.

cases of physical occupations of private property, because they entered businesses and homes without warrants, accessed private rooms and areas in order to take photographs, and remained on site for several hours while they inspected Section 2257 records.  Although the government attempts to describe these physical occupations as "consensual" and thus distinguishable from the trespass in <u>Jones</u>, the facts do not demonstrate "freely and voluntarily given" consent under <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973). The FBI was acting pursuant to a statute that made it a crime "to refuse to permit the Attorney General or his or her designee to conduct an inspection," 18 U.S.C. § 2257(f)(5), and in March 2007, agents began giving producers a letter informing them it was a "criminal violation of federal law" to decline the inspection.  (Pl. Ex. 31; Def. Ex. 226 (showing approximately 16 of the 29 inspections involved the handing of a pre-inspection letter, with this language, to the producer)).  Accordingly, the vast majority of the inspections that occurred satisfy the <u>Jones</u> test for a Fourth Amendment search. To deny that these inspections were searches is like denying that American cheese is cheese.

### ii.   Whether the Inspections Authorized by the Statutes Satisfy the "Administrative Search" Exception

The next question before the Court on remand is, given that the inspections authorized by the Statutes implicate the Fourth Amendment, whether they satisfy the "administrative search" exception to the warrant requirement.

The Fourth Amendment's Warrant Clause, providing that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation," obligates the government to obtain a warrant before undertaking a search. U.S. Const. Amend IV; <u>see also</u> <u>Showers v. Spangler</u>, 182 F.3d 165, 172 (3d Cir. 1999) (holding that "Fourth Amendment protections require law enforcement officers to procure and execute a warrant before conducting a search").  This is true for all searches that implicate the Fourth Amendment, including those made to ensure a party is

complying with a regulatory mandate. <u>Camara v. Mun. Court</u>, 387 U.S. 523, 535-39 (1967) (holding a warrant is still required in such an instance, but an administrative warrant may suffice).

However, there are "a few well recognized exceptions" to the Fourth Amendment's warrant requirement, <u>Showers</u>, 182 F.3d at 172, one of which is for searches that fall under the administrative search doctrine. See <u>New York v. Burger</u>, 482 U.S. 691, 701 (1987).   The administrative search doctrine provides that for commercial enterprises operating in "closely regulated" industries, "where the privacy interests of the owner are weakened and the government interests in regulating [the] particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." <u>Id.</u> at 702.[20]   To determine if such a search is reasonable, a court considers three factors: (1) whether there is a "substantial" government interest that informs the regulatory scheme; (2) whether the warrantless inspections are "necessary to further [the] regulatory scheme"; and (3) whether "the statute's inspection program, in terms of the certainty and regulatory of its application, provides a constitutionally adequate substitute for a warrant." <u>Burger</u>, 482 U.S. at 702-03 (internal quotation marks and citations omitted).

The government has the burden of demonstrating a warrantless search is permissible under an exception to the Fourth Amendment's warrant requirement.  <u>United States v. Herrold</u>, 962 F.2d 1131, 1137 (3d Cir. 1992).

---

[20] Although the Supreme Court did hold in <u>Marshall v. Barlow's, Inc.</u>, 436 U.S. 307 (1978), that a warrant was needed for inspections to ensure compliance with a regulatory statute, that case has been frequently distinguished, including in <u>Burger</u> itself.  <u>Burger</u>, 482 U.S. at 701.The statute in <u>Marshall</u> had authorized government agents to search any business subject to the Occupational Safety and Health Act ("OSHA"), to ensure compliance with OSHA regulations.  The Court held a warrant was required in that instance because the wide-reaching nature of the statute – and its lack of specificity as to which businesses would be inspected – did not curb the discretion of officials or put industry players on notice that their privacy expectations should be reduced.  <u>Marshall</u>, 436 U.S. at 314-24. Those concerns are not present here. The Court finds <u>Marshall</u> inapplicable to the present factual record.

