# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREE SPEECH COALITION, INC., et al.** | ) | **Civil Action No. 2:09-4607** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **JUDGE MICHAEL M. BAYLSON** |
| -vs- | ) | |
| | ) | |
| **THE HONORABLE JEFF B. SESSIONS,** | ) | |
| Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR ENTRY OF
JUDGMENT DECLARING 18 U.S.C. §§ 2257, 2257A AND THEIR IMPLEMENTING
REGULATIONS UNCONSTITUTIONAL UNDER THE FIRST AMENDMENT AND
ENJOINING THEIR ENFORCEMENT**

J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio  44113-1949
(216) 781-5245
(216) 781-8207 (Facsimile)

KEVIN E. RAPHAEL (72673)
KER@Pietragallo.com
J. PETER SHINDEL, JR. (201554)
JPS@Pietragallo.com
PIETRAGALLO GORDON ALFANO BOSICK
    & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200
(215) 981-0082 (Facsimile)

Attorneys for Plaintiffs

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      THE STATUTES DO NOT SURVIVE STRICT SCRUTINY . . . . . . . . . . . . . . . . . . . . 5

        A.      The Statutes Must Be Evaluated Against the Government's Interest in
                Preventing Minors from Being Used in the Production of Sexually Explicit
                Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.      The Government Has Failed to Prove that Adult Film Makers Have Ever
                Used Minors in Their Productions, Which Was the Problem the Statutes
                Were Ostensibly Enacted to Address, and the Unrebutted Evidence is That
                They Have Never Done So . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.      The Statutes Are Not Narrowly Tailored . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        D.      The Statutes Do Not Employ the Least Restrictive Means . . . . . . . . . . . . . . . 18

                1.      Criminal laws prohibiting and punishing child pornography . . . . . . . . . 19

                2.      18 U.S.C. § 2257A (h)'s certification procedure . . . . . . . . . . . . . . . . . 21

                3.      Industry standards and intellectual property laws . . . . . . . . . . . . . . . . 22

                4.      An age–verification law limited to persons who might reasonably
                        appear to be underage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                5.      A law limited to commercial productions . . . . . . . . . . . . . . . . . . . . . . 26

                6.      A law  limited to "primary producers" of sexually explicit
                        expression—as opposed to "secondary producers" who simply
                        publish or reproduce it . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

                7.      A recordkeeping law enforced by administrative sanction . . . . . . . . . . . 28

II.     THE STATUTES ARE UNCONSTITUTIONALLY OVERBROAD . . . . . . . . . . . . . . 28

i

**TABLE OF CONTENTS (cont'd)**

Page

III.   THE FREE SPEECH COALITION AND THE AMERICAN SOCIETY OF MEDIA
       PHOTOGRAPHERS HAVE STANDING TO CHALLENGE THE STATUTES
       UNDER THE FIRST AMENDMENT ON BEHALF OF THEIR MEMBERS. . . . . . . 30

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ATTACHMENT: U.S. Department of Justice Report to Congress, April 2016, Appendix A:
Prosecution Accomplishments Summary-All Project Safe Childhood Statutes

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**CASES**

*Am. Civil Liberties Union v. Ashcroft*, 542 U.S. 656 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003). . . . . . . . . . . . . . . . . . . . 4, 29

*Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181 (3rd Cir. 2008). . . . . . . . . . . 3, 5, 18, 19, 22

*Am. Library Ass'n v. Reno*, 33 F.3d 78 (D.C. Cir. 1994)
    *cert. denied*, 515 U.S. 1158 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Am. Library Ass'n v. Thornburgh*,
    713 F. Supp. 2d 469 (D.D.C. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*ASARCO Inc. v. Kadish,* 490 U.S. 605 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Ashcroft v. Free Speech Coalition,* 535 U.S. 234 (2002). . . . . . . . . . . . . . 3, 5, 6, 9, 13, 17, 30, 32

*Berg v. Traylor*, 148 Cal. App. 4th 809,
    56 Cal. Rptr. 3d 140 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Brown v. Entertainment Merchants Ass'n*,
    564 U.S. 786 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8, 11, 18, 30, 32

*Burson v. Freeman*, 504 U.S. 191 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Burwell v. Hobby Lobby*, 134 S.Ct. 2751 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Conchatta Inc. v. Miller*, 458 F.3d 258 (3rd Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*,
    518 U.S. 727 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Free Speech Coal., Inc. v. Attorney Gen. U.S.,*
    787 F.3d 142 (3rd Cir. 2015), *reh'g granted* (Sept. 1, 2015). . 2, 3, 6, 14-16, 17, 24, 26, 30

*Free Speech Coal., Inc. v. Attorney Gen. United States,*
    825 F.3d 149 (3rd Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3, 6, 7, 17, 24, 28, 31

**<u>TABLE OF AUTHORITIES (cont'd)</u>**

Page

*Free Speech Coal., Inc. v. Attorney General*, 677 F.3d 519 (3rd Cir. 2012).. . . . . . . . 2, 7-8, 19, 26

*Free Speech Coalition, Inc. v. Holder*,
    957 F. Supp.2d 564 (E. D. Pa. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333,
    97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*McCullen v. Coakley*, 134 S.Ct. 2518 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434 (2014). . . . . . . . . . . . . . . . . . . . . . . .  7, 18

*New York v. Ferber*, 458 U.S. 747 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
    280 F.3d 278 (3rd Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*R.A.V. v. City of St. Paul*, 505 U.S. 377, 112 S.Ct. 2538 (1992). . . . . . . . . . . . . . . . . . . . . . . .  5

*Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*Regents of Univ. of California v. Bakke*, 438 U.S. 265 (1978). . . . . . . . . . . . . . . . . . . . . . . . . .  32

*Sable Communications v. FCC,* 492 U.S. 115 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 6, 9

*United States v. Alvarez*, 132 S.Ct. 2537 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 6, 18

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 5, 7, 9, 10, 14, 18, 21

*United States v. Stevens*, 533 F.3d 218 (3d Cir. 2008) (en banc),
    *aff'd*, 559 U.S. 460 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 5, 20

### TABLE OF AUTHORITIES (cont'd)

Page

*United States v. Stevens*, 559 U.S. 460 (2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 16, 28, 30

*Williams-Yulee v. Florida Bar*, 135 S.Ct. 1656 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## CONSTITUTIONAL PROVISIONS

United States Const., amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7, 9, 12, 14, 16, 30, 33

United States Const., amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## STATUTES, RULES AND REGULATIONS

8 U.S.C. § 1324a (e)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

17 U.S.C. § 204 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 2251. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 2252. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 2252A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 2253. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 2256. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 2257. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11-13, 20, 21, 33

18 U.S.C. § 2257A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 13, 20, 21, 33

18 U.S.C. §2257A (h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

21 C.F.R. § 1140.14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

28 C.F.R. § 75.1 (c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# TABLE OF AUTHORITIES (cont'd)

Page

28 CFR § 75.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 33

28 CFR § 75.2 (e).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Cal. Civ. Code § 3344 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Cal. Fam. Code § 6710. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Cal. Fam. Code § 6751. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Me. Rev. Stat. tit. 22, § 1555-B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

Me. Rev. Stat. tit. 28-A, § 706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

N.Y. Pub. Health Law § 1399-cc (McKinney). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

Oregon Administrative Rule 845-006-0335. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

## MISCELLANEOUS

152 CONG. REC. H5724 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

## INTRODUCTION

In prior phases of this litigation, the constitutionality of 18 U.S.C. §§ 2257, 2257A and their implementing regulations, 28 CFR § 75.1 *et seq.,* were evaluated as content–neutral provisions under intermediate scrutiny.  The case has now been remanded for their evaluation as content–based regulations under strict scrutiny.

"Content–based regulations are presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817 (2000). "[T]he risk of non-persuasion... rest[s] with the Government, not with the citizen." *Id.* at 818. "It is rare that a regulation restricting speech because of its content will ever be permissible." *Id. See also*, *Burson v. Freeman*, 504 U.S. 191, 211 (1992) ("[I]t is the rare case in which ... a law survives strict scrutiny.").[1]

In its decision remanding this case, the Third Circuit signaled its doubt that this was that "rare case."  The court noted in its earlier decision reviewing the statutes under intermediate scrutiny, that it had identified flaws that posed problems for their survival under strict scrutiny:

> We relied heavily on the extensive record developed in the District Court, and we affirmed the District Court's conclusion that the Statutes and regulations satisfied intermediate scrutiny under the First Amendment. However, in doing so, we noted that the Statutes may not have been able to survive strict scrutiny. Specifically, we "reject[ed] the Government's contention that age verification of all performers regardless of their actual age always furthers the Government's interest in preventing the sexual exploitation of minors." [787 F.3d] at 156. Moreover, "the number of performers to whom the Statutes apply, yet for whom requiring identification does not protect children, is not insignificant." *Id.* at 158. Nonetheless, the Statutes satisfied intermediate scrutiny because, unlike strict scrutiny, "the Government need not employ the least restrictive or least intrusive means." *Id.* at 157.

