**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| FREE SPEECH COALITION, INC. et al., | ) | Civil Action No. 2:09-4607 |
|  | ) |  |
| Plaintiffs, | ) | Judge Michael M. Baylson |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| JEFFERSON B. SESSIONS, III, | ) |  |
| Attorney General, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

**DEFENDANT'S BRIEF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION ............................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ........................................ 3

RELEVANT PROCEDURAL HISTORY .............................................................. 4

ARGUMENT ...................................................................................................... 5

I.     PLAINTIFFS FSC AND ASMP LACK ASSOCIATIONAL STANDING TO
ASSERT AS-APPLIED FIRST AMENDMENT CLAIMS.................................. 5

II.    JUDGMENT SHOULD BE ENTERED FOR DEFENDANT ON PLAINTIFFS'
AS-APPLIED FIRST AMENDMENT CLAIMS ................................................. 8

    A.    The Statutes Further a Compelling Interest ............................... 9

        1.    The Compelling Interest Prong Is Outside the Scope of the Third
Circuit's Remand and thus Should Not Be Addressed .................. 9

        2.    The Government's Compelling Interest in Protecting Children
From Sexual Exploitation by Pornographers Is Well Supported.... 9

    B.    The Statutes Satisfy Strict Scrutiny's Narrow Tailoring Requirement..... 16

        1.    An Age Cut-Off Would Not Be Less Restrictive ........................ 21

        2.    Eliminating the Statutes and Relying Solely on Direct
Prohibitions on Child Pornography Would Be a Less Effective
Alternative .................................................................................. 24

        3.    Relying on Producer Certifications and Unspecified Industry
Standards Would Be Less Effective Alternatives ........................ 26

        4.    Excluding a Subset of Producers Other than Plaintiffs from the
Age Verification and Recordkeeping Requirements Does Not
Qualify as Less Restrictive as Applied to Plaintiffs and Would
Be a Less Effective Alternative ................................................... 29

        5.    Age Verification and Recordkeeping Requirements that Apply
Only to Primary Producers Would Be Less Effective ................. 31

6.      Setting a Different Statutory Penalty Range for Those Who
        Violate the Age Verification and Recordkeeping Requirements
        Would Not Be Less Restrictive .................................................... 32

III.    JUDGMENT SHOULD BE ENTERED FOR DEFENDANT ON
        PLAINTIFFS' FACIAL OVERBREADTH CLAIM ......................................... 33

        A.      The Court Should Not Address Plaintiffs' Facial Overbreadth Claim
                If It Holds that the Statutes Are Invalid As Applied to Plaintiffs ............ 33

        B.      Plaintiffs Bear the Burden to Establish Substantial Overbreadth ............ 36

        C.      The Statutes Are Not Facially Overbroad ................................................. 37

CONCLUSION .......................................................................................................... 39

# **TABLE OF AUTHORITIES**

## **Cases**

*Am. Library Ass'n v. Reno* ("*ALA*"), 33 F.3d 78 (D.C. Cir. 1994) ...................... 10, 11, 12, 15, 31

*Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997) ..................................................... 8

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) .............................................................................. 8, 21

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) ................................................................... 6

*Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943 (3d Cir.1985) .................................... 9

*Belitskus v. Pizzingrilli*, 343 F.3d 632 (3d Cir. 2003) ................................................................ 34

*Bd. of Trs. v. Fox*, 492 U.S. 469 (1989) .......................................................................... 20, 35

*Bordell v. Gen. Elec. Co.*, 922 F.2d 1057 (2d Cir. 1991) ......................................................... 34

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ....................................................................... 34

*Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011) .................................................. 6, 16, 29

*Burson v. Freeman*, 504 U.S. 191 (1992) ......................................................................... 17, 21

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), *as revised* (Feb. 9, 2016) ...................... 8

*Connection Distrib. Co. v. Holder*, 557 F.3d 321 (6th Cir. 2009) (en banc) ............. 10, 11, 24, 30

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) .............................................................. 13

*Free Speech Coal. v. Gonzales*, 406 F. Supp. 2d 1196 (D. Colo. 2005) ..................................... 15

*Free Speech Coal., Inc. v. Holder* ("*FSC I*"),
    729 F. Supp. 2d 691 (E.D. Pa. 2010) ................................................ 3, 4, 11, 12, 13, 15, 30

*Free Speech Coal., Inc. v. Attorney General* ("*FSC II*"),
    677 F.3d 519 (3d Cir. 2012) .................................... 3, 4, 8, 9, 10, 11, 12, 13, 19, 24, 27, 37

*Free Speech Coal., Inc. v. Holder* ("*FSC III*"),
    957 F. Supp. 2d 564 (E.D. Pa. 2013) ................ 4, 7, 15, 16, 19, 20, 23, 28, 30, 33, 35, 38

*Free Speech Coal., Inc. v. Attorney General* ("*FSC IV*"),
    787 F.3d 142 (3d Cir. 2015)......................................... 1, 4, 5, 10, 20, 27, 32, 35, 36, 38, 39

*Free Speech Coal., Inc. v. Attorney General* ("*FSC V*"),
    825 F.3d 149 (3d Cir. 2016)..................................................1-2, 5, 6, 7, 8, 9, 10, 19, 27, 36

*Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215 (3d Cir. 2004) ........................... 37, 39

*Green Party v. Aichele*, 89 F. Supp. 3d 723, 737–38 (E.D. Pa.),
    *aff'd*, 103 F. Supp. 3d 681 (E.D. Pa. 2015) ...................................................... 34

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ................................................ 6

*New York v. Ferber*, 458 U.S. 747, 756 (1982) ................................................... 10, 25

*N.Y. State Club Ass'n, Inc. v. City of New York,* 487 U.S. 1 (1988) ...................................... 35, 36

*Pa.  Psychiatric Soc'y v. Green Spring Health Servs., Inc*., 280 F.3d 278 (3d Cir. 2002) ........... 6

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ........................................................ 18

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ....................................................... 1, 8, 18, 36

*Serv. Employees Int'l Union, Local 3 v. Municipality of Mt. Lebanon*,
    446 F.3d 419 (3d Cir. 2006) ..................................................................... 34

*United States v. Alvarez*, 132 S. Ct. 2537 (2012) (plurality) ................................................. 16, 21

*United States v. Anderson*, 759 F.3d 891 (8th Cir. 2014) .......................................................... 10

*United States v. Katz*, 178 F.3d 368 (5th Cir. 1999) ................................................... 15

*United States v. Kikumura*, 947 F.2d 72 (3d Cir. 1991) ................................................. 9

*United States v. Malloy*, 568 F.3d 166 (4th Cir. 2009) ................................................ 15

*United States v. Mitchell*, 652 F.3d 387 (3d Cir. 2011) ..................................................... 34

*United States v. Riccardi*, 258 F. Supp. 2d 1212 (D. Kan. 2003) ................................................. 15

*United States v. Stevens*, 533 F.3d 218 (3d Cir. 2008) ................................................ 25

*United States v. Stevens*, 559 U.S. 460 (2010) ........................................................... 37

*United States v. Williams*, 553 U.S. 285 (2008) ........................................................ 37

*Virginia v. Hicks*, 539 U.S. 113 (2003) ................................................................. 36, 37

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ............................... 34

*Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015)  ................................................. 13, 14, 17

**Statutes**

Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"),
    Pub. L. No. 109-248, 120 Stat. 587 (2006) ............................................................... 13, 24

18 U.S.C. § 2251 ....................................................................................................................... 18

18 U.S.C. § 2256 ........................................................................................................... 14, 17, 18

18 U.S.C. §§ 2257 and 2257A (the "Statutes")  ................................................................. *passim*

**Legislative History**

152 Cong. Rec. H5724 (2006) (statement of Rep. Pence) ....................................................... 13, 30

152 Cong. Rec. S8012-02 (July 20, 2006) (statement of Sen. Leahy)  ....................................... 27

Attorney General's Commission on Pornography, *Final Report* ("*Report*") (1986),
    *available at* http://www.porn-report.com/contents.htm........................................ 11, 12, 24

Child Protection and Obscenity Enforcement Act and Pornography Victims Protection Act of
    1987: Hearing Before the S. Comm. on the Judiciary, 100th Cong. (1988) .............. 12-13

H.R. Rep. No. 98-536, at 3, 7-8 (1984)  ...................................................................................... 15

**Regulations**

Dep't of Justice, Final Rule, 70 Fed. Reg. 29607 (2005) ............................................................ 32

28 C.F.R. § 75.1 ......................................................................................................................... 31

28 C.F.R. § 75.2 ......................................................................................................................... 32

28 C.F.R. § 75.5 ........................................................................................................................... 1

**Secondary Sources**

R. Randall Kelso, *The Structure of Modern Free Speech Doctrine: Strict Scrutiny, Intermediate
    Review, and "Reasonableness" Balancing*, 8 Elon L. Rev. 291 (2016) .......................... 36

## INTRODUCTION

Under 18 U.S.C. §§ 2257 and 2257A (the "Statutes), producers of sexually-explicit films and photographs must verify the ages of individuals appearing in their work and keep records of having done so. This common sense, minimally-burdensome scheme is designed so that not only do primary producers avoid relying on their inevitably subjective assessments of performers' ages when creating sexually-explicit content that would fit within the statutory definition of child pornography if minors were used, but the resulting verified films and photographs can be traced back to their source, allowing law enforcement, who face the same problems assessing or proving an individual's age, to distinguish between depictions of young-looking, but adult, performers and images that evidence the sexual exploitation of children.

