# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREE SPEECH COALITION, INC., et al.** | **)** | **Civil Action No. 2:09-4607** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **JUDGE MICHAEL M. BAYLSON** |
| -vs- | ) | |
| | ) | |
| **THE HONORABLE JEFFERSON** | ) | |
| **B. SESSIONS,** Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' REPLY BRIEF

J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio  44113-1949
(216) 781-5245
(216) 781-8207 (Facsimile)

KEVIN E. RAPHAEL (72673)
KER@Pietragallo.com
J. PETER SHINDEL, JR. (201554)
JPS@Pietragallo.com
PIETRAGALLO GORDON ALFANO BOSICK
    & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200
(215) 981-0082 (Facsimile)

Attorneys for Plaintiffs

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.      THE STATUTES DO NOT SURVIVE STRICT SCRUTINY. . . . . . . . . . . . . . . . . . . . . . 1

      A.      The Government Has Failed to Establish the Existence of the Problem the
        Statutes Were Purportedly Enacted to Address. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.      The Statutes Are Not Narrowly Tailored. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      C.      The Statutes Do Not Employ the Least Restrictive Means to Advance the
        Government's Interest in Preventing the Use of Minors in the Production of
        Sexually Explicit Expression. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            1.      The Government has failed to produce evidence establishing criminal
                laws prohibiting and punishing child pornography are not effective
                alternatives to the statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            2.      The Government has failed to produce evidence establishing the
                certification procedure of 18 U.S.C. § 2257A  (h) and practices used
                to protect intellectual property rights are not effective alternatives to
                the statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            3.      The Government has failed to produce evidence establishing an
                age–verification law limited to persons who might reasonably appear
                to be underage is not an effective alternative to the statutes. . . . . . . . . . 21

            4.      The Government has failed to produce evidence establishing a
                recordkeeping law limited to commercial productions is not an
                effective alternative to the statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            5.      The Government has failed to produce evidence establishing a
                recordkeeping law limited to primary producers of sexually explicit
                expression is not an effective alternative to the statutes. . . . . . . . . . . . . 24

            6.      The Government has failed to produce evidence establishing a
                recordkeeping law enforced by administrative sanction is not an
                effective alternative to the statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF CONTENTS (cont'd)

Page

II.     THE STATUTES ARE UNCONSTITUTIONALLY OVERBROAD. . . . . . . . . . . . . . 26

III.    THE FREE SPEECH COALITION AND THE AMERICAN SOCIETY OF MEDIA
        PHOTOGRAPHERS HAVE STANDING ON BEHALF OF THEIR MEMBERS TO
        CHALLENGE THE STATUTES UNDER THE FIRST AMENDMENT. . . . . . . . . . . 27

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# **TABLE OF AUTHORITIES**

Page

<u>CASES</u>

*Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (3rd Cir. 2003). . . . . . . . . . . . . . . . . 13, 27

*Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181 (3rd Cir. 2008). . . . . . . . . . . . 13, 15, 22, 25

*Ashcroft v. Am.Civil Liberties Union,*
     542 U.S. 656 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 19

*Ashcroft v. Free Speech Coalition, Inc.*, 535 U.S. 234 (2002) . . . . . . . . . . . . . . . . . . . . . . . 17, 29

*Brown v. Entertainment Merchants Ass'n,* 564 U.S. 786 (2011). . . . . . . . . . . . . . . . 1, 5, 6, 8, 9

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3rd Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Burson v. Freeman*, 504 U.S. 191 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.,*
     518 U.S. 727 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Edenfield v. Fane*, 507 U.S. 761 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Edwards v. D.C.*, 755 F.3d 996 (D.C. Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Free Speech Coalition v. Attorney General U.S.,*
     787 F.3d 142 (3rd Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 21, 22, 27

*Free Speech Coalition, Inc. v. Attorney General of the United States,*
     677 F.3d 519 (3rd Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Free Speech Coalition, Inc. v. Attorney General United States,*
     825 F.3d 149 (3rd Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26-28

*Free Speech Coalition, Inc. v. Holder,*
     729 F.Supp.2d 691 (E.D. Pa. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Free Speech Coalition, Inc. v. Holder*, 957 F. Supp.2d 564 (E.D. Pa. 2013). . . . . . . . . . . . 8, 23

*Frisby v. Schultz*, 487 U.S. 474, 485 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

**<u>TABLE OF AUTHORITIES (cont'd)</u>**

Page

*Hill v. Colorado*, 530 U.S. 703 (2000) (Scalia, J. dissenting). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*McCullen v. Coakley*, 134 S.Ct. 2518 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
280 F.3d 278 (3rd Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*R.A.V. v. St. Paul*, 505 U.S. 377 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

*Sable Commc'ns of California, Inc. v. F.C.C.*,
492 U.S. 115 (1989**)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Simon & Schuster, Inc. v. Member of N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 24

*Thomas v. Schroer*, Case No. 13–cv–02987–JPM–cgc,
2017 WL 1208672 (W.D. Tenn., March 31, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Alvarez*, 132 S.Ct. 2537 (2012) (plurality) . . . . . . . . . . . . . . . . . 1, 2, 8, 12, 22, 24

*United States v. Playboy Entertainment Group, Inc.*,
529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 6, 9, 13, 15, 16, 19, 22, 24

*United States v. Stevens*, 559 U.S. 460 (2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wagner v. City of Garfield Heights*, No. 13-3474,
2017 WL 129034 (6th Cir., Jan. 13, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Williams–Yulee v. The Florida Bar*, 135 S.Ct. 1656 (2015). . . . . . . . . . . . . . . . . . . . . . 8, 9, 13-15

# **TABLE OF AUTHORITIES**

Page

CONSTITUTIONAL PROVISION

United States Const., amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-15, 27, 29


STATUTES, RULES AND REGULATIONS

8 U.S.C. § 1324a (e)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 2257. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18, 29

18 U.S.C. § 2257 (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. § 2257A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18, 19, 29

18 U.S.C. § 2257A  (h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

18 U.S.C. § 2257A (h)(1)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 2257A (h)(1)(A)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28 CFR § 75.1, *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

28 C.F.R. § 75.9 (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28 C.F.R. § 75.9 (c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20


MISCELLANEOUS

152 Cong. Rec. S. 8027. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20

Scott G. Hawkins, Perspective on Judicial Merit Retention in Florida,
     64 Fla. L. Rev. 1421 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## I.  THE STATUTES DO NOT SURVIVE STRICT SCRUTINY.

There are certain principles that get lost in Defendant's Brief.

18 U.S.C. §§ 2257, 2257A, as content–based regulations of expression, are presumptively invalid. *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1991); *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817 (2000); *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 660 (2004); *Brown v. Entertainment Merchants Ass'n,* 564 U.S. 786, 799 (2011); *United States v. Alvarez*, 132 S.Ct. 2537, 2544–45 (2012) (plurality).

To overcome that presumption, the Government must present *evidence* establishing that the statutes satisfy the exacting standard of strict scrutiny. The Court in *Playboy* explained why:

> [W]ere we to give the Government the benefit of the doubt when it attempted to restrict speech, we would risk leaving regulations in place that sought to shape our unique personalities or to silence dissenting views. When First Amendment compliance is the point to be proved, the risk of non-persuasion—operative in all trials—must rest with the Government, not with the citizen.

