IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC. et al., | ) | Civil Action No. 2:09-4607 |
| | ) | |
| Plaintiffs, | ) | Judge Michael M. Baylson |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFERSON B. SESSIONS, III, | ) | |
| Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL BRIEF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 4

    I.     PLAINTIFFS' PROPOSED ALTERNATIVES MUST BE EVALUATED IN LIGHT OF THE REALITY OF UBIQUITOUS, READILY-ACCESSIBLE CHILD PORNOGRAPHY ON THE INTERNET, AND FINITE LAW ENFORCEMENT RESOURCES ........................................................................ 4

    II.    MOST OF PLAINTIFFS' PROPOSED ALTERNATIVES WOULD BE LESS EFFECTIVE BECAUSE THEY DO NOT INCLUDE ALL NECESSARY COMPONENTS OF AN EFFECTIVE AGE VERIFICATION SCHEME ........ 10

    III.    IF THE COURT PROVIDES RELIEF UNDER THE FIRST AMENDMENT, IT SHOULD LEAVE THE CONSTITUTONAL APPLICATIONS OF THE STATUTES INTACT ........................................................................... 13

        A.    Partial, Rather Than Total, Invalidation Is Appropriate Here .................. 15

        B.    Under the Supreme Court's Standards for Partial Invalidation, This Court Should Invalidate the Statutes Only to The Extent That They Apply to Plaintiffs' Production of Images Showing Clearly Mature Adults Over the Age of 30 ...................................................................... 19

            1.    The Statutes as Applied to Images Depicting Young-Looking Individuals Are Constitutionally Valid ........................................ 19

            2.    The Statutes Can Function Independently Even If They Are Applied Only to Images Showing Young People ........................ 21

            3.    Sustaining the Statutes in Part Vindicates Congressional Intent .. 23

        C.    This Court Should Refrain From Addressing Plaintiffs' Facial Overbreadth Claim, Which in Any Event Lacks Merit ........................... 25

CONCLUSION .................................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987) ............................................................. 16, 21

*Allen v. Louisiana*, 103 U.S. 80, 13 Otto 80 (1881) ...................................................... 21

*Ayotte v. Planned Parenthood,* 546 U.S. 320 (2006) ............................................... 15, 16

*Bd. of Trs. v. Fox*, 492 U.S. 469, 486 (1989) ...................................................... 3, 15, 25

*Belitskus v. Pizzingrilli,* 343 F.3d 632 (3d Cir. 2003) ................................................. 25

*Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985) .................................. 16, 17, 18

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................................... 17

*Califano v. Yamasaki*, 442 U.S.. 682 (1979) ............................................................. 16

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) ......................................................... 17

*Champlin Refining Co. v. Corp. Comm'n*, 286 U.S. 210 (1932) ................................ 21

*Connection Distrib. Co. v. Holder*, 557 F.3d 321 (6th Cir. 2009) (en banc) ............ 13, 16, 20, 26

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996) ................ 18, 23

*Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014) ........................... 16, 23

*FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449 (2007) ................................................. 18

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) ......................... 18

*Free Speech Coal., Inc. v. Holder* ("*FSC I*"),
    729 F. Supp. 2d 691 (E.D. Pa. 2010) ....................................................... 24, 26

*Free Speech Coal., Inc. v. Attorney General* ("*FSC II*"),
    677 F.3d 519 (3d Cir. 2012) .......................................... 7, 10, 11, 19, 20, 24

*Free Speech Coal., Inc. v. Holder* ("*FSC III*"),
    957 F. Supp. 2d 564 (E.D. Pa. 2013) ................................ 6, 13, 15, 20, 21, 22, 23, 24, 25

*Free Speech Coal., Inc. v. Attorney General* ("*FSC IV*"),
    787 F.3d 142 (3d Cir. 2015)................................ 6, 7, 13, 14, 21, 22, 23, 25, 26

*Free Speech Coal., Inc. v. Attorney General* ("*FSC V*"),
825 F.3d 149 (3d Cir. 2016) ........................................................................... 7

*L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32 (1999) ................................. 15

*Marsh v. Alabama*, 326 U.S. 501 (1946) ................................................... 17

*Meyer v. CUNA Mut. Ins. Soc'y*, 648 F.3d 154 (3d Cir. 2011) ................................ 16

*Miller v. Johnson*, 515 U.S. 900 (1995) ................................................... 26

*NAACP v. Button*, 371 U.S. 415 (1963) ................................................... 17

*United States v. Booker*, 543 U.S. 220 (2005) ................................................ 15, 16, 19

*United States v. Grace*, 461 U.S. 171 (1983) ............................................... 17

*United States v. Nat'l Treasury Employees Union*, 513 U.S. 454 (1995) ................................ 25

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ....................................... 20, 26

*United States v. Williams*, 553 U.S. 285 (2008) ........................................... 15

## Statutes

18 U.S.C. §§ 1466A, 1470, 2251, 2252, 2252A, and 2260 ............................................... 8

18 U.S.C. § 2256 ................................................................................. 19

18 U.S.C. §§ 2257 and 2257A (the "Statutes") ................................................ *passim*

## Regulations

Dep't of Justice, Final Rule, 73 Fed. Reg. 77432 (2008) ............................................ 12

28 C.F.R. §§ 75.1-.4, .6-.9 (the "Regulations") ................................................ *passim*

## INTRODUCTION

Defendant submits this supplemental brief to further address the Court's First Amendment analysis, under strict scrutiny, of the age verification and recordkeeping scheme set forth in 18 U.S.C. §§ 2257 and 2257A (the "Statutes") and 28 C.F.R. §§ 75.1-.4, .6-.9 (the "Regulations"), which are designed to protect children by ensuring that producers of sexually-explicit films and photographs check the ages of their performers in advance and keep records that allow others to verify that an image is not child pornography. Defendant includes herewith additional relevant testimony of those involved in finding and investigating child pornography on the Internet, as well as new Proposed Findings of Fact marshaling the relevant evidence in the record. This evidence shows that Plaintiffs' proposed alternatives to the current scheme would be less effective in protecting children from sexual exploitation.

For one thing, while Plaintiffs have attempted to portray the "adult industry" as a separate world where child pornography does not exist, the reality is that millions of child pornography images are found every year everywhere on the Internet, not only hidden in the "dark web"[1] or on peer-to-peer networks, but also on the very same platforms—commercial websites, social networking applications, livestreaming webcam sites, video-sharing "tube" sites—that Plaintiffs have identified as forums for adult sexual expression. Moreover, the vast amount of child pornography that is produced, distributed, and re-distributed every year makes it impossible to investigate or prosecute every instance where a child is sexually exploited, a situation that has led law enforcement to prioritize the most egregious or high-impact cases over instances where it would be difficult to prove that an unknown young-looking but postpubescent individual in a

---

[1] The term "dark web" is used to refer to that part of the "deep web" that not only cannot be indexed by search engines but also is intentionally hidden. In contrast, the term "clear web" refers to websites on the Internet that are indexed by search engines and are thus generally accessible.

sexually-explicit image was a child.

