**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FREE SPEECH COALITION, INC. et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 2:09-4607 |
| v. | ) |
| | ) Judge Michael M. Baylson |
| JEFFERSON B. SESSIONS, III, | ) |
| Attorney General, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S PROPOSED FINDINGS OF FACT RELEVANT TO
PLAINTIFFS' AS-APPLIED CHALLENGES UNDER STRICT SCRUTINY**

## <u>TABLE OF CONTENTS</u>

I.   THE AGE VERIFICATION, RECORDKEEPING, AND LABELING
     REQUIREMENTS OF 18 U.S.C. §§ 2257 AND 2275A AND THEIR
     IMPLEMENTING REGULATIONS ......................................................... 1

     A.   The Statutory Age Verification Requirements ...................................... 1

     B.   The Statutory Recordkeeping Requirements ........................................ 3

     C.   Recordkeeping Requirements Set Forth in the Regulations ................. 7

          (I)     Keeping Copies of Performers' IDs ........................................ 7

          (II)    Linking Copies of Depictions to Age Verification Records ...... 8

          (III)   Keeping Copies of URLs with Age Verification Records ......... 9

          (IV)    Indexing Names and Cross-Referencing Records .................... 9

          (V)     Identifying the Date of Original Production ........................... 11

          (VI)    Segregating Age Verification Records from Other Business
                  Records ................................................................................. 11

     D.   The Statutory Labeling Requirement ................................................. 12

     E.   Labeling Requirements Set Forth in the Regulations ......................... 14

     F.   Requirements No Longer in Effect ..................................................... 15

II.  ADDITIONAL EVIDENCE DEMONSTRATING PLAINTIFFS'
     PROPOSED ALTERNATIVES WOULD NOT BE AS EFFECTIVE .............. 15

     A.   A Vast Amount of Child Pornography Exists on the Clear Web, on the
          Same Platforms that Host Adult Pornography ................................... 15

          (I)     Adult Pornography Online ...................................................... 15

          (II)    Child Pornography Online ...................................................... 17

     B.   Because Law Enforcement Resources Are Limited, Many Instances of
          Apparent Child Pornography Are Not Prosecuted, and Images of Older
          Children Are Not an Enforcement Priority ........................................ 20

     C.   The Statutes Serve to Deter the Production of Sexually-Explicit Images
          Without Age Verification .................................................................. 22

     D.   No Marker, Other than the 2257 Label, Provides a Uniform, Verifiable
          Means of Distinguishing Websites that Do Not Contain Child
          Pornography From Those That Do ..................................................... 23

     E.   FSC Does Not Have any Means to Enforce a Uniform
          "Industry Standard"of Age Verification ............................................. 24

I.     **THE AGE VERIFICATION, RECORDKEEPING, AND LABELING REQUIREMENTS OF 18 U.S.C. §§ 2257 AND 2275A AND THEIR IMPLEMENTING REGULATIONS**

1.     The scheme established under 18 U.S.C. §§ 2257 and 2257A (the "Statutes") contains three main requirements: (1) age verification, *see* 18 U.S.C. §§ 2257(b)(1), 2257A(b)(1); (2)  recordkeeping, *see* 18 U.S.C. §§ 2257(a), (b)(3), (c), 2257A(a), (b)(3), (c); and (3) labeling, *see* 18 U.S.C. §§ 2257(e), 2257A(e). Each of these three requirements is set forth separately in the Statutes. Department of Justice regulations (the "Regulations") implement and interpret the three requirements. 28 C.F.R. §§ 75.1-.4, .6-.9.

2.     In some respects, the Regulations implement the Statutes in a manner that minimizes burdens on producers that had been identified during the public notice-and-comment rulemaking process. In other respects, the Regulations interpret the Statutes in a manner that identifies obligations for producers to follow that are not expressly stated in the Statutes but that the Attorney General deemed necessary to implement an effective regulatory scheme.

     A.     **The Statutory Age Verification Requirements**

3.     With respect to age verification, the Statutes require producers to ascertain a performer's name and date of birth by examining the performer's identification document. 18 U.S.C. §§ 2257(b)(1), 2257A(b)(1).

4.     The Statutes also require producers to ascertain names previously used by the performer, other than the performer's "present and correct name," including "maiden name, alias, nickname, state, or professional name." *Id.* 2257(b)(2), 2257A(b)(2).

5.     The Regulations do not identify any additional obligations of producers with respect to the Statutes' age verification requirements.

1

6.      Checking performers' ages before using them in the production of a sexually-explicit film or photograph is necessary to ensure that the producer knows that an individual is not a minor, particularly for any performer younger than 30 years old. The evidence at trial has already established that minors could be mistaken for adults up to at least age 30.[1] *FSC III*, 957 F. Supp. 2d at 595 (finding the "general age range of confusion is 15 to 24 years old, but even individuals younger and older can be mistaken for adults or minors, respectively"); *Free Speech Coal., Inc. v. Attorney General* ("*FSC IV*"), 787 F.3d 142, 158 (3d Cir. 2015) (Dr. Biro's expert "testimony establishes that the rare minor could appear up to 30 years old"). Age verification that does not extend to age 30 would be "less effective in preventing child pornography." *Id.*

7.      Little or no additional burden is imposed by requiring Plaintiffs to verify ages for all performers, even those over 30 years old. *Id.* at 158-59. The evidence at trial has already established that a "significant proportion of Plaintiffs' work" involves models under age 30. *Id.* at 158. A universal requirement that applies regardless of a performer's age is less burdensome in that it eliminates the need for producers like Plaintiffs "to make subjective age determinations" when deciding whether to check a performer's ID or not. *FSC III*, 957 F. Supp. 2d at 595.

