# EXHIBIT A

# The National Strategy for Child Exploitation Prevention and Interdiction



A REPORT TO CONGRESS - APRIL 2016



U.S. Department of Justice

# The National Strategy
# for Child Exploitation
# Prevention and Interdiction

# A REPORT TO CONGRESS
# APRIL 2016

**Introduction by Attorney General Loretta Lynch**

**National Strategy on Child Exploitation Prevention and Interdiction**

Child exploitation is one of the most reprehensible and destructive offenses confronting America today. It harms the safety and well-being of our young people; it devastates our families and communities; and it degrades our strength as a nation of laws and civic security. No matter what form child exploitation takes—from the creation and circulation of child pornography to the trafficking of children for sex—it demands the full attention of law enforcement, policymakers, community leaders, and service providers, each of whom plays an essential role in combating this unconscionable crime.

At the Department of Justice, we're advancing and expanding a number of efforts to protect our nation's children, to hold perpetrators accountable, and to help victims reclaim their lives. We continue to build on initiatives like Project Safe Childhood, which brings together federal, state, local, and tribal law enforcement in a comprehensive and unified response to the abuse and exploitation of minors. Our Internet Crimes Against Children Task Force Program has facilitated the training of more than 500,000 law enforcement professionals since its inception, providing valuable techniques related to investigating, prosecuting, and preventing technology-enabled crimes against children. Just last year, 61 coordinated task forces representing more than 3,500 federal, state, local, and tribal law enforcement and prosecutorial agencies conducted more than 54,000 investigations that resulted in the arrest of more than 8,500 individuals. And we are aggressively confronting evolving threats online by prosecuting those who use the so-called "Dark Net" in the service of child pornography and child sex trafficking, and by seeking to work closely with the private sector to ensure that state-of-the-art encryption technology is no shield for criminal activity.

These are vital undertakings, and they have led to significant and life-changing progress —but we still have work to do. The pages that follow contain the National Strategy on Child Exploitation Prevention and Interdiction—a roadmap to building on our successes and tackling new challenges during the next several years. Formulated over the course of a year by an interagency working group, this strategy harnesses the expertise of law enforcement at all levels, as well as the experience and knowledge of non-governmental stakeholders. It identifies innovative ways in which the federal government and its partners can address child exploitation. And it reaffirms our unwavering commitment to ensuring that all children in America are able to reach their potential in a nation that protects them from violence and abuse.

Investigating and prosecuting child exploitation crimes is extraordinarily difficult work, but the dedicated prosecutors and agents of the Department of Justice have proven themselves equal to the challenge. I am confident that with the help of this critical document—and with the hard work and partnership of federal, state, local and tribal law enforcement, victim-service organizations across the country and our allies overseas—we will continue to make lasting progress toward a brighter future for our children, and a safer nation for all our people. I look forward to everything that we will accomplish together in the service of that mission in the days and months to come.

# Table of Contents

I.      Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

III.    Review of Efforts to Combat Child Exploitation . . . . . . . . . . . . . . . . . . . . .   18

        A. Federal Bureau of Investigation  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
        B. U.S. Immigration and Customs Enforcement/Homeland Security Investigations  .   24
        C. U.S. Postal Inspection Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
        D. U.S. Marshals Service  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34
        E. Child Exploitation and Obscenity Section. . . . . . . . . . . . . . . . . . . . . . . .   35
        F. U.S. Attorney's Offices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
        G. INTERPOL Washington  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44
        H. Bureau of Prisons  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45
        I.  Office of Justice Programs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48
        J.  Office of Community Oriented Policing Services  . . . . . . . . . . . . . . . . . . .   60
        K. Department of Health and Human Services  . . . . . . . . . . . . . . . . . . . . . .   61
        L. President's Interagency Task Force to Monitor and Combat Trafficking in Persons   65
        M. Department of Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   65
        N. Department of Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   67
        O. National Center for Missing & Exploited Children. . . . . . . . . . . . . . . . . . .   68

IV.     National Child Exploitation Threat Assessment 2016 . . . . . . . . . . . . . . . . . .   71

V.      Goals and Objectives for Continuing the Fight Against Child Exploitation. . . . . . .   80

        A. Investigations and Prosecutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   80
        B. Outreach and Awareness Activities . . . . . . . . . . . . . . . . . . . . . . . . . . .   83
        C. Victim Services  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   86
        D. Policy and Legislative Initiatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   91

VI.     Child Exploitation in Indian Country  . . . . . . . . . . . . . . . . . . . . . . . . . . .   97

VII.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

**Appendices**

        A. Prosecution Accomplishments Summary. . . . . . . . . . . . . . . . . . . . . . . . . 110
        B. Review of the Internet Crimes Against Children Task Force Program . . . . . . . . 114
        C. Department of Justice-Funded Research on Child Exploitation  . . . . . . . . . . . 136
        D. National Strategy on Child Exploitation Prevention and Interdiction 2016 Survey
           Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
        E. Legislative Proposals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

# I. EXECUTIVE SUMMARY

## 1. INTRODUCTION

The PROTECT Our Children Act of 2008 requires that the Attorney General develop and implement a National Strategy for Child Exploitation Prevention and Interdiction (National Strategy). The first National Strategy was published in 2010. This, the second National Strategy, builds on that work.

The National Strategy is a culmination of a year of discussions among members of an inter-agency working group convened by the National Coordinator for Child Exploitation Prevention and Interdiction at the Department of Justice (DOJ, or the Department). The National Strategy first discusses the work of federal law enforcement agencies and prosecutors since 2010, as well as other agencies and offices that play important roles in this work by supporting victims, providing grants to state, local, and tribal governments and non-profit partners, and educating the public about the dangers of child exploitation, and also the work of the non-governmental National Center for Missing & Exploited Children (NCMEC). Second, it provides a threat assessment that addresses the nature and scope of the problem and updates the assessment contained in the 2010 National Strategy. Third, it lays out plans for continuing the fight against child exploitation in four key areas: investigations and prosecutions; outreach and education; victim services; and policy initiatives. Fourth, the National Strategy has a section dedicated solely to child exploitation in Indian County, as the issues there are often unique. Finally, a series of appendices include statistics on federal prosecutions; detailed tables of information on the Internet Crimes Against Children Task Force Program (ICAC program) funded by DOJ; research on child exploitation funded by DOJ; a summary of the survey on which the threat assessment is based; and the text of DOJ legislative proposals. Throughout the National Strategy case studies are included as examples of child exploitation prosecutions brought by DOJ.

## 2. REVIEW OF EFFORTS TO COMBAT CHILD EXPLOITATION

This section of the National Strategy provides a comprehensive overview of existing efforts to combat child exploitation, including those by non-governmental organizations such as NCMEC.

### A. Federal Bureau of Investigation (FBI)

The FBI leads Child Exploitation Task Forces (CETFs), collaborating with nearly 400 state, local, tribal, and federal law enforcement partners to identify and prosecute individuals and enterprises that sexually exploit children. The FBI also leads the Innocence Lost National Initiative (ILNI) to address the problem of children being recruited into prostitution by sex traffickers. Currently, the ILNI operates as part of 71 CETFs nationwide. Under the ILNI, the FBI conducts Operation Cross Country annually to recover children from sex traffickers and coordinate victim services for identified victims.

1

The FBI also leads the Innocent Images National Initiative (IINI), a proactive, intelligence-driven, multi-agency investigative operation that focuses on combating the proliferation of child pornography and child sexual exploitation worldwide. The IINI provides centralized coordination and analysis of case information that is both national and international in scope. In Fiscal Year 2014 through 2015, the IINI program was credited with over 2,900 arrests and 2,200 convictions involving the online sexual exploitation of children. In addition, the FBI operates a Child Sex Tourism (CST) Initiative targeting U.S. citizens who travel abroad to engage in sexual activity with children. Finally, the FBI operates a Child Abduction Rapid Deployment (CARD) Team to provide a nationwide resource to support child abduction and critically missing children investigations.

The FBI's work is supported by the Violent Crimes Against Children (VCAC) Intelligence Unit, which engages in intelligence collection, analysis, and dissemination; identifies VCAC threats, trends, and vulnerabilities; writes national-in-scope intelligence products; identifies intelligence gaps and collection requirements; and provides actionable intelligence to law enforcement, policy-makers, non-governmental organizations, private industry, and the public to aid in the identification, recovery, and prevention of child victims. In addition, FBI's Digital Analysis Research Center provides digital forensic extraction and analysis, testimony, and support to the FBI's VCAC program.

## B. Department of Homeland Security (DHS)/U.S. Immigration and Customs Enforcement (ICE)/Homeland Security Investigations (HSI)

ICE HSI's child exploitation investigations focus on two areas of enforcement, under the auspices of what is known as Operation Predator: disruption and dismantlement of individuals and groups involved in: (1) the possession, receipt, distribution, transportation, advertisement, and production of child pornography; and (2) travel in foreign or interstate commerce to engage in illicit sexual conduct with minors. Since the launch of Operation Predator in 2003, ICE HSI has initiated over 35,000 criminal investigations and arrested over 13,000 child predators. Also part of Operation Predator, ICE HSI's Angel Watch is an international initiative to protect children from sexual predators who have been previously convicted of sex crimes against a child. ICE HSI strategically alerts foreign law enforcement partners through its ICE HSI Attaché offices of a convicted child predator's intent to travel to their country.

Key to ICE HSI's fight against child exploitation is its Cyber Crimes Center (C3), Child Exploitation Investigations Unit (CEIU). The CEIU directs ICE HSI in its mission to investigate producers and distributors of child pornography, as well as individuals who travel abroad for the purpose of engaging in sex with minors. The CEIU employs the latest technology to collect evidence and track the activities of individuals and organized groups who sexually exploit children through the use of websites, chat rooms, newsgroups and peer-to-peer trading. The CEIU provides assistance to ICE HSI field offices, coordinates major investigations, and conducts undercover operations throughout the world to identify and apprehend violators.

ICE HSI has also launched the Victim Identification Program to combine technological and investigative capabilities and resources to recover child victims of sexual exploitation. After the discovery of material that depicts an unidentified minor or minors being sexually abused, ICE HSI analyzes and enhances the material in order to identify clues that may lead to the identity of the victim, suspect, or geographic location. Another crucial program to help victims is Project VIC, launched in August 2012, by law enforcement agencies, technology firms, and non-governmental organizations to create efficiencies, adopt innovative technological solutions, and promote a victim-focused methodology to reduce backlogs in forensic analysis of images of sexual exploitation of children. Today, Project VIC has thousands of law enforcement users in the United States and 32 countries.

## C. U.S. Postal Inspection Service (USPIS)

USPIS investigates sexual exploitation of children when it involves the U.S. mail. USPIS works closely on investigations with DOJ, and from 2010-2015, Postal Inspectors have arrested more than 500 offenders. Furthermore, a Postal Inspection Service analyst works out of a NCMEC facility, handling, among other duties, all evidence submissions by law enforcement agencies to NCMEC's CVIP; receiving and coordinating thousands of requests by law enforcement for a review of images for known and identified victims; and handling CyberTipline reports made available to law enforcement that indicate the U.S. mail may have been used to facilitate any part of a child's sexual exploitation. From 2010-2015, the USPIS analyst reviewed more than 104,000 CyberTipline reports, 801 of which were distributed to Postal Inspectors for further action.

## D. U.S. Marshals Service (USMS)

USMS plays a unique role in efforts to combat child exploitation though its fugitive apprehension program, Sex Offender Investigations Branch (SOIB) investigations, and missing children recovery operations. Between May 1, 2010 and May 1, 2015, USMS received approximately ten thousand requests for assistance from law enforcement in fugitive cases involving the sexual exploitation of a child. USMS has apprehended approximately 9,000 of those fugitives. In addition, between May 1, 2010 and May 1, 2015, USMS investigators opened 16,320 investigations of convicted sex offenders and arrested 2,671 individuals for violation of their federal sex offender registration obligations. USMS also works closely with NCMEC to recover missing and exploited children, and between May 1, 2010 and May 1, 2015, recovered 427 children.

## E. DOJ's Child Exploitation and Obscenity Section (CEOS)

CEOS consists of 32 personnel, including 20 attorneys, a seven-person High Technology Investigative Unit (HTIU), an investigative analyst, a child victim-witness program coordinator, paralegals, and administrative staff. CEOS leads DOJ's Criminal Division's campaign against the sexual exploitation of children by shaping domestic and international policy, providing guidance and training to other prosecutors and law enforcement agents, identifying trends in online technology, initiating proactive

3

national and international investigations, and employing first-of-their-kind investigative and prose-cutorial tactics and techniques. In Fiscal Years 2013, 2014, and 2015, CEOS spearheaded 14 national and international operations that have resulted in the investigation of more than 2,600 individuals in the United States and generated leads against more than 8,000 foreign suspects.

CEOS's HTIU provides critical case support for this work, both in individual cases and in systemat-ically improving law enforcement's response to these technological challenges. Examples of HTIU's cutting-edge work include the development of a protocol to proactively mitigate offender's use of encryption; the design of an efficient working model to handle cases with exceptionally large volumes of media; the development of forensic approaches to identify offenders who use mobile applications, and methods of conducting investigations on anonymous networks.

CEOS partners with all U.S. Attorney's Offices and federal law enforcement agencies, as well as foreign law enforcement, to operate nationally and transnationally, and with key non-governmental organi-zations, foreign governments (through bilateral and multilateral efforts, and through international police organizations such as INTERPOL and Europol) and foreign entities such as the G8, the Global Alliance Against Child Sexual Abuse Online, and WePROTECT. CEOS also engages the private sector in order to help technology companies find ways to fight child sexual exploitation.

### F.  U.S. Attorney's Offices (USAOs)

The 94 USAOs across the country prosecute crimes against children as part of the Project Safe Childhood (PSC) program.  With support from the Executive Office for U.S. Attorneys (EOUSA) and CEOS, each U.S. Attorney guides the entire law enforcement community in his or her district to work as a cooperative team to combat sexual exploitation of children.  First established in 2006 as a coordinated prosecution and training effort, PSC was initially focused on technology-facilitated crimes against children.  In 2011, PSC was expanded from its original focus to include every type of federal crime involving sexual violence against children.  Following the expansion, each U.S. Attorney conducted a threat assessment in his or her district and developed a strategic plan for addressing PSC crimes, which was coordinated through DOJ headquarters for consistency across all districts.  These plans not only include ways to improve investigations and prosecutions of child sexual exploitation, but also address the integration of victim services and support into the PSC coalitions.  Furthermore, each district's victim assistance staff has been trained to ensure child victims have access to services aimed at addressing their unique and challenging needs and to coordinate their efforts with the Victim Assistance Specialists/Victim-Witness Coordinators within the PSC coalitions' law enforcement agencies.  As a result of the expanded PSC program, the number of federal child exploitation prosecu-tions has increased significantly, along with the number of federal, state, local, and tribal convictions, and the number of victims being identified.  In Fiscal Year 2014, the 94 USAOs filed 3,248 indictments against 3,422 defendants, representing a 31% increase over Fiscal Year 2010.

4

## G. INTERPOL Washington

INTERPOL Washington, a component of DOJ, is designated by the Attorney General as the official U.S. representative to the International Criminal Police Organization (INTERPOL). As the national point of contact for INTERPOL in the United States, INTERPOL Washington routinely exchanges criminal investigative data with international counterparts on behalf of the more than 18,000 federal, state, local, and tribal law enforcement agencies in the United States. Its work in the fight against child exploitation includes tracking sex offenders, providing law enforcement agencies with international investigative assistance, supporting international efforts to locate and recover missing children, maintaining the INTERPOL International Child Sexual Exploitation Database of images to assist investigators, and issuing international alerts for child sex offenders.

## H. Bureau of Prisons (BOP)

BOP houses a substantial number of individuals with a current or prior conviction for a sexual offense. As of January 1, 2016, such individuals comprise approximately 12% of the Bureau's total population, including inmates who victimized children, adults, and, in many cases, both. The Bureau offers reentry programs which afford sexual offenders in Bureau institutions the opportunity to change their behavior patterns, thereby reducing criminality and recidivism and increasing the likelihood that they will become productive, law-abiding citizens. This approach is guided by a respect for victims of sexual abuse and is based upon the belief that treatment services for sexual offenders can increase their ability to live healthy, non-abusive lives with the ultimate goal of making communities safer.

## I. DOJ's Office of Justice Programs (OJP)

Within OJP, several offices address child exploitation matters. The Office of Juvenile Justice and Delinquency Prevention (OJJDP) provides national leadership, coordination, and resources to prevent and respond to juvenile delinquency and victimization. Among other responsibilities, OJJDP provides funding and training support for the ICAC program, a national network of 61 coordinated task forces representing more than 3,500 federal, state, local and tribal law enforcement and prosecutorial agencies. These agencies are engaged in both proactive and reactive investigations, forensic examinations, and criminal prosecutions. By helping state, local and tribal agencies develop effective, sustainable responses to online child victimization—including responses to child sexual abuse images—the ICAC program has increased law enforcement's capacity to combat technology-facilitated crimes against children at every level. In addition, in 2010, OJJDP added a new initiative to bring the ICAC program to Indian Country. Finally, because the Department understands that arrests alone cannot resolve the problem of technology-facilitated child sexual exploitation, the ICAC program is also dedicated to training law enforcement officers and prosecutors, as well as educating parents and youth about the potential dangers of online activity.

The Bureau of Justice Assistance (BJA) supports law enforcement, courts, corrections, victim services, technology, and prevention initiatives that strengthen the nation's criminal justice system. Since 2004, BJA has provided funding to more than 40 human trafficking task forces across the United States. Those task forces conducted nearly 5,544 investigations that resulted in charges against 1,558 traffickers. Among the 2,071 confirmed victims who were identified and recovered in the last five years were 1,052 minor victims.

The National Institute of Justice (NIJ) is the research, development, and evaluation agency of the Department and is dedicated to researching crime control and justice issues. NIJ provides objective, independent, evidence-based knowledge and tools to meet the challenges of crime and justice, particularly at the state and local levels. NIJ supports a variety of research in the area of child exploitation. Specific NIJ research projects and findings are detailed in Appendix C.

The Office for Victims of Crime (OVC) enhances the nation's capacity to assist crime victims and to provide leadership in changing attitudes, policies, and practices to promote justice and healing for all victims. OVC administers the Crime Victims Fund, created by the 1984 Victims of Crime Act (VOCA), a major source of funding for victim services throughout the nation, including those in the area of child victimization and human trafficking. The Fund supports thousands of programs annually that represent millions of dollars invested in victim compensation and assistance in every U.S. state and territory, as well as training and demonstration projects designed to enhance the skills of those who provide services to victims. OVC also administers two major grant programs, supporting direct services to crime victims in every state, the District of Columbia, and five territories, and providing discretionary funds in various program areas to meet emerging needs and fill gaps in existing services. And OVC operates a Training and Technical Assistance Center that provides training opportunities for providers and advocates at all levels of victim services. OVC is currently implementing the strategic framework of its Vision 21 Report by launching new programs, expanding the scope of existing initiatives, and continuing collaboration with partner agencies and organizations to develop innovative projects to enhance victim services.

The Bureau of Justice Statistics (BJS) is the principal federal statistical agency for criminal justice information. BJS released more than a dozen reports since 2011 with findings on victim services, child exploitation, and child pornography.

The SMART Office administers the standards for the Sex Offender Registration and Notification Act (SORNA), providing jurisdictions with guidance regarding the implementation of SORNA, tracking important legislative and legal developments related to sex offenders, and spearheading sex offender management initiatives. In addition, the SMART Office provides technical assistance to territories, Indian tribes, federal, state, and local governments, and to public and private organizations. The SMART Office also responds to concerns from the public about sex offenders in their communities.

**J.  Office of Community Oriented Policing Services (COPS)**

DOJ's COPS has assisted in the development of various products to support law enforcement response to child exploitation.  For example, COPS funded the International Association of Chiefs of Police to create series of training videos in which law enforcement officers demonstrate possible responses to various scenarios involving child sex trafficking.  COPS funded the Texas Department of Public Safety to train patrol officers on the detection, interdiction, and recovery of child victims of crimes and the proper handling of these victims.  And COPS worked with NCMEC to publish a guidebook entitled What You Need to Know About Background Screening.  This guide provides information for measuring the effectiveness of applying background checks to youth-serving volunteers, which will help to minimize the risk to children, especially children that may be victimized and exploited.

**K.  Department of Health and Human Services (HHS)**

HHS administers programs to prevent human trafficking, identify victims of trafficking, and provide services to survivors, which includes minor victims of commercial sexual exploitation.  The Office on Trafficking in Persons (OTIP) was established in 2015 to combat human trafficking by supporting and leading systems that prevent trafficking through public awareness and protect victims through identification and assistance, helping them re-build their lives and become self-sufficient.  OTIP is responsible for the development of anti-trafficking strategies, policies, and programs to prevent human trafficking, build health and human service capacity to respond to human trafficking, increase victim identification and access to services, and strengthen health and well-being outcomes of trafficking survivors.  The Family and Youth Services Bureau (FYSB) supports projects to increase child sexual exploitation prevention and intervention within runaway and homeless youth programs, many of whom have experienced abuse and neglect and are at-risk for exploitation when living on the streets. The Children's Bureau (CB) focuses on improving the lives of children and families through programs that reduce child abuse and neglect, increase the number of adoptions, and strengthen foster care. CB accomplishes these goals through, among other means, grant funding for service providers and production of guidance documents.

**L.  President's Interagency Task Force to Monitor and Combat Trafficking in Persons  (PITF)**

The PITF, a Cabinet-level entity chaired by the Secretary of State, and the Senior Policy Operating Group (SPOG), consisting of senior officials designated by representatives of the PITF, help coordinate interagency policy initiatives to combat human trafficking, including the sex trafficking of children. Cabinet members meet in the PITF annually, while the same federal departments and agencies also convene more regularly in the SPOG and in its five committees. This coordination ensures a whole-of-government approach that addresses enforcement of criminal law, development of victim identification and protection measures, support for innovations in data gathering and research, education and public awareness, enhanced partnerships and research opportunities, strengthened policies on federal procurement, and strategically linked foreign assistance and diplomatic engagement.

**M.  Department of Defense (DOD)**

Various agencies within DOD contribute to the fight against child exploitation through cooperation with civilian law enforcement agencies and other partners, as well as implementing policies within the military to prevent child exploitation by members of the Armed Services.  Among other efforts, DOD supports child exploitation cases with criminal investigators from the Military Criminal Investigative Organizations (MCIOs) who review exploitation reports made available by NCMEC through the CyberTipline, conduct DOD database searches, and disseminate reports involving DOD personnel to the proper jurisdiction.

**N.  Department of Education (ED)**

ED helps combat child exploitation by raising awareness about and trying to prevent domestic human trafficking and exploitation amongst school-aged youth.  ED informs school leaders, faculty, and students about the problem; helps schools understand how the problem relates to teaching and learning and why it is important for schools to address it; embeds the issue in schools' emergency operations and management planning; and works with other federal agencies, state and local agencies, and public sector stakeholders to develop and disseminate resource material.

**O.  National Center for Missing & Exploited Children (NCMEC)**

NCMEC is a private, non-profit organization designated by Congress to serve as a national clearinghouse on issues related to missing and exploited children and works in cooperation with DOJ and other federal, state and local law enforcement, education and social service agencies, families and the public.

NCMEC created the CyberTipline to serve as a centralized reporting mechanism for the public and electronic service providers to report suspected child sexual exploitation.  Since 1998, the CyberTipline has handled more than 8.4 million reports—nearly half of those in 2015.  NCMEC staff review the reports, analyze the content, add relevant publicly available information and make the report available to the appropriate international, state, federal, or local law enforcement agency for independent review and possible investigation.  NCMEC's Child Victim Identification Program (CVIP) was launched in 2002 to enable NCMEC staff to track child pornography images of children previously identified by law enforcement.  Law enforcement officers submit copies of seized child pornography images to federal law enforcement agents working out of the NCMEC facility.  CVIP analysts review the copies of the seized images and videos and determine which images contain previously identified child victims.  Since 2002, NCMEC staff has reviewed more than 160 million images and videos.  Many children have been recovered from ongoing exploitation as a result of CVIP's technical assistance for law enforcement's efforts to locate and recover child victims depicted in sexually exploitive images. NCMEC's Child Sex Trafficking Team (CSTT) was launched in 2011 to further streamline the ability to make connections between cases of reported online child sex trafficking and active missing child

cases.  NCMEC's CSTT consists of specialized Child Sex Trafficking Analysts, Missing Child Case Management teams, and a Child Sex Trafficking Specialist dedicated to supporting law enforcement, social service agencies, legal guardians and families working to locate, recover and support children victimized through sex trafficking.

## 3.  NATIONAL CHILD EXPLOITATION THREAT ASSESSMENT 2016

The National Child Exploitation Threat Assessment in the 2010 National Strategy was the first national assessment by the federal government of the risks posed by child exploitation.  The 2016 assessment is based on a comprehensive survey of more than 1,000 investigators, law enforcement managers, prosecutors, analysts, victim service providers, and DOJ grant recipients.  The survey focused on changes to the child sexual exploitation threat since the previous assessment and potential threats over the next five years.  Key findings of the threat assessment in the five main areas of child exploitation are as follows.

### A.  Child Pornography

- *Globalization.*  Child pornography cases frequently involve offenders or evidence located abroad, which complicates, delays, or thwarts successful investigation and prosecution.

- *Mobile devices.*  Mobile devices can be used to photograph or film a child being sexually abused, access child pornography stored in remote locations, and stream video of child sexual abuse.

- *Encryption.*  Readily available, easy-to-use, often built-in encryption thwarts the collection and analysis of critical evidence in child sexual exploitation cases.  Even with proper legal process, law enforcement often is unable to obtain the evidence on an encrypted device, allowing an offender to escape justice.

- *The Dark Internet.*  Networks of technologies and platforms can obfuscate traditional IP addresses and make it highly difficult to identify offenders.  This anonymity emboldens users to commit more egregious offenses than are seen on traditional Internet platforms.

- *Offender Communities.*  In closed and highly protected online spaces, online communities dedicated to the sexual abuse of children have proliferated.  Hand-picked members normalize each other's sexual interest in children and encourage each other to act on their deviant sexual interests.

### B.  Sextortion and Live-Streaming of Child Sexual Abuse

- *Evolving threats.*  Novel methods of child sex abuse, such as sextortion, continue to emerge in the online context.

- *Evolving means of exploitation*.  Mobile devices have fundamentally changed the way offenders can abuse children.  Apps on these devices can be used to target, recruit or groom, and coerce children to engage in sexual activity.

- *Large number of victims, easily targeted.*  Offenders are adept at tricking and/or coercing children who are online and typically do so in large numbers.

## C.  Child Sex Trafficking

- *The impact of the Internet.*  Websites like Backpage.com have emerged as a primary vehicle for the advertisement of children to engage in prostitution.  At the same time, offenders are using social networking sites as a tool to identify and recruit underage victims.

- *Gangs.*  In addition to, or instead of, the drug trade, gang members have begun to prostitute children as a means to derive revenue.

- *Concentrated spikes in criminal activity.*  Major public events, such as championship or all-star sporting events or national conferences, can be venues for child sex trafficking such that offenders will transport children to those events to meet the demand.

- *Offender danger.*  Unlike other child sex offenders, child sex traffickers typically have extensive criminal histories for a variety of violent offenses.

## D.  Child Sex Tourism

- *Exploitation of systemic vulnerabilities.*  U.S. citizens, often with seemingly legitimate reasons for travel, seek sex with children in countries with high levels of poverty, large populations of at-risk youth, legalized prostitution, and/or fewer law enforcement resources.

## E.  Sex Offender Registry Violations

- *Deliberate evasion.*  Sex offenders who fail to register are often trying to evade their registration obligations so that they can offend again.


## 4.  GOALS AND OBJECTIVES FOR CONTINUING THE FIGHT AGAINST CHILD EXPLOITATION

The Department and its partners in the National Strategy Working Group have vigorously fought all aspects of child exploitation, but as the threats to our children change, enforcement, victim services, and outreach efforts must change as well.  This section of the National Strategy describes future goals and objectives in the fight against child exploitation in four areas: investigations and prosecutions; outreach and awareness; victim services; and policy and legislative initiatives.

## A.  Investigations and Prosecutions

- *Targeting emerging technologies.*  The Department and its partners will work to create novel investigative approaches to serve as models when prosecutorial teams are confronted with technological obstacles.

- *Targeting offender organizations.* The Department will focus on wide-scale investigation and prosecution of networked offenders, often across multiple jurisdictions, in investigations that involve the capture of boards, websites, or remote storage hubs utilized by, in some cases, hundreds or even thousands of offenders.

- *Targeting high-value individual offenders.* The Department will prioritize cases involving child pornography producers; offenders in positions of trust or authority over children; Americans who abuse children abroad, especially while serving in U.S. government positions; and American sex offenders who have fled U.S. sex offender registration requirements by relocating abroad.

- *Enhancing international collaboration.* The Department will coordinate with all international investigative entities focused on child sexual exploitation offenses, including the FBI-led Violent Crimes Against Children International Task Force, the Virtual Global Task Force, Europol, and INTERPOL.

- *Identifying victims.* The Department will enhance national capacity for victim identification, emphasizing the development and use of forensic technology.

**B. Outreach and Awareness Activities**

- *Expanding and updating community-based Internet safety outreach efforts.* Federal agencies and their partners will expand and update awareness, outreach, and educational measures to prevent child exploitation offenses based on new and emerging threats to children, such as sextortion and new electronic devices and applications.

- *Developing nationwide messages to prevent and deter offenses against children.* New public service announcements will include messages on the responsible use of electronic devices and the potential negative consequences to children of sending compromising data and images of themselves to others.

- *Enhancing awareness and educational activities to combat the commercial sexual exploitation of children.* The Department will engage the existing network of federal agents, prosecutors, and ICAC Task Force members to include outreach and awareness events focused on the commercial sexual exploitation of children into their current activities and will examine ways to include prevention and deterrence messages to potential buyers of commercial sex.

- *Additional awareness efforts on sextortion offenses.* The Department will work with its law enforcement partners and non-governmental organizations to develop, enhance and update outreach and educational efforts for children and parents on this specific threat.

- *Law enforcement and prosecutor training.* The Department is committed to providing training to federal, state, local, and tribal law enforcement and prosecutors on the

investigation and prosecution of child exploitation offenses through its litigating components, OJPs' Missing and Exploited Children's Program, and its annual national law enforcement conference on child exploitation.

## C.  Victim Services

- *Coordinating services to victims of child sexual exploitation.* The members of the National Strategy Working Group will work with survivors, service providers, and others to establish a stakeholder group to identify and build upon existing collaborative efforts to coordinate the identification and provision of immediate and long term services to victims of child sexual exploitation.

- *Assessing existing models and responses to establish a focused, evidence-based collaborative strategy.*  While there are numerous programs available to victims of child exploitation, there has been no formal analysis conducted to map what exists and determine how these resources and programs intersect and coordinate.

- *Publishing a summary of findings and guidance to the field.*  Before proposing new policies, statutes, and programs, the stakeholder group will identify existing laws, policies, and programs and then conduct thorough analyses to determine if they are working to address the specific problem/need.

- *Encouraging innovation through federally funded demonstration projects and, when possible, evaluation of these efforts to better extract and apply lessons learned about what works.*  This approach can lead the government to identify new, more effective ways of addressing issues that have long plagued communities.

- *Developing a specialized comprehensive housing stability program to better address the needs of victims.* There is a lack of available, appropriate homes for children, which sometimes leads to their running away in the first place, but can also result in their returning to the streets to be re-victimized because their living situation is intolerable.

## D.  Policy and Legislative Initiatives

- *Improving forensics and assessing the impact of technology.*  The Department will consider establishing minimum standards for forensic examinations in child sexual exploitation cases and also explore the development of a system for tracking the impact of technology on our ability to identify offenders.

- *Enhancing global coordination.*  The Department will work collaboratively with our international and industry partners to more effectively work in concert to fight child sexual exploitation, for example, through continued participation in the merged Global Alliance Against Child Sexual Abuse Online/WePROTECT initiative.

- *Improving the provision of victim services.* The Department will work more closely with the child welfare and juvenile justice systems; make prosecutors and victim service personnel fully aware of the existing benefits offered by state crime compensation and assistance programs; identify any structural barriers that inhibit funding for victims in protective custody or inhibit use of state crime compensation programs; provide training, outreach, and guidance to enable federal prosecutors to successfully seek restitution on behalf of victims; and ensure that the ICAC Task Forces are fully aware of victim service programs and resources.

- *Developing model state laws addressing child victims of commercial sexual exploitation.* The Department will explore developing a model state law for expungement of convictions for individuals arrested for prostitution as minors.

- *Improving sentencing and restitution in child pornography cases.* The Department will work to reform the sentencing scheme in child pornography trafficking cases to ensure that offenders are appropriately held accountable for the severity of their conduct and will assess the development of measures to improve the tracking of restitution awards and payments in child pornography distribution, receipt, and possession cases.

- *Improving Department and interagency efforts to support research and gather data.* The Department will examine ways to improve coordination between its grant-making, law enforcement, and litigating components and other agencies that work on child exploitation matters to develop and implement a coordinated research agenda.

- *Pursuing new legislation.* The Department will work with Congress to enact legislation to enhance the response to child sexual exploitation by promoting legislation on restitution for victims of child pornography trafficking offenses and to clarify, update, or expand certain criminal statutes.

## 5. CHILD EXPLOITATION IN INDIAN COUNTRY

In January 2010, the Deputy Attorney General announced DOJ's Indian Country Law Enforcement Initiative, declaring public safety in tribal communities a top priority and outlining the responsibilities of the USAOs to federally recognized tribes in their districts. The memorandum identified, in particular, violence against children in Indian Country as a focus of these efforts. In partnership with tribes, the Department's goal is to identify and implement solutions addressing immediate and long-term public safety challenges in Indian Country, particularly in the area of child exploitation. All USAOs with Indian Country responsibilities have at least one Tribal Liaison to serve as the primary point of contact with tribes in the district, and the Department's Tribal Special Assistant U.S. Attorney (SAUSA) program provides for cross-deputized tribal prosecutors or tribal attorneys to prosecute crimes in both tribal court and federal court as appropriate. The Department also provides training and technical assistance to federal, state, and tribal law enforcement personnel as well as to key stakeholders involved in responding to child exploitation cases through NCMEC, the Tribal Child Protection in Indian Country program, the National AMBER Alert program, and the ICAC program.

Tribes are included in PSC Coalitions, and the National Indian Country Training Initiative (NICTI), USAOs, the FBI, and the ICAC Task Forces are providing PSC training to tribal law enforcement. A number of tribes participate in ICAC Task Forces, either as formal permanent members of the task force or on a case-by-case basis

The prevalence of contact offenses in Indian Country PSC cases raises unique challenges for law enforcement, as such crimes require different training and resources. Obstacles to prosecuting PSC crimes occurring in Indian Country may stem from a lack of trust in off-reservation authorities; a lack of witness cooperation due to the small size of the tribal community; loyalty to the tribal community; and fear of reprisal from suspects and families. There is often family pressure on child exploitation victims not to disclose or to recant allegations of abuse. These dynamics may result in a significant delay in the reporting of PSC crimes or those crimes going unreported. For this reason, training is a significant part of the Department's forward-looking strategy in Indian Country. As noted above, the Department has instituted a robust training program for federal, state, local, and tribal criminal justice and social service professionals working in or with tribal communities. The NICTI, Amber Alert, and ICAC programs will continue to dedicate training efforts in support of law enforcement, prosecutors and investigators in Indian Country. DOJ will also continue to focus on inclusion of tribal and BIA law enforcement officers in ICAC Task Forces that are already in place in Indian Country.

## 6. <u>CONCLUSION</u>

This National Strategy for Child Exploitation Prevention and Interdiction has described in detail the current efforts of the Department of Justice and its law enforcement partners to find, prosecute, and punish those who prey on the nation's children. It has described, as well, efforts by those agencies and others to engage in public outreach and awareness to prevent children from being victimized in the first place, whether through enticement of the unwary on-line or through their exploitation on the streets of the nation's cities. It addressed the unique circumstances that lead to child exploitation in Indian County and the responses that are necessary to protect tribal victims. It further detailed the efforts by the Department and other agencies to provide services to children that account for the complex, intersecting, and long-lasting harms that exploitation causes. And it has forecast a future of greater technological and global threats. In order to face those threats, the National Strategy has outlined a series of goals for law enforcement, prosecutors, and victim service providers, among others, for protecting the nation's children. Most importantly, the National Strategy reaffirms our unwavering commitment to ensuring that all children in America are able to reach their potential and are protected from violence and abuse.

14

## II. INTRODUCTION

The PROTECT Our Children Act of 2008 (Public Law 101-401) requires that the Attorney General develop and implement a National Strategy for Child Exploitation Prevention and Interdiction (National Strategy).  The first National Strategy was published in 2010.  This, the second National Strategy, builds on that work.

The National Strategy is a culmination of a year of discussions among members of an inter-agency working group convened by the National Coordinator for Child Exploitation Prevention and Interdiction at the Department of Justice (DOJ, or the Department).  The National Strategy first discusses the work of federal law enforcement agencies and prosecutors since 2010, as well as other agencies and offices that play important roles in this work by supporting victims, providing grants to state, local, and tribal governments and non-profit partners, and educating the public about the dangers of child exploitation, and also the work of the non-governmental National Center for Missing & Exploited Children (NCMEC).  Second, it provides a threat assessment that addresses the nature and scope of the problem and updates the assessment contained in the 2010 National Strategy.  Third, it lays out plans for continuing the fight against child exploitation in four key areas:  investigations and prosecutions; outreach and education; victim services; and policy and legislative initiatives.  The National Strategy also has a section dedicated solely to child exploitation in Indian County, as the issues there are often unique.  Finally, a series of appendices include statistics on federal prosecutions; detailed tables of information on the Internet Crimes Against Children Task Force Program (ICAC program) funded by DOJ; research on child exploitation funded by DOJ; a summary of the survey on which the threat assessment is based; and the text of legislative proposals.  Throughout the National Strategy case studies are included as examples of child exploitation prosecutions brought by DOJ.

The National Strategy addresses the complex and intersecting aspects of the fight against child exploitation in detail.  The threat assessment reflects the experience of those on the front lines.  That assessment, in combination with the expertise of the members of the National Strategy Working Group, shows the following.  First, offenders are constantly adapting new technologies to find, groom, recruit and exploit victims, and to evade detection by law enforcement.  For example, they meet and trade images of the sexual abuse of children[1] with like-minded individuals around the globe through the "dark" side of the Internet—hidden websites not available through standard search engines and that rely on difficult-to-trace anonymous computer servers.  Other technological developments have significantly changed child sexual exploitation offenses, including the proliferation of mobile devices, which easily produce, store, and access child pornography, the development of default and advanced encryption, which can bring investigations to a halt, and the advent of remote storage, which permits offenders to consume child pornography without having to possess it in their homes.  Therefore, second, keeping up with how offenders use new technologies, identifying countermeasures to them, and educating the public about how to avoid being targeted are constant challenges for law enforcement agencies and their partners in protecting the public.  For example, "sextortion"—that is, hacking, coercing, or otherwise obtaining incriminating photos or information of minors and then threatening to expose

---

[1] DOJ generally uses the term "images of the sexual abuse of children" to emphasize that these images record crimes.  They are clearly distinct from legally protected sexually explicit material.  However, as "child pornography" is commonly used to describe them, the National Strategy will use the terms interchangeably.

them if the minors do not perform sex acts via web cameras—has become a major threat in recent years. This new threat requires both an aggressive offense in the form of investigations and prosecutions of offenders and a good defense by informing parents, educators, and children about this threat. Third, these offenses are becoming globalized in new ways. It was always true that the Internet made child pornography offenses borderless crimes. But today it is much more likely that evidence will be located in multiple countries, which complicates the investigative process. The Internet and mobile technology have also expanded in developing countries, increasing the locations where offenders or evidence may be found. Fourth, victims require more than just immediate assistance to address their most obvious injuries. Victims need individualized, trauma-informed care that addresses the intersecting physical, emotional, financial, and other needs that made them vulnerable in the first instance.

A recent case prosecuted by the Child Exploitation and Obscenity Section (CEOS) of DOJ's Criminal Division and the U.S. Attorney's Office (USAO) for the Central District of California, in which eight pimps and recruiters affiliated with a street gang were convicted, demonstrates the difficulty of pursuing child exploitation cases, as well as the essential need to do so. The investigation by the Inland Child Exploitation/Prostitution Task Force began when the Riverside County Sheriff's Department learned that teenage girls from the Inland Empire area were being recruited to engage in prostitution. It revealed that one defendant attended a school in the area and was able to recruit minor victims through a process of grooming and promises that they would make large sums of money if they worked for her pimp. Girls who were successfully recruited were brought to the Los Angeles area, where they were housed by several of the defendants. When the victims did not perform as required, they were physically and verbally abused in addition to the sexual exploitation they endured. All eight charged defendants ultimately plead guilty to charges corresponding to their role in the conduct, including sex trafficking[2] of a minor, conspiracy to engage in sex trafficking, and interstate transportation in the aid of racketeering. In March of 2014, the lead defendant, Paul Edward Bell, was sentenced to 30 years' incarceration.

Other recent cases demonstrate the technical sophistication and global reach of offenders and the complexity of the effort to find and punish them. For example, in a precedent-setting investigation and prosecution, the Federal Bureau of Investigation (FBI), working with prosecutors from DOJ, successfully identified individuals on the Dark Internet who, under the perceived cloak of anonymity, secretly congregated to celebrate the sexual abuse of children and to trade images of the sexual abuse of children. The operation required round-the-clock effort from agents, analysts, and prosecutors, and a rapid response to fast-breaking developments. A total of 28 defendants were indicted in the District of Nebraska as a result of this operation. To date, 20 of them have been arrested. Of those, three were convicted at trial and 16 pled guilty for offenses including child exploitation enterprise, conspiracy to advertise child pornography, conspiracy to distribute child pornography, and receipt

---

[2] For purposes of this document, "sex trafficking" means the recruitment, enticement, harboring, transportation, provision, obtaining, advertising, maintaining, patronizing, or soliciting of a person for the purpose of a commercial sex act where the commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age. It is criminalized by 18 U.S.C. § 1591. It is sometimes also called "commercial sexual exploitation" or "domestic sex trafficking," when referring to acts solely occurring within the United States. The National Strategy will use the terms interchangeably.

and access of child pornography with intent to view.  The last defendant is awaiting trial; the rest of have received sentences ranging from three and half to 25 years' incarceration.

Following on the success of this operation, a second operation targeted thousands of users of more than 200 websites operating on the Tor network and dedicated to the trade of child pornography, as well as the alleged administrator responsible for facilitating that enormous scope of criminal child sexual exploitation.  To shut this network down, DOJ, FBI, the European Union's Europol agency, and other foreign partners, conceived of and executed a globally coordinated criminal investigation unlike any other.  The operational strategy and framework allowed for parallel investigations to be conducted in each participating nation; enhanced efficiency by pooling resources among all participating countries; and recognized that real-time information sharing would—and needed to be—the norm.  More than 70 law enforcement agents from the United States, Finland, France, Germany, Greece, Ireland, the Netherlands, Norway, Poland, Spain, Sweden, Switzerland, and the United Kingdom cooperated in the investigation, while Europol served as the hub for operational support, facilities, and information sharing.

The impact of this complex, technically sophisticated, multi-national criminal investigative effort was unparalleled: more than 200 child sexual exploitation websites taken offline, along with hundreds of other sites sponsoring or facilitating criminal activity; the activities of tens of thousands of online child pornographers disrupted; over four million images and videos of child sexual abuse seized, including more than 100 previously unknown series of child abuse images and new images from more than 50 existing series; and dozens of offenders identified and prosecuted throughout the world.  The case also resulted in the largest seizure of virtual currency up to that time and the discovery of 120 previously unknown victims of child sexual exploitation.

In these cases, and in the many others described in the following pages, the Department and its partners have achieved great successes.  But there is more work to do.  The National Strategy is presented to Congress and the public in order to demonstrate those successes and commit to the next steps in the enduring fight to protect our nation's children.

### III.  REVIEW OF EFFORTS TO COMBAT CHILD EXPLOITATION

This section of the National Strategy provides a comprehensive overview of existing efforts to combat child exploitation, including those made in conjunction with private, non-profit organizations, such as NCMEC.

### A.  Federal Bureau of Investigation/Violent Crimes Against Children Section

The mission of the Violent Crimes Against Children Section (VCACS) is to provide a rapid, proactive, and comprehensive capability to counter all threats of abuse and exploitation to children under the jurisdiction and authority of the FBI; to identify and recover child victims in coordination with local, state, federal, tribal, and international partners; to reduce the vulnerability of children to in-person and online sexual exploitation and abuse; and to strengthen the capabilities of the FBI and federal, state, local, tribal, and international partners through training, intelligence-sharing, technical support, and investigative assistance.

Child Exploitation Task Forces and Innocence Lost National Initiative

Through FBI-led Child Exploitation Task Forces (CETFs), the FBI has collaborated with nearly 400 state, local, tribal, and federal law enforcement partners to identify and prosecute individuals, enterprises, and businesses who sexually exploit children, including those who facilitate the domestic sex trafficking of children.

In 2003, the FBI implemented the Innocence Lost National Initiative (ILNI), with support from CEOS and technical assistance from NCMEC, to address children recruited into prostitution by sex traffickers. Initially, the ILNI focused on 13 cities who reported high rates of child sex trafficking, but the ILNI now operates as part of 71 CETFs nationwide. Under the ILNI, the FBI conducts Operation Cross Country annually. The mission of Operation Cross Country, which takes place nationwide and has expanded internationally, is to recover children from sex traffickers and coordinate victim services for identified victims. The FBI, in coordination with federal, state, local, and tribal law enforcement partners, routinely uses a myriad of sophisticated investigative techniques, authorized under the law, to dismantle domestic sex trafficking organizations. The FBI uses an intelligence-driven approach to identify and target traffickers who sexually exploit children for financial gain.

Innocent Images National Initiative

The Innocent Images National Initiative (IINI) is a proactive, intelligence-driven, multi-agency investigative operation that focuses on combating the proliferation of child pornography and child sexual exploitation worldwide. The IINI provides centralized coordination and analysis of case information that is both national and international in scope. This requires unprecedented coordination between FBI field offices and state, local, and tribal law enforcement agencies. This also requires close coordination with international law enforcement agencies through FBI Legal Attachés. In Fiscal Years 2014 through 2015, the IINI program was credited with over 2,900 arrests and 2,200 convictions involving the online sexual exploitation of children.

18

Child Abduction Rapid Deployment Team

In 2006, the FBI created the Child Abduction Rapid Deployment (CARD) Team to provide a nationwide resource to support child abduction and critically missing children investigations.  The CARD Team is composed of Special Agents who offer and/or provide investigative and technical resources to law enforcement agencies following a child abduction.  CARD members attend specialized training on child abduction investigative search techniques and technology and develop best practices through operational experience.  CARD Teams are supported by the FBI's Behavioral Analysis Unit 3 (BAU-3).  BAU-3 assists with offender characteristics, victimology, investigative, interview, and media strategies.  The CARD Team is a nationwide resource to law enforcement at no cost to the requesting agency.  The priority of the CARD Team is to provide a timely response to aid in the recovery of an abducted child and to arrest the abductor.  The CARD Team has deployed 119 times since its inception, which resulted in the recovery of 52 alive children, 45 deceased children, and the arrest of numerous offenders.

Endangered Child Alert Program

Endangered Child Alert Program (ECAP) is a collaborative effort between the VCACS and NCMEC to identify unknown adults and/or persons of interest who appear in or are associated with unsolved series of child pornography.  FBI investigators select images from unidentified child pornography series in which an unknown adult's face and/or distinguishing characteristics are visible.  If all investigative efforts to identify the unknown adult have been exhausted, ECAP uses a national and/or international campaign to identify the unknown adult (referred to as "John/Jane Does").  Campaigns are usually composed of aggressive media campaigns using social media, websites, and television.  Since the program's inception in 2004, 35 John/Jane Does have been investigated, 24 of whom have been successfully identified.  Thus far in Fiscal Year 2016 alone, there have been two John Does identified, with "John Doe #28" arrested on February 9, 2016.

Operation Rescue Me

Operation Rescue Me is a victim identification program that utilizes image analysis and partnerships to identify unknown child victims depicted in child sexual exploitation material.  Since the program's inception in 2008, Operation Rescue Me and its collaborative efforts with ECAP have resulted in the identification of over 175 child victims depicted in numerous child pornography series traded on the Internet.  Potential candidate images for Operation Rescue Me are generated from new child pornography series discovered by FBI field investigations, forensic exams, or suggested by NCMEC.

Safe Online Surfing

The FBI's Safe Online Surfing (SOS) Program Internet Challenge is a free and informative web-based program that teaches students in grades 3-8 how to recognize and respond appropriately to online dangers.  The program promotes responsible cyber citizenship among students by engaging them in a fun, age-appropriate, and competitive online program where they learn the importance of safe and responsible use of the Internet.  Additionally, the program is used by many schools nationwide to meet guidelines established in their state for Internet safety awareness.  Revamped in October 2012 with a

new website and a new series of activities, FBI-SOS provides a ready-made curriculum for teachers that meet state and federal Internet safety mandates.  It includes testing for students and competition among schools to encourage participation and learning.  Since October 2012, the FBI-SOS website has been visited more than 555,000 times, with a total of 1.37 million page views.  In September 2013, the FBI also introduced a version of the FBI-SOS website in Spanish.

Child Sex Tourism

The Child Sex Tourism (CST) Initiative targets U.S. citizens who travel abroad to engage in illicit sexual activity with children.  The CST Initiative has identified and evaluated CST destinations, such as Thailand, Cambodia and the Philippines, and identified emerging and ongoing trends in the methodology of CST offenders and facilitators in those destinations.  The CST Initiative has embedded CST agents in Thailand, Cambodia and the Philippines since 2008.  This strategy also includes the development of intelligence and best practices to safely remove child victims from sexual abuse situations as well as identify predatory individuals and groups operating in these areas.  Since 2013, the successful development of the CST Initiative with our foreign partners has led to the arrest of 26 U.S. citizens in foreign countries who have been charged with sexually abusing children.  In addition, 25 of those same individuals have been indicted on U.S. charges.  Fourteen of the subjects have been convicted and are serving jail sentences both overseas and in the United States.

An additional component of the CST Initiative provides resources to facilitate the arrest, deportation and escort (repatriation back to the United States) of individuals with outstanding state and federal arrest warrants issued for their sexual exploitation of children.  The repatriation program has returned an additional 24 individuals to the United States to face outstanding U.S. charges since 2013.

Cooperation with NCMEC

As described in greater detail below, NCMEC is a private, non-profit organization working with law enforcement, education and social service agencies, families, industry professionals, and the public on issues related to missing and exploited children.  NCMEC serves as a national resource center and information clearinghouse for efforts to help missing and exploited children.  The FBI has personnel who work in NCMEC's facility to maximize their effective communication with FBI personnel in the field and to use NCMEC prevention and education resources at public awareness events.

The Violent Crimes Against Children Intelligence Unit

The mission of the Violent Crimes Against Children Intelligence Unit (VCACIU) is to manage the global Violent Crimes Against Children (VCAC) intelligence collection, analysis, and dissemination; identify VCAC threats, trends, and vulnerabilities; write national-in-scope intelligence products; identify national intelligence gaps and collection requirements; and provide actionable intelligence to law enforcement, policy makers, non-governmental organizations, private industry, and the public to aid in the identification, recovery, and prevention of child victims.

The VCACIU addresses the strategic, tactical, collection, and domain aspects of the VCAC threats within the FBI's investigative jurisdiction. This is accomplished through the efforts of Intelligence Analysts (IAs) embedded within the VCAC Section. Two IAs support the FBI's personnel in the field by working from the NCMEC facility, and one IA is detailed full-time to FBI's BAU-3. The VCACIU seeks to maintain a comprehensive understanding of the sexual exploitation of children threat, to include: perpetrators, their criminal tradecraft, and their vulnerabilities; victims and their vulnerabilities; and the geographical and online venues being used to commit these crimes.

The primary VCAC threats addressed are: child abductions (ransom and non-ransom), sexual exploitation of children enterprises (online networks or enterprises and domestic commercial exploitation of a child enterprises), contact sexual offenses against children (production of child pornography, sextortion, domestic commercial exploitation of a child non-enterprises and child sex tourism), child pornography distribution and possession, and international parental kidnapping.

Over the past five years, VCACIU has produced more than 250 national-level written products on the VCAC threat for a range of audiences to include executive management, law enforcement partners (domestic and international), non-government organizations, and the private sector. Products include analysis of emerging trends and technology, domain awareness, source coverage and collection opportunities, and private sector advisories and included topics of child abductions, commercial sexual exploitation of children, online sexual exploitation, and child sex tourism. During the same time period, VCACIU contributed to over 2,000 criminal targeting packages which provided investigative leads to FBI Field Offices directly resulting in the recovery of child victims and apprehension of offenders responsible for the victimization. VCACIU continues daily engagement with operational counterparts and key intelligence partners to document and distribute the most current information on the VCAC threat.

Violent Crimes Against Children International Task Force

In 2004, the FBI initiated the Violent Crimes Against Children International Task Force (VCACITF) to promote and develop a select cadre of international law enforcement experts to formulate and deliver a unified global response against child sexual exploitation matters. Objectives toward this goal include the establishment and furtherance of strategic partnerships with relevant foreign laws enforcement partners by utilizing extensive liaison as well as operational support and coordination. Since its inception, the VCACITF has been instrumental in the successful initiation and resolution of several high profile, extremely complex investigations with a true global footprint. The steadily expanding VCACITF is currently comprised of over 67 active task force officers from 43 different countries, and is the largest task force of its kind in the world. The VCACITF training is approximately five weeks in length and focuses on FBI strategy and methodology for combating every form of child sexual exploitation.

Office for Victim Assistance

The mission of the Office for Victim Assistance (OVA) is to ensure that victims of federal crimes investigated by the FBI have access to the rights and assistance to which they are entitled under the

law and the Attorney General Guidelines on Victim Witness Assistance. The rights guaranteed to victims and the services provided are designed to help them cope and effectively participate in the criminal justice system. A primary function of OVA is providing support, guidance, and training to Victim Specialists (VSs) in Field Offices. OVA employees also develop and provide training and educational materials for Special Agents and other federal criminal justice personnel on various aspects of the victim dynamics, liaison, and assistance resources. OVA directly administers special Victims of Crime Act funds to provide for emergency needs of victims when other resources are not available, such as reunification travel, crime-scene cleanup, replacement clothing, and shipment of victims' remains.

OVA manages 153 full-time VSs, one third of whom are assigned to Indian Country matters. VSs are funded through DOJ's Crime Victims' Fund administered by the Office for Victims of Crime. There is at least one VS in every FBI field office. VSs provide direct services to child and adolescent victims of sexual exploitation in

> ### Operation Kilo Hunter
>
> FBI and VCACITF representatives from Australia initiated an operation targeting an e-mail based, international child sexual abuse network with over 300 potential subjects around the world. To date, the investigation has resulted in 27 child victims recovered and 45 offenders within the U.S arrested. Furthermore, the investigation identified a high percentage of hands-on offenders involved in the conspiracy. The average age of the recovered children was six years old. The majority of the victims were sexually assaulted by family members, to include parents, step-parents, and grandparents.

addition to other federal crimes. Services for especially vulnerable populations such as child exploitation victims include ensuring victims and their families are afforded their victim rights, providing crisis support and working with the victim and local/state/national agencies for appropriate service provision. VSs also provide training on victim assistance throughout the nation and many internationally. In addition, OVA maintains eleven full-time Forensic Child Interview Specialists who conduct interviews with child and adolescent victims in challenging cases, and who provide consultation and forensic interview training.

OVA also participates in the Child Pornography Victim Assistance Program (CPVA), a joint program including the FBI, the U.S. Postal Inspection Service (USPIS), U.S. Immigration and Customs Enforcement/Homeland Security Investigations (ICE HSI) of the Department of Homeland Security (DHS), DOJ's USAOs, CEOS, and NCMEC. Its purpose is to streamline the notification process for victims of child pornography as an attempt to minimize the trauma of numerous notifications which may occur as the result of images appearing in an infinite number of potential investigations.

Behavioral Analysis Unit 3

The Behavioral Analysis Unit 3 (BAU-3) provides specialized and behaviorally based investigative and operational support to law enforcement agencies involved in the investigation of crimes against children. BAU-3 resources are focused on child abductions, child homicides, sexual exploitation of

children, and other acts targeting child victims. BAU-3 reviews and assesses the facts of a criminal act and interprets offender behavior and victim/offender dynamics during the commission of the crime or as displayed at the crime scene. BAU-3 operational support includes: criminal investigative analysis, deployments, expert testimony, interview strategies, investigative suggestions, linkage analysis, media strategies, profiles of unknown offenders, prosecutorial and trial strategies, search warrant affidavit assistance, statement analysis, and threat/risk assessments. BAU-3 also provides specialized training for federal, state, local, tribal, and international law enforcement agencies by integrating operational experience, research findings, and case studies.

Digital Analysis and Research Center

The Digital Analysis Research Center (DARC) is the forensic analysis laboratory of the Operational Technology Division (OTD), dedicated to supporting the Criminal Investigation Division's VCACS. DARC was established in January 2008 as part of the IINI to address the growing need for dedicated resources in the area of computer forensic analysis to support online child sexual exploitation investigations. In August 2010, DARC became a stand-alone operational unit and in late 2012 became part of OTD's Digital Forensics & Analysis Section (DFAS). DARC is comprised of a team of forensic examiners, information technology specialists, and a laboratory manager.

DARC's mission is to provide quality technical and scientific investigative support that includes detailed digital forensic extraction and analysis, testimony, and support to the FBI's VCAC program. DARC's primary function is to provide digital forensic services, namely through the acquisition, preservation, examination, processing and presentation of stored digital information in computers or other electronic devices or media. DARC also continually looks to develop new technologies and procedures to assist forensic examiners and investigators in combating the online sexual exploitation of children. The dedication of DARC to a specific mission allows examiners to specialize in this discipline and provide detailed content analysis to investigators. DARC forensic examiners participate in operational searches and the seizure of digital evidence. DARC, through coordination and leveraging other digital forensic components within the DFAS, is also capable of providing large scale forensic support and analysis to enterprise investigations involving numerous subjects/locations and containing multiple terabytes of data. DARC's research component is engaged in developing tools and resources to better identify and conduct operations against the most egregious offenders and to more effectively and efficiently review and de-conflict extremely large data sets containing child exploitation materials.

In Fiscal Year 2015, DARC processed 162 Terabytes of data, completed 189 forensic exams, and conducted 44 domestic and international deployments in support of VCAC matters.

Indian Country

The FBI's Indian Country Crimes program has investigative responsibility for federal crimes committed on approximately 200 Indian reservations and this responsibility is shared concurrently with the Bureau of Indian Affairs (BIA). This number generally excludes tribes in P.L. 280 states, with the exception of crimes of general applicability (e.g., drug offenses, Indian gaming, and violence-against-women

23

offenses).   Currently, there are approximately 124 full-time FBI Special Agents working in support of Indian Country investigative matters, in over 30 FBI Field Offices.   As of December 2015, there were approximately 3,000 pending Indian Country investigations.  Child sexual exploitation remains a priority within the Indian Country program, as it accounts for approximately 30 percent of the FBI's Indian Country pending investigations.

The FBI is committed to decreasing child sexual exploitation in Indian Country.  The FBI is continuing to address the threat of child sexual exploitation in Indian Country by providing advanced training on this issue for FBI Special Agents, BIA Special Agents, and tribal law enforcement.  Additionally, the FBI oversees 15 Safe Trails Task Forces which leverage federal, state, and tribal resources to combat violent crimes in IC, including child exploitation

### B.   Department of Homeland Security/U.S. Immigration and Customs Enforcement/Homeland Security Investigations

U.S. Immigration and Customs Enforcement/Homeland Security Investigations (ICE HSI) is an agency of the Department of Homeland Security (DHS).  ICE HSI's child exploitation investigations focus on two areas of enforcement, under the auspices of what is known as Operation Predator: disruption and dismantlement of individuals and groups involved in: (1) the possession, receipt, distribution, transportation, advertisement, and production of child pornography; and (2) travel in foreign or interstate commerce to engage in illicit sexual conduct with minors.

Since the launch of Operation Predator in 2003, ICE HSI has initiated over 35,000 criminal investigations and arrested over 13,000 child predators. Below is a breakdown of overall child exploitation enforcement statistics for ICE HSI over the past five years.

*ICE HSI Child Exploitation Enforcement Statistics*

|       | Arrests | Indictments | Convictions | Cases Initiated | Victims Identified* |
|-------|---------|-------------|-------------|-----------------|---------------------|
| FY 11 | 1,467   | 1,193       | 980         | 3,057           | -                   |
| FY 12 | 1,671   | 1,233       | 1,240       | 2,871           | 292*                |
| FY 13 | 2,114   | 1,664       | 1,365       | 4,098           | 927                 |
| FY14  | 2,405   | 1,737       | 1,629       | 4,362           | 1,036               |
| FY15  | 2,411   | 1,729       | 1,666       | 4,139           | 1004                |

*ICE HSI started tracking the number of victims associated with child exploitation investigations in FY2012.*

Key to ICE HSI's fight against child exploitation is its ICE HSI Cyber Crimes Center (C3), Child Exploitation Investigations Unit (CEIU).  The CEIU directs ICE HSI in its mission to investigate producers and distributors of child pornography, as well as individuals who travel abroad for the purpose of engaging in sex with minors, also known as child sex tourism.  The CEIU employs the latest technology to collect evidence and track the activities of individuals and organized groups who sexually exploit children through the use of websites, chat rooms, newsgroups and peer-to-peer

### Dreamboard

In December 2009, the Child Exploitation Section of ICE HSI's Cyber Crime Center (C3) and DOJ's CEOS began Operation Delego, a multi-year investigation targeting hundreds of individuals in countries around the world, for their participation in "Dreamboard"—a private, members-only online bulletin board that was created and operated to promote pedophilia, and encouraged the sexual abuse and exploitation of very young children in an environment designed to avoid detection by law enforcement.

One such member was Brian Musomba Maweu, 52, who was extradited from Kenya to the United States in September 2014 after being charged in the Western District of Louisiana with crimes related to his participation in Dreamboard, in a case handled by CEOS and the USAO in that district. In April 2015, he pleaded guilty to one count of engaging in a child exploitation enterprise. Maweu admitted that, using the online alias "Catfish," he posted 121 messages on the board, including 34 posts containing child pornography that he produced. Maweu was considered a "Super VIP" member of Dreamboard, a designation that was given to members who were prominent on the site and produced their own child pornography. In September 2015, he was sentenced to life in prison.

Operation Delego represents the largest prosecution in history of individuals who participated in an online child exploitation enterprise conceived and operated for the sole purpose of promoting child sexual abuse, disseminating child pornography, and evading law enforcement. Dreamboard members have been arrested on five continents, in 14 different countries. By September 2015, a total of 72 individuals had been charged; 57 of those defendants had been arrested either in the United States or abroad, and 49—including Maweu—had either pleaded guilty or been convicted after trial. Sentences ranged between five years to life in prison.

### Operation Round Table

Operation Round Table is a joint investigation by ICE HSI New Orleans, ICE HSI C3, and the U.S. Postal Inspection Service (USPIS) Baton Rouge into a child exploitation enterprise website operated on The Onion Router or Tor, part of the Dark Internet. The website was primarily dedicated to webcam-captured videos of juvenile boys enticed by the operators of the site to produce child pornography of themselves engaged in sexually explicit behavior. In this case, 50 individuals have been arrested and charged in the Eastern District of Louisiana as the main members operating the child exploitation enterprise site. Additionally, this investigation has led to the identification of 264 minor victims of sexual exploitation.

### Operation Protego

In 2012 ICE HSI, working with the Queensland, Australia Police Service (QPS) and the Royal Canadian Mounted Police (RCMP), initiated an investigation targeting a foreign based image-hosting website. This website is dedicated to the posting of amateur photography. This website has become one of the world's largest image repositories, and while the website caters to legitimate photography enthusiasts, pedophiles have been using the website to meet and trade child sexual abuse material. Because the website is hosted overseas, many suspects believe they are safe from U.S. law enforcement detection and that they are communicating with other pedophiles in a relatively safe online environment. Working with CEOS, ICE HSI secured copies of the website's data set. ICE HSI, under the direction of the C3 Victim Identification Program (VIP), detailed Special Agents and intelligence research specialists to Northern Virginia as part of Operation Protego. Special Agents and analysts assigned to the investigation sifted through user records to identify targets of interest. As a result of this operation, over 1,000 leads were distributed to ICE HSI offices worldwide, resulting in 348 individuals in the United States and 20 individuals from Canada being arrested. Additionally, over 100 minor victims were identified and rescued in North America (89 in the United States and 16 in Canada).

trading.  The CEIU provides assistance to ICE field offices, coordinates major investigations, and conducts undercover operations throughout the world to identify and apprehend violators.

ICE HSI also tracks the number of victims identified or recovered in the course of child exploitation investigations.  This is being done to gain a better understanding of the overall impact ICE HSI has in protecting children from sexual predators.

Current key programs and initiatives include:

Victim Identification Program (VIP)

Although the traditional law enforcement goal in combating child exploitation is often viewed as arresting and prosecuting predators, the true goal is to protect children.  In furtherance of this goal, ICE HSI launched the Victim Identification Program (VIP) in December 2011.  Its mission is to combine technological and investigative capabilities and resources to recover child victims of sexual exploitation.  The VIP is a simple idea that combines traditional investigative techniques with cutting-edge technology for the purposes of rescuing child victims of sexual exploitation.  The victim identification process starts with the discovery of new child abuse material (images, video, and/or audio) which depicts an unidentified minor or minors being sexually abused.  ICE HSI analyzes and enhances the material in order to identify clues that may lead to the identity of the victim, suspect, or geographic location.  When enough clues come together to form a viable lead, the lead is sent out to the appropriate ICE HSI field office for follow-up investigation.  ICE HSI is increasingly dedicating more of its time and resources towards identifying and rescuing the victims of child sexual exploitation and the prevention of these crimes.

Operation Angel Watch

Operation Angel Watch is an international initiative to protect children from sexual predators who have been previously convicted of sex crimes against a child.  Operation Angel Watch provides notification to foreign countries of those individuals previously convicted of child sexual abuse offenses, or production and distribution of child pornography, and who may intend to travel overseas for the purpose of sexually abusing or exploiting minors, a crime known as child sex tourism.  Through Operation Angel Watch, ICE HSI uses publicly available sex offender registry information and passenger travel data to investigate international travelers with child sex abuse convictions who are on the sex offender registry.  When appropriate, ICE HSI strategically alerts foreign law enforcement partners through its ICE HSI Attaché offices of a convicted child predator's intent to travel to their country.  In Fiscal Year 2015, ICE HSI made over 2,100 notifications to more than 90 countries, with a particular emphasis on those countries known to be primary destinations for child sex tourism.

26

The chart below represents Angel Watch totals for the previous three fiscal years.

|  | FY2013 | FY2014 | FY2015 |
|---|---|---|---|
| **Referrals to Foreign Countries** | 1,703 | 2,291 | 2,172 |
| **Denials of Foreign Countries based on referral** | 222 | 493 | 1,067 |

Education/Outreach

*Project iGuardian.*  In the summer of 2013, ICE HSI launched an educational outreach program called Project iGuardian, in conjunction with NCMEC's NetSmartz and the ICAC Task Forces.  Project iGuardian aims to educate kids, teens, and parents about online safety and how to stay safe from online sexual predators.

*Operation Predator Smartphone App.*  In September 2013, ICE HSI launched a new smartphone app —the first of its kind in U.S. federal law enforcement—designed to seek the public's help with fugitive and unknown suspect child predators.  All tips can be reported anonymously through the app, by phone or online, 24 hours a day, seven days a week.  In many cases, ICE HSI has been able to make an arrest just hours after issuing a nationwide plea for public assistance.

Virtual Global Taskforce

ICE HSI is a founding member and the U.S. representative of the Virtual Global Taskforce (VGT), an international alliance of law enforcement agencies and private industry sector partners working together to prevent and deter online child sexual abuse.  In December 2012, ICE HSI was appointed chair and secretariat of the VGT and served until 2015.  The VGT is committed to enhancing global capability and capacity to address online child sexual exploitation.  The VGT aims to support both member and non-member countries worldwide by influencing legislators, industry, and others to build necessary protections for children into the Internet,  implementing the reforms necessary for effective laws, training for law enforcement, and raising public awareness globally.

Since its inception, the VGT has evolved into an international alliance of 13 law enforcement agencies and 15 private industry sector partners, including ICE HSI, who represents the United States of America; the United Arab Emirates Ministry of Interior; Australian Federal Police; the United Kingdom's National Crime Agency/Child Exploitation Online Protection Centre; the Royal Canadian Mounted Police; the Italian Postal and Communication Police Service; New Zealand Police; INTERPOL, Europol, the Korean National Police, the Dutch National Police, and the Swiss Federal Office of Police/Cyber Crime Coordination Unit, and the Colombian National Police.

Relationships with non-government organizations and industry partners on non-operational issues are key to the success of the VGT.  VGT private sector partners on policy and prevention issues include:

End Child Prostitution Child Pornography and Trafficking of Children for Sexual Purposes network, International Association of Internet Hotlines, the National Center for Missing & Exploited Children, the International Centre for Missing & Exploited Children, PayPal, Microsoft Digital Crimes Unit, World Vision, Blackberry, The Code, KINSA, NetClean, Telstra, Kik, ZuiZ, and the International Justice Mission.

<u>NCMEC Partnership & CyberTipline Leads</u>

The CEIU partners work with NCMEC to make available ICE HSI's international contacts and expertise in child exploitation matters.  ICE HSI facilitates the distribution of NCMEC CyberTipline reports after NCMEC has made the reports available to national police agencies worldwide.  Additionally, the CEIU provides assistance with victim identification, international kidnappings, and other matters as needed.

<u>NCVIS 2</u>

The National Child Victim Identification System (NCVIS), version 2, is an application that assists federal, state, local, tribal, and international law enforcement agencies in the investigation and prosecution of child exploitation crimes, specifically those involving images of child sexual exploitation.  NCVIS 2 maintains a repository of digital images of child exploitation seized and/or submitted for comparison by law enforcement agencies.  ICE HSI has expanded the scope of system information that is shared with external law enforcement agencies that maintain their own databases of child exploitation crimes for the purposes of identifying the child victims and supporting law enforcement investigations into and prosecutions of these crimes.

<u>Victim Assistance Program</u>

The agency's Victim Assistance Program (VAP), which also includes the Forensic Interview Program (FIP), is a critical resource to ICE HSI, providing a victim-centered approach that places equal value on the identification and stabilization of victims and the investigation and prosecution of criminals.  During Fiscal Year 2015, VAP devoted substantial attention to strengthening and improving victim services.

At ICE HSI Headquarters, the VAP currently deploys six full-time Forensic Interview Specialists, who are available to support domestic and international investigations involving victims, particularly in the areas of child exploitation and human trafficking.  The primary function of the FIP is to conduct victim-centered, fact-finding forensic interviews.  Forensic Interview Specialists travel around the world conducting forensic interviews, building trust and rapport, and helping provide stability for victims, while obtaining facts based on evidence to support ICE HSI investigations and providing chargeable offenses for Assistant U.S. Attorneys.  Supporting their efforts in the field, ICE HSI also has 23 full-time Victim Assistance Specialists staffed across the country who complement the work of more than 250 collateral-duty special agent Victim Assistance Coordinators.  During Fiscal Year 2015, ICE HSI identified and assisted more than 2,112 crime victims, which included 384 human trafficking victims and 1,004 child exploitation victims.  The three Forensic Interview Specialists staffed during



In August 2012, law enforcement agencies, technology firms, and non-governmental organizations launched "Project VIC" to create efficiencies, adopt innovative technological solutions, and promote a victim-focused methodology to reduce backlogs in forensic analysis of images of sexual exploitation of children. The project also incorporates mental health benefits for personnel responsible for reviewing child abuse material, information-sharing between agencies, and, most importantly, the identification and recovery of child victims.

Project VIC was the result of a meeting among the International Centre for Missing & Exploited Children (ICMEC), ICE HSI, FBI, USPIS and several ICAC Task Forces in which participants identified the need to address inefficiencies and capability gaps that were preventing law enforcement from processing child exploitation data seizures efficiently.

As a result of the volume of data seized in a typical case and lack of state-of-the-art forensic capabilities, law enforcement agencies often only analyze just enough evidence to support and sustain criminal charges against an individual offender. Only reviewing enough content to make a criminal case against the suspect may mean, however, that many images of unidentified child victims go un-reviewed, undetected, and uninvestigated. For example, if an offender has 100,000 images on his computer, it may be image number 99,000 that enables agents to identify and locate a child victim they have never seen before. Project VIC is intended to use technological and other innovations to move from this "offender focused" strategy to one that is "victim focused" in order to lead to the identification of more victims.

Project VIC has therefore partnered with the ICAC Child Online Protective Service to leverage access to a comprehensive set of rich hash sets, providing significant workload reduction at the forensic level. Project VIC has also partnered with the National Criminal Justice Training Center (NCJTC) to leverage its training infrastructure and offer the popular Project VIC-Analyze DI Training. These partnerships ensure the long-term sustainability of a program making a significant difference in the fight against child exploitation in the United States.

Through Project VIC's partnership with non-governmental organizations, Project VIC has sought out and obtained technology donations including PhotoDNA, image visual comparison technology donated by Microsoft Corporation, and F1, video visual comparison technology donated by Friend Media Technology Solutions Inc., both of which provide time savings by identifying visually duplicative image and video files. In addition, Project VIC adopted the OData data exchange protocol, which allows data to be seamlessly exchanged between different products, encouraging information sharing and providing forensic examiners with the ability to utilize multiple tools to forensically analyze cases. By partnering with these forensic vendors and others, Project VIC has created an ecosystem of tools servicing thousands of police agencies concentrating on child exploitation.

Today, Project VIC has thousands of law enforcement users in the United States and 32 countries. These users are taking advantage of the Project VIC hash cloud, tool ecosystem, and more importantly, the victim-centric methodology and workflow. Survey results from a sample of users reported over 250 victims have been identified and over 125 offenders identified as a direct result of Project VIC participation.

Project VIC is currently working to create an interface with NCMEC's Child Recognition and Identification System (CRIS). This interface or will enable investigators the ability to compare newly seized images with seized images previously reported to NCMEC, including material depicting identified and unidentified children. These innovations will have a significant cost-cutting impact for agencies engaged in the detection and prevention of child exploitation.

In the fall of 2015 Project VIC launched a new initiative, Project VIC-International. This initiative looks to promote and grow the information sharing of Project VIC data and innovations globally. Project VIC has already begun work on a bridge to major data sources at INTERPOL and Europol. Other countries have adopted the Project VIC model of information sharing, and victim centric approach to investigations including the United Kingdom, Canada, New Zealand, and Australia.

this same period received a total of 704 referrals, conducted 354 forensic interviews, both domestic and international, and provided 106 case consultations.

Throughout Fiscal Year 2015, training and outreach activities strengthened ICE HSI's multidisciplinary collaboration (e.g., increased victim identification, enhanced delivery of services to all victims, identification of best practices, support of the victim-centered investigation approach, and building stronger prosecution strategies through increased forensic interviews).

- Victim Assistance Specialists located throughout DHS/ICE field offices held a total of 1,087 events providing outreach training to over 21,000 participants from state and local law enforcement and non-governmental organizations. The focus of these events was to raise awareness in combating human trafficking, educating both law enforcement and NGOs on immigration benefits available to victims, victim identification, utilizing a victim centered approach, best practices in rescuing and interviewing victims, working with NGOs, and providing a forum for information exchange and collaboration.

- Forensic Interview Specialists conducted a total of 15 training/speaking engagements throughout the United States, which focused on ICE HSI's Prepare and Predict Protocol utilized in conducting interviews and how to conduct a minimal facts interview of victims of human trafficking and child exploitation.

- VAP staff conducted international delegation briefings to representatives from more than 30 countries focusing on victim identification, forced child labor, protection and assistance to victims of trafficking, child exploitation, and best practices in working with NGOs.

- VAP personnel and/or Victim Assistance Specialists conducted 23 international presentations in support of Trafficking in Persons (TIP) and International Law Enforcement Academy (ILEA) training to foreign law enforcement, prosecutors, and victim service providers. Both TIP and ILEA training focused on combating human trafficking, victim identification, utilizing a victim centered approach, best practices in rescuing and interviewing victims, and working with NGOs.

HERO Child Rescue Corps Program

In April 2013, ICE HSI entered into a partnership with the U.S. Special Operations Command (SOCOM) and the National Association to Protect Children (PROTECT) to launch the "Human

Exploitation Rescue Operative (HERO) Child Rescue Corps" program for wounded, ill, or injured special operations forces.

The 12-month HERO Corps is designed to train, equip, and embed HERO participants into computer forensic intern positions within ICE HSI field offices around the country.  ICE HSI and PROTECT provide funding for the HERO Corps; PROTECT, a non-profit organization, covers the costs of participant travel, equipment and software, and relocation expenses, while ICE HSI provides the computer forensic training, procures vendor specific training and provides hands on field experience and mentorship.  HEROs begin the program by attending three weeks of training provided by PROTECT, which provides an overview of the child sexual abuse problem specifically covering child abuse and trauma, child sexual abuse prevention, prosecution of child sex offenders and coping with the stresses of working in the field of child sexual exploitation prevention.  Following the PROTECT training, the HEROs receive eight weeks of digital forensics and child exploitation investigation training at the ICE HSI C3.  Upon successful completion of both training courses, the HEROs are deployed to ICE HSI field offices for the remainder of the yearlong internship program.  The field internship portion is designed to give the HEROs hands-on experience with ICE HSI Special Agents in locating victims of child sexual abuse and exploitation, identifying the predators that produce, distribute and possess child exploitation material as well as get technical computer experience, such as:

- Conducting the full range of computer forensics lab activities, including imaging and processing digital media; forensic analysis in locating and identifying evidence of child sexual exploitation; validation testing of computer forensic hardware and software and participating in setting up virtualized computer system environments on stand-alone workstations;

- Utilizing specialized technical equipment to discover and analyze deleted or hidden information that may serve as useful evidence in a criminal case;

- Assisting first-responder teams to increase child victim identification; and,

- Preparing detailed written reports outlining forensic findings for case agents, management, and prosecutors; and participating in discovery conferences with prosecutors and defense attorneys to verbally explain and discuss forensic findings.

## C.  U.S. Postal Inspection Service

For more than a century, the U.S. Postal Inspection Service (USPIS) has investigated the sexual exploitation of children when it involves the U.S. mail.  Postal Inspectors specializing in child exploitation investigations provide guidance and assistance to law enforcement agencies throughout the United States and abroad.  From 2010-2015, Postal Inspectors have arrested more than 500 offenders.

Postal Inspectors cooperate with DOJ in investigations and prosecutions.  For example, a Postal Inspector has been assigned CEOS for approximately ten years.  Working side-by-side with CEOS's Trial Attorneys and its HTIU, the inspector is responsible for coordinating USPIS national operations targeting offenders engaged in child exploitation.  In addition, Postal Inspectors often lead workshops and training sessions at DOJ's Project Safe Childhood training programs.  Postal Inspectors also

regularly make presentations and conduct training related to the investigation of child exploitation at conferences of federal, state, local and international law enforcement officers and prosecutors.

Furthermore, a USPIS analyst works out of a NCMEC facility. The analyst is responsible for handling all evidence submissions by law enforcement agencies to NCMEC's CVIP; coordinating all activities related to the Deliver Me Home program (described below); serving as the primary point of contact between NCMEC and Postal Inspectors throughout the country; and performing other duties as assigned by USPIS. The analyst receives and coordinates the thousands of requests by law enforcement for a review of images for known and identified victims. From 2010-2015, the USPIS analyst received and logged more than 16,000 submissions from law enforcement agencies. The USPIS analyst also handles CyberTipline reports made available to law enforcement that indicate the U.S. mail may have been used to facilitate any part of a child's sexual exploitation. From 2010-2015, the USPIS analyst reviewed more than 104,000 CyberTipline reports, 801 of which were distributed to Postal Inspectors for further action.

Deliver Me Home Program

Deliver Me Home is a coordinated activity of NCMEC, USPIS, and the U.S. Postal Service (USPS). Postal Inspectors work with NCMEC and USPS to share resources in locating abducted or missing children. In addition to targeting every household in a designated area, USPIS and NCMEC have augmented the search for missing children by distributing missing child posters to letter carriers. In the last five years, posters for approximately 630 children have been disseminated to letter carriers working in an area where a missing child was believed to be located. Additionally, over the past five years, USPIS has assisted on missing child cases by utilizing USPS databases and personnel to respond to approximately 500 law enforcement requests.

Have You Seen Me?

In partnership with the U.S. Postal Service, Valassis, a leading marketing services company, distributes *Have You Seen Me?* flyers displaying the pictures of missing children to more than 90% of American homes. From 2010-2015, *Have You Seen Me?* flyers reached more than 100 million households each week through the mail, the newspaper, and online. According to NCMEC, these photos are the number one tool parents and law enforcement have in their search for missing children. By featuring recent or age-progressed photos of missing children and their alleged abductors, the program empowers the American public to help safely recover missing children. As a result of leads generated by the *Have You Seen Me?* flyers, about 1,900 of the nearly 3,500 children featured have been recovered.

Digital Evidence Unit (DEU)

The Digital Evidence Unit (DEU) is the principal group responsible for the collection, preservation, and examination of computer digital-evidence in support of all Postal Inspection Service investigations. With offices throughout the country, the unit is led by an Assistant Inspector-in-Charge located at Dulles, Virginia, and is composed of Inspector/Program Managers, Forensic Computer Analysts and Ad Hoc analysts domiciled in each of the 17 USPIS Field Divisions. In addition, there are Audio/Video Forensic Analysts located at the USPIS National Forensic Laboratory.

### Operation Spade

In 2010, USPIS initiated Operation Spade in coordination with the Toronto, Canada Police Service, which dismantled a multi-million dollar commercial child pornography business, called Azov Films. The effort also targeted the purchasers of videos that Azov offered for sale. Most of these videos, which featured young boys and were marketed as "naturist films from around the world," in fact depicted the genitals of nude minors for sexual gratification of the purchasers. Azov Films sold movies online beginning in 2005 and used the U.S. mail to send DVDs to its customers worldwide. Records seized from Azov's business premises and servers during the investigation revealed more than 100,000 customers from around the world who had purchased child pornography through Azov's website, including thousands of customers residing in the United States. Law enforcement estimated that the business's operators earned more than $4 million while the business was in operation. In 2015, Azov's owner and principal operator was tried and convicted in Canada and is awaiting sentencing. Many Azov customers were later arrested and prosecuted, as well, including 106 in the United States, on charges including receipt, possession, and distribution of child pornography and sexual abuse of children.

### Operation Rounder

USPIS conducted Operation Rounder in 2011 in coordination with the ICAC Task Forces in Indiana and Idaho and CEOS's HTIU. This investigation dismantled an Internet chat room dedicated to the distribution, receipt, and possession of child pornography. Its members used the chat room as a forum to discuss and promote the sexual depiction of children. Many of the members had amassed large collections of materials depicting child exploitation and sought to expand their collections and evade law enforcement through the use of data encryption software. The defendants conspired to produce new videos and images which were then distributed to other members within the group. Law enforcement identified nearly 100 children throughout the world as victims of child exploitation and sexual abuse. The group's principals have been tried and convicted in federal court.

Several additional defendants have been charged or are under investigation in other jurisdictions including Canada and Switzerland. One of the leads developed through Operation Rounder led to the identification of a sexually abused child and his adult abusers. The results of this spin-off investigation are highlighted below as "Operation Armada."

### Operation Armada

In coordination with ICE HSI, the FBI, the Indiana ICAC Task Force, and the Queensland Police Service, Australia, in 2012 USPIS conducted Operation Armada, which led to the arrest of the parents of a young boy who was sexually abused and whose abuse was recorded. The victim's parents allowed, on more than one occasion, another adult physical access to the child who was five to six years old at the time of the abuse. The sexual conduct with the victim was video recorded and the images produced were shipped to customers around the world. Postal Inspectors were alerted to the trafficking of materials which led to the identification in 2012 of the victim and the perpetrators involved. All three defendants, the victim's parents and the adult who engaged in sexual conduct with the victim, have been tried and convicted in federal court.

CEOS's HTIU provided investigative support to Operations Spade, Rounder, and Armada. The defendants identified in Rounder and Armada were prosecuted by CEOS and the U.S. Attorney's Office for the Southern District of Indiana.

Digital evidence analysts are tasked with examining computer evidence and any digital media for information or data pertinent to USPIS investigations. Examples of cases that may incorporate this type of evidence are: child pornography/exploitation, homicide, rape, suicide, mail theft, fraud, and identity theft, or other crimes involving the mail or the USPS's employees, infrastructure, or customers. Approximately 27% of the digital forensic work conducted by the DEU involves child exploitation cases. In Fiscal Year 2011, the DEU conducted forensic examinations in 176 child exploitation investigations; in Fiscal Year 2012, it conducted 140; in Fiscal Year 2013, it conducted 375; in Fiscal Year 2014, it conducted 201; and in the first six months of Fiscal Year 2015, it conducted 98. The significant increase in Fiscal Year 2013 was due to a large number of requests submitted in connection with a USPIS-led operation. In addition to processing cases, DEU is available for technical advice and assistance in seizing and preserving evidence at the crime scene.

**D. U.S. Marshals Service**

The U.S. Marshals Service (USMS) plays a unique role in efforts to combat child exploitation though its fugitive apprehension program, Sex Offender Investigations Branch (SOIB) investigations, and missing children recovery operations. This work provides critical support to law enforcement efforts to combat child exploitation and contribute significantly to preventing offenses against children.

USMS's fugitive apprehension program removes thousands of predators from the street every year. Between May 1, 2010 and May 1, 2015, the USMS received approximately 10,000 requests for assistance from law enforcement in fugitive cases involving the sexual exploitation of a child. To date, the USMS has apprehended approximately 9,000 of those fugitives.

USMS conducts these operations on behalf of any state, local, or federal law enforcement agency wishing to delegate apprehension authority for fugitives wanted on child exploitation charges. The agencies are then able to carry on with other investigative duties without expending considerable resources in tracking subjects. The network of USMS fugitive investigators maximizes the likelihood of arrest and contributes towards reducing the time between the date the warrant is issued and subsequent capture.

SOIB combats child exploitation by ensuring convicted sex offenders with a registration requirement are held to their obligation. In 2006 the Adam Walsh Act assigned USMS primary responsibility for locating and apprehending sex offenders who fail to register as required with state sex offender registries and for initiating federal investigations into sex offender registration violations and related offenses in noncompliance of the Act. Effective registration of sex offenders provides parents and law enforcement alike with valuable information about this population of offenders. Registries give families the ability to know if a sex offender lives in proximity to their children and frequently provide law enforcement investigative leads to consider while investigating child exploitation offenses.

Between May 1, 2010 and May 1, 2015, USMS investigators opened 16,320 investigations of convicted sex offenders for violations of the Act and arrested 2,671 individuals on federal sex offender registration charges. USMS closed by arrest 23,986 state/local warrants charging failure to register during that period, and based on USMS's investigations, federal prosecutors obtained 2,375 convictions.

34

Much of this success occurred because of close cooperation between USMS and state and local law enforcement agencies in assuring compliance with registry requirements. Sex offenders who fail to comply may do so in order to avoid detection while reoffending. For this reason, the USMS conducts sex offender specific operations in conjunction with their state and local counterparts to increase sex offender registry compliance and to identify, locate, and arrest those who are non-compliant. Between May 1, 2010 and May 1, 2015 USMS led 1,701 such operations in partnership with 7,710 law enforcement agencies. These operations involved 243,602 compliance checks which resulted in the arrest of approximately 12,232 un-registered sex offenders.

Compliance checks have led to subsequent referrals of possession of child pornography and other child exploitation crimes to FBI/ICE HSI/ICAC and/or state authorities. This multi-pronged departmental approach maintains a consistent level of focus across the broadest spectrum enhancing the overall impact on those who offend.

> **United States v. Bradley Bakken**
>
> On January 29, 2016, Bradley J. Bakken was sentenced in the Western District of Wisconsin to four years' incarceration in federal prison, to be followed by five years of supervised release, for failing to register as required by the Sex Offender Registration and Notification Act (SORNA). Bakken was required to register as a sex offender as a result of a 2005 conviction for third degree sexual assault of a child. On September 4, 2014, a state warrant was issued for his arrest by the Wisconsin Department of Corrections for a probation violation. USMS initiated a federal SORNA investigation and developed information that Bakken had traveled to Arizona and Texas without updating his sex offender registration information. An investigation revealed that Bakken had been working under the table, living in motels, and using an alias to avoid detection. Investigation further revealed that Bakken had never registered his address or place of employment with Texas and that he had not updated his Wisconsin registration to reflect moves to Arizona or Texas or his employment in Texas. Bakken was arrested by USMS in Austin, Texas on April 1, 2015 and pled guilty on October 22, 2015.

Thirdly, USMS has developed specific initiatives that focus on recovering missing children, many of whom are at risk of exploitation. USMS works closely with NCMEC to recover missing and exploited children. A USMS program manager works out of NCMEC's facility to coordinate USMS support for law enforcement in fugitive cases involving missing children. This work has resulted in the recovery of more than 600 children since its inception in 2005. Between May 1, 2010 and May 1, 2015, this USMS program recovered 427 children. In the future, USMS plans to expand its support for its law enforcement partners on missing and exploited children cases, particularly in the area of targeting fugitives and registered sex offenders associated with child sex trafficking offenses.

## E. DOJ Child Exploitation and Obscenity Section

DOJ's Child Exploitation and Obscenity Section (CEOS), situated within the Criminal Division, consists of 32 personnel, including 20 attorneys, a seven-person High Technology Investigative Unit (HTIU), an investigative analyst, a child victim-witness program coordinator, paralegals, and

administrative staff.  CEOS leads the Criminal Division's campaign against the sexual exploitation of children by shaping domestic and international policy, providing guidance and training to other prosecutors and law enforcement agents, and by identifying trends in online technology, initiating proactive national and international investigations, and employing first-of-their-kind investigative and prosecutorial tactics and techniques.  In Fiscal Years 2013, 2014, and 2015, CEOS spearheaded 14 national and international operations that have resulted in the investigation of over 2,600 individuals in the United States and generated leads against more than 8,000 foreign suspects.

CEOS partners with all USAOs and federal law enforcement agencies, as well as foreign law enforcement, to operate nationally and transnationally, and with key non-governmental organizations, foreign governments (through bilateral and multilateral efforts, and through international police organizations such as INTERPOL and Europol) and foreign entities such as the Group of Eight (G8), the Global Alliance Against Child Sexual Abuse Online, and WePROTECT.  CEOS also engages the private sector in order to help technology companies find ways to fight child sexual exploitation.

CEOS's HTIU provides critical, innovative case support for this work, both in individual cases and in systematically improving law enforcement's response to these technological challenges.  Examples of HTIU's cutting-edge work include the development of a protocol to proactively mitigate offender's use of encryption; the design of an efficient working model to handle cases with exceptionally large volumes of media; the development of forensic approaches to identify offenders who use mobile applications and methods of conducting investigations on anonymous networks.

Investigation and Prosecution of Child Exploitation Crimes

*National Operations and other Child Pornography Investigations*

In recent years, CEOS has focused on addressing the challenges posed by mass migration of child pornography offenders to anonymous Internet hosts, and the increased utilization of both cloud storage (often hosted in foreign countries) and encryption by many child exploitation offenders.  CEOS also specializes in launching nationwide and international operations targeting organized groups of child sex offenders located all over the country and the world.  These cases frequently involve highly sophisticated offenders who have banded together into tight-knit, secretive online groups that operate by strict security protocols and with high suspicion of newcomers or potential infiltrators.  Members of these groups trade child pornography, some of which they may have produced themselves.  Often, they have prior convictions for sex offenses against children or are currently molesting children.  Their technological sophistication and use of the Internet as a social support network renders them especially dangerous, as they collectively reinforce and normalize their shared sexual interest in children.

Within the past three fiscal years, CEOS-led operations have resulted in individual investigations of several thousand American child exploitation offenders, as well as numerous foreign offenders, who had admitted to, promoted, or otherwise shown interest in the sexual abuse of children.

36

*Child Sex Trafficking*

Cases involving the sex trafficking of children target defendants who ensnare minors into the sex trade. Successful prosecutions frequently turn on the testimony of the child victims, who have suffered extreme forms of psychological and physical abuse at the hands of their traffickers, who may have been physically, mentally, or sexually abused, who may lack any normal familial structure, and who may be addicted to drugs, in many cases because their trafficker provided the drugs to them as a means of controlling them. Such cases are often extremely difficult to prepare, requiring extensive rapport-building with critical witnesses, which is made more difficult by the severe shortage of secured housing and services for these young victims.

CEOS has also focused on prosecuting offenders who facilitate the online sex trafficking of minors. In 2014, CEOS and the Northern District of California secured convictions against two defendants in connection with their operation of myredbook.com ("myRedBook"), a website that facilitated prostitution. MyRedBook purported to provide "Escort, Massage, and Strip Club Reviews," but in fact hosted advertisements for sex workers—as well as some for minor sex trafficking victims—complete with explicit photos, lewd physical descriptions, menus of sexual services, hourly and nightly rates, and customer reviews of the sex workers' services. Although the website could be accessed for free, myRedBook charged fees for premier placement of prostitution advertisements, and also sold "VIP Memberships," which purportedly allowed customers access to "private forums" and heightened capabilities to search reviews of the prostitution services. According to an affidavit submitted in connection with the sentencing hearing, the FBI identified more than 50 juveniles who were also advertised on myRedBook for the purpose of prostitution. Furthermore, despite being contacted by NCMEC in 2010, myRedBook never registered to participate in the Center's CyberTipline, which receives leads and tips regarding suspected crimes of sexual exploitation committed against children, and never communicated with NCMEC. In May 2015, myRedBook's owner and primary operator Eric Omuro was sentenced to 13 months in prison and ordered to forfeit $1.28 million dollars. It is believed to be the first federal conviction of a website operator for facilitation of prostitution.

*Child Sex Tourism*

"Sex tourism" is a euphemism for when Americans go abroad to sexually abuse foreign children. Offenders often travel to impoverished countries like Cambodia, Honduras, or the Philippines, where they seek to take advantage of inadequate laws, weak law enforcement responses, and corruption. Perpetrators include humanitarian workers, U.S. government employees working abroad, and convicted sex offenders who have relocated to foreign countries to escape sex offender registration requirements. Such cases can be extremely difficult to prosecute, primarily because most of the evidence and witnesses are in foreign countries, and the witnesses often lack stable housing and food. As trial approaches, it is often necessary to bring not only the victims to the United States, but also their parents as well, making extensive preparation a necessity. Success is achieved through robust participation by U.S. law enforcement and prosecutors on the ground in targeted foreign countries, and in increasing the capacity of foreign law enforcement to detect and identify these offenders.

Though they may think they are evading U.S. law enforcement, countless offenders have been identified and successfully prosecuted by CEOS in cooperation with domestic and foreign law enforcement partners. For example, CEOS collaborated with the Southern District of Florida on the prosecution of Matthew Andrew Carter. Following a jury trial, Carter was found guilty of five counts of traveling in foreign commerce from the United States to Haiti for the purpose of engaging in illicit sexual conduct with children and one count of attempting to do so. From 1995 to 2011, Carter resided in and operated the Morning Star Center near Port-au-Prince, Haiti. The Morning Star Center was a residential facility that provided shelter, food, clothing, and school tuition to impoverished children from families who could not afford to feed, educate, or support them. Evidence at trial revealed that Carter specifically targeted these children due to their substantial vulnerability. Carter forced these children to comply with his sexual demands and required children to participate in sexual acts in order to receive food, remain at the Center, and/or to receive school tuition payments. Through the investigation and prosecution, evidence was established that Carter had been sexually abusing children for three decades on three different continents. In July 2013, he was sentenced to 165 years in prison followed by a lifetime of supervised release and was ordered to pay $20,560 in restitution to three dozen Haitian victims.

<u>Supporting Victims</u>

Victims of the distribution, receipt, and possession of child pornography are uniquely affected by the offenses, as the nature and mechanics of the crime necessarily mean that they are implicated in endless cases around the country. CEOS has worked closely with its partners to develop and implement a victim-centered approach to afford these victims their rights under the law in a sensitive and efficient way. For example, CEOS developed and maintains on its intranet site the Victim Impact Statement Application (VISA), which was designed and developed by HTIU. VISA collects all victim statements submitted by victims of child pornography possession, receipt, distribution and transportation offenses, and provides secure access to those statements to PSC Coordinators and Victim-Witness Coordinators in each U.S. Attorney's Office. In Fiscal Year 2015 alone, victim impact statements were downloaded 9,085 times from VISA by Assistant U.S. Attorneys (AUSAs) and Victim-Witness Coordinators throughout the country.

CEOS has also worked tirelessly to address restitution in child pornography cases. In 2009, child pornography victims began to request restitution, as mandated by law, from defendants who distributed, received, or possessed their images. See 18 U.S.C. § 2259. Never before in the federal criminal justice system had a victim sought restitution, under any statute, from multiple defendants in unrelated cases in multiple districts, which poses a number of legal and procedural challenges. CEOS launched a comprehensive response to this issue. The first step was to provide litigation support to the field. CEOS has provided training in this area numerous times, and issued guidance in the form of newsletter articles, emails to the field, and sample briefs and responses. In addition, CEOS maintains a database, collected from AUSA submissions, of restitution awarded to all victims of federal child pornography possession, receipt, distribution, and transportation offenses. This database is regularly used by AUSAs in responding to questions posed by judges during restitution proceedings.

*United States v. Matthew Durham*

The Upendo Children's Home, in Kenya, assists neglected children. Founded by a U.S. citizen who lives in Edmond, Oklahoma, members of an Oklahoma church community often volunteer there. Defendant Matthew Durham, from Edmond, volunteered a number of times, beginning in 2012, when he was 17 years old. He and the other volunteers stayed with sponsor families in Nairobi and did not stay overnight at the Children's Home. However, in the spring of 2014, when Durham was 19 years old, he traveled to Kenya to volunteer at the Children's Home and requested to sleep at the facility.

In June 2014, the live-in caretaker began finding Durham in bed at night with the children. She questioned them, and they disclosed that Durham had sexually molested them. Durham initially denied the allegations, but he ultimately confessed to the founder and a group of church members. His victims were both boys and girls, between the ages of four and nine years old. He described taking the children into the bathroom, holding them down, and anally abusing them. He also admitted forcing a young boy to perform oral sex on him, making some children watch while he molested others, and ejaculating on children.

With the assistance of the U.S. Embassy in Kenya, the U.S. Department of State, and the Kenyan National Police, the FBI began investigating Durham even before he returned to the United States, and he was arrested upon arrival. Subsequently, a grand jury in the Western District of Oklahoma charged Durham with 17 counts related to his molestation of eight different victims, boys and girls ranging in age from five to 15 years old. Charges included interstate travel with intent to engage in a sexual act with a minor under 12; traveling between the United States and Nairobi for the purpose of illicit sexual activity with minors; and traveling from the United States to Nairobi and engaging in illicit sexual activity with minors while there.

Despite his confession, Durham vigorously fought the charges against him. After his return to the United States, Durham claimed that he was powerless against his inner demon, whom he named "Luke," who whispered in his ear and took him over at night while he was asleep. He claimed he had no memory of the crimes and that he might have "Dissociative Personality Disorder." He claimed to the media that "some sort of pseudo-tribal psychological voodoo" was practiced on him. He also claimed that he had been framed by the founder of the children's home and her "criminal" associates, and that they had coerced his confession.

The case was complicated by the fact that the prosecution team had a very short time frame to prepare the Kenyan doctors and the children for trial, because these witnesses—including six child victims—only arrived in the United States five days prior to trial. However, when the children arrived in the United States, they were greeted by an outpouring of support from the local Oklahoma community. Churches opened the doors to make space available for interviews, provided food and offered an environment for the children to play between interviews. Several families even opened up their homes to allow the children to stay together in a warm, comforting environment rather than the cold confines of a hotel.

In June 2015, Durham was convicted at trial on seven counts of traveling from the United States to Nairobi and engaging in illicit sexual activity with minors while there. On March 7, 2016 he was sentenced to 40 years' incarceration. He was also ordered to pay more than $15,000 in restitution to the victims.

Training and Outreach

A critical part of CEOS's mission is to provide extensive guidance and training to AUSAs and agents around the country and the world who are working child sexual exploitation cases. This guidance, which takes the various forms described below, covers a wide range of topics such as (1) developing and presenting computer forensic evidence at trial; (2) addressing recurring defense strategies; (3) how to effectively use the specialized statutes and Rules of Evidence that apply to child sexual exploitation cases; (4) the novel issue of victim restitution in non-contact child pornography cases; and many other topics. In Fiscal Year 2014, CEOS provided training more than 30 times in various domestic and international venues, to thousands of federal, state, and local prosecutors and investigators, including many foreign officials.

For example, CEOS and HTIU offer extensive, nationwide in-person training through their participation in national conferences. CEOS helped design and host a course held in November 2015 at the National Advocacy Center (NAC) entitled Investigating and Prosecuting the Prostitution of Children, which was attended by approximately 60 AUSAs. CEOS also helped develop and sponsor the Project Safe Childhood (PSC) Advanced Online Child Exploitation Seminars, which took place in June 2014 and August 2015 at the NAC, attended by approximately 80 AUSAs each. CEOS helped design and host other courses at the NAC as well, including the September 2012 PSC Computer Forensics Advocacy Seminar and the February 2013 PSC Sentencing Seminar.

In June 2015, CEOS Trial Attorneys and Digital Investigative Analysts addressed nearly 2000 federal, state, and local agents, prosecutors, and victim specials at the OJJDP-sponsored national law enforcement training on child exploitation in Atlanta, Georgia.

CEOS also travels abroad to provide training for investigators, prosecutors, judges, and non-governmental organizations. Examples include the "Child Sex Tourism: Getting to Disclosure" conference in Tapachula, Chiapas, Mexico; the 21st Pan American Child Congress; trainings at the U.S. Embassies in Manila and Taiwan; ECPAT Taiwan's May 2014 "Conference on Combating Commercial Sexual Exploitation of Children"; a training sponsored by The Exodus Road Coalition, a coalition of 16 organizations operating in Southeast Asia and India to combat child sex trafficking in those regions; and the "Counter-Trafficking Investigations, Surveillance and Operations Conference" held in Thailand.

CEOS consults with numerous foreign delegations in the United States to discuss efforts to enhance worldwide efforts against child sexual exploitation crimes, including commercial sexual exploitation of children. These delegations have included prosecutors, judges, law enforcement, and non-governmental organizations from Israel, Lithuania, Bangladesh, Lithuania, Mexico, Bahrain, Lebanon, Oman, the Philippines, Spain, Argentina, Qatar, Turkey, South Korea, Japan, and Georgia. The meetings are usually organized by the Office of Overseas Prosecutorial Development, Assistance, and Training as part of the Department of State-sponsored International Visitor Leadership Program.

Finally, CEOS provides other resources as well, including a quarterly newsletter distributed to AUSAs and federal agents, a case digest summarizing the federal cases addressing significant child exploitation topics, and an intranet site, accessible by all USAOs and Main Justice components, with links to a variety of resources.

International Coordination

CEOS works extensively with a variety of international agencies to develop an effective global response to the sexual exploitation of children. For example, in December 2012, then Attorney General Eric Holder and the European Commission's Commissioner for Home Affairs Cecilia Malmstrom launched the Global Alliance Against Child Sexual Abuse Online, which seeks to unite countries through its high-level ministers around the shared goals of enhancing efforts to identify victims, to investigate online cases, to reduce the availability of child pornography online and the re-victimization of children, and to increase public awareness of the risks posed by children's activities online. On September 29-30, 2014, the United States hosted the Alliance's Second Ministerial Conference in Washington, D.C., which was attended by representatives of 37 of the Alliance's 54 member countries.

CEOS also serves on the governing board of WePROTECT, which is supported by more than 50 countries, 26 leading technology companies and 10 non-governmental organizations. The goal of WePROTECT is to develop a coordinated global response to the proliferation of child sexual abuse material in circulation on the Internet. Following a summit which took place in December 2014, 47 countries, including the United States, endorsed a Statement of Action pledging global action to identify and protect victims of online child sexual abuse, to remove child sexual abuse material from the Internet, to strengthen international cooperation to apprehend perpetrators, and to build global capacity to tackle the sexual exploitation of children online.

On October 7-9, 2013, the United States and United Kingdom jointly held a global symposium in London to raise awareness for G8 members and others of the phenomenon of transnational child sex offenders, share knowledge about the methodologies in addressing the issue, reach an agreement of initiatives for advancing communications, raise awareness of virtual travel across the web, and identify any area of concern for action. This symposium was attended by G8 member countries, as well as Brazil, Australia, the Europol Cybercrime Center, INTERPOL, and NGOs from Cambodia and Canada. The symposium focused working together through use of a consistent terminology to describe child exploitation, information sharing through INTERPOL and Europol, partnerships among law enforcement, non-governmental organizations, and the digital and Internet industries, and sharing best practices between the G8 countries on the one hand and countries with less developed criminal justice responses on the other. In addition, in December 2013, the United Kingdom and United States formed a Taskforce to Counter Online Child Exploitation to explore technological solutions, in collaboration with an Industry Solutions Group of private sector experts

## F. U.S. Attorney's Offices

The 94 U.S. Attorney's Offices (USAOs) across the country prosecute crimes against children as part of the Project Safe Childhood (PSC) program. With support from the Executive Office for U.S. Attorneys (EOUSA) and CEOS in Washington, DC, each U.S. Attorney guides the entire law enforcement community in his or her district to work as a cooperative team to combat sexual exploitation of children.

Each USAO has a PSC Coordinator, an experienced AUSA who provides a single point of contact for law enforcement agencies investigating any federal child sexual exploitation crime. In addition, a

growing number of AUSAs work on PSC cases.  These AUSAs are represented and supported by the National PSC Coordinator at EOUSA.  PSC prosecutors communicate extensively with each other through the PSC ListServ and through trainings at the National Advocacy Center, and with CEOS, capitalizing on the collective expertise of USAOs and the PSC network of individuals committed to fighting child exploitation.  This enables the AUSAs to prosecute increasingly sophisticated and dangerous offenders and to provide guidance and training to federal, state, local, and tribal government and non-government PSC coalition partners.  These AUSAs serve on the front lines as the go-to prosecutors for federal child sexual exploitation offenses, whether investigated by federal, state, local or tribal agencies.  They perform outreach to schools and local community entities on child safety.  And they serve as the coordinator for district resources coordinating the efforts of all federal, state, local, and tribal resources dedicated to child sexual exploitation.

---

### United States v. Gregory Bogomol

High school teacher Gregory Bogomol posed as a teenage girl on social media to initiate conversations with teenage boys.  On applications such as Kik and Pinger, Bogomol used his female persona to flirt with the boys, persuading them to send compromising pictures of themselves.  When they sent the pictures, however, Bogomol began blackmailing them for more explicit images and videos.  If a boy refused to comply with Bogomol's demands, Bogomol would threaten to send the images he had already received to the boy's friends and sports coaches.

Fear and shame kept most of Bogomol's victims silent.  However, one teenage victim finally told his parents about the "girl" who was harassing him for nude photographs, and the boy's parents reported the information to law enforcement.  ICE HSI worked quickly to identify Bogomol.  When confronted, Bogomol confessed, acknowledging that he had posed as a girl and coerced boys into sending him nude images.  By then, however, he had exploited at least 20 teenage victims.  Many of the boys did not know their blackmailer's identity until they saw media reports of Bogomol's arrest, or until they were contacted by ICE HSI.  ICE HSI worked tirelessly to identify Bogomol's victims, tracking them down via photographs found in Bogomol's possession or through the statements of other victims, to ensure that they were safe, and received the services they needed.

Charged in the Northern District of Texas, in October 2014, Bogomol pled guilty to two counts of production of child pornography; he received a sentence of 60 years imprisonment.  As result of the investigation, Bogomol also faces state charges for sexually assaulting two minors.

---

First established in 2006 as a coordinated prosecution and training effort, PSC was initially focused on technology-facilitated crimes against children.  In 2011, PSC was expanded from its original focus to include every type of federal crime involving sexual violence against children.  Following the expansion, each U.S. Attorney conducted a threat assessment in his or her district and developed a strategic plan for addressing PSC crimes, which was coordinated through DOJ headquarters for consistency across all districts.  These plans not only include ways to improve investigations and prosecutions of child sexual exploitation, but also address the integration of victim services and support into the PSC coalitions.  Furthermore, each district's victim assistance staff has been trained to ensure

### Oceanside Crips Prostitution Enterprise

Throughout 2010-2011, a multi-agency task force in San Diego County, California, including the FBI, ICE HSI, and state and local law enforcement, conducted Operation Vice Grip, investigating the Oceanside Crips. While engaged in traditional gang-related activity, such as attempted murder and drug trafficking, in recent years the Oceanside Crips increasingly focused on pimping and prostituting adult and juvenile females in northern San Diego County. Gang members, associates, and facilitators carried out prostitution activities, primarily in and around low-cost motels in Oceanside, California. Gang-controlled prostitution spawned a "pimping" subculture, known as "The Game," which operated under a set of strictly observed rules, with consequences for individuals who violated them—including physical abuse and public humiliation. Pimps and "bottoms" (pimps' most trusted/senior prostitute) promoted and managed prostitution activities. They heavily recruited new victims, focusing on vulnerable juvenile females who were runaways or from broken homes. Pimps and bottoms also conducted extensive online recruitment via various social networking websites, including MySpace, Facebook, and Twitter. The organization's pimps routinely provided newly recruited victims with controlled substances and alcohol in order to manipulate their loyalty and increase productivity as related to prostitution. Once these victims became dependent on the pimp, they were sometimes sold, traded or "gifted" to other pimps.

One of the victims of the Oceanside Crips was a 13 year old girl who had run away from home. Alone and vulnerable, she was easy pickings for the Oceanside Crips. They took her in, provided her with shelter and food, but then quickly "turned her out" to engage in prostitution. Defendants prostituted her on El Cajon Boulevard, one of the major "tracks" in San Diego, making her turn the money she made over to them. Thanks in part to this investigation, she has now been reunited with her family.

In 2011, a federal grand jury in the Southern District of California indicted 38 gang members, associates, and facilitators with engaging in a pattern of racketeering activity (RICO) through, among other things, the prostitution of minors. Among those charged with facilitating the enterprise's prostitution activities were two individuals and one LLC who owned and operated the Oceanside Travelodge hotel, where the enterprise prostituted minors and adults. The indictment also alleged the criminal forfeiture of the hotel.

Between 2011 and 2013, 35 defendants were convicted of RICO-related offenses. Among them were Hitesh Patel and Vinod Patel, who admitted to allowing gang members and associates to rent rooms at the Oceanside Travelodge, using other people's identification, knowing that illegal activity including prostitution would occur in those rooms. The Patels rented specific areas and rooms within the hotel to the enterprise, so that the illegal activity was segregated from legitimate customers, and commonly charged enterprise members and associates higher room rates in exchange for permitting the enterprise's prostitution activities to be conducted at the Travelodge. At times, the Patels actively facilitated the enterprise by warning enterprise members and associates of law enforcement activity or inquiries. On September 24, 2012, Vinod Patel was sentenced to a time served sentence and agreed to pay $100,000 to five charities that provide services to trafficking victims in lieu of a fine. In addition, Travelodge, owned by Wyndam, terminated their lease with the Patels. The sentences for the defendants who engaged in prostitution themselves varied; for example, one defendant received a sentence of more than 14 years' incarceration for his role in the enterprise, including an attempted murder he committed on its behalf.

child victims have access to services aimed at addressing their unique and challenging needs and to coordinate their efforts with the Victim Assistance Specialists/Victim-Witness Coordinators within the PSC coalitions' law enforcement agencies.

As a result of the expanded PSC program, the number of federal child exploitation prosecutions has increased significantly, along with the number of federal, state, local, and tribal convictions, and the number of victims being identified.  In Fiscal Year 2014, the 94 USAOs filed 3,248 indictments against 3,422 defendants, representing a 31% increase over Fiscal Year 2010.

## G.  INTERPOL Washington

INTERPOL Washington, a component of DOJ, is designated by the Attorney General as the official U.S. representative to the International Criminal Police Organization (INTERPOL).  As the national point of contact for INTERPOL in the United States, INTERPOL Washington routinely exchanges criminal investigative data with international counterparts on behalf of the more than 18,000 federal, state, local, and tribal law enforcement agencies in the United States.  INTERPOL Washington is uniquely positioned within the interagency process to facilitate secure and immediate international communications and information sharing between domestic and foreign law enforcement agencies which is critical in the global fight against child exploitation.  In this role, INTERPOL Washington is capable of instantly providing criminal intelligence and investigative leads from worldwide sources to all U.S. agencies assigned to INTERPOL Washington, which includes DOJ, Department of State (DOS), FBI, ICE HSI, USMS, and all relevant state and local liaison offices.
Key child protection efforts at INTERPOL Washington include:

- Providing support to USMS and other federal, state, local and tribal law enforcement agencies charged with locating and apprehending fugitive and non-compliant sex offenders;

- Tracking convicted sex offenders who relocate, visit, or are deported to foreign countries;

- Tracking convicted sex offenders who relocate or visit the United States from foreign countries;

- Utilizing the INTERPOL Notice System and I-24/7 Global Communications System, a secure messaging system, to exchange investigative information and requests for assistance to locate and identify victims and witnesses, combat sex tourism, and locate missing and abducted children;

- Providing ICE, FBI, and other law enforcement agencies with international investigative assistance, which includes combating the distribution of child sex abuse images via the Internet and identifying known victims;

- Supporting NCMEC in locating missing children, publishing international alerts on missing children, disseminating international CyberTipline leads, and collaborating with DOS and domestic and foreign law enforcement to return these children;

- Maintaining the INTERPOL International Child Sexual Exploitation Database (ICSE), which allows investigators to compare newly seized images of child pornography to those already known to the international law enforcement community in order to identify new victims and

recover them from ongoing abuse.  It currently contains over 650,000 images reported by 45 countries and has led to the identification of over 7,100 child victims; and,

- Issuing Green Notices against child sex offenders.  These notices serve as international warnings about subjects who are assessed by national law enforcement authorities as continuing threats to public safety or may commit other criminal offenses.  To date, INTERPOL Washington has published 6,455 such notices on deported child sexual predators in support of ICE HSI's Operation Predator.

## H. Bureau of Prisons

The Bureau of Prisons (BOP or the Bureau) houses a substantial number of individuals with a current or prior conviction for a sexual offense.  As of January 1, 2016, such individuals comprise approximately 12.1% of the Bureau's total population, including inmates who victimized children, adults, and, in many cases, both.  The agency offers reentry programs which afford sexual offenders in Bureau institutions the opportunity to change their behavior patterns, thereby reducing criminality and recidivism and increasing the likelihood that they will become productive, law-abiding citizens.  This approach is guided by a respect for victims of sexual abuse, and is based upon the belief that treatment services for sexual offenders can increase their ability to live healthy, non-abusive lives with the ultimate goal of making communities safer.

The Bureau's population of sexual offenders is heterogeneous with regard to victim type (child versus adult), as well as many other offense characteristics.  Consistent with the programming models found in other correctional settings, all sexual offenders receive services under an integrated model, in which offenders who victimized both children and adults are housed and receive services together.  All participants are evaluated to determine their unique programming needs, to include specific factors related to their offense and their choice of victim.  In addition, as discussed below, program participation is stratified by the offender's assessed level of risk, ensuring that low and high risk offenders receive services in separate program tracks.

<u>Programs for Sentenced Sexual Offenders</u>

The Bureau offers the Sex Offender Management Program (SOMP) at nine institutions, with a current staffing complement of 43 full-time positions.  SOMP institutions are responsible for coordinating four program components addressing the treatment and management needs of sexual offenders.  The four components, described in detail below, are: 1) treatment, 2) assessment, 3) specialized correctional management, and 4) population management.  Participation in treatment services is voluntary; however, high risk sexual offenders are strongly encouraged by staff to volunteer.  Although high risk sexual offenders are the primary recruitment target population, any inmate with a history of sexual offending is eligible to participate in treatment services.  Inmates at non-SOMP institutions who volunteer for treatment are transferred to a SOMP facility.  To maximize continuity of care during transition to the community, treatment is ordinarily provided in the final three years of the inmate's sentence.

At SOMP institutions, sex offender treatment is stratified into two levels of program intensity and duration: a high-intensity program for high risk offenders, and a moderate-intensity program for all other treatment participants. The Residential Sex Offender Treatment Program (SOTP-R) is a high intensity program with a cognitive-behavioral emphasis, designed for high risk sexual offenders. The program is 18 months in duration, with treatment activities occurring at least four days per week. The Non-Residential Sex Offender Treatment Program (SOTP-NR) is a moderate intensity program designed for low to moderate risk sexual offenders. A significant number of inmates who volunteer for the SOTP-NR are first-time offenders serving a sentence for an Internet sex crime. The SOTP-NR shares the SOTP-R's program content, but lacks the frequency of treatment groups and is 12 months in duration, with treatment activities occurring between two and three times per week. Unlike the SOTP-R population, which is housed together in a modified therapeutic community, SOTP-NR participants reside in the institution's general population.

The content of programming for both SOTP-R and SOTP-NR addresses empirically-demonstrated risk factors for re-offending in sexual offenders, especially the effective self-regulation of deviant sexual urges and the replacement of antisocial attitudes and beliefs with pro-social alternatives. Difficulties in emotional self-regulation, intimacy skills deficits, anger management problems, and substance abuse are additional treatment targets. The cognitive-behavioral approach employed in Bureau sex offender programs has been proven effective with correctional populations in numerous studies.

Female sexual offenders receive services at the SOTP-NR at the Federal Medical Center in Carswell, Texas. This program is based on a modified version of the cognitive behavioral techniques used with males, but also incorporates additional treatment elements to fully address the unique needs of this population. The SOTP-NR at FMC Carswell ordinarily is provided over the course of an 18-month period.

Inmates who complete the SOTP-R or SOTP-NR receive an evaluation summarizing their progress in treatment. A report based on this assessment is provided to U. S. Probation and Pre-Trial Services to aid in release planning and supervision. To ensure that treatment completers maintain positive behavioral changes following their release, community treatment services are afforded to inmates in Residential Reentry Centers and on home confinement. Inmates completing the SOTP-R and SOTP-NR are expected to participate in community treatment services. These services consist of group or individual sessions provided on an outpatient basis by a contracted treatment provider. An outcome evaluation of the Bureau's SOTP has been implemented, and is currently awaiting follow-up data on treated offenders and a comparison sample.

High-risk sex offenders at SOMP institutions who decline or fail to complete treatment receive discharge evaluations prior to their return to the community. Discharge evaluations are risk assessments which recommend strategies for the effective management of the offender in the community. These reports are provided to U. S. Probation and Pre-Trial Services to aid in release planning and supervision, thereby contributing to public safety.

A proportion of sexual offenders in Bureau institutions attempt to engage in conduct indicative of ongoing deviant sexual interests and behavior. In these cases, SOMP institutions may impose

46

Correctional Management Plans (CMP) on sex offenders who engage in risk relevant behavior while in Bureau custody.  Risk relevant behavior refers to conduct related to a sexual offender's history that indicates a risk of future sexual offending upon release.  For example, offenders convicted of the possession of child abuse images are subject to property restrictions to preclude their access to photographs or drawings of children.  Similarly, contact sexual offenders who attempt to communicate with former abuse victims, or to initiate contact with a potential new victim, are subject to telephone or mail restrictions.

Behavioral Sciences Research

BOP personnel conduct valuable research in child exploitation that helps inform law enforcement agents, prosecutors, and corrections officers.  Bureau staff recently published an article examining the personality characteristics of inmates convicted of Internet child pornography offenses. The authors found that online offenders tend to display interpersonal deficits and depression but demonstrate lower measured levels of dominance and aggression when compared to child molesters and non-sexual offenders.[3]   A second article authored by Bureau staff examined recidivism rates of Internet child pornography offenders compared to contact offenders, noting that child pornography offenders, as a group, showed lower rates of re-offense for most measures of recidivism.[4]   A third publication, examining the psychosocial histories and offense character-istics of female sexual offenders in the federal prison population, is currently under review.   In addition, Bureau staff have presented research findings at the annual conference of the Association for the Treatment of Sexual Abusers (ATSA).[5]   Additional proposed research projects are being developed, including the validation of treatment modules for Internet child pornography offenders, the development of actuarial instruments to assess recidivism risk among Internet offenders, and the psychosocial characteristics and offending patterns of female Internet sexual offenders.

Programs for Civilly-Committed Sexual Offenders

*Sex Offender Certification Review Branch*

The Sex Offender Certification Review Branch was established in connection with the Adam Walsh Child Protection and Safety Act of 2006.  The branch reviews inmates to determine whether the necessary conditions are met for civil commitment as a Sexually Dangerous Person, defined as an

---

[3] Magaletta, P. R., Faust, E., Bickart, W., McLearen, A. M. (2014).  Exploring clinical and personality characteristics of adult male Internet-only child pornography offenders.  International Journal of Offender Therapy and Comparative Criminology.  58(2): 137-153.

[4] Faust, E., Bickart, W., Renaud, C., & Camp, S. (2014).  Child pornography possessors and child contact sex offenders: A multilevel comparison of demographic characteristics and rates of recidivism.  Sexual Abuse: A Journal of Research and Treatment. 1 – 19. doi: 10.1177/1079063214521469

[5] Faust, E., Jimenez, A., & Bickart, W. (2007, October).  Implementation of civil commitment for sex offenders in the federal prison system.  Paper presented at the 26th Annual Conference for the Association for the Treatment of Sexual Abusers, San Diego, CA.; Faust, E., Renaud, C., & Bickart, W. (2009, October).  Predictors of re-offence among a sample of federally convicted child pornography offenders.  Paper presented at the 28th Annual Conference for the Association for the Treatment of Sexual Abusers, Dallas, TX.

individual who suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation.  See 18 U.S.C. § 4247 (a)(5),(6).   All sex offenders released from Bureau custody are formally reviewed prior to the end of their sentence.  Inmates who meet the criteria stipulated under the Adam Walsh Act are referred to federal prosecutors to pursue civil commitment proceedings.  An inmate determined by a court to be a Sexually Dangerous Person is transferred to the Commitment and Treatment Program.

*Commitment and Treatment Program*

The Bureau's Commitment and Treatment Program (CTP) seeks to reduce the incidence of sexual violence and child molestation in society, pursuant to Title III, Section 302 of the Adam Walsh Child Protection and Safety Act of 2006 (codified at 18 U.S.C. § 4248).  The CTP fulfills this mission by confining and providing comprehensive treatment services to individuals civilly committed as Sexually Dangerous Persons.  The purpose of the therapeutic confinement is to assist these individuals in developing effective self-management skills, and to prepare them for productive and crime-free lives upon conditional discharge and release to the community.  To date, a total of 63 inmates have been committed under Section 4248, with 61 committed in the last five years.

## I. Office of Justice Programs

Within DOJ's Office of Justice Programs (OJP) several components address child exploitation as part of their work.

### Office of Juvenile Justice and Delinquency Prevention (OJJDP)

OJP's Office of Juvenile Justice and Delinquency Prevention (OJJDP) provides national leadership, coordination, and resources to prevent and respond to juvenile delinquency and victimization.  OJJDP supports states and communities in their efforts to develop and implement effective and coordinated prevention and intervention programs.  OJJDP provides extensive training and technical assistance to state, local and tribal law enforcement regarding children's issues.  Additionally, OJJDP provides funding and training support for the ICAC program.  The ICAC program helps state, local and tribal law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children.  This support encompasses forensic and investigative components, training and technical assistance, victim services, prevention, and community outreach and education.

The ICAC program is a national network of 61 coordinated task forces representing more than 3,500 federal, state, local and tribal law enforcement and prosecutorial agencies.  These agencies are engaged in both proactive and reactive investigations, forensic examinations, and criminal prosecutions.  By helping state, local and tribal agencies develop effective, sustainable responses to online child victimization—including responses to child sexual abuse images—the ICAC program has increased law enforcement's capacity to combat technology-facilitated crimes against children at every level.  In addition, in 2010, OJJDP added a new initiative to bring the ICAC program to Indian Country.  The purpose of the ICAC in Indian Country initiative is to assess the extent to which tribal youth are

victims of, or at risk for, technology-facilitated sexual exploitation and assist the existing ICAC Task Forces and state, local, and tribal law enforcement agencies to effectively respond to the technology-facilitated exploitation of children in tribal communities.  Finally, because the Department understands that arrests alone cannot resolve the problem of technology-facilitated child sexual exploitation, the ICAC program is also dedicated to training law enforcement officers and prosecutors, as well as educating parents and youth about the potential dangers of online activity.

A comprehensive statistical review of the ICAC program's accomplishments may be found in Appendix B, comprising tables showing: funding provided to each Task Force; the numbers of personnel trained through each Task Force; training courses offered by the ICAC program; CyberTipline reports received by each Task Force; the number of forensic exams conducted by each Task Force; technical assistance to investigations provided by each Task Force; the number of cases referred for further investigation by each Task Force; the number of arrests as a result of Task Force leads; and cases referred for prosecution to U.S. Attorney's Offices by each Task Force.

Other programs supported by OJJDP that address child exploitation are listed below.

*Guides for Professionals to Assist in Combating Child Sex Trafficking*

In 2011, OJJDP commissioned the Institute of Medicine (IOM) to study how to promote effective responses to child sex trafficking.  The Institute's report, Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States, released in 2013, concluded, inter alia, that commercial sexual exploitation and sex trafficking of minors should be understood as acts of abuse and violence against children; minors who are commercially sexually exploited or trafficked for sexual purposes should not be treated as criminals; and that identification of victims and survivors, and any intervention, should do no further harm to any child.  The IOM recommended raising public awareness and understanding of the problem through additional training for professionals who routinely interact with children; the development of laws and policies that redirect young victims from arrest and prosecution to services that meet their complex needs; that state, local, and tribal jurisdictions strengthen and implement laws that hold exploiters and traffickers accountable; and that a national research agenda be undertaken to advance knowledge of the problem and to develop effective interventions to prevent children from becoming victims of exploiters and traffickers.

In response to the recommendation to raise awareness, in 2014, OJJDP funded the release of a series of guides based on the report targeted at different sectors of professionals to inform them about child sex trafficking and to identify solutions to address the problem.  Each guide discusses the problem and barriers to victim and survivor identification within that sector, how professionals in the sector can help, and recommended response strategies specific to that sector.  The guides are:

- *A Guide for the Health Care Sector,* which is intended to raise awareness among health care professionals, such as physicians, nurses, advanced practice nurses, physician assistants, mental health professionals, and dentists, who see children for prevention and treatment of injury, illness, and disease.  It also provides information about intervention models from related fields to provide health care services to victims and survivors of commercial sexual exploitation, which includes, but is not limited to:

- Using identification techniques similar to those used for recognizing victims of intimate partner violence and child abuse;

- Employing a Sexual Assault Nurse Examiner and integrated care models;

- Utilizing multi-disciplinary responses, such as those in Child Advocacy Centers and Sexual Assault Response Teams as well as multi-disciplinary public health approaches; and,

- Using "telehealth" to provide access to health care in rural and remote locations.

- *A Guide for the Legal Sector,* which presents the federal, state, and local legal framework of the issue and discusses approaches used by law enforcement, attorneys, and judges. A few examples include, but are not limited to:

  - Training to help law enforcement view behavior by youth that is technically criminal (e.g., prostitution) as part of the victimization of youth by the perpetrators of a more serious crime (commercial sexual exploitation or trafficking);

  - A toolkit developed by the Barton Child Law and Policy Center at Emory University School of Law as an example of how prosecutors can improve accountability of offenders and overcome some of the challenges related to pursuing cases of commercial sexual exploitation; and,

  - Instances where judges and community supervision personnel recognize and treat juveniles involved in sex trafficking as victims rather than delinquents or criminals, and provide adequate sentences for traffickers and purchasers of sex.

- *A Guide for Providers of Victim and Support Services,* which discusses how child welfare and child protective services, other agencies and programs within the state and federal governments (e.g., OVC) and non-governmental organizations can respond. This includes, but is not limited to:

  - Identifying examples of efforts to enhance the involvement of child welfare in addressing these crimes, such as a specific "allegation of harm" for commercial sexual exploitation of minors and how to improve case management and reporting to child protective services;

  - Providing an overview of how to make federal benefits and services available to victims of trafficking; and,

  - Discussing examples of direct service interventions for victims.

In addition, OJJDP supported dissemination of these reports and related user-friendly materials via a multi-media strategy that included web presentations, social media, and conferences.

In response to the recommendations to advance a national research agenda and effective policies and interventions, in 2014, OJJDP released the Commercial Sexual Exploitation of Children Field-Initiated Research and Evaluation Program, which supported investigator-initiated proposals for innovative research and evaluation projects that would inform policy, program, and legislative responses to the urgent and extensive needs of minors who are sexually exploited for commercial purposes. The two

50

funded projects under this initiative are studying the impact of "safe harbor" legislation with one focusing on their impact on increasing service delivery to victims and the other on their impact in decreasing arrests for juvenile prostitution.  Both are expected to conclude with final reports that will be publically available in early 2018.

OJJDP has also continued to support and disseminate two other research projects related to the topic that include: the study of  LGBTQ youth in New York City engaging in "survival sex" and examination of commercial sexual exploitation victims in six cities.[6]  Both projects have finished data collection and are in process of finalizing the complete technical reports, which will be posted on NCJRS.gov when complete.

Finally, OJJDP is also funding a 2015 secondary data analysis award describing disparities in the pathways into incarceration for Lesbian, Bisexual, Questioning, Gender Nonconforming and Transgender (LBQ/GNCT) girls incarcerated for prostitution.  The second portion of the study will be a national scan of statutory, regulatory, and case law that includes commercial sexual exploitation of children.  The final report is anticipated in winter 2017.

*Mentoring for Child Victims of Commercial Sexual Exploitation Initiative (CSEC Mentoring)*

The CSEC Mentoring Initiative is a grant program administered through OJJDP to support youth serving organizations responding to the needs of child victims of commercial sexual exploitation, including girls, boys, and lesbian, gay, bisexual, transgender and queer/questioning (LGBTQ) youth. The initiative includes direct service and training and technical assistance programs.  Under this initiative, grantee organizations develop or enhance their mentoring service models, facilitate outreach efforts to identify these underserved youth, develop strategies to recruit, train, support, and maintain mentors, and provide a comprehensive array of support services to empower girls, boys, and LGBTQ youth to move past their experiences with victimization and develop to their full potential.  Training and technical assistance is provided in the areas of child sexual exploitation, mentoring, program development, trauma informed practice, multidisciplinary collaboration and information-sharing, and sustainability.

Since the initiative began in 2011, OJJDP has funded the following programs:  Girls Educational And Mentoring Services (GEMS) in New York City; My Life My Choice, a program of the Justice Resource Institute in Boston, MA; MISSSEY in Oakland, CA; Kristie House in Miami, FL; the Milwaukee County Department of Health and Human Services in Milwaukee, WI; Big Brothers Big Sisters of El Paso, TX, and the Wichita Children's Home, Inc. in Kansas, as well as the training and technical assistance provider Mid-Atlantic Network of Youth and Family Services, Inc. (MANY).

In 2015, the National Mentoring Resource Center also posted a review that examines research on mentoring for youth with backgrounds of involvement (or high-risk for involvement) in youth commercial sex activity (YCSA).  The review is organized around four questions:

---

[6] "Survival sex" refers to the practice of trading sex for food, shelter, clothing, other basic needs, or drugs.  Minors who engage in survival sex are not controlled by a pimp, and are often homeless, runaways, or throwaways.

- What is the documented effectiveness of mentoring for YCSA?

- What factors condition or shape the effectiveness of mentoring for YCSA?

- What are the intervening processes that are most important in linking mentoring to outcomes for YCSA?

- To what extent have efforts to provide mentoring to YCSA reached and engaged targeted youth, been implemented with high quality, and been adopted and sustained by host organizations and settings?

*National Council of Juvenile and Family Court Judges*

Using funding from OJJDP, in 2013, the National Council of Juvenile and Family Court Judges created the National Judicial Institute on Domestic Child Sex Trafficking.  The program is designed to be a relatively small, interactive training for judicial officers with an emphasis towards juvenile and family court judges.  It helps these judicial officers better understand the dynamics of domestic child sex trafficking, the applicable laws and legal considerations involving trafficking victims, how to identify children at risk of or being trafficked, and how to connect them to appropriate services.

*AMBER Alert*

Since 1996 the Department has supported states and communities in developing their AMBER Alert response teams to respond to incidents of missing children before those children are victimized or exploited.  AMBER Alert is a partnership among state and local governments, the media, and DOJ.  There are currently 86 regional and local AMBER Alert plans covering all 50 states and the District of Columbia.  Special AMBER Alert initiatives help tribal governments develop capacity to implement AMBER Alert responses in Indian Country and to increase international law enforcement cooperation across the U.S. borders with Mexico and Canada.  Since 2010, 323 children have been recovered by federal, state, and local law enforcement through the AMBER Alert program.  The AMBER Alert communications network has also expanded the Secondary Distribution Program, which rapidly sends geographically targeted messages to the area defined by law enforcement.  AMBER Alert Secondary Distribution includes Internet Service Providers, Internet advertising providers, social networks, digital billboards, the trucking industry, and wireless emergency alerts on the cell phone.

*Children's Advocacy Centers*

The Department, through OJJDP, provides funding to national organizations and to regional and local Children's Advocacy Centers (CACs) to aid in coordinating the investigation, treatment, and prosecution of child sexual abuse cases by utilizing multidisciplinary teams of professionals involved in child protective and victim advocacy services, law enforcement and prosecution, and physical and mental health.  One of the primary goals of the CAC Program is to ensure that child abuse victims are not further traumatized by the systems designed to protect them.  OJJDP provides financial support through grants and cooperative agreements to the following organizations:

- Midwest Regional Children's Advocacy Center (Children's Health Care, MN)

- Northeast Regional Children's Advocacy Center (Philadelphia Children's Alliance, PA)
- Southern Regional Children's Advocacy Center (Children's Advocacy Center, AL)
- Western Regional Children's Advocacy Center (Children's Advocacy Center for the Pikes Peak Region, CO)
- National Children's Advocacy Center
- National Children's Alliance

These organizations strengthen and improve the nation's response to child abuse by providing critical training, technical assistance, and support services to state and local CAC's and to allied child protection professionals and victim advocates.

Bureau of Justice Assistance (BJA)

The Bureau of Justice Assistance (BJA) supports law enforcement, courts, corrections, victim services, technology, and prevention initiatives that strengthen the nation's criminal justice system. Since 2004, BJA has provided funding to more than 40 human trafficking task forces across the United States. Since effectively combating trafficking requires a multidisciplinary approach, the human trafficking task forces include members of state and local law enforcement agencies, prosecutors, immigration and customs enforcement officers, and victim assistance providers. These task forces are required to investigate all forms of human trafficking, with an emphasis on the identification, recovery, and restoration of victims, as well as the prosecution of the perpetrators of trafficking for forced labor and sexual exploitation. Although the task forces do not focus exclusively on child victims, proactive investigation techniques often include scans and reviews of Internet social media sites, where perpetrators often recruit young victims. Between Fiscal Years 2010 and 2015, BJA/OVC co-funded 44 Enhanced Collaborative Model task forces. Those task forces conducted nearly 5,544 investigations that resulted in charges against 1,558 traffickers. Among the 2,071 confirmed victims who were identified and recovered, during this five year period, were 1,052 minor victims.

National Institute of Justice (NIJ)

The National Institute of Justice (NIJ) is the research, development, and evaluation agency of the Department and is dedicated to researching crime control and justice issues. NIJ provides objective, independent, evidence-based knowledge and tools to meet the challenges of crime and justice, particularly at the state and local levels. NIJ supports a variety of research in the area of child exploitation. The Office of Research and Evaluation (ORE) within NIJ harnesses the social and behavioral sciences to address child exploitation, among other issues. Within ORE are a number of research portfolios that have provided stakeholders at the federal, state, local, and tribal level with evidence-based recommendations to prevent and address child exploitation. Examples of these portfolios include those that address trafficking in persons, violence against women, children exposed to violence, violence against American Indian and Alaska Native women, and teen dating violence. Specific NIJ research projects and findings are detailed in Appendix C.

NIJ's Office of Science and Technology (OST) is the federal government's lead agency for work in criminal justice technology. OST's mission is to improve criminal justice policy and practice through the application of technology and technology-related knowledge. To accomplish this, OST undertakes research, development, testing and evaluation projects; develops equipment performance testing standards; manages equipment conformity assessment activities; and informs federal policy as it relates to the application of technology applied to criminal justice purposes. NIJ's Fiscal Year 2016 solicitation "Developing Improved Means to Collect Digital Evidence," includes a request for proposals to conduct research and development of software tools to automatically detect children in pornographic videos.

Office for Victims of Crime (OVC)

The mission of the Office for Victims of Crime (OVC) is to enhance the nation's capacity to assist crime victims and to provide leadership in changing attitudes, policies, and practices in ways that will promote justice and healing for all victims. OVC is charged by Congress with administering the Crime Victims Fund, a major source of funding for victim services throughout the nation. Established by the Victims of Crime Act (VOCA) in 1984, the Fund supports thousands of programs annually that represent millions of dollars invested in victim compensation and assistance in every U.S. state and territory, as well as training and demonstration projects designed to enhance the skills of those who provide services to victims. Through statutory set-asides and other forms of funding administered by OVC to federal agencies, federal victims of crime also receive services.

The Fund is unique in that it is composed primarily of criminal fines, special assessments, and bond forfeitures from convicted federal offenders, making it a self-sufficient source of income. Its main funding streams include state victim compensation and assistance formula grants; discretionary grants; support for victim specialists in USAOs, FBI offices, and other federal agencies, and for the Federal Victim Notification System; and formula grants to states through the Department of Health and Human Services, as mandated by the Children's Justice Act. During Fiscal Years 2015 and 2016, Congress appropriated more than $2 billion each fiscal year from the Crime Victims Fund to be used to support victim services, a significant increase from years before that led to the field's ability to more fully support crime victim services.

Altogether, VOCA funds support a broad array of programs and services that focus on helping victims in the immediate aftermath of crime and supporting them as they rebuild their lives. Although the specific type of outreach provided varies by need and location, the common goal of OVC and VOCA is to reach out with a compassionate, skilled, and effective response to victims who have suffered physical, sexual, emotional, and financial harm as a result of crime.

*Crime Victim Compensation and Assistance*

OVC administers two major formula grant programs that account for 90% of the VOCA funds allocated annually to states and territories. VOCA formula grants for crime victim compensation supplement state funds that reimburse victims for out-of-pocket expenses resulting from the crime. VOCA formula grants for crime victim assistance, awarded through subgrants to state agencies and

local service providers, are the most visible and far-reaching demonstration of OVC's commitment to crime victims.  VOCA funding supports direct services to crime victims in every state, the District of Columbia, and five territories; it includes services such as crisis intervention, counseling and referrals, criminal justice advocacy, and emergency transportation.

Although these formula grants account for the majority of funding made available for services to crime victims, OVC also administers discretionary grants in various program areas to meet emerging needs and fill gaps in existing services.  These grants fund a broad range of program development and dissemination projects, including those in the area of child exploitation and human trafficking.

*Human Trafficking Programs*

OVC administers grant funding to support services for victims of human trafficking.  *The Services for Victims of Human Trafficking Program* awards funding for victim-serving organizations to provide either comprehensive services—including shelter, advocacy, and health care—or specialized legal or mental health services.  OVC and BJA developed the *Enhanced Collaborative Model To Combat Human Trafficking*, which requires law enforcement and victim organizations in the same region to demonstrate a coordinated, victim-centered community response to all forms of human trafficking. Many of these programs serve victims of child sex trafficking.  Specifically for child victims, through the *Domestic Minor Victims of Human Trafficking Demonstration Project*, OVC provided funding to implement a comprehensive strategy for serving trafficking victims under age 18 who are U.S. citizens or lawful permanent residents by identifying promising practices for providing wraparound services to young victims of forced labor or sex trafficking.

*Training and Technical Assistance*

OVC works to ensure that every victim has access to a well-trained, knowledgeable service provider. OVC's Training and Technical Assistance Center (OVC TTAC) provides training opportunities for providers and advocates at all levels of victim services. (See text box).

- The National Victim Assistance Academy is a biannual training event that offers three distinct tracks—Foundation, Professional Skill-Building, and Leadership Institute—to meet the needs of providers with varying levels of experience at different stages of their careers.  OVC now offers continuing education units (CEUs) for completing any of the three tracks.

- OVC supports State Victim Assistance Academies, state-based trainings modeled after the NVAA curriculum, but tailored to meet the needs of specific states.  Currently, 35 states, the District of Columbia, and Puerto Rico have these OVC-funded academies.

- Dedicated to providing training opportunities as efficiently as possible, OVC TTAC has launched an online training center where innovative, downloadable curricula are available at the click of a mouse. Offerings include Victim Assistance Training (VAT) Online, a foundation-level training program that has drawn more than 5,000 registered users to date.  Other curricula focus on skills for sexual assault advocates/counselors, ethics in victim services, and how best to serve victims of identity theft.

- Through the Federal Victim Training and Technical Assistance Program (FVTP), OVC addresses training related to crime issues in Indian Country, the Attorney General Guidelines for Victim and Witness Assistance, and the development of standards for victim assistance programs and VOCA-compliant training on victim issues.  Training must provide skills or knowledge that improves federal, military, or tribal assistance interventions.  FVTP support may include speaker/consultant expenses, training materials, and scholarship support.

- OVC supports State Victim Assistance Academies, state-based trainings modeled after the NVAA curriculum, but tailored to meet the needs of specific states.  Currently, 35 states, the District of Columbia, and Puerto Rico have these OVC-funded academies.

OVC continues to build service capacity by offering a schedule of regional training and developmental support in critical areas such as needs assessment, program design, strategic planning, and evaluation.  OVC also manages state and national conference support programs that assist nonprofit organizations interested in hosting conferences on victim-related issues.  Additionally, OVC operates a professional development scholarship program and maintains a speaker's bureau and a database of consultants who are available to support OVC's initiatives nationwide.

In addition, publications and videos are designed to inform and assist victim service providers and allied professionals in their efforts to help crime victims.

- Through Our Eyes: Children, Violence, and Trauma—this video series addresses the needs of children exposed to crime, abuse, and violence, including addressing the needs of sexually exploited youth through Child Advocacy Centers

- Faces of Human Trafficking—this nine-part video series is designed to raise awareness of human trafficking, and to support outreach and education efforts of multidisciplinary professionals who are responding to victims, including victims of child sexual exploitation.

- A Circle of Healing for Native Children Endangered by Drugs—this seven-part video series offers examples of successful programs and practices used to help drug-endangered Native youth heal from trauma.

*Vision 21*

OVC's Vision 21: Transforming Victim Services Final Report revealed that we need more empirical information about victimization to serve victims more effectively.  Basic questions about who is victimized, by whom, and what services survivors seek need answers.  OVC is supporting a number of efforts conducted by our partner federal agencies to collect and analyze such data, which will enable policymakers and victim service organizations to develop programming and implement projects to meet victims' needs.  OVC recognizes the increasing role that innovative technology plays in our society—especially with its capacity to serve victims in new ways.  Victim service providers and the VOCA state administering agencies must build organizational capacity to support data collection and support victims through new and innovative means that still protect their rights to confidentiality and safety.  OVC is focused on helping the field reach victims in all communities, no matter

how underserved or isolated, and is funding programs that prioritize doing so. In Fiscal Year 2014, OVC funded programs to develop mobile applications, or "apps," and increase use of social media to provide victims with information about available services through methods that work best for them including American Indian/Alaskan Native victims of crime. Beginning in Fiscal Year 2013, OVC began implementing the strategic framework of the Vision 21 Report by launching new programs, expanding the scope of existing initiatives, and continuing collaboration with partner agencies and organizations to develop innovative projects to enhance victim services.

---

### Direct Services for Victims

*Children's Advocacy Centers (CACs)* - CACs provide a safe, neutral, child and family-friendly atmosphere to provide a range of services and referrals to victims and their families. Often CACs have expertise in the area of child and youth victimization, and they serve as a hub for centralized, multi-disciplinary, victim-centered responses. Today there are over 800 CACs nationwide. To locate a CAC near you visit www.nationalcac.org/locator.

*Domestic Violence Shelters* These are places of temporary refuge and support for individuals escaping violent or abusive situations, such as rape and domestic violence. Individuals experiencing any type of violence, such as dating violence, and domestic violence can contact the National Domestic Violence hotline (at 1-800-799-7233 or www.thehotline.org) to request support, find a shelter, and receive referrals to other related services.

*Health Centers* - These centers are non-profit or public entities that serve designated medically underserved populations/areas of special medically underserved populations comprised of. To locate a nearby health center, visit http://findahealthcenter.hrsa.gov/

*The National Center for Missing & Exploited Children* The Center's Family Advocacy Division provides masters-level trained mental health and child welfare professionals to proactively help families, law enforcement, social service agencies, and mental health agencies by providing a support network for child victims and their families. Call 1-800-THE-LOST or visit www.missingkids.org.

*Runaway and Homeless Youth Programs* - These programs provide shelter and other comprehensive services to runaway and homeless youth coerced into sex trafficking and exploitation. To find a program, call 1-800-RUNAWAY.

*Sexual Assault Programs/Rape Crisis Centers* - These community-based organizations work to provide assistance to victims of rape, sexual abuse, and sexual violence. They provide services such as victim advocacy, crisis hotline support, community outreach, and education programs. To find local program and services, call 1-800-656-HOPE.

*This is not an exhaustive list of hotlines and referral sources for victims. The list provides current information on these services that are supported by a range of federal and other funding.*

## Hotlines and Referral Services for Victims

**Childhelp National Child Abuse Hotline**          **1-800-4-A-CHILD**          **(1-800-422-4453)**
Serving the United States, its territories, and Canada, the hotline is staffed 24/7 with professional crisis counselors who, through interpreters, can provide assistance in over 200 languages. The hotline offers crisis intervention, information, literature, and referrals to thousands of emergency, social service, and support resources. All calls are confidential. www.childhelp.org

**National Domestic Violence Hotline**          **1-800-799-7233**
The hotline provides highly-trained advocates that are available 24/7 to talk confidentially with anyone experiencing domestic violence, seeking resources or information, or questioning unhealthy aspects of their relationship. www.thehotline.org

**National Human Trafficking Resource Center Hotline**          **1-888-373-7888**
The hotline is a national, toll-free hotline, available to answer calls from anywhere in the United States, 24/7, in more than 200 languages. The NHTRC offers round-the-clock access to a safe space to report tips, seek services, and ask for help. The NHTRC connects human trafficking victims and survivors to critical support and services to get help and stay safe and helps equip the anti-trafficking community with tools to effectively combat all forms of human trafficking. www.traffickingresourcecenter.org

**National Runaway Safeline**          **1-800-RUNAWAY (786-2929)**
The Safeline links runaway, homeless, and at-risk youth and their families to crisis counseling, programs, and resources. It uses an approach that combines a 24-hour hotline, interactive online services, a comprehensive website a national resource database, public service announcement, outreach activities, and collaborative relationships with local and national partners. www.1800runaway.org.

**National Teen Dating Abuse Helpline**          **1-866-331-9474**
Trained peer advocates are available 24/7 through the helpline to offer education, support and advocacy to teens and young adults. Peer advocates help connect callers and texters to resources and helpful websites, help callers create a plan to stay safe, and just listen to callers' concerns. Call, text "loveis" to 22522, or go online to www.loveisresp.org.

**Rape, Abuse, & Incest National Network**          **1-800-656-HOPE**
The National Sexual Assault Online Hotline and the National Sexual Assault Telephone Hotline, operated by RAINN, provide free and confidential support, help finding a local health facility, local resources, and other information. www.rainn.org.

**SAMHSA's National Helpline**          **1-800-662-HELP (4357)**
The Helpline is a free, confidential, 24/7 treatment referral and information service (in English and Spanish) for individuals and families facing mental health and/or substance use disorders. Call or visit the online treatment locators at https://findtreatment.samhsa.gov/.

*This is not an exhaustive list of hotlines and referral sources for victims. The list provides current information on these services that are supported by a range of federal and other funding.*

58

Bureau of Justice Statistics (BJS)

The Bureau of Justice Statistics is the principal federal statistical agency for criminal justice information. BJS released the following reports since 2011 with findings on victim services, child exploitation, and child pornography: Characteristics of Suspected Human Trafficking Incidents, 2008-2010 (April 2011); Use of Victim Service Agencies by Victims of Serious Violent Crime, 1993-2009 (Aug. 2011); Federal Justice Statistics, 2009 (Dec. 2011); Criminal Victimization, 2012 (Oct. 2013); Federal Justice Statistics, 2010 (Dec. 2013); Nonfatal Domestic Violence, 2003-2012 (April 2014); Criminal Victimization, 2013 (Sept. 2014); Socio-emotional Impact of Violent Crime (Sept. 2014); Crimes Against the Elderly, 2003-2013 (Nov. 2014); Rape and Sexual Assault Among College-age Females (Dec. 2014); Federal Justice Statistics, 2011-12 (Jan. 2015); Crimes Against Persons with Disabilities, 2009-2013– Statistical Tables (May 2015); Criminal Victimization, 2014 (Aug. 2015).

BJS is in the process of preparing a special report on the prosecution of sex offenders in the federal criminal justice system during the time period of 2007-2013.  This report will document the volume and characteristics of, and the trends in these cases, along with a detailed description of how these cases were processed through the federal system including the dispositions received.

Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART)

The SMART Office was authorized by the Adam Walsh Child Protection and Safety Act of 2006 to administer the standards for the Sex Offender Registration and Notification Act (SORNA) as set forth in Title I of the Adam Walsh Act.  The responsibilities of the SMART Office include providing jurisdictions with guidance regarding the implementation of SORNA, tracking important legislative and legal developments related to sex offenders, and spearheading sex offender management initiatives.  In addition, the SMART Office provides technical assistance to territories, Indian tribes, federal, state, and local governments, and to public and private organizations.  This assistance includes but is not limited to statutory and regulatory development, analyzing social science research, and policy guidance regarding other SORNA  issues (such as special considerations for juvenile sex offenders) affecting state, local, tribal, and federal governments, as well as the military.  The SMART Office also responds to concerns from the public about sex offenders in their communities.

The SMART Office has supported the development of a number of tools to assist the public and SORNA registration jurisdictions in sharing information regarding sex offenders.  The National Sex Offender Public Website (NSOPW) is maintained by the SMART Office and provides a free nationwide search for sex offenders.  The Tribe and Territory Sex Offender Registry System (TTSORS) was developed to provide tribes and territories a free software system that establishes both an administrative sex offender registration database as well as public sex offender registry website, and the Sex Offender Registry Tool (SORT) was developed for states and serves a similar function.  The SMART Office also maintains the SORNA Exchange Portal, which allows all jurisdictions to track and share information regarding traveling sex offenders from jurisdiction to jurisdiction.

In addition to SORNA efforts, the SMART Office has several sex offender management initiatives.  Recognizing the important role of scientific evidence, the SMART Office developed the Sex Offender

Management Assessment and Planning Initiative (SOMAPI), a project designed to assess the state of research and practice in sex offender management. In developing the SOMAPI report, which reviews the literature on adult sex offenders and juveniles who commit sex offenses, the office gathered information and enlisted practitioners to provide details about sex offender management programs and practices that are promising or effective and identify the needs of the various disciplines involved in managing this population.

The SOMAPI project provides guidance on promising and evidence-based practices best suited for research and replication, and SMART supports several evidence-based projects based upon this guidance. SMART's Promoting Evidence Integration in Sex Offender Management Grant Program supports the development of adult and juvenile risk and needs assessment instruments, treatment progress scales, specialized reentry programs for high-risk sex offenders, treatment programs for youth who commit sex offenses, and fellowships focused on the prevention of sexual abuse and improving responses to victims of these crimes. The SMART Office is also working to prevent sexual violence perpetration on college and university campuses through targeting perpetrators of sexual violence on campuses for treatment and through the design and implementation of a comprehensive situational-based sexual assault prevention strategy.

### J. Office of Community Oriented Policing Services

DOJ's Office of Community Oriented Policing Services (COPS) has assisted in the development of various products to support law enforcement response to child exploitation. In 2012, in partnership with the FBI, the Department of Justice's Office of Community Oriented Policing Services (COPS) funded the International Association of Chiefs of Police to develop a toolkit to be utilized for training within law enforcement agencies across the country. The toolkit includes a series of training videos in which law enforcement officers demonstrate possible responses to various scenarios involving child sex trafficking. The toolkit also includes instructions for supervisors on how to give the training, a discussion guide, a customizable tip card for supervisors to write who the officers can call when coming into contact with victims of child sex trafficking, a fact sheet, an indicator sheet, a glossary of terms used, and a customizable poster. Additional materials to accompany the toolkit are currently in development.

In 2014, COPS funded the Texas Department of Public Safety to train patrol officers on the detection, interdiction, and recovery of child victims of crimes and the proper handling of these victims. The goal of the Interdiction for the Protection of Children program is to expand knowledge among law enforcement on interdiction techniques to identify missing and/or exploited children by improving the identification of high-risk threats to children and increasing the number of recovered missing exploited or at-risk children.

Finally, in 2013, COPS worked with NCMEC to publish a guidebook entitled What You Need to Know About Background Screening. This guide provides information for measuring the effectiveness of applying background checks to youth-serving volunteers, which will help to minimize the risk to children, especially children that may be victimized and exploited.

**K. Department of Health and Human Services/Administration for Children and Families**

The Department of Health and Human Services (HHS) is responsible for preventing human trafficking, identifying victims of trafficking, and providing services to survivors, which includes minor victims of commercial sexual exploitation, through the Office on Trafficking in Persons (OTIP), the Family and Youth Services Bureau (FYSB), and the Children's Bureau (CB), all within the Administration for Children and Families (ACF).  The Administration for Children and Families also co-chairs the HHS Task Force to Prevent and End Human Trafficking.

Office on Trafficking in Persons (OTIP)

The Office on Trafficking in Persons (OTIP) was established in 2015 to combat human trafficking by supporting and leading systems that prevent trafficking through public awareness and protect victims through identification and assistance, helping them re-build their lives and become self-sufficient.  OTIP is responsible for the development of anti-trafficking strategies, policies, and programs to prevent human trafficking, build health and human service capacity to respond to human trafficking, increase victim identification and access to services, and strengthen health and well-being outcomes of trafficking survivors.  OTIP advises the Assistant Secretary by providing subject-matter expertise and leadership of ACF's anti-trafficking activities.  OTIP collaborates with federal partners and other stakeholders to raise public awareness, identify research priorities for ACF's anti-trafficking work, and make policy recommendations to enhance anti-trafficking responses.

Support for child victims of trafficking and commercial sexual exploitation include:

- *Certification and Eligibility Letters:* OTIP issues Certification Letters to foreign adult victims of trafficking and Eligibility Letters to foreign minor victims of trafficking, extending eligibility for refugee resettlement benefits.

- *Trafficking Victim Assistance Program:* Funds comprehensive case management services and assistance (e.g., food, clothing, housing, healthcare, and legal services) to foreign victims of trafficking, potential victims seeking HHS certification, and certain family members through a network of subcontractors throughout the U.S.

- *Domestic Victims of Trafficking Assistance Program*: Funds comprehensive case management services for U.S. citizen and lawful permanent resident victims and potential victims of trafficking in the United States.

- *National Human Trafficking Resource Center (NHTRC)*: Toll-free, 24-hour human trafficking hotline providing crisis intervention, urgent and non-urgent referrals, tip reporting, anti-trafficking resources, and technical assistance.  Call 1-888-373-7888, visit www.traffickingresourcecenter.org, or email NHTRC@PolarisProject.org.

- *Human Trafficking Data Collection Project:* Measures progress in prevention, protection, and assistance to victims of trafficking and expands interagency procedures to collect and organize data.

- *Rescue & Restore Victims of Human Trafficking Regional Program*: Funds local organizations to identify victims of trafficking, refer victims to services, and build local capacity by leveraging local resources, providing training and technical assistance, and educating the public.

- *Rescue & Restore Victims of Human Trafficking Campaign:* Public awareness campaign launched in 2004 to identify and help victims of trafficking by encouraging professionals to "look beneath the surface" and recognize signs of trafficking.  Campaign materials (video, fact sheet, brochures, posters) available at www.rescueandrestore.org.

- *SOAR to Health and Wellness Training on Human Trafficking:* Trains health and human service providers and other first responders to Stop, Observe, Ask, and Respond to human trafficking.  Training focuses on types of trafficking, common indicators and high-risk factors, trauma-informed techniques, and referral resources.

The Family Youth Services Bureau (FYSB)

The Family and Youth Services Bureau (FYSB), within ACF's Administration on Children, Youth and Families (ACYF), supports projects to increase child sexual exploitation prevention and intervention within runaway and homeless youth (RHY) programs.  Many of the youth served by RHY programs have experienced abuse and neglect in their homes which has forced them to run away.  Youth who runaway or live on the streets are at high risk of developing serious long term health, emotional, and behavioral problems.  The longer they are exposed to the streets, the more likely they are to fall victims of commercial sexual exploitation and human trafficking.

FYSB's ongoing efforts therefore seek to diminish sexual exploitation incidents among at-risk youth and equip programs with the necessary tools to serve these young victims.

For example, FYSB partners with FBI Innocence Lost Task Forces in an initiative to integrate trafficking components into policies and to strengthen outcomes for trafficked children and youth through RHY programs.  In addition, FYSB's RHY programs continue to support the Innocent Lost Initiative by providing shelter and other comprehensive services to youth recovered from trafficking situations by FBI and other agencies.

FYSB funds numerous programs to assist vulnerable youth, as well.  For example, in 2013 FYSB funded a three-year cooperative agreement to strengthen efforts to address the needs to LGBTQ youth experiencing homelessness.  This study aims to identify gaps in services and identify evidence-based or promising LGBTQ specific intervention strategies.  LGBTQ youth who experience homelessness are at high risk of becoming victims of commercial sexual exploitation or engaging in "survival sex." Those who prey on these minors are aware that homeless youth, especially LGBTQ youth, are unable to meet basic needs and take advantage of their vulnerability.  By recognizing best practices and assessments tools, FYSB programs and other organizations will be able to effectively identify LGBTQ youth who are victims of sexual exploitation and provide culturally appropriate services.

FYSB also funded the Runaway and Homeless Youth Training and Technical Assistance Center (RHYTTAC), operated by the National Safe Place, to strengthen training and technical assistance

to more than 300 runaway and homeless youth serving organizations to enhance their capacity to provide services to runaway and homeless youth that may be survivors of human trafficking and sexual exploitation. Among other activities, in 2015 RHYTTAC convened a two-day Street Outreach Program (SOP) meeting in partnership with NCMEC and the Polaris Project to increase SOP grantees' knowledge on risks associated with social media and web communities. In the meeting, SOP grantees learned how these risks intersect with child sexual exploitation and human trafficking and the impact of these issues on at-risk and disconnected youth. In Fiscal Year 2016, RHYTTAC will continue providing technical support to RHY programs by expanding online trainings, developing prevention resources, and convening meetings with other subject matter experts.

FYSB also funds the National Runaway Safeline (NRS) operated by the National Runaway Switchboard, which ensures young people in crisis have a central place to call 24 hours a day before they run away. NRS links at risk, runaway, and homeless youth with services, programs, or reconnects them with their families, when appropriate. It uses a multi-pronged approach that combines a 24-hour hotline, online services (text and live chat), a national resource database, and collaborative partnerships with local, state, and national stakeholders to ensure comprehensive services for vulnerable youth. In 2015, NRS published the "National Trends on Youth in Crisis in United States", a report that provides an insight of current and new trends impacting vulnerable youth. NRS also focuses on prevention efforts by delivering educational resources and providing technical assistance to communities nationwide. Also in 2015, NRS revised its *Let's Talk: Runaway Prevention Curriculum* to include a module to addressing child sexual exploitation and human trafficking prevention.

FYSB's extensive anti-trafficking work led to the hiring in 2015 of a Human Trafficking Program Specialist to serve as a subject matter expert on issues centered on commercial sexual exploitation of minors and human trafficking. The Program Specialist builds internal capacity and works closely with FYSB contractors, grantees, and partners to assure RHY programs are identifying and providing quality services to youth victims of human trafficking and commercial sexual exploitation. Additionally, the Program Specialist participates in various committees, working groups, and taskforces to enhance FYSB's visibility and information sharing capabilities.

Children's Bureau (CB)

The Children's Bureau (CB) focuses on improving the lives of children and families through programs that reduce child abuse and neglect, increase the number of adoptions, and strengthen foster care. CB accomplishes these goals through, among other means, grant funding for service providers and production of guidance documents. For example, in 2015, CB funded the *Grants to Address Trafficking within the Child Welfare Population* program. The purpose of this grant program is to continue the development of child welfare systems' response to human trafficking through infrastructure building, and a multi-system approach with local law enforcement, juvenile justice, courts systems, runaway and homeless youth programs, Children's Justice Act grantees, child advocacy centers, and other necessary service providers.

In addition, CB supports capacity building for grantees. In June of 2015, the White House and the Department of Health and Human Services co-hosted the National Convening on Trafficking and Child

Welfare.  This convening brought together state child welfare agencies, courts, and law enforcement partners to enhance their capacity to identify and respond to children and youth who are, or are at risk of becoming, victims of trafficking.  In addition, this convening highlighted the importance of multisystem collaboration in addressing the problem of domestic child sex trafficking and supporting states in preparing for implementation of new mandates under the Preventing Sex Trafficking and Strengthening Families Act of 2014.  The convening focused on prevention; effective identification and assessment; securing appropriate placements; training the workforce and caregivers; and providing individualized services and supports.  The convening provided attendees with information on best practices from the anti-trafficking field, including specific examples from state and local entities that have been engaged in the work.  Participants also worked in state teams to assess progress in their state and develop plans to address the new mandates.

Similarly, CB funds the Child Welfare Capacity Building Collaborative.  Within the collaborative, the Capacity Building Center for States is supporting state and territory planning and implementation of The Preventing Sex Trafficking and Strengthening Families Act provisions.  In addition to engaging a Constituency Group (i.e., peer networking group) designed to promote collaboration among professionals responsible for implementing specific provisions, the Center has also developed and continues to develop resources aimed at helping states and territories meet the law's requirements.  The Center has developed and hosted webinars that offer a general overview of the Act's requirements and has provided or plans to provide a list of helpful resources (i.e., a list of organizations that are currently addressing the anti-trafficking provisions, a data snapshot related to youth who run away from foster care, a tip sheet for collaborating with youth-serving agencies and resources for youth-serving agencies and tribes, digital stories, a sex trafficking screening protocols directory, and a "Child welfare response to child and youth sex trafficking" training curriculum).

CB also provides a variety of resources.  For example, the Prevention Resource Guide is developed every year to support service providers in their work with parents, caregivers, and their children to prevent child abuse and neglect and promote child and family well-being.  The Prevention Resource Guide includes information regarding protective factors, strategies to help build community awareness and support the development of broad-based, meaningful community partnerships, tip sheets for parent and caregivers on specific parenting topics (in English and Spanish) and information for private and federal government partners working nationally to strengthen families.  Chapter 4 of the 2015 guide includes a section on *Human Trafficking and Children*, and Chapter 5 has a tip sheet for parents titled "Human Trafficking: Protecting Our Youth" which describes human trafficking and how to protect your child.

Finally, the Child Welfare Information Gateway is a service of CB that promotes the safety, permanency, and well-being of children, youth, and families by professionals as well as the public to information, resources, and tools covering topics on child welfare, and provides access to print and electronic publications, websites, databases, and online learning tools for improving child welfare practice, including resources that can be shared with families.  The Gateway has a specific section on its website that includes information on trafficking.

**L.  Department of State/President's Interagency Task Force to Monitor and Combat Trafficking in Persons**

The President's Interagency Task Force to Monitor and Combat Trafficking in Persons (PITF), a cabinet-level entity chaired by the Secretary of State, and the Senior Policy Operating Group (SPOG), consisting of senior officials designated by representatives of the PITF, help coordinate interagency policy initiatives to combat human trafficking, including the sex trafficking of children.  Cabinet members meet in the PITF annually, while the same federal departments and agencies also convene more regularly in the SPOG and in its five committees.  This coordination ensures a whole-of-government approach that addresses enforcement of criminal law, development of victim identification and protection measures, support for innovations in data gathering and research, education and public awareness, enhanced partnerships and research opportunities, strengthened policies on federal procurement, and strategically linked foreign assistance and diplomatic engagement.

The agencies of the PITF are the Departments of State, Defense, Justice, the Interior, Agriculture, Labor, Health and Human Services, Transportation, Education, and Homeland Security, as well as the Domestic Policy Council, the National Security Council, the Office of Management and Budget, the Office of the Director of National Intelligence, the FBI, the U.S. Agency for International Development, and the U.S. Equal Employment Opportunity Commission.  Agencies of the PITF have also brought together leaders from government, the private sector, advocates and survivors, faith leaders, law enforcement and academia.

**M.  Department of Defense**

Various agencies within the Department of Defense (DOD) contribute to the fight against child exploitation through cooperation with civilian law enforcement agencies and other partners, as well as implementing policies within the military to prevent child exploitation by members of the Armed Services.

<u>The MCIO Representative</u>

DOD supports child exploitation cases with criminal investigators from its Military Criminal Investigative Organizations (MCIOs)—Army Criminal Investigation Command, Naval Criminal Investigative Service, and Air Force Office of Special Investigations.  These investigators review exploitation reports made available by NCMEC through the CyberTipline, conduct DOD database searches, and disseminate reports involving DOD personnel to the proper jurisdiction.

The investigators also provide guidance and training on child exploitation investigations and operations to the DOD criminal investigative community, and assist criminal investigative agents and the Military Services' Judge Advocate General Corps community with obtaining Victim Impact Statements, age-regression/age-progression images, sanitized photographs for trial preparation, training-related PowerPoint presentations, Internet safety materials, and published research studies.  The investigators also assist outside law enforcement agencies with DOD database checks, Service Record Book reviews, and any additional support with child exploitation investigations.  Additionally, the

MCIO Representative sits on the NCMEC Law Enforcement Committee, Federal Agency Task Force on Missing and Exploited Children, and the Internet Crimes Against Children Advisory Group.

<u>DOD Human Trafficking Training Program</u>

DOD instituted a new training program in combating human trafficking, specifically designed for law enforcement officers and criminal investigators. This training supplements the training required of all uniformed and civilian DOD personnel. The respective Secretaries of the Military Departments are responsible for training all military and civilians in their departments, while the Commanders of the Combatant Commands are responsible for trafficking policy within their respective geographic region. Significant strides have been made globally by commanders in countries that have a high rate of human trafficking activities. For example, South Korea has been the focus of new initiatives by the military commanders in theatre to identify and reduce human trafficking. Identification of businesses near military installations that are involved in human trafficking and other violations are penalized economically for their practices by being put off-limits to all U.S. military personnel.

DOD has recently adopted a rule describing requirements for background checks for individuals providing child care services to military beneficiaries under age 18. Those services include health and mental health care, foster care, residential care, social services, day care, education and recreational programs, rehabilitative programs, and detention or correctional services.

<u>IREMS</u>

The Army developed the Identity Resolution Exploitation Management Services (IREMS), an interactive biometric platform, which has proven effective in combating crimes against children, both internationally and inside the United States. IREMS, combined with the International Child Exploitation image database managed by INTERPOL, allows investigators to share data with officials around the world in order to identify victims and perpetrators. For example, IREMS recently enabled the apprehension of a Brazilian citizen who had traveled to Colorado to have sex with two minor girls he had communicated with over the Internet. He was charged with travelling internationally to have sex with two minors, aged 16 and 12.

<u>D-DEx</u>

Finally, DOD developed and implemented the Law Enforcement Defense Data Exchange (D-DEx) a state of the art, web-based law enforcement information sharing tool that enables agents and analysts in multiple agencies to "connect the dots" and promote more efficient and effective responses to criminal incidents and terrorist threats. The D-DEx is the DOD interface to N-DEx (FBI's criminal justice data base) and is accessible by all DOD law enforcement and criminal investigation agencies.

Recently, the NCIS Resident Agency in Iwakuni, Japan, used the D-DEx to find and arrest a suspect wanted for the sexual exploitation of a child and cyber stalking. In that case, a military dependent minor had been extorted into providing sexually explicit photos online to a suspect known only by his social media usernames. With the usernames provided by the victim, NCIS obtained Internet

Protocol (IP) addresses from the social media sites and then subpoenaed the IP provider to provide subscriber information - resulting in two physical addresses.  A query in D-DEx yielded a record from the Alachua County, Florida Sheriff's Office (ACSO) identifying a suspect who had recently been arrested for child pornography.  Together NCIS and ACSO identified crimes associated with this suspect in Japan, Florida, Nebraska, and California.  The suspect was sentenced in federal court to 15 years in prison followed by 15 years of supervised release, and is required to register as a sex offender.

## N.  Department of Education

The Department of Education (ED) helps combat child exploitation by raising awareness about and trying to prevent domestic human trafficking and exploitation amongst school-aged youth.  ED informs school leaders, faculty, and students about the problem; helps schools understand how the problem relates to teaching and learning and why it is important for schools to address it; embeds the issue in schools's emergency operations and management planning; and works with other federal agencies, state and local agencies, and public sector stakeholders to develop and disseminate resource material.  This work is accomplished in large part through the Office of Safe and Healthy Students in the Office of Elementary and Secondary Education.

For example, in 2015, ED published Human Trafficking in America's Schools, a guide that provides up-to-date information for schools on how to address and respond to human trafficking.  ED believes that school personnel are uniquely positioned to identify and report suspected abuse and connect students to services.  Everyone who is part of the school community—administrators, teachers, bus drivers, maintenance personnel, food service staff, resource officers, and other school community members—has the potential to be an advocate for child victims of human trafficking.  The guide has made this topic more accessible and easier for school communities to broach.  It inspired one parent to set up a new trafficking prevention organization and to host a large summit scheduled for summer 2016.  ED co-hosted a stakeholder's event with the DHS Blue Campaign focused on engaging schools and released Human Trafficking 101 for School Administrators and Staff.  The #WhatIWouldMiss social media campaign is jointly sponsored by ED, President Lincoln's Cottage, a site of the National Trust for Historic Preservation, and HHS, and encourages teenagers to think about aspects of their daily lives that they would miss if they were victims of human trafficking.

In addition to these interagency collaborative products, ED hosts Webinars and presents information on trafficking at national conferences nationwide.  In 2015, ED provided training to the Social Workers and Psychologists Chapter of the United Federation of Teachers, the American Federation of Teachers, the School Social Work Association of America, and other school and student-serving organizations.  As part of its "Education Matters" bulletin series, ED's Center for Faith-based and Neighborhood Partnerships released a resource outlining the steps community-based organizations can take to recognize and effectively partner with school districts to increase awareness and develop policies and protocols that protect victims.  ED also uses two active technical assistance centers to post information about trafficking: Safe Supportive Learning and Readiness and Emergency Management for Schools.  For the latter, ED developed a webinar, hosted a live chat, and launched a new Community of Practice focused on integrating trafficking programs and school emergency operation plans.

**O.  National Center for Missing & Exploited Children**

The National Center for Missing & Exploited Children (NCMEC) is a private, non-profit organization designated by Congress to serve as the national clearinghouse on issues related to missing and exploited children and works in cooperation with DOJ and other federal, state and local law enforcement, education and social service agencies, families, and the public.

When it was created in 1984, there was no coordinated, national response to the issue of missing children.  A series of tragic cases began to awaken the nation to this problem:  In 1979, six-year-old Etan Patz vanished from a New York street while walking to his school bus.  Over the next several years, 29 children and young adults were abducted and murdered in Atlanta.  Then in 1981, six-year-old Adam Walsh was abducted from a Florida shopping mall and murdered.

Because of these tragedies, NCMEC was created by private individuals to help reunite families with missing children, reduce child sexual exploitation and prevent child victimization.  NCMEC is funded by DOJ, corporations and private foundations and individuals.  Since opening its doors, NCMEC has distributed billions of missing child posters and helped law enforcement in the recovery of more than 218,000 children.  NCMEC has coordinated the secondary distribution of AMBER Alerts, leading to the safe recovery of 816 abducted children, and offered emotional support to more than 55,000 affected families.

NCMEC's role has vastly expanded to respond to emerging threats against children, particularly online.  The Internet has ushered in an explosion in the online distribution of child sexual abuse images.  It has given rise to crimes with names like "online enticement" and "sextortion" and has become a thriving marketplace for selling children for sex.

In response, NCMEC created the nation's CyberTipline to serve as a centralized reporting mechanism for the public and electronic service providers to report suspected child sexual exploitation.  Since 1998, the CyberTipline has handled more than 8.4 million reports—nearly half of those in 2015.  These reports encompass suspected child sexual exploitation, including possession, manufacture and distribution of child pornography; online enticement of children for sexual acts; child sex trafficking; sex tourism involving children; extra familial child sexual molestation, unsolicited obscene material sent to a child, misleading domain names and misleading words or digital images on the Internet.  Reports are triaged to help ensure children in imminent danger get first priority.  NCMEC staff review the reports, analyze the content, add relevant publicly available information and make the report available to the appropriate international, state, federal, or local law enforcement agency for independent review and possible investigation.

NCMEC also offers resources to Electronic Service Providers (ESPs) to assist with their voluntary efforts to reduce child pornography on their servers.  Through NCMEC's "Hash Value Sharing Initiative," domestic and foreign ESPs can collaborate with NCMEC to receive a list of hash values that represent the "worst of the worst" images of apparent child pornography.

Additionally, through NCMEC's URL Initiative, ESPs are provided access to a list of URLs for active website pages containing apparent child pornography, which is updated daily. Lastly, in 2009, Microsoft donated PhotoDNA technology to help the online industry disrupt the spread of known child sexual abuse images online. This technology works by creating a unique signature for a digital photograph, like a fingerprint, that calculates the essential characteristics of the image. That signature, also known as a "hash," can then be compared with the digital signatures of other images to efficiently and reliably find matching signatures. PhotoDNA was designed to be usable by online service providers and others to identify matches across very large data sets. Unlike other common "hashing" technologies, PhotoDNA was designed to consistently match signatures even in cases where the image has been resized or similarly altered. Microsoft granted NCMEC the legal right to sublicense this technology for free to domestic and foreign ESPs interested in taking proactive steps to identify and eliminate child pornography from their servers. After an ESP has licensed PhotoDNA, NCMEC can also provide access to a set of NCMEC PhotoDNA signatures. These NCMEC-generated PhotoDNA signatures and hash values are derived from apparent child pornography images that have been reported by U.S.-based ESPs to NCMEC's CyberTipline.

NCMEC's Child Victim Identification Program (CVIP) was launched in 2002 to enable NCMEC staff to track child pornography images of children previously identified by law enforcement. The project became more significant after the Supreme Court held that the criminalization of child pornography applies only to images depicting "real" children.

Today CVIP's mission is to assist federal and state law enforcement agencies in their efforts to identify, locate and rescue child victims in sexually exploitive situations. Law enforcement officers submit copies of seized child pornography images to federal law enforcement agents working out of the NCMEC facility. CVIP analysts review the copies of the seized images and videos and determine which images contain previously identified child victims. Since 2002, the NCMEC staff have reviewed more than 160 million images and videos. Many children have been recovered from ongoing exploitation as a result of CVIP's technical assistance for law enforcement's efforts to locate and recover child victims depicted in sexually exploitive images.

NCMEC's role in preventing and combating child sexual exploitation has constantly evolved and expanded over the years to address the ever changing trends used by those seeking to harm children. Since 2003, NCMEC has played a crucial role in addressing child sex trafficking through the Innocence Lost Initiative. NCMEC's technical assistance to the FBI, CEOS, and local law enforcement agencies on this initiative has leveraged NCMEC's knowledge and resources to provide support to law enforcement's efforts to locate and recover missing children exploited through child sex trafficking. Recognizing that children exploited through sex trafficking are often both missing and exploited NCMEC is uniquely situated to provide law enforcement with specialized assistance. NCMEC data supports this trend finding that in 2014, one out of every six endangered runaways reported to NCMEC was likely a child sex trafficking victim.

NCMEC's Child Sex Trafficking Team (CSTT) was launched in 2011 to further streamline the ability to make connections between cases of reported online child sex trafficking and active missing child cases. NCMEC's CSTT consists of specialized Child Sex Trafficking Analysts, Missing Child Case

69

Management teams and a Child Sex Trafficking Specialist dedicated to supporting law enforcement, social service agencies, legal guardians and families working to locate, recover and support children victimized through sex trafficking.  This comprehensive approach provides analysis, technical assistance, victim support services and case management to support law enforcement and other child-serving professionals in their efforts to recover victims and build strong cases against individuals involved in trafficking children.

NCMEC recognizes that the recovery process for survivors of child sex trafficking is chaotic for child victims.  Due to the severe impact of trauma and exploitation, survivors of child sex trafficking are often reluctant to trust first responders and are frequently recovered with limited personal items.  In an effort to provide additional victim recovery support to the field NCMEC packs and provides Hope Bags to FBI Child Exploitation Task Forces and Victim Specialists in the field.  Hope Bags are packed with a comfortable change of clothes, shoes, toiletries, snacks and personal items to provide dignity and support to these courageous children.  Since the launch of this initiative in 2013, NCMEC has packed and provided over 1,500 Hope Bags to the field through the Innocence Lost partnership.

As the central repository for information related to missing and sexually exploited children, NCMEC is in a unique position to see the broad spectrum of online child sexual exploitation and to spot trends, such as sextortion, a relatively new form of online exploitation.  Analyzing all of these data can help shape policy and prevention messaging and training to help America's children have a safer future.  By working with the public and private sectors, NCMEC continuously looks for new and innovative ways to harness technology in this effort.

## IV. NATIONAL CHILD EXPLOITATION THREAT ASSESSMENT 2016

The National Child Exploitation Threat Assessment in the 2010 National Strategy was the first national assessment by the federal government of the risks posed by child exploitation. The 2016 assessment is based on a comprehensive survey of more than 1,000 federal, state, local, and tribal investigators, law enforcement managers, prosecutors, analysts, victim service providers, and DOJ grant recipients. The survey focused on changes to the child sexual exploitation threat since the previous assessment and potential threats over the next five years. This threat assessment is a narrative discussion based on the results of the survey. A summary of the results themselves is in Appendix D.

The threat assessment focuses on five areas of criminal offending in the child exploitation space: (1) child pornography; (2) "sextortion" and the live-streaming of child sexual abuse; (3) commercial sex trafficking of children; (4) child sex tourism; and (5) sex offender registry violations.

Child Pornography

---

### *Key Findings*

- *Globalization:* **Child pornography cases frequently involve offenders or evidence located abroad, which complicates, delays, or thwarts successful investigation and prosecution.**

- *Mobile devices:* **Mobile devices can be used to photograph or film a child being sexually abused, access child pornography stored in remote locations, and stream video of child sexual abuse.**

- *Encryption:* **In child exploitation investigations, readily available, easy-to-use, often built-in encryption thwarts the collection and analysis of critical evidence. Even with proper legal process, law enforcement often is unable to obtain the content of communications or the evidence stored on an encrypted device, allowing an offender to escape justice.**

- *The Dark Internet:* **Networks of technologies and platforms can obfuscate traditional IP addresses and make it highly difficult to identify offenders. This anonymity emboldens users to commit more egregious offenses than are seen on traditional Internet platforms.**

- *Offender Communities:* **In closed and highly protected online spaces, online communities dedicated to the sexual abuse of children have proliferated. Hand-picked members normalize each other's sexual interest in children and encourage each other to act on their deviant sexual interests.**

---

The expansion of the Internet has led to an explosion in the market for child pornography, making it easier to create, access, store, and distribute files depicting the sexual abuse of minors.

The Internet has also blurred traditional notions of jurisdiction and sovereignty, instantly making this crime problem global in scope and requiring a coordinated national and international response.

71

Because the term "child pornography" is used in federal statutes, it is also commonly used by lawmakers, prosecutors, investigators, and the public to describe this form of sexual exploitation of children, and it is the term used throughout this National Strategy.  However, this term fails to describe the true horror that is faced by countless children every year.  The production of child pornography creates a permanent record of a child's sexual abuse.  When these images are placed on the Internet and disseminated online, the victimization of the children continues in perpetuity.  Experts and victims agree that victims depicted in child pornography often suffer a lifetime of re-victimization by knowing the images of their sexual abuse are on the Internet forever.  The children exploited in these images must live with the permanency, longevity, and circulation of such a record of their sexual victimization.  This often creates lasting psychological damage to the child, including disruptions in sexual development, self-image, and developing trusting relationships with others in the future.

Offenders who engage in the production, distribution, advertising, and possession of child pornography may represent any age, race, sex, occupation, socio-economic status, geographical area, or education level.  These offenders may know their victims well, or not at all, and some specifically seek positions to gain direct access to potential child victims, such as a teacher, day care provider, member of the clergy, medical professional, or coach.  The lack of a single offender profile inhibits law enforcement's ability to mitigate the threat posed to child victims of these crimes.  Offenders engaged in child pornography activities demonstrate a high capability to groom and control their victims through the appearance of love, by preying on a child's need for acceptance, validation, and understanding, or through fear, manipulation, promises, lying, extortion, physical violence, or threats to avoid disclosure or discovery of their child sexual exploitation activities.  Child pornography offenders routinely employ operational security measures to ensure their computer files and online activities remain hidden.  Child pornography offenders tend to have a sophisticated understanding of a vast array of computer technologies that can facilitate, and hide, their criminal activity.  The primary motivation for committing child pornography offenses is to achieve sexual gratification with children, or by viewing the photographic depictions of such activities.

Unfortunately no area of the United States, or country in the world, is immune from individuals who seek to sexually exploit children through child pornography.  Wherever there are children, there can be adults who seek to produce child pornography and distribute it via the Internet.  This production and distribution increases the demand for new and more egregious images, perpetuating the continued molestation of child victims, as well as the abuse of new children.

Children as young as days old to 17 years, both male and female, across all ethnic and socio-economic backgrounds, are potential targets of individuals who engage in child pornography activities.  Based on information representing more than 10,000 identified children depicted in child pornography submitted to NCMEC by law enforcement, 40% of all child pornography victims are between infancy and "tween" years.  Child advocate personnel across the United States report that the ages of victims depicted in child pornography have significantly decreased in the past few years.

Investigations conducted by DOJ and its global partners show that child exploitation offenders often gather in communities over the Internet fostering the worldwide demand for new child pornography and providing their members with encouragement, validation, training, and status within these online

72

organizations. In fact, the trading of child pornography files within these online communities is just one component of a larger relationship that is premised on a shared sexual interest in children. This has the effect of eroding the shame that typically would accompany this behavior and desensitizing those involved to the physical and psychological damage caused to the children involved. This self-re-inforcing cycle is fueling ever greater demand in the market for these explicit files. In the world of child pornography, this demand drives supply. The individual possessor of child pornography who methodically gathers one image after another has the effect of validating the production of the image, which leads only to more production.

Although group members typically only meet online, countless investigations and intelligence reports confirm that some online group members also physically meet in person throughout the United States and abroad to share actual victims and their child pornography collections. Due to the transnational nature of many of these groups, even multiple arrests of enterprise members in one country do not necessarily dismantle the entire enterprise.

The methods many offenders use to evade law enforcement detection have become increasingly sophisticated. Purveyors of child pornography continue to use various encryption techniques and anonymous networks attempting to hide their amassed collections of illicit child abuse images. Several sophisticated online criminal organizations have written security manuals to ensure their members followed preferred security protocols and encryption techniques in an attempt to evade law enforcement.

Not only is the production and distribution of these images perpetuating the demand for new material, the 2016 National Strategy survey shows that offenders also have increased their demand for more depraved and egregious content. This content has appeared most voluminously on the Tor anonymous network. In fact, DOJ has observed a significant volume of offenders using the Tor network to advertise and distribute child pornography and seeking to communicate undetected by law enforcement. The anonymity of Tor attracts users willing to post egregious content, adding to the millions of child pornography images and videos already available and distributed online.

Any social networking website, file-sharing website, photo-sharing site, gaming device, and mobile app can potentially facilitate child pornography activities. Due to the global nature of the child pornography threat and the countless online platforms and venues that can be used to facilitate child pornography, it is extremely difficult to gauge the full scope of the child pornography threat. However, several indicators demonstrate child pornography continues to be a significant and growing global threat.

> ### Examples of the Extent of the Problem
>
> - FBI's analysis of one particularly egregious website on Tor found that it hosted approximately 1.3 million images depicting children subjected to violent sexual abuse.  Analysis of these specific files identified at least 73 new victims previously unknown to law enforcement.
>
> - NCMEC estimated in 2015 that more than 26 million sexual abuse images and videos were reviewed by their analysts.  Additionally NCMEC reported that since 2002, more than 10,500 victims depicted in child pornography have been located and identified by law enforcement.  According to NCMEC, 4.4 million CyberTipline reports were submitted in 2015.
>
> - Between 2011 and 2014, researchers from the University of Massachusetts-Amherst looked at five of the most common peer to peer (P2P) networks used to trade child pornography.[7]  They estimated that 3 in 10,000 Internet users on these five P2P networks worldwide were sharing known child pornography in a given month.  They also estimated there were 840,000 worldwide unique installations per month of P2P programs sharing child pornography, thus indicating a significant volume of new devices trading confirmed child pornography that connected to at least one of the P2P networks analyzed for the first time.
>
> - An FBI investigation of a single website hosted on Tor had approximately 200,000 registered users and 100,000 individuals had accessed the site during a 12 day period.

Sextortion and Live-Streaming of Child Sexual Abuse

Sextortion and live-streaming of child sexual abuse are extensions of the child pornography threat and involves offenders using Internet and cell phone technologies, such as mobile cameras, texting, social media, and mobile apps to interact with minors for the purpose of sexually exploiting them.  Modern technology allows offenders' access to an unlimited global population of minors they may seek to contact, groom, entice, coerce, lure, trick, or extort into producing and transmitting sexually explicit content.  And unlike the traditional production of child pornography where the producer is in the same physical location as their victim and photographing the exploitation, the online enticement of children allows the producer of this explicit content to be located anywhere in the world.  Countless online communication platforms are also used by offenders to befriend and convince children to

> ### Key Findings
>
> - *Evolving threats:*  Novel methods of child sex abuse, such as sextortion, continue to emerge in the online context.
>
> - *Evolving means of exploitation:*  Mobile devices have fundamentally changed the way offenders can abuse children.  Apps on these devices can be used to target, recruit or groom, and coerce children to engage in sexual activity.
>
> - *Large number of victims, easily targeted:*  Offenders are adept at tricking and/or coercing children who are online and typically do so in large numbers.

---

[7] "Characterization of Contact Offenders and Child Exploitation Material Trafficking on Five Peer-to-Peer Networks". George Bissias, Brian Neil Levine, Marc Liberatore· Brian Lynn, Juston Moore· Hanna Wallach, and Janis Wolak· Elsevier Child Abuse & Neglect, to appear 2016.  Available at doi:10·1016/j·chiabu·2015·10·022.

physically meet offenders in person to engage in illegal sex acts. As a result, online enticement is typically accompanied with one or more child pornography offenses, such as the production, distribution, receipt, or possession of such material.

Unsurprisingly, the exponential rise in the use of web cameras and camera-enabled mobile devices has also resulted in an observable increase in child sexual exploitation via real-time online streaming live video. Live-streaming video websites, web camera applications, and other similar video chat services for computers and mobile devices allow for the real-time production and transmission of child pornography. Any device with a web-enabled or cellular network-enabled camera can be used to facilitate this threat, including computers, tablets, cell phones, gaming devices, and wearable technology. These platforms also allow for free or paid live-streaming "on demand" sexual exploitation of children.

"Sextortion" is a growing type of online sexual exploitation in which offenders coerce or blackmail victims into providing sexually explicit images or videos of themselves, often in compliance with the offender's sexual demands and threats of posting the images publicly or sending the images to the victim's friends and family. Results of the 2016 National Strategy survey indicate that sextortion is by far the most significantly growing threat to children, with more than 60% of survey respondents indicating this type of online enticement of minors was increasing.

Sextortion cases tend to have more minor victims per offender than all other child sexual exploitation offenses. Unfortunately, it is becoming common for investigations to reveal that a single sextortion offender has been communicating with hundreds of potential victims. Forensic examinations of sextortion offenders' digital media commonly reveal thousands of organized folders containing videos and documentation of their contact with countless minors, often around the world.

> A recent DOJ investigation uncovered at least three live-streaming video and chat websites that were created by offenders for the sole purpose of luring minors to these sites and then sexually exploiting them. The offenders recorded tens of thousands of explicit live web cam sessions of minors and made the videos available to an unknown number of worldwide registered users of their websites. Offenders coerced, bullied, and blackmailed their victims into providing the explicit content. To date several hundred victims have been identified within the United States and Canada, with more than a thousand victims yet to be identified.

Offenders are proficient at enticing children to engage in risky behavior, such as displaying themselves online engaging in sexual activity or convincing minors they meet online to meet in person for sexual activity. Offenders create and share "how to" guides that discuss how to groom children to be sexually exploited. Many sextortion offenders purport to be like-aged peers to gain a child's trust and groom them to produce child pornography online. Offenders also routinely trick victims by representing themselves online as either the same sex as the victim, or as the opposite sex. Sextortion offenders typically threaten minors ages 10-17, the typical age range for juvenile Internet users, but increasingly it has been observed where the offender manipulates the victim to abuse younger siblings or friends, extending the threat to even younger and more vulnerable victims. Children who already engage in risky behavior online, such as communicating with strangers via webcam or exposing their bodies on live-streaming video sites, are particularly vulnerable to offenders

seeking to sexually exploit them.  In fact, a 2015 FBI sextortion investigation found that offenders were specifically seeking out those children they considered easy targets because of their demonstrated willingness to post personal content online and engage in live-streaming video activity, whether the content was sexually explicit or not.

Additionally, the threat of sextortion directed toward children is not just restricted to the immediate sexual and emotional abuse imposed by the offender on their victims.  Sextortion victims engage in cutting, have depression, drop out of school or have their grades decline, as well as engage in other forms of self-harm at an alarming rate.  In fact, a 2015 FBI analysis of 43 sextortion cases involving child victims revealed at least two victims committed suicide and at least ten more attempted suicide.  Thus, at least 28% of these cases had at least one sextortion victim who committed or attempted suicide.

<u>Child Sex Trafficking</u>

Child sex trafficking, which is also referred to as child prostitution or commercial sexual exploitation of children, and includes survival sex, refers to the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a minor for the purpose of a commercial sex act.  Child sex trafficking does not require proof that the victim was subjected to force, fraud, or coercion, nor does it require that the victim was moved across state lines.

> ### Key Findings
>
> - *The impact of the internet:* Websites like Backpage.com have emerged as a primary vehicle for the advertisement of children to engage in prostitution.  At the same time, offenders are using social networking sites as a tool to identify and recruit underage victims.
>
> - *Gangs:* In addition to, or instead of, the drug trade, gang members have begun to prostitute children as a means to derive revenue.
>
> - *Concentrated spikes in criminal activity:* Major public events, such as championship or all-star sporting events or national conferences, can be venues for child sex trafficking such that offenders will import children to those events to meet the demand.
>
> - *Offender danger:* Unlike other child sex offenders, child sex traffickers typically have extensive criminal histories for a variety of violent offenses.

Child sex trafficking is one the most complex forms of child sexual exploitation.  Offenders target and lure vulnerable children into prostitution and other forms of sexual exploitation using manipulation, drugs, and violence.  Victims frequently fall prey to traffickers who lure them in with an offer of food, clothes, attention, friendship, love, and a seemingly safe place to sleep.  Once a trafficker gains this control over a child, they often use acts of violence, intimidation, or psychological manipulation to trap the child in a life of prostitution.  Victims are heavily conditioned to remain loyal to the trafficker and to distrust law enforcement.

No child is immune to becoming a victim of child sex trafficking regardless of the child's race, age,

socioeconomic status, or location.  Traffickers actively recruit children—some as young as nine years old—who are easy to control, command a higher profit, and typically have fewer diseases.  Commonly victims are recruited from broken homes or may be runaways with whom a trafficker may come into contact during the course of routine or commercial sex related travel.  Traffickers use multiple methods to recruit and advertise their victims.  The most common physical and online venues used to recruit child victims are bus stops and train stations, schools, strip clubs, casinos, group homes, truck stops, and through social networking and escort sites.

> **Social networking websites, initially used by traffickers solely for recruitment, are being used with increasing frequency to advertise victims for the purposes of prostitution.  As escort and social networking websites have grown in number, they have gained popularity with pimps and have become the most popular platform to advertise sex trafficking victims.  These websites provide anonymity and 24-hour accessibility to a large pool of clients, thus increasing revenue to traffickers.  These websites vary in scope and may cater to a local, regional, or national audience.**

Traffickers are often involved in violent criminal activities other than facilitation of child sex trafficking, most have prior criminal records, and they are prone to recidivism.  Recent FBI analysis of more than 500 subjects of child sex trafficking investigations revealed approximately 60% had violent criminal arrest histories (including assault/battery, weapons offenses, kidnapping, and murder) and 24% had documented gang affiliations.  According to the 2016 National Strategy survey results, 40% of respondents reported there was an increase in cases involving traffickers who are also gang members or affiliated with a gang.  Illustrating a growing concern, 30% of survey respondents reported an increase in the volume of cases involving gang-led or gang-directed sex trafficking of minors operations.

The child sex trafficking threat is present across every region of the United States.  Nevertheless, high profile, large scale events have become lucrative opportunities for traffickers.  Major sporting events and large cultural or political events, which receive substantial media attention, traditionally attract spectators from across the country.  The substantial influx of tourists into the host city during the period surrounding the event creates an atmosphere where criminal enterprises engaged in sex trafficking can capitalize financially.  High attendance combined with the allure of the events, including numerous parties and other pre and post-event activities, make these locations especially attractive to traffickers for economic gain.  Recovered victims commonly disclose traveling to these locations specifically for these events and offenders often travel from all around the country to bring juveniles to these events.

Child sex trafficking investigations present unique challenges to law enforcement and require a robust multijurisdictional response, with multiple agencies playing a critical role in ensuring the protection of victims and effective prosecution of offenders.  The method by which most traffickers identify, recruit, market, and maintain their victims results in a unique combination of sustained violent criminal behavior with reluctant victims and witnesses.  Although interviews of sex trafficking victims frequently identify traffickers and other accomplices, some child victims may resist identifying their

traffickers because of fear or other means of manipulation that the pimp has exercised over them. Furthermore, the victim may only know their traffickers' street name and cannot fully identify their traffickers. Child sex trafficking victims are often not recognized as victims and may be arrested and jailed. The dangers faced by these children—from the traffickers, their associates, and from customers—are severe. These children become hardened by the treacherous street environment in which they must learn to survive. As such, they do not always outwardly present as sympathetic victims. These child victims also need specialized services that are not widely available given they often have illnesses, drug addictions, physical and sexual trauma, lack of viable family and community ties, and total dependence—physical and psychological—on their abusers.

Specific statistics regarding the number of minors victimized by sex trafficking remain difficult to calculate due to misidentification of juveniles as adults, varied classification of criminal incidents by law enforcement (particularly those incidents involving a juvenile), and extra measures taken by traffickers to ensure juveniles are not contacted by law enforcement. While the total number of children exploited through sex trafficking in the United States is immeasurable, the number of child victims reported missing, identified, and recovered in on-going sex trafficking investigations continues to increase.

Another threat related to sex trafficking is victims engaged in survival sex. These victims are not controlled by a sex trafficker, but trade sex for food, shelter, other basic needs, or drugs. As such, they are easily preyed upon because they are particularly vulnerable while living on the streets. One third of respondents to the 2016 National Strategy survey reported seeing an increase in the volume of cases where minors were engaging in survival sex.

Child Sex Tourism

> ### Key Finding
>
> *Exploitation of systemic vulnerabilities:* U.S. citizens, often with seemingly legitimate reasons for travel, seek sex with children in countries with high levels of poverty, large populations of at-risk youth, legalized prostitution, and/or fewer law enforcement resources.

The threat of child sex tourism pertains to U.S. citizens traveling or living abroad who sexually exploit foreign minors. This threat is a federal crime even if the minor is of legal age or if the sex act is not considered a crime according to the destination country's laws. Many offenders produce child pornography images and videos to memorialize the sexual abuse of their victims. There are online websites, newsgroups, and blogs where destinations and methods of sexually exploiting children are openly advertised.

Traditionally, popular destinations have high levels of poverty, a large population of at risk children, legalized adult prostitution, or ineffective law enforcement. Countries that are well-documented destinations (commonly referred to as "hotspots") include Thailand, Cambodia, the Philippines, Mexico, Costa Rica, Panama, Nicaragua, and Brazil. DOJ is starting to receive cases of child sex tourism occurring in African countries; however, any country could be a destination.

78

It is unknown how many Americans travel or relocate to other countries and then sexually exploit minors. Offenders may vacation with the intent to sexually exploit a child in their destination country or they may relocate to that country permanently. Offenders may seek employment or volunteer opportunities in chid sex tourism hotspots with occupations that give them access to children. Offenders most commonly are doctors, foreign aid workers, travel industry employees, teachers, orphanage employees, and construction workers. Additionally, U.S. citizens who travel internationally and have a sexual interest in children may become aware of the availability of children for sexual purposes in their destination country and take advantage of that opportunity, even if not their original purpose of travel. Depending on the host nation, there is also potential for global special events such the Olympics and other widely attended tournaments to attract offenders.

Sex Offender Registry Violations

The number of sex offenders in the United States with an obligation to register has recently been estimated at more than 843,000. A sex offender's failure to register as required often represents a deliberate effort to avoid being connected to new criminal activity, including sexual offenses against children.

> **Key Finding**
>
> *Deliberate evasion:* **Sex offenders who fail to register are often trying to evade their registration obligations so that they can offend again.**

DOJ and its state, local, tribal, and federal partners are united in an effort to protect the public from sex offenders through the coordinated enforcement of sex offender registration laws. The Sex Offender Registration and Notification Act created a comprehensive national system for the registration of both federal and non-federal sex offenders. Previously, a patchwork of registration statutes existed under both federal and state law. Sex offenders were often unaccounted for due to difficulties states faced in tracking offenders after they crossed state lines.

Administratively, registration of sex offenders often involves multiple jurisdictions because offenders are required to register where they live, work, and attend school. Similarly, investigations of non-compliance often involve multiple jurisdictions. An offender may have been convicted and required to register in one or more states, only to move to another state that does not comply with registration requirements. Effective coordination between all law enforcement agencies is required if registration of sex offenders is to have its desired effect on improving public safety.

Reliable research on how sex offender registration impacts recidivism rates is currently not available. Several studies have examined whether sex offenders who fail to comply with registration requirements are more likely to recidivate than offenders who do comply; however, the results of these studies do not have broad applicability or the results are inconclusive.

## V.  GOALS AND OBJECTIVES FOR CONTINUING THE
## FIGHT AGAINST CHILD EXPLOITATION

As the preceding pages have demonstrated, the Department and its partners in the National Strategy Working Group have vigorously fought all aspects of child exploitation.  As the threats to our children change, enforcement efforts, victim services, and outreach activities must change as well.  This section of the National Strategy describes future goals and objectives in the fight against child exploitation over the next several years in four areas: investigations and prosecutions; outreach and awareness; victim services; and policy and legislative initiatives.  The Department is committed to continuing to convene the Working Group members to ensure these goals are met.

### A.  Investigations and Prosecutions

As discussed throughout the National Strategy, the global networking of child exploitation offenders and their increased technological sophistication present new challenges to the investigation and prosecution of child exploitation cases.  In addition, the vast number of offenders requires a focus on "high-value" targets where law enforcement can have the greatest impact.  Cooperation across borders has become one of the most effective ways to carry on this work.  And across all of these matters, law enforcement takes a victim-centered approach in pursuing justice.

The following pages describe goals for overcoming the challenges posed in fighting child exploitation offenders.

Target emerging technologies.

Recent technological advances have emboldened child sexual exploitation offenders, particularly those operating primarily online, to an unprecedented degree.  For every innocuous need technology fills for law-abiding citizens, online sex offenders will find a malicious use.  Among the most daunting, and the most prevalent, of those challenges is offender utilization of anonymization networks, including Tor and Freenet, to obscure their identities.  These networks enable offenders to route all of their incoming and outgoing Internet traffic through a number of different locations anywhere in the world, so that law enforcement cannot use traditional means to ascertain the location of those offenders.  Because of the veil of perceived anonymity provided by these networks, the most prolific and sophisticated offenders feel empowered to share through them enormous quantities of the most vile child exploitation images on a multitude of Internet bulletin boards.

Savvy offenders have also increasingly utilized encryption to protect not just their identities, but the actual child exploitation materials they create, share, and collect, from observation by law enforcement.  Encryption is increasingly a standard feature of data storage devices, often resulting in the total inability of law enforcement to access customer data, even through lawful process or court orders.  Yet another challenge is posed by innovations in mobile technology, especially those that enable the easy and anonymous production and sharing of videos, allowing offenders to entice naive and trusting minors to more readily share explicit images they make of themselves via the Internet.

80

The Department and its partners will work to create novel investigative approaches to serve as models when prosecutorial teams are confronted with these types of technological obstacles. The Department will also focus on the most dangerous and sophisticated child sexual exploitation offenders through specific investigations targeting the most daunting technology-facilitated offenses. Those will include:

- Developing new protocols for ascertaining the identity of child exploitation offenders utilizing anonymization networks, in particular, Tor and Freenet;

- Combating encryption by building in investigative protocols that seek passwords and enhancing pre-search techniques to execute searches when encryption is disengaged;

- Targeting offenders who exploit children through webcams, including online enticement and sextortion;

- Explore legal and technological tools to assure access to evidence encrypted by offenders; and,

- Building forensic capacity and expertise to meet the challenges that mobile devices and cloud-based storage pose to online child exploitation investigations.

Target offender organizations.

Many of the most dangerous child exploitation offenders have increasingly migrated to organized group enterprises, where they can collaborate with other like-minded offenders to perpetrate their offenses. These concerted group activities are especially concerning for a number of reasons. First, they serve to validate, normalize and encourage behaviors that are widely condemned by society at-large. This often includes mutual encouragement of production of new child pornography images among group members. Second, groups thwart law enforcement by sharing best practices—such an encryption and anonymization, or the best venues to place ads promoting the commercial sexual abuse of minors—and also alerting all members to suspected law enforcement monitoring of child exploitation networks. Third, in the case of child pornography networks, members of those networks are able to rapidly build massive collections of the most severe materials by trading thousands upon thousands of child pornography files with other network members at the click of a button.

The Department will continue to prioritize the investigation and prosecution of online child exploitation groups. These investigations often involve the capture of boards, websites, or remote storage hubs utilized by, in some cases, hundreds or even thousands of offenders. The Department then coordinates wide scale investigation and prosecution of these networked offenders, often across multiple jurisdictions.

The Department has long prioritized the recovery of juvenile victims of commercial sex trafficking, and the prosecution of those responsible. Increasingly, however, commercial sex trafficking of minors has become a highly organized crime, oftentimes perpetrated by violent gangs operating in multiple states. The Department has responded accordingly, and will continue to target the enterprises that conspire to commercially exploit minors: gangs, motels and other venues that host exploitation, online advertisement sites, and networked interstate child sex trafficking rings.

Target high-value individual offenders.

Anyone who sexually exploits a child is a serious offender.  But given the tragically enormous volume of such offenses, the Department and its investigative partners cannot investigate or ultimately prosecute every such offense within its subject matter jurisdiction.  Accordingly, the Department has identified several categories of high-value offenders, who pose the most significant ongoing danger to children, when prioritizing investigative and prosecutorial resources.

First, the Department will continue to prioritize the apprehension of child pornography producers and other contact offenders.  Unfortunately, it is typically very difficult to ascertain whether a target is likely to be a contact offender prior to the execution of a search warrant (or other avenue to obtain comprehensive insight into the target's activities).  Accordingly, on-site or other early-stage forensics, as well as effective interviewing tactics (to include polygraphs), are critical to expeditiously ascertain whether an offender has previously engaged in hands-on abuse.  The Department will also focus on identifying technology that is regularly utilized by producers of child pornography, such as extensive use of Skype or webcams.

The Department will also prioritize the apprehension of offenders in a position of trust, such as teachers, coaches, clergy, primary caretakers, pediatricians, or other individuals who take advantage of privileged access to children to sexually exploit them.  This work will include increasing Department-wide attention to known risk factors at both the investigation and prosecution stage.  Further, the Department will prioritize the apprehension of American offenders who abuse children abroad while serving the U.S. government and/or by exploiting the wealth disparity between the United States and developing countries.  DOJ will also focus on American sex offenders who have fled U.S. sex offender registration requirements by relocating abroad.

Finally, as referenced above, the Department will work to enhance the forensic capabilities of front-line investigators to immediately identify risk factors for contact offending presented by a target's pattern of online activity and the contents of his electronic storage devices.

Enhance international collaboration.

Because online child exploitation offenders operate primarily in cyberspace, international borders are meaningless to them—they are able to network, via servers maintained in a second nation, with offenders in a third nation, to obtain exploitation images sourced from a fourth nation, and then store those images on cloud networks housed anywhere in the world.  Many of the most dangerous offenders will migrate, either physically or via an online avatar, to nations perceived to be hospitable to ensuring their anonymity while providing ready access to vulnerable victims.  And web-based child exploitation communities typically feature participation from members located throughout the world.  Accordingly, effective international collaboration when investigating child exploitation offenders operating in, or collaborating with other offenders living in, multiple countries is critical to successful apprehension of such offenders.  We cannot allow offenders to slip through our grasp, or exploited children to continue to suffer from ongoing abuse, because diligent investigators are unable to obtain crucial evidence in a timely manner due to jurisdictional impediments.

82

To enhance international collaboration efforts, the Department will first coordinate with all international investigative entities focused on child sexual exploitation offenses, including, the FBI-led Violent Crimes Against Children International Task Force, the Virtual Global Task Force, Europol, and INTERPOL.

In addition, the Department will focus on preventing travelling child sex offenders from committing cross-border offenses, and rapidly apprehending and prosecuting those who do. This involves identifying and targeting hot spots regularly frequented by these offenders, building proactive collaborative capacity to track offenders' movements, obtaining evidence of their offense conduct, expediting extradition, and coordinating with law enforcement in other countries for a rapid interdiction response once these crimes occur (or ideally, to prevent these offenders from completing planned offenses).

Ensure victim-centered investigations and prosecutions.

Identifying and rescuing victims of child exploitation remains the Department's highest priority. Each day that a victim suffers from ongoing abuse is one day too many. Accordingly, the Department is continuously striving for more effective methodologies to ascertain, in as timely a fashion as possible, the true identity of as-of-yet-unknown victims depicted within the often-massive child pornography collections seized from apprehended offenders. To effectuate these goals, the Department will enhance national capacity for victim identification.

The Department will also enhance the forensic capacity of investigators working child exploitation offenses in several ways. First, the Department will emphasize the development and use of forensic technology that can more efficiently and effectively search digital devices with ever-increasing data storage capacity, with the goal of moving cases faster through the "investigation to prosecution" pipeline. Second, the Department will coordinate its victim identification efforts with Project VIC, which allows domestic and international law enforcement agencies working crimes involving the sexual exploitation of children to leverage aggregate data, technologies and innovation.

In addition to these technology-based solutions, USMS will build on its ongoing partnership with NCMEC, as well as on existing partnerships with state and local investigators, to better coordinate timely information-sharing with the goal of expeditious recovery of victims in missing child cases. These cases may also involve children who have been sexually trafficked, and the focus on rescuing victims of those offenses is another top priority for the Department.

**B. Outreach and Awareness Activities**

Public awareness and education about the current and future threats to children in this country are fundamental to any successful strategy to combat child exploitation. Although the identification of those threats, the investigation and prosecution of offenders, and the provision of services to victims are essential, our greatest achievement would be to prevent these crimes from occurring in the first place. This section outlines a number of measures to positively impact the awareness, understanding, and responses of parents, educators, community members, and children of potential dangers. These

outreach activities range from educational messages regarding online safety to awareness efforts on the commercial sexual exploitation of children. The strategy directs efforts toward potential offenders as well. Federal, state, local, and tribal law enforcement and prosecutors are working across the country to identify, arrest, and incarcerate individuals who seek to victimize the most vulnerable among us. Through vigorous enforcement efforts, combined with appropriate awareness measures, the strategy seeks to expand activities to deter individuals from engaging in illegal conduct. By attacking the problem from both sides, the strategy builds upon and updates existing efforts to prevent our children from exploitation.[8]

Goals to further this strategy are described below.

Expand and update community-based internet safety outreach efforts.

Federal agencies and their partners involved in combating child exploitation will leverage their deep knowledge on child exploitation matters to expand and update awareness, outreach and educational measures to prevent child exploitation offenses by continuing to inform parents, educators, community members and children about online dangers to children. Currently, federal law enforcement agents, prosecutors, and members of the ICAC Task Forces conduct thousands of Internet safety educational events across the United States. The Department and NCMEC are collaborating to update materials for use in the field and to distribute those materials to presenters across the country. Those materials will be updated based on new and emerging threats to children, such as sextortion. In addition, those materials will also cover new electronic devices and applications, which in some ways make it easier for offenders to identify and contact children and more difficult for parents to be aware of those communications. The Department is also working with NCMEC to provide guidance and instruction for federal prosecutors, among others, on the type of information that should be included in awareness and outreach presentations and the most effective techniques to communicate with their audiences. Finally, the Department will work with its federal partners and ICAC Task Forces to conduct internet safety town hall meetings. The Department will consult with experienced federal, state, local, and tribal law enforcement officers and prosecutors to identify locations to conduct large-scale internet safety outreach efforts and seek participation from federal, state, local, and tribal leadership to give greater visibility and reach to those efforts.

---

[8] The outreach and awareness goals outlined in this section will be accomplished in collaboration with existing and future efforts that address child exploitation, abuse and neglect as a whole. As an example of the Department of Justice's overall efforts to address child exploitation, abuse and neglect, since 2010, the Department has been supporting the Defending Childhood Initiative, a Department-wide effort to address the Nation's crisis of children's exposure to violence as victims and as witnesses. Almost 60% of our Nation's children are affected by this issue, many of which are affected by multiple types of victimizations (poly-victimization) in their homes, schools, and communities. The Department is supporting efforts to improve the public's awareness, provide training to professionals who work with children, and creating comprehensive approaches to ensure that every child in need is identified early, assessed fully, and provided the resources and support they need to thrive. For more information about the Defending Childhood Initiative, visit https://www.justice.gov/defendingchildhood.

<u>Develop nationwide messages to prevent and deter offenses against children.</u>

The Department will collaborate with its federal, state, local, and tribal partners and non-governmental organizations to develop updated public service announcements on Internet safety. These public service announcements will include messages on the responsible use of electronic devices and the potential negative consequences to children of sending compromising data and images of themselves to others. In addition to those new public service announcements, the Department will seek to work with industry to deliver positive safety messages to the public through a variety of platforms. The Department will also continue to deliver educational programming through the Office of Justice Programs. For example, in 2014, OJJDP hosted a two-part webinar on Internet safety, cyber-bullying, sextortion, and sexting in partnership with the Department of Education. In 2016, OJJDP will deliver an updated webinar and collaborate with the National Strategy Working Group members to distribute the program to a wide audience. Finally, the Department will work with its federal, state, local, and tribal law enforcement partners to develop nationwide media campaigns to highlight operations that identify and capture individuals who prey on children using the internet and the results of prosecutions of those offenders. By highlighting the success of federal, state, local, and tribal law enforcement efforts in this space, and the lengthy sentences that prosecutors seek in these cases, a coordinated campaign that aggressively projects these efforts will make potential offenders think twice about acting against a child.

<u>Enhance awareness and educational activities to combat the commercial sexual exploitation of children.</u>

Federal agencies and their partners involved in combating child exploitation will continue to develop and distribute awareness and educational materials on the commercial sexual exploitation of children. The Department will engage the existing network of federal agents, prosecutors, and ICAC Task Force members to include outreach and awareness events focused on the commercial sexual exploitation of children into their current activities. The Department will also work with its federal, state, local, and tribal partners on approaches to deliver effective, age-appropriate education in schools on the commercial sexual exploitation of children.

DOJ will also work to expand its existing trafficking awareness efforts, taking a multi-faceted approach to combat the trafficking of children for sex. In doing so, the Department will examine ways to include prevention and deterrence messages to potential buyers of commercial sex. Similarly, DHS's anti-human trafficking awareness program, the Blue Campaign, will explore options on how to address the demand side of sex trafficking through current research and outreach pertaining to vulnerable populations including youth. The Blue Campaign will also explore how to incorporate discussion on the demand side of sex trafficking as part of a future stakeholder engagement.

The agencies represented on the National Strategy Working Group are also represented on the PITF and SPOG. The agencies will collaborate with the SPOG on trafficking-related activities and support the robust outreach and educational efforts by SPOG members, as well as the trafficking-related outreach and awareness efforts identified in the <u>Federal Strategic Action Plan on Services for Victims of Human Trafficking in the United States</u>. In addition to these collaborative efforts, the agencies

85

and their partners will continue to incorporate awareness, outreach and educational activities on the commercial sexual exploitation of children into their own agency strategies and programs.
<u>Focus additional awareness efforts on sextortion offenses.</u>

As discussed in the threat assessment, law enforcement has observed a startling increase in a form of online child exploitation called sextortion in which an offender obtains information or an image from a child and then uses that compromising information or image to extort the child to create sexually explicit images. The Department along with its federal, state, local, and tribal partners and non-governmental organizations will utilize the research that has been done on this form of exploitation to develop, enhance and update outreach and educational efforts for children and parents on this specific threat. The Department will also develop training materials for its prosecutors on the investigation and prosecution of these unique cases, along with information on effectively conducting educational activities in their communities on this issue. The Department will continue to develop and distribute information on sextortion for the general public and members of law enforcement.

<u>Continue the commitment to law enforcement and prosecutor training.</u>

Because the threats to our nation's children are sadly widespread and persistent and the electronic tools available to exploit children change and advance in sophistication, it is vital to maintain robust and up to date training for law enforcement and prosecutors. The Department is committed to providing training to federal, state, local, and tribal law enforcement and prosecutors on the investigation and prosecution of child exploitation offenses through its litigating components and OJPs' Missing and Exploited Children's Program. In particular, the Department will continue to provide annual training at the Department's National Advocacy Center on the investigation and prosecution of child pornography offenses and the commercial sexual exploitation of children. In addition, the Department will endeavor to provide specialized training on specific, advanced subjects such as sentencing advocacy and computer forensic issues in child exploitation matters. Furthermore, the Department will continue to support the annual national law enforcement conference on child exploitation, which provides cutting edge training on a wide range of child exploitation related matters, including child sex trafficking, to over 1,000 law enforcement officers and prosecutors from across the country in classroom and lab environments from established subject matter experts.

## C. Victim Services

The journey to health and recovery for victims of child exploitation does not end with the offender's arrest. In fact, that is often just the beginning. Investigative and prosecution agencies, educational institutions, mental health professionals, victim advocates, medical experts, child service agencies, juvenile justice systems, non-profits, and others who are engaged in responding to sexually exploited children and youth need to prioritize the provision of timely, victim centered, individualized, trauma informed, culturally competent, and comprehensive services to these victims. This goal is achievable, but it will take governments, organizations, programs, and individuals at all levels—federal, tribal, state, and local—to establish, grow, and sustain a proper response to these victims.

# CIRCLES OF SUPPORT
## FOR VICTIMS OF CHILD SEXUAL EXPLOITATION

"*When you meet me, you may not know that I've been victimized before, sometimes multiple times. You may not know my strengths, or who supports me. But, when you listen to me and understand my experiences, you are able to respond to my needs and those of my family and caregivers. You also offer me the chance to continue my childhood in a new way and the opportunity to become a healthy, self-sustaining, productive adult. You can help me survive the abuse that's happened to me and thrive in my life.*"



**HEAR AND VALIDATE MY EXPERIENCE**

**RESPOND TO MY NEEDS**

**PROVIDE SUPPORT AND ADDRESS MY UNIQUE CIRCUMSTANCES**

EXPERIENCES

EDUCATION

LEGAL

FOOD

POLYVICTIMIZATION

HISTORY OF TRAUMA

MEDICAL

MENTAL HEALTH

FAMILY/ CAREGIVERS

HOPE

SHELTER

CLOTHING

BELONGING

COMMUNITY

87

This response must consider the full landscape of victims' lives, which often include histories of multiple types of victimization at the hands of multiple offenders (referred to as "poly-victimization") and other traumatic experiences.  See, the Report of the [Attorney General's National Task Force on Children Exposed to Violence](#) and [OVC's Vision 21: Transforming Victim Services Final Report.](#)  Understanding an individual's life experiences, including trauma and victimization, but also other factors, including race/ethnicity, religion, social class, language, disability, sexual orientation, historical trauma, age, gender, and socioeconomic circumstances, help to affirm the value and worth of each individual victim and ensure their needs are fully assessed, identified, and provided for.  Taking a victim-centered, individualized, culturally competent, trauma-informed, comprehensive approach enables an understanding of the full scope of victims' experiences and needs, as well as those of their families and caregivers.  Professionals are then enabled to respond to and address the sexually exploited child or youth appropriately and wholly, setting victims on a path to healing and empowerment.

Certain factors create greater risk for children and youth, and services should be directed toward those at risk.  For example, while both girls and boys are victims of sexual exploitation, cultural stereotypes may affect boys' ability to disclose abuse and seek help.  Minors who have runaway or are homeless may be particularly vulnerable to exploitation.  They are often survivors of physical, sexual abuse and /or neglect.  They may have been exposed to other forms of trauma, including domestic violence, bullying, and neighborhood violence.  They may run away from abusive/dangerous situations, but due to their status as minors they are unable to sign a lease, continue their educations, access medical and mental health services, find a job, or even apply for federal assistance for themselves.  They may engage in survival sex to access funds to meet their basic human needs, such as food, shelter, and clothing. In particular, LGBTQ youth are disproportionately affected by homelessness because they are more likely to run away or be rejected by their family.  Children and youth involved with the child welfare system due to abuse or neglect are also at high risk of being exploited and trafficked because of lack of stability in their living situation, physical distance from friends and family, and emotional vulnerability.  Finally, children and youth who have been involved in both the child welfare and juvenile justice systems, meaning they have been identified at various points in time as both victims and delinquent, often have significant trauma histories and challenges that put them at greater risk for exploitation. Offenders may also capitalize on vulnerabilities—e.g., lack of social and familial support—and target these youth as both victims and accessories to crimes (e.g., to recruit other youth).

Although services, programs, policies, and laws exist to help victims and potential victims, there are significant barriers and challenges to getting the services to the right people.  As an initial matter, there is widespread misunderstanding—by the general public and by professionals who work with children and youth—of the nature of child exploitation, who is impacted by it, and what actions to take to assist victims, especially in Indian County.   Little information is available on how to effectively intervene and prevent the sexual victimization of minors, including an understanding of poly-victimization, the precursors to creating vulnerable children, and a clear understanding of the methods used by offenders to lure and victimize.  For example, often victims of child sexual exploitation present with complex histories and a multitude of needs, overwhelming the service systems.  There are times that these victims need specialized medical/dental services, therapeutic treatment, addiction services and educational assistance sometimes in a residential setting.  When specialized services and programs

88

exist, there can be legal, financial, or even physical barriers to get young victims to these services, such as lack of transportation to distant provider locations, limited legal definitions of who qualifies as a victim, or the need for parent/guardian consent in cases where children are estranged from their families.  And there is a general lack of useful and accessible information to inform victim services efforts, particularly basic data on the complex needs of victims, research that can be used as a basis for developing evidence-based practices, and evaluation of past efforts that can inform effective services to victims.

Furthermore, provision of services is often impeded by jurisdictional complications, lack of coordination, and inconsistent responses.  For example, oftentimes victims and the acts that victimized them cross criminal and civil jurisdictions, which presents challenges in terms of determining which agencies—law enforcement, child protection, healthcare—should intervene and provide services. These jurisdictional barriers and established (or perceived) boundaries can complicate responses, keep professionals from taking a victim-centered approach, and prevent vulnerable child victims from getting access to critical services.  Even victims who are able to access services often report frustration with the lack of coordination amongst agencies/programs.  For example, medical information is not shared and therefore multiple tests and/or examinations take place, some of which were already completed; mental health assessments and/or evaluations are started then stopped when the progress of sessions is not shared across providers; child victims are passed from one agency to the next resulting in having to tell their history to multiple professionals.  Sometimes even within the same agency, reintegration of victims to a home environment is done with little to no structure, follow-up, education and/or support.  Finally, responses to child sexual exploitation vary from community to community, some providing robust and coordinated services, others providing no response at all.  While most communities have an existing multidisciplinary team or child protection team in place to address child abuse and neglect, many do not fully address the issue of child sexual exploitation, particularly commercial sexual exploitation and trafficking, missing the opportunity to intervene with these young victims.  And, of course, lack of consistent funding for service provision—both short term and long term—creates situations where programs are created that serve the needs of victims but cannot be sustained.

Goals to address these matters are described below.

<u>Coordinate services to victims of child sexual exploitation.</u>

The members of the National Strategy Working Group will work with survivors, service providers, and others to establish a stakeholder group.  This effort must include local partners both in the public and private sector that possess specific connections, resources and commitment to serve the best interests of these exploited children.  The group will work to identify and build upon existing collaborative efforts such as Children's Advocacy Centers, the ICAC Task Forces, Anti-Trafficking Task Forces, child abuse multidisciplinary teams, and state Children's Justice Act Task Forces to spearhead a process to coordinate the identification and provision of immediate and long term services to victims of child sexual exploitation.  Such collaborations would close gaps in provision of services for these victims, reduce replication of services, ensure applicable statutory obligations are met, justice served, and pathways to healing laid for victims.

A similar effort was undertaken by an interagency working group to ensure that the various government departments and agencies work together to serve victims of human trafficking. This partnership approach is outlined in a comprehensive document published in 2013, Coordination, Collaboration, Capacity: Federal Strategic Action Plan on Services for Victims of Human Trafficking in the United States, 2013-2017. The plan is a collaborative effort of more than 15 agencies across the federal government and outlines a five-year path to further strengthen coordination, collaboration, and capacity across governmental and non-governmental entities to combat human trafficking and better serve victims of human trafficking. The Plan's victim-centered approach is designed to improve outcomes for survivors, expand services and access to services for victims, improve federal efforts to aid victims, and improve understanding among federal and nonfederal agencies working to support victims of trafficking. A similar approach is needed for victims of child exploitation.

Assess existing models and responses to determine what works and then establish a focused, collaborative strategy based on facts, statistics, and program analysis.

Once established, the work of the stakeholder group should start by looking at existing programs and services to identify ways to leverage established collaborations, infrastructures, and child/youth legitimacy, in order to replicate what works. There are a number of agencies and programs that support children and youth who are at risk or have been identified as victims of child sexual exploitation. This support ranges from health (i.e., physical, behavioral) to crime victim services and advocacy. While there are numerous programs available, there has been no formal analysis conducted to fully map out what exists and determine how these resources and programs intersect and coordinate. Taking a step back to analyze what exists and what's working can help ensure informed decision making and effective allocation of resources. Only together—public and private, professionals and survivors, government and non-government—can we create a realistic and achievable plan.

Publish a summary of findings and guidance to the field.

Over the past several decades numerous laws have been passed and enacted to raise awareness, offer protection, hold offenders accountable, provide services and establish rights for victims of crime. In response new services and approaches to responding to and serving victims have emerged. Before proposing new policies, statutes, and programs, the stakeholder group should first identify the range of existing laws, policies, and programs that exist and then conduct thorough analyses to determine if they are working to address the specific problem/need. A model for this assessment could be the issue brief entitled, *Child Welfare and Human Trafficking*, published by HHS's Children's Bureau in July 2015. The issue brief provides an overall description of human trafficking, federal agency activities, state and local efforts to help victims, resources available for professionals and communities, and relevant laws (federal and state).

Encourage innovation through federally-funded demonstration projects and, when possible, evaluation of these efforts to better extract and apply lessons learned about what works.

When available, the federal government has the ability to use funding to support innovative projects that can demonstrate new approaches and, when evaluated in real-time, can lead to lessons learned

90

that can be applied to the larger field.  This approach can lead the government to identify new, more effective ways of addressing issues that have long plagued communities.  For example, years ago the Bureau of Justice Assistance and the Office for Victims of Crime began partnering to support Anti-Human Trafficking Task Forces, composed of state and local law enforcement, investigators, victim service providers, and other key stakeholders.  Through this partnership, the Task Force members work together to investigate and prosecute human trafficking cases, provide comprehensive victim services, and evaluate their efforts.  As the efforts have grown, the offices developed a comprehensive Human Trafficking Task Force e-Guide that helps communities nationwide replicate this multisystem approach to address trafficking and help victims, available at https://www.ovcttac.gov/taskforceguide.  Similar efforts could be replicated to target the issues of child sexual exploitation, using a partnership between law enforcement efforts and child and family-serving agencies.

<u>Develop a specialized comprehensive housing stability program to better address the needs of victims of child sexual exploitation.</u>

Many victims of child sexual exploitation cannot return home, or have aged out of foster care and often have no place to go.  There is a lack of available, appropriate homes for these children which sometimes leads to their running away in the first place, but can also result in their returning to the streets to be re-victimized because their living situation is intolerable.  Models exist that can be adapted with the understanding that minors need supervision but that take into account that housing stability creates the opportunity for victims to access the services they need to recover and thrive. Housing stability models have been successful in providing an immediate response to groups such as homeless veterans and victims of domestic violence (for example, "Housing First").  These models address the foundational need of housing first, using rapid and direct housing to meet this basic need for individuals and families.  Once in stable housing, these models then provide the comprehensive services needed to address a range on issues and needs.

## D. Policy and Legislative Initiatives

The rapid technological advances of the past decade have emboldened child exploitation offenders to an unprecedented degree.  For every innocuous role technology plays for law-abiding citizens, sex offenders will find a malicious use.  Cloud storage enables offenders to easily and cheaply store tens of thousands of images or videos outside of a residence or place of business, and  those files can be either stored or accessed (or both) from anywhere in the world.  Encryption prevents even the most technically-proficient investigators from accessing contraband materials.  Anonymizing technology such as Tor thwarts traditionally successful investigative techniques for locating offenders.  Innovations in mobile technology, especially those that enable the easy and anonymous production and sharing of videos, allow offenders to entice naive and trusting minors to more readily share explicit images they make of themselves via the Internet.  And Internet-based advertising platforms facilitate the commercial sexual exploitation of minors in cities and towns throughout the country.

In order to effectively combat these offenses, DOJ plans to pursue the following policy goals.

Improve forensics and continually assess the impact of technology.

Computer forensic expertise has always been essential to the investigation and prosecution of child exploitation offenses. Often, the true identity of both offenders and victims of crimes with an online component (including nearly all child pornography offenses), as well as information regarding the scope, venue, and timeline of those offenses, can be ascertained only through the work of an investigator with forensic expertise. Over time, online child exploitation offenders have embraced increasingly sophisticated technological tools to facilitate their offenses, including utilizing cloud storage, encryption, and anonymization to hide their activities from detection by law enforcement. Accordingly, it is critical for the Department to support improved forensics capabilities and resources for those investigating and prosecuting these offenses.

To accomplish this goal, the Department will consider establishing minimum standards for forensic examinations in child sexual exploitation cases, with a focus on ensuring that examiners are trained not only to recover child pornography images, but also to recover any forensic data relevant to the provenance of those images, their history of distribution, the scope of the offense conduct, and the identities of the victims depicted. This information is critical for both prosecution of identified offenders and identification of other offenders with whom they may be acquainted.

The Department will also explore the development of a system for tracking the impact of technology on our ability to identify child exploitation offenders. This includes the impact of new programs, such as the Dark Internet, and changes in technology, such as the increasing implementation of types of encryption, where, for example, not even the device manufacturer can circumvent the encryption. This also includes changes in policy, such as shifts in companies' policies with respect to data sharing and notifying customers about the receipt of legal process. Ultimately, this information may reveal the need for changes to investigative techniques as well as broad policy measures to better enable law enforcement to obtain pertinent evidence. But the Department needs to gather data on and document to what extent the trend of offenders' use of technology to obscure their online identities and activities thwarts law enforcement interdiction efforts.

Enhance global coordination.

The servers that host child sexual abuse images may be located anywhere in the world, and offenders may concentrate their online activity in the jurisdictions most hospitable to protecting their illicit conduct. Offenders operate without regard to national sovereignty, using the Internet to sexually exploit minors living in foreign countries—for example, via online sextortion—without ever leaving their homes. We therefore must rely on effective and timely international cooperation to prevent offenders from using national boundaries as a shield insulating them from effective interdiction. Without the ability to obtain crucial evidence from foreign jurisdictions in a timely manner, exploited children may continue to suffer from ongoing abuse, and we may be unable to locate and apprehend those responsible. Thus, the Department will continue to support efforts to work collaboratively with our international and industry partners to more effectively work in concert to fight child sexual

92

exploitation, for example, through our continued participation in the merged Global Alliance Against Child Sexual Abuse Online/WePROTECT initiative.

<u>Improve the provision of victim services.</u>

In addition to the broad goals outlined in the section on victim services, above, the Department will seek to improve the direct response by Department personnel to victims of child sexual exploitation. First, recognizing that victims of child sexual exploitation often suffer from poly-victimization and often encounter both the child welfare and juvenile justice systems, the Department will work more closely with these systems to identify appropriate ways to quickly get these victims connected to the services they need. Second, the Department will work to make prosecutors and victim service personnel fully aware of the existing benefits offered by state crime compensation and assistance programs, so that they can help victims of child exploitation fully benefit from those programs. In addition, if the Department identifies any structural barriers that inhibit funding for victims in protective custody or inhibit use of state crime compensation programs (for example, making the payment of compensation contingent on prompt disclosure of the crime), it will work with the states to explore how those barriers might be removed. Third, the Department will commit to providing training, outreach, and guidance, to encourage and enable federal prosecutors to successfully seek restitution on behalf of victims of child sexual exploitation. Finally, the Department will ensure that the ICAC Task Forces across the country are fully aware of the victim service programs and resources offered by the Department, as well as state and local resources, to enhance their response to the needs of effected families and children.

<u>Develop model state laws addressing child victims of commercial sexual exploitation.</u>

Organized criminal enterprises, including violent gangs, have increasingly engaged in the commercial sexual exploitation of children, leading many vulnerable minors to be severely exploited over the course of months or even years. Unfortunately, despite efforts by the Department to ensure that victims of commercial child exploitation are viewed as such, and are not further stigmatized by virtue of that exploitation, many of these minors continue to face legal consequences following an arrest for solicitation offenses.

To reduce the collateral harm to those who have already been egregiously victimized, the Department will explore developing a model state law for expungement of convictions for individuals arrested for prostitution as minors. This effort will include addressing the removal, based on convictions which have been expunged, of foreign national victims of commercial sexual exploitation.

<u>Improve sentencing and restitution in child pornography cases.</u>

The Sentencing Commission's 2012 Child Pornography Report concluded, among other things, that advancements in technology and the evolution of the child pornography "market" have led to a significantly changed landscape – one that is no longer adequately represented by the existing sentencing guidelines. The Department agrees that some of the existing Specific Offense Characteristics (SOCs) in USSG § 2G2.2 may not accurately reflect the seriousness of an offender's conduct, nor

fairly account for differing degrees of offender dangerousness. For example, no current SOC accounts for the increased danger posed by offenders who operate in collaborative child exploitation networks, or who utilize anonymization, encryption, or other forms of technology to hide their identities.

The Department is committed to working with Congress to address the issues identified by the Sentencing Commission, as well as other areas in which the Guidelines can better reflect the evolution in child pornography offending, by reforming the sentencing scheme in child pornography trafficking cases to ensure that offenders are appropriately held accountable for the severity of their conduct. In conjunction with or parallel to these efforts, the Department also plans to develop internal guidance for prosecutors addressing sentencing issues in child pornography trafficking cases.

In recent years, another significant challenge has concerned the acquisition of restitution for victims of the distribution, receipt, and possession of child pornography. These victims are unique in that the nature of the offense against them necessarily means that they are implicated in hundreds of cases across the country and across time. Given the decentralized design of the federal criminal justice system, there is no automated way to track restitution orders entered on behalf of a victim, or to monitor payments made to one victim from potentially hundreds of defendants all over the country. To try and improve the efficiency and efficacy of this system, the Department will assess the development of measures to improve the tracking of restitution awards and payments in child pornography distribution, receipt, and possession cases.

Improve Department and interagency efforts to support research and gather data.

Critical to the Department's efforts to eradicate the sexual exploitation of children is its ability to fully understand the issues, including how individuals become offenders, what prevention strategies are effective, what fully aids victims in their recovery, how to prevent re-offending, and trends in the types of offenses and the demographics of the offenders and victims. This information will help the Department design effective prevention and interdiction strategies that are targeted on the appropriate population.

To this end, the Department will examine ways to improve coordination between its grant-making, law enforcement, litigating components, and other agencies that work on child exploitation matters to develop and implement a coordinated research agenda. Among other benefits, this will allow the components that conduct research and provide grants to promote research within the Department and its investigators and prosecutors to benefit from the subject matter expertise of the other. The goal will be to better promote research sponsored by the Department to its litigating offices, so that prosecutors, investigators, and victim witness personnel can incorporate the findings into their practice as appropriate, along with creating a conduit for the litigating components to identify areas where research may be needed, and provide input on research proposals. OJP, EOUSA, and the Criminal Division will collaborate on this effort, which will start by convening a meeting in Fiscal Year 2016 to identify any issues and establish a framework for exploring them.

The Department will also assess the National Incident Based Reporting System (NIBRS), which is an incident-based reporting system that collects data on each single crime occurrence. NIBRS data

94

comes from city, university and college, county, state, tribal, and federal automated records' systems. The NIBRS collects data on each single incident within 24 offense categories made up of 52 specific crimes. The Department will consider whether the NIBRS adequately captures information about child sexual abuse and exploitation, and if not, what improvements may be made. FBI, in partnership with BJS, is also transitioning states that cannot today fully submit NIBRS data to the FBI. These changes will help make sure that NIBRS is as robust a tool as possible in gathering data about child exploitation offenses, which will allow the government to identify any trends concerning these crimes.

Pursue new legislation.

The Department commits to working with Congress to create legislation as set forth in Appendix E. These legislative proposals will help enhance the overall response to child sexual exploitation by clarifying, updating, or expanding criminal statutes, closing loopholes, and ensuring child sexual exploitation investigations can proceed efficiently.

Summaries of the legislative proposals are below.

- *Restitution in child pornography cases*: This proposal amends the child pornography restitution statute, 18 U.S.C. § 2259, to clarify and improve the legal standards which govern restitution requests for victims of the distribution, receipt, and possession of child pornography, and to create an administrative compensation fund to provide these victims with an alternative means of obtaining relief. Under this system, child pornography defendants would be ordered to pay a special assessment in addition to any restitution they may owe. The special assessment would go into a fund. Victims of these types of child pornography offenses could then choose whether to present their full restitution claims in court, as is currently done, or to obtain a one-time payment of administrative compensation. To obtain administrative compensation, victims would have to show only that they are a victim of this type of child pornography offense. Once that finding is made by a district court, the victim would receive a fixed amount of compensation. Victims who opt to litigate their restitution claim would be ineligible to obtain compensation from the fund. Victims who obtain compensation from the fund could later seek restitution for losses incurred since receiving compensation. This two-track process is meant to ameliorate the structural impediments that are preventing victims from coming forward, while preserving the option of obtaining full restitution for those who wish to do so.

- *Jurisdictional language in 18 U.S.C. § 2252A:* This proposal corrects grammatical errors in the jurisdictional language of 18 U.S.C. § 2252A(a)(2), ensuring that the language in this provision is identical to that in 18 U.S.C. § 2252.

- *Amending the mandatory reporting statute in 18 U.S.C. § 2258A*: Section 2258A currently requires an electronic communication service or a remote computing service to report instances related to child pornography. This proposal amends the statute to also require reporting of instances related to child sex trafficking and online enticement of minors.

95

- *Clarifying 18 U.S.C. § 3559(e)*: Section 3559(e) mandates a life sentence for individuals with qualifying prior convictions who commit subsequent federal child sex offenses.  This provision lists the applicable federal crimes by statute number, with an additional parenthetical descriptor.  One of those crimes is listed as "2422(b) (relating to coercion and enticement of a minor into prostitution)".  However, Section 2422(b) covers the enticement of children into any illegal sexual activity, not just prostitution.  Therefore, the parenthetical language is inconsistent with the scope of the statute.  This proposal corrects this by striking the phrase "into prostitution".

- *Modernizing the definition of "sexually explicit conduct" in child pornography statutes:* Under federal law, child pornography must depict sexually explicit conduct as defined in 18 U.S.C. § 2256(2).  This definition has remained unchanged for thirty years.  This proposal modernizes the definition of sexually explicit conduct constituting "lascivious exhibition" to include not just the pubic area of a minor, but also the anus.

## VI.  CHILD EXPLOITATION IN INDIAN COUNTRY

Indian Country prosecutions are an important part of the Department's mission because of the federal government's trust relationship with tribes.[9]  In January 2010, the Deputy Attorney General announced DOJ's Indian Country Law Enforcement Initiative, declaring public safety in tribal communities a top priority for DOJ and outlining the responsibilities of the United States Attorneys' Offices (USAOs) to federally recognized tribes in their districts.  See, http://www.justice.gov/dag/dag-memo-indian-country.html.  The memorandum identified, in particular, violence against children in Indian Country as a focus of efforts.

DOJ's efforts in Indian Country are subject to certain unique jurisdictional features.  The two main federal statutes governing federal criminal jurisdiction in Indian country are 18 U.S.C. § 1152 and § 1153.  Section 1153, known as the Major Crimes Act, gives the federal government jurisdiction to prosecute certain enumerated offenses, such as murder, manslaughter, rape, aggravated assault, and child sexual abuse, when they are committed by Indians in Indian Country.  Section 1152, known as the General Crimes Act, gives the federal government exclusive jurisdiction to prosecute all crimes committed by non-Indians against Indian victims in Indian Country.  Section 1152 also grants the federal government jurisdiction to prosecute minor crimes by Indians against non-Indians, although that jurisdiction is shared with tribes, and provides that the federal government may not prosecute an Indian who has been punished by the local tribe.  Sections 1152 and 1153, as well as federal general criminal jurisdiction over offenses such as child pornography, provide the federal government with jurisdiction to prosecute most crimes related to sexual exploitation of children that occur in Indian Country.  In addition, tribes in Indian Country may have their own court system and criminal code or laws, and tribal law may be enforced in tribal courts.  Yet, while many tribal criminal codes criminalize child sexual abuse, most do not have laws criminalizing other child exploitation offenses, such as child pornography.

---

[9] "Indian Country" is the legal term used to describe reservations and other lands set aside for Indian use, such as Indian allotments, and lands held in trust for Indians or Indian tribes. 18 U.S.C. § 1151.  Indian Country includes (a) all land within the limits of any Indian reservation under the jurisdiction of the U.S. government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.  18 U.S.C. § 1151.



Within the scope of federal jurisdiction, many federal law enforcement agencies have responsibility for investigating crimes that occur in Indian Country.

- FBI.  Pursuant to 28 U.S.C. § 533, the FBI has investigative authority for federal crimes committed on approximately 200 Indian reservations.  The FBI also provides training and investigative support services, to include comprehensive laboratory functions, in support of Indian Country-based investigations for all law enforcement partners in Indian Country.  The FBI has also established 15 Safe Trails Task Forces (STTF) around the country to enhance the effectiveness of federal/state/local law enforcement resources through a well-coordinated initiative seeking the most effective investigative/prosecutive avenues by which to convict and incarcerate dangerous offenders.

- BIA.  The Department of the Interior's Bureau of Indian Affairs (BIA) plays a significant role in enforcing federal law, including the investigation of cases involving violations of 18 U.S.C. §§ 1152 and 1153.  In addition, for several dozen "direct service" tribes, BIA officers serve as the primary police presence on the reservation.  BIA also provides funding to tribes so that the tribe can operate its own law enforcement department; this is called compacting or

contracting. Both the BIA and FBI may have responsibility to investigate crime on the same reservation.  Accordingly, the delineation of responsibilities between the two agencies is the subject of a Memorandum of Understanding (MOU) executed between the Departments of Interior and Justice in 1993.  This MOU also provides that each U.S. Attorney "whose criminal jurisdiction includes Indian Country shall develop local written guidelines outlining responsibilities of the BIA, the FBI, and the Tribal Criminal Investigators, if applicable."

Other federal agencies with criminal jurisdiction in Indian Country include the National Park Service, the Drug Enforcement Administration, the U.S. Marshals Service, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the Bureau of Land Management, the United States Postal Inspection Service, and the United States Secret Service, to name a few.  In short, numerous federal and tribal law enforcement agencies are necessary for the effective and efficient administration of criminal justice in Indian Country, especially regarding the protection of children.  In addition, state and local law enforcement may also have jurisdictional authority, and on a limited number of reservations, the federal criminal responsibilities under Sections 1152 and 1153 have been ceded to the states pursuant to Public Law (P.L.) 280 or other federal laws.  Determining which law enforcement agency—federal, tribal, or even state or local—has primary responsibility for investigation of a particular crime may depend on the nature of the crime committed and any applicable local guidelines, which vary across jurisdictions.

**U.S. Attorney's Offices with Indian Country Responsibility**

| District Name | District Name |
|---|---|
| Middle District of Alabama | District of Nebraska |
| Southern District of Alabama | District of Nevada |
| District of Alaska | District of New Mexico |
| District of Arizona | Eastern District of New York |
| Central District of California | Northern District of New York |
| Eastern District of California | Western District of New York |
| Southern District of California | District of North Dakota |
| District of Connecticut | Northern District of Oklahoma |
| Southern District of Florida | District of Oregon |
| Northern District of Indiana | District of South Carolina |
| District of Kansas | Western District of Tennessee |
| District of Maine | Western District of Texas |
| Eastern District of Michigan | Eastern District of Washington |
| District of Minnesota | Eastern District of Wisconsin |
| Southern District of Mississippi | District of  Virginia |
| District of Montana | District of Wyoming |

The USAOs work closely with law enforcement in Indian Country.  In partnership with tribes, the Department's goal is to identify and implement solutions addressing immediate and long-term public safety challenges in Indian Country, particularly in the area of child exploitation.

All USAOs with Indian Country responsibilities have at least one Tribal Liaison to serve as the primary point of contact with tribes in the district.  In addition, EOUSA has a Native American Issues Coordinator who, among other responsibilities, supports the Tribal Liaisons.  The Tribal Liaison program—an important component of the USAOs' efforts in Indian Country—was first established in 1995 and codified with the passage of the Tribal Law and Order Act of 2010 (TLOA).  Tribal Liaisons play a critical and multi-faceted role.  In addition to their duties as prosecutors, Tribal Liaisons often coordinate and train federal agents, BIA Special Agents and tribal police officers investigating violent crime and sexual abuse cases in Indian Country.  Tribal Liaisons also know and work well with state and local law enforcement and social service providers from jurisdictions adjacent to Indian Country.  These relationships enhance information-sharing and assist the coordination of criminal prosecutions, whether federal, state, local, or tribal.

Tribal Liaisons frequently serve in a role similar to a local district attorney or community prosecutor in a non-Indian Country jurisdiction, and are accessible to the tribal community in ways not generally required of other AUSAs.  They serve as the primary point of contact between the USAO and the Indian tribes located in the district.  Tribal Liaisons typically have professional relationships and frequent contact with tribal governments, including tribal law enforcement officers, tribal leaders, tribal courts, tribal prosecutors, and social service agency staff.  It is important to note that while the Tribal Liaisons are collectively the most experienced prosecutors of crimes in Indian Country, they are not the only AUSAs handling these prosecutions.  The volume of cases from Indian Country requires these prosecutions in most USAOs to be distributed among numerous AUSAs.

In child exploitation matters, the Tribal Liaisons assist in developing multi-disciplinary teams (MDTs) for child abuse cases, consult and coordinate with tribal justice officials and victim advocates, develop relationships and maintain communication with tribal leaders and the community, provide training and technical assistance, and coordinate with the Department's Office of Tribal Justice (described below).

The Department's Tribal Special Assistant U.S. Attorney (SAUSA) program is another important tool contributing to improved collaboration.  Tribal SAUSAs, who are cross-deputized tribal prosecutors or tribal attorneys, are able to prosecute crimes in both tribal court and federal court as appropriate.  Tribal SAUSAs strengthen a tribal government's ability to fight crime and increase the USAO's coordination with tribal law enforcement personnel.  The challenges presented by these issues of jurisdiction and sovereignty as it relates to fighting crime in Indian Country are highlighted in the report of the Attorney General's Advisory Committee on American Indian and Alaska Native Children Exposed to Violence.  Their report, entitled "Ending Violence So Children Can Thrive", includes wide-reaching recommendations for improving the lives of native children exposed to trauma, including sexual abuse and exploitation.

The Office of Tribal Justice (OTJ) serves as the primary program and legal policy advisor to the Attorney General with respect to the treaty and trust relationships between the United States and Indian tribes. In addition, OTJ serves as the point of contact within the Department for federally recognized tribes with respect to public safety and justice in Indian Country, and serves as the coordination point between other components and divisions within DOJ, as well as with other agencies outside of DOJ. OTJ routinely works with DOI, HHS, and other federal agencies, as well as internally with FBI, EOUSA, and others on policies and programs that protect children in Indian Country.

Through the SMART Office, the Department provides support to tribal jurisdictions that have opted to implement SORNA. Based on Government Accountability Office analysis, in Fiscal Years 2014, 43% (71 of 164) of tribes had substantially implemented the SORNA. In Fiscal Year 2015, the SMART Office continued to support tribes in implementing SORNA and now 45%, or 74 of 164 eligible tribes, have been found to have substantially implemented SORNA and the rest are continuing to work towards substantial compliance. Further, DOJ has worked to expand the Tribal and Territory Sex Offender Registry System (TTSORS). This system allows tribes to set up a SORNA-compliant public website and public notification system at no cost to them. Currently, over 100 tribes have utilized TTSORS to set up public sex offender websites linked to the National Sex Offender Public Website which is administered by the SMART Office.

In addition, the Department is firmly committed to providing training to ensure that Department prosecutors, as well as tribal and state criminal justice personnel, receive the instruction and support needed to address the particular challenges relevant to Indian Country prosecutions. In July 2010, DOJ launched the National Indian Country Training Initiative (NICTI). This training initiative is led by the National Indian Country Training Coordinator and is based at the National Advocacy Center (NAC) in Columbia, SC. Since its inception, the NICTI has delivered dozens of training opportunities at the NAC and in the field. The NICTI has provided training to all USAOs with Indian Country responsibility and over 200 tribal, federal, and state agencies. In addition to live training, the NICTI issues written publications and serves as faculty for other federal agency training, webinars, tribally hosted conferences, and technical assistance providers serving Indian Country. Importantly, DOJ's Office of Legal Education covers the costs of travel and lodging for tribal attendees at classes sponsored by the NICTI. This allows many tribal criminal justice and social service professionals to receive cutting-edge training from national experts at no cost to the student or tribe.

Training and technical assistance is also provided to federal, state and tribal law enforcement personnel as well as key stakeholders involved in responding to child exploitation cases through NCMEC, the Tribal Child Protection in Indian Country program, the National AMBER Alert program and the ICAC program. These important programs receive support from OJJDP through annual grants via the Missing Children's Act and the PROTECT Act

OJJDP has a long history of providing training and technical assistance to law enforcement personnel and other key stakeholders on child exploitation issues impacting tribes. In 2006, the AMBER Alert in Indian Country Initiative was begun to design, develop, and implement AMBER Alert in Indian Country. Selected tribal communities served as demonstration projects to other Native American communities. As a result, AMBER Alert plans have been adopted in tribal communities across

the country, with many more tribal communities choosing to partner with their state and regional programs. To date more than 50 such programs exist, from California to Florida. More than 2,000 tribal officials and community members have attended training or participated in technical assistance programs specifically designed for Native American and Alaskan Native communities. Additionally, investigators and other specialists have recieved scholarships or access to advanced training. The AMBER Alert Training and Technical Assistance Program and NCMEC have also partnered on a Tribal Leadership/CEO Course for Fiscal Year 2016 designed to develop capacity on child protection issues among tribal law enforcement executives.

In 2010, OJJDP added a new initiative to bring the ICAC program to Indian Country. The purpose of the ICAC in Indian Country initiative is to assess the extent to which tribal youth are victims of, or at risk for, technology-facilitated sexual exploitation and assist the existing ICAC Task Forces and state, local, and tribal law enforcement agencies to effectively respond to the technology-facilitated exploitation of children in tribal communities. As part of this program tribes are provided hardware, software and training to conduct investigations and prevention programs for technology facilitated crimes against children in their communities. Tribal instructors have been recruited and developed for all AMBER Alert and ICAC training and technical assistance programs to provide greater diversity in the delivery of training and technical assistance. To date, over 50 tribes collaborate with their Regional ICAC Task Force to protect children from technology facilitated crimes.

The Tribal Child Protection in Indian Country Program was also developed in 2010 to increase the knowledge and capacity of tribal law enforcement and others working to address child sexual exploitation in tribal communities and respond to Internet crimes against children. Tribal personnel who have been trained include tribal law enforcement, school personnel, social services and child welfare. The goals of this program are to: 1) assess the extent to which tribal youth are victims of, or at risk for, technology-facilitated sexual exploitation; 2) improve coordination with state, local, and tribal law enforcement for more effective investigation and prosecution of child exploitation offenses; 3) provide training and technical assistance to tribal communities to prevent and respond to child exploitation, including child sex trafficking; and 4) provide community education programs in tribal communities to prevent and respond to child exploitation.

In Fiscal Year 2015, Tribal Child Protection in Indian Country Program provided over 32 different trainings regarding child exploitation in Indian Country, including in-person trainings and webinars, reaching more than 2,200 law enforcement officers and other Indian Country stakeholders. Topics included courses specifically designed to address PSC crimes in Indian Country, such as "Technology Facilitated Crimes Against Children in Indian Country" and "Child Sex Trafficking In Indian Country."

In 2014, the AMBER Alert in Indian Country Program developed a collaboration and data portal for tribal communities to improve collaboration, communications and data collection regarding missing, endangered, abducted and exploited children in Native American and Alaskan Native communities. This portal is also part of a "Tribal Help Desk" that helps provide tribes with access to resources, training and technical assistance to support efforts to develop child protection programs in their community. To date, the AMBER Alert in Indian Country program has recruited over a dozen tribal investigators, Chiefs of Police, Prosecutors, Judges, Probation Officers, Indian Child Welfare

Specialists, and tribal government leaders who act as consultants, conducting training and technical assistance programs in Indian Country.

Project Safe Childhood in Indian Country

When first established in 2006, Project Safe Childhood program ("PSC") focused on technology driven crimes against children.  However, in May 2011, PSC was expanded to include every type of federal crime involving sexual abuse against children.  This expansion includes the sexual abuse of minors in Indian Country.

All elements of the federal law enforcement efforts in Indian Country have aggressively taken up this task.  Increasingly, cross-designation is used to increase collaboration between the Department and the tribes.  For example, tribal police can be cross-deputized as BIA agents through the Special Law Enforcement Commission (SLEC) process, and tribal prosecutors can also serve as SAUSAs. Tribes are included in PSC Coalitions, and the NICTI, USAOs, the FBI and the ICAC Task Forces are providing PSC training to tribal law enforcement, and in many cases training is brought directly

The majority of Project Safe Childhood cases from Indian Country involve child sexual assault.  Due to shame and fear, it is not uncommon for victims of such offenses to remain silent for years after the offense.  The age of the offense often makes a case difficult to charge, but USAOs nevertheless bring charges when possible, to bring justice to the victims and to the community.  Two examples include the cases of Donald Clark Luger and Christopher James Preston.

Donald Clark Luger, a member of the Standing Rock Sioux tribe, came to the attention of the FBI in 2011, when a 16-year-old girl disclosed that Luger had sexually assaulted her.  During the investigation, conducted by the FBI and BIA several other victims disclosed that Luger had also sexually assaulted them.  One of these victims was assaulted in 1997; at the time, she was a 12-year old girl living in Fort Yates, North Dakota, and Luger had been in a relationship with a close associate of the girl.  Fort Yates is the tribal headquarters of the Standing Rock Sioux.

Due to the statute of limitations, the United States was unable to charge Luger with most of the crimes disclosed by the victims.  However, in May 2013, a federal grand jury in North Dakota indicted Luger with aggravated sexual abuse of a child, abusive sexual contact, and child abuse in Indian Country, stemming from his 1997 abuse of the 12-year-old victim.  At trial, two of the other victims were permitted to testify about Luger's similar crimes against them.  In November 2014, Luger was found guilty of aggravated sexual abuse by force, and, in 2015, Lugar was sentenced to 11 and a half years in prison.

Christopher James Preston is a member of the Tohono O'odham tribe.  In 1998, he sexually abused a 10-year-old boy on the Tohono O'odham reservation in Arizona.  Preston used his position as the victim's Little League coach to gain his trust, groom him, and then repeatedly molest him through the summer of 1998.  This crime went unreported until 2012, when the victim's mother called the Tohono O'odham Police Department to report Preston's repeated sexual assault of her son.  Together, the tribal police and the FBI investigated the case, and in 2013 a federal grand jury in the District of Arizona charged Preston with multiple counts of aggravated sexual abuse of a child.  In 2015, he was found guilty at trial, and sentenced to 162 months incarceration.

to the reservations.   A number of tribes participate in ICAC Task Forces, either as formal permanent members of the task force on a case-by-case basis.

As in other areas, criminal justice in Indian Country in unique.   Nationally, the majority of PSC cases are high-tech-related crimes, involving the Internet.   In Indian Country, however, the vast majority of PSC crimes involve contact offenses, while high-tech PSC crimes are rare.   This may change in the future as internet/cell presence in Indian Country increases.   In the meantime, the prevalence of contact offenses in Indian Country PSC cases raises unique challenges for law enforcement, as such crimes require different training and different resources.



*Criminal Caseload Statistics National Data; this chart includes data for PSC cases
classified under Program Category Code 092 (Violent Crime in Indian Country)
and Program Category Code 065 (Non-Violent Indian Offenses)[10]

Law enforcement, prosecutors, and victim service providers use a multidisciplinary, collaborative approach to investigate and prosecute contact offenses against children in Indian Country.   Indeed, 18 U.S.C. § 3509(g) recommends the use of multidisciplinary teams (MDT) in child abuse cases.   USAOs are encouraged to work with or establish MDTs in Indian Country.   Comprised of prosecutors, law enforcement, pediatricians, victim advocates, counselors, child protective services, child advocates, and others, the Indian Country MDTs in many districts meet regularly to discuss allegations of child physical and sexual assault.

---

[10] This data is limited to cases filed in federal court.   Indian Country case statistics can be drawn from three different jurisdictions: federal, state, or tribal.   The FBI's Uniform Crime Report (UCR) contains offense data from all three sources.   Further, TLOA requires DOJ to provide annual reports to Congress detailing investigative efforts by the FBI and dispositions of matters received by USAOs with Indian Country responsibility.   As set forth in those reports, there are limitations to the available data, because no single system exists that permits collection and analysis of aggregate Indian Country crime and prosecution data across sovereigns.   Even if such a system existed, data unreported crime would not be available.

Where possible, the MDTs work with Children's Advocacy Centers (CACs).  Access to victim services is a crucial component of DOJ's approach to PSC in Indian Country, which aims to address the comprehensive needs of tribal victims of sexual violence, including against children.  OVC, OJJDP, the FBI's Office of Victim Assistance (OVA), the Indian Health Service (IHS), and others have established initiatives to focus on building the capacity of tribal communities to provide coordinated, community-based, victim-centered responses to child victims of sexual violence and exploitation.  For example, the Children's Justice Act (CJA) program administered by OVC assists American Indian/Alaska Native communities in developing, establishing, and operating programs to improve the investigation, prosecution, and resolution of cases  involving child abuse, child sexual abuse, and severe physical abuse in a manner that increases support for, and lessens additional trauma to, child victims.  Another example is the Victims of Child Abuse (VOCA) program administered by OJJDP, which supports the development of Regional CACs, training and technical assistance and a National Subgrants Program aimed at developing and enhancing the presence of CACs in Indian Country.  OJJDP, through the National Children's Alliance, has provided subgrants to 186 CACs from 2010 to 2014 that provide services to American Indian and Alaska Native victims of child sexual abuse and their families.

Grantee sites are tasked with developing, enhancing and sustaining comprehensive victim assistance programs that provide coordinated collaborative multidisciplinary responses to child victims, their families, and the community, as well as provide trauma-informed, culturally competent holistic services.  OVC also administers the Comprehensive Tribal Victim Assistance program which assists American Indian/Alaska Native tribal communities in developing, establishing, and operating trauma informed holistic programs to serve victims of all crimes, their families, and the community including child victims of sexual violence and exploitation.

Looking Forward in Indian Country

The Department's commitment to public safety in Indian Country has resulted in significant progress in the enhancement of effective law enforcement, criminal justice, and childhood safety in Indian Country, but there is still significant room for improvement.

The most common reason that Indian Country crimes are declined for prosecution by USAOs is insufficient evidence.  The majority of declinations involve physical assaults or sexual assaults (on adults or children), sexual exploitation, or failure to register as a sex offender.  For a myriad of reasons, sex crimes, in particular, are very difficult to prosecute.  The challenges associated with the prosecution of physical assaults and sexual assaults are not unique to the federal system.  Sexual assault crimes are typically committed outside the presence of witnesses and some rapes, including child molestation crimes, frequently lack corroborating physical evidence.  Adult and adolescent victims of sexual assault may blame themselves for the crime, which may make them reluctant to report the offense or testify in court.  The assailant is, more often than not, a person known to the victim and may be someone the victim loved or trusted.  A victim may fear retribution or being ostracized by friends and family if the sexual assault is reported to law enforcement.  If the victim were using drugs or alcohol prior to the assault, the victim's recollection of the assault may be vague, or the victim may fear being evicted from tribal housing because drug or alcohol use may be in violation of the tribal housing rules.  Delayed reporting or insufficient first responder resources in tribal communities may further contribute to

105

prosecutors' challenges to accepting a case referral that meets the Principles of Federal Prosecution or, in other words, where the guilt of the defendant can be proven beyond a reasonable doubt.

Although none of these difficulties in prosecuting sexual assault and child molestation cases is unique to Indian Country, structural barriers in Indian Country may compound the challenges.  Obstacles to prosecuting PSC crimes occurring in Indian Country may stem from a lack of trust in off-reservation authorities; a lack of witness cooperation due to the small size of the tribal community; loyalty to the tribal community; and fear of reprisal from suspects and families.  There is often family pressure on child exploitation victims not to disclose or to recant allegations of abuse.  These dynamics may result in a significant delay in the reporting of PSC crimes or in PSC crimes going unreported.  Victims and witnesses may be reluctant to travel long distances from their community to the federal courthouse to testify.  Or, they may simply lack reliable transportation or money to buy gas.  In addition, federal investigators and prosecutors may encounter difficulties developing the rapport and trust needed to encourage a victim to see a case through, because they are often not co-located in the community in the same way as local law enforcement officer.  Further, in some tribal communities cases may suffer from the lack of a well-trained, adequately staffed local police force, shortfalls in training, insufficient forensics equipment and resources, and high turnover rates in personnel.  Child pornography cases rarely originate in Indian Country; this could be because the crimes are not occurring but it may also be due to the complex skill set that is needed to identify and investigate these cases.  Although they are typically the first responders to the crime scene, tribal police may not be trained to recognize and preserve child pornography and evidence of child exploitation crimes from computers and mobile phones.

For this reason, training is a significant part of the Department's forward-looking strategy in Indian Country.  As noted above, the Department has instituted a robust training program for federal, state, local, and tribal criminal justice and social service professionals working in or with tribal communities.  The National Indian Country Training Initiative, Amber Alert, and ICAC National Training programs will continue to dedicate training efforts in support of law enforcement, prosecutors and investigators in Indian Country.  For example, in Fiscal Year 2016 a number of residential training courses will be hosted by the NICTI at the NAC.  Courses addressing the investigation and prosecution of crimes committed against children in Indian Country include: Criminal Jurisdiction in Indian Country Seminar; National Institute on the Prosecution of Sexual Assault in Indian Country; Investigation and Prosecution of Child Fatalities, Neglect, and Abuse Seminar; and Sexual Assault Nurse Examiners' Expert Witness Training.

The NICTI is also working with OVC and DOJ's Office on Violence Against Women on two major video training projects.  The first project is a series of training videos on the investigation and prosecution of Alcohol Facilitated Sexual Assault in Indian Country, a training effort focused on sexual assault against minors as well as adults.  The second project is a series of training videos addressing the crimes of domestic violence, sexual assault, and sex trafficking committed against Alaska Natives.  Both video training projects will be completed and available for distribution in 2016.

OJJDP will continue to expand the reach of the VOCA National Subgrants program as well as the Regional CAC program to increase the number of CACs serving tribal victims of child sexual abuse,

including sex trafficking victims.  This intentional focus on Indian Country will also include the integration of tribal-specific plans and services provided by each of the four Regional CACs.

DOJ will also continue to focus on inclusion of tribal and BIA law enforcement officers in ICAC Task Forces that are already in place in Indian Country.  Through the ICAC Task Forces, tribal and BIA law enforcement have access to specialized training for officers in dealing with high-tech evidence involving cell phones, computers, and social media.  Inclusion in the ICAC Task Forces will also increase resources for trained officers to present internet safety material in schools in Indian Country. DOJ is working with NCMEC to develop community outreach/safety materials that are clearly targeted toward an Indian Country audience and will continue the work with the Boys and Girls Clubs in Indian Country, where NCMEC already presents NetSmartz information.  OJJDP, through NCMEC, the Amber Alert Program, and ICAC training and support, will continue to invest in Indian Country by improving access to hardware and training for tribal law enforcement.  DOJ will continue to encourage law enforcement officers, prosecutors and victim assistance personnel to have a visible presence in Indian Country and to work with victims in their own communities.

Looking forward, the Department's prioritization of initiatives in Indian Country, including the efforts to build capacity in tribal courts and to expand community outreach to children and other key stakeholders to encourage crime reporting, will lead to enhanced public safety and a better quality of life for Native Americans.

## VII.  CONCLUSION

This National Strategy for Child Exploitation Prevention and Interdiction has described in detail the current efforts of the Department of Justice and its law enforcement partners to find, prosecute, and punish those who prey on the nation's children.  It has described, as well, efforts by those agencies and others to engage in public outreach and awareness to prevent children from being victimized in the first place, whether through enticement of the unwary on-line or through their exploitation on the streets of the nation's cities.  It addressed the unique circumstances that lead to child exploitation in Indian County and the responses that are necessary to protect tribal victims.  It further detailed the efforts by the Department and other agencies to provide services to children that account for the complex, intersecting, and long-lasting harms that exploitation causes.  And it has forecast a future of greater technological and global threats.  In order to face those threats, the National Strategy has outlined a series of goals for law enforcement, prosecutors, and victim service providers, among others, for protecting the nation's children.  Most importantly, the National Strategy reaffirms our unwavering commitment to ensuring that all children in America are able to reach their potential and are protected from violence and abuse.

# The National Strategy
# for Child Exploitation
# Prevention and Interdiction

# Appendices

Appendix A: Prosecution Accomplishments Summary

## All PROJECT SAFE CHILDHOOD STATUTES

| Statute* | FY 2011 | | | FY 2012 | | |
|---|---|---|---|---|---|---|
| | Cases Filed | Defendants Filed | Defendants Guilty | Cases Filed | Defendants Filed | Defendants Guilty |
| 1466A – Obscene visual representation of the sexual abuse of children | 3 | 3 | 7 | 1 | 1 | 3 |
| 1470 - Transfer of obscene material to minors | 51 | 51 | 55 | 42 | 42 | 47 |
| 1591 – Sex trafficking | 86 | 151 | 83 | 99 | 148 | 96 |
| 2241 - Aggravated Sexual Abuse | 140 | 141 | 83 | 135 | 143 | 100 |
| 2242 - Sexual Abuse | 62 | 63 | 42 | 55 | 59 | 45 |
| 2243 - Sexual Abuse of a Minor or Ward | 74 | 74 | 61 | 70 | 70 | 61 |
| 2244 - Abusive Sexual Contact | 97 | 97 | 80 | 87 | 87 | 97 |
| 2245 – 1591, 2241-44, 2251, 2251A, 2260, 2421-23, or 2425 resulting in death | – | – | 1 | 1 | 1 | – |
| 2250 - Failure to Register under the Sex Offender Registration and Notification Act | 631 | 631 | 381 | 581 | 581 | 590 |
| 2251 – Sexual Exploitation of Children for the purpose of production/live-streaming of child pornography, and advertising) | 324 | 418 | 302 | 373 | 392 | 366 |
| 2251A - Selling or Buying of Children | 4 | 4 | 1 | 3 | 3 | 3 |
| 2252 - Child Pornography Offenses - transportation, receipt, distribution, sale, possession, accesses with intent to view | 1,559 | 1,652 | 1,408 | 1,389 | 1,416 | 1,490 |
| 2252A – Child Pornography Offenses - transportation, receipt, distribution, sale, possession, accesses with intent to view, advertisement | 541 | 546 | 527 | 494 | 497 | 538 |
| 2252B – Misleading Domain Names on the Internet | – | – | 1 | – | – | – |
| 2252C - Misleading Words or Digital Images on the Internet | – | – | – | – | – | – |
| 2257 - Record Keeping Requirements | – | – | 1 | – | – | 2 |
| 2257A - Record Keeping Requirements | – | – | – | – | – | – |
| 2258 – Failure to Report Child Abuse | – | – | – | – | – | – |
| 2260 – Production of Sexually Explicit Depictions of a Minor for Importation Into the United States | 8 | 8 | 10 | 10 | 10 | 8 |
| 2260A - Penalties for Registered Sex Offenders | 9 | 9 | 6 | 6 | 6 | 6 |
| 2421 - Transportation for Illegal Sexual Activity | 43 | 77 | 48 | 41 | 56 | 65 |
| 2422 – Coercion and Enticement | 212 | 226 | 197 | 240 | 262 | 213 |
| 2423 - Transportation of Minors/Travel with Intent to Engage in Criminal/Illicit Sexual Activity | 108 | 118 | 133 | 136 | 150 | 107 |
| 2424 – Filing Factual Statement about Alien Individual | 5 | 23 | – | 2 | 3 | 12 |
| 2425 – Use of Interstate Facilities to Transmit Information About a Minor | 7 | 8 | 8 | 1 | 1 | 4 |
| **Totals** | **3,964** | **4,300** | **3,435** | **3,766** | **3,928** | **3,853** |

*\* Caseload data extracted from the United States Attorneys' Case Management System. Data limitations for certain of these offenses did not permit subsetting statutes pertaining only to child victims. Thus, the numbers may over represent the offenses that involve a minor victim.*

## All PROJECT SAFE CHILDHOOD STATUTES

| | FY 2013 | | | FY 2014 | | | FY 2015 | |
|---|---|---|---|---|---|---|---|---|
| Cases Filed | Defendants Filed | Defendants Guilty | Cases Filed | Defendants Filed | Defendants Guilty | Cases Filed | Defendants Filed | Defendants Guilty |
| 1 | 1 | 1 | 7 | 7 | 1 | 2 | 2 | 4 |
| 44 | 44 | 49 | 37 | 37 | 42 | 67 | 67 | 51 |
| 143 | 203 | 126 | 205 | 293 | 174 | 185 | 268 | 195 |
| 155 | 158 | 106 | 130 | 131 | 101 | 147 | 147 | 94 |
| 48 | 50 | 45 | 41 | 42 | 43 | 34 | 35 | 38 |
| 75 | 77 | 57 | 63 | 63 | 70 | 50 | 50 | 57 |
| 131 | 133 | 90 | 91 | 93 | 111 | 96 | 96 | 100 |
| – | – | – | 1 | 1 | – | – | – | 1 |
| 612 | 612 | 582 | 488 | 488 | 525 | 518 | 518 | 477 |
| 467 | 500 | 382 | 483 | 528 | 412 | 490 | 532 | 488 |
| 2 | 2 | 2 | 6 | 7 | 2 | 9 | 9 | 6 |
| 1,584 | 1,620 | 1,413 | 1,491 | 1,520 | 1,471 | 1,435 | 1,460 | 1,456 |
| 593 | 597 | 506 | 468 | 475 | 528 | 624 | 634 | 493 |
| 1 | 1 | – | – | – | 1 | – | – | 1 |
| – | – | – | – | – | – | – | – | – |
| – | – | – | – | – | – | – | – | – |
| – | – | – | – | – | – | – | – | – |
| 1 | 2 | – | 1 | 6 | 2 | – | – | – |
| 11 | 11 | 7 | 22 | 23 | 9 | 21 | 21 | 21 |
| 10 | 10 | 9 | 11 | 11 | 10 | 7 | 7 | 9 |
| 50 | 71 | 67 | 64 | 84 | 66 | 65 | 100 | 76 |
| 268 | 280 | 241 | 275 | 291 | 282 | 293 | 313 | 254 |
| 155 | 175 | 138 | 173 | 203 | 153 | 162 | 193 | 153 |
| 1 | 1 | 5 | 2 | 3 | 2 | 2 | 2 | 6 |
| 4 | 4 | 4 | 4 | 4 | 5 | 4 | 4 | 3 |
| 4,356 | 4,552 | 3,830 | 4,063 | 4,310 | 4,010 | 4,211 | 4,458 | 3,983 |

## PROJECT SAFE CHILDHOOD BY CATEGORIES

| Category* | FY 2011 | | | FY 2012 | | |
|---|---|---|---|---|---|---|
| | Cases Filed | Defendants Filed | Defendants Guilty | Cases Filed | Defendants Filed | Defendants Guilty |
| Child Pornography Offenses | 2,154 | 2,252 | 1,997 | 1,926 | 1,956 | 2,078 |
| Child Pornography Production | 332 | 426 | 312 | 383 | 402 | 374 |
| Sex Abuse | 373 | 375 | 266 | 347 | 359 | 303 |
| Transportation /Trafficking | 453 | 576 | 462 | 519 | 619 | 484 |
| All PSC Offenses | 3,964 | 4,300 | 3,435 | 3,766 | 3,928 | 3,853 |

*Caseload data extracted from the United States Attorneys' Case Management System.*

*Statutes included for purposes of "Child Pornography Offenses" are 18 U.S.C. 1466A, 1470, 2252, and 2252A, which include offenses related to the possession and trafficking of child pornography, obscenity depicting minors, and transfer of obscenity to minors.  Statutes counted for purposes of "Child Pornography Production" are 18 U.S.C. 2251 and 2260, which include the sexual exploitation of children for the purpose of producing a live transmission or a visual depiction of the sexually explicit conduct, advertising child pornography or engaging in sexual activity with a minor for the purpose of producing child pornography, and producing child pornography outside the United States for the purpose of importing it into the country.  Statutes counted for purposes of "Sex Abuse" are 18 U.S.C. 2241, 2242, 2243, and 2244.  Statutes counted for purposes of "Transportation/ Trafficking" statistics include 18 U.S.C. 1591, 2251A, 2421, 2422, and 2423.  "All PSC Offenses" reflect statistics for all PSC offenses, including but not limited to the cases/defendants reflected in the sub-categories of offenses.*

*Data limitations for certain of these offenses did not permit subsetting statutes pertaining only to child victims. Thus, the numbers may over represent the offenses that involve a minor victim.*

*Where offenses charged in the same charging instrument include offenses in multiple categories, the matter is counted in each category.*

## PROJECT SAFE CHILDHOOD BY CATEGORIES

| FY 2013 | | | FY 2014 | | | FY 2015 | | |
|---|---|---|---|---|---|---|---|---|
| Cases Filed | Defendants Filed | Defendants Guilty | Cases Filed | Defendants Filed | Defendants Guilty | Cases Filed | Defendants Filed | Defendants Guilty |
| 2,222 | 2,262 | 1,969 | 2,003 | 2,039 | 2,042 | 2,128 | 2,163 | 2,004 |
| 478 | 511 | 389 | 505 | 551 | 421 | 511 | 553 | 509 |
| 409 | 418 | 298 | 325 | 329 | 325 | 327 | 328 | 289 |
| 618 | 731 | 574 | 723 | 878 | 677 | 714 | 883 | 684 |
| 4,356 | 4,552 | 3,830 | 4,063 | 4,310 | 4,010 | 4,211 | 4,458 | 3,983 |

Appendix B: Review of the Internet Crimes Against Children Task Force Program

## ICAC TASK FORCE FUNDING AMOUNTS

| State | Task Force Agency | Fiscal Years | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| AK | Anchorage Police Department | 219,103 | 222,663 | 227,522 | 241,641 | 239,863 | 238,087 |
| AL | Alabama Department of Public Safety | 295,777 | 317,848 | 310,090 | 327,407 | 326,989 | |
| AL | Alabama Law Enforcement Agency | | | | | | 319,379 |
| AR | Arkansas State Police | 292,419 | 297,127 | 305,086 | 339,477 | 318,338 | 329,013 |
| AZ | Phoenix Police Department | 357,900 | 362,527 | 350,122 | 392,207 | 406,701 | 392,843 |
| CA | Fresno County Sheriff's Office | 268,353 | 293,890 | 296,329 | 312,159 | 303,508 | 304,325 |
| CA | Los Angeles Police Department | 575,051 | 622,829 | 582,812 | 614,561 | 640,890 | 630,777 |
| CA | Sacramento County Sheriff's Office | 315,925 | 340,511 | 326,979 | 347,736 | 356,649 | 350,691 |
| CA | San Diego Police Department | 320,403 | 354,109 | 356,378 | 368,066 | 383,220 | 363,337 |
| CA | San Jose Police Department | 355,102 | 392,960 | 360,756 | 399,655 | 399,904 | 392,843 |
| CO | Colorado Springs Police Department | 317,604 | 328,856 | 345,744 | 371,877 | 377,659 | 372,369 |
| CT | Connecticut State Police | 268,353 | 278,997 | 274,436 | 301,359 | 297,329 | 294,088 |
| DE | Delaware Department of Justice | 214,625 | 224,606 | 221,893 | 241,006 | 239,863 | 236,280 |
| FL | Broward County Sheriff's Office | 379,168 | 391,665 | 388,279 | 414,442 | 415,352 | 413,919 |
| FL | Gainesville Police Department | 318,164 | 330,799 | 357,751 | 353,454 | 375,805 | 355,509 |
| FL | Polk County Sheriff's Office | 380,287 | 393,608 | 366,386 | 412,537 | 413,498 | 408,499 |
| GA | Georgia Bureau of Investigation | 409,390 | 447,352 | 450,830 | 476,066 | 481,469 | 468,716 |
| HI | Hawaii Department of Attorney General | 223,580 | 233,023 | 238,156 | 256,253 | 255,311 | 250,130 |
| IA | Iowa Division of Criminal Investigation | 279,547 | 284,177 | 299,456 | 330,583 | 315,249 | 309,142 |
| ID | Idaho Office of Attorney General | 226,378 | 233,671 | 235,654 | 254,983 | 251,603 | 245,915 |
| IL | Cook County State's Attorney's Office | 296,897 | 319,143 | 311,341 | 343,924 | 343,055 | 339,250 |
| IL | Illinois Office of Attorney General | 388,682 | 386,485 | 378,896 | 414,442 | 413,498 | 413,316 |
| IN | Indiana State Police | 341,670 | 359,289 | 369,513 | 410,631 | 398,050 | 387,423 |
| KS | Sedgwick County Sheriff's Office | 255,481 | 271,874 | 273,810 | 298,183 | 293,622 | 291,077 |
| KY | Kentucky State Police | 305,292 | 317,848 | 325,102 | 362,348 | 364,064 | 346,476 |
| LA | Louisiana Department of Justice | 292,979 | 310,078 | 333,859 | 360,442 | 326,371 | 317,572 |
| MA | Massachusetts State Police | 341,670 | 362,527 | 353,875 | 390,936 | 396,814 | 382,606 |
| MD | Maryland State Police | 301,374 | 318,496 | 302,584 | 342,654 | 346,145 | 338,648 |
| ME | Maine State Police | 231,415 | 233,023 | 227,522 | 246,724 | 247,278 | 244,108 |
| MI | Michigan State Police | 459,200 | 494,621 | 471,471 | 482,419 | 482,087 | 470,522 |
| MN | Minnesota Department of Public Safety | 320,000 | 326,913 | 320,098 | 347,101 | 347,999 | 362,735 |
| MO | Glendale Police Department | 332,715 | | | | | |
| MO | St. Charles County Sherriff's Department | | 335,000 | 372,015 | 404,913 | 402,993 | 383,810 |
| MS | Mississippi Office of Attorney General | 247,646 | 267,989 | 278,814 | 296,277 | 299,801 | 292,281 |
| MT | Billings Police Department | 220,782 | 255,253 | 230,650 | 256,253 | 254,693 | 248,343 |
| NC | North Carolina State Bureau of Investigation | 388,682 | 403,968 | 405,793 | 447,478 | 446,247 | |
| NC | North Carolina Department of Public Safety | | | | | | 442,220 |
| ND | North Dakota Bureau of Criminal Investigation | 204,551 | 216,188 | 241,909 | 247,359 | 237,391 | 232,065 |

## ICAC TASK FORCE FUNDING AMOUNTS

| State | Task Force Agency | Fiscal Years | | | | | |
|-------|-------------------|------|------|------|------|------|------|
| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| NE | Nebraska State Patrol | 244,288 | 249,858 | 250,041 | 276,583 | 271,377 | 264,582 |
| NH | Portsmouth Police Department | 226,938 | 234,318 | 237,531 | 256,253 | 260,254 | 256,152 |
| NJ | New Jersey State Police | 379,727 | 396,197 | 382,649 | 425,242 | 413,498 | 414,521 |
| NM | New Mexico Attorney General's Office | 256,041 | 254,391 | 272,559 | 298,183 | 280,028 | 276,023 |
| NV | Las Vegas Metropolitan Police Department | 261,078 | 273,817 | 276,938 | 312,795 | 305,980 | 306,131 |
| NY | New York State Police | 431,217 | 458,360 | 435,817 | 494,490 | 498,153 | 497,619 |
| NY | New York City Police Department | 371,332 | 381,305 | 363,884 | 422,066 | 420,913 | 413,919 |
| OH | Cuyahoga County Prosecutor's Office | 446,887 | 477,138 | 477,101 | 508,467 | 511,129 | 499,426 |
| OK | Oklahoma State Bureau of Investigation | 286,823 | 293,243 | 296,329 | 314,065 | 309,070 | 305,529 |
| OR | Oregon Department of Justice | 301,374 | 319,190 | 312,592 | 349,577 | 349,852 | 346,476 |
| PA | Delaware County District Attorney's Office | 450,805 | 466,130 | 587,718 | 645,761 | 667,926 | 522,910 |
| RI | Rhode Island State Police | 216,304 | 224,606 | 233,152 | 247,359 | 242,953 | 241,097 |
| SC | South Carolina Attorney General's Office | 305,851 | 315,258 | 318,847 | 339,477 | 333,786 | 326,605 |
| SD | South Dakota Division of Criminal Investigation | 215,185 | 218,130 | 219,391 | 239,100 | 236,155 | 233,871 |
| TN | Knoxville Police Department | 341,670 | 361,879 | 364,509 | 402,372 | 401,139 | 394,649 |
| TX | Pasadena Independent School District Police Dept. | 364,616 | 405,911 | | | | |
| TX | Houston Metro Police Department | | | 349,719 | 394,113 | 382,602 | 376,584 |
| TX | Dallas Police Department | 390,921 | 433,106 | 427,686 | 477,337 | 480,233 | 487,985 |
| TX | Office of Attorney General of Texas | 351,184 | 387,780 | 428,311 | 491,313 | 499,388 | 492,200 |
| UT | Utah Office of Attorney General | 263,316 | 271,874 | 303,209 | 328,677 | 331,315 | 347,078 |
| VA | Bedford County  Sheriff's Office | 305,292 | 325,618 | 333,859 | 350,913 | 364,064 | 365,745 |
| VA | Virginia State Police | 277,868 | 296,480 | 290,699 | 317,242 | 322,046 | 318,777 |
| VT | Burlington Police Department | 214,061 | 222,016 | 224,395 | 242,912 | 235,538 | |
| VT | Vermont Office of Attorney General | | | | | | 235,000 |
| WA | Seattle Police Department | 355,662 | 384,543 | 375,143 | 429,690 | 428,946 | 416,929 |
| WI | Wisconsin Department of Justice | 342,230 | 373,535 | 355,752 | 383,313 | 441,768 | 366,950 |
| WV | West Virginia State Police | 238,691 | 251,154 | 275,687 | 386,747 | 441,768 | 288,066 |
| WY | Wyoming Division of Criminal Investigation | 212,387 | 222,016 | 234,291 | 258,159 | 235,538 | 236,882 |

## ICAC TASK FORCE NUMBER OF PERSONNEL TRAINED

| State | Task Force Agency | FISCAL YEARS | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| AK | Anchorage Police Department | 407 | 69 | 336 | 147 | 221 | 289 |
| AL | Alabama Department of Public Safety | 360 | 363 | 158 | 127 | 259 | 988 |
| AR | Arkansas State Police | 388 | 222 | 541 | 1,412 | 872 | 2,610 |
| AZ | Phoenix Police Department | 414 | 751 | 617 | 876 | 285 | 221 |
| CA | Fresno  County Sheriff's Office | 480 | 551 | 666 | 277 | 298 | 809 |
| CA | Los Angeles Police Department | 305 | 1,203 | 2,864 | 846 | 1,062 | 1,769 |
| CA | Sacramento County Sheriff's Office | 553 | 881 | 613 | 753 | 589 | 194 |
| CA | San Diego Police Department | 198 | 245 | 82 | 211 | 38 | 74 |
| CA | San Jose Police Department | 364 | 2,578 | 1,687 | 570 | 900 | 320 |
| CO | Colorado Springs Police Department | 88 | 160 | 40 | 75 | 37 | 115 |
| CT | Connecticut State Police | 33 | 190 | 270 | 183 | 731 | 479 |
| DE | Delaware Department of Justice | 21 | 269 | 19 | 14 | 131 | 497 |
| FL | Broward County Sheriff's Office | 270 | 147 | 82 | 50 | 56 | 43 |
| FL | Gainesville Police Department | 803 | 333 | 270 | 429 | 281 | 292 |
| FL | Polk County Sheriff's Office | 508 | 581 | 257 | 669 | 724 | 870 |
| GA | Georgia Bureau of Investigation | 589 | 856 | 1,646 | 3,172 | 6,278 | 4,646 |
| HI | Hawaii Department of Attorney General | 1,319 | 210 | 231 | 39 | 96 | 115 |
| IA | Iowa Division of Criminal Investigation | 46 | 555 | 784 | 202 | 306 | 118 |
| ID | Idaho Office of Attorney General | 397 | 335 | 224 | 328 | 115 | 64 |
| IL | Cook County State's Attorney's Office | 666 | 827 | 2,472 | 1,214 | 574 | 1,816 |
| IL | Illinois Office of Attorney General | 6,716 | 5,444 | 3,308 | 1,184 | 1,378 | 2,957 |
| IN | Indiana State Police | 2,052 | 1,069 | 1,370 | 1,447 | 833 | 2,933 |
| KS | Sedgwick County Sheriff's Office | 512 | 339 | 290 | 59 | 499 | 115 |
| KY | Kentucky State Police | 905 | 1,499 | 865 | 1,051 | 744 | 46 |
| LA | Louisiana Department of Justice | 214 | 717 | 361 | 633 | 387 | 885 |
| MA | Massachusetts State Police | 2,364 | 1,856 | 2,116 | 1,353 | 728 | 710 |
| MD | Maryland State Police | 612 | 684 | 1,823 | 1,460 | 1,814 | 1,527 |
| ME | Maine State Police | 260 | 15 | 195 | 192 | 161 | 239 |
| MI | Michigan State Police | 208 | 325 | 216 | 388 | 311 | 283 |
| MN | Minnesota Department of Public Safety | 1,516 | 676 | 594 | 369 | 202 | 250 |
| MO | Glendale Police Department | 3,008 | 3,714 | | | | |
| MO | St. Charles County Sheriff's Department | | | 2,055 | 1,811 | 2,996 | 3,694 |
| MS | Mississippi Office of Attorney General | 1,079 | 1,175 | 1,185 | 258 | 2,044 | 1,211 |
| MT | Billings Police Department | 624 | 927 | 562 | 359 | 180 | 141 |
| NC | North Carolina State Bureau of Investigation | 433 | 219 | 51 | 171 | 120 | 539 |
| ND | North Dakota Bureau of Criminal Investigation | 43 | 24 | 84 | 61 | 146 | 279 |
| NE | Nebraska State Patrol | 399 | 276 | 926 | 303 | 484 | 298 |
| NH | Portsmouth Police Department | 1,163 | 676 | 194 | 115 | 263 | 277 |
| NJ | New Jersey State Police | 67 | 521 | 81 | 202 | 306 | 609 |
| NM | New Mexico Attorney General's Office | 463 | 1,171 | 233 | 287 | 650 | 730 |
| NV | Las Vegas Metropolitan Police Department | 44 | 536 | 1,120 | 58 | 40 | 23 |

## ICAC TASK FORCE NUMBER OF PERSONNEL TRAINED

| State | Task Force Agency | FISCAL YEARS | | | | | |
|-------|-------------------|------|------|------|------|------|------|
|       |                   | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| NY | New York State Police | 134 | 72 | 193 | 201 | 79 | 85 |
| NY | New York City Police Department | 452 | 343 | 343 | 255 | 533 | 666 |
| OH | Cuyahoga County Prosecutor's Office | 111 | 356 | 135 | 778 | 615 | 1,134 |
| OK | Oklahoma State Bureau of Investigation | 142 | 64 | 52 | 81 | 33 | 69 |
| OR | Oregon Department of Justice | 667 | 715 | 1,266 | 831 | 562 | 500 |
| PA | Delaware County District Attorney's Office | 494 | 476 | 445 | 1,048 | 1,155 | 1,265 |
| RI | Rhode Island State Police | 126 | 330 | 281 | 112 | 23 | 16 |
| SC | South Carolina Attorney General's Office | 579 | 311 | 145 | 165 | 217 | 334 |
| SD | South Dakota Division of Criminal Investigation | 64 | 49 | 38 | 23 | 31 | 189 |
| TN | Knoxville Police Department | 1,225 | 2,277 | 386 | 3,091 | 2,972 | 1,401 |
| TX | Pasadena Independent School District Police Dept. | 1,876 | 584 | 219 | | | |
| TX | Houston Metro Police Department | | | | 307 | 506 | 215 |
| TX | Dallas Police Department | 23 | 123 | 239 | 317 | 540 | 162 |
| TX | Office of Attorney General of Texas | 37 | 9 | 652 | 555 | 935 | 900 |
| UT | Utah Office of Attorney General | 621 | 951 | 459 | 563 | 560 | 939 |
| VA | Bedford County  Sheriff's Office | 953 | 1,601 | 1,138 | 701 | 683 | 1,835 |
| VA | Virginia State Police | 344 | 251 | 801 | 317 | 282 | 234 |
| VT | Burlington Police Department | 451 | 372 | 183 | 132 | 47 | 60 |
| WA | Seattle Police Department | 477 | 381 | 142 | 427 | 330 | 92 |
| WI | Wisconsin Department of Justice | 2,433 | 1,258 | 1,746 | 1,554 | 1,736 | 696 |
| WV | West Virginia State Police | 52 | 474 | 267 | 254 | 716 | 646 |
| WY | Wyoming Division of Criminal Investigation | 271 | 291 | 75 | 106 | 268 | 422 |

117

## ICAC TASK FORCE TRAINING COURSES OFFERED - YEAR OVER YEAR
### (Note: SES = Sessions and ATTD. = Attendees)

| Category and Type of Training | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # of SES | # of ATTD. | # of SES | # of ATTD. | # of SES | # of ATTD. | # of SES | # of ATTD. | # of SES | # of ATTD. | # of SES | # of ATTD. |
| Forensics - Local /TF Specific | 17 | 380 | 51 | 950 | 48 | 756 | 33 | 506 | 33 | 555 | 34 | 627 |
| Forensics - Online | - | - | - | - | - | - | - | - | - | - | 4 | 131 |
| Forensics - Regional | 8 | 161 | | | 5 | 8 | 2 | 21 | 2 | 143 | | |
| | | | | | | | | | | | | |
| Investigations - Local /TF Specific | 31 | 764 | 33 | 638 | 40 | 638 | 22 | 381 | 31 | 672 | 11 | 543 |
| Investiagtions - Online | 3 | 235 | 1 | 109 | 3 | 510 | 1 | 180 | 25 | 2,776 | 25 | 2,147 |
| Investigations - Regional | 21 | 616 | 22 | 589 | 43 | 979 | 35 | 819 | 42 | 1,211 | 19 | 544 |
| | | | | | | | | | | | | |
| Legal - Local / TF Specific | 1 | 16 | 1 | 15 | - | - | - | - | - | - | - | - |
| Legal - Regional | 1 | 27 | - | - | - | - | - | - | 1 | 125 | 2 | 17 |
| | | | | | | | | | | | | |
| Management  - Online | - | - | - | - | - | - | - | - | - | - | 6 | 988 |
| Management  - Regional | 1 | 42 | 1 | 18 | 1 | 37 | 5 | 71 | 2 | 47 | 2 | 66 |
| | | | | | | | | | | | | |
| National Conference | 1 | 1,205 | 1 | 1,266 | 1 | 2,115 | - | - | | | 1 | 1,170 |
| Regional Conference | | | | | | | | | 4 | 1,019 | | |
| | | | | | | | | | | | | |
| Peer-to-Peer - Local / TF Specific | 14 | 385 | 10 | 266 | 23 | 439 | 31 | 608 | 14 | 282 | 12 | 246 |
| Peer-to-Peer - Online | - | - | | | | | 7 | 261 | 7 | 718 | 11 | 977 |
| Peer-to-Peer - Regional | - | - | 8 | 234 | 7 | 235 | 20 | 452 | 10 | 315 | 8 | 208 |
| | | | | | | | | | | | | |
| Wellness - Regional | 17 | 491 | 27 | 918 | 20 | 728 | 17 | 860 | 17 | 726 | 23 | 1,077 |

[Page intentionally left blank]

## ICAC TASK FORCE CYBERTIPS RECIEVED

| Task Force Agency | Fiscal Years | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | |
| Alabama | 287 | 394 | 883 | 777 | 996 | 1,091 | 4,428 |
| Alaska | 41 | 101 | 147 | 116 | 161 | 154 | 720 |
| Arizona | 520 | 629 | 1,150 | 1,288 | 1,545 | 1,873 | 7,005 |
| Arkansas | 172 | 355 | 622 | 487 | 700 | 738 | 3,074 |
| California - Fresno | 111 | 139 | 460 | 344 | 560 | 604 | 2,218 |
| California - Los Angeles | 1,109 | 1,061 | 2,639 | 2,153 | 3,119 | 5,127 | 15,208 |
| California - Sacramento | 334 | 502 | 747 | 672 | 973 | 1,493 | 4,721 |
| California - San Diego | 550 | 529 | 996 | 1,038 | 1,237 | 1,682 | 6,032 |
| California - San Jose | 678 | 553 | 1,375 | 1,313 | 1,517 | 1,855 | 7,291 |
| Colorado | 404 | 652 | 967 | 791 | 1,038 | 1,325 | 5,177 |
| Connecticut | 205 | 245 | 653 | 479 | 713 | 1,255 | 3,550 |
| Delaware | 53 | 64 | 198 | 221 | 2,814 | 221 | 3,571 |
| Florida - Broward | 569 | 640 | 1,059 | 1,131 | 1,609 | 1,548 | 6,556 |
| Florida - Gainesville | 373 | 475 | 969 | 772 | 1,266 | 3,215 | 7,070 |
| Florida - Polk | 649 | 733 | 1,566 | 1,403 | 1,663 | 1,861 | 7,875 |
| Georgia | 595 | 1,381 | 2,083 | 1,837 | 2,378 | 2,902 | 11,176 |
| Hawaii | 46 | 84 | 142 | 201 | 221 | 373 | 1,067 |
| Idaho | 88 | 180 | 245 | 215 | 242 | 291 | 1,261 |
| Illinois - Attorney General | 704 | 773 | 1,452 | 1,096 | 1,340 | 1,460 | 6,825 |
| Illinois - Cook County | 308 | 460 | 1,222 | 1,202 | 1,325 | 1,378 | 5,895 |
| Indiana | 599 | 839 | 1,907 | 1,201 | 1,749 | 1,744 | 8,039 |
| Iowa | 171 | 449 | 717 | 458 | 584 | 589 | 2,968 |
| Kansas | 146 | 449 | 961 | 609 | 663 | 621 | 3,449 |
| Kentucky | 429 | 596 | 1,105 | 831 | 854 | 1,207 | 5,022 |
| Louisiana | 158 | 377 | 799 | 729 | 1,024 | 1,200 | 4,287 |
| Maine | 143 | 155 | 250 | 237 | 297 | 243 | 1,325 |
| Maryland | 472 | 440 | 1,281 | 1,041 | 1,382 | 1,622 | 6,238 |
| Massachusetts | 639 | 587 | 1,118 | 1,080 | 1,312 | 1,902 | 6,638 |
| Michigan | 612 | 1,062 | 2,349 | 2,156 | 2,389 | 2,855 | 11,423 |
| Minnesota | 237 | 412 | 898 | 820 | 985 | 1,237 | 4,589 |
| Mississippi | 110 | 217 | 387 | 394 | 475 | 570 | 2,153 |
| Missouri | 338 | 734 | 1,524 | 1,185 | 1,222 | 1,362 | 6,365 |
| Montana | 93 | 161 | 523 | 356 | 394 | 340 | 1,867 |
| Nebraska | 80 | 153 | 343 | 209 | 344 | 474 | 1,603 |
| Nevada | 292 | 250 | 685 | 522 | 782 | 973 | 3,504 |
| New Hampshire | 105 | 147 | 342 | 295 | 335 | 260 | 1,484 |
| New Jersey | 498 | 651 | 1,473 | 1,452 | 2,151 | 2,360 | 8,585 |

## ICAC TASK FORCE CYBERTIPS RECIEVED

| Task Force Agency | Fiscal Years | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | |
| New Mexico | 106 | 148 | 401 | 308 | 356 | 486 | 1,805 |
| New York - NYPD | 468 | 686 | 1,865 | 1,671 | 2,747 | 2,955 | 10,392 |
| New York - State Police | 824 | 998 | 2,210 | 1,965 | 2,445 | 2,660 | 11,102 |
| North Carolina | 646 | 1,051 | 2,705 | 1,948 | 2,099 | 2,366 | 10,815 |
| North Dakota | 72 | 82 | 144 | 173 | 144 | 140 | 755 |
| Ohio | 1,029 | 1,641 | 2,935 | 2,326 | 2,703 | 3,138 | 13,772 |
| Oklahoma | 197 | 572 | 1,172 | 744 | 907 | 1,008 | 4,600 |
| Oregon | 469 | 461 | 1,704 | 749 | 1,069 | 1,247 | 5,699 |
| Pennsylvania | 1,056 | 1,494 | 3,042 | 2,327 | 2,814 | 2,880 | 13,613 |
| Rhode Island | 94 | 143 | 268 | 169 | 261 | 275 | 1,210 |
| South Carolina - OAG | 243 | 434 | 1,227 | 863 | 1,008 | 1,145 | 4,920 |
| South Dakota | 43 | 70 | 121 | 94 | 95 | 128 | 551 |
| Tennessee | 486 | 613 | 1,535 | 1,368 | 1,476 | 1,574 | 7,052 |
| Texas - Dallas | 750 | 935 | 1,885 | 1,753 | 2,328 | 2,674 | 10,325 |
| Texas - Houston | 572 | 1,030 | 1,367 | 979 | 1,623 | 1,879 | 7,450 |
| Texas - OAG | 444 | 748 | 2,151 | 1,730 | 2,221 | 2,907 | 10,201 |
| Utah | 162 | 319 | 540 | 544 | 544 | 616 | 2,725 |
| Vermont | 111 | 64 | 107 | 120 | 106 | 159 | 667 |
| Virginia - Bedford County | 406 | 562 | 827 | 651 | 1,073 | 1,187 | 4,706 |
| Virginia - State Police | 382 | 392 | 724 | 665 | 805 | 913 | 3,881 |
| Washington | 659 | 744 | 1,885 | 1,455 | 1,543 | 2,073 | 8,359 |
| West Virginia | 221 | 303 | 326 | 328 | 334 | 401 | 1,913 |
| Wisconsin | 227 | 551 | 965 | 797 | 1,131 | 1,369 | 5,040 |
| Wyoming | 66 | 53 | 139 | 115 | 351 | 190 | 914 |
| **Total** | **24,661** | **33,734** | **68,494** | **56,966** | **74,556** | **86,390** | **332,726** |

## ICAC TASK FORCE FORENSIC EXAMINATIONS PERFORMED

| State | Task Force Agency | FISCAL YEARS 2010 | 2011 | 2012 | 2013 | 2014 |
|-------|-------------------|------|------|------|------|------|
| AK | Anchorage Police Department | 424 | 532 | 450 | 568 | 708 |
| AL | Alabama Law Enforcement Agency | 1,664 | 1,800 | 575 | 420 | 482 |
| AR | Arkansas State Police | 579 | 598 | 609 | 678 | 1,969 |
| AZ | Phoenix Police Department | 117 | 139 | 235 | 391 | 460 |
| CA | Fresno County Sheriff's Office | 268 | 601 | 848 | 741 | 812 |
| CA | Los Angeles Police Department | 707 | 1,273 | 1,177 | 1,346 | 1,619 |
| CA | Sacramento County Sheriff's Office | 496 | 614 | 552 | 272 | 256 |
| CA | San Diego Police Department | 230 | 942 | 542 | 441 | 352 |
| CA | San Jose Police Department | 282 | 1,322 | 1,113 | 1,164 | 1,078 |
| CO | Colorado Springs Police Department | 422 | 849 | 1,077 | 1,446 | 1,549 |
| CT | Connecticut State Police | 324 | 433 | 524 | 651 | 868 |
| DE | Delaware Department of Justice | 146 | 215 | 172 | 262 | 236 |
| FL | Broward County Sheriff's Office | 462 | 621 | 101 | 296 | 184 |
| FL | Gainesville Police Department | 721 | 753 | 778 | 1,015 | 1,125 |
| FL | Polk County Sheriff's Office | 1,344 | 854 | 2,087 | 2,670 | 2,003 |
| GA | Georgia Bureau of Investigation | 2,206 | 1,604 | 528 | 1,115 | 1,255 |
| HI | Hawaii Department of Attorney General | 53 | 17 | 49 | 65 | 94 |
| IA | Iowa Division of Criminal Investigation | 656 | 637 | 1,007 | 1,444 | 1,341 |
| ID | Idaho Office of Attorney General | 76 | 254 | 242 | 230 | 157 |
| IL | Cook County State's Attorney's Office | 56 | 48 | 99 | 112 | 202 |
| IL | Illinois Office of Attorney General | 873 | 397 | 665 | 1,254 | 1,804 |
| IN | Indiana State Police | 990 | 1,842 | 1,617 | 1,762 | 1,446 |
| KS | Sedgwick County Sheriff's Office | 312 | 228 | 378 | 448 | 586 |
| KY | Kentucky State Police | 415 | 410 | 536 | 676 | 744 |
| LA | Louisiana Department of Justice | 495 | 845 | 1,636 | 1,125 | 865 |
| MA | Massachusetts State Police | 451 | 517 | 875 | 1,092 | 1,130 |
| MD | Maryland State Police | 289 | 282 | 247 | 405 | 295 |
| ME | Maine State Police | 300 | 718 | 106 | 482 | 562 |
| MI | Michigan State Police | 343 | 328 | 521 | 120 | 176 |
| MN | Minnesota Department of Public Safety | 846 | 635 | 728 | 909 | 558 |
| MO | Glendale Police Department | 2,039 | 2,883 | | | |
| MO | St. Charles County | | | 3,989 | 3,060 | 4,160 |
| MS | Mississippi Office of Attorney General | 107 | 329 | 543 | 385 | 486 |
| MT | Billings Police Department | 261 | 275 | 270 | 375 | 577 |
| NC | North Carolina State Bureau of Investigation | 507 | 741 | 1,375 | 922 | 1,136 |
| ND | North Dakota Bureau of Criminal Investigation | 392 | 829 | 513 | 898 | 758 |
| NE | Nebraska State Patrol | 731 | 678 | 1,064 | 1,822 | 1,280 |
| NH | Portsmouth Police Department | 230 | 204 | 230 | 254 | 565 |
| NJ | New Jersey State Police | 360 | 561 | 286 | 463 | 849 |
| NM | New Mexico Attorney General's Office | 943 | 1,355 | 1,037 | 1,160 | 1,037 |
| NV | Las Vegas Metropolitan Police Department | 679 | 1,348 | 1,235 | 1,086 | 1,087 |

122

## ICAC TASK FORCE FORENSIC EXAMINATIONS PERFORMED

| State | Task Force Agency | FISCAL YEARS | | | | |
|-------|-------------------|------|------|------|------|------|
|       |                   | 2010 | 2011 | 2012 | 2013 | 2014 |
| NY | New York State Police | 761 | 1,094 | 1,107 | 1,051 | 1,123 |
| NY | New York City Police Department | 171 | 251 | 333 | 407 | 380 |
| OH | Cuyahoga County Prosecutor's Office | 1,046 | 1,547 | 1,003 | 1,685 | 1,290 |
| OK | Oklahoma State Bureau of Investigation | 213 | 254 | 656 | 507 | 831 |
| OR | Oregon Department of Justice | 639 | 571 | 785 | 335 | 430 |
| PA | Delaware County District Attorney's Office | 1,553 | 1,677 | 1,704 | 3,957 | 4,571 |
| RI | Rhode Island State Police | 461 | 777 | 436 | 136 | 284 |
| SC | South Carolina Attorney General's Office | 436 | 477 | 281 | 262 | 286 |
| SD | South Dakota Division of Criminal Investigation | 345 | 654 | 1,412 | 1,196 | 1,049 |
| TN | Knoxville Police Department | 517 | 684 | 892 | 1,190 | 1,757 |
| TX | Pasadena Independent School District Police Dept. | 813 | 1,148 | 1,058 | | |
| TX | Houston Metro Police Department | | | | 754 | 418 |
| TX | Dallas Police Department | 375 | 354 | 617 | 772 | 1,342 |
| TX | Office of Attorney General of Texas | 316 | 384 | 1,645 | 1,940 | 5,603 |
| UT | Utah Office of Attorney General | 408 | 999 | 1,375 | 1,601 | 2,040 |
| VA | Bedford County  Sheriff's Office | 339 | 459 | 785 | 1,671 | 1,792 |
| VA | Virginia State Police | 158 | 387 | 807 | 1,394 | 824 |
| VT | Burlington Police Department | 147 | 150 | 181 | 193 | 123 |
| WA | Seattle Police Department | 526 | 292 | 374 | 480 | 356 |
| WI | Wisconsin Department of Justice | 1,285 | 2,806 | 2,948 | 3,181 | 3,173 |
| WV | West Virginia State Police | 485 | 685 | 555 | 907 | 1,229 |
| WY | Wyoming Division of Criminal Investigation | 265 | 416 | 446 | 421 | 313 |

## ICAC TASK FORCE TECHNICAL SUPPORT PERFORMED

| State | Task Force Agency | FISCAL YEARS | | | | | |
|-------|-------------------|------|------|------|------|------|------|
| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| AL | Alabama Law Enforcement Agency | 76 | 191 | 161 | 178 | 89 | 130 |
| AR | Arkansas State Police | 501 | 707 | 610 | 384 | 1,076 | 1,366 |
| AZ | Phoenix Police Department | 132 | 112 | 179 | 349 | 457 | 601 |
| CA | Fresno  County Sheriff's Office | 896 | 932 | 467 | 531 | 854 | 1,197 |
| CA | Los Angeles Police Department | 1,137 | 1,534 | 1,113 | 1,798 | 2,124 | 3,062 |
| CA | Sacramento County Sheriff's Office | 122 | 90 | 64 | 15 | 56 | 35 |
| CA | San Diego Police Department | 397 | 1,208 | 669 | 1,117 | 592 | 377 |
| CA | San Jose Police Department | 161 | 353 | 515 | 475 | 539 | 547 |
| CO | Colorado Springs Police Department | 206 | 369 | 509 | 768 | 934 | 805 |
| CT | Connecticut State Police | 361 | 301 | 361 | 405 | 520 | 295 |
| DE | Delaware Department of Justice | 19 | 24 | 13 | 12 | 11 | 10 |
| FL | Broward County Sheriff's Office | 307 | 628 | 929 | 1036 | 1,375 | 1,057 |
| FL | Gainesville Police Department | 708 | 742 | 734 | 1,050 | 935 | 479 |
| FL | Polk County Sheriff's Office | 120 | 186 | 601 | 532 | 740 | 913 |
| GA | Georgia Bureau of Investigation | 599 | 765 | 871 | 855 | 716 | 1,800 |
| HI | Hawaii Department of Attorney General | 244 | 51 | 228 | 264 | 221 | 169 |
| IA | Iowa Division of Criminal Investigation | 666 | 823 | 932 | 1,052 | 1,004 | 971 |
| ID | Idaho Office of Attorney General | 155 | 148 | 102 | 88 | 26 | 40 |
| IL | Cook County State's Attorney's Office | 44 | 55 | 42 | 15 | 79 | 156 |
| IL | Illinois Office of Attorney General | 242 | 360 | 426 | 838 | 1,008 | 768 |
| IN | Indiana State Police | 409 | 372 | 480 | 419 | 294 | 196 |
| KS | Sedgwick County Sheriff's Office | 206 | 195 | 236 | 248 | 372 | 155 |
| KY | Kentucky State Police | 751 | 832 | 1,021 | 1,206 | 765 | 452 |
| LA | Louisiana Department of Justice | 1112 | 1017 | 875 | 635 | 599 | 606 |
| MA | Massachusetts State Police | 456 | 796 | 861 | 1,112 | 1,044 | 886 |
| MD | Maryland State Police | 70 | 58 | 100 | 227 | 94 | 277 |
| ME | Maine State Police | 110 | 63 | 42 | 36 | 90 | 295 |
| MI | Michigan State Police | 222 | 275 | 249 | 322 | 376 | 454 |
| MN | Minnesota Department of Public Safety | 725 | 525 | 342 | 510 | 725 | 383 |
| MO | Glendale Police Department | 713 | 978 | | | | |
| MO | St. Charles County Sheriff's Department | | | 1018 | 1324 | 840 | 919 |
| MS | Mississippi Office of Attorney General | 358 | 496 | 538 | 486 | 416 | 360 |
| MT | Billings Police Department | 207 | 264 | 203 | 177 | 123 | 116 |
| NC | North Carolina State Bureau of Investigation | 312 | 365 | 449 | 624 | 836 | 524 |
| ND | North Dakota Bureau of Criminal Investigation | 157 | 423 | 315 | 163 | 114 | 16 |
| NE | Nebraska State Patrol | 828 | 618 | 592 | 632 | 555 | 470 |
| NH | Portsmouth Police Department | 204 | 243 | 323 | 434 | 435 | 563 |
| NJ | New Jersey State Police | 178 | 184 | 296 | 408 | 737 | 241 |
| NM | New Mexico Attorney General's Office | 559 | 1,166 | 679 | 393 | 409 | 507 |
| NV | Las Vegas Metropolitan Police Department | 365 | 479 | 802 | 748 | 1,001 | 434 |

124

# ICAC TASK FORCE TECHNICAL SUPPORT PERFORMED

| State | Task Force Agency | FISCAL YEARS | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| NY | New York State Police | 378 | 278 | 280 | 883 | 1,380 | 2,299 |
| NY | New York City Police Department | 53 | 20 | 59 | 54 | 68 | 108 |
| OH | Cuyahoga County Prosecutor's Office | 65 | 102 | 64 | 121 | 95 | 138 |
| OK | Oklahoma State Bureau of Investigation | 91 | 109 | 33 | 59 | 111 | 117 |
| OR | Oregon Department of Justice | 185 | 315 | 300 | 305 | 500 | 362 |
| PA | Delaware County District Attorney's Office | 1291 | 795 | 857 | 973 | 1,044 | 1,294 |
| RI | Rhode Island State Police | 149 | 380 | 199 | 185 | 308 | 121 |
| SC | South Carolina Attorney General's Office | 694 | 156 | 247 | 222 | 86 | 347 |
| SD | South Dakota Division of Criminal Investigation | 209 | 201 | 217 | 185 | 163 | 257 |
| TN | Knoxville Police Department | 1116 | 1019 | 1140 | 1466 | 1,596 | 1,001 |
| TX | Pasadena Independent School District Police Dept. | 459 | 500 | 499 | | | |
| TX | Houston Metro Police Department | | | | 176 | 214 | 349 |
| TX | Dallas Police Department | 322 | 811 | 633 | 783 | 1,463 | 1,177 |
| TX | Office of Attorney General of Texas | 64 | 103 | 99 | 399 | 511 | 537 |
| UT | Utah Office of Attorney General | 510 | 1,158 | 1,219 | 1,508 | 2,299 | 2,410 |
| VA | Bedford County Sheriff's Office | 754 | 800 | 805 | 1107 | 1,471 | 1,580 |
| VA | Virginia State Police | 244 | 487 | 439 | 632 | 800 | 764 |
| VT | Burlington Police Department | 173 | 192 | 140 | 78 | 131 | 91 |
| WA | Seattle Police Department | 511 | 248 | 341 | 494 | 324 | 251 |
| WI | Wisconsin Department of Justice | 921 | 677 | 563 | 593 | 510 | 296 |
| WV | West Virginia State Police | 251 | 647 | 713 | 667 | 889 | 1,583 |
| WY | Wyoming Division of Criminal Investigation | 652 | 970 | 1090 | 96 | 329 | 7,566 |

125

## ICAC TASK FORCE NUMBER OF ARRESTS

| State | Task Force Agency | Fiscal Years | | | | | |
|-------|-------------------|------|------|------|------|------|------|
|       |                   | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| AK | Anchorage Police Department | 24 | 24 | 23 | 27 | 48 | 91 |
| AL | Alabama Law Enforcement Agency | 17 | 35 | 46 | 65 | 28 | 35 |
| AR | Arkansas State Police | 46 | 41 | 73 | 100 | 99 | 129 |
| AZ | Phoenix Police Department | 82 | 127 | 137 | 202 | 202 | 242 |
| CA | Fresno County Sheriff's Office | 47 | 103 | 45 | 93 | 50 | 48 |
| CA | Los Angeles Police Department | 163 | 276 | 241 | 247 | 703 | 568 |
| CA | Sacramento County Sheriff's Office | 61 | 59 | 54 | 27 | 37 | 33 |
| CA | San Diego Police Department | 64 | 59 | 69 | 108 | 83 | 120 |
| CA | San Jose Police Department | 95 | 115 | 176 | 228 | 194 | 128 |
| CO | Colorado Springs Police Department | 111 | 137 | 137 | 151 | 138 | 135 |
| CT | Connecticut State Police | 36 | 61 | 46 | 87 | 99 | 68 |
| DE | Delaware Department of Justice | 35 | 44 | 38 | 56 | 37 | 40 |
| FL | Broward County Sheriff's Office | 158 | 117 | 103 | 120 | 107 | 62 |
| FL | Gainesville Police Department | 165 | 212 | 182 | 404 | 272 | 280 |
| FL | Polk County Sheriff's Office | 301 | 274 | 497 | 473 | 543 | 355 |
| GA | Georgia Bureau of Investigation | 187 | 161 | 120 | 236 | 185 | 205 |
| HI | Hawaii Department of Attorney General | 22 | 13 | 8 | 4 | 8 | 8 |
| IA | Iowa Division of Criminal Investigation | 31 | 51 | 93 | 57 | 65 | 75 |
| ID | Idaho Office of Attorney General | 43 | 42 | 34 | 37 | 30 | 40 |
| IL | Cook County State's Attorney's Office | 32 | 71 | 39 | 50 | 330 | 285 |
| IL | Illinois Office of Attorney General | 71 | 62 | 98 | 135 | 207 | 191 |
| IN | Indiana State Police | 142 | 166 | 248 | 209 | 182 | 237 |
| KS | Sedgwick County Sheriff's Office | 40 | 26 | 50 | 30 | 45 | 50 |
| KY | Kentucky State Police | 64 | 61 | 74 | 70 | 72 | 108 |
| LA | Louisiana Department of Justice | 185 | 235 | 223 | 128 | 167 | 223 |
| MA | Massachusetts State Police | 55 | 58 | 125 | 75 | 71 | 90 |
| MD | Maryland State Police | 89 | 92 | 95 | 108 | 81 | 172 |
| ME | Maine State Police | 55 | 98 | 91 | 47 | 44 | 49 |
| MI | Michigan State Police | 147 | 134 | 97 | 252 | 332 | 168 |
| MN | Minnesota Department of Public Safety | 52 | 54 | 31 | 288 | 88 | 47 |
| MO | Glendale Police Department | 326 | 341 | | | | |
| MO | St. Charles County Sheriff's Department | | | 323 | 370 | 321 | 296 |
| MS | Mississippi Office of Attorney General | 74 | 87 | 54 | 60 | 58 | 37 |
| MT | Billings Police Department | 13 | 31 | 30 | 49 | 59 | 43 |
| NC | North Carolina State Bureau of Investigation | 85 | 92 | 86 | 84 | 109 | 96 |
| ND | North Dakota Bureau of Criminal Investigation | 3 | 15 | 47 | 45 | 75 | 34 |
| NE | Nebraska State Patrol | 84 | 81 | 72 | 66 | 80 | 77 |
| NH | Portsmouth Police Department | 20 | 30 | 17 | 6 | 23 | 35 |
| NJ | New Jersey State Police | 118 | 102 | 100 | 128 | 121 | 143 |
| NM | New Mexico Attorney General's Office | 78 | 82 | 108 | 89 | 92 | 74 |
| NV | Las Vegas Metropolitan Police Department | 69 | 101 | 137 | 125 | 97 | 108 |

# ICAC TASK FORCE NUMBER OF ARRESTS

| State | Task Force Agency | Fiscal Years | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| NY | New York State Police | 170 | 157 | 102 | 82 | 81 | 83 |
| NY | New York City Police Department | 16 | 15 | 59 | 74 | 185 | 93 |
| OH | Cuyahoga County Prosecutor's Office | 111 | 165 | 154 | 188 | 173 | 150 |
| OK | Oklahoma State Bureau of Investigation | 40 | 31 | 53 | 73 | 76 | 100 |
| OR | Oregon Department of Justice | 42 | 29 | 37 | 8 | 32 | 24 |
| PA | Delaware County District Attorney's Office | 283 | 144 | 158 | 316 | 416 | 444 |
| RI | Rhode Island State Police | 53 | 48 | 37 | 36 | 69 | 110 |
| SC | South Carolina Attorney General's Office | 66 | 48 | 32 | 39 | 57 | 119 |
| SD | South Dakota Division of Criminal Investigation | 25 | 86 | 42 | 50 | 31 | 14 |
| TN | Knoxville Police Department | 119 | 117 | 101 | 181 | 208 | 194 |
| TX | Pasadena Independent School District Police Dept. | 194 | 163 | 153 | | | |
| TX | Houston Metro Police Department | | | | 195 | 169 | 259 |
| TX | Dallas Police Department | 73 | 112 | 224 | 103 | 112 | 84 |
| TX | Office of Attorney General of Texas | 93 | 59 | 51 | 122 | 108 | 250 |
| UT | Utah Office of Attorney General | 165 | 170 | 129 | 133 | 182 | 218 |
| VA | Bedford County Sheriff's Office | 84 | 109 | 165 | 203 | 269 | 140 |
| VA | Virginia State Police | 135 | 190 | 193 | 157 | 205 | 256 |
| VT | Burlington Police Department | 14 | 16 | 17 | 12 | 14 | 17 |
| WA | Seattle Police Department | 35 | 47 | 42 | 46 | 34 | 65 |
| WI | Wisconsin Department of Justice | 123 | 143 | 115 | 177 | 214 | 273 |
| WV | West Virginia State Police | 39 | 62 | 40 | 110 | 273 | 215 |
| WY | Wyoming Division of Criminal Investigation | 25 | 14 | 15 | 30 | 29 | 52 |

# NUMBER OF CASES REFERRED FOR FURTHER INVESTIGATION

| State | Task Force Agency | FY 2010 | | | FY 2011 | | |
|-------|-------------------|---------|---------|---------|---------|---------|---------|
| | | Federal | State | Local | Federal | State | Local |
| AK | Anchorage Police Department | 0 | 19 | 5 | 2 | 11 | 0 |
| AL | Alabama Law Enforcement Agency | 9 | 28 | 20 | 25 | 68 | 40 |
| AR | Arkansas State Police | 5 | 14 | 18 | 2 | 22 | 35 |
| AZ | Phoenix Police Department | 9 | 102 | 167 | 23 | 129 | 233 |
| CA | Fresno  County Sheriff's Office | 23 | 46 | 20 | 26 | 15 | 12 |
| CA | Los Angeles Police Department | 23 | 184 | 47 | 35 | 138 | 131 |
| CA | Sacramento County Sheriff's Office | 58 | 19 | 30 | 18 | 10 | 44 |
| CA | San Diego Police Department | 61 | 12 | 98 | 56 | 15 | 39 |
| CA | San Jose Police Department | 3 | 41 | 106 | 11 | 65 | 105 |
| CO | Colorado Springs Police Department | 23 | 31 | 81 | 41 | 30 | 144 |
| CT | Connecticut State Police | 7 | 24 | 52 | 8 | 19 | 28 |
| DE | Delaware Department of Justice | 7 | 5 | 19 | 1 | 7 | 13 |
| FL | Broward County Sheriff's Office | 5 | 9 | 724 | 5 | 4 | 697 |
| FL | Gainesville Police Department | 78 | 54 | 34 | 60 | 81 | 24 |
| FL | Polk County Sheriff's Office | 8 | 72 | 38 | 19 | 92 | 60 |
| GA | Georgia Bureau of Investigation | 12 | 92 | 112 | 17 | 63 | 167 |
| HI | Hawaii Department of Attorney General | 6 | 1 | 7 | 7 | 2 | 5 |
| IA | Iowa Division of Criminal Investigation | 9 | 23 | 5 | 21 | 17 | 12 |
| ID | Idaho Office of Attorney General | 18 | 31 | 55 | 4 | 34 | 28 |
| IL | Cook County State's Attorney's Office | 2 | 7 | 9 | 1 | 7 | 3 |
| IL | Illinois Office of Attorney General | 28 | 18 | 28 | 13 | 37 | 16 |
| IN | Indiana State Police | 58 | 61 | 45 | 67 | 56 | 30 |
| KS | Sedgwick County Sheriff's Office | 43 | 29 | 16 | 21 | 30 | 23 |
| KY | Kentucky State Police | 15 | 29 | 18 | 17 | 71 | 9 |
| LA | Louisiana Department of Justice | 26 | 92 | 80 | 14 | 139 | 163 |
| MA | Massachusetts State Police | 19 | 33 | 17 | 19 | 30 | 28 |
| MD | Maryland State Police | 10 | 9 | 5 | 14 | 6 | 13 |
| ME | Maine State Police | 1 | 1 | 3 | 4 | 1 | 4 |
| MI | Michigan State Police | 2 | 0 | 121 | 3 | 0 | 134 |
| MN | Minnesota Department of Public Safety | 1 | 81 | 227 | 4 | 34 | 70 |
| MO | Glendale Police Department | 66 | 174 | 88 | 85 | 319 | 223 |
| MO | St. Charles County Sheriff's Department | | | | | | |
| MS | Mississippi Office of Attorney General | 2 | 12 | 25 | 9 | 52 | 59 |
| MT | Billings Police Department | 36 | 31 | 19 | 50 | 35 | 32 |
| NC | North Carolina State Bureau of Investigation | 11 | 25 | 86 | 24 | 54 | 96 |
| ND | North Dakota Bureau of Criminal Investigation | 4 | 4 | 0 | 2 | 10 | 1 |
| NE | Nebraska State Patrol | 33 | 47 | 25 | 15 | 40 | 10 |
| NH | Portsmouth Police Department | 10 | 24 | 34 | 10 | 23 | 37 |
| NJ | New Jersey State Police | 2 | 22 | 31 | 2 | 38 | 0 |
| NM | New Mexico Attorney General's Office | 33 | 52 | 20 | 27 | 47 | 20 |
| NV | Las Vegas Metropolitan Police Department | 38 | 76 | 56 | 40 | 104 | 95 |

## NUMBER OF CASES REFERRED FOR FURTHER INVESTIGATION

| FY 2012 | | | FY 2013 | | | FY 2014 | | | FY 2015 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Federal | State | Local | Federal | State | Local | Federal | State | Local | Federal | State | Local |
| 6 | 27 | 9 | 11 | 13 | 18 | 17 | 36 | 13 | 5 | 17 | 5 |
| 16 | 211 | 96 | 6 | 80 | 84 | 1 | 18 | 2 | 2 | 13 | 10 |
| 10 | 31 | 27 | 38 | 10 | 40 | 50 | 52 | 41 | 43 | 49 | 34 |
| 47 | 203 | 606 | 10 | 107 | 779 | 232 | 161 | 1106 | 160 | 502 | 1282 |
| 9 | 26 | 15 | 17 | 54 | 9 | 11 | 15 | 9 | 18 | 38 | 12 |
| 36 | 60 | 142 | 27 | 85 | 85 | 62 | 64 | 95 | 30 | 125 | 73 |
| 37 | 2 | 79 | 8 | 12 | 32 | 16 | 14 | 13 | 13 | 6 | 90 |
| 27 | 22 | 27 | 23 | 2 | 47 | 10 | 0 | 41 | 14 | 19 | 35 |
| 27 | 67 | 166 | 9 | 20 | 213 | 0 | 0 | 141 | 6 | 0 | 80 |
| 23 | 31 | 118 | 36 | 21 | 201 | 43 | 15 | 502 | 199 | 9 | 822 |
| 12 | 19 | 32 | 16 | 20 | 33 | 21 | 42 | 69 | 9 | 35 | 106 |
| 2 | 2 | 13 | 3 | 0 | 8 | 0 | 7 | 0 | 0 | 4 | 3 |
| 6 | 14 | 1010 | 8 | 6 | 1139 | 1 | 0 | 1639 | 32 | 1 | 1274 |
| 46 | 52 | 24 | 84 | 143 | 33 | 51 | 40 | 18 | 27 | 45 | 31 |
| 56 | 148 | 73 | 60 | 103 | 197 | 56 | 117 | 135 | 51 | 232 | 73 |
| 36 | 399 | 354 | 39 | 473 | 499 | 350 | 400 | 674 | 79 | 378 | 713 |
| 5 | 3 | 3 | 30 | 6 | 4 | 1 | 12 | 2 | 11 | 1 | 0 |
| 28 | 25 | 18 | 36 | 10 | 9 | 27 | 23 | 7 | 19 | 16 | 9 |
| 10 | 17 | 20 | 22 | 21 | 22 | 4 | 17 | 4 | 15 | 41 | 19 |
| 3 | 32 | 5 | 36 | 22 | 141 | 52 | 13 | 170 | 78 | 12 | 137 |
| 19 | 29 | 20 | 18 | 26 | 26 | 32 | 44 | 30 | 40 | 35 | 17 |
| 70 | 54 | 58 | 71 | 46 | 39 | 38 | 58 | 40 | 123 | 71 | 44 |
| 12 | 17 | 21 | 19 | 9 | 27 | 15 | 30 | 55 | 30 | 14 | 125 |
| 35 | 80 | 7 | 18 | 86 | 15 | 10 | 57 | 3 | 10 | 41 | 7 |
| 24 | 106 | 77 | 34 | 104 | 57 | 34 | 71 | 74 | 45 | 31 | 94 |
| 12 | 40 | 30 | 15 | 36 | 55 | 10 | 22 | 27 | 12 | 550 | 5 |
| 12 | 14 | 14 | 13 | 14 | 13 | 14 | 21 | 11 | 27 | 34 | 6 |
| 4 | 1 | 6 | 4 | 1 | 10 | 4 | 1 | 9 | 11 | 1 | 9 |
| 4 | 0 | 96 | 1 | 0 | 185 | 1 | 4 | 346 | 3 | 4 | 286 |
| 4 | 7 | 58 | 1 | 57 | 58 | 11 | 38 | 72 | 15 | 30 | 73 |
| | | | | | | | | | | | |
| 92 | 975 | 547 | 58 | 238 | 609 | 89 | 214 | 735 | 73 | 118 | 638 |
| 4 | 94 | 92 | 12 | 26 | 31 | 7 | 11 | 14 | 5 | 8 | 30 |
| 31 | 56 | 43 | 58 | 45 | 38 | 46 | 91 | 59 | 29 | 30 | 45 |
| 21 | 24 | 5 | 12 | 25 | 7 | 13 | 51 | 28 | 60 | 38 | 17 |
| 25 | 31 | 4 | 12 | 7 | 4 | 13 | 17 | 6 | 9 | 14 | 1 |
| 9 | 22 | 30 | 7 | 31 | 76 | 28 | 20 | 115 | 35 | 54 | 182 |
| 5 | 24 | 57 | 5 | 11 | 17 | 5 | 11 | 31 | 10 | 10 | 20 |
| 5 | 28 | 14 | 4 | 9 | 562 | 5 | 40 | 895 | 2 | 24 | 1078 |
| 28 | 63 | 15 | 36 | 50 | 10 | 24 | 64 | 47 | 26 | 65 | 92 |
| 60 | 128 | 144 | 61 | 103 | 130 | 68 | 135 | 100 | 101 | 115 | 110 |

# NUMBER OF CASES REFERRED FOR FURTHER INVESTIGATION

| State | Task Force Agency | FY 2010 | | | FY 2011 | | |
|-------|-------------------|---------|-------|-------|---------|-------|-------|
| | | Federal | State | Local | Federal | State | Local |
| NY | New York State Police | 17 | 77 | 74 | 27 | 107 | 119 |
| NY | New York City Police Department | 0 | 0 | 16 | 0 | 0 | 11 |
| OH | Cuyahoga County Prosecutor's Office | 8 | 50 | 54 | 23 | 46 | 124 |
| OK | Oklahoma State Bureau of Investigation | 27 | 20 | 11 | 14 | 16 | 13 |
| OR | Oregon Department of Justice | 12 | 30 | 39 | 11 | 42 | 174 |
| PA | Delaware County District Attorney's Office | 50 | 277 | 174 | 35 | 355 | 374 |
| RI | Rhode Island State Police | 2 | 19 | 2 | 6 | 2 | 0 |
| SC | South Carolina Attorney General's Office | 1 | 11 | 7 | 4 | 43 | 26 |
| SD | South Dakota Division of Criminal Investigation | 6 | 34 | 17 | 21 | 78 | 16 |
| TN | Knoxville Police Department | 45 | 74 | 139 | 117 | 89 | 274 |
| TX | Pasadena Independent School District | 22 | 3 | 184 | 46 | 0 | 131 |
| TX | Houston Metro Police Department | | | | | | |
| TX | Dallas Police Department | 26 | 175 | 361 | 32 | 70 | 402 |
| TX | Office of Attorney General of Texas | 15 | 3 | 77 | 3 | 7 | 201 |
| UT | Utah Office of Attorney General | 14 | 84 | 8 | 17 | 200 | 84 |
| VA | Bedford County Sheriff's Office | 6 | 29 | 257 | 36 | 30 | 219 |
| VA | Virginia State Police | 33 | 35 | 22 | 47 | 45 | 17 |
| VT | Burlington Police Department | 3 | 0 | 6 | 12 | 3 | 25 |
| WA | Seattle Police Department | 8 | 39 | 43 | 28 | 12 | 49 |
| WI | Wisconsin Department of Justice | 17 | 123 | 51 | 4 | 123 | 88 |
| WV | West Virginia State Police | 11 | 18 | 0 | 25 | 34 | 4 |
| WY | Wyoming Division of Criminal Investigation | 32 | 6 | 3 | 24 | 10 | 0 |

## NUMBER OF CASES REFERRED FOR FURTHER INVESTIGATION

| FY 2012 | | | FY 2013 | | | FY 2014 | | | FY 2015 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Federal | State | Local | Federal | State | Local | Federal | State | Local | Federal | State | Local |
| 12 | 98 | 104 | 4 | 120 | 116 | 8 | 163 | 123 | 5 | 164 | 69 |
| 1 | 1 | 45 | 0 | 0 | 12 | 0 | 0 | 0 | 0 | 0 | 0 |
| 27 | 54 | 141 | 39 | 33 | 105 | 36 | 49 | 52 | 28 | 77 | 42 |
| 8 | 42 | 4 | 1 | 77 | 19 | 11 | 56 | 17 | 16 | 45 | 27 |
| 106 | 45 | 210 | 85 | 35 | 401 | 79 | 33 | 294 | 44 | 63 | 460 |
| 228 | 940 | 1241 | 190 | 642 | 953 | 352 | 738 | 754 | 306 | 822 | 682 |
| 3 | 0 | 0 | 3 | 2 | 0 | 1 | 7 | 2 | 1 | 2 | 0 |
| 13 | 2 | 13 | 78 | 95 | 16 | 110 | 19 | 99 | 122 | 35 | 410 |
| 8 | 69 | 3 | 17 | 59 | 6 | 13 | 35 | 3 | 3 | 10 | 5 |
| 135 | 373 | 771 | 26 | 76 | 338 | 8 | 98 | 547 | 20 | 110 | 416 |
| 32 | 0 | 78 | | | | | | | | | |
| | | | 15 | 46 | 45 | 19 | 110 | 0 | 104 | 154 | 110 |
| 96 | 96 | 732 | 86 | 94 | 797 | 63 | 110 | 1017 | 43 | 172 | 1239 |
| 11 | 164 | 439 | 139 | 339 | 480 | 168 | 233 | 353 | 191 | 369 | 355 |
| 25 | 129 | 142 | 18 | 94 | 167 | 29 | 170 | 133 | 64 | 249 | 234 |
| 28 | 51 | 393 | 91 | 78 | 396 | 62 | 54 | 487 | 29 | 63 | 293 |
| 59 | 43 | 42 | 64 | 37 | 18 | 69 | 71 | 83 | 70 | 117 | 156 |
| 27 | 4 | 11 | 4 | 2 | 10 | 9 | 2 | 10 | 11 | 4 | 4 |
| 36 | 49 | 20 | 15 | 47 | 39 | 18 | 17 | 29 | 21 | 15 | 16 |
| 2 | 71 | 94 | 12 | 161 | 162 | 8 | 157 | 165 | 10 | 152 | 97 |
| 13 | 51 | 6 | 16 | 51 | 0 | 39 | 96 | 3 | 31 | 90 | 10 |
| 7 | 2 | 7 | 2 | 1 | 1 | 36 | 0 | 2 | 8 | 2 | 0 |

# ICAC TASK FORCE
## CRIMINAL REFERRALS TO UNITED STATES ATTORNEYS' OFFICES

| State | Task Force Agency | FY 2010 | | FY 2011 | |
|-------|-------------------|---------|---|---------|---|
| | | Submitted | Accepted | Submitted | Accepted |
| AK | Anchorage Police Department | 1 | 1 | 9 | 6 |
| AL | Alabama Law Enforcement Agency | 17 | 16 | 40 | 36 |
| AR | Arkansas State Police | 12 | 13 | 11 | 12 |
| AZ | Phoenix Police Department | 0 | 0 | 3 | 1 |
| CA | Fresno County Sheriff's Office | 21 | 18 | 27 | 23 |
| CA | Los Angeles Police Department | 18 | 19 | 33 | 17 |
| CA | Sacramento County Sheriff's Office | 14 | 9 | 25 | 5 |
| CA | San Diego Police Department | 46 | 41 | 45 | 44 |
| CA | San Jose Police Department | 5 | 6 | 15 | 16 |
| CO | Colorado Springs Police Department | 11 | 7 | 6 | 2 |
| CT | Connecticut State Police | 0 | 0 | 1 | 1 |
| DE | Delaware Department of Justice | 5 | 4 | 2 | 3 |
| FL | Broward County Sheriff's Office | 28 | 28 | 36 | 35 |
| FL | Gainesville Police Department | 62 | 59 | 45 | 27 |
| FL | Polk County Sheriff's Office | 9 | 7 | 29 | 28 |
| GA | Georgia Bureau of Investigation | 13 | 11 | 28 | 23 |
| HI | Hawaii Department of Attorney General | 7 | 11 | 3 | 4 |
| IA | Iowa Division of Criminal Investigation | 45 | 45 | 47 | 42 |
| ID | Idaho Office of Attorney General | 13 | 4 | 17 | 16 |
| IL | Cook County State's Attorney's Office | 0 | 0 | 0 | 0 |
| IL | Illinois Office of Attorney General | 19 | 17 | 20 | 20 |
| IN | Indiana State Police | 78 | 45 | 57 | 81 |
| KS | Sedgwick County Sheriff's Office | 12 | 14 | 4 | 2 |
| KY | Kentucky State Police | 54 | 47 | 36 | 32 |
| LA | Louisiana Department of Justice | 33 | 30 | 43 | 34 |
| MA | Massachusetts State Police | 2 | 0 | 9 | 6 |
| MD | Maryland State Police | 10 | 7 | 18 | 17 |
| ME | Maine State Police | 3 | 2 | 1 | 1 |
| MI | Michigan State Police | 3 | 3 | 3 | 3 |
| MN | Minnesota Department of Public Safety | 5 | 3 | 13 | 5 |
| MO | Glendale Police Department | 103 | 71 | 111 | 81 |
| MO | St. Charles County Sheriff's Department | | | | |
| MS | Mississippi Office of Attorney General | 7 | 5 | 5 | 5 |
| MT | Billings Police Department | 22 | 16 | 29 | 28 |
| NC | North Carolina State Bureau of Investigation | 27 | 24 | 38 | 37 |
| ND | North Dakota Bureau of Criminal Investigation | 4 | 3 | 3 | 3 |
| NE | Nebraska State Patrol | 25 | 22 | 15 | 13 |
| NH | Portsmouth Police Department | 10 | 8 | 7 | 8 |
| NJ | New Jersey State Police | 5 | 2 | 6 | 4 |
| NM | New Mexico Attorney General's Office | 33 | 23 | 34 | 27 |
| NV | Las Vegas Metropolitan Police Department | 37 | 40 | 64 | 62 |

132

## ICAC TASK FORCE
## CRIMINAL REFERRALS TO UNITED STATES ATTORNEYS' OFFICES

| FY 2012 | | FY 2013 | | FY 2014 | | FY 2015 | |
|---|---|---|---|---|---|---|---|
| Submitted | Accepted | Submitted | Accepted | Submitted | Accepted | Submitted | Accepted |
| 37 | 12 | 7 | 6 | 13 | 12 | 16 | 14 |
| 31 | 31 | 28 | 28 | 15 | 12 | 12 | 8 |
| 50 | 33 | 67 | 62 | 59 | 42 | 47 | 43 |
| 13 | 9 | 19 | 16 | 26 | 14 | 29 | 9 |
| 9 | 7 | 21 | 19 | 15 | 13 | 9 | 5 |
| 15 | 13 | 21 | 18 | 21 | 12 | 6 | 10 |
| 36 | 27 | 18 | 12 | 23 | 23 | 10 | 3 |
| 37 | 35 | 64 | 60 | 46 | 43 | 57 | 55 |
| 6 | 6 | 7 | 5 | 1 | 0 | 6 | 2 |
| 7 | 6 | 9 | 8 | 4 | 4 | 12 | 7 |
| 5 | 4 | 3 | 4 | 3 | 1 | 16 | 8 |
| 0 | 0 | 6 | 6 | 2 | 1 | 0 | 0 |
| 11 | 11 | 7 | 5 | 19 | 12 | 8 | 6 |
| 33 | 33 | 68 | 57 | 41 | 41 | 22 | 18 |
| 62 | 55 | 55 | 34 | 40 | 35 | 40 | 37 |
| 17 | 12 | 19 | 19 | 41 | 30 | 37 | 24 |
| 7 | 5 | 9 | 8 | 4 | 3 | 10 | 9 |
| 51 | 42 | 100 | 100 | 58 | 51 | 54 | 50 |
| 23 | 16 | 14 | 10 | 5 | 8 | 12 | 12 |
| 6 | 0 | 8 | 5 | 6 | 1 | 3 | 3 |
| 23 | 19 | 33 | 29 | 42 | 34 | 50 | 41 |
| 131 | 88 | 133 | 117 | 74 | 52 | 82 | 52 |
| 5 | 5 | 4 | 4 | 12 | 7 | 18 | 13 |
| 38 | 35 | 44 | 41 | 36 | 31 | 48 | 36 |
| 20 | 16 | 22 | 20 | 10 | 4 | 29 | 23 |
| 9 | 9 | 23 | 24 | 10 | 9 | 5 | 5 |
| 21 | 12 | 7 | 5 | 26 | 24 | 32 | 29 |
| 4 | 4 | 1 | 1 | 1 | 1 | 4 | 6 |
| 3 | 3 | 2 | 2 | 1 | 2 | 3 | 3 |
| 9 | 0 | 3 | 4 | 15 | 9 | 15 | 8 |
| | | | | | | | |
| 100 | 84 | 86 | 79 | 90 | 86 | 115 | 102 |
| 7 | 8 | 12 | 12 | 8 | 9 | 19 | 18 |
| 32 | 25 | 50 | 60 | 29 | 18 | 24 | 14 |
| 50 | 47 | 39 | 33 | 55 | 42 | 54 | 41 |
| 26 | 23 | 13 | 11 | 38 | 36 | 8 | 7 |
| 15 | 15 | 10 | 10 | 23 | 23 | 31 | 29 |
| 5 | 3 | 5 | 4 | 9 | 6 | 13 | 10 |
| 5 | 3 | 1 | 0 | 4 | 2 | 5 | 1 |
| 37 | 27 | 26 | 21 | 21 | 15 | 18 | 13 |
| 89 | 62 | 84 | 71 | 72 | 72 | 74 | 71 |

## ICAC TASK FORCE
## CRIMINAL REFERRALS TO UNITED STATES ATTORNEYS' OFFICES

| State | Task Force Agency | FY 2010 | | FY 2011 | |
|-------|-------------------|---------|---|---------|---|
| | | Submitted | Accepted | Submitted | Accepted |
| NY | New York State Police | 29 | 27 | 27 | 21 |
| NY | New York City Police Department | 0 | 0 | 0 | 0 |
| OH | Cuyahoga County Prosecutor's Office | 12 | 12 | 17 | 11 |
| OK | Oklahoma State Bureau of Investigation | 10 | 7 | 5 | 19 |
| OR | Oregon Department of Justice | 6 | 4 | 5 | 5 |
| PA | Delaware County District Attorney's Office | 39 | 39 | 21 | 21 |
| RI | Rhode Island State Police | 13 | 10 | 10 | 7 |
| SC | South Carolina Attorney General's Office | 4 | 2 | 4 | 4 |
| SD | South Dakota Division of Criminal Investigation | 22 | 11 | 12 | 12 |
| TN | Knoxville Police Department | 54 | 47 | 36 | 32 |
| TX | Pasadena Independent School District Police Depa | 29 | 31 | 52 | 54 |
| TX | Houston Metro Police Department | | | | |
| TX | Dallas Police Department | 4 | 1 | 22 | 21 |
| TX | Office of Attorney General of Texas | 9 | 7 | 6 | 9 |
| UT | Utah Office of Attorney General | 15 | 13 | 24 | 19 |
| VA | Bedford County Sheriff's Office | 176 | 3 | 69 | 10 |
| VA | Virginia State Police | 89 | 52 | 114 | 91 |
| VT | Burlington Police Department | 3 | 0 | 0 | 8 |
| WA | Seattle Police Department | 9 | 5 | 3 | 1 |
| WI | Wisconsin Department of Justice | 14 | 10 | 14 | 12 |
| WV | West Virginia State Police | 17 | 18 | 29 | 18 |
| WY | Wyoming Division of Criminal Investigation | 39 | 43 | 26 | 20 |

## ICAC TASK FORCE
## CRIMINAL REFERRALS TO UNITED STATES ATTORNEYS' OFFICES

| FY 2012 | | FY 2013 | | FY 2014 | | FY 2015 | |
|---|---|---|---|---|---|---|---|
| Submitted | Accepted | Submitted | Accepted | Submitted | Accepted | Submitted | Accepted |
| 12 | 12 | 6 | 6 | 11 | 11 | 3 | 3 |
| 3 | 3 | 0 | 0 | 40 | 37 | 1 | 0 |
| 22 | 14 | 15 | 18 | 6 | 7 | 17 | 16 |
| 7 | 7 | 4 | 3 | 9 | 10 | 3 | 3 |
| 4 | 3 | 3 | 3 | 3 | 3 | 3 | 2 |
| 36 | 35 | 57 | 53 | 36 | 33 | 17 | 12 |
| 3 | 1 | 12 | 8 | 2 | 1 | 4 | 1 |
| 4 | 3 | 27 | 5 | 91 | 43 | 117 | 6 |
| 6 | 5 | 13 | 13 | 11 | 9 | 5 | 5 |
| 38 | 35 | 44 | 41 | 36 | 31 | 48 | 36 |
| 34 | 35 | | | | | | |
| | | 20 | 24 | 20 | 10 | 7 | 7 |
| 32 | 29 | 25 | 23 | 26 | 24 | 15 | 11 |
| 16 | 10 | 53 | 51 | 59 | 56 | 60 | 56 |
| 13 | 10 | 14 | 13 | 28 | 22 | 67 | 60 |
| 18 | 10 | 21 | 14 | 26 | 16 | 23 | 16 |
| 97 | 91 | 79 | 74 | 55 | 48 | 84 | 78 |
| 0 | 14 | 0 | 2 | 0 | 2 | 0 | 2 |
| 19 | 16 | 24 | 21 | 17 | 11 | 26 | 23 |
| 22 | 14 | 13 | 12 | 12 | 6 | 15 | 14 |
| 18 | 18 | 21 | 12 | 47 | 33 | 47 | 38 |
| 19 | 12 | 18 | 23 | 15 | 13 | 17 | 14 |

135

**Appendix C:   Department of Justice-Funded Research on Child Exploitation**

As noted in the body of the National Strategy, the PROTECT Act requires that the Department provide a review of relevant research in the child exploitation field. A listing of Department-funded research products is below, followed by descriptions of currently-funded research that is still in progress. It is important to note that the inclusion of any study or research project in the National Strategy is not intended to convey support for the findings of any of such study or research project.

**DOJ Publications** (including sponsored projects, DOJ products, and sponsored journal articles)

**Age-Graded Risks for Commercial Sexual Exploitation of Male and Female Youth**
NCJ 247715, June 2014, by Joan A. Reid, Alex R. Piquero, NIJ-Sponsored Journal Article, (41 pages).

**Child Pornography on the Internet**
Richard Wortley; Stephen Smallbone, August 2012, COPS (76 pages).

**Children's Exposure to Violence, Crime, and Abuse: An Update**
NCJ 248547, David Finkelhor; Heather Turner; Anne Shattuck; Sherry Hamby; Kristen Kracke, September 2015, OJJDP, (16 pages).

**Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States**
NCJ 243838, 2013, OJJDP-Sponsored, (478 pages).

**Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States: A Guide for Providers of Victim and Support Services**
NCJ 247651, 2013, OJJDP-Sponsored, (52 pages).

**Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States: A Guide for the Health Care Sector**
NCJ 248472, 2014, OJJDP-Sponsored, (42 pages).

**Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States: A Guide for the Legal Sector**
NCJ 248447, 2013, Report, OJJDP-Sponsored, (48 pages).

**Content Analysis of Youth Internet Safety Programs: Are Effective Prevention Strategies Being Used?**
NCJ 248673, Lisa M. Jones; Kimberly J. Mitchell; Wendy A. Walsh, December 2014, NIJ-Sponsored, (17 pages).

**Effects of Federal Legislation on the Commercial Sexual Exploitation of Children**
NCJ 228631, William Adams; Colleen Owens; Kevonne Small, July 2010, Report, OJJDP, (12 pages).

**Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities**
NCJ 245295, Meredith Dank, Ph.D.; Bilal Khan, Ph.D.; P. Mitchell Downey; Cybele Kotonias; Deborah Mayer; Colleen Owens; Laura Pacifici; Lilly Yu, March 2014, NIJ-Sponsored, (350 pages).

**Evaluation of Internet Child Safety Materials Used by ICAC Task Forces in School and Community Settings, Final Report**
NCJ 242016, Lisa M. Jones, Ph.D.; Kimberly J. Mitchell, Ph.D.; Wendy A. Walsh, Ph.D., December 2012, NIJ-Sponsored, (114 pages).

**Evaluation of Services for Domestic Minor Victims of Human Trafficking**
NCJ 248578, Deborah Gibbs; Jennifer L. Hardison Walters; Alexandra Lutnick; Shari Miller; Marianne Kluckman, August 2014, NIJ-Sponsored, (115 pages).

**Federal Resources on Missing and Exploited Children: A Directory for Law Enforcement and Other Public and Private Agencies Sixth Edition**
NCJ 231619, 2011, Handbook, OJJDP, (48 pages).

**Internet Crimes Against Children: A Matrix and Summary of Major Federal and Select State Case Law**
NCJ 228814, Marieke Lewis; Patrick Miller; Alice R. Buchalter, October 2009, NIJ-Sponsored, (207 pages).

**Internet Crimes Against Children: A Matrix of Federal and Select State Laws**
NCJ 228812, Patrick Miller; Alice R. Buchalter, October 2009, NIJ-Sponsored, (16 pages).

**Internet Crimes Against Children: An Annotated Bibliography of Major Studies**
NCJ 228813, Marieke Lewis; Patrick Miller; Alice R. Buchalter, October 2009, NIJ-Sponsored, (37 pages).

**Internet-Facilitated Sexual Offending**
NCJ 248947, Michael Seto, July 2015, SMART-Sponsored, (5 pages).

**Measuring a Year of Child Pornography Trafficking by U.S. Computers on a Peer-to-Peer Network**
NCJ 246704, February 2014, by Janis Wolak, Marc Liberatore, Brian Neil Levine, NIJ-Sponsored Journal Article, (10 pages).

**Measurement and Analysis of Child Pornography Trafficking on P2P Networks, Final Technical Report**
NCJ 248597, Ryan Hurley; Swagatika Prusty; Hamed Soroush; Robert J. Walls; Jeannie Albrecht; Emmanuel Cecchet; Brian N. Levine; Marc Liberatore; Brian Lynn; Janis Wolak, September 2014, OJJDP-Sponsored, (19 pages).

**Measuring the Nature and Extent of Gang Involvement in Sex Trafficking in San Diego, Executive Summary**
NCJ 249246, Ami Carpenter Ph.D.; Jamie Gates Ph.D., October 2015, NIJ-Sponsored, (5 pages).

**Missing Children, State Care, and Child Sex Trafficking: Engaging the Judiciary in Building a Collaborative Response**
NCJ 248940, June 2015, OJJDP-Sponsored, (14 pages).

**Myths and Facts about Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States**
NCJ 248538, 2013, OJJDP-Sponsored, (1 page).

**National Survey of Residential Programs for Victims of Sex Trafficking**
NCJ 244678, Jessica Reichert; Amy Sylwestrzak, October 2013, BJA-Sponsored, (37 pages).

**On the Relationships Between Commercial Sexual Exploitation/Prostitution, Substance Dependency, and Delinquency in Youthful Offenders**
NCJ 248762, November 2014, by Joan A. Reid, Alex R. Piquero, NIJ-Sponsored Journal Article, (14 pages).

**Toward a Better Way to Interview Child Victims of Sexual Abuse**
NCJ 233282, Sara Harris, NIJ Journal, 267, 2010, 12-15, NIJ, (4 pages).

## Current Awards

*Dissemination of the Report on Commercial Sexual Exploitation and Sex Trafficking of Minors* in the United States, awarded to the National Academy of Sciences. The Institute of Medicine and the National Research Council will develop and coordinate communications and dissemination activities based upon the final report on Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States. These activities will include print and electronic materials and meetings and briefings to support the translation and diffusion of key findings and recommendations from the study into guidance for state and national legislators, executive branch leaders, law enforcement personnel, victim and support services providers, health care practitioners, community leaders, and members of the public. Enhanced communication and dissemination of the report will help raise public awareness about commercial sexual exploitation and sex trafficking of minors as domestic issues with significant public health and public safety implications; promulgate a solid evidentiary foundation for future discourse and work on commercial sexual exploitation of children in the United States; and help ensure that the OJJDP-sponsored report reaches decisionmakers, key stakeholders, and essential partners at all levels from a broad array of agencies and organizations.

*Sex Trafficking of Minors: The Impact of Legislative Reform and Judicial Decision Making in Metropolitan and Non-Metropolitan Communities,* awarded to the University of Kentucky Research Foundation in 2015. There has been a growing push to pass state safe harbor laws to align governmental and community responses to the reframing of the issue of sex trafficking of minors that was ushered in with

the passage of the Trafficking Victims Protection Act (TVPA). The proposed mixed-methods project has four aims: (1) Evaluate changes in key agency personnel's awareness, knowledge, and capacity for responding to sex trafficking of minors, including trends in charges of human trafficking offenses involving victims who are minors, from pre-implementation to postimplementation of a safe harbor law in one jurisdictional condition; (2) Examine the impact of immunity, protective, and rehabilitative provisions of a safe harbor law; (3) Provide guidance on how juvenile and family judges' knowledge and attitudes influence their responses to trafficking victims as witnesses and as defendants in crimes related to their trafficking victimization within metropolitan and nonmetropolitan communities; and (4) Identify and disseminate policy, education, and practice strategies that support informed judicial decision-making in family and juvenile court cases involving youth exploited in commercial sex. A formal partnership with a survivor who will serve as a consultant will inform all aspects of the study. This study will provide recommendations for legislative reform and policy implementation, and the identification of and dissemination of policy, education, and practice strategies that support informed judicial decision-making in cases of sex trafficking of minors will make a substantial contribution to the court system.

*Failure to Appear: Domestic Minor Sex Trafficking Victims Experience with the Juvenile Justice System and their Readiness to Change,* awarded to the Board of Regents, NSHE obo University of Nevada-Las Vegas in 2015. This exploratory, sequential mixed methods project investigates (a) actual and perceived facilitators and barriers (e.g., services, provider characteristics, etc.) victims encounter when attempting to exit a trafficking situation, and (b) readiness to change and other personal factors that may influence success. Following an in-depth qualitative phase, cross-sectional, self-report survey data will be collected from recently trafficked young adult women to assess the validity of a readiness-to-change measurement model, path analyses to assess direct and indirect effects, and the frequency and nature of attempts to leave sex trafficking.

*The prosecution of child sexual abuse: A partnership to improve outcomes*, awarded to the University of Massachusetts-Lowell in 2014. In collaboration with prosecutors' offices and mentors from the field, researchers aim to increase understanding of the criminal prosecution of child sexual abuse cases, the characteristics of cases prosecuted, and the factors associated with case attrition. Designed to enhance current and foster new researcher-practitioner collaborations, this research will identify barriers to prosecution of offenders and factors that contribute to successful outcomes while minimizing victim trauma. The attrition of CSA cases from the CJ system has been a concern to victims, practitioners and researchers for decades. In contrast to cases of sexual assault of adults, where considerable attrition occurs at earlier stages, reported child victim cases may experience most significant attrition at the prosecutorial stage. Past research indicates that less than 10% of child sex abuse cases brought forward for prosecution go to trial. Gaps in knowledge of the processing of these cases point to a need to examine current cases to understand more about these challenges and the factors predictive of attrition including the extent to which victims and their families decide not to participate in trials and why.

*Addressing Under-Reporting of Minor Victim Sex Trafficking in Illinois,* awarded to Research Triangle Institute in 2012. This study will address the apparent underreporting of minor victim trafficking by describing the number and characteristics of trafficked minors identified by two of the systems most

likely to encounter them — law enforcement and child welfare. Researchers aim to assess the potential underreporting of trafficking within the child welfare system; describe the characteristics of sex- and labor-trafficked minors in terms of: demographics, prior and current involvement with child welfare and juvenile justice, referral source, and geographic factors; and describe perspectives of leaders and organizations as the systems' processes change. Data for the study consists of de-identified administrative data from the Illinois Department of Children and Family Services for all minors referred to the agency by law enforcement and other sources over 1.5 years, with a separate sample representing all wards at a single point in time as a validation sample. For minors from Cook County (Chicago) only, data on juvenile justice system history are also available for inclusion in analyses.

*Gangs and Sex Trafficking in the San Diego/Tijuana Border Region*, awarded to the University of San Diego in 2012. This project aims to create a single, integrated database that lays the foundation for drawing on all possible sources of evidence of human trafficking in the San Diego County region, collecting and integrating existing databases and to diversify available sources of data beyond social service agencies and law enforcement. The project focuses specifically on one of the most under-studied aspects of human trafficking: the relationship between gangs and human trafficking. This project will measure the nature and extent of gang involvement in human trafficking by gathering data from four sources: victims who are assisted by social service agencies in San Diego County, non-public law enforcement incidence and arrest records, persons identified as trafficking victims and perpetrators at San Diego middle and high schools, and the traffickers themselves. The project will also build on a year's worth of fieldwork with gang members to collect ethnographic evidence of the scope of human trafficking from the facilitators of human trafficking themselves, including a snowball sample of a minimum of 30 facilitators of human trafficking.

*Adaptive Expert System that Learns to Detect and Track Patterns of Crime in Internet Advertisements,* awarded to Carnegie Mellon University in 2014. This award was competitively made in response to a proposal submitted by Carnegie Mellon University (CMU) to a National Institute of Justice FY 2013 solicitation: "Applied Technology Research and Development for Criminal Justice Purposes". The purpose of this award is to improve the practice of searching classified ads for trafficking and other criminal activity. With a huge volume of communication and transactions moving online in recent years, many criminals also move their activity to online media, particularly classified advertisements published on the internet. Carnegie Melon plans to develop tools which can be applied to the large volume of data that has the potential to inform criminal investigations, but is currently underutilized by law enforcement.

*Applied Technology Research and Development to Optimize Criminal Justice Use of Social Media in the Web 3.0 Environment,* awarded to the National Opinion Research Center (NORC) in 2013. This award was competitively made in response to a proposal submitted by NORC at the University of Chicago to a National Institute of Justice FY 2013 solicitation: Applied Technology Research and Development to Optimize Criminal Justice Use of Social Media in the "Web 3.0" Environment. NORC in collaboration with the International Association of Chiefs of Police (IACP) proposes to develop, design, test, and introduce a tool based on Web 3.0 technology to help law enforcement and other public safety agencies address the problem of human trafficking, particularly sex trafficking.

**Appendix D:  National Strategy on Child Exploitation Prevention and Interdiction
                     2016 Survey Analysis**

To inform the 2016 National Child Exploitation Threat Assessment, the DOJ National Strategy on Child Exploitation Prevention and Interdiction Working Group conducted a comprehensive survey between 12/17/2015 and 01/7/2016 of more than 1,000 federal, state, local, and tribal investigators; law enforcement managers; prosecutors; analysts; forensic examiners; victim service providers; and DOJ grant recipients.

The survey focused on the six primary threat areas the majority of child exploitation cases worked by federal, state, local, and tribal investigators fall within: (1) child pornography; (2) online enticement of children; (3) commercial sexual trafficking of children, (4) child sex tourism; (5) sex offender registry violations; and (6) child sexual abuse in Indian Country.

The survey focused on changes to the child sexual exploitation threat in the past five years (since 2010) and what changes are expected in the upcoming five years (through 2020).  Survey responses received were analyzed by the members of the working group and were incorporated into the 2016 National Child Exploitation Threat Assessment.

Caveats:  All survey questions were optional.  Respondents were encouraged to only answer questions about those threats and trends they has specific experience with in the course of their child sexual exploitation related employment.  If an individual did not complete the entire survey, those responses he or she did provide were still used.  Answers with a deliberate response of "unknown" were also considered; however, answers left blank were ignored.  Only questions deemed by the working group to have enough responses and representing an adequate cross-section of respondents were evaluated and included in this summary.  A total of 1,033 individuals answered at least some of the survey during the four weeks the survey was open for completion.

Responses to questions that ask if a certain threat is "increasing" or "decreasing" (and to what extent) are entirely subjective and based upon the respondents' own experiences.  Conclusions were drawn from analysis of all answers for the same question (and across related questions when possible). Unfortunately, there is no national baseline for the questions asked to allow DOJ to compare previous reporting to this survey's results.

A summary of the survey results are as follows.

<u>Child Pornography</u>

According to survey respondents, over the last five years there have been significant increases in the volume of child pornography available online; the volume of child pornography maintained on remote or cloud storage services; the volume of child pornography depicting more depraved and violent content; and the volume of child pornography produced via webcam, smart phones, and other camera-enabled mobile devices. Observed increases in use of law enforcement evasion software and tools were also reported.

- Approximately 70% of survey respondents reported an increase in the volume of child pornography available.

- Approximately 60% of survey respondents reported an increase in availability of self-produced child pornography. This includes child pornography a victim was forced or enticed to produce, as well as any explicit content a victim voluntarily produced.

The percentage of child pornography available for profit was most commonly reported as 10%. Most respondents did not know the extent to which profit-driven child pornography increased or decreased in the last five years, nor to what extent would it change in the next five years.

When asked if child pornography offenders were migrating or expanding to other criminal activities over the past five years, more than 43% of survey respondents indicated there was no change in child pornography offenders being involved in other criminal activity.

Child pornography offenders continue to be reported as predominantly male, with significant responses suggesting the volume of female child pornography offenders is widely unknown. The average age of child pornography producers, distributors, and possessors was reported as not changing over the last five years.

According to one third or more of respondents, the most commonly reported producer of child pornography was a victim's parent, other family members, and their caregivers. This reporting on the relationship between a child pornography production victim and their offender further reinforces the fact most victims of child pornography are victimized by someone they know well. These categories remained constant over the last five years, without any indication these relationships between victims and their abusers have or will change.

As law enforcement officials become savvier with investigating child pornography violations, offenders continue to learn about new tools and techniques to evade law enforcement detection. With regards to producers, distributors, and possessors of child pornography:

- More than 38% of survey respondents reported a significant increase in the technical sophistication and expertise of child pornography offenders.

- More than 36% of survey respondents reported a significant increase in the use of anonymization tools, services, and networks by child pornography offenders.

- More than 30% of respondents reported the use of encryption has significantly increased by child pornography offenders.

The known child pornography distribution platforms of instant messaging services, peer-to-peer networks, online file-storage services (cloud), anonymous networks, photo-sharing apps, and mobile-only apps each were reported as experiencing a significant increase in use by offenders to distribute child pornography over the last five years. Thirty percent of respondents indicated use of e-mail and photo-sharing websites to distribute child pornography had "increased somewhat." This reporting highlights the trend of offenders' increasing use of sophisticated, yet readily accessible and

often anonymous, Internet and cellular-based technologies to distribute child pornography. The only child pornography distribution platform reported as decreasing in use over the last five years was use of traditional mail/postal services.

Survey respondents reported the average age of child victims depicted in child pornography over the last five years was decreasing. This reporting is supported with significant feedback detailing it is now routine for child pornography investigations to include files depicting the sexual exploitation of infants and toddlers. Similarly, survey responses also indicate offenders have increased their demand for more depraved and egregious child pornography content. In fact, 30% of respondents indicated the level of violence depicted within child pornography has "increased somewhat". An increased volume of self-produced child pornography specifically created from webcams and camera-enabled smart phones was reported; however, it is unknown to what extent the victim depicted within the child pornography was forced to create it.

Sextortion and Live-Streaming of Child Abuse

Of all the major threats addressed by this survey, only the threat of online enticement of children was nearly unanimously reported as increasing over the last five years. All other threats were reported as staying the same, slightly increasing, or otherwise not increasing or decreasing. Online enticement of children is undoubtedly a growing threat, particularly the trend of sextortion being used as an effective means to sexually exploit children for the production of child pornography.

The vast majority of online enticement of children was reported as the result of social engineering – where an offender communicates with a child, gains the child's trust, and begins the grooming process with the goal of sexual exploitation. However, approximately 33% of survey respondents indicated an increase in the technique of threatened "hacking" or similar computer intrusion techniques to force the coercion of minors online. However, the rate at which these offenders carry out these threats is largely unknown and there is no baseline to determine if the reported increase is accurate or an over/ under estimation.

Survey respondents indicated over the past five years there was an increase in offenders contacting victims using live-streaming video services, social networking sites, mobile apps, video sharing/ hosting sites, online games, and through texting, with the intent to sexually exploit them. These services provide multi-functional and interactive communication options packaged in user-friendly interfaces. As a result, survey responses indicated an offender's initial contact with their victim is now typically occurring within the same online platforms as the actual sexual exploitation. This reporting is in contrast to past observed behavior where an offender needed to contact a potential victim via one instant messaging or chat-based platform and then seek to engage with them on another online platform with capability to exchange files or video chat.

- Kik Messenger App, Skype, Facebook, and Omegle were the most commonly mentioned platforms identified by survey respondents as being used by offenders to contact children for sexual purposes.

In contrast to the production of child pornography where the victims of child pornography are more likely to know their abuser, approximately 63% of survey respondents indicated online enticement child victims never, or almost never, know their offender.

- The age of online enticement offenders was reported as decreasing over the last five years.

- Online enticement offenders continue to be reported as predominantly male, with significant responses suggesting the volume of offenders who are actually female is widely unknown.

- The volume of cases where male offenders pose as teenage girls or adult females to exploit children have remained constant or increased slightly in recent years, according to survey results.

The online enticement of children allows the producer of child pornography to be located anywhere in the world because their exploitation occurs via webcams and camera-enabled phones. However, the fact this exploitation occurs from a distance should not be misunderstood as implying these offenders are less dangerous or are not in physical contact with minors. In fact, one quarter of respondents estimated 76%-100% of online enticement offenders are also hands-on contact offending against children; thus they were in direct sexual contact with minors in addition to exploiting minors online from a distance.

The number of child victims per individual offender was reported as increasing. This reporting highlights it is not uncommon for sextortion cases to now have hundreds of victims per offender. These victims can be located anywhere around the world, as can their exploiters.

- Many survey respondents expressed concern over the anticipated negative cascading effect increased sextortion cases will have on law enforcement, prosecutors, and victim services providers in the years to come. Concern was expressed that law enforcement resources could not keep up with the increasing volume of these time-intensive cases that each have multiple victims per case. It was reported that current resources will not be available to address the anticipated investigations, victim identifications, forensic examinations, child victim interviews, and victim services required to adequately identify and locate the tens of thousands of minors exploited globally via online sexual enticement.

Females are the most commonly reported victim gender in online enticement cases. Many respondents indicated there was no change in the volume of victimization of one gender over another within the last five years, possibly indicating survey respondents believed the victimization of females was already high and continues to be high.

The average age of online enticement victims was also reported as decreasing over the last five years due to potential victims' starting to use online technologies at younger ages. The growth of digital technologies in schools and at home are exposing children to technology at very young ages, thus increasing their potential exposure to online victimization at earlier ages.

144

Survey respondents provided detailed feedback about what factors they believed made online enticement victims vulnerable to this type of online sexual exploitation. The underlying themes centered on the victim children having low-self esteem, an unsupportive family structure, lack of parental supervision of their Internet use, lacking a sense of belonging amongst peers, loneliness, and not being educated about the risks of the Internet or safe online practices.

- Responses also indicated that once a child is victimized via online enticement, family support is the most important buffer to prevent future their victimization. For many victims, the successful arrest of their offender was also pivotal because otherwise the children were fearful their tormentor may return to exploit them further.

<u>Child Sex Trafficking</u>

According to analysis of the survey results, 41% of respondents believe the child sex trafficking threat has increased over the last five years. Pimps are routinely seen trafficking and controlling multiple juvenile victims at a time and were generally reported as recruiting younger girls and having a larger number of girls in their stable. However, the majority of respondents (60%) were unsure if the average number of victims per sex trafficker had changed over the last five years, limiting the DOJ's ability to confirm if the overall volume of juvenile sex trafficking victims is changing.

Survey responses reaffirmed that sex traffickers continue to engage in other criminal activity, including violent offences such as gang activity, drug trafficking, robbery, weapons offenses, and domestic violence.

- It was reported that offenders have begun engaging in sex trafficking after serving prison sentences for unrelated violent crimes. Thus, supporting anecdotal reporting that sex traffickers may see sex trafficking as less risk and yielding higher profits than other violent crimes.

- It was reported that sex trafficking offenders prefer to operate in states with anti-trafficking laws that prevent the victim from being arrested/prosecuted for prostitution.

When asked about a sex traffickers' association with gangs, survey results indicated about 40% of respondents reported observing an increase in cases involving sex traffickers who are also gang members or affiliated with a gang. In addition, 30% of survey respondents reported an increase in the volume of cases involving gang-led or gang-directed sex trafficking of minors operations.

- This reporting appears to illustrate a potential growing nexus of sex trafficking and gang activity; however, no baseline exists to measure the true extent of this potential trend. Additional analysis is required to determine if the observed increases are localized versus being reflective of a nationwide trend.

The technical acumen of sex traffickers and their associates also appears to be increasing, or at minimum, is keeping pace with increased use of technology. Pimps are taking advantage of available technologies to insulate their operations in an effort to evade law enforcement detection.

145

- 37% of survey respondents reporting that the technical sophistication or expertise of sex trafficking offenders has increased over the last five years.

- 29% of the respondents reported an increase in the use of anonymization tools, services, or networks by sex trafficking offenders.  Although widespread use of these methods is commonplace for child pornography offenders, the reported sex traffickers' use of anonymization tools may be an early indicator of this activity being an emerging sex trafficking threat.

Information about female sex traffickers and females acting as accomplices to sex traffickers was sought via the survey.  Forty-two percent of respondents indicated they observed an increase in the number of female offenders involved in the facilitation of sex trafficking.  Fifty-nine percent of respondents also reported that female offenders involved in sex trafficking most commonly acted at the request of, or in concert with, an adult male.  These results appear to indicate it is fairly rare to encounter female sex traffickers who work without a male accomplice.  Although noted as increasing, the overall prevalence of female sex traffickers and accomplices is still relatively unknown and could not be inferred from analysis of the survey results.

With regard to sex trafficking victims, the survey results indicated the volume of these victims being one gender versus another was not changing.  However, a significant gap in awareness about transgender victims was identified, with more than 70% of respondents specifically indicating they did not know if the volume of transgender sex trafficking victims was increasing or decreasing.

Almost 40% of respondents reported the demand for underage victims by "johns" was increasing. The average price paid for sex with a minor was reported by 19% of respondents as "no change" and another 19% reported the price "increased somewhat."  Despite specific reporting that "…offenders are seeking younger female victims because they demand a higher profit," the average age of sex trafficking victims appears to be constant with 29% of respondents reporting the average age of a sex trafficking victim has not changed in the last five years.

The physical locations that were most commonly reported as being used to recruit sex trafficking minors included schools, juvenile detention centers, and group homes.  Survey results highlight the increasing use of online communication platforms such social networking sites, mobile apps, and texting to recruit minors.  Widespread reporting also reported an observed increase in minors recruiting or enticing other minors (such as peers and other family members) to engage in commercial sex.  In fact, it was reported that sex trafficking offenders are recruiting victims directly from middle schools and encountering 12 year-old victims was not uncommon.

Almost one third of respondents to the survey reported seeing an increase in the volume of cases where minors were engaging in "survival sex" - where a victim is not controlled by a sex trafficker, but instead trades sex for food, shelter, other basic needs, or drugs.  Similar to sex trafficking of minors, survey results indicated the volume of survival sex victims being one gender versus another was not changing.  A significant gap in awareness about transgender victims of survival sex was identified, with 78% of respondents specifically indicating they did not know if the volume of transgender victims engaging in survival sex was changing.

146

<u>Child Sex Tourism</u>

The volume of responses to survey questions about child sex tourism cases was limited, with fewer than 12 % of the total survey respondents reporting they have investigated, prosecuted, or otherwise supported child sex tourism  cases.  A lower response rate to child sex tourism questions was expected due to the multi-jurisdictional and global aspects of this crime combined with limited state and local agency jurisdiction over these crimes.  Furthermore, the majority of those individuals who did respond to child sex tourism-related questions indicated the nature and extent of child sex tourism crimes remains relatively unknown to them.

While most survey respondents were unable to address to what extent there were any changes in child sex tourism activities, they did identify examples of child sex tourism destination countries for Americans based on their respective experiences and jurisdictions.  Most of the countries identified as destinations for child sex tourism were already known as such to the DOJ, including Thailand, the Philippines, Colombia, Peru, Belize, Nicaragua, Bolivia, Mexico, Honduras, and Laos.  However, additional countries identified that were lesser-known as child sex tourism "hot spots" included India, the Dominican Republic, Mauritius, Kenya, Russia, Haiti, and former Soviet Bloc countries.  Although not as prominently knows a child sex tourism destination, these countries' identification are not surprising given their socioeconomic factors are common amongst most child sex tourism hot spots, as well as the existence of anecdotal reporting of child sex tourism activity in those locations.

Three quarters of respondents reported child sex tourism offenders continue to be mostly male and act alone. Respondents had either not observed any changes or lacked enough information to respond to questions about female child sex tourism offenders.  It was reported that a child sex tourism offender who was directly abusing minor victims' in-country was more likely to be a tourist or someone who lives in the destination country part-time.  Not enough information was available to determine why someone who lives in the destination country full-time was not reported as being more likely to be a direct abuser of minors versus someone living there part-time.  Furthermore, it was unknown to what extent individuals in each of the following positions/roles were a direct sexual abuser of minors' in-country: registered sex offenders, employees of a non-governmental organization (NGO), partners of an NGO, medical services providers, teachers/educators, or orphanage employees.  It was also unknown to what extent any of this activity changed over the past five years.

The vast majority of survey respondents indicated they did not know to what extent various Internet platforms were used to facilitate child sex tourism.  Some responses indicated child sex tourism recruitment is done face-to-face and victims are usually located and recruited once the offender arrives in the destination country.

As expected, poverty was identified as the strongest contributing factor to a child's vulnerability to child sex tourism.  Approximately 21% of survey respondents indicated being connected to a social service and/or specific program would be the strongest protective factor for child sex tourism victims to prevent initial or additional victimization.

Sex Offender Registry Violations

Thirty-four percent of respondents reported the volume of sex offender registry violators was increasing over the last five years and an additional 19% indicated no change.  Only 2% of respondents indicated the volume of sex offender registry violators was decreasing.  Over half of the total respondents said that the percentage of offenses committed by already registered sex offenders (RSO) was 20% or less, based on their experience.

- The most common offenses reportedly committed by RSOs where child pornography violations (including possession, distribution, receipt, and production), according to 58% of respondents.
- The second most common offenses reportedly committed by RSOs where "contact offending" violations, including references to molestation, abuse, sexual assault, rape, indecency/indecent liberties with child, and lewd acts, according to 36% of respondents.

Many respondents reported there is an increasing trend of RSOs repeatedly failing to register; however, many indicated that the severity of the crime does not correlate with offenders failing to register. One respondent stated, "…the correlation is less between the offense and failure to register and more related to the existence of the offender's lengthy criminal history or lack thereof."  It was generally reported an offender may be more reluctant to comply with sex offender registry laws if the offender and their victim were close in age.

In general, respondents had little, to no, experience with cases in which RSOs moved abroad.  Nearly half of the respondents (46%) specifically indicated they did not know to what extent RSOs moved abroad to escape registration.  Some respondents described scenarios where offenders return to their country of origin if they are originally not from the United States.  Countries specifically mentioned where RSOs fled to included Belize, the Philippines, Costa Rica, and Mexico.

148

**Appendix E: Legislative Proposals**

Restitution in Child Pornography Distribution, Receipt, and Possession Cases

Section 1. Short Title.

      This Act may be cited as the "Child Pornography Victim Restitution Act."

Section 2. Findings.

      (1) The use of children in the production of sexually explicit material, including photographs, films, videos, computer images, and other visual depictions, is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved;

      (2) Where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years.

      (3) Defendants who have produced, advertised, transported, distributed, received, possessed, accessed, or viewed child pornography, as defined in section 2256(8) of title 18, United States Code, have harmed the physiological, emotional, and mental health of the children depicted in child pornography.

      (4) Every time defendants transport, distribute, receive, possess, access, or view images of child pornography, they have violated anew the privacy of the victims and have contributed to the ongoing collective harm inflicted on those children.

Section 3.  Purpose.

      (1) It is the intent of Congress to codify the Supreme Court's holding in Paroline v. United States, when determining whether defendants convicted of trafficking of child pornography caused a victim's losses for purposes of restitution under 18 U.S.C. § 2259.

      (2) It is the intent of Congress to codify case law that has held that 18 U.S.C. § 2259 provides restitution for future losses.

Section 4. Section 2259 of Title 18, United States Code, is amended as follows—

    (1) in subsection (b)(1), by striking "Directions.—The" and inserting in its place "Except for convictions for trafficking of child pornography addressed in paragraph (2), the" and striking the words "as determined by the court pursuant to paragraph (2)".

(2)  By redesignating subsection (b)(2) as subsection (c); redesignating subsection (b)(3) as subsection (f)(4); redesignating subsection (b)(4) as subsection (e); redesignating subsections (b)(4)(A) and (B) as subsections (e)(1) and (2), respectively; redesignating subsections (b)(4)(B)(i) and (ii) as subsections (e)(2)(A) and (B), respectively; and redesignating subsection (c) as subsection (f).

(3)  By inserting the following as subsection (b)(2):

"For defendants convicted of trafficking of child pornography, the order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court mechanism) an amount of restitution determined by the court as follows:

(A) The court shall first determine the full amount of the victim's losses and those losses that were incurred or reasonably projected to be incurred by the victim on or after the date of the defendant's offense conduct.

(B) In determining the defendant's amount of restitution, the court shall consider the following factors:

(i) The number and nature of visual depictions of the victim involved in the defendant's conviction;

(ii) A reasonable estimate of the number of past federal criminal defendants found to have contributed to the victim's losses;

(iii) The nature of the defendant's conviction (e.g., distribution, possession, receipt, transportation, advertising);

(iv) The duration and scope of the defendant's trafficking of visual depictions of the victim;

(v) Whether the defendant demonstrated a specific interest in child pornography depicting the victim;

(vi) Whether the defendant had any connection to the initial production of the images; and

(vii) Any other factor the court deems relevant.

(C) The amount of restitution ordered should be reasonably proportionate to the defendant's role in the overall causal process that resulted in the full amount of the victim's losses that were incurred or reasonably projected to be incurred on or after the date of the defendant's offense conduct.  The amount of restitution ordered shall not be less than 5% of the full amount of the victim's losses that were incurred or reasonably projected to be incurred by the victim on or after the date of the defendant's offense conduct, unless the defendant's conviction under this Chapter only involves sections 2252(a)(4) or 2252A(a)(5), in which case the amount of restitution ordered shall not be less than the lesser of $25,000 or 3% of the full amount of the victim's losses that were incurred or reasonably projected to be incurred by the victim on or after the date of the defendant's offense conduct."

150

(4) By inserting the following as subsection (d): "Termination of Payment.  In cas  involving the trafficking of child pornography, the total amount of payment collectively received by the victim shall not exceed the full amount of the victim's losses.  Once the victim has received payment for the full amount of the victim's losses, as measured by the greatest amount of such losses found in any case involving that victim that has resulted in a final restitution order under this section, the liability of each defendant who is or has been ordered to pay restitution for such losses to that victim shall be terminated.  The court may direct the victim to provide information concerning the amount of restitution the victim has been paid in other cases for the same losses."

(5) In subsection (e) (as so redesignated), by adding the following at the end of the subsection: "(3) In a case involving the trafficking of child pornography, the court's order shall reflect the full amount of the victim's losses that are a proximate result of all offenses involving the trafficking of child pornography depicting that victim; the full amount of the victim's losses that were incurred or reasonably projected to be incurred by the victim on or after the date of the defendant's offense conduct; and the amount of restitution to be paid by the defendant."

(6) In subsection (f) (as so redesignated), by deleting "Definition.—" and inserting in its place "Definitions.— For purposes of this section and section 2259A, the term—(1) ".

(7) In subsection (f)(1) (as so redesignated) by deleting "For the purposes of this section, the term"; by deleting ", including, in" and inserting in its place ".  In"; by inserting "may assume the crime victim's rights under this section, " after "suitable by the court, "; and by deleting "." at the end of the subsection and inserting ";" in its place.

(8)  By inserting the following in subsection (f):

> "(2) "trafficking of child pornography" or "trafficking" refer to conduct proscribed by sections 2251(d), 2252, 2252A(a)(1)-(5), 2252A(g) (in cases in which the series of felony violations exclusively involves violations of sections 2251(d), 2252, 2252A(a)(1)-(5), or 2260(b)), or 2260(b);
>
> (3) "child pornography production" means conduct proscribed by sections 2251(a)-(c), 2252A(g) (in cases in which the series of felony violations involves at least one violation of sections 2251(a)-(c) or 2260(a)), or 2260(a);"

(9) In subsection (f)(4) (as so redesignated), by deleting "For purposes of this subsection the term"; by inserting ", or reasonably projected to be incurred in the future, " after "costs incurred"; by inserting "as a proximate result of the offense of conviction or, in the case of a conviction for trafficking of child pornography, as a proximate result of all offenses involving the trafficking of child pornography of the victim, including" after "by the victim"; and by deleting "for".

(10) In subsection (f)(4)(F) (as so redesignated), by deleting "losses suffered by the victim as a proximate result of the offense" and inserting in its place "relevant costs incurred by the victim".

(11) By inserting the following:

"(g) Election of administrative compensation.—

(1) A victim of the trafficking of child pornography may elect administrative compensation from the Child Pornography Victims' Fund. The court must first make a finding that the claimant is a victim of the trafficking of child pornography. Upon such a finding and an election by the victim to receive administrative compensation, the court shall order payment of $35,000 to the victim from the Child Pornography Victims' Fund. The figure of $35,000 refers to the value of the dollar in the year this subsection is enacted and shall be adjusted annually for inflation in conformity with the Consumer Price Index.

(2) A victim may only obtain administrative compensation once. A victim who receives administrative compensation from the Child Pornography Victims' Fund may subsequently seek restitution under this section in cases involving the trafficking of child pornography. However, when determining the amount of restitution, the court shall deduct the amount the victim received in administrative compensation from the full amount of the victim's losses and shall exclude losses incurred prior to the victim being found eligible to receive administrative compensation. Obtaining administrative compensation shall not bar or limit the victim from receiving restitution for any other offenses.

(3) A victim who has obtained restitution pursuant to this section or any other law in a case involving the trafficking of child pornography shall be ineligible to receive administrative compensation."

Section 5.

(1) Chapter 110 of title 18, United States Code, is amended by inserting after section 2259 the following:

"§ 2259A. Assessments in child pornography cases.

(a) In general. – In addition to any other criminal penalty, restitution, or special assessment authorized by law, the court shall assess $3,000 on any person convicted of an offense under sections 2252(a)(4) or 2252A(a)(5), $5,000 on any person convicted of any other offense involving the trafficking of child pornography, or $10,000 on any person convicted of a child pornography production offense. The dollar figures in this section refer to the value of the dollar in the year this section is enacted and shall be adjusted annually for inflation in conformity with the Consumer Price Index.

(b) Imposition and implementation.—

(1) The provisions of subchapter C of chapter 227 (other than section 3571) and subchapter B of chapter 229 relating to fines apply to assessments under this section, except that the court must in any case impose an assessment in the amount specified in subsection (a) as part of the sentence regardless of the economic circumstances

152

of the defendant, and paragraph (2) applies in lieu of any contrary provisions of law relating to fines or disbursement of money received from a defendant.

(2) Imposition of an assessment under this section does not relieve a defendant of, or entitle a defendant to offset against, any other penalty.  Any money received from a defendant shall be disbursed so that each of the following obligations is paid in full in the following sequence:

  (A) A special assessment under section 3013,

  (B) Restitution to victims of any child pornography production offense, for which defendant was convicted,

  (C) An assessment under this section,

  (D) Other orders under section 2259 or any other section of this title, and

  (E) All other fines, penalties, costs, and other payments required under the sentence."

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of such chapter is amended by inserting after the item relating to section 2259 the following:

"Sec. 2259A.  Assessments in child pornography cases."

Section 6: Creation of the Child Pornography Victim's Fund.

(a) Establishment

  There is created in the Treasury a separate account to be known as the Child Pornography Victim's Fund (hereinafter referred to as the "Fund").

(b) Deposits in Fund

  Notwithstanding any other law, there shall be deposited in the Fund all assessments collected under section 2259A of title 18 and any gifts, bequests, or donations to the Fund from private entities or individuals.

(c) Retention of sums in Fund; availability for expenditure without fiscal year limitation.

  Sums deposited in the Fund shall remain in the Fund and be available for expenditure without fiscal year limitation.

(d) Availability for compensation payments.

  Such sums as may be necessary shall be available from the Fund for payment of compensation pursuant to section 2259(g) of title 18. If at any time the Fund has insufficient funds to make all of the payments ordered by courts under section 2259(g), the Fund shall make such payments as it can satisfy in full with the available funds.  In determining the order in which such payments shall be made, the Fund shall make payments based on the date they were ordered, with the earliest-ordered payments made first.  Sums shall be eligible to be disbursed from the Fund two years after the date of enactment of this title.

153

(e) Administration and administrative expenses.—The Attorney General shall administer the Child Pornography Victim's Fund and shall issue guidelines and regulations to implement this title. There are authorized to be appropriated to the Attorney General, for fiscal year 2016 and each fiscal year thereafter, such sums as may be necessary to pay the administrative expenses of the Fund.

Section 7.

(a) Technical amendment. –Section 3613 of Title 18, United States Code is amended in subsection (c) by inserting the phrase "an assessment imposed pursuant to section 2259A of this title," after "chapter 227 of this title,".

Section 8.  EFFECTIVE DATE.  This legislation shall go into effect on the date it is enacted.  Individuals who violate Chapter 110 before this legislation is enacted, but who are sentenced after this legislation is enacted, shall be subject to the statutory scheme that was in effect at the time the offenses were committed.

## Correcting Jurisdictional Language, Section 2252A(a) of Title 18, United States Code

Section 2252A of Title 18, United States Code is amended-

(1) In subsection (a)(2)(A) by striking "using any means or facility of interstate or foreign commerce"; by inserting "using any means or facility of interstate or foreign commerce or " after "child pornography"; and by inserting "has been" before "shipped";

(2) In subsection (a)(2)(B) by striking "using any means or facility of interstate or foreign commerce"; by inserting "has been" before "shipped"; and by inserting "using any means or facility of interstate or foreign commerce" after "transported".

## Amending the Mandatory Reporting Statute, Section 2258A of Title 18, United States Code

Section 2258A of Title18, United States Code is amended-

(1) in subsection (a)(2)(A) by deleting the second "or";

(2) in subsection (a)(2)(B) by deleting the period and inserting in lieu thereof "; (C) section 1591 involving a minor; or (D) section 2422(b)."

(3) in subsection (b)(1) by adding "payment information, " after "uniform resource locator ";

(4) in subsection (b)(2) by adding "or material pertaining to sections 1591 involving a minor or 2422(b)" after "child pornography" each place it appears;

(5) in subsection (b)(5) by adding "or material pertaining to sections 1591 involving a minor or 2422(b)" after "child pornography";

(6) in subsection (e) by deleting "and willfully";

(7) in subsections (e)(1) and (e)(2) by deleting "and willful" each place it appears.

**Clarifying Section 3559(e) of Title 18, United States Code**

Statement of Intent.  This legislation is a clarifying amendment that is meant to apply retroactively.

Subsection (e)(2)(A) of Section 3559 of Title18, United States Code is amended by striking the phrase "into prostitution".

**Modernizing the Definition of "Sexually Explicit Conduct," Section 2256 of Title 18, United States Code**

Statement of Intent.  This legislation is a clarifying amendment that is meant to apply retroactively.

Subsection (2) of Section 2256 of Title 18, United States Code is amended-

(1) in clause (A)(v) by inserting "anus, " before the word "genitals" and by adding a comma after the word "genitals";

(2) in clause (B)(iii) by inserting "anus, " before the word "genitals" and by adding a comma after the word "genitals".

**The National Strategy for Child Exploitation Prevention and Interdiction**



U.S. Department of Justice