**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FREE SPEECH COALITION, INC., et al<br><br>v.<br><br>HON. JEFFERSON B. SESSIONS, III | CIVIL ACTION<br><br>NO. 09-4607 |

Baylson, J.                                                    May 21, 2018

## TABLE OF CONTENTS

I.   Litigation History ................................................................................................. 1

  A.   The Statutes (enacted 1988 and 2006) and Regulations .................................... 1

    1.   Substantive requirements of the Statutes ..................................................... 2

    2.   Scope of the statutes ................................................................................ 4

    3.   Criminal penalties imposed by Section 2257 and 2257A ............................. 5

  B.   FSC I: Initial District Court Proceedings (2009-10) ........................................ 5

  C.   FSC II: First Appeal to the Third Circuit (2012) ............................................ 6

  D.   FSC III: First Remand and Results of Trial (2012-13) .................................... 7

    1.   Trial evidence ......................................................................................... 8

    2.   Legal Analysis ........................................................................................ 9

    3.   As-applied challenge ............................................................................... 9

    4.   Substantial overbreadth ........................................................................ 11

  E.   FSC IV: Second but Now-Vacated Decision of the Third Circuit (2015) ........ 12

    1.   Associational standing ............................................................................ 12

    2.   As-applied challenge ............................................................................. 12

i

3.  Substantial overbreadth challenge ............................................................ 13

F.  FSC V: Most Recent Third Circuit Decision and Remand in light of Reed .................... 13

II.  Proceedings After Remand ............................................................................ 15

A.  Summary of the parties' arguments ............................................................ 16

1.  Plaintiffs ...................................................................................... 16

2.  Government ................................................................................ 17

B.  Government's Supplemental Evidence ...................................................... 20

1.  Declaration of John Shehan ......................................................... 20

2.  Declaration of Jackie Dougher .................................................... 21

3.  Declaration of Janine Johansen ................................................... 22

III.  Burdens of Proof ........................................................................................ 22

IV.  Standing .................................................................................................... 24

V.  The Court rejects the Plaintiff's facial overbreadth challenge .............................. 25

VI.  How Courts Approach Strict Scrutiny Analysis .................................................. 29

A.  COPA Litigation ...................................................................................... 30

B.  United States v. Marcavage ...................................................................... 32

VII.  The Government's Theory of Partial Invalidation ............................................. 34

A.  As-applied challenges ............................................................................. 34

B.  Limiting construction of statutory language ............................................. 35

C.  Severance ............................................................................................... 35

D.  This Court Cannot Hold that the Statutes Apply Only to Performers over a Specific Age
    35

VIII.  As-applied Strict Scrutiny Analysis ................................................................. 38

   A.  Scope of the Statutes ................................................................................ 39

      1.  Review of statutory provisions ................................................................ 39

      2.  Applying the Statutes to secondary producers is not narrowly tailored to the
      Government's compelling interest in protecting children from child pornography ............ 39

      3.  Applying the Statutes to secondary producers is not the least restrictive means of
      effecting the Government's interest ................................................................ 40

      4.  The Statutes' application to commercial producers ...................................... 41

   B.  Identification and Age-Verification ........................................................... 42

      1.  Review of statutory provisions ................................................................ 42

      2.  As applied to Plaintiffs, the identification and age-verification requirements are
      narrowly tailored to the Government's interest in protecting children from child
      pornography ........................................................................................ 43

      3.  As applied to Plaintiffs, the identification and age-verification requirements are the
      least restrictive means of advancing the Government's interest in protecting children from
      child pornography .................................................................................. 47

         a.  A statutory scheme, including identification and age-verification requirements,
         applying only to individuals over a specific age ............................................ 47

         b.  Relying on criminal laws punishing child pornography .......................... 48

C.   Record-keeping ...................................................................................................... 50

   1.   Review of statutory and regulatory provisions ............................................. 50

   2.   The record-keeping requirements are not narrowly tailored to the Government's compelling interest in protecting children from child pornography ..................................... 51

      a.   Application to the Regulations ................................................................ 52

   3.   The record-keeping requirements do not add protection and are not protecting children from sexual exploitation ........................................................................................ 53

      a.   Plaintiffs' self-policing alternatives ...................................................... 53

      b.   Self-certification under § 2257A(h) ....................................................... 53

      c.   FSC's "self-certification" form .............................................................. 54

      d.   Relying on the fact that minors cannot enter binding contracts is a less restrictive, equally effective alternative to record-maintaining rule ................................................... 55

D.   Labeling ..................................................................................................................... 55

   1.   Review of statutory and regulatory provisions ............................................. 55

   2.   The labeling requirements are not narrowly tailored or the least restrictive means as applied to Plaintiffs .......................................................................................................... 56

E.   Criminal Penalties ..................................................................................................... 57

   1.   Review of statutory provisions ...................................................................... 57

   2.   Except for the required age verification, criminal penalties are not narrowly tailored or the least restrictive alternative as applied to Plaintiffs ....................................................... 58

3.    A statute allowing criminal punishment for record-keeping and labeling violations is not the least restrictive means of protecting minors from child pornography ...................... 59

IX.    Conclusion ..................................................................................................... 59

<u>MEMORANDUM</u>

Baylson, J.                                                                                    May 21, 2018

This case concerning the constitutionality of 18 U.S.C. §§ 2257 and 2257A and their implementing regulations, which impose labeling, recordkeeping, and inspection requirements governing the production of sexually explicit images, including pornography, returns once again to this Court.   In 2009, Plaintiffs Free Speech Coalition, Inc., the American Society of Media Photographers and individuals involved in the production of adult media, filed suit in this Court alleging that the Statutes and their implementing regulations violated the First, Fourth, Fifth, and Fourteenth Amendments, and were unconstitutionally vague.[1]

Only Plaintiffs' First Amendment challenge remains.   Specifically, this Court must again decide, under new controlling precedents, whether the Statutes violate the First Amendment as-applied and/or are facially overbroad.   Because the Third Circuit has ruled that the Statutes are content-based and therefore subject to strict scrutiny, this Court must decide, in evaluating the as-applied challenge, whether they are narrowly tailored to a compelling governmental interest. Also, the Court must decide whether the two organizational Plaintiffs, Free Speech Coalition and the American Society of Media Photographers, have standing to bring an as-applied challenge on behalf of their members.

I.      **Litigation History**

A.  **The Statutes (enacted 1988 and 2006) and Regulations**

In the wake of the report of the Attorney General's Commission on Pornography published in 1986, Congress in 1988 enacted the Child Protection and Obscenity Enforcement

---

[1] Plaintiffs' Fourth, Fifth, Fourteenth, and unconstitutional vagueness challenges are no longer before the Court.  For a fuller description of the early stages of this litigation until the second appeal in 2013, see <u>Free Speech Coal., Inc. v. Holder</u>, 957 F. Supp. 2d 564, 568 (E.D. Pa. 2013), <u>aff'd in part, vacated in part, remanded sub nom. Free Speech Coal., Inc. v. Attorney Gen. U.S.</u>, 787 F.3d 142 (3d Cir. 2015), <u>on reh'g sub nom. Free Speech Coal., Inc. v. Attorney Gen. United States</u>, 825 F.3d 149 (3d Cir. 2016), and <u>vacated and remanded sub nom. Free Speech Coal., Inc. v. Attorney Gen. United States</u>, 825 F.3d 149 (3d Cir. 2016).

1

Act, Pub. L. No. 100–690, § 7513, 102 Stat. 4485, 4487–88 (1988), which imposed identification, record-keeping, labeling, and inspection requirements on producers of adult media.

### 1.  Substantive requirements of the Statutes

An earlier opinion in this case summarized these requirements, which are now codified at 18 U.S.C. § 2257:

> Section 2257, as amended, imposes three basic requirements on producers of adult media. First, any person who produces visual depictions of "actual sexually explicit conduct" must "create and maintain individually identifiable records pertaining to every performer portrayed." 18 U.S.C. § 2257(a). The term "actual sexually explicit conduct" is defined to mean actual but not simulated: sexual intercourse, bestiality, masturbation, sadistic or masochistic abuse, or lascivious exhibition of the genitals or pubic area of any person. Id. at (h)(1); 18 U.S.C. § 2256(2)(A). To ensure the reliability of these records, a producer subject to § 2257 must review each performer's photo identification and ascertain, *inter alia,* the performer's name and date of birth. 18 U.S.C. § 2257(b)(1). The producer must also ascertain any other name used by the performer in previous depictions. Id. at (b)(2). Second, a producer subject to § 2257 must "affix[ ] to every copy of any [visual depiction covered by § 2257] ... a statement describing where the records required by [§ 2257] with respect to all performers depicted in that copy of the matter may be located." Id. at (e)(1). Third, producers must maintain copies of their performers' identification documents at their "business premises, or at such other place[s] as the Attorney General may by regulation prescribe and shall make such records available to the Attorney General for inspection at all reasonable times." Id. at (b)(3) and (c).

Free Speech Coal., Inc. v. Attorney Gen. of U.S., 677 F.3d 519, 526 (3d Cir. 2012) (FSC II).

A provision of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109–248, § 503, 120 Stat. 587, now codified at 18 U.S.C. § 2257A, extended the recordkeeping, labeling, and inspection requirements of § 2257 to visual depictions of <u>simulated</u> sexually explicit conduct, defined in regulations as follows:

> conduct engaged in by performers that is depicted in a manner that would cause a reasonable viewer to believe that the performers engaged in actual sexually explicit conduct, even if they did not in fact do so. It does not mean ... sexually explicit conduct that is merely suggested.

2

28 C.F.R. § 75.1(o) (emphasis added).   Section 2257A also contains an exception to the

recordkeeping, labeling, and inspection requirements under certain circumstances:

> Under § 2257A(h), the provisions of §§ 2257A and 2257 "shall not apply to
> matter, or any image therein ... of simulated sexually explicit conduct, or actual
> sexually explicit conduct [involving the lascivious exhibition of the genitals or
> pubic area of any person]" (the "Exempted Depictions") under either of two
> circumstances. The first circumstance is where the Exempted Depictions were: (1)
> "intended for commercial distribution"; (2) "created as part of a commercial
> enterprise by a person who certifies to the Attorney General that such person
> regularly and in the normal course of business collects and maintains individually
> identifiable information regarding all performers," such as the names, addresses,
> and dates of birth of the performers (the "Certification"); and (3) does not contain
> a depiction that an ordinary person would conclude was child pornography as
> defined by 18 U.S.C. § 2256(8). 18 U.S.C. § 2257A(h). The second circumstance
> is where the Exempted Depictions were: (1) subject to the authority and
> regulation of the Federal Communications Commission acting in its capacity to
> regulate the broadcast of obscene, indecent, or profane programming; and (2)
> created as part of a commercial enterprise and the Certification was made to the
> Attorney General. Id.

FSC II, 677 F.3d at 527.

The statutory scheme was fleshed out through implementing regulations issued by the

Attorney General, whose substantive requirements the Third Circuit summarized as follows:

> The regulations require primary and secondary producers to create and maintain
> copies of records reflecting the performers' legal names, dates of birth, stage
> names, and the date of the original production. See, e.g., 28 C.F.R. § 75.2(a).
> Secondary producers may satisfy these requirements by accepting copies of the
> records created and maintained by primary producers. See id. at (b).
>
> Moreover, the regulations standardize record maintenance procedures. The
> regulations set forth the manner in which the records are to be organized and
> require that these records be maintained separate from any other business records.
> 28 C.F.R. § 75.2(a)(3) and (e). Producers may contract with a non-employee
> custodian of the records, but such a contract does not relieve the producers of
> their liability under the Statutes. Id. at (h). Producers may make these records
> available for inspection either at their place of business or at the place of business
> for the non-employee custodian of records. 28 C.F.R. § 75.4.

FSC II, 677 F.3d at 527-28.

### 2. *Scope of the statutes*

The Statutes thus impose legal requirements on producers of sexually explicit media relating to the performers in those works.  The Statutes define "performer" as "any person portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct."  18 U.S.C. § 2257(h)(3).  The term "produces" is defined, in part, to mean

> (i) actually filming, videotaping, photographing, creating a picture, digital image, or digitally- or computer-manipulated image of an actual human being;
>
> (ii) digitizing an image, of a visual depiction of sexually explicit conduct; or, assembling, manufacturing, publishing, duplicating, reproducing, or reissuing a book, magazine, periodical, film, videotape, digital image, or picture, or other matter intended for commercial distribution, that contains a visual depiction of sexually explicit conduct; or
>
> (iii) inserting on a computer site or service a digital image of, or otherwise managing the sexually explicit content, of a computer site or service that contains a visual depiction of, sexually explicit conduct[.]

18 U.S.C. § 2257 (h)(2)(A).

Regulations supplementing the statutory scheme make clear that the Statutes apply not only to those "primary producers" actually making the depictions of sexually explicit conduct, but also to so-called "secondary producers," which are defined, subject to some exceptions, as follows:

> any person who produces, assembles, manufactures, publishes, duplicates, reproduces, or reissues a book, magazine, periodical, film, videotape, or digitally- or computer-manipulated image, picture, or other matter intended for commercial distribution that contains a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct, or who inserts on a computer site or service a digital image of, or otherwise manages the sexually explicit content of a computer site or service that contains a visual depiction of, an actual human being engaged in actual or simulated sexually explicit conduct, including any person who enters into a contract, agreement, or conspiracy to do any of the foregoing. When a corporation or other organization is the secondary producer of any particular image or picture, then no individual of that corporation or other organization will be considered to be the secondary producer of that image or

4

picture.