Turning to the present case, the Court concludes "producers" of sexually explicit depictions as defined by Sections 2257 and 2257A constitute a "closely regulated" industry for the purposes of the administrative search doctrine. A "closely regulated" industry is one that has been "long subject to close supervision and inspection," such that the privacy expectations of businesses in the sector are reduced. Colonnade Catering Corp. v. United States, 397 U.S. 72, 77 (1970); see also Lovgren v. Byrne, 787 F.2d 857, 865-66 (3d Cir. 1986).  To date, courts have recognized mine operators, Donovan v. Dewey, 452 U.S. 594 (1981); liquor sellers, Colonnade, 397 U.S. at 74; firearms dealers, United States v. Biswell, 406 U.S. 311 (1972); operators of automobile junkyards, Burger, 482 U.S. at 701; and manufacturers of veterinary drugs, United States v. Argent Chem. Labs., Inc., 93 F.3d 572, 575 (9th Cir. 1996), to qualify.  In those cases, the industry had to comply with a comprehensive set of federal or state laws aimed at ensuring its products did not threaten the safety or welfare of the public. Here, "producers" of sexually explicit depictions similarly must comply with a comprehensive set of federal laws aimed at protecting the safety and welfare of children. Dating back over twenty years, these laws prohibit the use of minors in sexually explicit depictions, see Child Protection Act of 1984, Pub. L. No. 98-292, 98 Stat. 204 (codified as amended at various sections of 18 U.S.C.), and require that producers and retailers obtain proof of performers' ages and maintain records of such, see Pub. L. No. 100-690, § 7513, 102 Stat. 4485 (1988) (codified as amended at 18 U.S.C. § 2257). Granted, "producers" under Sections 2257 and 2257A are not a uniform group – they include primary producers of commercial films, secondary retailers, photographers, and even couples who upload sexually explicit videos of themselves onto tube-sites. But the unity of the players in the industry was never the determinative factor in the administrative search cases cited above. Rather, it was the pervasiveness of laws aimed at ensuring the industry's practices did not

66

undermine the safety of the public, which justified the reduced privacy expectations of the businesses. And here, federal anti-child pornography laws are similarly extensive.

Accordingly, the Court turns to whether the warrantless inspections authorized by Sections 2257 and 2257A and the corresponding regulations are "reasonable" under the three-factor <u>Burger</u> test. Using the inspections in 2006 and 2007 as the evidentiary guide, the Court concludes the inspections contemplated by the Statutes and regulations are reasonable in all but one regard – the lack of advance notice, for inspections at bona fide residences of producers, cannot be justified on this record.

The first <u>Burger</u> factor asks whether there is a "substantial" government interest that informs the regulatory scheme. The third factor asks whether the application of the inspection program provides "a constitutionally adequate substitute for a warrant," because the statute or regulations inform businesses that "inspections will be made on a regular basis" and limit the inspections in time, place and scope. <u>Burger</u>, 482 U.S. at 708, 711. These two factors are satisfied with respect to the inspections authorized by the Statutes. The governmental interest informing the regulatory scheme – combatting child pornography – is substantial. Meanwhile, the Statutes and regulations provide "a constitutionally adequate substitute for a warrant" because they notify producers that inspections can occur on a regular basis, <u>see</u> 18 U.S.C. §§ 2257(c) & 2257A(c); 28 C.F.R. § 75.5(d) ("Records may be inspected once during any four-month period . . . ."), and they circumscribe the time, place and scope of the inspections, <u>see</u> 28 C.F.R. § 75.5(c)(1) (directing that inspections occur during "normal business hours"); <u>id.</u> § 75.5(c)(2) (referring to the "limited nature of the records inspection"); <u>id.</u> § 75.5(c)(3) (providing that the inspections should be "conducted so as not to unreasonably disrupt the operations of the

establishment"). The record developed at trial reinforces that the inspections effectuated in 2006 and 2007 were far less intrusive than are searches effectuated pursuant to search warrants.

The second Burger factor, however, poses more problems for the inspections program authorized by the Statutes. The second Burger factor asks whether the warrantless nature of the inspection program is "necessary to further [the] regulatory scheme." Burger, 482 U.S. at 702 (internal quotation marks and citation omitted). In Burger, the Court found this factor satisfied because "stolen cars and parts often pass quickly through an automobile junkyard, [and] 'frequent' and 'unannounced' inspections are necessary in order to detect them." Id. at 710. In other words, the Court found that a warrant might alert the regulated entity about the impending search and enable him to conceal stolen parts, thus defeating the purpose of the regulatory scheme. The Court reached similar conclusions in Biswell, 402 U.S. at 316 ("[I]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection . . . ."), and Donovan, 452 U.S. at 603 (citing Congress' finding that "in light of the notorious ease with which many safety or health hazards may be concealed if advance warning of inspection is obtained, a warrant requirement would seriously undercut this Act's objectives" (internal citation omitted)).