*Free Speech Coal., Inc. v. Attorney Gen. United States,* 825 F.3d 149, 158 (3rd Cir. 2016) (*FSC III*);

---

[1]  *Cf. Williams-Yulee v. Florida Bar*, 135 S.Ct. 1656, 1666 (2015) (finding state's judicial conduct rule prohibiting judges from personally soliciting campaign funds, rather than through their campaign committees, was "one of the rare cases in which a speech restriction withstands strict scrutiny").

*See also Free Speech Coal., Inc. v. Attorney Gen. U.S.,* 787 F.3d 142, 164 (3rd Cir. 2015), *reh'g granted* (Sept. 1, 2015), *on reh'g FSC III* (*FSC II*) ("Plaintiffs have proved not only that the problematic applications of the Statute are neither hypothetical nor imaginary, but also that they are not isolated in scope.").

In earlier decisions, both this Court and the Third Circuit stressed that under intermediate scrutiny, the means chosen to further a substantial governmental interest did not need to be the least restrictive, but simply needed to be reasonable. This Court wrote:

> The law need *not* be the least–restrictive means of effectuating its underlying purpose if "the means chosen are not substantially broader than necessary to achieve the government's interest." [*Ward v. Rock Against Racism*], 491 U.S. [781], 800, 109 S.Ct. 2746 [(1989)]. Rather what is required "is a 'fit' between the legislature's ends and the means chosen to accomplish those ends...a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (internal quotation marks and citation omitted).

*Free Speech Coalition, Inc. v. Holder,* 957 F. Supp.2d 564, 589 (E. D. Pa. 2013) (emphasis *sic*).

The Third Circuit echoed that conclusion in *FSC II*:

> Narrow tailoring does not require that the regulation be "the least restrictive or least intrusive" means of achieving "the government's legitimate, content–neutral interests." *Ward*, 491 U.S. at 798, 109 S.Ct. 2746. Instead, "[n]arrow tailoring is satisfied where the statute at issue does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *FSC I*, 677 F.3d at 536 (quoting *Ward*, 491 U.S. at 799, 109 S.Ct. 2746).

*FSC II*, 787 F.3d at 152. *See also, id.* at 157, 165 n.18; *Free Speech Coal., Inc. v. Attorney General*, 677 F.3d 519, 535 (3rd Cir. 2012) (*FSC I*).

Using that measure, this Court concluded that the statutory scheme was "reasonable," which, under intermediate scrutiny, was good enough. 957 F. Supp.2d at 590–91, 591–92, 595.

The Third Circuit likewise found the statutes constitutional under intermediate scrutiny,

2

although recognizing that a significant number of their applications unnecessarily burdened protected speech. *FSC II*, 787 F.3d at 157. The court— stressing that "time and again we have stated that under intermediate scrutiny, the Government need not employ the least restrictive or least intrusive means"— proceeded to evaluate the burdens on Plaintiffs' speech and then balance them against the Government's interest to find that the statutes were narrowly tailored. *Id.* at 158–59.

To survive strict scrutiny, however, the statutes must:

(1) serve a compelling governmental interest; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive means of advancing that interest. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).

*Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181, 190 (3rd Cir. 2008). Strict scrutiny's narrow tailoring inquiry requires an evaluation of the fit between a law's means and the interest it aims to advance in terms of whether there are effective, alternative ways of advancing the governmental interest that are less restrictive of speech. *FSC III*, 825 F.3d at 164.

Requiring the statutes to be evaluated under strict scrutiny changes the overbreadth analysis as well. *FSC III*, 825 F.3d at 164 n.11 ("We remand both the as–applied and overbreadth claims, as the level of scrutiny is a key factor in both as–applied and overbreadth challenges."). The statutes must be assessed to judge whether, on their face, they unnecessarily burden a substantial amount of protected expression. *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 244 (2002). That analysis "hinges on how broadly [the statutes] can be construed." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

Here, as in *Stevens*, Plaintiffs' facial overbreadth challenge to the statutes does not rest on "factual assumptions...that can only be evaluated in the context of an as–applied challenge." *Id.* at 473 n.3. Rather the statutes' sweep is measured by posing "reasonable but challenging hypotheticals." *United States v. Stevens*, 533 F.3d 218, 236 n.16 (3d Cir. 2008) (en banc), *aff'd*, 559 U.S. 460 (2010).

3

The amount of speech swept within the statutes' restrictions is then compared with the sweep of less restrictive alternatives.

The overbreadth analysis is closely allied with the narrow tailoring inquiry under strict scrutiny. *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 266 (3d Cir. 2003), *aff'd and remanded*, 542 U.S. 656 (2004). Supreme Court precedent illustrates the point.

In *United States v. Alvarez,* the Court, in assessing the constitutionality of the content–based Stolen Valor Act, measured its sweep. 132 S.Ct. 2537, 2542 (2012). It found the Act not only applied to Mr. Alvarez's "lie ...made at a public meeting," but applied "with equal force to personal, whispered conversations within a home." *Id.* 2547. The Act, the Court found, sought "to control and suppress all false statements on this one subject in almost limitless times and settings." *Id.* at 2547. It went on to conclude that the Government had failed to show that the Stolen Valor Act was the "least restrictive means among available, effective alternatives" in protecting the integrity of the military honors system and therefore, was unconstitutional. *Id.* at 2251.

In *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, the Court assessed whether the content–based Son of Sam law was narrowly tailored to advance its compelling interest in compensating victims from the fruits of the crime. 502 U.S. 105, 120–21 (1991). The Court focused on the "wide range of literature"—including The Autobiography of Malcolm X and works by Thoreau and St. Augustine—subject to the law's sweep that did "not enable a criminal to profit from his crime while a victim remains uncompensated" to conclude that it was not narrowly tailored to achieve its objective. *Id.* at 121–23.

In *United States v. Stevens*, the Court construed the federal statute criminalizing depictions of animal cruelty to determine that it applied to hunting videos and periodicals, depictions of livestock slaughter, and pictures of bullfighting. 559 U.S. 460*,* 476-78 (2010). The Government, nonetheless,

argued the law "was narrowly tailored to reinforce restrictions on the underlying conduct, prevent additional crime arising from the depictions, or safeguard public mores." *Id.* at 481. The Court rejected that argument, finding the law did not advance those objectives when applied to "depictions that are presumptively protected by the First Amendment." *Id.* It concluded the law was "substantially overbroad, and therefore invalid under the First Amendment." *Id.* at 482.

Similarly, in *Ashcroft v. Free Speech Coalition, Inc.,* the Court examined the sweep of the content–based Child Pornography Prevention Act and found that works such as *Romeo and Juliet* and acclaimed films, like *Traffic* and *American Beauty*, fell under its ambit. 535 U.S. at 247-48. The Court determined the Act "cover[ed] materials beyond" child pornography and obscenity and "abridged the freedom to engage in a substantial amount of lawful speech." *Id.* at 256. "For [that] reason," the Court concluded, the Act was "overbroad and unconstitutional." *Id. See also, Mukasey*, 534 F.3d at 202-04; *Brown v. Entertainment Merchants Ass'n,* 564 U.S. 786, 798-804 (2011); *Sable Communications v. FCC,* 492 U.S. 115, 126–31(1989); *Stevens*, 533 F.3d at 233–34.

## I.     THE STATUTES DO NOT SURVIVE STRICT SCRUTINY.

The Government bears the burden of demonstrating that the statutes satisfy strict scrutiny. *Playboy*, 529 U.S. at 817. It "must specifically identify an 'actual problem' in need of solving, *Playboy*, 529 U.S., at 822–823, 120 S.Ct. 1878, and the curtailment of free speech must be actually necessary to the solution, s*ee R.A.V.* [*v. City of St. Paul*, 505 U.S. 377], 395, 112 S.Ct. 2538 [(1992)]."*Entertainment Merchants Assn.*, 564 U.S. at 799. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813.