Following a trial, the Statutes were upheld, in relevant part,[1] by this Court and the Third Circuit against Plaintiffs' as-applied and facial overbreadth First Amendment challenges under intermediate scrutiny. However, this Court now has been directed to re-evaluate those challenges under strict scrutiny, due to the Supreme Court's subsequent decision in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015). In its remand decision, the Third Circuit took no position on the Statutes' validity under that standard but did specifically note that, given Plaintiffs' concession that the Government's interest in protecting children from sexual exploitation is compelling, this Court's strict scrutiny analysis of Plaintiffs' as-applied claims on remand should focus on whether the Statutes are narrowly tailored. *Free Speech Coal., Inc. v. Attorney General* ("*FSC V*"), 825 F.3d

---

[1] The only issue with respect to Plaintiffs' First Amendment challenges that remained unresolved under the Third Circuit's original opinion, post-trial, was the validity of a regulatory provision, 28 C.F.R. § 75.5(c)(1), which required producers to make their age verification records available for inspection at least twenty hours per week. *See Free Speech Coal., Inc. v. Attorney General* ("*FSC IV*"), 787 F.3d 142, 147 (3d Cir. 2015). However, in light of the Third Circuit's later decision holding § 75.5 is facially invalid under the Fourth Amendment, and this Court's entry of judgment to that effect, *see* Judgment [ECF No. 242], that provision, along with any asserted burdens that it imposed, is no longer at issue.

149, 164 & n.11 (3d Cir. 2016). While Plaintiffs now seek to revisit the compelling interest prong, the Court should reject their effort to go beyond the scope of the Third Circuit's remand. Moreover, contrary to Plaintiffs' argument, precedent, common sense, and the legislative history—including detailed findings in the report by the Attorney General's Commission on Pornography—amply support the conclusion that the Statutes further the Government's compelling interest in protecting children from sexual exploitation.

This Court should also conclude that the Statutes satisfy strict scrutiny's narrow tailoring requirement as applied to Plaintiffs. This Court's findings that none of the Plaintiffs exclusively produces images depicting clearly mature individuals, and that none of them produces private non-commercial sexually-explicit images, continue to be significant to Plaintiffs' as-applied challenge under strict scrutiny. No Plaintiff should be held exempt from the Statutes' age verification and recordkeeping requirements. The fact that the Statutes' requirements are not that burdensome to begin with, and do not prohibit any speech, also makes it difficult to conceive of any effective scheme that would be less restrictive, as to Plaintiffs. A scheme that exempted some depictions but not others produced by the same Plaintiff, based on the apparent age of performers, would not significantly reduce those already-minimal burdens.

In addition, none of the proposals that Plaintiffs advance would be as effective as the Statutes in ensuring age verification or in creating a system whereby sexually-explicit images found in the possession of an end user can be traced back to the primary producer, and thus to the relevant age verification records. Plaintiffs suggest that child pornography prohibitions are sufficient, but the Statutes were enacted in the first place due to gaps in those laws. Plaintiffs' proposal that members of the adult industry should be trusted to check identification on their own, in lieu of statutory requirements, relies on purported "industry standards" without any

genuine notion of a uniform "industry," much less an established set of standards that every industry member follows. (For that reason as well, the Court should hold that the two organizational Plaintiffs lack standing to assert as-applied claims on behalf of their members.) Indeed, some of Plaintiffs' own would-be projects, absent the Statutes, such as Alper's plan to photograph individuals anonymously engaging in sexual conduct in public without checking their ages, demonstrate the ineffectiveness of such a scheme.

If the Court recognizes that the Statutes survive strict scrutiny as applied to Plaintiffs, it should also reject Plaintiffs' facial overbreadth challenge. The same considerations that previously warranted rejection of such a challenge—in particular, that the Statutes constitutionally apply in a vast majority of applications, that the Government's interest in protecting children from sexual exploitation is of surpassing importance, and that any problematic applications would better be addressed through as-applied challenges—continue to apply. Moreover, as an exception to normal prudential standing requirements, the overbreadth doctrine places the burden on a claimant to establish substantial overbreadth. Thus, this Court's previous conclusions that Plaintiffs failed to establish a substantial number of producers of exclusively "clearly mature" pornography, or of purely private non-commercial depictions made by consenting adults for private use, again compel the rejection of Plaintiffs' overbreadth claim.

## <u>STATUTORY AND REGULATORY BACKGROUND</u>

The Statutes, together with their background and legislative history and the Department of Justice's implementing regulations, have been described in detail in prior briefing as well as in prior decisions issued in this case. *See, e.g.*, *Free Speech Coal., Inc. v. Holder* ("*FSC I*"), 729 F. Supp. 2d 691, 698-705 (E.D. Pa. 2010); *Free Speech Coal., Inc. v. Attorney General* ("*FSC II*"), 677 F.3d 519, 525-28 (3d Cir. 2012); *see also* Def. Mem. in Opp. To Pls. Mot. For Preliminary

Injunction & in Supp, of Def. Mot., to Dismiss [ECF No. 16], at 3-10; Def. Statement of

Undisputed Material Facts, submitted in support of Def. Mot. for Summ. J. [ECF No. 177-2], at

2-7.

**RELEVANT PROCEDURAL HISTORY**

Plaintiffs filed their Complaint in this case in 2009, raising a variety of constitutional

challenges to the Statutes and implementing regulations. Compl. [ECF No. 1]. This Court

granted the Government's motion to dismiss on July 27, 2010. *FSC I*, 729 F. Supp. 2d 691. On

appeal, the Third Circuit upheld this Court's conclusion that Plaintiffs' as-applied First

Amendment challenge should be analyzed under intermediate scrutiny, as well as its holdings

that the first and third prongs of the intermediate scrutiny test—that the Statutes advance a

substantial government interest and that the Statutes leave open ample alternative channels for

communication—were satisfied. *FSC II*, 677 F.3d at 535-36 & nn.12-13. However, the Third

Circuit remanded for factual development the second prong of intermediate scrutiny—that the

Statutes be narrowly tailored as applied to Plaintiffs—and similarly remanded Plaintiffs' facial

challenge under the First Amendment's overbreadth doctrine. *Id.* at 536, 538.

Following discovery and an 8-day bench trial, this Court entered judgment in favor of the

Government on Plaintiffs' as-applied and facial overbreadth challenges under the First

Amendment on July 18, 2013. *Free Speech Coal., Inc. v. Holder* ("*FSC III*"), 957 F. Supp. 2d

564, 570, 609 (E.D. Pa. 2013). In a decision issued May 14, 2015, the Third Circuit affirmed in

relevant part. *FSC IV*, 787 F.3d at 159, 166. The Third Circuit also held that the two

organizational Plaintiffs, Free Speech Coalition, Inc. ("FSC") and the American Society of

Media Photographers, Inc. ("ASMP"), lacked associational standing to raise as-applied First

Amendment claims on behalf of their members. *Id.* at 154.

Following the Supreme Court's decision in *Reed*, issued June 18, 2015, Plaintiffs filed a

petition for rehearing, which the Third Circuit granted on September 1, 2015, thus vacating its

earlier decision in *FSC IV*. The Third Circuit then issued a new decision on June 8, 2016,

concluding that, under *Reed*, the Statutes were content based and thus subject to strict scrutiny,

and remanding Plaintiffs' as-applied and facial overbreadth First Amendment claims. *FSC V*,

825 F.3d at 164 & n.12. The Third Circuit noted "that Plaintiffs have conceded that the

Government's interest in protecting children from sexual exploitation by pornographers is

compelling, and thus the District Court's inquiry on remand should be focused on whether the

Statutes are narrowly tailored to serve this interest." *Id.* at 164 n.11. The Third Circuit also noted

that it was remanding the question of whether FSC and ASMP have associational standing to

raise as-applied First Amendment claims in a strict scrutiny context. *Id.* at 164 n.12.

## ARGUMENT

## I.   PLAINTIFFS FSC AND ASMP LACK ASSOCIATIONAL STANDING TO ASSERT AS-APPLIED FIRST AMENDMENT CLAIMS

In its original post-trial decision, the Third Circuit held that neither FSC nor ASMP, as

organizational Plaintiffs, had associational standing to bring as as-applied claim of its own. *FSC*

*IV*, 787 F.3d at 153. The Third Circuit reasoned that "neither FSC nor ASMP represents 'the

adult film industry' as a whole," but that instead, "their members comprise various segments of

that industry." *Id.* It held, moreover, that "those individual members' participation is necessary to

assess properly FSC's and ASMP's as-applied First Amendment claims" because the First

Amendment inquiry depended upon "the specific conduct of FSC's and ASMP's members." *Id.*

In particular, because the as-applied narrow tailoring inquiry requires an examination of whether

an individual producer's speech was unnecessarily burdened, an "individualized inquiry" into

"the nature of each member's speech" and the degree to which it "is unnecessarily burdened"

was required, and the Statutes "might be narrowly tailored as to some of FSC's and ASMP's members but not others"; thus, "aggregating [the adult film] industry's speech in toto is an improper method for identifying the burdens imposed on specific members." *Id.*

When the Third Circuit remanded this case for reconsideration under strict scrutiny, it also noted that this Court should determine anew whether FSC and ASMP have associational standing. *FSC V*, 825 F.3d at 164 n.12. The Court should conclude that, in the strict scrutiny context, the Third Circuit's earlier reasoning on this issue continues to warrant the conclusion that FSC and ASMP lack association standing to raise as-applied claims.

In order to satisfy the requirements of associational standing, an organizational plaintiff must show that "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283 (3d Cir. 2002) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). While Plaintiffs cite two cases where trade organizations were plaintiffs in First Amendment challenges where strict scrutiny applied, these cases both addressed facial challenges. *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 805 (2011); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). Here, Plaintiffs' as-applied First Amendment claims continue to require consideration of the nature of each Plaintiff's speech. In particular, as discussed below, the fact that all the individual Plaintiffs use young-looking individuals in their work continues to be relevant, but FSC and ASMP might have members that do not use young-looking individuals. In addition, if an FSC or ASMP member produced only images of genitalia or other isolated body parts, such that it was not even possible to determine whether the depicted individual was elderly, or if a

member were in fact producing child pornography, that fact would also be relevant to the narrow
tailoring analysis.