529 U.S. at 818.

It is the rare case in which the Government can clear strict scrutiny's formidable hurdles. *Playboy*, 529 U.S. at 818; *Entertainment Merchants*, 564 U.S. at 799. This is not that rare case.

### A.  The Government Has Failed to Establish the Existence of the Problem the Statutes Were Purportedly Enacted to Address.

The Government writes: "Despite their previous concession that the Government's interest in protecting children from sexual exploitation by pornographers is compelling, Plaintiffs devote over eight pages of their brief to an argument that the compelling interest prong is not satisfied." Defendant's Brief (Doc. 249) at 9.[1] But Plaintiffs have never retreated from their position that the

---

[1]  The Government urges this Court to "reject Plaintiffs' invitation to reconsider this issue because it is out of the scope of the Third Circuit's remand." *Id.* That simply is not so. The Third Circuit remanded for review of the statutes under strict scrutiny. *Free Speech Coalition, Inc. v. Attorney General United States*, 825 F.3d 149, 164 (3rd Cir. 2016). While it noted that the Plaintiffs
(continued...)

protection of children from sexual exploitation by anyone, including pornographers, is a compelling governmental interest. Complaint (Doc. 1), ¶18; Brief in Support of Motion for Preliminary Injunction (Doc. 3) at 21; Plaintiffs' Brief in Support of the Motion for Entry of Judgment (Doc. 246) at 6. They have made clear their longstanding and universal condemnation of child pornography and the use of underage performers by any producers of sexually explicit expression. Their point has been that the claimed problem the statutes were designed to alleviate—the potential use of underage performers by the adult film industry—is non-existent. *See* Plaintiffs' Brief in Support of Motion for Entry of Judgment (Doc. 246) at 6. For decades, the industry has checked IDs and verified the ages of performers to make sure they are adults.

"The mere fact that a statutory regulation of speech was enacted for the important purpose of protecting children ... does not foreclose inquiry into its validity." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 875 (1997). "[T]o recite the Government's compelling interests is not to end the matter." *United States v. Alvarez*, 132 S.Ct. 2537, 2549 (2012). Rather, the Government must prove that its "chosen restriction on speech" is " 'actually necessary' to achieve its interests... There must be a direct causal link between the restriction imposed and the injury to be prevented."*Id.* (citations omitted). As part of that showing, the Government must come forward with evidence demonstrating the "injury" it purports to address actually exists.

---

[1](...continued)
had acknowledged that the protection of children from sexual exploitation was a compelling governmental interest, the court drew no conclusion about whether the Government had come forward with the evidence that strict, rather than intermediate, scrutiny demands, demonstrating the existence and dimension of the harm the statutes addressed. *Id.* at 164 n.11. That showing is integral in determining whether the statutes are narrowly tailored to serve the Government's interest using the least restrictive means under strict scrutiny. *Infra* at 10; *Edwards v. D.C.*, 755 F.3d 996, 1003 (D.C. Cir. 2014) ("To satisfy narrow tailoring, the District must prove the challenged regulations directly advance its asserted interests.").

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 809 (2000), best illustrates the point.

In evaluating a content–based regulation under strict scrutiny, the Court in *Playboy* assessed whether the Government had satisfied its burden of *"*demonstrating that the harms it recite[d] [were] real and that its restriction [would] in fact alleviate them to a material degree." *Playboy*, 529 U.S. at 817 (2000) quoting *Edenfield v. Fane*, 507 U.S. 761, 770–771 (1993). *See also Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2231–32 (2015).

The Court decided it had not. It found the government had failed to demonstrate that the problem the regulation purported to address–children's exposure to unblocked portions ("signal bleed") of sexually explicit broadcasts on cable television–was an actual one justifying the restrictions.

Quoting the district court, the Court wrote:

"The Government has presented evidence of only a handful of isolated incidents over 16 years since 1982 when Playboy started broadcasting. The Government has not presented any survey-type evidence on the magnitude of the 'problem.'" *Id.,* at 709 (footnote and record citations omitted).

*Playboy,* 529 U.S. at 820. The Court went on to describe additional evidence adduced by the Government at the district court's behest and its insufficiency in sustaining the Government's burden of connecting the expression to the harm its regulation sought to advance:

Spurred by the District Court's express request for more specific evidence of the problem, see 945 F.Supp., at 779, n.16, the Government also presented an expert's spreadsheet estimate that 39 million homes with 29.5 million children had the potential to be exposed to signal bleed, 30 F.Supp.2d, at 708–709. The Government made no attempt to confirm the accuracy of its estimate through surveys or other field tests, however. Accordingly, the District Court discounted the figures and made this finding: "[T]he Government presented no evidence on the number of households actually exposed to signal bleed and thus has not quantified the actual extent of the

problem of signal bleed." *Id.* at 709. ***The finding is not clearly erroneous; indeed it is all but required.***

*Id.* at 820–21 (emphasis added). The Court found the Government failed to prove "an actual problem," justifying  the statutory restrictions:

> This is not to suggest that a 10,000–page record must be compiled in every case or that the Government must delay in acting to address a real problem; but the Government must present more than anecdote and supposition. The question is whether an actual problem has been proved in this case. We agree that the Government has failed to establish a pervasive, nationwide problem justifying its nationwide daytime speech ban.

*Id.* at 822–23.

That brings us to the record here. The Government contends the prevalence of youthful–looking adults in the production of sexually explicit material presents the risk that older minors will also be used in its production.  The statutes were therefore enacted to address that risk.

In defending the statutes under intermediate scrutiny, the Government's trial evidence focused on the presence of youthful–looking adults in commercially produced sexually explicit expression. It did not, however, produce any evidence demonstrating that minors were actually used or depicted in adult productions. See Plaintiffs' Brief in Support of Motion for Entry of Judgment (Doc. 246) at 10.

Its approach was, therefore, similar to that of the Government in *Playboy,* which relied on evidence of a "potential problem," without evidence of its actual nature and extent, which the Court found fatal to its case. *Playboy*, 529 U.S. at 820–21 (Government's evidence failed to establish " the number of households ***actually*** exposed to signal bleed." *Id.* (emphasis added)).

At the initial status conference following remand, this Court asked the parties if they wanted to supplement the evidentiary record. The Government declined.