　　This reality makes clear that Plaintiffs' proposed alternatives relying on voluntary self-policing by the adult industry, or on the investigation and prosecution of child pornography crimes after the fact, would be ineffective. The Statutes' integrated scheme of age verification, recordkeeping, labeling with the address of age verification records, and a criminal penalty for failure to take these minimally-burdensome steps was intended to and does deter producers from creating sexually-explicit images without checking performers' ages, and makes it possible for law enforcement, secondary producers, and others to check that youthful-looking performers are adults even after a film or photograph has left the hands of its original creator and been shared, republished, or included in compilations made by others. Certainly, when applied to images of youthful-looking performers engaged in sexually-explicit activity, the current scheme is the most effective way to achieve the Government's compelling interest. The Court can and should preserve this crucially important aspect of the Statutes even if it concludes that their application to Plaintiffs' images of clearly mature adults cannot stand.

　　Indeed, out of all the alternatives proposed by Plaintiffs, the only one that deserves serious consideration by the Court is the suggestion that the Statutes and Regulations should apply only when a Plaintiff uses a performer under age 30. There is no question, and Defendant does not contest, that the Government's interest in the Statutes' age verification scheme is strongest when the requirements are applied to depictions of performers that could, going by appearance alone, be minors, and the record has already established that the appropriate cut-off age for this purpose is 30 years old. The rationale for applying the Statutes regardless of a performer's age has to do with the elimination of subjectivity in the scheme; the fact that applying the Statutes on a case-by-case basis rather than universally is not necessarily less

2

restrictive; and the fact that, from the perspective of those who ultimately view the producer's work, the maturity of depicted individuals may be less clear because only genitalia might be depicted, or individuals in an image may be masked or otherwise obscured.

Nevertheless, if the Court were to conclude that the age cut-off alternative is both less restrictive and equally as effective as the current scheme, clear and controlling Supreme Court authority provides a road map for appropriate and tailored relief. This Court should invalidate the Statutes and Regulations only as applied to Plaintiffs' depictions of clearly mature adults—those above 30 years old. This measured remedy is appropriate because, even if this Court were to find certain applications of the Statutes constitutionally troubling, valid applications undoubtedly remain. The Supreme Court has recognized that in such circumstances, total invalidation of federal statutes is misplaced, and the constitutional aspects of legislation should instead remain in effect. Here, this Court should not put minors needlessly at risk by invalidating the Statutes in their entirety, when the Statutes can be validly applied to the production of millions of images depicting the sexual activity of young-looking individuals. No broader relief, such as complete invalidation, is necessary or appropriate here. Furthermore, because invalidating the Statutes only as applied to images showing clearly mature adults will provide Plaintiffs full relief under the First Amendment, this Court should not reach Plaintiffs' facial overbreadth claim, which in any event lacks merit. *See generally Bd. of Trs. v. Fox*, 492 U.S. 469, 486 (1989) ("whether the statute is overbroad" is an "issue normally subsequent to rejection of [an] as-applied challenge").

## ARGUMENT

**I.    PLAINTIFFS' PROPOSED ALTERNATIVES MUST BE EVALUATED IN LIGHT OF THE REALITY OF UBIQUITOUS, READILY-ACCESSIBLE CHILD PORNOGRAPHY ON THE INTERNET, AND FINITE LAW ENFORCEMENT RESOURCES**

In arguing that the Statutes fail strict scrutiny because there are less restrictive alternatives—including the alternative of simply doing away with age verification requirements altogether, or (along much the same lines) trusting producers to check ages of their own accord—Plaintiffs rely heavily on the notion that the Statutes target a "non-existent" problem because, they maintain, the "adult industry" does not want to produce child pornography. Pl. Reply [ECF 252] at 6. The premise underlying this argument is that the world of the so-called adult industry, which produces sexually-explicit videos and photographs that are openly advertised and published on the Internet, is far removed from child pornography, which Plaintiffs suggest is found almost exclusively on peer to peer networks, or otherwise hidden in inaccessible corners of the Internet. *E.g.*, Pl. Br. [ECF 246] at 11.

According to those who investigate and prosecute child pornography, the reality is otherwise. Millions of apparent child pornography images are found online by members of the public as well as electronic service providers and reported each year to the National Center for Missing and Exploited Children ("NCMEC"), which acts as the nation's clearinghouse for information about the sexual exploitation of children. Declaration of John Shehan ("Shehan Decl.," attached hereto) ¶¶ 3-4, 10. For example, in Fiscal Year 2017, NCMEC received close to 10 million (9,864,767) reports of apparent child pornography, most of which was found online by electronic service providers ("ESPs"), including web-hosting companies, social network platforms, and file and video-sharing companies, monitoring content on their own platforms. *Id.* ¶¶ 5, 10, 14. NCMEC, in turn, notified ESPs of over 50 thousand apparent child pornography

images that had been found by others in 2017 on publicly-viewable webpages on those ESPs'

platforms. *Id.* ¶¶ 15-16. This is not a problem that is relegated to the deep or dark web. Child

pornography is reported across a wide variety of online platforms, including commercial

websites, video-sharing sites, web cam livestreaming sites, and social networking

applications[2]—the very kinds of platforms that Plaintiffs use to publish and advertise their own

films and photographs, and that they have identified as forums for adult sexual expression.[3]

     The apparent child pornography that is reported to NCMEC and passed on to law

enforcement agencies includes images of postpubescent teens. Dougher Decl. ¶ 3 ("The images I

see in CyberTips of suspected child pornography involve children of any age, from very young

---

[2] U.S. Dep't of Justice, *The National Strategy for Child Exploitation Prevention and Interdictions: A Report to Congress* 92 (April 2016) ("2016 Nat'l Strategy," attached hereto as Exhibit A) 9, 75 (child pornography is produced and transmitted via "[l]ive-streaming video websites, web camera applications, and other similar video chat services for computers and mobile devices"); Declaration of SSA Jackie Dougher ("Dougher Decl.," attached hereto) ¶ 3 ("Child pornography can be found on "commercial websites; discussion forums; video and image sharing sites; social media platforms including Facebook, Twitter, and Craigslist; mobile applications; web-cam sites; gaming platforms; and email."); Tr. June 11 [ECF 224] 46:22 - 47:1-17 (Wolak) (commercial adult websites contain links to child pornography), 81:8-14 (Wolak) (13 and 14-year old girls have advertised themselves on dating websites like Adult Friend Finder).