8.      Most Plaintiffs do not assert that checking performers' IDs in order to verify age is burdensome, and some concede that it is not. Tr. June 5 110:12-21 (Levingston)[2]; Tr. June 4

---

[1] The Court's previous findings of fact regarding expert testimony, as well as the nature of Plaintiffs' production of sexually-explicit material, based on the record of the trial that took place in this case from  June 3 to June 17, 2013, as set forth in its opinion, *Free Speech Coal., Inc. v. Holder* ("*FSC III*"), 957 F. Supp. 2d 564 (E.D. Pa. 2013), remain in force for purposes of the current analysis. Defendant therefore omits specific citations to the record where, as here, the Court has issued a clear finding, affirmed by the Third Circuit. Such record citations are available in the Proposed Findings of Fact that Defendant filed post-trial at ECF 217-1.

[2] Unless otherwise indicated, all transcript references herein refer to the transcripts of the trial that took place in this case from June 3 to June 17, 2013.

80:7–9 (Queen) (checking IDs takes "less than a minute").

9.      Some Plaintiffs assert they would check IDs of all performers even in the absence of the Statutes. Tr. June 3 211:22–24, 228:25–229:1 (Wilson/Sinclair); Tr. June 5 49:5–7 (Levine); Tr. June 5 99:16–17 (Levingston); Tr. June 4 68:10–16, 80:16–21 (Queen) (checks IDs of all participants in the Masturbatathon, "including the guy who was over 70," regardless of whether it is live-streamed); Tr. June 4 138:8–23 (Steinberg).

10.     However, some Plaintiffs admit that they would not check IDs in the absence of the Statutes unless they believed a performer might be a minor. Tr. June 7 167:6-15 (Nitke).

11.     Other Plaintiffs, including members of ASMP and FSC, admit that they want to, and would in the absence of the Statutes, undertake projects without checking IDs for any performers because they wish to create sexually-explicit images of anonymous individuals, Tr. June 4 227:23–228:3 (Alper) (describing project photographing anonymous couples having sexual intercourse on Fire Island), Tr. June 4 191:21–192:6 (Ross) (describing the anonymous Genital Art Gallery), 201:5–6 (Dodson) (explaining that "the whole point" of the Genital Art Gallery "was anonymity"), or they wish to appropriate sexually-explicit photographs created by others, where they do not know anything about the individuals depicted in the photographs, Tr. June 4 54:16-57:5, 57:6-23 (Queen) (explaining that she makes collages that include photographs of "genitals and nude bodies" but does not attempt to verify that the depicted individuals are over 18). Alper is a member of ASMP. Tr. June 3 54:5-10 (Mopsik). Queen is, or was, an FSC member. Tr. June 4 58:8-17 (Queen).

### B.      The Statutory Recordkeeping Requirements

12.     With respect to recordkeeping, the Statutes require producers to record the information collected pursuant to §§ 2257(b)(1)–(2) and 2257A(b)(1)–(2) in "individually

identifiable records." 18 U.S.C. §§ 2257(a), (b)(3), 2257A(a), (b)(3). The Regulations clarify that these records may be kept in digital form. 28 C.F.R. § 75.2(f).

13.    The Statutes also require producers to maintain these records at their business premises or "at such other place as the Attorney General may by regulation prescribe." 18 U.S.C. §§ 2257(c), 2257A(c). The Regulations clarify that the records may be kept by a third-party custodian rather than by the producer. 28 C.F.R. § 75.2(h).

14.    Eliminating the Statutory recordkeeping requirements would make any age verification scheme less effective in combatting child sexual exploitation. The Statutory recordkeeping requirements ensure that producers maintain age verification records for the performers appearing in their sexually-explicit films and photographs. Without such records, it would not be possible for law enforcement, secondary producers, or others to verify after the fact that a producer had checked the IDs of individuals appearing in the sexually-explicit films and photographs that he produced. *E.g.*, Final Rule, 73 Fed. Reg. 77432, 77442 (2008) ("Th[e] records enable the Department [of Justice] to identify who the primary producer was for any depiction and to verify that the depicted performers were of legal age. The Department believes that to avoid a commercial market in child pornography through the witting or unwitting actions of secondary producers, secondary producers must keep records that each depiction [was created] only after the primary producer checked valid identification documents.").

15.    Eliminating the Statutory recordkeeping requirements would also make any age verification scheme less effective in allowing identification of the individuals appearing in the films or photographs, which often requires significant effort in investigations of suspected child pornography. *Cf. The National Strategy for Child Exploitation Prevention and Interdictions: A Report to Congress* 92 (April 2016) ("2016 Nat'l Strategy," attached hereto as Exhibit A)

("Often, the true identity of both offenders and victims of crimes with an online component

(including nearly all child pornography offenses) . . . can be ascertained only through the work of

an investigatory with forensic expertise."); *id.* at 26, 83 (describing programs and priorities

aimed at ascertaining the identity of child pornography victims).

16.     Without age verification records for individuals over 30, it would be more

difficult for law enforcement or others to determine whether a producer should have checked the

ID of someone who appears to be under 30. *FSC III*, 957 F. Supp. 2d at 592 ("as Agent

Lawrence testified, anything less than a universal requirement would invite disputes between

Plaintiffs and law enforcement").

17.     Some Plaintiffs admit that the Statutes' recordkeeping requirements are not

burdensome at all, at least in some contexts. Tr. June 4 189:20–23, 191:12–15 (Ross) ("I have no

problem with complying with 2257 when we produce a film and keeping the records. I don't

think it's burdensome at all. I comply with it."); Tr. June 5 14:15–15:15 (Hymes) (asserting that

primary producers should check IDs of performers and keep records of having done so).