28 C.F.R. § 75.1(c)(2).  However, photo or film processors, distributors, or providers of

telecommunications services are not considered producers. Id. at (c)(4).

The Third Circuit previously accepted the Plaintiffs' submission that the Statutes

encompass "the entire universe of constitutionally protected expression involving sexually

oriented images of adults—including private, noncommercial depictions created and viewed by

adults in their homes."  FSC II, 677 F.3d at 538.

### 3.  *Criminal penalties imposed by Section 2257 and 2257A*

Producers subject to § 2257 may be exposed to criminal liability if they do any of the

following:

> "knowingly ... make any false entry in or knowingly ... fail to make an appropriate
> entry in, any [required] record"; "knowingly ... fail to comply with the [labeling
> provisions of § 2257(e) ]"; "knowingly sell or otherwise transfer, or offer for sale
> or transfer" any visual depiction subject to § 2257 that does not contain the label
> required by § 2257(e); or "refuse to permit the Attorney General or his or her
> designee for an inspection." 18 U.S.C. § 2257(f)(1)-(5).

FSC II, 677 F.3d at 526.  First-time violations of § 2257 are punishable by up to five years'

imprisonment, and subsequent violations are punishable by imprisonment of two to ten years.  18

U.S.C. § 2257(i).

Violations of § 2257A involving adults are punishable by imprisonment of up to one

year. 18 U.S.C. § 2257A(i)(1).  Section 2257A violations involving minors are punishable by

imprisonment of up to five years for a first offense, and two to ten years' imprisonment for any

subsequent offense.  Id. at § 2257A(i)(2)-(3).

### B.  <u>FSC I</u>: Initial District Court Proceedings (2009-10)

Plaintiffs, a group of "artists, sex educators, photographers, performers, commercial

producers of adult expression, and persons engaged in the dissemination of sexually explicit

materials," Free Speech Coal., Inc. v. Holder, 729 F. Supp. 2d 691, 705 (E.D. Pa. 2010) (FSC I), filed this action in 2009 seeking injunctive and declaratory relief against enforcement of 18 U.S.C. §§ 2257 and 2257A ("the Statutes") and their corresponding regulations.   Plaintiffs alleged that the Statutes and their implementing regulations violated the First, Fourth, and Fifth Amendments of the United States Constitution, and were unconstitutionally vague.  Id. at 708-12.  The Government moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Id. at 698.

Adopting the reasoning of decisions from the Sixth Circuit and D.C. Circuit, which had previously considered First Amendment challenges to the Statutes, the Court held the Statutes and regulations to be content-neutral.  Id. at 721-25.   Accordingly, they were subject to intermediate scrutiny, which they survived because they were narrowly tailored to the significant governmental interest in protecting children from child pornography and left open adequate alternate channels of communication.  Id. at 725-31.  The Court denied an evidentiary hearing and discovery.  Id. at 726-29.  After denying the Fourth Amendment, Fifth Amendment, and vagueness challenges, the Court dismissed the Complaint in its entirety, and denied leave to amend.  Id. at 746.

### C.  FSC II: First Appeal to the Third Circuit (2012)

On appeal, a split panel of the Third Circuit affirmed in part, vacated in part, and remanded for further proceedings.  Free Speech Coal., Inc. v. Attorney Gen. of U.S., 677 F.3d 519 (3d Cir. 2012) (FSC II).  After holding, as this Court had, that the Statutes were content-neutral, subject to intermediate scrutiny, and advanced a substantial governmental interest, the majority vacated this Court's dismissal of the First and Fourth Amendment claims and remanded for further development of the record on Plaintiffs' First Amendment as-applied and facial

challenges, and to allow Plaintiffs leave to amend their Fourth Amendment claim.  Id. at 535-46.
Finally, FSC II found that Plaintiffs had abandoned their claims that the Statutes
"unconstitutionally suppressed anonymous speech; imposed a prior restraint on protected
expression; unconstitutionally imposed strict liability for failing to create and maintain the
requisite records; violated equal protection of the laws; were unconstitutionally vague; and
violated the privilege against self-incrimination."  Id. at 545.

Judge Rendell concurred separately, writing that she would not have concluded on the
record before the court that the Statutes advanced a substantial governmental interest, and would
have held that administrative search exception to the Fourth Amendment could not apply to the
warrantless search procedures set forth in the Statutes.  Free Speech Coal., Inc. v. Attorney Gen.
of U.S., 677 F.3d 519, 546-50 (3d Cir. 2012) (Rendell, J., concurring).

### D.  FSC III: First Remand and Results of Trial (2012-13)

After the case was remanded to this Court, Plaintiffs filed an amended complaint in June
2012.  (Am. Compl., ECF 84).  At the conclusion of discovery, the parties cross-moved for
summary judgment.  Plaintiffs moved for summary judgment on their Fourth Amendment and
First Amendment overbreadth challenges.  (Pls.' Mot. for Summ. J., ECF 144.)  The Government
moved for summary judgment on the same grounds, as well as on Plaintiffs' First Amendment
as-applied claim. (Gov't Mot. for Summ. J., ECF 177.)  The Court found material factual
disputes in the record, and denied both motions.  (Mem. Denying Summ. J., ECF 185).

Thereafter, the Court held an eight-day bench trial in June 2013.  Plaintiffs presented
twelve fact witnesses, all of them named Plaintiffs, as well as three experts.  The Government
presented testimony from two FBI agents and four experts.  Id.  This Court's post-trial opinion

describes the evidence in greater detail.  Free Speech Coal., Inc., 957 F.Supp.2d 564, 571-83 (E.D. Pa. 2013) (FSC III).

>    *1. Trial evidence*

The Court made extensive findings of fact.  Among other things, it described the named plaintiffs as "'niche' players in the adult entertainment industry with unique and often creative approaches to sexually explicit conduct" who "testified, credibly, that it is their sincere belief that the use of sexually explicit material is a valued artistic endeavor and also serves valued educational motives."  Id. at 583.  The Court described Plaintiffs' production of images as "overwhelming[ly]" commercial.  Id.  The Court further found that "[y]outhful-looking performers are ubiquitous in the adult entertainment industry" across all pornography genres.  Id. at 584.  Moreover, "every Plaintiff-producer who testified admitted he or she has used models ages 18–24 years old."  Id.  While some Plaintiffs had modified their practices to avoid the requirements of the Statutes, the Court found only two projects were "made practically impossible by the Statutes, because those endeavors require the subjects of the art to have the opportunity to remain anonymous."  Id. at 585.

The Court found the Government's experts more persuasive and methodologically rigorous, specifically "reject[ing] all of Plaintiffs' experts' conclusions."  Id. at 587.  In particular, the Court credited the testimony of a pediatrician put on by the Government, whose testimony regarding different rates of physical and sexual maturation among 12-14 year olds, as the Court put it, "offered justification for Section 2257's prophylactic sweep, because it demonstrated the inability to determine chronological age from visual inspection."  Id. at 586.  The Court found that the "general age range of confusion" was from 15-24 years old.  Id. at 595.  Other testimony, in which the Court likewise credited the Government's experts, concerned the

proportion of teen porn on the Internet and the pervasiveness of sexting. <u>Id.</u> Finally, the Court noted that "some Plaintiffs suggested that without 2257, they would not necessarily request IDs from every model—only from those they suspected to be under age 18." <u>Id.</u> at 587. It also considered "the requirement to request and maintain copies of performers' photo identifications" to be "not uniquely onerous or burdensome on producers," but "consistent with other record-keeping requirements mandated by federal, state and local governments." <u>Id.</u>

### 2. *Legal Analysis*

Earlier in the opinion, this Court had identified three questions remanded by the Third Circuit:

> (1) for Plaintiffs' as-applied claim under the First Amendment (Count I), whether the Statutes are narrowly tailored as to Plaintiffs;
> (2) for Plaintiffs' facial over-breadth claim under the First Amendment (Count I), whether the Statutes unreasonably burden a substantial amount of protected speech; and
> (3) for Plaintiffs' facial and as-applied claims under the Fourth Amendment (Count IV), whether the inspections amount to "searches" either because they intrude on areas in which there is a reasonable expectation of privacy or because they involve "common-law trespass"; and if so, whether the inspections fall under the administrative search exception to the Fourth Amendment's warrant requirement.

<u>Id.</u> at 570.

### 3. *As-applied challenge*

This Court first addressed whether the Statutes were narrowly tailored as applied to Plaintiffs. <u>Id.</u> at 589. Because only the issue of narrow tailoring was at that point before the Court, the critical question was "'whether the Statutes burden substantially more of Plaintiffs' speech than is necessary to further the government's legitimate interest of protecting children,'" on which the Government bore the burden of proof. <u>Id.</u> (quoting <u>FSC II</u>, 677 F.3d at 536).

The bulk of this Court's analysis concerned the prevalence of youthful performers in the works made by Plaintiffs—none of whom, the Court noted, confined their production to clearly mature adults.  See FSC III, 957 F. Supp. 2d at 589-91.[2]  The Court rejected Plaintiffs' argument that the Statutes were not narrowly tailored as applied to them given that the vast majority of their performers were over 26 (e.g., 63% for Plaintiff Nitke and 80% for Plaintiff Sinclair, according to the Government's calculations), since the potential age range of confusion was substantially greater when a subject's age was assessed by non-experts.  In light of the commercial nature of Plaintiffs' work, the Court found "the fit between the Statutes' effect on Plaintiffs and its goal of combatting child pornography is reasonable because every Plaintiff that produces sexually explicit depictions uses a considerable number of youthful-looking performers and derives commercial revenue from these depictions, and the burden associated with record-keeping is a justifiable cost of doing business."  Id. at 591.  Citing other cases upholding universal, bright-line schemes under intermediate scrutiny, the Court found that a record-keeping scheme applicable only to persons who appear over a certain age would "introduce subjectivity into the regulatory scheme" by relying on producers' own assessment of a performer's age (which would, in turn, set the stage for disputes with law enforcement).  Id.  Such a rule would also "lessen [the] effectiveness" of the statutory scheme due to potential errors in identifying age. Id.

The Court also found that the Statutes were narrowly tailored as applied to Plaintiffs because "no Plaintiff demonstrated at trial that he or she produces sexually explicit depictions for purely private purposes or maintains records for such private depictions."  Id. at 592.  The only Plaintiff to have made depictions of private sexual conduct conceded to selling them later.  Id.

---

[2] In FSC II, the Third Circuit had posited that "if one of the Plaintiffs employs performers that no reasonable person could conclude were minors, then that plaintiff may be able to demonstrate that the Statutes burden substantially more of that plaintiff's speech than is necessary to protect children from sexual exploitation."  677 F.3d at 537.

Finally, the Court found that despite the fact that two projects would be "barred by the Statutes" and one photographer testified to the difficulties of requiring foreign photographers to provide appropriate documentation and comply with the Statutes, this was essentially a constitutionally acceptable price to pay under intermediate scrutiny. Id. at 592-93.

### 4.   Substantial overbreadth

The Court next examined whether the Statutes were substantially overbroad.  A Statute may be overbroad under the First Amendment if "a substantial number of its applications are unconstitutional, judged in relation to the Statute's plainly legitimate sweep."  Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n. 6 (2008).  In FSC II, the Third Circuit had suggested two situations where the Statutes might be facially overbroad: their application to depiction of "clearly mature adults" and to "private, noncommercial depictions created and viewed by adults in their homes."  FSC II, 677 F.3d at 538.  This Court limited its discussion to those two scenarios, finding that Plaintiffs had not met their burden in either case.

First, it noted that Plaintiffs had not presented evidence of any genre of pornography limited to clearly mature adults, in contrast to the "vast" legitimate sweep of the Statutes—over one-third of porn on the Internet, one Government expert testified, was teen porn.  FSC III, 957 F. Supp. 2d at 594.  On the basis of the evidence showing a substantial appetite for pornographic depictions of youthful individuals, the Court found that "the Statutes' prophylactic nature [was] justified because even though they may reach depictions of mature adults, any more targeted record-keeping requirement, i.e., a record-keeping requirement applying only to individuals who appear to be age 25 or younger, would introduce subjectivity, uncertainty and immeasurable enforcement difficulties into the regulatory scheme."  Id.  at 595.  The Court considered the question of the Statutes' application to private communications to be a closer issue, but

11

ultimately ruled for the Government because Plaintiffs had failed to show that there existed "a substantial amount of private communications that even fall under the Statutes' scope" or "actual burden or chilling of such communications caused by the Statutes." Id. at 596.[3]

### E.  FSC IV: Second but Now-Vacated Decision of the Third Circuit (2015)

#### 1.  Associational standing

On appeal, the Third Circuit for the first time addressed the ability of Plaintiffs Free Speech Coalition and the American Society of Media Photographers (the "organizational Plaintiffs") to bring an as-applied First Amendment challenge on behalf of their members.  To demonstrate associational standing, a party must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Free Speech Coal., Inc. v. Attorney Gen. U.S., 787 F.3d 142, 153 (3d Cir. 2015) (FSC IV) (quoting Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc., 280 F.3d 278, 283 (3d Cir. 2002)).  The panel held that the organizational Plaintiffs failed the third prong of this test because "aggregating that industry's speech in toto is an improper method for identifying the burdens imposed on specific members," for whom "individualized inquiry" was necessary.  FSC IV, 787 F.3d at 154.