Here, the record does not demonstrate that the *unannounced* aspect of warrantless inspections is as critical to "[the] regulatory scheme" in Sections 2257 and 2257A as it was in Burger, Biswell, or Donovan. The key difference is that unlike the former cases, where there was a concern that the regulated entity would conceal or destroy an improper condition at the 11th hour, the records mandated by the Statutes are so extensive that they cannot realistically be manufactured on the eve of an impending search. Both FBI agents testified that it was highly

unlikely that a producer could assemble Section 2257 records within 24-hours' notice of an inspection. (Audio File 6/12/13 P.M. at 0:24 (ECF 210); Audio File 6/12/13 A.M. at 1:14-1:15 (ECF 208)). Further, in about nine of the 29 inspections conducted in 2006 and 2007, advance notice *was* given, to ensure the producer or custodian of records was on site when the FBI team arrived, and there is no evidence that it undermined the integrity of those inspections. (Def. Ex. 226; Audio File 6/11/13 P.M. at 1:03-1:15, 1:25-1:28 (ECF 206); Audio File 6/12/13 A.M. at 0:38-0:40 (ECF 208)).

Meanwhile, the record also demonstrates that the ability of the FBI to show up at a producer's bona fide residence – if that is where the producer maintains his Section 2257 records – imposes significant burdens on such persons. It means the producer must be available at his home for at least 20 hours a week, even if he or she does not otherwise use the home as an office. It means the producer must be ready to welcome a team of FBI agents into the home for several hours at a time, even if his or her family or friends are there or personal items are strewn about. Some Plaintiffs, such as Thomas Hymes and David Levingston, have curbed their otherwise First Amendment protected activities to avoid triggering the Statutes' record-keeping requirements altogether, because they do not want to absorb the cost of using a third-party custodian, but they also do not want to be available at their homes 20 hours a week.

Given these two streams of evidence in the record – demonstrating advance notice would not undermine the regulatory scheme, but a lack of such notice significantly burdens producers who maintain records at home – the Court finds the regulations' lack of a notice requirement, as to searches at bona fide residences, unreasonable under <u>Burger</u>. The special status of the home in this country's constitutional doctrine reinforces this conclusion. <u>United States v. U.S. Dist.</u>

Court for the E. Dist. of Mich., 407 U.S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . .").[21]

There are two important limitations to this holding. First, it does not compel the conclusion that the Statutes are facially invalid under the Fourth Amendment. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). A challenger must show a statute "is unconstitutional in all of its applications." Wash. State Grange, 552 U.S. at 449. Here, the Statutes do not eliminate the *possibility* that government agents provide advance notice to producers before conducting inspections at residences. The Statutes merely authorize the Attorney General to conduct inspections "at all reasonable times," and they delegate the task of specifying the details of an inspection program to the Attorney General. 18 U.S.C. § 2257(c).  It is the regulations that suffer from facial invalidity, insofar as they provide that "[a]dvance notice of record inspections shall not be given."  28 C.F.R. §§ 75.5(b).  As to searches at residences, the record shows this aspect of the regulations is unjustified and thus unconstitutional.

---

[21]   When the Supreme Court developed the administrative search doctrine, it contemplated searches at commercial premises rather than at residences. See Donovan, 452 U.S. at 598-99 ("The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections.").  Accordingly, one could argue that the administrative search doctrine is not applicable to homes at all, and that any inspection at a residence should preceded by a warrant. This Court does not go so far.  It finds the administrative search doctrine *does* apply to Section 2257 inspections at residences, because "producers" of sexually explicit depictions are still part of a "closely regulated" industry even if they choose to store their records at home.  But the Court finds the *reasonableness* of an administrative search should be informed by the type of premises being inspected. When it is a bona fide residence, the place at which privacy expectations are highest, additional protections may be justified. The Court concludes such protections – in the form of advance notice – are required here, given the lack of evidence at trial as to the need for unannounced inspections and the considerable testimony about the burdens that no advance notice places on producers who maintain records at homes.