### A.     The Statutes Must Be Evaluated Against the Government's Interest in Preventing Minors from Being Used in the Production of Sexually Explicit Material.

The statutes are aimed at the Government's interest in preventing "producers of sexually

explicit materials from depicting minor performers, either purposefully or inadvertently." *FSC II*, 787 F.3d at 156. There is no dispute that interest is compelling. *FSC III*, 825 F.3d at 164 n.11.

It is that interest against which the statutory provisions must be measured. *See Simon & Schuster*, 502 U.S. at 119–20. Much of the evidence in this case concerned the quantity of expression depicting youthful–looking adults in sexually explicit expression. But that expression should not be confused with the target of the statutes—that is, expression depicting *minors*.

Sexual imagery depicting minors is unprotected speech. That is so, because the images themselves are the product of child sexual abuse. *New York v. Ferber*, 458 U.S. 747, 761 (1982). *"Ferber's* judgment about child pornography was based on how it was made, not on what it communicated." *Ashcroft*, 535 U.S. at 250–51. In contrast, sexually explicit expression depicting young adults over the age of 18 is fully protected by the First Amendment. *Ashcroft*, 535 U.S. at 251, 264.

That distinction must be kept in mind when evaluating the constitutionality of the two statutes here. Failing to preserve that distinction threatens to "take[] the effect of the statute"—verifying the age of adults appearing in sexually explicit expression to assure they are not minors—"and [to] posit[] that effect as the State's interest." *Simon & Schuster*, 502 U.S. at 120. That type of "circular defense" of the statutes sidesteps proper judicial review. *Id.*

**B.    The Government Has Failed to Prove that Adult Film Makers Have Ever Used Minors in Their Productions, Which Was the Problem the Statutes Were Ostensibly Enacted to Address, and the Unrebutted Evidence is That They Have Never Done So.**

The Court in *Alvarez* stressed: "[T]o recite the Government's compelling interests is not to end the matter." *Alvarez*, 132 S.Ct. at 2549. It explained:

> The First Amendment requires that the Government's chosen restriction on the speech at issue be "actually necessary" to achieve its interest. *Entertainment Merchants Assn.*,

> 564 U.S., at ___, 131 S.Ct., at 2738. There must be a direct causal link between the restriction imposed and the injury to be prevented. See *ibid.*

*Id.* Therefore, "[t]he [Government] must specifically identify an 'actual problem' in need of solving," and demonstrate "a direct causal link" between the expression sought to be regulated and the harm it seeks to remedy. *Entertainment Merchants Assn.*, 564 U.S. at 799.

Under strict scrutiny, a legislature's "predictive judgments," or "ambiguous proof," will not suffice to satisfy the Government's burden to produce evidence of the "actual problem" or of a direct causal link between it and the expression sought to be regulated. *Id.* at 799-800. *See also, McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1452 (2014) ("We 'have never accepted mere conjecture as adequate to carry a First Amendment burden.'" (citation omitted)).

The Third Circuit articulated the specific problem the statutes sought to address:

> Despite...direct prohibitions on child pornography, producers of sexually explicit materials continued to utilize youthful–looking performers....Law enforcement was viewed as ill–equipped to visually determine these performers' ages, and, as a consequence, the risk that children were being used in pornographic materials remained.

*FSC III*, 825 F.3d at 154 (citations omitted). The problem Congress sought to address was not the use of youthful–looking adult performers in sexually explicit expression, but rather the *risk* that "children were being used in pornographic materials." So in order to satisfy strict scrutiny, the Government must prove that the adult film industry's use of youthful–looking performers in many of their productions has actually and directly led to the use of minors in those productions. *Playboy,* 529 U.S. at 819; *Entertainment Merchants Ass'n*, 564 U.S. at 800. The record, however, establishes no such thing.

Judge Rendell's concurrence in *FSC I* provides a succinct summary of the legislative record in support of the statutes:

> [T]he evidence and reasoning set forth in the Pornography Report regarding the
> recordkeeping requirements are quite thin. The Report finds in some detail that the
> type of child pornography that persisted after federal and state bans were enacted was
> distinct from the adult–entertainment industry, mostly non-commercial in nature, and
> involved people who were unlikely to be deterred by criminal sanctions. *See, e.g.*,
> Pornography Report 406 ("[T]he industry of child pornography is largely distinct from
> any aspect of the industry of producing and making available sexually explicit
> materials involving adults."); *id.* at 410 ("The greatest bulk of child pornography is
> produced by child abusers themselves in largely 'cottage industry' fashion, and thus
> child pornography must be considered as substantially inseparable from the problem
> of sexual abuse of children."); *id*. at 610 ("Wholly commercial operations appear to
> be extremely unusual...."); *id*. ("However strong the criminal law, sexual exploitation
> of children is likely to remain an irresistible temptation for some."). The
> recommendation that Congress enact a recordkeeping statute, by contrast, grew out
> of an observation that commercial pornographers use models that look "young as
> possible," *id*. at 855, and an assertion that "[t]he growth of pseudo child pornography
> has made it increasingly difficult for law enforcement officers to ascertain whether an
> individual in a film or other visual depiction is a minor," *id*. at 618. The Report does
> not cite any evidence of the use of performers who are actually underaged or the
> asserted law–enforcement difficulties.

*FSC I*, 677 F.3d at 546 n.1.

Although Congress's " predictive judgment" may suffice to satisfy intermediate scrutiny, it

is not sufficient to satisfy strict scrutiny's demands. The Court in  *Entertainment Merchants Assn.,*

explained:

> The State must specifically identify an "actual problem" in need of solving, *Playboy,*
> 529 U.S., at 822-823, 120 S.Ct. 1878, and the curtailment of free speech must be
> actually necessary to the solution, see *R.A.V., supra,* at 395, 112 S.Ct.
> 2538....California cannot meet that standard. At the outset, it acknowledges that it
> cannot show a direct causal link between violent video games and harm to minors.
> Rather, relying upon our decision in *Turner Broadcasting System, Inc. v. FCC*, 512
> U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), the State claims that it need not
> produce such proof because the legislature can make a predictive judgment that such
> a link exists, based on competing psychological studies. But reliance on *Turner
> Broadcasting* is misplaced. That decision applied *intermediate scrutiny* to a content-
> neutral regulation. *Id.* at 661–662, 114 S.Ct. 2445. California's burden is much higher,
> and because it bears the risk of uncertainty, see *Playboy, supra,* at 816–817, 120 S.Ct.
> 1878, ambiguous proof will not suffice.

564 U.S. at 799–800 (emphasis *sic*).

At the trial of this case, the Government focused its evidence—not on the appearance of minors in sexually explicit expression—but rather on the appearance of young adults in that expression. The latter is constitutionally protected, the former is not. *See Ashcroft*, 535 U.S. at 251 (expression depicting "a person over the statutory age who perhaps looked younger" is fully protected under the First Amendment). It is the appearance of minors in sexually explicit expression that forms the basis of the Government compelling interest, however, and is the asserted problem the statutes were designed to address. The Government introduced no evidence that the use of young adults in the commercial production of sexually explicit expression has actually resulted in the depiction of underage performers.

The Government's case is, therefore, built on a sleight of hand. It has taken the effect of the statutes—verification that young adults appearing in sexually explicit expression are of age—and posited that as its interest. And based on that re-stated interest, the Government argues, the prevalence of young adults in that expression demonstrates proof of the problem. But that was the very strategy rejected by the Supreme Court in *Simon & Schuster*, 502 U.S. at 510–11. Again, the actual problem the Government must prove is the prevalence of *minors* in sexually explicit expression, not the prevalence of young adults.

The record here is even thinner than the one the Court in *Playboy* found wanting.  In determining the Government had failed to establish proof of the prevalence of exposure of sexually images as a result of signal bleed[2] to children—which was the harm the challenged regulation sought to address—the Court discussed the insufficiency of  the evidence:

There is little hard evidence of how widespread or how serious the problem of signal

---

[2]  "Signal bleed" is the audio and video portions of scrambled television programs that might be heard or seen. *Playboy*, 529 U.S. at 806.

bleed is. Indeed, there is no proof as to how likely any child is to view a discernible explicit image, and no proof of the duration of the bleed or the quality of the pictures or sound. To say that millions of children are subject to a risk of viewing signal bleed is one thing; to avoid articulating the true nature and extent of the risk is quite another. Under § 505, sanctionable signal bleed can include instances as fleeting as an image appearing on a screen for just a few seconds. The First Amendment requires a more careful assessment and characterization of an evil in order to justify a regulation as sweeping as this. Although the parties have taken the additional step of lodging with the Court an assortment of videotapes, some of which show quite explicit bleeding and some of which show television static or snow, there is no attempt at explanation or context; there is no discussion, for instance, of the extent to which any particular tape is representative of what appears on screens nationwide.