The nebulous nature of the adult entertainment or adult film industry also weighs against
finding associational standing for the organizational Plaintiffs' as-applied claims. As the Third
Circuit has pointed out, "no one is required to obtain a license or register with the Government
before producing a sexually explicit image." *FSC V*, 825 F.3d at 170. Rather, "[a]n artist"—or
indeed, anyone—"can pick up a camera and create an image subject to the Statutes without the
knowledge of any third party, much less the Government." *Id.* This image can then end up in the
universe of adult entertainment material. Indeed, the pornography industry today includes a vast
amount of material on the Internet, including material uploaded by third parties onto "tube sites"
such as Pornhub. *See FSC III*, 957 F. Supp. 2d at 577-78 & n.4; Tr. of June 7, 2013, 22:3-8;
27:8-29:2 (testimony of Gail Dines).

Neither FSC nor ASMP prevent those who upload such material from becoming
members, nor do they place any requirements on their members, conduct inspections, or
otherwise monitor their conduct. *See* Tr. of June 3, 2013, 52:2-8 (testimony of Eugene Mopsik)
(ASMP "ha[s] no force over [its] members to require them to do anything" and "does not
conduct any inspections to ensure that its members are using model releases" [2]); *see also* 59:8-10
(similar); 56:6-12 ("Nothing prevents someone who produces adult films from being an ASMP
member"); Tr. of June 3, 2013, 118:25-119:21 (testimony of Jeffrey Douglas) (testifying that
anyone involved in commercial production of sexually explicit images could become an FSC
member, and the only requirement was payment of dues); 140:23-141:6 (FSC does not monitor
its members to determine whether they check ages of individuals used in sexually-explicit

_____

[2] For example, Alper, an ASMP member, does not use model releases, at least when
photographing sexually-explicit conduct. *FSC III*, 957 F. Supp. 2d at 573, 587.

depictions). As the Third Circuit observed, "[t]he creation of sexually explicit expression is better characterized by its lack of regulation than by a regime of rules governing such expression." *FSC V*, 825 F.3d at 170. Thus, neither FSC nor ASMP can be said to represent a uniform set of members, either with respect to the nature of their films or photographs or with respect to their age verification or recordkeeping habits, aside from the requirements imposed by the Statutes. The Court therefore should hold that FSC and ASMP lack standing to assert as-applied claims on behalf of those members.[3]

## II.   JUDGMENT SHOULD BE ENTERED FOR DEFENDANT ON PLAINTIFFS' AS-APPLIED FIRST AMENDMENT CLAIMS

The Third Circuit has directed the Court to analyze Plaintiffs' as-applied challenge to the Statutes under strict scrutiny, which requires the Government to "prov[e] that the [Statutes'] restriction [on speech] furthers a compelling interest and is narrowly tailored to achieve that interest." *FSC V,* 825 F.3d at 164 (quoting *Reed*, 135 S. Ct. at 2231). The Third Circuit noted that "Plaintiffs have conceded that the Government's interest in protecting children from sexual exploitation by pornographers is compelling," so "the District Court's inquiry on remand should be focused on whether the Statutes are narrowly tailored to serve this interest." *Id.* at 164 n.11; *see FSC II*, 677 F.3d at 535 ("Plaintiffs concede that protecting children from exploitation by pornographers is an 'important, indeed compelling, governmental interest.'"). As part of the narrow tailoring analysis, the Government also bears the burden to show that any "proposed

---

[3] In addition to FSC and ASMP, it should be noted that Plaintiff Thomas Hymes has not posted on his dailybabylon.com website since May 4, 2014. Instead, according to his LinkedIn profile, he is currently engaged as editor-in-chief of MG Magazine, a magazine "for the cannabis professional." *See* https://www.linkedin.com/in/thymes. Plaintiffs have a continuing obligation to establish a live case or controversy. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016), *as revised* (Feb. 9, 2016) ("If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot."); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 72 (1997) (recognizing that plaintiff's "changed circumstances," in that she no longer had a stake in prospective relief due to a change in jobs, "mooted the case stated in her complaint").

alternatives will not be as effective as the challenged [Statutes]." *Id.* (quoting *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004)). The Third Circuit emphasized that its conclusion regarding the appropriate level of scrutiny would not necessarily "doom[]" the Statutes. *Id.* As set forth below, the Statutes should be upheld under strict scrutiny as applied to Plaintiffs.

### A.    The Statutes Further a Compelling Interest

#### 1.    The Compelling Interest Prong Is Outside the Scope of the Third Circuit's Remand and thus Should Not Be Addressed

Despite their previous concession that the Government's interest in protecting children from sexual exploitation by pornographers is compelling, Plaintiffs devote over eight pages of their brief to an argument that the compelling interest prong is not satisfied. This Court should reject Plaintiffs' invitation to reconsider this issue because it is out of the scope of the Third Circuit's remand. "[U]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must 'proceed in accordance with the mandate and the law of the case as established on appeal.'" *United States v. Kikumura*, 947 F.2d 72, 76 (3d Cir. 1991) (quoting *Bankers Trust Co. v. Bethlehem Steel Corp.,* 761 F.2d 943, 949 (3d Cir.1985)). Here, the Third Circuit concluded that, because of Plaintiffs' concession regarding the Government's compelling interest, "the District Court's inquiry on remand should be focused on whether the Statutes are narrowly tailored to serve this interest." *FSC V*, 825 F.3d. at 164 n.11. The Court therefore should limit its consideration of Plaintiffs' as-applied challenge to the narrow tailoring prong of strict scrutiny.

#### 2.    The Government's Compelling Interest in Protecting Children From Sexual Exploitation by Pornographers Is Well Supported

To the extent the Court addresses Plaintiffs' "compelling interest" arguments on the merits, it should conclude that the Statutes easily meet the compelling interest prong of the strict

scrutiny test. The Government's compelling interest in "protecting children from sexual exploitation by pornographers" is uncontested. *See FSC II*, 677 F.3d at 535; *FSC V*, 825 F.3d at 164 n.11; *see* Pl. Br. at 6 (conceding this interest qualifies as "compelling"); *see also FSC IV*, 787 F.3d at 166 ("[F]ew objectives are on par with the 'surpassing importance' of the Government's compelling interest in this case."). Indeed, the compelling nature of this interest has long been recognized, including in cases in other jurisdictions that have upheld the Statutes. *United States v. Anderson*, 759 F.3d 891, 895 (8th Cir. 2014) ("The Supreme Court has long recognized as 'compelling' the government's 'interest in safeguarding the physical and psychological well-being of a minor.'" (quoting *New York v. Ferber*, 458 U.S. 747, 756 (1982))); *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 329 (6th Cir. 2009) (en banc) (Congress's "unanimous concern" in enacting § 2257 "was to deter the production and distribution of child pornography" and "to ensure that its existing ban on child pornography could be meaningfully enforced. That objective . . . is a concern of the highest order[.]"); *Am. Library Ass'n v. Reno* ("*ALA*"), 33 F.3d 78, 88 (D.C. Cir. 1994) ("Appellees concede, as they must, that the Government has a significant—indeed compelling—interest in the prevention of child pornography.").

This compelling interest encompasses the Government's interest in investigating and prosecuting child pornography violations. Indeed, the Third Circuit has recognized that the Statutes "combat child pornography in at least four specific ways" by (1) "ensur[ing] that primary producers of sexually explicit expression confirm the ages of their performers prior to filming," (2) "permit[ting] secondary producers that publish the depictions to verify that the performers were not children," (3) "prevent[ing] children from passing themselves off as adults," and (4) "aid[ing] law enforcement and eliminate[ing] subjective disputes with producers over

whether the producer should have verified the age of a particular performer." *FSC II*, 677 F.3d at

535. Other courts have reached the same conclusion, with the D. C. Circuit also recognizing the

Government's purpose "to deprive child pornographers of access to commercial markets by

requiring secondary producers to inspect (and keep a record of) the primary producers' proof that

the persons depicted were adults at the time they were photographed or videotaped," and "to

establish a system by which a law enforcement officer in possession of materials containing

depictions of sexually explicit acts will be able to identify the performers and verify compliance

with" § 2257. *ALA*, 33 F.3d at 86; *see also Connection Distrib. Co.*, 557 F.3d at 329–30 (§ 2257

"creates a compliance system in which law-enforcement officers not only can identify the

performers depicted in magazines and movies and verify their ages but also can eliminate

subjective disputes with producers over whether a model's apparent age should have triggered an

age-verification check").

        This Court and the Third Circuit have already concluded that the Government's

compelling interest is amply supported by the legislative record. *See FSC II*, 677 F.3d at 535-36

(rejecting Plaintiffs' argument that the Statutes do not advance the Government's compelling

interest).  As this Court has recognized, the Statutes are "just one aspect of a larger statutory

scheme—beginning as early as 1978, and continuing through to the present—that has sought to

protect children from sexual exploitation." *FSC I*, 729 F. Supp. at 700. This scheme originated

with laws that directly prohibit child pornography, but those laws did not "end[] the problem."

*Id.* (quoting Attorney General's Commission on Pornography, *Final Report* ("*Report*"), at 314

(1986)[4]). After conducting hearings over a period of several months, in which it heard from

numerous law enforcement officers, among others, *see Report* at 1845-59 (listing witnesses), the

---

[4] *Available at* http://www.porn-report.com/contents.htm.

Attorney General's Commission on Pornography found that, although early child pornography

prohibitions "'drastically curtailed [child pornography's] public presence,' they did not end the

problem," and "'no evidence . . . suggest[ed] that children [were] any less at risk than before.'"

*FSC II*, 677 F.3d at 525 (quoting *Report*, at 608-09).[5]

The Commission's *Report* recommended legislation imposing age verification

requirements in order to "fill the 'gaps' in then-existing legislation which 'allow[ed] the

exploitation of minors to continue.'" *Id.* (quoting *Report*, at 619-20); *see ALA*, 33 F.3d at 89

("After fourteen months of investigation," the Commission recommended age verification and

recordkeeping requirements "precisely because of 'gaps' and 'loopholes' in existing law that

facilitated the exploitation of children."). In particular, such requirements would address the fact

that "an extensive interstate market for child pornography continued to exist and that children

were still at risk for sexual exploitation by pornographers," as well as the fact that "the

pornography industry's practice of employing youthful-looking performers made it nearly

impossible for law enforcement officers to effectively investigate potential child pornography."