4

Compensating for the shortfall of evidence in the trial record, the Government now points to various statements in the legislative record. Defendant's Brief (Doc. 249) at 11–13. But the "predictive judgments" of Congress, which may suffice to justify a law's restrictions on speech under intermediate scrutiny, will not suffice under strict scrutiny.  In its initial decision in this case, this Court explained:

> This Court disagrees with plaintiffs' position that *Playboy Entertainment* requires this Court to receive evidence regarding whether §§ 2257 and 2257A advance the government's interest in preventing the sexual exploitation of children.  First, §§ 2257 and 2257A are content–neutral, not content–based, regulations of speech, and so are subject to intermediate scrutiny, not strict, scrutiny. While plaintiffs are correct that both levels of scrutiny require a court to evaluate whether a regulation advances a governmental interest, neither *Playboy Entertainment*, nor any other case cited by plaintiffs, supports the proposition that the standards that govern this evaluation under strict scrutiny necessarily define those that control intermediate scrutiny. In fact, *Playboy Entertainment* itself indicates otherwise. *See* 529 U.S. at 815, 120 S.Ct. 1878 ("We have made clear that lesser scrutiny afforded regulations targeting the secondary effects of crime or declining property values has no application to content—based regulations targeting the primary effects of speech."); *see also id.* at 817, 120 S.Ct. 1878 ("When the Government seeks to restrict speech based on its content, the usual presumption of constitutionality afforded congressional enactments is reversed.  Content–based regulations are presumptively invalid, and the Government bears the burden to rebut that presumption." (internal quotation marks and citation omitted)).
>
> Under intermediate, rather than strict, level of scrutiny, "[i]n reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of Congress." *Turner Broad Sys., Inc. v. FCC*, 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d (1997) (internal quotation marks omitted).

*Free Speech Coalition, Inc. v. Holder*, 729 F.Supp.2d 691, 728–29 (E.D. Pa. 2010) (*FSC I*).

> *Brown v. Entertainment Merchants Assn*., 564 U.S. 786 (2011) offers further clarification:
>
> The State must specifically identify an "actual problem" in need of solving, *Playboy*, 529 U.S., at 822–23, 120 S.Ct. 1878, and the curtailment of speech must be actually necessary to the solution, see *R.A.V.*, *supra*, at 395, 112 S.Ct. 2538. That is a demanding standard. "It is rare that a regulation restricting speech because of its content will ever be permissible." *Playboy, supra*, at 818, 120 S.Ct. 1878.

California cannot meet that standard. At the outset, it acknowledges that it cannot show a direct causal link between violent video games and harm to minors. Rather, relying upon our decision in *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), the State claims that it need not produce such proof because the legislature can make a predictive judgment that such a link exists, based on competing psychological studies. But reliance on *Turner Broadcasting* is misplaced. That decision applied *intermediate scrutiny* to a content–neutral regulation. *Id.,* at 661–62, 114 S.Ct. 2445. California's burden is much higher, and because it bears the risk of uncertainty, see *Playboy*, *supra*, at 816–817, 120 S.Ct. at 1878, ambiguous proof will not suffice.

*Id.* at 799 (emphasis *sic*).

The same is true here. The Government must come forward with *evidence* demonstrating that the use of youthful–looking adult performers by the adult film industry leads to the use of minors in the production of sexually explicit expression. *Playboy,* 529 U.S. at 822–23;  *Entertainment Merchants,* 564 U.S. at 799. And if it relies on the legislative record for support, then the *evidence* in the legislative record–not "predictive judgments"–must demonstrate the existence of that problem.

But like the record produced at trial in this case, the legislative record fails to provide evidentiary support for the problem the statutes purportedly address.

Noting that "[f]emale models appearing in 'mainstream' commercial pornography appear rarely to be over thirty years old or even in their late twenties," the Final Report of the Attorney General's Commission on Pornography lists the ages at which "prominent 'X' rated films models" began performing. Report at 855. All were 18 or older–with one performer reported to be "fortyish."*Id.* at 855 n.969. The Commission further acknowledged that these performers may have "understated their ages" at which they began their work in adult films to "maintain a desirable public image." *Id.* The Report also states that "about half" of the performers who appeared as witnesses before the Commission – a total of six – had begun performing "in their teens." *Id.* Tellingly, it does

6

not claim that they began performing when they were minors.

The evidence presented before the Commission, in fact, confirmed that adult film producers customarily required performers to sign model releases in connection with their films. William Roberts, a Detective with the Los Angeles Police Department, testified that commercial producers had "[m]odels sign a standard release form which gives the film producer or the photographer complete ownership of, and unlimited rights to the material produced." Report at 870, 1853.

Congressional hearings on the legislation, for the most part, adopted the findings of the Commission. The only additional evidence regarding use of minors in adult films in the hearing before the Senate Judiciary Committee was a citation to *United States v. Kantor*, 622 F.Supp. 1421 (C.D. Cal. 1987) "arising out of the case of pornographic film 'star' Traci Lords who began making hard-core movies at the age of 15." Hearing at 266.

Jeffrey Douglas testified about Traci Lords at trial in this case, explaining that her appearance in adult films was an aberration which would not, in fact, have been prevented by the statutes here since Lords had obtained a valid identification document that misstated her birth date, so that it appeared to verify that she was an adult. Tr., June 3, 2013 (Doc. 220), Douglas at 79–81.[2]

Therefore, the evidence at trial and in the legislative record fails to support the Government's thesis that the adult film industry's widespread use of youthful–looking performers leads to the use of minors in adult films.[3] It has, therefore, failed to demonstrate "a direct causal link between the

---

[2]  Circumvention by "the most enterprising and disobedient young people" does not justify restrictions on protected expression. *Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 130 (1989**)**; *Reno*, 521 U.S. at 875.

[3]  It likewise has offered no evidence establishing that law enforcement's efforts in prosecuting child pornography have been hindered by "subjective disputes with producers over whether the producer should have verified the age of a particular performer." Defendant's Brief

(continued...)

restriction imposed and the injury to be prevented." *Alvarez*, 132 S.Ct. at 2549; *Entertainment Merchants*, 564 U.S. at 799.

Citing *Williams–Yulee v. The Florida Bar*, 135 S.Ct. 1656 (2015), the Government argues that rather than evidence, it may, nevertheless, rely on intuition and logical inference to support the existence of the problem the statutes address. Defendant's Brief (Doc. 249) at 14. The statutes, it reasons, address the "risk" that a minor will be used in sexually explicit productions. And even though it offers no evidence that minors are actually used in those productions, it argues that risk may be logically inferred because "child pornography continues to exist" and youthful–looking adults are used in the production of sexually explicit expression. *Id.* at 14–15.

First, the Government's inferences do not hold up in the face of the record evidence. The unrebutted testimony shows that adult film producers uniformly checked IDs to verify their performers were adults, not minors, years before the statutes were enforced. The Government produced no evidence that minors had actually appeared in adult films. That "child pornography continues to exist" does not prove otherwise. [4]

Secondly, the Government cannot substitute "logical inferences" for evidence in meeting its

---

[3](...continued)
(Doc. 249) at 10–11. Again, the evidence established that adult film producers have for decades checked and maintained records verifying their performers' ages. The Government offered no evidence to the contrary. Its assertion that Barbara Alper "does not use model releases, at least when photographing sexually–explicit conduct," Defendant's Brief at 7 n.2, overstates her testimony. Ms. Alper testified that she had not requested model releases or proof of age from the subjects she photographed in over–18 S & M clubs during the early 1980s. Tr., June 4, 2013, Alper at 221, 223. This Court accurately described her testimony in its opinion. *Free Speech Coalition*, 957 F. Supp.2d 564, 572, 587 (E.D. Pa. 2013).