[3] *See* Tr. June 5 [ECF 222] 44:14-24, 50:6-24 (Levine) & Def's Exs. 85A-C, 86B-D (Plaintiff Levine runs a website, www.nina.com, where she makes sexually-explicit videos available and offers live-streaming sex shows); Tr. June 4 [ECF 221] 10:2-10; 13:16-21 (Wilson/Sinclair) & Def's Exs. 122, 123 (Plaintiff Sinclair Institute's websites www.sinclairinstitute.com and www.bettersex.com advertise videos produced by itself and other companies); Tr. June 3 [ECF 220] 54:11-18 (Mopsik) & Def's Exs.31A-Z, 32A-I (ASMP member Craig Morey publishes sexually-explicit photographs at www.moreystudio.com); Tr. June 3 62:14-20 (Mopsik) & Def's Exs. 33A-J (ASMP member Ned Rosen's website); Tr. June 3 123:12-22 (Douglas) & www.wicked.com, www.vivid.com (FSC members Wicked Pictures and Vivid Video have websites offering films and live cams, with Vivid also offering a "dating" website at www.vividdating.com); Tr. June 7 [ECF 223], 160:13-162:1 (Nitke) & Def's Exs. 112A - 112E (Nitke's website www.barbaranitke.com); Tr. June 4 129:23-130:3 (Steinberg) & Pl.'s Ex. 62 (Steinberg's website http://www.nearbycafe.com/loveandlust/steinberg/photo/index.html); Tr. June 5 95:2-9  (Levingston) (Levingston's website http://davelevingston.com); Pl.'s Ex. 37 & A-U (identifying social networking and dating websites).

children to older individuals where it may be difficult to determine whether they are minors or adults."); 2016 Nat'l Strategy 17 ("Children as young as days old to 17 years, both male and female, across all ethnic and socio-economic backgrounds, are potential targets of individuals who engage in child pornography activities."); *id.* (also reporting that 40% of identified child pornography victims were between infancy and "tween" years, leaving 60% of such victims between 13 and 17 years old). As this Court noted in its post-trial findings, "approximately two-thirds of persons arrested for possessing child pornography were in possession of images of teenagers between the ages of 13 and 17." *Free Speech Coal., Inc. v. Holder* ("*FSC III*"), 957 F. Supp. 2d 564, 594 (E.D. Pa. 2013).

When child pornography involves children between 13 and 17 years old, it is often indistinguishable from sexually-explicit images that show youthful-looking adults. *Id.* (even websites supposedly focusing on sexually-explicit conduct by clearly mature individuals "show an abundance of young-looking performers," and expert testimony provided a conservative estimate that "approximately one-third of commercial pornography on the internet depicts" not only young-looking performers, but individuals who are, or purport to be, "teens") (citing Def's Exs. 273B, 264C-F, 267G-I, 266D); *Free Speech Coal., Inc. v. Attorney General* ("*FSC IV*"), 787 F.3d 142, 158 (3d Cir. 2015) (expert testimony established that "the rare minor could appear up to 30 years old"). There is no wall separating these two endeavors, or those who are involved in them. To the contrary, they coexist and intermingle on the Internet, and feed the same "appetite for viewing" youthful-looking individuals engaged in sexual conduct that this Court previously recognized. *FSC III*, 957 F. Supp. 2d at 594. Indeed, this Court also found that there are "incentives on both sides of the equation to use minors as performers in sexually explicit depictions," given the "high commercial value associated with the young-looking performer." *Id.*

at 595.

The record also refutes the notion that there is any such thing as a monolithic "adult industry." *E.g.*, *FSC IV*, 787 F.3d at 153 ("neither FSC nor ASMP represents 'the adult film industry' as a whole"). Some Plaintiffs, for example, purport to be artists, photographers, and educators, while video- and image-sharing websites host sexually-explicit material that might be commercial, amateur, or some combination thereof.  As the Third Circuit has observed, "no one is required to obtain a license or register with the Government before producing a sexually explicit image," and anyone "can pick up a camera and create an image subject to the Statutes." *Free Speech Coal., Inc. v. Attorney General* ("*FSC V*"), 825 F.3d 149, 170 (3d Cir. 2016). The various self-policing regimes that Plaintiffs propose—including the options of eliminating the Statutes altogether, removing the criminal penalties (thus making compliance entirely voluntary), or purporting to rely on the new "industry standards" that Plaintiff FSC composed only a few months ago—would leave the door wide open to circumvention by those who might claim to be part of an adult industry but instead use publicly-accessible platforms to sexually exploit children, allowing for even greater blurring of the lines between child pornography and the market demand for youthful-looking adult pornography.

Plaintiffs also propose that a reasonable "alternative" would be to jettison age verification and rely exclusively upon the federal laws punishing possession, production, and distribution of child pornography after the fact. Pl. Br. at 19-21. Of course, Congress enacted the Statutes to close a loophole in those very laws, and the Statutes serve important goals independent of the laws punishing child pornography crimes. *See generally* Def. Br. [ECF 249] at 24-25; *Free Speech Coal., Inc. v. Attorney General* ("*FSC II*"), 677 F.3d 519, 535 (3d Cir. 2012). Nevertheless, Plaintiffs argue that there is evidence that criminal punishment after the fact is

more effective than the Statutes' age verification requirements because there are "thousands" (in fact, approximately 2500) of successful prosecutions each year under the federal laws prohibiting possession, production, and distribution of child pornography, while there have been only a "scant number" of prosecutions under the Statutes and their implementing Regulations. Pl. Reply at 18.

Plaintiffs' argument, however, again ignores the reality that *millions* of child pornography images are found each year, and *hundreds* of thousands are referred to law enforcement authorities in the United States. Shehan Decl. ¶¶ 9-10 (nearly 8 million CyberTips of apparent child pornography were submitted to NCMEC in FY 2016, nearly 10 million were submitted in FY 2017, and those that appear to be tied to a U.S. geographic location are made available to federal and state law enforcement agencies, including Interstate Crimes Against Children task forces); *see also* 2016 Nat'l Strategy 121 (in FY 2014 and 2015, years when there were millions fewer total CyberTip  reports than there were in FY 2016 and 2017, the number of CyberTips sent to ICACs was 74,566 and 86,390, respectively). Against that backdrop, the prosecution statistics that Plaintiffs cite reveal that only a small fraction of cases of child pornography are ever prosecuted.[4]

The U.S. Department of Justice's 2016 National Strategy report to Congress, which contains these prosecution statistics, explains that, due to finite resources, law enforcement cannot investigate or prosecute every instance of child pornography. 2016 Nat'l Strategy

---

[4] For example, in FY 2013, 56,966 CyberTips—most of which involved reports of apparent child pornography, Shehan Decl. ¶ 10— were sent to ICAC task forces; in the same period, 2700 child pornography-related prosecutions were initiated. *Compare* 2016 Nat'l Strategy 121 (identifying total number of CyberTips received by ICACs in a fiscal year), *with id*. at 113 (reporting "child pornography offenses" and "child pornography production" cases filed, where charges were brought under 18 U.S.C. §§ 1466A, 1470, 2251, 2252, 2252A, and 2260). In FY 2014, the number of CyberTips to ICACs was 74,566 while the number of prosecutions was 2508. *Id.* In FY 2015, the number of CyberTips was 86,390 while the number of prosecutions was 2639. *Id.*

("[G]iven the tragically enormous volume of [child sexual exploitation] offenses, the Department and its investigative partners cannot investigate or ultimately prosecute every such offense within its subject matter jurisdiction," leading to "many images of unidentified child victims go[ing] un-reviewed, undetected, uninvestigated."). Rather, the law enforcement agencies and their partners who focus on this egregious problem have focused their resources on instances where there is evidence a child is in current danger or where enforcement against "'high-value' targets," such as organized groups, will have maximum impact. *E.g.*, *id.* at 68, 80-83.