18.     All the Plaintiffs who asserted any burden related to the recordkeeping

requirement expressly imposed by the Statutes (as opposed to recordkeeping obligations set forth

in the Regulations) appeared to hold the mistaken belief that they were obligated to create and

keep paper copies of the records. June 3 Tr. 212:4–18 (Wilson/Sinclair)[3] (describing process of

_____

[3] Certain aspects of Sinclair's recordkeeping practices appear to have been developed for its own convenience. For example, Sinclair creates "statements of compliance that are signed by someone who was on the site when the film was made" as well as "cast list[s]" for each scene. Tr. June 3 212:4–17 (Wilson/Sinclair). Nothing in the Statutes or Regulations requires a producer to create a signed statement of compliance or separate cast lists for each scene. These practices thus reflect the fact that Sinclair produces a large volume of material and also frequently re-uses individual scenes in new compilations. Tr. June 3 207:13–15, Tr. June 4 42:6–15 (Wilson/Sinclair) (indicating that "it gets a little confusing" to keep track of who is in a video because "[a] lot of the[m] are compilations," and a given scene "could appear in one movie, in

5

creating paper records, converting them into digital format, and keeping both paper and digital copies); Tr. June 5 47:6–13 (Levine) (indicating that she kept her own paper records even though she used a third party custodian and had trouble getting "the electronic to sync up with the paper"); Tr. June 4 124:20–23 (Steinberg) (describing practice of keeping hardcopies of records in a file cabinet and transcribing the same information onto a spreadsheet that he keeps on his computer); Tr. June 7 149:12–150:11, 162:15–22, 163:2–164:10, 165:1–17 (Nitke) (describing recordkeeping as an "ordeal" based on her mistaken understanding that she must keep three sets of paper 2257 files and rearrange them all whenever she changes the photographs on her website, and her lack of awareness that the Statutes, implemented by the Regulations, allow for keeping records in digital format); *FSC III*, 957 F. Supp. 2d at 591 n.15 (recognizing Plaintiffs' misunderstanding of requirements, including the fact that records can be maintained in digital format).

19.    The use of third party custodians and digital technologies either does or could minimize any burden associated with the Statutes' recordkeeping requirements. A variety of 2257 compliance technologies are advertised online, including third party services, web-based technologies, software that can be installed on a computer, and a $0.99 app that can be installed on either Apple or Android platforms that allows a producer to fill in the required information for a performer on a cell phone and email it in converted pdf format to the records custodian. Declaration of Janine Johansen ("Johansen Dec.," attached hereto) ¶¶ 3–7; *see also* 73 Fed. Reg. at 77463–64 (recognizing even in 2008 "the availability of software to assist in the record-keeping"). At least one Plaintiff has earned more from her website since hiring a third party custodian to store her 2257 records, due to the third party custodian's ability to set up revenue-

_____

five movies, or 500 movies").

sharing income by placing links on the Plaintiff's website to content on other websites. Tr. June 5 52:13–53:13 (Levine).[4]

20.     Little or no additional burden is imposed by requiring Plaintiffs to keep age verification records for all performers, even those over 30 years old. *FSC IV*, 787 F.3d at 159 ("Plaintiffs do not face a substantial additional burden attributable to keeping records for clearly mature performers on top of the records they must maintain for  young performers"). The use of third party custodians and digital technologies either does or could further reduce any incremental burden associated with recordkeeping for performers over age 30. Companies advertising 2257 recordkeeping services online do not charge by the performer; instead, some charge monthly or annually based on a total file storage size or based on whether a producer is small or large. Johansen Decl. ¶¶ 3–7. At trial, no Plaintiff identified or attempted to quantify an incremental burden "per performer" attributable to the Statutes' recordkeeping requirements.

### C.     Recordkeeping Requirements Set Forth in the Regulations

21.     With respect to recordkeeping, the implementing regulations identify a number of requirements, not expressly stated in the Statutes, that the Department deemed necessary to create an effective regulatory scheme.

### (I)     Keeping Copies of Performers' IDs

22.     First, the Regulations require that the records include copies of the identification document that the producer examined, as well as copies of a picture identification card if the identification document does not contain a recent and recognizable picture. 28 C.F.R. § 75.2(a)(1).

---

[4] Some Plaintiffs appear to hold the mistaken belief that they would be subject to strict liability in the event of any recordkeeping errors by third party custodians. *E.g*., Tr. June 5 96:22–97:4; 98:6–16 (Levingston).

23. Requiring a copy of the performer's ID to be included in a producer's age verification record is necessary in order to maintain accurate and verifiable identification information about the performer. *See* 73 Fed. Reg. at 77435 (drivers' license numbers or passport numbers can be used to confirm the validity of an ID).

24. Making a copy of performers' IDs is not burdensome. Tr. June 5 110:12–21 (Levingston). Modern technology allows producers simply to take a digital photo of performers' IDs. Tr. June 4 124:14–16, 143:19–24 (Steinberg) (explaining that he photographs his subjects' IDs and has them sign model releases at the same time, during the same session when he photographs them); Tr. June 7 141:14–142:4 (Nitke) (explaining that she photographs IDs at the same time that models fill out model releases and 2257 forms); Tr. June 4 66:14–67:2 (Queen) (volunteers would take a digital camera picture of Masturbatathon participants' IDs).

25. A $0.99 cell phone app is advertised as allowing producers to take a digital photo of the performer's ID with a cell phone and automatically incorporate the photo into the associated 2257 record. Johansen Decl. ¶ 7.

26. However, some Plaintiffs admit that, prior to the Statutes, they did not keep copies of performers' IDs. Tr. June 3 229:1–3 (Wilson/Sinclair); Tr. June 7 147:19–148:11, 159:18–23 (Nitke) (also admitting that the model release form she uses, separate from the 2257 form, does not record a model's date of birth).