#### 2.  As-applied challenge

The Third Circuit affirmed the ruling of this Court denying Plaintiffs' as-applied challenge.  The panel compared the nature of the burdens imposed by the Statutes on the individual Plaintiffs—all but two of whom were able to create explicit works, despite the

---

[3] On the Fourth Amendment issues, the Court ruled for the Government on all issues except as applied to the regulations allowing searches of records at producers' residences. Id. at 609.

statutory requirements—with the amount of speech "needlessly impacted."   Id. at 156.
Calculating the proportion of performers over age 30 involved in each Plaintiff's speech, it found
a "not insignificant" number of performers for whom the statutory requirements did not advance
the Government's interest of protecting children, but a "substantial" number of performers for
whom identification and record-keeping did advance that interest.   Id. at 158.   The panel also
emphasized that the additional burden for keeping records for clearly mature adult performers, as
well as for youthful performers, was minimal.   Id. at 159.   It held:

> Accordingly, because Plaintiffs each employ a substantial number of youthful-
> looking models, the qualitative burden to comply with the Statutes is minimal and
> prohibits none of their speech, and because most of the burden Plaintiffs face in
> establishing an identification and recordkeeping system accessible by law
> enforcement advances the Government's interest in combatting child
> pornography, we hold that the Statutes and regulations…are narrowly tailored as
> applied to Plaintiffs.

Id.

### 3.  Substantial overbreadth challenge

The Third Circuit also affirmed this Court's ruling that Plaintiffs had failed to show that
the Statutes were facially overbroad.  It found that although Plaintiffs had shown "the existence
of a universe of private sexually explicit images not intended for sale or trade along with, to a
limited degree, a universe of sexually explicit images that depict only clearly mature adults,"
"the invalid applications of the Statutes…still pale in comparison with the Statutes' legitimate
applications," and accordingly denied Plaintiffs' facial claim.  Id. at 164.

### F.  FSC V: Most Recent Third Circuit Decision and Remand in light of Reed

Shortly after FSC IV was decided, Plaintiffs filed a petition for rehearing, arguing that
Reed v. Town of Gilbert, 135 S. Ct. 2218 (2015), compelled a finding that the Statutes were
actually content-based restrictions on speech and therefore subject to strict scrutiny.  Plaintiffs

also argued the Statutes violated the Fourth Amendment under City of Los Angeles v. Patel, 135 S. Ct. 2443 (2015).  FSC V, 825 F.3d at 153.  The Third Circuit granted panel re-hearing, vacated the panel opinion in FSC IV, and heard further argument.

A split panel of Third Circuit adopted Plaintiffs' position that Reed was controlling.  Free Speech Coal., Inc. v. Attorney Gen. United States, 825 F.3d 149, 158 (3d Cir. 2016) (FSC V).  In Reed, the Supreme Court had held that a town code imposing different restrictions on different types of posted signs was a content-based restriction on speech that was subject to strict scrutiny because the applicable restrictions "depend[ed] entirely on the communicative content of the sign."  135 S. Ct. at 2227.  The majority held that, under Reed, because the Statutes pertained only to visual depictions of actual or simulated sexually explicit conduct, as statutorily defined, they were content-based because "the Statutes' restrictions 'depend entirely on the communicative content' of the speech."  FSC V, 825 F.3d at 160 (quoting id.).

Accordingly, the majority vacated and remanded the First Amendment issues to this Court.  Because "Plaintiffs ha[d] conceded that the Government's interest in protecting children from sexual exploitation by pornographers is compelling," the Third Circuit commanded this Court to "focus[] on whether the Statutes are narrowly tailored to serve this interest" such that they survived strict scrutiny.  Id. at 164 n.11.  The majority most succinctly described the scope of the remand in a footnote:

> We remand both the as-applied and overbreadth claims, as the level of scrutiny is a key factor in both as-applied and overbreadth challenges…We also remand for the District Court to determine if Free Speech Coalition and the American Society of Media Photographers have associational standing, as the level of scrutiny is relevant in resolving this issue.

Id. at 164 n.12 (citations omitted).   The panel also held that the warrantless inspection requirement of Statutes and regulations facially violated the Fourth Amendment, and directed this Court to enter judgment for Plaintiffs on the Fourth Amendment issue.  Id. at  172.

Judge Rendell concurred separately, as she had in FSC II, and stated that she would have analyzed the First Amendment issue under the doctrine of secondary effects established in City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986).  Free Speech Coal., Inc. v. Attorney Gen. United States, 825 F.3d 149, 173-77 (3d Cir. 2016) (Rendell, J., concurring).

## II.     Proceedings After Remand

After the case was remanded, the parties cross-moved for judgment on the First Amendment issues.  (Pls.' Br., ECF 246; Gov't Br., ECF 249.)   Oral argument was held on September 28, 2017.  (Hrg. Tr., ECF 257.)  Subsequent to oral argument, Plaintiff Free Speech Coalition "formalized" industry policies into official guidance regarding age verification and a certification form, which it docketed with the Court on October 27, 2017.  (FSC Industry Guidance and Standards, ECF 259.)   The Government requested that it be able to serve additional written discovery and take additional witness testimony.  (Gov't Mot. for Additional Disc., ECF 261.)  The Court then entered an order denying the Government's request to serve written discovery but allowing it to "file written sworn declarations, provided they are relevant on the concept of strict scrutiny, and contain specific proposals or requests that the Court should adopt in fashioning a final decree in this case under the strict scrutiny standard."  (Order at 1-2, ECF 262.)  Subsequently, the parties submitted supplemental briefing. (Gov't Supp. Br., ECF 265; Pls.' Supp. Br, ECF 266.)   The Government submitted three declarations, summarized below.

The cross-motions for judgment are now ripe for decision.

### A. Summary of the parties' arguments

#### 1. Plaintiffs

Plaintiffs stress the demanding standard of strict scrutiny, and argue that the Government has not met its burden of showing that the Statutes are narrowly tailored to a compelling governmental interest.  Specifically, argue that under United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 822 (2000), the Government, under strict scrutiny, must show an "actual problem in need of solving," which the Government had not done because there had been no evidence presented at trial that any Plaintiff had actually used minors in producing sexually explicit images.  (Pls.' Br. at 5-14, ECF 246; Pls.' Supp. Br at 3-4, ECF 266).

Plaintiffs next argue that the Government has failed to meet its burden of showing that the Statutes are the least restrictive means to protect children from child pornography among effective alternatives.  (Pls.' Br. at 14-28, ECF 246; Pls.' Supp. Br at 3-4, ECF 266.) Plaintiffs advance seven alternatives to the Statutes that they assert are less restrictive and equally effective, such that the Statutes are not narrowly tailored:

1) Criminal laws prohibiting and punishing child pornography
2) Self-certification of compliance, as provided by 18 U.S.C. 2257A(h)
3) "Industry standards" and intellectual property laws
4) An age-verification law limited to persons who might reasonably appear to be underage
5) A law limited to commercial productions
6) A law limited to "primary" producers of sexual expression
7) A recordkeeping law enforced only by administrative sanction

(Pls.' Br. at 16-28; Pls.' Supp. Br at 5-18.)

Plaintiffs then argue, briefly, that the Statutes are unconstitutionally overbroad because the Statutes would conceivably apply, regardless of the age of the individuals depicted, to private expression between consenting partners, "artistic expression, educational expression, political expression, journalistic expression."  (Pls.' Br. at 29.)  Finally, Plaintiffs assert that they have

organizational standing to challenge the Statutes on behalf of their members under Third Circuit precedent, particularly because organizations had successfully litigated First Amendment challenges in the past, as in Ashcroft v. Free Speech Coal., 535 U.S. 234 (2002) and Brown v. Entm't Merchants Ass'n, 564 U.S. 786 (2011).  (Id. at 30-33.)

In their supplemental brief, Plaintiffs reiterate their earlier arguments regarding the need for the Government to demonstrate an "actual problem" necessitating the enactment of the Statutes, point out the lack of evidence that any Plaintiff used minors in creating sexually explicit expression, assert that the Government has "failed to produce evidence" that any of the proposed alternatives would be less effective than the Statutes, and argue that this Court should evaluate Plaintiffs' facial challenge under strict scrutiny because it was remanded by the Third Circuit. (Pls.' Supp. Br. at 3-18.)  Plaintiffs object, in particular, to the Government's proposed limitation of the Statutes to Plaintiffs' depictions of mature adults over 30 as an improper judicial rewrite of the Statute under United States v. Stevens, 559 U.S. 460 (2010).  Finally, Plaintiffs object to the affidavits submitted by Government, and request that such testimony be taken in open court. (Pls.' Supp. Br. at 18-19.)

### 2.  Government

The Government first argues that the organizational plaintiffs lack standing to bring an as-applied (as opposed to facial) challenge on behalf of their members because, as the panel had held in the now-vacated FSC IV, "the as-applied narrow tailoring inquiry requires an examination of whether an individual producer's speech was unnecessarily burdened," which would make Free Speech Coalition and the American Society of Media Photographers improper plaintiffs because of their heterogeneous membership.  (Gov't Br. at 5-8, ECF 249.)  The

Government also distinguishes <u>Ashcroft v. Free Speech Coalition</u> and <u>Brown</u> as facial challenges.  (<u>Id.</u> at 6.)

The Government next argues that the Third Circuit remanded only the issue of whether the Statutes were narrowly tailored, and that this Court should decline to revisit whether preventing or combating child pornography is a compelling governmental interest.  (<u>Id.</u> at 9-16.)

The Government devotes the bulk of its brief to refuting the alternatives to the Statutes provided by Plaintiffs.  Citing <u>Burson v. Freeman</u>, 504 U.S. 191 (1992), and <u>Williams-Yulee v. Florida Bar</u>, 135 S. Ct. 1656 (2015), which concerned a state law creating a 100-foot "campaign-free zone" around polling places and a prohibition on personal campaign solicitations by judicial candidates, respectively, the Government argues that Statutes may be upheld under strict scrutiny based on "precedent, common sense, and…legislative history" if they are "narrowly" but not "perfectly" tailored.  (Gov't's Br. at 2, 16-17.)

The Government, which considers the Statutes to impose only minimally burdensome requirements, next attempts to demonstrate that each of the seven proposals advanced by Plaintiffs would be either less effective, or not less restrictive.  (<u>Id.</u> at 21-33.)  For example, the Government argues that an age restriction limiting the application of the Statutes to performers under 30 would not be less restrictive as applied to Plaintiffs, all of whom had testified that they had all used youthful-looking individuals in their work, and no Plaintiff had testified at trial that having an age cutoff was a desirable alternative.  (<u>Id.</u> at 21-24.)  With respect to relying criminal prosecutions alone, the Government argues that most prosecutions are for images of very young children, and it is hard to get a conviction for images of older children; for these children, including those in the age range of confusion, the Statutes therefore serve as a deterrent.  (<u>Id.</u> at 15.)

18

Finally, the Government asks the Court not to reach Plaintiffs' facial overbreadth challenge if it finds the Statutes invalid as applied to Plaintiffs, but if the Court chooses to address the issue, it should find that Plaintiffs have not met their burden of showing that the Statutes are substantially overbroad, as the Third Circuit had found in FSC IV. (Id. at 33-38.)

In its supplemental brief, the Government begins with the premise that Plaintiffs' proposed alternatives to the Statutes should be considered "in light of the reality of ubiquitous, readily-accessible child pornography on the Internet, and finite law enforcement resources." (Pls.' Supp. Br. at 4, ECF 265.) The Government cites prior opinions in this case, statistics regarding the millions of pornographic images of children on the Internet, and affidavits it attached to its supplemental brief from a vice-president of the National Center for Missing and Exploited Children and an FBI agent, to argue that "[t]he Statutes are unquestionably more effective than doing away with any enforceable age verification requirement whatsoever." (Id. at 10.)

The Government next argues that Plaintiffs' proposed alternatives would be less effective than the age verification, labeling, and recordkeeping scheme created by the Statutes, various "interrelated" provisions of which, it asserts, work together. The Government does not refute each of Plaintiffs' proposed alternatives to the Statutes, instead discussing at length why only one of the alternatives, exempting secondary producers of actual or simulated sexually explicit conduct, would be less effective than the Statutes. Limiting the Statutes to primary producers, the Government argues, would fail to effectuate a "crucial purpose" of the Statutes—namely "creating a regime whereby law enforcement, secondary producers, and others can easily find the age verification records associated with a particular film or photograph once it leaves the hands of its original creator," which the record evidence indicated occurred frequently. (Id. at 11.)

Finally, while the Government makes clear its position, expressed in its pre-argument briefing, that the Statutes should be upheld in full, it argues, in the alternative, that this Court might invalidate the Statutes, or applications thereof, only in part.  Specifically, if the Court deems "partial invalidation" appropriate, the Government requests that the Statutes be invalidated "only as applied to Plaintiffs' depictions containing no individuals under age 30." (Id. at 14.)  The Government argues that partial invalidation of the Statutes is warranted under various cases including Ayotte v. Planned Parenthood, 546 U.S. 320 (2006), United States v. Booker, 543 U.S. 220 (2005), Alaska Airlines, Inc. v. Brock, 480 U.S. 678 (1987), and Brockett v. Spokane Arcades, Inc., 472 U.S. 491 (1985).  In particular, the Government argues invalidating the Statutes as to Plaintiffs' depictions of clearly mature adults would satisfy the three-part test for what it terms "partial invalidation" set forth in Booker.  (Id. at 19-25.)