Second, it is not the lack of a warrant requirement in the regulations that shows disrespect of individual privacy, but the bar on advance notice. The regulations authorize inspectors to "enter without delay . . . any establishment of a producer where records under § 75.2 are maintained to inspect during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, for the purpose of determining compliance with the record-keeping requirements of the Act . . . ." 28 C.F.R. § 75.5(a). In other words, the regulations authorize inspectors to proceed without first obtaining a warrant. This is justified under the Fourth Amendment. A conventional search warrant would require probable cause that a crime has occurred or is about to occur – and here, the whole regulatory scheme would fall apart if the FBI needed probable cause to believe a producer wasn't keeping adequate records, before it could undertake a search. Further, the lack of an administrative warrant requirement also is justified, because there is no demonstration that the "authority to make warrantless searches devolves [] unbridled discretion upon executive and administrative officers" or that an administrative warrant, with its "assurances from a neutral officer that the inspection is . . . pursuant to an administrative plan containing specific neutral criteria," would make the Section 2257 inspections any more protective of producers' privacy. See Marshall, 436 U.S. at 323. The Statutes limit the inspections to Section 2257 records themselves, 18 U.S.C. § 2257(c), and the record shows the inspections in the past were effectuated carefully and respectfully, and were far less intrusive than searches pursuant to search warrants. There is no evidence suggesting that a neutral arbiter, blessing these inspections before they occurred, would add to their reasonableness.

Although the Court is aware of a number of cases in which the Third Circuit has required administrative warrants, they did not involve records inspections. Careful research has not

revealed any Supreme Court or Third Circuit case where a judge has ruled an administrative search warrant is required merely for a record inspection.  Cf. Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n, 715 F.3d 631, 646 (7th Cir. 2013) (holding that records demands of mine operators, pursuant to the Mine Health Safety Act, complied with the Fourth Amendment even though not proceeded by administrative warrants because they were more similar to subpoenas than to searches).

Finally, in determining that advance notice is necessary, the Court adds that the regulations must provide that notice has actually been received by the producer.  Not all producers stay at home seven days a week; many routinely travel for business or pleasure. Assuming that a producer has correctly noted the address at which the records are stored in the Section 2257 label, the government must first make the producer aware of an intention to inspect the records, and then give adequate and reasonable time for the producer to return home for the inspection. One option might be to give the producer the possibility of bringing his or her records to the local FBI office for inspection, or emailing them to the FBI.  The trial record showed that for three inspections in 2006 and 2007, the FBI permitted producers to provide their records to the government in such manners and the inspections were conducted at the L.A. office.  There was no testimony that these inspections were any less effective. See supra note 19.

### iii.   Injunctive Relief is Not Justified under the Fourth Amendment

Given the conclusion above, regarding the unconstitutionality of the DOJ's regulations with respect to their disallowance of advance notice for inspections at residences, the Court must determine whether injunctive relief is appropriate. Plaintiffs have requested not only a declaratory judgment, but that the Court permanently enjoin the government from enforcing the Statutes and their corresponding regulations under the Fourth Amendment going forwards.

The Court declines to grant Plaintiffs injunctive relief.  A court should grant permanent injunctive relief only where the plaintiff has demonstrated:  "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2757 (2010) (quoting eBay Inc. v. MercExchange, L.L. C., 547 U.S. 388, 391 (2006)); accord Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.").  Ultimately, "[t]he decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion."  eBay, 547 U.S. at 391.  Although the Third Circuit has never endorsed an exhaustive list of considerations relevant to the appropriate exercise of this discretion, in the context of a defendant's "voluntary cessation of a challenged practice . . . . [s]uch abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice . . . ."  City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982).

Under the factual record developed at trial, the equitable remedy of an injunction is not warranted at this time. The evidence shows the government has not conducted a Section 2257 inspection since 2007.  Rather, the FBI dismantled the inspections program in early 2008, and there has been no intent or effort to revive it.  It is moribund. As a result, Plaintiffs do not face a realistic threat of "irreparable harm" – due to an inspection – at any point in the foreseeable future.  A judge must take a deep breath before enjoining the nation's top law enforcement

officer from doing something that the Department of Justice has shown no interest in doing for the last six years. Under these circumstances, the Court believes it would be an abuse of discretion to enter an injunction against the Attorney General.

The Court is mindful that were the FBI to revive the Section 2257 inspections program, and were the DOJ to decline to update the regulations so as to require advance notice at inspections of residences, a producer could bring a lawsuit requesting an injunction at that time.

## V.      Conclusion

Except for Plaintiffs' claim that the regulations violate the Fourth Amendment as applied to inspections of records kept at bona fide residences, all other issues are decided in favor of the government, and a final judgment will be entered.

O:\CIVIL 09\09-4607 Free Speech v. Holder\Memorandum of Law - Final Judgment.docx