*Playboy,* 529 U.S. at 819. In short, the Court found: "The Government has presented evidence of only a handful of isolated incidents over the 16 years since 1982 when Playboy began broadcasting."*Id.* at 820.

The Court in *Playboy* also discounted a spreadsheet produced by the Government that was meant to evidence the potential exposure of children to signal bleed. It found that evidence unpersuasive. While the spreadsheet presented the *potential* of such exposure, it did not demonstrate the number of households *actually* exposed to signal bleed, and therefore, the Court found it failed to show the actual extent of the problem. *Id.* at 820.

Those same shortcomings are present here. While the Government introduced hundreds of images of sexually explicit conduct depicting youthful–looking adult performers, not a single one depicted a minor. *See e.g.,* Defendant's Exhibits 31, 32, 33, 63, 85, 124, 125, 126, 128. And while the Government offered evidence of the prevalence of youthful–looking *adults* in adult films, it offered no evidence regarding the prevalence of *minors* in that material. Like the Government in *Playboy*, it failed to satisfy its burden of producing evidence of the actual problem the statutes were intended to address. *See e.g.* Testimony of Gail Dines, (Doc. No. 223) at 43, 45, 101.

The testimony of Janis Wolak, the Government's expert on child pornography, supplied the

10

reason for this lack of evidence. She testified that the majority of child pornography is produced by family members or acquaintances like coaches, youth group leaders, priests and neighbors, as the legislative record reflected,[3] and that it is distributed—not commercially, but via peer to peer networks. (Doc. 224), Wolak at 59–60, 63.

The statutes' enforcement history—or more accurately, absence of an enforcement history—underscores the non-existence of the problem in commercially produced movies. Not a single prosecution has been brought under 18 U.S.C. § 2257A. As for 18 U.S.C. § 2257, between 2002 and 2015, the number of prosecutions brought for violating its provisions total **nine**. Plaintiffs' Exhibit 113 (Data for 2002 through 2012); U.S. Department of Justice Report to Congress, April 2016, Appendix A: Prosecution Accomplishments Summary-All Project Safe Childhood Statutes, attached (Data for 2011 through 2015).

In addition to failing to demonstrate the actual problem the statutes were enacted to address, the Government has failed to offer evidence establishing "a direct causal link" between the production of adult movies and the production of child pornography. *Entertainment Merchants Ass'n*, 564 U.S. at 800. The Court in *Entertainment Merchants Ass'n* determined the Government's evidence had demonstrated "at best some correlation" between violent video games and harmful effects on children, which was not enough to carry its burden. *Id.* Here, the evidence fails to make even that showing.

The unrebutted evidence produced by Plaintiffs demonstrated that adult film makers and photographers creating sexually explicit expression commercially simply do not use, and never have used, underage performers in their work.

---

[3] *See* 152 Cong. Rec. H5724 (2006) (Statement of Congressman Pence that child pornography is often produced "by family members, family friends, caretakers and other trusted individuals who violate that trust.").

11

Jeffrey Douglas, the Chair of the Board of Directors of the Free Speech Coalition, whom this Court credited as an attorney with "a lot of expertise in the background of the [adult entertainment] industry," (Doc. 226) at 88-89, explained that the Free Speech Coalition and its members universally condemn child pornography. (Doc. 220), Douglas at 75. They are dedicated to its eradication, have encouraged enforcement of the laws against the use of minors, and have offered rewards for tips used in successfully prosecuting it. *Id.* at 75–77. *See also* (Doc. 222), Levine at 40 ("[T]he general consensus was that anybody using minors should be covered in honey and tied to an ant hill."); (Doc. 223), Nitke at 136–37 ("Well, not only did they not have an interest, I think they would have been appalled... it's just something they wouldn't tolerate.").

Even before the enactment of the statutes, Douglas explained, adult film producers checked identification documents and secured model releases from their performers, as a matter of industry practice. (Doc. 220), Douglas at 77. Plaintiff Marie Levine, who has been a performer in adult movies since 1984, confirmed that checking performers' IDs has been a standard industry practice since the 1980s.  (Doc. 222), Levine at 37–39, 58.[4] And Barbara Nitke, who began her career taking still photographs on the sets of sexually explicit films in 1982, testified that on each of the sets of the 20 or 30 producers for whom she worked, it was standard practice to verify that a performer was an adult by requiring two forms of identification and photographing that documentation. (Doc. 223), Nitke at

---

[4]  While the earliest iteration of 18 U.S.C. § 2257 was adopted in 1988, the statute became the subject of a pre-enforcement challenge, and its enforcement was enjoined as unconstitutional under the First and Fifth Amendments. *Am. Library Ass'n v. Thornburgh*, 713 F. Supp. 2d 469 (D.D.C. 1989). In response, Congress amended the statute to address the constitutional defects identified by the D.C. district court in 1990. The amended version was challenged as well, but was upheld. *Am. Library Ass'n v. Reno*, 33 F.3d 78 (D.C. Cir. 1994) *cert. denied*, 515 U.S. 1158 (1995). Regulations implementing the statute did not take effect until 2005. Thus, the adult industry's practice of verifying the ages of its performers was in place long before the statutes began to be enforced.

134–36.

In thirty years of involvement with the industry, Douglas testified that he knew of only a handful of cases in which underage performers had appeared in sexually explicit productions. (Doc. 220), Douglas at 78–81. In each instance, the underage performer gained access to the production by use of a real, but nonetheless, fraudulent identification document. *Id.* at 81.

Douglas explained that using a minor in a movie would have devastating consequences for a producer. Use of an underage performer exposes the producer to criminal prosecution under the child pornography laws and requires it to recall all the material in which an underage performer appears and to destroy it, to notify everyone to whom it was sold that it is contraband, to follow the procedures for recalling contraband, and to provide credit for the material to all to whom it was sold. *Id.* at 82–83. It eliminates good will between the producer and its customers and gives a leg up to the producer's competitors. *Id.* at 83. Therefore, commercial producers have "enormous disincentives" to use underage performers—without 18 U.S.C. §§ 2257, 2257A. *Id.* at 83–84. *See also* (Doc. 222), Levine at 58–59.

Douglas testified that it would be "utterly mindless" for a person in the business of producing sexually explicit expression to use a performer who had not yet reached 18 years of age. *Id.* The Supreme Court made that same point in *Ashcroft*: "Few pornographers would risk prosecution abusing real children if fictional, computerized images would suffice." 535 U.S. at 254.

The individual Plaintiffs also testified they were emphatically opposed to the use of minors in the creation of sexually explicit expression and had always taken measures to verify that the subjects of their work were adults—absent the statutes' requirements. (Doc. 220), Wilson at 211; (Doc. 221), Steinberg at 114, 124, 138-39; (Doc. 221), Ross at 160, 188–89; (Doc. 221), Alper at 224, 230, 231, 245; (Doc. 222), Levine at 39–40, 49, 72, 73; (Doc. 222), Levingston at 88, 99; (Doc. 223),

Nitke at 141, 166–67, 174, 186.

The Government did not dispute their testimony.

### C.     The Statutes Are Not Narrowly Tailored.

Strict scrutiny's narrow tailoring requirement requires a tighter fit than that of intermediate scrutiny. The Third Circuit's opinion in *FSC II* helps illustrate the differences between the two.

In *FSC II*, the court began by stressing that the statutes did not ban speech, but simply burdened it—a fact it deemed significant under intermediate scrutiny:

> That the Statutes' requirements here do not operate as a ban on the speech in which Plaintiffs would engage weighs in favor of finding those regulations narrowly tailored....*See Hill v. Colorado*, 530 U.S. 703, 726, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) ("[W]hen a content–neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal.").

787 F.3d at 154–55.

Under strict scrutiny, however, whether a regulation imposes a ban or a burden is not significant. "It is of no moment" that a content–based regulation of speech "does not impose a complete ban." *Playboy*, 529 U.S. at 812. The difference between laws burdening speech and laws banning it "is but a matter of degree." *Id.* "The Government's content–based burdens must satisfy the same rigorous scrutiny as its content–based bans." *Id. See also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 571 (2001) (striking down limitations on advertising of tobacco under the First Amendment).