*FSC II*, 677 F.3d at 535; *see FSC I*, 729 F. Supp. 2d at 701. After the *Report* was issued,

Congress held additional hearings that provided similar evidence. *See, e.g.*, Child Protection and

Obscenity Enforcement Act and Pornography Victims Protection Act of 1987: Hearing Before

---

[5] Plaintiffs point to Judge Rendell's *FSC II* concurrence as questioning the connection identified in the *Report* between child pornography and the use of youthful-looking performers in adult pornography. However, although the Commission did not provide citations to the underlying hearing transcripts, its findings were based on the testimony of law enforcement officers with experience in child pornography investigation and prosecution. *See Report* at 1845-60. In those hearings, a Chief Postal Inspector testified, for example, that the inability to prove age for children over 14 resulted in the declination of child pornography prosecutions. *See* Comm'n Hr'g Tr. July 25, 1985, at 58-59 (testimony of Jack Swagerty). Others testified regarding an instance where a producer advertising for models in the local newspaper used underage models to produce S&M photographs, *see* Comm'n Hr'g Tr. Oct. 16, 1985, at 97B (testimony of Catherine Goodwin), and the fact that depictions of possible child pornography were found on the consumer end, in people's houses, where it would not always be possible to determine their origin, *see* Comm'n Hr'g Tr. June 19, 1985, at 149 (testimony of Daniel Mihalko).

the S. Comm. on the Judiciary, 100th Cong. (1988), at 53-54, 57, 61 (statement of Brent D. Ward, U.S. Attorney, District of Utah) (proposed recordkeeping requirements "would significantly enhance the ability of U.S. attorneys" to obtain convictions").

As for the enactment of § 2257A in 2006, "Members of both the House and Senate discussed how [that provision] was an important means of combating and deterring further child exploitation." *FSC I*, 729 F. Supp. 2d at 703. For example, Representative Pence explained that § 2257A was intended to address "[sexual] exploitation that occurs in the home, when 'children are forced to pose for pornographic pictures or act in pornographic videos.'" *Id.* (quoting 152 Cong. Rec. H5724 (2006) (statement of Rep. Pence)); *FSC II*, 677 F.3d at 527 n.2. In the Act that added § 2257A, Congress "made numerous findings, including that a substantial interstate market in child pornography continued to exist and that many of the individuals in this market distributed child pornography with the expectation of receiving the same in return." *FSC II*, 677 F.3d at 526-27 (citing Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"), Pub. L. No. 109-248, § 501(1)(B), 120 Stat. 587 (2006)).

Plaintiffs err in arguing that the Government must provide additional evidence to support its compelling interest under strict scrutiny. For one thing, even when applying strict scrutiny, a law restricting speech may be justified "based solely on history, consensus, and simple common sense." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation omitted). In *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015), for example, the Supreme Court upheld a state restriction on judicial candidates' solicitation of campaign funds for their election based on a compelling interest in "protecting the integrity of the judiciary" and in "maintaining the public's confidence in an impartial judiciary." *Id.* at 1666. The Court did so without requiring the state to show that there was any "actual problem," *see* Pl. Br. at 7, with a lack of public

confidence in judges before the restriction was established, and without requiring any empirical

evidence that the restriction was necessary in order to prevent harm. Rather, the Court

recognized that "[t]he way the Canon advances th[e state's asserted] interests is intuitive," and

that "[t]he interest served . . . has firm support in [the Court's] precedents." *Williams-Yulee*, 135

S. Ct. at 1666. The Court thus approved the state's conclusion "that the public may lack

confidence in a judge's ability to administer justice without fear or favor if he comes to office by

asking for favors," *id.*; in other words, the Court logically inferred a *risk* of harm and found that

risk sufficient to support the compelling interest in that case.

This case presents a similar situation where, as discussed above, court precedents amply

support the Government's compelling interests in preventing and prosecuting the sexual

exploitation of children. Moreover, the facts *underlying* the risk targeted by the Statutes are not

subject to dispute, and the conclusion that the Statutes address the risk is simply a matter of

logical inference. For one thing, child pornography continues to exist.[6] *See, e.g.*, Tr. of June 11,

2013, 27:19-28:6 (describing current methods of child pornography distribution); 31:22-32:6

(reporting 2009 study found 70% of child pornography victims were adolescents); 32:21-33:20

(the large amount of child pornography trafficking identified by law enforcement requires

methods to determine whom to target for prosecution) (testimony of Janis Wolak). In addition,

the Commission's finding in 1988 regarding the demand for youthful-looking performers,

---

[6] Plaintiffs appear to assume that the Statutes apply only to sexually-explicit images portraying adults. However, the Statutes apply to any production of child pornography as well as any production of visual images that, if they depicted an individual under eighteen, would be child pornography. *Compare* 18 U.S.C. §§ 2257(h)(1), 2257A(h)(1) (cross-referencing definition of "sexually-explicit conduct" in § 2256(2)(A)), *with* 18 U.S.C. § 2256(8) (defining "child pornography" by reference to "sexually-explicit conduct" as defined in that section). As the Third Circuit recognized in *FSC II*, the likelihood that those who intentionally produce child pornography regularly violate the Statutes' requirements in no way undermines the Government's interest in imposing age verification and recordkeeping requirements. *See FSC II*, 677 F.3d at 536 n.12 (rejecting the notion that the possibility of violating or circumventing a statutory requirement can negate the government's interest).

including performers who are indistinguishable from, if not actually, children, was reaffirmed by the evidence adduced at trial. *FSC III*, 957 F. Supp. 2d at 584 (finding that "[y]outhful-looking performers are ubiquitous in the adult entertainment industry and there is a significant market for pornographic materials depicting such individuals"); *see also FSC I*, 406 F. Supp. 2d at 1207 (finding in 2005 that the existence of a "significant market for pornography involving young-looking performers" is "undisputed"). Courts have repeatedly inferred a risk from these realities, recognizing the "obvious" connection between age verification requirements and ensuring that performers in sexually-explicit depictions are adults. *Free Speech Coal. v. Gonzales*, 406 F. Supp. 2d 1196, 1207 (D. Colo. 2005) (reaching "common sense conclusion" that the "extensive demand" for youthful performers in visual depictions of sexually explicit conduct creates a "substantial risk that performers under the age of 18 will be used in such material"); *see also ALA*, 33 F.3d at 88 (concluding that "it seems obvious" that the requirements "advance the abatement of child pornography in fundamental ways").

Moreover, there is no doubt that child pornography prosecutions are unable to address this problem fully, not only because of limited resources, but also "because the children depicted in child pornography frequently cannot be found," making it difficult for a prosecutor seeking a conviction under § 2251 to prove age unless the person depicted is "unmistakably a child." *United States v. Malloy*, 568 F.3d 166, 176 (4th Cir. 2009) (citing H.R. Rep. No. 98-536, at 3, 7-8 (1984)); *see United States v. Katz*, 178 F.3d 368, 373 (5th Cir. 1999) (upholding district court's exclusion of certain images in a child pornography prosecution because the Government was unable to present sufficient evidence of the subjects' ages); *United States v. Riccardi*, 258 F. Supp. 2d 1212, 1219 (D. Kan. 2003) (describing exclusion of four out of six computer images on the ground that a jury would be unable to determine the age of individuals depicted, and

explaining that only the images "contain[ing] images of extremely young models" were admitted); Wolak testimony, 35:15-25 (explaining that due to the difficulty of proving that an image is of a 13 or 14-year-old rather than an adult, prosecutors limit their charges to images of prepubescent children).

Moreover, prosecutions occur only after the harm to a child from sexual exploitation has already taken place. The Statutes establish a system whereby producers must take reasonable measures to prevent the harm from occurring in the first place. Indeed, Plaintiffs themselves admit that they cannot identify the ages of youthful-looking performers by appearance alone and thus would have to check age verification documents even absent the Statutes, in some circumstances. *FSC III*, 957 F. Supp. 2d at 585 ("many Plaintiffs testified that . . . they could not always tell from looking at an individual performer, whether he or she was of majority age"); Defendant's Proposed Findings of Fact [ECF No. 217-1] ¶ 125 (citing Plaintiffs' trial testimony); Pl. Br. at 12-13. Precedent, this Court's prior findings, and common sense thus provide adequate support for the Government's compelling interest here.[7]

### B.  The Statutes Satisfy Strict Scrutiny's Narrow Tailoring Requirement

As applied to Plaintiffs, the Statutes are narrowly tailored to serve the Government's compelling interest. The Supreme Court has explained that strict scrutiny under the First Amendment requires that a content-based law "be narrowly tailored, not that it be 'perfectly

---

[7] In contrast, in the two cases cited by Plaintiffs, the Court was skeptical of an asserted interest in avoiding psychological or reputational harm. *See United States v. Alvarez*, 132 S. Ct. 2537, 2549 (2012) (plurality) (striking down statutory prohibition on false claims of having a received a Congressional Medal of Honor where the Government's only justification for the law was the notion that "the public's general perception of military awards is diluted by false claims"); *Brown*, 564 U.S. at 799-800 (striking down statutory ban on the sale of violent video games to minors where the state could only point to "competing psychological studies," which had been "rejected by every court to consider them," to support the notion that violent video games caused harm to minors). Neither case is similar to this one, where the Government's compelling interest, and the harm it seeks to prevent, are obvious and indisputably real.

tailored.'" *Williams-Yulee*, 135 S. Ct. at 1671 (quoting *Burson v. Freeman*, 504 U.S. 191, 209 (1992)). Moreover, where the burden imposed by a content-based distinction does not "*significantly impinge* on constitutionally protected rights," the Court has refused to consider the possibility of reducing the burden even further "a question of constitutional dimension." *Burson*, 504 U.S. at 210.