[4] *See* Report at 604–09 (describing the "clandestine" and "underground" production of child pornography); Tr. June 11, 2013, Wolak at 45, 60 (testifying "in almost every case," child pornography is produced by a family member or acquaintance).

burdens under strict scrutiny. The Government must "specifically identify an 'actual problem' in need of solving" and "a direct causal link" between the expression and that harm. *Entertainment Merchants,* 564 U.S. at 799. A "predictive judgment that the link exists" is not enough to satisfy strict scrutiny. *Id.* The Government's "burden is much higher, and because it bears the risk of uncertainty, see *Playboy, supra,* at 816–817, 120 S.Ct. 1878, ambiguous proof will not suffice." *Id.* at 799–800.

As the Court put it in *Playboy*: "To say that millions of children are subject to a risk of viewing signal bleed is one thing; to avoid articulating the true nature and extent of the risk is quite another." 529 U.S. at 819.

*Yulee* provides no exception. *See Yulee*, 135 S.Ct. at 1670 *citing Playboy,* 529 U.S. at 813.

At issue in *Yulee* was the constitutionality of a canon of the Florida Code of Judicial Conduct prohibiting judicial candidates from personally soliciting campaign funds (as opposed to doing so through their campaign committees). 135 S.Ct. at 1663. The Court found that the canon advanced the "State's compelling interest in preserving public confidence in the integrity of the judiciary." *Id.* at 1666. The Court did not 'intuit' the actual problem the canon addressed; the record before it disclosed that "in the early 1970s, four Florida Supreme Court justices resigned from office following corruption scandals." *Id.* at 1666; 135 S.Ct. at 1662.[5] In reaction, Florida voters amended their Constitution to institute a merit selection system. The problem the canon was adopted to address–a crisis of confidence in the State's judiciary–was established by evidence, not inference.

---

    [5]  *See* Scott G. Hawkins, Perspective on Judicial Merit Retention in Florida, 64 Fla. L. Rev. 1421, 1427 (2012) (describing the court as "plagued with scandal.") cited by the Court. 135 S.Ct. at 1662.  *See also* Brief of Amici Curiae Major B. Harding, et al. (describing the particular incidents of bribery and favoritism by members of the Florida Supreme Court) available at http://www. americanbar.org/content/dam/aba/publications/supreme_ court_preview/BriefsV4/13-1499_amicus_resp_harding. authcheckdam.pdf.

### B.     The Statutes Are Not Narrowly Tailored.

Under strict scrutiny, the Government must show that the statutes "target[] and eliminate[] no more than the exact source of the 'evil' [they] seek[] to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). Narrow tailoring under strict scrutiny is to be measured by "the standards of Versace," not  those of "Omar the tentmaker." *See Hill v. Colorado*, 530 U.S. 703, 749 (2000) (Scalia, J., dissenting).

In evaluating the statutes under intermediate scrutiny in its opinion before rehearing, the Third Circuit contrasted its narrow tailoring requirement with that of strict scrutiny:

> Narrow tailoring does not require that the regulations be "the least restrictive or least intrusive" means of achieving "the government's legitimate, content–neutral interests."....Instead, "[n]arrow tailoring is satisfied where the statute at issue does not 'burden substantially more speech than is necessary to further the government's legitimate interests'....
>
> "When a content–neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal."

*Free Speech Coalition v. Attorney General U.S.*, 787 F.3d 142, 154–55 (3rd Cir. 2015) (*FSC IV*) (citations omitted).

To satisfy strict scrutiny, the Government must demonstrate the statutes' restrictions on speech are necessary to achieve their objectives. But the Third Circuit has already identified a number of the statutes' applications that are wholly unnecessary in achieving their objective. For instance, it found:

> Requiring identification and recordkeeping for clearly mature performers does nothing to prevent children from appearing in sexually explicit materials because, by definition, a minor could not be mistaken for a clearly mature adult.

*Id.* at 156. The court rejected the Government's claim "that age verification for all performers regardless of their age always furthers the Government's interest in preventing the sexual

10

exploitation of minors." *Id.* It concluded: "[T]he Government has not established that imposing some age cutoff would necessarily undermine the Statutes' effectiveness in preventing the exploitation of children." *Id.* at 157.

It identified specific examples in the record to underscore its point. Plaintiffs' own work, the court found, depicted "a substantial number of individuals for whom requiring identification does not promote the Government's interests." *Id.* at 159. And it went on to find the statutes applied to a "quantum" of "non-negligible" examples of expression from other producers that likewise was not necessary to achieve the statutory objectives. *Id.* at 162.

In addition, the court assessed the statutes' application to "private, non-commercial depictions," requiring "additional sensitivity to the core of First Amendment values implicated in this case." *Id.* at 162, 167. It described their reach to this expression as "expansive." *Id.* at 162. The court found the statutes reached "essentially the entire universe of sexually explicit images, 'including private, noncommercial depictions created and viewed by adults in their homes." *Id.* at 161 (citation omitted). It also found, based on Plaintiffs' expert's research, "there may be a significant number of private sexually explicit images shared between young adults" by sexting, and concluded "there is some substantial amount of private sexually explicit images that the Statutes unnecessarily burden." *Id.* at 163.

The Government attempts to avoid the inevitable conclusion that follows from these determinations.

Relying on observations by the Third Circuit and this Court as part of the analysis under intermediate scrutiny that no Plaintiffs' work exclusively depicts mature adults, it contends the statutes are narrowly tailored as applied to the Plaintiffs. Defendant's Brief (Doc. 249) at 17–19. But the Government mistakes the narrow tailoring requirement of intermediate scrutiny for the more

demanding narrow tailoring requirement of strict scrutiny. As the Sixth Circuit explained in reviewing a sign ordinance under strict scrutiny that it had previously upheld under intermediate scrutiny:

> The fact that we concluded that Section 1140.362 could survive the tailoring requirement associated with intermediate scrutiny has no bearing on our tailoring analysis on remand because as we noted then, "[i]ntermediate scrutiny's tailoring requirement differs importantly from the more rigorous tailoring mandated by strict scrutiny."

*Wagner v. City of Garfield Heights*, No. 13-3474, 2017 WL 129034 (6th Cir., Jan. 13, 2017) (on remand from the Supreme Court) (citation omitted).

Initially, the Government contends that in judging the statutes' fit with their objective, they must be interpreted as if they only applied to Plaintiffs' expression.  Defendant's Brief (Doc. 249) at 20, 21 n. 10. But that is not how a presumptively invalid, content–based regulation of expression is evaluated under the narrow tailoring prong of strict scrutiny.

In *Alvarez*, 132 S.Ct. at 2542 (2012), for instance, the Court did not confine its analysis of the Stolen Valor Act under strict scrutiny to the Act's effect on the speech of Alvarez, who at his first public meeting as a member of the Three Valley Water District Board, introduced himself as the recipient of the Congressional Medal of Honor. Rather the Court–while noting, "[h]ere the lie was made in a public meeting"–went on to consider the statute's application to speech beyond that of Mr. Alvarez: "[T]he statute would apply with equal force to personal, whispered conversations within a home. The statute seeks to control and suppress all false statements on this one subject in almost limitless times and settings." *Id.* at 2547. It found the Act permitted the government to decree speech to be a criminal offense "whether shouted from the rooftops or made in a barely audible whisper," and thus, its reach "cast a chill...the First Amendment cannot permit." *Id.* at 2547–48. It, therefore, failed strict scrutiny.