Criminal child pornography charges are less likely to be brought when it is difficult to determine that a sexually-explicit image depicts a child rather than an adult. Dougher Decl. ¶ 4 ("Due to the volume of child pornography distributed over the Internet, the FBI must prioritize its investigations and is less likely to investigate cases involving images where it is difficult to determine if the person in the image is a child or an adult."); Wolak testimony, Tr. June 11 35:15-25 (explaining that due to the difficulty of proving that an image is of a 13 or 14-year-old rather than an adult, prosecutors limit their charges to images of prepubescent children). In contrast, the Statutes' age verification scheme is aimed at exactly that situation, where older-looking children might be used to make sexually-explicit images that are circulated in markets seeking youthful-looking performers.

The fact that charges are rarely brought under the Statutes does not mean that the Statutes are ineffective. After all, Congress enacted the Statutes, including their criminal penalties, to *deter and prevent* the use of minors in the production of sexually explicit images. Indeed, Plaintiffs' testimony demonstrates the Statutes' success as a deterrent, with many Plaintiffs admitting that the Statutes cause them to check performers' IDs and keep age verification records that otherwise would not be kept at all, or would not be kept with the rigor that Congress

determined was necessary. *E.g.*, Tr. June 3 229:1-3 (Wilson/Sinclair) (acknowledging no records of age verification were kept before the Statutes); Tr. June 7 147:19-148:11 (Nitke) (same). Some Plaintiffs similarly admit that the Statutes have deterred them from creating sexually-explicit work in situations when they would have no way to verify that their subjects were over 18, and thus could have created child pornography inadvertently if they had proceeded. Tr. June 4 191:21-192:6 (Ross, describing Genital Art Gallery); Tr. June 4, 2013 227:23-228:3 (Alper, describing Fire Island project). The Statutes are unquestionably more effective than doing away with any enforceable age verification requirement whatsoever, which is essentially what many of Plaintiffs' proposed alternatives would amount to.[5]

## II.    MOST OF PLAINTIFFS' PROPOSED ALTERNATIVES WOULD BE LESS EFFECTIVE BECAUSE THEY DO NOT INCLUDE ALL NECESSARY COMPONENTS OF AN EFFECTIVE AGE VERIFICATION SCHEME

Plaintiffs' proposed alternatives focus on wholesale alternatives to the entire scheme set forth in the Statutes and Regulations. However, such a focus ignores the separate but interrelated functions of each aspect of the scheme as Congress designed it. For example, the Statutory labeling requirement is more than simply a producer's self-certification that everyone appearing in a film or photograph is over 18. Rather, the labels required by the Statutes identify the location of the age verification records associated with a film or photograph. 18 U.S.C. §§ 2257(e), 2257A(e).

---

[5] Plaintiffs regularly point out that those who intentionally produce child pornography are unlikely to comply with the Statutes' age verification regime. However, the Third Circuit has already rejected the argument that intentional noncompliance by some undermines the Government's interest in imposing age verification and recordkeeping requirements. *See FSC II*, 677 F.3d at 536 n.12 (rejecting the notion that the possibility of violating or circumventing a statutory requirement can negate the government's interest). Even if some are not deterred, it remains the case that the existence of the Statutes, including the prospect of criminal penalties, will deter others, like Plaintiffs, from producing sexually-explicit depictions without first verifying performers ages and creating records as the Statutes require. Thus, the Statutes remain more effective than a scheme that eliminates any enforceable age verification requirement.

Except for those alternatives that would keep the Statutes intact as applied to constitutional applications, Plaintiffs' proposals would eliminate the Statutes' labeling requirement. But a crucial purpose of the Statutes is to create a regime whereby law enforcement, secondary producers, and others can easily find the age verification records associated with a particular film or photograph once it leaves the hands of its original creator. *See FSC II*, 677 F.3d at 535 (recognizing the Statutes' purposes include "permit[ting] secondary producers that public the depictions to verify that the performers were not children" as well as "aid[ing] law enforcement"). The required labels serve that purpose, and the record before the Court demonstrates their importance. Indeed, the record is replete with evidence that once a producer creates a film or photograph, that same film or photograph will likely be published in different formats; may be re-published by the original producer or someone else in compilations of their own or others' work; may be shared, with or without the original producer's permission, on video- or image-sharing websites where many others also share their own images; may be linked to other peoples' websites; and may be divided into separate scenes that are then used separately in later compilations. *E.g.*, Tr. June 3 Tr. 207:13-15, Tr. June 4 42:6-15 (Wilson/Sinclair) (a given scene "could appear in one movie, in five movies, or 500 movies"); Tr. June 5, 53:1-6, 60:16—61:5 (Levine) & Def.'s Exs. 306, 307 (discussing links on Levine's website to sexually-explicit content on other sites, and appearance of Levine's videos on tube sites such as porn.com and bravotube.com). Sexually-explicit images of adults are quite similar, in this way, to child pornography, where the same images also may appear online again and again in different locations.[6]

---

[6] The recurrence of the same videos and photographs of child pornography is a problem of sufficient magnitude that NCMEC's Canadian counterpart, the Canadian Centre for Child Protection, has developed an automated tool, called Project Arachnid, specifically aimed at

The likelihood that a sexually-explicit film or photograph may end up being republished or reposted by secondary producers means that, absent the labels required by the Statutes, which lead back to the associated age verification records, it would be difficult to verify the ages of youthful-looking individuals appearing in that depiction. *See* Dep't of Justice, Final Rule, 73 Fed. Reg. 77432, 77442 (2008) ("2008 Final Rule") ("Th[e] records enable the Department [of Justice] to identify who the primary producer was for any depiction and to verify that the depicted performers were of legal age."). Indeed, given that sexually-explicit images of adults appear on the same platforms with child pornography (as shown by the evidence discussed above), the absence of labels could make it more difficult to distinguish between the two. Alternatives that omit labels identifying the location of associated age verification records, and those that omit the recordkeeping requirement itself, should be rejected because they would not be as effective as the current scheme.[7]

---

identifying known images of child pornography on the Internet. *See* https://www.cybertip.ca/app/en/projects-arachnid. Project Arachnid locates approximately 80,000 unique images of known child pornography on publicly available webpages on the Internet each month. *See* Arachnid Q&A (attached as Exhibit B), *available at* https://www.protectchildren.ca/pdfs/C3P_Arachnid_PressKit_en.pdf .