### (II)    Linking Copies of Depictions to Age Verification Records

27. Second, the Regulations require that the records include a copy of the depiction to which the age verification records pertain. 28 C.F.R. § 75.2(a)(1).

28. Requiring a copy of the depiction to be included in a producer's age verification record is necessary in order to link the record to the depictions where the performer appears.

8

Final Rule, 70 Fed. Reg. 29607, 29610 (2005) ("Reviewing identification records in a vacuum would be meaningless without being able to cross-reference the depictions, and having the depictions on hand is necessary to determine whether in fact age-verification files are being maintained for each performer in a given depiction.").

29.     No Plaintiff attempted to quantify any specific burden associated with this requirement. There are digital means of linking copies of depictions to the associated age verification records. *E.g.*, Johansen Decl. ¶ 3; Tr. June 3 212:18–20, 213:22–214:2 (Wilson/Sinclair) (explaining that Sinclair uses a computer program to link its electronic records "to the visuals," and that when Sinclair acts as a secondary producer, its "visual library system" links the primary producer's images to the associated age verification records). The Department has also observed that "large numbers of depictions can be electronically stored by purchasing hard drives at insubstantial prices." 73 Fed. Reg. at 77466.

### (III)   Keeping Copies of URLs with Age Verification Records

30.     Third, where the depiction is published on the Internet, the Regulations require that the records include a copy of any URL associated with the depiction, or, if there is no URL, another uniquely identifying reference associated with the depiction's location. 28 C.F.R. § 75.2(a)(1).

31.     Requiring a copy of any URL associated with a depiction to be included in a producer's age verification records is necessary in order to identify where the depictions associated with that record are located. 70 Fed., Reg. at 29617.

32.     No Plaintiff contested or asserted any burden in connection with this requirement.

### (IV)   Indexing Names and Cross-Referencing Records

33.     Fourth, the Regulations require that any additional names of a performer be

indexed by the title or identifying number of the relevant depiction. 28 C.F.R. § 75.2(a)(2). The Regulations also require that the records be "organized alphabetically, or numerically where appropriate, by the legal name of the performer," be "indexed or cross-referenced to each alias or other name used and to each title or identifying number" of the depiction where that performer appears, *id.* § 75.2(a)(3), (d), and be "categorized" and "retrievable" by the same information, *id.* § 75.3.

34.     Requiring that age verification records be organized in a way that they can be linked to the names of performers and the depictions in which those performers appear is necessary to allow verification that a producer checked the age of a specific performer, or of the performers in a specific depiction. The Department has explained that cross-referencing to each alias or other name used is necessary to allow the Department to trace records relating to the same performer even when the performer used different names. 73 Fed. Reg. at 77466.

35.     The indexing and cross-referencing requirements can be satisfied using automatic digital processes. *E.g.*, Johansen Decl. ¶ 3. When age verification records are kept in digital format, all depictions of a specific performer that are referenced in a given set of records can be found with a single electronic search and can be transmitted by printing out or emailing the results of that search. Tr. June 4 47:21–48:8 (Sinclair/Wilson).

36.     Some Plaintiffs who asserted burdens in connection with the indexing and cross-referencing requirements described steps that they took unnecessarily, based on their misunderstanding of the requirements. Tr. June 7 164:18–165:9 (Nitke) (describing a cross-referencing process involving keeping sheets of paper for each model rather than using a digital spreadsheet or other digital method).

37.     There was testimony at trial asserting that secondary producers were burdened by

the cross-referencing requirement because they would have to construct cross-references among work created by different primary producers. Tr. June 3 90:20–91:7 (Douglas). However, no individual Plaintiff identified this as a problem for his or her work. Nothing in the Regulations would preclude satisfaction of the cross-referencing obligation using a system that allowed for a series of digital searches in the electronic records of different primary producers, rather than a single search.

### (V)  Identifying the Date of Original Production

38.  Fifth, the Regulations require that the records include a "record of the date of original production of the depiction." 28 C.F.R. § 75.2(a)(4).

39.  The 2008 Final Rule explained that this requirement is necessary in order to verify that a performer was 18 as of the date a depiction was produced. 73 Fed. Reg. 77439–40, 77442.

40.  No Plaintiff contested or asserted any burden in connection with this requirement.

### (VI)  Segregating Age Verification Records from Other Business Records

41.  Sixth, the Regulations require that a producer's records maintained pursuant to the Statutes be segregated from the producer's other business records. 28 C.F.R. § 75.2(e).

42.  This requirement was established so that law enforcement could inspect a producer's age verification records in an efficient manner without having access to the producer's other business records. 70 Fed. Reg. at 29613.

43.  One Plaintiff appears to misunderstand the requirement as prohibiting 2257 records from being kept together unless all records relate to images that are currently published. As a result, she appears to believe she must reorganize her age verification records whenever she changes the images appearing on her website. Tr. June 7 149:12–150:11, 162:15–22, 163:2–

164:10, 165:1–17 (Nitke).

44.　　No other Plaintiff contested or asserted any burden in connection with this requirement.

### D.　　The Statutory Labeling Requirement

45.　　With respect to labeling, the Statutes require producers to affix to their depictions, in such manner and form as the Attorney General prescribes by regulation, a statement describing where the records required by the Statutes are located and, where the producer is an organization, identifying the name, title, and business address of the individual at the organization who is responsible for maintaining the required records. 18 U.S.C. §§ 2257(e), 2257A(e).[5]

46.　　Where a producer is an individual, the individual's name need not be identified in the label. *See* 73 Fed. Reg. at 77445 (indicating that the 2008 Final Rule eliminated a previous regulatory requirement that individual producers' names be listed on labels). On websites, the label can be in the form of a single statement that is accessed through a hyperlink that appears on each page of the website containing sexually-explicit material. 28 C.F.R. § 75.8(d); *see* 73 Fed. Reg. at 77447 (indicating that the regulatory change to allow hyperlinks responds "to essentially every concern that a comment raised regarding privacy, threats, aesthetics, or computer technology"). On DVDs containing multiple depictions, only a single label is required. 28 C.F.R. § 75.8(e).