### B.  Government's Supplemental Evidence

As encouraged by the Court, the Government attached several declarations to its final brief, to supply additional factual material in line with the implicit requirement of the Third Circuit that in order to sustain its new burden of proving narrow tailoring, and this Court's new requirement of applying strict scrutiny, the factual record should be supplemented.  The Government filed three declarations as follows:

#### 1.  Declaration of John Shehan

Shehan is Vice President of the Exploited Children Division of the National Center for Missing and Exploited Children (NCMEC), a non-profit "created to help find missing children, reduce sexual exploitation, and prevent child victimization."  (Shehan Decl. ¶ 2, ECF 265-2.) Shehan describes NCMEC's CyberTipline, which for the past two decades has allowed the public and electronic service providers to provide secure tips and leads about child sexual

exploitation, including child pornography.  (Id. ¶¶ 3-4.)  NCMEC refers tips to law enforcement both in the United States and internationally.  (Id. ¶¶ 8-9.)  Shehan describes a "tremendous increase" in reports to the CyberTipline in recent years; the number of reports designated by the submitting party as being related to child pornography rose from 506,611 in fiscal year 2013 to 9,864,767 in fiscal year 2017, although only a fraction of these reports are "resolved to a U.S domestic location."  (Id. ¶¶ 10, 13.)  NCMEC also works with the "Internet industry" by "notifying ESPs when NCMEC receives information concerning active, publicly-viewable web pages depicting apparent child pornography on their site."  (Id. ¶ 15.)  NCMEC provided 21,499 notifications of apparent child pornography on publicly viewable URLs in 2014; 45,923 in 2015; 45,243 in 2016; and 56,565 in 2017.

### 2.  Declaration of Jackie Dougher

Dougher is a Supervisory Special Agent in the Violent Crimes Against Children Section at the FBI, and the FBI liaison to NCMEC.  (Dougher Decl. ¶ 1, ECF 265-3.)   Through her work, Dougher reviews reports from the NCMEC CyberTipline, the "vast majority" of which "concern suspected child pornography."  (Id. ¶ 2.)  Dougher asserts that child pornography can be found "on a wide variety of platforms on the open internet," and the images she sees from CyberTips "involve children of any age, from very young children to older individuals where it may be difficult to determine whether they are minors or adults."  (Id. ¶ 3.)  Although she considers law enforcement to have made investigations of child pornography a priority, child pornography has not been eliminated, and due to the volume of available child pornography on the Internet, "the FBI must prioritize its investigations and is less likely to investigate cases involving images where it is difficult to determine if the person in the image is a child or an adult."  (Id. ¶ 4.)

### 3. Declaration of Janine Johansen

Johansen, a Department of Justice paralegal, conducted Google searches for "2257 compliance software" and "2257 compliance tools" at the behest of Kathryn Wyer, an attorney for the Government in this litigation. (Johansen Decl., ECF 265-4). She lists the URLs for five websites advertising web-based applications, recordkeeping services, and record management software for § 2257 recordkeeping, as well as the pricing for various subscription levels, if available.  (Id. at ¶¶ 3-7.) One subscription package available through http://www.my2257.com, for example, gives FSC members a $300 discount off the $2995 one-time licensing fee for the large organization package.  (Id. at ¶¶ 5.)  Johansen says nothing about the quality or reliability of these products or services, and does not specify whether she downloaded the software, or attempted to use it.

Attached to the last of these declarations is a voluminous report entitled "The National Strategy for Child Exploitation Prevention and Interdiction," a Department of Justice report to Congress dated as of April 2016.

## III. Burdens of Proof

By holding that the Statutes are content-based under Reed and subject to strict scrutiny, the Third Circuit altered the legal standard by which this Court is to assess Plaintiffs' as-applied challenge.

When faced with a First Amendment as-applied challenge to a restriction on speech under strict scrutiny, the Government must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." Reed v. Town of Gilbert, 135 S. Ct. 2218, 2231 (2015).   A content-based restriction, such as the Statutes, "must be the least restrictive or least intrusive means of serving the government's interests." Bruni v. City of Pittsburgh, 824 F.3d 353, 363 (3d Cir. 2016).  In making this inquiry, a court must "ask

whether the challenged regulation is the least restrictive means among available, effective alternatives." Ashcroft v. ACLU, 542 U.S. 656, 666 (2004).

In FSC V, the Third Circuit remanded the narrow tailoring part of this inquiry, stating in a footnote that "[w]e note that Plaintiffs have conceded that the Government's interest in protecting children from sexual exploitation by pornographers is compelling, and thus the District Court's inquiry on remand should be focused on whether the Statutes are narrowly tailored to serve this interest." 825 F.3d at 164 n.11. FSC V explained that "[o]n remand, it is for the District Court to ascertain whether the Government has met its burden of showing that the 'proposed alternatives will not be as effective as the challenged [Statutes].'" Id. at 164 (quoting Ashcroft v. ACLU, 542 U.S. at 665).

Traditionally, when attacking a Statute as substantially overbroad, "[t]he overbreadth claimant bears the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." Virginia v. Hicks, 539 U.S. 113, 122 (2003) (quoting New York State Club Assn., Inc. v. City of New York, 487 U.S. 1, 14 (1988)). However, in a recent overbreadth challenge to a law prohibiting depictions of animal cruelty, the Supreme Court stated, well before reaching the merits of the overbreadth analysis, that the statute in question was content-based, and therefore "presumptively invalid," forcing the Government to "bear[] the burden to rebut that presumption." United States v. Stevens, 559 U.S. 460, 468 (2010) (quotations and citations omitted). In its now-vacated, post-Stevens opinion denying Plaintiffs' overbreadth challenge—which held that the Government bore the burden of defending the Statutes as applied under intermediate scrutiny—the Third Circuit cited Hicks for its pronouncement that "[u]nlike an as-applied challenge, the burden falls upon Plaintiffs to demonstrate the Statutes' facial overbreadth." FSC IV, 787 F.3d at 160 (citing 539 U.S. at 122).

IV.     **Standing**

The Government continues to assert that the two associational Plaintiffs, Free Speech

Coalition and American Society of Media Photographers, lack standing to pursue as-applied

challenges on behalf of their members.

In the Third Circuit, associational standing requires that "(1) the organization's members

must have standing to sue on their own; (2) the interests the organization seeks to protect are

germane to its purpose; and (3) neither the claim asserted nor the relief requested requires

individual participation by its members." Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc., 886

F.3d 332, 345 (3d Cir. 2018).   Regarding the third condition, individual participation, the

Supreme Court held in a seminal case that claims may be "properly resolved in a group context"

if they do not require "individualized proof." Hunt v. Washington State Apple Advert. Comm'n,

432 U.S. 333, 344 (1977).

In FSC IV, which has since been vacated, the Third Circuit ruled as follows:

> [N]either FSC nor ASMP represents "the adult film industry" as a whole. Instead,
> their members comprise various segments of that industry. And those individual
> members' participation is necessary to assess properly FSC's and ASMP's as-
> applied First Amendment claims. Specifically, we must examine whether the
> Statutes and regulations are sufficiently circumscribed as they apply to the
> specific conduct of FSC's and ASMP's members. *See Bd. of Trs. of State Univ. of
> N.Y. v. Fox,* 492 U.S. 469, 482 (1989) (a plaintiff alleging a Statute is not
> narrowly tailored "asserts that *the acts of his that are the subject of the
> litigation* fall outside what a properly drawn prohibition could cover"). And as our
> description of the law governing narrow tailoring makes clear, whether the
> Statutes and regulations survive intermediate scrutiny as applied to each
> producer of sexually explicit images turns on the degree to which that individual
> producer's speech is unnecessarily burdened. Indeed, the Statutes might be
> narrowly tailored as to some of FSC's and ASMP's members but not others
> depending upon the nature of each member's speech. Identifying those members
> for whom the Statutes may be unconstitutional thus requires an individualized
> inquiry that fails to satisfy the requirements for associational standing. *Cf. Harris
> v. McRae,* 448 U.S. 297, 321 (1980) (individualized nature of a Free Exercise
> claim negated organizational standing); *Bano v. Union Carbide Corp.,* 361 F.3d
> 696, 714 (2d Cir. 2004) (no organizational standing where " 'the fact and extent'
> of the injury that gives rise to the claims for injunctive relief 'would require

individualized proof' " (quoting *Warth v. Seldin,* 422 U.S. 490, 515–16 (1975)))…

[E]ven if FSC's and ASMP's members collectively produce a significant portion of the works generated by the adult film industry, aggregating that industry's speech in toto is an improper method for identifying the burdens imposed on specific members. Generalized statements regarding the adult film industry's speech cannot replace the individualized inquiry required, and FSC and ASMP lack associational standing to bring an as-applied First Amendment claim on behalf of their members.

FSC IV, 787 F.3d at 153–54.

For the reasons articulated in FSC IV, the Court must conclude that FSC and ASMP lack standing to bring an as-applied challenge on behalf of their members.

If the individualized inquiry inherent to as-applied challenges negates associational standing, that conclusion is no less true when the narrow tailoring analysis is performed under strict, as opposed to intermediate scrutiny—a court simply requires a closer fit between the speech regulation and the speech of a particular individual.  The Third Circuit's holding does not affect their standing to bring a facial challenge.  Given the many small individual producers of adult pornography, who could not afford to maintain a case of this nature, the organizational Plaintiffs have served a valid purpose in bringing this litigation with superb counsel and very effective litigation strategy.  The inability of an individual producer to seek a declaration establishing and enforcing their First Amendment rights is an important reason to allow associations, of producers and others, to gather together and sponsor litigation of this nature.

## V.     The Court rejects the Plaintiff's facial overbreadth challenge

In the First Amendment context, the Supreme Court allows facial challenges to laws "whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the Statute's plainly legitimate sweep.'"  United States v. Stevens, 559 U.S. 460, 473 (2010).  Thus, "[t]he first step in overbreadth analysis is to construe

the challenged Statute; it is impossible to determine whether a Statute reaches too far without first knowing what the Statute covers." Id. at 474 (reading the plain language of the Statute at issue prohibiting depictions of animal cruelty "to create a criminal prohibition of alarming breadth"). As was discussed in a prior appeal in this case, the Third Circuit considers four factors relevant to this "challeng[ing]" determination: "(1) 'the number of valid applications' of the Statute; (2) 'the historic or likely frequency of conceivably impermissible applications'; (3) 'the nature of the activity or conduct sought to be regulated'; and (4) 'the nature of the state interest underlying the regulation.'" FSC II, 677 F.3d 519, 537–38 (3d Cir. 2012) (quoting Gibson v. Mayor and Council of the City of Wilmington, 355 F.3d 215, 226 (3d Cir.2004)).[4] "Thus," the Court added, "a significant consideration in overbreadth analyses is the likelihood and frequency of invalid applications of the Statute compared to valid applications." FSC II, 677 F.3d at 538.

The Government cites case law to the effect that this Court should first resolve Plaintiffs' as-applied challenge, and the Supreme Court has indeed held that "[i]t is not the usual judicial practice, however, nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily-that is, before it is determined that the Statute would be valid as applied. Such a course would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a Statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws." Bd. of Trustees of State Univ. of New York v. Fox, 492 U.S. 469, 484–85 (1989). When considering the constitutionality of the Statutes at issue in this case under intermediate scrutiny, the en banc Sixth Circuit, relying on Fox, began by addressing the plaintiffs' as-applied challenge. Connection Distrib. Co. v. Holder, 557 F.3d 321, 327 (6th Cir. 2009). Previous opinions in this

---

[4] This is a separate test from the narrow tailoring analysis conducted below.

case have also followed this sequence.  See, e.g., FSC II, 677 F.3d 519; Free Speech Coal., Inc. v. Attorney Gen. U.S., 787 F.3d 142 (3d Cir. 2015) (addressing as-applied challenge before overbreadth challenge).

In vacating this Court's dismissal of Plaintiffs' substantial overbreadth claim, the Third Circuit wrote:

> Under the First Amendment overbreadth doctrine, a party may bring a facial challenge against a Statute, even though it is not unconstitutional as applied to that particular party, because the Statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression. Declaring a Statute unconstitutional on overbreadth grounds is strong medicine and should be used sparingly and only as a last resort. Consequently, a single impermissible application cannot invalidate a Statute. Instead, a law may be invalidated as overbroad only if a substantial number of its applications are unconstitutional, judged in relation to the Statute's plainly legitimate sweep.

FSC II, 677 F.3d at 537.

However, the Court concludes that Plaintiffs' facial overbreadth claim should be considered first and in view of prior precedent, including the Third Circuit's decision in FSC IV, must be rejected.

Also, as developed below, the Court will find portions of the statute unconstitutional as applied to Plaintiffs in this case and this analysis will proceed more logically below.

Although the Third Circuit remanded for analysis of whether the Statutes are narrowly tailored, for purposes of the substantial overbreadth analysis, much of the Third Circuit's analysis in its now-vacated decision in FSC IV remains germane.  The text of the Statutes has not changed; their "plain text" continues to "'make[] clear that they apply broadly to all producers of actual or simulated sexually explicit depictions regardless of whether those depictions were created for the purpose of sale or trade.'"  FSC IV, 787 F.3d at 161 (quoting FSC II, 677 F.3d at 539).  The Statutes continue to "reach essentially the entire universe of sexually explicit images,

"including private, noncommercial depictions created and viewed by adults in their homes."  Id. (quoting FSC II, 677 F.3d at 538).  The task, for this Court, is to "compare 'the amount of speech that implicates the government's interest in protecting children' with 'the amount of speech that is burdened but does not further the government's interest' in an effort to 'weigh the legitimate versus problematic applications of the Statutes.'"  Id. (quoting FSC II, 677 F.3d at 538).