The Third Circuit went on to gauge the statutes' universally applied age–verification requirement under intermediate scrutiny. It began by noting that "requiring identification and recordkeeping for clearly mature adults does nothing to prevent children from appearing in sexually explicit expression," and rejected "the Government's contention that age–verification for all

14

performers regardless of their actual age furthers the Government's interest." *FSC II*, 787 F.3d at 156–57. The court noted "the Government's own expert testified that at a certain advanced age, no individual could be mistaken for a minor." *Id.* Therefore, it concluded, the Government had "not established that imposing some age cutoff would necessarily undermine the Statutes' effectiveness in preventing the exploitation of children." *Id.* It wrote:

> [T]he difficulties in accurately calculating age by sight alone justifies some of the Statutes' prophylactic reach, but the Statutes' burdens do not advance the Government's interest when imposed on performers whom no reasonable person could mistake for a minor.

*Id.*

Acknowledging that flaw would prove fatal under strict scrutiny's "least restrictive means" requirement, the court explained why it was not, under intermediate scrutiny:

> This observation does not mean, however, that the Statutes are not narrowly tailored as applied to these Plaintiffs. Indeed, time and again we have stated that under intermediate scrutiny, the Government need not employ the least restrictive or least intrusive means.... "So long as the means chosen are not *substantially* broader than necessary to achieve the government's interest, ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less–restrictive alternative." *Ward*, 491 U.S. at 800, 109 S.Ct. 2746 (emphasis added).

*Id.* (emphasis *sic*).

Applying that lesser level of scrutiny, the court found that the testimony of the Government's expert that "generally most minors could not be mistaken for a 25–year–old adult," failed to demonstrate that the Government's interests were not, in fact, furthered by applying the regulations to performers over the age of 25. *Id.* at 157–58. As for the expert's testimony that the "rare minor could appear up to 30 years old," the court wrote: "[W]e need not address whether the Government in a different case and on a different record can prove that requiring identification even for performers who appear over 30 helps protect children." *Id.* at 158 n.9.

But that is what the Government must now prove—in this case and on this evidentiary record.[5] The record does not permit that showing, however. Rather, it "demonstrate[s] that the number of performers to whom the Statutes apply, yet for whom requiring identification does not protect children, is not insignificant." *Id.* at 158. It additionally demonstrates the existence of the "universe of private sexually explicit images...that depict only clearly mature adults," to which the statutes' application would not help to protect children. *Id.* at 164.

The record is replete with applications—not hypothetical, but actual and concrete—to expression that in no way serves the protection of children. Specifically, the statutes apply to images of people who are palpably mature adults, well beyond the age of majority, Plaintiffs' Exhibit 60; private expression between husbands and wives, Plaintiffs' Exhibit 43; sexting between partners; communications on private adult social networking websites, Plaintiffs' Exhibit 116; and all manner of artistic, educational, and journalistic expression, Plaintiffs' Exhibit 37, bearing no relation to, nor resemblance to child pornography, and all of which are "presumptively protected by the First Amendment but remain subject to" the statutes' criminal restrictions. *Stevens*, 559 U.S. at 481.

The Plaintiffs produced a large body of their own work depicting sexuality that was in no way related to child pornography: the photojournalism of Barbara Alper documenting sexual behavior in the 1970s, Plaintiffs' Exhibit 43; the feminist expression of Betty Dodson and Carlin Ross regarding female orgasm and shame associated with genitalia, Plaintiffs' Exhibits 45–52; the fine art of David Steinberg examining sex between the "non-glamorous," Plaintiffs' Exhibits 60–62; the journalism of Thomas Hymes reporting on the adult industry, Plaintiffs' Exhibit 64; the photographs of David Levingston connecting the beauty of the female figure with nature, Plaintiffs' Exhibits 65–68; Barbara

---

[5] The Government has chosen not to supplement the record with any additional evidence.

16

Nitke's photographic examination of sadomasochism, Plaintiffs' Exhibits 70–73; the educational videos on a range of sexual health topics by Sinclair Institute, Plaintiffs' Exhibits 74–108, and by Marie Levine, Plaintiffs' Exhibit 69; and the political expression of Carol Queen. (Doc. 221), Queen at 62.

The evidence demonstrated that the greatest portion of Plaintiffs' work depicted adults who were well beyond the age at which, the Government's expert admitted, a person would rarely be confused as a minor: 76% of Steinberg's models were at least 30 years old or older; 66.03% of Sinclair Institute's performers were 30 years old or older; the same is true for 59.7% of Marie Levine's, 55% of Betty Dodson and Carlin Ross's, and 52.63% of Nitke's–with the "vast majority" of Carol Queen's subjects in their "30s and 40s." *FSC II*, 787 F.3d at 158. In fact, in 25 DVDs produced by Vivid Videos, a major adult film producer who is a member of the Free Speech Coalition, roughly 43% of the performers were 30 years old or older. (Doc. 220), Douglas at 123; (Doc. 222), Vecchio at 142; Defendant's Ex. 314A.

Based on this record, the Third Circuit concluded that the statutes imposed a significant number of problematic applications that were neither hypothetical nor imaginary, nor isolated in scope. *FSC III*, 825 F.3d at 158; *FSC II*, 787 F.3d at 164.

The statutes' overreach is further magnified by their application to individuals who play no part in the production of sexually explicit expression. Secondary producers—who only publish or reproduce sexual imagery created by others—must, nevertheless, obtain photo identification of the persons depicted in it—even if the expression is a movie featuring performers like 54–year–old Marie Levine who has performed in adult films for decades—or face criminal prosecution under the law. The statutes, therefore, have the same flaw the Court in *Ashcroft* found unconstitutional: they restrict "speech in the hands of subsequent possessors, making possession unlawful even though the content

17

otherwise would not be objectionable." 535 U.S. at 242–43.

The statutes restrict "much more speech than is necessary to further Congress' compelling interest" and apply to "an inordinate amount of...speech and certainly cover[] more than just commercial pornographers."*Mukasey* , 534 F.3d at 193.

### D. The Statutes Do Not Employ the Least Restrictive Means.

The Government now bears the burden of proving that the statutes employ the "least restrictive means among available, effective alternatives." *Alvarez*, 132 S.Ct. at 2551, *quoting Am. Civil Liberties Union v. Ashcroft*, 542 U.S. 656, 666 (2004). Put another way, "[i]f the belt works as effectively as suspenders, then the Government cannot prosecute people for not wearing suspenders." *Mukasey*, 534 F.3d at 204.

The Supreme Court clarified the analysis in *Am. Civil Liberties Union.* 542 U.S. at 665–66. It explained that requiring Congress to choose the least restrictive means to accomplish its objective "ensures that the speech is restricted no further than necessary to achieve the goal, for it is important to assure that legitimate speech is not chilled or punished." *Id.* at 666. "For that reason," the Court explained, the inquiry "does not begin with the status quo of existing regulations, then ask whether the challenged restriction has some additional ability to achieve Congress' legitimate interest." *Id.* "Instead," the Court instructed, the inquiry must evaluate "whether the challenged regulation is the least restrictive means among available, effective alternatives." *Id. See Playboy*, 529 U.S. at 826–27; *Alvarez*, 132 S.Ct. at 2551. *See also McCutcheon*, 134 S.Ct. at 1458–59; *Entertainment Merchants Assn.*, 564 U.S. at 803.

It is not enough for the Government to simply claim that the alternatives were "impracticable and insufficiently comprehensive." *Alvarez*, 132 S.Ct. at 2551. The Third Circuit emphasized:

"[T]he burden is on the Government to prove that the proposed alternatives will not

18

be as effective as the challenged statute." *Id.* (citing *Reno*, 521 U.S. at 874, 117 S.Ct. at 2346). The Government's burden is "not merely to show that a proposed less restrictive alternative has some flaws; its burden is to show that it is less effective." *Id.* at 669, 124 S.Ct. at 2793 (citing *Reno*, 521 U.S. at 874, 117 S.Ct. at 2346).

*Mukasey*, 534 F.3d at 198.

There are a number of effective, less restrictive alternatives to the statutes' recordkeeping and labeling requirements that protect against the use of minors in the production of sexually explicit expression.