Thus, in *Williams-Yulee*, the Court held that a ban on "all personal [campaign contribution] solicitations by judicial candidates" was narrowly tailored, even though some types of solicitations might "raise greater concerns than others" about the potential for undermining confidence in the integrity of the judiciary; as the Court explained, "most problems arise in greater and lesser gradations, and the First Amendment does not confine [the government] to addressing evils in their most acute form." *Williams-Yulee*, 135 S. Ct. at 1671. In *Burson*, the Court held that a restriction only on campaign speech within 100 feet of a polling place was sufficiently narrowly tailored to satisfy strict scrutiny because other types of speech near a polling place did not implicate the same problem; at the same time, in light of the "minor geographic limitation" imposed by that restriction, the Court refused to consider "whether the 100-foot boundary line could be somewhat tighter." *Burson*, 504 U.S. at 207, 210.

Like the laws at issue in *Williams-Yulee* and *Burson*, the Statutes are narrowly tailored, if not perfectly tailored—particularly as applied to Plaintiffs. Like the focus on campaign contribution solicitations in *Williams-Yulee* or on campaign speech in *Burson*, the Statutes' identification of depictions by reference to their sexually-explicit content is necessary in order to limit application of the age verification and recordkeeping requirements depictions that would be child pornography if a minor were used in their production. *See* 18 U.S.C. § 2256(2)(A), (8) and § 2257(h)(1), 2257A(h)(1). Indeed, Plaintiffs do not argue that the content-based language in the

Statutes should be eliminated, or that the resulting content-neutral alternative, requiring age verification and recordkeeping for all films and photographs, regardless of whether they depict sexually-explicit conduct, would be preferable. This is not a case where "[t]he existence of adequate content-neutral alternatives . . . 'undercut[s] significantly'" the conclusion that it is narrowly tailored. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (striking down city ordinance that prohibited cross-burning displays only if they included messages conveying racial or religious bias because content neutral ordinance "not limited to the favored topics"); *Reed*, 135 S. Ct. at 2231 (concluding that sign ordinance's content-based "distinctions fail as hopelessly underinclusive," essentially because a content neutral regulation could have served the same interests that the town put forward to justify singling out certain content-based categories).[8]

Plaintiffs also argue that the Statutes are not narrowly tailored as applied to them because "a large body of their own work . . . was in no way related to child pornography." Pl. Br. at 16. However, their assertion that they are subject to the Statutes' requirements means that they do produce work that, if it included minors, would qualify as child pornography under 18 U.S.C. § 2256. In fact, any work that would *not* qualify as child pornography if it depicted a minor would not be subject to the Statutes in the first place. This Court and the Third Circuit have suggested only two possible categories where a producer may be wholly exempt from the Statutes based on the content of the work that he produces—first, a situation where a producer

---

[8] Of course, instead of imposing the age verification and recordkeeping requirements on visual depictions of actual or simulated sexually explicit conduct, the Statutes could have been worded differently, to apply to any depiction where the use of a minor in that depiction would violate 18 U.S.C. § 2251(a), which prohibits the production of child pornography. The Statutes would presumably then be deemed content neutral on their face although their scope would be no different than it is under the current wording. There is little point in invalidating the current wording of the Statutes under strict scrutiny when the exact same requirements, described with different words, would be subject to intermediate scrutiny and thus constitutional under this Court's and the Third Circuit's prior decisions in this case.

only creates depictions of clearly mature adults, and second, a situation where an adult couple creates a private depiction of themselves for purely private use. *FSC II*, 677 F.3d at 537, 538. However, the Court's factual findings, based on the evidence adduced at trial, make clear that none of the Plaintiffs fall within either category. *FSC III*, 957 F. Supp. 2d at 584, 586.

Instead, the Court found that "the overwhelming nature of Plaintiffs' involvement in the adult pornography industry is commercial," that the work that Plaintiffs produced could be "purchased or used by consumers in different ways" regardless of Plaintiffs' intent, that "[no] Plaintiff is an exclusive producer of sexually explicit depictions of 'clearly mature' adults," that "[y]outhful-looking performers are ubiquitous in the adult entertainment industry and there is a significant market for pornographic materials depicting such individuals," that "the youthful-looking performer is pervasive across pornography genres," that "Plaintiffs *are* interested in using youthful-looking performers," that Plaintiffs "could not always tell from looking at an individual performer, whether he or she was of majority age," and that "[no] Plaintiff produces purely noncommercial sexual depictions or maintains records for such depictions." *Id.* at 584-86.

While Plaintiffs appear to view the Third Circuit's now-vacated decision in *FSC IV* as establishing that the Statutes are not narrowly tailored as a foregone conclusion, the Third Circuit in *FSC IV upheld* the Statutes as applied to Plaintiffs under intermediate scrutiny, and after vacating that decision, the Third Circuit did not address the merits of strict scrutiny's narrow tailoring prong; instead, it remanded that issue to this Court. *FSC V*, 825 F.3d at 164.

Moreover, when analyzing the Statutes under intermediate scrutiny, both this Court and the Third Circuit recognized that the Statutes' burdens were minimal. This Court reasoned that "every Plaintiff . . . derives commercial revenue from these depictions, and the burden associated with record-keeping is a justifiable cost of doing business." *FSC III*, 957 F. Supp. 2d at 591. The

Third Circuit similarly recognized that, based on the evidence at trial, the overall burden of complying with the Statutes' age verification and recordkeeping requirements was "relatively minimal." *FSC IV*, 787 F.3d at 155. Indeed, no Plaintiff was prohibited by the Statutes' requirements from producing depictions of sexually explicit conduct; rather, "the fact that some Plaintiffs are avoiding publishing certain images is not directly attributable to the Statutes and regulations themselves and is not equivalent to a governmental ban." *Id.*; *see also FSC III*, 957 F. Supp. 2d at 585 (finding that while some expression may be "more costly or burdensome to produce," no form of expression was "being blocked altogether").

Most importantly, the Third Circuit recognized that any incremental increase in the burden on any Plaintiff that could be attributed to verifying ages and keeping records for "clearly mature performers *on top of* the records they must maintain for young performers" was not "significant." *FSC IV*, 787 F.3d at 158 (emphasis added) (further stating that "any clearly mature performers would be just one more data point in a preexisting recordkeeping scheme").[9]

These facts are sufficient to show that the Statutes are narrowly tailored as applied to Plaintiffs. Every Plaintiff produces depictions that fall well within the scope of valid applications of the Statutes, even under strict scrutiny. Moreover, it continues to be true that the Statutes' requirements are not very restrictive to begin with, and no Plaintiff claimed that the requirements would be less burdensome if they applied only to some, but not all, of that Plaintiff's depictions. Given the minimal burdens at issue, this Court should apply the reasoning of *Burson* and

---

[9] While some of the Third Circuit's earlier statements in this analysis suggested that the Statutes imposed burdens or applied to *performers*, it clearly recognized here that the Statutes properly apply to *producers* and that the assessment of burdens must be viewed from the perspective of a producer, and in an as-applied context, from the perspective of a Plaintiff, all of whom have brought claims in their role as producers or representatives of producers. *See also id.* at 153 (recognizing a plaintiff in an as-applied challenge is asserting " 'that *the acts of his that are the subject of the litigation* fall outside what a properly drawn prohibition could cover'" (quoting *Bd. of Trs. v. Fox*, 492 U.S. 469, 482 (1989))).

conclude that, because all Plaintiffs produce a significant number of depictions validly within the Statutes' scope, any question of whether some quantity of depictions could be excluded from the Statutes' requirements is not "a question of constitutional dimension." *Burson*, 504 U.S. at 210.[10] As discussed below, the Statutes are also "the least restrictive means among available, effective alternatives," of serving the Government's compelling interest in protecting children from sexual exploitation. *Alvarez*, 132 S. Ct. at 2551 (quoting *Ashcroft v. ACLU*, 542 U.S. at 666).

### 1.  An Age Cut-Off Would Not Be Less Restrictive

Plaintiffs repeat their narrow tailoring argument in suggesting that an age cut-off, such that age verification and recordkeeping would not be required if a performer were above the age of 30, would be a less restrictive alternative to the Statutes' universal age verification requirement. *See* Pl. Br. at 24-25. While Plaintiffs again cite the now-vacated *FSC IV* (which Plaintiffs call *FSC II*) as endorsing that notion, the Third Circuit did not decide the issue. *FSC V*, 825 F. 3d at 164. In addition, full consideration of such an alternative compels the conclusion that, as a practical matter, it is no less restrictive than a universal requirement.

As discussed above, the minimal nature of any additional burden imposed by requiring age verification for all individuals, rather than only some of them, counsels against viewing this distinction as constitutionally significant, particularly with respect to Plaintiffs' as-applied claims. *See Burson*, 504 U.S. at 210. Again, no Plaintiff testified at trial that an age cut-off was a

---

[10] In their narrow tailoring argument, Plaintiffs also suggest other instances—such as sexting, communicating on private adult social networking websites, or qualifying as a "secondary," rather than primary producer— where, they contend, the Statutes do not serve the Government's compelling interest in protecting children from sexual exploitation. Pl. Br. at 16, 17. These examples have no relevance to Plaintiffs' as-applied claim because no Plaintiffs have asserted that they engage in sexting or social networking, and none of the Plaintiffs qualifies as exclusively a secondary producer. In any event, secondary producers are necessarily subject to the Statutes because, as explained above, the Government's compelling interest here includes establishing a scheme whereby the origin of a sexually-explicit depiction can be traced, and the age verification records for that image can be found.

desirable alternative, or that adding an age cut-off to the Statutes would reduce any burdens faced by Plaintiffs, and common sense suggests otherwise. An age cut-off would mean that Plaintiffs would have to worry not only about whether a performer was under eighteen, for purposes of avoiding the production of child pornography, but also about whether a performer was over 30, for purposes of determining whether the age verification and recordkeeping requirements applied or not.

The situation here is different from age verification requirements in other contexts, such as in sales of alcohol or tobacco. As Plaintiffs point out, some laws in those contexts do establish an age cut-off. Pl. Br. at 25. However, unlike here, such laws do not typically require that alcohol or tobacco sellers make copies and keep records of age verification documents so that compliance with the cut-off is itself subject to verification. That distinction reflects the different context presented by this case. Here, records are necessary because sexually-explicit depictions, unlike tobacco or alcohol, do not disappear when they are used or consumed but instead may be copied or otherwise used by secondary producers, who rely on those records to fulfill their own age verification obligations. At the same time, records also provide a means for law enforcement to verify compliance with the Statutes' age verification requirements long after a depiction is produced.