12

Similarly, in *Simon & Schuster*, *Inc. v. Member of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120-21 (1991), when the Court assessed whether the content–based Son of Sam law was narrowly tailored to advance its compelling interest in compensating victims from the fruits of the crime, it did not confine its analysis to the law's effect on mobster–turned–author Henry Hill's speech, nor that of his publisher. Rather, it took into account the "wide range of literature"–including The Autobiography of Malcolm X and works by Thoreau and St. Augustine–subject to the law that did "not enable a criminal to profit from his crime while a victim remains uncompensated." *Id.* at 122. On that basis, the Court concluded that the law was "not narrowly tailored" and was unconstitutional under the First Amendment. *Id.* at 123. *See also, Ashcroft,* 542 U.S. at 673; *United States v. Stevens*, 559 U.S. 460, 476–78 (2010); *Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181, 202-04 (3rd Cir. 2008); *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 266 (3rd Cir. 2003).

The Government additionally argues that content–based regulations that are not narrowly tailored can be excused because their burdens are "minimal" or "incremental." Defendant's Brief (Doc. 249) at 19–20.[6] But the Government is wrong on this point as well. Under strict scrutiny, "content–based burdens must satisfy the same rigorous scrutiny as its content–based bans." *Playboy*, 529 U.S. at 812. "There is no de minimis exception for a speech restriction that lacks sufficient tailoring or justification." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001).

*Burson v. Freeman*, 504 U.S. 191 (1992) and *Yulee*[7] do not hold otherwise.

---

[6] Plaintiffs dispute the underlying characterization of the statutes' burdens as "minimal." *See* 152 Cong. Rec. S. 8027 (Senator Leahy describing the statutes' requirements as "onerous" and emphasizing the "associated criminal liability" for non-compliance); Tr., June 3, 2013 (Doc. 220), Douglas at 88–106.

[7] The Court labeled each of these cases "rare." *Burson*, 504 U.S. at 210; *Yulee*, 135 S.Ct. at 1666)

In *Burson*, the Court was required to reconcile "the right to engage in political discourse with the right to vote." 504 U.S. at 193, 198. The Court explained that in cases where "the First Amendment right threatens to interfere with voting itself," it applied a "modified burden of proof," relieving the State of the "burden of demonstrating empirically the objective effects on instability that [are] produced" by the voting regulation in question. *Id.* at 209. Under this modified burden–one resembling the narrow tailoring prong of intermediate scrutiny– the State was simply required to demonstrate that its response was "reasonable and [did] not significantly impinge on constitutionally protected rights." *Id.* That, however, is not the proper measure here.

The Government fares no better under *Yulee.*

In *Yulee,* the Court described the reach of the judicial canon at issue: "By any measure, Canon 7(C)(1) restricts a narrow slice of speech." 135 S.Ct. at 1670. Yulee, a judicial candidate, nonetheless, argued that its application to her solicitation for funds in a letter posted online and distributed via mass mailing failed to serve the interest advanced by the canon and, therefore, was not narrowly tailored.

The Court disagreed. It found that "personal appeals for money by a judicial candidate inherently create an appearance of impropriety that may cause the public to lose confidence in the integrity of the judiciary." *Id.* at 1671. Measuring the "narrow slice of speech" restricted by the canon against the "breadth of the compelling interest that underlies" it, the Court concluded its ban on personal solicitations by judicial candidates was narrowly tailored to address Florida's concern with protecting "confidence in the integrity of the judiciary." *Yulee*, 135 S.Ct. at 1671. The Court, therefore, performed the analysis required by the narrow tailoring requirement of strict scrutiny: was the regulation of speech "carefully tailored" to "eliminate[] no more than the exact source of the 'evil' it seeks to remedy"? *Frisby*, 487 U.S. at 485. On those facts, the Court concluded it was.

14

In contrast to the judicial canon in *Yulee*, the statutes here apply to a significant universe of expression protected under the First Amendment, already declared by the Third Circuit to be unnecessary to the protection of children. *FSC IV*, 787 F.3d at 156, 159, 162, 166. They are not narrowly tailored.

**C.**     **The Statutes Do Not Employ the Least Restrictive Means to Advance the Government's Interest in Preventing the Use of Minors in the Production of Sexually Explicit Expression.**

Plaintiffs have identified a number of less restrictive alternatives that could meet the statutory goals. Plaintiffs' Brief in Support of Motion for Entry of Judgment (Doc. 246) at 19–28. Strict scrutiny requires the Government to come forward with evidence demonstrating that those alternatives are ineffective in advancing the interests the statutes purport to advance. *Mukasey*, 534 F.3d at 198; *Bruni v. City of Pittsburgh*, 824 F.3d 353, 371 (3rd Cir. 2016) (Government may not forgo "a range of alternatives ...which would burden substantially less expression...without a meaningful record demonstrating that those options would fail to alleviate the problems meant to be addressed."). It is not enough to show that an alternative "has some flaws." *Mukasey*, 534 F.3d at 198.

The Court in *Playboy* found the content–based regulation before it unconstitutional because the government had failed to meet that burden:

> The Government also failed to prove § 504 with adequate notice would be an ineffective alternative to § 505. Once again, the District Court invited the Government to produce its proof....Once again, the Government fell short....There is no evidence that a well–promoted voluntary blocking provision would not be capable at least of informing parents about signal bleed (if they are not aware of it yet) and about their rights to have the bleed blocked (if they consider it a problem and have not yet controlled it themselves).
>
> *     *     *     *     *     *     *     *     *     *     *     *
>
> [T]he Government takes issue with the District Court's reliance, without proof, on

15

a "hypothetical, enhanced version of Section 504." Brief for Appellants 32. It was not the District Court's obligation, however, to predict the extent to which an improved notice scheme would improve § 504. It was for the Government, presented with a plausible, less restrictive alternative, to prove the alternative to be ineffective, and § 505 to be the least restrictive means.

\*      \*      \*

A court should not assume a plausible, less restrictive alternative would be ineffective....

\*      \*      \*

Having adduced no evidence in the District Court showing that an adequately advertised § 504 would not be effective to aid desirous parents in keeping signal bleed out their own households, the Government can now cite nothing in the record to support the point.

529 U.S. at 823–24.

The Government is now in the position that it found itself in *Playboy.*

> **1.    The Government has failed to produce evidence establishing criminal laws prohibiting and punishing child pornography are not effective alternatives to the statutes.**

The comprehensive state and federal regime criminalizing the production of child pornography is an effective means of assuring that producers of sexually explicit expression verify the ages of performers and models to ensure they are adults. *See McCullen v. Coakley*, 134 S.Ct. 2518, 2538 (2014) (noting, even under intermediate scrutiny, existing local ordinances and generic criminal statutes were "less intrusive means" of addressing public safety concerns than zones restricting picketing).

Jeffrey Douglas explained why:

A.      ....If 2257 were to disappear tomorrow, no sane producer would knowingly use a

minor.[8]

Q.    Why not?

A.    It's, again, widely regarded as being immoral and wrong. In addition, there are severe criminal sanctions, and the consequences of inadvertently allowing a minor to be in a film are absolutely devastating because the materials have to be recalled and destroyed.