[7] Defendant has set forth the various aspects of the Statutes and, where different, the Regulations, in the accompanying Proposed Findings of Fact. The distinction between requirements imposed by the Statutes and those imposed by the Regulations could be important if the Court were inclined to consider specific burdens of the current regime unnecessary, in the course of its strict scrutiny analysis. If such burdens were imposed solely by the Regulations, the appropriate remedy would be to hold that aspect of the Regulations invalid as applied, while leaving the Statutes intact. As discussed below, should the Court find any aspect of the regime unconstitutional under the First Amendment as applied to Plaintiffs, the Court in any case should adopt the narrowest remedy possible so as to preserve the Statutes' ability to protect children from sexual exploitation in instances where they can constitutionally do so.

III.   **IF THE COURT PROVIDES RELIEF UNDER THE FIRST AMENDMENT, IT SHOULD LEAVE THE CONSTITUTONAL APPLICATIONS OF THE STATUTES INTACT**

Of Plaintiffs' proposed alternatives, only the age cutoff option comes close to serving the Government's compelling interest as effectively as the Statutes' universal age verification requirements. Certainly, the Government's compelling interest in age verification is at its zenith when it is unclear, by looking at an image, whether it depicts adults or children. As both this Court and the Third Circuit have recognized, the age range where there is a real possibility of mistaking a child for an adult extends to 30 years old. *FSC III*, 957 F. Supp. 2d at 595; *FSC IV*, 787 F.3d at 158.

The Government has never taken the position that minors could be confused for clearly mature adults (in most cases, adults older than 30)—at least when the individuals depicted are clearly visible in the image, which, of course, is often not the case.[8] In addition to the fact that even clearly mature adults may be photographed or filmed in a way that their maturity is not discernible, the Government's justifications for the Statutes' universal age verification scheme have been, first, that such a scheme avoids the need for producers to make subjective decisions regarding whether age verification is required or not; and second, that the incremental burden

---

[8] As this Court is aware, numerous images produced by Plaintiffs depict only the body parts of the persons shown in the images, most often the genitalia, or otherwise show people wearing masks, hoods, or other outfits that obscure their face or body. *See, e.g.*, Tr. June 3 93:24-94:1 (Douglas) (indicating it is common for box covers to contain images of "just the genitals"); Tr. June 7 173:23-174:10 (Nitke); Def's Exs. 112C, 112K, 112L (Nitke photographs of BDSM activity where individuals' faces and bodies are covered by masks and other material), 160 (Alper photograph where individual is partially obscured), 162D & 162G (Dodson & Ross, Genital Art Gallery), 316, p. 3. To the extent that a person's maturity cannot be discerned from looking at these images, *see Connection Distrib. Co. v. Holder*, 557 F.3d 321, 331 (6th Cir. 2009) (en banc) (the "record reveals many images (particularly the frequent depiction of mere body parts) from which no lay observer could readily discern the individuals' ages"); Tr. June 17, 43:8-19; 36:8 – 38:3; 39:8 – 21 (Biro) (expert testimony indicating isolated body parts do not provide enough information to identify age), age verification and recordkeeping should be required.

imposed by checking ages and keeping records for performers over age 30 is minimal and does not warrant invalidating the Statutes. *FSC IV*, 787 F.3d at 159 ("Plaintiffs do not face a substantial additional burden attributable to keeping records for clearly mature performers on top of the records they must maintain for young performers"). Indeed, as Defendant has noted previously, no Plaintiff testified at trial that an age cutoff would reduce any burden, nor have Plaintiffs explained in briefing how such an option would be less restrictive. The availability of third party custodians, the ability to keep age verification records in digital format, and the availability of technologies that allow many aspects of the age verification and recordkeeping requirements to be automated further reduce this incremental burden.[9] Nevertheless, Defendant acknowledges that this alternative is the one most likely to qualify as a less restrictive, effective alternative, should the Court determine that the Statutes cannot satisfy strict scrutiny under the First Amendment.

Should the Court reach that conclusion, it need not declare the Statutes wholly invalid as applied to Plaintiffs. Rather, as discussed below, it can and should provide a narrower remedy, invalidating the Statutes only as applied to Plaintiffs' depictions containing no individuals under age 30 while preserving the Statutes' ability to protect children from sexual exploitation in situations where performers could be minors.

---

[9] *See* Declaration of Janine Johansen ("Johansen Dec.," attached hereto) ¶¶ 3-7 (describing 2257 compliance technologies advertised online, including third party services, web-based technologies, software that can be installed on a computer, and a $0.99 app that can be installed on either Apple or Android platforms that allows a producer to fill in the required information for a performer on a cell phone and email it in converted pdf format to the records custodian). Companies do not appear to charge by the performer; instead, some charge monthly or annually based on a total file storage size or based on whether a producer is small or large. *See id.*

### A.      Partial, Rather Than Total, Invalidation Is Appropriate Here

A federal court asked to invalidate an Act of Congress must exercise its authority

carefully, with respect for Congress's right to address the serious problems facing the nation.

*See FSC III*, 957 F. Supp. 2d at 600 ("A court should tread most carefully in considering facial

challenges to anti-child pornography laws."). Striking down a federal statute in its entirety is "a

last resort," *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999), because

"invalidating a law that in some of its applications is perfectly constitutional – particularly a law

directed at conduct so antisocial that it has been made criminal – has obvious harmful effects"

that weigh in the constitutional balance. *United States v. Williams*, 553 U.S. 285, 292 (2008).

This case presents a particularly acute example of the costs that would be incurred if the Statutes

were invalidated on their face. The Statutes are designed to further the extraordinarily important

interest of protecting minors against sexual exploitation, and this Court should craft relief under

the First Amendment that frustrates that legislative goal as little as possible.

At the outset, as Defendant has argued previously, this Court should first address

Plaintiffs' as-applied challenges, rather than their claim that the Statutes are facially overbroad.

"It is not the usual judicial practice . . . [nor] generally desirable, to proceed to an overbreadth

issue unnecessarily—that is, before it is determined that the statute would be valid as applied."

*Fox*, 492 U.S. at 484–85.