47.　　The Statutes' labeling requirement serves an essential function by attaching information about a depiction's age verification records to the depiction itself, allowing that

---

[5] Where a producer contracts with a third-party custodian to maintain the records, the label need only contain the name and business address of the third-party custodian. 28 C.F.R. § 75.6(f).

information to be found by anyone, including law enforcement, who comes across the depiction

later on, regardless of who transmits, publishes, or shares the depiction after it is created. *See* 73

Fed. Reg. at 77448 (declining to require additional information be included in labels because

"the rule's record-keeping requirements . . . will ensure that the necessary information is

available," while labels only need to identify the records' location); Tr. June 5 22:10–19

(Hymes); Tr. June 5 73:1–14 (Levine); Tr. June 7 174:1–10 (Nitke). An age verification scheme

that did not include similar labels identifying the location of age verification records would be

less effective in preventing the sexual exploitation of children. Without labels, there would be no

way to verify whether age verification had occurred, and it would be more difficult to identify a

performer or verify a performer's age.

48.     Plaintiffs have asserted no burden attributable to the Statutes' labeling

requirement. *E.g*., Tr. June 5 17:11–18:18 (Hymes) (admitting it was not burdensome to post a

2257 label on a website); Tr. June 7 142:10–14, 171:5–25 (Nitke) (no burden identified with

including labels in books and on website).

49.     The only burdens Plaintiffs identified in connection with labeling were based on a

misunderstanding of the requirements. Several Plaintiffs testified that they would not be able to

attach labels to "every image captured on a camera or printed as a proof." *FSC III*, 957 F. Supp.

2d at 591 n.15; *see* June 4 Tr. 125:14–126:22 (Steinberg); June 5 Tr. 97:18–98:1 (Levingston);

June 7 Tr. 143:4–13 (Nitke). But as this Court has recognized, producers need not affix a label to

a photograph until it is made publicly available. *FSC III*, 957 F. Supp. 2d at 591 n.15; *cf. FSC IV*,

787 F.3d at 173 n.7 (declining to resolve the issue but suggesting that even if labels were

required for unpublished depictions, it would be unnecessary to affix a label to every image

taken during a photoshoot).

50.     One Plaintiff objected to including her home address on a label. Tr. June 4 250:3–

14 (Alper). However, that Plaintiff used her home address as her business address. *Id.* In

addition, as the Court has noted, that Plaintiff could avoid including her home address in a 2257

label by using a third party custodian. *FSC III*, 957 F. Supp. 2d at 591 n.15.

### E.      Labeling Requirements Set Forth in the Regulations

51.     With respect to labeling, the implementing regulations identify a number of

requirements, not expressly stated in the Statutes, that the Department deemed necessary to

create an effective regulatory scheme.

52.     First, the Regulations require labels to include the depiction's title, unless the title

is otherwise prominently displayed, or, if there is no title, a unique identifying number or similar

identifier. 28 C.F.R. § 75.6(b)(1).

53.     Second, the Regulations require that the location information in the label consist

of a street address, and not a post office box address. *Id.* § 75.6(b)(3).

54.     Third, the Regulations require that the label "be displayed in typeface that is no

less than 12-point type or no smaller than the second-largest typeface on the material and in a

color that clearly contrasts with the background color of the material." *Id.* § 75.6(e).

55.     Fourth, the Regulations require that, for any display of the label that is limited in

time, the label "be displayed for a sufficient duration and of a sufficient size to be capable of

being read by the average viewer." *Id.*; see id. § 75.8(b), (c).

56.     Fifth, the Regulations require that books, magazines, and periodicals contain the

required label either on the first page after the front cover or on the page on which copyright

information appears, *id.* § 75.8(a); that films or videos with end credits present the label at the

end of the end credits, *id.* § 75.8(b); that films or videos without end credits present the label

14

within one minute from the start, and before the opening scene, *id.* § 75.8(c); and that all other categories of depictions not specifically mentioned prominently display the label in a manner consistent with the requirements for the mentioned categories, *id.* § 75.8(f).

57.     These requirements are necessary in order to ensure that the label required by the Statutes is legible and that the location of age verification records thus can be identified.

58.     No Plaintiff contested or asserted any burden in connection with these requirements.

**F.     Requirements No Longer in Effect**

59.     The Court has declared invalid 18 U.S.C. §§ 2257(f)(5), 2257A(f)(5), the portions of §§ 2257(c) and 2257A(c) that require recordkeepers to "make such records available to the Attorney General for inspection at all reasonable times," and 28 C.F.R. § 75.5. Judgment of Jan. 6, 2017 [ECF 242].

60.     The purported burdens that Plaintiffs identified in their trial testimony as arising from those provisions—including burdens based on the requirement in 28 C.F.R. § 75.5 that producers make their records available for inspection at least 20 hours a week, or burdens based on the fact that they keep their 2257 records in their home office—no longer exist.

**II.     ADDITIONAL EVIDENCE DEMONSTRATING PLAINTIFFS' PROPOSED ALTERNATIVES WOULD NOT BE AS EFFECTIVE**

**A.     A Vast Amount of Child Pornography Exists on the Clear Web, on the Same Platforms that Host Adult Pornography**

**(I)     Adult Pornography Online**

61.     Plaintiffs post and advertise their sexually-explicit films and photographs online. Levine has a website, http://www.nina.com, where she makes sexually-explicit videos available and also offers live-streaming sex shows. Tr. June 5 44:14–24, 50:6–24 (Levine) & Def's Exs.