First, the number of valid applications of the Statute remains large, particularly in regards to the vast universe of child pornography.  Child pornography, despite carrying drastic criminal penalties, continues to flourish.  According to the affidavits submitted by the Government, a vast universe of child pornography exists on the Internet, subjecting children to brutality and sadism in the course of those images' creation.  The Government has submitted extensive findings of fact, numbers 62-75, in an attachment to its Supplemental Brief (ECF 265-1) which the Court, without repeating verbatim, finds to accurately and appropriately state the dangers of child pornography.  As long as the demand for child pornography continues in the United States, the Court cannot overlook the significance of the Congressional interests in enacting the Statutes, the high number of child pornography prosecutions, and the need for judicial decision making to respect these factors.

Moreover, the third and fourth factors for substantial overbreadth analysis—the nature of the activity to be regulated and the nature of the state interest underlying the regulation—continue to militate in favor of maintaining the Statutes' validity.  The Third Circuit in FSC IV identified the state interest in the Statutes as "protecting children from sexual exploitation by pornographers."  See 787 F.3d at 165.  This is a state interest of the highest order.  By enacting strict prohibitions on child pornography, and setting a clear boundary line at age 18, Congress addressed what it saw as a need to protect children under 18 from being sexually exploited by

28

pornographers, and this must be respected.  Read in the context of laws criminalizing child pornography, the Statutes make clear to producers and consumers that the activity to be regulated is adult pornography—and the Statutes' purpose is to keep adult pornography limited to adults. This, too, counsels in favor of upholding the Statutes.

Even after being invited by this Court to supplement the record on remand (which they did not), Plaintiffs simply have not shown that the impermissible applications of the Statutes to private, non-commercial depictions of sexual conduct and to depictions of clearly mature adults outweigh the legitimate applications of the Statutes so as to render the Statutes substantially overbroad.  The Third Circuit's prior approval, summarized above, is still controlling.

The Court finds that Plaintiffs have not met their burden of showing that the Statutes are substantially overbroad.  Thus, the Court rejects Plaintiffs' claim that existing precedent warrants striking down the challenged Statutes, 18 U.S.C. § 2257 and 18 U.S.C. § 2257A.

## VI.    How Courts Approach Strict Scrutiny Analysis

A three-part standard governs courts' evaluation of First Amendment challenges governed by the strict scrutiny standard.  "To survive strict scrutiny analysis, a statute must: (1) serve a compelling governmental interest; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive means of advancing that interest."  ACLU v. Mukasey, 534 F.3d 181, 190 (3d Cir. 2008).  With respect to the last prong of this test, a court must "ask whether the challenged regulation is the least restrictive means among available, effective alternatives." Ashcroft v. ACLU, 542 U.S. 656, 666 (2004).  Under strict scrutiny, the burden of proof falls on the government.  Reed v. Town of Gilbert, 135 S. Ct. 2218, 2231 (2015).

Two recent Third Circuit cases, decided prior to Reed, demonstrate the application of this standard, both in the facial and as-applied context.

### A.  COPA Litigation

The opinions in a facial challenge to the constitutionality of the Computer Online Privacy Act (COPA), a statute enacted "to protect minors from exposure to sexually explicit material on the Web," ACLU v. Mukasey, 534 F.3d 181, 184 (3d Cir. 2008), are of particular relevance to this case.  COPA imposed fines and criminal penalties on "anyone who knowingly posts 'material that is harmful to minors' on the Web 'for commercial purposes.'"  Id. at 184–85.  The statutory definition of "material harmful to minors" pertained to obscene or sexually explicit content.  Id. at 185.[5]

The plaintiffs filed suit in this Court in 1998, and moved for a preliminary injunction of COPA.  Am. Civil Liberties Union v. Reno, 31 F. Supp. 2d 473, 477 (E.D. Pa. 1999).  Judge Reed of this court found that COPA was content-based, and subject to strict scrutiny.  Id. at 493.  While the Court held that "Congress has a compelling interest in the protection of minors," the Court held that "it [was] not apparent" on the record then before it that the government could "meet its burden to prove that COPA is the least restrictive means available to achieve the goal of restricting the access of minors" to sexually explicit material.  Id. at 497.  Because the plaintiffs had demonstrated irreparable harm and "the public interest is not served by the enforcement of an unconstitutional law," the Court granted the requested preliminary injunction.  Id. at 498.

After five years of litigation over whether the plaintiffs were entitled to a preliminary injunction, the Supreme Court, in its second opinion in the case, found no abuse of discretion in granting a preliminary injunction and remanded to the district court for a merits trial.  Ashcroft v.

---

[5] The statute provided an affirmative defense to those websites that required a credit card number, adult access code or personal identification number, digital age verification certificate, or other technologically feasible means, which the district court and the Third Circuit believed posed issues as to narrow tailoring.  See ACLU v. Mukasey, 534 F.3d 181, 196 (3d Cir. 2008); ACLU v. Gonzales, 478 F. Supp. 2d 775, 811-13 (E.D. Pa. 2007).

Am. Civil Liberties Union, 542 U.S. 656 (2004).  It specifically directed the district court to consider whether user-installed filtering software—the less restrictive alternative proposed by the plaintiffs, which had been accepted by the district court at the preliminary injunction stage—was as effective as COPA, describing the government's burden as follows:

> The Government's burden is not merely to show that a proposed less restrictive alternative has some flaws; its burden is to show that it is less effective.  It is not enough for the Government to show that COPA has some effect. Nor do [the plaintiffs] bear a burden to introduce, or offer to introduce, evidence that their proposed alternatives are more effective. The Government has the burden to show they are less so.

Id. at 669 (internal citation omitted).

After substantial additional fact-finding on remand, the district court found that COPA failed strict scrutiny, and entered a permanent injunction.  ACLU v. Gonzales, 478 F. Supp. 2d 775 (E.D. Pa. 2007).  The district court first engaged in a lengthy review of the facts.  Id. at 781-807.  Because it had already been settled in the litigation that protecting children was a compelling governmental interest, the court began by addressing the issue of whether COPA was narrowly tailored to the compelling interest of protecting children.   The court found that COPA was not narrowly tailored because it was both overinclusive and underinclusive.  Id. at 810-11. COPA was overinclusive because it "prohibit[ed] much more speech than is necessary to further Congress' compelling interest" and "appl[ied] to an inordinate amount of Internet speech" far beyond commercial pornography and covered speech that was obscene as to minors of all ages. Id. at 810.  Moreover, COPA was underinclusive in that it did not apply extraterritorially, and thus had no effect on sexually explicit websites originating outside the United States.  Id. at 811. Reviewing the evidence regarding internet filters, the district court also found that the Government had failed to show that COPA was the least restrictive alternative to advance the

31

Government's compelling interest, and that filters were not "at least as effective" as the penalties and restrictions contained in the COPA statute.  Id. at 814.

The Third Circuit affirmed.  ACLU v. Mukasey, 534 F.3d 181 (3d Cir. 2008).  It rejected the Government's argument that COPA was narrowly tailored because it applied only to commercial pornographers and to material harmful to older minors—a contention it had already rejected in earlier proceedings—because such a reading found no basis in the statutory text.  Id. at 193.  While it expressed doubts in dicta about the merits of the district court rulings on underinclusivity, it nonetheless agreed that statute was not narrowly tailored.  Id. at 196.  It then proceeded to analyze less restrictive alternatives as a conceptually separate issue from that of narrow tailoring, and accepted the district court's finding that filters were more effective than COPA.  Id. at 198-202.  The Third Circuit was unimpressed by the Government's study showing that only 54% of parents used filters—an increase, it noted of some 65% from four years prior— and held that "[t]he Government simply has not carried its burden of showing that COPA is a more effective method than filters in advancing the Government's compelling interest."  Id. at 203.  The court found that filters were also less restrictive than COPA, and held the statute to violate the First Amendment.  Id. at 203-04.

## B.  United States v. Marcavage

United States v. Marcavage was an appeal from a criminal conviction arising out of the defendant's initially unpermitted anti-abortion protest on a sidewalk in Philadelphia directly outside the entrance to the Liberty Bell Center, which is controlled by the National Park Service. United States v. Marcavage, 609 F.3d 264, 269 (3d Cir. 2010).  After being told several times to move to across the street, and being given an oral permit to hold the protest in another location, the defendant was physically restrained by employees of the National Park Service and led away.

Id. 270-71.  The entire encounter lasted some two hours and twenty minutes.  Id. at 270.  After a

bench trial, Marcavage was convicted of two misdemeanors, violating the terms of a permit and

interfering with an agency function.  Id. at 271.

On appeal, Marcavage asserted that his convictions violated the First Amendment.  The

Third Circuit first clarified that Marcavage was making an as-applied attack on his conviction,

and went on to hold that the sidewalk on which he had led the demonstration was a public forum.

Id. at 274-78.  Reviewing the trial testimony at length, the panel reversed the district court's

finding that the suppression of speech had been content-neutral, and held that the park rangers

had led Marcavage away because of his anti-abortion message.  Id. at 278-86.  Thus, the speech

suppression was content-based, and therefore subject to strict scrutiny.  Id. at 286.

Turning to the strict scrutiny analysis, the Third Circuit began by reciting the test:  the

government's restrictions on Marcavage's speech must "(1) serve a compelling governmental

interest; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive means of

advancing that interest."  Id. at 286 (quoting ACLU v. Mukasey, 534 F.3d 181, 190 (3d Cir.

2008)).   The court assumed, without deciding, that the government's interest in "ensuring traffic

flow and/or public safety, and regulating noise" was compelling.  Marcavage, 609 F.3d at 288.

Next, it held that the speech regulation was not narrowly tailored because the government had

not shown that the suppression of Marcavage's speech "served its asserted interests"; to the

contrary, the record evidence showed that a nearby group of horse-drawn carriages and a large

group of breast-cancer marchers appeared to pose as great or greater a threat to traffic and public

safety.  Id. at 289 (noting that "[u]nderinclusive enforcement of a law suggests that the

government's 'supposedly vital interest' is not really compelling, and can also show that the law

is not narrowly tailored").  Finally, the Court held that the "Marcavage's wholesale removal from

the 6th Street sidewalk fail[ed] the least-restrictive-means test" because equally effective, less restrictive alternatives existed, such as asking him to move partway down the block.  Id. at 290. Accordingly, the panel held that the government had "failed to carry its burden of proving that its content-based regulation of Marcavage's speech survive[d] strict scrutiny," and vacated Marcavage's convictions.  Id. at 290.

## VII.   The Government's Theory of Partial Invalidation

Without conceding Plaintiffs are entitled to any relief, the Government alternatively suggests that, if the Court rules for Plaintiffs, it should invalidate the Statutes only in part, specifically, by "sustain[ing] the validity of the Statutes at least as applied to images depicting young people under 30 years old."  (Gov't's Supp. Br. at 19.)  The Government cites cases involving what it terms "partial invalidation."  The term appears to derive from Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 504 (1985), which announced the "normal rule that partial, rather than facial, invalidation is the required course."  Read in context, however, this is simply a statement of the general proposition that total invalidation of legislation is disfavored; rather, courts prefer "to enjoin only the unconstitutional applications of a statute while leaving other applications in force."  Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 329 (2006) (remanding for determination of the possibility of a remedy narrower than facial invalidation).

The Government's cases fall into three categories, none of which supports the Court making the particular "partial invalidation" that the Government seeks in ruling on Plaintiffs' as-applied challenge.

### A.  As-applied challenges

A successful as-applied challenge simply establishes that the application of a Statute to a particular factual scenario or person is unconstitutional.  The Government relies on a number of

as-applied challenges in support of its theory of "partial invalidation," such as <u>Marsh v. Alabama</u>, 326 U.S. 501, 509 (1946), in which a state trespass Statute was held to be unconstitutional as applied to an individual engaged in speech on a sidewalk in a company town.

### B.  Limiting construction of statutory language

In some cases, courts have read a limiting construction into statutory language to preserve the constitutionality of a Statute where the language is "susceptible" to such a reading.  One such case is <u>Brockett v. Spokane Arcades, Inc.</u>, 472 U.S. 491, 494 (1985), in which the Supreme Court reversed the Ninth Circuit's wholesale invalidation of a Washington moral nuisance law which defined the covered material as "appeal[ing] to the prurient interest" and defined "prurient," in turn, as "that which incites lasciviousness or lust." <u>Id.</u>  The Ninth Circuit had held that the Statute was overbroad because the term "lust" had come to mean a normal interest in sex. <u>Id.</u> at 499.  The Supreme Court reversed, holding that the law "should have been invalidated only insofar as the word 'lust' is to be understood as reaching protected materials," i.e., those that were not obscene.  <u>Id.</u> at 504.

### C.  Severance

In still other cases, such as <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court has found a stand-alone unconstitutional section of Statute to be severable and struck it down without invalidating the entire act.   <u>See</u> <u>id.</u> (invalidating statutory subsection making Sentencing Guidelines mandatory but not invalidating the Guidelines in their entirety).

### D.  This Court Cannot Hold that the Statutes Apply Only to Performers over a Specific Age

By suggesting the Court could invalidate the Statutes as to individuals over 30, the Government asks the Court to limit the reach of the Statutes in none of these ways; instead, it attempts to place a limitation on the Statutes that appears nowhere in the text.

The Third Circuit previously rejected a similar proposal from the Government in an earlier appeal in this case to limit the reach of the Statutes to commercial productions.  FSC II, 677 F.3d at 538 (on facial overbreadth challenge, rejecting the Government's argument, on constitutional avoidance grounds, that the scope of the Statutes be "narrowly construed as applying only to depictions of actual or simulated sexually explicit conduct *created for sale or trade*" because "the Statutes are not susceptible to such a limiting construction").