1.     Criminal laws prohibiting and punishing child pornography

The most obvious alternative for preventing producers' use of minors in sexually explicit expression are laws directly criminalizing that conduct and its depiction. There are numerous state and federal laws imposing "substantial...criminal penalties for creating and distributing child pornography, see generally 18 U.S.C. §§ 2251–2254, 2256; Pornography Report 602–08 (summarizing federal and state child pornography laws)...." *FSC I*, 677 F.3d at 547 (Rendell, J., concurring).The data demonstrates their effectiveness in confronting and meting out punishment for the sexual exploitation of children. Between 2002 and 2012, nearly 4,000 federal prosecutions were brought for child pornography offenses under 18 U.S.C. § 2252A. Plaintiffs' Exhibit 113. Between 2013 and 2015, more than 7,000 federal prosecutions were brought for child pornography offenses under 18 U.S.C. §§ 2251, 2252, 2252A. U.S. Department of Justice Report to Congress, April 2016, Appendix A: Prosecution Accomplishments Summary-All Project Safe Childhood Statutes, attached. Janis Wolak, the Government's expert on child pornography testified that the success rate of these federal prosecutions is "extremely high."(Doc. 224), Wolak at 61.

In addition to federal prosecutions, the enforcement efforts of each of the fifty states cannot be overlooked. The Final Report of the Attorney General's Commission on Pornography observed:

19

> The federal interest in protecting children, of course, is secondary to that of the states, which act as principal guardians against abuse or neglect of the young. It was indeed a **state** law substantially broader than the 1977 Act which prompted the landmark decision in *New York v. Ferber*. States are not limited, as is the federal government, to regulation of child pornography in or affecting interstate commerce; they have the power to prohibit **all** production and trafficking in such materials.

Final Report at 607 (emphasis *sic*).

The observations of the en banc Third Circuit Court in *Stevens* are, therefore, particularly apt here:

> [W]e have suggested that the compelling governmental interest should be redefined as "preventing cruelty of animals that state and federal statutes *directly* regulating animal cruelty under-enforce." And once this reformulation of the interest targeted by § 48 is accepted, we do not see how a sound argument can be made that the Free Speech Clause is outweighed by a statute whose primary purpose is to aid in the enforcement of an already comprehensive state and federal anti-animal cruelty regime.

533 F.3d at 233 (emphasis *sic*). Like the statute at issue in *Stevens*, the statutes' role in aiding an already comprehensive state and federal anti-child pornography regime cannot outweigh the Free Speech Clause. *See also McCullen v. Coakley*, 134 S.Ct. 2518, 2537-38 (2014) (cataloguing the various state laws already on the books that addressed the Commonwealth's interest in ensuring public safety, preventing harassment, and combating obstruction and that demonstrated the challenged law's failure to be sufficiently tailored even under intermediate scrutiny).

While more than 11,000 prosecutions have been brought under the substantive federal laws prohibiting the production, transfer and possession of child pornography between 2002 and 2015, a total of **nine** prosecutions were brought under 18 U.S.C.§ 2257 during that same time period. Plaintiffs' Exhibit 113; U.S. Department of Justice Report to Congress, April 2016-Appendix A: Prosecution Accomplishments Summary-All Project Safe Childhood Statutes, attached. And not a single prosecution has **ever** been brought under 18 U.S.C. § 2257A since its enactment. *Id. See also* Plaintiffs' Exhibit 110 (reporting that 29 inspections were performed under the statutes during which

recordkeeping violations were found, but no criminal charges were brought); Plaintiffs' Exhibit 112 (Defendant's supplemental answer to Plaintiffs' Interrogatories indicating that CEOS leadership had no knowledge of 2257 records being used in any child pornography case).

Enforcement of the sizeable arsenal of laws criminalizing child pornography is not only a less restrictive alternative to 18 U.S.C. §§ 2257, 2257A, but is a far more effective one.

2.      18 U.S.C. § 2257A (h)'s certification procedure

Another less restrictive alternative is found  in the statutory scheme itself—just as it was in *Playboy,* 529 U.S. at 823. *See also, Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 756 (1996).  18 U.S.C. § 2257A (h), permits Hollywood producers who, like adult film producers, maintain identification documents as a matter of industry practice, to certify to the Attorney General that they collect and maintain records containing their performers' names, addresses, and dates of birth, pursuant to industry standards in lieu of complying with the statutes' regime.  This certification procedure is a perfect example of a more targeted regulation that would serve the Government's interest in preventing the appearance of minors in commercially produced sexually explicit expression—allowing commercial producers to satisfy recordkeeping obligations by certifying they maintain records establishing their performers' ages, which, the evidence established, they do. (Doc. 220), Douglas at 77; (Doc. 222), Levine at 39; (Doc. 223), Nitke at 135–36. *See also, Burwell v. Hobby Lobby*, 134 S.Ct. 2751 (2014) (certification procedure allowing non-profits to exclude coverage for contraception serves as example of less restrictive measure that could be applied to accommodate religious convictions of closely held corporations under RFRA).

The certification option recognizes that Hollywood producers, as part of the practices and standards of the industry, already maintain records that verify their performers' ages. But as the unrebutted testimony of Jeffrey Douglas, Marie Levine, and Barbara Nitke demonstrate, so do adult

21

film producers. Therefore, if Congress is satisfied that the certification process is sufficient to accomplish its objective of preventing the use of underage performers in sexually explicit Hollywood films, there is no reason why it is not similarly sufficient with regard to the adult film industry, which follows a similar practice. The Government has offered no evidence demonstrating that the certification procedure would not be an effective alternative to the statutes' more restrictive requirements, as it must to prevail. *Mukasey*, 534 F.3d at 198.

       3.       Industry standards and intellectual property laws

Pre-existing industry standards and intellectual property laws are also effective, less restrictive alternatives to the statutes' content–based regulations, and therefore, doom the statutes for the same reason that the certification procedure dooms them. They are the "belt that works as effectively as [the statutes'] suspenders." *Id.* at 204.

Jeffrey Douglas testified that for years, it has been an industry practice to check identification documents and secure model releases. (Doc. 220), Douglas at 77. He explained the reasons why: the industry regards the use of minors as immoral and wrong, *id.* at 82; failure to verify the performer is an adult poses the risk that the producer will be subject to criminal prosecution, punishable by a mandatory 15–year prison term under federal law, *id* at 82, 83; any material created using a minor is contraband, which must be recalled, and for which a producer must provide credit to its customers who purchased it, *id.* at 83—which, in turn, affects the producer's reputation and good will and gives its competitors an advantage. *Id.*

Similarly, Eugene Mopsik, the Executive Director of the American Society of Media Photographers, testified that photographers uniformly require their models to execute releases in order to secure their rights to publish and license their work. A release executed by a minor, however, may be voidable. So to assure that the releases are legally binding, photographers verify that their models

are adults—not minors—who are bound by the release. (Doc. 220), Mopsik at 20-22. Mopsik explained: "[W]hen a photographer goes to a client, just part of the job is just creating the image. The other issues involve rights and clearances and permissions, and it's important that the photographer deliver a job to a client that he's then able to use." (Doc. 220), Mopsik at 21.

Photographers and movie producers must, therefore, confirm the age of their subjects to ensure they can earn money from their work.

In California, for instance, any person who "knowingly uses another's name, voice, signature, photograph, or likeness in any manner," without the subject's prior consent is subject to damages that include profits from such use, punitive damages, and attorney's fees. Cal. Civ. Code § 3344 (a). The statute provides that, in the case of a minor, the producer must obtain the prior consent of his parent or legal guardian. The minor's consent is insufficient to confer permission to use his likeness. *See also,* 17 U.S.C. § 204 (a) (requiring transfer of copyright ownership to be in writing).

Moreover, Cal. Fam. Code § 6710 provides that a minor may disaffirm a contract "before majority or within a reasonable time afterwards." That means, one who enters into a contract with a minor, does so "at his own risk." [6] *Berg v. Traylor*, 148 Cal. App. 4th 809, 816, 56 Cal. Rptr. 3d 140, 144 (2007). In *Berg*, the agent representing a ten–year old child television star learned about that risk the hard way—even though the child's parent had signed the contract with the agent and even though the contract contained a clause that expressly provided that the child would be liable for the agent's fees, notwithstanding any future action by the child to disaffirm the contract. *Id.* at 142. Finding that the child star was entitled to disaffirm the more than $500,000.00 in fees that an

---

[6] The only way a producer can avoid this risk is to submit the proposed contract with the minor to the superior court in which the minor resides, for approval of its terms and conditions. § 6751, Cal. Fam. Code.

arbitrator found were due and owing under the contract, the court stated:

> Sound policy considerations support this provision: "The law shields minors from their lack of judgment and experience and under certain conditions vests in them the right to disaffirm their contracts. Although in many instances such disaffirmance may be a hardship upon those who deal with an infant, the right to avoid his contracts is conferred by law upon a minor 'for his protection against his own improvidence and the designs of others.' It is the policy of the law to protect a minor against himself and his indiscretions and immaturity as well as against the machinations of other people and to discourage adults from contracting with an infant. Any loss occasioned by the disaffirmance of a minor's contract might have been avoided by declining to enter into the contract." (*Niemann v. Deverich* (1950) 98 Cal.App.2d 787, 793, 221 P.2d 178; *accord Burnand v. Irigoyen* (1947) 30 Cal.2d 861, 866, 186 P.2d 417.)