As this Court previously found, age cannot be determined based on appearance alone. However, if an age cut-off were established, producers would face the need to determine, not only whether a potential performer is a minor, but also whether that individual is above or below the age cut-off, whatever it might be. Producers thus would have to check IDs, or rely on inherently flawed subjective assessments, in order to determine whether the age verification requirements applied. Moreover, in order to avoid potential disputes with law enforcement over

whether a particular individual is above or below the age cut-off, a producer would need documentation that the performers for whom he had no age verification records were actually over 30; in other words, he would need age verification records in order to show that he did not need age verification records. Thus, there is no reason to conclude that an age cut-off would be less restrictive as a practical matter.

In addition, as explained above, the Third Circuit recognized that any incremental additional burden imposed on a producer by a universal age verification requirement was not significant, and indeed, the evidence adduced at trial supports the finding that any such burden is not only small but de minimis. Many of Plaintiffs' depictions contain youthful-looking individuals together with older individuals.[11] As this Court found, the same is true generally in the "adult entertainment industry." *FSC III*, 957 F. Supp. 2d at 584 (finding that "the youthful-looking performer is pervasive across pornography genres" including "in 'MILF' porn and granny porn, even though the latter genres theoretically focus on showing older-looking adults"). Thus, any given depiction may be subject to the same or nearly identical labeling and recordkeeping requirements even if age verification was not required for individuals above age 30.[12]

In light of these factors, an age verification scheme including an age cut-off is not less restrictive, particularly with respect to Plaintiffs, all of whom use young individuals in their work. As a practical matter, Plaintiffs and other producers are likely to follow the same age

---

[11] *See* Def. Findings of Fact ¶ 86 (Steinberg photographs include 25-year-old having sex with 73-year old; and 21-year-old having sex with 53-year-old); 133-34 (MILF and "granny porn" pornography and pornography produced by Sinclair Institute and FSC members David Connors and Levine often includes teens and other youthful looking individuals).

[12] In some instances, a producer may also use the same performer before and after the performer turns 30 and thus would likely already have age verification records for that performer. *See, e.g*., Def. Proposed Findings of Fact ¶ 16 (citing trial testimony that Plaintiff Levine began appearing in sexually-explicit depictions at age 25 and continues to do so).

verification and recordkeeping requirements for all their performers, regardless of age, even if the requirements technically included an age cut-off. Following the requirements for everyone, instead of trying to figure out when to follow them and when not to, would simply be easier—and that is the scheme that the Statutes have established. *Cf. Connection Distrib. Co.*, 557 F.3d at 329–30 (§ 2257 "creates a compliance system in which law-enforcement officers not only can identify the performers depicted in magazines and movies and verify their ages but also can eliminate subjective disputes with producers over whether a model's apparent age should have triggered an age-verification check"). The notion of an age cut-off alternative therefore does not warrant invalidating the Statutes as applied to Plaintiffs.

### 2. Eliminating the Statutes and Relying Solely on Direct Prohibitions on Child Pornography Would Be a Less Effective Alternative

Plaintiffs suggest that simply eliminating the Statutes' age verification and recordkeeping scheme altogether and instead relying on direct child pornography prohibitions is the "most obvious alternative." Pl. Br. at 19. However, the same rationale that Congress identified when enacting the Statutes in the first place, and that justifies the Government's compelling interest, requires the conclusion that this alternative is less effective. As explained above, the Statutes were intended to fill a gap in existing law. *See FSC II*, 677 F.3d at 535-36 ("Both the [Commission] Report and Congress's findings related to the 2006 Act expressed that an extensive interstate market for child pornography continued to exist and that children were still at risk for sexual exploitation by pornographers," and that the Statutes were enacted "to remedy these problems" (citing *Report* at 608-09; Adam Walsh Act § 501(1)(B))). When the Government encounters a film or photograph that may be child pornography, it bears the burden of establishing that the depiction includes a minor, but the producer of the image and the identity of the individuals portrayed may not be known, and older minors can be indistinguishable from

adults based on appearance alone, particularly given the prevalence of youthful-looking performers in adult pornography. Indeed, absent labels affixed pursuant to the Statutes, adult pornography is often indistinguishable from child pornography. The Statutes' requirements serve to aid law enforcement and secondary producers by allowing adult pornography to be identified as such, and prevent circumvention of child pornography prohibitions by those who might otherwise take advantage of or rely on the inherent difficulties in determining age based on appearance alone. The fact that child pornography prosecutions occur does not support the notion that child pornography prohibitions are alone sufficient; to the contrary, such prosecutions demonstrate that child pornography is an ongoing problem. On the other hand, while Plaintiffs point to low numbers of prosecutions under the Statutes, those figures do not suggest that the Statutes are not serving their intended purpose, which after all is prophylactic in nature. Plaintiffs, for example, acknowledge that they comply with the Statutes.

Moreover, Plaintiffs' attempt to analogize the situation here to *Stevens* is misguided because the Third Circuit's *Stevens* decision expressly distinguished a federal law seeking to ban visual depictions of animal cruelty, where the underlying conduct was already prohibited by state or federal law, from the child pornography context. *United States v. Stevens*, 533 F.3d 218, 235 (3d Cir. 2008) (concluding that the animal cruelty law was both under- and over-inclusive but distinguishing it from "the realm of child pornography and child sexual abuse," where the Supreme Court in *Ferber*, 458 U.S. at 760, had already concluded that child pornography laws may be the "'most expeditious' or the 'only practical method' of prosecuting such acts"). This proposed alternative should be rejected because it would reopen the very gap that the Statutes were designed to fill.

### 3.   Relying on Producer Certifications and Unspecified Industry Standards Would Be Less Effective Alternatives

Plaintiffs also suggest that a regime that allowed any producer simply to certify that he already collects and maintains age verification documentation pursuant to other laws or "as a matter of industry practice" would be less restrictive than the Statutes, as would a regime that simply assumed that all producers of sexually explicit depictions followed such an industry practice. Pl. Br. at 21-22. Plaintiffs note that the Statutes contain a certification option for producers of commercial depictions of simulated sexually-explicit conduct or actual conduct limited to lascivious display of the genitals, when those depictions are commercially distributed through channels that would not lead an ordinary person to conclude that the depictions were child pornography, and the producers are subject to age verification and recordkeeping requirements pursuant to other laws or industry standards. *Id.* at 21 (citing 18 U.S.C. § 2257A(h)(1)(A)). Plaintiffs argue that either of these proposals would be effective because Jeffrey Douglas, Chair of FSC's Board of Directors, testified that producers in the "adult industry" check performers' ages, Plaintiffs Barbara Nitke and Marie Levine testified that they do as well, and ASMP Executive Director Eugene Mopsik testified that commercial photographers have an incentive to verify ages because they cannot rely on contracts signed by minors. *Id.*

Some Plaintiffs may already be eligible for the § 2257A(h) certification option, if the sexually-explicit conduct depicted in their films or photographs is limited to simulated conduct and/or actual lascivious display of the genitals. However, extending the certification option to all producers, or relying on industry standards without certification, would not effectively serve the Statutes' compelling interests. The current scope of the certification option already represents the least restrictive means, with respect to such an exception. The option is available for "certain

commercial industries, including the motion picture industry," that do not depict actual sexually-explicit conduct (other than lascivious display of genitals) because those industries "'currently operate[] under a panoply of laws, both civil and criminal, as well as regulations and labor agreements governing the employment of children in any production.'" *FSC II*, 677 F.3d at 534 n.11 (quoting 152 Cong. Rec. S8012-02, S8027 (July 20, 2006) (statement of Sen. Leahy)); *see also FSC IV*, 787 F.3d at 147 n.1 (recognizing that the certification exemption applies "to industries where Congress believed that existing regulatory schemes already 'adequately achieve[d] the same age-verification ends as the Statutes,' such as the mainstream motion picture and television industries"). Because minors may perform in mainstream film and television outside the realm of sexually-explicit depictions, their participation in these industries is governed by film ratings standards (which, though not mandatory, may affect a film's distribution), FCC broadcast standards, Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") union agreements, and state regulation of child labor.

In contrast, as explained above, and as demonstrated at trial, there is no distinct "adult entertainment industry" that is governed by an identifiable regulatory scheme or set of uniform standards, aside from the Statutes. *See FSC V*, 825 F.3d at 170 (recognizing there is no "regime of rules" governing the production of sexually-explicit material aside from the Statutes). The Statutes apply to producers who publish or distribute their films or photographs in a way that does not qualify as "commercial" in the standard sense, such as on the Internet, on sites such as Pornhub where anyone can upload their own material, or on social media. Yet these producers may qualify as part of the "adult entertainment industry" because of the nebulous nature of the industry. Plaintiffs have failed to identify any mechanism that limits membership in FSC or ASMP to those who follow certain established standards. *See* Douglas testimony, Tr. of June 3,

2013, 118:25-21, 140:23-141:6.[13]

Thus, despite Mr. Douglas' assertion that FSC members consider child pornography "immoral and wrong," Pl. Br. at 22, the certification/industry standard alternative would allow producers who seek to distribute child pornography to join FSC as a cover for their illegal activities, thus facilitating the sexual exploitation of children. Indeed, the range of Plaintiffs in this case demonstrates that the Statutes apply beyond any definable "industry," simply because a variety of individuals produce sexually-explicit films and photographs for a variety of reasons. Moreover, not all Plaintiffs testified that they would check all performers' ages and maintain records, in the absence of the Statutes. Ms. Nitke, a photographer, testified that she would check drivers' licenses only if, in her subjective opinion, she were unsure whether an individual was over eighteen. Tr. June 7, 2013, 167:12-15. Ms. Ross testified that she and Ms. Dodson did not check IDs for submissions to their genital art gallery until the enactment of 18 U.S.C. § 2257A. Tr. June 4, 2013, 177:9-16. And the testimony of Ms. Alper—an ASMP member—made clear that she had no intention of verifying individuals' ages because she wished to photograph them anonymously as they engaged in sexually-explicit conduct on Fire Island. *FSC III*, 957 F. Supp. 2d at 573; *see also id.* at 587 (citing Alper's testimony that that she had not verified individuals' ages in the past when taking photographs in S&M clubs, when observing that "some Plaintiffs suggested that without 2257, they would not necessarily request IDs from every model").