The process of recalling when it's contraband is--is an unresolvable problem. If I have--if, unbeknownst to me a--a 17-year old appears in a film that I've produced, once I'm made aware of it, I have to notify everyone that I sold it to that such a thing exists.

They're not allowed to ship it. They have to simply destroy it, assuming that there's permission from law enforcement to destroy what might be a--a criminal artifact-- evidence.

And so the producer has to give credit--the seller has to give credit to everyone who bought it from them, whether or not that material has been sold, and there aren't necessarily strong records as to how many units there are.

So a distributor or a producer may end up paying--reimbursing customers significant amounts of--well, they will be necessarily significant amounts of money, but they may be paying them for material that the never even received--that they never purchased.

The consequences within the industry of an event like that are enormous. It--it eliminates goodwill because of all of the bad publicity and the cost. Competitors will jump on--on that is a--is a possibility. It's just--it's a disaster, there's no measurable benefit because if the--the performer is assumed to be of age, there's no additional benefit that the fact that they are underage, even the--the model release is not valid.

That is, if I knowingly use a 17-year old--and, again, apart from the criminal side, I can't legally distribute the material once the person is known to be of age because I don't have authorization to exploit their image.

There's--there's--as I said, there's no incentive. There's enormous disincentives. I mean it's 15 years' mandatory minimum to knowingly use a minor.

---

[8] The Supreme Court in *Ashcroft v. Free Speech Coalition, Inc.*, 535 U.S. 234, 254 (2002) likewise recognized: "Few pornographers would risk prosecution abusing real children if fictional, computerized images would suffice."

> But, again, even apart from that –
>
> THE COURT: Is it in California?
>
> THE WITNESS: No, that's under federal law.
>
> THE COURT: Okay.
>
> THE WITNESS: So--and, again, there's no--there's no economic advantage if--if, you know, I thought that this particular model was going to be a life-changing person, and she showed up or he showed up at 17 years and--and eight months, I might want to pay them $10,000 not to go to anyone else and to come to me first once they turn 18, but it--it would be utterly mindless to use them before that age.

Tr., June 3, 2013 (Doc. 220), Douglas at 83–84.

The Government offered no rebuttal to Douglas's testimony.

Plaintiffs also offered evidence of the thousands of prosecutions brought under the substantive federal laws prohibiting the production, transfer, and possession of child pornography and their high success rate. Plaintiffs' Exhibit 113; Tr., June 11, 2013 (Doc. 224), Wolak at 61. And they offered evidence of the scant number of prosecutions brought under the challenged statutes: nine under 18 U.S.C. § 2257; zero under 18 U.S.C. § 2257A.[9]

The Government is left with conjecture, not evidence. It argues that the statutes are needed to fill a "gap"–specifically to "prevent circumvention of child pornography prohibitions by those who might otherwise take advantage of or rely on the inherent difficulties in determining age based on appearance alone." Defendant's Brief (Doc. 249) at 24–25.

There are two problems with the Government's argument. The first is that it answers the wrong question. The Court in *Ashcroft* explained  the inquiry "does not begin with the status quo of

---

[9] The paucity of the prosecutions is particularly compelling evidence of the statutes' inutility, given the evidence showing that millions of Americans openly post sexually explicit images on social networking websites without the statement required by 18 U.S.C. § 2257 (e), identifying the location of the records it requires them to keep.

existing regulations and then ask whether the challenged regulation has some additional ability to achieve Congress' legitimate interest." 542 U.S. at 666. Instead, the question is whether the statutes are "the least restrictive means among available, effective alternatives."*Id.*  In order to make that showing, the Government must prove that state and federal laws prohibiting the production, distribution, and possession of child pornography are not effective in achieving that interest.

That brings us to the second problem: the Government has produced no evidence demonstrating that the laws criminalizing child pornography are ineffective in deterring commercial producers from using minors. While it argues that the statutes are needed to prevent  producers of sexually explicit expression to circumvent child pornography laws by relying on difficulties in determining the difference between youthful–looking adults and older minors, it has produced no evidence that they do. Argument and conjecture will not suffice—particularly on a record that demonstrates the exact opposite: laws criminalizing child pornography are an effective deterrent to those who might carelessly use a minor who looks older and in response, producers of sexually explicit expression verify their performers or models are adults.

    **2.**     **The Government has failed to produce evidence establishing the certification procedure of 18 U.S.C. § 2257A  (h) and practices used to protect intellectual property rights are not effective alternatives to the statutes.**

The statutory scheme itself contains a less restrictive alternative. *See Playboy*, 529 U.S. at 809–10; *Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.,* 518 U.S. 727, 756 (1996). Senator Leahy, the architect of the certification exception contained in 18 U.S.C. § 2257A (h), explained its function:

> [S]ection 2257A (h) enables law–abiding, legitimate businesses, which commercially create and commercially distribute materials that are not, and do not appear to be, child pornography, to certify to the Attorney General that, pursuant to existing laws, labor agreements, or industry standards, they regularly and in the normal course of

> business collect the name, date of birth, and address of performers employed by them.

152 Cong. Rec. S. 8027. This section of the statutes allows "[b]usinesses that so certify and thus exhibit good faith" to avoid "some of the onerous requirements and associated criminal liability." *Id.* It assured that the "focus of the underlying statute" remained "on helping apprehend child predators and not on legitimate businesses that have no role in harming children." *Id.*

The certification procedure, therefore, is a plausible, less restrictive alternative that would permit Plaintiffs and other commercial producers of sexually explicit expression "to exhibit good faith" that they keep records establishing that their performers and models are adults. Under this alternative, producers of qualifying expression can send a letter to the Attorney General of the United States signed by their chief executive officer or senior manager, certifying that they "regularly and in the normal course of business collect and maintain individually identifiable information regarding all performers." 28 C.F.R. § 75.9 (b), (c)(2).

The Government has produced no evidence demonstrating why this certification procedure would not be effective in achieving the statutory objectives, a conclusion Congress reached with respect to commercial producers of expression depicting simulated sexual conduct. Plaintiffs are "law–abiding, legitimate businesses," who fit the contours of the exception perfectly–save for the content of their expression, which depicts actual sexual conduct, not simulated sexual conduct: they create visual depictions "intended for commercial distribution," 18 U.S.C. § 2257A (h)(1)(A)(i), as "part of a commercial enterprise" that "in the normal course of business collects and maintains individually identifiable information regarding all performers" who they employ that includes their names, ages and dates of birth pursuant to standards of their profession as well as laws securing their intellectual property rights,18 U.S.C. § 2257A (h)(1)(A)(ii).

Instead of offering evidence that alternative  would be ineffective, the Government argues it should not apply because Plaintiffs have not demonstrated they are part of a "distinct adult industry" with a "written manifestation" of industry standards, Defendant's Brief (Doc. 249) at 27–28. Yet it also tells us, with regard to their expression depicting simulated sexual conduct, "[s]ome Plaintiffs may already be eligible for the § 2257A (h) certification option." *Id.* at 26.

The Government's argument misses the point.  It offers no reason, no explanation, no proof as to why a  procedure that allows commercial producers of *simulated* sexual expression to certify to the Attorney General that they keep records verifying the ages of their performers would not be equally as effective when applied to commercial producers of *actual* sexual expression.