Plaintiffs' as-applied claims—claims that the Statutes cannot constitutionally be applied

to images produced by the individual plaintiffs, and a claim that the Statutes are not narrowly-

tailored under the strict scrutiny standard—do not warrant wholesale invalidation of the age

verification and recordkeeping requirements. The Supreme Court clarified in *Ayotte v. Planned

Parenthood,* 546 U.S. 320, 328-29 (2006), *United States v. Booker*, 543 U.S. 220, 258 (2005),

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987), and related cases, that severance is appropriate when legislation can constitutionally be applied in certain settings, and those constitutional applications, enforced independently, coherently further the legislature's goals.[10] In fashioning an appropriate remedy, the Court must not "nullify more of a legislature's work than is necessary," not only to minimize damage to important social goals, but also because "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Ayotte*, 546 U.S. at 329 (internal quotation omitted).

Thus, "the normal rule is that partial, rather than facial, invalidation is the required course." *Id.*[11] This rule properly allows valid elements of the legislative scheme to remain in full effect. When a statute is invalidated only in part, the Court will "ordinarily give effect to the valid portion" of the statute, "so long as it 'remains "fully operative as a law,"' . . . and so long as it is not 'evident' from the statutory text and context that Congress would have preferred no statute at all." *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173 (2014); *see also Booker*, 543 U.S. at 258.

This preference for partial invalidation applies in full when First Amendment interests are at stake. The Supreme Court in *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985),

---

[10] Severance in this context does not necessarily mean severing "an offending portion of the *text* from the rest of the statute." *Connection*, 557 F.3d at 342. "Severance" also describes the situation where a court "enjoin[s] the unconstitutional *applications* of the law while preserving the other valid applications of the law." *Id.*

[11] Indeed, where injunctive relief is sought, as it is here, partial relief is particularly appropriate given the rule that "injunctive relief should be no broader than necessary to provide full relief to the aggrieved party." *Meyer v. CUNA Mut. Ins. Soc'y*, 648 F.3d 154, 169–70 (3d Cir. 2011) (citing *Califano v. Yamasaki*, 442 U.S.. 682, 702 (1979)). In *Ayotte*, the district court and court of appeals had held a parental notification law facially invalid and permanently enjoined its enforcement. 546 U.S. at 325. The Supreme Court, however, concluded that such a "blunt remedy" was unnecessary, and remanded for further consideration of narrower options, such as enjoining enforcement only as to certain applications. *Ayotte*, 546 U.S. at 331.

reversed a court of appeals' determination that although partial invalidation might be preferred in other constitutional settings, "in First Amendment cases an overbroad statute must be stricken down on its face." The Court in *Brockett* agreed that Washington's "moral nuisance" statute might criminalize speech protected under the First Amendment, but it determined that "[f]acial invalidation . . . was nevertheless improvident." *Id.* at 501. Explaining that "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it," *id.* at 502 (citing *Buckley v. Valeo*, 424 U.S. 1, 108 (1976)), the Court held that "the Washington law should have been invalidated only insofar as the word 'lust' is to be understood as reaching protected materials" under the First Amendment, and otherwise sustained. *Id.* at 504.

Notably, the Supreme Court in *Brockett* cited a series of cases in which it had provided relief under the First Amendment by partially invalidating statutes, while leaving constitutionally untroubling provisions in full effect. In *Cantwell v. Connecticut*, 310 U.S. 296 (1940), for example, the Court "did not invalidate the state offense of 'breach of the peace' on its face but only to the extent that it was construed and applied to prevent the peaceful distribution of religious literature on the streets." *Brockett*, 472 U.S. at 502. In *Marsh v. Alabama*, 326 U.S. 501, 509 (1946), the Court "struck down a state trespass law only '[i]nsofar as the State has attempted to impose criminal punishment' on those distributing literature on the streets of a company town." *Brockett*, 472 U.S. at 503-503. In *NAACP v. Button*, 371 U.S. 415, 419 (1963), the Court "did not facially invalidate the State's rules against solicitation by attorneys but only as they were sought to be applied to the activities of the NAACP involved in that case." *Brockett*, 472 U.S. at 503. Similarly, the Court in *United States v. Grace*, 461 U.S. 171, 175 (1983), "declined to invalidate on its face a federal statute prohibiting demonstrations on the Supreme Court grounds," and confined its holding instead "to the invalidity of the statute as applied to picketing

17

on the public sidewalks surrounding the building." *Brockett*, 472 U.S. at 503; *see also FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 481 (2007) (because "appellants identify no interest sufficiently compelling to justify burdening WRTL's speech, we hold that [the Bipartisan Campaign Reform Act] is unconstitutional as applied to WRTL's "Wedding," "Loan," and "Waiting" ads"); *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 768 (1996) (plurality) (partially invalidating, after *Brockett*, FCC indecency standards for broadcast television).

Plaintiffs have simply disregarded this line of authority. Instead, while insisting that the Statutes must be declared wholly invalid, at no point do Plaintiffs cite, explain or distinguish the cases addressing severance and partial invalidation. Nonetheless, partial invalidation is both the preferred remedy when relief under the First Amendment addresses a statute that is constitutional in some applications, and also a commonplace of First Amendment adjudication. If this Court concludes that the Statutes do not pass muster under strict scrutiny, it should consider partial invalidation here.[12]

---

[12] To be sure, not all of Plaintiffs' proposed alternatives could appropriately be implemented by the Court as a form of remedy. The Supreme Court has cautioned federal courts against using "editorial freedom" in fashioning First Amendment relief, because the task of making "extensive" alterations to legislation "belongs to the Legislature, not the Judiciary." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 510 (2010). The Court therefore could not rewrite the Statutes to substitute for age verification and record-keeping a certification program that Congress enacted primarily to address images of *simulated* sexually explicit conduct, Pl. Br. at 21-22; limit the Statutes to commercially-produced images, contrary to the plain language used by Congress, *see id.* at 25; restrict age verification and recordkeeping requirements to "primary" producers, *id.* at 26-28; or excise criminal penalties from the Statutes, *id.* at 28. Nor could the Court replace the Statutes with newly-created "industry standards." Each of these proposed alternatives would require too extensive a judicial reworking of the statutory scheme to be implemented as a remedy. By contrast, as discussed above, there is ample, controlling authority for severance and only partial invalidation where a statute is determined to be invalid in part. Even if this Court determines that the Statutes do not survive strict scrutiny in their entirety, it should hold that the Statutes, as applied to the production of images showing the sexual activity of people who appear to be younger than 30, function effectively as an

**B.** **Under the Supreme Court's Standards for Partial Invalidation, This Court Should Invalidate the Statutes Only to The Extent That They Apply to Plaintiffs' Production of Images Showing Clearly Mature Adults Over the Age of 30**

In *Booker*, the Supreme Court articulated a three-part test for crafting an appropriate remedy when partial, rather than total invalidation is required. The court "must retain those portions of the Act that are (1) constitutionally valid . . . (2) capable of 'functioning independently,' . . . and (3) consistent with Congress' basic objectives in enacting the statute." 543 U.S. at 258-59 (citations omitted). Under this standard, this Court should sustain the validity of the Statutes at least as applied to images depicting young people under 30 years old.