85A–C, 86B–D. The FSC members that FSC has identified have similar websites. *See, e.g.*, Tr.

June 3 123:12–22 (Douglas) (identifying Wicked Pictures and Vivid Video as FSC members);

http://www.wicked.com/tour/home/ (offering films, scenes, and live cams);

http://www.vivid.com (offering live cams as well as a "dating" website at

www.vividdating.com). Sinclair Institute's websites advertise videos produced by itself and by

other companies. *See* www.sinclairinstitute.com , www.bettersex.com; Tr. June 4 10:2–10;

13:16–21 (Wilson/Sinclair); Def's Exs. 122, 123. The photographer Plaintiffs Alper, Nitke,

Steinberg, and Levingston, and ASMP members Morey and Rosen all have websites where they

display and/or advertise their work online.[6]  Hymes seeks to post sexually-explicit images on his

website, DailyBabylon.com. Tr. June 5 11:8–16 (Hymes).

     62.     Many other websites, including video-sharing "tube" sites such as bravotube.com,

pornhub.com, porn.com, xnxx.com, and redtube.com, contain videos of adults engaged in

sexually-explicit conduct. *E.g.*, Def's Exs. 87, 306, 307 Plaintiffs also cite social networking and

dating websites as examples of platforms where adults share sexually-explicit content. Pl.'s Ex.

37, at 1–8 & A–U.

---

[6] See http://www.barbaraalper.com (Alper); Tr. June 7, 160:13-162:1 (Nitke) & Def's
Exs. 112A - 112E (Nitke's website http://www.barbaranitke.com); Tr. June 4 129:23-130:3
(Steinberg) & Pl.'s Ex. 62 (Steinberg's website Erotic by Nature,
http://www.nearbycafe.com/loveandlust/steinberg/photo/index.html); Tr. June 5 95:2-9
(Levingston) (Levingston's website http://davelevingston.com); Tr. June 3 [ECF 220] 54:11-18,
56:13-25 – 57:1-7 (Mopsik) & Def's Exs.31A-Z, 32A-I (ASMP member Craig Morey's website
https://www.moreystudio.com); Tr. June 3 62:14-20 (Mopsik) & Def's Exs. 33A-J (ASMP
member Ned Rosen's website).

### (II)     Child Pornography Online

63.     Available data shows that millions of images of child pornography exist on the

clear web, many of them on publicly-accessible websites.[7] The National Center for Missing and

Exploited Children ("NCMEC") maintains data regarding reports to its CyberTipline of

suspected child pornography. Declaration of John Shehan ("Shehan Decl.," attached hereto)

¶¶ 3–16. NCMEC data depends on reports made either by companies that are registered to

submit reports through a secure online portal or by others (both companies and individuals) that

submit reports through the CyberTipline website or phone number. *Id.* ¶¶ 3–4. Thus, there likely

exists child pornography online that is not captured in NCMEC's data. In Fiscal Year ("FY")

2016, NCMEC received over 7.8 million reports that were designated as apparent child

pornography. *Id.* ¶ 10. In FY 2017, NCMEC received over 9.8 million such reports. *Id.* While the

majority of such reports were identified as originating from international sources, a significant

number—at least five percent each year that NCMEC identified, which would be approximately

390,000 in FY 2016 and 490,000 in FY 2017—appeared to originate in the United States. *Id.* ¶¶

10, 13.

64.     NCMEC also alerts electronic service providers regarding apparent child

pornography that was identified on publicly-viewable webpages on their sites. *Id.* ¶¶ 15–16.

From 2014 to 2017, the number of notifications that NCMEC provided in a year regarding

apparent child pornography on publicly-available websites increased from 21,499 notifications to

56,565 notifications. *Id.* ¶ 16.

---

[7] "Clear web" refers to websites on the Internet that are indexed by search engines and
are thus generally accessible. The term "clear web" is used to distinguish the part of the Internet
that people generally see, as opposed to the "deep web," which cannot be indexed by search
engines, or the "dark web," a part of the deep web that is intentionally hidden.

65.    The CyberTips that NCMEC receives regarding apparent child pornography involve children of all ages, from infancy to 17 years old. Declaration of SSA Jackie Dougher ("Dougher Decl.," attached hereto) ¶ 3 ("The images I see in CyberTips of suspected child pornography involve children of any age, from very young children to older individuals where it may be difficult to determine whether they are minors or adults."); 2016 Nat'l Strategy 17 ("Children as young as days old to 17 years, both male and female, across all ethnic and socio-economic backgrounds, are potential targets of individuals who engage in child pornography activities."); *id.* (also reporting that 40% of identified child pornography victims were between infancy and "tween" years, leaving 60% such victims between 13 and 17 years old).

66.    NCMEC's Canadian counterpart, the Canadian Centre for Child Protection, has developed an automated tool, called Project Arachnid, that searches publicly available websites for known images of child pornography. *See* https://www.cybertip.ca/app/en/projects-arachnid. Project Arachnid locates approximately 80,000 unique images of suspected child pornography each month on publicly available websites. *See* Arachnid Q&A (attached as Exhibit B), *available at* https://www.protectchildren.ca/pdfs/C3P_Arachnid_PressKit_en.pdf .