In FSC II, after Plaintiffs appealed the grant of the motion to dismiss, the Government argued that the Third Circuit should affirm the dismissal of the overbreadth challenge, under the doctrine of constitutional avoidance, by construing them to apply "only to depictions of actual or simulated sexually explicit conduct *created for sale or trade*," and cited the preamble to the implementing regulations, "which states that the government interprets the Statutes as being 'limited to pornography intended for sale or trade.'"  FSC II, 677 F.3d at 538.   Such a construction, the Court held, was impossible to square with the statutory text:

> We conclude that the Statutes are not susceptible to such a limiting construction. Although we are mindful that facial overbreadth is not to be invoked where a "limiting construction has been or could be placed on the challenged Statute," such limiting constructions are available only if the Statute is "readily susceptible to such a construction." Thus, limiting constructions are not available where they require "rewriting, not just reinterpretation" of the Statute. Here, the plain language of the Statutes makes clear that they apply broadly to all producers of actual or simulated sexually explicit depictions regardless of whether those depictions were created for the purpose of sale or trade. See, e.g., 18 U.S.C. §§ 2257(a) and 2257A(a) (stating generally that "[w]hoever produces" any book or other matter containing "visual depictions" of actual or simulated "sexually explicit conduct" shall be subject to the Statutes). It is axiomatic that regulations cannot supersede a federal Statute. As a result, the plain text of the Statutes setting forth their broad scope must trump any conflicting statements contained within the preamble to the regulations, including the assertion that the Statutes are "limited to pornography intended for sale or trade."

Id. at 538–39 (internal quotations and citations omitted).

In this passage, the Third Circuit relied principally on <u>Stevens</u>, in which the Supreme Court rejected the Government's proposed limitation on a Statute prohibiting  "depictions of animal cruelty" to apply only to "extreme" animal cruelty, a term that appeared nowhere in the Statute.  The court rejected this approach as impermissible because it refused to "rewrite a ... law to conform it to constitutional requirements" and the Government's reading "requir[ed] rewriting, not just reinterpretation" of the statutory text.  559 U.S. at 481.  Accordingly, the Supreme Court invalidated the Statute as substantially overbroad.

While the Court respects the Government's implied approval to raising the applicable age, the Court concludes it cannot do so because that would be rewriting the Statutes.  The Supreme Court has repeatedly admonished lower courts for doing exactly that, including just months ago in <u>Jennings v. Rodriguez</u>, 138 S. Ct. 830, 843 (2018), in which the Supreme Court reversed the Ninth Circuit for "all but ignor[ing] the statutory text" by reading "implicit limitations" into an immigration statute on the length of immigration detention without bond hearings, that did not appear in the language of the statute.

Plaintiffs also rely on <u>United States v. Playboy Entm't Grp., Inc.</u>, 529 U.S. 803 (2000), which is a cautionary tale for district courts attempting to fashion relief in a First Amendment case.  <u>Playboy</u> was a challenge to § 505 of the Telecommunications Act of 1996, which required cable operators to scramble or block channels primarily dedicated to "sexually oriented programming," or to limit those channels' transmission to times when children were unlikely to be viewing.  <u>Id.</u> at 806.  A three-judge district court panel found that § 504 of the Act, which allowed consumers to ask a cable operator to block a channel, was a less restrictive alternative, so long as consumers knew about it.  The district court then found that § 505 was not narrowly tailored, declared § 505 unconstitutional, enjoined its enforcement, and ordered Playboy to

37

provide notice of the option to request channel blocking under § 504.  Id. at 810.  The Supreme

Court agreed with the district court that § 505 failed strict scrutiny but cautioned:

> to the extent the District Court erred, it was only in attempting to implement the less restrictive alternative through judicial decree by requiring Playboy to provide for expanded notice in its cable service contracts. The appropriate remedy was not to repair the Statute, it was to enjoin the speech restriction. Given the existence of a less restrictive means, if the Legislature wished to improve its Statute, perhaps in the process giving careful consideration to other alternatives, it then could do so.

Id. at 823–24 (emphasis added).

If the insertion of the single word "extreme" was too much for the Supreme Court in

Stevens, the proposed modification of the statutory scheme will not pass muster under current

doctrine because the proposed age limits do not appear in the Statutes, and the Court would

essentially have to insert them.

## VIII.   As-applied Strict Scrutiny Analysis

When remanding the case, the Third Circuit stated that "it is for the District Court to

ascertain whether the Government has met its burden of showing that the 'proposed alternatives

will not be as effective as the challenged [Statutes].'"   FSC V, 825 F.3d at 164 (quoting

Ashcroft, 542 U.S. at 665).  Having considered, in prior and the present Opinion, the significance

of the issues presented, within the First Amendment, the interests of Congress, the parental,

social, and law enforcement interests in combatting child pornography, and the principles of

"narrow tailoring" and "strict scrutiny," the Court has come to the following conclusions that the

Statutes, in part, are not narrowly tailored as applied to Plaintiffs.

### A.  Scope of the Statutes

#### 1.  *Review of statutory provisions*

Plaintiffs argue that the application of the Statutes to secondary and commercial producers renders them not narrowly tailored, and that the Statutes would be equally effective if they did not apply to either secondary or non-commercial producers.

Plaintiffs are correct in their reading of the Statutes' scope: the Regulations make clear that the substantive provisions of the Statutes apply to so-called "secondary producers."  See  28 C.F.R. 75.1(c)(2) (defining "secondary producer").  In FSC II, the Third Circuit previously held that the plain language of the Statutes covered depictions of sexual conduct not intended for sale or trade, and accepted Plaintiffs' submission that the Statutes encompass "the entire universe of constitutionally protected expression involving sexually oriented images of adults—including private, noncommercial depictions created and viewed by adults in their homes."  FSC II, 677 F.3d at 538.

#### 2.  *Applying the Statutes to secondary producers is not narrowly tailored to the Government's compelling interest in protecting children from child pornography*

The definition of "secondary" producers is set forth above at pages 4-5.  A number of Plaintiffs are secondary producers, including Hymes and the Sinclair Institute.   Hymes, for instance, operates a website in which he "posts reports about the [adult entertainment] industry"; he testified that he avoided uploading certain images to avoid triggering the Statutes.[6]  FSC III, 957 F. Supp. 2d at 574.   The Sinclair Institute is a for-profit corporation that, in addition to

---

[6] After remand, the Government asserted that the case might be moot as to Hymes, whose website has not been updated in some time, but Plaintiffs' counsel satisfied the Government and the Court that Hymes "[was] committed to his challenge and ha[d] not given up on the possibility of using the Daily Babylon website… to talk about the adult industry and to publish images."  (Tr. Hrg. of 9/28/17 at 5:11-13, ECF 257.)

producing educational films depicting explicit sexual activity, "also sells pornographic films produced by third-parties on its website and in catalogues." Id. at 575.

Applying the Statutes to those Plaintiffs who are secondary producers is not narrowly tailored to the Government's interest in protecting children from child pornography because it "chill[s] protected speech," see ACLU v. Mukasey, 534 F.3d at 197, and is overinclusive: it imposes requirements—and threatens imprisonment—on secondary producers, who, by their very definition in the Statutes and Regulations, are not producers who are actually making pornographic images of minors.

> 3. *Applying the Statutes to secondary producers is not the least restrictive means of effecting the Government's interest*

The Government, which bears the burden under strict scrutiny, asserts that application of the Statutes to secondary producers is necessary because "the Government's compelling interest here includes establishing a scheme whereby the origin of a sexually-explicit depiction can be traced, and the age verification records for that image can be found."  (Gov't Br. at 21 n.10.) That does not necessarily fall within the compelling interest of "protecting children from exploitation by pornographers" that the Third Circuit identified when it remanded the case most recently, see FSC V, 825 F.3d at 157 n.5, and the Government certainly has not met its evidentiary burden of showing that a statute applying only to primary producers would be less effective.

To the contrary, maintaining the requirements of the Statutes as to primary producers would sufficiently satisfy the Congressional and law enforcement considerations of protecting children as stated above, and would reduce a substantial burden on others in the adult pornography business.  The Statutes impose significant burdens on Plaintiffs' speech, as

discussed further below, and the Court sees no reason why they must be shouldered by secondary in addition to primary producers.

Because the Government has not shown that a statutory scheme imposing the same requirements on "secondary producers" as on the producers who actually create the sexually explicit content is least restrictive means of protecting children from child pornographers, the Statutes fail strict scrutiny as applied to secondary producers.

### 4. *The Statutes' application to commercial producers*

In their as-applied challenge, Plaintiffs offer, as an alternative to the Statutes, a hypothetical statutory scheme whose requirements were limited to commercial producers—not unlike the limiting construction rejected by the Third Circuit in FSC II.

Whether or not the application of the Statutes to non-commercial producers is narrowly tailored to a compelling governmental interest, it cannot be a less restrictive alternative as applied to the Plaintiffs in this case because this Court found that "almost all of [Plaintiffs'] work had a commercial or profit motive." FSC III, 957 F. Supp. 2d at 584. Thus, a statute covering only commercial producers might be less restrictive as to potential plaintiffs not currently before this Court, but would not be less restrictive as to Plaintiffs. However, the Court declines to decide whether the Statutes could constitutionally be applied to purely private depictions not intended for sale or trade. In the now-vacated FSC IV, the Third Circuit declined to rule on "[w]hether the Statutes and regulations may be constitutionally applied to individuals" to plaintiffs producing "only images intended for private use rather than public distribution." 787 F.3d 160. A hypothetical couple making, but not disseminating, sexually explicit videos is free to bring its own as-applied challenge, or to generate its own evidentiary record if seeking to challenge the Statutes on their face.

## B.  Identification and Age-Verification

### 1.  Review of statutory provisions

The Statutes require producers to ascertain a  performer's name and date of birth by examining the performer's identification document. 18  U.S.C. §§ 2257(b)(1); 2257A(b)(1).  The Statutes also require producers to ascertain names previously used by the performer, other than the performer's "present and correct name," including "maiden name, alias, nickname, state, or professional name."   Id.  §§ 2257(b)(2); 2257A(b)(2).   As the Government notes, the identification, age-verification, record-keeping, and labeling requirements together create a statutory scheme whereby an interested party who sees the label on a sexually explicit work can learn the location of the records, and find the records of the performer's identity and date of birth. (See Gov't's Supp. Br. at 10-12.)

Checking performers' ages before using them in the production of a sexually  explicit film or photograph is necessary to ensure that the producer knows that an individual is  not a minor. As to primary producers of adult pornography, the Court does not see the act of securing age verification, in and of itself, as particularly burdensome.  It is customary in the United States for individuals to produce photo identification when entering airports and/or airplanes, public and private buildings, etc.  Drivers' licenses, or ID cards for people who do not drive, contain a photograph and date of birth and are commonly required for identification in many instances, such as when a "youthful-looking" person wants to purchase an alcoholic drink, or buy alcohol itself, in a state requiring a minimum age of 21 for this purpose.

   2. *As applied to Plaintiffs, the identification and age-verification requirements are narrowly tailored to the Government's interest in protecting children from child pornography*

Plaintiffs boast a "uniform practice of verifying the ages of their performers by examining photo identification to assure that they were adults." (Pls.' Supp. Br. at 4, citing testimony of Plaintiffs Marie Levine and Barbara Nitke, and FSC Chairman Jeffrey Douglas.) However, as the Court previously found, some Plaintiffs, including Barbara Alper, admitted that they want to,  and would in the absence of the Statutes, undertake projects without checking IDs for any  performers because they wish to create sexually explicit images of anonymous individuals.   FSC III, 957 F. Supp. 2d at 587.

In its post-trial opinion, the Court found that "every Plaintiff-producer who testified admitted he or she has used models ages 18–24 years old…[D]espite Plaintiffs' professed interest in not employing women or men aged 17 or younger, the evidence is irrefutable that Plaintiffs are interested in using youthful-looking performers." Id. at 584.  The Court continued:

> For example, Sinclair Institute admitted that 10% of the models in its videos are ages 18 to 20 (Def. Ex. 132 at 7); David Steinberg admitted that 12% of the models in his works are ages 18–24 (Audio File 6/4/13 P.M.); Marie Levine admitted she has used models ages 21–25 in her web-shows and that her website offers access to third-party sites, with which she revenue-sharing arrangements, that show young-looking models (Audio File 6/5/13 A.M.); and Barbara Nitke admitted 8 out of 20 models in her works between 2005 and 2009 were under age 25 (Def. Ex 97). According to Defendant's analysis of Plaintiffs' depictions, which is part of the record in this case, between 21% and 61% of the performers in a cross-section of depictions by seven Plaintiffs (Dodson and Ross, Levine, Levingston, photographer Craig Morey (a member of ASMP), Nitke, Sinclair, and Vivid Video (a member of FSC)) were under the age of 25. (Def. Ex. 314A). Dr. Biro was given 150 images produced by Plaintiffs to review, and concluded that roughly half of them showed individuals "in their early to mid-twenties or younger." (Audio File 6/17/13 at 0:32–0:33) (ECF 214).
>
> Moreover, many Plaintiffs testified that although they intended that all of the performers in their works be age 18 or older, they could not always tell from looking at an individual performer, whether he or she was of majority age.