*Id.* at 818, 56 Cal Rptr. at 146.

The simple, common sense solution for a photographer or a film producer to protect the commercial value of his work is to verify that the performer is an adult, and if not, "to declin[e] to enter into the contract."

### 4. An age–verification law limited to persons who might reasonably appear to be underage

The Third Circuit explicitly rejected the contention that "age verification of all performers regardless of their actual age always furthers the Government's interest in preventing the sexual exploitation of minors." *FSC III*, 825 F.3d at 158. It observed:

> Requiring identification and recordkeeping for clearly mature performers does nothing to prevent children from appearing in sexually explicit materials because, by definition, a minor could not be mistaken for a clearly mature adult.

*FSC II*, 787 F.3d at 156.

The Court went on to explain:

> Here, given that the Government's own expert testified that at a certain advanced age, no individual could be mistaken for a minor, the Government has not established that imposing some age cutoff would necessarily undermine the Statutes' effectiveness in preventing the exploitation of children. Preventing all erroneous age determinations does not advance the Government's interest in combatting child pornography where even an error would not run the risk that a minor would appear in sexually explicit

24

materials.

*Id.* at 157.

A law requiring proof of age from only performers who might reasonably appear to be underage or who are younger than 30 years old would serve as an effective, less restrictive alternative to the statutes' universal application.

Dr. Francis Biro, the Government's expert on pubertal maturation, testified that there was a general age range where confusion about whether someone is an adult or a minor might exist. Generally speaking, Biro said, the age range where there might be confusion about whether someone *under* 18 might appear to be an *adult*, or whether someone *over* 18 might appear to be a *minor*, was between the ages of 15 and 24. (Doc. 227), Biro at 54–56. He agreed that generally speaking, 12– and 13–year olds will not be confused as adults, and most 14–year olds will not be confused as adults, either. *Id.* at 54-55. Biro further testified that generally speaking, someone who is 25–years old or older will not be confused as someone 17–years old or younger, and that nearly everyone who has reached the age of 30 will not be confused as a minor. *Id.* at 56.

Therefore, a law that tailors its restrictions to those who might reasonably appear to be minors or are under 30 years old constitutes an effective, less restrictive alternative to the statutes' chosen means of requiring proof of age from everyone. That approach is neither novel nor untested. Legislation regulating sales of tobacco and alcohol to minors does precisely that. *See e.g.,* N.Y. Pub. Health Law § 1399-cc (McKinney) (for sales of tobacco "identification need not be required of any individual who reasonably appears to be at least twenty-five years of age...."); 21 C.F.R. § 1140.14 (no age verification required for sale of tobacco for any person over the age of 26); Oregon Administrative Rule 845-006-0335 (requiring age verification if person appears to be under the age of 26 for sale of alcohol); Me. Rev. Stat. tit. 28-A, § 706 (prohibiting sale of alcohol to anyone under

the age of 27 unless age verified by photo identification); Me. Rev. Stat. tit. 22, § 1555-B (same re: tobacco).

5.      A law limited to commercial productions

The Third Circuit found the statutes applied to sexually explicit expression "including private, non-commercial depictions created and viewed by adults in their homes." *FSC I,* 677 F.3d at 583. It determined "there is some substantial amount of private sexually explicit images that the Statutes burden unnecessarily," and  Plaintiffs had demonstrated the existence of a universe of this expression that depicts "only clearly mature adults." *FSC II*, 787 F.3d at 163, 164. That finding, under strict scrutiny, sounds the death knell for the statutes.

Private explicit photos or videos created by husbands and wives or adult partners as part of their sexual relationship do not present a risk to minors. An adult taking a photo of herself knows her own age without the need to check identification; the same is true of adult partners who are on intimate enough terms such that they share explicit imagery with one another. Requiring them to produce and maintain age–verification records and to label their intimacies with the location of those records adds nothing to the fight against child pornography.

Therefore, a law imposing recordkeeping requirements only on commercial producers  would be a less restrictive means to accomplish the Government's interest in protecting the appearance of underage performers in sexually explicit expression.

6.      A law  limited to "primary producers" of sexually explicit expression—as opposed to "secondary producers" who simply publish or reproduce it.

A law that limits its application to persons who actually produce expression—"primary producers," in the parlance of the statutes—who are in the best position to evaluate and verify a performer's age is an effective, less restrictive alternative. The statutes, however, impose

26

recordkeeping obligations on people far removed from its actual production— "secondary producers," who publish images made by others. A "secondary producer" is any individual or entity who "produces, assembles, manufactures, publishes, duplicates, reproduces or reissues" a visual depiction of sexual imagery for commercial distribution. 28 C.F.R. § 75.1 (c)(2).

Plaintiff Thomas Hymes is an example of a secondary producer. He created a website with the intent of publishing news, commentary, and other content covering the adult industry. If he wishes to illustrate a news article with a photo or include a video clip as part of a movie review that contains sexually explicit content, Mr. Hymes is required to obtain copies of the photo identification of the performers depicted in those photos or videos. It does not matter that the persons depicted are well–known—and obviously adult—film celebrities. He must obtain and maintain the requisite records—with the requisite indices and cross-referencing—in order to publish those depictions, or face the risk of prosecution. The same is true of Sinclair Institute, who is both a primary and secondary producer, and numerous Free Speech Coalition members who are secondary producers as well. (Doc. 220), Douglas at 75, 90–92, 122; (Doc. 220), Wilson at 212.

The indexing and cross–referencing demands of the regulations implementing the statutes are a nightmare for secondary producers who are wholesalers. Wholesalers acquire videos from "scores of different sources." (Doc. 220), Douglas at 90. If a performer appears in 30 different films, which come from 10 different studios, the wholesaler has to cross–reference multiple studios. *Id.* Add to that the challenge of obtaining separate records for the thousands of video covers that appear on a wholesaler's website. While producers maintain a file of records for all the performers who appear in a film, they do not maintain separate records for the performers depicted only on the covers of the videos. So they will provide records of all the performers in the film to the wholesaler. The problem is, the statutes require the wholesaler to segregate the requisite records from all other records. 28 CFR

27

§ 75.2 (e) ("Records required to be maintained under this part shall be segregated from all other records, shall not contain any other records, and shall not be contained within any other records."). That poses an "enormous" problem that is "almost insurmountable." (Doc. 220), Douglas at 93

Requiring secondary producers, who have no role in creating the expression and thus no control in preventing the use of minors in its production, to jump through these hoops is far from the least restrictive means of advancing the Government's interest in protecting children.

7.      A recordkeeping law enforced by administrative sanction

Congress has enacted laws that require businesses to keep records in connection with their operations, which are enforced through administrative action. *See e.g.* 8 U.S.C. § 1324a (e)(5) (imposing duty on employers to examine identification documents for every hired employee and administrative penalties for failure to create and preserve I-9 forms and associated records, but *not* criminalizing otherwise lawful employment). Paperwork violations under these regimes are enforced by administrative sanction, rather than felony prosecutions.  Against the dense backdrop of criminal laws prohibiting the use of underage performers in sexually explicit expression, this less restrictive means effectively insures that producers will verify their performers' ages and maintain copies of their identification documents—particularly since maintaining age–verification records has been a uniform practice of adult film producers for decades.

## II.      THE STATUTES ARE UNCONSTITUTIONALLY OVERBROAD.

The Government bears the burden of rebutting the presumption that a law restricting expression based on its content is invalid. *Stevens,* 559 U.S. at 468.

In remanding the case, the Third Circuit stated it was remanding both the as–applied and overbreadth claims, "as the level of scrutiny is a key factor in both as–applied and overbreadth challenges." *FSC III*, 825 F.3d at 164 n.12, citing *Conchatta Inc. v. Miller*, 458 F.3d 258, 267 (3rd

Cir. 2006).