Significantly, Plaintiffs have not identified any written manifestation of the supposed industry standards that they reference (nor is that surprising when, as noted, the standard in existence for the past twenty-some years has presumably been compliance with the Statutes).

---

[13] Moreover, given that § 2257 has been in effect for over twenty years, any current "industry standard" would necessarily be governed by the § 2257 requirements. It is impossible to know what the industry standard might be if the Statutes were not in effect. *See Burson*, 504 U.S. at 208 ("The fact that these laws have been in effect for a long period of time also makes it difficult for the States to put on witnesses who can testify as to what would happen without them.").

This situation therefore differs from that in *Brown*, where the Court held that the video game industry's voluntary rating system qualified as a less restrictive alternative. *See Brown*, 564 U.S. at 803. Unlike the situation here, the voluntary rating system in *Brown* was implemented and overseen by an industry authority—the Entertainment Software Rating Board—and had been praised as effective by the Federal Trade Commission. *Id.*

In contrast, Plaintiffs' proposal would essentially remove any oversight of producers' age verification and recordkeeping practices and allow producers to monitor themselves, unregulated. However, that was the situation in effect when § 2257 was originally enacted, and the Attorney General's Commission found, and Congress agreed, that it resulted in gaps in the child pornography prevention and enforcement scheme. A return to that situation now would likely be even less effective, and create wider gaps, given the proliferation of sexually-explicit depictions on the Internet. Depictions of actual sexually-explicit conduct involving young-looking adults are distributed through some of the same channels as child pornography. Wolak Testimony, Tr. June 11, 27:21-28:6 (explaining child pornography is transmitted or posted in a variety of ways, including by e-mail, on commercial websites, and through internet applications). In the absence of the Statutes' labeling requirements, such depictions are likely to impede law enforcement efforts for the same reasons explained in the *Report*, but on a larger scale. Indeed, all the reasons set forth above for rejecting the alternative of simply eliminating the Statutes also apply here. The Court therefore should reject these proposed alternatives as less effective.

> **4.      Excluding a Subset of Producers Other than Plaintiffs from the Age Verification and Recordkeeping Requirements Does Not Qualify as Less Restrictive as Applied to Plaintiffs and Would Be a Less Effective Alternative**

Plaintiffs propose as another less restrictive alternative a law that is identical to the Statutes but excludes private, noncommercial depictions created and viewed by adults in their

homes. Pl. Br. at 26. However, such a proposal cannot properly be deemed a less restrictive alternative to the Statutes, particularly in an as-applied claim where none of the Plaintiffs would be impacted. This Court has found that all Plaintiffs qualify as commercial producers, and none of them has produced purely private depictions. *FSC III*, 957 F. Supp. 2d at 583, 586. To invalidate the Statutes as applied to Plaintiffs based on the notion that the Statutes could have excluded from their application an entirely different category of people would make the notion of an "as applied" strict scrutiny challenge meaningless. Indeed, under such a theory, any law subject to strict scrutiny would automatically be unconstitutional as applied to one person if the exclusion of an entirely different person from the law's application would not make the law less effective.

Moreover, age verification and recordkeeping requirements that did not apply to private, noncommercial depictions would be less effective in serving the Government's compelling interests. After all, child pornography is commonly created in private, noncommercial settings, and depictions created in such settings are often disseminated outside the home. *FSC I*, 729 F. Supp. 2d at 703 (citing 152 Cong. Rec. H5724 (2006) (statement of Rep. Pence)). The Government's interest in preventing and prosecuting child pornography would be served by requiring age verification, recordkeeping, and labeling in this context—even if, for other reasons and as a practical matter, the Government is unlikely to enforce the Statutes against adults who make sexually-explicit films and photographs in their own home for their own private use.[14]  *Cf. Connection Distrib. Co.*, 557 F.3d at 339. The Court should reject this proposed alternative.

---

[14] For purposes of an effectiveness analysis in an as-applied challenge by Plaintiffs, it is irrelevant whether application of the Statutes to the production of sexually-explicit depictions of an adult couple for their private use would be unconstitutional as applied to the couple.

     **5.**     **Age Verification and Recordkeeping Requirements that Apply Only to Primary Producers Would Be Less Effective**

Yet another alternative proposed by Plaintiffs is a scheme in which secondary producers—those who did not make the film or photograph but publish or reproduce it, 28 C.F.R. § 75.1(c)(2)—are exempted from compliance with the age verification and recordkeeping requirements. However, such a scheme, again, would be less effective. As the D.C. Circuit explained in *ALA*, one of the purposes of the Statutes is "to deprive child pornographers of access to commercial markets by requiring secondary producers to inspect (and keep a record of) the primary producers' proof that the persons depicted were adults at the time they were photographed or videotaped." *ALA*, 33 F.3d at 89. Imposing the requirements on secondary producers adds to the effectiveness of the statutory scheme by conditioning primary producers' access to the secondary producers' markets on the secondary producers' verification that the material they receive is not child pornography. *Id.* In contrast, if the requirements did not apply to secondary producers, they could, either intentionally or inadvertently, disseminate child pornography and then, if prosecuted, attempt to "plead honest mistake." *Id.* (describing AG Commission's finding that the lack of age verification requirements "provided an excuse to those in the distribution chain, who could profess ignorance that they were actually dealing in sexual materials involving children").

Moreover, it is questionable that exempting secondary producers from the requirements would be significantly less restrictive. As Plaintiffs point out, some secondary producers are also primary producers, so eliminating the requirements on secondary producers would only lead to an incremental reduction in any burden, which, as explained above, is de minimis. In addition, Plaintiffs mischaracterize the burdens that the Statutes impose on wholesalers. To the extent wholesalers merely distribute films or photographs, they are already exempt from the Statutes'

requirements. *See* 18 U.S.C. § 2257(h)(2)(B)(ii). The only reason the wholesalers that Plaintiffs

describe are subject to the age verification and recordkeeping requirements is, apparently, that

they choose to publish catalogs containing pictures of the covers of the films that they seek to

sell. Pl. Br. at 27. As Plaintiffs concede, these wholesalers may rely on records provided by the

primary producers of the videos. *Id.* However, contrary to Plaintiffs' assertion, the wholesalers

do *not* need to segregate the 2257 records relating to the performers who appear on the videos'

covers from other 2257 records that relate to performers in the videos themselves. The

segregation provision in 28 C.F.R. § 75.2(e) requires that 2257 records be maintained separately

from a producer's regular business records, or other records; it does not require 2257 records to

be kept separately from other 2257 records.[15] In addition, the indexing and cross-referencing

required under the Statutes is easily achieved using a digital spreadsheet or other software. This

proposed alternative thus should be rejected.

### 6.     Setting a Different Statutory Penalty Range for Those Who Violate the Age Verification and Recordkeeping Requirements Would Not Be Less Restrictive

The final alternative proposed by Plaintiffs is a scheme that eliminates any criminal

penalties for violations of the Statutes and instead imposes administrative sanctions. Pl. Br. at 28.

The Court should reject this alternative as well because it does not qualify as less restrictive and

it would be less effective. The Third Circuit recognized that the Statutes in their current form had

not prevented any Plaintiff from producing any depiction. *FSC IV*, 787 F.3d at 155 (concluding

that Plaintiffs' choices to avoid publishing certain images were "not directly attributable to the

---

[15] The segregation requirement in § 75.2 does not appear in the Statutes and thus cannot be
deemed a basis to invalidate the Statutes. This requirement was included in the regulations as a
means to minimize the intrusiveness of any Government inspections of a producer's 2257
records by ensuring that inspectors would not inadvertently come across a producer's other
business records. Dep't of Justice, Final Rule, 70 Fed. Reg. 29607, 29613 (2005) ("The
requirement that records maintained pursuant to section 2257 be segregated . . . protects
producers from unbridled fishing expeditions.").

Statutes"). Moreover, changing the potential penalties for statutory violations would not change the scope of permissible speech or conduct under the Statutes. In addition, while the Court noted that two of the Plaintiffs had refrained from certain projects, they did not do so because of the Statutes' criminal penalties. *FSC III*, 957 F, Supp, 2d at 585. Rather, both of these projects involved making or publishing sexually-explicit depictions of anonymous individuals, whose ages could not be determined from the depictions themselves. The Plaintiffs in question (Alper and Dodson and Ross) did not testify that they would go forward with these projects if the penalty for violation of the age verification and recordkeeping requirements were administrative rather than criminal. However, to the extent such a change would encourage them to violate the requirements and to proceed with producing sexually-explicit depictions of individuals of unknown age, this alternative would be less effective in achieving the Government's compelling interest. Accordingly, the Court should reject this alternative as well and hold that there is no less restrictive alternative available that would serve the Government's compelling interest in preventing sexual exploitation of children.

## III.   JUDGMENT SHOULD BE ENTERED FOR DEFENDANT ON PLAINTIFFS' FACIAL OVERBREADTH CLAIM

### A.   The Court Should Not Address Plaintiffs' Facial Overbreadth Claim If It Holds that the Statutes Are Invalid As Applied to Plaintiffs

Plaintiffs' First Amendment claims at this stage of the case are twofold. First, as discussed above, Plaintiffs assert as-applied claims, which the Third Circuit has directed must be evaluated under strict scrutiny. Second, Plaintiffs assert a facial challenge under the First Amendment's overbreadth doctrine. This facial challenge is only at issue, however, if Plaintiffs fail in their as-applied challenges. The overbreadth doctrine provides an exception to the usual prudential standing requirement that "a person to whom a statute may constitutionally be applied

will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973); *accord Serv. Employees Int'l Union, Local 3 v. Municipality of Mt. Lebanon*, 446 F.3d 419, 423 (3d Cir. 2006). Overbreadth claimants still must satisfy Article III standing requirements, and thus must show an injury-in-fact on the ground that "their own *constitutionally unprotected interests* will be adversely affected by application of the [challenged] statute." *Id.* (emphasis added); *see also Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1061 (2d Cir. 1991) (overbreadth exception "only allows those who have suffered some cognizable injury, but whose conduct is not protected under the First Amendment, to assert the constitutional rights of others").