### 3.   The Government has failed to produce evidence establishing an age–verification law limited to persons who might reasonably appear to be underage is not an effective alternative to the statutes.

The Third Circuit described the state of the record: "[T]he Government has not established that imposing some age cutoff would necessarily undermine the Statutes' effectiveness in preventing the exploitation of children." *FSC IV*, 787 F.3d at 157.  According to the testimony of its own expert, "at a certain advanced age, no individual could be mistaken for a minor," so that "imposing some age cutoff" would not "undermine the Statutes' effectiveness in preventing the exploitation of children." *Id.*  In evaluating the statutes under intermediate scrutiny, the Third Circuit wrote:

> [W]e need not address whether the Government in a different case and on a different record can prove that requiring identification even for performers who appear over 30 helps protect children.

*Id.* at 158 n. 9.

But the Government must not only prove that application of the statutes to adults who appear more than 30 years old serves its interest in protecting children, it must affirmatively demonstrate that a law limiting its requirements to depictions of people who appear less than 30 years old would

not be an effective, less restrictive alternative to the universal application now in place. It has failed to meet that burden.

The Government seems to suggest the "minimal nature of the additional burdens" the statutes impose, relieves it of its evidentiary burden. Defendant's Brief (Doc. 249) at 21. Plaintiffs dispute the Government's characterization of the statutory burdens as "minimal." *Supra* at 13 n.6.

But more importantly, as *Playboy* makes clear, as *Alvarez* makes clear, as *Am .Civil Liberties Union* makes clear, as *Mukasey* makes clear, to survive strict scrutiny, the Government must prove that a plausible, less restrictive alternative to the challenged regulation is not effective. Whether the burdens imposed by a content–based regulation on speech are incremental or acute does not alter what the Government must show. And it has not demonstrated that a law that limits its requirements to expression depicting people who could reasonably be confused as minors would be less effective in achieving its statutory objective.

>**4.    The Government has failed to produce evidence establishing a recordkeeping law limited to commercial productions is not an effective alternative to the statutes.**

The Third Circuit recognized that the statutes unnecessarily burdened private sexually explicit images. *FSC IV,* 787 F.3d at 163. Thus, a fortiori, a law restricted to commercial productions constitutes an effective, less restrictive alternative.

In fact, in earlier stages of this litigation, the Government recognized that limiting the statutes' application to commercial productions, and excluding their application to private expression, would be a less, restrictive means of alleviating the problem. Citing the preamble to the regulations implementing the statutes, it argued the statutes' "scope should be narrowly construed as applying only to depictions of actual or simulated sexually explicit conduct *created for sale or*

*trade*, and thus, producers of purely private depictions created and viewed by adults in their homes would not be subject to the Statutes." *Free Speech Coalition, Inc. v. Attorney General of the United States*, 677 F.3d 519, 538 (3rd Cir. 2012) (*FSC II*) (emphasis *sic*).

While the Third Circuit held that interpretation was not faithful to the plain meaning of the statute, it demonstrates that the Government has conceded the statutes' reach to private expression is unnecessary.  It, therefore, recognized that the statutes are not the least restrictive means. This Court appears to have concurred with that view. *Free Speech Coalition, Inc. v. Holder*, 957 F.Supp.2d 564, 597 (E.D.Pa. 2013) (*FSC III*) ("[T]he government's proposed construction of 'producer,' as being limited to one who makes an image intended for sale or trade, would accomplish the goals expressed by Congress—it would enable the government to impose record–keeping requirements on large–scale industry players, such as pornography film producers, as well as niche players and even private individuals who choose to upload their depictions to the internet for public viewing.").

Citing no authority, the Government, nevertheless, argues that excepting expression of private individuals cannot be considered an alternative here, contending that "none of the Plaintiffs would be impacted" because "none of them has produced purely private depictions." Defendant's Brief (Doc. 249) at 30. Again, the Government misses the point.

Strict scrutiny asks: is there a less restrictive, effective alternative that will serve the Government's interest? It does not ask whether there is a less restrictive alternative that will benefit the plaintiff. *Thomas v. Schroer*, Case No. 13–cv–02987–JPM–cgc, 2017 WL 1208672 (W.D. Tenn., March 31, 2017) (rejecting argument that plaintiff could not rely on "a less restrictive alternative" that would advance the State's interests, but would not "help" him. *Id.* at *20).  Strict scrutiny

focuses on the effect of the regulation on *speech*, not its particular effect on the *plaintiff*. *See Alvarez*, 132 S.Ct. at 2547; *Simon & Schuster,* 502 U.S. at 122.

If the answer is "yes," there is a less restrictive, effective alternative, then the content–based regulation fails. "The appropriate remedy...[is] to enjoin the speech restriction," leaving to the legislature the task of improving its statute. *Playboy*, 529 U.S. at 823–24.

The Government is also mistaken as to the facts.  The photographs of Barbara Alper and her husband are private expression. She testified that she did not have the intent of publishing those photos when she took them. Tr., June 4, 2013 (Doc. 221), Alper at 243. Yet the recordkeeping provisions fully applied the moment Alper began to photograph her moments of intimacy with her husband. That some of them were published later does not diminish the fact that, at the time she photographed herself with her husband in their own bedroom, her images became subject to the criminal laws challenged here. The same is true of the portraits David Steinberg created for couples in their own homes. Tr., June 4, 2013 (Doc. 221), Steinberg at 122.

**5.     The Government has failed to produce evidence establishing a recordkeeping law limited to primary producers of sexually explicit expression is not an effective alternative to the statutes.**

The Government offers no evidence demonstrating that a law limiting the  obligation to keep records of performers' ages on the people who create sexually explicit expression in the first instance would not be effective in preventing the use of minors in producing that expression. It offers argument and conjecture instead.

 The Government argues that imposing requirements on secondary producers "adds to the effectiveness of the statutory scheme" because it requires secondary producers to verify that the material is not child pornography. Defendant's Brief (Doc. 249) at 31. But again, strict scrutiny is

24

not satisfied by showing that the challenged regulation "has some additional ability to achieve" the Government's objectives. *Am. Civil Liberties Union*, 542 U.S. at 666. In the parlance of *Mukasey*, if the belt works, the Government cannot also require suspenders. 534 F.3d at 204.

   So in order to justify the statutes' application to secondary producers, the Government must come forward with evidence demonstrating that even if primary producers collect the records and label their expression, minors will still be used in the production of sexually explicit expression, and application of the recordkeeping requirements to secondary producers will eliminate the problem. It has produced no evidence supporting that premise, however.

> **6.   The Government has failed to produce evidence establishing a recordkeeping law enforced by administrative sanction is not an effective alternative to the statutes.**

   The Government asserts that the statutes are designed to "fill the gaps" in the statutory regime criminalizing child pornography.   Defendant's Brief (Doc. 249) at 12.   It offers no evidence demonstrating why their enforcement by administrative sanction would not be effective in achieving the statutes' objective of filling the supposed gap, however. *Compare* 8 U.S.C. § 1324a (e)(5). Instead, it reasons that an administrative scheme would not be less restrictive because changing the scope of the penalties for violating the recordkeeping requirements "would not change the scope of permissible speech or conduct." Defendant's Brief (Doc. 249) at 32–33. But surely the Government recognizes the difference in the chilling effect of a law that punishes paperwork violations with a five year prison term from one that secures compliance by administrative sanction.