**1.** **The Statutes as Applied to Images Depicting Young-Looking Individuals Are Constitutionally Valid**

The Statutes can constitutionally be applied to Plaintiffs' (and others') production of vast numbers of sexually explicit images showing people young enough to be taken for minors. Such applications easily survive strict scrutiny.[13] Images showing the sexual conduct of people who might be minors raise on their face the possibility of the sexual exploitation of children; any image that triggers age verification and regulation under the Statutes would constitute prohibited child pornography if the individuals depicted were under the age of 18. *See* 18 U.S.C. § 2256(8).

The Third Circuit has accordingly recognized that pornographic images showing "performers who are not obviously adults" directly implicate the Government's interest in protecting minors from sexual exploitation. *FSC II*, 677 F.3d at 537. Further, requiring young-

_____

independent whole, are consistent with the First Amendment, and remain fully in force.

[13] There is no dispute that the Statutes further a compelling interest. In addition, the Statutes in their entirety are narrowly-tailored under strict scrutiny, as explained in the Government's previous brief as well as above. Def. Br. at 16-32. For purposes of this discussion of remedy, however, we direct the Court's attention more narrowly to the reasons why images depicting the sexual activity of young people, viewed independently, meet the strict scrutiny standard.

looking sex performers to prove their age, and producers to keep age verification records for these performers, is the least restrictive alternative for ascertaining that sexual performers are of age, *see United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); a verification and recordkeeping program that did not encompass images showing obviously young people engaging in sexual activity would be wholly ineffective. And with no objective age verification program at all, minors would have to rely for protection upon the voluntary practices of the producers of sexually explicit images. Nothing in that proposal, however, addresses the "risks of delegating enforcement of this critical issue to the subjects of the regulation," *Connection*, 557 F.3d at 331, a problem that Congress properly eliminated in enacting the Statutes.[14]

This Court and the Court of Appeals have accordingly agreed that images showing young-looking people engaging in sexually explicit conduct are within the "plainly legitimate sweep" of the Statutes. *See FSC III*, 957 F. Supp. 2d at 593-94; *FSC II*, 677 F.3d at 538-539; *see also Connection,* 557 F.3d at 336 (noting that plaintiffs in that case agreed that the Statutes "would be constitutional if [they] applied only to people who appear to be under 26 or under 30" and commenting that "this 'legitimate sweep' of the law represents the vast majority of its applications"). Plaintiffs here have similarly proposed that a "law requiring proof of age from only performers who might reasonably appear to be underage or who are younger than 30 years old would serve as an effective, less restrictive alternative to the [S]tatutes' universal application." Pl. Br. at 25.

Narrowing the Statutes to the production of images showing younger-looking sexual performers would provide Plaintiffs with full relief under the First Amendment. Although

---

[14] As explained above, the fact that vast amounts of child pornography share the same online platforms containing sexually-explicit films and photographs of adults further demonstrates why self-policing would be ineffective.

Plaintiffs have also contended at times that the Statutes cannot constitutionally be applied to purely private images, such images are not relevant to Plaintiffs' as-applied challenge in this case. This Court held after trial that Plaintiffs had produced "no evidence that any Plaintiff produces purely non-commercial sexual depictions or maintains records for such depictions." *FSC III*, 957 F. Supp. 2d at 586.[15] The Court of Appeals acknowledged this factual finding. *See FSC IV*, 787 F.3d at 160 (none of "the plaintiffs in this litigation produce only images intended for private use rather than public distribution"). Because the Statutes have never been applied to any purely private image produced by any Plaintiff, this Court in applying the strict scrutiny standard need grant Plaintiffs no relief with respect to such images.

In sum, the Statutes survive strict scrutiny as applied to Plaintiffs' images depicting the sexual activity of younger-looking individuals, and this Court should hold that these valid applications of the Statutes remain in force.

> **2.      The Statutes Can Function Independently Even If They Are Applied Only to Images Showing Young People**

The Supreme Court has held that partial invalidation is the appropriate remedy when the constitutionally valid applications of a challenged statute can be enforced as an independently coherent whole. *Alaska Airlines*, 480 U.S., at 684; *see also Champlin Refining Co. v. Corp. Comm'n*, 286 U.S. 210, 234 (1932) (partial invalidation is acceptable because "[t]he unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions"); *Allen v. Louisiana*, 103 U.S. 80, 83-84, 13 Otto 80 (1881) ("the same statute may be in part constitutional and in part unconstitutional, and . . . if the parts are wholly

---

[15] *See also FSC III*, 957 F. Supp. 2d at 586 ("the Amended Complaint did not refer to private depictions when pleading Plaintiffs' as applied challenge under the First Amendment and no Plaintiff attempted to use private depictions as evidence of their as-applied burden when testifying at trial.").

independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected").

Here, the Statutes can function independently even if they are held to apply only to the production of images showing individuals who could be mistaken for minors. Moreover, as discussed below, the core goals of the age verification and recordkeeping Statutes are served by applying the Statutes to images showing young-looking people, even if no records are required for clearly mature sexual performers.

This Court has ample authority to craft relief that would construe the Statutes to require age verification and recordkeeping only when producers depict the sexual conduct of individuals under 30 years old. *See* Letter to Counsel of September 20, 2017, ¶ 7, 7.a., 7.b (asking counsel to address this possible form of relief). As discussed above, partial invalidation of a constitutionally troubling statute, and enforcement of only the valid aspects of the statutory scheme, is the preferred course for constitutional adjudication of this type.  In the First Amendment context in particular, the Supreme Court has routinely crafted relief by invalidating only specific applications of challenged statutes, and leaving the remainder in force, as the cases cited above make clear. Restricting the Statutes to the production of images showing younger people would be no different.

Relief tailored to a specific age cutoff is on a particularly solid footing here, because it can be crafted in response to facts found at trial. These findings are unaffected by the legal question of the appropriate standard of review under the First Amendment. Specifically, this Court found that the evidence supported an age cutoff of 30 years for images showing younger-looking people: the "general age range of confusion is 15 to 24 years old, but even individuals younger and older can be mistaken for adults or minors, respectively." *FSC III*, 957 F. Supp. 2d

22

at 595. The Court of Appeals agreed, explaining that because Dr. Biro's "testimony establishes that the rare minor could appear up to 30 years old," age verification that did not extend to age 30 "would . . . render the Statutes less effective in preventing child pornography." *FSC IV*, 787 F.3d at 158; *see also* Pl. Br. at 25 ("A law requiring proof of age from only performers . . . younger than 30 years old would serve as an effective, less restrictive alternative to the statutes' universal application").