67.    Child pornography exists on a wide variety of platforms across the clear web, including the same types of platforms that contain sexually-explicit images of adults. These include publicly available websites, commercial websites; social networking sites such as Facebook, Twitter, and Craigslist; video- and image-sharing sites; web-cam sites; and mobile device applications. 2016 Nat'l Strategy 9, 75 (child pornography is produced and transmitted via "[l]ive-streaming video websites, web camera applications, and other similar video chat services for computers and mobile devices"); Declaration of SSA Jackie Dougher ("Dougher Decl.," attached hereto) ¶ 3 ("Child pornography can be found on "commercial websites;

discussion forums; video and image sharing sites; social media platforms including Facebook, Twitter, and Craigslist; mobile applications; web-cam sites; gaming platforms; and email."); Tr. June 11, 46:22–47:17 (Wolak) (commercial adult websites contain links to child pornography), 81:8–14 (Wolak) (13 and 14-year old girls have advertised themselves on dating websites like Adult Friend Finder); *see also* Shehan Decl. ¶ 5 (the 1423 companies that participate in NCMEC's secure CyberTipline include website hosting, social network, and video-sharing companies). For example, the 2016 National Strategy report identified a recent investigation involving live-streamlining video and chat websites that "recorded tens of thousands of explicit live web cam sessions of minors." 2016 Nat'l Strategy 75.

68.     Instances of child pornography prosecutions that are described in the 2016 National Strategy report show that the same websites that contain adult pornography are also used to post and share child pornography. Operation Protego involved a foreign-based website devoted to "amateur photography," described as "one of the world's largest image repositories," which not only had postings by "legitimate photography enthusiasts," but also was used to trade child pornography. 2016 Nat'l Strategy 25. A significant amount of the child pornography posted to the site was produced in the United States. *Id.* (89 minor victims were identified in the United States, and 348 individuals in the United States were arrested).

69.     Operation Spade involved a multi-million dollar film distribution company, called Azov Films, which commercially distributed films marketed as "naturist" that "depicted the genitals of nude minors for sexual gratification of the purchasers." 2016 Nat'l Strategy 33. While the company was headquartered in Canada, it distributed its films to "thousands of customers residing in the United States." *Id.*

70.     The website myRedBook, which hosted advertisements for individuals claiming

19

to offer adult services in the "escort" or "massage" business, was in fact used by sex workers and those engaged in the sex trafficking of minors to advertise prostitution of adults and children. 2016 Nat'l Strategy 37. The advertisements included explicit photographs. *Id.* Although the report does not suggest that child pornography charges were filed, the FBI found that more than 50 minors were advertised on the site. *Id.*

**B.      Because Law Enforcement Resources Are Limited, Many Instances of Apparent Child Pornography Are Not Prosecuted, and Images of Older Children Are Not an Enforcement Priority**

71.      The 2016 National Strategy Report indicates that significant law enforcement resources are devoted to combatting child sexual exploitation. However, these resources are limited. As a result, "law enforcement agencies often only analyze just enough evidence to support and sustain criminal charges against an individual offender." 2016 Nat'l Strategy 29. Thus, "many images of unidentified child victims go un-reviewed, undetected, uninvestigated." *Id.*; *see also id.* at 82 ("[G]iven the tragically enormous volume of [child sexual exploitation] offenses, the Department and its investigative partners cannot investigate or ultimately prosecute every such offense within its subject matter jurisdiction."). The "countless online platforms and venues that can be used to facilitate child pornography" also make it "extremely difficult to gauge the full scope of the child pornography threat." *Id.* at 73.

72.      The relatively small number of child pornography prosecutions, compared to the amount of child pornography reported and identified, shows that only a small fraction of occurrences of child pornography can be prosecuted. For example, in FY 2013, 56,966 CyberTips—most of which involved reports of apparent child pornography, Shehan Decl. ¶ 10— were sent to Internet Crimes Against Children ("ICAC") task forces; in the same period, 2700 child pornography-related prosecutions were initiated. *Compare* 2016 Nat'l Strategy 121

(identifying total number of CyberTips received by ICACs in a fiscal year), *with id.* at 113 (reporting "child pornography offenses" and "child pornography production" cases filed, where charges were brought under 18 U.S.C. §§ 1466A, 1470, 2251, 2252, 2252A, and 2260). In FY 2014, the number of CyberTips to ICACs was 74,566 while the number of prosecutions was 2508. *Id.* In FY 2015, the number of CyberTips was 86,390 while the number of prosecutions was 2639. *Id.*

73.     Because the problem is so vast, law enforcement and cooperating entities have set certain priorities for investigations and prosecutions. First, they prioritize instances where there is evidence a child is in current danger. 2016 Nat'l Strategy 68, 83; Shehan Decl. ¶ 9. Second, they also "focus on 'high-value' targets where law enforcement can have the greatest impact." 2016 Nat'l Strategy 80. The Department of Justice has prioritized the investigation and prosecution of organized groups that share and encourage further production of child pornography by using encryption and anonymization tools. *Id.* at 81.

74.     It is difficult for law enforcement seeking to prosecute a producer on child pornography charges to prove that a performer in a sexually-explicit image is sixteen or seventeen years old rather than eighteen. *See United States v. Malloy*, 568 F.3d 166, 176 (4th Cir. 2009) ("because the children depicted in child pornography frequently cannot be found," it is difficult for a prosecutor seeking a conviction under § 2251 to prove age unless the person depicted is "unmistakably a child") (citing H.R. Rep. No. 98-536, at 3, 7–8 (1984)).

75.     Law enforcement is less likely to focus its resources on investigating apparent child pornography involving older children whose identities are unknown. Dougher Decl. ¶ 4 ("Due to the volume of child pornography distributed over the Internet, the FBI must prioritize its investigations and is less likely to investigate cases involving images where it is difficult to

21

determine if the person in the image is a child or an adult."); Tr. June 11 35:15–25 (Wolak)

(explaining that due to the difficulty of proving that an image is of a 13 or 14-year-old rather

than an adult, prosecutors limit their charges to images of prepubescent children).