Id. at 584-85.   At the same time, a substantial percentage of Plaintiffs' work depicts older

individuals.  In its vacated decision in FSC IV, the Third Circuit calculated that

> of the models employed by Dodson and Ross, 45% of them are under 30 years of age. Levine's under-30 models account for 40.3%. Similarly, 47.37% of Nitke's models are under 30. Levingston's number 60%. And 33.97% of the Sinclair Institute's models were under 30. Finally, based on self-reported figures, 24% of Steinberg's models were under 30 while the "vast majority" of participants in Carol Queen's live-streamed masturbation fundraiser were in their 30s and 40s along with "10 to 12 percent" under age 25.

> Undoubtedly, these figures demonstrate that the number of performers to whom the Statutes apply, yet for whom requiring identification does not protect children, is not insignificant.

787 F.3d at 158 (finding, under intermediate scrutiny, that the testimony of the Government's

expert "supports a finding that requiring identification for performers up to age 30 implicates the

Government's interest in protecting children" and "the evidence indeed demonstrates that a

significant proportion of Plaintiffs' work falls squarely within the Statutes' permissible scope")

(emphasis added).  To take FSC IV's analysis one step further, the opposite percentages from

those it quoted—i.e., the percentage of performers over 25 or 30—are also substantial.  For

example, for Levingston, it is 40%; for the Sinclair Institute, nearly 66%.  Both this Court and

the Third Circuit found that this was an acceptable balance to strike under intermediate scrutiny.

The question now before this Court, in considering Plaintiffs' as-applied challenge under strict

scrutiny, is whether that conclusion continues to hold true under a more stringent level of review.

Put differently, the question for this Court is whether a universal identification and age

verification requirement is narrowly tailored as applied to Plaintiffs, producers who depict a

substantial number of youthful-looking performers and a substantial number of performers who

are much older.  Although the Court is wary of reducing strict scrutiny analysis to a simple

numerical endeavor, it is clear that many performers depicted in Plaintiffs' work are subject to

the identification and age-verification requirements where, as <u>FSC IV</u> put it, "for whom requiring identification does not protect children."   787 F.3d at 158.   This remains true of Plaintiffs' expression is a relevant consideration for the Court's as-applied analysis.

Although the Court concludes providing identification and age verification is not burdensome, it is somewhat overinclusive as applied to Plaintiffs, who must check identification and age verification for a large proportion of their performers who are old enough not to be mistaken for minors.   Assessments of overinclusivity and underinclusivity have long been a part of narrow tailoring analysis under the First and Fourteenth Amendments.   <u>See, e.g.</u>, <u>Brown v. Entm't Merchants Ass'n</u>, 564 U.S. 786, 804 (2011) (holding California law regulating video games failed strict scrutiny because it was "vastly" and "seriously overinclusive"); <u>Zablocki v. Redhail</u>, 434 U.S. 374, 390 (1978) (striking down Wisconsin law requiring court approval for non-custodial parents of minor children to marry because it was "grossly underinclusive" and "substantially overinclusive" as to the government's interest); <u>ACLU v. Mukasey</u>, 534 F.3d at 193 (affirming district court's conclusion that pornography restriction was not narrowly tailored where lower court had found that the statute was overinclusive); <u>ACLU v. Ashcroft</u>, 322 F.3d 240, 266 (3d Cir. 2003) (First Amendment "[o]verbreadth analysis—like the question whether a statute is narrowly tailored to serve a compelling governmental interest—examines whether a statute encroaches upon speech in a constitutionally overinclusive manner").

The Statutes do apply the identification and age verification requirements to anonymous sex.   This Court previously found that two of Plaintiffs' projects, Dodson and Ross's "genital art gallery" and Alpers' depictions of anonymous sex on Fire Island were "effectively shut down" by the Statutes.   <u>FSC III</u>, 957 F. Supp. 2d at 585.   The Government nonetheless makes a valid point in noting that many adult pornography photos and videos do not show the faces of the

performers.  In a number of these depictions, which exist in this record, the image (such as the photos in the "genital art gallery") only shows parts of the female or male anatomy, such as genitalia, and there is no way of knowing from the images themselves, the age of the performer, or whether the performer is "youthful looking" or clearly mature.

The record reveals that virtually all producers require their performers to sign a release, authorizing the use of the work produced to be distributed commercially and setting forth any royalties, fees, etc.  This release document is obviously intended to be legally binding.

In their initial post-remand brief, Plaintiffs mention, in passing, the possibility of relying on the fact that minors cannot enter legally binding contracts or license their image, a proposal they essentially abandon in their supplemental brief.  (Pls.' Br. at 22-24.)  Plaintiffs explain that if a minor signed a release to disseminate the image of the minor, it would be voidable because minors cannot contract; thus, producers have to check verify a performer's age to ensure that the release is legally binding.  (Id.)

However, Congress' overriding intent to protect minors prevents the Court from finding this overinclusive, and requires a conclusion that the Statutes are, as to age verification, narrowly tailored.  Preventing minors from acting as performers in pornographic productions is a more important social goal than burdening producers with age verification requirements, and this requires that the age of all performers be verified.

For these reasons, the Court finds that the universal age verification and identification requirement is narrowly tailored to the Government's compelling interest in protecting children from participating in pornography as applied to Plaintiffs.

3.  *As applied to Plaintiffs, the identification and age-verification requirements are the least restrictive means of advancing the Government's interest in protecting children from child pornography*

a.  A statutory scheme, including identification and age-verification requirements, applying only to individuals over a specific age

The obvious implication of the narrow tailoring analysis conducted above is the alternative that has formed a principal focus of the parties' debate on remand: a statutory scheme applying only to individuals over 30. For the reasons discussed above, the Court finds that this would be less restrictive as applied to Plaintiffs, particularly insofar as Plaintiffs' speech involved individuals over 25 or 30. The Court is sympathetic to the Government's argument that requiring producers to assess whether a performer looked to be over 30 before asking for identification would introduce unnecessary and potentially harmful subjectivity into the age verification scheme.

Under federal (and also state) laws, child pornography criminal statutes apply to depictions of any person under the age of 18. Thus, the Plaintiffs have shown that adult pornography producers uniformly insist that their performers prove that they are at least 18 years old. Otherwise, the producers could be liable for producing child pornography with severe criminal penalties. Although the Statutes do not specify an age, the existence of a child pornography demarcation line at age 18 is significant.

Because the child pornography laws[7] draw a "strict demarcation line" at age 18, the Statutes make clear to producers of adult pornography, and others, including consumers, that as long as the performers are over 18 years of age, there are no statutory prohibitions on employing them for adult pornography. This strict dividing line does not allow for any confusion that

---

[7] Child pornography is criminalized by 18 U.S.C. §§ 2251-2252c, which proscribe various actions relating to pornography involving "minors." "Minor" is defined in a separate statutory section as "any person under the age of eighteen years." 18 U.S.C. § 2256(1).

would render the Statutes not narrowly tailored as applied to Plaintiffs.  By Congress adopting this strict borderline, there is no ambiguity, persons under 18 may not perform in adult pornography.  This fact is legally significant.  Congress perceived the need to protect children (under 18) from being performers, and, and this must be respected and upheld.

  b. Relying on criminal laws punishing child pornography

  Plaintiffs first argue that identification and age-verification pursuant to the Statutes is not necessary because child pornography is already a federal crime, and a sufficient deterrent to employing minors in adult entertainment.  They further note that there was no evidence at trial that any Plaintiff employed minors in their work.  Plaintiffs frequently note the fact that there are basically virtually no prosecutions for employing minors in adult pornography, citing to a 2016 Department of Justice report, which they attached to their initial post-remand brief, showing only three prosecutions for record-keeping violations of § 2257 and none for violations of § 2257A in fiscal years 2011 through 2015.   (DOJ Report, ECF 246-1.)   Plaintiffs argue the lack of prosecutions as evidence that minors are not used in pornography and the Statutes simply impose needless, onerous burdens.  The Plaintiffs' comparison of the frequency of child pornography prosecutions to the paucity of prosecutions for violations of §§ 2257 and 2257A does not necessarily prove any relation—except that many people are willing to watch and trade in child pornography despite the heavy criminal penalties.

  There is another inference that may be drawn from the DOJ Report: the Statutes are having a deterrent effect.  Indeed, in the criminal jurisprudence area, deterrence is an important factor in every judge's sentencing decision.  But, stiff penalties have failed to deter many persons from committing crimes.  However, perhaps crime would be much worse if the penalties were not so severe.  There is evidence that Congress and many citizens believe tough penalties deter criminal conduct.

The Government's supplemental affidavits showed that child pornography is a growing problem; Dougher, the FBI agent, attested to the fact that "the FBI must prioritize its investigations and is less likely to investigate cases involving images where it is difficult to determine if the person in the image is a child or an adult."   (Dougher Decl. ¶ 4.)  Even if the FBI were to pursue a particular investigation, cases have established that can be difficult to prosecute child pornography violations for older children.  See, e.g., United States v. Malloy, 568 F.3d 166, 176 (4th Cir. 2009) ("because the children depicted in child pornography frequently cannot be found, the prosecutor must show that the subject is a minor solely from…pictures.  Consequently, most prosecutions for child pornography involve a subject that is not simply 'youthful-looking' but unmistakably a child").

The Government's supplemental evidence demonstrates child pornography as a significant law enforcement problem.  The Government has shown that the sexual exploitation of children is a pressing, growing problem.   However, its burden as to Plaintiffs' as-applied challenge, was to show that, as applied to Plaintiffs' speech, relying on criminal laws is equally effective and less restrictive.  The record requires the Court to conclude that the Government has met its burden of doing so.  As long as Plaintiffs, and other producers, verify their performers are over 18, they have no risk of criminal prosecution.   The Statutes are effective in protecting children under 18 from being used as pornographic performers.

The Court finds that the identification and age-verification requirements do satisfy strict scrutiny.

### C.  Record-keeping

*1.   Review of statutory and regulatory provisions*

Section 2257 is entitled "Record keeping requirements," yet the identification and age-verification requirements are arguably closer to the core of the Statutes' protection of children from sexual exploitation.   Because the burdens imposed by the Statutes' record-keeping requirements were such a central focus of the trial, it is necessary to address this issue.

The Statutes require producers of depictions of actual or simulated sexually explicit conduct to "create and maintain individually identifiable records pertaining to every performer portrayed in such a visual depiction," to be maintained at the producer's business premises.  18 U.S.C.A. §§ 2257(a), (c); 2257A(a), (c).

The Regulations contain many additional requirements for record-keeping.   For example, the Regulations require—as the Statutes do not—that §§2257 and 2257A records must be segregated from other records, see 28 C.F.R. § 75.2(e), and "[r]ecords required to be maintained under this part shall be categorized alphabetically, or numerically where appropriate," and categorized both by name and work.  28 C.F.R. § 75.3.  In other respects, the Regulations lessen the burdens of §§2257 and 2257A, such as through time limits not mentioned in the Statutes: records must be maintained at the producer's place of business "for seven years from the date of creation or last amendment or addition" or for five years if the producer goes out of business.  28 C.F.R. § 75.4.  The Regulations also allow producers to "contract with a non-employee custodian to retain copies of the records."  28 C.F.R. § 75.2(h).  The Government, in its proposed findings of fact, details the ways in which the Regulations impose obligations on producers that go beyond the plain language of the Statutes.  (Gov't's Findings of Fact, ECF 265-1.)

In a general sense, eliminating the statutory record-keeping requirements altogether does not make the age verification scheme less effective in combatting child sexual exploitation. Although the Statutory recordkeeping requirements help ensure that producers not only secure, but also maintain age verification records for the performers appearing in their sexually explicit films and photographs, it creates significant extra burden. Most producers of adult pornography have agreed voluntarily to keep age documentation records.

> 2. *The record-keeping requirements are not narrowly tailored to the Government's compelling interest in protecting children from child pornography*

Plaintiffs provided ample trial testimony about the burdens that they perceived the Statutes' record-keeping provisions to impose. See FSC III, 957 F. Supp. 2d at 571-76 (summarizing testimony of individual Plaintiffs and representatives of organizational Plaintiffs). However, the Court found that the record-keeping requirements were

> comparable to and consistent with other federal, state and local record-keeping requirements incumbent on employers…The additional burdens associated with cross-referencing and with affixing labels to depictions are not so great so as to change that conclusion. Many Plaintiffs who complained of significant burdens under the Statutes appear to be misunderstanding the regulatory provisions, using outdated record-keeping systems, or declining to take advantage of the ability to use third-party custodians.

Id. at 591.

In its vacated opinion affirming the decision of this Court under intermediate scrutiny, the Third Circuit discussed the burdens of record-keeping:

> Plaintiffs do not face a substantial additional burden attributable to keeping records for clearly mature performers on top of the records they must maintain for young performers. Instead, most of the burden Plaintiffs face under the Statutes is due to the procedures they must put in place to store, organize, and make available records for performers generally. These startup costs associated with creating a recordkeeping system under the Statutes, including the costs of creating indexes, advance the Government's interests in preventing the sexual exploitation of children. Collecting additional identification for the clearly mature performers

51

> that each Plaintiff also employs and inserting them into this system does not impose a significant additional burden. For example, Plaintiffs are not required to create a separate electronic database for clearly mature adults. Instead, any clearly mature performers would be just one more data point in a preexisting recordkeeping scheme.

FSC IV, 787 F.3d at 159.  That was acceptable under intermediate scrutiny, the court reasoned, because "the additional burdens arising from collecting identification from clearly mature adults does not establish that a 'substantial portion of the burden on speech does not serve to advance [the Government's] goals.'"  Id. (quoting McCullen v. Coakley, 134 S. Ct. 2518, 2535 (2014)) (alteration original).