The overbreadth analysis is "akin to the portion of the strict scrutiny analysis" measuring whether the statutes are narrowly tailored. *Am. Civil Liberties Union*, 322 F.3d at 266. "Overbreadth analysis—like the question whether a statute is narrowly tailored to serve a compelling governmental interest—examines whether a statute encroaches upon speech in a constitutionally overinclusive manner." *Id.* That analysis under strict scrutiny requires a comparison of the amount of speech unnecessarily "encroached upon" by the statutes with the amount of speech affected by less restrictive alternatives. And that comparison demonstrates that the statutes "encroach[] upon a significant amount of protected expression beyond that which the Government may target constitutionally" in preventing the appearance of minors in sexually explicit expression. *Id.* at 266–67.

The statutes apply to sexually explicit expression—actual and simulated—without regard to the actual or apparent age of the person depicted. They apply to private expression—sexting, bedroom videos and portraits, posts on member–only adult websites—produced by husband and wives, life partners, and adults seeking romance. They apply to artistic expression, educational expression, political expression, journalistic expression. The universe of the statutes' application is broad and expansive.

When that universe is compared to the amount of speech regulated by available, effective less restrictive alternatives, the statutes' overbreadth becomes clear.

Federal and state laws criminalizing child pornography apply only to sexually explicit expression depicting minors. By comparison, the statutes encroach upon a substantial amount of constitutionally protected expression.

A recordkeeping law that applies only to youthful looking adults who might reasonably appear to be minors or adults under a certain age—who are nonetheless well beyond the age of

29

majority—leaves constitutionally protected expression depicting mature adults (which according to the Government's expert, Dr. Dines, constitutes two-thirds of commercially produced sexually explicit expression, (Doc. 223), Dines at 99-102) unburdened. Again, by comparison the statutes' universal application encroaches upon a significant amount of constitutionally protected speech.

A recordkeeping law that applies only to commercial producers leaves private expression unburdened—unlike the statutes here that apply to intimate, personal expression exchanged by lovers.

Compared to any of these less restrictive alternatives, the statutes encroach upon an intolerable amount of protected expression. They are, therefore, unconstitutionally overbroad. *See Stevens,* 559 U.S. at 482; *Ashcroft,* 535 U.S. at 256, 258; *Entertainment Merchants Assn.,*, 564 U.S. at 804.

## III.   THE FREE SPEECH COALITION AND THE AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS HAVE STANDING TO CHALLENGE THE STATUTES UNDER THE FIRST AMENDMENT ON BEHALF OF THEIR MEMBERS.

The Third Circuit in *FSC II*, evaluated whether the Free Speech Coalition and the American Society of Media Photographers had associational standing to challenge the statutes on behalf of their members. 787 F.3d at 153. It concluded they did not.

The court set forth the three factors that an organization must satisfy to possess standing to assert claims on behalf of its members:

> (a) its members would otherwise have standing to sue in their own right; (b) the interest it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id. quoting Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283 (3rd Cir. 2002) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

The court did not take issue with the organizations' associational standing under the first two

factors. It recognized that "FSC's members comprise individuals and businesses across many facets of the adult film industry, including those involved in the creation, distribution, and sale of both live and prerecorded sexual materials," who are consequently subject to the statutes. *Id.* at 154. And it acknowledged that the Free Speech Coalition is a "trade association representing more than 1,000 member businesses and individuals involved in the production and distribution of adult materials." *Id.* at 149 n.2.   The Coalition's interest in challenging the statutes is, therefore, germane to its purpose.

Similarly, the court noted that the American Society of Media Photographers is a trade association representing photographers, *id.* at 149 n.2, and recognized that 400 of the Society's members  produce work containing sexually explicit imagery. *Id.* at 154. Plaintiff Barbara Alper is, in fact, a Society member. (Doc. 220), Mopsik at 23. Like the Free Speech Coalition, the American Society of Media Photographers' interest in challenging a content–based law that applies to the work of a sizeable number of its members is relevant to its purpose as a trade association representing them.

The court, however, found a problem under the third factor, which requires a showing that participation of the individual members of the organizations was not necessary in litigating the claims asserted or the relief requested. Here, the organizations sought only declaratory and injunctive relief. So the relief requested posed no issue. *Hunt,* 432 U.S. at 344. The court's concern was with the proof required in asserting a claim to the statutes under intermediate scrutiny.

The court determined the narrow tailoring inquiry under intermediate scrutiny required an examination of "the degree to which [an] individual producer's speech is unnecessarily burdened." *Id.* at 154. And because of that requisite "individualized inquiry" into the burdens on specific members of the Free Speech Coalition and the American Society of Media Photographers as part of that analysis, the court concluded, those two organizations could not satisfy the third factor necessary

31

to establish associational standing. *Id.*

After granting rehearing in light of *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015) and concluding that the appropriate level of review for the challenged statutes was strict scrutiny, the Third Circuit remanded to this Court "to determine if the Free Speech Coalition and the American Society of Media Photographers have associational standing, as the level of scrutiny is relevant in resolving this issue." *FSC III*, 825 F.3d at 164 n.12.

Under strict scrutiny—in contrast to intermediate scrutiny—the participation of the Free Speech Coalition's and the American Society of Media Photographers' individual members is not required. The statutes' constitutionality does not depend on their application to particular members, but rather on whether the Government can overcome the presumption of unconstitutionality by showing they are narrowly tailored to serve a compelling governmental interest and employ the least restrictive means of doing so. Both organizations can represent their members with regard to that evaluation without the participation of their individual members. They, therefore, satisfy all three requirements for associational standing.

Two Supreme Court cases, employing strict scrutiny, support the Free Speech Coalition's and the American Society of Media Photographers' associational standing here under strict scrutiny. In *Ashcroft v. Free Speech Coalition,* the Free Speech Coalition, as a trade association for the adult entertainment industry, was permitted to challenge a law that criminalized sexually explicit images that appeared to depict minors, but were produced without using actual children, on behalf of its members under strict scrutiny. 535 U.S. at 243. And in *Entertainment Merchants Ass'n*, two trade associations representing the video game and software industries were permitted to challenge California's law restricting the sale of violent video games to minors, on behalf of their members under strict scrutiny. 564 U.S. at 789. At no point, did the Supreme Court question the standing of

32

these organizations to prosecute those challenges on behalf of their members. *See ASARCO Inc. v. Kadish,* 490 U.S. 605, 611 (1989) (Court " would be required... to raise" issue of standing "on [its] own initiative" because "legitimate exercise of judicial power is confined both by statutes and by Article III of the Constitution*"); Regents of Univ. of California v. Bakke*, 438 U.S. 265, 281 (1978) (although Petitioner had not objected to it, Plaintiff's standing "concern[ed] [Supreme Court's] jurisdiction under Art. III," such that "it must be considered").

The Free Speech Coalition and the American Society of Media Photographers satisfy the factors for associational standing to bring a challenge to the statutes under strict scrutiny. They seek declaratory and injunctive relief on behalf of their members, who have standing to sue in their own right, regarding an issue that is germane to the organizations' missions in representing the interests of producers of expression. Resolution of their claims challenging the constitutionality of the content–based statutes does not require participation of their individual members in resolving those claims or in granting relief.

## CONCLUSION

Plaintiffs respectfully request that this Court enter judgment declaring 18 U.S.C. § 2257, 18 U.S.C. § 2257A, and their implementing regulations, 28 CFR § 75.1, *et seq.*, unconstitutional, on their face and as applied, under the First Amendment and issue a permanent injunction enjoining their enforcement.

Respectfully submitted,

February 24, 2017

/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200

33

Cleveland, Ohio  44113-1949
(216) 781-5245 / (216) 781-8207 (Facsimile)

KEVIN E. RAPHAEL (72673)
KER@Pietragallo.com
J. PETER SHINDEL, JR. (201554)
JPS@Pietragallo.com
PIETRAGALLO   GORDON   ALFANO
BOSICK
   & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200 / (215) 981-0082 (Facsimile)

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2017, the foregoing was filed electronically.  Notice of

this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may

access this filing through the Court's system.

/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
LORRAINE R. BAUMGARDNER (0019642)
BERKMAN, GORDON, MURRAY & DeVAN

KEVIN E. RAPHAEL (72673)
J. PETER SHINDEL, JR. (201554)
PIETRAGALLO GORDON ALFANO BOSICK
 & RASPANTI, LLP

Attorneys for Plaintiffs