A plaintiff who succeeds in showing that a law violates the First Amendment as applied to him no longer has an injury-in-fact that could be redressed by a ruling that the law is also facially overbroad. *See Belitskus v. Pizzingrilli,* 343 F.3d 632, 649–50 (3d Cir. 2003) (cautioning that district courts "should craft remedies no broader than necessary to provide full relief to the aggrieved plaintiff" (internal quotation omitted)). This notion is consistent with the general principle that "[f]acial challenges are disfavored," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008), and the "usual judicial practice" of addressing an as-applied challenge before a facial challenge, *Green Party v. Aichele*, 89 F. Supp. 3d 723, 737–38 (E.D. Pa.), *aff'd,* 103 F. Supp. 3d 681 (E.D. Pa. 2015) (quoting *United States v. Mitchell*, 652 F.3d 387, 406 (3d Cir. 2011)). Indeed, it would be particularly inappropriate to proceed to consideration of an overbreadth challenge when a plaintiff has already obtained a ruling that a law is invalid as applied, given the nature of such a challenge as requiring broad consideration of applications of a statute to parties not before the court. The Supreme Court thus has recognized that a court should

address an overbreadth claim only if the challenged law has been held valid as applied to the plaintiff before it. *See, e.g.*, *Bd. of Trustees*, 492 U.S. at 484–85 ("It is not the usual judicial practice, however, nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied."); *N.Y. State Club Ass'n, Inc. v. City of New York,* 487 U.S. 1, 11 (1988) (recognizing facial overbreadth challenge requires a plaintiff to demonstrate facial overbreadth "even though [a law] may be validly applied to the plaintiff and others").

Here, the Statutes should be upheld as applied to Plaintiffs. However, if the Court reaches a contrary conclusion on Plaintiffs' as-applied claims, it should end its First Amendment analysis there and not proceed to Plaintiffs' facial overbreadth claim. Plaintiffs' overbreadth claim continues to rely on the arguments that the Statutes are invalid as applied to clearly mature adults, and that they are invalid as applied to purely private films and photographs produced by consenting adults for private use. Pl. Br. at 29. As this Court and the Third Circuit have recognized, no Plaintiff is in a position to raise an as applied claim on either basis. *FSC III*, 957 F. Supp. 2d at 584 ("There is no evidence that any Plaintiff is an exclusive producer of sexually explicit depictions of 'clearly mature' adults."), 586 ("There is no evidence that any Plaintiff produces purely noncommercial sexual depictions or maintains records for such depictions."); *FSC IV*, 787 F.3d at 160 ("Whether the Statutes and regulations may be constitutionally applied to individuals falling in either those categories are therefore questions we need not reach."). Because any ruling addressing the validity of such applications would not affect Plaintiffs if the Statutes had already been held invalid as applied to them, the Court should decline to reach the issue in such a circumstance.

### B.      Plaintiffs Bear the Burden to Establish Substantial Overbreadth

When first addressing Plaintiffs' overbreadth claim in their post-trial appeal, the Third Circuit recognized that, "[u]nlike an as-applied challenge, the burden falls upon Plaintiffs to demonstrate the Statutes' facial overbreadth." *FSC IV*, 787 F.3d at 160 (citing *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)). The Third Circuit held in that decision that Plaintiffs failed to meet their burden. *Id.* at 165. However, after concluding that the Supreme Court's decision in *Reed* required reconsideration of Plaintiffs' as-applied challenge, this time applying strict scrutiny, the Third Circuit remanded Plaintiffs' overbreadth claim as well. *See FSC V*, 825 F.3d at 164 n.12. Because the overbreadth analysis requires consideration of whether "a substantial number of [the challenged law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *FSC IV*, 787 F.3d at 160 (internal quotation omitted), the Third Circuit evidently considered it possible that the number of constitutional versus unconstitutional applications might be affected by the strict scrutiny standard.

However, given the exceptional nature of an overbreadth challenge in allowing a plaintiff to raise claims on behalf of parties not before the Court, the burden of establishing overbreadth remains with the plaintiff even where the challenged law is subject to strict scrutiny. *Virginia*, 539 U.S. at 122 ("The overbreadth claimant bears the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists."); *N.Y. State Club Ass'n*, 487 U.S. at 14 (the overbreadth claimant must show "that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally").[16]  Plaintiffs argue to the contrary, but the

---

[16]*See also* R. Randall Kelso, *The Structure of Modern Free Speech Doctrine: Strict Scrutiny, Intermediate Review, and "Reasonableness" Balancing*, 8 Elon L. Rev. 291, 397 (2016) ("Reflecting that the doctrine of overbreadth is an exception to application of standard free speech analysis, the challenger bears the burden of establishing overbreadth, as is standard for most defenses. This is true even for cases where the underlying First Amendment claim would be

only case they cite for the notion that the Government must prove that a law is *not* substantially overbroad is *Stevens*, which recited the general principle that a content-based restriction is presumptively invalid early in the opinion, well before reaching the overbreadth analysis. *See United States v. Stevens*, 559 U.S. 460, 468 (2010). Indeed, in *Stevens*, the Court did not address the question of burden with respect to an overbreadth claim, instead noting that the Government "makes no effort to defend such a broad ban as constitutional" and that the Government's only opposition concerned issues of statutory interpretation. *Id.* at 473. *Stevens* therefore cannot be read as overturning well-established precedent regarding the allocation of the burden in an overbreadth claim. Indeed, the same reasoning requires placing the burden on the overbreadth claimant regardless of whether intermediate or strict scrutiny applies. Invalidation under the overbreadth doctrine remains "strong medicine" that should not be "casually employed." *United States v. Williams*, 553 U.S. 285, 293 (2008) (internal quotation omitted).

### C.     The Statutes Are Not Facially Overbroad

Plaintiffs' facial overbreadth claim should be rejected for the same reasons identified by this Court and the Third Circuit in the past. The overbreadth analysis "requires consideration of four factors: (1) 'the number of valid applications' of the statute; (2) 'the historic or likely frequency of conceivably impermissible applications'; (3) 'the nature of the activity or conduct sought to be regulated'; and (4) 'the nature of the state interest underlying the regulation.'" *FSC II*, 677 F.3d at 537-38 (quoting *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 226 (3d Cir. 2004)). Plaintiffs have not shown that any of these factors weigh in their favor. Nor have they shown that "a substantial number of [the Statutes'] applications are unconstitutional, judged in relation to the [Statutes'] plainly legitimate sweep," as would be required to prevail on their

---

analyzed under an intermediate or strict scrutiny standard of review, where the burden is on the government." (citing *Virginia*, 539 U.S. at 122)).

overbreadth claim. *See id.*

In its decision after trial, this Court concluded that "Plaintiffs have failed to demonstrate facial overbreadth with respect to the Statutes' application to depictions of clearly mature adults," finding that "Plaintiffs presented no evidence at trial demonstrating there even exist bona fide, compartmentalized genres of commercial pornography dedicated to depicting mature adults, exclusively." *FSC III*, 957 F. Supp. 2d at 594. This Court also found that Plaintiffs "have failed to show there exists a substantial amount of private communications that even fall under the Statutes' scope," and they also "have failed to show an actual burden or chilling of such communications caused by the Statutes." *Id.* at 596; *accord FSC IV*, 787 F.3d at 162 ("[y]outhful-looking performers appear across pornographic genres regardless of whether the material is expressly categorized as featuring young adults"). The Third Circuit concluded that Plaintiffs had demonstrated "the existence of a universe of private sexually explicit images not intended for sale or trade along with, to a limited degree, a universe of sexually explicit images that depict only clearly mature adults," but noted that the "precise size of these groupings defy easy calculation." *Id.* at 164.

Nevertheless, the Third Circuit agreed with this Court that any invalid applications that Plaintiffs had demonstrated "still pale in comparison with the Statutes' legitimate applications." *Id.* It also acknowledged the fact that facial invalidation on overbreadth grounds is "strong medicine" that "should be used sparingly and only as a last resort," due the "obviously harmful effects" of prohibiting a law's valid applications along with those that are invalid. *Id.* at 164-65. In analyzing the other overbreadth factors, the Third Circuit explained that the "compelling" nature of the Government's interest in protecting children from sexual exploitation by pornographers was "central." *Id.* at 165. Indeed, it recognized that "few objectives are on par

with the 'surpassing importance' of the Government's compelling interest in this case." *Id.* at

166.  In addition, the court emphasized the fact that the Government had established the age

verification and recordkeeping requirements only after finding "that direct prohibitions of child

pornography had not solved the problem," which "supports the Statutes' facial validity." *Id.* It

thus rejected Plaintiffs' overbreadth claim. *Id.* at 166.

Although the Third Circuit's decision in *FSC IV* has been vacated, its prior analyses and

conclusions continue to apply—particularly if the Court addresses Plaintiffs' overbreadth claim

only after concluding that the Statutes remain valid as applied to Plaintiffs. This Court should

hold that the *Gibson* factors continue to weigh against facial invalidation of the Statutes, and that

Plaintiffs have failed to meet their burden to establish substantial overbreadth.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of defendant.

Dated this 12th day of May, 2017.           Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
LOUIS D. LAPPEN
Acting United States Attorney
JOHN R. TYLER
Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
NATHAN M. SWINTON
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Washington, DC
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.1.2(8)(b), I hereby certify that the foregoing Memorandum has been filed electronically and is available for viewing and downloading from the ECF system.  I further certify that the foregoing document was served via ECF on counsel of record for plaintiffs in the above-captioned case.


Dated: May 12, 2017                         /s/
                                            Kathryn L. Wyer