   In the face of this record demonstrating that these Plaintiffs and the industries and professions of which they are a part, uniformly verify the ages of the persons depicted in their expression for a range of reasons beyond compliance with these statutes, its claim that enforcement by administrative

sanction would "encourage them to violate the requirements and to proceed with producing sexually—explicit depictions of individuals of unknown age," *id.* at 33, is wholly baseless.

## II.    THE STATUTES ARE UNCONSTITUTIONALLY OVERBROAD.

Having determined that strict, rather than intermediate, scrutiny applied, the Third Circuit remanded for a fresh evaluation of Plaintiffs' challenge to the statutes as unconstitutionally overbroad—finding that the "level of scrutiny [was] a key factor in both as-applied and overbreadth challenges." *Free Speech Coalition, Inc. v. Attorney General United States*, 825 F.3d 149, 164 n.12 (3rd Cir. 2016) (*FSC V*). The Government, however, has defended the statutes by relying on findings by this court and the Third Circuit under intermediate scrutiny, that carry no weight under strict scrutiny. Defendant's Brief (Doc. 249) at 38.

In its opinion before rehearing, the Third Circuit, in responding to argument by amici supporting the Plaintiffs, contrasted the demands of the two levels of scrutiny:

> Amici the American Civil Liberties Union of Pennsylvania and the Electronic Frontier Foundation argue that *McCutcheon v. FEC*, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014), requires us to consider whether it would have been difficult for Congress legislatively to exempt the invalid applications of the law that we have identified. Surely if Congress could not have achieved a constitutional purpose through any other means, its efforts would be narrowly tailored. But *McCutcheon* does not stand for the proposition that the existence of a legislative alternative that would be less burdensome on speech means Congress is constitutionally required to choose that alternative. Indeed, as the Supreme Court observed,
>
> > when the Court is not applying strict scrutiny, we still require 'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' ... that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.
>
> *Id.* at 1456–57 (alterations in original) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). Amici's position

26

is simply a least restrictive means test by another name that is inapplicable under intermediate scrutiny.

*FSC IV*, 787 F.3d at 165 n.18.

The overbreadth analysis is closely allied with the narrow tailoring inquiry under strict scrutiny. *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d at 266. The statutes encroach upon a significant amount of protected expression that does not advance the Government's interest. They are, therefore, unconstitutionally overbroad.

## III. THE FREE SPEECH COALITION AND THE AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS HAVE STANDING ON BEHALF OF THEIR MEMBERS TO CHALLENGE THE STATUTES UNDER THE FIRST AMENDMENT.

To be clear, the Third Circuit's original determination that the Free Speech Coalition and the American Society of Media photographers lacked associational standing was confined to the ***as–applied*** claims of their members. *FSC IV*, 787 F.3d at 153, 154. ("FSC and ASMP lack associational standing to bring an as–applied First Amendment claim on behalf of their members."). Their standing to challenge the statutes on their face remained unchallenged, however. It is Plaintiffs' standing to raise an as–applied challenge on behalf of their members, therefore, that has been remanded to this Court for resolution. *Free Speech Coalition*, 825 F.3d at 164 n.12. *See* Defendant's Brief (Doc. 249) at 5–6.

In determining whether Plaintiffs Free Speech Coalition and American Society of Media Photographers had standing to assert as–applied challenges to the statutes under intermediate scrutiny, the Third Circuit found that the two organizations met the first two requirements of associational standing: their "members would otherwise have standing to sue in their own right," and the interests they sought to "protect are germane to the organization's purpose." *FSC IV,* 787 F.3d

27

at 154, 149 n.2. The court determined, however, that the examination required by intermediate scrutiny of "the degree to which [an] individual producer's speech is unnecessarily burdened," required "an individualized inquiry" that made associational standing inappropriate. *Id.* at 154.

But having determined that the statutes were subject to strict, rather than intermediate, scrutiny, the Third Circuit remanded the standing issue to this Court for evaluation in light of the change in analysis merited by strict scrutiny. *FSC V,* 825 F.3d at 164 n.12.

Strict scrutiny's narrow–tailoring and least restrictive means requirements do not evaluate individualized applications of presumptively invalid content–based regulations. It is enough to show that the statutes apply to Plaintiffs' members, and they must comply with them. The constitutionality of the statutes here does not depend on "the degree to which" each member's "speech is unnecessarily burdened." Therefore, Plaintiffs Free Speech Coalition and American Society of Media Photographers have standing to assert a challenge to the statutes under strict scrutiny on behalf of their memberships. *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283 (3rd Cir. 2002).

The Government argues, nevertheless, that the "nebulous nature of the adult entertainment industry of adult film industry" weighs against associational standing. Defendant's Brief (Doc. 249) at 7. But the standing inquiry focuses on the organizations, not the nature of the industry they represent. The Third Circuit already concluded that the two organizations were proper representatives under the first two requirements. And the Supreme Court raised no issue with the appearance of the Free Speech Coalition on behalf of its members in challenging a statute criminalizing sexually explicit images that appeared to depict children, but were produced without

using actual children. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002).[10]

## CONCLUSION

Plaintiffs respectfully request that this Court enter judgment declaring 18 U.S.C. § 2257, 18

U.S.C. § 2257A, and their implementing regulations, 28 CFR § 75.1, *et seq.*, unconstitutional, on

their face and as applied, under the First Amendment and permanently enjoining their enforcement.

Respectfully submitted,

June 8, 2017                          /s/ J. Michael Murray
                                     J. MICHAEL MURRAY (0019626)
                                     jmmurray@bgmdlaw.com
                                     LORRAINE R. BAUMGARDNER (0019642)
                                     lbaumgardner@bgmdlaw.com
                                     BERKMAN, GORDON, MURRAY & DeVAN
                                     55 Public Square, Suite 2200
                                     Cleveland, Ohio  44113-1949
                                     (216) 781-5245 / (216) 781-8207 (Facsimile)

                                     KEVIN E. RAPHAEL (72673)
                                     KER@Pietragallo.com
                                     J. PETER SHINDEL, JR. (201554)
                                     JPS@Pietragallo.com
                                     PIETRAGALLO GORDON ALFANO BOSICK
                                        & RASPANTI, LLP
                                     1818 Market Street, Suite 3402
                                     Philadelphia, Pennsylvania 19103
                                     (215) 320-6200 / (215) 981-0082 (Facsimile)

                                     *Attorneys for Plaintiffs*

---

[10]  This Court also rejected the Government's argument in earlier stages of this litigation that the Free Speech Coalition lacked representational standing to assert challenges to the statutes under the Fourth Amendment on similar grounds. Memorandum re: Motion to Dismiss in Part (Doc. 117) at 10–12.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2017, the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
LORRAINE R. BAUMGARDNER (0019642)
BERKMAN, GORDON, MURRAY & DeVAN

KEVIN E. RAPHAEL (72673)
J. PETER SHINDEL, JR. (201554)
PIETRAGALLO GORDON ALFANO BOSICK
 & RASPANTI, LLP

Attorneys for Plaintiffs