### 3.   Sustaining the Statutes in Part Vindicates Congressional Intent

Finally under the *Booker* standard, it is inconceivable here that Congress would have preferred "no statute at all" to a law limited to the production of images showing people under age 30. *Arkison*, 134 S. Ct. at 2173; *see also Denver Area Educ. Telecommc'ns Consortium, Inc.*, 518 U.S. at 768 (plurality) ("[W]e can find no reason why, in light of Congress' basic objective (the protection of children), Congress would have preferred no provisions at all to the permissive provision standing by itself"). Even if invalidated as applied to images showing clearly mature adults, the Statutes carry out in large part Congress's goals in enacting the legislation.  All indications thus suggest that Congress would favor enforcing the Statute if their scope were narrowed by this Court to images of people who appear to be under 30.

First, enforcing the Statutes in the production of images showing younger individuals (those under age 30) would reach a significant volume (and proportion) of Plaintiffs' sexually explicit material. This Court found after its eight-day bench trial that every Plaintiff in this case produces a significant amount of work that contained images showing young people, and no Plaintiff's "depictions are confined to clearly mature adults." *FSC III*, 957 F. Supp. 2d at 590. That finding was in line with the broader conclusion that "[y]outhful-looking performers are ubiquitous in the adult entertainment industry and there is a significant market for pornographic

materials depicting such individuals." *Id.* at 584. "Some of the most popular categories of

commercial pornography . . . are popular precisely because they depict women and men who

appear to be 18, 19 or 20 years old, or younger." *Id.* Even those "sub-genres of pornography that

purport to focus on mature-looking adults" do not, in fact, show older people exclusively; rather,

they "also include significant numbers of young-looking performers." *Id.* at 594. This Court

accordingly found that "a vast amount of depictions" fall within this category of images showing

people young enough to be mistaken for minors. *Id.* at 584; *see also id.* (testimony establishing

that 136 million internet sites tagged as teen porn, and 78 million tagged "porn, 18 year old").

Even if age verification and recordkeeping cannot be required for images showing older people,

therefore, the Statutes can continue to play an important role in protecting minors and

significantly advance the goals of Congress.

Second, enforcing the Statutes for images showing younger people satisfies the core

concerns Congress addressed in the legislation. The Attorney General's Commission on

Pornography found in 1986 that "producers of sexually explicit matter generally sought youthful-

looking performers, which 'has made it increasingly difficult for law enforcement officers to

ascertain whether an individual in a film or other visual depiction is a minor.'" *FSC II*, 677 F.3d

at 526 (quoting the Commission's Report at 618). The Statutes thus "clearly advance a

substantial governmental interest—protecting children from sexual exploitation by

pornographers." *FSC II*, 677 F.3d at 535 (affirming *Free Speech Coal., Inc. v. Holder* ("*FSC I*"),

729 F. Supp. 2d 691, 721 (E.D. Pa. 2010) (the Statutes "were enacted to combat the use of

children in the production of pornography and to prevent the 'harm[ ] and debase[ment of] the

most defenseless of our citizens'")). These goals are manifestly well-served when they provide

an objective, verifiable system of age verification for sexual performers who are young enough

that they cannot be distinguished from minors. There is thus every reason to believe that Congress would prefer the Statutes to be applied to images showing exclusively young people over the prospect of their not being applied at all.

    **C.**    **This Court Should Refrain From Addressing Plaintiffs' Facial Overbreadth Claim, Which in Any Event Lacks Merit**

If this Court were to determine that the Statutes cannot constitutionally be applied to images showing clearly mature sexual performers, then it could grant Plaintiffs complete relief by invalidating the Statutes only as applied to such images. Plaintiffs here are all individuals (and, arguably, two organizations, *but see* Def. Br. at 5-8), to which the Statutes, perhaps as narrowed by this Court, may constitutionally be applied, and as discussed above, severance and partial invalidation will address their First Amendment narrow-tailoring concerns.  A federal court should "neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 478 (1995) (citing *Fox*, 492 U.S. at 484-85); *see also Belitskus v. Pizzingrilli*, 343 F.3d 632, 649-50 (3d Cir. 2003) (same); *see generally* Def. Br. at 33-35.

In any event, the overbreadth claim lacks merit, as this Court found after trial, in a ruling the Third Circuit affirmed. *See FSC III*, 957 F. Supp. 2d at 594; *FSC IV*, 787 F.3d at 164-65. That judgment is unaffected by the level of scrutiny that is relevant to the as-applied claims. As explained in Defendant's Brief (at 37-39), the factors relevant to overbreadth (the numbers of constitutional and potentially unconstitutional applications of the Statutes, and the compelling nature of the government's interest) remain unchanged.

Plaintiffs are mistaken in contending (Pl. Br. at 29-30) that overbreadth is necessarily co-extensive with a lack of narrow-tailoring under the First Amendment. Although in some cases the concepts may be congruent, *see, e.g. Fox*, 492 U.S. at 482, they are not identical. Here, where

the Statutes are reviewed on the as-applied claim under strict scrutiny, the "most rigorous and exacting standard of constitutional review" known to the law, *Miller v. Johnson*, 515 U.S. 900, 920 (1995), there is ample room for a court to determine that a statute that does not survive strict scrutiny is nonetheless not overbroad. A statute may sometimes be found at least partially invalid if it does not employ the least restrictive means of achieving its goals. *See Playboy*, 529 U.S. at 813. "Determining whether a statute is facially unconstitutional," by contrast, "requires 'as much in the way of judgment' as it does 'a comparison between the constitutional and unconstitutional applications of a law.'" *FSC IV*, 787 F.3d at 161 (quoting *Connection*, 557 F.3d at 340). That judgment must be exercised in favor of preserving the Statutes, as this Court has already correctly held.

In sum, this Court has correctly acknowledged the "'surpassing importance of the government's interest in safeguarding the physical and psychological well-being of children.'" *FSC 1*, 729 F. Supp. 2d at 719. That interest should be protected here, even as the Court, should it deem it necessary in order to give full consideration to the First Amendment rights of those who produce images showing people engaging in sexually explicit activity, fashions measured relief. There is no legal basis for invalidating the Statutes in their entirety, and this Court should decline to take that radical step.

## **CONCLUSION**

For the foregoing reasons, and those set forth in prior briefing, the Court should enter judgment in favor of the Government on Plaintiffs' First Amendment claims. In the alternative, the Court should hold the Statutes invalid only as applied to Plaintiffs' depictions where the individuals depicted are over 30 years old.

Dated this 5th day of January, 2018.          Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
LOUIS D. LAPPEN
Acting United States Attorney
JOHN R. TYLER
Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
NATHAN M. SWINTON
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Washington, DC
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.1.2(8)(b), I hereby certify that the foregoing Memorandum has been filed electronically and is available for viewing and downloading from the ECF system. I further certify that the foregoing document was served via ECF on counsel of record for plaintiffs in the above-captioned case.

Dated: January 5, 2018                    /s/
                                           Kathryn L. Wyer