### C. The Statutes Serve to Deter the Production of Sexually-Explicit Images Without Age Verification

76.     In many instances, it would be easier for law enforcement to prove a producer's

noncompliance with the Statutes than to prove that a performer in a sexually-explicit image is a

child. Compliance with the Statutes can be determined by examining a producer's age

verification records. By including the address where age verification records are located, the

label required under the Statutes provides a means of verifying whether sexually-explicit content

on a website depicts minors or depicts only adults and ensures that compliance with the Statutes

can be verified whenever law enforcement deems it necessary.

77.     Producers recognize that violations of the Statutes can be easily identified and can

result in criminal penalties. As a result, many producers, including those Plaintiffs who produce

sexually-explicit depictions, take care to ensure that they comply with the Statutes' requirements.

Some producers did not keep records of age verification before the Statutes went into effect, but

now do. Tr. June 3 229:1–3 (Wilson/Sinclair); Tr. June 7 147:19–148:11 (Nitke). Because of the

Statutes, some producers have refrained from projects that would involve making depictions of

sexually-explicit conduct without knowing the identities of the individuals being filmed or

photographed. Tr. June 4 191:21–192:6 (Ross, describing Genital Art Gallery); Tr. June 4, 2013

227:23–228:3 (Alper, describing Fire Island project).

78.     The Statutes' deterrent purpose is served when producers are careful to comply

with the Statutes' age verification and recordkeeping requirements and refrain from creating

sexually-explicit depictions when they have not verified the performers' ages.

**D.    No Marker, Other than the 2257 Label, Provides a Uniform, Verifiable Means of Distinguishing Websites that Do Not Contain Child Pornography From Those That Do**

79.    No marker or characteristic on a website or on sexually-explicit films or photographs, other than the label required under the Statutes, allows material to be identified as "adult industry" content or allows the ages of individuals appearing in the material to be verified by law enforcement, secondary producers, or others.

80.    Websites such as Plaintiffs', containing films and photographs of sexually-explicit conduct by adults, are not segregated in any specific location online. Search engines do not identify a website as belonging to the "adult industry" in lists of search results. Nothing about the appearance of a website—such as its URL, its domain name, its title, the images on its home page, whether it requires registration or payment to view content beyond the home page— uniquely marks that website as a location that does not contain child pornography.

81.    No registration or license number exists that would allow verification by law enforcement or others that a website is part of the "adult industry." *See Free Speech Coal., Inc. v. Attorney General* ("*FSC V*"), 825 F.3d 149, 170 (3d Cir. 2016) ("[N]o one is required to obtain a license or register with the Government before producing a sexually explicit image."). In fact, there is no uniform "adult industry." *See id.* ("[t]he creation of sexually explicit expression is better characterized by its lack of regulation than by a regime of rules governing such expression"). Rather, "[a]n artist"—or indeed, anyone—"can pick up a camera and create an image subject to the Statutes without the knowledge of any third party, much less the Government." *Id.*

82.    Moreover, sexually-explicit content found online is frequently copied, shared, and linked on other websites. *E.g.*, Tr. June 4, 9:14–10:1 (Wilson/Sinclair) (discussing Sinclair

Institute selling videos created by other companies); Tr. June 5, 53:1–6 (Levine) (discussing

links on Levine's website to sexually-explicit content on other sites). Some of the videos in

which Levine performs with teens have ended up on tube sites such as porn.com, bravo tube, and

redtube.com. Def's Exs. 87, 306, 307; Tr. June 5, 60:16—61:5 (Levine). On its website, FSC has

shared an article acknowledging widespread re-posting of online sexually-explicit content. *See*

https://www.freespeechcoalition.com/blog/2017/12/22/tech-way-forward-piracy-xbiz-opinion/

("With millions of uploads and no real way to effectively monitor," image- and video-sharing

sites known as "tube sites" "were commandeered early on by illegal uploads . . . . .").

### E.  FSC Does Not Have any Means to Enforce a Uniform "Industry Standard" of Age Verification

83.    Neither FSC nor ASMP has any way to enforce its members' compliance with

industry standards or with an age verification regime. Neither FSC nor ASMP conducts

inspections of its members or otherwise monitors their conduct. *See* Tr. June 3 52:2–8 (Mopsik)

(ASMP "ha[s] no force over [its] members to require them to do anything" and "does not

conduct any inspections to ensure that its members are using model releases" [8]); *see also* 59:8–10

(similar); Tr. June 3  140:23–141:6 (Douglas) (FSC does not monitor its members to determine

whether they check ages of individuals used in sexually-explicit depictions). Neither FSC nor

ASMP limits their membership in a way that would prevent producers of child pornography from

becoming a member. Tr. June 3 56:6–12 (Mopsik) ("Nothing prevents someone who produces

adult films from being an ASMP member"); Tr. June 3 118:25–119:21 (Douglas) (testifying that

anyone involved in commercial production of sexually explicit images could become an FSC

member, and the only requirement was payment of dues).

---

[8] For example, Alper, an ASMP member, does not use model releases, at least when
photographing sexually-explicit conduct. *FSC III*, 957 F. Supp. 2d at 573, 587.

Dated this 5th day of January, 2018.        Respectfully submitted,
                                            CHAD A. READLER
                                            Acting Assistant Attorney General
                                            LOUIS D. LAPPEN
                                            Acting United States Attorney
                                            JOHN R. TYLER
                                            Assistant Director, Federal Programs Branch

                                            /s/ Kathryn L. Wyer
                                            NATHAN M. SWINTON
                                            KATHRYN L. WYER
                                            U.S. Department of Justice, Civil Division
                                            20 Massachusetts Ave., NW,
                                            Washington, DC
                                            Tel. (202) 616-8475 / Fax (202) 616-8470
                                            kathryn.wyer@usdoj.gov
                                            *Attorneys for Defendant*