These "additional burdens" are real, and this Court is obliged to take a closer look at them under strict scrutiny.  Plaintiffs incur these burdens with respect to the substantial proportion of their performers who are clearly adults, and thus maintaining these records does not actually serve to protect children.  The universal record-keeping requirement, as applied to Plaintiffs, is overinclusive, and therefore not narrowly tailored to the Government's interest in protecting children from sexual exploitation.

### a.  Application to the Regulations

Moreover, the Court finds that the Regulations impose many burdensome obligations, including obligations that go beyond the requirements of the Statutes.  In a footnote to its final post-remand memorandum, the Government proposed that the Court might wish to sever the portions of the Regulations imposing additional burdens, "hold[ing] that aspect of the Regulations invalid as applied, while leaving the Statutes intact."  (Gov't's Supp. Br. at 12 n.7.)

The record-keeping portions of the Statutes and regulations are unconstitutional as applied to Plaintiffs because they are overinclusive and not narrowly tailored; the record-keeping requirements of the Regulations apply overinclusively to Plaintiffs' by virtue of the overinclusivity of the record-keeping portions of the Statutes themselves, and impose more

burdens still.   Courts regularly declare both statutes and their regulations unconstitutional simultaneously.   See, e.g., Conchatta Inc. v. Miller, 458 F.3d 258, 268 (3d Cir. 2006) (considering Pennsylvania statute and implementing regulation together and finding that both were substantially overbroad under the First Amendment).

### 3.   The record-keeping requirements do not add protection and are not protecting children from sexual exploitation

#### a.   Plaintiffs' self-policing alternatives

Plaintiffs offer various self-policing alternatives to the Statutes: self-certification through § 2257A(h); the self-certification form it developed in the course of the proceedings after remand (ECF 265-2; 265-3), and relying on producers to verify age in order to ensure that contracts to reproduce an individual's image are legally binding.

#### b.   Self-certification under § 2257A(h)

The self-certification alternative offered by Plaintiffs is the so-called 2257A(h) exception. Section 2257A(h) states as follows:

> (h)(1) The provisions of this section and section 2257 shall not apply to matter, or any image therein, containing one or more visual depictions of simulated sexually explicit conduct, or actual sexually explicit conduct as described in clause (v) of section 2256(2)(A), if such matter--
> (A)
> (i) is intended for commercial distribution;
> (ii) is created as a part of a commercial enterprise by a person who certifies to the Attorney General that such person regularly and in the normal course of business collects and maintains individually identifiable information regarding all performers, including minor performers, employed by that person, pursuant to Federal and State tax, labor, and other laws, labor agreements, or otherwise pursuant to industry standards, where such information includes the name, address, and date of birth of the performer; and
> (iii) is not produced, marketed or made available by the person described in clause (ii) to another in circumstances such than [sic] an ordinary person would conclude that the matter contains a visual depiction that is child pornography as defined in section 2256(8)…

(2) Nothing in subparagraphs (A) and (B) of paragraph (1) shall be construed to exempt any matter that contains any visual depiction that is child pornography, as defined in section 2256(8), <u>or is actual sexually explicit conduct within the definitions in clauses (i) through (iv) of section 2256(2)(A).</u>

18 U.S.C. § 2257A(h) (emphasis added).

The plain language of 2257A(h) makes clear its limited scope.  Among other things, depictions of actual sexually explicit conduct (excluding "lascivious exhibition of the genitals or pubic area")—which would encompass much of Plaintiffs' speech—are not eligible for this exemption.  It would therefore not be an equally effective alternative.

c.   FSC's "self-certification" form

At the suggestion of the Court during post-remand proceedings, Plaintiff Free Speech Coalition developed a self-certification form intended to formalize the "industry standards" referred to in § 2257(h)(A)(ii).  (<u>See</u> ECF 259-3.)  The form is accompanied by a memorandum explaining the use of the form and stating, as policy binding on all members of Plaintiff Free Speech Coalition, that "[i]f any potential performer does not produce a valid photo identification document verifying that the person is an adult, the initial producer shall not produce, record, or transmit any image of that person in any work or production containing visual depictions of <u>actual</u> or <u>simulated sexually explicit conduct</u>."   (FSC Memo, ECF 259-2.)   The inclusion of actual sexually explicit conduct in the policy thus extends the self-certification outside what is allowed by 18 U.S.C. § 2257A(h)(2).

It is also entirely unclear to whom "compliance" is being certified under this supposed self-certification regime.   The form itself contains fields to be filled out by the performer, including name and date of birth, and fields for the "initial producer" to attest that he has checked an identification, and to specify the type of identification document (e.g. driver's license or passport).  (<u>See</u> ECF 259-3.)  The form further states, in small print, that it "must be filled out for

each performer for each adult production and kept for seven years <u>in confidence</u>."  (ECF 259-3; emphasis added.)  While the form states on the second page that the initial producer is responsible for "[m]aking sure that the signed release, this form, and the copy of the identification document are forwarded to the person or company responsible for the production."

It is also unclear what is meant by "in confidence," a term not used in the Statutes or Regulations.

The Court finds that the proposed self-certification form would be an equally effective alternative for recordkeeping.

d.  Relying on the fact that minors cannot enter binding contracts is a less restrictive, equally effective alternative to record-maintaining rule

Most of the testimony on this point was from representatives of the organizational Plaintiffs and concerned purportedly general "industry" practices.  <u>FSC III</u>, 957 F. Supp. 2d at 572, 576.  The Court specifically found that "[m]ost Plaintiffs stated they have no desire to depict individuals under 18 in their works and would continue to request identification from models without Sections 2257 and 2257A, to ensure they were over age 18 and <u>that their model releases were thus valid</u>."  <u>Id.</u> at 587 (emphasis added).

Because the record-keeping requirements are not narrowly tailored, the Court finds that the record-keeping requirements of the Statutes and Regulations are unconstitutional as applied to Plaintiffs.

### D.  Labeling

#### 1.  *Review of statutory and regulatory provisions*

The Statutes require a label "in such manner and in such form as the Attorney General shall by regulations prescribe, a statement describing where the records required by this section with respect to all performers depicted in that copy of the matter may be located."  18 U.S.C. §

2257(e)(1); 18 U.S.C. § 2257A(e)(1) (identical language).   For organizations, the required label "shall include the name, title, and business address of the individual employed by such organization responsible for maintaining the records required by this section."   18 U.S.C. § 2257(e)(2); 18 U.S.C. § 2257A(e)(2).

The Regulations impose many additional requirements on the label describing the location of the records.   For example, "the required statement shall be displayed in typeface that is no less than 12–point type or no smaller than the second-largest typeface on the material and in a color that clearly contrasts with the background color of the material. For any electronic or other display of the notice that is limited in time, the notice must be displayed for a sufficient duration and of a sufficient size to be capable of being read by the average viewer."   28 C.F.R. 75.6(e).   An entire subsection of the Regulations concerns the location of the required statement as to various media, see 28 C.F.R. 75.8.   The Regulations also allow the possibility of a separate statement, available under certain circumstances, attesting to the fact that the images to which they pertain are exempt from the Statutes.   See 28 C.F.R. 75.7.

### 2. *The labeling requirements are not narrowly tailored or the least restrictive means as applied to Plaintiffs*

Relatively less of the trial testimony concerned the Statutes' labeling requirement.   A representative of Plaintiff Free Speech Coalition testified that wholesalers have to hire screeners trained in the requirements of § 2257 to ensure that the labels are proper.   (Tr. 6/3/13 98:5-23, ECF 220.)   Plaintiff Steinberg, a still photographer whose recent work principally "depict[s] older people and people with disabilities in sexual encounters," FSC III, 957 F. Supp. 2d at 572, and 76% of whose models were over 30, see FSC IV, 787 F.3d at 158, testified that he did not comply with the labeling requirement because he believed it would "deface" his photographs. FSC III, 957 F. Supp. 2d at 572.

For the reasons identified above regarding the age-verification and identification requirements, the Court finds that the labeling requirements of the Statutes are narrowly tailored as applied to Plaintiffs, but that new regulations will be required.

The overall necessity of labeling benefits consumers, who do not want to be subject to criminal prosecutions for child pornography from watching a sexually explicit video. The labeling requirement gives these consumers assurances that the producer has verified the age of the performers and that none of the performers are under age 18. The Court finds this is an important factor in finding that the labeling requirement is narrowly tailored. However, the Statute itself only requires labeling, in general, but then provides for the Attorney General to devise regulations for the form and nature of the label. The Court believes that the new regulations should be simple and straight forward. Counsel will be required to submit the proposed regulations, or an agreed upon outline of them, as part of the proposed final decree as set forth below.

### E.  Criminal Penalties

#### 1.  *Review of statutory provisions*

Section 2257 imposes criminal penalties of imprisonment of up to five years for a first offense (including for a recordkeeping violation), and imprisonment of two to ten years for a subsequent offense. Section 2257 itself contains no age limit, and does not contain penalties for employing minors in the production of sexually explicit conduct. However, such employment would violate child pornography laws.[8] Rather, the conduct it forbids includes violating record-

---

[8] Conceivably, if a producer employed a 17-year-old in a depiction of actual sexually explicit conduct, ascertained that individual's name and date of birth, kept the required records (without making any false statements), and affixed the required label stating where the records could be found, that producer would not have violated the plain terms of § 2257—although, of course, he would have violated criminal prohibitions on child pornography and generated considerable evidence of having done so.

keeping and labeling requirements, for making false statements, and for selling or transferring explicit works without the required labels.  See 18 U.S.C. § 2257(f).

Like Section 2257, Section 2257A imposes criminal penalties for record-keeping and labeling violations, for making false statements, and for selling or transferring explicit works without the required labels.  See 18 U.S.C. § 2257A(f).  First-time Section 2257A violations are punishable by imprisonment of up to one year, or up to five years for offenses involving minors. 18 U.S.C. § 2257A(i)(1)-(2).  Subsequent offenses involving minors are punishable by two to ten years' imprisonment.  Id. at § 2257A(i)(3).

> 2. *Except for the required age verification, criminal penalties are not narrowly tailored or the least restrictive alternative as applied to Plaintiffs*

Plaintiffs contend the punishments contained in the statute are unduly harsh—one could receive five years in prison for a simple record-keeping or labeling violation.  Moreover, the acts rendered unlawful do not precisely address the problem for which the Statutes were ostensibly enacted, the protection of minors from being used in child pornography.  Because Section 2257 mandates prison time for record-keeping and labeling violations regardless of the age of the performers—without imposing its requirements on, or addressing its penalties to, minors—the only way that the Statutes address child pornography is if they have deterrent effect on individuals considering engaging in child pornography.  As noted above, it is possible that the small number of prosecutions is evidence of some deterrent effect.  By explicitly imposing penalties on violations involving adults (regardless of age) separate from those it imposes for violations involving minors, see 18 U.S.C. § 2257A(i), Section 2257A essentially acknowledges that it is overinclusive by design.

Thus, a criminal law that is not actually targeted to child pornography and punishes record-keeping and labeling violations with several years' imprisonment is obviously unduly harsh and is not narrowly tailored.

> 3. *A statute allowing criminal punishment for record-keeping and labeling violations is not the least restrictive means of protecting minors from child pornography*

Plaintiffs assert the criminal penalties are not the least restrictive means of achieving the Government's compelling interest, and that a punishment for record-keeping violations by administrative sanction would be equally effective and less restrictive. Plaintiffs offer the example of a subsection of federal immigration law, 8 U.S.C. § 1324a(e)(5), which imposes civil monetary penalties for "paperwork violations" on employers for failing to make or keep records that an individual is legally authorized to work in the United States. The Court finds this alternative eminently reasonable. A punishment by administrative sanction would be equally effective, and less restrictive.

The Court repeats, that the laws punishing child pornography are not affected by this conclusion.

## IX.   Conclusion

The above discussion of the litigation history, contentions, and this Court's analysis of these issues has led to several conclusions that certain sections of the Statutes are unconstitutional as applied to Plaintiffs. Other parts remain intact.

The Third Circuit did exactly this in its last ruling when it invalidated a portion of §2257(c). The Circuit Court did not strike the requirement that a person who is subject to §2257(a) "shall maintain the records required by this section at his business premises" but struck the remainder of the Statute giving the Attorney General more power to prescribe regulations as to what other places could house those records and, more importantly, that the records must be

"available to the Attorney General for inspection at all times."  In striking this latter language, the Third Circuit was relying on a Supreme Court case, City of Los Angeles v. Patel, 135 S. Ct. 2443 (2015), which appears to be a valid approach.

The Court has labored in trying to be fair, yet follow the dictates of the controlling precedents.  The parties may conclude that coming to a joint agreement, even though neither side is getting everything it asks for, is superior to further appeals and possible further remands.

The Court has purposely not attempted to finalize the exact parameters of this relief, in specific language.

The Court will require counsel to consider these rulings and propose a decree with precise language to carry out the Court's decision.  Even if the parties cannot agree totally on all issues, the Court requests that they attempt to agree on the language the Court should use in its final judgment.  If the parties cannot agree, then the Court will require each party to submit their own draft and the Court will make a final decision on the final decree.

In the event the parties cannot agree, within 14 days (which time will be extended upon request if discussions warrant), the Court will expect each side to propose its own decree with specific language as to statutory sections that are or not impacted, within 21 days, and as to any injunctive relief.

O:\CIVIL 09\09-4607 Free Speech v. Holder\09cv4607 Memorandum May 18 2018 - new master document.docx